UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

                                      :

UNITED STATES OF AMERICA

                                      :

         - v. -

                                      :      16 Cr. 371 (RA)

JASON GALANIS,

                                      :

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

                                      JOON H. KIM
                                       Acting United States Attorney for the
                                       Southern District of New York,
                                       Attorney for the United States
                                           of America

Rebecca Mermelstein
Brian Blais
Andrea M. Griswold
Assistant United States Attorneys

        - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of defendant Jason Galanis ("Galanis" or "Jason"), which is scheduled for August 11, 2017, at 2:30 p.m.   For the reasons that follow, the Government believes that a sentence at the upper end of the Stipulated Guidelines range of 188 to 235 months, to be served concurrently to the 135 month sentence the defendant is currently serving, is appropriate.

## FACTUAL BACKGROUND[1]

### A. Jason Galanis's Criminal and Regulatory History

*1. The SEC Bar*

In May 2007, Galanis settled an enforcement action filed against him by the Securities and Exchange Commission ("SEC").   That enforcement action alleged that Galanis had agreed with others to file, on behalf of Penthouse International ("Penthouse"), a Form 10-Q that improperly inflated Penthouse's financial results and that improperly stated that the Chief Executive Officer of Penthouse had authorized the filing.   Without admitting or denying the SEC's allegations, Galanis agreed to settle the SEC's action and agreed, as part of that settlement, to a five-year ban from serving as an officer or director of a publicly-traded company.

---

[1]  The information provided in the factual background discussed herein is derived from paragraphs 10-37; 55-60 and 106 of the Presentence Investigation Report ("PSR"), the PSR prepared in connection with Galanis's sentencing in *United States* v. *Galanis,* 15-Cr-643 (PKC), as well as the Complaint and Superseding Indictment in this matter.

2



3. *The Gerova and Tagliaferri Schemes*

As set forth in far more detail in the Government's sentencing submission in that case, *United States* v. *Galanis*, 15 Cr. 643 (PKC) (the "Gerova Matter"), in approximately 2010, Galanis, members of his family, and certain of their associates, began a scheme to take control of the publicly traded company Gerova Financial Group, Ltd. ("Gerova"), fraudulently cause the issuance of Gerova stock that could be

sold for their benefit, and ultimately to manipulate the market in Gerova stock.   More specifically, in May 2010, Galanis caused more than 5 million shares of Gerova, worth more than $72, million to be issued – for no legitimate business purpose – in the name of a foreign nominee, whom Galanis ultimately controlled.   Galanis and his co-conspirators then created various back-dated agreements which together purported to justify the share issuance.

The coconspirators then began to sell the Gerova shares.   Because, however, Gerova was a relatively low-volume stock, these efforts caused the market price of Gerova to decline substantially.   In an effort to "staunch the bleeding" caused by the open-market sales of Gerova, Galanis and his co-conspirators lined up corrupt investment advisers, including James Tagliaferri, who were willing to buy Gerova stock at the time, price and quantity dictated by the conspirators.

Ultimately, in early 2011, Galanis's undisclosed role at Gerova and the history of financial fraud involving his family became publicly known.   Soon thereafter, the New York Stock Exchange halted trading in Gerova's shares and Gerova was eventually de-listed and filed for bankruptcy protection.   Individuals holding shares of Gerova at the time of the trading halt, including many of Tagliaferri's clients, suffered substantial losses in Gerova.

Before Gerova was de-listed, more than $19 million of proceeds were generated from the sale of the Gerova shares controlled by Galanis, substantial portions of which were used to benefit the Galanis family.   More specifically, approximately $4.3 million of these proceeds went to two entities controlled by Jason Galanis; more than $2 million was used to pay various lawyers and other expenses, and approximately $1 million was paid to entities controlled by Jason's father John.

4

In addition to the Gerova conduct, Galanis pleaded guilty to his involvement in a separate fraudulent scheme with James Tagliaferri.[2]   As noted above, James Tagliaferri was an investment adviser who managed money for his investment advisory clients.   Over time, Tagliaferri invested his clients in a number of ventures connected to the Galanis family.   In particular, Tagliaferri invested his clients in notes issued by entities controlled by Jason Galanis – entities that had no obvious business purpose, or whose purpose was to facilitate Galanis's personal endeavors, such as 1920 Bel Air LLC, an entity that paid expenses associated with Galanis's Bel Air mansion.   When these notes became due, Tagliaferri and Galanis would ensure payment to the noteholders by, in Ponzi-like fashion, causing Tagliaferri clients to invest in new notes issued by Galanis-controlled entities, the proceeds of which were used to make the payments due on existing notes.   In some cases, funds from a Tagliaferri client were used to purchase notes, the proceeds of which were used to pay off different Galanis-entity notes *owned by the very same client*.

Over time, instead of issuing new notes from Galanis entities, the old notes were paid off in a different fashion:   Tagliaferri clients purchased shares of fund.com from an entity controlled by Galanis.   Fund.com was a public-traded entity in which Galanis had substantial involvement and where he operated in a functional capacity similar to that in which he served at Gerova (namely, as a transaction facilitator/sponsor/promoter).   The funds generated by causing Tagliaferri clients to purchase fund.com shares were then used to pay off notes issued by the various Galanis-controlled entities.   Fund.com shares ultimately became worthless and

_____

[2] As this Court well knows, Tagliaferri was indicted by this Office in 2013 for, among other things, his involvement in fraudulent deals with Galanis.   *See United States* v. *Tagliaferri*, 13 Cr. 115 (RA).

5

Tagliaferri clients lost more than $18 million on their investments in fund.com shares. Tagliaferri received bribes and other compensation from Galanis in exchange for agreeing to make these various investments in Galanis-related entities.

On or about July 21, 2016, Galanis entered a plea of guilty, pursuant to a plea agreement with the Government, to one count of conspiracy to commit securities fraud and one count of securities fraud in connection with the Gerova offense conduct described above; one count of aiding and abetting the investment adviser fraud in connection with the matched trading by investment advisers other than Tagliaferri; and one count of conspiracy to commit securities fraud in connection with the Tagliaferri conduct described above.

On or about February 15, 2017, Judge Castel sentenced Galanis in connection with his role in the Gerova and Tagliaferri offenses to the bottom of the applicable Guidelines range – 135 months' imprisonment.

### B.  The Present Offense Conduct

Between approximately 2014 and 2016, Jason Galanis and his co-conspirators fraudulently induced the Wakpamni Lake Community Corporation, a Native American tribal entity (the "WLCC") to issue more than $60 million worth of bonds and caused approximately $40 million of those bonds to be purchased using the assets of clients of two captive investment advisory firms.   As described in greater detail below, rather than invest the bond proceeds as promised, Galanis and his co-conspirators misappropriated the money for their own purposes, thus guaranteeing that the WLCC would never be able to make payments on the bonds and that the investment advisory clients would lose the entirety of their investments.

6

More specifically, in 2014, Jason and John Galanis induced the WLCC, through false and misleading representations and omissions, to issue approximately $60 million worth of bonds, over the course of four separate bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," and the "Fourth Bond Issuance," and, together, the "Bond Issuances.").   According to the trust indentures and other documents relating to the Bond Issuances (collectively, the "Bond Agreements") entered into by the WLCC, proceeds of the Bond Issuances were to be provided to Wealth Assurance Private Client Corporation ("Wealth Assurance") – an annuity provider established by Hugh Dunkerley at Galanis's direction – to be invested in an annuity for the benefit of the WLCC which would generate sufficient income to pay interest and eventually the principal to bond holders. According to the Bond Agreements, a separate investment manager (the "Investment Manager") was to receive the bond proceeds from the Annuity Provider so that they could be invested on the WLCC's behalf.   In fact, the bond proceeds were not invested as set forth in the Bond Agreements and the proceeds of the Bond Issuances were never turned over to the Investment Manager as provided for in the Bond Agreements.   Instead, Galanis and his co-conspirators misappropriated the funds for both personal and business purposes.

In connection with each of the Bond Issuances, the WLCC also entered into a placement agreement with Burnham, the broker-dealer at which Dunkerley was employed, and in which co-defendants Devon Archer and Bevan Cooney had an ownership interest.   Pursuant to the placement agency agreements, Burnham would solicit investors for the WLCC bonds in exchange for a fee.

Jason Galanis's role in the bond issuance and his purported affiliation with Burnham

were intentionally misrepresented throughout the course of the conspiracy.   For example, John

Galanis falsely represented to the WLCC that Jason Galanis was affiliated with Burnham in

order to create the false impression that Jason's role in the transaction was legitimate or

authorized.   Notwithstanding Galanis's lack of affiliation with Burnham, the placement agent

agreements between the WLCC and Burnham (which were generally signed by Dunkerley)

instructed that any notice provided to Burnham should be sent to Jason Galanis, thus ensuring

that the conspirators were apprised of any developments concerning the Bond Issuances.

Galanis's criminal conduct extended beyond merely inducing the WLCC to issue bonds

through fraudulent misrepresentations.   Galanis also took control of Hughes Capital

Management Inc. ("Hughes") and Atlantic Asset Management LLC ("Atlantic"),[3] investment

advisers run by codefendant Michelle Morton.   In August 2014, Morton and Hirst, at Galanis's

direction, used Hughes client funds to purchase $27 million of bonds, representing the entirety of

the First Bond Issuance.   In April 2016, again at Galanis's direction, Morton used Atlantic client

funds to purchase $16.2 million of bonds representing the entirety of the Fourth Bond Issuance.

In directing the purchase of the First and Fourth Bond Issuances in Hughes and Atlantic

client accounts, Morton and Hirst wholly abdicated their responsibility to act in the best interest

of their investment advisory clients, as Jason Galanis well knew.   Morton and Hirst failed to

---

[3] Hughes was an investment advisor registered with the SEC with its principal place of business in Alexandria, Virginia.   On August 4, 2015, GMT Duncan, a limited liability company of which Morton was the 50% owner – acquired Hughes, following which Morton became the CEO of Hughes and co-defendant Gary Hirst became Chief Investment Officer of Hughes.   In or about April 2015, GMT Duncan purchased another investment advisor, Atlantic, with its principal place of business in Stamford, Connecticut.   Thereafter Hughes was merged into Atlantic, following which Morton served as the CEO of the joint entity.   Both acquisitions were funded at Jason Galanis's direction through an entity controlled by Hugh Dunkerley.

make any disclosure to any Atlantic/Hughes clients prior to the purchase of the bonds,

notwithstanding that the bond purchases were outside the investment parameters of many of the

clients.   Morton and Hirst also failed to disclose to Atlantic/Hughes' clients the numerous

conflicts of interest that existed with regard to Atlantic/Hughes' role in the purchase of the

bonds, despite their legal obligation to make such disclosures.   For example:

- Jason Galanis (i) held himself out as affiliated with Burnham and was the notice party for certain of the agreements between Burnham and the WLCC; (ii) orchestrated, and helped to arranged the financing for, the purchase of Hughes and Atlantic; (iii) directed the purchase of the Bond Issuances using Atlantic and Hughes client funds; and (iv) exercised control over Wealth Assurance.   Jason Galanis was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the bond issuances and purportedly investing those proceeds on the WLCC's behalf.

- Gary Hirst was (i) the Chief Investment Officer, and later the Chairman of the Investment Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Tribal Bond Issuance on behalf of Hughes clients; (ii) the Assistant Secretary of Wealth Assurance; and (iii) a signatory on a bank account in the name of Wealth Assurance (the "Wealth Assurance Account").   Hirst was thus affiliated both with the entities whose clients purchased the bonds and the entity receiving the proceeds of the Bond Issuances and purportedly investing those proceeds on the WLCC's behalf.

- Hugh Dunkerley was (i) a Managing Director at Burnham, the placement agent for the Bond Issuances; (ii) a managing member of an entity that invested in both Investment Advisers; (iii) an officer of Wealth Assurance; and (iv) a signatory on the Wealth Assurance Account.   Dunkerley was thus affiliated with the entity purportedly soliciting investors for the WLCC bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the Bond Issuances and purportedly investing those proceeds on the WLCC's behalf.

When Hughes and Atlantic clients learned that certain of the Bond Issuances had been

purchased in their accounts, several demanded that the bonds be liquidated.   However, because

there was no ready secondary market for the bonds, none were ever able to be sold or redeemed

from the client accounts and, to this day, no Hughes or Atlantic client has been able to monetize their investment in the Bond Issuances.

As referenced above, rather than invest the bond proceeds as directed, Jason Galanis, aided by Hugh Dunkerley, misappropriated the bond proceeds for his own benefit and for the benefit of various co-defendants.   In particular, the entirety of the bond proceeds from the First and Fourth Bond Issuances were deposited into the Wealth Assurance Account.   At no time were the funds deposited in the Wealth Assurance Account transferred to the Investment Manager as specified in the Bond Agreements.   Instead, at Jason Galanis's direction, Dunkerley transferred more than $43 million of bond proceeds from the Wealth Assurance Account to accounts controlled by both Jason Galanis (the "Jason Galanis Account") and John Galanis. Jason Galanis then transferred those proceeds, often through layers of intermediaries, (i) to accounts controlled by Gary Hirst, Devon Archer, John Galanis, and Bevan Cooney, among others; (ii) to other business interests of Jason Galanis and his co-defendants; and (iii) for use in connection with his own personal expenses.

For example, at Jason Galanis's direction, Hugh Dunkerley transferred approximately $2.3 million to a bank account associated with John Galanis, which John Galanis used for personal expenses.   In addition, between on or about August 27, 2014 and on or about October 30, 2015, Jason Galanis used approximately $8,750,000 of the proceeds of the Bond Issuances for his own personal expenses, including: at least $5,000,000 for expenses associated with Jason Galanis's home; at least $1,250,000 to pay various law firms; at least $875,000 in payments to various members of the Jason Galanis's family; at least $500,000 in payments to the IRS; at least $200,000 on automobile-related expenses; at least $75,000 for restaurants and other food-related

expenses; at least $75,000 for travel expenses; at least $40,000 in payments to Jason Galanis

directly; at least $350,000 in clothing and jewelry purchases; at least $55,000 in ATM

withdrawals; and at least $100,000 in miscellaneous personal expenses. Jason Galanis also

transferred at least $1.3 million from the Jason Galanis Account to an account controlled by

Hirst.

       With respect to the Second and Third Bond Issuances, no actual investor money was used

to purchase the bonds.   Rather, Jason Galanis, Hugh Dunkerley, Devon Archer and Bevan

Cooney misappropriated the proceeds of the First Bond Issuance and used the money to purchase

the Second and Third Bond issuances.   More specifically, in or about September 2014, Jason

Galanis transferred approximately $15 million from the proceeds of the First Bond Issuance via

an intermediary to an entity controlled by Devon Archer.   Archer then used the funds to

purchase the entirety of the Second Bond Issuance.   Similarly, in or about October 2014, Jason

Galanis transferred $5 million from the proceeds of the First Bond Issuance to Bevan Cooney.

Cooney then used the funds to purchase the entirety of the Third Bond Issuance.

       This recycling served two purposes.   First, by having Archer and Cooney purchase the

bonds, Galanis kept secret the fact that Burnham had not found any investors and that there were,

in fact, no investors to purchase the bonds.   Second, as a result of this recycling, although both

the face value of the outstanding bonds increased and the amount of interest payable by the

WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did

not increase.   Galanis, Cooney and Archer then used the bonds purchased with the recycled

proceeds of the First Bond Issuance to, among other things, support other business endeavors.

For example, Archer provided $2.6 million of the WLCC bonds to Burnham, an entity in which

he was an investor, so that Burnham could purportedly meet its net capital requirements as a registered broker-dealer under applicable SEC regulations.   Cooney transferred $5 million of bonds to another registered broker-dealer for the same purpose.

### C.  Galanis's Plea and Applicable Sentencing Guidelines

On January 19, 2017, Galanis entered a plea of guilty to Counts One, Two and Three of the Indictment in this case.   Count One charged conspiracy to commit securities fraud and Count Two charged securities fraud in connection with the Wakpamni offense conduct described above.   Count Three charged conspiracy to commit investment adviser fraud, in connection with Galanis's involvement in the Atlantic/Hughes offense conduct described above.

Galanis's plea agreement with the Government reflects an agreement among the parties as to how the Guidelines apply to Galanis's sentencing.   The parties stipulated that:   Under U.S.S.G. § 3D1.2(d), Galanis's offenses constitute a single group because the offense level is largely driven by the amount of loss caused.   Galanis's base offense level is seven, under U.S.S.G. § 2B1.1(a)(1), because at least one of his offenses of conviction has a statutory maximum sentence of 20 years.   Twenty-two levels are added, under U.S.S.G. § 2B1.1(b)(1)(L) because the losses caused by Galanis's offenses of conviction were between $25 million and $65 million.   A two-level enhancement, under U.S.S.G. § 2B1.1(b)(2)(A), is warranted because Galanis's offenses of conviction had 10 or more victims.   A four-level enhancement is warranted under U.S.S.G. § 3B1.1(b) because Galanis was an organizer or leader of criminal activity involving five or more participants.   A two-level enhancement is warranted under U.S.S.G. §3C1.1 because Galanis willfully obstructed the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.   Finally, the

parties agreed that a three-level decrease is warranted under U.S.S.G. § 3E1.1 for Galanis's acceptance of responsibility.   Thus, the parties agree that the applicable offense level is 34.

The parties also stipulated that Galanis had four criminal history points, resulting in a Criminal History Category of III.   More specifically, the parties stipulated that: ███████████ ███████████████████████████████████████████████████████████████ (ii) one criminal history point associated with his plea of guilty in the Gerova matter for which he had not yet been sentenced at the time of his plea in this matter[4]; ████████████████████████ ████████████████████████████████████████████████. (PSR ¶ 7; 55-62).   As described above, since the time the parties entered into the plea agreement in this matter, Galanis has been sentenced in the Gerova matter to a term of imprisonment of 135 months.   Under U.S.S.G. § 4A1.1(a), this sentence results in the imposition of three criminal history points, raising Galanis's criminal history points from 4 to 6.   (PSR ¶ 59).   The addition of such criminal history points does not however, change Galanis's Criminal History Category, which remains III.   (PSR ¶ 63)

The Probation Office ("Probation"), in its Presentence Investigation Report ("PSR"), concurs with the Guidelines calculation set forth above.   At an offense level of 34 and a Criminal History Category of III, Galanis's applicable Guidelines range is 188 to 235 months'

---

4 U.S.S.G. §§ 4A1.1(c) & 4A1.2(a)(4), "[w]here a defendant has been convicted of an offense, but not yet sentenced, such conviction shall be counted as if it constituted a prior sentence under § 4A1.1(c) if a sentence resulting from that conviction otherwise would be countable. Accordingly, at the time of his plea in the present matter Galanis's conviction in the Gerova matter resulted in 1 criminal history point.

imprisonment.   The Government believes that this range is consistent with the parties' plea agreement and reflects an accurate calculation of the applicable Guidelines.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."   *United States* v. *Booker*, 543 U.S. 220, 252 (2005).   Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."   *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.   *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).   In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims."   *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered.   Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.   That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.   *See Crosby*, 397 F.3d at 103.   First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."   *Id*. at 112.   Second, the Court must consider whether a departure from that Guidelines range is appropriate.   *Id*.   Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence.   *Id.* at 113.   In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances."   *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

15

## **DISCUSSION**

In light of the factors set forth in Title 18, United States Code, Section 3553(a), a sentence at the upper end of the Stipulated Guidelines range of 188 to 235 months, to be served concurrently to the defendant's current sentence, is "sufficient but not greater than necessary" to serve the goals of sentencing in this case.

The seriousness of Galanis's offense is beyond dispute.   Galanis victimized one of the poorest Native American Tribes in the country by causing them to issue bonds with the promise of money for needed Tribal development projects and the guaranteed ability to repay investors in the bonds through secure annuity investments.   And Galanis also defrauded the Atlantic and Hughes clients – pension funds held for the benefit of among others, transit workers, longshoremen, housing authority workers, and city employees – by investing their money in the illiquid and impossible-to-monetize Wakpamni bonds for his own selfish purposes.   When the fraud fell apart, Jason Galanis had personally benefited by more than $8 million, while both the WLCC and the Atlantic and Hughes investors were left with nothing.

Galanis's conduct is all the more egregious because the Wakpamni fraud was not his first brush with the law but was merely the latest of his repeated efforts to enrich himself and support an opulent lifestyle at the expense of his victims.   Since first being barred by the SEC in 2007, over 10 years ago, Galanis has again and again been confronted with his illegal and criminal behavior and has had the opportunity to change his ways.   But at each and every turn, Galanis had declined to do so. To the contrary, the scale and scope of his illegal conduct, and his willingness to lie and deceive to cover it up, has only grown over time.   Galanis's longstanding

16

criminal conduct, and his orchestration of the massive Wakpamni fraud in particular, warrants a substantial sentence.

Galanis, however, seeks a below-Guidelines sentence to be served concurrently to the sentenced imposed by Judge Castel in the Gerova Matter.   In other words, Galanis seeks to receive no additional punishment whatsoever for his role in the Wakpamni offense.   Galanis offers several arguments in support of this extraordinary request, none of which are availing.

First, Galanis urges the Court to use as its Guidelines "starting point" the 168 to 210 month Guidelines range included in a plea offer – rejected by Galanis – to plead to both his Gerova and Wakpamni conduct in a single plea.   But to allow a defendant to have the benefit of a rejected plea offer or to anchor the Guidelines to those contained in a plea offer a defendant did not accept, would be to undermine plea negotiations altogether.   The Government would have little reason to negotiate if a defendant could reject a plea offer and then demand to be sentenced in light of the very offer he had previously rejected.   Even if, in any event, the Court found the combined Gerova and Wakpamni Guidelines to be a useful starting point, the defendant is incorrect that the combination yields a Guidelines range of 168 to 210 months.   The defendant spends many pages of his sentencing submission reciting the contents of his rejected plea agreement and the increase to his Criminal History Category resulting from his having entered two separate pleas.   But, as discussed in further detail below, the defendant fails to mention, let alone to grapple with, the implication of his obstructive conduct in this case.

At the time of the initial plea discussions, the Government was unaware that in an effort to prevent the Government's investigation of this matter, Galanis created false documentation and provided the documentation to another coconspirator for provision to the Government in

response to a subpoena.   The documentation purported to demonstrate – falsely – that the proceeds of the Bond Issuances had been invested as promised and was intended to fool the Government into believing that no criminal conduct had occurred.   Thus, to the extent a combined Guidelines calculation is valuable, that calculation must include an additional 2-level enhancement for obstruction.[5]   Adding that enhancement to the Guidelines calculation included in the rejected plea offer yields a Guidelines range of 210 to 235 months – a range the Government in fact believes reasonable.

Galanis next argues that even using his requested starting point, a further reduction is warranted because the loss guidelines are not based on empirical research and because they turn too much on the single factor of loss amount.   But while loss amount may sometimes be an imperfect proxy for wrongdoing, it is an appropriate one in this case.   Galanis stole more than $40 million from numerous pension fund clients, left the WLCC without money for economic development, and left the WLCC owing more than $60 million on the outstanding bonds.   Thus, the criticisms that are generally levelled at the loss Guidelines – namely that they overstate the true loss by including theoretical losses, anticipated but unrealized losses, or losses beyond the defendant's control – do not apply in this case.   The loss figure of between $25 and $65 million

---

[5] Even if Galanis had accepted the original combined plea offer (which did not include an obstruction enhancement) the Government would still have sought the obstruction enhancement at sentencing.   Indeed, the Government's plea agreements expressly provide that "nothing in this Agreement limits the right of the government to seek an enhancement for obstruction of justice . . . regardless of any stipulation set forth [in the plea agreement] should it be determined that the defendant has . . . engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice."

is not an exaggerated figure but an accurate assessment of the financial harms directly attributable to the defendant.

Galanis also points to analysis conducted on his behalf by MCM Data Consulting, which attempts to compare Galanis to purportedly similarly situated defendants.   In particular, MCM provided statistical information for defendants sentenced between 1999 and 2016 pursuant to the fraud loss guidelines found in U.S.S.G. § 2B1.1 and who had the same loss category and criminal history category as Galanis.   This resulted in a sample size of less than 10 "similarly situated" defendants.[6]   Leaving aside the dubious value of such a tiny sample size, the comparisons are flawed in significant other ways.   For example, if such statistical analysis is to have any utility – and in light of the need for individualized sentencing it has little if any – it must allow the Court to compare apples to apples.   The defendants to whom Galanis wishes to be compared must be truly similarly situated.   But the MCM analysis compares Galanis only to defendants who faced the same loss amount and criminal history, without providing information about what additional Guidelines enhancements were applicable.   Surely a more significant sentence is warranted for a defendant like Galanis who was a leader of large conspiracy, who defrauded multiple victims, and who caused fraudulent documents to be produced in response to a subpoena, than for one who had a more limited role, fewer victims, and who did not obstruct justice.   In short, statistical analysis of the sentences received by defendants whose circumstances may have varied vastly from Galanis's is simply of little value and certainly does

---

[6] The MCM reports provide data both for the loss amount and Criminal History Category indisputably applicable to Galanis as well as for the loss amount and Criminal History Category contained in the rejected "joint" plea agreement.   The MCM Report analyzes 8 defendants in the first category and 7 defendants in the latter category.

not warrant leniency in this case.

Galanis next argues that no additional period of incarceration is warranted in light of the sentence already imposed by Judge Castel.   As a preliminary matter, the defendant incorrectly suggests that Judge Castel's 135-month sentence was meant to account for both the Gerova and Wakpamni conduct.   That is wrong.   The Government did, of course, put before Judge Castel the fact that Jason Galanis ███████████████████████████████████████ ███ continued to engage in criminal conduct *after* the Gerova fraud was complete.   The Government argued that Galanis's recidivist nature,███████████████████████████ necessitated a significant sentence.   But the Government sought nothing more than a Guidelines sentence based on the criminal conduct to which Galanis had pled in the case before Judge Castel.   More significantly, in imposing sentence, Judge Castel made clear that his sentence was focused on the Gerova conduct and that it would be for this Court to craft appropriate punishment for the Wakpamni conduct.   (Judge Castel: "I'm mindful that Jason Galanis has another day of court ahead of him on other charges for which he has not yet been sentenced.") (Sent. Tr. at 47, attached hereto as Exhibit A).

To be sure, this Court can and should consider the fact that Galanis is serving a 135-month sentence in crafting the appropriate sentence here.   But the defendant's request – that he suffer not a single day of additional punishment as a result of his organization of a brazen fraud resulting in more than $60 million of losses – is extraordinary.   The sentence the defendant seeks would give him a free pass for his criminal conduct.   It would also incentivize precisely the wrong behavior.   It would perversely suggest that a defendant who had committed one crime

20

need not learn from his mistakes, but rather, should continue to commit as many crimes as he could get away with before getting caught.

Galanis's criminal conduct with respect to Gerova and with respect to Wakpamni was unrelated.   Though both white collar frauds, the two crimes were dissimilar.   The first was the theft of shares from a publicly traded company, followed by a market manipulation.   In contrast, the present crime involves the fraudulent issuance of bonds, the misappropriation of investment advisor client funds to purchase the bonds, and the outright theft of the bond proceeds.   Nor did the two crimes overlap in time.   The Gerova fraud was largely complete by 2011, while the Wakpamni fraud did not begin until approximately 2014.   Jason Galanis thus had years to reflect on his involvement in the Gerova fraud, and to decide on a different path.   Instead, he moved from defrauding the shareholders of a publicly traded company to defrauding one of the poorest Native American Tribes in the country, as well as numerous pension funds.   Indeed, but for the repeat involvement of Galanis's father and certain other criminal confederates, the two crimes have nothing in common.

In short, Galanis's orchestration of the Wakpamni fraud should not go unpunished.   It is a standalone crime and necessitates a standalone sentence.   Galanis's suggestion that *no* additional punishment be imposed on him should be rejected out of hand.

Galanis also argues that his present crime should go unpunished because of unique personal circumstances – namely his father's prior criminal history and its effect on Jason and his family – and based on his purported "complete transformation" since his incarceration.   With respect to the first contention, the defendant attempts to simultaneously disclaim any efforts to blame his father ("Jason, to his credit, does not blame his father, or his upbringing, for his

21

criminal conduct and the above history is not an attempt to offload responsibility for his crimes")
(Def. Sub. at 11), while simultaneously doing exactly that. (Galanis "developed a maladaptive
set of coping skills in response to enduring years of lifestyle instability, leading to the lack of
successful identity formation and social and emotional development as an adult.") (Id.)   The
Government has little doubt that being raised by John Galanis was a significant formative and
negative experience.   But Jason's upbringing – like so many defendants' – may explain, but
cannot excuse, his subsequent behavior.   If anything, having witnessed first-hand the
devastating familial costs of criminal behavior, Jason might have been expected to live his life on
the straight-and-narrow and to aspire to a life both more productive and modest than that of his
father.   Instead, he did the opposite – he emulated his father exactly.   He put his own material
wants ahead of the rights of his victims and – as he himself admits – did so through one
illegitimate and criminal activity after another.   ("Jason . . . walk[ed] close to and several times
cross[ed], ethical and legal lines") (Def. Sub. at 10).

    The defendant's arguments concerning his familial history as well as his purported
"complete transformation" must also be considered in light of his ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ efforts to mislead and hoodwink prosecutors, and attempts to obstruct and
prevent the investigation and prosecution of his crimes.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22



As described above, in the Gerova scheme, Galanis, working hand-in-hand with his father and brothers, defrauded Gerova's shareholders of tens of millions of dollars and personally profited to the tune of more than $4 million.   When the scheme had run its course, Galanis had had a front row seat to the devastation he had left in his wake; the delisting and ultimate bankruptcy of Gerova, and the financial devastation to the investment adviser clients who had lost the entirety of their investments.   But Galanis learned all the wrong lessons from Gerova. The havoc he had wreaked did not cause him to see the error of his ways; the $4 million he had pocketed caused him to look for a way to get even more.

And he did.   As described above, Galanis and his family members received the lion's shares of the Wakpamni fraud proceeds.   Indeed of the slightly more than $40 million stolen from the Atlantic and Hughes clients, Galanis and his family received more than $8 million, which went to continue to fund Galanis's lavish lifestyle, including multi-million dollar homes in

both Bel Air and Tribeca.   When that fraud too began to unravel, Galanis ███████████

███████████████████ attempted to con both investors and the Government all over again.

First, with respect to the Gerova investigation, and in an effort to dissuade the prosecutors

from bringing charges against him, Galanis met with the prosecutors in a so-called "innocence

proffer," without the protections of a proffer agreement.   In the proffer, while purporting to

provide truthful information, Galanis disavowed any criminal conduct and claimed his

involvement in Gerova had been wholly legal – claims completely belied by his later guilty pleas

in that matter.

Then, while on pretrial release in the Gerova matter, Galanis made repeated efforts to

obstruct any investigation into his criminal activities in this matter.   First, Galanis created

fraudulent documents purporting to demonstrate that the WLCC's money had in fact been

invested properly through an offshore entity called Calvert.   Galanis created the documents and

provided them to a co-conspirator specifically so that the documents could be produced in

response to government subpoenas and in order to prevent the Government from discovering the

complete misappropriation of the bond proceeds.

Thereafter, in February 2017, Galanis sent a letter to the WLCC, claiming that interest on

the Wakpamni bonds had been paid through annuity distributions "precisely as contemplated in

the Indenture and related agreements," that is, through annuity investments made by the

Investment Manager, (Compl.[7] ¶ 63(a)), and that the SEC's complaint against Atlantic had

---

[7] "Compl." Refers to the Government's complaint in this matter, which is available at Docket
Entry [1].

erroneously alleged that an entity controlled by Galanis had diverted proceeds of the Wakpamni

bonds for its own benefit.   (Compl. ¶ 63(b)).   In fact, and as the defendant has now admitted

through his guilty plea, neither were true.[8]

      In short, Jason Galanis has a long history of self-dealing and duplicity.   He has had

opportunity after opportunity to recognize the error of his ways and to cease his criminal

conduct, but at every turn he has instead chosen luxury over ethics.   His efforts to deceive so

many █████, prosecutors, agents, and victims over the years reveals his true self.   A charismatic

charmer willing to say and do whatever is necessary to extricate himself from his latest

fraudulent conduct.   Galanis's claim to have undergone a "complete transformation" in advance

of his sentencing must thus be treated with incredulity.   But even if such a transformation has

finally occurred, it is simply insufficient to warrant the extraordinary break the defendant now

seeks.

      Finally, the defendant seeks a functionally non-incarceratory sentence for this offense

because he argues that while he engaged in "fraudulent and corrupt business practices," he

"never contemplated a loss to anyone."   (Def. Sub. at 21).   In an argument that attempts to very

carefully thread its needle, Galanis appears to argue that (i) he intentionally structured the bonds

to insulate the Native American Tribe from any obligation should the WLCC fail to make

payments;[9] (ii) while Galanis did not invest the bond proceeds as agreed, he believed that the

---

[8] It is also worth noting, as the Government advised Judge Castel during a proceeding to revoke Galanis's bail in that case, that Galanis sent threatening text messages to a potential Government witness, calling him, among other things, a "Government fag," and admonishing the witness to "Sleep tight…be worried."

[9] The import of this argument is not wholly clear, as the specific identity of the victim renders the

investment of the bond proceeds in his private equity endeavors would be successful and would allow him to repay the bonds; and (iii) he was justified in taking more than $8 million of the bond proceeds for his own personal use because he had sufficient collateral to repay the amount if necessary.

As a preliminary matter, it is difficult to reconcile Galanis's use of nearly a quarter of the total bond proceeds to support his luxurious lifestyle as consistent with a belief that ultimately everything would work out.   Galanis's explanation, that it was his "intention to deliver [his] Valor securities to [Wealth Assurance] as collateral" is nonsensical.   (Def. Sub. at 24).   First, there is no indication he ever in fact did so.   But even if he did, the Valor shares were of uncertain value and, more importantly, were not readily saleable.   Thus, Galanis could not have, in fact, believed that the existence of the purported collateral would guarantee that no one lost any money.   Indeed, if the Valor shares were in fact as valuable and saleable as Galanis now claims, there would have been no reason for Galanis to swap them for the cash proceeds of the bonds; he could simply have sold the Valor shares himself and used the proceeds for any purpose he wished.   The entire purpose of the Wakpamni fraud was to provide Galanis with the cash he wanted and did not otherwise have.   (*See, e.g.,* August 15, 2014 email from Galanis to Archer and Cooney noting that the WLCC has approved the First Bond Issuance and stating, "my primary objective is to get us a source of discretionary liquidity.   Sick of begging.").

Nor does the investment of the bond proceeds in risky private equity efforts – rather than in the secure annuities the WLCC had been promised – suggest a good faith belief that no one

criminal conduct no less egregious.   Moreover, the defendant's focus on his efforts to protect the Native American Tribe in the event of default suggests that he more than suspected that the bonds would ultimately go unpaid.

would lose any money.   Galanis cannot skim 25 percent of the proceeds, put the remainder of

his chips on black, hope the roulette wheel landed on black, and then claim that he had truly

believed no one would lose any money.   If Galanis had truly believed that the Wakpamni bond

scheme would all work out, he would not have gone to such pains to cover his tracks.   He could

simply have told the WLCC where he actually intended to invest the bond proceeds.   He could

have pitched the bonds to investors, rather than acquiring an investment adviser for the purpose

of forcing its clients to purchase the bonds.   Galanis would not have had to lie about his

affiliation with the placement agent, going so far as to create a fake "Burnham" email account

for himself.   Galanis's own communications with his co-conspirators also make clear that his

purpose in orchestrating the Wakpamni scheme was to obtain a ready supply of cash to use for

his own purposes and that the ultimate outcome of the bonds was of little moment.   Thus for

example, Galanis made clear his view that the bond proceeds were his to use however he wished

when he emailed Archer on August 13, 2014, about a Paris-based private equity "fund of funds"

manager that Dunkerley was trying to acquire, noting, "[first name] and Hugh have locked it up

and came to me for the money, which I have agreed to arrange/provide (probably Indians)."

Similarly, Galanis and his co-conspirators lack of concern as to whether the scheme would work

out in the end was laid bare when, in response to an email from Galanis stating that the WLCC

had executed the legal documents for the First Bond issuance, Cooney replied, "This is pure

genius alla Mikey Milken!! The Native American Bonds!!! . . . Great work here [Jason]!!."

Galanis's claims also reveal even more complex aspects of his fraud.   For example, he

states – it appears truthfully – that "[t]he bonds were central to his strategy because they gave

[him] the capital necessary to acquire the undervalued insurance companies he and others had

identified."   (Def. Sub. at 23).   Indeed, the purpose of "recycling" the bond proceeds appears to have been to create bonds with apparent value to be used for net-equity and other capital requirements of broker-dealers or insurance companies.   But this only highlights the further ways in which Galanis's house of cards was set to leave destruction in its wake.   There is a *reason* that there are net capital and other regulatory requirements.   Broker-dealers, insurance companies, and other business ventures need to have adequate capital available to protect against losses.   Because the bonds were in fact essentially un-monetizable, Galanis's plan, which allowed these business endeavors to escape the requirement to maintain appropriate capitalization, was a recipe for disaster.   In other words, Galanis's justification for his behavior is in fact just one more aspect of the fraud.

In sum, Galanis engaged in an egregious effort to defraud both the WLCC and the Atlantic and Hughes investors of tens of millions of dollars so that he could enrich himself and further his lavish lifestyle.   When he got caught, rather than take responsibility for his actions, he lied to investors, caused fraudulent documentation to be produced to the Government, and threatened at least one witness against him.   To reflect the seriousness of this conduct, promote just punishment for Galanis's offenses, deter Galanis from engaging in criminal conduct in the future and to send a general deterrent message that fraudulent market conduct will result in substantial consequences, a concurrent sentence at the upper end of the applicable Guidelines range of 188 to 235 months' imprisonment is sufficient, but not greater than necessary, to advance the goals of sentencing.

## RESTITUTION AND FORFEITURE

Galanis has already consented to the entry of a forfeiture order against him and the Court

has already entered the appropriate orders.   Nonetheless, the Court is required, at sentencing, to orally pronounce the imposition of forfeiture, which in this case includes the forfeiture of a sum of money equal to $43,277,436.   The Government is still in the process of ascertaining the correct restitution amounts and will provide a supplemental submission and proposed restitution order within 90 days of sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that Galanis has committed serious offenses, the appropriate punishment for which is adequately reflected at the upper end of the applicable Guidelines range.   Accordingly, the Government requests that the Court impose a sentence at the upper end of the applicable Guidelines range of 188 to 235 months' imprisonment, to run concurrently with the sentence imposed by Judge Castel in the Gerova case, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:    _/s/ Rebecca Mermelstein_____
Brian R. Blais/Andrea M. Griswold/
Rebecca Mermelstein
Assistant United States Attorneys
(212) 637-2521/1205/2360

Dated: August 4, 2017
New York, New York