# **Exhibit A**

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          16 CR. 371 (RA)

5   JASON GALANIS, et al.,

6            Defendants.

7   ------------------------------x

                                         New York, N.Y.
8                                        June 8, 2016
9                                        2:45 p.m.

10
    Before:
11
                        HON. RONNIE ABRAMS,
12
                                         District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    AMEE HECTOR
17  REBECCA MERMELSTEIN
    BRIAN BLAIS
18       Assistant United States Attorney

19  STEVEN WITZEL
         Attorney for Defendant Jason Galanis
20
    MICHAEL TREMONTE
21       Attorney for Defendant Hirst

22  PELUSO & TOUGER
         Attorneys for Defendant John Galanis
23  BY:  DAVID TOUGER

24

25
```

GOVERNMENT
Case 1:16-cr-00371-RA Document 260-1 Filed 12/20/17 Page 3 of 23
Case 1:16-cr-00371-RA Document 460-1 Filed 06/22/18 Page 2 of 32

2

APPEARANCES (CONT'D)

SUSAN BRUNE
     Attorney for Defendant Dunkerley

BOIS, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Archer
BY:  MATTHEW LANE SCHWARTZ

NEIL BRUCE CHECKMAN
     Attorney for Defendant Morton

SPERTUS, LANDES & UMHOFER, LLP
     Attorneys for Defendant Cooney
BY:  MATTHEW DONALD UMHOFER

1             (Case called)

2             THE COURT:  If counsel would state your appearances

3    for the record.

4             MS. HECTOR:  Good afternoon, your Honor.  Amy Hector,

5    Rebecca Mermelstein, and Brian Blais for the government.  With

6    us at counsel table is Postal Inspector Adam Fascio and an

7    intern with our office, Natalie Noble.

8             THE COURT:  On behalf of defendants, if counsel can

9    state their names and then indicate their clients, and if their

10   clients can either stand up or raise their hands so I know who

11   is who, please.

12            MR. SCHWARTZ:  Good afternoon, your Honor.  Matthew

13   Schwartz for Defendant Devon Archer, who is standing in the

14   first row.

15            THE COURT:  Good afternoon to both of you.

16            MR. CHECKMAN:  Good afternoon, your Honor.  Neil

17   Checkman for Michelle Morton who is sitting there in the pink

18   sweater.

19            THE COURT:  Good afternoon to both of you.

20            MS. BRUNE:  Good afternoon, your Honor.  Susan Brune

21   for bail purposes only for Hugh Dunkerley who will stand.

22            THE COURT:  Good afternoon to you as well.

23            MR. TREMONTE:  Good afternoon, your Honor.  Michael

24   Tremonte for Gary Hirst who is standing in the first row with

25   the red tie.

4

```
 1              THE COURT:  Good afternoon.

 2              MR. WITZEL:  Good afternoon, your Honor.  Steven

 3   Witzel, CJA attorney.  I just walked in the door.  I understand

 4   I'm here for Mr. Galanis, Jason Galanis, for bail purposes

 5   only.

 6              THE COURT:  Do you need a minute with your client?  I

 7   understand you just got here.

 8              MR. WITZEL:  I just walked in 30 seconds before you

 9   came out.

10              THE COURT:  Why don't we have everyone else state

11   their appearances.  Then if you need a few minutes to talk, we

12   can take a break.

13              MR. WITZEL:  Thank you, your Honor.

14              MR. TOUGER:  Good afternoon, your Honor.  David Touger

15   for John Galanis.

16              THE COURT:  Good afternoon.

17              MR. UMHOFER:  Good afternoon, your Honor.  Matthew

18   Umhofer on behalf of Bevan Cooney, who is present in court

19   today.

20              THE COURT:  Good afternoon.

21              Mr. Witzel, would you like to take a little bit of

22   time?

23              MR. WITZEL:  I would very much, your Honor, if -- I

24   don't want to inconvenience everybody.

25              THE COURT:  Why don't we take a break.  Just let us
```

1    know when you're ready.

2              MR. WITZEL:  Thank you, your Honor.

3              (Recess)

4              MR. WITZEL:  Your Honor, thank you for giving us the

5    time.  I think we'll be able to proceed at this point.

6              THE COURT:  Okay.  So good afternoon, all.  I'm

7    Judge Abrams, and this case has been assigned to me.  We're

8    here to present, as I understand it, two of the defendants,

9    Hugh Dunkerley and Bevan Cooney, and arraign all of the

10   defendants on the indictment.

11             It's numbered 16 CR 371.  It was filed on May 31, and

12   the indictment has four counts:  One is conspiracy to commit

13   securities fraud, securities fraud, conspiracy to commit

14   investment adviser fraud, and investment adviser fraud.

15             So let's begin with the two defendants who have not

16   yet had an initial presentment.  I understand that that is

17   Mr. Dunkerley and Mr. Cooney.  Could you both please rise.

18             What I want to do first is to inform you of certain

19   rights that you have, inform you of the charges against you,

20   and consider whether counsel should be appointed for you and

21   decide under what conditions you should be released.

22             So, first, the date and time of arrest of these two

23   individuals?

24             MS. HECTOR:  Your Honor, both defendants were arrested

25   on May 11, 2016, at approximately 9:00 in the morning.

 1          THE COURT:  So both of you have the right to remain

 2    silent.  You are not required to make any statements.  Even if

 3    you have made statements to the authorities, you need not make

 4    any further statements.

 5          Anything that you say or do can be used against you.

 6    You have the right to be released, either conditionally or

 7    unconditionally, pending trial, unless I find that there are no

 8    conditions that would reasonably assure your presence in court

 9    or the safety of the community.

10          You have the right to be represented by counsel during

11    all proceedings, including this one, and during all questioning

12    by the authorities.

13          I understand that you both have counsel for today.

14          Ms. Brune, are you retained for purposes of bail only?

15          MS. BRUNE:  For bail only, your Honor.

16          THE COURT:  If you wish to have the Court appoint you

17    counsel because you are unable to afford counsel, then I would

18    need a financial affidavit from you and would consider that

19    application.  But I understand that there is no such

20    application for either defendant.

21          MS. BRUNE:  Not at this time, your Honor.

22          THE COURT:  Do you understand those rights?

23    Mr. Cooney?

24          DEFENDANT COONEY:  Yes.

25          THE COURT:  And Mr. Dunkerley?

 1          DEFENDANT DUNKERLEY:  Yes.

 2          THE COURT:  So what I'm going to do now is arraign

 3    each of you on the indictment.  That's the charging instrument

 4    that I mentioned a moment ago.

 5          Mr. Dunkerley, let's start with you.

 6          Have you seen a copy of the indictment in this case?

 7          DEFENDANT DUNKERLEY:  I have.

 8          THE COURT:  Have you discussed it with your attorney?

 9          DEFENDANT DUNKERLEY:  I have.

10          THE COURT:  Would you like me to read it out loud, or

11    do you waive its public reading?

12          DEFENDANT DUNKERLEY:  I waive its public reading.

13          THE COURT:  How do you plead to the charges?

14          DEFENDANT DUNKERLEY:  Not guilty.

15          THE COURT:  You may be seated.

16          Mr. Cooney, have you seen a copy of the indictment?

17          DEFENDANT COONEY:  Yes.

18          THE COURT:  Have you discussed it with your attorney?

19          DEFENDANT COONEY:  Yes.

20          THE COURT:  Would you like me to read it out loud, or

21    do you waive its public reading?

22          DEFENDANT COONEY:  I waive.

23          THE COURT:  How do you plead?

24          DEFENDANT COONEY:  Not guilty.

25          THE COURT:  You may be seated.

1          Now, Defendant Jason Galanis, could you please rise.

2          Mr. Galanis, have you seen a copy of the indictment in

3     this case?

4          DEFENDANT JASON GALANIS:  Yes, your Honor.

5          THE COURT:  Have you discussed it with your attorney?

6     Do you need more time?

7          MR. WITZEL:  No.  He's discussed it with his previous

8     attorney.  He has, and we've discussed it.  He's discussed it

9     with his previous attorney and would waive the reading.

10         THE COURT:  How do you plead to the charges?

11         DEFENDANT JASON GALANIS:  Not guilty, your Honor.

12         THE COURT:  You may be seated.

13         Defendant Gary Hirst, please rise.

14         Have you seen a copy of the indictment?

15         DEFENDANT HIRST:  Yes, your Honor.

16         THE COURT:  Have you discussed it with your attorney?

17         DEFENDANT HIRST:  Yes, your Honor.

18         THE COURT:  Do you waive its public reading?

19         DEFENDANT HIRST:  I do, your Honor.

20         THE COURT:  How do you plead?

21         DEFENDANT HIRST:  Not guilty, your Honor.

22         THE COURT:  You may be seated.

23         Ms. Morton, would you please stand.

24         Have you seen a copy of the indictment?

25         DEFENDANT MORTON:  I have, your Honor.

1     THE COURT:  Have you discussed it with your attorney?

2     DEFENDANT MORTON:  I have, your Honor.

3     THE COURT:  Would you like me to read it out loud, or

4  do you waive its public reading?

5     DEFENDANT MORTON:  I waive it, your Honor.

6     THE COURT:  How do you plead?

7     DEFENDANT MORTON:  Not guilty.

8     THE COURT:  You may be seated.

9     And Defendant John Galanis.  Have you seen a copy of

10  the indictment?

11     DEFENDANT JOHN GALANIS:  I'm sorry, your Honor.  I'm

12  hard of hearing.

13     THE COURT:  Have you seen a copy of the indictment, of

14  the charging instrument in this case?

15     DEFENDANT JOHN GALANIS:  Yes, your Honor.

16     THE COURT:  Have you discussed it with your attorney?

17     DEFENDANT JOHN GALANIS:  I have.

18     THE COURT:  Would you like me to read it out loud here

19  in court, or do you waive its public reading?

20     DEFENDANT JOHN GALANIS:  No.  I waive that,

21  your Honor.

22     THE COURT:  How do you plead?

23     DEFENDANT JOHN GALANIS:  Not guilty, your Honor.

24     THE COURT:  All right.  You may be seated.

25     Finally, Devon Archer.  Please stand.

 1             Have you seen a copy of the indictment?

 2             DEFENDANT ARCHER:  Yes, I have, your Honor.

 3             THE COURT:  Have you discussed it with your attorney?

 4             DEFENDANT ARCHER:  Yes, I have.

 5             THE COURT:  Would you like me to read it out loud, or

 6    do you waive its public reading?

 7             DEFENDANT ARCHER:  I waive its public reading.

 8             THE COURT:  How do you plead?

 9             DEFENDANT ARCHER:  Not guilty.

10             THE COURT:  You may be seated.

11             So I understand that bail has been set except for

12    Mr. Galanis, who is detained.  Bail has been set for all of the

13    defendants in this district except for Mr. Cooney and

14    Mr. Dunkerley.

15             MS. HECTOR:  That's correct, your Honor.

16             THE COURT:  What is the government's position with

17    respect to bail for each of these defendants?

18             MS. HECTOR:  Your Honor, I understand that the

19    government and Mr. Dunkerley's counsel are in agreement that

20    the conditions set at his initial presentment out of the

21    district be continued.  Those conditions were a $1,000,000 bond

22    secured by one financially responsible person and $200,000 in

23    real property.

24             His travel is restricted to California and New York,

25    and home confinement is electronic monitoring.

1          MS. BRUNE:  Your Honor, in addition, we'd ask

2     permission to have Mr. Dunkerley remain in the New York area

3     through June 17 so as to obtain counsel.

4          MS. HECTOR:  We, of course, have no objection to that.

5          THE COURT:  So just read through those conditions once

6     more.  A $1,000,000 bond signed by one financially responsible

7     person.  $200,000 worth of property; is that correct?

8          MS. HECTOR:  Correct, your Honor.

9          THE COURT:  Travel restricted to California.  Which

10    district?

11         MS. HECTOR:  To all districts, your Honor.

12         THE COURT:  To all of the districts in California and

13    the Southern District of New York?

14         MS. HECTOR:  Correct, your Honor.

15         THE COURT:  And that he shall remain here until -- I'm

16    sorry.  June 27?

17         MS. BRUNE:  Through June 17.

18         MS. HECTOR:  I guess I should add that he has already

19    surrendered his passport, but he is not to make any new

20    applications.

21         THE COURT:  Has a bond already been signed?

22         MS. HECTOR:  I believe, your Honor, that it has

23    already been signed.  I think it has to be resigned here.

24    Although to the extent the person who signed it is located in

25    California, they should be able to sign it in California and

1   have it sent to the clerk's office here.

2          THE COURT:  So I am going to order those conditions

3   with respect to Mr. Dunkerley.

4          MS. BRUNE:  Thank you, your Honor.

5          THE COURT:  And with regard to Mr. Cooney?

6          MS. HECTOR:  With regard to Mr. Dunkerley, is there a

7   date by which they should be satisfied?

8          THE COURT:  What do you propose?

9          MS. HECTOR:  I think a week should be sufficient.

10          THE COURT:  Ms. Brune, is that enough time, a week to

11   have the bond signed by one financially responsible person and

12   the $200,000 in property?

13          MS. BRUNE:  I believe that's already been posted in

14   the Central District of California.

15          THE COURT:  Is that right?

16          MS. BRUNE:  Yes.

17          MS. HECTOR:  I think as a technical matter, the

18   Southern District bond will supersede the bond in California,

19   and it has to be sort of redone.

20          THE COURT:  So it needs to be reposted.  Is a week

21   enough time to do that is the question.

22          MS. BRUNE:  Yes.

23          THE COURT:  So those two conditions must be completed

24   within one week.  He should sign the bond though today, but he

25   may be released on those conditions.

1          MS. BRUNE:  One of my co-counsel just suggested

2    something to me that I think makes good sense, which is we may

3    want to extend to the Eastern District of New York so he can

4    fly into La Guardia or JFK without being in violation of the

5    bail restrictions.

6          THE COURT:  That's fine.  Will he be supervised by

7    pretrial services in the Southern District of New York or in

8    California?

9          MS. HECTOR:  He'll be supervised in California.  I

10   think he'll just continue to be supervised by his pretrial

11   services officer there this week while he's here.

12         THE COURT:  Ms. Cunningham, is that correct with

13   respect to his supervision will remain in California?

14         MS. CUNNINGHAM:  Yes.

15         THE COURT:  So those conditions will be set with

16   respect to Mr. Dunkerley.

17         MS. HECTOR:  We're in a little bit of -- with regard

18   to Mr. Cooney, we're in a difficult situation, which is the

19   government's general view was that a bond -- that he could be

20   released on bond.

21         The district in which he was first presented generally

22   either released people on their own recognizance or remands

23   them.  So Mr. Cooney was released on his own recognizance.

24         In thinking about the appropriate amount of the bond,

25   the challenge is that the pretrial services report, which was

1  prepared in the district where he was first presented, not

2  here, provides very little information about his financial

3  situation.

4        Indeed, he declined to answer certain questions about

5  his finances, apparently, on the advice of his lawyer at

6  presentment.

7        He lists a residence in Michigan worth about $500,000;

8  $90,000 in a checking account; and two cars with unknown value,

9  although I'm informed by his counsel here that he has sold one

10  of those cars since this report was prepared.

11        The difficulty is that the government, as a result,

12  doesn't have a clear sense -- and the Court doesn't have a

13  clear sense -- what his financial situation is.  It makes it

14  very hard to understand what amount of a bond would guarantee

15  his appearance in this district.

16        I would just note -- in any event, I think he needs to

17  proffer more about his financial situation in order for any

18  bond to be set.

19        THE COURT:  Counsel?

20        MR. UMHOFER:  Your Honor, I think we have no better of

21  an indication of what it would take to get Mr. Cooney here to

22  appear than the fact that he's here today on his own

23  recognizance bond.

24        He's been on that for a month with exemplary conduct

25  during that time, subject to a set of restrictions that are

1    more than what's necessary in the case.  The bond format states

2    that the least restrictive condition is always required under

3    the circumstances, and we have that right here.

4         You have a man who has known about this case for

5    months, knew about his arrest.  He was sitting on his stoop

6    with his passport in hand when the officers arrived to arrest

7    him.

8         He's got two kids and a wife.  He's been here.  He

9    appeared here today on a minimal bond.  I don't think any

10   financial conditions are necessary.

11        I think the Court has all it needs to simply continue

12   the bond that is set or a minimal signature bond with even less

13   restrictions.  And I would like to be heard on some of those

14   restrictions.

15        The bottom line is, in terms of his financial

16   condition, you've got the fact that he owns a house with

17   $100,000 equity in it, you've got his checking account, and

18   you've got his two cars.

19        That's all the Court needs, in addition to what we

20   have here, which is his actual appearance, which makes it clear

21   that he would appear going forward.  If the Court wants any

22   more information, I will proffer it.

23        THE COURT:  I do think it's appropriate to set a bond

24   at the very least.  I think the question is how much.  I don't

25   know if you want to proffer that the information that his wife

1    gave to pretrial services essentially represents his finances.

2    If you don't want to proffer at all, then I'll take the

3    information I have.

4         MR. UMHOFER:  Your Honor, I think that the savings

5    amounts to probably less.  I think probably it's about $60,000.

6    That's the amount he has in savings.  So it's a little bit less

7    than what Mr. Cooney's wife stated.  That's my proffer to the

8    Court.

9         MS. HECTOR:  Let me then add something about what the

10   government knows about Mr. Cooney's financial situation, which

11   is that in 2014/2015, the defendant obtained a $1.2 million

12   loan from City National Bank.

13        In connection with obtaining that loan, he filled out

14   financial information in which he represented to the bank that

15   he had a net worth of approximately $15,000,000.

16        Now, to be clear, the government thinks that many of

17   those statements were false and, indeed, represent the separate

18   crime of bank fraud.

19        He listed among his assets $5,000,000 of the Wakpamni

20   bonds that are at issue in this case which he purchased using a

21   loan -- he purchased using money that had been given to him

22   through Jason Galanis.

23        He did not disclose to the bank that there was any

24   encumbrance on the money that he used to buy the bonds or that

25   he had purchased them using a loan.

1        He then transferred the bonds out of his possession to

2   another entity.  He then reconfirmed in writing for the bank

3   that he continued to own the bonds, which was false.  So I

4   don't think that that was in fact a $5,000,000 asset of his,

5   but he so represented to the bank.

6        He also made representations that he had a $5,000,000

7   life insurance policy, that he owned $2,000,000 in Code Rebel

8   stock, which is no longer worth anything like that as a result,

9   in part, of the conduct here.

10        Even taking out the $5,000,000 of bonds, the

11   $5,000,000 of life insurance, and the $2,000,000 of stock,

12   there should be $3,000,000 more roughly of assets that are

13   nowhere represented in what he's just said.

14        There's just a total disconnect here certainly between

15   what he represented to the bank and what he's now representing,

16   even assuming, as I think is true, that some of what he said to

17   the bank is false.

18        So I do think the bond is nonetheless appropriate in

19   this case, but I think a significant amount is necessary

20   because the defendant certainly, as recently as 2015, appeared

21   to have more serious assets than he claims now.  I don't think

22   this has been a fully forthcoming proffer about the nature of

23   his assets.

24        THE COURT:  Would you like to respond?

25        MR. UMHOFER:  Well, your Honor, I'm not even sure that

1    was a proffer.  So there are a lot of facts that were just put

2    forward that are not actually appropriately before the Court on

3    this.  That was years ago.  Frankly, my client has been

4    decimated by what happened to him in this case finally.

5           Again, your Honor, to come back to the point of what's

6    required to make sure he shows up, he's shown up today without

7    any financial bond whatsoever, and he's going to continue to

8    show up, and he's going to appear here at trial, and he's going

9    to defend himself.

10          So regardless of what's being said here, he's here

11   now, which shows he's going to appear regardless of what the

12   bond is.  So the notion that a substantial bond needs to be set

13   is just inconsistent with the fact that for weeks he's been on

14   bond on his own recognizance and has appeared here today and

15   will continue to do so.

16          THE COURT:  What I'm going to do is I'm going to set a

17   $1,000,000 bond to be signed by one financially responsible

18   person.

19          How much time would you need to get someone to sign

20   that?

21          MR. UMHOFER:  Two weeks, your Honor.

22          THE COURT:  That should be signed within two weeks.

23   He can be released on his signature today.  Travel should be

24   restricted to the Southern and Eastern Districts of New York,

25   the District of Michigan, and the District of Nevada.  That's

1    what pretrial recommended until his expected relocation date of

2    June 20, 2016.

3              Is that acceptable in terms of the travel?

4              MR. UMHOFER:  Your Honor, I'm not sure why a travel

5    restriction would be necessary here.  I understand that it's

6    not been required with some of the other defendants who are

7    similarly situated.

8              A travel restriction to the 48 states seems reasonable

9    under the circumstances.  Mr. Cooney currently lives in an area

10   that spans -- it's very close to a border.  So he's got

11   permission to go into California from Nevada because he's on

12   the border.

13             He also needs to travel for business to continue to do

14   his work.  So, your Honor, we'd request a travel restriction to

15   the 48 states.

16             THE COURT:  Does the government have a position on

17   that?

18             MS. HECTOR:  Your Honor, there's one defendant in this

19   case whose travel has not been restricted to the district that

20   is foreseeable for the defendant to need, and that was as a

21   result of proffers of the need of that defendant to travel more

22   broadly.

23             Given that the defendant has not answered questions

24   about his income or the nature of his work, it seems to me that

25   there's no reason for him to be able to travel to any of the

1    states.  California, to the extent it's close to the boarder

2    with Nevada and as a practical matter, he might, in the

3    ordinary course of his life, cross into California.  That seems

4    fine.

5              THE COURT:  So I can going to restrict travel to the

6    Southern and Eastern Districts of New York, the District of

7    Michigan, the District of Nevada, all the districts in

8    California.  And to the extent that he needs to travel for

9    business, you can submit a request for permission to travel.

10             Has he surrendered his passport or any other travel

11   documents?

12             MR. UMHOFER:  The morning of his arrest, your Honor.

13             THE COURT:  He's to refrain from applying for any new

14   travel documents, refrain from possession of any firearms,

15   destructive devices, and/or weapons.  Surrender of all firearms

16   to pretrial services, and it will be the standard pretrial

17   supervision.

18             Where will he be supervised?

19             MS. CUNNINGHAM:  In his home district, the District of

20   Nevada, is my understanding.

21             THE COURT:  Until he relocates, which is June 20.

22             MR. UMHOFER:  Right.

23             THE COURT:  So he'll be supervised in the district of

24   his residence at the time he's there.  So we'll make it easy.

25             MS. HECTOR:  Your Honor, he appears to own a firearm

 1    in Michigan.  Defense counsel has proffered to me that his lack

 2    of a firearm's license is because Michigan does not require a

 3    firearms license, but I think there should be a specific date

 4    for the surrender of that pretrial to pretrial services.

 5            THE COURT:  How much time?

 6            MR. UMHOFER:  He cannot have access to the gun until

 7    he gets there.  So 30 days, your Honor?

 8            THE COURT:  So we'll do 30 days for surrender of the

 9    firearm.

10            So those are the conditions with respect to

11    Mr. Cooney.

12            MR. UMHOFER:  Your Honor, I just want to clarify.

13            THE COURT:  Yes.

14            MR. UMHOFER:  There are a couple conditions that I

15    just want to make clear.  The Court did not state them, but

16    there's a reference involving handling of investors.  I don't

17    think that's necessary.  In fact, he does business in that

18    area.  That was set when he appeared in Reno, but I don't think

19    it's necessary going forward.

20            THE COURT:  Is the government seeking any other

21    conditions?

22            MS. HECTOR:  No, your Honor.  Michigan is not actually

23    one district.  It has multiple districts.  We have no objection

24    to his travel being permitted within all of the districts in

25    Michigan.

1        THE COURT:  Thank you for clarifying that.  I should

2   have done that.

3        So, yes.  Your clarification is correct.  The

4   conditions that I set will govern.

5        MR. UMHOFER:  Your Honor, may I check with my client

6   for a moment just to make sure we covered everything?

7        THE COURT:  Yes.

8        MR. UMHOFER:  One other request with respect to

9   travel.  He has family near the boarder between Michigan and

10  Ohio.  He would like permission to be able to travel to see

11  them.

12       THE COURT:  How often does he go to see them?

13       MR. UMHOFER:  Not much now, but when he gets to

14  Michigan, it will be regularly.  Perhaps subject to pretrial

15  services approval on that?

16       THE COURT:  That's fine.

17       MR. UMHOFER:  Thank you, your Honor.  Nothing further,

18  your Honor.  Thank you.

19       THE COURT:  Ohio also has multiple districts.  So

20  we'll just clarify that.

21       MR. UMHOFER:  Yes.

22       THE COURT:  So I think that's settled with respect to

23  bail or detention with respect to all of the defendants.

24       Everyone who has been released should be warned that

25  if you fail to appear in court or you violate any of the

1  conditions of your release, a warrant will be issued for your

2  arrest, and you or anyone who signed the bond will not

3  responsible for paying the full amount of the bond.  In

4  addition, you may be charged with the crime of bail jumping.

5          Why don't we turn to discovery.

6          What's the status of discovery?  What does it include?

7  And how long do you think it will take to produce it?

8          MS. HECTOR:  It's a significant volume of discovery in

9  this case.  We produced today just people's individual rap

10  sheets, marshal intake forms, and credit reports for those

11  defendants for whom the government had received them.

12          We have bank records, a GPS affidavit and order, and

13  the results of the GPS order that we will produce to the

14  defendants next week.

15          The bulk of the discovery is all going to come in a

16  single database.  It's documents principally that were

17  subpoenaed by the SEC from numerous different custodians.

18          That database contains about 85,000 documents, not

19  pages, documents, and is about 75 gigabytes in size.  In

20  addition to that, the government has received a number of

21  individual productions in separate databases that it will also

22  produce.

23          The way it proposes to do that is if the defendants

24  provide the government with a 1 terabyte hard drive, we will be

25  able to produce both the entirety of the SEC databases and the

1    database that the government has in one unit.

2           The SEC, as I understand it, maintains its IT

3    processing all in a central location for the country.  So we

4    anticipate having a copy of that SEC database in our possession

5    in about the next two weeks and then making copies for the

6    defendants as we receive their hard drives.

7           In addition, there's a handful of other evidence.

8    There is, for example, the contents of one of the defendant's

9    phones.  There are recordings that were made by one of the

10   defendants.

11          I don't know the exact number of hours, but it's about

12   2 gigabytes worth of data.  And then the final two issues are

13   Atlanta and Hughes were the two investment adviser firms that

14   were taken captive and whose clients' money was used to

15   purchase the bonds in this case.

16          The SEC received a number of hard drives, USB drives,

17   and laptops from those entities.  They searched them using

18   search terms and documents that they deemed relevant or

19   important have been added into the database I described.

20          But to the extent the defendants want copies of the

21   entirety of those computer devices, those can be produced.

22   It's about 2 terabytes of data.  As I understand it from the IT

23   people, the logical way to do is that is to get a separate 2

24   terabyte hard drive.  They make 4 terabyte ones, but they're

25   much more expensive than two smaller ones.  So that is the

1    logical way to do it.

2          Then finally, leaving aside those particular computer

3    devices that were received, Atlanta and Hughes maintained

4    servers, and entire contents of the servers are either in one

5    case have been given to the SEC but not yet processed and are

6    being given -- we simply have no idea what the volume of that

7    is.  I mean it's enormous.  It's an entire server.  I'm not

8    sure yet what the logical way is to make it available.

9          Obviously, the key documents that have been identified

10   will be produced individually.  If the defendants want access

11   to the servers at large, as we understand how to do that, we

12   will make that available.

13          THE COURT:  All right.

14          MS. HECTOR:  So I think from a timing perspective,

15   assuming that the government takes possession of the SEC

16   database in two weeks and assuming that the defendants have

17   given us hard drives by that date, I think it probably will

18   take us something like another two weeks to process it out.

19          So I think we're talking about the bulk of the

20   discovery hopefully being accomplished in the next four,

21   depending on IT issues, six weeks with the servers and the

22   other stuff being done on a rolling basis as we understand

23   exactly what's necessary.

24          THE COURT:  Yes.

25          MR. TOUGER:  David Touger.  The recordings are 2

1    gigabytes.  Whose recordings were they?

2          MS. HECTOR:  Those were recordings made by Defendant

3    Michelle Morton.

4          MR. TOUGER:  And you want the terabyte hard drive and

5    the 2 gig hard drive?

6          MS. HECTOR:  No.  Unless I've gotten the technology

7    wrong, I think the recordings will fit on to the terabyte hard

8    drive in addition to the SEC database.  So one 1 terabyte hard

9    drive should cover the bulk of the documents, unless you also

10   want copies of the hard drives, etc.  Then we need a separate 2

11   terabyte hard drive.

12         THE COURT:  So, defense counsel, how much time -- when

13   should I set another conference?  I'm not going to set a trial

14   date at this time.  I think there's just too much material for

15   you to review.

16         What I would like to do is set another conference.  At

17   that time I'm going to ask whether you intend to make any

18   motions and set a schedule for motions, as well as a trial

19   date.

20         How much time do you think you need?  60 days?  90

21   days?  What do you think makes sense?  Feel free to talk

22   amongst yourselves.

23         (Pause)

24         MR. TOUGER:  Your Honor, the complicating factor here

25   is some of us have a companion date in front of Judge Castel

Case 1:16-cr-00371-RA Document 60-1 Filed 06/22/16 Page 27 of 33

27

1   which has, if you can imagine, probably five times the amount

2   of documents as in this case.  And that trial is scheduled for

3   September, which some of us are obviously reviewing all of

4   those documents.

5           THE COURT:  Right.

6           MR. TOUGER:  Now we're being added 85,000 new

7   documents to review.  So we were wondering if we could have

8   until October to get back to you.  We can set it 90 days out,

9   but it would be unrealistic that some of us who have two

10  trials -- and Mr. Checkman also has another case.  Sometime in

11  October would seem like a more realistic time.

12          MR. TREMONTE:  Another complicating factor that's

13  relevant to the Court's evaluation of this is that a

14  substantial component of the discovery issue in that other

15  case -- there are three defendants here who are scheduled to go

16  to trial in that case in September -- a substantial component

17  of that discovery is made available to the defense only at the

18  U.S. Attorney's Office on appointment.

19          So, in addition to the -- I think it's fairly

20  characterized as an overwhelming volume of documents, much of

21  which is relevant to the case, another very substantial chunk

22  of discovery takes, I would say, three to four times as long to

23  review.

24          So realistically, it's all but impossible that we

25  would be able to focus in any meaningful sense on the discovery

1    in this case between six weeks from now and September.

2          MR. CHECKMAN:  Your Honor, Neil Checkman for Michelle

3    Morton.  I would also like to add to that that I've been

4    appointed on this particular case, and at the time of the

5    appointment, your Honor, I was also appointed on several other

6    cases of the large take-downs in this district, White Plains,

7    and two others, one before Judge Nathan and one before

8    Judge Kaplan.

9          There are hard drives' worth of discovery information.

10   I believe it makes sense to put off the next court date in this

11   case until October so we get the chance to get a handle on all

12   of this and be able to do justice to the other cases.

13         THE COURT:  Does anyone have an objection to my

14   putting the case off until October?  No.

15         So why don't we do that.  How long is the trial?  What

16   is the actual September trial date before Judge Castel?

17         MS. HECTOR:  September 12, your Honor.

18         THE COURT:  How long is it expected to last?

19         MS. HECTOR:  It's a little unclear because the

20   defendants are all still in the case, and we'll see what

21   unfolds over the summer, but I think it's going to be many

22   weeks.  I think we will certainly be on trial in the beginning

23   of October.  I'm optimistic that we will be done by the end of

24   October.

25         THE COURT:  So does it make sense to put it off --

 1          MR. TOUGER:  The first week of November.  And then I

 2   know Mr. Galanis is incarcerated, but he's incarcerated on the

 3   other case.

 4          THE COURT:  Mr. Witzel, do you want to weigh in on the

 5   timing?

 6          MR. WITZEL:  When we discussed bail, we're going to

 7   wait for the -- we're not going to ask for bail now until after

 8   the Second Circuit has resolved the matter before Judge Castel.

 9   So with that in mind, we would have no objection to a late

10   October or early November date.

11          THE COURT:  Why don't we put it off for November 4.

12          Do you want to do it at 9:00 a.m.?  It's a Friday.

13   9:00 a.m. on November 4.  Does that work for everyone?

14          MS. HECTOR:  Your Honor, that's generally fine.  I

15   think, assuming that Jason Galanis will still be in custody at

16   that time -- I assume he will be -- the marshals may have

17   trouble being here by 9:00.

18          THE COURT:  I'm on trial that day.  I can put it on

19   for 1:00 that day.

20          MS. HECTOR:  Great.

21          THE COURT:  So 1:00 on November 4.  As I said, at that

22   time, I am going to set a motion schedule and a trial date.  So

23   you just need to be in a position to do that.  You don't need

24   to know exactly which motions you intend to make, but you have

25   to have enough of a sense to weigh in on timing.  So I hope

Case 1:16-cr-00371-RA Document 266-1 Filed 12/20/17 Page 31 of 33
Case 1:16-cr-00371-RA Document 60-1 Filed 06/22/16 Page 30 of 32

30

1    that's clear.

2           Does the government seek to exclude time under the

3    Speedy Trial Act?

4           MS. HECTOR:  We do, your Honor, to allow the

5    defendants to review the voluminous discovery in this case and

6    to begin to consider any motions they may wish to make.

7           THE COURT:  Any objection?  So I will exclude time

8    from today until November 4 pursuant to 18 U.S. Code, Section

9    3161(h)(7)(A).  I find that the ends of justice served by

10   excluding such time outweigh the interests of the public and

11   the defendants in a speedy trial because it will allow the

12   defendants and counsel to review discovery and consider any

13   motions they'd like to make.

14          Are there any other issues we need to discuss today?

15          MS. HECTOR:  I don't think so, your Honor.  Just a

16   very general heads-up, I guess, which is the government

17   returned a very sort of statutory charging indictment in this

18   case because one of the defendants declined to waive until the

19   30th day.

20          As a result, we anticipate returning a superseding

21   indictment in the near future that will that will just set

22   forth the case in more detail.  I don't expect at this time

23   that it will change the charges or otherwise alter the

24   landscape.  But we'll, of course, send a copy to your Honor

25   when that's done, and then the defendants can be arraigned at

1    that time.

2            THE COURT:  Do you have any sense of timing on the

3    superseder?

4            MS. HECTOR:  I think it will come in the next weeks

5    probably, not more than a month or so from now.  It will be

6    long before anything is done.

7            THE COURT:  Defendants are on notice of that.

8            Now, with respect to Mr. Galanis and Mr. Dunkerley, I

9    understand that Ms. Brune and Mr. Witzel are just here for bail

10   purposes only.

11           Is there anything the Court needs to set all with

12   respect to substitution of counsel?

13           MS. BRUNE:  Not at this time, your Honor, because it's

14   not clear exactly how we're going to resolve it.  If it's all

15   right, may we be in touch with your deputy?

16           THE COURT:  Yes.  If you could do that or just write a

17   letter to the Court.  So just let me know if we need any

18   further proceedings.

19           MR. WITZEL:  The same for Mr. Galanis.  As the Court

20   is aware, there is the other case before Judge Castel.  There

21   is a substantial bail package, including $3,000,000 of

22   collateral.  We respectfully submit that would be adequate

23   here.

24           Until that matter is resolved by the Second Circuit,

25   we reserve the right to come back and make a bail argument, and

 1   we'll be in touch with chambers when that moment ripens.

 2           THE COURT:  All right.  Understood.

 3           Are there any other applications at this time?  All

 4   right.

 5           One moment, please.

 6           (Pause)

 7           MS. HECTOR:  The two defendants for whom bail was

 8   first set today have to sign the bond in the magistrate's

 9   clerk's office.  So they should be directed to go to the fifth

10   floor.

11           THE COURT:  That's what we were just discussing.  We

12   were discussing the paperwork to be sure they are in a position

13   to sign those bonds today.  We'll get out the paperwork that we

14   need to get out shortly.

15           MS. HECTOR:  Thank you, your Honor.

16           THE COURT:  Thank you.  We're adjourned.

17           (Adjourned)

18

19

20

21

22

23

24

25