UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                           :

UNITED STATES OF AMERICA

                                           :

               - v. -

                                           :     16 Cr. 371 (RA)

JASON GALANIS, et al. ,

                                           :

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL MOTIONS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York,
Attorney for the United States of America

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
       - Of Counsel -

## **Table of Contents**

I.    The Court Should Find that the Crime-Fraud Exception Applies to Certain Emails, or in the Alternative, Conduct an *In Camera* Inspection of Those Emails .......................................... 1

   A.    Overview of the Criminal Scheme ............................................................................... 1

   B.    The Defendants Are Arrested and Indicted, and the Government Obtains Email Search Warrants .................................................................................................................... 8

   C.    Applicable Law.......................................................................................................... 10

   D.    Discussion.................................................................................................................. 12

II.    ████████████████████████████████████████████████████████████████████████

      ██    ██████████████████████████████████████████████████████████

      ██    ██████████████████████████████████████████████████████████

      ██    ██████████████████████████████████████████████████████████

III.    The Court Should Set a Deadline for Defense Rule 16 Disclosures ............................. 23

CONCLUSION.................................................................................................................... 24

## **Table of Authorities**

### **Cases**

*In re Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339 (2d Cir. 2013)................... 20

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032 (2d Cir. 1984) 11, 12, 14

*In re Grand Jury Subpoenas Dated Mar. 2, 2015*, No. 15-1976, 2015 WL 5806060 (2d Cir. Oct. 6, 2015) ................................................................................................................................... 11

*In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994) ........................................................................ 11

*In re Richard Roe, Inc.* v. *Richard Roe Inc. et. al,* 168 F.3d 69 (2d Cir. 1999) .......................... 14

*In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472 (S.D.N.Y. 2017) ...................... 21, 22

*United States* v. *Chervin*, No. 10 Cr. 918 (RPP), 2011 WL 4424297 (S.D.N.Y. Sept. 21, 2011) ...................................................................................................................................... ….14

*United States* v. *Constr. Prods. Research, Inc.*, 73 F.3d 464 (2d Cir. 1996)............................... 11

*United States* v. *Jacobs*, 117 F.3d 82 (2d Cir. 1997) ............................................................. 11, 13

*United States* v. *Kovel*, 296 F.2d 918 (2d Cir. 1961).................................................................... 10

*United States* v. *Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) ...... 13

*United States* v. *Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017). 23

*United States* v. *Punn*, 737 F.3d 1 (2d Cir. 2013)........................................................................ 20

*United States* v. *Salameh,* 152 F.3d 88 (2d Cir.1998) ................................................................. 20

*United States* v. *Tucker*, 254 F. Supp. 3d 620 (S.D.N.Y. 2017) .................................................. 13

*United States* v. *Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. Dec. 12, 2017)............................... 23

*United States* v. *Vanwort*, 887 F.2d 375 (2d Cir. 1989) ............................................................. 20

*United States* v. *Zolin*, 491 U.S. 554 (1989)................................................................... 11, 12, 17

### **Rules**

Federal Rule of Criminal Procedure 16(b)..................................................................................... 23

The Government respectfully submits this memorandum of law in support of its motions regarding three issues.   First, the Government respectfully requests that the Court rule that certain e-mail evidence is subject to the crime-fraud exception to the attorney-client privilege, or, in the alternative, that the Court conduct an *in camera* review of that evidence, to determine whether the crime-fraud exception applies. ████████████████████████████

████████████████████████████████████████████████████████

████   Third, the Government requests that the Court set a deadline for defense disclosures under Federal Rule of Criminal Procedure 16(b).

I.   **The Court Should Find that the Crime-Fraud Exception Applies to Certain Emails, or in the Alternative, Conduct an *In Camera* Inspection of Those Emails**

The Government respectfully requests a ruling that certain e-mail evidence is subject to the crime-fraud exception to the attorney-client privilege, or, in the alternative, that the Court conduct an *in camera* review of that evidence, to determine whether the crime-fraud exception applies

**A.  Overview of the Criminal Scheme**

Between approximately March 2014 and April 2016, the defendants fraudulently induced the Wakpamni Lake Community Corporation, a Native American tribal entity (the "WLCC"), to issue more than $60 million worth of bonds (the "WLCC Bonds"), through four separate bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," and the "Fourth Bond Issuance," and, together, the "Bond Issuances.").   As discussed more below, the defendants used money from the clients of captive investment advisory firms to buy WLCC Bonds, thereby defrauding those clients as well.   The defendants then misappropriated bond proceeds for their own use.

**1.   The Defendants Make Misrepresentations Regarding the WLCC Bonds**

The WLCC issued the bonds after a series of false and misleading representations by the defendants.

First, for example, in connection with each of the four bond issuances, the WLCC entered into a number of agreements, including indentures, placement agency agreements, and annuity provider agreements ("the Bond Agreements").   In substance, under these agreements, (i) a placement agent, Burnham Securities, would, in return for a fee, find buyers for the bonds; (ii) the bond proceeds would be provided to an annuity provider, to be invested in an annuity to generate sufficient income to pay the interest and principal on the bonds; and (iii) an investment manager would assist in investing the bond proceeds on WLCC's behalf.   (Complaint ¶ 30(a)).[1] The placement agent, however, did not solicit any of the purchasers of the WLCC Bonds, and none of the bond proceeds were actually invested in an annuity or turned over to an investment manager.   (*See* Complaint ¶ 30(a)).   Instead, as discussed more below, the defendants misappropriated the funds for their own use.

In addition, defendant John Galanis, who functioned as the defendants' primary point of contact with the WLCC's representatives, told those representatives that defendant Jason Galanis[2]  was an investment banker at Burnham Securities, the placement agent for the bonds, even though Jason Galanis did not actually work at Burnham.   (*See* Complaint ¶¶ 31(b), 34(a)).

---

[1]  A copy of the Complaint is attached as Exhibit A, and a copy of the operative indictment, S1 16 Cr. 371 (RA), is attached as Exhibit B.

[2]  As the Court is aware, defendant Jason Galanis pled guilty on January 19, 2017 to (a) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, (b) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, and (c) conspiracy to commit investment adviser fraud, in violation of 18 U.S.C. § 371.   On August 11, 2017, this

Further, after the First Bond Issuance, defendant John Galanis falsely told representatives of the WLCC that the first issuance had been a success and that investors were demanding more WLCC Bonds.   (Complaint ¶ 45).   This was false; indeed, as discussed below, the entirety of the First Bond Issuance had been placed with the clients of one firm, Hughes Capital Management, and many of these clients were already demanding to have the bonds removed from their accounts after learning of the purchase.   (Complaint ¶ 45).   As a result of John Galanis's misrepresentations, the WLCC agreed to issue another $20 million of bonds, which resulted in the Second and Third Bond Issuances.   (*See* Complaint ¶¶ 44-53).   These bonds were purchased not by new investors, but by defendants Archer and Bevan Cooney ("Cooney"), using recycled proceeds from the First Bond Issuance.   (*See* Complaint ¶ 47(c)-(e) (describing Archer's purchase of the Second Bond Issuance and his false statements to a brokerage firm in connection with that purchase), ¶ 49(b)-(d) (describing Cooney's purchase of the Third Bond Issuance and subsequent sale of those bonds)).

Similarly, in March 2015, John Galanis told representatives of the WLCC, in substance that the First, Second, and Third Bond Issuances had been successful and that investors were demanding even more WLCC Bonds.   (Complaint ¶ 54).   This, again, was false; indeed, there was no ready market for the bonds, and the Second and Third Bond Issuances had each been purchased by a single investor—defendants Archer and Cooney, respectively—using the proceeds from the First Bond Issuance.   (Complaint ¶ 54).

---

Court sentenced Jason Galanis to 173 months' imprisonment, with 113 months to be served concurrently with the sentence imposed in case number 15 Cr. 643 (PKC), and the remaining 60 months to be served consecutively to the term of imprisonment imposed in case number 15 Cr. 643 (PKC).

3

### 2.   The Defendants Obtain Control of Key Entities

The scheme was made possible because, by the time of the Bond Issuances, the defendants and other individuals working with them owned or controlled most of the key entities involved.   Indeed, the bond fraud was effectuated in order to assist the defendants and their associates in "rolling up" the various entities into an enormous financial services conglomerate. The entities involved included, for example, the placement agent, the annuity provider, and two investment adviser firms.

### a.   The Placement Agent

As noted above, the placement agent for the Bond Issuances—i.e., the entity that was supposed to find buyers for the bonds—was Burnham Securities.   (*See* Complaint ¶ 12). Defendants Archer and Cooney owned a portion of Burnham Securities.   (*Id.*).   In 2014, in connection with efforts to obtain control of the parent entity of Burnham Securities, Burnham Financial Group ("BFG"), defendant Archer made false statements to the board of the Burnham Investment Trust (the "BIT Board"), regarding defendant Jason Galanis's relationship with Burnham Securities and its affiliates.   (*See, e.g.*, Complaint ¶ 34(b)).   Defendant Hugh Dunkerley also worked at Burnham as a Managing Director.   (*See* Complaint ¶ 30(c)).   Also, as noted above, Jason Galanis held himself out to investors as a Burnham Securities employee, even though he was not actually employed by Burnham. (*See* Complaint ¶¶ 31(b), 34(a)).

### b.   Valor, Wealth Assurance, and WAPCC

Pursuant to the Bond Agreements, the bond proceeds were to be invested in an annuity, which was to generate both income for the WLCC and funds needed for interest payments to the bondholders.   Defendants Hirst and Dunkerley, however, controlled the purported annuity provider for the bonds, Wealth Assurance Private Client Corporation ("WAPCC").   (*See, e.g.*,

4

Complaint ¶¶ 14, 55(c)).   Defendants Dunkerley, Archer, and Jason Galanis also maintained control over a similarly named, but unaffiliated, entity, Wealth Assurance, and its parent, Valor Group.   (*See* Complaint ¶¶ 26, 28 (noting that Archer and Dunkerley were members of Valor's Board of Directors), ¶ 37 (noting that Wealth Assurance and WAPCC were not in fact affiliated).

### c.   The Investment Advisers

The defendants also controlled the investment advisers that purchased the First and Fourth Bond Issuances on behalf of their pension fund clients and through those purchases defrauded those clients.

Hughes Capital Management ("Hughes") purchased the First Bond Issuance in late August 2014 on behalf of its clients.   (*See* Complaint ¶ 39(v)).   Just weeks earlier, defendant Michelle Morton ("Morton") had acquired Hughes.   (Complaint ¶ 20).   Morton financed her purchase of Hughes by using funds she had received days before from BFG-Socially Responsible Investing ("BFG-SR"), an entity managed by defendant Dunkerley, which was a subsidiary of Wealth Assurance.   (Complaint ¶ 20, 39(f)).   In addition, defendants Jason Galanis, Archer, and Cooney directed, supported, and financed Morton's acquisition of Hughes. (*See, e.g*., Complaint ¶ 39(a)-(n)).   Morton, in consultation with Jason Galanis, then installed defendant Hirst as Hughes' Chief Investment Officer.   (Complaint ¶ 38(i), (l)-(m)).

Atlantic Asset Management ("Atlantic") purchased the Fourth Bond Issuance in April 2015, on behalf of one of its clients.   (Complaint ¶ 56(d)).   Morton had acquired Atlantic earlier

that same month.   (*See* Complaint ¶ 22).[3]   Again, BFG-SR, the entity managed by Dunkerley, financed the purchase.   (*Id.*).

### 3.   The Defendants Defraud Clients of Hughes and Atlantic

The defendants' scheme also defrauded the Hughes and Atlantic clients on whose behalf the investment advisers purchased the bonds.

For one, Morton and Hirst failed to make any disclosure to any Atlantic or Hughes clients prior to the purchase of the bonds, notwithstanding that the bond purchases were outside the investment parameters of many of the clients.   (*See* Complaint ¶ 30(b)).

In addition, Morton and Hirst also failed to disclose to the Atlantic or Hughes clients the numerous conflicts of interest that existed with regard to Atlantic/Hughes' role in the purchase of the bonds, despite their legal obligation to make such disclosures.   (Complaint ¶ 30(c)).   For example:

Defendant Hirst was (i) the Chief Investment Officer, and later the Chairman of the Investment Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Tribal Bond Issuance on behalf of Hughes clients; (ii) the Assistant Secretary of Wealth Assurance; and (iii) a signatory on a bank account in the name of WAPCC.   (*See* Complaint ¶ 39(w)).   Hirst was thus affiliated both with the entities whose clients purchased the bonds and the entity receiving the proceeds of the Bond Issuances that was purportedly investing those proceeds on the WLCC's behalf.

---

[3] In connection with the acquisition, Hughes and Atlantic merged into a single entity, which continued to operate as Atlantic.

Also, defendant Dunkerley was (i) a Managing Director at Burnham, the placement agent for the Bond Issuances; (ii) a managing member of BFG-SR, the entity that invested in both Investment Advisers; (iii) an officer of Wealth Assurance; and (iv) a signatory on the WAPCC's bank account.   (Complaint ¶¶ 30(c), 39(w), 56(f)).   Dunkerley was thus affiliated with the entity purportedly soliciting investors for the WLCC Bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the Bond Issuances and purportedly investing those proceeds on the WLCC's behalf.

Further, when Hughes and Atlantic clients learned that certain of the Bond Issuances had been purchased in their accounts, several demanded that the bonds be liquidated.   (Complaint ¶¶ 39(y), 56(i)).   However, because there was no ready secondary market for the bonds, none were ever able to be sold or redeemed from the client accounts and, to this day, no Hughes or Atlantic client has been able to recoup their investment in the Bond Issuances. (Complaint ¶¶ 39(y), 56(j)).

### 4.  The Defendants Misappropriate the Bond Proceeds

In addition, the defendants' scheme involved the misappropriation of the bond proceeds, both to pay personal expenses and to further their business interests.

For example, at Jason Galanis's direction, defendant Dunkerley transferred approximately $2.3 million from the First Bond Issuance to a bank account associated with John Galanis, which John Galanis used for personal expenses.   (*See* Complaint ¶ 43(c)).   In addition, between on or about August 27, 2014 and on or about October 30, 2015, Jason Galanis used approximately $8,750,000 of the proceeds of the Bond Issuances for his own personal expenses, including: at least $5,000,000 for expenses associated with Jason Galanis's home; at least $1,250,000 to pay various law firms; at least $875,000 in payments to various members of the

7

Jason Galanis's family; at least $500,000 in payments to the IRS; at least $200,000 on automobile-related expenses; at least $75,000 for restaurants and other food-related expenses; at least $75,000 for travel expenses; at least $40,000 in payments to Jason Galanis directly; at least $350,000 in clothing and jewelry purchases; at least $55,000 in ATM withdrawals; and at least $100,000 in miscellaneous personal expenses.   (*See* Complaint ¶ 62, 63(b)).   Jason Galanis also transferred at least $1.3 million to an account controlled by Dunkerley and Hirst.   (*See* Complaint ¶ 43(e)).

Also, as noted above, the defendants used the proceeds of the First Bond Issuance to finance defendant Archer's and Cooney's purchase of the Second and Third Bond Issuances. Defendants Jason Galanis, Cooney and Archer then used the bonds purchased with of the Second and Third Bond Issuances to, among other things, support other business endeavors, including in connection with the larger effort to create a financial services conglomerate.   For example, Archer provided $2.6 million of the WLCC bonds to Burnham, an entity in which he was an investor, so that Burnham could purportedly meet its net capital requirements as a registered broker-dealer under applicable SEC regulations.   (Complaint ¶ 47(i)).   Cooney transferred $5 million of bonds to Bonwick Capital, another registered broker-dealer, for the same purpose. (Complaint ¶ 49(d)).

**B.  The Defendants Are Arrested and Indicted, and the Government Obtains Email Search Warrants**

On May 9, 2016, the Honorable Sarah Netburn signed the Complaint, charging all of the defendants with conspiracy to commit securities fraud and securities fraud, and charging defendants Jason Galanis, Morton, and Hirst with conspiracy to commit investment adviser fraud and investment adviser fraud, based on the conduct described above.   (*See* Dkt. No. 1).   On

8

May 31, 2016, a grand jury returned an initial indictment against the defendants based on that conduct, Dkt. No. 22, and then, in November 2016, returned a superseding indictment, Dkt. No. 90 (the "Indictment").

As the Court is aware, in December 2016, the Government obtained email search warrants on five email accounts—two email accounts used by defendant Archer, two email accounts used by defendant Archer's personal assistant ("Assistant-1"), and one email account used by defendant Cooney.

After the service providers produced the contents of the email accounts but before the Government conducted any review, the Government took steps to ensure that the trial team did not review any privileged emails.   Specifically, the Government asked counsel for Archer, Assistant-1, and Cooney to provide the names of, and emails addresses used by, attorneys for Archer, Assistant-1, and Cooney.   Information provided by counsel was then used to craft search terms designed to segregate potentially privileged communications.   The Government's vendor then ran these search terms across the entirety of the materials obtained pursuant to the search warrants.

Once the searches had been run, a filter team (the "Filter Team"), consisting of prosecutors not involved in this case, then reviewed documents that "hit" on the search terms for privilege.   The undersigned (the "Trial Team") understand that in the course of this review, the Filter Team identified (i) emails protected by the attorney-client privileged (the "Privileged Emails"); (ii) emails which were not protected by the attorney-client privilege, for example, because a third party was included on a communication between an attorney and client (the "Non-Privileged Emails"); and (iii) several hundred emails which, although potentially

9

privileged, appeared to be subject to the crime-fraud exception to the privilege (the "Crime-Fraud Emails").   With respect to the Non-Privileged emails, the Filter Team provided those emails to counsel for the privilege holders to attempt to reach agreement with counsel before giving those emails to the Trial Team.   Emails which counsel agreed were not subject to any privilege have since been provided to the Trial Team.   With respect Non-Privileged Emails over which counsel intends to assert privilege, the Filter Team has requested and received a privilege log.   The Filter Team will seek a ruling from the Court with respect to Non-Privileged Emails for which the parties are unable to reach an agreement.   Finally, with respect to the Crime-Fraud Emails, the Trial Team seeks a ruling from the Court on the applicability and scope of the crime-fraud exception in this case, so that any emails falling within that exception may be shared with the Trial Team and agents and others working with the Trial Team.[4]

### C.  Applicable Law

The attorney-client privilege protects from disclosure certain communications involving a client and his legal adviser related to the provision of legal advice.   *See, e.g.*, *United States* v. *Kovel*, 296 F.2d 918, 921 (2d Cir. 1961).   "To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or

---

[4]  The Trial Team assumes, for purposes of this motion only, that the Crime Fraud Emails would otherwise fall within the scope of the attorney-client privilege, absent the application of the crime-fraud exception.   The Trial Team understands that there may be some overlap between (i) Non-Privileged Emails for which the Filter Team and defendant Archer's counsel disagree about whether the privilege applies in the first instance and (ii) documents potentially subject to the crime-fraud exception.

providing legal advice." *United States* v. *Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).

The privilege is not, however, absolute.   Communications that otherwise might be privileged are not entitled to that protection if they "relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."   *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984)).   The purpose of the so-called "crime-fraud exception" is to "assure that the 'seal of secrecy' . . . between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime."   *United States* v. *Zolin*, 491 U.S. 554, 563 (1989) (internal citations omitted).

To establish that the crime-fraud exception applies to a communication, the Government must "demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime."   *United States* v. *Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) *abrogated for other reasons by Loughrin* v. *United States*, 134 S. Ct. 2384 (2014); *accord e.g.*, *In re Grand Jury Subpoenas Dated Mar. 2, 2015*, No. 15-1976, 2015 WL 5806060, at *2 (2d Cir. Oct. 6, 2015) (party invoking exception must "prove (1) that the client communication or attorney work product in question was itself in furtherance of the crime or fraud and (2) probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity." (internal quotation marks and citations omitted)).

That said, the "crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the client's communication."   *In re Grand Jury Subpoena*, 731 F.2d at 1038.   Therefore, "[i]f a fraudulent plan were ineffective, the client's communications would not thereby be protected from disclosure."   *Id.*

Likewise, the crime-fraud exception applies to communications and documents in furtherance of a crime even if the attorney involved in such communications is unware that his or her services are being used in furtherance of a fraud.   *Id.* at 1038 ("Such communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose.")   .

Where it is not clear whether the crime-fraud exception applies to a set of documents that one party asserts to be privileged, courts in this circuit may conduct an *in camera* review of those documents.   *See, e.g.*, *In re John Doe, Inc.*, 13 F.3d at 636.   Thus, to obtain *in camera* review of such materials, the Government need not meet the "probable cause" standard described above. Instead, prior to an *in camera* disclosure of purportedly privileged communications, a court "'should require'" only "'a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.'"   *Id.* (quoting *Zolin*, 491 U.S. at 572).

**D.  Discussion**

Here, communications related to (i) the issuance of the WLCC Bonds, (ii) the purchase of those bonds by clients of Hughes and Atlantic and Archer and Cooney, (iii) the defendants' control of and involvement in the entities used to facilitate the issuance and purchase of the bonds, and (iv) the misappropriation of the WLCC Bond proceeds fit squarely within the crime-

12

fraud exception and the Government respectfully requests that the Court find as such and order

that the Crime-Fraud Emails be released to the Trial Team for review.   In the alternative, should

the Court conclude that probable cause has not yet been established that the crime-fraud

exception applies to these categories of documents, the Government respectfully requests that the

Court conduct an *in camera* review of the Crime-Fraud Emails, to determine whether the

exception applies.

### 1.   There is Probable Cause to Believe a Crime or Fraud Has Been Committed

There is "a factual basis for a showing of probable cause to believe that a fraud or crime

has been committed . . . ."   *Jacobs*, 117 F.3d at 87.   The grand jury's Indictment of the

defendants is, standing alone, sufficient to meet the first prong of the crime-fraud test.   *See*

*United States* v. *Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y. 2017) ("[T]he fact that a grand jury

issued the Indictment . . . supports a finding of probable cause that a crime was committed");

*United States* v. *Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *5 (S.D.N.Y. Oct. 5, 2015)

("The Grand Jury has returned an Indictment, finding probable cause to charge the defendants

with mail and wire fraud.   The Government has thus satisfied the first prong of the crime-fraud

exception.").   The 45-page sworn Complaint, based on which Judge Netburn authorized the

defendants' arrest, also provides the Court with an additional basis for finding probable cause to

believe the defendants committed a crime with respect to the issuance and purchase of the

WLCC Bonds and the misappropriation of the bond proceeds.

### 2.   The Circumstances Show that the Communications Were in Furtherance of the Fraud or Crime, and, at the Very Least, That *In Camera* Review is Appropriate

There is also probable cause to believe communications and documents related to the

WLCC Bonds "were in furtherance of the fraud or crime."   *Jacobs*, 117 F.3d at 87.   Documents

13

are "in furtherance of" a crime or fraud when "the 'particular communication with counsel or attorney work product was *intended in* some way to facilitate or conceal the criminal activity.'" *United States* v. *Chervin*, No. 10 Cr. 918 (RPP), 2011 WL 4424297, at *3 (S.D.N.Y. Sept. 21, 2011) (emphasis in original) (quoting *In re Richard Roe, Inc.* v. *Richard Roe Inc. et. al,* 168 F.3d 69, 71 (2d Cir. 1999)).   A fraudulent objective need not be established definitely; "there need only be presented a reasonable basis for believing that the objective was fraudulent."   I*n re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039.   As explained above, the crime-fraud exception applies even if the attorney involved in the communications is unware that his or her services being used in furtherance of a fraud.   *See id.* at 1038.

Based on the record developed to date,[5] including as set forth in the sworn Complaint, thereis probable cause to believe that the crime-fraud exception applies to at least four categories of documents and communications.

First, there is probable cause to believe that the crime-fraud exception applies to communications involving the defendants and attorneys regarding the issuance of the WLCC Bonds.   Such communications would include, for example, emails relating to the drafting, editing, or execution of documents needed to issue the WLCC bonds, including indentures *see*

---

[5] While the Government's description of the below documents is admittedly general, that is a necessary consequence of the status of the privilege review and the cautious approach taken by the Government.   The Trial Team has neither received a final privilege log from the defendants nor reviewed any of the documents the Filter Team believes may be subject to the crime-fraud exception.   While the Filter Team could provide the Court with more specificity regarding the materials to which the Government believes the crime-fraud exception applies (and can do so if the Court requests), the use of a filter team to litigate a crime-fraud motion instead of a trial team has been criticized by at least one judge in this District, *see Levin*, 2015 WL 5838579, at *2, and thus the Government therefore believes it is more prudent to have the Trial Team make this motion in the first instance.

Complaint ¶ 11; the private placement memoranda and agreements, *see, e.g.,* Complaint ¶¶ 32(a), 46(a)-(d), 55(c)-(d) (describing the private placement agreements); and the annuity agreements. Given that these documents were necessary to issue the bonds in the first instance, communications with an attorney concerning the creation, editing, or transmission of those documents are "in furtherance" of a fraud related to those bonds.

Second, the crime-fraud exception applies documents and communications between the defendants and attorneys regarding the purchase of the WLCC bonds by Archer, Cooney, clients of Hughes and Atlantic, and attempts by the Hughes and Atlantic client to liquidate those bonds. Once again, the need to secure purchasers for the bonds was a necessary part of the scheme. (*See, e.g.*, Complaint ¶ 39(e) (discussing July 16, 2014 email correspondence among Jason Galanis, Archer, and Cooney regarding acquisition of Hughes, and Jason Galanis's "belie[f]" Hughes "will take $28 million of the Wakpamni/Ogala [sic] Sioux issue"); ¶ 56(b) (discussing email correspondence just prior to Fourth Bond Issuance between Jason Galanis and Morton, in which Jason Galanis asked Morton to "maintain [her] word" because "[b]ased on commitments from you and [Atlantic], we caused the tribe and the tribal council to make various commitments")).

Third, the crime-fraud exception should applies to documents and communications regarding the misappropriation of bond proceeds.   Notably, the defendants' misappropriation included both sending bond proceeds to law firms, *see, e.g.*, Complaint ¶¶ 43(f)-(g), 47(f), 51, and using a particular law firm ("the Florida Law Firm") as a pass-through for the recycling of bond proceeds.   As reflected in the Complaint, just days before the Second Bond Issuance, the Florida Law Firm acting as registered agent for Rosemont (an entity controlled by defendant

15

Archer) filed with the Florida Secretary of State an application for authorization for Rosemont to transact business in Florida.   (Complaint ¶ 17).   The following day, Jason Galanis transferred $15,000,000—proceeds of the First Bond Issuance—to the Florida Law Firm, which then transferred the money to Archer, so it could be used to purchase the Second Bond Issuance. (Complaint ¶ 47(b)-(d)).   Similarly, the defendants used the Florida Law Firm as an intermediary in the transfer of $5,000,000, representing proceeds from the First Bond Issuance, from Jason Galanis to defendant Cooney, which Cooney used to purchase the Third Bond Issuance.   (*See* Complaint ¶ 51).   Later, in May 2015, the Florida Law Firm, while purporting to represent Burnham Financial Group, helped facilitate the transfer of the $5,000,000 worth of bonds Cooney bought in the third issuance to Bonwick Capital, to enable Bonwick to meet net capital requirements.   (*See* Complaint ¶ 49(d)).

Finally, the crime-fraud exception applies to communications and documents relating to defendants' establishment of and/or efforts to gain control of the legal entities discussed above and entities referenced in paragraphs 11 through 22 of the Complaint.   The defendants either established or gained control of multiple entities in the months leading up to the Bond Issuances. (*See, e.g.*, Complaint ¶ 14 (describing incorporation of WAPCC on August 22, 2014, days before the First Bond Issuance); ¶ 17 (describing establishment of Rosemont Seneca Bohai in February 2014 and its application to do business in Florida in September 2014, just days before the Second Bond Issuance); ¶ 18 (describing establish of Sovereign Nations Development Corp in August 2014, days before First Bond Issuance); ¶ 19 (describing establishment of BFG-SR in August 2014, just weeks before First Bond Issuance); ¶ 21 (describing Morton's acquisition of Hughes just weeks before First Bond Issuance); ¶ 22 (describing Morton's acquisition of Atlantic just

16

weeks before Fourth Bond Issuance); ¶ 34(b) (describing Archer's false statements to the BIT Board, in connection, with efforts to acquire Burnham).   Given this timing, to the extent the defendants were involved in communications with attorneys regarding these acquisitions or efforts to gain control, there is probable cause to believe that these communications were in furtherance of the fraud.

In summary, the Government has established probable cause that the crime-fraud exception applies to the categories of documents and communications set for the above and respectfully requests that the Court order any such documents and communications released by the Filter Team to the Trial Team

In the alternative, if the Court deems it necessary to its determination of the application of the crime-fraud exception, the Court should conduct an *in camera* review of any communications that the Filter Team identifies as falling into the above four categories.   The Government need not establish probable case to obtain such an *in camera* review; instead, the Government must show only "a factual basis to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies," to such communications and documents, making such a review appropriate.   *Zolin*, 491 U.S. at 572 (internal quotation and citation omitted).   This standard is not "a stringent one." *Id.*.   The Government respectfully submits that the facts outlined herein certainly establish a good-faith belief that *in camera* review may reveal evidence that crime-fraud exception applies to the four categories of potential evidence discussed above.

**II.**











**III.**   **The Court Should Set a Deadline for Defense Rule 16 Disclosures**

Finally, the Court should set a deadline of March 30, 2018, one month before trial, for defense disclosures of any Rule 16(b) materials not previously produced by the Government.[9]

The Government has requested in writing reciprocal discovery from the defendants pursuant to Rule 16(b) on several occasions.   To date, the Government has received exactly one item of reciprocal discovery from one of the defendants.

Rule 16(b) imposes reciprocal discovery obligations on the defense.   Rule 16(b) requires the defense disclose, among other things, (i) "documents" and "tangible objects" that "the defendant intends to use" in his "case-in-chief at trial," Rule 16(b)(1)(A); (ii) reports of examinations and tests, Rule 16(b)(1)(B); and (iii) expert disclosures, Rule 16(b)(1)(C).

The term "case-in-chief" in Rule 16(b) applies not only to exhibits offered in any defense case, but also to "all non-impeachment exhibits [the defendants] intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by the defendant."   *United States* v. *Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (noting "this interpretation of Rule 16 has been adopted by almost every district court to consider the issue" (collecting cases)).

Timely defense Rule 16(b) disclosures (as with timely Government disclosures) reduce the possibility of time-consuming disputes during trial over the admissibility of evidence.   *Cf., e.g.*, Minute Entry, *United States* v. *Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. Dec. 12, 2017)

---

[9] The parties have agreed that the defense will provide any actual exhibits the defense intends to use in its case-in-chief (i.e., excluding impeachment material) one week prior to trial.   The parties have also agreed that the Government will disclose its exhibits 45 days before trial, subject to reasonable, good-faith supplementation.

(reflecting mid-trial evidentiary hearing regarding authenticity and admissibility of late-produced defense exhibit in case involving the same law firm as counsel for defendant Archer).

Accordingly, the Court should set a deadline of March 30, 2018, one month before trial, for defense disclosures of any Rule 16(b) materials.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court (i) rule that certain e-mail evidence is subject to the crime-fraud exception to the attorney-client privilege, or, in the alternative, that the Court conduct an *in camera* review of that evidence, to determine whether the crime-fraud exception applies; (ii) ███████████████████ ███████████████████; and (iii) set a deadline for defense Rule 16(b) disclosures.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    _/s/ Brendan F. Quigley_____
Rebecca Mermelstein / Brendan F. Quigley /
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360 / 2190/ 2442

Dated: January 16, 2018
       New York, New York