**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

JASON GALANIS,
GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
HUGH DUNKERLEY,
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

Defendants.

No. 16 Cr. 371 (RA)

**DEVON ARCHER'S CORRECTED[†] MEMORANDUM OF LAW IN SUPPORT OF HIS MOTIONS TO DISMISS THE SECURITIES FRAUD COUNT, FOR A BILL OF PARTICULARS, FOR RULE 16 DISCOVERY, FOR DISCLOSURE OF *BRADY* MATERIAL, AND FOR OTHER RELIEF**

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

[†]     This corrected memorandum of law fixes certain citation forms, typos, and other non-substantive errors.  It is otherwise materially identical to the originally-filed version.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND ............................................................................................... 3

A.     The Indictment ........................................................................................................... 3

B.     Discovery Thus Far .................................................................................................. 6

ARGUMENT ......................................................................................................................... 8

I.     The Substantive Securities Fraud Count Should Be Dismissed As Against Mr. Archer .................................................................................................................... 8

II.     The Government Should Be Required To Provide A Bill Of Particulars ........................ 13

     A.     Applicable Law ................................................................................................ 13

     B.     A Bill Of Particulars Is Necessary For Mr. Archer To Understand The Charges Against Him And To Prepare A Defense ................................................. 15

          1.     Unindicted Co-Conspirators ..................................................................... 16

          2.     Other Specific But Unnamed Individuals, Entities, And Accounts Referenced In The Indictment ................................................................. 19

          3.     Purchases and Sales of Securities ............................................................ 21

          4.     Primary Liability Versus Aiding And Abetting .......................................... 23

          5.     Instances Of Alleged Wrongdoing ........................................................... 24

     C.     The Voluminous Discovery In This Case Makes A Bill Of Particulars More, Not Less, Critical ................................................................................. 31

III.     The Government Should Be Compelled To Produce Certain Rule 16 Information Undisputedly In Its Possession And Control ....................................................... 34

     A.     Evidence from the Gerova Case. ..................................................................... 34

     B.     Wiretap Applications and Recordings. ............................................................. 35

     C.     Court Orders, Warrants, and Subpoenas. ........................................................ 36

IV.     The Government Should Be Required To Provide *Brady* and *Giglio* Material No Later Than 60 Days Before Trial ....................................................................... 38

i

A.    *Brady* Material From The Gerova Case, Or Other Prior Frauds By Jason Galanis And His Co-Conspirators ........................................................................ 41

B.    *Brady* Material Regarding Jason Galanis's Attempts To Cooperate With The Government, Including The Consensual Wiretaps ......................................... 43

C.    *Brady* Material Buried In The Voluminous Discovery Produced Thus Far ......... 44

V.    The Government Should Be Required To Immediately Determine Whether It Intends To Invoke The Crime-Fraud Doctrine ................................................................. 45

VI.   The Government Should Be Required To File A Rule 12.4 Notice Immediately ............ 46

VII.  Mr. Archer Joins In Any Applicable Motions Made By His Co-Defendants................... 47

CONCLUSION ........................................................................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*,
    373 U.S. 83 (1963) ............................................................................................... 39

*Chemical Bank v. Arthur Anderson & Co.*,
    726 F.2d 930 (2d Cir. 1984) ............................................................................... 11

*DiSimone v. Phillips*,
    461 F.3d 181 (2d Cir. 2006) ............................................................................... 39

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ........................................................................................... 36

*In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*,
    767 F.2d 26 (2d Cir. 1985) ................................................................................ 37

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ........................................................................................... 42

*Leka v. Portuondo*,
    257 F.3d 89 (2d Cir. 2001) ................................................................................ 39

*SEC v. Archer, et al.*,
    No. 16 Civ. 3505 (WHP) ..................................................................................... 3

*United States v. Acosta*,
    357 F. Supp. 2d 1228 (D. Nev. 2005) ............................................................... 45

*United States v. Ajemian*,
    No. 11 Cr. 1091 (VM), 2012 WL 6762011 (S.D.N.Y. Dec. 27, 2012) ................ 18

*United States v. Alfonso*,
    143 F.3d 772 (2d Cir. 1998) ................................................................................. 9

*United States v. Barnes*,
    158 F.3d 662 (2d Cir. 1998) ............................................................................... 14

*United States v. Barrett*,
    153 F. Supp. 3d 552 (E.D.N.Y. 2015) ............................................................... 18

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) ........................................................... 26, 32

*United States v. Bonventre*,
    No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013) .................. 29

*United States v. Bortnovsky,*
   820 F.2d 572 (2d Cir. 1987)..................................................................................... passim

*United States v. Carroll,*
   510 F.2d 507 (2d Cir. 1975)........................................................................................... 25

*United States v. Chacko,*
   169 F.3d 140 (2d Cir. 1999)........................................................................................... 12

*United States v. Connolly,*
   No. S1 16-CR-00370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017) .......................... 33

*United States v. Contorinis,*
   No. 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739 (S.D.N.Y. May 5, 2010) ................. 30

*United States v. Coppa,*
   267 F.3d 132 (2d Cir. 2001)........................................................................................... 39

*United States v. Crisona,*
   271 F. Supp. 150 (S.D.N.Y. 1967).................................................................................. 29

*United States v. Davidoff,*
   845 F.2d 1151 (2d Cir. 1988)................................................................................... passim

*United States v. Failla,*
   No. CR-93-00294 (CPS), 1993 WL 547419 (E.D.N.Y. Dec. 21, 1993) ............................... 16

*United States v.* Farrah,
   11 Fed. Appx. 34 (2d Cir. 2001) .................................................................................... 12

*United States v. Fassoulis,*
   49 F.R.D. 43 (S.D.N.Y. 1969) ....................................................................................... 29

*United States v. Feola,*
   651 F. Supp. 1068 (S.D.N.Y. 1987)................................................................................ 19

*United States v. Finnerty,*
   533 F.3d 143 (2d Cir. 2008)........................................................................................... 11

*United States v. Gil,*
   297 F.3d 93 (2d Cir. 2002)............................................................................... 40, 42, 44

*United States v. Graham,*
   477 F. App'x 818 (2d Cir. 2012) .................................................................................... 14

*United States v. Hsia,*
   24 F. Supp. 2d 14 (D.D.C. 1998) .................................................................................. 24

*United States v. Jason Galanis, et al.*,
  15 Cr. 643 (PKC) ..................................................................................... 35, 41

*United States v. Kahale*,
  789 F. Supp. 2d 359 (E.D.N.Y. 2009) ........................................................ 14, 18

*United States v. Landham*,
  251 F.3d 1072 (6th Cir. 2001) .......................................................................... 8

*United States v. Lino*,
  No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ................... passim

*United States v. Mahaffy*,
  446 F. Supp. 2d 115 (E.D.N.Y. 2006) .............................................................. 32

*United States v. Mahaffy*,
  693 F.3d 113 (2d Cir. 2012) ............................................................................ 40

*United States v. McElroy*,
  697 F.2d 459 (2d Cir. 1982) ............................................................................ 34

*United States v. McGuinness*,
  764 F. Supp. 888 (S.D.N.Y. 1991) .................................................................. 28

*United States v. Minkowitz*,
  104 F.3d 350 (2d Cir. 1996) ............................................................................ 44

*United States v. Nachamie*,
  91 F. Supp. 2d 565 (S.D.N.Y. 2000) .............................................................. passim

*United States v. Nekritin*,
  No. 10-CR-491 S-1 KAM, 2011 WL 1674799 (E.D.N.Y. May 3, 2011) ............ 21

*United States v. Oluigbo*,
  375 F. App'x 61 (2d Cir. 2010) ....................................................................... 16

*United States v. Oruche*,
  No. 07 Cr. 0124 (WHP), 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008) ......... 16, 17, 26

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) ................................................................................ 9

*United States v. Polizzi*,
  257 F.R.D. 33 (E.D.N.Y. 2009) ....................................................................... 12

*United States v. Rajaratnam*,
  No. 09 CR. 1184 (RJH), 2010 WL 2788168,  (S.D.N.Y. July 13, 2010) ........... 14, 26, 30, 33

v

*United States v. Reale,*
    No. 96-CR-1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) ................................. 27

*United States v. Reed,*
    639 F.2d 896 (2d Cir. 1981) .............................................................................. 12

*United States v. Rittweger,*
    524 F.3d 171 (2d Cir. 2008) .............................................................................. 39

*United States v. Rivas,*
    377 F.3d 195 (2d Cir. 2004) .............................................................. 39, 41, 42

*United States v. Rodriguez,*
    496 F.3d 221 (2d Cir. 2007) .............................................................................. 39

*United States v. Savin,*
    No. 00-CR-45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ....................... 27, 30, 33

*United States v. Scully,*
    108 F. Supp. 3d 59 (E.D.N.Y. 2015) .............................................................. 29

*United States v. Siddiqi,*
    No. 06 CR. 377 SWK, 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ............................ 28, 29

*United States v. Silver,*
    117 F. Supp. 3d 461 (S.D.N.Y. 2015) .............................................................. 26

*United States v. Solomonyan,*
    451 F. Supp. 2d 626 (S.D.N.Y. 2006) .............................................................. 14

*United States v. Stein,*
    488 F. Supp. 2d 350 (S.D.N.Y. 2007) ........................................................ 34, 36

*United States v. Stewart,*
    305 F. Supp. 2d 368 (S.D.N.Y. 2004) .............................................................. 10

*United States v. Thomas,*
    981 F. Supp. 2d 229 (S.D.N.Y. 2013) .............................................................. 44

*United States v. Trie,*
    21 F. Supp. 2d 7 (D.D.C. 1998) ................................................................ 24, 28

*United States v. Turkish,*
    458 F. Supp. 874 (S.D.N.Y.1978) .............................................................. 32

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017) .............................................................................. 37

*United States v. Walsh,*
    194 F.3d 37 (2d Cir. 1999)..................................................................... 8

*United States v. Wozniak,*
    126 F.3d 105 (2d Cir.1997)................................................................... 23

*United States v. Zandstra,*
    No. 00 CR 209 RWS, 2000 WL 1368050 (S.D.N.Y. Sept. 20, 2000)................... 29

*Will v. United States,*
    389 U.S. 90 (1967)............................................................................. 13

## Statutes

15 U.S.C. § 78ff ...................................................................................... 10

15 U.S.C. § 78j....................................................................................... 10, 11

18 U.S.C. § 2 ......................................................................................... 23

## Other Authorities

Code of Judicial Conduct,
    Canon 3C(1)(c)(1972) ........................................................................ 47

United States Attorney's Manual § 9-5.001 ..................................................... 42

United States Attorneys' Manual § 9-11.120 .................................................... 37

## Rules

Fed. R. Crim. P. 12 ................................................................................. 9

Fed. R. Crim. P. 12.4 .............................................................................. 46, 47

Fed. R. Crim. P. 16 ............................................................................ 31, 32, 34, 35

Fed. R. Crim. P. 7 ................................................................................ 8, 9, 13

Fed. R. Evid. 404(b)............................................................................... 38, 44

Fed. R. Evid. 803(7)............................................................................... 38

## PRELIMINARY STATEMENT

The Indictment in this case alleges a pair of complex conspiracies involving numerous individuals, entities, accounts, and victims.  The subject matter includes bond underwriting practices, investment advice, fiduciary duties and conflicts of interest, annuities, bond placement, brokerage services, insurance, and other financial services.  And the evidence thus far consists of millions upon millions of pages of documents, audio recordings, forensic data, and other things – with more coming.

By any account, however, fairly little of this has to do with Devon Archer.  Mr. Archer is charged in only one of the two conspiracies alleged, and his alleged role in that single conspiracy is narrower and far less clearly defined than others'.  In fact, most of the limited allegations against him entail no words or deeds on his part whatsoever.  He is alleged to be "affiliated with the Placement Agent," and entities in which he had an "ownership interest" are alleged to figure into the alleged scheme through the misdeeds of others.  Other than to be kept "apprised" of progress by Jason Galanis – the undisputed prime mover of the alleged fraud – Mr. Archer is not alleged to have had any role in the operations of the investment advisers, underwriter, or annuity provider involved in this case.  Indeed, the primary allegation against Mr. Archer seems to be that he bought certain bonds – bonds that the government claims are worthless, and the other purchasers of which the government calls victims.

Because Mr. Archer is not alleged to have committed any fraud in the connection with the purchase or sale of a security, the substantive securities fraud charge against him must be dismissed.  Mr. Archer also requires a bill of particulars setting forth the precise nature of the allegations against him.  The government has thus far refused to provide particulars that are routinely given in cases like this, such as the identities of unindicted co-conspirators or of specific individuals and entities named (but not identified) in the Indictment.  Absent such

information, Mr. Archer cannot know or understand the nature of the charges against him and is unable to adequately prepare for trial.  The millions of pages of documents produced by the government in discovery make the problem worse, not better, because there is no indication of what in that mass of documents is relevant to Mr. Archer, or indeed is relevant to the case at all.

The evidence thus far defies simple (or automated) review, and makes the need for particulars essential.  In addition, the government has failed to produce other critical evidence unquestionably in its custody and control, having unilaterally declared it irrelevant.  But as set forth below, this evidence – about Jason Galanis's criminal history with certain of Mr. Archer's co-defendants, and their pattern of lying to others in furtherance of their crimes, among other things – is both relevant and exculpatory.  The government should be required to produce it, and also to complete its *Brady* review at least 60 days in advance of trial.

The particulars and disclosures Mr. Archer requests are essential to enable him to prepare his defense and to ensure that his fundamental right to full and fair disclosure – and, ultimately, a fair trial – is honored. At the same time, the government has the requested information in its possession and has no legitimate interest in obtaining any tactical advantage over Mr. Archer through surprise.  Mr. Archer therefore respectfully requests that the Court dismiss the securities fraud charge and order the government to provide the particulars and other disclosures described below.

## RELEVANT BACKGROUND

**A.    The Indictment[1]**

The Indictment in this case alleges at least two fundamentally separate schemes.  In the first, Jason Galanis, Gary Hirst, and Michelle Morton took over two investment advisers (collectively, "Atlantic Asset Management," "AAM," or the "Investment Advisers").  Ind. ¶¶ 5, 12, 13.  Jason Galanis and his father John Galanis then "induced the WLCC [*i.e.*, Wakpamni Lake Community Corporation], through false and misleading representations and omissions, to issue a total of approximately $60 million of bonds."  *Id.* ¶ 6.

Although the bonds were allegedly supposed to be sold through a placement agent at which Hugh Dunkerley was employed, *see id.* ¶ 9, more than $43 million of the bonds were instead allegedly moved into customer accounts of AAM by Jason Galanis, Morton, and Hirst, *see id.* ¶ 13.  In doing so, the Indictment alleges, Morton and Hirst purchased the bonds in AAM client accounts without the knowledge of those clients and in violation of the "investment parameters of many of the clients."  *Id.* ¶ 14.  In addition, Morton and Hirst allegedly failed to disclose numerous conflicts to their AAM clients, including that Dunkerley, Hirst, and Jason Galanis were each involved in numerous entities that had different and allegedly inconsistent obligations with respect to the bonds.  *Id.* ¶ 15(a)-(c).

In the second scheme, the proceeds of the WLCC bonds were allegedly misappropriated, principally by Jason Galanis, Hugh Dunkerley, and Gary Hirst.  The Indictment alleges that rather than invest the bond proceeds as promised, the money was instead routed to an account controlled by Hirst and Dunkerley, where it was misappropriated.  *Id.* ¶ 7.  According to the

---

[1]    In this memorandum, references and citations to the "Indictment" are to the first superseding indictment, returned on or about November 2, 2016 [ECF No. 90].  References and citations to the "SEC Complaint" are to the Amended Complaint and Jury Demand filed by the U.S. Securities and Exchange Commission on November 14, 2016, in *SEC v. Archer, et al.*, No. 16 Civ. 3505 (WHP) [ECF No. 88].

Indictment, more than $43 million of the bond proceeds were transferred to accounts controlled by Jason and John Galanis, and Jason Galanis then transferred some of that money on, "often through layers of intermediaries," to pay his own expenses (including his legal fees in connection with defending himself against allegations of a prior fraud) and advance his own business interests, as well as to accounts associated with Hirst, John Galanis, Bevan Cooney, and Mr. Archer. *Id.* ¶ 17.

Thus, according to the Indictment itself, Mr. Archer was merely a downstream recipient of some of the allegedly misappropriated money, which was transferred to him via "layers of intermediaries," in the second scheme. *Id.* He is not alleged to have had any involvement in the first scheme at all, and is not charged in Counts Three or Four of the Indictment, which allege conspiracy to commit investment adviser fraud and substantive investment adviser fraud. *See id.* ¶¶ 31-36. Indeed, there is no allegation that Mr. Archer had *anything at all* to do with the fraud at AAM. He is not alleged to have had any contact with the WLCC, or to have been aware of any representations allegedly made to the WLCC by Jason or John Galanis, or by anyone else. Mr. Archer is also not alleged to have had any contact with AAM's clients, or to have been aware of any representations allegedly made to those customers by Hirst, Morton, Jason Galanis, or by anyone else. And Mr. Archer is not alleged to have been aware of the existence of any alleged conflicts at AAM, let alone the fact that they were undisclosed to AAM's clients.

Rather, the Indictment's allegations against Mr. Archer are of an entirely different character, because he had absolutely no operational involvement with either the alleged fraud or the underlying businesses, even according to the Indictment's allegations. The Indictment's factual allegations against Mr. Archer are limited to the following:

- Jason Galanis "apprised" Mr. Archer, along with Bevan Cooney, "of the status of the Bond Issuances and the likely proceeds to be obtained therefrom." *Id.* ¶ 6; *see also id.* ¶ 11 (containing examples of communications from Jason Galanis).

4

- Messrs. Archer and Cooney "had an ownership interest" in the placement agent. *Id.* ¶ 9.

- Jason Galanis arranged for an entity that Messrs. Archer and Cooney, among others, "controlled" to provide financing for Morton's acquisition of AAM. According to the Indictment, Messrs. Archer and Cooney "were well aware of JASON GALANIS's efforts to locate and gain control of the Investment Advisers, and that client funds were to be used for the purchase of the Bond Issuances." *Id.* ¶ 12.

- As noted above, the Indictment alleges that Mr. Archer, among others, received, "through layers of intermediaries," funds that had allegedly been misappropriated by Jason Galanis and others. *Id.* ¶ 17; *see also id.* ¶ 19 (alleging that Jason Galanis e-mailed Messrs. Archer and Cooney about the potential acquisition of another business).

The single instance of active conduct alleged on the part of Mr. Archer was that he allegedly purchased some of the WLCC bonds using funds transferred to him by Jason Galanis. *Id.* ¶ 21.[2] The Indictment alleges that the funds that Jason Galanis transferred to Mr. Archer, and which he in turn used to purchase the bonds, had been misappropriated from earlier WLCC bond issuances. *Id.* The Indictment *does not allege*, however, that Mr. Archer had any knowledge of the source of the funds that he allegedly used to purchase the bonds. To the contrary, the Indictment alleges that Jason Galanis directed interest payments to be made on the bonds – including those bond issuances that had allegedly been purchased in whole by Mr. Archer – presumably to lull the bondholders (including Mr. Archer) into believing that the bonds were being handled appropriately. *Id.* ¶ 25.

---

[2]    The Indictment also alleges that Mr. Archer made two false representations, one to "affiliates of the Placement Agent" and one to a "brokerage firm." Ind. ¶¶ 10, 21(a). As set forth below, *see* Section I, pp. 10–11, neither of these alleged misstatements had any apparent relationship to the scheme charged in the Indictment.

**B.      Discovery Thus Far**

Since June 2016, the government has made approximately 20 separate document productions, most recently on or about January 10, 2018.  The government has thus far produced more than 4.3 million documents from at least 70 custodians, comprising well over 5.1 million pages – or a total of more than 1,500 gigabytes of data, including massive amounts of raw forensic and native data that defy automated review.  *See* Declaration of Matthew L. Schwartz ("Decl.") ¶ 47.  This discovery has not only been mammoth in volume, but it has also been particularly challenging to review.  Among other things:

- The government identified the custodians for the underlying documents, but nothing else – and sometimes not even that.  *See id.* ¶ 47.

- The government produced in excess of 3 million documents gathered by the Securities and Exchange Commission and explained that the documents were produced to the SEC "by multiple custodians," but virtually all of the documents lacked custodian metadata.  *See id.*[3]

- The government produced entire native and forensic images of certain drives and devices, without any information about what evidence on those drives or devices might be relevant, including an 850 GB drive containing forensic images of multiple other devices with no other identifying information and which cannot be loaded into a traditional document review platform.  *See id.*

- The government produced numerous files that were not text-searchable.  *See id.*

- The government produced "documents" that were in fact each hundreds or thousands of documents, meaning that they had to be reviewed page-by-page.  For example, one "document" is actually a 4,565 page scanned pdf of records from Fulton Meyer, consisting of a mix of e-mails, financials statements, and other records.  *See id.*

- The government stripped metadata out of certain documents.  For example, the government produced to Mr. Archer certain e-mails that it obtained pursuant to search warrant, without certain critical metadata fields such as DATE_ACCESSED and TIME_ACCESSED.  When Mr. Archer produced these *exact same* documents to the

---

[3]      The government states that the custodian can be determined from the Bates stamp provided by the originally-producing party (separate from the Bates stamp provided by the government in its reproduction of these files).  However, the second Bates stamp does not reliably appear in the metadata, and text recognition often fails with respect to these documents. Additionally, not all of the Bates prefixes clearly identify the custodian.

government two years ago, however, he did so with the relevant metadata, meaning that the government must have removed it.  *See id.*[4]

- And the government continues to produce new documents, most recently just last week.  *See id.* ¶ 42.[5]

Simply put, the productions to date are unwieldy in size and form, and make it difficult to prepare for trial, especially because the government has provided no information regarding which documents relate to the charges against Mr. Archer.

In addition, the government has identified a subset of materials it received in response to the warrant that it maintains may be subject to the "crime fraud" exception, but has expressly decided not to seek a ruling on that issue yet.  *See id.* ¶ 59, Exs. 26 & 33.  As a result, Mr. Archer is in a position where he does not know what evidence the government believes falls within the scope of Rule 16.

---

[4]     Mr. Archer has also had to spend an inordinate time working through discovery issues with the government.  For example, Mr. Archer's counsel informed the government months ago that metadata was missing from the government's productions.  Mr. Archer had to make multiple requests, and receive several metadata overlays and follow up on them, to get to the point where only a handful of fields – which Mr. Archer knows are associated with the original documents – are still missing.  Where metadata was unavailable or corrupted, counsel worked in tandem with a vendor – at significant expense to Mr. Archer – in an attempt to isolate files of interest and then manually identify associated native image files.  Certain load files were corrupted in their entirety and had to be replaced.  *See* Decl. ¶ 48.  These time and resources should have been spent on reviewing the evidence and trial preparation, rather than on making sure Mr. Archer had the evidence itself.

        To be clear, Mr. Archer is not accusing the government of going out of its way to make discovery more difficult for the defendants, and the prosecutors in this case have generally been helpful in working through technical issues.  For example, Mr. Archer does not doubt that the government (or perhaps the SEC) added its own Bates stamps to the material gathered by the SEC for legitimate housekeeping reasons, and did not intend in doing so to obscure the original Bates stamps or to remove the associated metadata.  But intentional or inadvertent, the way that discovery has been produced in this case, in addition to the sheer volume of discovery, has made review particularly burdensome.

[5]     In addition, the government continues to possess a significant number of documents, recovered as a result of its post-Indictment e-mail search warrant, that it has not yet produced.

## ARGUMENT

### I.     The Substantive Securities Fraud Count Should Be Dismissed As Against Mr. Archer

Count Two of the Indictment, which charges all seven defendants with substantive securities fraud, should be dismissed as against Mr. Archer because it fails to allege facts that support a cognizable legal theory under which Mr. Archer could be said to have committed, or willfully aided others in committing, securities fraud.  In particular, the Indictment fails to allege any misleading statement or omission made by Mr. Archer in connection with the purchase or sale of securities, and it fails to identify any allegedly manipulative device or artifice to defraud employed *by Mr. Archer*.  The Indictment therefore fails to set forth allegations that demonstrate the elements of securities fraud could be proven against Mr. Archer, and that charge must be dismissed as to him.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  This requirement performs three constitutionally mandated functions:  "It fulfills the Sixth Amendment right 'to be informed of the nature and cause of the accusation;' it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury."  *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

"[I]t is axiomatic that, to be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime."  *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001).  The two main criteria for testing the sufficiency of an indictment are: (1) whether it "contains the

elements of the offense charged and fairly informs a defendant of the charge against which he must defend"; and (2) whether it "enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). Where an indictment's factual allegations fail to establish the offenses charged, those offenses must be dismissed. *See* Fed. R. Crim. P. 7(c)(1) & 12(b)(3)(B)(v); *see also, e.g.*, *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000).

Here, Count Two of the Indictment charges all seven defendants with substantive securities fraud. The "to wit" language provides as follows and in full:

> the defendants engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC and also caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed.

Ind. ¶ 30.

With respect to Mr. Archer, these allegations fail to state a criminal offense. The Indictment does not allege that Mr. Archer took any steps to misappropriate bond proceeds; at best it alleges that he was a passive recipient of some of those proceeds. It also does not allege that he had any knowledge of the fact that there was no secondary market for the bonds, or that there were "multiple conflicts of interest," or that investment into the bonds was "outside the investment parameters" of certain AAM clients. Indeed, the Indictment does not allege that Mr. Archer had any interaction with AAM or its clients at all (other than a passive ownership interest), or that he was aware of any representations made to them – let alone that he made those misrepresentations himself, or somehow aided and abetted them.

The fact that Count Two purports to incorporate the allegations from Count One, *see* Ind. ¶ 29, does nothing to help.  Although the Indictment alleges certain acts taken by Mr. Archer, none of them can fairly be said to be part of the substantive securities fraud alleged in Count Two, and in fact many of the allegations related to Mr. Archer are entirely innocent.  The Indictment contains precisely three – and only three – allegations that Mr. Archer took any action at all.  Everything else – allegations about being kept "apprised" of lawful developments concerning the acquisition of a business, or being "well aware" that the bonds might be lawfully sold to certain investors – cannot suffice to save a securities fraud charge that fails to apprise Mr. Archer of his alleged *actus reus*.[6]

The three allegations of affirmative conduct on Mr. Archer's part, meanwhile, cannot constitute a substantive securities fraud as a matter of law, and certainly are not part of the fraud alleged in Count Two.

- First, the Indictment alleges that Mr. Archer "falsely represented to affiliates of the Placement Agent that, among other things, JASON GALANIS would not be involved with any entities affiliated with the Placement Agent or source deals to the Placement Agent, despite ARCHER's knowledge of JASON GALANIS's role in procuring the Bond Issuances."  Ind. ¶ 10.  This alleged misrepresentation to *affiliates* of the Placement Agent does not constitute a statement or omission in connection with "the purchase or sale of any security," 15 U.S.C. § 78**Error! Bookmark not defined.**j(b)—the securities here being the bonds issued by the WLCC, *see* Ind. ¶ 4, and acquired by the clients of the Investment Advisers, *see id.* ¶ 5.  The Placement Agent allegedly contracted with the WLCC to solicit investors for the bonds.  *See id.* ¶ 9.  The alleged misrepresentation by Mr. Archer was "to affiliates of the Placement Agent," who were neither the issuer nor purchaser of the bonds, nor the entity responsible for locating investors in the bonds.  Moreover, as the Indictment alleges, "[n]one of the eventual purchasers of the WLCC bonds, however, were solicited by the Placement Agent."  *Id.*  Thus, even if Mr. Archer had made some alleged misrepresentation to the Placement

---

[6]      Count Two must also be dismissed because its allegations of willfulness are deficient.  In order to state a claim of securities fraud, the Indictment must allege that Mr. Archer acted willfully and with intent to defraud, not that he was simply "kept apprised" or "well aware" of actions taken by others.  *See, e.g., United States v. Stewart*, 305 F. Supp. 2d 368, 378 (S.D.N.Y. 2004) (defendant's knowledge of a statement's falsity was insufficient to establish willfulness under 15 U.S.C. § 78ff).

Agent itself, it would not have been "in connection with the purchase or sale of any security."

- Second, the Indictment alleges that Mr. Archer personally acquired the entirety of the second bond issuance. *See* Ind. ¶¶ 21(a), 23. This is the sole "purchase or sale of any security" in which Mr. Archer was allegedly personally involved, 15 U.S.C. § 78j(b), but there is nothing allegedly fraudulent about it. Rather, according to the Indictment, Mr. Archer purchased the entirety of the "Second Bond Issuance" for fair market value. *See* Ind. ¶ 21(a). Thus, the bonds that Mr. Archer allegedly purchased were not foisted upon AAM investors, who were in no way victimized by Mr. Archer's alleged conduct, and allegations of undisclosed conflicts of interest and ignored investment parameters simply have nothing to do with this transaction. Likewise, because Mr. Archer allegedly paid in full for the bonds, the bond issuers were not injured *by Mr. Archer*. *See Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) (Friendly, *J.*) (if purchaser gets "exactly what they expected," there is no securities fraud).

- Third and finally, the Indictment alleges that after purchasing the bonds, Mr. Archer "falsely represented" to a brokerage firm at which he was attempting to custody the bonds that the funds he had used to purchase the bonds "came from real estate sales." Ind. ¶ 21(a). But this allegation is neither here nor there. This alleged statement, made a month after the alleged transaction and to a third party unaffiliated with the bond issuances, was not made "in connection with the purchase or sale" of the WLCC bonds; the sale had already been consummated. Even assuming Mr. Archer's representation was false, the misrepresentation was to the third party who was simply acting as a custodian for the bonds, and so cannot constitute a stand-alone act of securities fraud, nor did it aid and abet others' conduct or advance the charged scheme in any intelligible way.

These are the *only* allegations of affirmative action on the part of Mr. Archer, and none can constitute securities fraud as a matter of law.

"The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate." *Chemical Bank*, 726 F.2d at 943. In order to allege substantive securities fraud, therefore, an Indictment must allege that the defendant committed some deceptive act – "some act that gives the victim a false impression" – in connection with the purchase or sale of securities. *United States v. Finnerty*, 533 F.3d 143, 148-49 (2d Cir. 2008).

Mr. Archer, however, is not alleged to have had any interactions with any alleged victim, and he is not alleged to have been aware of, let alone aided or abetted, any misrepresentations by others to any alleged victim.  He therefore cannot be liable for substantive securities fraud.  *See id.* ("The government has identified no way in which Finnerty communicated anything to his customers, let alone anything false.").

Because the only alleged misrepresentations, or indeed affirmative acts, alleged to have been made by Mr. Archer were purportedly to parties other than those participating in the securities transactions at issue, Mr. Archer cannot be liable for the charged substantive securities fraud violation.  *See, e.g.*, *United States v. Farrah*, 11 Fed. Appx. 34, 27 (2d Cir. 2001) (table) ("Because the objects and methods of deceit for each were different," defendant's fraud upon bankruptcy trustee and general creditors was "not part of the 'same course of conduct'" as charged wire fraud).  At best, the Indictment's allegations support a charge of conspiracy, *i.e.*, Count One.  But to sustain a charge of substantive securities fraud on the part of Mr. Archer, the government needs to do more than simply allege the agreement required for conspiracy.[7]  In order to support a substantive securities fraud count, Mr. Archer needs to have undertaken – or at least willfully aided and abetted – some specific fraudulent act or omission "in connection with

---

[7]      In the absence of any allegation that Mr. Archer made a material misstatement or omission, or otherwise took some affirmative fraudulent act "in connection with the purchase or sale of any security," the Indictment's substantive and conspiracy charges are also multiplicitous, and must be dismissed on that ground.  *See United States v. Polizzi*, 257 F.R.D. 33, 34 (E.D.N.Y. 2009) ("A multiplicitous indictment creates an exaggerated impression of a defendant's criminal activity by 'charging an offense multiple times, in separate counts, when, in law and in fact, only one crime has been committed.'" (quoting *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999)); *see generally United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981) ("The vice in multiplicity of charges is that it may lead to multiple sentences for the same offense and may improperly prejudice a jury by suggesting that a defendant has committed not one by several crimes.").

the purchase or sale of any security."  Because the Indictment is bereft of any such allegation *as to Mr. Archer*, Count Two must be dismissed against him.

## II.   <u>The Government Should Be Required To Provide A Bill Of Particulars</u>

As discussed immediately above, the Indictment provides no guidance as to how Mr. Archer could be liable for substantive securities fraud, and his alleged role in any conspiracy is amorphous, at best.  Especially in the event that the Court declines to dismiss Count Two of the Indictment, it is essential that the government provide a bill of particulars so that Mr. Archer can understand the crimes with which he is charged.  The government must also provide a bill of particulars identifying his alleged co-conspirators, as well as the various individuals and entities identified in the Indictment.[8]

### A.   Applicable Law

The Sixth Amendment to the United States Constitution requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation" against him. U.S. Const. Amend. VI. To help effectuate that right, a district court has broad discretion to order the government to provide a bill of particulars. *See Will v. United States*, 389 U.S. 90, 98–99 (1967); *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988); Fed. R. Crim. P. 7(f).

A bill of particulars is intended to allow a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a

---

[8]    Mr. Archer, along with Bevan Cooney, has moved to sever his trial. In the event the Court grants that motion, Mr. Archer respectfully requests that the government be directed to specify in the bill of particulars what portions of the Indictment it intends to prove at the severed trial. *See United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *9 (S.D.N.Y. Jan. 2, 2001) ("This request has merit because of the multi-faceted and wide-ranging nature of the RICO violation alleged in the indictment as well as the vast amount of discovery material produced to defense counsel.").

second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).  Although a bill of particulars does not serve as a discovery device, the government must disclose information necessary for a defendant to prepare a defense, even if doing so reveals the government's evidence or theories of the case.  *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) ("it is of no consequence that the requested information would have required the disclosure of evidence or the theory of the prosecution.").

A bill of particulars is particularly necessary in complex conspiracy cases.  *See Davidoff*, 845 F.2d at 1154–55 (reversing judgment and remanding for new trial based on district court's denial of bill of particulars where indictment alleged conspiracy spanning seven years and involving various offenses, and noting: "With the wide latitude accorded the prosecution to frame a [conspiracy charge] comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." ); *see also United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000); *Barnes*, 158 F.3d at 665–66.  In a conspiracy case, "the potential for unfair surprise and the difficulty of preparing a defense are amplified."  *United States v. Rajaratnam*, No. 09 CR. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010).

Fraud charges likewise make the need for particulars especially acute.  *See United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *7–8 (S.D.N.Y. Jan. 2, 2001) ("Courts consistently order the filing of particulars directed to the details of misrepresentations or fraudulent acts." (citing cases)); *United States v. Kahale*, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009) (holding "[c]ertain charges, such as [] fraud charges, carry a greater potential for causing unfair surprise at trial due to their complexity"), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012). *Cf. United States v. Solomonyan*, 451 F. Supp. 2d 626, 642 (S.D.N.Y. 2006) (finding that bill of particulars was not warranted where defendants "do not have the need,

14

as compared, say, to defendants in an intricate fraud conspiracy, to identify unnamed co-conspirators in order to piece together the nature of the charges against them").

> **B.      A Bill Of Particulars Is Necessary For Mr. Archer To Understand The Charges Against Him And To Prepare A Defense**

The Indictment in this case alleges two separate conspiracies, but is extraordinarily sparse in describing Mr. Archer's alleged role.  As set forth above, the Indictment fails to allege any false statement or omission by Mr. Archer in connection with the purchase or sale of securities, and aside from generalized allegations that he was kept "apprised" of or was "well aware of" developments, silent as to his knowledge.  These vague, open-ended allegations are insufficient to put Mr. Archer on notice of the government's case against him, or to allow him to prepare for trial.  *See Bortnovsky*, 820 F.2d at 574–75 (reversing for failure to provide bill of particulars where government did not identify which insurance claims were falsified); *see also Davidoff*, 845 F.2d at 1154–55 (government should have identified victims of extortionate schemes).  Mr. Archer therefore asks for a bill of particulars designed to help him understand how the government alleges he fits into the broader crimes alleged in the Indictment.

Specifically, the government should be required to provide a bill of particulars containing the following information:

1. With respect to each of the conspiracies charged in the Indictment, the identities of all unindicted co-conspirators and the time period during which each of them is alleged to have taken part in the conspiracy.

2. The names of the other specific but unidentified individuals, entities, and accounts referenced in the Indictment.

3. The "purchases or sales of securities" that the government contends comprise the securities fraud charged in Count Two.

4. With respect to the securities fraud charged in Count Two, whether the government contends that Mr. Archer is liable for a primary violation, or as an aider and abettor.

    5. Any instance of Mr. Archer's alleged conduct in furtherance of the offenses charged in the Indictment.

This sort of information is routinely provided in complex fraud cases, and the government should be required to provide it to Mr. Archer here.

### 1. Unindicted Co-Conspirators

The government should be required to identify any unindicted co-conspirators with respect to each of the conspiracies charged in the Indictment. *See* Ind. ¶¶ 4–5, 26–27, 30, 32–33. It is simply impossible for Mr. Archer to defend himself against allegations that he was part of an undefined conspiracy, and it will be necessary for the Court and the parties to understand the alleged participants in each conspiracy in order to properly address various evidentiary issues, such as the admissibility of co-conspirator statements.

"The request for the names of unindicted co-conspirators is a fairly common request and one that is generally granted by the district courts." *United States v. Failla*, No. CR-93-00294 (CPS), 1993 WL 547419, at *7 (E.D.N.Y. Dec. 21, 1993); *see also Lino*, 2001 WL 8356, at *13. In determining whether providing the identities of unnamed co-conspirators would "permit a defendant to prepare for trial, and to prevent surprise," "courts consider the following factors: (1) the number of co-conspirators, (2) the duration and breadth of the alleged conspiracy, (3) whether the Government otherwise has provided adequate notice of the particulars, (4) the volume of pretrial disclosure, (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct, and (6) the potential harm to the Government's investigation." *United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694, at *3 (S.D.N.Y. Mar. 5, 2008), *aff'd sub nom. United States v. Oluigbo*, 375 F. App'x 61 (2d Cir. 2010).

16

Here, these factors squarely favor disclosure.  This case involves at least eight alleged co-conspirators,[9] numerous legal entities, at least four bond issuances, and a span of several years.  The government has provided no particulars thus far apart from the allegations of the Indictment – allegations that are, with respect to Mr. Archer, sparse.  And although the government has produced an incredible amount of discovery, the volume of discovery and the way it has been produced makes the need for particulars more acute, not less.  Meanwhile, this case does not involve any allegations of violence or threats, and no one would be endangered by the identification of alleged unindicted co-conspirators, nor would any investigation by the government be compromised.[10]  Thus, all of the relevant factors favor disclosure.

The Indictment in this case is replete with references to unnamed "others":  "other" conspirators, "other" recipients of the allegedly misappropriated money, and "others" who aided in core operational aspects of the alleged fraud, among other things.  *See, e.g.*, Ind. ¶¶ 4, 5, 11, 17, 26, 27, 30, 32, 33; *see also id.* ¶¶ 6 (referencing unnamed "co-conspirators"), 10 (unnamed "conspirators").  Mr. Archer simply cannot understand the nature of the crime he is charged with absent information about the identity of these "others."

This case fits comfortably within the bounds of other cases where the government was ordered to provide particulars regarding unnamed co-conspirators, let alone the numerous fraud cases in which the government voluntarily produces particulars about unnamed conspirators without having to be compelled to do so.  In *Oruche*, the conspiracies spanned a number of

---

[9]      In addition to the seven defendants charged criminally, the Securities and Exchange Commission has sued one additional defendant in its parallel case.

[10]     To Mr. Archer's knowledge, and notwithstanding the government's continued and inappropriate use of grand jury subpoenas, there is no ongoing criminal investigation that could be prejudiced by revealing the identities of unindicted co-conspirators.  To the extent the government maintains otherwise, Mr. Archer has no objection to receiving this aspect of the government's bill of particulars subject to the confidentiality order in place in this case.  [ECF No. 227].

years, the government produced thousands (not millions) of documents and audio files, and the moving defendant was involved in only a subset of the alleged criminal activity.  In order to narrow the moving defendant's review of the evidence and to facilitate his preparation for trial, the court ordered the government "to provide a bill of particulars thirty days before trial identifying any known unindicted co-conspirator with respect to each paragraph of the Indictment in which the word 'others' appears."  2008 WL 612694, at *4.

In *Nachamie*, the court similarly granted a request to identify unindicted co-conspirators in a Medicare fraud case where the government produced "more than 200,000 pages" and "there are a large number of co-conspirators (eight defendants and an unknown number of unindicted co-conspirators) and the alleged conspiracy has operated for a significant period of time (more than three years)."  91 F. Supp. 2d at 573.  *See also United States v. Ajemian*, No. 11 Cr. 1091 (VM), 2012 WL 6762011, at *2 (S.D.N.Y. Dec. 27, 2012) (ordering the government to show cause why it should not provide particulars "[g]iven the large number of named co-conspirators (and unspecified number of unnamed co-conspirators), the extended duration of the alleged conspiracy, the volume of pre-trial disclosures, the apparent lack of potential harm to co-conspirators," and a lack of harm to the government's investigation); *United States v. Barrett*, 153 F. Supp. 3d 552, 572–73 (E.D.N.Y. 2015) (ordering government to provide bill of particulars naming unindicted co-conspirators where volume of pre-trial discovery was "quite large" and "the equivalent of at least tens of thousands of pages of documents," and where the indictment repeatedly stated defendant operated his alleged scheme "together with others" and it was unclear whether "others" referred to the same or different sets of co-conspirators); *Kahale*, 789 F. Supp. 2d at 373 (granting request for particulars where, despite the small production of documents, there were four named conspirators and a potentially large number of unnamed co-

conspirators and the defendant "must be able to ascertain which primary actors [he is] accused of having conspired with").

### 2. Other Specific But Unnamed Individuals, Entities, And Accounts Referenced In The Indictment

The Indictment also uses generic terms to identify a variety of individuals, entities, and accounts, the true identity of which are unknown to Mr. Archer. This includes both specific defined terms such as the "Annuity Provider" or the "Investment Manager," as well as other specific but unnamed individuals, entities, and accounts such as "the "entity controlled by GARY HIRST and HUGH DUNKERLEY," "affiliates of the Placement Agent," and the like. In a particularly unenlightening allegation, the Indictment even alleges a transfer from "an intermediary to an entity." The government should be required to identify all of these things in a bill of particulars.[11]

Disclosure of the names of unidentified individuals and entities, including the identities of the alleged victims of the offenses charged in the Indictment, is necessary for Mr. Archer to prepare his defense, and is commonly ordered in these circumstances. *See Lino*, 2001 WL 8356, at *7–8 (ordering the government to "to identify each of the publicly traded companies over which the enterprise obtained 'secret control' of large blocks of free trading securities."); *United States v. Feola*, 651 F. Supp. 1068, 1134 (S.D.N.Y. 1987) (requiring multiple categories of particulars in a complex conspiracy, including "the names, to the extent known, of any persons

---

[11]    In particular, the government should be required to identify with specificity at least the following individuals, entities, and accounts identified in the Indictment: (a) the "Morton Corporation," Ind. ¶ 2, (b) "certain of the clients of the Investment Advisers," *id.* ¶ 5, (c) the "Annuity Provider," *id.*, (d) the "Dunkerley Account," *id.*, (e) the "Investment Manager," *id.* ¶ 8, (f) the "Placement Agent," *id.* ¶ 9, (g) the "affiliates of the Placement Agent," *id.* ¶ 10, (h) the "entity" that Jason Galanis arranged to provide financing for Michelle Morton's purchase of the Investment Advisers, *id.* ¶ 12, (i) the "entity that invested in both Investment Advisers," *id.* ¶ 15(a)(ii), (j) the "Jason Galanis Account," *id.* ¶ 17, (k) the "entity controlled by GARY HIRST and HUGH DUNKERLEY," *id.* ¶ 20, (*l*) the "intermediary," and the "entity controlled by" Mr. Archer, *id.* ¶ 21(a), and (m) the "brokerage firm," *id.*

present when the overt and substantive acts allegedly took place" and "the names of or names used by the persons with whom Defendant Dratch met on September 9, 1985, to the extent known"), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

The Indictment relies on broad and generic descriptions; there are a significant number of potential people and entities who may fall within its umbrella. But in each case, the generic terms in the Indictment are stand-ins for specific individuals, entities, and the like.  For example, the "Morton Corporation" is a particular entity, the "Dunkerley Account" is a particular bank account, and the "clients of the Investment Advisers" refer to particular people or entities.  The government of course knows the identity of each of these things, and by necessity must have presented that evidence to the Grand Jury.  There is no legally cognizable reason for the government to withhold this information from Mr. Archer, and without it his trial defense will be virtually impossible.  Without particulars, Mr. Archer will have to be prepared to confront everyone and anything that could conceivably be referenced in the Indictment – an obviously impossible task, and one which also underscores the Double Jeopardy issues that would be implicated absent particulars.

To be clear, the need for the government to identify the entities and individuals referenced in the Indictment includes the identities of any alleged victims.[12]  The "identity of victims of offenses that the prosecution intends to prove" is "a straightforward identification in a bill of particulars."  *Davidoff*, 845 F.2d at 1155.  For example, in *Davidoff*, the Second Circuit held that the trial judge exceeded his discretion by denying a bill of particulars identifying "at

---

[12]     In addition to a bill of particulars, the government was long ago obliged to identify any alleged organizational victims of the alleged offenses, under Rule 12.4.  As set forth below, the government failed to make the required notice and continued to do so when specifically requested by Mr. Archer's counsel.  The government's failure to identify organizational victims is significant not only for notice purposes, but also to ensure that the Court and counsel are conflict-free.

least the victims of discrete [] schemes that the prosecution intended to prove," ultimately

reversing the defendant's conviction. *Id*. at 1154. Here, however, the government has merely

referred generically to certain "Hughes clients" or "Atlantic clients."[13] This provides no

guidance to Mr. Archer, who had no connection with Hughes, Atlantic, or their clients.

### 3.     Purchases and Sales of Securities

The Indictment alleges fraud "in connection with the purchase and sale of securities."

Ind. ¶ 30; *see also id.* ¶ 27 (conspiracy to commit fraud "in connection with the purchase and

sale of securities). To be sure, the Indictment seems to allege that the only relevant securities

were "the bonds," but it fails to identify which of the several bond transactions identified in the

Indictment were allegedly fraudulent.

Absent particulars describing what transactions are alleged to be the subject of the

substantive fraud charge against him, Mr. Archer will have to spend substantial resources

preparing a defense against every possible transaction that plausibly relates to either any kind of

WLCC bond or any conceivable downstream transaction resulting in an alleged misappropriation

of the proceeds. This deprives Mr. Archer of the ability to focus on the actual transactions that

the government will allege form the basis of the securities fraud charge. *See United States v.*

*Nekritin*, No. 10-CR-491 S-1 KAM, 2011 WL 1674799, at *8 (E.D.N.Y. May 3, 2011) ("The

Second Circuit has ruled that a bill of particulars is necessary when the government alleges that a

few unspecified transactions, part of a larger pool, are fraudulent, because defendants 'were

forced to explain the events surrounding [legitimate transactions] and to confront numerous

---

[13]     This assumes that the investment adviser clients are the victims of the offenses alleged
against Mr. Archer. The government may well respond that those clients are the victims of the
investment adviser counts only, in which Mr. Archer is not charged. That would only heighten
the need for severance, however, as the introduction of victim testimony unrelated to Mr. Archer
would be deeply prejudicial and require extensive and impossible-to-follow limiting instructions.

documents unrelated to the charges pending' against them" (citing *Bortnovsky*, 820 F.2d at 574–75)).

The Indictment alleges that all of the defendants committed fraud "in connection with the purchase and sale of securities" when they allegedly "engaged in a scheme to misappropriate the proceeds of several bond issuances by the WLCC and also caused investor funds to be used to purchase the bonds, for which there was no secondary market through which such bonds could be redeemed, without disclosure to those investors of material facts, including the existence of multiple conflicts of interest, and which investments, in some cases, were outside the investment parameters of the accounts in which they were placed." Ind. ¶ 30. This "to wit" language suggests either or both of two kinds of transactions form the basis for the securities fraud counts: (1) the original issuance of the bonds by the WLCC (assuming for the sake of argument a bond issuance constitutes a "purchase or sale" of securities), and (2) the sale of the bonds to certain customers of the Investment Advisers. The problem, though, is that Mr. Archer is not alleged to have had anything to do with either of those things,[14] and so if those are the securities transactions encompassed by the Indictment, the securities fraud charges against Mr. Archer necessarily fail.

Mr. Archer's concern, however, is that absent a bill of particulars the government may attempt to rely on other transactions to confuse this essential element of the crime. For example, the Indictment alleges that Mr. Archer himself purchased certain of the WLCC bonds. That transaction, however, could not be a *substantive* securities fraud: the bonds allegedly purchased by Mr. Archer were never foisted upon the clients of the investment advisers or otherwise injured

---

[14]     Viewed in the light most favorable to the government, the Indictment alleges that Mr. Archer was generally aware of this scheme. But simple and passive knowledge cannot, by itself, support a substantive securities fraud charge. *See generally* Sand, et al., Modern Federal Jury Instructions (2008), Instr. 57–20 (listing elements of securities fraud).

them in any way, nor did it injure the WLCC since even according to the Indictment Mr. Archer paid fair value for the bonds. Ind. ¶ 21(a).[15]  Thus, while this transaction could serve as part of the government's broader allegations of conspiracy, *see id.* ¶ 28(e) (identifying Mr. Archer's alleged purchase of bonds as the sole overt act involving him), it does not and could not represent a stand-alone substantive securities fraud.

Without particulars, therefore, there is a substantial likelihood that the government will attempt to convict Mr. Archer on a theory not fairly embraced by the Indictment.[16]

### 4.    Primary Liability Versus Aiding And Abetting

For similar reasons, the government should be required to particularize whether it intends to argue that Mr. Archer committed a primary violation of the securities fraud statute, or whether it will argue that he was an aider and abettor. *See* Ind. ¶ 30 (charging that all seven of the defendants "willfully and knowingly, directly and indirectly," committed securities fraud, but also citing to 18 U.S.C. § 2, the aiding and abetting statute).  Given Mr. Archer's total remove from any interactions with victims, any alleged misstatements "in connection with" securities transactions, and any of the accounts through which funds were allegedly misappropriated, it is simply impossible to prepare for trial without understanding the government's theory of liability.

---

[15]    Likewise, the Indictment alleges that Mr. Archer made a misrepresentation to a brokerage firm about the source of funds used to purchase the bonds. Ind. ¶ 21(a).  As the Indictment acknowledges, this alleged misstatement was not "in connection with the purchase or sale" of the bonds.  Rather, according to the Indictment, Mr. Archer had already purchased them and was merely custodying them at the unnamed brokerage firm. *Id.*

[16]    There is also a substantial risk that the government will attempt to confuse the issue by pointing to transactions in entirely different securities.  For example, as set forth in Mr. Archer's simultaneously-filed severance motion, the government may attempt to introduce evidence related to an IPO of a technology company called Code Rebel that Jason Galanis and certain co-defendants (but not Mr. Archer) allegedly manipulated.  The Indictment makes no mention, directly or indirectly, of Code Rebel and it would be profoundly unfair for the government to attempt to point to Code Rebel transactions as satisfying the elements of securities fraud. *See generally United States v. Wozniak*, 126 F.3d 105 (2d Cir.1997) (vacating conviction based on an impermissible constructive amendment of the indictment).

The contrast between the Indictment's broad allegations against all of the defendants, on the one hand, and the very limited allegations against Mr. Archer, on the other, leaves him vulnerable to surprise at trial, should the government raise new theories of fraudulent conduct against him.  For example, the government alleges that all of the defendants "*caused* investor funds to be used to purchase the bonds." Ind. ¶ 30 (emphasis added).  Mr. Archer can only defend against a securities fraud charge based on this allegation if he is on notice of how he allegedly "caused" others to act—particularly individuals with whom he never interacted.  *See United States v. Hsia*, 24 F. Supp. 2d 14, 32 (D.D.C. 1998) ("[T]he government still has not provided a coherent explanation of how Ms. Hsia 'caused' those false statements to be made. Accordingly, the Court will order a bill of particulars disclosing how Ms. Hsia is alleged to have caused each of the false statements to be made."); *see also United States v. Trie*, 21 F. Supp. 2d 7, 21–22 (D.D.C. 1998) (government must provide details of how defendant "caused [false statements] to be made" (emphasis added)).

## 5.    Instances Of Alleged Wrongdoing

Finally, the government should be required to particularize the discrete acts of wrongdoing alleged against Mr. Archer, including particulars about how he allegedly acquired knowledge of the scheme perpetrated by others.

The Indictment describes a conspiracy among seven named co-conspirators and an unknown number of "others" that unfolded over two years across numerous entities, relating to four separate bond offerings and perhaps other transactions as well.  The Indictment alleges one overt act by Mr. Archer, *see* Ind. ¶ 28(e), but of course that does not limit the government's proof at trial.  To properly prepare for trial and to understand the charges against him, Mr. Archer must be informed of what other acts, if any, the government will allege he took in furtherance of the conspiracy charged in Count One.  Otherwise, Mr. Archer must review an unwieldy amount of

information in order to prepare against any act that conceivably falls within the broad contours of the conspiracy alleged in the Indictment.

To take just one example of the ridiculousness of this task, the Indictment alleges that, directly or indirectly, misappropriated funds were used by Mr. Archer to "among other things, support other business endeavors." Ind. ¶ 23. Mr. Archer has numerous "other business endeavors," and without particulars Mr. Archer will need to be prepared to defend against the insinuation that each and every one of them is tainted by the allegations in this case.

The government's allegations of Mr. Archer's knowledge and intent are similarly amorphous. For example, it alleges that Jason Galanis kept him "apprised" of the scheme, but the examples cited in the Indictment hardly make it clear how. *See, e.g.,* Ind. ¶ 11(b) (Jason Galanis writing "my primary objective is to get us a source of discretionary liquidity"). Indeed, the examples cited in the Indictment are entirely innocent; they simply amount to Galanis informing Mr. Archer that the bond issuances had been approved, and that Galanis was attempting to identify an investment adviser to be acquired. *Id.* ¶¶ 10-12.

If this is the sort of weak sauce that the government will rely upon to prove Mr. Archer's alleged knowledge of a sweeping scheme to misappropriate tens of millions of dollars, it should be required to provide particulars; otherwise, Mr. Archer will need to be prepared to defend against each and every communication he received *from* Jason Galanis.

While "there is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge," *United States v. Carroll*, 510 F.2d 507 (2d Cir. 1975), *cert. denied*, 426 U.S. 923 (1976), there are circumstances in which courts hold that the government should provide this information, and Mr. Archer respectfully submits that – with respect to him, and given the Indictment's sparse allegations specifically against him – this is such a case.

25

In *Oruche*, for example, the district court held that the "rationale for requiring disclosure of unindicted co-conspirators applies with equal force" to "particulars concerning all acts that the government alleges [the defendant] took in furtherance of the conspiracy and when, where, and under what circumstances all overt acts . . . took place." 2008 WL 612694, at *4. Particulars are appropriate where, as here and as it relates to Mr. Archer, the allegations of the Indictment "provide too little information to the [d]efendants and their counsel to permit them reasonably to focus their trial preparations, especially in light of the voluminous amount of material that has been produced in discovery to date." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008); *see also Rajaratnam*, 2010 WL 2788168, at *3 ("[C]ourts have sometimes ordered the government to provide more particulars about overt acts alleged in terms too general to enable the defendant to defend against them.").

In *Bin Laden*, 92 F. Supp. 2d at 237, the district court held that, even though the government had alleged 144 overt acts in the indictment, the government was still required to provide the particulars relating to all of the overt acts it intended to prove at trial. Because the government was not limited in its proof of overt acts at trial to those listed in the indictment, "[t]he [d]efendants and their counsel cannot . . . limit their trial preparations to the set of 144 overt acts set forth in the [i]ndictment." *Id.*; *see also id.* at 236 (particularity required because the Indictment described defendant's alleged conduct "in general terms that refer to so broad a class of activity that they would require an exceedingly extensive investigation by defense counsel"); *United States v. Silver*, 117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015) (ordering government to explain why a Bill of Particulars was not required where mail and wire fraud indictment, among other things, "includes language permitting the Government to rely on any mailing or wire transmission in furtherance of [the defendant's] wide-ranging crimes"); *Lino*, 2001 WL 8356, at

*9 (ordering government to identify portions of the indictment it intends to prove at trial so defendants can prioritize their review of the "vast amount of discovery material produced to defense counsel").

By withholding this information, or by arguing (as it surely will) that the information is included in the vast discovery provided to the defendants, the government impermissibly shifts the burden of proof to Mr. Archer.  *See United States v. Savin*, No. 00-CR-45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) *(*ordering bill of particulars where defendant would otherwise "be forced to comb through this veritable mountain of documents and to attempt to guess which of the numerous transactions documented therein, and conducted over a six-year period, are alleged by the government to have been improper"); *Nachamie*, 91 F. Supp. 2d at 576 ("The Government is required to identify each claim for which it intends to prove that Hernandez may be held criminally responsible."); *United States v. Reale*, No. 96-CR-1069 (DAB), 1997 WL 580778, at *13, *17 (S.D.N.Y. Sept. 17, 1997) (finding insufficient Indictment's failure to identify "the specific mailings or wire transfers that are alleged to constitute the offenses" and ordering Bill of Particulars to "identify[] the specific mailings and wire transfers and the approximate dates . . . on which they occurred").

Without particulars, Mr. Archer would have to spend his limited time and resources investigating each and every one of the agreements, transactions, and statements produced in discovery (and yet to be produced). This is both fundamentally unfair and deprives Mr. Archer of the ability to focus on the actual allegations of wrongdoing against him.

> Not only does the government's position presume that the defendant knows what the government alleges that he did and with whom he dealt and therefore has all the information he needs, a premise inconsistent with the presumption of innocence, but it smacks of gamesmanship. A defendant faced with false statements charges should not have to waste precious pre-trial preparation

27

> time guessing which statements he has to defend against or which
> contributors may be witnesses against him at trial when the
> government knows precisely the statements on which it intends to
> rely and can easily provide the information.

*Trie*, 21 F. Supp. 2d at 21.

Courts in the Second Circuit have repeatedly held that it is impermissible to force the

defendant to have to determine which transactions of many form the basis of the alleged

conspiracy, and to prepare to defend potentially legitimate transactions unrelated to the

conspiracy charge.  In *Nachamie*, 91 F. Supp. 2d at 576, the district court ordered the

government to identify and provide details regarding each and every one of the allegedly false

and misleading Medicare claims that were allegedly submitted and/or filed as part of the

conspiracy, and that the government intended to prove at trial. These particulars included details

such as who prepared the claim, who submitted the claim, the manner in which each entry on the

claim was false, and the proper statement or amount that the government contended would have

been more accurate. *Id.*; *see also Davidoff*, 845 F.2d at 1153–54 (error to deny bill of particulars

where indictment described allegedly extortionate conduct as "includ[ing] but . . . not limited to"

violations set forth in indictment); *Bortnovsky*, 820 F.2d at 573–75 (finding that the district court

abused its discretion by denying a motion for a bill of particulars identifying which insurance

claims were fraudulent, and thus putting defendant in the impermissible position of having to

defend all of the produced insurance claims as legitimate); *United States v. Siddiqi*, No. 06 CR.

377 SWK, 2007 WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007) (ordering bill of particulars

specifying the date and amount of alleged illegal cash bribes); *Lino*, 2001 WL 8356, at *4

(ordering government to provide particulars regarding whom defendant bribed, "the pension fund

with which the bribe recipient was affiliated, and the amount of the bribe"); *United States v.

McGuinness*, 764 F. Supp. 888, 892-93 (S.D.N.Y. 1991) (requiring bill of particulars listing the

28

payer and the approximate date and amount of payments allegedly made in violation of the Taft-Hartley Act).

For the same reasons, "a request to particularize allegations of false statements" is "routinely award[ed]." *Lino*, 2001 WL 8356, at *6. Courts in this Circuit and others apply the same reasoning for granting a bill of particulars identifying fraudulent transactions to identifying false statements and omissions. *Id.* "[W]here defendants have prepared multiple statements or documents, the Government should specify which of these are being called into question, lest defendants be forced to review all of the statements or documents in order to prepare a defense of the veracity of each." *Siddiqi*, 2007 WL 549420, at *3; *see also United States v. Scully*, 108 F. Supp. 3d 59, 126 (E.D.N.Y. 2015) (finding insufficient government's refusal to identify the specific false statements underlying each count and ordering Bill of Particulars); *United States v. Zandstra*, No. 00 CR 209 RWS, 2000 WL 1368050, at *6 (S.D.N.Y. Sept. 20, 2000) (ordering bill of particulars "identifying the approximate dates of the allegedly fraudulent mailings"); *United States v. Fassoulis*, 49 F.R.D. 43, 45 (S.D.N.Y. 1969) (ordering disclosure of "false statements alleged and a summary of the respects in which it is claimed that the statements were false"); *United States v. Crisona*, 271 F. Supp. 150, 157 (S.D.N.Y. 1967) (ordering disclosure of "the substance of any false representations"); *see also United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013) (in multi-defendant fraud case involving voluminous discovery, ordering the government in lieu of bill of particulars to provide an exhibit list that specified "which exhibits it will use against which of the Defendants. This additional disclosure is necessary so that the Defendants can prepare adequately for trial."), *aff'd*, 646 F. Appx. 73, 79 (2d Cir. 2016) (table).

The particulars requested by Mr. Archer are well within the mainstream of what courts in this Circuit order in complex fraud cases, and are necessary for him to prepare for trial. For

example, in *Rajaratnam*, an insider trading case, the government was directed to identify "the substance of the information provided" and "the date(s) on which it was conveyed" for the tips underlying multiple conspiracy counts. 2010 WL 2788168, at *4-9; *see also United States v. Contorinis*, No. 09 Cr. 1083 (RJS) [ECF No. 49], 2010 U.S. Dist. LEXIS 74739, at *1 (S.D.N.Y. May 5, 2010) (directing the government to "submit a bill of particulars with respect to the material, non-public information allegedly disclosed in connection with" a specified transaction).

The court in *Savin* ordered disclosure of similarly detailed information. There, the government alleged conspiracy and wire fraud, and its discovery left the defendant "to guess which of the numerous transactions documented therein . . . over a six-year period, are alleged by the government to have been improper." 2001 WL 243533, at *3. The court held that "the fact that the government has obligations under *Brady* does not mean that it may meet its obligation to provide adequate notice of the charges 'merely by providing mountains of documents.'" *Id*. (citing *Bortnovsky*, 820 F.2d at 575). The court in *Savin* required the government to provide a bill of particulars that included "each of the 'intercompany transfers' [at issue in the indictment], including the originating . . . corporation, the dates and amounts of such transfers, the account numbers to and from which such transfers were made, and [the defendant's] alleged role in such transfers, if any." *Id*. at *2.

Under the same reasoning as in this long line of cases, a bill of particulars is warranted to guard against violations of Mr. Archer's Sixth Amendment rights. He is currently unable to answer fundamental questions regarding the nature of the charges *against him* alleged in Counts One and Two of the indictment. This handicaps his trial preparation, deprives him of his right to be protected from unfair surprise, and renders him unable to interpose a plea of double jeopardy in any future prosecutions for the same conduct.

C.    **The Voluminous Discovery In This Case Makes A Bill Of Particulars More, Not Less, Critical**

Although in some cases pre-trial discovery may obviate the need for particulars, the volume of discovery produced by the government in this case, and the form and timing of its production, make a bill of particulars absolutely essential.

On January 4, 2018, the government denied Mr. Archer's request for any particulars. The government wrote, "the approximately 45-page complaint, the Indictment and superseding Indictment, and the discovery provided in this matter adequately advise your client as to the nature of the charges with which he is accused. Given that adequacy, a bill of particulars is not required in this matter." Decl. Ex. 29. That argument is just wrong.

The government's discovery and other disclosures to date do not provide the level of detail necessary for Mr. Archer to prepare for trial. As discussed above, the government's production of over 1,500 gigabytes of data, or at least 5.1 million pages of documents (plus numerous native documents, recordings, photographs, and other things) does little more than identify who the custodians are, and sometimes not even that.

The government's approach to discovery also severely undercuts its usefulness as a source of notice. For example, the government has produced to the defendants large volumes of information that are irrelevant and do not actually comprise Rule 16 material. *See* Fed. R. Crim. P. 16(a)(1)(E) (requiring discovery of evidence the government "intends to use in its case-in-chief at trial," or that would be "material to preparing the defense"). The government has produced entire forensic images of certain hard drives, laptops, and other devices, as well as entire e-mail in-boxes, rather than the particular documents that are assertedly relevant to this case. In doing do, the government has dumped a tremendous amount of material on the defendants that serves only to frustrate their trial preparation and confuse the issues in the case.

31

By producing these undifferentiated masses of evidence, the discovery actually obscures the

government's allegations rather than sharpens them.[17]

This sort of "open file" discovery accentuates the need for particulars, because it has the

effect of unfairly "burying the defendant in paper by merely generally making all of the

documents available to defendants." *United States v. Turkish,* 458 F. Supp. 874, 882

(S.D.N.Y.1978) (internal quotation marks and alterations omitted).[18]  As one court explained:

> Perhaps the most frequent case in which particulars are warranted
> is where discovery is overwhelmingly extensive and the
> government fails to designate which documents it intends to
> introduce and which documents are merely relevant to the defense.
> . . . The discernible principle, then, is that a large volume of
> discovery warrants a bill of particulars if it obfuscates the allegedly
> unlawful conduct and unfairly inhibits the defendant's preparation
> for trial.

*United States v. Mahaffy*, 446 F. Supp. 2d 115, 119–20 (E.D.N.Y. 2006) (emphasis omitted).  Put

more succinctly, "[s]ometimes the large volume of material disclosed is precisely what

necessitates a bill of particulars."  *Bin Laden*, 92 F. Supp. 2d at 234; *see also Bortnovsky*, 820

---

[17]      To provide a concrete example of the burden the government's approach to discovery has
placed on Mr. Archer, consider the government's production of the 850 GB hard drive
containing forensic images of storage devices and e-mail archives (one of many sources of "raw"
data produced by the government). In order to first access the data, Mr. Archer's document
vendor, at a cost of thousands of dollars, pre-processed the forensic data in order to retrieve the
underlying native files. Facing the prohibitively expensive cost of having the vendor further
process that raw data to be loaded to a document review platform, Mr. Archer's counsel instead
used a different software program to filter out system files and other meaningless, irrelevant
information. After whittling down the mass of information to roughly 85 GB of files containing
actual information, Mr. Archer's counsel attempted to identify *locations* of potentially relevant
information, using such indicators as folder paths. Only then was Mr. Archer's counsel able to
reduce the information to a size where an index could be made of the remaining data and a text
search run on the thousands of remaining files.  *See* Decl. ¶ 48.

[18]      The government's approach to discovery has not truly been "open file," however.
Although the government dumped massive amounts of irrelevant evidence on the defendants, it
continues to withhold specifically-identified evidence in its possession and control that would
undoubtedly be "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  *See* Section
III, below.

32

F.2d at 574–75 (government's production of "mountains of documents" meant that, without particulars, the defendants would be "forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending," effectively, but impermissibly, shifting the burden of proof); *United States v. Connolly*, No. S1 16-CR-00370 (CM), 2017 WL 2537808, at *5 (S.D.N.Y. May 24, 2017) ("given the nature and the volume of the underlying evidence in this case, I agree with defendants that the Government must provide them with a list of trades that will, or at least may, be presented to the jury."); *Rajaratnam*, 2010 WL 2788168, at *2 (granting defendant's request for bill of particulars in part because of the volume of discovery materials produced by the government and the complexity of the insider trading case); *Nachamie*, 91 F. Supp. 2d at 568 (granting particulars where "[t]he problem . . . is not a failure to produce, but a failure to designate.").

        That is undoubtedly the case here.  The volume of documents in this case far exceeds the volume in many other cases where particulars were granted. *See, e.g.*, *Davidoff*, 845 F.2d at 1154–55 (6,000 pages of wiretap applications and transcripts of wiretap intercepts); *Bortnovsky*, 820 F.2d at 574 (4,000 documents); *Savin*, 2001 WL 243533, at *3 (100,000 pages); *Nachamie*, 91 F. Supp. 2d at 571–72 (200,000 documents).  Here, the government has produced literally orders of magnitude more evidence than in those cases; it has done so in a particularly unwieldy and inaccessible form, including by stripping out metadata from electronic files; it has produced a great deal of entirely irrelevant documents; and it has continued to produce documents as recently as last week – the government's last production to Mr. Archer was on January 10, 2018, *see* Decl. ¶ 42, notwithstanding the government having pledged long ago that discovery was complete.  Simply put, the overwhelming amount of discovery, coupled with the government's approach to it, makes a bill of particulars more necessary, not less.

*        *        *

For the reasons set forth above, Mr. Archer respectfully requests that the Court order the government to provide a bill of particulars.

## III.    The Government Should Be Compelled To Produce Certain Rule 16 Information Undisputedly In Its Possession And Control

The government is in possession of a great deal of evidence that it refuses to produce to Mr. Archer, but which is plainly relevant to the preparation of his defense and may give rise to motion practice. *See* Fed. R. Crim. P. 16(a)(1)(E)(i); *United States v. Stein*, 488 F. Supp. 2d 350, 356–57 (S.D.N.Y. 2007) ("The materiality standard [of Rule 16] normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal. Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense." (internal quotation marks omitted)); *see also United States v. McElroy*, 697 F.2d 459, 465 (2d Cir. 1982) (vacating conviction where undisclosed Rule 16 material would have provided "clear notice of possible grounds for a suppression motion"). In addition, as explained in Section IV below, much of this evidence constitutes *Brady* material.

Among other things, the government has explicitly refused to provide the following categories of documents, which are unquestionably in its possession:[19]

### A.    Evidence from the Gerova Case.

As the Court is aware, three of the defendants in this case – but not Mr. Archer – were charged in a somewhat similar case in this District, *United States v. Jason Galanis, et al*., 15 Cr.

---

[19]    For record purposes, Mr. Archer also moves to compel the government to produce records in the SEC's actual or constructive possession, and to review those records for *Brady* material. Mr. Archer is mindful, however, that the Court has already denied Michelle Morton's identical motion [ECF No. 284], and so he incorporates by reference her arguments [ECF Nos. 267, 283], but does not repeat them here.

643 (PKC) (the "Gerova case").  The Gerova case was investigated and prosecuted by the same U.S. Attorney's Office and indeed some of the same specific individual prosecutors and FBI agents as this case, and it was still pending when this case was initiated.  *See* Decl. ¶ 49.

Evidence of the way in which Jason Galanis, John Galanis, and Gary Hirst perpetrated the Gerova fraud – including by taking over legal entities, compromising investment advisers, and lying to their alleged co-conspirators – is material and indeed exculpatory given Mr. Archer's core defense that he was lied to and used by Jason Galanis and his alleged criminal confederates.

### B.    Wiretap Applications and Recordings.

The U.S. Attorney's Office is also in possession of what they have described in open court as approximately a year of consensually wiretapped calls involving Jason Galanis, *see* Decl. ¶ 50, as well as (presumably) wiretap applications, line sheets, transcripts, Title III notices, and the like.  The government has refused to produce this material to Mr. Archer, and has also refused to say definitively whether Mr. Archer is captured on any wiretap, in which case discovery would also be mandatory under Rule 16(a)(1)(B)(i).  Instead, the government has represented that it is not aware of Mr. Archer being recorded on any wiretap, and has invited Mr. Archer to provide information to the government about every phone number he has ever used. *See* Decl. Ex. 31.

Putting aside the troubling Fifth Amendment consequences of the government's approach, it is wrong to put any burden on Mr. Archer.  The government has an absolute obligation to produce to Mr. Archer any "recorded statement" in its possession, if "the attorney for the government knows—or through due diligence could know—that the statement exists." Fed. R. Crim. P. 16(a)(1)(B)(i).  There is no doubt that the government could, through due

diligence, know whether Mr. Archer (or any of the other defendants) is captured on the wiretaps, but the government appears to have refused to conduct that diligence.

Even if the government could represent that Mr. Archer was definitively not on the wiretaps, they would still constitute Rule 16 material because they are "material to preparing the defense" in the same way that the Gerova materials are:  evidence that shows Jason Galanis lying to and/or bullying his alleged co-conspirators is directly relevant to Mr. Archer's core defense here.  *See Stein*, 488 F. Supp. 2d at 356–57 ("Evidence . . . is material if it could be used to counter the government's case or to bolster a defense." (internal quotation marks omitted)); *see also Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (holding exclusion of evidence relating to third-party guilt based on strength of prosecution case was "arbitrary" and denied the defendant "a meaningful opportunity to present a complete defense" (internal quotation marks omitted)).

### C.    Court Orders, Warrants, and Subpoenas.

Finally, the government has also refused – without authority – to produce to Mr. Archer the court orders, warrants, and subpoenas it obtained or issued *in the course of this investigation*. Aside from its post-Indictment Stored Communications Act warrant and a GPS tracking warrant issued immediately prior to the defendants' first appearance in this case, the discovery is bereft of any orders, warrants, or subpoenas issued or obtained by the government.  Yet this material is plainly relevant to preparing Mr. Archer's defense, in at least two ways, and the government has no legitimate interest in withholding it.

*First*, Mr. Archer is aware that the government has continued to issue Grand Jury subpoenas long after the Indictment in this case issued, seemingly for reasons that relate solely to trial preparation.  *See* Decl. ¶ 51.   The law is clear, however, that the government abuses Grand Jury process when it does just that.  *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2,*

*1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) ("The law is settled in this circuit and elsewhere that it is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial" (internal quotation marks and alteration omitted)); U.S. Attorneys' Manual § 9-11.120 (citing cases and explaining that the Grand Jury's power "is limited by its function toward possible return of an indictment" and that "the grand jury cannot be used solely to obtain additional evidence against a defendant who has already been indicted" nor "used solely for pre-trial discovery or trial preparation").  Discovery of the government's subpoena practice is therefore directly relevant to a potential defense motion to dismiss the Indictment or for other relief as a result of prosecutorial misconduct.  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d at 30 (quashing subpoena and noting that "it may be appropriate to enforce the rule against using a grand jury subpoena predominantly for trial preparation simply by barring use at trial of evidence obtained pursuant to the subpoena").

*Second*, seeing the orders, warrants, and subpoenas pursuant to which evidence was produced to the government are necessary to prepare for trial and determine whether Mr. Archer must issue his own Rule 17 subpoenas.  For example, when Mr. Archer receives discovery from the government that contains documents from a particular third party, absent the subpoena or other process pursuant to which it was obtained, it is impossible to understand whether the third party has produced all of its records concerning the events alleged in this case, or only a subset requested by the government.[20]  *Cf. United States v. Ulbricht*, 858 F.3d 71, 109–10 (2d Cir. 2017) (upholding denial of request to issue Rule 17 subpoenas where defendant failed to

---

[20]     Indeed, in the parallel civil case, the SEC invoked precisely this line of argument to demand that Mr. Archer produce not only every subpoena he issued, but also all communications between his counsel and the third party reflecting negotiations about the scope of the subpoena or subsequent production.  *See* Decl. ¶ 52.

articulate the required specificity of evidence sought).  In certain cases, Mr. Archer may wish to

argue that the absence of records is itself admissible, *see* Fed. R. Evid. 803(7), which he cannot

do without confirming that the third party production represents the entirety of its file.

Literally the only information contained in the orders, warrants, and subpoenas that the

government is withholding is (a) information about what evidence the government has collected,

or opted not to collect, in this investigation, (b) with respect to orders and other judicially-

authorized process, the content of the government's representations to the Court; and (c)

information about the extent to which the government is improperly using Grand Jury process to

prepare for trial in this case.  Because all of that information is relevant to the preparation of the

defense, the government should be compelled to produce it.

## IV.    The Government Should Be Required To Provide *Brady* and *Giglio* Material No Later Than 60 Days Before Trial

In this complex, multi-scheme, multi-defendant case, it is absolutely essential that the

government make its pretrial disclosures sufficiently in advance of trial in order to allow the

defense to adequately prepare.  The government has already agreed to a timetable for disclosure

of its expert and Rule 404(b) notices, an exhibit list and set of marked exhibits, and a witness list

and Jencks Act material.[21]  In addition, the government should be required to confirm to the

Court and the defendants that it has completed its *Brady* review and produced any *Brady* or

*Giglio* material at least 60 days before trial.

"*Brady* and its progeny require the Government to disclose material information that is

favorable to the accused, either because it is exculpatory, or because it is impeaching . . . in

---

[21]     Specifically, the parties have agreed that the government will provide expert and Rule 404(b) notice 60 days before trial; a copy of its exhibit list and a set of marked exhibits 6 weeks before trial; and a copy of its witness list and Jencks Act material 4 weeks before trial.  *See* Decl. Ex. 1.

sufficient time that the defendant will have a reasonable opportunity to act upon the information

efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 225–26 (2d Cir. 2007) (internal

quotation marks and citations omitted); *see also, e.g.*, *DiSimone v. Phillips*, 461 F.3d 181, 197

(2d Cir. 2006) ("The more a piece of evidence is valuable and rich with potential leads, the less

likely it will be that late disclosure provides the defense an opportunity for use." (internal

quotation marks omitted)).  Further, exculpatory evidence includes information that tends to

mitigate punishment as well as guilt.  *See Brady v. Maryland*, 373 U.S. 83, 89 (1963).  The fact

that evidence may have incriminating as well as exculpatory aspects does not preclude its

treatment as *Brady* material.  *See United States v. Rivas,* 377 F.3d 195, 199-200 (2d Cir. 2004);

*see also DiSimone v. Phillips,* 461 F.3d 181, 195 (2d Cir. 2006).  Nor is the exculpatory value of

information negated by the fact that the government has other evidence that contradicts the

exculpatory information. *See United States v. Rittweger,* 524 F.3d 171, 181 (2d Cir. 2008).

     The government has given no indication of when it intends to provide defense counsel

with *Brady* or *Giglio* material, and has recently committed to the Court that it will review an

additional body of evidence (transcripts, memoranda, and interview notes maintained by the

SEC, [ECF No. 278]; *see also* Decl. Ex. 32) for potential *Brady* material.  The disclosure of

*Brady* material must be made sufficiently early in the proceedings so that the defense has an

opportunity to make effective use of the information at trial.  *See United States v. Coppa*, 267

F.3d 132, 144 (2d Cir. 2001); *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001).

     The government indicated as early as June 8, 2016, that while it was then "unaware of

any *Brady* material regarding" Mr. Archer, the government "will provide timely disclosure if any

such material comes to light."  *See* Decl. Ex. 3 at 1. The government then seemed to indicate it

was aware of *Giglio* material when it wrote, "The Government will provide material under

[*Giglio*], and its progeny, in a timely manner prior to trial."  *Id.*

39

A year-and-a-half later and the government has still not made any *Brady* or *Giglio* disclosures.  In a letter dated January 4, 2018, the government stated it "has complied with [its] obligations" under *Brady* and other requirements, but the government has yet to identify any specific *Brady* material.  *See* Decl. Ex. 29, at 2.  While the government "recognizes that its obligation to comply with such disclosure requirements is an ongoing one," *id.*, its lengthy delay—years without any disclosures and still none on the eve of trial—is unreasonable both under case law and Rule 3.8(d) of the Model Rules of Professional Conduct.  *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 454, at 6 (2009), available at http://bit.ly/2B6MzVB ("In general, for the disclosure of information to be timely, it must be made early enough that the information can be used effectively. Because the defense can use favorable evidence and information most fully and effectively the sooner it is received, such evidence or information, once known to the prosecutor,  must be disclosed under Rule 3.8(d) as soon as reasonably practical.").

The government's approach to identifying *Brady* material in this case is also troubling, as it appears to be taking the position that it may unilaterally determine which of Mr. Archer's potential defenses are valid – which explains how, in a complex multi-defendant fraud cause, it has not produced a single page of *Brady* material.  But the law is clear that whether information is *Brady* turns in part on the defendant's theory of the case; *Brady* does not permit the prosecutor to make a determination as to the reliability, admissibility, or usefulness of evidence as a bar to disclosure.  *See, e.g., United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012).  Put differently, while certain kinds of evidence – for example, evidence of misidentification, or alibi, or of another credible suspect – are inherently exculpatory, other kinds of evidence become exculpatory depending on the defense theory.  *See Mahaffy*, 693 F.3d at 133(holding that certain suppressed transcript excerpts that "harmonize

40

with a defendant's theories are material and favorable to the defense" and vacating convictions under *Brady*); *Rivas*, 377 F.3d at 199 (vacating convictions and explaining: "In view of Rivas's defense that the narcotics belonged to Pulgar, the fact that Pulgar brought the narcotics on board might well have been viewed by the jury as a critical piece of evidence supporting the defense theory."). In this case, Mr. Archer has put the government on notice of specific defense theories, and specific evidence in its possession that is exculpatory under those theories.

## A.   *Brady* Material From The Gerova Case, Or Other Prior Frauds By Jason Galanis And His Co-Conspirators

Evidence of prior crimes committed by Mr. Archer's co-defendants – and in particular by Jason Galanis – is incredibly exculpatory in this case. Mr. Archer's core defense is that he was lied to and used by Jason Galanis. Galanis's history of deceit therefore directly tends to support Mr. Archer's defense, and is therefore *Brady* material. This request especially includes evidence of criminality concerning Jason Galanis, Gary Hirst, and John Galanis in the Gerova case (*United States v. Jason Galanis, et al.*, 15 Cr. 643 (PKC)), and evidence of criminality concerning any co-conspirators in any other criminal matter. The fact that three of the people at the center of the alleged fraud in this case – but not Mr. Archer – have an established history of conspiring with one another to commit securities fraud is directly probative of Mr. Archer's defense.

By letter to the government dated June 17, 2016, Mr. Archer requested all discovery in the Gerova matter. *See* Decl. Ex. 30. In subsequent correspondence with the government over a period of several months, Mr. Archer explained that Jason Galanis's admitted history of fraudulent activity was relevant to his defense theory that Galanis deceived and used Mr. Archer. Since that time, Galanis has pleaded guilty in this case, admitting to yet another fraud. His history of fraudulent conduct is a core defense, and Mr. Archer requests that the Court order the

government to produce the Gerova evidence, including all discovery materials, 3500 material, and trial exhibits from that case.

For its part, the government represented that it would produce "any part" of the discovery in the Gerova matter "that is *Brady* or *Giglio* material," but so far the government has not made such a production. *See* Decl. Ex. 31. The government later took the position that "Jason Galanis's 'history of fraudulent activity,'" as well as "evidence obtained through the consensual monitoring of Jason Galanis's phone" (discussing further below), were not subject to disclosure under Rule 16 or *Brady*. *Id.* The government reiterated this position in a letter dated January 4, 2018. *See* Decl. Ex. 29 at 2 ("we do not believe you are entitled to the materials you demand, and we do not intend to produce them.").

This is simply another example of the government substituting its views for the defense's. But the law is crystal clear that *Brady* encompasses evidence that has *any* exculpatory or impeachment value. *See Rivas*, 377 F.3d at 199–200 (fact that evidence may be viewed as both incriminatory and exculpatory does not disabuse it of its status as *Brady* material); *see also* U.S. Attorneys' Manual § 9-5.001(B)(1) ("prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence." (citing *Kyles v. Whitley*, 514 U.S. 419, 439 (1995)).

To be clear, Mr. Archer is not arguing that all of the gory details of the Gerova fraud are appropriately at issue in this case, and certainly not that they are all admissible. *See Gil*, 297 F.3d at 104 (evidence need not be admissible to constitute *Brady* material, so long as it "could lead to admissible evidence"). But that case involved the same core co-conspirators as here, and involved Jason Galanis's lies and manipulations of others to do his bidding, as here. Evidence of that deceit, at a minimum, is exculpatory and should be produced.

42

B.      *Brady* Material Regarding Jason Galanis's Attempts To Cooperate With The Government, Including The Consensual Wiretaps

In Mr. Archer's late 2016 dialogue with the government, we also explained that the government's year-long wiretap of Jason Galanis's phone was discoverable both under Rule 16, and because evidence from and concerning the wiretap was exculpatory to Mr. Archer.

Mr. Archer has been able to piece together the following, based upon stray statements that were made on the record during the course of the Gerova proceedings, and by the government in this case.  In sum, Mr. Archer understands that at some point before or during the Gerova investigation by the United States Attorney's Office in this District, Jason Galanis attempted to cooperate with a United States Attorney's Office in California.[22]  During the course of that attempted cooperation, Galanis proffered to the government on at least one occasion, and also agreed to a consensual wiretap of his phone for over a year.  *See* Decl. ¶ 50.  Mr. Archer believes that the government ultimately came to the conclusion that Jason Galanis's cooperation was insincere and that his proffers were false.  But the government's determination is beside the point; statements made by Jason Galanis may be directly relevant to Mr. Archer's defense here, such as, for example, if Galanis made statements about the way he interacted with his alleged co-conspirators or kept them in the dark about aspects of his plans.  Likewise, the wiretaps themselves are likely to contain exculpatory information, to the extent that they evidence Galanis's deceit towards his co-conspirators.  Indeed, Jason Galanis's successful deceit of the government – seemingly for over a year, since the government presumably submitted wiretap applications and reauthorizations that turned on Galanis's cooperation – is itself relevant, and tends to support Mr. Archer's defense.

---

[22]     It is not clear to Mr. Archer whether Jason Galanis was aware of the S.D.N.Y. investigation at the time of his attempted cooperation.

The simple fact is that Jason Galanis was and is an extraordinarily talented liar.  He lied

to the government, he lied to his victims, he lied to his business associates, he lied to his alleged

co-conspirators, and he certainly lied to Mr. Archer.  Prior example of Jason Galanis's modus

operandi are directly relevant to Mr. Archer's defense here.  *See generally* Fed. R. Evid.

404(b)(2); *United States v. Minkowitz*, 104 F.3d 350 (2d Cir. 1996) (upholding decision to admit

evidence of prior credit card fraud that could prove a modus operandi, motive and intent, and

knowledge and absence of mistake).

### C.   *Brady* Material Buried In The Voluminous Discovery Produced Thus Far

Finally, in addition to any *Brady*/*Giglio* material that has not been produced to date, to

the extent any such material exists within the voluminous discovery the government has already

produced, the government should also be directed to identify such materials.  The need for the

government to identify *Brady* material within the discovery is particularly acute in this case,

where it has produced so much evidence that is irrelevant and outside the scope of Rule 16, as

discussed above.  Otherwise, the defense will be forced to search for "an exculpatory needle in a

haystack of discovery materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y.

2013); *see also Gil*, 297 F.3d at 106 (vacating judgment for failure to identify two-page piece of

*Brady* material out of "reams" of disclosure).

*        *        *

The government has now spent years investigating this case.  While the government has

attempted to blame the defendants for delaying trial, it still waits until the last moment, if at all,

to provide the defendants with the guidance they need to prepare a defense.  A trial now,

following the government's production of millions of documents without a single *Brady*

disclosure, would deny the defendants a fair trial.  Requiring the government to review its file for

any *Brady*/*Giglio* material and to produce any such material at least 60 days before trial is the

bare minimum required to ensure a fair trial. *See, e.g.*, *United States v. Acosta*, 357 F. Supp. 2d 1228, 1248 (D. Nev. 2005) ("Given the complexity of this case, and the need for the orderly preparation for and conduct of the trial, the court will require the government to turn over evidence that tends to negate guilt or mitigate the offenses charged no later than 60 days before trial.").

## V.   The Government Should Be Required To Immediately Determine Whether It Intends To Invoke The Crime-Fraud Doctrine

By letters dated November 2 and December 28, 2017, the government notified Mr. Archer that it had preliminarily identified certain documents, recovered as a result of its post-Indictment Stored Communications Act warrant, that it believes *might* be subject to the so-called "crime-fraud exception" to the attorney-client privilege.[23]  The government advised Mr. Archer that he did not need to do anything with respect to that material, as the government had not yet determined whether to invoke that doctrine, and that if it did, it would apply to the Court for relief. *See* Decl. ¶ 58, Exs. 26 & 33.  Further, the government refused to provide information that Mr. Archer requires in order to assess any invocation of the "crime-fraud exception," which Mr. Archer requested so that he could be in a position to promptly respond if and when the government decides to do so.  *See* Decl. Ex. 34.

It is patently unfair to Mr. Archer for there to be uncertainty as to whether the government will seek to pierce the attorney-client privilege.  Not only will any reliance on the crime-fraud doctrine be hotly litigated, but Mr. Archer will have to make critical strategic determinations depending upon the result of any decision by the Court – including potentially

---

[23]   Mr. Archer has simultaneously moved to suppress any evidence recovered pursuant to the post-Indictment warrants.  An order suppressing that evidence might moot any issue related to the crime-fraud exception, although Mr. Archer is cognizant of the fact that the government has obtained documents directly from several attorneys in this case, so it is quite possible that the government may seek to invoke the doctrine regardless.

whether to waive the privilege.  Right now, Mr. Archer is in limbo as to which, if any, of his

privileged documents the government will attempt to put into evidence, let alone how the Court

will rule.  Further, Mr. Archer's co-defendants have never seen those documents at all, precisely

because they are privileged.  This is an issue that simply needs to be resolved substantially

before trial, and the Court should therefore set an immediate deadline for the government to

make any motion to invoke the crime-fraud doctrine, and require the government to provide the

information requested by Mr. Archer (*i.e.*, what crime the communication is allegedly in

furtherance of, along with the identities of any alleged co-conspirators) immediately.

## VI.    The Government Should Be Required To File A Rule 12.4 Notice <u>Immediately</u>

Finally, the government should be ordered to immediately file the notice required by Rule

12.4.  There is absolutely no excuse for its failure to have done so for the past year-and-a-half.

Federal Rule of Criminal Procedure 12.4 provides:

> If an organization is a victim of the alleged criminal activity, the government *must* file a statement identifying the victim. If the organizational victim is a corporation, the statement *must* also disclose the information required by Rule 12.4(a)(1) [relating to corporate ownership] to the extent it can be obtained through due diligence.

Fed. R. Crim. P. 12.4(a)(2) (emphasis supplied).  The government is required to file its Rule 12.4

notice "upon the defendant's initial appearance," and to "promptly file a supplemental

statement" as required.  Fed. R. Crim. P. 12.4(b)(1) & (2).

"The purpose of the rule is to assist judges in determining whether they must recuse

themselves because of a 'financial interest in the subject matter in controversy.' . . .  Although

the disclosures required by Rule 12.4 may seem limited, they are calculated to reach the majority

of circumstances that are likely to call for disqualification on the basis of information that a

judge may not know or recollect." Fed. R. Crim. P. 12.4, advisory committee note (quoting Code of Judicial Conduct, Canon 3C(1)(c)(1972)).

Mr. Archer entered his initial appearance on May 11, 2016, which should have triggered the filing of the government's Rule 12.4 notice. The Complaint and the Indictment certainly both appear to allege that a number of organizations, including several corporations, are alleged victims. Notwithstanding the mandatory nature of the rule, however, the government in this case has never filed a Rule 12.4 notice, let alone supplemented it. When Mr. Archer explicitly asked the government to provide the information required by Rule 12.4, it flatly rejected the demand even as the government claimed to understand its obligations. *See* Decl. Exs. 27 & 28.

The government should be required to file its Rule 12.4 statement immediately, so that the Court and counsel can undertake the conflict analysis that should have been at the outset of this case.

## VII.   Mr. Archer Joins In Any Applicable Motions Made By His Co-Defendants

Mr. Archer also respectfully seeks leave to join in, and incorporates by reference, any motion made by any of his co-defendants to the extent applicable to him.

## CONCLUSION

For the foregoing reasons, Devon Archer respectfully requests that the Court issue an order (a) dismissing Count Two of the Indictment as against him, (b) requiring the government to promptly file a bill of particulars; (c) requiring the government to immediately produce certain Rule 16 discovery in its possession, custody, or control; (d) requiring the government to complete its *Brady* review and to produce any *Brady* or *Giglio* material no later than 60 days before trial; (e) setting a short deadline for the government to file any motion invoking the crime-fraud exception to Mr. Archer's privileged communications and requiring the government to immediately provide certain related information; and (f) requiring the government to immediately file a Rule 12.4 notice.

Dated:      January 22, 2018
            New York, New York

Respectfully submitted,

/s/   Matthew L. Schwartz
Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorney for Devon Archer*