UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                          :
UNITED STATES OF AMERICA
                                                          :
            - v. -
                                                          :        S1 16 Cr. 371 (RA)
JASON GALANIS, et al.,
                                                          :
            Defendants.
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRE-TRIAL MOTIONS


                                          GEOFFREY S. BERMAN
                                          United States Attorney for the
                                          Southern District of New York,
                                          Attorney for the United States of America


Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
            - Of Counsel -

# Contents

Background ......................................................................................................................... 1

   I.     The Defendants Make Misrepresentations Regarding the WLCC Bonds ...................... 2

   II.    The Defendants Obtain Control of Key Entities ............................................................. 4

       A.    The Placement Agent ............................................................................................... 4

       B.    Valor, Wealth Assurance, and WAPCC ................................................................. 4

       C.    The Investment Advisers ......................................................................................... 5

   III.   The Defendants Defraud Clients of Hughes and Atlantic ............................................. 6

   IV.   The Defendants Misappropriate the Bond Proceeds ...................................................... 7

Morton's Motion to Dismiss the Indictment and Suppress Evidence Based on Outrageous

Government Misconduct is Without Merit ........................................................................... 8

   I.     Factual Background ........................................................................................................ 8

   II.    Relevant Law ............................................................................................................... 10

   III.   Discussion .................................................................................................................... 13

There is No Basis to Suppress the Consensual Search of Morton's Phone ........................ 18

   I.     Relevant Law ............................................................................................................... 18

   II.    Discussion .................................................................................................................... 19

The Court Should Not Sever the Trials of the Co-Defendants .......................................... 20

   I.     The Defendants are Properly Joined Under Rule 8 ..................................................... 21

       A.    Applicable Law ...................................................................................................... 21

       B.    Discussion .............................................................................................................. 22

   II.    Severance Under Rule 14 Is Not Warranted ............................................................... 24

       A.    Applicable Law ...................................................................................................... 24

       B.    Discussion .............................................................................................................. 27

The Court Should Deny Archer and Cooney's Motion to Dismiss Count Two .................. 36

I.     Applicable Law ................................................................................................ 36

   A.   Dismissal of an Indictment ........................................................................ 36

   B.   Multiplicity ................................................................................................ 38

II.    Discussion ....................................................................................................... 39

The Court Should Deny Archer and Cooney's Motions to Suppress ........................................... 41

I.     Background ...................................................................................................... 42

   A.   The Affidavit .............................................................................................. 42

   B.   The Warrants .............................................................................................. 48

   C.   Litigation Prior to the Execution of the Warrants .................................... 50

   D.   The Privilege Review ................................................................................. 51

   E.   The Responsiveness Review ...................................................................... 53

   F.   The Government's July 2017 Production .................................................. 53

II.    Defendants Have Not Established Standing to Challenge Either the Cooney Warrant or the Momtazi Warrants ........................................................................................... 54

   A.   Applicable Law ........................................................................................... 54

   B.   Discussion .................................................................................................. 55

III.   The Warrants Were Supported by Probable Cause ........................................ 55

   A.   Applicable Law ........................................................................................... 55

   B.   Discussion .................................................................................................. 57

IV.    The Warrants Were Sufficiently Particularized ............................................. 64

   A.   Applicable Law ........................................................................................... 64

   B.   Discussion .................................................................................................. 65

V.     The Court Should Reject Defendants' Overbreadth Challenge ..................... 69

   A.   Background .................................................................................................. 69

B.     Applicable Law ..................................................................................... 70

C.     Discussion ............................................................................................ 70

VI.    Even if the Court Finds the Warrants Overbroad or Insufficiently Particular, They Are Still Valid Under the Severance Doctrine ......................................... 75

A.     Applicable Law ..................................................................................... 75

B.     Discussion ............................................................................................ 76

VII.   The Affidavit Did Not Omit Material Information ........................................ 78

A.     Applicable Law ..................................................................................... 78

B.     Discussion ............................................................................................ 80

VIII.  The Good-Faith Exception Applies .............................................................. 83

A.     Applicable Law ..................................................................................... 83

B.     Application ........................................................................................... 84

IX.    The Execution of the Warrants Was Reasonable ......................................... 85

A.     Applicable Law ..................................................................................... 86

B.     Application ........................................................................................... 87

The Court Should Deny the Defendants' Demands for a Bill of Particulars ............................... 92

I.      Applicable Law ..................................................................................... 92

II.     Discussion ............................................................................................ 96

The Court Should Deny the Defendants' Rule 16, Brady and other Discovery Demands ......... 105

I.      Relevant Background .......................................................................... 106

II.     Evidence From the Gerova Case, the Consensual Recordings and Any Other Bad Conduct of Jason Galanis or His Confederates Constitutes Neither Rule 16 Nor Brady Material ............................................................................................... 108

III.    The Government Need Not Produce Its Subpoenas ................................... 110

IV.    The Court Should Deny Archer and Cooney's Motion Regarding *Brady* and *Giglio*

Materials ................................................................................................................ 112

    V.      The Defendant's Demand for Rule 12.4 Notice......................................................... 113

CONCLUSION............................................................................................................. 114

## Table of Authorities

### Cases

*Blockburger* v. *United States*, 284 U.S. 299 (1932) ...................................................... 38

*Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337 (1952)...................................... 37

*Brown* v. *Ohio*, 432 U.S. 161 (1977). ............................................................................. 38

*Coolidge* v. *New Hampshire,*403 U.S. 443 (1971) ......................................................... 68

*Costello* v. *United States*, 350 U.S. 359 (1956)..................................................... 36, 40

*District of Columbia* v. *Wesby*, --- S. Ct. ----, No. 15-1485, 2018 WL 491521, (Jan. 25, 2018) . 55

*Ganek* v. *Leibowitz*, 874 F.3d 73 (2d Cir. 2017)............................................................ 56

*Griffin* v. *United States,* 502 U.S. 46 (1991) ............................................................... 101

*Hemphill* v. *United States*, 392 F.2d 45, 49 (8th Cir. 1968) ........................................ 104

*Herring* v. *United States*, 555 U.S. 135 (2009)). ........................................................... 83

*Illinois v. Gates*, 462 U.S. 213 (1983) ..................................................... 56, 57, 59, 81

*In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.* (*"In re Google Warrant"*), 33 F. Supp. 3d 386 (S.D.N.Y. 2014) ................................................. 71

*In re Terrorist bombings of U.S. Embassy in East Africa*, 552 F.3d 177 (2d Cir. 2008) ............. 14

*Kaley* v. *United States*, 571 U.S. - - - -, 134 S. Ct. 1090, 1103 (2014)........................................ 55

*Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corporation*, 829 F.3d 197 (2d Cir. 2016)................................................................... 73

*Nicholson* v. *United States*, No. 09-CR-414 RJS, 2014 WL 4693615 (S.D.N.Y. Sept. 22, 2014), aff'd, 638 F. App'x 40 (2d Cir. 2016) ...................................................... 37

*nited States* v. *Galpin*, 720 F.3d 436 (2d Cir. 2013)............................... 65, 68, 70, 76

*Pereira* v. *United States*, 347 U.S. 1 (1954) ........................................................ 38, 39

*Rakas* v. *Illinois*, 439 U.S. 128 (1978)........................................................................ 54

*Richardson* v. *Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)..................... 25, 26

*Rivera* v. *United States*, 928 F.2d 592 (2d Cir. 1991) ................................................. 78

*Smith* v. *Maryland*, 442 U.S. 735 (1979)..................................................................... 74

*Texas* v. *Brown*, 460 U.S. 730 (1983)......................................................................... 56

*United States* v. *Abboud*, 438 F.3d 554 (6th Cir. 2006)......................................... 60, 62

*United States* v. *Aleman*, 286 F.3d 86 (2nd Cir. 2002).......................................... 12, 13

*United States* v. *Ali*, 870 F. Supp. 2d 10 (D.D.C. 2012).......................................... 59, 61

*United States* v. *Alston*, No. 15 Cr. 435 (CM), 2016 WL 2609251 (S.D.N.Y. Apr. 29, 2016) ... 65, 66

*United States* v. *Ansaldi*, 372 F.3d 118 (2d Cir. 2014)................................................ 18

*United States* v. *Bari*, 750 F.2d 1169 (2d Cir. 1984).................................................... 34

*United States* v. *Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003)................................ 95

*United States* v. *Black*, 733 F.3d 294 (9th Cir. 2013).................................................. 11

*United States* v. *Bonczek*, No. 08 Cr. 361(PAC), 2008 WL 4615853 (S.D.N.Y. Oct. 16, 2008). 66

*United States* v. *Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013)

.................................................................................................................. 104

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ................................................... 92, 94

*United States* v. *Bosch*, 385 F. Supp. 2d 387 (S.D.N.Y. 2005) .............................................. 21, 27

*United States* v. *Cafaro*, 480 F. Supp. 511 (S.D.N.Y. 1979) .................................................... 40

*United States* v. *Canfield*, 212 F.3d 713 (2d Cir. 2000). ........................................................ 79, 82

*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991)........................................................ 26, 28

*United States* v. *Carson*, 702 F.2d 351 (2d Cir. 1983) .......................................................... 26, 33

*United States* v. *Cervone*, 907 F.2d 332 (2d Cir. 1990)............................................................. 22

*United States* v. *Chacko*, 169 F.3d 140 (2d Cir. 1999)............................................................. 38

*United States* v. *Christine*, 687 F.2d 749 (3d Cir. 1982) .......................................................... 76

*United States* v. *Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009)................................................. 67

*United States* v. *Clark*, 638 F.3d 89 (2d Cir. 2011)................................................................. 57

*United States* v. *Colkley*, 899 F.2d 297 (4th Cir. 1990)............................................................ 79

*United States* v. *Cook*, 657 F.2d 730 (5th Cir. 1981)............................................................... 76

*United States* v. *Coon*, No. 10 Cr. 110 (RJA) (HBS), (W.D.N.Y. Nov. 8, 2010), Dkt. No. 33 ... 61

*United States* v. *Coon*, No. 10 Cr. 110A, 2010 WL 6647779 (W.D.N.Y. 20, 2010) .................. 61

*United States* v. *Cordova*, 792 F.3d 1220 (10th Cir. 2015) ...................................................... 61

*United States* v. *Cromitie*, 727 F.3d 194   (2d Cir. 2013) ......................................................... 11

*United States* v. *Cuti*, 2009 WL 3154310 (S.D.N.Y. 2009) ..................................................... 93

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)........................................... 93, 95

*United States* v. *Davis*, 766 F.3d 722 (7th Cir. 2014)................................................................ 11

*United States* v. *Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164 (S.D.N.Y. Mar. 11, 2009) ... 101

*United States* v. *Deppish*, 994 F. Supp. 2d 1211 (D. Kan. 2014) .................................................. 59

*United States* v. *DiGregorio*, 795 F.Supp. 630 (S.D.N.Y. 1992) .............................. 12, 14, 15, 17

*United States* v. *Doan*, 245 F. Appx. 550 (7th Cir. 2007) ............................................................. 63

*United States* v. *Doumanis*, et al., No. 17 Cr. 87 (ALC), 2018 U.S. Dist. LEXIS 13964 (S.D.N.Y. Jan. 29, 2018)..................................................................................................................... 15, 16

*United States* v. *Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011)................................................... 87

*United States* v. *Durante, et al.*, No. 15 Cr. 171) (ALC) ........................................................... 109

*United States* v. *Ellis*, 121 F. Supp. 3d 927 (N.D. Cal. 2015) .................................................. 101

*United States* v. *Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997)....................................................... 37

*United States* v. *Falso*, 544 F.3d 110 (2d Cir. 2008)................................................................. 83

*United States* v. *Farrah*, 11 F. App'x 34 (2d Cir. 2001) ............................................................ 40

*United States* v. *Feng Ling Liu*, No. 12 Cr. 934(RA), 2014 WL 101672 (S.D.N.Y. Jan. 10, 2014) .................................................................................................................................................. 87

*United States* v. *Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................................... 35

*United States* v. *Finnerty*, 533 F.3d 143 (2d Cir. 2008) ............................................................. 40

*United States* v. *Fiorito*, 640 F.3d 338 (8th Cir. 2011)............................................................... 66

*United States* v. *Fitzgerald,* 542 F. App'x 30 (2d Cir. 2013) ................................................... 101

*United States* v. *Frampton,* 382 F.3d 213 (2d Cir. 2004) ........................................................... 101

*United States* v. *Friedman*, 854 F.2d 535 (2d Cir.1988) ................................................................ 22

*United States* v. *Gallo*, 863 F.2d 185 (2d Cir. 1988) .................................................................... 60

*United States* v. *Gambino*, 809 F. Supp. 1061 (S.D.N.Y. 1992) ................................................... 41

*United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) ...................................................... 67, 75, 76, 78

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)................................................... 95

*United States* v. *Gleason*, 616 F.2d 2 (2d Cir. 1979).................................................................... 24

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985)............................................................... 37

*United States* v. *Hameedi*, No. 17 Cr. 137 (JGK), 2017 WL 5152991   (S.D.N.Y. Nov. 3, 2017) ................................................................................................................................ 29, 30

*United States* v. *Haqq*, 278 F.3d 44 (2d Cir. 2002) ..................................................................... 54

*United* States v. *Heatley,* No. 96 CR 515, 1999 WL 61816 (S.D.N.Y. Jan. 29, 1999) ............... 13

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ................................................. 93, 95

*United States* v. *Hoffecker*, 530 F.3d 137 (3d Cir. 2008) ............................................................. 11

*United States* v. *Huezo*, 546 F.3d 174 (2d Cir.2008) .................................................................. 101

*United States* v. *Isiofia*, 370 F.3d 226 (2d Cir. 2004) .................................................................. 18

*United States* v. *Jones*, 129 F.3d 718 (2d Cir. 1997) ................................................................. 110

*United States* v. *Jones*, 482 F.3d 60 (2d Cir. 2006) ..................................................................... 38

*United States v. Juarez*, No. 12 Cr. 59 (RRM), 2013 WL 357570 (E.D.N.Y. Jan. 29, 2013)...... 66

*United States* v. *Klump*, 536 F.3d 113 (2d Cir. 2008) .................................................................. 78

*United States* v. *Labat*, 905 F.2d 18 (2d Cir. 1990)..................................................................... 40

*United States* v. *LaChance*, 788 F.2d 856 (2d Cir. 1986)............................................................ 65

*United States* v. *Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013). ................................................. 79

*United States* v. *Leon*, 468 U.S. 897 (1984) ............................................................................... 83

*United States v. Leonelli,* 428 F. Supp. 880 (S.D.N.Y. 1977) ...................................................... 94

*United States* v. *Levin*, No. 15. Cr. 101 (KBF), 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) ..... 88

*United States* v. *Levy*, 2013 WL 664712 (S.D.N.Y. 2013)................................................... 94, 104

*United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356, (S.D.N.Y. Jan. 2, 2001) .......... 104

*United States* v. *Lumiere*, No. 16 Cr. 483, 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) ... 85, 87, 90, 91

*United States* v. *Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014)................................................... 55

*United States* v. *Mahabub*, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ............................ 94, 95

*United States* v. *Martino*, 664 F.2d 860 (2d Cir.1981) ................................................................. 60

*United States* v. *Martoma*, No. 12 Cr. 973 (PGG), 2013 WL 2435082, (S.D.N.Y. Jun. 5, 2013) 99

*United States* v. *Masotto,* 73 F.3d 1233 (2d Cir.1996) ............................................................... 101

*United States* v. *Matias*, 836 F.2d 744 (2d Cir. 1988)................................................................. 86

*United States* v. *Mauskar*, 557 F.3d 219 (5th Cir. 2009)............................................................. 11

*United States* v. *Meregildo*, 876 F. Supp. 2d 445 (S.D.N.Y. July 6, 2012)............................... 110

*United States* v. *Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ............................................. 89, 90

iii

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ............................................... 94, 95

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y.2001) ...................................................... 99

*United States* v. *Molina*, No. 11 Cr. 528 (JFK) 2013 WL 2455922 (S.D.N.Y. June 5, 2013) ... 101

*United States* v. *Monserrate*, 2011 WL 3480957 (S.D.N.Y. 2011)............................................... 93

*United States* v. *Moreno*, 701 F.3d 64 (2d Cir. 2012) ................................................................. 18

*United States* v. *Morrison*, 449 U.S. 361 (1981) ........................................................................ 12

*United States* v. *Munoz*, 987 F. Supp. 2d 438 (S.D.N.Y. 2013) ................................................. 19

*United States* v. *Murphy,* 16 F. Supp. 2d 397 (S.D.N.Y. 1998) ................................................. 19

*United States* v. *Nachamie*, 91 F. Supp. 2d at 565 (S.D.N.Y. 2000) ......................................... 103

*United States* v. *Nadeem*, No. 13 Cr. 424 (BMC), 2014 WL 3563407 (E.D.N.Y. July 18, 2014). ....................................................................................................................................................... 21

*United States* v. *Nazemzadeh*, No. 11 Cr. 5726, 2014 WL 310460 (S.D. Cal, Jan. 28, 2014) ... 102

*United States* v. *Nerlinger*, 862 F.2d 967 (2d Cir.1988)............................................................... 22

*United States* v. *Nordlicht*, No. 16 Cr. 640 (E.D.N.Y. Jan. 8, 2018)......................................... 111

*United States* v. *Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) ................................................... 111

*United States* v. *Page*, 657 F.3d 126 (2d Cir. 2011) .................................................................... 26

*United States* v. *Patel*, No. 16-CR-798, 2017 WL 3394607, (S.D.N.Y. Aug. 8, 2017) .............. 91

*United States* v. *Payne*, 394 F. App'x 891(3d Cir. 2010) ............................................................ 61

*United States* v. *Percan,* No. 98 Cr. 0392, 1999 WL 13040 (S.D.N.Y. Jan. 13, 1999).............. 57

*United States* v. *Persico*, 447 F. Supp. 2d 213 (E.D.N.Y. 2006)............................................... 112

*United States* v. *Rahman*, 854 F. Supp. 254 (S.D.N.Y 1994) ..................................................... 34

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ........................................................ 79

*United States* v. *Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ........................................................................................................................................... 81

*United States* v. *Raphael* 786 F. Supp. 450 (S.D.N.Y. 1992)..................................................... 111

*United States* v. *Raymonda*, 780 F.3d 105 (2d Cir. 2015) .......................................................... 63

*United States* v. *Reinhold*, 994 F.Supp. 194 (S.D.N.Y. 1998).................................................... 98

*United States* v. *Riggs*, 690 F.2d 298 (1st Cir. 1982) ................................................................... 76

*United States* v. *Roberts*, No. 97 Cr. 10 (RSP/DH), 1998 WL 278293 (N.D.N.Y. 1998)........... 12

*United States* v. *Romain*, No. 13 Cr. 724 (RWS), 2014 WL 6765831 (S.D.N.Y. 2014), aff'd 678 F. App'x 23, 25-26 (2d Cir. 2017) .......................................................................................... 84

*United States* v. *Rooney*, 866 F.2d 28 (2d Cir. 1989) ................................................................. 24

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993) ..................................................................... 56

*United States* v. *Rosa*, 626 F.3d 56 (2d Cir. 2010) ...................................................................... 67

*United States* v. *Rosa,* 626 F.3d 56 (2d Cir. 2010). ..................................................................... 84

*United States* v. *Rosario*, 237 F.Supp.2d 242 (E.D.N.Y. 2002) ................................................. 13

*United States* v. *Roshko*, 969 F.2d 9 (2d Cir. 1992) .................................................................... 38

*United States* v. *Russell*, 411 U.S. 423 (1973)............................................................................. 11

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) ............................................................... 21

*United States* v. *Samsonov*, 2009 WL 176721 (S.D.N.Y. 2009) .................................................. 93

*United States* v. *Sattar*, No. 02-Cr-395, 2003 WL 22510398 (Nov. 4, 2003) (JGK) ....... 12, 18, 39

*United States* v. *Savin*, No. 00 CR 45, 2001 WL 243533, (S.D.N.Y. Mar. 7, 2001) .................. 103

*United States* v. *Schaefer*, 519 F. App'x 71 (2d Cir. 2013) ........................................................ 19

*United States* v. *Schandl*, 947 F.2d 462 (11th Cir. 1991) .......................................................... 86

*United States* v. *Seiver*, 692 F.3d 774 (7th Cir. 2012) ............................................................... 61

*United States* v. *Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000) ............................................. 64, 65, 86

*United States* v. *Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017) ................................................ 30

*United States* v. *Shuford*, 454 F.2d 777 (9th Cir. 1971) ........................................................... 35

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004). .............................................................. 83

*United States* v. *Spinelli*, 352 F.3d 48 (2d Cir. 2003) .............................................................. 21

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ............................................... 36, 39

*United States* v. *Stern*, 511 F.2d 1364 (2d Cir. 1975) .............................................................. 90

*United States* v. *Stewart*, 305 F. Supp. 2d 368 (S.D.N.Y. 2004) ............................................. 40

*United States* v. *Stewart*, No. 15 Cr. 287 (LTS) ...................................................................... 93

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) .................................................. 92, 98, 104

*United States* v. *Tramunti*, 513 F.2d 1087 (2d Cir. 1975) ....................................................... 36

*United States* v. *Travisano*, 724 F.2d 341 (2d Cir. 1983) ........................................................ 56

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................................ 93

*United States* v. *Triumph Capital Grp.* 211 F.R.D. 31 (D. Conn. 2002) .............................. 86, 87

*United States* v. *Tsarnaev*, 53 F. Supp. 3d 450 (D. Mass. 2014) .............................................. 72

*United States* v. *Tuzman*, No. 15 Cr. 536 (PGG), 2017 WL 4785459 (S.D.N.Y. Oct. 19, 2017) 28,
31

*United States* v. *Ulbricht*, 858 F.3d 71 (2d Cir. 2017) .............................................................. 73

*United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) .. 54

*United States* v. *Van Hise*, 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013) ................................. 26

*United States* v. *Vanwort*, 887 F.2d 375 (2d Cir. 1989) ...................................................... 23, 24

*United States* v. *Villegas*, 899 F.2d 1324 (2d Cir. 1990) .......................................................... 34

*United States* v. *Wagner*, 989 F.2d 69 (2d Cir. 1993) .......................................................... 63, 64

*United States* v. *Walker*, 142 F.3d 103 (2d Cir. 1998) ............................................................. 26

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................................ 92

*United States* v. *Washington*, 431 U.S. 181 (1977) ................................................................. 14

*United States* v. *Watson*, 404 F.3d 163 (2d Cir. 2005) ............................................................ 55

*United States* v. *Williams*, No. 02 CR. 1372(BSJ), 2004 WL 1469491 (S.D.N.Y. June 29, 2004)
............................................................................................................................................. 57

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008) ........................................................... 36

*United States* v. *Yousef*, 327 F.3d 56 (2d Cir. 2003) .......................................................... 28, 29

*United States* v. *Yu-Leung*, 910 F.2d 33 (2d Cir. 1990) ........................................................... 18

*United States* v. *Zackson*, 6 F.3d 911 (2d Cir. 1993) ............................................................... 26

*Whitfield* v. *Ricks*, No. 01 Civ. 11398 (LAK), 2006 WL 3030883, (S.D.N.Y. Oct. 24, 2006). . 101

*Wilson* v. *Russo*, 212 F.3d 781 (3d Cir. 2000) ............................................................... 79

*Zafiro* v. *United States*, 506 U.S. 534 (1993) .............................................. 25, 26, 29

### Federal Statutes

15 U.S.C. § 78j(b) ............................................................................................................ 37

18 U.S.C. § 2 .................................................................................................................... 40

18 U.S.C. § 2510(8) ......................................................................................................... 73

18 U.S.C. § 2518(5) ......................................................................................................... 81

18 U.S.C. § 2711(1) ......................................................................................................... 73

### Rules

Fed. R. Crim. P. 16 ........................................................................................................ 119

Fed. R. Crim. P. 29 .......................................................................................................... 40

Fed. R. Crim. P. 7 ............................................................................................................ 40

Fed. R. Crim. P. 8 ............................................................................................................ 23

### Other Authorities

Leonard B. Sand, et al., 3 Modern Federal Jury Instructions: ................................. 37, 41

Orin Kerr, A User's Guide to the Stored Communications Act, 72 Geo. Wash. L Rev.

1208, 1231 (2004) ....................................................................................................... 61

The Government respectfully submits this memorandum of law in opposition to the pretrial motions of defendants Gary Hirst, Michelle Morton, Devon Archer, and Bevan Cooney. These papers address: (i) Morton's motion to dismiss the Indictment on the basis of purported outrageous Government misconduct or to suppress any evidence resulting from her "cooperation;" (ii) Archer and Cooney's motions to dismiss Count Two of the Indictment for failing to allege the necessary elements of securities fraud; (iii) Hirst, Morton, Archer, and Cooney's motions to sever; (iv) Archer and Cooney's motions to suppress the evidence obtained pursuant to search warrants on their respective email accounts; (v) Morton, Archer, and Cooney's motions for a bill of particulars; and (vi) Archer and Cooney's motions for the production of Rule 16, *Brady*, *Giglio* and other discovery materials.   These motions should be denied in their entirety.

## Background

Between approximately March 2014 and April 2016, the defendants fraudulently induced the Wakpamni Lake Community Corporation (the "WLCC"), a Native American tribal entity, to issue more than $60 million worth of bonds (the "WLCC Bonds"), through four separate bond issuances (respectively, the "First Bond Issuance," the "Second Bond Issuance," the "Third Bond Issuance," and the "Fourth Bond Issuance," and, together, the "Bond Issuances").   As discussed further below, the defendants caused clients of captive investment adviser firms to buy certain of the WLCC Bonds, thereby defrauding those clients as well.   The defendants then misappropriated the bond proceeds for their own use.

## I.      **The Defendants Make Misrepresentations Regarding the WLCC Bonds**

The defendants orchestrated a series of false and misleading representations as part of the issuance of the WLCC bonds.

In connection with each of the four Bond Issuances, the WLCC entered into a number of agreements, including indentures, placement agency agreements, and annuity provider agreements ("the Bond Agreements").   In substance, under these agreements, (i) a placement agent, Burnham Securities, would, in return for a fee, find buyers for the bonds; (ii) the bond proceeds would be provided to an annuity provider, to be invested in an annuity to generate sufficient income to pay the interest and principal on the bonds; and (iii) an investment manager would assist in investing the bond proceeds on the WLCC's behalf.   (Complaint ¶ 30(a)).[1]   The placement agent, however, did not solicit any of the purchasers of the WLCC Bonds, and none of the bond proceeds were actually invested in an annuity or turned over to an investment manager. (*See* Complaint ¶ 30(a)).   Instead, as discussed in further detail below, the defendants misappropriated the funds for their own use.

In addition, defendant John Galanis, who functioned as the defendants' primary point of contact with the WLCC's representatives, told those representatives that defendant Jason Galanis[2] was an investment banker at Burnham Securities, the placement agent for the bonds, even though Jason Galanis did not actually work at Burnham.   (*See* Complaint ¶¶ 31(b), 34(a)).

---

[1]  A copy of the Complaint is attached as Exhibit A, and a copy of the operative indictment, S1 16 Cr. 371 (RA) (the "Indictment"), is attached as Exhibit B.

[2]  As the Court is aware, defendant Jason Galanis pled guilty on January 19, 2017 to (a) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, (b) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, and (c) conspiracy to commit investment adviser fraud, in violation of 18 U.S.C. § 371.   On August 11, 2017, this

Further, after the First Bond Issuance, John Galanis falsely told representatives of the WLCC that the first issuance had been a success and that investors were demanding more WLCC Bonds.   (Complaint ¶ 45).   This was false; indeed, as discussed below, the entirety of the First Bond Issuance had been placed with the clients of one firm, Hughes Capital Management, and many of these clients were already demanding to have the bonds sold from their accounts after learning of the purchase.   (Complaint ¶ 45).   As a result of John Galanis's misrepresentations, the WLCC agreed to issue another $20 million of bonds, which resulted in the Second and Third Bond Issuances.   (*See* Complaint ¶¶ 44-53).   These bonds were purchased not by new investors, but by defendants Archer and Cooney, using recycled proceeds from the First Bond Issuance.   (*See* Complaint ¶ 47(c)-(e) (describing Archer's purchase of the Second Bond Issuance and his false statements to a brokerage firm in connection with that purchase), ¶ 49(b)-(d) (describing Cooney's purchase of the Third Bond Issuance and subsequent sale of those bonds)).

Similarly, in March 2015, John Galanis again told representatives of the WLCC that the First, Second, and Third Bond Issuances had been successful and that investors were demanding even more WLCC Bonds.   (Complaint ¶ 54).   This, again, was false; indeed, there was no ready market for the bonds, and the Second and Third Bond Issuances had each been purchased by a single investor—defendants Archer and Cooney, respectively—using the proceeds from the First Bond Issuance.   (Complaint ¶ 54).

---

Court sentenced Jason Galanis to 173 months' imprisonment, with 113 months to be served concurrently, and the remaining 60 months to be served consecutively, to the term of imprisonment imposed in case number 15 Cr. 643 (PKC).

## II.    The Defendants Obtain Control of Key Entities

The defendants were able to carry out this scheme in part because by the time of the Bond Issuances the defendants and other individuals working with them owned or controlled most of the key entities involved in the relevant transactions.   Indeed, the bond fraud was part of an effort by the defendants and their associates to "roll up" the various entities involved into an enormous financial services conglomerate under the "Burnham" brand.   The entities involved included, for example, the placement agent, the annuity provider, and two investment adviser firms.

### A.  The Placement Agent

As noted above, the placement agent for the Bond Issuances—i.e., the entity that was supposed to find buyers for the bonds—was Burnham Securities.   (*See* Complaint ¶ 12). Defendants Archer and Cooney each owned a portion of Burnham Securities.   (*Id.*).   In 2014, in connection with efforts to obtain control of the parent entity of Burnham Securities, Burnham Financial Group ("BFG"), Archer made false statements to the board of the Burnham Investment Trust (the "BIT Board"), regarding defendant Jason Galanis's relationship with Burnham Securities and its affiliates.   (*See, e.g.*, Complaint ¶ 34(b)).   Hugh Dunkerley also worked at Burnham Securities as a Managing Director.   (*See* Complaint ¶ 30(c)).   Also, as noted above, Jason Galanis held himself out to investors as a Burnham Securities employee, even though he was not actually so employed.   (*See* Complaint ¶¶ 31(b), 34(a)).

### B.  Valor, Wealth Assurance, and WAPCC

Pursuant to the Bond Agreements, the bond proceeds were to be invested in an annuity, which was to generate both income for the WLCC and funds needed for interest payments (and ultimately payments of the principal) to the bondholders.   Defendants Hirst and Dunkerley,

4

however, controlled the purported annuity provider for the bonds, Wealth Assurance Private

Client Corporation ("WAPCC").   (*See, e.g.*, Complaint ¶¶ 14, 55(c)).   Defendants Dunkerley,

Archer, and Jason Galanis also maintained control over a similarly named, but unaffiliated,

entity, Wealth Assurance, and its parent, Valor Group.   (*See* Complaint ¶¶ 26, 28 (noting that

Archer and Dunkerley were members of Valor's Board of Directors), ¶ 37 (noting that Wealth

Assurance and WAPCC were not in fact affiliated)).

### C.  The Investment Advisers

The defendants also controlled the investment advisers that purchased the First and

Fourth Bond Issuances on behalf of their pension fund clients and through those purchases

defrauded those clients.

Hughes Capital Management ("Hughes") purchased the First Bond Issuance in late

August 2014 on behalf of its clients.   (*See* Complaint ¶ 39(v)).   Just weeks earlier, defendant

Michelle Morton had acquired Hughes.   (Complaint ¶ 20).   Morton financed her purchase of

Hughes by using funds she had received days before from BFG-Socially Responsible Investing

("BFG-SR"), an entity managed by Dunkerley, which was a subsidiary of Wealth Assurance.

(Complaint ¶ 20, 39(f)).   In addition, defendants Jason Galanis, Archer, and Cooney directed,

supported, and financed Morton's acquisition of Hughes.   (*See, e.g.*, Complaint ¶ 39(a)-(n)).

Morton, in consultation with Jason Galanis, then installed Hirst as Hughes' Chief Investment

Officer.   (Complaint ¶ 38(i), (l)-(m)).

Atlantic Asset Management ("Atlantic") purchased the Fourth Bond Issuance in April

2015 on behalf of one of its clients.   (Complaint ¶ 56(d)).   Morton had acquired Atlantic earlier

5

that same month.   (*See* Complaint ¶ 22).[3]   Again, BFG-SR, the entity managed by Dunkerley,

financed the purchase.   (*Id.*).

III.   <u>**The Defendants Defraud Clients of Hughes and Atlantic**</u>

The defendants' scheme also defrauded the Hughes and Atlantic clients on whose behalf

the investment advisers purchased the bonds.

Morton and Hirst failed to make any disclosure to any Atlantic or Hughes clients prior to

the purchase of the bonds, notwithstanding that the bond purchases were outside the investment

parameters of many of the clients.   (*See* Complaint ¶ 30(b)).   Morton and Hirst also failed to

disclose to the Atlantic or Hughes clients the numerous conflicts of interest that existed with

regard to Atlantic/Hughes' role in the purchase of the bonds, despite their legal obligation to

make such disclosures.   (Complaint ¶ 30(c)).   For example:

Hirst was (i) the Chief Investment Officer, and later the Chairman of the Investment

Committee, of Hughes and signed the trade tickets authorizing the purchase of the First Bond

Issuance on behalf of Hughes clients; (ii) the Assistant Secretary of Wealth Assurance; and (iii) a

signatory on a bank account in the name of WAPCC.   (*See* Complaint ¶ 39(w)).   Hirst was thus

affiliated both with the entities whose clients purchased the bonds and the entity receiving the

proceeds of the Bond Issuances that was purportedly investing those proceeds on the WLCC's

behalf.

Also, Dunkerley was (i) a Managing Director at Burnham Securities, the placement agent

for the Bond Issuances; (ii) a managing member of BFG-SR, the entity that invested in both

---

[3] In connection with the acquisition, Hughes and Atlantic merged into a single entity, which
continued to operate as Atlantic.

Investment Advisers; (iii) an officer of Wealth Assurance; and (iv) a signatory on the WAPCC's bank account.   (Complaint ¶¶ 30(c), 39(w), 56(f)).   Dunkerley was thus affiliated with the entity purportedly soliciting investors for the WLCC Bonds; the entities whose clients actually purchased the bonds; and the entity receiving the proceeds of the Bond Issuances and purportedly investing those proceeds on the WLCC's behalf.

Further, when Hughes and Atlantic clients learned that certain of the Bond Issuances had been purchased in their accounts, several demanded that the bonds be liquidated.   (Complaint ¶¶ 39(y), 56(i)).   However, because there was no ready secondary market for the bonds, none were ever able to be sold or redeemed from the client accounts and, to this day, no Hughes or Atlantic client has been able to recoup their "investment" in the Bond Issuances. (Complaint ¶¶ 39(y), 56(j)).

**IV.    The Defendants Misappropriate the Bond Proceeds**

In addition, the defendants' scheme involved the misappropriation of the bond proceeds, both to pay personal expenses and to further their business interests.

For example, at Jason Galanis's direction, Dunkerley transferred approximately $2.3 million from the First Bond Issuance to a bank account associated with John Galanis, which John Galanis used for personal expenses.   (*See* Complaint ¶ 43(c)).   In addition, between on or about August 27, 2014 and on or about October 30, 2015, Jason Galanis used approximately $8,750,000 of the proceeds of the Bond Issuances for his own personal expenses, including for his home, cars, legal bills, travel, entertainment, IRS bills, and payments to family members. (*See* Complaint ¶ 62, 63(b)).   Jason Galanis also transferred at least $1.3 million to an account controlled by Dunkerley and Hirst.   (*See* Complaint ¶ 43(e)).

Also, as noted above, the defendants used the proceeds of the First Bond Issuance to finance Archer's and Cooney's purchase of the Second and Third Bond Issuances. Jason Galanis, Cooney and Archer then used the bonds purchased with the Second and Third Bond Issuances to, among other things, support other business endeavors, including in connection with their larger effort to create a financial services conglomerate. For example, Archer transferred the bonds to VL Assurance and then provided $2.6 million of the WLCC bonds to Burnham Securities, an entity in which he was an investor, so that Burnham Securities could purportedly meet its net capital requirements as a registered broker-dealer under applicable SEC regulations. (Complaint ¶ 47(i)). Cooney transferred $5 million of bonds to Bonwick Capital, another registered broker-dealer, for the same purpose. (Complaint ¶ 49(d)).

### Morton's Motion to Dismiss the Indictment and Suppress Evidence Based on Outrageous Government Misconduct is Without Merit

Morton seeks the dismissal of the Indictment, or in the alternative, the suppression of the fruits of her attempted cooperation, as the result of purported Government misconduct. Because there was no Government misconduct—let alone the type of outrageous Government misconduct that would justify this extraordinary remedy—Morton's motion must be denied.

### I.   Factual Background[4]

On or about August 25, 2015, Morton was interviewed by law enforcement agents at her residence in New Jersey. The following week, on September 3, 2015, Morton voluntarily

---

[4] Morton's brief offers a detailed—and purportedly exculpatory—description of both her role in the acquisition of Hughes and Atlantic and in the placement of the bonds. As evidenced by the Government's charges in this case, and as the Government expects to prove at trial, Morton's self-serving rendition of the events surrounding her acquisition of Atlantic and Hughes and the purchase of the First and Fourth Bond Issuances is false. With respect to the circumstances of Morton's purported cooperation, the Government agrees with the basic contours of Morton's

attended an interview at the U.S. Attorney's Office, with both law enforcement agents and

AUSAs.[5]   Prior to beginning the interview, Morton was informed that her attendance was

voluntary, that she could leave at any time, and that she could have an attorney with her if she

---

factual allegations—that she was interviewed at her residence by the FBI, that she was
subsequently interviewed by AUSAs who informed her that she could have an attorney, that she
declined to retain an attorney, agreed to speak to the Government, consented to a search of her
phone, and agreed to make consensual recordings involving other members of the scheme—but
disputes many of the details concerning what representations were made to her.   The
Government does not believe, however, that a resolution of such factual disputes is necessary
because even assuming arguendo that Morton's allegations were correct (as the Government
generally does for purposes of this brief only), she would still not be entitled to the remedy she
now seeks.

In her affidavit, Morton alleges that with respect to certain documents the Government
"indicated that it would have the SEC send another request."   (Morton Aff. at 21).   On the basis
of this vague allegation, Morton's brief alleges that an AUSA "told Ms. Morton that he would
direct [] the SEC to issue a new document request" and that "[t]he AUSA's direction
demonstrates the requisite control of the SEC's actions to qualify as a joint investigation."
(Morton Br. at 25, n. 16).   Morton thus renews her request – previously denied by this Court –
that the Government review the entirety of the SEC's file for *Brady* material and requests
discovery regarding communications between the Government and the SEC "to determine
whether the communications are relevant to a number of issues here, most importantly Ms.
Morton's status as a cooperator."   (*Id.*).   Morton's renewed requests are meritless and should be
denied.   As a preliminary matter, notwithstanding the characterization in her brief, her affidavit
fails to establish that the Government "directed" the actions of the SEC.   More significantly,
even if there had been a joint investigation – which there was not – the Government has already
voluntarily agreed to conduct a *Brady* review of any interview notes or testimony taken in
connection with the SEC investigation.   As this Court recognized in dismissing Morton's
previous motion for a broader scope of materials, *Gupta* "limit[s] [the Government's] *Brady*
obligation to documents produced from interviews conducted jointly with the SEC."   (Dkt. At
284).   Thus, even if there had been a joint investigation, Morton is entitled to no more than she
has already received.

[5] None of the undersigned AUSAs were present at that interview.

9

wished.   Morton was also accurately informed that individuals interviewed in an investigation

may be mere witnesses, subjects, or targets, and that she was considered a subject.

During the course of the interview, Morton was asked for permission for law enforcement

to make a forensic image of her phone.   Morton was provided with a consent to search form,

which was reviewed with her, and was told that she did not have to sign the form or consent to

granting the Government access to her phone.   Morton agreed to allow law enforcement to make

a forensic image, but indicated that she wished to review the consent form and would let the

Government know whether she wanted to sign it.   Nearly six weeks later, on October 13, 2015,

Morton executed the consent to search form, following which the Government executed a search

of the phone.   (Consent to Search Form, attached hereto as Exhibit C).[6]   The form indicated,

among other things that, (i) Morton had been advised of her right to refuse to consent to any

search, (ii) the search could be conducted "for any purpose," (iii) by signing the form Morton

was "relinquish[ing] any constitutional right to privacy" in her phone, (iv) Morton understood

that "any contraband or evidence on these devices may be used against me in a court of law,"

and (v) Morton's consent had been given voluntarily and without any promises.   (*Id.*).

Following the interview, Morton agreed to consensually record telephone calls and

meetings with Jason Galanis, which she did.

## II.  <u>Relevant Law</u>

A court may order that an indictment be dismissed "as a sanction for some fault in the

government's prosecution of the case."   *United States* v. *Davis*, 766 F.3d 722, 728 (7th Cir.

---

[6] In her affidavit, Morton alleges that she signed the consent to search form during the
September interview.   The date on the form, together with the signature of Morton's mother as
witness, makes clear that the form was signed several weeks later.

2014).   This defense was anticipated by the Supreme Court in dicta when it wrote: "[W]e may

some day be presented with a situation in which the conduct of law enforcement agents is so

outrageous that due process principles would absolutely bar the government from invoking

judicial processes to obtain a conviction . . . ."   *United States* v. *Russell*, 411 U.S. 423, 431-32

(1973).   Dismissing an indictment for outrageous Government conduct, however, is reserved for

"extreme" cases in which the defendant can demonstrate that the Government's conduct violates

"fundamental fairness" or is "so grossly shocking and so outrageous as to violate the universal

sense of justice."   *United States* v. *Black*, 733 F.3d 294, 298 (9th Cir. 2013) (internal citations

omitted).   This is an "extremely high standard."   *Id.*

The Government's conduct can be considered "so offensive that it requires the dismissal

of an indictment only if it is most intolerable [and] a court should not dismiss an indictment each

time the government acts deceptively or participates in a crime that it is investigating."   *United*

*States* v. *Hoffecker*, 530 F.3d 137, 154 (3d Cir. 2008).   The Government conduct must "shock

the conscience," such as forced stomach pumping to induce vomiting of evidence.   *United*

*States* v. *Cromitie*, 727 F.3d 194, 218 (2d Cir. 2013) (internal citation omitted).   Thus, it follows

that dismissal of an indictment for outrageous Government misconduct "will only be found in the

rarest circumstances."   *United States* v. *Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009).   The

Second Circuit has found that "this type of claim is an issue frequently raised that seldom

succeeds."   *Cromitie*, 727 F.3d at 218 (internal citation omitted).

Even where Government misconduct meets the *Russell* test for outrageousness, dismissal

of an indictment is warranted only where the Government's behavior "resulted in [] prejudice to

the [defendant's] defense or legal representation.   *United States* v. *DiGregorio*, 795 F. Supp.

630, 635 (S.D.N.Y. 1992); *United States* v. *Morrison*, 449 U.S. 361, 363 (1981) (dismissal of indictment unwarranted where motion to dismiss was "based solely on the egregiousness of the agents' behavior and not upon any allegation that the claimed violation had prejudiced the quality or effectiveness of [the defendant's] legal representation).   Absent a showing of prejudice, the appropriate remedy for conduct violating the *Russell* test for outrageousness is suppression of the evidence obtained as the result of the Government's outrageous misconduct. *United States* v. *DiGregorio*, 795 F. Supp. at 635.

In this case, Morton contends principally that the Government's so-called outrageous conduct stemmed from its purportedly implicit suggestion that Morton would not be prosecuted and was not at legal risk.   In evaluating a defendant's claim that the Government promised immunity, a court must first determine whether any binding agreement existed between the Government and the defendant.   *See United States* v. *Roberts*, No. 97 Cr. 10 (RSP/DH), 1998 WL 278293 at *6 (N.D.N.Y. May 19, 1998) (finding there was no "'meeting of the minds between the government and the defendants").   Any such agreement is interpreted according to principles of contract law.   *United States* v. *Aleman*, 286 F.3d 86, 89 (2d Cir. 2002).   The relevant question is thus whether there was the "meeting of the minds" necessary to create an "actual agreement under principles of contract law."   *United States* v. *Sattar*, No. 02-Cr-395, 2003 WL 22510398, *2 (Nov. 4, 2003) (JGK) (S.D.N.Y. Nov. 5, 2003).   The Second Circuit has warned that when considering an allegation that an oral agreement existed courts must be especially careful to "consider the possibility that immunity discussions in this case never progressed to a meeting of the minds and a formation of an enforceable bargain."   *Aleman*, 286 F.3d. at 90.   In lieu of an actual agreement, the principles of promissory estoppel only allow the

defendant to hold the Government to "any clear and unambiguous promise of immunity." *United States* v. *Sattar*, 2003 WL 22510398 at *2, *citing United States* v. *Rosario*, 237 F. Supp. 2d 242, 244-45, 248 (E.D.N.Y. 2002).

Notably, the relevant inquiry does not concern the defendant's subjective belief with respect to the terms of any agreement with the Government.   To the contrary, a defendant's unreasonable understanding of an agreement with the Government is unenforceable.   *See Aleman*, 286 F.3d at 90 ("Whether the agreement [between the government and a defendant] is written or oral, the court must determine what the parties reasonably understood to be its terms, including intended remedies in the event of a breach." (internal quotation marks omitted)); *United* States v. *Heatley*, No. 96 CR 515, 1999 WL 61816, at *9–11 (S.D.N.Y. Jan. 29, 1999) (finding that the defendant's interpretation of promises made by the Government at proffer sessions was not reasonable).

## III.   Discussion

Morton admits that at the September 3, 2015 meeting the Government accurately advised her that she could have counsel present for any interview and that she was a subject of the Government's investigation.   (Morton Aff. ¶¶ 15, 16).   And Morton does not dispute that she was not in custody, that she could leave the meeting at any time, and that she was under no obligation to consent to a search of her phone.   Nor does she allege that the Government made any false statements to her or promised her that her assisntance in the Government's investigation would guarantee any favorable outcome.   Instead, Morton alleges that the Government "lulled her into a false sense of security" without advising her (i) "that most voluntary interviews with the USAO come with proffer protection," (ii) "that it might someday seek to use Ms. Morton's statements against her;" (iii) "that she would be best served by

13

speaking with counsel about the potential risks;" and (iv) that cooperation generally results in a guilty plea.   (Morton Br. at 20; 22-23; Morton Aff. ¶¶ 17, 22, 24-25).

Morton cites no case, and the Government is unaware of any, finding that any such warnings are required in a voluntary, non-custodial interview.   To the contrary, the law is clear that the Government is not obligated to disclose its future intentions when conducting a non-custodial interview nor to apprise the interviewee of every possible risk.   *Sattar*, 2003 WL 22510398 at *2 (Government was "not obligated to disclose to [defendant] that she could be indicted").   Indeed, with the exception of a warning concerning the possibility that her statements could be used against her, the warnings Morton demands are not even required in a *custodial interrogation*, let alone the voluntary non-custodial interview at issue here.   *See, e.g.*, *In re Terrorist bombings of U.S. Embassy in East Africa*, 552 F.3d 177, 212-13 (2d Cir. 2008) (no warnings beyond the *Miranda* warnings must be given to a defendant in a custodial interrogation and the defendant need not be informed that he may delay questioning in order to call counsel, call his wife, or seek assistance from his consulate); *United States* v. *Washington*, 431 U.S. 181, 188 (1977) (*Miranda* does not require additional warnings simply because the suspect is a potential defendant).   Morton's claim that additional warnings were required in a *voluntary*, non-custodial interview are thus wholly unavailing.

In arguing that the failure to provide such warnings constituted the type of outrageous Government misconduct warranting dismissal of the Indictment or suppression of the evidence, Morton relies almost exclusively on *United States* v. *DiGregorio*, 795 F. Supp. 630 (S.D.N.Y. 1992), a case whose facts are so wildly different that they only highlight how far away from outrageous the Government's conduct was here.   In *DiGregorio*, agents forced a defendant at

14

gunpoint—and without identifying themselves as law enforcement—to accompany them to their offices, where agents conducted a body cavity and strip search.   795 F. Supp. at 631.   Although clearly in custody, the defendant was not advised of his constitutional rights, was refused a lawyer, was refused access to medication for his claustrophobia, and was informed that he faced felony charges but that if he cooperated "nothing would happen to him."   *Id.* at 631-32.   The agents then arrested a second defendant who requested counsel and was told that he did not need a lawyer so long as he cooperated.   *Id.* at 632.   Thereafter, over the course of many months of cooperation, the agents failed to present the defendants before a judicial officer and continued to deny their request for counsel by telling the defendants that the retention of counsel risked a loss of their immunity.   *Id.* at 632-33.

Notably, while recognizing that the agents' conduct was "despicable," the Court found that it need not decide whether the conduct met the *Russell* standard of outrageousness because "dismissal of the Indictment is not warranted . . . because the Defendants have failed to show that this behavior resulted in any prejudice to their defense or legal representation."   *Id.* at 635. Dismissal of the Indictment would be all the more unwarranted here where there was no outrageous Government misconduct and where Morton cannot show that the Government's behavior prejudiced her defense or legal representation.   Similarly, because there was no misconduct by the Government, there is no basis to suppress Morton's interview statements, consensual recordings, or—as discussed further below—the contents of her cellphone.

In this regard, Judge Carter's recent decision in *United States* v. *Doumanis*, et al., No. 17 Cr. 87 (ALC), 2018 U.S. Dist. LEXIS 13964 (S.D.N.Y. Jan. 29, 2018), is instructive.   In that case the defendant participated in a voluntary, non-custodial interview with law enforcement in

which he was apprised that he could have an attorney present, but declined to do so.   He

thereafter made consensual recordings, provided law enforcement with access to documents, and

continued to proffer with the Government.   Following his arrest, the defendant sought to dismiss

the indictment arguing that the Government's conduct in "insinuating that Defendant was not at

risk of prosecution and then leading him to provide the evidence that led to this indictment"

constituted outrageous government misconduct.   2018 U.S. Dist. LEXIS 13964 at *6.   Judge

Carter summarily rejected the defendant's arguments, finding that even if the defendant's

allegations were true, such tactics "do not shock the conscience or violate fundamental fairness."

*Id.*   Judge Carter similarly rejected the defendant's motion to suppress evidence gathered during

the pendency of his cooperation.   At base, Morton's allegations are virtually identical—that the

Government unfairly misled her to believe that she was not at risk.   But, as was true in

*Doumanis*, such allegations, even if true, simply do not constitute outrageous Government

misconduct.

Morton also appears to argue that the Government's treatment of her constituted an

implied oral agreement that she would not be prosecuted.   But even in Morton's rendition of

events, no such promise was ever made.   At most, according to Morton, an AUSA asked her to

step outside so that the Government could assess her credibility, following which she was told

that "they believed me, that they thought that I was trustworthy, and that they thought I was an

honest person" and that the Government later warned her "not to sell the Bonds because [she]

could be perpetrating a fraud."   (Morton Aff. at ¶¶ 18, 21).   But even assuming that Morton's

allegations are true, they would be far too vague to support a finding that a binding non-

16

prosecution agreement had arisen or that "a clear and unambiguous promise" of immunity had been made.

Morton, argues, however, that "like *DiGregorio*, the Court should evaluate the government's misconduct relative to Ms. Morton's personal circumstances." (Morton Br. at 19). That is plainly not what *DiGregorio* says. In *DiGregorio*, the court considered the defendant's motions (i) to dismiss the indictment based on outrageous Government misconduct; (ii) to dismiss the indictment based on a violation of the Speedy Trial Act; and (iii) to dismiss the indictment based on an oral immunity agreement. In considering the Speedy Trial Act issue, the Court rejected the Government's "formalistic" argument that because formal charges were never filed, the defendants had not been "arrested" for purposes of the Speedy Trial Act. 795 F. Supp. at 637. The Court then found that the "cases and the policies behind the Speedy Trial Act suggest that it is not so much the formal act of filing charges that implicates the Speedy Trial Act but rather the imposition by the federal Government of significant, involuntary restrictions on an individual's liberty." *Id.* Accordingly, the Court found that "perhaps more significant than the actual filing of charges is the defendant's subjective belief that charges have been brought and are pending." *Id.* at 638. But the significance of a defendant's subjective belief concerning her arrest status with respect to a Speedy Trial issue has nothing to say about the relevance of a defendant's subjective belief that she would not be prosecuted in evaluating the existence of an oral immunity agreement. To the contrary, as described above, in considering whether the Government entered into an oral immunity agreement with Morton, the Court must apply basic contract principles and consider whether there was ever a meeting of the minds. Whatever Morton's claimed subjective understanding, there can be no question that the conversations

17

Morton described did not constitute an intentional agreement to offer immunity by the Government.   *Sattar*, 2003 WL 22510398 at *2 ("while [the defendant] might have hoped that the Government's silence concerning her prosecution meant that none was contemplated, no reasonable person could have interpreted [the AUSAs] conduct or his representations to have been, explicitly or implicitly, an agreement or promise not to prosecute her.").   Accordingly, Morton's motion must be denied on this ground as well.

<u>**There is No Basis to Suppress the Consensual Search of Morton's Phone**</u>

Morton also argues that suppression of her phone is warranted because she did not voluntarily consent to its search.   The incontrovertible evidence, however, dictates otherwise. Accordingly, Morton's motion to suppress the search of her phone must be denied.

**I.**   <u>**Relevant Law**</u>

"The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States* v. *Moreno*, 701 F.3d 64,76 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2797 (2013) (internal quotation marks and citation omitted).   Whether consent is voluntary "is a question of fact determined by a totality of all the circumstances."   *United States* v. *Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (internal quotation marks omitted).   Thus, consent may be voluntary even when given in a coercive environment.   *See, e.g.*, *United States* v. *Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) ("Nor does a finding of coercion follow from the fact that [the individual] was handcuffed."); *United States* v. *Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2014) (consent voluntary even though consenting individual was handcuffed and arrested by five or six officers with their weapons drawn).   Courts may consider factors such as age, intelligence, experience with the criminal justice system, and whether the defendant was aware of his right to withhold consent in

18

determining voluntariness. *See United States* v. *Munoz*, 987 F. Supp. 2d 438, 444 (S.D.N.Y. 2013) (internal quotation marks omitted).

Execution of a written consent form advising a defendant of the right to refuse a search is strong evidence of voluntary consent. *See United States* v. *Schaefer*, 519 F. App'x 71, 72 (2d Cir. 2013) ("the totality of circumstances supports [the] finding that the refusal could not reasonably be understood to have coerced [the defendant's] subsequent consent to search, particularly as [the defendant's] consent was given in writing on a form that specifically advised him of his right to refuse consent") (internal citations omitted); *United States* v. *Castillo,* 866 F.2d 1071, 1082 (9th Cir. 1988) ("Execution of a consent form is one factor that indicates that consent was voluntary."); *United States* v. *Murphy,* 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) ("[t]he consent form, which [defendant] read and which was explained to him before he signed it, gave clear notice of his rights.").

## II.   **Discussion**

Morton alleges that her consent to the search of her phone was not knowing and voluntary because "the Government tacitly coerced her into signing the consent by drawing her into a false sense of safety and alignment of interest."   (Morton Br. at 28).   As discussed in greater detail above, the Government did not draw Morton into a false sense of safety and security.   Here, it is difficult to imagine how Morton's consent could have been obtained in a less coercive fashion.   Morton was presented with the option to give her consent and was offered as much time as she liked to consider the matter.   Indeed, as evidenced by the date of signature on the consent to search form, Morton waited several weeks to make a decision and did so outside the presence of law enforcement or prosecutors.   By signing the form, Morton explicitly acknowledged that she had the right to refuse to consent to any search, that her consent

was given voluntarily, and that she had not been promised anything in exchange for her consent. Although Morton now alleges that she "did not understand that the government could . . . use this information against me," (Morton Aff. ¶23), the form she signed is explicit that by virtue of her consent any information on her phone could "be used against me in a court of law."   (Exhibit C).

Morton makes much of her "lack of legal sophistication," and her "personal illness and trauma triggers that cause her to be susceptible to stress and pressure."   (Morton Br. at 19).   As a preliminary matter, there is no evidence that Morton was legally unsophisticated and her affidavit describes neither a lack of sophistication nor any personal trauma.   To the contrary, Morton was a college-educated financial professional who held securities licenses and who had previous experience dealing with legal matters, including with FINRA.   Her personal traumas, which the Government accepts at face value, are tragic, but there is simply no connection between those historic events and Morton's consent to search her phone years later.   Morton was a sophisticated professional.   She was presented with the option to consent to a search of her phone, and was advised both that she need not agree and that any evidence gathered could be used against her.   Having considered the matter, several weeks later and outside the presence of the Government, Morton signed the consent form of her own free will.   Nothing could be less coercive.   Because the record is clear that Morton's consent was voluntary, her motion to suppress the search of her phone must be denied.

### The Court Should Not Sever the Trials of the Co-Defendants

Archer and Cooney seek a trial separate from co-defendants John Galanis, Morton and Hirst, and Morton and Hirst each seek separate trials.   In support of their motions, Archer, Cooney, Morton and Hirst argue that (a) their defenses are inherently antagonistic to the defenses

of their co-defendants, (b) disparities exist in the amount or type of proof offered against their

co-defendants, (c) there are varying degrees of involvement by the defendants in the overall

scheme, and (d) there is risk of spillover prejudice.   In addition, Morton argues that Count One

of the Indictment improperly joins Morton with Archer and Cooney because it fails to establish

that they agreed to become part of the same conspiracy or that they were part of the same

fraudulent scheme.   The defendants' arguments are meritless.   The conduct underlying each of

the charges in the Indictment comprises a single conspiracy involving an interrelated series of

acts and transactions involving many of the same participants.   The evidence would be almost

entirely the same whether this case is tried jointly or separately, and no defendant has identified

any prejudice from a joint trial other than the "run-of-the-mill situation where codefendants

accuse one another of being the guilty parties."   *United States* v. *Nadeem*, No. 13 Cr. 424

(BMC), 2014 WL 3563407, at *6 (E.D.N.Y. July 18, 2014).   Courts have recognized a

"particularly strong" preference for joint trials in multi-defendant conspiracy cases like this one,

*United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also United States* v. *Spinelli*, 352

F.3d 48, 55 (2d Cir. 2003); *United States* v. *Bosch*, 385 F. Supp. 2d 387, 389 (S.D.N.Y. 2005),

and none of the defendants provide reason to disregard that preference here.

I.   **The Defendants are Properly Joined Under Rule 8**

   **A.  Applicable Law**

   Rule 8 of the Federal Rules of Criminal Procedure provides:

> Rule 8(b) Joinder of Defendants. The indictment or information may
> charge 2 or more defendants if they are alleged to have participated
> in the same act or transaction, or in the same series of acts or
> transactions, constituting an offense or offenses. The defendants
> may be charged in one or more counts together or separately. All
> defendants need not be charged in each count.

21

Fed. R. Crim. P. 8.

The Second Circuit has interpreted Rule 8(b) to mean that "'joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common scheme or plan.'"  *United States* v. *Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (quoting *United States* v. *Cervone*, 907 F.2d 332, 341 (2d Cir. 1990)).   "Under the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment'" and not on the evidence adduced at trial.   *Rittweger*, 524 F.3d at 178 (citing Fed. R. Crim. P. 8(b)).   It is an established rule that "a non-frivolous conspiracy charge is sufficient to support joinder of defendants."  *United States* v. *Nerlinger*, 862 F.2d 967, 973 (2d Cir.1988); *United States* v. *Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense.") (quoting *United States* v. *Castellano*, 610 F.Supp. 1359, 1396 (S.D.N.Y. 1985).   The Second Circuit has warned that "the plain language of Rule 8(b)" precludes "consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for consideration of evidence at trial."  *Rittweger*, 524 F.3d at 178 n.3.

**B.  Discussion**

Count One properly joins Morton with Jason Galanis, John Galanis, Hirst, Dunkerley, Archer and Cooney as set forth in Rule 8(b).  *See Rittweger*, 524 F.3d at 178.   The Indictment alleges a single conspiracy, wherein the defendants conspired to commit securities fraud by "(a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the

22

light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons," in connection with the purchase or sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.   (Indictment ¶¶ 26, 27).   As alleged in the Indictment, the fraudulent scheme that the defendants engaged in involved (1) causing the WLCC to issue more than $60 million in bonds based on false and misleading representations, and causing Hughes and Atlantic clients to purchase issuances of the bonds, (2) failing to invest the bond proceeds on the WLCC's behalf in the manner agreed upon, and (3) instead misappropriating the proceeds of the bonds for their own purposes.   (Indictment ¶¶ 4, 6-25).

Morton's claim that the Indictment "does not allege facts to establish that they agreed to become part of the same conspiracy or that they were part of the same fraudulent securities scheme" is unpersuasive.   As alleged in the Indictment, Morton, Archer and Cooney participated in a "common plan or scheme" that was "unified by some substantial identity of facts or participants." *Rittweger*, 524 F.3d 171, 177.   Morton's claim that Count One "fails to allege any overt acts that involve both Ms. Morton and Archer and Cooney" misapprehends the law of conspiracy.   "A single conspiracy may be found where there is mutual dependence and assistance among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States* v. *Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (quoting *United States* v. *Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)) (internal quotation marks omitted).

The Second Circuit has long held that:

> All that needs to be proved is that it reasonably could be inferred that [the defendants] participated in the alleged enterprise with a consciousness of its general nature and extent. . . . The members of the conspiracy do not have to conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member. . . . There is no requirement that the same people be involved throughout the duration of the conspiracy.

*Id.* (quoting *United States* v. *Rooney*, 866 F.2d 28, 32 (2d Cir. 1989)) (internal quotation marks omitted); *see also United States* v. *Gleason*, 616 F.2d 2, 16 (2d Cir. 1979) ("To be convicted as a member of a conspiracy, a defendant need not know every objective of the conspiracy . . .   every detail of its operation or means employed to achieve the agreed-upon criminal objective, . . . or even the identity of every co-conspirator.").   In addition, "[a] defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member." *United States* v. *Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992) (citations omitted).   In short, there is simply no requirement for the Indictment to allege that Morton conspired directly with every member of the conspiracy, or that she committed overt acts with every member of the conspiracy, or that she participated in every aspect of the scheme, in order for Morton to be properly joined in Count One.   Count One properly alleges a single conspiracy in which each of the charged co-conspirators, including Morton, "participated in the alleged enterprise with a consciousness of its general nature and extent."   *Vanwort*, 887 F.2d at 383 (2d Cir. 1989).

## II.   <u>Severance Under Rule 14 Is Not Warranted</u>

### A.   Applicable Law

Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the

24

court may order separate trials of counts, sever the defendants' trials, or provide any other relief

that justice requires."    A defendant seeking severance under Rule 14, however, has a very heavy

burden.   "There is a preference in the federal system for joint trials of defendants who are

indicted together."   *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993).   "This preference is

particularly strong where, as here, the defendants are alleged to have participated in a common

plan or scheme."   *Salameh*, 152 F.3d at 115; *see also Spinelli*, 352 F.3d at 55 ("Joint trials are

often particularly appropriate in circumstances where the defendants are charged with

participating in the same criminal conspiracy.").   As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal
> justice system to require . . . that prosecutors bring separate
> proceedings, presenting the same evidence again and again
> requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand.   Joint trials generally serve the
> interests of justice by avoiding inconsistent verdicts and enabling
> more accurate assessment of relative culpability—advantages which
> sometimes operate to the defendant's benefit.   Even apart from
> these tactical considerations, joint trials generally serve the interests
> of justice by avoiding the scandal and inequity of inconsistent
> verdicts.

*Richardson* v. *Marsh*, 481 U.S. 200, 210 (1987).   In light of this presumption, "defendants are

not entitled to severance [under Rule 14] merely because they may have a better chance of

acquittal in separate trials."   *Zafiro*, 506 U.S at 540.   Thus, the mere fact that defendants have

mutually antagonistic defenses will not itself justify severance.   Instead severance based on

mutually antagonistic defenses is warranted if, and only if, "in order to accept the defense of one

defendant, the jury must of necessity convict a second defendant."   *United States* v. *Van Hise*,

25

No. 12 Cr. 847 (PGG), 2013 WL 6877319, at *12 (S.D.N.Y. Dec. 31, 2013) (quoting *United States* v. *Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991)).

Finally, even assuming that a particular defendant is somehow prejudiced by joinder, the issue under Rule 14 is whether that prejudice "'is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials.'" *United States* v. *Page*, 657 F.3d 126, 129 (2d Cir. 2011), quoting *United States* v. *Walker*, 142 F.3d 103, 110 (2d Cir. 1998).   Indeed, it is well settled that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States* v. *Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983); *United States* v. *Bonventre*, 646 F. App'x 73, 81 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 676, 196 L. Ed. 2d 560 (2017).   The Supreme Court has instructed that district courts should only grant a severance under Rule 14 when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.   Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* (citing *Richardson* v. *Marsh*, 481 U.S. 200, 211 (1987)).   Thus, a proper limiting instruction that the jury consider the evidence separately as to each charge against each defendant will typically provide appropriate protection against any potential for confusion or prejudice.   Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

**B. Discussion**

The defendants' requests for severance are meritless and should be denied.   The defendants are all charged with conspiring with each other and other individuals to commit securities fraud related to the WLCC Bonds scheme.   While each defendant played different roles in the course of the fraudulent enterprise, and Hirst and Morton are additionally charged with conspiring to commit and committing investment adviser fraud in connection with the purchase of the WLCC Bonds into client accounts managed by Hughes and Atlantic, their conduct was all part of a common plan and scheme.   Indeed, the acquisition of Hughes and Atlantic and the purchase of illiquid WLCC Bonds, even though the bonds were outside the investment parameters of many of those firms' clients and even though multiple conflicts of interests had not been disclosed, were both part of the investment adviser fraud and part of the larger securities fraud scheme.   (*See* Indictment ¶¶ 12-16 ("Control of Atlantic and Hughes")).

No defendant has identified—nor could they—any particular circumstance that distinguishes this case from numerous others in which multiple co-conspirators are charged and tried together for their crimes, despite inevitable differences in their involvement, conduct, culpability, and their lack of esteem for one another.   In the absence of this showing, this is hardly the exceptional case that warrants departing from the "particularly strong" preference for joint trials of defendants charged with interconnected schemes.   *Salameh*, 152 F.3d at 115; *see also Spinelli*, 352 F.3d at 55 ("Joint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy[.]"); *Bosch*, 385 F. Supp. 2d at 389 (S.D.N.Y. 2005) ("The arguments in favor of a joint trial are especially compelling where, as here, the crime charged involves a criminal conspiracy.").

1. **Antagonistic Defenses**

Archer, Cooney, Hirst and Morton all claim that their trials should be severed because they expect to introduce mutually antagonistic defenses.   For example, Hirst expects to argue that Morton exercised "ultimate decision-making authority over Hughes' investments and owed a fiduciary duty to its clients," (Hirst Br. at 9), and Morton expects to argue that she believed Hirst was a "legitimate CIO" and that she relied on Hirst "in determining which client portfolios could permissibly accept the [WLCC] Bonds" (Morton Br. at 37).   Likewise, Archer and Cooney expect to argue that they were "unwitting tools of Jason Galanis" who were "duped by Jason Galanis and used by him to further his criminal conspiracy with the other defendants," and that "the most essential components of Jason Galanis's overall scheme . . . involved one or several of the other defendants."   (Archer and Cooney Severance Br. at 9-10).   All defendants argue that, in putting on their respective defenses, they will be pointing fingers at each other and/or would be required to act as *de facto* prosecutors for one or more of their remaining defendants.   (Hirst Br. at 12; Morton Br. at 37; Archer and Cooney Severance Br. at 10).   All of these claims are meritless.

"Defenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'"   *United States* v. *Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (quoting *United States* v. *Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991)).   Even mutually antagonistic defenses, however, are not per se prejudicial; "[i]nstead, a defendant must show that antagonistic defenses will result in prejudice such that 'there is a serious risk that a joint trial would compromise a specific trial right.'"   *United States* v. *Tuzman*, No. 15 Cr. 536 (PGG), 2017 WL 4785459, at *6 (S.D.N.Y. Oct. 19, 2017) (quoting *Zafiro* v. *United States*, 506 U.S. 534, 539 (1993)).   "Moreover, 'Rule 14 does not require severance even if prejudice is

28

shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.'"   *Id.* (quoting *Yousef*, 327 F.3d at 151).

Here, the defendants have not established that their defenses are mutually antagonistic, much less that there is a serious risk that a joint trial will compromise a specific trial right. Instead, they "seek severance essentially on the ground that they will argue that they are not guilty because they were duped by other members of the conspiracy."   *United States* v. *Hameedi*, No. 17 Cr. 137 (JGK), 2017 WL 5152991, at *4 (S.D.N.Y. Nov. 3, 2017).   "The Second Circuit Court of Appeals has repeatedly rejected 'fingerpointing' arguments of this sort as a basis for severance."   *Id.*   (collecting cases).   A jury could accept Hirst's defense that Morton was the "ultimate decision mak[er]" at Hughes, who owed fiduciary duties to Hughes' clients *and* also that Morton acted appropriately, by, for example, buying the WLCC bonds without the requisite knowledge or intent to defraud Hughes' clients.   Similarly, a jury could accept Morton's claim that she relied on Hirst and also find that Hirst acted without the requisite knowledge or intent to defraud Hughes investors.

Likewise, if a jury credited Archer and Cooney's arguments that they were "unwitting dupes" of Jason Galanis, it could also find that the other defendants were similarly used by Jason Galanis.   *Hameedi*, 2017 WL 5152991, at *4 (denying motion for severance based on purported antagonistic defenses and noting that "[a]ll of the defendants can argue that they acted in good faith without knowledge that what they were doing was fraudulent, whether or not they relied on the statements of their co-defendants"); *Cardascia*, 951 F.2d at 486 (affirming denial of severance motion and noting that "the essence of both defenses—that each defendant was not

29

involved in the conspiracy—plainly is typical of co-conspirator trials and does not warrant severance").

Accordingly, the defendants have not shown that a severance is warranted based on their purported antagonistic defenses, and the Court can cure any potential prejudice by instructing the jury to consider each count and each defendant separately.   *Hameedi*, 2017 WL 5152991 at *5 ("Severance is also not the appropriate remedy for any prejudice asserted by the defendants resulting from allegedly antagonistic defenses.   It is well established that a court can cure prejudice caused by allegedly antagonistic defenses through the use of jury instruction.").

Finally, an aberrant decision from the Eastern District granting severance in *United States* v. *Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), does not support the severance arguments made here.   In *Shkreli*, the defendants—a hedge fund manager and his corporate attorney—were charged with defrauding investors.   *Id.* at 249-52.   Each defendant planned to blame the other at trial: the hedge fund manager claimed that he relied on advice of counsel, while the attorney contended that he was a victim of the manager's fraud.   *Id.* at 254.   Despite the obvious potential for finger pointing, the Court found that "the defendants ha[d] *not* shown that their defenses [were] mutually antagonistic, or that the risk of spillover prejudice [was] so great that severance [was] warranted."   *Id.* at 256 (emphasis added).   The Court nevertheless granted a severance because of the "extraordinary and unique facts" presented by the "rare" situation in which an attorney defendant intended to argue that his hedge fund manager client was in fact guilty of the charged fraud and that he was a victim of that fraud.   *Id.* at 256 (granting severance "because . . . . Greebel's defense team will act as a second prosecutor against Shkreli, by arguing

that Shkreli is guilty and that Greebel is, himself, *just another victim of Shkreli's fraud*" and noting the "extraordinary and unique facts presented here" (emphasis added)).

Even accepting the rationale of the court in that case, this case is simply not comparable to *Shkreli*.   While, as discussed above, the defendants may well cast blame on each other, and even argue that other co-defendants are guilty, such "fingerpointing" is common in multi-defendant conspiracy cases and not a basis for severance under well-settled case law.   *Tuzman*, 2017 WL 4785459, at *7 (denying severance and noting that there was no record of the "extraordinary and unique facts" present in *Shkreli*).   As discussed above, "[w]hile the defendants may present different theories to the jury and may disagree about one or more of the underlying facts, each defendant could be acquitted (or convicted) under either side's presentation of the facts."   *Tuzman*, 2017 WL 4785459, at *7.

Also, unlike *Shkreli*, no defendant is claiming to have been victimized by a fellow trial defendant's fraud.   *See Tuzman*, 2017 WL 4785459, at *7 (finding that regardless of whether each defendant intended to introduce evidence and arguments related to harm suffered by the other's actions, the defendants were charged with having defrauded investors, and not each other).   Instead, Archer, Cooney, Morton and Hirst are charged with participating in a scheme that defrauded and victimized the WLCC and the victim pension funds.

### 2.  Spillover Prejudice

Despite their claims to the contrary, no defendant will be subject to any "spillover prejudice" from a joint trial.   Each defendant attempts to characterize the Government's charges and evidence to suggest that there is little overlap in the nature of the evidence that would be introduced were separate trials conducted.   That is simply not the case.

31

Archer and Cooney's spillover prejudice arguments are two-pronged: first, they argue, the evidence against Archer and Cooney is different in kind and degree from the evidence against their co-defendants, and, second, certain prejudicial evidence against their co-defendants would not be admissible against Archer and Cooney.   (Archer and Cooney Severance Br. at 16-23).   Archer and Cooney attempt to divide parts of the overall common scheme by arguing that the case alleges "at least two fundamentally separate schemes"—the so-called "first" scheme, involving the fraudulent inducement of the WLCC to issue the WLCC bonds, which were then moved into Hughes and Atlantic customer accounts controlled by Hirst and Morton, and the so-called "second" scheme, involving the misappropriation of the WLCC bond proceeds by Jason Galanis, Dunkerley, Hirst, Archer and Cooney.   (Archer and Cooney Severance Br. at 2). Morton similarly argues that she will be tainted by evidence regarding the fraudulent inducement of the WLCC to issue the bonds, misappropriation of the bond proceeds by Archer and Cooney, the recycling of the bond proceeds, and evidence of her co-defendants' prior bad acts.   (Morton Br. at 38-39).   Hirst also argues that he will be prejudiced because the magnitude of the evidence against his co-conspirators "dwarfs" the amount of evidence against him, that the Government's case will include evidence of misconduct—such as the fraudulent inducement of and misrepresentations to the WLCC, and the Second, Third and Fourth Bond Issuances—that did not involve him.   (Hirst Br. at 14-16).

The defendants' characterization of the evidence related to the various aspects of their common plan and scheme attempts to create an artificial distance between them so as to generate an appearance of prejudice.   However, there are very few, if any, conspiracy cases where all of the evidence at trial implicates each defendant or where each defendant is equally culpable.   The

nature of a conspiracy is that each defendant plays a different role, and takes actions that do not directly involve his or her co-conspirators.   *See Carson*, 702 F.2d at 366-67 ("There is no question that Thomas played a less prominent role in the conspiracy than many of his co-defendants.   However, differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials. . . . Moreover, the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance").   That Morton and Hirst are also charged with investment adviser fraud as a result of their roles at the Investment Advisers does not change the assessment, since placing the bonds in client accounts at captive investment adviser firms was necessary to the success of the overarching securities fraud scheme.   Because there was no real market for these bonds, causing these advisory clients to purchase the bonds was the mechanism by which the defendants could profit from the scheme.   This is also why Archer and Cooney's arguments that "[s]tatements by co-conspirators in furtherance of the investment adviser fraud conspiracy will not be admissible against" them fails—the conspiracy to commit investment adviser fraud in connection with the First Bond Issuance and the Fourth Bond Issuance is but one aspect of the overall securities fraud scheme charged in Counts One and Two.

Here, the evidence to be introduced at separate trials would overlap considerably given the intertwined nature of the conduct underlying the charges in this case.   A trial against any single defendant in this case would necessarily involve the same evidence of how the participants in the scheme caused the WLCC to issue more than $60 million in bonds based on false and misleading representations, caused Hughes and Atlantic clients to purchase issuances of the bonds, failed to invest the bond proceeds on the WLCC's behalf in the manner agreed upon,

33

recycled certain of the bond proceeds, and misappropriated the proceeds of the bonds for their own purposes.   (Indictment ¶¶ 4, 6-25).   As a result, contrary to the defendants' assertions, it is difficult to envision a case involving a multi-faceted fraudulent scheme in which the evidence relating to each aspect of the scheme could be even more intertwined.

The upshot of the factual overlap is also that no defendant would benefit from severance: the evidence will be same whether they are trial jointly or separately.   *See, e.g.*, *United States* v. *Villegas*, 899 F.2d 1324, 1347 (2d Cir. 1990) (finding no prejudicial spillover where evidence regarding a charged conspiracy was admissible against each of the defendants); *United States* v. *Bari*, 750 F.2d 1169, 1178 (2d Cir. 1984) (denying motion to sever "the least active, but nevertheless fully implicated conspirator" because the evidence would have been admissible at a separate trial); *United States* v. *Rahman*, 854 F. Supp. 254, 262 (S.D.N.Y 1994) ("Once such proof is shown to be admissible, there is no potential prejudice to be avoided by severing the charges [or defendants] to which that proof relates.").[7]

The defendants' arguments about the prejudicial effect of the prior bad acts evidence of their co-defendants is similarly unavailing.   While the Government reserves the right to prove that (i) Jason Galanis, John Galanis, and Hirst were arrested together in a prior proceeding in September 2015, and (ii) that, during the relevant period, there was publicly available information about prior regulatory enforcement activity against Jason Galanis as well as John Galanis's prior criminal history, the Government does not intend to prove up the substance those events.   In addition to being relevant to show the pre-existing relationships between Jason

---

[7]  Because the defendants are co-conspirators, this would include each of the defendant's statements during the conspiracy.

Galanis, John Galanis, and Hirst, the evidence is, among other things, relevant to provide context for and explain actions taken by the other defendants, including Archer, Cooney and Morton, during that period.   As such, there is zero spillover prejudice to Archer, Cooney, or Morton from such evidence, much less the level of prejudice necessary to justify severance.   In addition, if any such evidence is introduced pursuant to Rule 404(b), it can be accompanied by an instruction of the Court explaining the limit purpose for which, and against whom, the jury can consider it.

### 3.  Considerations of Judicial Economy

If anything, the factual overlap in this case also means that considerations of judicial economy favor a joint trial.  The same evidence would be admitted against Archer, Cooney, Morton and Hirst whether tried jointly or separately, meaning that severance would require the same complex, month-long case to be tried multiple times.   For example, the WLCC victims and pension fund victims, and various witnesses from the Investment Advisers and other entities the defendants used in furtherance of their scheme would testify at every trial about substantially the same topics and with reference to many of the same documents.   Such a result would be inefficient and a waste of the time and resources of the Court and witnesses.   *See United States* v. *Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980) (declaring that "a co-defendant is obliged to accept some risk of prejudice because of the public advantages of a joint trial"); *Van Hise*, 2013 WL 6877319, at *12 (citing *United States* v. *Shuford*, 454 F.2d 777 n.5 (9th Cir. 1971) (noting that courts considering severance have examined the complexity and length of trials)).

Accordingly, the Court should deny the defendants' severance motions.

**The Court Should Deny Archer and Cooney's Motion to Dismiss Count Two**

Archer and Cooney each argue that Count Two of the Indictment should be dismissed against them because it "fails to allege facts that support a cognizable legal theory under which" Archer and Cooney could be said to have committed, or willfully aided others in committing, securities fraud.   (Archer Omnibus Br. at 8; Cooney Br. at 2).   Archer and Cooney also argue that the Indictment should be dismissed as multiplicitous.   These claims rest on a mischaracterization of what is charged in the Indictment and should be denied.

I.     **Applicable Law**

A.  **Dismissal of an Indictment**

The Federal Rules of Criminal Procedure provide that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). To satisfy this requirement, an indictment generally "'need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"   *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).   "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."   *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks and citation omitted).

A facially valid indictment "is enough to call for trial of the charge on the merits." *Costello* v. *United States*, 350 U.S. 359, 363 (1956).   A defendant must wait until after the close

36

of the Government's case-in-chief at trial before contesting the sufficiency of the evidence.   *See* Fed. R. Crim. P. 29; *see also, e.g.*, *United States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997) ("[I]t is well established that an Indictment that is valid on its face may not be dismissed on the ground that it is based on inadequate or insufficient evidence. . . . [T]he Government is not required to demonstrate the sufficiency of its proof until the close of its case-in-chief at trial."). As dismissal is an extraordinary remedy, the allegations of the indictment are assumed to be true when considering a motion to dismiss, and the court reads the indictment as a whole.   *Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 343 n.16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).   "A court properly considers the 'to wit' clauses in an indictment when assessing its sufficiency under Rule 7(c)."   *United States* v. *Percoco*, No. 16-CR-776 (VEC), 2017 WL 6314146, at *5 (S.D.N.Y. Dec. 11, 2017) (citations omitted).

To prove a violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. 240.10b-5, as charged in Count Two, the Government must establish the following elements:

> First, that in connection with the purchase or sale of [a security] the defendant did *any one* or more of the following: (1) employed a device, scheme or artifice to defraud, or (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or (3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.
>
> Second, that the defendant acted willfully, knowingly and with the intent to defraud.
>
> Third, that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct."

*Nicholson* v. *United States*, No. 09-CR-414 RJS, 2014 WL 4693615, at *7 (S.D.N.Y. Sept. 22,

37

2014), *aff'd*, 638 F. App'x 40 (2d Cir. 2016) (citing Leonard B. Sand, et al., 3 Modern Federal

Jury Instructions: Criminal, Instruction 57:20 (2012) (emphasis added)).

### B.  Multiplicity

"An indictment is multiplicitous when a single offense is alleged in more than one

count."  *United States* v. *Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (quoting *United States* v.

*Roshko*, 969 F.2d 9, 12 (2d Cir. 1992)) (internal quotation marks omitted).   A multiplicitous

indictment violates the Double Jeopardy Clause of the Fifth Amendment, which "assur[es] that

the court does not exceed its legislative authorization by imposing multiple punishments for the

same offense."  *Brown* v. *Ohio*, 432 U.S. 161, 165 (1977).

"To assess whether the two offenses charged separately in the indictment are really one

offense charged twice, the 'same elements' test or the '*Blockburger*' test is applied."  *United*

*States* v. *Chacko*, 169 F.3d 140, 146 (2d Cir. 1999) (citing *Blockburger* v. *United States*, 284

U.S. 299 (1932)); *see also Brown*, 432 U.S. at 166.   Under *Blockburger*, "where the same act or

transaction constitutes a violation of two distinct statutory provisions, the test to be applied to

determine whether there are two offenses or only one, is whether each provision requires proof

of a fact which the other does not."  *Blockburger*, 284 U.S. at 304.   In other words, "[i]f there is

an element in each offense that is not contained in the other, they are not the same offense for

purposes of double jeopardy, and they can both be prosecuted."  *Chacko*, 169 F.3d at 146.

It is well established that a conspiracy to commit an offense and the substantive

commission of that offense are separate crimes that may be charged separately.  *See, e.g.,*

*Pereira* v. *United States*, 347 U.S. 1, 11 (1954) ("[T]he commission of a substantive offense and

a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no

38

defense to a conviction for both."); *United States* v. *Sattar*, 314 F. Supp. 2d 279, 306 (S.D.N.Y.

2004) (citing *Pereira*, 347 U.S. at 11), *aff'd sub nom. United States* v. *Stewart*, 590 F.3d 93 (2d

Cir. 2009).

## II.    **Discussion**

As discussed above, the Indictment charges Archer and Cooney in two counts.   Count

One charges Archer and Cooney with conspiring to commit securities fraud, and Count Two

charges Archer and Cooney with the substantive offense of securities fraud.   Specifically, Count

Two, which incorporates the detailed factual allegations set forth in prior paragraphs 1 through

25—including about Archer's and Cooney's conduct and roles in the fraudulent scheme—states:

> From at least in or about March 2014 through in or about April 2016,
> in the Southern District of New York and elsewhere, JASON
> GALANIS, GARY HIRST, JOHN GALANIS, a/k/a "Yanni,"
> HUGH DUNKERLEY, MICHELLE MORTON, DEVON
> ARCHER, and BEVAN COONEY, the defendants, and others
> known and unknown, willfully and knowingly, directly and
> indirectly, by use of the means and instrumentalities of interstate
> commerce, and of the mails, and of the facilities of national
> securities exchanges, used and employed manipulative and
> deceptive devices and contrivances, in connection with the purchase
> and sale of securities, in violation of Title 17, Code of Federal
> Regulations, Section 240.10b-5, by (a) employing devices, schemes,
> and artifices to defraud; (b) making untrue statements of material
> fact and omitting to state material facts necessary in order to make
> the statements made, in the light of the circumstances under which
> they were made, not misleading; and (c) engaging in acts, practices,
> and courses of business which operated and would operate as a fraud
> and deceit upon persons, to wit, the defendants engaged in a scheme
> to misappropriate the proceeds of several bond issuances by the
> WLCC and also caused investor funds to be used to purchase the
> bonds, for which there was no secondary market through which such
> bonds could be redeemed, without disclosure to those investors of
> material facts, including the existence of multiple conflicts of
> interest, and which investments, in some cases, were outside the
> investment parameters of the accounts in which they were placed.

(Indictment ¶ 30).   These allegations, which "track the language of the statute charged and state the time and place . . . of the alleged crime," *Stavroulakis*, 952 F.2d at 693 (internal quotation marks omitted) plainly satisfy Rule 7's pleading requirements: they provide notice of the charges and are sufficiently definite that the defendants can plead double jeopardy in a future prosecution based on the same conduct.   Count Two also charges Archer and Cooney with violating 18 U.S.C. § 2, the "aiding and abetting" statute, and, as such, charges Archer and Cooney with "aiding and abetting," or "willfully causing" the substantive crime of securities fraud.   *See United States* v. *Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (discussing requirements of aiding and abetting liability).   This is sufficient for the case to proceed to trial.   *See, e.g.*, *Costello*, 350 U.S. at 363 ("An indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits."); *United States* v. *Cafaro*, 480 F. Supp. 511, 520 (S.D.N.Y. 1979) ("An indictment, valid on its face and returned by a properly constituted grand jury, is sufficient to require trial of the charge on the merits.").

The Court should reject the defendants' contrary arguments.

To begin with, none of the criminal securities fraud decisions Archer cites on pages nine through 13 of his brief involve a facial challenge to an Indictment.   *Cf. United States* v. *Finnerty*, 533 F.3d 143, 145 (2d Cir. 2008) (post-trial appeal of Rule 29 motion); *United States* v. *Stewart*, 305 F. Supp. 2d 368, 369 (S.D.N.Y. 2004) (post-trial Rule 29 motion); *United States* v. *Farrah*, 11 F. App'x 34, 37 (2d Cir. 2001) (relevant language comes from discussion of relevant conduct under the Sentencing Guidelines; conviction and sentence affirmed in all respects).

And, as discussed above, "it is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence.   Instead, a defendant must await a Rule 29 proceeding . . . ."   *United States* v. *Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992).

It is also well-settled that, to be found guilty of participating in a securities fraud scheme, a criminal defendant need not have personally interacted with the victims of the scheme or personally made any misrepresentations.   *See* Sand, Modern Federal Jury Instructions, Instr. 57-21 ("It is no defense to an overall scheme to defraud that the defendant . . . played only a minor role with no contact with the investors . . . Nor is it necessary for you to find that the defendant was the actual seller or offeror of the securities. . . . [T]he government need not prove that the defendant personally made the misrepresentation or that he omitted the material fact.").

Archer nonetheless claims that he was merely a "passive recipient of" bond proceeds, that he had only a "passive" ownership interest in Atlantic Asset Management, and that his receipt of repeated communications from Jason Galanis do not show his involvement in the scheme. (Archer Omnibus Br. at 8-13).   But these arguments are what trials are for.   They go to the weight and sufficiency of the evidence against him, particularly his knowledge and intent.   It is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence.   *See United States* v. *Williams*, 504 U.S. 36, 54 (1992).

Accordingly, the Court should deny the motion to dismiss Count Two.

## <u>The Court Should Deny Archer and Cooney's Motions to Suppress</u>

The Court should deny Archer and Cooney's motion to suppress evidence the Government seized pursuant to two Stored Communications Act warrants (the "Warrants").

41

As a threshold matter, Cooney has failed to establish standing to challenge the Warrants. In any event, the motion to suppress fails on the merits as well.   The warrant application was factually accurate and complete.   Based on that application, which detailed Archer and Cooney's involvement in a complex, multi-year scheme and showed that each of the accounts in question sent or received emails related to that scheme, the issuing magistrate judge had a substantial basis to authorize search and seizure for each of the categories of information sought. Read as a whole, the Warrants complied with the Fourth Amendment's particularity requirement, appropriately constraining the searching officers' discretion to locate evidence of specific crimes in connection with the scheme at issue.

Further, the Government's execution of the warrants was reasonable and in good-faith. The Government took adequate steps to protect the attorney-client privilege, employing many of the electronic search terms proposed by the defendants and, to date, releasing potentially privileged documents to the trial team only after the defendants agreed that the documents are not in fact privileged.   More generally, over a period of only several months, the Government culled the hundreds of thousands of documents it initially received to a set of approximately 8,700 responsive records, demonstrating a careful, efficient, and ultimately reasonable review.

I.   **Background**

    **A.  The Affidavit**

On December 28, 2016, the Honorable Barbara Moses signed two search warrants pursuant to the Stored Communications Act, 18 U.S.C. § 2703, for a total of five email accounts (the "Subject Accounts"). The first warrant, directed to Apptix (the "Apptix Warrant"), authorized the Government to obtain all content and other information associated with the email accounts darcher@rosemontcapital.com (the "Archer Account") and

smomtazi@rosemontcapital.com (the "Momtazi Account").   The second warrant, directed to

Google (the "Google Warrant"), authorized the Government to obtain all content and other

information associated with the email accounts btcooney@gmail.com ("the Cooney Account"),

darcher@rosemontseneca.com (the "Archer Seneca Account") and

smomtazi@rosemontseneca.com (the "Momtazi Seneca Account") (and, together with the

Archer Account, the Momtazi Account, the Cooney Account and the Archer Seneca Account, the

"Subject Accounts").

    Judge Moses issued the warrants based on a 20-page affidavit, attached hereto as Exhibit

D, signed by FBI Special Agent Shannon Bieniek, which attached and incorporated by reference

the 23-page superseding indictment (the "Affidavit").   (Aff. ¶ 11).   The Affidavit explained that

the Government sought "all content, including emails and draft emails, created, sent or received

between January 1, 2014 and May 11, 2016, inclusive, and other information associated with"

the Subject Accounts.   (Aff. ¶ 2).   Agent Bieniek stated that she believed probable cause

existed to believe that "the Subject Accounts contain evidence, fruits, and instrumentalities of

violations of Title 18, United States Code, Section 1348 and Title 15, United States Code,

Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy

to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment

adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and

conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code,

Section 371 (the "Subject Offenses")."   (Aff. ¶ 3).

In the introductory paragraphs of the Affidavit, Agent Bieniek also stated that "[b]ecause [the Affidavit] is being summited for the limited purpose of establishing probable cause, it [did] not include all the facts I have learned during my investigation." (Aff. ¶ 3).

The Affidavit went on to summarize the services that Google and Apptix (the "Providers") offer to the public.   (*See generally* Aff. ¶ 4).   With respect to email content, the Affidavit explicitly stated that emails are "maintained on the Providers' servers unless and until the subscriber deletes the email."   (Aff. ¶ 4(b)(i)).   Accordingly, "[i]f the subscriber does not delete the email, it can remain on the Providers' computers indefinitely[.]"   (*Id.*).   And, the Affidavit noted, "even if the subscriber deletes the email, it may continue to be available on the Providers' servers for a certain period of time."   (*Id.*).   The Affidavit also described other services that the Providers, particularly Google, offered to their email account users.   (Aff. ¶ 4(b)(ii)-(xvii)).

The Affidavit then described why there was probable cause to believe that Archer and Cooney had committed the Subject Offenses.   (Aff. ¶¶ 8-11).   Agent Bieniek explained that "[s]ince at least 2015," law enforcement had been investigating a multi-faceted scheme relating to the issuance of bonds (the "Tribal Bonds") by the Wakpamni Lake Community Corporation (the "WLCC").   (Aff. ¶ 9).   The Affidavit "provide[d] a summary of the charged fraudulent scheme," noting (i) Jason and John Galanis' misrepresentations to the WLCC, and the WLCC's issuance of $60 million of bonds, (Aff. ¶ 11(a)); (ii) the misappropriation of the bond proceeds, (Aff. ¶ 11(b)); (iii) the fact that Archer and Cooney financed the acquisition of two investment adviser firms (the "Investment Advisers"), which provided the necessary buyers for the bonds, (Aff. ¶ 11(c)-(d)); (iv) the fact that Archer and Cooney bought the second and third issuances of

Tribal Bonds, using recycled proceeds from the first issuance, (Aff. ¶ 11(e)).   As noted above, the Affidavit also attached and incorporated by reference the Indictment.   (Aff. ¶ 11).

Next, the Affidavit provided evidence linking the Subject Accounts to the scheme.   (Aff. ¶¶ 12-19).   Agent Bieniek noted that "as part of the investigation," she had reviewed email correspondence from the Subject Accounts concerning "the initiation of the scheme to orchestrate the issuance of the Tribal Bonds; the placement of the Tribal Bonds with clients of the captive Investment Advis[e]rs; and the use of Tribal Bond proceeds."   (Aff. ¶ 13).

Agent Bieniek then provided "[s]ome examples" of emails she had reviewed involving Archer, Cooney, Momtazi, and Jason Galanis during the investigation.   (Aff. ¶ 13).   These examples demonstrated that the Subject Accounts had been used to send or receive messages regarding numerous aspects of the multi-faceted scheme.   These included:

- Email communications sent or received by the Archer Account and the Cooney Account regarding the First Bond Issuance, including emails regarding the proceeds that Jason Galanis, Archer, and Cooney could expect to receive from the issuance (Aff. ¶ 14(a));[8] the timing of the bond issuances and Jason Galanis's "primary objective," which was to get him, Archer, and Cooney "a source of discretionary liquidity," (Aff. ¶ 14(b)); and the WLCC's approval of the bond issuances, to which Cooney responded ""This is pure genius alla [sic] mikey  Milken!!   The Native American Bonds!!," Afff. ¶ 14(c).[9]

- Email communications sent or received by the Archer Account and the Cooney Account regarding efforts to obtain control over Hughes Asset Management, the Investment Adviser that ultimately purchased the first WLCC bond issuance on behalf of it clients, (Aff. ¶ 15(a)), including an email regarding the likelihood that Hughes would purchase the Tribal Bonds, to which Archer responded "This is very encouraging!" (Aff. ¶ 15(b)).

[8]  The subject line of this e-mail was "Oglala Native Spirits Memo."   *(See id.)*.   The Wakpamni Lake Community is a sub-division of the larger Oglala Sioux tribe.

[9]  As the Court is aware and is well known, Michael Milken was convicted of securities fraud in this District in 1990.

- Email communications sent or received by the Archer and Momtazi Accounts in September and October 2014, related to Archer's purchase of the second WLCC Bond issuance, which, as noted above, Archer bought used recycled proceeds from the first WLCC Bond issuance. (Aff. ¶ 17). These included an email in which Momtazi, cc-ing Archer, attached a client representation letter, which falsely stated "The funds used to purchase the bonds were from real estate sales through my business." (Aff. ¶ 17(c)).

- A September 2014 email related sent from the Momtazi Seneca Account, cc-ing the Archer Seneca Account, which attached a letter containing false and misleading information regarding Jason Galanis's relationship with the placement agent for the Tribal Bonds. (Aff. ¶ 18). Just days later, Archer provided this letter to the Independent Trustees of an asset manager affiliated with the placement agent, which had sought assurances from Archer that Jason Galanis would not be involved with either the placement agent or related entities. (*Id.*)

- An email sent to the Archer Account and the Cooney Account regarding a technology company, in which the proceeds of the WLCC Bond issuances were later invested, and whose shares were later used as a source of interest payments on the Tribal Bonds. (Aff. ¶ 19).

The Affidavit also noted that "Archer and Cooney resided, at least in part, in different locations throughout the United States from Jason Galanis and the other co-conspirators in the charged scheme, and therefore were likely to frequently communicate with each other via electronic, rather than in-person, communication." (Aff. ¶ 20).

Agent Bieniek then stated, that based on the above, she believed the Subject Accounts were likely to "contain evidence, fruits, and instrumentalities of the Subject Offenses," in particular:

- evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the Wakpamni Lake Community Corporation ("WLCC") and the misappropriation of the proceeds of those bonds, from January 1, 2014 to May 11, 2016;

- evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to:

    o all emails with or pertaining to Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, Devon Archer, and Bevan Cooney;

46

- o   all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;

- o   all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information);

- email communications with co-conspirators;

- emails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.,* the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

- passwords or other information needed to access the user's computer or other online accounts.

(Aff. ¶¶ 21-22).

The Affidavit also explained that "law enforcement personnel," including both agents and "attorneys for the government" would review the materials produced by the Provider for evidence of the Subject Offenses.   (Aff. ¶ 23).   The Affidavit also noted that law enforcement personnel would use "various methods" to review the records for responsive data, including potentially both "undertaking a cursory inspection of all emails within the Subject Account" and key-word searches.   (Aff. ¶ 24).

### B.  The Warrants

The Affidavit attached the proposed Warrants—one to Google for the Cooney Account, the Archer Seneca Account, and the Momtazi Seneca Account, and one to Apptix, for the Archer Account and the Momtazi Account.

The Warrants each listed and described (i) in Section I, the relevant Subject Accounts; (ii) in Section II, the information to be produced by the Provider; and (iii) in Section III, the method by which the Government would review the information produced by the Provider.

As to Section II, the Warrants ordered, for the time period between January 1, 2014 to May 11, 2016, the disclosure of (i) email contents; (ii) any address book; (iii) subscriber, billing, and transactional information; (iv) records of customer contact; and (v) preserved copies of the foregoing categories of records.   In addition, the Google Warrant also ordered the production of certain other information associated with Google accounts including Google Docs, Google Drive, Google chats and hangouts, location data, photographs, and analytical data.

In Section III, the Warrants contained identical "Review of Information by the Government" sections, which are re-produced below in relevant part:

> Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, . . .) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371, among other statutes, including the following:

48

- evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the Wakpamni Lake Community Corporation ("WLCC") and the misappropriation of the proceeds of those bonds, from January 1, 2014 to May 11, 2016;

- evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to:

  o all emails with or pertaining to Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, Devon Archer, and Bevan Cooney;

  o all emails with or pertaining to entities involved in the issuance, placement, purchase or sale of the bonds;

  o all emails with or pertaining to entities involved in the receipt and/or use of the bond proceeds;

- evidence of crime (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), communications constituting crime (*e.g.*, emails containing fraudulent representations); and identities and locations of co-conspirators or victims (communications with co-conspirators or victims, photos or other attachments, address book information);

- email communications with co-conspirators;

- emails that can be helpful to establish user identity;

- email header information which can assist in placing the targets or confederates at a certain time and place;

- geographic location of user, computer, or device (*e.g.,* the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location);

- identities and locations of co-conspirators or victims (communications with co-conspirators, photos or other attachments, address book information);

- location of other evidence (*e.g.*, emails reflecting registration of other online accounts potentially containing relevant evidence);

49

- passwords or other information needed to access the user's computer or other online accounts.

After Judge Moses signed the Warrants, law enforcement agents served them on the Providers.

### C.  Litigation Prior to the Execution of the Warrants

On January 27, 2017, Archer filed a motion to, *inter alia*, prevent Google from complying with the Google Warrant until Archer decided whether to move to quash.   (Dkt. 127).   At a conference four days later, after Archer orally amended his motion to include the Apptix Warrant, the Court denied the motion in its entirety, explaining it was "not willing at this time to take the novel step of blocking the execution of these warrants."   (*See* 1/31/17 Tr. at 17-18).

The next day, Archer and Cooney moved for a stay pending appeal.   (Dkt. 132-33). The Court then issued a written order denying Archer's stay motion.   (Dkt. 140).   The Court noted, among other things, that Archer and Cooney could not demonstrate irreparable injury because "[t]he alleged injury to Archer and Cooney is the Government's potential misuse of privileged or other non-responsive materials, which is not actual and imminent, especially where, as here, the Government has committed to adhere to procedures designed to avoid such harm." (Dkt. 140 at 2).

Archer then filed a motion in the Second Circuit seeking a stay of this Court's decision, *see* Docket, *United States* v. *Galanis (Archer)*, No. 17-346 (2d Cir.) and also filed a petition for a writ of mandamus, *see* Docket, *In re Archer*, 17-353 (2d Cir.)   The Government moved to dismiss the appeal, opposed the stay, and opposed the petition for a writ of mandamus.   On or about March 7, 2017, the Second Circuit granted the Government's motion to dismiss Archer's

appeal and denied his petition for a writ of mandamus.   Order, *United States* v. *Galanis, et al.*, 17-346.

### D.  The Privilege Review

After the Second Circuit disposed of Archer's appeal, the Government requested that Archer, Momtazi, and Cooney each provide the Government with a list of attorneys or law firms with whom they had communicated during the relevant time period, so that such communications could be segregated for review by a privilege "wall" team that was not involved with the investigation or prosecution of this matter.   In April 2017, Archer (on behalf of himself and Momtazi) provided the Government with a list of over 150 proposed search terms to use in segregating potentially privileged documents.   Archer's list included not just attorney or law-firm names, but also generic terms like "claim*," "confid*," "exhibit*," and "attorney."

Following a discussion with counsel, the Government agreed to run search terms for all attorneys identified on Archer's list, all law firms on Archer's list, and variations thereof (the "Privilege Search Terms").   The Government declined to use many of the generic terms Archer requested, because it believed those would have been over-inclusive, particularly given that the Privilege Search Terms already included Archer's known attorneys and their firms.[10]

Once the searches had been run, a filter team (the "Filter Team") consisting of prosecutors not involved in this case reviewed documents that had hit on the Privilege Search Terms (the "Potentially Privileged Emails").   As discussed in the Government's January 16,

---

[10]  Indeed, the proposed privilege search terms demanded by Archer's counsel were so overbroad that more than 109,000 of the e-mails and attachments—almost half of the total number of records produced by the service providers in response to the search warrant—hit on at least one of Archer's proposed terms.

2018 motion regarding the crime-fraud exception, the undersigned understand that in the course of this review, the Filter Team identified three categories of Potentially Privileged Emails: (i) emails protected by the attorney-client privileged (the "Privileged Emails"); (ii) emails which were not protected by the attorney-client privilege, for example, because a third party was included on a communication between an attorney and client (the "Non-Privileged Emails"); and (iii) several hundred emails which, although potentially privileged, appeared to be subject to the crime-fraud exception to the privilege (the "Crime-Fraud Emails").

With respect to the Non-Privileged emails, the Filter Team provided those emails to counsel for the privilege holders to attempt to reach agreement with counsel before giving those emails to the trial team (the "Trial Team").   Emails which counsel agreed were not subject to any privilege have since been provided to the Trial Team.   Counsel for the Filter Team and counsel for Archer still disagree as to whether the privilege applies to a number of other emails. The Trial Team understands that the Filter Team has continued to try to reach an agreement with counsel for Archer on these emails and is preparing to seek a ruling from the Court with respect to Non-Privileged Emails for which the parties are unable to reach an agreement.

In short, the Filter Team has not unilaterally turned any Non-Privileged Emails over to the Trial Team, without first obtaining agreement from counsel that the documents are non-privileged.

Finally, with respect to the Crime-Fraud Emails, the Government moved on January 16, 2018 for an order from the Court regarding the applicability of the crime-fraud exception in this case.   (*See* Dkt. 285, 300).

### E.  The Responsiveness Review

On July 3, 2017, with the Potentially Privileged Emails having been segregated for the privilege review by the Filter Team, the Trial Team first received access to emails obtained pursuant to the Warrants that had not hit on the Privilege Search Terms, consisting of approximately 186,000 total files or "records."   The Trial Team then used a detailed list of search terms to assist in identifying documents responsive to the Warrants (the "Responsiveness Search Terms").   The Responsiveness Search Terms yielded approximately 12,503 potentially responsive records.   Non-privileged records which did not hit on a search term, of which there are approximately 173,000, were deemed non-responsive and have not been further reviewed by the Government.

The Trial Team then reviewed those approximately 12,503 records during the late summer and fall of 2017.   The Trial Team completed the bulk[11]  of its review in early November 2017, after determining that approximately 8,700 of the records that hit on the Responsiveness Search Terms were in fact responsive to the Warrants.   All of these records were produced to the defendants as of December 2017.[12]

### F.  The Government's July 2017 Production

In July 2017, separate and apart from the then-ongoing responsiveness review and privilege review, the Government produced to all defendants all emails in the Subject Accounts

---

[11]  Since that time, the Trial Team has reviewed smaller numbers of the Non-Privileged E-mails that the Filter Team initially reviewed and which the defendants ultimately agreed were not privileged.   The review of these documents for responsiveness was delayed by the privilege review process described above.

[12]  While Archer's motion references a January 2018 production, the Trial Team is unaware of any such production.

which had not hit on the Privilege Search Terms (the "July 2017 Production").   The

Government did so in an effort to comply with its *Brady* obligations and because it believed that

the defendants had consented to this procedure.   (*See generally* Gov't 7/27/17 Letter, Dkt. 195

at 1).

    After defendants Archer and Cooney objected, the Court ordered the defendants "to

return or destroy" the July 2017 Production and ordered the Government "to replace the

production with a new production consisting solely of materials responsive to the warrant."

(Dkt. 212.).   As discussed above, the Government has done so.

## II.  Defendants Have Not Established Standing to Challenge Either the Cooney Warrant or the Momtazi Warrants

    As a threshold matter, the defendants have not established standing to challenge the

warrants for the Cooney Account or either of the Momtazi Accounts.

### A.  Applicable Law

    Fourth Amendment rights are personal rights and may not be vicariously

asserted.   *See United States* v. *Haqq*, 278 F.3d 44, 47 (2d Cir. 2002).   Thus, a defendant

seeking to suppress evidence based on an alleged Fourth Amendment violation must demonstrate

that he had a reasonable expectation of privacy in the location or items searched.   *See Rakas* v.

*Illinois*, 439 U.S. 128, 143 (1978).

    "The law is clear that the burden on the defendant to establish [Fourth

Amendment] standing is met only by sworn evidence, in the form of affidavit or testimony, from

the defendant or someone with personal knowledge."   *United States* v. *Montoya-Eschevarria*,

892 F. Supp. 104, 106 (S.D.N.Y.1995) ( citations omitted); *see also United States* v. *Ulbricht*,

No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *6 (S.D.N.Y. Oct. 10, 2014).   An attorney's

declaration is insufficient to make the requisite showing.  *See Montoya-Eschevarria*, 892 F. Supp. at 106.

Further, the Second Circuit has also made clear that a defendant does not have standing to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial."  *United States* v. *Watson*, 404 F.3d 163, 166-67 (2d Cir. 2005).

### B.  Discussion

Here, Cooney has not filed any affidavit asserting a privacy interest in the contents of the Cooney Account.   Neither defendant has established a privacy interest in either the Momtazi Account or the Momtazi Seneca Account.   *United States* v. *Lustyik*, 57 F. Supp. 3d 213, 223 (S.D.N.Y. 2014) ("A person has no expectation of privacy in another person's email account."). Indeed, Archer's declaration admits those accounts "belonged to Sebastian Momtazi."   (Archer Decl. ¶ 3).   As such, neither defendant has met his threshold standing burden, and the Court should deny the motions to suppress the evidence seized from the Cooney Account, Momtazi Account, and the Momtazi Seneca Account on that basis.

## III.   <u>The Warrants Were Supported by Probable Cause</u>

In any event, each of the Warrants was also supported by probable cause.   The Court should reject Archer and Cooney's contrary arguments, which, among other things, ignore the deferential standard of review that applies to a magistrate judge's probable cause finding.

### A.  Applicable Law

As the Supreme Court recently reiterated "[p]robable cause 'is not a high bar.'"   *District of Columbia* v. *Wesby*, --- S. Ct. ----, No. 15-1485, 2018 WL 491521, at *6 (Jan. 25, 2018) (quoting *Kaley* v. *United States*, 571 U.S. - - - -, 134 S. Ct. 1090, 1103 (2014)).   It "is a 'fluid'

standard, which is not usefully analogized to a *prima facie* case, or even to a preponderance (*i.e.*,

more likely than not) showing of criminal activity." *Ganek* v. *Leibowitz*, 874 F.3d 73, 83 (2d

Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

      Accordingly, when considering a request for a search warrant, "[t]he task of the issuing

magistrate is simply to make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence

of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S. at 238. Such

determinations must be approached in a practical way, *id*. at 231-32, because "probable cause is

a flexible, common-sense standard," *Texas* v. *Brown*, 460 U.S. 730, 742 (1983). Additionally,

the training and experience of law enforcement agents bear significantly on probable cause

determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on

facts known to them, the totality of the circumstances, and their training and experience may all

support a probable cause finding. *Id.* at 231-32.

      Once a warrant has been issued by a judge and executed, the duty of a court reviewing a

magistrate judge's probable cause determination on a motion to suppress is far more limited: its

task is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that

probable cause existed." *Gates*, 462 U.S. at 238-39. The issuing magistrate's decision is

"entitled to substantial deference, and doubts should be resolved in favor of upholding the

warrant." *United States* v. *Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (internal quotation marks

omitted). Indeed, the magistrate's "finding of probable cause is itself a substantial factor

tending to uphold the validity of [the] warrant." *United States* v. *Travisano*, 724 F.2d 341, 345

(2d Cir. 1983). "Such deference derives not only from the law's recognition that probable cause

56

is a 'fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant."   *United States* v. *Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232, 236).   Thus, as described in *Clark*, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate a 'substantial basis' for making the requisite probable cause determination."   *Clark,* 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

### B.  Discussion

Here, Judge Moses had a substantial basis for finding probable cause as to each of the Subject Accounts.

*First*, when Judge Moses issued the Warrants, a grand jury had indicted Archer and Cooney for securities fraud, wire fraud, and conspiracy to commit those offenses, in connection with the WLCC scheme.   In the same indictment, the grand jury charged three of Archer and Cooney's co-conspirators in the securities fraud conspiracy with investment adviser fraud and conspiracy to commit investment adviser fraud; those charges also arose out of the WLCC scheme.   The grand jury's indictment itself provides significant evidence of Archer's and Cooney's involvement in the Subject Offenses and thus provides substantial support to Judge Moses' probable-cause finding.   *See United States* v. *Percan,* No. 98 Cr. 0392, 1999 WL 13040, at *4 (S.D.N.Y. Jan. 13, 1999) (finding that "[t]he affidavits relied upon by the magistrate judge issuing the search warrants at issue in this case established probable cause to search the computer, safe, and storage locker" for several reasons, including that "the affidavits reported the issuance of the Indictment and the grand jury's finding that probable cause existed that defendant had committed crimes relating to money laundering and the interstate transportation of stolen airbags"); *accord United States* v. *Williams*, No. 02 CR. 1372 (BSJ), 2004 WL 1469491, at *1

57

(S.D.N.Y. June 29, 2004) (rejecting challenge to search warrant, based in part, on fact that grand jury had indicted defendant); *see also Ganek*, 874 F.3d at 83 ("To be sure, probable cause demands more than a 'mere suspicion' of wrongdoing, but when, as here, a person's conduct satisfies the actus reus of a crime, we have moved well beyond mere suspicion." (citation omitted)).

*Second*, the Affidavit provided specific examples of emails that each of the Subject Accounts had sent or received related to the WLCC scheme.   These examples included communications related to multiple aspects of the WLCC scheme, including emails sent or received by the Archer Account and the Cooney Account regarding the first bond issuance and the fact that their "primary objective," was to get "a source of discretionary liquidity," Aff. ¶ 14(a)-(c); emails sent or received by the Archer Account and the Cooney Account regarding the acquisition of the investment adviser that ultimately purchased the first WLCC bond issuance on behalf of it clients, Aff. ¶ 15(a)); and email communications sent or received by the Archer Account and Momtazi Account in September and October 2014, related to Archer's purchase of the second WLCC Bond issuance, Aff. ¶ 17.   The Affidavit also noted the likelihood that Archer, Cooney, and Galanis continued to communicate via email throughout the time period of the scheme.   (Aff. ¶ 20) (noting that "Archer and Cooney resided, at least in part, in different locations throughout the United States from Jason Galanis and the other co-conspirators in the charged scheme, and therefore were likely to frequently communicate with each other via electronic, rather than in-person, communication").

While the Affidavit provided only one specific example of an email received by the Archer Seneca Account, this does not undercut probable cause for that account.   "[P]robable

cause requires only a probability or substantial chance of criminal activity, not an actual showing

of such activity."   *Gates*, 462 U.S. at 245 n.13.[13]   To hold otherwise would be to allow the

Government to obtain a search warrant for an account only where it was already in possession of

some portion of the account's contents—a requirement finding no purchase in Fourth

Amendment case law and one inconsistent with the recognition that probable cause is a "fluid

standard" which should not present a "high bar" to investigation.   *See Wesby*, --- S. Ct. ---, No.

15-1485, 2018 WL 491521, at *6; *Ganek*, 874 F.3d at 83.

With respect to the Archer Seneca Account, the Affidavit offered much more than a

single email on which the magistrate could rely in making a probable cause determination.

Even before reaching the particular email cited, the Affidavit more generally established

probable cause regarding Archer's involvement in that WLCC scheme, Affidavit ¶ 11 and Ex. A

(Indictment); showed that he had used email communications in furtherance of that scheme, *id.*,

¶¶ 14-17, 19; cited particular examples of emails from the Archer Account, *id.*, and provided a

basis to believe that Archer, Cooney, and Galanis continued to use emails to communicate

through the relevant period, *id.* ¶ 20.   This in and of itself was sufficient to establish probable

cause to search the Archer Seneca Account.

---

[13]  Indeed, courts have found probable cause to search an e-mail account even when an affidavit
provided no specific examples of emails sent or received by that account.   *See, e.g.*, *United
States* v. *Ali*, 870 F. Supp. 2d 10, 37-38 (D.D.C. 2012) (rejecting challenge to e-mail search
warrant, because, even though affidavit cited no specific examples of emails sent to or from the
subject account, it established nexus between account and underlying offenses); *United States* v.
*Deppish*, 994 F. Supp. 2d 1211, 1218 (D. Kan. 2014) (rejecting challenge to email search
warrant, because even though affidavit did not cite *any* emails sent or received by the account,
requisite nexus had been demonstrated because account was associated with internet bulletin
board user who had posted pornographic images).

But the magistrate was not limited to the above referenced evidence because the Affidavit also described a particular email and its attachment which independently demonstrated that the Account contained evidence of false and misleading statements by Archer that were related to the WLCC scheme and the activities of a key co-conspirator in that scheme.   More specifically, the Affidavit explained that the Archer Seneca Account had received an email from the Momtazi Seneca Account, attaching a letter from Archer, which *itself* contained false and misleading information regarding Jason Galanis's relationship with placement agent and related entities. (Aff. ¶ 18).

Viewed together, these facts amply supply probable cause for Archer Seneca Account. *Cf. Dist. of Columbia* v. *Wesby*, 2018 WL 491521, at *9 (faulting court of appeals for "view[ing] each fact in isolation, rather than as a factor in the totality of the circumstances" and explaining that "our precedents recognize that the whole is often greater than the sum of its parts— especially when the parts are viewed in isolation." (quotations and citations omitted)).   As such, Judge Moses certainly had a "substantial basis" for finding probable cause, as to the Archer Seneca Account.

Nor was the information in the Affidavit stale.   There is "no bright-line rule for staleness," *Walczyk* v. *Rio*, 496 F.3d 139, 162 (2d Cir. 2007), which must instead be evaluated "on the basis of the facts of each case," *United States* v. *Martino*, 664 F.2d 860, 867 (2d Cir.1981).   "[T]he critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]."   *United States* v. *Abboud*, 438 F.3d 554, 572 (6th Cir. 2006).   The principal factors in assessing whether the supporting facts in an affidavit have

become stale are "the age of those facts and the nature of the conduct alleged to have violated the law." *United States* v. *Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (internal quotation marks omitted). Where a supporting affidavit presents "a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant." *Id.* (internal quotation marks and citation omitted).

There are at least two reasons why staleness is not an issue on these facts. *First*, courts have consistently held that staleness concerns are significantly reduced when the records sought are digital. *See United States* v. *Seiver*, 692 F.3d 774, 777 (7th Cir. 2012) ("'Staleness' is highly relevant to the legality of a search for a perishable or consumable object, like cocaine, but rarely relevant when it is a computer file."); *United States* v. *Ali*, 870 F. Supp. 2d 10, 34 (D.D.C. 2012) ("Where the records or documents in question are digital, staleness is even less of a problem."); *accord United States* v. *Payne*, 394 F. App'x 891, 894 (3d Cir. 2010) (noting that "the nature of digital evidence also weighs against a finding of staleness"); *see also* Orin Kerr, A User's Guide to the Stored Communications Act, 72 Geo. Wash. L Rev. 1208, 1231 (2004) ("A stored communication rests on a network server in a permanent or semipermanent state.").[14] Indeed,

---

[14] Thus *United States* v. *Cordova*, 792 F.3d 1220, 1224 (10th Cir. 2015), replied upon by Archer, is wholly distinguishable inasmuch as it considered the search of a physical residence for evidence of a drug enterprise – the precise opposite of evidence residing on a network server in a "permanent or semipermanent state."

Archer's brief also gives the misimpression that, *United States* v. *Coon*, No. 10 Cr. 110A, 2010 WL 6647779 (W.D.N.Y. 20, 2010) involved an email search warrant. It did not. Instead, *Coon* again involved a search of the defendant's residence based on a single log-on from an Internet Protocol address associated with the home eleven months prior. *See* 2010 WL 6647779, at *1. Moreover, the Magistrate Judge's Report and Recommendation cited in Archer's brief was reversed on a motion for reconsideration. *See* Report and Recommendation, *United States* v.

the Affidavit explicitly noted that emails and other records remained on the Providers' services "indefinitely" if not deleted, and, even if deleted, may continue to be retrievable for a period of time:

> in general, any email sent to or from a subscribers' account, or stored in draft form in the account, is maintained on the Providers' servers unless and until the subscriber deletes the email.   If the subscriber does not delete the email, it can remain on the Providers' computers indefinitely.   Even if the subscriber deletes the email, it may continue to be available on the Providers' services for a certain period of time.

(Aff. ¶ 4(b)(i)).

*Second*, the Affidavit described not a single, isolated instance of conduct by Archer and Cooney, but instead showed their involvement in multiple aspects of a complex, multi-year scheme, which ended only in April 2016, *just months* before the Affidavit was sworn out. *Abboud*, 438 F.3d at 573 (rejecting staleness argument because, even though premises search warrant was sworn out in 2002, affidavit stated that defendant "engaged in bank fraud numerous times during a three-month period in 1999" and "ongoing criminal activity *at a given time* may be sufficient to defeat a claim of staleness" (emphasis in original)).   Here, the Affidavit details numerous communications at the Subject Accounts throughout the spring, summer, and fall of 2014.   The attached Indictment also states that a year later, in September 2015, Archer and three

---

*Coon*, No. 10 Cr. 110 (RJA) (HBS), (W.D.N.Y. Nov. 8, 2010), Dkt. No. 33.   And, although the district judge then reinstated the magistrate judge's initial ruling, the district court noted that there was nothing in the affidavit suggested that the physical computer in question would "still be located at the defendant's address."   Order, *United States* v. *Coon*, No. 10 Cr. 110 (RJA) (HBS), (W.D.N.Y. May 6, 2011), Dkt. No. 43 at 6 (noting "the agents had information indicating the defendant had terminated his internet service").

of the other charged defendants helped finance purported interest payments on the first, second, and third bond issuances.   (Indictment ¶ 25).

The extended time period of the scheme here distinguishes numerous cases relied upon by Archer.   Those cases found probable cause was lacking not only because of the age of the information at issue, but also because there was no evidence that the defendant's criminal conduct (regardless of whether it was connected to the place or object to be searched) had continued over a period of time.

*United States* v. *Raymonda*, 780 F.3d 105 (2d Cir. 2015), for instance, held that an isolated, fleeting instance of accessing child pornography nine months earlier was not enough to show probable cause to search a home.   The court explained that one could not infer, based solely on a single incident, which lasted 17 seconds and did not involve the download of any full-size pornographic images, that Raymonda was actually interested in child pornography. 780 F.3d at 117 (noting that the sole activity cited in the affidavit, was "at least equally consistent with an innocent user inadvertently stumbling upon a child pornography website, being horrified at what he saw, and promptly closing the window").

Similarly, in *United States* v. *Doan*, 245 F. Appx. 550 (7th Cir. 2007), another case cited by Archer, the court based its decision not only on the age of the information at issue, but also on the fact there was no other information tying the defendant to the conduct being investigated. *See* 245 F. App'x at 554 ("In other words, when aged information is minimal *and when there is no additional information about the individual* beyond the seventeen-month-old information, even taking the affidavit as a whole, there is no probable cause." (emphasis added)).

Archer does no better with *United States* v. *Wagner*, 989 F.2d 69 (2d Cir. 1993).   There, the Second Circuit found stale an affidavit for the search of a home, which was based on a single sale of a small amount of marijuana to a confidential informant six weeks earlier.   989 F.2d at 74-75.   Even leaving aside the obvious differences between searching a home for physical perishable objects like marijuana and searching an email account for digital files, the Second Circuit noted that staleness concerns could also have been met by demonstrating "a pattern of continuing criminal activity so there is reason to believe that the cited activity was not a one-time occurrence."   *Id.* at 75.

Here, while the Affidavit may have listed only one email received by the Archer Seneca Account, the totality of the circumstances provided a basis to believe that Archer's involvement in the conduct under investigation extended well beyond that single instance.   Indeed, the Indictment incorporated by reference in the Affidavit says as much.   As discussed more fully above, the Affidavit provided evidence of Archer and Cooney's involvement in multiple aspects of the WLCC scheme, showed that the scheme lasted over a significant period of time, and showed that Archer had repeatedly used email generally in connection with that scheme.

Thus, because the Warrants sought stored electronic communications and the offenses involved a multi-year scheme, the Court should reject Archer's staleness argument.

## IV.   <u>The Warrants Were Sufficiently Particularized</u>

The Court should also reject defendants' argument that the Warrants were not sufficiently particularized.

### A.  Applicable Law

With respect to particularity, a warrant must be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize."   *United*

*States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (brackets and internal quotation marks omitted). This requirement has three components:

> First, a warrant must identify the specific offense for which the police have established probable cause.   Second, a warrant must describe the place to be searched.   Third, the warrant must specify the items to be seized by their relation to designated crimes.

*United States* v. *Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (internal citations and quotation marks omitted).

## B.  Discussion

The Warrants here specifically identified the offenses for which the Government had established probable cause, accurately described the Subject Accounts, and included specific language in the "Review of Information by the Government section" regarding the WLCC scheme.

The Warrants did not become general warrants because they included the phrase "among other statutes" after specifically enumerating five offenses for which the Government had established probable cause and—six bullet points later—included the phrase "evidence of a crime" when giving examples of the "evidence, fruits, and instrumentalities."   Even with this language, the Warrants were "'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.'"   *United States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (quoting *United States* v. *LaChance*, 788 F.2d 856, 874 (2d Cir. 1986)).

"'A warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement.'"   *See United States* v. *Alston*, No. 15 Cr. 435 (CM), 2016 WL 2609521, at *4 (S.D.N.Y. Apr. 29,

2016) (quoting *United States* v. *Otero*, 563 F.3d 1127, 1132 (10th Cir. 2003)); *see also United States* v. *Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) ("The particularity requirement is a standard of practical accuracy rather than a hypertechnical one.").

Here, Archer's "sentence diagramming," *Alston*, 2016 WL 2609251, at \*4, aside, a fair reading the Warrants as a whole demonstrates that the Warrants authorized the Government to search Subject Accounts for evidence of securities fraud, investment adviser fraud, and conspiracy to commit those offenses, as related to the Tribal Bonds.   The Warrants list those statutes.   And they cite, as examples of the evidence the Government was authorized to obtain "evidence of the agreement to engage in a fraudulent scheme involving the issuance of bonds on behalf of the [WLCC] and the misappropriation of the proceeds of those bonds," during a specified time period; and "evidence of communications and/or meetings involving or related to the bonds issued on behalf of the WLCC, including but not limited to" communications involving the named defendants in this case.   (Warrants, Section III).

Even if the "among other statutes" or "evidence of a crime" language is less than clear on its own "'where warrants contain ambiguous language, precise descriptions of some of the items to be seized along with specifications of the suspected crimes can cure the imprecision.'" *United States* v. *Juarez*, No. 12 Cr. 59 (RRM), 2013 WL 357570, at \*5 (E.D.N.Y. Jan. 29, 2013) (finding that warrant authorizing search of a cellphone for evidence of "Unlawful Surveillance in the Second Degree, P.L. § 250.45(4), in the vicinity of 4th Avenue and 14th Street, New York, New York, and *the commission of related crimes* . . ." sufficiently particular) (quoting *United States* v. *Bonczek*, No. 08 Cr. 361(PAC), 2008 WL 4615853, at \*12 (S.D.N.Y. Oct. 16, 2008)).

The warrant here did just that—specifying the statutes for which Magistrate Judge Moses had found probable cause and providing "precise descriptions of some of the items to be seized."[15]

The cases relied on by the defendants are easily distinguishable.   Unlike the Warrants here, the warrants in *United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) and *United States* v. *Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009) failed to mention *any* offense under investigation. The *George* warrant authorized a search of the defendants' apartment for various enumerated items and "other evidence relating to the commission of a crime," without listing any statutes. 975 F.2d at 74; *see also id.* at 76 ("Nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken").   Similarly, the *Cioffi* warrant allowed for the seizure of *"all email up through August 12, 2007, including any attachments and all instant messages, sent by or received by the accounts [sic], whether saved or deleted,"* again without reference to *any* offense under investigation.   668 F. Supp. 2d at 389 ("There was no provision limiting the emails to be seized to those containing evidence of the crimes charged in the indictment or, indeed, of *any crime at all*.") (emphasis added).[16]

---

[15]  In his "corrected" memorandum of law, which purportedly contains only non-substantive changes, Archer makes more explicit his challenge to the "communications constituting crime" language in the Warrants.  But this language does not raise any particularity issue, because it is followed by the words "*e.g.*, emails containing fraudulent representations," illustrating the types of communications that would fall within that category.   *See United States* v. *Riley*, 906 F.2d 841, 844 (2d Cir. 1990) ("In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items.").   Such emails, of course, would likely be evidence of securities fraud and/or investment adviser fraud.

[16]  *See also United States* v. *Rosa*, 626 F.3d 56, 58 (2d Cir. 2010), cited in Archer Suppression Br. at 36 (finding insufficiently particularized warrant authorizing the seizure of "computer equipment, electronic digital storage media included but not limited to floppy diskettes, compact disc, hard drives whether mounted in a computer or otherwise, video or audio tapes, video surveillance systems, video and digital camera systems, printing devices, monitors, firearms and

The warrant in *United States* v. *Galpin*, 720 F.3d 436 (2d Cir. 2013) is similarly distinguishable.   That warrant authorized a search of "Galpin's residence including all computers, vehicle, and person for property 'believed to contain evidence that will constitute, substantiate or support violations of NYS Corrections Law, section 168–f subdivision four, *NYS Penal Law and or Federal Statutes*.'"   720 F.3d at 441 (emphasis added)).   Although the *Galpin* warrant did list one New York States Corrections Law provision, that statute required sex offenders to register their email and other online addresses.   720 F.3d at 439-40 nn.1-2.   But despite this relatively technical and narrow statute, the *Galpin* warrant authorized the seizure of a items that appear wholly unrelated to that offense, including all electronic devices, storage media, software, and electronic data in or on Galpin's home, vehicle, or person, as well as images of child pornography.   *See, e.g.*, 720 F.3d at 448 ("[T]here was no probable cause to believe that Galpin possessed or produced child pornography—crimes that were mentioned neither in the warrant application nor in the warrant itself, which nonetheless authorized a search for images depicting child sexual activity.").   It is thus not surprising that the Second Circuit viewed that warrant as authorizing "'a general, exploratory rummaging in [Galpin's] belongings . . . .'"   720 F.3d at 445 (quoting, *Coolidge* v. *New Hampshire,* 403 U.S. 443, 467 (1971)).

Here, by contrast, read as a whole and in a common-sense, non-hypertechnical way, the Warrants sufficiently cabin the executing officers' discretion.   They precisely identify the

---

any written and/or printed and/or electronic stored notes or records *which would tend to identify criminal conduct* and any personal papers or documents which tend to identify the owner, leasee or whomever has custody or control over the premises searched or the items seized" (emphasis added)).

Subject Accounts.   They explicitly list the statutes under investigation.   And they indicate that the investigation relates to the WLCC scheme.   And notably, Archer cites no examples of documents that the Government has produced responsive to the Warrants (as opposed to documents produced in the July 2017 Production) that are not evidence of the securities fraud or investment adviser fraud offenses listed in the Warrants.   Accordingly, the Court should reject the defendants' particularity challenge.

## V.    The Court Should Reject Defendants' Overbreadth Challenge

Relatedly, the Court should reject the defendants' assertion that the Warrants were overbroad, in that they purportedly authorized the seizure of evidence for which probable cause had not been established.   Probable cause plainly existed for the categories of documents sought.

### A.  Background

As discussed above, the Warrants authorized the disclosure of email content between "January 1, 2014 and May 11, 2016," the time period of the conspiracy charged in the Indictment.[17]

In addition to email content, the Warrants also authorized the seizure of certain categories of non-email records (the "Non-Email Records") associated with the Subject Accounts, during the relevant time period.   These included the account's "address book," "subscriber and billing information," "customer correspondence," and in case of the Google Warrant, additional categories of records for services that Google provides to email account subscribers.

---

[17] Thus, as an initial matter, Archer is incorrect that the Google Warrant authorized the Government "to seize his entire Google Account."

Ultimately, it appears that only 11 non-email records (not including files that were attachments to emails) hit on the Responsiveness Search Terms and reviewed by the Government for responsiveness.   Ten of these were ultimately deemed responsive: (i) Archer's Outlook Contacts for three individuals associated with this case; (ii) Momtazi's Outlook contacts for Cooney, Dunkerley, and another individual associated with this case; (iii) two Microsoft Word docs reflecting promissory notes to Cooney; (iv) IP and other connection data for one of Archer's email accounts; and (v) a Bloomberg Terminal screenshot found in the Google Drive portion of the Archer Seneca Account, reflecting pricing information for Wealth Assurance Holdings, an entity for which co-defendant Dunkerley was the President and Director and Archer was Vice-Chairman and which, among other things, provided financing to Hughes Capital Management.

### B.   Applicable Law

The overbreadth doctrine, focuses on whether the "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (internal quotation marks and citation omitted).   "[T]he overbreadth inquiry asks whether the warrant authorized the search and seizure of items as to which there is no probable cause."   *Lustyik*, 57 F. Supp. 3d at 228 (internal quotation marks, citation, and alteration omitted).   A warrant is not overbroad if it only authorizes the Government to seize and search evidence, fruits, and instrumentalities of specific crimes supported by probable cause.   *Id.* at 229.

### C.   Discussion

The Court should reject Archer and Cooney's overbreadth challenge.

70

*First*, there was nothing improper about the Warrant authorizing the seizure of (i) all emails sent or received by the Subject Accounts during the relevant time period and (ii) other records and materials, in addition to emails ("Non-Email Records"), associated with the Subject Accounts.

In *In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.* ("*In re Google Warrant*"), 33 F. Supp. 3d 386 (S.D.N.Y. 2014), Judge Gorenstein approved a warrant authorizing the seizure of all emails, all address book information, and "a variety of other information" associated with a particular Google account.   33 F. Supp. 3d at 388.   In approving the warrant, Judge Gorenstein explained it was "well-established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government."   *Id.* at 393; *accord United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014) (denying motion to suppress fruits of Google, Facebook, and computer warrants and noting that "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized").

The "well-established" principles outlined in *In re Google Warrant* clearly support seizing of the entirety of the emails in the Subject Accounts and then conducting a later search for evidence responsive to the Warrants.   *See In re Google Warrant*, 33 F. Supp. 3d at 394 (agreeing with case law that "supports the Government's ability to access an entire email account

in order to conduct a search for emails within the limited categories contained in the warrant"). The same authorities support the seizing of the Non-Email Records as well.   As the Affidavit explained, the Providers maintain the Non-Email Records for email subscriber accounts. (Affidavit ¶ 4(b)(ii)-(xviii)).   As such, by allowing the Government to seize the Non-Email Records associated with the Subject Account, the Warrants simply allowed the Government to seize "the entirety of the premises or object," i.e., the entirety of the account as maintained by the Provider.   *Ulbricht*, 2014 WL 5090039, at *14.   And with respect to the Archer Seneca Account more specifically, it was certainly reasonable for Judge Moses to conclude that evidence of the Subject Offenses could be found in Archer's Google Docs or Google Drive, for instance, given that Archer had received a document related to the WLCC scheme at that account, which was later provided to an entity affiliated with the placement agent for the Tribal Bonds.   (Aff. ¶ 18; *see also* Aff. ¶ 4(b)(ii) ("Google provides users with the ability to write, edit, and collaborate on various documents . . . ."); ¶ 4(b)(iii) (explaining Google Drive allow "to store email, attachments, . . . documents and other content . . . ")).[18]   After the seizure, a responsiveness review can be (and was here) conducted.

*Second*, probable cause was not even required for almost all of the Non-Email Records on the Warrants.   It would stand the overbreadth doctrine on its head to find a warrant overbroad

---

[18] *See also United States* v. *Tsarnaev*, 53 F. Supp. 3d 450, 461-63 (D. Mass. 2014) (denying motion to suppress warrant authorizing seizure of e-mail content; data files, including documents and videos; calendar data; and buddy lists from defendant's Yahoo! account, noting that magistrate judge "could . . . legitimately have accepted the inference . . . that, because it was likely the defendant actively used his Yahoo! e-mail account, some evidence of the criminal activity referred to in the affidavit could be expected to be found in the Yahoo! e-mail accounts").

because it authorized the seizure of information that Government did not need to show probable cause to obtain in the first place.

More specifically, the SCA requires a showing of probable cause only to obtain "contents" of communications.   *See Matter of Warrant to Search a Certain Email Account Controlled and Maintained by Microsoft Corporation*, 829 F.3d 197, 217 (2d Cir. 2016) (explaining that, "'a governmental entity may require the disclosure ... of the contents of a wire or electronic communication . . . only pursuant to a warrant issued using the rules described in the Federal Rules of Criminal Procedure,' except (in certain cases) if notice is given to the user." (quoting 18 U.S.C. § 2703(a), (b)).   "Contents" refers to the "substance, purport, or meaning" of an "electronic communication."   *See* 18 U.S.C. § 2510(8); 18 U.S.C. § 2711(1) (incorporating § 2510's definitions into the SCA).   And Archer, perhaps tacitly recognizing this, claims a reasonable expectation of privacy only in the "contents" of his accounts.   (Archer Decl. ¶ 2).

The SCA explicitly recognizes that the Government does *not* need to show probable cause to obtain other types of records.   Information concerning "the name and address of a subscriber, "records of session times and duration," "any temporarily assigned network address," "length of service and types of services utilized," and "means of sources of payment for such service" are explicitly available via subpoena.   *See* 18 U.S.C. § 2703(c)(2).   The fact that a Government does not need a warrant to obtain this information in consistent with the general Fourth Amendment rule that an individual has no reasonable expectation of privacy in information he or she voluntarily shares with a third party.   *See United States* v. *Ulbricht*, 858 F.3d 71, 96-97 (2d Cir. 2017) (explaining that "no reasonable person could maintain a privacy interest" in "IP address information and similar routing data," explaining that "[t]he Supreme

Court has long held that a 'person has no legitimate expectation of privacy in information he voluntarily turns over to third parties[.]'" (quoting *Smith* v. *Maryland*, 442 U.S. 735, 743-44 (1979).

Thus many of the Non-Email Records—including subscriber and billing information, transactional information, and Android Services, which consist of non-content records concerning the device used to log-on to an account, are precisely the type of records that the SCA makes available via subpoena and have absolutely nothing to do with the overbreadth doctrine.

More generally, other types of Non-Email Records, including "Customer Correspondence" and "Google Payments" are the kinds of non-content business records for which there is no basis to assert for either defendant to assert a reasonable expectation of privacy.   *Cf. United States* v. *Chavez*, No. 14 Cr. 185 (JAM), 2016 WL 740246, at *2 (D. Conn. Feb. 24, 2016) ("A bank's records are not a customer's private papers, but are the business records of the banks, and a bank customer can assert neither ownership nor possession over such documents for Fourth Amendment purposes.").

Further, with respect to remaining categories of the Non-Email Records in the Archer Seneca Account, Google disclosed to users that it collected and monitored many of those records, further undercutting any objectively reasonable expectation of privacy.   Google's Privacy Policy in effect that time of the Warrants noted, among other things, that Google collects a wide variety of information from its users, including device information, Ex. E at 1; log information, which includes the user's "search queries," IP address information, and "cookies that may uniquely identify your browser," *id.* at 1-2; location information, Ex. E at 1; Google

Analytics information, including, for example, the user's language preferences, *id.* at 3-4, and "information like your usage data preferences, Gmail messages, G+ profile, *photos*, *videos*, *browsing history,* map searches, *docs or other Google-hosted content*."   Ex. F at 1 (screenshot of portion of Exhibit E (emphasis added)).   The Privacy Policy also noted that "our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection."   Ex. E. at 3.   Simply put, given that Google advised users that it could access, and use for its own purposes, essentially all records associated with a Google account, Archer has not established a reasonable expectation of privacy in the Non-Email Records in the Archer Seneca Account.

In short, the Warrants were not overbroad, both because it was appropriate for the Government to obtain both the email and Non-Email Records associated with the Subject Accounts once a probable cause showing had been made, and, also, because the defendants have not established a reasonable expectation of privacy in the Non-Email Records.

## VI.   Even if the Court Finds the Warrants Overbroad or Insufficiently Particular, They Are Still Valid Under the Severance Doctrine

### A.  Applicable Law

Even where a warrant is facially invalid, suppression can be narrowly tailored to remedy only the constitutionally infirm portion of a search warrant.   In *George*, the Second Circuit adopted the doctrine of severance, *i.e.*, the separation of any constitutionally infirm portion of a warrant from the rest of the warrant, thereby permitting the admission of evidence pursuant to the valid portion of the warrant.   975 F.2d at 79 ("Fourth Amendment guarantees are adequately protected by suppressing only those items whose seizure is justified solely on the basis of the

constitutionally infirm portion of the warrant, which no reasonably well-trained officer could presume to be valid." (citing *United States* v. *Riggs*, 690 F.2d 298, 300 (1st Cir. 1982); *United States* v. *Christine*, 687 F.2d 749, 754 (3d Cir. 1982); *United States* v. *Cook*, 657 F.2d 730, 735 (5th Cir. 1981).

In *Galpin*, the Second Circuit instructed district courts to apply a three-step severance analysis.   Specifically, the Court should

> (1) "separate warrant into its constituent clauses";
>
> (2) "examine each individual clause to determine whether it is sufficiently particularized and supported by probable cause"; and
>
> (3) "determine whether the valid parts are distinguishable from the nonvalid part."

730 F.3d at 448-49.   In short, "the court must be able to excise from the warrant those clauses that fail the particularity or probable cause requirements in a manner that leaves behind a coherent, constitutionally compliant redacted warrant." *Id.*   Severance "is not available where no part of the warrant is sufficiently particularized, where no portion of the warrant may be meaningfully severed, or where the sufficiently particularized portions make up only an insignificant or tangential part of the warrant."   *George,* 975 F.2d at 79-80 (citations omitted). (summarizing the analysis as requiring that "the court must be able to excise from the warrant those clauses that fail the particularity or probable cause requirements in a manner that leaves behind a coherent, constitutionally compliant redacted warrant").

## B.  Discussion

### 1.  Particularity

Here, the Court can easily sever the language the defendants rely on for their particularity challenge.   The phrase "among other statutes" is its own clause, which is set off by commas

from the other language in the Warrant.   Striking this phrase leaves a sufficiently particular

warrant, which would authorize the Government to search the Subject Accounts for

> any evidence, fruits, and instrumentalities of violations of Title 18,
> United States Code, Section 1348, and Title 15, United States Code,
> Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations,
> Sections 240.10b-5; conspiracy to commit securities fraud, in
> violation of Title 18, United States Code, Section 371; investment
> advisor fraud, in violation of Title 15, United States Code, Sections
> 80b-6 and 80b-17; and conspiracy to commit investment adviser
> fraud, in violation of Title 18, United States Code, Section 371, . . .
> , including the following . . .

The Court would not even need to strike the "evidence of crime" bullet point after

striking "among other statutes," because "evidence of a crime" would then unquestionably be

limited to evidence of the crimes enumerated in the Warrant.   Nonetheless, the "evidence of a

crime" bullet is, itself, its own clause.   Striking this bullet as well would still leave a sufficiently

intact, robust, and undoubtedly particularized warrant.

Accordingly, the Warrants are severable, even if the Court accepts the defendants'

particularity arguments.   Notably, the defendants point to no evidence the Government produced

as responsive to the Warrants any emails which are responsive *only* to the allegedly not-

particularized language.   Instead, the Government unsurprisingly intends to rely upon evidence

of securities fraud and investment adviser fraud and conspiracy to commit those offenses.   Thus,

in the event the Warrants are insufficiently particularized in connection with the two challenged

clauses, the severance doctrine requires that no evidence should actually be suppressed.

### 2. Overbreadth

Similarly, if the Court found that (i) some or all of Non-Email Records were subject to a Fourth Amendment probable cause analysis and (ii) probable cause was lacking as to those records, severance would be appropriate.

Again, the different categories of materials in the "Information to be Produced by the Provider" are separate clauses and readily distinguishable.   Here, for the reasons set forth above, the Government clearly had probable cause to search the Subject Accounts for "Email Contents." Moreover, although the Warrants authorized the Government to obtain numerous categories of information, the heart of the Government's search in this case related to email contents.   As noted above, the Government ultimately found only ten Non-Email Records responsive to the Warrant, compared with approximately 8,700 emails and attachments.   The email contents, therefore, are clearly not an "insignificant or tangential part of the warrant."   *George,* 975 F.2d at 79-80.   Accordingly, to the extent the Court accepts the defendants' overbreadth arguments, the email contents are severable from the remainder of the Warrants.

## VII.   **The Affidavit Did Not Omit Material Information**

The Court should also reject the defendants' argument that the Affidavit intentionally or recklessly omitted material information from application.

### A. Applicable Law

To successfully challenge the truthfulness of the factual statements in a supporting affidavit, the defendant must demonstrate (1) that there were intentional misstatements or omissions in the search warrant affidavit; and (2) that those misstatements or omissions were

material.   *See United States* v. *Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003); *see also Franks* v. *Delaware*, 438 U.S. 154, 164–72 (1978).

The defendant must establish both components—i.e., intent and materiality—by a preponderance of the evidence.   *See United States* v. *Klump*, 536 F.3d 113, 119 (2d Cir. 2008). "The *Franks* standard is a high one."   *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991).

Moreover, because "[a]ll storytelling involves an element of selectivity," *Wilson* v. *Russo*, 212 F.3d 781, 787 (3d Cir. 2000), "an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."   *Awadallah*, 349 F.3d at 67-68 (quoting *United States* v. *Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)).   Thus, "*Franks* claims based on omissions are less likely to justify suppression than claims of intentionally or recklessly false assertions."   *United States* v. *Vilar*, No. 05 CR 621, 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007).

To find that there were intentional misstatements or omissions in the search warrant affidavit, "the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'"   *United States* v. *Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *Awadallah*, 349 F.3d at 68)).   A misstatement or omission is intentional when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth."   *United States* v. *Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000).   And "[t]o prove reckless disregard for the truth, the defendant[] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations."   *Rajaratnam*, 719 F.3d at 154 (citation and brackets omitted).

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause."  *United States* v. *Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013).   "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate."  *Canfield*, 212 F.3d at 718. I

### B.  Discussion

Here, Archer comes woefully short of proving by a preponderance of the evidence that the Affidavit intentionally or recklessly omitted material information.

*First*, the fact that Archer had produced emails from the Archer Account and the Archer Seneca Account, in response to grand jury and SEC subpoenas, is simply irrelevant to the probable cause analysis.[19]   To begin, the Affidavit in fact noted that Agent Bieniek had "reviewed, among other things . . . email correspondence . . . and spoken to SEC staff attorneys about their review of such records."   (Aff. ¶ 8).   The Affidavit also made clear that the emails specifically cited were examples of emails that Agent Bieniek had reviewed from the Subject Accounts.   (Aff. ¶ 13) (noting Agent Bieniek had "reviewed email correspondence" at the Subject Accounts relating to the Tribal Bonds, and "[s]ome examples of such emails are described herein, . . .   For example . . .").   In any event, unlike in the Title III wiretap context, the Affidavit did not need to show that email search warrants were necessary to obtain the access to the Subject Accounts, just that there was a fair probability that evidence of a crime would be

---

[19]  While Archer refers to his productions of emails to the USAO and SEC as "voluntary," Archer Suppression Br. at 50, responding to a subpoena is, of course, compulsory.   Archer's failure to make a complete production would run the risk of contempt sanctions and, potentially, obstruction of justice.

found in those accounts.   *Compare* 18 U.S.C. § 2703 (a), (b) *with* 18 U.S.C. § 2518(5)

(requiring, in addition to probable cause, that a wiretap application provide "a full and complete

statement as to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous").[20]   Even if

Archer had produced every relevant email from his email accounts to the Government—and he

did not—there would be no impropriety in the Government obtaining that same evidence by

search warrant.   In short, Archer cannot show that by not providing more details about the SEC

investigation Agent Bieniek sought to intentionally withhold material information from Judge

Moses.

  *Second*, the fact that the Affidavit did not mention Jason Galanis's 2015 arrest and

conviction was not a material omission under *Franks*.   To the contrary, mentioning Galanis's

prior arrest and conviction would have strengthened probable cause, showing Archer and

Cooney had teamed up with a convicted fraudster, and that Archer had concealed Galanis's

affiliation with an entity related to the Tribal Bonds.   *See* Aff. ¶ 18.

  Archer's contrary arguments are unavailing and nonsensical.   While Archer argues that

Jason Galanis's arrest made it less likely that relevant emails would be found in Archer's

accounts (presumably because Archer might have destroyed them), this possibility does not

undermine probable cause.   *Ali*, 870 F. Supp. 2d at 34 (D.D.C. 2012) ("The fact that Ali

---

[20]  Indeed, the one case cited by Archer in support of the purported relevance of the SEC investigation to the Affidavit, *United States* v. *Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) illustrates this distinction.   *Rajaratnam*, which concerned a *Franks* challenge to a Title III wiretap affidavit, analyzed the relevance of the parallel SEC investigation in assessing whether the Government had omitted information regarding the sufficiency of alternative investigative techniques, not whether the wiretap affidavit omitted information relevant to probable cause.   *See* 2010 WL 4867402 at *15.

conceivably could have deleted his email, wiped his phone, cleared his computer, or destroyed his business records is of no consequence to the Court's inquiry, for probable cause requires only '*a fair probability* that contraband or evidence of a crime will be found.'" (quoting *Gates*, 462 U.S. at 238) (emphasis in original)).   Finally, Archer's analogy to the owner of a drug stash house is misplaced.   For one, as noted above, narcotics, which are inherently transient, are not akin to stored electronic communications.   And, in responding to grand jury and SEC subpoenas, Archer had not "opened [his] doors," Archer Suppression Br. at 55, to the authorities; he had responded to compulsory process.[21]   In short, the omitted information was irrelevant to the probable cause analysis, and there is no basis to find that it was intentionally or recklessly not included in the Affidavit.

Further, and for substantially the same reasons disused above, the allegedly omitted information was immaterial because an Affidavit including the purportedly omitted information would have still supported probable cause.   *See, e.g.*, *United States* v. *Canfield*, 212 F.3d at 718-19 (describing probable cause analysis under *Franks*).   Again, the fact that Archer and Cooney had produced emails to the Government and SEC is irrelevant to the probable cause analysis. As to Jason Galanis's 2015 arrest, to the extent Archer is suggesting that an individual's arrest makes the disappearance or destruction of evidence more likely, the Affidavit clearly stated that Jason Galanis—as well as Archer himself—had been arrested in *this* case.   (*See* Aff. ¶ 10 ("The Defendants had all previously been arrested on May 11, 2016 pursuant to a criminal complaint.")

---

[21]  Indeed, the Government understands that Archer's productions in the parallel SEC civil action remain on-going, almost two years after that action was filed, and Archer has refused to confirm whether he ever completed his response to the Government's grand jury subpoena.

Thus, adding information about Jason Galanis's arrest in another case would not have materially impacted the probable cause analysis.

In short, Archer has not made a substantial preliminary showing that the Affidavit recklessly or intentionally omitted material information.   Thus, the Court should deny his motion without an evidentiary hearing.

## VIII.   **The Good-Faith Exception Applies**

Further, even if the Court were to accept the defendants' arguments regarding probable cause, particularity, or overbreadth, the good-faith exception would make suppression inappropriate, because the accounts were seized in objectively reasonable reliance on the Warrants.

### A.  **Applicable Law**

The exclusionary rule "does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid."   *United States* v. *Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States* v. *Leon*, 468 U.S. 897, 922 (1984)).

Accordingly, evidence collected pursuant to a search warrant later found defective will be suppressed only if (1) the issuing judge was knowingly misled; (2) the issuing judge wholly abandoned his judicial role; (3) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant is so facially deficient that reliance upon it is unreasonable.   *Id.*   The central question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."   *Leon*, 468 U.S. at 922 n.23.   If the reviewing court finds that the officer's reliance on the warrant was objectively reasonable, suppression is not warranted.   *See, e.g.*, *United States* v. *Singh*, 390 F.3d

83

168, 183 (2d Cir. 2004).   Put another way, recourse to the exclusionary rule is appropriate only where law enforcement misconduct was so "deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring* v. *United States*, 555 U.S. 135, 144 (2009).

### B.  Application

Here, the Government and its agents acted in objectively reasonable reliance on the Warrants and all arguments by Archer to the contrary are made largely in conclusory fashion. (*See* Archer Suppression Br. at 66-88).   This is unsurprising given that none of the four circumstances outlined in *Falso* are present here.

*First*, as discussed above, there is no basis to conclude that the Affidavit contained any material misstatements or omissions.   *Second*, there is no evidence that Judge Moses abandoned her judicial role.   *Third*, it is absurd to suggest that the Affidavit, which described emails sent by or received from each of the Subject Accounts relating to the WLCC bond scheme and attached a fulsome indictment returned by a grand jury in this District, so entirely lacked probable cause that reliance upon it was unreasonable.   And *fourth*, there is no basis to conclude that the Warrants were "so facially deficient" as to preclude reliance when they enumerated the Subject Offenses, specifically described the Subject Accounts, and explicitly referenced the WLCC bond scheme and the categories of responsive documents.[22]

---

[22] Further, with respect to particularity, while courts "may no longer rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct in a particular case."   *United States* v. *Rosa,* 626 F.3d 56, 64 (2d Cir. 2010).   Here, the Affidavit describes the Subject Offenses, without the "among other statutes" language, Aff. ¶ 3, and submits there is probable cause to

Accordingly, to the extent the Court accepts any of the defendants' arguments regarding probable cause, particularity, or overbreadth, the good-faith exception applies and suppression is not the appropriate remedy.[23]

## IX.   The Execution of the Warrants Was Reasonable

Finally, the Court should reject the defendants' arguments regarding the execution of the search, including, *inter alia*, their arguments regarding the July 2017 Production and the use of a Filter Team.

---

search for evidence of the Subject Offenses in the same categories of information as described in Section III of the Warrants.   *Compare* Aff. ¶¶ 21-22 *with* Warrants Section III.   The Affidavit thus makes made clear that the searches were a good-faith effort to find evidence of specific crimes related to the WLCC scheme, and not an excuse to conduct a general rummaging through the Subject Accounts.   *See. e.g.*, *United States* v. *Romain*, No. 13 Cr. 724 (RWS), 2014 WL 6765831, at *7 (S.D.N.Y. 2014), aff'd 678 F. App'x 23, 25-26 (2d Cir. 2017) (applying good-faith exception, even though warrant did not reference *any* statute, where "the Application and its supporting documents made clear that the purpose of the warrant was to find evidence of specific criminal offenses—that is, the narcotics and narcotics conspiracy statutes," and there was "no evidence or allegation that the Government actually relied on the defective warrant, as opposed to [its] knowledge of the investigation and the contemplated limits," (quotation omitted)).

[23] The Court should also reject Archer's arguments that the Government waived reliance on the good-faith exception by stating "the risk is on the government" and by refusing to comply with Archer's demands to cease execution of the validly issued Warrants.   With respect to the "risk is on the government" statement, that was made on the record in the context of a discussion about the privilege review protocol in the case.   (*See* 1/31/17 Tr. at 16) ("To the extent there are privileged communications . . . ultimately the risk is on the government.").   The statement was not intended as, and could not be reasonably construed as, a waiver of the ordinary, established principles of Fourth Amendment and Stored Communications Act jurisprudence outlined above.

## A.  Applicable Law

"'[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant—subject, of course, to the general Fourth Amendment protection against unreasonable searches and seizures."  *United States* v. *Lumiere*, No. 16 Cr. 483, 2016 WL 7188149, at *7 (S.D.N.Y. Nov. 29, 2016) (quoting *Salameh*, 54 F. Supp. 2d 236 at 277.

As a general rule, "when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search."  *United States* v. *Matias*, 836 F.2d 744, 747 (2d Cir. 1988).

The drastic remedy of blanket suppression of all seized evidence is justified only where the agents executing the warrant "flagrantly disregard" the warrant's terms.  *United States* v. *Liu*, 239 F.3d 138, 140 (2d Cir. 2000); *see United States* v. *Matias*, 836 F.2d at 747 ("the drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted in flagrant disregard of the warrant's terms" (emphasis in original) (internal quotation marks omitted)).   "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant, . . . and (2) do not act in good faith."  *United States* v. *Liu*, 239 F.3d at 140 (internal quotation marks omitted); *United States* v. *Schandl*, 947 F.2d 462, 465-66 (11th Cir. 1991) ("blanket suppression inappropriate where "[i]t was inevitable that some irrelevant materials would be seized as agents searched through numerous documents for evidence of tax evasion and failure to file, crimes that are generally only detected through the careful analysis and synthesis of a large number of documents"); *United States* v. *Triumph*

86

*Capital Grp.* 211 F.R.D. 31, 61 (D. Conn. 2002) ("Egregious, callous, and reckless conduct must be shown to justify blanket suppression.").

### B.  Application

There was nothing unreasonable about the Government's review of materials obtained through execution of the Warrants and certainly nothing so "egregious, callous, and reckless" as to justify blanket suppression.

*First*, as discussed above, the Government took multiple steps to respect and protect the attorney-client privilege.   These included seeking input from defense counsel as to what search terms it would use to segregate potentially privileged documents, having a Filter Team then review those documents for privilege, and then having the Filter Team consult with defense counsel, to attempt to reach agreement on privilege issues.   Because of this procedure, the Filter Team has not unilaterally turned any Non-Privileged Emails over to the Trial Team, without obtaining agreement from counsel that the documents are non-privileged.   Thus, to the extent this procedure has prejudiced anyone, it has been the Trial Team, which has not yet been able to view the Non-Privileged Emails the Filter Team provided to Archer's counsel months ago, but which Archer's counsel continues to claim are privileged.

*Second*, while Archer nonetheless objects to this procedure, use of a Filter Team has repeatedly been upheld as an appropriate way to protect the attorney-client privilege.  *See, e.g.*, *United States* v. *Dupree*, 781 F. Supp. 2d 115, 162-63 (E.D.N.Y. 2011); *United States* v. *Triumph Capital Gr. Inc.*, 211 F.R.D. at 43 (D. Conn. 2002) ("The use of a taint team is a proper, fair and acceptable method of protecting privileged communications when a search involves property of an attorney."); *Sattar*, 2003 WL 22137012, at *20–21 (approving the use of a taint

team); *accord Lumiere*, 2016 WL 7188149 at *7 n.10 (noting that Government's representation that it would "use a 'wall' protocol if it becomes aware of privileged documents" "may well moot" potential privilege related issues).   And the use of a filter team is certainly not a basis for suppression.   *United States* v. *Feng Ling Liu*, No. 12 Cr. 934 (RA), 2014 WL 101672, at *12 (S.D.N.Y. Jan. 10, 2014) ("Although certain decisions in this district have expressed disapproval of the government's use of 'ethical walls' or 'taint teams' to screen for privileged material . . . none of these cases suggests that this practice necessitates the suppression of evidence." (citations omitted)).   Further, in light of the concerns raised by Judge Forrest in *United States* v. *Levin*, No. 15. Cr. 101 (KBF), 2015 WL 5838579, at *2 (S.D.N.Y. Oct. 5, 2015), the Trial Team, not the Filter Team, moved on January 16, 2018 for a ruling on the crime-fraud exception. Thus, Judge Forrest's concerns in *Levin* about the "Wall AUSA" "bringing the [crime-fraud] motion" are not at issue here.   2015 WL 5838579, at *2.

*Third*, in executing the warrants the Government did not "convert[]" them into "'general warrants.'"   (Archer Suppression Br. at 55).   To the contrary, the manner in which the Government executed the Warrants provides further evidence of the reasonableness of the Government's review.   The Providers produced over 200,000 records to the Government; the Government's initial set of responsiveness search terms resulted in 12,000 "hits," and the Government's subsequent review of those documents yielded approximately 8,700 records responsive to the Warrants.   (Archer Suppression Br. at 26).   And because of pre-execution litigation, the Government did not begin its responsiveness review until July 2017.   In short, the Government, far from undertaking a "general rummaging" through the Subject Accounts, carefully, deliberately, and efficiently culled the materials for responsiveness to the Warrants.

*Finally,* Archer's complaints about the July 2017 Production are a red herring.   The Court will recall that the July 2017 Production was a provision of all emails from the Warrants that did not hit on the Privilege Search Terms.   It was designed to get potentially-relevant materials to the defendants as quickly as possible to allow them to prepare for trial while the Government performed its responsiveness check and determined what emails could ultimately be used in its case-in-chief.   The Government gave all counsel the opportunity to object to this procedure.   No one did.   Only after the Government produced the materials did Archer for the first time cry foul, resulting in the Court's order to claw back the production.

Archer essentially makes two arguments from this effort by the Government to help facilitate discovery.   *First*, he complains that the Government has produced (and by producing, impermissibly used) materials non-responsive to the Warrants.   As Archer (and the Court) well know, the Government never represented that it had performed a responsiveness search on the materials that became the July 2017 Production.   Indeed, the entire idea behind the production was to allow the defendants access to the materials while the Government performed such a review.   Mindful that a defendant—including Archer—might object and instead ask that the Government wait and produce only responsive data, the Government asked if any counsel objected.   Again, no one—including Archer—did.   (*See generally* Gov't 7/27/17 Letter, Dkt. 195 at 1).   For Archer to claim now that it was the Government that wronged him is inappropriate.   Any potential prejudice to Archer is of his own making.   In any event, any (purely hypothetical) harm to Archer was cured when the Court ordered the other defendants "to return or destroy" the July 2017 Production and ordered the Government "to replace the production with a new production consisting solely of materials responsive to the warrant,"

which it has done.   (Dkt. 212).[24]   As such, any issues surrounding the July 2017 Production

relating to the responsiveness review are moot.[25]

     *Second*, Archer claims that the July 2017 Production has created fatal privilege issues.

In sum, Archer claims that the July 2017 Production included emails between Archer and his

wife, "attorney-client privileged communications," and emails "between Mr. Archer and his

lawyers discussing" how to respond to subpoenas in this case, Schwartz Corr. Decl. ¶¶ 29-30.

Even accepting Archer's claims as true, they do not provide a basis for relief or a hearing.

---

[24]  Indeed, given the incredibly short time period between the production of these emails and the
Court's order that the production be returned, as well as the time necessary to load email
productions for review, it is virtually certain that no counsel reviewed any emails produced
pursuant to the July 2017 Production prior to their destruction.

[25]  *United States* v. *Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), cited by Archer, is not to the
contrary.   The primary issue in *Metter* was that, 15 months after the search warrants were
executed, the Government had not conducted *any* relevance review.   *See* 860 F. Supp. 2d at 211-
12 ("The Court finds that the government's more than fifteen-month delay in reviewing the
seized electronic evidence, under the facts and circumstances of this case, constitutes an
unreasonable seizure under the Fourth Amendment"); *see id.* at 215 (finding unreasonable that
the Government seized, imaged, and retained electronic data "with no plans whatsoever to *begin*
review of that data . . ."").   Notably, Judge Irizarry found nothing wrong with the fact that the
Government initially seized the entirety of numerous electronic devices and an email account.
*See id.* at 214 ("Up to this point, there is nothing problematic with the manner in which the
government executed the warrants.").

Here, there was no unreasonable delay in beginning, or for that matter, completing, the relevance
review.   The Trial Team began to access the data in July 2017, after the conclusion of pre-
execution challenges to the Warrants by the defendants.   The Trial Team first completed the
bulk of its review November 2017, with limited additional review after the Filter Team provided
the Trial Team with access to materials defendants had agreed were not privileged.   Moreover,
although Judge Irizarry in *Metter* also criticized the fact that the Government had "repeatedly
asserted" its intent to release the entirety of its electronic collection to all defendants, the
Government's July 2017 production here was based on the mistaken belief that the defendants
had consented to such a production, and the production was clawed back within days.

To begin, Archer's counsel's conclusory statements regarding the privileged nature of these communications are insufficient in and of themselves to establish a claim of privilege. *See Lumiere*, 2016 WL 7188149 at *7 (citing *United States* v. *Stern*, 511 F.2d 1364, 1367 (2d Cir. 1975) ("The burden of establishing the existence of an attorney-client relationship rests on the claimant of the privilege.")). Archer does not reference any particular potentially privileged communications. While Archer need not provide the Government with the emails themselves, he provides no information, for example, as to the date of the emails, the general subject matter, or the presence of third parties. As such, there is no way of knowing whether (i) the attorneys in question were attorneys whose names Archer provided to the Government (and, if they were not, why Archer chose not to include them on his list); (ii) the emails are in fact privileged at all even if a lawyer is on the emails; and (iii) the emails would have hit on the Responsiveness Search Terms, which would have been the only way the emails would have been viewed by the Trial Team. Accordingly, Archer has failed to make even a preliminary showing that any taint occurred.

Moreover, even if such documents (i) had not been captured by the Privilege Search Terms, (ii) had been captured by the Responsiveness Search Terms as potentially responsive, and (iii) may thus have been reviewed by the Trial Team, that would not be a basis for blanket suppression or even a taint hearing. As with the blanket suppression doctrine generally, wholesale suppression is generally not a remedy for violation of the attorney-client privilege. *Lumiere*, 2016 WL 7188149, at *6 ("The general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial not to order wholesale suppression." (quotation omitted)); *accord United States* v. *Patel*, No. 16-CR-798,

2017 WL 3394607, at *6 (S.D.N.Y. Aug. 8, 2017) ("Neither Patel nor the Government has identified any instances where a court authorized blanket suppression or invalidation of a search warrant following seizure of privileged material.").

Moreover, "the Government's review need only be reasonable, not perfect . . . ." *Lumiere*, 2016 WL 7188149, at *6 n.9.   Here, as discussed above, the Government acted more than reasonably in seeking to avoid viewing any attorney-client communications.   The Privilege Search Terms included all attorneys identified on the list Archer provided to Government, all law firms on Archer's list, and variations thereof.   To proceed this way in consultation with defense counsel was certainly a reasonable way of identifying attorney-client communications and is not a basis for suppression or a taint hearing.

In sum, the Government acted in good faith at all times, attempted to diligently protect potentially-privileged information, thoroughly reviewed voluminous email correspondence for responsive materials, and worked to ensure the defendants received records as quickly as possible so as to prepare for trial.   Under such circumstances, the Government's review was more than reasonable and Archer and Cooney have not identified any basis for suppression, much less blanket suppression of all materials seized pursuant to the Warrants.

## The Court Should Deny the Defendants' Demands for a Bill of Particulars

**I.**   **Applicable Law**

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial."   *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added).   "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the

defendant of the specific acts of which he is accused."   *United States* v. *Walsh*, 194 F.3d 37, 47

(2d Cir. 1999) (internal quotations omitted).

In exercising its broad discretion to determine whether the charges are "so general" that

they require supplementing, the Court should consider not just the text of the Indictment, but also

discovery and other information supplied to the defendant to date.   *See United States* v.

*Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *Torres*, 901 F.2d at 234 (affirming

denial of request for bill of particulars where defendants had "been provided with a wealth of

evidentiary detail from the discovery to date, including electronic intercepts, search evidence and

exhaustive supporting affidavits") (internal citation omitted); Order, *United States* v. *Stewart*,

No. 15 Cr. 287 (LTS) (S.D.N.Y. Jan. 19,2016) (denying request for a bill of particulars in an

insider trading case where the information already proffered was sufficient to enable the

defendant to prepare for trial), Dkt. No.64; *United States* v. *Monserrate*, No. 10 Cr. 965 (CM)

2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where

discovery materials and indictment were "sufficient to apprise the defendant of the charge

against him" and to allow him to prepare for trial); *United States* v. *D'Amico*, 734 F. Supp. 2d

321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts were

supplied to defense by way of letter); *United States* v. *Cuti*, No. 08 Cr. 972 (DAB), 2009 WL

3154310, at *3-4 (S.D.N.Y. Sept. 24, 2009) (in accounting fraud case, denying request for

particulars identifying all fraudulent transactions, payments, and statements made in furtherance

of charged scheme where Government had furnished more than a million pages of discovery and,

by letter, identified a series of fraudulent transactions and payments); *United States* v. *Samsonov*,

No. 07 Cr. 1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying bill of

particulars request where indictment, discovery letters, and discovery materials gave defendant

adequate information to prepare for trial); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240

(S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15

pages long and substantial discovery had been provided); *United States* v. *Henry*, 861 F. Supp.

1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of

particulars, the Court must ascertain whether the information sought has been provided

elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the

indictment itself.").

    Although the Government's provision of "mountains of documents to defense counsel

who [a]re left unguided as to which documents" are relevant to the charges does not substitute

for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575,

in no event should the volume of discovery alone warrant a bill of particulars; "[w]hile [a]

[c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that

continue to be produced," that concern is addressed by granting the defense sufficient time in

which to conduct the review in advance of trial.    *See United States* v. *Levy*, No. 11 Cr. 62

(PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013).

    Bills of particulars would undoubtedly be helpful to the defense in any case.    But

because "the law does not impose upon the Government an obligation to preview its case or

expose its legal theories," *United States* v. *Leonelli,* 428 F. Supp. 880, 882 (S.D.N.Y. 1977),

"[t]he ultimate test must be whether the information sought is necessary, not whether it is

helpful."    *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001); *United States* v.

*Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The purpose of a bill of

94

particulars is to ensure that a defendant has the information necessary to prepare a defense, not to

turn over all information that would aid the defendant."); *United States* v. *Rittweger*, 259 F.

Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible

attempt to compel the Government to provide the evidentiary details of its case") (citation and

quotation marks omitted).    A bill of particulars should not be misused to compel the

Government to disclose "the manner in which it will attempt to prove the charges, the precise

manner in which the defendant committed the crime charged, or a preview of the Government's

evidence or legal theories."    *Mitlof*, 165 F. Supp. 2d at 569; *see also D'Amico*, 734 F. Supp. 2d

at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to

compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting

*United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*,

263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the

government's evidence; restrict the government's evidence prior to trial; assist the defendant's

investigation; obtain the precise way in which the government intends to prove its case; interpret

its evidence for the defendant, or disclose its legal theory.").

There are good reasons why bills of particulars are warranted only where the allegations

in the Indictment, as supplemented by discovery and elsewise, are so general as to render it

impossible to prepare a defense.    Because "a bill of particulars confines the Government's proof

to particulars furnished," it can "restrict unduly the Government's ability to present its case."

*Id.*; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in

deciding whether to order a bill of particulars because "[t]he government's presentation of

evidence at trial is limited to the particulars contained in the bill").    Moreover, the

95

Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *United States* v. *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

## II.   Discussion

Applying these principles, defendants Archer, Cooney, and Morton are not entitled to, and should not be granted, a bill of particulars. The defendants' request impermissibly seeks to compel the Government to preview its case-in-chief and to cabin the Government's proof months before trial. Accordingly, the request should be denied.

The 45-page, single-spaced Complaint and 24-page superseding indictment[26] (together the "Charging Instruments") in this case, standing alone, are sufficiently detailed to defeat a claim for a bill of particulars. The Charging Instruments provide the defendants with a detailed chronology of the Government's allegations concerning the inducement of the WLCC to issue bonds, the false statements made to the WLCC in connection with this solicitation,[27] the use of

---

[26] Defendants Archer, Cooney, and Morton each seek to compel the Government to identify the anonymized entities referenced in the superseding indictment. Although the Government believes that the identities of these entities was apparent from, among other things, their explicit identification in the Complaint, the Government has provided all defendants with the requested information. This aspect of the defendants' motion for a bill of particulars is thus moot.

[27] *See, e.g.*, Indictment ¶¶ 6-10; Complaint ¶¶ 31, 34(b), 35.

entities controlled by the defendants, including Burnham Securities (the placement agent),[28]

Wealth Assurance Private Client Corp. (the purported Annuity Provider),[29] and Atlantic Asset

Management and Hughes Capital (the investment advisers)[30] to cause pension fund client funds

to be used to purchase the First and Fourth Issuances of the Wakpamni bonds[31] and to

misappropriate the bond proceeds for their own purposes, *see, e.g.*, Complaint ¶¶ 42-43; 58-62.

The Charging Instruments track, in significant detail, the defendants' relationships to these

entities, including, but not limited to the fact that Morton acquired both Atlantic and Hughes

through GMT Duncan, an entity she had formed, and did so with capital provided by BFG

Socially Responsible Investing, an entity formed by Hugh Dunkerley.   (*See* Complaint ¶¶ 19-22,

Indictment ¶ 12).   Similarly, the Charging Instruments allege in detail that Archer and Cooney

were investors in Burnham Securities, the placement agent purportedly responsible for placing

the WLCC bonds.   (*See, e.g.*, Complaint ¶ 12, Indictment ¶ 9).   The Charging Instruments also

allege with specificity the defendants' principal roles in the offense, including that Morton was

responsible for placing the bonds in Atlantic and Hughes client accounts and that she did so

notwithstanding that the investments were outside of the clients specified parameters and without

disclosing various conflicts of interest (each of which is themselves detailed in the Charging

Instruments).   (Complaint ¶ 38-39; Indictment ¶¶ 13-16).   So too, the Charging Instruments set

forth the manner in which Archer and Cooney each received proceeds of the First Bond Issuance

---

[28] *See, e.g.*, Complaint ¶ 12; Indictment ¶ 9.

[29] *See, e.g.*, Complaint ¶ 14; Indictment ¶ 7.

[30] *See, e.g.*, Complaint ¶¶ 20-22; Indictment ¶¶ 2-3, 12.

[31] *See, e.g.*, Complaint ¶¶ 39(x)-(y), 56(d)-(j).

and used the proceeds to purchase the Second and Third Bond Issuances, thus creating an additional $20 million of bonds for which there had been no actual investment.   (Complaint ¶¶ 44, 47(a)-(d), 49(a)-(c)); Indictment ¶¶ 21-23).   The Charging Instruments also set forth the manner in which Archer and Cooney used these fraudulently created bonds in other business endeavors, including to satisfy net capital requirements.   (*See, e.g.*, Indictment ¶ 23; Complaint ¶¶ 47(i), 49(d), 56(k)).   Finally, with respect to Morton, Archer and Cooney, the Charging Instruments highlight particular significant email and text communications between the defendants and Jason Galanis, which demonstrate the defendants' knowledge of the fraudulent nature of the scheme. (*See, e.g.*, Compl. ¶¶ 31(c)-(d); 33; 36 39(b)-(d), (h), (i), (n), (p)-(u), (v); 41; 56(c); 58(b); Indictment ¶ 11(a)-(c); 19, 20(b)).

       In addition to the facts set forth in the Charging Instruments, the defense has also been provided with substantial additional detail in the productions the Government has made, which includes, among many other things, communications between Morton and the pension fund investors; the pension funds agreements with Atlantic and Hughes; the various legal agreements governing the Bond Issuances; bank and other financial records demonstrating the movement of the bond proceeds between pertinent accounts; records documenting the transfer of the bonds purchased by Archer and Cooney to various of their other business interests, and email communications between Archer, Cooney, and Jason Galanis.   No more is necessary.

       Notwithstanding all this, Morton further demands that the Government identify not just *what* it intends to prove but to specify the precise manner in which the Government will establish the allegations contained in the Charging Instruments and the precise timing of various facts. Thus, Morton demands that the Government provide a bill or particulars identifying (i) the date

on which Morton joined the conspiracy;[32] (ii) the identities of any cooperating witnesses and the

dates they began cooperating; (iii) the basis for Morton's knowledge of the three means through

which WLCC was defrauded; (iv) the basis for allegations that the WLCC Bonds did not fit

within the investment parameters; (v) the particulars concerning Morton's knowledge of the the

"Dunkerley Account," defined in the Indictment; (vi) support for assertion that Morton installed

Gary Hirst; (vii) evidence of Morton's knowledge of the specific conflicts of interest in

paragraph 15 of the Indictment; and (viii) when Government alleges Morton became aware of

the "Galanis bond fraud."   (Morton Br. at 29-34).   In sum, she essentially seeks an order-of-

proof as to how they Government intends to prove its case.

      Morton's request is precisely the sort of overbroad, general investigative tool designed to

request the Government to preview its case-in-chief at trial, which Courts routinely reject.   At

their core, Morton's requests constitute an improper demand the Government specify the "where,

when and with whoms" of her crime and explain in detail *how* it intends to prove its case.[33]   *See,*

---

[32] All three defendants argue that the Government is required to identify any known co-conspirators in advance of trial (Morton Br. at 30; Archer Omnibus Br. at 16).   This is not the law.   Courts routinely deny requests for a list of all unindicted co-conspirators.   *See, e.g.*, *Rittweger*, 259 F. Supp. 2d at 292 (collecting cases); *Torres*, 901 F.2d at 233–34 (upholding district court's denial of a bill of particulars where the defendant had requested, in part, "the identity of other persons 'known and unknown' as alleged in . . . the indictment"); *United States* v. *Reinhold*, 994 F. Supp. 194, 200-01 (S.D.N.Y. 1998) (denying defendants' motion for a bill of particulars that sought "identification of alleged co-conspirators who have not been named in the Indictment"). In order to facilitate the orderly preparation of trial, however, the Government will voluntarily provide the defendants with a list of unindicted co-conspirators 6 weeks prior to trial, understanding that the Government reserves the right to supplement this list as necessary.

[33] In many cases, the information Morton now demands is readily apparent from a review of the Charging Instruments and the discovery. For example, Morton demands the basis for the Government's allegation that the WLCC bonds did not fit within the investment parameters of the pension funds.   The Government has produced the agreements between Atlantic/Hughes and the pension funds concerning investment parameters, as well as email communications between

*e.g., United States* v. *Mitlof,* 165 F. Supp. 2d 558, 569 (S.D.N.Y.2001) ("The Government may

not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to

prove the charges, the precise manner in which the defendant committed the crime charged, or a

preview of the Governments evidence or legal theories."); *United States* v. *Martoma*, No. 12 Cr.

973 (PGG), 2013 WL 2435082, at *5 (S.D.N.Y. Jun. 5, 2013) (emphasis added) (internal

quotation marks omitted) ("It is well settled," that "defendants need not know the *means* by

which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which

the Government intends to adduce to prove their criminal acts.")   That, the Government need

not do.   Indeed, Morton's demand that the Government identify *how* it will prove each of its

detailed allegations, merely highlights the fact that the Government's specific allegations as to

Morton's actions and knowledge provide her with more than adequate notice to prepare her

defense.

   Turning next to Archer's specific demands, Archer demands that the Government

identify (i) which of the several bond transactions identified in the indictment were allegedly

fraudulent; (ii) whether the Government intends to proceed on a legal theory of aiding and

abetting versus primary liability; and (iii) to particularize the instances of alleged wrongdoing.

All of Archer's demands on without merit.

   Archer first argues that a bill of particulars is necessary to notify him of "what

transactions are alleged to be the subject of the substantive fraud charge against him"   (Archer

Omnibus Br. at 21) and similarly that the Government should be ordered to "particularize

---

the pension funds and various Atlantic/Hughes personnel.   Morton is thus well apprised of the
basis for this allegation.

whether it intends to argue that Mr. Archer committed a primary violation of the securities fraud statute, or whether it will argue that he was an aider and abettor."   (Archer Omnibus Br. at 23). But the Government need not limit itself to a single theory of criminal liability.   As alleged in the Indictment, all four bond issuances – including the bond issuance purchased directly by Archer were fraudulent.   Archer committed a primary violation of the securities fraud statute when he purchased $15 million of the Wakpamni bonds in the Third Bond Issuance and then transferred those bonds to VL Assurance and to Burnham.   Archer is also liable for aiding and abetting all Four Bond Issuances and the Government may argue either or both theories of liability to the jury.

It is axiomatic that "[a]n indictment is not defective simply because it charges a defendant with alternative offenses." *Whitfield* v. *Ricks*, No. 01 Civ. 11398 (LAK), 2006 WL 3030883, at *12 (S.D.N.Y. Oct. 24, 2006).   In fact, the Government not only may *charge* a defendant based on alternative theories of liability, it may present those alternative theories to a jury.   *See United States* v. *Masotto*, 73 F.3d 1233, 1241 (2d Cir.1996) ("When the jury is properly instructed on two alternative theories of liability, as here, we must affirm when the evidence is sufficient under either of the theories." (citing, *inter alia, Griffin* v. *United States*, 502 U.S. 46 (1991))).   It is not uncommon to charge aiding and abetting and principal liability as alternative theories.   *See, e.g., United States* v. *Fitzgerald*, 542 F. App'x 30, 34 (2d Cir. 2013); *United States* v. *Huezo*, 546 F.3d 174, 179 (2d Cir.2008); *United States* v. *Frampton*, 382 F.3d 213, 224 (2d Cir. 2004).

As a result, where, as here, an indictment alleges both principal and aiding and abetting liability, the Government need not specify on which theory it intends to proceed.   *United States*

101

v. *Molina*, No. 11 Cr. 528 (JFK) 2013 WL 2455922, at *4 (S.D.N.Y. June 5, 2013) ("The Court notes that Molina seeks very specific information about how the Government will present its case against him, including . . . whether he is alleged to be a principal or an aidor and abettor. This level of detail is plainly beyond the proper scope of a bill of particulars under the caselaw." (citation omitted)); *United States* v. *Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *13 (S.D.N.Y. Mar. 11, 2009) (denying motion for bill of particulars seeking, *inter alia*, "whether . . . [the defendant] is charged as a principal or as an aider and abettor"); *accord United States* v. *Ellis*, 121 F. Supp. 3d 927, 941 (N.D. Cal. 2015) (denying motion for bill of particulars to specify which defendants are principals and who are aiders and abettors because "[t]he indictment may charge a defendant with being both a principal and an aider and abettor"); *United States* v. *Nazemzadeh*, No. 11 Cr. 5726, 2014 WL 310460 at*13 (S.D. Cal. Jan. 28, 2014) (denying defendant's motion for a bill of particulars to specify whether or not government was proceeding on an aiding and abetting theory because "all indictments for substantive offenses must be read as if the alternative provided by 18 U.S.C. § 2 [aiding and abetting] were embodied in the indictment." (citations omitted));

In the present case the Government intends to present evidence to the jury from which the jury may find either that Archer committed substantive securities fraud, or, in the alternative, that he aided and abetted the commission of a substantive securities fraud.   Having thus answered Archer's inquiry, no bill of particulars is warranted.

Finally, Archer argues that a bill of particulars is required to notify him of any instances of alleged wrongdoing.   In particular, Archer alleges that he is ill advised as to (i) which of his other business endeavors were supported by the fraudulently issued bonds and bond proceeds;

and (ii) that manner in which he was kept apprised of the criminal scheme.   With respect to the

first, the Charging Instruments and discovery highlight clearly which of Archer's many business

endeavors benefited from the bond proceeds or the bonds themselves.   For example, bond

proceeds went directly and indirectly to Rosemont, Vaudioise, VL Assurance and were used to

purchase millions of dollars of Code Rebel Shares.   The bonds purchased by Archer were

transferred to VL Assurance, and then again to Burnham, where they were used for net capital

purposes.   (*See* Complaint ¶ 46(g)-(i)).   Similarly, the bonds purchased by Cooney were

transferred to Bonwick, also for net capital purposes.   (Complaint ¶ 49(d)).   All of this financed

and supported an effort by the defendants to create a financial services conglomerate to be

formed under the "Burnham" banner and to include insurance, asset management and investment

banking services.   The roadmap of the Government's case is thus clear—Archer participated in

a scheme involving four fraudulent bond issuances and used the bond proceeds and the bonds

themselves in an effort to build a financial services conglomerate under the "Burnham" name.

        This is not a case—unlike many of the cases cited by Archer, in which the Government

alleged that some, but not all of universe of undifferentiated transactions were fraudulent and

then refused to apprise the defense of *which* of such transactions the Government believed were

fraudulent.   *See Bortnovsky*, 820 F.2d at 575 (in an insurance fraud case, holding that bill of

particulars should have been granted where the Government refused to identify at any point

before trial were alleged to have been fabricated and thus the subject of fraudulent insurance

claims); *United States* v. *Savin*, No. 00 CR 45, 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001)

(in case where investment adviser was charged with misappropriating client funds through a

number of fund transfers, and Government had failed to specify which transfers were alleged to

103

have constituted missaopriation, bill of particulars granted in part); *United States* v. *Nachamie*, 91 F. Supp. 2d at 565, 571 (S.D.N.Y. 2000) (in Medicare fraud case, applying *Bortnovsky* to require Government to identify those of the 2,000 Medicare claims for which it had produced discovery were alleged to have been fraudulent).   There are not thousands of undifferentiated transactions in the present case.   There are four bond issuances and the resulting transfers of both the bonds and the bond proceeds, all of which is described in detail in the Charging Instruments.   Where this kind of specificity regarding means and methods of a securities fraud scheme has been furnished, courts in this District have held that bills of particulars are unwarranted.   *United States* v. *Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5 (S.D.N.Y. May 28, 2013) (denying bill of particulars, in case arising out of the decades-long Bernard Madoff Ponzi scheme, seeking "the allegedly false records upon which the Government intends to rely to prove its case, the particular entries in those records that the Government alleges that [defendant] knew were false, and the documents on which it will rely from the 43 gigabytes of data on Bonventre's office computer."); *United States* v. *Heredia,* No. 02 Cr. 1246 (SWK), 2003 WL 21524008, at *9 (S.D.N.Y. July 3, 2003); *see also*, *e.g.*, *United States* v. *Levy*, 2013 WL 664712, at *4, 13 (in case charging stock manipulation through false representations by corrupt brokers, bill of particulars "recounting [] each specific misrepresentation and omission alleged" denied as "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and quotation marks omitted); *United States* v. *Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356, at *10-11 (S.D.N.Y. Jan. 2, 2001) (denying request for particulars concerning "pump and dump" stock manipulation scheme where the Government had identified the basic components and timeframe of the

scheme, as well as the issuers in question).   To order the Government to provide anything more would simply serve to provide Archer with the evidentiary detail which he may want, but to which he is not entitled.   *See, e.g.*, *Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *Hemphill* v. *United States*, 392 F.2d 45, 49 (8th Cir. 1968)).

Archer's demand for a bill of particulars specifying the manner in which he was kept apprised of the criminal scheme is even less availing.   The Government has already put Archer on notice that it intends to prove that he was kept informed about the advancement of the scheme and its fraudulent purpose.   The Government need not itemize its proof with respect to this allegation, and, as noted above, the Government has cited various communications of this nature in the Charging Instruments, and provided Archer with his own email communications. Nothing further is warranted.

### The Court Should Deny the Defendants' Rule 16, Brady and other Discovery Demands[34]

Archer, joined by Cooney, also seeks to compel the Government to provide, pursuant to Rule 16, (i) the entirety of the Government's discovery from an unrelated criminal matter involving the misappropriation and disposition of Gerova shares; (ii) consensual recordings and related information involving Jason Galanis; and (iii) copies of any court orders, warrants, and subpoenas issued in the present matter.   In the alternative, Archer and Cooney argue that they are entitled to the materials identified in (i) and (ii) above as *Brady* material and further demand (i)

---

[34] Cooney also demands that the government be directed to make various pretrial disclosures well in advance of trial.   This request is moot as the parties have agreed to a reciprocal schedule for the production of expert disclosures, Rule 404(b), exhibit lists, witness lists, and witness's prior statements.

evidence of other crimes perpetrated by their co-defendants; (ii) the identification of any *Brady* material contained in the Rule 16 materials produced to date; and (iii) production of all Brady and *Giglio* material at least 60 days prior to trial.

## I.    <u>Relevant Background</u>





## II.    Evidence From the Gerova Case, ████████████████ and Any Other Bad Conduct of Jason Galanis or His Confederates Constitutes Neither Rule 16 Nor Brady Material

Archer makes essentially the same argument with respect to his claim that a variety of evidence from the Gerova matter constitutes either Rule 16 or *Brady* material in the present case. In particular, Archer argues that "evidence of prior crimes committed by Mr. Archer's co-defendants—and in particular by Jason Galanis—is incredibly exculpatory" because it "tends to support Mr. Archer's defense," "that he was lied to and used by Jason Galanis and his alleged criminal confederates." (Archer Omnibus Br. at 35; 41). Archer is wrong.

The Government has no duty to search a co-defendant's prior criminal case file to gather information for the defense. Jason Galanis's prior criminal case was a wholly separate investigation that did not involve Archer at all. Archer makes much of the fact that the Gerova matter is relatively recent and that certain of the AUSAs assigned to the present matter were also



responsible for the Gerova matter.   But the overlap of personnel is irrelevant.   The ruling
Archer seeks—requiring the Government to search the files of every co-defendant's prior
criminal matters to search for Rule 16 or *Brady* materials—would expand the Government's
obligations beyond reason.   Unsurprisingly, the Government is aware of no authority, nor,
unsurprisingly has Archer pointed to any, that requires the Government to review materials from
a co-defendant's prior, closed criminal case in which the moving defendant is not alleged to have
been involved.[38]

To the contrary, in a remarkably similar set of circumstances, Judge Carter recently
rejected precisely this request from a defendant.   In *United States* v. *Durante, et al.*, No. 15 Cr.
171) (ALC), Judge Carter considered a demand from defendant Abida Khan that the Government
search its files from a prior prosecution of co-defendant Edward Durante for information
demonstrating "how extraordinarily deft and brazen a con-man Durante is, consistent with Ms.
Khan's trial defenses" that she was duped by Durante.   (*See Durante* Dkt. No. 121).   Judge
Carter—recognizing the baseless nature of the request—denied Khan's motion from the bench.
As Judge Carter understood, Archer's argument is premised on a fallacy.   At issue in this trial
will be Archer's conduct and state of mind based on his knowledge and understanding of the
operative facts during the charged scheme.   To the extent that others involved in the scheme had

---

[38] Archer already has access, of course, to a great deal of information about Jason Galanis, John
Galanis, and Hirst's criminal conduct in the Gerova matter, as the briefing and trial record in that
matter provide a tremendous amount of detailed information.   *United States v. Zackson,* 6 F.3d
911, 918 (2d Cir. 1993) (the Government need not produce as *Brady* material information that
which is already known to the defense*).*   The Government also notes—and if necessary will so
move *in limine*—that Archer may not introduce evidence of prior wrongdoing by his co-
defendants in order to suggest that they are guilty, while he is not.   Nor may he argue that his
lack of participation in a prior criminal conspiracy renders him innocent of the present charges.

committed prior, unrelated bad acts about which he had no awareness, such prior acts are in no way relevant to whether Archer willfully chose to undertake criminal activity based on his knowledge and understanding of the relevant transactions at issue in this case.

███████████████████████████████
████████████████████████████████████
██████████████████████████████
███████████████████████████████
█████████████████████████████
██████████████████████████
███████████████████████████████
████████████████████████████████████
█████████████████████████████
██████████████████████████████
███████████████████████████████
██████████████████████████████
██████████████████████████
█████████████████████████ .

## III.   The Government Need Not Produce Its Subpoenas

Archer alleges that the Government has, "without authority," refused to produce copies of court orders, warrants, and subpoenas it obtained or issued in the course of this investigation. To be clear, and as Archer acknowledges, the Government has produced both search warrants and GPS tracking warrants.   The sole issue is thus whether Archer is entitled to copies of grand jury subpoenas issued in this case.   He is not.

Archer first argues that he is entitled to copies of any grand jury subpoenas because he "is aware that the government has continued to issue Grand Jury subpoenas long after the Indictment in this case issued, seemingly for reasons that relate solely to trial preparation." (Archer Omnibus Br. at 36).   Archer is correct that the Government has continued to issue grand jury subpoenas since the return of the Indictment in this matter.   That is because—as it should—the Government has continued to investigate individuals and conduct outside the scope of the present Indictment.   *United States* v. *Meregildo*, 876 F. Supp. 2d 445, 448-449 (S.D.N.Y. July 6, 2012) (quoting *United States* v. *Jones*, 129 F.3d 718, 723 (2d Cir. 1997)) (internal citations omitted) ("A grand jury's investigative power does not end when it indicts a defendant.   Instead, 'post-indictment action is permitted to identify or investigate other individuals involved in criminal schemes or to prepare superseding indictments against persons already charged.'")   The mere fact that the Government has continued to do its job thus in no fashion suggest that it has misused the grand jury subpoena process.   *United States* v. *Ohle*, 678 F. Supp. 2d 215, 233 (S.D.N.Y. 2010) (quoting *United States* v. *Raphael*, 786 F. Supp. 450, 358 (S.D.N.Y. 1992); ("[A]bsent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the Grand Jury proceedings is proper.").

In the alternative, Archer argues that subpoenas are necessary to prepare for trial, to determine whether to issue any Rule 17(c) subpoenas, and to understand the scope of what the Government has produced.[39]   Having accused the Government of lacking authority for its

---

[39] As the Court is aware, a significant portion of the discovery in this case was provided to the Government by the SEC.   Archer is in possession of many of the SEC's subpoenas, and thus, in

111

refusal to provide its subpoenas, Archer fails to cite any authority in support of his contention

that it must.   Judge Cogan's recent decision in *United States* v. *Nordlicht*, in which the court

considered and summarily rejected a similar argument by defense counsel is instructive in this

regard.   *See* Decision and Order, *United States* v. *Nordlicht*, No. 16 Cr. 640 (E.D.N.Y. Jan. 8,

2018), Dkt. No. 280.   Judge Cogan offered two independent reasons to reject the defendant's

demand.   First, Judge Cogan noted that there did not appear to be any legal authority in support

of the defendant's request and that there was no indication that "receipt of the Government

subpoenas would 'significantly [] alter the quantum of proof in their favor."   *Id.* at 3 (citing

*United States* v. *Persico*, 447 F. Supp. 2d 213, 217 (E.D.N.Y. 2006)).   Second, Judge Cogan

found that disclosure of the Government's grand jury subpoenas would run afoul of Rule 6(e)

and was especially problematic, where, as here, the Government's investigation is ongoing.   *Id.*

at 3-4.

## IV.   The Court Should Deny Archer and Cooney's Motion Regarding *Brady* and *Giglio* Materials

Defendant's Archer and Cooney demand that the Court order the Government to produce

*Brady* and *Giglio* material no less than 60 days prior to trial.   No such order is necessary.   As it

has informed the defendants, the Government has, as it represented it would, reviewed for *Brady*

interview notes and deposition transcripts in the possession of the SEC in connection with the

---

many cases, is already aware of the scope of documents requested. The Government also notes
that Archer has been actively using subpoena power in the parallel civil proceeding to gather
documents and in many cases to specifically ascertain that particular custodians have no
documents relevant to him.   If, as now seems clear, Archer is doing so principally to defend
himself in the criminal matter, he is abusing the civil subpoena process.   He has also, in any
event, apparently gathered the evidence necessary to demonstrate the "absence of [any] records,"
(Archer Omnibus Br. at 38), thus further obviating the need to see the Government's subpoenas.

parallel proceedings.   That review did not identify any such material.   The Government has also, in an abundance of caution, produced excerpts of law enforcement memoranda of certain witness interviews which contain information that is arguably helpful to the defense.   Finally, the Government has agreed to produce 3500 material for its witnesses a full month before trial and will include produce any *Giglio* for these witnesses by that time.   The Government is aware of and will continue to comply with its obligations—no further order is necessary.

## V.   The Defendant's Demand for Rule 12.4 Notice

Defendants Archer and Cooney seek an order directing the Government to file a notice, pursuant to Rule 12.4 of the Federal Rules of Criminal Procedure, setting forth the identities of any organizational victims.   As indicated in the advisory notes, the purpose of Rule 12.4 is "to assist judges in determining whether they must recuse themselves because of a 'financial interest in the subject matter in controversy.'"   Because the organizational victims in the present case consist of (i) the Wakpamni Lake Community Corporation, a subdivision of the Oglala Sioux Tribe of South Dakota; and (ii) pension funds (none of which relate to law firms, federal employees, or the judiciary), the defendants concerns about a possible judicial conflict seems misplaced.   Having previously provided such information to the defendants, the Government of course has no objection to providing the same information the Court.   Accordingly, the pension fund clients who were victims of the fraud are listed below:

- OSERS (through the GYOF Fund)
- Birmingham Water Works Board
- Chicago Transit Authority Retiree Health Care Trust
- Management—ILA Managed Health Care Trust Fund
- Michelin North America
- Pension Trust for the Milk Drivers and Dairy Employees Local Union No. 246

- Philadelphia Housing Authority
- Richmond Retirement
- Terrapin Insurance Company
- Washington Suburban Sanitary Commission Employee's Retirement Plan

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court deny

the defendants' motions in their entirety.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     /s/_____

Rebecca Mermelstein / Brendan F. Quigley /
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360 / 2190/ 2442

Dated: February 5, 2018
       New York, New York

114