UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

    -against-

JASON GALANIS, *et al.*

                Defendants.

Case No. 16-cr-371 (RA)


# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT GARY HIRST'S MOTION FOR SEVERANCE

Barry Levin
1225 Franklin Ave., Suite 325
Garden City, New York 11530
Tel: (516) 222-4500
Email: barry@barrylevinlaw.com

Michael Tremonte
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: (212) 202-2600
Email: mtremonte@shertremonte.com

*Attorneys for Defendant Gary Hirst*

Defendant Gary Hirst, by and through his undersigned attorneys, respectfully submits the following reply memorandum of law in further support of his motion for severance.

## PRELIMINARY STATEMENT

The government recites formulaic arguments that severance is generally not warranted based on mutual antagonism when defendants are simply engaged in "finger-pointing" and that the risk of spillover prejudice rarely warrants severance in conspiracy cases. But the government wholly fails to address the substance of Mr. Hirst's arguments as to why the circumstances here justify severance. As discussed further below and in Mr. Hirst's opening brief, Mr. Hirst and his co-defendant Michelle Morton are not simply seeking to shift blame to each other. Rather, Mr. Hirst and Ms. Morton are presenting mutually exclusive defenses that are in direct conflict, and the government is likely to argue that the conflict itself provides a basis to infer that the jury should not credit either of them. Thus, severance is warranted to prevent the significant prejudice that would result if they were forced to present these defenses in a joint trial. Mr. Hirst's trial should also be severed from that of Ms. Morton and of his other co-defendants because there is a significant risk that Mr. Hirst will suffer spillover prejudice from the cumulative effect of all of the evidence that would be introduced at a joint trial regarding criminal conduct in which, the government essentially concedes, Mr. Hirst played no part. Finally, Mr. Hirst's trial should be severed to protect his constitutional rights because if Ms. Morton and Mr. Hirst are tried together, each will act as a second prosecutor of the other, arguing that the other is guilty, leading the jury to convict either or both based on these arguments, rather than the actual evidence presented by the government. The Court should reject the government's platitudinous arguments and grant Mr. Hirst's motion for severance.

**ARGUMENT**

I.  **MR. HIRST'S MOTION FOR SEVERANCE SHOULD BE GRANTED**

The government acknowledges, as it must, that severance is warranted under Federal Rule of Criminal Procedure 14 where, as here, a defendant is prejudiced by "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Gov't Br. at 26 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).[1]  A determination whether there is a "sufficient risk of prejudice to warrant a separate trial is 'highly fact-specific and must be evaluated on a case-by-case basis.'"  *United States v. Hawit*, No. 15-cr-252 (PKC), 2017 WL 2271352, at *3 (E.D.N.Y. May 22, 2017) (citing *Zafiro*, 506 U.S. at 539)).  For reasons explained below, the factual circumstances here – in particular, Mr. Hirst's and Ms. Morton's mutually antagonistic defenses, the significant potential for spillover prejudice from the evidence as to other defendants to unfairly prejudice Mr. Hirst, and the serious risk that Mr. Hirst's constitutional right to a fair trial

---

[1]  Citations to "Gov't Br." refer to Government's Memorandum of Law in Opposition to Defendants' Pre-Trial Motions, *United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y. Feb. 5, 2018), ECF No. 308.  Citations to "Hirst Br." refer to Memorandum of Law in Support of Defendant Gary Hirst's Motion for Severance, *United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y. Jan. 16, 2018), ECF No. 286.  Citations to "Morton Br." refer to Memorandum of Law in Support of Michelle Morton's Pre-Trial Motions, *United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y. Jan. 17, 2018), ECF No. 298.  Citation to "Archer/Cooney Br." refer to Memorandum of Law in Support of Devon Archer and Bevan Cooney's Motion for Severance," *United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y. Jan. 16, 2018), ECF No. 290.  Citations to "Superseding Indictment" refer to Superseding Indictment, *United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y. Nov. 2, 2016), ECF No. 90.

will be impaired if he is forced to defend himself against the attacks of Ms. Morton's counsel as a *de facto* second prosecutor – warrant severance.

### A. Mr. Hirst's and Ms. Morton's Mutually Antagonistic Defenses Warrant Severance

The government misconstrues Mr. Hirst's and Ms. Morton's arguments for severance as suggestions that each is "not guilty because they were duped by other members of the conspiracy." Gov't Br. at 29 (quoting *United States v. Hameedi*, No. 17-cr-137 (JGK), 2017 WL 5152991, at *4 (S.D.N.Y. Nov. 3, 2017)). As an initial matter, the government's argument ignores the Second Circuit's decision in *United States v. Serpoosh*, 919 F.2d 1078 (2d Cir. 1990), which reversed the denial of a motion for severance where each defendant "described himself as the unwitting dupe of the other," and "each defense counsel attacked the credibility of the other defendant as well as his version of events." *Id.* at 836-37.[2] The Government makes no attempt to distinguish *Serpoosh*, and its suggestion that the jury could theoretically find that that neither defendant had the requisite knowledge and intent, *see* Gov't Br. at 29, is disingenuous, given that here, as in *Serpoosh*, the Government is likely to "contrast[ ] the 'theoretical[ ] possibility' that neither of the defendants knew of the [criminal conduct of others] (i.e., both stories were true) with the 'realistic world' in which neither story could be true." *Id.* at 838.

Moreover, as detailed in Mr. Hirst's opening brief, antagonism inheres in Mr. Hirst's and Ms. Morton's respective defenses well beyond the generic defense that the government ascribes

---

[2] To the extent that the Second Circuit's decision in *Serpoosh* held that mutual antagonism *requires* severance, it has been overruled by *Zafiro*. *See United States v. Haynes*, 16 F.3d 29, 31-32 (2d Cir. 1994). But, as the Second Circuit has noted, even after *Zafiro*, trial courts retain "sound discretion" to "tailor[ ] the relief" for the prejudice that would result from a joint trial, and severance may be warranted where "joinder would "compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *id.* at 32, which (as explained *infra*) is the case here.

3

to them.  Ms. Morton will argue that Mr. Hirst was installed at Hughes Capital Management, Inc. ("Hughes") for the purpose of perpetrating a fraud based on willful misrepresentations of the propriety of placing the tribal bonds in clients' accounts and willful omissions of material conflicts of interest.  Mr. Hirst, meanwhile, will argue that while he offered certain opinions on the bonds and Hughes's clients' investment guidelines, the decision to place the bonds in the clients' accounts was entirely Ms. Morton's, and she did so knowing that the decision was part of a scheme she joined with Jason Galanis.  Mr. Hirst will also argue that he relied on information provided to him by Ms. Morton, which she knew was false.  In sum, each will argue that the other's *deliberate fraud* establishes his or her good faith.  Further, at least with respect to the investment adviser fraud counts, which require the government to establish the breach of a duty, each will argue that the other had the exclusive duty.  These defenses, beyond simply a claim of being duped by another member of the conspiracy, are directly contradictory and require the jury to convict Mr. Hirst in order to acquit Ms. Morton, and vice versa.

      The case relied on by the government, *United States v. Hameedi*, is plainly distinguishable from the situation here.  In that case, the possibility for prejudice was significantly reduced because the Indictment discussed an unindicted co-conspirator, CC-1, and the named defendant "asserted that CC-1 is ultimately responsible for the fraudulent scheme" and a jury could "accept this CC-1 theory without having to convict [the named defendant's] co-defendants."  2017 WL 5152991, at *4.  By contrast, where a jury "cannot logically accept both [defendants'] defenses as true . . . . the likelihood of antagonistic defenses . . . supports severance."  *United States v. Basciano*, No. 05-cr-060 (NGG), 2007 WL 3124662, at *8 (E.D.N.Y. Oct. 23, 2007) (contrasting a situation in which a defendant's "defense would be to show that a third party committed [the charged offense]," in which severance was not warranted,

with one in which one defendant's defense was "in direct conflict" with another's, such that severance was warranted).

Here, unlike in *Hameedi*, it is not possible to argue that a third party was "ultimately responsible" for disclosing the alleged conflicts of interest to Hughes's clients or for determining whether Hughes's clients' funds would be invested in tribal bonds.  Either Ms. Morton bore the responsibility, or Mr. Hirst did.[3]  Thus, the government's argument that "each defendant could be acquitted (or convicted) under either side's presentation of the facts," Gov't Br. at 31, is simply incorrect.  In fact, in the case the government cites for this proposition, *United States v. Tuzman*, No. 08:15-cr-536 (PGG) 2017 WL 4785459 (S.D.N.Y. Oct. 19, 2017), Judge Gardephe expressly recognized that severance has been found to be warranted in cases where, as here, "defendants have affirmatively argued that the other committed the charged offense." *Id.* at *7.  Mr. Hirst will affirmatively argue that Ms. Morton defrauded Hughes's clients, and Ms. Morton will affirmatively argue that Mr. Hirst did so.  *See* Hirst Br. at 9-11; Morton Br. at 37-38.  The mutual antagonism of these "'irreconcilable' defenses . . . mandate[s] severance." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (quoting *Zafiro*, 506 U.S. at 538).

The government suggests that any prejudice from mutual antagonism could be cured by a limiting instruction.  That is wrong.  The "general[ ] presum[ption] that juries follow limiting instructions . . . evaporates when there is an overwhelming probability that the jury will be unable to follow the court's instructions." *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994).  For example, in *United States v. Tootick*, 952 F.2d 1078 (9th Cir. 1991), limiting

---

[3]   Though Jason Galanis was charged with investment adviser fraud along with Ms. Morton and Mr. Hirst, he is not alleged to have been an agent or employee of Hughes.  There is therefore no basis for either Ms. Morton or Mr. Hirst to allege that Jason Galanis had any responsibility to disclose information to Hughes's clients or to consult with the clients about the placement of tribal bonds in their portfolios.

5

instructions were held to be inadequate when in a joint trial, defendants' counsel "maintained mutually exclusive positions and traded incriminating accusations" and the government's argument "rested on the logical impossibility of accepting both defendants at their word." *Id.* at 1085.  As the Ninth Circuit explained in that case, "No reins were placed on defendants' respective counsel as they acted as unsanctioned prosecutors during the course of the trial," and "the prosecutor relied upon the mutually exclusive nature of the codefendants' defenses in an effort to nail down their mutual guilt in his closing argument," thus, the limiting instructions given were deemed inadequate because the jury had "been numbed by the conflicting defenses and [wa]s ready to believe nobody."  *Id.* at 1085-86.  In such circumstances, the court held that the trial court's failure to sever was an abuse of discretion, because it was not possible to otherwise "ensure that the jury determines the guilt or innocence of each defendant on an independent basis."  *Id.* at 1086.

The same is true here.  If Mr. Hirst and Ms. Morton are tried together, their situation will be virtually identical to the one described in *Tootick*:  they will adopt mutually exclusive positions and trade accusations, and the government will capitalize on that antagonism by arguing to the jury that the conflict between their defenses supports an inference that both are guilty.  Such a situation undermines both defendants' rights to a fair trial and warrants severance.

### B. The Significant Risk of Spillover Prejudice Warrants Severance

Separate and apart from any mutual antagonism between Mr. Hirst and Ms. Morton, the significant risk of spillover prejudice would provide an independent basis for the severance of Mr. Hirst's trial from that of all of his co-defendants.  Though the government makes a blanket assertion as to all of the defendants that "evidence to be introduced at separate trials would overlap considerably," it makes no attempt to distinguish Mr. Hirst's case from others in which

the Second Circuit found severance to be warranted when the cumulative effect of evidence relating to "incidents of criminal conduct which do not involve th[e] defendant in any way," but only involve his co-defendants. *See* Hirst Br. at 14-15 (quoting *United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968)).

   Moreover, the government's own description of the evidence it intends to rely upon underscores that much of the "overlap" consists of evidence does *not* involve Mr. Hirst in any way.  First, the government refers to evidence of "false and misleading representations" made to the Wakpamni Lake Community Corporation ("WLCC").  Gov't Br. at 33.  But the Superseding Indictment does not allege that Mr. Hirst made – or was even aware of – any false representations to the WLCC.  *See* Superseding Indictment ¶ 6 ("Jason Galanis and John Galanis . . . induced the WLCC, through false and misleading representations and omissions, to issue . . . bonds.").  Second, the government refers to evidence that the defendants caused clients of Hughes and Atlantic Asset Management, LLC ("Atlantic") to purchase issuances of the bonds."  Gov't Br. at 33.  But the Superseding Indictment does not allege that Mr. Hirst held any position at Atlantic, had any contact with Atlantic's clients, or was involved in any way in the Fourth Bond Issuance in which Atlantic's client purchased tribal bonds.  *See* Superseding Indictment ¶¶ 2-3, 13(b), 14 (alleging that Ms. "Morton became the Chief Executive Officer of Atlantic," but not that Mr. Hirst held any position there, and alleging Ms. "Morton . . . directed the use of Atlantic client funds to purchase . . . the Fourth Bond Issuance" and "failed to disclose the contemplated bond purchases to, or to consult with" Atlantic clients, but making no such allegations regarding Mr. Hirst).  Third, the government refers to evidence of a "fail[ure] to invest the bond proceeds on the WLCC's behalf in the manner agreed upon," Gov't Br. at 33, but, again, the Superseding Indictment does not allege that Mr. Hirst reached any agreement with

the WLCC or played any role in determining how the bond proceeds were invested.[4]  *See* Superseding Indictment ¶ 8 (alleging that the "Bond Agreements," to which Mr. Hirst was not a party, provided that "a separate investment manager was to receive the bond proceeds . . . so that they could be invested on the WLCC's behalf").  Fourth, the government refers to "recycl[ing] certain of the bond proceeds" in the Second and Third Issuances, Gov't Br. at 33-34, but Mr. Hirst is not alleged to have taken part in this recycling.  *See* Superseding Indictment ¶ 21 ("Jason Galanis, Hugh Dunkerley, Devon Archer, and Bevan Cooney . . . misappropriated $20 million from the proceeds of the First Bond Issuance and used the money to purchase the Second and Third Bond Issuances").  Finally, though the government offers a scattershot citation to twenty-five paragraphs of the Superseding Indictment discussing how the defendants "misappropriated the proceeds" of the bond issuances only one of those paragraphs mentions Mr. Hirst.  *See* Gov't Br. at 34 (citing Superseding Indictment ¶¶ 4, 6-25).  And even that paragraph does not allege that Mr. Hirst directly misappropriated any bond proceeds.  *See id.* ¶ 20 (alleging that Jason Galanis "transferred significant amounts [of bond proceeds] to various co-defendants, including at least $1.3 million to an entity controlled by Gary Hirst and Hugh Dunkerley.").

Mr. Hirst's lack of involvement in multiple bond issuances places him in a different position than all of the other defendants, who are all alleged to have participated in or been made aware of the progress of multiple issuances.  *See id.* ¶ 6 ("Jason Galanis and John Galanis . . . induced the WLCC . . . to issue . . . four bond issuances"); *id.* ¶ 9 ("In connection with each of the Bond Issuances, the WLCC . . . entered into a placement agency agreement with a broker-

---

[4]  Though the Superseding Indictment alleges Mr. Hirst was the Assistant Secretary of an annuity provider, *see* Superseding Indictment ¶ 7, it does not allege that Mr. Hirst played any role in determining whether the WLCC's funds were invested in that annuity provider rather than some other provider.  *See id.* ¶ 8.

8

dealer . . . at which Hugh Dunkerley . . . was employed and in which Devon Archer and Bevan Cooney . . . had an ownership interest"); *id.* ¶ 11 ("Jason Galanis . . . apprised Devon Archer and Bevan Cooney . . . about the progress of the Bond Issuances"); *id.* ¶ 13 (alleging that Ms. "Morton and [Mr.] Hirst, at the direction of Jason Galanis, directed the use of Hughes client funds to purchase . . . the entirety of the First Bond Issuance," but only Ms. "Morton, at the direction of Jason Galanis, directed the use of Atlantic client funds to purchase . . . the entirety of the Fourth Bond Issuance"); *id.* ¶ 21 ("Jason Galanis, Hugh Dunkerley, Devon Archer, and Bevan Cooney . . . misappropriated $20 million from the proceeds of the First Bond Issuance and used the money to purchase the Second and Third Bond Issuances"); *see also* Gov't Br. at 2 ("John Galanis . . . told [the WLCC's] representatives that defendant Jason Galanis was an investment banker at Burnham Securities, even though Jason Galanis did not actually work at Burnham.") (footnote and citation omitted). Simply put, even crediting the government's claim of a single, comprehensive conspiracy, Mr. Hirst's role in that conspiracy, as alleged by the government, is minor relative to his co-defendants and confined to a brief period of time and a discrete set of transactions.

Though the government asserts that any potential prejudice is outweighed by considerations of judicial economy because "[t]he same evidence would be admitted against Archer, Cooney, Morton and Hirst," Gov't Br. at 35, that assertion is highly questionable. A trial against Mr. Hirst alone would be easily streamlined and include a fraction of the evidence it will seek to introduce against the co-defendants. For example, whether or not the bond issuances were induced by a fraud on the WLCC could be assumed, and it would have no bearing on Mr. Hirst's guilt or innocence. Moreover, the government completely ignores the fact that, as discussed in Mr. Hirst's opening memorandum, the government's attempts to admit that

9

evidence in a joint trial will be met with vigorous opposition from five sets of defense counsel, resulting in a "litany of side bar debates about various legal issues including limiting instructions" that "will likely confuse the jury in what is already a complex case," which will "disrupt the flow of trial and increase the length of trial," thereby nullifying any purported gains in efficiency that the Government claims a joint trial will provide. *See* Hirst Br. at 18-19 (quoting *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017)). Accordingly, the risk of spillover prejudice similarly warrants a separate trial for Mr. Hirst.

### C. Severance is Warranted to Protect Mr. Hirst's Constitutional Right to a Fair Trial

Even if the Court finds that neither mutual antagonism nor spillover prejudice warrant severance, the Court should still conclude that severance is warranted in order to protect Mr. Hirst's constitutional right to a fair trial. As explained in Mr. Hirst's opening brief, this case presents a scenario like the one in *Shkreli*, in which Mr. Hirst's and Ms. Morton's defenses each have an underlying theme that the other "lied, committed fraud, and is guilty," which raises a "serious risk that the jury would be prevented from making a reliable judgment about guilt or innocence," and here, as in that case, severance is warranted to ensure that both Mr. Hirst and Ms. Morton "receive a constitutionally fair trial." *Shkreli*, 260 F. Supp. 2d at 256.

The Government's attempt to distinguish *Shkreli* by asserting that "no defendant is claiming to have been victimized by a fellow defendant's fraud," Gov't Br. at 31, is unavailing. The well-reasoned decision in that case did not rest on the status of one of the defendants as a victim, but rather on the likelihood that his defense would involve painting the co-defendant as a fraudster who deceived him. Similarly, here, while neither Mr. Hirst nor Ms. Morton is a "victim" in the sense that neither invested funds in the tribal bonds, each will argue that the other

10

deceived both him or her and Hughes's clients by making false representations and omissions regarding the suitability of the tribal bonds for those clients.

Similarly, the government alludes to the possibility that it will attempt to introduce evidence that Mr. Hirst, Jason, and John Galanis were "Arrested together in a prior proceeding," albeit without introducing "the substance [of] those events." Gov't Br. 34. To do so will all but ensure that all of the co-defendants, save John Galanis, will argue that they were victims of a scheme perpetrated by the Galanises and Mr. Hirst. *See* Archer/Cooney Br. 11 (describing Mr. Hirst as "a recidivist enabler of Jason Galanis's criminal schemes"). Mr. Hirst will in turn be forced to point to evidence showing his co-defendants' substantially greater roles in the subject transactions as part of his defense. Because there is a serious risk that the jury will convict Mr. Hirst based on the defenses asserted by counsel for the other defendants, and his co-defendants based on his defenses, rather than the theory asserted by the government, severance is warranted to ensure that the jury's decision as to each defendant is appropriately based on the evidence and consistent with due process. *See Shkreli*, 260 F. Supp. 2d at 247 (finding severance warranted where there is a "risk . . . the jury [will] find both defendants guilty based on each defendant's arguments that he was deceived by the other, instead of deciding the case on the evidence presented").

## **CONCLUSION**

For the foregoing reasons, Mr. Hirst respectfully requests that the Court issue an order severing his trial from that of his co-defendants.

Dated: New York, New York
February 12, 2018

                                      SHER TREMONTE LLP

                                      By:  /s/ Michael Tremonte
                                              Michael Tremonte
                                              Noam Biale
                                      90 Broad Street, 23rd Floor
                                    New York, New York 10004
                                    Tel: 212.202.2600
                                    E-mail: mtremonte@shertremonte.com

                                              Barry Levin
                                    1225 Franklin Ave., Suite 325
                                    Garden City, New York 11530
                                    Tel: (516) 222-4500
                                    Email: barry@barrylevinlaw.com

                                    *Attorneys for Gary Hirst*