UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        - v. -

JASON GALANIS, et al.,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:

16 Cr. 371 (RA)

## THE GOVERNMENT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF PRE-TRIAL MOTIONS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York,
Attorney for the United States of America

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
      - Of Counsel -

# Table of Contents

I.      The Court Should Find that the Crime-Fraud Exception Applies to Certain Emails, or in the Alternative, Conduct an *In Camera* Inspection of Those Emails ........................................ 1

    A.      Applicable Law .................................................................................................... 2

    B.      The Government Has Met the Requirements to Apply the Crime-Fraud Exception ... 2

    C.      The Government Has Made a Sufficiently Specific Showing ..................................... 4

    D.      The Government Is Not Seeking to Apply the Exception to Communications that Merely "Relate To" the Crime-Fraud ....................................................................... 8

    E.      Archer's Arguments Regarding the Government's Purported "Failure" to Provide Certain Information Are Both Incorrect and Irrelevant ........................................... 9

    F.      Archer's Arguments About "Outsourcing" to the Filter Team Are Moot and Illusory 10

    G.      *In Camera* Review Would Also Be Appropriate ..................................................... 10

    III.    The Court Should Set a Deadline for Defense Rule 16 Disclosures ............................. 26

CONCLUSION ......................................................................................................................... 28

# Table of Authorities
## Cases

*Almont Ambulatory Surgery Ctr., LLC* v. *United Health Grp., Inc.*, No. 14-CV-02139, 2017 WL 5201731 (C.D. Cal. Mar. 8, 2017) ....................................................................... 22, 23

*Chevron Corp.* v. *Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2011) ........................................................ 5

*District of Columbia* v. *Wesby*, --- S. Ct. ----, No. 15-1485, 2018 WL 491521 (Jan. 25, 2018) .... 3

*In re 650 Fifth Avenue*, No. 08 Civ. 10934 (KBF), 2013 WL 3863866 (S.D.N.Y. July 25, 2013) 4

*In re Cueto*, 554 F.2d 14 (2d Cir. 1977) ........................................................................................ 1

*In Re Grand Jury Proceedings (Caucus Distributors)*, 871 F.2d 156 (1st Cir. 2014)................. 20

*In re Grand Jury Proceedings (Narraganset Indian Tribal Historic Preservation Office)*, 744 F.3d 211, (1st Cir. 2014)...................................................................................................... 21, 22

*In re Grand Jury Proceedings (Sutton)*, 658 F.2d 782 (10th Cir. 1981) ...................................... 20

*In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Robert M. Simels Esq.)*, ("*Simels*") 767 F.2d 26 (2d Cir. 1985) ...................................................................................... 25

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032 (2d Cir. 1984) ...................................................................................................................................... 3, 4

*In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994) ......................................................................... 2

*In re Richard Roe*, 68 F.3d 38 (2d Cir. 1995)............................................................................... 9

*In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472 (S.D.N.Y. 2017) ...................... 23, 25

*Kaley* v. *United States*, 571 U.S. - - - -, 134 S. Ct. 1090 (2014).................................................... 3

*Securities Investor Protection Corporation* v. *Bernard L. Madoff Investment Securities LLC*, 319 F.R.D. 100 (S.D.N.Y. 2017) ...................................................................................................... 5

*Specialty Minerals, Inc.* v. *Pleuss-Stauffer AG,* No. 98 Civ. 7775 (VM), 2004 WL 42280, (S.D.N.Y. Jan. 7, 2004)................................................................................................................ 5

*United States* v. *Bergstein*, No. 16-Cr-746 (PKC), 2017 WL 453944, (S.D.N.Y. Oct. 10, 2017) 18

*United States* v. *Chambers*, No. 17-Cr-396 (WHP), 2017 WL 4857599, (S.D.N.Y. Oct. 26, 2017) .............................................................................................................................................. 18

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999)........................................................................ 8

*United States* v. *Jacobs*, 117 F.3d 82 (2d Cir. 1997) ................................................................. 2, 9

*United States* v. *Jones*, 129 F.3d 718 (2d Cir. 1997)................................................................... 25

*United States* v. *Kleen Laundry and Cleaners, Inc.*, 381 F.Supp. 519 (E.D.N.Y.1974) .............. 21

*United States* v. *Leung*, 40 F.3d 577 (2d Cir. 1994) .................................................................... 26

*United States* v. *Meregildo*, 876 F. Supp. 2d 445 (S.D.N.Y. 2012) ............................................ 25

*United States* v. *Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) ..................................................... 26

*United States* v. *Pyun*, 737 F.3d 1 (2d Cir. 2013) ....................................................................... 18

United *States* v. *Redzepagic*, No. 17 Cr. 228, 2017 WL 2838145 (E.D.N.Y. June 30, 2017) ..... 18

*United States* v. *Tucker*, 254 F. Supp. 3d 620 (S.D.N.Y. 2017) ................................................. 4, 5

*United States* v. *Vanwort*, 887 F.2d 375 (2d Cir. 1989) ............................................................. 25

*United States* v. *Zolin*, 491 U.S. 554 (1989) ................................................................. 2, 8, 10, 11

The Government submits this reply memorandum of law in further support of its motions regarding (i) the crime-fraud exception, (ii) ███████████████████████████████ █████████ and (iii) the timing of defense Rule 16(b) disclosures.

To prevent the Government from obtaining potentially highly relevant evidence, Archer relies on a series of "Catch 22" scenarios of his own making.   After previously asserting in this case that it would be inappropriate for the Government's Filter Team to file a motion based on the crime-fraud exception, Archer now faults the Trial Team for failing to make a sufficiently specific showing about emails which it has not seen.   In addition, he seeks to prevent the Court from viewing those same emails *in camera*. ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.

The law does not condone such sophistry.   Instead, it recognizes that the "right to every person's evidence" requires compliance with validly issued process and, in appropriate circumstances, like the situation here, overcomes common-law privileges.[1]

## I.   The Court Should Find that the Crime-Fraud Exception Applies to Certain Emails, or in the Alternative, Conduct an *In Camera* Inspection of Those Emails

The Court should find that the crime-fraud exception applies to communications concerning four categories: (i) the issuance of the WLCC Bonds, (ii) the purchase of those bonds by clients of Hughes and Atlantic and Archer and Cooney, (iii) the defendants' control of and involvement in the entities used to facilitate the issuance and purchase of the bonds, and (iv) the misappropriation of the WLCC Bond proceeds.

---

[1]  *See In re Cueto*, 554 F.2d 14, 15 (2d Cir. 1977).

### A.  Applicable Law

There are only two requirements to apply the crime-fraud exception.   First, the Government must "demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed . . ."   *United States* v. *Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).   Second, the Government must show probable cause that "the communications in question were in furtherance of the fraud or crime."   *Id.*

Further, when it is not clear whether the crime-fraud exception applies to a set of documents that one party asserts to be privileged, courts in this circuit may conduct an *in camera* review of those documents.   *See, e.g.*, *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994). To obtain *in camera* review of such materials, the Government must show only "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States* v. *Zolin*, 491 U.S. 554, 572 (1989).

### B.  The Government Has Met the Requirements to Apply the Crime-Fraud Exception

The Government has met the first requirement for the application of the crime-fraud exception— "a showing of probable cause to believe that a fraud or crime has been committed." *Jacobs*, 117 F.3d at 87.   Archer does not seriously argue otherwise.   Instead, he claims that the Government's motion "concerns broad swaths of conduct with which Mr. Archer was never charged," including the "issuance of the WLCC bonds or the sale of those bonds to the customers of Atlantic and Hughes."   Archer, however, is charged with that conduct, which is part of the securities fraud scheme alleged in the Indictment.   (*See, e.g.*, S1 Indictment ¶ 30 ("to wit, the defendants engaged in a scheme to purchase the proceeds of several bond issuances by

2

the WLCC and also caused investor funds to purchase the bonds . . . .").   In any event, there can be no real question that the Government has established probable cause that a crime or fraud—specifically, a scheme to defraud relating to WLCC bonds—has been committed by Archer and co-conspirators.

The Government has also established probable cause, or "a reasonable basis" to believe that all communications regarding the four categories set forth above during the time period of the charged conspiracy were in furtherance of the WLCC bond scheme.   *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984) ("The fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent.").   Each of the four categories communications identified by the Government involved an essential part of the scheme.   (*See* Gov't Mem. of Law at 14-17).   The scheme, which resulted in the misappropriation of bond proceeds, would not have been possible without (i) the issuance of the bonds; (ii) the existence of purchasers for the bonds, including clients of the captive investment adviser firms, and Archer and Cooney, who bought the second and third issuances using recycled proceeds from the first issuance; and (iii) the defendants' (including Archer's) control over most of the relevant entities involved in the WLCC offerings, including the placement agent, the investment adviser firms, and the annuity provider.   Thus, there is probable cause to believe that communications related to these issues were "in furtherance of" the scheme.   *District of Columbia* v. *Wesby*, --- S. Ct. ----, No. 15-1485, 2018 WL 491521, at *6 (Jan. 25, 2018) ("Probable cause 'is not a high bar.'") (quoting *Kaley* v. *United States*, 571 U.S. - - - -, 134 S. Ct. 1090, 1103 (2014)).

As set forth below, the Court should reject Archer's contrary arguments.

## C. The Government Has Made a Sufficiently Specific Showing

*First*, it is entirely appropriate for the Court to find that certain categories of documents—as opposed to particular, individual communications—fall within the crime-fraud exception.   While Archer cites *In re 650 Fifth Avenue*, No. 08 Civ. 10934 (KBF), 2013 WL 3863866, at *1 (S.D.N.Y. July 25, 2013) for the proposition that the Government must present "particularized evidence that each challenged communication was in furtherance of the crime or fraud," this "particularized evidence" standard appears in no prior decisions of the Court of Appeals or the district courts in this circuit.[2]

To the contrary, other courts in this District regularly find that the second element of the crime-fraud test is met with respect to categories of documents, as opposed to making findings on a document-by-document, or communication-by-communication, basis.   *See, e.g.*, *In re Grand Jury Subpoenas Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1039 (2d Cir. 1984) ("conclud[ing] that there is a sufficient basis to require the production of documents not dated

---

[2] *In re 650 Fifth Avenue* is also distinguishable from this case in at least two ways.   First, it involved a civil forfeiture action.   While the Court in *In re 650 Fifth Avenue* noted the "unproven allegation[s] from the" civil complaint, *In re 650 Fifth Ave.,* 2013 WL 3863866, at *1-2, the law is clear that in the criminal context, the grand jury's return of an indictment establishes probable cause that a crime has taken place for purposes of crime-fraud analysis. *See, e.g.*, *United States* v. *Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y. 2017) ("[T]he fact that a grand jury issued the Indictment . . . supports a finding of probable cause that a crime was committed").   Second, in *In re 650 Fifth Avenue*, the Government sought to invoke the crime-fraud exception more broadly than it does here, arguing that all documents on the defendants' privilege log fell within the crime-fraud exception.   *See In re 650 Fifth Ave.*, 2013 WL 1870090, at *1 (S.D.N.Y. 2013) ("The Government asserts that the crime-fraud exception applies as to all such documents—and apparently therefore seeks disclosure of all documents on defendants' privilege logs.").   Here, by contrast, the Government has taken pains to be more surgical in its request, arguing approximately half of the documents on Archer's privilege log fall within that exception, assuming *arguendo* they are privileged at all.   *See infra*.

later than July 20, 1983" under the crime-fraud exception); *United States* v. *Tucker*, 254 F. Supp. 3d 620, 625 (S.D.N.Y. 2017) ("The Court therefore concludes that in camera review is unnecessary, and that *documents and communications related to Tucker v. AMG withheld by McDowell Rice pursuant to the attorney-client privilege* shall be produced to the government." (emphasis added)); *Securities Investor Protection Corporation* v. *Bernard L. Madoff Investment Securities LLC*, 319 F.R.D. 100, 109 (S.D.N.Y. 2017) ("The second element of the crime-fraud exception is therefore established with respect to *any communications between the Defendants and Guston & Guston concerning the Defendants' efforts to take title to the house in the name of someone other than Ms. Crupi*." (emphasis added)); *Chevron Corp.* v. *Salazar*, 275 F.R.D. 437, 455 (S.D.N.Y. 2011) ("Chevron has thus carried its burden of demonstrating that the crime-fraud exception applies to the creation of the Calmbacher report, the Cabrera report, and the cleansing memos.   Mr. Woods is therefore directed to produce all of the documents identified on his privilege log that *relate to these reports*." (emphasis added)); *see also Specialty Minerals, Inc.* v. *Pleuss-Stauffer AG,* No. 98 Civ. 7775 (VM), 2004 WL 42280, at *13 (S.D.N.Y. Jan. 7, 2004) ("Plaintiff may question Mr. Rosenberg concerning communications with Mr. Delfosse about prior art, the 997 patent, the relationship of that patent to the 365 patent and the potential for using the 365 patent as a basis for litigating infringement claims against SMI or other manufacturers of calcium carbonate products.").

These decisions make sense.   Presenting "particularized evidence" as to "each challenged communication" would require far more information than is typically available to a party seeking to invoke the crime-fraud exception, since the moving party, unless the motion is brought by a wall or taint team, does not have access to the documents themselves.   Such a

standard would effectively create a Catch 22 by which the individualized assertions purportedly required to show probable cause could never be obtained absent probable cause that the exception applies.   Such a rule would render the crime fraud exception a nullity.   In short, based on the information available to it, the Government has made a sufficiently specific showing that the certain categories of communications were in furtherance of the WLCC bond scheme.

In any event, to the extent any more specificity is required, the Trial Team was, within the last several days, given access to (i) Archer's privilege log related to the Email Search Warrants in this case (the "Privilege Log"), attached as Exhibit A and (ii) a draft Crime-Fraud Log created by the Filter Team, attached as Exhibit B.

The Privilege Log represents documents that the Filter Team believes are non-privileged, but for which counsel for defendant Archer continues to assert the privilege.   Of the 147 documents on the Privilege Log, the Government believes that approximately half are subject to the crime-fraud exception.   Although the Privilege Log inexplicably contains no dates, many of these documents, on their face, appear to be contemporaneous communications between Archer and one or more of his co-conspirators regarding the WLCC Bonds themselves.[3]   Many of the others involve communications with Jason Galanis or other co-conspirators regarding entities the defendants used to further the bond scheme, including Atlantic Asset Management, Burnham, or

---

[3] (*See, e.g.*, pr.review.archer__00002103; pr.review.archer__00010059; pr.review.archer__00010250; pr.review.archer__00010252; pr.review.archer__00010253; pr.review.archer__00020664; pr.review.archer__00020665; pr.review.archer__00020669; pr.review.archer__00020670).

Valor.   The Government has provided additional information in Appendix 1 regarding the connection between the communications on the Privilege Log and the scheme.

The draft Crime-Fraud Log represents documents that the Filter Team initially believed to be potentially privileged but possibly subject to the crime-fraud exception.[4]   As with the Privilege Log, the Crime-Fraud Log reflects multiple communications involving Archer and his co-conspirators regarding the WLCC bonds, during the time period of the charged conspiracy. (*See, e.g.*, Crime-Fraud Log Rows 2, 57, 69-74, 77-78).   Again, as with the Privilege Log, the Crime-Fraud Log also contains numerous communications between Archer and his co-conspirators relating to the two investment adviser firms used to purchase the WLCC bonds, Burnham, Valor, and related entities. The Government has also provided additional information in Appendix 1 regarding the connection between the communications on the Crime-Fraud Log and the scheme.

In sum, however, the documents for which the Government seeks to invoke the crime-fraud exception concern issues directly relevant to the charged scheme and many of them involve one or more of Archer's co-conspirators, most often Jason Galanis, who has already pled guilty to his role in the scheme.   In light of this, there is certainly a "reasonable basis," *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039, to find that these

---

[4]  The Crime-Fraud Log is in draft format, because the Filter Team continues to attempt to reach a resolution with Archer's counsel regarding whether certain documents on the log are privileged in the first instance.   The Trial Team understands that Archer's counsel told the Filter Team he would not be able to discuss the matter further until after today's filings.   To be clear, by making this motion, the Government is not conceding the privileged status of either the documents on the Crime-Fraud Log or the Privilege Log.   A number of entries on both logs concern communications involving no attorneys at all.   Others contain third parties who do not appear to have a privileged relationship with the entity that is asserting the privilege

communications were in furtherance of the charged scheme, and at the very least, a "basis . . . to support a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."   *Zolin*, 491 U.S. at 572.

### D.  The Government Is Not Seeking to Apply the Exception to Communications that Merely "Relate To" the Crime-Fraud

*Second*, the Government is not arguing that communications that merely "relate" to the WLCC scheme fall within the crime-fraud exception.   To be sure, based on currently available facts, the Government is not asserting, for example, that communications between Archer and his current counsel regarding this prosecution fall within the crime-fraud exception, even though those communications presumably "relate" to the WLCC scheme.   Nonetheless, the Government submits that there is probable cause to believe that the communications on Appendix 1 (which do not appear to reflect communications between Archer and his current counsel) both relate to, *and are in furtherance of*, the WLCC scheme.   Again, the vast majority of the communications listed on Appendix 1 involve not only Archer and an attorney, but also either Jason Galanis or Cooney, two of Archer's charged co-conspirators.   The presence of Archer's co-conspirators on these communications provides additional evidence these communications were not merely retrospective or incidental communications about the scheme but instead were intended to "promote or facilitate achievement" of its goals.   *See United States* v. *Diaz*, 176 F.3d 52, 85 (2d Cir. 1999) (defining the term "in furtherance of the conspiracy" as involving statements "designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example . . . seeking to induce a coconspirator's assistance, serving to

foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy.").

### E. Archer's Arguments Regarding the Government's Purported "Failure" to Provide Certain Information Are Both Incorrect and Irrelevant

*Third*, the Government's purported "fail[ure]" to provide information requested by Archer is irrelevant to the merits of this motion.   In any event, the Government has provided the requested information.   To the extent Archer previously harbored any doubt or illusions, the Government's moving brief on this motion identified (i) the "crime each communication was supposedly in furtherance of"—the WLCC bond scheme—and (ii) the participants in the crime—Archer and his co-conspirators.[5]   Further, based in part on the Trial Team's January 16, 2018 motion, the Filter Team has, in fact, prepared the attached draft Crime-Fraud Log.[6]

---

[5] The fact that Archer is not the author of many of the documents at issue, *see* Archer Mem. of Law at 17, is simply irrelevant.   A defendant, or even an unindicted co-conspirator, need not be the author of a document for the crime-fraud exception to apply.   *See, e.g.*, *Jacobs*, 117 F.3d at 88-89 (applying crime-fraud exception to two letters attorney sent to defendant, which "strongly advised" defendant "to have nothing to do" with the fraudulent program at issue).

[6] To the extent Archer suggests that *In re Richard Roe*, 68 F.3d 38 (2d Cir. 1995) requires a district court to making findings regarding, *inter alia*, "which of the parties . . . possessed a criminal or fraudulent purpose . . . and whether the crime-fraud exception applies to an innocent joint privilege-holder," the Court should reject that argument.   As noted above, there are only two requirements for the crime-fraud exception to apply: probable cause to believe a crime has been committed, and that the communications were in furtherance of that crime.   *Roe*'s instructions are more appropriately viewed as the court's way of ensuring, in that particular case, that the district court conduct a more thorough analysis on remand than it did in the first instance. *Roe*, 68 F.3d at 39-41 (explaining district court applied wrong standard by finding crime-fraud exception applied, simply because "documents, read collectively, have the *real potential of being relevant evidence of activity* in furtherance of a crime" (emphasis added)).

F. **Archer's Arguments About "Outsourcing" to the Filter Team Are Moot and Illusory**

Archer also argues that it would be inappropriate for the Filter Team to turn over to the Trial Team documents that fit within the four categories of communications outlined above, if the Court granted the Government's motion.   These concerns are unfounded.   First, the size of the Filter Team's Crime-Fraud Log has been significantly reduced, to focus only on documents that appear centrally relevant to this case.   The current log, for example, includes no communications between Archer and his current attorney, nor does it include documents related to "BAK USA."   (*Cf.* Archer Mem. of Law at 19-20).   In short, should the Court order certain documents disclosed, the narrowed set of documents on the crime-fraud log eliminate Archer's purported concerns.

G. *In Camera* **Review Would Also Be Appropriate**

Finally, to the extent the Court requires additional specificity on the documents at issue before reaching a final decision on the application of the crime-fraud exception, *in camera* review is appropriate.   As noted above, to obtain *in camera* review, the Government need only show "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."   *Zolin*, 491 U.S. at 572.

Archer does not seriously address this standard.   Nor could he.   There is certainly a basis to support a good-faith belief that an *in camera* review of the communications on Appendix 1, almost all of which involve Archer and his co-conspirators, and many of which explicitly refer to the WLCC bonds or entities involved in scheme related to those bonds, "may reveal evidence to establish the claim that the crime-fraud exception applies."

Archer instead argues that the Court should exercise its discretion not to inspect the materials.   But this argument also fails.   For one, the volume of the materials is rather small. Appendix 1 contains only approximately 250 emails and attachments, a relatively small number in a case involving tens of thousands of emails.   *Zolin*, 491 U.S. at 573 (noting that "volume of materials the district court has been asked to review" is one factor the court can consider in determine whether *in camera* review is appropriate").   Second, the "alleged privileged information," *id.*, may provide critical evidence regarding Archer's knowledge and intent.   *Id.* (noting that the "relative importance to the case of the alleged privileged information" is another factor to consider).   While Archer claims he was just a "passive" buyer of the Second WLCC bond issuance, and a "passive" investor in entities involved in the scheme,[7] evidence that he sought and/or obtained legal advice regarding the bonds or the entities involved may substantially undermine any assertion regarding his "passivity."   Finally, there is a strong "likelihood," *id.*, that *in camera* review "will establish that the crime-fraud exception" applies. *Id.*   As noted above, most of the communications in Appendix 1 involve both Archer and his co-conspirators and many explicitly related to the WLCC bonds or to entities involved in the transaction.

Accordingly, if the Court declines to order the documents produced to the Trial Team immediately, it should order an *in camera* review.

---

[7] (*See* Archer Corrected Mem. of Law in Support of Omnibus Mots. at 9 (asserting Archer "was a passive recipient of some of [the WLCC bond] proceeds" and that Archer had a "passive ownership interest" in Atlantic Asset Management)).

**[Pages 12 through 25 redacted from publicly-filed version]**

████████████████████

　　████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ .

## III.     The Court Should Set a Deadline for Defense Rule 16 Disclosures

The defendants have acknowledged that they too have obligations pursuant to Fed. Rule Crim. P. 16(b) and state that they have no objection to an order directing them to produce such materials no later than March 30, 2018.   The defendants caveat this agreement, however, by claiming that their defense case is "necessarily reactive" and that while they will "produce one month before trial any evidence that they reasonably anticipate using in their case-in-chief at that time, the defense trial strategy is likely to be significantly influenced by the government's production of its exhibit list and 3500 material, and by the development of its evidence at trial" such that a defendant should not be precluded from offering evidence produced after this date.

26

(Br. at 37).[18]

This claim is worrisome.   As has been proffered to the Court, the parties have agreed on a mutually binding disclosure schedule for expert notice, exhibit lists, exhibits, 404(b) material, witnesses, 3500 and Rule 26.2 material.   The Government agreed to provide an exhibit list 45 days prior to trial and to provide 3500 material a month prior to trial – in both cases agreeing to deadlines far earlier than it was otherwise inclined to do.   It made these concessions to allow for the orderly preparation of trial and to permit the "necessarily reactive" defense to digest the Government's case-in-chief so that – among other things – the defendants would be in a position to provide their Rule 16 material and exhibits in a timely fashion.   But it would be grossly unfair for the defendants to obtain early production of Government materials only to claim mid-trial that they could not have anticipated that they might offer a newly produced document. Recognizing that this is a fact specific inquiry, at this time the Government requests only that the Court order the defendants to produce Rule 16 material no later than March 30, 2018.   To the extent that the defendants fail to produce any materials by such date, and to the extent it was reasonably foreseeable that such evidence might be useful at trial, the Government will move to preclude the admission of such evidence.   To the extent a truly new issue arises during trial, the Government would of course have no objection to the admission of late-produced materials on that topic.

---

[18] The defendants also note that they may acquire additional materials following March 30, 2018 and that – because Rule 16 requires only the production of materials within a defendant's possession, custody, and control – the present agreement should not preclude the defendants from offering evidence produced to the Government after March 30, 2018 if such material was first possessed by the defendants after that date.   So long as any materials obtained after March 30, 2018 are produced expeditiously to the Government, the Government has no objection on this ground.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully requests that the Court (i) rule that certain e-mail evidence is subject to the crime-fraud exception to the attorney-client privilege, or, in the alternative, that the Court conduct an *in camera* review of that evidence, to determine whether the crime-fraud exception applies; (ii) ████████████████████████ ████████████████████████████████ and (iii) set a deadline for defense Rule 16(b) disclosures.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     /s/ Brendan F. Quigley
Rebecca Mermelstein / Brendan F. Quigley /
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360 / 2190/ 2442

Dated: February 12, 2018
New York, New York

**Appendix 1**

| Category | Description from Privilege Log | Relevant Crime Fraud Log Entries |
|---|---|---|
| (1) The issuance of the WLCC Bonds, (2) the purchase of those bonds by clients of Hughes and Atlantic and Archer and Cooney and/or (3) the misappropriation of bond proceeds | • An email from Jason Galanis to Bevan Cooney and Archer "reflecting legal advice regarding term sheet for the Wakpamni sovereign bonds";[19]<br><br>• An email sent to Archer and Galanis, Subject "$20 million";[20]<br><br>• An email from Galanis to Archer, his assistant, and an attorney, subject "Your Wire Transfer," "reflecting communications with counsel | 2, 4-5, 12[30], 13-14, 15, 16-17, 50, 53, 56-59, 69-72, 73-74, 75-76,[31] 77-78, 99, 104, 120-28, 144, 145-46, 150, 152-76,[32] |

---

[19] (pr.review.archer_00002103).

[20] (pr.review.archer_00004884).   $20 million was, at one point, the anticipated amount of the second WLCC offering.   Ultimately, there were two separate offerings in which Archer bought $15 million of bonds on October 1, 2014, and Cooney bought $5 million of bonds on October 9.

[30] The defendants attempted to use the Wisconsin bond transaction to obtain liquidity to buy out disgruntled investors in the WLCC bonds.

[31] Burnham purchased 87% of the shares offered in Code Rebel's initial public offering, and Archer and Hirst also bought shares. (Complaint ¶ 59(e)).   The defendants later sold certain of those shares and used the proceeds to fund interest payments on the WLCC Bonds.   (Complaint ¶ 58(g)).

[32] Given the timing of these emails, the Government submits there is probable cause to believe they may contain communications in furtherance of Archer and Cooney's efforts to purchase the second and third tranches of WLCC bonds, which they purchased on October 1 and 9, 2014, *see* Complaint ¶ 3(d)-(e), and/or regarding the first issuance, which took place in late August, *see* Complaint ¶ 3(c).



|  | reflecting request for legal advice regarding bond offering";[21]<br><br>• An email from an attorney to Archer and Galanis, cc-ing Archer' assistant, subject "Instructions," "regarding the bond offering";[22]<br><br>• An email from Archer to any attorney, cc-ing Archer's assistant, subject "Wire Received," "regarding loan proceeds";[23]<br><br>• An email from an attorney to Archer's assistant, subject "Seb, this was the first tranche closed a couple weeks ago," purportedly "reflecting request for legal advice regarding the bond offering," and a response to that email;[24]<br><br>• An email from Archer's assistant to Galanis, cc-ing Archer and an attorney, subject "Indenture |  |
|---|---|---|

---

[21] (pr.review.archer_00010059).

[22] (pr.review.archer_000102520).

[23] (pr.review.archer_00020517). To finance Archer's purchase of the second tranche of WLCC bonds, Galanis send Archer $15,000, which was documented as a loan.   (*See* Complaint ¶ 47(c)).

[24] (pr.review.archer_00010254, 0020665-69, 0020734).   Archer purchased the second WLCC bond issuance, approximately one month after the first issuance, or "first tranche."   (*See* Gov't Mem of Law at 3).

|  | Trustee," "reflecting legal advice regarding Wakpamni bond indenture";[25]<br><br>• A "[s]lide deck attached to communication with counsel reflecting request for legal advice . . . regarding Burnham Indian Tribal Sovereignty Program."<br><br>• "Document attached to communication with counsel reflecting request for legal advice from Clifford Wolff, Esq. regarding Wakpamni Trust Indenture."[26]<br><br>• An email from Jason Galanis to Archer, subject "fwd: buyer," "regarding the bond offering";[27]<br><br>• An email from Galanis to Archer and Cooney, subject "Fwd: Olgala" "reflecting legal advice regarding term sheet for Wakpamni sovereign bonds";[28] |  |
|---|---|---|

---

[25] (pr.review.archer_00010252-53, 0020664).

[26] (pr.review.archer_00020670).

[27] (pr.review.archer_00016377).

[28] (pr.review.joint_00000014).

| | | |
|---|---|---|
| | • Emails among co-conspirators that appear to involve unspecified investments or financial transactions, potentially included the WLCC bonds;[29] | |
| (3) The defendants' control of and involvement in the entities used to facilitate the issuance and purchase of the bonds, | • An email from Jason Galanis to Archer, Cooney, and another individual "relaying discussions with counsel reflecting request for legal advice regarding negotiation of Atlantic Asset Management acquisition"[33]<br><br>• Multiple emails between Jason Galanis and an attorney, cc-ing Archer, "regarding Valor Group organizational structure,"[34] an email between | • Atlantic Asset Management/Hughes Asset Management[41]-29-45, 73, 79-81, 105-08<br><br>• Burnham[42]-2, 51, 52, 55, 60-61, 62-66, 86-90, 91-94, 97, 100-03, 118, 129-33, |

---

[29] (pr.review.archer_00004891, 00005224, 0006534, 10042-43, 10047, 10802, 10807, 20241-44;

[33] (pr.review.archer_00003362-53).   As noted in the Government's opening brief, days after defendant Michelle Morton acquired Atlantic Asset Management, using funds provided by BFG-Socially Responsible Investing, Morton purchased the entirety of the fourth WLCC bond issuance on behalf of one of Atlantic's clients.   (Govt. Mem. of Law at 5-6).

[34] (pr.review.archer_00004893-97).   Valor Group was the parent company of Wealth Assurance AG, which in turn was the parent of BFG Socially Responsible Investing, the entity that financed the purchase of both Hughes and Atlantic.   (Complaint ¶¶ 13, 19, 20, 22).

[41] Atlantic and Hughes were the investment advisers that purchased first and fourth WLCC issuances on behalf of their clients.   (*See*, *e.g.*, Complaint ¶¶ 21-22).

[42] Burnham was the placement agent for the bonds.   (Complaint ¶ 12).   Among other things, Archer, who, as noted above, was an

| | | |
|---|---|---|
| | Galanis and Archer "regarding investments in Valor Group,"[35] and miscellaneous emails between Archer and Galanis concerning Valor,[36]<br><br>• Emails involving Archer and Galanis regarding Burnham office space;[37]<br><br>• Multiple emails between Jason Galanis and an attorney, cc-ing Archer and others, "regarding CORFA-related [Burnham Securities] | 134-37, 139-142, 143, 148-49, 177-81.<br><br>• Bonwick[43]-49, 62-66, 91-94, 100-03, 109,<br><br>• CORFA-49, 62-66, 97<br><br>• Wealth Assurance/Valor/VL Assurance[44]-1, 3, 7-10, 18-19, 20-28, 82-85, 95-96, 112-114, 115-117, 120-128, 147, 151, |

---

investor in Burnham through CORFA, made false representations regarding Jason Galanis's affiliation with Burnham.   (*See* Complaint ¶ 34).

[35] (pr.review.archer_00004914).

[36] (pr.review.archer_00020284).

[37] (pr.review.archer_00003840, 4481-82).

[43] Proceeds from the WLCC bonds were used to help Bonwick meet its net capital requirements.   (*See* Complaint ¶ 30(a) (referring to Bonwick as "Brokerage Firm-1")).   During the time period of the conspiracy, Burnham acquired 49% of Bonwick.   (*See* Complaint ¶ 48).

[44] (*See* Complaint ¶ 13).

| | | |
|---|---|---|
| | contributions"[38] and other emails regarding Burnham-related issues;[39]<br><br>• An email from Galanis to Archer, Cooney, and a third party, subject "Atlantic," "relaying discussions with counsel reflecting request for legal advice regarding negotiation of Atlantic Asset Management acquisition," attaching a memo "reflecting legal advice regarding negotiation of Atlantic Asset Management Acquisition"[40] | • Wealth Assurance Holdings-16-17, 54<br><br>• Thorsdale[45]-18-19, 20-28, |

---

[38] (pr.review.archer_00005207-23).   CORFA, an entity controlled by Archer and Cooney, was an investor in Burnham Securities, the purported placement agent for the bonds.   (Complaint ¶ 12).   In addition, the defendants used bonds issued in the second bond issuance, which Archer purchased, to assist Burnham in meeting net capital requirements.   (Complaint ¶ 47(i)).

[39] (pr.review.archer_00008393, 9516-17, 9551, 14236-39, 14275-76, 14313-16, 14352-55, 18155-57, 20038-42, 20107).

[40] (pr.review.joint_00000022-23).

[45] Thorsdale was an entity controlled by Jason Galanis, which received proceeds from the bond issuances.   (*See, e.g.*, Complaint ¶¶ 15, 34(b), 43(d)-(g)).