**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       v.<br><br>JASON GALANIS,<br>GARY HIRST,<br>JOHN GALANIS, a/k/a "Yanni,"<br>HUGH DUNKERLEY,<br>MICHELLE MORTON,<br>DEVON ARCHER, and<br>BEVAN COONEY,<br><br>              Defendants. | No. 16 Cr. 371 (RA) |

**DEVON ARCHER'S CONSOLIDATED REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF HIS PRE-TRIAL MOTIONS**

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## <u>TABLE OF CONTENTS</u>

I.   THE COURT SHOULD DISMISS COUNT TWO OF THE INDICTMENT AS AGAINST MR. ARCHER ................................................................................ 1

    A.   The Indictment Fails To Allege A Substantive Securities Fraud Because, Among Other Things, Mr. Archer Is Not Alleged To Have Done Anything Fraudulent In Connection With The Purchase Or Sale Of Securities.................... 1

    B.   Count Two Is Multiplicitous Of Count One Because, As Explained By The Government, It Alleges No More Than A General Conspiracy To Commit Securities Fraud ........................................................................................ 4

    C.   The Government's Response Makes Clear That Count Two Is Duplicitous Because The Jury Could Convict Without Unanimously Agreeing On Any Alleged Crime......................................................................................... 5

II.  TO PREVENT UNFAIR SURPRISE AT TRIAL REGARDING UNRELATED TRANSACTIONS AND ALLOW MR. ARCHER TO UNDERSTAND THE CHARGES AGAINST HIM, THE COURT SHOULD ORDER PARTICULARS............................................................................................. 7

    A.   The Government Should Be Required To Provide Particulars Concerning Mr. Archer's Alleged Bad Acts, Misappropriation Of Funds, And Knowledge Of The Fraud ........................................................................................... 8

    B.   The Complexity Of This Case And The Amount Of Ongoing Discovery Renders The Need For Particulars Even Greater .................................................. 10

    C.   The Government's Offer To Provide A List Of Unindicted Co-Conspirators Six Weeks Prior To Trial Is Not Adequate ......................................................... 12

III. MR. ARCHER'S AND MR. COONEY'S TRIALS SHOULD BE SEVERED FROM THE OTHER DEFENDANTS' ........................................................................ 14

    A.   The Government Misstates The Law and Messrs. Archer's And Cooney's Arguments To Contend That Their Defenses Are Not Antagonistic To Those Of The Other Defendants...................................................................... 14

    B.   The Government's Attempt To Minimize The Substantial Spillover Prejudice That Messrs. Archer and Cooney Would Suffer In A Joint Trial Is Unavailing .. 18

        1.   The Government Fails To Respond Meaningfully To Messrs. Archer's And Cooney's Arguments That Disparities In Kind And Degree Of Evidence Against Them Versus Their Co-Defendants Creates Prejudice Mandating Severance................................................. 18

2. The Government's Opposition Does Nothing To Show That Prior Acts Evidence Admissible Only Against Their Codefendants Would Not Seriously Prejudice Messrs. Archer And Cooney.............................. 23

IV. **EVIDENCE OF JASON GALANIS'S PRIOR FRAUDS, COOPERATION, AND CONSENSUAL WIRETAPS IS DISCOVERABLE UNDER RULE 16 AND IS *BRADY* MATERIAL**................................................................. **25**

A. Evidence Of Jason Galanis's Prior Bad Acts Is Exculpatory To Mr. Archer....... 25

B. Evidence Of Jason Galanis's Prior Bad Acts Is Discoverable Because Mr. Archer Must Be Allowed To Impeach Galanis.................................................... 28

V. **THE GOVERNMENT HAS NOT ESTABLISHED THAT THERE IS AN ONGOING INVESTIGATION, AND HAS NO LEGITIMATE REASON TO WITHHOLD COURT ORDERS, WARRANTS, OR SUBPOENAS** ........................ **29**

VI. **A COURT ORDER COMPELLING THE PRODUCTION OF *BRADY* MATERIAL BY A DATE CERTAIN IS NECESSARY TO ENSURE THE TIMELY PRODUCTION OF ANY EXCULPATORY EVIDENCE IN THE MILLIONS OF DOCUMENTS ALREADY PRODUCED** ......................................... **32**

VII. **THE FRUITS OF THE WARRANTS SHOULD BE SUPPRESSED** ....................... **33**

A. Mr. Archer Plainly Has Standing To Challenge The Warrants ............................ 33

B. The Warrants Were Insufficiently Particularized And Therefore Authorized An Unconstitutional General Search ..................................................................... 38

C. The Warrants Were Not Supported By The Requisite Probable Cause............... 46

D. The Warrants Were Overbroad To The Extent That They Authorized The Seizure Of Various Categories Of Non-Email Documents That The Bieniek Affidavit Does Not Substantively Address ....................................... 53

E. The Severance Doctrine Cannot Save The Warrants From Their Fatal Overbreadth And Lack Of Particularity.................................................................. 60

F. Several Material Facts Were Deliberately Omitted, Or Were Omitted With Reckless Disregard For The Truth, From The Bieniek Affidavit............... 63

G. The Good Faith Exception Does Not Apply......................................................... 67

H. The Warrants Were Executed In An Unconstitutional Manner............................ 71

## I.    THE COURT SHOULD DISMISS COUNT TWO OF THE INDICTMENT AS AGAINST MR. ARCHER

Count Two either fails to state an offense as against Mr. Archer, or it fails to provide adequate notice to Mr. Archer of the offense alleged against him.  Either way, Count Two must be dismissed.  In arguing to the contrary, the government points to the statutory text and recites legal truisms, concluding that Mr. Archer's arguments "are what trials are for."  Gov. Mem. at 41.[1]  But that glib response is wrong:  where the indictment fails to allege a crime, and where none is discernable on the face of the indictment, it must be dismissed.  Moreover, the scant information provided by the government in its response makes clear that Count Two is fatally defective:  it is both multiplicitous of Count One (the securities fraud charge), and duplicitous because, according to the government, a jury would be allowed to convict Mr. Archer of Count Two without agreeing unanimously on what crime he supposedly committed.

### A.    The Indictment Fails To Allege A Substantive Securities Fraud Because, Among Other Things, Mr. Archer Is Not Alleged To Have Done Anything Fraudulent In Connection With The Purchase Or Sale Of Securities

The government's response compounds the problems with Count Two.  *See* Gov. Mem. at 39-41, 100-105.  To begin with, the government does not engage with the core factual point raised in Mr. Archer's motion:  Count Two, as against Mr. Archer, does not allege facts constituting a substantive securities fraud.  *See* Gov. Mem. at 39-41.  The government quotes

---

[1]    In this consolidated reply memorandum, citations to "MTD Mem." refer to "Devon Archer's Corrected Memorandum Of Law In Support Of His Motions To Dismiss The Securities Fraud Count, For A Bill Of Particulars, For Rule 16 Discovery, For Disclosure Of *Brady* Material, For Early Pre-Trial Disclosures, And For Other Relief."  [ECF No. 303].  Citations to "Severance Mem." refer to the "Memorandum Of Law In Support Of Devon Archer And Bevan Cooney's Motion For Severance." [ECF No. 290].  Citations to "Suppression Mem." refer to "Devon Archer's Corrected Memorandum Of Law In Support Of His Motion To Suppress The Fruits Of Three Post-Indictment Stored Communications Act Warrants." [ECF No. 302].  And citations to "Gov. Mem." refer to the "Government's Memorandum Of Law In Opposition To Defendants' Pre-Trial Motions."  [ECF No. 308].  Capitalized terms have the same meaning as in Mr. Archer's moving briefs.

Count Two, which describes the elements of the offense and the general scheme at the highest

levels, and claims that nothing more is required.  *Id.* at 39-40.  But that is not the law.  In order to

be facially sufficient, an indictment must not only contain the elements of the offense and some

factual allegations, it must "fairly inform[] a defendant of the charge against which he must

defend" and allow the defendant "to plead an acquittal or conviction in bar of future prosecutions

for the same offense."  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).

The cases relied upon by the government are not to the contrary; they are either irrelevant

entirely,[2] or they feature indictments that included both the language of the statute *and* alleged

facts that constituted a crime – which is why those indictments were facially valid.  *See United

States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) ("[The indictment] states the

approximate time and place of the alleged acts. Each count further provides a brief explanation

of how Stavroulakis attempted to execute the scheme: by selling stolen checks drawn on two

federally chartered and insured banks."); *United States v. Gambino*, 809 F. Supp. 1061, 1066,

1079 (S.D.N.Y. 1992) (holding indictment facially valid where "the Government alleges five

acts of racketeering against" the defendant, including "threatening to murder and mutilate" a

victim and specific acts of narcotics trafficking); *United States v. Cafaro*, 480 F. Supp. 511, 516

(S.D.N.Y. 1979) (holding indictment valid that described telephone calls where defendant

attempted to deal in narcotics, and government provided dates, times, and places of overt acts).

*See* Gov. Mem. at 36-41 (citing all of the foregoing).

The indictment in this case fails to provide the same kind of notice with respect to Mr.

Archer.  Specifically, the allegations against Mr. Archer do not concern any kind of fraud *in*

---

[2]      *E.g.*, *See United States v. Williams*, 504 U.S. 36, 55 (1992) (holding that a prosecutor is
not obligated to disclose exculpatory evidence to the grand jury); *Costello v. United States*, 350
U.S. 359, 363 (1956) (holding a grand jury could rely on hearsay evidence to return an
indictment).

*connection with the purchase or sale of a security*, as is required for a substantive securities

fraud.  *See* MTD Mem. at 9-13.  Because the allegations in the indictment fail to allege a

substantive securities fraud as against Mr. Archer, it by definition neither informs him of the

charges against him nor allows him to plead an acquittal or conviction for Double Jeopardy

purposes.  Fed. R. Crim. P. 7(c)(1) & 12(b)(3)(B)(v).

The government's response fails to address the absence of any allegation that Mr. Archer

committed, or aided and abetted, a fraud in connection with the purchase or sale of a security.

The government admits that Mr. Archer is not accused of having "personally interacted with the

victims of the scheme or [having] personally made any misrepresentations."  Gov. Mem. at 41.

And the government acknowledges that factual allegations concerning Mr. Archer's passive

receipt of bond proceeds, passive ownership interests, and receipt of communications *from* Jason

Galanis are all, at best, relevant to "his knowledge and intent."  *Id.*[3]

The government also makes no attempt to explain how the only three *affirmative acts*

allegedly taken by Mr. Archer could be criminal.  *See* MTD Mem. at 10-11.  As explained in Mr.

Archer's moving brief, those alleged acts – a purported misstatement to an affiliate of the

placement agent having nothing to do with the bond issuances at all; the alleged purchase of the

"Second Bond Issuance" in full and for fair market value; and a purported misstatement to a

brokerage firm relating to *custody* of the bonds purchased by Mr. Archer, but having nothing to

do with their purchase or sale – could not possibly constitute a securities fraud as a matter of law.

For example, the government does not explain what about the *only* act by Mr. Archer alleged in

the indictment to have been in connection with the purchase or sale of a security—Mr. Archer's

alleged purchase of the second bond offering at full market value – could possibly make it a

---

[3]     The government does not explain how these allegations show Mr. Archer acted willfully
and with intent to defraud.  *See* MTD Mem. at 10 n.6.

securities fraud.  No other investor was involved, Mr. Archer did not make or cause, and was not aware of, any alleged misstatements, and the only conceivable victim—the seller of the bonds—received full value for them.  The indictment is deficient, therefore, because Mr. Archer is not alleged to have taken, or willfully aided and abetted, any fraudulent act or omission in connection with the purchase or sale of a security.  This is not a matter of argument or competing proof:  the facts, as alleged by the government, simply do not constitute a securities fraud.

### B.    Count Two Is Multiplicitous Of Count One Because, As Explained By The Government, It Alleges No More Than A General Conspiracy To Commit Securities Fraud

The government's response reveals the truth:  the substantive securities fraud charge is indistinguishable from the conspiracy charge, and indeed the investment advisor charges are indistinguishable from the securities charges.  *See* MTD Mem. at 12 n.7; Gov. Mem. at 33, 41. This response proves that Count Two is multiplicitous of Count One:  It does not allege a separate crime, and therefore serves only to "create[] an exaggerated impression of [Mr. Archer's alleged] criminal activity."  *United States v. Polizzi*, 257 F.R.D. 33, 34 (E.D.N.Y. 2009).[4]

The government's characterization of the "securities fraud scheme" in Count Two is "so broadly defined as to amount to a general conspiracy allegation rather than a substantive offence."  *United States v. Castellano*, 610 F. Supp. 1359, 1409 (S.D.N.Y. 1985) (quoting *United States v. Tanner*, 471 F.2d 128, 139 (7th Cir. 1972)).  A multiplicitous count "may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981).  Because Count Two is not supported by allegations of fact that could sustain a conviction for substantive fraud, the inclusion of Count

---

[4]       By the government's admission, Counts Three and Four would also be multiplicitous of Counts One and Two, but Mr. Archer is not charged in those counts.  *E.g.,* Gov. Mem. at 33 ("the conspiracy to commit investment adviser fraud . . . is but one aspect of the overall securities fraud scheme charged in Counts One and Two.").

4

Two in addition to the charge of conspiracy to commit securities fraud in Count One serves only to give the appearance of additional alleged wrongdoing, and thus risks improperly prejudicing Mr. Archer with the jury.[5]

### C.   The Government's Response Makes Clear That Count Two Is Duplicitous Because The Jury Could Convict Without Unanimously Agreeing On Any Alleged Crime

In Mr. Archer's moving brief, he asked a fundamental question necessary in order to understand the charges against him and prepare for trial:  what act of substantive securities fraud does the government allege that Mr. Archer actually committed?  *See* MTD Mem. at 15-16, 21-24 (requesting particulars as to the "purchases or sales of securities" and whether Mr. Archer is liable for a primary violation or as an aider and abettor).  The government attempts to salvage this ambiguous charge by arguing that it is permitted to put forward "alternative theories" of liability.  *See* Gov. Mem. at 100-02.  But the government's "alternative theories" are in actuality "alternative crimes."  They rest on different alleged acts in connection with different securities offerings, not simply different legal theories.  In other words, the government's response makes clear that Count Two is duplicitous.

Duplicitous charges result from the joining of multiple offenses within a single charge.  Duplicity is not only forbidden by Federal Rule of Criminal Procedure 8(a), it also implicates Mr. Archer's "right to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution."  *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980).  "The vice of duplicity is that there is no way for a jury to convict on one offense and acquit on another offense contained in the same count."  Wright & Miller, 1A Fed. Prac. & Proc. Crim. § 142 (4th ed.).  And a "general verdict of guilty

---

[5]      In the event of a conviction, the existence of Count Two would also have the effect of dramatically increasing the potential punishment.

will not reveal whether the jury unanimously found the defendant guilty of either offense, both

offenses, or guilty of one crime and not guilty of the other." *Id.* The test for determining

whether the same act or transaction constitutes two offenses or only one is whether conviction

under each statutory provision requires proof of an additional fact which the other does not.

*Blockburger v. United States*, 284 U.S. 299, 304 (1932).

The government's "alternative theories" for Count Two are that Mr. Archer is liable for a

primary securities law violation "when he purchased $15 million of the Wakpamni bonds in the

[Second] Bond Issuance," *or* he is liable "for aiding and abetting all Four Bond Issuances." Gov.

Mem. at 101.[6] These are not merely alternative theories, but fundamentally different crimes that

require different proof.

To convict Mr. Archer of aiding and abetting "all Four Bond Issuances," the government

must prove that someone else committed a fraud in connection with each bond issuance and that

Mr. Archer took some (unspecified) action for each with the specific purpose of bringing about

the underlying crime. *See United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (holding the

evidence did not support aiding and abetting where defendant took no action to further the

crime). For primary liability, in contrast, the government does not need to prove anyone else

committed a fraud, or that any but the second bond offering was fraudulent, but it must prove

that Mr. Archer personally defrauded the seller of the securities when he purchased the bonds in

the second bond offering at fair value – and as explained, that could not have happened as a

matter of law because the seller was not defrauded in connection with the Second Bond Issuance.

---

[6]     The government's brief is not even consistent as to which bond issuance Mr. Archer
allegedly committed a primary securities fraud violation. *Compare* Gov. Mem. at 3 (Second
Bond Issuance) with *id.* at 101 (Third Bond Issuance). For purposes of this memorandum, Mr.
Archer assumes that the government intends to argue that he committed primary securities fraud
in connection with the $15 million issuance that he allegedly purchased himself, for fair value,
*i.e.*, the Second Bond Issuance.

On the government's "alternative theories" argument, the jury could convict Mr. Archer of Count Two without agreeing unanimously what crime he committed.  For example, half the jury might believe that Mr. Archer somehow aided and abetted something fraudulent about all four bond issuances, while the other half of the jury rejects that "theory."  Meanwhile, the half that rejected the first theory could believe that Mr. Archer somehow misled the seller of the bonds when he bought the Second Bond Issuance, while the first half of the jury rejects that second "theory."  In this way, the jury could convict Mr. Archer of Count Two when in reality it was deadlocked on each of the government's two "theories" – and neither the Court nor the parties would ever know.

This is precisely the outcome that the duplicity doctrine forbids, and why Count Two must be dismissed.  *Cf. United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000) ("If a court finds that an indictment is duplicitous it must take one of two courses of action; it must either dismiss the duplicitous count in the indictment, or require the government to make an election to select and charge one, but not all, of the offenses embraced in the duplicitous count."); *see also id.* at 556 ("Because the law is well established that a bill of particulars cannot cure a defective indictment, no other remedy is available or appropriate.").[7]

## II.   TO PREVENT UNFAIR SURPRISE AT TRIAL REGARDING UNRELATED TRANSACTIONS AND ALLOW MR. ARCHER TO UNDERSTAND THE CHARGES AGAINST HIM, THE COURT SHOULD ORDER PARTICULARS

For many of the same reasons that Count Two is legally insufficient, a bill of particulars is required to allow Mr. Archer to understand the nature of the charges against him and to

---

[7]    If the Court does not dismiss Count Two, the Court should require the government to provide particulars specifying its theory of securities fraud, and should instruct the jury to return a special verdict specifying, unanimously, whether or not Mr. Archer (1) committed substantive securities fraud when he purchased bonds in the second bond offering, or (2) aided and abetted a securities fraud in connection with a particular bond offering.  *See United States v. McCourty*, 562 F.3d 458, 470 (2d Cir. 2009) (encouraging use of special verdict forms to rectify ambiguous indictments and to avoid double jeopardy consequences).

prepare for trial.  *See* MTD Mem. at 15-16, 24-30.  The indictment alleges one overt act that Mr. Archer allegedly took in furtherance of the broad securities fraud conspiracy charged in the indictment:  purchasing the bonds in the second bond offering, at full face value.  *See* Ind. ¶ 28(e).  Without particulars, however, Mr. Archer must attempt to prepare to defend against any act that conceivably falls within the broad contours of the alleged conspiracy.

     **A.**     **The Government Should Be Required To Provide Particulars Concerning Mr. Archer's Alleged Bad Acts, Misappropriation Of Funds, And Knowledge Of The Fraud**

Mr. Archer's concern is well-founded.  The government's brief suggests that it will attempt to prove Mr. Archer committed wrongdoing beyond what is contained in the indictment, including with respect to securities entirely unrelated to the Wakpamni bonds.  The government also suggests that it may rely on any communication Mr. Archer has ever received or sent in order to prove he was "apprised" of Jason Galanis's scheme.  The unbounded nature of the case the government intends to prove warrants particulars.

In his opening brief, Mr. Archer pointed to an example of the Indictment's overbreadth. The Indictment alleges that, directly or indirectly, misappropriated funds were used by Mr. Archer to "among other things, support other business endeavors."  Ind. ¶ 23.  Mr. Archer requests particulars because he has numerous "other business endeavors" and cannot reasonably be expected to defend each and every one of them.  In response, the government argues that "the Charging Instruments and discovery highlight clearly which of Archer's many business endeavors benefited from the bond proceeds or the bonds themselves."  Gov. Mem. at 103.  The government then points to four examples of Mr. Archer's business endeavors, including one ("Vaudioise") that is not referenced or alluded to in the indictment or the complaint, or for that matter in the SEC's parallel action.

The government also says that the proceeds of the bond issuances "were used to purchase millions of dollars of Code Rebel Shares." *Id.* Code Rebel, as discussed in Mr. Archer's moving brief, *see* MTD Mem. at 23 n.16; Severance Mem. at 27-28, is a pump-and-dump scheme orchestrated by Jason Galanis involving securities unrelated to the Wakpamni bonds. If Jason Galanis or others used bond proceeds to invest in Code Rebel, that is conduct that does not involve Mr. Archer in any way. To the contrary, Jason Galanis induced Mr. Archer to buy Code Rebel shares with his own money – which Mr. Archer promptly lost. But this is precisely why particulars are necessary: because Mr. Archer did not expend any monies other than his own on Code Rebel shares, he never could or would have known that was part of the government's case *against him*. If the government believes that Mr. Archer used misappropriated bond proceeds in some other way, it must say so in a bill of particulars or else Mr. Archer will be utterly unable to defend himself.

As to how the government might prove Mr. Archer was "apprised" of Jason Galanis's scheme, the government's blank check is just as broad. The government argues that Mr. Archer is on notice of how he was kept informed of the scheme's fraudulent purpose because it has "cited various communications of this nature in the Charging Instruments, and provided Archer with his own email communications." Gov. Mem. at 105. But as explained in Mr. Archer's opening brief, the communications the government refers to consist of Jason Galanis updating Mr. Archer that the bonds had been approved and the deal executed—not that Galanis was on the cusp of misappropriating tens of millions of dollars. *See* MTD Mem. at 25.

The government's response justifies Mr. Archer's concern that he "will need to be prepared to defend against each and every communication he received *from* Jason Galanis" when it argues that particulars are not necessary because the government "provided Archer with his own email communications." MTD Mem. at 25; Gov. Mem. at 105. In essence, the government

is forcing Mr. Archer to prepare a defense for every single communication he is on that contains a word arguably relevant to this case.  Especially given the government's apparently expansive view of which communications concern the alleged scheme to misappropriate funds, this is an impossible task.  *See* Gov. Mem. at 45-46.[8]

By invoking irrelevant "business endeavors" and all of Mr. Archer's "own email communications," the government previews the unpredictability of its case-in-chief.  It would be profoundly unfair for Mr. Archer to face a trial where the government can point to any of his business endeavors or communications as evidence of a conspiracy or securities fraud.  *See generally United States v. Wozniak*, 126 F.3d 105 (2d Cir.1997) (vacating conviction based on an impermissible constructive amendment of the indictment).

**B.     The Complexity Of This Case And The Amount Of Ongoing Discovery Renders The Need For Particulars Even Greater**

The government's response – pointing to the discovery in this case and contending that it could "clearly highlight" anything, Gov. Mem. at 103 – also fails to grapple with the fact that the incredible volume of discovery makes a bill of particulars more essential, not less.  *See* MTD Mem. at 31-33.  Contrary to what the government argues, the charging instruments are not

---

[8]     The government's brief highlights purported examples of communications about the scheme, but as noted above most are entirely innocuous and refer to legitimate business developments, such as the acquisition of companies.  The government's best examples of communications concerning any scheme to defraud are one in which Jason Galanis writes that his "primary objective" was to get "a source of discretionary liquidity," and another in which Mr. Cooney writes, "This is pure genius alla mikey Milken!!"  Gov. Mem. at 45.  This is weak sauce indeed, for there is nothing remotely nefarious about the concept of "discretionary liquidity" – especially for an asset manager – and although the government observes that Michael Milken was convicted of securities fraud, that is irrelevant to the e-mail chain it cites.  Milken pleaded guilty to charges that in no way resemble the alleged conduct here.  On the other hand, and as actually relevant here, Milken is known for creating the modern high-yield bond.  Indeed, the government's proposed reading of the "mikey Milken" e-mail is so wrong and prejudicial, and the true story around Michael Milken so complex, that that e-mail should be excluded at trial.  Mr. Archer – who did not even send that e-mail – will so move *in limine*, if necessary.

"supplemented by discovery" in this case, *see* Gov. Mem. at 95; rather, the Indictment is lost in it.

As noted in Mr. Archer's moving brief – and as the government completely ignores – the complexity of this case and the quantity of information produced dwarfs numerous other cases where particulars were granted. *See* MTD Mem. at 33 (citing cases ordering bill of particulars involving, respectively, 6,000 pages of wiretap material; 4,000 documents; 100,000 pages of documents; and 200,000 documents). Instead, the government characterizes its production of millions of pages of documents, not to mention hundreds of gigabytes of undifferentiated data, as "substantial additional detail" about the facts in the Indictment. But this additional detail, as described in Mr. Archer's opening brief, is simply overwhelming and impossible to manage in a timely and cost-efficient manner.

Moreover – and as the government completely ignores – a seemingly tremendous amount of the material produced by the government is entirely irrelevant, not even constituting Rule 16 material. For example, the government has produced forensic images of entire drives and devices, constituting hundreds of gigabytes of information – information not captured within the page counts of millions of pages of discovery produced by the government, in fact. *See* Corrected Declaration of Matthew L. Schwartz ("Schwartz Moving Decl.") ¶ 47 [ECF No. 301]. Presumably the government believes that *something* on those drives and devices is relevant, but it has failed to say what. As a result, the defendants must wade through incredible amounts of totally irrelevant information and then are forced to guess at what the government may believe is relevant. The government's views of relevance, moreover, may be literally impossible for the defendants to discern. For example, while e-mails between the defendants discussing the subject matter of this case are obviously of some relevance (even if their purported criminal character is far from obvious), the government may also believe that seemingly irrelevant information is in

fact important – information such as calendar or contact information, information about where a person was when they logged onto a device, user names, etc.

Even more troubling, the government's productions are still ongoing.  Since January 16, 2018—the deadline for pretrial motions—the government has produced 16,037 pages of documents from 4 custodians.  Producing this volume of information on the cusp of trial is especially unfair.  Particulars are the only way to provide some reasonable contours on what all this discovery is and how it can be properly used, and to ensure that Mr. Archer is not hopelessly surprised and prejudiced at trial.

### C.     The Government's Offer To Provide A List Of Unindicted Co-Conspirators Six Weeks Prior To Trial Is Not Adequate

Finally, and as the government seems to acknowledge, Mr. Archer is entitled to know who his alleged co-conspirators are.  *See* MTD Mem. at 16-19.  But the government's offer to provide this information only six weeks before trial is unsupported and inadequate.  *See* Gov. Mem. at 99 n.32.  The government has no legitimate reason to delay providing this information, which must also identify when each co-conspirator was part of the conspiracy.  Otherwise, Mr. Archer will be prejudiced in his ability to address evidentiary issues such as the admissibility of co-conspirator statements.

The government does not even attempt to argue that it should be excused from providing a list of unindicted co-conspirators.  Mr. Archer provided reasons why each of the relevant factors weighs in favor of disclosure.  *See* MTD Mem. at 16-19 (discussing, for example, the size and complexity of this case, and the fact that there are no allegations of violence or threats).  All the government says in response is that courts have denied such requests.  *See* Gov. Mem. at 99 n.32.  The government then offers to provide such a list six weeks prior to trial and reserves the right to supplement the list as necessary.

There is no reason to wait.  The government would suffer no prejudice from providing the list now.  If the government is concerned that the list it currently has may be incomplete, the government may still reserve the right to supplement it if necessary – although it is hard to imagine that it will learn of new alleged conspirators over the next few months.  There is no ongoing investigation that could be undermined by revealing the identities of other co-conspirators—only the government's continued use of grand jury subpoenas to prepare for trial in this case.  Even then, the government could produce a list of co-conspirators now subject to the confidentiality order.  [ECF No. 227.]  In short, the government's proposed delay is unreasonable.

Additionally, the government must provide more than just names.  In a complex conspiracy case such as this one, the *time* when an unindicted co-conspirator is alleged to have participated in the conspiracy is critical to determining whether statements by that co-conspirator will be subject to the co-conspirator statement exception to the hearsay rule, among other evidentiary issues.  To determine whether a communication may, in the government's view, be a co-conspirator statement, Mr. Archer needs to know when each person was supposedly a part of the conspiracy.  *See United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) ("Extra-judicial statements by co-conspirators may be admitted if the government establishes by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy."); *see also id.* ("Because there was no independent corroborative evidence of Roy's participation in that conspiracy, the proffered hearsay statement was inadmissible.").

## III.   MR. ARCHER'S AND MR. COONEY'S TRIALS SHOULD BE SEVERED FROM THE OTHER DEFENDANTS'

Mr. Archer, along with Bevan Cooney, should be tried separately from their remaining co-defendants.  Contrary to the government's blanket assertion, the evidence in a trial of only them would not be identical to the evidence in a joint trial, and principles of both fairness and trial management demand severance.

### A.   The Government Misstates The Law and Messrs. Archer's And Cooney's Arguments To Contend That Their Defenses Are Not Antagonistic To Those Of The Other Defendants

The government's opposition to severance mischaracterizes the nature of Messrs. Archer's and Cooney's defenses to mask the fact that they conflict with those of the other defendants in a manner requiring severance.  The government's opposition never addresses Messrs. Archer's and Cooney's several defenses that "tend to preclude the acquittal" of the remaining defendants.  *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998).  Instead, the government reduces these defenses to one – that Messrs. Archer and Cooney were "'unwitting dupes' of Jason Galanis" – and argues that this defense does not require severance.  Gov. Mem. at 29.  This distortion elides the fact that Messrs. Archer and Cooney would advance several defenses that contradict and undermine those of the other defendants, requiring Messrs. Archer's and Cooney's counsel "to act as additional *de facto* prosecutors of each of the[] remaining defendants."  Severance Mem. at 13.

It is true that "[t]he mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance."  *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990).  "The defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core testimony offered on behalf of that defendant, must necessarily disbelieve the

testimony offered on behalf of his co-defendant."  *United States v. Carpentier*, 689 F.2d 21, 28 (2d Cir. 1982) (citation omitted).  That is the case here.

The government sums up its argument as follows:  "[I]f a jury credited Archer and Cooney's arguments that they were 'unwitting dupes' of Jason Galanis, it could also find that the other defendants were similarly used by Jason Galanis."  Gov. Mem. at 29 (quoting *United States v. Hameedi*, No. 17-cr-137 (JGK), 2017 WL 5152991, at *4 (S.D.N.Y. Nov. 3, 2017)).  This would be true if it accurately summarized Messrs. Archer's and Cooney's arguments.  But as described at length in their motion, Messrs. Archer and Cooney do not plan to simply argue that they were "unwitting dupes" of Jason Galanis.  They would in their defense advance the fraudulent conduct of each of their remaining co-defendants.

Going well beyond "fingerpointing," Messrs. Archer's and Cooney's motion outlined several defenses that "tend to preclude the acquittal" of their co-defendants and, if accepted, would necessarily undermine the defenses of Gary Hirst, John Galanis, and Michelle Morton. Severance Mem. at 9-15.  For instance, Messrs. Archer and Cooney will focus on the following alleged facts:

- John Galanis allegedly induced the WLCC to issue bonds through false representations and acted as the WLCC's primary point of contact regarding the bonds, *id.* at 11;

- Hirst personally directed that AAM client funds be used to purchase tribal bonds and was one of two signatories on the bank account through which the bond proceeds were misappropriated, *id.* at 12;

- Morton authorized the investment of AAM client funds to purchase tribal bonds in violation of her clients' investment guidelines and without disclosing material conflicts of interest, *id.*; and

- Hirst and John Galanis misappropriated the tribal bond proceeds for their own benefit, *id.* at 11.

15

Messrs. Archer and Cooney have none of these things in common with their co-defendants, and will therefore seek to highlight them at trial.  In these ways and others, Messrs. Archer's and Cooney's "defense team[s] will act as [] second prosecutor[s] against" their co-defendants. *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017).  And "in order to believe" the defenses advanced by Messrs. Archer and Cooney, the jury "must necessarily disbelieve the testimony offered on behalf" of their co-defendants.  *Carpentier*, 689 F.2d at 28 (citation omitted).  This mutual antagonism requires severance.

Tellingly, the government's opposition does not counter these points; it just overlooks them and disputes a caricature of Messrs. Archer's and Cooney's defense instead.  The cases the government relies on are inapposite for this reason.  In *Hameedi*, for instance, the court declined to grant severance to certain co-defendants "because their defenses depend on their own good faith and lack of fraudulent intent, not the existence of fraudulent intent by their co-defendants." 2017 WL 5152991 at *4.  Similarly, in *United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991), the Second Circuit affirmed the denial of severance where each defendant argued that she "was not involved in the conspiracy," a situation that "plainly is typical of co-conspirator trials and does not warrant severance."  Gov. Mem. at 29-30 (quoting *Cardiscia*, 951 F.2d at 484).

Unlike the defendants in *Hameedi* and *Cardascia* – and contrary to the government's mischaracterizations – Messrs. Archer's and Cooney's defenses advance the misconduct of their co-defendants, not just their own lack of involvement or good faith.  Their defenses thus "would tend to preclude the acquittal" of their co-defendants, *Salameh*, 152 F.3d at 116, and require that the jury "disbelieve the testimony offered on behalf of [their] co-defendant[s]."  *Carpentier*, 689 F.2d at 28.  This mutual antagonism requires severance to preserve fair trials for Messrs. Archer and Cooney, as well for their co-defendants.

Finally, the government erroneously suggests a jury instruction "can cure any potential prejudice."  Gov. Mem. at 30.  *But see Carpenter*, 689 F.2d at 28 (holding that mutual antagonism "*compels severance* of that defendant, if the jury, in order to believe the core testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant" (citation omitted, emphasis supplied)).  Messrs. Archer and Cooney anticipate putting on trial defenses that – if accepted – necessarily undermine the defenses of their codefendants.  In doing so, Messrs. Archer's and Cooney's counsel would act as second prosecutors, which itself has been grounds for severance in this circuit.  *See Shkreli*, 260 F. Supp. 3d at 256; *Zafiro v. United States*, 506 U.S. 534, 544 n.3 (1993) (Stevens, J., concurring) ("The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor." (quotation marks omitted)).

*Second*, the number and kind of instructions that would be required in this case would be unwieldy and simply impossible for a juror to follow, let alone obey – a point essentially ignored by the government.  *See* Gov. Mem. at 26.  In a case as complicated as this one – with five differently-situated defendants, four bond issuances, numerous legitimate and allegedly illegitimate legal entities, and two alleged long-term conspiracies – a jury instruction cannot cure the prejudice.  *See generally United States v. McDermott*, 245 F.3d 133, 139-40 (2d. Cir. 2001) (holding that the presumption that jurors will adhere to limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity," and noting that in a case where prejudicial spillover is "overwhelming," jury instructions "cannot be presumed to be effective"); *Shkreli*, 260 F. Supp. 3d at 256 ("[T]he underlying theme of Greebel's defense, that Shkreli lied, committed fraud, and is guilty, will permeate a joint trial to the substantial prejudice of Shkreli.  Through such double

17

prosecution . . . there is a serious risk that the jury would be prevented from making a reliable

judgment about guilt or innocence even with limiting instructions by the court.").

**B.      The Government's Attempt To Minimize The Substantial Spillover Prejudice That Messrs. Archer and Cooney Would Suffer In A Joint Trial Is Unavailing**

Messrs. Archer's and Cooney's motion outlined how several factors that courts consider

when deciding a motion for severance based on spillover prejudice favor severance in this case,

including "(i) the complexity of the indictment; (ii) the estimated length of trial; (iii) the

disparities in the amount or type of proof offered against defendants, [and] (iv) disparities in the

degrees of involvement by defendants in the overall scheme."  Severance Mem. at 16 (quoting

*United States v. Lino*, No. 00-cr-632 (WHP), 2001 WL 8356 at *23 (S.D.N.Y. Jan. 2, 2001)).

The government ignores most of this analysis, and when it does address evidentiary issues, it

lumps all the defendants together, previewing the problems a joint trial would present and the

spillover prejudice it would produce.  The reality is that this is a complex case and trial of all five

defendants together will span several months.  The evidence properly admitted against Messrs.

Archer and Cooney is fundamentally different, in degree and kind, from the evidence that would

be admitted in a joint trial, as Messrs. Archer and Cooney were allegedly *aware of* only a small

part of the broader alleged conspiracy, and were *involved* in an even smaller part of it.

**1.      The Government Fails To Respond Meaningfully To Messrs. Archer's And Cooney's Arguments That Disparities In Kind And Degree Of Evidence Against Them Versus Their Co-Defendants Creates Prejudice Mandating Severance**

The Supreme Court has found "a serious risk that a joint trial would compromise a

specific trial right of one of the defendants" when "evidence of a codefendant's wrongdoing in

some circumstances erroneously could lead a jury to conclude that a defendant was guilty" or

"[w]hen many defendants are tried together in a complex case and they have markedly differing

degrees of culpability." *Zafiro*, 506 U.S. at 539.  Messrs. Archer's and Cooney's motion for

severance explained in detail how the evidence against them differs markedly in kind and degree

from that of their co-defendants, and how this creates serious spillover prejudice in such a

complicated and broad case.  Severance Mem. at 16-23.[9]  The government fails to address this

analysis at all, asserting instead that "the evidence will be the same whether they are trial [*sic*]

jointly or separately."  Gov. Mem. at 34.

 That simply cannot be so.  To the contrary, the government's response makes clear that

the vast majority of its planned joint trial will be spent on evidence that uncontrovertibly has

nothing to do with Messrs. Archer and Cooney.

 Omitting the names of any individual defendants, the government states that a joint trial

will include "evidence of how the participants in the scheme [(i)] caused the WLCC to issue

more than $60 million in bonds based on false and misleading representations, [(ii)] caused

Hughes and Atlantic clients to purchase issuances of the bonds, [(iii)] failed to invest the bond

proceeds on the WLCC's behalf in the manner agreed upon, [(iv)] recycled certain of the bond

proceeds, and [(v)] misappropriated the proceeds of the bonds for their own purposes."  Gov.

Mem. at 33-34.  In fact, Messrs. Archer or Cooney were not involved in the first four categories

at all, and are only alleged to have had tangential involvement in the fifth.  Moreover, the

government's summary omits a broad category of evidence that it necessarily must introduce at

trial – evidence about Morton and Hirst's failure to disclose conflicts at the investment advisers,

---

[9] As Messrs. Archer's and Cooney's brief explains – and the government's opposition does not controvert – all the indictment alleges of Messrs. Archer and Cooney is "that they (1) received a handful of vague and entirely innocent e-mails from Jason Galanis; (2) were kept 'apprised' of perfectly lawful developments, such as the acquisition of a business; (3) had ownership or 'control' interests in certain of the entities that Jason Galanis used to further his crimes; (4) received, 'through layers of intermediaries,' certain of the bond proceeds; and (5) allowed themselves to be unwittingly used by Jason Galanis by purchasing some of the bonds with money provided by Galanis."  *Id.* at 18.

and their placement of bonds with clients in contravention of those clients' investment guidelines – that has absolutely nothing to do with Messrs. Archer and Cooney.

First, there is no evidence that Messrs. Archer and Cooney had any contact with the WLCC at all, let alone that they made – or were aware of – false representations to induce bond issuances.  *See* Severance Mem. at 3.  Second, there is no evidence that Messrs. Archer and Cooney had any contact with Hughes and Atlantic's clients, or were aware of any representations made to their clients.  *See id.*  Third, there is no evidence that Messrs. Archer and Cooney were aware of representations made to the WLCC by anyone, let alone that they were false.  *See id.*  Fourth, there is no evidence that Messrs. Archer or Cooney knew the source of funds that Jason Galanis transferred to them, which they allegedly used to purchase the second and third bond issuances.  *See id.* at 4-5.

Even according to the indictment, four of the government's five categories of evidence do not involve Messrs. Archer and Cooney at all.[10]  Concerning the fifth category – the misappropriation of bond proceeds – the Indictment alleges only that Messrs. Archer and Cooney received certain bond proceeds "through layers of intermediaries."  Ind. ¶ 17.  It does not allege that either had control over or visibility into the accounts through which the bond proceeds were allegedly misappropriated, and unlike their codefendants, Messrs. Archer and Cooney are not alleged to have received any bond money for their personal use.  *See id.*  Nonetheless, Messrs. Archer and Cooney understand that the government will attempt to prove their knowledge that funds were somehow being misappropriated through their reliance on highly ambiguous communications such as the ones discussed above.  *See supra*, Point II.A.

---

[10]     Not only does the Indictment not allege these things, but there is no evidence to support any contention that Mr. Archer was aware of – let alone involved in – the first four phases described by the government.  To the extent that the government intends to try to prove that Mr. Archer was involved in those aspects of the scheme, it is absolutely essential that the government be required to file a bill of particulars or else Mr. Archer will be hopelessly surprised.

So in a complex securities and investment advisory fraud trial likely to take several months and involve more than twenty prosecution witnesses alone – not to mention a share of the millions of documents produced in discovery – Messrs. Archer and Cooney would likely spend weeks as spectators, with the evidence against their co-defendants serving to prejudice but not implicate them.  Whereas the evidence against the other defendants will include recorded phone calls discussing the alleged scheme, their direct role misappropriating funds from the annuity provider, lies told by them to the WLCC and to clients of the investment advisers, and their failure to fulfill their responsibility as investment advisors to disclose conflicts and act in their clients' best interests, none of that has anything to do with Messrs. Archer and Cooney.  Instead, the trial against Messrs. Archer and Cooney would involve a handful of ambiguous e-mails, two alleged misstatements about entirely peripheral and ultimately irrelevant matters, and an indirect money trail.  This disparity requires severance.  *See United States v. Cambindo Valencia*, 609 F.2d 603, 629 (2d Cir. 1979) (ordering a new trial for defendants who "may have in fact have been participants in the [at-issue] conspiracy" when "there was simply too much other evidence offered of entirely separate actions and unconnected defendants, fanning the flames of prejudicial spillover"); *United States v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994) (finding that defendants may be entitled to severance where they "would have to endure a trial involving many incidents of misconduct which do not involve them").

Rather than engage with Messrs. Archer and Cooney on these points, the government responds with generalities and broad legal principles untethered to the facts of this case.  For example, in response to Messrs. Archer's and Cooney's arguments about the complexity of the case and their lack of involvement in most features of the alleged scheme, *see* Severance Mem. at 16-19, the government simply argues that "there are very few, if any, conspiracy cases where all of the evidence at trial implicates each defendant or where each defendant is equally culpable.

The nature of a conspiracy is that each defendant plays a different role, and takes actions that do not directly involve his or her co-conspirators."  Gov. Mem. at 32-33.  This truism is irrelevant. Just because conspiracy cases tend not to feature identically situated defendants does not mean defendants with vastly different levels of alleged culpability and involvement must be tried jointly.  Tellingly, the government does not dispute that Messrs. Archer and Cooney appear minimally in the indictment as peripheral figures.

None of the government's cited authority supports its position and notably, not a single one of them involved a complex fraud case.  *United States v. Carson*, 702 F.2d 351 (2d Cir. 1983), for instance, involved the prosecution of three defendants accused of conspiracy to possess and distribute heroin.  Faced with fewer defendants and a more unified scheme than at-issue here, the court found that "[t]he evidence against [the moving party] was simple enough for the jury to consider without significant spillover effect."  *Id.* at 367.  *United States v. Villegas* likewise involved a narcotics conspiracy, where the court observed "we cannot assume that a multi-defendant drug trial is beyond the ken of the average juror."  899 F.2d 1324, 1347 (2d Cir. 1990).  *United States v. Bari* involved a conspiracy to escape from prison, and the court upheld the denial of severance partly because one defendant was acquitted, and it did "not view the factual issues of this case as unduly complex."  750 F.2d 1169, 1178 (2d Cir. 1984).  Finally, the government quotes a proposition in *United States v. Rahman*, 854 F. Supp. 254 (S.D.N.Y. 1994), a terrorism case, that concerned the joinder of charges, not joinder of defendants, so the government's addition of "[or defendants]" when it quoted from that case is entirely misleading. *See generally* Gov. Mem. 33-34 (citing each of the foregoing).

In short, the government has neither grappled with the realities of what a joint trial of this case would look like *to Messrs. Archer and Cooney,* nor has it cited a single case with comparable facts showing that severance is unwarranted.

> **2.    The Government's Opposition Does Nothing To Show That Prior Acts Evidence Admissible Only Against Their Codefendants Would Not Seriously Prejudice Messrs. Archer And Cooney**

Spillover prejudice is a particular concern with prior-acts evidence admissible against only some defendants.  *See Zafiro*, 506 U.S. at 539 (finding that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants . . . when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant," and that "evidence of a co-defendant's wrongdoing . . . could lead a jury to conclude that a defendant was guilty").  Where such risk arises, severance is the proper remedy.

Messrs. Archer's and Cooney's motion spends seven pages outlining how evidence of their codefendants' prior frauds – which would be inadmissible if they were tried alone – would gravely prejudice them in a joint trial.  *See* Severance Mem. at 23-30.  In response, the government offers conclusory assertions devoid of analysis.  The government argues:  "[T]he [prior-acts] evidence is, among other things, relevant to provide context for and explain actions taken by the other defendants, including Archer, Cooney and Morton during [a certain] period.  As such, there is zero spillover prejudice to Archer, Cooney, or Morton from such evidence."  Gov. Mem. at 35.  The government does not elaborate on the "context" or "actions" that make John Galanis's, Jason Galanis's, and Gary Hirst's prior frauds relevant to Messrs. Archer and Cooney, or how these unexplained factors result in "zero spillover prejudice."  With no facts or even allegations that Messrs. Archer and Cooney were involved in or aware of their co-defendants' prior misconduct, the Court is left only with the government's unexplained assertion that "there is zero spillover prejudice" to Messrs. Archer and Cooney.  Such vacuous contentions will not do in the face of the serious prejudice outlined in Messrs. Archer's and Cooney's motion.

Moreover, the government's response conspicuously discusses only two or three categories of prior acts evidence that would be horrendously prejudicial to Messrs. Archer and Cooney – the Gerova fraud, and Jason and John Galanis's prior criminal and/or regulatory enforcement history. *See* Gov. Mem. at 34-35. But Messrs. Archer and Cooney also discussed a third category of prior act evidence: the alleged Code Rebel fraud. As explained in their moving brief, the Code Rebel fraud was an entirely separate fraud, involving Jason Galanis's acquisition of nearly all of the shares of an IPO that he orchestrated, which he then sold for a profit, using the proceeds to, among other things, pay for his own criminal defense attorneys in the Gerova case. As discussed, however, Mr. Archer had nothing to do with Code Rebel other than that he purchased some of its shares at his own expense at Jason Galanis's urging, suffering a material loss. *See* Severance Mem. at 27-28.

Allegations about this fraud have no role in a trial of Messrs. Archer and Cooney, but the government's response fails to address this important item entirely. Elsewhere in its brief, however, the government suggests that it may attempt to introduce evidence about Code Rebel as a part of Messrs. Archer and Cooney's trial. For example, and as discussed briefly above, in response to Mr. Archer's request for particulars about which of his "business endeavors" he allegedly used misappropriated bond proceeds to fund, the government's brief states that "bond proceeds . . . were used to purchase millions of dollars of Code Rebel Shares." Gov. Mem. at 103. This use of the passive voice obscures the fact that Mr. Archer did *not* use bond proceeds (knowingly or unknowingly) to purchase his Code Rebel shares – he paid for them with his own money, which he lost. Evidence about the Code Rebel fraud would therefore be entirely out of place and prejudicial at Mr. Archer's trial, and the government's apparent intention to introduce the Code Rebel fraud into evidence as against his co-defendants is yet another reason severance is needed.

IV.   **EVIDENCE OF JASON GALANIS'S PRIOR FRAUDS, COOPERATION, AND CONSENSUAL WIRETAPS IS DISCOVERABLE UNDER RULE 16 AND IS *BRADY* MATERIAL**

Evidence of Jason Galanis's lies to and manipulation of others in connection with the Gerova matter and his cooperation with the government – including his year-plus of consensual wiretaps – is exculpatory.  *See* MTD Mem. at 41-44.  The Court should not credit the government's arguments that Mr. Archer's defense theory is illogical and the evidence irrelevant. The government misunderstands Mr. Archer's position by confusing what it must prove with what mitigates Mr. Archer's guilt.  At the same time, the government undermines its own argument by reserving its right to put forward exactly the same kind of evidence that Mr. Archer seeks in discovery.  And the one case the government relies on is a one-sentence bench ruling, the meaning of which is unclear and its precedential value nil.

A.    **Evidence Of Jason Galanis's Prior Bad Acts Is Exculpatory To Mr. Archer**

Both Rule 16 and *Brady* require that the government produce evidence probative of the fact that Jason Galanis misled Mr. Archer.  *See* MTD Mem. at 34, 38–39; *United States v. Stein*, 488 F. Supp. 2d 350, 356–57 (S.D.N.Y. 2007) ("'Evidence . . . is material if it could be used to counter the government's case or to bolster a defense.'" (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).  A central feature of Mr. Archer's defense is that Jason Galanis deceived and used him to achieve the objectives of the fraud in this case, just as he did with others in the Gerova matter.  The Gerova fraud also involved the same core co-conspirators as here:  Jason Galanis, John Galanis, and Gary Hirst.

The fact that Jason Galanis successfully misled the government, victims, business associates, and co-conspirators is relevant to whether or not he also misled Mr. Archer.  The *manner* in which Jason Galanis duped people previously – and the way that he fooled and used people who played roles in the Gerova fraud similar to the one that Mr. Archer is alleged to have

played in this case – is also relevant to understanding the same behavior he exhibited in connection with the Wakpamni bonds. *See generally* Fed. R. Evid. 404(b)(2); *United States v. Minkowitz*, 104 F.3d 350 (2d Cir. 1996) (upholding decision to admit evidence of prior credit card fraud that could prove a modus operandi, motive and intent, and knowledge and absence of mistake).

The government seeks to preclude Mr. Archer from using this evidence while at the same time reserving the government's own right to use it. *See* Gov. Mem. at 34–35 (reserving right to introduce prior bad acts evidence of Jason Galanis and his co-conspirators in Gerova, as well as Jason and John Galanis's other prior criminal and/or regulatory enforcement history). The government has tunnel vision, focusing solely on what it must prove—that Mr. Archer "willfully chose to undertake criminal activity based on his knowledge and understanding of the relevant transactions at issue in this case," Gov. Mem. at 110—while ignoring what tends to mitigate Mr. Archer's guilt—that his knowledge and understanding of the transactions was based on Jason Galanis's misrepresentations *to him* as well as everyone else. Just because the government may see some value in the Gerova material for its own case-in-chief, does not mean Mr. Archer cannot also find exculpatory value in it as well. *See United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012) ("Where suppressed [*i.e.*, undisclosed] evidence is inculpatory as well as exculpatory, and its exculpatory character harmonizes with the theory of the defense case, a *Brady* violation has occurred." (internal quotation marks and alteration omitted)); *see also United States v. Rittweger*, 524 F.3d 171, 181 (2d Cir. 2008) (holding that the exculpatory value of information is not negated by the fact that the government has other contradictory evidence).

The government also argues incorrectly that Mr. Archer's defense "is premised on a fallacy." Gov. Mem. at 109. The government's only legal support for its argument is a discussion of a bench ruling from Judge Carter in *United States v. Durante, et al.*, No. 15 Cr. 171

(S.D.N.Y.).  The government attributes much to Judge Carter's reasoning, but in fact he issued

no written decision, and the entirety of the bench ruling is as follows:

> Regarding the request for the government to do a sort of an extra
> search for Brady material, that is also denied.

*Durante*, ECF No. 162 at 4:15-16.  The case does not show that Judge Carter understood the

defense theory to rest on flawed logic, as the government states.  *See* Gov. Mem. at 109.  We

simply do not know the reason for Judge Carter's decision.[11]

The evidence Mr. Archer seeks is probative of his core defense.  Jason Galanis and other

co-conspirators (including some in this case) engaged in repeated behavior of the kind at issue

here.  Mr. Archer does not share this history with them—he is an outsider, and upon information

and belief, Jason Galanis lied to and used similarly-situated outsiders in his prior frauds in much

the same way that he used Mr. Archer.  The government already represented that it would

produce "any part" of the discovery in the Gerova matter "that is *Brady* or *Giglio* material," *see*

MTD Mem. at 42 (citation to declaration exhibit omitted), but now appears to take the position

---

[11]    If anything can be inferred, the likely basis for Judge Carter's decision – based on his
reference to an "extra search" for *Brady* material – is that the government was not obligated to
review materials from a co-defendant's prior, closed case.  However, as noted in Mr. Archer's
moving brief, in this case the same "prosecution team" handled the Gerova case as this one, so
no "extra search" would be required.  The prosecutors and agents need only search their own
files, which is well within the confines of what *Brady* requires.  *See, e.g.*, *Valentin v. Mazzuca*,
No. 05-CV-0298 VEB, 2011 WL 65759, at *17 (W.D.N.Y. Jan. 10, 2011) (collecting cases
where courts "have found that prosecutors 'suppressed' [*Brady*] evidence by failing to search for
background information, such as a witness's criminal history, that is readily available through
routine investigation of the prosecution's files or the files of other government agencies"
(internal quotation omitted); *cf.* Jonathan Abel, *Brady's Blind Spot: Impeachment Evidence in
Police Personnel Files and the Battle Splitting the Prosecution Team*, 67 Stan. L. Rev. 743, 753
(2015) ("[I]t is hard to imagine that the prosecutor could be allowed to turn a blind eye to
evidence of a witness's dishonesty, known to members of the prosecution team, simply because
the evidence was housed in a different case file and was not uncovered in the course of
investigating this particular case. Clearly, the prosecutor's duty to learn . . . cannot be strictly
limited to case-related information, as such a strict limitation would permit a police officer to
stay quiet about his knowledge of, say, an informant's history of lying, so long as those lies were
discovered in a separate case.").

that none of it is exculpatory.  It would be deeply prejudicial to Mr. Archer if the government

withholds evidence demonstrating Jason Galanis's prior crimes, particularly so when the

government has a full understanding of his defense theory.

> **B.**  **Evidence Of Jason Galanis's Prior Bad Acts Is Discoverable Because Mr. Archer Must Be Allowed To Impeach Galanis**

Information about Jason Galanis's prior crimes, and his failed cooperation with the

government, is *Brady* material for a second reason, as well.  Much of the evidence that the

government will attempt to introduce against Mr. Archer comes in the form of e-mails – e-mails

that by and large are not *from* Mr. Archer, but *to* him, from Jason Galanis.  The government will

argue, as the indictment alleges, that these communications demonstrate that Galanis was

keeping Mr. Archer "informed" of his plans, and it will point to a handful of ambiguous e-mails

as purported proof of a conspiracy to misappropriate funds.  But Mr. Archer is entitled to

discovery of evidence that impeaches Jason Galanis, as the declarant in those critical

communications.

"It is [] clear that *Brady* and its progeny may require disclosure of exculpatory and/or

impeachment materials whether those materials concern a testifying witness or a hearsay

declarant. A contrary conclusion would permit the government to avoid disclosure of

exculpatory or impeachment material simply by not calling the relevant witness to testify."

*United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003).  Whenever the government intends to

introduce a statement by an out-of-court witness for the truth – such as under the co-conspirator

exception to the hearsay rule – a defendant is entitled to impeach the declarant.  *See, e.g., United

States v. Palermo*, No. 99 CR. 1199 (LMM), 2001 WL 185132, at *1 (S.D.N.Y. Feb. 26, 2001)

("The Court notes, as a reminder, that 3500 and Giglio impeachment material must be produced

as to any declarant whose hearsay statement or statement defined in Fed. R. Evid. 801(d)(2)(C), (D) or (E), will be offered for its truth.").

Here, the government will attempt to introduce numerous e-mails from Jason Galanis for the truth of the matter asserted.  As such, Mr. Archer is entitled to any information in the government's possession, custody, or control that will impeach Galanis.[12]

## V.   THE GOVERNMENT HAS NOT ESTABLISHED THAT THERE IS AN ONGOING INVESTIGATION, AND HAS NO LEGITIMATE REASON TO WITHHOLD COURT ORDERS, WARRANTS, OR SUBPOENAS

The compulsory process by which the government obtained evidence against Mr. Archer is relevant to deciding what motions he might be able to make or additional discovery he might need.  *See* MTD Mem. at 36–38.  The questionable circumstances surrounding the government's issuance of post-indictment grand jury subpoenas suggest the government has abused the grand jury process in order prepare for trial.  Apart from this misconduct, the scope of the subpoenas is also relevant to determining what information has *not* been collected by the government that Mr. Archer may need to collect himself.  The requested information is "likely to shed light on matters at issue in th[e] case" and is thus material to preparing the defense.  *Stein*, 488 F. Supp. 2d at 359; *see also id.* at 369 (ordering production of correspondence between third party and government).[13]

---

[12]    The government would likely argue that these e-mails are not being introduced for the truth of the matter asserted, but rather to show that Mr. Archer received them.  But the fact that Mr. Archer received them is only meaningful if they are true – if Galanis were sharing untrue information with Mr. Archer, then the indictment's allegation that Galanis kept Mr. Archer apprised of matters would be false.  If the government nonetheless persists in this view, and if the Court agrees, then Mr. Archer would be entitled to a limiting instruction that none of the e-mails from Galanis to him should be considered for their truth.

[13]    Even if the documents sought by Mr. Archer are not strictly considered "material to preparing the defense" pursuant to Rule 16(a)(1)(E)(i), its production would nevertheless be appropriate and within the Court's discretion.  Rule 16 "prescribe[s] the minimum amount of discovery to which the parties are entitled," and "is not intended to limit the judge's discretion to

Case 1:16-cr-00371-RA   Document 314   Filed 02/12/18   Page 33 of 82

The government's principal argument for why it should not be required to disclose court orders, warrants, and subpoenas issued in connection with this case is that there is an ongoing investigation. *See* Gov. Mem. at 110–12. But on the record before the Court, *there is no ongoing investigation.* There is only a trial set to start in less than three months. The government's sole support for the claim that there is an ongoing investigation is the statement in its opposition brief that the government "has continued to investigate individuals and conduct outside the scope of the present Indictment" and "has continued to do its job." Gov. Mem. at 111. The Court should not credit the government's unsworn, undocumented, and unsubstantiated claim of an ongoing investigation. *Cf. United States v. Stevens*, 500 F.3d 625, 628 (7th Cir. 2007) ("arguments in a Government brief, unsupported by documentary evidence, are *not* evidence." (emphasis in original)). That is particularly so in light of the fact that Mr. Archer put forward specific evidence indicating that the government's use of post-indictment grand jury process has been for trial preparation. *See* MTD Mem. at 36-37; Schwartz Moving Decl. ¶ 51. [14]

---

order broader discovery in appropriate cases." Fed. R. Crim. P. 16 Advisory Committee's Note to 1974 Amendment. Accordingly, the Court has broad discretion to grant all "appropriate relief" not explicitly called for by Rule 16, *see* Fed. R. Crim. P. 16(d)(l), and "the authority to enter pretrial case management and discovery orders designed to ensure that . . . the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly." *United States v. W.R. Grace*, 526 F.3d 499, 509 (9th Cir. 2008).

[14]     In a total non sequitur, the government claims in a footnote that it "now seems clear" that Mr. Archer is "abusing the civil subpoena process" by issuing third-party subpoenas in the parallel SEC case. *See* Gov. Mem. at 111-12 n.39. This is an outrageous accusation that has absolutely no support. Mr. Archer has issued third-party subpoenas in the SEC case, on notice to the SEC as required under Federal Rule of Civil Procedure 45, to defend himself in that case. There is no basis on which to claim that he is abusing process in doing so, and the government's unexplained, unsupported, and false accusation is emblematic of the degree to which it has become blinded to the facts in this case.

The cases cited in the government's opposition brief are not remotely similar.  In *United States v. Meregildo*, the court described *ongoing* homicides and noted that the "charges related only to four homicides and five non-fatal shootings out of the 23 total homicides and non-fatal shootings related to this ongoing gang- and drug-related conflict."  876 F. Supp. 2d 445, 449–50 (S.D.N.Y. 2012) (internal quotation marks omitted).  In *United States v. Ohle*, the court declined to hold an evidentiary hearing where "not a single Grand Jury subpoena ha[d] been issued" since the superseding indictment was filed five months earlier.  678 F. Supp. 2d 215, 234 (S.D.N.Y. 2010).  In *United States v. Nordlicht*, the court found credible the government's claims that the investigation was in fact ongoing, *see* No. 16 Cr. 640 (E.D.N.Y. Jan. 1, 2018), Dkt. No. 280 at 3–4, and that the need to protect that ongoing investigation was especially acute in light of prior attempts at improper witness contact.  *See Nordlicht*, 16 Cr. 640 (E.D.N.Y. Aug. 18. 2017), Minute Entry ("Defense counsel and defendant are ordered to desist from making any efforts to communicate with any government witnesses or their attorneys upon pain of sanctions, finding of contempt, and remand of the defendant.  The government shall notify the Court of any such behavior immediately.").

Here, the government has not pointed to any related crimes, whereas Mr. Archer has provided *evidence* that the government has issued at least one grand jury subpoena post-dating the superseding indictment for seemingly no reason other than trial preparation.  Schwartz Moving Decl. ¶ 51.  Without any reasonable basis to believe there is an ongoing investigation, the government should be required to produce all court orders, warrants, and subpoenas issued in connection with this case so that Mr. Archer can properly prepare his defense including any potential motion for abuse of the grand jury process.  Indeed, even if the Court credits the government's unsubstantiated claim that there is an ongoing investigation, it should still be ordered to produce its subpoenas and other process to Mr. Archer so that he can formulate any

31

appropriate defense.  Mr. Archer has no objection to the government producing this material

under the confidentiality order in this case, which would totally obviate any purported concerns

arising from its claimed investigation.

**VI.    A COURT ORDER COMPELLING THE PRODUCTION OF *BRADY*
       MATERIAL BY A DATE CERTAIN IS NECESSARY TO ENSURE THE
       TIMELY PRODUCTION OF ANY EXCULPATORY EVIDENCE IN THE
       MILLIONS OF DOCUMENTS ALREADY PRODUCED**

When Mr. Archer filed his pretrial motion seeking *Brady* material, it had been a year-

and-a-half since the government first indicated it would "provide timely disclosure if any such

material comes to light."  *See* MTD Mem. at 39 (citation to declaration exhibit omitted).  The

government assures the Court that no order is necessary and that it is aware of its disclosure

obligations.  *See* Gov. Mem. at 112–13.  Yet it was only on January 30, 2018 – and only in

response to the defense motions – that the government made its first *Brady* production,

consisting of four almost entirely redacted draft interview memoranda.  *Id.*[15]  The government

makes no mention of the millions of documents and terabytes of data already produced in this

case (nor the ongoing productions, for that matter).

Given the magnitude of discovery and the paltry production of *Brady* material to date,

Mr. Archer is rightly concerned that the government will either be unable to fulfill its obligations

under *Brady* to review and produce exculpatory evidence, or will do so just as the trial is

beginning (or later), rendering it nearly impossible to make effective use of the information.  *See*

MTD Mem. at 44.  Mr. Archer therefore requests that the Court order the government to produce

---

[15]      Even these entirely exculpatory documents – such as an interview memo in which a
witness confirmed that Mr. Archer did not sign a letter the government accuses him of signing –
the government refused to characterize as *Brady* material, claiming to produce them only in "an
abundance of caution."

*Brady*/*Giglio* material currently within its possession no later than 60 days before trial so that he is not unfairly prejudiced.

## VII.   THE FRUITS OF THE WARRANTS SHOULD BE SUPPRESSED

### A.   Mr. Archer Plainly Has Standing To Challenge The Warrants

The government argues as a threshold matter that Mr. Archer lacks standing to challenge the search and seizure of records from the Momtazi Google Account, the Momtazi Apptix Account, and the Cooney Account.[16]  There is no dispute that Mr. Archer has standing to challenge the search and seizure of records from the two Archer Accounts, but he also plainly has standing with respect to the Momtazi Accounts, as well.

The government gives short shrift to the Fourth Amendment's protection of the right of the people to be secure in their effects against unreasonable searches.  Ignoring most Fourth Amendment unreasonable search jurisprudence since *Katz v. United States*, 389 U.S. 347 (1967), the government argues that because Mr. Archer "admits" that the Momtazi Accounts belong to Mr. Momtazi, Mr. Archer cannot have "standing" to challenge the validity of the government's search of those accounts.[17]   Gov't Mem. at 54-55.

Whether the Fourth Amendment protects Mr. Archer's expectations of privacy in the contents of the Momtazi Accounts does not turn on whether the accounts "belonged to" Mr. Momtazi.  Rather, Mr. Archer can challenge conduct that invades his legitimate expectation

---

[16]     As mentioned above, capitalized terms in this brief have the same meaning as in Mr. Archer's moving memoranda.  *See supra* n.1.  In particular, Mr. Archer uses the terminology in his motion to describe the relevant internet accounts – the "Archer Google Account," "Archer Apptix Account," "Momtazi Google Account," and "Momtazi Apptix Account" – rather than the government's defined terms for the same accounts so that it is easier to keep track of the relevant service provider.

[17]     The domain names of each of the Momtazi Accounts ("@rosemontseneca.com" and "@rosemontcapital.com") show that these accounts are, in fact, associated with entities in which Mr. Archer has an interest even according to the government's charging instruments.

of privacy by showing that this expectation is "reasonable, *i.e.* one that has a 'source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (some internal quotation marks omitted; quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

Mr. Archer's ability to challenge the government's search of the Momtazi Accounts therefore turns on whether he had a legitimate expectation of privacy in the contents of those accounts.  *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[T]he Court in *Katz* held that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (citing *Katz*, 389 U.S. at 353)); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (stating that the *Rakas* decision "abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched").

Private correspondence constitutes Fourth Amendment "effects" that are protected against unreasonable searches and seizures.  *See United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable.").  Courts have consistently held that e-mails and other private electronic correspondence are deserving of the same protection as letters sent through the mail. *See generally United States v. DiTomasso*, 56 F. Supp. 3d 584, 595-96 (S.D.N.Y 2014) (holding, with regard to inquiry into expectation of privacy, that "there is no different between regular mail and email"); *United States v. Warshak*, 631 F.3d 266, 285-86 (6th Cir. 2010) ("Given the

fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection."); *R.S. ex rel  S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1142 (D. Minn. 2012) (holding that "[n]umerous courts have . . . concluded that individuals maintain a reasonable expectation of privacy with respect to their private email accounts and that such accounts are entitled to the same Fourth Amendment protections as conventional letters," and collecting cases).

Accordingly, Mr. Archer has a legitimate expectation of privacy in, at the very least, any e-mails that he sent to Mr. Momtazi that the government searched when it seized the contents of the Momtazi Accounts.  *See DiTomasso*, 56 F. Supp. at 595 ("For Fourth Amendment purposes, there is no basis for treating *recipients* of email differently from *senders* of email.  Both have a reasonable expectation of privacy in the content of correspondence." (emphasis in original)). Yet Mr. Archer's expectation of privacy in the Momtazi Accounts extends beyond the ordinary case of private correspondence.  As discussed further below, Mr. Archer had not only a reasonable, but a *legally protected* expectation that none of his sensitive information contained in the Momtazi Accounts would be disclosed without his authorization.

The government does not contest Mr. Archer's sworn statement that Mr. Momtazi used the Momtazi Accounts in connection with his work for Mr. Archer.  *See* Archer Decl. ¶ 3 [ECF No. 301-35].[18]  Further, Mr. Archer stated in his Declaration that Mr. Momtazi was employed as his personal assistant during the relevant time period, and that their correspondence contained "personal and private details about [Mr. Archer's] life and work and, in some cases, privileged communications."  *Id.*

---

[18]     It would be difficult for the government to refute that allegation, as the relevance of the Momtazi Accounts to the subject matter of the Warrants depended on it.

Mr. Archer did not sacrifice his expectation of privacy in his personal, private, and privileged information simply by sharing it with his personal assistant.  Even if Mr. Momtazi did not have a fiduciary duty to keep Mr. Archer's sensitive information confidential, Mr. Archer would not have lost all expectation of privacy in the personal and private information contained in his correspondence with Mr. Momtazi, or in Mr. Momtazi's correspondence on his behalf. *See DiTomasso*, 56 F. Supp. 3d at 591 ("Although the government is correct that 'when an individual reveals private information to another, he assumes the *risk* that his confidant will reveal [it] to the authorities,' it does not follow that no expectation of privacy exists.  In fact, just the opposite: it only make[s] sense to speak of a betrayed expectation of privacy insofar as one *has* an expectation of privacy." (quoting *Jacobsen*, 466 U.S. at 117) (emphases and first alteration in original)).

Mr. Momtazi plainly owes Mr. Archer a duty of confidentiality with respect to information he learned while Mr. Archer's personal assistant.[19]  Mr. Momtazi's relationship with Mr. Archer imposed on Mr. Momtazi a duty to keep Mr. Archer's sensitive information confidential.[20]  Indeed, Mr. Archer's expectation of privacy in the contents of the Momtazi Accounts is so strong that he would, in certain circumstances, be able to obtain an injunction to prevent Mr. Momtazi from disclosing the contents of their correspondence.  *See* Restatement

---

[19]     Mr. Archer is not, of course, accusing Mr. Momtazi of breaching any duty.  Rather, Mr. Archer's legally protected right against any breach of that duty establishes that his rights were invaded by the government's unreasonable search of the Momtazi Accounts.

[20]     *Cf.* Restatement (Third) of Agency § 8.05 ("An agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."); *see also id.* cmt. c ("Many employees and other agents are given access by the principal to information that the principal would not wish to be revealed or used, except as the principal directs. . . . An agent's duty of confidentiality extends to all such information concerning a principal even when it is not otherwise connected with the subject matter of the agency relationship.").

(Third) of Agency § 8.01 cmt. d ("Under appropriate circumstances, an agent's breach or threatened breach of fiduciary duty is a basis on which the principal may receive specific nonmonetary relief through an injunction.").  In sum, society recognizes Mr. Archer's legitimate expectation of privacy in the contents of the Momtazi Accounts to such an extent that this expectation is protected by law against any disclosure, let alone against an unreasonable search.

The government cites *United States v. Lustyik* for the statement that "[a] person has no expectation of privacy in another person's email account."  57 F. Supp. 3d 213, 223 (S.D.N.Y. 2014).  *Lustyik* is, however, entirely inapposite.  There, the defendant was attempting to establish a reasonable expectation of privacy in the email account of one of his "business associate[s]," not his personal assistant and agent.  *See id.* at 218.  This isolated general statement is inconsistent with the broader legal principles, cited above, that recognize that one can have a reasonable expectation of privacy in another person's e-mail correspondence under certain circumstances, such as those present here.  Moreover, unlike in *Lustyik*, the Momtazi Accounts contain primarily (if not exclusively) correspondence either written by or addressed to Mr. Archer, or written by Mr. Momtazi in his role as Mr. Archer's personal assistant.[21]

Mr. Archer had a strong expectation of privacy in the contents of the Momtazi Accounts. Mr. Archer's Declaration establishes that Mr. Momtazi was Mr. Archer's employee and personal assistant, and that Mr. Momtazi used the Momtazi Accounts in connection with his work as Mr. Archer's employee and personal assistant.  Therefore, Mr. Momtazi had a duty of loyalty to Mr.

---

[21]     This also distinguishes the Momtazi Accounts from the correspondence at issue in *United States v. Knoll*, a Second Circuit decision relied on by *Lustyik*.  In *Knoll*, the Second Circuit held that because the defendant "sent the letters to an individual with whom he *had no relationship of confidentiality*, any legitimate expectation of privacy he may have had in them was abandoned." 16 F.3d 1313, 1322 (2d Cir. 1994) (emphasis added).  As explained above, Mr. Archer had a recognized relationship of confidentiality with Mr. Momtazi, and thus the reasoning of *Knoll* is expressly inapplicable to the contents of the Momtazi Accounts.

Archer that includes a well-recognized duty of confidentiality.  Mr. Momtazi's revelation of

personal and sensitive information about Mr. Archer to anyone without authorization would

constitute a breach of this duty, and Mr. Archer would be entitled to either prevent a threatened

breach of that duty by seeking an injunction, or to seek redress for any damages resulting from

an actual breach of that duty.  Therefore, the government's search of the Momtazi Accounts

invaded a legally protected right belonging to Mr. Archer, and thus Mr. Archer may challenge

the validity of that search under the Fourth Amendment.

### B.      The Warrants Were Insufficiently Particularized And Therefore Authorized An Unconstitutional General Search

The Warrants themselves are insufficiently particularized on their faces and, for that

reason, constitutionally infirm.  As a result, the fruits of the Warrants must be suppressed.

The government attempts to get out from under the unambiguous, straightforward reading

of the plain language of the Warrants – which impermissibly authorized the government to seize

all "evidence of crime" related to fraud, "among other statutes" – by accusing Mr. Archer of

"hyper-technical sentence diagramming."  *Id.* (internal quotations omitted).  But as Mr. Archer

made clear in his moving papers, "[a]s a matter of straightforward grammar, . . . the Warrants

authorized the government to search for and seize evidence of crime relating to four specified

statutes, *among other statutes*," and "list[ed] the four crimes charged in the Indictment . . . *as*

*mere examples* of the types of crimes for which law enforcement personnel are authorized to

review the records produced by Google and Apptix to locate any evidence of violations of other

statutes."  Suppression Mem. at 34 (quotations from Warrants and alterations omitted; second

emphasis in original).  Nor is this a case where a general phrase is sensibly limited by the

specific examples that precede it; rather, the general phrase follows specifically enumerated

offenses, and there is no sensible reading of the relevant language where "among other statutes"

38

does not serve to expand the universe of evidence to be seized beyond evidence or communications relating to the enumerated offenses.

The government would simply read the phrase "among other statutes" out of the Warrants.  But it is precisely that clause – which, of course, the government authored in the first place, along with the equally boundless phrases "evidence of crime" and "communications constituting crime" – that is central to the lack of particularity in the Warrants.   Obviously, asking the Court to simply ignore the broadest and most problematic language in the Warrants, which explicitly authorized a literally limitless search for "evidence of crime" and "communications constituting crime" untethered to any statute, would be anything but fair.  Moreover, two of the cases cited by the government in support of its charges of "hyper-technical sentence diagramming" and its request for a so-called "fair reading" are wildly inapposite, while the other case – the one from which the phrase "hyper-technical sentence diagramming" originates, no less – actually makes Mr. Archer's point for him.

In *United States v. Alston*, the warrant being challenged "identifie[d] the specific offense as 'violations of Title 18, United States Code, Section 846 (conspiracy to distribute narcotics),'" and the defendant took issue with "the fact that the attachment to the warrant, which specifie[d] the information to be taken from [his] phone, list[ed] seven categories of information, but only categories 5 through 7 include[d] a specific reference to the target offense."  No. 15-cr-435 (CM), 2016 WL 2609521, at *4 (S.D.N.Y. Apr. 29, 2016).  Thus, unlike the Warrants here, the warrant at issue in *Alston* did not explicitly allow the government to search for "evidence of crime" related to any criminal offense and "communications constituting" any criminal offense. The claimed issue in *Alston* – which the court rightly had no difficulty rejecting – was merely that the specific offense identified in the warrant was not *repeated* in every item listed in the attachment.  On these facts, the court appropriately held that "[a]ny executing officer would, in

39

reviewing the warrant, quickly ascertain the relevant target offense to which each item in the search warrant's attachment pertained." *Id.* Here, however, while certain specific statutes were identified in the Warrants, the identification of those statutes was then followed by the phrase "among other statutes," which – again, as a matter of straightforward grammar – expressly and necessarily negated any potential limitation to only the specifically identified statutes. Thus, any executing officer would, in reviewing the Warrants here, understand that they gave that officer free reign to seize any "evidence of" violations of *any statute* and any "communications constituting" violations of *any statute*.

Similarly, in *United States v. Fiorito*, the appellant claimed that the warrant authorized a search for "[e]ntire files involving [Fiorito,]" a phrase that "was located at the opening of an extensive list of specific documents sought." 640 F.3d 338, 346 (8th Cir. 2011) (alteration in original). But the Eighth Circuit "conclude[d] that the warrant was sufficiently particularized" in large part due to the fact that "[t]he warrant did not authorize a blanket search of documents for no particular purpose, but rather for the purpose of discovering evidence of an ongoing, well-defined equity-stripping scheme." *Id.* at 347. Here, again, precisely the opposite is true: The Warrants, by their express terms, did not authorize a search "for the purpose of discovering evidence" relating to only the four crimes charged in the Indictment; rather, they authorized a search "for the purpose of discovering evidence" *of any violation of a veritably unlimited list of "other statutes." Id.* That is, the sin of the Warrants here is that they *both* do not relate back to only specific crimes *and* that the particular items to be seized list unbounded categories like "evidence of crime." Taken together, therefore, the Warrants authorized the government to search for and seize any evidence of any crime.

Lastly, in *United States v. Otero*, the Tenth Circuit actually *rejected* the government's argument "that under a natural reading of the warrant [at issue there,] the computer search [was]

40

limited to uncovering only evidence of the mail and credit card theft along Ms. Otero's delivery

route" or, "[i]n other words, [that] paragraphs six, seven, eight, and nine, which fall under the

heading 'COMPUTER ITEMS TO BE SEIZED,' are limited by paragraphs two, three, and five,

which fall under the separate heading of 'ITEMS TO BE SEIZED,' and restrict the search to

'information related to or pertaining to the theft of mail, the fraudulent credit cards, bank fraud

and conspiracy.'" 563 F.3d 1127, 1132 (10th Cir. 2003).[22]  Specifically, the court found that:

> Each paragraph under the first section ["ITEMS TO BE SEIZED"]
> takes pains to limit the search to evidence of specific crimes or
> evidence pertaining to specific persons along Ms. Otero's delivery
> route. Each paragraph under the second section ["COMPUTER
> ITEMS TO BE SEIZED"], in contrast, has no limiting instruction
> whatsoever. Read alone, they each authorize a search and seizure
> of "[a]ny and all" information, data, devices, programs, and other
> materials.  There is no explicit or even implicit incorporation of the
> limitations of the first five paragraphs. . . . In fact, the presence of
> limitations in each of the first five paragraphs but absence in the
> second four suggests that the computer searches are *not* subject to
> those limitations. Even when read in the context of the overall
> warrant, therefore, the paragraphs authorizing the computer search
> were subject to no affirmative limitations.

*Id.* at 1132-33 (emphasis in original).  The court then proceeded to rule as follows:

> Differences such as subject headings and paragraph formation
> might seem insignificant, but if we are to follow our command of
> reading each part of the warrant in context, these structural
> indicators are useful tools.  *Affording the government a practical*
> *rather than a technical reading does not require us to indulge*
> *every possible interpretation.* Though a reasonable person might
> be forgiven for reading the entire warrant as subject to limitations,
> we believe that the most practical reading authorizes a wide-

---

[22]      The Tenth Circuit also acknowledged that "[t]he modern development of the personal
computer and its ability to store and intermingle a huge array of one's personal papers in a single
place increases law enforcement's ability to conduct a wide-ranging search into a person's
private affairs, and accordingly makes the particularity requirement that much more important,"
and noted that its "case law required that 'warrants for computer searches must *affirmatively*
*limit* the search to evidence of specific federal crimes or specific types of material.'"  563 F.3d at
1132 (quoting *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005); emphasis in
original).

> ranging search of Ms. Otero's computer. The warrant as it
> pertained to the computer search was therefore invalid.

*Id.* at 1133 (emphasis added).

Here, too, the section of the Warrants that explicitly permit law enforcement to search for and seize any "evidence of crime" or "communications constituting crime" with respect to certain specifically identified statutes, "among other [unidentified] statutes," contains "no explicit or even implicit" limitation to the specified statutes; to the contrary, the reference to "other statutes" makes clear that the "searches are *not* subject to [any such] limitation[.]" *Id.* at 1132-33 (emphasis in original). Indeed, as in *Otero*, the Warrants here have "no limiting instruction whatsoever." *Id.* at 1132. Thus, while the government is entitled to "a practical rather than a technical reading" of the Warrants, the Court is not required to "indulge" the government's "interpretation," which would require the Court to ignore key language in the very section of the Warrants that explicitly told the executing officers what they were legally entitled to search for and seize. *Id.* at 1133. Accordingly, "the most practical reading" of the Warrants is the literal reading – that they "authorize[d] a wide-ranging search" of the Targeted Accounts for "evidence of" violations of *any statute* and "communications constituting" violations of *any statute* – and therefore lacked the constitutionally required particularity. *Id.* In short, the Warrants describe "the items to be seized with neither technical precision nor practical accuracy, and [they] therefore lack[] sufficient particularity." *Id.* at 1132.

The government also contends that even if the language with which Mr. Archer takes issue "is less than clear on its own," the Warrants can still be salvaged because, "where warrants contain ambiguous language, precise descriptions of some of the items to be seized along with specifications of the suspected crimes can cure the imprecision." Gov. Mem. at 66. In support of this point, the government cites *United States v. Juarez*, No. 12-cr-59 (RRM), 2013 WL

357570, at *5 (E.D.N.Y. Jan. 29, 2013), which it describes in a parenthetical as "finding that [a] warrant authorizing [the] search of a cellphone for evidence of 'Unlawful Surveillance in the Second Degree, P.L. § 250.45(4), in the vicinity of 4th Avenue and 14th Street, New York, New York, and *the commission of related crimes* . . . ' [was] sufficiently particular."  Gov. Mem. at 66 (alteration and emphasis in original).

In *Juarez*, the defendant was alleged to have "set his cell phone to make a video recording, placed it in the mesh pocket of his backpack, and placed the backpack between the legs of women wearing dresses or skirts, without their knowledge, in the vicinity of Union Square Park in Manhattan."  2013 WL 357570, at *1.  The court acknowledged that "authorizing a search for evidence linked to [unlawful surveillance in violation of P.L. § 250.45(4),] 'related crimes, and conspiracy to commit those crimes' is not terribly precise," but deemed this construction sufficiently particular in large part because "the warrant authorize[d] a search for photographs and video recordings, which sufficiently guide[d] the officers executing the warrant to the type of evidence he may search for and seize."  *Id.* at *5.

The Warrants here are different.  First, there is a significant difference between the phrase "related crimes" – which by necessity refers back to and is limited by the listed offense – and "among other crimes" – which is not in any way so limited.  For example, no one could claim that violations of securities fraud are "related" to the unlawful surveillance violation at issue in *Juarez*, whereas the "among other crimes" language in the Warrants here would certainly include N.Y. Penal Law § 250.45(4) – and indeed literally any other criminal statute, whether federal, state, or local.  Moreover, the warrant in *Juarez* was limited to "photos and video recordings" – items of obvious relevance to the unlawful surveillance offense – whereas the Warrants here allow the seizure of all "evidence of crime" and "communications constituting crime" – categories that are in no way limited to fraud offenses, let alone to the charged fraud offenses.

43

As Mr. Archer pointed out in his moving brief, the case most analogous to this one is the Second Circuit's fairly recent decision in *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013). There, the warrant affidavit purported to provide probable cause in connection with the defendant's failure to register as a sex offender under N.Y. Correction Law § 168–f.  The warrant, however, authorized the government to search for "evidence that will constitute, substantiate or support violations of NYS Corrections Law, section 168–f subdivision four, *NYS Penal Law and or Federal Statutes*."  720 F.3d at 441 (emphasis added).  The Second Circuit held that the warrant impermissibly allowed the government to search for "evidence that will constitute, substantiate or support violations of . . . NYS Penal Law and or Federal Statutes," and so was invalid.  *Id.* at 447; *see also id.* ("the warrant was facially overbroad and thus violated the Fourth Amendment").

The warrant in *Galpin* is simply analytically and grammatically indistinguishable from the Warrants here.  The government attempts to distinguish *Galpin* by arguing that the warrant there "authorized the seizure of a [sic] items that appear wholly unrelated to" the offense of failure to register as a sex offender.  Gov. Mem. at 68.  But the government's attempts to recast the Second Circuit's holding in *Galpin* finds zero support in the decision itself.  Indeed, the Second Circuit explicitly stated that "[t]he district court determined, and the government does not dispute, that *insofar as the warrant generally authorized officers to search Galpin's physical property and electronic equipment for evidence of violations of 'NYS Penal Law and or Federal Statutes,'* the warrant violated the Fourth Amendment's particularity requirement," and then "agree[d] that the warrant was facially overbroad and thus violated the Fourth Amendment." 720 F.3d at 447-48 (emphasis added).

Moreover, even if the government was correct that the reason why the Second Circuit deemed the warrant in *Galpin* to be overbroad was because it "authorized the seizure of a [sic]

44

items that appear wholly unrelated to" the violation of N.Y. Correction Law § 168–f, Gov. Mem. at 68, and not because the reference to violations of "NYS Penal Law and or Federal Statutes" rendered the warrant insufficiently particular, *the Warrants here suffer from precisely the same kind of overbreadth.* As Mr. Archer made clear in his moving papers, the Warrants inappropriately and unconstitutionally both authorize the government to seize all "evidence of crime" and "communications constituting crime," and also "authorize the government to seize twenty-three categories of documents and data for which the Bieniek Affidavit does not even purport to supply probable cause," Suppression Mem. at 40-44, many of which likewise "appear wholly unrelated to" the securities fraud- and investment adviser fraud-related charges against Mr. Archer, Gov. Mem. at 68.[23]

Accordingly, the inescapable conclusion – commanded by the Second Circuit's decision in *Galpin*, among other things – is that the Warrants, on their faces, explicitly permitted the executing officers to search for and seize "evidence of" violations of any statute and "communications constituting" violations of any statute, and thus lacked the particularity required by the Fourth Amendment.

---

[23]     *See*, *e.g.*, Suppression Mem. at 42 & n.18 ("[T]here is nothing in the Bieniek Affidavit, the Google Warrant, or the attachments to the Google Warrant that would supply probable cause to believe that Mr. Archer's browsing history – let alone his Google Payments data, Google URL Shortener data, Google Analytics data, or Google Alerts history, to name but a few examples – would shed any light whatsoever on any of the crimes charged in the Superseding Indictment. . . . As to Picasa Web Albums, . . . [the Bieniek Affidavit] does not provide any basis for believing that Mr. Archer would have [photographs containing the identities and locations of co-conspirators or victims] in his Picasa Web Albums (or anywhere else), or for inferring that defendants accused of committing securities fraud and/or participating in conspiracies to commit securities fraud typically photograph their co-conspirators or victims, or anything else relevant to the crimes they are alleged to have committed.").

### C.      The Warrants Were Not Supported By The Requisite Probable Cause

Not only are the Warrants invalid on their faces, but they are also based on an insufficient

showing of probable cause.  The probable cause cited in the Bieniek Affidavit is hopelessly stale,

and with respect to the Google Warrant far too tenuous to support the wide-ranging search that

the government requested.[24]  Moreover, as discussed below, the Bieniek Affidavit also failed to

supply probable cause entirely for numerous categories of information, and failed to disclose

critical information that further eroded any showing of probable cause.  *See infra* at Points VII.D

and VII.F.

*First*, while it is of course true that Mr. Archer had already been indicted at the time the

Warrants were issued,[25] the indictment supplied no reason to believe that Mr. Archer continued

to be engaged in any criminal activity or that evidence of past criminal activity would still be

present in the Archer Accounts.  Indeed, the Supreme Court has expressly held that the fact that

there is probable cause to believe someone committed a crime does not in any way entitle the

police to search his or her electronic accounts.  *See generally Riley v. California*, 134 S. Ct. 2473

(2014).  Rather, the government must make a specific showing of probable cause to believe that

the accounts to be searched will contain evidence of crime at the time they are searched.  That is

precisely what the government failed to do here, and nothing in the Indictment saves it from the

---

[24]      Citations to the "Bieniek Affidavit" are to the numbered paragraphs of the first twenty
pages of Exhibit 4 to the Corrected Declaration of Matthew L. Schwartz filed with Mr. Archer's
pre-trial motions, and citations to the "Indictment" herein are to the numbered paragraphs of the
last twenty-four pages of Exhibit 4.

[25]      The government states in its opposition brief that, at the time the Warrants were issued,
"a grand jury had indicted Archer . . . for securities fraud, wire fraud, and conspiracy to commit
those offenses."  Gov. Mem. at 57.  This is, of course, incorrect.  Mr. Archer had not (and has
not) been indicted for wire fraud or conspiracy to commit wire fraud.  *See generally* Indictment.

consequences of this failure.  And of course, with respect to the Momtazi Accounts, this argument falls away entirely, since Mr. Momtazi was never charged.

*Second*, the government acknowledges that the Bieniek Affidavit "provided only one specific example of an email received by the" Archer Google Account – and no emails actually sent by that account – in seeking to obtain all content and other information associated with that account for a nearly two-and-a-half-year period, from January 2014 through May 2016.  *Id.* at 58.  As Mr. Archer noted in his moving papers, "[t]he sole asserted basis for a sweeping search of [his] Google Account[] . . . is a single e-mail from September 2014, on which Mr. Archer was merely cc'd, and to which he is not alleged to have responded.  In other words, there is no allegation anywhere in the Bieniek Affidavit that any relevant communications were actually sent *from* Mr. Archer's Google Account, and a single e-mail was sent *to* his account from an individual who is not alleged to be a co-conspirator."  Suppression Mem. at 39 (citation to Declaration omitted; emphasis in original).  The government claims, however, that the dearth of information indicating anything untoward with regard to the Archer Google Account "does not undercut probable cause for that account" given that the Bieniek Affidavit also "more generally established probable cause regarding Archer's involvement in th[e] WLCC scheme," "showed that he had used email communications in furtherance of that scheme," "cited particular examples of emails from" the entirely separate and distinct Archer Apptix Account, and "provided a basis to believe that Archer, Cooney, and Galanis continued to use emails to communicate through the relevant period" of January 2014 through May 2016, all of which the government describes as being "sufficient to establish probable cause to search the Archer [Google] Account."  Gov. Mem. at 58-59 (citations to Bieniek Affidavit omitted).

But while, as mentioned above, the Indictment may have established probable cause to believe that Mr. Archer had committed and conspired to commit securities fraud, that is wholly

separate from the question of whether there was probable cause to believe that any evidence, fruits, or instrumentalities of those two crimes would be found in the Archer Google Account. Likewise, the fact that the Bieniek Affidavit "cited particular examples of emails" *from the Archer Apptix Account*, and thereby demonstrated that Mr. Archer had communicated with Jason Galanis and Mr. Cooney over email using that account, *id.* at 59, does not provide probable cause to search the wholly separate and distinct *Archer Google Account* – through which Mr. Archer is not alleged to have communicated with any of his alleged co-conspirators. *See United States v. Goff*, 2016 WL 3264129, at *5 (S.D.N.Y. June 13, 2016) (search warrant only valid insofar as it "rests on a finding that probable cause exists to believe that a crime has been committed and evidence or instrumentalities of the crime will be found *in the place to be searched*" (emphasis added)).

        And even if the government could rely on emails from the Archer Apptix Account to establish probable cause to search the Archer Google Account, all of the "particular examples of emails" from the Archer Apptix Account cited by the Indictment and the Bieniek Affidavit were stale.  *See* Suppression Mem. at 37-40.  Specifically, (1) the two latest Archer Apptix Account e-mails cited by the Indictment both date to August 2014, *see* Ind. ¶¶ 11(c), 19; and (2) the two latest Archer Apptix Account emails cited by the Bieniek Affidavit both date to October 2014, *see* Bieniek Affidavit ¶¶ 17(b)-(c).  Moreover, the most recent e-mails from the Archer Apptix Account *involving Jason Galanis and/or Mr. Cooney* cited by both the Indictment and the Bieniek Affidavit – that is, the most recent e-mails involving any alleged co-conspirators – date to August 2014, as certain September and October 2014 e-mails cited by the Bieniek Affidavit were between Messrs. Archer and Momtazi only – and Mr. Momtazi is neither an alleged co-conspirator, nor is there anything remarkable or suspect about Mr. Archer communicating via e-mail with his personal assistant.  *See* Indictment ¶¶ 11(c), 19; Bieniek Affidavit ¶¶ 14(c),

17(a)-(c).  Accordingly, contrary to the government's claims in its opposition brief, the Archer Apptix Account e-mails cited by the Indictment and the Bieniek Affidavit do not "provide[] a basis to believe that Archer, Cooney, and Galanis continued to use emails – specifically Apptix emails – to communicate through the relevant period" – *i.e.*, through May 2016 – but rather, at best that they "continued to use emails to communicate through" August 2014, which is well over two years before the Warrants were issued.  Gov. Mem. at 58-59

     *Third*, the government is incorrect in contending that "staleness is not an issue on these facts."  *Id.* at 61.  While it is true that courts have held that, as a general matter, staleness concerns may be somewhat reduced where the records being targeted are digital, none of the cases relied upon by the government for this general proposition involve both the age and paucity of evidence here.  Where the government can point to, for example, a single e-mail on which the subject account was merely copied from two years prior, there is neither probable cause to believe that evidence of a crime will be found in that account, nor that it will still be available at the time of execution.  That is particularly true here, where the Archer and Momtazi Accounts were associated with operating businesses, which can be expected to have e-mail retention policies that would render old communications inaccessible.  *See, e.g.*, *Larson v. Bank One Corp.*, No. 00-cv-2100, 2005 WL 4652509, at *11 (N.D. Ill. Aug. 18, 2005)..

     As the government acknowledges, "'the critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search].'"  Gov. Mem. at 60 (alterations in original) (quoting *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006)) (internal quotation marks omitted).  Here, neither the Indictment nor the Bieniek Affidavit provides the requisite probable cause to believe that the e-mail communications and other

material sought by the Warrants would still be in either of the Archer Accounts – least of all the Archer Google Account – in December 2016.  *See* Suppression Mem. at 37-40.

Additionally, the government is incorrect in contending that the fact that the alleged "offenses involved a multi-year scheme" – itself a misleading contention – somehow undermines Mr. Archer's staleness argument.  Gov. Mem. at 62-64.  While the Indictment does allege, in mostly conclusory terms and based, apparently, on a single allegation that has nothing to do with Mr. Archer, that the scheme "ended only in April 2016, just months before the [Bieniek] Affidavit was sworn out," Gov. Mem. at 62 (emphasis omitted), the latest dated allegations in the Indictment concerning Mr. Archer's own personal conduct in relation to any alleged "scheme" are from October 2014, and thus predate the swearing of the Bieniek Affidavit by more than *two years*.  *See* Indictment ¶¶ 21(a), 28(e); *see also* Suppression Mem. at 37 ("Every single one of the e-mails relied upon in the Bieniek Affidavit was sent more than two years before the Warrants were issued on December 28, 2016.  The allegations regarding Mr. Archer's conduct are likewise dated, as they concern a September 2014 funds transfer and certain alleged communications in October 2014.") (citation omitted).[26]  Indeed, the Indictment's dated allegations involving Mr. Archer's own personal conduct span only a brief seven-month period,

---

[26]     The government claims that the Indictment alleges misconduct on Mr. Archer's part in September 2015.  *See* Gov. Mem. at 62-63 (citing Indictment ¶ 25).  This is not, however, what the Indictment alleges.  Instead, the Indictment alleges that (1) interest payments on the first three bond issuances were due in September 2015, and (2) these interest payments "were made using funds provided directly or through entities or accounts controlled by Jason Galanis, Hugh Dunkerley, Gary Hirst, and Devon Archer."  Ind. ¶¶ 24-25 (capitalization removed).  The fact that Mr. Archer, or an entity or account purportedly controlled by Mr. Archer, may have been the indirect source of funds ultimately used by others to make these interest payments does not mean that Mr. Archer himself personally and/or knowingly "helped finance" such payments, nor does the Indictment or Bieniek Affidavit supply any reason to believe that there are communications relevant to these payments in the Archer Accounts.  Even if this allegation were credited, however, the September 2015 interest payment still took place well over a year before the government sought and obtained the Warrants.

from April 2014 through October 2014 – a far cry from his participating in a "multi-year scheme." *See* Ind. ¶¶ 11(a)-(c) (allegations regarding certain e-mail communications involving Mr. Archer in April, July, and August 2014); *id.* ¶ 19 (allegation regarding e-mail communication involving Mr. Archer in August 2014); *id.* ¶ 21(a) (allegations regarding transfer of funds to Mr. Archer in September 2014 and Mr. Archer's outward transfer of same funds in October 2014); *id.* ¶ 28(c) (allegation regarding Mr. Archer's outward transfer of aforementioned funds in October 2014).

Moreover, most or all of the post-October 2014 allegations in the Indictment appear to relate *not* to the securities fraud-related charges against Mr. Archer, but to the investment adviser fraud-related charges against certain of his co-defendants. These include allegations regarding (1) the April 2015 purchase of one of the two investment adviser firms at issue in the investment adviser fraud charges and its subsequent merger with the other investment adviser firm so at issue, *id.* ¶ 3; (2) defendant Michelle Morton directing the use of certain investment adviser client funds to purchase certain bonds in April 2016, *id.* ¶ 13(b); and (3) the sources of the funds used to make certain interest payments to the clients of the aforementioned investment adviser firms in September 2015, *id.* ¶ 25.[27]

Mr. Archer is not only not charged in the investment adviser counts, he is not alleged to have had anything to do with any of this conduct. It is therefore completely disingenuous for the government to attempt to use investment adviser fraud-specific allegations that substantially post-date its allegations about Mr. Archer's own personal conduct as an end-run around the staleness of the evidence supporting the Warrants. Accordingly, the appropriate end-date for the

---

[27]    The only post-October 2014 allegation in the Indictment that does not appear to be tied only to the investment adviser fraud-related counts is the allegation that, from August 2014 through October 2015, Jason Galanis used misappropriated bond proceeds "for his own personal expenses." Ind. ¶ 18. But this allegation does not relate to Mr. Archer in any way.

Court to use when considering the staleness of that evidence is not April 2016, but October 2014, some eighteen months earlier.  When the Court views the facts presented to the issuing magistrate judge through this lens, it becomes abundantly clear that the government's more-than-two-year-old allegations relating to Mr. Archer in both the Indictment and the Bieniek Affidavit rendered any probable cause hopelessly stale at the time the Warrants were actually sought and obtained.

Additionally, the one case affirmatively cited by the government on this point makes reference to "*ongoing* criminal activity," *see* Gov. Mem. at 62 (citing *Abboud*, 438 F.3d at 572; emphasis added), as do other cases that reject staleness challenges based on arguments like the one the government is making here, *see*, *e.g.*, *United States v. Ortiz*, 143 F.3d 728, 732-33 (2d Cir. 1998) ("[I]n investigations of *ongoing* narcotics operations, 'intervals of weeks or months between the last described act and the application for a warrant [do] not necessarily make the information stale.'") (emphasis added) (quoting *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).  There is no allegation, however, that Mr. Archer was engaged in ongoing criminal activity in December 2016.  Indeed, the government waited until more than six months after it had indicted Mr. Archer – and more than two years after the Indictment's latest dated allegations regarding his conduct – to seek the Warrants.  Accordingly, the Indictment does not allege that Mr. Archer was engaged in any "ongoing criminal activity" as of the December 2016 issuance of the Warrants, which only underscores the fact that that the probable cause supposedly supporting the Warrants was stale.

### D. The Warrants Were Overbroad To The Extent That They Authorized The Seizure Of Various Categories Of Non-Email Documents That The Bieniek Affidavit Does Not Substantively Address

The Warrants are also constitutionally overbroad because they authorized the government to search through and seize categories of information that the Bieniek Affidavit failed to address (other than to identify them), let alone provide probable cause for.

As the government acknowledges, the Warrants authorized it "to obtain all content and other information associated with" the Targeted Accounts. Gov. Mem. at 42-43. The government contends that "the issuing magistrate judge had a substantial basis to authorize search and seizure for each of the categories of information sought," including twenty-three categories of non-email records contained in or associated with the Archer Google Account and five categories of non-email records contained in or associated with the Archer Apptix Account. *Id.* at 42; *see also id.* at 70-75.

The government's response relies on two cases – *In re A Warrant for All Content & Other Information Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386 (S.D.N.Y. 2014) ("*In re Google Warrant*") and *United States v. Ulbricht*, No. 14-cr-68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) – which it says "support the seizing of [these] non-email records." Gov. Mem. at 71-72 (capitalization removed). These two cases, however, merely stand for the proposition that the wholesale search and seizure of certain categories of records is permissible *where the government establishes probable cause to believe that such categories of records contain evidence of crime*. Here, however, the entire issue is that the Bieniek Affidavit *did not* establish probable cause to believe that any non-email categories of records located in or associated with the Archer Accounts contained any evidence of the crimes with which Mr. Archer is charged.

The government describes *In re Google Warrant* as "approv[ing] a warrant authorizing the seizure of all emails, all address book information, and 'a variety of other information' associated with a particular Google account," Gov. Mem. at 71 (quoting *In re Google Warrant*, 33 F. Supp. 3d at 388), and holding that it is "'well-established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government,'" *id.* (quoting *In re Google Warrant*, 33 F. Supp. 3d at 393). This case is entirely inapposite, however, as it was all about whether, after the government had already established probable cause to believe that both the emails *and the other non-email information* in or associated with an email account contained evidence of criminal activity, it could then seize and search through the full email and non-email contents of that account, a question which the court correctly answered in the affirmative. *See In re Google Warrant*, 33 F. Supp. 3d at 390-96 ("Thus, we conclude that the warrant properly required that Google deliver all emails in the account to the Government for the purpose of allowing the Government to search the emails *for items within the categories specified in the warrant*." (emphasis added)). Mr. Archer, however, does not contend that the government *could not possibly have* established (as a theoretical matter) probable cause to search through and seize the non-email contents of the Archer Accounts. Rather, it is his contention that, because the government's probable cause case was based entirely on emails, it *simply did not* establish probable cause to search and seize the non-email contents of those accounts, which are plainly distinguishable from the email contents of those accounts.

Indeed, the court in *In re Google Warrant* did not analyze the probable cause supporting the search and seizure at issue there. Instead, it stated as follows:

> The application includes an affidavit from an agent of the Federal Bureau of Investigation that describes the Government's investigation and provides probable cause to believe that the target of the Government's investigation has been using the subject email account to engage in criminal activity. *The affidavit also provides probable cause to believe that emails <u>and other information in that account</u> will provide evidence of those criminal activities.* Because the investigation is ongoing and the warrant and application are sealed, this Memorandum Opinion will not provide any further information regarding the probable cause showing.

*Id.* at 388. If the Bieniek Affidavit had actually established probable cause to believe that any specific categories of non-email records in or associated with the Archer Accounts contained evidence of criminal activity, then the Warrants would not have been constitutionally overbroad as to those categories of records. The problem, however, is that, for all the reasons stated in Mr. Archer's moving papers, *see* Suppression Mem. at 40-44, and unlike in *In re Google Warrant*, the government plainly did not establish probable cause to believe that any non-email areas of the Archer Accounts contained any incriminating records or information.

The government also quotes the following passage from *In re Google Warrant*: "a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government." 33 F. Supp. 3d at 393. But the government's quotation of this passage – which the government says supports its seizure of non-email records from Mr. Archer – is entirely misleading. *In re Google Warrant* had to do with the *method* by which the government executes a search warrant – *i.e.*, that it need not demonstrate probable cause for every single record in order to search through them and that, instead, where there is probable cause to believe that there is evidence of specific criminal activity in an e-mail account, the government may search through all of the e-mails. So, for example, had the government established probable cause to believe that Mr. Archer used Google Drive to commit

crime or stored evidence of crime there, then the government could have looked through the entire Google Drive.  But *In re Google Warrant* decidedly does *not* stand for the proposition that when the government demonstrates probable cause to search one kind of record, it may search any kind of record.  and here, the government simply did not establish probable cause to believe that any non-email areas of the Archer Accounts contained any evidence of any crimes.

The government describes *Ulbricht* in a parenthetical as "denying [a] motion to suppress [the] fruits of Google, Facebook, and computer warrants and noting that '[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized.'"  *Id.* (third alteration in original) (quoting *Ulbricht*, 2014 WL 5090039, at *14). The government then states that, because the Bieniek Affidavit explained that Google and Apptix "maintain the non-email records for email subscriber accounts, . . . by allowing the Government to seize the non-email records associated with the [Targeted] Account[s], the Warrants simply allowed the Government to seize 'the entirety of the premises or object,' i.e., the entirety of the account[s] as maintained by" Google and Apptix.  *Id.* at 72 (capitalization removed; citation to Bieniek Affidavit omitted) (quoting *Ulbricht*, 2014 WL 5090039, at *14).

But *Ulbricht* is inapposite, as well.  As in *In re Google Warrant*, the *Ulbricht* court found "[t]hat probable cause support[ing] [the warrant for the defendant's Gmail account] was well and solidly established," 2014 WL 5090039, at *13, which, for the reasons stated above and in the Suppression Motion, simply was not the case here, particularly with regard to the non-email information in those accounts.  The warrants at issue in *Ulbricht* were also specific in ways that the Warrants here were not:

> Each of the warrants listed specific categories of items, including
> evidence of aliases, evidence concerning attempts to obtain fake
> identification, writings which can be used as stylistic comparisons

> for other "anonymous" writings, evidence concerning Ulbricht's
> travel patterns or movement, communications with co-conspirators
> regarding specified offenses, evidence concerning Bitcoin in
> connection with the specified offenses, and other evidence *relating
> to the specified offenses.*

*Id.* at *14 (emphasis added).  Here, the Warrants explicitly authorized the executing officers to

seize any "evidence of" and "communications constituting" violations of *any* statute, *see*

Suppression Mem. at 32-36, not merely any evidence of and communications constituting only

certain "specified offenses."  2014 WL 5090039, at *14.  Accordingly, neither of the two cases

cited by the government on this point support the proposition that the government can search

through and seize any portion of the non-email areas of the Archer Accounts based on a probable

cause showing comprised solely of references to emails from those accounts.

In some ways, though, *Ulbricht*'s analogy to physical "premises" is a helpful one.

Mr. Archer's e-mail box is a fundamentally different "premises" than, for example, his Google

Drive, his Picasa Web Album, his browser history, and the other categories of non-email records

that the government obtained through the Warrants.  The only thing that links those discrete

premises is an account with Google – essentially, Mr. Archer's name.  But no one would ever

claim that, for example, an individual's car is the same as her house is the same as her rental

property, just because they are all registered in the same name.  No one would even claim that an

individual's laptop is the same as her phone is the same as her office computer.  So too with the

Google and Apptix accounts.  Google in particular stores an incredible breadth of data in

different locations, and by the government's logic it could invade all of that information – far

more than any individual could store in her or her home[28] – based on a single e-mail. That goes

too far.

---

[28]     *See* "How Many Pages in a Gigabte?", LexisNexis, available at http://bit.ly/2sJt1mM
(providing that one gigabyte of data represents approximately 677,963 pages of text, or 15,477

The government also argues that the overbreadth of the Warrants should be excused because "probable cause was not even required for almost all of the non-email records [listed in] the Warrants." Gov. Mem. at 72 (capitalization removed). As a threshold matter, this argument is irrelevant. The fact that the government possibly could have obtained certain of the non-email information through alternative means (although not the information it actually wishes to use)[29] in no way cures the overbreadth of the Warrants. The government could have – and did, through its subpoena to Mr. Archer – obtain e-mail *content* information without a showing of probable cause. But where the government elects to seek, obtain, and execute a search warrant, as it did here, it must comply with the Fourth Amendment's requirements. *See Groh v. Ramirez*, 540 U.S. 551, 559-60 (2004) ("The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional. That rule is in keeping with the well-established principle that except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." (citations and internal quotation marks omitted)).

The government's argument that Mr. Archer had no expectation of privacy in the non-email records in his Google account because "Google disclosed to its users that it collected and monitored many of those records," is equally irrelevant. Gov. Mem. at 73. Indeed, Google collects and monitors its users' e-mail *contents* – as anyone who has ever gotten targeted advertisements or had Gmail suggest a response to an e-mail knows – but the government could

---

pages of images). Thus fifteen gigabytes of storage could store approximately 10,169,445 pages of text, or 232,155 pages of images.

[29]     *Compare* Gov. Mem. at 70 (stating that of the non-email records, only eleven hit on the government's undisclosed Responsiveness Search Terms, and of those, ten "were ultimately deemed responsive"), *with id.* at 88 (government's review of "over 200,000 records" produced under the Warrants "yielded approximately 8,700 records responsive to the Warrants").

not plausibly suggest that Mr. Archer lacks an expectation of privacy in his e-mail contents.[30]

Indeed, the government's argument has been squarely rejected by at least one court in this

District:

> In essence, the government argues that by consenting to have his
> emails and chats searched by AOL and Omegle – as DiTomasso
> arguably did when he agreed to their respective terms of use – he
> *also* consented to permitting the government to search.  Fourth
> Amendment privacy, however, is a context-sensitive question of
> societal norms.  In some domains, people expect information to
> stay shielded from law enforcement even as they knowingly
> disclose it to other parties.  As the Supreme Court has recognized,
> workplace desks and hotel rooms are two such domains. In the
> digital age, electronic communication is another.

*DiTomasso*, 56 F. Supp. 3d at 593 (emphasis in original).  Similarly, Google's terms of use, like

those of AOL and Omegle in *DiTomasso*, should not be read to consent to a government search.

Users of Google's services – who are reassured by Google that their data is safe and secure from

others, and are told of specific uses for which Google's *automated programs* will search their

data – would, in fact, be surprised to discover that the government can demand to search their

internet search history; the contents of "cookies," many of which keep track of their personal

information; their personal photos and videos, which can be of a very intimate and personal

nature; their browsing history; and, most surprising of all, any documents or other content that

Google hosts.

---

[30]    The version of Google's privacy policy in effect at the time of the warrants informed
users of the specific purposes for which Google used the information that it collected through
automated searching of user content.  *See, e.g.*, Google's Privacy Policy as of Aug. 29, 2016,
available at http://bit.ly/2Bq8VFq ("We use the information we collect from all of our services to
provide, maintain, protect and improve them, to develop new ones, and to protect Google and
our users.  We also use this information to offer you tailored content – like giving you more
relevant search results and ads.").  At the same time, this policy told users that Google would
"ask for [the user's] consent before using information for a purpose other than those that are set
out in this Privacy Policy."  *Id.*  None of the purposes that Google describes involve a human
accessing Mr. Archer's private communications or other personal information.

Simply put, the government's argument as stated in its opposition brief would vitiate the constitutional protections of the Fourth Amendment for all electronic data stored remotely. The Court need not conduct a survey of Google's users or society at large to demonstrate that reasonable expectations of privacy have not shrunk that far: Congress has made a contrary judgement, and manifested it in the statutory scheme under which the government obtained the very Warrants at issue here. Through that scheme, the Stored Communications Act, Congress recognized that the people are indeed still secure in their papers and effects, even if they are hosted remotely, and it regulates government searches of that content accordingly. The Court should hesitate to approve of an argument with such broad-reaching consequences.

### E.   The Severance Doctrine Cannot Save The Warrants From Their Fatal Overbreadth And Lack Of Particularity

In recognition of the fundamental defects in the Warrants, the government argues that the Court should rely on the severance doctrine to save them. But the severance doctrine does not work in the way the government urges. Indeed, its argument – utterly unsupported by any authority – that the Court can sever the "among other statutes" language from the Warrant to save its lack of particularity flies in the face of the Second Circuit's decision in *Galpin* and would render the particularity requirement a dead letter.

While the Warrants may be grammatically amenable to the kind of parsing the government would like to do here, the government's suggestion does not seriously engage with the problematic nature of the Warrants as they were authorized. Indeed, the government's attempt to excise the three words "among other statutes" from the Warrants underscores the degree to which the Warrants were fatally overbroad *as they were authorized by the magistrate*.

Under the Second Circuit's decision in *Galpin*, the undeniable breadth of those three words shows that the remaining language is actually an insignificant portion of the original

Warrants.  *Galpin* emphasizes that a "warrant's grammatical amenability to severance is not alone sufficient to justify enforcement of the remainder."  720 F.3d at 449.  *Galpin* further explains that "[t]his step of the analysis should not simply be a technical exercise of counting words and phrases but, rather, 'a holistic test that examines the qualitative as well as the quantitative aspects of the valid portions of the warrant relative to the invalid portions.'"  *Id.* at 449 (quoting *United States v. Sells*, 463 F.3d 1148, 1160 (10th Cir. 2006)); *cf. id.* at 450 ("Mere mention of the crime that prompted the investigation will not ensure that an authorization to search for evidence relating to that crime is more than an insignificant or tangential element of a warrant focused on evidence of other criminal activity.").  And it cannot be underscored enough: the warrant in *Galpin* was virtually identical – and identically problematic – to the Warrants here.

Applying severance in this case would manifest the threat that *Galpin*, among other cases from the Second Circuit and beyond, specifically warn against.  Due to the nature of electronic files, "[o]nce the government has obtained authorization to search" a repository of electronic information, "the government may claim that the contents of every file it chose to open were in plain view," and thus there is "'a serious risk that every warrant for electronic information will become, in effect a general warrant, rendering the Fourth Amendment irrelevant.'"  *Id.* at 447 (quoting *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam)).  "This threat demands a heightened sensitivity to the particularity requirement in the context of digital searches."  *Id.*

Tellingly, the government does not identify any case in the Second Circuit approving of severance in the context of a warrant to search electronic media.  *Galpin*, the case the government claims "adopted" the severance doctrine, actually *vacated* the district court's decision to apply severance to an otherwise invalid warrant, and remanded for further

61

consideration.  And *United States v. George*, decided in 1992, did not deal with a search or seizure of electronic media.  *See* 975 F. 2d 72 (2d Cir. 1992).

Indeed, as mentioned above, many cases in this Circuit expressly caution against validating an overbroad warrant targeting electronic media through severance.  In *United States v. Wey*, Judge Nathan noted that warrants targeting electronically stored information "implicate[] at least two additional considerations."  256 F. Supp. 3d 355, 382-83 (S.D.N.Y. 2017).

> First, as the Second Circuit has recognized, "[w]here . . . the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance."  That is because the "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure."  As such, "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous" – a "threat [that] is compounded by the nature of digital storage."

*Id.* at 383 (alterations and omission in original; some internal quotation marks omitted; quoting *Galpin*, 720 F.3d at 446; *United States v. Ganias*, 720 F.3d 199, 217 (2d Cir. 2016) (en banc)); *see also United States v. Zemlyansky*, 945 F. Supp. 2d 438, 459 (S.D.N.Y. 2013) ("The broad, undefined, and ambiguous terms of this search warrant render it, for all practical purposes, a prohibited general warrant to search Tri-State for evidence of a crime."); *id.* at 458 n.5 ("The Second Circuit has unequivocally rejected the argument that the particularity requirement should be relaxed when dealing with electronic information.  Indeed, the Second Circuit has stated that the particularity requirement is 'much more important' when a warrant allows for the search of electronics.'" (quoting *United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010)).[31]

---

[31]     The only decision that appears to approve of severance in a case involving electronic searches, *United States v. Vilar*, did so in the context of a warrant that did not primarily target electronic media.  *See* No. S305-cr-621 (KMK), 2007 WL 1075041, at *7 (S.D.N.Y. Apr. 4, 2007) (noting that one out of eighteen paragraphs authorized the seizure of electronic material).

Nothing could constitute a greater relaxation of the particularity requirement than allowing the government to sever language in order to retroactively convert a general warrant into one that otherwise appears to satisfy the particularity and overbreadth requirements of the Fourth Amendment.

Along the same lines, in *United States v. Cioffi*, the district court noted "one form of particularity whose absence the Second Circuit has unequivocally and unqualifiedly condemned" in warrants authorizing searches of electronic media: "[A]uthorization to search for 'evidence of *a* crime,' that is to say, any crime, is so broad as to constitute a general warrant." 668 F. Supp. 2d 385, 392 (E.D.N.Y. 2009) (quoting *George*, 975 F.2d at 76) (emphasis in original). As *Cioffi* notes, "*George* represents not simply a majority view, but the unanimous view of courts across the nation." *Id.* This kind of infirmity simply cannot be cured by severance, as a matter of law.

F.     **Several Material Facts Were Deliberately Omitted, Or Were Omitted With Reckless Disregard For The Truth, From The Bieniek Affidavit**

The Court should suppress the fruits of the Warrants because they are defective on their face, and were never supported by probable cause. But these problems were compounded by the critical information that the government intentionally, or at least recklessly, omitted from the warrant affidavit.

---

In *Vilar*, the court found the warrant to be overbroad, and rejected the government's arguments that its search was validated by the "all-records" or good faith exceptions. *See id.* at *21, *23-24. The court did, however, find severance to be appropriate. *Id.* at *31-32 ("The Warrant is organized into eighteen well-delineated paragraphs, thereby simplifying the task of redaction. Many of these paragraphs, or substantial portions thereof, are both sufficiently particularized and firmly rooted in probable cause.") (citations omitted). Unlike in *Vilar*, "the lack of particularity pervades the entire[ty]" of the Warrants at issue here; "there is, therefore, no valid portion under which [the fruits of the Warrants] could have been seized." *Cioffi*, 668 F. Supp. 2d at 396 n.8; *see also United States v. Cardwell*, 680 F.2d 75, 79 (9th Cir. 1982) ("[W]e do not have the information necessary to salvage any portion of the search. Therefore, all the materials seized under the defective warrant should be suppressed.") (citation omitted).

The government claims that there were no material omissions.  But the uncontroverted fact is that Special Agent Bieniek failed to disclose the extent of the SEC's parallel investigation, failed to disclose that Mr. Archer had produced thousands of records from the Targeted Accounts in response to SEC and grand jury subpoenas, and failed to disclose Jason Galanis's arrest on separate charged in September 2015.  None of this can be disputed.  Instead, the government claims that these omissions were not material to the magistrate judge's decision to issue the Warrants.  That argument should be rejected.

"[T]he preliminary issue to be resolved is whether" a defendant can show that the law enforcement official swearing out a search warrant affidavit "knew or had reason to know the 'facts' he [or she] omitted from the search warrant affidavit."  *United States v. Harding*, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003).  The government ignores this threshold issue, but cannot deny "that Special Agent Bieniek was well aware of the omitted facts when she swore out her affidavit," as she "was personally involved in the underlying investigation" in this case and "was fully familiar with the charges in the Gerova case."  Suppression Mem. at 49.  Mr. Archer has therefore unquestionably satisfied this preliminary requirement.

Mr. Archer can also establish that the omissions were material.  "Though an officer need not volunteer every fact that arguably cuts against the existence of probable cause, the officer may not omit circumstances that are critical to the evaluation of probable cause."  *Brown v. D'Amico*, 35 F.3d 97, 99 (2d Cir. 1994).  This is exactly what Special Agent Bieniek did.

As set forth above, the probable cause that purportedly supported the Warrants was razor-thin and hopelessly stale.  The government's only rejoinder is to argue that, as a generic matter, e-mail communications tend to stay around for long periods of time.  On the basis of this proposition, the government asks the Court to find, for example, that a single e-mail on which

the Archer Google account was cc'd more than two years prior to the issuance of the Warrant could supply *fresh* probable cause.

The Court should reject this argument on its own terms, but if not, then the omitted information is absolutely essential.  Had the magistrate judge known that the SEC had conducted an extensive investigation pursuant to which the government had received millions of documents and that Mr. Archer himself had produced thousands of e-mails to the government, and the government still could not find any more recent examples of purportedly incriminating e-mails, she would not have issued the Warrants.  Likewise, had the magistrate judge known that in the many intervening months between the transmission of the e-mails purportedly establishing probable cause and the issuance of the Warrants, Jason Galanis – the prime mover of the fraud – had been arrested on other charges, she would not have issued the Warrants.  All of these facts call into question the general presumption that the government relies upon, *i.e.*, that e-mails stay around for a long time, so there was reason to believe that other relevant communications would be uncovered.

As explained in Mr. Archer's moving papers, the government based its indictment of Mr. Archer on the slenderest of reeds in terms of documentary evidence of his involvement in the alleged conspiracy to commit securities fraud.  The Bieniek Affidavit relied on only a handful of e-mails to support the notion that there was probable cause to search the Archer Accounts, and the Indictment relied on only a handful of e-mails (mostly the same ones) to support the notion that there was probable cause to believe that Mr. Archer committed and conspired to commit securities fraud.  The cited e-mails involving Mr. Archer, Jason Galanis, and/or Mr. Cooney, in particular – which form the crux of the government's allegations against Mr. Archer – involve e-mails from Jason Galanis and Mr. Cooney which were merely received by Mr. Archer, and to which he is not alleged to have responded (save for one in which

65

Mr. Archer merely replied with the vague statement that "[t]his is very encouraging"), and are misleadingly framed as Jason Galanis keeping Mr. Archer "apprised" of the alleged scheme. *See*, *e.g.*, Bieniek Affidavit ¶¶ 14(a)-(c), 15(a)-(b), 19(a); Indictment ¶¶ 11(a)-(c), 19.

Had Special Agent Bieniek informed the issuing magistrate judge of the breadth and extent of the SEC investigation – including, but not at all limited to, Mr. Archer's substantial document productions to both the SEC and the government well prior to the issuance of the Warrants – it would have revealed to the magistrate judge that fresh probable cause to search the Archer Accounts did not exist. The inclusion of this information would have shown that the misleadingly cherry-picked e-mails cited in both the Indictment and the Bieniek Affidavit were not merely the tip of some iceberg of criminal communications for which the Warrants were needed to reveal what was below the surface of the water, but were actually the paltry best evidence that the government could come up with of such communications after reviewing literally *millions* of documents, including more than 30,000 pages of documents from Mr. Archer, which he had already turned over. The inclusion of this information would have thus "eviscerated the idea that the Archer Accounts would contain any other relevant evidence" beyond that which he had already produced – let alone that such evidence would still be present there in December 2016. Suppression Mem. at 47.[32]

---

[32] Notably, while the government points out that the Bieniek Affidavit states that Special Agent Bieniek reviewed e-mails from the Targeted Accounts, *see* Gov. Mem. at 80, the government fails to mention that the Bieniek Affidavit does not provide any indication as to the provenance of those e-mails, let alone state that Mr. Archer actually produced them to the government and/or the SEC. The government also does not deny that "[o]ther than one passing reference to conversations with SEC staff attorneys about their review of certain records, the Bieniek Affidavit does not disclose the substantial, nearly year-and-a-half-long SEC investigation that preceded the submission of the warrant application." Suppression Mem. at 45 (quotation and alteration omitted).

The government also dismisses the significance of Jason Galanis's September 2015 arrest on unrelated charges, noting that Mr. Archer himself had been arrested prior to the issuance of

Accordingly, Special Agent Bieniek's decision to keep all of the omitted information from the issuing magistrate judge gave her a woefully incomplete and entirely misleading portrait of the investigation that had been done in advance of the submission of the government's warrant application, and inappropriately papered over the staleness of the evidence on which the government's purported probable cause showing was based.  Mr. Archer has therefore made a substantial preliminary showing that the several important facts that Special Agent Bieniek omitted from her affidavit were deliberately omitted, or were omitted with reckless disregard for the truth, and he is thus entitled to a *Franks* hearing on this issue.

G.     **The Good Faith Exception Does Not Apply**

The government may not rely on the good faith exception to justify its search.  Contrary to the government's argument, this case fits into well-recognized categories for which the good faith exception does not apply.  In addition, Mr. Archer's extensive pre-execution litigation, and the government's recognition that it proceeded at its own risk – when it could easily have cured many, if not all, of the problems with the Warrants in advance – make the good faith exception inapplicable.

As the government observes, it is well-settled that the good faith exception does not apply where "(1) the issuing judge was knowingly misled; (2) the issuing judge wholly abandoned [her] judicial role; (3) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant is so facially deficient that reliance upon

---

the Warrants.  It is certainly true that the government obtained the Warrants post-indictment. But there is a substantial difference between the significance of Jason Galanis's prior arrest on unrelated charges, and the arrest of the defendants in this case.  After being arrested in this case, Mr. Archer ran the risk of being accused of the destruction of evidence or obstruction of justice if he deleted communications with Jason Galanis.  Indeed, Mr. Archer had been subpoenaed by the SEC and the U.S. Attorney's Office months before he was arrested.

it is unreasonable."  Gov. Mem. at 83 (citing *United States v. Falso*, 544 F.3d 110, 125 (2d Cir.

2008)).  This case fits into at least three of those categories.

*First*, the good faith exception does not apply where the magistrate was misled by the

government.  Here, material facts relating to (1) the pre-December 2016 investigation performed

by both the SEC and the government, (2) Mr. Archer's production of tens of thousands of pages

of documents to the SEC and the government, and (3) Jason Galanis's 2015 arrest in the Gerova

case were deliberately omitted, or were omitted with reckless disregard for the truth, from the

Bieniek Affidavit.  *See* Suppression Mem. at 45-54; *see also United States v. Leon*, 468 U.S.

897, 923 (1984) ("Suppression . . . remains an appropriate remedy if the magistrate or judge in

issuing a warrant was misled by information in an affidavit that the affiant knew was false or

would have known was false except for his reckless disregard of the truth.").

*Second*, the Bieniek Affidavit so lacked probable cause that reliance upon it was

unreasonable given (1) the staleness of all of the e-mails on which the government's overall

probable cause case was based, (2) the dearth of information that the affidavit provided with

regard to the Archer Google Account, and (3) the affidavit's failure to supply probable cause to

search numerous categories of non-email materials.  *See* Suppression Mem. at 36-44; *see also*

*United States v. Raymonda*, 780 F.3d 105, 118 (2d. Cir. 2015) ("the good faith exception cannot

shield . . . an officer . . . where the application is so lacking in indicia of probable cause as to

render reliance upon it unreasonable" (internal quotation marks omitted)).

*Third*, the Warrants were so facially deficient that reliance upon them was unreasonable

insofar as they explicitly authorized the executing officers to seize any "evidence of" violations

of *any statute* and any "communications constituting" violations of *any statute*.  *See* Suppression

Mem. at 32-36; *see also Raymonda*, 780 F.3d at 118 ("To claim the benefits of the good faith

exception, however, the officer's reliance on the duly issued warrant 'must be objectively reasonable.'" (quoting *Leon*, 468 U.S. at 922)).

Mr. Archer also set forth two additional reasons why the good faith exception is not available to the government in this case: (1) because the government "affirmatively waived any reliance on the good faith exception . . . [i]n volunteering that 'the risk is on the government' when Mr. Archer tried to challenge the Warrants *before* they were executed," and (2) because, even if the government had not waived its ability to rely on the good faith exception, the exception would still "be inapplicable here because Mr. Archer put the government on explicit notice of the many problems with the Warrants and Bieniek Affidavit before it executed" the Warrants.  Suppression Mem. at 67-68 (citations to hearing transcript omitted; emphasis in original).

The government's opposition brief only addresses the affirmative waiver argument, claiming that it proceeded at its own risk only with respect to privilege issues.  *See* Gov. Mem. at 85 n.23.  A review of the government's arguments, including the hearing transcript before the Court, reveals that not to be the case.  Indeed, the main issue being addressed at the hearing was Messrs. Archer and Cooney's request for "an order directing Google [to] hold[] off on producing the data" pending a pre-execution challenge to the Warrants.  Schwartz Moving Decl. Ex. 9 a. at 2:8-10, 2:24-3:3.  The privilege issue raised by Mr. Archer was merely one example of the many different grounds on which he would have been able to challenge the Warrants if the Court had granted him the relief he was seeking – indeed, it was the best example that he could bring to bear at the conference because the government had, up to that point, refused to provide him with unredacted copies of the Google Warrant, had only informed him the night before the conference of the existence of the Apptix Warrant, and had not at that point provided any version of the Bieniek Affidavit.  For the government to now claim that its "risk" statement concerned only the

69

privilege issue and not the broader relief being requested by Mr. Archer is a disingenuous

rewriting of history, and is not supported by the conference transcript. *See generally* Schwartz

Moving Decl. Ex. 9.

 The government has repeatedly argued that a pre-enforcement challenge to the Warrants

was premature because Mr. Archer could litigate the same questions afterwards, and that the

government wished to proceed in the face of Mr. Archer's numerous arguments about the

sufficiency of the Warrants.  This is waiver.  Indeed, even if the government's waiver was not

express (it was), it was certainly implied.  The government could easily have cured most of the

problems identified by Mr. Archer had it done so beforehand, but it chose not to.  In doing so,

the government disclaimed reliance on the good faith doctrine.

 The Court's own statements confirm as much, namely that the Court clearly did not

construe the government's statement as being limited to the privilege review issue alone:

> Mr. Archer and Mr. Cooney are essentially asking me to set a
> precedent for staying the execution of all warrants of this nature, to
> allow a potential pre-execution motion, a proposition for which
> they offer no authority in this circuit and which I'm not prepared to
> adopt today. The magistrate judge has deemed these warrants to be
> proper, and *Mr. Archer and Mr. Cooney will have ample
> opportunity to challenge <u>the validity of the warrants</u> and the
> manner in which the government conducts its search*.  As [the
> government] noted, *the risk is on the government.*  I am not willing
> at this time to take the novel step of blocking the execution of
> these warrants.

*Id.* at 18:13-24 (emphases added).

 Moreover, even if the government did not waive reliance on the good faith doctrine, it is

inapplicable on these facts.  The purpose of the good faith doctrine is to ensure that the

government is not penalized for relying upon a warrant that is later found to be invalid, because

it is entitled to rely on the magistrate's decision to grant the warrant.  *See United States v. Leon*,

468 U.S. 897, 920-21 (1984) (noting that "when an officer with objective good faith has obtained

a search warrant from a judge or magistrate and acted within its scope" then "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of the Fourth Amendment violations").  But when the government is expressly put on notice of the problems with a warrant, the rationale for the good faith exception falls away. Indeed, the rule urged by the government would have the decidedly perverse effect of "cleansing" a defective warrant – which the government knows to be defective prior to its execution – via the magistrate judge's signature.  This turns the good faith doctrine on its head, and incentivizes bad behavior by law enforcement officials, rather than serving its proper purpose, which is to insulate law enforcement from smaller defects that evade both their own and the magistrate judge's detection.

### H.      The Warrants Were Executed In An Unconstitutional Manner

Finally, even if the Warrants were not facially invalid, lacking in probable cause, overbroad, unparticularized, and based on misleading information, their fruits would still be subject to suppression because of the way that the government executed them.

As an initial matter, the government acknowledges that its July 2017 production comprised approximately 186,000 records obtained pursuant to the Warrants that did not hit on any of its "Privilege Search Terms," only approximately 8,700 of which "were in fact responsive to the Warrants," meaning that the government not only seized, but also produced to all defense counsel in this case, approximately 170,000 admittedly non-responsive documents, Gov. Mem. at 53-54, including "approximately 70,000 documents that it had explicitly determined" prior to making the production "to be non-responsive to the Warrants," Suppression Mem. at 62.  Thus, Mr. Archer is clearly able to meet the first prong of the "flagrant disregard" test, as the government plainly "'effect[ed] a widespread seizure of items that were not within the scope of'" the Warrants.  Gov. Mem. at 86 (quoting *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000)).

All that is left is for Mr. Archer to obtain "wholesale suppression" of the fruits of the Warrants is to establish that the government did "not act in good faith" in doing so. *Id.* (quoting *Liu*, 239 F.3d at 140). Mr. Archer is easily able to make such a showing here – and at the very least to receive a hearing on this issue – for all the reasons stated in his Suppression Motion. *See* Suppression Mem. at 54-66. All of the government's arguments to the contrary are unavailing.

*First*, the government contends that it "took multiple steps to respect and protect the attorney-client privilege," including "seeking input from defense counsel as to what search terms it would use to segregate potentially privileged documents." Gov. Mem. at 87. But the government's claim that it "attempted to diligently protect potentially-privileged information" by consulting with defense counsel is laughable. *Id.* at 92. As Mr. Archer has explained:

> the government rejected dozens of the search terms proposed by Mr. Archer without any substantive discussion, agreeing only to run the proper names of individual lawyers and law firms identified by Mr. Archer. As a result, the government did not segregate for privilege review documents marked "Attorney Client Privileged," "Attorney Work Product," or the like – markings that typically designate potentially privileged communications, and which lawyers and their clients include precisely because they are so easily picked up on automated review.

Suppression Mem. at 60-61.[33] And while the government now states in its opposition brief that "more than 109,000 [records] – almost half of the total number of records produced by the service providers in response to the [Warrants] – hit on at least one of" Mr. Archer's proposed privilege search terms, Gov. Mem. at 51 n.10, the government never actually told Mr. Archer as

---

[33]      To be clear, the government has still never shared either its privilege or responsiveness search terms with Mr. Archer or the Court. The Court therefore has no evidence on which to credit the government's assertion of how it conducted its search. The only thing the Court can have confidence in is that the government did not use the search terms suggested by Mr. Archer for privilege, and that it produced to all defense counsel numerous privileged documents – meaning that those documents evaded its privilege search terms. Schwartz Moving Decl. ¶¶ 29-30. At the very least, Mr. Archer is entitled to a hearing on the manner in which the government conducted its review and the resulting taint.

much.  Instead, Mr. Archer learned it for the first time upon reading the government's opposition

brief.  Had the government actually done as good faith would have demanded and engaged in a

substantive discussion with Mr. Archer about his proposed privilege search terms, the parties

could have worked together to scale back his initial list of privilege search terms to a set of terms

that struck an appropriate balance between adequately protecting his privileged communications

and avoiding unnecessarily burdening the government in conducting its privilege review.

Instead, however, the government rejected all of the search terms that Mr. Archer provided, save

for some unknown version of the proper names of individual lawyers and law firms, without so

much as a word.  In so doing, the government all but assured that Mr. Archer's privileged

communications would be invaded.

     *Second*, the government contends that its use of a "filter team" was "an appropriate way

to protect the attorney-client privilege."  Gov. Mem. at 87-88.  For the reasons stated in

Mr. Archer's moving papers, however, "filter teams" present "inevitable, and reasonably

foreseeable, risks" that could have easily been avoided here by using the alternative privilege

review protocol suggested by Mr. Archer, or that could have at least been minimized had the

government taken any of the lesser measures that Mr. Archer suggested for conducting its

privilege review.  *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006); *see also*

Suppression Mem. at 17-20, 57-59.  Accordingly, "because the government's privilege review

procedure is premised on trusting the government to screen itself from information that it will

naturally desire to see," Mr. Archer finds himself "at the mercy of a situation in which 'the

government's fox is left in charge of [his] henhouse, and will inevitably 'err by neglect or

malice, as well as by honest differences of opinion,' thereby vitiating his attorney client

privilege."  Suppression Mem. at 58-59 (quoting *In re Grand Jury Subpoenas*, 454 F.3d at 523).

The government's use of a "filter team" is thus not at all indicative of anything resembling good faith.

      *Third*, and relatedly, the government claims that its privilege review protocol and approach to the crime-fraud exception avoids the problems – which the government appears to accept as legitimate – outlined in *United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015). Specifically, the government claims that because the trial team, rather than the filter team, moved to apply the crime-fraud exception, there is no problem. *See* Gov. Mem. at 88. This misstates the government's approach; in fact, its approach here is substantially worse than in *Levin*. In *Levin*, Judge Forrest appropriately criticized the practice of having the filter team seek to apply the crime-fraud doctrine, because the filter team should be protecting the privilege rather than seeking to invade it, and because any motion to apply the crime-fraud doctrine must be made by someone who has not already seen the contents of the privileged communications at issue. *Levin*, 2015 WL 5838579, at *2. Here, however, while the trial team ostensibly moved to apply the crime-fraud exception, the relief it asked for was to allow the filter team to unilaterally determine that a document falls within the exception (limited only by broad categories of relevance) and then to be permitted to release any such documents to the trial team, all without any court supervision. This approach, as outlined further in Mr. Archer's response to the government's motion to invoke the exception, is simply not permissible, and underscores the government's total disregard for his privilege.

      *Fourth*, the government contends that it did not convert the Warrants into general warrants in executing them because Google and Apptix "produced over 200,000 records to the Government[,] the Government's initial set of responsiveness search terms resulted in 12,000 'hits,' and the Government's subsequent review of those documents yielded approximately 8,700 records responsive to the Warrants." Gov. Mem. at 88. But the

government's generalized recitation of its culling of these materials for responsiveness conveniently omits the fact that it produced approximately 170,000 non-responsive documents to all defense counsel in this case prior to the completion of its so-called "responsiveness review," including many of Mr. Archer's privileged, personal, private, and confidential communications, which is itself indicative of the government's bad faith here.

*Fifth*, the government contends that Mr. Archer's "complaints about the July 2017 Production are a red herring."  Gov. Mem. at 89.  As an initial matter, the government states that it "gave all counsel the opportunity to object to this procedure" and "[n]o one did," with Mr. Archer only "cry[ing] foul . . . after the Government produced the materials."  *Id.*  As Mr. Archer has previously informed the Court, however, the government did not "tell defense counsel that it intended to ignore the restrictions placed upon it by the Warrant[s]" and produce non-responsive, irrelevant, privileged, personal, and confidential materials to all defense counsel in this case.  [ECF No. 191, at 3 n.5].  Instead, the June 19, 2017 e-mail to which the government's opposition brief refers

> discussed the ongoing privilege review by a "wall team" and stated that it intended to produce "all of the emails (other than those being reviewed for privilege) to all defendants now [and would] make a supplemental production of any emails that are ultimately determined not to be privileged at the completion of the privilege review."  Read in context, defense counsel understood the government to be proposing to make a staged production of responsive e-mails: first the ones that were not segregated for review, and later additional e-mails that were determined not to be privileged.  Certainly nothing in the government's June 19 e-mail "explicitly" informed counsel that the government intended to flaunt the Warrant[s].  And the only other subsequent communication on the topic was on July 12, when the government informed counsel that it had just received "the SW results" and was going to begin loading them on hard drives for production. The government's reference to "SW results" enforced the commonsense notion that the government would only be seizing and producing that which they were authorized by the Warrant[s] to seize, *i.e.*, the "SW results."

*Id.*  Thus, while "the entire idea behind" the July 2017 production might well have been "to allow the defendants access to the materials while the Government performed such a review," that "idea" was never communicated to Mr. Archer.  Gov. Mem. at 89.  Accordingly, the reason why Mr. Archer did not "object and instead ask that the Government wait and produce only responsive data" was because he reasonably understood that the July 2017 production would, in fact, be comprised of "only responsive data." *Id.*  Under these circumstances, particularly given that the government had been put on notice that Mr. Archer believed (correctly, as it would turn out) that the government's privilege search terms would not capture all of the privileged communications in the Archer Accounts, it simply cannot be said that the government made the July 2017 production in good faith.

The government also claims that any harm to Mr. Archer from the release of his privileged, personal, private, and confidential communications to all of his co-defendants "was cured when the Court ordered the other defendants to return or destroy the July 2017 Production and ordered the Government to replace the production with a new production consisting solely of materials responsive to" the Warrants because, "given the incredibly short time period between the production of these emails and the Court's order that the production be returned, as well as the time necessary to load email productions for review, it is virtually certain that no counsel reviewed any emails produced pursuant to the July 2017 Production prior to their destruction." Gov. Mem. at 89-90 & n.24 (quotations omitted).  This, of course, is wrong, as the contents of the production were viewable without need of loading them onto a document review platform, as evidenced by counsel for Mr. Archer's "manual review shortly after receipt of . . . the first 2,000 pages of [the] over 500,000 pages of material produced by the government," which is what allowed counsel "to determine that the government had made absolutely no effort to adhere to the restrictions in the Warrants," and had instead "seized and produced to co-counsel – without

even a protective order to shield private information – thousands upon thousands of pages of

irrelevant, privileged, personal, and business confidential information."  Suppression Mem. at 21

(quotation omitted).

      The government also claims that Mr. Archer failed to make a sufficient showing that his

privileged communications were invaded by the government's July 2017 production.  Gov.

Mem. at 90.  But that is wrong, too.  Contrary to the government's arguments, Mr. Archer did

not provide only "counsel's conclusory statements regarding the privileged nature of these

communications."  Gov. Mem. at 91.  Instead, Mr. Archer's counsel – based on personal

knowledge gained from reviewing the July 2017 production – provided *evidence* that numerous

personal and privileged communications were produced, including communications between

Mr. Archer and his wife and, importantly, communications between Mr. Archer and his former

lawyers *in this investigation* concerning the government's subpoenas and how to respond thereto.

Suppression Mem. at 22, 24-26.  The government's contention that Mr. Archer must provide

specific dates for those communications is unsupported by any case law, and its contention that

Mr. Archer needed to show that those communications would have hit on its "Responsiveness

Search Terms" is particularly galling, given that the government has consistently refused to

identify those terms.  Mr. Archer has made a more than sufficient showing that privileged

communications evaded the government's privilege review, including communications that are

directly relevant to this case, such as e-mails about the government's investigation of this case.

That is more than enough to warrant a hearing.[34]

---

[34]      In the event that the Court wishes Mr. Archer to provide additional details about these
privileged communications *ex parte*, Mr. Archer is certainly willing to do so and should be given
an opportunity to do so given the absence of any authority requiring Mr. Archer to provide the
level of specificity requested by the government.

The government also argues that its production of these materials to all defense counsel in this case does not warrant suppression of the full fruits of the Warrants because "wholesale suppression is generally not a remedy for violation of the attorney-client privilege." Gov. Mem. at 91. But Mr. Archer's request for wholesale suppression is not based merely on the government's "violation of the attorney-client privilege," *id.*; rather, it is based on the government's egregious bad faith in violating his attorney-client privilege by not only seizing and retaining, but also producing to all of Mr. Archer's co-defendants, approximately 70,000 documents that it had already by that point explicitly determined to be non-responsive to the Warrants. *See generally* Suppression Mem. at 62-66.

The government attempts to distinguish the main case on which Mr. Archer relies for this point – *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) – on the basis that its July 2017 production "was based on the mistaken belief that the defendants had consented to such a production, and the production was clawed back within days," Gov. Mem. at 90 n.25, but for the reasons stated above, this excuse simply does not hold water, particularly given that Mr. Archer had put the government on notice of the fact that the government's privilege search terms would not capture all of the privileged communications in the Archer Accounts.[35]

Accordingly, Mr. Archer is able to establish both that the government effected a widespread seizure of items outside the scope of the Warrants and that it did not act in good faith, thereby entitling him to blanket suppression of the fruits of the Warrants under the "flagrant disregard" standard.  In the alternative, and at a minimum, Mr. Archer is entitled to a hearing on this point given the government's repeated refusals to explain the manner in which it executed the Warrants.

---

[35]     Additionally, the government did not act in good faith, thereby fulfilling the second prong of the "flagrant disregard" test, for all the same reasons that the good faith exception does not apply here. *See* Suppression Mem. at 66-68; *see also supra* at Point VII.G.

*       *       *

The Court should suppress any evidence obtained pursuant to the Warrants, directly or indirectly, and should order a hearing to determine the extent to which the government's subsequent evidence and investigation has been tainted by the search and seizure.  Alternatively, the Court should conduct an evidentiary hearing on, among other things, the government's review protocols, as well as the misleading statements and omissions in the Bieniek Affidavit.

Dated:     February 12, 2018
           New York, New York

                                         Respectfully submitted,

                                         /s/ Matthew L. Schwartz
                                         Matthew L. Schwartz
                                         BOIES SCHILLER FLEXNER LLP
                                         575 Lexington Avenue, 7th Floor
                                         New York, New York 10022
                                         Tel.: (212) 446-2300
                                         Fax: (212) 446-2350
                                         mlschwartz@bsfllp.com

                                         *Attorneys for Devon Archer*