# SHER TREMONTE LLP

March 23, 2018

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

**Re:  *United States v. Galanis et al.*, 16-cr-371 (RA)**

Dear Judge Abrams:

We write on behalf of our client, Gary Hirst, pursuant to the Court's March 6, 2018 order directing the parties to set forth their arguments regarding the admissibility *vel non* of evidence included in the government's March 12, 2018 Rule 404(b) notice.  In that notice, the government also argued that the proffered evidence is not a basis for granting severance.  For the reasons that follow, the Court should deny the government's motion to admit evidence relating to (1) the Gerova arrests and convictions; and (2) Code Rebel.  In addition, the Court should grant Mr. Hirst's motion for severance.

## I.     Applicable Law

For evidence of uncharged criminal activity to be admitted as direct evidence, the government must prove that the uncharged criminal activity (1) "arose out of the same transaction or series of transactions as the charged offense," (2) "is inextricably intertwined with the evidence regarding the charged offense," or (3) "is necessary to complete the story of the crime on trial."  *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997).  Only under these limited circumstances may uncharged criminal activity be "appropriately treated as part of the very act charged, or at least, proof of that act." *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (internal quotation marks omitted).  The *Gonzalez* criteria are *not* met, however, when evidence involves a "discrete offense . . . not undertaken to conceal or further the charged conduct," that is "remote to the charged conduct in both time and place and is thus not essential to completing the story," or the "charged and uncharged conduct [were] not a single continuous offense."  *United States v. Kassir*, No. 04-cr-356 (JFK), 2009 WL 976821, at *3 (S.D.N.Y. Apr. 9, 2009).

"Where it is not *manifestly clear* that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)."  *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) (emphasis added); *see United States*

Hon. Ronnie Abrams
March 23, 2018
Page 2 of 12

*v. Levy,* 731 F.2d 997, 1001-04 (2d Cir. 1984) (trial court erred in admitting evidence of an uncharged sale of heroin by defendant, which occurred six hours prior to the charged sale, as intrinsic evidence without first conducting 404(b) analysis); *Kassir,* 2009 WL 976821, at *2 ("to avoid Rule 404(b) analysis, evidence of uncharged criminal activity must do more than provide context or be relevant").  Under the Second Circuit's approach to other acts evidence, "other acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity."  *United States v. Ortiz,* 857 F.2d 900, 903 (2d Cir. 1988); *see also United States v. Edwards,* 342 F.3d 168, 176 (2d Cir. 2003).  This approach is not intended to afford the prosecution "carte blanche" to introduce "any prior act of the defendant in the same category of crime."  *United States v. Garcia,* 291 F.3d 127, 137 (2d Cir. 2002); *see also United States v. Scott,* 677 F.3d 72, 78 (2d Cir. 2012).

Even if evidence is admissible as either direct evidence or pursuant to Rule 404(b), it is nonetheless excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  In other words, other acts evidence that is relevant and purportedly offered for a proper purpose should still be excluded if "the practical effect of admitting such evidence will prompt the jury to 'generaliz[e] [the defendant's] earlier bad act into bad character and tak[e] that as raising the odds that he did the later bad act now charged.'"  *United States v. Mundle,* No. 15-cr-315 (NSR), 2016 WL 1071035, at *5 (S.D.N.Y. Mar. 17, 2016) (quoting *Old Chief v. United States,* 519 U.S. 172, 182-83 (1997)) (alterations in original).  In securities fraud cases, courts in this circuit have excluded other acts evidence under Rule 403 when the introduction of such evidence would, in effect, result in a "mini trial" relating to the prior acts, would result in undue delay, and would be likely to confuse and mislead the jury.  *See United States v. Levy,* No. 11-cr-62 (PAC), 2013 WL 655251, at *1 (S.D.N.Y. Feb. 22, 2013); *United States v. Daugerdas,* No. 09-cr-584 (WHP), 2011 WL 573587, at *1-2 (S.D.N.Y. Feb. 16, 2011) (government's 404(b) evidence excluded where it was likely to "spawn a mini-trial").

## II.    The Gerova Arrests and Convictions Are Not Admissible Either as Direct Evidence or Pursuant to Rule 404(b)

The government intends to introduce "evidence that defendants Gary Hirst, Jason Galanis, and John Galanis were arrested in [the Gerova case] on or about September 24 and 25, 2015 . . . and subsequently convicted [in that case]."  Gov't Letter at 2.  The government advances two theories in seeking to admit this evidence.  First, the government contends that the Gerova arrests and convictions are "direct evidence of the present crime because [they] demonstrate[] the preexisting relationship between the defendants and will aid the jury's understanding of how the present transaction came about."  *Id.* at 7.  Second, the government argues that this evidence is admissible under Rule 404(b) because, since Mr. Hirst and John Galanis intend to argue that they were duped by Jason Galanis, the fact of the Gerova scheme undercuts this argument by demonstrating knowledge and intent.  *Id.* at 8.  Both of these theories are unavailing.

Hon. Ronnie Abrams
March 23, 2018
Page 3 of 12

A.   The Gerova Arrests and Convictions Are Not Direct Evidence

First, the government inaccurately represents the law on what constitutes direct evidence in conspiracy cases.  The very case the government cites in support of admitting the Gerova arrests and convictions as direct evidence, *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990), affirmed the introduction of prior acts evidence *under Rule 404(b)*, not as direct evidence.  Contrary to the government's argument, as noted above, direct evidence (in conspiracy cases or otherwise) must either (1) "ar[i]se out of the same transaction or series of transactions as the charged offense," (2) be "inextricably intertwined with the evidence regarding the charged offense," or (3) be "necessary to complete the story of the crime on trial."  *Gonzalez*, 110 F.3d at 942.  The Gerova evidence does not fall into any of those categories.  It relates to an entirely separate scheme conducted years before the charged conduct in this case.  *See United States v. Kahale*, 789 F. Supp. 2d 359, 384-85 (E.D.N.Y. 2009) (holding that uncharged prior acts that occurred "years before" the actions giving rise to the charged conduct were not direct evidence).  The charged scheme and the Gerova scheme involve discrete business transactions and do not involve any of the same investors.  *See United States v. Townsend*, No. 06-cr-34, 2007 U.S. Dist. LEXIS 32639 (S.D.N.Y. Apr. 30, 2007) (conducting Rule 404(b) analysis after finding that, "although the proffered evidence is certainly relevant to show the background of the charged conspiracy, it does not appear to be inexorably intertwined" (internal quotation marks and alterations omitted)).  Moreover, the schemes are sufficiently distinct such that the Gerova scheme is not necessary to "complete the story" of the Wakpamni scheme.  *See Kassir*, 2009 WL 976821, at *3 (prior conduct not admitted because it was "not essential to understanding the sequence of events surrounding the charged conduct").

The only other argument the government advances for its claim that the Gerova evidence is relevant as direct evidence is that "the fact of Jason Galanis's arrest in the Gerova matter . . .  is inexorably linked to Archer's lies to the BIT board," and alleged evidence that Archer and Cooney discussed how to manage the Wakpamni bond situation following the arrest.  Gov't Letter at 7.  Of course, neither of these arguments render the Gerova evidence admissible as direct evidence against Mr. Hirst, as they do not relate to him in any way.  Accordingly, if the Court were to admit this evidence as direct evidence against Archer and Cooney, no limiting instruction would need to be given as to them.  *See Kassir*, 2009 WL 976821, at *2 (if uncharged criminal activity is admitted as direct evidence, "the court is not required to instruct the jury against making an improper inference of criminal propensity" (internal quotation marks omitted)).  But the same would not apply to Mr. Hirst and John Galanis – instead, the Court would need to instruct the jury that it must not make an improper inference of criminal propensity based on that

Hon. Ronnie Abrams
March 23, 2018
Page 4 of 12

evidence, but *only* as to Mr. Hirst and John Galanis.[1]  Moreover, these two bases for
admitting the Gerova evidence as direct evidence relate only to the *arrest* of Jason
Galanis alone.  It is entirely unnecessary for the government to introduce the fact that Mr.
Hirst was arrested in the same case as Jason Galanis or that any of the defendants in the
Gerova case were convicted in order to establish these facts that it claims are necessary
elements of the charged conspiracy.  Thus, the government has failed to proffer any basis
for admitting the Gerova arrests and convictions as direct evidence.  Even if there were
some doubt as to whether the Gerova conduct is admissible as direct evidence, it is by no
means "manifestly clear that [the Gerova conduct] is intrinsic proof of the charged
crime," *Nektalov*, 325 F. Supp. 2d at 372, and thus the government must proceed under
Rule 404(b).

> B.  The Gerova Case Serves Only to Highlight the Defendants' Propensity; It Is
>     Not Relevant to Any Proper Purpose Under Rule 404(b)

The Gerova evidence is not admissible as Rule 404(b) other acts evidence.  It is
not "background" to the Wakpamni scheme and does not "complete the story" of the
Wakpamni scheme because, as explained further below, the two schemes are completely
distinct and can each be understood without reference to the other.  Moreover, to admit
the Gerova arrests and convictions as evidence of the relationships between the co-
conspirators would be highly misleading at least as it relates to Mr. Hirst and John
Galanis:  although both were charged in the Gerova case and both were ultimately
convicted (John Galanis by plea and Mr. Hirst at trial), there was no allegation and no
evidence introduced in that case that the two ever met or interacted with each other in any
way.  Thus, to admit the arrests and convictions as evidence of the prior relationship
between these co-defendants would mislead the jury and result in a conviction based on a
suggestion that is flatly contrary to the evidence in the Gerova case.

The Gerova arrests and convictions also cannot serve as evidence of Mr. Hirst's
knowledge or intent because the two cases are not "sufficiently similar."  *United States v.
Gordon*, 987 F.2d 902, 908 (2d Cir. 1993); *see also United States v. Edwards*, 342 F.3d
168, 177 (2d Cir. 2003) ("[S]ome similarity or tangible connection between the acts must
be identified, something that makes the prior act relevant to proving the contested fact.").
The two alleged schemes involved different types of securities, targeted different
investors, occurred at different times, and generated profits in different ways (though not
to Mr. Hirst).  The conduct Mr. Hirst was alleged to have engaged in as part of the
Gerova case involved Mr. Hirst's role as president of a public company and his
authorizing the issuance of Reg-S restricted stock to a foreign nominee.  Here, by
contrast, Mr. Hirst is alleged to have acted as a consultant for the investment manager for
a period of several weeks surrounding the issuance of the first bond tranche and to have

---

[1]     The need for intricate limiting instructions that relate to some defendants and not
others will lead to substantial juror confusion and is one reason that severance is
appropriate in this case, among others discussed below.

Hon. Ronnie Abrams
March 23, 2018
Page 5 of 12

assisted in opening a bank account for the purported annuity provider.  These two courses
of conduct are starkly different.  *See United States v. Curley*, 639 F.3d 50, 61 (2d Cir.
2011) ("This Circuit has upheld the admission of subsequent [and prior] act evidence to
prove a state of mind only when it so closely paralleled the charged conduct that it was
probative regardless of the temporal difference."); *United States v. Casimiro*, No. 09-cr-
497 (NRB), 2011 WL 2714217, at *3 (S.D.N.Y. July 8, 2011) (excluding evidence of
uncharged acts from 2005 or 2006 when the charged conduct began in 2009, because the
"lack of temporal proximity between the alleged act and the conduct charged in the
indictment renders the probative value limited").[2]

The government's true aim in seeking to admit the Gerova arrests and convictions
is plain:  Because its case against Mr. Hirst is a thin, circumstantial one, it is all the more
important for the government to inform the jury that Mr. Hirst was previously convicted
of a separate securities fraud with two of the co-defendants in this case.  That is classic
"propensity evidence in sheep's clothing."  *United States v. McCallum,* 584 F.3d 471,
477 (2d Cir. 2009).  The Court should preclude the introduction of the Gerova arrests and
convictions because they serve no proper purpose under Rule 404(b).

## C.   The Gerova Evidence Is Inadmissible Under Rule 403

Even if the Gerova evidence were relevant to a proper purpose under Rule 404(b),
which it is not, the Court should preclude it under Rule 403 because any probative value
of the Gerova evidence is "substantially outweighed by its potential for prejudice."  Fed.
R. Evid. 403.  The Second Circuit has held that "evidence of prior convictions merits
particularly searching, conscientious scrutiny."  *McCallum,* 584 F.3d at 476.  This is
because "[s]uch evidence easily lends itself to generalized reasoning about a defendant's
criminal propensity and thereby undermines the presumption of innocence."  *Id.*  The
Gerova convictions are especially prejudicial here because they appear to involve three of
the same defendants and, though starkly different, the complex securities crimes in each
case lend themselves to a generalized conclusion by a lay jury that the defendants are
guilty because of their propensity to engage in securities fraud together.  Given that the
jury might erroneously believe there are similarities between the Gerova scheme and
Wakpamni scheme, there is a significant risk the jury will convict on an improper basis
and not on the evidence introduced to establish the charges alleged in the Indictment.  *See
id.* at 478 ("[P]rior convictions present a singular risk of serious prejudice and . . . their
introduction can jeopardize the fairness of a trial . . . standing alone, prior convictions are
capable of undermining the presumption of innocence and distracting the jury from the

---

[2]     Even if the Court were to conclude that the Gerova evidence could be admissible
as to Mr. Hirst's knowledge or intent, it would only be admissible to the extent that the
defense opens the door to such evidence by putting Mr. Hirst's knowledge or intent in
dispute.  Therefore, we request in the alternative that the Court defer ruling on this issue
until such time as that happens.

Hon. Ronnie Abrams
March 23, 2018
Page 6 of 12

business of determining guilt or innocence based on the proof of the charges in the indictment.").[3]

Moreover, when evidence of a prior bad act is remote in time, the older acts become "'too attenuated' to be relevant or too remote" to be reliable. *Curley*, 639 F.3d at 59 (quoting *United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997)); *see also Garcia*, 291 F.3d at 138 ("[T]he length of time between the events . . . detract[s] from any potential probative value of the prior acts."). Here, the Gerova conduct occurred in 2010, several years before Mr. Hirst's involvement in the charged conduct. Indeed, the government itself has argued on more than one occasion that the defendants in this case may not introduce prior statements of Jason Galanis made contemporaneously with the Gerova conduct because, it contends, these events, which took place in 2010 and 2011, *are too remote in time* to be relevant to this case. *See* Transcript of Mar. 6, 2018 Hearing at 12:22-13:6 ("MS. MERMELSTEIN: Not to beat a dead horse, these are phone calls that are all from four years before the charged conduct here . . . The notion that things Jason Galanis may have said to Mr. Cooney in 2010 is in any fashion exculpatory or []relevant continues to be highly unlikely."); Letter from the Government to the Honorable Ronnie Abrams, dated Mar. 12, 2018, at 2-3 & n.2 (contrasting *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984), because that case "involved a situation in which the 404(b) evidence and the charged crimes were much closer in time and in character than that presented here, where defendants are seeking to introduce evidence of Jason Galanis's prior bad acts that pre-date the time period of this conspiracy by at least *four years* and were not part of the same scheme charged in this case"). In other words, the government seeks to have the Court deny the admission of defendants' Rule 404(b) evidence because it is too remote in time but admit its own evidence from the same time period. The government cannot have it both ways.

Admission of the Gerova convictions should also be denied because "[i]f the existence of other evidence makes the prior conviction less necessary to the Government's case, then a court should give more weight to the risk of prejudice to the defendant." *United States v. Nachamie*, 101 F. Supp. 2d 134, 144 (S.D.N.Y. 2000); *see also Old Chief*, 519 U.S. at 182-83 ("[A] judge could reasonably apply some discount to the probative value of an item of evidence when faced with less risky alternative proof going to the same point."). Here, any evidence of Mr. Hirst and Jason Galanis's relationship in unnecessarily cumulative. Their relationship is thoroughly documented through the evidence in the case, and is not disputed by Mr. Hirst. *See United States v. Mercado*, 573 F.3d 138, 145 (2d Cir. 2009) (finding prior gun transactions not

---

[3]     Further, it is misleading and improper to allow the government to introduce that Mr. Hirst was arrested in the Gerova case, which, although true as a legal matter, will conjure in the minds of the jury popular images of perp walks and rides in squad cars, which are not only prejudicial, they are also inaccurate given that Mr. Hirst self-surrendered.

particularly relevant to "the development of mutual trust between [coconspirators]" in part because their "strong relationship and friendship was undisputed").

      Finally, if the Gerova arrests and convictions are allowed in at trial, Mr. Hirst will be forced to present substantial evidence regarding the factual circumstances surrounding the Gerova case to counter the inference that the government will seek to have the jury draw from the conviction, including the facts that (1) Mr. Hirst had no knowledge of the market manipulation scheme by which Jason Galanis and others, including James Tagliaferri, offloaded Gerova shares into the accounts of unsuspecting investors (a point the government conceded at trial); (2) Mr. Hirst did not profit in any way from the Gerova scheme and in fact lost money because he held his Gerova shares (and still holds them) while the stock price plummeted; (3) the supposedly fraudulent transaction that Mr. Hirst was accused of facilitating was ratified shortly thereafter by the Gerova Board of Directors, who had full knowledge of his conduct and its consequences; and (4) Jason Galanis admitted that he concealed relevant information from Mr. Hirst because he knew Mr. Hirst would not participate in investment opportunities with him if he were in possession of the full facts.  This would create a massive trial-within-a-trial resulting in juror confusion over the issues actually alleged in the Indictment.  *See Daugerdas*, 2011 WL 573587, at *1-2.[4]

      Because the Gerova evidence "will result in delay, confusion of the issues" and poses a significant risk of "mislead[ing] the jury to make a determination of guilt based on propensity," *Kahale*, 789 F. Supp. 2d at 384, it accordingly should be precluded.

## III.    The Code Rebel Evidence Is Not Admissible Either as Direct Evidence or Pursuant to Rule 404(b)

      The government seeks to introduce evidence related to the "Code Rebel" initial public offering, which it describes as evidence that certain defendants (including Mr. Hirst) "took control of the entirety of Code Rebel's shares prior to the IPO, and

---

[4]     It is important to note, and this Court should consider, that the Gerova conviction is currently on appeal.  In that appeal, Mr. Hirst will argue, among other things, that (1) the government was improperly permitted to call an expert in the guise of a fact witness to testify as to legal definitions such as materiality; (2) the government misrepresented the evidence in its summation by arguing that the face value of shares that could not be legally sold in the United States reflected their actual market value; and (3) the trial judge committed reversible error by admitting aspects of the conspiracy which were not reasonably foreseeable to Mr. Hirst and by refusing to admit exculpatory evidence that bore directly on Mr. Hirst's state of mind.  To the extent the Second Circuit vacates Mr. Hirst's conviction after this Court has admitted the Gerova convictions as either direct evidence or 404(b) evidence, any conviction in this case will be rendered unreliable.

Hon. Ronnie Abrams
March 23, 2018
Page 8 of 12

purchased virtually the entirety of IPO shares."  Gov't Letter at 1, Dkt. 339 (March 12, 2018).  According to the government, the defendants obtained control over Code Rebel's stock, which "enabled them to move Code Rebel's stock price from approximately $5 to a high of more than $40."  *Id.* at 1-2.  The government suggests that this activity is "intertwined" with the criminal conduct as alleged in the Indictment, and therefore is admissible as direct evidence of the charged conspiracy, because the defendants allegedly purchased the Code Rebel shares with proceeds from the Wakpamni bond scheme, and therefore the Code Rebel IPO "demonstrates how the defendants profited from the Wakpamni scheme."  *Id.* at 6.

As an initial matter, the government has failed to provide a cogent explanation as to why the investment in Code Rebel stock prior to the anticipated IPO was improper, let alone criminal, and therefore why this evidence is being proffered as uncharged criminal conduct.  First, the government stated several times at the conference of March 6, 2018 that the stock price for Code Rebel was "pumped" from $5 a share to over $40 a share. Transcript of Mar. 6, 2018 Hearing at 64:1-5.  However, the government provided no explanation as to how that price was fraudulently pumped.  Although the criminal complaint contains summary allegations related to Code Rebel, it does not allege any facts relating to the fraudulent pumping activity.  The mere fact that a small group of people owned the bulk of the Code Rebel shares is obviously not alone sufficient to effect a market manipulation, absent allegations describing the means by which other investors were induced to purchase the stock at an artificially inflated price.  Second, the government stated that there were "pretend buyers" who purchased Code Rebel shares in order to meet round lot requirements for listing on the NASDAQ.  *Id.* at 63:15-18.  But, even assuming that is true, a violation of the NASDAQ's listing requirements is not in and of itself a crime.  The government has proffered no reason to conclude that the purchasing of shares by entities – a perfectly normal, routine occurrence in the stock market – is indicative of criminal intent by any of the defendants here.

Moreover, the government has not proffered any basis from which a jury could infer that any of Mr. Hirst's conduct relating to the Code Rebel IPO was criminal – to the contrary, the complaint alleged that the vast majority of shares in Code Rebel were purchased with proceeds of the *fourth* bond issuance, an issuance that Mr. Hirst had nothing to do with and about which he is not alleged to have any knowledge.  The sole allegation as to Mr. Hirst – that Francisco Martin opened certain brokerage accounts "at Mr. Hirst's direction" that were later used to purchase Code Rebel stock (which is not in fact what happened) – is plainly deficient to ground any finding of *mens rea* as to Mr. Hirst.  Thus, we are at a loss to understand how the government conceives of the Code Rebel IPO as uncharged criminal conduct, especially as to Mr. Hirst, nor how it is relevant to any issue to be tried in this case.  Instead, it appears that the government plans to introduce the Code Rebel evidence to create a whiff of a separate market manipulation scheme and to improperly suggest that the defendants likely committed the charged offenses.

Hon. Ronnie Abrams
March 23, 2018
Page 9 of 12

Nevertheless, assuming *arguendo* that the government could proffer a theory that evidence relating to Code Rebel is uncharged criminal conduct, which it has not done, such evidence is inadmissible as direct evidence of the charged crime or under Rule 404(b) for the following reasons:

## A.  Code Rebel Is Not Direct Evidence of the Charged Crime

The evidence that the government proffers in its letter cannot fairly be characterized as direct evidence of the charged crime.  It would be different if the government merely sought to complete the story of the Wakpamni bonds by showing that certain proceeds from the bond issuance were invested in stock.  But the government seeks to do much more than that.  Instead, it proposes to put an entirely separate scheme before the jury – namely the alleged "pump and dump" manipulation of Code Rebel stock – and argue that it is directly relevant to the alleged Wakpamni bond scheme.  Nothing could be further from the truth.  Any alleged manipulation of Code Rebel's stock price (of which Mr. Hirst had no knowledge) does not arise out of the same transaction as the charged conduct (*i.e.*, the Wakpamni bond issuance), is not inextricably intertwined with the charged conduct, and is not necessary to complete that story.  *See Gonzalez*, 110 F.3d at 942.  As alleged, it is a distinct, intervening scheme that, while involving stock purchased with the proceeds of the bonds, is not necessary to explain the charged conspiracy or to demonstrate that "the defendants profited from the Wakpamni scheme."  Gov't Letter at 6.  There is no basis to permit the introduction of Code Rebel as direct evidence.

## B.  Evidence of Code Rebel Is Inadmissible Pursuant to Rules 404(b) and 403

Evidence concerning Code Rebel also cannot be admitted pursuant to Rule 404(b).  The government does not even attempt to set forth a proper purpose under 404(b) in its moving papers.  Nor could it.  The alleged Code Rebel market manipulation cannot serve as evidence intended "to inform the jury of the background of the conspiracy charged" or "to help explain to the jury how the illegal relationship between participants in the crime developed," *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992), since the Code Rebel allegations occurred *after* the underlying conspiracy began, and long after Mr. Hirst is alleged to have entered into the charged conspiracy.

The Code Rebel evidence also is not relevant to Mr. Hirst's knowledge or intent.  As noted above, in order to meet either of these purposes, the other act must be "sufficiently similar to the conduct at issue."  *Gordon*, 987 F.2d at 908.  That is not the case here.  The charged conspiracy alleges that the defendants conspired to fraudulently induce a Native American tribe to issue bonds, which were then purchased by institutional investors whose investment manager failed to disclose certain conflicts of interest and purchased the bonds in derogation of the clients' investment guidelines, and that the conspirators misappropriated the proceeds of the bonds to, among other things, pay for subsequent tranches of bonds and make various investments, including Code

Hon. Ronnie Abrams
March 23, 2018
Page 10 of 12

Rebel stock. The Code Rebel scheme, by contrast, as alleged in the Complaint and discussed at the March 6, 2018 conference and in the government's letter, is a more traditional market manipulation scheme, whereby a group of individuals allegedly obtained control of the majority of shares in a preexisting company, created fictitious entities to meet round lot requirements, and then pumped the stock (though it is unclear how) in order to increase its price in the weeks following the IPO and sold the shares at a profit.

These two schemes are dramatically different – the only arguable similarity is that they involve securities – and thus the one cannot be used to establish knowledge of the other. *See United States v. Ezeh*, 64 F. App'x 275, 278 (2d Cir. 2003) (holding that in order to show knowledge or intent, "[t]he degree of similarity required between a past act and the act of which a defendant stands accused . . . needs to be very high"). Far from being relevant to any proper Rule 404(b) purpose, it is clear that the government will seek to use the Code Rebel evidence – arguing with inference upon inference – that the defendants are perpetual schemers, engaged in a series of uncharged fraudulent transactions. That is a classic propensity argument that is an improper basis for conviction.

Lastly, the Code Rebel evidence, while entirely separate from the Wakpamni scheme alleged in the Indictment, is also extremely prejudicial to the defendants – and especially to Mr. Hirst. The evidence tying Mr. Hirst to the Code Rebel scheme is weak, at best. *See Huddleston v. United States*, 485 U.S. 681, 689 n.6 (1988) ("[T]he strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balance."). For example, there is an absence of evidence that Mr. Hirst was aware that the Wakpamni bond proceeds were being used toward the IPO of Code Rebel. Nor is there any evidence that Mr. Hirst knew about any Code Rebel pump and dump scheme. The evidence suggests otherwise, namely that Mr. Hirst believed the IPO to be a legitimate investment unconnected to the bond proceeds. Thus, if this evidence were to be admitted at trial, Mr. Hirst would put on a full defense demonstrating his lack of knowledge and criminal intent regarding the alleged Code Rebel scheme. A "mini trial" would ensue over whether Mr. Hirst was aware of and participated in any such scheme. This would necessarily result in jury confusion and undue delay. *See Levy*, 2013 WL 655251, at *1; *Daugerdas*, 2011 WL 573587, at *1-2.

For these reasons, the Court should preclude the introduction of any evidence relating to Code Rebel.

## IV.     Severance is Warranted

In a coda to its 404(b) notice, the government asserts that the "intertwined nature of each defendant's conduct underlying the charges in this case" makes this case one that should not be severed. Gov't Letter at 9. Specifically as to Mr. Hirst, the government argues that he is involved in multiple aspects of the conspiracy, including: (1) his

Hon. Ronnie Abrams
March 23, 2018
Page 11 of 12

supposed "control" over the purported annuity provider; (2) his actions related to purchasing the Wakpamni Lake Community Corporation bonds on behalf of Hughes Capital Management; and (3) his actions related to Code Rebel. *Id*. n.3.

The government mischaracterizes Mr. Hirst's role in the alleged scheme. As noted at the March 6, 2018 conference, Mr. Hirst's role is limited to providing consulting services to Hughes for a period of several weeks in August 2014 (for which he collected a single paycheck in a total net amount of $1,333.98), assisting the sole director and president of the purported annuity provider, Wealth Assurance Private Client Corporation, in opening a bank account, and, to the extent the Code Rebel evidence is admitted, indirect involvement in setting up accounts that purchased stock in that company based on his belief that it was a promising IPO. These allegations, evidence of which consists in total of perhaps one or two witnesses and a few documents, and their connection to other aspects of the charged conspiracy, could easily be established in a short trial. The government insists that it would introduce the exact same evidence at the trial of any individual defendant in this case, but that would be a needless waste of the Court's time and, indeed, would aid Mr. Hirst's defense – he would simply ask the jury on summation why they were forced to listen to weeks of testimony that did not involve him. Despite the government's dramatic protestations, Mr. Hirst expects it would act strategically in its presentation of evidence at an individual trial.

Severance is also warranted because of the inherent tension between the multiple categories of evidence being introduced as to some defendants but not others. In *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980), the Second Circuit addressed the question whether evidence that creates a risk of prejudice to some defendants (even when limited by a cautionary instruction) may be admitted in a joint trial. *Id*. at 944. The Second Circuit framed the question as one of "admissibility of evidence or severance." *Id*. The Court held that "[i]f the justification for a joint trial is outweighed by the prejudice to the co-defendants, the trial court can confront the prosecutor with the choice of forgoing either the evidence or the joint trial." *Id*. Here, the government seeks to introduce substantial 404(b) evidence that would unfairly prejudice various of the defendants. That, in addition to the mutually antagonistic defenses of Mr. Hirst and Michelle Morton, which we outlined in detail in our motion for severance, would substantially compromise the defendants' rights to a fair trial. For instance, it was made clear at the March 6, 2018 conference that whatever Mr. Hirst says at trial to explain the Gerova conduct will be aggressively countered not just by the government, but by counsel for the co-defendants. *See* Tr. of Mar. 6, 2018 Hr'g at 106:2-6 (following argument by the undersigned regarding the need for Mr. Hirst to explain the Gerova evidence at trial, "MR. SCHWARTZ [counsel for Devon Archer]: . . . I want to make the exact opposite of the argument that Mr. Biale was saying. I want to say that John Galanis and Gary Hirst and Jason Galanis are a close trio of criminal conspirators and we are the three people on the outside."). The government should not be allowed to have a joint trial where it introduces prejudicial and irrelevant other acts evidence, the purpose of which is to paint all the defendants with the same broad stroke of guilt-by-association,

Hon. Ronnie Abrams
March 23, 2018
Page 12 of 12

nor should it gain the unfair advantage of a second, third, and fourth prosecutor by dint of the internal antagonism between the defendants.

Accordingly, the Court should preclude the Gerova and Code Rebel evidence as to Mr. Hirst, and issue an order severing his trial from that of his co-defendants.

Respectfully submitted,

/s/
Michael Tremonte
Noam Biale
Emma Spiro
SHER TREMONTE LLP

/s/
Barry Levin, Esq.

*Attorneys for Gary Hirst*

cc:     All counsel (by ECF)