

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 2, 2018

**BY EMAIL AND ECF**

The Honorable Ronnie Abrams
United States District Judge
40 Foley Square
New York, NY 10007

Re:   <u>United States v. Jason Galanis, et al.</u>, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

      The Government writes in reply to the defendants' letters seeking to preclude the evidence detailed in the Government's March 12, 2018 letter motion (the "March 12 Letter"), which identified categories of evidence the Government seeks to admit as direct evidence of the scheme charged in the Indictment and which are also admissible pursuant to Federal Rule of Evidence 404(b).  The defendants' arguments disregard or ignore the scope of the charged conduct in this case.  Having designed and participated in a complex criminal scheme, the defendants now attempt to argue that evidence of that scheme is too complex and prejudicial to present to a jury.  Further, the defendants' arguments ignore well-settled case law about the propriety of admitting evidence to show the background of the relationships between the co-conspirators, to complete the story of the crime on trial, and more generally, to present a case "'with evidentiary richness and narrative integrity.'"[1]  Accordingly, the Court should reject their arguments.

      Between approximately March 2014 and April 2016, the defendants engaged in a multi-faceted fraudulent scheme that was as brazen as it was complex.  During the course of the conspiracy, the defendants caused the Wakpamni Lake Community Center (the "WLCC") to issue more than $60 million in bonds (the "Wakpamni bonds") based on false and misleading representations, and caused clients of captive investment advisory firms Hughes Capital Management ("Hughes") and Atlantic Asset Management ("Atlantic") to purchase the issuances of the bonds.  The defendants then failed to invest the bond proceeds on the WLCC's behalf in an annuity as promised, and instead recycled certain of the bond proceeds and misappropriated other bond proceeds for their own personal and business purposes.  The defendants were able to carry out their scheme through a series of interrelated, fraudulent financial transactions designed to conceal the true nature of the bonds and the bond proceeds.  The defendants were also able to carry out this scheme in part because, by the time of the Wakpamni bond issuances, the defendants and other individuals working with them owned or controlled most of the key entities

---

[1] *See, e.g.*, *United States v. Ahmed*, No. 14 Cr. 277 (DLI), 2016 WL 8732355, at *10 (E.D.N.Y. June 24, 2016) (quoting *Old Chief v. United States*, 519 U.S. 172, 183 (1997)).

involved in the relevant transactions, including the placement agent for the bonds, the annuity provider, and Hughes and Atlantic, the two captive investment adviser firms whose clients purchased the majority of the bond issuances.

The defendants perpetrated their scheme—their fraud—through a series of lies, misrepresentations, omissions, and concerted efforts to conceal the true nature of their actions. In a detailed 46-page criminal complaint and 23-page speaking indictment, the Government described the defendants' multi-faceted scheme, the lies they told, and the methods they used to try conceal their fraud. Much of the evidence the Government detailed, out of an abundance of caution, in its March 12 Letter mirrors or expands upon the allegations in the Complaint and the Indictment. Now, having perpetrated a complex fraudulent scheme involving multiple entities, individuals, and monetary transfers, the defendants attempt to argue that the evidence of their crimes is so complicated, confusing, and prejudicial that it should be excluded. But the defendants' repeated lies and fraud are the mechanisms by which they were able to carry out the fraudulent scheme. To grant the defendants' requests would reward the defendants for carrying out a complex fraudulent scheme and lead to an absurd result: the inability of the Government to present direct evidence of their complex scheme to the jury or, in the alternative, to present such evidence as proof of the defendants' motives, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident pursuant to Rule 404(b).

For the reasons set forth below, and taking each category in turn, the Court should admit such evidence as direct evidence of the charged crimes and, in the alternative, pursuant to Rule 404(b).

**I.     Archer's False Statements to Morgan Stanley and Deutsche Bank**

As alleged in the Complaint and Indictment in this case, on October 1, 2014, defendant Devon Archer purchased the entirety of $15 million of bonds issued by the Wakpamni Lake Community Center (the "WLCC") in its second bond issuance, which happened that same day. Complaint ¶¶ 47(c)-(d); Indictment ¶ 21(a). The $15 million dollars that Archer used to purchase the second bond issuance were proceeds from the first bond issuance, which had been transferred by Jason Galanis via an intermediary to Rosemont Seneca Bohai, LLC ("Rosemont"), an entity controlled by Archer. Complaint ¶¶ 47(c)-(d); Indictment ¶ 21(a). In October 2014, Archer attempted to deposit approximately $15 million of the bonds into brokerage firm accounts at Morgan Stanley, Complaint ¶ 47(d); Indictment ¶ 21(a), and Deutsche Bank and, in doing so, sent emails and other documentation to both banks in which he falsely stated that the source of the funds used to purchase the bonds was real estate sales through Rosemont. *See* Complaint ¶ 47(e); Indictment ¶ 21(e) (lies to Morgan Stanley). Archer later transferred $2.6 million of the bonds he had purchased to Burnham Securities, Inc. ("Burnham") so that Burnham could meet its net capital requirements. Complaint ¶ 47(i); Indictment ¶ 23.

Archer's lies to Morgan Stanley and Deutsche Bank are admissible as direct evidence— they are *part of* the fraudulent scheme, "arose out of the same transaction or series of transactions as the charged offense," "inextricably intertwined with the evidence regarding the charged offense," and "necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *United States v. Concepcion*, 983 F.2d 369, 392 (2d

Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy, however, is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."). The information Morgan Stanley requested from Archer regarding the source of the funds used to purchase the bonds was information Morgan Stanley required for purposes of depositing the bonds. Archer's ability to successfully deposit the bonds and later transfer the bonds in support of his and his co-conspirators' other business endeavors was an essential aspect of the charged scheme, which involved an effort by him and his co-conspirators to "roll up" the various entities involved in the scheme into a financial services conglomerate under the "Burnham" brand. The steps he took and lies he told in his attempts to place the bonds in accounts at Morgan Stanley and Deutsche Bank so that he could later—as he did with $2.6 million of the bonds—use the bonds to support his business endeavors demonstrate his knowledge of the fraudulent scheme and his direct participation in it. Archer's lies to Morgan Stanley and Deutsche Bank are also admissible pursuant to Rule 404(b) as proof of his motive, opportunity, intent, preparation, plan and knowledge. Fed. R. Evid. 404(b).

Archers' arguments to the contrary are nonsensical. First, Archer's attempt to cast his lies as merely giving rise to a "fair inference that [he] knew that there was something improper or illicit about the source of the funds" without "understand[ing] *what* was improper about it," ignores the standard for relevance. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. Certainly, evidence giving rise to a "fair inference . . . that Mr. Archer knew that there was something improper or illicit" about the $15 million he received from Jason Galanis to buy the bonds "has [a] tendency to make" Archer's knowledge that he was engaging in a fraudulent transaction "more probable than it would be without the evidence." Further, Archer's argument ignores the overarching scheme and his critical role in it. While Archer may argue to the jury he did not "understand *what* was improper" about lying to Morgan Stanley and Deutsche Bank, that argument goes to the weight of the evidence, not its admissibility. Second, Archer's analogies to money laundering and narcotics cases are equally unavailing. Evidence of Archer's lies to Morgan Stanley and Deutsche Bank not only demonstrate that he knew the bonds were derived from illegal means, but also demonstrate steps he took in furtherance of the conspiracy to conceal the true nature of the bonds. In other words, he was not merely exchanging money he suspected was derived from illegal activities or holding narcotics that he suspected were illegal—he knew the bonds were derived from illegal means, and lied to two brokerage firms in order to attempt to have them hold the bonds to lend credibility to them and conceal their true nature so that he could further use those bonds to support his and his co-conspirator's business endeavors.

## II. Archer's False Statements to the BIT Board about Jason Galanis, and Jason Galanis and John Moran's Prior Regulatory History

As alleged in the Complaint and Indictment, in 2014, in connection with efforts to obtain control of Burnham Financial Group ("BFG"), the parent entity of Burnham (part of the defendants' efforts to create a financial services conglomerate under the "Burnham" brand funded, at least in part, by the proceeds of the bond issuances), Archer made false statements to the Board of the Burnham Investment Trust (the "BIT Board") regarding Jason Galanis's relationship with Burnham and its affiliates. Complaint ¶ 34(b); Indictment ¶ 10.

A. Background

Under applicable law, the BIT Board was required to approve amended investment advisory agreements as a result of Archer's acquisition of BFG. In approximately February 2014, through its due diligence process, the BIT Board learned that the SEC had previously barred both Jason Galanis and John Moran from holding certain positions in the securities industry. In approximately March 2014, the BIT Board told Archer that they would not approve of Burnham's bid to purchase BFG if either Jason Galanis or John Moran were involved in Burnham.

With respect to Galanis in particular, Archer and the BIT Board engaged in a series of meetings and correspondence over several months. In late August and early September 2014, i.e., precisely during the time when the first set of Wakpamni bonds were being issued, Archer doubled-down on his assurances to the BIT Board that Galanis would have no involvement with Burnham. For example:

- In an August 21, 2014 meeting with the BIT Board, Archer told the board "that he had been asked to remove Mr. Galanis from the [acquisition] and that he had done so."

- In a September 5, 2014 letter, Archer stated that "Jason Galanis has never been, and will not become, an officer, employee, consultant, director, or member of the management of either Burnham Financial Group Inc.('BFG'), BAM, or Burnham Securities Inc. ('BSI,' and with BFG and BAM, the 'Burnham Group'). CORFA and BAM Holdings will continue to abide by the above commitment. In addition, Mr. Galanis will not be sourcing any type of transaction to Burnham Group or any member thereof."

- In a letter dated September 26, 2014—five days before he bought the second tranche of WLCC bonds and while preparations for that purchase were ongoing— after the BIT Board demanded an "iron-clad assurance" regarding Galanis's involvement with Burnham "going forward," Archer "confirmed" the Board's understanding that "Galanis will have no interest of any kind, direct or indirect, in any of the Burnham entities or their successors, that he will not source deals to the Burnham entities and that the Burnham entities will not invest with or in, directly or indirectly, any business or enterprise in which Mr. Galanis has any association, affiliation, or investment, pecuniary or otherwise, directly or indirectly."

All the while, and continuing going forward, Jason Galanis held himself out as representative of Burnham, including to the WLCC, among other things, by using an @burnhamequitypartners email address. Moreover, Galanis sourced the WLCC bond issuances, three of which occurred after Archer's September 26 letter, which nominally used Burnham as the "placement agent." The Government also anticipates introducing testimonial evidence that Jason Galanis was a regular at Burnham's New York offices, where he played a significant (if concealed and unofficial) role.

In September 2015, after Jason Galanis was arrested in the Gerova matter, the BIT Board again confronted Archer about Jason Galanis. Archer "thanked the [BIT Board] for their insistence that Mr. Galanis not be involved in the management of Burnham," notwithstanding that Galanis had been involved with managing Burnham, and "acknowledged he had been wrong the past . . . ."

Later, in February 2016, the BIT Board asked Archer "if he had any involvement with any of the events detailed in [the] SEC complaint against Atlantic Asset Management," which concerned the WLCC bonds. *See* Complaint, *SEC v. Atlantic Asset Management*, 15 Civ. 9764 (WHP) (S.D.N.Y. Dec. 15, 2015). Archer falsely said "he had no involvement whatsoever with those events, and that the individual was likely Mr. Galanis."

B. Discussion

Like Archer's lies to Morgan Stanley and Deutsche Bank, Archer's repeated lies to the BIT Board over an extended time and during the time period of the conspiracy—indeed within days of the issuance of the first two tranches of the WLCC bonds—are highly relevant and admissible evidence.

For one, they are probative of Archer's knowledge and intent. Archer claims he was duped, lied to, and used by Jason Galanis. However, evidence that, immediately before and during the time when Archer was purchasing the WLCC bonds, others were raising red flags about Galanis and demanding "iron-clad assurances" that Galanis not be involved with Burnham, provides powerful evidence that Archer knew what he was getting into when he joined forces with Galanis. *See, e.g.*, *United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) (evidence of uncharged falsification of business inventory admitted to prove charged crime of making false statements to obtain a line of credit, noting that "Carboni's failure to comply when his accountant advised him to delete the fictional inventory makes it less likely that he believed pre-billing and addition of NACC inventory to Cableco's books reflected sound accounting practices").

Relatedly, the fact that Archer was willing to repeatedly minimize and lie about the role of Jason Galanis, in the face of the BIT Board's repeated demands, shows the nature of the relationship between Jason Galanis and Archer. *See United States v. Mermelstein*, 487 F. Supp. 2d 242, 262 (E.D.N.Y. 2007) ("[E]vidence of the nature of the relationship between alleged co-conspirators is frequently admitted by courts."). This is especially true since Archer apparently intends to raise the equivalent of a "mere presence" defense, i..e, that although he was involved in multiple aspects of the scheme, including as a backer of the acquisition of the investment advisers, a manager of the placement agent, and a buyer of the bonds, he was nonetheless not a knowing participant. But the fact that Archer repeatedly took steps to obfuscate his relationship with Jason Galanis substantially undercuts this argument. *Cf. United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996) ("The challenged evidence legitimately tended to prove the nature of the relationship between Flores and the other conspirators, to explain why Garcia asked Flores to participate in the pick-up, and to explain why Garcia trusted Flores as a co-conspirator. Without evidence of a prior relationship or explanation of a connection with Garcia, Flores's 'mere

presence' defense would be much stronger, particularly because the locale of the pick-up was a shopping center").

The Court should reject Archer's contrary arguments. Archer's argument that his repeated misrepresentations to the BIT Board were not part of the charged scheme because they "cannot constitute statements or omissions in connection with 'the purchase or sale of any security'" is a red herring, as it would mean other acts evidence is never admissible. That of course is not the law. "[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).

Further, Archer's arguments about the complexity of the transaction and the fact that it was "heavily lawyered" are not a basis to exclude this highly relevant evidence. For one, as discussed above, Archer made several of the misstatements himself, at meetings with the BIT Board, and the Government's proof on this issue is expected to come through testimonial evidence of one or more attendees at those meetings. To the extent Archer wants to argue that his lawyers drafted the letters he signed and sent to the BIT Board, that argument goes to the weight of the evidence, not its admissibility. Finally, while there are certainly complex aspects to this case, this part is not one of them: Archer was repeatedly asked about his associations with Galanis, and he repeatedly lied about them. In short, there is nothing particularly time consuming or complex about the Government's proof regarding Archer's statements to the BIT Board.

### III. The Gerova Arrests and Convictions

The Gerova arrests and convictions are clearly admissible.

Most significantly, they are relevant to show the nature of the relationship between Gary Hirst and Jason Galanis, and Jason Galanis and John Galanis. It is well-settled that, "in a conspiracy case, 'other acts' evidence is admissible as background information, to demonstrate the existence of a relationship of mutual trust, or to 'enable the jury to understand how the illegal relationship between the co conspirators developed.'" *United States v. Riley*, No. 13 Cr. 339 (VEC), 2014 WL 3435721, at *4 (S.D.N.Y. July 14, 2014) (admitting evidence of co-conspirator's uncharged trades using material non-public information) (quoting *United States v. Lin Guang*, 511 F.3d 110, 121 (2d Cir.2007)). Further, evidence offered to show "the background of a conspiracy or the development of a relationship of trust" need not be similar to the charged conduct. *See United States v. Pascarella,* 84 F.3d 61, 73 (2d Cir. 1996) ("[F]or prior bad act evidence to be admissible, the act need not be sufficiently similar that it approaches near identity with the elements of the offense charged. . . In contrast, evidence of wholly different acts has been held admissible to show the background of a conspiracy or the development of a relationship of trust between the participants").

Accordingly, courts routinely allow the Government to introduce, as direct evidence of the charged offenses, evidence that co-conspirators engaged in other criminal conduct in the past,

even where that evidence is not "substantially similar" to the charged conduct.  For example, in *United States v. Gracesqui*, No. 10 Cr. 74 (PKC) (S.D.N.Y. June 3, 2016), Judge Castel permitted the Government to introduce, as direct evidence, evidence that the defendant and a co-conspirator participated together in numerous uncharged robberies, including a robbery-kidnapping, "to show the development of a relationship of trust," in the lead up to the charged the murder-for-hire conspiracy. ECF No. 133 at 4, 22; *accord United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (holding that prior acts evidence can be admitted as background evidence in a conspiracy case "to explain how a criminal relationship developed" or "to help the jury understand the basis for the co-conspirators' relationship of mutual trust").

As such, evidence that Hirst and the Galanises engaged in securities fraud is relevant to show the nature of Hirst's relationship with Jason Galanis and John Galanis's relationship with Jason Galanis. [2]  And, given that the case involved charges of securities fraud, wire fraud, and investment adviser fraud, the Gerova case is certainly no more sensationalistic or disturbing than the charges here.

The Gerova convictions are also admissible pursuant to Rule 404(b) to show John Galanis's and Hirst's knowledge, intent, and lack of mistake, especially in light of their expected defenses that they were duped by Jason Galanis into participating in what they believed to be a legitimate business transaction.  Even if prior offenses need to be "similar" to be charged conduct to be admissible as evidence of knowledge or intent under Rule 404(b), they need not be identical.  *United States v. Inserra,* 34 F.3d 83, 89 (2d Cir. 1994) (prior false oral statements to the Department of Labor regarding pension fund in a prior case showed the defendant's intent to make false written statements to the United States Probation Office regarding personal assets in a different case); *United States v. Smith,* 727 F.2d 214, 220 (2d Cir. 1984) (evidence that investment broker previously caused investors to file false documents with regulatory agency shows intent to defraud investors in present scheme).  Here, the Gerova case and this one involved the same crimes, securities fraud and investment adviser fraud, and, moreover, overlapping participants.  As such, even if the frauds are not mirror images of each other, they are sufficiently similar to be admitted under Rule 404(b) as evidence of knowledge and intent.

To address Hirst's concern that evidence of the conviction could give rise to the inference that he and John Galanis had a pre-existing relationship, the Government would be willing to enter into separate stipulations that (i) Jason Galanis and Hirst were previously convicted of securities fraud in a prior case and (ii) Jason and John Galanis were previously convicted of securities fraud in a prior case.  This would also address concerns raised by Archer regarding references to the Southern District of New York in the judgments of conviction.

Further evidence regarding the Gerova arrests is necessary to provide background and context to communications among various of the defendants, including Archer and Cooney and at least one cooperating witness, about how to manage the Wakpamni bond situation following

---

[2] While Archer argues that the relationship between Jason and John Galanis is "self-evident" because they are "father and son," that misses the point.  The Gerova evidence is relevant because it shows the nature of their relationship; the Galanises are not merely father and son, but criminal co-conspirators.

Jason Galanis's arrest. Those communications are direct evidence because they demonstrate the defendants' knowledge of Jason Galanis's role in the conduct charged in this case, and their responsibility to manage the fraud in Jason Galanis's absence.

## IV. Cooney's Involvement in 1920 Bel Air

A. Background

The proceeds of the WLCC bond issuances were deposited an account in the name of Wealth Assurance Private Client Corporation. Again, instead of then being invested in an annuity, the bond proceeds were used by the defendants. In one of these transactions, on November 12, 2014, Hugh Dunkerley transferred $3,895,000 to Cooney. (Complaint ¶ 49(f-g)). This money appears to have been used to attempt to "purchase" Jason Galanis's home at 1920 Bel Air in Los Angeles, California, even though Jason Galanis lived there the whole time. On January 15, 2015, Cooney wrote an email asking for "the wire info on the 3.9 mm that came into my account and went out to . . . escrow for the down payment for the 1920 bel air purchase." (Complaint ¶ 49(h)).

B. Discussion

The 1920 Bel Air transaction is relevant for multiple reasons. First, it is further proof that the bond proceeds were not invested in an annuity as they were supposed to be; instead, a significant portion, almost ten percent of the bond proceeds that had been received as of November 2014, was wired to Cooney. The Government is certainly entitled to prove where the bond proceeds went; such proof is direct evidence of the charged scheme. Second, Cooney's involvement in a transaction in which that money was intended to be used for a "down payment" on a house that Jason Galanis, his close friend,[3] was already living in, is probative of the nature of the relationship between Cooney and Jason Galanis.

The Court should reject Cooney's contrary arguments. For one, the transaction was not "unrelated" to the Wakpamni bonds; it involved the use of bond proceeds. Further, Cooney's assertion that the transaction was ultimately cancelled and that "again . . . Mr. Cooney relied upon the advice of lawyers and real estate professionals" "at every turn" goes to the weight of the evidence and not its admissibility.[4] Finally, the Government anticipates that a cooperating

---

[3] The Government anticipates introducing testimonial evidence that Cooney and Jason Galanis were close personal friends and often socialized in Southern California.

[4] Notably, Cooney has not waived any privilege so as to support any advice of counsel defense. To the extent Cooney, or any other defendant, is asserting an advice-of-counsel defense, the Court should order them to provide notice of that defense forthwith. The Government must be apprised of this information in a timely fashion so that the Government can seek any documents or testimony no longer covered by the attorney client privilege. *In re Grand Jury Proceedings*, 219 F.3d 175, 182-83 (2d Cir. 2000) ("The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter."); Fed. R. Evid. 502(a). In addition, the Government needs time to

witness will offer evidence about his own involvement in various transactions involving 1920 Bel Air, including the Cooney transaction, and therefore the evidence is also admissible as *Giglio* evidence for that witness, unless the defendants represent that they do not plan to cross examine on this issue.  *See, e.g., United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (explaining that the Government is permitted to elicit a witness's testimony about the uncharged crimes "to avoid the appearance that it [is] concealing impeachment evidence from the jury").  Even under the scenario, it is admissible for the reasons set forth above.

### V.     Efforts to Issue New Tribal Bonds to Cover Up the WLCC Bond Fraud

#### A.  Background

Soon after forcing Hughes' clients' portfolios to purchase the first issuance of the bonds, in response to objections by angered pension fund investors left holding the bonds in their portfolios with no ready secondary market for the bonds, the defendants began devising strategies to conceal their fraudulent actions.

One of those strategies involved having Bonwick Capital ("Bonwick") buy the bonds. Bonwick was a registered broker-dealer that Burnham acquired into its financial services conglomerate.  To help Bonwick meet its net-capital requirements, Cooney transferred to Bonwick the $5 million bond he bought in the third WLCC bond issuance.

To raise the money needed for Bonwick to purchase the Wakpamni bonds that were in Hughes client portfolios, the defendants engaged in efforts to induce a second Native American tribal entity to issue bonds, which were referred to as the "Wisconsin," "Rosebud" or "propane" bonds.

Evidence of the defendants' methods to conceal the Wakpamni bond fraud is direct evidence of their participation in the scheme.  That the defendants tried to do so by inducing yet another Native American tribal entity to issue bonds is necessary to complete the story of the different ways in which they tried to sell and resell the Wakpamni bonds to conceal their crimes. It is separately admissible pursuant to 404(b) because it demonstrates the defendants' motives and intent, their lack of mistake, and their *plan* in using fraudulently induced bond issuances to provide them with capital for their interrelated business ventures.

Defendants do not appear to seriously argue otherwise.  Only Archer directly addresses the admissibility of this evidence, and even he acknowledges that evidence "that the defendants intended to buy back the WLCC bonds from disgruntled investors in order to conceal their alleged crimes . . . *may* be admissible." (Archer Mem. of Law at 10 (emphasis in original)). While Archer argues that the "source of the funds for the buy-back is besides the point," neither

---

consider whether to seek a hearing regarding whether any defendant can establish that he (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly laid all the facts before his counsel; and (3) in good faith and honestly followed counsel's advice, believing it to be correct and intending that his acts be lawful, as required to benefit from an advice of counsel defense. *United States v. Colasuomo*, 697 F.3d 164, 181 (2d Cir. 2012).

of the cases he cites for that proposition supports it; in fact, both affirmed the admission of other acts evidence. (*See id.* (citing *United States v. Edwards*, 342 F.3d 168, 177 (2d Cir. 2003) and *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992)).

Moreover, the presentation of the evidence will not "be tortured." (*Id.* at 11). The Government anticipates that its proof on this issue will be straightforward and, in significant measure, overlap with other evidence concerning investor complaints about the WLCC bonds.

## VI.    False Statements in the Hughes and Atlantic Form ADVs

False statements and omissions in the Hughes and Atlantic Form ADVs are direct evidence of the charged scheme. Notably, Michelle Morton, the defendant against whom this evidence is most relevant, does not actually challenge the admissibility of the evidence; only Archer does.

The Form ADV requires investment advisers to identify every person that "controls" the advisers, including those with "the power directly or indirectly, to direct the management or policies of a person, whether through ownership of securities by contract, or otherwise." According to the Form ADV, "a person is presumed to control a limited liability company if the person . . . has contributed 25 percent or more of the capital of the LLC."

Here, Morton's financial backers, including Jason Galanis, Archer, and Cooney, controlled Hughes and Atlantic. Those defendants funded Morton's August 2014 purchase of Hughes, through an entity called BFG Socially Responsible Investments ("BFG-SRI"). Among other things, BFG-was given certain rights, including the right to approve Hughes' Chief Investment Officer and to appoint members to Hughes' board.[5]

The defendants also funded Morton's purchase of AAM, again through BFG. Once again, BFG was given two seats on AAM's board of managers and the ability to approve AAM's CIO.

Moreover, as a practical matter. Morton was well aware that Jason Galanis and her other financial backers controlled both investment advisers. For example, in an August 2014 e-mail to Jason Galanis regarding Hughes' purchase of the bonds, Morton stated "the decision regarding what should be done is yours, not mine . . . To be fair to both of us, if you made the investment with this in mind, I do not have the moral right to stand in the way and everything is in place to move forward."

Even though Jason Galanis and Morton's other financial backers were clearly "direct[ing]" Hughes and Atlatnic's "management [and] policies," the Form ADVs filed by Hughes and Atlantic failed to disclose this control.

---

[5] Hirst was initially installed as Hughes' CIO but resigned because he did not want his name listed on the Form ADV.

In failing to disclose the control of Atlantic and Hughes exercised by her co-defendants in the Hughes and Atlantic Form ADVs, Morton perpetuated the scheme by continuing to hide from her clients that various individuals and entities exercising control over the investment adviser were also connected to both the placement agent for the bonds and the purported annuity provider guaranteeing payment on the bonds.

Morton's causing inaccurate Form ADVs to be filed is thus direct evidence of the charged scheme.  It shows Morton's knowledge and intent, and her consciousness of guilt, in failing to disclose that she had ceded control of Hughes and Atlantic, in violation of her fiduciary duties as an investment adviser.  Moreover, her actions arose out of the same transaction or series of transactions as the charged offense, are inextricably intertwined with the evidence regarding the charged offense, and necessary to complete the story of the crime on trial.

Archer's argument that the Form ADV evidence would be prejudicial because it would somehow inject issues of race and ethnicity into the trial is puzzling and nonsensical, as the Form ADV evidence has nothing to do with race.  Put simply, Morton was required to disclose who controlled the investment advisers Hughes and Atlantic in the Form ADV, and she failed to do so.

Accordingly, the Court should admit evidence of the Form ADVs.

## VII. Code Rebel

### A. Background

As alleged in the Complaint and the Indictment, the fourth Wakpamni bond issuance was purchased by a pooled investment vehicle at Atlantic, an investment advisory firm purchased and controlled by the defendants.  Complaint ¶ 56; Indictment ¶ 13(b).

From approximately April 29, 2015 to May 18, 2015, approximately $5 million of the proceeds of the fourth bond issuance were transferred to two brokerage accounts—Thunder Valley Engineering ("Thunder Valley") and Seymour Capital—set up at Burnham at the direction of defendant Gary Hirst.  Complaint ¶ 58.  The Thunder Valley and Seymour Capital accounts were opened so that the accounts could purchase a significant percentage of the shares of the Code Rebel IPO, a Burnham-sponsored initial public stock offering, with the proceeds of the fourth bond issuance.  *Id.*  In fact, on May 19, 2015, the Thunder Valley and Seymour Capital accounts purchased 867,000 of the 1,000,983 shares of Code Rebel stock offered in the IPO, or approximately 87%.  *Id.*  Archer, Cooney, Hirst, and family members and spouses of Archer and Cooney were among the purchasers of the remaining 13% of the shares offered in the IPO.  *Id.*  As a result, defendants Jason Galanis, Archer, Cooney and Hirst controlled virtually the entirety of Code Rebel's stock, which enabled them to move the stock prices from approximately $5 to a high of more than $40—making their shares, including the shares

purchased with the proceeds of the fourth bond issuance, worth millions of dollars for some period of time.

As described in the Complaint, on September 1, 2015, an interest payment of $1,546,417.13 was due with respect to the first Wakpamni bond issuance. *Id.* On that date, a bank account opened by Hirst—referred to as the WAPCC Account in the Complaint—began with only approximately $3,000 in it. *Id.* On September 1, 2015, Archer transferred $250,000 to the WAPCC Account. *Id.* On September 2, 2015, another $1,212,000 representing the proceeds received by Thunder Valley and Seymour Capital from the Code Rebel IPO was transferred to the WAPCC Account. *Id.* Later that day, a total of $1,546,417.13 was transferred from the WAPCC Account and used to make the interest payment for the first bond issuance that was due on September 1, 2015. *Id.*

B. Discussion

Contrary to the defendants' assertions, the evidence of the Code Rebel IPO is direct evidence of the charged offense.

First a key allegation in the case is that the WLCC was told that the bond proceeds would be placed in an annuity, but they were instead misappropriated. The Code Rebel IPO shows how the bonds for the fourth issuance were misappropriated: they were placed into accounts at the direction of defendant Hirst and then used to buy not an annuity, but shares of Code Rebel. This is obviously direct evidence of the charged crimes.

Second, the fact that then sought to "pump" the Code Rebel stock shows one way the defendants expected to profit from their scheme. By using the proceeds of the fourth issuance to control 87% of the Code Rebel stock, the defendants were able to effectively control the price of Code Rebel, as it rocketed from approximately $5 s share to a high of more than $40 over a few days. Whether the defendants ultimately individually profited from the Code Rebel shares or individually purchased Code Rebel shares with their own money is irrelevant to their intent when they purchased the shares. What is relevant as direct evidence of the charged conduct is that they expected to and intended to profit from the Code Rebel shares, both personally and in support of the "Burnham" financial services conglomerate. Further, the Government does not anticipate its proof on the "pump" aspect of Code Rebel to be complicated or lengthy. At the present time, and subject to continued investigation and witness preparation, the Government intends to rely on stock/volume numbers from Bloomberg and witness testimony regarding the purpose of sales in and out of the Thunder Valley and Seymour Capital accounts.[6]

Third, the defendants' use of proceeds from Code Rebel shares (which, again, had been purchased using the proceeds of the *fourth* issuance) to fund interest payments on the *first*

---

[6] The testimony will be from one or more witnesses who will also testify about other aspects of their involvement in the Wakpamni scheme. Thus, the evidence would also be admissible as *Giglio* material for the relevant witness(es). *See, e.g., Coonan*, 938 F.2d at 1561 (explaining that the Government is permitted to elicit a witness's testimony about the uncharged crimes "to avoid the appearance that it [is] concealing impeachment evidence from the jury").

Wakpamni bond issuance is, again, critical direct proof of the scheme. Again, the interest was supposed to be paid out of the annuity. Evidence that it was not is evidence that is "inextricably intertwined" with the rest of the charged conduct in this case and "necessary to complete the story of the crime on trial." It is also direct evidence that "furnish[es] an explanation of the understanding or intent with which certain acts"—such as the fraudulent inducement of the WLCC to issue the bonds, the purchase of the bonds by clients of the captive investment adviser firms, and the misappropriation of the bond proceeds for their own use—"were performed." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).

The Court should also reject the defendants' arguments that explaining the Code Rebel aspect of their fraudulent scheme will somehow be a "waste of time" or create a "mini-trial" or a "trial-within-the-trial." The Code Rebel evidence is central to showing that WLCC bond proceeds were never invested in any annuity and instead were misappropriated to serve the defendants' own ends. Further, as noted above, the evidence of the "pump" aspect of Code Rebel is not expected to be unduly complicated or lengthy.

Moreover, the defendants' Rule 403 arguments essentially ask the Court to reward them for purposely carrying out a complex, multi-faceted financial fraud in order to avoid detection and using the proceeds of the WLCC bonds to engage in other potentially criminal conduct. Now that they have been charged and face trial for their crimes, they cannot argue that their own scheme is too complex to present to a jury. Nor is the probative value of evidence of the Code Rebel aspect of the defendants' scheme "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Rule 403 generally does not preclude evidence of prior criminal conduct when that prior conduct is not "any more sensational or disturbing" than the charged crime. *Pitre*, 960 F.2d at 1120 (citation omitted); *see also United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (finding no error in district court's admission of uncharged criminal conduct when the evidence "did not involve conduct more serious than the charged crime"); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (Rule 403 did not preclude evidence of prior narcotics transactions that "did not involve conduct any more sensational or disturbing" than the charged crime); *United States* v. *Smith*, 727 F.2d 214, 220 (2d Cir. 1984) (essential inquiry under Rule 403 for admission of other crimes evidence is whether it involves "conduct likely to arouse irrational passions"). That the defendants used the Code Rebel IPO to recycle the Wakpamni bond proceeds and make additional self-related entity transactions from those proceeds is no more sensational or disturbing than any other aspect of the charged scheme.

## VIII.   Cooney's False Statements to City National Bank

Cooney's statements and misrepresentations to City National Bank throughout the time period of the conspiracy about his ownership of $5 million of Wakpamni bonds—ownership that was a substantial step taken in furtherance of the charged crimes—should be admitted as direct evidence or, in the alternative, pursuant to Rule 404(b) as proof of his knowledge that the Wakpamni bond transactions were fraudulent.

The Government anticipates establishing Cooney's false statements through the testimonial evidence of approximately one to two witnesses, supported by documentary evidence. Specifically, the Government anticipates showing that, in June 2015, Cooney obtained

a $1.2 million loan from City National Bank. At the time, Cooney's assets included $2 million of Code Rebel stock. The bank was concerned about Cooney's ability to cover the loan, and Cooney stated that, in addition to the stock, he had $5 million in Wakpamni bonds. Cooney intentionally withheld from the bank that he did not truly own the bonds, because he had purchased them using borrowed money, i.e., the proceeds from the first issuance.

Cooney then defaulted on the loan. Because the price of Code Rebel stock had sank precipitously by this point, the Code Rebel stock was not sufficient to cover the loan, and the bank asked about the Wakpamni bonds. At that point, Cooney admitted that he had never owned them, had borrowed money to buy them, and had transferred them away.

Cooney's misrepresentations and inconsistent statements regarding to his ownership of the bonds are direct evidence of the scheme and evidence of Cooney's knowledge and intent that his purchase of the bonds was fraudulent.

Cooney's reliance on *United States v. Cushing*, S3 00 CR. 1098 (WHP), 2002 WL 1339101, at *1 (S.D.N.Y. June 18, 2002) is misplaced. In *Cushing*, the defendant was charged, among other things, with committing perjury and obstructing justice with respect to an SEC investigation of a company called Wamex Holdings. *Cushing*, 2002 WL 1339101, at *1 (S.D.N.Y. June 18, 2002). The Government sought to introduce evidence of the defendant's false statements to a separate investigatory authority—the National Association of Securities Dealers—in an NASD investigation of another company, Monitor Investment Group. *Id.* at 2. In precluding such evidence under Rule 404(b), the district court rejected the argument that the NASD evidence—evidence that Cushing "lied to a different investigative authority on a different subject at a different point in time"—admissible under 404(b), because it would only tend to demonstrate his willingness to lie to an investigatory authority. *Id.* at *3.

Unlike *Cushing*, here the Government is not seeking to introduce evidence of Cooney's lies "on a different subject at a different point in time." Instead the Government seeks to offer evidence that Cooney lied to City National Bank about the subject of the crime charged in this case—the Wakpamni bonds—during the time period of the charged conduct.

Cooney's Rule 403 arguments about the City National Bank evidence should also be rejected because such evidence is no more sensational or disturbing than the ongoing fraudulent scheme with which he is charged. Nor is presentation of the evidence going to relate in "undue delay" or "wasting time," as Government anticipates proving up Cooney's statements through testimonial evidence of one to two witnesses and limited documentary evidence.

**IX.    The Defendants' Continued Severance Arguments Should Be Rejected**

The evidence described above further underscores the intertwined nature of the defendants' conduct and how "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." *Richardson v. Marsh*, 481 U.S. 200,

210 (1987). The burden on victims and witnesses is particularly important here. The pension-fund and WLCC victims in this case, along with numerous lay witnesses, are not from New York and requiring them to travel repeatedly imposes a meaningful inconvenience in many cases.

Further, much of the evidence cited above demonstrates the interconnectedness between the defendants, the fraudulent entities they created and controlled, and the significance of each defendant's role and conduct in the fraudulent scheme. A key element of the case is that the bond proceeds were not invested in an annuity and instead were misappropriated, and key theme of the Government's case is that the bond issuances were intended to provide capital for the defendants other business endeavors. Only a few examples illustrate this point:

- Morton's false statements on the Hughes and Atlantic Form ADVs concealed the numerous conflicts of interest that existed with respect to Hughes' and Atlantic's role in purchasing the Wakpamni bonds. If properly disclosed, those would have alarmed Hughes and Atlantic investors in a way that would have shed light on the defendants' criminal actions and put a stop to the personal and business rewards they intended to reap from the conspiracy.

- Archer's false statements to the BIT Board and to Morgan Stanley and Deutsche Bank had a similar effect: they were designed in part to protect and further the conspiracy, allowing the bonds Archer purchased to be held at a reputable bank, which later facilitated their transfer when used to help Burnham meet net-capital requirements;

- The defendants' ongoing efforts to recycle and misappropriate the proceeds of the fraudulently induced Wakpamni bonds is evidenced by (a) their efforts to issue new tribal bonds to raise money to purchase the Wakpamni bonds that were in the Hughes client portfolios; (b) Cooney's attempted sham purchase of Jason Galanis's home with Wakpamni bond proceeds; (c) Cooney's false statements and misrepresentations to City National Bank; (d) Archer's lies to Morgan Stanley and Deutsche Bank, his placement of the bonds at Morgan Stanley, and his use of the bond proceeds to help meet Burnham's net capital requirements; and (e) the Code Rebel IPO.

- The Code Rebel IPO, a Burnham-sponsored offering, was fueled by the proceeds of the Wakpamni bonds, and—unsurprisingly—was designed to benefit both the business interests of the defendants *and* their personal wealth, as demonstrated by shares purchased personally by Archer, Cooney, Hirst, and various of their spouses and family members. In yet another example of how the defendants' furthered their interests through the misappropriation of the Wakpamni bonds, proceeds from the Wakpamni bond-fueled Code Rebel IPO were then *used to make an interest payment on the first issuance of the Wakpamni bonds*.

- The purchase of the Code Rebel shares (and the use of Code Rebel shares to fund interest payments of the bonds), the evidence regarding 1920 Bel Air is relevant to show the misappropriation, and Archer's placement of the bonds at Morgan

Stanley (which were subsequently used to help Burnham meet net capital requirements).

Here, where the combined trial of the defendants is expected to last approximately four to six weeks, "[o]nly non-violent, allegedly fraudulent conduct is at issue," and given the "interconnectedness of the alleged fraud . . . it is by no means clear that the evidence at separate trials would be significantly different." *United States v. Tuzman*, No. 15 Cr. 536 (PGG), 2017 WL 4785459, at *8 (S.D.N.Y. Oct. 19, 2017). Evidence of the various ways in which the bond proceeds were misappropriated, including the $3.8 million transfer to Cooney and the used of bond proceeds to purchase Code Rebel shares, would be admissible at any trial regarding this scheme. Moreover, "this is not a case where the evidence is so inflammatory that there is reason to be concerned that a jury may have difficulty in considering the evidence against each [defendant] separately, nor does there appear to be a significant risk of jury confusion." *Id.*

Finally, because if the nature of the scheme and the interconnectedness of the defendants and the entities they used to further the scheme, this is not a case where there are real concerns about the disparity of proof. But, "[t]o the extent that other evidence is only admissible against one defendant, that issue can be adequately addressed through the use of a limiting instruction." *Id.*

In sum, none of this evidence overcomes the strong preference for joint trials by creating "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). And no defendant will be subject to any "spillover prejudice" from a joint trial because the evidence to be introduced at separate trials would overlap considerably given the intertwined nature of each defendant's conduct underlying the charges in this case. The defendants' requests for severance should be denied.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

by: \_\_\_\_/s/_____
Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360 / 2190 /2482