**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

        v.

GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

                Defendants.

No. 16 Cr. 371 (RA)

---

## <u>DEVON ARCHER'S MEMORANDUM IN SUPPORT OF HIS MOTIONS *IN LIMINE*</u>

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## <u>TABLE OF CONTENTS</u>

APPLICABLE LAW ....................................................................................................... 2

I.      The Government Should Not Be Permitted to Refer to "the Defendants" Unless It Really Means All of the Defendants ...................................................... 2

II.     The Court Should Require the Parties to Be Precise When Referring to the Various Similarly Named Entities in This Case ............................................ 5

III.    The Court Should Preclude Unnecessary References to the "Minority Business Enterprise" Status of Certain Entities (*e.g.*, GXs 2018, 2019, 2029, 2030, 2069, 2207, and 2213) ...................................................................... 7

IV.     The Court Should Preclude One Other Racially Inflammatory Exhibit (GX 2085) ............................................................................................................ 12

V.      The Court Should Preclude Testimony About the Effects of the Alleged Fraud on Any Victims and About the WLCC's Financial Condition ............... 13

VI.     The Court Should Preclude Any Evidence Concerning How the Allegedly Misappropriated Bond Proceeds Were Spent ...................................................... 17

VII.    The Court Should Preclude *Any* Evidence About Michelle Morton's Purported "Cooperation" or "Whistleblowing" – Not Just from Ms. Morton (*e.g.*, GXs 103, 104, 1403, and 2658) .................................................... 19

VIII.   The Court Should Preclude References to and Arguments About Michael Milken (*e.g.*, GX 375, 2204, 2217, 2292, 3004, 3226) ...................................... 22

IX.     The Court Should Preclude Exhibits Providing Summaries of the Securities Laws Because It Will Usurp the Court's Role and Confuse the Jury (*e.g.*, GXs 1024, 1025, 1026, and 1027) ........................................................ 29

X.      The Court Should Preclude or Redact Government Trial Exhibits Containing Irrelevant, Inflammatory Language (*e.g.*, GX 2049, 2067, and 2069) .................................................................................................................... 31

CONCLUSION ............................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Blumberg v. United States*,
   222 F.2d 496 (7th Cir. 1955) ........................................................................ 18

*Brough v. Imperial Sterling Ltd.*,
   297 F.3d 1172 (11th Cir. 2002) .................................................................... 15

*Contemporary Mission, Inc. v. Bonded Mailings, Inc.*,
   671 F.2d 81 (2d Cir. 1982)........................................................................... 13

*Demore v. Kim*,
   538 U.S. 510 (2003)........................................................................................ 4

*Drake v. Woods*,
   547 F. Supp. 2d 253 (S.D.N.Y. 2008)........................................................... 2

*Kelly v. Boeign Petroleum Servs.*,
   61 F.3d 350 (5th Cir. 1995) ......................................................................... 12

*Loussier v. Universal Music Grp., Inc.*,
   No. 2-cv-2447 (KMW), 2005 WL 5644421 (S.D.N.Y. Jul. 14, 2005) .......... 18

*Scales v. United States*,
   367 U.S. 203 (1961)........................................................................................ 3

*Smith v. Farley*,
   59 F.3d 659 (7th Cir. 1995) ........................................................................... 8

*Sprint/United Mgmt. Co. v. Mendelsohn*,
   552 U.S. 379 (2008)...................................................................................... 16

*United States v. Blake*,
   195 F. Supp. 3d 605 (S.D.N.Y. 2016).......................................................... 21

*United States v. Bonventre*,
   No. 10 Cr. 228 (LTS) (S.D.N.Y. 2014) .......................................................... 5

*United States v. Bowman*,
   302 F.3d 1228 (11th Cir. 2002) ..................................................................... 8

*United States v. Copple*,
   24 F.3d 535 (3d Cir. 1994)...................................................................... 14, 16

*United States v. Doe*,
   903 F.2d 16 (D.C. Cir. 1990) ......................................................................... 8

*United States v. Dwyer*,
   539 F.2d 924 (2d Cir. 1976) ................................................................. 29

*United States v. Esso*
   684 F.3d 347 (2d Cir. 2012) ................................................................. 26

*United States v. Ewings*,
   936 F.2d 903 (7th Cir. 1991) ......................................................... 17, 18

*United States v. Figueroa*,
   618 F.2d 934 (2d Cir. 1980) ................................................................. 31

*United States v. Finkelstain*,
   No. S 89-CR-0009 (MBM), 1989 WL 96629 (S.D.N.Y. Aug. 15, 1989) ..................... 20

*United States v. Frasch*,
   818 F.2d 631 (7th Cir. 1987) ................................................................. 32

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) ................................................................... 9

*United States v. Gupta*,
   747 F.3d 111 (2d Cir. 2014) ......................................................... 20, 21

*United States v. Ham*,
   998 F.2d 1247 (4th Cir. 1993) ............................................................. 13

*United States v. Harding*,
   No. 08-10061-JTM, 2009 WL 982106 (D. Kan. Apr. 13, 2009) ........................... 16

*United States v. Harwood*,
   998 F.2d 91 (2d Cir. 1993) ................................................................. 20

*United States v. Hatfield*,
   685 F. Supp. 2d 320 (E.D.N.Y. 2010) ..................................................... 17

*United States v. Heimann*,
   705 F.2d 662 (2d Cir. 1983) ................................................................. 16

*United States v. Jackson-Randolph*,
   282 F.3d 369 (6th Cir. 2002) ......................................................... 16, 18

*United States v. MacQueen*,
   596 F.2d 76 (2d Cir. 1979) ................................................................... 4

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001) ................................................................. 31

*United States v. Quattrone,*
    441 F.3d 153 (2d Cir. 2006)...........................................................................15, 31, 32

*United States v. Saccoccia,*
    58 F.3d 754 (1st Cir. 1995) ...................................................................................... 8

*United States v. Scarpa,*
    913 F.2d 993 (2d Cir. 1990) .................................................................................. 34

*United States v. Schweihs,*
    971 F.2d 1302 (7th Cir. 1992) ............................................................................... 32

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ..........................................................................................16, 18

*United States v. Sokolow,*
    91 F.3d 396 (3d Cir. 1996) ................................................................................13, 16

*United States v. Stahl,*
    616 F.2d 30 (2d Cir. 1980)..................................................................................... 18

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) .................................................................................. 21

*United States v. Tuzman,*
    No. 15-CR-536 (PGG) (S.D.N.Y. 2017) ............................................................. 31

*United States v. Valencia,*
    826 F.2d 169 (2d Cir. 1987)..................................................................................... 2

## **Rules**

Fed. R. Evid. 401 ............................................................................................29, 30, 33

Fed. R. Evid. 403 ..................................................................................................30, 31

Fed. R. Evid. 801(d)(2)(E) .......................................................................................... 21

Fed. R. Evid. 803 ......................................................................................................... 31

Fed. R. Evid. 807(a)(1).................................................................................................. 21

Defendant Devon Archer respectfully submits the following motions *in limine* for an order precluding the introduction of certain evidence at the trial scheduled to begin on April 30, 2018.  Specifically, the Court should enter an order:

(1)    requiring the government to be precise in its references to "the defendants";

(2)    requiring the parties to be precise in their references to the various corporate entities involved in this case;

(3)    precluding any evidence or argument about the "minority business enterprise" status of any entities involved in this case (*e.g.*, GXs 2018, 2019, 2029, 2030, 2069, 2207, and 2213);

(4)    precluding an e-mail that could be construed as containing an irrelevant and derogatory reference to Native Americans (GX 2085);

(5)    precluding any evidence or argument regarding the financial condition of, or the extent of the losses allegedly suffered by, the WLCC or any of the clients of the investment advisers at issue in this case;

(6)    precluding any evidence or argument about how the defendants spent the allegedly misappropriated funds;

(7)    precluding any evidence – including from the government – regarding Michelle Morton's purported "cooperation" or "whistleblowing" (*e.g.*, GXs 103, 104, 1403, and 2658);

(8)    precluding or redacting certain government trial exhibits that reference Michael Milken, and precluding the government from making any arguments, introducing any evidence, or eliciting any testimony about Mr. Milken's prior conviction for securities fraud (GXs 375, 2204, 2217, 2292, 3004, 3226);

(9)    precluding certain government exhibits, which were never seen (or even alleged by the government to have been seen) by the defendants, that contain extensive summaries of the securities laws (GXs 1024-27); and

(10)    precluding or redacting certain government exhibits that contain stray, irrelevant, and offensive remarks (GXs 2049, 2067, 2069).

In addition, at trial, all defendants should be presumed to join in all objections made by their co-defendants' counsel, and should not be required to reiterate their *in limine* objections on the record again.

## APPLICABLE LAW

This Court "ha[s] discretion in deciding whether a pretrial ruling on evidence may be made in advance of trial." *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir. 1987). This discretion includes the authority to preclude irrelevant and unduly prejudicial evidence, arguments, or references at trial. *See, e.g.*, *Drake v. Woods*, 547 F. Supp. 2d 253, 265 (S.D.N.Y. 2008) ("[J]udges have broad discretion to limit evidence that they consider to be prejudicial, irrelevant, or collateral.").

### I.   The Government Should Not Be Permitted to Refer to "the Defendants" Unless It Really Means All of the Defendants

This case involves five defendants who, as alleged, are involved in very different conduct. Two of the defendants are alleged to have engaged in two separate conspiracies; three are alleged to have been involved in only one. One allegedly was the main point of contact with the WLCC in inducing them to issue bonds; two worked at the investment advisers whose clients purchased the bonds; and two were outside investors in certain of the other entities involved in this case. Most of the defendants had never met each other before they appeared in this courthouse. Even the government's main cooperator has described the alleged conspiracy in this case as involving a "hub," Jason Galanis, who compartmentalized his interactions with the various alleged co-conspirator "spoke[s]." *See* Interview of Hugh Dunkerley (Oct. 21, 2016) (3506-2).[1]

In these circumstances, it is critical that the government be precise when making arguments or introducing evidence, because it will rarely be the case that all, or even most, of the

---

[1] The government's 3500 material is designated confidential and therefore has not been included as an exhibit. We are happy to provide the Court with copies of the 3500 material cited herein at the Court's request.

defendants will have been involved in a single course of conduct.  Conversely, the threat to Mr. Archer's right to a fair trial from being lumped in with his co-defendants is substantial.

Although the government should have no legitimate interest in misleading the jury by conflating the roles of the various defendants, its language throughout this case suggests that it does not appreciate the importance of specificity.  For example, at the most recent hearing before the Court, when providing an overview of the Rule 404(b) evidence that the government intends to admit, it had to be prompted to disaggregate its references to "defendants."  *See, e.g.*, Ex. 1 (Mar. 6, 2018 Tr. at 65:21-67:5) (regarding the government's Rule 404(b) notice, the government insisted it was not "prepared to answer on the fly" whether "literally all of" the defendants were implicated in an alleged scheme to induce another Native American Tribe).  The Complaint likewise uses the term "the defendants" when it does not refer to all of the defendants, *see, e.g.*, Complaint ¶ 30(a) ("significant portions of the [WLCC bond] proceeds were misappropriated by the defendants for their personal use"), and the government's briefing contains numerous such references, *see*, *e.g.*, Gov't Mem. in Support of Pre-Trial Motions [ECF No. 300] at 1-2, 4-7, 12-13, 15-17; Gov't Mem. in Opp. to Defs.' Pre-Trial Motions [ECF No. 308] at 1-2, 4-8; Gov't Reply Mem. in Further Support of Pre-Trial Motions [ECF No. 313] at 1, 6-7.

In argument to the Court, the use of the term "the defendants" may be an acceptable shorthand in cases where precision is not critical.  But arguments and evidence before the jury are a different matter.  The Constitution requires that the government present its case and any argument to the jury with this precision, as the Fifth Amendment requires that the government prove the guilt of each defendant individually.  *See Scales v. United States*, 367 U.S. 203, 224-25 (1961) ("In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct

to other concededly criminal activity . . . , that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment."); *Demore v. Kim*, 538 U.S. 510, 551 (2003) ("Due process calls for an individual determination before someone is locked away.") (Souter, J., concurring).

Likewise, references to "the defendants" when the government means anything other than all five trial defendants will be in irreconcilable tension with the standard instruction that the jurors "are required to consider each defendant individually to determine whether each element of the charge is a fact beyond a reasonable doubt with regard to each defendant; and the fact that you may find one defendant guilty or innocent with regard to any count of the indictment does not require you, and should not be considered by you as requiring you to find any other defendant guilty or innocent of that same count."  *See*, *e.g.*, *United States v. MacQueen*, 596 F.2d 76, 79 (2d Cir. 1979).

If, over the many weeks of the trial, the jurors have been inundated through the presentation of the government's proof, several of the defense cases, and the parties' arguments with the phrase "the defendants," this instruction at the close of trial will be rendered meaningless.  For precisely that reason, judges in this District have warned prosecutors in multi-defendant cases that references to "the defendants" constitutes improper argument unless they truly mean each and every defendant on trial.  For example, Judge Swain recently admonished the government in the middle of its rebuttal summation as follows:

> [I]n a five-defendant case, where there are hundreds of thousands, if not millions, of pages of documents, one has to be – the government has a responsibility to be accurate when it is purporting to describe evidence. . . . And so the "theys" [*i.e.*, referring to all five defendants as "they"] . . . must be very, very careful . . . .   And to the extent you're arguing, there was a situation at Madoff Securities and the "they," which it seemed to me sometimes, you can certainly accuse Madoff Securities of whatever you want, but when you say "they" in this courtroom with five individuals here, people who did different functions, that's problematic. . . . And be very careful

whom you accuse of what on what basis.  And don't brand each of these people with your institutional thesis.  You have to prove your case with respect to each individual and, obviously, it isn't seriously in dispute that the institution was corrupt.  The question here is whether these individuals knowingly participated in the corruption. . . .  So you have an extra responsibility both of persuasion but of accuracy and precision.

Trial Tr. at 11665-66, 11671-72, *United States v. Bonventre*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Mar. 13, 2014) [ECF No. 944] (relevant pages attached as Exhibit 3); *see also id.* at 11657 (court *sua sponte* interrupting prosecutor to say "please be careful about 'they' and 'these people' in relation to particular issues and accusations"); *id.* (court, responding to prosecutor's explanation that he was "just trying to be efficient," by saying "justice demands precision").

Accordingly, the Court should require that the government and all defense counsel refer to either "all five defendants" (or some other sufficiently clear variant of that phrase), or to specific individual defendants or groups of defendants wherever applicable.  This relief is straightforward in application, does not prejudice the government's presentation of evidence, and is essential to ensuring that, to the extent they are tried together (which they should not be, for all the reasons set out in Mr. Archer's still-pending severance motion), all five defendants remaining in this case receive a constitutionally fair trial.

## II.   The Court Should Require the Parties to Be Precise When Referring to the Various Similarly Named Entities in This Case

This case involves a large number of entities, many of which have similar-sounding names. In some instances, the similarly-named entities are corporate affiliates of one another; in other cases they have some common element but are not affiliates; and in some cases one entity has allegedly been misleadingly named to sound like another entity.  There is, for example, Burnham Financial Group, BFG Socially Responsible Investments, Burnham Securities Inc., Burnham Asset Management, and the Burnham Investment Trust.  There is Rosemont Seneca Bohai, Rosemont Seneca Partners, Rosemont Seneca Technology Partners, RSTP Capital, and Rosemont Realty.

5

There is Wealth Assurance AG, Wealth Assurance Holdings, and two different Wealth Assurance Private Clients.  And there is COR Fund Advisors, COR International, COR Capital International, and COR Advisors.  Because of this multiplicity of entities, where in some cases the precise relationship amongst them is absolutely critical, it would be horribly misleading for the Court to permit references to, for example, Burnham, Rosemont, Wealth Assurance, or COR.

Again, the government has no legitimate interest in eliding the distinction between these entities, but past practice indicates that it may do so before the jury.  If the parties are permitted to describe entities by inaccurate or ambiguous names, there is a high likelihood of prejudicial jury confusion.  For example, if the government is permitted to refer to any entity with "Wealth Assurance" in its name as "Wealth Assurance" alone, it could elide the fact that one entity bearing that name, unbeknownst to Mr. Archer, was not part of the Wealth Assurance family of companies (which later became Valor Group).

To take another example, there is a subsidiary of Wealth Assurance AG named "BFG Socially Responsible Investments."  In that entity's name, "BFG" is not an acronym; however, another entity, Burnham Financial Group, is commonly referred to as "BFG."  Mr. Archer may have been involved with one (BFG), but not the other (BFG Socially Responsible Investments). Likewise, Mr. Archer may have been involved with COR Fund Advisors, or CORFA, but that entity is unrelated to any of the other COR entities.  If the government refers to COR or CORFA in describing an action undertaken by COR Capital, COR International, COR Capital International, or COR Advisors (an LLC managed by COR Capital LLC, but not related in any way to COR Fund Advisors LLC), then it will confuse the jury and falsely attribute actions to Mr. Archer.  Any shorthand references to these companies would be inaccurate, misleading, and would confuse the

jury in a way deeply prejudicial to Mr. Archer because it would conflate his role with one entity and his non-role with the other.[2]

To the extent that employing a shorter but ambiguous name could aid a party's presentation of evidence to the jury, that interest is obviously outweighed by the need for an accurate presentation of evidence and the countervailing risk of jury confusion and unfair prejudice to Mr. Archer. It will be hard enough for the jury to keep all of these similarly-named entities straight. A shorthand label, such as "Wealth Assurance," will encourage the jury to conflate one "Wealth Assurance" entity with another and mislead the jury into believing that one entity is related to another because they were referred to by confusingly similar names.

Mr. Archer therefore respectfully requests that the Court require the parties and witnesses to refer to all corporate entities by their proper names to avoid confusion or misleading the jury.

## III. The Court Should Preclude Unnecessary References to the "Minority Business Enterprise" Status of Certain Entities (*e.g.*, GXs 2018, 2019, 2029, 2030, 2069, 2207, and 2213)

As discussed in Mr. Archer's opposition to the government's motion to introduce evidence pursuant to Rule 404(b), the two investment advisers at issue in this case, Hughes Capital Management and Atlantic Asset Management (the "Investment Advisers"), were majority-owned by GMT Duncan (later called Atlantic Capital Holdings). *See* Rule 404(b) Opp. at 12 [ECF No. 355]. GMT Duncan qualified as a minority business enterprise ("MBE"), thereby entitling it (and, in turn, the Investment Advisers) to certain economic benefits. *See id.*

Although the Investment Advisers' status as MBEs was perfectly lawful, testimony about that fact has the potential to be incredibly inflammatory by creating the false impression that

---

[2]     There is an analogous concern with respect to "RSTP Capital, LLC." That entity has no corporate relationship to Rosemont Seneca Technology Partners, L.P., which is sometimes referred to as "RSTP."

certain of the defendants were fraudulently taking advantage of the rules surrounding minority

owned businesses, and therefore targeting minorities.  Any such evidence would introduce

sensitive and highly inflammatory racial dynamics with no probative value.

    In a case in which five defendants – four white men and one African American woman

(who apparently intends to point the finger at her co-defendants and claim that she was a

whistleblower) – are already accused of victimizing a Native American tribe, the (false)

insinuation by the government that some of the defendants fraudulently took advantage of the

rules surrounding minority owned businesses, or more generally took advantage of minorities,

will be toxic.  *United States v. Bowman*, 302 F.3d 1228, 1239-40 (11th Cir. 2002) (government

"should have scrupulously avoided the possibility that the jury's verdict might be clouded by

racial issues" and trial court "should have[] prevented the injection of racial issues"); *Smith v.

Farley*, 59 F.3d 659, 663 (7th Cir. 1995) ("There is no place in a criminal prosecution for

gratuitous references to race . . . ."); *United States v. Saccoccia*, 58 F.3d 754, 774 (1st Cir. 1995)

("[C]ourts must not tolerate prosecutors' efforts gratuitously to inject issues like race and

ethnicity into criminal trials. Emphasizing a person's national origin not only may raise concerns

of relevancy, undue prejudice, and prosecutorial misconduct, but also may pose issues of

constitutional dimension." (citations omitted)); *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir.

1990) ("Racial fairness of the trial is an indispensable ingredient of due process and racial

equality a hallmark of justice. Appeals to racial passion can distort the search for truth and

drastically affect a juror's impartiality." (footnotes omitted)).

    The fact that the Investment Advisers qualified as MBEs, and that their MBE status was

apparently something that Jason Galanis found desirable for reasons that do not appear – at least

based on the Complaint and Indictment, the government's trial exhibits, and the 3500 material –

to have been criminal in nature, is irrelevant to the charged conduct here and will be of no

probative value at trial.  Indeed, the Indictment does not mention the MBE status of any entities involved in this case, and the Complaint merely states once, in passing and without any further elaboration or explanation of how it is at all relevant to the government's overarching allegations of criminal conduct, that GMT Duncan was formed "with the stated business purpose of providing socially responsible fixed income investment management and advisory services as a minority business enterprise."  Complaint ¶ 20.  Nor is this evidence "necessary to complete the story of the crime on trial" because, for the reasons stated above, the government can still tell the complete story of everything about this case that it alleges to have been criminal in nature without including any details regarding any entities' MBE status.  *Cf. United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997).

Importantly, given that references to the MBE status of the Investment Advisers pervade the government's trial exhibits – and in particular, the exhibits from Hughes Capital Management, which is to be expected given that the firm possessed MBE status well before any of the events at issue in this case – Mr. Archer is <u>not</u> moving for all exhibits containing such references to be redacted or precluded.  Instead, he is merely requesting that the Court (1) preclude the government from introducing any exhibits that are solely or primarily about the Investment Advisers' (or any other entities') MBE status, as opposed to exhibits that primarily relate to other, relevant issues and only contain stray references to these entities' MBE status; (2) preclude the government from eliciting any testimony or making any arguments to the jury about the MBE status of the Investment Advisers or any other entity; and (3) require the government to redact a handful of irrelevant references to MBE status in certain e-mails sent by Jason Galanis, all of which go directly to the problematic, irrelevant, and unduly prejudicial

notion that Galanis affirmatively sought out such entities to use them in furtherance of his fraudulent scheme.[3]

For example, GXs 2029, 2030, and 2213 illustrate the potential prejudice.  These exhibits are all versions of e-mail chains that include a July 16, 2014 e-mail from Jason Galanis to Messrs. Archer and Cooney that contains the following paragraph:

> [Hughes Capital Management] is a minority owned firm now, and will continue to be so with our partner, Michelle Morton. There are a great number of minority opportunities for affirmative action type of allocations to a fixed income shop like this. the group we are sponsoring are amazing marketers with a track record in the institutional world. Richard raised $6bn for his last firm, which was hispanic owned. this is black woman, which i am told there are more mandates for.

*See* Exs. 3-5 at 1.  This e-mail shows Galanis pushing an investment in Hughes Capital Management primarily because of the benefits inherent in its MBE status – *i.e.*, the fact that "[t]here are a great number of minority opportunities for affirmative action type of allocations" and "mandates."  The jury is likely to misunderstand these comments – which are perfectly lawful – as improperly exploiting Hughes's MBE status.  A juror could well infer from these communications that Galanis and certain of the other defendants were essentially coopting economic opportunities that were reserved for minorities, thereby preying on minorities themselves.  *See, e.g.*, *Soul Man* (1986) (film starring C. Thomas Howell portraying a student who qualifies for a scholarship to Harvard Law School only after pretending to be African American and wearing blackface).  This evidence is entirely irrelevant, especially because there is no allegation that anyone broke any laws relating to MBEs.  Even if it had marginal relevance, its inflammatory nature would substantially outweigh any probative value.  Accordingly,

---

[3]    With regard to the redactions to government trial exhibits requested here and throughout these motions *in limine*, Mr. Archer requests that the Court order that any such redactions be simple "white-out" redactions rather than "black boxes" or anything else similarly conspicuous.

Mr. Archer respectfully requests that the Court order that this entire paragraph be redacted from GXs 2029, 2030, and 2213, as well as any other exhibits in which it may appear.

Similarly, GXs 2018, 2019, and 2207 are all e-mail chains that include a May 9, 2014 e-mail from Jason Galanis to Messrs. Archer and Cooney in which he states, without any explanatory context, that, if Hughes Capital Management were to be acquired, it "would need to continue [its] minority owned status." *See* Exs. 6-8 at 1. Again, for the same reasons, this sentence is inflammatory in addition to being irrelevant. This one line could also be easily redacted from each of these exhibits without impacting the rest of the document.

As a final example, GX 2069, yet another e-mail from Jason Galanis to Messrs. Archer and Cooney, this time from February 26, 2015, contains a reference to "minority asset maageemnt [sic] sales and trading" which, again, is similarly prejudicial. *See* Ex. 9 at 1. The problem with this exhibit can be even more easily and inconspicuously solved, as only the word "minority" would need to be redacted.

For all the reasons set forth above, the quoted portions of GXs 2018, 2019, 2029, 2030, 2069, 2207, and 2213 should all be redacted. While passing references to the MBE status of the Investment Advisors need not be redacted from Hughes Capital Management's custodial documents, for example, any references in e-mail communications between the defendants to the role that MBEs were conceived by Jason Galanis (or anyone else) to play in the charged scheme, or about the need for or how to use MBEs in relation to anything having to do with this case, should be redacted or precluded, and the government should be barred from presenting any argument or testimony on this point, as well.[4]

---

[4]    As explained in Mr. Archer's opposition to the Rule 404(b) evidence, it may be necessary for the defendants to introduce evidence about the Investment Advisers' MBE status if the government is permitted to introduce evidence about so-called false statements in the Forms ADV for the Investment Advisers. *See* ECF No. 355 at 13. As the Court will recall, the

**IV.    The Court Should Preclude One Other Racially Inflammatory Exhibit (GX 2085)**

For similar reasons, the Court should preclude GX 2085.  *See* Ex. 10.  That exhibit is an

e-mail from Mr. Cooney to Mr. Archer, Andrew Godfrey (an individual not alleged by the

government to be a co-conspirator), and Jason Galanis that attaches a photograph of his niece

playing high school lacrosse, writing, "My niece Chloe Cooney firing montana lacross!!" [sic].

Mr. Archer replies, in what can only be described as a bad joke, "Our families [sic] commitment

to respecting and honoring the Native American through sport runs deep!"

This exhibit should be excluded.  Lacrosse is a sport with Native American roots and one

that Mr. Archer has a long association with.  He played lacrosse in college and he coaches his

children's lacrosse teams now.  His bad joke was simply about lacrosse – not, as the government

apparently intends to argue, somehow about defrauding Native American tribes.  Indeed, as

noted above, this e-mail could not have been any kind of conspiratorial statement because it

included at least one person that the government does not claim to be a co-conspirator.  It was

simply a bad joke, but one that has the potential to portray Mr. Archer as somehow prejudiced

towards Native Americans.  *See Kelly v. Boeing Petroleum Servs.*, 61 F.3d 350, 357-58 (5th Cir.

1995) (upholding trial court's exclusion of defendant's "derogatory remarks about race, sex, and

national origin" as irrelevant and prejudicial in a trial over a disability claim); *Rauh v. Coyne*,

744 F. Supp. 1181, 1183 (D.D.C. 1990) (excluding evidence of racial discrimination in a gender

---

government's theory is that the Forms ADV fail to disclose that Jason Galanis, Devon Archer,
and Bevan Cooney controlled the Investment Advisers.  That evidence is entirely irrelevant and
unduly prejudicial as to Mr. Archer, because Mr. Archer is not alleged to have had any
knowledge of the Forms ADV, let alone that they may have contained misstatements.
Nonetheless, if the government were permitted to introduce the Form ADV evidence in a trial
involving Mr. Archer, Mr. Archer would be forced to rebut it by reference to the Investment
Advisers' MBE status, which would needlessly inject issues of race into this case, as explained at
greater length in Mr. Archer's 404(b) opposition.  *See id.*  If the Court nonetheless permits the
Form ADV evidence, then reference to the Investment Advisers' MBE status should be
permitted solely for the limited purpose of responding to that Form ADV evidence.

discrimination case, finding that such evidence "would be likely to be of little probative value but it would have very great potential for prejudice" (citations omitted)).  It is, in fact, difficult to conceive of comments more likely to inflame or prejudice a juror in a case like this one than statements that could be misconstrued as disparaging Native Americans or making light of the WLCC's victimhood.  *See, e.g.*, *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 84 (2d Cir. 1982) (noting inflammatory nature of evidence of a witness's religious affiliation); *United States v. Ham*, 998 F.2d 1247, 1252-53 (4th Cir. 1993) (noting inflammatory nature of evidence defendant's sexuality).  Accordingly, the Court should preclude GX 2085 in its entirety.

## V.     The Court Should Preclude Testimony About the Effects of the Alleged Fraud on Any Victims and About the WLCC's Financial Condition

It appears that the government intends to call certain of Jason Galanis's victims.  None of these victims had any personal interactions with Mr. Archer.  At least one of them did not have any contact with any of the defendants.  Their purpose, presumably, is to present testimony about the impact of the alleged fraud on the members of the Oglala Sioux Tribe and/or the individual retirees whose funds were invested through the Investment Advisers.  Because Jason Galanis's crimes are undisputed, this evidence serves no purpose other than to inflame the jury and provoke sympathy for the victims.  *See United States v. Sokolow*, 91 F.3d 396, 406-07 (3d Cir. 1996) (attempting to highlight personal tragedies of the victims was irrelevant and prejudicial).

The government should not be allowed to confuse the jury about the guilt or innocence of the defendants by pointing to the effects of the alleged fraud on the victims. The government's May 11, 2016 press release announcing the charges in this case stated that "[t]he defendants' alleged fraud has left devastation in its wake: a tribe with tens of millions in bond obligations it cannot pay, and investors out tens of millions, left holding bonds they did not want. . . . The most egregious fallout from this scheme is that the bondholders now hold worthless securities, and the

tribe can't make the interest payments due."  Press Release, Department of Justice, U.S.

Attorney's Office for the Southern District of New York, Seven Defendants Charged In

Manhattan Federal Court With Defrauding A Native American Tribe And Investors Of Over $60

Million, May 11, 2016, *available at* https://goo.gl/fz4CPs.  At various times in papers filed with

the Court, the government has referenced the poverty of the Oglala Sioux Tribe, painting its

members as particularly sympathetic victims.  *See, e.g.*, Sentencing Mem. of the United States of

America at 16 [ECF No. 215] ("Galanis victimized one of the poorest Native American Tribes in

the country by causing them to issue bonds with the promise of money needed for Tribal

development projects . . . .").  The 3500 material produced by the government suggests that it

intends to elicit information about the Tribe's poverty at trial, including its widespread

unemployment, the inadequacy of government assistance, members' difficulty obtaining

insurance, and other specific examples of how difficult life is for Tribe members, such as the fact

that many members have to seek employment in a town approximately 17 miles away, but they

have no cars.  *See* Interview of Geneva Lone Hill (Mar. 27, 2018) (3520-2).

  At least one witness appears to be on the government's list for no other reason than to

elicit this sort of improper appeal to sympathy and class warfare.  Geneva Lone Hill

acknowledged to the government that she "never spoke to or met JASON or JOHN GALANIS,

HUGH DUNKERLEY, or anyone else involved in the transaction" other than another member of

the Tribe and the WLCC's own lawyer.  3520-2 at 3.  She therefore has no competent evidence

to offer apart from the fact of any losses the WLCC may have incurred, although she concedes

she "was informed that the tribe was not liable" and "would not have to pay back the bonds."  *Id.*

at 4.  To the extent the government intends to call Ms. Lone Hill in order to testify about the

WLCC's financial circumstances, such testimony should be precluded.  *See, e.g., United States v.*

*Copple*, 24 F.3d 535, 544 (3d Cir. 1994) (finding that evidence as to loss was admissible to show

intent to defraud where defendant was directly involved with victims, but evidence as to impact of loss on victims was irrelevant and unduly prejudicial).

This sort of testimony, which serves no purpose other than to provoke sympathy for the victims by demonstrating the effects of the alleged fraud on an already impoverished population, should be excluded.  This evidence is simply irrelevant to the question of whether any of the five remaining defendants committed the charged crimes, and can only serve to unfairly prejudice them in their respective defenses.

The relative wealth or poverty of the victims of financial crimes is irrelevant to the question of the guilt or innocence of the defendants accused of committing those crimes.  *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (wealth evidence may generally be admitted only if relevant as proof of charged conduct or of motive); *cf. Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1178 (11th Cir. 2002) ("general rule" is that "no reference should be made to the wealth or poverty of a party").  Put differently, it makes no difference in the search for truth in a criminal trial whether, for example, the victims of Jason Galanis's fraudulent scheme were movie stars or professional athletes instead of the WLCC ("whose members," as the Securities and Exchange Commission has repeatedly stated, "live in one of the poorest regions in the United States," SEC Complaint[5] ¶ 3), or whether the clients of the Investment Advisers were billionaires instead of fixed-income retirees who invested in what they believed to be low-risk pension funds.

The fact remains, however, that the WLCC and these pension fund investors may elicit greater sympathy than wealthier victims.  Any references at trial to the extent or effect of their losses and/or their financial condition therefore would be unfairly prejudicial to Mr. Archer and

---

[5]     References to the "SEC Complaint" are to the Amended Complaint and Jury Demand filed by the U.S. Securities and Exchange Commission on November 14, 2016, in *SEC v. Archer, et al.*, No. 16 Civ. 3505 (WHP) [ECF No. 88].

his co-defendants.  *See, e.g.*, *United States v. Harding*, No. 08-10061-JTM, 2009 WL 982106, at

*4 (D. Kan. Apr. 13, 2009) (ordering the government to refrain from calling Medicare

beneficiaries "victims" in a Medicare fraud case because the alleged scheme defrauded Medicare

and not the beneficiaries).  The inflammatory nature of this evidence is also exacerbated given

certain of the defendants' own personal wealth, which may create a class-warfare dynamic that

will only serve to improperly prejudice the jury.  *See generally United States v. Socony-Vacuum*

*Oil Co.*, 310 U.S. 150, 239 (1940) ("[A]ppeals to class prejudice are highly improper and cannot

be condoned and trial courts should ever be alert to prevent them."); *United States v. Jackson-*

*Randolph*, 282 F.3d 369, 378 (6th Cir. 2002) (holding that evidence that appeals to "class

prejudice" is unduly prejudicial and should be excluded).

Moreover, "proof of actual loss by the intended victim is not necessary" to satisfy

elements of a fraud.  *Sokolow*, 91 F.3d at 406 (quoting *Copple*, 24 F.3d at 544) (alteration

omitted).  While there may be some limited circumstances where a victim's loss may be relevant

to a charged fraud, *see United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983), such

circumstances do not exist here, at least with regard to Mr. Archer.  Mr. Archer did not have any

contact with any of the WLCC or pension fund investor victims, and proof that a fraud occurred

and that losses were inflicted on investors and other victims, without more, does not comprise

competent evidence as to Mr. Archer's knowledge and intent.  Even if it did, there is a vast

difference between introducing evidence of the *fact* of the losses allegedly suffered by the

WLCC and the clients of the Investment Advisers, as opposed to introducing evidence showing

the extent and effect of the alleged losses.  *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S.

379, 386 (2008) ("Relevance and prejudice . . . are determined in the context of the facts and

arguments in a particular case, and thus are generally not amenable to broad *per se* rules.").

The victims of Jason Galanis's fraud are of course worthy of sympathy, but sympathy should play no role in the jury's deliberations. The government should therefore be precluded from introducing any evidence, eliciting any testimony, or making any arguments regarding the extent or effect of the losses allegedly suffered by, and/or the financial condition of, the WLCC or any of the investors in the Investment Advisers.

## VI.   The Court Should Preclude Any Evidence Concerning How the Allegedly Misappropriated Bond Proceeds Were Spent

The Court should also preclude evidence and argument concerning the defendants' "lifestyles" and how the defendants allegedly spent the misappropriated bond proceeds. How a defendant spends stolen money is simply not probative of whether he or she stole it in the first place.[6]

In a section titled, "MISSAPROPRIATION [sic] OF THE BOND PROCEEDS," the Indictment alleges that stolen bond proceeds were used for various personal expenses, legal fees, luxury items, unrelated business interests, and the like. Ind. ¶ 17. This evidence is not relevant to the charged crimes, however, and carries a significant risk of prejudice to the defendants. *See United States v. Ewings*, 936 F.2d 903, 906 (7th Cir. 1991) ("That the defendant went to Las Vegas, or bought a new car, tells us nothing about why he defrauded the insurance companies. Ewings might have spent the money the same way had the [allegedly fraudulent insurance] policies been legitimate . . . ."); *United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) ("[I]t is irrelevant if Mr. Brooks spent his fortune on lavish parties, instead of donating it to starving

---

[6]      To the extent that misappropriated bond funds were allegedly spent in continued furtherance of the charged scheme, Mr. Archer does not seek to preclude that evidence. For example, the government alleges that Mr. Archer and Mr. Cooney purchased the second and third tranche of WLCC bonds with money recycled from the first issuance. While there is no evidence that Mr. Archer or Mr. Cooney (or, for that matter, the government's main cooperator) knew that was the source of the funds, Mr. Archer does not seek to exclude that evidence. Rather, this motion *in limine* is aimed only at the expenditure of funds on unrelated things, especially luxury goods and separate business ventures.

Malawian orphans."); *see also Blumberg v. United States*, 222 F.2d 496, 500 (7th Cir. 1955) (evidence of lavish wedding provided to daughter and cash given to groom irrelevant and prejudicial in tax evasion case).

The government apparently intends to introduce evidence about expenditures on cars, travel, jewelry, clothes, a country club, legal fees, and a house in Bel Air.  But these expenditures are extraneous to the actual crimes charged, so can only serve to unfairly prejudice defendants. *See Ewings*, 936 F.2d at 907 ("[W]e are reluctant to subscribe to the government's theory that criminal intent may be inferred from the items on [the defendant's] shopping list.").  Worse, none of these expenditures were by Mr. Archer, so whatever scant relevance they might have to the person who spent the money, *but see Jackson-Randolph*, 282 F.3d at 378 ("The problem with a general rule of permitting evidence of an affluent lifestyle to show 'motive' for committing a crime is that it ignores the real possibility that the extreme or extravagant wealth or spending was made possible by legitimate means and, if so, the introduction of such evidence would appeal solely to class prejudice."), they say nothing whatsoever about Mr. Archer's guilt.

The Supreme Court has observed that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should be ever alert to prevent them."  *Socony-Vacuum Oil Co.*, 310 U.S. at 239; *see also United States v. Stahl*, 616 F.2d 30, 33 (2d Cir. 1980) (holding that a prosecutor's references to defendant's property, net worth, and "suite office" were "appeal[s] to class prejudice [that] are improper and have no place in a court room"); *Loussier v. Universal Music Grp., Inc.*, No. 02-cv-2447 (KMW), 2005 WL 5644421, at *2 (S.D.N.Y. Jul. 14, 2005) (excluding evidence of defendants' "wealth" and "financial condition" as "substantially outweighed by the danger of unfair prejudice that might result from jurors basing their conclusions on the relative wealth of the parties").  As explained elsewhere, certain aspects of this case create a particular risk of prejudice based only on the identities of the parties involved.  The Court should

not allow the government to exacerbate this risk by introducing irrelevant expenditure or lifestyle evidence.

**VII.    The Court Should Preclude *Any* Evidence About Michelle Morton's Purported "Cooperation" or "Whistleblowing" – Not Just from Ms. Morton (*e.g.*, GXs 103, 104, 1403, and 2658)**

Mr. Archer joins the government's motion to exclude evidence of Michelle Morton's attempted cooperation or whistleblowing, *see* ECF No. 370 at 8-12, as that evidence is unduly prejudicial.  But the government's exhibit list includes precisely some of that evidence, in a way deeply unfair to Mr. Archer.  This includes at least GXs 103, 104, 1403, and 2658, in which Ms. Morton writes after-the-fact that she was the victim of a fraud by her co-defendants.  *See* Exs. 11-14.  This evidence is inadmissible hearsay and highly prejudicial.  Its introduction at trial would violate Mr. Archer's constitutional right to confront the witnesses against him.  By the government's own logic, it should be excluded.

As explained in the government's motion *in limine*, Ms. Morton apparently reached out to the Financial Industry Regulatory Authority (FINRA) after she purportedly grew concerned about the threat of investigations and litigation related to the WLCC bonds.  Her clients had complained about the bonds, and Ms. Morton knew that as a result, the government might be investigating her.  ECF No. 370 at 9.  Ms. Morton then began meeting with the FBI, prosecutors, and the SEC – after the SEC had served document requests on her and on the FBI's initiative, not her own.  *Id.* at 10-11.  As the government argues, her statements to government investigators are inadmissible hearsay and prejudicial, with no probative value.

What the government leaves out is that while Ms. Morton was making self-serving statements to government investigators, she was also making similar self-serving statements to her clients in an attempt to salvage what goodwill possibly remained after the allegations of impropriety became public.  The government seeks to introduce these statements at trial.  *See*

19

Exs. 11-14.  For example, on December 17, 2015 – not only after Jason Galanis was arrested in

the Gerova case, but after the SEC filed a complaint against Ms. Morton's company, Atlantic

Asset Management, and put it into receivership in connection with the WLCC bonds – Ms.

Morton wrote to certain investors that her co-defendants "took advantage of our good intentions

and by deceit, fraud and manipulation, used our company for their own illicit purposes,

misleading us and our employees, and wrongfully tarnishing our reputations in the investment

community."  Ex. 11 (GX 103).

The Court should exclude these exhibits along with Ms. Morton's other "cooperation"

and "whistleblowing" statements.  First, for the reasons explained in the government's brief, the

statements in these exhibits are hearsay.  Both her statements to investigators *and* to former

clients are out-of-court statements offered for their truth – that Ms. Morton's co-defendants are

guilty.  The government notes in its brief that it can offer these statements against Ms. Morton as

a party-opponent, but Mr. Archer is not a party-opponent for this purpose.  *See United States v.*

*Harwood*, 998 F.2d 91, 97 (2d Cir. 1993) ("[T]he admission sought to be introduced was made

by a co-defendant who is not a party opponent.  The Government is the party opponent of both

defendants." (internal quotation marks omitted)); *United States v. Finkelstain*, No. S 89-CR-0009

(MBM), 1989 WL 96629, at *1 (S.D.N.Y. Aug. 15, 1989) ("There is one party opponent of

Finkielstain [sic] in this case, and it is the United States, not Kaplan.").

Nor could it possibly be a co-conspirator statement, since the gist of the statement is to

place blame on her alleged co-conspirators.  These statements were not made "during and in

furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); *United States v. Gupta*, 747 F.3d

111, 123 (2d Cir. 2014) ("In order to admit a statement under this Rule, the court must find (a)

that there was a conspiracy, (b) that its members included the declarant and the party against

whom the statement is offered, and (c) that the statement was made during the course of and in

furtherance of the conspiracy." (internal quotation marks and alterations omitted)).  In fact, the statements were antagonistic to the alleged conspiracy and aimed squarely at her alleged co-conspirators.  *See Gupta*, 747 F.3d at 123 ("In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself.").  And even as to any statements Ms. Morton may have made with the intention of misleading investigators as to her own guilt, there is no evidence that Mr. Archer was part of that separate conspiracy.  *Cf. United States v. Stewart*, 433 F.3d 273, 292 (2d Cir. 2006) ("Here the truthful portions of the testimonial statements were made in furtherance of a conspiracy to obstruct justice.  The essence of such a conspiracy necessarily contemplates that the conspirators would provide false information to government agencies during the course of their investigation and during interrogations that would produce testimonial statements of one or the other of them.").

Second, there is no applicable hearsay exception to admit these statements against Mr. Archer.  As the government argues, they are irrelevant to Ms. Morton's state of mind because they are not contemporaneous, but rather reflect a "self-serving explanation of past events." *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016).  For the same reason, the residual hearsay exception is inapplicable, as the statements have zero "circumstantial guarantees of trustworthiness."  Fed. R. Evid. 807(a)(1).

Third, they are prejudicial and have no probative value.  If the government does not offer Ms. Morton's self-serving statements for their truth, then there is no conceivable use to which they can be put that won't hopelessly confuse the jury and unduly prejudice Mr. Archer with his co-defendant's bald assertions of his guilt.  Ms. Morton was on a sinking ship and said whatever she could to try to salvage it.

Lastly, admitting hearsay statements by Ms. Morton against Mr. Archer would violate his constitutional right to confront the witnesses against him.  Ms. Morton is immune to cross examination; Mr. Archer will have no way of testing her motives and the accuracy and truthfulness of her statements.  A limiting instruction, such as that the statements can be admitted against Ms. Morton only, will not stop jurors from pondering the very substance of the statements – that Ms. Morton was taken advantage of by her co-defendants through deceit, fraud and manipulation.  The only corrective measure that can be taken under these circumstances is to exclude the introduction of evidence regarding Ms. Morton's attempted cooperation and whistleblowing, to either the government or her former clients.[7]

## VIII.   The Court Should Preclude References to and Arguments About Michael Milken (*e.g.*, GX 375, 2204, 2217, 2292, 3004, 3226)

References to Michael Milken – the noted financier, philanthropist, and convicted felon – should be excluded as irrelevant, misleading, and unduly prejudicial.  For example, GX 2217, parts of which are quoted in both the Complaint (¶ 33) and the Indictment (¶ 11.c), is an e-mail from Mr. Cooney in reply to an e-mail from Jason Galanis.  *See* Ex. 15.  In it, Cooney writes as follows, copying Mr. Archer:

> This is pure Genius allá mikey Milken!! The Native American Bonds!! Leon Black would approve of this trade!! Right up his alley!! Love the names!! I had a girl named Tiffany Lame Woman pull a knife on me when I was in 8th grade!! Great work here Greek!!"

*Id.*[8]

---

[7]      Of course, the other potential corrective measure would be to sever Ms. Morton's trial from Mr. Archer's.  It may well be that these purported false exculpatory statements are admissible against Ms. Morton, though not against Mr. Archer, which would be an appropriate basis on which to grant severance.

[8]      This e-mail should also be excluded because the reference to Tiffany Lame Woman – who is apparently a real person that Mr. Cooney went to school with – is likely to be perceived by the jury as racially biased, and because it serves no probative purpose.

Mr. Archer respectfully submits that references like this one to Michael Milken should be precluded from trial and, where appropriate, redacted from the government's trial exhibits pursuant to Federal Rules of Evidence 401 and 403.  Mr. Archer further submits that the government should be precluded from making any arguments, introducing any trial exhibits, or eliciting any testimony about any aspects of Mr. Milken's history or biography in order to try to argue that these exhibits show the defendants somehow idolizing Mr. Milken because of his past crimes.

The fact is that Michael Milken has a complicated and circuitous track record that includes both illegal conduct and positive contributions, rendering any reference to him ambiguous at best.  He is famous for revolutionizing the high yield bond industry on Wall Street, essentially creating a brand new financial product and making it a mainstay of the financial industry.  He was also convicted of securities fraud for various offenses relating to his activities at Drexel Burnham Lambert.  He is most famous now as a philanthropist and sponsor of a think tank, the Milken Institute, that hosts high-level industry conferences.  Simply put, unlike a reference to "Bernie Madoff" or "Charles Ponzi," references to Michael Milken do not clearly – and in this case do not at all – refer to his criminal misdeeds.  *See generally* Wikipedia entry for Michael Milken, *available at* https://en.wikipedia.org/wiki/Michael_Milken ("Known for: developing the High-yield bond market, Indictment for securities fraud, philanthropy").  But that is clearly the inference that the government has repeatedly urged.  *See* ECF No. 308 at 45 n.9; ECF No. 301-4 at 13; ECF 301-12 at 140.

Certain of the defendants in this case, especially Mr. Cooney, appear enamored of Mr. Milken because of his legitimate successes.  For example, in one of the Galanis wiretaps – from years before the conduct alleged in this case – Mr. Cooney is recorded extolling Mr. Milken's virtues and talking about going to a Milken Institute conference.  And references to Michael

Milken are further complicated by his actual, albeit scant, relationship to this case: "Today's Burnham is currently a modest firm spun out of Drexel Burnham Lambert in 1989[,] a year before the firm was wound-up in response to the Michael Milken legal affair."  Ex. 16 at 4 (GX 3226).[9]

The reality is that Mr. Cooney was not idolizing Mr. Milken because he was a criminal; he was idolizing him because of his legitimate deeds, including his history with Burnham and his financial innovation – as the reference in GX 2217 to Leon Black, another Drexel alum, the founder of Apollo Global Management, and a man never accused of any crime, proves.  *See* Ex. 15.  If the government urges the opposite inference, its argument is counterfactual and misleading.  If it does not, then the evidence is irrelevant.

Either way, it has no place in this trial and, if permitted, would require the defendants to introduce fairly extensive evidence about Mr. Milken's complex personal history to contextualize the comment, just as the government would need to introduce extrinsic evidence to prove up Mr. Milken's criminal history.  As the Court is surely well aware, Mr. Milken, who is still regularly touted today as "the 1980s junk bond king," played a leading role in Drexel Burnham Lambert's creation of "the market for so-called junk or high-yield bonds, loans to companies not previously considered creditworthy, [which] became the financial tool of choice for many of the corporate raiders of the 1980s, and . . . briefly turned Drexel into the most

---

[9]     If the Court otherwise grants this motion, Mr. Archer is not seeking that the reference to "the Michael Milken legal affair" in GX 3226 be redacted, or that the government be precluded from entering this exhibit into evidence at trial, as he does not believe that this particular reference, standing alone, runs any risk of unfairly prejudicing him.  However, if the Court does not grant Mr. Archer's request to redact the references to Mr. Milken from GXs 2217 and 2204, this reference to "the Michael Milken legal affair" will exacerbate the unfair prejudice caused by the references to Mr. Milken in GXs 2217 and 2204.  *See also* Exs. 17-19 (GXs 375 at 4, 2292 at 27, 3004 at 624).  It will also increase the jury's temptation to impermissibly conduct their own internet-based research into Mr. Milken's history and biography in order to contextualize Messrs. Cooney's and Galanis's references to him in these two exhibits.

profitable investment bank on Wall Street." *See* James Koren, *Junk bond king Michael Milken looms large in L.A. finance industry*, L.A. Times, May 1, 2016, *available at* https://goo.gl/Vb9Kcl.

In addition to creating juror confusion and wasting the Court's and the jury's time, the inference urged by the government would be unfairly prejudicial to Mr. Archer. Mr. Milken was indicted for racketeering and securities fraud in 1989 as part of an insider trading investigation that was only tangentially related to his high yield bond business. After pleading guilty to securities and tax violations, Mr. Milken was sentenced to ten years in prison, fined $600 million, and permanently barred from the securities industry by the SEC, and Drexel Burnham Lambert collapsed. *See* Kurt Eichenwald, *The Milken Sentence; Milken Gets 10 Years for Wall St. Crimes*, N.Y. Times, Nov. 22, 1990, *available at* https://goo.gl/HkQhH6.

While Mr. Milken's crimes are now several decades old, they remain notorious. *See*, *e.g.*, Peter Lattman, *Milken's Past Invoked in Gupta Sentencing*, N.Y. Times, Oct. 29, 2012, *available at* https://goo.gl/tKwHse ("More than two decades after pleading guilty to securities fraud, the financier Michael Milken still looms large."). To this day, Mr. Archer appears in news outlets all over the world on a daily or near-daily basis, including for his many philanthropic endeavors, his economic think tank (the Milken Institute), his investments, and the Milken Institute's annual "ideas" conference.[10] Countless books have been written about him,

---

[10]     *E.g.*, Jasper Craven and Suzanne Gordon, *Is This Hedge-Fund Titan Greasing the Levers for Privatizing the Veterans Health Administration?*, The Nation, Apr. 11, 2018, *available at* https://bit.ly/2JFrXcr ("The salon was part of a weekend retreat hosted by the Milken Institute, a conservative California think tank founded by Michael Milken, another infamous financier, who pushed high-yield junk bonds and was later convicted of violating US securities laws."); Gary Shteyngart, *A Sidelined Wall Street Legend Bets On Bitcoin*, The New Yorker, Apr. 16, 2018, *available at* https://bit.ly/2EtXmej ("Think about Michael Milken and Drexel Burnham in the late seventies and early eighties. None of the big investment banks wanted to touch high-yield trading, and Drexel ultimately became the most profitable bank on Wall Street."); Kiel Porter and Scott Deveau, *Stone Canyon Weighs IPO for SCI Packaging Businesses*, Bloomberg

with titles like *Den of Thieves*, *Predators' Ball*, and *A License to Steal*.  One of cinema's most
well-known Wall Street villains was reportedly based, in part, on Mr. Milken.  *See* Elizabeth
Blair, *Decades Later, Is Greed Still Good?*, NPR, Sept. 24, 2010, *available at*
https://goo.gl/TZCcVM ("Gordon Gekko is also partly inspired by Michael Milken, known as
the junk bond king.").  A play entitled *Junk*, which is "based partly on [Mr. Milken's] fall from
grace," opened last November on Broadway.  *See* Ben Brantley, *Review: 'Junk' Revives a Go-
Go Era or Debt and Duplicity*, N.Y. Times, Nov. 2, 2017, *available at* https://goo.gl/9CYTzP;
Dennis Berman, *Who Is the Next Michael Milken? A Review of the New Play 'Junk,'* Wall St. J.,
Nov. 2, 2017, *available at* https://goo.gl/XF8JPQ.

It is thus overwhelmingly likely that a jury – and, in particular, a New York jury – will be
sufficiently familiar with Mr. Milken's history and biography such that any references to him in
the government's trial exhibits would prove inflammatory and unfairly prejudicial to Mr. Archer
and his remaining co-defendants.  This is especially true of emails like GX 2217, in which
Mr. Cooney describes "[t]he Native American Bonds" as "pure Genius allá mikey Milken!!"
And even for those jurors who may not be familiar with Mr. Milken or the concept of "junk
bonds," Mr. Cooney's vague and out of context reference to Mr. Milken in GX 2217 will surely
tempt them to search for further information on the internet.  *See*, *e.g.*, *United States v. Esso*, 684
F.3d 347, 352 (2d Cir. 2012) ("In the age of electronic information, there is already a significant
risk that jurors will conduct research, given how easy it is to search online for a defendant's
name or for a particular legal concept.").

And while there is nothing inherently wrong or illegal about "junk" or "high-yield bonds"
in and of themselves, in a case that revolves entirely around what the government contends were

---

Markets, Mar. 13, 2018, *available at* https://bloom.bg/2GPYYRr ("Stone Canyon Industries, a
closely held investment firm whose backers include billionaire investor Michael Milken. . . .")

worthless bonds issued by the WLCC, anything yoking the defendants to Mr. Milken, the infamous "junk bond king" who was convicted and sentenced in this very courthouse to ten years in prison, will prove unfairly prejudicial at trial.  Jurors who are only vaguely or broadly aware of Mr. Milken's well-known criminal conviction and status as the "junk bond king" may believe incorrectly that it was Mr. Milken's dealings in "junk bonds" (a phrase that has now entered the common parlance) that led to his criminal conviction, and may therefore unfairly surmise that Mr. Cooney's reference to Mr. Milken's "pure Genius" referred to "[t]he Native American bonds" being somehow illegal, when instead it appears to have related to the perfectly common (and legal) practice of issuing debt to entities that are generally not considered to be exceptionally creditworthy, such as, in this case, the WLCC.  The same can be said for GX 2204, where the sentence "Milky comes to mind" could unfairly paint the Code Rebel transaction in the jury's mind as inherently criminal even though Mr. Milken was criminally convicted on completely different types of charges.[11]

Permitting the government to color Mr. Archer and the other defendants with the infamous crimes of Mr. Milken would therefore necessitate a trial-within-a-trial in which the defendants would need to go to great lengths to establish the inherent lawfulness of Mr. Milken's dealings in so-called "junk bonds," re-litigate his decades-old conviction, and draw distinctions between the crimes to which Mr. Milken pled guilty, all of his perfectly legal dealings in "junk bonds," and the facts of this case, not to mention Mr. Milken's post-conviction philanthropy and establishment of the Milken Institute.

---

[11]    In GX 2204, Jason Galanis writes that there will be much that he can "do with several hundred million NASDAQ paper – even illiquid paper.  Milky comes to mind."  Ex. 20 at 1.  For the same reasons discussed above, the Court should redact the sentence "Milky comes to mind" from GX 2204.  Of course, if the Court denies the government's Rule 404(b) application and excludes evidence concerning Code Rebel, as it should, this e-mail would be excluded in its entirety.

Moreover, rather than signaling anything untoward, Mr. Milken seems to merely have been a common reference point for Mr. Cooney, as he is for many in business and finance. To wit, counsel for Mr. Archer has discovered, over the course of our still-ongoing review of thousands of Jason Galanis's consensual phone recordings that the government produced to the defendants just several weeks ago, at least two instances where Mr. Cooney referenced Mr. Milken. In one April 19, 2010 recording, bearing the file name 310-425-9575 ATTM 2010-04-19 06-17-34 01687-001.wav, Mr. Cooney asks Galanis whether he will be able to "make it out to see [him] next week in La La Land . . . next Monday through Friday, J, it's the Milken conference." Mr. Cooney then tells Galanis that "we've got literally probably eight to ten of the biggest CIOs on the planet we're meeting with on Monday night. We've got Milken's CIO, Carl Icahn's CIO, and George Soros' CIO." And in another recording from August 30, 2010, bearing the file name 310-425-9575 ATTM 2010-08-30 16-04-49 14915-001.wav, Mr. Cooney makes a reference to "Blackstone and Michael Milken," the context of which is not entirely clear in part due to audibility issues. This additional context for GX 2217 reinforces the notion that Michael Milken was an important financial figure in Mr. Cooney's mind long before the WLCC bonds were ever conceived. As a result, any prejudice flowing to the defendants from the introduction of this evidence would be inherently unfair, as there is simply no indication that Mr. Cooney's reference to Mr. Milken was intended in the sinister way that the government surely intends to paint it.

Accordingly, the Court should either preclude GX 2217 in its entirety, or order it redacted so that its only content is "This is pure Genius . . . The Native American Bonds!! . . . Great work here Greek!!" GX 2204 should likewise be redacted, if it is introduced at all.

**IX.    The Court Should Preclude Exhibits Providing Summaries of the Securities Laws Because It Will Usurp the Court's Role and Confuse the Jury (*e.g.*, GXs 1024, 1025, 1026, and 1027)**

The Court should exclude GXs 1024-27, which are outlines and other study materials related to FINRA qualification exams, including the Series 7 (GX 1024), the Series 24 (GX 1025), the Series 63 (GX 1026), and the Series 86/87 (GX 1027).  *See* Exs. 21-24.  Each of these exhibits includes summaries of the "laws and regulations" relevant to the exams, including the Securities Exchange Act of 1934, Rule 10b-5, and the Investment Advisors Act of 1940, and none is relevant to the questions of fact the jury will be charged to determine.  *See* Fed. R. Evid. 401 (relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").  Even were these materials minimally probative – and they are not – the Court should exercise its "wide discretion" to exclude these exhibits because there is substantial risk of jury confusion and that the exhibits will undermine the Court's role to instruct the jury on the law.  *United States v. Dwyer*, 539 F.2d 924, 927 (2d Cir. 1976).

GXs 1024, 1025, 1026, and 1027 each purport to set forth summaries of the material tested in the Series 7, 24, 63, and 86/87 qualification exams administered by FINRA and, in the case of the Series 86/87, the North American Securities Administrators Association.  In so doing, they set forth hundreds of pages of overviews of federal securities laws, regulations, and model rules related to everything from the purchase and sale of securities, securities registration requirements, the foundations of portfolio analysis, and broker-dealer licensing requirements.  *See, e.g.* Ex. 22 at 18-19 (GX 1025 (listing sections of the Securities Exchange Act of 1934 and "SEC Rules Thereunder")); Ex. 23 at 6 (GX 1026 ("The Securities Act of 1933 establishes, among other things, the requirement that companies wishing to sell their securities to the public in interstate commerce or by use of the mails must register their securities with the Securities and

29

Exchange Commission . . . .")); *id.* at 19-20 (setting forth transactions "exempted from the registration . . . requirements of the Act"); *id.* at 37-107 (setting forth the in its entirety the Uniform Securities Act); Ex. 24 at 15 (GX 1027 (describing Regulation D). The exhibits' irrelevance and the risks of unfair prejudice warrant exclusion.

These materials have no conceivable relevance to the questions of *fact* the jury ultimately will be charged to determine. They have no connection to the defendants or the events at issue in the case. Mr. Archer never took any of the FINRA qualification exams and would have had no cause to have come across any of these materials. Even if he or any other defendant had taken the exams, the government cannot establish any connection between these documents and any defendant – and cannot establish that any defendant had knowledge of the content in the outlines – given that FINRA appears to have produced them. *See* Ex. 25 (excerpting the government's exhibit list). In short, the texts are not probative of any relevant question of fact and have no place in the evidence of the case. *Cf.* Fed. R. Evid. 401.

Even were the exhibits relevant, their exclusion would still be appropriate because they will serve only to undermine the Court's role of deciding legal issues and instructing the jury on the law, and would pose a substantial risk of confusing the jury as to the legal standards at issue. *See* Fed. R. Evid. 403. Presenting the jury with reference texts detailing securities laws, regulations, and model laws presents a substantial risk of distraction from the factual questions they will be called to resolve. Moreover, the jury may misinterpret the significance of the regulatory and legal standards, and infer that any defendant's failure to abide by those standards (or, even more irrelevantly, the model rules) is necessarily relevant to the question whether the defendant has committed securities fraud. They may simply do legal research that supplements, or even contradicts, the Court's instructions. Asking lay jurors to distinguish between the

30

permissible and impermissible inferences associated with complicated legal and regulatory reference materials is inappropriate and unwarranted.

Excluding GXs 1024, 1025, 1026, and 1027 ensures that the only legal instructions the jury will receive are those the Court provides before the jury's deliberations.  Indeed, if the exhibits are admitted, the standard charge that the jury "take the law as [the Court] give[s] it" will be a nullity.  *See* Trial Tr. at 7131, *United States v. Tuzman*, No. 15-CR-536 (PGG) (S.D.N.Y. 2017) [ECF No. 706].  During deliberations, the jury will be confronted not only with the law "as the Court gives it," but also as FINRA, the former National Association of Securities Dealers, and the North American Securities Administrators Association "give it."  The risks of juror confusion and the concomitant risk of unfair prejudice to the defendants underscores the need for the exhibits' exclusion.[12]

## X.  The Court Should Preclude or Redact Government Trial Exhibits Containing Irrelevant, Inflammatory Language (*e.g.*, GX 2049, 2067, and 2069)

Government trial exhibits 2049, 2067, and 2069 contain material that has no probative value but is extremely prejudicial.  Under Rule 403, unfair prejudice "may be created by the tendency of the evidence . . . unfairly to excite emotions against the defendant."  *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)).  Where offensive material has some probative value, courts have required parties to use less inflammatory replacement terms or phrases.  *See United States v. McDermott*, 245 F.3d 133, 141-42 (2d Cir. 2001) (finding that references to defendant's "clientele" should have been excluded in favor of less prejudicial but equally probative words like "friends,"

---

[12]     To the extent the government may contend these exhibits are intended to be used with its securities law expert witness, they should be excluded.  While Rule 803 permits a hearsay exception for "statement in learned treatises," the Rule explicitly provides that such a statement– if called to the attention of an expert and established as a reliable authority – "may be read into evidence but not received as an exhibit."  Fed. R. Evid. 803(18).

"acquaintances," or "business acquaintances.").  Where offensive material is irrelevant, it should

be excluded entirely.  *See United States v. Schweihs*, 971 F.2d 1302, 1314 (7th Cir. 1992)

(approving trial court judge who "redacted certain portions of one of the tapes because she found

those portions to contain offensive language the context of which was unrelated to any element

of the crime charged").  Here, the offensive material is irrelevant and should be excluded

entirely.

GX 2069 includes an e-mail from Galanis concerning a potential Chinese investment in

which he signed off: "Drunk and 'yellowed.'"  Ex. 9 at 1 (GX 2069).  This is a textbook case for

exclusion.  The prejudice here is obvious and the probative value nonexistent.  This is not even a

statement, just an offensive closing to an e-mail, made by a non-defendant.  Redacting it will not

affect whatever probative value the e-mail might have, and it will eliminate the prejudice such an

offensive phrase is likely to create.  *See United States v. Frasch*, 818 F.2d 631, 634 (7th Cir.

1987) (endorsing the replacement of an ethnic slur with a neutral term and admonishing the trial

court to "carefully consider whether substitution or deletion of the offensive words would

damage the probative value of the evidence").

GX 2049 is an e-mail exchange in which Galanis wrote of a Morgan Stanley employee,

"She's truly as dumb as they come," and Mr. Archer wrote, "Just ignore the moron."  Ex. 26 at 1

(GX 2049).  These are gratuitous comments with no relevance to the crimes charged.  The

woman referred to is not an alleged victim but will be a government witness, and these offhand,

derogatory comments about a woman that the jury will have the opportunity to meet do not have

"any tendency to make a [material] fact more or less probable than it would be without the

evidence."  Fed. R. Evid. 401.  These statements could only serve to improperly "excite emotions

against the defendant," *Quattrone*, 441 F.3d 153 at 186, and should thus be excluded.

Finally, GX 2067 is an e-mail exchange in which Galanis wrote in response to news of VL Assurance receiving funding, "WEASELS getting' shit done," and Mr. Archer responded, "Weasels win!"  Ex. 27 (GX 2067).  These comments have no probative value, and failing to redact them would unfairly prejudice the defendants and waste the jury's time.  The only reason for the government to introduce this document would be to unfairly and baselessly imply the term "weasels" constituted evidence of unscrupulous behavior.  If this document were introduced without redactions, the defendants would be forced to present evidence of how they used this term in jest and without any negative connotation elsewhere.  The result would be a complete waste of time over six words that have no relevance to the crimes charged.  The Court should exclude these two lines.

## XI.  At Trial, All Defendants Should Be Presumed to Join in All Objections Made By Their Co-Defendants' Counsel, and Should Not Be Required to Reiterate Their *In Limine* Objections on the Record Again

When the Court rules on Mr. Archer's *in limine* motions, we respectfully request that the Court include a standing order that all defense counsel will be presumed to join in any objection by a co-defendant's counsel.  Such an order will relieve counsel – and the Court – of the burden of having all counsel state that they join in each objection made by a colleague.  In what promises to be a lengthy and hard-fought trial, this procedure will help make the proceedings slightly more streamlined and orderly.

Similarly, if the Court denies any of the defendants' motions *in limine*, Mr. Archer respectfully requests that the Court include in its order that the defendant need not restate his or her objection on the record at the time the evidence in question is admitted, in order to preserve the objection for appeal.  This will also streamline the trial and minimize interruptions.

Finally, to the extent Mr. Archer's co-defendants make motions *in limine*, Mr. Archer joins in those motions to the extent they are applicable to him.

## CONCLUSION

The Court should grant defendant Devon Archer's motions *in limine*.[13]  Moreover, where appropriate, the Court should redact the Indictment to conform to its rulings *in limine*.  *See United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (surplusage from an indictment will be struck "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial" (internal quotation marks omitted)).

Dated:     April 11, 2018
           New York, New York

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

---

[13]     Mr. Archer is continuing to review the government's trial exhibits and 3500 material, and reserves the right to raise additional evidentiary issues prior to trial.  Of course, in making these motions *in limine*, Mr. Archer does not waive any other bases on which to object to the evidence discussed in this motion, or any objections to other evidence that the government or the other defendants may seek to admit.