# EXHIBIT 2

Case 1:16-cr-00371-RA Document 402-2 Filed 04/11/18 Page 2 of 13
Case 1:10-cr-00228-LTS Document 944 Filed 04/04/14 Page 2 of 150
11631

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

            v.                           10 Cr. 228 (LTS)

DANIEL BONVENTRE,
JEROME O'HARA,
GEORGE PEREZ,
ANNETTE BONGIORNO,
JOANN CRUPI,
                                         Jury Trial
            Defendants.

------------------------------x
                                         New York, N.Y.
                                         March 13, 2014
                                         9:50 a.m.

Before:

            HON. LAURA TAYLOR SWAIN

                                         District Judge


            APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
MATTHEW L. SCHWARTZ
RANDALL W. JACKSON
JOHN T. ZACH
     Assistant United States Attorneys


GORDON MEHLER
SARAH LUM
     Attorneys for Defendant O'Hara


LARRY H. KRANTZ
KIMBERLY A. YUHAS
     Attorneys for Defendant Perez
```

1    sheets, right?

2              We looked at thousands of -- you saw that there were
3    thousands and thousands of pages of information that
4    Miss Bongiorno created during the course of the time that she
5    was at Madoff Securities. Did we know if she balled up every
6    random sheet? I don't know. You saw one because that's an
7    example of what she did. You also saw all of the fake account
8    information, all of the fake client statements that went out
9    time after time, and there's no dispute it was fake.

10             The randomization was part of her job. It was part of
11   Mr. O'Hara and Mr. Perez's job that they were doing on behalf
12   of Miss Crupi. It was a part of Madoff Securities. It was a
13   critical part, and it's one thing that all by itself exposes
14   that these defendants knew that the trading was entirely fake.

15             What's a fifth reason that you should reject this
16   argument that they didn't know that the trading was fake?
17   Well, what about the fact that the accounts that they managed
18   always managed to get this very consistent, reasonable rate of
19   return? Very consistent rate of return, I think some people
20   talked about, was around 18 percent most years. Some of the
21   articles talked about the fact that Bernie was beloved because
22   he had a consistent rate of return.

23             These people have suggested to you that they believed
24   plausibly that Bernard Madoff could pull any security in the
25   market, going back as far as 12 years, just pick any time that

1   it was bought and any sell date and just add that in and it
2   would be totally legit because he had so much market volume.
3   Well, if he could do that, if they really believed that you
4   could do that at any time, why are the rates of return so
5   consistent?
6            THE COURT:  Mr. Jackson, please be careful about
7   "they" and "these people" in relation to particular issues and
8   accusations.
9            MR. JACKSON:  Absolutely, your Honor.  I'm just trying
10  to be efficient, but I will use names.
11           THE COURT:  Well, justice demands precision.
12           MR. JACKSON:  And all of these demands are reasonable.
13           So just to go back to what we were talking about, why
14  are the rates of return so consistent?  Why don't you see some
15  people just popping off of the charts?  I mean, wouldn't it
16  have been easy for them to just grab Apple stock right before
17  the iPod was invented on any particular day and, you know, put
18  the sell date of now and have a gabillion dollars in any given
19  day, under their understanding of what Mr. Madoff was capable
20  of doing?
21           And they didn't do that, though.  They kept the rates
22  of return for the customers consistent and reasonable.  Why?
23  They wanted it to look realistic.  They didn't want eye-popping
24  numbers that wouldn't look realistic.  That's the only reason.
25           THE COURT:  Is the "they," Madoff Securities?  Is the

E3DRBON2                                                              11658
Case 1:10-cr-00228-LTS  Document 944-2  Filed 04/04/14  Page 28 of 150
Case 1:16-cr-00371-RA  Document 402-2  Filed 04/17/18  Page 5 of 13

1  "they" particular defendants?  Please be precise.

2        MR. JACKSON:  Absolutely, your Honor.

3        THE COURT:  Thank you.

4        MR. JACKSON:  Ms. Crupi and Ms. Bongiorno wanted to
5  keep it looking realistic.

6        Let me move on.  What's another reason that you know
7  that they knew that the trading was fake, that you should
8  reject this argument that they didn't know that the trading was
9  fake?  Well, their own words tell you that.  There was a note
10  that Mr. Riopelle used during the course of the trial.  There
11  was a lot of talk about it, where he referenced Miss Bongiorno
12  writing on something, Don't do anything until you hear from
13  Bernie.

14        Don't do anything until you hear from Bernie, what
15  does that note mean?  Who has to write a note like that to
16  themselves?  A person who will often do things without hearing
17  from Bernie.  I mean, you don't have to write that note if
18  Bernie Madoff is the person who gives you detailed instructions
19  on every single thing that you should be doing.  You do have to
20  write that note if you are an autonomous individual who manages
21  the fake investment advisory business and often makes your own
22  decisions about how things are supposed to go down.  Their own
23  words tell you that they knew that the trading was fake.

24        Let's also look at Government Exhibit 105-B504.  This
25  is the other note.  If you could blow up the top half,

1              I can't emphasize more what the Judge just said.  What

2    I'm saying is argument.  What all the defense attorneys have

3    said is argument.  But what I'm asking you to do is look at the

4    facts, look at the reality of the situation, and probably after

5    we take a break, I want to focus specifically on the subject of

6    what is argument versus reality.

7              And we'll get to that in a moment, but just to tie up

8    the last thing I was saying about the Wall Street Journal

9    articles and the Bloomberg research.  If you think that the

10   trading is actually happening somewhere, why do you need to go

11   to periodicals to research trades?  Wouldn't you, at some point

12   in the decades that you were working there, said, well, let's

13   just get the information from the actual trades?  Whether it's

14   upstairs or in Europe, why don't we just get the information of

15   the actual trades?  Of course you would.

16             You only need to go to the Wall Street Journal to look

17   up historical prices.  You only need to go to Bloomberg to do

18   that if you know that what you're doing is a fantasy, it's all

19   made up, and you can do whatever you want.  The notion that

20   these defendants didn't know that the trading was fake is an

21   absurdity.  It's completely inconsistent with the evidence,

22   with common sense and with logic.  You should reject it.

23             And, your Honor, I could continue, or I don't know if

24   this is --

25             THE COURT:  Yes, we can take our morning break now.

1     MR. JACKSON: Thank you very much, your Honor.

2     THE COURT: Members of the jury, we'll take our

3  ten-minute morning break now. Thank you for your attentive

4  work. Continue to keep your minds open and your thoughts to

5  yourselves. All rise. Ms. Courtney, would you please escort

6  the jury out.

7     (Jury exits)

8     Please be seated for a moment. So, Mr. Jackson, in

9  the rebuttal in a five-defendant case, where there are hundreds

10 of thousands, if not millions, of page of documents, one has to

11 be -- the government has a responsibility to be accurate when

12 it is purporting to describe evidence. To the extent the

13 government is arguing inferences to be drawn from evidence that

14 may or may not literally say what the government is claiming

15 should be inferred from it, that distinction must be made.

16    And so the theys, the things that sound like

17 quotations that may not be, must be very, very careful, and I'm

18 not saying that I know the record well enough to know whether,

19 you know, every single one of the characterizations of the

20 record was spot on or not, but I do know enough to be

21 concerned. And I know that the prudent way to approach this is

22 to say, you know, you should draw from the evidence as to such

23 conclusion.

24    MR. JACKSON: Your Honor, I will definitely endeavor

25 to be as precise as possible. The only thing I would say with

regard to the "they," I'm going to definitely add names and may get more precise. I thought some of the theys I was referring to arguments that I believe all defendants had made, but I'm going to undertake to follow your Honor's good suggestion to add more -- good, good instruction to add more precision. It may lengthen me out just a little bit, but I'm going to do that.

THE COURT: Very good. And to the extent you're arguing there was a situation at Madoff Securities and the "they," which it seemed to me sometimes, you can certainly accuse Madoff Securities of whatever you want, but when you say "they" in this courtroom with five individuals here, people who did different functions, that's problematic.

MR. JACKSON: Absolutely, Judge.

THE COURT: Mr. Frisch?

MR. FRISCH: Your Honor, there have been a number of occasions where Mr. Jackson has simply either misstated the records or just made things up. I'm going to address one of them. I think Mr. Breslin, possibly Mr. Krantz has another. I didn't want to object when it happened. I don't like objecting during an adversary's closing statement. I may have to change that preference as we go forward.

In talking about what was overheard by Ms. Squillari, Mr. Madoff saying to his brother "Mind your own business, Dan knows how everything works," it was plain that was something

1   she heard. There's no context whatever for it. I believe, I
2   may have, I don't remember, objected to its admission at the
3   time, certainly questioned it. And Mr. Jackson now says it was
4   in response to Peter questioning authority over his realm.
5   That's just made up.
6          And I think it might be prudent for the Court to hear
7   what each of us has to say with regards to that. I request an
8   instruction that that simply isn't in the evidence because it
9   simply isn't in the evidence, and it's a very explosive piece
10  of evidence. "Dan knows how everything works," we don't know
11  the context, but Mr. Jackson just made up his own context and
12  it's inappropriate.
13         THE COURT: Mr. Breslin?
14         MR. BRESLIN: The issue I rose on, your Honor, and I
15  concede that Mr. Jackson, as a matter of fairness, is entitled
16  to a certain.degree of latitude --
17         THE COURT: You need to talk a little louder because I
18  told Ms. Prater she could stay there.
19         MR. BRESLIN: Mr. Jackson is entitled to a certain
20  degree of latitude, your Honor, but to say that these
21  defendants controlled the trading, which he said, it not only
22  lumps them all together, but it lumps them all together in
23  something that's utterly fictional, and, really, almost
24  nonsensical after five-and-a-half months. The idea that any of
25  these -- that there's been any testimony that any of these five

1  the statement means, and it is an argument, but it is one that,
2  on this record and in the context of this case, has to be made
3  as one tied to inference from context, not a supposed
4  description of a scenario that was testified to by the witness.
5      This witness didn't say that she had heard what the
6  argument between Bernie and Peter was about.  She didn't say
7  what Bernie was reacting to there, and your inference and your
8  contextual extrapolation puts in there, as a fact of the
9  testimony about the conversation, that there was some
10 understanding or knowledge or discussion that Mr. Bonventre had
11 dominion over everything and that, of course is a highly
12 contested fact.
13     MR. JACKSON:  I agree, your Honor, it's highly
14 contested.  I think it's a fair extrapolation.  I will endeavor
15 to make a clear delineation between what is argument and what
16 is what a witness said.  I will say, your Honor, I think that
17 each one of the defense counsel during their summations
18 referenced testimony.  They made arguments about what the
19 implications were, what that meant.  There was interpretation
20 of things that were said by Frank DiPascali, what this really
21 meant.
22     THE COURT:  There was a lot of that, and a lot of that
23 was tied to specifically showing the evidence and showing the
24 testimony.  And in both the government's opening and in this
25 argument so far, there is an awful lot of absurd, broad brush,

1   unbelievable, they did everything that's not tied particularly
2   to evidence. Mr. Riopelle?
3          MR. RIOPELLE: Indeed, your Honor. I didn't get a
4   chance to make my objection to Mr. Jackson's statement to the
5   jury that Ms. Bongiorno ran the investment advisory business,
6   which I think way overstates her role. And, by gosh, right
7   there on Page 2631 of Eleanor Squillari's testimony, we have
8   the following: Annette worked for Bernie down in what I
9   originally thought was accounting, but it was the investment
10  advisory business. She worked on the accounts downstairs."
11  That's a fair characterization of what went on. She worked for
12  Bernie. She didn't run it. The evidence is completely
13  contrary to that.
14         THE COURT: Your broad conclusions, to the extent
15  they're within the ambit of fair argument, and of course I'm
16  not even going to try to parse statement by statement, should
17  be presented as, you the jury can find from the whole body of
18  evidence here X, but don't try to put something in somebody's
19  mouth that wasn't in that person's mouth.
20         And be very careful whom you accuse of what on what
21  basis. And don't brand each of these people with your
22  institutional thesis. You have to prove your case with respect
23  to each individual and, obviously, it isn't seriously in
24  dispute that the institution was corrupt. The question here is
25  whether these individuals knowingly participated in the

1    corruption. And it is, as you've embraced, the government's
2    burden to prove that, and this is not a situation in which, as
3    with the prior closing arguments any defendants are going to be
4    able to come back and say, well, that had to have been
5    hyperbole because this is what the statement was. So you have
6    an extra responsibility both of persuasion but of accuracy and
7    precision.
8            MR. FRISCH: And, your Honor, the reason I request
9    instruction on that particular point, I don't want to be in a
10   position of objecting during Mr. Jackson's summation going
11   forward on something like this, on this statement,
12   Mr. Bonventre knows how everything works, when it's clear
13   Miss Squillari heard nothing else. That's such a major
14   statement on which the government is relying on, and I objected
15   to it at the time.
16           And I simply ask for an instruction that that
17   statement that Miss Squillari heard was just one thing that she
18   heard, without any other part of the conversation, something of
19   that effect. Take the sting out of what Mr. Jackson did in
20   that regard.
21           THE COURT: Let me ask it to you another way. Are you
22   asking that the particular section of Ms. Squillari's testimony
23   be read?
24           MR. FRISCH: I hadn't thought of that, but I think
25   that would be another way of doing it.

1       MR. RIOPELLE:  Why don't we read 2,631, it's all on
2  the page for both of us.
3       MR. JACKSON:  Your Honor, I'd be happy, when we come
4  back from the break, to start off by just reading exactly what
5  Ms. Squillari wrote -- said in the testimony.
6       MR. FRISCH:  I guess my only problem with that is now
7  they're going to hear it twice, and now we're going to hear
8  another argument about what he said.  This is a problem
9  Mr. Jackson has created.  I don't know why he had to do it.
10      I guess if you're asking me what relief I'm seeking,
11 the relief I'm seeking is an instruction that Mr. Jackson, in
12 substance, work on the language, put more in this conversation
13 than the witness had heard.  All the witness heard was
14 Mr. Madoff's response, not what the question was or not what
15 the conversation was about.  That's the request for relief that
16 I seek.
17      (Continued on next page)