UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        - v. -

GARY HIRST, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    :

    :

    :     S3 16 Cr. 371 (RA)

    :


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANTS' MOTIONS *IN LIMINE***


                              ROBERT KHUZAMI
                              Attorney for the United States,
                              Acting Under Authority Conferred by 28
                              U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
      - Of Counsel -

## **Table of Contents**

GENERALLY APPLICABLE LAW ........................................................................................ 1

    I.     Rules 401 and 402 ........................................................................................................ 1

    II.    Rule 403 ....................................................................................................................... 1

DISCUSSION .......................................................................................................................... 1

    I.     Archer's Motions ........................................................................................................ 1

        A.     The Court Should Deny Archer's Motion for an Order Prohibiting References to "the Defendants".......................................................................................................................... 1

        B.     The Court Should Deny Archer's Request for an Order "Requir[ing] the Parties to Be Precise When Referring to the Similarly Named Entities"...................................................... 3

        C.     The Court Should Deny Archer's Motion Regarding Minority Business Enterprises . 4

        D.     The Court Should Not Preclude GX 2085 ................................................................ 6

        E.     Testimony Regarding the Effects of the Fraud on Victims and About the WLCC's Financial Condition is Admissible .......................................................................................... 8

        F.     The Court Should Allow Evidence Showing how the Misappropriated Bond Proceeds Were Spent .......................................................................................................................... 10

        G.     The Government Does Not Currently Intend to Offer GX 103, 104, 1403, and 2658 12

        H.     The Court Should Not Require Redaction or Exclusion of References to Michael Milken ................................................................................................................................ 13

        I.     The Court Should Not Preclude GX 1024 through 1027 ............................................ 14

        J.     The Court Should Reject Archer's Arguments Regarding GX 2049, 2067, and 2069 .. 15

        K.     The Government Has No Objection to Archer's Motion that All Defendants Should Be Presumed to Join in Their Co-Defendants' Objections and Should Not Be Required to Reiterate Their *In Limine* Objections on the Record .......................................................... 17

    II.    Cooney's Motions ..................................................................................................... 17

        A.     The Court Should Deny Cooney's Motion to Exclude Evidence of Cooney's References to "Honey" and Desire to Grow His Personal Wealth ....................................... 17

        B.     GX 2085, 2217 and 2291 ........................................................................................ 21

        C.     The Government Does Not Currently Intend to Elicit Evidence of Cooney's Prior Drug Use ............................................................................................................................. 21

    III.    Hirst's Motions........................................................................................................ 22

    IV.    Morton's Motions .................................................................................................... 23

A.      Morton's Motion to Preclude the Testimony of Philip Guess Should Be Rejected ... 23

B.      The Testimony of Arthur Laby is Completely Appropriate and Should Not be
Preclude.................................................................................................................... 25

CONCLUSION ................................................................................................................... 33

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Degregorio* v. *Metro-North R. Co.*, No. 05 Civ. 533 (JGM), 2006 WL 3462554 (D. Conn. Nov. 1, 2006) ................................................................................................................................... 28

*Hangarter* v. *Provident Life and Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) ............................ 28

*Highland Capital Management, L.P.* v. *Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) ......... 27

*Marx & Co., Inc.* v. *Diner's Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) .................................. 25, 26

*Old Chief* v. *United States*, 519 U.S. 172 (1997) .................................................................. 1, 4, 7

*Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143 (2d Cir. 1997) ............................................................ 1

*Pinkerton* v. *United States*, 328 U.S. 640 (1946) ........................................................................ 2

*SEC* v. *Daifotis*, 11-00137, 2012 WL 2051193 (N.D. Cal. June 7, 2012) ................................... 28

*SEC* v. *U.S. Environmental, Inc.*, No. 94 Civ. 6608, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ............................................................................................................................... 25, 27

*United States* v. *Awer*, 770 F.3d 83 (1st Cir. 2014) ............................................................ 22, 23

*United* States v. *Berger*, 22 F. Supp. 2d 145 (S.D.N.Y. 1998) ................................................... 2

*United States* v. *Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ................................................... 25, 27

*United States* v. *Bueno Risquet*, 799 F.2d 804 (2d Cir. 1984) .................................................... 5

*United States* v. *Cooper*, 947 F. Supp. 2d 108 (D.D.C. 2013) .................................................... 6

*United States* v. *Ewings*, 936 F.2d 903 (7th Cir. 1991) ........................................................... 8, 9

*United States* v. *Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4240782 (D. Conn. Nov. 30, 2007) .................................................................................................................................... 19

*United States* v. *Hatfield*, 685 F. Supp. 2d 320 (E.D.N.Y. 2010) ............................................... 9

*United States* v. *Heimann*, 705 F.2d 662 (2d Cir. 1983) ............................................................ 7

*United States* v. *Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002) ........................................... 19

*United States* v. *Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ....................................................... 10

*United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982) .......................................................... 10

*United States* v. *Offill*, 666 F.3d 168 (4th Cir. 2011) ............................................................... 28

*United States* v. *Quattrone*, 441 F.3d 153 (2d Cir. 2006) ................................................... 10, 19

*United States* v. *Scop*, 846 F.2d 135 (1988), *modified* 856 F.2d 5 (2d Cir. 1988) ................. 26, 27

*United States* v. *Socony-Vacuum Oil*, 310 U.S. 150 (1940) ..................................................... 19

*United States* v. *Sokolow*, 91 F.3d 396 (3d Cir. 1996) ............................................................... 7

*United States* v. *Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y.) ................................................... 13

**Other Authorities**

Transcript, *United States* v. *Durante*, No. 15 Cr. 151 (ALC) (S.D.N.Y.) .............................. 29, 30

Transcript, *United States* v. *Gary Hirst*, No. 15 Cr. 643 (PKC) (S.D.N.Y.) ............................... 29

Transcript, *United States* v. *James Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y.) ...................... 29

**Rules**

Federal Rule of Evidence 401 ......................................................................................................... 1

Federal Rule of Evidence 402 ......................................................................................................... 1

Federal Rule of Evidence 403 ................................................................................................... 1, 21

The Government submits this memorandum in opposition to the defendants' motions *in limine*.

## GENERALLY APPLICABLE LAW

### I.  Rules 401 and 402

Pursuant to Federal Rule of Evidence 402, relevant evidence is admissible, unless the United States Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise.   Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence [and] the fact is of consequence in determining the action."   Fed. R. Evid. 401.

### II.  Rule 403

A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."   Fed. R. Evid. 403.   To show unfair prejudice, the defense must show that the prejudice "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence."   *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997) (quotation omitted); *see also Old Chief* v. *United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged.").

## DISCUSSION

### I.  Archer's Motions

#### A.  The Court Should Deny Archer's Motion for an Order Prohibiting References to "the Defendants"

The Court should deny Archer's motion for an order regarding references to "the defendants" collectively.   Archer cites no precedent for such relief, except for Judge Swain's

comments during a rebuttal summation—in a case in which Archer's counsel represented the Government.

In this case, the Government, of course, fully intends to properly attribute particular acts to the defendant or defendants who committed those particular acts.   That said, each of the defendants in charged in Count Two with conspiracy to commit securities fraud, and it is axiomatic that co-conspirators are vicariously liable for the reasonably foreseeable acts of each other.   *See, e.g.*, *United* States v. *Berger*, 22 F. Supp. 2d 145, 156 (S.D.N.Y. 1998) ("Each member of a conspiracy remains responsible for the known or reasonably foreseeable acts committed by his coconspirators in furtherance of a conspiracy, unless and until he takes an affirmative action to withdraw from the conspiracy." (quoting *Pinkerton* v. *United States*, 328 U.S. 640, 646 (1946))).   As such, not only is Archer's requested order unprecedented and unnecessary, it is also potentially in tension with the legal principles governing this case.

Accordingly, the Court should decline to issue the requested order.   While in many instances actions were taken by a particular defendant, on other occasions the scheme's purposes were accomplished through the collective efforts of the charged defendants.   As such, there will be many instances in which the Government will accurately refer to the conduct or goals of the defendants as a group.   The Government should be permitted to do so.   If Archer believes that the Government has inaccurately lumped him with his co-defendants, his counsel may make that argument to the jury.

**B.  The Court Should Deny Archer's Request for an Order "Requir[ing] the Parties to Be Precise When Referring to the Similarly Named Entities"**

Similarly, the Court should deny Archer's request for an order "parties and witnesses to refer to all corporate entities by their proper names to avoid confusion or misleading the jury." (Archer Mem. of Law at 7).

Here, a key part of the scheme was that the defendants used entities with similar-sounding names to mislead investors and the public.   For example, defendant Hirst, along with Hugh Dunkerley, controlled the purported annuity provider for the Wakpamni bonds, Wealth Assurance Private Client Corporation, an entity that was not, in fact, affiliated with Wealth Assurance AG, an entity that financed the purchase of Hughes and Atlantic.   Similarly, Cor Fund Advisors ("CORFA") had no actual affiliation with certain other "COR" entities.   The Government obviously does not share the defendants' interest in misleading the jury.   To the contrary, the Government intends to highlight to the jury that certain entities with similar-sounding names were not, in fact, affiliated.

That said, certain of the Government's lay witnesses may refer to entities by shorthand names (e.g., "Wealth Assurance" or "Burnham").   That, however, is a consequence of the charged fraud.   Distinctions, for example, between Wealth Assurance AG and Wealth Assurance Private Client Corporation, or between CORFA and the COR, may escape certain lay witnesses, but that is precisely what these names were intended to do.   Similarly, during lengthy discussions of a particular entity, the Government may refer to it by its shorthand, where the identity of the entity being discussed is already sufficiently clear.   Again, if Archer believes the Government has improperly lumped together distinct entities, that can be clarified through questioning or arguments before the jury.

Accordingly, the Court should deny Archer's motion *in limine* on this issue.

### C. The Court Should Deny Archer's Motion Regarding Minority Business Enterprises

The Court should also deny Archer's motion regarding references to minority business enterprises ("MBEs").   By way of background, MBE's are businesses owned, capitalized, operated and controlled by a member of an identified minority group.   Such businesses may receive preferences in the awarding of Government contracts or investments by private entities.

As the Court is aware, Wealth Assurance AG, an entity controlled by Archer, Galanis, and others, financed defendant Morton's acquisition of Hughes Capital Management in August 2014, through an entity called BFG Socially Responsible Investing.   Defendant Hirst was promptly installed as Hughes' Chief Investment Officer and executed the purchases of the first tranche of Wakpamni bonds on behalf of Hughes clients.   Less than eight months later, history repeated itself.   Wealth Assurance AG, through BFG Socially Responsible Investing, financed Morton's purchase of Atlantic Asset Management, and Morton promptly purchased the entirety of the fourth tranche of Wakpamni bonds on behalf of Atlantic's clients.

Because both Atlantic and Hughes were MBE's they could only be purchased by a member of a minority group or they would lose their MBE status (and risk losing investors who had selected Atlantic/Hughes on the basis of this status).   It was seemingly for this reason that Morton was provided with the funding to purchase Hughes and later Atlantic.   While the Government does not intend to belabor this point with the jury, the fact of Atlantic/Hughes MBE status is relevant and necessary background to the acquisition of Atlantic/Hughes and is properly put in evidence.

4

Moreover, there is nothing unfairly prejudicial or inflammatory about this evidence.   In this regard, it bears noting that the references to MBE status in the exhibits that Archer cites are largely ephemeral, reducing any possible risk the references are likely to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."   *Old Chief*, 519 U.S. at 180.

GX 2018, 2019, and 2207, for example, different versions of the same email chain among Galanis, Archer, and Cooney, contain only a passing reference to the fact that the "structure would need to continue the minority owned status."   Similarly, GX 2069, an email from Galanis to Archer and Cooney, mentions only "minority asset [management] and sales and trading" in the context of a larger list of "proprietary things," which also includes "municipals for tribal governments."   While GX 2029, 2030, and 2213, also all versions of an email chain among Galanis, Archer, and Cooney, each contain a three-sentence paragraph regarding Hughes' MBE status, nothing in this paragraph is particularly inflammatory.   Moreover, the challenged portion of GX 2029, 2030, and 2213, is also relevant for a separate and independent reason because in that same section Galanis describes Morton to Archer and Cooney as "our partner."   Thus, the paragraph is highly relevant to Archer and Cooney's intent and their knowledge of the scope of the conspiracy.   The relevance of this evidence is heightened by the defendants' anticipated arguments highlighting the purported lack of connectivity between the conspirators.   (*See, e.g.*, Archer Mem. of Law at 2 (claiming that "[m]ost of the defendants had never met each other before they appeared in this courthouse.")).

Accordingly, the Court should deny Archer's motion to redact these references.

5

### D.  The Court Should Not Preclude GX 2085

Archer and Cooney also ask the Court to preclude GX 2085, a May 9, 2015 email chain involving Archer, Cooney, Jason Galanis, and one of their associates, Andrew Godfrey.   Among other things, Godfrey was installed as an employee at Burnham Securities in connection with Archer's attempted acquisition of that entity and during April and May 2015, and was involved in e-mail communications regarding the use of the Wakpamni bonds to help Burnham meet net capital requirements.

The May 9 e-mail chain begins with an individual who is apparently Cooney's niece forwarding an email titled "LAX Photos," which attaches of photographs of Cooney's niece in a lacrosse uniform.   The Government has no objection to redacting this e-mail or the attached photos.

Cooney then forwards the e-mail to Jason Galanis, Archer, and Godfrey, stating "My niece Chloe Cooney firing montana lacross!! [sic]"   Archer responds "[o]ur families commitment to respect and honoring the Native Americans through sport runs deep!"

This evidence is probative of the relationship among Cooney, Galanis, and Archer, and in particular Archer's knowledge and intent that he, Cooney, and Galanis (and Godfrey, through his affiliation with Burnham), were benefitting from the Wakpamni bonds.   The Government is nonetheless prepared to refrain from offering GX 2085 so long as the defendants refrain from any argument that they were motivated to participate in the bond issuance or purchase by a desire to assist an impoverished Native American community.   If the defendants advance such an argument, the Government will seek to offer GX 2085 as evidence of Cooney and Archer's cavalier attitude about support for Native Americans and their willingness to defraud the Wakpamni Lake Community.

In this regard, the probative value of the evidence is not substantially outweighed by the possibility of *unfair* prejudice.   Evidence probative of Archer and Cooney's attitude towards Native Americans is highly relevant in a trial in which they and their and his co-defendants are charged with¸ *inter alia*, defrauding a Native American tribe.

"[T]he prejudice that Rule 403 is concerned with involves some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence."   *United States* v. *Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quotation marks and alterations omitted); *see also United States* v. *Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008) ("Rule 403 was not drafted to 'scrub the trial clean of all evidence that may have an emotional impact.'" (*quoting United States* v. *Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008))).   The cases cited by Archer are distinguishable precisely because they involve inflammatory or derogatory remarks regarding groups or individuals unrelated to the issues at trial.   *Kelly* v. *Boeing Petroleum Services, Inc.*, 61 F.3d 350, 358 (5th Cir. 1995) (holding, in disability discrimination case, that district court's pre-trial exclusion of evidence "regarding anecdotal incidents of *unrelated kinds of prejudice*" was not abuse of discretion (emphasis added)); *Rauh* v. *Coyne*, 744 F.Supp. 1181, 1183 (D.D.C. 1990) (excluding evidence of racial discrimination in gender and marital discrimination case, noting "there is little reason in common experience to infer that an employer who discriminates against blacks in his employment decisions is also likely to discriminate against women"); *Contemporary Mission, Inc.* v. *Bonded Mailings, Inc.*, 671 F.2d 81, 84 (2d Cir. 1982) ("The trial court's ruling—which kept complicated issues of religious affiliation out of a relatively simple contract damages case—was proper); *United States* v. *Ham*, 998 F.2d 1247, 1255 (4th Cir. 1993) (finding, in mail fraud prosecution, "that the government's introduction of evidence of child

7

molestation, homosexuality, and mistreatment of women" violated Rule 403).   Here, by

contrast, the reference concerns an ethnic group that Archer and his co-conspirators defrauded.

Further, Archer's argument that the email was "simply about lacrosse" is not a basis to

exclude the evidence.   Arguments regarding what inferences should be drawn from a piece of

evidence go to weight, not admissibility.   *United States* v. *Schultz,* 333 F.3d 393, 414 (2d Cir.

2003) ("[F]actors which make evidence less than conclusive affect only weight, not

admissibility.")

Accordingly, the Court should admit GX 2085, with the redactions proposed above by

the Government.

### E.  Testimony Regarding the Effects of the Fraud on Victims and About the WLCC's Financial Condition is Admissible

The Court should also reject Archer's argument seeking to preclude evidence regarding

(i) the effects of the alleged fraud on the victims in this case; or (ii) about the WLCC's financial

condition.

First, it is axiomatic that testimony of fraud witnesses is perfectly admissible to prove,

among other things, the materiality of the allegedly fraudulent misstatements and omissions.

"[A]s the victims of the alleged fraud and participants in relevant communications with [the

fraudster]," victim witnesses "are likely to provide testimony that is highly material to the

charges in the indictment."   *United States* v. *Cooper*, 947 F. Supp. 2d 108, 112 n.2 (D.D.C.

2013).

Here, the Government currently anticipates calling three to four witnesses from the ten

pension funds into whose accounts the Wakpamni bonds were placed.   Each of these witnesses

will explain how they came to learn that Atlantic/Hughes has been acquired, how they learned

8

that the bonds had been placed into their accounts, the ways in which the purchase violated their pension funds' investment parameters, and their efforts to remove the bonds from their accounts. Importantly, each of these witnesses communicated directly with defendant Morton about some or all of these matters.   In addition, the Government anticipates calling two to three witnesses from the WLCC to testify about representations John Galanis made to WLCC and, as discussed below, about the reasons the WLCC sought to issue bonds.

Contrary to Archer's assertions, victims' testimony about their losses is also admissible for other purposes.   In *United States* v. *Sokolow*, 91 F.3d 396 (3d Cir. 1996), cited by Archer, for example, the Third Circuit explained that "[e]vidence of loss . . . may be treated as evidence of the schemer's intent to defraud," *id*. at 406, even if in that case—where the district court had permitted the testimony of 20 victims, who testified to their losses with "significant embellishment concerning adverse personal consequences"—the trial court went too far.   *See also United States* v. *Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) ("While technically the success or failure of a scheme to defraud is irrelevant in a . . . fraud case, realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence." (internal citations omitted)).

In short, victim testimony—about what they were told, what they relied upon, who they spoke to, and how much they lost—is relevant, and should be admitted.

*Second*, evidence of the WLCC's financial condition is relevant for multiple reasons. Most significantly, testimony regarding the lack of infrastructure and the lack of economic opportunities in the Wakpamni Lake Community explains why the WLCC sought to issue the bonds in the first place—specifically to finance the development of more local infrastructure and

self-sustaining economic activity.   *See Old Chief* v. *United States*, 519 U.S. at 183 (recognizing

the legitimate need for "evidentiary richness and narrative integrity in presenting a case").   It

also demonstrates the significance of the defendants' misstatements about the annuity provider.

The Community's poverty meant that in the absence of an annuity the Community had no hope

of making interest payments on or repaying the bonds.

Accordingly, the Court should deny Archer's request to preclude this evidence.

### F.  The Court Should Allow Evidence Showing how the Misappropriated Bond Proceeds Were Spent

The Court should also reject Archer's attempt to preclude the Government from

introducing evidence showing how the defendants spent the misappropriated bond proceeds.   As

alleged in the Indictment, certain of the defendants, particularly Jason and John Galanis, spent

bond proceeds on personal expenses, including payments related to real estate, payments to

various law firms, payments at restaurants, payments for travel, and payments for clothing and

jewelry.   (*See* S3 Indictment ¶¶ 17-19).

As an initial matter, the fact that the bond proceeds were spent in this way is not merely

an extrinsic fact that generally casts the defendants in a bad light.   Instead, it is an intrinsic part

of the story of the charged crimes—and is direct evidence that the bond proceeds were not

invested in an annuity, as promised.   As such, the evidence is clearly relevant and admissible.

The cases Archer cites are distinguishable and, if anything, support the Government's

view.   In *United States* v. *Ewings*, 936 F.2d 903 (7th Cir. 1991), the defendant took out 20 life

insurance policies on his chronically ill niece, which he obtained by failing to disclose his niece's

health problems.   When his niece died, the defendant collected on the policies and used the

money on various personal expenses.   The Seventh Circuit questioned whether this evidence

was relevant to motive.   936 F.2d at 906.   Notably, however, unlike the case here, there were no apparent restrictions on the defendant's use of the life insurance proceeds; his crime was fraudulently obtaining the life insurance policies in the first place, by lying about his niece's health.   936 F.2d at 906 (noting the defendant "might have spent the money the same way had the policies been legitimate . . . ."). Here, by contrast, use of the bond proceeds was restricted; they were supposed to be place in an annuity.   Evidence that they were not is direct evidence of the charged crime.

Moreover, the *Ewings* court nonetheless found the spending evidence relevant on the issue of identity, reasoning that "[s]pending sprees, like other evidence of pecuniary gain, tend to show participation in crimes where financial enrichment is the motive."   936 F.2d at 906. Thus, here, particularly with respect to John Galanis, who spent misappropriated bond proceeds on personal expenses, the spending evidence "tend[s] to show [his] participation in [the] crime." *Id.*

Similarly, in *United States* v. *Hatfield*, 685 F. Supp. 2d 320 (E.D.N.Y. 2010), in excluding evidence of the defendant's "'lavish' personal spending," the court noted it was "entirely speculative whether" the money used for that spending "came from the alleged scheme or from [the defendant's] sizable pre-existing fortune."   685 F. Supp. 2d at 326.   Here, by contrast, the funds at issue came from the bond proceeds that were supposed to be invested in an annuity.[1]

---

[1]  Notably, the court allowed the admission of evidence that the defendant used company funds "to pay for prostitutes and pornography," as direct evidence of the defendant's looting of his company.   685 F. Supp.2d at 328.

11

Finally, the Government does not anticipate introducing any significant "'lifestyle'" evidence, *see* Archer Mem. of Law at 17, which the Government takes to mean evidence about the defendants' existing standard of living, apart from evidence showing how the bond proceeds were misappropriated.   But even if the Government did introduce such evidence, it would nonetheless be relevant on the defendants' motive for engaging in the charged scheme.   *See, e.g., United States* v. *Quattrone,* 441 F.3d 153, 187 (2d Cir. 2006) (holding that the district court did not abuse its discretion in permitting the government to offer evidence of Quattrone's salary to establish "motive for him to obstruct the IPO allocation investigations").

Accordingly, the Court should not preclude evidence of how the bond proceeds were spent.

### G.  The Government Does Not Currently Intend to Offer GX 103, 104, 1403, and 2658

Archer also argues that the Court should preclude the Government from offering GX 103, 104, 1403, and 2658, which consist of emails and correspondence in which Michelle Morton blames others for issues related to the Wakpamni bonds.

As the Court is aware, the Government has moved to preclude Morton's purported attempted cooperation and whistleblowing.   If that motion is granted, the Government does not intend to offer GX 103, 104, 1403, and 2658.   If the motion is denied, the Government may seek to offer some or all of those exhibits to front arguments that Morton may raise.   In any event, Morton may not offer her own statements in those exhibits for the truth of the matter asserted. *United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *see also United States* v. *Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant

may not introduce his own prior out-of-court statements because they are hearsay, and . . .   not

admissible." (internal quotation marks omitted)).

### H.  The Court Should Not Require Redaction or Exclusion of References to Michael Milken

Archer argues that the Court should preclude references to Michael Milken, which appear

in GX 2217, among other exhibits.   Relatedly, Cooney argues that the Government should

redact references to "Tiffany Lame Woman" in GX 2217.

GX 2217 is a highly relevant Government exhibit.   Just days before the offering of the

first tranche of Wakpamni bonds, Jason Galanis emailed Archer and Cooney to let them know

that "Wilma Standing Bear and Geneva Lone Hill"—two elders of the WLCC—"have fully

executed the agreements."   Cooney's response began "This is pure Genius allà mikey

Milken!!":

Cc:        Devon Archer <darcher@rosemontseneca.com>
From:      Bevan <btcooney@gmail.com>
Subject:   Re: Wilma Standing Bear and Geneva Lone Hill have fully executed the agreements
Sent:      Fri, 15 Aug 2014 20:52:41 -0700
To:        jason galanis <jason@holmbycompanies.com>

This is pure Genius allá mikey Milken!! The Native American Bonds!! Leon Black would approve of this trade!! Right up his alley!! Love the names!! I had a girl named Tiffany Lame Woman pull a knife on me when I was in 8th grade!! Great work here Greek!!

Sent from my iPhone.

On Aug 15, 2014, at 8:25 PM, jason galanis <jason@holmbycompanies.com> wrote:

            <8signatures08112014.pdf>

The Government has no objection to redacting the sentence "I had a girl named Tiffany

Lame Woman pull a knife on me when I was in 8th grade!!"

The Court, however, should not require redaction of the first sentence of Cooney's

response, referencing Milken, or other references to Milken in the Government's exhibits.

13

As Archer suggests, Milken's crimes "remain notorious," Archer Mem. of Law at 25, and a common-sense inference (if not the only logical inference) one could draw from Cooney's reference to Milken is that he was aware that the bond transaction was fraudulent.   As such, the "mikey Milken" reference constitutes powerful evidence of Cooney's state of mind, including his appreciation of the criminal nature of the conduct.   This is particularly true here, given that Cooney apparently intends to argue that he did not appreciate that the bond transactions were fraudulent, despite his deep involvement in, and awareness of, numerous phases of the scheme.

Archer argues that the Milken reference should be excluded because the jury should actually draw another inference—that Cooney "idoliz[ed]" Milken "because of his legitimate deeds, including his history with Burnham and his financial innovation."   Archer Mem. of Law at 24-25.   But "factors which make evidence less than conclusive affect only weight, not admissibility."   *United States* v. *Schultz*, 333 F.3d at 416.   If Archer or Cooney want to argue that Cooney believed the bond transaction was "pure Genius allà mikey Milken!!" because Cooney "idolized" Milken's philanthropy and "financial innovation," but not the criminal aspects of Milken's career, they can do that through argument and evidence, subject to the ordinary rules on form and admissibility.   But that is not a basis to require redaction of Milken's name in GX 2217 or the other exhibits referencing Milken.

## I.   The Court Should Not Preclude GX 1024 through 1027

Archer seeks to preclude the Government from offering GX 1024 through 1027, which are study guides for the FINRA qualification exams for Series 7 (the general registered representative exam), Series 24 (the exam for branch supervisors), Series 63 (an exam focused on state securities law regulations), and Series 86/87 (the research analyst qualification exam).

Defendant Morton passed each of these exams (some of them more than once) during her career in the securities industry.   The fact that Morton passed these exams is relevant to show that she was aware, generally, of the rules and regulations governing the securities industry.   *See e.g.*, *United States* v. *Mahaffy*, 693 F.3d 113, 124 (2d Cir. 2012) (finding that evidence showing that defendants had passed Series 7 exams, and what topics were covered by those exams, was probative of defendants' knowledge that their conduct was improper); *see also United States v. Durante*, 15 Cr. 171 (ALC) (admitting FINRA study guides as evidence of the defendant's knowledge on the prohibition on matched trading).

The Court should reject Archer's Rule 403 arguments.   The Government does not disagree that Archer "never took any of the FINRA qualification exams" and does not intend to argue that he had knowledge of those materials.   Archer's suggestion that the admission of GX 1024 through 1027 would render the Court's instructions on the law a "nullity" is overwrought.[2] The jury will be instructed that it is bound by the Court's instructions on the law.

### J.  The Court Should Reject Archer's Arguments Regarding GX 2049 and 2067

Archer also seeks to redact purportedly inflammatory language in three emails between him and Galanis.

As to GX 2069, the Government has no objection to redacting the phrase "drunk and yellowed."

As to GX 2049, an October 1, 2014 email, the Government has no objection to redacting Galanis's statement that a Morgan Stanley employee is "truly as dumb as they come" and

---

[2]  Archer cites a portion of the Court's instructions in *United States* v. *Tuzman*, No. 15 Cr. 536 (PGG) for this proposition, but *Tuzman* says nothing about the admissibility of FINRA materials.

Archer's instruction to "just ignore the moron."   However, the next sentence in GX 2049, in which Archer states "I initiated the wire and am awaiting voice confirm" is highly relevant—it appears to refer to Archer's wiring funds to purchase the second tranche of Wakpamni bonds— and should thus remain unredacted.

Finally, the Court should not require redaction of the phrase "weasels" in GX 2067.

| From: | Devon Archer [darcher@rosemontcapital.com] |
|-------|---------------------------------------------|
| Sent: | 12/20/2014 1:49:45 AM |
| To: | jason galanis [jason@holmbycompanies.com] |
| CC: | Bevan Cooney [btcooney@gmail.com] |
| Subject: | Re: VL Assurance - Funded |

Weasels win!

Devon Archer
646 436 3745

On Dec 19, 2014, at 7:12 PM, jason galanis <jason@holmbycompanies.com> wrote:

> WEASELS gettin' shit done

> Begin forwarded message:

> From: Jason Sugarman <jsugarman@camdencap.com>
> **Subject: Re: VL Assurance - Funded**
> Date: December 19, 2014 at 4:03:08 PM PST
> To: Gary Hirst <gary@hirstlaw.com>
> Cc: "Jason Galanis (jason@holmbycompanies.com)" <jason@holmbycompanies.com>

> Were in biz! Thanks

> Sent from my iPhone

> On Dec 19, 2014, at 3:17 PM, "Gary Hirst" <gary@hirstlaw.com> wrote:

>> <image001.png>
>> <image001.png>

There is nothing particularly inflammatory about Archer and Galanis referring to *themselves* as "weasels."   To the contrary, Archer and Cooney's acknowledgement that they were acting as "weasels" in completing a transaction with VL Assurance is evidence that they

16

understood their conduct to be improper.   It also demonstrates the close connection between these defendants who grouped themselves together as "weasels" and felt comfortable utilizing such jargon with each other.   Again, Archer's argument that the term "weasels" was used "in jest" and "without any negative connotation elsewhere" by Archer and Galanis goes to the weight of the evidence, not its admissibility.

> **K. The Government Has No Objection to Archer's Motion that All Defendants Should Be Presumed to Join in Their Co-Defendants' Objections and Should Not Be Required to Reiterate Their *In Limine* Objections on the Record**

Finally, the Government has no objection to Archer's request for a standing order (i) presuming that all defendants have joined in one another's objections at trial and (ii) that defendants need not re-state on the record any objections they raised in their motions *in limine*.

## II. Cooney's Motions

> **A. The Court Should Deny Cooney's Motion to Exclude Evidence of Cooney's References to "Honey" and Desire to Grow His Personal Wealth**

Cooney asks the Court to exclude evidence of his use of the term "honey" as code for "money" as well as all evidence relating to his desire to earn money.   In other words, Cooney requests that the Court exclude powerful evidence that is directly relevant to his state of mind and his motive in committing the charged crimes.   The Court should deny Cooney's motion.

The Government expects the evidence at trial will show that Archer, Cooney and Jason Galanis misappropriated the bond proceeds to support various personal and business endeavors for which they otherwise lacked liquidity.   GX 2005, which Cooney seeks to redact, in part, is an email from Jason Galanis to Archer and Cooney regarding "shell" entities that Jason Galanis was preparing to help generate liquidity:

| To: | Devon Archer[darcher@rosemontcapital.com]; Bevan Cooney[btcooney@gmail.com] |
|---|---|
| From: | Holmby |
| Sent: | Wed 2/19/2014 2:32:55 AM |
| Subject: | No Subject-4501.EML |

Guys I am getting close on the shell. I'm working on a second shell as well for another Arben deal. We also will have a draft of the registration statement for the NASDAQ IPO that I am including you shitheads in. I also think that Dan McClory will have an engagement for Dynatronics. We are back in moneymaking mode. The Greek is good at this part. Product manufacturing, and product sales. Equals luxury merchandise fund.

The Government expects the evidence at trial will show that the "Arben deal" and "NASDAQ IPO" named by Jason Galanis refer to the owner of Code Rebel—Arben Kane—and what later became the Code Rebel IPO.   Jason Galanis's statement that he, Archer and Cooney are "back in moneymaking mode" which "[e]quals luxury merchandise fund" is evidence of the defendants' motive in committing the crime—making money—and the way in which "shell" companies and deals are being discussed in the context of "moneymaking" makes clear that the defendants contemplate these deals directly funding their lifestyles.   Cooney's motion to preclude the statement "Equals luxury merchandise fund" is effectively a motion for the Court to preclude evidence of the defendants' motives and state of mind, and should be denied.

Similarly, in connection with these efforts, the defendants frequently used the term "honey" as code or slang for "money" in their communications with Jason Galanis when discussing the charged scheme.   For example, GX 2065 is a November 20, 2014 email from Jason Galanis to Archer and Cooney with the subject "honey trail" and which attaches a document containing bullet points outlining a plan for what appears to be additional bond issuances from the WLCC.   GX 2253, a portion of which Cooney moves to preclude, contains a January 12, 2015 email exchange between Jason Galanis and Bevan Cooney regarding a transfer of funds from Wealth Assurance AG to Thorsdale that was expected to occur on January 9, 2015. In the email exchange, Jason Galanis forwards Cooney a series of emails with an individual at

18

Wealth-Assurance AG on the status of the transfer, and both Cooney and Jason Galanis comment

on the stress of waiting for the transfer to complete:

From:      Bevan Cooney <btcooney@gmail.com>
Subject:   Re: AW: transfer confirmation
Sent:      Mon, 12 Jan 2015 07:44:08 -0800
To:        Holmby <jason@holmbycompanies.com>

Super stressful having no liquid honey

Sent from my iPhone

On Jan 12, 2015, at 7:38 AM, Holmby <jason@holmbycompanies.com> wrote:

    Yeah stressful

Sent from my iPhone

On Jan 12, 2015, at 7:37 AM, Bevan Cooney <btcooney@gmail.com> wrote:

        At least somewhere in transit J!

Cooney's statement "Super stressful having no liquid honey," should not be redacted because it

his highly probative to his state of mind during the time period of the conspiracy and establish a

motive—his need for liquidity.   Then, on April 29 and 30, 2015, days after the Fourth Bond

Issuance, Cooney and Jason Galanis exchanged the emails reflected in GX 2084 regarding Jason

Galanis's continued efforts with Cooney and Archer to generate liquidity through the use of the

WLCC bonds:

**Cc:**      Devon Archer[darcher@rosemontcapital.com]
**To:**      Holmby[jason@holmbycompanies.com]
**From:**    Bevan Cooney
**Sent:**    Thur 4/30/2015 1:47:35 PM
**Subject:** Re: "Morgan" revised 5 responses

We continue to press until we have a huge surplus of excess honey. Devin should be a great Bee Keeper for our native bonds. Excited to hear how that meeting goes.

Sent from my iPhone

On Apr 29, 2015, at 10:12 PM, Holmby <jason@holmbycompanies.com> wrote:

> Arch and i attacking teneo tomorrow

I have devin with an i tomorrow

Huge

Sent from my iPhone

On Apr 30, 2015, at 1:06 AM, Bevan Cooney <btcooney@gmail.com> wrote:

> The "Greek Machine" just doesn't stop!!!

Sent from my iPhone

On Apr 29, 2015, at 9:49 PM, jason galanis <jason@holmbycompanies.com> wrote:

> relentless greek attack

The "devin with an i" referenced in Jason Galanis's April 29 email is Devin ▌▌▌▌▌, an unindicted co-conspirator in this case who was the head of Bonwick Capital, a registered broker-dealer that Burnham acquired into its financial services conglomerate.   Cooney's statement that "Devin should be a great Bee Keeper for our native bonds" makes sense only when read in the context of his full statement:   "**We continue to press until we have a huge surplus of excess honey.**  Devin ▌▌▌▌▌ should be a great Bee Keeper for our native bonds."   (emphasis added).   This statement is probative of Cooney's state of mind and motive in participating in the fraudulent scheme, and, as with the statements in GX 2005 and 2253 which Cooney also seeks to preclude, demonstrates the defendants' cavalier attitude regarding the ultimately $60 million of bonds involved in the scheme.   Moreover, the use of the term "honey," is not substantially prejudicial.   The defendants used "honey" to refer to money, and their desire for liquidity and

the methods by which they hoped to achieve it are all core evidence in this case.

Cooney's argument to preclude such evidence ignores the relevance of evidence regarding a defendant's financial motives for committing crimes.   *See, e.g.*, *United States* v. *Quattrone,* 441 F.3d at 187 (2d Cir. 2006); *United States* v. *Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4240782, at \*1 (D. Conn. Nov. 30, 2007) ("Evidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud.") (citing *Quattrone*, 441 F.3d at 187).   The cases Cooney cites in support of his argument are inapposite.   Far from being the appeal to "class prejudice" discussed in *United States* v. *Socony-Vacuum Oil*, 310 U.S. 150, 239 (1940), or the evidence of an "affluent lifestyle" at issue in *United States* v. *Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002), the use of "honey" and references by the defendants to their desire for liquidity in Government Exhibits 2005, 2084 and 2253 are relevant to the defendants' motives in perpetrating the charged scheme and should not be precluded.

## B.  GX 2085, 2217 and 2291

As described above, the Government is not offering GX 2291 and will seek to offer GX 2085 only if the defendants argue that their participation in the issuance and purchase of the bonds was motivated by a desire to help Native Americans.

The Government also has no objection to redacting the reference to "Tiffany Lame Woman" in GX 2217 but, as described above, the remainder of this exhibit is admissible as relevant to Cooney's state of mind and knowledge of the criminal nature of his conduct.

## C.  The Government Does Not Currently Intend to Elicit Evidence of Cooney's Prior Drug Use

The Government does not intend to elicit testimony regarding Cooney's use of cocaine

21

with Hugh Dunkerley unless defense counsel open the door through their questioning of Dunkerley.

## III.  Hirst's Motions

### A.  Martin Code Rebel Testimony

In light of the Court's April 13, 2018 ruling precluding evidence of the Code Rebel pump-and-dump scheme, the Government does not intend to elicit testimony regarding the pump-and-dump aspect of the Code Rebel scheme unless defense counsel opens the door through their questioning of the Government's witnesses.

### B.  The Court Should Not Preclude Testimony Regarding Jason Galanis and Hirst's Use of an Encrypted Messaging Application

Hirst moves to preclude testimony that he, Jason Galanis, Hugh Dunkerley and Francisco Martin, an anticipated Government witness,[3] used an encrypted and self-deleting instant messaging application, to communicate about their crimes.   The Court should deny this motion. The Government expects that one or more witnesses will testify that Jason Galanis's preferred method of communication was through Wickr, an instant messaging application available on smartphones such as iPhones and Android phones that allows users to exchange end-to-end encrypted and content-expiring messages, including photos, videos, and file attachments.   That means that only parties to a message on Wickr can see the contents of the message, and the message self-destructs based on users' automatic deletion settings.   That Hirst and other defendants used a method of communication notable for its undetectable nature, and which also involved self-deleting messages, to communicate about aspects of the charged scheme is directly

---

[3]  Although Hirst's motion does not so indicate, John Galanis also used the messaging application at issue.

relevant to Hirst's knowledge, state of mind and consciousness of guilt.   Hirst's argument that this evidence should be precluded because the Government "has not offered any Wickr messages as evidence" underscores precisely why his use of Wickr is relevant—it was designed to avoid law enforcement detection and to prevent law enforcement from having such evidence to begin with.   While Hirst may argue that there are benign inferences to be drawn from his use of Wickr, and that there may be legitimate uses for end-to-end encrypted communications that automatically delete, such arguments regarding what inferences should be drawn from this evidence go to weight, not admissibility, and are not a basis to exclude this evidence. *Schultz*, 333 F.3d at 414.   Furthermore, evidence of Hirst's use of Wickr is not "*substantially outweighed by a danger of . . . unfair prejudice*," Fed. R. Evid. 403, when such evidence is no more sensational or disturbing than any other aspect of the charged scheme.

## IV.  Morton's Motions

### A.  Morton's Motion to Preclude the Testimony of Philip Guess Should Be Rejected

Morton moves to preclude the testimony of Philip Guess, an attorney who represented the Richmond Retirement System ("RRS"), a victim pension fund client of Hughes Capital Management that purchased $300,000 of bonds in the First Bond Issuance.   Morton's motion should be denied.

Guess represented RRS in connection with its efforts to have Hughes remove the WLCC bonds from its investment portfolio, and communicated directly with Morton for several months from approximately March 2015 through August 2015.   As such, Guess is a percipient fact witness who had direct communications with Morton, some of which did not involve Leo Griffin, RRS's Executive Director.   The Government expects to elicit testimony from Guess about his communications with Morton, including her statements acknowledging that it was a

mistake to have purchased the WLCC bonds into the RRS portfolio, and her false statements about having been just brought in to the issue.   The Government also expects Guess to testify that he asked Morton if she had an attorney to speak with, and that she responded "no," and stated that she would deal with him directly—facts that are relevant if Morton is allowed to argue that she attempted to cooperate and was somehow misled during meetings with the Government regarding her legal representation, should the Court allow Morton to introduce that evidence.

The Government also expects that Guess will testify about Morton's assurances that she would find a buyer for the bonds, and her purported attempts to sell the bonds throughout June, July and August 2015, including to Bonwick Capital.   Other evidence at trial will demonstrate that Bonwick Capital was the broker dealer that was acquired by Burnham and received $5 million of WLCC bonds from Cooney to meet its net capital requirements, as well as the purported buyer of other WLCC bonds that Morton was trying to sell out of Hughes and Atlantic portfolios.

Guess's testimony is highly probative of Morton's knowledge and state of mind as she continued her participation in the charged conspiracy even in the face of efforts by RRS and other victim pension funds which for several months demanded that the bonds be liquidated. The Government does not intend to seek testimony regarding Guess's legal opinions regarding the bonds or his research regarding the Wakpamni tribe, but does intend to elicit factual testimony regarding how the WLCC bonds violated RRS's investment management agreement with Hughes and why RRS attempted to take remedial steps.

*United States* v. *Awer*, 770 F.3d 83 (1st Cir. 2014), cited by Morton, is inapposite.   In *Awer*, the defendant was charged with cocaine distribution after a car stop revealed cocaine

inside of a car driven by another individual who later prepared notarized statements that the drugs belonged to her and not the defendant.   770 F.3d at 85-87.   The driver was murdered in an unrelated incident prior to trial, and the defendant sought to introduce testimony, pursuant to Rules 804(b)(3) and 807, from the driver's attorneys that the driver had on multiple occasions told her attorneys the drugs were hers and not the defendant's.   *Id.* at 85-87, 94-95.   The district court excluded the testimony of the driver's attorneys under Rule 807(a)'s third element—which allows for hearsay only if, in addition to meeting the other elements of the rule, the evidence is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"—because the attorneys' testimony was duplicative of the driver's own notarized statements and thus would have been cumulative rather than more probative.   *Awer*, 770 F.3d at 94 (1st Cir. 2014).   Here, the Government seeks to admit Guess's testimony based on his personal knowledge under Rule 602 and, to the extent he testifies about statements made by Morton, under Rule 801(d)(2)(A) (statements of a party opponent), not pursuant to the residual exception to the hearsay rule.

Finally, as described above, Guess's testimony about Hughes, RRS, and the bonds will not be repetitive or cumulative of other evidence and therefore should not be precluded under Rule 403.

### B.  The Testimony of Arthur Laby is Completely Appropriate and Should Not be Precluded

Morton also moves to preclude virtually the entirety of the testimony of Professor Arthur Laby, arguing that Laby's testimony would improperly instruct the jury on the law.[4]   Morton is

---

[4] To a lesser extent Morton also argues that Laby's testimony is irrelevant or unnecessary in light of other evidence.   Here too Morton is wrong.   Thus, for example, Morton objects that the

wrong.   Laby's expertise in the areas of both securities and investment advisers is both relevant and proper and will be of tremendous assistance to the jury in understanding new concepts and terminology in the financial industry.

### 1.  Background

As set forth in further detail in the Government's expert disclosure, the Government expects Professor Laby's testimony to encompass several areas.   Professor Laby will explain certain fundamentals of the securities industry, with a focus on the roles of investment advisers. Professor Laby will testify about the types of investment advisers and the various types of investor accounts, including discretionary and non-discretionary accounts.   Professor Laby will also testify about the regulations and norms relating to that industry, including an investment adviser's fiduciary duties and resulting practices and standards, including that (i) an investment

---

Government need not explain the general principles governing investment adviser agreements, the issuance and registration of a security, or the filing of a Form ADV because the Government separately intends to offer the Hughes/Atlantic investment advisory agreement and Form ADVs and the registration statements for the bond issuances in this case.   But the fact that the jury will see specific examples of these technical and/or industry specific documents is precisely why Laby's testimony is necessary.   The primer offered by Laby will permit the jury to understand the meaning and significance of the particular investment advisory agreements, Form ADVs and bond documents to be offered in this trial.

Morton similarly objects to Laby's testimony that certain investment advisers must register with the SEC and that investment advisers are compensated in various ways.   Morton argues that such testimony is unnecessary because "there is no dispute here that Hughes Capital Management or Atlantic Asset Management were registered investment advisers" and that its particular fee arrangements are not at issue here (Morton Br. at 6).   But the Government intends to prove that certain statements contained in the Form ADVs filed by Atlantic and Hughes were false.   In so doing, the Government is certainly entitled to explain to the jury what a Form ADV is, and which investment advisers must file them.   Similarly, in order to convict Morton (and Hirst) on the investment adviser counts, the Government must prove that they were investment advisers, namely that they provided investment advice for money.   It is thus wholly reasonable for the Government to educate the jury that there are many ways in which investment advisers may be compensated for their services.

adviser must provide suitable investment advice; (ii) an investment adviser may purchase or sell securities only at a client's specific direction or pursuant to an explicit agreement granting discretion to the investment adviser; (iii) an investment adviser must disclose any conflicts of interest and may not engage in self-dealing; and (iv) an investment advisor may not transfer a client contract without the client's consent.   Professor Laby will also explain that certain investment advisers are registered with the SEC and that investment advisers are obligated to file form ADVs.   The Government does not intend to elicit testimony from Professor Laby concerning the criminal statutes charged in this case or the elements of those statutes.   Nor does the Government intend to elicit testimony from Professor Laby regarding the defendants' conduct in this case.

### 2.   Discussion

"In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding trading patterns, *securities industry regulations and complicated terms and concepts inherent in the practice of the securities industry*."   *SEC* v. *U.S. Environmental, Inc.*, No. 94 Civ. 6608, 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) (citations omitted) (emphasis added).   Courts in this Circuit have found such testimony entirely appropriate because, "[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."   *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (rejecting defense argument that the district court erred in allowing testimony from government expert on certain regulatory disclosure requirements).   Such testimony may include testimony concerning general industry practices.

Contrary to Morton's assertion, the Second Circuit's opinion in *Marx & Co., Inc.* v. *Diner's Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) and its progeny do not counsel, let alone compel,

27

the exclusion of Professor Laby's testimony.   In *Marx*, a civil case involving a contract dispute, the Second Circuit found that testimony from the plaintiff's expert on securities regulation regarding the legal obligations imposed on the parties by the very contract at issue was both outside the bounds of his expertise and improper because he "repeatedly gave his conclusions as to the legal significance of various facts adduced at trial."   *Id*. at 510.   In reaching its decision, however, the Second Circuit made clear that: "Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs:   to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."   *Id*. at 509.   The Second Circuit went on to explain that in the context of a securities related case, that an expert may quite properly "tell the jury whether he thinks the method of trading was normal, but not, in our view, whether it amounted to *illegal* manipulation under [a particular statute]."   *Id*. at 512 (emphasis in original).

Subsequent Second Circuit opinions have continued to draw the distinction between an expert on the one hand appropriately testifying regarding customs and standards in the securities industry, and, on the other hand, an expert inappropriately testifying as to their conclusion that a party in the case engaged in illegal conduct.   For example, in *United States* v. *Scop*, 846 F.2d 135 (1988), *modified* 856 F.2d 5 (2d Cir. 1988), the Second Circuit reversed a criminal securities fraud conviction because the Government's expert essentially testified as to the guilt of the defendant, literally testifying that the stock at issue in the case "was manipulated," "that certain individuals were active participants and material participants" in that manipulation, and that "these individuals engaged in a manipulative and fraudulent scheme in furtherance of that

manipulation." *Id*. at 138.   The Second Circuit noted that the expert "consciously used the same formulation" throughout his testimony, which essentially tracked the elements of the criminal statute at issue.   *Id*.   In reaching its decision, however, the Second Circuit was careful to note that had the expert "merely testified that controlled buying and selling of the kind alleged here can create artificial price levels to lure outside investors, no sustainable objection could have been made." *Id*. at 140.

Building on that distinction, and expressly analyzing both *Scop* and *Marx*, the Second Circuit in *Bilzerian*, another criminal securities fraud case, rejected a similar argument made by the defendant.   In upholding the conviction, the Court noted that, "[u]nlike *Scop* and *Marx*, the government's expert in the present case did not give his opinion as to whether Bilzerian's actions violated the securities laws." 926 F.2d at 1294.   Instead, the expert testimony was "general background on federal securities regulation and the filing requirements of Schedule 13D . . . ." *Id*.   The *Bilzerian* Court recognized the danger articulated in *Marx* and *Scop* of an expert testifying as to a legal conclusion regarding the defendant's culpability based on the particular facts of the case, but concluded that the expert's testimony in that case regarding securities regulatory requirements did not veer into such impermissible territory.   *Id*. at 1295.

Other cases subsequent to *Bilzerian* have also quite properly upheld government experts discussing industry norms and standards in technical areas such as securities law.   S*ee United States* v. *Dinero Express*, 57 Fed. App'x 456, 460 (2d Cir. 2002) (upholding government's use of expert testimony regarding the money remitting business in general and operations of legal and illegal money remitters); *Highland Capital Management, L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 180-82 (S.D.N.Y. 2008) (allowing expert in securities case to testify regarding industry custom

and practice); *see also SEC* v. *Daifotis*, 11-00137, 2012 WL 2051193, at *3 (N.D. Cal. June 7, 2012) (holding that the expert's opinion "regarding the industry practice and regulatory framework for a mutual funds' communications with the public, the process by which communications with the public are created, reviewed and approved, is the proper subject of expert testimony and may be helpful to the jury in understanding the technical regulatory process and industry practice").

This is so even if a discussion of industry standards necessarily includes reference to applicable law.   For example, in *United States* v. *Offill*, 666 F.3d 168 (4th Cir. 2011), the Fourth Circuit in a criminal securities fraud case upheld the admission of testimony from two government experts on the general operation of particular federal securities registration requirements and relevant Texas state securities laws.    Citing *Bilzerian*, *Scop*, and *Marx*, the Fourth Circuit deemed such testimony entirely appropriate since it did not attempt to reach any sort of legal conclusion regarding the defendant's criminal liability based on an assessment of the facts of the case.   *Id.* at 173-76.   In *Hangarter* v. *Provident Life and Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004), the Ninth Circuit considered expert testimony that the defendant failed to comport with industry standards, in part on the basis of certain requirements of state law.   The Ninth Circuit upheld such testimony, explaining that, "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Id.* at 1017 (citing *Sprecht* v. *Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)); *see also Degregorio* v. *Metro-North R. Co.*, No. 05 Civ. 533 (JGM), 2006 WL 3462554, at *4 (D. Conn. Nov. 1, 2006) (finding that if an expert's "testimony is based on certain regulations in addition to his industry experience, he may reference those regulations").

30

Indeed, Professor Laby has offered this very same testimony in multiple trials in this

District, including before this Court.    *United States* v. *James Tagliaferri*, No. 13 Cr. 115 (RA)

(Tr. at 268-510); *see also United States* v. *Gary Hirst*, 15 Cr. 643 (PKC) (Tr. 148-205).[5]

Ignoring Laby's prior testimony in *Tagliaferri*, and side-stepping it in *Hirst*, Morton instead

purports to rely on Judge Carter's ruling on Laby's testimony in *United States* v. *Durante*, No.

15 Cr. 151 (ALC).    But Morton significantly mischaracterizes Judge Carter's ruling in that case

and inaccurately implies that Judge Carter precluded Laby from testifying about an investment

adviser's duties of loyalty and care.    That is simply not the case.    To the contrary, Judge Carter

recognized that:

> The [G]overnment is [] entitled to prove that the defendant was
> under a professional duty to make [certain] disclosure[s] and that
> the defendant knew such a disclosure was required to be made and
> that the defendant failed to make such disclosure with the intent to
> defraud.
>
> Professor Laby's proffered testimony in terms of fiduciary duty
> certainly may be relevant regarding professional obligations of the
> defendants in this case. The fact that those professional obligations
> may be derived from or rooted in legal obligations doesn't mean
> that that is something this witness can't testify about as an expert
> witness to talk about professional obligations.

(Tr. at 89).

In an effort to avoid Professor Laby from venturing into the realm of instructing the jury

on the law Judge Carter directed that Professor Laby avoid specific references to the law (i.e., the

Investment Advisers Act of 1940) and requested that Professor Laby generally attempt to avoid

---

[5]  Morton alleges that Laby's testimony in the *Hirst* trial was "erroneous and is one of the
grounds of appeal in that case."    (Morton Br. at 5-6, n. 2).    As Hirst has not yet filed his brief in
support of appeal in the Gerova matter, it is unknown whether Hirst intends to challenge Laby's
testimony on appeal.

the term "fiduciary duty" in describing an investment adviser's duty of loyalty and duty of care. (Tr. at 89) (Judge Carter: "I'm not overly concerned if Professor Laby slips up and says 'fiduciary duty'").   Beyond those limitations—which were, in the Government's view unnecessary—Judge Carter *permitted* Professor Laby to offer virtually the identical testimony it seeks to elicit in the present case.   Professor Laby defined the term investment adviser, described the sort of work done by investment advisers, and explained the ways in which investment advisers are paid.   (Tr. 239-240).   Professor Laby also described the way in which investment advisers select appropriate investments, constraints in the kind of investments investment advisers make for clients, including the differences between discretionary and non-discretionary accounts, and the ways in which a relationship with a client may end.   (Tr. 244-248).   Professor Laby testified that certain investment advisers must registered with the SEC. (Tr. 248).   And Professor Laby testified that investment advisers are bound by duties of loyalty and good faith.   (Tr. 239).

Professor Laby's proffered testimony regarding the mechanics and standards governing certain aspects of the securities industry falls well within the established contours of legitimate and appropriate testimony that will aid the trier of fact.   Professor Laby's testimony will be properly cabined to testimony industry regulations and norms for investment advisers. Professor Laby will *not* be asked to opine on the conduct at issue in this case or whether the conduct at issue was illegal.   There is thus nothing improper about Laby's testimony and Morton's motion to preclude should be denied.

## **CONCLUSION**

The Court should deny the defendants' motions *in limine*, as set forth above.

Dated: New York, New York
      April 18, 2018

                        Respectfully submitted,


                        ROBERT KHUZAMI
                        Attorney for the United States, Acting Under
                        Authority Conferred by 28 U.S.C. § 515


         by: _____/s/_____
                        Rebecca Mermelstein
                        Brendan F. Quigley
                        Negar Tekeei
                        Assistant United States Attorneys
                        (212) 637-2360 / 2190 /2444