# Exhibit A

I4ddgalc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              16 Cr. 371 (RA)

JOHN GALANIS, et al.,

            Defendants.

------------------------------x

                          New York, N.Y.
                          April 13, 2018
                          12:08 p.m.

Before:

                HON. RONNIE ABRAMS,

                            District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
BY:  BRENDAN FRANCIS QUIGLEY
     REBECCA GABRIELLE MERMELSTEIN
     NEGAR TEKEEI
        Assistant United States Attorneys

SHER TREMONTE LLP
     Attorneys for Defendant Gary Hirst
BY:  MICHAEL TREMONTE
     NOAM KORATI BIALE
     EMMA SPIRO

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

I4ddgalc

1                              APPEARANCES (Cont'd)

2    MORVILLO LLP
          Attorneys for Defendant Michelle Morton
3    BY:  GREGORY ROBERT MORVILLO
               – and –
4    ORRICK, HERRINGTON & SUTCLIFFFE LLP (NYC)
          Attorneys for Defendant Michelle Morton
5    BY:  CAITLIN CAREY SIKES
          SAVANNAH STEVENSON
6
     BOIES, SCHILLER & FLEXNER LLP (NYC)
7         Attorneys for Defendant Devon Archer
     BY:  MATTHEW LANE SCHWARTZ
8
     PAULA JACLYN NOTARI
9         Attorney for Defendant Bevan Cooney
               – and –
10   O'NEILL and HASSEN
          Attorneys for Defendant Bevan Cooney
11   BY:  ABRAHAM JABIR ABEGAZ-HASSEN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I4ddgalc

1              THE CLERK:  In the matter of the United States v.

2     Galanis, et al., docket number 16 Cr. 371, counsel please state

3     your name for the record.

4              MR. QUIGLEY:  Good afternoon, your Honor.  Brendan

5     Quigley, Rebecca Mermelstein and Negar Tekeei for the United

6     States.

7              THE COURT:  Good afternoon.

8              MR. TREMONTE:  Good afternoon, your Honor.  Michael

9     Tremonte, Noam Biale and Emma Spiro for Mr. Hirst, who is

10    present to my right.

11             THE COURT:  All right.  Good afternoon.

12             MR. TOUGER:  Good afternoon, your Honor.  David

13    Touger, T-o-u-g-e-r, for Mr. Galanis, who has still not been

14    produced.

15             THE COURT:  OK.  And are you waiving his presence for

16    purposes of today?

17             MR. TOUGER:  I have no choice but to do that.

18             THE COURT:  All right.

19             MR. TOUGER:  I certainly would have liked him to be

20    here, but I certainly have no choice.

21             THE COURT:  Any word on when he is going to get here?

22             MR. TOUGER:  All I know, your Honor, is that as of

23    this morning he was still in Los Angeles.

24             MR. QUIGLEY:  Judge, we were informed by the marshals

25    this morning that he will be arriving in the district on

I4ddgalc

1   Wednesday.

2            THE COURT:  Wednesday.  OK.  All right.  Thank you.

3            MR. TOUGER:  I find that to be suspect.

4            THE COURT:  I don't know if you have a basis for it

5   being suspect.  You made a decision to keep him there.

6            MR. TOUGER:  Your Honor, I didn't make a decision to

7   keep him there.  I made a decision to keep him there until

8   April 1st.  That was the only decision I made.  And that was

9   based on that the BOP would give him the tests, the medical

10  tests, to find out --

11           THE COURT:  Everyone can be seated.

12           MR. TOUGER:  To find out if he has cancer, which they

13  never did.  So we still have an inmate who has been told he

14  possibly has prostate cancer for two-and-a-half months now and

15  the BOP hasn't given him the medical attention that their own

16  doctors ordered that they give him.  The only reason I delayed

17  him coming here, your Honor, is so that those tests could be

18  done, he could recover from the surgery, and get here a month

19  before trial starts.  That was under the circumstances.

20           So what has actually happened is that they haven't

21  done any of the medical tests.  He is still sitting there with

22  a possible cancer growing in his body, going from curable to

23  deathly, and they are now 13 days late and counting from when

24  we asked him to be here.  So there is no way this Court can say

25  I consented to any of this.

I4ddgalc

1          THE COURT:  Let me ask you a question.  Have you

2     spoken to the marshals or the BOP, or has the government here,

3     to see if while he is here he can get those tests done?

4          MR. TOUGER:  Your Honor, when I talked to the

5     marshals, they are less than giving of information about

6     anything.

7          THE COURT:  All right.

8          MR. TOUGER:  They always say we'll do it and security

9     will get it done.  There is no doubt that you can get that done

10    here in New York City.

11         My application -- if you want to get into the

12    application?

13         THE COURT:  No.  We can talk about it later and I am

14    going to talk about the request for adjournments.  But I'll

15    tell you one thing.  I was planning on sitting half days on

16    Fridays.  I don't usually sit on Fridays, but half days on

17    Fridays, given I think the ambiguity in terms of how long this

18    case is going to take.  But on a certain Friday I cannot sit.

19    I can work around the schedule.  And I can ask the government

20    and will ask the government to work with, you know, the

21    marshals and the BOP to get him the tests once he gets here.

22         MR. TOUGER:  The only problem, your Honor, it is not

23    for the tests.  It is the surgery.  He has been told there is

24    at least a two-week recovery period for that surgery.  They

25    have to cut him open.  They've already done all the blood tests

I4ddgalc

1    and stuff, and that's come back that he needs this surgery.  We

2    are not talking about --

3              THE COURT:  But it is a biopsy.  You can do a biopsy

4    in a day, right?

5              MR. TOUGER:  The surgery can be done in a day, but we

6    are not talking about a 24-year-old man, your Honor, we are

7    talking about a man in his mid-70s getting a surgical

8    procedure.  The doctors have told him that they would want him

9    in the hospital for two weeks.  That's what he was told.

10             THE COURT:  All right.  OK.

11             MR. QUIGLEY:  Your Honor, we'll talk to BOP as soon as

12   Mr. Galanis gets here.  I understand he is going to be housed

13   at MDC, and we will talk to them about arranging a biopsy for

14   him on Friday.

15             THE COURT:  All right.  I want to be kept apprised of

16   the health issues.  I mean, as I'll address the requests for

17   adjournments separately -- and I do want to talk about

18   Ms. Morton separately.  I think we should do that outside of

19   the hearing of everyone else, if you agree?

20             MR. MORVILLO:  Yes, your Honor.

21             THE COURT:  OK.  So that we can just talk frankly.  In

22   light of the sensitivity of medical issues, I thought it would

23   be better to do that in the robing room.

24             OK.  So the rest of the appearances.  Mr. Schwartz.

25   Ms. Notari

I4ddgalc

1          MS. NOTARI:  Paula Notari on behalf of Mr. Bevan

2    Cooney.

3          MR. SCHWARTZ:  Good afternoon, your Honor.  Matthew

4    Lane Schwartz for Devon Archer, who is present in the

5    courtroom.

6          THE COURT:  All right.  Good afternoon to all of you.

7          MR. MORVILLO:  Good afternoon, your Honor.  Gregory

8    Morvillo and Caitlin Sikes and Savannah Stevenson on behalf of

9    Ms. Morton, who is not here today.

10         THE COURT:  OK.  Good afternoon.

11         So, we have a lot to cover.  I am not going to cover

12   all of the outstanding issues but I am going to cover as many

13   as I can and then we'll schedule what's left for another day.

14         First, I know that the defendants need to be arraigned

15   on the Superseding Indictment.  Obviously, a number of them are

16   not here.  Two of them are here.  Do you want to arraign them

17   now or do you want to do it all later?

18         MR. QUIGLEY:  Your Honor, the defendants can do

19   whatever they want to do.  I think it just might make sense to

20   do them all at one time.

21         THE COURT:  OK.  So, we'll do them all at the final

22   pretrial conference or on the first day of trial before jury

23   selection.

24         So, first what I want to do is I want to turn to the

25   government's motion to admit evidence pursuant to Rule 404(b).

I4ddgalc

1    In its notice to defendants, the government has indicated that

2    it intends to introduce evidence with respect to nine topics.

3    The government also argues, however, that all of this evidence

4    constitutes direct evidence of the conspiracy and that it made

5    its 404(b) notice in an exercise of caution.

6          I've obviously read all of your letters.  Is there

7    anything else anyone wants to add with respect to the 404(b)

8    arguments?

9          All right.  OK.  So --

10         MR. SCHWARTZ:  One of the points that I think several

11   of the defendants made in connection with the Code Rebel is

12   that it is utterly unclear how this supposed pump and dump

13   worked.  Since our papers went in, we've received all of the

14   3500 material, and it still remains utterly unclear, and I

15   think Mr. Tremonte pointed that out in his motions in limine in

16   connection with the motion to exclude aspects of Francisco

17   Martin's testimony.  So with more disclosure, the clarity has

18   not gotten any better.  I thought that was important

19   information for your Honor to have.

20         THE COURT:  All right.  Thank you.

21         Let me actually ask the government -- yes?

22         MS. NOTARI:  Your Honor, I have the same issue with

23   regard to the alleged false statements of CNB Bank.  It seems

24   that based on the 3500 materials and specifically the

25   statements of the banker Steven Shapiro, that the government

I4ddgalc

1    is -- the financial statement that they are referring to in

2    their initial notice was dated January 2015.  That was admitted

3    in regard to a hundred-thousand-dollar line of credit which was

4    granted.  Then there was a separate loan in June.  And there

5    seems to be another document, financial statement, that we are

6    not sure how they intend to prove this and we have yet to see

7    that produced, and so I think that's also --

8                THE COURT:  Do you want to respond to that?

9                MR. QUIGLEY:  Yes, your Honor.  I'm not sure it goes

10   to the admissibility, but just in the interest of transparency,

11   my understanding is that there is a January 2015 financial

12   statement that Mr. Cooney filled out, and then in June 2015, in

13   connection with getting a promissory note, he was asked to

14   confirm the information on the prior promissory -- the prior

15   financial statement.  It is in the promissory note itself.  It

16   says that he confirmed the prior financial statement from

17   January --

18               THE COURT:  Do you have that promissory note,

19   Ms. Notari?

20               MS. NOTARI:  Do I have the --

21               THE COURT:  Yes.  What are you saying that you don't

22   have that you think --

23               MS. NOTARI:  I don't have the financial statement that

24   he supposedly submitted in connection with the June 2015

25   promissory note.  So, in other words, what the government is

I4ddgalc

just saying is that he confirms the actual one he signed in

January, but there is no documentation of that.

MS. MERMELSTEIN:  I think Ms. Notari is

misunderstanding the nature of the documents, all of which she

has.  I think Mr. Quigley is right that the question is whether

or not these facts are admissible, not how the government is

going to prove them.  But just to be clear -- there is no

secret here -- in January of 2015 Mr. Cooney submitted a

personal financial statement to City National Bank in

connection with a hundred-thousand-dollar loan.  That personal

financial statement contained false statements concerning the

bonds.

In May of 2015, he sought a larger loan, a $1.2

million promissory note.  Having already had a personal

financial statement on file, City National Bank did not require

him to resubmit a financial statement.  Instead, in the

promissory note Mr. Cooney represents, over his signature, that

nothing has changed, that all of the information that he

previously submitted is correct.  So, he reaffirms that

incorrect information.  And then, as we proffered, when he is

unable to pay back the loan and there are inquiries about

selling the bonds in order to pay back the loan, he then for

the first time says:  Oh, that's not really my money.  I didn't

really buy the bonds when I claimed I own these bonds and

didn't tell you I had the loan.  That was wrong.  In fact, it

I4ddgalc

was a loan and I transferred the bonds.  So, you are out of
luck.

That is the sort of overview of the City National
evidence, all of which Ms. Notari has.

MS. NOTARI:  That was the first time I've heard that
recitation, so.

THE COURT:  That's why we're here.

MS. NOTARI:  Thank you.

THE COURT:  To Mr. Schwartz's point with respect to
Code Rebel, I do have one question for the government.  What is
the probative value of the pump and dump?  I understand the
relevance of the proceeds from the fourth bond issuance being
used to purchase the shares of the IPO, right, the
misappropriation.  And I understand that the resulting increase
in the price share of Code Rebel stock provided the capital the
defendants utilized to make the first interest payment on the
bonds sold in the initial issuance.  But what I don't
understand is why you need to prove up the pump and dump, why
that's probative and why it's not substantially more
prejudicial.  Why can't you just get out those two pieces, that
the proceeds were misappropriated and then the money was
ultimately utilized to make the first interest payment?

MS. MERMELSTEIN:  Your Honor, I think the reason that
that evidence is admissible as direct evidence of this
conspiracy is that part and parcel of the ways in which these

I4ddgalc

1    defendants operated and the ways in which their scheme were

2    designed to enrich them was to take small amounts of money and

3    make it -- sort of grow it at least on paper exponentially.

4    So, for example, by recycling the bonds, the defendants end up

5    with bonds that no one has in fact paid for but that they can

6    use for net capital and other purposes.

7            Similarly, the fraudulent efforts to increase the

8    paper value of Code Rebel shares was a way both to pay various

9    defendants for their roles in this scheme and to continue one

10   more step of inflating the value of the ill-gotten gains;

11   rather than just share a small pot, to increase that pot.  So I

12   think that that effort is itself direct evidence of the crime.

13   I think separately, Mr. Martin, who is going to testify about

14   both sort of receiving the shares, buying the shares,

15   transferring the share, etc., is going to himself admit that he

16   understood that the purpose of much of his trading in the stock

17   was not only to liquidate the stock for the use of the scheme

18   but to stabilize the price, a slightly different manipulation

19   than increasing it, so as to avoid the selloffs causing the

20   price to crash, itself also criminal conduct.  So, I think it

21   is intertwined inexorably with his testimony, but I think it is

22   direct evidence of the charged crime.

23           THE COURT:  All right.  I am prepared to rule.

24           I am going to allow in much of the evidence the

25   government seeks to introduce as direct evidence of the

I4ddgalc

conspiracy but not all of it.  In my view, defendants, in their

moving papers, have largely ignored the scope of the conspiracy

alleged in the indictment, but I do think that there are two

particular things that are just unduly prejudicial.  Evidence

of an uncharged crime is not considered "other act" evidence if

it:  "Arose out of the same transaction or series of

transactions as the charged offense"; is inextricably

intertwined with the evidence regarding the charged offense";

or "is necessary to complete the story of the crime."  That is

from the Gonzalez case, 110 F.3d at 942.  This type of evidence

need not "directly establish an element of the offense

charged," rather, it can "provide background" for the alleged

events, and may be admitted to show "the circumstances

surrounding the events or to furnish an explanation of the

understanding or intent with which certain acts were

performed."  See the Coonan case, 938 F.2d at 1561.  Such

evidence may be admitted without regard to 404(b) and its

attendant notice requirements and limiting instructions.  See

Brand, 2005 WL 77055 at *3.

          However, "where it is not manifestly clear that the

evidence in question is intrinsic proof of the charged crime,

the proper course is to proceed under 404(b)."  Nektalov, 325

F.Supp.2d at 372.  Rule 404(b) provides that:

          "Evidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show

I4ddgalc

action in conformity therewith.  It may, however, be admissible
for other purposes, such as paragraph of motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of
mistake or accident."

The Second Circuit follows an inclusionary approach,
allowing the admission of such evidence for any purpose other
than to show a defendant's criminal propensity, so long as the
evidence is relevant and satisfies the probative-prejudice
balancing test of 403.  To determine admissibility under
404(b), the Court should consider whether the evidence is
offered for a proper purpose; the evidence is relevant to a
disputed issue; and the probative value of the evidence is
substantially outweighed by its prejudice effect.  United
States v. Curley, 639 F.3d at 56-57.  The Court should also
consider giving an appropriate limiting instruction.  And if
there are any limiting instructions you want me to do, please
propose them to me in advance.

I'll begin with Archer's alleged false statements to
Morgan Stanley and Deutsche Bank and the BIT board.  These acts
are admissible as direct evidence of the charged conspiracy.
In October 2014, after purchasing the second tranche of bonds,
Archer attempted to deposit approximately $15 million worth of
the bonds into brokerage firm accounts at Morgan Stanley and
Deutsche Bank.  As part of that process, he sent emails and
other documentation to both institutions in which he

I4ddgalc

purportedly made false statements indicating that the funds
used to purchase the bonds came from real estate transactions
involving Rosemont when in fact the money was from the proceeds
of the first bond issuance and was provided by Jason Galanis.
Archer later transferred $2.6 million of the bonds he had
purchased to Burnham Securities so that it could meet net
capital requirements.

          These acts were very much an integral part of the
fraudulent scheme alleged by the government.  The information
requested by Morgan Stanley to which Archer allegedly gave
false statements was required by the bank in order to deposit
the bonds.  And the deposit of the bonds was critical to
furthering the conspiracy alleged, i.e., the misuse of the
bonds to further the business endeavors of the conspirators.
That Mr. Archer allegedly provided false information, moreover,
is probative of his state of mind, which, in light of his
anticipated defense at trial, will be an essential element for
the jury to resolve.  See Carboni, 204 F.3d at 44.  Whether
Mr. Archer did in fact provide false information to either of
these financial institutions in the course of the charged
conspiracy will be for the jury to decide.  Similarly, the
degree of knowledge that Mr. Archer may have had as to the
purported improper nature of the information he provided goes
to its weight rather than admissibility.  The jury will be free
to assess how much weight, if any, to provide these purported

I4ddgalc

misstatements in assessing Mr. Archer's guilt.

          Moreover, substantially the same reasoning applies to
Archer's purported misrepresentations to the BIT board about
the involvement of Jason Galanis in Burnham.  Even assuming, as
Archer argues, that the Bit board's approval was not necessary
to effect the transactions at issue, that doesn't preclude it
from being direct evidence of the conspiracy.  See Coonan at
1561.  Because the purported misstatement concerned the very
transactions which comprised the alleged conspiracy, they are
exceptionally probative as direct evidence of Mr. Archer's
intent -- again, a critical issue in light of the defense I
expect will be presented at trial.  See Carboni at 44.  That
Mr. Archer would make false statements specifically with
respect to Mr. Galanis is further probative of the relationship
between the two men during the precise time that they are
engaged in the alleged conspiracy.  See United States v.
Mermelstein, 487 F.Supp.2d at 262.  Mr. Archer's argument --
essentially that this is a complicated issue -- is insufficient
to justify exclusion.  The jury's role will be to assess
whether the statements were in fact inaccurate and, if so, how
critical they were to the overall conspiracy.  Mr. Archer also
seems to argue that the only misstatements or omissions
admissible as direct evidence of a conspiracy are those that
are made in conjunction with the sale or purchase of a
security.  That is simply not the law.

I4ddgalc

1              I'll also note that if somehow these statements were

2      not direct evidence, they would be admissible under 404(b) as

3      to Mr. Archer's intent and knowledge.

4              I similarly find that the purported misstatements and

5      omissions made in the Hughes and Atlantic form ADVs are

6      admissible.  A substantial portion of the evidence against

7      Ms. Morton is her failure to disclose conflicts of interest to

8      her clients due in part to the failure to disclose the control

9      of Atlantic and Hughes by certain other co-defendants.  This

10     effectively hid from investors that certain individuals

11     controlling the investment advisor also were involved with the

12     placement agent for the bonds and the annuity provider.  I

13     simply fail to see how this is not directed evidence of the

14     conspiracy.  It is probative of Ms. Morton's knowledge, intent,

15     and consciousness of guilt in failing to disclose that she had

16     ceded control of Hughes and Atlantic, in violation of her

17     fiduciary duties as an investment advisor.  This failure also

18     permitted the fraudulent scheme to continue operating

19     unbeknownst to Ms. Morton's clients.  Mr. Archer claims that

20     these statements are in fact not true but that explaining so to

21     the jury will be difficult and will create a "toxic"

22     environment due to "the racial dynamics that hang over this

23     case."  That, however, is not a sufficient basis upon which to

24     exclude evidence.

25              Next, I'll address the evidence pertaining to

I4ddgalc

1    Mr. Cooney's involvement in a transaction concerning Jason

2    Galanis' residence in Bel Air.  On November 12, 2014, Hugh

3    Dunkerley transferred $3,895,000 of the bond proceeds -- which,

4    again, were supposed to be invested in annuities on behalf of

5    the tribe -- to Cooney, who then used them to "purchase" the

6    home in which Jason Galanis was living in Bel Air.  This, too,

7    is direct evidence of the crimes charged.  It shows, in the

8    first instance, yet another way in which the bond proceeds were

9    misappropriated by the conspirators for personal use.

10   Moreover, it is exceptionally probative of the relationship

11   enjoyed by Cooney and Jason Galanis during period in which the

12   conspiracy was alleged to have taken place.  See, for instance,

13   the Pascarella case, 84 F.3d at 72, and Rosa, 11 F.3d at

14   333-334.  I agree with the government that the various

15   arguments made by Mr. Cooney, if they have merit, go to the

16   evidence's weight rather than admissibility.  If, for example,

17   Mr. Cooney was simply following the advise of lawyers and real

18   estate professionals, he is free to make that evident to the

19   jury.

20        The same reasoning applies to the efforts to issue

21   additional tribal bonds.  The government here has alleged a

22   broad conspiracy.  One element of which was the

23   misappropriation of the bond proceeds.  The government alleges

24   that the conspirators engaged in the effort to issue bonds from

25   another Native American tribe so that they could use the

I4ddgalc

proceeds to buy back bonds from pension fund investors who were
not pleased that the bonds had been placed into their accounts.
I fail to see how this is not direct evidence of the charged
conspiracy, and defendants do not seem to even seriously
dispute this point.

As to the Code Rebel IPO, as I suggested earlier, I am
going to grant in part and deny in part the government's
motion.  Proceeds from the fourth bond issuance were used to
purchase shares of the IPO -- again, part of the conspiracy,
which included the misappropriation of proceeds that were
supposed to be invested in an annuity on behalf of the Native
American tribe.  Moreover, the resulting increase in the price
per share of Code Rebel stock provided capital the defendants
utilized to make the first interest payment on the bonds sold
in the initial issuance, again contributing to the ability of
the defendants to carry out the conspiracy.  Thus, I am going
to allow in evidence of those facts.  I am not, however, going
to permit the introduction of evidence related to the
pump-and-dump scheme.  The alleged pump-and-dump scheme is
itself not probative, in my view, of the conspiracy charged in
this indictment, and, in any event, is too prejudicial to pass
muster under 403.  Moreover, the presentation of evidence can
confuse or mislead the jury, as well as result in a minitrial
regarding the merits of the government's claim that the
defendants engaged in such a scheme.  I will just warn the

I4ddgalc

1    defendants that you should be cautious not to open the door on

2    this issue relating to the alleged pump and dump.

3            As for the SEC bars, isn't it true that they relate

4    only to Jason Galanis and John Muran, neither of whom will be a

5    defendant at this trial, correct?

6            MR. QUIGLEY:  That is correct, your Honor.

7            THE COURT:  So, in the vast majority of instances,

8    prior bad acts of people who are not defendants would perhaps

9    be irrelevant, but here, as the government has detailed, at

10   least with respect to Jason Galanis, that he was barred from

11   the SEC is highly probative of Mr. Archer's intent in light of

12   the representations he made to the BIT board in response to its

13   queries regarding the involvement of Jason Galanis in Burnham.

14   So, I am going to how this evidence in.

15           MR. SCHWARTZ:  I just want to be clear on one thing.

16   Mr. Galanis was not operating under that bar at the time of the

17   alleged misstatements.  There was no evasion of the bar.  It

18   was simply a historical fact.  And as the government has said,

19   the only reason they want to introduce it is for context and to

20   say that essentially Mr. Archer should have known better than

21   to do business with someone with that in their past.

22           THE COURT:  Do you want to respond to that?

23           MR. QUIGLEY:  Your Honor, I think it is relevant -- as

24   your Honor has already ruled, it is relevant to provide context

25   as to why the BIT board was questioning Mr. Archer about his

I4ddgalc

association with Mr. Galanis, which frankly inextricably linked

to the BIT board's testimony and provides context for why they

over a period of months very specifically asked them repeatedly

about Jason Galanis and made the lack of association -- Jason

Galanis' lack of association with Burnham a condition of their

approval of the transaction.

THE COURT:  All right.  I do think it's relevant.  And

I do think it's probative of his intent, and I am going to

allow that in.

With the exception I noted earlier of the

pump-and-dump scheme related to the Code Rebel IPO, I also

don't find that any of this evidence is prohibited under Rule

403.  As I detailed, each piece of evidence is of significant

probative value given the allegations, and I fail to see how

any of the proposed evidence creates a risk of unfair

prejudice -- or of any of the other countervailing

considerations in 403 -- that substantially outweigh the

significant probative value.

I am concerned, however, with respect to Cooney's

purported misstatements to CNB.  I mean, I'm not inclined to

allow this evidence in.  I fail to see how it is direct

evidence, because it doesn't seem to have in any way assisted

the conspiracy or otherwise be probative of Mr. Cooney's

involvement.  I am not sure, for the same reasons under 404(b),

why it is relevant to his motive, intent, or knowledge with

I4ddgalc

1    respect to these allegations.

2            MR. QUIGLEY:  Your Honor, I think it is probative of

3    inconsistencies.  He first says owns the bonds.  Then he says

4    he doesn't.  His inconsistencies in that and his false

5    statements, frankly, are probative of his consciousness of

6    guilt.  This is not evidence that would take a lot of detail to

7    introduce.  We are talking about, as we mentioned before,

8    essentially two forms and limited interactions with the people

9    with City National.  Again, it's highly probative because it

10   goes to his state of mind with respect to the bonds.

11           THE COURT:  All right.  Ms. Notari, do you want to be

12   heard on this?

13           MS. NOTARI:  Your Honor, I would just reiterate that

14   they are completely mischaracterizing this evidence, and CNB

15   and Fulton management were involved in every aspect of this

16   transaction.  And Mr. Cooney did not misrepresent anything in

17   his financial statement.  And the reason for that financial

18   statement was in regard to a hundred-thousand line of credit,

19   right, which he was granted.  At that point the banks, they

20   were not relying upon the bonds.  The only reason why things

21   changed and why the bank eventually granted him this

22   $1.2 million loan was because his Code Rebel stock increased in

23   value.  And there are emails to show that CNB clearly relied on

24   the fact that there was an increase -- there was no

25   misrepresentations.  They were handling all of his business

I4ddgalc

transactions.  In fact, CNB Bank, Steve Shapiro, ultimately was
involved in transferring the bonds before he ever even obtained
the $1.2 million loan.  CNB Bank signed the medallion so that
he could transfer the bonds to Burnham and Bonwick.  So the
fact that -- all of this is going to be a minitrial and a trial
that has nothing to do with the case and it's just being used
to show propensity evidence, it is prejudicial, and we are
going to have to bring in all of these different witnesses and
it's going to be a separate trial.

MR. QUIGLEY:  Your Honor, it's not going to be a
minitrial.  There is email evidence in which he repeatedly --
in which he states to City National, he talks about the bonds,
how the bonds are doing well, how the bonds show his assets to
get this loan and this promissory note.  It's highly relevant.
It's proof that he bought the bonds, that he possessed the
bonds, and that he lied about the bonds.  And this is not --
again, this is several documents.  There will probably be a
witness from City National here who they can cross-examine and
ask all of these questions.  It is not very complicated
evidence by any stretch.

THE COURT:  I will reserve judgment on this.  I'll
take a closer look at the underlying facts and I will write an
order.

MS. NOTARI:  Your Honor, it is not going to be just
City National Bank, it is going be every person -- it is going

I4ddgalc

1   to be the Fulton management people are going to have to

2   testify.  They were all part of all of these different

3   transactions.  They were part of -- from this entire period of

4   time, they basically -- Steve Shapiro admits that he had no

5   personal dealings with Mr. Cooney until much later in the

6   timeline.  And it's very hard for really the Court to

7   understand like all of the intricacies with the emails, but

8   it's not just one witness, it is at least three witnesses that

9   we're going to have to deal with.

10          MS. MERMELSTEIN:  Just to clarify, your Honor, that's

11  not the case.  I actually think the government can do it in one

12  witness from Fulton Management, who is the intermediary between

13  Mr. -- he is Mr. Cooney's agent for this purpose.  He is the

14  intermediary between Mr. Cooney and the bank.

15          And I think that there is just no question that a very

16  important fact, a very essential question here is was Mr.

17  Cooney's purchase of these bonds legitimate?  Right?  Was he

18  really buying them because he felt they were a good investment?

19  And was he doing so with his own money, or was he doing so with

20  money from Mr. Galanis?  So there is just no question that both

21  of his statements with respect to his efforts to obtain this

22  loan, the initial statement in which he falsely claims that he

23  owns them in full, as Mr. Quigley points out, there are emails

24  where Mr. Cooney writes to Fulton Management and says, look,

25  the bonds are showing a value, this should help me get the

I4ddgalc

loan.  And there is no question that he is affirmatively

representing that they belong to him, and that in failing to

disclose the reliability of the purported loan from Jason

Galanis, he's claiming these are fully mine.  He then later

admits that that's not true, and then he claims that this was a

loan from Jason Galanis and that he in fact has to pay the loan

back for the first time and that he, as a result, in fact does

not own the bonds.  And, in fact, he then submits a corrected

personal financial statement admitting that he has that

liability.

          Those two statements are essential evidence of

Mr. Cooney's intent with respect to the bonds and his

understanding about whether or not this was a legitimate

transaction or a fraudulent transaction.  And the changing

story about it's my money, it's Jason Galanis' money, it is a

loan that has to be paid back I think is essential evidence of

his intent with respect to these bonds.  I think it is a

30-minute witness and, you know, a handful of documents.  It is

just not that complicated.

          THE COURT:  All right.  I will reserve ruling on this.

          Finally, I am not going to permit the government to

introduce evidence relating to the arrests and convictions of

Mr. Hirst and John and Jason Galanis in <u>Gerova</u>.  I just fail to

see how it is direct evidence of this conspiracy.  Indeed, in

the context of discussing discovery, the government repeatedly

I4ddgalc

1    represented to me that the <u>Gerova</u> matter was wholly unrelated

2    and irrelevant to the current case.  In any event, I think the

3    unfair prejudice substantially outweighs its probative value.

4    I just can't conclude that such evidence passes the 403

5    balancing test in light of the substantial prejudice that would

6    result from jurors in one criminal prosecution hearing that a

7    jury in a previous matter had convicted two of the defendants

8    for engaging in a scheme to defraud.

9          I will say, if the government thinks that there are

10   certain arguments that the defendants make will open the door

11   to this, I want to have that discussion in advance.  I want to

12   sort of tee that up.  I'm not suggesting you can't get in the

13   fact that these individuals knew each other before -- I mean,

14   obviously the Galanises did -- but I just think it's too

15   prejudicial.

16         MR. QUIGLEY:  Your Honor, we would ask your Honor to

17   reconsider.  I mean, they put in -- Mr. Galanis in particular

18   put in a surreply that we didn't get a chance to respond to.  I

19   think what you just said really illustrates the probative value

20   of this evidence.  You said it is obvious that the Galanises

21   know each other.  Yeah, it is obvious.  But it is not

22   obvious -- the nature of the relationship is not obvious.  Just

23   because they are father and son, there are a lot of -- you

24   know, there are millions of father-and-son relationships

25   throughout the United States.

I4ddgalc

1          THE COURT:  I think it is too prejudicial.  They were

2     convicted before another jury in another case.

3          MR. QUIGLEY:  Judge, courts routinely introduce

4     evidence of prior -- in the Gracesqi case, we cited I think

5     Judge Castel's decision that was affirmed by the Second Circuit

6     two weeks ago after our reply brief.  I mean, that was evidence

7     that there was a robbery and kidnapping, that the defendant and

8     a -- somebody was a cooperator -- eventually a cooperator but a

9     co-conspirator were involved in.  It shows the nature of their

10    relationship.  I think, frankly, it is more probative because

11    they were father and son, because they had a preexisting

12    relationship.  If it were just two random guys who teamed up in

13    a securities fraud conspiracy, maybe; but because they were

14    father and son, it's probative -- it's highly probative, the

15    nature of their relationship.  And the defendants -- and this

16    goes for Mr. Hirst also -- their whole argument is that they

17    relied on and trusted Mr. Galanis.  And the idea --

18         THE COURT:  That's why I'm teeing up the issue.

19    That's why I'm saying if there are arguments that you think the

20    defendants will make with respect to their previous

21    relationships, you know, specifically to Jason Galanis, we can

22    talk about it beforehand so we can set some guidelines on what

23    could potentially open the door to this testimony.  Right now I

24    think it is too prejudicial.  You are welcome to submit a

25    letter if you didn't have a chance to respond before and I'll

I4ddgalc

1    read it, but that is my ruling.

2            MR. QUIGLEY:  They have made those arguments, your

3    Honor.  They've all said that we relied on Jason Galanis.  We

4    had Mr. Touger, I'm paraphrasing, but he said they had an

5    ordinary father and son relationship --

6            THE COURT:  He doesn't say that they relayed on Jason

7    Galanis.

8            Sorry.  Go on.

9            MR. QUIGLEY:  I think that's clearly where this case

10   is going.  That was the whole point of part of the severance

11   motion is because everybody is going to point the finger at

12   Jason Galanis and the other defendants.  So, certainly for

13   Mr. Galanis and Mr. Hirst, the relationship -- the type of

14   relationship that they had with Mr. Galanis, with Jason

15   Galanis, is highly probative of the type of relationship that

16   they had and the fact that they couldn't trust him and they

17   shouldn't trust him.  And they knew when he said to them, oh,

18   here's, you know --

19           THE COURT:  Then maybe there is some other evidence

20   that can come in -- and, frankly, there is going to be a lot of

21   it, I imagine, that is going to come in anyway about Jason

22   Galanis and his conduct in the past, and so maybe there is

23   evidence that could come in about their knowledge of his

24   misconduct in the past that's not so prejudicial as to tell

25   this jury that John Galanis and Mr. Hirst were previously

I4ddgalc

1    convicted --

2            MR. QUIGLEY:  Right, but --

3            THE COURT:  -- of fraud.

4            MR. QUIGLEY:  -- I'm sure there will be plenty of

5    evidence of Jason Galanis's misconduct, but he is not on trial

6    here.

7            THE COURT:  No.  I understand that.  What I'm saying

8    is maybe there is evidence that you can get in, again,

9    without -- and I'm sure that there is -- of defendants'

10   knowledge of Jason Galanis's criminal past without getting in

11   the fact that these two defendants were previously convicted of

12   fraud.

13           MR. QUIGLEY:  Right.  But that doesn't go to the

14   relationship -- Jason Galanis could have been convicted or done

15   all kinds of things, but the issue and the reason it is

16   relevant is because Mr. Hirst and John Galanis knew about that.

17   So you could introduce --

18           THE COURT:  So maybe there is a way to get in the fact

19   that they knew about it without getting in the fact that they

20   were convicted of fraud themselves.  I just think it is too

21   prejudicial.

22           MR. QUIGLEY:  There is not, your Honor.

23           THE COURT:  Then, too bad.

24           MR. SCHWARTZ:  Your Honor, before we move off the

25   404(b), I have just one question.

I4ddgalc

1          THE COURT:  Yes.

2          MR. SCHWARTZ:  It is not on this issue.  If you are

3     still on this issue, go ahead.

4          MR. QUIGLEY:  Your Honor --

5          THE COURT:  As I said, you indicated you wanted to

6     submit a letter because you didn't have a chance to respond to

7     the reply.  You can.

8          As I see it, I don't know why there can't be a way to

9     elicit evidence that the defendants were aware of Jason

10    Galanis's history and in addition to preexisting connections

11    between them without getting in the fact that they were

12    convicted by another jury of fraud with him, which, as I said,

13    I think is too prejudicial.  So, think about that.

14         MR. QUIGLEY:  We will submit a letter, your Honor.

15         THE COURT:  Yes.  Mr. Schwartz.

16         MR. SCHWARTZ:  I have a question.  I am going back to

17    the forms ADV.

18         I understood your Honor's ruling about the relevance

19    of that evidence is direct evidence of the charged scheme with

20    respect to Ms. Morton, and apparently the argument is that she

21    was somehow involved in these false statements in the ADV.  One

22    of the arguments that we made, which your Honor didn't address

23    and which is important, is that I think it is undisputed that

24    Mr. Archer and Mr. Cooney didn't have any knowledge of the form

25    ADV, let alone the false statements in the form ADV, but the

I4ddgalc

1  false statements are supposedly about them.  Supposedly, they

2  ought to have been disclosed, amongst others, in the ADV.

3          I want to be clear, in addition to one of many reasons

4  why Ms. Morton should be severed from Mr. Archer and

5  Mr. Cooney, that with respect to them it is not evidence of the

6  charged scheme and your Honor will entertain a limiting

7  instruction.

8          THE COURT:  I will entertain a limiting instruction.

9  So, feel free to, as I said earlier, just submit that to me in

10  advance so we can talk about it.

11          MR. SCHWARTZ:  Thank you, your Honor.

12          THE COURT:  All right.  Thank you.

13          So, now let's turn to the motions for severance.  I

14  think I heard argument on this the last time.  If anyone wants

15  to be heard further, I am happy to hear you out.

16          So I have -- yes, go ahead.

17          MR. SCHWARTZ:  I'm sorry.  I think this is very

18  intertwined with some of the motions in limine, which I assume

19  your Honor hasn't gotten through yet --

20          THE COURT:  Right.

21          MR. SCHWARTZ:  -- as the responses aren't due yet.

22  Because a number of the government's exhibits and part of

23  Ms. Morton's defense have to do with her whistleblowing, her

24  attempts to cooperate.  And so the government has asked for

25  that to be excluded, but at the same time they intend to

I4ddgalc

introduce a number of exhibits in which Ms. Morton makes

representations to the clients of the investment advisors that

she was duped by the people who now are her codefendants.   To

me, that is part and parcel and if the cooperation comes out,

the exhibits the government wants to put in should come out as

well.   But your Honor should be aware of that evidence in

connection with the severance.

THE COURT:   Do you want me to wait to rule on

severance until I review that material?

MR. SCHWARTZ:   Or at least you ought to look at the

evidence the government wants to put in, because one of the

critical severance factors is whether there is going to be

evidence that's admissible as to one defendant but not others.

So in a trial that's just Ms. Morton, it may be OK to get into

all of this stuff and to show these what the government is

going to say are false exculpatory statements blaming her

codefendants, but it's not proper as to the codefendants.

These are not co-conspiratorial statements.   They're setting up

a trial defense, if in fact they are false, or they are

evidence that she's innocent if they are accurate.   But either

way, they are not -- they are hearsay as to my clients.   We'll

have no opportunity to confront Ms. Morton, and it is wholly

prejudicial.   So, your Honor needs to consider that and be

aware of that evidence in connection with the severance motion?

THE COURT:   I haven't looked at the statements in

I4ddgalc

1    evidence.

2           Yes.

3           MR. QUIGLEY:  Your Honor, let me cut to the chase on

4    this ruling.  To the extent there are -- and I think we know

5    because we just got the motions in limine filed the other

6    night, I think I am aware of the statements that Mr. Schwartz

7    is talking about, the particular statements.  We can either

8    redact those statements or not offer them from where she claims

9    the other defendants had said --

10          MR. TOUGER:  Your Honor, I would object to the

11   redaction because my client is not mentioned by her at all as

12   having any involvement in this case, and it's obviously

13   prejudicial to him.  Possibly, the jury might think he's part

14   of the defendants that she is talking about, when he isn't.  It

15   would be highly prejudicial for Ms. Morton to say, oh, these

16   other people are involved in which she hasn't mentioned my

17   client and, therefore, they might think that she did, and I

18   think that's highly prejudicial.  It certainly goes to his

19   ability, if those statements did come in, to say to the jury,

20   look, you see, we weren't involved at all.

21          MS. SIKES:  And Ms. Morton would also be objecting to

22   any redaction of that, as it would go to her state of mind at

23   the time, essentially because the government is alleging that

24   the conspiracy lasts all through 2016.

25          MR. QUIGLEY:  As to Mr. Touger's point, if it was

I4ddgalc

1   redacted, the jury is not going to have any idea what it says.

2   It could say any one of a million things.  I don't think that

3   really prejudices John Galanis.

4          THE COURT:  I haven't read the motions in limine yet.

5   I am happy to defer judgment on this issue until then.  I think

6   everyone should assume that it is going to be one joint trial

7   for now just for purposes of trial preparation, but I am happy

8   to read the submissions and look at the evidence before I rule

9   formally.

10         Mr. Biale.

11         MR. BIALE:  I am going to ask Mr. Quigley to speak a

12  little louder because we are having a hard time understanding

13  him.

14         THE COURT:  OK.  Is there anything in particular you

15  did not hear?

16         MR. BIALE:  No.  I think I've got it.

17         THE COURT:  OK.

18         MR. TOUGER:  I think I misheard, which is why --

19  Mr. Schwartz just told me his argument is they are going to

20  redact everything and not just the names.

21         THE COURT:  Right.

22         MR. QUIGLEY:  That is what we offered, yes, your

23  Honor.

24         THE COURT:  Yes.

25         MR. TOUGER:  Then my argument obviously --

I4ddgalc

THE COURT:  OK.  But Ms. Morton, as I understand it,
still wants it in because she wants to -- I mean, you phrased
it in terms of state of mind, but she wants to show the efforts
she made to assist.

MS. SIKES:  Yes, your Honor.

THE COURT:  OK.  Why don't we talk now about the
various motions for an adjournment.  I think I have 16 defense
letters for an adjournment at this point.  I don't think as a
matter of law any of the defendants have demonstrated an
adjournment is warranted.  A district court has a great deal of
latitude in scheduling trials.  As a result, trial judges enjoy
very broad discretion in granting or denying trial
continuances.

I will begin by addressing the primary themes
emanating from the defendants' motions for adjournment -- the
volume and timing of the discovery production in this matter.

I don't believe this factor warrants an adjournment.
As Mr. Cooney rightly notes in his March 19th letter, prior to
the disclosure of the Gerova materials and consensually
recorded calls, the government had produced 5.1 million pages
of discovery, and I recognize how much that is.  This number
doesn't include the 734,166 documents comprising the Gerova
discovery, nor the 12,000 audio files comprising Jason Galanis'
recorded calls.  It's also noted that from January 16th to
March 19th of this year, the government produced an additional

I4ddgalc

1    32,500 pages of material, demonstrating the continued nature of

2    discovery production.

3              So, I am sympathetic to the amount of materials.  It's

4    why I granted a very long adjournment previously, over the

5    government's strenuous objection.  I don't think that's an

6    adequate basis for a lengthy adjournment here, which has been

7    what's requested.

8              First, I want to make something clear on the record.

9    As you are aware, I urged the government to disclose the

10   discovery in the Gerova matter, which I understand was made

11   available to all the defendants by Mr. Biale, who was in

12   possession of the materials from representing Mr. Hirst in that

13   Gerova case before Judge Castel.  The government also produced

14   recordings of consensually recorded calls involving Jason

15   Galanis.

16             If I wasn't already clear on this, I want to make

17   clear for the record that although Mr. Hirst and Jason and John

18   Galanis were defendants in Gerova and some of the defendants

19   here were on recorded calls when Jason Galanis was cooperating

20   with the FBI on an unrelated investigation four years ago,

21   prior to any of this conduct in this case, I remain unconvinced

22   that the defendants were legally entitled to those matters, to

23   those materials, given that the two matters are otherwise

24   wholly unrelated to the present case.  But, nonetheless, I

25   thought, in an exercise of caution, it should be disclosed.

I4ddgalc

1          This conclusion, though, is buttressed by my ruling

2     today prohibiting the government from introducing the fact of

3     the arrests and convictions in _Gerova_.  I mean, my previous

4     urging to the government, or direction, was out of an abundance

5     of caution and considerations of fairness, particularly in

6     light of the fact that Mr. Hirst and perhaps John Galanis as

7     well, had some or all of the materials from the _Gerova_ case and

8     I thought it was appropriate to make it even and have everyone

9     have the same materials.  And while it is true that some of the

10     materials contained in that discovery may be _Giglio_ as to Jason

11     Galanis, there is already a veritable mountain of such

12     evidence, and at a certain point in the trial that is going to

13     become cumulative anyway.

14          Moreover, the transcript of the _Gerova_ trial, which

15     was held in September 2016, is and has been publicly available

16     on this court's docket.  So as a result, I just want to make

17     clear that the volume of the new material, at least the _Gerova_

18     material, that was recently received by defendants doesn't

19     substantially weigh in favor of an adjournment.  Although, the

20     government continues to make new productions, they're

21     comparatively smaller than the previous discovery productions

22     and don't require an adjournment, particularly in a case of

23     this nature.

24          Mr. Archer contends, in addition, that a continuance

25     is appropriate in light of the publication of a book detailing

I4ddgalc

1   his involvement in the hedge fund industry with the children of

2   John Kerry and Joe Biden, including one entity that will be

3   referenced at the trial in this matter.  This is an

4   insufficient basis upon which to require a continuance.  Archer

5   is correct that a continuance can be necessitated by pretrial

6   publicity, but such a continuance is only required when the

7   publicity amounts to a wave of public passion, creating a

8   presumption of prejudice.  That is a quote from the Romero

9   case, 897 F.2d at 53.  Here, Archer has failed to make such a

10  showing.  He has cited to several news articles, but they fall

11  well short of arising to a wave of public passion.  And I'll be

12  sure to question all the jurors during voir dire about their

13  familiarity both with Archer and with the book and any

14  additional questions you think appropriate.

15        With respect to Ms. Morton, we'll talk privately

16  regarding her health issues.

17        The Second Circuit has long held that granting or

18  denying a motion for a continuance or a severance on the ground

19  that an accused is physically incompetent to stand trial falls

20  within the sound discretion of the trial court.  And as I said,

21  we'll talk about that because that really relates to

22  Ms. Morton.

23        But, finally, I want to address the motions submitted

24  by John Galanis and Mr. Hirst, which are similarly denied.

25        Remind me, the day that you had asked for Mr. Galanis

I4ddgalc

1    to be here was April 1st, is that right?

2             MR. TOUGER:  Your Honor, let's get the history exactly

3    correct.  In February, Mr. Galanis was given tests by BOP --

4             THE COURT:  I don't mean to sound unsympathetic or

5    to -- I didn't mean to sort of accuse you of misconduct in

6    bringing him here late.  But in any event, go on.  Go on.

7             MR. TOUGER:  I hope it is not misconduct.

8             THE COURT:  No.  But at the start of this, you know,

9    when I said like, look, it was your choice to do this, I just

10   want to be clear that I am sympathetic to his health concerns

11   and I understand why you did what you did.  I just want to note

12   that.  But go on.

13            MR. TOUGER:  You are right, your Honor, there is no

14   legal -- there is no case that says when somebody has been

15   diagnosed with possibly prostate cancer the trial must be

16   adjourned.  So you are right, there is no law on this.  But

17   this is a matter of humanity.  This is a man who has now waited

18   two-and-a-half months for a test that anybody in this courtroom

19   would have taken within 48 hours.

20            THE COURT:  OK.

21            MR. TOUGER:  To not --

22            THE COURT:  Why hasn't that happened?  Is this

23   something that the government was asked to assist with with the

24   BOP, because it has been months?

25            MR. TOUGER:  You ordered them to do it.

I4ddgalc

1              THE COURT:  Yes.

2              MR. TOUGER:  I mean, so I don't know why they didn't.

3    I can't answer that for the BOP.  Maybe a BOP representative

4    can tell you.  But Mr. Galanis has been sitting there in the

5    Los Angeles prison, in their custody, for two-and-a-half

6    months, and he hasn't said, no, don't give me the test, he has

7    been asking for the test.  So for two-and-a-half months he has

8    been sitting there.  And now you want to start a trial that's

9    going to last another two months.  He can't get the tests

10   during the trial.  So, it's going to be another two and a half

11   months until he gets the tests.  So five months is going to go

12   by --

13             THE COURT:  Let me ask you this.  Remind me,

14   Mr. Quigley, when is he supposed to come here?

15             MR. QUIGLEY:  Wednesday, your Honor.

16             THE COURT:  Wednesday.

17             MR. TOUGER:  I'll tell you why I'm not so excited

18   about that date, your Honor.  The government has made it very

19   clear in their letters that nobody can be transported in 48

20   hours to New York from Los Angeles.  They said that in their

21   letter.  Mr. Galanis is still in Los Angeles as we speak.  He's

22   not going to be moved during the weekend, he has been told

23   that.  So the earliest he's possibly moving, starting to move,

24   is Monday.  So that means that they are going to get him here

25   in 48 hours.  Yes, that is possible.  They could put him on a

I4ddgalc

plane and fly him here in 48 hours, in that time period, no

doubt about it.  But the government said in their letter that

that's not possible, it takes at least a week.  I'm just going

to go with what the government said in their letter to the

Court.

So if he gets here Wednesday, that's wonderful.  But

there are two related issues to that.  One, he still has to

have the tests, and, two, that gives me less than two weeks --

less than two weeks -- to talk to my client.  And believe me,

every issue that Mr. Tremonte has had with Mr. Hirst, I am

going to have with Mr. Galanis.  The BOP could come in here and

the government could come in here -- and they do this all the

time, oh, we have access, you have access, you have this, you

have that.  That's not true.  I can tell you, I have been

practicing in this federal court for decades.  That's not true.

Mr. Tremonte's letters show you that is not true.  He is not

lying to this Court.  The BOP says a lot of things.  They don't

produce them.

Yes, there is a computer on the floor that he can use

24 hours a day, but there are 30-odd other individuals wanting

that computer.  Yes, there are computers in every attorney room

in the MDC.  Anecdotally, half the time -- I mean, all the time

half of those are not working.  And I am not the only one who

is going to want those computers.

So I can go to the MDC, spend the hour and 20 minutes

I4ddgalc

waiting for my client to come down, which they say doesn't

occur.  The hour and 20 minutes he comes down and I don't have

a computer.  I can wait another hour or so for a computer, but

I'm not seeing my client with any credibility of an interview

because there is paperwork that he hasn't even seen yet.

And the Court discounts this 35,000 documents.  And

the 3500 material, you haven't even mentioned how many

documents that is.  I don't even know.  Do anybody here know

how many documents are in the 3500 material?

(Counsel conferred)

24,000, at least, documents.  Mr. Galanis has not seen

that yet.  The exhibits are 24,000.  Who knows how many

documents are there.  But let's be honest, there are a lot.  He

hasn't seen any of that yet.  And I haven't seen it with him.

It is not a use -- it is not complete for me to look at a

document and say, oh, here's this email or, oh, Dunkerly says

this, or Raines says that, or Haynes says that without

consulting with my client, who was there when Haynes says that

happened or Raines says that happened.  Did it happen, as they

say exactly now we have --

THE COURT:  I'm not minimizing it and --

MR. TOUGER:  But that's just the first -- let's go

back to the first issue.

THE COURT:  All I was going to say is, look, this is a

lengthy trial.  You are going to have time to work --

I4ddgalc

1          MR. TOUGER:  How, your Honor?  You want me to be here

2     eight hours a day.  Wait for Mr. Galanis to get back to the

3     MDC.  Then go sit with Mr. Galanis.  And when am I supposed to

4     prepare for tomorrow's witnesses?  When am I supposed to do the

5     motions in limine that are going to be done?  When am I

6     supposed to prepare -- read the record from the day before?

7     It's very easy for the Court --

8          THE COURT:  I'm not --

9          MR. TOUGER:  -- to say it could get done.

10          THE COURT:  I'm not minimizing it.  Look, I put this

11     trial off, over the government's objection, for what, six

12     months --

13          MR. TOUGER:  Your Honor, part of my argument is you

14     have done everything you can.

15          THE COURT:  I know.  But it is for this reason,

16     because I understand this concern, and I think it is a very

17     legitimate concern and I think the health concerns are

18     legitimate concerns, too.  I mean --

19          MR. TOUGER:  I want to get back to the health

20     concerns.

21          THE COURT:  OK.

22          MR. TREMONTE:  Before you do that, can I be heard on

23     this briefly?

24          THE COURT:  Yes.

25          MR. TREMONTE:  We submitted an update letter of two

I4ddgalc

pages this morning, which I'm assuming the Court has not had

time to consider.  And I want to emphasize just a couple of

things briefly because I think they are relevant to the sort of

practical considerations here.

You know, we've been in frequent contact with the

government, and the government has actually been very

cooperative and attempting to move the folks over at the MCC to

put us in a position where Mr. Hirst can meaningfully review

materials and participate in his defense.  It is true, I mean,

we went to see Mr. Hirst frequently when he was in Jesup.  We

did our --

THE COURT:  There he had full access to materials.

MR. TREMONTE:  He didn't have full access to the

materials but he did have full access to us, and we did a very

good job, I think, of summarizing for him and educating him

about what we were seeing in the Rule 16.  So I have no quarrel

about that.  And as I said, the government has actually been

very helpful trying to move the needle at the MCC and I

actually think has made some progress.

The issue we have is that there is an enormous

difference in terms of trial preparation between our diligent

efforts to educate Mr. Hirst on the Rule 16 and the sort of

more general issues of trial prep and going over the 3500 and

the government exhibits.  And that's what we haven't been able

to do.  But the good news is I think -- and it is in our

I4ddgalc

letter -- within a week at the outside, assuming that the folks
at the MCC are not completely intransigent, right, I think we
will actually be in a position where we'll be able to review
what we need to review, Mr. Hirst will have access --
meaningful access to his materials, which he doesn't currently
have.  That suggests to me, especially when coupled with the
situation with Mr. John Galanis, which I don't know that much
about but I understand from today's colloquy the basics, that,
you know, a relatively short adjournment will go a long way
towards alleviating the practical concern that we have that
Mr. Hirst has really not been able to meaningfully prepare.  He
will be, but the fact of the matter is that conditions at the
MCC have just not changed until maybe next --

          THE COURT:  I'll tell you this:  I had planned, coming
in here, to adjourn it for two weeks.  I wanted to make the
record clear on the lengthy adjournment that has been requested
and why I didn't think it is appropriate, and I have other
reasons based on who had what information at what time.  And so
I was going to do that anyway and put it off for two weeks.
And then the question becomes are there health or other issues
that prevent us from even doing it then, which I think is
May 14th.

          MR. TOUGER:  Your Honor, I'm just trying to play this
out, so to speak.  And the Court has been wonderful in
everything I've asked the Court to do --

I4ddgalc

1          THE COURT:  It is not about me.

2          MR. TOUGER:  The issue here is, your Honor, that we

3     have a man sitting there -- and everybody knows with cancer,

4     early detection is the key.  Prostate cancer is curable if

5     caught early enough.  OK?

6          THE COURT:  But you don't know that he has it.

7          MR. TOUGER:  That's why I'm saying, early detection is

8     the key.

9          THE COURT:  To put off a trial --

10          MR. TOUGER:  I'm not asking you to put off the trial.

11    I'm asking you to allow him the time to get here, because he is

12    obviously not having the test -- that surgery done in Los

13    Angeles, that is obviously not happening.  So all I'm asking

14    your Honor is for him to get here.  If he gets here on

15    Wednesday, that's wonderful.

16          THE COURT:  And if I put off the trial for two

17    weeks --

18          MR. TOUGER:  No.  Let's play that out.  If he gets

19    here on Wednesday and then the surgery is done, let's say,

20    within 48 hours of that, I have a friend who just had the same

21    procedure done, and he's 64 years old, and he needed two weeks,

22    at least, of recovery.  He is still not fully recovered, but

23    two weeks he was again, you know, able to move uncomfortably.

24          And then I still have these days that I have to go see

25    Mr. Galanis and talk to Mr. Galanis and meet with Mr. Galanis

I4ddgalc

1    and go over this paperwork.  You are asking me to do a

2    Herculean task.  And my name is David Touger, it is not

3    Hercules.  OK?

4              THE COURT:  OK.

5              MR. TOUGER:  So, two weeks is nice but it is not

6    effective.  I'd rather start April 30th.  But May, June 1st --

7              THE COURT:  Would you rather start April 30th?

8              MS. NOTARI:  No.

9              MR. TOUGER:  June 1st I think would be fair, your

10   Honor.  Why don't you tell the government they can't meet with

11   their witness for two weeks?  They'd never agree to that.  But

12   you're asking me -- I've given up two weeks of my time --

13             THE COURT:  Look, again, I understand it was for

14   health reasons, but you made a decision to wait until he is

15   brought here --

16             MR. TOUGER:  No.  No.  I made a decision to wait until

17   April 1st, your Honor.  You keep saying that.

18             THE COURT:  I know.  But if I adjourn it for two

19   weeks, it will get you those two weeks back.

20             MR. TOUGER:  But the tests haven't been done yet.  If

21   he would have come here April 1st, fully done, fully

22   recuperated, fully ready to go.  Instead, what's happened, your

23   Honor, and what the Court is also discounting -- and this is a

24   much less vital reason, but the last time they tried to move

25   him for these tests, they did so without a wheelchair-

I4ddgalc

1    accessible vehicle, so they tried to pick him up and put him in

2    the van.  Of course they dropped him.  So, of course, they've

3    ordered an MRI because all the benefits of his surgical -- of

4    his spinal fusion has been wiped out.  So now he is sitting

5    there with a numb right arm and dizziness because they dropped

6    him.  Because they didn't listen to him when he said, no, don't

7    pick me up and put me in this van.  So that test also hasn't

8    been done yet.  So the two weeks is nice but it doesn't field

9    equally, your Honor, because he is not coming here fully tested

10   with his mind solely prepared for trial.

11            And let me ask you this question, your Honor.  If he

12   has the tests and they prove positive for cancer --

13            THE COURT:  We're not get into that.

14            MR. TOUGER:  I know, but that is why it is important

15   to start the trial after he has the tests, because if you start

16   the trial and we go through all of that and he comes back and

17   he has the tests, you are going to tell him you can't have the

18   surgery for your prostate cancer?  I don't think the Court

19   wants that on its shoulders, to wait to do surgery on cancer

20   for two-and-a-half months.  Because that's humanitarian.

21   That's cruel and unusual punishment, to sit here and let your

22   cancer grow in your body for two and a half months while you

23   sit on trial.

24            THE COURT:  Again, we haven't gotten there.  He does

25   not have a diagnosis.

I4ddgalc

    MR. TOUGER:  Right.  So what I'm asking the Court,
your Honor, is that as soon as he gets here, BOP do the surgery
and we adjourn the trial for a month after the surgery.

    THE COURT:  I don't know if BOP will do the surgery
right away.

    Does the government want to speak to this?

    MS. MERMELSTEIN:  Yes, your Honor.  Thank you.

    First of all, let me note that sort of barring some
freak storm or some other problem, Mr. Galanis will be here on
Wednesday.  The marshals, since this defendant is not available
as a general principle, at great expense are flying New York
marshals to California to get Mr. Galanis and bring him here.
So, it is true that he hasn't been picked up yet.  He will be
picked up on Tuesday and he will be here on Wednesday.  That is
the representation that has been made to the government by the
marshals.

    No one has asked the U.S. Attorney's office to
participate or have discussions with FCI Terminal Island or BOP
about Mr. Galanis' health situation so I don't have any
information about that situation.  What I can say is simply
from having dealt with medical issues for incarcerated
defendants for a long time now is that I'm sympathetic to
Mr. Galanis' situation.  It is not --

    THE COURT:  Speak into the microphone, please.

    MS. MERMELSTEIN:  I'm sorry.  I am sympathetic to

I4ddgalc

Mr. Galanis' situation, but it is not at all clear from what we know at this point in time that BOP will be able to accommodate a biopsy sort of immediately upon his arrival.  Indeed, given the complicated nature of bringing an inmate to a medical facility, I suspect it can't be done as a matter of, you know, immediate turnaround.  And while I'm sympathetic to his discomfort, I also don't think that given the nature of his complaint it is necessarily clear that there is a medical difference between doing a biopsy sort of now versus sort of six weeks from now.  I'm not suggesting that he should be told to wait, only that I don't think it is clear that that is an issue.

And I think that life experience from medical treatment, including for just people who are seeing regular doctors and are not incarcerated, is that it is frequently the case that following a biopsy surgery takes a long time to schedule just in the ordinary course of treatment, in the event that he needed such a thing, which it is not clear that he does.  And I think that the recovery from this type of biopsy, when you say full recovery, it appears that that means no strenuous exercise, for example, not an inability to function and participate in preparing for a trial.

So I think your Honor is right that there is no sort of basis for an adjournment on that basis and that this can all be accomplished.  Look, the government thinks we should go

I4ddgalc

forward on April 30th.  There are some reasons why an

adjournment would be very difficult on a trial front for the

government, but if your Honor adjourns it for two weeks, we

will try it two weeks later.

THE COURT:  How long do you think the trial -- what is

your best estimate now, given my 404(b) rulings?  I know it is

hard to predict, and I am going to ask the defendants the same

thing, but I feel like I've heard everywhere from three weeks

to three months.

MS. MERMELSTEIN:  I struggle to predict, which is why

I hesitate to commit to something.  I think in part the problem

is that with so many defendants, it is unclear to the

government what the length of cross-examinations will be for

its witnesses.  So if it is exponentially longer than the

directs in every case, then that is a very different ballgame

than if it is not.  I would guess that with respect to many of

these witnesses there would only be cross-examination by one

defense counsel, because many witnesses pertain to different

pieces but I don't know how to speak to that.

I think -- oh, that's a very good point by

Mr. Quigley.  The other issue is that there are an enormous

number of document custodians that are necessary in this case,

dozens and dozens of them.  Because of that, the government

provided proposed stipulations to the defendants, and we

provided the bulk of them three weeks ago now and a number of

I4ddgalc

additional ones this week and we've heard back, despite

repeated entreaties that they respond to us, nothing, no

indication one way or the other, no response one way or the

other.

        THE COURT:  Let me ask them right now.

        MR. TOUGER:  Your Honor.

        THE COURT:  Yes.

        MR. TOUGER:  As far as stipulations, I can't talk to

my client about them so I haven't responded to them.

        I love it that Ms. Mermelstein just casts off this

idea.  His prostate specific antigen level is four times the

normal level.  That's what has caused this.  It is not, oh, I'm

going to the bathroom a lot and therefore I think -- he has had

the preliminary tests.  The preliminary tests say he is a good

bet to have prostate cancer.  He is the age of men who get

prostate cancer.  Everything points to the fact that he has

prostate cancer.  Hopefully he doesn't.  Nobody is wishing that

on him.  But it's very easy for this U.S. Attorney to sit here

and says, oh, it's not a big deal, he can wait a little bit

longer.  I can't believe I'm hearing that.  This is a human

being.

        THE COURT:  All right.

        MR. TOUGER:  So --

        THE COURT:  I understand.

        MR. TOUGER:  My point is, your Honor, that they have

I4ddgalc

1    been meeting with their witnesses for two weeks now these two

2    weeks who knows how many hours a day.  I haven't had the

3    ability -- because the government decides that every phone call

4    that they make is listenable, that every email he sends me they

5    can read, so I haven't had an attorney-client, government not

6    listening in except for maybe ten-minute phone calls that he is

7    allowed to get maybe every two weeks I get to have a private

8    attorney phone call that can last ten minutes.  So I have yet

9    to have, since January, an attorney-client conversation that

10   the government is not privy to.  And they want me to be ready

11   within less than two weeks.  And you want me to be ready within

12   less than four weeks.  I don't think that's fair.

13           THE COURT:  All right.

14           MR. TOUGER:  So I would ask the Court, at a minimum,

15   to adjourn this case from April 30th to May 30th.

16           THE COURT:  Go ahead.

17           MS. MERMELSTEIN:  Sorry, your Honor.

18           So I think we were somewhere in the middle of the

19   stipulation point.

20           THE COURT:  Yes.  To your stipulation, does that

21   affect the length of trial?

22           MS. MERMELSTEIN:  It does, your Honor.  There are so

23   many custodians at issue, I think we are talking about -- I

24   haven't counted up, I think we are talking about something like

25   40 custodians.  So I think it does affect the length of the

I4ddgalc

trial, which is why we tried to resolve this with the

defendants early.

One thing we wanted to raise, your Honor, is that

obviously your Honor can't order the defendants to stipulate

but there are an enormous number of what seem to be

noncontroversial kinds of things -- emails provided pursuant to

a search warrant, documents provided by a bank -- that it would

seem silly to not have stipulations, but we would like to sort

of know where we stand.

Leaving that issue aside, assuming there are

reasonable stipulations and that the defendants may wish for a

limited number of custodians they want to question so we put on

a few, I think that my best guess is that the government's case

is about three weeks; maybe it goes a little into the fourth,

hard to say.

THE COURT:  Is that including sitting a half day on

Friday or is that a four-day week, or did you not think it out

that way?

MS. MERMELSTEIN:  I don't know how to think about that

time.

THE COURT:  All right.

MS. MERMELSTEIN:  Yes, I think if we sit half days

Fridays, then a little less.

I would note one scheduling matter in that regard,

which is the 28th of April is a Jewish holiday, it's a

I4ddgalc

1    Monday -- I'm sorry, of May.  I lost track of the calendar.

2                THE COURT:  It is Memorial Day, anyway.

3                MS. MERMELSTEIN:  The 21st, I'm sorry, the Monday

4    before Memorial Day.  So we would ask not to sit that day.  We

5    were going to suggest that we would be happy to sit Friday to

6    make it up if your Honor wanted.  But in any event, I still

7    think that we are talking about something like three weeks.

8                THE COURT:  All right.  Yes.

9                MS. NOTARI:  Your Honor, I just wanted to note that

10   with regard to the stipulations, part of the problem is us

11   getting through the government's exhibits and 3500 materials to

12   know exactly where we stand with our -- what evidence we intend

13   to admit.  So it is not something that we would -- I know in my

14   case I would love to get back to them, but I am just not in a

15   position -- I fully intend to get there, and I think my

16   colleagues agree with me that this adjournment of two weeks, or

17   whatever the Court can give us, will help facilitate all of

18   that.

19               MS. MERMELSTEIN:  Your Honor, I'm sorry to bicker, but

20   the government produced exhibits in this case six weeks prior

21   to trial, which is vastly longer than almost any case in this

22   district.  The defendants have had the exhibits for a month.

23   So -- and the point of doing that was in part to allow for this

24   kind of discussion.  So I'm sympathetic to the fact that it

25   takes time to get through them, but I don't think that that is

I4ddgalc

1    sort of a reasonable answer.

2              MR. TOUGER:  Does the government think we're not

3    reading the documents?  Do they really think we said, oh, we

4    got the documents and we're not reading them?

5              THE COURT:  This is not productive.  Look, I was on

6    the CJA Panel.  I know how difficult it is to meet the client

7    and have them review documents.  I get it.  So I understand it,

8    but I don't think that this back and forth is productive in any

9    way.

10             MR. TOUGER:  I agree but --

11             THE COURT:  But I will tell you that scheduling is an

12   issue here.  I am sympathetic both to the health concerns and

13   to the ability of the defendants themselves to review

14   discovery.  So even if and even though I will say it is true

15   that the government produced both 3500 material and the

16   exhibits far in advance of trial, and they are to be credited

17   for that, on the other hand, some of the defendants have not

18   been in a position to review that.  And that is a concern.  And

19   I understand that you've been trying to work to allow Mr. Hirst

20   to do that and there are specific issues with respect to John

21   Galanis and I get that.

22             But I will tell you scheduling is an issue.  I have

23   trials scheduled from mid-July.  I have, you know, things --

24   other, you know, trials in August.  I have a whole host of

25   issues throughout the summer.  So how long this trial is going

I4ddgalc

1    to take and an accurate assessment of that will help me

2    determine if I can give you more than two weeks.

3            So what I am going to ask you to do is I am going to

4    ask you to get back to the government on the stipulations or on

5    as many of them as you can.  If you can do that -- I don't know

6    when you can do that.  Can you do that -- you have to wait, I

7    guess, Mr. Touger, for your client.

8            MR. TOUGER:  Your Honor, I would think that most of

9    those witnesses have nothing to do with Mr. Galanis.

10           THE COURT:  OK.

11           MR. TOUGER:  I am just assuming that.

12           THE COURT:  If you could do that by tomorrow, I can

13   get back to you tomorrow on when this trial will start.  But

14   you have to get back to the government --

15           MR. TOUGER:  We can do it right now.

16           THE COURT:  All right.  Why don't you talk.  Take a

17   minute now.  Speak amongst yourselves.  If any of you need

18   permission from your client, then you can let me know tomorrow

19   but take a minute.

20           (Defense counsel conferred)

21           (Continued on next page)

22           (Pages 58 through 75 SEALED)

23

24

25

I4ddgalc

1           (In open court)

2           THE COURT:  Do you need any more time?

3           No.  All right.

4           MR. SCHWARTZ:  Judge, before we go back on the record,

5    Mr. Archer was excused at 2 o'clock for an engagement.

6           THE COURT:  Yes, absolutely.

7           All right.  So any progress on stipulations as it may

8    affect the length of trial?  I mean, I'm concerned for a number

9    of reasons, but, one, I think it is going to be really hard to

10   choose a jury that can sit through Memorial Day and July 4th.

11   So, I'm hoping if we -- I really would like to get it done

12   before the 4th.  I also have trials that I scheduled a very

13   long time ago, starting on July 9th.

14           So, any progress?

15           MR. TREMONTE:  Yes.  We had constructive conversation

16   amongst defense counsel and also with the government briefly.

17   We're confident that, even though we don't have the specific

18   documents in front of us, that the overwhelming majority of the

19   stipulations will be agreed to in advance.  To the extent that

20   there may be a handful of custodian witnesses, I think everyone

21   is in agreement that it will not meaningfully add to the trial

22   time at all.

23           MS. MERMELSTEIN:  So --

24           MR. TREMONTE:  And just to finish the thought -- I'm

25   sorry Rebecca -- the other thing we discussed is, you know,

I4ddgalc

1    from our perspective, respectfully, a month would solve a whole

2    host of problems, including in particular the issues relating

3    to Mr. John Galanis, because it would in fact afford him

4    sufficient time to be back here, based on the government's

5    representation that is in fact going to happen next week,

6    tested, and to recover with sufficient additional time for

7    Mr. Touger to prepare, and we are also cautiously optimistic --

8    again, because the government has been helpful in this

9    regard -- that Mr. Hirst will have access -- real access to

10   materials within a week.

11              MS. MERMELSTEIN:  So that's helpful on the

12   stipulations.  The government requested that we receive -- if

13   the entire stipulations are acceptable, we receive the signed

14   copies and, if not, we receive the answer on what the

15   defendants are willing to sign, because my experience is that

16   until the signed stipulations are in hand, the government can't

17   stop lining up these custodians.  So, we need to know which

18   limited set they want us to call, and we need to know that now.

19              MR. TREMONTE:  I'm confident that we can confer.

20              THE COURT:  Can we set a date on that?  That would be

21   really helpful if we just set a date by which you agree.

22              MR. TREMONTE:  Wednesday of next week, your Honor?

23              THE COURT:  Does that work?  OK.  Thank you.  That is

24   helpful.

25              Yes.

I4ddgalc

1        MS. MERMELSTEIN:  Your Honor, with respect to the time

2    period of the adjournment, I think for all the reasons your

3    Honor has said, there is no legal basis for needing one at all.

4    I think if your Honor intends to adjourn it a week or two,

5    obviously the government will try it when your Honor orders it

6    is to be to tried, but there is an enormous difference from the

7    government's perspective between a one- or two-week adjournment

8    and the four weeks from now that seems to be floated, and we

9    really object to the four weeks.  If you tell us it is

10   May 15th, or whatever that Monday is, we will be here.  That

11   difference is enormous to us.

12       I also note that we produced our materials based on

13   this initial trial date.  That puts our 3500 and our exhibits

14   in the hands of the defendants for far more time than had

15   really been agreed to.  So, I think for the reasons that we

16   discussed and some others that we're happy to discuss not on

17   the record, the government really urges the Court not to

18   adjourn it more than two weeks.

19       THE COURT:  All right.  Yes.

20       MR. TOUGER:  Your Honor, I just don't see the logic in

21   that last statement.  So what they're saying is they wanted to

22   produce that stuff closer to trial so we would have come in

23   here and say we didn't have enough time to read all the

24   documents.

25       THE COURT:  Look, you know what the law is on 3500

I4ddgalc

material, and as I said, I think the government is to be

commended for producing it early.  That being said, I don't

find it particularly persuasive.  I'm not offended by the

notion of defense counsel and defendants having more time to

prepare for trial.  I think that is a good thing and not a bad

thing.  That being said, you know, we had a trial date.  I had

already granted one very lengthy adjournment.  I am loath to do

it again.

        The thing that, frankly, I'm most persuaded by -- and

for all the reasons I said, I don't think you are legally

entitled to one.  On the other hand, there are these issues,

the health issues with respect to John Galanis, and there are

issues with respect to Mr. Hirst and Mr. Galanis actually being

able to review the materials and prepare for trial.

        So, I'm going to adjourn the trial to May 21st.

        Is that the date you said was a Jewish holiday?

        MR. TOUGER:  Monday is --

        THE COURT:  OK.  So we will start May 22nd.  And my

hope is that the trial is kept within a month.  I don't know if

that is reasonable or not, but hopefully it will be completed

at the latest before, you know, the July 4th holiday.  I will

tell you that I have -- one of those weeks is going to be

shorter.  I have the Judicial Conference on June 13th.  So it

may be that we -- I think I would sit for half a day on the

13th and then would not be sitting the 14th or the 15th.

I4ddgalc

1          MR. TOUGER:  Your Honor, could I just make one

2     suggestion?

3          THE COURT:  Yes.

4          MR. TOUGER:  And I am thankful to the Court for the

5     adjournment.

6          Since the next weekend is Memorial Day weekend, why

7     don't we pick the jury on May 22nd and then start the trial on

8     that next Tuesday, and this way we are not telling the jury

9     this they are sort of taking up Memorial Day weekend.  And I

10    think it gives us -- it saves us a couple of days.  I know the

11    Court has basically cut the baby in half between two weeks and

12    a month, but it does --

13         THE COURT:  I actually think if you come in on

14    May 21st, you are juror who has committed that you can serve

15    for at least two weeks, and so what they can't say if they come

16    in on the 21st is say I can't sit at all because of Memorial

17    Day.  I mean, we could still sit half a day on the Friday --

18         MR. TOUGER:  We are not sitting on the 21st, your

19    Honor.  We are sitting on Tuesday, the 22nd.  So all we are

20    asking for, it is going to take -- with five defendants, it is

21    probably going take a day at least to pick a jury.  So

22    basically, what I ask --

23         THE COURT:  You are asking me to give up that whole

24    week, basically.

25         MR. TOUGER:  No.  I am asking to pick a jury and then

I4ddgalc

1   start the trial the day after Memorial Day.  I have spoken to

2   defense counsel and that seems -- I've also talked to defense

3   counsel, and the half day on Friday, we don't really know the

4   efficiency of that because it seems like we're going to be

5   doing this trial in three weeks.  If you --

6           THE COURT:  If you really thought we could try this in

7   three weeks, then I wouldn't sit on Fridays.

8           MR. TOUGER:  I truly think we can try this case in

9   three weeks.

10          THE COURT:  But that's not what I heard from

11  Mr. Schwartz, whose representation is it was going to be up to

12  three months.  I know it is hard to predict.

13          MR. SCHWARTZ:  That is just my prediction on what we

14  are getting from the government.  I am not doing anything to

15  prolong the trial.  But we got notice of 27 witnesses.  We have

16  over a thousand government exhibits.  I think we have three

17  government experts.  We have four defense experts.  It is going

18  to take a little bit of time.

19          THE COURT:  All right.

20          MR. SCHWARTZ:  When you are talking about

21  cross-examination, there are going to be orders of magnitude

22  longer than the direct, because what we heard from the

23  government a second ago before the break was that a majority of

24  their witnesses really pertain to only one defendant.  I think

25  I'd ask you to consider that as you think about severance

I4ddgalc

because that is different from what we heard before.  But I
think that's right.  And most of these witnesses really do only
pertain to one person so there won't be duplicative
cross-examinations.

My skepticism has always simply been based on the fact
that given the scope of the crimes charged, the number of
witnesses and exhibits that the government has proffered, it
doesn't feel like three weeks.  If they are still saying this
far out that it is a three-week trial, then I guess it is a
three-week trial.

THE COURT:  All right.  Yes.

MS. MERMELSTEIN:  Thank you, your Honor.  A few
things.

First of all, with respect to severance, those
witnesses -- just to be clear, those are witnesses we would
call on trial if every single defendant went to trial alone.  I
just expect that with respect to some of them, the defense
counsel's argument will be you never met my client, you don't
know anything about them.  So if they take it seriously, then
we would offer it because it relates to severance.

With respect to scheduling, it seems unfair to call it
splitting the baby since the government doesn't want any
adjournment.  We just want two weeks.  We still think we should
start the 14th; it makes an enormous difference to us.  But if
we are going to start on the 22nd, we should pick the jury the

I4ddgalc

week before, I think.  Let's pick a jury the prior week and
tell them to be here on Tuesday morning for openings so that we
can hit the ground running on the 22nd.  That saves us a day,
maybe two, in a trial with this many defendants, and I think
that that's worth doing and I think it is worth sitting half
days on Fridays trying to --

MR. TOUGER:  It takes away my ability to meet with my
client for those few days.

THE COURT:  No.  I understand.

I am going to start on the 22nd.  We are going to
choose a jury on the 22nd or the 23rd, and I'm not going to
tell them to come back after Memorial Day.  As I said, those
jurors will have committed to being free for two weeks.  So
even though the court, of course, is closed on the 29th, I'm
going to assume that we're going to move forward.

The only question that I have -- and I'll make this
decision when I hear people out during voir dire -- is if we
should take off the Friday or not, just so that we can keep as
many people on the jury, or we should sit half a day on Friday.
As a general rule, though, I plan to sit half a day on Fridays.
I think we can do it from 10 to 1 and just take a very short
break, and so there will be no lunch break.  As I said, there
may be, you know, one or two exceptions to that, and one of
those weeks where we are going to have a shorter week is the
week of June 11th.  So that's the schedule.  I am not going to

I4ddgalc

1    move it again, and that is the schedule.

2            Yes.

3            MR. TOUGER:  Your Honor, so we could hit the ground

4    running, as the government likes to say, is have the

5    government -- because the MDC doesn't talk to me, so maybe the

6    government can talk to the MDC between now and Wednesday and

7    smooth the road, so to speak, so when Mr. Galanis does get

8    there, they are anticipating his arrival and they know the

9    issues as far as him having access to materials.

10           I have already burnt the CDs to give to him, so they

11   are ready to put into his attorney mail and give to him as soon

12   as he gets there.  What I'm saying, your Honor, is just so

13   when -- we don't have the same problems as Mr. Hirst and we

14   waste two weeks getting to where Mr. Hirst is now.

15           THE COURT:  I'm sure you will assist.

16           MS. MERMELSTEIN:  Absolutely, your Honor.  I will note

17   that we also have a new hard drive of all the discovery for

18   Mr. Galanis that is ready to go.  I didn't think it would be a

19   good idea to send it to MDC before he arrives because I don't

20   know that it will be processed properly, but we will coordinate

21   that and do whatever we can.  They don't work for us, but we'll

22   try and do that.

23           One other request from the government.  I think

24   fairness dictates, given the agreed-upon schedules, that the

25   defendants still produce their exhibits to the government on

I4ddgalc

1    the date on which they agreed to produce them.

2              THE COURT:  I agree.  I agree.

3              So the defendant still have to produce their exhibits

4    on the same -- the date that was previously scheduled, which

5    was April --

6              MS. MERMELSTEIN:  One week before the trial was to

7    begin.

8              THE COURT:  OK.  So that is April 23rd.  So defendants

9    still have to produce all of their exhibits on April 23rd, and

10   I think that's fair.

11             There are a couple of things.  I think we have to

12   reschedule the final pretrial conference.  Also, we still have

13   some remaining issues.  This has been a long session so I think

14   we should schedule something else for next week.  We have to

15   address the motion to suppress -- Mr. Archer and Cooney's

16   motion to suppress and the crime fraud exception and other

17   related issues that relate specifically to Mr. Archer and

18   Cooney.  Obviously, anyone is welcome to be there if you would

19   like to.

20             So, are you free next Thursday?

21             MS. NOTARI:  Yes.

22             MR. TOUGER:  In the afternoon, if that is possible.

23             THE COURT:  OK.  I mean, we could -- you know, I can't

24   do it in the afternoon, I could do it in the morning, but we

25   could just meet when the final pretrial conference was

I4ddgalc

1    originally scheduled, April 25th, at 3.

2              Is that all right, since you already had that on your

3    calendar?  Is that good?

4              MS. MERMELSTEIN:  Your Honor, I guess the only

5    question is -- and I don't know if your Honor is -- with

6    respect to suppression, that's fine.

7              THE COURT:  Yes.

8              MS. MERMELSTEIN:  We are waiting for answers on the

9    crime fraud and the privilege issues, and those are documents

10   that are not in our possession because we are still fighting

11   about them, so we are hesitate to wait that long.

12             THE COURT:  Right.

13             MS. MERMELSTEIN:  But if your Honor was otherwise

14   prepared to rule.

15             THE COURT:  Yes.  So let's -- what about noon on

16   Thursday, the 19th?

17             MS. NOTARI:  That is fine.

18             THE COURT:  Let's do that.  I have a meeting at 1, so

19   we'll just keep it short.

20             MS. NOTARI:  So is that instead of the 25th?

21             THE COURT:  That is instead of the 25th.  So the 25th

22   is canceled.

23             I assume you can't do 11:30, is that right?

24             MR. TOUGER:  No.

25             THE COURT:  OK.  So we will just make it from 1 to 2

I4ddgalc

1    on the 19th.

2              MR. TOUGER:  From 1 or noon, your Honor?

3              THE COURT:  I'm sorry.  From noon to 1 -- I apologize.

4    From noon to 1 on the 19th.  And then we're canceling the 25th.

5    And then I will reschedule the final pretrial conference for

6    May 16th at 2 o'clock.  OK?

7              And -- yes.

8              MR. MORVILLO:  You raised this before.  This is a very

9    minor issue.  But to the extent that you were considering not

10   sitting on the Friday before Memorial Day --

11             THE COURT:  Yes.

12             MR. MORVILLO:  -- I think that is the right way to do

13   it.  I think it will be much harder to get a jury that knows

14   that they have to be here on that Friday.

15             THE COURT:  Right.  You just want to know that in

16   advance?

17             MR. MORVILLO:  Yes.  I think that we are going to have

18   some very unhappy jurors if they have to sit that Friday.

19             THE COURT:  So we won't sit that Friday.  So let's not

20   sit that Friday.  We will have three days to sit that week.

21   And then we'll have -- I will sit a half day, though, on Friday

22   starting the next week.  So June 1st we'll sit a half day and

23   the other Fridays.  OK?  So we'll have three-and-a-half days

24   that week.

25             I think the last issue is discovery.  And I know we

I4ddgalc

had some email -- some letters back and forth about that.  I

just want to remind the parties of their obligation to comply

with Rule 16 in good faith, and I don't know where we are on

the reciprocal discovery issue.

MS. MERMELSTEIN:  Your Honor, we received yesterday

from Mr. Schwartz, I don't know the exact number, 50,000 or so

documents.  The vast, vast majority, as his cover letter

represents, are Outlook calendars, so not really an enormous

number notwithstanding the numbers, and I think approximately

6,000 other sort of real documents.  They haven't properly been

downloading from the site.  We are still working on it.  As

soon as we have them, we intend to produce them to the other

defendants.

THE COURT:  OK.  All right.

MR. TOUGER:  What was that?  I didn't hear the last

sentence.

MS. MERMELSTEIN:  I'm sorry.  As soon as we have

successfully acquired them ourselves, we intend to produce them

to everyone else.

THE COURT:  OK.  So are there any other issues we need

to discuss today?

MR. QUIGLEY:  Your Honor, I think, in light of the

adjournment, just in an abundance of caution, we move to

exclude speedy trial time between now and May 22nd since that

is at the defendants' request.  I'm not sure how much time has

I4ddgalc

1  clicked off the clock but just to be safe.

2          THE COURT:  Yes.  That application is granted until

3  the trial begins on May 22nd.

4          Yes.  Mr. Morvillo.

5          MR. MORVILLO:  The last time I was here I raised the

6  issue of not being able to hear.  I still can't hear.  My

7  hearing has not gotten better --

8          THE COURT:  We are not going to be sitting in this

9  courtroom.

10          MR. MORVILLO:  I understand.  But the next time we

11  meet, can we meet where we are supposed to meet where we are

12  going to have the trial so at least I can figure out if I can

13  hear there or if I need to get --

14          THE COURT:  I will try and get that courtroom.  We

15  will look into it and just make sure another judge isn't using

16  it.  But are you coming on the 19th?

17          MR. MORVILLO:  I guess I am now.

18          THE COURT:  OK.  No.  I mean just because it was

19  really related to --

20          MR. MORVILLO:  I mean I wasn't planning on it, but if

21  you will be in the courtroom that you will be in --

22          THE COURT:  What I was going to say is I will ask if I

23  can have it.  I am trying a case there now, so it may be that

24  they let me keep it.

25          (Pause)

I4ddgalc

1          It should be fine.  So it is 110.  So why don't we

2     plan to meet in Room 110 then.

3          And then during the course of the trial, you are just

4     going to have to kind of remind me by raising your hand or

5     otherwise for me to remind people to speak into the

6     microphones.

7               MR. MORVILLO:  Will do.

8               THE COURT:  OK.  All right.

9               Anything else?

10              (Pause)

11              All right.  Thank you.  Have a nice afternoon.

12              MS. MERMELSTEIN:  Thank you, your Honor.

13

14                              -   -   -

15

16

17

18

19

20

21

22

23

24

25