**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        v.

GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

                Defendants.

No. 16 Cr. 371 (RA)

**DEVON ARCHER'S REPLY MEMORANDUM OF LAW IN**
**FURTHER SUPPORT OF HIS MOTIONS *IN LIMINE***

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## **TABLE OF CONTENTS**

ARGUMENT ............................................................................................................. 1

I.      Michelle Morton's Self-Serving Statements to Federal Authorities and
        Her Clients Should Be Excluded, Or Morton's Trial Should Be Severed ........... 1

II.     The Government Must Be Specific When Referring to Defendants and
        Entities .............................................................................................................. 5

III.    Gratuitous References to the "Minority Business Enterprise" Status of
        Hughes Capital Management and Atlantic Asset Management Should Be
        Excluded ............................................................................................................ 9

IV.     GX 2085 – An E-Mail About Mr. Cooney's Niece – Should Be
        Excluded .......................................................................................................... 11

V.      The Court Should Preclude Testimony About the Effects of the Alleged
        Fraud on Any Victims and About the WLCC's Financial Condition ............... 12

VI.     The Court Should Preclude Any Evidence Concerning How the
        Allegedly Misappropriated Bond Proceeds Were Spent ................................... 15

VII.    The Court Should Preclude References to and Arguments About
        Michael Milken (*e.g.*, GX 375, 2204, 2217, 2292, 3004, 3226) ....................... 16

VIII.   The Court Should Preclude Exhibits Providing Summaries of the
        Securities Laws (*e.g.*, GXs 1024, 1025, 1026, and 1027) ................................. 17

IX.     Government Trial Exhibits Containing Irrelevant, Inflammatory
        Language (*e.g.*, GX 2049, 2067, and 2069) ..................................................... 19

CONCLUSION ...................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

*Kelly v. Boeing Petroleum Services, Inc.*,
   61 F.3d 350 (5th Cir. 1995) ...................................................................... 12

*Old Chief v. United States*,
   519 U.S. 172 (1997) .................................................................................. 14

*Pinkerton v. United States*,
   328 U.S. 640 (1946) .................................................................................... 6

*Rauh v. Coyne*,
   744 F. Supp. 1181 (D.D.C. 1990) .............................................................. 12

*Scales v. United States*,
   367 U.S. 203 (1961) .................................................................................... 5

*United States v. Shkreli*,
   260 F. Supp. 3d 247 (E.D.N.Y. 2017) ........................................................ 4

*United States v. Biaggi*,
   909 F.2d 662 (2d Cir. 1998) ........................................................................ 3

*United States v. Blake*,
   195 F. Supp. 3d 605 (S.D.N.Y. 2016) ......................................................... 2

*United States v. Bonventre*,
   No. 10 Cr. 228 (LTS) (S.D.N.Y. 2014) ................................................. 7, 18

*United States v. Brooks*,
   No. 06-cr-550 (JS), 2010 WL 11515680 (E.D.N.Y. Jan. 25, 2010) ............... 13

*United States v. Copple*,
   24 F.3d 535 (3d Cir. 1994) ......................................................................... 14

*United States v. Goffer*,
   531 F. App'x 8 (2d Cir. 2013) ...................................................................... 3

*United States v. Gonzalez*,
   No. 09 Cr. 481 (CM), 2010 WL 339698 (S.D.N.Y. Jan. 28, 2010) ................ 4

*United States v. Hatfield*,
   685 F. Supp. 2d 320 (E.D.N.Y. 2010) ........................................................ 15

*United States v. Lino*,
   No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) .................. 4

*United States v. Mahaffy*,
   693 F.3d 113 (2d Cir. 2012) ........................................................................ 18

*United States v. Nordlicht*,
  No. 16-cr-00640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018) ...................... 4, 5

*United States v. Salameh*,
  152 F.2d 88 (2d Cir. 1998)................................................................................................ 4

*United States v. Scarpa*,
  913 F.2d 993 (2d Cir. 1990)............................................................................................ 19

*Zafiro v. United States*,
  506 U.S. 534 (1993)......................................................................................................... 3

Defendant Devon Archer respectfully submits this reply memorandum of law in further support of his motions *in limine* in advance of the trial scheduled to begin on May 22, 2018. [ECF No. 399].

## ARGUMENT

### I.     Michelle Morton's Self-Serving Statements to Federal Authorities and Her Clients Should Be Excluded, Or Morton's Trial Should Be Severed

Evidence that – after the alleged fraud was completed, after clients began complaining, and after the government's investigation had begun – Michelle Morton purportedly reported her suspicions to authorities and told her clients that she had been victimized by her co-defendants is inadmissible.  The purpose of the hearsay rule's prohibition on the admission of retrospective out-of-court statements like Morton's is because they are inherently unreliable.  Mr. Archer is not attempting to "rewrite history" as Morton claims; to the contrary, he seeks to prevent Morton from doing so through the admission of false exculpatory statements that, in an effort to create a scapegoat for her own conduct, falsely inculpate Mr. Archer.

As set forth in both Mr. Archer's and the government's opening motions, Morton's statements to law enforcement and her clients are not admissible as non-hearsay or under any exception to the hearsay rule.  The fact of Morton's cooperation, the content of her statements to the government, and her thirteenth-hour attempts at saving face before her clients are all inadmissible hearsay.  Furthermore, because the statements refer on their face to events *in the past*, albeit inaccurately, they are equally improper to prove Morton's state of mind.  *See, e.g.*, GX 103 ("When we became suspicious of their activities *eight months ago*, we contacted the SEC and requested the government to investigate our concerns." (emphasis supplied)); GX 1403 (chronicling events from April through September 2015 in a letter dated November 30, 2015).

Federal Rule of Evidence 803(3) provides that "[a] statement of the declarant's *then-existing* state of mind (such as motive, intent, or plan) . . . but not including a statement of

memory or belief to prove the fact remembered or believed unless it relates to the validity or

terms of the declarant's will" is admissible.  The Rule's drafters anticipated attempts, like

Morton's, to introduce backwards-looking statements under the guise of "state of mind"

evidence, and cautioned that such evidence would cause "the virtual destruction of the hearsay

rule" by permitting the "inference of the happening of the event which produced the state of

mind."  *Id.* at Adv. Comm. Note to Para. (3).

Morton's argument that she requires the statements' admission to prove her withdrawal

from the conspiracy in the fall of 2015 is insufficient to overcome this prohibition and does not

warrant the admission of "self-serving explanation[s] of past events" and prejudicial finger-

pointing at her co-defendants.  *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y.

2016).

In addition, Morton does not – and cannot – dispute that the admission of her out-of-court

statements would violate Mr. Archer's right to confront the witnesses against him.  Instead, she

deflects the issue by raising the specter of her testimony to argue that her statements are

potentially admissible under Rule 801(d)(1)(B) as prior consistent statements.  *See* Morton Mem.

of Law in Opp. to Devon Archer's and Gary Hirst's Mot. *in Limine*, ("Morton Opp.)  at 3 n.4

[ECF No. 413].  But consistent statements that post-date the start of the investigation in this case

have no probative value.  The purpose of Rule 801(d)(1)(B) is to allow a witness, accused of

"recently" making something up, to prove that she has been saying the same thing for a long

time.  In this case, however, Morton's prior statements would not rehabilitate her.  Rather, they

would just prove that, once it became apparent that the WLCC bonds were an enormous problem

and the government was investigating, Morton picked a story and stuck to it.  Her prior

statements would therefore have no probative value, but would be tremendously prejudicial.

Moreover, Morton's statements would needlessly confuse the jury and waste valuable time in an already complex trial by presenting an inaccurate and self-serving recitation of the events.

Nor does Morton's argument that the documents are relevant to a "consciousness of innocence" defense do anything to change the result. Unlike the defendant in *United States v. Biaggi*, who denied any "knowledge of others' wrongdoing" even though it "would have assured him immunity," Morton's cooperation with the government is not probative of her lack of criminal intent. 909 F.2d 662, 690 (2d Cir. 1998). Morton could have had any number of reasons for speaking to law enforcement. As every criminal practitioner knows – but few jurors do – consciousness of guilt is at least as likely to lead to cooperation as consciousness of innocence. As a result, there is no basis to permit the jury to hear evidence that not only lacks any probative value, but also is undeniably prejudicial and likely to cause confusion. *See United States v. Goffer*, 531 F. App'x 8, 21-22 (2d Cir. 2013) (affirming exclusion of evidence defendant argued was probative of "consciousness of innocence" where rejected plea deal was not probative of "a strong belief of [defendant's] innocence" and was likely to confuse the jury). Evidence of Morton's cooperation and her statements to clients blaming her co-defendants should therefore be excluded.

\*      \*      \*

Notwithstanding the above, to the extent the Court believes that Morton is entitled to introduce evidence of her purported cooperation and her statements to clients, it is essential that she be severed from Mr. Archer. Whatever probative value this evidence may have for Morton, the evidence is nothing but prejudicial to Mr. Archer. Where prejudicial evidence is properly admitted against one defendant but not others, severance is appropriate. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (finding that a risk of prejudice sufficient to grant severance "might occur when evidence that the jury should not consider against a defendant and that would

not be admissible if a defendant were tried alone is admitted against a codefendant"); *United States v. Gonzalez*, No. 09 Cr. 481 (CM), 2010 WL 339698, at *3 (S.D.N.Y. Jan. 28, 2010) (finding that prejudice justifying severance may occur "when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper" (quoting *United States v. Salameh*, 152 F.2d 88, 115 (2d Cir. 1998))); *United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356, at *23 (S.D.N.Y. Jan. 2, 2001) (observing that court's ruling on severance "should consider . . . prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant." (citation omitted)).

Moreover, as set forth in Mr. Archer's pending Motion for Severance, [ECF No. 290], fairness requires that Mr. Archer not be required to stand trial alongside a "second prosecutor" whose defense will rely on documents as self-serving as they are accusatory. *United States v. Shkreli*, 260 F. Supp. 3d 247, 256-57 (E.D.N.Y. 2017) (severing trial where the "defenses amount to more than simple finger pointing by two defendants" but rather "the defense strategy of [the] co-defendant presents a realistic scenario that Shkreli will be prosecuted, not only by the government, but also by . . . his co-defendant"); *see also* Mem. of Law in Supp. of Mot. for Severance ("Severance Mot.") at 9-15 [ECF No. 290].

To that end, Judge Cogan's recent decision in *United States v. Nordlicht* is right on point. Case No. 16-cr-00640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018).  In *Nordlicht*, one defendant "intend[ed] to argue that he is innocent, that his co-defendants are guilty as charged, and that he reported their allegedly illegal conduct to the Government." *Id.* at *1.  Judge Cogan found it appropriate to sever the trials for principally two reasons:  first, because the defense would subject the other defendants to "double prosecution," and second, because "this strategy

4

would inevitably lead to frequent objections against [that defendant's] argument and evidence, seriously disrupting trial in a manner that would test any jury." *Id.* at *2.

A trial in which Morton argues that "[s]he is innocent, that [her] co-defendants are guilty as charged, and that [s]he reported their allegedly illegal conduct to the Government" raises exactly the same problems. Worse, unlike in *Nordlicht*, Morton's alleged cooperation was not contemporaneous with the underlying charged conduct, but appears to have been an after-the-fact attempt to mask her own guilt. As a result, Mr. Archer and the other defendants would have to attack Morton and accuse her of falsely cooperating with the government and implicating them in an effort to save herself – *i.e.*, the other defendants would need to advance precisely the same argument as the government. In a joint trial in which this evidence is admitted, therefore, Morton will act as a "second prosecutor" against her co-defendants, and they will act as a "second prosecutor" against her. While Morton's proposed evidence should be excluded, if the Court finds otherwise it is essential that she be severed from her co-defendants.

## II.     The Government Must Be Specific When Referring to Defendants and Entities

It is fundamental that guilt is individual, and that the government must prove each defendant guilty of each crime charged beyond a reasonable doubt. *See Scales v. United States*, 367 U.S. 203, 224-25 (1961). Yet, surprisingly, the government contends that it should be allowed to argue that "the defendants" engaged in conduct, regardless of *which* defendants were actually engaged in that conduct.

The government's argument, premised on *Pinkerton* liability, is circular. It argues that because conspirators can be liable for the reasonably foreseeable actions of their co-conspirators, it can therefore prove each alleged conspirators' guilt by lumping all of the defendants together. But that isn't the law. *Pinkerton* provides that where defendants have joined in an unlawful conspiracy, one conspirator can be liable for the *substantive* crimes of another, so long as those

crimes were in furtherance of the conspiracy and were reasonably foreseeable to both.  *See*

*Pinkerton v. United States*, 328 U.S. 640, 645-47 (1946).  Under *Pinkerton*, the government may

argue that Conspirator A is legally responsible for Conspirator B's behavior.  But that does not

give the government license to argue that Conspirator A *engaged* in the behavior itself.  Put

differently, *Pinkerton* constitutes a theory of liability, but it does not entitle the government to

twist the facts.[1]

In *Pinkerton* itself, two brothers were charged with conspiring to violate the Tax Code

and with multiple substantive tax offenses arising out of a scheme to transport and sell untaxed

whiskey.  The Supreme Court recognized that while the evidence against one brother was

unassailable, there was "no evidence to show that [the other brother] Daniel participated directly

in the commission of the substantive offenses on which his conviction has been sustained."  *Id.* at

645.  Indeed, Daniel was in prison at the time his brother Walter committed the substantive

bootlegging.  *See id.* at 648 (Rutledge, *J.*, dissenting).  Nonetheless, because the two conspired to

commit tax offenses and because Walter's rum-running was in furtherance of the conspiracy and

was reasonably foreseeable to Daniel, the Supreme Court affirmed the substantive convictions

against both of them.  Nothing in the Court's opinion, however, suggests that the government

could argue that Daniel actually engaged in the physical act of transporting and selling the

untaxed whiskey, which is analogous to what the government seeks to do here.

Mr. Archer's request is simple:  the government should be required to identify which

defendant or defendants it is talking about with specificity, rather than lumping them all in

together.  For example, although the charged conspiracy involves undisclosed conflicts of

interest and breaches of fiduciary duty at the investment advisers, Atlantic and Hughes, only two

---

[1]     Mr. Archer does not concede that a *Pinkerton* charge is appropriate.  But even if it were,
that would not entitle the government to make the arguments about "the defendants" that it
apparently plans to.

of the defendants (Morton and Hirst) are alleged to have engaged in that conduct.  Mr. Archer, along with Bevan Cooney and John Galanis, are not alleged to have had any involvement in or awareness of those undisclosed conflicts.  If the government is permitted to argue, for example, that "the defendants" hid conflicts of interest from Atlantic's and Hughes's clients, it will be misleading, confusing, prejudicial – and factually wrong.

This is precisely what Judge Swain held in *United States v. Bonventre*, in which she repeatedly – and in several cases *sua sponte* – interrupted the government's closing arguments to insist upon precisely this kind of specificity.  The government dismisses this authority by noting that in that case "Archer's counsel represented the Government."  Gov. Mem. of Law in Opp. to the Defendants' Mots. *in Limine* ("Gov. Opp.") at 2 [ECF No. 414].  But: so what?  The identity of counsel does not in any way undermine the force of Judge Swain's logic that "justice demands precision," Devon Archer's Mem. in Supp. of Mots. *in Limine* ("Mot."), Ex. 2 at 11657, and nothing in the government's opposition provides any reason why it could possibly be appropriate to confuse which defendant engaged in what conduct.  *See also id.*, Ex. 2 at 11671-72 ("[W]hen you say 'they' in this courtroom with five individuals here, people who did different functions, that's problematic. . . .  So you have an extra responsibility both of persuasion but of accuracy and precision.").

The government's assertion that "[i]f Archer believes that the Government has inaccurately lumped him with his co-defendants, his counsel may make that argument to the jury" is similarly unpersuasive.  Gov. Opp. at 2.  The same thing could be said about any misleading or confusing argument:  "If you think my argument was misleading, you're free to tell the jury so."  That's not how trials are supposed to work, *see* Fed. R. Evid. 403, and certainly not criminal trials.  The government should not be able to make arguments that intentionally blur

the lines between defendants and confuse the facts, and defense counsel should not have to police the government's inaccuracies.

Although Mr. Archer's counsel will certainly be vigilant, the government always retains the responsibility to accurately describe the evidence.  It cannot shirk that responsibility by arguing that the defendants must repair the damage after-the-fact.  Even if counsel had the time and ability in closing argument to disentangle every sloppy reference to "the defendants," the effect on the jury of the drum-beat of consistently accusing "the defendants" of conduct that only some of them engaged in will be irreversible.  As Judge Swain explained, the government will have "brand[ed] each of these people with [its] institutional thesis," Mot., Ex. 2 at 11671, and the damage will have already been done.

The same precision is required with respect to the numerous entities at issue in this case. When the government elicits testimony from a witness, it should not do so in such a manner as to invite ambiguity and blurred lines between entities that the government acknowledges "had no actual affiliation . . . ."  Gov. Opp. at 3.  To do otherwise is "misleading the jury."  *Id.*[2]

---

[2]     The government argues that certain lay witnesses may refer to entities by shorthand names.  Gov. Opp. at 3.  To the extent that the witnesses do not have an understanding of which precise entity is involved, Mr. Archer has no objection to this sort of testimony.  For example, if a witness only knew that "Burnham" was involved in a particular transaction rather than which of the several entities with "Burnham" in its name, then Mr. Archer has no objection to that kind of testimony.

Mr. Archer likewise has no objection if, in the course of a line of questioning about a particular entity, the government or a witness resorts to shorthand *after* making clear which entity is the subject of the line of questioning.  However, to the extent the government uses such testimony in closing arguments, it should be required to either include the full line of questioning or otherwise make clear (*e.g.,* through the addition in brackets of the full name) which entity the testimony refers to.

**III.    Gratuitous References to the "Minority Business Enterprise" Status of Hughes Capital Management and Atlantic Asset Management Should Be Excluded**

Evidence and argument concerning Atlantic's and Hughes's status as Minority Business Enterprises ("MBEs") should be excluded, because it serves no legitimate purpose and has the potential to be extraordinarily inflammatory by further injecting race into a trial that already features minority victims.

In response, Morton argues that (1) Hughes and Atlantic's MBE status is "directly relevant to Ms. Morton's state of mind and critical to her defense," and (2) that this material "carries no risk of unfair prejudice to Mr. Archer."  Morton Opp. at 7, 9.[3]  The government argues further that the challenged portions of GXs 2018, 2019, 2029, 2030, 2069, 2207, and 2213, Mot. Exs. 3-9, are relevant to establish the relationships among the various co-defendants and provide the "necessary background to the acquisition of Atlantic/Hughes."  (Gov. Opp. at 4-5).  These arguments are misplaced.

To reiterate, Mr. Archer is not moving to exclude any mention of Hughes and Atlantic's MBE status in their custodial documents.  The only materials Mr. Archer seeks to exclude are references in e-mail communications among the defendants regarding Jason Galanis's vision for MBEs.  The government should also be barred from presenting any similar argument or testimony.

Morton makes no effort to link any of the exhibits to which Mr. Archer objects to the defenses she insists they are necessary to support.  As Morton observes, she did not receive any of the challenged e-mails.  *See* Morton Opp. at 9.  They therefore say nothing about her state of mind.  For the same reason, the challenged e-mails do not say anything about "her motivation for

---

[3]    This evidence once again underscores the antagonisms inherent in Morton's and Mr. Archer's defenses: material Morton insists is crucial to her defense is unduly prejudicial to Mr. Archer.

acquiring Hughes and [Atlantic], her goals with respect to those companies and the placement of

the bonds, her relationship with Jason Galanis and other alleged conspirators," what Jason

Galanis may have told Ms. Morton in order to induce her to purchase the bonds, or how the

bonds figured in Ms. Morton's portfolio strategy.  Morton Opp. at 7-8.   In short, there is no

argument that appears to be foreclosed to Morton as a result of the exhibits' exclusion.

Indeed, the paragraph to which she points in GXs 2029, 2030, and 2213 (all of which are

versions of the same e-mail chain) underscores the reasons why Mr. Archer seeks to exclude

those exhibits and the absence of any legitimate prejudice to Morton.  *See* Morton Opp. at 8-9:

> **To:** Devon Archer[darcher@rosemontcapital.com]; Bevan[btcooney@gmail.com]
> **From:** jason galanis
> **Sent:** Wed 7/16/2014 6:31:47 PM
> **Subject:** Fwd: EXECUTED HCM TERM SHEET
> Term Sheet.pdf
>
> gents
> greek is forging ahead for us.
>
> see attached executed term sheet for the acquisition of 100% of Hughes Capital Management. Firm manages $900 million on
> a discretionary basis for 28 institutional clients (pensions and endowments).
>
> Need to determine where the $2.647 million for the acquisition is getting allocated from.
>
> it is a minority owned firm now, and will continue to be so with our partner, Michelle Morton. There are a great number of
> minority opportunities for affirmative action type of allocations to a fixed income shop like this. the group we are sponsoring
> are amazing marketers with a track record in the institutional world. Richard raised $6bn for his last firm, which was hispanic
> owned. this is black woman, which i am told there are more mandates for.
>
> Sug said Villaragosa would be interested in the board as well and could open doors, as well as Magic's guy who sits on Banc
> of California.

Morton insists that she wishes to use the exhibits to establish that "Jason Galanis viewed Ms.

Morton as a means to an end" and that Morton was targeted "as a victim of his intended

fraudulent scheme."  *Id.* at 9.  This argument conflates Galanis's description of a business

opportunity with Morton's victimization, and relies on precisely the inflammatory and specious

inference that Mr. Archer is concerned about:  the jury will see Galanis, whom all parties will

agree is crooked, talking bluntly about his plans for MBEs, and will conclude that he – and by

extension the defendants – were targeting minorities.  As Mr. Archer explained in his original

motion, *see* Mot. at 10-11, the jury is likely to misunderstand the references to "minority

opportunities," "affirmative action type allocations," or "mandates" for a "black woman" to

describe an improper exploitation of Hughes's MBE status.  Morton acknowledges that she
hopes to do exactly that by arguing on the basis of this e-mail that she was a "victim" and
"target," exacerbating the risk that the jury will draw improper inferences that are both contrary
to the record and fundamentally irrelevant to the charged conduct.  Morton Opp. at 7, 9.

The government's arguments are similarly unpersuasive.  It does not respond to Mr.
Archer's suggestion that the MBE references in GXs 2018, 2019, 2207, and 2069 could be easily
redacted without any loss of meaning (*i.e.*, probative value), and does not dispute that the
inflammatory language in GXs 2029, 2030, and 2213 is unnecessary to the government's case.
Instead, the government points to other language in the challenged paragraph as relevant, but Mr.
Archer is not asking that the exhibits be excluded in their entirety.  In short, the government's
arguments fail to establish that whatever marginal relevance the challenged language might have
is not overwhelmingly outweighed by the threat of unfair prejudice to Mr. Archer from evidence
that risks polluting the case with gratuitously inflammatory racial undertones unrelated to the
charged conduct.

## IV.    GX 2085 – An E-Mail About Mr. Cooney's Niece – Should Be Excluded

GX 2085 should be precluded for precisely the reasons articulated in the government's
opposition. The government argues that this exhibit – a photo of Mr. Cooney's niece in her
lacrosse uniform, to which Mr. Archer replies – is evidence of Mr. Archer's and Mr. Cooney's
"cavalier attitude about support for Native Americans and their willingness to defraud the
Wakpamni Lake Community."  Gov. Opp. at 6.  But the e-mail on its face concerns lacrosse and
is plainly unrelated to the charged fraud; it certainly does not mention the WLCC.

Contrary to the government's argument, there is nothing probative about Mr. Archer's or
Mr. Cooney's attitude towards lacrosse "in a trial in which they and their . . . co-defendants are
charged with . . . defrauding a Native American tribe."  Gov. Opp. at 7.  Whatever one might say

about the tone-deafness of Mr. Archer's statement, or whether Native Americans are actually honored by the growth of modern lacrosse, the statement simply has nothing to do with defrauding Native Americans in a financial scheme.  In this way, the cases Mr. Archer cited are directly on point:  Mr. Archer is on trial for fraud, not cultural appropriation.  *See Kelly v. Boeing Petroleum Services, Inc.*, 61 F.3d 350, 358 (5th Cir. 1995) (holding, in disability discrimination case, that district court's pre-trial exclusion of evidence "regarding anecdotal incidents of unrelated kinds of prejudice" was not abuse of discretion); *Rauh v. Coyne*, 744 F. Supp. 1181, 1183 (D.D.C. 1990) (excluding evidence of racial discrimination in gender and marital discrimination case, noting "[t]here is little reason in common experience to infer that an employer who discriminates against blacks in his employment decisions is also likely to discriminate against women").

In response, the government suggests that the photo and underlying e-mail could be redacted.  Gov. Opp. at 6.  This would be worse than offering the exhibit in its totality, because it would deprive Mr. Archer's reply of context and foreclose his ability to explain his remark.  GX 2085 should be excluded in its entirety.  Whatever scant probative value Mr. Archer's bad lacrosse joke has is substantially outweighed by the prejudice that will be caused by this confusing and inflammatory remark.[4]

## V.    The Court Should Preclude Testimony About the Effects of the Alleged Fraud on Any Victims and About the WLCC's Financial Condition

Evidence concerning the financial impact of the allege fraud, or about the baseline poverty of the WLCC, should be inadmissible.  Fraud is fraud, whether it makes a rich person

---

[4]    The government also offers not to admit GX 2085 "as long as the defendants refrain from any argument that they were motivated to participate in the bond issuance or purchase by a desire to assist an impoverished Native American community."  Gov. Opp. at 6.  For his part, Mr. Archer confirms that he has no intention of making that argument.  Indeed, as set forth below, any evidence about the economic condition of the WLCC or the Oglala Sioux Tribe should be excluded as well.

slightly less rich, or robs a pauper of his or her last penny.  Either way, the jury should be focused solely on the elements of the crime rather than sympathy towards the victims, and victim loss is simply not an element of criminal securities fraud.  *See* Joint Requests to Charge [ECF No. 371], at Request 13 (Proposed charge for "Securities Fraud – Elements of the Offense," none of which is loss or damages).

Mr. Archer is *not* asking that all victim testimony be excluded.  Thus, as the government rightly points out, testimony from victim witnesses can be used to demonstrate the materiality of alleged misstatements or omissions, and to establish "relevant communications" with the alleged "fraudster."  Gov. Opp. at 8.  Mr. Archer is not making a categorical objection to victim witnesses, and has no objection to alleged victims testifying about their interactions with the defendants.  (None will testify that they ever interacted with Mr. Archer.)  For example, Mr. Archer has no generalized objection to pension fund witnesses who apparently "will explain how they came to learn that Atlantic/Hughes has been acquired, how they learned that the bonds had been placed into their accounts, the ways in which the purchase violated their pension funds' investment parameters, and their efforts to remove the bonds from their accounts."  *Id.* at 8-9.[5]

What Mr. Archer objects to is a parade of victims discussing the ways in which they have been devastated by the alleged fraud.  This sort of testimony has no relevance to the charges, but will play on the sympathy of the jurors.  *See United States v. Brooks*, Case No. 06-cr-550 (JS), 2010 WL 11515680, at *2 (E.D.N.Y. Jan. 25, 2010) (precluding financial fraud victims' "testimony as it pertains to the impact the alleged fraud had on each witness" because "any probative value of this 'victim impact testimony,' is substantially outweighed by the 'danger of

---

[5]      Certain of that evidence may, of course, be inadmissible for some specific reason.  For example, testimony about how a witness "came to learn that Atlantic/Hughes had been acquired" may well be inadmissible hearsay.

unfair prejudice' to the Defendants.  Indeed, permitting the [victims] to testify regarding their losses, and how these losses affected their lives, may mislead the jury to declare guilt on a 'ground different from [the] proof specific to the offense charged.'" (citing *Old Chief v. United States*, 519 U.S. 172, 180 (1997))); *United States v. Copple*, 24 F.3d 535, 544 (3d Cir. 1994) (finding that evidence as to loss was admissible to show intent to defraud where defendant was directly involved with victims, but evidence as to impact of loss on victims was irrelevant and unduly prejudicial).

The government argues that testimony about how impoverished the WLCC is "explains why the WLCC sought to issue the bonds in the first place," and "demonstrates the significance of the defendants' misstatements about the annuity provider."  Gov. Opp. 9-10.[6]  But evidence about the WLCC's poverty is hardly needed to make this point.  The WLCC sought to issue bonds for the same reason as any other issuer, rich or poor:  to raise money.  And no one can (or will) argue that the misstatements to the WLCC that the government alleges – that the bond proceeds would be invested rather than stolen by Jason Galanis – were insignificant.  Evidence about the extreme poverty of the WLCC and the damage caused by the alleged fraud does nothing to advance either argument, and will only serve to inflame the jury.  The Court should exclude this kind of victim evidence.  The government's desire for "narrative richness" is, in this case, a thinly veiled attempt to seek a conviction based on emotion rather than proof.

---

[6]      Mr. Archer never made any statements or misstatements about the annuity provider, and the government will not contend otherwise.  This is another example of the prejudicial use of the phrase "the defendants" to paint all five trial defendants with a broad brush.  *See* Section II, above.

**VI.    The Court Should Preclude Any Evidence Concerning How the Allegedly Misappropriated Bond Proceeds Were Spent**

For similar reasons, evidence about how the allegedly misappropriated money was spent is irrelevant, but highly prejudicial.  It is simply not probative of any element of the crime whether stolen funds were spent on luxury items, but such evidence will be highly inflammatory.

In response, the government argues that the way the money was spent "is direct evidence that the bond proceeds were not invested in an annuity, as promised."  Gov. Opp. at 10.  If the government seeks to introduce evidence that money was transferred from the annuity provider *directly* to pay for certain expenditures, then Mr. Archer has no categorical objection to such evidence.  So, for example, if there is evidence that Jason Galanis caused money to be transferred from the account for Wealth Assurance Private Client ("WAPC," the annuity provider) to a travel agency to pay for his personal travel, that would generally be unobjectionable.  But if Galanis caused money to be transferred from WAPC to his own personal account, or withdrew it in cash, and then used that money to pay for a plane ticket, such evidence would be unnecessary – the act of misappropriation was complete when Galanis transferred the money to his own pocket.[7]  The additional fact that he used that stolen cash to pay for "real estate, payments to various law firms, payments at restaurants, payments for travel, and payments for clothing and jewelry," Gov. Opp. at 10, adds nothing, but will have a serious prejudicial effect.  *See United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) ("[I]t is irrelevant if Mr. Brooks spent his fortune on lavish parties, instead of donating it to starving Malawian orphans.").  That is particularly so because none of these expenditures were made by

---

[7]    Mr. Archer acknowledges that if one of the other defendants were to argue otherwise, then that could open the door for this type of indirect expenditure evidence.  Mr. Archer certainly does not intend to open that door.

Mr. Archer:  he will be tarred by the excesses of Jason Galanis and others, when that evidence is utterly unnecessary to prove the charged offenses.

**VII.    The Court Should Preclude References to and Arguments About Michael Milken (*e.g.*, GX 375, 2204, 2217, 2292, 3004, 3226)**

The government continues to persist in its argument that any references to Michael Milken are tantamount to an admission of fraud.  But the inference the government seeks to draw is far from a natural one, and permitting the parties to argue competing inferences will require both sides to admit extrinsic evidence of Milken's good and bad deeds and result in a literal mini-trial on Milken's moral qualities.

As Mr. Archer explained at length in his opening brief, *see* Mot. at 22-28, and as the government does not dispute, Milken is a complicated public figure.  The most natural reading of Mr. Cooney's reference to Milken in GX 2217 ("This is pure Genius allá mikey Milken!!") is that Mr. Cooney was referring to Milken's innovations in junk bonds (similar to the WLCC bonds), not Milken's crimes.  This reading is supported by, among other things, the remainder of the e-mail, which adds "Leon Black would approve of this trade!!"  The thing that Michael Milken and Leon Black have in common, of course, is that they are both fabulously wealthy and successful financial services professionals.  It would make little sense if the reference to Milken were an admission of criminality, while the reference to Black was to a legitimate financier.

While it is of course possible, as the government suggests, for each side to argue competing inferences, that would be substantially and unduly prejudicial to the defense, consume a disproportionate amount of time in court, and confuse the jury.  Both sides would have to introduce competing evidence about Milken's life and history (and Black's, too).  But the government, of course, will put its case on first, and so for weeks every reference to Milken (and there are many, mostly by Cooney) will become a shorthand for fraud.  In the defense case, Mr. Archer will have to unravel the tangled story of Milken's life, taking the jury down a path

completely unrelated to the core issues in the case, but crucially necessary to put the Milken comments in context – and all after the damage has been done.  The danger is especially acute to Mr. Archer, since he was not the one who uttered Milken's name.  As the government argues (wrongly), "the 'mikey Milken' reference constitutes powerful evidence of *Cooney's* state of mind, including his appreciation of the criminal nature of the conduct."  Gov. Opp. at 14 (emphasis supplied).  But, as he was copied on the same e-mail, Mr. Archer will be prejudiced by this evidence even though it does not say anything about *his* state of mind.  Even if Mr. Cooney *did* intend the reference to Milken to be some sort of admission, there is certainly no reason to believe that Mr. Archer understood it that way.  But the government will surely show that e-mail and argue, over and over, that it constitutes "powerful evidence" and, in effect, an admission of criminality.

At the end, the government at best gets an ambiguous reference to a complicated and prominent public figure.  At worst, the government gets a conviction by association.  What is certain is that any probative value of the Milken reference is extraordinarily weak with respect to Mr. Cooney, and non-existent with respect to Mr. Archer.  The government does not contend otherwise.  To avoid the danger of this unfair prejudice, and to remove the risk of further complicating an already long trial, the Court should preclude GX 2217 in its entirety and order that prejudicial references to Milken be redacted.

## VIII.   The Court Should Preclude Exhibits Providing Summaries of the Securities Laws (*e.g.*, GXs 1024, 1025, 1026, and 1027)

GX 1024, 1025, 1026, and 1027 constitute FINRA exam study guides that contain descriptions of the securities laws.  The government concedes that these exhibits have nothing to do with Mr. Archer, and that he did not have knowledge of their substance.  Gov. Opp. at 15. Nonetheless, the government seeks to put in the jury room a primer on the securities laws – the same securities laws that include the charged offenses here.

The government says this evidence is relevant to show that Ms. Morton "was aware, generally, of the rules and regulations governing the securities industry." *Id.* Mr. Archer certainly has no objection to an appropriate government witness testifying about what topics are covered in FINRA licensing exams for which Ms. Morton held the relevant license. But as the case the government cites acknowledges, there is no need to admit these exhibits to accomplish that goal. *See United States v. Mahaffy*, 693 F.3d 113, 124 (2d Cir. 2012) ("Various witnesses testified that, in order to pass the Series 7 exam, an individual would have known of the dangers of frontrunning and an accompanying need to keep block order information confidential.").

Rather than introducing testimony about "what topics were covered by those exams," Gov. Opp. at 15, the government seeks to introduce exhibits containing hundreds of pages of overviews of federal securities laws, regulations, and model rules related to everything from the purchase and sale of securities, securities registration requirements, the foundations of portfolio analysis, to broker-dealer licensing requirements. The government has no need to introduce this voluminous material, which carries the very real risk that the jury will use the exhibits in place of the Court as aids in interpreting the law. *See also* Fed. R. Evid. 803(18) (permitting material from "learned treatises" to be read into evidence, but not admitted as a documentary exhibit).[8]

---

[8] The government notes that in *United States v. Durante*, the court admitted FINRA study guides, but provides no specific citation, context, or reasoning. Mr. Archer notes that in *United States v. Bonventre*, 10 Cr. 228, Judge Swain excluded an AICPA guide precisely because it would have usurped the Court's role in instructing the jury on the law. (Judge Swain did permit the government to introduce select passages that had been underlined and annotated by two of the defendants).

**IX.    Government Trial Exhibits Containing Irrelevant, Inflammatory Language (*e.g.*, GX 2049, 2067, and 2069)**

Finally, the government has agreed to redact the inflammatory language in GX 2069 and GX 2049.[9]  With respect to GX 2067, the government apparently intends to argue that Mr. Archer was referring to himself as one of the "weasels."  In light of this argument, Mr. Archer withdraws his objection to GX 2067.

## CONCLUSION

The Court should grant defendant Devon Archer's motions *in limine*.[10]  Moreover, where appropriate, the Court should redact the Indictment to conform to its rulings *in limine*.  *See United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (surplusage from an indictment will be struck "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial" (internal quotation marks omitted)).

---

[9]    Mr. Archer does not object to the sentence "I initiated the wire and am awaiting voice confirm" in GX 2049.

[10]    Mr. Archer is continuing to review the government's trial exhibits and 3500 material, and reserves the right to raise additional evidentiary issues prior to trial.  In making these motions *in limine*, Mr. Archer does not waive any other bases on which to object to the evidence discussed in this brief or his original motion, or any objections to other evidence that the government or the other defendants may seek to admit.

Dated:      May 10, 2018
            New York, New York

                                        Respectfully,

                                         /s/  Matthew L. Schwartz
                                        Matthew L. Schwartz
                                        BOIES SCHILLER FLEXNER LLP
                                        575 Lexington Avenue, 7th Floor
                                        New York, New York 10022
                                        Tel.: (212) 446-2300
                                        Fax: (212) 446-2350
                                        mlschwartz@bsfllp.com

                                        *Attorneys for Devon Archer*