UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                   :

UNITED STATES OF AMERICA

                                   :

          - v. -

                                   :       S3 16 Cr. 371 (RA)

GARY HIRST, et al.,

                                   :

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENDANT ARCHER'S APRIL 24, 2018 FILING

 

ROBERT KHUZAMI,
Attorney for the United States,
Acting Under Authority Conferred by 28
U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
     - Of Counsel -

**Table of Contents**

I.    The Court Should Reject Archer's Claims Regarding a Purported Constructive Amendment ............................................................................................................ 1

    A.   Applicable Law ................................................................................................ 1

    B.   Discussion ........................................................................................................ 2

II.   A Limiting Instruction is Not Appropriate for the Form ADV Evidence ...................... 4

    A.   Background ....................................................................................................... 4

    B.   Discussion ........................................................................................................ 5

III.  The Gerova Evidence Does Not Require a Severance ................................................... 6

CONCLUSION ........................................................................................................................ 8

The Government submits this memorandum in response to defendant Archer's April 24, 2018 letter motion.   As set forth below, the Court should reject Archer's arguments regarding (i) a purported constructive amendment of the Indictment, (ii) the Form ADV evidence, and (iii) the Gerova evidence.

## I.  The Court Should Reject Archer's Claims Regarding a Purported Constructive Amendment

First, the Court should reject Archer's argument regarding a purported constructive amendment.

### A.  Applicable Law

A constructive amendment occurs when "'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'"   *United States* v. *D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (quoting *United States* v. *Mollica*, 849 F.2d 723, 729 (2d Cir. 1988)) (emphasis added in *D'Amelio)*; *United States* v. *Rigas*, 490 F.3d 208, 227 (2d Cir. 2007).   This is a very stringent standard; the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the *core of criminality* to be proven at trial."   *United States* v. *D'Amelio*, 683 F.3d at 417 (citation and quotation marks omitted; emphasis added in quoted case).

"The 'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."   *Id.* at 418. Indeed, even a variance from a specific allegation in the "to wit" clause of the statutory allegations section of an indictment will not ground a claim of constructive amendment unless the facts alleged therein go to the essence of the crime.   *See United States* v. *Bastian*, 770 F.2d

212, 220-21 (2d Cir. 2014); *see D'Amelio*, 683 F.3d at 416-18; *United States* v. *Dupre*, 462 F.3d

131, 140-41 (2d Cir. 2006).   And the "essence of a crime," in turn, means the core

"'*conduct* that was the subject of the grand jury's indictment'"—as distinct from, for example,

the motive behind it.   *United States* v. *Banki*, 685 F.3d 99, 119 (2d Cir. 2012) (quoting *United*

*States* v. *Milstein*, 401 F.3d 53 (2d Cir. 2005)) (emphasis added in *Banki*).

### B.  Discussion

Archer claims that the Government has constructively amended the Indictment by

asserting that defendant Cooney purchased the third tranche of Wakpamni bonds, for among

other reasons, to "falsely suggest that there were legitimate purchasers of the bonds . . . ."

Archer argues that, by making this argument, the Government is raising for the first time a "fraud

on the market theory of the case."   (Archer 4/24/14 Ltr. at 2).   The Court should reject Archer's

argument.

First, it is unclear what Archer even means by a "fraud on the market theory," a phrase

that is usually used in discussing the element of reliance in a civil securities fraud case.   *See,*

*e.g.*, *Amgen Inc.* v. *Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 463 (2013)

("The fraud-on-the-market theory . . . facilitates class certification by recognizing a rebuttable

presumption of classwide reliance on public, material misrepresentations when shares are traded

in an efficient market.").   But reliance is not an element in criminal securities fraud actions.

*United States* v. *Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) ("Reliance, however, is not an element of a

criminal case brought by the government under Section 10(b) or Rule 10b–5.").

Second, and in any event, the Government's theory regarding one of Cooney's reasons

for purchasing the third tranche of Wakpamni bonds is well within the core of criminality

charged in the Indictment.   The Government expects the evidence at trial will show that, after

2

the first Wakpamni bond issuance, John Galanis told representatives of the Wakpamni Lake Community that the first issuance had been a success and falsely stated that investors were demanding even more Wakpamni bonds.   This led to the second and third issuances, in which Archer and Cooney purchased the bonds using proceeds recycled from the first issuance. (Indictment ¶ 21).   As alleged in the Indictment, "[a]s a result of this recycling, although the face amount of WLCC bonds outstanding increased and the amount of interest payable by the WLCC increased, the actual bond proceeds available for investment on behalf of the WLCC did not increase."   (*Id.* ¶ 22).   Further, Archer and Cooney "then used the bonds [they] purchased . . . to . . . support other business endeavors," including by using the bonds to show that other business interests had adequate net capital.   (*Id.* ¶ 23).   In short, the presence of Archer and Cooney—who were previously unknown to the WLCC—as purchasers of the bonds, made John Galanis's representations regarding purported additional investors appear true.   On the basis of these representations, among others, the WLCC agreed to issue the second and third tranches of Wakpamni bonds, which the defendants misappropriated for their own purposes.

As should be clear from the above, nothing about arguing that Archer and Cooney's role was, in part, to make it appear that there were actual, legitimate purchasers for the second and third tranche of the bonds modifies the essential elements of the charged scheme or affects the core of the charged criminality.   Instead, this conduct is part and parcel of the charged scheme set forth in the Indictment.   Accordingly, there is no basis to preclude the Government from

making such an argument because of a purported constructive amendment, or for any other reason.[1]

## II.  A Limiting Instruction is Not Appropriate for the Form ADV Evidence

The Court should also reject Archer's proposed limiting instruction regarding the Form ADV evidence.

### A.  Background

At the April 13 conference is this case, the Court ruled that evidence regarding omissions on Form ADVs filed by Atlantic and Hughes was admissible as "direct[] evidence of the conspiracy," not just of Morton's guilt.   Specifically, the Court explained:

> I similarly find that the purported misstatements and omissions made in the Hughes and Atlantic form ADVs are admissible.   A substantial portion of the evidence against Ms. Morton is her failure to disclose conflicts of interest to her clients due in part to the failure to disclose the control of Atlantic and Hughes by certain other co-defendants. This effectively hid from investors that certain individuals controlling the investment advisor also were involved with the placement agent for the bonds and the annuity provider.   I simply fail to see how this is not direct[] evidence of the conspiracy.

(4/13/18 Tr. at 17).   Later in the conference, Archer's counsel asked the Court if it would "entertain a limiting instruction" on the Form ADV issue, and the Court responded that it "would entertain a limiting instruction."   (*Id.* at 31).

---

[1]  As Archer notes, the "to wit" clause of the substantive securities fraud count refers to the defendants' (i) misappropriation of the bond proceeds and (ii) the use of investor funds to purchase the bonds, without disclosure of material facts, including conflicts of interest. Although not necessarily at issue here, the Government notes that Archer's letter incorrectly states that Archer and Cooney "are not alleged to have been involved in the second sort of misconduct at all."   (4/24/18 Ltr. at 3).   This is plainly incorrect, as Archer and Cooney are charged in the substantive securities fraud count, which does not distinguish between the defendants involved the two "sort[s] of misconduct," since both are part of the charged scheme.

### B.  Discussion

A limiting instruction is both unnecessary and inappropriate.

It is well-settled that "'where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant.'"   *United States* v. *Al Fawwaz*, 67 F. Supp. 3d 581, 585 (S.D.N.Y. 2014) (quoting *United States* v. *Salameh*, 115 F.3d 88, 111 (2d Cir. 1998)).

Here, as the Court previously found, misstatements regarding the true ownership of Atlantic and Hughes are direct evidence of the charged conspiracy.   The misstatements furthered the defendants' scheme because, as the Court correctly noted, the misstatements "effectively hid from investors that certain individuals controlling the investment advisor[s] also were involved with the placement agent for the bonds and the annuity provider."   (4/13/18 Tr. at 17).

Further, Archer's claim that "it is undisputed that Mr. Archer (and Mr. Cooney) had no knowledge of the Form ADV—let alone the purported misstatements on it," Archer 4/24/18 Ltr. at 4, is not correct.   In fact, the Government anticipates introducing evidence that, around the time of the Hughes ADV filing, Archer, Cooney, and Galanis discussed aspects of one of Atlantic's recently filed Form ADVs.   Moreover, as the Court is aware from previous briefing, during the same period, Archer was involved in extended discussions with the BIT Board regarding the identities of the individuals who would be acquiring another investment adviser, Burnham Asset Management.   These interactions clearly provided Archer with notice about the need for fulsome disclosures regarding the control persons of a registered investment adviser. As such, the fact that Hughes and Atlantic would have to make disclosures regarding their

ownership following their sale was, at the very least, reasonably foreseeable to Archer and Cooney.

In short, the Form ADV evidence is admissible not just against Morton, but against all of the defendants, including Archer and Cooney.   As such, the *only* instruction the Court should give relating to this evidence is the standard instruction on liability for the acts and declarations of co-conspirators, which is set out in the parties joint requests to charge and is re-produced herein in Appendix A.

## III. The Gerova Evidence Does Not Require a Severance

Finally, the Court should also reject Archer's argument that admitting evidence of Gary Hirst and/or John Galanis's involvement in the Gerova fraud would result in prejudice to Archer that is so "overwhelming" that severance is required.   (Archer 4/24/18 Ltr. at 2).

First, it bears noting that Archer has previously indicated he believes the Gerova case is relevant to his defense, and he has not disavowed that idea.  (*See, e.g.*, Archer Mem. of Law in Support of Severance Motion, Dkt. 290 at 25 n.8 ("expressly reserv[ing] the right to seek to introduce [Gerova] evidence if sound trial strategy suggests that it is appropriate")).   Indeed, Archer's defense exhibits include at least three Gerova-related emails.

Second, and in any event, the limited evidence the Government seeks to introduce concerning John Galanis and/or Hirst's involvement in Gerova will not result in prejudice to Archer, let alone "overwhelming" prejudice.   Indeed, the Second Circuit has explicitly stated that "'the fact that [certain] evidence may be admissible against one defendant but not another does not require a severance.'"   *United States* v. *Tuzman*, --- F. Supp. 3d ----, 2017 WL 4785459, at *8 (S.D.N.Y. Oct. 19, 2017) (quoting *United States* v. *Carson*, 702 F.2d 351, 367 (2d Cir. 1983*)); accord United States* v. *Chang An–Lo*, 851 F.2d 547, 556 (2d Cir. 1988)

6

(rejecting defendants' claim that severance was required that because the "overwhelming majority of evidence introduced at trial was not admissible against them" and explaining that a jury instruction was sufficient to ensure that the defendants did not suffer unfair prejudice). This is particularly true here because the Gerova-related evidence that Government seeks to introduce against John Galanis or Hirst is limited in scope and involves "[o]nly non-violent, allegedly fraudulent conduct." *Tuzman*, 2017 WL 4785459, at *8; *accord United States* v. *Scott*, 637 F. App'x 10, 13 (2d Cir. 2015) ("Even if, as Scott insists, he had a limited role in the alleged fraud schemes compared to Gilliams, and most of the evidence introduced at trial related only to Gilliams, 'differing levels of culpability and proof . . . standing alone, are insufficient grounds for separate trials.'" (quoting *United States* v. *Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003))).

Finally, Government has not changed its "story" regarding the relevance of the Gerova evidence.  As previously stated, John Galanis and Gary Hirst's involvement in the Gerova fraud is relevant and admissible to show the nature of their relationship with Jason Galanis and to show their knowledge and intent.   In particular, it rebuts any argument that they were duped by Jason Galanis or otherwise unwittingly participated in the Wakpamni fraud.

And, separate and apart from John Galanis and Hirst's involvement in Gerova, the fact of Jason Galanis's September 2015 arrest remains direct evidence against Archer.   Indeed the purportedly inconsistent statements cited in footnote 1 of Archer's April 24 letter, when read in context, clearly refer to Jason Galanis's arrest.[2]   These include statements made by Archer at

---

[2] *See* ECF No. 369 at 7-8 ("Further evidence regarding the Gerova arrests is necessary to provide background and context to communications among various of the defendants, including Archer and Cooney and at least one cooperating witness, about how to manage the Wakpamni bond situation following Jason Galanis's arrest."); ECF No. 339 at 7 ("Jason Galanis's arrest will also

meetings convened by the BIT Board following Jason Galanis's arrest, at which Archer was

confronted about previous statements he had made about Jason Galanis, and emails sent by

Archer about how to manage different ventures following Jason Galanis's arrest.

## **CONCLUSION**

For the reasons stated above, the Court should reject Archer's arguments.

Dated: New York, New York
       May 11, 2018


                                    Respectfully submitted,


                                    ROBERT KHUZAMI
                                    Attorney for the United States, Acting Under
                                    Authority Conferred by 28 U.S.C. § 515


                        by:    __/s/_____
                                    Rebecca Mermelstein
                                    Brendan F. Quigley
                                    Negar Tekeei
                                    Assistant United States Attorneys
                                    (212) 637-2360 / 2190 /2444

---

necessarily be admitted at trial because the evidence demonstrates that various of the defendants, including Archer and Cooney, discussed how to manage the Wakpamni bond situation following Jason Galanis's arrest.   These emails constitute direct evidence because they demonstrate that the defendants knew Galanis had orchestrated the bonds and that with his arrest it was their responsibility to manage the fraud.").

## Appendix A

## Liability for Acts and Declarations of Co-Conspirators

You will recall that I have admitted into evidence against the defendants the acts and statements of others because these acts and statements were committed or made by persons who, the Government charges, were also confederates [**the defense objects to word "confederates"**] or co-conspirators of the defendants.

The reason for allowing this evidence to be received against the defendants has to do in part with the nature of the crime of conspiracy.   A conspiracy is often referred to as a partnership in crime: as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Therefore, the reasonably foreseeable acts or statements of any member of the conspiracy, committed in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts or statements of all of the members, and all of the members are responsible for such acts or statements.

If you find, beyond a reasonable doubt, that a defendant was a member of the conspiracy charged in the Indictment, then any acts done or statements made in furtherance of the conspiracy by a person also found by you to have been a member of the same conspiracy may be considered against that defendant.   This is so even if such acts were committed or such statements were made in that defendant's absence, and without his or her knowledge **[the defense would add the following language, to which the Government objects:** , however as I have just said, they must be reasonably foreseeable to that defendant].

9

However, before you may consider the acts or statements of a co-conspirator in deciding the guilt of a defendant, you must first determine that the acts were committed or statements were made during the existence, and in furtherance, of the unlawful scheme.   If the acts were done or the statements were made by someone whom you do not find to have been a member of the conspiracy, or if they were not in furtherance of the conspiracy, they may not be considered by you in deciding whether a defendant is guilty or not guilty.

> Adapted from the charges of the Honorable P. Kevin Castel in United States v. Bergstein, 16 Cr. 746 (PKC); the Honorable Paul G. Gardephe in United States v. Tuzman, 15 Cr. 536 (PGG); the Honorable George B. Daniels in United States v. Ilya Boruch, 08 Cr. 820 (GBD); the Honorable Colleen McMahon in United States v. Edmund Boyle, 08 Cr. 523 (CM); the Honorable Barbara S. Jones in United States v. Weissman, 01 Cr. 529 (BSJ); and from Sand et al., Modern Federal Jury Instructions, Instr. 19-4; see also United States v. Rea, 958 F.2d 1206, 1214 (2d Cir. 1992) ("In order to prove conspiracy, the government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice.   The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan, and their goals need not be congruent, so long as they are not at cross-purposes.") (citations omitted).