**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

       v.

GARY HIRST,
JOHN GALANIS, a/k/a "Yanni,"
MICHELLE MORTON,
DEVON ARCHER, and
BEVAN COONEY,

              Defendants.

S3 No. 16 Cr. 371 (RA)


**DEVON ARCHER'S MEMORANDUM IN OPPOSITION TO THE GOVERNMENT'S
MOTION TO PRECLUDE EXPERT TESTIMONY**

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com

*Attorneys for Devon Archer*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

APPLICABLE LAW ........................................................................................... 2

    A.    Expert Testimony, Generally ................................................................... 2

    B.    Expert Notice ......................................................................................... 3

ARGUMENT ...................................................................................................... 6

    I.    John Finnerty's Testimony Is Admissible .............................................. 6

        A.    Prof. Finnerty's Testimony About The Features Of The WLCC Bonds And How They Compare To Industry Norms Is Appropriate ....................................................................................... 7

        B.    Prof. Finnerty's Testimony About Tribal Immunity Is Appropriate ..................................................................................... 11

    II.    William Jannace's Testimony Is Admissible, And His Notice Is Appropriate ....................................................................................... 13

        A.    Mr. Jannace's Notice Was Sufficient ............................................ 14

        B.    Mr. Jannace's Testimony Is Relevant ............................................ 15

        C.    Mr. Jannace's Testimony About Rule 144 Transfers Is Appropriate ..................................................................................... 17

    III.    Paul Atkins' Testimony Is Admissible, Appropriate, and Correctly Noticed ............................................................................................. 18

        A.    Commissioner Atkins's Testimony Is Relevant And Not Overly General ....................................................................................... 19

        B.    Commissioner Atkins's Notice Is Sufficient ................................... 21

        C.    Commissioner Atkins's Testimony Does Not Usurp The Role Of The Jury .................................................................................. 24

        D.    Commissioner Atkins Is Uniquely Qualified To Testify About SEC Enforcement Actions .............................................................. 25

    IV.    If The Court Determines That Any Of Mr. Archer's Notices Were Inadequate,  He Should Be Given The Opportunity To Amend Them ............................................................................................... 26

CONCLUSION ................................................................................................. 27

# <u>TABLE OF AUTHORITIES</u>

*AUSA Life Ins. Co. v. Dwyer,*
  899 F. Supp. 1200 (S.D.N.Y 1995) ........................................................................ 2

*Campbell ex rel. Campbell v. Metropolitan Prop. & Cas. Ins. Co.,*
  239 F.3d 179 (2d Cir. 2001) ................................................................................. 15

*Cromeans v. Morgan Keegan & Co.,*
  1 F. Supp. 3d 994 (W.D. Mo. 2014) ..................................................................... 13

*Hein v. Cuprum, S.A., De C.V.,*
  53 Fed. Appx. 134 (2d Cir. 2002) ................................................................... 6, 26

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,*
  37 F.3d 804 (2d Cir. 1994) ................................................................................... 18

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
  716 F. Supp. 2d 220 (S.D.N.Y. 2010) ................................................................. 15

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
  691 F. Supp. 2d 448, 463-65 (S.D.N.Y. 2010) ............................................... 9, 13

*SEC v. Razmilovic,*
  738 F.3d 14 (2d Cir. 2013) ................................................................................... 15

*SEC v. U.S. Environmental, Inc.,*
  No. 94-cv-6608, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ..................... 8, 9

*Tribble v. Evangelides,*
  670 F.3d 753 (7th Cir. 2012) ............................................................................... 19

*United States v. Ahmed,*
  No. 12-cr-661 (SLT) (S-2), 2015 WL 1611947 (E.D.N.Y. Apr. 9, 2015) ...... 6, 27

*United States v. Biglow,*
  No. 07-10221-MLB, 2012 WL 887485 (D. Kan. Mar. 15, 2012) ......................... 5

*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991) ............................................................. 7, 8, 16, 19

*United States v. Boisoneault,*
  926 F.2d 230 (2d Cir. 1991) ................................................................................... 3

*United States v. Bonventre,*
  10 Cr. 228 (LTS) (ECF No. 519) ......................................................................... 27

*United States v. Cuellar,*
  478 F.3d 282 (5th Cir. 2007) ............................................................................... 27

*United States v. DiDomenico*,
  985 F.2d 1159 (2d Cir. 1993)............................................................................ 3, 10, 24

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994)..................................................................................... 7, 11

*United States v. Dunn*,
  846 F.2d 761 (D.C. Cir. 1988) .................................................................................... 3

*United States v. Dupre*,
  339 F. Supp. 2d 534 (S.D.N.Y. 2004)..................................................................... 3, 10

*United States v. Fredette*,
  315 F.3d 1235 (10th Cir. 2003) ........................................................................... 19, 21

*United States v. Jakobetz*,
  955 F.2d 786 (2d Cir. 1992)....................................................................................... 8

*United States v. Mehta*,
  236 F. Supp. 2d 150 (D. Mass. 2002) ........................................................................ 5

*United States v. Nacchio*,
  519 F.3d 1140 (10th Cir. 2008) .............................................................................. 4, 5

*United States v. Offill*,
  666 F.3d 168 (4th Cir. 2011) ................................................................................... 25

*United States v. Tuzman*,
  No. 15 Cr. 536 (PGG), 2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017)............................. 5

*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017)........................................................................................ 4

Defendant Devon Archer respectfully submits this memorandum of law in opposition to the government's motion to preclude the testimony of three expert witnesses.  *See* ECF No. 410. For the reasons that follow, the government's motion should be denied or, in the alternative, Mr. Archer should be permitted to supplement his disclosures.

## PRELIMINARY STATEMENT

Mr. Archer has proposed three highly qualified experts who will testify on a limited number of topics of central relevance to this case and to his defense.  The credentials of these three experts are beyond reproach and the testimony that they will offer is necessary to refute the government's case, which appears to be based upon incorrect and misleading applications of various business, securities, and accounting principles.

The proffered experts will assist the jury by explaining relevant principles outside of the experience of the lay person and therefore "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  In particular, the experts will explain how municipal bond offerings work and why the features of the WLCC bond offering are entirely consistent with industry practice; the features of private placements and the rules surrounding the transfer of securities issued in private placements; net capital rules for broker-dealers; the roles and responsibilities of officers and directors; and the meaning of SEC bars.

All of these topics are at the heart of this case as the government has repeatedly explained it, and the government essentially concedes, through its own proffered expert testimony, that jurors are unlikely to be familiar with these and related issues.  Its objection, instead, is based primarily on a misunderstanding of Rule 704, which prohibits an expert in a criminal case from offering "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or a defense."  Fed. R. Evid. 704(b).  But none

of the proffered experts will testify about Mr. Archer's mental state at all, or come close to the line drawn by Rule 704(b).

The government's remaining challenges are to the relevance of certain topics and the sufficiency of Mr. Archer's expert notice. As set forth below, the proffered testimony is plainly relevant to the charges against Mr. Archer, and the bases for the experts' opinions have been appropriately set out in Mr. Archer's expert notice. If the Court determines otherwise, the proper remedy is to order Mr. Archer to supplement his notice, not to exclude the experts. This would preserve Mr. Archer's right to put on a defense and cause the government no prejudice. Indeed, it is customary in this courthouse for defendants to provide expert notices in the middle of trial, just prior to the start of the defense case. Here, the government has had Mr. Archer's expert notice for almost two months prior to trial.

## APPLICABLE LAW

### A.    Expert Testimony, Generally

The Federal Rules of Evidence provides that a qualified expert may testify "in the form of an opinion" when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Generally, expert testimony is admissible if it is helpful to the trier of fact." *AUSA Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200, 1202 (S.D.N.Y 1995). "Under this liberal rule, a qualified expert may generally suggest inferences that should be drawn from the facts, including

inferences embracing the ultimate issue in the case." *United States v. Boisoneault*, 926 F.2d 230, 232 (2d Cir. 1991).

While Rule 704(b) prohibits an expert witness from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," "testimony on the subject of defendant's mental state or condition that does not go directly to the mental elements of the crime charged or a defense is not precluded by Rule 704(b)." Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6283 (2d ed.). "Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state." *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993) (citation omitted). Rather, "experts are precluded from reaching a definite conclusion about what mental state a defendant actually possessed at the time of the offense because such testimony 'poses a uniquely heightened danger of intruding on the jury's function.'" *United States v. Dupre*, 339 F. Supp. 2d 534, 542 (S.D.N.Y. 2004) (quoting *DiDomenico*, 985 F.2d at 1164), *aff'd in relevant part*, 462 F.3d 131 (2d. Cir. 2006).

"Thus, this rule prevents experts from 'expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime.'" *Id.* (quoting *DiDomenico*, 985 F.2d at 1164). Or put differently, "[i]t is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent." *DiDomenico*, 985 F.2d. at 1164 (quoting *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988)).

## B.    Expert Notice

Under Rule 16 of the Federal Rules of Criminal Procedure, the "defendant must, at the government's request, give to the government a written summary of any expert testimony that a defendant intends to use. This summary must describe the witness's opinions, the bases and

reasons for those opinions, and the witness's qualifications."  *United States v. Ulbricht*, 858 F.3d 71, 114 (2d Cir. 2017) (quoting Fed. R. Crim. P. 16(b)(1)(C)) (alterations omitted).

Although Rule 16 thus requires a criminal defendant to disclose a summary of "the witness's opinion," including the "bases and reasons" for those opinions, that disclosure obligation does not contemplate a complete recitation of each and every opinion expected to be offered by a witness, nor does it require an expert in a criminal trial to index the materials he or she relied upon.  Indeed, Mr. Archer's expert disclosure obligations under Rule 16 stand in stark contrast to, for example, the expert disclosures contemplated by the Federal Rules of Civil Procedure, which requires a "written report . . . prepared and signed by the witness," containing (among other things), "a *complete* statement of *all* opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them," and copies of "any exhibits that will be used to summarize or support them."  Fed. R. Civ. P. 26(a)(2)(B) (emphases supplied); *see also United States v. Nacchio*, 519 F.3d 1140, 1152-53 (10th Cir. 2008) (contrasting criminal and civil expert disclosure requirements, and concluding that "[i]n a criminal trial the proponent of expert testimony is not under any obligation to provide a 'complete statement' of the reasons for the expert's opinion, or an explanation of the expert's

4

methodology"), *vacated on other grounds*, 555 F.3d 1234 (10th Cir. 2009) (en banc);[1] *United States v. Mehta*, 236 F. Supp. 2d 150, 155-56 (D. Mass. 2002) ("One way to decipher the meaning of the criminal expert discovery rules is to compare them to the civil discovery rules, which are much broader.  While Fed. R. Civ. P. 26(a)(2) requires a 'complete statement' of the expert's opinion, the criminal rule requires only a 'summary of testimony.'  Civil Rule 26(a)(2) additionally requires the disclosure of: '*all* opinions to be expressed and the basis and reasons therefore'" (emphasis supplied)).

Unlike in civil cases, the purpose of expert notices in criminal cases is not to provide an exhaustive list of opinions, bases, and data; it is "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 amt.  Accordingly, the appropriate remedy for an insufficient expert notice is not to preclude the expert, it is to supplement the notice.  *See United States v. Tuzman*, Case No. 15 Cr. 536 (PGG), 2017 WL 6527261, at *11 (S.D.N.Y. Dec. 18, 2017) ("The Second Circuit has instructed that excluding a defendant's expert's [sic] is a 'harsh sanction' that is 'not . . . to be imposed lightly.'  Trial courts in this circuit have concluded that preclusion is generally not appropriate where a defendant's

---

[1]     In *Nacchio*, a panel of the Tenth Circuit held that the District Court abused its discretion in excluding a defense expert on both Rule 16 and *Daubert* grounds.  The *en banc* Tenth Circuit subsequently vacated the panel decision and affirmed the district court's exclusion of the defense expert, but did so solely on *Daubert* grounds, leaving the panel's opinion intact on the Rule 16 issue.  *See Nacchio*, 555 F.3d at 1257 n.21 (noting that the en banc court had "elected not to opine on the Rule 16 issue"); *id*. at 1264 (McConnell, *J.*, dissenting) ("all parties now seem to agree that Mr. Nacchio's disclosure was sufficient under Rule 16").  Thus, the *Nacchio* panel decision continues to be good law on Rule 16 expert disclosure issues.  *See, e.g.*, *United States v. Biglow*, No. 07-10221-MLB, 2012 WL 887485, at *1 (D. Kan. Mar. 15, 2012) (quoting *Nacchio* panel on the "differences between expert discovery in a criminal action and a civil action," and denying defense motion to preclude government expert because "*Nacchio*'s interpretation of Rule 16 does not require the additional disclosure being sought by defendants").

supplemental disclosures permit the Government to prepare a meaningful cross-examination.");
*United States v. Ahmed*, Case No. 12-cr-661 (SLT) (S-2), 2015 WL 1611947, at *2 (E.D.N.Y.
Apr. 9, 2015) (ordering defendants to supplement insufficient expert disclosures because
"[p]reclusion . . . is a drastic remedy").  Even in a civil case, if the disclosure is deficient, "the
drastic remedy of excluding expert testimony is not appropriate unless the party's conduct
represents flagrant bad faith and callous disregard of the federal rules."  *Hein v. Cuprum, S.A.,
De C.V.*, 53 Fed. Appx. 134, 137 n.1 (2d Cir. 2002) (quotation and citations omitted).

## ARGUMENT

Applying these standards, the expert testimony proffered by Mr. Archer is admissible,
and the expert notices more than sufficient.

## I.    John Finnerty's Testimony Is Admissible

Prof. Finnerty is a recognized expert on municipal bonds, and will testify about the
features of the WLCC bonds, how private placements work, the function of the municipal/tribal
bond market, the role of the Depository Trust & Clearing Corporation in the municipal/tribal
bond market, the secondary market for municipal/tribal bonds, and related issues.  Of the twenty-
two items in Prof. Finnerty's notice, *see* Gov. Mem. Of Law to Preclude Expert Testimony
("Mot."), Ex. A at 1-3 [ECF 410], the government objects to five:

- The bonds in this case allegedly purchased by Mr. Archer through Rosemont
  Seneca Bohai LLC were described in the Trust Indenture as being for an amount
  of $15 million, for a period [of] seven years, with an interest rate of
  approximately 6% per year. The Trust Indenture also provides that most of the
  funds were to be invested in an annuity and the surplus of the annuity payments
  over the interest were to fund the construction of a community center for the
  Wakpamni Lake Community Corporation ("WLCC"), a tribal entity affiliated
  with the Sioux Oglala Nation, and other projects to benefit the tribe.

- A second issuance of the bonds in the amount of $5 million was purchased by Mr.
  Cooney. They were subject to the same terms and intended use.

- Nothing about the terms of any of the WLCC bond issuances or the intended use of proceeds was unusual or would have raised any concerns about the legitimacy of the offering.

- In order to encourage municipalities and tribal entities to engage in such transactions (and make improvements to their communities) there are laws that provide the tribal entities with some form of limited immunity from lawsuits.

- In this case the Sioux tribe was subject to such immunity and thus not subject to any liability in connection with the offering of the bonds, including whatever happened to them in the future.

(Mot. at 5).

### A.  Prof. Finnerty's Testimony About The Features Of The WLCC Bonds And How They Compare To Industry Norms Is Appropriate

The government's challenge to the first two bullet points is totally misplaced.  According to the government, these bullets "concern factual issues," and the "provisions of the Wakpamni bonds are easily ascertainable by documentary evidence," so they should not be the subject of expert testimony.  *Id.*  This argument misunderstands both the expert notice and the law.

Prof. Finnerty is not being called simply to recite the terms of the bonds as contained in the offering documents.  Rather, after providing background and context to the municipal bond offering business (none of which is objected to by the government), Prof. Finnerty will assist the jury in understanding the economic terms of the bonds and the use of proceeds from the bonds.

This is perfectly appropriate expert testimony.  Experts may testify to "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, expert testimony may be admissible if it is helpful to the trier of fact."); Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6283 (2d ed.) ("While experts usually offer opinions or inferences, experts also can be used for other purposes such as explaining evidence.").  "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  Explanation about an obscure

financial instrument is the exact type of evidence that an expert can properly offer to a jury.  *See SEC v. U.S. Environmental, Inc.*, No. 94-cv-6608, 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) ("In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding trading patterns, securities industry regulations and complicated terms and concepts inherent in the practice of the securities industry." (citations omitted)).

The government clearly concedes that testimony about how bonds and the bond markets work is a proper subject of expert testimony:  the government's own experts will testify about these topics, *see* Gov. Expert Notice (attached as Ex. A) at 4 (noticing expert testimony that "[a] common type of security is a stock or bond" and "[a] bond is a fixed income security through which an investor loans money to the issuer of the bonds"), and the government does not object to the bulk of Prof. Finnerty's testimony on these subjects, *see* Mot., Ex. A at 1-2 (listing 17 bond-related items of testimony to which the government does not object).  Prof. Finnerty's testimony about the terms and conditions of the WLCC bonds is no different, and an appropriate subject of expert testimony.  *See United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) ("[B]ecause the federal rules emphasize 'liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.'" (quoting Weinstein & Berger, Weinstein's Evidence § 702[03] at 30 (1989))).  Indeed, the government has made precisely this point in responding to Michelle Morton's motion to preclude one of its experts:

> [T]he fact that the jury will see specific examples of . . . technical and/or industry specific documents is precisely why [the expert's] testimony is necessary.  The primer offered by [the expert] will permit the jury to understand the meaning and significance of the particular investment advisory agreements, Form ADVs and bond documents to be offered in this trial.

ECF No. 414, at 25 n.4.

In addition to being appropriate subjects of expert testimony in their own right, the first two bullets are part of "the bases and reasons for th[e] opinions" contained in the third bullet point:  that there was nothing unusual or suspicious about the terms of the WLCC bonds or the stated use of proceeds.  This, too, is a perfectly appropriate and customary area of expert testimony:  industry norms and practices.  *See Bilzerian*, 926 F.2d at 1295 ("[T]estimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice." (citation omitted)); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 463-65 (S.D.N.Y. 2010) (permitting expert testimony on "industry standards" in the hedge fund business); *U.S. Envtl., Inc.*, 2002 WL 31323832, at *3 (permitting expert testimony comparing certain trading patterns with "the standard practices of the securities industry"); *see also* Ex. A at 2 (government expert notice about "generally recognized standards of practice in the investment advisory industry); *id.* at 5 (government expert notice about "the terms of a typical bond," how issuers "typically" market them, and what "generally" happens with bond proceeds).[2]

Prof. Finnerty will testify, based upon his experience in the bond markets and his review of the WLCC bonds, that the WLCC bonds are consistent with industry norms and have all of the hallmarks of legitimate (*i.e.*, ordinary) bond offerings, and therefore are not unusual or suspicious.  This opinion is central to the defense argument that nothing about the WLCC bonds

---

[2]   The government's experts have not been offered to testify about the defendants' conduct in comparison to industry norms, presumably because that comparison is unhelpful to the government.  But as the above-cited cases – and many more – make clear, opinion testimony comparing the facts of a specific case to industry norms is absolutely acceptable and commonplace.

was inherently unlawful, and that his receipt of information about the bonds did not put Mr.

Archer on notice of Jason Galanis's criminal scheme.

The government's claim that this testimony is barred by Rule 704(b) "because it attempts

to tell the jury . . . that the defendants' actions demonstrate that they lacked a guilty *mens rea*,"

Mot. at 6, is wrong.  Dr. Finnerty will not testify about Mr. Archer's *mens rea*:  he will not

testify that Mr. Archer believed the bonds to be legitimate, or that Mr. Archer lacked the intent to

defraud.  Rather, he will offer the absolutely routine expert opinion that the WLCC bonds are in

line with the market and not irregular or unusual.  This is testimony that Prof. Finnerty is

perfectly qualified to give – the government does not argue otherwise – and that does not in any

way run afoul of Rule 704(b)'s prohibition on an expert "'expressly stating the final conclusion

or inference as to a defendant's actual mental state at the time of a crime.'" *Dupre*, 339 F. Supp.

2d at 542 (quoting *DiDomenico*, 985 F.2d at 1164).  The only case the government cites in

support of its Rule 704(b) argument, *DiDomenico*, is actually to the contrary:  "Clearly, Rule

704(b) does not prohibit all expert testimony that gives rise to an inference concerning a

defendant's mental state."  985 F.2d at 1165.  Rather, "[i]t is only as to the last step in the

inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b)

commands the expert to be silent."  *Id.* at 1164 (citation omitted).

Prof. Finnerty will not opine in any way on Mr. Archer's "actual mental state."  His

testimony provides a factual – not legal – opinion of how the terms of a bond issuance compare

to the norm, based on his specialized knowledge, which is perfectly appropriate.  The

government again made this precise point in its opposition to Morton's motion in *limine*, noting

that Second Circuit cases "have . . . quite properly upheld government experts discussing

industry norms and standards in technical areas such as securities law.  This is so even if a

discussion of industry standards necessarily includes reference to applicable law."  ECF No. 414,

at 29-30 (citations omitted).  Testimony about the relative characteristics of bond issuances is "helpful to the trier of fact" and several steps removed from "a conclusion as to the defendant's actual mental state."

An example from the advisory committee's note to Rule 704(b) illustrates the distinction between a factual opinion and an impermissible legal conclusion:

> [T]he question, "Did T have the capacity to make a will?" would be excluded [because the answer would merely tell the jury what result to reach], while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

*Duncan*, 42 F.3d at 103 (quoting Advisory Committee Note, Fed. R. Evid. 704(b)) (alterations supplied).  Here, Prof. Finnerty's testimony is considerably farther away from the Rule 704(b) line than the testimony permitted by *Duncan* and the advisory committee's note.

### B.      Prof. Finnerty's Testimony About Tribal Immunity Is Appropriate

On the final two challenged bullet points, which relate to tribal immunity, the government argues that the Sioux tribe's limited immunity to suit in connection with the bonds is irrelevant because "ultimate harm to the tribe is not an element of the offense."  Mot. at 6.  But that is hardly the test for expert testimony, or for the defense case generally.  For example, under that argument, a defendant could not introduce evidence of motive (or lack thereof), since motive is never an element of the offense.  In fact, much of what the government proposes for its own experts does not constitute "elements of the offense."  *See, e.g.*, Ex. A at 4-5 (proposing expert testimony that a "revenue bond is a bond that a government agency or similar entity issues to get cash to finance revenue-producing projects" and "[b]ond investors very frequently do not hold bonds until the maturity date").

Here, Prof. Finnerty will provide testimony about the material terms of the offering to help a jury understand how an investor might evaluate a bond offering.  Given that the

government alleges that Mr. Archer purchased the second WLCC bond offering, this is directly relevant to whether there is a legitimate economic explanation for Mr. Archer's conduct, as opposed to the criminal inference the government will urge.  The government's claim that tribal sovereign immunity is irrelevant is particularly striking, given its more recent argument elsewhere that the government itself intends to elicit testimony about tribal immunity.[3]

The government argues that this testimony "is a transparent effort to suggest both that Archer was aware of this fact (if true) and that Archer did not believe that the Wakpamni bond transactions would ultimately harm the Wakpamni community."  Mot. at 6.  Prof. Finnerty will not testify to either of those things.  With respect to the first, Prof. Finnerty will certainly not testify about what Mr. Archer was or was not aware of.  (That said, the tribal immunity issue is no secret.  Among other things, the WLCC bond offering materials, trust indenture, and opinions of counsel all make explicit reference to the tribe's immunity.  *See, e.g.* GX 204 at 1, 45-47, A-6 (indenture for first bond issuance); GX 206 at 1, 46, 47, A-6) (indenture for second bond issuance); GX 207 at 1, 8, 9, A-4–A-6 (indenture for the third bond issuance); GX 203 at 15 (private placement memorandum for third bond issuance).)  With respect to the second, Mr.

---

[3]    *See* ECF No. 441, at 6-7 ("The Government expects that these witnesses [from the WLCC] will testify about the circumstances that led the [WLCC] to issue bonds, including the [WLCC]'s lack of access to many types of more traditional financing. . . .  As the Court may be aware, Native American communities generally suffer from a lack of access to traditional financing options. The poverty of many Native American communities has left them without access to a tax base. Mortgages are unavailable on tribal lands because the land itself is not personally owned and thus cannot be pledged as collateral. *Tribal sovereign immunity similarly dissuades typical lenders from doing business with Native American communities*. As a result, Native American communities have frequently sought to capitalize on their sovereign status in order to generate revenues for the community." (emphasis added)).

Prof. Finnerty's testimony is a direct response to this proposed evidence, and will explain the bonds' terms in light of, among other things, the WLCC's limited sovereign immunity.

Archer has no intention of arguing that he believed the WLCC bonds, despite being fraudulent, would not harm the WLCC because of its tribal immunity.

The government also questions Prof. Finnerty's qualifications to opine on "issues of tribal or sovereign immunity."  Mot. at 6-7.  But Prof. Finnerty's qualifications are unassailable. Prof. Finnerty, as the government notes, specializes in "business and securities valuation, solvency analysis, derivatives instruments, and calculation of damages."  Mot. at 7.  "His writings and teaching have focused on the analysis and valuation of fixed income securities," such as municipal and tribal bonds.  John D. Finnerty, Ph.d., https://www.fiasi.org/fixed-income-hall-of-fame/69/224-dr-john-d-finnerty.  One feature of any government or sovereign-backed debt issuance is immunity.  *See, e.g.*, *Cromeans v. Morgan Keegan & Co.*, 1 F. Supp. 3d 994 (W.D. Mo. 2014) (dismissing claims by municipal bondholders, holding that City of Moberly, Missouri and the Industrial Development Authority of the City of Moberly were entitled to sovereign immunity).  Prof. Finnerty therefore is experienced with immunity issues (as they relate to bonds), and is perfectly competent to testify on that subject.  The government is certainly free to cross-examine Prof. Finnerty on his expertise, but especially considering that "[c]ourts within the Second Circuit have liberally construed expert qualification requirements," *Pension Comm. of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 457 (quotation and citations omitted), the Court should not exclude Prof. Finnerty's testimony.

## II.     William Jannace's Testimony Is Admissible, And His Notice Is Appropriate

Mr. Jannace, a former FINRA and New York Stock Exchange official, was noticed to testify on nineteen items regarding, generally, the regulations applicable to broker-dealers, including reporting requirements, net capital requirements, and so-called Rule 144 transfers.  *See* Mot., Ex. A at 3-4.  The government objects to eight of those items, contending that the "bases"

13

for certain opinions are not sufficiently identified, certain of his testimony is irrelevant, and other opinions run afoul of Rule 704(d).  All of these arguments should be rejected.

A.    **Mr. Jannace's Notice Was Sufficient**

The government contends that Mr. Archer's notice was insufficient with respect to Mr. Jannace, although its actual argument – which is a total of two sentences – is hard to follow.  It asserts first that Mr. Jannace's "website biography provides no insight into Mr. Jannace's opinions regarding [Burnham Securities, Inc.] or the WLCC bonds."  Mot. at 8.  But it is unclear how an expert's website biography could or should "provide . . . insight" specific to the facts of this case.  The only other argument the government advances about the expert notice is that Mr. Jannace's "website biography provides no insight into how Mr. Jannace concluded that '[m]ost securities get a "haircut" of 100% for purposes of calculating net capital' such that their value for net capital purposes is 'exactly zero,'" a conclusion that the government contends is "factually inaccurate."  Mot. at 8.  Construed generously, the government appears to be questioning what experience Mr. Jannace has regarding net capital calculations and the valuation of securities for purposes of net capital.  But that concern is misplaced.

As Mr. Jannace's website biography[4] makes clear, he has over 25 years' experience as a securities regulator and in-house counsel at broker-dealers, and among other things formerly ran FINRA's "Sales Practice Policy department responding to interpretive, policy and disposition requests" concerning topics including broker-dealer registration and books and records, *i.e.*, precisely the reports on which net capital is reported.  Moreover, Mr. Jannace's website biography discloses that he "teaches courses at Fordham School of Law, Wharton Business School, Georgetown Global Education Institute, and Financial Markets World on" various

---

[4]     *See* https://www.batesgroup.com/experts/william-jannace

securities regulatory topics including specifically "Broker-Dealer Regulation[ and] Broker-Dealer Operations/Net Capital."  Therefore, based on his extensive experience with FINRA's and the SEC's rules and regulations, including but not limited to Rule 15c-3, Mr. Jannace is amply qualified to testify on reporting requirements and net capital calculations, including the way that securities are treated for net capital calculation purposes.  *See, e.g.*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 222, 227 (S.D.N.Y. 2010) (holding that a proposed expert's experience consulting for prime brokers of hedge funds is a sufficient basis for testifying on the "industry standards of care for prime brokers of hedge funds").

Finally, the government's contention that Mr. Jannace's opinions about net capital are "factually inaccurate" lacks citation or explanation.  In any event, the government is certainly able to cross-examine Mr. Jannace on this point, which goes to the weight of his testimony, not its admissibility.  *See SEC v. Razmilovic*, 738 F.3d 14, 35 (2d Cir. 2013) ("[P]erceived gaps, inconsistencies, or errors in the reasoning leading to an expert's opinion are matters that properly go to the weight of the evidence; and the weight of the evidence is a matter to be argued to the trier of fact."); *Campbell ex rel. Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (finding a disagreement between experts goes "to the weight of the evidence, not to its admissibility") (citations omitted).

### B.  Mr. Jannace's Testimony Is Relevant

The government next argues that certain of Mr. Jannace's testimony is "irrelevant and not the proper subject matter of expert testimony."  Mot. at 8.  The only elaboration provided by the government is as follows:

> Expert testimony is not needed to read or interpret BSI's annual report, a document which is intended for the general public.  And the distinction between "clearing" broker and "introducing" brokers is not relevant to this case.

*Id.*

The government's argument about BSI's annual report should be rejected for substantially the same reasons discussed above, with respect to Prof. Finnerty's testimony. Specifically, just because BSI's annual report is public does not mean that a financial reporting expert cannot "help the trier of fact to understand" it.  Fed. R. Evid. 702(a).

In this case, Mr. Jannace will testify that BSI's annual report had to contain a net capital calculation, and that its annual reports in 2014 and 2015 showed that BSI was in compliance with its net capital requirements. Mot., Ex. A at 4-5.  The government's suggestion that this testimony is somehow irrelevant is baffling.  In this case, the government will argue that Mr. Archer transferred the WLCC bonds he allegedly purchased to BSI, in order to satisfy its net capital requirements.  *See* Complaint ¶¶ 47.i, 49.d; S3 Indictment ¶ 23.  Evidence concerning BSI's reported net capital is therefore of central importance to Mr. Archer's defense, and it is critical that the jury understand how net capital calculations work, how it is reported, and what effect the WLCC bonds did or did not have on BSI's net capital.  *See Bilzerian*, 926 F.2d at 1294 ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.").

The government's argument about clearing and introducing brokers is also wrong.  As set forth in Mr. Jannace's expert notice, the two kinds of brokers have different reporting requirements, including with respect to net capital, *see* Mot., Ex. A at 4, an issue of central relevance to this case.  Indeed, all of the testimony above leads to Mr. Jannace's conclusion that the WLCC bonds were entirely discounted for net capital purposes, and "[t]hey would have no positive effect on the calculation of BSI's net capital."  *Id.* at 7.  Although the government includes this opinion in its list of ones it says are "impermissible," Mot. at 7, the government's motion includes absolutely no argument about this opinion.  And for good reason: Mr. Jannace's

16

conclusion that the WLCC bonds are worthless for net capital calculation purposes is entirely appropriate. It is well-supported, within Mr. Jannace's experience and expertise, and directly relevant to the government's theory of the case.

### C.    Mr. Jannace's Testimony About Rule 144 Transfers Is Appropriate

Finally, the government objects to Mr. Jannace's testimony that "Rosemont Seneca Bohai's transfer of WLCC bonds to VL Assurance and/or BSI was entirely permissible, and consistent with Rosemont Seneca Bohai's representation letter." Mot. at 8 (also objecting to similar testimony about Mr. Cooney's transfer of WLCC bonds to Bonwick). Contrary to the government's argument, this opinion does not contravene Rule 704(d). Rather, it is an absolutely routine expert opinion that Mr. Archer's transfer was in accordance with Rule 144, which governs the sale or transfer of so-called restricted securities like the WLCC bonds.

As set forth above, Federal Rule of Evidence 704(d) only bars opinion testimony about the defendant's mental state. That is not what this is. Mr. Jannace will not opine about Mr. Archer's mental state at all; his opinions are entirely about Mr. Archer's *conduct*. Specifically, Mr. Jannace will testify that the alleged transfer of WLCC bonds from Rosemont Seneca Bohai to BSI and/or VL Assurance was permissible in accordance with SEC rules, including the representations Mr. Archer allegedly made in his Rule 144 accreditation letter.

The government has made clear that its experts will themselves testify at length about Rule 144, *see* Ex. A at 3, 5, and the government presumably intends to argue that Mr. Archer violated Rule 144. In particular, it appears that the government intends to point to Mr. Archer's Rule 144 accreditation letter, which said "[w]e are purchasing the Securities for our own account for investment only, and not with a view to, or for sale in connection with, any distribution of the Securities. . . ." *See* GX 374 at 10. The government seems to intend to argue that this representation was inconsistent with the transfer of the bonds to BSI and/or VL Assurance. But

the language of the accreditation letter is very specific, and tailored to the requirements of Rule 144, as Mr. Jannace will testify.  This is again critical testimony that rebuts a core government theory, is well within the witness's expertise, and does not entail any testimony about Mr. Archer's *mens rea*.

The government argues that this testimony is improper because "[i]t is up to the jury to decide on whether the action of the defendants' [sic] were permissible and consistent with representations they had made to others."  Mot. at 9.  This is a truism that would eliminate all expert testimony.  Of course the jury will decide the facts, but (although it is not what Mr. Jannace will do) "an expert witness may testify as to an ultimate fact issue the jury will decide." *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 826 (2d Cir. 1994) (citing Fed. R. Evid. 704).  In a complicated case like this one, involving highly regulated markets and multiple rules and regulations governing entities in the financial services industry, deciding whether or not a defendant's *actions* were consistent with those rules and regulations, while the province of the jury, is a subject that is particularly ripe for the assistance of guiding expert testimony.

### III.    Paul Atkins' Testimony Is Admissible, Appropriate, and Correctly Noticed

As a former SEC commissioner, a practitioner at a prominent accounting firm, and the founder of his own financial services consulting firm, Paul Atkins has intimate working knowledge and experience concerning the matters noticed for his testimony.  His credentials and expertise to speak to issues of the relative roles and responsibilities of officers, directors, and managers in public and private companies cannot seriously be questioned.  He is well qualified to speak to issues surrounding the regulation and customary business activities of registered investment advisors, and his insights from years as an SEC Commissioner into SEC enforcement actions are unassailable.  Finally his deep experience at an accounting firm and more recently

with a broad range of corporate and financial consulting issues makes him eminently qualified to

testify about various corporate growth strategies.

### A.     Commissioner Atkins's Testimony Is Relevant And Not Overly General

Mr. Atkins's noticed testimony is not "general" or "irrelevant"[5]  but rather precisely the

sort of expert testimony permitted to assist juries.  "Broad generalizations and abstract

conclusions are textbook examples of opinion testimony."  *Tribble v. Evangelides*, 670 F.3d 753,

758 (7th Cir. 2012); *see also* Advisory Committee Notes, Fed. R. Evid. 702 ("The rule . . .

recognizes that an expert on the stand may give a dissertation or exposition of scientific or other

principles relevant to the case, leaving the trier of fact to apply them to the facts."); *Bilzerian*,

926 F.2d at 1295 ("[T]estimony concerning the ordinary practices in the securities industry may

be received to enable the jury to evaluate a defendant's conduct against the standards of accepted

practice." (citation omitted)).  The government's own prior briefing and expert notice – to which

Mr. Archer does not object – support this, and the one authority cited by the government, *United

States v. Fredette*, 315 F.3d 1235 (10th Cir. 2003), is inapposite.

The government's challenge to Mr. Atkins is utterly at odds with the expert testimony it

has noticed for its own witnesses.  For instance, the government proposes that Arthur Laby

testify as to how client relationships with investment advisers are "*typically* governed," Ex. A at

2 (emphasis added); how these agreements "*typically* specify fees to be paid and any

[investment] parameters," *id.* (emphasis added); and which investment advisers "typically" must

---

[5]     This argument is strikingly inconsistent with the government's other objections, which
are based on the opposite – but equally flawed – notion that Mr. Archer's proposed expert
testimony is too specific and thereby usurps the role of the jury.  *See* Mot. at 5-7 (arguing that
testimony concerning "the terms and conditions of certain of the Wakpamni bonds" and "BSI's
annual report" is improper); *id.* at 8 (arguing that testimony on specific bond transfers would
improperly "usurp the role of the jury").

register with the SEC, *id.* at 3.[6]  Mr. Laby's proposed testimony by the government provides no

insight into the specific investment advisory agreements, investment advisory fees, investment

advisory parameters, or registration requirements of the investment advisers at issue in this case,

but that does not prevent it (at least in the government's view) from "help[ing] the trier of fact to

understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The

government's challenge to Mr. Atkins is further undermined by its response to Morton's motion

in *limine* to exclude Laby's testimony:  it argues that expert testimony on finance and securities

regulation "may include testimony concerning general industry practices."  ECF No. 414, at 27;

*see also id.* at 26 (it is proper for Laby to "explain certain fundamentals of the securities

industry" and "the regulations and norms relating to that industry").

The government also proposes broad brush expert testimony from Martha Haines who

will testify as to "the terms of a typical bond," where a bond's terms "are usually set forth," Ex.

A at 4, how "[i]ssuers typically market bonds to potential investors," *id.*, how "[b]ond investors

very frequently do not hold bonds until the maturity date," *id.*, how "[t]he vast majority of

bonds" are listed, *id.* at 5, how "[b]onds are generally rated," *id.*, that "[b]ond proceeds are

generally invested," and that "[g]enerally, the law prohibits the sale of bonds and other

securities" that are not registered with the SEC, *id.*.  Again, this testimony does not touch on the

specific bonds and issuers in this case, but Mr. Archer does not dispute that it may help the jury

understand or interpret relevant facts.

Mr. Atkins's testimony will likewise provide information about corporate structure and

governance (relevant to the different roles and responsibilities of the defendants), insights into

the SEC enforcement regime (relevant to the SEC bars against Jason Galanis and John Moran

---

[6]     *See also* ECF No. 414, at 25-32.

that the government will seek to admit), and observations about corporate growth strategies (relevant to the "financial conglomerate" that Galanis sold to Mr. Archer and others), all of which will help the jury understand important background concepts and draw conclusions from the evidence.

The single authority cited by the government on this point, *Fredette*, is inapposite and does not support the exclusion of Mr. Atkins's testimony.  In *Fredette*, a defendant offered expert testimony on rebate programs, but later admitted that "he had never before encountered a rebate program like [the defendant's]" and "conceded that applying 'an industry standard doesn't really work.'"  315 F.3d at 1239.  When the expert offered to testify about the defendant's specific program, the court rejected this testimony in light of the expert's prior concession that he was not familiar with it.  *Id.*  Far from supporting the exclusion of testimony from Mr. Atkins, *Fredette* stands for the proposition that specific expert testimony is impermissible when the expert has no specific knowledge and general testimony is impermissible when it is demonstrably irrelevant.  The case says nothing about Mr. Atkins's proposed testimony, which is both highly qualified and highly relevant.

### B.   Commissioner Atkins's Notice Is Sufficient

The notice and proposed testimony for Mr. Atkins are proper.  His opinions are based on the experience described in his biography, including six years as an SEC commissioner, a stint with a major international auditing firm, and most recently his experience as CEO of the financial services consulting firm that he founded.  These credentials provide more than adequate support for his opinions on the roles and responsibilities of officers and directors in a corporate setting, SEC regulations and requirements relating to investment advisors, and corporate expansion strategies.

The notice is also more than sufficient with respect to Mr. Atkins's more specific opinions. For example, the opinion that the "Burnham Financial Group 'roll up' plan was perfectly lawful and appropriate," Mot., Ex. A at 7, is based on Mr. Atkins's long experience in the financial services industry as well as the "roll up" plan itself. Moreover, the government ignores the next three bullets in Mr. Atkins's notice, which provide additional "reasons and bases" for this opinion:

- Companies pursue many different business models to expand in size. Some companies put their efforts into "organic growth" by, for example, trying to increase the number of customers for their existing business lines. For example, Whole Foods might try to increase revenues by persuading customers at other stores to come to Whole Foods.

- Other companies try to expand by acquiring other companies. This is a common and recognized business model. For example, Amazon recently bought Whole Foods in order to increase both the business of Amazon and the business of Whole Foods.

- The growth-by-acquisition model is common in the financial services industry as well. Companies often conclude that people who have an interest in buying insurance might also want to buy stocks and bonds, and vice versa. A bank that provides savings and checking accounts might enter into the credit card business and offer credit cards to its customers. Trying to build a company that had insurance, brokerage, and investment advisory services would not be unusual at all and would be perfectly lawful.

*Id.*, Ex. A at 7.

Similarly, the government objects to Mr. Atkins' conclusion that "at no point was either Hughes or Atlantic required to disclose Mr. Archer or Mr. Cooney as a direct or indirect owner on Schedule A or Schedule B of the Form ADV," but it ignores the preceding bullet that provides the basis for this opinion:

- Investment advisers are a type of entity regulated by the SEC. Under SEC rules, investment advisers who control assets over a certain threshold have to register with the SEC and make certain disclosures on a Form ADV. That form contains information about the investment adviser including who the principals are, who the owners are, and who the control persons are. The identification of owners and control persons is defined in the SEC rules, and other people with interests in the investment adviser do not need to be disclosed unless they meet those definitions.

22

*Id.*, Ex. A at 6.

Finally, the conclusion that Mr. Archer, as an outside director, "would not be expected to be aware of the specifics of any of the particular businesses of the Burnham Financial Group, including the details of the WLCC bonds or the nature of the annuity investment," *Id.*, Ex. A at 6, is supported by seven prior bullets:

- Companies are led by two types of leaders: executive managers and directors. Executives, such as the Chief Executive Officer, President, Vice President, Chief Financial Officer, Chief Investment Officer, and General Counsel are responsible for the day-to-day operation of the company.

- The Board of Directors of the company has a different role. They oversee the executives to make sure that they are performing up to expectation, including meeting the company's projections and targets.

- Directors are also involved in larger decisions involving the company, such as the decision to acquire another company.

- Directors are generally not involved in daily decisions about the company, nor are they aware of them, nor should they be.

- In the financial services industry, entities such as broker-dealers and investment advisers also have executives and directors. The executives are responsible for the day-to-day operation of the companies, including assuring that the company complied with all SEC and other rules.

- The directors would generally not receive information about the daily activities of the firm. For financial services firms, directors would not be expected to be aware of particular transactions, investments, financial products, or customers. It would be highly unusual for directors to be aware of such matters unless, for some specific reason, a member of the executive team elevated it to the board level.

- Directors are instead involved in broad, top level decisions about the business, and receive information of a more general nature that broadly impacts the business. They would not receive information about the day-to-day operations such as individual transactions that were made unless they had a significant impact on the business.

*Id.*, Ex. A at 5-6.

Simply put, when read in context rather than selectively quoted, it is clear that Mr. Atkins's expert notice provides more than adequate notice of his opinions and the reasons and bases that support them.

### C. Commissioner Atkins's Testimony Does Not Usurp The Role Of The Jury

None of Mr. Atkins's proposed testimony improperly "usurp[s] the role of the jury." Mot. at 10. The government states that testimony as to Mr. Archer's "'awareness' of the 'details of the WLCC bonds [and] the nature of the annuity investment' are fact questions for the jury." *Id.* This argument both misperceives the nature of Mr. Atkins's testimony and is wrong.

First of all, Mr. Atkin will *not* testify about Mr. Archer's "awareness" (or lack thereof) of anything. That is, he will not testify that Mr. Archer was actually unaware of BFG's business or aspects of the WLCC bonds. Rather, his testimony is that, as an outside director, Mr. Archer would not "be expected to be aware" of those details. *Id.*, Ex. A at 6. The purpose of this testimony is simply to explain to the jury that despite their role in the corporate hierarchy and, in some cases, significant compensation, outside directors have a specific role that is strategic rather than operational, and the jury therefore should not infer that Mr. Archer was aware of BFG's operations or the details of its financial products solely by virtue of his position. This testimony will explain to the jury corporate governance issues that are outside of the layperson's experience, and so will assist them within the meaning of Rule 702 without in any way opining on Mr. Archer's mental state. *See DiDomenico*, 985 F.2d at 1165 ("Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state.").

Mr. Atkins's opinions about the Form ADV and about the proposed corporate consolidation plan are also clearly within the bounds of admissible testimony. This testimony does not tell the jury what conclusion to reach on the charged crimes; it informs the jury about

relevant conduct.  The government's opposition to Morton's motion in *limine* concedes as much, citing several cases upholding expert testimony where the legal opinions stopped (appropriately) short of conclusions about a defendant's liability.  ECF No. 414, at 30 (citing *United States v. Offill*, 666 F.3d 168, 173-76 (4th Cir. 2011) (finding expert testimony on securities laws appropriate because it did not include a legal conclusion of defendant's criminal liability)).

The Second Circuit explained this distinction in *Duncan* while addressing an earlier case: "In holding the testimony of a Securities and Exchange Commission . . . investigator inadmissible, we were particularly concerned that the witness repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms such as 'manipulation,' 'scheme to defraud' and 'fraud' in opining on the defendant's conduct."  42 F.3d at 101 (citation omitted); *see also* ECF No. 414, at 28-29 (government distinguishing between inadmissible expert testimony tracking a statute and permissible, informative expert testimony).  Mr. Atkins's proposed testimony does not include language tracking the securities fraud statute that Mr. Archer is charged with violating or state a conclusion about his liability.  It just states his informed opinions about relevant facts, all of which arise in the context of the highly regulated securities industry.

### D. Commissioner Atkins Is Uniquely Qualified To Testify About SEC Enforcement Actions

Finally, Mr. Atkins's opinions about SEC enforcement and regulatory issues are properly noticed, relevant, and consistent with Rule 704.  The government blandly suggests that two full pages of Mr. Atkins's expert notice contain improper opinions about SEC enforcement and regulatory issues, but its motion supplies scant support, addressing only one portion of a single bullet point from the supposed two pages of improperly noticed testimony.  Neither that limited portion nor the rest of the noticed testimony is improper and, importantly, the government has not provided any reason, much less a cogent one, to exclude it.

Mr. Atkins has decades of experience in the securities and financial compliance industries, including six years as an SEC commissioner.  He could hardly be more qualified to discuss SEC enforcement and regulation, including well-informed observations on the general frequency of repeat offenders.  He does not need to be an "expert on recidivism" to assist the jury with the insights he gained from presiding over hundreds if not thousands of enforcement recommendations over more than half a decade.

Importantly, this evidence is entirely responsive to the government's arguments.  It intends to offer Jason Galanis's and John Moran's SEC bars to attempt to prove what kind of people Mr. Archer was doing business with, and that he knew what he was getting into.  *See* ECF No. 339, at 2.  Mr. Archer should therefore in fairness be permitted to meet this evidence by being allowed to provide the appropriate context for SEC enforcement actions.  This evidence is (assuming the SEC bars are admitted) directly relevant, within Mr. Atkins's experience and expertise, and helpful to the jury which hopefully will have had little to no experience with SEC enforcement actions.  To be sure, the government would like for evidence of the SEC bars to seem damning, but it isn't.  Mr. Atkins should be allowed to explain why.

**IV.    If The Court Determines That Any Of Mr. Archer's Notices Were Inadequate, He Should Be Given The Opportunity To Amend Them**

For the reasons given above, all of the proffered expert testimony is appropriate, admissible, and properly noticed.  If the Court disagrees for any reason, however, Mr. Archer should be given the opportunity to amend his expert disclosures.  As set forth above, the preclusion of expert testimony based on notice issues is strongly disfavored, and "is not appropriate unless the party's conduct represents flagrant bad faith and callous disregard of the federal rules."  *Hein*, 53 Fed. Appx. at 137 n.1.

Mr. Archer's notice was timely, extensive, and plainly not in bad faith.  He should therefore have the opportunity to amend it if the Court perceives some deficiency.  *See, e.g.*,

26

*Ahmed*, 2015 WL 1611947 at *2 (ordering defendants to supplement insufficient expert disclosures because "[p]reclusion . . . is a drastic remedy"); *United States v. Cuellar*, 478 F.3d 282, 294 (5th Cir. 2007) (holding that where government's failure to comply with Rule 16 did not "frustrate[]" its "purpose" – "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through cross-examination" – then exclusion of government's expert, "the most extreme sanction possible," was not warranted (internal quotation marks and citations omitted), *vacated on entirely different grounds*, 553 U.S. 550 (2008); *see also Nacchio*, 555 F.3d at 1274 (McConnell, *J.*, dissenting) (trial court abuses its discretion when it excludes expert because of inadequate Rule 16 disclosures "unless those violations seriously affect the trial"); *see also, e.g.*, *United States v. Bonventre*, 10 Cr. 228 (LTS) (ECF No. 519) (for trial that began in September 2013, permitting amendment of defense expert disclosures in the second week of November 2013, *i.e.*, approximately six weeks into the trial).

## **CONCLUSION**

The Court should deny the government's motion to exclude Mr. Archer's noticed expert testimony.

Dated:  May 11, 2018
     New York, New York

                              Respectfully,

                               /s/  Matthew L. Schwartz
                              Matthew L. Schwartz
                              BOIES SCHILLER FLEXNER LLP
                              575 Lexington Avenue, 7th Floor
                              New York, New York 10022
                              Tel.: (212) 446-2300
                              Fax: (212) 446-2350
                              mlschwartz@bsfllp.com

                              *Attorneys for Devon Archer*