

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

May 30, 2018

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re: *United States v. John Galanis, et al.*, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

I represent Devon Archer. I write in response to the government's letter of this evening seeking to offer hearsay testimony from Michael Smith. Although the government has abandoned its claim that Michelle Morton's statements to Mr. Smith are admissible as co-conspirator statements, its new theories are no more successful.

There are certainly questions that the government may properly pose to the witness to elicit the facts that (a) information about the identity of the parties in the deal was important to him, and (b) he took certain actions after speaking to Morton. What the government may not do, however, is use this witness to introduce what is effectively Morton's confession that she – an actual investment adviser – failed to disclose conflicts of interest and had purchased bonds in her customer's account without its consent. Among other things, this proposed testimony – which is utterly unlike the testimony the government points to – raises substantial Confrontation Clause problems.

As a threshold matter, the proffered testimony here is different in kind from the testimony at issue in *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), and *United States v. Tagliaferri*, 13 Cr. 115 (RA).[1] In those cases, the witness took some action based upon false or incomplete information. The government was permitted to ask, in essence, "if you had known X [*i.e.*, some relevant fact that the government had laid the foundation for], would you have still taken the same action?" This sort of question is permissible because it demonstrates that the information mattered to the witness, *i.e.*, that it was material. Moreover, to the extent that there was testimony about statements made to the witness, those statements were *false* – that is, part of the fraud.

In this case, however, Mr. Smith cannot point to any action or decision that would have turned out differently, because he took no action in the first place. This was not a situation in which Mr. Smith purchased WLCC bonds based upon fraudulently-concealed conflicts of

---

[1] *Tagliaferri* is also of no significance because there was no objection to the testimony the government cites.



interest.  In such a case, the government could likely ask him some version of the question:  had you known the true state of affairs, would you have still purchased the bonds?   Here, Mr. Smith never consented to the bonds' purchase in the first place and he plainly was not the party to have made the purchase.  Rather, Atlantic Asset Management made the purchase without his knowledge and only informed him after the fact.  There was thus nothing he could have done differently; nor were there any prior misrepresentations about the absence of conflicts to Mr. Smith.

Mr. Smith's proffered testimony makes clear why Morton's purported disclosure of the various conflicts related to bonds cannot be in furtherance of a conspiracy and instead amounts to a confession: the disclosure exposed the very relationships the government alleges the conspiracy intended to conceal.  If, as the government claims, "the allegation in this case is that these defendants knew that there was a conflict of interest and failed to disclose it," the disclosure of those conflicts ran counter to the very purpose of the conspiracy. Trial Tr. 661:14-17.  It is nonsensical to claim that the disclosure of those conflicts furthered their concealment.  Either the concealment of the interrelatedness of various parties and corporate entities is an object of the alleged conspiracy or it is not—the government should not be permitted to have it both ways.

The notion that Morton's statements were intended to "keep the scheme going" is likewise unsupported.  After Morton's disclosure, Mr. Smith – by the government's own telling – "wanted  the Wakpamni bond sold immediately out of OSERS' portfolio." Gov't Ltr. at 1. There is therefore simply no basis to the claim that revealing the relationships among Morton's "financial backers" and various parties involved in the bond's placement and issuance was intended to lull Mr. Smith into thinking there was nothing wrong.  A disclosure that, by its terms, uncovers the object of the conspiracy cannot be within the conspiracy's scope, particularly where it puts the alleged victim of the conspiracy on notice. *See United States v. Rubin*, 609 F.2d 51, 64 (2d Cir. 1979) (recognizing extension of scheme where the "scope of the alleged conspiracy" to "fraudulently obtain[] loans" included "lulling lenders into not calling" the loans); *United States v. Rogers*, 1991 WL 8544, at *4 (S.D.N.Y. 1991) ("[T]he object of defrauding an institution has been held to include later attempts to "lull" the defrauded party into believing that no fraud has occurred.").[2]

At base, what the government is trying to do is introduce into evidence the confession of a non-testifying co-conspirator who is not on trial.  This raises profound constitutional questions, particularly when the purported confession is *about* two of the trial defendants.  In general, the introduction of a confession by a trial defendant must be sanitized to remove references to other defendants, in order to avoid Sixth Amendment issues with respect to the non-confessing

---

[2]   For the same reason, the government's argument that the statements reflect Morton's state of mind is misplaced.  To the extent that Morton's state of mind could ever be relevant in a trial not involving her, it could only be when she was acting in furtherance of the conspiracy. Where, as here, she was acting directly contrary to the interests of the alleged conspiracy, her state of mind is totally irrelevant.  *See* Trial Tr. 661:14-24 (The Court:  "She is not a defendant here.").



defendants.  *See Gray v. Maryland*, 523 U.S. 185 (1998); *Harrington v. California*, 395 U.S. 250 (1969) (use of co-conspirator confession violated Confrontation Clause); *Bruton v. United States*, 391 U.S. 123, 135-137 (1968) (the admission of a co-defendant's "powerfully incriminating extrajudicial statements" during a joint trial of a non-testifying accomplice violated the Confrontation Clause).

But where the co-conspirator who confessed is *not* on trial, the evidence raises literally nothing but Confrontation Clause issues. *See Lilly v. Virginia*, 527 U.S. 116, 134 (1999) ("[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been define in our Confrontation Clause jurisprudence."); *Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005) (reversing murder conviction, holding "The court required Howard to choose between his Sixth Amendment right to cross-examine Dr. Martin, and his Sixth Amendment right to exclude the unreliable hearsay confession of a co-conspirator."); *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (Sotomayor, *J.*) ("[A] plea allocution by a co-conspirator who does not testify at trial may not be introduced as substantive evidence against a defendant unless the co-conspirator is unavailable and there has been a prior opportunity for cross-examination."); *United States v. Cabrera-Rivera*, 583 F.3d 26 (1st Cir. 2009) (vacating Hobbs Act conviction where testimony regarding non-defendant accomplices' confessions was admitted in violation of Confrontation Clause).

The Constitutional problem is further exacerbated here because the alleged conduct was not reasonably foreseeable to the trial defendants, as we have elsewhere briefed at length, and because Morton's confession was not truthful – in the same breath as she was revealing the conflicts, she was falsely diverting blame to others, including by implication the defendants.  *See Lilly*, 527 U.S. at 137 ("It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing."); *United States v. Becker*, 502 F.3d 122, 129-30 (2d Cir. 2007) ("'Where testimonial statements are at issue,' the Supreme Court held, 'the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.'" (quoting *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004)); *see generally Ohio v. Roberts*, 448 U.S. 56, 62, 66 (1980) (examining "the relationship between the Confrontation Clause and the hearsay rule" and noting that a hearsay "statement is admissible [under the Confrontation Clause] only if it bears adequate 'indicia of reliability'").

The government cannot skirt these clear constitutional limits by now claiming that it does not wish to introduce the testimony for its truth.  *But see* Trial Tr. at 680 ("THE COURT: It seems like you want it in for the truth.  [AUSA]: Yes, I think it's true.").  The government can easily elicit testimony that will demonstrate the effect of Morton's confession on Mr. Smith, without introducing the substance of that confession.  It can likewise elicit testimony demonstrating the materiality of the conflicts.  For example, one could imagine the following testimony:

Case 1:16-cr-00371-RA   Document 488   Filed 05/30/18   Page 4 of 4



Page 4

> Q: When did you first learn that WLCC bonds had been purchased in the GYOF?
> A: In a telephone call with Michelle Morton on April 23, 2015.
> Q: What did you do in response to that phone call?
> A: I instructed Michelle Morton to sell the WLCC bonds.
>
> \*   \*   \*
>
> Q: Was information about the identities of the parties involved in packaging the WLCC bonds important to you?
> A: Yes.
> Q: Were Atlantic's representations that the GYOF would be diversified, with no investment constituting more than 5% of the total fund, important to you?
> A: Yes.
> Q: If you had known that Atlantic was going to purchase the WLCC bonds, which comprised 15% of the total fund, would you have invested in the first place?
> A: No.

This kind of testimony makes all of the points that the government claims are important, without introducing the grossly prejudicial substance of Morton's self-serving confession.

    Thank you for your consideration.

    Respectfully,

    /s/  Matthew L. Schwartz
    Matthew L. Schwartz