| | |
|---|---|
| **From:** | jason galanis <jason@holmbycompanies.com> |
| **Sent:** | Monday, February 10, 2014 11:12 PM |
| **To:** | Hugh DP Dunkerley |
| **Cc:** | Bevan Cooney; Devon Archer |
| **Subject:** | RSTP Capital Bank account |
| **Attachments:** | RSTP Capital LLC articles.pdf; RSTP Capital Operating Agreement Delaware.doc; RSTP Capital No CA biz letter.docx; RSTP Resolution Appointing Bank Signatory {Blank}.docx; Subscription Agreement (Subscriber - HSDC Capital Fund, LLC).pdf; Subscription Agreement (Subscriber - RSTP Capital, LLC).pdf |

hugh

attached are the documents for the bank account. they are:

1. articles of formation
2. operating agreement
3. no business in california
4. board of managers resolution to open a bank account

Bevan, you need to sign the Operating Agreement on behalf of BOE Capital, the sole Member of the LLC. Return it to Hugh above.

Hugh, please obtain a FEIN in the morning online. You will need it for the bank account.

The expected transaction flow will be a $595,000 transfer from the account of Ballybunion at Banc of California initiated when you open this account. Nordgren will be initiating that internal transfer.

RSTP will be wiring $594,000 to mbloom in connection with the Subscription Agreement (attached) and the related capital call.

Thank you.

Jason

1

GOVERNMENT
EXHIBIT
1286
16 Cr. 371 (RA)

BC003984
SEC-SDNY_EPROD-000005063



PAGE   1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "RSTP CAPITAL LLC",
FILED IN THIS OFFICE ON THE FOURTH DAY OF DECEMBER, A.D. 2013,
AT 2:44 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0948371

DATE: 12-05-13

5443263   8100

131376840

You may verify this certificate online
at corp.delaware.gov/authver.shtml

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:44 PM 12/04/2013
FILED 02:44 PM 12/04/2013
SRV 131376840 - 5443263 FILE

## STATE of DELAWARE
## LIMITED LIABILITY COMPANY
## CERTIFICATE of FORMATION

**First:** The name of the limited liability company is  RSTP Capital LLC

**Second:** The address of its registered office in the State of Delaware is  1209
Orange Street  in the City of  Wilmington
Zip code  19801 . The name of its Registered agent at such address is
The Corporation Trust Company

**Third:** (Use this paragraph only if the company is to have a specific effective date of dissolution: "The latest date on which the limited liability company is to dissolve is  .")

**Fourth:** (Insert any other matters the members determine to include herein.)

In Witness Whereof, the undersigned have executed this Certificate of Formation this
4th  day of  December,  2013 .

By:

Authorized Person (s)

Name:  Stephen A. Weiss

Attorney-In-Fact

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

PAGE  1                **State of Delaware**          131376840

SECRETARY OF STATE
DIVISION OF CORPORATIONS
P.O. BOX 898
DOVER, DELAWARE 19903

9986313                                                    12-05-2013
HUNTER TAUBMAN WEISS, LLP
575 LEXINGTON AVENUE
NEW YORK                    NY    10022

ATTN: ELLIOT WEISS

| DESCRIPTION | AMOUNT |
|---|---|
| RSTP CAPITAL LLC | |
| 5443263    0102Y Register L.L.C. | |
| Certification Fee | 50.00 |
| Formation Fee | 70.00 |
| Court Municipality Fee, Wilm. | 20.00 |
| Expedite Fee, Same Day | 100.00 |
| FILING TOTAL | 240.00 |
| TOTAL PAYMENTS | 240.00 |
| SERVICE REQUEST BALANCE | .00 |

BC003987
SEC-SDNY_EPROD-000005066

# OPERATING AGREEMENT
## OF
## RSTP CAPITAL LLC

THIS OPERATING AGREEMENT is made effective as of the 1st day of February 2014, by and between BOE Capital LLC (the "Member") and RSTP Capital LLC (the "Company").

## ARTICLE I
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

**1.1** **"Act"** shall mean the Delaware Limited Liability Company Act, codified at 68 Del. Laws, c. 434, §1, et seq. (the "Act"), as amended from time to time.

**1.2** **"Articles of Organization"** shall mean the Articles of Organization of the Company as filed with the Secretary of State of Delaware, as amended from time to time.

**1.3** **"Capital Contribution"** shall mean any contribution to the capital of the Company in cash or property by the Member whenever made.

**1.4** **"Cash Flow"** shall mean the gross cash proceeds from the operation of the Company's business less the portion thereof used to establish Reserves for or to pay Company expenses, debt payments and capital expenditures. "Cash Flow" shall include any net cash proceeds from the sale or disposition of Company property and from the refinancing of indebtedness of the Company, shall be increased by any reduction of Reserves previously established by the Member, and shall not be reduced by depreciation, cost recovery, amortization or similar non-cash deductions.

**1.5** **"Company"** shall refer to RSTP Capital LLC

**1.6** **"Entity"** shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

**1.7** **"Fiscal Year"** shall mean the period terminating on December 31 of each year during the term hereof or on such earlier date on which the Member's taxable year ends.

**1.8** **"Initial Capital Contribution"** shall mean the initial contribution to the capital of the Company pursuant to Paragraph 6.1 of this Operating Agreement.

**1.9** **"Member"** shall mean the Person who executed a counterpart of this Operating Agreement as a Member and any Person who may hereafter become a member of the Company.

**1.10** **"Net Profits"** and **"Net Losses"** shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, as of the close of each Fiscal Year.

**1.11** **"Operating Agreement"** shall mean this Operating Agreement as originally executed and as amended from time to time.

BC003988

SEC-SDNY_EPROD-000005067

**1.12**     **"Person"** shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person," where the context so permits.

**1.13**     **"Representative"** shall mean the legally appointed guardian of a mentally incapacitated Member, the conservator of a mentally incapacitated Member's assets or the legally appointed and qualified executor or personal representative of the estate of a deceased Member. In the event no such guardian, executor or personal representative is appointed, then the Representative shall mean the spouse of such incapacitated or deceased Member, or if such Member does not have a spouse or the spouse is not then living or is unable or unwilling to act, such Member's then living lineal descendants who are willing and capable of acting, one at a time in descending order of age but in no event younger than 21 years of age or, if none, such Member's then-living lineal ancestors who are willing and capable of acting, one at a time and in ascending order of age.

**1.14**     **"Reserves"** shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Member for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

**1.15**     **"Manager"** means one or more managers. Specifically, "Manager" means the Person listed below in Section 4.2, or any other Persons that succeed him, her or it in that capacity. References to the Manager in the singular or as him, her, it, itself, or other like references will also, where the context so requires, be deemed to include the plural or the masculine or feminine preference, as the case may be.

## ARTICLE II
## FORMATION OF COMPANY

**2.1 Formation.** The Company shall be, or has been, organized as a Delaware limited liability company by executing and delivering Articles of Organization to the Delaware Secretary of State in accordance with and pursuant to the Act.

**2.2 Name.** The name of the Company is "RSTP Capital LLC".

**2.3 Place of Business.** The principal place of business of the Company is Delaware. The Company may locate its places of business and registered office at any other place or places as the Member may deem advisable.

**2.4 Registered Office and Registered Agent.** The Company's initial registered office shall be at the office of its registered agent at 1209 Orange Street · Wilmington DE 19801, and the name of its initial registered agent shall be The Corporation Trust Company. The registered office and registered agent may be changed by the Member by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

**2.5 Term.** The term of the Company shall continue indefinitely from the date of filing of the Articles of Organization with the Delaware Secretary of State, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

## ARTICLE III
## BUSINESS OF COMPANY

The business of the Company (its "Business") shall be:

3.1 To engage in the business of making investments in technology companies or technology focused funds.

3.2 To exercise all other powers necessary to or reasonably connected with the Company's business that may be legally exercised by limited liability companies under the Act

3.3 To engage in all activities necessary, customary, convenient or incidental to any of the foregoing.

## ARTICLE IV
## MANAGEMENT OF THE COMPANY

**4.1 Management of Company.** The business and affairs of the Company will be managed by the managers (each individually a "Manager" and collectively the "Managers"), who may, but need not, be a Member. The Managers are authorized and directed to manage and control the business of the Company. Except for situations in which the approval of the Members is expressly required by non-waivable provisions of the Act, the Managers have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, any one Manager may take any action permitted to be taken by the Managers, unless the approval of more than one of the Managers is expressly required pursuant to this Agreement or the Act, in which case the Managers shall have the power to make decisions and take actions only with the consent of a majority of the Managers then outstanding.

**4.2 Manager.** Hugh Dunkerley and Devon Archer shall serve as Managers and shall continue to serve as Managers until death, resignation, disability or removal with or without Cause. Either Manager has the power to bind the company acting alone as Manager.

**4.3 Certain Powers of Manager.** Without limiting the generality of Section 5.1, the Manager shall have the power and authority on behalf of the Company to:

(a) acquire any real or personal property from any Person, whether or not such Person is directly or indirectly affiliated or connected with the Manager or any Member;

(b) borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, mortgage, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums, including margin borrowing on securities;

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

(c) construct, operate, maintain and improve any real and personal property owned by the Company;

(d) prepay, in whole or in part, refinance, amend, modify or extend any mortgages or trust deeds affecting the assets of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or trust deeds;

(e) purchase liability and other insurance to protect the Company's property and business;

(f) hold and own Company real and personal properties in the name of the Company;

(g) invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(h) sell, exchange or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan as long as such disposition is not in violation of, or a cause of a default under, any other agreement to which the Company may be bound;

(i) execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes, negotiable instruments and other evidences of indebtedness obligating the Company to pay money to a third party; mortgages or deeds of trusts; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments and bills of sale; leases; and any other instruments or documents necessary or desirable to the business of the Company;

(j) endorse checks, drafts or other evidence of indebtedness to the Company for deposit into one of the Company's accounts;

(k) employ employees accountants, legal counsel, managing agents, tradesmen, contractors, subcontractors or other Persons to perform services for the Company;

(l) enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve;

(m) commence lawsuits and other proceedings on behalf of the Company; and

(n) Open bank accounts or securities accounts with licensed brokerage firms, trust companies, banks or other financial institutions and to deposit and manage cash and securities in those accounts and to transfer cash and securities at its discretion;

(o) do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Agreement or by the Manager, no Member (other than a Member acting as a Manager), attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it

liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the preceding sentence. Any Member who takes any action or binds the Company in violation of this Section 5.3 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company and the Manager harmless with respect to such loss or expense.

**4.4 Liability for Certain Acts.**  The Manager shall perform its duties as Manager in good faith, in a manner it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. *If the Manager so performs his or her duties as Manager he or she shall not have any liability by reason of being or having been a Manager of the Company.* The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence or willful misconduct by the Manager. The Manager does not, in any way, guarantee the return of the Member's Capital Contributions or a profit for the Members from the operations of the Company.

**4.5 Manager Has No Exclusive Duty to Company.**  The Manager shall not be required to manage the Company as his sole and exclusive function, and he or she may have other business interests and engage in activities in addition to those relating to the Company, including but not limited to activities that may be competitive with the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or any Member as a result of engaging in any other business interests or activities.

**4.6 Bank Accounts.**  The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall be a signatory thereon.

**4.7 Indemnity of the Manager.**  The Company must indemnify and hold harmless the Manager from and against all claims and demands to the maximum extent permitted under the Act as provided more fully in Article X.

**4.8 Reimbursement to Manager; Salaries.**  The Company shall reimburse the Manager for all ordinary, necessary, and direct expenses incurred by the Manager on behalf of the Company in carrying out the Company's business activities. The salaries and other compensation of the Manager will be fixed from time to time by the vote or written consent of at least a Majority Interest of the Members. No Manager is prevented from receiving such a salary or other compensation because the Manager is also a Member.

**4.9 Execution of Documents.**  Any document or instrument of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind the Company or convey or encumber title to its real or personal property shall be valid and binding for all purposes only if executed by the Manager.

BC003992

SEC-SDNY_EPROD-000005071

**4.10**     **Resignation.**  Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**4.11**     **Removal.**  Any Manager of the Company may be removed or replaced with or without Cause by the vote of Members who hold at least a majority of Membership Interests. The removal of a Manager who is also a Member will not affect the Manager's rights as a Member and will not constitute a withdrawal of the Member.

### ARTICLE V
### RIGHTS AND OBLIGATIONS OF MEMBERS

**5.1 Limitation of Liability.** The Member will not be personally liable for any obligations, liabilities, debts or losses of the Company, whether arising in tort, contract or otherwise, except as otherwise required by law.

**5.2 Right to Indemnification.** Subject to the limitations and conditions provided in this Article 5 and in the Act, each Person ("Indemnified Person") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he was or is a Member or an officer of the Company or he was or is the legal representative of or a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of a Member or of an officer of the Company, shall be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that his conduct was unlawful.

**5.3 Survival.** Indemnification under this Article 5 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 5 shall be deemed contract rights, and no amendment, modification or repeal of this Article 5 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

BC003993
SEC-SDNY_EPROD-000005072

**5.4 Advance Payment.** The right to indemnification conferred by this Article 5 shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article 5 and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Article 5 or otherwise.

**5.5 Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred by this Article 5 shall not be exclusive of any other right which a Person may have or hereafter acquire under any law (common or statutory), provision of the Articles of Organization or Operating Agreement, agreements, vote of members or otherwise.

**5.6 Savings Clause.** If Paragraph 5.2 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article 5 that shall not have been invalidated and to the fullest extent permitted by applicable law.

**5.7 Tax Matters Member** (Tax Matters Partner). The Company designates Hugh Dunkerly as Tax Matters Member (Tax Matters Partner), as defined in Code section 6231(a)(7) [26 U.S.C.A. § 6231(a)(7)], to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities, to expend Company monies to obtain necessary professional services in connection with such examinations, make necessary arrangements to file and pay all state and federal tax returns on behalf of the Company.

## ARTICLE VI CONTRIBUTIONS TO THE COMPANY

**6.1 Member's Initial Capital Contributions.** The Member agrees to contribute One Hundred Dollars ($100.00) as his Initial Capital Contribution to the Company.

**6.2 Subsequent Contributions.** The Member shall not be obligated to make any Capital Contributions to the Company other than those set forth in Paragraph 6.1.

**6.3 Loans by Members.** The Member may, but is not obligated to, loan to the Company such sums as the Member determines to be appropriate for the conduct of the Company's business. Any such loans shall bear interest at one percent (1%) above the prime rate of interest charged from time to time by the Federal Reserve Bank of San Francisco and shall be on such other terms as the Member may agree.

## ARTICLE VII ALLOCATIONS AND DISTRIBUTIONS

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

**7.1 Allocations of Profits and Losses.** All of the Net Profits and Net Losses of the Company for each Fiscal Year shall be allocated to the Member.

**7.2 Distributions of Cash Flow.** Cash Flow shall be distributed to the Member at such time or times as the Member shall determine in his sole discretion.

**7.3 Limitation upon Distributions.**

    **(a)**    No distribution or return of capital contributions may be made and paid if, after the distribution or return of a capital contribution, either:

        **(1)** the Company would be insolvent; or

        **(2)** the net assets of the Company would be less than zero.

    **(b)**    The Member may base a determination that a distribution or return of a capital contribution may be made under Paragraph 7.3(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

## ARTICLE VIII DISSOLUTION AND TERMINATION

**8.1 Dissolution.**

    **(a)**    The Company shall be dissolved upon the occurrence of any of the following events:

        **(1)** The entry of a decree of judicial dissolution under the Act;

        **(2)** the expiration of the term fixed pursuant to Paragraph 2.5 hereof;

        **(3)** by the written agreement of the Member; or

        **(4)** upon the death, retirement, resignation, court declaration of incompetence, bankruptcy or dissolution of the Member or the occurrence of any other event which terminates the continued membership of the Member.

    **(b)**    If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's Representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

**8.2 Winding Up, Liquidation and Distribution of Assets.**

    *(a)*    If the Company is dissolved and its affairs are to be wound up, the Member *(or his*

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

*Representative)* is directed to:

(1) sell or otherwise liquidate such of the Company's assets as may be required to discharge all liabilities of the Company, including any liabilities to the Member and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company; and

(2) distribute the remaining assets to the Member, such distribution to be made either in cash or in kind, as determined by the Member *(or his Representative)*.

(b) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**8.3 Articles of Dissolution.** When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets of the Company have been distributed, articles of dissolution, as required by the Act, shall be executed and filed with the Delaware Secretary of State.

**8.4 Effect of Filing of Articles of Dissolution.** Upon the filing of articles of dissolution with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Member *(or his Representative)* shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

## ARTICLE IX MISCELLANEOUS PROVISIONS

**9.1 Choice of Law.** This Operating Agreement, and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Delaware *(other than its conflicts of laws rules)* and specifically the Act.

**9.2 Amendments.** This Operating Agreement may not be amended except in writing signed by the Member.

**9.3 Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**9.4 Severability.** If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**9.5 Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

BC003996
SEC-SDNY_EPROD-000005075

**9.6 Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company or of the Member.

**ARTICLE X**
**INDEMNIFCIATION**

**10.1 Indemnity of the Manager.**

(a) Subject to the limitations and conditions provided in this Section, each Person ("Indemnified Person") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, or a Person of whom he is the legal representative, is or was a Manager of the Company or is or was serving as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another entity that is or was a Manager shall be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorney's fees) actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that his conduct was unlawful.

(b) To the extent that an Indemnified Person has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in (a) above, or in defense of any claim, issue or matter therein, he will be indemnified against expenses (including attorney's fees) actually and reasonably incurred in connection therewith.

(c) Any indemnification under this Section (unless ordered by a court) shall be made by the Company only as authorized in the specific case, upon a determination that indemnification is proper in the circumstances because he has met the applicable standard of conduct set forth therein. Such determination shall be made by the holders of a majority of the Percentage Interests held by Members who were not parties to or subjects of such threatened or actual Proceeding. If there are no disinterested Members, then the determination shall be made by the Company's independent legal counsel, whose fees must be paid by the Company.

(d) Indemnification under this Section shall continue as to an Indemnified Person who has ceased to serve in the capacity which initially entitled such Indemnified Person to indemnity hereunder. The rights granted pursuant to this Section shall be deemed contract rights, and no amendment, modification or repeal of this Section shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

(e) The right to indemnification conferred by this Section shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his good faith belief that he has met the standard of conduct necessary for indemnification under this Section and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Section or otherwise.

IN WITNESS WHEREOF, the Company and the Member have executed this Operating Agreement on the date first written above.

MEMBER:

**BOE CAPITAL LLC**

_____
By: Bevan Cooney
Its: Attorney in Fact

COMPANY:

**RSTP CAPITAL LLC**

_____
By: Hugh Dunkerley
Its: Manager

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC003998
SEC-SDNY_EPROD-000005077

RSTP Capital LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington DE 19801

February 11, 2014

To Whom It May Concern:

Please allow this letter to serve as confirmation for your records that RSTP Capital
LLC does not conduct business in the state of California.

Please do not hesitate to contact me should you have any further questions or
concerns.

Best Regards,

RSTP Capital LLC

Hugh Dunkerley
Manager

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC003999
SEC-SDNY_EPROD-000005078

**RSTP Capital LLC**
**(The "Company")**
**Delaware**

**Certified Resolution of the Company**

_____

I, Hugh Dunkerley, being the Manager of the Company, do hereby certify that at a meeting of the board of managers of the Company, held on February a, 2014, it was:

**RESOLVED THAT**, the person named below as signatory of the Company (the "Signatory"), is hereby authorized in the name and on behalf of the Company to open bank accounts at such banks as the Signatory chooses (the "Banks"), and to take all actions and sign all documents needed to open and maintain accounts with the Banks, and to deposit, withdraw, and/or transfer funds on deposit from the Banks.  Any action taken by the Signatory with respect to any of the matters stated above is hereby ratified and confirmed; and further

**RESOLVED THAT**, the Signatory of the Company shall be:

Hugh Dunkerley

**RESOLVED THAT**, these Resolutions, insofar as the Banks are concerned, shall continue in full force and effect until the Bank receives written notice from the Company of the changes, if any, therein.

Effective as of this February 1, 2014


_____
Hugh Dunkerley
President and Director

| | |
|---|---|
| Full Legal Name of Subscriber: | HSDC Capital Fund, LLC |
| Contact Person: | Karl K. Fooks |
| Address: | P.O. Box 2359 |
| City, State and Zip: | Honolulu, HI  96804 |
| Email Address: | karl.fooks@dbedt.hawaii.gov |
| Telephone Number: | (808) 587-3830 |
| Fax Number: | N/A |
| Subscriber's State/Nation of Domicile (for individuals) or Principal Place of Business (for entities): | Hawaii |
| Social Security or Tax Identification Number: | 99-0356813 |
| Subscription Amount: | US$5,000,000 |

## SUBSCRIPTION AGREEMENT

### for

### LIMITED PARTNERSHIP INTERESTS

### in

### MBLOOM FUND I, L.P.,

### a Hawaii Limited Partnership

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY NOR THE REGULATORY AUTHORITY OF ANY OTHER COUNTRY HAS APPROVED OR DISAPPROVED THIS SUBSCRIPTION AGREEMENT OR THE LIMITED PARTNERSHIP INTERESTS ("*PARTNERSHIP INTERESTS*") PROVIDED FOR HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), NOR UNDER THE SECURITIES LAWS OF ANY OTHER COUNTRY, AND THE COMPANY IS UNDER NO OBLIGATION TO REGISTER THE PARTNERSHIP INTERESTS UNDER THE SECURITIES ACT OR ANY SUCH OTHER LAWS IN THE FUTURE.

A PARTNERSHIP INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE PARTNERSHIP'S GENERAL PARTNER THAT SUCH REGISTRATION IS NOT REQUIRED.  HEDGING TRANSACTIONS INVOLVING A PARTNERSHIP INTEREST MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF PARTNERSHIP INTERESTS ARE CONTAINED IN THE PARTNERSHIP'S LIMITED PARTNERSHIP AGREEMENT.

BASED UPON THE FOREGOING, EACH ACQUIROR OF A PARTNERSHIP INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.  SUBSCRIBERS ARE ENCOURAGED TO SEEK INDEPENDENT LEGAL, ACCOUNTING, INVESTMENT AND TAX ADVICE REGARDING THEIR INDIVIDUAL CIRCUMSTANCES AND FINANCIAL OBJECTIVES IN DETERMINING WHETHER TO SUBSCRIBE FOR A PARTNERSHIP INTEREST IN THE PARTNERSHIP.

291472.2

BC004001
SEC-SDNY_EPROD-000005080

**MBLOOM FUND I, L.P.,**
a Hawaii Limited Partnership

## SUBSCRIPTION AGREEMENT

TO:     mbloom Ventures, LLC
          77 Ho'okele Street, Unit 101
          Kahului, HI 96732

Ladies and Gentlemen:

You have informed the undersigned ("*Subscriber*") that mbloom Fund I, L.P., a Hawaii limited partnership (the "*Partnership*"), has been formed pursuant to the Hawaii Uniform Limited Partnership Act, as amended (the "*Act*"); that the General Partner of the Partnership is mbloom Ventures, LLC, a Hawaii limited liability company (the "*General Partner*"); and that the Partnership will be governed by, and operated in accordance with, its Limited Partnership Agreement which, as of the time of Subscriber's admission into the Partnership, will be identical in all material respects to the form of such Limited Partnership Agreement (including any amendments) made available to Subscriber prior to Subscriber's execution of this Subscription Agreement (such Limited Partnership Agreement, the "*Partnership Agreement*"). Capitalized terms not defined herein are defined in the Partnership Agreement. All references to section numbers are to this Subscription Agreement unless otherwise indicated.

1.     <u>Subscription</u>. Subject to the terms and conditions of this Subscription Agreement, Subscriber hereby subscribes (the "*Subscription*") for a Partnership Interest in the Partnership (the "*Partnership Interest*").

2.     <u>Acceptance of Subscription; Obligations under Partnership Agreement</u>.

(a)     The General Partner, acting on behalf of the Partnership, may accept or reject the Subscription in the General Partner's sole and absolute discretion. If the Subscription is accepted, the General Partner will cause Subscriber to be admitted into the Partnership as a Limited Partner and execute the Partnership Agreement as Subscriber's attorney-in-fact pursuant to *Section 13(a)*. In connection with such acceptance and admission, the General Partner (acting in its sole and absolute discretion) will determine the amount of Subscriber's Capital Commitment; *provided, however*, that such amount will not in any event exceed the amount set forth below as the "*Subscription Amount*."

(b)     Subscriber hereby ratifies, adopts and accepts the Partnership Agreement. If Subscriber is admitted as a Limited Partner pursuant to *Section 2(a)*, Subscriber will be bound by the Partnership Agreement and will duly satisfy all of Subscriber's obligations arising thereunder. Without limitation on the preceding sentence, in the event Subscriber fails to make payments in respect of its Capital Commitment when due, Subscriber will be subject to strict enforcement of the default provisions set forth in the Partnership Agreement.

(c)     If Subscriber deposits funds with the Partnership's legal counsel or an escrow agent in anticipation of Subscriber's initial capital contribution (if required under the Partnership Agreement), and Subscriber is admitted into the Partnership as a Limited Partner, any interest that accrues on such funds will be paid over to the Partnership and treated as a capital contribution to the Partnership in respect of Subscriber's Capital Commitment. If Subscriber is not admitted into the Partnership, such interest will be paid over to Subscriber.

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

3.    Closing.    Subject to **Section 10**, Subscriber's admission into the Partnership in accordance with the terms of this Subscription Agreement (the "**Closing**") will occur at such time (the "**Closing Time**") and place as is determined by the General Partner.

4.    Representations as to Investor Status.    Subscriber has carefully reviewed, completed and signed, or caused its authorized representative to sign, **Exhibit A** attached hereto and makes each of the representations set forth therein and such representations are true and correct in all respects.

5.    Other Representations and Warranties of Subscriber.    Subscriber hereby represents and warrants to the General Partner and the Partnership as follows:

(a)    Subscriber is acquiring the Partnership Interest for Subscriber's own account for investment, with no intention of distributing or reselling any portion thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), and will not transfer the Partnership Interest in violation of the Securities Act or the then applicable rules or regulations thereunder or any other applicable law.  No one other than Subscriber has any interest in or any right to acquire any portion of the Partnership Interest or any interest in the Subscription.  Subscriber hereby confirms and makes all of the representations and warranties of a Limited Partner set forth in the Partnership Agreement. Subscriber understands and acknowledges that the Partnership will have no obligation to recognize the ownership, beneficial or otherwise, of the Partnership Interest by anyone other than Subscriber, except as provided in the Partnership Agreement.

(b)    Subscriber is able to bear the financial and other risks of holding the Partnership Interest for an indefinite period of time and the risk of loss of Subscriber's entire investment in the Partnership.  Subscriber has such knowledge and experience in financial and business matters that Subscriber is capable of evaluating the merits and risks of acquiring the Partnership Interest and of making an informed investment decision with respect thereto.

(c)    Subscriber has reviewed and understands the confidential offering materials prepared by the Partnership related to this Subscription (the "**Offering Materials**"), the Partnership Agreement, and this Subscription Agreement.  For purposes of the preceding sentence, the Offering Materials and the Partnership Agreement means the most recent versions of such documents that were made available to Subscriber through the time immediately prior to the execution of this Subscription Agreement.  In addition, Subscriber acknowledges that: (i) there may be material differences between the descriptions of Partnership terms and conditions in the Offering Materials and the actual terms and conditions set forth in the Partnership Agreement; (ii) Subscriber has reviewed Schedule 5(c) annexed hereto which has been prepared by the Partnership and sets forth in reasonable detail the material differences (if any) between the Offering Materials presented and the final Partnership Agreement; and (iii) in the event of such differences, the terms and conditions of the Partnership Agreement will supersede any contrary information set forth in the Offering Materials.

(d)    Subscriber acknowledges and agrees that, except as set forth in the Partnership Agreement, the Offering Materials, this Subscription Agreement, or an additional written document (executed by a member or officer of the General Partner) which clearly and explicitly indicates that Subscriber is entitled to rely thereon, Subscriber has neither received, nor is entitled to rely upon, any representations or warranties from the Partnership, the General Partner, or any partner, member, officer, employee, attorney, or agent thereof.  Subject to the preceding sentence: (i) the General Partner and its members or officers have made available all additional information which Subscriber has requested in connection with the transactions contemplated by the Partnership Agreement, the Offering Materials and this Subscription Agreement; (ii) Subscriber has been provided the opportunity to ask questions of and receive answers from the General Partner and its members or officers concerning the terms and conditions

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004003

SEC-SDNY_EPROD-000005082

of the Partnership Agreement and this Subscription Agreement and the purchase of the Partnership Interest; and (iii) Subscriber has been provided the opportunity to obtain any additional information (to the extent the General Partner had such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of information otherwise furnished by the General Partner, its members or its officers.  Subscriber has investigated the acquisition of the Partnership Interest to the extent Subscriber deemed necessary or desirable and the General Partner has provided Subscriber with any assistance Subscriber has requested in connection therewith.

(e)     Subscriber is aware that Subscriber's rights and ability to transfer the Partnership Interest are restricted by the Securities Act, applicable state securities laws, the laws of other jurisdictions, the Partnership Agreement and the absence of a market for the Partnership Interests.  Subscriber further understands that: (i) the Partnership does not intend, and is not required, to register the Partnership Interests under the Securities Act; and (ii) except as provided in the Partnership Agreement, Subscriber will have no right to withdraw from the Partnership or to receive distributions in liquidation of its Partnership Interest.

(f)     Subscriber understands that Subscriber's Partnership Interest will not be evidenced by a certificate subject to Article 8 of the Uniform Commercial Code.

(g)     Subscriber understands that the Offering Materials, the Partnership Agreement and this Subscription Agreement do not purport to satisfy the "prospectus" requirements that would apply to the issuance of the Partnership Interest if the offering of the Partnership Interest were a "public offering" within the meaning of the Securities Act.  Subscriber is not acquiring the Partnership Interest as a result of, or in reliance on, any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or any other general solicitation regarding the offering of Partnership Interests conducted by the General Partner or any of its partners, members, officers, employees or agents.

(h)     Subscriber has full power and authority or full capacity, as applicable, to execute, deliver and satisfy its obligations under the Partnership Agreement and this Subscription Agreement, and such actions will not cause Subscriber to be in breach or violation of any contractual, legal or regulatory duty or obligation.

(i)     Subscriber understands that no governmental agency has made any finding or determination as to the fairness of the terms of the offering and sale of the Partnership Interest or of the Partnership Agreement.

(j)     Subscriber is not relying on the Partnership, the General Partner or any of their partners, members, officers, employees, attorneys, agents or representatives for legal, accounting, investment or tax advice, and Subscriber has sought independent legal, accounting, investment and tax advice to the extent Subscriber has deemed necessary or appropriate in connection with Subscriber's decision to subscribe for the Partnership Interest.

(k)     To the best of Subscriber's knowledge, the money to be contributed in respect of Subscriber's Capital Commitment is not related to, or derived from, any activities that would be illegal under United States law or the laws of any individual state.

6.     Representations and Warranties of the Partnership.  Upon the General Partner's execution of the Partnership Agreement on behalf of Subscriber, the Partnership will be deemed to make the following representations and warranties.  As of the Closing Time:

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004004

SEC-SDNY_EPROD-000005083

(a)     The Partnership is validly existing and in good standing as a limited partnership under the laws of the State of Hawaii, and has all requisite power and authority to carry on its business as described in the Offering Materials.  The General Partner is validly existing and in good standing as a limited liability company under the laws of the State of Hawaii.  The General Partner has all requisite power and authority to act as the General Partner of the Partnership.

(b)     The Partnership has full power and authority to execute, deliver and satisfy its obligations under this Subscription Agreement, and such actions will not cause the Partnership to be in breach or violation of any material contractual, legal or regulatory duty or obligation.  The General Partner has full power and authority to execute, deliver and satisfy its obligations under the Partnership Agreement, and such actions will not cause the General Partner to be in breach or violation of any material contractual, legal or regulatory duty or obligation.

(c)     Neither the Partnership nor anyone acting on its behalf has knowingly taken or will take any action that would subject the issuance and sale of the Partnership Interest to the registration requirements of the Securities Act.

(d)     The Partnership is not required to register as an "investment company" under the Investment Company Act.

(e)     There is no action, proceeding or investigation pending or, to the knowledge of the General Partner or the Partnership, threatened against the General Partner or the Partnership.

(f)     All of the disclosures included in the Offering Materials furnished by or on behalf of the Partnership to the Subscriber regarding the Partnership and the transactions contemplated hereby, are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  The Partnership acknowledges and agrees that the Subscriber does not make and has not made any representations or warranties with respect to his or its investment in the Partnership or any other transaction contemplated hereby other than those specifically set forth in **Section 5** hereof.

(g)     Assuming the accuracy of the Subscriber's representations and warranties set forth in **Section 5**, neither the Partnership, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Partnership Interests to be integrated with prior offerings by the Partnership for purposes of the Securities Act which would require the registration of any such securities under the Securities Act.

7.     Accuracy of Information.

(a)     Subscriber hereby undertakes that the representations and warranties made by Subscriber and the information provided by Subscriber in this Subscription Agreement are true and accurate as of the date of this Subscription Agreement and, except as may be set forth in a written notice (which describes any discrepancy in reasonable detail) actually received by the General Partner (via the means and at the address set forth therefor in **Section 12(b)**) prior to the Closing, will be true and accurate at all times through the Closing Time.  Without limiting the duties of Subscriber under the foregoing provisions of this **Section 7** or otherwise limiting the rights of the General Partner and the Partnership: (i) Subscriber will immediately notify the General Partner in writing in the event that, at any time prior to the Closing Time, any representation, warranty or other information described in this **Section 7** fails to be true and accurate; and (ii) if the General Partner receives from Subscriber within seven days after the

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004005

SEC-SDNY_EPROD-000005084

Closing Time any notice described in this **Section 7**, the General Partner may, in its sole and absolute discretion, rescind Subscriber's admission into the Partnership.

(b)     The Partnership hereby undertakes that the representations and warranties made by the Partnership and the information provided by the Partnership in this Subscription Agreement are true and accurate as of the date of this Subscription Agreement and, except as may be set forth in a written notice (which describes any discrepancy in reasonable detail) actually received by the Subscriber via the means and at the Subscriber's address set forth herein prior to the Closing, will be true and accurate at all times through the Closing Time. Without limiting the duties of the Partnership under the foregoing provisions of this **Section 7(b)** or otherwise limiting the rights of the Subscriber, (i) the Partnership will immediately notify the Subscriber in writing in the event that, at any time prior to the Closing Time, any representation, warranty or other information described in this **Section 7(b)** fails to be true and accurate; and (ii) if the Subscriber receives from the Partnership within seven days after the Closing Time any notice described in this **Section 7(b)**, the Subscriber may rescind its investment in the Partnership and receive a full refund of 100% of such Subscriber's Capital Contribution and Subscription Amount investment in the Partnership, without interest or deduction.

8.      Indemnification. Each of the Partnership and the Subscriber acknowledges that the other party will rely upon the representations, warranties and other information as set forth in this Subscription Agreement, as well as in any notices provided under **Section 7**, in determining whether Subscriber should invest in the Partnership or be admitted into the Partnership. Accordingly, each of the Subscriber, on one hand, and the Partnership, on the other hand (as applicable, an "**Indemnifying Party**"), agrees to and will indemnify and hold harmless the other party, the General Partner (if applicable) and each partner, member, officer, employee, attorney, agent and other Affiliate of each of them (as applicable, each an "**Indemnified Party**"), to the extent permitted by law, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of an Indemnifying Party or any other inaccuracy of an Indemnifying Party contained in this Subscription Agreement or any notice of an Indemnifying Party provided under **Section 7**. Notwithstanding any provision of the Partnership Agreement to the contrary, all representations, warranties and covenants contained in this Subscription Agreement will survive the execution and delivery of this Subscription Agreement and the admission of Subscriber as a Limited Partner into the Partnership.

9.      Transferability.   The rights and obligations of Subscriber under this Subscription Agreement are not transferable.

10.     No Revocation. The Subscription may be revoked solely by means of a written notice of revocation executed by Subscriber and actually received by the General Partner via the means and at the address set forth therefor in **Section 12**. Such notice of revocation will become effective at the latest to occur of: (a) the 30th day following the date of such actual receipt by the General Partner; and (b) any later effective date specified in such notice. Notwithstanding the foregoing, the Subscription will not in any event be revoked if it has been accepted, in whole or in part, by the General Partner prior to the effectiveness of such notice.

11.     Termination of Agreement.  If the Subscription is revoked pursuant to **Section 10** or rejected in full by the General Partner, this Subscription Agreement will thereafter be deemed terminated and without further force or effect.

12.     Notices, Consents, Elections, Etc.   All notices, consents, agreements, elections, acceptances, amendments, and approvals provided for or permitted by this Subscription Agreement will be in writing. Without limitation on the preceding sentence, acceptance of the Subscription will occur only pursuant to a written document executed by the General Partner. For purposes of the following

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004006

SEC-SDNY_EPROD-000005085

provisions of this *Section 12*, the term "notice" will be deemed to include any notice, statement, document, report, consent or similar item required or permitted to be provided to one or more Persons under this Subscription Agreement or applicable law.

(a)    *Notice to Subscriber*.    Except as otherwise specifically provided in this Subscription Agreement, notice to Subscriber will be deemed duly given upon the earliest to occur of the following: (i) personal delivery to Subscriber at the address set forth below, or at any other address which Subscriber has provided to the General Partner for purposes of this *Section 12(a)*; (ii) the Close of Business on the second day after being deposited in the United States mail, registered or certified, postage prepaid and addressed to Subscriber at the address set forth below, or at any other address which Subscriber has provided to the General Partner for purposes of this *Section 12(a)*; (iii) the Close of Business on the first business day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid, addressed as provided in the preceding clause, and marked for next business day delivery; (iv) at the time of transmission by electronic mail; or (v) at the time of transmission by facsimile, transmitted to Subscriber at its facsimile number specified herein, with confirmation of receipt made by printed confirmation sheet verifying successful transmission of the facsimile.

(b)    *Notice to the General Partner*.    Except as otherwise specifically provided in this Subscription Agreement, notice to the General Partner will be deemed duly given when clearly identified as such and duly given to the General Partner in accordance with the procedures set forth in *Section 12(a)*.    For purposes of the preceding sentence, the General Partner's address initially will be 77 Ho'okele Street, Unit 101, Kahului, Hawaii 96732 (fax: 808-298-0450).

13.    Power of Attorney.

(a)    Subscriber hereby grants to the General Partner a special power of attorney, making, constituting and appointing the General Partner as Subscriber's attorney-in-fact, with full power and authority to act in Subscriber's name and on Subscriber's behalf to execute, acknowledge and swear to the execution, acknowledgment and filing of the Certificate of Limited Partnership and the Partnership Agreement as well as any other documents as are necessary to create, operate, dissolve or liquidate the Partnership in accordance with the terms of the Partnership Agreement and this Subscription Agreement. In the event of conflict between the Partnership Agreement and any other document executed, acknowledged or filed pursuant to this power of attorney, the Partnership Agreement will control.

(b)    This special power of attorney is a special power of attorney coupled with an interest, is irrevocable, and will survive the death or legal incapacity of Subscriber.

14.    Miscellaneous.    Subscriber will pay Subscriber's own expenses relating to this Subscription Agreement and the transactions contemplated hereby.    Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of Subscriber and the Partnership.    This Subscription Agreement may be executed in any number of counterparts, each of which will be an original but all of which taken together will constitute one agreement.    Electronically transmitted signature pages or facsimile copies of original signature pages will be deemed to be, and will be legally effective as, originally signed signature pages for all purposes of this Subscription Agreement.    This Subscription Agreement and all amendments hereto will be governed by and interpreted and enforced in accordance with the laws of the State of Hawaii as such laws are applied to agreements entered into and to be performed entirely within Hawaii by Hawaii residents, without giving effect to principles of conflict of laws or the choice of law rules of any jurisdiction to the extent that the application of the laws of any jurisdiction other than the laws of the State of Hawaii would be required or permitted thereby.    To the extent permitted by the Act and other applicable law, the provisions

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004007

SEC-SDNY_EPROD-000005086

of this Subscription Agreement will supersede any contrary provisions of the Act or other applicable law. In the event any provision of this Subscription Agreement is determined to be invalid or unenforceable, such provision will be deemed severed from the remainder of this Subscription Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and will not cause the invalidity or unenforceability of the remaining portion of this Subscription Agreement.  The headings in this Subscription Agreement are for convenience of reference, and will not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

*(Remainder of this page left blank intentionally; signature pages follow.)*

291472.2

7

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004008
SEC-SDNY_EPROD-000005087

mbloom Fund I, L.P.

CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

Dated:      December 20, 2013

HSDC CAPITAL FUND, LLC
Entity Name (Full Legal Name)

Hawaii limited liability company
Entity Type and Jurisdiction of Formation

By:  HAWAII STRATEGIC DEVELOPMENT
     CORPORATION, a public body corporate and
     politic and an instrumentality and agency of the
     State of Hawaii, its Managing Member

By:  _____
        Signature

Karl K. Fooks, President
Signing Individual's Printed Name/Title

(808) 587-3830
Telephone Number

karl.fooks@dbedt.hawaii.gov
Email Address

US$5,000,000.00
Capital Commitment
(Subscription Amount)

Business Address:

250 S. Hotel Street #508
Number and Street

Honolulu, HI 96813
City/State/Country/Zip Code

Approved as to form this 30th day of
December 2013 by:

_____
Gregg J. Kinkley
Deputy Attorney General

Mailing Address (if different):

P.O. Box 2359
Number and Street

Honolulu, HI 96804
City/State/Country/Zip Code

99-0356813
Federal Taxpayer I.D. Number of Subscriber

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

mbloom Fund I, L.P.

### GENERAL PARTNER SIGNATURE PAGE

Subscriber Name: _____HSDC CAPITAL FUND, LLC_____

Series of Partnership Interest: US$2,000,000 - Series A; US$3,000,000 - Series B

Closing Time:

        Month: _Dec._____

        Day: _30_____

        Year: 2013

        Time: _12_ [a.m. / (p.m.)]

Effective as of the Closing Time:

    1.    The undersigned, acting in its capacity as the General Partner of the Partnership, hereby agrees to the foregoing, accepts the Subscription, and hereby admits Subscriber into the Partnership as a Limited Partner with respect to the Series of Partnership Interests specified above.

    2.    The General Partner's execution of the Partnership Agreement is hereby deemed to have been made, in part, as attorney-in-fact on behalf of Subscriber.

    3.    Subscriber's Capital Commitment into the Partnership is hereby deemed to equal US$5,000,000, which amount will be set forth as Subscriber's Capital Commitment on Schedule A to the Partnership Agreement.

    Executed this _30_ day of _December_ 2013

                    **MBLOOM VENTURES, LLC,**
                    a Hawaii limited liability company

                    By: _____

                    Name: Arben Kryezu

                    Title: President

291472.2

BC004010
SEC-SDNY_EPROD-000005089

EXHIBIT A

ACCREDITED INVESTOR CERTIFICATION

(attached hereto)

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

MBLOOM FUND I, L.P.

ACCREDITED INVESTOR CERTIFICATION

The undersigned (hereinafter, "**Subscriber**") hereby represents and warrants that Subscriber is an "accredited investor" under Section 501(a) of Regulation D promulgated under Section 4(a)(2) of the Securities Act of 1933, as amended (the "**Act**"), because Subscriber is (initial all applicable sections):

FOR INDIVIDUALS ONLY:

1.   I hereby certify that I am an accredited investor because I am an individual whose net worth, or joint net worth with my spouse, exceeds $1,000,000.  For purposes of this questionnaire, "net worth" means the excess of total assets,[1] at fair market value, over total liabilities.

Initial

2.   I hereby certify that I am an accredited investor because I am an individual whose individual income[2] (*i.e.*, exclusive of any income attributable to my spouse) exceeds $200,000 in each of the two most recent years, and I reasonably expect to reach the same income level in the current year.

Initial

3.   I hereby certify that I am an accredited investor because I am an individual whose joint income (*i.e.*, inclusive of any income attributable to my spouse) exceeds $300,000 in each of the two most recent years, and I reasonably expect to reach the same income level in the current year.

Initial

FOR CORPORATIONS, PARTNERSHIPS OR BUSINESS TRUSTS:

  4.   I hereby certify that I am an accredited investor because I am a corporation, partnership, or business trust, which has total assets in excess of $5,000,000 and was not formed for the specific purpose of acquiring the subject Partnership Interest.

Initial

---

[1]  Notwithstanding anything to the contrary herein, for purposes of determining "*net worth*" (1) the primary residence owned by an individual must be excluded from the net worth calculation, (2) the related amount of indebtedness secured by the primary residence up to the fair market value of that residence may also be excluded from the calculation, and (3) indebtedness secured by the primary residence in excess of the fair market value of that residence should be considered a liability and deducted from the Subscriber's net worth.

[2]  For purposes of this questionnaire, *individual income* means adjusted gross income, as reported for Federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (not including amounts attributable to a spouse or a spouse's property):  (a) the amount of any tax-exempt interest income under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), received; (b) the amount of losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040; (c) any deduction claimed for depletion under Section 611, *et seq.* of the Code; (d) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan; (e) alimony paid; and (f) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code.

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004012

SEC-SDNY_EPROD-000005091

5.  I hereby certify that I am an accredited investor because I am an entity where all of its equity owners are accredited investors.  Please attach a separate sheet listing all equity owners and setting forth the bases for the representation that they are accredited investors.

Initial

## FOR TRUSTS (OTHER THAN BUSINESS TRUSTS):

6.  I hereby certify that I am an accredited investor because I have total assets in excess of $5,000,000, was not formed for the specific purpose of acquiring the subject Partnership Interest and its purchase is directed by a sophisticated person (a "sophisticated person" is one who has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment).

Initial

7.  I hereby certify that I am an accredited investor because I am (i) a bank as defined in Section 3(a)(2) of the Act, (ii) acting in its fiduciary capacity as trustee, and (iii) subscribing for the purchase of the securities being offered on behalf of a trust.

Initial

8.  I hereby certify that I am an accredited investor because I am a revocable trust which may be amended or revoked at any time by the grantors thereof, and all of the grantors are accredited investors under either (a) Section 1 above ($1,000,000 net worth) (b) Section 2 above ($200,000 individual income), or (c) Section 3 above ($300,000 joint income).

Initial

## FOR OTHER INSTITUTIONS:

9.  I hereby certify that I am an accredited investor because I am a bank, as defined in Section 3(a)(2) of the Act, or savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Act.

Initial

10.  I hereby certify that I am an accredited investor because I am an insurance company as defined in Section 2(13) of the Act.

Initial

11.  I hereby certify that I am an accredited investor because I am a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

Initial

12.  I hereby certify that I am an accredited investor because I am an investment company registered under the Investment Partnership Act of 1940 or a business development company as defined in Section 2(a)(48) of said Investment Partnership Act of 1940.

Initial

291472.2

☐ 
Initial

13. I hereby certify that I am an accredited investor because I am a Small Business Investment Partnership licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐ 
Initial

14. I hereby certify that I am an accredited investor because I am a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940 (the "Investment Advisers Act").

**IN WITNESS WHEREOF,** the undersigned has completed and executed this Accredited Investor Certification on the date set forth below, and declares that it is truthful and correct.

Executed at Honolulu, Hawaii on December 20 2013.
　　　　　　　(City and State)　　　　　　　　(Date)

**FOR INDIVIDUALS:**

_____       _____
Signature of Subscriber (Individual)            Signature of Co-Subscriber (Individual)


_____       _____
Printed Name of Subscriber                      Printed Name of Co-Subscriber


**FOR ENTITIES:**


HSDC CAPITAL FUND, LLC
Entity Name (Full Legal Name)

Hawaii limited liability company
Entity Type and Jurisdiction of Formation

By:  Hawaii Strategic Development Corporation
　　　Its Managing Member

By: _____
　　　Signature

Karl K. Fooks, President
Signing Individual's Printed Name/Title


291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004014
SEC-SDNY_EPROD-000005093

| | |
|---|---|
| Full Legal Name of Subscriber: | RSTP Capital, LLC |
| Contact Person: | Devon Archer |
| Address: | 401 Greenwich St., Suite 300 |
| City, State and Zip: | New York, NY 10013 |
| Email Address: | darcher@rosemontcapital.com |
| Telephone Number: | 212-933-9974 |
| Fax Number: | 212-933-9975 |
| Subscriber's State/Nation of Domicile (for individuals) or Principal Place of Business (for entities): | Limited Liability Company of Delaware |
| Social Security or Tax Identification Number: | |
| Subscription Amount: | $5,000,000 |

## SUBSCRIPTION AGREEMENT

### for

## LIMITED PARTNERSHIP INTERESTS

### in

## MBLOOM FUND I, L.P.,

### a Hawaii Limited Partnership

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY NOR THE REGULATORY AUTHORITY OF ANY OTHER COUNTRY HAS APPROVED OR DISAPPROVED THIS SUBSCRIPTION AGREEMENT OR THE LIMITED PARTNERSHIP INTERESTS ("*PARTNERSHIP INTERESTS*") PROVIDED FOR HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), NOR UNDER THE SECURITIES LAWS OF ANY OTHER COUNTRY, AND THE COMPANY IS UNDER NO OBLIGATION TO REGISTER THE PARTNERSHIP INTERESTS UNDER THE SECURITIES ACT OR ANY SUCH OTHER LAWS IN THE FUTURE.

A PARTNERSHIP INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE PARTNERSHIP'S GENERAL PARTNER THAT SUCH REGISTRATION IS NOT REQUIRED. HEDGING TRANSACTIONS INVOLVING A PARTNERSHIP INTEREST MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF PARTNERSHIP INTERESTS ARE CONTAINED IN THE PARTNERSHIP'S LIMITED PARTNERSHIP AGREEMENT.

BASED UPON THE FOREGOING, EACH ACQUIROR OF A PARTNERSHIP INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME. SUBSCRIBERS ARE ENCOURAGED TO SEEK INDEPENDENT LEGAL, ACCOUNTING, INVESTMENT AND TAX ADVICE REGARDING THEIR INDIVIDUAL CIRCUMSTANCES AND FINANCIAL OBJECTIVES IN DETERMINING WHETHER TO SUBSCRIBE FOR A PARTNERSHIP INTEREST IN THE PARTNERSHIP.

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

**MBLOOM FUND I, L.P.,**
a Hawaii Limited Partnership

## SUBSCRIPTION AGREEMENT

TO:     mbloom Ventures, LLC
        77 Ho'okele Street, Unit 101
        Kahului, HI 96732

Ladies and Gentlemen:

You have informed the undersigned ("***Subscriber***") that mbloom Fund I, L.P., a Hawaii limited partnership (the "***Partnership***"), has been formed pursuant to the Hawaii Uniform Limited Partnership Act, as amended (the "***Act***"); that the General Partner of the Partnership is mbloom Ventures, LLC, a Hawaii limited liability company (the "***General Partner***"); and that the Partnership will be governed by, and operated in accordance with, its Limited Partnership Agreement which, as of the time of Subscriber's admission into the Partnership, will be identical in all material respects to the form of such Limited Partnership Agreement (including any amendments) made available to Subscriber prior to Subscriber's execution of this Subscription Agreement (such Limited Partnership Agreement, the "***Partnership Agreement***"). Capitalized terms not defined herein are defined in the Partnership Agreement. All references to section numbers are to this Subscription Agreement unless otherwise indicated.

1.      <u>Subscription.</u>  Subject to the terms and conditions of this Subscription Agreement, Subscriber hereby subscribes (the "***Subscription***") for a Partnership Interest in the Partnership (the "***Partnership Interest***").

2.      <u>Acceptance of Subscription; Obligations under Partnership Agreement.</u>

(a)     The General Partner, acting on behalf of the Partnership, may accept or reject the Subscription in the General Partner's sole and absolute discretion. If the Subscription is accepted, the General Partner will cause Subscriber to be admitted into the Partnership as a Limited Partner and execute the Partnership Agreement as Subscriber's attorney-in-fact pursuant to ***Section 13(a)***. In connection with such acceptance and admission, the General Partner (acting in its sole and absolute discretion) will determine the amount of Subscriber's Capital Commitment; *provided, however,* that such amount will not in any event exceed the amount set forth below as the "***Subscription Amount***."

(b)     Subscriber hereby ratifies, adopts and accepts the Partnership Agreement. If Subscriber is admitted as a Limited Partner pursuant to ***Section 2(a)***, Subscriber will be bound by the Partnership Agreement and will duly satisfy all of Subscriber's obligations arising thereunder. Without limitation on the preceding sentence, in the event Subscriber fails to make payments in respect of its Capital Commitment when due, Subscriber will be subject to strict enforcement of the default provisions set forth in the Partnership Agreement.

(c)     If Subscriber deposits funds with the Partnership's legal counsel or an escrow agent in anticipation of Subscriber's initial capital contribution (if required under the Partnership Agreement), and Subscriber is admitted into the Partnership as a Limited Partner, any interest that accrues on such funds will be paid over to the Partnership and treated as a capital contribution to the Partnership in respect of Subscriber's Capital Commitment. If Subscriber is not admitted into the Partnership, such interest will be paid over to Subscriber.

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004016

SEC-SDNY_EPROD-000005095

3.      Closing.     Subject to **Section 10**, Subscriber's admission into the Partnership in accordance with the terms of this Subscription Agreement (the "**Closing**") will occur at such time (the "**Closing Time**") and place as is determined by the General Partner.

4.      Representations as to Investor Status.  Subscriber has carefully reviewed, completed and signed, or caused its authorized representative to sign, **Exhibit A** attached hereto and makes each of the representations set forth therein and such representations are true and correct in all respects.

5.      Other Representations and Warranties of Subscriber.  Subscriber hereby represents and warrants to the General Partner and the Partnership as follows:

(a)     Subscriber is acquiring the Partnership Interest for Subscriber's own account for investment, with no intention of distributing or reselling any portion thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), and will not transfer the Partnership Interest in violation of the Securities Act or the then applicable rules or regulations thereunder or any other applicable law.  No one other than Subscriber has any interest in or any right to acquire any portion of the Partnership Interest or any interest in the Subscription.  Subscriber hereby confirms and makes all of the representations and warranties of a Limited Partner set forth in the Partnership Agreement. Subscriber understands and acknowledges that the Partnership will have no obligation to recognize the ownership, beneficial or otherwise, of the Partnership Interest by anyone other than Subscriber, except as provided in the Partnership Agreement.

(b)     Subscriber is able to bear the financial and other risks of holding the Partnership Interest for an indefinite period of time and the risk of loss of Subscriber's entire investment in the Partnership.   Subscriber has such knowledge and experience in financial and business matters that Subscriber is capable of evaluating the merits and risks of acquiring the Partnership Interest and of making an informed investment decision with respect thereto.

(c)     Subscriber has reviewed and understands the confidential offering materials prepared by the Partnership related to this Subscription (the "**Offering Materials**"), the Partnership Agreement, and this Subscription Agreement.  For purposes of the preceding sentence, the Offering Materials and the Partnership Agreement means the most recent versions of such documents that were made available to Subscriber through the time immediately prior to the execution of this Subscription Agreement.  In addition, Subscriber acknowledges that: (i) there may be material differences between the descriptions of Partnership terms and conditions in the Offering Materials and the actual terms and conditions set forth in the Partnership Agreement; (ii) Subscriber has reviewed Schedule 5(c) annexed hereto which has been prepared by the Partnership and sets forth in reasonable detail the material differences (if any) between the Offering Materials presented and the final Partnership Agreement; and (iii) in the event of such differences, the terms and conditions of the Partnership Agreement will supersede any contrary information set forth in the Offering Materials.

(d)     Subscriber acknowledges and agrees that, except as set forth in the Partnership Agreement, the Offering Materials, this Subscription Agreement, or an additional written document (executed by a member or officer of the General Partner) which clearly and explicitly indicates that Subscriber is entitled to rely thereon, Subscriber has neither received, nor is entitled to rely upon, any representations or warranties from the Partnership, the General Partner, or any partner, member, officer, employee, attorney, or agent thereof.  Subject to the preceding sentence: (i) the General Partner and its members or officers have made available all additional information which Subscriber has requested in connection with the transactions contemplated by the Partnership Agreement, the Offering Materials and this Subscription Agreement; (ii) Subscriber has been provided the opportunity to ask questions of and receive answers from the General Partner and its members or officers concerning the terms and conditions

291472.2                                      2

BC004017

SEC-SDNY_EPROD-000005096

of the Partnership Agreement and this Subscription Agreement and the purchase of the Partnership Interest; and (iii) Subscriber has been provided the opportunity to obtain any additional information (to the extent the General Partner had such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of information otherwise furnished by the General Partner, its members or its officers. Subscriber has investigated the acquisition of the Partnership Interest to the extent Subscriber deemed necessary or desirable and the General Partner has provided Subscriber with any assistance Subscriber has requested in connection therewith.

(e) Subscriber is aware that Subscriber's rights and ability to transfer the Partnership Interest are restricted by the Securities Act, applicable state securities laws, the laws of other jurisdictions, the Partnership Agreement and the absence of a market for the Partnership Interests. Subscriber further understands that: (i) the Partnership does not intend, and is not required, to register the Partnership Interests under the Securities Act; and (ii) except as provided in the Partnership Agreement, Subscriber will have no right to withdraw from the Partnership or to receive distributions in liquidation of its Partnership Interest.

(f) Subscriber understands that Subscriber's Partnership Interest will not be evidenced by a certificate subject to Article 8 of the Uniform Commercial Code.

(g) Subscriber understands that the Offering Materials, the Partnership Agreement and this Subscription Agreement do not purport to satisfy the "prospectus" requirements that would apply to the issuance of the Partnership Interest if the offering of the Partnership Interest were a "public offering" within the meaning of the Securities Act. Subscriber is not acquiring the Partnership Interest as a result of, or in reliance on, any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or any other general solicitation regarding the offering of Partnership Interests conducted by the General Partner or any of its partners, members, officers, employees or agents.

(h) Subscriber has full power and authority or full capacity, as applicable, to execute, deliver and satisfy its obligations under the Partnership Agreement and this Subscription Agreement, and such actions will not cause Subscriber to be in breach or violation of any contractual, legal or regulatory duty or obligation.

(i) Subscriber understands that no governmental agency has made any finding or determination as to the fairness of the terms of the offering and sale of the Partnership Interest or of the Partnership Agreement.

(j) Subscriber is not relying on the Partnership, the General Partner or any of their partners, members, officers, employees, attorneys, agents or representatives for legal, accounting, investment or tax advice, and Subscriber has sought independent legal, accounting, investment and tax advice to the extent Subscriber has deemed necessary or appropriate in connection with Subscriber's decision to subscribe for the Partnership Interest.

(k) To the best of Subscriber's knowledge, the money to be contributed in respect of Subscriber's Capital Commitment is not related to, or derived from, any activities that would be illegal under United States law or the laws of any individual state.

6. <u>Representations and Warranties of the Partnership</u>. Upon the General Partner's execution of the Partnership Agreement on behalf of Subscriber, the Partnership will be deemed to make the following representations and warranties. As of the Closing Time:

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004018

SEC-SDNY_EPROD-000005097

(a)     The Partnership is validly existing and in good standing as a limited partnership under the laws of the State of Hawaii, and has all requisite power and authority to carry on its business as described in the Offering Materials.  The General Partner is validly existing and in good standing as a limited liability company under the laws of the State of Hawaii.  The General Partner has all requisite power and authority to act as the General Partner of the Partnership.

(b)     The Partnership has full power and authority to execute, deliver and satisfy its obligations under this Subscription Agreement, and such actions will not cause the Partnership to be in breach or violation of any material contractual, legal or regulatory duty or obligation.  The General Partner has full power and authority to execute, deliver and satisfy its obligations under the Partnership Agreement, and such actions will not cause the General Partner to be in breach or violation of any material contractual, legal or regulatory duty or obligation.

(c)     Neither the Partnership nor anyone acting on its behalf has knowingly taken or will take any action that would subject the issuance and sale of the Partnership Interest to the registration requirements of the Securities Act.

(d)     The Partnership is not required to register as an "investment company" under the Investment Company Act.

(e)     There is no action, proceeding or investigation pending or, to the knowledge of the General Partner or the Partnership, threatened against the General Partner or the Partnership.

(f)     All of the disclosures included in the Offering Materials furnished by or on behalf of the Partnership to the Subscriber regarding the Partnership and the transactions contemplated hereby, are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  The Partnership acknowledges and agrees that the Subscriber does not make and has not made any representations or warranties with respect to his or its investment in the Partnership or any other transaction contemplated hereby other than those specifically set forth in *Section 5* hereof.

(g)     Assuming the accuracy of the Subscriber's representations and warranties set forth in *Section 5*, neither the Partnership, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Partnership Interests to be integrated with prior offerings by the Partnership for purposes of the Securities Act which would require the registration of any such securities under the Securities Act.

7.     Accuracy of Information.

(a)     Subscriber hereby undertakes that the representations and warranties made by Subscriber and the information provided by Subscriber in this Subscription Agreement are true and accurate as of the date of this Subscription Agreement and, except as may be set forth in a written notice (which describes any discrepancy in reasonable detail) actually received by the General Partner (via the means and at the address set forth therefor in *Section 12(b)*) prior to the Closing, will be true and accurate at all times through the Closing Time.  Without limiting the duties of Subscriber under the foregoing provisions of this *Section 7* or otherwise limiting the rights of the General Partner and the Partnership: (i) Subscriber will immediately notify the General Partner in writing in the event that, at any time prior to the Closing Time, any representation, warranty or other information described in this *Section 7* fails to be true and accurate; and (ii) if the General Partner receives from Subscriber within seven days after the

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004019

SEC-SDNY_EPROD-000005098

Closing Time any notice described in this *Section 7*, the General Partner may, in its sole and absolute discretion, rescind Subscriber's admission into the Partnership.

(b)      The Partnership hereby undertakes that the representations and warranties made by the Partnership and the information provided by the Partnership in this Subscription Agreement are true and accurate as of the date of this Subscription Agreement and, except as may be set forth in a written notice (which describes any discrepancy in reasonable detail) actually received by the Subscriber via the means and at the Subscriber's address set forth herein prior to the Closing, will be true and accurate at all times through the Closing Time. Without limiting the duties of the Partnership under the foregoing provisions of this *Section 7(b)* or otherwise limiting the rights of the Subscriber, (i) the Partnership will immediately notify the Subscriber in writing in the event that, at any time prior to the Closing Time, any representation, warranty or other information described in this *Section 7(b)* fails to be true and accurate; and (ii) if the Subscriber receives from the Partnership within seven days after the Closing Time any notice described in this *Section 7(b)*, the Subscriber may rescind its investment in the Partnership and receive a full refund of 100% of such Subscriber's Capital Contribution and Subscription Amount investment in the Partnership, without interest or deduction.

8.      Indemnification. Each of the Partnership and the Subscriber acknowledges that the other party will rely upon the representations, warranties and other information as set forth in this Subscription Agreement, as well as in any notices provided under *Section 7*, in determining whether Subscriber should invest in the Partnership or be admitted into the Partnership. Accordingly, each of the Subscriber, on one hand, and the Partnership, on the other hand (as applicable, an "*Indemnifying Party*"), agrees to and will indemnify and hold harmless the other party, the General Partner (if applicable) and each partner, member, officer, employee, attorney, agent and other Affiliate of each of them (as applicable, each an "*Indemnified Party*"), to the extent permitted by law, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of an Indemnifying Party or any other inaccuracy of an Indemnifying Party contained in this Subscription Agreement or any notice of an Indemnifying Party provided under *Section 7*. Notwithstanding any provision of the Partnership Agreement to the contrary, all representations, warranties and covenants contained in this Subscription Agreement will survive the execution and delivery of this Subscription Agreement and the admission of Subscriber as a Limited Partner into the Partnership.

9.      Transferability. The rights and obligations of Subscriber under this Subscription Agreement are not transferable.

10.      No Revocation. The Subscription may be revoked solely by means of a written notice of revocation executed by Subscriber and actually received by the General Partner via the means and at the address set forth therefor in *Section 12*. Such notice of revocation will become effective at the latest to occur of: (a) the 30th day following the date of such actual receipt by the General Partner; and (b) any later effective date specified in such notice. Notwithstanding the foregoing, the Subscription will not in any event be revoked if it has been accepted, in whole or in part, by the General Partner prior to the effectiveness of such notice.

11.      Termination of Agreement. If the Subscription is revoked pursuant to *Section 10* or rejected in full by the General Partner, this Subscription Agreement will thereafter be deemed terminated and without further force or effect.

12.      Notices, Consents, Elections, Etc.      All notices, consents, agreements, elections, acceptances, amendments, and approvals provided for or permitted by this Subscription Agreement will be in writing. Without limitation on the preceding sentence, acceptance of the Subscription will occur only pursuant to a written document executed by the General Partner. For purposes of the following

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004020

SEC-SDNY_EPROD-000005099

provisions of this *Section 12*, the term "notice" will be deemed to include any notice, statement, document, report, consent or similar item required or permitted to be provided to one or more Persons under this Subscription Agreement or applicable law.

(a)      *Notice to Subscriber.*  Except as otherwise specifically provided in this Subscription Agreement, notice to Subscriber will be deemed duly given upon the earliest to occur of the following: (i) personal delivery to Subscriber at the address set forth below, or at any other address which Subscriber has provided to the General Partner for purposes of this *Section 12(a)*; (ii) the Close of Business on the second day after being deposited in the United States mail, registered or certified, postage prepaid and addressed to Subscriber at the address set forth below, or at any other address which Subscriber has provided to the General Partner for purposes of this *Section 12(a)*; (iii) the Close of Business on the first business day after being deposited in the United States with a nationally recognized overnight delivery service, with delivery charges prepaid, addressed as provided in the preceding clause, and marked for next business day delivery; (iv) at the time of transmission by electronic mail; or (v) at the time of transmission by facsimile, transmitted to Subscriber at its facsimile number specified herein, with confirmation of receipt made by printed confirmation sheet verifying successful transmission of the facsimile.

(b)      *Notice to the General Partner.*  Except as otherwise specifically provided in this Subscription Agreement, notice to the General Partner will be deemed duly given when clearly identified as such and duly given to the General Partner in accordance with the procedures set forth in *Section 12(a)*.  For purposes of the preceding sentence, the General Partner's address initially will be 77 Ho'okele Street, Unit 101, Kahului, Hawaii 96732 (fax: 808-298-0450).

13.    Power of Attorney.

(a)      Subscriber hereby grants to the General Partner a special power of attorney, making, constituting and appointing the General Partner as Subscriber's attorney-in-fact, with full power and authority to act in Subscriber's name and on Subscriber's behalf to execute, acknowledge and swear to the execution, acknowledgment and filing of the Certificate of Limited Partnership and the Partnership Agreement as well as any other documents as are necessary to create, operate, dissolve or liquidate the Partnership in accordance with the terms of the Partnership Agreement and this Subscription Agreement. In the event of conflict between the Partnership Agreement and any other document executed, acknowledged or filed pursuant to this power of attorney, the Partnership Agreement will control.

(b)      This special power of attorney is a special power of attorney coupled with an interest, is irrevocable, and will survive the death or legal incapacity of Subscriber.

14.    Miscellaneous.  Subscriber will pay Subscriber's own expenses relating to this Subscription Agreement and the transactions contemplated hereby.  Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of Subscriber and the Partnership.  This Subscription Agreement may be executed in any number of counterparts, each of which will be an original but all of which taken together will constitute one agreement.  Electronically transmitted signature pages or facsimile copies of original signature pages will be deemed to be, and will be legally effective as, originally signed signature pages for all purposes of this Subscription Agreement.  This Subscription Agreement and all amendments hereto will be governed by and interpreted and enforced in accordance with the laws of the State of Hawaii as such laws are applied to agreements entered into and to be performed entirely within Hawaii by Hawaii residents, without giving effect to principles of conflict of laws or the choice of law rules of any jurisdiction to the extent that the application of the laws of any jurisdiction other than the laws of the State of Hawaii would be required or permitted thereby.  To the extent permitted by the Act and other applicable law, the provisions

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004021

SEC-SDNY_EPROD-000005100

of this Subscription Agreement will supersede any contrary provisions of the Act or other applicable law. In the event any provision of this Subscription Agreement is determined to be invalid or unenforceable, such provision will be deemed severed from the remainder of this Subscription Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and will not cause the invalidity or unenforceability of the remaining portion of this Subscription Agreement. The headings in this Subscription Agreement are for convenience of reference, and will not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

*(Remainder of this page left blank intentionally; signature pages follow.)*

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004022
SEC-SDNY_EPROD-000005101

mbloom Fund I, L.P.

## CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

Dated: __DEC__ __14__, 2013

RSTP Capital, LLC
Entity Name (Full Legal Name)

Limited Liability Company, Delaware
Entity Type and Jurisdiction of Formation

By: _____
Signature

Bevan Cooney, Authorized Agent for Devon Archer
Signing Individual's Printed Name/Title

212-933-9974
Telephone Number

212-933-9975
Facsimile Number

darcher@rosemontcapital.com
Email Address

US$ _____ 5,000,000 _____
Capital Commitment
(Subscription Amount)
300 _____

10013 _____

Business Address.

401 Greenwich Street, Suite
Number and Street

New York, NY
City/State/Country/Zip Code

Mailing Address (if different):

_____
Number and Street

_____
City/State/Country/Zip Code

291471.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

BC004023

SEC-SDNY_EPROD-000005102

mbloom Fund I, L.P.

### GENERAL PARTNER SIGNATURE PAGE

Subscriber Name: RSTP Capital, LLC

Series of Partnership Interest: US$5,000,000 – Series A

Closing Time:

> Month: December
>
> Day: 16th
>
> Year: 2013
>
> Time: 12 [a.m. / p.m.]

Effective as of the Closing Time:

     1.     The undersigned, acting in its capacity as the General Partner of the Partnership, hereby agrees to the foregoing, accepts the Subscription, and hereby admits Subscriber into the Partnership as a Limited Partner with respect to the Series of Partnership Interests specified above.

     2.     The General Partner's execution of the Partnership Agreement is hereby deemed to have been made, in part, as attorney-in-fact on behalf of Subscriber.

     3.     Subscriber's Capital Commitment into the Partnership is hereby deemed to equal $ 5,000,000 , which amount will be set forth as Subscriber's Capital Commitment on Schedule A to the Partnership Agreement.

     Executed this 16th day of December, 2013

> **MBLOOM VENTURES, LLC,**
> a Hawaii limited liability company
>
> By:
>
> Name: Arben Kryeziu
>
> Title: President

291472.2

BC004024
SEC-SDNY_EPROD-000005103

EXHIBIT A

ACCREDITED INVESTOR CERTIFICATION

(attached hereto)

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

MBLOOM FUND I, L.P.

ACCREDITED INVESTOR CERTIFICATION

The undersigned (hereinafter, "*Subscriber*") hereby represents and warrants that Subscriber is an "accredited investor" under Section 501(a) of Regulation D promulgated under Section 4(a)(2) of the Securities Act of 1933, as amended (the "*Act*"), because Subscriber is (initial all applicable sections):

FOR INDIVIDUALS ONLY:

☐
Initial

1.  I hereby certify that I am an accredited investor because I am an individual whose net worth, or joint net worth with my spouse, exceeds $1,000,000.  For purposes of this questionnaire, "net worth" means the excess of total assets,[1] at fair market value, over total liabilities.

☐
Initial

2.  I hereby certify that I am an accredited investor because I am an individual whose individual income[2] (*i.e.*, exclusive of any income attributable to my spouse) exceeds $200,000 in each of the two most recent years, and I reasonably expect to reach the same income level in the current year.

☐
Initial

3.  I hereby certify that I am an accredited investor because I am an individual whose joint income (*i.e.*, inclusive of any income attributable to my spouse) exceeds $300,000 in each of the two most recent years, and I reasonably expect to reach the same income level in the current year.

FOR CORPORATIONS, PARTNERSHIPS OR BUSINESS TRUSTS:


Initial

4.  I hereby certify that I am an accredited investor because I am a corporation, partnership, or business trust, which has total assets in excess of $5,000,000 and was not formed for the specific purpose of acquiring the subject Partnership Interest.

---

[1] Notwithstanding anything to the contrary herein, for purposes of determining "*net worth*" (1) the primary residence owned by an individual must be excluded from the net worth calculation, (2) the related amount of indebtedness secured by the primary residence up to the fair market value of that residence may also be excluded from the calculation, and (3) indebtedness secured by the primary residence in excess of the fair market value of that residence should be considered a liability and deducted from the Subscriber's net worth.

[2] For purposes of this questionnaire, *individual income* means adjusted gross income, as reported for Federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (not including amounts attributable to a spouse or a spouse's property):  (a) the amount of any tax-exempt interest income under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), received; (b) the amount of losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040; (c) any deduction claimed for depletion under Section 611, *et seq.* of the Code; (d) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan; (e) alimony paid; and (f) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code.

291472.2

CONFIDENTIAL TREATMENT REQUESTED BY B. COONEY

5. I hereby certify that I am an accredited investor because I am an entity where all of its equity owners are accredited investors.  Please attach a separate sheet listing all equity owners and setting forth the bases for the representation that they are accredited investors.

Initial

## FOR TRUSTS (OTHER THAN BUSINESS TRUSTS):

6. I hereby certify that I am an accredited investor because I have total assets in excess of $5,000,000, was not formed for the specific purpose of acquiring the subject Partnership Interest and its purchase is directed by a sophisticated person (a "sophisticated person" is one who has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment).

Initial

7. I hereby certify that I am an accredited investor because I am (i) a bank as defined in Section 3(a)(2) of the Act, (ii) acting in its fiduciary capacity as trustee, and (iii) subscribing for the purchase of the securities being offered on behalf of a trust.

Initial

8. I hereby certify that I am an accredited investor because I am a revocable trust which may be amended or revoked at any time by the grantors thereof, and all of the grantors are accredited investors under either (a) Section 1 above ($1,000,000 net worth) (b) Section 2 above ($200,000 individual income), or (c) Section 3 above ($300,000 joint income).

Initial

## FOR OTHER INSTITUTIONS:

9. I hereby certify that I am an accredited investor because I am a bank, as defined in Section 3(a)(2) of the Act, or savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Act.

Initial

10. I hereby certify that I am an accredited investor because I am an insurance company as defined in Section 2(13) of the Act.

Initial

11. I hereby certify that I am an accredited investor because I am a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

Initial

12. I hereby certify that I am an accredited investor because I am an investment company registered under the Investment Partnership Act of 1940 or a business development company as defined in Section 2(a)(48) of said Investment Partnership Act of 1940.

Initial

291472.2

BC004027

SEC-SDNY_EPROD-000005106

☐  13. I hereby certify that I am an accredited investor because I am a Small Business Investment Partnership licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

Initial

☐  14. I hereby certify that I am an accredited investor because I am a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940 (the "Investment Advisers Act").

Initial

**IN WITNESS WHEREOF**, the undersigned has completed and executed this Accredited Investor Certification on the date set forth below, and declares that it is truthful and correct.

Executed at ___New York, NY_____ on _____, 2013.
               (City and State)                          (Date)

**FOR INDIVIDUALS**:

_____          _____
Signature of Subscriber (Individual)          Signature of Co-Subscriber (Individual)

_____          _____
Printed Name of Subscriber          Printed Name of Co-Subscriber

**FOR ENTITIES**:

___RSTP Capital, LLC_____
Entity Name (Full Legal Name)

___Limited Liability Company, Delaware_____
Entity Type and Jurisdiction of Formation

By: _____
      Signature

_____ Devon Archer
Signing Individual's Printed Name/Title
*authorized agent*

291472.2

BC004028

SEC-SDNY_EPROD-000005107