

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 1, 2018

**BY EMAIL AND ECF**
The Honorable Ronnie Abrams
United States District Judge,
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>United States v. John Galanis, et al.</u>, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

      The Government writes as requested by the Court to set forth the admissibility of evidence that both Devon Archer and Bevan Cooney were rewarded by Jason Galanis for their participation in the Wakpamni bond fraud through, in part, the receipt of Code Rebel Shares. The Government also wishes to raise one other Code Rebel related matter.

Factual Background

      The Government expects the evidence at trial to establish that in May of 2014, with plans for the Wakpamni fraud already well underway,[1] Jason Galanis ("Galanis") arranged to compensate his co-conspirators through the gifting of Code Rebel shares, as described in greater detail below. In other words, *in the midst of the criminal scheme*, Archer and Cooney received shares from Galanis worth tens of millions of dollars. Galanis effectuated these gifts in two ways.

      First, on May 20, 2014, Devon Archer executed a Code Rebel Note Purchase Agreement pursuant to which Rosemont Seneca Technology Partners ("RSTP") agreed to lend $500,000 to Code Rebel. *See* GX 1213 (Archer emailing the signed agreement to Galanis and others). Neither Archer nor RSTP, however, actually loaned any money. Instead, on June 18, 2014, a

---

[1] By this time, for example, John Galanis had already met with the WLCC at the Native American Sovereign Development conference in Las Vegas and pitched the idea of the bonds and Archer and Cooney were already involved with Jason Galanis in efforts to build a financial services conglomerate.

bank account in the name *RSTP Capital*[2] wired $485,000 to Code Rebel.[3] As a result of this transaction, RSTP, Archer's entity, was the holder of a $500,000 convertible note for which it (and Archer) had not paid. On May 19, 2015, following the Code Rebel IPO, the RSTP convertible note was converted to 510,831 Code Rebel shares. The shares were then deposited into the Rosemont Seneca Bohai Account at Morgan Stanley (controlled by Archer), which had also been used to purchase and hold the Wakpamni bonds. (GX 301). As of June 10, 2015, the value of the Code Rebel shares in the RSB account was more than $19 million. (Id. at page 156).

Second, on May 30, 2014 (approximately a year before the IPO) at Jason Galanis's direction, pre-IPO shares were distributed to the below listed individuals, in the specified amounts.[4]

| Recipient | Number of Shares | Recipient | Number of Shares |
|---|---|---|---|
| Arben Kryeziu | 1,800,000 | Jason Sugarman | 245,000 |
| Volodymyr Bykov | 1,500,000 | Walton 2011 Irrevocable Trust | 200,000 |
| Myla Blu Trust | 490,000 | Blaise Capital LLC | 150,000 |
| Crystal Johnson | 490,000 | Petrarca Advisory Services LP | 105,000 |
| Jonathan Miller | 490,000 | Insurance Company of the Americas | 100,000 |
| Mineta Growth Equity LP | 490,000 | Wiggle Advisory Partners | 100,000 |
| Lule Renz Trust | 490,000 | Chester Trust | 75,000 |
| Ray Shirkhodai | 490,000 | Condor Financial Limited (Francisco Martin) | 50,000 |
| Waverly Capital Advisors LP | 490,000 | Hugh Dunkerley | 50,000 |

---

[2] It is this RSTP Capital account that was discussed at length yesterday. As indicated in GX 1286, in February 2014, Jason Galanis – with Archer's full knowledge – directed Dunkerely to open a bank account in the name of RSTP Capital. The Government continues to believe that this email is plainly admissible both as a statement in furtherance of the conspiracy and as evidence of Archer's knowledge that Dunkerley was creating the account. The email also functions as a directive to Dunkerely to open the account – as directives are not hearsay, the email is also admissible on this third basis. So long as Archer does not intend to argue, however, that the RSTP Capital account was his – or that money in that account belonged to him – the Government is willing to refrain from offering this email.

[3] That money was provided to RSTP Capital days earlier by Daniel White, counsel to Jason Sugarman.

[4] GX 1240, the Code Rebel daily transfer journal records the fact of these share issuances. Witness testimony will establish Jason Galanis's role in selecting the recipients and the affiliations between certain entities and relevant parties.

| | | | | |
|---|---|---|---|---|
| Thorsdale Fiduciary & Guaranty Co Ltd. | 490,000 | | Gary Hirst | 35,000 |
| Zasis LLC (Hirst) | 400,000 | | Rachel F. Cooney | 5,000 |
| VL Assurance | 375,000 | | Curantes Services LLC (Hirst) | 5,000 |
| Bevan Cooney | 370,000 | | John Greenwood | 5,000 |
| Hilltop Trust (Monet Berger)[5] | 300,000 | | Nancy Niec (Hirst) | 5,000 |
| Elizabeth Sugarman IRA | 345,000 | | | |

Notably, numerous of the individuals who received these shares were involved in the Wakpamni fraud, including, Cooney, Sugarman, Dunkerley, Hirst, and John Greenwood.[6]

Bevan Cooney's shares were similarly worth millions of dollars. More specifically, by June 2015, Cooney's shares were valued at $11,976,000. (DX 3586).

Discussion

The Government is well aware that the Court has precluded any evidence that the Code Rebel IPO was a pump-and-dump scheme and will, of course, abide by that ruling. But the Court's ruling did not preclude evidence that these shares themselves (without reference to any independent wrongful manipulation of value) were used as a method of compensating co-conspirators in the charged crimes, and for obvious reason: Evidence of illicit gain is central to proving motive to commit any fraud. The defense knows this and so tries to pivot, claiming the Government is sandbagging them by now raising the Code Rebel shares as compensation for the first time. This is absurd – the Government has been raising this precise argument since at least March 2018. *See, e.g.*, March 6, 2018 Tr. at 63 ("Archer, Cooney, in some cases spouses, family members, Hirst, entities associated with them all received . . . pre-IPO and in some cases post-IPO shares of Code Rebel . . . [a]s a result of that, these defendants, who had been given shares for no consideration ended up with shares that were worth millions, if not tens of millions of dollars."); April 13, 2018 Tr. at 12 (arguing that the Code Rebel shares were a way to "pay various defendants for their roles in this scheme").

Since the time of the pretrial conferences, the significance of this evidence has only increased. That is because both Archer and Cooney argued extensively in their opening statements that they had not benefited from their participation in the charged scheme, but indeed, had lost money. *See, e.g.* Tr. at 77; 97-98 (Archer Opening) ("And one other thing that Devon didn't do in this case that the government says is all about greed, he didn't make any money. He didn't make $15 million. I'll talk about that a little bit later. But in fact, Devon lost money. He

---

[5] Monet Berger was Jason Galanis's then wife.

[6] As Francisco Martin will testify, John Greenwood allowed his identity to be used to open certain of the accounts into which the Code Rebel shares purchased with bond proceeds were deposited and from which shares were sold in order to make interest payments on the first round of Wakpamni bonds.

Case 1:16-cr-00371-RA   Document 492   Filed 06/01/18   Page 4 of 6

Page 4

lost a lot of money;" "Common sense says that people who are engaged in a fraud don't actually take money out of their own pocket and put it into the scheme. The evidence will show that Jason Galanis profited. He got millions. The government's witnesses, Hugh Dunkerley and man name Francisco Martin, they profited. Lots of people profited, but Devon didn't. Devon lost money."); Tr. at 113-114 (Cooney Opening) ("And I say to you, again, the government talks about the money that Mr. Cooney received. Well, Mr. Cooney, like Mr. Archer, they were about the only two who actually gave money to Jason Galanis. You're going to hear and see money charts of all the money that Mr. Cooney lost. All the money that Mr. Cooney gave to Jason Galanis. Because he believed in this financial collaboration, he believed he was part of this great investment. But in fact, he lost everything. He's bankrupt. He lost everything and he had to move back to Montana to live with his dad.").

The defense is perfectly entitled to make such an argument. But keeping the Government's evidence to the contrary from the jury would be a miscarriage of justice. While the defendants portray themselves as hapless victims of Jason Galanis, the Government has evidence that Galanis arranged to pay Archer and Cooney for their role in the Wakpamni scheme through invaluable Code Rebel shares. The payoff is the motive – it's why the defendants committed the charged crimes. There is no more relevant evidence in this case. The defense may wish to argue a different inference from this evidence to the jury. And again, they are entitled to do so. But the Government is entitled to argue that the fact of the fact of these "gifts" during the pendency of the conspiracy is – even without more – circumstantial evidence of the method by which Galanis compensated his co-conspirators.

But to be clear, the Government does not reply upon the timing of these staggeringly valuable "gifts" alone. The conclusion that these shares were payment for the Wakpamni fraud is significantly strengthened by the significant number of other Wakpamni fraud participants who also received Code Rebel shares, including Dunkerely, Greenwood, Hirst, and Martin.[7] The Code Rebel IPO was a piggy bank for the conspirators. That these shares were used as payment for this scheme is further supported by evidence of the other ways in which the Code Rebel shares were used, notably to support the Wakpamni bond fraud and the broader financial services roll up plan. For example, as the Court is aware, proceeds from sales of Code Rebel shares were used to make interest payments on the first bond issuance. Code Rebel shares were also provided to Bonwick Capital and were used to assist it in meetings its net capital requirements. (GX 1074).[8] In short, there is overwhelming evidence that Code Rebel shares were used as the currency of this fraud – used to buoy businesses acquired in connection with the roll-up efforts, to make interest payments on the bonds, and to reward the various participants.

---

[7] The Government notes that VL Assurance, another entity connected to the Wakpamni bond fraud, and to which Archer transferred his Wakpamni bonds, was itself a recipient of Code Rebel shares.

[8] As the Court will recall, Burnham acquired Bonwick in connection with the financial services roll up plan. In connection with that acquisition Cooney transferred his Wakpamni bonds to Bonwick for net capital purposes.

Evidence that a defendant was compensated for his role in a criminal scheme is of course admissible. *See, e.g.*, *United States v. Heras*, 609 F.3d 101, 111 (2d Cir. 2010). The admission of this evidence is all the more necessary where, as here, the defendants have made a central tenet of their defense that they did *not* profit from this crime. The Government respectfully submits that the Court should not let this critical and false argument by the defense go unanswered.

## Related Matters

The Government also wishes to raise one additional Code Rebel related matter. Government moves to preclude any cross-examination of Francisco Martin relating to his participation in the efforts to manipulate the price of Code Rebel. Because the defendants moved to preclude evidence of efforts to pump Code Rebel's price, the Government understood that they would not elicit any evidence relating to that element of the scheme. In opening statements, however, Archer's counsel argued that "you are going to hear that Galanis instructed that man, Francisco Martin, to take some of the stolen money and buy gold bars so they wouldn't be traceable." (Tr. at 98). Following opening statements, the Government spoke to counsel and indicated that it objected to this language because Martin's purchase of gold bars was for the purpose of paying stock promoters who were involved in pumping Code Rebel's stock price. The Government indicated that it would not seek any remedy, but that counsel should not cross-examine Martin about any gold bars as this conduct related solely to the pump-and-dump scheme. Counsel for Archer would not agree, and indicated that he did not believe the 3500 made clear that the purchase of the gold bars was specifically connected to the pump and dump scheme. Counsel is wrong. 3522-09 explicitly states the following:

> Tasked by Galanis to buy Gold bars with proceeds of CR – said to buy about $80k worth and get them to him. Martin asked why. JG said he needed to stabilize the CR price and I need to pay certain promoters to get the price stabilized. Did this two separate times. Gold easier to sell without a trace.

The 3500 material is thus crystal clear that Martin purchased gold bars for the purpose of aiding in the pump-and-dump scheme. The Government does not, of course, object to the admission of the full scope of the pump-and-dump scheme. But the defendants cannot use the pump-and-dump as both a sword and a shield, preventing the jury from learning about this element of the fraud, while simultaneously cross-examining Martin about related conduct. Accordingly, any cross examination of Martin concerning the purchase of gold bars must be precluded.

        Respectfully submitted,

        ROBERT KHUZAMI
        Attorney for the United States, Acting Under
        Authority Conferred by 28 U.S.C. § 515

By: /s/ Rebecca Mermelstein
        Rebecca Mermelstein
        Brendan F. Quigley
        Negar Tekeei
        Assistant United States Attorneys
        (212) 637-2360/2190/2442

cc:    Defense Counsel (via e-mail)