

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 3, 2018

**BY EMAIL AND ECF**
The Honorable Ronnie Abrams
United States District Judge,
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: <u>United States v. John Galanis, et al.</u>, S3 16 Cr. 371 (RA)

Dear Judge Abrams:

The Government writes in brief reply to Archer's letter yesterday arguing that (i) the Court has already precluded evidence of his receipt of Code Rebel shares; (ii) he has been "sandbagged" by the Government's stated intention to offer evidence concerning Archer's receipt of such shares; (iii) there was nothing illicit about his receipt of such shares; and (iv) such evidence will confuse the jury and complicate the trial.  Archer is wrong on all counts.  Having participated in a complex fraudulent scheme involving multiple entities, individuals, and monetary transfers, Archer once again attempts to argue that the evidence of his crimes is so complicated, confusing, and prejudicial that it should be excluded.  Jason Galanis, the defendants' co-conspirator, arranged to compensate Archer and Cooney for their participation in this fraudulent scheme by giving them Code Rebel shares.  Those payouts are direct evidence of this conspiracy and one of the ways in which Archer and Cooney expected to profit from it.  Had Galanis simply wired tens of millions of dollars to his co-conspirators there could be no straight-faced argument to preclude such essential Government evidence.  That Galanis compensated his co-conspirators in more covert manner, does nothing to alter that assessment.  This Court should reject Archer's arguments to the contrary.

First, the Court's ruling with respect to Code Rebel precluded evidence that the defendants had engaged in a pump-and-dump scheme in order to artificially inflate the value of Code Rebel shares.  Nothing about this ruling precluded evidence that Archer and Cooney had simply received such shares.  Indeed, the Government has been clear from the beginning that it intended to offer evidence that the defendants had received shares for which they had not paid.  The Government previously argued that evidence of the pump-and-dump scheme was relevant and admissible because it demonstrated how the defendants had increased the value of the their ill-gotten gains.  But the fact that the Court precluded evidence of the manner in which the defendants *increased* the value of the shares in no way suggest that straightforward evidence of their mere receipt of such shares (or the value of those shares) is inadmissible.

Second, Archer's claims of sandbagging are unwarranted. To the contrary, for the second time in this trial, faced with a clear ruling of the Court, and on notice of the Government's intention to offer certain evidence, Archer has chosen not to seek any further clarity from the Court. Instead, Archer has unilaterally decided to interpret rulings in the light he prefers, only to make claims of prejudice and sandbagging when the Government does exactly what it made clear it would do. Archer's references to the parties' negotiations over stipulations make this perfectly plain. In response to Archer's assertion that the Court had precluded the Code Rebel evidence, the Government responded that the Court had permitted evidence of how the Code Rebel shares were disposed of – including that they went to Archer and Cooney. Archer now claims to take a different view of both the Court's ruling and the Government's intentions. But he cannot now claim prejudice for his own failure to confirm his own understanding.

Archer's claims of surprise are further undercut by the very Government exhibits of which he now complains. In Archer's reading, the Government is permitted to offer evidence only that bond proceeds were used to purchase Code Rebel shares and that those shares were sold to make interest payments on the bonds. But exhibits marked by the Government – exhibits Archer has now had for approximately 10 weeks – make clear that the Government intended to prove more than that. And Archer has long been on notice that the Court's preclusion of the pump-and-dump scheme did not alter the Government's intention to offer evidence of the distribution of Code Rebel shares.[1] For example, the Government marked as an exhibit GX 1240 – the Code Rebel Daily Stock Transfer Journal – and made clear to Archer (even after the Court's 404(b) ruling) that it intended to offer GX 1240. But GX 1240 has nothing to say about the use of bond proceeds to purchase Code Rebel shares, nor does it in any fashion reflect the sale of such shares to make interest payment on the bonds. Indeed, GX 1240 is completely silent on the receipt or sale of shares by Thunder Valley Engineering or Seymour Capital (the entities used to purchase Code Rebel Shares with bond proceeds and from which accounts shares were sold to make interest payments). In other words GX 1240 would be completely irrelevant if the Court's ruling were in fact as restrictive as Archer now claims. Thus, the Government's clear intention to offer GX 1240 put Archer on clear notice that the Government intended to prove who had received the Code Rebel shares.

Such evidence is all the more important in light of Archer's opening statement in which he falsely claimed to have *lost* money on this fraud. The Government is, of course, entitled to respond to allegations made by the defendant in his opening statement. Even if the Government had not advised Archer of its intention to offer evidence of his receipt of Code Rebel shares for no consideration – and it did – it would be entitled to supplement its trial evidence in order to address this fallacious argument raised by Archer in opening. *See, e.g.*, *United States v. Feng Ling Liu*, 12 Cr. 934 (RA*)* (permitting the Government to offer exhibits marked after opening statements in order to rebut arguments made in opening statements). Where, as here, the Government made its

---

[1] As the draft stipulation attached to Archer's letter makes clear, Archer requested that all Code Rebel related exhibits be removed from the Government's stipulation. The Government responded that it still intended to offer these exhibits, which it did not believe were precluded by the Court's ruling. Archer was thus on notice that the Government intended to prove to the jury that Archer had received Code Rebel shares for which he had not paid.

intention to offer this evidence clear prior to opening statements, Archer can have even less cause to complain.

Third, Archer's argument that his receipt of the Code Rebel shares were not "illicit" is a red herring. Archer argues that his receipt of the Code Rebel shares was not "illicit" because the shares were paid for using funds unrelated to the WLCC bonds and he did not know any gain was illicit. And Archer further suggests that the mere fact of his gains proves nothing about criminal intent because "[l]iterally every business person seeks profits." (Ltr. at 5). However, as Archer has carefully avoided acknowledging, *he did not pay for these shares*. This was no profit from a business deal. It was a straightforward payout from Jason Galanis. Jason Galanis's payment of these shares to Archer in the midst of their criminal dealings is no different (and no less admissible) than if Galanis had simply wired $19 million directly to Archer. That Galanis paid his conspirators in a manner designed to obscure these payments does nothing to change the admissibility of these payments.

Nor does the Government intend to argue that the gain was illicit because of the increase in value of the shares from $700,000 when issued, to $19 million a few weeks later. Indeed, in order to avoid even suggesting the existence of the pump-and-dump scheme, the Government did not intend to highlight for the jury the fact of the initial value of the shares issued to Archer.[2] Instead, the Government intends to demonstrate for the jury simply that (i) Archer and Cooney received Code Rebel shares for which they had not paid in the midst of the criminal conspiracy; (ii) Jason Galanis directed the issuance of these shares; and (iii) the shares were worth tens of millions of dollars.

Archer's efforts to strong-arm the Court into precluding plainly admissible evidence with overwrought claims of its complexity should be firmly rejected. These defendants hid their criminal conduct behind a web of related entities. They should not now prevent a jury from hearing that evidence because of any complexity they created.[3] The Government intends to show the jury that Rosemont Seneca Bohai received $19 million of shares for which it had not paid. If Archer is

---

[2] Of course, were Archer to argue that he received only $700,000 worth of shares from Galanis, and that the subsequent increase were merely due to market forces, he would open the door to evidence of the pump and dump scheme.

[3] In his continued efforts to suggest that his crimes are too complicated to put before a jury, Archer claims that he "will be forced to contextualize the transactions and the businesses to which they related in order to establish that, so far as he knew, all were wholly real and appropriate" and that he will need to "mark a number of additional exhibits, identify several new witnesses . . . and provided "additional expert testimony to [help the jury] understand the nature of venture capital investments, due diligence, IPO pricing, and pre-IPO share valuation." Given Archer's concession that he did not pay for these shares, it is unclear that any such evidence exists or would be admissible. Nor does the Government believe that any such expert testimony would be appropriate. But in light of the fact that any defense case will not start for at least two weeks, Archer has ample time to consider any additional evidence he may wish to offer.

willing to stipulate that RSB did nothing to pay for these shares, the Government need do no more.[4] If Archer intends to claim that these shares were legitimately paid for, then the Government intends to demonstrate simply that Archer *was not the one who paid for them*.  This can be done straightforwardly through a limited number of bank records demonstrating the actual source of the funds used to pay for the convertible note.[5]  For example, much of this story can be established through a simple summary chart, such as the one attached hereto as Exhibit A.

In short, the Government is entitled to show the jury the manner in which Archer and Cooney financially benefited from this fraud.  To preclude such evidence – especially in light of the defendants' explicit arguments that their lack of profit evinces a lack of guilt – would pervert the jury's ability to accurately assess the guilt of these defendants.  The Court should not allow such a miscarriage of justice.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By: /s/ Rebecca Mermelstein
Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360/2190/2442

cc:  Defense Counsel (via e-mail)

---

[4] Archer has already conceded that he did not pay for these shares.  Indeed, in attaching this evidence, Archer explicitly claimed that "[t]here was never a transaction in which RSTP Capital . . . or Rosemont Seneca Technology Partners, invested in any way in Code Rebel."  (Tr. at 710).

[5] As the Government made clear in its letter on Friday, it is willing to refrain from offering GX 1286, which demonstrates Archer's awareness of the RSTP Capital account, so long as Archer does not intend to argue that the RSTP Capital account was his – or that money in that account belonged to him.