

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 14, 2018

**BY ECF**

The Honorable Ronnie Abrams
United States District Judge, Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:     **United States v. Galanis, et al., S3 16 Cr. 371 (RA)**

Dear Judge Abrams:

The Government respectfully submits this letter to renew its motion to admit evidence of John Galanis's Gerova conviction, in light of Galanis's arguments and cross-examination of Government witnesses. In addition, the Government writes to address two other issues with the Court.

**I.   John Galanis Has Opened the Door to Evidence of His Gerova Conviction**

John Galanis's core defense appears to be that he believed he was entitled to the $2.35 million he received in WLCC bond proceeds as a "finder's fee." But there is no evidentiary basis for this belief in the record. None of the deal-related documents contain any reference whatsoever to a finder's fee to John Galanis. Nor have any witnesses testified that they expected John Galanis to obtain a $2.35 million finder's fee. *See, e.g.*, Tr. 1956 (Raines testimony that he was not aware that John Galanis received $2.35 million of the bond proceeds).

The record is similarly clear that John Galanis lied to both Raycen Raines and Timothy Anderson about – at a minimum – Jason Galanis's role at Burnham Securities[1] and the purported relationship between Wealth Assurance-AG ("WA-AG") and Wealth Assurance Private Client Corp ("WAPCC"), *see, e.g.* Tr. at 1852 (John Galanis told Raines that Wealth Assurance Private Client Corp. was a subsidiary of Wealth Assurance-AG). John Galanis has attempted to suggest that he believed he was entitled to the finder's fee, believed Jason Galanis worked at Burnham, and believed that Wealth Assurance-AG was the parent company of Wealth Assurance Private Client Corporation. But in doing so, he has implicitly argued that he was given this information by Jason Galanis and relied on it in good faith.

---

[1] *See, e.g.*, Tr. 154 (Anderson's understanding that Jason Galanis was an investment banker at Burnham came from statements made by John Galanis); Tr. 1792 (John Galanis told Raines that Jason Galanis worked at Burnham Securities)

Thus, as discussed in more detail below, John Galanis's cross-examinations of Government witnesses have focused on their "trust" of Jason Galanis, their belief in his false statements, and Jason Galanis's "influence" on the Wakpamni bond deals. These questions have operated as an implicit argument that John Galanis too trusted his son and that his belief he was entitled to a finder's fee, that Jason Galanis was employed at Burnham, and that the WAPCC was a subsidiary of WA-AG all stemmed from representations by his son.

**A.  The Court's Prior Ruling**

The Court has been abundantly clear that if John Galanis argued that he relied on Jason's statements, was following Jason's instructions, or trusted Jason during their course of dealings, that would open the door to the admissibility of John Galanis's Gerova conviction.  The Court questioned both the Government and defense counsel regarding what arguments could open the door to such evidence during the May 16 conference:

> The Court:  Although I still view this evidence as simply too prejudicial, I do remain of the opinion that *the evidence may be presented in some form if Mr. Galanis opens the door to it.* . . . So I think the issue remains what arguments would open the door to the admission of this evidence. . .
>
> Mr. Quigley:  Your Honor, we think really any argument that Mr. John Galanis relied on Jason Galanis would open the door to the evidence.  It casts light on the - or certainly evidence or argument that Mr. Galanis Mr. John Galanis was helping Jason Galanis as his son because I think, as the case law indicates, prior bad acts between coconspirators are relevant to show the nature of that relationship. And we would argue that the Gerova evidence shows that they were not just father and son but had previously committed securities fraud together. So those are the two that immediately come to mind.  Any evidence -- any evidence or argument regarding John Galanis's reliance on Jason Galanis trusting him or any evidence about or argument about them being father and son.
>
> The Court:  Do you want to be heard?
>
> Mr. Touger: Your Honor, I think there are a lot of arguments that can be made that don't open the door. I'm not going to go through each and every one. But I can tell you we're not going to be presenting a defense based on the fact, father and son, or trusting Jason Galanis, or any of those.  *Obviously, if we got up and argued that John Galanis was just following the instructions of Jason Galanis and trusted him to the Nth degree, that would promptly open the door.*
>
> The Court:  *I think that will open the door.*  I think, as well, that if you were to argue that John Galanis didn't know that Jason Galanis had a history of engaging in fraudulent activity *or that he was duped by him in the context of this conspiracy, that that would open the door.*
>
> Mr. Touger:  *I would agree with Your Honor.*

May 16, 2018 Tr. 8-9 (emphasis added).

### B. The Evidence and John Galanis's Arguments and Questioning at Trial

In his opening, John Galanis's counsel acknowledged that Galanis was paid for his role in the scheme, but argued that "those millions [he] received, and he did receive money from there, was merely a fee for being the originator of the deal" which "was anticipated by all the parties[.]" Tr. 73. He further argued that "he was paid for putting these two parties together, just as anyone else would have been in this business and was anticipated by all the parties." Tr. 75. During sidebars, counsel has reiterated that theory. Tr. 1158 ("I am trying to show this was a valid business transaction up until the moment when Jason Galanis decided it wasn't.).

However, there is no evidence in the record to support an argument that John Galanis was entitled to a finder's fee. The deal documents reflect no such fee. *See, e.g.*, GX 214 (Schedule B to Closing Statement for first bond issuance, reflecting issuance costs and disbursements to the parties to the transaction, but not John Galanis); GX 1304 (June 16, 2014 email from John Galanis to Steven Haynes and Timothy Anderson, copying Jason Galanis, with proposed terms of the bond transaction, including disbursements to parties to the transaction, but not John Galanis). Nor have any witnesses testified that they expected John Galanis to obtain a $2.35 million finder's fee. *See, e.g.*, Tr. 1956 (Raines testimony that he was not aware that John Galanis received $2.35 million of the bond proceeds).[2]

The only basis for such an argument appears to be that John Galanis believed he was entitled to such a fee based on the representations of Jason Galanis. And, consistent with this anticipated argument, counsel has repeatedly questioned Government witnesses about their own "trust" of Jason Galanis and his "influence" on the deal. It is clear that, through this cross-examination, John Galanis seeks to lay the groundwork for an impermissible argument—that he too relied on Jason Galanis.

#### 1. Cross-examination of Timothy Anderson

During the cross-examination of Timothy Anderson, for example, John Galanis's counsel sought to portray John Galanis as a mere conduit for information from Jason Galanis.

---

[2] Furthermore, any contention that John Galanis was relying only on the investment professionals and lawyers involved, and not on his son, Jason, is undercut by how intertwined Jason Galanis was in John Galanis's communications with others about the WLCC bond transactions. *See, e.g.*, Tr. 167 (Anderson testimony that, in conversations with John Galanis and Jason Galanis, they did not contradict each other and "[t]hey appeared to be in harmony."); GX 1304 (June 16, 2014 email from John Galanis to Steven Haynes and Timothy Anderson, copying Jason Galanis, with proposed terms of the bond transaction, including proposed annuity payment schedule); 1306 (June 27, 2014 email from John Galanis to Timothy Anderson, copying Jason Galanis, with term sheet for the bond transaction); 1312 (August 4, 2014 email from John Galanis to Jason Galanis and other attaching "Burnham Municipal Capital LP" marketing materials).

Q. I believe you testified last week that they always seemed to be in harmony, right, that was the word you used?

A. Jason and Yanni?

Q. Yes.

A. Yes.

Q.  Would you agree with me that the way the process was working in this May, April to June time period, right, that basically Mr. Galanis would speak to you about -- when I say "Mr. Galanis," I mean John Galanis would speak to you about a problem, you would discuss the problem, and then John would say let me get back to Jason, and then he would talk to Jason and get back to you with what Jason said, right?

A. Yes.

Tr. 323.

John Galanis's counsel also emphasized that Anderson "believed" Jason Galanis and "trusted [his word].

Q. You **believed** Jason when he told you that?

A. I did.

Q. You didn't do any due diligence on your part to confirm that statement, did you?

A. No.

Q. You **trusted** the word of Jason Galanis?

A. I **trusted** the word of Jason Galanis, and the purpose of the letter is to establish they were sophisticated parties, and by the looks of the names, I was able to come to a reasonable conclusion that they were.

Tr. 387.

Later in the cross-examination, John Galanis's counsel again emphasized that Anderson "trusted" Jason Galanis:

Q. You represented Burnham Securities? That was your role?

A. Correct.

Q. And you worked closely with Jason Galanis during this deal?

A. Correct.

Q. You followed instructions from Jason Galanis during this deal?

A. Correct.

. . .

Q. And you **trusted** words when it came to the sale of each series from Jason Galanis?

A. Say that again.

Q. You **trusted** some statements that Jason Galanis made as the deal became closer and closer.

A. Correct, yes.

Q. And you communicated many ideas that Jason Galanis had to Greenberg Traurig?

A. Yes.

Tr. 424-25.

### 2.   Cross-examination of Hugh Dunkerley

Similarly, during the cross-examination of Hugh Dunkerley, John Galanis's counsel emphasized that Jason Galanis gave "orders" and "instructions" and expected others to follow them

Q. And this demonstrates that Jason Galanis was basically giving out orders about how the closing of a deal to buy Burnham was going to go, correct? Look at the last paragraph for instance.

Tr. 1071.

Q. Jason Galanis or Jason Sugarman would give you instructions, **and you would do them**?

A. Yes.

Tr. 1095.

Q. Well, Jason Galanis would give you certain **orders** on deals, right?

A. Correct.

Q. And he **expected you to follow those orders, right**?

A. Correct.

Q. And he didn't really take much response from you when he gave you those orders, did he?

. . .

Q: Did he expect you just to do it?

A: In most cases, yes.

Q: Without asking questions, right?

A: Yes.

Tr. 1118.

Similarly, John Galanis's counsel repeatedly sought to establish Jason Galanis's control over the entities involved in the Wakpamni bond deals:

Q. Okay. And Jason Galanis, once that idea started to pick up speed around the summer of 2014, was the one pushing that deal more than Jason Sugarman.

A. Yes.

Q. And he **was controlling the implementation** of that idea, wasn't he?

A. Yes.

Q. And I believe you described Jason Galanis as the hub of the wheel on the deals he was working on, correct?

A. Correct.

Tr. 1119-20.

Q. One overwhelmingly common factor in all those entities is Jason Galanis, right?

A. I am not exactly sure what you mean.

Q. Jason Galanis was involved in Wealth Assurance Holdings, right?

A. Informally, but not formally.

Q. Well, he owned shares?

A. He did own shares, yes.

Q. He is involved in Wealth Assurance Holdings?

A. Yes.

Q. And he was involved in the purchase of Burnham Asset Management, correct?

A. Of Burnham Asset Group, Financial Asset Management, correct.

Q. He was involved in the Wealth Assurance AG purchase, correct?

A. Yes.

Q. He was involved in the purchase of Hughes Capital Management, correct?

A. Yes.

Q. As a matter of fact, you just testified that he gave Michelle Morton orders?

A. Yes.

Q. And he was involved in the acquisition of Valor Life?

A. Yes.

Q. By the way, would you agree with me that the funds to purchase Valor Life came from the WAPC?

A. I believe they did.

Q. He was involved in the Vaudoise Assurance, Incorporated, correct?

A. Yes.

Q. And he was involved in the acquisition of Fondinvest?

A. Yes.

Q. And he was involved in the acquisition of Bonwick Capital?

A. I believe so, yes.

Q. And he was involved in the COR family of funds also, correct?

A. Yes.

Q. And I believe that's because, as you said, he was the hub of everything, right?

> A. Basically, yes.

Tr. 1542-43.

Further, John Galanis's counsel attempted to establish that Dunkerley had been partially duped by Jason Galanis:

> Q. Do you agree with me that Jason Galanis lied to you at times during this whole situation?
>
> A. At times he lied to me, absolutely.
>
> Q. Absolutely, right?
>
> A. Yes.
>
> Q. Right to your face.
>
> A. Yes.
>
> Q. And of course you didn't know he was lying at that point, right?
>
> A. Correct.

Tr. 1142.

At the final pre-trial conference, John Galanis's counsel acknowledged that it would "promptly open the door" "if we got up and argued that John Galanis was just following the instructions of Jason Galanis and trusted him to the Nth degree." 5/16/18 Tr. at 8.  The Court agreed with this and also stated that "if you were to argue that John Galanis . . . was duped by [Jason] Galanis in the context of the conspiracy, that would open the door."  5/16/18 Tr. at 8-9.

Counsel's repeated emphasis on Jason Galanis's control of the transaction, including his "instructions" to others, others' "trust[]" of Jason Galanis and the fact that they "believed" what Jason Galanis said, and the fact that Jason Galanis "expected [others] to follow [his] orders," clearly seeks to advance the very themes that the Court has said would open the door—that John Galanis followed the instructions of his son, that he trusted him, and was duped by him.

Therefore, the Government seeks to introduce evidence of John Galanis's Gerova conviction in a limited fashion.  Specifically, from Galanis's guilty plea, the Government seeks to introduce the following:

> I, John Galanis, along with others conspired to commit securities fraud in or about 2009 to in or about 2011 in that I and others openly managed brokerage accounts of an individual and effected the sale of Gerova stock and received and concealed proceeds derived therefrom knowing that this activity was designed to conceal from the investing public the true ownership and control of that Gerova stock.

Transcript, *United States* v. *Galanis*, 15 Cr. 643 (PKC), (S.D.N.Y. July 20, 2016), at 21, attached as Exhibit A.

> From Galanis's sentencing allocution, the Government seeks to introduce the following:

> Most of my involvement in the Gerova matter started when Jason came to me and asked me to sell the shares on an arrangement he had made with an investment advisor . . . .   Jason explained that the deal would be the investment advisor would buy shares which would save him and Gerova.

Transcript, *United States* v. *Galanis*, 15 Cr. 643 (PKC), (S.D.N.Y. Feb. 16, 2017), at 21-22.  The proposed evidence is necessary to properly rebut the claims made by John Galanis in his opening statement and testimony elicited during cross-examination of the Government's witnesses attempting to suggest that John Galanis believed in and relied on Jason Galanis. .

## II.   To the Extent the Court Does Not Agree John Galanis Has Opened the Door to the Gerova Evidence, the Government Reserves the Right to Seek to Introduce Gerova Evidence Following the Defense Summations

In the alternative, if the Court finds that John Galanis has not yet opened the door to his Gerova conviction, the Government may seek to reopen its case after defense summations should John Galanis continue to argue that he and/or others trusted Jason Galanis, relied on Jason Galanis, followed instructions from or received information from Jason Galanis, and, as a result, did not understand they were engaged in any fraudulent activity throughout the course of the Wakpamni bond scheme.  *See United States v. Alcantara*, 674 F. App'x 27, 29 (2d Cir. 2016) (explaining that "the district court did not abuse its discretion in reopening the case to permit the government to respond to a defense that it was told would not be raised."); *United States v. Parkes*, 497 F.3d 220, 231 (2d Cir. 2007) (A district court "retains wide discretion to allow the government to re-open its case to correct errors or if some other compelling circumstance justifies a reopening and no substantial prejudice will occur.") (internal quotation marks, brackets, and citation omitted)).

## III.   Additional Issues

### A.   Testimony of Witness-1

In an abundance of caution, the Government also notes that a witness scheduled to testify on June 18 ("Witness-1") was interviewed by the Government during the Gerova investigation based on Witness-1's dealings with John Galanis, Jason Galanis, and other Galanis family members.  Witness-1 received immunity in September 2015 for grand jury testimony in connection with the Gerova investigation, and was then interviewed in ancillary proceedings by the Government from late 2015 through 2016.  Since then, Witness-1 has proffered with the Government on several occasions, including in connection with the Wakpamni bond scheme. Witness-1 is expected to testify that, in August 2014, John Galanis directed Witness-1 to open a bank account in the name of "Sovereign Nations Development Corp" ("Sovereign Nations").

Shortly after opening the account, $2.35 million—all proceeds from the first Wakpamni bond issuance—were transferred into the account at John Galanis's direction. Witness-1 then transferred funds out of the Sovereign Nations bank account for several months at the direction John Galanis. Based on discussions with Mr. Touger, the Government understands that defense counsel do not intend to ask Witness-1 questions about Witness-1's involvement in the Gerova investigation, the immunity order compelling him to testify in grand jury proceedings in September 2015, or the fact that some of the Wakpamni bond proceeds in the Sovereign Nations account were used—at John Galanis's direction—to pay for Witness-1's legal fees in connection with the Gerova investigation. Any such questioning would open the door to evidence regarding the Gerova investigation and convictions.

### B. Potentially Improper Summation Arguments

Finally, the Government also requests a ruling from the Court that it would be inappropriate for *any* defendant to make any arguments during closings about who is on trial, who has pled guilty, and/or who has not been charged in this case. *See* Tr. 1157 (explaining that it would be "totally improper" for defense to suggested that "a man who is not indicted in this case, has knowledge and didn't get indicted"). While the Court has admitted evidence of the guilty pleas of Jason Galanis, Michelle Morton, and Gary Hirst, it did so pursuant to Rules 806 and 609. *See* Tr. 1567 (giving limiting instruction). The defendants should not be allowed to argue, or even to imply, for example, that the truly guilty defendants have already pled guilty and only innocent defendants proceed to trial. The mere fact that a defendant elected to proceed to trial is evidence of nothing. Any suggestion to the contrary would be wildly improper.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By:  /s/_____
Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360/2190/2482

cc:      Counsel of record (via ECF)