I5o6gal1

1   UNITED STATES OF AMERICA
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              16 CR 371(RA)

5   JOHN GALANIS, et al.,

6              Defendants.

7   ------------------------------x

8                                       New York, N.Y.
                                        May 24, 2018
9                                       9:30 a.m.

10

    Before:
11
                        HON. RONNIE ABRAMS,
12
                                        District Judge
13

14                      APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  BRENDAN FRANCIS QUIGLEY
17       REBECCA GABRIELLE MERMELSTEIN
         NEGAR TEKEEI
18          Assistant United States Attorneys

19

    PELUSO & TOUGER
20       Attorneys for Defendant John Galanis
    BY:  DAVID TOUGER
21

22  BOIES, SCHILLER & FLEXNER LLP (NYC)
         Attorneys for Defendant Devon Archer
23  BY:  MATTHEW LANE SCHWARTZ
         LAURA HARRIS
24       CRAIG WENNER

25

I5o6gal1

Appearances (Cont'd)


PAULA JACLYN NOTARI
        Attorney for Defendant Bevan Cooney
            – and –
O'NEILL and HASSEN
        Attorneys for Defendant Bevan Cooney
BY:   ABRAHAM JABIR ABEGAZ–HASSEN



Also present:   Kendall Jackson, Paralegal
                Ellie Sheinwald, Paralegal
                Eric Wissman, Paralegal
                Special Agent Shannon Bienick, FBI

I5o6gal1

```
 1              (In open court; jury not present)
 2              THE COURT:  Good morning, everybody.
 3              We're still waiting for a number of jurors.
 4              I understand there is an A/V issue that we need to
 5    take care of before openings; is that right?
 6              MS. MERMELSTEIN:  Not before openings, your Honor.
 7    We'll need it for the first witness.
 8              THE COURT:  Got it.
 9              You asked yesterday about scheduling issues with
10    respect to these jurors.  I did not have anything in my notes
11    about any of these jurors have scheduling issues.
12              Do any of you?
13              MS. MERMELSTEIN:  No, your Honor.
14              MR. SCHWARTZ:  That's what we had as well.
15              THE COURT:  All right.
16              (Pause)
17              THE COURT:  Are you doing openings in order of the
18    indictment -- Mr. Touger, Mr. Schwartz and Ms. Notari?
19              MR. SCHWARTZ:  That's correct.
20              THE COURT:  We're missing one.  So we're almost ready.
21              (Pause)
22              The juror called.  There are apparently train delays.
23    She is in an Uber.  She said she will be here before 10:00.  I
24    am letting you know what I know.
25              I stand corrected on scheduling.  Looking at my notes
```

I5o6gal1

it seems like Dennise Sanchez, who is the first alternate,

Juror No. 13, said something about June 28th and 29th.  We're

all hopeful that we'll be done by then.

        MR. TOUGER:  That's the only one I had.

        THE COURT:  Right.

        (Pause)

        MR. TOUGER:  Can we have a side bar?

        (Discussion at side bar; off the record)

1              (Pause)

2              THE COURT:  We're going to bring the jury in now.

3              I would tell you to sit, but I know as soon as I do,

4    they'll come in the door.

5              (Jury present)

6              THE COURT:  Good morning, everyone.  This morning

7    we're going to hear opening arguments.  Remember, this is not

8    evidence, but rather previews of what the lawyers expect the

9    evidence will show.

10             We'll begin with the government.  Ms. Tekeei, good

11   morning.

12             MS. TEKEEI:  Thank you, your Honor.  Good morning.

13             Good morning.  In the southwest corner of South

14   Dakota, lies the Pine Ridge Reservation, home of the Oglala

15   Sioux tribe, among the poorest Native American tribes in the

16   country.  Within the reservation live roughly 800 people who

17   are members of the Wakpamni Lake Community.

18             In the badlands of South Dakota, economic

19   opportunities have been few and far between for these Wakpamni

20   people.  But in 2014, things started to look up.  An

21   opportunity appeared on the horizon.  A promise that the

22   Wakpamni could get money to build buildings, a promise that the

23   Wakpamni could get money to grow their businesses.  They just

24   had to do one thing:  They had to issue bonds.  In total, $60

25   million worth of bonds.  They had to go $60 million in debt.

1          Now, that was a lot of money.  But they did it, and

2     they did it because they were told everything would be okay.

3     But it wasn't okay.  Not even close.  It was all a

4          lie.  Ladies and gentlemen, these three men,

5     defendants Devon Archer, Bevan Cooney, and John Galanis, were

6     part of an elaborate scheme.  A scam.  A plan to defraud the

7     Wakpamni into issuing more than $60 million worth of bonds.  A

8     scheme to force pension funds into buying those same bonds,

9     bonds the pension funds didn't even know about.  A scam to

10    steal that investor money and use it for themselves and for

11    their businesses, by lying over and over again.  Money that

12    those pension funds never got back.  Lies that put the Wakpamni

13    people into massive amounts of debt.

14         How did they do it?  A criminal conspiracy.  A

15    conspiracy that went on for years.  A conspiracy that ran clear

16    across the country.  From South Dakota to Florida, from

17    California to New York City.  A conspiracy involving many, many

18    people.  And every one of these people had their own role.

19         Here was their playbook, step by step:

20         Step one:  Get the Wakpamni people to issue bonds

21    based on false promises.  Defendant John Galanis, he was the

22    point man here.  Through lies and deceit, he convinced the

23    Wakpamni people to issue tens of millions of dollars in bonds.

24         Step two:  Take over financial firms with lots of

25    clients, lots of pension fund clients, and then use that client

I5O3GAL2                         Opening - Ms. Tekeei

1   money to buy those bonds.  You'll see that defendants Devon

2   Archer and Bevan Cooney wholeheartedly supported that step,

3   every step of the way.  And these bonds, they were purchased on

4   behalf of those pension funds without their permission, and

5   before any of them could find out what was going on.  Before

6   anyone could stop the fraud.

7          Step three:  Steal the money, and spend it on whatever

8   you want.  Personal items, businesses.  That's where all of the

9   defendants came in.

10         Step four:  Repeat.  The conspirators caused the

11  Wakpamni people to issue bonds not once, not twice, but three

12  times over the course of nine months for a total of $60 million

13  in bonds issued by the Wakpamni community.

14         And finally, step five:  Cover it up.  The defendants

15  and their partners in crime lied repeatedly to hide their

16  crimes.  And that was their playbook and they used it over and

17  over again.  Fraud from beginning to end.

18         But their time is up.  And that's why we're here.

19  That's why the defendants are charged with serious federal

20  crimes.

21         This opening is our chance to outline what the

22  evidence will show happened in this case, and I'll break it

23  into two parts.  First, I'm going to explain in more detail how

24  the defendants' fraudulent scheme worked, and second, I'll give

25  you an overview of how we're going to prove it.  So let's take

1    a closer look at the fraudulent scheme.

2              In early 2014, defendants Devon Archer and Bevan

3    Cooney, along with their friend and partner in crime, Jason

4    Galanis, had a plan.  A plan to build a financial services mega

5    company.  Archer and Cooney held themselves out as legitimate

6    businessmen.  They bragged about their important connections.

7    But it was all a front.

8              Jason Galanis was defendant John Galanis's son.  And

9    you will hear that this was not Jason's first criminal scheme.

10   Jason Galanis quarterbacked for this one, and the defendants

11   Archer, Cooney and John Galanis, along with others, worked hand

12   in hand with Jason to commit this crime.

13             Archer and Cooney started by investing in an

14   established company in the financial services company called

15   Burnham which is located right here in New York City.  But they

16   had a major problem right off the bat.  Money.  They needed

17   money.  Money for themselves, money to fund their business

18   empire.  And they were willing to do whatever was necessary to

19   get it.  So they, and their partners in crime, devised a

20   scheme, a scheme to use tribal bonds to fuel those dreams.

21             Let's go through how they did it, step by step in a

22   little more detail.

23             Step one:  Convince the Wakpamni people to issue

24   millions of dollars in bonds.  You will learn that in 2014,

25   defendant John Galanis met with a Wakpamni tribal member.  He

I5O3GAL2                      Opening - Ms. Tekeei

1    sold the idea of the Wakpamni people issuing bonds to raise

2    money for development projects.  Now, what is a bond?  It's

3    basically like a loan.  It is an IOU.  Investors would give the

4    Wakpamni money, and the Wakpamni would repay it over time with

5    interest.

6          John Galanis said his son Jason worked at Burnham and

7    would help the Wakpamni people find buyers, people who would

8    buy bonds.  That is investors, the people who would essentially

9    loan the Wakpamni the money.  Once the investors bought the

10   bonds, the Wakpamni would use some of that money for projects

11   on the reservation.

12         But they weren't going to get all that money right

13   away.  You see, John Galanis told the Wakpamni he had a better

14   idea.  He told them that the vast majority of that money, it

15   would go into an annuity.  The annuity was supposed to be a

16   very safe investment.  The annuity would grow, slowly, over

17   time, and it would be available to help the Wakpamni people pay

18   back what they owed to the investors.  To follow through on

19   their IOU.

20         It sounded great.  It seemed like a safe and

21   responsible way of raising money for their projects.  So they

22   agreed to issue the bonds that John Galanis had proposed.

23         The Wakpamni community was excited, and some of those

24   people were excited, too.  But Devon Archer, Bevan Cooney, John

25   Galanis and Jason Galanis, they were excited for different

1   reasons.  And they had a very different plan for how that bond

2   money was going to be used.  They weren't going to put it in

3   that annuity.  The annuity was a lie.  In fact, you'll hear

4   that none of the $60 million in bonds was ever placed into that

5   annuity.  The defendants planned to use that money for

6   themselves and for their own businesses, and that's exactly

7   what they did.  We'll get to how they did that in just a

8   minute.  One step at a time.

9           Step one was accomplished.  The Wakpamni people were

10   ready to issue bonds.

11          Step two:  Find buyers for those bonds.  As the

12   defendants and their partners in crime knew, there was an issue

13   with these bonds.  The Wakpamni were not a wealthy people.

14   Maybe they wouldn't be able to pay the money back.  Buying

15   their bonds would be incredibly risky for any investor.  People

16   weren't going to want them.  That was a really big problem for

17   the defendants and their partners in crime.  After all, how

18   could they steal the money if no one bought the bonds?

19          So they came up with a solution.  A way to make sure

20   that investors would buy the bonds.  A way to make sure that

21   the conspirators would get their payday.  Here's how they did

22   it.  The conspirators bought a firm called an investment

23   advisor.  An investment advisor advises clients on how to

24   invest the clients' money.  For example, what stocks or bonds

25   to buy.  And in some cases, the investment advisor may actually

I5O3GAL2                    Opening - Ms. Tekeei

1    make investments for the clients, subject, of course, to the

2    rules set by the clients.

3           Now, this particular investment advisor the

4    conspirators bought had lots of clients.  Pension funds,

5    retirement funds, they were responsible for investing money for

6    school employees, for longshoremen, for city transit workers,

7    water and utility service workers, sanitation workers, among

8    others.  Many others.

9           Within days, days of when the conspirators took over

10   that investment advisor firm -- wouldn't you know it -- that

11   firm started buying Wakpamni bonds into its client accounts.

12   And not just a few Wakpamni bonds; a lot of Wakpamni bonds.

13   $27 million in Wakpamni bonds.  Bonds that were outside of the

14   rules set by investors, and the investors, the clients, they

15   didn't know anything about it until after their millions of

16   dollars were already spent.  The bonds were bought without

17   investor knowledge and without their permission.

18          And as you can see, this was a massive conflict of

19   interest.  The same group of people who conspired to convince

20   the Wakpamni to issue the bonds, were now causing the investors

21   to buy the bonds.  The defendants were on all sides of the

22   deal.  These important facts, these conflicts of interests,

23   were hidden from those pension fund clients every step of the

24   way.

25          So step two is accomplished.  Money was flowing into

I5O3GAL2                     Opening - Ms. Tekeei

1    the defendants' hands.

2           Step three:  Use those millions of dollars, however

3    you like.  What happened with that $27 million?  Some of it

4    went to the Wakpamni community as they were promised.  But what

5    happened to the rest of it?  Did it go into that annuity that

6    was supposed to be used to invest for the Wakpamni to pay back

7    the investors?  Remember that?  That really safe place to keep

8    the money?  Did it go there?  Nope.  The defendants spent it.

9           Defendant John Galanis got $2,350,000 all for himself.

10   John Galanis spent that money on jewelry and luxury cars, and

11   other personal expenses.  Jason, John's son, also took money

12   for himself.  Where did the rest go?  $15 million went to

13   defendant Devon Archer.  $5 million went to defendant Bevan

14   Cooney.

15          What did they do with that money?  Well, Archer and

16   Cooney planned to make that money work for them quietly.  They

17   planned to move the money around.  You'll learn that Devon

18   Archer and Bevan Cooney used the money from the pension fund

19   clients to buy more Wakpamni bonds.  Here's how that happened.

20   And it brings us to step four:  Repeat.

21          John Galanis went back to the Wakpamni community and

22   told them that the first round of bonds had been a great

23   success, that the investors wanted more bonds, and again, this

24   was totally false.  But the Wakpamni didn't know they were

25   being lied to.  They thought this sounded great.  They would

1    get money to build a town center for their businesses, and they

2    thought their money was safely in that annuity, growing.  They

3    thought everything was fine.

4          So the Wakpamni issued more bonds.  They issued $20

5    million more in bonds.  More IOUs, and they went even deeper

6    into debt.  But there were no real buyers for these new bonds.

7    Instead, Devon Archer and Bevan Cooney bought them all, using

8    the money that the pension funds had used to buy the first set

9    of bonds.

10         Now, that might seem strange.  Why not just steal the

11   money outright instead of moving it around and hiding it in

12   more bonds?  Well, the first thing to understand is that it

13   didn't cost the defendants anything to buy more bonds.

14   Remember, they weren't going to put that money into the annuity

15   anyway.  It wasn't going to happen.  So Archer and Cooney spent

16   $20 million of investor money from the first bond offering to

17   buy the bonds in the second bond offering.  But that money

18   didn't go into the annuity either.  It basically just went in a

19   circle, right back into the hands of the co-conspirators.

20         So, okay.  It didn't hurt them to buy more bonds, they

21   ended up with the same amount of stolen money.  But how did it

22   help them to own those bonds?  Because they were able to use

23   the bonds for themselves to further their schemes.  Remember I

24   told you that Archer and Cooney and Jason schemed to build a

25   big financial services company under the Burnham name.  So the

1    defendants stashed some of those bonds in Burnham and another

2    company that they wanted to control, to try to make it look

3    like those companies were more stable than they actually were.

4    So that no one would ask difficult questions about those

5    companies.

6            Now, as you might imagine, the banks involved had some

7    questions when Archer and Cooney tried to move $20 million in

8    Wakpamni bonds through their accounts.  Questions about the

9    bonds, questions about the money involved.  Archer and Cooney

10   couldn't answer those questions.  They couldn't answer them

11   honestly.  It could reveal the entire Wakpamni bond scheme.  So

12   you'll hear that they both lied.  They lied to the banks about

13   where they got the money, they lied about how they got the

14   bonds, they lied about who was involved in those transactions.

15           And amazingly, the scheme didn't stop there.  The

16   defendants kept going.  They went back to the well again.  John

17   Galanis convinced the Wakpamni to issue another round of bonds.

18   And history repeated itself.  The defendants and their partners

19   in crime found another investment advisor firm to buy.  They

20   forced a single investor at that firm to buy $16 million of

21   Wakpamni bonds.  A pension fund that was supposed to grow

22   retirement money for school teachers in Nebraska.  An investor

23   left holding the bag while the conspirators ran off with

24   another $16 million.

25           And, did that $16 million go into that annuity as had

been promised to the Wakpamni?  By now you know the answer.
The defendants and their partners in crime took that money for
themselves.  Millions of dollars went to businesses controlled
by the defendants, and millions more were used to buy up shares
in yet another company for the defendants' benefit.

          Some of the money from these new bonds, from this
third round of bonds, was actually used to make interest
payments on the first round of bonds, like in a Ponzi scheme,
to keep the investors from realizing that they had been
scammed.  The defendants and their partners in crime robbed
Peter to pay Paul.

          By the end, the Wakpamni were $60 million in debt.
They thought that their money had safely been in that annuity
waiting for them.  It wasn't.  It was gone.  Pension funds all
over the country had been forced to buy Wakpamni bonds they
didn't want.  They couldn't sell them, no one would buy them,
and they were stuck with worthless paper.

          They were out $40 million.  The defendants got away
with it.  Which leads us to the final step.

          Step five:  Cover it up.  Or try to.  The defendants
and their partners in crime repeatedly lied to hide their
crimes.  They lied to the Wakpamni, they lied to the investors
who were stuck with the bonds, they lied to the banks and the
brokerage firms that they used to funnel the investor money and
bonds through.  They lied to the lawyers who prepared the

documents, they lied to the people who asked them the questions

about the bonds and about their relationships with each other,

and sometimes they even lied to each other.  All until the

scheme unraveled.

          That is why we are here today.  Because the scheme

that each of these defendants participated in was a fraud.

Each defendant played an important role in this scheme.  At

different times, and at different places, and even working with

different people.  But they all participated in it.  So that is

what the evidence will show.

          Now let's briefly talk about how we're going to prove

our case.  You're going to see documents, documents that show

all of the different real and scam companies and bank accounts

that the defendants owned, operated, or set up to carry out

their scheme.  You are going to hear a lot of the same name of

companies with slightly different variations.  That is because

a key part of this scheme was that the defendants used

companies with similar sounding names to mislead the Wakpamni

people, the investors, and everyone they used to carry out the

scheme.

          You will also see e-mails sent and received by

defendants, e-mails showing how Archer and Cooney stayed in the

loop and cheered each other on during every step of this

scheme.  E-mails showing how John Galanis drove each bond deal

forward.  E-mails showing how each of these defendants hid

I5O3GAL2                      Opening - Ms. Tekeei

1   important facts or outright lied to the law firms, brokerage

2   firms and banks that they used to carry out the scheme.

3           You'll also see bank records and other documents that

4   follow the money, and show you where it went.  How it went to

5   benefit the defendants, their family members, those who worked

6   for them, how it went to benefit the businesses they wanted to

7   buy.

8           You'll also hear from witnesses to whom the defendants

9   lied.  You'll hear from witnesses who will provide important

10  pieces of the story in this case.  Witnesses who will explain

11  to you how bonds work, and what the rules are for investment

12  advisors.

13          You'll hear from an FBI agent who will walk you

14  through the financial transactions, and she'll show you the

15  charts going through the money flow and how the defendants

16  transferred the bonds and the money back and forth to suit

17  their needs.

18          And there's more.  You're going to get an inside view

19  of this scheme from the people who worked on the scheme with

20  the defendants.  One of these witnesses has pled guilty to

21  participating in the fraudulent scheme in the hopes of

22  receiving leniency at sentencing.  Two more are being forced to

23  testify and will receive immunity from the Court to do so.

24  They'll be able to explain the way this worked in the way that

25  only insiders can.

1           And when you consider these witnesses' testimony next

2    to all the other evidence in this case, you will see that it

3    fits together.  It will describe the ins and outs of this

4    conspiracy.

5           And finally, you will also hear from the victims.  I

6    started this morning by telling you about what happened to the

7    Wakpamni people.  That is because, more than anything, this is

8    a case about victims.  The Wakpamni people who trusted the

9    defendants and their partners in crime and believed that the

10   defendants were interested in their economic development, who

11   now owe tens of millions of dollars that they will never be

12   able to repay.  You will hear about all of the lies they were

13   told to get them to issue the bonds.  You'll also hear from

14   some of the pension fund investors who lost tens of millions

15   when the defendants and their cohorts caused them to buy the

16   bonds.  They'll tell you in their own words what happened when

17   they found out that the bonds had been purchased for them,

18   without their knowledge, without their permission, and without

19   anyone telling them about all of the conflicts of interests

20   that were inherent in those bonds.

21          To this day, those victims carry more than $40 million

22   in losses on their books.

23          Now, as you can imagine, in a case like this, there is

24   no single document, no single witness who can give you the

25   entire picture.  You won't get the whole picture after one or

two witnesses.  The evidence will come in in bits and pieces.
And some of the evidence will at times focus more on one
defendant than another, and vice versa, but at the end of the
trial you will see how all of the pieces fit together to show
how the defendants were part of this fraudulent scheme and how
they are each guilty as charged.

        Ladies and gentlemen, the defendants tried to make
this scheme complicated.  They carried out a fraud that
involved lots of different companies, and lots of different
people, who played lots of different roles.  The defendants
wanted this scheme to be too complicated for anyone to uncover.
Complexity was their friend.

        But, at its very core, this case is simple.  It is
about people and trust and lies and the choices made by these
defendants.

        At the close of this case, we'll have a chance to talk
again.  Between now and then, we're going to ask you to do
three things:  First, pay careful attention to the evidence as
it comes in.  Second, pay close attention to Judge Abrams'
instructions on the law.  Third, use your common sense.  The
same common sense that you use in your every day lives as New
Yorkers.

        When you do those three things, we are confident that
the defendants will get a fair trial, that the government will
get a fair trial, and that you will return the only verdict

1    that is consistent with the evidence in this case, that these

2    defendants, Devon Archer, Bevan Cooney, and John Galanis, are

3    guilty.

4              THE COURT:  Thank you.  Mr. Touger.

5              MR. TOUGER:  Good morning, ladies and gentlemen.  My

6    name is David Touger.  It is my honor and privilege to

7    represent John Galanis.

8              I want to thank you, first off, for sitting through

9    two days of probably the most boring days of your life and

10   sticking up for it and sticking through it and sitting here.

11   Now we get to the good part.  You get to do the trial.

12             And let me start by saying that I give each and every

13   one of you a lot more credit than any of these people sitting

14   at this table do.  They are insulting your intelligence.  The

15   prosecutors, as is evident from that opening statement, want to

16   enrage your emotions against my client by alleging that my

17   client, along with others, took advantage of a Native American

18   tribe, stole money from an already impoverished people, and

19   made them poorer, and that is terrible, and you should convict

20   him.

21             That's what they just told you.  It's a nice story,

22   makes a nice movie, maybe, but there's one problem with the

23   argument.  It's just not true.  And that's what the evidence

24   will show you.  That's what all those binders full of evidence

25   will show you, and that's what the witnesses from that stand

1    will show you.

2               Not only is it not true, but the opposite is true.

3    Not only did no Native American tribe or individual lose a

4    penny in this case, not one Native American or Native American

5    tribe risked a penny in this case.

6               But the prosecution knows they have a very weak case

7    against John Galanis.  They don't have the evidence to prove

8    it.  So what do they do to meet their burden?  They resort to

9    the argument that they are the knights in shining armor coming

10   to rescue these poor Native Americans living in South Dakota,

11   and they're going to swoop in and protect them from these big

12   bad finance people.  The one everybody likes to blame.  They

13   can't win on the facts, so they resort to emotionally charged

14   arguments to turn you against my client.

15              Don't be fooled.  Don't be taken in.

16              I want you to do exactly as the government asked you

17   to do.  Listen to the evidence as it comes from that witness

18   stand, read the documents that you get, and put it all

19   together.

20              The issuers of the bonds in this case was not a Native

21   American tribe.  It was not even an authorized agent of a

22   Native American tribe.  The WLCC, the Wakpamni Lake Community

23   Corporation, is the one who issued these bonds that you will

24   hear about.  And it's just that: A corporation.  It is founded

25   by a small group of Native Americans who wanted to make some

1   money.  Nothing wrong with that.  They wanted to make some

2   money, so they formed a corporation.

3        No Native American tribe lost a penny.  In fact, the

4   Native American community that was associated with the WLCC

5   received millions because of the bonds that were done in this

6   case.  Yes, in the end, the WLCC did not receive as many

7   millions as it had hoped.  That's definitely true.  But they

8   did receive millions of dollars.  And that is what the evidence

9   will show you.

10       The prosecution has just told you that the object of

11  the criminal conspiracy that my client is supposedly guilty of

12  was to steal millions of dollars from a bond deal that he

13  initiated and that he profited from.

14       However, the evidence that will come from that witness

15  chair, that will be placed before you, will show you that not

16  one of the three individuals got this deal going.  It will tell

17  you an entirely different story.  The one thing that will be

18  clear is that John Galanis is not guilty of the charges and

19  they will not be able to meet their burden of proving John

20  Galanis guilty of anything.

21       The evidence will demonstrate that John Galanis does

22  not work for any financial institution.  And most importantly,

23  the evidence will show you that he did not reach out to the

24  Wakpamni Corporation.  They reached out to him.  The fact is,

25  it was members of the WLCC who reached out to him for some

1    advice, and that John Galanis gave that advice to them and then

2    their lawyers and their highly experienced financial

3    representatives.  It is those sophisticated lawyers who

4    accepted his advice.

5           John Galanis did not negotiate this with individual

6    Native American tribesmen.  He negotiated this with lawyers,

7    and not some lawyer from some strip mall in South Dakota.

8    Lawyers from some the largest firms in this country.  Lawyers

9    who are sophisticated bond attorneys from firms who have won

10   award after award after award.  The bond deal was negotiated

11   directly between lawyers in the end.  Not between John Galanis

12   and anybody else.

13          You will hear how John Galanis did not force, cajole,

14   or in any way pressure anyone to get involved in this financial

15   transaction.  You will see e-mails from the WLCC

16   representatives saying let's get this deal going.  That it

17   wasn't moving as fast as they wanted it to move.  It will show

18   that during that first meeting, when this whole bond deal

19   started to form, that John Galanis didn't make any false

20   promises, any false statements, or anything other than the

21   truthful statements of what they could do to make a buck.

22          And that's what the WLCC was about.  Making a buck.

23   And again, there is nothing wrong with wanting to make a buck.

24          You'll find that the bonds themselves were perfectly

25   legal financial transactions in private equity.  There is

1    nothing illegal about the bonds.  They were sold to

2    sophisticated buyers.  And the annuity that was set up to

3    support the bonds with well-established profitable companies

4    were invested in.

5         You will hear how the parties involved in this

6    transaction were represented by high-powered lawyers who had

7    represented their clients for many years, and had established a

8    very high trust level with their clients.  You'll also see some

9    of the people who were involved in the WLCC made large sums of

10   money.  The individuals who formed the WLCC made money off of

11   this deal.  And you know who they didn't tell they were making

12   that money?  Those same people who they just told you were the

13   victims of this alleged crime.  They didn't -- the people who

14   made the money in the WLCC, didn't tell the Native Americans

15   they were making the money off their backs.

16        You will also find out that the law firms that worked

17   for the WLCC, you know what they made?  Lots of money.

18        What I urge each and every one of you to do in this

19   case is follow the money trail.  It will not be easy.  I agree

20   with the prosecution.  This was a complicated deal, as most $60

21   million deals are.  But follow it.  Follow the complicated

22   transactions.  It had many moving parts and many participants.

23   But if you follow the path of the money, it will only point you

24   to the correct verdict:  That John Galanis is not guilty of the

25   crimes he is charged with.

1          In a nutshell, the bonds were issued, they were sold,

2     the annuity was set up, it was backed by over $150 million in

3     assets, and as determined by some of the most famous accounting

4     firms in the world.  Again, not some accounting firm in a strip

5     mall in Ohio.  Big ones, world international accounting firms.

6     And they reviewed every asset and found that it was backed up

7     by over $150 million.

8          You'll also find out that the annuity was meeting its

9     financial obligations to the WLCC.  In total, the tribal entity

10    associated with the WLCC received millions of dollars in cash

11    revenue from the bonds.  The WLCC was receiving everything that

12    was negotiated, that they had negotiated for to receive.  And

13    the deal was solely responsible for the first new commercial

14    building built on the Pine Ridge Reservation in over 30 years.

15    And none of that construction financing cost the WLCC or any

16    Native American a penny.

17         The government will undoubtedly point to the movement

18    of millions of dollars from the WAPC, the company that had the

19    annuity that was supposed to be investing the holdings of the

20    annuity to Thorsdale, a company controlled by Jason Galanis,

21    the son of my client.

22         And those millions my client received, and he did

23    receive money from there, was merely a fee for being the

24    originator of the deal.  That was anticipated by all the

25    parties, and is very normal in financial transactions.

1      The government will allege it is this movement of

2  funds that proves my client's guilt.  That it is this movement

3  of millions of dollars to Thorsdale in the fall of 2014 was an

4  outright theft of money.  But the facts as you will hear them

5  from the witness stand will prove to you that it is just the

6  opposite.  That no theft of funds ever occurred.

7      Again, I urge you, follow the money and what was

8  exchanged for the money.  The evidence will show you that there

9  was no theft or embezzlement of funds, there was a fair market

10  value of transaction that benefited the annuity and thus the

11  WLCC.

12      If you find that the facts of this transaction are as

13  I have stated the evidence will show, then I'm certain you will

14  agree with me that John Galanis is not guilty of any wrongdoing

15  herein.  And that this financial transaction was not a total

16  fraud from the beginning as the government alleges in an effort

17  to steal millions of dollars, but the exact opposite.  A

18  complete legally, a completely legal and well thought out

19  financial transaction that was to benefit the WLCC and all the

20  parties involved.

21      But this is where your job will get difficult.  You

22  must remember that your sworn duty is to only convict John

23  Galanis of the crimes alleged if you find he committed them

24  beyond a reasonable doubt.  It does not matter -- and I stress

25  this -- it does not matter if others committed crimes.  It only

1   matters if the prosecution has proved that John Galanis

2   committed a crime beyond a reasonable doubt.

3           The Court will charge you on the law of conspiracy at

4   the end of this case.  And it is those words that I want you to

5   listen to very carefully.  Because the Court will tell you that

6   the mere proximity to a crime or relationship with a person who

7   commits a criminal act is not enough.  The prosecution must

8   prove to you beyond a reasonable doubt that a person knowingly

9   became a member of that conspiracy and furthered the goal of

10  that conspiracy.

11          The fact that other individuals involved in this

12  financial transaction, including Jason Galanis, committed a

13  crime, does not mean that John Galanis is guilty of anything.

14  The fact that John Galanis is the father of Jason Galanis does

15  not by itself mean that John Galanis committed a crime just

16  because Jason did.

17          The prosecution must prove to you beyond any

18  reasonable doubt that John Galanis knowingly joined the

19  criminal conspiracy alleged in the indictment and advanced its

20  goals.  That's the important fact that they must prove.  Not

21  that John Galanis is Jason Galanis's father.

22          The evidence will demonstrate to you that the criminal

23  acts of Jason Galanis, Michelle Morton, who you will hear

24  about, and others who are not here, that caused this financial

25  transaction to ultimately fail.  The evidence will clearly

1    demonstrate that, as opposed to what the prosecution wants you

2    to believe, that this was not a setup from the very beginning

3    to steal millions of dollars.  But the acts of others and the

4    ensuing government investigation that caused the financial

5    transaction to ultimately fail.

6          You must keep the charges and the different

7    participants clear in your mind and find exactly who did what.

8    That is your job in this case.  To keep clear who did what.

9    This is a difficult task, because there are many individuals

10   involved in this case who have been charged with crimes, and

11   some who haven't.  And you have that difficult task of sorting

12   out everyone's actions and deciding who committed a crime, and

13   who did not.

14         The evidence will demonstrate that John Galanis never

15   knew, communicated, or consulted with any of his co-defendants.

16   Never met those people in his life.  And most importantly, had

17   nothing to do with Michelle Morton and her various businesses

18   or business decisions she made.  That John Galanis was not

19   involved at all in recruiting buyers of the bonds or the

20   ultimate sale of the bonds.

21         The evidence will further demonstrate that John

22   Galanis was not involved in the day-to-day decision making

23   concerning the bond deal.  The evidence will show that John

24   Galanis, after being introduced to members of the WLCC, advised

25   those parties on a method to finance their business interests,

I5O3GAL2                         Opening - Mr. Schwartz

1    introduced them to his son, and once the marriage was made, his

2    involvement slowly started to trickle down.  And he was paid

3    for this idea, he was paid for putting these two parties

4    together, just as anyone else would have been in this business

5    and was anticipated by all the parties.

6         Follow the money.  Don't let them dazzle you with the

7    fact that millions of dollars went one way, and then another,

8    so there must be a crime.  Follow the path of the money.  See

9    exactly where it went, and what assets were purchased, and the

10   value of those assets.  Listen to what each party to this

11   transaction made or lost.  But most importantly, listen to why

12   certain parties made money, and why certain parties lost money.

13   It is not just where the money went or didn't go.  But why the

14   money took the path it did.

15        And in the end, when you follow what will seem as a

16   complicated and twisted path of money, but the reality is was

17   just a method to turn one large sum of money into an even

18   larger sum of money, which is exactly what private equity and

19   an annuity is supposed to do, you will find that the

20   prosecution has not proven to you beyond a reasonable doubt

21   that John Galanis did anything criminally wrong.  Thank you.

22        THE COURT:  Thank you Mr. Schwartz.

23        MR. SCHWARTZ:  Good morning, folks.

24        That in the corner over there is Devon Archer.  And

25   let me start by saying this:  Devon Archer is innocent.  Devon

1    Archer is innocent.

2            Let me say that again:  The evidence throughout this

3    trial will show that Devon Archer is innocent.

4            The evidence will show that because Devon had

5    connections and money and legitimacy, he was used by Jason

6    Galanis.  That was his role.  That was the role that he had to

7    play.  Devon was used, and he's not guilty.

8            Now, the prosecutors in this case have accused Devon

9    of being part of a scheme to steal the proceeds of those bonds

10   issued by the WLCC when those bonds were sold to the customers

11   of these two investment advisors that are called Atlantic and

12   Hughes.  That's what this case is about.

13           Did Devon willfully and intending to defraud the WLCC

14   and the customers of Atlantic and Hughes join a scheme to steal

15   that money?  That's the question that we're here to discuss.

16   Was Devon part of a conspiracy to steal that money?  That's the

17   only question that matters.

18           And the evidence will show that Devon was not part of

19   any such scheme.  The evidence will show that Devon had no clue

20   that other people, people whose names you've heard about, like

21   Jason Galanis, and that you haven't heard about yet, like Hugh

22   Dunkerley, who is the individual that is cooperating with the

23   government, were stealing that money.  Devon had no clue.

24           In fact, the evidence will show that Devon was in a

25   fundamentally different place from all the other people that

I5O3GAL2                    Opening – Mr. Schwartz

1   you are going to hear about over the next few weeks and from

2   the other two defendants that are on trial here.  Devon never

3   talked to the issuer of the bonds, the WLCC.  Never spoke to

4   them.  Devon also never talked to any of the customers of

5   Atlantic and Hughes that bought the bonds.  Devon didn't

6   control or even have access to the bank account that received

7   all of this bond money, and from which the money was stolen.

8   Devon didn't even meet many of the people that the prosecutors

9   claim are his co-conspirators.  People like Hugh Dunkerley,

10  their star witness, and John Galanis, who you just heard from.

11         Before they ended up in this courthouse, Devon had

12  never met John Galanis before in his life.  Never talked to

13  him, never communicated with him in any way, shape or form.

14  Devon didn't do any of those things.

15         And one other thing that Devon didn't do in this case

16  that the government says is all about greed, he didn't make any

17  money.  He didn't make $15 million.  I'll talk about that a

18  little bit later.  But in fact, Devon lost money.  He lost a

19  lot of money.

20         He was asked, asked by Jason Galanis, to put hundreds

21  of thousands of dollars of his own money into this business,

22  that he thought was a good investment, and he lost it all.

23         So you might be asking yourself, if Devon didn't talk

24  to the issuer of the bonds, and he didn't speak to the

25  customers of Atlantic and Hughes that bought the bonds, and he

1    was cheated out of his money, then why is Devon on trial?

2    Well, that would be a very good question.  And that's why

3    jurors like you and not prosecutors decide guilt or innocence.

4    In this country, trials are decided by a jury that is fair,

5    that's open minded, and that's impartial.  People just like

6    you.  And that's why we all worked so hard over the last few

7    days to select each and every one of you, because Devon's fate

8    is in your hands.  That is your solemn responsibility.  To

9    listen to the evidence, to listen to Judge Abrams' instructions

10   on the law, and to decide whether these prosecutors have met

11   their enormous burden of eliminating each and every reasonable

12   doubt that you could possibly have about Devon's guilt.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SCHWARTZ:  Until they can do that, until they can

2     remove each and every possible reasonable doubt you may have,

3     Devon is not guilty.

4          My responsibility, my privilege of course is to

5     represent Devon at this trial.  I am going to be joined by my

6     colleagues, Laura Harris and Craig Wenner and our colleague

7     Kendall Jackson from time to time.  We will be Devon's

8     representatives.  I want to tell you now a little bit about

9     what the evidence is going to show about Devon.  I will take a

10    little time to do it because the evidence is important.  The

11    government talked a lot about the defendants, but I want to

12    talk about Devon and what the evidence is going to show about

13    Devon.

14         Devon is 43 years old.  He is married to a wonderful

15    woman Krista, whom he has known since he was literally a baby.

16    They grew up together in the same town in Long Island.  Now

17    Devon and Krista live right here in Brooklyn and they have

18    three small kids of their own.  You will hear that during the

19    time period that the government says that Jason Galanis was

20    orchestrating this scheme to steal this bond money, Devon had a

21    lot of other things going on in his life.  Krista and Devon had

22    their two youngest kids.  In 2013 Krista gave birth to a girl,

23    Lakelyn, and just 18 months later on July 4th, 2014, Krista had

24    their third child, Felix.  Hopefully we will be done before

25    Felix turns four on July 4th this year.

1          During the time that Jason Galanis and Hugh Dunkerley

2     and the other people that the other lawyers talked about were

3     plotting to steal that bond money, Devon and Krista were knee

4     deep in diapers.

5          Devon is also a successful businessman.  He has been

6     very, very fortunate.  Devon studied hard and he got into one

7     of the best colleges in the country.  He worked his way through

8     school and he was a division one athlete.  He also had the

9     fortune, while he was in college to meet some people who became

10    very important to him in his life.  One was Chris Heinz.  Heinz

11    like the ketchup.  You may remember that Chris's mother, Teresa

12    Heinz, is married to John Kerry, who was a senator at the time.

13    Another person Devon befriended in college is Hunter Biden, who

14    is Joe Biden's son.  Hunter was at Yale Law School when Devon

15    was an undergraduate.  Like I said, Devon has been very

16    fortunate.

17         In fact, Devon even won an Emmy Award for his work on

18    a documentary about a bicycle race through Vietnam involving

19    veterans like Devon's dad who returned to Vietnam for the first

20    time.

21         Now, a few years after Devon graduated from college,

22    you might remember that John Kerry ran for president.  He ran

23    against George W. Bush.  Devon was a big part of that campaign.

24    He was actually ultimately the national cochair of Senator

25    Kerry's finance committee.  That means that he was one of the

people who helped raise money.  That was something that Devon

was really good at.  He was well spoken, well liked, well

connected and he was very successful at that job; but as you

know, John Kerry did not win that election and so Devon and

Chris and Hunter had to find real jobs and they decided to go

into business.

        You will hear that some combination of Devon and Chris

and Hunter started a number of businesses with the name

Rosemont.  That is what Devon does.  He builds businesses by

investing money that he has raised and turns those businesses

into successes.  For example, you will hear about Rosemont

Realty.  Rosemont Realty was a real estate investment fund.

Devon raised about $2 billion -- billion with a B -- in

investments for Rosemont Realty.  Meaning, he was managing

about $2 billion of other people's money that was invested in

real estate.

        Now, in the Summer and Fall 2014 of through into late

2015, the very same time period that Jason Galanis and his real

coconspirators were plotting to steal that bond money, Devon

was occupied selling Rosemont Realty not to mention he had a

new baby at home and another that was still in diapers.  In

August and September 2015, Devon finally completed that sale of

Rosemont Realty to an outside investor for more than $100

million.  Now, let me be clear that is not money that went into

Devon's pocket.  Only a very small amount of it did.  Most of

I5o6gal3                    Opening - Mr. Schwartz

1   it was returned to the investors as profits.  But like I said,

2   Devon has been a successful man and a fortunate man.

3            Now, I give you this background not only so that you

4   get to know who Devon Archer is, but also so that you

5   understand all of the evidence that you are going to hear over

6   the next few weeks and months and so you understand what Devon

7   was spending his time doing.  You see, the prosecutors are

8   going to call a lot of witnesses and most of them are going to

9   tell you they have never met Devon, they never talked to Devon,

10  they have never communicated with Devon in any way.  The very

11  small handful that had any sort of direct interaction with

12  Devon are going to tell you that he was busy with all of these

13  other things all the time or with his family or with his

14  business.  Again, even the government's star witness, their

15  cooperating witness, Hugh Dunkerley, is going to tell you that

16  he never met Devon and he only had spoken to him on the phone a

17  handful of times as part of large conference calls about

18  totally legitimate businesses.

19           So now you are probably really asking:  If Devon

20  didn't talk to the issuer of the bonds and he didn't speak to

21  the customers of Atlantic and Hughes and he was cheated out of

22  his and his friends' money and barely any of the witnesses have

23  ever met him and he was occupied with his family and his other

24  business interests, then what in the world is Devon doing here?

25  Why?  Why in the world could anyone possibly think for even a

I5o6gal3                    Opening - Mr. Schwartz

1    second that Devon Archer had anything to do with stealing that

2    bond money, which again is the only thing that matters.

3        Well, let me tell you why Devon is here.  Devon is

4    here because after years and years of nothing but good luck,

5    Devon finally ran into some very bad luck and that bad luck had

6    a name -- Jason Galanis.  Now, at first Devon thought that he

7    was extremely lucky to meet Jason Galanis.  Devon was in the

8    process of selling Rosemont Realty and he was looking for his

9    next project, his next business to build.  He invested in a

10   bank in Europe.  Along with Hunter he got involved with an

11   energy company and a private equity fund.  Devon was even named

12   to the board of directors of the central bank of a country in

13   Asia.

14       Like any good investor, Devon was diversifying.  He

15   wasn't putting all of his eggs into one basket, but then along

16   came Jason Galanis, along with Jason Sugarman.  They were

17   referred to sometimes as the two Jasons.  The two Jasons as

18   they were called seemed to be fabulously successful.  The

19   evidence will show that Jason Sugarman's family owned banks and

20   brokerage firms and his father-in-law was an actual

21   billionaire.  He, the father-in-law produced the movie Batman

22   and The Color Purple.  He was a part owner of the Golden State

23   Warriors and the L.A. Dodgers.  Jason Galanis, he lived in a

24   huge mansion in Los Angeles.  He drove Bentleys.  Plural,

25   Bentleys.  He flew on private jets and he seemed to be

I5o6gal3                      Opening – Mr. Schwartz

fabulously successful in real estate and finance.

          The two Jasons had an idea.  They were going to invest
in a financial company called Burnham Financial Group just like
the prosecutor said.  At the time that the two Jasons were
trying to convince Devon to invest, Burnham managed almost $1
billion of its clients' money.  Now, the Jasons also had an
opportunity to invest in a major insurance company called
Wealth Assurance and it later got named Valor.  So valor and
its subsidiary Valor Life, they were also totally legitimate,
totally successful.  They manage about $6 billion in funds.

          Just to take a step back, when I say they "managed"
that money, when I talk about their assets, I am obviously not
talking about the value of the companies themselves.  I am
talking about the amount of customer money that they managed.
So think about money in the bank, money deposited in the bank,
that money in the bank belongs to the customers who deposited
it.  But you know that the bank also uses that money for itself
to make profits, right.  You know from your every day
experience that banks lend out money in the form of mortgages
or auto loans or whatever and that the money that they are
lending out to make money for the bank, it's the very same
money that other people have deposited into their savings and
checking accounts.  That is one of the main ways that banks
profit.

          Insurance companies actually work exactly the same

I5o6gal3                          Opening – Mr. Schwartz

way.  An insurance company takes in money in the form of

premiums and then they invest those premiums to make profits

for themselves and also have money at the end of the day to pay

out the insurance policies.  Valor was a really big insurance

company.  It had almost $6 billion in assets.

       So Burnham Financial Group and Valor were major

successes in their own rights.  But the two Jasons, they had an

idea.  They wanted to buy Burnham, the asset manager and the

stockbroker, and they wanted to combine it with Valor, the

insurance company.  And then they wanted to buy some more

financial companies, some more asset managers and they were

going to throw them in the mix so that they would have more

money to investment.  So Jason Galanis found two other asset

managers, these companies Atlantic and Hughes that the

prosecutor talked about and they had another $11 billion in

assets under management.

       So the two Jasons' idea was that if they rolled up all

of these different financial companies into one giant brand,

then they would have a huge, diversified, full-service, global

financial services company like some of the ones you may have

heard of like CitiGroup or Guggenheim.  They were going to

manage tens of billions of dollars.  The idea was they could

build it up, make it successful and sell it for a lot more than

they paid.

       Now, by the way, to you or me that might sound totally

1    crazy, right, buying banks and insurance companies and

2    brokerage firms and then mashing them together and selling

3    them.  But remember, Jason Sugarman and his family, they

4    already owned a bank and a brokerage firm.  Jason Galanis

5    already was tremendously successful.  The two Jasons were the

6    kinds of people that had the actual ability to find those kinds

7    of investments and they had the know-how to make them

8    successful -- or at least that is what they wanted Devon to

9    believe and Devon did believe it.

10         This made perfect sense to Devon because raising money

11   to help build companies is what he does.  Devon believed it to

12   the tune of about a million dollars, which he put into those

13   companies out of his own pocket.  Not only that, Devon went out

14   and he put his reputation on the line and he raised money from

15   his other business partners, people from all over the world

16   that he was doing other business with and got them to put in

17   millions of dollars more.

18         Now, I do want to be clear about one thing.  Although

19   Devon invested in Burnham Financial Group and Valor and some of

20   these other companies, he never worked there.  He was never an

21   employee.  He was never an officer.  He was never an executive.

22   He was an investor.  And for some of these companies he was on

23   what is called the board of directors.  So you may know this

24   but a board of directors is a group that meets once in a while

25   and is involved in certain very high-level big-picture

I5o6gal3                       Opening - Mr. Schwartz

1    decisions about a company, like whether it should buy another

2    company or enter into a merger.  Outside directors of a company

3    like Devon was, they are not involved in the day-to-day

4    operations.  They are not supposed to be involved in the

5    day-to-day operations and often they have very busy day jobs of

6    their own.  So, for example, the board of directors of Walt

7    Disney Co. includes the chief executives of General Motors and

8    Nike and some other massive companies.

9          Now, Devon was an investor and it he was an outside

10   director and so as a result you will see that he was kept in

11   the loop about certain big-picture aspects of the two Jasons'

12   plan, that plan that they were putting into motion.  Devon was

13   informed about the potential acquisitions and as far as Devon

14   could tell, the two Jasons were executing their plan of

15   creating a big financial services company just like they said

16   they were.  At one point Devon used his contacts to bring in a

17   high-powered consulting company and they did a thorough review

18   of all of these businesses.  They developed a strategy for the

19   two Jasons' roll-up plan and Devon even paid for it out of his

20   own pocket.  He paid $100,000.  He was supposed to be paid

21   back, but that didn't happen.  He didn't mind because Devon

22   thought that he was building a business.

23         That is what Devon thought the two Jasons were putting

24   together and that is what he thought he was investing in, but

25   what Devon did not know, and the evidence will not show

1    otherwise, was that Jason Galanis had plans of his own, plans

2    that he didn't share with Devon, plans to use one small part of

3    one of those businesses to steal millions of dollars from those

4    bonds.  In fact, at the exact same time that Devon was putting

5    his own hard earned money into the Burnham companies, Jason

6    Galanis was stealing money and using it for himself, using it

7    just like they said for his lifestyle, to pay for his travel,

8    to pay for jewelry, to buy fancy things.  That is what Jason

9    Galanis was doing.

10             That gets to the real issue.  That is the heart of

11   what we're going to spend the next few weeks talking about.

12   The government has accused Devon of engaging in a conspiracy to

13   steal the bond money and to cheat the customers who purchased

14   the bonds.  I want to ask you with all due respect to remember

15   that and I want you to keep that question, that accusation in

16   the front of your mind as you listen to the evidence throughout

17   this trial.  Whenever the government puts on a witness,

18   whenever they show you a document, whenever they introduce an

19   exhibit, I want to ask you to ask yourself, Does this show that

20   Devon knew that Jason Galanis was stealing the proceeds from

21   the bonds?  Does this show that Devon knew that Jason Galanis

22   was stealing the bond money?  Does this evidence show that

23   Devon was part of a scheme to steal that money let alone that

24   he devised that scheme as the prosecutors said?

25             I submit to you that the answer will always be no.  I

I5o6gal3                    Opening – Mr. Schwartz

1    submit to you that throughout the course of this trial, you are

2    not going to hear a single witness, you are not going to see a

3    single document, you are not going to see a single exhibit that

4    is going to demonstrate that Devon knew that Jason Galanis was

5    stealing the bond money.  That is why he is innocent.

6              Now, it doesn't mean that Devon hasn't done things

7    that he doesn't regret.  Of course he does.  You don't end up

8    sitting in that chair unless you have a few regrets.  Devon's

9    biggest regret is simple.  It is letting Jason Galanis into his

10   life.  It is falling for Jason Galanis' promises and lies.  I

11   want to talk about one of those for a second.

12             I expect that you are going to hear about something

13   called the board of trustees of the Burnham Independent Trust.

14   We'll call it the BIT board in this trial.  The BIT board was a

15   customer of one of the many, many Burnham companies.  The BIT

16   board oversaw hundreds of millions of dollars in investments

17   and it was a very important client.  When Devon and his

18   partners were going to invest in Burnham Financial Group, the

19   BIT board wanted to meet him.  They wanted to meet Devon and

20   they wanted to understand who he was and how he might change

21   things.  You will hear that John Burnham, whose family owned

22   Burnham Financial Group, owned Burnham Asset Management, and

23   wanted to be Devon's partner in this new group, he introduced

24   Devon to the BIT board and guided him through every step of the

25   process.

I5o6gal3                    Opening - Mr. Schwartz

1              Now, the BIT board was managing some very safe

2    investments and so they approached the process very, very

3    cautiously.  You might even say overcautiously.  Through the

4    process of Devon investing in Burnham Financial Group, the BIT

5    board had questions and they raised some issues.  The

6    discussions between the investor group that Devon was a part

7    and the BIT board, they spanned over a year.  They involved

8    numerous lawyers.  There was extensive back and forth involving

9    hundreds of pages of letter-writing.  In the course of those

10   discussions, you will hear that some of the members of the BIT

11   board expressed concerns about certain people -- about Jason

12   Galanis, about Jason Sugarman, about Hugh Dunkerley, their

13   witness, about Bevan Cooney, about a man named John Moran,

14   about someone named Lucas Mann, and about other people, too.

15   Basically they only liked Devon.

16             Now, let me be clear about one thing.  The BIT board's

17   concerns were never ever about anyone stealing their money or

18   stealing bond money or anything like that.  The BIT board in

19   fact had nothing to do with the bonds and their money was never

20   ever at risk and no one can tell you otherwise in this trial.

21   But some of the members of the BIT board were nervous and the

22   BIT board in particular was nervous about Jason Galanis, who

23   years earlier had entered into a civil settlement with the SEC,

24   Securities and Exchange Commission.  Although Jason Galanis was

25   not found to have engaged in any wrongdoing in this case, you

1    can understand why an ultra conservative asset manager might be

2    worried.

3         So now in hindsight, looking backwards, the BIT board

4    was 100 percent right.  Devon should have -- should have -- cut

5    Jason Galanis out of the deal at that point or he should have

6    walked away from it himself.  But Devon wanted to be loyal to

7    the person who brought him the deal and whose know-how he

8    thought was important.  Obviously Devon is sitting here because

9    the BIT board was right.  He should have listened the BIT board

10   and stopped doing business with Jason Galanis.  Devon is going

11   to regret not walking away every day for the rest of his life

12   because if he had, he wouldn't be here today.  That was a

13   mistake.  It was in hindsight an error in judgment, but it

14   definitely was not a crime.

15        I want to be clear about one other thing.  Devon

16   absolutely did not lie to the BIT board.  He did not lie to

17   them.  The negotiations between the investment company that

18   Devon was a part of and the BIT board were handled by

19   experienced securities lawyers.  In fact, as Mr. Touger said

20   just about everything in this case was handled by experienced

21   lawyers.  In that case there were lawyers for the investor

22   group.  There were lawyers for the BIT board.  They went back

23   and forth for over a year on various other questions that were

24   raised by the BIT board and made very, very specific agreements

25   and representations.

I5o6gal3                    Opening – Mr. Schwartz

1           Devon absolutely -- absolutely -- behaved consistently

2    with the representations in those letters and he limited Jason

3    Galanis's role to what he agreed to, but Devon never promised

4    to cut Jason Galanis out altogether.  The evidence will show

5    that Devon was very straightforward about this.  At one point

6    he said, Look, I cannot deny doing business with Jason Galanis

7    to the BIT board.  You can take it or leave it, and they took

8    it.  Devon absolutely did what he promised to do, but he should

9    have listened to them.

10          You see now also why Jason Galanis worked so hard to

11   gain and then to abuse Devon's trust.  Jason Galanis needed

12   someone like Devon.  He needed Devon's connections to people

13   like Hunter and Chris.  In fact, although you will see that

14   Devon himself was always pretty careful about not exploiting

15   those connections with his friends, Jason Galanis and other

16   people, they were constantly playing up or even exaggerating

17   those connections especially when Devon wasn't there.  Jason

18   Galanis also needed someone he could manipulate, a pretty face

19   that he could put out in front of the business.

20          Manipulate is what happened here.  It is the right

21   word.  The evidence will show that Jason Galanis and his real

22   coconspirators, people like Hugh Dunkerley and Gary Hirst, who

23   actually had control over the money that was stolen from those

24   bonds, they worked very, very hard behind the scenes to make

25   sure that everything they did seemed legitimate to people like

1    Devon.  They used the best law firms.  They used the biggest

2    accounting firms.  They were associated with credible,

3    successful people like John Burnham and Jason Sugarman.

4    Galanis used those tricks to put Devon at ease, to convince

5    Devon that he was investing in something that could be great.

6            Now, we all know that Jason Galanis had his own plan.

7    While Devon was focused on that big picture, Jason Galanis had

8    a scheme to steal the proceeds of that one very specific

9    financial product that was offered by one particular company

10   within this group of companies, these WLCC bonds.  So think

11   about for example a real estate investor.  A real estate

12   investor might buy up a whole bunch of plots of land and when

13   he is done, he owns a entire New York City block.  The plan is

14   to put up skyscraper.  It is going to have great restaurants.

15   It is going to have 50 stories of apartments.

16           Now, imagine that in one of those offices somewhere on

17   the 43rd floor in a closet with the lights out there is a guy

18   on a cell phone running a telemarketing scam.  That is what

19   this case is, right.  Devon was investing in the skyscraper and

20   Jason Galanis was the guy in the closet.  Now, you will

21   definitely hear evidence that Devon knew what those bonds were.

22   There is no doubt about that.  Jason Galanis like any master

23   manipulator kept in touch with Devon.  He was always making

24   Devon feel like he was being kept in the loop.  Except Jason

25   Galanis didn't let Devon know what was really going on.  He

I5o6gal3                        Opening - Mr. Schwartz

would send Devon general updates about the progress of the

business, but of course Jason Galanis never told Devon that he

was stealing money from the bonds.  Of course not.

        If Devon knew that Jason Galanis was stealing that

money, he would have run in the other direction.  Devon would

have called the police.  Certainly Devon would not have

continued to put his own money into this business.  Like the

prosecutor said, use your common sense.  Why would anyone

invest their own money into a business that was infected by

fraud?  What is the long-term strategy for that business?  So,

yeah, Devon was aware of the bonds; but no, he didn't know what

Jason Galanis was doing with that money.  You can see that for

yourself.

        Let's talk about this $15 million that they said Devon

received.  The prosecutor said that Devon bought some of those

bonds -- actually, a company called Rosemont Seneca Bohai

bought those bonds using money that they say was recycled from

the first bond issuance.  They made it sound like Devon just

got that money directly from the WLCC.  Maybe that is where

Jason Galanis got the money, but Devon sure didn't know it.

Jason Galanis took great, great care to make sure Devon didn't

know it.  The evidence will show that Devon had no clue that

Jason Galanis had recycled money from the first bond issuance.

        The evidence will show that the money that was used by

Rosemont Seneca Bohai to pay for those bonds, they went from

I5o6gal3                    Opening - Mr. Schwartz

1    Wealth Assurance Private Client -- that is the company or the

2    bank account that is the annuity provider, the account

3    controlled by their witness, Hugh Dunkerley and Gary Hirst, and

4    it was withdrawn in cash.  That $15 million in cash was

5    deposited into the accounts of another entity called Thorsdale

6    Fiduciary and Trust, which the evidence will show was held out

7    to be the family office for Jason Galanis, the way he invested

8    all of his personal wealth.  Thorsdale then took that $15

9    million and they wired it to the escrow account of a lawyer, a

10   lawyer named Cliff Wolff and that lawyer transferred it from

11   his escrow account to RSB and RSB bought those bonds.

12          Now, why did Jason Galanis put all of those layers,

13   all of those steps, including a lawyer escrow account, in the

14   middle of the transaction?  Why in the world did he take $15

15   million in cash out of the bank and put it right back in, again

16   something that Devon had absolutely no idea about?  Think about

17   that.  It was to hide where the money was coming from and to

18   convince Devon that he was investing Jason Galanis's own money.

19   Why in the world would Jason Galanis go to all those lengths if

20   Devon was in on the scheme?  It doesn't make sense.  The

21   evidence will show that Devon had absolutely no idea that money

22   came from the first bond issuance.  In fact, Devon received

23   zero information that even suggested that money could have come

24   from the first bond issuance.  When he was asked two separate

25   times by two separate banks where the money came from, Devon

1    gave the same honest answer.

2            Now, that honest answer ended up being wrong, but

3    there is a tremendous difference between being wrong and

4    telling a lie.  Lying means you are trying to trick someone.

5    The weatherman isn't lying when they say it is going to be

6    sunny and it rains that day instead.  A dad doesn't lie to his

7    daughter when he says they can go to the zoo and it turns out

8    that the zoo is closed.  The weatherman was wrong.  The dad is

9    wrong.  He regrets it.  He feels awful about it, but he is not

10   lying.  Those are not lies.  That is just wrong.  They are

11   mistaken.

12           When Devon repeated the lies that he had been fed by

13   Jason Galanis, Devon wasn't lying either.  Devon was wrong, but

14   he wasn't lying.  The prosecutors are going to ask you to

15   conclude beyond a reasonable doubt, beyond each and every

16   single reasonable doubt that Devon knew that Rosemont Seneca

17   Bohai was using stolen money to buy those bonds and you are not

18   going to be able to do it because there is no such evidence.

19           In fact very, very little of the evidence you will

20   hear throughout this trial will even be about Devon.  Virtually

21   none of the government's witnesses have even met Devon.

22   Virtually none of them.  Throughout this trial you are going to

23   hear from a lot of witnesses.  Count them and make a note how

24   many of them ever met Devon or talked to Devon or communicated

25   with Devon.  Think about that for a second.  These prosecutors

I5o6gal3                    Opening - Mr. Schwartz

1    are going to ask you to convict Devon based on the testimony of

2    people who have never ever talked to him and based on e-mails

3    that are about totally ligitimate business deals.

4            In fact, you are going to hear that the government

5    brought this case before they even finished their investigation

6    of Devon.  The government brought this case against Devon for

7    the very same reason that Jason Galanis wanted to get his hooks

8    into Devon.  Because in this case Devon is the big name and he

9    is connected to even bigger names and he is relying on you, a

10   jury of his peers, to see that.  I agree entirely with what the

11   prosecutor said before.  Listen carefully to Judge Abrams'

12   instructions on the law and to the evidence.  None of it will

13   prove the only thing that matters in this case, which is

14   whether Devon knew that Jason Galanis was stealing the bond

15   money and willfully joined him in that theft.  In fact, barely

16   any of it will be about Devon at all.

17           Most of all -- most of all -- just like she said, use

18   your common sense.  Common sense says that Devon had so much to

19   lose and nothing to gain by engaging in wrongdoing.  Devon was

20   doing business with people like Chris and Hunter, people who

21   care deeply about their reputation, who are able to open any

22   door and whose friendship and partnership was far more

23   important to Devon than anything Jason Galanis had to offer.

24   Common sense says that people who are engaged in a fraud don't

25   actually take money out of their own pocket and put it into the

1    scheme.  The evidence will show that Jason Galanis profited.

2    He got millions.  The government's witnesses, Hugh Dunkerley

3    and man name Francisco Martin, they profited.  Lots of people

4    profited, but Devon didn't.  Devon Lost money.

5            Common sense tells you that when people are engaged in

6    a criminal conspiracy, when they are really engaged in an

7    unlawful conspiracy, there is some evidence of that.  In this

8    trial you are going to hear evidence about conspiratorial

9    behavior.  You will hear that Jason Galanis and Hugh Dunkerley

10   would meet at Galanis's house and they would literally draw out

11   their scheme on whiteboards.  Devon was not there.  You are

12   going to hear that Galanis and Dunkerley used special encrypted

13   self-destructing messaging apps specifically to hide their

14   communications when they were trying to fool the SEC.  Devon

15   did not.  You are going to hear that Galanis instructed that

16   man Francisco Martin to take some of the stolen money and buy

17   gold bars so they wouldn't be traceable.  You will not hear

18   about Devon being involved in any of that or anything remotely

19   like it.  Your common sense is going to tell you the same thing

20   as the evidence, Devon Archer is not guilty.

21           So why is Devon sitting here?  Why is he on trial?

22   Devon is sitting here today because he has maintained his

23   innocence because he is not guilty.  There are guilty people

24   here.  Jason Galanis is guilty.  Hugh Dunkerley is guilty.  The

25   guy who handled all the money, made all the fake documents, he

I5o6gal3                    Opening - Mr. Schwartz

1    is guilty.  In fact, the prosecutors have gotten in bed with

2    Hugh Dunkerley and they are going to call him as a witness.  He

3    never met Devon.

4            Gary Hirst and a woman name Michelle Morton, who were

5    responsible for sticking the customers of Atlantic and Hughes

6    with those bonds, they are guilty too.  Galanis, Dunkerley,

7    Hirst, Morton, each of them, the people who were actually

8    responsible for this crime, they are guilty.  Devon has

9    maintained his innocence because he is innocent.  When the

10   evidence comes in, when you listen to all of it and when you

11   ask yourself, what does it really prove, does the evidence

12   prove beyond a reasonable doubt that Devon willfully joined a

13   scheme to steal millions of dollars in bond money?  When you

14   use that common sense, you will know it too.  Devon Archer is

15   not guilty.

16           Thank you for listening.

17           THE COURT:  Thank you.

18           Ladies and gentlemen, we will take a short break now.

19   We'll come back and hear the final opening statement.

20           Please remember don't discuss the case and keep an

21   open mind.  You will hear me say that a lot during the course

22   of the trial.

23           (Jury excused)

24           (In open court; jury not present)

25           THE COURT:  Why don't we say 10 minutes, folks.

1            (Recess)

2            (In open court; jury present)

3            THE COURT:  Everyone can be seated.

4            Thank you.

5            Ms. Notari.

6            MS. NOTARI:  Good afternoon.

7            Members of the jury, you have already heard from some

8    of the other lawyers in this case.  You heard from the

9    government and you have heard from Mr. Touger and Mr. Schwartz,

10   and you have heard about the different roles of some of the

11   people in this case, but I want you to now focus for a moment

12   on Mr. Cooney.  I want to put you in the world of Mr. Cooney.

13   Throughout this trial, I want you to consider who Mr. Cooney is

14   and who he is not.

15           Mr. Cooney you will learn is from Missoula, Montana.

16   He comes from the kind of place, a small town where people make

17   business on a handshake.  Mr. Cooney left Montana, but he kept

18   in touch with the people from his hometown.  In fact, during

19   the past year after his mom last March passed away from brain

20   cancer, he moved back in with his dad and has been living there

21   awaiting this trial.

22           Mr. Cooney is not your typical finance person.  In

23   fact, he has no finance background whatsoever.  He is a

24   fun-loving, upbeat person.  He is what you would call a people

25   person.  Mr. Cooney is extremely good at bringing people

together.  He is very funny, charismatic.  He is the kind of

person that lights up at room with a joke.  He makes friends

wherever he goes.  He is the guy talking to the court officers

and making everyone feel good.  He is lightheartedness.  And

throughout this trial, you are going to get a view into his

world and you are going to get to see some of the e-mails in

this case and you are going to get a sense of his personality.

You are going to learn who he is, but more

importantly, we want to you focus on who Mr. Cooney is not.

Mr. Cooney is not an investment banker.  He is not a financial

analyst.  He is not an investment manager.  He is not an

investment advisor.  He was not an accountant.  He is not a

lawyer.  He is not an officer, a CEO or decision-maker.  He is

not any part of any type of management of any company.  He

never worked at a bluechip financial firm.  He is not an alumni

of an ivy league school.  He never quite frankly even graduated

from college.

Mr. Cooney moved to California.  He made his way from

Montana and moved to the west coast and he was hoping to make

it in the music industry.  He started a business called U.S.

Concerts where he was promoting famous hiphop groups such as

Outcast, Most Def, the Roots, and he started investing in bars

and nightclubs.  You will hear that he was a part owner of the

Viper Room, a famous Los Angeles nightspot, which he and others

purchased from the actor Johnny Depp.  He started investing in

I5o6gal3                          Opening – Mr. Schwartz

1    bars and he eventually made his way to investing in startup

2    companies mostly dealing with natural resources.

3            In early and 2013, as you already heard from Mr.

4    Schwartz and you heard about the two Jasons.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MS. NOTARI:  (Continuing) Well, in early 2013,

2      Mr. Cooney was asked, he had done well, he had a few good years

3      of investing from 2011, 2012, 2013, he had some money to

4      invest, he was living in Lake Tahoe with his wife and two

5      children.  And at that point, his life was everything that he

6      dreamed it to be.

7           He was doing really well, and he knew Jason Galanis

8      from his past.  And Jason Galanis and Jason Sugerman, the two

9      Jasons, approached him with the opportunity of what he

10     considered to be the opportunity of a lifetime.  Mr. Cooney was

11     approached by Jason Galanis, who knew that Mr. Cooney had made

12     money, and Jason Sugerman.  Mr. Schwartz has already told you

13     about Jason Sugerman, a proven financial genius, a guy who was

14     one of the leading top investors in the state of California,

15     guy who came from a millionaire family, his father-in-law owns

16     The Golden State Warriors.  And they asked him to invest in

17     Burnham.  And Mr. Cooney was thrilled at the opportunity of

18     being given the chance to invest in Burnham Financial.

19          Why was he so excited about this?  Well you have to

20     understand his background.  He didn't go to college.  He was

21     hoping to make it in the music industry, and because of his

22     personality, and because he was so well liked, and because he

23     had some success in investing and startup companies, he had

24     money to invest.

25          And his friends, well, frankly, they wanted to bring

1  him in, and he was excited about this opportunity.  And he was

2  excited about being now part of this world that he would never

3  have had access to.  He was suddenly in the room with people

4  like Jason Sugerman who went to Stanford and had a BA in

5  economics, Mr. Archer who went to Yale.  He was associating

6  with names like the Bidens and the Kerries, Theresa Heinz, Joe

7  Biden, Hunter Biden.  Anyone would be thrilled at the

8  opportunity to be a part of this Burnham Financial that he saw

9  as the chance of a lifetime.

10         Now, you'll hear about Burnham Financial Group and

11  you'll hear that Burnham was a storied firm that traces its

12  history way back to 1935.  And it's important to understand

13  that the goal of the shareholders, and Mr. Cooney became a

14  small shareholder in this company, that they were trying to

15  create a global financial service company.  Mr. Schwartz told

16  you about that.  That this was their goal, and you're going to

17  see in e-mails that the Wakpamni bonds, we're going to call it

18  the WLCC bond, was just a small portion of Burnham and all of

19  Burnham's legitimate deals.  You'll hear that Mr. Cooney was an

20  investor, he was not a director.  He was just a shareholder.

21         Now, when you consider the evidence, and how

22  Mr. Cooney became involved in this, I want you to focus on

23  trust.  And I want you to consider in your own lives.  You've

24  heard the judge and the government said to you to keep an open

25  mind and to use your common sense.  And you're allowed to bring

your life experiences into this courtroom.  And when you

consider the evidence, I want you to consider how you make

decisions.  When you make a decision, what do you look for?

When you hire a doctor, do you get excited that your doctor is

from Harvard?  when you hire an investment advisor, does it

make a difference if the person worked at Goldman Sachs, at a

top investment firm?

          When you consider the evidence in this case, and how

Mr. Cooney ended up in this situation, it's important for you

to understand, first, that Jason Galanis inspired trust in

people.  He knew exactly what to say, he knew their weak spots,

he took advantage of people's weaknesses.  He used his

relationship with legitimate high-profile people, and the most

successfully educated people, like Jason Sugerman, and he used

his relationships with these people to convince average people,

any average person like Mr. Cooney, of -- now, Jason Galanis

was incredibly charming.  You will hear evidence that he lived

in a $10 million mansion in Bel Air, Los Angeles, one of the

ritziest places that a celebrity can live.  You will learn that

Jason drove fancy cars and was associated with the most

accomplished lawyers, real estate professionals, and savvy tech

engineers.  The evidence will show that on every transaction

that Mr. Cooney participated, there were brilliant financial

experts and top-rated law firms like Dillworth Paxson,

Greenberg Traurig, involved in every aspect of the WLCC bond.

1     You will see evidence at every level that Mr. Cooney's
2  decision to invest in this bond was based on the involvement of
3  these top law firms, legal expert opinions, and brilliant
4  financial minds.
5     Now, when you review the evidence, and you are going
6  to get to look at the documents, you are going to get to look
7  at the legal opinions, ask yourself:  Are these people that I
8  would trust?  Members of the jury, I submit to you that you
9  will say yes.
10    Now, the government has started to indicate what their
11 evidence is.  There is not going to be any direct evidence,
12 there is not going to be a single witness who will sit on that
13 witness stand and who is going to say Bevan Cooney knew what
14 was involved in this case.
15    You're going to hear from Hugh Dunkerley.  He is not
16 going to say that Mr. Cooney knew anything about this bond.
17 You are going to hear from Michelle Morton.  You are not going
18 to hear any testimony that Mr. Cooney knew anything about this
19 bond.
20    You are going to see e-mail, and the government is
21 going to make a big deal about this e-mail.  And they're going
22 try to point to sinister comments.  I submit to you, members of
23 the jury, that this e-mail is going to show informal
24 conversations between investors like Mr. Cooney and Mr. Archer
25 talking about business deals.  And in some of those e-mails

I5O3GAL4                          Opening - Ms. Notari

1     you're going to see Mr. Cooney is excited.

2               Can I just have a drink, your Honor?

3               THE COURT:  Sure.  Take your time.

4               MS. NOTARI:  Some of these e-mails that you read, I

5     submit to you, the best thing way to think of this, and I was

6     thinking last night how can I help the jury understand.

7     Imagine if you were standing in a room and someone was throwing

8     mud on the walls, and some of the mud landed on some clear

9     glasses, and then there were glasses that had no mud.

10              Well, the government is going to ask you to pick up a

11    dirty muddy glass and look at the e-mails through these muddy

12    glasses.  And when you consider these e-mails, I ask you to

13    pick up the clear glass and look at these e-mails through clear

14    glasses.

15              Keep an open mind and consider the context of the

16    e-mail, consider Mr. Cooney's background.  Consider his

17    personality, that he's not an Ivy League educated formal

18    business guy.  He's more of the kind of guy you would meet at a

19    bar, the kind of guy who owns the Viper Room.  The kind of guy

20    who hangs out with hip hop artists.  And he's very informal and

21    he's excited so and he says things like "Go Greek."  "West

22    Coast offense charging down the field."  You are never going to

23    see an e-mail where Mr. Cooney is saying anything of substance.

24    You are going to see Mr. Cooney is just cheering on his

25    investor friends, and they're giving him details about the

I5O3GAL4                          Opening - Ms. Notari

progress of their investments, and they're excited, and you're

going to see a lot of the investments were doing extremely

well.

          And they had every reason to believe that the WLCC

bond was a great success.  You are going to hear evidence that

the Native Americans got their town center, they got money,

Jason Galanis was feeding them lie after lie after lie, and

they had every reason to believe that these bonds were

thriving.  And Mr. Cooney, again, WLCC is just one small aspect

of Burnham and what was going on.  And there are many other

deals, many other deals going on.  This is just a small part of

what they were doing.  And Mr. Cooney was extremely excited

about what was going on.  He was excited to be part of this

team, and he would cheer on his investor friends, and that's

what you are going to see in the e-mail.

          I challenge you to find one e-mail where Mr. Cooney is

ever saying anything of substance in these e-mails.  You will

not.  What will you see in these e-mails?  You will see Jason

Galanis, you will see Jason Galanis is at the center of almost

every e-mail.  He's taking charge and he's a con artist.

          Now, we know today, June -- I'm sorry May 2018,

several years have gone by, we have the benefit of being the

Monday morning quarterback.  We know he was a con artist.  But

Mr. Cooney did not know that back then.  He had every reason to

believe that everything that he was involved in was entirely

1    legitimate.  And you will see in these e-mails, Jason, he's

2    working Mr. Cooney and he's working some of the people who were

3    actually innocent in this case, the professionals.

4              You're going to hear today Tim Anderson from Dillworth

5    Paxson, a top law firm in the country.  You're going to hear

6    him.  The government wants you to believe that this was a scam.

7    That this bond was a scam.  After you listen to Mr. Anderson's

8    testimony today, you decide if this bond was a scam.  You will

9    see Jason Galanis supplying his investors with supporting

10   research, examples of other brilliant deals that have been

11   successful.  You see that in almost every e-mail he brings in

12   legal and financial experts.  Not just any financial experts.

13   Leading experts from the entire world.  He brings in the most

14   elite law firms in the country.  Greenberg Traurig, Dillworth

15   Paxson.  People who have worked in the most reputable financial

16   institutions in the world.

17             You will hear that many of the investment firms that

18   are involved are Goldman Sachs, Morgan Stanley, top investment

19   firms.

20             Now, Mr. Schwartz has already said, and I agree with

21   him, when you look at the e-mail, look at every e-mail and ask

22   yourselves is there any evidence here that Mr. Cooney could

23   have known or did know how Jason Galanis was investing the

24   proceeds from the WLCC bond.  And I submit to you that the

25   answer is no.  You will not see in these e-mails any

1    substantive conversations.  You will not see in these e-mails

2    any evidence that Mr. Cooney could have known how Jason Galanis

3    was investing this bond.

4              And again, I thought of a good analogy or an image for

5    you to consider.  Imagine you're working in a school and you

6    are a teacher.  And the principal of the school is involved in

7    receiving tuition money and investing the money on behalf of

8    the students.  Now, the tuition comes into the school.  You're

9    just a teacher.  How could you possibly know what the principal

10   of the school is doing with the money.

11             Mr. Cooney had no access to these bank accounts, he

12   had no access to the investor annuity, he had no control, he

13   never talked to any of the issuers of the bonds, he never spoke

14   to the customers.

15             You've heard a little bit about Atlantic Asset

16   Management and Hughes, these clients.  He never had any access

17   to these people.  He was just an investor.  You heard about

18   lies to banks.  There's no evidence of any lies to banks.

19             Mr. Cooney was a victim in this case.  And in order

20   for you to understand how a fraudster, how a conman like Jason

21   Galanis could possibly pull this off, it's important for you to

22   consider the two worlds of Jason Galanis, and Mr. Schwartz

23   already told you about that.  There were two worlds of Jason

24   Galanis.  Okay.  And in order for him to make this fraud work,

25   he was very good at masterminding, manipulating people, he

1    seized on their weaknesses, he seized on the fact that

2    Mr. Cooney was not a finance guy and he was every –– he was

3    very easy to take advantage of.  He was from Montana.  He was

4    very trusting.  He comes from the kind of place where if you

5    trust your friend and your friend maintains that he's wealthy

6    and has these businesses, that he's not trying to take

7    advantage of you and con you and destroy you, which is exactly

8    what Jason Galanis did here.

9           But in the two worlds of Jason Galanis, there is the

10   dark underworld where he's masterminding, he's committing ––

11   he's creating fraudulent documents.  He's playing with the

12   names of entities.

13          You know when you get those e-mails and you think it's

14   from Target, and they say you have won a prize?  And you're

15   like, hmm, maybe I've –– I might get those calls from my mom

16   and she's like, "I won a prize."  I'm like, "Mom, you did not

17   win a prize."  They're perfectly engineered to look like they

18   came from legitimate sources, the stationery looks the same,

19   and then sure enough it's not.  It is a fraud.

20          And Jason Galanis was very masterful.  He not only

21   conned Mr. Cooney, he conned Dillworth Paxson, he conned

22   Greenberg Traurig, he conned the top law firms in the world

23   that what he was doing was entirely legitimate.

24          When you hear these witnesses speak on the witness

25   stand, keep that in mind.  Listen for that.  Listen for the

1    fact that they believed what was going on.  And we will

2    question, I will question the witnesses, and I'm going to try

3    to steer you down the road so that you know when I ask those

4    questions what I'm looking for.

5           But I submit to you that Jason Galanis conned the

6    biggest law firms in the world, and Mr. Cooney had every reason

7    to believe that everything here was legitimate.  There were top

8    law firms, Goldman Sachs, Morgan Stanley, all of these people

9    from the most elite investment firms, and if it was good enough

10   for them, why would he question it?  He was just a music guy

11   who was, like, excited to be part of this deal.  He wasn't

12   going to go in the board room and say -- well, he never

13   actually made it into the board room.  But even if he did, he

14   was the last person in the room to say, "Excuse me, Dillworth

15   Paxson, there seems to be something wrong with this bond."  The

16   evidence will show that that just doesn't make sense.  And that

17   you should use your common sense and your life experience.

18          Now, I told you about the dark underworld where Jason

19   Galanis was manufacturing documents.  You're going to hear from

20   some of the witnesses, Hugh Dunkerley will tell you he was part

21   of that underworld.  He was part of that, he was like

22   Mr. Galanis's henchman.  He was doing all his dirty work.

23   Dunkerley has nothing to do with Mr. Cooney.  He was doing his

24   thing and he was lying to the outside world.

25          Who is in the outside world?  We know in the outside

1   world there were legitimate businessmen, lawyers from Dillworth

2   Paxson, Greenberg Traurig, all the people, Yale educated,

3   Stanford, these people that obviously were not part of this.

4   In order for his scheme to work, he had to, he had to fool the

5   outside world to make the things going on in the dark world

6   work.

7          And he wasn't about to -- just common sense, why he

8   would tell Mr. Cooney what he was doing?  He kept it limited.

9   He kept it limited to the dark world.  He kept only who he had

10  to know, only the people who had to know what was going on.

11         Mr. Dunkerley is going to tell you, he wasn't even

12  allowed to speak to anybody.  He was kept in this dark world.

13  He was afraid of Jason Galanis.  And he never even was allowed

14  to have access to the people, the legitimate people, or at

15  least his access was limited.  But he certainly didn't go

16  telling people what was going on.  Because if you told people,

17  legitimate people, why would they get involved in this?

18         And I say to you, again, the government talks about

19  the money that Mr. Cooney received.  Well, Mr. Cooney, like

20  Mr. Archer, they were about the only two who actually gave

21  money to Jason Galanis.  You're going to hear and see money

22  charts of all the money that Mr. Cooney lost.  All the money

23  that Mr. Cooney gave to Jason Galanis.  Because he believed in

24  this financial collaboration, he believed he was part of this

25  great investment.  But in fact, he lost everything.  He's

bankrupt.  He lost everything and he had to move back to

Montana to live with his dad.  That's what this case is about.

And when you think about the money, you think about

the money, I urge you to pay attention to the fact when the

government puts on their case, let's see if they show you any

of the money that Mr. Cooney sent to Thorsdale.  They're going

to focus on money that Mr. Cooney was sent, but they're not

going to talk about the loans and the going back and forth and

how Mr. Cooney thought, you know, Jason would say I need money

for this, I need money, Dr. Worey is coming from England and he

needs money to put him up in a hotel, $35,000.  Mr. Cooney

says, all right, I'll do what I can.  I'll come up.

Think about all the money that Mr. Cooney sent to

Jason Galanis.  And why would he possibly give his money, when

he didn't make any money?  The only person who walked away with

money was Jason Galanis.

Now, when you consider evidence of if a person's a

fraudster, you're going to see evidence of a man who is a

conman and how he led his life and how he changed his name.

Contrast that with the life of Bevan Cooney and how he

was living his life.  Now, he was not a very sophisticated

finance guy.  But, he took pride in the life he was building

and he took pride in his credit.  And he realized that he had a

lot of business deals going on, and about eight years before he

ever became involved in the WLCC bond, and he had all of these

1    different investments going on, and like Mr. Archer, there was

2    a lot, a lot going on.  On like any particular day, there was,

3    you know, many, many investments that he was trying to be a

4    part of.  There were investments that he was already a part of.

5          He realized when he was living in Los Angeles, he

6    couldn't possibly keep up with this.  He couldn't possibly keep

7    up with paying his bills, and it was really important to him

8    that he paid his bills and he maintained his credit.  And so,

9    he very responsibly hired Fulton & Meyer, money managers and

10   accounting firm to handle his finances.

11         That's something that the government didn't count on

12   in this case.  Okay.  Every aspect of Mr. Cooney's life, every

13   detail was handled by Fulton & Meyer.  They paid every bill,

14   they even paid his son -- his children had a subscription to

15   Highlights, you know, where you circle the hidden photos.  They

16   even paid those bills.  Every bill that he paid was paid

17   through Fulton.  On a daily basis he would call up Fulton &

18   Meyer and he would say wire's coming in, please document it as

19   a loan.  Wire's going out, please document it as a loan.  Pay

20   my car bill, pay this, pay that.

21         You will hear from Fulton & Meyer.  They're going to

22   testify.  And they're going to tell you about Mr. Cooney's

23   involvement.

24         Now the tricky part here is that the government has no

25   evidence against Mr. Cooney.  So what they're going to try to

1   do is they're going to try to distract you with other details.

2   You're going to hear evidence about a bank loan in 2015 that

3   Mr. Cooney took out with CNP Bank.  And you're going to see

4   that Fulton & Meyer was involved in this bank loan and they're

5   going to distract you with these details.

6         I promise you, by the end of this trial, I'm going to

7   come back to you with closing argument and we're going to talk

8   about these bank loans and these distractions and you're going

9   to realize they're distractions.  You are going to realize that

10  this is just mud on the walls that the government is trying to

11  throw at you.  I'm going to help you wipe off the mud so you

12  can see through the fact that there is no evidence in this case

13  against Mr. Cooney.

14        Now, it's very, very difficult in a case like this,

15  because I've been working with Mr. Cooney for over the past

16  year, and you can tell I'm very emotional right now.  I'm

17  emotional because in this country the standard of proof is

18  beyond a reasonable doubt, which means that it is the

19  government's job to prove to you beyond a reasonable doubt that

20  their case -- "innocence" is not actually a word that should

21  ever come into this courtroom because that is not the standard

22  of proof.  But members of the jury, my client is innocent.  And

23  he stands before you because he was dragged into this world of

24  Jason Galanis because Jason Galanis was a brilliant conman.

25        And I submit to you that by the end of this trial, you

1    are going to see through this.  And we've taken a long time to

2    pick you, because we believe that all of you have the ability

3    to -- not everyone, a lot of people left this room.  All of you

4    sitting in front of me are handpicked because we believe that

5    you can be fair, we believe that your life experiences, you can

6    relate to Mr. Cooney.  And we believe that you are going to do

7    your job as jurors and pay careful attention to the details and

8    see through the lack of evidence in this case.

9          Ms. Tekeei, she told you before that there are victims

10   in this case.  We're very sympathetic to anyone who is

11   victimized.  Nobody, nobody wants to work hard, put their money

12   in a retirement fund, and at the end of the day accept the fact

13   that some person like Jason Galanis has taken their money and

14   taken advantage of them and victimized them.

15         But Mr. Cooney is a victim.  Mr. Cooney was an

16   investor.  Mr. Cooney, just like the people whose money was

17   invested, the retirement funds, he is just like those people.

18   He relied on experts, he relied on lawyers, he relied on

19   finance people.  He relied on all of the documentation, and he

20   believed that what he was doing was entirely 100 percent

21   legitimate.

22         At the time that he was brought into this, his life,

23   his star was on the rise.  He had $400,000, almost half a

24   million dollars to invest in this.  His -- his family was --

25   everything was just exactly where he dreamed it to be.

I5O3GAL4

1        None of that is true today.  None of that is true

2    today.  He had to declare bankruptcy.  He lost everything.  And

3    I submit to you that the only person who walked away with

4    anything here was Mr. Galanis and people who were part of this

5    scheme.  But Mr. Cooney was not.  And at the end of this trial,

6    I'm going to ask you return the only just verdict in this case,

7    and I'm going to ask you to return a verdict of not guilty.

8        THE COURT:  Thank you.  I'm going to see the lawyers

9    briefly at sidebar.

10        (At the sidebar)

11        THE COURT:  I was planning on going until 1.  But then

12    I understand that you have --

13        MR. TOUGER:  Remember I told you about the situation

14    in the Eastern District with my client.  I just got a phone

15    call.  They want my -- text message.  They want my client to

16    meet.  I just need a break.

17        THE COURT:  It's in the Eastern District?  I didn't

18    realize that.

19        MR. TOUGER:  The investigation is being held in the

20    Eastern District.  I have to make a phone call.

21        MR. SCHWARTZ:  Why don't we just take an earlier

22    lunch.

23        MS. MERMELSTEIN:  That's fine.

24        THE COURT:  Okay.  I got the wrong message.  Okay.  So

25    we'll come back at 1:45.  We'll take lunch now.

I5O3GAL4

1                (In open court)

2                THE COURT:  Ladies and gentlemen, I think it makes

3      sense to take lunch now.  So we'll take lunch.  We'll start at

4      1:45.  Keep an open mind, don't discuss the case, and enjoy the

5      weather.

6                (Jury excused)

7                THE COURT:  I'll see you all at 1:45.

8                MS. MERMELSTEIN:  Your Honor, can we raise one issue

9      briefly?

10               THE COURT:  Sure.

11               MS. MERMELSTEIN:  I just want to put it on your

12     Honor's radar.  If people want to take it up right before the

13     jury comes back, that's obviously fine.

14               Ms. Notari this morning identified for us a number of

15     exhibits she expects to offer through Mr. Anderson, the

16     government's first witness.  Many of them are unobjectionable

17     and that's fine.  But a number of them are e-mails that

18     Mr. Anderson is not on, that there is no suggestion he had any

19     awareness of, that have nothing to do with them.

20               MR. TOUGER:  Can we do this when we come back so I can

21     make this phone call?

22               THE COURT:  Just can we do it quickly because if I

23     need to review something over lunch, I need to get it.

24               MS. MERMELSTEIN:  That's why I wanted to bring it up

25     now so there's time.  I don't know that Mr. Anderson will get

I5O3GAL4

1      to cross-examination today or Ms. Notari is going first.  There

2      are e-mails, for example, between Mr. Cooney and Mr. Fillman,

3      an employee of Fulton & Meyer about depositing the bond.  We

4      don't think those are properly offered with Mr. Anderson.  I

5      think what the defense is trying to do is sort of get ahead

6      into a different part of the story during this first witness.

7      And that's really not appropriate.  If they want to, while

8      Mr. Anderson is on the stand, put in affirmatively other

9      documents he's on or knows about, that's fine.  But, documents

10     that he's not on that he has nothing to do with belong either

11     in an affirmative defense case at the end of the government's

12     case, or when Mr. Fillman testifies.  It doesn't belong now and

13     it will be confusing to the jury to get into it, and it has

14     nothing to do with this witness.  So this is the government's

15     case and we object to those things being offered now.

16               THE COURT:  Do you want to be heard briefly?

17               MS. NOTARI:  I'm not going --

18               THE COURT:  Bring the mic close, please.

19               MS. NOTARI:  I'm not going to go into anything on this

20     witness that he was not a part of.  There are e-mail threads

21     with Mr. Anderson where he's part of the threads involving many

22     people, including people in Fulton & Meyer, where he's giving

23     directions to Mr. Cooney and Fulton & Meyer as to what to do

24     with the bonds, and he was part of those e-mails.  So he has,

25     he has personal knowledge of those transactions.  I'm not going

I5O3GAL4

1     to ask him things that he didn't know about.

2             THE COURT:  Just to be clear, you agree that it would

3     be improper to try and introduce through him e-mails that he

4     was not a party to?

5             MS. NOTARI:  Yes.

6             THE COURT:  Okay.  Thank you.

7             MS. MERMELSTEIN:  Thank you, your Honor.

8             MR. SCHWARTZ:  For the record, I don't agree with

9     that.

10            MS. NOTARI:  Well, okay, we can --

11            THE COURT:  But in any event, you're not going to do

12    it with this witness.

13            MS. NOTARI:  I'm not.

14            THE COURT:  Okay.

15            (Recess)

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

I5O3GAL4

```
1                        AFTERNOON SESSION

2                           1:45 p.m.

3          THE COURT:  I'm going to see the lawyers at sidebar

4    for a minute.

5          (At the sidebar)

6          THE COURT:  On a scheduling matter.  I said there are

7    certain days we have to start late.  Two of them are Tuesday

8    and Wednesday of next week, so we'll start at 11.

9          I also want to make a disclosure, and that is that I

10   have met Hunter Biden.  He was a couple of years behind me at

11   Yale and we have a mutual friend in common.  I haven't seen him

12   in years.  I don't know him well at all.

13         MR. TOUGER:  You can't be a juror in this case.

14         THE COURT:  But I didn't realize until openings that

15   he would be more than a passing reference.  So I wanted you all

16   to know that.

17         MS. MERMELSTEIN:  One thing to note for the record.

18   Mr. Touger was not here, so it's new to you, but defense has

19   not said whether or not they are going to do this, but I don't

20   think it is appropriate, given the references to Greenberg

21   Traurig, that the current U.S. attorney used to work there.

22         MR. TOUGER:  Who said that?

23         MS. MERMELSTEIN:  No one said it.  We assume you're

24   not going to do that.  They said they're thinking about it.

25         THE COURT:  I don't think that should come in.  I
```

I5O3GAL4

1    don't think it is relevant.  It is clear that Mr. Khuzami is

2    the acting U.S. attorney for purposes of this case.  So I don't

3    think it relevant.  I completely agree.

4            MR. SCHWARTZ:  I also want to put something else on

5    the record.  So, I want to object to one aspect of the

6    government's opening.

7            MR. TOUGER:  Can we do that in front of the clients?

8            MR. SCHWARTZ:  Sure.

9            (In open court; jury not present)

10           THE COURT:  Do you want to raise the issue now,

11   Mr. Schwartz?

12           MR. SCHWARTZ:  Please.

13           THE COURT:  Okay.  Go ahead.

14           MR. SCHWARTZ:  So, in its opening, the government said

15   that this was not Jason Galanis's first criminal scheme.  And I

16   asked Ms. Mermelstein, because Ms. Tekeei was out of the room,

17   what that was a reference to.  And she said, well, the jurors

18   are going to hear that about the -- I don't know actually what

19   can I say.

20           MS. MERMELSTEIN:  Well, I think you can now say.

21           MR. SCHWARTZ:  So the California thing and the Gerova

22   matter.  And I object to that.

23           Under your Honor's 404(b) ruling, the Gerova arrests

24   and convictions are out.  And the California matter is in

25   solely to impeach Jason Galanis.  But the gist of the

I5O3GAL4

1      government's opening statement is that these defendants,

2      Mr. Archer in particular, ought to have known better, because

3      this was not Jason Galanis's first rodeo.  So I object to that,

4      and I certainly object to the government developing that

5      evidence in the way that they've suggested, in their case in

6      chief.

7              MS. NOTARI:  Also I would like to note that I join in

8      all -- I think Mr. Archer had made a motion previously that all

9      defendants are joining in all objections and motions.

10             THE COURT:  Fine.  I want to be clear on exactly what

11     you're asking me to do going forward.

12             MR. SCHWARTZ:  So, what I am asking you to do going

13     forward is merely to hold the government to your Honor's prior

14     rulings and our agreements, which are, one, that the Gerova

15     arrests and convictions are not part of this case.  And two,

16     that the California affair is admissible solely to impeach

17     Jason Galanis.

18             THE COURT:  I thought you were working on a

19     stipulation.

20             MS. MERMELSTEIN:  Yes.  And I don't think anything the

21     government has done is in violation of your Honor's order.  To

22     be clear, there is going to be evidence before this jury that

23     Jason Galanis, Michelle Morton, and Gary Hirst has pled guilty

24     in this case.  There is also going to be evidence that Jason

25     Galanis pled guilty in California.  So, that is simply a fact

I5O3GAL4

that will be before the jury.

In addition, as your Honor knows, while your Honor has precluded the government from telling this jury, unless the door is opened, that John Galanis participated in the Gerova fraud with Jason Galanis and was convicted, and we are not going to do that, it has always been the case and has been clear from the beginning that the fact of Jason Galanis's Gerova arrest is absolutely going to be a part of this trial, because it is intertwined with all kinds of things that happened.  He gets arrested and as a result of that, things happened like disclosures to the BIT board and other things that are nonsensical without the arrest in Gerova.

And I frankly had assumed, since the defendants want to put in for impeachment of Jason Galanis the fact of a attempted tax evasion fraud, they were going to want to put in the securities fraud.  Maybe they don't.

In any event, the fact of Jason Galanis's involvement with Gerova and arrest in this case is going to be before this jury.  I don't think the Court has ever suggested that is improper.  There will be no reference that John Galanis was involved in that, which was your Honor's 404(b) ruling, which we will abide by.

The fact that the government wanted the jury to understand it was not hiding from them that Jason Galanis sort of this wasn't his first rodeo is not in any violation of the

I5O3GAL4

1    Court's order.  And the government's suggestion was not in any

2    fashion in its opening that these defendants should have known

3    that.  we didn't say that.  That's not the argument we've made.

4    So I don't know there is much to say.

5         THE COURT:  I think the difference is between the

6    arrest and the conviction.  I understand the significance of

7    the arrest, and I think it is permissible because it will allow

8    other evidence as to how people reacted to that and what they

9    did in response and the significance of that.

10        So, I'm happy for you to clarify exactly, assuming

11   that's my ruling.  I agree with respect to John Galanis that

12   that shouldn't come in at all and I've already ruled that.  But

13   with respect to Jason Galanis having been arrested in Gerova, I

14   think that's fair game.

15        MR. SCHWARTZ:  First of all, with respect, I disagree

16   with that.  And I think this is an issue that was specifically

17   addressed in the course of the 404(b) briefing, and there are

18   plenty of ways to explain what happened in September 2015 that

19   don't involve revealing that Jason Galanis was arrested on

20   completely separate securities fraud charges.  They could, as

21   we suggest in our papers, for example, simply say that the BIT

22   board renewed their questions about Jason Galanis.  It doesn't

23   matter why they did it.  It doesn't add anything to the proof

24   against Mr. Archer that they were prompted by Galanis's arrest.

25   They ask those questions.  The government's view is that there

I5O3GAL4

were misstatements.  Our view is there weren't.  It has

everything to do with the interaction between the BIT board and

Mr. Archer and not what prompted them to ask the questions.

The fact of Jason Galanis's arrest is grossly

prejudicial and not needed to make that point.

More broadly, though, the idea that Mr. Archer was

somehow on notice that Jason Galanis was a bad guy, which is

the -- if not the explicit argument, the insinuation from the

government's opening, it is something I want to nip in the bud.

It doesn't make sense.  The California conviction was

sealed, no one knew about it until long after this case was

started.  The Gerova arrests -- just the arrests didn't occur

until this alleged scheme was substantially complete.

Certainly all of the bonds involving Mr. Archer had been issued

by that point, and his conviction didn't come until after this

case was charged.

And then, yes, it's true, the jury will hear that

Jason Galanis was convicted in this case, but that plainly

doesn't support the argument that this was not his first rodeo.

So I don't think any of those things, one, supports

that argument, and then two, I don't think that's permissible

argument because the reason why those prior convictions are

coming in is to impeach Jason Galanis, not to somehow prove up

Mr. Archer's state of mind.

MR. TOUGER:  I would also add that really the arrest

I5O3GAL4

of Jason Galanis doesn't change anything.  What changes things
in this case is shortly after the arrest, subpoenas start
coming, and that's what changes everybody's conduct.  And
obviously there is no problem because it's truthful in fact
that subpoenas were issued about this case, shortly after Jason
Galanis's arrest.  That's when the conduct of people actually
changes, and a lot of conversation starts taking place and
people's attitudes to other people start changing.

          When Jason Galanis is arrested, nothing really changes
there, and I think the overriding change in conduct happens
when the subpoenas are issued.  And the 403 analysis, the
prejudicial effect of saying that in the middle of this factual
sequence of this case that Jason Galanis is arrested for a
securities fraud, is overwhelmingly damaging, I would say more
so to my client than the other two individuals, but certainly
to all three of us.  And it doesn't need to be put in.

          The only reason it's relevant, the only argument that
could be made from that is, they know Jason's a bad guy, why
are they dealing with him.  What other relevance does that
arrest have to this case.  There is no other relevance of that
arrest and this case, because the conduct doesn't change upon
the arrest.  The conduct changes shortly thereafter when the
subpoenas go out.  And that's when Mr. Anderson starts talking
to people and that's when other people start reacting to the
situation.

I5O3GAL4

1          It puts me in a very bad position because, as a matter
2     of fact, the evidence will show that after the arrest comes
3     out, Mr. Anderson says very nice things to my client like he
4     doesn't think he's guilty.  Trust him.  I'm not going to bring
5     that out.
6          But the point is their argument isn't the way the
7     reaction was of the people who are going to be witnesses in
8     this case.  The witnesses in the case don't really change their
9     view of Jason Galanis or John Galanis until the subpoenas go
10    out.  And I don't understand the relevance of the arrest of
11    Gerova to this case.  It has no impact.
12         MR. SCHWARTZ:  Let me say one last thing before the
13    government responds.  That was your Honor's ruling --
14         THE COURT:  No, my ruling --
15         MR. SCHWARTZ:  I'm sorry to cut you off.
16         THE COURT:  My ruling -- I'm happy to hear you out.
17    And I'll clarify my ruling for you to the extent it was
18    unclear, but go ahead.
19         MR. SCHWARTZ:  It was not unclear.  Your Honor said --
20    I'm reading from the transcript:  "I am not going to permit the
21    government to introduce evidence relating to the arrests and
22    convictions of Mr. Hirst and John and Jason Galanis in Gerova.
23    I just fail to see how it is a direct evidence of this
24    conspiracy."  That is page 25 of the April 13 conference, your
25    Honor.

I5O3GAL4

1     We've been preparing for this trial in reliance on

2     that ruling.  I would have opened on the arrest if I knew it

3     was coming in.  It is a very substantial fact to my client, and

4     we prepared with that ruling in mind.

5     At every point we have said and your Honor has been

6     clear that Gerova is out of this case.  You've said some of the

7     underlying facts may come in, like relationships.  But, you've

8     never, with respect, you've never indicated that arrests or

9     convictions could come in, and your Honor specifically on the

10    record --

11    THE COURT:  Let me look back at the transcript.  My

12    recollection was that my ruling was with respect to John

13    Galanis and Gary Hirst.  So to the extent that -- and I will

14    look back on the transcript and see if in fact that was

15    unclear.  I don't know if it was an error in the transcript, an

16    error in something I said.  I'll look back.

17    My understanding was always, and I think it should be

18    clear from the rest of my ruling, that it was focused on how

19    prejudicial it would be if it came out that defendants who are

20    at the table here had previously been arrested or convicted in

21    a previous fraud case.  But I'll look back at that.  So, I'm

22    happy to look back at that.  But, that was my intention all

23    along.

24    I also am not entirely clear.  I understand your point

25    with respect to impeachment.  I think that's fair.  Other than

I5O3GAL4

1    his arrest and how it affected how people acted, the rest of

2    the sort of bad acts with respect to Jason Galanis were

3    supposed to come in as impeachment.  But I thought you were

4    working out a stipulation with respect to what was going to

5    come in.  If that's the case, I'm not sure what the prejudice

6    is.

7                I understand the prejudice of the timing on the Gerova

8    arrest.  But I'm not sure what the prejudice is if it's coming

9    in anyway and you were going to have me read something as to

10   his prior bad acts if the government mentions it.

11               MR. TOUGER:  The stipulation had nothing to do with

12   Gerova.  Nothing.

13               MS. MERMELSTEIN:  I think --

14               THE COURT:  I haven't seen the stipulation.

15               MS. MERMELSTEIN:  Your Honor, I don't know what

16   Mr. Schwartz is reading from.  I don't have the copy of the

17   transcript in front of me.  That's clearly from your Honor's

18   404(b) ruling.

19               The government has understood from the beginning that

20   the government was permitted to tell the jury that Jason

21   Galanis was arrested in Gerova because of all the things that

22   happened that were relevant from that case that flow from that.

23   We can give you more on that.  I think it's not a close call.

24   I'm inclined to say we should take this up later because it

25   doesn't pertain to Mr. Anderson.

I5O3GAL4

1          THE COURT:  Does it relate to this witness?

2          MR. SCHWARTZ:  I want to put the marker down because

3     it came up in opening.  I wanted to make sure that that

4     argument --

5          THE COURT:  You can put the marker down.  I'll tell

6     you from my perspective, my ruling was always with respect to

7     John Galanis and Gary Hirst who were defendants at the table in

8     this case.  I think that's clear from the context of my entire

9     ruling.

10          I don't know if I misspoke.  I don't know if there was

11     an error in the transcript.  I will look back at it.  But, and

12     again, I haven't seen the stipulation.  Maybe the stipulation

13     only refers to the California conviction.

14          MR. SCHWARTZ:  I mean, I really do invite you to go

15     back and look at the transcript.

16          THE COURT:  I will.

17          MR. SCHWARTZ:  Because your Honor ordered what I just

18     said out loud.  And then throughout, your Honor suggested there

19     might be other ways that they can make the same point.  But,

20     there is never a suggestion that the fact of any arrest could

21     come in in connection with Gerova, and that totally blindsided

22     us this afternoon.

23          THE COURT:  But the whole focus of my ruling was based

24     on the prejudice to defendants at this trial from the fact that

25     they had previously been arrested or convicted.  Was it not?

I5O3GAL4

1          MR. SCHWARTZ:  That was certainly one of the

2     arguments.  But everyone, certainly I know Mr. Archer when he

3     made this motion to exclude all of the Gerova evidence, it was

4     not just because those other two people were involved in it.

5     In fact, if Gerova was going to come in, we liked the fact that

6     the other two were in on it with Jason Galanis, and Mr. Archer

7     was not.

8          Our argument always was the entire Gerova thing should

9     go out and your Honor granted that motion.  And I don't know

10    what your thinking was.

11         THE COURT:  I'll look back on it.

12         MR. TOUGER:  I can honestly say my notes from that day

13    say "Gerova out of case."  That's what your ruling is.

14         THE COURT:  I kept your client's conviction out of the

15    case.

16         MR. TOUGER:  That's not --

17         THE COURT:  I'm going to check the transcript.  As I

18    said --

19         MR. TOUGER:  My point --

20         THE COURT:  -- that is not any recollection at all.

21         MR. TOUGER:  If that's not coming in through this

22    witness, where is it coming in?

23         MS. MERMELSTEIN:  Through other witnesses who became

24    aware that Jason Galanis --

25         MR. TOUGER:  Who?

I5O3GAL4

1              THE COURT:  It's not coming in through this witness?

2              MS. MERMELSTEIN:  It's not.  We can take this up

3      later.  I did want to put down a marker with respect to

4      objections to opening.  Which is that Mr. Schwartz referenced

5      the fact that Francisco Martin was involved in obtaining gold

6      bars.  That fact -- and Mr. Schwartz says he did not understand

7      this from the 3500 and I credit that is what his understanding

8      may have been.  That's a misunderstanding.

9              The gold bars were used in furtherance of the pump and

10     dump scheme that your Honor has precluded.  If the defendants

11     are going to ask Mr. Martin about his bad conduct about the

12     pump and dumb scheme.  If they don't want it in, they can't

13     start asking half questions to suggest that he was involved in

14     something illicit and not tell the whole story.

15             I think there should be no further reference of the

16     gold bars unless the pump and dump will be fair game.  Again,

17     not an issue for today, but markers with respect to problems

18     with the opening.

19             MR. TOUGER:  Just to go back --

20             THE COURT:  Just last comment and let's bring the jury

21     out.

22             MR. TOUGER:  I cannot cross-examination Mr. Anderson

23     without knowing the ruling, because Mr. Anderson and

24     Mr. Galanis have a lot of discussion after the arrest.  And my

25     whole cross will change if it's coming in.

I5O3GAL4

1          THE COURT:  All right.  Okay.  I will tell you before

2     the cross.  We'll take a break before the cross.  Okay.

3          MR. TOUGER:  Well, I can't say I'm going to be able to

4     change my cross in five minutes.

5          MS. MERMELSTEIN:  There is no question, no one is

6     trying to suggest that the fact of John Galanis's arrest should

7     come into evidence with respect to Gerova.  So to the extent

8     Mr. Anderson had communications with Mr. John Galanis, in which

9     he did not immediately disavow him in light of the fact of his

10    arrest, cannot be a ground of cross-examination unless we're

11    going to get into the fact that John Galanis was part of the

12    Gerova case.  No one is trying to do that.

13         I think the government needs to know if Mr. Touger is

14    going to cross-examine Mr. Anderson about the fact that he

15    didn't immediately disavow John Galanis.  First of all, I don't

16    think it is relevant, but we would obviously elicit that on

17    direct.  We weren't intending to do it, because we think that

18    whole area is foreclosed.

19         THE COURT:  How long is this testimony on direct?

20         MS. MERMELSTEIN:  Two plus hours.

21         MS. TEKEEI:  It is approximately two hours, your

22    Honor.

23         THE COURT:  Can we start now.  I'm going to look at

24    the transcript.

25         MR. TOUGER:  Let me just make it clear so the

I5O3GAL4

1   government isn't misstating my position.  I had no plans to go

2   to Mr. Anderson about this whatsoever.  There is a distinct

3   left turn in my cross when we get to that time.  I had no plans

4   to do it.  But there is not just discussions between

5   Mr. Galanis and Mr. Anderson about John Galanis's arrest.

6   There is discussions between those two about Jason Galanis's

7   arrest, and it's going to take a parsing, and that's why I said

8   I can't prepare my cross in five minutes, because you're right,

9   I don't want the John Galanis arrest to come out whatsoever.

10  Obviously.  So, but, I would like an offer of proof from the

11  government whose conduct changed when Jason Galanis got

12  arrested.

13          MS. MERMELSTEIN:  There is two ways it is essential.

14  Mr. Archer's lies to the BIT board in light of the fact he knew

15  Mr. Galanis had been arrested, the concerns of Mr. Galanis take

16  on a different color.  Number two, as is clear in the 3500

17  material, Mr. Cooney had a conversation with Francisco Martin

18  following Jason Galanis's Gerova arrest in which he said, in

19  sum and in substance, like, uh-oh, our co-conspirator got

20  arrested and now what.  Mr. Cooney said to Mr. Martin, don't

21  worry.  He didn't get arrested with respect to our fraud, he

22  got arrested with respect to Gerova.

23          That's obviously incredibly significant evidence about

24  Mr. Cooney's state of mind and it cannot be explained without

25  the fact of Jason Galanis's arrest, and I don't understand how

I5O3GAL4

1    it could possibly prejudice the defendants for there to be

2    evidence that Jason Galanis was arrested -- forget convicted --

3    just arrested with respect to Gerova when they want to argue

4    that he is a sociopathic mastermind who deceived them all and

5    he had prior convictions.  They want to put in the California

6    conviction.  They want them to know he got convicted in this

7    case.  What is the prejudice of there being another arrest

8    that's so relevant?

9         MR. TOUGER:  The government is using "they" when they

10   should be using individual defendants.  John Galanis's defense

11   has nothing to do with Jason Galanis being a sociopath.  So

12   this is the prejudice about going to trial with three

13   defendants as opposed to going to trial alone.  I was cringing

14   every time they said that in their opening.  So to put me in

15   that boat is completely false.

16        Our defense is exactly the opposite at this point.

17   That Jason Galanis gave fair market value for whatever money he

18   took out of the annuity account.  So, the idea that we want

19   Jason Galanis painted as this heinous criminal and mastermind,

20   that's ridiculous.  Why would we want that.  It is so

21   detrimental to John Galanis's case that his son is being, in a

22   case he is a co-defendant on, is being are portrayed as this

23   mastermind defrauder.  And while the Court and the government

24   might disagree, might not believe me, when I say that John

25   Galanis did not think of his son that way.  I can't even say

I5O3GAL4

that, because if I say that, then the 404(b) evidence is going
to come in.  You're handcuffing me with the 404(b) ruling that
if I mentioned anything like John was trusting his son, you are
going to slap me with the 404(b) evidence coming in.  But you
are allowing them to discredit Jason on the same side when it's
not relevant to this case.

        I'm sure Mr. Schwartz can argue the BIT board element
more than I can.  As far as the fact that Mr. Cooney knew about
the arrest of Jason Galanis, so what?  It's after he bought the
bond.  It is a year later.  So what's the difference.  It is a
year later.

        Your Honor, the second tranche was in September of
2014.  And the arrest doesn't happen until September of 2015.
So where is the relevance?  If they were going to argue that
Mr. Anderson or another witness changed their conduct, which
Mr. Anderson does, but he doesn't do it on the arrest.  He does
it when he gets a subpoena.  That's when he changes his
conduct.  And therefore, I just don't see relevance of that
information.  Especially when you compare it to the detrimental
value, that that's not even fair evidence against my client.

        MR. SCHWARTZ:  With respect to the BIT board, I really
think the government has made my argument.  The only reason
that they want this in, is for its prejudicial value.  It's
because it affects the tenor of the representations, whatever
that means.  The statements that Mr. Archer made to the BIT

I5O3GAL4

1    board either were true or they were false.  And their truth or

2    falsity is not affected by whether or not Jason Galanis got

3    arrested.  They only want that in because it makes it all seem

4    so much more sinister, not because it is.  That's an improper

5    use of that evidence, and certainly doesn't add anything to the

6    alleged misrepresentations.

7            THE COURT:  Last comment.  We'll bring the jury in.

8            MS. MERMELSTEIN:  Mr. Schwartz in opening, there was a

9    lot made of the difference between a mistake and sort of an

10   intentional falsehood.  And the significance of a

11   representation matter.  Why a representation is being made in

12   the context it's being made matters to what a jury may evaluate

13   about your intent in making it.  The fact of Jason Galanis's

14   arrest in Gerova is unquestionably relevant with respect to the

15   fact of the BIT board.

16           There are also e-mail communications between the

17   defendants talking about the fact of Galanis being charged that

18   put into context their conduct.  It's relevant who steps up to

19   deal with Atlantic and Hughes in the aftermath.  Who steps in

20   as the number two when Jason Galanis can't be involved anymore

21   because he's been arrested.

22           (Continued on next page)

23

24

25

I5o6gal5

1          MS. MERMELSTEIN:  And with respect to his

2     conversations with Mr. Cooney, the issue isn't that Mr. Cooney

3     became aware after.  There has been no suggestion and the

4     government's doesn't intend to suggest that the defendants knew

5     that Jason Galanis was perpetrating the fraud at the time he

6     was doing it.  A conversation in which you say, Are we in

7     trouble because our coconspirator got arrested? and you say,

8     No, we're okay, that is a different fraud, not our fraud, is

9     such incredible evidence of a person's intent with respect to

10    their participation in this fraud.  It doesn't matter that it

11    happens after the fact.  It reflects their state of mind, which

12    is the issue in this case.

13          So we don't have so belabor the point.  I think we can

14    keep moving, but this is not a close call in the government's

15    view.  You already rule.

16          MR. TOUGER:  Your Honor, he doesn't use the word

17    fraud.

18          MS. NOTARI:  This is so terrifying what they are

19    trying to do.  They are trying to convict Mr. Cooney, and I

20    will stick with Mr. Cooney, based on this prejudicial evidence.

21    Of course it makes sense that he has been working with a person

22    on a bond deal and he gets arrested and he says, Don't worry.

23    You are obviously shocked he got arrested, but don't worry

24    because it has nothing to do with our bond deal.  It has a

25    Gerova.

I5o6gal5

1          I had a situation last week where I found out a

2     paralegal I was working with got implicated in a situation with

3     an MCC guard and the first question was, who is the client that

4     snitched out.  It is not my client.  Thank God.  This is just

5     natural human behavior that they are trying to put criminal --

6          MR. TOUGER:  Your Honor --

7          MS. NOTARI:  It is so prejudicial in a case where they

8     don't have evidence.

9          Ms. Mermelstein misconstrued the statements.  He never

10    said -- we have got the 3500 material.  At most he said he got

11    a phone call and Cooney said, No worries.  The 3500 material

12    is -- Francisco Martin is obsessed when Jason Galanis gets

13    arrested.  So they sense that he is obsessed and he confronts

14    Cooney and Cooney says, Don't worry.  It is Gerova.

15         MR. TOUGER:  I think the government's misstatement of

16    adding word fraud to that conversation just proves how damaging

17    this is and how it is not true.  Bevan Cooney doesn't use the

18    word fraud.  He says, Mr. Galanis got arrested on a case that

19    is a fraud.  He doesn't say our case is a fraud.  That is

20    totally not true.  She made that up out of thin air.

21         MR. SCHWARTZ:  One last separate thing.  I want this

22    to be clear.  I think the government misspoke in an important

23    way.  I thought I heard Ms. Mermelstein say that the government

24    is not going to argue or contend that these defendants had any

25    knowledge or involvement in Gerova.  If that were true, that

I5o6gal5

1    might be okay.  We might be okay stipulating that Mr. Archer

2    had no idea that Jason Galanis was perpetrating that fraud and

3    he had no involvement in the fraud.  The problem is that is

4    only true about two.  It is not true about the third.  So they

5    will not stipulate -- Mr. Touger will not stipulate to that.

6    That evidence then comes in an absolutely cockeyed way that is

7    nothing but prejudicial and I think that is important it be

8    stated clearly.

9           MS. MERMELSTEIN:  I am happy to take this up later.

10   The government is not making up out of whole cloth what the

11   witnesses are saying.  If the defendants want to argue that is

12   not the meaning of that conversation, they can certainly do so.

13   I think it is very important evidence for the jury.

14           With respect to Mr. Archer and Mr. Cooney's knowledge,

15   I said the government is not intending to argue they knew

16   Mr. Galanis was involved in the jury fraud.  I am not saying he

17   didn't know.  I wouldn't be prepared that is the case.  They

18   were very close to Mr. Galanis and many people knew he was

19   involved in the fraud.  We're not suggesting it to the jury.

20   We would not saying that they affirmatively didn't know.  We're

21   not saying anything about it.

22           THE COURT:  We're going to bring the jury in.

23           Why don't you get the witness.

24           (Continued on next page)

25

I5o6gal5                         Anderson - direct

1                    (In open court; jury present)

2                    THE COURT:  Welcome back, everyone.

3                    You can be seated.

4                    The government can call its first witness.

5                    MS. TEKEEI:  The government calls Tim Anderson.

6     TIMOTHY ANDERSON,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MS. TEKEEI:

11    Q.  Good afternoon.

12    A.  Good afternoon.

13    Q.  What do you do, Mr. Anderson?

14    A.  I am an attorney.

15    Q.  Can you describe your educational background?

16    A.  Yes.  I am a 1995 graduate of Fordham University, a 1998

17    graduate of Vermont Law School, and a 2004 graduate of

18    Villanova Law School in taxation.

19    Q.  Where do you currently work?

20    A.  Dinsmore & Shohl in Philadelphia.

21    Q.  What areas of law do you practice?

22    A.  I practice economic development, bonds, corporate, tax, and

23    finance and municipal government law.

24    Q.  Have you ever worked on Native American bond issuances?

25    A.  I have.

I5o6gal5                          Anderson - direct

1    Q.   Describe your work on the Native American bond issuances.

2    A.   Since approximately 2006, I have worked on Native American

3    bond issuances, five to 10 bond transactions, ranging from

4    marines and other infrastructure to head-start buildings to

5    things along those lines.

6    Q.   So how many Native American bond issuances have you worked

7    on previously?

8    A.   Five to 10.

9    Q.   Have you ever worked with members of the Oglala Sioux

10   Tribe?

11   A.   I have.

12   Q.   In what capacity?

13   A.   I worked with them on a few of their economic development

14   projects.

15   Q.   Are you familiar with Wakpamni Lake Community Corporation?

16   A.   I am.

17   Q.   What is it?

18   A.   It is the economic development corporation of the Wakpamni

19   Lake Community, which is part of the Oglala Sioux Tribe.

20   Q.   Where is the tribe located?

21   A.   South Dakota.

22   Q.   What is the name of the reservation?

23   A.   It is the Pine Ridge Reservation of the Oglala Sioux Tribe.

24   Q.   Are you familiar with an individual named Yanni Galanis?

25   A.   I am.

I5o6gal5                        Anderson - direct

1    Q.  Did you ever know him to go by any other names?

2    A.  No.

3    Q.  When did you first meet Yanni Galanis?

4    A.  I met Yan Galanis in March of 2014.

5    Q.  Would you recognize him if you saw him again?

6    A.  Yes.

7    Q.  If you could please take a look around the courtroom, do

8    you see him in the courtroom today?

9    A.  I do.

10   Q.  Can you point him out and identify an item of clothing he

11   is wearing.

12   A.  There is a computer monitor in the way.

13              MR. TOUGER:  Your Honor --

14   A.  Looks like a blue shirt.

15              THE COURT:  The record shall so reflect.

16   Q.  Going back to when you first met Mr. Galanis, what location

17   did you first meet him?

18   A.  I met him at an economic development conference for tribal

19   projects in Las Vegas.

20   Q.  What is an economic conference for tribal projects?

21   A.  It is conference annually held in Las Vegas for various

22   tribes as well as professionals and other people who work on

23   tribal projects.  The seminar is dedicated to discussing past

24   successful economic development projects and proposals for new

25   projects that would help the situation on many of the Indian

I5o6gal5                        Anderson - direct

1   tribes economically.

2   Q.  Why did you attend?

3   A.  I had previously worked on any number of projects so I had

4   a number of clients that were there.  In addition, like any

5   professional, you go to these things to find in clients, new

6   protects.  Generally for business purposes, business marketing

7   purposes.

8   Q.  How did you come to meet Mr. Galanis during that

9   conference?

10  A.  I received a phone call from the economic development

11  director at Wakpamni, who called -- actually another person we

12  worked with, Steven Haynes, who is a developer in Indian

13  country, and asked that we attend a meeting that he met a

14  gentleman that wanted to -- had a proposal for the tribe that

15  we wanted to discuss.

16  Q.  Who is the individual at the Wakpamni Lake Community

17  Corporation who contacted you?

18  A.  Raycen American Horse Raines.

19  Q.  You mentioned another individual Steven Haynes.  Who is

20  that?

21  A.  He is the principal of Haynes Investments, who is a

22  developer in Indian country.

23  Q.  So what was the purpose of the meeting with Mr. Galanis?

24  A.  Mr. Galanis had a proposal.  He wanted to discuss that

25  looked to benefit the economic situation for the at Pine Ridge

I5o6gal5                          Anderson - direct

1    Reservation.

2    Q.   What was that proposal?

3    A.   It was an economic development annuity bond.

4    Q.   What does that mean?

5    A.   Sure.   That means the majority of the money raised with the

6    bond issue, unlike a bond issue for a state or something like

7    that where most the money is spent at closing or shortly

8    thereafter, the majority the money raised by the bond issue

9    goes into an investment and that investment produces revenue

10   over the course of the bond to do a number things, one of which

11   is to pay back debt service, principal and interest on the bond

12   and the other portion is to support economic development

13   projects at the tribe.

14   Q.   So let's break that apart a little bit more.   In layman's

15   terms what is a bond?

16   A.   A bond is a debt security.   Meaning, it is an investment

17   vehicle.   Someone purchases it with the anticipation that they

18   are going to be paid principal and interest over the life of

19   that bond according to its terms.

20   Q.   What is an issuer of a bond?

21   A.   The issuer of the bond is the entity, the legal entity that

22   was going to issue the bond.

23   Q.   What is an investor?

24   A.   An investor is the group that purchases the bond.

25   Q.   How do investors get paid back?

1  A.  They are paid at stated times and periods principal and

2  interest on the bonds.  So annually, semiannually.  It is a

3  scheduled repayment over the course of the investment security.

4  Q.  So now what is an annuity?

5  A.  An annuity is a type of investment whereby the contract is

6  purchased and it itself produces income that is then paid back

7  over time to the holder of the annuity.

8  Q.  So now let's go back to the bond deal that Mr. Galanis

9  discussed at this conference.

10       How did he describe the structure of the deal?

11  A.  The structure of the deal would be Wakpamni would issue a

12  bond and the proceeds of that bond would go into an annuity

13  investment.  That annuity investment over time would pay back

14  the principal and interest on that bond in addition to

15  providing money upfront as well as annually for the economic

16  development projects of the tribe.

17  Q.  Now, the structure, who did Mr. Galanis say would be the

18  issuer on the bond?

19  A.  The issuer of the bond would be Wakpamni.

20       MR. TOUGER:  Your Honor, can we have a side bar,

21  please?

22       THE COURT:  Sure.

23       (Continued on next page)

24

25

1           (At the side bar)

2           MR. TOUGER:  This goes along with what we pointed out

3   before the trial started.  There is the Wakpamni Lake Community

4   and there is the Wakpamni Lake Community Corporation, both

5   start with Wakpamni.  In this incident the issuer was not the

6   Wakpamni Lake Community.  It was the Wakpamni Lake Community

7   Coroporation.  I think for the juror's clarity, he should have

8   to stay WLCC or Wakpamni Lake Community Corporation.

9           THE COURT:  Try to clarify that along the way and you

10  can clarify further on cross.

11          MR. TOUGER:  It is clear that the issuer is the WLCC.

12          THE COURT:  The government is going to clarify.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    BY MS. TEKEEI:

3    Q.  Mr. Anderson, I asked you some questions a couple minutes

4    ago about what is the Wakpamni Lake Community Corporation.

5              Who were the issuers of the bond as proposed by

6    Mr. Yanni Galanis?

7    A.  It was generally Wakpamni.

8    Q.  Was there an entity related to the Wakpamni Community that

9    issued the bonds?

10   A.  Yes.

11   Q.  What was that entity?

12   A.  Wakpamni Lake Community Corporation.

13   Q.  What is your understanding of why the Wakpamni Lake

14   Community Corporation was set up?

15   A.  It was set up for to undertake the economic development

16   products of the Wakpamni Lake Community.

17   Q.  Thank you.

18             So going back to the structure the bond deal, who if

19   anyone did Mr. Yanni Galanis say would be -- who else did he

20   say would be involved with the deal?

21   A.  He stated that his son was an investment banker at Burnham

22   in New York and they would be the proposed banker on the deal.

23   Q.  Who is his son?

24   A.  Jason Galanis.

25   Q.  Now, what particular role would his son Jason Galanis play

1    in this bond deal?

2    A.   Again, he would be the investment banker in connection with

3    Burnham on the deal.

4    Q.   What would he do as the investment banker as described by

5    Mr. Galanis?

6    A.   Well, the investment banker would be the seller of the

7    bonds.

8    Q.   Are you familiar with the concept of placement agent?

9    A.   I am.

10   Q.   What is a placement agent?

11   A.   A placement agent is a type of investment banker who will

12   sell the bonds and use their best efforts to sell the bonds to

13   the investor.

14   Q.   So what role would Burnham play in this proposed deal?

15              MR. SCHWARTZ:  Objection.

16              THE COURT:  Overruled.

17              Can you clarify the entity, please.

18              MS. TEKEEI:  Sure.

19   BY MS. TEKEEI:

20   Q.   Mr. Anderson, which entity was supposed to be the placement

21   agent for these bonds?

22   A.   As discussed at the meeting?

23   Q.   Yes.

24   A.   The word Burnham was used in New York.

25   Q.   As discussed by Mr. Galanis at that meeting, what role

1    would Burnham play in that -- in this proposed bond deal?

2    A.   They would act as placement agent.

3    Q.   What, if anything, did Mr. Yanni Galanis say about who

4    would be the investors in this proposed bond deal?

5    A.   He believed there was a market for the bonds with pension

6    funds who had a requirement of a social impact investment.

7    Q.   What does that mean?

8    A.   That means the fund itself had -- a certain amount of its

9    money needed to be invested in projects that had a benefit to

10   the public at large, not necessarily to raise, produce the most

11   money.

12   Q.   What, if anything, did Mr. Galanis say about his role in

13   the potential deal?

14   A.   He was helping his son get deals for his bank.

15   Q.   How did this meeting end as it related to the bond

16   proposal?

17   A.   There seemed to be interest by both Wakpamni and stated

18   interest on behalf of Burnham that they would want to do the

19   deal and it was left with, If everyone is interested, let's

20   talk again in the future.

21   Q.   Did there come a time after this meeting when you discussed

22   the bond deal again with Yanni Galanis?

23   A.   Yes.

24   Q.   Approximately when?

25   A.   Approximately four to six weeks later.

I5o6gal5                         Anderson - direct

1    Q.   What did he say?

2    A.   That the project looked like it was going to go forward.

3    Q.   Did there come a time when you discussed this bond deal

     with Jason Galanis?

4

5    A.   Yes.

6    Q.   Approximately when was that?

7    A.   Generally around the same time period.

8    Q.   What did Jason Galanis say about the annuity bond or the

     deal bond?

9

10   A.   Again, that it looked like the project was going to go

11   ahead and they had good interest of potential buyers.

12   Q.   Did you ever meet Jason Galanis?

13   A.   I did.

14   Q.   Approximately when?

15   A.   I met him in the summer, July of 2015.

16   Q.   Where?

17   A.   In New York City.

18   Q.   What particular location in New York City?

19   A.   Just south of Central Park on around 47th Street.

20   Q.   What was the purpose of that meeting?

21   A.   To discuss a bond issue.

22   Q.   Did the meeting happen inside a building or outside?

23   A.   Inside the building.

24   Q.   What building?

25   A.   It was Burnham's offices in New York.

I5o6gal5                        Anderson - direct

1   Q.  How much office space did Burnham take up?

2   A.  It appeared to be a floor of that building.

3   Q.  Now, going back to the proposed bond deal, what was your

4   understanding of Jason Galanis's role with respect to the deal?

5   A.  That he was an investment banker at Burnham working on the

6   deal.

7   Q.  What was the source of that understanding?

8   A.  Both Jason Galanis and Yanni Galanis.

9   Q.  What was your role at that point in the Spring of 2014 with

10  respect to the Wakpamni bond project?

11  A.  I was an attorney closely following the deal awaiting to

12  see if it was going to start and become a real deal.

13  Q.  What do you mean by that?

14      I apologize.

15  A.  -- closely following the deal to see if it was going to

16  become a real deal and go forward.

17  Q.  What do you mean by that?

18  A.  Well, some deals never go forward.  They are talked about a

19  lot and then for whatever reason different parties don't decide

20  to move forward.

21  Q.  Where did you work at the time?

22  A.  Dillworth Paxson in Philadelphia.

23  Q.  What is that?

24  A.  It is a law firm.

25  Q.  Was Dillworth Paxson going to be compensated in connection

1    with its role in this transaction?

2    A.   Yes.

3    Q.   How?

4    A.   Early on in the transaction we would agree on a projected

5    fee and then be paid at closing on that transaction.

6    Q.   Did there come a time when you represented one of the

7    parties in connection with this transaction?

8    A.   Yes.

9    Q.   Which party was that?

10   A.   Burnham Securities, Inc.

11   Q.   Why did you represent Burnham Securities, Inc.?

12   A.   They were an investment bank and it was a type of work I

13   did and it seemed like a good opportunity to work with them and

14   I could be helpful.

15   Q.   Had you previously worked with the Oglala Sioux Tribe?

16   A.   I had worked with their Wakpamni District, yes.

17            MR. TOUGER:   I missed it.  Can I have the answer read

18   back?

19            THE COURT:   Can you repeat that?

20   A.   I worked with the subdivision of the Oglala Sioux Tribe,

21   the Wakpamni District.

22   Q.   So why not represent the Wakpamni Lake Community

23   Corporation in connection with this transaction?

24   A.   It had been discussed.  I had worked with them on other

25   matters that were not bond matters.  So it was an open question

1    on who I would represent.  Burnham showed an interest in me

2    representing them and looking at the transaction.  I am a New

3    York lawyer as well as a Pennsylvania lawyer.  Burnham was in

4    New York.  And realizing how far South Dakota was there would

5    be a lot of visits to South Dakota and after discussing with

6    various people, it seemed the best approach to represent

7    Burnham.

8    Q.  Who represented the Wakpamni Lake Community?

9    A.  The law firm of Greenberg Traurig.

10   Q.  Which particular attorneys at that firm?

11   A.  Heather Dawn Thompson and Michael McGinnis.

12   Q.  At the time what, if any, understanding did you have in

13   with the relationship between Ms. Thompson and Mr. Raycen

14   Raines, who you spoke about a few moments ago?

15   A.  I understood that Raycen Raines had a romantic interest in

16   Heather Thompson.

17   Q.  Going back to the bonds, did the Wakpamni Lake Community

18   Corporation ever issue bonds as proposed by Yanni Galanis?

19   A.  They did.

20   Q.  How many series of bonds did they issue?

21   A.  They issued three separate series of bonds.

22   Q.  What was the total amount of bonds issued by the Wakpamni

23   Lake Community Corporation throughout those?

24   A.  Approximately 60 million.

25   Q.  Were you involved in all of those bond issuances?

1    A.  I was.

2    Q.  What was your role throughout?

3    A.  I was placed in agent counsel to Burnham.

4    Q.  Generally speaking, and we'll go into this a little bit

5    later, what did you do as placement agent and counsel to

6    Burnham Securities, Inc.?

7    A.  I drafted and reviewed various bond documents related to

8    the transaction, coordinate with the other parties, other

9    attorneys and the trustee in order to keep the project on

10   schedule.

11   Q.  Can we call it the WLCC just to make it short, Wakpamni

12   Lake Community Corporation?

13   A.  Sure.

14   Q.  Approximately when did the WLCC issue its first series of

15   bonds?

16   A.  The first series of bonds was in August 2014.

17   Q.  For how much?

18   A.  28 million.

19   Q.  Is that an exact figure or an approximation?

20   A.  27 million plus some change.  I forget what it was.

21   Q.  Who were the investors of those bonds?

22   A.  They were 67 pension funds.

23   Q.  Did they invest in the bonds directly?

24   A.  No.

25   Q.  How did they invest in the bonds?

1    A.  They invested through their investment manager, Hughes

2    Capital Management.

3    Q.  For what WLCC development project were those bonds issued?

4    A.  For a commercial warehouse.

5    Q.  Approximately when did the Wakpamni Lake Community

6    Corporation issue the second series of bonds?

7    A.  End of September 2014.

8    Q.  What was the amount issued during that bond issuance?

9    A.  20 million.

10   Q.  Who purchased those bonds?

11   A.  Those bonds were purchased by Bohai -- an entity named

12   Bohai and an individual named Bevan Cooney.  Bohai Seneca or

13   Seneca Bohai.

14   Q.  How many bonds did Seneca Bohai purchase?

15   A.  They purchased 15 million.

16   Q.  Who, if anyone, did you understand was associated with

17   Seneca Bohai?

18   A.  Devon Archer.

19   Q.  How many bonds did Mr. Cooney purchase?

20   A.  Five million.

21   Q.  For what development project were these bonds issued?

22   A.  That was for the town center development, which was a

23   shopping center.

24   Q.  What short of shopping center?

25   A.  A shopping center that had a cleaner, a coffee shop.

I5o6gal5                         Anderson - direct

1   Things along those lines.

2   Q.  Approximately when did the Wakpamni Lake Community

3   Corporation issue the third series of bonds?

4   A.  April 2015.

5   Q.  What was the amount of that issuance?

6   A.  16.2 million.

7   Q.  Who purchased those bonds?

8   A.  Atlantic Asset Management.

9   Q.  What is that?

10   A.  That is an investment firm management firm.

11   Q.  What development project were those bonds issued for?

12   A.  They were issued to fund the businesses that would operate

13   out of the commercial warehouse.

14   Q.  Throughout these transactions, who were your primary points

15   of contract at Burnham?

16   A.  Jason Galanis and Yanni Galanis.

17   Q.  Are you familiar with an individual named Hugh Dunkerley?

18   A.  I am.

19   Q.  Who is that?

20   A.  Hugh is the president of Burnham Securities, Inc.

21   Q.  Did you have any communications with Mr. Dunkerley in

22   connection with these bond transactions?

23   A.  I did.

24        MS. TEKEEI:  Your Honor, before we go forward I would

25   like to introduce in bulk a series of exhibits that the parties

I5o6gal5                    Anderson - direct

1    are all in agreement to.

2             THE COURT:  Go ahead.  What are the numbers?

3             MR. TOUGER:  We are in agreement that they go into

4    evidence.

5             THE COURT:  Understood.  What are the exhibit numbers?

6             MS. TEKEEI:  Government Exhibit 200, 201, 202, 204,

7    205, 206, 207, 208, 209, 210 through 217, 250, 252, 254, 263,

8    281, 402, 1220, 1268, 1270, 1272, 1300, 1301, 1303 through

9    1316.

10            THE COURT:  6-0?

11            MS. TEKEEI:  1-6.

12            1364, 1365 and 2027.

13            MR. SCHWARTZ:  No objection.

14            THE COURT:  They will be admitted.

15            Thank you, your Honor.

16            (Government's Exhibits 200-202, 204-217, 250, 252,

17    254, 263, 281, 402 received in evidence)

18            (Government's Exhibit 1220, 1268, 1270, 1272, 1300,

19    1301 received in evidence)

20            (Government's Exhibits 1303-1316 received in evidence)

21    BY MS. TEKEEI:

22    Q.  Mr. Anderson, you will see a binder of exhibits in front of

23    you.  If you can please turn to what has been entered into

24    evidence as Government Exhibit 1300.

25    A.  Okay.

1              MS. TEKEEI:  Ms. Sheinwald, can you please publish

2        that to the jury.

3        Q.  Mr. Anderson, do you recognize this document?

4        A.  I do.

5              MS. TEKEEI:  Your Honor, I believe the jury may be

6        having a problem with their screens.

7              JUROR:  There is a signal.

8              THE COURT:  Give us one second, please.

9              Is anyone's working?

10             JUROR:  Yes.

11             THE COURT:  We'll check on that at the break.  If you

12       can look over a shoulder or move seats down, that will be

13       helpful.

14             Raise your hand if you cannot see.  What I am going to

15       do is maybe ask you to move up there and then we'll fix.  The

16       government is going to move its screen right now.  If you can't

17       see, raise your hand.  We'll fix it at the break.

18             Can you see that?

19             JUROR:  Yes.

20             THE COURT:  Thank you.

21             If not, you can change seats to the ones in the back.

22       BY MS. TEKEEI:

23       Q.  Mr. Anderson, do you recognize this document?

24       A.  I do.

25       Q.  Can you describe generally what it is?

I5o6gal5                          Anderson - direct

1    A.  It is an e-mail with an attachment.

2    Q.  Who is sending the e-mail?

3    A.  Yanni Galanis.

4    Q.  Who is it to?

5    A.  It is to -- would you like me to read all of the names?

6    Q.  To the extent that you know who they are?

7    A.  One is a guy John, who is John Shint and Peter Shannon and

8    those guys two partners that were at the meeting -- the initial

9    meeting in Las Vegas.

10   Q.  2who is Elmurv --

11   A.  That is Michael Murphy.

12   Q.  Who is that?

13   A.  He is a retired attorney in California.

14   Q.  What is the date of this e-mail?

15   A.  April 15, 2014.

16   Q.  What is the subject?

17   A.  Tribal bonds.

18   Q.  Before we get to the attachment, do you see at the bottom

19   corner of the e-mail.  There is a name listed an e-mail

20   address?

21   A.  Yes.

22   Q.  Whose e-mail address is JGalanis@me.com?

23   A.  Yanni Galanis.

24   Q.  Do you see a quote under there?

25   A.  I do.

I5o6gal5                        Anderson - direct

1   Q.  Was it common for Mr. Yanni Galanis to send e-mail quotes

2   at the bottom?

3   A.  Yes.

4   Q.  Can you please read the name of the attachment to this

5   e-mail?

6   A.  WAH Valor two-page tear sheet March 23rd and then marked in

7   parentheses.

8   Q.  Can you please turn the the attachment.  What is this

9   document?

10  A.  This is an overview of Wealth Assurance Holdings, LTD, who

11  they are what they do, their finances, etc.

12  Q.  What is --

13         MR. TOUGER:  Can I ask you to keep your voice up.

14         THE COURT:  Sorry.  It is the courtroom and high

15  ceilings.

16         THE WITNESS:  Sorry.

17  A.  It is a overview of Wealth Assurance Holdings, Ltd., who

18  they are, what they do, what their finances are, the type of

19  things that they are interested in doing, who some of the

20  people who work for Valor or, excuse me, Wealth Assurance.

21  Q.  What type of company is Wealth Assurance Holdings, Ltd.?

22  A.  They are an insurance company who provide annuities.

23  Q.  Where are they located?

24  A.  They are listed as being located in Europe.

25  Q.  If you look at the top and a couple of lines below the

I5o6gal5                          Anderson - direct

1    name, who are listed as the director of Wealth Assurance

2    Holdings, Ltd.?

3    A.  Devon Archer, Jason Sugarman and Hugh Dunkerley.

4    Q.  Who Jason Sugarman?

5    A.  I don't know.

6    Q.  If you go to the next page, you'll see in the middle of the

7    page the line beginning with Devon Archer.

8    A.  Yes.

9    Q.  Can you please read that to the jury?

10   A.  Yes.  Devon Archer is a principal at COR Fund Advisors and

11   a principal in the Rosemont Group, a $2.4 billion private

12   equity firm he co-founded.  Mr. Archer is a director of WAH and

13   a founding shareholder.

14   Q.  Can you please read the description for Mr. Dunkerley?

15   A.  Yes.  The president of WAH and director is a director of

16   COR Securities Holdings and COR Clearing.  He was formerly a

17   bank regulator at the Federal Deposit Insurance Corporation,

18   the principal federal regulator in the United States

19   responsible for oversight of insured banking institutions.

20   Q.  What is the COR Group?

21   A.  I don't know.

22   Q.  What is COR Finance Advisors?

23   A.  I don't know.

24   Q.  I would like to direct your attention to Government

25   Exhibit 1301.

I5o6gal5                    Anderson - direct

1          Can you describe the e-mail that we're looking at

2    here?

3    A.  Yes.  It is an e-mail from Yanni Galanis dated May 19th,

4    2014 with the subject line engagement.

5    Q.  What information is provided here?

6    A.  It is information on the contact for my firm regarding the

7    prospective Oglala Sioux Tribe transaction.

8    Q.  Who is listed as contract of the COR Fund Advisors, LLC?

9    A.  Hugh Dunkerley, managing director.

10   Q.  What does it say about Mr. Dunkerley -- in the next

11   paragraph, what does it say about Mr. Dunkerley?

12   A.  He is also a director of the following companies, which may

13   play a role in the transaction.

14   Q.  What are those companies?

15   A.  Burnham Securities, Inc., and Wealth Assurance Holdings,

16   Ltd. parent of Wealth Assurance, HD.

17   Q.  Who is listed as the contact of the transaction?

18   A.  Jason Galanis.

19   Q.  Did you conduct any research on these entities

20   independently?

21   A.  I did.

22   Q.  Did there come a time when you contacted Jason Galanis

23   regarding Burnham Securities, Inc. when engaging Dillworth

24   Paxson, your former law firm, to work on the bond transactions?

25   A.  Yes.

I5o6gal5                          Anderson - direct

1    Q.  How did Burnham Securities formally hire Dillworth Paxson?

2    A.  We sent -- my firm sent them an engagement letter.

3    Q.  Who signed the letter?

4    A.  That was signed by Hugh Dunkerley.

5    Q.  Now, during the Summer of 2014 -- Spring of and Summer of

6    2014, can you describe for the jury the types of communications

7    you had with Yanni Galanis related to his bond posting?

8    A.  Yes.  E-mails and phone calls related to the bonds, status

9    of the bonds, the structuring of the bonds, a schedule for the

10   bonds.

11   Q.  Did you also have communications with Jason Galanis

12   regarding this bond proposal during that time period?

13   A.  Yes.

14   Q.  What were the nature of those communications?

15   A.  Similar.

16   Q.  Did there come a time when you had conversations with the

17   two of them together?

18   A.  Yes.

19   Q.  How did that happen?

20   A.  There were a number of different times.  There is a

21   question about the some piece of the bond.  I remember one

22   specifically on whether or not -- what the minimum denomination

23   of the bond would be.  It had to be 100,000.  Another specific

24   one early in September after the first deal had closed that a

25   second deal had been green lit, meaning there were -- had been

1    approved to move forward.

2    Q.  We will get into that in just a moment.

3            Focusing on the first bond transaction, what, if

4    anything, did Mr. Yanni Galanis describe to you about how that

5    deal was progressing in this Spring and Summer of 2014?

6    A.  They had a buyer in mind and the buyer was firming up and

7    there was an intention to close by the end of July.

8    Q.  Did you have discussions along those same lines with

9    Mr. Jason Galanis?

10   A.  Yes.

11   Q.  In your conversations with Yanni Galanis and Jason Galanis,

12   did they ever contradict each other?

13   A.  No.  They appeared to be in harmony.

14   Q.  What information did you need in order to begin working on

15   the bond-related documents that you described earlier?

16   A.  Primarily what the business terms of those bonds would be

17   and what the project would be.  Business terms, meaning what

18   the interest rate would be, the amount, the terms of repayment.

19   Information like that.

20   Q.  What at the time was your understanding of who were the

21   potential investors of the bond or in the early Summer of 2014?

22   A.  There would be a handful pension funds that had a social

23   impact need.

24   Q.  What was the source of that understanding?

25   A.  Conversations with both Yanni Galanis and Jason Galanis at

1   different times.

2   Q.  Who provided you with the information that you needed in

3   order to begin working on the bond-related documents?

4   A.  Yanni Galanis.

5   Q.  How did he provide you with that information?

6   A.  He provided e-mail correspondence that gave an overview of

7   the transaction in the form of summaries and a term sheet.

8   Q.  I would like to direct your attention to Government

9   Exhibit 1303, 1304, 1305, and 1306 if could you take a moment

10  to look at those.

11  A.  Okay.

12  Q.  Just generally speaking what are these documents?

13  A.  It is an overview of the proposed transaction.  Meaning,

14  the source of the funds, uses of the funds, the amounts.

15  Q.  Who provided you with this overview?

16  A.  Yanni Galanis.

17  Q.  Let's take a look at Government Exhibit --

18          MR. TOUGER:  Your Honor, our screen is dead.

19          JUROR:  Ours are, too.

20          MS. MERMELSTEIN:  I think the exhibit hasn't been

21  called up.

22          MS. TEKEEI:  Ms. Sheinwald, can you please publish

23  Government Exhibit 1303.

24  BY MS. TEKEEI:

25  Q.  Showing you Government Exhibit 1303, what is the date of

I5o6gal5                        Anderson - direct

1   this e-mail?

2   A.  It is June 9th, 2014.

3   Q.  What is the subject line?

4   A.  Is this the format you needed?  Please call with any edits.

5   Q.  What is the name of the attachment to this e-mail?

6   A.  Wakpamni source and use of funds version nine.

7   Q.  If you could please turn to the attachment and very briefly

8   describe what is attached here.

9   A.  It is an overview of the program relating to Wakpamni Lake

10  Community Corporation.  It states the goal, the approach, the

11  rationale, who the participants are going to be, and then

12  provides an estimated overview of the sources and use of funds.

13  Q.  I would like to direct your attention now to Government

14  Exhibit 1304.

15          What is the date of mail?

16  A.  June 16th, 2014.

17  Q.  Who sends it?

18  A.  Yanni Galanis.

19  Q.  What is the e-mail address that appears on the CC line in

20  this e-mail?

21  A.  It is Steven Haynes -- oh, CC line.  Sorry.

22          Jason@Holmbycompanies.com.

23  Q.  Who is Jason@Holmbycompanies.com?

24  A.  Jason Galanis.

25  Q.  What is the subject of this e-mail?

I5o6gal5                          Anderson - direct

1    A.   Source and use final.

2    Q.   What is the name of the document attached here?

3    A.   Wakpamni source and use of funds version 15.

4    Q.   If you could please turn to the attachment.

5             How does this document compare to the prior Wakpamni

6    use and source of funds document that was attached to

7    Government Exhibit 1303?

8    A.   It is more of a summary of the summary.  It's a term sheet.

9    Q.   So what is the stated goal of this proposed deal?

10   A.   For the issuance of the 2014 bonds.

11   Q.   For what purpose were the bonds being issued if you look at

12   the whole section.

13            I want to make sure you are looking at of the correct

14   exhibit, Government Exhibit 1304.

15   A.   I am sorry.  I jumped ahead.

16            I am there.

17   Q.   So let's rewind.

18            What is the document that is attached here?

19   A.   It is Wakpamni source and use of funds.

20   Q.   If you could look at the whole section of this attachment

21   here, what is the stated goal?

22   A.   Create a permanent endowment to provide a current income

23   stream supporting economic development, which will provide

24   significant long-term employment gains to the community thereby

25   permanently enhancing the quality of life for tribal members.

1    Q.   Now, if you could go to the consideration section.  Can you

2    please read the first sentence beginning with, The above?

3    A.   Yes.  The above strategy of the program appears to be

4    simple to implement, however, there are numerous challenges.

5    Foremost, is successfully placing an unrated bond with the

6    willing buyer or buyers.

7    Q.   What is an unrated bond?

8    A.   An unrated bond is a bond that has not gone through a

9    process with one of the three major rating agencies.

10   Q.   What is a rating agency?

11   A.   A rating agency is a company that analyzes an investment --

12   any type of investment, including bonds, to determine what the

13   risks are and identify what the risks are and analyze what the

14   opportunities or probability of repayment would be of buying

15   that investment.

16   Q.   Were the Wakpamni Lake Community Corporation bonds rated or

17   unrated?

18   A.   Unrated.

19   Q.   So just directing your attention to that last sentence that

20   you read, which began with, Foremost is successfully placing

21   unrated bonds with a willing buyer or buyers.

22        Why is that a challenge?

23   A.   Unrated bonds are more difficult to sell then rated bonds.

24   Q.   Now, if you could please take a look at the program

25   participant section of this attachment.

I5o6gal5                          Anderson - direct

1    A.   Okay.

2    Q.   Who is listed as issuer of the bonds?

3    A.   Wakpamni Lake Community Corporation.

4    Q.   What is that as stated here in this document?

5    A.   It is a tribal entity incorporated by the Oglala Sioux

6    Tribe, a sovereign nation located within the United States of

7    America.

8    Q.   Can you please read the description of the placement agent

9    of the bonds?

10   A.   Burnham Securities, Inc., an independent asset management

11   and investment banking firm, who traces its history to 1935.

12   Q.   Can you please read the description for annuity issuer?

13   A.   Wealth Assurance, AG -- would you like me to read all of

14   it?

15   Q.   Yes.

16   A.   Wealth Assurance, AG, is a European insurance company

17   co-owned by COR Capital, Inc., a private equity investor with

18   banking and asset management investments of over of 13 billion,

19   Signal 120-year-old $80 billion insurance company based in

20   Homburg.

21   Q.   Without going into the full description, who is listed as

22   the portfolio manager?

23   A.   Private Equity Management, LLC.

24   Q.   What is the purpose of the portfolio manager?

25   A.   Their role was to provide the issuer of the tribe with

1  guidance and their advice with respect to the selection --

2  investment selection for the annuity.  They gave them a saying

3  with the annuity what they can invest in.

4  Q.  Who is Francisco Martin?

5  A.  He is listed as a professional involved with Private Equity

6  Management.

7  Q.  Who is Dr. Gary Hirst?

8  A.  The same.

9  Q.  Just looking at the custodian line, what is the custodian?

10 A.  The custodian in -- there are different forms, but an

11 entity that would hold funds.  In the instance of a bond

12 issuance, it would be the trustee.  They would play the role of

13 trustee for the bonds.

14 Q.  What they do in that role?

15 A.  They would receive the sale proceeds and disburse the money

16 based upon what is in the contract and the closing documents

17 and then throughout the entire transaction as monies is

18 received from the annuity and elsewhere, they would use that

19 money to repay the bondholders and however else as directed

20 under of the trust indenture.

21 Q.  Who in particular is listed as the custodian in this

22 version of the source of funds attachment?

23 A.  It is Morgan Stanley & Co.

24 Q.  Now, directing your attention to the offering source and

25 uses of financing section, just generally speaking what does

I5o6gal5                          Anderson - direct

1    this section convey will happen to the money -- to the bond

2    issuance and the money?

3    A.  So it conveys that $28 million will be raised from the bond

4    offering.  So from the sale of the bond.  And then it states

5    how that money is to be used at closing.

6    Q.  How much would go to Burnham Securities, Inc. in their role

7    as placement agent?

8    A.  250,000.

9    Q.  How much was intended to go to the Wakpamni Lake Community

10   Corporation for the development of their warehouse and

11   distribution center?

12   A.  2.2 million.

13   Q.  How much was to go to the annuity at Wealth Assurance?

14   A.  27,500,000.

15   Q.  What do the subsequent sections mean, the annual cash flow

16   sources and uses?

17   A.  Well, the first line, annuity annual cash flow source

18   annually 1,823,600.  So $1,823,600 annually would be paid to

19   the trustee, the custodian from the annuity investment.

20   Q.  For what purpose?

21   A.  $1,573,600 to pay interest on the bond.  That is the

22   investors return.

23   Q.  How much would go to pay investors?

24   A.  $1,573,600.

25   Q.  Then what are the per annum distributions to WLCC?

1  A.   That is a payment of the 1.8 million that would go to the

2  tribe for their future economic development projects.

3  Q.   If you could just take a moment to turn the page.

4  A.   Okay.

5  Q.   You see a diagram there.

6       Before we go to that, what is that flow chart.

7  A.   The flow chart lists how the money is disbursed at closing

8  and how money throughout the program would flow back in.

9  Q.   How many years does this flow chart project out?

10 A.   25.

11 Q.   So let's look at the diagram on the left-hand side of the

12 page.

13 A.   Okay.

14 Q.   Can you describe the flow of funds as described or conveyed

15 in this diagram?

16 A.   Yes.  $28 million would come into the trustee of the bond

17 issue at closing.  The 28 million -- from that 28 million,

18 250,000 would go for Burnham as their placement agent fee.  The

19 remaining money, the $27,750,000 would go to the annuity.  From

20 there out of the annuity 2.2 million -- this is all in the same

21 day -- 2.2 million would go to tribe to build the commercial

22 warehouse.

23 Q.   And then what are the subsequent following amounts?

24 A.   And then annually at the first anniversary of the bond at

25 closing, the annuity would pay out 1.8 -- $1,823,600 to

I5o6gal5                          Anderson - direct

1   Wakpamni –– the trustee for Wakpamni on the bond issue.

2   Q.   And then what about the interest?

3   A.   Sure.   Out of that 1.8 million, interest in the amount of

4   $1,573,600 is paid to the bondholders as the return on their

5   investment.

6   Q.   What would happen at year 10?

7   A.   At year 10 the principal amount of the bond, meaning the

8   original investment of 28 million or 27 million and change,

9   would be paid off, redeemed out of the annuity.

10  Q.   What does that mean?

11  A.   That means you receive payment in full for your investment.

12  If it was a loan, you receive the full amount of the loan.

13  Q.   What was supposed to happen in years 11 and 25?

14  A.   And then years 11 and 25 the tribe, Wakpamni, was to

15  receive 350,000 a year annually over those next 10 years.

16  Q.   Where was that $350,000 a year to come from?

17  A.   The annuity.

18  Q.   And then what is reflected in the annuity termination

19  section?

20  A.   In the year 25 $5 million would be paid out to Wakpamni.

21  Q.   About what the endowment section?

22  A.   Yes.   That would be the $5 million that would distributed

23  to Wakpamni.

24  Q.   So then in the right-hand side of this flow chart, what are

25  the breakdowns that are reflected here?   What do these mean?

1    A.   It lists out the next 25 years from closing and how much

2    money the tribe was to receive during that period.   In years

3    one through 10 -- one through 10 the tribe was to receive

4    $250,000 a year.   In years 11 through 24 the tribe was to

5    receive $350,000 a year.   And then year 25 they were to receive

6    $5 million.

7    Q.   For a total net distribution of how much?

8    A.   12,400,000.

9    Q.   Thank you.

10              I to would like to direct your attention now to

11   Government Exhibit 1305.

12   A.   Okay.

13   Q.   What is this?

14   A.   This is an e-mail from Yanni Galanis dated June 25th, which

15   is the attachment of the term sheet for the bonds.

16   Q.   What is the subject line?

17   A.   Use this one.

18   Q.   If you can turn the page, what is a term sheet?

19   A.   A term sheet is a summary of the business terms for the

20   bonds.

21              (Continued on next page)

22

23

24

25

1    Q.  Moving on to Government Exhibit 1306.  What is the date and

2    time of this e-mail?

3    A.  June 27, 2014.

4    Q.  Who is this e-mail from?

5    A.  Yanni Galanis.

6    Q.  Who is it to?

7    A.  It is to me and cc'd is Jason@Burnhamequitypartners.com.

8    Q.  Whose e-mail is Jason@Burnhamequitypartners.com?

9    A.  Jason Galanis.

10   Q.  What is the name of the attachment here?

11   A.  Term sheet bonds version 6.1.

12   Q.  I'd like to go ahead and turn the page and take a look at

13   the attachment.  We'll just go through a couple of the terms

14   here.

15           What is the project name or series of this bond

16   proposal as listed here on this term sheet?

17   A.  Wakpamni Lake Community Corporation 5.62 percent.  Special

18   limited revenue bonds, bond 2024.

19   Q.  What does the 5.26 percent reflect?

20   A.  The interest rate.

21   Q.  What does the date 2024 represent?

22   A.  The proposed final maturity on the bond.

23   Q.  Just looking at QCIP.  What is the QCIP?

24   A.  It is an identification number placed on a security, like a

25   serial number.

15O3GAL6                       Anderson - Direct

1    Q.   The offering price, what does that reflect?

2    A.   That is the -- if a bond is stated to be 28 million, that's

3    the amount of proceeds received at closing.

4    Q.   What is the offering yield?

5    A.   A yield, a calculation of how much the security or

6    investment will yield over the life of the issue.

7    Q.   Okay.  You can set that to the side.

8         Did there come a time when you began to prepare the

9    legal documents that were related to the WLCC bond transaction?

10   A.   Yes.

11   Q.   What were the documents that you drafted?

12   A.   I drafted a trust indenture, a closing statement, a legal

13   opinion, and I reviewed other documents prepared by other

14   counsel, but that wasn't the question.

15            MR. TOUGER:  Can you keep your voice up.

16            THE WITNESS:  Sure.

17   Q.   What is a trust indenture?

18   A.   A trust indenture is similar to a loan agreement.  A trust

19   indenture lays out the terms of the bond.  The repayment matter

20   for the bonds, the different obligations of the various parties

21   to the agreement.  And generally how the money is to flow at

22   closing and thereafter.

23   Q.   What -- you mentioned one other category of documents

24   before you mentioned legal opinion.  What was that?

25   A.   The indenture, legal opinion, and closing statement.

15O3GAL6                         Anderson - Direct

1   Q.   What is a closing statement?

2   A.   Closing statement is sort of the back end of the opposite

3   of the term sheet.   And that lists at closing how the money is

4   actually going to flow.   That is signed by all the parties.

5   Q.   So in layman's terms, what is a closing in this sort of

6   transaction?

7   A.   In connection with any transaction, you select a date in

8   the future, a specific date when all the legal documents will

9   be signed.   The purchases will be made.   And the money will be

10  paid out in accordance with those documents.   That's a specific

11  date.

12  Q.   What is the legal opinion that you mentioned?

13  A.   It is an opinion provided by legal counsel in connection

14  with the transaction.   For me that was as placement agent

15  counsel, that state items certain about the transaction.

16  Q.   Turn to Government Exhibit 250.

17  A.   Okay.

18  Q.   What is the date of this e-mail?

19  A.   It is July 1st, 2014.

20  Q.   Who is the sender?

21  A.   Me.

22  Q.   Who were you sending this e-mail to?

23  A.   Jason Galanis, Yanni Galanis, Steven Haynes and Raycen

24  Raines.

25  Q.   What information do you convey about the closing in this

1    e-mail?

2    A.   Based upon a purported closing 10 of July, what would have

3    to happen each week throughout the month of July in order to

4    get to that closing to keep to the schedule.

5    Q.   How did you have the understanding that the closing would

6    happen at the end of July?

7    A.   That was communicated to me by both Jason Galanis and Yanni

8    Galanis.

9    Q.   Did the bond transaction happen at the end of July?

10   A.   It did not.

11   Q.   Why not?

12   A.   I was told that the buyer wasn't quite there yet.

13   Q.   Who told you that?

14   A.   I received that information from both Jason Galanis and

15   Yanni Galanis.

16   Q.   Showing you Government Exhibits 1307 and 1308.  You can

17   begin with 1307.

18   A.   Okay.

19   Q.   Can you describe who sent this e-mail and the date and

20   time.

21   A.   Yanni Galanis on July 7, 2014.  Subject "form of annuity."

22   Q.   What is the document that's attached to it?

23   A.   It is a draft of the annuity contract.

24   Q.   What is an annuity contract?

25   A.   That is the specific investment vehicle for the annuity.

1   So what the purchaser of the annuity would receive from the

2   annuity company.

3   Q.   What's the title of this particular attachment?

4   A.   Wealth Assurance Private Client Corporation.  I'm sorry.

5   Q.   If you look at the attachments line, can you read the

6   title?

7   A.   Sure.  WAPC annuity contract version two.

8   Q.   If you can turn the page.  What is the attachment?

9   A.   It is a draft of the annuity contract.

10  Q.   If you can take a look at Government Exhibit 1308.  What is

11  the date and time of this e-mail and who sent it?

12  A.   July 8, 2014, titled "I proofed the annuity and made

13  several changes," and it is sent by Yanni Galanis.

14  Q.   What is the name of the attachment to this e-mail?

15  A.   WAPC annuity contract version 3.1.

16  Q.   Okay.  If you take a look at the document that's attached.

17  And just looking at the name of the company that's stated at

18  the top.

19  A.   Wealth Assurance Private Client.

20  Q.   Below that, what is the name just under that line?

21  A.   Institutional variable annuity contract.

22  Q.   I'm just asking you to state the full name of the entity.

23  A.   Sure.  Wealth Assurance Private Client Corporation.

24  Q.   What is Wealth Assurance Private Client Corporation?

25  A.   It is the annuity provider.

15O3GAL6                          Anderson - Direct

1    Q.  Did you have any conversations with Yanni Galanis about the
2    role of Wealth Assurance Private Client Corporation in this
3    bond deal?
4    A.  Yes, that they would be the annuity provider.
5    Q.  What, if anything, did Mr. Galanis say about the
6    relationship between this entity and the other Wealth Assurance
7    entity that we talked about earlier, Wealth Assurance holdings?
8    A.  That this entity, Wealth Assurance Private Client
9    Corporation, is a BVI, British Virgin Islands subsidiary of the
10   Wealth Assurance AG, and they handled private equity
11   investments for the United States.
12   Q.  What was the purpose of using, as conveyed by Mr. Galanis,
13   Yanni Galanis, what was the purpose of using Wealth Assurance
14   Private Client Corporation?
15   A.  That they handled the private equity investments for the
16   United States.
17   Q.  Where were they located?
18   A.  British Virgin Islands.
19   Q.  What, if any, benefits were derived from the location of
20   Wealth Assurance Private Client Corporation in the British
21   Virgin Islands?
22   A.  Well, the benefit to Wealth Assurance Private Client
23   Corporation, as I understand it, is a tax benefit to being an
24   offshore fund.
25   Q.  What's the source of that understanding?

15O3GAL6                          Anderson - Direct

1   A.   General knowledge.

2   Q.   Did you have any conversations with Mr. Yanni Galanis about

3   the tax benefit of the offshore funds?

4   A.   No, other than that's why entities establish themselves

5   offshore.

6   Q.   Why was Mr. Yanni Galanis sending you drafts of the annuity

7   contract with Wealth Assurance Private Client Corporation?

8               MR. TOUGER:  Objection.

9               THE COURT:  Sustained.

10  Q.   What, if anything, is your understanding of why Mr. Yanni

11  Galanis was sending you drafts of this annuity contract?

12              MR. TOUGER:  Objection.

13              THE COURT:  Sustained.

14  Q.   Did there come a time when you requested information

15  related to Wealth Assurance Private Client Corporation?

16  A.   I requested information with respect to the annuity, yes.

17  Q.   Who provided you with that information?

18  A.   Yanni Galanis.

19  Q.   Who did you ask for that information?

20  A.   Jason Galanis.

21  Q.   Okay.  If you could turn to Government Exhibit 2027.  If

22  you can please take a look at the e-mail in the middle dated

23  Friday, July 11, 2014.  Who is that e-mail from?

24  A.   That is from KoehnF@GTlaw, which I understand is the

25  assistant to Mike McGinness, a lawyer at Greenberg Traurig.

15O3GAL6                        Anderson - Direct

1   Q.  What is this individual attaching?

2   A.  It is a distribution list for the transaction.

3   Q.  If you can go ahead and turn the page to the attachment.

4   What is a distribution list in this context?

5   A.  It is a list of the contact parties for the transaction.

6   Q.  So let's look at a few of these.  Who is listed as the

7   placement agent?

8   A.  Burnham Securities, Inc.

9   Q.  Who is listed as the individual contact or contacts under

10  the placement agent section?

11  A.  Hugh Dunkerley and Jason Galanis.

12  Q.  Who is listed as the trustee?

13  A.  US Bank National Association.

14  Q.  Which individual is the contact or individuals are the

15  contact at US Bank?

16  A.  Scott Graham and Keith Henselen.

17  Q.  If you could take a look at the annuity contract provider

18  section.  Who is listed as the annuity contract provider?

19  A.  Wealth Assurance AG.

20  Q.  Do you have any understanding as to why Wealth Assurance

21  Private Client Corporation was not listed here?

22  A.  No.

23  Q.  Who is listed as the individual associated with Wealth

24  Assurance AG?

25  A.  Francisco Martin.

1    Q.   What was your understanding at the time about the

2    relationship, if any, between Burnham Securities Inc. and

3    Wealth Assurance AG?

4    A.   That they had a common director in Hugh Dunkerley.

5    Q.   Did that relationship cause you any concern at the time?

6    A.   Not significant concern, no.

7    Q.   Why not?

8    A.   It's common for a board of directors to have someone who

9    sits on a board of directors to also sit on a board of

10   directors of another entity, even a related entity.

11   Q.   Do you have any understanding as to whether the

12   relationship that Mr. Dunkerley had with Burnham Securities

13   Inc. and Wealth Assurance AG was ever disclosed to the

14   investors in these bonds?

15   A.   No.

16   Q.   What, if anything, is your understanding of who would have

17   been responsible for that disclosure?

18   A.   That would have been Burnham Securities.

19   Q.   Were you responsible for drafting any investor disclosures

20   for the bonds in this deal?

21   A.   No.

22   Q.   Were you ever asked to do so?

23   A.   No.

24   Q.   I'd like you to take a look at Government Exhibit 1309,

25   which is an e-mail dated July 30, 2014.  Who is this e-mail

15O3GAL6                          Anderson - Direct

1   from?

2   A.  Yanni Galanis.

3   Q.  What is the subject of the e-mail?

4   A.  "As close as I am to getting to a final."

5   Q.  What's attached to this e-mail?

6   A.  Burnham Municipal Capital LP, final version two.

7   Q.  What is the actual document that's attached here?

8   A.  It is a document entitled "Memoranda On Municipal Financing

9   of Wakpamni Lake Community Corporation."

10  Q.  Generally speaking, what kind of document is this?

11  A.  It seems to be a marketing material.

12  Q.  Can you please also turn to Government Exhibit 1310.  What

13  is the date and time of this e-mail?

14  A.  July 30, 2014.

15  Q.  What's the subject?

16  A.  "Final."

17  Q.  What's attached here?

18  A.  Burnham Municipal Capital LP version two.

19  Q.  Who sent this e-mail?

20  A.  Yanni Galanis.

21  Q.  What is the actual attachment?

22  A.  It is Memoranda On Municipal Financing of Wakpamni Lake

23  Community Corporation.

24  Q.  Now turning to Government Exhibit 1311.

25  A.  Okay.

15O3GAL6                          Anderson - Direct

1    Q.  What's the date and time of this e-mail and who sent it?

2    A.  August 2nd, 2014, from Yanni Galanis, subject line "buyer

3    approved this version."

4    Q.  What is the e-mail address on the cc line?

5    A.  Jared@Galanislaw.com.

6    Q.  Whose e-mail is that?

7    A.  That's the son of Yanni and brother of Jason Galanis.

8    Q.  The subject line "buyer approved this version."  What, if

9    anything, is your understanding of that?

10   A.  That they had firmed up whoever the buyer was going to be

11   on the first bond transaction.

12   Q.  What's listed as the attachment here?

13   A.  Burnham Municipal Capital LP final version 2.2.

14   Q.  Generally speaking, what is attached to this e-mail?

15   A.  Memoranda On Financing of Native American Economic

16   Development.  Same document as the prior two.

17   Q.  Can you please turn to Government Exhibit 1512.

18   A.  Okay.

19   Q.  What is the date and time of this e-mail?

20   A.  August 4, 2014.

21   Q.  And what's the subject line?

22   A.  "At last."

23   Q.  And what is attached?

24   A.  Burnham Municipal Capital LP final version 2.4.

25   Q.  Now going back to the cover e-mail.  What does Mr. Galanis

15O3GAL6                        Anderson - Direct

1   write in this e-mail?

2   A.   "Hear me, my chiefs.  I am tired.  My heart is sick and

3   sad.  From where the sun now stand, I will edit no more

4   forever."

5   Q.   Okay.  If you can turn to Government Exhibit 1313.  What is

6   the date and time of this e-mail?

7   A.   August 6, 2014.

8   Q.   What's the subject line?

9   A.   "Being retired does not mean retiring."

10  Q.   What is attached here?

11  A.   Burnham Municipal Capital LP, final version 2.8.

12  Q.   Again, generally speaking, what is the document Mr. Galanis

13  attaches to this e-mail?

14  A.   It is a Memorandum On Financing Native American

15  Development.

16  Q.   Was it common for someone in Mr. Galanis's position to be

17  sending drafts of a memorandum like this?

18  A.   No, no.

19  Q.   Why not?

20  A.   It seemed to be, at this point, I considered him to be a

21  consultant for Burnham.  And it seemed to be a very hands-on

22  approach for a consultant.

23            MR. TOUGER:  I couldn't hear that.

24            THE COURT:  Could you repeat that, please?

25            THE WITNESS:  Yes.  The entire thing?

1             It was uncommon to have a consultant have that much of

2    a hands-on approach for an investment bank.

3    Q.  Did you review this version of the memo when you received

4    it?

5    A.  No.

6    Q.  Did you review any of the prior versions when you received

7    them?

8    A.  No.

9    Q.  Did you provide any input on it?

10   A.  No.

11   Q.  Did you provide any edits to it?

12   A.  No.

13   Q.  What, if anything, was your understanding of why you were

14   receiving it?

15   A.  It seemed to be a marketing material.  And they were sort

16   of showing a commitment to future bond issues and bragging a

17   little bit.

18   Q.  Focusing on the time period of August 2014.  What stage of

19   the transaction were the parties in, in August of 2014?

20   A.  By mid August, we had an understanding that the deal was

21   heating up and that a buyer was being located and we were to

22   close at some point in August.

23   Q.  How did you have that understanding?

24   A.  Communications with Jason Galanis and Yanni Galanis.

25   Q.  What, if anything, at that time did Mr. Yanni Galanis tell

15O3GAL6                           Anderson - Direct

1    you about who were the buyers of the bonds?

2    A.   That they identified pension funds who had a social impact

3    requirement that they had a difficult time fulfilling.

4    Q.   I'd like you to take a look at a stack of documents,

5    Government Exhibits 204, 205, 211, 200, 210, 252, 214, and

6    1364.

7    A.   Okay.

8    Q.   Just in general terms, what are these documents?

9    A.   These are some of the core documents relating to the first

10   bond transaction.   The first one is a trust indenture, which,

11   in layman's terms, is similar to a loan agreement.

12   Q.   We'll take a look at that one by one in just a moment.   You

13   mentioned trust indenture.   Let's take a look at that.

14          Can you please look at Government Exhibit 204.

15   A.   Yes.

16   Q.   Was this the trust indenture for at least part of the first

17   series of bond issuances?

18   A.   It was.

19   Q.   Government Exhibit 205, what was that?

20   A.   That is a supplement to the original trust indenture.

21   Q.   What does that mean?

22   A.   If you have a situation where you have a number of bonds,

23   you have a bond transaction closing, but all the proceeds

24   aren't received on the closing date, as originally scheduled,

25   you oftentimes need to push it a week or two weeks and it is

1   still part of the same transaction, but because it wasn't

2   included in the initial transaction, you need to supplement it

3   or amend the original indenture.  And that's what that document

4   does.

5   Q.  So what happened here?

6   A.  We were given a closing date and an amount and who the

7   buyers would be.  And all the money did not -- all investors

8   did not provide their money by August 5, which was the closing

9   date listed here.

10  Q.  So, the bonds were broken up into two pieces; is that fair

11  to say?

12  A.  Correct, correct, two separate closings.

13  Q.  Do the trust indentures here, are they similar or different

14  in nature?

15  A.  Similar.

16  Q.  So let's look at one of them.  Who are the parties -- let's

17  look at Government Exhibit 204.  Who were the parties to the

18  trust indenture?

19  A.  Wakpamni Lake Community Corporation, and US Bank National

20  Association.

21  Q.  Pursuant to the terms of the trust indenture, what are the

22  Wakpamni Lake Community Corporation's obligations?

23  A.  To use the funds as described in the agreement, meaning use

24  the funds on the project as described therein.  And to

25  otherwise abide by the covenants.  There are some basic

1503GAL6                        Anderson - Direct

1    covenants for structures that's being built.  You need to have

2    insurance and things along those lines.

3    Q.  What about the trustee, what are the obligations that US

4    Bank has pursuant to this trust indenture?

5    A.  To ensure at closing that the funds are used as specified,

6    meaning the funds of the bond issues, the money raised from the

7    investors are used as specified in here, and throughout the

8    term of the bond issue, here 10 years, that funds that are

9    received are used in a manner that the document states.  In

10   addition, they have certain duties relating to if someone sells

11   a bond or something like that, they have to help to facilitate

12   that transaction.

13   Q.  Okay.  Now if you could turn to page 45 of this document.

14            THE COURT:  Just tell us when we should take our

15   afternoon break.

16            MS. TEKEEI:  Now would be fine, your Honor.

17            THE COURT:  Ladies and gentlemen, we're going to take

18   an afternoon break.  Just remember don't discuss the case and

19   keep an open mind.  Thank you.

20            (Jury excused)

21            (Continued on next page)

22

23

24

25

1            THE COURT:  You can step down and come back in 10

2    minutes.  Thank you.

3            You all can be seated.  You can just step out.

4    Thanks.

5            I just wanted to say one thing on the record and we

6    can take a break.  You can go ahead.  Thank you.

7            (Witness not present)

8            THE COURT:  So, I've reviewed the April 23 transcript.

9    Mr. Schwartz is correct as to what I stated.  I think the

10   government had the same understanding of my ruling in the

11   context of the back and forth I had with Mr. Quigley as I did.

12   And I apologize that I was not clearer.  I'm happy to, you

13   know, I'm going to reread everything, so why don't you -- and

14   I'm happy to hear you out if you want to be heard any more.

15   I've obviously heard you today and I have all the briefing.

16           But, Ms. Tekeei, can you just give me a sense of your

17   timing because it just affects -- we can meet again tomorrow

18   morning or -- tomorrow afternoon, but I know it's near Memorial

19   Day.  So I'm also happy to meet and just address this Tuesday

20   morning before we see the jury.

21           MS. TEKEEI:  Your Honor, I'm about halfway through.  I

22   apologize it's a little bit slower.

23           THE COURT:  I think realistically, you'll just about

24   finish, and if you finish a little early, because I know you

25   want a ruling on this as well before you finish your direct,

1    we'll just adjourn for the weekend and then I'm happy to hear

2    you out if you want to be heard out further.  And after

3    reviewing everything more closely, I'll give you a final ruling

4    on Tuesday unless you want to meet tomorrow.

5                MR. TOUGER:  On a totally different subject, my

6    greatest fears have been met.  Mr. Galanis can't hear anything

7    that the witness is saying, even with the speaker.  So I make

8    the application renew my application for the realtime.

9                THE COURT:  Okay.  So I'm going to speak to the

10   district executive's office to look at that.  You have been

11   having trouble hearing even with the headset?

12               DEFENDANT GALANIS:  It has to do with the range of

13   different pitches that affects my hearing.

14               THE COURT:  Okay.  I'll look into that right now.

15               MS. MERMELSTEIN:  Your Honor, I'm so sorry.  I think,

16   I know that sort of this issue only came up before your Honor

17   now, and we want you to have time to consider it.  But I think

18   if the government is going to basically finish its direct of

19   Mr. Anderson, and I don't think that he should be asked

20   anything about his interactions with Mr. Yanni Galanis, with

21   Mr. Jason Galanis about the fact of the Gerova arrest.  But in

22   the event your Honor were inclined to allow that, we don't want

23   to ask those odd questions on Tuesday.  If it is possible, I

24   think we should have that issue resolved before we --

25               THE COURT:  Do you want to be heard further on it?

15O3GAL6                          Anderson - Direct

1     I've looked back at the transcript.  I just want to spend more

2     focused time.  I wanted to listen to the testimony.

3               MR. TOUGER:  I think the best thing to do -- I don't

4     want the Court to rush.  I think the best thing to do is --

5               THE COURT:  I know you are going to say end early.

6               MR. TOUGER:  No.  I don't plan on doing anything with

7     this witness.  I don't think it is important.  And if the

8     Court's ruling changes that, then --

9               THE COURT:  My intended ruling was to let it in.  But

10    looking back at the transcript now, I was not as clear as I

11    should have been.  I think it was clear in the back and forth

12    we had that my main concern was the prejudice to Mr. Hirst and

13    Mr. John Galanis.  Getting in the fact that they had both been

14    convicted in a different case and convicted with the very

15    person that at least some of the defendants were going to argue

16    was the main fraudster in this case.  And that was my concern.

17    I view this evidence as similar to the SEC bar for the same

18    reasons.

19              But again, I'm sorry that this wasn't as clear as I

20    thought it had been.  I looked back at the transcripts.  And so

21    I'm a little frustrated now primarily with myself.

22              MR. SCHWARTZ:  I guess I take two things.  One is to

23    the extent you have not had time to do it today, I really would

24    urge your Honor to go back and look at all of the briefing,

25    because it may be the case that you were thinking about

1    principally the prejudice to Mr. Hirst and John Galanis at the

2    time.

3            THE COURT:  I did read your brief and I will go back,

4    so the short answer is I will do that.  I understand your

5    concern and I know you made the argument in your brief that

6    even if I let in the SEC bar, that this is more prejudicial.

7    So just to be clear, I have read it.  But I'll do again.

8            MR. SCHWARTZ:  And thank you, your Honor.  The second

9    point is, you were not unclear is the problem.  You were very

10   clear in ruling this was not admissible.  It may be that that

11   is not what was in your Honor's head.

12           THE COURT:  Or in the government's understanding that

13   sat in the same courtroom.

14           MR. SCHWARTZ:  But your ruling was crystal clear.  And

15   there were discussions, not just in the passage that I read,

16   but in the rest of the conversation about ways that some of the

17   same points could be made without the evidence of the arrest

18   coming in.

19           So, you know, there is a lot of water under the bridge

20   since late April, and there are reliance interests at play

21   here, and I'd ask your Honor to consider that as you consider

22   this issue over the weekend.

23           MS. MERMELSTEIN:  Your Honor I think it obviously was

24   not crystal clear.  Because the government has your Honor's

25   understanding as to what your ruling was.  So while the words

in the transcript may not reflect that it was crystal clear to

the government, the fact of the Gerova arrest with respect to

Jason Galanis was fine.  To the extent there is an argument, we

can have the bigger fight -- look, I think this is important.

I think your Honor has suggested that the ruling you intend to

make, even if it wasn't understood by defendants, is going to

stand.  If that's not true, the government wants to have every

opportunity to be heard because I think this is important.  The

water under the bridge --

          MR. SCHWARTZ:  I didn't hear that.

          MS. MERMELSTEIN:  This is important and I think we

shouldn't rush it if it doesn't give your Honor enough time to

consider the issue properly.  Because I think your Honor had

intended to rule a certain way, whatever the defense understood

from the words that were spoken.  And I don't think there is

any, any suggestion here that somehow there is some prejudice

to the defendants in not having understood what your Honor

suggested.  That nothing has changed in terms of what -- so far

the jury has heard only that Jason Galanis, this wasn't his

first rodeo.  That's all they heard.  They don't know anything

about it.  There is no difference now that would justify

changing that ruling for purposes of Mr. Anderson and the need

to resolve this right this minute.

          Mr. Anderson continued to be in contact with Mr. Yanni

Galanis following both his and Jason Galanis's arrests in

15O3GAL6                         Anderson - Direct

1   Gerova, and there are communications that suggest he was sort
2   of initially supportive of them, notwithstanding the arrests.
3            In the government's view, leaving aside the
4   admissibility of the fact of the Gerova arrest, Mr. Anderson's
5   sort of personal feelings in light of learning that are
6   irrelevant.  And it wouldn't be a proper set of questions to
7   ask him, whatever your Honor's ruling is, with respect to the
8   Gerova matter, and we're not intending to ask him anything
9   about it.
10           I will note that he in his own head sort of recollects
11  and thinks about that time as being -- he doesn't separate out
12  the arrests of the two people.  He sort of understood Jason and
13  John Galanis to work together and he understood their arrests
14  to have happened together.  If he is questioned about it
15  without having sort of first been really -- he thinks about
16  them as one issue and will have trouble answering about just
17  Jason Galanis and not John Galanis.
18           THE COURT:  What did you want to elicit today?
19           MS. MERMELSTEIN:  Nothing.  Nothing.  But if the
20  defense is going to elicit something then we think we should
21  know that in advance.
22           MR. TOUGER:  I think I have a fair compromise.  I'm
23  sure Ms. Tekeei has a last page or two of her final part of her
24  direct.  Why don't we stop prior to her last page or two, we
25  can have this discussion Tuesday morning, and we can go from

1   there.  But I don't plan to do anything with Mr. Anderson

2   unless -- I first have to go back and review the 3500 material

3   on this issue, because frankly, whenever you made that ruling

4   two months ago, I stopped looking at it, because I didn't think

5   it was important because my notes clearly have the clear

6   writing "Gerova out of this case."  So I stopped looking at it.

7           I don't know that I'm going to ask Mr. Anderson any

8   questions because I literally stopped looking at that

9   information two months ago when the Court made its ruling.

10          But I don't see why we're wasting -- I think the Court

11  needs to get fully briefed on the issues.  I think that's the

12  time to argue this.  The original argument Ms. Mermelstein put

13  forward is she doesn't want the government coming back and just

14  asking questions about this.  So finish two pages before your

15  you end, and then we'll go forward.

16          MS. MERMELSTEIN:  Given there is no relevance to

17  Mr. Anderson's personal feeling about the facts of the arrest.

18          MR. TOUGER:  I don't know the answer to that question.

19          THE COURT:  Is anyone going to ask Mr. Anderson about

20  the Gerova arrests?

21          MS. MERMELSTEIN:  No, not from the government.

22          MR. TOUGER:  I can't answer that question right now

23  without going back and looking at the 3500 material.

24          THE COURT:  Okay.

25          MR. TOUGER:  Frankly, I put it out of my mind.

1    THE COURT:  In any event, I think in all fairness, I

2    want to read everything again.  And I want to read the

3    transcript, I want to read it in the context of rereading the

4    briefs.  And so unless people want to come in tomorrow, I'll be

5    here, but I'm happy to meet Tuesday at 11.  I understand that

6    puts you in a slightly awkward position in terms of getting

7    through most of Mr. Anderson's testimony.  On the other hand,

8    it is almost 4 o'clock, so if you want to end a little bit

9    early, we'll end a little bit early.

10    MR. SCHWARTZ:  That's all fine by me and obviously not

11    something I want to mention with anyone.

12    I just want to repeat what I said before in response

13    to Ms. Mermelstein's point that there has been no prejudice.  I

14    would have opened on this point.  I opened on the SEC bar.  As

15    you could see, a lot of my opening was spent trying to preempt

16    some of the government's evidence.  And this something that I

17    absolutely would have opened on.  And when it comes in the

18    middle of a case, it's going to be a big stink bomb.  So we

19    have been prejudiced by it.  I want to be clear on that.

20    MS. MERMELSTEIN:  Let's have that fight not now.  We'd

21    like to be heard on this issue tomorrow.  We don't want to be

22    having this conversation at 11 a.m. Tuesday morning.

23    THE COURT:  Let's have it after, let's take a

24    two-minute break now let's come back.  And then let's have it

25    when we let the jury go.

1            MS. MERMELSTEIN:  That's fine.

2            THE COURT:  Make it a five-minute break, actually.

3            (Recess)

4            THE COURT:  Can we bring the jury in?

5            MR. SCHWARTZ:  Can I say one quick thing.  I know it's

6    not being done on purpose.  But whoever is operating the tech

7    on the government's side is sometimes getting ahead of the

8    witness with blowing things up and highlighting.  Can you just

9    follow either a prompt from the questioner or of a witness so

10   we're not kind of coaching the witness through technology.  I

11   know it's not on purpose.

12           MS. MERMELSTEIN:  I think largely Ms. Sheinwald is

13   blowing up the whole exhibit, other than being directed by

14   Ms. Tekeei, but we'll be careful.

15           THE COURT:  Thanks.

16           Mr. Touger, if you fill out your CJA form to get the

17   real time, I'll sign it so you'll have it for you on Tuesday.

18           MR. TOUGER:  Okay.  I'll have my secretary do it.  I

19   messed up so many CJA forms.

20           (Continued on next page)

21

22

23

24

25

1      (Jury present)

2           THE COURT:  We were unable to fix the two screens.

3      We're going to fix it tomorrow.  If you want to sit in

4      different seats for today, you're free to do so.  Whatever is

5      more comfortable for you.

6      BY MS. TEKEEI:

7      Q.  Mr. Anderson, we were looking at Government Exhibit 204

8      before the break.  And in particular we were looking at page

9      45.

10          THE DEPUTY CLERK:  I'll call audio visual.

11          MS. TEKEEI:  Just wait for the screens to come up.

12          THE COURT:  Are yours working?

13          A JUROR:  No.

14          THE COURT:  Now?  I see lights.

15          A JUROR:  Yes.

16          THE COURT:  Good.

17          MS. TEKEEI:  If we could turn to page 45 of Government

18     Exhibit 204.

19     Q.  Just looking at the bottom of the page, section 12.12.

20     What's the title of that section, Mr. Anderson?

21     A.  "Limited waiver of sovereign immunity."

22     Q.  What is sovereign immunity?

23     A.  Sovereign immunity is a right that governments have --

24          MR. TOUGER:  Can we have a sidebar?

25          THE COURT:  Sure.

1                (At the sidebar)

2                MR. TOUGER:  We were going to make this application

3      when she first started, but then it stopped, but now it's going

4      back again.  If they want to qualify him as an expert, we're

5      fine with that.  If he's not an expert, he can't answer that.

6                MS. TEKEEI:  He drafted this document.  He put it

7      together.  And certainly we formed the question to say what

8      does this section reflect, what is the information in here,

9      what is sovereign immunity as conveyed in this document.  He is

10     a percipient witness to the events.  He drafted the documents.

11     We're entitled to ask him basic questions.

12               MR. TOUGER:  I'm not arguing --

13               MS. NOTARI:  I don't know that there was testimony

14     that he drafted these documents.

15               MS. TEKEEI:  There was.

16               MR. TOUGER:  No, he said that.  I know he knows the

17     answers, like he knew BVI was the reason common knowledge.

18     It's not common knowledge.  It is common knowledge because he's

19     a tax guy.  He went to law school and got a degree.  So let's

20     make him an expert.  But if he's not an expert, just because he

21     drafted the document and used two words doesn't mean you can

22     say what the definition of those words are.  He is a lawyer.

23     He is an expert.  He knows.  Make him an expert.  We won't

24     fight it.  But he has to be qualified as an expert before he

25     can answer these questions.  In the beginning -- I forget what

1    the line was now.  In the beginning of his direct examination

2    there were a bunch of questions that called for expert answers.

3         MS. NOTARI:  I think it is confusing for the jury that

4    he is a fact witness and not an expert.  And I mean, they need

5    to understand he was part of this but --

6         MR. TOUGER:  If they want to qualify him as an expert

7    in Native American bond transactions, that's fine.

8         MR. SCHWARTZ:  This is really identical to Ms. Haines'

9    testimony, so it should come through this witness or her, but

10   not both.

11        MS. TEKEEI:  The defendants have known that we would

12   be calling Mr. Anderson for months.

13        THE COURT:  How many legal questions are you going to

14   ask him?

15        MS. TEKEEI:  I am going to ask him what sovereign

16   immunity is in the context of this paperwork and how he -- why

17   he put it in the trust indenture, why it was important to this

18   document and this deal as a person who represented the

19   placement agent on the deal, and as the person who drafted the

20   document.  Not as a legal expert on these transactions.

21        MR. TOUGER:  The point is he is.  He is.  And it's

22   going to be very hard for him to divorce what he knows from

23   what --

24        THE COURT:  Is he being asked to render an opinion or

25   just explain what his understanding is of why this was in the

15O3GAL6                          Anderson - Direct

1    document?

2              MS. TEKEEI:  Yes, your Honor, he's going to be

3    asked -- he drafted the document.  He's going to be asked why

4    there is a section on sovereign immunity and why it was

5    necessary for the bond deal, based on his participation in it

6    and his role as counsel for the placement agent.

7              THE COURT:  I'll allow that.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1503GAL6                          Anderson - Direct

 1                (In open court)

 2    BY MS. TEKEEI:

 3    Q.  Okay.  Mr. Anderson, just to be clear, what role did you

 4    play with respect to this trust indenture?

 5    A.  I drafted the first draft of this trust indenture.

 6    Q.  This section that is pulled out on your screen here, what

 7    is this section?

 8    A.  This section relates to the limited waiver of sovereign

 9    immunity by Wakpamni Lake Community Corporation.

10    Q.  What does that mean?

11    A.  All governments are vested with sovereign immunity, which

12    means they cannot be sued unless they agree to be sued.

13                MR. TOUGER:  Is that an expert opinion?

14                MS. TEKEEI:  Your Honor.

15                THE COURT:  Overruled.

16    A.  That pertains to the United States of America, and the

17    State of New York, all government entities have this.  And in

18    order to be sued, they have to waive that immunity.  And as it

19    relates to Wakpamni Lake Community Corporation as a division

20    of -- ultimately division of Oglala Sioux tribe, they have

21    sovereign immunity, that in order for the counterparty, here

22    the trustee, to enforce this agreement, they have to waive

23    their immunity as it relates to enforcement of this agreement.

24    Q.  Did they waive their immunity in connection with this bond

25    transaction?

15O3GAL6                              Anderson - Direct

1   A.  They did.

2   Q.  Okay.  Now if you could turn to Government Exhibit 211.

3   A.  Okay.

4   Q.  What is this document?

5   A.  This is the placement agency agreement.

6   Q.  What is that?

7   A.  That is the agreement between the issuer of the bonds, here

8   Wakpamni Lake Community Corporation, and Burnham Securities

9   Inc., whereby Burnham agrees to sell the bonds for Wakpamni

10  Lake Community Corporation.

11  Q.  What are, pursuant to this document, what are the Wakpamni

12  Lake Community Corporation's obligations?

13  A.  Their obligation is primarily to not engage anyone else to

14  sell their bonds during the period this agreement is in force.

15  Q.  Who signed this on behalf of Burnham Securities Inc.?  This

16  is, if you turn to S1, I'm sorry.

17  A.  It is Hugh Dunkerley.

18  Q.  Who signed on behalf -- who is listed in the signature line

19  on behalf of the Wakpamni Lake Community Corporation?

20  A.  Geneva Lonehill.

21  Q.  What, pursuant to this document, this agreement, what would

22  Burnham Securities receive in connection with its role as

23  placement agent on this transaction?

24  A.  A placement agent fee.

25  Q.  How much was that?

15O3GAL6                          Anderson - Direct

1     A.   $250,000.

2     Q.   If you could now turn to Government Exhibit 200.

3     A.   I'm there.

4     Q.   What is this document?

5     A.   This is the executed annuity contract from Wealth Assurance

6     Private Client Corporation.

7     Q.   Who signed on behalf of Wealth Assurance Private Client

8     Corporation this document?

9     A.   Hugh Dunkerley.

10    Q.   Who are the parties to this contract?

11    A.   Wealth Assurance Private Client Corporation and Wakpamni

12    Lake Community Corporation.

13    Q.   Under the terms of this document, what obligations did the

14    Wakpamni Lake Community Corporation have?

15    A.   Wakpamni Lake Community Corporation's obligation was to

16    receive the money paid from the annuity.

17    Q.   What about Wealth Assurance Private Client Corporation,

18    what obligations did it have pursuant to this document?

19    A.   To pay, to invest the funds and pay the money, pay funds to

20    Wakpamni Lake at stated times and in stated amounts.

21    Q.   If you could turn to Government Exhibit 210.  What is this

22    document?

23    A.   It is the investment management agreement.

24    Q.   Is this a document that you reviewed in the course of your

25    work on this transaction?

1  A.  Yes.

2  Q.  Who are the parties to the investment management agreement?

3  A.  Private Equity Management Limited, and Wakpamni Lake

4  Community Corporation.

5  Q.  Pursuant to -- let me ask you one more question.  What is

6  Private Equity Management Limited, or your understanding of

7  that entity?

8  A.  It is an investment management fund.

9  Q.  What are the obligations that Private Equity Management

10  Limited has pursuant to this investment management agreement

11  that you reviewed?

12  A.  They are to assist Wakpamni Lake Community Corporation in

13  choosing investments to recommend to the annuity company.

14  Q.  What about the Wakpamni Lake Community Corporation, what

15  are its obligations pursuant to this investment management

16  agreement?

17  A.  To pay Private Equity Management an amount.

18  Q.  If you could turn to Government Exhibit 214.  What is this

19  document?

20  A.  This is the closing statement for the first bond

21  transaction.

22              (Continued on next page)

23

24

25

I5o6gal7                          Anderson - direct

1    BY MS. TEKEEI:

2    Q.   Who prepared this closing statement?

3    A.   I did.

4    Q.   Generally speaking, what does this closing statement

5    provide?

6    A.   It gives an overview.  It's executed at closing and it

7    gives an overview of what the parties had taken to date, what

8    actions they had taken to date and the establishes the flow of

9    funds that are received from the investors at closing.

10   Q.   If you could turn now to Schedule C 1, which is the very

11   last page of this document, what is supposed to happen

12   according to this schedule to the flow of the funds at the

13   close of this deal?

14   A.   $24,844,800 are received at settlement and in Roman numeral

15   two that was the disposition of the funds and that is to the

16   purchase of the annuity, $22,094,089.  And then to the project

17   fund, which is the 18 Junction Development, which is the

18   commercial warehouse, 2.25 million and the payment of issuance

19   costs 500,000.

20   Q.   According to this document, how much debt did the Wakpamni

21   Lake Community Corporation incur as a result of this bonds?

22   A.   $27 million.

23   Q.   Well, with respect to the just --

24   A.   Just this one?

25   Q.   Yes.

1    A.  $24,844,089.

2    Q.  The 27-some-odd figure that you were referring to, what was

3    that?

4    A.  That was the additional amount that was closed a week

5    later.  Those were funds that did not arrive at closing on this

6    date, but arrived a week or so later.

7    Q.  That was related to the supplemental trust indenture that

8    we reviewed earlier which was Government Exhibit 205?

9    A.  It was.

10   Q.  Now, according to this closing statement, when was the next

11   payment due to the Wakpamni Lake Community Corporation?

12   A.  After closing?

13   Q.  After closing.

14   A.  On the one-year anniversary of the closing.

15   Q.  For how much?

16   A.  Just for Wakpamni Lake?

17   Q.  Yes.

18   A.  250,000.

19   Q.  And how much was due to the investors in these bonds

20   pursuant to this closing statement at the one-year anniversary?

21   A.  Approximately 1.5 million.

22   Q.  If you could turn to Government Exhibit 1364, what is this

23   document?

24   A.  That is the legal opinion of my law firm Dillworth Paxson.

25   Q.  Who drafted this?

I5o6gal7                        Anderson - direct

1    A.  I did.

2    Q.  What is the purpose of this legal opinion?

3    A.  Lay out certain legal conclusions at closing with respect

4    to the issuance of the bonds.

5    Q.  What types of legal conclusions does this document that you

6    drafted lay out with respect to the closing of the bonds?

7    A.  That the issuer of the bonds is a dually formed government

8    entity, that the indenture has been dually executed and

9    approved, that the bonds have been dually executed and approved

10   by the issuer.  The issue has properly waived its sovereign

11   immunity as it relates to its obligations under the bond and

12   that the bonds are exempt from federal securities regulations

13   under the Federal Security Act.

14   Q.  Now, what is this legal opinion based on?

15   A.  The bond documents and the convenance in those bond

16   documents, which includes the indenture, other relevant

17   documents, certificates, the bonds themselves that we received

18   at closing.

19   Q.  If you could turn to the second page of this document, the

20   paragraph in -- the second paragraph if you could please read

21   that?

22   A.  We have assumed that each party to the bond documents will

23   carry out all obligations imposed on such party by the bond

24   documents in accordance with the terms thereof and that all

25   representations and certifications contained in the bond

1   documents are accurate, true and complete.

2   Q.  What does that mean?

3   A.  That means that for each bond document, the parties who

4   signed it are going to undertake their obligations in those

5   documents.

6   Q.  Now, earlier you described who were the purchasers of these

7   bonds.  What was the investment advisor that purchased these

8   bonds?

9   A.  Hughes Capital Management.

10  Q.  What, if anything, was your understanding of Burnham

11  Securities, Inc.'s relationship with and Hughes Capital

12  Management at that time?

13  A.  That they had a working relationship.

14  Q.  What do you mean by that?

15  A.  That Burnham had identified Hughes Capital Management as an

16  advisor who advises funds who have a social impact criteria

17  need -- investment need.

18  Q.  I would like you to take a look at Government Exhibit 252.

19          What is this document?

20  A.  This is the investment letter also known as a big boy

21  letter.  The purpose of the document is to help establish that

22  the buyers of the bonds are sophisticated investors, they know

23  how to review them, they are aware of the risks, and generally

24  are sophisticated.

25  Q.  Who signed this letter?

I5o6gal7                          Anderson – direct

1   A.   The signature is a little tough to read, but I believe it

2   is Michelle Morton.

3   Q.   I am sorry.  I should rephrase that.

4          What is the entity that signed this letter?

5   A.   Hughes Capital Management.

6   Q.   And if you could turn back to the first page and read the

7   entities that are listed in the middle of the first paragraph?

8   A.   Birmingham Waterworks Pension Plan, Chicago Transit

9   Authority, Michelin North America, MILA ILA Managed Healthcare

10   Pension Fund, Milk Drivers and Dairy Employees Local Union No.

11   246 Pension Fund, Philadelphia Housing Authority, City of

12   Richmond Retirement System, Terrapin Insurance Company,

13   Washington Suburban Sanitary Commission.

14   Q.   What are these entities?

15   A.   Pension funds.

16   Q.   What is the import of this paragraph.

17          Let me ask you one question before that.

18          Did you have any role in drafting this letter?

19   A.   I provided a form of this letter to Burnham Security.

20   Q.   Is this a letter that you reviewed in the course of your

21   work in the bond transaction?

22   A.   Yes.

23   Q.   What is the import of the paragraph listing the different

24   entities in the investors who purchased the bonds?

25   A.   That Hughes Capital Management is stating that those names,

I5o6gal7                          Anderson - direct

1    those entities are sophisticated investors.

2    Q.  If you could turn, sir, to Government Exhibit 1268, what is

3    the date of this e-mail?

4    A.  August 24th, 2014.

5    Q.  Who is it from?

6    A.  Jason Galanis.

7    Q.  Who is listed on the copy, CC line?

8    A.  Michelle Morton.

9    Q.  Who is Michelle Morton?

10   A.  She is an individual at Hughes Capital Management.

11   Q.  At the time that you received this e-mail, did you know who

12   were the owner or owners of Hughes Capital Management?

13   A.  No.

14   Q.  What is the subject matter of this e-mail?

15   A.  Terrapin Wilmington Trust.

16   Q.  What is the information being conveyed here by Mr. Jason

17   Galanis?

18   A.  It is a copy the delivery instructions for the bonds.

19   Q.  Now, why did you need a copy of the delivery instructions?

20   A.  Well, there are two different matters of issued bonds.  One

21   is through physical bonds and one is through electronic

22   platform.  These were going to be physical bonds.  So we needed

23   to have the contact information to provide to the trustee so

24   they would know where to send the bond as well as send interest

25   payments.

I5o6gal7                          Anderson - direct

1    Q.   You mentioned physical.  You also mentioned another way of

2    delivering bonds digitally.  Can you describe what you mean by

3    that?

4    A.   Yes.  There is a company called Depository Trust Company

5    that allows for a digital platform for closing issues as well

6    as selling in the secondary market and -- but in order to be

7    use DTC, you have to be a member or partner of DTC.

8    Q.   And why couldn't these bonds be delivered digitally?

9    A.   Burnham Securities was not a member and they didn't have a

10   partner in DTC to work.

11   Q.   Had you ever worked on bonds that needed to be physically

12   delivered?

13   A.   I have.

14   Q.   When was last time you worked on bonds prior to this

15   transaction that required physical delivery?

16   A.   Approximately early 2000 -- 2003 or '04.

17   Q.   Was it common for bonds in 2014 based on your work on this

18   transaction and others for bonds to be delivered physically?

19   A.   No.

20   Q.   If you could turn, sir, to the attachment here, and I know

21   it is small print, but if we can start with the first name.

22            What is the information that is being conveyed here?

23   A.   That is the name -- they are listing names of the different

24   buyers of the bonds and the amounts.

25   Q.   If you could read the name of the buyer or the holder as it

I5o6gal7                        Anderson - direct

1    is listed and the amount for the entities on this attachment?

2    A.   Okay.  Management International Longshoreman's Association

3    Managed Health, $2,829,171.

4            Second one is Terrapin Insurance Company, capital

5    surplus fund.  $1,376,549.

6            Third one is Chicago Transit Authority Retiree

7    Healthcare Trust, $4,073,499.

8            The next one is Michelin North America, Inc., Master

9    Trust Investment Committee, $8,102,154.

10           Next one is Washington Suburban Sanity Commission

11   Employees Retirement Plan, $4,118,076.

12           Next one is Waterworks and Sewer Board of the City

13   Birmingham, $4,344,640.

14           Then Richmond Retirement System, $283,146.

15           Finally, Prudential Financial, Inc., $1,254,027.

16   Q.   Mr. Anderson, did you have any conversations with the

17   purchasers of these bonds about the pros or cons of this

18   investment ever?

19   A.   No.

20   Q.   Did Dillworth Paxson play any role in providing an opinion

21   as to the creditworthiness of these bonds?

22   A.   No.

23   Q.   Did Dillworth Paxson have any role with respect to whether

24   these bonds were appropriately purchased for these investors?

25   A.   No.

I5o6gal7                         Anderson - direct

1   Q.  Did Dillworth Paxson play any role with respect to

2   disclosing to these investors the potential conflict of

3   interest?

4   A.  No.

5   Q.  When I say "potential conflict of interest," I mean the one

6   that Mr. Dunkerley had these vis-á-vis his role at Burnham

7   Securities, Inc. and his role at Wealth Assurance, AG?

8              MR. SCHWARTZ:  Objection.

9              THE COURT:  One second.

10             Why don't you rephrase?

11             MS. TEKEEI:  Sure.

12  Q.  Did you play any role with disclosing any potential

13  conflict of interest with respect to Mr. Dunkerley to these

14  investors?

15  A.  No.

16  Q.  During this time period in August and September 2014, what,

17  if anything, was your understanding of where the proceeds of

18  this bond issuance, this first series of bonds went?

19  A.  As set forth in the closing statement, some amount to paid

20  at issuance cost of 2.25 million to the Tribe of Wakpamni Lake

21  and then the remainder to the annuity investment.

22  Q.  Did you have any information as to whether the proceeds

23  were disposed of in any way other than what was set forth in

24  the closing statement?

25  A.  No.

1  Q.  Now, at this time in August of 2014, had you heard of an

2  entity called Sovereign Nations Development Corporation?

3  A.  No.

4  Q.  Did Yanni Galanis mention it to you at that time?

5  A.  No.

6  Q.  Or ever?

7  A.  No.

8  Q.  Did you know anyone named Mark McMillan?

9  A.  No.

10  Q.  Did you know anyone named Barry Finer?

11  A.  No.

12  Q.  What was your understanding of whether Mr. Yanni Galanis

13  would be compensated for his role in this August 2014 series of

14  bonds?

15  A.  I had no understanding.

16  Q.  Now, did there come a time when you began working on a

17  second series of bond issuances by the Wakpamni Lake Community

18  Corporation?

19  A.  Yes.

20  Q.  Describe how that happened?

21  A.  Shortly after closing on the first bond issue in early

22  September 2014, I received a call from Jason Galanis and Yanni

23  Galanis stating that a second bond issue has been green lit.

24  Q.  What did you understand that to mean, has been green lit?

25  A.  That it had been approved by Burnham and they had a buyer

1     in mind.

2     Q.  What, if anything, was conveyed during this conversation

3     about who that buyer was?

4     A.  No information at that time other than that it was a

5     Burnham client who was excited about what had occurred with the

6     first bond issue and wanted to be supportive.

7     Q.  Who told you that?

8     A.  Yanni Galanis and Jason Galanis on that phone call.

9     Q.  And you said shortly after.  Approximately how long after

10    the first series of bonds were issued did this conversation

11    take place?

12    A.  A week or two.

13    Q.  Did there come a time when you learned who was the

14    purchaser or who were the purchasers of the second series of

15    bond issues?

16    A.  Yes.

17    Q.  What was the source of that information?

18    A.  Jason Galanis.

19    Q.  What did Jason Galanis tell you about the purchasers?

20    A.  He provided me an e-mail and stated who the purchaser was

21    on for the first $15 million piece of the $20 million deal.

22    Q.  Who was that?

23    A.  That was entity by the name of Seneca Bohai.

24    Q.  Were any individuals associated with that entity in the

25    information that Mr. Jason Galanis provided to you?

I5o6gal7                          Anderson - direct

1    A.   Yes.   Devon Archer.

2    Q.   Who was that?

3    A.   Devon Archer.

4    Q.   You said the $15 million piece.   What was the other piece

5    of that bond issuance?

6    A.   It was a $5 million piece to bring the total to 20 million

7    and that was to be purchased by Bevan Cooney.

8    Q.   I would like you to take a look at Government Exhibits

9    1314, 1315 and 1316.

10             Beginning with 1314, what is the date of this e-mail?

11   A.   September 4th, 2014.

12   Q.   Who is sending it?

13   A.   Yanni Galanis.

14   Q.   What is the subject line?

15   A.   Series B.

16   Q.   What is attached to this e-mail?

17   A.   Wakpamni second tranche source and use of funds version

18   one.

19   Q.   If you can just take a look at the attachment, just

20   generally speaking what is described here?

21   A.   It is an overview of the second bond deal for the Wakpamni

22   Lake Community Town Center.

23   Q.   And if you could take a look at Government Exhibit 1315,

24   what is the date and time of this e-mail?

25   A.   September 4th, 10:34 p.m.

1    Q.  What is the subject line here?

2    A.  Please review and comment.

3    Q.  What is attached to this document?

4    A.  Wakpamni second tribe source and use of funds version one.

5    Q.  Now, finally if you could take a look at Government

6    Exhibit 1316, what is the date and time of this e-mail?

7    A.  September 5th, 9:48 p.m.

8    Q.  What is the subject line?

9    A.  Source and use town center.

10   Q.  What is attached?

11   A.  Proposal for creating the Wakpamni Lake Community Town

12   Center.

13   Q.  If you could go ahead and take a look at the source and use

14   of funds attachment here -- proposal here.  My apologies.

15   A.  Uh-huh.

16   Q.  What is the stated goal for this series of bond issuances?

17   Without reading it, if could you summarize it for us.

18   A.  Sure.  To fund a multi use shopping center that would be

19   used for commercial, civic, cultural and recreational uses.

20   Q.  Now, what was the structure of this series of bond

21   issuances as it compared to the August 2014 series that we just

22   reviewed?

23   A.  Nearly identical structure.

24   Q.  When you say "nearly identical," what, if any, differences

25   were there?

1   A.  The one difference was as opposed to the initial annuity

2   amount that went to the tribe at closing, that amount was

3   postponed until later in the spring.

4   Q.  Why was that?

5   A.  Well, by the time this was occurring, it was September and

6   in South Dakota it gets very cold early on and it becomes

7   difficult to build anything.  So the money wasn't needed until

8   the spring thaw for lack of a better word.

9   Q.  Was that money that was delayed to May 1st, 2015 ever paid

10  to the Wakpamni Lake Community Corporation?

11  A.  It was not.

12  Q.  Now, let's look at the parties here.

13          Who is the placement agent for this series of bonds?

14  A.  Burnham Securities, Inc.

15  Q.  Who is the annuity issuer?

16  A.  Wealth Assurance, AG.

17  Q.  Who is the portfolio manager?

18  A.  Private Equity Management, LLC.

19  Q.  Who is the trustee?

20  A.  U.S. Bank, N.A.

21  Q.  If you could please turn to Government Exhibit 1270 and

22  just focusing on the e-mail in the middle of the page from

23  Jason Galanis dated September 23rd, 2014?

24  A.  Okay.

25  Q.  What is subject line of this e-mail?

I5o6gal7                         Anderson - direct

1   A.   Buyer.

2   Q.   Can you please read what Mr. Galanis writes about the

3   buyer?

4   A.   The buyer of the 15 million allocation of the 5.67 percent

5   seven-year bonds will be Rosemont Seneca Bohai, LLC.   And

6   attention Devon Archer and an address.   And I will find out

7   information on the other buyer tomorrow and find out Morgan

8   Stanley as it relates to DTC instructions.

9   Q.   What was your understanding of Rosemont Seneca Bohai at

10  that time?

11  A.   That it was a Burnham client.

12  Q.   What, if anything, did you know about Devon Archer?

13  A.   Nothing.

14  Q.   What was the source of your understanding of Rosemont

15  Seneca Bohai?

16  A.   Jason Galanis and Yanni Galanis.

17  Q.   Did you communicate with Devon Archer in connection with

18  Rosemont's purchase of these bonds?

19  A.   I did.

20  Q.   What was the nature of those communications?

21  A.   To have him sign an investment letter -- let me back up.

22         An investment letter was sent to Jason Galanis to have

23  Seneca Bohai sign.   I received that executed, the investment

24  letter, from Devon Archer.

25  Q.   We'll take a look at that letter in a moment, but first

1   approximately when did you learn there was a purchaser for the

2   other portion of this series of bonds?

3   A.   In the next few days.

4   Q.   Showing you Government Exhibit 1272, directing your

5   attention to the first e-mail in the chain at the bottom that

6   is dated October 6, 2014 at 7:24 p.m.

7   A.   Okay.

8   Q.   Who is that e-mail from?

9   A.   Jason Galanis.

10  Q.   And if you could please read the first paragraph there?

11  A.   Sure.

12          I'd like to close him tomorrow if possible.  His name

13  is Bevan Cooney.  He has his money managed at City National.

14  Experienced institutional.  Bond desk there.

15  Q.   Had you heard of Bevan Cooney prior to this e-mail?

16  A.   No.

17  Q.   And what is your understanding of what Mr. Galanis writes

18  about having Mr. Cooney's money being managed at the City

19  National?

20  A.   That he is receiving sophisticated advice.

21  Q.   What about experienced institutional bond desk, what does

22  that mean?

23  A.   The same.  They know what they are looking at.  They are

24  able to analyze the transaction.

25          MS. NOTARI:  Your Honor (inaudible).

I5o6gal7                      Anderson - direct

1     THE COURT:  Can you say that answer again, please.

2   A.  Experienced institutional bond, they have a knowledge and

3   skill to be able to provide sophisticated advice for the

4   security.

5   Q.  If you could then look at the e-mail dated October 7, 2014

6   where you write back, He'll need to sign the big boy letter,

7   what does that mean?

8   A.  That is an investor letter.  We ask the investor to sign to

9   sign to establish that they are sophisticated investor and

10  aware of risks of the transactions and able to analyze it

11  properly.

12  Q.  If you could now take a look at the next series of

13  documents, which are Government Exhibits 206, 213, 201, 209,

14  215, 207, 216.

15          MR. SCHWARTZ:  Could you read that list again?

16          MS. TEKEEI:  Sure.  206, 213, 201, 209, 215, 207 and

17  216.

18          MR. SCHWARTZ:  Thank you.

19  BY MS. TEKEEI:

20  Q.  What are these documents?

21  A.  These are the core bond documents for the second bond

22  transaction.

23  Q.  When you say the core bond documents, can you run us

24  through what they are?

25  A.  Sure.  Trust indenture, the placement agency agreement, the

1    annuity, the investment management agreement, the closing

2    statement, and the legal opinion.

3    Q.  So these are similar categories of documents that we just

4    reviewed in connection with the first series of bond issuance?

5    A.  Other than a description of the project is different.

6    Different dates, different amounts, but otherwise similar.

7    Q.  Now, if we could take a look at one of the closing

8    statements here, Government Exhibit 215.

9           What is this closing statement for?

10   A.  This is for the second bond transaction.  The first piece

11   of the second bond transaction that closed on October 1st,

12   2014.

13   Q.  If you look at Schedule C, what was supposed to happen to

14   the $15 million at closing according to this schedule?

15   A.  It was suppos the to be disposed of as follows:  The

16   payment of issuance costs 220,000 and the remaining 14,780,000

17   to the purchase of an annuity.

18   Q.  In total how much debt did the Wakpamni Lake Community

19   Center incur as a result of this second series of bond

20   issuances?

21   A.  Both parts of second series?

22   Q.  Yes.

23   A.  20 million.

24   Q.  Did Dillworth Paxson issue an opinion letter in connection

25   with this series of bond issuances?

1    A.   We did.

2    Q.   What was the opinion letter based on?

3    A.   That the parties who were entering into the bond documents

4    and executing the bond documents were going to undertake their

5    obligations within those bond documents.

6    Q.   If you could take a look now at Government Exhibit 281,

7    what is the date of this letter?

8    A.   September 24th, 2014.

9    Q.   What entity is listed at the top?

10   A.   Rosemont Seneca Partners.

11   Q.   What is this letter?

12   A.   It is an investment letter, slash, big boy letter.

13   Q.   The same type of letter we discussed earlier?

14   A.   Yes.

15   Q.   How does this compare to the letter that was signed by

16   Hughes Capital Management in connection with the first series

17   of bond issuances?

18   A.   The same form other than different contact information.

19   Q.   If you could turn to the second page of this letter, who is

20   listed in the signature line here?

21   A.   Devon Archer.

22   Q.   What is his title?

23   A.   Managing member.

24   Q.   At the time did you have any understanding of where Devon

25   Archer obtained the $15 million to purchase this second

I5o6gal7                          Anderson - direct

1    issuance of bonds?

2    A.   No.

3    Q.   Can you please take a look at Government Exhibit 254.

4         What is the date of this document?

5    A.   October 7, 2014.

6    Q.   And what is this document?

7    A.   It too is a big boy letter.

8    Q.   If you could turn to the second page here, who is listed in

9    the signature line of this big boy letter?

10   A.   Bevan Cooney.

11   Q.   What is does this letter relate to?

12   A.   The $5 million portion of the second bond issue.

13   Q.   If I could turn your attention to Government Exhibit 402,

14   who is the center of this e-mail dated October 29th, 2014 at

15   the top?

16   A.   Bevan Cooney.

17   Q.   And what is the subject of this e-mail?

18   A.   The instructions are for the purchase of Wakpamni Town

19   Center bonds for tomorrow a.m., 10-9-2014.

20   Q.   Did you communicate with Mr. Cooney in connection with this

21   bond issuance?

22   A.   I did.

23   Q.   What was the nature of those communications?

24   A.   Two items.  One, to receive his big boy letter, his

25   investor letter, and two, to confirm his contact information

I5o6gal7                      Anderson - direct

1    for the physical bond.

2              MS. TEKEEI:  Your Honor, in terms of the logical

3    stopping point that we discussed earlier, now would be a good

4    time.

5              THE COURT:  Why don't we stop for the day ladies and

6    gentlemen.

7              I think I mentioned to you our general schedule is

8    10:00 to 5:00 most Mondays through Thursdays.  There are going

9    to be a couple days where the days have to be a little bit

10   shorter for one reason for the another.  The first of those

11   days is Tuesday.  We'll start at 11:30 on Tuesday and we may

12   end a little bit early, but I am not sure about that yet.  I

13   will let you know in advance.  We'll start at 11:00 on

14   Wednesday, but go until 5:00.

15             We will not have breakfast for you on Tuesday, but I

16   just ask you to be here a little bit earlier, 11:15, so we can

17   start promptly at 11:30.  We'll take a break for lunch and then

18   we'll go through the rest of the day.

19             Just remember don't discuss the case.  Keep an open

20   mind.  Have a nice long weekend.  Thank you.

21             (Jury excused)

22             (Continued on next page)

23

24

25

I5o6gal7                         Anderson - direct

1          THE COURT:  You are excused.  See you Tuesday.

2          THE WITNESS:  See you Tuesday.

3          You can all be seated.

4          MS. MERMELSTEIN:  Your Honor, before we resume the

5    conversation, I think that part of the disconnect here is I

6    think that your Honor may have missed some of what your Honor

7    said in the transcript.  I think there are parts of the

8    transcript that make relatively clear why the government and

9    your Honor had the understanding that we did that we haven't

10   talked about.

11         So if you look at the transcript -- it is sealed

12   although portions that are sealed are pursuant to what we have

13   done generally.  It is May 16th, page 10.  There was sort of

14   revisiting of the Gerova issue, and Mr. Quigley said, Just to

15   be clear with respect to Mr. Archer, we continue to believe

16   that we don't think that this is part of your Honor's 404(b)

17   ruling, that testimony that Jason Galanis was arrested in 2015,

18   September 2015 without reference to any defendants' involvement

19   in that arrest.  It is relevant because it is necessary to

20   provide context for communications related to this charged

21   conspiracy.  We think that is direct proof.

22         That issue never sort of -- the government -- just so

23   we're all clear this is our understanding of the ruling, and it

24   never gets revisited in the transcript.  If the defendants

25   thought that wasn't their understanding, they should have said

I5o6gal7                        Anderson - direct

so.  I think that what your Honor intended was in fact made

clear.  If that is not what the defendants understood, they

certainly may have been mistaken.  But for all the reasons that

I think that was your Honor's intention at the time, that is

still the correct ruling.  I don't think there is any basis to

change it.  The efforts now by the defendants in an effort to

get the ruling that they initially wanted to claim that there

has been some prejudice by the way they opened, I just don't

think matches the way that the parties opened in this case.

The government didn't say much about this at all other than to

reference the fact that there is going to hear that Galanis had

prior problems.

          The defendants who fought very hard to tell the jury

about Galanis's California problems, about his conviction in

this case, didn't get into the details of any of those things.

So when it comes time for that information to come in the

normal order of storytelling with witnesses who knew about it,

there is nothing about that that is going to look to the jury

like the defendants were hiding something or they weren't told

something.  No one has gotten into that level of detail.  The

jury knows that it is the government's burden and they are

putting on their case first.  Notwithstanding that Mr. Schwartz

now says he would have done that, there is no prejudice from

the way the parties opened and there would be a great deal of

prejudice keeping out this plainly relevant direct evidence in

I5o6gal7                    Anderson - direct

1    the case.

2            So we're happy to address this in whatever level of

3    detail your Honor warrants.  I don't want to belabor the point,

4    but I think that the record was more clear with respect to

5    where we left things prior to the trial than the initial view

6    of the transcript and the government thinks the rule should

7    stand.

8            THE COURT:  The one thing I will add to that -- again,

9    I wish I had been clearer.  I wish I had reread the transcript

10   or frankly had someone raise it with me.  But in the April 23rd

11   transcript in back and forth between the Court and Mr. Quigley,

12   I said a couple times and now I am going to quote, "So there

13   may be evidence that could come in about their knowledge of his

14   misconduct in the past.  That is not so prejudicial as to tell

15   this jury that John Galanis, Mr. Hirst were previously

16   convicted," and there is more of a back and forth.

17           On page 29 I say again, "So maybe there is a way to

18   getting in the fact that they" -- I think it is clear from that

19   context that they is Hirst and John Galanis -- "knew about it,

20   meaning Jason Galanis's arrest and conviction in Gerova perhaps

21   in addition to other prior conduct without getting into the

22   fact they were convicted of fraud themselves.  I just think it

23   is too prejudicial," and then I said similar later.

24           At the very least to the extent it wasn't clear or I

25   initially said which I undoubtedly did that the arrests of -- I

I5o6gal7                    Anderson - direct

1   am trying to get the language exactly right -- that the

2   evidence relating to the arrest and convictions of Hirst and

3   John and Jason Galanis in Gerova were not going to be permitted

4   in.  There is then enough of a discussion about what may come

5   in about Jason Galanis's past including perhaps the Gerova

6   arrest and conviction as long as it didn't implicate John

7   Galanis and Gary Hirst that that it is not something that I

8   think it was just fair to rely on in light of the back and

9   forth and numerous comments that I made to that effect.

10          MR. SCHWARTZ:  I have a few things.

11          THE COURT:  Go ahead.

12          MR. SCHWARTZ:  First of all, this is a significantly

13   substantial issue for us that I would like the opportunity to

14   put in something supplemental.  I can do that tomorrow.

15          THE COURT:  Do it by tomorrow at noon.

16          MR. SCHWARTZ:  Noon.  Sure.

17          A few quick reactions.  One is the portions of the

18   transcript from April that you are looking at are exactly the

19   ones that I was talking about before that supported the plain

20   language of your Honor's ruling, which is that arrests and

21   convictions are out.  Every time we talked about it after that,

22   we talked about things like their misconduct in the past.  The

23   upshot of that conversation if you will recall was the

24   government really wanted to make the point that Jason Galanis

25   and John Galanis and Jason Galanis and Gary Hirst had a history

1    together.  So the point that was being discussed, and I think

2    your Honor was making, government, you can make that point some

3    way but not with reference to arrest and convictions.  That I

4    understood.

5            THE COURT:  I never addressed head on other than the

6    statements that I read and I never talked about the rationale

7    for discussing people's reactions in e-mails to Jason Galanis's

8    arrests.  I see now that I didn't do it and I wish I had, but I

9    think it is clear here that on the table was a lot of

10   background about Jason Galanis as long as it didn't implicate

11   Gary Hirst and John Galanis.

12           MR. SCHWARTZ:  I disagree with that.  I am not talking

13   about what was in your head obviously, but your Honor said the

14   words Jason and John and Galanis and Gary Hirst's arrests and

15   all the other conversation was about evidence other than

16   arrests and convictions that might come in and I think we were

17   entitled to rely on that very, very clear order which was

18   followed by the sentence, I don't see how any of this can be

19   direct evidence.

20           So when a few weeks later the government tried to

21   reargue your Honor's ruling, as they tried to reargue

22   everything, the fact that we didn't get into extensive debate

23   because they said we continue to think it is direct evidence

24   when your Honor had already held in black and white it is not

25   direct evidence, I don't know how that somehow opens the door

                  I5o6gal7                    Anderson - direct

1    to this issue.

2              So if your Honor wants to reconsider your prior

3    ruling, I can't stop you from doing that.  Obviously there are

4    intricacies to the evidence that we're discussing now that

5    weren't discussed before.  I don't know why we're pretending

6    that was not ruling.  It was very, very clear.  We relied upon

7    it and we're prejudiced by.  We're prejudiced by it not just in

8    the opening, and that is a very substantial prejudice, but

9    about the way the evidence is going to come in.

10             THE COURT:  This issue was raised prior to any

11   witnesses testifying.  So when you say with respect to how the

12   evidence is coming in --

13             MR. SCHWARTZ:  Let me finish the sentence.

14             With respect to how the evidence of the conviction is

15   going to come in, that is when the arrests is going to come in.

16   They say they are going to have communications with people who

17   are knowledgeable about at arrest, but there is no way for me

18   to get in what is -- they may be sceptics but as a matter of

19   evidence, it is going to be uncontroversial that Mr. Archer was

20   not involved in that conduct and was not aware of that conduct.

21   That is absolutely critical.

22             Otherwise, the fact that there is an arrest -- even

23   though they are not going to I assume make the arguments

24   explicitly, jurors are going to sort of draw the same

25   conclusion that the government was suggesting, which is of

1    course that guy knew about it, but he didn't.  He had no idea

2    about it.  There is not a shred of evidence suggesting that he

3    had any hint about it.  There is no way for me to get that in.

4    So there is a very substantial evidentiary problem especially

5    if the government is not going to stipulate to that.

6            THE COURT:  First of all, tell me exactly how you

7    anticipated this would come in and give me the exhibit numbers

8    of the particular exhibits.  I assume none has been we redacted

9    because it was your understanding none of it would be redacted.

10           MS. MERMELSTEIN:  More than that.  In some cases they

11   have been partially redacted.  We redacted them in light of

12   your Honor's ruling with respect to Hirst and John Galanis and

13   left the Jason Galanis Genova part in based on your

14   understanding.  Notwithstanding Mr. Schwartz's assertion that

15   your Honor's ruling was clear, the government had the

16   understanding the opposite was true.  Mr. Quigley saying, This

17   is the government's understanding, and no one saying, That is

18   not true, makes clear the Court's ruling as it stood at the

19   time was that this was coming in.

20           In any event, I think it will come in through -- I

21   haven't thought it possible missing something, as I said

22   Mr. Francisco Martin will testify that he learned that Jason

23   Galanis had been arrested and that he then, among other things,

24   had a conversation with Mr. Cooney about the fact of

25   Mr. Galanis's arrest the import of which in sum and substance,

I5o6gal7                       Anderson - direct

1    and we can fight about the details, is that there was a

2    understanding between Mr. Cooney and Mr. Martin, one, that they

3    were both involved in the bond issue with Galanis.  It is not

4    without significance that Mr. Cooney in having that

5    conversation acknowledged the understanding both his own

6    involvement and Mr. Martin's generally in the one issues.  And

7    then also a sort of a we're okay because this isn't about the

8    transaction that we are involved in, fashioned in the

9    government's view reflects an understanding that the

10   transaction they were involved in might well give rise to

11   someone being arrested given the nature of the conduct.

12          In addition, the witness from the BIT board will

13   similarly testify that they learned of Jason's Galanis's arrest

14   and raised it with Mr. Archer and had the discussions as we

15   talked about before with respect to that issue.  There are with

16   respect to the BIT board.  I don't believe there are exhibits

17   with respect to the BIT board.  He is going to talk about what

18   he remembers.  There are two exhibits that reference Jason

19   Galanis's Genova arrest, Government Exhibit 782, which is a set

20   of BIT board minutes reflecting it.

21          THE COURT:  Reflecting the BIT board raising it with

22   Mr. Archer?

23          MS. MERMELSTEIN:  Yes.  And and e-mail, Government

24   Exhibit 2103, in which someone at Burnham receives an e-mail

25   news alert announcing the charges in Genova.  It initially

1    reflects the charges against all defendants, but we had already

2    redacted it to remove the ones your Honor ruled could not be

3    put before the jury.  That e-mail is forwarded by John Burnham

4    to Mr. Archer asking if he is aware of it and Mr. Archer says,

5    Yes, it was brought to his attention.  It was a surprise to him

6    and that he is pleased with the actions that you took.

7    Meaning, he is claiming that he had followed the BIT board's

8    requirements to separate himself from Jason's Galanis and

9    pleased in light of the arrest.  Of course that is not true.

10   So I think that -- and cannot represent that there is not

11   another exhibit that I have forgotten -- is the two big places

12   where the fact of the Genova arrests are essential to the

13   storytelling of what happened and understanding things.

14           With respect to Mr. Schwartz's suggestion that somehow

15   alleging that Galanis arrest was no suggestion that these

16   defendants knew of that criminal conduct before.  And, look,

17   this e-mail for example contains his denial that he knew

18   before.  I don't think that that in any fashion suggests to the

19   jury absent an argument by any party that they did know.  And

20   while I cannot say one way or the other whether or not they

21   knew and there certainly are people who were not involved in

22   Genova who knew that Jason Galanis sort of was doing fraudulent

23   things, the government is not going to make that argument.

24           Unless we learn something between now and the end of

25   the trial -- if Mr. Schwartz says, I want to be clear, there is

1    no allegation that my client knew that, we're not going to say

2    there is an allegation.  I don't think we can stipulate because

3    I am not confident that fact is true.  I don't have anyway to

4    dispute it, but given the circumstances here I couldn't say --

5              THE COURT:  Would you stipulate that you don't have

6    any evidence to that effect.

7              MS. MERMELSTEIN:  I would like to think about that,

8    your Honor.  I don't think that that is necessary because it

9    suggests more than what the government sort of the what its own

10   inclinations are given the information it has and

11   circumstantial evidence.  So we can have that conversation.

12   Although, I don't think it should be required.

13             THE COURT:  Mr. Schwartz.

14             MR. SCHWARTZ:  I think this is why a letter will be

15   helpful.  Some of the exhibits the government has pointed out

16   at least with respect to Mr. Archer I think just demonstrate

17   both the extreme prejudice to Mr. Archer and the lack of

18   prejudice to the government.

19             So the Government Exhibit 2103 is literally a copy of

20   the SEC's press release announcing the charges against these

21   defendants, except one name will be whited out.  It describes

22   the nature of the charges and it thanks the U.S. Attorney's

23   Office for their help and indicates their arrests in addition

24   the SEC action.  I don't understand in what world that sort of

25   specificity is relevant especially because as the government

I5o6gal7                    Anderson - direct

1    just acknowledged, the whole point of this e-mail, the whole
2    point of the communication, whole point of everything that
3    happens between Mr. Archer and the BIT board after the arrest
4    is the arrest happens and the BIT board comes to Mr. Archer and
5    say, Hey, we talked about this guy last year.  What's up?  And
6    Mr. Archer said, Yeah, what I told you before is true.  And
7    they say, It was a lie then and so it was a lie to double down
8    on it.  We say it was true then and it was true when he
9    reaffirmed it.

10        It adds nothing.  First of all, to get into the fact
11   that he reaffirmed it, that you can simply say they asked a
12   question again and in September 2015.  It adds literally
13   nothing to the government's proof.  There is literally no
14   prejudice to them by taking out the fact that the question was
15   prompted by Mr. Galanis's arrest.  The only reason with respect
16   for Mr. Archer they want that evidence in is because it makes
17   the whole thing seem more sinister, but it is not.

18        The response that Mr. Archer gave was the accurate
19   one.  This was a surprise to both of us.  Meaning, Mr. Archer
20   and Andrew Godfrey, an individual who is on that communication
21   and is not alleged to be a coconspirator.  It was a surprise to
22   both of us.  We're pleased that we took these actions.  Back
23   then a year ago in response to the BIT board's questions.  It
24   is simply an affirmation of a prior statement.  So they are not
25   harmed at all by sanitizing that conversation if they like it

1   they can get it, but they don't think it was prompted by the

2   arrest whereas the prejudice to Mr. Archer of putting in the

3   fact that there was an arrest on the securities fraud on those

4   facts is incredible.

5           THE COURT:  The press release, and will look at the

6   exhibits, but is that something that is forwarded from one

7   person to another?  How is that exhibit going to be utilized?

8   What does it show you?

9           MR. TOUGER:  We're not going to put in the press

10  release.  The press release goes on.  It is obviously redacted

11  individuals.  There is no doubt that the jury would know --

12          THE COURT:  I am asking what exactly it is.

13          MR. SCHWARTZ:  It's a press release forwarded to a

14  person, forwarded to a person that goes to John Burnham.  You

15  will see it.

16          The last thing I will say is I guess I understand in

17  the event your Honor is inclined to reconsider this, and you

18  shouldn't, and the government isn't willing to stipulate there

19  is no due a morale certainty that Mr. Archer didn't know about

20  this, even though he didn't know Jason Galanis when that

21  conduct was ongoing, then I think a limiting instruction from

22  your Honor is appropriate.  That was actually the conversation

23  that we were having back on May 10th that prompted Mr.

24  Quigley's comment.  It concluded in response to his comment

25  that your Honor wants to think about it.  So I think it is

I5o6gal7                      Anderson - direct

1  appropriate that if it comes in, but it shouldn't, that we pick

2  that back up.

3              MS. NOTARI:  I also want to add --

4              THE COURT:  Go ahead, Ms. Notari.

5              MS. NOTARI:  As far as Mr. Cooney, the arguments I

6  made before, I don't think these comments are probative of

7  anything.  I think the jury will be left to speculate that

8  there is this entire other Genova fraud that my client -- they

9  are going to naturally think he was a part of it.  They are

10 going to think there are things that they don't know.  We are

11 in no position to defend that.  It is just out there and it is

12 just so prejudicial.  It is not probative of anything.  The

13 fact that my client said to Francisco Martin, Did you hear --

14 at best he says, Did you hear that you Jason Galanis was

15 arrested in Genova but we're not part of that, what does that

16 mean?  It doesn't mean anything.  It is just prejudicial.

17             THE COURT:  Mr. Touger.

18             MR. TOUGER:  If the Court is -- take this by no way of

19 waving the white flag that the Court should change the ruling,

20 but if the Court is going to change its ruling, first off I

21 don't see why the press release has to go into evidence at all.

22 The press release is -- the fact what they are saying is that

23 the arrest is important.  It doesn't seem to matter the details

24 of the arrest are completely irrelevant to anything.  Nobody

25 knows about the details of the arrest in this case.

I5o6gal7                    Anderson - direct

1           Secondly, your Honor, I would say that a compromise is

2    suggested that we just say if the Court is going to go back and

3    its ruling that we understand it to be that Jason Galanis was

4    arrested in September of 2016 and not bring out that it is a

5    securities fraud or anything else or any other defendants are

6    arrested or any other individuals are arrested and the

7    background.  If what the government is saying is the arrest was

8    important because that brought back to the BIT board, then not

9    that I think it is relevant at all, and I am not conceding that

10   issue, but why is any other detail important other than Jason

11   Galanis was arrested in September of 2016?  If that is all they

12   are going to use it for and nothing else, then nothing else is

13   relevant.

14           THE COURT:  Tell me why this is probative and what it

15   is probative of.

16           MS. MERMELSTEIN:  Sure.  I think that the fact of the

17   arrest is as we said relevant to both the conversations between

18   Mr. Martin and Mr. Cooney and the statements to the BIT board.

19           With respect to the press release itself, the

20   government doesn't have any objection -- we passed our copy to

21   your Honor so I don't have it in front of me, but we don't have

22   any objection considering further redactions so there is less

23   information about what the arrest was.  I think contextually it

24   is relevant.  I mean, you can get arrested for a DUI.  The

25   conversation between Cooney and Francisco Martin the kind of

I5o6gal7                        Anderson - direct

1  like he got arrested but it is not this, obviously if it had

2  been something sort of not white-collared fraudy, it would have

3  been a nonsensical conversation, but we're amenable to less

4  information with respect to what gets forwarded there.  I don't

5  know how many times I can say it.  Your Honor is not

6  reconsidering the government's ruling.  It is reaffirming.  I

7  don't know how much we have to add.  I think it is relatively

8  straightforward.

9           MR. SCHWARTZ:  I don't agree that it will be

10 nonsensical if it were not a white-collared arrest.  The

11 morning that Bernie Madoff was arrested, everyone in his office

12 thought he was arrested for prosecution but it still provoked

13 the same kind of coconspirator statements that the government

14 said happened here.  Arrests are arrests.  If people are

15 actually engage in the wrongdoing, they are going to respond in

16 that particular way.

17          THE COURT:  If anyone wants to be heard on this issue,

18 write me a letter by noon tomorrow so I can read it and think

19 about it over the weekend.  We'll meet Tuesday at 11:00 and the

20 jury is coming in at 11:30.

21          MS. MERMELSTEIN:  I don't think we have much more to

22 add.

23          THE COURT:  That's fine.

24          MS. MERMELSTEIN:  If the defense files --

25          THE COURT:  Get it in by the end the day.

1              MS. MERMELSTEIN:  We'll file it Friday.

2              THE COURT:  By the end the day.

3              Have a good weekend.

4              MS. MERMELSTEIN:  Your Honor, when we take up the

5    issue about whether or not cross-examination of Mr. Anderson

6    with respect to the fact of the arrest.

7              THE COURT:  Let's go back to that.  Is anyone planning

8    to ask Mr. Anderson anything about the arrest?

9              Mr. Touger, I thought you said, No, you weren't

10   planning to ask Mr. Anderson about the arrest.

11             MR. TOUGER:  I am not.

12             THE COURT:  No one is going to ask it.  Tell me also

13   what other issues do you need teed up?  I want to make sure I

14   give you rulings in advance of any issues.

15             MS. MERMELSTEIN:  I think, your Honor, there is the--

16             THE COURT:  Expert issue.

17             MS. MERMELSTEIN:  -- the expert issue.  I don't think

18   there is much remaining challenge to the government's experts;

19   but to the extent that the defense intends to try and use the

20   government's experts go ask the questions that the government

21   believe to be improper and ask the defense experts that issue

22   is ripe.  I expect the government will call its experts

23   following Mr. Anderson.

24             I think that there is the issue with respect to the

25   parties disagreement over the admissibility of the California

1    prosecutor's assessments of Jason Galanis.  The government

2    understood your Honor to have suggested that under 404(b) you

3    will not permit that kind of argument, that Jason Galanis is a

4    good liar and thus deceived these defendants.  We are prepared

5    to stipulate to the fact of the California conviction, the fact

6    of the California cooperation and the fact that Galanis did not

7    commit the Genova fraud while claiming to cooperate.

8            MR. QUIGLEY:  Nothing that is really time-sensitive

9    right now.

10           THE COURT:  Thank you.

11           MR. SCHWARTZ:  Can we find out who your next week's

12   witnesses are.

13           MS. MERMELSTEIN:  We need to reevaluate as things have

14   moved slower than expected.  We got answers this morning about

15   issues that are going to affect scheduling.  We'll come up with

16   a list and get it to them by the end of tomorrow.

17           MR. SCHWARTZ:  Thank you.

18           THE COURT:  Because of the long weekend if you can get

19   it to them by midday, I think that will be good.

20           MS. MERMELSTEIN:  Sure, your Honor.

21           MR. SCHWARTZ:  Have a good weekend, your Honor.

22           THE COURT:  One question.  Morton and Hirst were the

23   only ones who objected to the government's experts.  Is anyone

24   else joining in that objection?

25           MR. SCHWARTZ:  We had adopted a portion of it.  I

1    think really there are two issues.  One is it will be very

2    helpful to know which happens with our experts, what their

3    excepts know.  I actually and don't think there is disagreement

4    because now I saw the exhibits that they intend to use the

5    government's experts -- as I understand it are really being

6    used (inaudible) as opposed to saying anything about this case.

7              MR. QUIGLEY:  That's fair.

8              MS. MERMELSTEIN:  True.

9              MR. SCHWARTZ:  As I said at side bar, I think the next

10   witness is going to be entirely duplicative of what Mr.

11   Anderson is now testified to, but if they want it before the

12   jury that's fine.

13             THE COURT:  All right.  Thank you.

14             (Adjourned to May 29, 2015 at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                         Page
 3    TIMOTHY ANDERSON
 4   Direct By Ms. Tekeei . . . . . . . . . . . . 143
 5                    GOVERNMENT EXHIBITS
 6   Exhibit No.                          Received
 7    200-202, 204-217, 250, 252, 254, 263, 281, 402160
 8    1220, 1268, 1270, 1272, 1300, 1301    . . . . 160
 9    1303-1316   . . . . . . . . . . . . . . . . 160
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```