```
I5TJGAL1                         Anderson – direct
```

 1   UNITED STATES OF AMERICA
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                                16 Cr. 371 (RA)

 5   JOHN GALANIS, et al.,

 6                  Defendants.

 7   ------------------------------x

 8                                           New York, N.Y.
                                             May 29, 2018
 9                                           11:29 a.m.

10

     Before:
11
                        HON. RONNIE ABRAMS,
12
                                             District Judge
13

14                           APPEARANCES

15   ROBERT KHUZAMI,
          Acting United States Attorney for the
16        Southern District of New York
     BY:  BRENDAN F. QUIGLEY,
17        REBECCA G. MERMELSTEIN,
          NEGAR TEKEEI,
18            Assistant United States Attorneys

19   PELUSO & TOUGER
          Attorneys for Defendant John Galanis
20   BY:  DAVID TOUGER

21   BOIES, SCHILLER & FLEXNER LLP (NYC)
          Attorneys for Defendant Devon Archer
22   BY:  MATTHEW LANE SCHWARTZ
          LAURA HARRIS
23

24

25

I5TJGAL1                        Anderson – direct

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4               – and –
     O'NEILL and HASSEN
5         Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                        Eric Wissman, Paralegal
                         Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Trial resumes)

2              (In open court; jury not present)

3              THE COURT:  Good morning, everyone.  You may be

4     seated.  Sorry to get started a little bit late today.  I know

5     that the parties have submitted a number of letters both late

6     last night and this morning.  I have not had a chance to review

7     them yet.  Why don't you just tell me while we're checking on

8     the jury what you think is most pressing and we'll address

9     whatever we can now and the rest of the items either at lunch

10    or at another time.

11             My mike was not on.  Actually just before that, I

12    think the government had suggested that given that we'll have a

13    few short days in the near future, that we have the jury eat

14    lunch here, which is fine.  I think the question is how long a

15    lunch should be.  Does anyone have an opinion on that?

16             MS. TEKEEI:  Your Honor, we suggest half an hour just

17    to keep the day moving.

18             THE COURT:  Does that give everyone else enough time?

19             MR. SCHWARTZ:  45 minutes would be more helpful.

20             THE COURT:  We'll do 45 minutes, okay.  So that is

21    that issue.  Yes?

22             MS. TEKEEI:  Your Honor, we received late last week

23    and also yesterday a number of exhibits from defense counsel.

24    Well, we received what defense counsel identified a number of

25    exhibits they intend to offer through Mr. Anderson.  Some of

I5TJGAL1                       Anderson - direct

1     those exhibits had been previously provided to the government

2     last week.  There were several new ones late yesterday

3     afternoon.

4          We reviewed them and we submitted the letter to your

5     Honor lodging our objections to them.  There are roughly two

6     categories of exhibits.  One category of exhibits are documents

7     that Mr. Anderson emails that Mr. Anderson is not on.  He may

8     be on lower portions of the e-mail chain in some respects, but

9     he is simply not on the higher chain.  Some of those documents

10    are marked as government exhibits, and the government intends

11    to introduce those in its case in chief as the trial

12    progresses.

13         We understand that defense counsel may want to get out

14    ahead of that a little bit, but we don't think it is

15    appropriate to do that with this witness, particularly where

16    the top email or emails do not involve him, do not include him,

17    he is not a recipient witness to that, and the government

18    should be able to advance those exhibits through its case in

19    chief as it intends to.

20         A second category of exhibits are exhibits that

21    contain hearsay and for which we cannot identify any hearsay

22    exception.  Defense counsel have filed letters.  Mr. Archer has

23    filed letters offering up that several of his exhibits are

24    non-hearsay, they're not being offered for the truth of the

25    matter asserted.  We can go through those one-by-one.

I5TJGAL1                        Anderson - direct

1            Mr. Cooney's counsel has filed a letter saying that

2     many of those exhibits are relevant but not providing any

3     hearsay exception to why they should be admitted through this

4     witness during the government's case in chief.

5            We raise those to your Honor because we don't expect

6     that there is much left on direct examination, and we think

7     that to the extent defense counsel seeks to admit these

8     exhibits in their cross-examination, you should address those

9     issues before cross-examination begins.

10           THE COURT:  First of all, have you spoken with defense

11    counsel?

12           MS. TEKEEI:  By the time we spoke with them briefly

13    last week and we exchanged our exhibits, by the time we

14    received Ms. Notari's list of more than 50 exhibits yesterday

15    afternoon and had a chance to identify them and identify which

16    ones we would object to and wouldn't, we didn't have a chance

17    to engage back-and-forth with them, and we filed a letter with

18    the court so the court is aware we do have objections to some

19    of those exhibits.

20           THE COURT:  In the future while you all are sitting

21    here in the morning, try to speak to each other and see if you

22    can resolve whatever issues can be resolved.

23           As to the first category of documents, the ones that

24    Mr. Anderson is not a party to, my understanding, based on what

25    you said, is that he was party to an email lower on the chain,

1   but there is an attempt to introduce subsequent emails that he

2   is not on after that.  Is that right?

3          MS. TEKEEI:  It is in two parts, your Honor.

4          Yes, there are some of them where he appears on the

5   lower portions of the email chain, and then there are some in

6   which he doesn't appear at all, and they're principally

7   communications between Mr. Cooney, Mr. Archer and Jason

8   Galanis, for example.

9          MS. NOTARI:  Your Honor, I am not cross-examining Mr.

10  Anderson until after this afternoon, so perhaps we can go

11  through this more carefully, but it is just what the government

12  is basically saying is that they're putting these exhibits into

13  evidence, but they don't want the defense to have the

14  opportunity to review Mr. Anderson's own comments in the

15  context of email threads that he is on.

16         I assure you he is part of these.  They're not very

17  voluminous.  There are probably two, and it is crucial to the

18  defense because it tells the narrative, it tells what he was

19  telling my client, what directions he was giving him.

20         As far as --

21         THE COURT:  Let me stop you.  With respect to emails

22  he is on, he is actually a party to, you're not trying to

23  exclude those, are you?

24         MS. NOTARI:  Oh, yes, they are.

25         MS. TEKEEI:  Your Honor, there are emails that the

1  defense has marked where the top of the email is an e-mail from

2  Mr. Cooney forwarding those to other people.

3           THE COURT:  You can redact the party?

4           MS. TEKEEI:  They have not done so.  Then separately

5  there are other emails that Mr. Anderson is on, but for which

6  there is no hearsay exception or non-hearsay reason provided

7  for introducing it through him.

8           THE COURT:  Go ahead.

9           MS. NOTARI:  No.  First of all, these emails are going

10 to be as part of the government's, going to be in evidence so

11 it is not like the jury is not going to see them.

12          To the extent that I ask Mr. Anderson questions about

13 who he was emailing, what this was about, you know, who was on

14 this email, that this particular thread, you're talking if he

15 doesn't know, if he has no personal knowledge of, it is common

16 sense under the rule of completeness and telling this narrative

17 state of mind.

18          They want hearsay exceptions, but I can give you five.

19 There is business record, there is admitted for state of mind,

20 it is admitted because it tells a narrative, the rule of

21 completeness.  This is just part of the core part of this

22 story.  These are not irrelevant.  This is a witness who is

23 drafting emails, and we're asking him questions about what he

24 was telling Mr. Cooney.  It is just Trial 101.

25          THE COURT:  For the exhibits that you're going to

1    admit later in the case, do you want them to call Mr. Anderson

2    back?

3              MS. TEKEEI:  If it is okay, let me give the court an

4    exhibit.  Government Exhibit 1264, I have a copy if your Honor

5    would like to see it.

6              THE COURT:  Sure.

7              MS. TEKEEI:  The cover email is an email from

8    Mr. Galanis to Mr. Archer and Mr. Cooney, forwarding a memo

9    that Mr. Anderson had drafted.  Now, they want to show Mr.

10   Anderson this cover email that he is not on and it is an email

11   that the government intends to introduce in its case in chief.

12             They're certainly welcome to ask him questions about

13   his drafting of the memorandum.  There is no problem with that,

14   but they want to get out ahead of this email by showing it

15   first before we have had a chance to, that is simply not proper

16   for them to do.

17             MS. NOTARI:  Quite frankly, I couldn't put the email

18   in without the cover sheet because that's what the government

19   exhibit is.  Of course, I am going to go into the substance of

20   what he drafted and not the fact that this was forwarded to

21   Devon and Cooney.  This is something that is proper argument.

22   The jury can read it later on.  I am not going to go into the

23   cover letter and say did you know this was sent to Bevan Cooney

24   when obviously he didn't.  I hope that --

25             THE COURT:  Why don't you just make the memorandum a

1  defense exhibit and not include the email portion in the front?

2          MS. NOTARI:  At what point is this going to go to the

3  jury, this particular exhibit?

4          THE COURT:  I believe, Ms. Tekeei, you said you don't

5  have an objection to them asking about the memorandum, but you

6  don't want the email portion?

7          MS. TEKEEI:  Your Honor, they're welcome, yes, your

8  Honor, they're welcome to ask about the memorandum.  This is

9  the government exhibit we intend to enter the --

10         THE COURT:  I understand that.  Do you have an

11 objection to the first page being redacted, the email portion

12 and then marking as a defense exhibit the memorandum?

13         MS. NOTARI:  That is a lot of effort when we're not

14 publishing these exhibits to the jury today, are we?

15         MS. TEKEEI:  Your Honor, we have no objection if they

16 want to mark what exhibits as defense exhibits.  We asked them

17 to.  Many of the defense exhibits are not marked with a defense

18 exhibit sticker at all.  So if they wanted to mark that

19 memorandum and ask Mr. Anderson questions about it with this

20 particular memorandum, we don't have an objection to that.

21 What they've done instead is use our exhibits.

22         THE COURT:  Mr. Schwartz.

23         MR. SCHWARTZ:  There is literally no rule of evidence

24 that prohibits this.  A witness does not have to have

25 first-hand knowledge of every piece of a document in order for

1     that exhibit to come in through this witness.  For example,

2     this document is not one I intend to offer, but one I intend to

3     offer, Defense Exhibit 4600 is subject to a stipulation between

4     the parties already.

5          There is no question about its authenticity.  This

6     afternoon they're going to call a paralegal to start reading

7     emails into evidence.  That paralegal doesn't know anything

8     about the content of those communications.  That is why they're

9     going to call him or her.

10          To go through this pointless exercise of exacting

11     emails from their cover pages, I don't know why we would do

12     that when there is no rule of evidence that prohibits it.  I

13     note also the government in their direct put in on this witness

14     a number of exhibits that are just like this.

15          They're communications between Mr. Anderson and

16     someone else that at the very top have been forwarded to

17     Mr. Archer and Mr. Cooney or someone else.  That is, for

18     example, Government Exhibit 2027 and Government Exhibit 1220.

19     It is identical.

20          The witness either knows or doesn't know that it was

21     forwarded, but I can't locate any rule of evidence or any good

22     principle of trial management that suggests we should take

23     something everyone agrees is going to be an exhibit and break

24     it in half and artificially have to talk about the back half of

25     it especially because when we went through the painful process

1    of reaching stipulations, the government repeatedly told us

2    they would refuse to do that and we could only put in

3    documents, attachments when they had their cover pages on, by

4    and large.  I don't know why we're revisiting this now.

5            There is no gamesmanship here, no idea of trying to

6    get in front of some bad email.  If Mr. Anderson was on a

7    communication, we want to ask him about it, all right?  So DX

8    4600, which is the one I intend to use, it is a six-page email

9    chain, five and five, these pages are between Mr. Anderson and

10   other people.

11           At the very, very top Jason Galanis forwards the email

12   chain to Mr. Archer and Mr. Cooney without comment.  I don't

13   know why I should have to redact that to use the exhibit with

14   him just so they can put in later a different version of the

15   same exhibit, and in closing I have to explain to the jury that

16   Mr. Anderson's testimony about DX 4600 is really the same thing

17   as testimony about GX whatever, whatever, and I have to put up

18   the two documents to prove to them that I'm telling the truth.

19           It is pointless.  It is going to result in closings

20   that will take days and days and days, and there is no rule of

21   evidence that suggests it is required or appropriate.

22           MR. TOUGER:  Your Honor, as far as 1264, there is no

23   argument Tim Anderson wrote the memo.  I think that is agreed

24   upon by everybody.  He wrote the memo.  So why can't we

25   cross-examine him about the memo?

1          Nobody is going to be -- if they're going to bring out

2     the cover page six hours from now or four hours from now, what

3     is the difference -- nobody is going to be cross-examining him,

4     at least I won't be crosses examining Mr. Tim Anderson over the

5     cover page.  I will cross him he wrote this memo, and he wrote

6     that memo, and there is a reason he wrote the memo, and that is

7     all that will be the subject of cross-examination.

8          MS. TEKEEI:  Your Honor, there is a potential

9     compromise situation where we don't have a problem with the

10    defense asking Mr. Anderson questions about the emails that he

11    is on and showing those emails to the jury.  Obviously, the

12    emails that are exchanged between the defendants and with their

13    co-conspirators, the government is allowed to offer those in in

14    its case in chief and that is why it didn't redact those

15    emails.

16         If you notice going back, the government also did not

17    highlight those portions of the email for the jury in this

18    instance.  We are fine if defense counsel want to ask questions

19    of Mr. Anderson about memos that he drafted or emails that he

20    is on, but we asked, and we think it is fair that they not

21    highlight then their defendants or their clients and

22    co-conspirator statements that are above those emails for the

23    jury since we intend to do that.

24         THE COURT:  First of all, the jury is here.  I will

25    tell you, look, as a technical matter, I agree with the

1    government, but just in terms of trial management, I agree with

2    the defendants.  I think it would be frankly silly to have the

3    defendants spend the time to redact and mark the very exhibits

4    there is no dispute are coming in in the government's case, but

5    you shouldn't be highlighting the portions that wouldn't

6    otherwise be admissible for the defendants to elicit.

7           If you're using, for example, Ms. Notari, 1264, you

8    should just be focusing on the memorandum and not the email

9    with Mr. Anderson, but I am going to let you use this exhibit

10   because otherwise I think it would be a pointless exercise and

11   we would keep the jury waiting.

12          Is that, Mr. Touger, you just --

13          MR. TOUGER:  That is fine with me.

14          THE COURT:  That is what you intend to do anyway?

15          MR. TOUGER:  That is fine with me.

16          THE COURT:  That way, and I agree with Mr. Schwartz on

17   this for the purposes of summation, the jury isn't going to

18   have two sets of the same things, which would be really

19   unnecessarily confusing.  That is my ruling on that.

20          Is there anything else we need to talk about before we

21   can bring the jury in?

22          MR. TOUGER:  Just two things.

23          THE COURT:  I am sorry.  Mr. Galanis, he is wearing a

24   neck brace.  I apologize.

25          MR. TOUGER:  I wanted to tell the court what happened

1     on Thursday on the way home.  Unfortunately, the mechanism of

2     keeping his wheelchair bolted into the floor didn't work

3     properly, and there was a short stop, and he went back over top

4     and he fell on his head and he was taken to the emergency room.

5           The problem with that is that Mr. Galanis, basically

6     his spine is put together by pins and needles, operated -- that

7     is a literal point that, so there was worry he might have

8     broken some of it.  Operative procedures that were done.  It

9     doesn't seem like that has happened.  He probably did suffer a

10    concussion.  We don't intend to wear this during trial because

11    I don't want the jury thinking we are trying to get extra

12    sympathy.

13          It is okay for him to do that, basically he wears it

14    when he is moving just in case, but I wanted to inform the

15    court that that occurred, and they haven't done any lower back

16    examination of him yet, so if the pain persists in his lower

17    back, that might become a problem because he had operations

18    there also.  I wanted to inform the court of that.

19          THE COURT:  Thanks you.  I am sorry to hear that.

20          MR. TOUGER:  The second thing, we are not getting

21    anything on our screens as far as the real time.

22          (Off-the-record discussion)

23          THE COURT:  You indicated there is a hearsay objection

24    to other documents?

25          MS. TEKEEI:  Yes.  I will call the court's attention

1    to Government Exhibit 1344 as one exhibit.

2                MR. TOUGER:  I don't want to interrupt you.  I wanted

3    to let the Marshals know they did handle the situation really

4    well.  They brought him to the emergency room, and I want to

5    make sure that that --

6                THE COURT:  Thank you.  Yes.

7                MS. TEKEEI:  Government Exhibit 1344, which is a

8    series of text messages between Mr. Galanis --

9                MS. NOTARI:  That is me.

10               MS. TEKEEI:  It is both Mr. Schwartz and Ms. Notari's

11   exhibit.  Our point is that there are a series of text messages

12   here, some of which are entirely irrelevant, some of which are

13   hearsay as offered by the defendants.

14               We asked the defendants to identify for us what

15   portions of these series of text messages they would intend to

16   offer so we could consider what portions we have rather than go

17   through 60-page document.  We asked Mr. Touger to let us know

18   if he objects to the other defendants entering these as

19   exhibits, and we haven't received additional clarity on that.

20               I will call the court's attention, for example, to one

21   instance of what appears to be a completely irrelevant text

22   text message.  The bottom page, DP 18765, it is a picture of a

23   signpost that Mr. Galanis and Mr. Anderson have an exchange

24   about that is utterly irrelevant.

25               I would say that many of these text messages are also

just in the manner of banter, a friendly banter and have no

relevance to the case and would be hearsay if offered by the

defendants.  The government is not intending to offer these

text messages into evidence at this time.

          MR. TOUGER:  I say I don't intend to offer them, but I

have no objection if my co-counsel wanted to do that.

          MR. SCHWARTZ:  I do intend to offer them.

          If the government is saying they withdraw this

exhibit, I am happy to cut it down to only have the portions

that I want, and I'll represent that every portion I want in is

for non-hearsay purpose.  I am not trying to get into the truth

of any of this, although I suspect I don't agree with the

government about their view of relevance.

          For example, I think friendly banter may be entirely

relevant.  The sort of friendly banter Mr. Archer and Cooney

have been accused of here, they say is sinister, is exactly the

same sort of communications Mr. Anderson and Mr. Galanis engage

in, and it shows the way people do business with one another,

which is they make friends and they mirror with one another,

and they may express enthusiasm even though they have no idea

what the other person is talking about.  That is a point I

intend to make through Mr. Anderson and through some of these

texts.

          MS. TEKEEI:  Perhaps he could mark the portions he

intends to offer and we could during a break take a look at

1        those, your Honor.  We are happy to look at them one-by-one.

2                THE COURT:  Look, this is the problem with the system

3        we have set up now.  We are going to spend hours every morning

4        and we're never going to be able to present evidence to the

5        jury and we'll have to meet a whole lot earlier every morning

6        if you aren't able to work together to try to figure this stuff

7        out in advance.  I am happy to resolve these issues, but now we

8        kept the jury waiting for 15 minutes.

9                MR. TOUGER:  Has the court made a decision on the

10       whole Gerova arrest?

11               THE COURT:  I am ready to talk with you about that,

12       but I am wanting to do that during the lunch break.  Can we

13       proceed with Mr. Anderson or are there other issues that need

14       to be decided beforehand?

15               MS. TEKEEI:  We can.  We'll take a moment during the

16       break and talk to defense counsel about the remaining issues

17       that there are, your Honor.

18               THE COURT:  Thank you.  All right.

19               MR. SCHWARTZ:  Did your Honor say what time you intend

20       to take lunch?

21               THE COURT:  I am open to whatever you all want to do,

22       so I would say we should probably go for an hour and a half,

23       maybe 1:15 if they works for everybody.

24               THE CLERK:  I ordered their lunch for 1:00 o'clock.

25               THE COURT:  Their lunch is ordered for 1:00, so

1    somewhere between 1:00 and 1:15 let me know when is a good time

2    to stop.

3              MR. SCHWARTZ:  One last thing.  Logistically, I had

4    made the proposal to the government that when we want to use

5    government exhibits on cross, they could put them into evidence

6    so that they would retain their GX marking.  I don't want to be

7    moving GX into evidence.  Is that something you all intend to

8    do before you rest with this witness?

9              MS. TEKEEI:  Do you want to just give me a list of the

10   ones that are the GX's?   Thank you.

11             MR. SCHWARTZ:  I think I have.  I can do it again.

12             MS. NOTARI:  Also, your Honor, does the government

13   have a problem if it is a government exhibit of them calling it

14   onto the screen, because it might be easier to do that.

15             MS. MERMELSTEIN:  We are happy to pull these up for

16   defense counsel.  I think it is hard to go back and forth, so

17   if they're going to intersperse defense exhibits for

18   impeachment materials we don't know about, it may be tough to

19   go back and forth, but we are happy to help.

20             THE COURT:  Do one or the other.  You should be

21   handling it, or is it Ms. Shinewald, ask her to do it for you.

22   Does that make sense?  Are you okay with that?

23             MS. NOTARI:  I don't want to task Ms. Shinewald of

24   putting in defense exhibits.  That might be too complicated.

25   Just if it is a government exhibit.  They actually have been

1    putting it on the screen.

2              MS. MERMELSTEIN:  My understanding of the courtroom

3    technology, you have to go back-and-forth.  There is only one

4    kind of thing.

5              THE COURT:  We have ordered another system.  It will

6    take some time.

7              MS. MERMELSTEIN:  Even that system is there you have

8    to toggle the controls.  We are happy to do whatever makes

9    everyone's life easier, but --

10             THE COURT:  It will take more time if you go back and

11   forth.

12             (Jury present)

13             THE COURT:  Good morning, everyone.

14             THE JURY:  Good morning.

15             THE COURT:  I hope you had a nice weekend.  Sorry to

16   keep you waiting this morning.  I assure you we were working in

17   here.  Please be seated.  Mr. Anderson, come on up.  Thank you.

18    TIMOTHY ANDERSON,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION (Continued)

22             THE COURT:  I remind you, sir, you're still under

23   oath.

24   BY MS. TEKEEI:

25   Q.  Good morning.

1    A.   Good morning.

2    Q.   Mr. Anderson, focusing your attention on the fall of 2014,

3    did there come a time when you visited the Pine Ridge

4    Reservation?

5    A.   Yes.

6    Q.   Approximately when was that?

7    A.   That was in the middle of November 2014.

8    Q.   What was the purpose of your visit?

9    A.   The purpose of the visit was to attend a groundbreaking

10   ceremony for the project, financed by the bonds.

11   Q.   I am sorry.  What do you mean by a groundbreaking ceremony?

12   A.   The location where the warehouse was to be located, they

13   had cleared the land and there was one of those ceremonies

14   where people have shovels and some people say nice things and

15   they take a picture and try to break ground on the project or

16   the construction portion of the project.

17   Q.   Who was present for that groundbreaking ceremony?

18   A.   Representatives of Wakpamni, the developer, myself,

19   Wakpamni's legal counsel and a few other people.

20   Q.   Were they able to break ground and begin building then?

21   A.   They were not.

22   Q.   Why not?

23   A.   I learned that South Dakota in November gets very cold, and

24   it was 17 degrees, and with the wind chill it was approximately

25   zero and the ground was frozen.  The shovel cannot actually

1    break ground, but they took a picture.

2    Q.  Did there come a time when they were able to begin

3    constructing the warehouse?

4    A.  Yes.

5    Q.  Now, at the time, at this time in late 2014, did you have

6    any knowledge as to whether the money from the August 2014

7    series of bonds had been put in an annuity?

8    A.  It was my understanding that it had.

9    Q.  At that time did you have any knowledge of whether the

10   money from the bonds that were purchased during the second

11   series of issuances by Rosemont Seneca Bohai and Bevan Cooney

12   had been put into an annuity as required?

13   A.  It was my understanding that it had.

14   Q.  Did there come a time when you learned about plans for

15   another issuance of Wakpamni Lake Community Center bonds,

16   community corporation bonds?

17   A.  Yes, in April of 2015.

18   Q.  How did you learn about that?

19   A.  I received a phone call and correspondence from both Yanni

20   Galanis and Jason Galanis.

21   Q.  Can you describe the conversation or conversations that you

22   had with Yanni Galanis.

23   A.  Yes.  There was a third deal, I learned again from Jason

24   and Yanni, and the discussion was it was a third deal to raise

25   money to fund the projects that would be the, the businesses

1    that would be located in the commercial warehouse.

2    Q.   What sorts of businesses?

3    A.   Distribution businesses relating to things along the lines

4    you would find in a casino, so television sets and alcohol,

5    wine, tables all that sort of stuff, supplier to casinos.

6    Q.   What, if anything, did Mr. Yanni Galanis tell you about who

7    would be the investor or investors in this next series of

8    bonds?

9    A.   Nothing at that time.

10   Q.   Did you have any understanding of who would be the investor

11   or investors in this series of bonds?

12   A.   I came to learn it was going to be Atlantic Asset

13   Management as an investment manager.

14   Q.   At the time did you have any understanding of who owned

15   Atlantic Asset Management?

16   A.   I did not.

17   Q.   Okay.  Mr. Anderson, you'll see that binder in front of you

18   that we had last week.  If you could turn to Government Exhibit

19   1365.  Do you recognize this email?

20   A.   Yes.

21   Q.   Directing your attention -- well, who is it from?

22   A.   That is from Yanni Galanis.

23   Q.   Who is on the CC line?

24   A.   Jason at holmbycompanies dot com.

25   Q.   If you could just remind us who is Jason at holmbycompanies

1   dot com?

2   A.   Jason Galanis.

3   Q.   Who is Steven at Haines Investments dot net?

4   A.   He is the developer for the first two projects.

5   Q.   What is the subject line of this email?

6   A.   Soft final on 3rd.

7   Q.   What is attached here?

8   A.   WLCC third tranche soft final Version 1.

9   Q.   Please, sir, turn to the attachment.  Can you describe what

10  is this document.

11  A.   This is a draft of a preliminary placement memorandum for

12  the bonds.

13  Q.   What is that?

14  A.   That is a marketing document provided to potential

15  investors in the bonds that describes the project, who the

16  issuer is, what the project is and various other items.

17  Q.   If I could just direct your attention to the title of the

18  document, I think you said preliminary, but just to be clear,

19  can you please read the title of the first page for the jury.

20  A.   Yes, "Private supplemental memorandum, dated April 1,

21  2015."

22  Q.   Do you have any knowledge as to whether this memorandum was

23  ever finalized?

24  A.   No.

25  Q.   As to whether any version of it was distributed to the

1    investors who would potentially be purchasing the bonds?

2    A.   A draft was provided to Atlantic Asset Management.

3    Q.   Who provided that draft?

4    A.   I did.

5    Q.   To whom did you provide it?

6    A.   Michelle Morton at Atlantic Asset.

7    Q.   Why did you provide it to Michelle Morton?

8    A.   At her request.

9    Q.   Who is Michelle Morton?

10   A.   Michelle Morton was the decision-maker on the bonds, the

11   first series of bonds and the third series of bonds for the

12   investors.

13   Q.   I'd like to direct your attention to Pages 12 and 13 of

14   this document.

15   A.   Okay.

16   Q.   Do you see the heading the annuity and insurance provider?

17   A.   I do.

18   Q.   If you could go ahead and turn to the next page.

19   A.   Okay.

20           (Continued on next page)

21

22

23

24

25

BY MS. TEKEEI:

Q.  If I could ask you to read the sentence just above the investment consideration section, the sentence that begins with "In addition"?

A.  "In addition, certain officers and directors of the placement agent are affiliated with the insurance provider."

Q.  What is your understanding of what that means?

A.  My understanding is that relates to the role of Hugh Dunkerley as the director of Burnham as well as the director on the board of directors of Wealth Assurance.

Q.  Do you know whether that particular relationship was disclosed to the ultimate investor in the third series of bond issuance?

A.  I do not.

Q.  And if you could just describe, sir, what is -- you said this was a draft.  What is the typical process by which a private placement memorandum or this private placement memorandum would be finalized?

A.  So, in order to finalize the draft along these lines, all the parties that are referenced in the document would review it for accuracy, meaning that the issuer of the bonds would have reviewed it, their counsel would have reviewed it and have signed off on it, the trustee bank would have reviewed the portions related to them, the attorneys would have provided the exhibits that are appendix A and B, I believe; and in fact the

1    issuer would have taken the memoranda before their board for

2    approval.  So really all the parties would have weighed in on

3    the various provisions of it until it was deemed final.

4    Q.  Was that done with respect to this draft?

5    A.  Not to my knowledge, no.

6    Q.  Was this third series of bonds that was contemplated, was

7    it ever issued?

8    A.  It was.

9    Q.  Approximately when?

10   A.  In mid to late April.

11   Q.  I would like to show you a series of documents that are in

12   your binder, Government's Exhibits 208, 202, 212, 217 and 263.

13            Do you recognize these documents?

14   A.  I do.

15   Q.  Generally speaking what are they?

16   A.  They are the core documents for the third bond issue,

17   namely the indenture, the annuity contract, the placement

18   agency agreement, the closing statement and the investor/big

19   boy letter.

20   Q.  Now, with respect to the third series of bond issuances,

21   was it the same issuer as the prior two series?

22   A.  It was.

23   Q.  Same placement agent?

24   A.  Yes.

25   Q.  Same trustee?

1    A.  Yes.

2    Q.  Same annuity?

3    A.  Yes.

4    Q.  What were the differences, if any, between -- generally

5    between this bond issuance and the prior two bond issuances?

6    A.  The project for which the money could be spent -- again

7    this was to fund businesses that were going to be in the

8    warehouse, where as the other projects were the building of the

9    warehouse and the building of the town center -- there are

10   differences in amounts, dates of repayment, things along those

11   lines, but substantially the same.

12   Q.  Now, directing your attention to Government Exhibit 217,

13   what is this document?

14   A.  This is the closing statement for the third deal.

15   Q.  And what is supposed to happen to the flow of money at the

16   close of this third deal?

17   A.  Well, on appendix C there were a total of $16.2 million in

18   proceeds from the sale of the bonds, and the flow of funds,

19   $350,000 was to go to pay the various issuance cost, and

20   $15,850,000 was to go for the annuity purchase payment.

21   Q.  How much debt did the Wakpamni Lake Community Corporation

22   incur as a result of this series of bonds?

23   A.  $16.2 million.

24   Q.  Now, was there a portion of this series of bonds that was

25   not sold?

1   A.   Initially the plan was for this issue to be 20 million.

2   Q.   What happened?

3   A.   The $3.8 million piece was not sold.

4   Q.   Can you describe the circumstances of that.

5   A.   Yes.  We had a closing date, a date was set for closing,

6   and on the date of closing only $16.2 million was raised, was

7   actually paid in, so there was a piece that was not paid in.

8   At that point the bond transaction itself was reduced to 16.2

9   million.

10  Q.   Did Dilworth Paxson, your former law firm, issue an opinion

11  letter with respect to this third series of bonds?

12  A.   Yes.

13  Q.   And what was that opinion letter based on?

14  A.   Based upon the statements of the various parties and the

15  bond documents, what they were going to undertake, how the

16  money was to flow, what their different responsibilities were

17  under the contract.

18  Q.   Approximately how much money did Dilworth Paxson receive as

19  a result of its work on the Wakpamni Lake Community Corporation

20  bond?

21  A.   All three?

22  Q.   Yes?

23  A.   Approximately $250,000.

24  Q.   Do you still work at Dilworth Paxson?

25  A.   I do not.

1    Q.  When did you leave?

2    A.  I left in February 2016.

3    Q.  Why did you leave?

4    A.  I had another job opportunity that looked promising for me.

5    Q.  And what was that opportunity?

6    A.  At another law firm in Philadelphia, Dinsmore & Shohl.

7    Q.  Is that the law firm where you currently work?

8    A.  Yes.

9    Q.  OK.  Now, I think last week you mentioned other deals that

10   you discussed with Mr. Galanis.  Can you describe what other

11   deals Yanni Galanis discussed with you or tried to bring about

12   with Burnham?

13   A.  Yes.  There was one deal relating to propane, and that was

14   to be a cooperative of -- so a number of tribes that were going

15   to ban together to purchase propane, and propane for that part

16   of the country, South Dakota, North Dakota, Montana and the

17   like, that's the primary source of heating on some of these

18   reservations which are pretty remote.  And there was another

19   deal relating to medical clinics as well.

20   Q.  Over what period of time did you discuss these projects

21   with Mr. Yanni Galanis?

22   A.  You mean the propane and medical clinics?

23   Q.  Yes.

24   A.  Approximately December 2014 through January/February of

25   2016.

1   Q.   How would you describe the nature of your relationship with

2   Mr. Galanis?

3   A.   Good, friendly.

4   Q.   Going back to the propane deal, who are the parties

5   involved in the propane deal in the summer of 2015?

6   A.   They were -- Burnham was involved.  An investment bank by

7   the name of Bonwick Capital was involved.  U.S. Bank was

8   involved.  I was involved.  A law firm Greenberg Traurig was

9   involved, Wakpamni was involved, as well as a number of other

10  tribes.  The entity that the tribes were members of was the

11  Tribal Infrastructure Development Cooperative, so they were

12  involved.  And the Public Finance Authority, which is a

13  Wisconsin entity, was involved as well.

14  Q.   You mentioned Bonwick Capital.

15  A.   They are an investment bank similar to Burnham.

16  Q.   At the time, what if any understanding did you have of the

17  relationship between Bonwick Capital and Burnham?

18  A.   That Burnham was an investor in Bonwick.

19  Q.   Was the propane deal ever completed?

20  A.   It was not.

21  Q.   Now, going back to the Wakpamni Community Corporation bond

22  issuances, were there any issues with respect to annuity

23  payments to the Wakpamni Lake Community Corporation?

24  A.   There were.

25  Q.   What were some of those issues?

I5T7GAL2                          Anderson - direct

A.  Well, initially after the second bond issue, the provisions

of the second bond issue provided that the payment that would

go to the project for the town center would be received in the

summer of 2015, the rationale being that the funds weren't

needed until they got the other project started, and the ground

gets frozen pretty early on, the thaw is pretty late, so they

weren't to receive the funds until the summer of 2015.  And as

the summer of 2015 approached, the funds were not received, and

there was a discussion of why that was the case, and

representatives of the annuity stated that the money was there,

they were ready to pay it out, however, a formal request had to

be made in writing.  Once the formal request was made, it would

be 90 days.

Q.  Who were those representatives you are referring to?

A.  They were Hugh Dunkerley, Jason Galanis and Yanni Galanis.

Q.  So was that annuity payment ever made to the Wakpamni Lake

Community Corporation?

A.  It never was ultimately made, to my understanding.

Q.  Did there come a time when -- well, let me back up for just

a moment.  You had mentioned a medical clinic earlier as one of

the potential transactions you discussed with Mr. Yanni

Galanis.

A.  Yes.

Q.  Did that transaction ever come to fruition?

A.  It did not.

1   Q.  Now, were there ever any issues with respect to the

2   mandated interest payments to investors on the Wakpamni Lake

3   Community Corporation bonds?

4   A.  Yes.

5   Q.  And what were some of those issues?

6   A.  The first interest payment was to be made on the

7   anniversary -- well, each anniversary of each bond issue.  And

8   the first anniversary came around for the first bond issue, and

9   the money -- we received a communication from the U.S. Bank

10  that the money had not been received as of the time of the

11  indenture provided.  Those funds eventually came in, however,

12  they were late.  And subsequently on the second bond issue the

13  same thing occurred, the money came in late, the payment for

14  the bond issue.

15  Q.  Did there come a time when the mandated annuity payments to

16  the Wakpamni Lake Community Corporation stopped being made?

17  A.  Yes.

18  Q.  And how about the mandated interest payments to the

19  investors, did there come a time when those payments stopped

20  being made?

21  A.  Yes.

22          MS. TEKEEI:  Your Honor, I would just like to take a

23  moment to offer some exhibits into evidence.

24          THE COURT:  Yes, go ahead.

25          MS. TEKEEI:  Government's Exhibits 1334, 1336, 1338,

1346, 766 and 777.

Q.  Mr. Anderson, were any interest payments made to the
Wakpamni Lake Community Corporation in the year 2016?  I'm
sorry.  Annuity payments.  Were any annuity payments made to
the Wakpamni Lake Community Corporation in the year 2016?

A.  Not that I am aware of.

Q.  How about the year 2017?

A.  No.

Q.  How about this year to date?

A.  Not to my knowledge.

Q.  Were any interest payments made to the investors in the
Wakpamni Lake Community Corporation bonds in the year 2016?

A.  No.

Q.  How about the year 2017?

A.  No.

Q.  And how about this year to date?

A.  Not to my knowledge, no.

            MS. TEKEEI:  Thank you, your Honor.  No further
questions at this time.

            MR. SCHWARTZ:  There is no objection to the exhibits.
We ask that they be received.

            THE COURT:  All right, they are received.  Thank you.

            Cross-examination.

            (Government Exhibits 1334, 1336, 1338, 1346, 766 and
777 received in evidence)

1  CROSS EXAMINATION

2  BY MR. TOUGER:

3  Q.  Good afternoon, Mr. Anderson.

4  A.  Good afternoon.

5  Q.  My name is David Touger, and I represent John Galanis who

6  you knew as Yanni.  Correct?

7  A.  Yes.

8  Q.  Same person?

9  A.  Same person.

10  Q.  No doubt about that, right?

11  A.  That's right.

12  Q.  And Yanni is just a Greek name for John, right, as far as

13  you know?

14  A.  I presume, yes.

15  Q.  I just want to go back a little bit in time to when you

16  went to school.

17  A.  Sure.

18  Q.  I believe you said you went to Fordham University?

19  A.  I did.

20  Q.  And what did you major in at Fordham University?

21  A.  Political science.

22  Q.  Didn't use it that much?

23  A.  And classics.  And I used classics even less.

24  Q.  And then you went on to law school?

25  A.  Yes.

I5T7GAL2                          Anderson - Cross

1    Q.  And you graduated from Vermont Law School?

2    A.  I did.

3    Q.  From there you also said you had a master's in tax law?

4    A.  Correct.

5    Q.  So you know the tax law pretty well.

6    A.  Pretty well.

7    Q.  And corporate, mostly in the corporate realm?

8    A.  Mostly, yes.

9    Q.  And would you consider yourself sort of a legal expert on

10   corporate tax law?

11   A.  Certain divisions of it.

12   Q.  And what type of classes was in that tax program?

13   A.  Well, local real estate, general overview of corporate tax

14   law, property tax, along those lines.

15   Q.  And did you do bond work?

16   A.  Yes.

17   Q.  So you studied bonds back when you were doing this masters

18   program, correct?

19   A.  To a degree, yes.

20   Q.  And you also took some securities law, I would assume, in

21   law school also.

22   A.  Yes.

23   Q.  And municipal government is sort of a specialty for you?

24   A.  It is.

25   Q.  And you've done Indian bond deals before this one, correct?

I5T7GAL2                         Anderson - Cross

1   A.  I have.

2   Q.  I believe you said on direct five to ten?

3   A.  Yes.

4   Q.  So you are pretty well acquainted with Indian bond deals

5   also?

6   A.  Of a type, I believe so, yes.

7   Q.  And what type of bond deals have you done prior to this

8   one?

9   A.  I had worked on a bond issue wherein the tribe funded land

10  that had been part of the reservation at one point, and they

11  were able to purchase that land back, 20 some thousand acres

12  for the buffalo herd.

13  Q.  What tribe was that?

14  A.  That is the Cheyenne River Sioux Tribe, also in South

15  Dakota.

16  Q.  Not related at all to the WLCC?

17  A.  No, there are six or seven Sioux tribes.

18  Q.  And then you went to work at some point with Dilworth

19  Paxson, correct?

20  A.  Yes.

21  Q.  Did you go to Dilworth Paxson when in your legal career?

22  A.  I went to Dilworth Paxson in 2012, so it would have been

23  13th or 14th year.

24  Q.  What did you do prior to that?  What was your legal

25  experience prior to that?

I5T7GAL2                         Anderson - Cross

1    A.   The same.

2    Q.   Same type of corporate practice?

3    A.   Correct, economic development, bonds, tax.

4    Q.   And would you agree with me that the firm Dilworth Paxson

5    was founded in 1933?

6    A.   That sounds correct to me.

7    Q.   And how many attorneys did they have working for them in

8    2014?

9    A.   Approximately 120.

10   Q.   It's a big law firm?

11   A.   It is.

12   Q.   There were attorneys, paralegals, office staff, everything

13   a big law firm has at its disposal.

14   A.   Correct.

15   Q.   And how many different cities did Dilworth Paxson have

16   offices in, if any?

17   A.   I don't recall offhand, but it was from New York down

18   through D.C.; New Jersey; Harrisburg, Pennsylvania; Delaware.

19   Q.   Again, it was a very large firm that's on the East Coast of

20   the United States.

21   A.   Yes.

22   Q.   And can we agree that the firm Dilworth Paxson represents

23   many different kinds of clients?

24   A.   Yes.

25   Q.   From Fortune 500 companies to individuals.

1   A.   I would agree.

2   Q.   And they represent -- they represent Native American

3   entities also, correct?

4   A.   While I was there, yes.

5   Q.   Yes, I'm saying while you were there, you weren't the only

6   one working on Native American entities, correct?

7   A.   That's fair, yes.

8   Q.   And I looked at the website of Dilworth Paxson.  Would you

9   agree with me that they say on their website that they have a

10  tradition of legal excellence?  Would you agree with that?

11  A.   I haven't looked at their website for a while, but I would

12  agree they do.

13  Q.   I'm asking do you believe they have tradition of legal

14  excellence at the firm.

15  A.   Yes.

16  Q.   And they have clients that are many different areas of

17  corporate work, correct?

18  A.   Correct.

19  Q.   And there are many different types of corporate work,

20  right?  You couldn't even begin to list them, could you?

21  A.   No.

22  Q.   But Dilworth Paxson as a firm could cover almost any

23  corporate problem a corporation would have, correct?

24  A.   I think so.

25  Q.   Now, and would you agree with me also that in 2014

1  Dilworth's attorneys were named Pennsylvania super lawyers and

2  rising stars?

3  A.   I don't know.  I wouldn't be surprised, but I don't know.

4  Q.   And in November 2014 U.S. News put them on their best law

5  firms of 2015.

6  A.   I don't know.

7  Q.   But you wouldn't be surprised if that happened either?

8  A.   I would not be surprised.

9  Q.   Now, also you attended this Native American conference in

10  Las Vegas prior to 2014, right?

11  A.   Yes.

12  Q.   And how many times prior to 2014 did you attend this

13  conference?

14  A.   I believe at least three or four times prior.

15  Q.   And you would go there because you had Native American

16  clients?

17  A.   I did, yes.

18  Q.   And you would also go there to recruit new work, correct?

19  A.   Correct.

20  Q.   It was sort of an income-generating visit.

21  A.   That was the goal, yes.

22  Q.   And in March of 2014 was the conference that is relative to

23  this case, right?

24  A.   Yes.

25  Q.   And that was in mid-March?

I5T7GAL2                      Anderson - Cross

1   A.  Yes.

2   Q.  You don't remember the exact date?

3   A.  Mid or early, somewhere in there.

4   Q.  And you attended that conference for reasons that had

5   nothing to do with this case at all, right?

6   A.  Correct.

7   Q.  You were going no matter what.

8   A.  Correct.

9   Q.  And again you were going to stay in touch with old clients

10  and try to find some new clients.

11  A.  That's right.

12  Q.  And the firm paid for your visit to go there, right?

13  A.  Correct.

14  Q.  Now, there was a man there named Raycen Raines, right?

15  A.  There was.

16  Q.  And you had known Raycen Raines prior to your attending

17  that conference, right?

18  A.  Yes.

19  Q.  As a matter of fact, you had done work with him before.

20  A.  I had.

21  Q.  And he did not invite you to come to that conference.

22  A.  The entire conference?

23  Q.  Right.

24  A.  No, I don't believe so.

25  Q.  It wasn't on his invitation that you went to the

I5T7GAL2                          Anderson - Cross

1   conference.

2   A.  That's correct.

3   Q.  And do you know a woman named Geneva Lonehill?

4   A.  At that time?

5   Q.  Yes.

6   A.  No.

7   Q.  Did you get to know a woman named Geneva Lonehill?

8   A.  I did.

9   Q.  Who is Geneva Lonehill?

10  A.  She is the president or chair woman of Wakpamni Lake

11  Community Corporation.

12  Q.  And she is also president of the Wakpamni Lake Community,

13  right?

14  A.  I believe so, yes, she was.

15  Q.  Those are two different titles, right?

16  A.  They are.

17  Q.  And for two different organizations.

18  A.  Wakpamni Lake Community Corporation my understanding is

19  it's a subsidiary agency of Wakpamni Lake Company or

20  Corporation -- Community.  Sorry.

21  Q.  We will call it the WLCC so we don't have to go through

22  that tongue twister every time.

23  A.  That would make it easier.

24  Q.  The WLCC was set up by the Wakpamni Lake Community, right?

25  A.  That's my understanding, yes.

1   Q.  And it was set up as a corporation for the community.

2   A.  Correct.

3   Q.  And it was set up separate and distinct from the Wakpamni

4   Community.

5   A.  Correct.

6   Q.  And it was set up as a holding company to explore business

7   opportunities for the Wakpamni Lake Community.

8   A.  That's correct.

9   Q.  And the Wakpamni Lake Community is part of the Wakpamni

10  district, right?

11  A.  That's my understanding.

12  Q.  And Wakpamni district has six communities inside of it, one

13  of which being the Wakpamni Lake Community.

14  A.  I don't know if there are six, but there are others.

15  Q.  There are others, right?  And the Wakpamni district

16  entailed is one of nine districts of the Oglala Sioux Tribe,

17  right?

18  A.  I don't know if there is nine, but it is a district of the

19  tribe.

20  Q.  And would I be correct in saying that there are no

21  contracts between the WLCC and the district, the Wakpamni

22  district -- the WLCC is connected to the Wakpamni Lake

23  Community.

24  A.  I don't know.

25  Q.  And the Wakpamni Lake Community though created the WLCC.

1    A.  That's my understanding, um-hum.

2    Q.  And you worked for the WLCC before, before March of 2014?

3    A.  The corporation, yes.

4    Q.  The corporation itself?

5    A.  Correct.

6    Q.  And would I also be correct in saying that if the WLCC

7    creates any profits, that goes to Wakpamni Lake Community?

8    A.  That would seem correct, yes.

9    Q.  And would I also be correct in saying that the Oglala Sioux

10   Tribe receives nothing from the WLCC?

11   A.  I don't know.  I don't know their arrangement.

12   Q.  OK.  Are you aware of the conflict between the Oglala Sioux

13   Tribe counsel and the WLCC?

14   A.  No.  I understand there are some politics there, but I am

15   not aware of the specifics of any conflict.

16   Q.  You're not aware that the fact that the WLCC has been

17   involved in online lending, that that has caused a conflict

18   with the Oglala Sioux Tribe?

19            MS. TEKEEI:  Objection.

20            THE COURT:  Just if he is aware of it.  Overruled.

21   Q.  Do you want me to repeat the question?

22   A.  Yes, please.

23   Q.  Are you aware that there is a conflict between the WLCC and

24   the Oglala Sioux Tribe Council because the WLCC is involved in

25   online lending?

I5T7GAL2                    Anderson - Cross

1    A.  I am not.

2    Q.  You do know that the WLCC is involved in online lending

3    though.

4    A.  I do.

5    Q.  And what is another word for online lending?

6             MS. TEKEEI:  Objection.  Your Honor, can we have a

7    sidebar?

8             THE COURT:  We can have a sidebar.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. TOUGER:  Your Honor, I'm not going to bring out

3     any argument that it is illegal or anything like that, if that

4     is what the government is worried about.  I just want to

5     establish that the WLCC has a pay day loan business.

6          THE COURT:  And why does that matter?  Why is that

7     relevant?

8          MR. TOUGER:  It will matter when Mr. Raines takes the

9     stand and Ms. Lonehill takes the stand.  I just wanted to see

10    if he knew that they were doing this operation.

11         MS. MERMELSTEIN:  Well, I think this was precluded

12    from your Honor's ruling.  We had this fight about whether or

13    not there was going to be a conversation about pay day lending.

14    The government said it shouldn't be discussed at all.  I mean

15    now -- I don't know what the last question you just asked was,

16    is there another name for it, but he is clearly trying to

17    suggest that it's kind of an ugly business, number one.

18         Number two, my understanding of your Honor's ruling

19    was that if Mr. Touger had a good faith basis to ask Mr. Raines

20    about whether or not Mr. Raines had done anything wrong in

21    connection with pay day lending, based on allegations on the

22    Internet that there were disgruntled investors or borrowers,

23    that that would be a proper ground for cross-examination.  And,

24    frankly, it was an issue we intended to revisit because I think

25    the foundation he is suggesting he has for asking those

1    questions is wrong, but this isn't Mr. Raines testifying, and

2    so it never occurred to us pay day lending was going to come up

3    now.  Can I finish?

4            The notion that there is somehow a relevance to a

5    political dispute between the Oglala Sioux about whether or not

6    they wanted to be involved in pay day lending is wholly

7    irrelevant, and it's an attempt to improperly besmirch the

8    activities the WLCC.  There is no other reason for asking these

9    questions, and they should not be allowed.

10           MR. TOUGER:  That's entirely not true.  First of all,

11   your Honor, all I'm bringing out from this witness is that WLCC

12   had other witnesses, one of them being online lending, pay day

13   loans.

14           Two, the relevance of this is that it shows that their

15   argument that the Oglala Sioux Indians themselves, Native

16   Americans themselves, suffered is totally ridiculous, because

17   the Oglala Sioux had made sure that they had no relationship

18   with the WLCC, and had no intent to take any money from the

19   WLCC, and had totally brought actions against the WLCC.

20           It has nothing to do that pay day loans or online lend

21   something illegal.  It is legal as far as they're concerned,

22   and I have no reason to object to that.  That's not the

23   question that's being brought out.

24           The question that's being brought out with this

25   witness only -- and that's all I think we need to discuss right

I5T7GAL2                        Anderson - Cross

1    now -- is the WLCC had other busies, and one of those other

2    businesses was online lending, which is also known as pay day

3    loans.  That's all I was going to, and I was moving on.

4              MS. MERMELSTEIN:  I think there should be no further

5    questioning on this topic period with this witness.

6              THE COURT:  Why don't you move on.  It seems like you

7    got out what you wanted to get out, so why don't we move on,

8    and then we will revisit it before Raines.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5T7GAL2                         Anderson - Cross

1    BY MR. TOUGER:

2    Q.   Moving on to Mr. Raines and his relationship with the WLCC.

3    He is the business consultant for the WLCC.

4    A.   I believe his title is executive director.

5    Q.   Can you just speak a little bit louder.

6    A.   Oh, sure.   It's my understanding at the time he was

7    executive director.   I don't know what his role is now.

8    Q.   He was an employee of the WLCC?

9    A.   Right.

10   Q.   And are you aware that he is to be paid a percentage of the

11   profits of the WLCC?

12   A.   No.

13   Q.   You're not aware, or he is not?

14   A.   I am not aware.

15   Q.   And would I also be -- if you know -- correct in saying

16   that Mr. Raines had a municipal corporate background?

17   A.   I don't know.

18   Q.   OK.   Now, taking you back in time to April 2014.   OK?   At

19   that time Mr. Raines had discussions with you about bringing a

20   fire station on the reservation, correct?

21   A.   I recall a conversation about a fire station.   I don't know

22   if it was April, but I have no reason to believe it wasn't

23   April.

24   Q.   Sometime around that time period you had conversations with

25   Mr. Raines about a fire station being put on the reservation,

I5T7GAL2                          Anderson - Cross

1    correct?

2    A.  Yes.

3    Q.  And had he told you that he wanted to discuss that issue

4    with you at the convention if he saw you?

5    A.  I don't know.  I don't know.  I don't recall.

6    Q.  Now, you also know a person named Steven Haynes, right?

7    A.  I do.

8    Q.  And who is Steven Haynes?

9    A.  Steven Haynes is a developer in, among other things, Indian

10   country.

11   Q.  And would I be correct in saying that you had worked with

12   Steven Haynes on prior deals involving Native American

13   financing?

14   A.  Yes.

15   Q.  And would I be correct in saying that you also first met

16   Steven Haynes somewhere around the 2010, 2011 period?

17   A.  I think it was earlier than that.  I think it was 2009

18   maybe, but 2009, 2010.

19   Q.  But you had known him for quite many years back in 2014.

20   A.  That's correct.

21   Q.  And Mr. Haynes had done a lot of work with Native Americans

22   including casinos.  I believe he was involved in 30 or 40

23   different deals with casinos?

24   A.  I believe that's correct, yes.

25   Q.  And a windmill project?

1    A.  Again I believe that's correct.

2    Q.  Slot machines?

3    A.  Correct.

4    Q.  Coal?

5    A.  I believe so, yeah.

6    Q.  Online lending business, right?

7    A.  I believe so, yes.

8    Q.  And it was Mr. Haynes who called you and told you that he

9    wanted you to meet with some people down in the lobby, right?

10   A.  Correct.

11   Q.  That call did not come prior to you going to Las Vegas.

12   A.  No, no, I was in Las Vegas when I got that call.

13   Q.  So when you got that call, it had nothing to do again with

14   you taking the trip to Las Vegas?

15   A.  Right.

16   Q.  And you got the call, and you simultaneously or thereabouts

17   went down to the lobby to meet who he wanted you to meet.

18   A.  Well, I wasn't in that hotel.  I was somewhere else.  But I

19   met at the location that was discussed.

20   Q.  Right.  But I'm trying to bring out that you got a call one

21   morning, and you went to the place to get have that meeting.

22   A.  That's correct.

23   Q.  It wasn't a prearranged meeting.

24   A.  That's right.

25   Q.  And would I be also correct in saying that it wasn't in

1    anybody's hotel room; it was in the lobby of one of the hotels?

2    A.   That's correct.

3    Q.   And I would assume you don't remember which one?

4    A.   I believe it was The Four Seasons.

5    Q.   Very good.  And would I be correct in saying that one of

6    the things he wanted to discuss that day was his idea to set up

7    a winery with a Native American tribe in northern California.

8    A.   Excuse me.  Who is the he?

9    Q.   Steven Haynes.

10   A.   That's not how I recall sort of the events, how they played

11   out.  I'm happy to explain it to you.

12   Q.   Let me ask you this question.  When he had the phone call

13   with you, had you spoken to him prior to that since you had

14   come to Las Vegas?

15   A.   Yes, um-hum.

16   Q.   And was there any discussion about this winery deal at that

17   time?

18   A.   I don't recall.

19   Q.   And was there any discussion about alcohol distribution to

20   Native American casinos?

21   A.   There was.

22   Q.   That, you had had discussions with him prior to the

23   meeting.

24   A.   Correct, correct.

25   Q.   And was it your idea -- was it your thought that that was

I5T7GAL2                        Anderson - Cross

1   what you would be discussing -- one of the topics you would be

2   discussing at that meeting?

3   A.   The topic to be discussed was the winery project.

4   Q.   At the meeting.

5   A.   At the meeting, yes.

6   Q.   And the winery, the topic, was going to distribute wine or

7   alcohol to Native American casinos, correct?

8   A.   Correct.

9   Q.   Now, do you know a man named Pete Shannon?

10  A.   I do.

11  Q.   And is Steven Haynes -- had Steven Haynes worked with Pete

12  Shannon on certain deals before?

13  A.   Not that I am aware of.

14  Q.   But you do know Pete Shannon?

15  A.   I met him --

16  Q.   Let me withdraw that question and ask you this.

17          When you went to Vegas in 2014 did you know Pete

18  Shannon?

19  A.   I never met him, but there were a number of e-mails from

20  him with respect to Raycen and some projects they were looking

21  at.

22  Q.   What were those projects, if you remember?

23  A.   At least one was a project called Affineon which was a

24  light bulb project of some sort.

25  Q.   Light bulb?

I5T7GAL2                    Anderson - Cross

1    A.   Yes.

2    Q.   So, if I understand what you're saying, is you never met

3    Pete Shannon but you had e-mailed with him?

4    A.   I was on e-mails with him.

5    Q.   And did you ever speak to him on the telephone?

6    A.   At that time, I don't believe so.

7    Q.   Did you ever do any investigation into finding out who Pete

8    Shannon was?

9    A.   No.

10   Q.   Now, did you know that he had a liquor distribution

11   business named SSH?

12   A.   I don't recall.

13   Q.   Did that business come up at the meeting that you had that

14   afternoon?

15   A.   I don't believe so, but I really don't recall.

16   Q.   OK.  Now, I'd like to give the jury a little lesson on

17   sovereign immunity right now.

18            There is obviously a liquor tax in this country,

19   right, an excise tax on liquor.

20   A.   That's my understanding, yes.

21   Q.   And if I a sovereign nation owns a business and sells that

22   liquor and it never leaves Indian property, it goes from one

23   Indian property to another Native American property, do they

24   have to pay the excise tax?

25            MS. TEKEEI:  Objection, your Honor.

1            MR. TOUGER:  This will connect up later.

2            THE COURT:  I will allow it.

3   A.  That idea has been discussed.  I don't know if that issue

4   has ever been resolved.

5   Q.  OK.  Was that idea discussed at the meeting that day?

6   A.  No, I don't believe so.

7   Q.  OK.  Now, when you get the call from Steven Haynes, does he

8   mention John Galanis' name at that point?

9   A.  No.

10  Q.  Does he mention Raycen Raines' name at that point?

11  A.  He does.

12  Q.  And again I don't want to put words in your mouth, but

13  correct me if I'm wrong, Steven Haynes calls you and says come

14  to The Four Seasons and sit down and talk to myself and Raycen

15  Raines and others.

16  A.  Yeah, the exact line was there is a guy who has a project

17  he wants to discuss with Raycen, and Raycen would like us to

18  come over.

19  Q.  And would I be correct in saying that it was a pretty

20  informal meeting?

21  A.  Yes.

22  Q.  And when you got -- well, let's withdraw that question and

23  ask you, did you arrive at The Four Season and take a seat

24  before anybody met you, or did somebody come greet you?  What

25  was the process?

1    A.  I got there, and I sat down in a couch area, and I waited,

2    and approximately five minutes later a group came down from --

3    it seemed like they were coming down from upstairs.

4    Q.  And it was Raycen Raines who initially made the

5    introduction of you to John Galanis.

6    A.  Yes.

7    Q.  So using deductive reasoning, it would seem that Raycen

8    Raines knew who John Galanis was prior to him introducing you

9    to the meeting -- at the meeting.

10   A.  That was my impression, yes.

11   Q.  And at this meeting, just to establish the players that you

12   remember, it was you?

13   A.  Correct.

14   Q.  John Galanis?

15   A.  Correct.

16   Q.  Steven Haynes?

17   A.  He was not at the table where we were discussing things; he

18   was off doing something else.

19   Q.  Exactly what I wanted to bring out.  So he came over and

20   then left the meeting?

21   A.  It was a lobby of a hotel, sort of a lobby area, and he was

22   somewhere else taking a phone call in the lobby.

23   Q.  Right.  And Raines was there, obviously.

24   A.  Yes.

25   Q.  And was there a man named John Henning there?

1   A.  Henning or Henneth.

2   Q.  Yes.

3   A.  Yes.

4   Q.  And did you know that he was an associate of Pete Shannon?

5   A.  I did, or at least he introduced himself that way, yes.

6   Q.  Had you ever communicated with Mr. Henning before?

7   A.  I don't recall if he had been on some of the e-mails with

8   Peter Shannon.  I don't recall.

9   Q.  By the way, do you recall seeing John Galanis' name on any

10  of these e-mails prior to your meeting in mid-March in Vegas.

11  A.  No.

12  Q.  And so I take it from your answer that you had never met

13  Mr. Henning before either.

14  A.  No.

15  Q.  But you knew when you were sitting at that meeting that he

16  was there as a representative for Pete Shannon.

17  A.  Yes.

18  Q.  And you knew that Pete Shannon is a big businessman in

19  Chicago, right?

20  A.  I don't know that I knew that.  I knew he was a

21  businessman.

22  Q.  Did you later learn that?

23  A.  Not that he was a big businessman.  Again, it was he was a

24  businessman and he had roots in Chicago.  I didn't know the

25  full extent of his businesses.

1    Q.  Did you later find out -- either at the meeting or shortly

2    thereafter wards -- that the way that John Galanis came to the

3    meeting was that he was invited there by Mr. Shannon through

4    Mr. Henning?

5    A.  I did not know that.

6    Q.  Now, the niceties are done, everybody is introduced, and

7    would I be correct in saying that Raines then proceeds to

8    discuss on behalf of the WLCC that he was interested in

9    building a warehouse on the Wakpamni land to warehouse the wine

10   that was coming from this winery project?

11   A.  Yes, um-hum.

12   Q.  And was one of the topics that was discussed at that

13   meeting was using TED bonds to finance this project?

14   A.  Yes.

15   Q.  And can you describe for the jury what a TED bond is?

16   A.  The TED part is an acronym for Tribal Economic Development

17   bonds, and they are a type of bond that has special federal

18   support for them from a tax standpoint.

19   Q.  I would be correct in saying that TED bonds can't be used

20   for one specific reason; they're a more general nature bond?

21   A.  Correct, yes.

22   Q.  And also if the TED bond was used, it would go through --

23   the Oglala Sioux is the one who had the TED bonds, right?

24   A.  I don't know if we came to that conclusion at that time.

25   Q.  But that was discussed.

1     A.  I don't recall that.

2     Q.  You don't recall that.  OK.

3          But Raines wanted to figure out a way to finance this

4     business through the WLCC, right?

5          MS. TEKEEI:  Objection.

6     Q.  As far as you know.

7          THE COURT:  As far as you know.

8     A.  Well, he was executive director of Wakpamni Lake Community

9     Corporation, so presumably he was acting on their behalf and

10    wanted it to be done through them.  I don't know his thinking

11    otherwise.

12         THE COURT:  OK.

13    Q.  So the topic being discussed was trying to figure out a

14    financing deal that could be run through the WLCC that could

15    finance the winery and the warehouse on the Wakpamni district.

16    A.  It seemed like the goal was to get the project financed.  I

17    don't know if there was any objection to it being Oglala Sioux.

18    Q.  Excuse me?

19    A.  I don't know that there was any objection to it being

20    financed through Oglala Sioux.  I think it was more goal orient

21    in getting the project financed.

22    Q.  But the idea being discussed was financing of the project.

23    A.  Correct.

24    Q.  And that's when John began to talk, right?

25    A.  Yes.

1  Q.  And he was explaining at that point -- well, before I ask

2  you this question, what is a government services bond?

3  A.  A government services bond I would define as a bond that

4  funds sort of the core parts of government, so a road, or an

5  ambulance, a school, government building.

6  Q.  Buildings, correct?

7  A.  Correct, um-hum.

8  Q.  And would I be correct in saying that that was one of the

9  ideas that John was talking about, running this through a

10  government service type bond?

11  A.  I don't recall that.

12  Q.  OK.  Do you remember that his idea was to finance a bond,

13  whatever type it was, through the use of pension funds?

14  A.  Yes.

15  Q.  And the reason he figured that pension funds would want to

16  do this is they have a social impact requirement to their

17  investments, right?

18  A.  Correct.

19  Q.  And could you explain to the jury what that means, the

20  social impact requirement.

21  A.  A social impact investment would be as opposed to a typical

22  investment where you want to make as much as you possibly can

23  presumably.  You may take as an investor a little less of a

24  return in return for funding something that is what you

25  perceive as good for the community.

1   Q.  And so if I understand what you're saying is everybody

2   wanted to do this deal, the winery warehouse deal, and the way

3   to finance it was still in flux.

4   A.  Yes, that's correct.

5   Q.  And would I also be correct in saying that it wasn't --

6   withdraw that question.

7          After the meeting ended, you left Las Vegas that day,

8   correct?

9   A.  I believe so, yes.

10  Q.  And you didn't have any further discussions about this

11  topic with these individuals before you left Las Vegas.

12  A.  No.

13  Q.  And would I be correct in saying that it wasn't until after

14  you left Las Vegas that you first heard of the annuity idea,

15  that John called you after you left Las Vegas and told you

16  about this idea of setting up an annuity?

17  A.  That's not my recollection.

18          MR. TOUGER:  One moment, your Honor.

19          THE COURT:  Sure.

20  Q.  You were interviewed by the government on April 12, 2018,

21  correct?

22  A.  I believe so, yes.

23  Q.  And there were certain questions and answers.

24  A.  Correct.

25          MR. TOUGER:  Now, if you could bring up Government

1    Exhibit 1220.

2    Q.  Do you see the document?

3    A.  I do.

4    Q.  And --

5              No, you're not supposed to see it.

6              And the date on that document is May 20, 2014,

7    correct?

8    A.  Yes.

9              MR. TOUGER:  May I approach the witness?

10             THE COURT:  Yes.

11   Q.  I want to ask you, if you read this, this refreshes your

12   recollection that you first heard of the annuity after you

13   left?

14   A.  Right here?

15   Q.  Yes.

16   A.  OK.

17   Q.  So isn't it true that when the government showed you, you

18   said you first heard of the annuity sometime in the time period

19   of this referenced document.  Is that what you said?

20   A.  My --

21   Q.  I'm asking you a different question.  Is that what you

22   said?

23   A.  Close but not exactly.

24   Q.  So, you're telling me the government got this wrong.

25   A.  Those are not my notes.  But I can clarify if it's helpful.

1    Q.   Now, at some point the annuity idea did come out, right?

2    A.   The annuity or the investment idea.

3    Q.   Well, you explain to me the difference.

4    A.   OK.   At this meeting, at the initial meeting, what was

5    referred to as --

6    Q.   You have to speak louder.

7    A.   At the meeting in Las Vegas, at this what we have been

8    discussing, there was a discussion of an investment.   An

9    investment would be purchased that could make a return that

10   would then be allowed to pay the bonds.   I don't know if at

11   that meeting the word annuity was used or what that investment

12   was.   An annuity is a specific type of investment, so I think

13   that's what the confusion is with the notes.

14   Q.   I understand you completely.   Thank you for clarifying.

15   A.   Sure.

16   Q.   So at some point though the idea did come that we were

17   going to use an annuity to finance this deal, right?

18   A.   Correct.

19   Q.   And the idea was for the annuity to generate enough money

20   to pay back the bond and have money left over to use for the

21   economic development through the WLCC.

22   A.   That's right.

23   Q.   Now, on direct you said at page 152 that after the meeting

24   in Vegas, it wasn't until -- which was in mid-March, right --

25   A.   Yes.

1    Q.  -- that you didn't speak about this deal again until four

2    to six weeks later.

3    A.  That was my sense of it, yes.

4    Q.  Can we agree that that's not correct, right?  On April 4 --

5    which is nearly two or three weeks later -- you wrote a

6    memorandum about the winery deal, right?

7    A.  I discussed that I hadn't heard about the annuity project.

8    I saw that as different from the winery project.

9    Q.  OK, but that's fine, but what I'm trying to bring out is

10   when you left Vegas, this idea did not die for four to six

11   weeks; the idea about the winery and the warehouse was still

12   being discussed during that time period.

13   A.  The winery portion was, not necessarily the annuity portion

14   of it.

15   Q.  Well, you wrote a memorandum on April 4, right?

16   A.  I did.

17   Q.  And what did that memorandum detail?

18   A.  It discussed the winery project as a whole.

19   Q.  Right.

20   A.  Yes.  But that winery project was different from sort of

21   the warehouse portion of it.

22   Q.  Right.  The deal was still in flux about what all the

23   details were, right?

24   A.  Correct.

25   Q.  As a matter of fact, the deal stayed in flux almost up

I5T7GAL2                          Anderson - Cross

1  until the day it closed?

2  A.  That's correct, it's fair.

3  Q.  It was constantly changing, certain degrees of it, right?

4  A.  Correct.

5  Q.  And what you discussed in the memo was that the

6  governmental bonds would be issued by the WLCC, right, and the

7  proceeds from the bonds would be used to construct and operate

8  a winery in Dry Creek, California.

9  A.  Correct.

10 Q.  And the winery project was to be jointly owned by the WLCC

11 and a Haynes subsidiary which hadn't been determined yet,

12 right?

13 A.  That was being discussed.

14 Q.  Right?

15 A.  And 51 percent of the ownership was to go to the WLCC, and

16 49 percent was to go to Haynes.

17 Q.  Right?

18 A.  Correct, based upon the memo.

19 Q.  I'm just talking about the memo.

20 A.  Right.

21 Q.  And the reason it was 51 to 49 in ownership percentages was

22 they wanted to preserve the tribal majority ownership of the

23 business, right?

24 A.  Correct.

25 Q.  Because that would possibly have some tax advantages.

1    A.  It could, yes.

2    Q.  And that goes back to the whole excise tax on alcohol,

3    etc., correct?

4    A.  I believe it has other nontax implications as well.

5    Q.  It was definitely advantageous to have a Native American

6    ownership of the business as opposed to a United States

7    citizenship ownership of the business.

8    A.  Yes.

9    Q.  Now, getting back to the meeting for a little bit.  It was

10   pretty clear to you at that meeting that Mr. Galanis was a

11   retired old man who didn't work for anybody, right?

12   A.  That was my impression at the time, yes.

13   Q.  And basically he seemed to be just like an old guy looking

14   for something to do, right, if I can quote you.

15   A.  That was my impression, yes.

16   Q.  But John did mention that he had a son who was an

17   investment banker, right?

18   A.  Correct.

19   Q.  And he would try to get him interested in the deal, right?

20   A.  Correct.

21   Q.  And Mr. Galanis also mentioned his son was associated with

22   Burnham Securities.

23   A.  Burnham in New York, I believe were the exact words.

24   Q.  And maybe he could get Burnham to find investors into this

25   project, for the bonds.

1  A.  I'm not sure if he used the word maybe, but that was the

2  gist of it, um-hum.

3  Q.  And can we agree that in April of 2014 Jason Galanis was

4  associated with Burnham Securities?

5  A.  That was my impression, yes.

6  Q.  And did you know at that time that Jason Galanis through

7  other companies was a part owner of Burnham Securities?

8  A.  No, I did not know that.

9  Q.  By the way, it was Jason Galanis' influence at Burnham that

10  ultimately weeks later got you hired as counsel for Burnham in

11  this deal, right?

12  A.  That's -- yeah, I believe so.

13  Q.  And can we also agree that in July you even asked Jason --

14  Jason Galanis -- if you should bring Hugh Dunkerley into the

15  e-mail chain about the bonding.

16  A.  I believe I did, yes, on or about that time.

17  Q.  And can we also agree that as far as you know that Jason

18  Galanis had some influence about what deals Burnham Securities

19  would take on and what deals they wouldn't?

20  A.  Yes.  Yeah, um-hum.

21  Q.  And by mid-April you were introduced to a company called

22  Wealth Assurance Holdings.

23  A.  I'm not sure if it's mid April, but at some point, yes.

24          MR. TOUGER:  OK.  Can we bring up DX-1300.  This is in

25  evidence, so you can show it to the jury.

I5T7GAL2                          Anderson - Cross

1    Q.  I'd like you to go to the second page of that.  Can you see

2    that clearly?

3    A.  Clearly enough, yeah.

4    Q.  You received this document at some point in April or May of

5    2014, correct?

6    A.  I did.

7    Q.  And what is this document?

8    A.  This is a summary or overview of Wealth Assurance Holdings

9    Ltd.

10   Q.  And who was the auditor of this document?

11   A.  Pardon?

12   Q.  Who did the audit?  Who prepared this information?

13   A.  I don't know.

14   Q.  It says it right on top there.

15   A.  Oh, PWC.

16   Q.  Do you know what PWC is?

17   A.  It's commonly used as a shorthand for Price Waterhouse

18   Coopers.

19   Q.  Right.  And could you describe to the jury who Price

20   Waterhouse Coopers is.

21   A.  They are one of the large accounting firms.  I believe

22   there are four left in the United States.

23   Q.  And they're worldwide, right?

24   A.  I don't know that, but I would not be surprised.

25   Q.  And they are one of the largest ones left, right?

1    A.  I believe in the United States, yes.

2    Q.  And you had no -- they're pretty respected in the United

3    States also, their work?

4    A.  I think so.

5    Q.  They're not some fly-by-night strip mall accounting firm,

6    right?

7    A.  Correct.

8    Q.  They have lots of offices in lots of cities with lots of

9    accountants and everything working for them, right?

10            MS. TEKEEI:  Objection.  Relevance.

11            THE COURT:  I will allow.

12   A.  That's my impression.

13   Q.  And did you read this document when you got it?  Not now.

14   A.  I reviewed it.  I wouldn't say I read it, but yeah.

15   Q.  So you had no doubt once you reviewed this document that

16   Wealth Assurance Holdings was a real company.

17   A.  I did not.

18   Q.  And had real financial assets.

19   A.  Correct.

20   Q.  And did you do your own due diligence on WAH?

21   A.  I believe I went on their website.

22   Q.  And from that information on the website and what you have

23   in front of you, it had just recently acquired Wealth Assurance

24   AG, which was an $80 billion German mutual insurance company,

25   correct?

1    A.  I don't know where it says that here, but I had the

2    impression they had large assets and they were a European

3    company.

4             MR. TOUGER:  You can take that down.

5    Q.  So, now once the deal started to come more in focus as time

6    went on, the idea was to sell bonds to raise capital, right?

7    A.  Correct.

8    Q.  And the bond proceeds would be invested, and the return on

9    the investment would be used to pay off the bonds and get some

10   extra money to do some work with the WLCC, right?

11   A.  That's right.

12   Q.  And just so us laymen can understand it, a bond is really a

13   mechanism for corporations to get what we call a loan.

14   A.  In some ways that's an apt description, yes.

15   Q.  Now, would I be correct in saying that when this idea

16   started to take focus, that you were intrigued by this idea?

17   A.  Yes, um-hum.

18             (Continued on next page)

19

20

21

22

23

24

25

I5TJGAL3                         Anderson - cross

Q.  And the more you thought about it, the more you thought

hey, this could work?

A.  My feeling was if the economics worked, then the deal could

work.

Q.  Excuse me?

A.  If the economics worked, the deal could work.

Q.  Exactly.  And you also thought that pension funds would be

interested in buying these bonds for two reasons; one, they had

a good rate of return because they were a risky investment,

right?

A.  Ah-huh.

Q.  The more risky investment, the higher the interest rate,

right?

A.  That is generally how it works, yes.

Q.  And these bonds were paying a higher interest rate than the

going rate on safe AAA bonds, right?

A.  At that time, yes.

Q.  At that time, that is what I am talking about?

A.  Right.

Q.  The second reason was so they could do their socially

responsible investments?

A.  That's right.

Q.  And these bonds they we're talking about met both of those

requirements?

A.  It appeared to, yes.

I5TJGAL3                     Anderson - cross

1    Q.  By the way, what is the percentage, if you know?  Does it

2    change on different pension funds?  Is it legally all the same

3    on pension funds for the socially economic part?

4    A.  It is my understanding that's a decision each fund makes on

5    its own.

6    Q.  On its own?  There is no legal standard, right?

7    A.  Not to my understanding, no.

8    Q.  There was nothing illegal about the way this deal was being

9    put together as far as --

10              MS. TEKEEI:  Objection.

11   Q.  -- as far as you were concerned?

12              MS. TEKEEI:  Objection.

13              THE COURT:  As far as you understood, I will allow

14   that.

15              THE WITNESS:  No, there was none.

16   BY MR. TOUGER:

17   Q.  You wouldn't have involved yourself in an illegal

18   transaction, would you?

19   A.  No, I would not.

20   Q.  So if the deal worked, right, the WLCC would get money up

21   front for issuing the bonds, right?

22              They would get what ultimately turned out to be two

23   and a quarter million dollars, right?

24   A.  I believe that's the number, correct.

25   Q.  And Burnham would make money for selling the bonds, right?

1    A.  Correct.

2    Q.  And the Wakpamni Lake Community would receive a new

3    commercial space on its land?

4    A.  Correct.

5    Q.  Now, just going back through how this deal sort of came

6    into being, so to speak, okay?

7          So would I be correct in saying about six or so weeks

8    after you left Vegas, you got a call from Mr. Raines, with an

9    R, Mr. Raines, saying that this bond deal may actually move

10   forward?

11   A.  I did receive a call from him to that effect, ah-huh.

12   Q.  And then shortly after that, Mr. Galanis sent you an email

13   with people that Burnham that you would be working with, right?

14   A.  I did receive that email, yes.

15   Q.  And those people were Jason Galanis and Hugh Dunkerley,

16   right?

17   A.  Correct.

18   Q.  Would it be correct in saying one of your impressions with

19   John was that he would find deals and bring them to Burnham?

20   A.  Yes.

21   Q.  And then once the deals were accepted, meaning Burnham was

22   interested and decided to take up the deal, he would not really

23   be as much of a presence, he would become more of a

24   troubleshooter on that deal between the parties?

25   A.  You're speaking of at that time?

1    Q.   Yes.

2    A.   April, May, somewhere in there.

3    Q.   Exactly.

4    A.   My impression was he was helping his son find deals.

5    Q.   Would your impression also be he was acting as a go-between

6    between you, Raycen Raines, Jason and the Burnham people?

7    A.   Yes.

8    Q.   I believe you testified last week that they always seemed

9    to be in harmony, right, that was the word you used?

10   A.   Jason and Yanni?

11   Q.   Yes.

12   A.   Yes.

13   Q.   Would you agree with me that the way the process was

14   working in this May, April to June time period, right, that

15   basically Mr. Galanis would speak to you about -- when I say

16   "Mr. Galanis," I mean John Galanis would speak to you about a

17   problem, you would discuss the problem, and then John would say

18   let me get back to Jason, and then he would talk to Jason and

19   get back to you with what Jason said, right?

20   A.   Yes.

21   Q.   Would you also agree with me that you never, ever spoke to

22   John Galanis and Jason Galanis at the same time?

23   A.   I spoke with them at the same time.

24   Q.   Excuse me?

25   A.   I did speak with them at the same time.

1    Q.  You did speak with them at the same time?

2    A.  Yes.

3    Q.  When did you do that?

4    A.  A number of times.  I remember at least --

5    Q.  May I interrupt you.  By telephone or in person?

6    A.  Telephone.

7    Q.  Now you may continue.

8    A.  Leading up to the first deal, I remember receiving a phone

9    call from Jason and Yanni related to a question they had about

10   the bonds and the structure.  I could go into deal if you like.

11   Q.  That is fine.  You did speak to them at times together?

12   A.  Correct.

13   Q.  Most of the time, you spoke to them individually?

14   A.  Most of the time, correct.

15   Q.  When I say "most," the fair majority of them you spoke to

16   them individually?

17   A.  I would say the majority of the time, yeah.

18   Q.  Would you agree with me that in the beginning months of the

19   deal, you spoke a lot more with John than Jason, and then as

20   you got into July and August, you spoke more with Jason than

21   John?

22   A.  That's correct.

23   Q.  Would you also agree with me that most of the time when you

24   spoke to John, it was more you calling him than him calling

25   you?

1    A.  I would disagree with that.

2    Q.  You would disagree with that?

3    A.  Ah-huh.

4    Q.  But you believed your primary contact on the deal would be

5    Jason Galanis?

6    A.  I did.

7    Q.  And you point of contact really switched somewhere around

8    late June of 2014, where you switched from more John to more

9    Jason?

10   A.  I don't recall specifically when it switched, but as we

11   approached closer to closing on the deal, there was a

12   switching, yes.

13   Q.  Would you say that John structured and organized the

14   parties to the deal in the beginning, then Jason Galanis took

15   over the negotiations over the point, and you really closed the

16   deal, signed the closing documents, right?

17   A.  That is a fair description.

18   Q.  As a matter of fact, you got the email from John with the

19   contacts at Burnham, Jason and Hugh Dunkerley, and I believe

20   you got that on May 19th, 2014?

21   A.  I don't know if it was a specific date, but on or about

22   there.

23   Q.  On or about there?

24        And that is when you really thought you would have

25   more contact with Jason and Hugh Dunkerley than you would with

I5TJGAL3                          Anderson - cross

1   John, correct?

2   A.   That's correct.

3           MR. TOUGER:  May we take the lunch break, your Honor?

4           THE COURT:  Sure, whenever you're ready.

5           MR. TOUGER:  A little bit longer would be a good

6   break.

7           THE COURT:  Okay.

8   BY MR. TOUGER:

9   Q.   You had this meeting with Jason Galanis in New York City

10  you talked about on direct, right?

11  A.   I did.

12  Q.   John Galanis wasn't there, right?

13  A.   He was not.

14  Q.   He wasn't supposed to be there, either?

15  A.   No.

16  Q.   During the summer months of July and August, would I be

17  correct in saying your conversations with John Galanis really

18  had to do with problems that were arising and trying to work

19  out these problems?

20  A.   That is a fair description of it.

21  Q.   That is because John was really there in the beginning to

22  work on this financing deal with Pete Shannon and John Moran

23  about the winery, right, that was how he got to this deal, as

24  far as you know?

25          MS. TEKEEI:  Objection.

1           THE COURT:  Sustained.

2     BY MR. TOUGER:

3     Q.  Well, when you first met Mr. Galanis, the conversation at

4     that meeting was all about this winery, right?

5           MS. TEKEEI:  Objection.

6           THE COURT:  I'll allow that.

7           THE WITNESS:  There were two topics for discussion at

8     the meeting.  There was the winery and then this other project

9     that again a guy wanted to discuss with --

10    BY MR. TOUGER:

11    Q.  Excuse me.  I didn't get the last part.

12    A.  There was the winery project which had been kicking around

13    for a while, but then there was the second project which was

14    what raise described to Steven as a guy he wanted to talk about

15    a problem with the tribe, quote-unquote.

16    Q.  And that guy was Mr. Galanis?

17    A.  Correct.

18    Q.  The conversation at the meeting was trying to get

19    financing, someone to finance the winery?

20    A.  That was one topic, but then the other project was

21    described.

22    Q.  What was the other project?

23    A.  Well, it was a project that would be an investment would be

24    placed into what would end up being the annuity project, an

25    investment would purchase the bond issue, and the proceeds

1    would be to pay off the interest, and a trust would be created

2    for the tribe long term, there was no physical project at that

3    time that was being discussed.

4    Q.  Okay.  By the way, the winery project never got done,

5    right?

6    A.  There were two parts to the winery project, which is the

7    grapes and then the warehouse.  The warehouse --

8    Q.  The warehouse portion?  The grapes portion never got done?

9    A.  Correct.

10   Q.  That was because Mr. Haines couldn't work out a deal with

11   the Native American tribe at that point?

12   A.  I don't know why it fell apart, honestly.

13   Q.  And by the way, in your time you got to know Jason Galanis

14   also, I presume?

15   A.  Yes.

16   Q.  Was there any doubt in your mind that Jason Galanis could

17   handle this negotiation of this deal?

18   A.  Say that again.

19   Q.  That Jason Galanis had the wherewithal by himself to handle

20   the negotiation of this deal?

21   A.  He seemed pretty sophisticated, so I had no reason to doubt

22   that he could.

23            MR. TOUGER:  This would be a good place.

24            THE COURT:  Ladies and gentlemen, we're going to take

25   our lunch break.  Because we had a short day today, now we have

I5TJGAL3                         Anderson - cross

1    ordered you lunch here.  We are going to take a 45 minute break

2    for lunch.  Remember please don't discuss the case and keep an

3    open mind.  Thank you.

4              (Jury excused)

5              THE COURT:  You may step down and come back in 45

6    minutes.  Thank you.

7              (The witness left the courtroom)

8              THE COURT:  You all can be seated.

9              I want to give you all time to have lunch as well, but

10   let's just talk about whatever issues we need to discuss for

11   the purposes of the afternoon.  So first are there any other

12   objections with respect to exhibits for this cross-examination

13   or for anything else you think will take place this afternoon

14   we should discuss?

15             MR. SCHWARTZ:  I don't think so, your Honor.  I will

16   give the government the pages.

17             THE COURT:  You will confer over the lunch break.

18             MR. SCHWARTZ:  Yes.  I will give them the pages I

19   intend to use, and they can look at it and we'll talk.

20             THE COURT:  Thanks.  I am happy to address the Jason

21   Galanis' arrest in Gerova now if you want to take a few minutes

22   to do that now.  Do you want to or --

23             MR. TOUGER:  Are we finish with the witness?

24             MS. TEKEEI:  We would like a ruling, your Honor.

25             THE COURT:  Let's talk about this for a few minutes

1    and then break for lunch.

2              First I want to say some things and I want to ask a

3    few questions.  I have reviewed the parties' most recent

4    submissions regarding Jason Galanis' arrest in the Gerova case,

5    and I want to make a few things clear on the record.

6              First, and as I noted on Thursday, Mr. Schwartz

7    correctly quoted the transcript from the April 13th conference

8    where I said that I'm not going to permit the government to

9    introduce evidence related to the arrest and convictions of

10   Mr. Hirst and John and Jason Galanis and Gerova.

11             Mr. Schwartz said he interpreted that statement to

12   mean no evidence of Jason Galanis' Gerova arrest or conviction

13   could come in for any purpose even absent evidence that any of

14   the defendants at this trial were similarly arrested or

15   convicted in relation to Gerova.

16             My comments at that hearing were intended as a

17   reference to the arrest and conviction of those three

18   individuals, Jason Galanis, John Galanis and Gary Hirst

19   collectively, which I think my back-and-forth with Mr. Quigley

20   at the April 13th conference and the final pretrial conference

21   made clear.

22             I never viewed the isolated introduction of Jason

23   Galanis' arrest and conviction in Gerova as barred by 404 (b)

24   in light of the fact he had already pled guilty to the

25   indictment; and, therefore, would not be a defendant in trial.

I5TJGAL3                          Anderson - cross

1      That was the motion I was ruling on, the Government's 404 (b)

2      motion.  My analysis of the SEC evidence bars rather of Jason

3      Galanis and John Moran similarly emphasize that point.

4            In light of the discussion that took place at the

5      April 13th conference and at the final pretrial conference, I

6      thought defendants were on clear notice that at the very least

7      this issue, the introduction of Jason Galanis' arrest and

8      conviction in Gerova about implicating the involvement of any

9      of the other defendants on trial was not something that I had

10     squarely addressed or had yet been asked to address.

11           Moreover, Government Exhibit 2103, the press release

12     related to the Gerova arrests, redact the names of John Galanis

13     and Gary Hirst while highlighting the name of Jason Galanis,

14     further putting the defendants on notice while also

15     demonstrating that the government had the same understanding I

16     did of the rulings as to the 404 (b) evidence, and given how

17     thorough much of the preparation has been in this case, I am

18     sure the defendants reviewed those redacted exhibits.

19           So I don't view the current posture of this as a

20     motion for reconsideration.  The defendants, none of them, have

21     moved to exclude, had moved to exclude Government Exhibits 781,

22     782, 2102 or 2103.  Whether it was in good-faith reliance of my

23     statements or for strategic reasons, those motions were not

24     made, but I will deem them now to have been made, and that is

25     what I think we should address right now.  I want to view it

I5TJGAL3                    Anderson - cross

1   and I think it is appropriately viewed as a motion under 403,

2   it is too prejudicial, substantially more prejudicial than

3   probative.

4            So I am going to consider that made with respect to

5   those exhibits as well as the testimony, anticipated testimony

6   of Francisco Martin.  So let's start with the SEC press release

7   with the government.  First of all, I think it is just too

8   prejudicial as is.  We can talk about if there is some

9   additional stipulation, and I know the government has agreed to

10  make a stipulation, but I think the way it looks right now, it

11  is simply too prejudicial.

12           So let's make for the record clear what the government

13  proposed stipulating to.  Next, the letter of May 25th, the

14  government represented it will stipulate to the following, the

15  Gerova investigation concerned neither Mr. Archer or

16  Mr. Cooney, that neither Mr. Archer nor Mr. Cooney were

17  subjects of the Gerova investigation and/or that the

18  government's investigation into Gerova was not public on

19  September 24th, 2015, the day the charges were unsealed and

20  Jason Galanis was arrested.

21           I think that is important.  I think without that

22  stipulation, all of this would have been too prejudicial.  One

23  question that that stipulation, agreement to stipulate to those

24  facts highlights is, of course -- Mr. Touger is raising his

25  hand -- you know that stipulation can be made without

1    suggesting the guilt of Mr. John Galanis.  I think it can be

2    done because I think it can be done piecemeal with respect to

3    the pieces of evidence.

4            So to the extent -- and I am not saying I will rule

5    this way, I will hear you out first -- to the extent, for

6    example, that I were to allow in Francisco Martin's testimony,

7    I could at that time, either you could or I could, read a

8    stipulation with respect to Bevan Cooney similarly, and then

9    any evidence were to come in with respect to the BIT Board

10   minutes, for example, I could or you could read a stipulation

11   with respect to Devon Archer.  If I do that, it counters it and

12   does not implicate John Galanis, especially if I am not letting

13   in the press release, which has the clear redactions so you're

14   wondering whose name would have been there.  So those are kind

15   of initial reactions.

16           I want to hear more about exactly what you anticipate

17   Francisco Martin's testimony would be with respect to

18   Mr. Cooney because I think the tone and nature of the

19   conversation really matter, the specifics matter, and then I

20   also just want to hear you all out further.

21           Who wants to go first?

22           MS. MERMELSTEIN:  With respect to your Honor's

23   suggestion, as we said at the last time we were here, we are

24   happy to further redact the SEC press release or otherwise

25   alter that exhibit so it is less of a highlighted matter.

1         I think your Honor's suggestion with respect to how to

2    make clear that there is no assertion that Cooney or Archer was

3    involved in Gerova, about highlighting Mr. Yanni Galanis' role

4    is very smart, and we have no objection to doing it that way.

5         To the extent there is evidence of Mr. Cooney's

6    discussion about Gerova, the jury gets instructed there is no

7    allegation he knew of any of that before, and similarly with

8    respect to the Mr. Archer's vindication in the BIT Board, the

9    jury can be instructed at that point with respect to

10   Mr. Archer, and it will appear to the jury that Mr. Galanis

11   isn't being referenced because there is no reference to Gerova

12   and him at all.

13        With respect to Mr. Martin, I don't know how much more

14   I have to add to what we have already said.  There has been a

15   fair amount of fighting between the difference between the

16   government's characterization of it and how it is reflected in

17   the 3500, and having met with Mr. Martin, the characterization

18   I have given is certainly my characterization, but it is my

19   characterization of my understanding of how Mr. Martin

20   understood the conversation; that is to say, that he received a

21   phone call from Mr. Cooney, informing him that Jason Galanis

22   had been arrested.

23        I think that is Step 1.  That is significant because

24   of the fact Mr. Martin is a person Mr. Cooney would call upon.

25   Learning that information is itself evidence that Mr. Cooney

1     understood himself to be involved in an enterprise with

2     Mr. Martin.  That is not a small fact here, right, because I

3     understand that these defendants are going to say look, we

4     didn't know about all these other parts of the bond set up that

5     were a problem, like we just weren't involved and didn't have

6     notice of it.

7              The fact Mr. Cooney knows who Mr. Martin is and knows

8     he is involved in the same enterprise is itself incredibly

9     relevant to Mr. Cooney's understanding of the broader scope

10    here.

11             THE COURT:  Is that not going to come out in other

12    portions of his testimony, through other evidence?

13             MS. MERMELSTEIN:  I don't think it comes out with this

14    level of clarity.  I also think even more significantly,

15    obviously, what Mr. Cooney then says to Mr. Martin is look,

16    don't worry, it is not the bond stuff, it's this other thing

17    Gerova, and it is so incredibly demonstrative about Mr.

18    Cooney's mind set for him to be saying like don't worry, it is

19    not -- and I think the import to Mr. Martin is we both know it

20    could be our thing, our thing is a crime and it could be us,

21    but luckily it is not.

22             If the defense wants to argue there is a different

23    inference there, the inference is look, I need two people who

24    are in business together would be perturbed to know a third

25    business partner had been arrested and relieved it wasn't in

1    their deal, that is an argument they could make.

2            That wasn't Mr. Martin's understanding of that

3    conversation, and it is in a case that is all about knowledge,

4    the notion that that communication could be precluded is

5    immensely prejudicial to the government, and I don't think

6    there is any 403 argument here that it is not, that the

7    probative value of this because it is so probative is

8    substantially outweighed by the prejudice when all the jury

9    will learn is Jason Galanis committed another crime.

10           Let's be super clear.  The defendants opened on Jason

11   Galanis is a criminal mastermind who was controlling everyone

12   and deceiving everyone, so the prejudice to them from evidence

13   that -- and the jury will be told there is no suggestion they

14   knew about that before or went into business with someone they

15   knew to be a criminal at the time they went into business with

16   them, but how could that be prejudicial to the defendants when

17   they have moved to put in evidence of the California matter and

18   of other people's convictions in this matter, just Jason

19   Galanis' conviction in this matter, the such a big part of the

20   defense is Jason Galanis is the criminal mastermind.  The

21   notion a different arrest of Jason Galanis is so prejudicial

22   that it weighs against the admission of this incredibly

23   probative evidence --

24           THE COURT:  Just to be clear, are you going to be

25   asking Martin what his understanding was of --

1          MS. MERMELSTEIN:  Of course.

2          THE COURT:  What will he say?

3          MS. MERMELSTEIN:  He will say he understood what

4     Mr. Galanis was saying.  Mr. Martin is going to say I

5     understood how he was perpetrating a crime with respect to

6     these bonds with Mr. Galanis and others, and he called me.

7          The import of that admission is like, he didn't say it

8     explicitly, right, but the understanding is we are presently

9     committing a fraud together but don't worry, right, our

10    co-conspirator who got caught got caught for something else.

11    That is what he is going to say.

12         MR. TOUGER:  I would like to ask the government one

13    pointed question.  How does any of that change if the only

14    testimony is Jason Galanis got arrested?

15         THE COURT:  Jason Galanis got what?

16         MR. TOUGER:  Got arrested.  They can make every

17    argument they just made.  If the court's ruling is as it just

18    said, what is the difference in the grand scheme of things to

19    their case if the only testimony is Jason Galanis got arrested?

20         It seems to me from the arguments they're making that

21    it doesn't matter one iota that the testimony Jason Galanis got

22    arrested for financial crimes dealing with Gerova, because none

23    of those individuals, Mr. Martin and none of them involved with

24    Gerova, they have no idea what that is about.

25         THE COURT:  I assume that their argument is it

1    provides context for that particular statement.

2              MR. TOUGER:  It doesn't because "just arrested" is

3    fine, and then nobody is harmed.  If the court will --

4              THE COURT:  Sorry.  Clarify.  You think it should be

5    he was arrested, but not for a separate crime?

6              MR. TOUGER:  No.  Jason Galanis was arrested for a

7    separate crime.

8              THE COURT:  Right.

9              MR. TOUGER:  That is it.  They can make every argument

10   that they want to make based on that, and it is a fair

11   compromise to get rid of any taint to Mr. Galanis.  Mr. Martin

12   doesn't even know John Galanis.

13             THE COURT:  I am misunderstanding.  I want to make

14   sure I understand exactly what your proposal is.

15             MR. TOUGER:  My proposal is, your Honor, is that the

16   testimony from Mr. Martin be that Jason got arrested for a

17   crime separate and distinct from the one being alleged in this

18   case.

19             MR. SCHWARTZ:  In other words, without it being clear

20   it was a securities fraud, there were SEC charges, it was this

21   district, anything like that?  Just that he was arrested,

22   not -- I am just clarifying -- he was arrested for unrelated

23   charges, period, full stop, and then Mr. Touger was saying that

24   would allow the government to make the argument it wants to

25   make about the conversation that supposedly happened between

1   Mr. Martin and Mr. Cooney.

2           MR. TOUGER:  Let me finish my thought.  I am not

3   willing to sign a stipulation that pinpoints my client as being

4   involved.  I won an appeal on that issue in state court, not

5   federal court, but if you put the two together, it is obviously

6   pointing a finger at him.

7           THE COURT:  But if I am not allowing in the press

8   release, and I am not, I understand I didn't make clear exactly

9   if there are redactions that could be made, but it is hard for

10  me to see how redactions could be made to that press release to

11  let it in, but that doesn't mean that the top part of the email

12  doesn't come in or the BIT Board minutes or Mr. Martin's

13  testimony.

14          MR. TOUGER:  Here is the problem with that.  I can't

15  argue to the jury, and rightfully so, that John Galanis knew

16  about this because he was Jason Galanis' father and no other

17  reason because then you will allow the 404 (b) in.  I am

18  handcuffed with giving the jury a credible reason why John

19  Galanis would not as opposed to the other two, I can't do that

20  and I wouldn't do that because that would obviously open the

21  door.

22          If the agreement is made between the parties the only

23  testimony is going to be that Jason Galanis got arrested for a

24  crime separate and distinct from the actions in this case, then

25  everybody's protected and they can all make the arguments they

1    want to make.

2              MR. SCHWARTZ:  The prejudice would also be

3    substantially mitigated if this really only came in in the

4    context of the conversation that supposedly happened between

5    Mr. Martin and Mr. Cooney.  Having heard the explanation, I

6    sort of understand a little bit better the government's

7    argument about that.

8              What I still don't understand and I never heard a

9    response to is why, with respect to Mr. Archer and the BIT

10   Board evidence, it is necessary to say even there was an

11   arrest.  They're not talking about the arrest.  The arrest is

12   just what precipitates the BIT Board reasking the questions

13   they asked a year before, and saying basically, you know, did

14   you do what you promised to do.

15             In order to get all of that testimony, the stuff they

16   say is relevant, you don't need the fact that Jason Galanis was

17   arrested.  So if in this trial the evidence of Jason Galanis'

18   2015 arrest could be limited to that one conversation between

19   Martin and Mr. Cooney that supposedly happened, accompanied by

20   an appropriate limiting instruction from your Honor that was

21   totally separate, and then no one is alleged to have been

22   involved or knowledgeable about it, that substantially takes

23   the air out of the prejudice of Jason Galanis being arrested

24   for a different offense right in the middle of this conduct.

25             I really disagree with the idea it doesn't cause

incremental prejudice because we argued Jason Galanis was a

master criminal.  The whole point was he was a master criminal,

but no one knew it, and so if in the middle of all of this he

gets arrested for securities fraud, and it is not made crystal

clear, as the government has told us they're not willing to

stipulate, that Mr. Archer had no clue not only about the

Gerova contact but the Gerova investigation, didn't know

anything until Mr. Galanis arrested on September 2015, that

would be enormously prejudicial to Mr. Archer.

MS. NOTARI:  I want to add what the government is not.

It is clear we are not disputing Francisco Martin and

Mr. Cooney and Mr. Galanis were in the same social circle, they

were friends and it makes perfect sense on an everyday, common

sense basis that if one of your friends gets arrested, you find

out about it, you call up your friend and say Jason Galanis was

arrested, right?

Now, we know from the 3500 material, and I am

reviewing my notes, that Francisco Martin met with the FBI in

February 2016, and all he could talk about was his fear that

his name was all over the bond documents.  It makes sense that

he confronts Mr. Cooney and says my name is all over the

documents.  Mr. Cooney says don't worry, this is about Gerova,

this has nothing to do with us.

Clearly the jury will hear that and they will

speculate there is something more that Mr. Cooney is involved

1    with the Gerova fraud, what is the Gerova fraud.  The fact that

2    they're putting so much emphasis on Mr. Cooney's statement is

3    just utterly ridiculous.  Anybody, anybody that got a phone

4    call that was involved in business dealings with someone, the

5    first logical question would be, or the comments would be well,

6    don't worry, you have nothing to do with that.  You know,

7    somebody gets again --

8            THE COURT:  Why is that not an issue for the jury to

9    decide?  Why are these not arguments for the jury?

10            MS. NOTARI:  It is prejudicial and it has no

11    relevance.  It is not probative.  Last week Ms. Mermelstein

12    couldn't articulate why it was probative, and now it is just

13    this, so prejudicial and it has no probative value and that is

14    what the test is.

15            MR. TOUGER:  I think it is important that the court

16    remember the facts that Mr. Schwartz brought up last week when

17    Bernie Madoff got arrested, all these same phone calls were

18    made because everybody thought he was being arrested for

19    prostitution, but the same phone calls were made.

20            When somebody gets arrested, people make phone calls.

21    As a criminal defense lawyer, I know that, you know that as a

22    Judge, people make phone calls when people get arrested.  It is

23    of no relevance to this case why Mr. Galanis got arrested.  The

24    "why" is not relevant.  I have yet to hear the government give

25    a reason of why Mr. Galanis got arrested is important as

1    opposed to the fact that he got arrested is important.

2             MS. MERMELSTEIN:  What I have been trying to say is

3    that I don't agree.  I think the notion that this has no

4    probative value is, frankly, silly and the government was very

5    clear what the probative value is.

6             In an effort to resolve this and recognizing the

7    legitimate concerns of Mr. John Galanis, the government is

8    willing to put this in without reference to Gerova.  We are

9    willing to say Jason Galanis got arrested.  Look, the way

10   Mr. Martin recounts it is he says he said to me don't worry, it

11   is not the bonds, it is Gerova, but we'll work it out.  I think

12   it may be clear it wasn't an arrest for DUI, but we don't need

13   to elicit the specifics of the Gerova matter.

14            While we are having this conversation, I don't think

15   Mr. Touger has yet stepped over the line, but I don't see how

16   he is not going to open the door to this during the course of

17   the trial given what he has already done because he is already

18   eliciting from Mr. Anderson that sort of John Galanis made

19   representations about Jason Galanis' role, that they we are in

20   frequent communication.  It is getting very close to a

21   suggestion that he relied on Jason Galanis' representations

22   with respect to how this deal was structured and it was

23   legitimate.

24            I am not saying he has done it yet, but I don't want

25   there to be any surprise when he does it, that the government

1    will say the whole thing comes in and there can be no question

2    that a defense that is I relied on Jason Galanis in good faith

3    would be so preposterous.

4             MR. TOUGER:  That is not going to happen.

5             MS. MERMELSTEIN:  I don't want that to be a surprise.

6    To the extent we are having this --

7             THE COURT:  Let me understand your proposal.

8             MS. NOTARI:  That proposal is utterly ridiculous.  The

9    only way, the court's remedy here, this stipulation which could

10   somehow lessen the blow, somehow just lessen it is totally lost

11   on that compromise because then the jury is just left to wonder

12   he was arrested, Jason Galanis was arrested, don't worry, it is

13   not about the bonds.  That is even worse.  It doesn't work.

14            MS. MERMELSTEIN:  One other small point.  With respect

15   to the SEC press release, I understand your Honor's ruling.  I

16   think the one issue will be that the import of the press

17   release is it gets forwarded along and Archer's response says

18   he was thinking was brought to our attention yesterday, a

19   surprise to both of us, we are pleased with the actions we

20   took, we're open to whatever further redaction or change your

21   Honor promises, but the jury has to understand the content of

22   what is being forwarded is about Jason Galanis' arrest or

23   Archer's response is nonsensical.  We can't redact the entirety

24   of the press release without doing something because then the

25   email has no meaning.

 1                THE COURT:  What in that email do you think adds

 2      something that is not in the BIT Board minutes?

 3                MS. MERMELSTEIN:  "We are pleased with the actions we

 4      took" is a false representation that he had done as he had

 5      promised to do with respect to Jason Galanis' role.  It is

 6      important because one thing that Mr. Schwartz made clear in his

 7      opening is part of his response to the BIT Board story is going

 8      to be a closer look at all these lawyers, a gazillion lawyers

 9      and I am not the one making the representation, it has been

10      signed off by counsel, from counsel, this is Mr. Archer himself

11      making that false representation, and that is the significance

12      and some context is required.

13                THE COURT:  Is there anything else you want to say

14      about the probative value, in your view, of the BIT Board

15      minutes?

16                MS. MERMELSTEIN:  More generally or with respect to

17      the arrest?

18                THE COURT:  With respect to the arrest and more

19      generally with respect to government exhibit -- I am sure you

20      know what the government exhibit is.

21                MR. QUIGLEY:  781 and 782.

22                THE COURT:  Why are those probative?

23                MR. QUIGLEY:  Sure, your Honor, they are probative of

24      his relationship with Mr. Galanis and he continued to lie to

25      Mr. Galanis over an extended period of time, over a year

I5TJGAL3                        Anderson - cross

1      after --

2                  THE COURT:  Tell me exactly how.  Point to the exact

3      language you think shows that.

4                  MR. QUIGLEY:  Well, I think in the 781 --

5                  THE COURT:  Yes.

6                  MR. QUIGLEY:  -- under the discussion, the second

7      paragraph, second sentence, he says he stated he had been

8      shocked by the development, and then the independent trustees

9      for their insistence that Mr. Galanis not be involved in the

10     management of Burnham.  So that is, and I think a witness would

11     interpret --

12                 THE COURT:  You don't have any evidence he wasn't

13     shocked?

14                 MR. QUIGLEY:  Correct.  That is absolutely right.

15                 The second part of the sentence where he thanked the

16     independent trustees for their insistence Mr. Galanis not be

17     involved in the management of Burnham suggests, and I think the

18     witness who wrote these minutes who was present at the meeting

19     would testify that it was her impression, having been present

20     at the meeting, he was indicating that Mr. Galanis had been cut

21     out of Burnham, which is not true.  We just heard the

22     time-frame is a little earlier, but testimony about Mr. Galanis

23     was, in fact, very much involved in Burnham.

24                 I also think in terms of there are ways we can

25     introduce this because I think some of this meeting is also

I5TJGAL3                        Anderson - cross

1    necessary to provide context for how Mr. Archer's interactions

2    with the board of the Burnham Investors Trust kind of wound up

3    because there are a couple of more meetings after this where

4    the deal kind of went away.

5              Burnham Asset Management was moved to a different

6    investment adviser, the trust moved the asset managers to a

7    different investment adviser.  Some of this we can elicit

8    through testimony.  I would mark the exhibits because I think

9    they're a business record, but also past recollection recorded

10   for the witness.

11             We don't necessarily have to get into the exhibits

12   themselves, but we expect to elicit testimony about the general

13   representations that were made at that meeting both regarding

14   Mr. Galanis and regarding Mr. Archer's interaction with the

15   Burnham board more generally.

16             THE COURT:  Do you want to respond and we'll take a

17   break for lunch.

18             MR. SCHWARTZ:  Again, I don't have any difficulty with

19   them eliciting testimony that in September 2015 the BIT Board

20   went back to Mr. Archer and said hey, you told us this last

21   year.  Did you really do it?  And Mr. Archer will say yeah, I

22   did it, what I said before was true.  All of that which is the

23   import, right, that is what Mr. Quigley says is the probative

24   value of this testimony, which is he's calling it Mr. Archer

25   lying again for Mr. Galanis.  I call it repeating the same true

statement from before.

Either way, it has the same import.  You can elicit
that fact to the extent it is probative without making
reference at all to Jason Galanis' arrest.  You can also get
out the fact that over the ensuing months, to the extent I
don't think it is relevant, but to the extent it is relevant,
the BIT Board moved money they were managing out of Burnham
Asset Management to a new investor.

That was largely as a result of the investigation in
this case, not the arrest of Jason Galanis in the first case,
but they can also get that out through their witnesses.  There
is no reason with respect to Archer to reference Jason Galanis'
indictment, and I have no question that we can work together to
sanitize these exhibits to the extent that there is other stuff
in here they feel is important to make sure they can get in the
other stuff that is important without reference to the fact
that Jason Galanis was arrested.

MR. QUIGLEY:  Your Honor, could I raise one other
issue kind of separate and apart from what we have been
discussing so far.  It shows the interaction between the issue
that is still on the table with respect to Mr. Galanis'
California conviction and this arrest.

One thing the defense has sought is essentially to say
that Mr. Galanis lied to the prosecutors in California, fooled
the prosecutors in California, and we think presumably we can

1    make an argument Mr. Galanis was such a good liar, he fooled

2    the government, right?  We think that is precluded under your

3    Honor's 404 (b) ruling, and we have raised that.

4              THE COURT:  I will tell you, I am not going to allow

5    that because I am not allowing his prior bad acts and his 404

6    (b), but rather his impeachment.

7              MR. QUIGLEY:  Understood.  If there was a fool the

8    government argument, that one, an additional basis to get in

9    his Gerova arrest, we arrested him twice actually, but I take

10   your point you won't allow it in.

11             THE COURT:  I want you to have time to have lunch.  If

12   you can come back at 2:00, but if you feel like you need a

13   couple of extra minutes, I understand.  Thank you.

14             (Luncheon recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I5T7GAL4

```
                        AFTERNOON SESSION

                           2:00 p.m.

        (Jury not present)

        THE COURT:  Can we bring the jury in?

        MS. NOTARI:  Can I just say something?  I want to
revise my position that in light of everything that was said,
and after thinking more carefully about Mr. Touger's proposal,
I think that was endorsed by Ms. Mermelstein about the
comments, that it would be better to have the suggestion of the
arrest without reference to Gerova, with the simultaneous
stipulation read.  That would be the worst of evils.

        THE COURT:  From your perspective.

        MS. NOTARI:  From our perspective.  Of course we don't
want that evidence in, but if the court is inclined to let it
in, that would be our position.

        MS. MERMELSTEIN:  We don't have to take this up right
now, since the jury is waiting, but to us we're either
anonymizing the arrest to the point of vagueness, or there is
going to be a stipulation that no one was alleged to be
involved.  I think it's nonsensical to do both, especially in
light of the fact that Mr. John Galanis was in fact involved,
and so we can't stipulate to something that's not true, and
it's more confusing that way.

        The notion that Galanis was arrested without more, I
don't think in any fashion suggests that these defendants were
```

I5T7GAL4

1    involved, so if we're going to an anonymize it to that extent,

2    I don't think we need a stipulation, but we are happy to deal

3    with the cross examination materials that are time sensitive

4    and deal with this later.

5           THE COURT:  I think that's right.  The only thing I

6    will say is that I am going to allow the government to elicit

7    Francisco Martin's testimony with respect to the call with

8    Cooney regarding Galanis' arrest.  In light of his anticipated

9    testimony, I do think it's of great probative value and not

10   outweighed by the danger of unfair prejudice.

11          I think the other issues are closer ones.  So, what I

12   think is probably most useful at this point is if that's the

13   case -- you tell me your proposals -- if I'm letting that in,

14   Mr. Schwartz, tell me what you're asking me to do with respect

15   to Mr. Archer.  I think I understand Mr. Touger's position, but

16   with respect that it's changed with that piece, and the

17   government's as well, I will think about those.  But I think

18   the other issues are much closer, in my view.

19          So why don't we bring the jury in.

20          MS. MERMELSTEIN:  I think Ms. Tekeei has to take up a

21   matter with respect to the text messages that Mr. Schwartz

22   identified as the one he wants to use.

23          THE COURT:  OK.

24          MS. MERMELSTEIN:  Although we can conceivably do it at

25   the break.

I5T7GAL4

1              THE COURT:  If we can do it at the break, thanks.

2              MS. TEKEEI:  Your Honor -- oh.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  I know that was longer than 45 minutes,

3     and I apologize.  We'll do better in the future.

4              Please be seated.

5              You may proceed, Mr. Touger.

6     TIMOTHY ANDERSON, resumed.

7     CROSS EXAMINATION (Continued)

8     BY MR. TOUGER:

9     Q.  Good afternoon again.

10    A.  Good afternoon.

11    Q.  If you could put up 2027, government Exhibit 2027.  It's in

12    evidence.  Go to the second page of that.

13             Do you see what is before you, Mr. Anderson?

14    A.  I do.

15    Q.  And is that the distribution list for the title that it

16    says on top there?

17    A.  Yes.

18    Q.  Basically this is the distribution list for the bond lien.

19    A.  A draft of it, yes.

20    Q.  And I would be correct in saying that Raycen Raines is

21    there for the WLCC?

22    A.  Yes.

23    Q.  And Jason Galanis and Hugh Dunkerley on the representatives

24    for Burnham?

25    A.  Yes.

I5T7GAL4                    Anderson - Cross

1   Q.  And you are there as a representative of Dilworth Paxson?

2   A.  Yes.

3   Q.  Because you are the attorney for who?

4   A.  Placement agent.

5   Q.  Which is?

6   A.  Burnham Securities, Inc.

7   Q.  And U.S. Bank is there?

8   A.  They are.

9   Q.  And U.S. Bank is what?

10  A.  Trustee.

11  Q.  Of the bond?

12  A.  Yes, correct.

13  Q.  And Greenberg Traurig is there, right?

14  A.  Yes.

15  Q.  And there are actually three lawyers mentioned there?

16  A.  There are.

17  Q.  And Greenberg Traurig is there for what reason?

18  A.  They are issuer's counsel.

19  Q.  WLCC's counsel?

20  A.  WLCC's counsel.

21  Q.  And Francisco Martin is there?

22  A.  Yes.

23  Q.  And Dr. Gary Hirst's name is there?

24  A.  Yes.

25  Q.  And they are there why?

I5T7GAL4                         Anderson - Cross

1    A.   On behalf of the annuity.

2    Q.   The annuity provider?

3    A.   Wealth Assurance.

4    Q.   Is John Galanis' name on that document?

5    A.   No.

6    Q.   And Wealth Assurance is listed as the annuity provider, not

7    WAPC, right?

8    A.   Correct.

9    Q.   But John Galanis had told you that WAPC was going to be the

10   annuity provider, correct, Wealth Assurance Private?

11   A.   No, it referred to as Wealth Assurance generally.

12   Q.   OK.   Now, Burnham was the underwriter for the bonds, right?

13   A.   That were.

14   Q.   What does the term underwriter mean?

15   A.   Well, they're the placement agent on the bonds.

16   Q.   And what does that mean, just so the jury is clear?

17   A.   It's the investment banking entity that sells the bonds.

18   Q.   Their job is to sell the bonds.

19   A.   Correct.

20   Q.   And Wealth Assurance was to be the annuity provider, right?

21   A.   Correct.

22   Q.   And what does the annuity provider do?

23   A.   Provide the annuity contract.

24   Q.   And WLCC was the issuer of the bonds, right?

25   A.   Correct.

 1    Q.  And --

 2              You can take that down.

 3              Now, can we also agree that the Wakpamni Lake

 4    Community was not a party to this action, that the WLCC was,

 5    not the Wakpamni Lake Community.

 6    A.  WLCC was the issuer of the bond.

 7    Q.  And in fact in your opinion the Wakpamni Tribe couldn't

 8    issue a bond because they are a governmental entity, correct?

 9    A.  Could you repeat that question.

10    Q.  It was your opinion that the Wakpamni Tribe itself -- not

11    the WLCC but the tribe itself -- could not issue the bonds.

12    A.  Oh, no, they could issue bonds.

13    Q.  Do you remember being interviewed back in April 17, 2018?

14    A.  That date, yes.

15    Q.  May I approach?

16              THE COURT:  Yes.

17    Q.  We can read this together.  Isn't it true that there you

18    wrote --

19              MS. TEKEEI:  Objection, your Honor.  This is improper.

20              THE COURT:  Are you trying to refresh his

21    recollection?

22              MR. TOUGER:  No, your Honor, just inconsistent

23    statement.

24              MS. TEKEEI:  He has to establish first that that is

25    the case, your Honor.

1          MR. TOUGER:  I tell you what, why don't you just read

2     that paragraph.

3          THE WITNESS:  It says --

4          MS. TEKEEI:  Your Honor, if the witness could be --

5          THE COURT:  For the time being just without saying it

6     out loud, just read it and see if it refreshes your

7     recollection or not.

8     Q.  Have you read that first paragraph?

9     A.  I have.

10    Q.  And does that refresh your recollection that you told the

11    government on April 17, 2018 that the Wakpamni Tribe is

12    considered a government entity, so a separate entity was

13    created to issue bonds.  Government entities could not be

14    issued bonds.

15    A.  It does not.  And there is a document reference there.

16    Q.  So we are in agreement that it was WLCC that issued the

17    bonds.

18    A.  WLCC, correct.

19    Q.  So the party at risk here was the WLCC.

20    A.  As the issuer of the bonds, yes.

21    Q.  Right.  Now, last week I believe you stated that the WLCC

22    waived their immunity status, right?

23    A.  With respect to the bond, yes.

24    Q.  That's what I'm talking about.

25    A.  Um-hum.

1   Q.  But would you agree with me that it wasn't a total waiver;

2   it was a limited waiver?

3   A.  Correct.

4   Q.  And the only thing that WLCC was risking was the assets

5   that it got from the bonds?

6   A.  Yes and no.

7   Q.  OK, why don't you give more detail.

8   A.  So, they were risking the revenue produced by those assets,

9   not the assets themselves.  Someone couldn't take the warehouse

10  away.

11  Q.  They couldn't take the warehouse.

12  A.  Correct.

13  Q.  They couldn't take the land.

14  A.  Correct.

15  Q.  What they were risking was the revenue that was produced by

16  that entity.

17  A.  That's correct.

18  Q.  And if it produced no money, profit, they weren't risking a

19  penny.

20  A.  They were risking whatever revenue would be produced by

21  those warehouses -- or the warehouse.

22  Q.  And if no revenue was produced, then they weren't risking

23  anything?

24  A.  No other assets, correct.

25  Q.  And at the time the WLCC had no assets, right?

I5T7GAL4                          Anderson - Cross

1    A.  I don't know.  I don't know.

2    Q.  It had no revenue from the warehouse, right?

3    A.  Before it was built?

4    Q.  Yes.

5    A.  Correct.

6    Q.  So when the WLCC signed onto this bond deal, they were only

7    risking the revenue they might get from this bond deal.

8              MS. TEKEEI:  Objection.

9              THE COURT:  Overruled.

10   A.  The bond -- the loan under the bond -- was secured by

11   revenue from the warehouse.

12   Q.  And if it -- again, if it generated no revenue, there was

13   nothing at risk to the WLCC?

14   A.  From a revenue standpoint, no, correct.

15   Q.  And also the bond paperwork itself stated that all lawsuits

16   brought on these bonds, if any, had to be brought in South

17   Dakota federal court, correct?

18   A.  Yeah, with respect to any questions under the indenture.

19   Q.  Right.  Do you know of any lawsuits brought under these

20   bonds in South Dakota federal court?

21             MS. TEKEEI:  Objection.

22             MR. TOUGER:  All I'm asking is does he know.

23             MS. TEKEEI:  Your Honor, it's hearsay.

24             THE COURT:  Sustained.

25   Q.  Have you received any documents about a lawsuit brought

1   regarding these bonds in a South Dakota federal court?

2          MS. TEKEEI:  Objection.

3          THE COURT:  Sustained.

4   Q.  Are you counsel to the WLCC on any actions brought against

5   them in a South Dakota federal court regarding these bonds?

6          MS. TEKEEI:  Objection.

7          THE COURT:  I will allow that.

8   A.  No.

9   Q.  Are you counsel to Burnham on any actions brought on these

10  bonds in South Dakota federal court?

11  A.  No.

12  Q.  By the way, at some point you decided to become the lawyer

13  for Burnham, correct?

14  A.  Correct.

15  Q.  Burnham Securities.  When I say Burnham in our discussions

16  I mean Burnham Securities.

17  A.  Correct.

18  Q.  And you were paid by Burnham Securities -- well, not you --

19  Dilworth Paxson was paid by Burnham Securities, right?

20  A.  Correct.

21  Q.  But you were not working for Burnham Securities as

22  "in-house counsel."  You still remained employed by Dilworth

23  Paxson.

24  A.  Correct.

25  Q.  Could you describe to the jury what in-house counsel means.

1   A.   In-house counsel is a type of representation where you

2   actually work as an employee of that entity, the corporate

3   entity, other entities.

4   Q.   And again just so the jury is clear, that was not how you

5   worked in this case.  You work for a law firm that was retained

6   by Burnham Securities to represent them.

7   A.   That's correct.

8   Q.   And you decided to work for Burnham because not only

9   because they wanted to hire you, but you thought that they

10   could give you more business in the future.

11   A.   That was one consideration, um-hum.

12   Q.   And when you went to work for Burnham, they knew you had a

13   prior relationship with WLCC, correct?

14   A.   Correct.

15   Q.   And they knew you knew Raycen Raines before?

16   A.   Correct.

17   Q.   And they knew you knew Steven Haynes before.

18   A.   Correct.

19   Q.   And they knew that you had worked on bond deals with the

20   WLCC before.

21   A.   No, I had never worked on a bond deal for the WLCC.

22   Q.   But other representation.

23   A.   Correct.

24   Q.   By the way, when you were working for Burnham in this

25   deal -- would you -- and this is a hypothetical question of

I5T7GAL4                          Anderson - Cross

 1   course -- but would you have allowed the deal to go forward

 2   that was taking advantage of the WLCC?

 3           MS. TEKEEI:  Objection.  Hypothetical.

 4           THE COURT:  Sustained.

 5   Q.  Well, let me rephrase the question then.

 6           Burnham Securities knew you had represented -- as we

 7   just went over -- WLCC before.

 8           MS. TEKEEI:  Objection.

 9           THE COURT:  Sustained.

10   Q.  Jason Galanis and Hugh Dunkerley knew that you had

11   represented the WLCC before, as far as you know?

12           MS. TEKEEI:  Objection.  Lack of knowledge.

13           THE COURT:  To your knowledge, do you know if Jason

14   Galanis and Hugh Dunkerley were aware that you represented the

15   WLCC before?

16           THE WITNESS:  No, I don't know.

17   Q.  And at some point Mr. Raines tells you that Greenberg

18   Traurig was going to represent the WLCC, correct?

19   A.  Correct.

20   Q.  And Greenberg Traurig is another one of these giant law

21   firms, correct?

22   A.  They are large, yes.

23   Q.  And they have over 2,000 lawyers in 38 different locations.

24           MS. TEKEEI:  Objection.

25           THE COURT:  Overruled.

1  A.  I don't know that, but I wouldn't be surprised if that's

2  the number.

3  Q.  And again, like Dilworth Paxson, they are equipped to

4  represent clients, corporations, in any different facet of a

5  deal.

6          MS. TEKEEI:  Objection.

7          THE COURT:  I will allow that.

8  A.  They have a very strong reputation as a full service law

9  firm.

10  Q.  And you knew that they would take -- WLCC was well

11  represented by having Greenberg Traurig as their attorneys.

12          MS. TEKEEI:  Objection.

13          THE COURT:  Just based on your understanding.

14  A.  Yeah, they have a very good reputation.

15  Q.  And as a matter of fact at that time you knew -- withdraw

16  that question.

17          Heather Thompson was a lawyer for Greenberg Traurig,

18  correct?

19  A.  Correct.

20  Q.  And at the time you knew that she had a personal

21  relationship with Raycen Raines, right?

22  A.  At what time?

23  Q.  When they became the lawyer for WLCC.

24  A.  I don't know if I knew that was her name at the time.  I

25  knew there was -- I knew there was a female attorney at

1   Greenberg.

2   Q.  That Raycen Raines had a relationship with.

3   A.  Had an interest.

4   Q.  And you later learned it was Heather Thompson.

5   A.  Correct.

6   Q.  And Heather Thompson worked on this case.

7   A.  She did.

8   Q.  Isn't it also true that you now know that Raycen Raines and

9   Heather Thompson got married.

10  A.  I heard that.

11  Q.  And so again -- and Heather Thompson is also part Native

12  American; is she not?

13  A.  That's my understanding.

14  Q.  So you felt quite comfortable with your former client being

15  represented by Greenberg Traurig.

16  A.  Yes.

17  Q.  You weren't having second thoughts about leaving them and

18  representing Burnham.

19  A.  No.

20  Q.  And you had done your due diligence on Burnham, correct?

21  You reviewed their website?

22  A.  Correct, I reviewed their website.

23  Q.  And you knew it had a historic background?

24  A.  Historic background, what type of deals they had done.

25  Q.  And that's why you wanted to work with them, because they

1   were a big entity that you thought you could get other business

2   from.

3   A.   That was one of the considerations.

4   Q.   And you also knew that Wealth Assurance was going to be

5   involved in this deal as the annuity provider, right?

6   A.   At what point?

7   Q.   At some point.

8   A.   At some point, yes.

9   Q.   And could you pinpoint the moment you knew that?  I doubt

10  you could, but if you could, that's wonderful.

11  A.   I can't pinpoint it.  There was a point I received

12  background information on the annuity, and the annuity listed

13  Wealth Assurance as the entity providing.

14  Q.   And when you saw that, you remembered the document you had

15  previously seen about Wealth Assurance, right?

16  A.   I believe that document was a response to a request for

17  information about the annuity.

18  Q.   So at that point you put the two together, right?

19  A.   Right.

20  Q.   And this was a large insurance company?

21  A.   It appeared to be.

22  Q.   And would I be correct to say that as the deal got closer

23  and closer to closing, your involvement in the deal ratcheted

24  up?

25  A.   Yes.

1    Q.  And it became much more of a daily and weekly part of your

2    work.

3    A.  Certainly weekly, um-hum, yes.

4    Q.  And your job as Burnham's attorney was really to -- one of

5    your jobs, I should say, was to coordinate the deal between all

6    of the parties, right?

7    A.  Correct.

8    Q.  And you also had the responsibility of writing certain of

9    the documents.

10   A.  Yeah, drafting, reviewing certain documents.

11   Q.  That was my next question.  And your other job besides

12   writing documents, if you didn't write them, you were reviewing

13   the documents --

14   A.  Correct.

15   Q.  -- that were important to the bonding.

16   A.  The bond documents.

17   Q.  And a lot of them have been placed into evidence by the

18   government already, right?  The trust indenture, those types of

19   documents.

20   A.  Yes.

21   Q.  I would like to discuss now the annuity contract.  Do you

22   remember the annuity contract?

23   A.  I do.

24           MR. TOUGER:  If you could bring up -- for the first

25   bonding, Exhibit 200, that's it right there.

I5T7GAL4                    Anderson - Cross

1   Q.   Now, the annuity contract you have before you, this is for
2   the first bond series, correct?
3   A.   I don't see a date on there, but gauging but the amount,
4   $25 million.
5   Q.   I was going to say, gauging by the amount, you know it's
6   the first bond series, correct?
7   A.   Correct.
8   Q.   And it says that Wealth Assurance Private Client Corp.
9   would be the annuity provider, right?
10  A.   Correct.
11  Q.   And we'll refer to that as WAPC, W-A-P-C, if you don't
12  mind.
13  A.   OK.
14  Q.   OK.  And this is the contract that controls the annuity,
15  correct?
16  A.   Correct.
17  Q.   And would I be correct in saying to your knowledge that
18  WAPC is an affiliate of WAHY?
19  A.   Yes.
20  Q.   And would you please read the line under the address of
21  home office.  It starts with nonparticipating.
22  A.   "Nonparticipating - Dividends will not be paid on the
23  contract."
24  Q.   Keep going.
25  A.   "The dollar amount of any payments and values under this

1  contract which are based on investment results of the separate

2  account are variable and not guaranteed."

3  Q.  OK, stop there.  Can we agree from that language that

4  according to this contract none of the payments to the WLCC as

5  far as the interest payments were guaranteed?

6  A.  Based upon what that says, yes.

7  Q.  Yes.  And this is the one that's signed by Hugh Dunkerley

8  and went into effect, right?

9  A.  Correct.

10 Q.  And can we go to the second page now.  Can you read the

11 first paragraph of the second page starting with "account

12 values" sort of three and a half lines down.

13 A.  If I have the right spot, "Account values under the

14 contract are based on the investment experience of a separate

15 account established under the contract."

16 Q.  Keep going.

17 A.  "These values may increase or decrease in amount.

18 Investments of funds held in the separate account may be made

19 in non-U.S. entities as well as U.S. entities.  The assets in

20 the separate account may be adversely affected by changes in

21 foreign governments, and other economic and political events,

22 which might not affect U.S. investments or entities, and by

23 fluctuations in the value of foreign currency."

24 Q.  OK.  So, basically -- and again correct me if I'm wrong --

25 the proceeds of the bond, the money that came in when the bonds

1  are purchased, were supposed to go to a separate account at

2  WAPC.

3  A.  Yes.

4  Q.  OK.  You have to say yes.

5  A.  Sorry.

6  Q.  And all that means is that WAPC had to keep a separate

7  account for this transaction as opposed to any other funds that

8  it was managing at the time, right?

9  A.  That's what it appears to say, yes.

10  Q.  And just so the jury understands what that means, it's sort

11  of, for instance, if somebody had an account at E-Trade, that

12  your money should not be mixed with the other investors who

13  have accounts at E-Trade.

14  A.  I don't know enough about E-Trade but...

15  Q.  It's a separate account.

16  A.  Correct.

17  Q.  All that means is that they shouldn't mesh the money with

18  other people's money, right?

19  A.  Correct.

20  Q.  And the funds should be invested if there are profits.

21  And, importantly, only if there were profits would the WLCC

22  then get their payments.  Right?

23  A.  Based upon the reading of that paragraph.

24  Q.  Right.  And all the parties involved -- the WLCC, Greenberg

25  Traurig, everybody that was involved with WLCC -- had access to

I5T7GAL4                        Anderson - Cross

1   this document.

2   A.  Correct.

3   Q.  And Greenberg Traurig reviewed this document.

4   A.  I don't know.

5   Q.  Well, you sent it to them.

6   A.  I sent it to them, yes.

7   Q.  You don't know if they actually did review it.

8   A.  Right.

9   Q.  But you would think that they did.

10  A.  Correct.

11  Q.  You didn't hide the document from them.

12  A.  No.

13  Q.  And all the parties also understood that the bond proceeds

14  were going to be invested in private equity, right?

15          MS. TEKEEI:  Objection.

16          THE COURT:  Sustained.

17  Q.  Did you understand that the bond proceeds were going to be

18  invested in private equities?

19  A.  Yes.

20  Q.  And do the documents that were involved in the bond deal

21  say the proceeds were going to be invested in private equity?

22  A.  I don't believe so.

23          MR. TOUGER:  Well, can we put up Government Exhibit

24  210.  And if you go to schedule A -- Exhibit A, I should say.

25  Yes.

1   Q.  Now, that's the statement of investment objectives, right?

2   A.  It is.

3   Q.  And again this document was made available to everybody in

4   the deal.

5   A.  Correct.

6   Q.  And it specifically states that the WLCC would suggest the

7   manager invest in situations that may be overlooked by others,

8   including in companies suffering from capital markets

9   dislocation, financial distress, complexity or negative market

10  sediment.  To secure the best investments, the manager is

11  instructed to take a variable approach to sourcing and

12  structuring investments and be involved in the multi-faceted

13  transactions, including investments through the bankruptcy

14  process.  The manager whenever possible will give preference to

15  investments in the financial services sector."

16          Do you see that there?

17  A.  I do.

18  Q.  And the "we" there in the beginning of that paragraph is

19  the WLCC, right?

20  A.  I don't know that.

21  Q.  Well, who else would it be?

22  A.  Well, this is an exhibit to the equity -- the --

23  Q.  You have to speak louder.

24  A.  This is an exhibit to the investor management agreement.  I

25  am not sure how they are defined.

I5T7GAL4                          Anderson - Cross

1   Q.  Whose money was being invested?

2   A.  Wakpamni's money was being invested.

3   Q.  And would you agree with me that they are value oriented

4   investors?

5   A.  That they are?

6   Q.  That they are the value oriented investors that this line

7   is talking about.

8   A.  Yes, um-hum.

9   Q.  And would you also agree with me that the idea was to find

10  companies that were selling low with a possible big upside?

11  A.  Yes.

12  Q.  That's the idea, right?

13  A.  As private equity, yes.

14  Q.  And that's private equity.

15  A.  Right.

16  Q.  Would you also agree with me that this is a risky method of

17  investment?

18  A.  I don't know that. I don't know enough about private equity

19  myself.

20  Q.  OK.

21  A.  I know it has higher returns than other types, so

22  presumably it's higher.  And earlier --

23  Q.  Presumably it's a higher risk.

24  A.  Yes.  And when you had mentioned the bond documents, I

25  thought you were referring to the trust indenture and those

1   sort of core bond documents.  I would consider these the

2   annuity documents, in response to your question.

3   Q.  And if we could go to paragraph 12.  I believe it's on

4   page -- paragraph 12 is acknowledgment of investment risk.

5   Correct?

6   A.  Yes.

7   Q.  In that paragraph the client -- who is the client?

8   A.  I believe that is Wakpamni.

9   Q.  Right, WLCC?

10  A.  WLCC, correct.

11  Q.  "The client understands that the value of investments made

12  for the account may go down as well as up and is not

13  guaranteed."  That's what it says right there in the document?

14  A.  Um-hum.

15  Q.  So again, you gave this document to Greenberg Traurig.

16  A.  Correct.

17  Q.  And, as far as you know, you have no reason to doubt that

18  they reviewed this document.

19  A.  None.

20  Q.  So basically if the private equity investments didn't

21  profit, the deal wasn't going to work, right?

22  A.  If Wealth Assurance could not satisfy the repayment

23  schedule, correct.

24          MR. TOUGER:  Could we go to Government Exhibit 201.

25  Q.  What is this document?

1    A.  This is another annuity contract.  There is no date on the

2    cover.  It's hard to tell which transaction it relates to, but

3    this is an annuity contract relating to Wakpamni Lake Community

4    Corporation.

5    Q.  Right.  And can we go to page 11 -- sorry -- paragraph 11.

6    Sorry, there is no page 11.

7           I will come back to that.  I can't find it right now.

8           Now, you also knew that some of the funds were going

9    to -- some of the funds from the bond money that came in were

10   going to purchase Valor, right?

11   A.  No.

12   Q.  You didn't know that?

13   A.  No.

14   Q.  OK.  So basically the deal, the way it worked out

15   ultimately -- August comes, the deal closes, right -- finally

16   gets to closing.

17   A.  Correct.

18   Q.  And the way it worked out is the WLCC would get $2.25

19   million right off the top.

20   A.  Correct.

21   Q.  And they were to use that to build a warehouse.

22   A.  Correct.

23   Q.  Burnham would get $250,000 as the placement agent.

24   A.  Correct.

25   Q.  And is that a normal fee within the realm of the market

1   rate for that?

2   A.  Yes.

3   Q.  And there were some incidental payments.  For instance,

4   Greenburg Traurig got $75,000.  Do you remember it, or should I

5   refresh your recollection?

6   A.  You would have to show me.  I don't know specifically what

7   they got.

8          MR. TOUGER:  Can we show him schedule B.  One second.

9   Government Exhibit 214, schedule B.

10  Q.  Does that refresh your recollection that Greenberg Traurig

11  got $75,000?

12  A.  It does.

13  Q.  And they got that for representing the WLCC.

14  A.  Correct.

15  Q.  They got their legal feels paid out of the bond money.

16  A.  Correct.

17  Q.  And Dilworth Paxson made $97,000.

18  A.  Correct.

19  Q.  And so you got your legal fees paid out of the money from

20  the bonds, right?

21  A.  Correct.

22  Q.  And Burnham got their placement agent fee, which was

23  $250,000.

24  A.  Correct.

25  Q.  And Haynes Investments got $60,000.  Do you see that?

1    A.   Correct.

2    Q.   What did Haynes do to get that money?

3    A.   That was their payment for developing, being the developer

4    on the project, for coordinating the building of the warehouse.

5    Q.   It was $60,000 to coordinate the building of the warehouse.

6    A.   Correct, to be the developer on the warehouse project.

7    Q.   It doesn't include the two and a quarter million he was

8    going to get to build the warehouse.

9    A.   I believe the $2.2 million was the actual building of the

10   warehouse itself.

11   Q.   Which he did, right?

12   A.   He did, yes, um-hum.

13   Q.   And then Russo & Russo and Slania got $6500.

14   A.   Correct.

15   Q.   And they got that because they were the trustee counsel.

16   A.   Correct.

17   Q.   That's U.S. Bank, right?

18   A.   Correct.

19   Q.   And it's the remaining funds that were left over after

20   those payments were made that were sent to WAPC to put in the

21   annuity.

22   A.   Correct.

23   Q.   And once that money got into the annuity, the bond deal

24   basically closed, right?

25   A.   That's correct.

I5T7GAL4                    Anderson - Cross

1   Q.  Everything was done as supposed to?

2   A.  At the closing date.

3   Q.  And again can we agree that in your mind there was nothing

4   illegal about what happened in this deal at that point?

5   A.  Correct.

6   Q.  And again you would not have involved yourself in any type

7   of illegal conduct.

8   A.  Correct.

9   Q.  And we also can agree though that the investment was risky.

10  A.  I don't know how to define that.

11  Q.  We can agree that everybody knew the annuity could go up or

12  the annuity could go down.

13          MS. TEKEEI:  Objection.

14          THE COURT:  Sustained.

15  Q.  Well the paperwork says the annuity could go up or the

16  annuity could go down.

17  A.  Based upon the provision you pointed out, yes.

18  Q.  Can we go to Government Exhibit 1312.  This is an e-mail

19  that you discussed on direct, correct?

20  A.  Yes.

21  Q.  And the parties to this e-mail came from John Galanis,

22  right?

23  A.  It did.

24  Q.  And it went to Jason Galanis, right?

25  A.  It did.

I5T7GAL4                          Anderson - Cross

1   Q.  You?

2   A.  Yes.

3   Q.  Steven Haynes?

4   A.  Correct.

5   Q.  And I believe you said the last e-mail was that of a man

6   named Michael Murphy.

7   A.  Correct.

8   Q.  And at this time when this e-mail is sent -- which is

9   August 4, 2014 -- you were the lawyer for Burnham, right?

10  A.  Correct.

11  Q.  Jason is obviously working on the deal for his relationship

12  in Burnham, right?

13  A.  Correct.

14  Q.  Steven Haynes is the one who is going to build the

15  warehouse, right?

16  A.  Correct.

17  Q.  And Michael Murphy is a friend of John's.

18  A.  Correct.

19  Q.  And John starts this e-mail by saying "Hear me, my chiefs."

20  right?

21  A.  Yes.

22  Q.  And if you go to the attachment to the e-mail, I believe

23  you described what is attached as marketing materials of

24  Burnham.

25  A.  Yes.

1    Q.  And this document itself was not significant at all to the

2    actual bond deal.

3    A.  No.

4    Q.  I think, as a matter of fact, you said you didn't even read

5    it.

6    A.  Correct.

7    Q.  And I believe you stated last week that it seemed to be a

8    document to be used to get some new business in the future.

9    A.  Correct.

10   Q.  And in your mind that's what John's role was, to get new

11   business for Burnham, right?

12   A.  Yes.

13   Q.  So, it wouldn't be surprising that he was on that document.

14   A.  Correct.

15   Q.  And would you agree with me that it's common in the

16   financial transaction business world that if someone recruits

17   new business for an investment bank, that they would receive a

18   commission on that deal?

19            MS. TEKEEI:  Objection.

20            THE COURT:  Sustained.

21   Q.  To your knowledge, is that a common practice?

22            MS. TEKEEI:  Objection, your Honor.

23            THE COURT:  Why don't you rephrase that question.

24   Q.  Well, you brought them many financial transactions,

25   correct?

1    A.  I have.

2    Q.  And not all of them were your idea, correct?

3    A.  Correct.

4    Q.  And in your years and years of experience on working on

5    financial transactions, is it common in your knowledge that

6    people who bring ideas, who start the idea, who genesis the

7    idea, and bring it to a financial investment bank like Burnham,

8    get a commission from that bank to bring the deal to them?

9                MS. TEKEEI:  Objection.

10               THE COURT:  Can you answer that?

11               THE WITNESS:  Generally, yes.

12               THE COURT:  OK.  So why don't you answer it generally,

13   based on your knowledge.

14   A.  Yes, in the financial industry investment banks do

15   compensate people who are helpful to them.

16   Q.  Right, that's all I asked.

17               And isn't it also true that because of John's role, in

18   the beginning of this deal you had assumed that he would

19   receive a commission from either Burnham or Jason?

20   A.  I did not.

21   Q.  Let's go back.  Were you interviewed by the government on

22   November 28, 2017?

23   A.  Yes.

24               MR. TOUGER:  May I approach the witness again, your

25   Honor?

I5T7GAL4                          Anderson - Cross

1              THE COURT:  Yes.

2    Q.  The part that's underlined.  So, can we agree that back on

3    November 28, 2017, that you told the government that you

4    assumed Yanni, John Galanis, was getting a commission from

5    Burnham or from Jason Galanis?

6    A.  I don't recall it that way.

7              (Continued on next page)

1    Q.  Again you remember it different from what the government

2    put down in their notes?

3              MS. TEKEEI:  Objection.

4              THE COURT:  Sustained.

5    BY MR. TOUGER:

6    Q.  Now, I believe you talked about on direct that there were

7    many different deals being discussed during this time period,

8    right?

9    A.  Yes.

10   Q.  There was the winery deal?  There was the fire station

11   deal?

12   A.  Yes.

13   Q.  There was I believe you said a medical clinic deal?

14   A.  Yes.

15   Q.  And there were other deals also, right?  Wasn't there a

16   life insurance deal also?

17   A.  Yes.  Propane.

18   Q.  And propane deal?

19              So many deals were being discussed, right?

20   A.  They were.

21   Q.  And for each of these deals, the problem that always came

22   down to finding people that would buy, would invest in these

23   deals that would buy the bonds for that deal?

24   A.  Among other issues.

25   Q.  Right, but that was a major issue, would people buy the

1    bonds supporting this deal?

2    A.  It was a major issue, yes.

3    Q.  And again the target market for these deals was always

4    pension funds, due to their socially responsible requirement?

5              MS. TEKEEI:  Objection.

6              THE COURT:  Do you know the answer to that based on

7    your experience in this deal?

8              THE WITNESS:  I do not.

9              THE COURT:  Then you can move on.

10   BY MR. TOUGER:

11   Q.  I am moving on to a different subject.

12             Can we also agree that you and Raines and Mr. Haines

13   to a certain extent were anxious once we got into July and

14   August to get this deal consummated?

15             MS. TEKEEI:  Objection.

16             THE COURT:  Sustained.

17   BY MR. TOUGER:

18   Q.  Were you, when it got into July and August, anxious to get

19   this deal consummated?

20   A.  I don't believe anxious is the correct word for it.  I was

21   hopeful for the project.

22   Q.  You wanted to get it done already, right?

23   A.  Sure, yes.

24   Q.  And because everything was basically done on the deal, the

25   paperwork was all written, everybody agreed to it, the problem

1   was finding buyers for the bonds, right?

2   A.   There were gaps in the documents together, and they needed

3   to be finalized.

4   Q.   You needed to find buyers, right?

5   A.   Correct.

6   Q.   Burnham needed to do their job?

7   A.   Correct.

8   Q.   Ultimately, at some point Jason Galanis told you he had

9   found buyers for the bonds?

10  A.   Correct.

11  Q.   If you can remember, and only if you can remember, do you

12  know approximately when this happened?

13  A.   I'd say August, mid-August, some part of August.

14  Q.   Sometime in August before the bonds were actually --

15  A.   Correct.

16  Q.   -- bought?

17  A.   Correct.

18  Q.   Would I be correct in saying you're not aware how the

19  buyers got selected?

20  A.   Correct.

21  Q.   That is not part of your jurisdiction in this deal, right?

22  A.   Correct.

23  Q.   Would I also be correct in saying that you had no idea of a

24  relationship between Michelle Morton and Jason Galanis other

25  than they were both working on this deal?

1   A.   Correct.

2   Q.   Jason Galanis told you that a firm named Hughes Capital

3   Management, which was run by Michelle Morton, had a few pension

4   fund clients who were going to buy the bonds?

5   A.   Correct.

6   Q.   And Jason Galanis provided you with a letter that stated

7   each of the pension funds wanted to purchase the bonds?

8   A.   Correct.

9   Q.   And that came attached to an email to you, correct?

10   A.   Correct.

11   Q.   And who received that email?

12   A.   I don't know who all the other parties were.  I received

13   it.

14   Q.   Okay.  Would you put up Government Exhibit 1268.

15   A.   Okay.

16   Q.   This is after the closing, correct?

17   A.   I don't recall the closing date offhand, but I believe this

18   is before the closing date.

19   Q.   Okay.  Now, who received this email?

20   A.   I received it and Michelle Morton received it.

21   Q.   If you go to Page 2 of that.  These are a list of all the

22   pension funds that bought the bonds, right?

23   A.   Correct.

24   Q.   Did John Galanis receive this email?

25   A.   I don't know.

1    Q.  Was he on the address to this email?

2    A.  No.

3    Q.  This letter that you got from Michelle Morton that Jason

4    Galanis showed you, did the pension fund sign that they agreed

5    that they would buy the bonds, or did Michelle Morton sign the

6    letter?

7    A.  Michelle Morton signed on their behalf.

8    Q.  On behalf of the pension funds, right?

9    A.  Correct.

10   Q.  You found that a little odd, didn't you?

11   A.  Not odd, but certainly not the usual.

12   Q.  Certainly not the usual course of events, right?

13   A.  Correct.

14   Q.  Usually the pension funds themselves would sign?  Are these

15   called big boy letters?

16   A.  Big boy or investor letter.

17   Q.  Would you describe for the jury what that is.

18   A.  Sure.  It is an letter from the investor stating they are,

19   among other things, a sophisticated investor and they're aware

20   of the risks and they know how to analyze the investments.

21   Q.  Usually in the normal course of events, the pension funds

22   themselves would sign that type of letter?

23   A.  Correct, yes.

24   Q.  And in this case, Michelle Morton signed on behalf of the

25   pension funds?

1    A.  She did.

2    Q.  And you asked Jason Galanis about that, in fact, right?

3    A.  I did.

4    Q.  And he told you that she signed because she has permission

5    to sign on their behalf?

6    A.  Correct, based upon their guidelines.

7    Q.  You believed Jason when he told you that?

8    A.  I did.

9    Q.  You didn't do any due diligence on your part to confirm

10   that statement, did you?

11   A.  No.

12   Q.  You trusted the word of Jason Galanis?

13   A.  I trusted the word of Jason Galanis, and the purpose of the

14   letter is to establish they were sophisticated parties, and by

15   the looks of the names, I was able to come to a reasonable

16   conclusion that they were.

17   Q.  Because they were pension funds?

18   A.  They were large institutions, yes.

19   Q.  By the way, do you happen to know -- if you don't, that is

20   fine -- do you happen to know the percentage of each pension

21   fund's investments into this bond deal?  Do you understand my

22   question?

23   A.  I don't.

24   Q.  Just to make it easier, if I have a million dollars and I

25   invested a million dollars -- $2 million and I invest a million

1   of it, I invested 50 percent of my assets into this deal,

2   right?

3   A.   Correct.

4   Q.   Do you happen to know each pension fund's percentage of

5   what they invested as what is in their total pension fund?

6   A.   No, I don't.

7   Q.   You didn't look into that, either?

8   A.   No.

9   Q.   Because again that wasn't your bailiwick, right?

10  A.   Correct.

11  Q.   It wasn't your job?

12  A.   Correct.

13  Q.   Now, when the deal finally gets done, right, you had either

14  written or reviewed all the documents pertaining to the bond

15  deal, right?

16  A.   Correct.

17  Q.   It was your opinion, as Burnham's counsel, that no

18  securities laws were violated in the bond deal itself?

19  A.   Correct.

20          MS. TEKEEI:  Objection.

21          THE COURT:  Sustained.

22          MS. TEKEEI:  Your Honor, we move to strike the answer.

23          THE COURT:  Let's just have a sidebar.

24          (Continued on next page)

25

I5TJGAL5                        Anderson - cross

1              (At sidebar)

2              MS. TEKEEI:  Your Honor, Mr. Touger has now asked a

3     series of questions asking for Mr. Anderson's legal opinion on

4     various issues.  He was not an expert witness.  He is not an

5     expert.  These questions are entirely improper.  We're careful

6     where we are objecting.  That is a line of questions entirely

7     improper with this witness.  If he would like to notice an

8     expert and elicit expert testimony on any of these issues --

9              MR. TOUGER:  He is a lawyer advising a client.  I can

10    ask him if he thought his client was doing something illegal or

11    legal.

12             MS. TEKEEI:  We disagree.  If he wants to argue that

13    point to the jury later, he can deal with it then.  This is not

14    the witness to be --

15             MR. TOUGER:  I am not asking him if the deal is legal.

16             Is it, in you mind, when you advise your client, that

17    the deal was legal.  It is totally two separately questions.

18             THE COURT:  Strike the answer and I want you to ask

19    that specifically.

20             MR. TOUGER:  Okay.

21             (Pause)

22             THE COURT:  Let me just see the lawyers at sidebar for

23    one more minute.  Thanks.

24             You started your cross-examination, Mr. Touger, and

25    asked a lot of questions.  You start essentially trying to lay

1     a foundation for this witness to be an expert, but in light of

2     the fact he was not listed as one, do you want me to advise the

3     jury he is not being called as an expert witness?

4              MR. TOUGER:  If they want to make him an expert, I

5     will stipulate.

6              THE COURT:  I don't think they want to.

7              MS. TEKEEI:  We dealt with this already.  He is not an

8     expert.  We don't believe he is an expert in the general sense.

9     We are not calling him as a witness in the general sense.

10             THE COURT:  Can he testify about his own understanding

11    of the deal and its legality?

12             MS. TEKEEI:  My question is what is his understanding

13    relevant to that?  It isn't what is relevant to this as he

14    testified on direct.  His legal opinion was based on the

15    assumption that other parties were carrying out their

16    obligations under the contract.

17             The legal opinion doesn't say this is not a violation

18    of the securities laws.  The legal opinion says that the WLCC

19    was duly authorized to issue these bonds, that the contracts

20    are properly executed, among other things, does not provide a

21    legal opinion as to the merits of the bond transaction, the

22    legality of the securities at issue.

23             He doesn't know, for example, what the defendants'

24    intentions were, so how can he possibly give an opinion as to

25    whether this was legal?  He cannot.  That is what they're

1    trying to get him to do.  It is improper.

2              MR. TOUGER:  One of my questions, this particular

3    question, at the time that the bond deal closed, at that point

4    everything, in your opinion, was legal according to the law as

5    you know it.  That is all.

6              If you want to give the jury a limiting instruction

7    that he is not saying, not performing your job, that is fine, I

8    have no problem with that.  I don't see why I can't bring out

9    that he, when he was a witness involved in this action, he

10   thought he was doing everything legally and proper.  That is

11   all I am bringing out.  I have no problem if you want to tell

12   the jury he is not espousing the overall legality of it.  That

13   is for you and them to decide.

14             MR. SCHWARTZ:  I would just say they're definitely

15   going to ask their witnesses if they understood they were doing

16   something illegal.  It seems to me to be their flip side to the

17   same issue.

18             MS. TEKEEI:  They're members of the conspiracy.  It is

19   a separate separate issue.  If Mr. Touger and Mr. Schwartz want

20   to ask Mr. Anderson about the legal opinion that this witness

21   drafted and what that covered, that is in evidence.  They can

22   do that.  If they're asking him the ultimate legal

23   conclusion --

24             (Multiple voices)

25             THE COURT:  One at a time.

I5TJGAL5                          Anderson - cross

1              MS. TEKEEI:  -- asking him the ultimate legal opinion

2      whether this transaction was a legal transaction, which is

3      exactly what Mr. Touger is asking, that is improper and he

4      opened on that.  He opened on that theory and it is improper to

5      ask this witness that.

6              THE COURT:  Can't he answer it based on his limited

7      knowledge?  He doesn't have all the knowledge, right?  That is

8      what your --

9              MS. MERMELSTEIN:  That's right.  Mr. Touger's

10     questions are improperly and misleadingly suggestive to the

11     jury that this witness can say this was illegal.  He can't.  If

12     he wants to -- he already said this 17 times so I really think

13     we should move on.

14             This witness said I would never advise someone to do

15     anything illegal.  He can make the argument that he didn't

16     think he was doing anything wrong, so other people could have

17     said that, too.  These continued questions are very clear

18     attempts to do what cannot be done, which is offer expert

19     opinion testimony from someone not an expert on a topic from

20     which opinion testimony would, in any event, not be

21     appropriate.

22             THE COURT:  He is based on his involvement.

23             MS. MERMELSTEIN:  That point has been made and these

24     questions are giving misleading impressions to the jury.  That

25     is improper, suggesting --

1            MR. TOUGER:  I have asked him at each step and this

2     last question is at the last step.  The bond is closed, the

3     money was sent.  At this step we can agree that according to

4     your interpretation of the securities law, nothing was illegal.

5            MS. TEKEEI:  That is completely improper.  He is

6     interpreting the securities law.

7            (Multiple voices)

8            THE COURT:  One at a time.  One at a time.

9            MS. TEKEEI:  Mr. Touger just said he would ask the

10    witness based on his interpretation of the securities laws.

11    That is what Mr. Touger said.  That is an improper question to

12    put to this witness.  If the question is based on your review

13    of these documents, did you believe that the WLCC was

14    improperly incorporated and could issue bonds, the witness can

15    probably answer that narrow question.

16           THE COURT:  I will strike the last question and answer

17    and you can ask the question.

18           MR. TOUGER:  I already asked and answered the

19    question.

20           THE COURT:  Move on.

21           MR. TOUGER:  My question, now that it is closed, just

22    the last question, when the deal is closed, in your mind, was

23    the deal legal in the way it was closed.  That is the only

24    question left.

25           I don't understand why if I can ask the beginning part

I5TJGAL5                        Anderson - cross

1   of the deal, right to issue the bonds and I also asked did

2   Burnham have the right to sell the bonds along the lines.  The

3   last question was when the bond deal closed, at that point, in

4   your mind, had anything illegal transpired?

5           THE COURT:  Yes.

6           MR. TOUGER:  You can give the limiting instruction if

7   you want.

8           THE COURT:  I don't want you to ask if anything

9   illegal transpired.  Tell me how you want to rephrase it.

10          MR. TOUGER:  At the point when the bond deal closed

11  and the money went to -- in your mind -- had everything gone

12  according to the paperwork that was outlined.

13          THE COURT:  That I will allow.

14          MS. TEKEEI:  That is fine.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  I will strike the last question and

3    answer, ladies and gentlemen.  Just disregard it and you can

4    ask the revised question, Mr. Touger.

5              MR. TOUGER:  Thank your Honor.

6    BY MR. TOUGER:

7    Q.  At the point in time when the first series of bond deal

8    closed and the money was sent to WAPC, the insurance private

9    client as annuity provider, had all the actions of the WLCC

10   Burnham and those involved gone according to the documents that

11   you had written or reviewed?

12   A.  Yes.

13   Q.  Now, at some point Greenberg Traurig writes an opinion as

14   to the bond deal, correct?

15   A.  Correct.

16   Q.  Do you remember reading that letter?

17   A.  Yes.

18   Q.  What was the gist of that letter?

19   A.  That the entity has the ability to issue bonds.

20   Q.  The entity being WLCC?

21   A.  WLCC, it had undertaken all actions necessary in order to

22   issue those bonds, that the documents that were executed were

23   authorized to be executed by the people who ultimately executed

24   them, I mean the president, secretary, treasurer, that the type

25   of project was one they could undertake.  Those were the

I5TJGAL5                          Anderson - cross

1   primary ones.

2   Q.  You issued a similar letter on behalf of Burnham, correct?

3   A.  I did.

4   Q.  Now, was the lawyer you dealt most at Greenberg Traurig up

5   until this proposing of the first series of bonds Heather

6   Thompson?

7   A.  I don't know that I can say the most.

8   Q.  You certainly interacted with her on a routine basis?

9   A.  Correct.

10  Q.  Would you agree with me that the process leading up to the

11  closing was a very transparent process, that everyone shared

12  documents with each other?

13  A.  They appeared to, yes.

14  Q.  Would you also agree with me that the reason that the WAPC

15  became the annuity provider as opposed to WLCC was because of

16  the tax benefits that WAPC could have as opposed to if WLCC was

17  the annuity provider?

18          MS. TEKEEI:  Objection.

19          THE COURT:  Sustained.

20  BY MR. TOUGER:

21  Q.  I believe you testified on direct just last week when she

22  was asking you the questions, that same question, so I will say

23  it again.  The record, Page 183.  As far as you know, the

24  reason that the WAPC became the annuity provider was there were

25  tax benefits to WLCC being the annuity provider?

I5TJGAL5                        Anderson - cross

1           MS. TEKEEI:  Objection.

2           THE COURT:  One second.

3           (Pause)

4           THE COURT:  Ms. Tekeei, look back at 183, Line 19, and

5    let me know if you have an objection.

6           MS. TEKEEI:  Thank you.

7           (Pause)

8           MS. TEKEEI:  Thank you, your Honor.  We think it is

9    fine.

10          THE COURT:  You can answer.

11          THE WITNESS:  Yes.

12          MR. TOUGER:  Thank you.

13   BY MR. TOUGER:

14   Q.  And I believe you have already stated, but just so the jury

15   is clear, you had no role in finding the investors for the

16   bonds?

17   A.  Correct.

18   Q.  And you did no due diligence on that part of the deal?

19   A.  Correct.

20   Q.  Because that was not what you needed to do to complete your

21   task?

22   A.  Correct.

23   Q.  Your role in the deal was to write or review the bond

24   documents themselves?

25   A.  Correct.

1   Q.  Would you agree with me that before the bond deal occurred,

2   that the WLCC already had -- well, withdrawn.  The WLCC had bad

3   credit already?

4            MS. TEKEEI:  Objection.

5   BY MR. TOUGER:

6   Q.  In your mind, from the information you had?

7            THE COURT:  Based on the information you had?

8            THE WITNESS:  I wouldn't know how to describe bad

9   credit or good credit.  It wasn't a AAA credit.  It wasn't San

10  Francisco or something.

11  BY MR. TOUGER:

12  Q.  Isn't it, in fact, in April 12, 2018, you describe their

13  credit as bad to the government?

14  A.  In comparison to other issuers.

15  Q.  Okay.  Can we agree that unlike you, who only had a

16  specific realm of responsibility, Jason Galanis had a much

17  broader realm of responsibility --

18            MS. TEKEEI:  Objection.

19  Q.  -- as far as you knew?

20            THE COURT:  Why don't you rephrase that.

21  BY MR. TOUGER:

22  Q.  As far as you know, Jason Galanis was involved in every

23  aspect of this deal?

24            MS. TEKEEI:  Objection.

25            THE COURT:  Sustained.

I5TJGAL5                          Anderson - cross

```
 1   BY MR. TOUGER:
 2   Q.  Was Jason Galanis involved in finding the investors for
 3   this deal?
 4   A.  That is my understanding, yes.
 5   Q.  For instance, you did not know that Jason Galanis, who was
 6   your client, really, purchased Hughes Capital?
 7          MS. TEKEEI:  Objection.
 8   Q.  He didn't know --
 9          THE COURT:  One second.  What is the basis for the
10   objection?
11          MS. TEKEEI:  It is fine, your Honor.  We withdraw the
12   objection.
13          THE COURT:  You can answer it.
14   BY MR. TOUGER:
15   Q.  Do you want me to repeat the question or do you have it?
16   A.  To clarify, my client was Burnham Securities.
17   Q.  And Jason Galanis was associated with Burnham Securities,
18   right?
19   A.  No.
20   Q.  You did not know that he had purchased Hughes Management,
21   right?
22   A.  I don't recall that.
23   Q.  By the way, you were asked on direct questions about the
24   groundbreaking ceremony in November?
25   A.  Yes.
```

1    Q.  You told us you've never been?

2    A.  Pretty close, pretty close.

3    Q.  But even though it was really close, you went?

4    A.  I did.

5    Q.  You had no thinking it was going to be 80 degrees that day?

6    A.  No.

7    Q.  Why did you go?

8    A.  Well, it was an important transaction and it was something

9    to be proud of, in my opinion, and I thought I had done a lot

10   of good and I wanted to be part of it.

11   Q.  Would you agree with me that the people at the

12   groundbreaking ceremony were very excited about this?

13   A.  They were.

14   Q.  It was a big celebration for the Wakpamni Community, wasn't

15   it?

16   A.  Yes.

17   Q.  Everyone was real happy about it?

18   A.  Yes.

19   Q.  And this was the first new building on the reservation in

20   over 30 years, right?

21   A.  I don't know.

22   Q.  So the groundbreaking in actual, the warehouse got built,

23   right?

24   A.  To my knowledge, yes.

25   Q.  This was, the WLCC had done exactly what it had been

1    contracted to do, it brought economic development to the

2    Wakpamni Community, right?

3    A.  The building got built, yes.

4    Q.  And the bond deal made it all happen, right?

5    A.  The building got built, yes, in part to the bond issue.

6    Q.  By the way, Jason Galanis and John Galanis were not the

7    only Galanises involved in this deal, right?

8    A.  Correct.

9    Q.  There was another Galanis, Jared Galanis, also involved,

10   right?

11   A.  Correct.

12   Q.  And Jared Galanis had what role?

13   A.  He was counsel to Wealth Assurance.

14   Q.  Wealth Assurance?  He was the attorney for Wealth

15   Assurance?

16   A.  Correct.

17   Q.  And you didn't find it strange or unusual that members of

18   the Galanis family were involved in this deal?

19   A.  No.

20   Q.  You didn't find it all strange or unusual that John was

21   referring deals to Jason?

22   A.  No.

23   Q.  Just like you didn't find it strange or unusual that

24   Heather Thompson had a relationship with Raycen Raines of

25   Greenberg Traurig, representing the WLCC?

1  A.  It was interesting, but not strange.

2  Q.  But not strange, right?

3        By the way, you didn't even know Michelle Morton until

4  the closing of the deal, right?

5  A.  Correct.

6  Q.  And again because that information was not necessary for

7  you?

8  A.  Correct.

9  Q.  You had a job to do, and you completed that job?

10  A.  Yes.

11  Q.  Others involved in the deal had other jobs, right?

12  A.  Correct.

13  Q.  If they were not related to your role, it was not necessary

14  for you to know about them?

15  A.  Correct.

16  Q.  Would I be correct in saying that after the bond deal

17  closed, there were still ongoing discussions about other deals?

18  A.  There were.

19  Q.  Part of the reason of that is because everyone was pretty

20  happy about how the bond deal had worked out, right?

21  A.  They were.

22  Q.  I am sure you're going to agree with this one, every bond

23  deal, tribal deal is complex, right?  Maybe I shouldn't be so

24  sure.

25  A.  Well, to a degree, yes.

1    Q.  Things were always in flux and changing is what I mean by

2    that?

3    A.  Yes, that is true.

4    Q.  It wasn't like 2 plus 2 equals 4 on Monday, and on

5    Wednesday 2 plus 2 could equal 5 in this type of deal, right?

6    A.  Correct.

7    Q.  And your level of doing due diligence was limited by your

8    abilities, right?

9    A.  By my role there, yes.

10   Q.  And the Wakpamni deal was similar to other deals that you

11   had worked on, but the annuity concept was something new,

12   right?

13   A.  The annuity concept was something new.

14   Q.  But every bond deal has some type of credit enhancement of

15   some sort, right?

16   A.  Not every, but many.

17   Q.  To pay interest, you have to make money on a bond, right?

18   A.  Correct.

19   Q.  So the lump sum has to be increased, right?

20   A.  You have to restate.  I am sorry.  I was getting confused.

21   Q.  The proceeds of the bond deal, to pay out interest, have to

22   increase in value, otherwise you can't pay interest, right?

23            MS. TEKEEI:  Objection, your Honor.

24            THE COURT:  What is the basis of your objection?

25            MS. TEKEEI:  Just generalized questioning, your Honor.

1    It goes along the lines of what we discussed earlier at the

2    sidebar.

3              THE COURT:  I will allow you to answer based on your

4    knowledge how the deal was structured.

5              THE WITNESS:  In this deal, the security was derived

6    from the warehouse and annuity, the revenue help providing

7    repay the bonds.

8    BY MR. TOUGER:

9    Q.  All the revenues you worked on, something had something to

10   produce revenue?

11   A.  Had something to produce the revenue.

12   Q.  This deal was no different than other tribal deals you had

13   worked on, that there were changes up until and including the

14   day of the closing, right?

15   A.  That is a common occurrence, yes.

16   Q.  As a matter of fact, in this deal some of the pension funds

17   wasn't liquid that day and there had to be a second closing,

18   correct?

19   A.  That's correct.

20   Q.  Would I also be correct in saying you weren't really

21   focused on the annuity investment part of the deal?

22   A.  Correct.  I am not an annuity expert.

23   Q.  Right.  That was not your role at all?

24   A.  Correct.

25   Q.  Did you at any time check to see if the annuity was meeting

1    its financial goals?

2    A.  What do you mean by, "checked"?

3    Q.  Let me put it this way.  In October of 2014, did you check

4    to see if the annuity had increased in value?

5    A.  That early on, no.

6    Q.  How about in November of 2015?

7    A.  By November 2015, yes.

8    Q.  Right, and as a matter of fact, the WLCC signed an addendum

9    to the annuity contract in November 2015, correct?

10   A.  They did.

11   Q.  In that addendum you stated they had reviewed the

12   investments made and found them to be consistent with the terms

13   negotiated and that the current market value of the securities

14   holdings for the contract are in excess of the issuer's

15   obligations set forth in the contract?

16   A.  They stated that, yes.

17   Q.  Yes.  In the summer of 2016, moving forward a little bit

18   more, the bond deals were all done by this point, right?

19   A.  Yes.

20   Q.  And the monies had gone to Wealth Assurance, WAPC?

21   A.  That was my understanding, yes.

22   Q.  And your understanding is WAPC was making investments?

23   A.  I don't really have an understanding at that time.

24   Q.  You had no understanding at that point?

25   A.  Yes.

1    Q.   Now I want to go back to the time period before the second

2    series of bonds, okay?

3    A.   Okay.

4    Q.   Can you agree with me that you have no memory today exactly

5    who called you first to say there was going to be a second

6    series of bonds?

7    A.   I do have a memory.

8    Q.   Who is the one you first got the call from?

9    A.   For the second series of bonds, I got a call from both

10   Jason Galanis and Yanni Galanis on one call.

11   Q.   One or both of them said we're going to do a second series

12   of bonds, right?

13   A.   A second series of bonds has been green lit.

14   Q.   That means?

15   A.   Green lighted, maybe.

16   Q.   Go ahead.

17   A.   Yeah.

18   Q.   And Jason Galanis said that they had additional buyers and

19   to get the documents ready, right?

20   A.   Correct.

21   Q.   And you didn't question this statement, either?

22   A.   No.

23   Q.   Again not your job?

24   A.   Correct.

25   Q.   And this telephone call came relatively soon after the

1    first bond deal had closed, right?

2    A.  Yes, within a week or two.

3    Q.  And Jason Galanis told you that there was more demand for

4    socially responsible investments, right, and there were

5    additional buyers?

6    A.  He said there was interest in a new series of bonds, yes.

7           I am not sure if he used social impact in that

8    conversation, but based upon the Wakpamni deal, there was

9    interest in buyers of buying more of those bonds.

10   Q.  Raines also decided he could find a use for that money,

11   correct?

12   A.  Yes.

13   Q.  So he was on board to do a second series also?

14   A.  Correct.

15   Q.  So from those two conversations between Raines and Jason,

16   yourself -- and I am sure you talked to Greenberg Traurig, I

17   assume?

18   A.  Yes.

19   Q.  Everybody was on board with doing a second series of bonds?

20   A.  Yes.

21   Q.  You understood from those conversations that everybody was

22   pretty happy at that point how the first series of bonds had

23   gone?

24              MS. TEKEEI:  Objection.

25              THE COURT:  Sustained.

1   BY MR. TOUGER:

2   Q.   Did you question at all doing a second series of bonds, did

3   you personally?

4   A.   No.

5   Q.   Did you understand that the second series of bonds --

6   excuse me -- were going to be Burnham customers?

7   A.   I did.

8   Q.   You became aware of the buyers before the closing

9   presumably?

10  A.   Yes.

11  Q.   And Bevan Cooney was one of the purchasers?

12  A.   Yes.

13  Q.   And it is not uncommon or unusual that an individual as

14  opposed to a corporation would buy a bond?

15  A.   No.  They're permitted to buy bonds.

16  Q.   Just like a corporation, they can buy bonds, right?

17  A.   Correct.

18  Q.   There is nothing unusual about that?

19  A.   Correct.

20  Q.   You spoke about on direct this morning about the payment of

21  a second series didn't come right away.  Do you remember that?

22  A.   I did.

23  Q.   Isn't it true at that point you worked out an addendum that

24  the payment would be delayed and would be due in a year?

25  A.   I believe it was worked out that it would be due by July

I5TJGAL5                          Anderson - cross

1    1st of 2016.

2    Q.  2016, so it is a substantial delay in the payment?

3    A.  Correct.

4    Q.  And again this document was reviewed or written by you?

5    A.  Reviewed or written, yes.

6    Q.  And was reviewed or written by Greenberg Traurig?

7    A.  Correct.

8    Q.  You would presume reviewed by members of the WLCC?

9    A.  Yes.

10             MS. TEKEEI:  Objection.

11             THE COURT:  Sustained.  So strike that last question

12   and answer, please.

13   BY MR. TOUGER:

14   Q.  And then at some point in March of 2015, there was the idea

15   to do a third series, right?

16   A.  Correct.

17   Q.  And that proposal again happened in March 2015, it there

18   was, in fact, a big lead-up to that?

19   A.  March or April.

20   Q.  Again the WLCC stated they had a need for more money,

21   right?

22   A.  They had a project, yes.

23   Q.  And you did not think that the debt that the WLCC was

24   taking on was too large, right?

25   A.  No.

1   Q.  You spoke about DTC.  Do you remember speaking about that

2   last week?

3   A.  I do.

4   Q.  Just so I know the jury might have heard it once, but just

5   quickly explain to them again what DTC is.

6   A.  DTC is a digital platform as opposed to receiving a

7   physical bond.  DTC allows you to get, receive that bond

8   electronically and then sell it electronically the way you do a

9   lot of things online.

10  Q.  Would you agree with me that in your experience, that bonds

11  with Native American tribes or corporations are usually done in

12  a private placement?

13  A.  Yes.

14  Q.  Could you explain to the jury what a private placement is.

15  A.  It means it is marketed to and sold to a select amount of

16  investors who are typically sophisticated, accredited

17  investors, banks or institutions.

18  Q.  Basically they're not put on the open market; they're

19  individuals or pension funds are approached individually to buy

20  the bonds?

21  A.  Institutions, yes.

22  Q.  And when the bond deals actually close, there is already a

23  purchaser for those bonds already in line?

24  A.  Correct.

25  Q.  The fact that the bonds weren't DTC is sort of mitigated by

 1    the fact that this was a private placement, so people already

 2    knew they were buying the bonds when they did?

 3              MS. TEKEEI:  Objection.

 4              THE COURT:  One second.

 5              (Pause)

 6              THE COURT:  Sustained.

 7    BY MR. TOUGER:

 8    Q.  Would you agree with me that, in your experience, the fact

 9    that this was a private placement lowers the necessity for DTC?

10              MS. TEKEEI:  Objection.

11              THE COURT:  Sustained.

12    Q.  By the way, the fact that bonds are not DTC doesn't make

13    them illegal?

14              MS. TEKEEI:  Objection.

15    Q.  In your experience?

16              THE COURT:  Sustained.

17    BY MR. TOUGER:

18    Q.  Have you worked on prior deals that were not DTC?

19    A.  Yes.

20    Q.  Nobody went to jail for that, right?

21              MS. TEKEEI:  Objection.

22              THE COURT:  Sustained.

23    BY MR. TOUGER:

24    Q.  By the way, you put together a CD that contained all the

25    bond going back to the first series, all the bond documents for

1   that deal, right?

2   A.  I did.

3   Q.  You sent that CD out to the relevant parties, right?

4   A.  Based upon the distribution list, yes.

5   Q.  And the distribution list that we went over before, right?

6   A.  Correct.

7   Q.  And as we noted before, John Galanis was not on that

8   distribution list?

9   A.  He was not.

10  Q.  Mr. Anderson, before today or even last Thursday when you

11  testified, you had never seen me before, right?

12  A.  No.

13  Q.  You had never spoke to me by telephone call or got an email

14  from me, right?

15  A.  I did not.

16  Q.  You had never gotten a telephone call or email or met

17  anyone representing John Galanis?

18  A.  Me?

19  Q.  Yes.

20  A.  No, I did not.

21  Q.  Before today you had never answered a question from me

22  about this case.

23  A.  I did not.

24  Q.  I would assume the answers are the same for Ms. Notari, you

25  never met her before, right?

1   A.  I have not.

2   Q.  You don't know who she is, right?

3           MR. TOUGER:  Ms. Notari, raise your hand.

4   BY MR. TOUGER:

5   Q.  You never met that woman before?

6   A.  I have not.

7   Q.  Have you ever talked to her on the phone?

8   A.  I have not.

9   Q.  Have you ever answered any questions from her?

10  A.  No.

11  Q.  Relative to this case?

12  A.  I have not.

13  Q.  Mr. Schwartz, would you raise your hand.  Ever met him

14  before?

15  A.  I have not.

16  Q.  You never met any of the those wonderful people sitting him

17  behind?

18  A.  No.

19  Q.  You never answered any questions from him before or any of

20  those people behind him?

21  A.  No.

22          THE COURT:  How much more do you have, Mr. Touger?

23          MR. TOUGER:  Two pages.

24          THE COURT:  How long will that take?

25          MR. TOUGER:  10 minutes.

1          THE COURT:  Why don't we take a break.  We're going to

2     keep it really short today because we are ending a bit early

3     and I know it has been a short day.  Let's keep it to five

4     minutes.  Use the restroom, grab a cookie and we'll meet back

5     here.  Thank you.

6          (Jury excused)

7          THE COURT:  You may step down for a few minutes.

8          (The witness left the stand)

9          THE COURT:  What do we need to resolve with respect to

10    other people's cross?

11         MR. SCHWARTZ:  Only if the government continues to

12    have objections to the pages I have identified from Exhibit

13    1344.  Otherwise, nothing from me.

14         MS. TEKEEI:  Your Honor, Mr. Schwartz has marked a

15    page, we conferred during the last recess, a page of Government

16    Exhibit 1344 he would like to introduce as evidence.  It is

17    banter between Mr. Anderson, and I can hand it up in a moment,

18    banter between Mr. Anderson and ending in --

19         MR. SCHWARTZ:  Is that the only page you're objecting

20    to?  I'll represent that is for impeachment, so that will only

21    be an issue if he contradicts himself.

22         MS. TEKEEI:  I am happy to explain to the court, but

23    it is an exchange about a female --

24         THE COURT:  Why don't I look at it while we take our

25    now four-minute break.  There is nothing else with respect to

1    this witness?

2            MR. SCHWARTZ:  That is it.

3            THE COURT:  Just run out.  We'll meet back here.  I

4    would like to just go for another hour and we have to end early

5    today.  This is the last day this week we are starting late

6    tomorrow at 11:00, but not end early, so we'll get more done.

7            MS. TEKEEI:  I amount sure Mr. Touger did not

8    intentionally do this, but he was speaking with a juror briefly

9    before we took the break.  There was some exchange there.

10   Obviously, that is not allowed.  I don't know if it was by

11   accident or in response to something.  We don't believe he

12   should be doing that.

13           THE COURT:  Were you talking to a jury about?

14           MR. TOUGER:  (Inaudible).

15           THE COURT:  Just don't interact directly with the

16   jurors.

17           MR. SCHWARTZ:  When are we ending today?

18           THE COURT:  At 4:40.

19           (Recess)

20           THE COURT:  I am going to meet the lawyers at sidebar

21   while we bring in the jury.  Go see if they're ready.

22           (Continued on next page)

23

24

25

1            (At sidebar)

2            THE COURT:  I didn't want to talk in front of the

3      witness.  How do you intend to use any of this?

4            MR. SCHWARTZ:  This is in context of the discussion,

5      we had conversations they had had been between and business lawyers

6      and clients, and the question that will get this in if it comes

7      in as impeachment is whether he said some things the exact

8      opposite of what he believed.  He doesn't believe that.  That

9      is a pretty horrible thing to say, and he said it just to go

10     along and get along.

11           MS. TEKEEI:  That is precisely the type of banter

12     excluded with respect to other emails, some of which the

13     defendants are on, for example, reference and other references

14     between the defendants that we have agreed to exclude and to

15     redact out of documents and emails.  I don't think this is an

16     example of what Mr. Schwartz is saying it is.  I am surprised

17     Mr. Touger is okay with this.

18           MR. TOUGER:  This will be edited down further.

19           MR. SCHWARTZ:  We don't need the picture.

20           MS. TEKEEI:  Without that context, I still don't

21     understand what Mr. Schwartz is intending to get out with this.

22     There may be another witness to make this point, but I don't

23     think this is --

24           MR. SCHWARTZ:  If the witness agrees with me he

25     sometimes says thing that are the exact opposite of what he

1  believes, I won't have to get through is.  If he pushes against

2  that proposition, then I think I am entitled to confront him.

3          MS. TEKEEI:  There are so many other ways to confront

4  him.  This is not --

5          MR. SCHWARTZ:  Show me some other lie that he told,

6  something he said that was not true?

7          MS. TEKEEI:  That question itself?

8          THE COURT:  You all can be seated.  Thanks.

9          MR. SCHWARTZ:  Can we have one government lawyer

10 arguing for one issue?

11         MS. MERMELSTEIN:  But there is so many of you.

12         MR. SCHWARTZ:  No.

13         THE COURT:  Let's not argue.

14         Why don't you finish your cross and I'll see you at

15 sidebar if he, in fact, says no to your question.  It is fine

16 to ask the question.  I am more troubled by the prejudice that

17 would come from some of these statements.  Let's see how it

18 goes.

19         (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2    BY MR. TOUGER:

3    Q.  Getting back to where you didn't know any of us, do you

4    remember that?

5    A.  Right.

6    Q.  On the other hand, these people sitting at this table, you

7    know them very well, right?

8    A.  I do.

9    Q.  You were interviewed by them at least a half dozen times,

10   right?

11   A.  Five or six times, yes.

12   Q.  During those interviews, some of them lasted well over an

13   hour, right?

14   A.  Yes.

15   Q.  Some of them lasted all day, right?

16   A.  A long time, yes.

17   Q.  During those interviews, they asked you literally hundreds

18   of questions?

19   A.  Correct.

20   Q.  And they showed you literally dozens and dozens of

21   documents?

22   A.  Yes.

23   Q.  And you answered all their questions to the best of your

24   abilities?

25   A.  I did.

I5TJGAL5                         Anderson - cross

1   Q.  Would I be also correct in saying that when Ms. Tekeei was

2   asking you questions, none of her questions surprised you?

3   A.  No.

4   Q.  You had gone over your answer to each and every one of

5   those questions?

6   A.  I had been asked them before, yes.

7   Q.  That is my point.

8   A.  Yes.

9   Q.  And you gave the answers that you had given to her on other

10  occasions?

11  A.  Correct.

12  Q.  Whereas, when I asked you questions, you had never given me

13  those answers because I never had asked you the question

14  before?

15  A.  Correct.

16  Q.  Would I be correct in saying that they interviewed you just

17  twice last week before you testified?  So now two weeks ago?

18  A.  Yes.

19  Q.  Would I also be correct in saying they interviewed you just

20  this past weekend?

21  A.  When?

22  Q.  Just this past weekend?

23  A.  This weekend?

24  Q.  On May 28th?

25  A.  No.

1  Q.  So you have not talked to them this weekend?

2  A.  No.

3  Q.  They interviewed you last month also at three different

4  occasions?

5  A.  Two or three.

6  Q.  And they interviewed you back in November of 2017?

7  A.  Yes.

8  Q.  During those interviews, basically you went over the whole

9  history of this transaction, right?

10  A.  I did.

11  Q.  And Ms. Mermelstein, Mr. Quigley or Ms. Tekeei were there

12  for most of those interviews, right?

13  A.  One of them, yes.

14  Q.  At least one of them was there throughout those interviews,

15  right?

16  A.  Correct.

17  Q.  You went to those meetings, right?

18  A.  I did.

19  Q.  And you brought somebody with you, right?

20  A.  Yes.

21  Q.  You brought an attorney, right?

22  A.  Yes.

23  Q.  Who represented you?

24  A.  Yes.

25  Q.  And you hired that attorney to represent you, correct?

1    A.  I retained him, yes.

2    Q.  That is what I meant.  You paid him money?

3    A.  No.

4    Q.  He did it for free?

5    A.  Yes, well, no.  My prior law firm, representatives of my

6    prior law firm.

7    Q.  Someone from Dillworth Paxson came with you?

8    A.  Yes.

9    Q.  Would I be correct in saying you have not been granted

10   immunity for any of your actions in this case?

11   A.  No.

12   Q.  Would you describe to the jury your idea of what immunity

13   is.

14           MS. TEKEEI:  Objection.

15           THE COURT:  Sustained.

16   BY MR. TOUGER:

17   Q.  You have not been granted immunity, right?

18   A.  No.

19   Q.  Would I also be correct in saying to this day the

20   prosecution has not told you point blank that you're not going

21   to get indicted for anything?

22           MS. TEKEEI:  Objection.

23           THE COURT:  I'll allow that.

24   A.  No.

25   BY MR. TOUGER:

1   Q.  But you're not really worried about being indicted, are

2   you?

3   A.  No.

4   Q.  Because, in your mind, you never did anything wrong, right?

5   A.  No.

6   Q.  You didn't commit any crimes?

7   A.  No.

8   Q.  Would I be correct in saying you worked on this deal from

9   the first day back during the Nevada convention until the last

10  day, the third tranche, the third series of bonds was done?

11  A.  Yes.

12  Q.  And you were intrinsically involved in the transaction

13  during that time?

14  A.  I believe so, yes.

15  Q.  And you wrote or reviewed every important document and some

16  unimportant documents, too, correct?

17          MS. TEKEEI:  Objection.

18          THE COURT:  Sustained.

19  BY MR. TOUGER:

20  Q.  Did you write or review the documents that pertained to

21  each bond, series of bond sales?

22          MS. TEKEEI:  Objection.  It mischaracterizes his

23  testimony.

24          MR. TOUGER:  If you want, I can go through each

25  document.  It was a shorter way of shortening this.

1          THE COURT:  Why don't you rephrase it so you're making

2    sure you're only talking about things he was involved with.

3    BY MR. TOUGER:

4    Q.  You wrote and reviewed the trust indenture on each bond

5    transfer, correct?

6    A.  Yes.

7    Q.  You wrote and reviewed the annuity contract on each bond

8    contract transfer, right?

9    A.  Reviewed.

10   Q.  I said wrote or reviewed?

11   A.  Correct.

12   Q.  You wrote or reviewed every memorandum that was signed in

13   this bond transfer, correct?

14   A.  Memorandum?

15   Q.  Yes.  The addendum, I should say to the bond transfer?

16   A.  I reviewed, yes.

17   Q.  You wrote your own opinion letter on this bond deal,

18   correct?

19   A.  Correct.

20   Q.  And you reviewed Greenberg & Traurig's --

21   A.  Yes, their opinion, yes.

22   Q.  Their opinion letter, right?

23          And there were other documents that you wrote and

24   reviewed, correct?

25   A.  Correct.

1   Q.  The documents that pertained to the actual sale of the

2   bonds, did you write or review each one of those documents for

3   each series of bonds series of bonds?

4           MS. TEKEEI:  Objection; clarification.

5           THE COURT:  Why don't you clarify that question.

6   Ladies and gentlemen, in case you're wondering, I have a rough

7   transcript here in front of me which is why I look at my screen

8   so often.  Why don't you clarify that question, please.

9           MR. TOUGER:  I think we have dealt with it enough.

10  BY MR. TOUGER:

11  Q.  You were in intrinsically involved in this deal, right?

12  A.  Yes.

13  Q.  You represented Burnham Securities?  That was your role?

14  A.  Correct.

15  Q.  And you worked closely with Jason Galanis during this deal?

16  A.  Correct.

17  Q.  You followed instructions from Jason Galanis during this

18  deal?

19  A.  Correct.

20  Q.  And you worked for Burnham Securities?

21  A.  For Burnham Securities, yes.

22  Q.  And you trusted words when it came to the sale of each

23  series from Jason Galanis?

24  A.  Say that again.

25  Q.  You trusted some statements that Jason Galanis made as the

1    deal became closer and closer?

2    A.   Correct, yes.

3    Q.   And you communicated many ideas that Jason Galanis had to

4    Greenberg Traurig?

5    A.   Yes.

6    Q.   I believe you stated that in total, your ex-firm, Dillworth

7    Paxson, received approximately $250,000 for your work?

8    A.   Correct.

9    Q.   And I assume you had people working with you?

10   A.   Correct.

11   Q.   Not just you, but other individuals at Dillworth Paxson?

12   A.   That's right.

13   Q.   All these payments that amounted up to that $250,000, for

14   instance, the $97,000 that came for the first series came out

15   of the bond proceeds?

16   A.   Say that again.

17   Q.   The payments to Dillworth Paxson, they were paid out of the

18   bond proceeds from each series of bonds, right?

19   A.   At the closing on each bond transaction, we were paid out

20   of the bond proceeds, yes.

21   Q.   You got paid for work that you actually did, correct?

22   A.   Yes.

23   Q.   You didn't fake any work, right?

24   A.   No.

25   Q.   If I asked you to provide little slips of paper that or

1    computer generated slips of paper that account for every hour

2    you worked, you could do so?

3    A.  I believe so, yes.

4    Q.  You tried to do this work as diligently as you could?

5    A.  Correct.

6    Q.  You didn't just say hey, what the hell, and phone it in, so

7    to speak?

8    A.  Correct.

9    Q.  And we can agree that in your mind, as you said before,

10   you're not afraid of being indicted?

11   A.  No.

12   Q.  You got paid for your work on the bond deal which you did

13   to the best of your abilities?

14   A.  Correct.

15   Q.  The fact that others involved in the bond deal, including

16   Jason Galanis, did something illegal doesn't mean that you did

17   anything illegal, does it?

18              MS. TEKEEI:  Objection.

19              THE COURT:  Sustained.

20   BY MR. TOUGER:

21   Q.  It doesn't mean in your mind you did anything illegal, does

22   it?

23              MS. TEKEEI:  Objection.

24              THE COURT:  Sustained.

25              MR. TOUGER:  Nothing further, your Honor.

1           THE COURT:  All right, Mr. Schwartz.

2    CROSS EXAMINATION

3    BY MR. SCHWARTZ:

4    Q.  Good afternoon.

5    A.  Good afternoon.

6    Q.  I have been silent all day.  It feels like the morning.

7           Good afternoon, Mr. Anderson.

8    A.  Good afternoon.

9    Q.  You just reviewed a lot of things with the other two

10   lawyers.  I am going to try not to cover the same ground.  If I

11   do a little bit for context, I hope you will forgive me.

12   A.  Sure.

13   Q.  We haven't met before?

14   A.  We have not, no.

15   Q.  In fact, you have not ever met Devon Archer before, have

16   you?

17   A.  I have not.

18   Q.  You testified last week that you, "communicated with"

19   Mr. Archer.  Is that right?

20   A.  Correct.

21   Q.  But you never spoke to Devon Archer in person, correct?

22   A.  Correct.

23   Q.  You never spoke to Mr. Archer on the phone, correct?

24   A.  To my recollection, no.

25   Q.  You never texted with Mr. Archer, correct?

```
 1    A.  Correct.

 2    Q.  You were never on the same email with Mr. Archer, correct?

 3    A.  I believe I received emails from him.

 4    Q.  Well, you and your former law firm, Dillworth Paxson,

 5    produces thousands of pages of documents to the government as

 6    part of their work, correct?

 7    A.  Correct.

 8    Q.  And you and your lawyers at Dillworth Paxson did a very

 9    thorough review of all of your files to make sure that the

10    government had everything that was relevant, correct?

11              MS. TEKEEI:  Objection.

12              THE COURT:  Just speak for yourself.

13    A.  To my understanding, yes.

14    BY MR. SCHWARTZ:

15    Q.  You gave your lawyers instructions to produce everything

16    that was relevant from your files, correct?

17              MS. TEKEEI:  Objection.

18              THE COURT:  Overruled.

19    A.  Correct.

20    BY MR. SCHWARTZ:

21    Q.  And you understand that all of those documents have been

22    produced to me and the other defense lawyers, correct?

23    A.  Yes.

24    Q.  Have you ever seen anywhere in those tens of thousands of

25    pages of documents any emails with you and Mr. Archer on them?
```

I5TJGAL5                    Anderson - cross

1    A.  I don't recall.

2    Q.  In all of your sessions meeting with the government to

3    prepare for your testimony, were you ever shown an email with

4    you and Mr. Archer on them?

5    A.  I recall receiving a communication, the investor letter on

6    behalf of Mr. Archer.  I don't recall how that was received.

7              MR. TOUGER:  Ask you to keep your voice up.  We can't

8    hear you over here.

9              THE WITNESS:  Sure.

10   BY MR. SCHWARTZ:

11   Q.  Did I hear you correctly, you said you recall receiving an

12   investment letter, but you don't recall how it was received?

13   A.  Correct.

14   Q.  That is what you were referring to when you testified last

15   week that you quote-unquote communicated with Mr. Archer,

16   right?

17   A.  I received the document that was signed by him, yes.

18   Q.  Other than receiving the investment letter back, you had no

19   communications of any kind with Mr. Archer, true?

20   A.  Correct.

21   Q.  So let's talk about that investment letter for a second.

22             MR. SCHWARTZ:  Mr. Jackson, can you pull up Exhibit

23   281 in evidence and publish it to the entire courtroom.  It may

24   take a second to switch over to our system.

25             (Continued on next page)

1            MR. SCHWARTZ:  281, please.  Here we go.

2    Q.  There is the investment letter you were referring to,

3    correct?

4    A.  Correct.

5            MR. TOUGER:  I don't have it.

6            THE COURT:  You don't have the screen working?  OK.

7    For the time being I'm just going to ask you if you could look.

8            MR. TOUGER:  It just popped up.

9            THE COURT:  Exhibit 281.  OK, you can proceed.  Thank

10   you.

11   BY MR. SCHWARTZ:

12   Q.  This document is Exhibit 281, this was a document that you

13   had drafted, correct?

14   A.  I had drafted a form of this document.

15   Q.  When you say a form of the document, you mean everything

16   except for filling in the names and addresses, correct?

17   A.  Probably date too.

18   Q.  Names, addresses and dates, but otherwise you drafted this,

19   correct?

20   A.  Correct.

21   Q.  And, by the way, there is nothing remotely improper about

22   an investment letter like this, is there?

23   A.  No.

24   Q.  This kind of letter is absolutely routine for securities

25   sold in private placements, right?

1    A.  It is.

2    Q.  In fact it's required for securities sold in private

3    placements, right?

4    A.  No.

5    Q.  Well, the letter may not be required, but the qualification

6    of a buyer as an accredited investor or a qualified

7    institutional buyer is required, true?

8    A.  Not necessarily.  There are a number of exemptions.  You

9    want to be able to fit in one of them.  These are the most

10   clear cut definitive.

11   Q.  So if a person or entity is going to buy securities in a

12   private placement like this, they have to fit into an exception

13   under the securities laws, right?

14   A.  Correct.

15   Q.  And this letter reflects the facts that make a buyer fit

16   into one of those exemptions, true?

17   A.  At least one of them, yes.

18   Q.  And that's the exemption for being an accredited investor

19   or qualified institutional buyer, right?

20   A.  That's correct.

21   Q.  And you have used this kind of investment letter many times

22   in your deals before this, right?

23   A.  Yes.

24   Q.  And you've used it many times since, true?

25   A.  Yes.

1  Q.  Now, this investment letter, Exhibit 281, you did not send

2  this to Devon Archer, true?

3  A.  Correct.

4  Q.  You sent this to Jason Galanis to be signed, right?

5  A.  Correct, yes.

6  Q.  And you never discussed this document with Mr. Archer,

7  right?

8  A.  No, I did not.

9  Q.  And you received the signed document back from Mr. Galanis,

10  true?

11  A.  I'm not sure about that.

12  Q.  Well, you didn't get it back directly from Mr. Archer,

13  correct?

14  A.  I'm not sure about that.  I recall receiving it back.

15          MR. SCHWARTZ:  Well, Mr. Jackson, if you could take

16  that down, and could I ask you to show only for the witness,

17  the judge and the lawyers Exhibit 4126 for identification.

18  Q.  Now, the bottom e-mail in this chain is an e-mail from you

19  to Jason Galanis, true?

20  A.  That is true.

21  Q.  This is the e-mail which you sent Jason Galanis, the

22  investor letter for Mr. Archer's signature, correct?

23  A.  Correct.

24          MR. SCHWARTZ:  I move Exhibit 4126 into evidence.

25          MS. TEKEEI:  No objection.

1              THE COURT:  It will be admitted.

2              (Defendant's Exhibit 4126 received in evidence)

3              MR. SCHWARTZ:  Can you publish that for the jury now,

4    Mr. Jackson.  So if you could blow up the bottom third of this,

5    Mr. Jackson.

6    Q.  This is an e-mail from you to Jason Galanis, and the text

7    is "Attached is the investor letter, can you get to Devon for

8    signature.  If he has any questions, tell him he's free to

9    call."

10             Did I read that right?

11   A.  That is correct, yes.

12   Q.  And you never, to be clear, had a phone call with

13   Mr. Archer, correct?

14   A.  Not that I recall.

15   Q.  Did he have your phone number, to your knowledge?

16   A.  It's on the bottom of the e-mail.  He had this e-mail

17   perhaps.

18             MR. SCHWARTZ:  Now, if you could back out of this,

19   Mr. Jackson.

20   Q.  And if you read through the rest of the chain, are you

21   familiar with the name Cliff Wolff?

22   A.  No.

23   Q.  Are you familiar with the name Sebastian Momtazi?

24   A.  No.

25   Q.  Do you see in this chain that at the very top it says

1   "Gentlemen, based on my understanding of the request, this

2   letter is executed and attached."

3              It's signed Seb.  Do you see that?

4   A.  Yes.

5   Q.  Does this refresh your recollection that you did not

6   receive the investor letter from Jason Galanis?

7   A.  No, I just don't recall who forwarded this to me -- who

8   forwarded the executed letter to me.

9   Q.  Does this refresh your recollection that you did not

10  receive it from Mr. Archer?  I apologize.

11  A.  No, not necessarily.  I received it from one of them.

12  Q.  From someone.

13  A.  Correct.

14  Q.  But you don't have in Dilworth Paxson's files the e-mail in

15  which you received it.

16  A.  We may.  I don't recall.

17  Q.  You didn't produce it to the government as part of your

18  thorough review in this case.

19  A.  We did.

20  Q.  You did.  You produced that e-mail attaching --

21  A.  No, not this one.  We produced everything that we have.

22  Q.  You did not produce an e-mail where you received the

23  investor letter, Government Exhibit 281, did you?

24  A.  I don't recall.

25  Q.  So, sitting here today you don't know whether or not you

1   have ever communicated with Mr. Archer directly at all; isn't

2   that true?

3   A.   Correct.

4   Q.   Because the only potential communication was if he e-mailed

5   that investor letter to you, correct?

6   A.   Correct.

7   Q.   And now you can't recall if he in fact did e-mail it to

8   you, correct?

9   A.   Correct.

10  Q.   And we don't have any record of how it got to you, correct?

11  A.   Correct.

12  Q.   But we can see from Defense Exhibit 4126 that everyone else

13  was handling this investor letter other than Mr. Archer,

14  correct?

15         MS. TEKEEI:   Objection, your Honor.

16         THE COURT:   Sustained.

17  Q.   All of the information you received about Mr. Archer, it

18  came from Jason and Yanni Galanis, true?

19  A.   Correct.

20  Q.   And all of the information you received about Rosemont

21  Seneca Bohai, that also came from Jason and Yanni Galanis,

22  true?

23  A.   Correct.

24  Q.   You hadn't even heard of Mr. Archer until late September

25  2014 in connection with this second bond issuance, right?

I5T7GAL6                          Anderson - Cross

1    A.  Correct.

2    Q.  And that's when Jason Galanis told you that Rosemont Seneca

3    Bohai would be the buyer for the second issuance, right?

4    A.  That's correct.

5    Q.  And it was Jason Galanis who told you that Rosemont Seneca

6    Bohai was somehow associated with Mr. Archer, right?

7    A.  Correct.

8    Q.  And that's when you obtained Government Exhibit 281, the

9    investor letter, correct?

10   A.  Could you repeat that?

11           MR. SCHWARTZ:  Mr. Jackson, could we put that back on

12   the screen.

13   A.  Yes, um-hum.

14   Q.  And go to the second page of this, please.  Would it

15   surprise you to learn that that's not Mr. Archer's signature?

16           MS. TEKEEI:  Objection.

17           THE COURT:  Sustained.

18   Q.  Do you know whether that's Mr. Archer's signature?

19   A.  No.

20           MR. SCHWARTZ:  You can take that down.

21           Now, can we have Government Exhibit 1270 in evidence

22   up.

23   Q.  Do you remember testifying about this e-mail last week?

24   A.  Yes.

25   Q.  This is how you learned that Rosemont Seneca Bohai was

1  going to be the buyer of part of the second bond issuance,

2  true?

3  A.  The bottom part, yes.

4  Q.  And Jason and Yanni Galanis told you that this buyer,

5  Rosemont Seneca Bohai --

6          MR. TOUGER:  Objection.  John Galanis is not on this

7  e-mail.

8          MR. SCHWARTZ:  I will rephrase.

9          THE COURT:  All right.

10 Q.  So you learned that Rosemont Seneca Bohai was a customer of

11 Burnham, true?

12 A.  Correct.

13 Q.  Who did you learn that from?

14 A.  I learned that in a call with Jason Galanis and Yanni

15 Galanis.

16 Q.  So that was a phone call.

17 A.  Correct.

18 Q.  And in that phone call they also told you that Rosemont

19 Seneca Bohai was attracted to the socially responsible aspect

20 of the bonds, true?

21 A.  I don't recall if they used that term then, but I believe

22 the exact -- well, not the exact -- but the line was they are

23 Burnham clients who are excited about what we're doing and want

24 to be part of this.

25 Q.  Well, you told the government in one of your interviews

I5T7GAL6                        Anderson - Cross

1   specifically that Rosemont was attracted to the socially

2   responsible aspect, didn't you?

3   A.   Yes, I believe that's an accurate statement.

4   Q.   Now, I just want to be clear on one thing.  You testified a

5   moment ago that you hadn't heard of Mr. Archer or Rosemont

6   Seneca Bohai prior to late September 2014, this time period,

7   true?

8   A.   Correct.

9   Q.   Now, that's true even though you had received documentation

10  with his name on it previously, right?

11  A.   Correct.

12  Q.   So we looked, for example, last week at Government Exhibit

13  1300 --

14          If we could have that up.  Page 3 of this document.

15          You recall Ms. Tekeei had you read right in the middle

16  of the page the paragraph beginning Devon Archer?

17  A.   Yes.

18  Q.   That's not something -- if you could blow that up,

19  Mr. Jackson --

20          You see the second paragraph up from the bottom, Devon

21  Archer is a principal?

22  A.   I do.

23  Q.   That's not something you paid attention to at the time you

24  received this document, correct?

25  A.   Correct.

1   Q.  Even though it has his name on it, correct?

2   A.  Correct.

3   Q.  And even though Ms. Tekeei had you read it, right?

4   A.  I did read it.

5   Q.  You read it last week, but you didn't read it at the time.

6   A.  Correct.

7           MR. SCHWARTZ:  You can take that down.

8           By the way, can we show just to the witness, the judge

9   and the lawyers Defense Exhibit 4907.

10  Q.  Do you recognize who that is?

11  A.  I believe that's a younger Jason Galanis.

12          MR. SCHWARTZ:  I move defense Exhibit 4907 into

13  evidence.

14          MS. TEKEEI:  No objection.

15          THE COURT:  All right.  That will be admitted.

16          (Defendant's Exhibit 4907 received in evidence)

17          MR. SCHWARTZ:  Publish that, please, Mr. Jackson.

18  Q.  Let's see who we have been talking about.  Now, again,

19  everything you know about Devon Archer comes from Jason Galanis

20  and Yanni Galanis, correct?

21  A.  Correct.

22  Q.  Incidentally, there is another Devon in these deals, right?

23  A.  There is.

24  Q.  There is a Devon Wicker?

25  A.  Correct.

I5T7GAL6                          Anderson - Cross

1    Q.  He spells his name differently?

2    A.  Yeah, I-N.

3    Q.  D-e-v-i-n, right?

4    A.  Correct.

5    Q.  And at one point early on you even confused the two Devons,

6    right?

7    A.  I did.

8    Q.  Now, you spoke directly with Devin Wicker because he was

9    associated with that firm Bonwick Capital that you talked

10   about, true?

11   A.  That's correct.

12   Q.  And you also spoke to him because at one point his firm

13   Bonwick Capital acquired the bonds that Mr. Cooney had

14   originally purchased, true?

15   A.  I wasn't aware of that.

16   Q.  In 2015 you did start working directly with Mr. Wicker,

17   correct?

18   A.  Correct.

19   Q.  And you met Devin Wicker in person, true?

20   A.  I did.

21   Q.  For example, you attended a meeting in Burnham Securities

22   Inc.'s offices in New York City with Jason Galanis and Devin

23   Wicker and a man named Andrew Godfrey and a woman named

24   Marcelle Devine, true?

25   A.  I don't recall if Marcelle was in the meeting.  She was

1     there in the building.

2     Q.   Who is Marcelle Devine?

3     A.   Some employee of Burnham.

4     Q.   And who is Andrew Godfrey?

5     A.   The same.

6     Q.   An employee of Burnham?

7     A.   Yes.

8     Q.   By the way, when you were in the Burnham offices in

9     Manhattan, you also saw Hunter Biden, true?

10    A.   I saw a Biden, presumably it was Hunter, yeah.

11    Q.   It wasn't Joe Biden?

12    A.   It wasn't Joe, no.

13    Q.   Did someone point Mr. Biden out to you?

14    A.   Someone did.  I don't recall who, but someone who was

15    there.

16    Q.   Did Jason Galanis point Mr. Biden out to you?

17    A.   I don't recall specifically who did.

18    Q.   It might have been.

19    A.   It may have been.

20    Q.   Mr. Archer was not there.

21    A.   I don't recall seeing him there, no.

22    Q.   You never met with Mr. Archer?

23    A.   No.  No.

24    Q.   Now, Mr. Touger asked you a number of questions about your

25    meetings with the government.  I don't want to go through the

1    same material, but I do want to be clear about one thing.  The

2    very first time that you met with the government, that was in

3    late November 2017, correct?

4    A.  That sounds correct.

5    Q.  And after Thanksgiving, late in the month.

6    A.  Right.

7    Q.  And you were aware at the point that you met with the

8    government that they had already brought this case, right?

9    A.  Yes.

10   Q.  That they had in fact brought this case about a year and a

11   half earlier, right?

12   A.  Correct.

13   Q.  So they first got around to interviewing you a year and a

14   half after they brought this case, true?

15   A.  It seems to be correct.

16   Q.  And even though you were the one -- you were the lawyer on

17   every single important document on the bonds, right?

18              MS. TEKEEI:  Objection.

19              THE COURT:  Sustained.

20   Q.  You were the lawyer representing Burnham Securities for

21   every single important bond document, correct?

22              MS. TEKEEI:  Objection.

23              THE COURT:  Sustained.

24   Q.  You were the lawyer representing Burnham Securities, Inc.

25   who wrote or reviewed every important WLCC bond document, true?

I5T7GAL6                        Anderson - Cross

1          MS. TEKEEI:  Objection.

2          THE COURT:  Just rephrase it.

3   Q.  You were the lawyer representing Burnham Securities, Inc.

4   who wrote or reviewed what you have described as the core bond

5   documents for all three of the WLCC bond offerings, true?

6          THE COURT:  I will allow that.

7   A.  The core, yes.

8   Q.  Thank you.  After that original November 2017 interview,

9   the next time you spoke to the government was just last month,

10  in April, true?

11  A.  That sounds correct.

12  Q.  And since then, in rehearsing your testimony, you have met,

13  as you said, five or six times, true?

14         MS. TEKEEI:  Objection.

15         THE COURT:  Sustained.

16  Q.  Since then you have met with the government five or six

17  times to prepare for your testimony, true?

18  A.  I have met with the government five or six times since

19  then, yes.

20  Q.  Just over April and May of 2018.

21  A.  I believe the first meeting was in April, yes.

22  Q.  Now, I don't want to go back over all of your many

23  qualifications, but suffice it to say you are an experienced

24  securities lawyer, right?

25         MS. TEKEEI:  Objection.

I5T7GAL6                         Anderson - Cross

1          THE COURT:  I will allow that.

2   A.  As it relates to bond issuances.

3   Q.  You've represented bond issuers.

4   A.  I have.

5   Q.  And you've represented bond placement agents?

6   A.  I have.

7   Q.  You have represented bond underwriters.

8   A.  Correct.

9   Q.  You are a member of the National Association of Bond

10  Lawyers.

11  A.  I am.

12  Q.  You are a member of the board of the Pennsylvania

13  Association of Bond Lawyers.

14  A.  I am.

15  Q.  And you have experiences, as you testified, specifically

16  with municipal and tribal bonds, true?

17  A.  Correct.

18  Q.  Over ten years of experience, right?

19  A.  Yes.

20  Q.  And you were an experienced bond lawyer when you got into

21  these deals in 2014, right?

22  A.  Yes.

23  Q.  Your prior experience with Native American bonds involve

24  bonds of similar value to the WLCC bonds, true?

25  A.  Similar value to whom?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I5T7GAL6                         Anderson - Cross

1   Q.  Face value, the amount of the issuance.

2   A.  Oh, yes, yes.

3   Q.  In other words, you had previously worked on Native

4   American issuances up to about $40 million in size?

5   A.  Depending, yes.  Some were smaller, some were around the

6   size of each of these.

7   Q.  And each of these was less than $40 million, right?

8   A.  They were.

9   Q.  The biggest was about 28?

10  A.  That sounds correct, yes.

11  Q.  Now, you testified I believe that the WLCC had been -- was

12  it the WLCC or was it the Wakpamni Lake Community that had been

13  a client of Dilworth Paxson prior to the bonds?

14  A.  WLCC, the economic development corporation.

15  Q.  The specific entity that was the issuer of the bonds here.

16  A.  That's right.

17  Q.  But not in connection with bond issuances.  In connection

18  with other work.

19  A.  Correct.

20  Q.  And were they clients of yours specifically or others at

21  Dilworth Paxson?

22  A.  Of mine.

23  Q.  Now, even though the WLCC had been personally your client

24  before, you did not represent the WLCC with respect to these

25  bonds, true?

I5T7GAL6                         Anderson - Cross

1    A.   That's correct.

2    Q.   Your client, as you've testified, was Burnham Securities

3    Inc., the placement agent, right?

4    A.   Correct.

5    Q.   Now, you testified last week that Burnham showed an

6    interest in you representing them and looking at the

7    transaction, true?

8    A.   Yes.

9    Q.   In fact, when you first got involved in the WLCC bond

10   project, Jason Galanis suggested that you should represent the

11   WLCC because of your prior relationship, right?

12   A.   I don't know.  I don't recall.

13   Q.   You don't -- you don't recall that that was Mr. Galanis'

14   suggestion?

15   A.   I don't recall if that was a suggestion or he took note

16   that I had worked with them in the past.  I don't know.

17   Q.   And you don't recall that it was your idea to represent

18   Burnham Securities, Inc.?

19   A.   I don't, no.

20   Q.   So let's take a look at Government Exhibit 1220 in

21   evidence.

22             Can you blow up the bottom e-mail, please,

23   Mr. Jackson, including the header.

24             This is an e-mail from Jason Galanis to you, correct?

25   A.   Correct.

1    Q.   In May 2014, in advance of the first offering, right?

2    A.   Correct.

3    Q.   And if you look three paragraphs down Jason writes, "We

4    understand you will be issuer counsel given your existing

5    representation."

6             Did I read that right?

7    A.   You did.

8    Q.   And your existing representation was of the WLCC, true?

9    A.   Correct.

10   Q.   And issuer in the context of this bond deal is also the

11   WLCC, right?

12   A.   Correct.

13   Q.   So what Jason Galanis was writing here was we understand

14   you will represent the WLCC, given your existing representation

15   of the WLCC, true?

16   A.   That's what he wrote, yes.

17   Q.   And if we could back out of that and see the next e-mail

18   up, what was your response?

19   A.   "Jason, upon reflecting on things, I'm determining if the

20   tribe can find special counsel and then I could represent

21   Burnham, which I think would make this go more smoothly.  Are

22   you in agreement?"

23   Q.   So, would you agree with me, Mr. Anderson, that Jason

24   Galanis originally suggested that you represent the WLCC?

25   A.   I don't know.  The part you had highlighted, first, I don't

1    know where he got the understanding I was representing

2    Wakpamni.  Early in the transaction it was sort of unresolved,

3    an unresolved matter, who was representing whom.  I hadn't

4    represented Wakpamni on any prior bond issues or anything like

5    that, so I don't know where he got that understanding.  It

6    could have been, but I just don't recall.

7    Q.  Would you agree with me that Dilworth Paxson represent

8    Burnham Securities, Inc.?

9    A.  I don't recall it that way.  Someone had brought up to me

10   the idea of representing Burnham Securities, and I believe

11   that's upon reflecting upon things, but that's how I recall it.

12   Q.  Do you recall a conversation with someone outside of your

13   law firm suggesting that you might represent Burnham?

14   A.  Yes.

15   Q.  In between the time that you received this first e-mail

16   from Jason Galanis and the time that you responded?

17   A.  Sometime around that time period people were sort of coming

18   to the conclusion that it was going to be a deal and

19   determining how all the parties fit together.

20   Q.  Now, you testified a little bit earlier today about the law

21   firm you were at at the time, Dilworth Paxson.  It was a big

22   full service law firm, right?

23   A.  Right.

24   Q.  And in May 2014 were you what is called a partner at the

25   law firm?

1    A.  Yes.

2    Q.  And as a partner of Dilworth Paxson, your compensation,

3    your pay, was based in part upon the profits of the firm, true?

4    A.  Correct.

5    Q.  And in part upon the profits that you personally generated,

6    true?

7    A.  Correct.

8    Q.  And one of your responsibilities as a partner at Dilworth

9    Paxson was to generate business, right?

10   A.  Sure.

11   Q.  Meaning find new clients or new deals to work on, right?

12   A.  That's correct.

13   Q.  That's why you were at that conference in Las Vegas; it was

14   a business development trip for you, right?

15   A.  Correct.

16   Q.  No one was paying you to be there, right?

17   A.  That's right.

18   Q.  It was client development.

19   A.  Correct.

20   Q.  And to state the obvious, bigger clients, clients with

21   bigger legal problems are better clients from a profit

22   perspective, true?

23   A.  Yes.

24   Q.  And, therefore, more valuable to you personally, right?

25   A.  Correct.

I5T7GAL6                          Anderson - Cross

1   Q.  And the reason why you, Tim Anderson, wanted to represent

2   Burnham Securities, Incorporated, rather than the WLCC, is

3   because you believed Burnham Securities was going to be the

4   more valuable client, right?

5   A.  I don't know if I agree with that.  There were a number of

6   considerations.

7   Q.  But that was one of the considerations, right?

8   A.  They appeared that they could be a good client, yes.

9   Q.  And it could be a long-term client, right?

10  A.  Could be, yes.

11  Q.  And in particular Jason Galanis seemed to be a valuable

12  contact, correct?

13  A.  Correct.

14  Q.  And he was someone who you hoped would get you business and

15  refer business to you in the future, correct?

16  A.  Via Burnham.

17  Q.  And your expectation was that Jason Galanis would refer

18  more business to you and your law firm through Burnham, true?

19  A.  Yes.

20  Q.  And in fact Jason Galanis told you about some of his plans

21  for Burnham, right?

22  A.  He did.

23  Q.  And he told you about how he was going to make it into a

24  big full service financial institution, true?

25          MS. TEKEEI:  Objection.  Hearsay.

1        MR. SCHWARTZ:  Not for the truth.

2        THE COURT:  I will allow it.

3   A.  He never really used those words, but he seemed to have an

4   interest in economic development projects, which is what I do.

5   Q.  He gave you the impression that he was going places, right?

6   A.  He gave me the impression that he was committed to economic

7   development financing projects.

8   Q.  And that would mean more work for you and your law firm.

9   A.  It could, yes.

10  Q.  And from time to time Jason Galanis would send you

11  information about how his plans were going, right?

12  A.  From time to time, yes.

13  Q.  He would send you information about deals he was working on

14  to acquire new companies under the Burnham brand, true?

15  A.  I don't know if I recall that, but I do recall receiving

16  marketing materials.

17  Q.  Well, let me back up.  From time to time Jason or Yanni

18  Galanis talked to you about other business you might do with

19  them, right?

20  A.  Of other projects, other -- yes.

21  Q.  And you testified about some of this before.  You talked

22  about a propane deal and a fire station?

23  A.  Fire station was Wakpamni's, but it was a propane deal, a

24  medical clinic.

25  Q.  And these were other deals where you were hoping that your

1    law firm would be engaged, true?

2    A.  Correct.

3    Q.  And that would be profitable for you personally, true?

4    A.  Hopefully, yes.

5    Q.  And so in your communications with John and Yanni -- excuse

6    me -- Yanni and Jason Galanis -- one of the things you were

7    doing was pushing a new business, true?

8    A.  Discussing any projects, sure.

9    Q.  And trying to make sure that it came to you, right?

10   A.  Sure, yes.

11   Q.  For example --

12           One second, your Honor.  So, at this time, your Honor,

13   I move into evidence Defense Exhibit 1344.

14           THE COURT:  Any objection?

15           MS. TEKEEI:  Your Honor, only the agreed upon excerpts

16   that we had discussed earlier, but other than that, no

17   objection.

18           THE COURT:  All right.  Consistent with our prior

19   discussion.

20           (Defendant's Exhibit 1344 received in evidence)

21           MR. SCHWARTZ:  Absolutely, your Honor.  We haven't cut

22   the PDF down yet, so I will refer to pages.

23           THE COURT:  Fine.  Just have the sections blown up.

24           MR. SCHWARTZ:  Exactly.

25           So, Mr. Jackson, you can put up Defense Exhibit 1344

1    and go directly to page 24.

2    Q.   What are we looking at here?

3              MR. TOUGER:  Before we do this, can we have a sidebar?

4              THE COURT:  Sure.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (At the side bar)

2             MR. TOUGER:  I thought we decided that we were going

3    to do this tomorrow, because I haven't yet looked at the exact

4    ones.

5             MR. SCHWARTZ:  No.

6             THE COURT:  No.

7             MR. SCHWARTZ:  We decided just that when we get to

8    that one page, if I get the answer that provokes impeachment,

9    we will come back and talk about it.

10            MR. TOUGER:  This isn't that page?

11            MR. SCHWARTZ:  This is not that page.

12            MR. TOUGER:  What page is this?

13            MR. SCHWARTZ:  He's talking about the propane deal.

14            THE COURT:  Look, I'm unlikely to allow it in, that

15   sexist banter.  I think there is another way to get it in to

16   get your point across, so I'm going to ask you to do that in

17   the first instance.  I mean, as I said, I will see how it goes

18   and I will think about it, but I will just tell you now that's

19   the way I'm leaning.

20            MR. SCHWARTZ:  That's fine.  That's not what I'm doing

21   right now.  And when we get to that point, your Honor -- even

22   if that is your ruling -- I do intend to confront him with

23   that.  I won't publish it to the jury, but I do intend to

24   confront him.

25            THE COURT:  That's fine.  Part of my problem is just

1    the vagaries of a comment of saying something totally contrary

2    to what you believe, in addition to the prejudice that may flow

3    from the sexism, it's inherent in the banter.  But why don't

4    you proceed for now.

5           MR. TOUGER:  So this one is only concerning the

6    propane deal?

7           MR. SCHWARTZ:  Yes, but we're going to get to this

8    pretty soon.

9           MS. TEKEEI:  We just want to make sure that we do not

10   believe it's appropriate for Mr. Schwartz to use an example of

11   Mr. Anderson's communications with Mr. Galanis whether by

12   question or whether by showing it to him as a way of showing

13   him an analogy to how he, his client, communicated with people

14   in business.  That's just not an appropriate question for this

15   witness.  Would don't believe he should be able to ask that

16   question at all, especially the way he has posed it.

17          THE COURT:  I will let you get the general idea out,

18   but I agree -- I agree with you in principle, but I will let

19   you ask some questions about the way he communicates and a

20   level of informality and the like, but again I think I'm going

21   to have a problem with sort of the ultimate question and

22   impeachment.

23          MR. SCHWARTZ:  Not the ultimate question but the

24   reading of those pages.

25          THE COURT:  Yeah.

1          MS. TEKEEI:  But I think it was the ultimate question,

2     your Honor, the way he has phrased it.

3          THE COURT:  I think there is another way to get out

4     without asking the question as you phrased it earlier with

5     respect to do you ever say something and you mean the exact

6     opposite.  I do think that's an improper way of questioning

7     this witness, so I'm sorry if I wasn't clear on that.

8          MR. SCHWARTZ:  Look --

9          THE COURT:  But I think you can ask about the

10    informality of banter, and I think there are other ways to get

11    at your point.

12         MR. SCHWARTZ:  It's informality, but it's also -- I

13    don't know what the exact word is.  It's more than puffery.

14    It's the placation that people who are trying to get money give

15    to people in business.  You know, he doesn't read everything,

16    and sometimes he will say that's great, and sometimes he says

17    things that are the exact opposite of what he believes, just to

18    maintain the relationship.  And making the point that that's

19    how business works is a legitimate point.

20         THE COURT:  I will tell you that -- so I will sustain

21    the objection, but I will let you ask some questions about the

22    way people do business and speak to each other.

23         MR. SCHWARTZ:  OK.

24         (Continued on next page)

25

1              (In open court)

2              MR. SCHWARTZ:  Can we get back up Defendant's Exhibit

3      1344, page 24.

4              I apologize, can you remind me the last question.

5              (Record read)

6      Q.  Thank you very much.  And so I have up on your screen

7      Defense Exhibit 1344.  Mr. Anderson, can you tell us what this

8      is?

9      A.  This is I describe it as a transcript of texts with Yanni

10     Galanis.

11     Q.  This is your texts with Yanni Galanis.

12     A.  Correct, yes.

13     Q.  From your cell phone to his cell phone, true?

14     A.  Correct.

15     Q.  And this was one of the many documents that your law firm

16     Dilworth Paxson produced as part of its thorough review of

17     every single document about this case, true?

18              MS. TEKEEI:  Objection.

19              THE COURT:  Sustained.

20     Q.  This was one of the documents that your law firm Dilworth

21     Paxson produced after its review of its files, true?

22     A.  It produced it, yes.

23     Q.  And they even went to you said we want to get your texts

24     from your cell phone, right?

25     A.  Right.

1    Q.   They produced e-mails, right?

2    A.   Right.

3    Q.   They produced drafts of deal documents, right?

4    A.   Correct.

5    Q.   It did not produce any e-mails between you and Mr. Archer,

6    true?

7    A.   I'm not sure.

8    Q.   You're not aware of any?

9    A.   I'm not aware of any.

10   Q.   About four lines down you say "That'll let us focus on

11   propane."  Right?

12   A.   Correct.

13   Q.   You're trying to turn Mr. Galanis' attention to the propane

14   deal that you want to work on, true?

15   A.   Well, the propane had already started by then, but...

16   Q.   And you wanted to advance that deal, right?

17   A.   Yes.

18   Q.   Because your law firm gets paid at closing, right?

19   A.   We do.

20   Q.   And if a deal doesn't close, you may not get paid, right?

21   A.   Correct.

22   Q.   That deal, for example, the propane deal, never closed,

23   right?

24   A.   It did not.

25   Q.   So you never got paid for it, true?

I5T7GAL6                           Anderson - Cross

1   A.  Correct.

2   Q.  So it was important for you that the deal reach completion,

3   right?

4   A.  Correct.

5   Q.  And that's why you wanted to focus on propane, right?

6   A.  Correct.

7   Q.  So let's look at page 36.  Here too you're saying I

8   represent Burnham and Bonwick on the propanes bonds, right?

9   A.  That doesn't relate to the propane bond, as I recall.

10  Q.  It says "on the propane bonds," right?

11  A.  The very first line?

12  Q.  Sorry, I'm looking at the third.

13  A.  Third, oh, yes, sorry.

14  Q.  "I represent Burnham and Bonwick on the propane bonds."Did

15  I read that right?

16  A.  You did, yes.

17  Q.  And is that true that you represented both Burnham and

18  Bonwick on the propane bonds?

19  A.  At that time, um-hum.

20  Q.  Do you get paid extra if you have two clients?

21  A.  No.

22  Q.  That's the same deal though, right?

23  A.  Correct.

24  Q.  And that was an entirely different deal from these WLCC

25  bonds, right?

1    A.  It was.

2    Q.  Now, you were also talking with Mr. Galanis about other

3    potential bond issuances, right?

4    A.  There was at least one other one, yes.

5    Q.  So let's look at page 28.  If you look at the second line

6    down, second bubble down, you say "I'm waiting on an update on

7    matters from LSH.  Rating meeting is the 19th.  Am boarding

8    now.  Will call tomorrow and text what I know tonight."  Did I

9    read that right?

10   A.  You did.

11   Q.  When you say "rating meeting is the 19th," you're referring

12   to a meeting you were going to have with Moody's Investors

13   Services, right?

14   A.  Correct.

15   Q.  And that's one of the rating agencies, true?

16   A.  Correct.

17   Q.  Rating agencies can -- but don't have to -- review

18   securities, right?

19   A.  Correct.

20   Q.  And if they're asked to review a security, they assign a

21   risk rating, true?

22   A.  Right.

23   Q.  Can be triple A?

24   A.  Yeah, depending on the rating agency.

25   Q.  Triple A is the best, right?

1    A.  Well for at least one of the rating agencies, yes.  One may

2    be A plus.  I don't know.

3    Q.  There are a few different services; they don't use exactly

4    the same scale, but it's like school, A is the best, right?

5    A.  Pardon?

6    Q.  It's like school, A is the best, right?

7    A.  A is the best, some version of A.

8    Q.  And on the next page, page 29, you say -- I'm looking at

9    the bottom third --

10            If you could blow that up, Mr. Jackson --

11            So Mr. Galanis asks you, "All go well?"

12            And your response is, "We think so.  Likely not

13   investment grade but hoping for the b's.  Key is to get them to

14   turn it around so we can close this year."  Right?

15   A.  Correct.

16   Q.  And a B is also a rating for the bond, right?

17   A.  Correct.

18   Q.  And you were focused on wanting to close this deal before

19   the end of the year in part so your law firm would get paid,

20   true?

21   A.  In part probably, yes.

22            THE COURT:  Mr. Schwartz, is this a good time to stop?

23            MR. SCHWARTZ:  This would be an excellent time, your

24   Honor.  Thank you.

25            THE COURT:  All right.  So, ladies and gentlemen,

I5T7GAL6                         Anderson - Cross

1    tomorrow we're starting at 11, so please get here a little

2    early, and we will do what we did today and take a shorter

3    lunch.  Just remember don't discuss the case and keep an open

4    mind.  Thank you.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              MR. TOUGER:  May I just have one moment of the court's

3      time.

4              THE COURT:  One moment.

5              MR. TOUGER:  It has nothing to do with the trial.

6      Going back to Mr. Galanis's situation this morning that we were

7      discussing, when he went to the emergency room they said he

8      needed to follow up with spinal testing.  I know we're off in

9      that 13th or 14th area.  I was wondering if -- I will alert

10     legal -- but if the government could do what they did before,

11     could also talk to legal about scheduling that during that time

12     period so we don't lose any trial time.

13             THE COURT:  If they can assist in the coordination

14     with the facility, that would be great.

15             MR. SCHWARTZ:  We have something that we can raise at

16     side bar.

17             THE COURT:  I just have to go.  On the record or off

18     the record?

19             MR. SCHWARTZ:  It could be off the record.

20             (Discussion held off the record)

21             (Trial adjourned to May 30, 2018 at 11 a.m.)

22

23

24

25

464

INDEX OF EXAMINATION

Examination of:                                    Page

TIMOTHY ANDERSON

Direct The Court . . . . . . . . . . . . . . .269.

Cross By Mr. Touger  . . . . . . . . . . . . . 284

Cross By Mr. Schwartz . . . . . . . . . . . . 427

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1334, 1336, 1338, 1346, 766 and 777  . . . . 283

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 4126   . . . . . . . . . . . . . . . . . . 433

 4907   . . . . . . . . . . . . . . . . . . 439

 1344   . . . . . . . . . . . . . . . . . . 452