I5V7GAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          16 Cr. 371 (RA)

JOHN GALANIS, et al.,

                    Defendants.

------------------------------x

                                       New York, N.Y.
                                       May 31, 2018
                                       9:30 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                       District Judge


                         APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY:  BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
         Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
     LAURA HARRIS

I5V7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              – and –
     O'NEILL and HASSEN
5          Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:   Kendall Jackson, Paralegal
                     Ellie Sheinwald, Paralegal
9                    Eric Wissman, Paralegal
                     Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5V7GAL1

1           (Trial resumed; jury not present)

2           THE COURT:  So I want to -- we will talk about Smith's

3     testimony, and we will talk about the ADV evidence now, and

4     then I just received a letter from Mr. Archer regarding

5     Government Exhibit 1286.  Are you still intending to admit

6     that?

7           MS. MERMELSTEIN:  Yes, your Honor.  As we told

8     Mr. Schwartz, we are prepared to redact the language that

9     refers to the fact that money is coming in from Ballybunnion --

10    which was another fraud in which these guys were all

11    involved -- to the RSTP Capital account, so that it's not

12    suggesting the fact of Mr. Archer's involvement in that.  But

13    the relevance of the creation of the account, and who is

14    creating the account, is evidence we need, so we're not

15    prepared to get rid of the exhibit.

16          THE COURT:  OK.

17          MR. SCHWARTZ:  I don't want to get ahead of it, but I

18    appreciate redacting the one line, but the whole exhibit is

19    irrelevant.  These entities don't have anything to do with

20    anything, and the proffer that Ms. Mermelstein gave me this

21    morning about what they say the relevance is doesn't make

22    sense.  I mean RSTP Capital, MBloom, these are not entities

23    that have anything to do with the charged conduct?

24          MS. MERMELSTEIN:  So, I disagree with that factual

25    assertion, obviously.  It's complicated, but I will give it a

I5V7GAL1

1    go to explain it.

2           Obviously -- so RSTP Partners is a Rosemont Seneca

3    related entity that is Mr. Archer's.  As is evidenced in this

4    e-mail, Dunkerley was involved in opening a bank account for

5    RSTP Capital, named obviously to sound like RSTP Partners.  Mr.

6    Archer was aware that that was true.  He is on the e-mail, so

7    it's clear, right, that he knows that this is being done.

8           The existence of the RSTP Capital account and the

9    money-flow through it we have marked as an exhibit, and it's in

10   a stipulation as a bank record, a statement from RSTP Capital

11   account.  The significance is the following:  These defendants

12   have asserted that they received nothing of value in connection

13   with their participation in the fraud and that in fact they

14   lost money.  That's not true, in the government's view, and one

15   of the reasons it's not true, in the government's view, is that

16   Jason Galanis arranged for Mr. Archer to receive $19 million

17   worth of Code Rebel shares.

18          As your Honor knows, bond fraud money was used to buy

19   the Rebel entity, and so it's all part and parcel of the story

20   here.  The way that was done is that RSTP Partners -- sorry,

21   Rosemont Seneca Technology Partners entered into a convertible

22   note with Code Rebel before the IPO, a $500,000 note.  That

23   agreement was between RSTP, not RSTP Capital.  However, the

24   money that went to Code Rebel to pay for the note came from

25   RSTP Capital -- which is this account that Hugh Dunkerley

I5V7GAL1

created -- and it wasn't Mr. Archer's money, and so it's

significant because he didn't pay for that convertible note,

but when the shares are converted at the time of the IPO, the

shares don't go to RSTP Capital and they don't go to RSTP, they

go to Rosemont Seneca Bohai, the same account through which the

Wakpamni bonds flowed, and they're worth after the pump $19

million.  We're not going to elicit the pump, obviously, but

they become worth $19 million.

        So, the notion that in the government's view Jason

Galanis was rewarding his coconspirators for their involvement

in this broad scheme, that's obviously very important evidence

in a trial where the defendants have alleged that they didn't

get anything and in fact lost money.  It's necessary to prove

that Mr. Archer -- it was not Mr. Archer's money that paid for

that note, but that he knew that this was all being done on his

behalf, and this e-mail establishes that.

        I understand Mr. Schwartz's point with respect to the

suggestion that he also was involved in and knew about the

Ballybunnion fraud.  That wasn't noticed as 404(b), and we're

not intending to elicit it with respect to Mr. Archer, but the

fact that the account was opened and who opened it is relevant

to the story, and the fact that that was done before the

timeframe charged in the conspiracy I don't think is relevant.

        MR. SCHWARTZ:  There is a lot wrong with what was just

said.  Starting with just looking at this exhibit, this is an

I5V7GAL1

exhibit dated February 10, 2014, the relevance of which the

government says is somehow because Mr. Archer was copied on

this he therefore had knowledge that there was going to be an

RSTP Capital account created, which leads into these other

things that Ms. Mermelstein talks about.

Now, to be clear, the Code Rebel IPO is more than a

year later, it's May 2015.  So just on its face the connection

between this document and the Code Rebel IPO is very, very

attenuated.  But, more importantly, the transaction that

Ms. Mermelstein just described did not happen.  There was never

a transaction in which RSTP Capital -- the Dunkerley account --

or Rosemont Seneca Technology Partners -- the legitimate

entity -- invested in any way in Code Rebel.  There were

discussions -- not by Mr. Archer but by others -- about a

potential investment that did not happen.  Rosemont Seneca

Technology Partners backed out and decided to do a different

deal with Goldman Sachs instead.

Later Rosemont Seneca Bohai paid its own money --

having nothing to do with RSTP Capital -- for shares of Code

Rebel.  So, unlike every other person except for Mr. Cooney who

acquired Code Rebel shares, Mr. Archer through Rosemont Seneca

Bohai paid for his shares.  That is Government Exhibit 305 at

page 40.  That's a Rosemont Seneca Bohai bank account showing

that Rosemont Seneca Bohai made the transfer to Signature Bank,

who was the escrow agent for the Code Rebel IPO.

I5V7GAL1

1          There was never, ever a transaction between RSTP

2     Capital or Rosemont Seneca Technology Partners and Code Rebel.

3     And the suggestion that this document from more than a year

4     earlier somehow proves up an abortive attempt by Jason Galanis

5     to reward Mr. Archer with Code Rebel shares that he didn't know

6     about, that never ever happened, is crazy to me, especially

7     when the argument that I made in opening was that Mr. Archer

8     didn't take a penny of the Wakpamni bond money.  And none of

9     this is Wakpamni bond money, even on the government's theory,

10    so this has nothing to do with anything.

11         MS. MERMELSTEIN:  We can preview the government's case

12    in as much detail as necessary.  That's wrong.  It is true that

13    Mr. Archer bought Code Rebel shares at the time of the IPO.

14    Those are shares that went to Burnham.  That's not what we're

15    talking about.  There is marked as a government exhibit -- I'm

16    just trying to pull it up, your Honor, I apologize --

17    Government Exhibit I believe it's 1245 are documents from the

18    transfer agent directing that the -- first of all, I should say

19    we have the convertible note that Mr. Archer signs and sends

20    in.  That's marked as an exhibit.  Second, we have the transfer

21    agent records where there is a direction saying -- there are

22    three convertible notes in existence at the time of the IPO:

23    Ralph Berger -- that's Jason Galanis' father-in-law --

24    Francisco Martin, who is going to testify at this trial, and

25    Rosemont Seneca Technology Partners.  The Rosemont Seneca

I5V7GAL1

Technology Partners shares are converted at the time, and the

transfer agent has records saying per this convertible note

issue the shares; and those shares show up in Rosemont Seneca

Bohai's account.  Those are not the shares that relate to the

IPO purchase where Mr. Archer puts his money.

　　　　So it's hard to -- the factual fight is for the jury

obviously, but what the government has proffered happened is

what happened, and there is clearly evidence of that.  And if

Mr. Archer wants to argue that he didn't really enter into that

transaction, he can do so, but I think the evidence is

relatively clear.

　　　　MR. SCHWARTZ:  Well, look, given that I got the

proffer this morning, I'm not prepared to go point for point,

other than to say what I said before, which is that the

transaction didn't happen.

　　　　More fundamentally, your Honor excluded the Code Rebel

evidence for a reason, and that was because it was a frollick

and detour.  Your Honor held very clearly in response to a

motion to preclude the Code Rebel evidence that it was

admissible solely for one purpose, and that was to show that

bond proceeds went to Code Rebel and went right back out from

Code Rebel to pay the coupon on the bond.  This is far, far

beyond that.

　　　　As Ms. Mermelstein knows, I objected to each and every

one of the Code Rebel documents that they marked.  She said,

I5V7GAL1

1   well, we're only going to use them consistent with the judge's

2   ruling, and I said, OK, if that's what you're going to do, I'm

3   not going to fight you on the thousands of pages of stuff.  But

4   they are now going far, far beyond your Honor's ruling and what

5   they promised to do, let alone the facts.  They're trying to

6   introduce entities and transactions that really have nothing to

7   do with this case.

8           MS. NOTARI:  Your Honor, Mr. Cooney is included on

9   Government Exhibit 1286, and I haven't had a chance to read.

10          THE COURT:  So, why don't you read that, and I will

11  hear anything you'd like to say.

12          In terms of timing, my understanding is that Dunkerley

13  is next, correct?

14          MS. MERMELSTEIN:  Ms. Driever is next.  She is pretty

15  short from the government's perspective, I think less than a

16  half hour.  Mr. Schwartz indicated to me he thought his

17  cross-examination would be very lengthy, so I don't know where

18  that puts us timing wise, but I think we can probably do this

19  at lunch.

20          THE COURT:  All right.  So I will give you time to

21  review that.

22          Just a couple of questions about the Smith issue and

23  the ADV issue.  Just so I have a full understanding, what, if

24  anything, had to be communicated or discussed with the pension

25  fund before Atlantic made investments on its behalf?

I5V7GAL1

1              MS. MERMELSTEIN:  So, your Honor, the Atlantic -- the

2     account was discretionary, so investments that were within the

3     parameters didn't have to be disclosed in advance.  This one

4     wasn't for a number of reasons, and so it could only be made

5     following --

6              THE COURT:  And the number of reasons were?

7              MS. MERMELSTEIN:  It exceeded the percentage

8     allocation, so there is a threshold -- you know, there is a

9     maximum allocation of any one security, and it exceeded that.

10    Also any conflicts of interest would have to be disclosed.

11    Frankly, that's true without respect to whether or not it's

12    discretionary; conflicts always have to be disclosed prior to

13    the investment.  And I think those are the two principal --

14             MR. TOUGER:  Just to be clear, Ms. Mermelstein is

15    absolutely correct that it's a discretionary account, and,

16    furthermore, part of the PPM says not only is it discretionary

17    but the investment manager can at its own decision making

18    extend beyond what is allowed in the PPM if it feels it's

19    necessary.

20             So, while I agree the conflict of interest obviously

21    has to be disclosed in any deal, whether it's within the

22    parameters or not, the idea that Ms. Morton could make the deal

23    is allowed in the PMM.  The conflicts of interest is a

24    different animal, obviously.

25             MS. MERMELSTEIN:  I am sorry.  So, in addition to the

I5V7GAL1

conflict issue, which would have to be disclosed in any event,

the percentage, Mr. Smith is certainly going to say that this

investment did not fit into any of the prescribed sleeves, so

each investment manager in the sleeve could invest only in the

kind of specified category, and this does not fit; it's outside

of the contemplated nature of investments.  So, Mr. Smith is

going to say in his view all of that needed to be told if this

was going to be made; it would have to have been approved in

advance.

THE COURT:  So just to defense counsel, put aside the

hearsay arguments that you've made, but as to relevance, isn't

Mr. Smith's testimony probative as to the materiality of the

omission?

MR. SCHWARTZ:  I think it's fair for them to ask, you

know, would you have wanted to know the terms of the WLCC bond

purchase before it was made.  That's totally fair.  Was that

important to you?  That's fair.

MR. TOUGER:  Your Honor, as far as the idea that the

only discretion is within the limited sleeves, if you look at

page 161 of the PPM, there is --

MS. MERMELSTEIN:  Sorry to interrupt, but this seems

like a factual issue.  If there is a dispute about sort of what

the documents mean, that's fine, but it doesn't seem to go to

the admissibility of the testimony.

MR. TOUGER:  All I'm saying, your Honor --

I5V7GAL1

1            THE COURT:  No, I was asking because there was an

2     argument as to relevance anyway.

3            MS. MERMELSTEIN:  Of course.

4            THE COURT:  So I wanted to have an understanding.

5     Obviously the conflict of interest needed to be disclosed, but

6     what he felt like he was entitled to know and why that's

7     relevant.

8            MR. TOUGER:  Obviously, in the PPM there are

9     designated types of investments that should be made, that's

10    clear; and obviously in the PPM it says the investment

11    manager -- which is Michelle Morton -- has discretion.  What it

12    continues to say at the end of the document is that if

13    opportunities arise, the investment manager has the ability to

14    go outside those parameters.  That doesn't include obviously

15    conflict of interest.  I'm not arguing that.

16            The only thing --

17            Now, what could certainly happen is once they make

18    that decision, Mr. Smith on behalf of OSERS could argue, could

19    say I don't want that investment, you know, sell it, but there

20    is no doubt that Michelle Morton had the right, according to

21    the PPM, to make the investment if there weren't the conflict

22    of interest.

23            THE COURT:  If there were no conflicts of interest.

24            MR. TOUGER:  Yes.

25            THE COURT:  In the stipulation you all are working on

I5V7GAL1

1    with respect to Michelle Morton's plea, what is it going to say

2    with respect to what she admitted to doing?

3          MR. SCHWARTZ:  Just the bare legal labels of the

4    counts.

5          MR. QUIGLEY:  The date of the plea and the counts of

6    conviction, not anything about what she said.  We think that

7    would be inappropriate, anything she said in her allocution.

8    It's the bare fact that she pled on X date, she pled to these

9    charges.

10          THE COURT:  Now, with respect to the ADV evidence,

11    what role does it play -- this is a question for the

12    government -- with respect to the conspiracy alleged in Count

13    One?  And I'm looking in particular at paragraph 4 of the third

14    superseding indictment as opposed to paragraph 5, so, I'm

15    focused on the language in Count Four, and then it goes to

16    Count Five.

17          Count Four has all the defendants mentioned, and then

18    Count Five focuses on Gary Hirst and Michelle Morton in a

19    conspiracy to defraud certain of their clients of the

20    investment advisors by gaining ownership and control without

21    disclosing material facts.

22          MR. QUIGLEY:  That's all part and parcel of the -- I

23    realize it says Gary Hirst and Michelle Morton in that

24    paragraph, but that's all part and parcel of the securities

25    fraud conspiracy.

I5V7GAL1

1              I mean if you look at the -- that's how the conspiracy

2      was carried out.  It's the acts of the trial defendants'

3      coconspirators.  And I think in terms of -- well --

4              THE COURT:  Is there anything else anyone wants to

5      say?  We're holding off on 1286 for now.  But on ADV or Smith?

6              MS. NOTARI:  Your Honor, I just want it clear it's

7      very clear in the 3500 material of Michael Smith that he says

8      in particular that on December 31, 2015 he learned that the

9      Wakpamni bonds were fraudulent, at that point Smith found out

10     the Wakpamni bonds were fraudulent when legal proceedings

11     began, and he repeatedly talks about that, and Ms. Mermelstein

12     talked about the garbage bonds yesterday, so I just want to

13     make sure that he is not going to testify about that.

14             MS. TEKEEI:  We don't intend to ask any questions that

15     would elicit that statement from Mr. Smith, if that's what Ms.

16     Notari is talking about.  I'm not quite sure what Ms. Notari is

17     asking.  I'm happy to speak to her about it.

18             MS. NOTARI:  I think he should be admonished that he

19     shouldn't say things like they're fraudulent.  I am afraid he

20     is going to start talking about fraudulent bonds, and that's

21     obviously inappropriate testimony and it would prejudice the

22     case for the jury to hear that.

23             MS. TEKEEI:  I mean we don't intend to ask him any

24     questions to which a response might be these bonds were

25     fraudulent, full stop.  If defense counsel on cross-examination

I5V7GAL1

1    are asking him questions, I can't control what he would say in

2    response to their questions if they're asking him about his

3    understanding of the bonds, if they're asking him about his

4    understanding of the relationships between the parties, you

5    know, what steps were taken after he learned about the

6    disclosures.  He is like any other witness, your Honor.

7          MS. NOTARI:  But it seems like with Mr. Anderson he

8    was told in his preparation what was appropriate for him to

9    testify about, and I'm just worried that that same line of

10   questioning was not approached with Mr. Smith.

11         THE COURT:  Anything else, Mr. Schwartz?

12         MR. SCHWARTZ:  Yes, just two quick points.  One is I

13   don't know if your Honor saw it, the government put in a letter

14   this morning responding on the confrontation clause issue.  I

15   think it should be obvious why their argument is sort of a

16   misjoinder, but the government says there is no confrontation

17   clause issue, because, if there were, then things like, you

18   know, recorded statements on a wire would raise confrontation

19   clause issues.  The reason why this is totally different than

20   that is those are coconspirator statements.

21         The government here has -- although they advanced that

22   argument yesterday -- abandoned the argument that Michelle

23   Morton's statement to Mr. Smith was a coconspirator statement;

24   it was a confession.

25         A coconspirator statement raises totally different

I5V7GAL1

1    issues for hearsay and Sixth Amendment purposes.  They're not

2    advancing any longer that argument, and so the cases that they

3    cite are irrelevant, and the cases that we cite are the

4    controlling ones, so that's very substantial.  And if your

5    Honor has any other questions, I'm happy to talk about that

6    more, but I think that's crystal clear.

7         The other very small issue is obviously we all agree

8    that there is appropriate questioning that can be put to this

9    witness on this issue.  I suggested some of it in my letter.

10        THE COURT:  I saw some of it, and in my view the

11   question is are there a few additional questions that can be a

12   added?  I do want to be very careful with this witness, but go

13   ahead.

14        MR. SCHWARTZ:  I think that's fair.  I am sure there

15   are lots of additional questions that could be added.  The one

16   marker I want to put down is he should not be asked -- no

17   witness should be asked about conflicts of interest.  That

18   calls for a legal conclusion.  Questions could be asked of this

19   witness or other witnesses about the facts.  Would you have

20   wanted to know who the placement agent was?  Who the annuity

21   provider was?  Who the issuer was?  Things like that that will

22   give the government a predicate to make the argument.

23        THE COURT:  The problem there is the more factual

24   questions you ask of him, the more risk I would think that

25   there is that he can say more about what Michelle Morton told

I5V7GAL1

1    him.  And if the notion is that the reason this is -- I mean

2    from my perspective I'm really looking at it as how do you tell

3    the story, why did he do what he did next, why did he view this

4    as material, and what facts can you get out that go to that, to

5    materiality.

6             MR. SCHWARTZ:  I agree with that, and I will let

7    Mr. Touger talk.  My point is simply I know they can do this

8    through leading -- I wouldn't object to leading -- it's just

9    the phrase "conflicts of interest" shouldn't come up because

10   that's a legal phrase.

11            MR. TOUGER:  Your Honor, I don't think -- I don't plan

12   to cross-examine at all about this conversation whatsoever, as

13   long as it goes in as we hope it will go in.

14            But I also, there is a part of the PPM where the OSERS

15   waives a lot of conflict of interest arguments, that they allow

16   the investment advisors -- if you look -- it's in there, you

17   can look at it; you don't have to look at that face.

18            THE COURT:  Yeah, let's not get personal, OK?

19   Seriously.

20            MR. TOUGER:  OK.  If the PPM states if the investment

21   manager can have interest in some of the products that they're

22   selling, that some of the junior -- you know, the sleeve people

23   can have interest in the products they're selling.  So, there

24   is a lot of talk about what conflicts of interest are allowed.

25            So, once we get into this idea of conflict of

I5V7GAL1

interest, that brings up that whole paragraph that's in the

PPM.  And I'm not sure whether the conflict of interest that

was discussed in that telephone call actually fits into that

definition or not.  That could be disputable, I'm sure.  But

the point is I don't think, as you say, it advances the story

at all.  It's a legal conclusion what conflict of interests are

allowed in this PPM and what conflict of interests are not

allowed.

            So, the idea, as the court just said, is what happened

and how does it move the story along.

            What the government I think wants out of this -- what

is legal for the government to get out of this, what is allowed

by the rules of evidence, is that a phone call was made, Mr.

Smith learned some information and decided that he didn't want

the bonds after that phone call.  And I think that's the kind

of questioning that Mr. Schwartz writes in his letter that

should be allowed.

            THE COURT:  But the problem is if all you allow in is

just that there was a phone call and that they didn't want them

anymore after the phone call, I don't know that that makes

clear what the material omission was.

            MR. TOUGER:  Well, he could say -- he decided after

the -- because I was wrong yesterday, and the court was right,

he doesn't make the decision instantaneously.  He makes the

decision shortly after that phone call -- I think it's days

I5V7GAL1

1    after -- the point, your Honor, is all he can say is I found

2    out some facts about the bonds and I decided that I didn't want

3    the bonds.  What he found out is not important.

4         It's the same way that when you're doing an

5    identification hearing, the police officer is not allowed to

6    say what the description was of the witness.  He went and he

7    made an arrest based on that testimony.  He learned information

8    and he sold the bonds.  It's very similar, your Honor.  What

9    the facts are is unimportant.

10        THE COURT:  So let me tell you generally what my

11   thinking is, and then why don't we try to narrow it down or

12   address how to proceed.

13        So I do view the statement as relevant.  I think I've

14   made that clear.  A key allegation in the indictment is

15   defendants failed to disclose material facts, including

16   conflicts of interests, in connection with the purchase of

17   these bonds and, therefore, Mr. Smith's testimony that he would

18   not have approved of the transaction is probative of the

19   materiality of that omission.

20        But I remain of the view that I think I expressed

21   yesterday that this statement attributed to Ms. Morton cannot

22   qualify as a coconspirator statement because it wasn't made in

23   furtherance of the conspiracy.  And I don't see any other

24   hearsay exception that would apply.  It can be admitted for the

25   nonhearsay purpose of showing its effect on Mr. Smith and the

I5V7GAL1

1    role it played in his decision to ask that the bonds be removed

2    from OSERS's account.

3            So, I won't allow Mr. Smith to provide a detailed

4    description of Ms. Morton's statements; I think that would be

5    inappropriate.  What I'm trying to got at, and what I think

6    would be appropriate, is if he is permitted to testify in very

7    general terms about what it is that was the material omission.

8            So, I had been thinking about it -- and I think,

9    Mr. Schwartz, this is the first time you raised the concern

10   with respect to the conflict of interest term and if that's a

11   legal term.  My inclination coming in this morning was to say

12   he can testify generally that Ms. Morton informed him that

13   there were undisclosed conflicts of interest in the

14   transaction.  But I'm happy to talk further about how that

15   concept can come out if there is a problem with the term

16   conflict of interest, and I'm happy to address that.

17           I will just say then generally we have to talk about

18   if a limiting instruction would be appropriate.  If it was

19   being admitted for the truth of the matter, I would have

20   provided a limiting instruction; but because it's being

21   permitted for a nonhearsay purpose, my inclination was just to

22   instruct the jury that her statement is not being offered for

23   the truth but for the effect on the listener.  So I was

24   inclined only to give that instruction.

25           So, that's my thinking.  Then the question is so what

I5V7GAL1

1   exactly is appropriate.

2          MR. TOUGER:  Your Honor, may I have a moment to talk

3   with cocounsel?

4          THE COURT:  Sure.  The ADV evidence is not coming in

5   until Dunkerley, correct?

6          MR. QUIGLEY:  Just to be clear, we're not intending to

7   introduce any form ADVs through Dunkerley.  That would come

8   later, if at all.  So the issue with Dunkerley is can he

9   testify -- and again I'm happy to lead him on this, happy to

10  state it in a more general way -- that he was aware, he and

11  Jason Galanis discussed that Morton had failed to accurately

12  disclose the ownership of Hughes on a form ADV and that they

13  believed that gave them some level of leverage over --

14         THE COURT:  And the they in that sentence?

15         MR. QUIGLEY:  He is only percipient to his

16  conversations.  It was him and Jason Galanis and Gary Hirst.

17  These defendants were not present.  He doesn't know, and I'm

18  not going to obviously ask him to speculate whether they knew

19  anything like that.  It's just going to be:  Did you and Jason

20  Galanis discuss certain disclosures that Michelle Morton failed

21  to make?

22         THE COURT:  Sorry, I didn't mean to interrupt you.

23         MR. SCHWARTZ:  So I think having talked, I understand

24  your Honor's point about the scope of the permissible

25  questioning.  Rather than ask -- I forget how you phrased it --

I5V7GAL1

1    but did you become aware of conflicts of interest, you can

2    simply ask in a leading way the factual predicate for that.

3              So, like, did you become aware that there were

4    individuals that were associated with Atlantic Asset

5    Management, the placement agents and the annuity provider?

6    Whatever the actual content of that conversation is.  It gets

7    to the same point without using the legal label.

8              THE COURT:  Is the government OK with that?

9              MS. MERMELSTEIN:  Yeah, I think as a general -- I

10   don't agree with the defendants that the use of the words

11   "conflict of interest" is inappropriate because it's a legal

12   conclusion.  It's also very much a colloquial term that people

13   use to describe this, and I think it should be allowed by

14   witnesses whose natural inclination is to describe it that way.

15             With respect to this witness, we have no objection to

16   leading and to asking it without the words "conflict of

17   interest".  On that call were you told that there was a

18   relationship between the placement agent and the annuity

19   provider?  That the funding of Ms. Morton's acquisition was

20   related to the placement agent?  That the investment was

21   outside of the sleeve?  That it exceeded the permissible

22   percentage of investment?  And then sort of what was your

23   reaction to that.

24             MR. SCHWARTZ:  I mean that's now five questions that

25   get in the entirety of the conversation.  I was suggesting, as

I5V7GAL1

1    your Honor did, one question that got to the material

2    information that mattered to him.

3             MS. MERMELSTEIN:  But all of that is material

4    information that mattered to him, and it's not only the failure

5    to disclose the conflict of interest; it's also the failure to

6    disclose these problems before making investment with respect

7    to the fact that it was outside the parameter.

8             MR. SCHWARTZ:  But he can testify about it being

9    outside the parameters and outside the concentration risk

10   parameters, outside the sleeves, all of that, without reference

11   at all to the conversation.  Right?  Because that's obvious

12   from the face of the facts.  Once he sees that he's got 15

13   percent of his GYOF investment is is in Wakpamni bonds, he

14   knows -- regardless of any conversation -- that they have

15   exceeded the parameters, they have exceeded the sleeves.  The

16   only piece of it that comes from the conversation is about the

17   alleged conflicts.

18            MS. MERMELSTEIN:  I think that given that this witness

19   has to be allowed to testify that he learned this information

20   and it was material to him, it's needlessly technical to not

21   let him tell the story the way it actually happened.

22            I also think as we said yesterday that the fact that

23   Morton is on the call when these things are being disclosed is

24   evidence that she knew these things to be true, it right there

25   could be an argument that a person wasn't aware that it was

I5V7GAL1

1    outside the sleeve.  That's obviously not the case because

2    Morton is participating in the disclosure that that's the case.

3    So, we are willing to do it in a leading fashion in four or

4    five questions, but I think those questions are appropriate,

5    and that's the way we would propose to proceed.

6              THE COURT:  Let me just take a closer look at the

7    particular questions.

8              MR. SCHWARTZ:  I think we should all agree on what

9    exactly those four or five questions are.

10             THE COURT:  As to information that he had from other

11   sources, what's the harm in asking him a leading question about

12   did you learn in the course of this call, you know, X, and then

13   say independently ask about, you know, investments outside the

14   sleeve, etc., and based on -- you know, if you had known all of

15   that previously, would you have made the same decision?

16   However you want to phrase that, but is there a way to focus

17   less on the call, because it is hearsay, and so I do want to

18   limit it to really what it is, why he did and what he did next.

19             MS. MERMELSTEIN:  I don't think that he learned the

20   information that it was outside the sleeve from a source other

21   than the phone call.

22             THE COURT:  I thought that's what you just said.

23             MR. SCHWARTZ:  I'm sorry, I didn't hear that.

24             MS. MERMELSTEIN:  I do not believe that the witness

25   learned that these were outside of the sleeves from a source

I5V7GAL1

other than the phone call.

          MR. SCHWARTZ:  Well, he knew it from a source other
than the phone call.  Obviously he first heard it on this phone
call.  But then once he sees that the GYOF is invested in these
Wakpamni bonds, he knows immediately that they are outside of
the parameters, outside the concentration risk parameters, not
one of the specifically enumerated types of investments.

          MS. MERMELSTEIN:  I'm not sure I follow what
Mr. Schwartz is saying, the way he learned that information is
from the phone call.  When you say when he sees it?  I mean the
way he knows it is that he is told it.

          THE COURT:  I'm just looking back at the questions you
proposed, Ms. Mermelstein.

          MS. MERMELSTEIN:  I think I can give them to you again
if it's easier.

          THE COURT:  Go ahead.

          MS. MERMELSTEIN:  Maybe.  I think the questions that
need to be elicited are as follows:

          THE COURT:  Slowly.

          MS. MERMELSTEIN:  Were you told of a relationship
between the placement agent and the annuity provider?

          Were you told of a connection between the funders of
Morton's acquisition of Atlantic and the placement agent?

          Were you told that the investment exceeded the maximum
concentration permitted?

I5V7GAL1

1          And were you told that the investment was outside of

2     the seven sleeves contained in GYOF?

3          THE COURT:  And how would you narrow that down, in

4     your view?

5          MR. SCHWARTZ:  So, I mean, look, as an evidentiary

6     purist I can say a lot of things, but the reality is that the

7     question that I care about here -- and the one that gets in the

8     out-of-court testimonial statement that matters to me -- is the

9     question that Ms. Mermelstein suggested about the funders of

10    Morton's acquisition of Atlantic.

11         Let me hear that question again.  I'm sorry.

12         THE COURT:  Were you told of a connection between the

13    funders of Morton's acquisition of Atlantic and the placement

14    agent?  Is that what you proposed?

15         MS. MERMELSTEIN:  Something along those lines, your

16    Honor.

17         MR. SCHWARTZ:  Right.  That I think implicates all of

18    these Sixth Amendment issues.  I also am very far from clear

19    that that is an actionable conflict the way the government has

20    alleged.

21         THE COURT:  Let's do this.  Let's just take a minute.

22    We're going to check on the jury, and I will rule any minute.

23    Let me just look at the questions.  So, if anyone wants to step

24    out for a minute.

25         MS. NOTARI:  Your Honor, right the fourth question,

I5V7GAL1

1    right before the question about the outside investments of the

2    sleeves --

3            THE COURT:  Look, the reason that I was trying to

4    propose more general language was to avoid just this, and the

5    way I had been thinking about it is in terms of conflict of

6    interest, but I understand there is an objection to, you know,

7    that general proposal as well.

8            MR. TOUGER:  The problem is that their last two

9    questions have nothing to do with conflict of interest.  The

10   last two questions go beyond the conflict of interest thing.

11   And Ms. Morton is allowed to make -- under the PPM she is

12   allowed to go outside the sleeves, and she is allowed to go out

13   if she finds it's in her best interests of the fund.  The PPM

14   says she can do that.  So, the conflict of interest questions

15   we can discuss, but the last two questions have nothing to do

16   with conflict of interest.

17           MS. TEKEEI:  Your Honor, we appreciate Mr. Touger's

18   interpretation of the PPM, however, that is not this witness's

19   understanding.  And those two things -- that the purchase was

20   outside of the strategies, and it was higher than the

21   concentration allowed -- are material facts for this witness.

22           Mr. Touger is welcome to make those arguments to the

23   jury at the appropriate time, but that is not in any way an

24   appropriate argument to make in tailoring Mr. Smith's

25   testimony.  It was a material fact.  Those were material to his

I5V7GAL1

1    decision later to request that the bonds be sold immediately

2    from the Global Yield Opportunity Fund, the size and the fact

3    that they did not fit within any of the investment strategies.

4              MR. TOUGER:  There is no doubt that's true, your

5    Honor, therefore that's why the questions don't have to be

6    asked.  Because, as Mr. Schwartz said before, that's a fact

7    that he knows and can see from the physical nature of the

8    bonds, and he can use that.  There is no reason he has to say

9    that this was reinforced by what he was told by Ms. Morton.

10             The only important thing that he is told by Ms. Morton

11   that is not clear to him from the facts in the bonds themselves

12   is the "conflict of interest" problem.

13             As Mr. Schwartz said five minutes ago, there is no

14   doubt that Mr. Smith felt it important that it's 15 million and

15   that it's what he considers outside the sleeves.  And he can

16   say that I felt that.  But he doesn't have to say that Michelle

17   Morton told him that, because the bonds themselves told him

18   that and he knew that.

19             MS. MERMELSTEIN:  The problem is I don't believe

20   Mr. Smith ever saw the bonds.  The way he knows of sort of what

21   the nature of them is and that they don't fit is what was told

22   to him.  And, look, I think the government would not

23   necessarily object to having him testify that he learned that

24   information about the bonds and this was his reaction, but

25   Mr. Schwartz said that would be worse than eliciting that he

I5V7GAL1

1    learned it on the call, to just say generally he learned it.

2            And the fact that those facts -- that he came to

3    acquire that information and how he reacted is obviously

4    necessary.  So he has either got to be allowed to say that he

5    learned it on this call or that he learned it generally, but

6    there is no way around it.

7            MR. SCHWARTZ:  This is not my issue about the

8    concentration risk and the sleeves and all that.  I only care

9    about the conflicts.  On the conflicts I would have no

10   objection to the following one question:  Were you told that

11   there were individuals associated with the annuity provider,

12   the placement agent and Atlantic Asset Management?  That gets

13   the point out they want to make.

14           MS. MERMELSTEIN:  It certainly does not.  What

15   Mr. Schwartz is trying to do is you can tell the jury only that

16   information that doesn't implicate my client, not the

17   information that's bad for me.

18           There was more than one conflict here, and the

19   relationship between Burnham the placement agent and Michelle

20   Morton -- the funding of Michelle's Morton's acquisition of

21   Atlantic -- is an essential conflict of interest, and it was

22   very much in the mind of Michelle Morton, which is clearly

23   relevant.

24           The jury is going to hear -- there are going to be

25   communications between Michelle Morton where see says things

I5V7GAL1

like to Jason Galanis if when you and your group funded my
acquisition it was in your head it was so that I would buy
these bonds, then I sort of owe it to you to do it.  That
conflict is a key conflict; it's alleged in the indictment.
So, it is absolutely not an acceptable way to parse this
question to exclude the conflict that relates to Mr. Archer.

          MR. SCHWARTZ:  It is.  First of all, there is no
conflict of interest that arises from funding the acquisition
of and investment manager; that's not just an actual conflict.
But the thing that Ms. Mermelstein is objecting to is exactly
right.  I am objecting that this statement by Michelle
Morton -- which I actually don't think was intended to
implicate Mr. Archer -- could be misinterpreted to implicate
him.  I am in effect trying to Brutonize the statement.  That's
what you do, right?  You remove the parts of the statement even
if they were said because they are not admissible, while still
allowing the government to introduce the admissible parts of
the statement.

          So if, as they say, the purpose of this testimony is
not for its truth, and it's not to implicate Mr. Archer, but
rather it's to show the materiality of undisclosed conflicts,
then the question that I proposed gets to that purpose.

          If they are trying to introduce this testimony for an
improper purpose, then I understand their objection, but it's
plainly inadmissible.

I5V7GAL1

1          MS. MERMELSTEIN:  Just to be clear, Bruton doesn't

2     apply to nontestimonial statements, so the analogy is

3     misplaced.  Second, when you Brutonize a statement, this is

4     exactly -- there is not going to be any conversation here

5     elicited about Mr. Archer.  You take out the person's name and

6     anonymize it.  There is nothing here about Mr. Archer, so even

7     if it was testimonial -- which it's not -- there is no Bruton

8     issue.

9          THE COURT:  But there is also the question of how much

10     information needs to come out to get at what was material to

11     this witness and why he did what he did, because again I'm not

12     letting this in for the truth, so it's not a situation where

13     Ms. Morton is at trial, and it's against her but it's being

14     Brutonized to protect another defendant.  I mean it's a

15     different situation, so the question is how much does the jury

16     really need to hear about this hearsay statement to get at his

17     state of mind and why he did what he did next.

18          MS. MERMELSTEIN:  I agree with everything your Honor

19     has just said, but one of the things the jury needs to

20     understand is that it mattered to investors that the investment

21     advisor had a conflict in that she felt that she was motivated

22     by owing a duty to her financial backers who were connected to

23     the placement agent of these particular bonds in placing the

24     bonds in their accounts.

25          THE COURT:  This is what I want to do briefly.  I want

I5V7GAL1

1    to bring Mr. Smith in without the jury.  I just want to hear

2    from him exactly what in his view made a difference to him in

3    his own words, and then I will make a decision.  So why don't

4    we bring in Mr. Smith.

5     MICHAEL SMITH, resumed.

6              THE COURT:  Good morning, Mr. Smith.

7              THE WITNESS:  Good morning.

8              THE COURT:  I am just going to remind you you are

9    still under oath.

10             THE WITNESS:  Yes.

11             THE COURT:  So just tell me in your own words about

12   the telephone call you had with Michelle Morton on April 23,

13   2015, what was said and how you felt about it.

14             THE WITNESS:  The reason for the call was Atlantic

15   Management had the view that the bonds that had been purchased

16   had conflict of interest inherent in them and that they didn't

17   fit the Global Opportunity Fund structure, so they were asking

18   for OSERS to grant them authority to go ahead and proceed with

19   keeping those bonds in the fund.

20             THE COURT:  And what was your reaction?  How did you

21   react?

22             THE WITNESS:  My reaction was discomfort and, OK, let

23   me see written documentation of what you're asking me to

24   approve.  So, it was letting them know that I was not inclined

25   to proceed that way but I wasn't going to act without something

I5V7GAL1

```
 1    in writing.

 2              THE COURT:  And what did you do next?

 3              THE WITNESS:  They then -- the following day -- Ron

 4    Sellers is the one who sent it -- sent through a one-page

 5    bullet point list of kind of the features of the bonds and then

 6    a write-up synopsis of the phone call.

 7              I then called Ron -- this would be the 24th -- and

 8    said, Ron, no, I will not approve this; they have conflict of

 9    interest inherent in them, and they just don't fit, there is

10    nothing in the parameters of the private placement memorandum

11    that permit these bonds.

12              I then followed that up with an e-mail to Ron copying

13    some of the folks that were on that phone call, indicating I

14    feel strongly enough about this that if you don't get these

15    removed from GYOF by the Thursday preceding our board meeting,

16    that I would then place on the agenda an item requesting that

17    the trustees take action to actually withdraw OSERS from GYOF.

18              THE COURT:  Let me just see the lawyers at sidebar for

19    a minute.  Thank you.

20              (At the sidebar)

21              MR. TOUGER:  Can you just ask one more question?  I

22    just want to make sure I heard this right.  He seemed to

23    indicate that something prompted him to call Michelle Morton.

24              MS. TEKEEI:  No, your Honor.

25              MR. TOUGER:  Well, why did he call Michelle Morton?
```

I5V7GAL1

1          MR. SCHWARTZ:  Michelle Morton calls him because she

2     was starting to protect herself.  I would ask him what did he

3     see the conflict to be, just so we can have this discussion.

4          MS. TEKEEI:  Similarly, I think a question to him

5     about what his understandings were of those conflicts is

6     appropriate.

7          THE COURT:  I will ask him that, and then we will meet

8     back here.  OK?

9          (In open court)

10          THE COURT:  What did you understand this conflict of

11     interest to be.

12          THE WITNESS:  What was in the phone call and then what

13     came through in that written synopsis was that the placement

14     agent and the insurance company that was providing the

15     annuity -- which was an integral part of the bond -- were both

16     affiliated entities with the firm that had provided funding for

17     Michelle Morton and Richard Deary to purchase Atlantic Asset;

18     and having basically two entities that brought this conflict of

19     interest into place just doubled the peril.

20          THE COURT:  All right.  Anything else?

21          THE WITNESS:  Those were the conflict of interest

22     issues.

23          THE COURT:  Thank you.

24          (At the sidebar)

25          MR. SCHWARTZ:  My view is that this sort of proves the

I5V7GAL1

1  point that the question that I proposed is the right one:  Did

2  you learn on that phone call, were you told that there were

3  individuals associated with the placement agent, the annuity

4  provider and Atlantic Asset manager?  Period.

5          MS. MERMELSTEIN:  I think -- well, the dispute is

6  certainly teed up clearly.  The part where he says I understood

7  that the funding used to fund the GMT's acquisition of Atlantic

8  is I think a key point here, and he should be allowed to say

9  that, not just everything else in his answer.

10          MS. TEKEEI:  Your Honor, he said it doubled the peril.

11          MR. SCHWARTZ:  The conflict -- that's the purpose of

12  the testimony -- the conflict is the relationship to Atlantic.

13  Whether that relationship was through the CEO, or through the

14  funders, or through, you know, the daughter of Ron Sellers, it

15  doesn't matter.

16          MS. MERMELSTEIN:  I think it does matter.

17          THE COURT:  I'm going to allow him.  I want to keep

18  this very short.  I don't want it any longer than we just had,

19  but I'm going to allow him to define the conflict in his own

20  words.  You can ask a question like briefly describe what you

21  understood that conflict to be, and I will then instruct the

22  jury that this is not being admitted for its truth but, rather,

23  the effect that it had on the listener.

24          MS. MERMELSTEIN:  I'm sorry to raise one more issue --

25  and I am sure this has not been Mr. Schwartz's intention doing

I5V7GAL1

1   this -- but so far with each witness on cross Mr. Schwartz has

2   greeted the jury, and greeted the witness, and asked about the

3   fire drill or the lunch break.  I think it's making witnesses

4   uncomfortable at the beginning of cross to be forced to seem to

5   sort of engage in a casual conversation when they are ready to

6   answer questions, and so if you can go just straight to the

7   questioning.

8        THE COURT:  Honestly, in a case that's been so

9   contentious, a little bit of pleasantries doesn't offend me.

10       MS. MERMELSTEIN:  It's not offending the parties.

11  There are witnesses who are very nervous to get started, and I

12  think it puts them in -- they don't know how to start, and so

13  it's not about pleasantries; I think that it's about putting

14  witnesses at ease.

15       THE COURT:  I don't think this is worth pursuing

16  further.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  We are going to bring the jury in now.

3              (Jury present)

4              THE COURT:  Good morning, everyone.  Thank you for

5     your patience this morning.  Everyone can be seated.

6              THE COURT:  Good morning again, Mr. Smith.

7              THE WITNESS:  Good morning.

8              THE COURT:  You may proceed.

9              MS. TEKEEI:  Thank you, your Honor.

10    DIRECT EXAMINATION

11    BY MS. TEKEEI:

12    Q.  Good morning, Mr. Smith.

13    A.  Good morning.

14    Q.  Mr. Smith, before we took a break yesterday, we were

15    discussing when you first learned the bonds, the Wakpamni Lake

16    Community Corporation bonds, had been purchased into the Global

17    Yield Opportunity Fund.

18              Do you recall that testimony?

19    A.  Yes, I do.

20    Q.  I would like to ask you just a few more questions about

21    that call.  Sir, during that call, were you told anything about

22    the relationship between the parties to the bond transaction?

23    A.  Yes, I was.

24    Q.  What is your understanding of those relationships?

25    A.  I was informed that the placement agent for the bond and

i5v2gal2                         Smith - Direct

the life insurance company that was providing the annuity that

was integral within the bonds were both affiliated entities or

related entities with the folks who had provided the funding

for Michelle Morton and Richard Deary to purchase Atlantic

Asset Management.

Q.   What were you -- were you told on the call about the

concentration of the bonds that were purchased into GYOF?

A.   Yes, I was.

Q.   And what were you told about the concentration?

A.   That it was outside of the parameters of the GYOF fund, and

they were asking OSERS' permission to accept this violation of

the PPM.

Q.   What were you told about -- let me strike that and

rephrase.

          Were you told anything on the call about whether the

Wakpamni Lake Community Corporation bonds fit within the seven

sleeves or investment strategies that we talked about

yesterday?

A.   Yes, I was.

Q.   And what were you told?

A.   I was told that the bonds did not fit within any of the

existing structures that were in place within the fund and that

it was going to be necessary to create an eighth sleeve to hold

this one investment.

Q.   Had you been provided any of this information prior to when

i5v2gal2                          Smith - Direct

1    the bonds were purchased into the Global Yield Opportunity

2    Fund?

3    A.  No, I was not.

4    Q.  And during that phone call, were you asked any questions?

5    A.  For my permission on behalf of OSERS to permit these

6    violations and conflicts to exist.

7    Q.  What steps did you take after this phone call?

8    A.  During the phone call, I indicated that I would not make

9    any decisions based on the phone call, that I wanted written

10   information sent to me for my perusal.  Ron Sellers then sent,

11   by e-mail attachment, a one-page bullet point which listed some

12   of the features of the bonds, and I believe about a

13   page-and-a-half or two-page synopsis of the phone call where

14   this information was disclosed.

15   Q.  Now, without telling us the content of that communication,

16   what, if any, steps did you take next?

17          MR. SCHWARTZ:  Excuse me, your Honor.  Before we move

18   on, would your Honor consider giving the agreed-upon limiting

19   instruction?

20          THE COURT:  Yes.  I was waiting to see the right time

21   to do that, but I agree it is now.

22          Ladies and gentlemen, I just want to make clear to you

23   that all of the statements that you have heard testimony about

24   that were made during this call are not being admitted for the

25   truth of those statements, but just the effect that it had on

i5v2gal2                          Smith - Direct

1    the listener.  So when you consider the evidence, don't take

2    them to be admitted for their truth but, rather, the effect

3    that they had on Mr. Smith and what was done next and why.

4                MR. SCHWARTZ:  Thank you, your Honor.

5                And would you consider reading the parties' agreement

6    about Michelle Morton's guilty plea at this time?

7                MS. MERMELSTEIN:  Your Honor, may we approach?

8                THE COURT:  Sure.  We will approach.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. MERMELSTEIN:  I feel like that was out of bounds,

3     your Honor.  We have talked extensively about how this was

4     going to come in, how it was going to be raised, who was going

5     to bring it up, and it was going to be for your Honor to do at

6     a time requested by the government.

7          For Mr. Schwartz to say in front of the jury I would

8     like an offer now is, I think, clearly not an agreement to what

9     we have agreed it to, and I think it is unfair to the

10    government.

11         MR. QUIGLEY:  It's not admissible.

12         MS. MERMELSTEIN:  It is also, Ms. Morton has not in

13    fact -- no statement of Ms. Morton has been admitted for its

14    truth.  She cannot yet be impeached by the fact of the

15    conviction.  So, frankly, it's not yet admissible, one; and

16    it's a violation of the parties' agreement, your Honor, of how

17    this was going to be handled.

18         THE COURT:  Look.  It was a stipulation, in any event,

19    so in terms of admissibility or both agreeing to its

20    admissibility, I think you are right it should come in when you

21    are ready for it to come in.  I also don't have it.  No one has

22    given it to me.  But why don't we just move on?

23         MR. SCHWARTZ:  Thank you.

24         (Continued on next page)

25

1              (In open court)

2              THE COURT:  You may proceed, Ms. Tekeei.

3              MS. TEKEEI:  Thank you, your Honor.

4    BY MS. TEKEEI:

5    Q.  Mr. Smith, after you received the information about the

6    Wakpamni Lake Community Corporation bonds that you just

7    described to the jury, what steps, if any, did you take next?

8    A.  The morning of the 24th, after I had received and read the

9    written material, I called Ron Sellers and informed him that I

10   would not approve the violations of the PPM and the inherent

11   conflicts of interest with these bonds; and that I demanded

12   that they be sold out of GYOF; and that any losses sustained by

13   OSERS would be covered by Atlantic.  After the phone call, I

14   did put that into the form of an e-mail and e-mailed that to

15   him.

16   Q.  Now, did you communicate with anyone at Atlantic about

17   efforts to sell the Wakpamni Lake Community Corporation bonds?

18   A.  Yes.

19   Q.  With whom did you communicate?

20   A.  I spoke and Ron and I spoke with Michelle Morton.  I spoke

21   with Cliff Cole.

22   Q.  Who was your primary point of contact?

23   A.  It started with Ron, but then it migrated to Michelle.

24   Q.  And what, if anything, did Ms. Morton initially propose to

25   do to sell the bonds out of GYOF?

i5v2gal2                          Smith - Direct

1   A.  She indicated that she understood my concerns and that she

2   was going to remove them from the fund, not necessarily sell

3   them, which I didn't fully understand, but from the OSERS --

4            (Discussion off the record between the witness and

5   court reporter)

6   Q.  Did that proposal change over time?

7   A.  Yes.  Then she indicated that she was seeking other Native

8   American partners that might be interested in buying the bond.

9   She assured me that she and Richard were working on this

10  hands-on, daily, top priority to accomplish this removal.

11  Q.  What was the time frame in which you engaged in these

12  discussions with Ms. Morton?

13  A.  I was made aware of these bonds in April.  The ongoing

14  discussions and demands occurred then in May, June, July,

15  August.

16           MS. TEKEEI:  Let's look at a couple of examples.

17  Ms. Sheinwald, can you please pull up Government Exhibit 2433

18  which is in evidence.

19  BY MS. TEKEEI:

20  Q.  Mr. Smith, there is a binder in front of you with that same

21  document.

22           Can you please describe for us what is the date of

23  this e-mail and who sent it?

24  A.  The top e-mail is Wednesday, May 6, and it is from Michelle

25  Morton to myself.

i5v2gal2                          Smith - Direct

1    Q.   And what is the subject line?

2    A.   "Update."

3    Q.   Can you please read the sentence beginning with "to

4    provide"?

5    A.   "To provide greater clarification on our intent, please

6    know that Richard and I are playing a 'hand on' role in

7    ushering this situation to a conclusion."

8    Q.   Can you go ahead and please read the next two sentences.

9    A.   "From an economic standpoint, the strategy is to remove the

10   position from the portfolio, not 'sell' it out of the

11   portfolio, thus mitigating investment loss.  In regard to a

12   timeline, we believe we can achieve our goal within 30 days."

13   Q.   What is your understanding of what this means?

14   A.   She was promising us that the bonds would be removed from

15   GYOF, and that the fund would be made whole as it was prior to

16   the purchase.

17   Q.   Were the bonds removed or sold within 30 days?

18   A.   They were not.

19   Q.   I would like to show you now what is marked as Government

20   Exhibit -- what is in evidence as Government Exhibit 2436.

21             MS. TEKEEI:  Ms. Sheinwald, can you please?  Thank

22   you.

23   BY MS. TEKEEI:

24   Q.   Mr. Smith, what is the date of this e-mail and who is the

25   sender?

1    A.   June 9, 2015, from Michelle Morton.

2    Q.   And what is the subject line here?

3    A.   "Update on Bond."

4    Q.   Can you please go ahead and read the first two sentences.

5    A.   "As I have been communicating for the last few days,

6    removal of the bond is of primary importance to us.  We have

7    been working on multiple avenues for removal, with the primary

8    driver being speed."

9    Q.   Can you please also read the following two sentences.

10   A.   "To that end, my representative and I had a conference call

11   with the issuer today.  During the call, we expressed our

12   strong desire to have the issue removed."

13   Q.   What is your understanding of who is the issuer?

14   A.   The issuer, in my understanding, would be the folks who

15   actually place the bond.

16   Q.   Now, were the bonds removed during the month of June 2015?

17   A.   No, they were not.

18            MS. TEKEEI:  Let's go ahead and take a look at one

19   more.  Ms. Sheinwald, can you please pull up Government Exhibit

20   2441, which is in evidence.

21   BY MS. TEKEEI:

22   Q.   Mr. Smith, I believe you have a copy there.

23            I would like to direct your attention to the bottom

24   series of e-mails, Mr. Smith.

25            Do you see the e-mail beginning Monday, July 6, at

i5v2gal2                        Smith - Direct

1   8:58 a.m., at the bottom?

2   A.  I do.

3   Q.  Who is that from?

4   A.  From Michelle Morton.

5   Q.  Can you please read the sentence beginning with "on

6   behalf."

7   A.  "On behalf of Richard and I, we want to thank you again for

8   your patience with this matter."

9   Q.  And if you could go ahead and read the following sentence.

10  A.  "Per our conversation from last Thursday, the brokerage

11  firm Bonwick Capital has clients interested in the issue and

12  will be placing orders today to buy the entire Wakpamni holding

13  (approximately 16 million) from the GYOF account."

14  Q.  Now, sir, I would like to direct your attention to the

15  e-mail at the very top of this document, the e-mail July 6,

16  2015, at 16:34.  Who is that e-mail from?

17  A.  That's from Michelle Morton.

18  Q.  Can you please read what Michelle Morton writes in this

19  e-mail?

20  A.  "Working with Bonwick's back office and Sara Roche on our

21  side to get the paperwork together to book the trade and

22  generate the confirm."

23  Q.  Were the bonds sold on July 6, 2015, to Bonwick Capital?

24  A.  No, they were not.

25  Q.  Were they sold at any time in July of 2015?

i5v2gal2                          Smith - Direct

1    A.  No, they were not.

2    Q.  Were they sold in August?

3    A.  No, they were not.

4    Q.  Were they sold in September?

5    A.  No, they were not.

6    Q.  What, if any, changes did OSERS make with respect to its

7    investments in the Global Yield Opportunity Fund in the fall of

8    2015?

9    A.  As a result of the failure of confidence that the board of

10   trustees had in Atlantic asset, they requested a full

11   withdrawal of OSERS's money from GYOF in the month of

12   September.

13   Q.  And can you describe for the jury what that means, the full

14   withdrawal of OSERS's money?

15   A.  It meant that assets that were intended to be a longer term

16   in nature were then going to have to be sold because OSERS was

17   the primary investor in GYOF.  As I indicated earlier, we were

18   the only institutional investor, so it was primarily OSERS'

19   money.  So OSERS was telling Atlantic:  Instruct all of your

20   various managers to begin liquidating those securities, because

21   OSERS wants cash back from GYOF.

22   Q.  And were those assets sold?

23   A.  Not all of them, no.

24   Q.  Were the Wakpamni Lake Community Corporation bonds sold?

25   A.  They were not.

i5v2gal2                          Smith - Direct

1   Q.  Did there come a time in the fall of 2015 when OSERS made

2   any decisions with respect to its relationship with Atlantic

3   Asset Management?

4   A.  Yes.

5   Q.  What was that?

6   A.  Again, because of a failure of confidence in Atlantic

7   Asset, the board of trustees in October of 2015 requested a

8   cancellation or termination of the investment management

9   contract with Atlantic Asset Management.

10  Q.  And what did that mean?

11  A.  That meant that all of the assets that Atlantic was

12  managing separate from the GYOF were also being liquidated and

13  that cash being returned to Atlantic for investment elsewhere.

14  Q.  Why was this decision made?

15  A.  There was a failure of confidence in the Atlantic -- the

16  new Atlantic management to fulfill promises that they had made.

17  Q.  Sitting here today, has OSERS ever been able to sell the

18  Wakpamni Lake Community Corporation bonds?

19  A.  They have not.

20  Q.  What was the impact of these bonds to OSERS?

21  A.  Very significant.  The first impact is a loss of $16.2

22  million in bonds.  But the unwinding of GYOF in this rapid

23  fashion meant that we actually lost $25 million in the GYOF

24  investment; and that $25 million is not just stand-alone,

25  because when you prefund a retirement system, you are doing so

i5v2gal2                          Smith - Cross

1    so you can accrue money over the lifetime of members.  So over

2    the lifetime of our members, that 25 million would have grown

3    to in excess of $100 million to be able to pay the benefits to

4    our members, and that money is gone.

5              MS. TEKEEI:  No further questions at this time, your

6    Honor.

7              THE COURT:  Any cross-examination?

8              MR. TOUGER:  Thank you, your Honor.

9    CROSS EXAMINATION

10   BY MR. TOUGER:

11   Q.  Good morning, Mr. Smith.

12   A.  Good morning.

13   Q.  Have you ever met John Galanis?

14   A.  Excuse me?

15   Q.  Have you ever met John Galanis?

16   A.  I have not.

17   Q.  Have you ever heard his name before?

18   A.  Not prior to this trial.

19   Q.  And have you ever communicated at all with John Galanis?

20   A.  I have not.

21   Q.  And can we agree -- by the way, how much in total funds

22   does OSERS have?

23   A.  When I retired, it was $1.2 billion.

24   Q.  1.2?

25   A.  Billion.

1   Q.  Billion.

2           So 1.2 billion is a gross amount of money that OSERS

3   has, and I think you just testified that your total loss here

4   was 25 million, right?

5   A.  Correct.

6   Q.  Can you do that math, because I can't; what is that

7   percentage?

8   A.  I couldn't tell you.

9   Q.  Can we agree it's a small percentage of the funds?

10  A.  No.

11  Q.  Okay.

12          Now, when I -- would you also -- would you agree with

13  me, though, that you have been related to OSERS for how many

14  years?

15  A.  1989 is when I was hired.

16  Q.  And during the years that you were there that OSERS had

17  some good investments and some not-so-good investments beside

18  this is particular deal.

19  A.  This -- the markets do provide ups and downs.

20  Q.  And what OSERS does to try to level out those ups and downs

21  is diversify its assets.

22  A.  OSERS attempts to diversify assets.

23  Q.  And that's to protect itself from the ups and downs of

24  various markets.

25  A.  Yes, it is.

i5v2gal2                           Smith - Cross

1    Q.  And that is why, out of the $1.2 billion you had at your

2    disposal, you only put 100 or so million in this GYOF fund.

3    A.  That is true.

4    Q.  And so if my math is correct, 100 million is less than 10

5    percent of the 1.2 billion, right?

6    A.  Yes.

7    Q.  And out of the 100 million, you lost 25 million, right?

8    A.  Correct.

9    Q.  So you lost about 3 percent of your gross amount of money,

10   correct?

11   A.  On a direct-cash basis, not on an accrued basis.

12   Q.  Exactly.  On a direct-cash basis you lost about 3 percent

13   of the fund's money.

14   A.  I will let you do the math.

15   Q.  Okay.  And would I be correct in saying that, in the

16   history of OSERS, that's happened on other investments also?

17   A.  During 2000, during that particular market, the markets

18   went down, but we didn't lose the money.  There is a

19   difference.

20   Q.  So OSERS has never lost money on an investment?

21   A.  The security values declined, but we stayed with them and

22   they then returned.  In this instance, they are not returning.

23   Q.  That's not the question I am asking you.  I'm saying has --

24   besides this instance, has OSERS ever lost money at the end of

25   an investment?

i5v2gal2                        Smith - Cross

1   A.   Yes.

2   Q.   That's what I was asking.

3          And that's happened on more than one occasion,

4   correct?

5   A.   Yes.

6   Q.   And because there is a risk in investing.

7   A.   There is.

8   Q.   As a matter of fact --

9          MR. TOUGER:   If you can bring up the PPM, the one you

10  just had.   The number?

11         MR. SCHWARTZ:   122.

12         MR. TOUGER:   122.

13  BY MR. TOUGER:

14  Q.   Now, the reason that you started the GYOF fund is

15  because -- I think you testified on direct because interest

16  rates around the 2010, 2011 period were historically low, and

17  you were trying to seek ways to increase the return of your

18  investment.

19  A.   That is correct.

20         MS. TEKEEI:   Objection, your Honor.

21         THE COURT:   I will allow it.

22  BY MR. TOUGER:

23  Q.   Did you say that is correct?

24  A.   That is true.

25  Q.   So the idea was to sort of branch out to try to make more

i5v2gal2                        Smith - Cross

1    money elsewhere.

2    A.   I wouldn't say that, no.

3    Q.   What would you say?

4    A.   That we were attempting to blend styles, many of which we

5    already used into a single fund so that they could then be more

6    risk mitigated and more efficient.

7    Q.   But you would agree with me that the idea of the fund was

8    to take slightly more risks than investing in, for instance,

9    United States bonds.

10   A.   This fund had more risk than bonds, than United States

11   bonds, but that's not different than what we were previously

12   in.  So, no, we weren't taking more risk.

13   Q.   Well, there are safer investments, for instance, buying

14   United States bonds, than doing the investments that you did in

15   the GYOF account.

16   A.   That is true.

17   Q.   And if we could go to 130, page 130 at the bottom of the

18   page, it is actually highlighted already, the highlighted

19   sentence, if you could just bring that up.  Will you read the

20   bottom part of that paragraph, the one that's actually

21   highlighted?

22   A.   "Investment in the partnership involves a high degree of

23   risk and is suitable only for sophisticated investors.  No

24   assurance can be given that the master fund's investment

25   objectives will be achieved and investment results may vary

i5v2gal2                          Smith - Cross

1   substantially on a monthly, quarterly, annual and/or other

2   periodic basis."

3   Q.  So the PPM itself, right there in the very beginning,

4   brings out that risk is involved, correct?

5   A.  Yes.

6          MR. TOUGER:  And if we can go to page 135, and if you

7   could highlight the second part that is highlighted there, the

8   second part in the "Investment Objective" paragraph.

9   BY MR. TOUGER:

10  Q.  Can you read again the highlighted part there?

11  A.  "However, no assurance can be given that the master fund's

12  investment objective will be achieved, and investment results

13  may vary substantially on a monthly, quarterly, annual and/or

14  other periodic basis."

15         MR. TOUGER:  And can you go to page 139, and can you

16  bring up the second to last paragraph starting with "at the end

17  of each accounting period."

18  BY MR. TOUGER:

19  Q.  Can you read that paragraph?

20  A.  "At the end of each accounting period of the master fund,

21  any distributions, income, gain, or loss (whether or not

22  realized) or deductions (or otherwise allocable to periods)

23  will be allocated to each capital account."

24  Q.  You can stop there.

25         In that sentence, it realizes that you have gain and

1    loss, either realized or not, right?

2    A.   Yes.

3           MR. TOUGER:   And if we can go to page 155, if you can

4    highlight that first paragraph.

5    BY MR. TOUGER:

6    Q.   And if you could just read the highlighted part of the

7    highlighted paragraph?

8    A.   "However, no assurance can be given that the master fund's

9    investment objective will be achieved, and the investment

10   results may vary substantially on a monthly, quarterly, annual,

11   and/or other periodic basis."

12          MR. TOUGER:   And finally, page 167, if you could

13   highlight the "risk of loss" paragraph.

14   BY MR. TOUGER:

15   Q.   If you could just read the last sentence of that paragraph.

16   A.   "Accordingly, partners may incur substantial losses on

17   their investments in the partnership, and it is possible that

18   the partnership's and/or the master fund's performance will

19   fluctuate substantially from period to period."

20   Q.   So the PPM makes it quite clear that investing is a risky

21   business, correct?

22   A.   It does.

23          MR. TOUGER:   Now, by the way, if you can go back to

24   page 134 and if you could blow up the Cayman Island section in

25   the second section.

i5v2gal2                    Smith - Cross

BY MR. TOUGER:

Q.  Who is that?

A.  I couldn't tell you.

Q.  You don't -- you have no idea?

A.  No.

Q.  Now, when you found out about OSERS' investment that
Michelle Morton made in the bonds for the WLCC, you immediately
basically decided that you didn't want these in the account for
the reasons you stated on direct, right?

A.  That is true.

Q.  Within a week, two days really, right?

A.  That is true.

Q.  And you had received at that point no financial reports --
no money was due to OSERS at that point in time when you
decided you didn't want the investment.

A.  Please restate the question.

Q.  Sure.

        THE COURT:  It sounds like someone keeps mouthing the
microphone.  I don't know who the culprit is, but let's just
all be careful.

        Please proceed.

BY MR. TOUGER:

Q.  You decided within 48 hours of finding out that OSERS owned
these WLCC bonds that you didn't want them, is that right?

A.  That is true.

i5v2gal2                          Smith - Cross

1    Q.  The WLCC bonds had not failed on any of their payment

2    structure to you at that point in time.

3    A.  They had not.

4    Q.  By the way, has OSERS, in your history with them, ever

5    failed to meet their financial obligations to their union

6    members?

7    A.  No.

8              MR. TOUGER:  Nothing further, your Honor.

9              THE COURT:  Any other cross-examination?

10             MR. SCHWARTZ:  With your Honor's permission,

11   Mr. Wenner will question.

12   CROSS EXAMINATION

13   BY MR. WENNER:

14   Q.  Good morning Mr. Smith, members of the jury.

15   A.  Good morning.

16   Q.  My name is Craig Wenner.  I represent Devon Archer.  You

17   and I have never met before, is that right?

18   A.  That is true.

19   Q.  You have met with the government before, is that true?  You

20   have met with the government before in this case, the

21   prosecutors here?

22   A.  That is true.

23   Q.  And you were interviewed by the government in December of

24   2017, is that right?

25   A.  I don't remember the dates, but I will assume that you have

1    got it correct.  I don't remember.

2    Q.  Sure.  Give me a moment.

3         MR. WENNER:  Mr. Jackson, are you able to pull up,

4    please, 3534-1, 3500 material.

5         (Pause)

6    Q.  You recall, Mr. Smith, that it was toward the end of last

7    year?

8    A.  Yes.

9    Q.  And that meeting at the end of last year, was that the

10   first time that you met with the government?

11   A.  Yes, as far as my memory.

12   Q.  Did you meet with the government again on April 20, 2018,

13   to prepare for your testimony here today?

14   A.  That probably was by telephone, because I don't remember

15   any meetings.

16   Q.  Do you recall speaking with them on the phone in April?

17   A.  Yes, yes.

18   Q.  And that was about the testimony here today, is that right?

19   A.  Yes, um-hmm.

20   Q.  When the government was asking you questions, you testified

21   about your interactions with Michelle Morton and others at

22   Atlantic.  Do you recall testifying about that?

23   A.  Yes.

24   Q.  Approximately how many times would you say you spoke with

25   Michelle Morton?

i5v2gal2                          Smith - Cross

1    A.  When you say "spoke," do you mean by telephone or other

2    communication?

3    Q.  Well, let's take it one at a time.  Do you recall how many

4    phone calls you had?

5    A.  My recollection, two.

6    Q.  Two phone calls.  Do you recall if you had in person

7    meetings with her?

8    A.  Never.

9    Q.  And approximately how many e-mails do you think you

10   exchanged with Michelle Morton?

11   A.  I couldn't be precise, but a dozen or more.

12   Q.  You mentioned a phone call on April 23, 2015.

13           (Pause)

14           THE WITNESS:  I'm the culprit, am I?

15           THE COURT:  It was the binders.

16   BY MR. WENNER:

17   Q.  Let me begin again.

18           Mr. Smith, you testified about a phone call on April

19   23, 2015 with members of Atlantic.  Do you recall?

20   A.  Yes.

21   Q.  And you said that you spoke on the phone in that call with

22   Morton, Sellers, Deary, and you had the impression that there

23   were others on the call.  Do you recall saying that?

24   A.  Correct.

25   Q.  Were the people on that call that day, Deary, Morton, Cole,

1   Trotter, sellers and yourself?  Does that sound right?

2   A.  As I say, I remember Ron and Michelle and Richard.  I don't

3   remember specifically the others.

4        MR. WENNER:  Mr. Jackson, are you able to pull up the

5   3500 at this time?  Could you please bring up 3534-1.  And I

6   would like if you can to show it just to the judge, the

7   attorneys, and the witness, please.

8        (Pause)

9   Q.  Once I am able to bring that up, I will come back and ask

10  you about that.

11       In all time you were talking to people from Hughes and

12  Atlantic, you never spoke with Devon Archer, is that right?

13  A.  That is true.

14  Q.  And you have never exchanged text messages with Mr. Archer,

15  have you?

16  A.  Not that I'm aware of.

17  Q.  You have never e-mailed with Mr. Archer, have you?

18  A.  Not that I'm aware of.

19  Q.  Am I correct that you have never communicated with

20  Mr. Archer in any way?

21  A.  Not to my knowledge.

22  Q.  And am I correct that here today you in fact have nothing

23  to say about Mr. Archer at all?

24  A.  I don't know the gentleman.

25  Q.  So I would like to just ask you a few more questions about

1    OSERS' portfolio of investments generally.

2           You spoke with Mr. Touger about the broad range of

3    investments that OSERS' makes, and I believe you said at the

4    time you retired, in 2015, OSERS had approximately $1.2 billion

5    assets under management, is that right?

6    A.   Correct.

7    Q.   And the types of investments that OSERS held were in a

8    broad range of assets and that included stocks, private equity,

9    real estate, and fixed income.  Does that sound correct?

10   A.   Yes.

11   Q.   And on fixed income investments specifically, am I correct

12   that fixed income investments includes debt investments, like

13   bonds?

14   A.   Yes.

15   Q.   And debt investments are sometimes rated by a third party,

16   such as Standard & Poor's, is that right?

17   A.   That is correct.

18   Q.   And last year or at the time you retired, if you recall,

19   were approximately over 60 percent of OSERS' debt investments

20   unrated?

21   A.   Not to my recollection.

22          MR. WENNER:  Mr. Jackson, would you please bring up

23   for the witness, the lawyers, and the court, but not the jury,

24   DX 4759, please.

25          (Pause)

i5v2gal2                          Smith - Cross

1                MR. WENNER:  Your Honor I have a paper copy for the

2    witness.  May I approach?

3                THE COURT:  Yes, you may.

4                THE DEPUTY CLERK:  If it's easier, Mr. Wenner, you can

5    pull out the drawer there --

6                MR. TOUGER:  Oh, this.  The Elmo.

7                THE DEPUTY CLERK:  -- and then everyone can see it.

8    BY MR. WENNER:

9    Q.  Mr. Smith, the document I have just handed you is OSERS'

10   financial statement and supplementary information from August

11   31, 2017.  Is that correct?

12   A.  Yes, it is.

13   Q.  And in your -- the many years working with OSERS, you have

14   seen documents like this, you have reviewed OSERS' financial

15   statements, is that right?

16   A.  I have.

17               MR. WENNER:  Your Honor, this document is stipulated

18   to as a business record, and I would move it into evidence at

19   this time?

20               THE COURT:  Any objection?

21               MS. TEKEEI:  We have no objection, your Honor.

22               THE COURT:  That will be admitted.

23               (Defendant's Exhibit 4759 received in evidence)

24               (Counsel confer)

25   BY MR. WENNER:

1    Q.  Mr. Smith, this is the same exhibit that you are holding.

2    It just has a different stamp on the bottom of it that is on

3    the screen.  It is the same document.

4            MR. WENNER:  If you could please turn to PDF page 13,

5    and if you could please expand section B, "Credit Risk."

6    BY MR. WENNER:

7    Q.  Mr. Smith, this is the report page 11, and I'm not sure if

8    you prefer working with the paper or the screen.  Is the screen

9    sufficient?

10   A.  Either way.

11   Q.  If you are looking at the screen, please, would you please

12   read in that first paragraph, the last sentence, beginning

13   "OSERS' rated debt investments"?

14   A.  "OSERS' rated debt investments as of August 31, 2017, were

15   rated by Standard & Poor's and/or an equivalent national rating

16   organization, and the ratings are presented below using the

17   Standard & Poor's rating scale.

18   Q.  And looking at the last row, what does NR stand for?

19   A.  Not rated.

20   Q.  And if you add up the numbers along the bottom row, is that

21   approximately 150 million?

22   A.  Approximately.

23   Q.  And there was nothing unusual about OSERS holding unrated

24   debt investments, is that correct?

25   A.  Well, this was after I retired, so I can't speak to this

i5v2gal2                          Smith - Cross

1   particular period of time.  We did have nonrated while I was

2   there, but it was not a large component of things.

3   Q.  Not a large component, but there was no problem with OSERS'

4   holding unrated securities.  They were just a particular kind

5   of security within your asset portfolio.

6   A.  It would have to have fit within the parameters of that

7   particular manager.

8   Q.  As with all of your investments.

9   A.  Right, right.  So . . .

10  Q.  And there is also nothing that prohibited -- as long as it

11  fit within investment parameters, there was nothing that

12  prohibited OSERS from investing in restricted securities, is

13  that right?

14  A.  True.

15          MR. WENNER:  You can pull the document down now,

16  please.  Thank you.

17  BY MR. WENNER:

18  Q.  You can set that aside, Mr. Smith.

19          Part of your responsibility at OSERS was overseeing

20  investment managers, is that right?

21  A.  That is true.

22  Q.  And it was approximately in July of 2013 that OSERS

23  invested in Atlantic Asset Management's GYOF, is that right?

24  A.  Yes.

25  Q.  And in making that investment in GYOF, I believe you

i5v2gal2                          Smith - Cross

1   testified with the government that OSERS had moved funds from a

2   previous fixed income investment to GYOF in order to bring in

3   higher returns, is that right?

4   A.   Yes.

5   Q.   And in that sense, GYOF was intended to be a high-yield

6   investment vehicle, is that right?

7   A.   Not in the terms of how I think about that.

8   Q.   Let me ask you --

9   A.   High yield is a specific type of security.

10  Q.   A specific type of security.

11         Is a high-yield investment an investment that carries

12  a higher risk but also the possibility of a higher reward?

13  A.   A high-yield security does trade off risk against reward,

14  yes.

15  Q.   And, generally speaking, the higher the interest rate

16  reflects the higher relative risk of that particular

17  investment.

18  A.   That is accurate.

19  Q.   And in contrast, what you might say is a more conservative

20  or safe investment, like a treasury bond, would have a lower

21  interest rate.

22  A.   That is accurate.

23  Q.   With respect to GYOF, I believe you testified that there

24  were no other investors other than OSERS, is that correct?

25  A.   No other institutional investors.

i5v2gal2                          Smith - Cross

1   Q.  Are you aware of any other investors in GYOF?

2   A.  Yes, there were individual investors because when we would

3   see the accounting, there was more than just OSERS' money

4   showing up in the accounting, but they were not institutional

5   size.

6   Q.  They were not institutional size.  And what is

7   institutional size?

8   A.  50 to 100 million would be the minimum you would think of

9   in terms of institutional.

10  Q.  And OSERS was the only of that magnitude, is that right?

11  A.  We were the only investor in GYOF of that size.

12  Q.  And when GYOF was investing, they were investing into an

13  account that they held on behalf of OSERS, is that right?  In

14  other words -- I can rephrase.

15  A.  Please.

16  Q.  When GYOF would make investments, OSERS did not own those

17  particular investments.  OSERS was an investor in the fund, is

18  that right?

19  A.  That's accurate.

20  Q.  And the fund itself, GYOF, would hold assets for the

21  benefit of OSERS.

22  A.  That is true.

23  Q.  And so I just want to be clear, you had an interest in the

24  fund, correct?

25  A.  Correct.

i5v2gal2                          Smith - Cross

1    Q.  And the fund owned assets, is that true?

2    A.  Correct.

3    Q.  And there was nothing unusual about that arrangement, was

4    there?

5    A.  No.

6    Q.  And that's typically how investments with investment

7    advisors worked, is that true?

8    A.  No.  Most of the investments we had were an investment

9    advisor purchasing or having someone purchase securities that

10   went into a fund held by our custodial bank.  So this fund

11   arrangement was unusual, where we were investing in a fund and

12   then the fund was the one holding the security.  So this was

13   not the norm.

14   Q.  Not the norm for OSERS, is that true?

15   A.  Correct.

16   Q.  But it is common in the industry for investment advisors to

17   purchase assets on behalf of someone else, is that right?

18              MS. TEKEEI:  Objection.

19              THE COURT:  Sustained.  Let's focus on his knowledge.

20              MR. WENNER:  Certainly.

21   BY MR. WENNER:

22   Q.  To your knowledge, as -- to your knowledge, do investment

23   advisors invest in assets on behalf of their clients?

24              MS. TEKEEI:  Objection, your Honor.

25              THE COURT:  Just based on your experience.

i5v2gal2                    Smith – Cross

1    BY MR. WENNER:
2    Q.  Are you aware -- you have described one arrangement and I
3    have described another.  I am just asking if investment
4    advisors, to your knowledge, have contracts, such as OSERS did
5    in this instance, where the investment advisor will acquire
6    assets on behalf of its client?
7              MS. TEKEEI:  Same objection.
8              THE COURT:  Have you seen that in your experience?
9              THE WITNESS:  I can't speak to it because our approach
10   was primarily investment managers buying funds that went into
11   our custodial bank fund.  This was unusual for us.  So I can't
12   speak to how common it is.
13   Q.  But it was the arrangement that OSERS had agreed to in this
14   instance, correct?
15   A.  This was the way GYOF was set up.
16   Q.  Right.  Okay.
17             Mr. Smith, thank you.
18             No further questions, your Honor.
19             THE COURT:  Thank you.
20             Ms. Notari.
21   CROSS EXAMINATION
22   BY MS. NOTARI:
23   Q.  Good afternoon, Mr. Smith.
24   A.  Good morning.
25   Q.  Did you say "good morning"?

i5v2gal2                           Smith - Cross

1    A.  I believe it still is.

2    Q.  Okay, sorry.

3             Mr. Smith, you testified that you were -- the OSERS

4    pension plan is set up in such a way that the board of trustees

5    use outside investment advisors who present investment

6    strategies.

7    A.  An investment consultant would provide the investment

8    strategy.

9    Q.  Okay.  And these investment consultants define the strategy

10   and policy for the pension plan, correct?

11   A.  They recommend a strategy.

12   Q.  And then, based on those recommendations, once they are put

13   in place, then they contract out with investment managers who

14   oversee the investments.  Correct?

15   A.  Once the strategy is put in place, then the board of

16   education will contract with managers to execute that strategy.

17   Q.  And in this particular situation, Atlantic Asset --

18   Atlantic was the investment manager, correct?

19   A.  Correct.

20   Q.  And they had been the investment manager, working with

21   OSERS since 1993?

22   A.  That is correct.

23   Q.  And it's fair to say that Atlantic was partially owned by

24   Ron Sellers?

25   A.  That is correct.

i5v2gal2                          Smith - Cross

1   Q.   And you had a very positive relationship with Ron Sellers

2   over the 20 years that he was working with OSERS?

3   A.   That is correct.

4   Q.   And it's fair to say that you had a lot of trust in him.

5   A.   Yes, we did.

6   Q.   And you had a great track record over the years with your

7   pension funds with Atlantic and when Ron Sellers was in charge,

8   correct?

9   A.   That is true.

10  Q.   Now, at some point you said that Ron Sellers called you to

11  let you know that he had a buyer for Atlantic.

12  A.   Yes.

13  Q.   And your understanding was that he was going to merge with

14  another company, and he would continue to be in place

15  assisting.

16  A.   We were assured that not only he, but his entire team would

17  be.

18  Q.   And it's fair to say that Ron Sellers gave you some

19  details.  He told you that Hughes Capital Management would be

20  purchasing Atlantic and he told you that -- he provided you

21  details and it's fair to say that at that moment during that

22  phone call he was enthusiastic about the merger.

23  A.   I can't really speak to his enthusiasm.  He was informing

24  us of the merger.

25  Q.   Well, you previously met with the government in this case

i5v2gal2                          Smith - Cross

1   and one of the words that you used was that you were

2   enthusiastic, that Mr. Sellers was enthusiastic about the

3   merger.

4   A.  Okay.

5   Q.  Okay.  So you may have used that word.

6   A.  Okay.

7   Q.  And you -- during this conversation, Mr. Sellers assured

8   you that he was impressed with Michelle Morton's credentials.

9   A.  Yes.  He felt that it was going to work well to have a

10  minority owner of the firm.

11  Q.  And Mr. Sellers saw this as a positive move for -- in terms

12  of OSERS.

13           THE COURT:  Sustained.

14           MS. TEKEEI:  Objection.

15  Q.  Mr. Sellers explained to you that this was going to be a

16  positive move.

17           MS. TEKEEI:  Objection: relevance, hearsay.

18           MS. NOTARI:  Your Honor, again, it is for the effect

19  on the listener.

20           THE COURT:  Sustained.

21  BY MS. NOTARI:

22  Q.  At some point, your discussion -- this merger eventually

23  was the subject of an approval with the board of trustees,

24  correct?

25  A.  Yes, it was.

i5v2gal2                          Smith - Cross

1  Q.  And in fact, the board of trustees had to approve the

2  merger of Atlantic and Hughes Capital, correct?

3  A.  No.  The board of trustees had to determine whether they

4  were going to continue to allow the investment management

5  agreement to stay in place after the merger had occurred.  They

6  had no control over the merger.

7  Q.  So at some point, Mr. Sellers and yourself presented to the

8  board of trustees that there was going to be a merger, correct?

9  A.  Yes.

10  Q.  And during that meeting, the board of trustees decided that

11  they would continue to work with Atlantic and Hughes Capital,

12  correct?

13  A.  Yes.

14  Q.  And in fact, the new management firm was now going to be

15  called Atlantic Asset Management.

16  A.  That is correct.

17  Q.  And you attended that meeting, correct?

18  A.  Excuse me?

19  Q.  You attended that meeting with the board of trustees.

20  A.  Yes, I did.

21  Q.  And the board of trustees voted to continue investing with

22  the merged companies of Atlantic and Hughes.

23  A.  Yes, they did.

24  Q.  And in fact, you yourself did not oppose the continued

25  relationship with Atlantic after the merger.

i5v2gal2                          Smith - Cross

1    A.  I did not.

2    Q.  Now, you talked about the GYOF, and you would agree that

3    there are different styles of income management.

4    A.  Yes.

5    Q.  Not every pension plan uses the same investment strategies.

6    A.  That is correct.

7    Q.  And in this particular instance, your pension plan had very

8    specific, unique pension strategies that were unique to OSERS,

9    correct?

10   A.  I don't know that they were unique to OSERS.  We had our

11   investment strategy, but I don't know that it was that unique

12   from other pension plans.

13   Q.  But your strategies were determined by an independent group

14   that assessed the risks and what your needs were and they put

15   these strategies in place.

16   A.  The board of trustees employed an investment consultant to

17   provide guidance as to how best to achieve the rate of return

18   that the board needed.  That consultant very well could have

19   provided the identical guidance to dozens of others plans.  I

20   have no knowledge of that.

21   Q.  But each -- the guidelines were -- the pension plan had,

22   you said there were seven sleeves and within each sleeve there

23   were specific parameters as to the investments.

24              MS. TEKEEI:  Objection: relevance, asked and answered.

25              THE COURT:  Overruled.

i5v2gal2                          Smith - Cross

1          You can answer, if you can.

2    A.  Well, within GYOF, you had this very specific arrangement

3    laid out in the private placement memorandum, yes.

4    Q.  And you did not believe that the Wakpamni bonds fit within

5    the investment guidelines of what was required by the OSERS

6    pension plan, correct?

7    A.  No.  What I said was that they didn't fit within the

8    parameters of the private placement memorandum that governed

9    GYOF.

10   Q.  You decided that the bonds were not good given -- given

11   what your -- what your goals were as per your investment

12   strategies.

13   A.  No.  What I said was that they were two and a half times

14   the maximum limitation imposed in the private placement

15   memorandum.  They fit within no sleeve that had been agreed to

16   within the private placement memorandum, and they were

17   purchased by none of the seven investment professional groups

18   that were to govern the investments within the private

19   placement memorandum.

20   Q.  And that's specific to OSERS?

21   A.  That's specific to GYOF.

22   Q.  And GYOF was what OSERS was investing in, correct?

23   A.  Invested in, yes.

24   Q.  And it's fair to say that the fact that the WLCC bonds were

25   not rated did not disqualify them from being in GYOF?

i5v2gal2                          Smith - Cross

1   A.   That alone did not.

2   Q.   And the fact that the -- in fact, GYOF had previously

3   utilized unrated bonds, correct?

4   A.   I wouldn't know, but I wouldn't be surprised.

5   Q.   So if you had previously told the government in a prior

6   meeting that unrated bonds were allowed into GYOF, but only

7   after they had been approved, you would stand by that

8   statement.

9   A.   Yeah.  I mean, they were up to the seven different

10  professional management firms to determine what fit within

11  their parameters.

12  Q.   Now, the fact that the WLCC bonds were 144A issuance was

13  also not an issue for you.

14  A.   That was not an issue.

15  Q.   Now, it's fair to say that over time it became clear that

16  Michelle Morton was responsible -- the person responsible for

17  purchasing the bonds?

18            MS. TEKEEI:  Objection, your Honor.

19            THE COURT:  Sustained.

20  BY MS. NOTARI:

21  Q.   On April 23, 2015, you contacted Ron Sellers to discuss the

22  purchase of the WLCC bonds into the OSERS account.

23  A.   No.

24  Q.   You didn't?

25  A.   I didn't make the contact, no.  They contacted me.

i5v2gal2                        Smith - Cross

1    Q.  Did you have a conversation with Ron Sellers on April 23,

2    2015?

3    A.  Yes.

4    Q.  And during that conversation, you discussed with him the

5    fact that the WLCC bonds had been purchased into the OSERS

6    account.

7    A.  He informed me of that fact.

8    Q.  And you recall during that conversation that Mr. Sellers'

9    attitude was enthusiastic about the purchase of the bonds?

10            MS. TEKEEI:  Objection.

11            MR. TOUGER:  Objection.

12            THE COURT:  Sustained.

13   BY MS. NOTARI:

14   Q.  During that conversation, what was Mr. Sellers' attitude

15   toward the purchase of the bonds?

16            MR. TOUGER:  Objection.

17            THE COURT:  Sustained.

18   BY MS. NOTARI:

19   Q.  During that conversation, what do you recall discussing

20   with Mr. Sellers as far as the bonds?

21            MR. TOUGER:  Objection.

22            MS. TEKEEI:  Objection.

23            THE COURT:  Sustained.

24            You can ask Mr. Smith how he felt and why he did what

25   he did.

i5v2gal2                          Smith - Cross

1           MR. TOUGER:  Objection.

2    BY MS. NOTARI:

3    Q.  What was --

4           MS. NOTARI:  Can I just have one moment?

5           THE COURT:  Sure.

6    BY MS. NOTARI:

7    Q.  Now, at some point during the time you maintained contact

8    with your -- with people at Atlantic, even after the merger.

9    A.  What is the question?

10   Q.  I said after the merger, you continued to maintain contact

11   with individuals at Atlantic.

12   A.  Yes, I did.

13   Q.  And you discussed with them the issues concerning the bond

14   and what was going on with the bond.

15          MS. TEKEEI:  Objection.

16          MR. TOUGER:  Objection, your Honor.

17          THE COURT:  Sustained.

18   BY MS. NOTARI:

19   Q.  At some point you learned that Burnham was involved in this

20   transaction?  You had a discussion with Mr. Sellers?

21   A.  I don't remember names.  What role did -- what question

22   would you like me to answer?

23   Q.  Did you discuss with Ron Sellers the fact that he was --

24          THE COURT:  Sustained.

25   BY MS. NOTARI:

i5v2gal2                          Smith - Cross

1   Q.  Now, at some point you did audits of the value of the bonds

2   during this time?

3   A.  At a board of trustees meeting, one of the board members

4   requested that a third party look at the bonds to make an

5   independent evaluation.  I don't know that I would call it an

6   audit, but we cooperated by sending material to that third

7   party.

8   Q.  And you did an audit of the bonds and it was determined

9   that the value of the bonds were at par.

10           MS. TEKEEI:  Objection.

11  BY MS. NOTARI:

12  Q.  In September of 2015.

13           THE COURT:  Sustained.

14  BY MS. NOTARI:

15  Q.  Mr. Smith, you have never met Bevan Cooney?

16  A.  I have not.

17  Q.  You have never spoken to him?

18  A.  I have not.

19  Q.  You have never participated in any meetings with him?

20  A.  I have not.

21  Q.  You have never text messaged him?

22  A.  No.

23  Q.  Or e-mailed him?

24  A.  Not to my awareness.

25           MS. NOTARI:  I have no further questions.

i5v2gal2                        Smith - Cross

1              THE COURT:  Thank you.

2              MS. TEKEEI:  We have no further questions, your Honor.

3              THE COURT:  All right.  Anyone else?

4              All right.  Thank you.  You may step down.

5              (Witness excused)

6              THE COURT:  Do you want to take our morning break now?

7    So why don't we take a short morning break -- I know we got

8    started a little late -- and then we will continue with the

9    rest of the testimony this morning.

10             Just remember, keep an open mind and don't discuss the

11   case.

12             Thank you.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

i5v2gal2                          Smith - Cross

1              (Jury not present)

2              THE COURT:  Mr. Touger, you made one objection, I

3    think, to something I said, which is a little unorthodox.  I

4    was just -- the questions I thought would elicit hearsay, so I

5    was saying that she could ask him about something that he felt

6    or that he did, meaning the witness, not another individual, so

7    just to make that clear.  That was the basis of my ruling.

8              Any issues that need to be addressed?  Okay.

9              MR. SCHWARTZ:  We are just going to make sure we have

10   our tech in place over the break so that everything goes

11   smoothly afterwards, because we obviously had a hiccup there.

12             THE COURT:  I'm sorry.  I didn't hear you.

13             MR. SCHWARTZ:  We are just going to make sure that we

14   have our tech in place, because we had a hiccup there.  Just

15   before the jury comes back, let's just make sure that's smooth.

16             THE COURT:  Just so you know, we have a tech person

17   coming tomorrow -- i know you are not going to be here -- but

18   hopefully to set up another station which hopefully will make

19   the tech move more smoothly.

20             MR. SCHWARTZ:  Perfect.  Thank you, your Honor.

21             (Recess)

22

23

24

25

I5V7GAL3

1              (Jury not present)

2              MR. SCHWARTZ:  It appears that it's a wire issue, so

3      if we could take a two minute break after the direct before we

4      go into cross, just to make sure.  If it's working, it will

5      work.  If not, we will have to use the government's wire and

6      just reshuffle the seating.

7              THE COURT:  Just let me know.  We will keep the jury

8      there and see if anybody wants to step out.

9              So why don't we bring them in now.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5V7GAL3                         Driever - Direct

 1            (Jury present)

 2            THE COURT:  Government can call its next witness.

 3            MS. MERMELSTEIN:  Thank you, your Honor.  The

 4   government calls Catharine Driever.

 5    CATHARINE DRIEVER,

 6         called as a witness by the government,

 7         having been duly sworn, testified as follows:

 8            THE WITNESS:  My name is Catharine Driever,

 9   C-A-T-H-A-R-I-N-E, last name D -- as in David -- R-I-E-V-E-R.

10            THE COURT:  You may proceed.

11   DIRECT EXAMINATION

12   BY MS. MERMELSTEIN:

13   Q.  Good morning, Ms. Driever.  Where are you employed?

14   A.  Morgan Stanley.

15   Q.  And how long have you worked at Morgan Stanley?

16   A.  Since August of 2010.

17   Q.  What is your current title?

18   A.  Client service associate.

19   Q.  And how long have you been a client service associate?

20   A.  Since July of 2012.

21   Q.  As a client service associate at Morgan Stanley, are you

22   part of any particular group?

23   A.  Yes.

24   Q.  What group is that?

25   A.  In private wealth management at Morgan Stanley; I am on a

1    team of ten people.

2    Q.   What is private wealth management?

3    A.   It's a division at Morgan Stanley.

4    Q.   What does it generally do?

5    A.   Private wealth management is a department in which clients

6    can employ a team for their professional management of money.

7    Q.   What are your specific responsibilities as a client service

8    associate in that group?

9    A.   As a client service associate, I support the financial

10   advisor in his business.

11   Q.   Are you responsible for giving financial advice to clients

12   yourself?

13   A.   No.

14   Q.   What kinds of things do you do?

15   A.   I perform the daily operational aspects of the business.

16   Q.   I think if you leave a little space between the microphone

17   it's actually better.

18            THE COURT:  You're not the first.

19   A.   So, I answer the phones, I help with account openings, so I

20   would send the documents to the client when they are a new

21   client to our group.  I handle the daily operational things

22   such as wire requests, journals, transfers, answering any

23   questions the clients have dealing with their accountants,

24   anything just to help with the daily base.

25   Q.   Are you responsible for actually sending out monthly

1  statements to clients?

2  A.  No.

3  Q.  How is that done?

4  A.  Statements are automated.  It will be sent via automated

5  e-mail.

6  Q.  Turning to approximately 2014, who did you report to at

7  that time?

8  A.  Five advisors on my team.

9  Q.  Was one of those people Eugene Schatz?

10 A.  Yes.

11 Q.  Are you familiar with a person named Devon Archer?

12 A.  Yes.

13 Q.  Have you ever met him in person?

14 A.  No.

15 Q.  How are you familiar with him?

16 A.  Devon Archer was a client of Eugene Schatz.

17 Q.  Have you ever spoken to Mr. Archer on the phone?

18 A.  Yes.

19 Q.  Are you also familiar with a person named Sebastian

20 Momtazi?

21 A.  Yes.

22 Q.  And how are you familiar with Mr. Momtazi?

23 A.  Sebastian Momtazi was Devon Archer's assistant.

24 Q.  Did you ever speak to Mr. Momtazi on the phone?

25 A.  Yes.

1    Q.   Does he have any kind of accent?

2    A.   He does.

3    Q.   What kind of accent?

4    A.   It was European.  I'm not sure where it was from, but I

5    would say probably Great Britain.

6    Q.   And have you ever met him in person?

7    A.   Yes.

8    Q.   For extended periods of time or a brief period of time?

9    A.   Brief periods of time.

10   Q.   Do you think you would recognize him if you saw him again?

11   A.   Possibly.

12   Q.   Now you mentioned that you became familiar with Mr. Archer

13   when he became a client of Eugene Schatz's.  Approximately when

14   did Mr. Archer become a client of Mr. Schatz's?

15   A.   Early 2014.

16   Q.   And in general terms, what involvement did you have in

17   working on Mr. Archer's accounts?

18   A.   I had sent him the account opening documents, which were

19   then returned.  We opened the accounts for him.  And I assisted

20   him in wire requests.

21   Q.   Who did you generally interact with with respect to Mr.

22   Archer's account?  Mr. Archer?  Mr. Momtazi?  Both?

23   A.   Both but more Mr. Momtazi.

24   Q.   I want to turn your attention now to September of 2014.

25   Did there come a time that you became involved in an effort by

1    Mr. Archer to purchase a Wakpamni bond?

2    A.  Yes.

3              MS. MERMELSTEIN:  Your Honor, I'm now going to offer

4    by agreement between the parties the following Government

5    Exhibits:  339, 341, 342, 343, 344, 348, 349, 352, 301.

6              I apologize.  I realize I've read from only a partial,

7    so let me start over.  301, 339, 341 to 344, 348 to 355.

8              THE COURT:  All right.  They will be admitted.  Thank

9    you.

10             (Government Exhibits 301, 339, 341 to 344, 348 to 355

11   received in evidence)

12             MS. MERMELSTEIN:  Now, let me ask, Mr. Wissman, if you

13   can please pull up Government Exhibit 339 in evidence for

14   everyone.

15   Q.  Let me direct your attention, Ms. Driever -- you have it on

16   the screen and if it's easier, you have it in a binder in front

17   of you -- let me direct your attention to Government Exhibit

18   339.

19             And if we can start on the fourth page of that e-mail,

20   Mr. Wissman.

21             And if we can start at the bottom e-mail from Mr.

22   Momtazi to you cc'ing Mr. Archer.  What is the date of that

23   e-mail?

24   A.  September 29, 2014.

25   Q.  And let me ask you to read that e-mail for the jury through

1   and including the issuer.

2   A.  "Good morning, Catharine.  As discussed, we would like to

3   make the following bond purchase.  This is a new issue, which

4   is DTC eligible.  It can settle either DTC or physical

5   delivery.  From Rosemont Seneca Bohai LLC, a purchase in the

6   amount of $15 million of issuer Wakpamni Lake Community Corp. S

7   D SPL LTD. REV."

8   Q.  What did you understand was Rosemont Seneca Bohai LLC?

9   A.  It was an entity account that Mr. Archer had opened up at

10  Morgan Stanley.

11  Q.  And turning then to page 2 of this exhibit -- and let me

12  direct your attention to the bottom of the page, to your full

13  e-mail.  Who are you writing to there?

14  A.  Sebastian.

15  Q.  And who is being cc'd?

16  A.  Devon Archer.

17  Q.  And what do you write?

18  A.  "Hi, Sebastian.  I'm waiting for confirmation from the

19  trader if we can hold the security on our platform.  Thanks,

20  Catharine."

21  Q.  Now, are you responsible for deciding whether Morgan

22  Stanley can hold a security in its accounts or on its platform?

23  A.  No.

24  Q.  Who is responsible for that decision at Morgan Stanley?

25  A.  There is a due diligence process.  Documents must be

1    submitted, and multiple parties at Morgan Stanley have to

2    review the bonds.

3    Q.  Did there come a time that Mr. Archer purchased the bond

4    that we were just discussing in that e-mail?

5    A.  He did not purchase them through Morgan Stanley.

6    Q.  Did there come a time generally that he did purchase them?

7    A.  Yes.

8              MR. SCHWARTZ:  Objection.

9              THE COURT:  As far as you know.

10   A.  Yes.

11   Q.  Were you then involved following the purchase in efforts to

12   deposit that bond at Morgan Stanley?

13   A.  Yes.

14   Q.  So let's look at Government Exhibit 341, please.

15             Mr. Wissman, if we can pull up the first and second

16   pages side by side.

17             So, Ms. Driever, let me direct your attention to the

18   e-mail that starts at the very bottom of the first page and

19   continues on to the second page.  Who are the senders and

20   recipients of that e-mail?

21   A.  The e-mail is coming from Sebastian Momtazi; it's being

22   sent to me with a cc to Devon Archer.

23   Q.  Let me ask you to read the e-mail, please.

24   A.  "Good morning, Catharine.  Per the attached instructions,

25   please wire $15 million from Rosemont Seneca Bohai LLC, account

1    876018483 to U.S. Bank National Associate."

2    Q.  Let just ask you to skip down to where it says "Ref:" and

3    read just what that wire is in reference to.

4    A.  The reference is Wakpamni Town Center 211683000, attention

5    Tia Xiong, (651) 466-6134.

6    Q.  And then let's go to the first page of this e-mail, please.

7    And how do you respond to Mr. Momtazi's e-mail at the bottom of

8    that page at 9:05 a.m.?

9    A.  "Confirming receipt.  Will call shortly with Gene to give a

10   status on holding Wakpamni bonds.  Thanks, Catharine."

11   Q.  Why were you calling to give a status on the Wakpamini

12   bonds?

13   A.  There is a due diligence process in order to see if we can

14   hold the bonds on our platform.  It was currently under review.

15   Q.  And then let me ask you to read Mr. Archer's response to

16   you at 9:15 a.m.

17   A.  "Thanks, Catharine.  Please initiate the wire and I'll be

18   available for voice confirm until ten a.m. and then after 11

19   a.m.  Devon Archer."

20   Q.  What is a voice confirm?

21   A.  The rules at the time were for wires over 500,000 we must

22   have a manager on the line with us from our branch to verbally

23   confirm the instructions with the client.

24   Q.  So, how does a voice confirm actually work logistically?

25   A.  First I would get Devon on the line; then I would

1    conference in one of our branch managers; I would introduce

2    him, and they would ask him whatever they needed to know about

3    the wire transfer before it was released.

4    Q.  Now, the $15 million wire transfer requested in this

5    e-mail, was that in fact sent as requested?

6    A.  Yes.

7    Q.  Let me direct your attention now to Government Exhibit 342.

8    And we're going to start at the very top of this e-mail from

9    you to Mr. Momtazi.  Who is cc'd on that e-mail?

10   A.  Devon Archer and Eugene Schatz.

11   Q.  Let me ask you to read the second paragraph and third

12   paragraph beginning "Apologies".

13   A.  "Apologies, but we will also need the attached private

14   securities form completed.  Please complete all blank fields

15   and have Devon sign on page 3.  You can drop the forms off this

16   afternoon or tomorrow is fine too.  The original cert is not

17   arriving until tomorrow anyways.  Thanks, Catharine."

18   Q.  What is a private securities form?

19   A.  A private securities form is one of the documents that we

20   require for private placements.  It's almost like a cover sheet

21   that goes with the bond certificate that outlines the amount of

22   the bonds to be deposited, the CUSIP, how they acquired the

23   bonds, general information.

24   Q.  Just so we're clear, at this point in time on October 1,

25   2014, had Morgan Stanley in fact agreed to hold the Wakpamni

1    bonds for Mr. Archer?

2    A.   No.

3    Q.   Was the completion of this private securities form the

4    final step in that process or just one of the steps?

5    A.   It was not the final step; it was just one of the steps.

6    Q.   Did there come a time when you received a completed copy of

7    the private securities form?

8    A.   Yes.

9    Q.   Let me direct your attention to Government Exhibit 343.

10   Now, this is an October 3, 2014 e-mail that appears to be from

11   you to you, and let's look at the attachment to that e-mail.

12   What is this document?

13   A.   This is the form that we had just referenced in the

14   previous e-mail, the client representation letter.

15   Q.   Why were you e-mailing yourself a copy of the client

16   representation letter?

17   A.   We required an original copy of this letter.

18   Q.   And so how did you obtain the original copy?

19   A.   Sebastian had dropped off the original in the lobby of our

20   building, and I had scanned a copy to myself before turning it

21   in.

22   Q.   And when you say turning it in, who do you turn it into?

23   A.   It's first turned into the branch manager with other

24   documents to start the due diligence process.

25   Q.   Now, if you look at paragraph one on this document.  Where

1    it says "I acquired and fully paid for the private security on

2    10/1/2014, in the following manner," what is the method of

3    acquisition?

4    A.  Purchase.

5    Q.  And what is the manner of payment?

6    A.  Wire transfer.

7    Q.  And then if we can look at paragraph 3, please.  What does

8    this indicate about whether the shares are restricted?

9    A.  It indicates that the shares are not restricted.

10   Q.  If we can go to the last page of this attachment, please,

11   Mr. Wissman.  Never mind.

12          Now, did Morgan Stanley deem this a sufficiently

13   detailed response with respect to that information?

14          MR. SCHWARTZ:  Objection.

15          THE COURT:  Sustained.

16   Q.  Did you follow up with Mr. Archer with respect to this

17   form?

18   A.  I did.

19   Q.  And why was that?

20   A.  It was not sufficient.

21   Q.  Let's direct your attention to Government Exhibit 344.  And

22   again if we can pull up pages 1 and 2 side by side, let me

23   direct your attention to the e-mail at the very bottom of the

24   page, and let me ask you what is the date of that e-mail?

25   A.  October 7, 2014.

1    Q.  And starting with the beginning of that e-mail, let me ask

2    you to read that whole e-mail and onto the second page.

3    A.  "Hi, Devon.  Our compliance group needs more info regarding

4    FLKM and Wakpamni.  More detail is better than less in order to

5    get these approved.

6              "FLKM.  How were these shared obtained?  We know they

7    were transferred here from Interwest, but how did they get to

8    Interwest?

9              "2.  On the form you indicated that the shares were

10   free.  Were they a form of compensation, etc.?

11             "3.  Were these shares ever restricted?"

12             "Wakpamni:

13             "1.  Please provide more detail as you how you came to

14   know about this issuance.

15             "2.  How is the 15 million generated that was used to

16   purchased the bonds?

17             "Best, Catharine."

18   Q.  What was FLKM?

19   A.  That was another security that Mr. Archer was trying to

20   deposit.

21   Q.  And the questions that you relayed to Mr. Archer, where did

22   those questions come from?

23   A.  From our compliance group.

24   Q.  Now, if we can look up on the first page to Mr. Archer's

25   response to you, and if I can ask you to read just the

I5V7GAL3                        Driever - Direct

1   responses with respect to the Wakpamni, so numbers 1 and 2 at

2   the bottom there.

3   A.   "1.   Burnham Financial packaged the issuance of which I am

4   a shareholder.

5        "2.   $15 million was generated through sale of real

6   estate."

7   Q.   And what did you do with this information?

8   A.   This information was then passed back along to our

9   compliance officer.

10  Q.   Let's go to Government Exhibit 348, please.   So, we are now

11  on October 17, 2014.   By this time had the bonds been deposited

12  at Morgan Stanley?

13  A.   No.

14  Q.   And if we look at the second e-mail down on the page, let

15  me ask you to read your e-mail to Mr. Archer.

16  A.   "Devon, to confirm, you don't plan on selling the Wakpamni

17  bonds, correct?   We can hold them here, but we cannot sell

18  them.   Kindly confirm at your convenience.   Best, Catharine."

19  Q.   And how does Mr. Archer respond?

20  A.   "Confirmed, Devon Archer."

21  Q.   Again, why were you seeking this information from Mr.

22  Archer?

23  A.   Before the bonds could be deposited, it was part of our due

24  diligence process, and they needed to know that the bonds would

25  not be sold.

1    Q.  Let's move to Government Exhibit 349, please, and let's

2    start with the second e-mail on the bottom of that page on

3    October 20 from Mr. Momtazi to you, cc'ing Mr. Archer.  What

4    does Mr. Momtazi ask?

5    A.  "Good morning, Catharine.  Just looking for an update on

6    the status of the bonds.  Best, Seb."

7    Q.  And can you read your response, please.

8    A.  "Hi, Seb/Devon.  We have several people working on this.

9    We appreciate your patience.  Our back office confirmed with

10   DTC, they are eligible for custody deposit.  We are in the

11   process of adding the CUSIP to our system.

12          "On another note, our risk team came back and

13   confirmed that these bonds are restricted.  You had indicated

14   on the form that they are not, thus we will need a new rep

15   letter signed.  I have attached it here.  Please scan a signed

16   copy now, and return the original to me at your convenience.

17   Best, Catharine."

18   Q.  Now let's look at the attachment to this e-mail, please.

19   So this is that same form we were looking at earlier; is that

20   right?

21   A.  Yes.

22   Q.  Now whose handwriting is on this form?

23   A.  That's my handwriting.

24   Q.  And let me ask you to read what you have written under

25   "method of acquisition and manner of payment".

1   A.  "Method of acquisition:  Purchased through a private

2   placement.  I am a shareholder of Burnham Financial who

3   packaged the issuance.  They approached me regarding the

4   offering.

5         "B.  Manner of payment:  The funds used to purchase

6   the bonds were from real estate sales through my business

7   Rosemont Seneca Bohai."

8   Q.  And if we can also ask you to indicate, what does it now

9   indicate about whether the shares are restricted?

10  A.  The shares are restricted.

11  Q.  And what does it indicate about Mr. Archer's intent to hold

12  or sell the shares?

13  A.  "I will not" --

14        MR. SCHWARTZ:  Objection.

15        THE COURT:  I will allow that if you're literally just

16  reading from the form.

17  A.  "I will not be selling these bonds.  I would only like to

18  hold them at Morgan Stanley."

19  Q.  At the time you completed this form, did you have any

20  independent knowledge of the Wakpamni bonds?

21  A.  Define what you mean by independent.

22  Q.  Sure.  Did you have any information other than information

23  provided by Mr. Archer or Mr. Momtazi?

24  A.  No.

25  Q.  In completing this form, did you rely on information

1   provided by Mr. Archer and Mr. Momtazi.

2   A.  Yes.

3   Q.  And was that just the e-mail from Mr. Archer that we looked

4   at, or did you have any conversations with Mr. Archer or Mr.

5   Momtazi?

6   A.  It could have been through phone conversation as well.

7   Q.  Do you remember one way or the other?

8   A.  I don't remember, but we did speak with Mr. Archer and

9   Sebastian Momtazi a few times on the phone.

10  Q.  Now let's pull up Government Exhibit 352.

11          If you look at the second e-mail down on Monday

12  October 20, 2014, what do you write to Mr. Momtazi?

13  A.  "Sebastian, I believe you attached the wrong form.  I need

14  the attached returned.  Thanks, Catharine."

15  Q.  And how does he respond?

16  A.  "Yes, apologies, they were next to each other.  Please

17  destroy the previous e-mail.  Best, Seb."

18  Q.  And let's look at what is attached to Government Exhibit

19  352.  What is attached to Government Exhibit 352?

20  A.  This is the second version of the client representation

21  letter.

22  Q.  And if we can go to the last page of this.  Is there now a

23  signature on the form?

24  A.  Yes.

25  Q.  Now this is an e-mailed copy.  Did you also receive an

1    original copy of this form?

2    A.  My colleague received the original.

3    Q.  How do you know that?

4    A.  I was out of the office that day, and Sebastian came to

5    drop off the original to the lobby.

6    Q.  Now, were the Wakpamni bonds ultimately deposited into one

7    of Mr. Archer's accounts?

8    A.  Yes.

9    Q.  Let's pull up Government Exhibit 301.

10            Is this the account into which the bonds were

11   deposited?

12   A.  Yes.

13   Q.  So I want to walk quickly through the monthly account

14   balances on this statement, and so we will start on page 1.

15   This is the statement -- as you can see at the very top on the

16   left -- from March 1 to 31st of 2014, and let me ask you to

17   read the total value of the account on that day.

18   A.  $2,436,115,00.

19   Q.  Mr. Wissman, if we can go to page 9 of this document.

20            We are now looking at the April statement.  What is

21   the total value of the account on that day?

22   A.  $1,151,171.14.

23   Q.  Let's go to the June statement, which is page 25.  Let me

24   ask you again.

25   A.  $928,801.62.

I5V7GAL3                    Driever - Direct

1   Q.  Page 33, the July statement.

2   A.  $882,357.71.

3   Q.  Page 41, the August statement.

4   A.  $2,176,238.22.

5   Q.  And then let's go to page 49, the September statement.

6   A.  $17,206,369.21.

7   Q.  Now, in September the bonds had not yet been deposited,

8   right?

9   A.  Correct.

10  Q.  So that the significant increase isn't the bonds being

11  deposited.

12  A.  No.

13  Q.  Let's go to page 53, Mr. Wissman, of this statement.

14          And if you look at the entry, it's about five clients

15  up from the bottom on September 25.  Let me ask you to read

16  across what that indicates.

17  A.  September 25, funds were received from Citibank in the

18  amount of $15 million.

19  Q.  And what does it indicate under Citibank?

20  A.  Clifford A. Wolff PA.

21  Q.  And let's jump to page 63, please.

22          Let me direct your attention to the third line down,

23  the settlement date –– third line down in the activity cash

24  flow section, the settlement date 10/1.  Let me ask you to read

25  across there.  What does that indicate?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.   October 1, an outbound wire fund sent of $15 million to a

2   beneficiary of Wakpamni Town Center 211, account ending in

3   7365.

4   Q.   And what was the amount of that wire?

5   A.   $15 million.

6   Q.   Do you presently have any involvement with Mr. Archer's

7   accounts?

8   A.   No.

9   Q.   Why not?

10  A.   He moved his accounts.

11  Q.   Moved them out of Morgan Stanley or within Morgan Stanley?

12  A.   He moved them within Morgan Stanley to another team.

13  Q.   And following that swing to another team, did you have any

14  further involvement in the accounts?

15  A.   No.

16  Q.   Approximately when was it that Mr. Archer swung his

17  accounts away from your team?

18  A.   November of 2014.

19          MS. MERMELSTEIN:  No further questions, your Honor.

20          THE COURT:  Cross-examination?

21          MR. SCHWARTZ:  Yes.  Thank you, your Honor.

22          Can we have two seconds to get ourselves set up?

23          THE COURT:  Sure.  We are just going to work on the

24  technology for a minute.  If anyone wants to stand, stretch or

25  use the restroom, you can do so.

I5V7GAL3                          Driever - Cross

1    CROSS EXAMINATION

2    BY MR. SCHWARTZ:

3    Q.  Good afternoon, Ms. Driever.

4    A.  Good afternoon.

5    Q.  My name is Matthew Schwartz; I'm one of Mr. Archer's

6    lawyers.  We have never talked before; is that right?

7    A.  That's correct.

8            MR. SCHWARTZ:  Your Honor, to make things go more

9    smoothly, I'd like to move into evidence what will be marked as

10   Joint Exhibits 300, 302, 305, 312, 313, 314, 328, 331 through

11   338, 345 through 347.

12           THE COURT:  All right.  They will be admitted.

13           MR. SCHWARTZ:  Thank you.

14           (Joint Exhibits 300, 302, 305, 312, 313, 314, 328

15   received in evidence)

16           (Joint Exhibits 331 through 338, 345 through 347

17   received in evidence)

18   Q.  Now, Ms. Driever, you testified a moment ago that you've

19   worked in Morgan Stanley's private wealth management group

20   since 2012; is that right?

21   A.  Yes.

22   Q.  And you said your title is client service associate?

23   A.  Yes.

24   Q.  And you described some of your responsibilities as taking

25   client phone calls, answering the phones, things like that,

1   right?

2   A.   Correct.

3   Q.   To be clear, you're a financial professional, right?

4   A.   Yes.

5   Q.   You are a college graduate?

6   A.   Yes.

7   Q.   You graduated from Bucknell, right?

8   A.   Right.

9   Q.   You have a masters in business administration, right?

10   A.   I do.

11   Q.   An MBA?

12   A.   Yes.

13   Q.   From the Stern School of Business at NYU here in New York

14   City?

15   A.   Yes.

16   Q.   Which is one of the best business schools in the world.

17   A.   Hopefully.

18   Q.   Now, in the course of your work as a client services

19   associate, you've had opportunity to be involved in basically

20   all aspects of client management within the private wealth

21   group, right?

22   A.   Within reason of my responsibilities.

23   Q.   Are you familiar with what is called a portfolio loan

24   account?

25   A.   Somewhat.

1    Q.   You understand that a portfolio loan account -- also

2    sometimes referred to as a PLA -- is basically a tally of money

3    that Morgan Stanley is lending its customers against the assets

4    in their accounts?

5    A.   Yes.

6    Q.   And PLA loans can be long term or short term, right?

7    A.   They're not really within my realm of responsibility, but

8    most likely.

9    Q.   You've certainly assisted clients in making disbursements

10   from PLAs, right?

11   A.   They're not common.

12   Q.   Clients call you and sometimes make that request, don't

13   they?

14   A.   Yes.

15   Q.   And one of the reasons that clients like PLAs is loans can

16   be available on fairly short notice, right?

17              MS. MERMELSTEIN:  Objection, your Honor.

18              MR. SCHWARTZ:  I will rephrase.

19   Q.   PLA money can be available on fairly short notice, true?

20   A.   That wouldn't be my decision to make.

21   Q.   I'm sorry, I didn't ask that.  I'm saying --

22   A.   There is a separate group that handles portfolio loan

23   accounts who makes the decision about disbursements.

24   Q.   In your experience where a client has a portfolio loan

25   account, they can get a draw on that account fairly quickly,

I5V7GAL3                          Driever - Cross

1   true?

2   A.  It would depend on the type of transaction.

3   Q.  Let me show you -- it might go easier this way.

4          Mr. Jackson, just for now for the judge and the

5   witness and the lawyers, show what has been marked as

6   Defendant's Exhibit 4512.

7          This is a portfolio loan account statement from Morgan

8   Stanley, true?

9   A.  I don't receive copies of these, so I'm not sure.

10  Q.  You've never seen a portfolio loan account statement?

11  A.  The portfolio loan account was discontinued soon after I

12  joined private wealth management, and we now use what is called

13  a liquidity access line.

14  Q.  Well, you see the date of this statement is 2015, true?

15  A.  Yes.

16  Q.  2015 was three years into your tenure in the private wealth

17  management group, true?

18  A.  That's correct.

19  Q.  You've seen forms like this before, true?

20  A.  I don't recall.

21  Q.  You don't recall whether in the now six years that you've

22  worked in private wealth management you've ever seen a

23  portfolio account statement?

24          MS. MERMELSTEIN:  Objection.

25          THE COURT:  Overruled.  I mean if you don't remember,

1    you don't remember.

2    A.  So portfolio loan accounts, I would not have access to see

3    it.

4    Q.  That wasn't my question.  My question was:  In your six

5    years in private wealth management at Morgan Stanley, have you

6    ever seen a portfolio loan account statement?

7    A.  I could have.

8    Q.  You don't recall whether you ever have.

9    A.  No.

10   Q.  Rosemont Seneca Bohai LLC was a client of Morgan Stanley's,

11   true?

12   A.  Yes.

13   Q.  And that was an entity that you understood was associated

14   with Mr. Archer, right?

15   A.  Yes.

16   Q.  Rosemont Seneca Bohai LLC was a capital management firm,

17   true?

18   A.  I'm not sure.

19   Q.  Well, you told the government in one of your meetings

20   before coming to testify that Rosemont Seneca Bohai LLC was a

21   capital management firm, didn't you?

22   A.  I knew that it was a private equity type of firm.

23   Q.  In your mind, what's the difference between capital

24   management and private equity?

25   A.  Private equity is the investment in private businesses, but

1    capital could be a number of things.

2    Q.  When you spoke to the government you explained that

3    Rosemont Seneca Bohai LLC was a capital management firm, didn't

4    you?

5    A.  If you say that I did.

6    Q.  Well, don't take my word for it.  Let me show you --

7              And again, Mr. Jackson, just for the witness, the

8    judge and the lawyers --

9              -- what has been marked as 3505-2.  I'm sorry, 3505-1.

10   Take a moment to look at that to yourself, and in particular I

11   want to draw your attention to the highlighted language at the

12   very bottom of the page.  Do you see that?

13   A.  Yes.

14   Q.  This is page 1.  Would you agree with me that Rosemont

15   Seneca Bohai LLC was a capital management firm?

16   A.  Yes.

17   Q.  Thank you.  Now, Ms. Mermelstein reviewed with you some of

18   the pages from the bank account statement for RSB, LLC.  Do you

19   recall that?

20   A.  Yes.

21   Q.  And you understand that RSB, LLC refers to Rosemont Seneca

22   Bohai LLC, right?

23   A.  Yes.

24   Q.  The capital management firm, right?

25   A.  Rosemont Seneca Bohai LLC.  It refers to Rosemont Seneca

1   Bohai LLC.

2   Q.  And you have seen those kinds of bank statements before?

3   A.  The Morgan Stanley statement?

4   Q.  The Morgan Stanley statements that the prosecutor showed

5   you.

6   A.  Yes.

7   Q.  Now, that is not the only account -- strike that.

8          During the time that you covered these accounts in

9   2014 the Rosemont Seneca Bohai LLC account was not the only

10  Morgan Stanley account that was associated with Mr. Archer,

11  true?

12  A.  Yes.

13  Q.  There were other accounts that were also associated with

14  Mr. Archer, right?

15  A.  Yes.

16  Q.  Do you remember what they were?

17  A.  We had one other account, I believe, Archer Diversified.

18  Q.  And was there an account in Mr. Archer's individual name?

19  A.  I can't remember.

20  Q.  I want to show you --

21         And now, Mr. Jackson, you can bring this up for

22  everyone, including the jury.

23         -- what has been marked as Exhibit 312.

24         And if you could just blow up the top third of that,

25  please.

1             This is an account profile for RSB, LLC, true?

2    A.  This was not his account with my team.

3    Q.  This document says account profile, true?

4    A.  The account number in the top left was not his account

5    number with my team.

6    Q.  At the top left of this page it says account profile,

7    right?

8    A.  It does say account profile.

9    Q.  And underneath that it says RSB, LLC, correct?

10   A.  It does say that.

11   Q.  And then there are two names, the names that you've

12   testified about, Devon Archer and Sebastian Momtazi, correct?

13   A.  Yes.

14   Q.  And next to each of them it says Auth Ind Person.  Do you

15   see that?

16   A.  Yes.

17   Q.  What does that mean?

18   A.  That would be shortened for authorized individual person.

19   Q.  What does it mean to be an authorized individual person?

20   A.  I believe on the form you have to specify what actions the

21   authorized individual could take, the different actions being

22   send wires, money movement, trading activity.

23   Q.  These are individuals who have authority to take certain

24   actions on behalf of Morgan Stanley account, true?

25   A.  It doesn't say what actions, but yes.

I5V7GAL3                        Driever - Cross

1    Q.  And can we go to page 11 of this document.  And here at the

2    top, under client profile for Mr. Sebastian Momtazi, person

3    authorized individual person, there are all sorts of personal

4    information, right?

5    A.  Again, this account is not with our team, so I can only

6    read what is on the screen in front of me.

7    Q.  That's all I'm asking you to do.

8    A.  It does say Sebastian Momtazi.

9    Q.  And it lists his home address, right?

10   A.  Yes.

11   Q.  And his birthday and the Social Security number, blacked

12   out appropriately, right?

13   A.  Yes.

14   Q.  And page 8 of this document, it's the same sort of stuff

15   for Mr. Archer, right?

16   A.  Correct.

17   Q.  By the way, what is Mr. Archer's birthday?

18   A.  May 31, 1974.

19   Q.  That's today, right?

20   A.  It is.

21   Q.  Now, Mr. Momtazi was an authorized person on basically all

22   aspects of the RSB, LLC account, true?

23   A.  I can't speak to this account.  It was not with our team.

24   Q.  The Rosemont Seneca Bohai LLC account at Morgan Stanley was

25   with your team, was it not?

1    A.  When an account changes branches and teams, the

2    authorization can be changed.

3    Q.  My question is about 2014, when you were covering Rosemont

4    Seneca Bohai LLC's accounts.

5    A.  I can't remember.  I know that Mr. Archer was authorized.

6    Q.  Let's go to page 191 of this document.  This is a limited

7    liability entity agreement for RSB, LLC, correct?

8    A.  It appears so.

9    Q.  What is a limited liability entity agreement at Morgan

10   Stanley?

11   A.  For a limited liability entities they're required to

12   complete this form as one of the account opening documents.

13   Q.  So this is what is needed to open an account, right?

14   A.  One of the documents.

15   Q.  And again RSB, LLC's account was opened in 2014?

16   A.  This is not our account.

17   Q.  RSB, LLC's account at Morgan Stanley was opened in 2014?

18   A.  Rosemont Seneca Bohai LLC was opened with our team in 2014.

19   Q.  OK.  So are you trying to tell us that when the

20   relationship swung away from your team and Eugene Schatz's team

21   to the different team at Morgan Stanley, the account was

22   retitled?

23   A.  I can't speak for the other team.

24   Q.  Can we go to the next page of this document.  And you

25   see --

1             If you could blow up the top third of that.

2             Do you see that there are two names there, Mr. Archer

3    and Mr. Momtazi?

4    A.  There are two names.

5    Q.  And you would agree with me that at least the dates appear

6    to have been filled out by the same person, right?

7    A.  This appear to be similar.

8    Q.  And Mr. Archer and Mr. Momtazi are both listed as managing

9    member or general partner, true?

10   A.  Again, this is not our account.

11   Q.  I'm really just asking you to read the document, right?  So

12   on this page Mr. Archer and Mr. Momtazi are listed as managing

13   member or general partner, correct?

14   A.  It does list that on the form, yes.

15   Q.  And each of them have listed their names, and there is a

16   signature and a date over that part of the form, true?

17   A.  There is a signature and a date.

18   Q.  Now, during the period of time when you covered the account

19   in 2014 -- or I should say accounts, right?  Plural?

20   A.  Yes.

21   Q.  You dealt fairly regularly with Mr. Momtazi, true?

22   A.  Define regularly.

23   Q.  Well, you tell me.  How regularly did you deal with Mr.

24   Momtazi?

25   A.  As the account needed servicing, so wire requests, there

I5V7GAL3                        Driever - Cross

1   were a few a week.

2   Q.  You would agree with me, wouldn't you, that you mainly

3   dealt with Mr. Momtazi while handling these accounts?

4   A.  Yes.

5   Q.  And you would agree with me that you only spoke to Mr.

6   Archer a few times, right?

7   A.  I'd say about, yeah, correct.

8   Q.  And I think you testified before you've never actually met

9   Mr. Archer in person, right?

10  A.  I have not.

11  Q.  And in general when you spoke to him on the phone the

12  purpose of the phone conversation was to get what you testified

13  about, the voice confirmation for wire transfers, right?

14  A.  Voice confirmation for wire transfers, more information,

15  whatever we needed.

16  Q.  But you only spoke to him a few times, and more often than

17  not it was to get voice confirmation for wires, right?

18  A.  I spoke to him whenever I needed his help, yes.

19  Q.  Now, talking specifically about those WLCC bonds, your main

20  point of contact with those was also Mr. Momtazi, true?

21  A.  We interacted with both Devon Archer and Sebastian Momtazi

22  regarding the bonds.

23  Q.  Your main point of contact was Mr. Momtazi, right?

24  A.  Yes.

25  Q.  You spoke with him on the phone about the bonds, right?

1   A.  Yes.

2   Q.  And you e-mailed with him about the bonds, right?

3   A.  Yes.

4   Q.  Can we put up Government Exhibit 2039.

5          This is an e-mail from Mr. Momtazi to you, true?

6   A.  Yes.

7   Q.  And Mr. Archer is copied on this e-mail?

8   A.  Yes.

9   Q.  And there appears to be a bcc to an e-mail address

10  jason@holmbycompanies.com.  Do you see that?

11  A.  I do see it.

12  Q.  Do you know whose e-mail that is?

13  A.  I do not.

14  Q.  You don't know why Mr. Momtazi would have bcc'd

15  jason@holmbycompanies.com on an e-mail to you, do you?

16  A.  No.

17          MR. SCHWARTZ:  I'm correct, I offer Exhibit 2039.

18          THE COURT:  All right, so we will clarify that.  Thank

19  you.

20  Q.  Now, in this e-mail Mr. Momtazi is telling you that he

21  would like to make --

22          THE COURT:  I'm sorry, I just want to clarify.  When

23  you say you're correcting something, you just mean you hadn't

24  moved to admit it yet?

25          MR. SCHWARTZ:  I thought it was in but --

1          THE COURT:  So, it will be admitted, 2039.  Thanks.

2          (Defendant's Exhibit 2039 received in evidence)

3   Q.  In this e-mail Mr. Momtazi is telling you that he'd like to

4   make a new issue bond purchase on behalf of Rosemont Seneca

5   Bohai LLC that's DTC eligible and can settle either DTC or

6   physical delivery, right?

7   A.  Yes.

8   Q.  And you know what the DTC is, right?

9   A.  I have a general understanding, yes.

10  Q.  Generally the DTC is a system for how clients and brokers

11  can transfer securities, right?

12  A.  Yes.

13  Q.  And securities can also be transferred physically in

14  certificates, right?

15  A.  That's correct.

16  Q.  So it can be done electronically or physically, same

17  difference, right?

18  A.  Yes.

19  Q.  Now, in this e-mail Mr. Momtazi is telling you the purchase

20  amount was $15 million, right?

21  A.  Yes.  Yes.

22  Q.  And he provides the issuer name here which is Wakpamni Lake

23  Community Corp. S D Special Limited Rev, right?

24  A.  Um-hum, yes.

25  Q.  Sorry, we need a yes or no --

I5V7GAL3                         Driever - Cross

1    A.  Yes.

2    Q.  -- for the court reporter.  And he provides the other

3    necessary information here, including what is called a CUSIP

4    number, right?

5    A.  Yes, there is a CUSIP number limited.

6    Q.  And you know what a CUSIP is, right?

7    A.  Yes.

8    Q.  A CUSIP generally speaking is a unique identifier

9    associated with a security, right?

10   A.  Yes.

11   Q.  Now, if we can take a look at Joint Exhibit 339 in evidence

12   and turn to page 4.

13          OK.  So this is a continuation of that same e-mail

14   chain, right?

15   A.  Yes.

16   Q.  The one at the bottom is what we just looked at, and now on

17   top of it is your response?

18   A.  Yes.

19   Q.  Can we blow that up, Mr. Jackson.

20          And you respond that the Wakpamni Lake Community

21   Corporation bond is not offered through MS, meaning Morgan

22   Stanley, right?

23   A.  Yes.

24   Q.  And you ask Mr. Momtazi if there is some other security

25   that he might want to buy instead, right?

1    A.  Yes.

2    Q.  And you say is there anything else you're interested in.

3    A.  Yes.

4    Q.  But Mr. Momtazi keeps asking you to purchase the WLCC

5    bonds, right?

6    A.  There is further communication on the bonds, yes.

7    Q.  OK.  So if we go back one page to page 3, at the bottom Mr.

8    Momtazi is asking you to go into DTC and indicate the order,

9    right?

10   A.  Yes.

11   Q.  And he suggests that Morgan Stanley can settle directly and

12   physically, meaning physical share certificates, with U.S.

13   Bank, right?

14   A.  Yes.

15   Q.  And then going above that, now, you didn't respond.  He is

16   responding on top of his own previous e-mail, right?

17   A.  He is.

18   Q.  He says, thanks for your call, right?

19   A.  Yes.

20   Q.  And, as you testified a moment ago, you did speak to Mr.

21   Momtazi about the bonds, right?

22   A.  Yes.

23   Q.  He asked you again to call U.S. Bank directly, true?

24   A.  Yes.

25   Q.  And then he e-mails you again just an hour later, right?

1           If we can back out.

2     A.   I don't see a time stamp.

3           MR. SCHWARTZ:   Mr. Jackson, you might have to jump to

4     the previous page to show the time.

5     Q.   Do you see that?

6     A.   Um-hum.

7     Q.   That's 1:31 p.m.  And flipping back to page 3, the prior

8     one was 12:33 p.m.?

9     A.   Yes.

10    Q.   So he was hitting you every hour, right?

11    A.   There was one hour in between.

12    Q.   And in his 1:31 p.m. e-mail, he is again pushing you to

13    reach out directly to U.S. Bank about the bonds, right?

14    A.   He lists the contact.

15    Q.   And he is giving you some information about the mechanics

16    of how Morgan Stanley could help buy the bonds, right?

17    A.   He is giving his understanding.

18    Q.   And, to be clear, at this point Mr. Momtazi is still trying

19    to see if Morgan Stanley can actually buy the bonds, right?

20          MS. MERMELSTEIN:   Objection.

21          THE COURT:   Sustained.

22    Q.   In this communication, these questions from Mr. Momtazi are

23    all about Morgan Stanley actually buying the bonds, right?

24          MS. MERMELSTEIN:   Objection.

25          THE COURT:   I'm just going to ask what your

1    interpretation is.

2              MR. SCHWARTZ:  Let me rephrase, your Honor.

3              THE COURT:  OK.

4    Q.  This is simply what I'm trying to get at.  You testified

5    before that Morgan Stanley at some point made a determination

6    it couldn't execute the purchase of the bond but it got

7    involved in simply holding the bonds after they were bought,

8    right?

9    A.  Yes.

10   Q.  All I'm trying to be clear about is this line of

11   communication that we're looking at, this is still talking

12   about whether Morgan Stanley can actually do the purchase,

13   right?

14   A.  It's not clear from his e-mail.

15   Q.  OK.  Well, when he talks about physically settling with

16   U.S. Bank and going into DTC, that's not clear to you?

17   A.  Are you asking if we purchased the bond directly from the

18   bond registrar and the agent?

19   Q.  You did not, right?  Morgan Stanley did not purchase these

20   bonds.

21   A.  We did not.

22   Q.  I'm asking in this exhibit that we're looking at, Mr.

23   Momtazi is still pursuing that with you, right, whether Morgan

24   Stanley can buy the bonds.

25   A.  We would never be able to buy the bonds directly from the

1    agent.  I think that maybe he didn't understand the process.

2    Q.  Let's flip back to page 2 of this document.  Now, right in

3    the middle of the page there is a longer e-mail from you,

4    right?  Right?

5    A.  Yep, yes.

6    Q.  And you indicate that you actually spoke with someone named

7    Keith Henselen at U.S. Bank, right?

8    A.  Yes.

9    Q.  You recall speaking to Mr. Henselen?

10   A.  I don't recall it, but it does say that I spoke with him,

11   and this is an e-mail from me.

12   Q.  And you report in this e-mail to Mr. Momtazi that he would

13   not be able to buy these bonds through Morgan Stanley, right?

14   A.  Yes.

15   Q.  Does this now refresh your recollection that this exhibit

16   is about whether or not Morgan Stanley can buy the bonds?

17           Don't worry about it.

18           You also informed Mr. Momtazi in this e-mail that

19   there was a chance that Morgan Stanley might not be able to

20   hold the bonds, right?

21   A.  That's correct.

22   Q.  Now, if we can back out and go to the top of this, now this

23   top e-mail is again from you to Mr. Momtazi, right?

24   A.  Yes.

25   Q.  And it's the next morning, true?

1    A.  Actually it's to Mr. Archer.

2    Q.  It's addressed to both of them, but you started "Hi Devon,"

3    right?

4    A.  I can't see the to fields in the e-mail, but it says "Hi,

5    Devon."

6    Q.  Do you want to back out?  Maybe put page 1 and 2 side by

7    side, 1 on the left, 2 on the right.

8            So, on Monday the 29th you and Seb Momtazi was

9    e-mailing.  Mr. Archer was cc'd on that thread, right?

10   A.  He is, but I don't know if that's the same thread from --

11   Q.  Just listen to my question for a second.  The e-mails on

12   the right side from the 29th -- we just went through a few

13   pages of those -- those were between you and Sebastian Momtazi,

14   and Mr. Archer was copied, right?

15   A.  Yes.

16   Q.  Now, the following morning -- this is the e-mail that hangs

17   over from page 1 into 2 -- is it page 2 into 3?

18           You're exactly right, page 1 of that is not the same

19   page.  Here.

20           So, on the top of page 2, this is now 10 a.m. on

21   September 30, right?

22   A.  Yes.

23   Q.  This is an e-mail from you, right?

24   A.  It's from me.

25   Q.  And for whatever reason some of the header information got

1    cut off, but we know from looking at page 1 that now Eugene

2    Schatz has been added to the conversation, right?

3    A.  Well, the header is removed, so I can't confirm that.

4    Q.  I'm saying from the e-mail at the bottom of page 1.  Do you

5    see that?

6    A.  From Sebastian's e-mail?  Yes, Gene Schatz is now copied.

7    Q.  And in your e-mail, top of page 2, you say "I just spoke

8    with Gene."  And that's a reference to Gene Schatz, right?

9    A.  Yes.

10   Q.  And speaking to Mr. Archer:  Hi, Devon.  You tell him that

11   Morgan Stanley can't proceed with asking for an exception from

12   compliance to hold this product placement until we know if the

13   bonds will be DTC eligible or not.  Right?

14   A.  Yes.

15   Q.  Now, we looked at this a second ago.  Mr. Momtazi had

16   already told you that the bonds were DTC eligible, true?

17   A.  He did say that.

18   Q.  Now, you referred to an exception from compliance in this

19   e-mail, right?

20   A.  Yes.

21   Q.  And what you're referring to there was an internal Morgan

22   Stanley rule that said private wealth clients had to be with

23   Morgan Stanley for at least a year in order to hold private

24   placement securities absent permission, right?

25   A.  The rules changed from time to time, but I believe that was

1    the rule at the time.

2    Q.  And that's just a Morgan Stanley internal rule, right?

3    A.  Yes.

4    Q.  It's not a law or a regulation or anything like that.

5    A.  I wouldn't know, but I do know that it was a Morgan Stanley

6    rule.

7    Q.  Now, Mr. Momtazi at the bottom of page 1 is the one who

8    responds, right?

9         I will represent to you the government and I have

10   agreed that this is a complete exhibit.  For whatever reason

11   the header information got cut off at the top of page 2.  And

12   you can see, by the way, at the bottom right hand this is a

13   document that was produced by Morgan Stanley.  Do you see that,

14   that stamp that says MS?

15   A.  Yes.

16   Q.  This came from Morgan Stanley's files, and they put those

17   numbers on them.  Do you see they're sequential, right?

18   A.  Yes.

19   Q.  So, that e-mail at the bottom of page 1 -- which is just

20   four minutes after your e-mail -- that's from Mr. Momtazi,

21   right?

22   A.  Yes.

23   Q.  And he again confirms that the bonds are DTC eligible,

24   right?

25   A.  Yes.

1   Q.  And you then respond and ask for a working CUSIP, right?

2   A.  Yes.

3   Q.  And again for whatever reason this e-mail in the middle of

4   the page from you cuts off the other header information.

5   A.  It appears so.

6   Q.  Do you have any doubt in your mind that you hit reply all?

7   A.  I wouldn't know.

8   Q.  Well, we can see from the rest of the thread that no one

9   got dropped off, right?

10  A.  It appears in the following e-mail that everyone is copied,

11  yes.

12  Q.  So you asked for a working CUSIP, but in fact he had given

13  you the CUSIP already, right?

14  A.  He had given the CUSIP, but that doesn't necessarily mean

15  that it's a working CUSIP.

16  Q.  And so he gives it to you again in response, right?

17  A.  Yes.

18  Q.  Let me now look at Exhibit 341.  This is the next day.

19          Go to page 2.

20          So, Mr. Momtazi --

21          Maybe you can put both pages side by side.

22          He e-mails you the next day with a wire transfer

23  request for $15 million to an account at U.S. Bank, right?

24  A.  Yes.

25  Q.  And the reference, as you went over with the prosecutor, is

1   to Wakpamni Town Center, right?

2   A.  Yes.

3   Q.  Now, you understood that the purpose of this wire was to

4   purchase those WLCC bonds, right?

5   A.  Yes.

6   Q.  Now, even though Morgan Stanley was wiring the money to pay

7   the purchase price, Morgan Stanley was not buying the bonds,

8   right?

9   A.  We were not.

10  Q.  The bonds were not purchased through Morgan Stanley, true?

11  A.  Correct.

12  Q.  Morgan Stanley was not involved in the purchase or sale of

13  the WLCC bonds, true?

14  A.  Correct.

15  Q.  Turning to Exhibit 301 for a moment, this is the Rosemont

16  Seneca Bohai LLC bank statement that you looked at with the

17  prosecutor, right?

18  A.  Yes.

19  Q.  And can we go back to page 53.  On September 25 there is

20  that incoming wire from Clifford A. Wolff PA.  Do you see that?

21  A.  Yes.

22  Q.  And based on your experience in private wealth management,

23  do you recognize PA to be an abbreviation often associated with

24  a law firm?

25  A.  I wouldn't be able to confirm.  I don't recognize it.

I5V7GAL3                          Driever - Cross

1   Q.  You're not familiar with the abbreviation PA or

2   professional association?

3   A.  No.

4   Q.  And, by the way, a little bit further up this page you see

5   that there are two transfers to someone named Robert Biden?

6   A.  Yes.

7   Q.  One for $20,000 and one for $15,000?

8   A.  Yes.

9   Q.  And in your experience managing this account, Rosemont

10  Seneca Bohai often transferred money to Robert Biden, correct?

11  A.  This statement indicates that he had transferred $15,000

12  and $20,000 to Robert Biden.

13  Q.  And you know Robert Biden also goes by the name Hunter

14  Biden?

15          MS. MERMELSTEIN:  Objection.

16          THE COURT:  If you know.

17          Sustained.

18          You know what, overruled.

19          Answer it if you know.

20  A.  I don't know.

21  Q.  Well, did you have an understanding from managing these

22  accounts that Mr. Archer had a business relationship with

23  Hunter Biden?

24  A.  No.

25  Q.  Did you have an understanding broadly speaking, yes or no,

1    of what Mr. Archer's business was?

2    A.   Private equity.

3    Q.   Now, returning to Exhibit 341, you looked at this with the

4    prosecutor.   Mr. Momtazi tells you we must send the wire to

5    U.S. Bank this morning, right?

6    A.   He says that in his e-mail, yes.

7    Q.   And he told you that Mr. Archer would be available for

8    voice confirmation after 11 a.m., right?

9    A.   Yes.

10   Q.   And again this was a Morgan Stanley rule because this wire

11   was for more than $500,000 at the time, someone needed to get

12   on the phone with Mr. Archer and confirm that he authorized the

13   wire, right?

14   A.   Yes.

15   Q.   And in this case someone actually got that voice

16   confirmation, true?

17   A.   Yes.

18   Q.   And Morgan Stanley actually sent that wire, true?

19   A.   Yes.

20   Q.   Now, in this e-mail Mr. Momtazi also indicated that someone

21   named Maggie Fiore "is on top of the delivery side".   Right?

22   A.   Yes.

23   Q.   Now, Maggie Fiore is a woman who worked at the time in

24   Morgan Stanley's compliance settlement group, right?

25   A.   I'm not sure.   I know she worked at Morgan Stanley, but I'm

I5V7GAL3                         Driever - Cross

1   not sure the name of her department.

2   Q.  OK.  You previously told the government that she worked in

3   the compliance department.

4   A.  I believe it was settlements, yeah, yeah.

5   Q.  And in general she was the one who became responsible for

6   the mechanics of the acquisition of the security?

7   A.  Yes.

8   Q.  That's not what you were responsible for, right?

9   A.  No.

10  Q.  And you responded here to Mr. Momtazi's e-mail -- even

11  though it was from Mr. Momtazi -- "Thanks, Devon."  Right?

12  A.  Yes.

13  Q.  "I'm in communication with Maggie."  That's a reference to

14  Maggie Fiore, right?

15  A.  Correct.

16  Q.  And going back to Government Exhibit 301, page 63, there is

17  that $15 million being wired out to an account in the name of

18  Wakpamni Town Center, right?

19  A.  Yes.

20  Q.  And, by the way, two $20,000 transfers to Robert Biden,

21  correct?

22  A.  Yes.

23  Q.  And there were a few incoming credits from something called

24  Burisma Holdings, right?

25  A.  This statement indicates that.

1    Q.  And you understood that to be an energy company that Mr.

2    Archer was invested in, correct?

3    A.  I'm not sure, I don't recall.

4    Q.  Now let's go one page back to 62.  This statement now

5    reflects the Wakpamni Lake Community Corporation bonds being

6    held at Morgan Stanley at the bottom there, correct?

7    A.  Yes.

8    Q.  I want to be clear, the bonds were not purchased through

9    Morgan Stanley, right?

10   A.  Correct.

11   Q.  This is a month end statement, right?

12   A.  Yes.

13   Q.  This statement reflects all of the activity for October

14   2014, true?

15   A.  Yes.

16   Q.  As it turned out, the wire out to U.S. Bank was at the

17   beginning of the month, right?

18   A.  I don't recall the date.

19   Q.  Just flip to the next page.  The wire out is October 1,

20   correct?

21   A.  Yes.

22   Q.  And then the bonds were purchased somewhere else, right?

23   A.  Yes .

24   Q.  And sometime -- not on October 1, but sometime later -- but

25   before the end of the month they made their way into Morgan

I5V7GAL3                    Driever - Cross

1    Stanley's possession, right?

2    A.  Yes.

3    Q.  And that's why both the bonds and the wire transfer are

4    reflected on the same statement, right?

5    A.  Yes.

6    Q.  Not because Morgan Stanley bought the bonds.

7    A.  Yes.

8    Q.  True?

9    A.  Yes.

10   Q.  And, in fact, it wasn't until October 27, 2014 that Morgan

11   Stanley actually got custody of the bonds, right?

12   A.  I don't see the exact date on this statement.

13   Q.  OK.  Now, let's look at page 73 of this exhibit for a

14   second.

15            THE COURT:  Mr. Schwartz, just tell me when it would

16   be a good time for lunch.

17            MR. SCHWARTZ:  Sure.  I can do maybe five minutes and

18   then take a break?

19            THE COURT:  Sure.

20   Q.  Now, this is now the November month end statement, true?

21   A.  Yes.

22   Q.  And the bonds are still reflected in the account, correct?

23   A.  This is not our statement, so I can't speak to this.

24   Q.  I'm sorry.  This statement that says Morgan Stanley private

25   wealth management is not a Morgan Stanley statement?

1    A.   The account number is 654028319; that's not our account

2    number.

3    Q.   It's not a Morgan Stanley account number?  Or it was after

4    it swung?

5    A.   Not my team's Morgan Stanley account number.

6    Q.   This was after the account swung to a different account

7    manager at Morgan Stanley, right?

8    A.   Yes.

9    Q.   But it's still a Morgan Stanley record, right?

10   A.   It is a Morgan Stanley statement.

11   Q.   You are familiar with these statements, right?

12   A.   I would not be familiar with another team's statements; we

13   would not have access to this.

14   Q.   But you were familiar with this type of statement, right?

15   A.   Yes.

16   Q.   It is identical in form to the previous month when it was

17   your group's, correct?

18   A.   The format would be the same.

19   Q.   Now, at the bottom of the page this reflects that the

20   Wakpamni bonds are still in the account, true?

21   A.   I can't answer that, because this is not my team's account.

22   Q.   Again, I'm merely asking you to read the page.

23            MS. MERMELSTEIN:  Well, if that's true, then the

24   document speaks for itself, your Honor.

25            THE COURT:  Overruled.

1          I mean just what can you tell?  I understand it's not

2     your team's document, but can you answer that based on

3     reviewing this document?

4          THE WITNESS:  It appears as though the bond is in the

5     account.

6     Q.  Now, in the middle column it says market value $16,787,850.

7     Did I read that correctly?

8     A.  That is what it says.

9     Q.  Did you familiar with the term mark to market?

10    A.  Yes.

11    Q.  Mark to market means that a securities value may change

12    depending on what the markets are doing, right?

13    A.  I don't know the definition of it.

14    Q.  You tell me what you understand it to mean.

15         MS. MERMELSTEIN:  Objection, your Honor.

16         THE COURT:  Do you feel qualified to answer that

17    question?

18         THE WITNESS:  I don't.  I don't work in pricing; I

19    couldn't speak to that.

20         THE COURT:  All right, sustained.

21    Q.  You understand from being an MBA and a private wealth

22    management professional at Morgan Stanley that when Morgan

23    Stanley holds securities for its clients, it values those

24    securities, true?

25    A.  That's not my department; I wouldn't know.

I5V7GAL3                          Driever - Cross

1    Q.  That wasn't my question.  My question was:  You understand

2    that someone at Morgan Stanley values securities that are held

3    by private wealth management clients, correct?

4    A.  I don't know how the securities get valued.

5    Q.  That wasn't my question either.  Yes or no, you know that

6    someone at Morgan Stanley does value securities that are held

7    in the accounts of private wealth management clients, true?

8    A.  The securities do get valued, but I don't know how they get

9    valued.

10             MR. SCHWARTZ:  Thank you.  This would be a great time

11   for lunch.

12             THE COURT:  All right.  Ladies and gentlemen, we will

13   take an hour for lunch and be back here at five after two.

14   Please remember don't discuss the case and keep an open mind.

15   Thank you.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  So first just briefly, a juror was

3       speaking to Mr. Schwartz.  I don't think it was worth doing

4       anything about it, but it was just about a particular document,

5       so I just wanted to note that for the record.

6              Ms. Notari, did you want to speak at all to the

7       letter?  You said you were going to respond to it.  Do you want

8       to do that?

9              MS. NOTARI:  I didn't have a chance.  I will make that

10      a priority over lunch.

11             THE COURT:  Then I will see you all at two.

12             MR. QUIGLEY:  One other issue we wanted to raise

13      because it pertains to Dunkerley who is the next witness, and

14      it is with respect to government's exhibits -- I believe

15      it's -- just give me one second to confirm, your Honor -- yes,

16      Government Exhibit 867.  It's an e-mail chain, it begins from

17      Mr. Dunkerley to Michelle Morton on October 2, and the

18      substance of the e-mail chain is Mr. Dunkerley is trying to set

19      up a meeting between Ms. Morton, Jason Sugarman, Mr. Archer and

20      a third person named Andrew Godfrey.  And I think I would

21      proffer it's not plain from the e-mail that this is discussing

22      a funding request that Michelle Morton has made of those

23      individuals for Atlantic Asset Management.

24             In one of the e-mails on the page ending in 39 it's a

25      long e-mail from Mr. Morton and she alludes to the events of

1    this past week that provoked chaos, to put it mildly.  This was

2    a week or so after Jason Galanis' arrest.  I don't intend to

3    elicit anything -- I intend to get the e-mail in through Mr.

4    Dunkerley.  I'm not sure I intend to elicit anything about his

5    interpretation of that statement.  And I think there are a

6    number of other events that occurred around that time that it

7    could also could refer to.  But, you know, we do think this

8    goes to one of our arguments for the relevancy of the Jason

9    Galanis arrest, because it talks about the efforts to manage

10   the situation following his arrest.

11          Again, I don't intend to get into that sentence with

12   Mr. Dunkerley, but I do intend to introduce the exhibit.  I

13   just wanted to flag that for the Court.

14          MR. SCHWARTZ:  For context, I had asked that that

15   clause in the sentence be redacted.  I mean if Mr. Quigley is

16   not going to dwell on it --

17          MR. QUIGLEY:  I'm not going to ask him what he thinks

18   that means or anything like that.

19          THE COURT:  Is there any reason you can't redact it

20   then, I mean if it's not something you were going to highlight?

21          MR. QUIGLEY:  I mean it's -- I guess we can redact.

22          THE COURT:  OK.

23          MR. QUIGLEY:  I mean, your Honor, we are still waiting

24   on a ruling on whether the arrest is relevant to show how the

25   defendants -- particularly Mr. Archer -- attempted to manage

1   the situation following Mr. Jason Galanis' arrest.

2           So, I think this could be relevant for us to argue

3   from at some later point -- that's my hesitancy in redacting

4   it -- and to show why Mr. Archer and Mr. Sugarman became

5   involved.  I don't again intend to get into that with Mr.

6   Dunkerley.  It's just I'm not going to ask him about that line.

7           MR. SCHWARTZ:  If I could just make a practical

8   suggestion.  If you're not going to get into this with this

9   witness, I agree there is an issue that still is ripe probably

10  for conversation in addition to potential ruling, but we have

11  already sort of agreed on what you will get into on your direct

12  with Mr. Dunkerley; and if you are not going to dwell on that,

13  why don't we redact it for now and then pending a ruling we can

14  always pop it back in.

15          THE COURT:  Why don't you do that.  I mean no one

16  raised this exhibit with me, so I haven't looked at it yet, and

17  I have been asking you to tell me what is time sensitive, and

18  I'm happy to rule on anything that's time sensitive.  But I

19  think for now you can admit the exhibit.  Don't show that

20  sentence to the jury, and I will make a decision on whether

21  that sentence should be redacted or not prior to publishing it.

22  Is that fair?

23          MR. QUIGLEY:  That's fine.

24          THE COURT:  Like that won't affect your presentation.

25          MR. QUIGLEY:  We won't publish that sentence to the

I5V7GAL3                    Driever – Cross

1    jury.

2                 THE COURT:  All right, thank you.  And I will take a

3    look at it, in any event.

4                 (Luncheon recess)

5                 (Continued on next page)

1                    A F T E R N O O N   S E S S I O N

2                             2:15 p.m.

3          (Jury not present)

4          THE COURT:  Please be seated.  I'm going to bring the

5     jury in.

6          Actually, can we meet at sidebar for a minute?

7          (At the sidebar)

8          THE COURT:  So Juror No. 2 mentioned to Ms. Cavale

9     that she recognizes someone in the courtroom, and I believe it

10    is Chris Conniff, who I understand to be Ms. Driever's lawyer.

11    She said they live in the same town and she knows him.  I don't

12    know if you think there is a need to inquire further.

13         MR. SCHWARTZ:  I don't particularly.

14         MS. MERMELSTEIN:  No.

15         MR. SCHWARTZ:  I don't have any intention to point out

16    that he is here.

17         THE COURT:  And he will be gone after today.  Do you

18    want Ms. Cavale to say anything to her?

19         MS. MERMELSTEIN:  To the juror or to Ms. Driever?

20         THE COURT:  Do you want anything to be said or do you

21    want to leave it alone?

22         MS. MERMELSTEIN:  I think you can leave it alone.

23         THE COURT:  All right.

24         (Continued on next page)

25

I5v2gal4                              Driever - Cross

1                    (In open court; Jury present)

2                    THE COURT:  Everyone can be seated.  Thank you.

3                    Please proceed.

4                    MR. SCHWARTZ:  Thank you, your Honor.

5                    Good afternoon, ladies and gentlemen.

6                    JURORS:  Good afternoon.

7      BY MR. SCHWARTZ:

8      Q.  Did you have a good lunch, Ms. Driever?

9      A.  Yes, thank you.

10     Q.  So before the break we were looking at the Morgan Stanley

11     bank account statements for Rosemont Seneca Bohai, right?

12     A.  Yes.

13     Q.  And you recall this morning that Ms. Mermelstein just had

14     you read out the total account value for some of the months for

15     that account?

16     A.  Yes.

17                   MR. SCHWARTZ:  Can we go, Mr. Jackson, to Exhibit 301,

18     at page 73.

19     BY MR. SCHWARTZ:

20     Q.  This is where we had left off, I think.  You had read that

21     the market value, as reflected on this document, for the WLCC

22     bonds, as of month end November 2014, was $16,787,850, correct?

23     A.  You had read it; but, yes, that's correct.

24     Q.  And I read that correctly, right?

25     A.  Yes.

I5v2gal4                    Driever - Cross

Q.   And now turning to page 83, this appears to be the December

2014 month-end statement for Rosemont Seneca Bohai LLC, right?

A.   That's what it reads, yes.

Q.   And in the middle of the page, this document reflects the

market value for the WLCC bonds as $16,674,900, correct?

A.   That is what it reads, yes.

Q.   On page 102, this appears to be the January 2015 account

statement for RSB, LLC, right?

A.   Yes, RSB, LLC.

Q.   And at the bottom of the page, the market value of the WLCC

bonds, according to this document, was $17,253,000, right?

A.   That is what it reads, yes.

Q.   And just jumping ahead to do one more, page 121, this

appears to be the March 2015 statement, now the title is MSB

FBO RSB, LLC.  Do you see that?

A.   Yes.  That's what it says.

Q.   That means Morgan Stanley Bank for the benefit of RSB, LLC,

right?

A.   Yes.

Q.   And this reflects that the market value of the WLCC bonds,

as of month end March 2015 was $16,791,435, right?

A.   That's what it reads, yes.

Q.   That figure changed from month to month as we just flipped

the pages, right?

A.   It had.

I5v2gal4                          Driever - Cross

1   Q.  And I believe you testified earlier that someone at Morgan

2   Stanley, and you are not sure who or how they do it, but

3   someone at Morgan Stanley is responsible for valuing securities

4   that private wealth management clients hold, correct?

5   A.  There is a separate pricing group, yes.

6   Q.  And you understand that the figures that are reflected for

7   market value of securities in account statements like these

8   come from someone within Morgan Stanley, right?

9   A.  There could have been an outside vendor.

10  Q.  An outside vendor retained by Morgan Stanley to do the

11  valuation?

12  A.  That would be employed by Morgan Stanley, yes.

13  Q.  Right.  It doesn't come from the client, in other words?

14  A.  No.

15  Q.  Now, can we go to page 135 of the same document, Government

16  Exhibit 301.  This reflects the transfer out of the RSB, LLC,

17  account of all of the WLCC bonds, correct?

18  A.  Again, this was when the account was not with my team so I

19  can't speak to this transaction.

20  Q.  The document says, under "Security Transfers" under

21  "Activity Type," "transfer out of account," right?

22  A.  It does say that.

23  Q.  And the date is listed as April 9, 2015, right?

24  A.  It does say that.

25  Q.  And the security listed here is the WLCC bonds, right?

I5v2gal4                        Driever - Cross

1    A.  It says "Security Wakpamni Lake BE6020 210C01."

2    Q.  And you recognize that number to be a CUSIP, right?

3    A.  I'm not sure what the number is.

4    Q.  And under "Quantity," it says "15 million," right?

5    A.  It does say that.

6    Q.  And you, I think you testified to this earlier, Morgan

7    Stanley never transacted in these bonds, right?

8    A.  Define "transacted."

9    Q.  Bought or sold.

10   A.  No, not to my knowledge, while the account was held with

11   us.

12   Q.  But Morgan Stanley was able to receive the bonds, true?

13   A.  Yes.

14   Q.  And it was able to transfer out the bonds.

15   A.  I can't speak to the transfer out.

16   Q.  Okay.

17          MR. SCHWARTZ:  You can take that down, please,

18   Mr. Jackson.

19   BY MR. SCHWARTZ:

20   Q.  You said that the Rosemont Seneca Bohai account was

21   transferred away from your group when?

22   A.  November 2014.

23   Q.  Do you recall when in November?

24   A.  I don't recall the day, but it was November.

25   Q.  Do you recall whether it was in the first half or the

I5v2gal4                        Driever - Cross

1   second half of the month?

2   A.  No.

3   Q.  You were -- switching gears entirely -- you were first

4   interviewed by the government about this case in November of

5   2017, correct?

6   A.  I believe so.

7   Q.  And you understood at that point that this case had already

8   been filed, right?

9   A.  Yes.

10  Q.  You knew that it had been filed about 18 months earlier,

11  right?

12  A.  I didn't know the date.

13  Q.  And since that meeting in November 2017, have you met with

14  the government again?

15  A.  Yes.

16  Q.  You met with them just recently, right?

17  A.  Yes.

18  Q.  To go over your testimony today?

19  A.  We went over the general proceedings.

20  Q.  You didn't rehearse it, but you went over the general

21  topics that you were going to be testifying about?

22  A.  We went over the possible questions and the proceedings.

23  Q.  And you were told that I might ask you questions about

24  after the time period when the account moved away from your

25  group, correct?

I5v2gal4                      Driever - Cross

1    A.  Yes.

2    Q.  And you were told that you didn't have to answer those

3    types of questions if you didn't have personal knowledge of

4    them, right?

5    A.  I wouldn't answer questions I didn't have personal

6    knowledge of, no.

7    Q.  I want to talk now about the process of Morgan Stanley

8    receiving those WLCC bonds.  Okay?  That was during your

9    tenure, right?

10   A.  When we received the physical -- sure.

11   Q.  That was October 2014, right?

12   A.  Yes.

13   Q.  Now, I think you testified that before Morgan Stanley could

14   hold the bonds, there was all sorts of paperwork that had to be

15   completed?

16   A.  Yes.

17   Q.  And we looked at some of this during your direct testimony,

18   but there was other paperwork, too, right?

19   A.  I believe so, yes.

20   Q.  There was something called a stock power, right?

21   A.  Yes.

22   Q.  Something called a private security deposit approval form,

23   right?

24   A.  I believe that's what we looked at.

25   Q.  And there was something called a client representation

I5v2gal4                          Driever - Cross

1   letter, right?

2   A.   Yes.

3   Q.   That's what we looked at, right?

4   A.   Yes.

5   Q.   And then you also needed some other paperwork.  For

6   example, you needed the corporate resolution of Rosemont Seneca

7   Bohai LLC, correct?

8   A.   Yes.

9   Q.   Now, you provided Mr. Momtazi with the forms that needed to

10  be filled out, right?

11  A.   I believe -- we would have to look at the e-mails, but I

12  believe they were e-mailed to Sebastian and Devon.

13              MR. SCHWARTZ:  Let's look at Exhibit 342.  This is an

14  e-mail at the bottom.  If you blow up the bottom half here,

15  please, Mr. Jackson.  No.  Above that.  There you go.

16  BY MR. SCHWARTZ:

17  Q.   And, again, for some reason Morgan Stanley's e-mails cut

18  out the headers when they get forwarded, huh?  You are not

19  sure.

20              This is an e-mail that you sent on October 1, right?

21  A.   Yes.

22  Q.   And it is addressed to "Hi Devon/Sebastian," right?

23  A.   Yes.

24  Q.   And it says, "We will need two signed copies of the

25  attached stock power to deposit the bonds.  Originals, please.

I5v2gal4                    Driever - Cross

1    No need to fill anything out.  We only need Devon's signature."

2    Right?

3    A.  Yes.

4    Q.  And then above that, you say, "We will also need the

5    private securities form.  Please complete all blank fields and

6    have Devon sign on page 3."  Right?

7    A.  Yes.

8    Q.  And you tell Mr. Momtazi that he can drop the forms off,

9    right?

10   A.  No one is addressed in the e-mail, but I do say that "you

11   can drop the forms off this afternoon, or tomorrow is fine,

12   too.  The original cert is not arriving until tomorrow

13   anyways."

14   Q.  And you were responding to Mr. Momtazi, right?

15   A.  Yes, yes.

16   Q.  And you needed them dropped off because, as you testified,

17   you needed the originals of these for Morgan Stanley's files,

18   right?

19   A.  Yes.

20   Q.  And Mr. Momtazi in fact did deliver an original of the

21   client representation letter to your offices, right?

22   A.  Yes.

23   Q.  I think that you mention that you have met Mr. Momtazi in

24   person?

25   A.  I have.

I5v2gal4                    Driever - Cross

1    Q.  And you said that you might recognize him, right?

2    A.  I could, maybe.

3    Q.  When you met with the government just recently, did they

4    show you a photograph of Mr. Momtazi?

5    A.  No.

6    Q.  So let me show you --

7         MR. SCHWARTZ:  Mr. Jackson, if you could put this up

8    just for the witness, Judge Abrams, and the lawyers, Defense

9    Exhibit 4910.

10   BY MR. SCHWARTZ:

11   Q.  Do you recognize this as a picture of Mr. Momtazi?

12   A.  It's hard to say because -- can I describe the photo?  He

13   has -- he is wearing a hat and sunglasses.

14   Q.  Does that appear to be Mr. Momtazi to you?

15   A.  I couldn't say based on this picture.

16        MR. SCHWARTZ:  Okay.  You can take that down.

17   BY MR. SCHWARTZ:

18   Q.  Let's look at Exhibit 343.  And you testified previously

19   you are e-mailing this to yourself because you were scanning

20   the hard copies, right?

21   A.  Yes, I received a hard copy and before I turned it in, I

22   went to scan it, so I had it for our records.

23   Q.  Now, Ms. Mermelstein showed you some of the pages.  This is

24   the entire stack of documents you had requested of Mr. Momtazi,

25   right?

I5v2gal4                         Driever - Cross

1   A.  I can't see the documents.  It's just a blank page.

2   Q.  Okay.  Let's look at them.  So on page 9 --

3   A.  That's their bond certificate.

4   Q.  This is the actual bond, right?

5   A.  Yup, yes.

6          MR. SCHWARTZ:  This is up on the jury screen?

7          MR. JACKSON:  Yes.

8          MR. SCHWARTZ:  Thank you.

9   BY MR. SCHWARTZ:

10  Q.  Moving to page 8, this is the stock power form, correct?

11  A.  Yes.

12  Q.  This is the one that you said no need to fill it out, just

13  have Devon sign, right?

14  A.  Yes.  That's my handwriting with the name of the security

15  and the amount.

16  Q.  That was exactly my question.  So that's your handwriting

17  that says Wakpamni Lake Community Corporation and 15 million,

18  right?

19  A.  Yes.

20  Q.  And the form is otherwise blank beside the date and the

21  signature, right?

22  A.  Yes.

23  Q.  And is the idea that you were going to fill this out at

24  some later point in time?

25  A.  No.  This is just a cover sheet that goes in front of the

I5v2gal4                      Driever - Cross

1    bond certificate.

2    Q.  What happens with all of these other fields that aren't

3    filled out in this form?

4    A.  As far as I know, this is how it stays when it is

5    deposited.  I'm not sure.

6    Q.  So Morgan Stanley just keeps this as sort of a blank check

7    sort of thing?

8    A.  I don't know because I'm not in the securities processing

9    group, so I'm not sure.

10   Q.  Fair enough.

11            Turning to page 7, this is corporate resolution for

12   Rosemont Seneca Bohai, correct?

13   A.  Yes.

14   Q.  And in this case, the only resolution is that the principal

15   place of business of the company shall be 401 Greenwich Street

16   in Manhattan, right?

17   A.  These documents are reviewed by our legal team, so I

18   wouldn't be one to say what -- how to interpret the document,

19   if that's what you are asking.

20   Q.  In your job, do you have occasion to see corporate

21   resolutions with any frequency?

22   A.  Yes.  The corporate resolution shows who is authorized to

23   sign on behalf of the entity.

24   Q.  And you know from your experience that it is common when

25   corporations are formed for there to be resolutions that say

I5v2gal4                        Driever - Cross

1    things simply like place of business will be at an address or

2    an authorized signatory will be a person, right?

3    A.   Yes.

4    Q.   Now, moving to page 6, this is a private security deposit

5    approval form, right?

6    A.   Yes.

7    Q.   This is a form that Morgan Stanley uses whenever securities

8    that are not publicly traded, private placement securities, are

9    deposited, right?

10   A.   Yes.

11   Q.   And the name on this form, the signature, is Eugene Schatz,

12   right?

13   A.   Yes.

14   Q.   And you told us that was your one of your bosses at the

15   time.

16   A.   Correct.  He was the financial advisor that I worked for.

17   Q.   And was Mr. Schatz the financial advisor at Morgan Stanley

18   with primary responsibility for the Rosemont Seneca Bohai LLC

19   account?

20   A.   Yes, it was his client.

21   Q.   Now, the bottom of the page has handwriting, correct?

22   A.   Yes.

23   Q.   And whose handwriting is that?

24   A.   That's my handwriting.

25   Q.   And is it fair to say that the sort of gist of this form is

I5v2gal4                    Driever - Cross

1    that Mr. Schatz and you are going to bat for Mr. Archer and

2    Rosemont Seneca Bohai?

3    A.   We outlined what the client is requesting in order to get

4    approval from the appropriate parties to deposit the bonds.

5    That's the purpose of the form.

6    Q.   And you were suggesting and recommending that the deposit

7    of the securities be approved because you viewed Mr. Archer and

8    Rosemont Seneca Bohai as potentially valuable sources of

9    revenue for Morgan Stanley, true?

10   A.   In my notation, I am stating facts.

11   Q.   Okay.  So in your handwriting those are facts that you are

12   stating, correct?

13   A.   Yes.

14   Q.   You write that Mr. Archer "runs a real estate private

15   equity group and will be a good source of liquidity for our

16   team to bring in new clients.  Even though his accounts have

17   been with us less than one year, we would like you to grant an

18   exception."

19            Did I read that right?

20   A.   Yes.

21   Q.   And when you wrote that "Mr. Archer would be a good source

22   of liquidity for our team to bring in new clients," you meant

23   that Mr. Archer knew a lot of people and he could be a good

24   source of business for your wealth management group at Morgan

25   Stanley, right?

I5v2gal4                        Driever - Cross

1   A.  Yes.

2   Q.  And in particular, what did you mean by the term "good

3   source of liquidity"?

4   A.  Meaning that he could bring in new assets, friends that he

5   knows, or business partners.

6   Q.  I mean, "liquidity" is a polite way of saying "money" and

7   "assets," right?

8   A.  Yes, "liquidity" means "money."

9   Q.  And in banking there is nothing remotely improper about

10  wanting a good source of liquidity, right?

11  A.  Our business is based on having assets with our team.

12  Q.  Right.  You wanted to have assets under management because

13  that's how your group at Morgan Stanley earned its fees, right?

14  A.  That's how the financial advisors earn their fees, yes.

15  Q.  And your impression of Mr. Archer was that he had valuable

16  business relationships, right?

17  A.  Yes.

18  Q.  And valuable personal relationships, right?

19  A.  Could be.

20  Q.  Well, we talked a little bit before lunch about Hunter

21  Biden.  Do you recall that?

22  A.  Yes.

23  Q.  And you know from your personal experience dealing with

24  Mr. Momtazi that Mr. Archer was regularly transacting business

25  with Mr. Biden, correct?

I5v2gal4                        Driever - Cross

1   A.   There were rider transfers to Mr. Biden.  I believe we read

2   that it said Robert Biden.

3   Q.   But you new that that was Hunter Biden, true?

4   A.   I would have only known what he had indicated on the letter

5   of authorization, but I can't remember what was on the letter

6   of authorization.

7   Q.   I have handed to you what was marked as Defense Exhibit

8   4609 and 4610 for identification.  Could you take a look at

9   those.

10  A.   Yes.

11  Q.   And does this reminded you now that you knew that

12  Mr. Archer was regularly transacting with Hunter Biden?

13  A.   The e-mails are from Sebastian saying, "Could you please

14  make the 20,000 wire transfer to Hunter for the attached.

15  Thank you so much, Seb."

16          MR. SCHWARTZ:  I will offer those exhibits, your

17  Honor.

18          MS. MERMELSTEIN:  No objection.

19          THE COURT:  They will be admitted.

20          (Defendant's Exhibits 4609 and 4610 received in

21  evidence)

22  BY MR. SCHWARTZ:

23  Q.   In fact, those documents in front of you referencing those

24  wires to Hunter, those are the exact same ones we were looking

25  in the bank statements that said Robert, right?

I5v2gal4                     Driever - Cross

1   A.  The letter must have indicated Robert, because that's what

2   the letter said.

3   Q.  Because that's his formal legal name, right?

4   A.  I don't know what his formal legal name is.

5   Q.  You can put those documents aside.

6          Returning to the document that's up on your screen,

7   which is Exhibit 343, and let's go to page 2, now, this is the

8   client representation letter for the deposit of private

9   securities, right?

10  A.  This is the first version, yes.

11  Q.  That's what I was going to ask.  This is the first version,

12  right?

13  A.  Yes.

14  Q.  And I believe you testified this is Mr. Momtazi's

15  handwriting on the document, correct?

16  A.  Oh, I didn't say whose handwriting it is, but it would be

17  assumed that it was either -- hopefully Devon.  I think it is

18  Devon's signature on page 2.

19  Q.  So, sorry, you don't know whose handwriting it is?

20  A.  I don't know whose handwriting that is, no.

21  Q.  Now, under question 1 in the middle of it, under "Method of

22  Acquisition," the answer that's printed there is "Purchase."

23  Correct?

24  A.  Yes.

25  Q.  And that's as opposed to, I guess, as a gift or

I5v2gal4                    Driever - Cross

1    compensation, right?

2    A.  I can't interpret it.  I'm not sure.  It says "Method of

3    Acquisition:  Purchase."

4    Q.  And you understood that to be an accurate answer, right?

5            MS. MERMELSTEIN:  Objection.

6            THE COURT:  Sustained.

7    BY MR. SCHWARTZ:

8    Q.  Well, you knew from your communications with Mr. Archer and

9    Mr. Momtazi that Rosemont Seneca Bohai LLC had been in the

10   process of purchasing these WLCC bonds, correct?

11   A.  Their intention was to purchase the bonds.

12   Q.  And under "Manner of Payment," the answer here is "wire

13   transfer."  Right?

14   A.  Yes.

15   Q.  And you knew that to be accurate, right?

16   A.  It's not up to me to approve this form.  I simply turn it

17   in.

18   Q.  We looked this morning, though, at the actual wire transfer

19   that came from Morgan Stanley, the RSB account, to U.S. Bank to

20   pay for these bonds, right?

21   A.  We did.

22   Q.  And it was in fact a wire transfer, right?

23   A.  Yes.

24   Q.  As opposed to a cash transaction or a check or some other

25   thing like that, right?

I5v2gal4                      Driever - Cross

1    A.  Yes.

2    Q.  Now, under -- anywhere on this form, it's not indicated

3    that the money that was used to acquire the bonds came from

4    real estate sales from Rosemont Seneca Bohai, would you agree

5    with me?

6    A.  It does not say that, no.

7    Q.  Now, under paragraph 2, it's checked off, "I have not been

8    a controlling officer or board member of the company."  Right?

9    A.  That's correct.

10   Q.  And in this case, the company refers to the WLCC, right?

11   A.  The Wakpamni bonds.

12   Q.  The company that's the issuer of the securities, right?

13   A.  Yes.

14   Q.  As opposed to Rosemont Seneca Bohai LLC.

15   A.  Right.

16   Q.  Now, under question 3, the form has checked the box saying

17   that "the shares are not restricted" --

18              (Noise)

19              THE COURT:  Just ignore.

20   BY MR. SCHWARTZ:

21   Q.  "The shares are not restricted or subject to any

22   restrictions on transfer."  Do you see that?

23   A.  Yes, that's what it says.

24   Q.  And that ended up to be a mistake, right?

25   A.  Yes.

I5v2gal4                    Driever - Cross

1   Q.  In fact, in this very same document, Exhibit 343, on page

2   9 -- Mr. Jackson -- is the bond, right?

3   A.  Yes.

4   Q.  And the bond says, right at the top in big, bold letters

5   that it is restricted, that it's not a registered security,

6   right?

7   A.  It says that the bond is not registered.

8   Q.  And these forms were all handed to someone at Morgan

9   Stanley at the same time, right?

10  A.  Yes.

11  Q.  Okay.  Now, going back to the representation letter, that

12  was page 2.  The next page of the form is just legalese, right?

13  If you flip the page.  And then the final page of the form on

14  page 4 of this exhibit, there is a signature block, right?

15  A.  Yes.

16  Q.  And under the name as it appears on the certificate it says

17  "Rosemont Seneca Bohai LLC," right?

18  A.  Yes.

19  Q.  And then there is a signature, right?

20  A.  Correct.

21  Q.  And you don't know whose signature that is, do you?

22  A.  The corporate resolution showed that Devon was the only one

23  authorized to sign on behalf of the entity so it would have to

24  be his signature.

25  Q.  Well, the corporate resolution only said that the address

I5v2gal4                         Driever - Cross

1    was on Greenwich Street, isn't that right?

2    A.  The corporate resolution is what we use at Morgan Stanley

3    to show who is authorized to sign on behalf of the entity.

4    Q.  You don't know who actually signed this form, do you?

5    A.  I do not.

6    Q.  Would it surprise you to learn that that is not

7    Mr. Archer's signature?

8              MS. MERMELSTEIN:  Objection.

9              THE COURT:  Sustained.

10   BY MR. SCHWARTZ:

11   Q.  The date on this form is October 1, 2014, right?

12   A.  Yes.

13   Q.  So let's move forward a week to Exhibit 344.  We looked at

14   this before as well.  This was some questions that had come

15   back from your compliance group about two separate securities

16   one called Flikmedia and the other these WLCC bonds, right?

17   A.  Yes.

18   Q.  And to be clear, these were not going to go into the same

19   account, right?

20   A.  I'm not sure.

21   Q.  The Flikmedia shares were going to go into that Archer

22   Diversified account that you talked about earlier, weren't

23   they?

24   A.  That's possible.

25   Q.  Turning to page 2 of this document, the questions that you

I5v2gal4                         Driever - Cross

1    put to Mr. Archer with respect to the bonds are, first, "Please

2    provide more detail as to how you came to know of this

3    issuance."  Right?

4    A.  Yes.

5              MR. SCHWARTZ:  And, Mr. Jackson, if you could put this

6    up on the right side and page 1 on the left side.

7    BY MR. SCHWARTZ:

8    Q.  Mr. Archer's response to the question, "Please provide more

9    detail as to how you came to know of this issuance" was

10   "Burnham Financial packaged the issuance of which I am a

11   shareholder."  Right?

12   A.  That was his response in the e-mail, yes.

13   Q.  Do you know what Burnham Financial is?

14   A.  No.

15   Q.  Now, your second question about the WLCC bonds was, "How

16   was the $15 million generated that was used to purchase the

17   bonds?" Right?

18   A.  Yes.

19   Q.  The question was how was the money generated.  Right?

20   A.  Yes.

21   Q.  You didn't ask who generated it, right?

22   A.  No.  It says, "How was the $15 million generated that was

23   used to purchase the bonds?"

24   Q.  You didn't ask where did Mr. Archer get the money from,

25   right?

I5v2gal4                      Driever - Cross

1   A.  Not in this e-mail, no.

2   Q.  You didn't ask whether it was income or a gift or a loan,

3   right?

4   A.  No.

5   Q.  You asked how it was generated, right?

6   A.  Yes.

7   Q.  And Mr. Archer's response on page 1 was that the money "was

8   generated through sale of real estate."  Right?

9   A.  That was his response in the e-mail, yes.

10  Q.  That was a satisfactory response with respect to those two

11  questions, right?

12  A.  It would not be my decision to make that.

13  Q.  Well, there was no follow-up to those two questions, true?

14  A.  We often had to call Sebastian and Devon on the phone for

15  follow-up.  I can't speak to whether there was follow-up after

16  this.  I don't remember.  There could have been.

17  Q.  You don't recall any follow-up to this, right?

18  A.  I can't be certain.

19  Q.  I'm sorry?

20  A.  I can't be certain.

21  Q.  You can't remember any specific follow-up, correct?

22  A.  No.

23  Q.  Now, in this answer, "$15 million was generated through

24  sale of real estate," Mr. Archer did not say who sold the real

25  estate, right?

I5v2gal4                       Driever - Cross

1    A.  In the e-mail response, no.

2    Q.  And he didn't say he sold the real estate, right?

3    A.  No.

4    Q.  And he didn't say that it was his real estate, right?

5    A.  No.

6    Q.  He also didn't say it was Rosemont Seneca Bohai's real

7    estate, right?

8    A.  In the e-mail response, no.

9    Q.  The e-mail response simply says that the money was

10   generated from sale of real estate, right?

11   A.  Yes.

12   Q.  And then, moving up the chain, you do follow up on other

13   things, right?  Right at the very top?

14   A.  Yes.

15   Q.  You say, "Thank you, Devon.  Just a few more follow-up

16   questions, as our compliance group is very thorough."  Right?

17   A.  Yes.

18   Q.  So you had gone back to your compliance group and they had

19   one or two more questions, right?

20   A.  I don't know.  I can't infer from this whether I went back

21   to the compliance group or if it's just my own follow-up in the

22   next two lines.

23   Q.  Fair enough.  And those follow-up questions were regarding

24   Flikmedia, true?

25   A.  Yes.

I5v2gal4                         Driever - Cross

1    Q.  Okay.  And the time, the date and time of this e-mail is

2    October 7, 2014, at 7:30 p.m., correct?

3    A.  That is what the time stamp says.

4    Q.  Okay.  So let's hold on to that in our head for a second.

5             MR. SCHWARTZ:  And you can take that down and can we

6    pull up Exhibit 345.

7    BY MR. SCHWARTZ:

8    Q.  This is an e-mail from you, and the time stamp is October

9    7, 2014, at 7:56 p.m., correct?

10   A.  Yes, that's what the time stamp says.

11   Q.  So about 25 minutes after the previous e-mail, Exhibit 344,

12   right?

13   A.  Yes.

14   Q.  And this is an e-mail to someone named Elena Tomasino,

15   right?

16   A.  Yes.

17   Q.  Who is Elena Tomasino?

18   A.  She is the branch service manager, so she would be the one

19   who would be speaking with all of the respective groups at

20   Morgan Stanley as far as the due diligence process to get these

21   funds deposited.

22   Q.  And you sent this e-mail to Ms. Tomasino after you received

23   Mr. Archer's responses to your questions, correct?

24   A.  Yes.

25   Q.  And you tell her, "Just got the following from the client."

1    Right?

2    A.  Yes.

3    Q.  And at the very beginning you say, "Let me know if you need

4    any more information," right?

5    A.  Yes.

6    Q.  Now, focusing on the bottom half of this about the Wakpamni

7    bonds, there is a reference to Rosemont Seneca Bohai LLC,

8    right?

9    A.  Yes.

10   Q.  And that number to the left of it is the account number,

11   right?

12   A.  Yes.

13   Q.  And that, to be clear, that was Rosemont Seneca Bohai LLC's

14   account number during the time period that you oversaw the

15   account, right?

16   A.  Yes.

17   Q.  And can you now see that the Flikmedia shares were going to

18   be deposited in a different account, Archer Diversified?

19   A.  Yes, I see that.

20   Q.  Now, under Wakpamni, you wrote, "Devon Archer is a

21   shareholder of Burnham Financial.  Burnham Financial packaged

22   the issuance for the Wakpamni bonds.  Some of the bankers at

23   Burnham came to Devon with the bonds, and he agreed to purchase

24   them."  Is that right?

25   A.  It says that, yes.

1                MR. SCHWARTZ:  Now, can we, Mr. Jackson, leave this up

2       on the left side of the screen and put Exhibit 344 on the right

3       side.  And go to page 2.  No, I'm sorry, leave it right there.

4       BY MR. SCHWARTZ:

5       Q.  Now, the answer that Mr. Archer had provided to you was

6       simply "Burnham Financial packaged the issuance of which I am a

7       shareholder."  Right?

8       A.  Yes.

9       Q.  You embellished his answer somewhat, fair?

10      A.  We often had to speak with them on the phone for further

11      follow-up.

12      Q.  You don't recall any such conversation, true?

13      A.  I don't, but it's practice to only write what the client

14      relays to us.

15      Q.  You cannot testify to this jury that you had any such

16      conversation, true?

17      A.  I can't remember it to be certain.

18      Q.  And even if you had, you could not tell us who that

19      conversation was with, true?

20      A.  That's correct.

21      Q.  It could have been with Mr. Momtazi, true?

22      A.  It could have been.

23      Q.  And it could have not happened at all, true?

24      A.  No, that's not true.  I would not have written something

25      that a client did not say.

I5v2gal4                       Driever - Cross

1   Q.  I'm sorry.  Is it your testimony now that you are certain

2   that in the 26 minutes between the e-mail on the left and the

3   e-mail on the right that you spoke to someone?

4   A.  I can't remember, but the information that is relayed, it's

5   under the understanding that that was relayed to us by the

6   client.

7   Q.  And what had been relayed to you by Mr. Archer was "Burnham

8   Financial packaged the issuance of which I am a shareholder,"

9   right?

10  A.  In the e-mail, yes.

11  Q.  Now, the original client representation simply said "wire

12  transfer" for how the assets were purchased, right?

13  A.  That's correct.

14  Q.  Now, looking at the next portion on the right side at 345,

15  you wrote to Ms. Tomasino, "The funds used to purchase the

16  bonds ($15 million) were from real estate sales through his

17  business, Rosemont Seneca Bohai LLC."  Correct?

18  A.  Yes.

19  Q.  On the left side, Exhibit 344, Mr. Archer did not write

20  that the funds used to purchase the bonds were from real estate

21  sales through his business.  Isn't that so?

22  A.  That's correct.  In the e-mail it does not say that.

23  Q.  Mr. Archer had just simply answered your question about how

24  the money was generated by saying that the $15 million was

25  generated through sales of real estate, correct?

I5v2gal4                          Driever - Cross

1    A.  That's what it says in the e-mail, yes.

2    Q.  And again, in his answer to you, Mr. Archer did not say

3    that it was generated from Rosemont Seneca Bohai's sale of real

4    estate, correct?

5    A.  In the e-mail, yes, that's correct.

6    Q.  But you told Elena Tomasino in compliance that the money

7    came from Rosemont Seneca Bohai's real estate sales, right?

8    A.  Yes.

9          MR. SCHWARTZ:  You can take that down.

10   BY MR. SCHWARTZ:

11   Q.  A few weeks later, Mr. Momtazi contacted you and he wanted

12   an update on the status of the bonds.  Do you recall that?

13   A.  I don't.  There was a lot of back and forth on these bonds.

14   I don't recall one particular phone call.

15   Q.  Well, let's look at Exhibit 349.  Does this reminded you

16   that a few weeks later, on October 20, Mr. Momtazi came back

17   and was looking for an update on the status of the bonds?

18   A.  Yes.

19   Q.  And you told him that Morgan Stanley had several people

20   that were working on the bonds, right?

21   A.  That's correct.

22   Q.  And you also told him that Morgan Stanley had confirmed

23   with DTC that the bonds were eligible for deposit, right?

24   A.  Yes.

25   Q.  But you also told him that he needed to get you a new

1   client representation letter because of that mistake we talked

2   about where the wrong box was checked about whether the bonds

3   were restricted, right?

4   A.  Yes.

5   Q.  And that was an issue that the risk team had spotted,

6   right?

7   A.  Yes.

8   Q.  The correction that was requested and that you are talking

9   about here had nothing to do with what we were just talking

10  about, how the money was generated, true?

11  A.  I did say in my earlier e-mail that there was follow-up

12  from compliance and that I needed further answers.

13  Q.  And you sent Mr. Momtazi a new version of that client rep,

14  right?

15  A.  I did, yes.

16  Q.  And you told him to return the original to you and also to

17  scan a signed copy in the meanwhile?

18  A.  Yes.  It was addressed to Sebastian and Devon.

19  Q.  And this second version of the client representation

20  letter, you filled this one out, right?

21  A.  I had prepopulated it, yes.

22  Q.  Prepopulated it meaning you were the one who wrote in the

23  blanks, right?

24  A.  Yes.

25  Q.  And so turning to page 2 of this document, this is the

1    client representation letter that you filled out, right?

2    A.  That's correct.

3    Q.  And this is, all of the handwriting on this page is your

4    handwriting, right?

5    A.  On this page, yes.

6    Q.  Focusing on question 3, this is the issue that the cover

7    e-mail talked about.  It asked whether the securities are

8    restricted, right?

9    A.  Correct.

10   Q.  And you fixed the mistake and you checked the box for "the

11   shares are restricted," right?

12   A.  Yes.  And then I added a line per my conversation with

13   Devon, "I will not be selling these bonds.  I would only like

14   to hold them at Morgan Stanley."

15   Q.  You added "per my conversation with Devon," didn't you?

16   A.  I believe we had looked at an e-mail in an earlier exhibit.

17   Q.  Right.  You had an e-mail communication with --

18   A.  E-mail conversation, yes.

19   Q.  You don't know whether you had any actual conversation with

20   Mr. Archer, do you?

21   A.  There was an e-mail with him stating he would not sell the

22   bonds.

23   Q.  You had an e-mail conversation in which you asked him the

24   specific question, whether Rosemont Seneca Bohai was planning

25   to sell the bonds, right?

I5v2gal4                         Driever - Cross

1   A.  Yes.

2   Q.  And he responded that they were not going to sell the

3   bonds, right?

4   A.  Correct.

5   Q.  And that was the basis for your answer, I will not be

6   selling these bonds.  True?

7   A.  Yes.

8   Q.  And in fact, we looked at the bank statements.  Rosemont

9   Seneca Bohai didn't sell the bonds, right?

10  A.  In the statements we looked at, no.

11  Q.  I'm sorry.  I didn't hear that.

12  A.  In the statements we reviewed, he did not sell the bonds.

13  Q.  Right.  They were simply transferred away, right?

14  A.  Yes.

15  Q.  So this answer is consistent with that specific e-mail

16  which, per your notes, is Government Exhibit 348 in which

17  Mr. Archer had told you in response to your question, "To

18  confirm, you don't plan on selling the Wakpamni bonds," he

19  wrote "Confirmed."  Correct?

20  A.  Yes.

21  Q.  So this change, checking the correct box and writing that

22  in, this was directly responsive to the request of the risk

23  team, right?

24  A.  Yes.

25  Q.  That's what the cover e-mail to this exhibit had talked

I5v2gal4                         Driever - Cross

1    about, right?

2    A.  Yes.

3    Q.  So backing out of this, you also changed the responses to

4    questions 1A and 1B, right?

5    A.  Yes.

6    Q.  Now, your cover e-mail enclosing this didn't make any

7    reference to those questions or that kind of information, true?

8    A.  There was an earlier e-mail to Sebastian and Devon saying

9    that there was follow-up from our compliance team for these two

10   questions.

11   Q.  The e-mail that we looked at, right?

12   A.  Yes.

13   Q.  In connection with this form, however, the cover e-mail

14   enclosing this form that you filled out doesn't make any

15   reference to this kind of information, true?

16   A.  It doesn't.

17            MR. SCHWARTZ:  Now, if you could back out of this,

18   Mr. Jackson, and keep this up on the right hand side of the

19   screen, let's bring back up Exhibit 343, page 2, on the left

20   side.

21   BY MR. SCHWARTZ:

22   Q.  These are the two different client representation letters

23   for the deposit of private securities in connection with

24   Rosemont Seneca Bohai's LLC's custody of the WLCC bonds at

25   Morgan Stanley, right?

I5v2gal4                         Driever - Cross

1    A.  Yes.

2    Q.  In the original form on the left, under "Method of

3    Acquisition," someone had written "Purchase," right?

4    A.  Correct.

5    Q.  In the form that you filled out, you wrote "Purchased

6    through a private placement.  I am a shareholder of Burnham

7    Financial who packaged the issuance.  They approached me

8    regarding the offering."  Right?

9    A.  Yes.

10   Q.  And you wrote that in Mr. Archer's voice, right?

11   A.  Repeat that.  I'm sorry.

12   Q.  You wrote that in the first person, in Mr. Archer's voice,

13   right?

14   A.  Yes.

15   Q.  Those were not the words that Mr. Archer wrote to you in

16   his e-mail, correct?

17   A.  We would have to compare it against what was written in the

18   e-mail.

19   Q.  Do you want me to bring the e-mail back up?

20   A.  If you want to.

21   Q.  Didn't we just go through that?

22   A.  We did.

23   Q.  And the words that you put here on the right side, those

24   were not the same words that Mr. Archer wrote to you in his

25   e-mail, correct?

I5v2gal4                        Driever - Cross

1    A.  They might not be exact.  I would have to look at the

2    e-mail.

3    Q.  Okay.  Now, question 1B asks for manner of payment, right?

4    A.  Yes.

5    Q.  And the original answer on the left side, Exhibit 343, was

6    "wire transfer."  True?

7    A.  Yes.

8    Q.   The answer that you wrote in on Exhibit 349 was, "The

9    funds used to purchase the bonds were from real estate sales

10   through my business, Rosemont Seneca Bohai LLC."  Correct?

11   A.  Yes.

12   Q.  Again, those were not the words Mr. Archer wrote to you in

13   his e-mail, true?

14   A.  They were not the words in the e-mail; but, again, I can't

15   remember specific phone conversation, but we did have phone

16   conversations with them regarding the bonds.

17   Q.  Is it your testimony now that 26 minutes between

18   Mr. Archer's e-mail to you containing specific words and you

19   writing back your e-mail to Elaine Tomasino, you certainly had

20   a conversation with him and not anyone else --

21   A.  No.

22   Q.  -- where he conveyed to you what is on this form?

23   A.  I can't remember.

24   Q.  Okay.

25              But what we do have is his e-mail to you, and in his

I5v2gal4                          Driever - Cross

1    e-mail to you he never said that the funds came from his own

2    real estate sales, true?

3    A.   In the e-mail he did not say that.

4    Q.   And he never said that the real estate sales were from

5    Rosemont Seneca Bohai LLC, correct?

6    A.   In the e-mail he did not say that, correct.

7    Q.   And in fact, by the way, Morgan Stanley had approved these

8    bonds for deposit based on the first version of the client rep

9    letter, isn't that true?

10   A.   No.

11            MR. SCHWARTZ:  If you could take these down,

12   Mr. Jackson, and bring up, just for the witness, Judge Abrams,

13   and the lawyers, Exhibit 4604 -- I'm sorry, 4606.

14            (Pause)

15   BY MR. SCHWARTZ:

16   Q.   This is an e-mail from someone named Debra Lee to a whole

17   bunch of e-mails at Morgan Stanley, correct?

18   A.   Yes.

19   Q.   Including you, correct?

20   A.   Yes.

21            MR. SCHWARTZ:  I offer Exhibit 4606.

22            MS. MERMELSTEIN:  Objection: hearsay.

23            MR. SCHWARTZ:  For the fact that it was said, your

24   Honor.

25            THE COURT:  I'm sorry?  What did you say?

I5v2gal4                          Driever - Cross

1               MR. SCHWARTZ:  For the fact that it was said.

2               THE COURT:  Let's just meet at sidebar for a moment.

3               MR. SCHWARTZ:  Your Honor, I don't mind leaving it for

4        now and taking it up at a break, unless you guys need a break.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. SCHWARTZ:  It's for impeachment.

3          MS. MERMELSTEIN:  But I don't think it is admissible.

4     She can be confronted.  What she said, sort of, I don't know

5     this.  It is being offered, right, to be clear, to try and

6     prove that it had been approved prior to the statements by

7     Mr. Archer in order to suggest to the jury that somehow

8     Mr. Archer's statements were not wrong.  But of course

9     Mr. Archer would know -- there is no evidence that Mr. Archer

10    knew this.  So Mr. Schwartz has said it was for the fact it was

11    said.  But what this witness knew with respect to it is,

12    frankly, not really relevant.  What Mr. Archer knew is what's

13    relevant.  So it's not relevant and it's hearsay because it is

14    being offered to prove that this approval had in fact been

15    made.  It's not admissible.

16         MR. SCHWARTZ:  First of all, it's not true that this

17    was -- I'm sorry.  You said that this happened after -- before

18    the misstatement, alleged misstatement, right?  But that's not

19    right.

20         MS. MERMELSTEIN:  The suggestion you are trying to

21    make is that his misstatements are somehow not important

22    because it didn't weigh on the decisions, and I think there is

23    no indication that Mr. Archer knew that.  That fact is

24    relevant.

25         MR. SCHWARTZ:  I'm just trying to impeach this

1    witness's testimony.

2              MS. MERMELSTEIN:  I don't think you can put it up as

3    evidence.  She says she doesn't remember it that way.

4              THE COURT:  Did she say she doesn't remember?

5              MR. SCHWARTZ:  I don't think so.  We can go back.

6              (Record read as follows:

7              "Q. And in fact, by the way, Morgan Stanley had

8                approved these bonds for deposit based on the first

9                version of the client rep letter, isn't that true?

10               A. No.")

11             THE COURT:  I think you can use it then.

12             MS. MERMELSTEIN:  He can use it, but I don't think he

13   can offer it.

14             MR. SCHWARTZ:  A nonhearsay use as to impeach.

15             MS. MERMELSTEIN:  He can't prove that impeachment by

16   extrinsic evidence by putting it into evidence.  He confronted

17   her.  She has said that is not her answer.

18             MR. SCHWARTZ:  That's not what that rule means.  The

19   answer is that I can't prove up collateral matters by extrinsic

20   evidence.  It is not a collateral matter.  I am not proving it

21   up.  I am impeaching her.

22             MR. QUIGLEY:  It's not an inconsistent statement *per

23   se* though.

24             MR. SCHWARTZ:  It's not an inconsistent statement.

25   She said something that was wrong, and I am impeaching her with

I5v2gal4                          Driever - Cross

1    that.

2              THE COURT:  She said it is not true.

3              MR. SCHWARTZ:  She is on this.

4              THE COURT:  If he can't admit it because it is

5    extrinsic evidence --

6              MS. MERMELSTEIN:  He can ask her about it.

7              MR. QUIGLEY:  He can confront her with it.

8              THE COURT:  I would do that.

9              MR. SCHWARTZ:  That's fine.

10             THE COURT:  I would do that.  And if you need to, you

11   can also refresh her recollection, although she didn't appear

12   to have trouble with her memory.  But I don't think you can

13   admit it because I do think it is extrinsic evidence, but you

14   can definitely confront her with it.

15             MR. SCHWARTZ:  It's not an important issue, but that's

16   not how the rules work.

17             (Continued on next page)

18

19

20

21

22

23

24

25

I5v2gal4                              Driever - Cross

 1                (In open court)

 2                THE COURT:  You may proceed.

 3                MR. SCHWARTZ:  Thank you, your Honor.

 4     BY MR. SCHWARTZ:

 5     Q.  So when we left off, I had just handed you what's been

 6     marked Defense Exhibit 4606 for identification.  Have you had a

 7     moment to look through that?

 8     A.  Yes.

 9     Q.  And you see the cover and you see the attachment, right?

10     A.  I can't speak to whether this was the attachment for this

11     e-mail.

12     Q.  It says, "Having reviewed this, isn't it the case that

13     Morgan Stanley approved the WLCC bonds for deposit based upon

14     the first version of the client rep letter?"

15     A.  So this e-mail is dated October 20.  When was the second

16     client representation letter obtained from the client and

17     submitted?

18                MR. SCHWARTZ:  That is Exhibit 349, Mr. Jackson.

19     Q.  Same day, right?

20     A.  So at some date the second version of the client

21     representation letter was turned in to the parties on this

22     e-mail chain, so my question is -- or I should say that I

23     believe that they already had the second client representation

24     letter in their possession before the date of this e-mail.

25     Q.  Let me ask you a different question, and we will go forward

I5v2gal4                         Driever - Cross

1    a few days so that the record is very clear.

2               As you were finalizing the deposit of the WLCC bonds

3    at Morgan Stanley, you continued to use the original version of

4    the client rep letter.  Isn't that right?

5    A.  I did not.  This e-mail is not from me.

6               MR. SCHWARTZ:  Let's look at Defense Exhibit 4607.

7    Mr. Jackson, if you could pull this up just for the lawyers,

8    Judge Abrams, and the witness.

9    BY MR. SCHWARTZ:

10   Q.  This e-mail is from you, true?

11   A.  Yes, this is from me.

12              MR. SCHWARTZ:  I offer 4607.

13              MS. MERMELSTEIN:  No objection.

14              THE COURT:  It will be admitted.

15              (Defendant's Exhibit 4607 received in evidence)

16   BY MR. SCHWARTZ:

17   Q.  This is an e-mail from you four days after the

18   communications that we were just talking about, correct?

19   A.  After the e-mail from Debra Lee.

20   Q.  After you sent the second version of the client rep letter

21   to Mr. Archer and Mr. Momtazi.

22   A.  I don't remember the dates of what I -- what date was the

23   second version.

24   Q.  You have that binder in front of you?

25   A.  Yes.

I5v2gal4                    Driever - Cross

1   Q.  Could you open it to Exhibit 349 in the binder.  That's the

2   second version of the rep letter.  And then maybe you can have

3   that to refer back to.

4           So you see that that was October 20, right?

5   A.  Yes.  This is October 20.

6   Q.  And the exhibit that is up on the screen, Exhibit 4607, is

7   October 24, right?

8   A.  Yes.

9   Q.  And if we flip the page, you have attached the first

10  version of the client rep letter, right?

11  A.  It should have been the second version.  That could have

12  been a mistake since they were both labeled as the same.

13  Q.  But that was the first version, right?

14  A.  Yes, but the second version had already been turned in.

15  Q.  Right.  So even after the second version was turned in, you

16  were attaching the first version, true?

17  A.  This is the first version if this was what was attached to

18  the e-mail.

19  Q.  Now, you sent the filled-out version of the -- the second

20  version of the client rep letter at 3:10 p.m. approximately on

21  October 20, right?

22  A.  Yes.

23  Q.  And Mr. Momtazi tried to send it back to you signed almost

24  immediately, true?

25  A.  I did let him know in another e-mail that I was leaving for

I5v2gal4                         Driever - Cross

1    the day and that one of my colleagues could come pick up the

2    original from him.

3    Q.  So let's look at Exhibit 350 in evidence.

4              MR. SCHWARTZ:  Put it up on the screen, please,

5    Mr. Jackson.

6    BY MR. SCHWARTZ:

7    Q.  And this is an e-mail --

8              MR. SCHWARTZ:  If you could blow up the top third.

9    A.  Yes.

10   Q.  He responds to you at 3:27 p.m., correct?

11   A.  He does.

12   Q.  That's about 17 minutes after you sent the document to him,

13   correct?

14   A.  That's correct.

15   Q.  And just to be clear for the jury, if we pull up 349 on the

16   left side, so you sent the second version on the right side at

17   3:10 p.m., and Mr. Momtazi tried to send it back to you signed

18   at 3:27 p.m., correct?

19   A.  Yes.

20             MR. SCHWARTZ:  Okay.  You can take those down.

21   BY MR. SCHWARTZ:

22   Q.  Now, as it turns out -- you went over this with

23   Ms. Mermelstein -- he attached the wrong document, right?

24   A.  Yes, I believe that's correct.

25   Q.  And you had to point it out to him, and then he sent you

I5v2gal4                           Driever - Cross

1    the right version, right?

2    A.  Yes.

3    Q.  And that is Exhibit 352 in evidence.  And if you go to page

4    6 of this exhibit, it is signed, correct?

5    A.  Yes, it is now signed.

6    Q.  And on the signature page, the words "Rosemont Seneca Bohai

7    LLC," that's your handwriting, correct?

8    A.  Yes.

9    Q.  And you have no idea if he signed this, do you?

10   A.  The only person who was authorized to sign on behalf of the

11   entity was Devon Archer.

12   Q.  You have no idea who signed this form, do you?

13   A.  I can't speak to whose handwriting that is.

14          MR. SCHWARTZ:  Now, you can take that down.

15   BY MR. SCHWARTZ:

16   Q.  The bonds, the WLCC bonds, were in fact deposited at Morgan

17   Stanley not long after that second version of the client rep

18   letter was submitted, true?

19   A.  I don't have the exact date that they were deposited, but I

20   know it was November.

21   Q.  You know it was?

22   A.  November they were deposited.

23   Q.  Well, didn't we look before --

24   A.  Or October, I'm sorry.  October.

25   Q.  Right.

I5v2gal4                         Driever - Cross

1  A.  You are right, yeah.

2  Q.  October.  We have looked at the month-end statement and we

3  saw --

4  A.  Yes, we saw it there.

5  Q.  And you testified that just a little while after that

6  Mr. Archer moved to a different private wealth manager at

7  Morgan Stanley, right?

8  A.  Yes.

9  Q.  He stayed within Morgan Stanley, just a different

10 relationship.

11 A.  Different branch, different team.

12 Q.  Now, that did have an effect on your group's business,

13 right?

14 A.  The only effect it would be was that we were no longer

15 servicing his account.  We no longer had the relationship.

16 Q.  Right.  But within Morgan Stanley, they keep track of the

17 clients and the assets under management by group, correct?

18 A.  By team, yes.

19 Q.  By team.  So when these accounts move to a different team,

20 that was something that mattered to you and Mr. Schatz and the

21 folks on your team, true?

22 A.  Given the time that went by between the deposit and when

23 the account was moved, I don't even know if that would have

24 been reflected in our assets under management because it's only

25 captured once a month.

I5v2gal4                          Driever - Cross

1    Q.   Well, the movement of Mr. Archer and Rosemont Seneca Bohai

2    and Archer Diversified to a new group, that had some negative

3    potential effects on your group, true?

4    A.   It's not negative.  It's just that the client was no longer

5    with our team.

6    Q.   You lost the client, right?

7    A.   We did, yes.

8    Q.   Even though they stayed within Morgan Stanley, Morgan

9    Stanley didn't lose the business, your group lost the business,

10   right?

11   A.   Correct.  He was no longer with our team.

12   Q.   And you had filled out -- we saw that form before, that his

13   reputation, his connections would be good for your group,

14   right?

15   A.   We thought so.

16   Q.   It was going to be a good source of liquidity is what you

17   thought, right?

18   A.   Yes.

19   Q.   And you valued his business, right?

20   A.   That would be up to the advisor, but, yes, it's his client.

21   Q.   But you thought, as reflected on that form, that you

22   thought that Mr. Archer was a high-value client, right?

23   A.   Yes.

24            MR. SCHWARTZ:  I have no more questions for you right

25   now.  Thank you.

I5v2gal4                          Driever - Cross

1            THE COURT:  Thank you.

2            It seems like we are having some technical issues.

3    Why don't we take our afternoon break now for ten minutes and

4    come back.  Thank you.

5            (Recess)

6            THE COURT:  Do you want to talk about anything while

7    we are waiting?

8            MS. MERMELSTEIN:  No.  We were just discussing that if

9    your Honor was going to rule on the 1286 issue before --

10           THE COURT:  I have a question.  Do you want to meet at

11   sidebar about it?

12           MS. MERMELSTEIN:  Sure.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I5v2gal4                    Driever - Cross

1          (At the sidebar)

2          MS. NOTARI:  I reviewed Mr. Schwartz's letter over

3     lunch, and we join in his objections to 1286.  I have nothing

4     to add.

5          THE COURT:  So as I understand it, Mr. Archer is

6     arguing that the exhibit constitutes 404(b) evidence for which

7     the government didn't provide adequate notice.  It is

8     irrelevant, inadmissible hearsay and unduly prejudicial and

9     misleading.  The government has agreed to redact all references

10    to the separate fraud referred to as the Ballybunnion scheme.

11    Does that moot any of your arguments in your view?

12         MR. SCHWARTZ:  Well, yes and no.  So it moots some of

13    the arguments, to the extent the prior bad act we were

14    concerned about was the Ballybunnion fraud.  If they are not

15    going to insinuate in any way, shape, or form Mr. Archer was

16    knowledgeable about that, then that's fine.  But what they told

17    us for the first time this morning is the purpose for this

18    exhibit is not to prove the Ballybunnion fraud, which is sort

19    of what's going on here unbeknownst to Mr. Archer.  It is to

20    set some sort of predicate, although it was a year and a half

21    earlier for something Code Rebel related.  And the problem with

22    that is it runs full force into your Honor's ruling about the

23    admissible uses of Code Rebel.  But you said that the

24    admissible uses of Code Rebel are to show that Wakpamni bond

25    proceeds went into Code Rebel and that Code Rebel shares were

1   redeemed or, I don't know, however it was worded, came out of

2   the bank account and were used to pay some of the annuity

3   payments to prior bondholders for the WLCC bonds.  What they

4   are saying now is this evidence is relevant to an entirely

5   different use of Code Rebel, which is supposedly there is some

6   transaction which harness RSTP Capital or perhaps Rosemont

7   Seneca Technologies Partners enters into some convertible note

8   involving Code Rebel shares and receives some shares having

9   nothing to do whatsoever with the WLCC bonds.  And I guess

10  their theory is that is some sort of -- I am making their

11  arguments.  But that is something we have had no prior notice

12  of, it was something that was precluded under your Honor's

13  ruling, it is something that is totally prejudicial, and it

14  introduces so much additional complexity into a trial that is

15  already ridiculously complex.  It introduces new entities, new

16  transactions, and new theories of the case, and I think it

17  shouldn't permitted at this late date.  I objected to each and

18  every Code Rebel document that they marked other than within

19  the strict confines of your Honor's rulings, and I was

20  repeatedly reassured that that was the only reason why the Code

21  Rebel documents were being marked.  Now we are two weeks into

22  trial.  It's too late.

23          THE COURT:  I want to hear your response, but I want

24  to understand if the funds from the RSTP Capital account were

25  used to pay for the convertible note -- that were used to pay

I5v2gal4                         Driever - Cross

1    for the convertible note consisted of proceeds from the bond

2    issuance.

3               MS. MERMELSTEIN:  No.

4               THE COURT:  Okay.  All right.  So you can respond.

5               MS. MERMELSTEIN:  Sure.

6               So I think the first problem we are having here is

7    that your Honor ruled that the government would not be

8    permitted to prove to the jury that the Code Rebel endeavor was

9    a pump-and-dump scheme, and we are not going to.  That is --

10   the proper purposes of the Code Rebel evidence, as we have

11   always maintained, is: one, the bond proceeds were used to buy

12   the shares; two, the bond proceeds were used to make interest

13   payments on the bonds when they came due and there was no money

14   in the annuity; and, three, that they were used as a currency

15   to repay various coconspirators.

16              I don't want to hide the ball on where this is going.

17   The government intends to show the jury that at the time of

18   the -- that before the IPO Jason Galanis directed the issuance

19   of shares to all kind of people, including Gary Hirst, Bevan

20   Cooney, Francisco Martin, and the who's who of the people who

21   were in on this.  This was a method of repaying the members of

22   the group.

23              And to be clear, the $19 million of Code Rebel shares

24   that Mr. Archer receives or received in the time frame of the

25   conspiracy, the relevance of this account is sort of the way in

I5v2gal4                        Driever - Cross

 1   which he receives them and the fact that he doesn't personally

 2   pay for them.  Because if he paid for them, there would be an

 3   argument that they weren't payment for some fraud scheme.  The

 4   fact that the account was opened earlier seems wholly

 5   irrelevant to me.  We offer account opening documents all the

 6   time to show whose account it is, and it's not relevant that

 7   the account was opened before the crime charged.  That account

 8   is in the name of certain people, and the fact that Mr. Archer

 9   knew that that account existed is relevant to his understanding

10   that he essentially received shares for free that end up being

11   worth $19 million.  So I don't think it is a violation of your

12   Honor's ruling at all.

13           Mr. Schwartz is right that he has said everything Code

14   Rebel is precluded, and we said, no, just the pump-and-dump

15   scheme is precluded.  We didn't mark any exhibits.  But that's

16   not my understanding of your Honor's ruling at all.  And I

17   think in the case where there has been so much made of nobody

18   profiting, the notion that the government can't prove that it

19   was given for free, for no consideration, tens of millions of

20   dollars of shares it is nonsensical.

21           THE COURT:  Let's finish up with this witness and we

22   will take this up later.

23           (In open court)

24           THE COURT:  Does anyone other than Mr. Schwartz have

25   any questions?

I5v2gal4                          Driever - Cross

1          MR. TOUGER:  Yes, your Honor.

2     CROSS EXAMINATION

3     BY MR. TOUGER:

4     Q.  Good afternoon, Ms. Driever.

5          In your professional experience or personal experience

6     did you ever have any communication with John Galanis?

7     A.  No.

8     Q.  Have you ever seen John Galanis?

9     A.  No.

10    Q.  Can you point him out in this courtroom?

11    A.  No.

12    Q.  And you have never communicated with him whatsoever?

13    A.  That's correct.

14         MR. TOUGER:  Nothing further.

15         THE COURT:  Ms. Notari.

16    CROSS EXAMINATION

17    BY MS. NOTARI:

18    Q.  Good afternoon.

19    A.  Hello.

20    Q.  Have you ever, before today, been in a courtroom or seen

21    Bevan Cooney?

22    A.  No.

23    Q.  Have you ever spoken to him before?

24    A.  No.

25    Q.  Have you ever communicated by e-mail?

I5v2gal4                      Driever - Redirect

1    A.  No.

2                MS. NOTARI:  Thank you.

3                MS. MERMELSTEIN:  Very, very briefly, your Honor.

4                THE COURT:  Sure.

5    REDIRECT EXAMINATION

6    BY MS. MERMELSTEIN:

7    Q.  Good afternoon.

8    A.  Hi.

9    Q.  Mr. Schwartz asked you a number of questions about the fact

10   that Morgan Stanley wasn't the purchaser of these bonds.  And

11   that's right, right?  Morgan Stanley didn't buy the bonds for

12   Morgan Stanley, right?

13   A.  Correct.

14   Q.  And the way in which the bonds were purchased is that

15   Morgan Stanley wired $15 million to buy the bonds, right?

16   A.  Yes.

17   Q.  So that wire was executed by Morgan Stanley, right?

18   A.  Yes.

19   Q.  And then the bonds came back into a Morgan Stanley account,

20   right?

21   A.  Yes.

22   Q.  Now, Mr. Schwartz also asked you a lot of questions about

23   your e-mails with Mr. Momtazi and we are not going to go back

24   through all of them.  Fair to say that all, if not -- virtually

25   all, if not all, of your communications with Mr. Momtazi

I5v2gal4                    Driever - Redirect

1   were -- included Mr. Archer on those same e-mail chains, right?

2   A.  Yes.

3   Q.  And let's pull up just for a moment Government Exhibit 344,

4   and if we start at the bottom, on October 7, you write, "Hi

5   Devon.  Our compliance group needs more information regarding

6   FLKM and Wakpamni."  Right?  So you are telling him that more

7   information is required from compliance in order to try and

8   deposit the bonds, right?

9   A.  Yes.

10  Q.  And the information he provides is for the purpose of

11  having the bonds deposited, right?

12  A.  Correct.

13  Q.  Those answers come directly from Mr. Archer, right?

14  A.  Yes.

15  Q.  Then you were asked a number of questions about the forms

16  that got filled out and the signatures on them.  Let's go to

17  Government Exhibit 352 for just a moment.  This is the e-mail

18  in which Mr. Momtazi provides the second signed form with the

19  more detailed information, right?

20          MS. MERMELSTEIN:  If we can pull up the attachments,

21  Mr. Wissman.

22  BY MS. MERMELSTEIN:

23  Q.  Right?  So this is Mr. Momtazi sending back to you the

24  form?

25  A.  Is there a signature on the second page?

I5v2gal4

1           (Pause)

2    A.   Yes.

3    Q.   Looking at the cover e-mail, when Mr. Momtazi says that to

4    you, he cc's Mr. Archer, right?

5    A.   Yes.

6           MS. MERMELSTEIN:  No further questions.

7           THE COURT:  Anything else?  Yes.

8           MR. SCHWARTZ:  I have one question.

9           Mr. Jackson, can I have Exhibit 343 on the left and

10   352 on the other side.  For Exhibit 343, can you go to page 4?

11   For Exhibit 352, can you go to page 6?

12           Can you blow up the signatures, please, Mr. Jackson.

13   RECROSS EXAMINATION

14   BY MR. SCHWARTZ:

15   Q.   My question for you, Ms. Driever, is:  You would agree with

16   me, would you not, that those signatures don't match?

17   A.   I'm not an expert in determining signatures or whose

18   signature it is.

19           MR. SCHWARTZ:  Thank you very much.

20           MS. MERMELSTEIN:  Nothing further.

21           THE COURT:  All right.  You can step down.  Thank you.

22           (Witness excused)

23           MR. QUIGLEY:  Your Honor, we can deal with that

24   evidentiary issue later.

25           THE COURT:  That would be great.  Thank you.

1              MR. QUIGLEY:  The government calls Hugh Dunkerley.

2     HUGH DUNKERLEY,

3          called as a witness by the government,

4          having been duly sworn, testified as follows:

5              MR. QUIGLEY:  May I proceed, your Honor.

6              THE COURT:  You may.

7     DIRECT EXAMINATION

8     BY MR. QUIGLEY:

9     Q.  Good afternoon, Mr. Dunkerley.

10    A.  Good afternoon.

11    Q.  How old are you, sir?

12    A.  I am 44 years old.

13    Q.  Where were you born?

14    A.  I was born in Hong Kong, which is now China.

15    Q.  Where did you grow up?

16    A.  Originally in Hong Kong; and then, when I was 13, I moved

17    and was educated in England; and when I was 28 I moved to

18    California in the United States.

19    Q.  Sir, are you familiar with a series of bonds issued by the

20    Wakpamni Lake Community Corporation in 2014 and 2015?

21    A.  I am.

22    Q.  How are you familiar with those bonds?

23    A.  I acted as placement agent for Burnham Securities for those

24    bonds, and I was also the sole managing member of the

25    corporation called Wealth Assurance Private Client that was the

1   purported annuity provider for those bonds, and I also was a

2   director of or at least the face of a company called CORFA that

3   owned Hughes Capital Management and Atlantic Asset Management.

4   Q.  What was supposed to happen to the proceeds of those bond

5   issuances?

6   A.  They were supposed to be invested in variable annuity

7   contracts.

8   Q.  What actually happened?

9   A.  The money was wired to a series of corporations and people,

10  and none was invested in a variable annuity contract.

11  Q.  Were you involved in wiring those funds out of the annuity

12  account?

13  A.  I was.

14  Q.  And did you plead guilty to federal crimes as a result of

15  your involvement in the Wakpamni fraud?

16  A.  I have.

17  Q.  We will get back to the Wakpamni bonds in a second, but

18  let's back up a little bit.  You said you grew up in England

19  and Hong Kong.  How far did you go in school?

20  A.  I got a bachelor's degree in business and then -- that is

21  how far I got.

22  Q.  Did you take any courses after your bachelor's degree?

23  A.  I did.  I took accountancy courses and I also took an MBA

24  where I took all of my exams and did all of my course work, but

25  I never actually graduated with a certificate from the school

I5v2gal4                          Dunkerley – Direct

1    from which I attended my MBA.

2    Q.  Have you represented that you had an MBA when you actually

3    didn't?

4    A.  I have, yes.

5    Q.  What year did you get out of school approximately?

6    A.  I believe 1999.

7    Q.  And what did you do between about 1999 and 2003?

8    A.  I worked for a series of companies in the United Kingdom

9    mainly in the Internet and technology space.

10   Q.  And in 2003, where did you go?

11   A.  I came to Laguna Beach in California.

12   Q.  What type of work did you do when you first got to the

13   United States?

14   A.  I was a waiter.

15   Q.  Did you have work papers at that time?

16   A.  No, I did not.

17   Q.  So was it legal for you to be working?

18   A.  No, it wasn't.

19   Q.  Did you get work papers eventually?

20   A.  Three months later I got work papers, yes.

21   Q.  And where did you work once you got work papers?

22   A.  I joined a company called Chromidex.

23   Q.  What type of company was Chromidex?

24   A.  Chromidex is a scientific company that supplies compounds

25   or reference standards to both the pharmaceutical and the

I5v2gal4                          Dunkerley - Direct

1    neutraceutical industry.

2    Q.  How long were you an employee of Chromidex?

3    A.  Roughly three years.

4    Q.  Were you still affiliated with Chromidex after that?

5    A.  I remained on the board of directors for another ten years,

6    taking the company public, yes.

7    Q.  After you left Chromidex as an employee, where did you work

8    next?

9    A.  I went to Hunter Wise Securities.

10   Q.  What is Hunter Wise Securities?

11   A.  A small broker-dealer based in Irvine, California.

12   Q.  What do you mean by a broker-dealer?

13   A.  A broker-dealer is like a small investment bank arranging

14   financings, helping companies with corporate finance.  They are

15   just termed broker-dealers.

16   Q.  How long did you stay at Hunter Wise?

17   A.  Six months.

18   Q.  Where did you go after that?

19   A.  I joined a company called Faldara & Company.

20   Q.  What did Faldara do?

21   A.  Faldara was a technology supplier.  It supplied software as

22   a service in order to organize your e-mail and your documents

23   and your calendar all into one seamless service online in the

24   cloud.

25   Q.  How long were you at Faldara for?

I5v2gal4                       Dunkerley - Direct

1    A.   About two years.

2    Q.   What roles did you have at that company?

3    A.   When I started at Faldara, it was to help with corporate

4    finance and investor relations.  After about a year of that, I

5    became chief operating officer of Faldara, and then after about

6    another six months the board asked me to become the chief

7    executive officer of Faldara.

8    Q.   What ended up happening to Faldara?

9    A.   It ended up running out of money and going out of business

10   at the end of 2008.

11   Q.   Why was that?

12   A.   The great financial crisis meant that raising money was

13   hard, so we failed.

14   Q.   Where did you work next?

15   A.   I worked at the Federal Deposit Insurance Corporation,

16   which is also known as the FDIC, who regulate the banks here in

17   the United States.

18   Q.   Is that a federal agency?

19   A.   It is.

20   Q.   What was your role at the FDIC?

21   A.   I was manager of capital markets for the west coast region.

22   Q.   And generally what were your job responsibilities during

23   that time?

24   A.   We closed a number of banks, and from those banks we

25   collected the securities, the assets, and we pooled those into

I5v2gal4                          Dunkerley - Direct

1    Washington, D.C., where they were either held or sold.  I was

2    also involved in starting, restarting the securitization

3    business at the time.  I oversaw the selling of a bunch of

4    securities and also the management of a large portfolio of

5    derivatives, as well as some legislation to do with Dodd-Frank

6    and living wills.

7    Q.  And when did you end up leaving the FDIC?

8    A.  I left about April 2011, I believe.

9    Q.  Why did you leave the FDIC?

10   A.  I was headhunted to join another company, and the contracts

11   that most employees at my office has was only a three-year

12   limited term contract, so it is natural that people were going

13   to leave the FDIC.

14   Q.  You said you were headhunted.  What company did you work at

15   after the FDIC?

16   A.  COR Capital.

17   Q.  And who ran COR Capital?

18   A.  Steven Sugarman.

19   Q.  And COR is spelled C-O-R?

20   A.  It is.

21   Q.  No E?

22   A.  No E.

23   Q.  How had you first met -- when had you first met

24   Mr. Sugarman?

25   A.  Mr. Sugarman was introduced to me by a colleague at the

I5v2gal4                          Dunkerley – Direct

FDIC called Richard Herring, and I would have met him in 2013.

Q.  What was your role initially at COR Capital?

A.  My role was to set up a business development corporation, also known as a BDC index which allows people to trade ETFs and other types of financial instruments against a publicly known index and basket of those corporations.

Q.  During the time you worked at COR Capital, did you meet Steven Sugarman's brother?

A.  I did.

Q.  What's his name?

A.  Jason Sugarman.

Q.  Did he have an official role at COR Capital?

A.  Not an official role, no.

Q.  During the time you were at COR Capital, was Jason Sugarman involved in any legal proceedings?

A.  Yes, he was.

Q.  What was that proceeding?

A.  I believe it was to do with a fund that he ran called MKA Advisors.

Q.  And was that in connection with entity called Westmore?

A.  Again, my understanding is that there was a connection with another firm called Westmore, yes.

Q.  Did you ever meet someone named Dan White while you were working at COR Capital?

A.  Yes, I did.

I5v2gal4                           Dunkerley - Direct

Q.   Who is Mr. white?

A.   Daniel White is Jason Sugarman's personal attorney.

Q.   Did there come a time when Steven Sugarman introduced you
to someone named Jason Galanis?

A.   Yes.

Q.   When was that?

A.   In the beginning of 2011.

Q.   And before you met Jason Galanis for the first time, what,
if anything, did you know about him?

A.   Steven Sugarman took me to one side, he explained that he
planned to have this meeting with Jason Galanis, and that
Mr. Galanis had a mixed reputation, that 50 percent of the
people who knew him didn't like him and 50 percent of the
people who knew him did like him, and that I should go do my
own private investigation to decide what I thought of that
scenario.

Q.   Did you do your own private investigation?

A.   I did.

Q.   So what did you do essentially?

A.   Essentially I went on to the Internet, I read blogs and
reports put out by certain people that did -- half the people
said he was, you know, an amazing businessperson and the other
half of the people had some very derogatory things to say about
him.

            I found out, for example, that he was barred from

1   being a director of any public corporation due to accounting

2   irregularities to do with the Penthouse Guccione corporation.

3   That was one example of some of the information I found out.

4   Q.  Did you still go to the meeting with Jason Galanis?

5   A.  I did.

6   Q.  Why did you do that?

7   A.  The project I was working on at the time wasn't working

8   out, and I believe that Steve Sugarman expected me to attend

9   the meeting regardless.

10  Q.  Who was at this meeting?

11  A.  There were four of us present at the meeting.  Jason

12  Galanis, Lucas Mann, myself, and Steven Sugarman.

13  Q.  And you were there with Steven Sugarman?

14  A.  Correct.

15  Q.  And who was Lucas Mann there with?

16  A.  Jason Galanis.

17  Q.  What was the context of the meeting?

18  A.  Jason Galanis and Lucas Mann had quite a few assets, what

19  we call distressed assets, that COR Capital, as a hedge fund,

20  we were in the business of buying distressed assets, so we ran

21  through the assets that they had and we talked about if it was

22  possible for our two firms to do business together.

23  Q.  And how did the meeting end?

24  A.  We took a list of all the different opportunities that were

25  available, and for about three weeks I researched all those

I5v2gal4                    Dunkerley - Direct

1   different opportunities to see if there was a fit with COR

2   Capital's strategies and those assets, and I determined that

3   there was no fit, and no business came out of that meeting.

4   Q.  After the initial meeting with Jason Galanis in early 2011,

5   how long approximately went by before you had extended

6   interaction with him again?

7   A.  About a year to 18 months.

8   Q.  And how did you reconnect with him?

9   A.  COR Capital had been very successful in the financial

10  space, buying a bank which is now known as Bank of California,

11  and also buying a clearing firm which is now known as COR

12  Clearing.  So because of that success, the team decided that it

13  would be a good idea to do a financial roll-up strategy which

14  would be to combine a series of different financial firms into

15  one and the sum of the parts being more valuable as a whole.

16  Q.  Who was involved in this plan initially?

17  A.  COR Capital in general, but the -- the person who is asked

18  to really lead the plan was Jason Sugarman, and Jason Galanis

19  also got involved in this plan as well.

20  Q.  Did other people get involved in this roll-up plan over

21  time?

22  A.  Over time, absolutely.  As we took over companies, the CEOs

23  CFOs, admins of all the companies we took over became involved

24  in the plan itself, yes.

25  Q.  Did other people become involved as investors?

I5v2gal4                        Dunkerley - Direct

1    A.  Yes, absolutely.

2    Q.  And who were some of those people?

3    A.  As investors, individuals to name are people -- Ed Zucker

4    became an investor in one of our companies.  Devon Archer

5    became an investor.  Bevan Cooney became an investor.  There

6    were other hedge funds who were investors, as well.  I believe

7    Sincloud became an investor.  There were quite a large number

8    of investors depending on the type of investment.  So, you

9    know, I can't remember them all at this point in time.

10   Q.  Before the time when you started working on this roll-up

11   plan with Jason Galanis and the time when the first set of

12   Wakpamni bonds were issued, what were some of the entities that

13   you were involved in acquiring or attempting to acquire?

14   A.  We looked at all different types of financial entities.

15   The first one we looked to acquire was based in Switzerland.

16   It was called Force Vives.  We studied that for about two

17   months or so and decided that we would not go forward with that

18   transaction.

19        There were a couple other factoring companies,

20   equipment leasing companies, and finally we ended up doing our

21   first acquisition of a company called Wealth Assurance that was

22   based in Lichtenstein in Europe.

23   Q.  During this time that you were working on the roll-up plan,

24   did you become familiar with an entity called COR Fund

25   Advisors?

I5v2gal4                         Dunkerley - Direct

```
 1    A.  I did.

 2    Q.  And what was COR Fund, or CORFA?

 3    A.  CORFA was originally a special purpose vehicle or special

 4    purpose entity, so basically a blank company with no particular

 5    purpose that was started by Jason Sugarman as the sole member

 6    and proprietor, so it was a vehicle used to raise money to buy

 7    other companies.

 8    Q.  You said Jason Sugarman started the company.  Who became

 9    involved over time?

10    A.  Over time, a number of people.  Devon Archer became

11    involved.  Jason Galanis, I believe, became involved under the

12    name of Thunder Valley, I believe.  Bevan Cooney was involved.

13    A man called Viktor Abidov was involved, and another man called

14    Sean Liu was involved, and obviously Jason Sugarman was

15    involved as well.

16    Q.  One of the people you mentioned with Bevan Cooney?

17    A.  Correct.

18    Q.  Have you ever met Mr. Cooney in person?

19    A.  Yes.

20    Q.  Where did you meet him?

21    A.  I met him in Los Angeles.

22    Q.  And about how many times have you met him?

23    A.  Roughly two or three times.

24    Q.  And who was he with when you met him?

25    A.  Jason Galanis.
```

I5v2gal4                          Dunkerley - Direct

1    Q.   How did Mr. Cooney and Mr. Galanis describe their

2    relationship?

3    A.   Best of friends.

4    Q.   And based on your observations of them, what could you tell

5    about their relationship?

6    A.   They were best of friends.

7    Q.   Now, you also mentioned somebody named Devon Archer.   How

8    many times do you think you spoke or communicated with

9    Mr. Archer between 2013 and the time of the arrest in this

10   case?

11   A.   Speaking with him on conference calls, I would imagine at

12   least 20 or so times on conference calls.

13   Q.   Were you also on e-mails together?

14   A.   Yes, many, many e-mails, yes.

15   Q.   And you mentioned conference calls.   What types of

16   conference calls were you on?

17   A.   They were conference calls to do with being director of a

18   number of companies that we were both directors of.   There were

19   organizational conference calls about those companies and

20   financings about those companies.   Yeah, conference calls to do

21   with the running of any business that we were operating

22   together.

23   Q.   Did you ever meet him in person until you met him in this

24   courthouse?

25   A.   I had not, no.

I5v2gal4                         Dunkerley - Direct

1   Q.  Now, were you also familiar with someone named Gary Hirst?

2   A.  Yes, I am.

3   Q.  And had you worked with Gary Hirst in the context of this

4   roll-up plan?

5   A.  Yes, I had.

6   Q.  In what context?

7   A.  I worked with Gary on a number of different projects.  He

8   helped with some of the due diligence with buying Burnham

9   Financial Group.  He helped with some of the due diligence of

10  buying Wealth Assurance Group.  He also had a number of his own

11  companies that he ran, one specifically called Insurance

12  Companies of the Americas.  That was a Florida-based insurance

13  corporation that he asked me to become CEO of for a period of

14  about six months.

15  Q.  Were you also familiar with an entity called Rosemary &

16  Rue, R-U-E?

17  A.  Yes.

18  Q.  What was that?

19  A.  It's an entity owned by Gary Hirst but I'm not sure what it

20  does.

21  Q.  Did Gary Hirst ever use any other names to your knowledge?

22  A.  I -- to my knowledge there was an e-mail address he used

23  that was Paul Puncheon.

24  Q.  P-U-N-C-H-E-O-N?

25  A.  Correct.

1    Q.  Had you ever met John Galanis before your arrest in this

2    case?

3    A.  I don't think I have ever met John Galanis.

4    Q.  Now, let's talk about some of the entities you mentioned.

5    You mentioned Wealth Assurance.  How did the acquisition of

6    Wealth Assurance come about?

7    A.  Wealth Assurance was introduced to us -- introduced to me

8    by Jason Galanis, introduced to Jason Galanis by a broker out

9    of the United Kingdom called Stephen Wheatley who knew the

10   prior owner of Wealth Assurance who was a man called Aloyse

11   Steichen, so with Aloyse's help, we started pursuing the

12   acquisition of Wealth Assurance.

13   Q.  And what was the name of the entity that ended up buying

14   Wealth Assurance?

15   A.  We created a special purpose vehicle, a holding company, so

16   it was called Wealth Assurance Holdings.

17   Q.  And who were the entities or people that provided the

18   financing?

19   A.  So the people who provided the financing for that

20   acquisition would again be Ed Zucker, Adam Levine, Devon

21   Archer, Bevan Cooney, Jason Sugarman, Gary Hirst.  I think

22   those were the majority of the people.

23   Q.  After the acquisition, what role did you play at Wealth

24   Assurance?

25   A.  I was a director of Wealth Assurance.

I5v2gal4                    Dunkerley - Direct

1   Q.  And what role did you play at Wealth Assurance Holdings,

2   the parent company?

3   A.  I was also a director of Wealth Assurance Holdings.

4   Q.  And with respect to Wealth Assurance Holdings, who else was

5   on the board of directors?

6   A.  There was Jason Sugarman, Devon Archer, Dr. Rory Knight,

7   Aloyse Steichen, and I believe that's it.

8   Q.  What role did Jason Galanis play at Wealth Assurance and

9   Wealth Assurance Holdings?

10  A.  He was an advisor to the board.

11  Q.  In 2014, did Wealth Assurance Holdings acquire any other

12  company?

13  A.  It acquired a company called Valorlife.

14  Q.  And from whom did Wealth Assurance Holdings acquire

15  Valorlife?

16  A.  From a large Swiss insurance company called the Vaudois

17  Group.

18  Q.  That is V-A-U-D-I-O-S-E?

19  A.  D-O-I-S.

20  Q.  What happened to Wealth Assurance's name after it acquired

21  Valorlife?

22  A.  It became the Valor Group.

23  Q.  Wealth Assurance Holdings became the Valor Group?

24  A.  Correct.

25  Q.  Are you familiar with another entity called VL Assurance?

```
       I5v2gal4                    Dunkerley - Direct
```

1    A.   I am.

2    Q.   What is that entity?

3    A.   It is a subsidiary of the Valor Group that was created --

4              MR. TOUGER:   I missed the name.

5              MR. QUIGLEY:   VL Assurance.

6    Q.   Tell us about VL Assurance.

7    A.   VL Assurance was a subsidiary of the Valor Group that was

8    created in order to write insurance premiums with U.S. clients.

9    Q.   What about Bermuda International Insurance Services, or

10   BIISL, B-I-I-S-L?

11   A.   Sorry.  The question is?

12   Q.   Were you familiar with that entity?

13   A.   Yes, I became familiar with that entity, yes.

14   Q.   What -- tell us about that company.

15   A.   It became a part of the Valor Group.  We acquired the BIISL

16   Group.

17   Q.   Now, during this time between 2013, around 2013, did you

18   also become involved with Burnham Securities International?

19   A.   Burnham Securities, Inc., yes, I did.

20   Q.   Sorry, Burnham Securities, Inc.

21            And what was the parent company of Burnham Securities,

22   Inc.?

23   A.   Burnham Financial Group, I believe.

24   Q.   And did Burnham Financial Group have any other subsidiaries

25   in addition to Burnham Securities, Inc.?

I5v2gal4                    Dunkerley - Direct

1   A.  Burnham Asset Management.

2           MR. QUIGLEY:  Your Honor, at this time I would like to

3   publish an aid to the jury, Government Exhibit 4002.

4           THE COURT:  Any objection?

5           MR. SCHWARTZ:  As I understand it, these are being

6   offered as demonstratives at this time and not being moved into

7   evidence.

8           MR. QUIGLEY:  That's right, just as an aid to the

9   jury.

10          THE COURT:  These are demonstratives used to assist

11  you, but they are not evidence in and of themselves.

12          Go ahead.

13  BY MR. QUIGLEY:

14  Q.  Does this fairly and accurately depict at a high level the

15  structure of the Burnham Financial Group?

16  A.  Yes, it does.

17  Q.  Were you aware of any entity at Burnham called Burnham

18  Municipal Capital?

19  A.  No, I wasn't.

20          MR. QUIGLEY:  You can take this down, Mr. Wissman.

21  Thank you.

22  BY MR. QUIGLEY:

23  Q.  Was part of the role and plan to acquire Burnham Financial?

24  A.  Yes.

25  Q.  And what was the entity that was going to be involved in

1   acquiring -- carrying out that acquisition?

2   A.   COR Fund Advisors, CORFA.

3   Q.   And what was your role in the acquisition initially?

4   A.   I helped negotiate part of the acquisition, and really I

5   was as an investment banker with the right qualifications.  I

6   sort of represented the type of person and business that we

7   could bring to Burnham Financial Group.

8   Q.   During the course of the acquisition did you actually start

9   working at Burnham Securities?

10  A.   I did.

11  Q.   When was that approximately?

12  A.   In the summer of 2013, I believe.

13  Q.   Where did you start working -- where were you physically

14  located?

15  A.   There was an office created in Irvine in California for

16  Burnham Securities Group.

17  Q.   And had that been an existing office of Burnham Securities?

18  A.   No, it was new made for myself.

19  Q.   Who else worked in that office with you?

20  A.   Daniel McClory.

21  Q.   Where were the other office or offices of Burnham

22  Securities at that time?

23  A.   The main office of Burnham Securities at that time was in

24  Manhattan, I believe 1325 Avenue of the Americas.

25  Q.   And during the time -- during the 2013 to 2016 time period,

1    about the Burnham Securities office move to another location in

2    Manhattan?

3    A.   Yes, it did.  I believe it moved to 40 West 57th Street.

4    Q.   Between 2013 and 2016 have you traveled to both of those

5    offices?

6    A.   I did.

7    Q.   Focusing on the initial occasion on Avenue of the Americas,

8    how many floors in the building did that occupy?

9    A.   One floor.

10   Q.   And focusing on the West 57th Street location, how many

11   floors of the building did that occupy?

12   A.   One and a half floors.

13   Q.   And about how many people worked at Burnham Securities' New

14   York office?

15   A.   The original office I believe was around 50 people.

16   Q.   Slightly more once they moved?

17   A.   We undertook an acquisition, so, yes, I believe that

18   increased to roughly 100 people for the large office space

19   obviously.

20   Q.   Did you ever see Jason Galanis at the West 57th Street

21   office?

22   A.   I did.

23   Q.   About how many times?

24   A.   At least twice.

25   Q.   Based on your work at Burnham, would you say that Jason

I5v2gal4                          Dunkerley – Direct

1   Galanis was involved in the inner workings of Burnham

2   Securities?

3             MR. SCHWARTZ:  Objection.

4             THE COURT:  I'll allow it.

5   A.  Yes.

6   Q.  Was he actually a Burnham Securities employee?

7   A.  He was not an employee, no.

8   Q.  What was Mr. Archer's role at Burnham during the 2014 to

9   roughly 2016 time period?

10            MR. SCHWARTZ:  I object to "Burnham."

11            THE COURT:  Could you specify the particular entity?

12  BY MR. QUIGLEY:

13  Q.  What Mr. Archer's role at Burnham Financial Group during

14  the 2014 to 2016 time period?

15  A.  I believe his title was chairman of Burnham Financial

16  Group.

17  Q.  And what about Burnham Securities?  Was he on any

18  committees at Burnham Securities?

19  A.  He was on the investment committee of Burnham Securities.

20            MR. QUIGLEY:  Your Honor, at this time the government

21  would offer Government's Exhibits 511, 513, 565, 801, 828, 867,

22  pursuant to the prior discussion we had, 958, 1412, 1575, 1577,

23  1579, 1581, 1582, 2218, and 3506-07.

24            THE COURT:  Any objection?

25            MR. SCHWARTZ:  No objection.

1          THE COURT:  They will be admitted.

2          (Government's Exhibits 511, 513, 565, 801, 828, 867,

3     958, 1412, 1575, 1577, 1579, 1581, 1582, 2218, and 3506-07

4     received in evidence)

5          MR. QUIGLEY:  Your Honor, just while we are on this

6     topic, we would also offer as aids to the jury again two other

7     demonstratives, Government Exhibits 4001 and 4002.

8          THE COURT:  Have you shown them to defense counsel?

9          MR. QUIGLEY:  They have seen it.

10         MR. SCHWARTZ:  Again, those are simply aids to the

11    jury at this point?

12         MR. QUIGLEY:  At this time, yes.

13         MR. TOUGER:  They are not being admitted into

14    evidence.

15         THE COURT:  But only 4001 and 4002.  Everything else

16    is being admitted.

17         MR. SCHWARTZ:  By agreement, when we get to it, one of

18    those exhibits will be subject to a limiting instruction.

19         MR. QUIGLEY:  That's right, your Honor.

20         THE COURT:  All right.

21         MR. QUIGLEY:  Mr. Wissman, can we publish Government

22    Exhibit 756.

23    BY MR. QUIGLEY:

24    Q.  If you are having trouble reading the screen, there is a

25    binder next to you also.

I5v2gal4                        Dunkerley - Direct

1              So do you recognize this e-mail?

2    A.   I do.

3    Q.   Did you receive it?

4    A.   I did.

5    Q.   Who is the e-mail from?

6    A.   It is from Jason Galanis.

7    Q.   What is the date on the e-mail?

8    A.   It is the 12th of August, 2014.

9    Q.   And who is on the "to" line?

10   A.   It is sent to Dan McClory.

11   Q.   He is the person you mentioned who worked in the Burnham

12   Irvine office with you?

13   A.   He was my parter in the Burnham Irvine, yes.

14   Q.   Who is on the cc line?

15   A.   Devon Archer, myself, and Steven Weiss.

16   Q.   What is the subject of the e-mail?

17   A.   "Burnham closing and board control."

18   Q.   Can you read the e-mail, the top e-mail?

19   A.   "Dan, Larry has, of course, executed the documents.

20   Sebastian is coordinating with Steve today on affixing Devon's

21   signatures.  Once received and delivered to Larry and/or his

22   counsel, Weiss will need written instruction from Larry to

23   release the money from escrow."

24              Do you want me to continue?

25   Q.   Yes.

I5v2gal4                    Dunkerley - Direct

A.  "Weiss will coordinate with Kaplan to seat the new board on
the next day.  So as to a date, if Devon signs today, and Larry
gives his go ahead later today North America time (morning
China time, assuming he is still there), then the date would be
Thursday, the 14th.  I advise all parties to have a board
meeting in the immediate term, if nothing else, to make the act
more official within Burnham.  It will be psychologically
important demarcation for Burnham as well as for Larry, who we
owe a lot for supporting the plan, Jason."

Q.  Was this e-mail sent in connection with the acquisition of
Burnham Securities?

A.  Yes.

        MR. QUIGLEY:  You can take that down, Mr. Wissman.
Thank you.

BY MR. QUIGLEY:

Q.  During the time you were working at Burnham Securities, you
had mentioned previously that the New York office had been
involved in an acquisition.  The New York office of Burnham
Securities had acquired another company.  Let me back up a
second.

A.  Oh, yes, sorry.  They did acquire another -- certainly a
partnership or an acquisition -- I'm not exactly sure which --
of a firm called I believe Bonwick Capital.

Q.  What was Bonwick Capital?

A.  It was a bond trading house.

I5v2gal4                     Dunkerley - Direct

1    Q.   Who ran Bonwick?

2    A.   Devin Wicker, I believe.

3    Q.   Did there come a time when you became involved in a

4    transaction between Ballybunnion -- sorry, between Wealth

5    Assurance AG and an entity called Ballybunnion.

6    A.   Yes.

7    Q.   When was that approximately?

8    A.   I believe that it was mid 2013.

9    Q.   And how did you get involved in it, in that transaction?

10   A.   Wealth Assurance being an insurance company received

11   premiums from its clients and it invested those premiums in

12   order to make money and to do payouts, and it believed that it

13   wasn't making as much a return on those premiums as it could

14   with its current asset management program, so another asset

15   manager was looked for to manage the funds of Wealth Assurance,

16   and the firm that was selected was a firm called Ballybunnion.

17   Q.   Where was Ballybunnion located?

18   A.   Ballybunnion in the United Kingdom.

19   Q.   And was Ballybunnion in the United Kingdom actually able to

20   take that investment?

21   A.   No, it wasn't.

22   Q.   So what happened after that?

23   A.   Upon finding out that Ballybunnion in the UK could not

24   receive the investment, I received a telephone call from Jason

25   Galanis.  He informed me that he wanted the transactions still

I5v2gal4                    Dunkerley - Direct

to go ahead, but that he was going to create a completely

unrelated entity in Nevada with the same name Ballybunnion UK

Growth Capital Fund, I believe, and that new wiring

instructions would need to be sent to Wealth Assurance in

Liechtenstein for the money that was originally to be sent to

the UK that was now to be sent to the fake Ballybunnion in the

United States.

Q.   And did you send the money to the fake Ballybunnion in the

United States?

A.   I wired the instructions to the accountants of Wealth

Assurance who wired the money to the fake Ballybunnion, yes.

Q.   And did you know that was wrong when you did it?

A.   Absolutely.

Q.   After that wire transfer was made, what, if any, documents

did you provide to Wealth Assurance AG regarding Ballybunnion?

A.   Account statements.

Q.   Were those account statements accurate?

A.   No, they were totally fraudulent.

Q.   What did those documents purport to show?

A.   They purported to show that the principal and interest of

the money invested by Wealth Assurance AG continued to grow and

was stable in the accounts.

Q.   I want to talk about one additional entity.  Are you

familiar with a company called Fond Invest, F-O-N-D

I-N-V-E-S-T?

I5v2gal4                         Dunkerley - Direct

1    A.  Fond Invest Capital, yes.

2    Q.  And where was Fond Invest located?

3    A.  It is located in Paris, France.

4    Q.  And where did you go in about March of 2015?

5    A.  I went to Paris, France, to undertake the closing of

6    funding the closing the buying of Fond Invest Capital.

7    Q.  What was going to be your role in Fond Invest?

8    A.  I became president and CEO of Fond Invest.

9    Q.  And how had you gotten involved in that acquisition?

10   A.  It had been introduced to us by one of our normal finders

11   in the investment banking field.  I had negotiated with the

12   owner of Fond Invest Capital for about a period of a year.  We

13   had settled on a price and gone through all the legal work to

14   buy the company.

15   Q.  And who financed the purchase?

16   A.  Jason Galanis.

17   Q.  Where did he get the money?

18   A.  From Wealth Assurance Private Client, the Indian bond

19   issuances.

20   Q.  And who was -- who owned Fond Invest after the purchase?

21   A.  Technically I owned Fond Invest or there was a subsidiary

22   company called Newline Trading that I was the majority owner

23   of.

24   Q.  So not Wealth Assurance Private Client Corporation?

25   A.  Not Wealth Assurance Private Client.

I5v2gal4                           Dunkerley - Direct

1    Q.  And not the Wakpamni Lake Community Corporation?

2    A.  And not the Wakpamni Lake Community Corporation.

3    Q.  While you were working at Fond Invest, did there come a

4    time when you became involved with someone named Omar Amanat?

5    A.  Yes.

6    Q.  How did you become familiar with Mr. Amanat?

7    A.  Jason Galanis introduced me to Amanat.

8    Q.  In what context?

9    A.  Mr. Amanat was in an intense legal battle for a reasonably

10   sized hotel chain called Aman Resorts with a Russian oligarch

11   about control of this entity, and so between Jason Galanis and

12   Mr. Amanat, they asked me, as the head of Fond Invest to

13   represent and to fund what's called debtor in possession

14   proceedings for -- to take back the hotel group for Mr. Amanat.

15   Q.  Was Fond Invest really a debtor in possession?

16   A.  No it wasn't.

17   Q.  Did it have any financial interest in Aman Resorts?

18   A.  No.  That was a fraudulent claim.

19   Q.  In the course of making that fraudulent claim, were you

20   involved in the filing of false documents in bankruptcy

21   proceedings?

22   A.  I was.

23   Q.  Now, I want to focus on May 2016.  What happened to you at

24   that time.

25   A.  I was arrested.

I5v2gal4                        Dunkerley - Direct

1    Q.   For what?

2    A.   Mainly for securities fraud.

3    Q.   In connection with what security?

4    A.   The Wakpamni Lake Community Corporation bond issuance.

5    Q.   So you were not arrested for the Ballybunnion or the

6    bankruptcy fraud schemes that you have just described?

7    A.   I was not.

8    Q.   What did you decide to do after your arrest?

9    A.   I decided to cooperate with the government.

10   Q.   When did you first meet with the government?

11   A.   I believe it was in the summer of 2016, I believe,

12   somewhere around there.

13   Q.   And over the last two years, roughly, how many times have

14   you met with the government?

15   A.   Roughly about 20 times.

16   Q.   Who has been at those meetings?

17   A.   Yourself as the prosecution team, the F.B.I., the United

18   States Postal Service, the SEC, and any other associated

19   government entities that needed to be there.

20   Q.   What did you have to do at those meetings?

21   A.   I had to tell the truth.

22   Q.   In those meetings did you tell the government what you knew

23   about the crimes you were involved in?

24   A.   I told them everything I knew about the crimes I was

25   involved in.

I5v2gal4                         Dunkerley - Direct

1    Q.  Did there come a time when you pled guilty to federal

2    crimes?

3    A.  Yes.

4    Q.  When was that approximately?

5    A.  I believe it was in the fall of 2016, I believe.

6    Q.  Was that pursuant to an agreement between you and the

7    government?

8    A.  Yes, it was.

9              MR. QUIGLEY:  Your Honor, I would like to publish

10   3506-07, which is in evidence.

11             THE COURT:  Any objection.

12             MR. SCHWARTZ:  No objection.

13             THE COURT:  Oh, no objection.  Go ahead.

14   BY MR. QUIGLEY:

15   Q.  Sir, do you recognize this document?

16   A.  I do.  This is my cooperation agreement with the

17   government.

18   Q.  And the date on this document is?

19   A.  May 3.

20   Q.  May 3, 2017?

21   A.  It is.

22             MR. QUIGLEY:  Mr. Wissman, can you go to the last

23   page?

24   BY MR. QUIGLEY:

25   Q.  And you signed this document on June 17 of 2017?

I5v2gal4                         Dunkerley - Direct

1   A.  I did.

2   Q.  Is that approximately when you pled guilty?

3   A.  Yes.

4          MR. QUIGLEY:  We can back out, Mr. Wissman, and go to

5   the first page.

6   BY MR. QUIGLEY:

7   Q.  What crimes did you plead guilty to?

8   A.  I pled guilty to five crimes:  Three counts of securities

9   fraud, the first two counts being to do with the Wakpamni Lake

10  Community Corporation bond issuances; the second, security --

11  the third count of securities fraud to do with the Ballybunnion

12  affair; the fourth to do with bankruptcy proceedings; and the

13  fifth to do with obstruction of justice and the falsification

14  of documents to the government.

15  Q.  And what did the last count relate to?

16  A.  There were documents that were produced that tried to cover

17  up the crimes that had been committed.

18  Q.  And were you involved in creating those documents?

19  A.  I was.

20  Q.  With who?

21  A.  With Jason Galanis.

22  Q.  And did you give those documents to your attorney at the

23  time?

24  A.  I did.

25  Q.  And that was before you began cooperating with the

I5v2gal4                    Dunkerley - Direct

1   government?

2   A.  It was.

3   Q.  Were those documents submitted to government authorities?

4   A.  Yes.

5   Q.  Mr. Dunkerley, have you ever used any drugs?

6   A.  Yes.

7   Q.  What drugs have you used?

8   A.  Mainly social, recreational drugs, marijuana, cocaine,

9   Ecstasy, a bit of ketamine.

10  Q.  And under your cooperation agreement, what has the

11  government agreed to do with respect to any personal drug use

12  within the last five years?

13  A.  They have agreed not to prosecute me for any personal drug

14  use over the last five years.

15  Q.  Since you pled guilty in this case, have you used any

16  drugs?

17  A.  Yes, I have.

18  Q.  What did you use?

19  A.  Marijuana.

20  Q.  Where did you do that?

21  A.  In California.

22  Q.  And are you now aware that it's a federal crime to smoke

23  marijuana regardless of whether it is permissible under state

24  law?

25  A.  Correct.

1    Q.   You are.

2    A.   I am.  I had a prescription at the time, and I was in

3    California.  I didn't completely understand my cooperation

4    agreement.  My lawyer explained that it was a federal

5    cooperation agreement I applied to, so since then I have not

6    smoked marijuana.

7    Q.   What are your obligations under your cooperation agreement?

8    A.   My obligation is to meet with the government, to tell the

9    truth, to testify in court, and to commit no further crimes.

10   Q.   If you carry out your obligations under the cooperation

11   agreement, what does the government agree to do?

12   A.   It has agreed to write a letter to the judge.

13   Q.   Now, has the government -- have you gotten that letter yet?

14   A.   No.

15   Q.   Do you know for sure whether you are getting that letter?

16   A.   I do not know for sure if I am getting that letter.

17   Q.   If you get the letter, what's your understanding of what

18   goes in the letter.

19   A.   My understanding is that a detailed description of my

20   crimes go in the letter and a detailed description of my

21   cooperation goes in the letter to the judge.

22   Q.   In light of all the counts that you have pled guilty to,

23   what's the maximum amount of time in jail you are facing?

24   A.   70 years.

25   Q.   Even if you get --

1          MS. NOTARI:  Was that 17 or 70?

2   Q.  Seven zero?

3   A.  Seven zero.

4   Q.  Even if you get the letter, what's the highest sentence you

5   can get?

6   A.  70 years, seven zero.

7   Q.  What sentence are you hoping to get?

8   A.  I would hope to get time served.

9   Q.  Would a letter, if you get it, recommend any particular

10  sentence for you?

11  A.  I don't believe it would.

12  Q.  Does whether or not you get that letter depend on whether

13  the defendants at this trial are convicted?

14  A.  No, it doesn't.

15  Q.  Has anyone told you what sentence you are going to get?

16  A.  No, they haven't.

17  Q.  Has anyone promised you a particular sentence?

18  A.  No, they haven't.

19  Q.  Who decides what sentence you will get?

20  A.  The judge decides.

21  Q.  And what's your understanding of what happens to your

22  cooperation agreement if you lie?

23  A.  It is null and voided and effectively ripped up.

24  Q.  Do you get to take your guilty plea back?

25  A.  I do not.

I5v2gal4                           Dunkerley - Direct

1    Q.   Have you also been charged civilly by the Securities and

2    Exchange Commission?

3    A.   I have.

4    Q.   What do those charges relate to?

5    A.   They relate to the Wakpamni bonds issuance and I believe

6    the other crimes that -- securities frauds that I have admitted

7    to.

8    Q.   They only relate to the Ballybunnion and the bankruptcy

9    fraud, is that correct?

10   A.   I'm not 100 percent correct (sic), but I think you are

11   right, they don't relate to those two, but mainly to the

12   Wakpamni bond issuances.

13   Q.   In any event, does your cooperation agreement resolve your

14   charges with the SEC in any way?

15   A.   No.

16   Q.   Do you have any children, sir?

17   A.   I do.

18   Q.   You have child support obligations?

19   A.   I do.

20   Q.   Are you currently behind this those obligations?

21   A.   I am, but I'm negotiating with my wife to become as current

22   as possible on them.

23   Q.   And how much are you currently behind in those obligations?

24   A.   Roughly about $200,000.

25   Q.   Does your cooperation agreement help you in any way or

I5v2gal4                          Dunkerley - Direct

1   assist you in any way in paying back those obligations?

2   A.  Absolutely not.

3   Q.  It's on you to pay what you owe?

4   A.  It is.

5   Q.  Now, let's step back a second and talk in more detail about

6   the Wakpamni bonds.

7          Did there come a time when you learned that Jason

8   Galanis and others were considering a transaction involving

9   Native American bonds?

10  A.  Yes.

11  Q.  How did you first learn about this?

12  A.  I was in Jason Galanis's house and he told me that it made

13  sense both from the tribe's perspective and from an investment

14  banking perspective to do a bond issuance.

15  Q.  And you said you were at Jason Galanis's house.  Where was

16  his house?

17  A.  1920 Bel Air, Los Angeles, California.

18  Q.  And at this meeting at Jason Galanis's house, did you also

19  discuss the potential acquisition of an investment advisor

20  firm?

21  A.  We did.

22  Q.  What was that investment advisor firm?

23  A.  Hughes Capital Management.

24  Q.  Who owned Hughes Capital Management at the time?

25  A.  Frankie Hughes.

1    Q.  And based on your conversations with Jason Galanis, who was

2    going to run Hughes Capital Management after this acquisition?

3    A.  Michelle Morton.

4    Q.  And how were Michelle Morton -- how was Michelle Morton

5    going to finance the purchase?

6    A.  We were going to find her the money to finance the purchase

7    of the company.

8    Q.  And what was the, as you understood it, the near-term goal

9    of purchasing Hughes Capital Management?

10   A.  The primary reason for the purchase of Hughes Capital was

11   for the purchase of the bond issuances.

12   Q.  To provide a client base to purchase those bonds?

13   A.  Yes.

14   Q.  And the bonds you are referring to are the Native American

15   Wakpamni bonds, is that right?

16   A.  Yes, they are.

17   Q.  Now, with respect to the Native American bonds, did Jason

18   Galanis ever tell you who the person who was making contact

19   with the Native American tribe was?

20   A.  He informed me that it was Michelle Morton.

21          MR. QUIGLEY:  Can we publish -- it is in evidence, as

22   Government Exhibit 801, and just the attachments.

23   BY MR. QUIGLEY:

24   Q.  Sir, what is this document?

25   A.  This is a term sheet for the conditional financing

I5v2gal4                    Dunkerley - Direct

1    commitment or guarantee for GMT Duncan by COR Fund Advisors in

2    order to purchase Hughes Capital Management.

3    Q.  Can you read the first paragraph?

4    A.  "This term sheet summarizes the principal terms of a

5    proposed investment (the 'transaction') by COR Fund Advisors,

6    LLC, ('CORFA') directly or through its affiliate Burnham

7    Financial Group and/or its subsidiaries (collectively 'the

8    investors') in GMT Duncan, LLC, ('GMT' or 'the company') to

9    enable the company to finance the acquisition of 100 percent of

10   the capital stock of Hughes Capital Management, Inc.,

11   ('Hughes')."

12   Q.  Do you see reference to CORFA Fund Advisors in there?

13   A.  I do.

14   Q.  Is that the same CORFA we discussed before?

15   A.  It is.

16          MR. QUIGLEY:  Can you, Mr. Wissman, highlight the

17   second paragraph.

18   BY MR. QUIGLEY:

19   Q.  There is a reference to -- let's go back to the first

20   paragraph one second.  You see the reference to GMT Duncan in

21   the first paragraph, Mr. Dunkerley?

22   A.  I do.

23   Q.  How is GMT Duncan defined?

24   A.  GMT Duncan is an entity I believe that's owned and

25   controlled by Michelle Morton and Richard Deary.

1   Q.  So here GMT is defined as "GMT" or "the company" in the

2   first paragraph of this document?

3   A.  It is "a company" or "the company" in this paragraph, yes.

4           MR. QUIGLEY:  And then, Mr. Wissman, if we can

5   highlight the second paragraph of the document.

6   BY MR. QUIGLEY:

7   Q.  Do you see a reference to Ms. Morton down there?

8   A.  I do.

9   Q.  Read what it says after "Michelle Morton."

10  A.  "Michelle Morton, the owner of 100 percent of the equity of

11  the company ('Ms. Morton' or the 'company owner')."

12  Q.  Thank you.

13          MR. QUIGLEY:  If we can go to the page ending in Bates

14  stamp 470, Mr. Wissman.

15  BY MR. QUIGLEY:

16  Q.  Who signed on behalf of GMT Duncan?

17  A.  Michelle Morton.

18  Q.  And who signed on behalf of COR Fund Advisors?

19  A.  Myself.

20  Q.  Did you actually have a role as executive vice president of

21  COR Fund Advisors?

22  A.  I have no role in COR Fund Advisors.

23  Q.  So why did you sign this document?

24  A.  I was told to by Jason Galanis.

25  Q.  Now, this is a term sheet between CORFA and GMT Duncan, is

I5v2gal4                    Dunkerley - Direct

1    that right?

2    A.   It is.

3    Q.   What is the entity that actually ended up investing in GMT

4    Duncan?

5    A.   An entity was created called Burnham Financial Group

6    Socially Responsible Investing, also known by BFG SRI.

7    Q.   Did BFG SRI have any actual affiliation with Burnham

8    Financial Group?

9    A.   None.

10   Q.   Where did BFG SRI get the money from to invest in GMT

11   Duncan.

12   A.   From Wealth Assurance, also known as the Valley Group.

13            MR. QUIGLEY:  So if we can put up on the screen,

14   Mr. Wissman, as an aid to the jury, Government's Exhibit 4000.

15   BY MR. QUIGLEY:

16   Q.   Mr. Dunkerley, does this accurately describe, fairly and

17   accurately describe your understanding of the flow of funds for

18   the Hughes Capital acquisition?

19   A.   Yes, it does.

20   Q.   So Wealth Assurance AG is a company you mentioned earlier?

21   A.   Yes.

22   Q.   And they are sending money to where?

23   A.   They are sending money to BFG Socially Responsible

24   Investing that sent the money to GMT Duncan that then gave the

25   money to Hughes Capital.

1                MR. QUIGLEY:  You can just leave this up for a second,

2     Mr. Wissman.

3     BY MR. QUIGLEY:

4     Q.  When approximately did this transaction close?

5     A.  In August 2014.

6     Q.  Who named the entity BFG SRI?

7     A.  Jason Galanis.

8     Q.  What, if anything, did BFG SRI get in return for investing

9     in GMT Duncan?

10    A.  It received a certain amount of profitability from the

11    entity, but I think the main point of investing in GMT

12    Duncan --

13               MR. TOUGER:  Objection.

14               THE COURT:  One second.  I will allow it.

15               MR. TOUGER:  Are these his personal thoughts?

16               MR. QUIGLEY:  I can lay a better foundation.

17               THE COURT:  Do you want to rephrase?

18               MR. QUIGLEY:  Yes.

19    BY MR. QUIGLEY:

20    Q.  What was your role at BFG SRI?

21    A.  I was the sole managing member and director of BFG SRI.

22    Q.  And without getting -- we will get into this in more detail

23    in a second, but were you involved in communications and

24    meetings regarding BFG SRI's investment in GMT Duncan?

25    A.  Absolutely.

I5v2gal4                        Dunkerley - Direct

1   Q.  And what was BFG SRI getting in return for its investment

2   in GMT Duncan?

3   A.  It was receiving class B shares for its investment in the

4   entity.

5   Q.  As a practical matter, what was BFG SRI getting?

6   A.  As a more practical matter, it was receiving the investors

7   for the bond issuances that were about to occur.

8            MR. QUIGLEY:  Can we pull up what is in evidence as

9   GX1412, Mr. Wissman.

10  Q.  Sir, do you recognize this document?

11  A.  I do.

12  Q.  And what is this?

13  A.  This is an escrow agreement between Wealth Assurance

14  Holdings, BFG SRI, and Hunter Taubman Weiss as the escrow agent

15  for the purchase of Hughes Capital Management by GMT Duncan.

16           MR. QUIGLEY:  If you can highlight the first

17  paragraph.

18  BY MR. QUIGLEY:

19  Q.  What's the date on the escrow agreement?

20  A.  11th day of August 2014.

21  Q.  Is that approximately when the transaction -- the

22  acquisition of Hughes Capital Management closed?

23  A.  Yes.

24  Q.  And the escrow agreement is between Wealth Assurance

25  Holdings, BFG Socially Responsible Investments and Hunter

I5v2gal4                         Dunkerley – Direct

1    Taubman Weiss?

2    A.  This agreement is between those entities, yes.

3              MR. QUIGLEY:  And if we could pull back from that

4    Mr. Wissman.  Thank you.

5              If you can go to the last page of the document.

6    BY MR. QUIGLEY:

7    Q.  Who signed this document on behalf of BFG Socially

8    Responsible Investments?

9    A.  I did.

10   Q.  From who signed on behalf of Wealth Assurance Holdings?

11   A.  I did.

12   Q.  Now, did you ever meet Michelle Morton in person?

13   A.  I did.

14   Q.  And when was the first time you met her?

15   A.  On the day that we closed the transaction for the purchase

16   of Hughes Capital Management.

17   Q.  And prior to that day, where had you met?

18   A.  I had never met her prior to that day.

19   Q.  How did you end up at the closing?

20   A.  I was in New York visiting the offices of Burnham Financial

21   Group.  I received a telephone call from Jason Galanis

22   informing me that the closing of the acquisition was to happen

23   the next day and that I was to make my way from New York to

24   Alexandria in Washington, D.C.

25             THE COURT:  Do you want a sidebar?

I5v2gal4                        Dunkerley - Direct

1              MR. TOUGER:  Yes.

2              THE COURT:  Sure.

3              (Continued on next page)

1           (At the sidebar)

2           MR. TOUGER:  I'm sorry to interrupt.  I know we are

3    probably finishing soon, but we have an emergent situation, so

4    I don't know if you wanted to stop here.

5           THE COURT:  Do you want to go for another couple of

6    minutes?

7           MR. QUIGLEY:  I can get through the Hughes acquisition

8    and then that will be a natural stop.

9           MR. TOUGER:  How long do you think that will be?  Is

10   it five minutes or 20 minutes?

11          MR. QUIGLEY:  No, five minutes.

12          THE COURT:  We can wait.

13          MR. TOUGER:  We can wait five minutes.

14          (Pause)

15          THE COURT:  Just while we have time, so I looked back

16   with respect to my previous ruling regarding Jason Galanis's

17   arrest in Gerova.  I ruled the government would be able to

18   elicit testimony for Francisco Martin regarding the phone call

19   he had with Mr. Cooney.  I wasn't going to introduce the SEC

20   press release, at least that portion of it, and we all talked

21   about that, and I think the way that it was left, Mr. Schwartz,

22   is that I turned to you to ask what you want to do next.  And

23   by that I mean that I had agreed to read the government's

24   stipulation sort of per person.  So during Francisco Martin's

25   testimony I was going to read it just with respect to

1   Mr. Cooney so that it did not highlight the fact that John

2   Galanis is --

3              MR. TOUGER:  I haven't signed on to that yet.

4              THE COURT:  I understand that.  I'm just telling you

5   what I had said.

6              MR. TOUGER:  What you had said, yes.

7              THE COURT:  Then I left it to Mr. Schwartz to tell me

8   do you want some of this to come in, in which case I will read

9   that stipulation with respect to Mr. Archer, but I'm not going

10  to read it with respect to Mr. Archer if nothing is coming in.

11  It wouldn't make sense to do that.

12             MR. SCHWARTZ:  I understand now.

13             THE COURT:  Okay.

14             MR. SCHWARTZ:  I understand the issue.  I will reflect

15  on that.  It's --

16             THE COURT:  I'm only doing it because we have some

17  time together.  I'm trying to utilize the time.

18             MR. TOUGER:  So I understand this correctly, what you

19  plan to say at that point as of now is that Mr. Galanis was

20  arrested for something or just that he was arrested.  That's

21  really the key here, your Honor.

22             MR. SCHWARTZ:  It was that he was arrested and somehow

23  that --

24             MR. TOUGER:  If it's just arrested, then we don't

25  really have -- then I don't have a problem.

1           THE COURT:  And specifically, I know we have talked

2    about this before, but your issue is with respect to it being

3    for securities fraud, it being in the Southern District of New

4    York?

5           MR. TOUGER:  Yes, your Honor.  And the reason I

6    thought of since we have had this discussion is also I know we

7    tell jurors not to do any googling, but I don't always trust

8    that that's true, and I don't want to help them --

9           THE COURT:  I don't think --

10          MR. TOUGER:  -- especially now that they have just

11   heard that apparently Google is filled with information about

12   good and bad about Jason Galanis.

13          MR. QUIGLEY:  With respect to that, the jurors were

14   instructed not to do any research in the case.  I think they

15   are presumed to follow that instruction.

16          THE COURT:  I will reminded them at the end of the day

17   today.  Why do you need the fact that it was either in the

18   Southern District of New York, I don't know the relevance of

19   that, and it was for securities fraud specifically?

20          MR. QUIGLEY:  I think we are fine, your Honor, on just

21   the fact it was an arrest.  I think the Southern District was

22   kind of, frankly, pending the ruling on the CDCA cooperation,

23   and that's not coming in, so I don't think we have to.

24          THE COURT:  Okay.

25          MS. MERMELSTEIN:  But I think we mentioned this last

1    time, but we talked about it so many times, in the event that

2    all that's going to be said is Jason Galanis was arrested, I

3    don't see the need then for any discussion of who wasn't

4    arrested.

5              MR. TOUGER:  Exactly.

6              MS. MERMELSTEIN:  I just don't agree that there is

7    some risk that there was going to be speculation on the mere

8    fact.  Why would anyone assume that when all we have heard is

9    Jason Galanis got arrested --

10             MR. TOUGER:  I agree.

11             MS. MERMELSTEIN:  -- that anyone else got arrested?

12             MR. TOUGER:  I find myself agreeing with the

13   government.

14             MS. NOTARI:  We disagree.

15             MR. SCHWARTZ:  I understand your point, which is, I

16   have to sort of pick my poison, and I will think on that.

17             MR. TOUGER:  Your Honor, this is where different

18   clients -- different defendants have different stands.  I have

19   to agree more with the government at this point than my

20   co-counsel because --

21             MS. MERMELSTEIN:  That never happens.

22             MR. TOUGER:  -- it's going to show that John Galanis,

23   which he did obviously, one, because it is his son and, two, he

24   was arrested with him, and it's going to lead to assumptions

25   that I can't --

I5v2gal4                          Dunkerley – Direct

1              MS. NOTARI:  Obviously.

2              THE COURT:  For you, for example, if there is

3    testimony from Francisco Martin that Cooney made various

4    statements regarding Jason Galanis's arrest, don't you want the

5    jury to know that there is no evidence that Mr. Cooney --

6              MS. NOTARI:  Absolutely.

7              MR. TOUGER:  She does.  She definitely does.

8              THE COURT:  I am sorry.  I thought you were agreeing

9    with Mr. Touger.

10             MS. NOTARI:  No, no.

11             THE COURT:  Mr. Galanis is back, so let's continue.

12             (Continued on next page)

1                (In open court)

2                THE COURT:  We are just going to go for a few more

3     minutes, then we will end for the day.

4                MR. QUIGLEY:  May I proceed, your Honor?

5                THE COURT:  Yes.

6     BY MR. QUIGLEY:

7     Q.  Mr. Dunkerley when we left off you were talking about how

8     you ended up at the Hughes Capital Management closing.  Do you

9     recall that?

10    A.  I do.

11    Q.  Tell us again how you ended up there.

12    A.  I received a phone call from Jason Galanis instructing me

13    to be in Alexandria in DC the next day for the closing of

14    the -- or the acquisition of that firm.

15    Q.  And where were you when you got that phone call?

16    A.  I was in the offices of Burnham Financial Group in New

17    York.

18    Q.  That's here in Manhattan?

19    A.  Yes.

20    Q.  Did Jason Galanis tell you about anyone else who was going

21    to be at the closing?

22    A.  He did, Gary Hirst.

23    Q.  What was your understanding of why Gary Hirst was going to

24    be there.

25    A.  He was proposed to become the chief investment officer of

Hughes Capital Management.

Q.  And what do you remember about that day at -- when you

arrived in Alexandria, Virginia, at Hughes Capital Management?

A.  We arrived.  I met Michelle Morton, Richard Deary, and Gary

Hirst outside the company.  Michelle ran us through what the

general schedule of the day would be.  We were then taken for a

five-minute tour of the employees and the actual facilities.

We met a few of the employees, we discussed with them, and then

myself and Gary Hirst were ushered, along with Richard Deary,

into a conference room where we waited for about three or four

hours while Michelle Morton and Frankie Hughes finalized the

end of the acquisition of the company.

Q.  And Frankie Hughes was the seller of Hughes Capital

Management?

A.  She was.

Q.  And was the sale finalized that day?

A.  It was.

          MR. QUIGLEY:  Your Honor, this would be kind of a

logical breaking point.  I am about to move on to another

topic.

          THE COURT:  So why don't we adjourn, ladies and

gentlemen, until Monday morning.  We will be on the regular

schedule on Monday.  So we will start at 10:00.  Please, as

usual, get here early and you can have breakfast.  Remember,

keep an open mind.  Don't discuss the case.  Don't research

I5v2gal4                    Dunkerley - Direct

1    anything about it or anything you may have heard during the

2    course of the trial and have a nice weekend.  Thank you.

3            JURORS:  Thank you.

4            (Jury not present)

5            THE COURT:  You can step down.  Thank you.

6            (Witness not present)

7            THE COURT:  Everyone can be seated.

8            So with respect to the conversation we were having at

9    sidebar regarding Jason Galanis's arrest, I still do think it

10   is appropriate to read the stipulation, even if it is not clear

11   that it is a securities fraud case.  I just think there is too

12   much potential for prejudice or confusion otherwise.

13           MR. TOUGER:  Your Honor, I guess as long as the

14   statement is just that Jason Galanis got arrested.  And if

15   Mr. Schwartz goes along with the idea that it would come in

16   only at times where it is acceptable, if the court is not

17   willing to change that idea, it leaves me no choice but to

18   accept that stipulation as opposed to it coming out that

19   securities fraud and the rest of the way the government wanted

20   to do it.

21           THE COURT:  I just think this way it is just much more

22   subtle.  I am reading that --

23           MR. TOUGER:  That's only if Mr. Schwartz accepts that.

24           THE COURT:  Right.  Otherwise I will just make the

25   statement with respect to Mr. Cooney during Mr. Martin's

I5v2gal4                        Dunkerley - Direct

1    testimony.

2            MR. SCHWARTZ:  And can I just say out loud what I

3    understand the state of play to be so there is no confusion as

4    I think about this overnight?

5            So the question is to what extent anything about Jason

6    Galanis's September 2015 arrest comes in, and your Honor has

7    ruled it definitely at least comes in in the context in the

8    Francisco Martin conversation.

9            THE COURT:  Right, but that 861, 862, and I think it

10   was 2102 and 2103 are closer calls.  2103 was the one with the

11   press release, and that I think is too prejudicial at the very

12   least the press release itself.  But that's when I turned it

13   back to you.

14           MR. SCHWARTZ:  Right.  And so, more broadly, stepping

15   back in those exhibits, the question is, in general, in the

16   context of the BIT Board interactions and more broadly

17   Mr. Archer's involvement in Burnham Financial Group

18   post-September 2015, you are asking me would I prefer that

19   there be no reference to Jason Galanis's arrest at all, in

20   which case I do not get the benefit of an instruction when it

21   comes in about this conversation between Mr. Martin and

22   Mr. Cooney.

23           THE COURT:  Right, and it was going to come in that he

24   was arrested.

25           MR. SCHWARTZ:  Correct.

1              THE COURT:  Right?

2              MR. SCHWARTZ:  So I have to choose between --

3              THE COURT:  I'm not telling you I am going to -- I

4    want to hear your position.  I'm not promising I will give you

5    what you want, but I wanted to hear you out on that and I

6    wanted to make clear that that's what I was waiting for in this

7    discussion.  I wanted to hear what you thought was the best way

8    to proceed on that.

9              MR. SCHWARTZ:  Got it.  I understand that perfectly.

10   Thank you.

11             MR. QUIGLEY:  Your Honor, once he puts something in,

12   we would like an opportunity to respond.  We may have a

13   proposal.  I understand your ruling with respect to the press

14   release in 2103, but we think the top part of the e-mail has --

15   given that it is an e-mail statement of Mr. Archer, it is not

16   testimonial evidence through somebody else, has very high

17   probative value and would be want to explore a way in which

18   that could come in perhaps with the press release redacted or

19   some type of a stipulation at the bottom.

20             THE COURT:  That's fine.

21             And, as I said, I haven't ruled on 861, 862, 2102 and

22   the top part of 2103.  And I am still open to argument.  I just

23   wanted to make clear where I was, where I thought we were, and

24   what I want to hear you out on.

25             MR. SCHWARTZ:  To reiterate my position, I have never

1      objected to the government eliciting the fact that the

2      conversation between the BIT Board and Mr. Archer was

3      reinitiated in September 2015, and I am sure, regardless of

4      what your Honor rules on the arrest issue, we will be able to

5      work out a way for them to get in that evidence.

6                THE COURT:  All right.

7                MR. QUIGLEY:  We will take a look at what they put in,

8      your Honor.  If we want to put in something else --

9                THE COURT:  If you could tell me, whether it is

10     tomorrow by way of letter or Monday morning, tell me where you

11     are on this so I know what I need to do.

12               MR. QUIGLEY:  Understood, your Honor.

13               THE COURT:  And then with respect to -- I'm sorry,

14     Mr. Touger.  Did you want to say anything additional on this?

15               MR. TOUGER:  No, your Honor.

16               THE COURT:  With respect to 1286, I do think it would

17     be helpful if the government put in a letter on this, and

18     addressed why this isn't hearsay, given the timing, why it is

19     in furtherance of the conspiracy, if that's your argument as to

20     why it doesn't constitute hearsay, and address if the funds

21     from the RSTP Capital account that were used to pay for the

22     convertible note were not proceeds of the bond issuance which I

23     believe is what you said at sidebar, exactly why they are

24     probative and I know you talked about that a little bit this

25     morning, but I think a letter would be helpful.

1          MS. MERMELSTEIN:  I'm happy to put in a letter.  The

2     concern on the hearsay, your Honor, is that it's not being

3     offered for its truth.  It's being offered to show Archer's

4     awareness that an account was being opened in an entity related

5     to his entity's name.

6          THE COURT:  But is your position that in fact the

7     conspiracy started earlier and that this was -- is it just -- I

8     understand earlier you said, look, the fact that an account was

9     opened earlier doesn't mean they didn't do things with the

10    account later.  But, from your perspective, is it that the

11    opening of the account was an act in furtherance of the

12    conspiracy and the dates of the conspiracy as alleged in the

13    assignment were off two months?  Is that your argument.

14         MS. MERMELSTEIN:  I do think that this conspiracy goes

15    back farther than the dates alleged in the indictment as a

16    factual matter.  I think it doesn't -- and I don't think that

17    that fact precludes us -- I mean the dates of the indictment

18    don't constrain us that, I think, tightly, but I think the

19    point here is that -- and I'm happy to put it in, I recognize

20    it is complicated.  It is hard to keep all the entities in your

21    head.  But the issue is that Mr. Archer -- that first piece is

22    necessary for the second piece.  Mr. Archer was claimed that he

23    had sort of no benefit from his fraudulent conduct with

24    Mr. Galanis received $19 million worth of Code Rebel shares in

25    the government's view as payment for his participation in these

I5v2gal4                    Dunkerley - Direct

schemes.  How that was effectuated, right, is that RSTP, his

entity, entered into a convertible note with Code Rebel in

which it was meant to pay Code Rebel $500,000 in return for --

the loan could convert into shares later.  That payment was

made to Code Rebel.  However, it was not made from RSTP, it was

made from RSTP Capital.  Mr. Archer would say, well, I have no

idea that that happened.  And I think it is relevant in that

regard that he knew there was an account with a similar

sounding name which had been opened with his blessing, as you

can see in that e-mail, by sort of Galanis/Dunkerley.  And that

money, the money, there is a lot more detail I could here.

That money comes in from Jason Sugarman, and it goes out to pay

the note.  The note then exists.  At the time of the IPO, the

loan is converted to shares and the shares go to Mr. Archer and

they go to Rosemont Seneca Bohai, not to the noteholder or to

the actual payor of the note, and Mr. Archer ends up with $19

million worth of shares that he did nothing to earn and which

he didn't pay for.

          THE COURT:  Are you going to have a witness who is

going to testify that Archer knew that he was getting that

payment for that purpose?

          MS. MERMELSTEIN:  I think that the expectation is that

we would prove through Continental Stock transfer records and

probably just a witness to explain what they mean that the

share -- right, that the convertible note converted and that

I5v2gal4                          Dunkerley - Direct

the shares issued.  Francisco Martin is going to -- and Hugh
Dunkerley to some extent will talk about the fact that who else
got the shares, what their understanding was of who was
directing the shares, which is to say Jason Galanis was
directing it.  And so when you put together those pieces, it is
clear that Jason Galanis is using Code Rebel shares to pay his
criminal conspirators.  Mr. Dunkerley, Mr. Martin, sort of
everyone, almost everyone involved gets shares.  And this is
how Mr. Archer got his.

          So I think it is complicated.  It may be that it is
better put in writing, and we are happy to put something in.

          THE COURT:  Okay.

          MR. SCHWARTZ:  I will look forward to reading the
writing.

          The way I heard it was it keeps getting more and more
and more remote.  Now it appears to be the argument that
because in February 2014 Mr. Archer was cc'ed on an e-mail that
referred to the possibility in the future of creating a bank
account for an entity called RSTP Capital, he therefore is
charged with the knowledge that a year and a half later there
was in fact a payment from RSTP Capital of clean funds to
acquire shares in an IPO of Code Rebel and that those shares
went to Rosemont Seneca Bohai.  And no witness is going to
testify that that was part of any *quid pro quo*.  No witness is
going to testify that Mr. Archer had any understanding that

1    that had anything to do with the WLCC, because it didn't.

2             This is the government trying to make any business

3    dealings between people who are professional business people --

4    and I have said all along there was a crime here and Jason

5    Galanis was part of a crime, but we just heard for several

6    hours Mr. Dunkerley talking about all of the very legitimate

7    transactions that were engaged in and, under the government's

8    theory, any transaction involving these people is part of the

9    conspiracy, is relevant, because it involves money even if it

10   was clean.  That can't be right.

11            And so, look, I will respond when I see their writing,

12   but this theory of relevance doesn't make sense.  And, again, I

13   want to reiterate, this is directly contrary to your Honor's

14   ruling, and I'm sure they will address that in their writing,

15   but I moved *in limine* to exclude Code Rebel in its entirety

16   because it was this total frolic and detour, and your Honor

17   issued a very specific ruling and you said it was admissible

18   for specific purposes, which is to show that WLCC money was

19   used to buy Code Rebel shares and that Code Rebel shares were

20   redeemed to pay WLCC coupons or annuity payments, and this is

21   not that.

22            THE COURT:  All right.  In your letter address if

23   there is any evidence that ties the transfer of shares back to

24   this conspiracy.  That is what I want to understand.  Are you

25   viewing this as -- is this 404(b) that wasn't disclosed?

1          MS. MERMELSTEIN:  No.

2          THE COURT:  This is a payment, in your view, in

3     furtherance of this conspiracy?

4          MS. MERMELSTEIN:  Yes.  This is how Mr. Archer was

5     paid for his role in this conspiracy.  That is the government's

6     view.  It is obviously not 404(b).  This is complicated.  It's

7     late.  We will put it in writing.

8          THE COURT:  So do that.  If you could do it by noon

9     tomorrow so Mr. Schwartz can respond, great.  If you can't, you

10    know, do it as soon as you can.

11         MS. NOTARI:  Your Honor, you seem to be focusing on

12    Mr. Archer, but then there is some innuendo that there is going

13    to be the same type of evidence against Mr. Cooney.

14         THE COURT:  Yes.  I was just doing that because

15    Mr. Schwartz --

16         MR. TOUGER:  No, no.  I'm not talking about you.

17         THE COURT:  So please make your argument.

18         MS. NOTARI:  I'm talking about the government, and

19    part of the problem here is there has been no notice and we are

20    sort of now -- we were totally acting under the belief that

21    there was going to be nothing about Code Rebel, and I even made

22    a motion at some point that by my raising Code Rebel, would I

23    be opening the door during the testimony of Matthew Fillman

24    related to the bank loan.  I just have no idea that there was

25    going to be anything about Code Rebel, and I think we are

1   seriously being disadvantaged here because some of this might

2   be proper testimony for, you know, an expert in terms of how --

3   what people are often paid in stock.  It is not uncommon.  And

4   so there is just, you know, it is just very last minute, and we

5   had no idea about this.  So I would like to know.

6          THE COURT:  Go ahead.

7          MS. MERMELSTEIN:  I can respond to that, your Honor.

8   First of all, I don't think it is a proper subject of expert

9   testimony.  Second of all, I fear that the reality of where we

10  are is that the defendants have many weeks to go until they

11  need to put on their case, so there is plenty of time if they

12  want to consider that issue.  But there has been more notice in

13  this case to the defense than in any case I have tried.  They

14  have had these exhibits now for literally months.  We marked as

15  exhibits, the Code Rebel transfer journal, for example, which

16  shows that Mr. Cooney got -- and I understand that Mr. Schwartz

17  wants to say he objected to that.  That's fine.

18         MR. SCHWARTZ:  That's not notice.

19         MS. MERMELSTEIN:  Yes, it is.  We said we are going to

20  show what happened with Code Rebel.  We are going to show that

21  the bond proceeds were used to buy those shares.  We are going

22  to show how those shares were used to compensate the

23  conspirators and to pay the interest.  It is crystal clear the

24  story is frankly much more straightforward with respect to

25  Mr. Cooney.  Jason Galanis gave him Code Rebel shares before

1    the IPO.  That's the story.  And it is in the transfer records

2    and there are some e-mails that have been marked as exhibits

3    that make clear that Jason Galanis told Archer and Cooney, I'm

4    including you guys in this, perfectly clear that they were not

5    in fact, as Mr. Cooney claimed to other people, working on the

6    transaction.

7              So I think this is not productive anymore.  We will

8    put in a letter.  We will try to get it in as soon as possible

9    tomorrow.  We think it is complicated, but we will do our best.

10             THE COURT:  Yes.

11             MR. TOUGER:  I didn't mean to interrupt the Court.

12             THE COURT:  I was going to go to a different subject.

13             MR. TOUGER:  I'm going to a different subject, too,

14   your Honor.

15             Just because I think the order of witnesses has

16   changed over this week, if you could just send us out tomorrow

17   what your order is going to be next week?

18             MS. MERMELSTEIN:  I can't, and I was going to raise

19   that issue.  Here is the issue:  The crosses so far have gone

20   on exponentially longer than predicted.  Obviously I expect the

21   cross of Mr. Dunkerley is going to be very long, but we have

22   almost none of the witnesses in this case are local.  We are

23   flying people in from the Pine Ridge Reservation.  We are

24   flying people in from Europe.  We are flying people in from

25   California.  The government doesn't want to waste the jury's

1     time.  We want to have people here.  But if Mr. Dunkerley is

2     not going to get off the stand until Thursday morning, we don't

3     want to have a week's worth of witnesses sitting in New York

4     waiting around to testify.  So I think -- and there is a lot of

5     complicated scheduling issues with respect to certain witnesses

6     who can only testify at certain times.  So I think we need to

7     have a better understanding of when, big picture, we should be

8     expecting --

9              THE COURT:  How much longer do you expect his direct

10    to be?  We are sitting a whole day Monday, Tuesday, Wednesday.

11    Thursday I have to leave an hour early, but everything else is

12    full days.

13             MR. QUIGLEY:  I think I will be done in the morning on

14    Monday.

15             MR. TOUGER:  That could be 11:30 --

16             THE COURT:  I am about halfway done.  I have about

17    another hour or two left, maybe 90 minutes left.

18             MR. TOUGER:  Cross will be two hours.

19             THE COURT:  Ms. Notari and Mr. Schwartz, do you have

20    any sense of timing just for scheduling purposes so you can

21    find out who the next witnesses are?

22             MR. SCHWARTZ:  I don't, but I am happy to think about

23    it and let the government know tomorrow morning.

24             MR. QUIGLEY:  Your Honor, I mean, it will be

25    appreciated.  We have at least two witnesses who are caretakers

1    for a sick spouse who are coming in.  Obviously we don't want

2    to call these people out of order and we don't want to keep

3    these people in New York for four days sitting around.  We are

4    not trying to get into any defense strategy or anything like

5    that, but a ballpark would be very helpful and appreciated.

6              THE COURT:  The more you disclose about the timing of

7    your crosses, the more accurate it is, the more information you

8    get.

9              MR. TOUGER:  Not speaking for my co-counsel that

10   Mr. Dunkerley will take up all of Monday.

11             THE COURT:  I'm sure he will take all of Monday.  The

12   question is, is he going to take all of Tuesday?

13             MR. TOUGER:  I think he will take into Tuesday morning

14   and then Tuesday afternoon I think is a pretty safe bet that we

15   would be done with him.

16             THE COURT:  Are you speaking for anyone else or just

17   yourself?

18             MR. TOUGER:  I am just speaking of my 33 years trying

19   cases.  I don't want to ever speak for Ms. Notari or the crew

20   of --

21             THE COURT:  Think about it tonight, please.  Get back

22   to the government tomorrow morning so that they can reach out

23   to the witnesses next week, and then you will find out who the

24   other witnesses are going to be.

25             You also have to give me advance notice.  You had made

I5v2gal4                    Dunkerley – Direct

1    a reference to a limiting instruction with respect to one of

2    the exhibits.  Just make sure that you give me notice on that

3    so that I have a limiting instruction and everyone is

4    comfortable with reading in advance, then we don't have to take

5    a break.

6              MR. QUIGLEY:  It's just a standard, for 1278 it does

7    not come in for the truth of the matter asserted.

8              MR. SCHWARTZ:  It's the same one you gave today, but

9    we will put it in writing and put it in front of you.

10             THE COURT:  That's fine.  Because then I know that I

11   had committed to you at the appropriate time to make -- to give

12   a limiting instruction about what's reasonably foreseeable, so

13   I wanted to run that language by you in advance.  But we can

14   talk about that closer to when it is going to happen.  Just

15   give me some advance notice.  Okay?  Not sidebars.

16             MR. SCHWARTZ:  That is not an issue with this witness,

17   right?

18             MR. QUIGLEY:  No.

19             THE COURT:  What else do you need from me in the near

20   future?  I just want to make sure we are all on the same page.

21   I'm waiting for the government's letter on 1286.  I'm waiting

22   for Mr. Schwartz to get back to me on 861, 862, 2102, and a

23   little bit of 2103.  Is there anything else?  I know I have

24   other motions pending, but anything for next week, for example,

25   or anything that you need for some other reason?  I will

I5v2gal4                     Dunkerley - Direct

1    prioritize it.

2              MR. QUIGLEY:  Your Honor, I think there is that -- I

3    think it's maybe mooted out, but -- given that we are not going

4    to publish it, but the one issue with 867 regarding, I'm

5    paraphrasing, but the events of last week, but we are not going

6    to publish that to the jury.  I think that will await further

7    development of the -- of your Honor's decision-making and our

8    briefing with respect to the Jason Galanis arrest.

9              THE COURT:  All right.  So I will incorporate that

10   issue into it.  Anything else you are waiting for me on?

11             MS. MERMELSTEIN:  As your Honor said, I think you know

12   that there are a few things that are outstanding.  We can

13   catalog them if it is helpful.

14             THE COURT:  The expert issue.

15             MR. SCHWARTZ:  That's the only one, although it is not

16   in itself extrinsically time sensitive, you know, every day

17   that goes by, if something is going to need to be massively

18   readjusted --

19             THE COURT:  I'm happy to prioritize it.  I just need

20   to know.  Okay.  Anything else?

21             MR. SCHWARTZ:  Your Honor, I just want an *ex parte* CJA

22   issue I would like to take up with the court after court.

23             THE COURT:  Sure.

24             MR. SCHWARTZ:  I want to say one thing.  I did not

25   object to this because I did not want to draw attention to it

1    in front of the jury.  But I want to register very strongly my

2    objection to the way the information about Jason Galanis's SEC

3    bar came in.  This was the subject of extensive motion

4    practice.  The resolution was a crafted stipulation and,

5    instead, what we got was Hugh Dunkerley testifying incorrectly

6    that Jason Galanis was the subject of a public officer's bar

7    because of his involvement in an accounting fraud involving

8    Penthouse, and that should not have happened.

9              MR. QUIGLEY:  Your Honor, I disagree.  I mean, your

10   Honor said -- and I could go back to the transcript -- that the

11   SEC bar can come in.  It was relevant.  Frankly, there were

12   other things he could have mentioned, including Gerova and the

13   *Tagliaferri* case that he found during his Google research that

14   he was instructed explicitly not to mention.  That testimony

15   was very sanitized.  Your Honor said the SEC bar could come in.

16   If Mr. Schwartz wants to cross-examine him on the particulars

17   of what the bar was for, that's fine.  I think your Honor's

18   ruling --

19             THE COURT:  Had you reached a stipulation on how it

20   was going to come in?

21             MR. QUIGLEY:  I don't think a stipulation was ever on

22   the table, your Honor.  I could look back at the transcript.

23             MS. MERMELSTEIN:  I think what happened with that was

24   we initially proposed a stipulation not in one of these

25   sensitive areas, just of the SEC bars.  Mr. Schwartz said he

1    would only stipulate if there was all kinds of other language

2    that we didn't think was appropriate to put into a stipulation.

3    We never reached a stipulation.  Your Honor ruled the SEC bar

4    was coming in, and that's testimony of the SEC bar.  If

5    Mr. Schwartz had a different understanding, then we may have

6    miscommunicated on this one, but we understood your Honor said

7    the SEC bar comes in.  We didn't reach a stipulation as to what

8    the language was going to be and we will elicit it through

9    witness testimony.

10          MR. SCHWARTZ:  I agree we did not finalize the

11   stipulation; but, if you will recall, the government had wanted

12   to put in all of the public documents and we objected to that.

13   And I forget if your Honor agreed or they voluntarily withdrew

14   the application to put those all in, and we all said on the

15   record that the way to get it in is via tight stipulation.

16   This was something very different than that, and I have no

17   doubt Mr. Dunkerley could have testified for hours and hours

18   about all the things he could have found when he googled Jason

19   Galanis, but none of that would have been proper testimony and

20   this in particular was improper testimony.

21          It's happened.  I trust that you are not going to go

22   back to it.  I'm not asking for relief, but I am registering my

23   objection.

24          MR. QUIGLEY:  Your Honor, again, we elicited

25   testimony -- there were many things he found during that Google

I5v2gal4                    Dunkerley – Direct

1    search, including about John Galanis which we explicitly

2    instructed him not to relay in front of the jury.  Kept the

3    testimony very general and consistent with our understanding of

4    your Honor's decision on that issue.

5              THE COURT:  All right.  Anything else we need to talk

6    about today?  All right, so 9:30 Monday morning.  Thank you.

7              COUNSEL:  Thank you, your Honor.

8              (Adjourned to Monday, June 4, 2018, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2   Examination of:                           Page
 3   MICHAEL SMITH
 4   Direct By Ms. Tekeei . . . . . . . . . . . . 741
 5   Cross By Mr. Touger  . . . . . . . . . . . . 753
 6   Cross By Mr. Wenner  . . . . . . . . . . . . 761
 7   Cross By Ms. Notari  . . . . . . . . . . . . 772
 8
 9   CATHARINE DRIEVER
10   Direct By Ms. Mermelstein  . . . . . . . . . 786
11   Cross By Mr. Schwartz  . . . . . . . . . . . 805
12   Cross By Mr. Touger  . . . . . . . . . . . . 893
13   Cross By Ms. Notari  . . . . . . . . . . . . 893
14   Redirect By Ms. Mermelstein  . . . . . . . . 894
15   Recross By Mr. Schwartz  . . . . . . . . . . 896
16
17   HUGH DUNKERLEY
18   Direct By Mr. Quigley  . . . . . . . . . . . 897
19
20                        GOVERNMENT EXHIBITS
21   Exhibit No.                            Received
22    301, 339, 341 to 344, 348 to 355  . . . . . . 790
23    511, 513, 565, 801, 828, 867, 958,  . . . . . 918
24              1412, 1575, 1577, 1579, 1581,
25              1582, 2218, and 3506-07
```

1                        DEFENDANT EXHIBITS

2       Exhibit No.                              Received

3       4759    . . . . . . . . . . . . . . . . . 766

4       2039    . . . . . . . . . . . . . . . . . 818

5       4609 and 4610   . . . . . . . . . . . . . 856

6       4607    . . . . . . . . . . . . . . . . . 882

7

8                          JOINT EXHIBITS

9       Exhibit No.                              Received

10      300, 302, 305, 312, 313, 314, 328         805

11      331 through 338, 345 through 347          805

12

13

14

15

16

17

18

19

20

21

22

23

24

25