I667GAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                          16 Cr. 371 (RA)

JOHN GALANIS, et al.,

             Defendants.

------------------------------x

                                         New York, N.Y.
                                         June 6, 2018
                                         9:45 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                         District Judge


                         APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY:  BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
         Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
     LAURA HARRIS

I667GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
         Attorney for Defendant Bevan Cooney
4            – and –
     O'NEILL and HASSEN
5        Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                     Ellie Sheinwald, Paralegal
9                         Eric Wissman, Paralegal
                          Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I667GAL1

 1             (Trial resumed; jury not present)

 2             THE COURT:  Good morning, everyone.  Please be seated.

 3             So, I'm ready to rule on the admissibility of evidence

 4     relating to the receipt of Mr. Archer and Cooney of the Code

 5     Rebel shares.

 6             I have given this issue a lot of thought in the last

 7     couple of days.  I'm not going to permit the government to

 8     introduce the evidence of the Code Rebel shares that were given

 9     to Mr. Archer and Mr. Cooney.  I don't find persuasive Mr.

10     Archer's argument that my 404 ruling precludes it; instead, I

11     think it runs afoul of Rule 403 in light of its limited

12     probative value and the substantial risk of unfair prejudice to

13     both Mr. Archer and Mr. Cooney.

14             The government acknowledges that it has no direct

15     evidence that Jason Galanis gifted shares of Code Rebel to Mr.

16     Archer and to Mr. Cooney as compensation for their

17     participation in the WLCC scheme.  Obviously, circumstantial

18     evidence is not barred by 403.

19             The government's circumstantial evidence consists of

20     the following:  One, the Code Rebel IPO was held during the

21     course of the WLCC scheme; two, individuals who received

22     pre-IPO shares of Code Rebel are either the alleged members of

23     the WLCC conspiracy or their family members and friends; three,

24     the Code Rebel IPO itself was in certain respects in

25     furtherance of the WLCC scheme because two entities used

I667GAL1

1    proceeds from the fourth bond issuance to purchase
2    approximately 87 percent of the IPO shares and when the price
3    of Code Rebel stock increased, the resulting profit was used in
4    part to make the initial interest payment on the first tranche
5    of bonds when it became due; and, four, some of the Code Rebel
6    shares were used by certain of the entities that participated
7    in the WLCC scheme to, for instance, satisfy net capital
8    requirements.

9            While the government clearly views the Code Rebel IPO
10   as part and parcel of the WLCC bond conspiracy, it's not how
11   the case was charged.  There is not a single reference to the
12   Code Rebel IPO in the operative indictment.  Particularly in
13   light of Jason Galanis' notorious history of fraud, that there
14   was a separate pump and dump scheme does not render the
15   distribution of shares of Code Rebel to Jason Galanis'
16   associates -- which was necessary for him to carry out the pump
17   and dump -- evidence of the fraudulent scheme charged in this
18   case.

19           This finding is bolstered by the only two government
20   witnesses who can testify to the receipt of Code Rebel shares:
21   Hugh Dunkerley and Francisco Martin.  Mr. Dunkerley testified
22   that despite his involvement in the WLCC scheme, he received
23   50,000 shares of Code Rebel in return for his role as the
24   purported placement agent for the IPO.  Mr. Martin received two
25   sets of shares, according to the 3500 material:  One set of

I667GAL1

50,000, which he received in return for his efforts in setting

up the two corporate entities that purchased the vast majority

of the shares offered in the IPO, and another 500,000 shares he

received -- like Mr. Archer -- via a convertible note he

entered into with Code Rebel, which Mr. Martin claims were not

compensation of any kind but instead were held in his name for

the benefit of Jason Galanis.  This was presumably done so that

Jason Galanis could surreptitiously maintain control of the

shares without owning them, which seems to be direct evidence

of the mechanics by which Jason Galanis effected the pump and

dump rather than of the WLCC scheme.

        The argument that Mr. Archer received shares for his

role in the WLCC scheme is questionable for a few reasons.

First, Mr. Archer signed the convertible note with Code Rebel

in May 2014 -- more than three months prior to the first WLCC

bond issuance -- and well before Jason Galanis could determine

what his appropriate compensation would be as a result of his

alleged contributions to the WLCC scheme.  More persuasive is

the fact that the transaction between Mr. Archer was structured

as a loan, which the government alleges was a sham transaction

because Jason Sugarman, a close associate of Jason Galanis',

provided the money to Code Rebel.  But, particularly in light

of Francisco Martin's statement to law enforcement that he did

not actually own the Code Rebel shares and that Jason Galanis

later created a fake paper trail making the transaction appear

I667GAL1

to be a loan, strengthens the conclusion that this evidence of

Mr. Archer's receipt of shares is in fact probative of the pump

and dump scheme, which I have already precluded.  As I

previously noted, Code Rebel is not charged as part of this

conspiracy in the operative indictment.  Moreover, while the

government wants to rely on this transaction as evidence of Mr.

Archer's motive, he transferred these shares out of the

Rosemont Seneca Bohai account without receiving any

consideration.  If anything, this fact renders the transaction

even more probative of the pump and dump -- but further

counsels against finding that the shares were somehow

compensation for his role in the charged conspiracy.

Substantially similar reasoning applies to Mr. Cooney's receipt

of 370,000 shares, which, like Mr. Dunkerley's shares and

Mr. Martin's set of 50,000 shares, were distributed without

Code Rebel receiving any compensation.

          This limited probative value is countered by the

substantial danger of unfair prejudice to the defendants.  The

theory now advanced by the government was not articulated to me

until Thursday, and it only came in light of Mr. Archer's

objection to the government exhibit on a separate and distinct

basis.  The government has marked several exhibits relating to

this category of evidence since the trial began.  Both

defendants opened in part on a theory that they did not make

any money in this alleged conspiracy.  While those statements

I667GAL1

are not necessarily inaccurate in light of the evidence the

government seeks to introduce, that is in part the point.  The

defendants did not sell the shares for gain but the

introduction of this evidence may mislead the jury into

thinking they profited on the market value of the shares that

they held.

        Most importantly, in my view -- and the deciding

factor, frankly, in this analysis for me -- is the danger of

unfair prejudice due to the limitations on defense counsel's

ability to cross-examine Francisco Martin with respect to his

receipt of Code Rebel shares in light of my ruling that the

evidence of the pump and dump is inadmissible pursuant to

404(b), and to make the arguments that they want to make about

an alternative inference for the purpose of the transfer of the

shares to the jury.  This is especially true in light of

Mr. Martin's belief that the 500,000 shares he received via

convertible note were not compensation of any sort but being

held for Jason Galanis' benefit presumably for the pump and

dump.  To sufficiently cross-examine Mr. Martin on this point,

in order to show that Mr. Archer similarly did not receive his

shares by way of convertible note as compensation for his role

in the WLCC scheme, would seem to necessarily require Mr.

Archer to open the door to the pump and dump, forcing the

defendant to now make a choice between effectively

cross-examining Mr. Martin about the purpose of the transfer of

I667GAL1

1    the Code Rebel shares and make the arguments that he thinks he

2    needs to make for an alternative inference, or keeping out

3    evidence of the pump and dump, is simply too prejudicial in

4    light of my prior ruling that the pump and dump shouldn't come

5    in.

6           So, for those reasons, I find that the probative value

7    is substantially outweighed by the danger of unfair prejudice,

8    and I will not permit the government to introduce evidence that

9    any of these defendants received shares of Code Rebel stock

10   without compensation.

11          With respect to the ADV evidence, Mr. Archer has asked

12   that I reconsider my 404(b) ruling with respect to the form ADV

13   evidence in light of Ms. Morton's guilty plea.  I'm not going

14   to alter my ruling that the form ADV evidence is admissible as

15   direct evidence of a conspiracy.  The government has proffered

16   that Ms. Morton's purported misstatements on the form ADVs

17   helped conceal the conflicts of interest that persisted in the

18   transactions that resulted in the deposit of the WLCC bonds

19   into the accounts of clients of Hughes and Atlantic.  It is

20   thus still direct evidence of the conspiracy alleged in Count

21   One of the indictment; and I further note that Count Two, the

22   substantive security fraud count, similarly alleges that the

23   failure to disclose these conflicts of interest represented

24   material omission.  Moreover, while Ms. Morton has pled guilty,

25   this evidence is clearly probative of her intent, and it

I667GAL1

1    remains relevant in light of the fact that the defendants here

2    are alleged to have been members of a conspiracy with her.

3         I also have not changed my mind, however, about giving

4    limiting instructions -- as requested by Mr. Archer -- at a few

5    specific junctures of trial, instructing the jury that this

6    evidence is to be considered against the three defendants only

7    if the jury finds that they were part of the conspiracy and

8    that these acts were committed in furtherance of the conspiracy

9    and were reasonably foreseeable to them.

10        Ms. Notari, with respect to your motion to admit the

11   subpoena issued to the Los Angeles County Registrar and the

12   certification from the clerk along with those records, I am

13   going to admit them pursuant to 803(8) the public records

14   exception.  The subpoena, just to be clear, is not being

15   offered for the truth of the matter asserted but rather to show

16   what was communicated to the clerk's office and how it bears on

17   the certification; so, they will be admitted.

18        I think those are the issues that you wanted to

19   address for this morning.

20        MR. TOUGER:  Your Honor, just as a result of your

21   ruling on the Code Rebel shares, obviously Mr. Galanis will

22   abide by your ruling, but we would move for a severance at this

23   point, because obviously that evidence that Mr. Cooney and Mr.

24   Archer got Code Rebel shares as compensation and that Mr.

25   Galanis did not would be beneficial to him, so we would move

I667GAL1

1    for a severance on that issue.

2              THE COURT:  I'm sorry, walk me through that a little

3    bit more.

4              MR. TOUGER:  The evidence that you have not allowed to

5    be placed in front of this jury is that Mr. Archer and

6    Mr. Cooney received Code Rebel shares as payment for their

7    participation in the charged conspiracy.  Mr. Galanis did not

8    get any Code Rebel shares at all, and, therefore, that proof

9    would be probative to the jury to say these two got shares and

10   we didn't, so obviously we're not involved in the conspiracy.

11             THE COURT:  OK, that motion is denied.

12             And then I have not had a chance, Mr. Touger, to

13   review your letter.  I will tell you that, as I ruled at the

14   final pretrial conference, that Mr. Raines is engaged in pay

15   day lending is not probative of his character for truthfulness

16   in light of the reasonable belief that it's not illegal.  So, I

17   have to say I fail to see why his participation specifically in

18   pay day lending is of any probative value, but I'm going to

19   read your letter before I rule, but I just want to tell you

20   what my thinking is on this, and then I will consider your

21   letter and let you know for sure.

22             MR. TOUGER:  Your Honor, I also sent the Court -- and

23   I am apologize for the informality of the e-mails -- but

24   further e-mails supportive of that letter.

25             THE COURT:  So I will review them before Raines

I667GAL1

testifies.

          MR. QUIGLEY:  Judge, we had one other issue we wanted

to raise, and this is in regards to the agreement between the

parties about the guilty pleas of Jason Galanis, Gary Hirst and

Michelle Morton, as well as the Jason Galanis central district

of California conviction.

          We proposed a stipulation to the defense; they've had

it for some time; we sent it over to them again on Friday; we

reminded them again last night about it.  We would like this to

be read in after the testimony of Dunkerley.  That's the

logical place to do it.  They have not yet agreed to this.

          We would also propose -- as I proposed to the

defense -- a limiting instruction, and I can hand up what we

instructed.

          THE COURT:  Can we just decide this and not put things

off?  I mean I've said previously that I'm happy to read it.  I

think the government can read it in its case; I will make sure

that it's a joint exhibit.  But what I don't want to have

happen is that you just not get back to the government so they

can't do what they're trying to do.  I don't think that's fair

if you substantively don't have an objection to it.

          MR. SCHWARTZ:  Understood.  To be clear -- and I have

been clear with the government about this -- for reasons of our

trial strategy -- which obviously I have not explained in

detail to the government -- I have told them that our

I667GAL1

1    comment -- my comments on that stipulation -- were contingent

2    upon your Honor's ruling this morning.  Now that we've gotten

3    the ruling, I can get back to them on the stipulation.

4              THE COURT:  Can you do it right now while I keep the

5    jury waiting?

6              MR. SCHWARTZ:  I mean I need my computer, but I can do

7    it during the break.

8              MS. MERMELSTEIN:  We have a copy.

9              THE COURT:  I will keep the jury waiting, because I

10   think it's only fair to them to do this after Dunkerley

11   completes his testimony, and I think he is almost done.

12             MR. SCHWARTZ:  If we can take 15 minutes, I will go

13   upstairs to the room where my computer is.

14             MR. QUIGLEY:  I have it here.

15             MR. SCHWARTZ:  But my notes on my comments are

16   upstairs on my computer.

17             THE COURT:  OK.  So can I make it ten minutes?

18             MR. SCHWARTZ:  I will do it as quickly possible.

19             THE COURT:  Just let Ms. Cavale know when you're

20   ready, please.  Thank you.

21             (Recess)

22             THE COURT:  All right.  The jury is all ready, so if

23   we could do this quickly, it would be appreciated.

24             All right.  Mr. Galanis isn't here.

25             MR. QUIGLEY:  So, I mean do you want to hand it up to

I667GAL1

the judge?

MR. SCHWARTZ:  Oh, sure.

MR. QUIGLEY:  Judge, I think a couple things.  Just on overall formatting, for purposes of clarity, we think the Galanis, Hirst and Morton guilty pleas in this case should come first, just because otherwise it could be read to suggest that Jason Galanis, Gary Hirst and Morton pled guilt in the Central District of California, which isn't the case.  So, we think that needs to come first, and then have an addition about the Central District of California.

Then on the two paragraphs regarding the Central District of California, we don't think -- looking at Mr. Schwartz's version -- that the clause "pursuant to a cooperation agreement" should be in there.  I think that gets at your Honor's ruling suggesting that Mr. Galanis was a good liar and that the government signed him up out there.

And then with respect to the second paragraph about the Central District of California --

THE COURT:  So, you just want in that on or about June 29, 2010 he pled guilty to attempted tax evasion for tax year 2005 in the United States District Court for the Central District of California.

MR. QUIGLEY:  Yes.

THE COURT:  OK.  And what was your next?

MR. QUIGLEY:  Again, on the second paragraph about the

I667GAL1

1   Central District of California, we do think -- and I don't have

2   our version in front of us because I handed it up -- that there

3   should be some reference to what he lied about, because he lied

4   about his involvement in a market manipulation scheme.

5           MR. TOUGER:  I would object to that, your Honor.

6           THE COURT:  Why?

7           MR. TOUGER:  Because I think it's too close to what

8   the charges are here.

9           MR. SCHWARTZ:  The government basically described the

10  Gerova crimes and said that he took over a public company and

11  caused -- so on and so forth.  If we're not getting in that he

12  deceived the government, then it doesn't really matter what he

13  lied about.

14          Now, I disagreed, however, that the cooperation

15  agreement should come out under the same reasoning, because

16  that shows the weight of his lies.

17          The jury has just heard that when you agree to

18  cooperate with the government you have an obligation to tell

19  the truth, and it was that that Jason Galanis violated.  That

20  goes to his credibility; that's what impeaches him.  It doesn't

21  say anything about whether he was ever believed, whether he

22  fooled anyone, which I understand your Honor has excluded.

23          THE COURT:  Are you not at all worried that if it

24  becomes clear that he cooperated, that it suggests that he gave

25  up your clients?

I667GAL1

1          MR. TOUGER:  No, the cooperation is before, it's 2010,

2     your Honor.

3          THE COURT:  Yes, that's true.  But even if he was

4     talking to the government in some capacity.  I understand the

5     timing doesn't work here; I understand that he lied.  I am just

6     saying for a jury that doesn't know how these things work at

7     all, are you not at all worried about that?

8          MR. SCHWARTZ:  I mean, look, I agree with your Honor

9     that the force of this is substantially neutered by taking out

10    the fact that he successfully deceived the government.

11         THE COURT:  And I am not going to keep that in; I

12    think I said that before.

13         MR. SCHWARTZ:  I understand, and I'm not rearguing

14    that.  I am just acknowledging the reality of the situation.  I

15    think the reality of the situation is if the jury were to think

16    that the government got in bed with Jason Galanis and

17    cooperated with him, that would reflect much more poorly on

18    them than us, especially after Mr. Dunkerley's testimony, so

19    I'm not particularly --

20         THE COURT:  Fair enough.

21         MR. TOUGER:  And my other argument -- it leads right

22    from that -- is unlike the other defendants, Jason Galanis is

23    still a son of my client, and obviously because of the 404(b)

24    ruling and other rulings I can't really combat that issue, so

25    there has to be some semblance that John Galanis, you know,

I667GAL1

1  is -- that Jason Galanis is not a complete fraud in everything

2  that he does, and that would impact negatively on my client

3  because he is his father, and there is obviously a knowledge

4  there of prior crimes that he might have committed.

5           So I think just that he lied gets the point across

6  that we need to get across, and it doesn't influence or impact

7  the jury at all about other defendants.

8           MR. SCHWARTZ:  You know what, can I have one more

9  second to speak with cocounsel?

10           THE COURT:  Yes.

11           MR. QUIGLEY:  I think --

12           THE COURT:  Let's just listen to Mr. Quigley first.

13           MR. QUIGLEY:  Between the two, our concern is really

14  with the cooperation agreement.  I think that could be read as

15  again suggesting that he deceived the government; he

16  successfully deceived the government out there in California.

17  I mean that gets at all the issues that your Honor addressed in

18  the 404(b) ruling, and also, frankly, suggests that people who

19  get signed up for cooperation agreements are liars and are

20  deceivers that could be used to impugn the government's

21  witnesses in this case, which would be improper, given that

22  we -- this office -- was not involved at all in signing up Mr.

23  Galanis in California, and again have charged him twice with

24  federal crimes, convicted him twice, including for what he lied

25  to the Central District of California about.  And that's a road

I667GAL1

1    I don't think we want to go down.

2              THE COURT:  All right.  I will tell you what I'm

3    inclined to do.  I'm inclined to work off the government's

4    draft of the stipulation, keep the order of paragraphs 1, 2 and

5    3 in front, keep paragraph number 4 the same, and cut paragraph

6    5 short, so that it would read, "In the course of meetings in

7    2010 and 2011 with the United States Attorney's Office for the

8    Central District of California, and law enforcement agents,

9    Jason Galanis lied by concealing his participation in criminal

10   activity."

11             MR. QUIGLEY:  That's fine with the government.

12             MR. SCHWARTZ:  I'm sorry, I don't have a copy of the

13   government's in front of me.  So the preceding paragraph will

14   simply say he pled guilty to tax evasion without reference to a

15   cooperation agreement?

16             THE COURT:  Right.

17             MR. TOUGER:  Tax evasion in the year 2005?

18             THE COURT:  It doesn't say that, but I have no problem

19   adding in the year.

20             MR. SCHWARTZ:  Your Honor, I think upon reflection and

21   discussion with my cocounsel, I think we would withdraw our

22   request to go into any of the 2010 and '11 conduct, and so we

23   could limit the stipulation to simply the pleas in this case.

24             MR. QUIGLEY:  Not go into any of the 2010 or '11

25   conduct at all, like at any point in the trial?

I667GAL1

|   |   |
|---|---|
| 1 | MR. SCHWARTZ:  Nothing about his plea, cooperation or |
| 2 | lies to the government. |
| 3 | MR. QUIGLEY:  Your Honor, just give us one second. |
| 4 | That's kind of a new one. |
| 5 | THE COURT:  Sure. |
| 6 | MR. SCHWARTZ:  And to be clear, we were always fine |
| 7 | with the other language. |
| 8 | THE COURT:  The language in those three paragraphs |
| 9 | about the pleas. |
| 10 | MR. SCHWARTZ:  About this case, correct. |
| 11 | MR. QUIGLEY:  That's fine, your Honor. |
| 12 | THE COURT:  OK.  So, I'm going to just read paragraphs |
| 13 | 1 through 3 about Jason Galanis' plea of guilty in this case to |
| 14 | conspiracy to commit securities fraud, securities fraud, and |
| 15 | conspiracy to commit investment advisor fraud; Gary Hirst's |
| 16 | plea to the various crimes -- I'm he not going to read them |
| 17 | unless you want me to -- and Michelle Morton's plea to the two |
| 18 | counts. |
| 19 | MR. SCHWARTZ:  Yeah.  And just I want to be very sort |
| 20 | of clear about how this is going to be stage managed. |
| 21 | So, the government is going to invite the court to |
| 22 | read a joint stipulation. |
| 23 | THE COURT:  Yes. |
| 24 | MR. SCHWARTZ:  Your Honor will read the joint |
| 25 | stipulation.  I don't know if it's going to be displayed on the |

I667GAL1                    Dunkerley - Cross

1    screens, but if it is, it will bear government and defense

2    stickers.  Otherwise, you will explain that it's a joint

3    exhibit being read at the request of both parties, correct?

4            MR. QUIGLEY:  I would be fine with your Honor reading

5    it in.

6            THE COURT:  That's fine.  I will just read it, and

7    then I was going to give the instruction that the evidence is

8    being admitted solely to assist you in assessing the

9    credibility of statements made by Jason Galanis, Michelle

10   Morton and Gary Hirst.  I instruct you that you are to consider

11   it for no other purpose.

12           MR. SCHWARTZ:  That's right.  And you are going to say

13   you are reading it at the request of all parties.

14           THE COURT:  Yes, I'm happy to.

15           MR. SCHWARTZ:  Thank you.

16           THE COURT:  All right.  Can we bring the jury in.

17   Thank you.

18           (Continued on next page)

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Good morning, everyone.  You can be

 3     seated.  Mr. Schwartz, you may proceed.

 4              Mr. Dunkerley, you are still under oath.

 5      HUGH DUNKERLEY, resumed.

 6     CROSS EXAMINATION (Continued)

 7     BY MR. SCHWARTZ:

 8     Q.  Thank you, your Honor.  Good morning, ladies and gentlemen.

 9     Good morning, Mr. Dunkerley.

10     A.  Good morning.

11     Q.  I have just a few more questions for you.  When we broke

12     yesterday afternoon we were talking about your white boarding

13     sessions with Jason Galanis in late 2015.  Do you recall that?

14     A.  I do.

15     Q.  And I believe when we had just left off you had told us

16     that you and Jason Galanis sometimes used cocaine together,

17     correct?

18     A.  Correct.

19     Q.  Now, in the course of those white boarding sessions, Jason

20     Galanis came up with the idea of throwing Michelle Morton under

21     the bus, true?

22     A.  True.

23     Q.  And, Mr. Jackson, can we bring -- we were looking at

24     Defense Exhibit 1705 -- can we bring that up.

25              This is where we had left off, right?

I667GAL1                    Dunkerley - Cross

1   A.   Correct.

2   Q.   So, Jason Galanis said you were going to throw Michelle

3   Morton under the bus and that was going to be his narrative,

4   correct?

5   A.   Correct.

6   Q.   When the authorities came asking him questions, he was

7   going to blame Michelle Morton, true?

8   A.   That was one of his narratives, correct.

9   Q.   And another big part of his narrative was this company

10  Calvert, correct?

11  A.   Correct.

12  Q.   And Calvert's sole purpose was to deceive people, correct?

13  A.   Yes.

14  Q.   And again the only people that you ever discussed Calvert

15  and its illicit purpose with were Gary Hirst and Jason Galanis,

16  true?

17  A.   True.

18  Q.   Did you ever discuss Calvert and its illicit purpose with

19  Francisco Martin?

20  A.   He may have come up in conversation, but I don't

21  specifically remember talking to him about it.  Obviously, his

22  cousin ran the firm and was the individual, but I don't

23  remember talking to him about it.

24  Q.   When you say ran the firm, I mean there was no firm, right?

25  A.   Well, correct, but there is a company that was incorporated

1  in the UK, and an individual needed to head that company up,

2  and that was Francisco Martin's cousin.

3  Q.  He was the one who lent his name to the fake paperwork to

4  say he ran the fake company, right?

5  A.  His name was on the paperwork.

6  Q.  Certainly, you did not ever discuss Calvert and its illicit

7  purpose with Mr. Archer, true?

8  A.  True.

9  Q.  You can take that down, please, Mr. Jackson.

10       Yesterday we talked a little bit about the $15 million

11  that Rosemont Seneca Bohai LLC used to purchase the second bond

12  issuance.  Do you recall that?

13  A.  Yes, I do.

14  Q.  And we had said that originally at the time -- which was

15  about September/October 2014 -- Jason Galanis had told you that

16  Mr. Archer had Chinese investors and this was their money

17  because it needed to be placed before an investment contract

18  expired, true?

19  A.  True.

20  Q.  And you believed him at the time, correct?

21  A.  Absolutely.

22  Q.  And one of the reasons you believed him was because you

23  knew that Mr. Archer in fact had connections to Chinese private

24  equity firms, true?

25  A.  True.

I667GAL1                    Dunkerley - Cross

1    Q.  I want to show you -- Mr. Jackson just for the witness, the

2    lawyers and Judge Abrams -- Defense Exhibit 4722.

3           Now, focusing on the bottom e-mail here, this is an

4    e-mail from Dan McClory to you, true?

5    A.  Yes.

6           MR. SCHWARTZ:  I offer Defense Exhibit 4722.

7           MR. QUIGLEY:  No objection.

8           THE COURT:  It will be admitted.

9           (Defendant's Exhibit 4722 received in evidence)

10   Q.  And this e-mail is about something called BHR, right?

11   A.  Yes.

12   Q.  And you understand that to be a Chinese private equity

13   firm, right?

14   A.  Yes.

15   Q.  And it refers to $6 trillion of AUM with 112 state owned

16   enterprises, correct?

17   A.  Yes.

18   Q.  And again AUM means assets under management, right?

19   A.  Yes.

20   Q.  And you see at the bottom it says "Devon was stellar,"

21   right?

22   A.  Absolutely.

23   Q.  And can we turn to the next page.  Do you see that picture?

24   A.  I do.

25   Q.  And you recognize the fellow third from the left as the

I667GAL1                     Dunkerley – Cross

1    same fellow who is sitting over there in the corner, Mr.

2    Archer, correct?

3    A.   Mr. Archer, yes.

4    Q.   You hadn't met him though before you met in this

5    courthouse, correct?

6    A.   Correct.

7    Q.   Thank you.

8            Are everyone else's screens working?

9            THE COURT:  So a couple people's screens are not

10   working.  Can you look over the folks in front of you?  Thank

11   you.  We will work on that over the break.  Thanks.

12   Q.   Mr. Jackson, could I just ask you to go back to the first

13   page so everyone can see it, and just blow up the bottom e-mail

14   that we were looking at.

15           Now, we also talked about in the context of that $15

16   million that was used to purchase the second bond issuance the

17   fact that you had withdrawn $15 million from the Wealth

18   Assurance Private Client account, and you had deposited it in

19   the Thorsdale Fiduciary Guaranty –– Thorsdale Fiduciary &

20   Guaranty account, right?

21   A.   Yes.

22   Q.   And you later learned after you were arrested that that was

23   the money that was used to buy the second bond issuance,

24   correct?

25   A.   Yes.

I667GAL1                    Dunkerley - Cross

1    Q.  And you told us that you learned that in part from seeing

2    the charges against you, correct?

3    A.  Yes.

4    Q.  But you did not know that at the time.

5    A.  I had no idea.

6    Q.  Even as you were doing that deposit, you didn't know what

7    the purpose was.

8    A.  Correct.

9    Q.  You did that deposit, however, in a very specific way;

10   isn't that true?

11   A.  Could you expand on your question of what you mean by

12   specific.

13   Q.  Sure.  I want to show you Exhibit 565 already in evidence

14   at page 2.  This is a withdrawal slip for $15 million from the

15   Wealth Assurance Private Client account, correct?

16   A.  Correct.

17   Q.  And the date on it is September 23, 2014, correct?

18   A.  Correct.

19   Q.  And you have signed it, true?

20   A.  True.

21   Q.  And you can take that down, Mr. Jackson, and please bring

22   up Exhibit 510, also in evidence, and pull up page 32, and blow

23   that up.

24          Now, this is a deposit slip for the Thorsdale

25   Fiduciary & Guaranty Company Ltd. account, correct?

I667GAL1                    Dunkerley – Cross

1   A.  Correct.

2   Q.  On the same date, correct?

3   A.  Correct.

4   Q.  And you see it says the deposit is $15 million in cash.

5   True?

6   A.  That's what it says, yes.

7   Q.  You physically went to a Chase branch, you withdrew $15

8   million using a withdrawal slip, and then you deposited $15

9   million in cash using this deposit slip into a different

10  account, correct?

11  A.  So, to characterize what you're saying to me is I

12  physically took $15 million out of a bank in notes and placed

13  into another account?  Is that what you're trying to tell me?

14  Q.  No, sir.  You were there so you know what happened.

15  A.  I'm asking you.

16  Q.  I'm asking you a question.  All right?  You are telling me

17  that you at no point were handed big stacks of cash, $15

18  million in cash, right?

19  A.  I was at no point handed big stacks of $15 million in cash,

20  correct.

21  Q.  I understand that.  But you're a professional, correct?

22  A.  I'm a professional executive type person, correct.

23  Q.  You have done many, many wire transfers in your life,

24  correct?

25  A.  Yes.

1  Q.  And you do those wire transfers by giving instructions to

2  your bank, and they just wire the money, right?

3  A.  Yes.

4  Q.  In this instance you physically went to a Chase bank,

5  correct?

6  A.  Yes.

7  Q.  Yes.  And you physically filled out a withdrawal slip,

8  correct?

9  A.  I filled out this withdrawal slip, correct.

10 Q.  And then you physically did a deposit with a deposit slip

11 into a different bank account, correct?

12 A.  Correct.

13 Q.  And the reason for doing it that way, sir, was so that

14 there would be no paper trail, true?

15 A.  I would have absolutely no idea about that.

16 Q.  Well, Jason Galanis told you to go down to the branch,

17 correct?

18 A.  Yes.

19 Q.  OK.  And I want to look at the bank statements now.  I want

20 to look at Exhibit 512 in evidence at page 6.

21         If you could blow up the middle of the page.  Thank

22 you.

23         OK.  You see at the top under "electronic

24 withdrawals"?  Do you see that?

25 A.  Yes.

I667GAL1                    Dunkerley - Cross

1   Q.  There is a record for a wire transfer, true?

2   A.  Yes.

3   Q.  And you can see exactly where that wire transfer is going

4   to, right?

5   A.  Yes.

6   Q.  It's going to the account of something called Car Sync LLC,

7   right?

8   A.  Yes.

9   Q.  It's a car dealership, true?

10  A.  Yes.

11  Q.  Was this in connection with Jason Galanis upgrading from

12  the Bentley to the super Bentley?

13  A.  You know, I actually have no idea.

14  Q.  What is a super Bentley?

15          MR. QUIGLEY:  Objection.  Judge, we objected to this

16  yesterday and you sustained it.

17          THE COURT:  Yes, sustained.  I'm sorry, I didn't hear

18  the last word.

19  Q.  I want to know the answer, so maybe we can talk about it

20  later.  But I will ask a different question.

21          MR. QUIGLEY:  Objection again.

22          THE COURT:  Let's stop the commentary, please.

23  Q.  Underneath where it says "fees and other withdrawals" you

24  see that there is something that says on the 11th "transfer to

25  checking" and then there is a checking account, right?

I667GAL1                    Dunkerley - Cross

1   A.  Yes.

2   Q.  And you can tell exactly where that money is going too,

3   right?

4   A.  Yes.

5   Q.  All right.  But underneath that is the September 23rd

6   withdrawal of $15 million, right?

7   A.  Correct.

8   Q.  And that one just says withdrawals, true?

9   A.  Correct.

10  Q.  Now, take that down, and let's look at the other side of

11  the transaction.  That money went to Thorsdale, correct?

12  A.  The withdrawal money -- yes, the 15 million?

13  Q.  Right, it went from Wealth Assurance Private Client to

14  Thorsdale, right?

15  A.  Yes.

16  Q.  And we just looked at the bank statement for the outgoing

17  money from Wealth Assurance Private Client, right?

18  A.  Yeah.

19  Q.  And it just showed withdrawal, right?

20  A.  Yes.

21  Q.  So now let's look at the Thorsdale statement.  That's

22  Exhibit 522.

23          And if we can go to page 47.  And if you could blow

24  that up.

25          And here too at the top you see a wire, and you can

1    tell exactly where that wire is coming from, right?

2    A.  Right.

3    Q.  But if you look on the 23rd at that $15 million deposit it

4    just says deposit, right?

5    A.  Correct.

6    Q.  So if you look at these bank statements, you couldn't tell

7    where the money was coming from or going to, correct?

8    A.  Correct.

9    Q.  And that was Jason Galanis' instruction, to go down to the

10   bank and do it that way, right?

11              MR. QUIGLEY:  Objection.

12              THE COURT:  Sustained.

13   Q.  Jason Galanis told you physically to go down to the bank

14   and do the transaction in the way that you did, true?

15   A.  True.

16   Q.  And that's not the only time you did it that way, right?

17   A.  Correct.

18   Q.  By the way, if we can just jump forward a few pages to page

19   51 of this exhibit, and right in the middle of the page if you

20   can blow up the activity for the 24th, Mr. Jackson.

21              This is the following day, correct?  Correct?

22   A.  Yes.

23   Q.  That's the money leaving Thorsdale, and here it is done by

24   wire, correct?

25   A.  Yes.

I667GAL1                        Dunkerley - Cross

1    Q.  And it's a fed wire to the Wolff Law Firm, right?

2    A.  Yes.

3    Q.  On this one there is a clear paper trail, true?

4    A.  Absolutely, yes.

5    Q.  You can take that down.

6            Now, as we were just saying, you have done that on

7    other occasions, right?

8    A.  Yes.

9    Q.  Jason Galanis would instruct you from time to time that

10   certain transactions had to be done in the Chase bank branch,

11   right?

12   A.  Yes.

13   Q.  And to your knowledge Gary Hirst was also instructed the

14   same way, true?

15           MR. QUIGLEY:  Objection.

16           THE COURT:  Sustained.

17   Q.  To your knowledge.

18           Well, are you aware -- were you ever a witness --

19   A.  I'm not aware.

20   Q.  You're not aware.  OK.

21           Now, you recall yesterday we talked a little bit about

22   the Wealth Assurance American Express card?

23   A.  Yes.

24   Q.  That was the one where you had charged Jason Galanis'

25   landscaping?

1    A.  Yes.

2    Q.  And you said yesterday you didn't know how it was paid,

3    just that Jason Galanis had caused it to be paid, correct?

4    A.  Correct.

5    Q.  I want to show you for now just for the witness, the

6    lawyers and Judge Abrams Exhibit 1583.  This is an e-mail chain

7    between yourself, Jason Galanis and Gary Hirst, correct?

8    A.  Yes.

9              MR. SCHWARTZ:  I offer Exhibit 1583.

10             THE COURT:  Any objection?

11             MS. MERMELSTEIN:  One moment, your Honor.

12             MR. QUIGLEY:  No objection, your Honor.

13             THE COURT:  All right, it's admitted.

14             (Defendant's Exhibit 1583 received in evidence)

15   Q.  Now, focusing on your e-mail of April 16, 4:30 p.m., you

16   say "$4.955 million is great.  Amex is not linked to any

17   account and it is paid as necessary over the Internet."

18   Correct?

19   A.  Correct.

20   Q.  And the response comes from -- it says Holmby.  Do you see

21   that?

22   A.  Yes.

23   Q.  You know home by was Jason Galanis, correct?

24   A.  Yes.

25   Q.  And he says, "please pay Amex from WAPC today," correct?

1  A.  Correct.

2  Q.  And WAPC is Wealth Assurance Private Client, right?

3  A.  Yes.

4  Q.  That was the account that received the WLCC bond money,

5  true?

6  A.  Yes.

7  Q.  That is the entity that had nothing to do with the real

8  Wealth Assurance holdings and Wealth Assurance AG, correct?

9  A.  Correct.

10  Q.  And if we look at -- excuse me -- Joint Exhibit 512 in

11  evidence, at page 34, if you look -- if you blow up the account

12  activity and you go one, two, three, four, five transactions

13  down, that's an actual payment on that American Express card

14  from the Wealth Assurance Private Client account, true?

15  A.  Yes.

16  Q.  So you would agree with me that the credit card that you

17  and Jason Galanis were using for various personal expenses was

18  paid at least from time to time from the Wealth Assurance

19  Private Client account, correct?

20  A.  Yes, absolutely.

21  Q.  And in fact we can see just looking at this page alone that

22  money from Wealth Assurance Private clients went all over the

23  place, didn't it?

24  A.  Yes.

25              (Continued on next page)

I66JGAL2                          Dunkerley - cross

1   Q.   You see there is a wire for $171,000 to something called

2   Murphy Pearson Bradley & Feeney, right?

3   A.   Yes.

4   Q.   That is a law firm, true?

5   A.   I believe so.

6   Q.   And underneath that, $100,000 goes to Thorsdale, right?

7   A.   Yes.

8   Q.   There is $49,700.00 that goes to Newline Trading, right?

9   A.   Yes.

10  Q.   And again Thorsdale was Jason Galanis' company, right?

11  A.   Yes.

12  Q.   And Newline was your company, correct?

13  A.   Yes.

14  Q.   There is $100,000 to Santa Fe National Insurance Company,

15  right?

16  A.   Yes.

17  Q.   And I skipped one, $236,000 to Jason and Elizabeth

18  Sugarman, true?

19  A.   True.

20  Q.   There is $170,000 -- jumping around a little bit -- to

21  First American Title Company in connection with a property at

22  1254 Canton court Encinitas, California.  Do you see that?

23  A.   Yes.

24  Q.   Do who lived at 1254 Canton Court in Encinitas?

25  A.   I don't know.

I66JGAL2                           Dunkerley - cross

1    Q.  You were paying some sort of real estate related fees for

2    someone you didn't know whose house that is?

3    A.  That's correct.

4    Q.  You see there is a big payment of more than $5 million that

5    goes also to Newline Trading, correct?

6    A.  Correct.

7    Q.  And that was in connection with the purchase by Newline

8    Trading of Fondinvest, the fund of funds we talked about

9    before?

10   A.  Yes.

11   Q.  That was the company in France you went to go run, right?

12   A.  Yes.

13   Q.  You see there is $1,250,000 that actually goes to the

14   Wakpamni Lake Distribution Project, right?

15   A.  Yes.

16   Q.  That was a payment to the WLCC as part of the bond

17   contracts, right?

18   A.  I believe so, yes.

19   Q.  There is $305,000 to Hughes Capital Management, right?

20   A.  Yes.

21   Q.  And that was working capital for Hughes, correct?

22   A.  I believe so, yes.

23   Q.  Working capital, meaning money that they used to pay their

24   everyday expenses, correct?

25   A.  Yes.

1    Q.  Money from Wealth Assurance Private Clients, proceeds of

2    the bonds went all over, true?

3    A.  True.

4    Q.  And am I not correct that there was, however, not a single

5    penny that went directly to Devon Archer?

6    A.  I would have to look through all of this to sort of come up

7    with a true and accurate statement on that.

8    Q.  You can't recall, correct?

9    A.  I cannot recall.

10    Q.  In your 20 meetings with the government, you never talked

11    about one, right?

12    A.  Correct.

13    Q.  You'd think you would talk about that, right?

14          MR. QUIGLEY:  Objection.

15          THE COURT:  Sustained.

16    Q.  And there was also not a single penny that went directly to

17    Rosemont Seneca Bohai, correct?

18    A.  I have to give the same answer to that, I did so many wire

19    transfers, I get lost in which ones were made and not made.

20    Q.  To your memory, there is not a single penny that went to

21    Rosemont Seneca Bohai?

22    A.  To my memory, yes.

23    Q.  To your memory, there was not a single penny that went to

24    Archer Diversified, correct?

25    A.  Correct.

I66JGAL2                          Dunkerley - cross

1   Q.  In fact, the only interaction, to your knowledge, that
2   Mr. Archer had with Wealth Assurance Private Client was that he
3   actually put money into it at one point, true?
4   A.  Yes, I believe that is the case, yes.
5   Q.  And again you never discussed the WLCC bonds with
6   Mr. Archer in any way, shape or form except on that one single
7   Burnham Securities, Incorporated investment committee call,
8   correct?
9   A.  Correct.
10  Q.  In that call absolutely nothing improper was discussed,
11  correct?
12  A.  Correct.
13  Q.  In fact, you were never part of the conversation with
14  Mr. Archer in which anything improper was discussed, correct?
15  A.  Correct.
16  Q.  You had discussions with Mr. Galanis about improper things,
17  true?
18  A.  Absolutely.
19  Q.  And Gary Hirst, true?
20  A.  True.
21  Q.  And Francisco Martin, true?
22  A.  Yes.
23  Q.  But never Devon Archer, correct?
24  A.  Correct.
25  Q.  In fact, the only bad thing you have to say about Devon

I66JGAL2                    Dunkerley - redirect

 1   Archer is that his lawyer asked you way too many questions?

 2          MR. QUIGLEY:  Objection.

 3          MR. SCHWARTZ:  I withdraw that.  I want to thank you

 4   very much for your time, Mr. Dunkerley.  You have been very

 5   helpful.  No further questions.

 6          THE COURT:  Going forward, we don't need the

 7   commentary.  Do you have any redirect.

 8          MR. QUIGLEY:  Briefly, your Honor.

 9   REDIRECT EXAMINATION

10   BY MR. QUIGLEY:

11   Q.  Good morning.

12          MR. QUIGLEY:  Mr. Wissman, pull up Government Exhibit

13   565.-2.

14   Q.  Mr. Dunkerley, you were shown this exhibit both on direct

15   and on cross, right?

16   A.  Yes.

17   Q.  This is a withdrawal slip from the Wealth Assurance Private

18   Client account on September 23rd, 2014, right?

19   A.  Correct.

20   Q.  No secret about where this money is going?

21   A.  No secret.

22   Q.  In fact, what does it say where the money is going to?

23   A.  Thorsdale Fiduciary & Guaranty Limited.

24   Q.  You can take that down.

25          You were asked a number of questions about, by the

I66JGAL2                      Dunkerley - redirect

1  different attorneys about Hughes and Atlantic.  Do you remember

2  that?

3  A.  Yes.

4  Q.  One of the things you were asked was that Hughes and

5  Atlantic had discretion or at least some discretion over some

6  portion of the client accounts, right?

7  A.  Yes.

8  Q.  Of course, clients can set limits on an investment

9  adviser's discretion, right?

10  A.  Yes.

11  Q.  Mr. Touger asked you about the many conversations you had

12  before the first bond deal with Michelle Morton.  Do you recall

13  that it was a couple of days ago?

14  A.  I don't know who Mr. Touger is.

15  Q.  Mr. John Galanis' attorney?

16  A.  Great.

17  Q.  You first met Ms. Morton on or about August 11, 2014?

18  A.  Yes.

19  Q.  At the Hughes closing?

20  A.  Yes.

21  Q.  And the first tranche of bond closed two weeks.  Is that

22  right?

23  A.  That's correct.

24  Q.  Fair so say you didn't know, you did not know her all that

25  long when the first tranche of bonds closed?

I66JGAL2                        Dunkerley - redirect

1    A.  Correct.

2    Q.  You were asked some questions about whether you had a

3    conversation with Michelle Morton about whether the bonds fit

4    into the profile of her clients.

5    A.  Yes.

6    Q.  You couldn't recall any conversation in any event, right?

7    A.  Yes.

8    Q.  Fair to say that was not something you were focused on

9    whether or not the bonds fit into the Hughes clients'

10   investment parameters?

11              MR. SCHWARTZ:  Objection to leading, your Honor?

12              THE COURT:  I will let it go, but watch the leading.

13              THE WITNESS:  It was not something I was focused on.

14   BY MR. QUIGLEY:

15   Q.  You were asked some questions about BFG Socially

16   Responsible Investments.  Do you recall that?

17   A.  I do.

18   Q.  Just remind us what your role was BFG Socially Responsible

19   Investments was.

20   A.  I was the sole managing member and director of BFG SRI.

21   Q.  What was your understanding in that role of what BFG was

22   intended to stand for?

23   A.  So originally when the company was created, my

24   understanding was that BFG stands for Burnham Financial Group

25   Socially Responsible Investing, and then later on as the

I66JGAL2                    Dunkerley - redirect

1    transaction progressed, I was specifically told by Jason

2    Galanis that BFG didn't stand for anything and it was just to

3    be known as BFG Socially Responsible Investing.

4    Q.  There was no actually affiliation with Burnham Financial?

5    A.  There was none.

6    Q.  You were also asked questions about GMT Duncan?

7    A.  YES.

8    Q.  Just so we're on the right page, that became the parent

9    company of Hughes Atlantic.  Is that right?

10   A.  Yes.

11   Q.  Just to situate ourselves again, you were asked questions

12   about the Class A shareholders of Michelle Morton and Richard

13   Dearie?

14   A.  Yes.

15   Q.  About how they had control under the operating unit?

16   A.  Yes.

17   Q.  As a practical matter, could Jason Galanis tell Michelle

18   Morton what to do?

19            MR. TOUGER:  Objection.

20            THE COURT:  Just talk about what you observed.

21            THE WITNESS:  Yeah, so what I observed is he did tell

22   Michelle Morton what to do, correct.

23   BY MR. QUIGLEY:

24   Q.  Including with respect to Wakpamni?

25   A.  Yes.

I66JGAL2                    Dunkerley - redirect

1   Q.  You recall being asked if you had a discussion with Jason

2   Galanis after the subpoenas came down about the fact that --

3   what did you believe about you and Jason Galanis believe about

4   the Michelle Morton's disclosures?

5          MR. TOUGER:  Objection what Jason Galanis believed,

6   your Honor.

7          THE COURT:  Sustained as to that.

8   BY MR. QUIGLEY:

9   Q.  Did you have conversations with Jason Galanis about

10  Michelle Morton's disclosures on certain forms that were to be

11  filed with the SEC?

12  A.  Yes.

13  Q.  What did you discuss during those discussions?

14  A.  We discussed that she had not disclosed the investment by

15  BFG SRI into GMT Duncan on a Form ADV at the time Hughes

16  Capital Management was purchased.

17  Q.  Was she required to disclose that because of the ownership

18  and control interest that BFG --

19          MR. TOUGER:  Objection; calls for a legal opinion,

20  your Honor.

21          THE COURT:  First of all, let's just watch the

22  leading.  Why don't you rephrase the question.

23  BY MR. QUIGLEY:

24  Q.  Why did you believe that she was required to disclose BFG

25  SRI on that form?

1            MR. TOUGER:  Objection, your Honor.

2            THE COURT:  I think you can ask generally what his

3    understanding was of how the --

4    BY MR. QUIGLEY:

5    Q.  What was your understanding of what she was required to

6    disclose on that form?

7            MR. TOUGER:  Objection to required to disclose.

8            THE COURT:  Of what?

9            What is your understanding based on your participation

10   of what was required to be disclosed?

11           THE WITNESS:  A full disclosure of all investors into

12   the entity was required.

13   BY MR. QUIGLEY:

14   Q.  Let's shift topics and talk about, you were asked a bunch

15   of questions about the different entities involved in this

16   plan, right?

17   A.  Yes.

18   Q.  Were there always clear lines between the people and

19   entities involved?

20   A.  No.

21   Q.  Was there an overlap in the people involved in these

22   different entities?

23   A.  Yes.

24   Q.  Can we pull up what is in evidence as defense Exhibit 4733.

25   Do you recall seeing this document?

I66JGAL2                    Dunkerley - redirect

1   A.  I do.

2   Q.  You were familiar with this -- you received this email back

3   in 2015?

4   A.  I did.

5   Q.  The date on this email is what?

6   A.  The 18th of July 2015.

7   Q.  So this is after all four Wakpamni bond issuances?

8   A.  Yes.

9   Q.  What is the purpose of this presentation?

10  A.  The purpose really was to set out a strategy and to show

11  Burnham and Co. as a major financial institution for possible

12  sale, I believe.

13  Q.  So it is a promotional document?

14  A.  Yes.

15  Q.  If we go to Page 4.  Do you see the slide recognized brand

16  name?

17  A.  I do.

18  Q.  Let's just break this down.

19          Burnham Legacy refers to what?

20  A.  I am sorry?

21  Q.  Do you have an understanding of what Burnham Legacy refers

22  to?

23  A.  Yes.

24  Q.  What does it refer to?

25  A.  Burnham during the 80's was known by the name of Drexel

1  Burnham Lambert and was a major player in junk yield bonds

2  during that time.

3  Q.  So everything from Apollo going around to Moelis & Company

4  deals with Burnham Legacy.  Is that right?

5  A.  Yes.

6  Q.  Those entities were not entities you acquired during the

7  roll-up plan?

8  A.  Correct.

9  Q.  During 2013 and 2015?

10 A.  Correct.

11 Q.  Do you see future acquisitions.  Do you see that on the

12 bottom of the page?

13 A.  I do.

14 Q.  That is everything from Eurobank to IAG Malta?

15 A.  Yes.

16 Q.  How many of those acquisitions were ultimately consummated?

17 A.  To my knowledge, none of those acquisitions ultimately

18 consummated.

19 Q.  Is it fair to say the only entities actually involved in

20 the roll-up plan on this slide are Burnham, Valor Life,

21 Atlantic Asset Management, Fondinvest and Bonwick?

22 A.  Yes.

23 Q.  What was Burnham's role in the bond transactions?

24 A.  Placement agent.

25 Q.  What was Atlantic Asset Management's role in the

1    transactions?

2    A.   It was the investor into the bonds.  It represented those

3    investors.

4    Q.   Into the final tranche of bonds?

5    A.   Yes.

6    Q.   How much time, roughly, went by between the acquisition of

7    Atlantic and placement of bonds with Atlantic Investors?

8    A.   I'm not exactly sure, but I think about three or four

9    months.

10   Q.   We looked at this in Government Exhibit 512, but how was

11   the purchase of Fondinvest financed?

12   A.   It was purchased with money from Wealth Assurance Private

13   Clients.

14   Q.   That was the proceeds of the final bond issuance?

15   A.   Yes.

16   Q.   That was purchased by Atlantic, on behalf of Atlantic

17   clients?

18   A.   Yes.

19   Q.   Do you know whether Bonwick had any role in the bonds, the

20   Wakpamni bonds?

21   A.   No, I really don't know much about Bonwick Capital.

22   Q.   Fair enough.  Can we jump ahead to Page 7.

23          This reports the last Burnham established

24   relationships.  Is that right?

25   A.   Yes.

I66JGAL2                          Dunkerley - redirect

1    Q.  Teneo Consulting, what was their role at Burnham?

2    A.  Their role was to produce this presentation and put

3    together the strategy that we're looking at right now.

4    Q.  They produced this presentation?

5    A.  Yes.

6    Q.  And then under regulators, do you see that?

7    A.  I do.

8    Q.  Did Burnham have any?  It says SEC?

9    A.  Yes.

10   Q.  Does every company in the financial services industry have

11   a relationship with the SEC?

12   A.  Yes.

13   Q.  FINRA, do you know what that stands for?

14   A.  I can't remember the exact definition.

15   Q.  Don't worry about it.  Does every broker-dealer have a

16   relationship with FINRA?

17   A.  Yes.

18   Q.  If you could go to Page 11.  Go back to Page 8 for a

19   second.  Did this structure with Burnham & Company overseeing

20   Valor Group Ltd, did that actually come to fruition?

21   A.  Not to my knowledge.

22   Q.  If we can go to Page 11.  This is a discussion of certain

23   people involved in the roll-up plan, right?

24   A.  Yes.

25   Q.  Was Jason Galanis a key player in the roll-up plan?

I66JGAL2                          Dunkerley – redirect

1    A.  Yes.

2    Q.  He is not on here?

3    A.  Correct.

4    Q.  If you go back to the email, first Page 1, who is the

5    second person on the "to" line after Mr. Archer?

6    A.  Jason at Burnham Equity Partners, which is the email for

7    Jason Galanis.

8    Q.  Go back to Page 13.  Do you see the picture of the Burnham

9    headquarters on the left?

10   A.  I do.

11   Q.  What address is that?

12   A.  I believe that is 40 West 57th street in New York, New

13   York.

14   Q.  Did Burnham occupy that entire building?

15   A.  No.  Just one and a half floors of that building, I

16   believe.

17   Q.  Just one and a half floors?

18   A.  Yes.

19   Q.  That wasn't the Burnham skyscraper or anything?

20   A.  There was no Burnham skyscraper.

21   Q.  You can take that down.  Thank you.

22          You were asked a number of questions by Ms. Notari

23   about 1920 Bel Air.  Do you remember that?

24   A.  Yes.

25   Q.  To clarify, what was your role as managing member of 1920

I66JGAL2                    Dunkerley - redirect

1   Bel Air, LLC?

2   A.  Really just to administrate the entity of 1920 Bel Air

3   owning that particular company, so documentation, some basic

4   replies.  There was not a tremendous amount of work to do with

5   that particular entity.

6   Q.  So is it fair to say you were not a caretaker for the

7   property itself?

8           MS. NOTARI:  I can't hear you.

9   Q.  Is it fair to say you were not a caretaker for the property

10  itself?

11  A.  Yes, that's correct.

12  Q.  Who was the owner on paper of 1920 Bel Air?

13  A.  At the entity 1920 Bel Air Holdings was the owner, I

14  believe.

15  Q.  And who lived there the whole time, the whole relevant

16  period of this case?

17  A.  Jason Galanis.

18          MR. QUIGLEY:  One moment, your Honor.

19          (Off-the-record discussion)

20          MR. QUIGLEY:  I have one more question.  Just scroll

21  through it, Mr. Wissman.  (Pause)

22  BY MR. QUIGLEY:

23  Q.  Do you see -- one more question -- do you see where it says

24  expanded platform?

25  A.  I do.

I66JGAL2                           Dunkerley - redirect

1    Q.  Did each of the entities listed here have different owners

2    and boards of directors?

3    A.  Substantially, yes.

4    Q.  There was overlap, is it fair to say?

5    A.  There was some overlap between the directors in some of

6    these entities, yes.

7    Q.  In reality, they were all part of the roll-up plan.  Is

8    that right?

9    A.  Yes.

10   Q.  Regardless of what was actually on paper?

11   A.  These entities all would have been combined into one to be

12   sold off as a single entity.

13   Q.  You can take that down.  Thank you.

14           Going back to 1920 Bel Air, were you familiar with an

15   entity called Hilltop Trust in relation to 1920 Bel Air?

16   A.  No, I actually wasn't.

17   Q.  Can we pull up Defense Exhibit 3056 A.  Do you recall

18   seeing this email yesterday with Ms. Notari?

19   A.  I do.

20   Q.  This is, if you go to the attachment, and so do you recall

21   seeing Government Exhibit 512 the day before this email

22   Mr. Cooney had gotten $3.8 million from the Wealth Assurance

23   Private Client account?

24   A.  I do.

25   Q.  This document, what is the date on this document?

I66JGAL2                    Dunkerley - redirect

1   A.   The 13th of November, 2014.

2   Q.   Can you highlight, Mr. Wissman, "In accordance with."

3          Just read that, Mr. Dunkerley, that sentence.

4   A.   In accordance with Addendum No. 1, buyer and seller hereby

5   instruct escrow to release a total amount of $3.995 million to

6   seller's counsel in accordance with the below instructions.

7   Q.   So where is the money going?

8   A.   To the Wolff Law Firm.

9   Q.   Look at the bottom of the page.  You signed that document

10  for the seller.  Who signed for the buyer?

11  A.   Bevan Cooney.

12  Q.   Just to be clear, Mr. Cooney never lived at 1920 Bel Air?

13  A.   That's correct.

14  Q.   There was never any discussion of him living there?

15  A.   Never any discussion of the sort.

16  Q.   Never any discussion of him buying that property?

17  A.   Correct.

18  Q.   You were asked a number of questions about the Calvert

19  documents.  Do you recall that?

20  A.   Yes.

21  Q.   Just to be clear, the Calvert documents were created to

22  come with a cover story after you learned of the government

23  investigation in this case?

24  A.   That's clear, that's correct.

25  Q.   That was in the fall of 2015?

1   A.  Yes.

2   Q.  You were arrested in this case in the spring of 2016?

3   A.  Yes.

4   Q.  You first met Mr. Archer in person at a court proceeding in

5   this case when you were both present in June 2016?

6   A.  Yes.

7   Q.  Were you both in court as defendants.  Is that right?

8   A.  Yes.

9   Q.  Mr. Dunkerley, did Jason Galanis lie to you?

10  A.  Yes.

11  Q.  Did he tell you everything about the scope of this Wakpamni

12  scheme?

13  A.  No.

14  Q.  Did he tell you everything about everyone else's role in

15  the scheme?

16  A.  No.

17  Q.  Did he tell you the identities of everyone else?

18  A.  No.

19  Q.  Did he know every detail of the scheme?

20  A.  I did not know every detail of the scheme.

21  Q.  Were you still a participant in the scheme?

22  A.  Yes.

23  Q.  Were you still part of the conspiracy?

24  A.  Yes.

25          MR. QUIGLEY:  No further questions, your Honor.

1           THE COURT:  Any recross?

2    RECROSS EXAMINATION

3    BY MR. TOUGER:

4    Q.  In all those questions that Mr. Quigley just asked you at

5    the end, would they be the same for people who were

6    non-participants in the conspiracy?

7           MR. QUIGLEY:  Objection.

8           THE COURT:  Sustained.

9    Q.  Did Jason Galanis, through you, hide information from

10   non-participants in the conspiracy?

11          MR. QUIGLEY:  Objection?

12          THE COURT:  Sustained.

13   Q.  Did you hide information from non-participants in the

14   conspiracy?

15          MR. QUIGLEY:  Objection.

16          THE COURT:  Overruled.

17   A.  Repeat the question, please.

18   Q.  Did you hide information from people who were involved in

19   part of the aspects of this case that were not involved in the

20   conspiracy?

21   A.  Yes.

22   Q.  Now, Mr. Quigley just asked you about Ms. Morton and your

23   relationship.

24   A.  Yes.

25   Q.  Did you say this was the first time you met her?

I66JGAL2                        Dunkerley - recross

1    A.  The first time I physically met her was at the closing of

2    Hughes Capital Management.

3    Q.  You had developed a relation with her prior to that,

4    correct?

5    A.  There were a few emails back-and-forth, but actually not,

6    no, I had not really developed much of a relationship with her

7    before that.

8    Q.  The personal relationship came later, correct?

9    A.  Correct.

10   Q.  But you had business emails with her prior to the closing?

11   A.  There were, yes, a few emails, yes.

12   Q.  To set up the deal, right?

13   A.  Yes.

14   Q.  Now, you also said that you did not concern yourself with

15   her business, correct, with her purchasing of the bonds?

16   A.  Could you rephrase the question.

17   Q.  Sure.  Mr. Quigley just asked you did you delve into the

18   fact of her having authority to buy the bonds or not, correct?

19   A.  That was not something I was that interested in.

20   Q.  Exactly.  That was not your concern, right?

21   A.  Right, right.

22   Q.  You trusted that she was a professional and was going to do

23   her job?

24   A.  Yes.

25              MR. TOUGER:  Now, Mr. Jackson, if you could just bring

1    up DX 4733 A, thank you, and go to Page 12.  If you can just

2    highlight that entities line, all the different entities.

3    Thank you.

4    BY MR. TOUGER:

5    Q.  I am talking about the arrow that has all the different

6    entities involved in this transaction, right?

7    A.  Yes.

8    Q.  One overwhelmingly common factor in all those entities is

9    Jason Galanis, right?

10   A.  I am not exactly sure what you mean.

11   Q.  Jason Galanis was involved in Wealth Assurance Holdings,

12   right?

13   A.  Informally, but not formally.

14   Q.  Well, he owned shares?

15   A.  He did own shares, yes.

16   Q.  He is involved in Wealth Assurance Holdings?

17   A.  Yes.

18   Q.  And he was involved in the purchase of Burnham Asset

19   Management, correct?

20   A.  Of Burnham Asset Group, Financial Asset Management,

21   correct.

22   Q.  He was involved in the Wealth Assurance AG purchase,

23   correct?

24   A.  Yes.

25   Q.  He was involved in the purchase of Hughes Capital

I66JGAL2                    Dunkerley - recross

1    Management, correct?

2    A.  Yes.

3    Q.  As a matter of fact, you just testified that he gave

4    Michelle Morton orders?

5    A.  Yes.

6    Q.  And he was involved in the acquisition of Valor Life?

7    A.  Yes.

8    Q.  By the way, would you agree with me that the funds to

9    purchase Valor Life came from the WAPC?

10   A.  I believe they did.

11   Q.  He was involved in the Vaudoise Assurance, Incorporated,

12   correct?

13   A.  Yes.

14   Q.  And he was involved in the acquisition of Fondinvest?

15   A.  Yes.

16   Q.  And he was involved in the acquisition of Bonwick Capital?

17   A.  I believe so, yes.

18   Q.  And he was involved in the COR family of funds also,

19   correct?

20   A.  Yes.

21   Q.  And I believe that's because, as you said, he was the hub

22   of everything, right?

23   A.  Basically, yes.

24   Q.  And Jason Sugarman was his brawn, as you said?

25   A.  Was his what?

I66JGAL2                          Dunkerley - recross

1    Q.  Brawn, as you said?

2    A.  Brawn?

3    Q.  Yes, brawn?

4    A.  Yes, yes, yes.

5    Q.  And I think it came out during Mr. Schwartz's

6    cross-examination, he had a nickname for Jason Sugarman, right?

7    A.  Correct.

8    Q.  They were very close?

9            MR. QUIGLEY:  Beyond the scope.

10           MR. TOUGER:  This was mr. Schwartz's cross.

11           THE COURT:  I'll allow it.

12   BY MR. TOUGER:

13   Q.  They were very close, right?

14   A.  Yes.

15   Q.  Now, you also testified during Mr. Schwartz's

16   cross-examination, and can we bring up Defense Exhibit 512,

17   Page 34.

18           MR. QUIGLEY:  Your Honor, this is beyond the scope of

19   redirect.  I don't know whether your Honor is allowing.  We

20   wait to recross on other people's cross, but --

21           MR. TOUGER:  We are three separate defendants, your

22   Honor.

23           THE COURT:  Yes, I will allow it given the other

24   cross-examination, but I will also give you the opportunity to

25   follow up if you would like to.

I66JGAL2                    Dunkerley - recross

1          MR. TOUGER:  Page 34.  If you could go to the $1.25

2     million and highlight that.

3     BY MR. TOUGER:

4     Q.  That is money from WAPC going directly to the Wakpamni Lake

5     Distribution, correct?

6     A.  Correct.

7     Q.  That is part of the bond payment, right?

8     A.  Correct.

9     Q.  $1.25 million?

10    A.  Correct.

11    Q.  If you could go down for the one for 236,000 to Jason

12    Sugarman and his wife.  That shows a payment of WAPC funds to

13    Jason and Elizabeth Sugarman personally, correct?

14    A.  It does.

15    Q.  Of $236,000?

16    A.  Yes.

17    Q.  And would you agree with me that Mr. Sugarman also got

18    payments through different companies of his through WAPC?

19    A.  Yes.

20         MR. TOUGER:  Could you go down to the one for 5.3

21    million, I believe FOUR from the bottom.  The ONE for

22    Fondinvest.

23    Q.  That is for the purchase of Fondinvest, you testified?

24    A.  Yes.

25    Q.  That is one of the companies WAPC brought as part of the

I66JGAL2                    Dunkerley - recross

1    roll-up and --

2              MR. QUIGLEY:  Objection.

3              THE COURT:  Sustained.

4    Q.  Do you know if that was part of the purchase of Wakpamni

5    proceeds, WLCC proceeds to purchase private equity, namely

6    Fondinvest?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  I'll allow that.

9    A.  So Wealth Assurance Private Client proceeds were used to

10   buy Fondinvest, yes.

11   Q.  Thank you.

12             Now, there was a white board, Exhibit 1705, where the

13   initials JWG was on the white board.  Whose initials are those?

14   A.  They would be Jason Woodruff Galanis.

15   Q.  Not John Galanis, right?

16   A.  Correct.

17             MR. TOUGER:  You can take this down, Mr. Jackson.

18   Thank you.  If you could go back to Defense Exhibit 4733 A,

19   Page 4.  Highlight the current acquisitions area.  Thank you.

20   BY MR. TOUGER:

21   Q.  What this shows, I believe as you testified on redirect,

22   are companies that were bought as part of the roll-up, correct?

23             And Valor Life, you testified, was bought with WAPC

24   funds, right?

25   A.  Correct.

1   Q.  Fondinvest was bought with WAPC funds, right?

2   A.  Correct.

3   Q.  Bonwick Capital was bought with WAPC funds?

4   A.  I don't know about that.

5   Q.  All of those companies are private equity investments,

6   correct?

7          MR. QUIGLEY:  Objection.

8          THE COURT:  Sustained.

9   Q.  Do you know if all three of those companies are private

10  equity investments?

11         MR. QUIGLEY:  Objection.

12         THE COURT:  I'll allow that.

13  A.  Sorry.  Do I know?

14  Q.  In general, buying those companies would be a private

15  equity investment?

16  A.  Yes.

17         MR. TOUGER:  If you could go to Page 7, please.  You

18  can highlight the professional services part.  That is fine.

19  Thank you.

20  Q.  Do you see the professional services circle?

21  A.  I do.

22  Q.  Or oval?

23  A.  Yes.

24  Q.  Mr. Quigley asked you about Teneo Consulting, which is the

25  international firm that did this document, correct?

I66JGAL2                         Dunkerley - recross

1   A.   Correct.

2   Q.   Also in there is Baker & McKenzie.   What is Baker &

3   McKenzie?

4   A.   Top five accounting firm in the world.

5   Q.   They worked in this roll-up?

6   A.   They produced accounts for some of the entities in this

7   roll-up.

8   Q.   What is Winston & Strawn?

9   A.   I am not exactly sure what Winston & Strawn actually is.

10  Q.   Okay.  E&Y?

11  A.   Ernst & Young.

12  Q.   A top five accounting firm?

13  A.   Absolutely.

14  Q.   Deloitte?

15  A.   Top five world accounting firm.

16  Q.   These are five top accounting firms in the world, right?

17  A.   Yeah, and PWC as well, yes.

18  Q.   So four of them were involved intricately in these

19  transactions?

20          MR. QUIGLEY:  Objection.

21          THE COURT:  Do you know the answer to that?

22          THE WITNESS:  Yes, I do.

23          THE COURT:  You can answer it then.

24          THE WITNESS:  They produced the accounts for a lot of

25  these transactions, correct.

1    BY MR. TOUGER:

2    Q.  And the audits, right?

3    A.  Yes.

4          MR. TOUGER:  You can take that down.  Thank you,

5    Mr. Jackson.  One moment, your Honor.

6          THE COURT:  Sure.

7          (Pause)

8    BY MR. TOUGER:

9    Q.  You and Mr. Galanis and Mr. Sugarman had discussions about

10   placing the bond proceeds into private equity, correct?

11         MR. QUIGLEY:  Objection; beyond the scope of recross

12   and redirect.

13         THE COURT:  Overruled.

14   A.  Yes.

15         THE COURT:  Let's just make sure all of your questions

16   are follow-up questions asked, and I don't want to go over

17   everything again.

18         MR. TOUGER:  That is why I am going through it, your

19   Honor, just to make sure.

20         (Pause)

21   BY MR. TOUGER:

22   Q.  One last question.  I know you've testified that all the

23   Calvert documents were a fake, correct?

24   A.  Correct.

25   Q.  In the end, though, the result of all those documents were

I66JGAL2                    Dunkerley - recross

1    that Thorsdale placed the shares that they owned in WAH which

2    were legitimate, correct?

3              MR. QUIGLEY:  Objection.

4              THE COURT:  Sustained. .

5    BY MR. TOUGER:

6    Q.  Thorsdale owned shares of WAH, correct?

7    A.  Yes.

8    Q.  And in the end, all those documents did was place those

9    Thorsdale shares of WAH into Wealth Assurance Private Client?

10             MR. QUIGLEY:  Objection.

11             THE COURT:  To your knowledge, you can answer that.

12   A.  Into Wealth Assurance Private Client or into Calvert?

13   Q.  From Calvert into Wealth Assurance Private Client?

14   A.  Can you rephrase the question.

15   Q.  In the end, those documents that you say are all false --

16   A.  Ah-huh.

17   Q.  -- I am not disputing your characterization, in the end

18   what those documents purported to do was take the shares that

19   Thorsdale owned in WAH which were legitimate, transferred them

20   to Calvert, which then transferred them to Wealth Assurance

21   Private Client?

22   A.  Calvert held the shares.  The fake documents showed Calvert

23   held the shares on behalf of Wealth Assurance Private Client.

24   Q.  Right, and the reason you're saying they're fake is because

25   they were done a year after that transaction allegedly

1    occurred?

2    A.  Correct.

3            MR. TOUGER:  Nothing further.

4            THE COURT:  All right.  Anything else?

5            MS. NOTARI:  Yes, your Honor.

6    RECROSS EXAMINATION

7    BY MS. NOTARI:

8    Q.  Good morning, Mr. Dunkerley.

9    A.  Good morning.

10   Q.  Mr. Dunkerley, 1920 Bel Air was owned by an LLC, correct?

11   A.  Yes.

12   Q.  It was not owned by an individual?

13   A.  Correct.

14   Q.  It is fair to say that we established yesterday, when we

15   reviewed the file and all the documents, that there are a lot

16   of complex transactions involved with this particular property?

17   A.  Yes.

18   Q.  You would agree that you said that Mr. Jason Galanis wanted

19   to refinance his property, correct?

20   A.  Yes.

21   Q.  And he was hoping that Mr. Cooney would help him with the

22   refinance of the property?

23           MR. QUIGLEY:  Objection.  .

24   Q.  You testified --

25           THE COURT:  Sustained.

BY MS. NOTARI:

Q.  -- you testified yesterday that Mr. Cooney was going to help Jason Galanis with the refinance of 1920 Bel Air, correct?

A.  Yes.

Q.  And you said that you were given -- it is fair to say that whatever you did on behalf of 1920 Bel Air, these instructions came from Jason Galanis, correct?

A.  Yes.

Q.  And it is fair to say that you testified during this trial that not every conversation you had with Jason, you were not privy to conversations that Jason Galanis had with Mr. Cooney, correct?

A.  I was not privy to all those conversations, correct.

Q.  And it is fair to say that you don't know what Jason Galanis told Mr. Cooney?

A.  Exactly right.

Q.  Now, if we look at -- if you can bring up Government's Exhibit 3236.

            MR. QUIGLEY:  It is not in evidence.

            MS. MERMELSTEIN:  It is not in evidence.

            MS. NOTARI:  Your Honor, may I approach?

            THE COURT:  Yes.

            (Pause)

            MS. NOTARI:  Your Honor, at this time I would move Government Exhibit --

1              MS. MERMELSTEIN:  Your Honor, this appears to be on

2      the jury's screens.

3              JUROR:  It is not any more.

4              MS. MERMELSTEIN:  Perfect.

5      BY MS. NOTARI:

6      Q.  Can you please read through this.

7      A.  (Pause)

8      Q.  Now, do you recall the details of -- can you review that,

9      please.

10     A.  Can I read the what?

11     Q.  Can you review this document?

12     A.  Yes, yes.

13             THE COURT:  He didn't say he didn't remember anything.

14             MS. NOTARI:  I will ask him a question.

15             THE COURT:  Ask him before you ask him to review it.

16     He hasn't said his memory needs refreshing.

17             MR. QUIGLEY:  He is not not even on the email.

18     BY MS. NOTARI:

19     Q.  Have you ever seen the actual wire that that was sent to

20     Mr. Cooney from Wealth Assurance Private Client?

21             THE COURT:  You don't have to look at that.

22             Do you recall, have you ever seen, the question was,

23     the actual wire that was sent to Mr. Cooney from Wealth

24     Assurance Private Client?

25             THE WITNESS:  I don't know how you see an actual wire.

I66JGAL2                    Dunkerley - recross

1    BY MS. NOTARI:

2    Q.  Did you ever see the documentation for the wire that was

3    sent to him?

4    A.  No.

5    Q.  Would it help you if you looked at government exhibit --

6            THE COURT:  He said he didn't see it.

7    Q.  Are you aware of the fact that the actual wire was sent to

8    Mr. Cooney, care of his accountants at Fulton & Meyer?

9            MR. QUIGLEY:  Objection.

10           THE COURT:  Do you know who it was sent to?

11           THE WITNESS:  I have no idea.

12           THE COURT:  He has no idea.

13   BY MS. NOTARI:

14   Q.  Now, the actual wire was for -- do you remember the amounts

15   that we discussed yesterday?

16   A.  We discussed a lot of emails yesterday.

17   Q.  So the actual amount of the wire was for -- may I -- 3.8 --

18           THE COURT:  Just ask him questions.

19   Q.  The actual wire was for 3.8 million 50,000, correct?

20   A.  I believe so.

21   Q.  If we refer back to Defense Exhibit 30056 A --

22           THE COURT:  Is that in evidence?

23           MS. NOTARI:  Yes, it is.

24           THE COURT:  Okay.

25           MR. SCHWARTZ:  Apologies.  We don't have that one.

1          (Off-the-record discussion)

2          THE COURT:  The government has it.

3          MR. QUIGLEY:  We have it.

4          MS. NOTARI:  Thank you.

5    BY MS. NOTARI:

6    Q.  If we can move to the second page.  So the actual wire that

7    was wired was released to the Wolff Law Firm was for 3.995,

8    correct?

9    A.  Correct.

10   Q.  So actually the wire, the amount of money that was sent to

11   the Wolff Law Firm was in excess of $100,000 more than the

12   money that was sent to Mr. Cooney, correct?

13   A.  From the WAPC account, correct.

14   Q.  Is it fair to say if you're doing your math, Mr. Cooney

15   actually put in $100,000 more than he received from Wealth

16   Assurance Private Client, correct?

17          MR. QUIGLEY:  Objection.

18          THE COURT:  Sustained.

19          MS. NOTARI:  No further questions.

20          THE COURT:  Keep it short, all right?

21          MR. SCHWARTZ:  Yes, your Honor.

22   RECROSS EXAMINATION

23   BY MR. SCHWARTZ:

24   Q.  Can we, please, Mr. Jackson, bring back up 4733 A, at Page

25   4.  This is the charge from the Teneo presentation that Mr.

Quigley asked you about and Mr. Touger also asked you about.

You testified that the money used to finance the acquisition of the companies under current acquisitions for some if not all of these companies came from Wealth Assurance Private Client, correct?

MR. QUIGLEY:  Objection; misstates his testimony.

THE COURT:  I'll let you clarify, Mr. Dunkerley.

THE WITNESS:  So the money that went to purchase Burnham did not come from Wealth Assurance Private Client, and so some of them, yes; and some of them, no.

BY MR. SCHWARTZ:

Q.  So some but not all of these, the purchase was financed with money from Wealth Assurance Private Client, true?

A.  Correct.

Q.  In other words, financed with the proceeds from the WLCC bonds, correct?

A.  Correct.

Q.  And this is my point.  The only people that knew that, to your knowledge, were yourself, Gary Hirst and Jason Galanis, true?

A.  True.

Q.  The only people who had access to the Wealth Assurance Private Client bank account were yourself, Gary Hirst and Jason Galanis, true?

A.  True.

I66JGAL2                    Dunkerley – redirect

1    Q.   And you yourself did not know that you were engaged in a

2    fraud until you saw in the activity of the Wealth Assurance

3    Private Client account where the money was being directed,

4    correct?

5    A.   Correct.

6          MR. SCHWARTZ:   Thank you very much.

7    REDIRECT EXAMINATION

8    BY MR. QUIGLEY:

9    Q.   Mr. Touger asked you some questions about Private Equity

10   Investments.   Do you recall that?

11   A.   I do.

12   Q.   So we're abundantly clear, there was no actual Wealth

13   Assurance Private Client annuity?

14         MR. TOUGER:   Objection.   May we approach?

15         THE COURT:   Sure.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

I66JGAL2                    Dunkerley – redirect

1              (At sidebar)

2              MR. TOUGER:  The money has no foundation in fact.

3    Wealth Assurance Private Client existed.  It opened a bank

4    account.  Money went in, money went out.  They made

5    transactions.  They can argue on summation whether it was a

6    fraudulent company or not, but Wealth Assurance Private Client

7    existed for whatever purposes they want to argue, that is fine.

8              THE COURT:  That is a factual question.  I will let

9    the witness answer.

10             MR. TOUGER:  Depending on how he answers it, then

11   there is recross.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2     BY MR. QUIGLEY:

3     Q.  Mr. Dunkerley, with respect to the Wealth Assurance Private

4     Client contract, annuity contracts, no annuity was actually

5     purchased?

6               MR. TOUGER:  Objection; foundation, your Honor.

7               THE COURT:  What?

8               MR. TOUGER:  He has no knowledge of what the annuity

9     was.

10              THE COURT:  Overruled.  Overruled.  I already ruled on

11    this.

12              MR. TOUGER:  He is talking about the annuity.  It is a

13    totally different question.

14              THE COURT:  Overruled.

15              THE WITNESS:  No annuity was purchased with that

16    money.

17    BY MR. QUIGLEY:

18    Q.  Although it talks about a private equity manager in the

19    documents, you never got any investment advice from Francisco

20    Martin or Private Equity Management?

21    A.  Never.

22    Q.  You sent that money wherever you were told?

23    A.  Yes.

24              MR. QUIGLEY:  No further questions.

25    RECROSS EXAMINATION

I66JGAL2                    Dunkerley - recross

1   BY MR. TOUGER:

2   Q.  Mr. Dunkerley, are you familiar with the annuity contract?

3   A.  Yes.

4   Q.  And the annuity contract calls for an investment in private

5   equity, right?

6   A.  There is, I believe, a clause that allows that to take

7   place.

8   Q.  That's what it is supposed to do, right, find distressed

9   companies and buy them, right?

10  A.  A variable annuity contract.

11  Q.  The annuity contract in this case and trust indenture in

12  this case says point blank, find distressed companies and buy

13  them, right?

14          MR. QUIGLEY:  Objection; misstates the record.

15          THE COURT:  What was the objection?

16          MR. QUIGLEY:  Misstates the record and the documents.

17          THE COURT:  I will let Mr. Dunkerley answer.

18          THE WITNESS:  So there are three annuity contracts --

19  BY MR. TOUGER:

20  Q.  Just deal with the first one.

21  A.  Okay.

22  Q.  It says in the indenture, then find distressed companies,

23  even though possibly in bankruptcy, and buy them if you think

24  they're going to be of value more later on, right?

25  A.  Yes, it does, yes.

I66JGAL2                    Dunkerley - recross

1   Q.  And would you agree with me that Valor, the purchase of

2   Valor fits that description?

3          MR. QUIGLEY:  Objection.

4          THE COURT:  I'll allow it.

5   A.  Yes.

6   Q.  Would you agree with me that the purchase of Fondinvest

7   fits that description?

8   A.  Yes.

9   Q.  Would you agree with me the purchase of Bonwick Capital

10  fits that description?

11  A.  Again I don't know that much about the purchase of Bonwick

12  Capital.

13  Q.  Bonwick Capital is a finance company?

14  A.  Yes.

15  Q.  It was bought?

16  A.  Yes.

17  Q.  That much you do know, right?

18  A.  That much I do know, yes.

19  Q.  And all those companies were bought with Wealth Assurance

20  Private Client funds?

21  A.  Again I don't know that much about Bonwick Capital.

22  Q.  Take Bonwick Capital out.  Talk about Valor and Fondinvest.

23          They were bought with Wealth Assurance Private Client

24  funds?

25  A.  They were.

1    Q.   Which came from the WLCC bonds?

2    A.   Yes.

3    Q.   And whether you got advice from Mr. Martin or not, those

4    investments match what we just spoke about, correct?

5              MR. QUIGLEY:   Objection.

6              THE COURT:   Do you understand that question?

7              THE WITNESS:   Not exactly.

8    BY MR. TOUGER:

9    Q.   No matter who advised the WAPC to buy those funds, it was

10   matched, what we just said in the beginning, was the idea to

11   buy distressed financial companies that you think will be more

12   valuable later, right?

13   A.   To do a roll-up program would be another way of describing

14   it?

15   Q.   Yes.

16   A.   Yes.

17   Q.   So what WAPC did was to take funds they got from the WLCC

18   bonds and buy companies that they were supposed to buy

19   according to the annuity contract and the indenture?

20             MR. QUIGLEY:   Objection.

21             THE COURT:   Do you feel qualified to answer these

22   questions based on your knowledge?

23             THE WITNESS:   Ah --

24             MR. TOUGER:   He has already, your Honor.   I am just

25   summing up.

I66JGAL2                          Dunkerley - recross

1              THE COURT:  If you're summing up, you can sit down.

2              MR. TOUGER:  It is a sum-up.  If he answers the

3       question, I will.

4              THE COURT:  If he is not qualified to answer, he

5       shouldn't be answering the questions.  You tell us, Mr.

6       Dunkerley.  You are the one --

7              THE WITNESS:  I am qualified, but they're complicated

8       answers.  They're not simple.

9              THE COURT:  Just answer it in your own words.

10             MR. TOUGER:  I withdraw that question and I'll break

11      it down to make it easier.

12             THE COURT:  All right.

13      BY MR. TOUGER:

14      Q.  You already testified just a few minutes ago that the idea

15      was to buy distressed private equity assets that is believed to

16      be worth money more later on, right?

17             MR. QUIGLEY:  Objection.

18      Q.  Is that correct?

19             THE COURT:  I'll let you answer that.  Did you testify

20      to that?

21             THE WITNESS:  I did testify to that.

22      BY MR. TOUGER:

23      Q.  And the purchase of Valor Life meets that definition?

24      A.  Correct.

25      Q.  And the purchase of Bonwick Capital meets that definition?

I66JGAL2                    Dunkerley - redirect

1    A.  Again, Bonwick is something --

2    Q.  Excuse me.  I didn't mean to say Bonwick Capital.  The

3    purchase of Fondinvest meets that definition?

4    A.  Yes.

5    Q.  Those funds were purchased after the bond proceeds came

6    into the WAPC?

7    A.  Yes.

8            MR. TOUGER:  Nothing more.

9            THE COURT:  Any additional questions?

10           MR. QUIGLEY:  Very briefly.

11   REDIRECT EXAMINATION

12   BY MR. QUIGLEY:

13   Q.  Fondinvest, who owned Fondinvest?

14   A.  A firm called Newline Trading, which I effectively owned

15   the majority of.

16   Q.  Not the Wealth Assurance Private Client Corporation?

17   A.  Correct.

18   Q.  Not the Wakpamni Lake Community Corporation?

19   A.  Correct.

20   Q.  Who owned Valor Life?

21   A.  The Wealth Assurance Holdings bought Valor Life.

22   Q.  Not Wealth Assurance Private Client?

23   A.  Correct.

24   Q.  Not the Wakpamni Lake Community?

25   A.  Correct.

1           MR. QUIGLEY:  Nothing further.

2    RECROSS EXAMINATION

3    BY MR. TOUGER:

4    Q.  All those entities were involved in the Burnham Financial

5    roll-up plan, correct?

6    A.  Correct.

7    Q.  And the plan was to then sell that plan, that roll-up plan

8    to one large buyer, right?

9           MR. QUIGLEY:  Objection; beyond the scope.

10          MR. TOUGER:  I'm getting to the point.

11          THE COURT:  Yes, okay.  You can ask it, but I want you

12   to move on and sit down.

13          MR. TOUGER:  I am moving them as quick as I can.

14   BY MR. TOUGER:

15   Q.  Think idea was to sell Burnham to one big buyer, right?

16          MR. QUIGLEY:  The same objection.

17          THE COURT:  Overruled.

18   A.  Yes.

19   Q.  And then everybody would reap their profits?

20   A.  Yes.

21          MR. TOUGER:  Nothing else.

22          THE COURT:  Anything else from the government?

23          MR. QUIGLEY:  No, your Honor.

24          THE COURT:  Thank you.  You can step down.

25          (Witness excused)

I66JGAL2

1          THE COURT:  Would the parties like me to read the

2     joint stipulation or take a break and read it later.

3          MR. QUIGLEY:  Please read it now.

4          THE COURT:  Ladies and gentlemen, this is a joint

5     stipulation that all of the parties have asked me to read, and

6     it reads:

7          It is hereby stipulated and agreed by and among the

8     United States of America, by Robert Khuzami, United States

9     Attorney for the United States, acting under authority

10    conferred by 28 United States Code 515, Rebecca Mermelstein,

11    Brendan F. Quigley and Negar Tekeei, Assistant United States

12    Attorneys, of counsel, and John Galanis, a/k/a Yanni, the

13    defendant, by and with the consent of his attorney, David

14    Touger; Devon Archer, by and with the consent of his attorney,

15    Matthew Schwartz; and Bevan Cooney, the defendant, by and with

16    the consent of his attorney, Paula Notari, that:

17         1.  On or about January 19th, 2017, Jason Galanis pled

18    guilty in this case to:  One, conspiracy to commit securities

19    fraud; two, securities fraud; and, three, conspiracy to commit

20    investment adviser fraud.

21         2.  On or about May 15th, 2018, Gary Hirst pled guilty

22    in this case to:  One, conspiracy to commit securities fraud;

23    two, securities fraud; three, conspiracy to commit investment

24    adviser fraud; and, four, investment adviser fraud.

25         3.  On or about May 16th, 2018, Michelle Morton pled

I66JGAL2

1    guilty in this case to:  One, conspiracy to commit securities

2    fraud; and, two, conspiracy to commit investment adviser fraud.

3              It is further stipulated and agreed by and among the

4    parties that this stipulation is admissible as a joint exhibit

5    at trial.  It is dated today.

6              Do you know the exhibit numbers or should we advise

7    them later?

8              MR. TOUGER:  We'll agree on one afterwards.

9              THE COURT:  Why don't we take a short break.

10             MR. SCHWARTZ:  Your Honor, there is an instruction

11   that goes along with the stipulation.

12             THE COURT:  Thank you for reminding me.

13             I should have added that the evidence contained in the

14   stipulation that I just read to you is being admitted solely to

15   assist you in assessing the credibility of statements made by

16   Jason Galanis, Michelle Morton and Gary Hirst.  I instruct you

17   that you are to consider it for no other purpose.

18             Thank you.  Why don't we take our short break now.

19             (Jury excused)

20             THE COURT:  Try to come back at noon.

21             MR. SCHWARTZ:  Can we get the witness order for the

22   remainder of the day?

23             THE COURT:  Talk among yourselves.

24             (Recess)

25             (Continued on next page)

I667GAL3

1     MR. QUIGLEY:  So what we intend to do, is to read in a

2  variety of different e-mails.  We're going to do it -- I think

3  this has been alluded to before -- but our intention is to have

4  an agent and myself kind of do the back-and-forth.  There is a

5  microphone there, we can have an agent in the witness box but

6  who would not be sworn as a witness, just consistent with the

7  way I have done it in other trials.  I just want to be clear.

8     THE COURT:  OK.  Any objection?

9     MR. SCHWARTZ:  No, as long as we can cross-examine

10  within the scope of the documents.

11     MR. QUIGLEY:  He is not being sworn as a witness.

12     MR. TOUGER:  I think the agent should be sworn.  He is

13  reading something into testimony; I think he should be sworn.

14     MR. QUIGLEY:  We are publishing documents to the jury.

15     THE COURT:  Yes, I think it's just a way of publishing

16  documents.  I don't think it's proper to cross-examine him.

17  You can call the agent on your own case if you have something

18  to ask him.

19     MR. SCHWARTZ:  Well, we may have completeness issues.

20     THE COURT:  That's a different story.

21     MR. TOUGER:  That's why I think he should be sworn

22  though, your Honor.

23     MR. SCHWARTZ:  Right.  I'm not going to cross-examine

24  him beyond the scope of whatever he's reading.  And I guess

25  you've done it differently than I have.  When I've done it,

I667GAL3

it's been a paralegal from the office who gets sworn; they
don't know anything about the case but they're just reading the
documents, and that circumscribes the scope of
cross-examination.  If they want to do it a different way,
that's fine.

But, you know, there may be issues on these documents
and I think we're entitled to go into it.  Otherwise, they can
just move the documents into evidence but then they don't get
the theater of having a live person read them for an hour.

THE COURT:  I think it's fine to have a live person
reading.  I mean I have seen mostly with a paralegal, but I
don't think it matters if it's an F.B.I. agent.

I think if there is a completeness issue, you should
raise the completeness issue and ask him to read other
documents that are in evidence, but if you want to ask him
substantive questions, you should do it on your own case.

MR. SCHWARTZ:  Right, understood.

THE COURT:  But I mean is it the scope?  I mean I
would have thought again this is something you could have
figured out beforehand.  I mean you know what documents they're
reading, right?  So what are the completeness issues?  Why
don't you ask him to read all of them.

MR. SCHWARTZ:  No, I would prefer that I do it.

THE COURT:  You what?

MR. SCHWARTZ:  I would prefer that I do it.

I667GAL3

1           MR. QUIGLEY:  He can do that in his defense case.

2           THE COURT:  Yes, I think that's right.  Are they

3      literally parts of the same documents, or are they different

4      documents?  If they're different documents, do it on your case;

5      if it's part of the same document, I am OK with it.

6           MS. MERMELSTEIN:  Your Honor --

7           MR. SCHWARTZ:  I'm happy to make a proffer on the

8      side.  I don't want to tell them what I want to do.

9           MS. MERMELSTEIN:  Your Honor --

10          MR. SCHWARTZ:  But it is absolutely within the scope

11     of what they are doing.

12          THE COURT:  I don't think so.

13          MR. SCHWARTZ:  Can I --

14          THE COURT:  Again, if for completeness only a portion

15     of a document is read, and you want him to read the rest of the

16     document, I think that is fair; but if you're asking him to

17     read other documents you think are relevant, you should save

18     that for your case.

19          MR. SCHWARTZ:  Right.

20          MS. MERMELSTEIN:  Respectfully, I don't agree with

21     that.  I think that this is -- first of all, I think this is an

22     incredibly standard practice in this District.  I have done it

23     before your Honor other times; we did this in the previous

24     Galanis case.  And I think there has been really an

25     inappropriate effort to try and insert the defense case into

I667GAL3

the government's case, that the remarking of every exhibit with

a defense exhibit sticker so that everything --

          If the government wants to offer certain evidence and

point the jury to certain things, then we can do that.  If they

want to call someone to read e-mails, that's fine.  If they

want to ask us to read a certain portion for rule of

completeness purposes --

          THE COURT:  That's all I said.

          MR. SCHWARTZ:  But Mr. Schwartz is saying, no, no, no,

you don't get to know what I want to do, and then I during the

government's case get to point the jury to this is what they

didn't show you.

          If he wants to put someone on to read e-mails in his

case, of course we have no objection, and he can point them to

those parts, but we're reading e-mails now.  They have had

these e-mails; we've identified them a week ago; they never

said anything.  I don't think it's fair to have it be that in

the middle of the government's case they're pointing to other

portions.

          THE COURT:  I think that's a fair point.  What I'm

going to do is I'm going to give you five minutes now; talk

about the things that you want read that you think they're not

going to read.  I mean have you talked about this?

          MR. QUIGLEY:  We sent them a list of exhibits on May

28, Memorial Day.

I667GAL3

1         THE COURT:  But are you reading the entirety of those

2    exhibits?

3         MR. QUIGLEY:  For most of them, yes.

4         THE COURT:  And for the ones that you're not --

5    because as I said, with respect to rule of completeness I was

6    only going to allow reading more of the same document.

7         MR. QUIGLEY:  For example, there are documents, there

8    are e-mails that attach an indenture.  We are obviously not

9    going to read the entire indenture into evidence.  But in terms

10   of the e-mails, the e-mails themselves, our intention is to

11   read in most cases all of the e-mail.  In some cases we may not

12   read all of the e-mail because it's a continuation of a

13   subsequent chain.  But in the e-mails we intend to read in we

14   intend to read by and large the entirety of the e-mail.

15        THE COURT:  I have to say I agree with the government

16   on this; they can present their case the way they want to

17   present it.  All I had in mind is if there was an extra line

18   here and there that wasn't going to be read, that you wanted it

19   read in context of the statement, I was going to be OK with

20   that.  But if you're going to really try and cross-examine him,

21   I don't think that's proper, and I don't think it matters if he

22   is an F.B.I. agent or a paralegal for that purpose, because all

23   you're talking about is reading portions of the documents which

24   you can have read on your case.

25        MR. SCHWARTZ:  I'm not going to really cross-examine

I667GAL3

1    him; I'm going to offer under the rule of completeness

2    additional information.

3              THE COURT:  OK.  So can we talk with those issues now

4    so that all of it will be read at one time?

5              MR. SCHWARTZ:  But, look --

6              THE COURT:  I don't think this is proper cross.

7              MR. SCHWARTZ:  Here is the issue, your Honor, with

8    respect.  They have chosen to put on a misleading presentation

9    of the evidence, and I don't want to correct their mistakes so

10   that it can seem as if that's what they had intended to do all

11   along.  I want to be able to point out the fact that that's

12   what they're doing.

13             MR. QUIGLEY:  But that's what the defense case is for.

14             MR. TOUGER:  Can I talk to cocounsel?

15             THE COURT:  Sure.

16             MS. MERMELSTEIN:  What rule of completeness issue when

17   the entire thing is being put into evidence?

18             MR. TOUGER:  Besides this, I think the witness should

19   be sworn.

20             THE COURT:  I disagree with you.

21             MR. TOUGER:  You disagree?

22             THE COURT:  I disagree with you, yes.  I can swear the

23   witness to say do you swear that you will read the material to

24   the best of your knowledge the way we swear in an interpreter.

25   I can do that.

I667GAL3

|    |    |
|----|----|
| 1  | MR. TOUGER:  Exactly. |
| 2  | THE COURT:  That's fine.  I don't think that's |
| 3  | necessary but I will do it. |
| 4  | MR. TOUGER:  That's what I ask. |
| 5  | THE COURT:  So, are there particular lines -- pursuant |
| 6  | to the rule of completeness -- you want to be read? |
| 7  | MR. SCHWARTZ:  Your Honor -- |
| 8  | THE COURT:  Otherwise, I agree with the government you |
| 9  | should do it on your case. |
| 10 | MR. SCHWARTZ:  Look, I will do it on my case unless |
| 11 | the jury can be instructed that the additional information is |
| 12 | being read at my request. |
| 13 | MR. QUIGLEY:  It's in his case; it will be obvious. |
| 14 | THE COURT:  Just do it in your case. |
| 15 | MR. SCHWARTZ:  OK. |
| 16 | MS. NOTARI:  I have just one, and it's completely what |
| 17 | you're saying. |
| 18 | THE COURT:  Sure. |
| 19 | MS. NOTARI:  So I want to just do it that way. |
| 20 | THE COURT:  So tell me what the -- |
| 21 | MS. NOTARI:  I don't want to preview. |
| 22 | THE COURT:  That's the thing.  I mean if you want it |
| 23 | to be complete -- what I don't want is the gamesmanship.  If |
| 24 | you want it to be complete, I will ask the government to read |
| 25 | that portion now at one time.  But this is a witness who is |

I667GAL3

1     just reading documents that are already in evidence.  So, in

2     terms of how the government wants to present its case, I'm

3     going to allow them to do that.  It's not real cross.  But if

4     you want to tell me what it is, tell them what it is, and let

5     us know, and if they don't have an objection, then we will do

6     both.

7             MS. NOTARI:  Your Honor, I think they should read it,

8     and then I will give it to you and then the agent can read it.

9             MR. QUIGLEY:  They can read it in the defense case.

10            THE COURT:  I agree with the government, otherwise you

11    can read it in the defense case.  It's in evidence.  If you

12    want to highlight it during the defense case, you can do it.

13    Or you can ask them to do it right now, and they will do it

14    right now all together.  But this kind of gamesmanship I don't

15    think is appropriate with this witness.

16            MR. SCHWARTZ:  Could I just ask, you're intending to

17    read all of the ones you had identified in those e-mails?

18            MR. QUIGLEY:  I mean anything we're reading, we're

19    intending to offer -- anything we're offering, we're intending

20    to read the entirety of the e-mail.

21            MR. SCHWARTZ:  My question is when you do this right

22    now -- you had sent us -- you sent us originally a long list.

23            MR. QUIGLEY:  I did cut that down somewhat.

24            MR. SCHWARTZ:  That's my question.  I need to know the

25    subset.

I667GAL3

1      MR. QUIGLEY:  So, 811, 813, 917, 925, 938, 943, 1220,

2  1235, 1267, 2011, 20818, 2023, 2024, 2026, 2027, 2028, 2029,

3  2030, 2031, 2034, 2035, 2069, 2111, 2212, 2213, 2215, 2216,

4  2217, 2224, 2299, 2633 and 2120.

5      MR. SCHWARTZ:  Say the last three again.

6      MR. QUIGLEY:  2299, 2633 and 2120.

7      MR. TOUGER:  Your Honor, I would just ask concerning

8  the e-mails that the whole e-mail be read.  They didn't tell us

9  which ones they edited.

10      MR. QUIGLEY:  We sent this over on May 28.

11      MR. TOUGER:  I'm not talking about that.  You didn't

12  tell us which e-mails you're not reading the whole thing.

13      THE COURT:  Look, I'm going to let them do it the way

14  they want to do it.  We can have a sidebar when they're done.

15  If there are particular portions you think need to be read, we

16  can talk about it at sidebar.

17      But, as I said earlier, I agree generally with the

18  government's approach that they should be able to present their

19  case the way they want to present it.  But, again, if you know

20  that there is an extra sentence or two, or a portion that you

21  think needs to be read, it should be read.

22      As I think about it, the issue with swearing in the

23  agent is that Mr. Quigley is not being sworn in, so there is an

24  awkwardness, but I also don't see any harm in having him swear

25  or affirm that he will read the documents to the best of his

I667GAL3

ability -- accurately to the best of his ability.

            MR. QUIGLEY:  That's fine, your Honor.

            Do you want the agent to step up?

            THE COURT:  Yes, please.

            And are all of these documents in evidence?  Are you

moving them in now?

            MR. QUIGLEY:  Moving them in now.

            THE COURT:  Pursuant to a stipulation.

            MR. QUIGLEY:  We have authenticity stipulations.  I

would say all of them are either statements of defendant or

statements of Mr. Galanis.  There are a couple that are

actually just submitted for the effect on the hearer.

            (Continued on next page)

I667GAL3

1          (Jury present)

2          (Agent sworn)

3          MR. QUIGLEY:  Your Honor, we move those documents into

4     evidence.

5          THE COURT:  All right.  Just note them for the record,

6     please so the jury can hear the numbers.

7          MR. QUIGLEY:  Can I ask him to state his name for the

8     record.

9          AGENT KROLL:  Nicholas Kroll, N-I-C-H-O-L-A-S

10    K-R-O-L-L.

11         MR. QUIGLEY:  For the record, Mr. Kroll and I will be

12    reading a series of documents.

13         At this time the government offers Government's

14    Exhibits 811, 813, 917, 925, 938, 943, 1220, 1235, 1267, 2011,

15    2018, 2023, 2024, 2026, 2027, 2028, 2029, 2030, 2031, 2034,

16    2035, 2069, 2111, 2212, 2213, 2215, 2216, 2217, 2224, 2229,

17    2633 and 2120.

18         THE COURT:  Any objection?

19         MR. SCHWARTZ:  No objection, your Honor.

20         THE COURT:  Those documents will be admitted.

21         (Government Exhibits 811, 813 received in evidence)

22         (Government Exhibits917, 925, 938, 943 received in

23    evidence)

24         (Government Exhibits 1220, 1235, 1267 received in

25    evidence)

I667GAL3

1              (Government Exhibits 2011, 2018, 2023, 2024, 2026,

2        2027 received in evidence)

3              (Government Exhibits 2028, 2029, 2030, 2031, 2034,

4        2035 received in evidence)

5              (Government Exhibits 2069, 2111, 2212, 2213, 2215

6        received in evidence)

7              (Government Exhibits 2216, 2217, 2224, 2229, 2633 and

8        2120 received in evidence)

9              THE COURT:  You will may proceed.  Just bring in the

10       microphone close.  Thank you.

11             MR. QUIGLEY:  Can we publish what is in evidence as

12       Government Exhibit 2011.

13             Mr. Kroll will you read this e-mail?

14             AGENT KROLL:  This e-mail is to Devon Archer and Bevan

15       Cooney from Holmby, sent Friday, April 4, 2014, at 3:17 p.m.,

16       subject Oglala Native Spirits memo.docx.

17             $20 million bond approved.  Proceeds are $15 million

18       to us and $5 million to them for a winery investment that they

19       want to make.

20             MR. QUIGLEY:  Mr. Wissman, can we publish the

21       attachment, both pages.  Then the next page.

22             MR. SCHWARTZ:  Can we have this read out loud, your

23       Honor?

24             MR. QUIGLEY:  Sure.

25             THE COURT:  Were you planning on reading it out loud?

I667GAL3

1           MR. QUIGLEY:  I was not, but we're happy to.

2           THE COURT:  It's up to you.  If you want to read it,

3    go ahead; if you don't, defense can do it on defendant's case.

4           MR. QUIGLEY:  Read the attachment.

5           THE COURT:  But let's not give directions at this

6    point.  OK?

7           MR. SCHWARTZ:  I'm sorry, I thought they intended to.

8           THE COURT:  That's all right.  Go ahead.

9           MR. QUIGLEY:  Mr. Kroll, can you read the attachment.

10          AGENT KROLL:  Sure.  "This is a Dilworth Paxson

11   memorandum to Burnham from Dilworth Paxson LLP/Timothy

12   Anderson; subject Oglala Native Spirits Sovereign Bond Issue,

13   dated April 4, 2014.

14          It states:  This memorandum addresses the structure of

15   the proposed Oglala Native Spirits Bond Issue.  The structure

16   entails the issuance of $20 million of Sovereign governmental

17   bonds ("bonds") by the Wakpamni Lake Community Corporation, the

18   Economic Development Corporation of the Wakpamni Lake Community

19   ("community"), a governmental division of the Oglala Sioux

20   Tribe of the Pine Ridge Reservation, South Dakota.  The

21   proceeds from the bonds will be used for the construction and

22   operation of a winery in Dry Creek, California; the purchase of

23   a single premium annuity to enhance tribal social services; and

24   the payment of costs relating to the issuance of the bonds.

25          Wakpamni Lake Community Corporation ("Wakpamni"),

I667GAL3

pursuant to its article of incorporation as duly approved by

the community on behalf of the tribe, has the power "to borrow

or loan, to issue the evidence of indebtedness, and to repay

the same."  Article VI (7)(g).  Articles of incorporation.  The

bonds will be sovereign governmental bonds and will be exempt

from securities registration under one or more private

placement exemptions to the securities laws.

          Proceeds of the bonds shall be held under the trust

indenture pending payment of project costs.  Any earnings on

investments while held under the trust shall accrue tax free to

the tribe, pursuant to Internal Revenue Code Section 115 as

well as the other provisions of federal tax policy relating to

Indian tribes.  The bonds will be secured by a first lien on

winery revenue and equipment and the annuity payments.  In

addition, a "Cinderella" provision shall automatically reduce

the rate of the bonds to some pre-determined reset rate in the

event a BIA guarantee is obtained post-closing.

          The winery project will be jointly owned by Wakpamni

and a Hayes investment subsidiary to be determined, 51 percent

to 49 percent (SPE).  This ownership model will preserve the

status as a "tribal" project.  The winery will be located on a

parcel of land leased by the SPE from Dry Creek Tribe in

California.  Both the lease and subleases will be of a duration

at least equal to the final maturity date on the bonds.  A

warehouse/distribution center will be built at Pine Ridge as

I667GAL3

1    part of the winery business.

2              MR. QUIGLEY:  Thank you, Mr. Kroll.  Can we now

3    publish what is in evidence as Government Exhibit 2120.  And,

4    Agent Kroll, I will read the bottom e-mail, you can read the

5    middle one, and I will read the top one again.

6              On April 4, 2014, at 8:17 a.m., Holmby,

7    jason@holmbycompanies wrote $20 million bond approved.

8    Proceeds are $15 million to us and $5 million to them for a

9    winery investment they want to make.

10             AGENT KROLL:  And the e-mail response sent April 4,

11   2014 at 11:38 a.m. from Bevan Cooney to Holmby cc Devon Archer,

12   subject Oglala Native Spirits memo.  What do we get to do with

13   the 15 million?

14             MR. QUIGLEY:  From Jason, Jason@holmbycompanies.com,

15   sent Friday April 4, 2014 at 8:44 a.m., to Bevan Cooney, cc

16   Devon Archer, subject Oglala Native Spirits memo.

17   Discretionary.

18             If we can now publish what is in evidence as

19   Government Exhibit 2018.  And I will read the bottom e-mail,

20   it's actually duplicated.  You can scroll up.  I will read the

21   bottom e-mail, and if you could read the top e-mail, Agent

22   Kroll.

23             From Jason Galanis, jason@holmbycompanies.com, date

24   May 9, 2014 at 10:40:18 a.m. PDT to Devon Archer, Andrew

25   Godfrey, cc Bevan, subject Hughes Asset Management.  Arthur

I667GAL3

Chacabordy brought us an RIA to acquire, possibly useful, $1.0

billion AUM, all fixed income, $52 clients, all institutional,

four employees, $2 million revenue, $800K expense, can buy for

one time seven fee.  $3.4 million with 70 percent down.  The

deal referral comes from two competent sounding marketing

people, résumés attached.  Structure would need to continue the

minority owned status.  Based in Washington D.C.

          AGENT KROLL:  Next e-mail.

          Subject:  Forward Hughes Asset Management from Bevan,

sent Friday, May 9, 2014 at 10:43.  To Lucas Mann.

          The Greek machine gun continues to fire ... with

attachments Richard Deary pdf and Michelle A. Morton pdf.

          MR. QUIGLEY:  If we go to Government Exhibit 2111, and

I will begin reading from the e-mail from Chris Schwartz.  We

will not read the press highlights below that.

          On December 15, 2013 at 10:29 a.m. Chris Schwartz

wrote:  Jason, I have attached the proposal you requested.  It

details our recommended solutions, the benefits to you, the

cost involved to mitigate the effects of negative content

currently appearing in your search results.  As I mentioned on

the phone call, I can reduce the fender package by 20 percent

while providing you with a discount of $2,000 off our Google

auto complete service.  Please review the attachments and I can

address any questions you have.  Feel free to contact me with

any questions by e-mail or phone.  I will give you a call in a

I667GAL3

few days once you've had the chance to look things over.  You

can reach me at your convenience on my direct line

650-381-2940.

Can you read the e-mail from Jason Galanis to Chris

Schwartz on Thursday, December 5, 2013 at 11:18 a.m.?

AGENT KROLL:  From Jason Galanis, sent Thursday

December 5, 2013 at 11:18 a.m. to Chris Schwartz, subject

reputation.com proposal.

Chris, I don't see your proposal attached, just

product sheets.

MR. QUIGLEY:  From Chris Schwartz, subject

reputation.com proposal, date December 5, 2013 at 11:44 a.m. to

Jason Galanis.

Hello Jason, attached is the proposal detailing the

defender service and Google auto complete issue.  Pricing is

based on the recommended value of both services.  Please let me

know if you have any questions.  Kind regards, Chris Schwartz.

AGENT KROLL:  On April 11, 2014 at 10:37 p.m., Jason

Galanis wrote:

This is a proposal I got in December and did nothing

about.  $12,000.  So I have the Equities Magazine writer

chunking out content.  Could hire reputation.com below.

Arben's team is humping.  Could hire the consultant as well.

MR. QUIGLEY:  Next e-mail from Devon Archer, Saturday,

12th of April, 2014, 07:13:07 to so Jason Galanis, re:

I667GAL3

reputation.com proposal.

         I think this is a worthwhile investment.  Don't get me
wrong in that I enjoy defending you but it might be nicer if it
wasn't as challenging.  Let's do this.

         AGENT KROLL:  Response to Devon Archer from
jason@holmbycompanies.com, sent Saturday, April 12, 2014 at 3
p.m., subject reputation.com proposal.

         OK I'm going all in on it.  The professionals tell me
the bad content is old so is defeatable.

         MR. QUIGLEY:  If we could publish what is in evidence
as Government Exhibit 1220, and just read the second to top
e-mail from Timothy Anderson to Jason.

         AGENT KROLL:  E-mail from Timothy Anderson, subject
Oglala, dated May 20, 2014 at 9:33 a.m. PDT, to Jason at
Burnhamequitiespartners.com.

         Jason, upon reflecting on things, I'm determining if
the tribe can find special counsel and then I could represent
Burnham, which I think would make this go more smoothly.  Are
you in agreement?  Tim.

         MR. QUIGLEY:  Top e-mail from Jason Galanis to Devon
Archer, Bevan, forward Oglala, Tuesday May 20, 2014, 1:56:32
p.m.  See string.

         Moving the $20 million sovereign nation debt issued.

         Publish what is in evidence as Government Exhibit
2212.

I667GAL3

1      AGENT KROLL:  An e-mail from Jason Galanis dated June

2    3, 2014 at 11:04 a.m. PDT, to Michelle Morton.

3      For Frankie when appropriate to demonstrate who your

4    financial sponsors are.  Jason.

5      MR. QUIGLEY:  On June 3, 2014 at 4:58 p.m., Jason

6    Galanis, jason@holmbycompanies wrote:

7      Whoring it out shamelessly.  Thank you, Steve.

8      AGENT KROLL:  Subject, forward from Bevan, sent

9    Tuesday, June 3, 2014, at 17:32 to Jason Galanis.

10      It has to be done.

11      MR. QUIGLEY:  Can we publish what is in evidence as

12    Government Exhibit 1235.  I will read this one.

13      From Jason Galanis, 6/20/2014, 12:13:06 a.m. to Devon

14    Archer, Bevan.

15      Arch, the Indians signed our engagement.  Here is

16    their counsel from Greenberg.  Nothing for you to do at this

17    point but giving you a heads-up.  The use of proceeds is to

18    place the bond proceeds into a Wealth Assurance annuity.  Maybe

19    good for GT to know that you are associated with the insurance

20    company at the right moment.  Not necessary, but might be nice

21    icing on the cake.  By the way, annuity proceeds get invested

22    by an appointed manager on a discretionary basis on a 20 year

23    contract.  Hercules has been appointed.  Greek.

24      Can we publish what is in evidence as Government

25    Exhibit 2023.

I667GAL3

1          AGENT KROLL:  To Devon Archer and Bevan from Jason

2     Galanis, sent Saturday, July 5, 2014 at 3:59 p.m., subject

3     Oglala Trust Indenture (2) pdf with an attachment of Oglala

4     Trust Indenture pdf.

5          We got U.S. Bank to act as trustee for the bond issue.

6     GT is issuer counsel, as I mentioned.  Tribe counsel met and

7     approved the issue.  Shooting for end of the month.  Lots to

8     accomplish to finesse this over the line.  I'm not counting the

9     money yet, but I'm encouraged by the quality fo the work and

10    the professionalism from everyone I'm coordinating.  If we

11    perform, there are several other things we can do with them

12    that are potentially interesting.  My primary objective is to

13    get us a source of discretionary liquidity.  Sick of begging.

14         MR. QUIGLEY:  And, Mr. Wissman, while keeping that up,

15    can we also put up the attachment, the first page of the

16    attachment.

17         Can we publish what is in evidence as Government

18    Exhibit 2024, and can we go to page 3 of the document and

19    continue from the e-mail that we just had read, about the

20    source of the discretionary liquidity, and I will read on July

21    5, 2014, at 9:06 a.m., Devon Archer wrote:

22         Unreal.  This is just a testament to taking a

23    portfolio approach to pursuing opportunity (a/k/a the ping pong

24    method).  Unreal as you never know where the nuggets pop up.

25         AGENT KROLL:  E-mail response, cc'ing Jason Galanis to

I667GAL3

Devon Archer from Bevan, sent Saturday, July 5, 2014 at 1800

p.m.  Subject Oglala Trust Indentures (2) pdf.

          The Greek.

          MR. QUIGLEY:  If we can go to the second page, the

image that's in Mr. Cooney's e-mail.

          Can we go publish what is in evidence as Government

Exhibit 2026 and continue reading up from the e-mail above "The

Greek."

          AGENT KROLL:  On July 5, 2014 at 9:19 a.m. Devon

Archer wrote phonetic laughter, Hahahahaha.

          MR. QUIGLEY:  July 5, 2014 at 12:20 p.m. Jason Galanis

wrote:

          On a semi serious note, you guys as partners are

enabling so much more, and I am eternally appreciate.  We've

laid the foundation, as importantly we know the ground rules

and the strengths and weak spots now.  With dry powder in our

control, we will be scary effect.

          AGENT KROLL:  From Devon Archer to Jason Galanis,

cc'ing Bevon, subject Oglala Trust Indentures (2) pdf, sent

Saturday, July 5, 2014, 16:34.

          Appreciate that Jack.  And completely correct.

          MR. QUIGLEY:  Can we publish what is in evidence as

Government Exhibit 2027.  I will read the bottom e-mail.  From

Koehnf at gtlaw.com sent Friday, July 11, 2014, 1:08 p.m. to

Raycen Raines, Deb Bluberg, H. Dunkerley,

I667GAL3

1   jason@burnhamequitypartners.com, tanderson@dilworthlaw.com,

2   keithhenselon@usbank.com, mikes@rs-law.com, mcginnis@gtlaw.com,

3   weddlej@gtlaw.com, thompsonh@gtlaw.com, Gary Hirst, subject

4   Wakpamni Lake Community Corporation Distribution List:

5            On behalf of Mike McGinnis, attached please find a

6   draft of a distribution list of the group.  Please contact Mike

7   with any questions or comments.  Faye Koehn, legal assistant.

8            AGENT KROLL:  E-mail from Jason Galanis sent July 11,

9   2014, 10:47 p.m. to Devon Archer, subject forward Wakpamni Lake

10  Community Corporation Distribution List, with attachments

11  distribution list Wakpamni Lake.docx.

12           Close, Archie, target close is July 31.

13           MR. QUIGLEY:  And, Mr. Wissman, if we could publish

14  the attachment to the jury.  Can we publish what is in evidence

15  as Government Exhibit 2028 and begin reading from where we left

16  off, I will read.  On July 11, 2014 at 4:47 p.m. Jason Galanis

17  wrote:

18           Close, Archie, target close is July 31.

19           AGENT KROLL:  Response from Devon Archer, dated

20  Saturday, July 12, 2014 at 2:18 to Jason Galanis, subject

21  Wakpamni Lake Community Corporation Distribution List.

22           From your lips to Gods ears.  July 31 is right around

23  the corner.

24           MR. QUIGLEY:  From jason@holmbycompanies sent

25  7/12/2014, 2:55 a.m. to Devon Archer re Wakpamni Lake Community

I667GAL3

1     Corporation Distribution List.

2              So close.  Cliff is running the stall for me on NYC

3     mansion.  I want to be here and won't live in 1750 square foot

4     cage.  Massively motivated.

5              Can we publish what is in evidence as Government

6     Exhibit 2213.  From Frankie Hughes, date Wednesday July 16,

7     2014 at 12:56 p.m., subject e-mailing term sheet pdf to

8     Michelle Morton.

9              Good afternoon, Michelle.  Attached please find the

10    document we discussed.  I will sent over the client information

11    shortly.  I'm working on getting the data room set up and saw

12    your need for access for six.  As soon as I have more details,

13    I'll let you know.  Best, Frankie.

14             AGENT KROLL:  Forwarded message from Michelle Morton,

15    subject executed HCM term sheet dated July 16, 2014, 10:02 a.m.

16    PDT, to Richard Deary, Jason Galanis.

17             It's here.  It's here.  Hurray.  I will sent the other

18    information as soon as I receive it.

19             MR. QUIGLEY:  On July 16, 2014 at 2:32 p.m., Jason

20    Galanis wrote:

21             Gents, Greek is forging ahead for us.  See attached

22    term sheet for the acquisition of $100 percent of Hughes

23    Capital Management.  Firm manages $900 million on a

24    discretionary basis for 28 institutional clients, pensions and

25    endowments.  Need to determine where the $2.647 million for the

I667GAL3

acquisition is getting allocated from.  It is a minority owned

firm now, and will continue to be so with our partner Michelle

Morton.  There are a great number of minority opportunities for

affirmative action type allocation to a fixed income shop like

this.  The group we are sponsoring are amazing marketers with a

track record in the institutional world.  Richard raised $6

billion for his last firm, which was Hispanic owned, this is

black woman, which I am told there are more mandates for.

Sug said Villaragosa would be interested in the board

as well and could open doors as well as Magic's guy who sit on

Banc of California.

By the way, the firm is highly profitable as is.

Small money overall, but a cash flow positive asset.  What a

concept.

We have agreed to give the firm an opportunity to

participate in Native American bond new issues.  I believe they

will take $28 million of the Wakpamni Oglala Sioux issue that

Greenberg Traurig is working on.  Jason.

AGENT KROLL:  Response e-mail from Devon Archer,

cc'ing Bevan, to Jason Galanis, sent Wednesday, July 16, 2014

at 8:12 p.m.  Subject, executed HCH term sheet.

This is very encouraging.

MR. QUIGLEY:  If we go to Government Exhibit 2030 and

read above the e-mail we just read after "Gents, Greek is

forging ahead for us."

I667GAL3

1          AGENT KROLL:  Cc'ing Devon Archer to Jason Galanis,

2     from Bevan, sent Wednesday, July 16, 2014 at 7:15 p.m., subject

3     executed HCM term sheet:

4          West Coast offense charging down the field.

5          MR. QUIGLEY:  Can we publish what is in evidence as

6     Government Exhibit 2031.  Go to the bottom e-mail from

7     jason@holmbycompanies.com date Saturday, 19th July 2014,

8     02:55:10 to Rory Knight, reply to Jason at holmbycompanies.com,

9     cc Jason Sugarman.

10          Rory, DB and Jason spoke.  J asked me to relay that it

11     all played perfectly.  Came off as a limited issuer specific

12     problem and not a jurisdictional or other bigger issue.  Warg

13     did us a massive favor.  So, next element is for the executive

14     chairman to speak with DB directly.  Main and almost only

15     message is growth plan; they care about size.

16          To that end, they like funding 100 percent of

17     Valorlife including the CHF 30 million intended for the special

18     divident.  This gets the facility to around CHF 45 to 47

19     million, which is barely their minimum.  Would be imperative to

20     explain the growth plans -- sorry -- growth plans.  That said,

21     Jason and I do not believe we are obliged to tell the name or

22     jurisdiction of any target.  Specifically we think we hold it

23     close, as we know there is institutional leakage with

24     information.  It is the nature of large banks.  So ...

25     excellent large opportunity.  We're also using Valor pacing as

I667GAL3

1    tool to push them, which they said is fine.  We want the credit

2    originated in the near term.  Let's get you and he on the phone

3    on Saturday, his request.  They are deadly serious.

4            Next e-mail up.

5            AGENT KROLL:  From jason@holmbycompanies.com dated

6    Saturday, July 19, 2014 at 4:28, to Devon Archer, reply to

7    Jason at holmbycompanies.com, subject forward.

8            Working on credit line.  Not mutually exclusive to

9    Harvest ... at all.  May help.  I am in closing docs on 28

10   million with GT.  Close.  Could fall apart but close.  Arben

11   good for 10D a month.  Give me entity.  BHR is still making my

12   head swim.

13           MR. QUIGLEY:  Next e-mail up.  July 19, 2014 at 12:30

14   a.m., jason@holmbycompanies wrote:

15           Idea ... if I get this 28 million, I have 12 to 15

16   million to put into WAH.  WAH will have 70 million in cash.

17   Would perhaps buy Karlsson $1550 million note for 15 million

18   markup for capital purposes.  Thoughts?

19           AGENT KROLL:  Response from Devon Archer, dated

20   Saturday, July 19, 2014, at 11:01 to jason@holmbycompanies.com,

21   subject re:  The Precious.

22           I'm not sure can I take anymore of the Precious.  It's

23   incredibly capital intensive greenfield work, but let's discuss

24   because there is also a lot of blue sky.

25           MR. QUIGLEY:  Next e-mail from

I667GAL3

1   jason@holmbycompanies.com to Devon Archer, Saturday, July 19,

2   2014, 1:12:59 p.m., re the precious.

3        Me either.  Tom Hanks starring in The Money Pit but

4   it's got a multibillion appraisal.  Surely with a five year

5   hold with a tiny basis we could consider.

6        Next Government Exhibit 2034.  I will read this one.

7   From jason@holmbycompanies.com to Devon Archer, Bevan Cooney,

8   Monday, 8/11/2014, 3:30:46 p.m.  WAGG wired $2.76 million today

9   to close Hughes.

10       Publish what is in evidence as Government Exhibit

11  2609, and can you read this one, Agent Kroll?

12       AGENT KROLL:  To Daniel Turney, cc'ing Frankie Hughes,

13  Richard Deary, from Michelle Morton, sent Monday, August 11,

14  2014 at 9:26 p.m.  Subject Gary Hirst and Hugh Dunkerley.

15       Daniel, Gary Hirst will be joining us as our portfolio

16  management consultant.  His primary focus will be to analyze

17  the investment process and help us improve the investment

18  returns and expand our product offerings so that we can grow

19  assets.  As part of this process he will want to sot down with

20  the investment staff to get specific information.  He will

21  probably arrive late morning.  Let's touch base about the best

22  way to present the information.  Since the information required

23  will be precise, I don't know if the due diligence meeting is

24  the best forum, but we will take direction from you.

25       The other person joining us is Hugh Dunkerley, who

I667GAL3

1    represents our investor.  He will be observing the transition.

2    He will likely arrive late morning as well.  Michelle.

3            MR. QUIGLEY:  If we go to what is in evidence as

4    Government Exhibit 1267, and we will read just from the e-mail,

5    the second e-mail from Andrew Maher, subject forward CUSIP

6    confirmation, Wakpamni Lake Community Corp. S D, SPL LTD REV,

7    August 13, 2014 to jason@burnhamequitypartners,

8    keithhenselen@usbank.com, mikes@rs-law.com, cc Timothy

9    Anderson.

10           Below please find the CUSIP for the WLCC bonds.

11           Next e-mail.

12           AGENT KROLL:  Forwarded from Jason Galanis, sent

13   Wednesday, August 13, 2014 at 11:59 a.m. to Devon Archer and

14   Bevan.  Subject CUSIP confirmation:  Wakpamni Lake Community

15   Corp. S D SPL LTD REV.

16           Closing soon.

17           MR. QUIGLEY:  Publish what is in evidence as

18   Government Exhibit 2217.

19           AGENT KROLL:  From Bevan, cc'ing Devon Archer, subject

20   Wilma Standingbear and Geneva Lonehill have fully executed the

21   agreements.  Sent Friday, August 15, 2014 at 20:52 to Jason

22   Galanis.

23           This is pure genius, Native American bonds.  Great

24   work here Greek.

25           MR. QUIGLEY:  Publish what is in evidence as

I667GAL3

1    Government Exhibit 2299.  Just publish that side by side with

2    the attachment.

3            Can we publish what is in evidence as Government

4    Exhibit 2035, and I will read from the bottom.

5            From Timothy Anderson to Keith Henselen, usbank.com,

6    cc Timothy Anderson, 08/28/2014, 10:45 a.m., subject Wakpamni

7    Second Tranche.

8            Keith, this should be everything, Tim.

9            AGENT KROLL:  From Keith Henselen sent Thursday,

10   August 28, 2014 at 2:12 p.m., to Timothy Anderson, subject

11   Wakpamni Second Tranche.

12           Tim, attached are copies of the fully executed first

13   Supp Ind and closing statement.  Copies of bonds are being

14   e-mailed now and original bonds sent per delivery instructions.

15   Thanks.  Keith Henselen.

16           MR. QUIGLEY:  From Timothy Anderson, subject forward

17   Wakpamni Second Tranche, date August 28, 2014 to Jason Galanis.

18           Well on our way.  Second annuity wire to go out this

19   afternoon.

20           Can you read that, agent?

21           AGENT KROLL:  From Timothy Anderson, forward Wakpamni

22   Second Tranche, dated August 28, 2014 at 11:33 a.m. PDT, to

23   Jason Galanis.

24           Well on our way.  Second annuity wire to go out this

25   afternoon.  Tim.

I667GAL3

1          MR. QUIGLEY:  I believe there is one e-mail above this

2     from Jason Galanis to Devon Archer, Saturday, 8/30/2014 at

3     4:18:17 a.m., forward Wakpamni Second Tranche, attaching

4     closing statement pdf, first supplemental indenture pdf.

5          Closed second tranche.

6          Your Honor, this would be a good time to break.

7          THE COURT:  Yes, I think this is a good time.

8          Ladies and gentlemen, let's break for lunch.  Just

9     remember don't discuss the case and keep an open mind.  Thank

10    you.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I667GAL3

1          (Jury not present)

2          THE COURT:  OK.  We will resume at 2.

3          MR. QUIGLEY:  For the record, we will call a witness

4    right after lunch.  It will be Leo Griffin.

5          THE COURT:  All right.  Thank you.

6          I do have one issue I want to raise.  That's juror 7

7    asked a question of Ms. Cavale.  She said do defendants -- he

8    said this -- he said:  Do defendants ever testify?

9          What I would like to do in response is read the

10   language essentially that was in the jury questionnaire and

11   just say:

12         I understand a juror asked a question about whether

13   defendants ever testified.  Under our Constitution, a defendant

14   dolls not have to testify, because the burden of proof beyond a

15   reasonable doubt remains with the government at all times.

16         If a defendant does not testify, the jury may not draw

17   any unfavorable inference against that defendant based on that

18   decision.  That fact cannot enter at all into the jury's

19   deliberations.

20         Is everyone OK with that?

21         MR. SCHWARTZ:  Yes, your Honor.

22         MS. MERMELSTEIN:  One thing while we're addressing

23   instructions to the jury, I guess, which is it's Juror 6 --

24   5 -- Ms. Miscevic, has with some frequency during the trial

25   spoken to the lawyer who is at the podium.  I think all of the

I667GAL3

1    lawyers have handled that with as much grace as a person can

2    do.  It's awkward because you can't respond, and she is sitting

3    right there.

4         I think it might be useful at a time that the court is

5    otherwise giving generic instructions to remind the jurors that

6    the lawyers aren't going to speak to the parties even in the

7    courtroom directly, and so if they have any questions,

8    whatever, something generic.

9         THE COURT:  OK.  I will do that.  Thank you.

10        (Luncheon recess)

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          2:00 pm

3          (Trial resumes)

4          (In open court; jury not present)

5          THE COURT:  You may be seated.  Thanks.  Is everyone

6    here?  I wanted to first raise a scheduling issue.  I will do

7    it off the record.

8          MS. MERMELSTEIN:  I think Mr. Touger is not here.

9          THE COURT:  Sorry.  I thought he was.  I'll wait.

10   Thanks.  (Pause)

11         THE REPORTER:  This will be off the record, your

12   Honor?

13         THE COURT:  Yes.

14         (Off-the-record discussion)

15         (Jury present)

16         THE COURT:  Welcome back, folks.  You can be seated.

17         First of all, Ms. Cavale told you due to unforeseen

18   circumstances, we are not going to sit tomorrow, and I

19   apologize for that.  I thank you for your willingness to sit a

20   little bit late today so we can keep moving forward and stay on

21   schedule.

22         I wanted to address one other issue.  I understand

23   that one of the jurors asked Ms. Cavale if defendants testify

24   in criminal trials, and I just want to make sure that it is

25   clear under our Constitution, a defendant does not have to

I66JGAL4                          Griffin - direct

1   testify because the burden of proof beyond a reasonable doubt

2   remains with the government at all times.  If a defendant did

3   not testify, the jury may not draw any unfavorable inference

4   against that defendant based on that decision.  That fact

5   cannot enter into the jury's deliberations at all, so I wanted

6   to make sure you understood that.  You may proceed.

7              MR. QUIGLEY:  The government calls Leo Griffin.

8              Your Honor, before we get into the substance, pursuant

9   to a prior discussion between the parties, the government

10  offers Government Exhibits 106, 107, 111, 153, 162, 186, 197,

11  198, 214 A and 2609.

12             THE COURT:  They will be admitted

13             (Government's Exhibits 106, 107, 111, 153, 162, 186,

14  197, 198, 214 A and 2609 received in evidence)

15             MR. SCHWARTZ:  No objection.

16             MR. QUIGLEY:

17   LEO GRIFFIN,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  Q.  Where do you work, Mr. Griffin?

22  A.  Richmond Retirement System.

23  Q.  What is your role at the retirement system?

24  A.  I am the executive director.

25  Q.  In your role as the Richmond Retirement System, have you

1    become familiar with bonds issued by the Wakpamni Lake

2    Community Corporation in August of 2014?

3    A.   Yes.

4    Q.   Were those bonds placed into one of your accounts?

5    A.   Yes.

6    Q.   Let's back up a second.

7         How long have you been the executive director of the

8    Richmond retirement systems?

9    A.   Five years.

10   Q.   What is the Richmond retirement System?

11   A.   The Richmond Retirement System is primarily a defined

12   benefit pension system for the employees of the City of

13   Richmond, Virginia.

14   Q.   What did you do before you became executive director of the

15   Richmond Retirement System?

16   A.   I was the director of the Spokane Employees Retirement

17   System in Spokane, Washington.

18   Q.   A similar role?

19   A.   Yes.

20   Q.   What did you do before that?

21   A.   Prior to that, I was director of finance for Sisters of the

22   Holy Names, a not-for-profit organization with an endowment in

23   Spokane, Washington.

24   Q.   Focusing on the Richmond Retirement System, how many

25   participants are in that program?

I66JGAL4                           Griffin - direct

1   A.   There are approximately 8,000.

2   Q.   What types of people are beneficiaries or enrolled in the

3   Richmond Retirement System's program?

4   A.   Police officers, firefighters, general employees,

5   secretaries, garbage truck drivers.

6   Q.   Are these people who work for the City of Richmond?

7   A.   Yes.

8   Q.   What is the mandate or mission of the Richmond Retirement

9   Systems?

10  A.   To provide an annuity for life, which is to provide a

11  pension once the person reaches certain criteria and is

12  eligible to provide a pension for the rest of their life.

13  Q.   How does the Richmond Retirement System fund itself so it

14  can make payments for the length of the person's life?

15  A.   There are contributions that are made by the employer,

16  which is the City of Richmond.  There is contributions made by

17  the employees out of their paychecks, and there are investment

18  earnings.

19  Q.   With respect to investments, does Richmond Retirement

20  Systems do that in-house or do you have other people do that

21  for you?

22  A.   We use professional external money managers.  There are no

23  money managed in-house.

24  Q.   Does Richmond Retirement Systems have any requirements or

25  mandate to make a certain percentage of investments in social

I66JGAL4                          Griffin - direct

1    responsible causes?

2    A.  No.

3    Q.  Did it in 2014?

4    A.  No.

5    Q.  You mentioned investment advisers and investment managers.

6    How many investment advisers or investment managers does RRS

7    have at this time?

8    A.  Between 30 and 35.

9    Q.  Focusing on 2014, was one of those investment advisers

10   Hughes Capital Management?

11   A.  Yes.

12   Q.  Who owned Hughes Capital Management at that time?

13   A.  It was my understanding that Hughes Capital Management was

14   owned by Frankie Hughes.

15   Q.  During the time when you took over at Richmond retirement

16   five years ago, 2013, in and August 2014, do you recall any

17   issues with Hughes Capital Management?

18   A.  Excuse me?  Can you repeat the question.  In which month?

19   Q.  Between the time you took over as executive director of

20   Richmond retirement and August of 2014, were there any issues

21   with Hughes Capital Management?

22   A.  There was an issue related to a change in the portfolio

23   manager, and we had a discussion with Ms. Hughes about that.

24   Q.  Anything else?

25   A.  No.

1          MR. QUIGLEY:  At this time the government offers

2    Government Exhibit 185.  I believe it is the subject of a

3    stipulation.

4          THE COURT:  It will be admitted.

5          (Government's Exhibit 185 received in evidence)

6    BY MR. QUIGLEY:

7    Q.  Can we put up on the screen for the witness Government

8    Exhibit 185 and the jury.  Mr. Griffin, if you prefer in the

9    binder next to you.

10   A.  Okay.

11   Q.  What is this document, Mr. Griffin?

12   A.  It's what we refer to as an IMA, it is an investment

13   management agreement.  This is entitled Investment Counsel

14   Agreement.  It is essentially the contract between the money

15   manager, Hughes Capital Management, and the system, the

16   Richmond Retirement System.

17   Q.  Do you see where it says under Investment Authority,

18   "discretionary"?

19   A.  Yes.

20   Q.  What does discretionary mean in this context?

21   A.  So in the industry, discretionary, it has a couple of

22   definitions, but in short, the investment manager has

23   discretion to invest within guidelines.

24   Q.  They can't do anything wild?

25   A.  Correct.

I66JGAL4                     Griffin - direct

1   Q.  They have to stay within the guidelines?

2   A.  Correct.

3   Q.  If you could go to Page 7.  Are these the guidelines?

4   A.  Yes, these are the investment guidelines of Richmond

5   Retirement System as of the date that they entered into the

6   contract with Hughes.

7   Q.  By the way, these were the guidelines in effect in 2014?

8   A.  They were, yes.

9   Q.  Can we go to page, two pages ahead in this document.

10          Under investment guidelines, can you read Paragraph 2,

11  highlighted as 2.

12  A.  Paragraph 2 states:  Domestic fixed income investments are

13  permitted, subject to the guidelines in Appendix 1, and may

14  include U.S. Government and agency obligations, mortgage-backed

15  securities, including non-agency mortgages and commercial

16  mortgage-backed securities; asset-backed securities, corporate

17  bonds, debentures, commercial paper, and taxable municipals.

18  Q.  Do you understand a bond to be a type of fixed income

19  security?

20  A.  Yeah, those two terms, to me, are synonymous.  A bond is a

21  fixed income security.

22  Q.  Can you read the paragraph below that.

23  A.  Paragraph 3.  The minimum quality rating of any fixed

24  income issue held in an investment grade portfolio shall be B

25  as rated by Moody's or an equivalent rating agency, and the

overall weighted average quality shall be A or higher.  The

ratings in this policy statement are for guidance only.  The

investment managers are responsible for making an independent

analysis of the creditworthiness of securities and their

suitability as investments regardless of the classifications

provided by rating agencies.

Q.  Directing your attention to No. 5 of this paragraph, what

is that?

A.  Paragraph states that securities of an individual issuer,

excepting the U.S. Government and agencies and Sovereign

Nations and their agencies, shall not constitute more than 5

percent of an investment manager's portfolio at any time, at

market value.

Q.  At this time, 2014, how common was it for Richmond's

investment advisers to buy a bond with the idea it would be

held to maturity?

A.  That would be unusual.

Q.  So let's shift topics a little bit and focus on August of

2014.  Did you learn about a change in Hughes' ownership at

that time?

A.  Yes, I did.

Q.  How did you learn about that?

A.  I received a phone call from Michelle Morton, which was a

voice-mail.  When I returned the call, my conversation, I

believe, was with Richard Dearie.

1   Q.  Did you learn about this change in ownership before it

2   happened or after it happened?

3   A.  After.

4           MR. QUIGLEY:  Can we pull up for the witness only and

5   the lawyers and the Judge, Government's Exhibit 170.

6   BY MR. QUIGLEY:

7   Q.  Do you recognize this document, Mr. Griffin?

8   A.  Yes, this is an email from Hughes Capital Management to me.

9   Q.  Does Richmond Retirement in the regular course of its

10  business keep records of its communications with investment

11  advisers?

12  A.  Yes, we do.

13  Q.  Was this communication made part of the records of Richmond

14  Retirement at or near the time it was received?

15  A.  Yes, it was.

16          MR. QUIGLEY:  The government offers Government Exhibit

17  170.

18          THE COURT:  Any objection?

19          MR. SCHWARTZ:  No objection.

20          THE COURT:  It will be admitted.

21          (Government's Exhibit 170 received in evidence)

22          MR. QUIGLEY:  Can we put this up side-by-side with the

23  attachment.

24  BY MR. QUIGLEY:

25  Q.  Mr. Griffin, first of all, what is the date on the letter?

1    A.  The date on the letter is August 20th of 2014.

2    Q.  In substance, what is this letter telling you about?

3    A.  It is a letter addressed to me at Richmond Retirement

4    System, thanking me for the conversation that we had.  Let me

5    just read this a moment.  It's been a while.  (Pause)

6         It essentially is the letter announcing the purchase

7    of Hughes Capital Management.

8    Q.  Thank you.  We can take that down.

9         How did you react to learning about the ownership

10   change at Hughes?

11   A.  Some surprise.

12   Q.  Why were you surprised?

13   A.  In the industry, large investment firms sometimes get

14   bought and sold, but a smaller firm like Hughes, it just wasn't

15   what we were expecting.  There was no conversation with Hughes

16   about that.  It didn't, it seemed like it just came out of the

17   blue, so it was a bit of a surprise.

18   Q.  I want to jump ahead a couple of weeks to around September

19   9th of 2014.  Without getting into what anyone said, did you

20   have a conversation with someone named Kevin Leonard that day?

21   A.  Yes, I you did.

22   Q.  Who is Mr. Leonard?

23   A.  Kevin Leonard is an investment consultant and partner with

24   NEPC, which is an independent investment consulting firm based

25   in Boston, Massachusetts.

I66JGAL4                         Griffin - direct

1   Q.  As a result of that conversation with Mr. Leonard, did you

2   look at Richmond Retirement's account with Hughes?

3   A.  Yes, we did that day.

4   Q.  What did you find?

5   A.  We found a Native American bond.

6   Q.  Was that the Wakpamni bond?

7   A.  Yes.

8   Q.  Had you asked Hughes to buy this bond?

9   A.  No.

10  Q.  Had anyone at Hughes, had anyone at Hughes asked Richmond

11  about buying this bond?

12  A.  No.

13  Q.  Had you heard of this bond before September 9th, 2014?

14  A.  No, I had not.

15  Q.  What was your reaction to learning the bond was in your

16  account?

17  A.  Shock.

18  Q.  Why were you shocked?

19  A.  It is a no-name bond from a Native American tribe in the

20  Dakotas.  It just, in my opinion, it didn't seem to fit with

21  the other names in the portfolio, meaning the other bonds in

22  the portfolio.

23  Q.  Did you eventually get, sometime after you found out about

24  the bond, did you get a communication from Hughes a monthly

25  report in August of 2014?

1   A.  We did receive a report with a list of holdings, yes.

2   Q.  Can we publish what is now in evidence as Government

3   Exhibit 186.  Do you have it in the binder?

4   A.  I do have it in the binder.

5   Q.  What is that document?

6   A.  Government Exhibit 186 is an email from Hughes Capital

7   Management to me.

8   Q.  This is after you learned about the purchase of the bond in

9   the first place?

10  A.  That I'm not sure.  This is dated September 16th.  I can't

11  say with certainty the exact date.

12  Q.  It was on or about September 9th you had the phone call

13  with Kevin Leonard?

14  A.  Yes.

15  Q.  This is after the purchase, you learned of the purchase of

16  the bond?

17  A.  Yes.

18  Q.  This is the August report for Richmond's portfolio with

19  Hughes?

20  A.  Yes, a pretty standard management report.

21  Q.  If you go to the page ending in Bates No. 267, we can blow

22  up the table.  What does this reflect?

23  A.  This is what I would refer to as a list of holdings.  It

24  lists each security with different data points on each one of

25  the bonds in the portfolio.

I66JGAL4                        Griffin - direct

1   Q.   What are some of the companies listed here?

2   A.   Sorry?  Could you repeat that?

3   Q.   What are some of the companies listed here?

4   A.   Dupont, Hartford, Morgan Stanley, Starbucks, Walmart,

5   Metropolitan Life, PNC funding, Prudential, Jeffries Group,

6   U.S. Treasuries, there is the Native American bond, Bear

7   Stearns, Morgan Stanley, that's about 75 percent of the names.

8   Q.   If you could Column U A L -- the quality?

9   A.   The QUAL, that is the rating?

10  A.   Yes.

11  Q.   For everything but the Native American bond, what is the

12  rating?

13  A.   The Native American bond is the only bond on this report

14  without a rating.  It is rated as N/A, meaning not applicable.

15  Q.   Everything else is A or B?

16  A.   Everything else is A or B, yes.

17  Q.   What percentage of the portfolio did the Wakpamni bond make

18  up?

19  A.   According to this report, it is 5.33 percent of the Hughes

20  portfolio.

21  Q.   Of Richmond's portfolio with Hughes?

22  A.   Richmond's portfolio with Hughes, 5.33 percent.

23  Q.   When you found out about the bond being placed in your

24  account, had you made any decision at that time about

25  Richmond's relationship with Hughes going forward?

1   A.  Yes.  Although I'm not the one that makes the decision, the

2   board does, but I had decided it was time to move on, and that

3   was going to be my recommendation to the board.

4   Q.  Why had you decided it was time to move on?

5   A.  The sale of the company without, in my opinion, proper

6   notice, when I was on the phone call with Mr. Dearie, I asked

7   him when was the company sold, and he said last week, and to me

8   that was a red flag.  That was enough right there to tell me we

9   wanted out.

10          Then on top of that, later we learned in September the

11  purchase of the Native American bond.  That was enough

12  information to take to the board.

13  Q.  Was there a board meeting later in September 2014?

14  A.  Yes.  It was later in September, it may have been around

15  the 23rd.

16  Q.  What, if anything, did you recommend to the board of

17  Richmond Retirement at that meeting?

18  A.  I recommended termination of Hughes Capital Management.

19  Q.  Did the board agree to terminate Hughes?

20  A.  Yes, they did.

21  Q.  What did you attempt to have done at that point with the

22  holdings in Richmond's portfolio at Hughes?

23  A.  I notified the manager, meaning Hughes, to stop trading,

24  which means stop touching the account, and then we handed the

25  portfolio to a brokerage and instructed them to liquidate

I66JGAL4                          Griffin - direct

1   everything to cash.

2   Q.  Was the brokerage able to liquidate everything in the

3   portfolio to cash?

4   A.  They were not.

5   Q.  How many securities were they not able to liquidate to

6   cash?

7   A.  One.

8   Q.  What security was that?

9   A.  The Native American bond.

10  Q.  Did you attempt to continue to get Hughes to get the

11  Wakpamni bond out of your portfolio?

12  A.  Yes, I think it is safe to say we pressed them repeatedly.

13  Q.  So let's take a look at a couple of examples.

14          Take a look for the witness only, lawyers and Judge

15  only Government Exhibit 171.  Do you recognize this document,

16  Mr. Griffin?

17  A.  Yes.

18  Q.  How do you recognize it?

19  A.  It's an email from Michelle Morton at Hughes to me.

20          MR. QUIGLEY:  The government offers Government Exhibit

21  171.

22          THE COURT:  Any objection?

23          MR. SCHWARTZ:  No objection.

24          MR. TOUGER:  No objection.

25          THE COURT:  171 will be admitted.

1              (Government's Exhibit 171 received in evidence)

2              MR. QUIGLEY:  May we publish it to the jury.  Thank

3    you.

4    BY MR. QUIGLEY:

5    Q.  If we could look at the page ending in 186.  That email in

6    the middle here from you on November 14th, 2014, do you see

7    that?

8    A.  Yes, November 14th from me.

9    Q.  What do you say to Richard Dearie and Michelle Morton here?

10   A.  I am stating, I am saying it has been a week since we heard

11   from you.  We need immediate resolution regarding the

12   disposition from our portfolio of the Wakpamni Lake SD

13   Community Corp. bond.  Please provide me an answer by the close

14   of business day.

15   Q.  We can take that down.  Can we put up for the witness, the

16   Judge and lawyers only Government Exhibit 175.

17             Do you recognize this email, Mr. Griffin?

18   A.  Yes.

19   Q.  This was sent to Michelle Morton?

20   A.  From me to Michelle Morton regarding the bond.

21             MR. QUIGLEY:  The government offers Government Exhibit

22   175.

23             THE COURT:  Any objection?

24             MR. TOUGER:  No objection, your Honor.

25             THE COURT:  175 will be admitted.

1      (Government's Exhibit 175 received in evidence)

2      MR. QUIGLEY:  If you can publish it to the jury,

3  please.

4  BY MR. QUIGLEY:

5  Q.  What is the date on this email, Mr. Griffin?

6  A.  January 7th, 2015.

7  Q.  What are you asking Ms. Morton here?

8  A.  I state in the email I would appreciate an update on the

9  Native American bond.

10  Q.  The bond had not been sold at this point?

11  A.  The bond had not been sold at this point.

12      MR. QUIGLEY:  Finally, if you could go just for the

13  witness, the lawyers and the Judge, Government Exhibit 171.

14      MR. SCHWARTZ:  No objection.

15  BY MR. QUIGLEY:

16  Q.  Are these all the communications you had with Ms. Morton

17  and Mr. Dearie about the bond or just a sample?

18  A.  Could you repeat the question.

19  Q.  The emails we just looked at, are those all the emails you

20  had with Ms. Morton and Mr. Dearie about the bond?

21  A.  No, those are not all the emails I had with Michelle Morton

22  and Richard Dearie regarding the bond.

23  Q.  Has the bond been sold, ever been sold out of Richmond's

24  account?

25  A.  The bond has not been sold out of our account.

I66JGAL4                    Griffin - cross

1   Q.  You're still holding it to this day?

2   A.  Written down to zero, still holding it today.

3   Q.  Before the filing of charges in this case, did you know how

4   Morton had financed her purchase of Hughes Capital Management?

5   A.  No, I had not.

6   Q.  Did anyone at Hughes ever tell you about the relationship

7   between the placement agent for the bonds and the people who

8   financed the acquisition of Hughes?

9   A.  Not to my knowledge.

10   Q.  Would you have wanted to know about any such relationship

11   before the bond was placed in your account?

12   A.  I would have wanted to have known of that type of

13   relationship.

14           MR. QUIGLEY:  One moment, your Honor.

15           THE COURT:  Yes.

16           MR. QUIGLEY:  No further questions.

17           THE COURT:  Any cross-examination?

18           MR. SCHWARTZ:  With your Honor's permission, Mr.

19   Wenner will question the witness.

20           THE COURT:  Yes, of course.

21   CROSS EXAMINATION

22   BY MR. WENNER:

23   Q.  Mr. Griffin, good afternoon.

24   A.  Good afternoon.

25   Q.  My name is Craig Wenner.  I represent Devon Archer.  We

I66JGAL4                          Griffin - cross

1   have never met before, right?

2   A.  We have never met before.

3   Q.  You have met with the prosecutors in this case before.  Is

4   that right?

5   A.  That is correct.

6   Q.  You were interviewed by the government, by the prosecutors

7   in this case for the first time on February 9, 2018.  Is that

8   correct?

9   A.  That is correct.

10  Q.  You testified a little bit about your interactions with

11  Michelle Morton and other individuals at Hughes Capital

12  Management.  Am I correct you have never met Mr. Archer before?

13  A.  That is correct, I have never met Mr. Archer.

14  Q.  Am I correct you have never exchanged any written

15  correspondence with Mr. Archer?

16  A.  That is correct.

17  Q.  You have never spoken to him on the phone.  Is that

18  correct?

19  A.  Correct, I have never spoken to Mr. Archer.

20          MR. WENNER:  Mr. Jackson, are you able to pull up

21  Government Exhibit 185, please.  Would you please expand the

22  first two sentences.

23  BY MR. WENNER:

24  Q.  Mr. Griffin, am I correct that in this contract the adviser

25  is Hughes Capital Management?

1   A.   That is correct.

2   Q.   Would you please read under Section 1 A the sentence under,

3   "discretionary".

4   A.   The first sentence reads advisor will supervise and direct

5   the investments and make all investment decisions for the

6   account.

7            MR. WENNER:  Thank you, Mr. Griffin.  Your Honor, no

8   further questions.

9            THE COURT:  Any cross-examination?

10           MR. TOUGER:  Yes, your Honor.

11  CROSS EXAMINATION

12  BY MR. TOUGER:

13  Q.   Good afternoon, sir.

14  A.   Good afternoon.

15  Q.   Have you ever met me before?

16  A.   No, sir.

17  Q.   I am David Touger.  Nice to meet you.

18  A.   Nice to meet you, sir.

19  Q.   Have you ever spoken to me before?

20  A.   I have not.

21  Q.   Have you ever spoken with anybody from the John Galanis

22  defense team?

23  A.   I have not.

24  Q.   Have you ever met John Galanis?

25  A.   I have not met Mr. Galanis.

I66JGAL4                    Griffin - cross

1   Q.  Have you ever spoken to John Galanis?

2   A.  No.

3   Q.  Is he related to the Richmond Retirement fund in any way?

4   A.  Is Mr. Galanis?

5   Q.  John Galanis, yes.  Has he ever made any investment

6   decisions for you?

7   A.  I am not able to answer that question.  I am not aware.

8   Q.  By the way, how much in total is the Richmond Retirement

9   fund worth?

10  A.  Today, close to $600 million.

11  Q.  Would it be a similar number back in 2014?

12  A.  Possibly 525, 550 million, somewhere maybe in that range.

13  Q.  So the Hughes Asset Management part was a very small

14  percentage of the entire account, correct?

15  A.  Hughes was $6 million of a $550 million account.

16  Q.  Can you do that math?  What percentage that is?

17  A.  It sounds like 1 percent.

18  Q.  And the investment in these Wakpamni Lake Community

19  Corporation bonds was approximately 5 percent of that 1

20  percent?

21  A.  It was a little over 5 percent of the bond.  The bond was a

22  little over 5 percent of the 1 percent.

23  Q.  In total, it is about .002 percent?

24  A.  That math I can't do in my head.

25          MR. TOUGER:  I think the jury gets the point.  Thank

1   you.

2   CROSS EXAMINATION

3   BY MS. NOTARI:

4   Q.  Good afternoon.

5          We have never met before, correct?

6   A.  Good afternoon.  We have never met before.

7   Q.  My name is Paula Notari, by the way, and I am the lawyer

8   for Bevan Cooney seated in the left.  You never met with

9   Mr. Cooney before?

10  A.  I have not.

11  Q.  You never exchanged any correspondence with Mr. Cooney

12  before?

13  A.  I have not.

14  Q.  You have never spoken to him on the telephone before?

15  A.  No, ma'am.

16  Q.  I take it the first time you've heard his name, Bevan

17  Cooney, was in relation to this case, correct?

18  A.  When I read the complaint.

19         MS. NOTARI:  Thank you.

20         THE COURT:  Any redirect?

21         MR. QUIGLEY:  A few questions.

22  REDIRECT EXAMINATION

23  BY MR. QUIGLEY:

24  Q.  Sir, Mr. Wenner asked you when you were first interviewed

25  by the government in February 2018.  Do you recall that?

I66JGAL4                          Griffin - redirect

1  A.  Yes.

2  Q.  Were you interviewed by another agency in December of 2015?

3  A.  I received a phone call from the SEC at that time.

4  Q.  The Securities & Exchange Commission?

5  A.  Yes, exactly.  It was a telephone call.

6  Q.  You discussed this case with them?

7  A.  I don't recall the specifics, but it was at least one phone

8  call with them related -- that is when I learned that a fraud

9  had been committed.  That is what comes out of that

10 conversation to me.

11 Q.  You were asked a number of questions by the lawyers about

12 different people that you knew and didn't know.  Do you recall

13 that?

14 A.  Sorry.  Could you repeat that?

15 Q.  The lawyers asked you about different people that you knew

16 and didn't know.  Do you recall that?

17 A.  Yes, I was asked that today.

18 Q.  Before the filing of charges in this case, had you ever

19 heard of Jason Galanis?

20 A.  No.

21 Q.  Before the filing of charges in this case, had ever heard

22 of Hugh Dunkerley?

23 A.  No.

24         MR. QUIGLEY:  No further questions.

25         THE COURT:  Anything else?

I66JGAL4                          Griffin - recross

1   RECROSS EXAMINATION

2   BY MR. TOUGER:

3   Q.  You obviously heard of Michelle Morton, though, right?

4   A.  Yes, I have.  The answer is I have heard of Michelle Morton

5   when she purchased the company.

6   Q.  Exactly.  You spoke to her or had emails with her after

7   that date, correct?

8   A.  Yes, sir.

9            MR. TOUGER:  Nothing further.

10           MR. QUIGLEY:  Nothing further.

11           (Witness excused)

12           MS. MERMELSTEIN:  The government calls Professor

13   Arthur Laby, and if we can approach for one minute before he

14   takes the stand.

15           THE COURT:  Sure.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MS. MERMELSTEIN:  I wasn't sure I realized what your

3     Honor's policy was, whether or not you wanted the government to

4     tender him as an expert or elicit his qualifications, and I

5     think just to be consistent, I didn't want to do it without

6     raising the issue.

7              THE COURT:  Normally people are tendered as an expert

8     and I qualify them if there is no objection.  If you're in

9     agreement otherwise, I am flexible.

10             MS. MERMELSTEIN:  I don't feel strongly except to say

11    that I don't know that we are going to agree that some of the

12    defense experts are experts in the event they're permitted to

13    testify.  If you want to have the theatrics now or later, that

14    is fine.

15             MR. SCHWARTZ:  In other words, we're going to have to

16    qualify our experts?

17             MS. MERMELSTEIN:  Since there hasn't yet been a ruling

18    on the motion to preclude them, I don't know that I have

19    reached this conclusion.  I don't know if they're totally

20    qualified.

21             MR. SCHWARTZ:  Why don't you ask your questions and

22    you can tender him as an expert.  I won't object.

23             THE COURT:  Okay.

24             MR. SCHWARTZ:  You'll state his expertise?

25             MS. MERMELSTEIN:  Yes.

I66JGAL4                        Laby - direct

 1              (In open court)

 2              THE COURT:  In terms of scheduling, I know two of you

 3      have issues on the 26th.  I promise we'll respect those events,

 4      so don't worry about that.  If you're amenable to that, we're

 5      happy to start earlier, at 9:30.  Often I don't do that because

 6      people are coming from Westchester in particular, it is a long

 7      trip.  If you're amenable to that, I'm happy to start court

 8      every day at 9:30.  Talk amongst yourselves and let Ms. Cavale

 9      know.  Thank you.

10       ARTHUR LABY,

11          called as a witness by the Government,

12          having been duly sworn, testified as follows:

13      DIRECT EXAMINATION

14      BY MS. MERMELSTEIN:

15      Q.  Good afternoon, Professor Laby.

16              Let me ask you a balance.  If we get too close, it

17      makes noise, but come a little closer to the microphone?

18      A.  Is that better?

19      Q.  Yes, perfect.  How are you employed?

20      A.  I am a law professor at Rutgers University in New Jersey.

21      Q.  As a professor, what do you do?

22      A.  Well, I do several things.  I put it in three categories.

23              First, of course, I teach law school classes to

24      students each semester.  Then I have a series of research

25      projects I undertake that are always ongoing, and have a third

I66JGAL4                    Laby - direct

1   category we call service.  So helping law school in certain

2   ways, serving on various committees, acting in the public

3   interest in ways related to my field.

4   Q.  I think I led you astray.  You're a little too close to the

5   microphone now.

6   A.  Sorry about that.

7   Q.  Do you also do any work as an expert consultant?

8   A.  I do.  I undertake several projects as expert witness or

9   consultant.

10  Q.  Stepping back for a moment, give the jury your educational

11  background.

12  A.  Sure.  So I went to college at the University of

13  Pittsburgh, graduated from college, went to law school at

14  Boston University School of Law.

15  Q.  What year did you get your law degree?

16  A.  I graduated from law school in 1989.

17  Q.  What did you do following law school?

18  A.  In the first year after law school, I clerked for a federal

19  judge in Baltimore, Maryland and after that I joined a law firm

20  as a law firm associate in Washington, D.C.

21  Q.  How long did you stay at the law firm?

22  A.  I stayed at the firm for approximately four years.

23  Q.  What did you do after that?

24  A.  After that, I applied for a Fulbright Grant to go overseas

25  to do some teaching and writing.

I66JGAL4                          Laby - direct

1   Q.  Did you receive that Fulbright Grant?

2   A.  I did I got the Fulbright Grant.  Initially that was going

3   to be a one-year period.  I ended up staying for two years.

4   Q.  What did you do when you finished the Fulbright?

5   A.  When I finished the Fulbright, I came back to the United

6   States and I joined the staff of the U.S. Securities & Exchange

7   Commission in Washington.

8   Q.  What is the U.S. Securities & Exchange Commission?

9   A.  The Securities & Exchange Commission, or SEC, is the

10  federal regulatory agency in Washington and around the country

11  that regulates all matters pertaining to securities, the

12  issuance and sale of securities.

13  Q.  How long were you at the SEC?

14  A.  I was at the SEC almost 10 years.

15  Q.  Were you in any particular divisions of the SEC during that

16  time?

17  A.  Yes, yes.  So when I first joined the SEC, I was in an

18  office called the Office of International Affairs in part

19  because I had some experience overseas when I was on the

20  Fulbright.

21          Then I left that office at some point and joined an

22  office called the Division of Investment Management.  I was

23  there for a few years.  Then ultimately I moved to the Office

24  of the General Counsel.

25  Q.  What does the Division of Investment Management do?

I66JGAL4                        Laby - direct

1    A.  That is the division, the office of division at the SEC

2    which regulates investment management.  That means it regulates

3    investment advisers and it regulates mutual funds.

4    Q.  What about the Office of General Counsel?

5    A.  The Office of the General Counsel is an office which really

6    oversees any and all matters that have to go up to the

7    commission itself for approval, so that can be enforcement

8    cases, rule-makings, anything that actually goes to the

9    five-member commission.  Those matters have to be approved by

10   the General Counsel's Office.

11   Q.  Does that include matters that pertain to investment

12   advisers?

13   A.  Yes, absolutely that includes investment adviser matters.

14   Q.  What did you do when you left the SEC?

15   A.  When I left the SEC, I joined the Rutgers Law School

16   faculty, although there was a short period when I first left

17   the SEC, I was doing some private legal work as well.

18   Q.  What kind of classes do you generally teach?

19   A.  I teach a course, the securities regulation class because

20   my experience at the SEC, there is a survey securities class.

21       I also teach an advanced class in securities

22   regulation, and then I teach a general corporations class.  We

23   call it business associations, but it is essentially

24   partnerships and corporate law.

25   Q.  Have you published any books or articles?

1    A.  I have.  I have published numerous book chapters and

2    articles over the years and I am a co-author of a multi-volume

3    treatise in the area of investment management.

4    Q.  What generally has been, besides the treatise, the topics

5    of your articles or books?

6    A.  My focus has been on investment management, investment

7    advisers, mutual funds.  I have focused in particular on

8    fiduciary duties and the fiduciary relationship.

9    Q.  In addition to your academic research and writing, do you

10   do anything else to stay up to speed on developments in the

11   investment adviser world?

12   A.  Yes, yes.  In my field, it is important not to stay in your

13   office all the time and just do legal research and writing, but

14   to get out into the world and to stay in touch with various

15   practitioners and members of the investment management

16   community, so I'm a member of various organizations,

17   roundtables which meet a few times a year, sometimes more

18   often, where folks come together and talk about developments in

19   the industry.

20   Q.  Have you testified as a witness in a trial or deposition

21   before?

22   A.  Yes, I have testified before both at trial and in

23   depositions.

24   Q.  Approximately how many times?

25   A.  Oh, I've probably had my deposition taken approximately 15

I66JGAL4                      Laby - direct

1   to 17 times over the past 10 years, and I've probably testified

2   in a trial about the same, maybe a little bit fewer, say 14 or

3   15 times.

4   Q.  In some of those instances, were you testifying as an

5   expert witness?

6   A.  Yes, that's correct.

7   Q.  Have you testified in only criminal matters or civil

8   matters as well?

9   A.  No, I have testified in both criminal matters and in civil

10  matters.

11  Q.  Have you worked with both plaintiffs and defendants?

12  A.  Yes, yes, I've worked on behalf of both plaintiffs and

13  defendants, that's right.

14          MS. MERMELSTEIN:  The government tenders Professor

15  Laby as an expert in the area of investment advisers.

16          MR. SCHWARTZ:  No objection.

17          MR. TOUGER:  No objection.

18          MS. NOTARI:  No objection.

19          THE COURT:  You are so qualified.

20  BY MS. MERMELSTEIN:

21  Q.  Before we move on, are you being paid by the government for

22  your testimony today?

23  A.  Yes, I am.

24  Q.  How much do you charge?

25  A.  My rate on this case is $750 per hour.

1   Q.   Is that your standard fee?

2   A.   That is my standard fee for the government.

3   Q.   Lower than your standard fee for non-government?

4   A.   That's correct.

5   Q.   Approximately how much have you worked in total for your

6   work in this case?  Have you calculated it?

7   A.   I don't know exactly, I have spent maybe three to four,

8   three to five hours preparing, so whatever that is, whatever

9   the math is, maybe four to five thousand dollars.

10  Q.   Does your compensation depend in any part on the outcome of

11  this case?

12  A.   No, it does not.

13  Q.   What, if anything, do you know about the underlying facts

14  of this case?

15  A.   I know virtually nothing about the underlying facts of this

16  case.

17  Q.   Let's then turn to talking about investment advisers.  What

18  is an investment adviser?

19  A.   An investment adviser is a person or a firm who is in the

20  business of providing advice about securities to their clients,

21  to other people for compensation.  They have to be paid or

22  they're not really considered to be an investment adviser.

23  Q.   Are investment advisers registered?

24  A.   Some investment advisers are registered with the U.S.

25  Securities & Exchange Commission, but not all advisers have to

register so, yes, some are registered, but others can be

considered investment advisers but they're not registered with

the SEC.

Q.   The obligations of investment advisers we're about to talk

about, are those different depending on whether or not an

investment adviser is registered or not?

A.   Well, certain requirements apply to any and all investment

advisers whether or not they're registered.  There are some

technical requirements that only apply to registered investment

advisers.

Q.   So we'll come back to that as we go on.

          What sort of things do investment advisers do for

their clients?

A.   Well, investment advisers typically meet with their

clients, try to understand their financial position, their

financial situation.  They then try to understand the goals of

their clients and then typically they recommend various

investments, stocks, bonds, mutual funds, that sort of thing

where the investors can invest to ultimately increase the

client's wealth.

Q.   How are investment advisers typically paid?

A.   They can be paid in several ways.  Most investment advisers

are paid by what's called an assets under management fee, so

that means they receive, say, 1 percent of the assets under

their management.

1            So, for example, if the client, just to use an

2    example, has $100.00 in assets under management with the

3    adviser, he would charge a 1 percent fee, but that would be

4    $1.00 per year in my example multiplied, of course, by the

5    actual amount of assets.

6    Q.   Is 1 percent an example or is that a typical fee?

7    A.   1 percent is actually a typical fee.  They can be higher,

8    can be lower, but that is not so far off the mark.

9    Q.   Do investment advisers have to be compensated in that

10   manner or can they be compensated in other ways?

11   A.   There are others.  For example, some investment advisers

12   might charge similarly an hourly fee.  They might sit down with

13   their clients for a given number of hours each year or each

14   quarter and they'll charge an hourly fee.

15           Other investment advisers continue to charge what's

16   called a commission, so each time the investor actually buys or

17   sells a security, the client, the customer, pays a commission

18   on the stock sale or purchase, and the advisers charge that

19   way.

20   Q.   Are there generally recognized standards of practice in the

21   investment advisory industry?

22   A.   Yes, yes.  Investment advisers are typically held to what

23   is called a fiduciary duty or a fiduciary standard.  That is

24   the common custom and practice that is applied to the world of

25   investment advisers.

1   Q.   Does that apply to both registered and unregistered?

2   A.   Absolutely, that is one of the key requirements that is

3   applied to both registered and unregistered advisers.

4   Q.   You said that investment advisers are bound by a fiduciary

5   duty.   What is a fiduciary duty?

6   A.   A fiduciary duty typically is composed of what is called a

7   duty of loyalty and a duty of care.   So the duty of loyalty

8   means that the investment adviser always has to act in the best

9   interests of the client and not in the adviser's own interests,

10  and the duty of care means that the investment adviser has to

11  undertake and use its skill, its care, use a lot of diligence

12  in whatever it is doing on behalf of that client.

13  Q.   How does a conflict of interest play into that?

14  A.   Well, a conflict of interest comes up fairly often in the

15  world of investment advisers, and under the fiduciary standard,

16  investment advisers have to do what they can to mitigate or

17  eliminate that conflict of interest.

18       If they can't do that, then at a minimum they have to

19  make sure that they disclose the conflict of interest to the

20  client so that the client understands the conflict of interest

21  that the adviser has.

22  Q.   We'll come back to that in a moment.   How does an

23  investment advisory relationship typically begin?

24  A.   It can begin in a number of ways.   Sometimes a client will

25  ask a friend or a family member for a referral to an investment

1    adviser, and a relationship will begin that way.

2              Some investment advisers advertise, and they seek new

3    clients through advertisements.  Inevitably, the client or the

4    adviser, one, calls or communicates with the other and

5    eventually they meet and sometimes a relationship forms.

6    Q.  When an investment advisory relationship begins, is it

7    typically memorialized in writing?

8    A.  Yes, it is typically memorialized in an investment advisory

9    contract, a writing that lays out the basics of the

10   relationship.

11   Q.  What kinds of things are typically included?

12   A.  Sure.  In a typical advisory contract, that document would

13   spell out the various things that the adviser is going to do

14   for that particular client.

15             It then would, of course, include the fees that are

16   going to be charged by the investment adviser.  It also might

17   include like some conflicts of interest that we discussed

18   earlier if the adviser wants to disclose a certain conflict to

19   the client, but most importantly, it lays out the various items

20   that the adviser will do for the client and the fees that will

21   be charged.

22   Q.  Who makes the decision about how a client's money will be

23   invested?

24   A.  Well, ultimately that decision is made by the client.  That

25   is the client's decision.  There are certain circumstances

1    where a client can hand over responsibility or what is called

2    discretion to an investment adviser, and then the adviser has

3    the ability to make those decisions on behalf of the client,

4    but that is a special kind of relationship.

5    Q.  In that kind of relationship where the client is handing

6    over discretion, can the client set parameters for that

7    discretion?

8    A.  Absolutely, the client can set forth various parameters and

9    give the adviser discretion over the client's funds, but then

10   set forth any parameters that the client would like because

11   ultimately it is the client's money and the client decides how

12   that money will be invested.

13   Q.  In what manner can the client set parameters?  Does it have

14   to be in writing?  Can it be orally?

15   A.  It can be both.  It can be a writing and that is often

16   recommended, but it certainly can be orally.  The client might

17   contact the adviser and say look, I've made a decision, I don't

18   want a certain kind of investment or I want only another type

19   of investment, and they can certainly communicate that orally.

20   Q.  If an investment adviser is making discretionary

21   investments, other than obviously following those parameters,

22   what are the investment adviser's obligations with respect to

23   selecting investments for a particular client?

24   A.  Yes, well under the general fiduciary standard that we

25   spoke about earlier, the adviser has a duty of care when of it

1    selects a investment on behalf of a client.  What does that

2    mean?  That means that the adviser has to undertake a

3    reasonable amount of diligence and research and kick the tires,

4    as it were, to take a look at that investment, make sure that

5    the investment is a sound investment, and then perhaps just as

6    importantly, make sure that it's an appropriate investment for

7    that client, whoever or whatever that client might be.

8    Q.  Does that include an assessment of the riskiness of the

9    investment?

10   A.  Yes, absolutely, that assessment would absolutely include

11   an understanding of the risks entailed by that investment.

12   Q.  Are you familiar with the phrase know your security?

13   A.  Yes, absolutely.

14   Q.  What does that mean?

15   A.  That is a phrase very often used in the industry.  It is

16   often used by the regulators.  Know your security means what it

17   sounds like.  It is the obligation of the adviser is to

18   understand or know or become knowledgeable about that

19   particular security, a stock, a bond, a mutual fund, whatever

20   it might be.

21          The adviser has to understand the various

22   qualifications of that security and whether it is appropriate

23   for the client.

24   Q.  Now, can an investment adviser assign its clients to

25   someone else?

I66JGAL4                          Laby - direct

1    A.  Well, an investment adviser can assign its clients to

2    someone else, but only under very specific conditions.

3    Q.  What are those conditions?

4    A.  Well, the conditions are that the client in that case, of

5    course, has to be told that that advisory relationship is going

6    to be transferred to somebody else, and then the client itself

7    has to agree to that in writing because, of course, the client

8    initially hired one adviser, and if that entire relationship is

9    going to be transferred to somebody else, that is a very

10   significant -- the client, of course -- that can only be done

11   once the client agrees to that in writing.

12   Q.  Can an investment advisory firm sell itself to new

13   ownership?

14   A.  Well, an advisory firm can be sold to new ownership, yes,

15   but that would then bring in exactly this question that you

16   raised a minute ago about the advisory contract being

17   effectively assigned to somebody else.

18   Q.  Is there a difference between assigning a relationship and

19   the sale of the investment adviser or change in ownership?

20   A.  Well, yes.  I see those as separate things, although

21   they're very much related.  So assigning the contract is just

22   what it sounds like, the contract itself is essentially handed

23   over from one investment adviser to another investment adviser.

24          The firm, an advisory firm, can also be sold from one

25   owner to another owner, and again I see those as separate.  If

1    that investment adviser is sold to a new adviser, and the new

2    adviser is the firm managing the funds, then that is

3    effectively a transfer of that advisory contract that we spoke

4    about a moment ago.

5    Q.  So is it the same obligation then of the investment adviser

6    to notify clients of that kind of change in ownership?

7    A.  Yes, absolutely, that would be considered a transfer of the

8    advisory contract, and the client has to be notified.

9    Q.  Can the new ownership of an investment advisory firm begin

10   to trade in client accounts prior to notifying clients?

11   A.  No, absolutely not.  That is a key custom and practice and

12   responsibility in the world of investment advisers.

13           The new adviser cannot begin to trade or execute

14   trades or really give advice until the client signed off on

15   that new owner.

16   Q.  Can the new ownership change the investment strategy of the

17   firm or of a particular client's accounts prior to notification

18   of the client?

19   A.  No, no, it can't.  The old relationship is the relationship

20   in place, and the new adviser, the new owner cannot change any

21   strategy before again notifying the client and getting the

22   client's consent.

23           MS. MERMELSTEIN:  No further questions.

24           THE COURT:  Any cross-examination?

25           MR. SCHWARTZ:  Ms. Harris will question.

I66JGAL4                          Laby - cross

1    CROSS EXAMINATION

2    BY MS. HARRIS:

3    Q.  Good afternoon, Professor Laby.  My name is Laura Harris,

4    and I represent Devon Archer.

5            We have never met before, have we?

6    A.  No, not that I remember.

7    Q.  It is a pleasure to meet you.

8            You have never met my colleagues, Mr. Schwartz, Mr.

9    Wenner or Mr. Jackson, have you?

10   A.  I don't believe so.

11   Q.  You know the attorneys representing the government today.

12   Is that right?

13   A.  I know one of them, I would say, yes.

14   Q.  Is that Ms. Mermelstein?

15           You testified from the government in several other

16   cases, right?

17   A.  That's correct.

18   Q.  That is when you had occasion to meet Ms. Mermelstein?

19   A.  I had occasion to meet her on one or two of those cases,

20   but I worked with the government on maybe two or three others

21   as well.

22   Q.  One of those cases was what I'll refer to as the Gerova

23   case.  Is that right?

24   A.  Sorry.  Can you say that again?

25   Q.  The Gerova case?

I66JGAL4                          Laby - cross

1    A.  That sounds right, but I know so little about the

2    underlying facts of the cases, that I don't recall that

3    specific name, but it does ring a bell and I believe that's

4    correct.  I am just not a hundred percent sure.

5    Q.  Understood.

6            You testified in the Tagliaferri case as well?

7    A.  Yes, I have.

8    Q.  In those cases, you met with the government several times

9    before you testified.  Is that right?

10   A.  I don't know if "several times" is always accurate.  At

11   least once and sometimes on several occasions.

12   Q.  And spoke with them throughout the case?

13   A.  I wouldn't say throughout the case.  Of course, I spoke to

14   them from time to time, but it is not as if we spoke throughout

15   the case as it were.

16   Q.  You discussed your testimony at least before your actually

17   testimony, right?

18   A.  Yes.

19   Q.  In the course of your preparation for your testimony, the

20   government would ask you questions about the topics that they

21   anticipated you would testify about, right?

22   A.  Yes.

23   Q.  The same is true this time around, right?

24   A.  Yes, we discussed my testimony before I came here today.

25   Q.  They also told you in the course of that preparation the

1    questions that they thought I might ask you.  Is that right?

2    A.  We did not have much of a discussion about those questions,

3    maybe one short discussion.  I really don't recall details

4    about that.

5    Q.  So you mostly covered the areas that you anticipated that

6    you'd testify about?

7    A.  That's correct.

8    Q.  And the questions that Ms. Mermelstein would ask you?

9    A.  That's right.

10   Q.  You mentioned earlier you haven't been provided with any of

11   the facts underlying this case, right?

12   A.  That's correct.

13   Q.  So you don't know anything about the government's

14   allegations against Mr. Archer, right?

15   A.  I don't.

16   Q.  You've only been asked to provide general background

17   information about investment advisers, right?

18   A.  I don't know if I would say "general background," but I've

19   been asked to provide answers to questions, some more detailed

20   than others.  You may call it background.  I don't know that I

21   necessarily agree, but I think I understand.

22   Q.  Sure.  The government didn't inform you Mr. Archer was

23   never an investment adviser, right?

24   A.  Sorry.

25            MS. MERMELSTEIN:  Objection, your Honor.

I66JGAL4                      Laby - cross

1              THE COURT:  Sustained.

2     BY MS. HARRIS:

3     Q.  Moving to the time, the date on which you were retained, do

4     you recall I being retained in the fall 2016 for this case?

5     A.  I don't remember the dates.  I apologize.

6     Q.  Was that around the time you were testifying in another

7     government case, too?

8              MS. MERMELSTEIN:  Objection, your Honor.

9              THE COURT:  Sustained.

10    BY MS. HARRIS:

11    Q.  We can turn, Professor Laby, to your testimony about the

12    nature of the fiduciary duties that investment advisers have

13    towards their clients.

14             You testified earlier that with respect to investment

15    advisers, not everyone who works at an investment advisory firm

16    has those fiduciary duties toward their clients.  Is that

17    right?

18    A.  I don't think I testified about that today, but I am more

19    than happy to answer those questions if that is what you're

20    asking me.

21    Q.  Sure, that is exactly what I am asking, yes.  Thank you.

22             It is true, isn't it, not everyone who works at an

23    investment advisory firm holds those fiduciary duties towards

24    the clients of the investment adviser, right?

25    A.  There might be clerical employees who probably would not

1    have a fiduciary duty, but people who are acting in an advisory

2    capacity, of course, do have that duty.

3    Q.   It is the individuals who are actually providing advice to

4    clients who have those fiduciary duties.  Is that right?

5    A.   I wouldn't put it quite that way.  So there might be some

6    individuals who are involved in the provision of advice but are

7    not actually giving advice to clients, and I would say they

8    also have a fiduciary duty.  There are certain, as I say, maybe

9    lower level clerical employees that just don't have

10   professional responsibilities who would not have a fiduciary

11   duty.

12   Q.   So an employee who is undertaking an advisory capacity or

13   working towards providing a client with a particular type of

14   advice would have a fiduciary duty.  Is that right?

15   A.   I think that's right.  These are very sort of fact-specific

16   questions, and it is difficult for me to testify yes or no

17   without a lot more information, but generally speaking, if an

18   individual is either providing advice or is involved with the

19   provision of advice to a client, then that individual would owe

20   a fiduciary duty to the client.

21   Q.   You said that would be fact-specific, so that might depend

22   on the day-to-day business of that particular employee,

23   correct?

24   A.   It might depend on a variety of things, but I think it is

25   fair to say that if that individual is involved with the

I66JGAL4                    Laby – cross

1    provision of advice, then that individual would owe a fiduciary

2    duty.

3    Q.  Moving on, are you familiar with the Form ADV?

4    A.  Yes.

5    Q.  Just to be clear, it's an investment, the investment

6    adviser who fills out a Form ADV.  Is that right?

7    A.  That's right, the investment adviser fills out the Form ADV

8    and submits it both to the government and clients.

9    Q.  It is the investment adviser who has responsibility for

10   ensuring that information is accurate.  Is that right?

11   A.  The investment adviser has that responsibility.  There is

12   generally one individual or one or more individuals who are

13   involved in filling out the Form ADV, but ultimately, yes, it

14   is the investment adviser, whether it is a person or a firm,

15   who has that responsibility.

16   Q.  When you say one or more individuals, you mean within the

17   investment advisory firm specifically, right?

18   A.  Yes, although in some instances some advisers might

19   outsource the filling out of the Form ADV, and so a third party

20   service provider would then have some responsibilities as well.

21   Q.  One of the areas that the form requires investment advisers

22   to make particular disclosures is with respect to control

23   persons.  Is that right?

24   A.  Yes, that is correct.

25   Q.  The form requests this information in a few different ways.

I66JGAL4                    Laby - cross

1    Is that right?

2    A.  Yes.  I am familiar with at least one way that the form

3    requests the information.  I suppose I could think of it as

4    requesting the information in multiple ways.  I am not sure

5    what you have in mind.

6    Q.  Let me make it a little bit clearer.  It requests names of

7    direct owners and executive officers.  Is that right?

8    A.  That's correct.

9    Q.  It also requests indirect owners, right?

10   A.  That is right.

11   Q.  So just taking for a moment the direct owners and executive

12   officers, by "executive officers" it really means the people

13   who are running the company on a day-to-day basis.  Is that

14   right?

15   A.  I believe that is a defined term, and I just don't have the

16   definitions in front of me.  You might be right, but I would

17   want to look at the definitions before answering that question.

18   Q.  Would it be helpful if we pulled up an example form for you

19   to use while we're walking through this?

20   A.  We can.  It is up to you.

21   Q.  Just as a demonstrative, if we can pull up DX 4756, please.

22   That is just for the attorneys, the Court and the witness.

23           Professor Laby, do you recognize this as a Form ADV?

24   A.  I do.

25           MS. HARRIS:  We move to publish this to the jury as a

1    demonstrative?

2              MS. MERMELSTEIN:  No objection.

3              THE COURT:  It will be published as a demonstrative.

4              MS. HARRIS:  Mr. Jackson, if you could turn to Page

5    28.

6    BY MS. HARRIS:

7    Q.  Do you see there in part 2 A, it lists under direct owners

8    and executive officers, chief executive officer, chief

9    financial officer, chief operations officer, chief legal

10   officer, do you see that?

11   A.  Yes, I do.

12   Q.  Is that the definition that you were referring to?

13   A.  This is one definition.  I simply don't recall offhand,

14   under the definitional section of the Form ADV, there also

15   might be additional definitions of some of these individuals.

16   Again, I just don't remember.

17   Q.  Do you think it would probably be consistent with this

18   definition in that it is asking for the executives of the

19   company.  Is that right?

20   A.  Yes, under the title direct owners and executive officers,

21   yes, it would be consistent with that.

22   Q.  Further down that page, it also lists, asks that the

23   investment adviser list direct, in the case of a corporation,

24   that is, the direct owners -- sorry.  Withdrawn.

25              For direct owners of a corporation, the form looks to

I66JGAL4                      Laby - cross

1    those who own at least 5 percent of the voting shares of the

2    investment advisory firm, right?

3    A.  I believe that's correct, yes.

4    Q.  So in the course of filling out this form, the investment

5    adviser lists these individuals and entities that meet criteria

6    that are specified in the form, right?

7    A.  Yes, for this particular question, it does, yes.

8    Q.  Then they're asked to indicate whether or not those

9    individuals are control persons.  Is that right?

10   A.  I just don't recall if that is the way the question is

11   phrased.  You might be right.

12   Q.  We can turn to the next page to take a look at that if that

13   would be helpful?

14   A.  Sure.

15            MS. HARRIS:  Turning, Mr. Jackson, if you could

16   highlight Point 7 A.  If you can actually expand that box just

17   a little bit, just above.

18   BY MS. HARRIS:

19   Q.  So it asks in the control person column, you indicate "yes"

20   if the person has control as defined in the glossary of terms

21   to Form ADV and enter "no" if the person does not have control.

22            Is that right?

23   A.  Yes, that's right.

24   Q.  We'll get to this a little bit later, but just to be clear,

25   at this stage you're only indicating whether or not the people

1   who are direct owners or executive officers are control people.

2            Is that right?

3   A.  I am sorry.  Your question trailed off.  Ask again.

4   Q.  Sorry about that.

5            At this stage, the investment adviser is only

6   indicating whether or not the people who are listed in that

7   portion of the form are control people.  Is that right?

8   A.  I believe that's what 7 A is asking for, yes.

9   Q.  Then there is a second part of the disclosure that we

10  discussed earlier, and that is indirect owners.  Is that right?

11  A.  Yes, that's correct.

12           MS. HARRIS:  If you could turn to Page 30,

13  Mr. Jackson.

14  Q.  Here again the form lists specific ownership thresholds

15  that trigger disclosure.  Is that right?

16  A.  Yes.

17  Q.  And in the case of a corporation, that threshold is 25

18  percent or more of the company's voting shares.  Is that right?

19  A.  Yes, although we're now talking about indirect owners.

20  Q.  Exactly?

21  A.  We're talking about a corporation that owns another

22  corporation that is the owner of the advisory, yes.

23  Q.  Exactly.

24  A.  Yes.

25  Q.  The investment adviser fills out out information all the

I66JGAL4                       Laby - cross

1    way up the ownership chain as you just mentioned, right?

2    A.  I am not sure what you mean by all the way up the ownership

3    chain.  I think it is asking for both direct owners and then

4    indirect owners.

5                 (Continued on next page)

I667GAL5                        Laby - Cross

1    BY MS. HARRIS:

2    Q.  So, in the event an indirect owner is in turn owned by

3    another company, you'd indicate the ownership -- you'd indicate

4    the individuals who qualify under the definitions of ownership

5    in this section; is that right?

6    A.  No, I'd have to go back and take a more careful look to

7    determine how many levels back the advisor has to go, as it

8    were, with respect to indirect owners.  I just don't --

9    Q.  Turning to point 3 on the form right there, is that what

10   it's describing?

11   A.  Yes.  Can I take a look at that for a second?

12   Q.  Of course.

13   A.  Yes, the instruction indicates here how far back to go, as

14   it were, with respect to indirect owners.

15   Q.  And it also indicates there that once a reporting company

16   is reached, no further ownership need be given; is that right?

17   A.  That's what it says, yes.

18   Q.  And just as we saw with the direct ownership chart --

19   turning to the next page, Mr. Jackson -- here again it asks

20   that for any individual or entity that you're listing, and that

21   qualifies under those specific ownership thresholds, that you

22   indicate whether or not that person is a control person; is

23   that right?

24   A.  Yes, that's what this is asking for under item 7.

25   Q.  And it refers to the glossary of terms to the form ADV.  Do

I667GAL5                        Laby - Cross

1   you see that in point 7?

2   A.  Yes, I see it.

3   Q.  And are you familiar with the glossary of terms in the form

4   ADV?

5   A.  I'm generally familiar with it, yes.

6   Q.  And the glossary states -- again consistent with what we

7   saw earlier in the definition -- that officers, partners and

8   directors exercising executive responsibility are presumed to

9   have control.  Is that right?

10  A.  I don't recall the specific language.  I'd have to take a

11  look.  I don't doubt what you're saying, but I don't remember.

12  Q.  Well, let's turn to -- Mr. Jackson, if you could pull up

13  4757.  Sorry, just for the court and the attorneys and the

14  witness.

15          Professor Laby, do you recognize this as the general

16  instructions that accompany the form ADV?

17  A.  I do.

18  Q.  And, Mr. Jackson, if you could turn to page 28 -- sorry,

19  27.

20          Do you recognize this as the glossary of terms that

21  accompanies the form ADV?

22  A.  Yes, I do.

23          MS. HARRIS:  Your Honor, if we could publish this to

24  the jury as a demonstrative.

25          MR. QUIGLEY:  No objection.

I667GAL5                         Laby - Cross

1    Q.  Turning back to 28, do you see point 9 there the definition
2    of control?
3            And, Mr. Jackson, if you could highlight in
4    particular, I'm sorry, the first two bullet points under
5    control.  Actually you can down point 9 and the first two
6    bullet points.  That would be great.
7            And professor Laby, this indicates that the firm's
8    officers, partners, directors, exercising executive
9    responsibility are presumed to control the firm; is that right?
10   A.  May I read it just for one moment?
11   Q.  Of course, yes.
12           THE COURT:  Just let me know when it would be a good
13   time to take our afternoon break.
14           MS. HARRIS:  Whenever is convenient for your Honor, of
15   course.
16           THE COURT:  So, we will take a quick break.  Please
17   remember don't discuss the case, and keep an open mind.
18           (Continued on next page)
19
20
21
22
23
24
25

1          (Jury not present)

2          THE COURT:  Why don't we come back no more than ten

3     minutes.

4          MS. MERMELSTEIN:  Could we raise a quick scheduling

5     matter?  We have one more witness, who we had frankly as you

6     know, worried we wouldn't get through.  I now fear we're going

7     to end a little bit early.  The next witness is Raycen Raines,

8     and if we put him on now, we're not going to finish, and then

9     there are witnesses who have to testify Monday, so I'm inclined

10    to say we should just finish at whatever time.  We're trying to

11    be efficient, but I think it just doesn't make sense.

12         THE COURT:  That's fine, so we will just do that.

13         MS. MERMELSTEIN:  Thank you, your Honor.

14         (Recess)

15         THE COURT:  While we're waiting.  Do you want to tell

16    me what issues you need rulings on for next week.

17         MS. MERMELSTEIN:  Sure, your Honor.  So, I don't think

18    there has been a final ruling on the Francisco Martin gold bar

19    issue.  I will note the witness is here, but given where we

20    are, I don't think it matters unless anyone objects.

21         The lending --

22         THE COURT:  I'm inclined to keep the gold bars out of

23    the cross of Francisco Martin, but go ahead.

24         MS. MERMELSTEIN:  The lending issue --

25         (Continued on next page)

1        (Jury present)

2        THE COURT:  Thank you.  You can be seated.

3        You may proceed.

4        MS. HARRIS:  Thank you, your Honor.  Mr. Jackson, if

5    we could pull up the demonstrative that we were just looking

6    at, the form ADV glossary.

7    Q.  Professor Laby, focusing on again point 9 where we left

8    off, the definition of control, would you agree that this

9    definition gives a few examples of potential sources of

10   control; is that right?

11   A.  May I just read it?  That's where I think we left off.

12   Q.  Of course.

13       And, Mr. Jackson, you can pull up the entire

14   definition there.

15   A.  Yes, this is the SEC's definition of control, that's right,

16   for purposes of the form ADV.

17   Q.  For purposes of the form ADV.  And it states that officers,

18   partners and directors exercising executive responsibility are

19   presumed to have control; is that right?

20   A.  Yes, that's correct.

21   Q.  And turning to another example in that list there, in the

22   case of a corporation, a person with 25 percent of a

23   corporation's voting rights is presumed to have control; is

24   that correct?

25   A.  I'm sorry, just bear with me for one second.  Yes, that's

I667GAL5                       Laby - Cross

1   right.

2   Q.  And would you agree that nonvoting shares do not create a

3   presumption of control under this definition?

4   A.  Sorry.  Can you ask the question again.

5   Q.  Of course.  Would you agree that nonvoting shares do not

6   create a presumption of control in the case of this definition?

7   A.  Yes, under this definition I would agree with you.  That

8   doesn't necessarily mean that that person would never be in a

9   controlling position, but under this definition that's correct.

10  Q.  So for the purposes of the form ADV and the definition of

11  control that the form ADV provides, nonvoting shares do not

12  create a presumption of control, correct?

13  A.  Nonvoting shares alone do not create that presumption,

14  that's correct.

15  Q.  And you would agree also that none of these examples

16  describes ad hoc influence; is that right?

17  A.  Well, I'm not sure that's quite right, because the first

18  bullet indicates that each of the firm's officers, partners or

19  directors exercising executive responsibility, or persons

20  having similar status or functions, are presumed to control, so

21  I'm not sure exactly what you mean by ad hoc, but this suggests

22  that if somebody who doesn't have that formal title generally

23  exercises a similar function, then they are presumed to have

24  control.

25  Q.  Sure.  And a similar function, just looking at that list

I667GAL5                          Laby - Cross

1    for a moment, officers, partners or directors, that describes

2    generally people with formal legal duties toward a corporate

3    organization; is that right?

4    A.  It does include individuals with formal legal duties.  I

5    think it would also include those with business duties as well,

6    not just legal.

7    Q.  Sure.  So day-to-day responsibilities that are akin to

8    those of a firm's officers or partners or directors; is that

9    right?

10   A.  It can be day-to-day, although in the case of directors

11   they typically don't have day-to-day responsibility, they have

12   more strategic responsibility.

13   Q.  Sure.

14   A.  So I think it can be both.

15   Q.  And supervisory authority; is that right?

16   A.  That's right.

17   Q.  Now, professor Laby, I'd also like to ask you a few

18   questions about the concept of liquidity.

19   A.  Sure.

20   Q.  Now, liquidity or a liquid investment, that can mean a

21   number of different things; is that right?

22           MS. MERMELSTEIN:  Objection, your Honor.

23           THE COURT:  Overruled.

24   A.  I'm not sure I would say it means a number of things.  I

25   have an understanding of liquidity.  I'm not sure that I would

I667GAL5                      Laby - Cross

1    agree that it means a number of things.

2    Q.  Of course, I will rephrase the question to make it a little

3    bit clearer.  It can mean something as straightforward as cash

4    on hand; is that right?

5    A.  No, I wouldn't define liquidity as quote cash on hand.

6    That's not how I would define or describe liquidity.

7    Q.  So maybe to put it a different way, if the company has "a

8    lot of liquidity," you'd understand that to mean that the

9    company has a lot of available cash; is that right?

10             MS. MERMELSTEIN:  Objection to beyond the scope, your

11   Honor.

12             THE COURT:  Is this something you feel qualified to

13   answer?

14             WITNESS:  I feel qualified to talk about liquidity

15   generally, yes.

16             THE COURT:  OK, overruled.  You can answer that

17   question.

18   Q.  Would you like me to repeat the question?

19   A.  Yes, please.

20   Q.  If a company has a lot of liquidity, you would understand

21   that to mean that the company has a lot of available cash; is

22   that right?

23   A.  It could mean that.  That's not how I generally view the

24   term liquidity.  I'm not suggesting it never means that, but it

25   might or it might not.

I667GAL5                          Laby - Cross

1   Q.  Mr. Jackson, could you pull up just for the court, the

2   lawyers and the witness what has been marked as DX4791 for

3   identification at page 49.

4               MS. MERMELSTEIN:  One more time?

5               MS. HARRIS:  That's DX4791 at pdf page 49.

6               And if you could highlight at line 2 -- I'm sorry --

7   from line 2 to line 5 I think it is -- or line 6.

8               And, your Honor, I'd ask to move this in as DX4791 for

9   impeachment.

10              MS. MERMELSTEIN:  Objection, your Honor.  I don't

11  think it's inconsistent.

12              THE COURT:  I'm sorry.  Is this his deposition?

13              MS. HARRIS:  No, this is prior testimony, your Honor.

14              THE COURT:  No, I don't think it should be admitted.

15  Q.  Well, professor Laby, does that refresh your recollection

16  that in general you would understand a company that has a lot

17  of liquidity to mean that the company has a lot of available

18  cash?

19  A.  I think -- what's the question?  What's the question you're

20  asking?

21  Q.  So my question is:  If I say that a company has a lot of

22  liquidity, would you understand that to mean that the company

23  has a lot of available cash?

24  A.  As I said earlier, I think it can mean that; it depends on

25  the circumstances.  When I think about the term liquidity, the

I667GAL5                         Laby - Cross

way I understand the industry and the way I teach that term in

my securities regulation class and my business organizations

class, it means something a bit different, but again it could

mean this depending on the circumstances.

Q.   And we can talk about a couple of other meanings that might

be assigned to liquidity.  I just wanted to address this one in

particular first.

So, moving on to the other potential definitions of

liquidity, would you agree that it could also mean the ease by

which a stock or bond is bought and sold?

A.   Yes, I would agree that that's generally what the term

liquidity refers to.

Q.   And so if I describe a stock as illiquid, that would just

mean that there aren't as many buyers and sellers for that

particular stock; is that right?

A.   Right, there are not as many buyers and sellers in the

market, that's correct.

Q.   And the same would be true for a bond.  There is no

distinction between the two of them for the purposes of

describing them as liquid or illiquid, right?

A.   I would generally agree with that, yes.

Q.   And there is nothing inherently unusual about illiquid

investments, is there?

A.   There is nothing unusual about them, no.

Q.   Private equity investments are typically illiquid; is that

1    right?

2    A.   I'm not necessarily an expert on the precise liquidity of

3    private equity investments, but I have heard generally speaking

4    that those kinds of investments tend to be less liquid than

5    other kinds of investments.

6    Q.   And real estate is also typically thought of as an illiquid

7    investment; is that right?

8    A.   That is correct.

9    Q.   So in calling a particular investment illiquid, we're not

10   actually talking about whether an investment is a good

11   investment or a bad investment; is that right?

12   A.   Again that depends on the circumstances, and it depends on

13   the investor.  For certain investors an illiquid investment

14   might not be appropriate and therefore might be considered a

15   bad investment.

16   Q.   Sure.

17   A.   But that doesn't mean that qualitatively it's a bad

18   investment.  Again, these questions all depend on the context.

19   Q.   So you're distinguishing between suitability on the one

20   hand and the profitability of the investment on the other; is

21   that right?

22   A.   Right, exactly.  So for some kinds of clients the lack of

23   liquidity might mean that the investment is not a good

24   investment for that investor.

25   Q.   But putting aside the question of suitability, with respect

1    to just the potential for profitability, an illiquid investment

2    could also be a profitable investment, correct?

3    A.  Yes, correct.

4            MS. HARRIS:  Your Honor, if I could have just one

5    moment.

6            THE COURT:  Yes.

7            MS. HARRIS:  I have no further questions, your Honor.

8            THE COURT:  Any additional cross-examination?

9            MR. TOUGER:  Very briefly, your Honor.

10   CROSS EXAMINATION

11   BY MR. TOUGER:

12   Q.  Good afternoon, professor Laby.

13   A.  Hello.

14   Q.  By the way, my son is a proud grad of Rutgers University,

15   so thank you.

16   A.  I didn't hear what you said.

17   Q.  My son is a proud graduate Rutgers University, so thank

18   you.

19          Your whole testimony had to do with the regulations

20   and responsibilities of investment managers, correct, and

21   investment advisors?

22   A.  I think it also had to do with the customs and practices of

23   investment advisors.

24   Q.  Of investment advisors, right?

25   A.  I think generally we were speaking about investment

I667GAL5                          Laby – Cross

1    advisors, yes.

2    Q.  If somebody isn't an investment advisor, then they're not

3    subject to the same rules that you went through on your direct,

4    correct?

5    A.  Well, that's not necessarily the case.  I talked a little

6    bit about fiduciary duties.  Those duties and obligations apply

7    in a number of instances, not only to investment advisors.

8    Q.  OK.  If somebody is a coinvestor and not an advisor but an

9    investor, they don't have any fiduciary responsibility to the

10   other investor.

11   A.  That depends on the circumstances.  If they're partners in

12   a partnership and coinvest --

13   Q.  No, they have no relationship whatsoever, they're just two

14   people investing in the same thing.

15   A.  Two people who are investing in the same thing typically

16   don't owe fiduciary duties, but again they might.  It just

17   depends on the facts and circumstances.

18   Q.  But in general your testimony concerns the duties and

19   responsibilities and fiduciary responsibility of an investment

20   manager and advisors to their clients.

21   A.  Yes, I think generally the questions were about advisors,

22   if I recall.

23   Q.  And that's what you were talking about on direct.

24   A.  Yes, that's correct.

25            MR. TOUGER:  Nothing further.

1    THE COURT:  Anything, Ms. Notari?

2    CROSS EXAMINATION

3    BY MS. NOTARI:

4    Q.  So, professor, basically what you're saying is that the

5    determination as to whether someone has a fiduciary duty as an

6    investment advisor is a fact-based inquiry, correct?

7    A.  Oh, no, that's not what I said.

8    Q.  Well, it's a determination based on multiple factors.

9    A.  No, that's not correct.  So there is no question that

10   investment advisors, as the term is defined -- and I defined it

11   during my direct examination -- that advisors, those persons

12   and firms owe a fiduciary duty to their clients.

13   Q.  OK.  And whether someone rises to the level of being an

14   investment advisor is a determination based on certain factors.

15   A.  Well, it's a defined term.

16   Q.  There is not just one standard, correct?

17   A.  There is a definition under the federal securities laws.

18   It's in Section 202(a)(11) of the relevant statute.  We can

19   look at that definition which I gave during my examination and

20   then make a determination if somebody qualifies as an

21   investment advisor under that definition.

22   Q.  In this case the government did not review the facts of

23   this case with you, correct?

24   A.  That's correct.

25   Q.  You don't know what my client, Bevan Cooney, you don't know

1    what he is charged with, correct?

2    A.  I do not.

3    Q.  You don't know any facts about his case.

4    A.  I do not.

5    Q.  And you don't know whether -- if -- withdrawn.

6           No further questions.

7           THE COURT:  All right.

8           MS. MERMELSTEIN:  Very, very briefly, your Honor.

9    REDIRECT EXAMINATION

10   BY MS. MERMELSTEIN:

11   Q.  Mr. Jackson, would it be all right if I asked you to pull

12   up 4757.  Thank you.

13          While we're doing that, let me ask you, professor

14   Laby, you were asked a fair number of questions on

15   cross-examination about if people work at a firm that's an

16   investment advisor are themselves an investment advisor.  I

17   just want to make sure I understood what you said.  Clerical

18   staff, someone who answers the phones, or an IT person, doesn't

19   have fiduciary duties just because they work at a place that's

20   an investment advisor.  Have I gotten that right?

21   A.  That's correct.

22   Q.  But people who directly give advice to the clients, or who

23   participate in the business of giving advice to clients, have

24   those same fiduciary duties as the firm.

25   A.  Yes, that's correct.  I think I used the phrase "involved

1    with the giving of advice," those individuals would also be

2    considered fiduciaries.

3    Q.  Mr. Jackson, can we go to page 28 of this, please.

4           So, we were looking earlier at the definition of

5    control, and you were asked a fair amount about the bullet

6    points underneath the sort of intro section to control.

7           The control definition itself though says the power

8    directly or indirectly to direct the management or policies of

9    a person, whether through ownership of securities, by contract,

10   or otherwise.

11          So, the notion of control is not sort of a

12   bureaucratic notion of what you're technical title is, right?

13   It's someone who exerts control over the investment advisor has

14   to be disclosed.  Am I right about that?

15   A.  Yes.

16          MR. SCHWARTZ:  Objection to form.

17          THE COURT:  Overruled.

18   Q.  Go ahead, professor Laby.

19   A.  Yes, that's right.  As you can see, it says the power

20   directly or indirectly to direct the management or policies,

21   whether that's in some formal way through owning securities,

22   whether that's a formal contract that the parties have signed,

23   or otherwise, meaning in some other way, shape or form.

24   Q.  And the bullet points that follow give presumptions where

25   in certain circumstances by virtue of position there is going

I667GAL5                     Moore - Direct

1    to be a presumption that a person is exercising control, right?

2    A.  Yes, that's correct.

3    Q.  Those bullet points are not a limitation on who is deemed

4    to exercise control, right?

5    A.  I don't believe so, no, they are not a final list.  They

6    are simply examples, as I think was indicated during my other

7    questions and answers.

8            MS. MERMELSTEIN:  Nothing further, your Honor.

9            THE COURT:  Any other questions?

10           All right.  Thanks, you can step down.  Thank you.

11           (Witness excused)

12           THE COURT:  You can call your next witness.

13           MS. MERMELSTEIN:  The government calls Clifford Moore.

14    CLIFTON MOORE,

15        called as a witness by the government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. MERMELSTEIN:

19   Q.  Good afternoon, Mr. Moore.

20   A.  Good afternoon.

21   Q.  Where do you currently work?

22   A.  Michelin Tire Company.

23   Q.  And what is the Michelin Tire Company?

24   A.  We're a manufacturer of tires that operates all over the

25   world.

I667GAL5                          Moore - Direct

1   Q.  And what kind of tires does Michelin make?

2   A.  Primarily car and truck tires, but pretty much anything

3   with tires from bicycles to the space shuttle.

4   Q.  Approximately how many employees does Michelin have in the

5   United States?

6   A.  Approximately 16,000.

7   Q.  And in what areas do those employees principally work?

8   A.  Most of them are manufacturing employees.

9   Q.  Meaning they actually make the tires.

10  A.  That's right.

11  Q.  When did you begin working at Michelin?

12  A.  In August of 2000.

13  Q.  And what is your current title?

14  A.  I am the portfolio manager and chief investment officer for

15  the Michelin retirement plans.

16  Q.  And how long have you held that title?

17  A.  Since 2013.

18  Q.  Did you begin your career at Michelin in a financial role?

19  A.  No, I have an undergraduate degree in engineering, and I

20  started working in research and development working on

21  industrializing new materials for making tires.

22  Q.  When did you transition to working in a financial role?

23  A.  In 2005.

24  Q.  You mentioned the Michelin pension fund.  What is the

25  Michelin pension fund?

1    A.  It is a retirement plan that's a defined benefit plan, and

2    it's a benefit provided to employees that gives them income in

3    retirement, and the amount they get is based on the number of

4    years they worked and their average salary.

5    Q.  And what is a defined benefit plan?

6    A.  It's a type of retirement plan where there is a formula

7    that determines the benefit, based on salary and years of work,

8    and there is different forms that a person can take that

9    benefit in, but typically it would be a payment for the rest of

10   their life.

11   Q.  Approximately how many current and former Michelin

12   employees are covered by the pension plan?

13   A.  It's approximately 25,000.

14   Q.  Generally speaking, what types of employees are covered by

15   the pension plan?

16   A.  Again it would mostly be manufacturing employees.

17   Q.  What is the typical monthly payment to a retiree under the

18   plan?

19   A.  It would vary a lot with how many years they worked, but on

20   average about $2,000 per month.

21   Q.  Now, who is responsible for Michelin's pension plan?

22   A.  There is a pension board that is the named fiduciary, so

23   they have primary responsibility, so that's made up of some

24   senior executives in the company.  Then they delegate

25   responsibility down to an investment committee, which I'm a

1    member of, and then my team, the retirement investment staff,

2    handles the day-to-day management of the fund.

3    Q.   How does Michelin fund the pension plan of its employees?

4    A.   Through contributions made by the company into the fund.

5    Q.   What happens if the contributions that the company has

6    made, the investments don't do well enough to pay out the

7    pensions that are owed?

8    A.   The company would have to make additional contributions to

9    satisfy the benefit payment requirements.

10   Q.   Who makes the decisions about the investment strategies in

11   the pension plan?

12   A.   The investment committee.

13   Q.   And does the investment committee then go out and actually

14   make investments itself, or does it rely on others?

15   A.   We hire external investment managers to make the actual

16   decisions about which securities to buy and sell.

17   Q.   Approximately how many different managers is Michelin using

18   at any one time?

19   A.   Approximately 30.

20   Q.   And what is the total value of all of the assets that are

21   in the Michelin pension plan?

22   A.   It's about $3 billion.

23   Q.   Billion with a B?

24   A.   That's right.

25   Q.   Now, who supervises the managers that work for Michelin?

I667GAL5                           Moore - Direct

1    A.   The investment committee and then myself, as well as my

2    other coworkers.

3    Q.   Let me ask you if you can pull your microphone a little

4    close to you but not too close.

5    A.   All right.

6    Q.   Are you familiar with a fixed income manager?

7    A.   Yes.

8    Q.   What is a fixed income manager?

9    A.   A fixed income manager would buy bonds issued by

10   governments or corporations primarily.

11   Q.   Does Michelin use any fixed income managers?

12   A.   Yes, a lot of our portfolio is invested in fixed income.

13   Q.   Why?

14   A.   Fixed income is a good choice for a pension plan because

15   it's not as volatile as stocks and other types of investments,

16   and it provides a regular cash flow stream that is similar to

17   the benefit payments that need to be made to the participants.

18   Q.   Are you familiar with an asset management firm called

19   Hughes Capital Management?

20   A.   Yes.

21   Q.   How?

22   A.   We were a client of Hughes Capital Management from 1999

23   through 2014.

24             MS. MERMELSTEIN:  Your Honor, I would now like to move

25   in, I understand without objection, the following Government's

1    Exhibits:  130 to 132, 134 to 135, 2607, 136, 927, 2632, 2411

2    and 137.

3              MR. SCHWARTZ:  Could I have that list again.

4              MS. MERMELSTEIN:  Of course, 130 to 132, 134 to 135,

5    2607, 136, 927, 2632, 2411 and 137.

6              MR. SCHWARTZ:  Say the last two again.

7              MS. MERMELSTEIN:  2411 and 137.

8              THE COURT:  No objection?

9              MR. SCHWARTZ:  Give me one second, your Honor.

10             THE COURT:  Sure.

11             MR. SCHWARTZ:  I'm sorry.

12             MS. MERMELSTEIN:  Why don't I lay the foundation for

13   the first one.

14             MR. SCHWARTZ:  There is certainly no problem with the

15   100s.

16   Q.  So let me direct your attention --

17             THE COURT:  So the 100s will be admitted.

18             MS. MERMELSTEIN:  Thank you, your Honor.

19             (Government Exhibits 130, 131, 132, 134, 135, 136, 137

20   received in evidence)

21   Q.  Let me direct your attention to Government Exhibit 130, 132

22   and 134 to 135.

23             Before we start pulling up on the screen, you have a

24   copy set in the binder.  Just take a flip through that set of

25   exhibits.  Are those the agreements, the Hughes agreements

1    between Hughes and Michelin -- and their addendums, I should

2    have said.

3    A.   Yes, it's the investment management agreement and

4    amendments to the agreement.

5    Q.   Let's pull up Government Exhibit 130, please, for the jury.

6         Now, let me ask you, according to this agreement, what

7    kind of manager is Hughes with respect to its work for

8    Michelin?  Paragraph 1 I'm looking at.

9    A.   1?  According to this they are a domestic bond investment

10   manager.

11   Q.   If we can turn to the next page and look at paragraph 4,

12   please.

13        What does this indicate about the nature of Hughes'

14   authority to make investments for Michelin?

15   A.   It indicates they have discretionary authority to choose

16   which investments to purchase or sell.

17   Q.   Does that mean that Hughes could make any investment it

18   wanted for Michelin?

19   A.   No, there were some restrictions in their investment

20   management agreement as well as part of our investment policy.

21   Q.   Let's go ahead to Exhibit B1 to this document, which I

22   think is page 7 in the pdf, Ms.Sheinwald.

23        According to this section of the agreement, what was

24   the investment objective of Michelin's investments through

25   Hughes?

1   A.  It was to replicate the Lehman Brothers

2   Government/Corporate Index.

3   Q.  What was the Lehman Brothers Government/Corporate Index?

4   A.  It was a collection of government and corporate bonds, so

5   it was a list of the bonds that make up the index as well as

6   the percentage amount of each bond that was in that index.

7   Q.  So just so everyone understands, you can't buy the Lehman

8   Index; it's not like a mutual fund.

9   A.  Right.  You could invest in a mutual fund that would track

10  the index, but you can't invest directly in the index.

11  Q.  Index is just a list of various securities and allocations

12  to those securities.

13  A.  That's right.

14  Q.  So when this says that the portfolio is going to be

15  invested in domestic fixed income as an index fund to replicate

16  the Lehman Brothers index, what does that mean about Hughes'

17  direction?

18  A.  It means that they should put together a portfolio that

19  contains bonds that are in that index in such a way that the

20  performance of the portfolio would closely track the index, so

21  they didn't have a goal to outperform the index but just to

22  match it.

23  Q.  Did there come a time that Michelin directed Hughes to move

24  away from this index to a different index?

25  A.  Yes, at some point we changed to the Lehman Brothers Long

1    Government Index.

2    Q.  Let's pull up Government Exhibit 131, please.  Is this what

3    you were talking about when you said it switched to the Long

4    Government Index?

5    A.  Yes.

6    Q.  Now, how does that change the direction of Hughes

7    investing?

8    A.  So this index would only contain U.S. government bonds, so

9    no corporate bonds, and the long indicates it would be bonds

10   that had a maturity of ten years or longer.

11   Q.  So now the only thing that's going to be invested in is

12   U.S. government bonds?

13   A.  That's right.

14   Q.  Let's go back to Government Exhibit 130 for a moment,

15   please, and if we can go to page 11 of the document in the pdf.

16   Let me direct your attention to section 5, portfolio

17   guidelines.  Let me ask you to read paragraph 2.

18   A.  OK.  "For directly held securities, no more than 10 percent

19   of the market value of the account managed on behalf of the

20   master trust may be held in the securities of any one

21   corporation or entity (except U.S. government guaranteed or

22   agency securities, to which no restrictions apply) with the

23   exception of private placement category.

24   Q.  So what does this mean in lay person terms?

25   A.  We were trying to limit our exposure to investments that

I667GAL5                          Moore - Direct

1   could lose significant value, so we didn't want to have any

2   more than 10 percent invested in an entity other than the U.S.

3   government.

4   Q.  And just so it's not confusing, this agreement was before

5   the switch to the index that would only allow government bonds

6   anyway.

7   A.  That's right.

8   Q.  And why is it that there is no limitation on U.S.

9   government bonds?

10  A.  We believe that the probability of the U.S. government not

11  making interest payments and principal payments on their bonds

12  to be extremely low.

13  Q.  Could we turn to the next page, please, and let me ask you

14  to read the paragraph that begins under the paragraph numbered

15  4 that begins "unless".

16  A.  "Unless authorized in specific manager guidelines, managers

17  may not sell securities short, buy securities on margin, buy

18  private placements or restricted securities, borrow money or

19  pledge assets, nor buy or sell financial futures, options,

20  commodities or currencies."

21  Q.  And why did Michelin preclude private placements or

22  restricted securities?

23  A.  Private placement securities have limited documentation.

24  They are not rated by a rating agency, so they are less liquid.

25  There is less buyers and sellers; it can only be bought by

I667GAL5                    Moore - Direct

1    qualified investors, and so we wanted to limit our exposure to

2    those.

3    Q.  Now I want to look briefly at the Hughes portfolio for

4    Michelin in the spring of 2015.

5              Mr. Schwartz, am I OK on 2607?

6              MR. SCHWARTZ:  Yes.  Can I talk to you for one second?

7              MS. MERMELSTEIN:  Of course.

8              Can I have one moment, your Honor?

9              THE COURT:  Sure.

10             If anyone wants to stand and stretch, you are welcome

11   to do so.

12             MS. MERMELSTEIN:  Your Honor, I'm now going to move in

13   on consent 2607, 2632 and 2411.

14             THE COURT:  OK.

15             (Government Exhibits 2607, 2632 and 2411 received in

16   evidence)

17   Q.  In we can now publish 2607, please.

18             Do you recognize this e-mail?

19   A.  Yes.

20   Q.  And what is attached to it?

21   A.  It is a report from Hughes Capital on our portfolio.

22   Q.  And let's go to the actual attachment, please.

23             Now, what is the significance of the green versus the

24   blue bars here?

25   A.  The blue bars are our portfolio, and the green bars are the

I667GAL5                          Moore - Direct

1    index that it is measured against.

2    Q.  What does this indicate in the quality distribution

3    section?

4    A.  In the quality distribution section, it's just showing that

5    99 percent of our portfolio was bonds that were rated AAA and

6    one percent were bonds that were rated AA.

7    Q.  Looking down to the chart at the bottom, what does sector

8    distribution mean?

9    A.  This chart is showing the amount of bonds that were

10   allocated to U.S. government bonds versus U.S. government

11   agency bonds.

12   Q.  And what is the allocation?

13   A.  Let's see if I can make it out.  It looks like 85 percent

14   was U.S. government bonds and 14 percent was U.S. government

15   agency bonds.

16   Q.  Can we turn to the next page.  Let's go one more, actually.

17          OK.  What does this indicate about the holdings of the

18   Hughes portfolio for Michelin in the spring of 2014?

19   A.  It is showing the individual securities that were held in

20   the portfolio, it's a collection of U.S. treasury bonds and

21   U.S. government agency bonds, and then a small allocation to

22   cash.

23   Q.  Did there come a time that you learned that Hughes Capital

24   Management had been acquired?

25   A.  Yes.

1    Q.  How did you learn that?

2    A.  Through a letter.

3    Q.  And do you remember approximately when that was?

4    A.  I believe that was in August of 2014.

5    Q.  Who was the letter from?

6    A.  I'm not sure.  I think the original letter came from

7    Frankie Hughes, the former owner of Hughes Capital Management.

8    Q.  And did you subsequently get a communication from the new

9    owners?

10   A.  Yes.

11   Q.  So let me -- let's pull up Government Exhibit 136, please.

12   Is this that communication?

13   A.  Yes.

14   Q.  OK.  And if we can look at the last paragraph in this

15   page -- actually let's skip to the next page, page 2.  And can

16   I ask you to read the entire third paragraph beginning "With

17   the imposition..."

18   A.  "With the imposition of our socially responsible screen we

19   are precluded from direct or indirect investments in gaming, so

20   many Native American fixed-income opportunities are

21   functionally closed to our strategy.  Accordingly, we

22   identified a non-gaming opportunity in the ten year 5.62

23   percent special limited revenue bonds (taxable) series of 2014

24   (economic development program) of the Oglala Sioux Tribe, OST.

25   The OST has funded a long-term pension plan with the proceeds

1    of the offering.  We participated in the offering for a number

2    of reasons and have a high degree of conviction about the

3    prospect of the OST plan in long-term value creation.  We

4    concluded the yield enhancement of 310 basis points over the

5    curve adequately compensates us for risk.  Accordingly, we made

6    an allocation in your portfolio.  The allocation is within the

7    investment guidelines prescribed by investment management

8    agreement already in place with HCM.

9    Q.  Let me talk about this a little bit more.  Was the

10   allocation within the investment guidelines?

11   A.  It was not.

12   Q.  Now, at the very beginning of that paragraph there is a

13   reference to the Hughes socially responsible screen.  Prior to

14   new management taking over in 2014, had Hughes had a socially

15   responsible focus?

16   A.  They did not.

17   Q.  And what was -- did Michelin have a mandate to make

18   socially responsible investments?

19   A.  We did not.

20   Q.  Is socially responsible investing relevant to the type of

21   fixed income strategy that Hughes was effectuating for

22   Michelin?

23   A.  Not for a U.S. government bond portfolio, no.

24   Q.  Why is that?

25   A.  Because typically socially responsible investing would be

1  related to corporations that have good governance, or are doing

2  things to avoid polluting the environment, things like that.

3  It typically does not pertain to a U.S. government security.

4  Q.  Now, what was your reaction to learning that new management

5  had purchased a Native American bond into the Michelin account?

6  A.  It did not fit with our expectations of what they should be

7  purchasing for this type of account.

8  Q.  Did you have any idea at this point in time how big a

9  purchase had been made?

10  A.  I did not.  All I had was the information in the letter at

11  that time.

12  Q.  Did you have any understanding of whether the investment of

13  the bonds were restricted or had been via a private placement?

14  A.  Not at this point, no.

15  Q.  Did anyone prior to this purchase being put into the

16  Michelin account, did anyone at Hughes ever disclose who had

17  funded Morton and Deary's acquisition of Hughes?

18  A.  No.

19  Q.  Did anyone ever tell you about a relationship between

20  Burnham Securities and Hughes?

21  A.  No.

22  Q.  Did anyone tell you who had served as the placement agent

23  for these Wakpamni bonds?

24  A.  No.

25  Q.  If you had known that the entity that served as the

1  placement agent was also involved in funding the acquisition of

2  Hughes, what would your reaction have been?

3         MR. SCHWARTZ:  Objection.

4         THE COURT:  I will allow that.

5  Q.  You can answer the question.

6  A.  OK.  I would see that as a conflict of interest.

7  Q.  And would it have mattered to you?

8  A.  Yes.

9  Q.  What did Michelin decide to do with respect to its

10  relationship with Hughes in September of 2014?

11  A.  We decided to terminate our relationship with Hughes.

12  Q.  Why?

13  A.  The biggest driver at that point was turnover in the

14  management of the account, so we had had a portfolio manager

15  that we worked with for several years who had left the firm

16  earlier that year, and then the person who took his place

17  decided to leave the company as well in September of 2014, and

18  that was what prompted us to move forward with terminating the

19  relationship.

20  Q.  At the time that you made that decision, had you yet

21  learned about the purchase of the Wakpamni bonds?

22  A.  I had gotten this letter at that point, but I still did not

23  know the exact amount that had been purchased.

24  Q.  And how did you communicate the fact of your termination to

25  Hughes?

I667GAL5                        Moore - Direct

1   A.  By letter.

2   Q.  So maybe I can just pull up 927.

3              OK, Mr. Schwartz?

4              MR. SCHWARTZ:  No objection.

5              MS. MERMELSTEIN:  And we will pull up 927 for

6   everyone, and the government offers 927.

7              THE COURT:  927 will be admitted.

8              (Government Exhibit 927 received in evidence)

9   Q.  And if we can turn to the attachment of that e-mail,

10  please.

11  A.  OK.

12  Q.  Is this the termination letter were you talking about?

13  A.  Yes.

14  Q.  And what is the date of that letter?

15  A.  It is October the 10th, 2014.

16  Q.  Now, if you look at the second paragraph in this letter,

17  you indicate that you have retained Northern Trust Investments

18  to manage the transition of the portfolio.  What does that

19  mean?

20  A.  When we decide to change investment managers we sometimes

21  use a transition manager to transition the account from one

22  manager to the other, and the purpose of that is so that they

23  would sell the securities and buy the new securities for the

24  incoming manager in a cost efficient way.

25  Q.  If you look at the end of that paragraph, you indicate that

I667GAL5                    Moore - Direct

1   you're going to transition to Northern Trust except with

2   respect to the Wakpamni bonds, which you would like for Hughes

3   to dispose of.  Why did you leave that responsibility to

4   Hughes?

5   A.  I gave the list of securities to the Northern Trust

6   transition team, and they tried to find the buyer for this bond

7   but were unable to do so, and so they asked that I have Hughes

8   sell it prior to the termination date.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Let me now turn your attention to Government Exhibit 2632

2  and if we can pull that up, please.  Let's go to the

3  attachment.

4  Q.  This is that same report we looked at before?

5  A.  Right, with an end date of September 30, 2014.

6  Q.  This is the first report following the purchase of the

7  Wakpamni bonds?

8  A.  That's correct, yes.

9  Q.  What is now indicated in the quality distribution section?

10 A.  The portfolio has 87 percent in AAA rated securities, 1

11 percent in AA rated securities, and 11 percent in non rated

12 securities.

13 Q.  If we can turn to Page 4 of this document, probably Page 5.

14        If you look at the entry here for the Wakpamni Lake

15 Community Corporation, which is three lines down the chart,

16 what is the percentage of the portfolio of your portfolio that

17 that makes up?

18 A.  10.54 percent.

19 Q.  We can take that down now.

20        What dollar value does that represent?

21 A.  It is showing about $8.6 million.

22 Q.  Having seen that document, do you have any additional

23 information about the ways the investment was outside the

24 investment parameters?

25 A.  So it was a private placement security which was not

1  allowed for this account and it was also above the 10 percent

2  threshold.

3  Q.  Had you not already decided to fire Hughes, what would the

4  impact have been in learning that the investment had been made

5  not only outside the parameters, but in the size it had been

6  made?

7          MR. TOUGER:  Objection; hypothetical.

8          THE COURT:  I'll allow it.

9  A.  We certainly would ask them to sell the security and we

10  would likely would have terminated the relationship as a

11  result.

12  BY MS. MERMELSTEIN:

13  Q.  You said you directed Hughes to find a buyer for the

14  Wakpamni bonds in October of 2014.  Were they, in fact, sold in

15  October?

16  A.  They were not.

17  Q.  Were they sold in November?

18  A.  No.

19  Q.  December?

20  A.  No.

21  Q.  Have they ever been sold?

22  A.  They have not.

23  Q.  Why not?

24  A.  They were unable to find a buyer for the bonds.

25  Q.  Did you communicate with anyone at Hughes about efforts to

I66JGAL6                        Moore - direct

1    sell the Wakpamni bonds?

2    A.  Yes.

3    Q.  Who was your primary point of contact?

4    A.  Michelle Morton.

5    Q.  Did she offer a consistent plan with respect to how to sell

6    the bonds or did the plan change?

7    A.  It changed several times.  There were different buyers over

8    different periods, and including at one point the Native

9    American tribe indicated was going to purchase the securities

10   back from us, but ultimately none of them ended up working out.

11   Q.  What, if anything, did she tell you about an effort to sell

12   the bonds to an entity called Bonwick?

13   A.  She introduced us to Bonwick as a broker who was going to

14   be involved in the sale, that there was a purchaser that had

15   been identified committed to buying the bonds, and I worked

16   through a gentleman named Devin Wicker.  The stipulation for

17   this buyer was they wanted to have the bond registered through

18   the DTC, and so I had correspondence back-and-forth with them

19   about the sale process.

20   Q.  Would you say that Michelle Morton was generally responsive

21   to your communications about selling the bonds?

22   A.  Not all the time.  There were several instances when I

23   wouldn't hear back from her for several days or a week or

24   longer with an update on what was happening, and then there was

25   also dates that she indicated we would have this done by that

1    would pass and then we would have a new date.

2    Q.  Did there come a time you reported the Wakpamni bond issue

3    in any way?

4    A.  We ask the Department of Labor to investigate Hughes

5    Capital for breach of fiduciary duty related to the purchase of

6    the bond.

7    Q.  Did that in any way change the inability to sell the bonds?

8    A.  No.

9              MS. MERMELSTEIN:  No further questions.

10   CROSS EXAMINATION

11   BY MR. TOUGER:

12   Q.  Good afternoon, sir.

13   A.  Good afternoon.

14   Q.  Did you ever communicate with John Galanis?

15   A.  I have not.

16   Q.  In person or email or telephone?

17   A.  Not in any form.

18   Q.  Did you say the total worth of the Michelin Pension Fund is

19   worth how much?

20   A.  Approximately $3 billion.

21   Q.  3 billion with a B, correct?

22   A.  That's right.

23   Q.  And the total investment in the bonds was?

24   A.  Approximately 8 million.

25   Q.  And that would be less than 2/100s of a percent of your

I66JGAL6                          Moore - cross

1    investment?

2    A.  It is a little less than a quarter of a percent, I think,

3    yes.

4            MR. TOUGER:  Nothing further, your Honor.

5            THE COURT:  Any other cross?

6    CROSS EXAMINATION

7    BY MS. NOTARI:

8    Q.  I just have a couple very quick questions.  We never spoke,

9    correct?

10   A.  We have not.

11   Q.  And my client is Mr. Bevan Cooney who is seated over there.

12   You have never met with Mr. Cooney, correct?

13   A.  I have not.

14   Q.  You never corresponded with him?

15   A.  I have not.

16   Q.  You have never spoken to him on the telephone?

17   A.  I have not.

18           MS. NOTARI:  No further questions.

19           THE COURT:  Mr. Wenner.

20   CROSS EXAMINATION

21   BY MR. WENNER:

22   Q.  Good afternoon, Mr. Moore.

23   A.  Good afternoon.

24   Q.  I represent Devon Archer.  Have you ever met Devon Archer?

25   A.  I have not.

I66JGAL6                        Moore - cross

1    Q.  Have you ever spoken or corresponded with Devon?

2    A.  I have not.

3    Q.  You spoke briefly about your interactions with Michelle

4    Morton, and you spoke about the possibility for Bonwick Capital

5    to acquire the bonds.  Do you recall testifying about that?

6    A.  Yes.

7    Q.  Did Michelle Morton ever tell you in a telephone

8    conversation that Hugh Dunkerley was going to buy the Wakpamni

9    bonds?

10   A.  I don't recall her ever telling me that, no.

11           MR. WENNER:  Mr. Jackson, are you able to pull up,

12   please, 3525-4.

13   BY MR. WENNER:

14   Q.  Mr. Moore, did you tell the government that Michelle Morton

15   in a telephone conversation told you that Hugh Dunkerley was

16   going to buy the bonds?

17   A.  I don't recall telling the government that, no.

18           MR. WENNER:  Mr. Jackson, could you turn to Page 7,

19   please.  Would you expand the 5th paragraph, please.

20   BY MR. WENNER:

21   Q.  Mr. Moore, I'm focused on the second sentence, but why

22   don't you take a moment to read that paragraph.

23   A.  (Pause)  Okay.

24   Q.  Mr. Moore, does that refresh your recollection that you

25   told the government that Ms. Morton in a telephone conversation

I66JGAL6                    Moore - recross

1    told you that Hugh Dunkerley was going to buy the Wakpamni

2    bonds?

3    A.   I don't recall telling them that.  I may have, but I don't

4    recall it.

5               MR. WENNER:  Thank you very much, Mr. Moore.  Have a

6    great weekend.

7               THE WITNESS:  Thank you.

8    REDIRECT EXAMINATION

9    BY MS. MERMELSTEIN:

10   Q.   Is $8 million, maybe two, is $8 million a lot for the

11   Michelin Pension Fund?

12              MS. NOTARI:  Objection.

13              MR. TOUGER:  Objection.

14              THE COURT:  I'll allow that.  Go ahead.

15   A.   It is small as a percentage of assets, but I think $8

16   million is a lot of money for anybody.

17   Q.   Do you have to make a lot of tires to make $8 million?

18   A.   Yes.

19              MR. TOUGER:  Objection.

20              MS. NOTARI:  Objection.

21              THE COURT:  Sustained.

22              MS. MERMELSTEIN:  Nothing further.

23              THE COURT:  Anything else?

24   CROSS EXAMINATION

25   BY MR. TOUGER:

I66JGAL6

1    Q.  Had Michelin tires ever failed to make a payment to one of

2    its employees?

3                MS. MERMELSTEIN:  Objection.

4                THE COURT:  Sustained.  You may step down.

5                (Witness excused)

6                THE COURT:  Does the government have any additional

7    witnesses today?

8                MS. MERMELSTEIN:  No, your Honor.

9                THE COURT:  Ladies and gentlemen, I want to talk for a

10   minute about the schedule.  I am sorry that we had a couple of

11   short weeks.  I know you want to get on with your lives, and we

12   are doing our best to have that happen.  Some things couldn't

13   be avoided.

14               For next week, we're sitting Monday through Wednesday.

15   On Monday, we'll sit 9:30 to 5:00.  On Tuesday, 9:30 to 5:30.

16               JUROR:  Sorry.  Slow down.

17               THE COURT:  Sorry, sorry, sorry.  Monday, the 11th,

18   we'll sit 9:30 to 5:00 o'clock.  On the 12th, which is Tuesday,

19   we are going to sit 9:30 to 5:30.  On the 13th, we are going to

20   sit 9:30 to 3:00.  Next week we are not sitting on the 14th and

21   the 15th.

22               The week after, assuming we are still going, we can

23   sit every day from 9:30 to 5:30 if it works for you, and if you

24   want to sit on Friday, I am happy to sit on Friday as well, the

25   22nd, if we're still going at that point.  So that is the

I66JGAL6

1   schedule.

2          I want to remind you not to research the case in any

3   way, not to talk about the case, not to talk to the lawyers,

4   whether it is outside of court or even in court, and just keep

5   an open mind and have a nice weekend.  I'll see you on Monday

6   morning.  Thank you.

7          (Jury excused).

8          THE COURT:  Everyone can be seated.

9          First, in term of time, when does the government

10  anticipate it will rest?  I know it is hard to predict cross.

11         MS. MERMELSTEIN:  We have not been good at predicting

12  the cross so far.  I think that we will rest probably not the

13  short week, but early the following week.

14         THE COURT:  Early the week after?

15         MS. MERMELSTEIN:  Exactly.

16         MR. TOUGER:  Personally, I have no problem working as

17  late in the evening as the court wants, but when we work late,

18  it really affects Mr. Galanis immensely because he doesn't get

19  back and things in the jail don't move smoothly.  He is 75

20  years' old, and things are starting to wear on him.  On that

21  full week, I don't think he could make it 9:30 to 5:30.  He is

22  willing to try.

23         THE COURT:  We only have one long day.

24         MR. TOUGER:  Next week is not the problem.

25         THE COURT:  Let's see how it goes.  Keep that in mind

I66JGAL6

1     when you're cross-examining people.  Obviously, Mr. Galanis'

2     health is critical and I have tried to be sensitive.

3               MR. TOUGER:  You have been wonderful.  I am using this

4     as informational.  I am not asking for anything in particular.

5               THE COURT:  It may be the government does, indeed,

6     rest early that week.  You may not be in a position to tell me

7     what you expect on the defense case, and I understand that.  At

8     some point I'll want to give the jury an estimate.  I don't

9     think we need to do that now.

10              So in terms of the issues that remain, with respect to

11    Mr. Schwartz's experts, you were beginning to think about if

12    your position changed on who you're going to call.  Do you have

13    any update you want to provide?

14              MR. SCHWARTZ:  Is that where we left things?

15              THE COURT:  I thought so.  I was ready to talk about

16    it.  I thought you had said it depends.  I may not come to

17    that, you may not want to call any of these people.

18              What is still an issue?  What do you need rulings on

19    and what should I prioritize because I want to get you what you

20    need when you need it.  Yes, good night, Mr. Galanis.

21              MR. SCHWARTZ:  I didn't mean to convey, if I did, that

22    we were prepared to edit their testimony now.

23              What I meant to say was I think that it is quite

24    possible, depending on what happens throughout the entirety of

25    the government's case, that we will edit down either the number

I66JGAL6

1        or the expected testimony of our experts.

2                I don't think that those are issues that are

3        implicated by the government's motion.  Their motion is

4        basically:  One, there is some notice issues; and, two, whether

5        those are appropriate subjects of testimony.  I don't think

6        there is anything particularly on which a real opinion is being

7        offered as opposed to just sort of predicate facts that support

8        an opinion, where I am prepared to say right now we're not

9        going to offer that opinion.

10               The one exception may be, and the government doesn't

11       have to answer this question, but it seems to me like they may

12       not be advancing any argument that there was an inappropriate

13       transfer of a restricted security here, and if that's right,

14       then I don't think we need that opinion.  They may not want to

15       commit to that right now, and I understand that.

16               MS. MERMELSTEIN:  I don't think we are prepared to

17       answer right now.  With respect to the defense experts, our

18       concern about the timing was with the effect on Professor Laby.

19       Obviously, we want to have time to prepare for the defense case

20       and we sort of would like to have sort of -- we got a

21       preliminary defense witness list that was I think fairly very

22       comprehensive, in an effort to be careful.  Many of those

23       people --

24               (Multiple voices).

25               THE COURT:  Why don't we talk about that next week?  I

I66JGAL6

1    will deal with the payday lending issue first thing Monday

2    morning.

3              MR. TOUGER:  May we see the court ex-parte?  And I

4    would appreciate it.

5              MS. NOTARI:  We also have an ex-parte issue.

6              MS. MERMELSTEIN:  So I think the outstanding issues

7    then are, just so we are all checking the boxes, are the gold

8    bar issue, the lending issue, and --

9              THE COURT:  I don't think the defendants should cross

10   about the gold bar issue given that I've kept out the context

11   for that activity.  That is my ruling on that.  If you need

12   more reasoning, I will give it to you on Monday.

13             MS. MERMELSTEIN:  There is still the matter of the

14   Cooney recording.

15             THE COURT:  Yes.  I will talk about that early Monday

16   morning as well.  The other thing I think I am waiting for you

17   on, Mr. Schwartz --

18             MR. SCHWARTZ:  When to rest?

19             THE COURT:  Yes.  As I said, I won't promise you I do

20   what you ask.  I understand what your issue is.  My ruling is

21   clear with respect to Mr. Cooney.

22             MR. SCHWARTZ:  It hasn't, and that was also contingent

23   on your Honor's Code Rebel ruling through a large chain of

24   inferences in my edit.  Now I have that ruling, I will let you

25   know by letter in a day or so.

I66JGAL6

1           With respect to the experts, the only thing I will

2     say, there is not an immediacy except in the sense if the

3     government is really a week and a half away from resting and we

4     have to start putting in our cases, it would be help --

5           THE COURT:  We can talk about it first thing Monday

6     morning.  I will tell you the notice issues were not a problem

7     for me.  I had delineations I want to draw.  There are some

8     things I thought were appropriate and some areas where you were

9     getting to the ultimate issue, so I am going to draw some

10    lines.  I can do that with you Monday morning.

11          MR. SCHWARTZ:  Fair enough.  We should, without your

12    ruling, proceed on the assumption that we will have the ability

13    to call the witnesses that we have noticed, although their

14    testimony may have to be adjusted?

15          THE COURT:  That's correct.

16          MR. SCHWARTZ:  Thank you.

17          MR. QUIGLEY:  There was one other pending motion in

18    limine regarding the Government Exhibit 2117 which the defense

19    had moved to preclude, and we had briefed a response.  That is

20    not something --

21          THE COURT:  Remind me what exactly what that is.

22          MR. QUIGLEY:  2117, the email involving Mr. Archer and

23    somebody named Mark Waddington.

24          MR. SCHWARTZ:  There are letters on this.  You don't

25    have to rule right now, but it implicates a variety of issues

I66JGAL6

1    post-Galanis arrest, post this investigation, advice of counsel

2    issues with respect to what was going on during the time of

3    this investigation, which is why I put in a letter specifically

4    on that exhibit when it was marked to us.

5              If it is helpful to your Honor, there are odds and

6    ends like that, we can put them in a quick bullet point letter

7    so nothing gets lost.

8              THE COURT:  That is fine.  Okay.  Why don't we meet at

9    9:00 Monday morning.  There is a discovery issue I am happy to

10   talk to you in terms of your receipt of discovery now that Ms.

11   Morton is out of the case, I am happy to talk about that at

12   sidebar if you still want to talk about that.

13             Anything else?

14             MS. MERMELSTEIN:  By "receipt of discovery," you mean

15   access to what co-defendants have been making available, not

16   sort of --

17             THE COURT:  I think this was spoken about in general

18   terms on the record previously, a search function based on what

19   they already have, nothing implicating the government, but

20   Ms. Morton was providing access in a way that now that she is

21   out, they don't have.

22             MS. MERMELSTEIN:  Understood.

23             THE COURT:  All right.  We'll deal with these issues

24   on Monday.

25             MS. MERMELSTEIN:  Thank your Honor.

I66JGAL6

1                    THE COURT:  Do you want to meet at sidebar.

2                    (Sidebar conference not reported)

3                    (Court adjourned until Monday, June 11, 2018, at 9:00

4        o'clock a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

HUGH DUNKERLEY

Cross By Mr. Schwartz . . . . . . . . . . .1507

Redirect By Mr. Quigley . . . . . . . . . .1525

Recross By Mr. Touger . . . . . . . . . . .1540

Recross By Ms. Notari . . . . . . . . . . .1551

Recross By Mr. Schwartz . . . . . . . . . .1555

Redirect By Mr. Quigley . . . . . . . . . .1557

Recross  . . . . . . . . . . . . . . . . .1560

Redirect By Mr. Quigley . . . . . . . . . .1564

Recross By Mr. Touger . . . . . . . . . . .1565

LEO GRIFFIN

Direct Q. . . . . . . . . . . . . . . . . .1601

Cross By Mr. Wenner . . . . . . . . . . . .1617

Cross By Mr. Touger . . . . . . . . . . . .1619

Cross By Ms. Notari . . . . . . . . . . . .1621

Redirect By Mr. Quigley . . . . . . . . . .1621

Recross By Mr. Touger . . . . . . . . . . .1623

ARTHUR LABY

Direct By Ms. Mermelstein . . . . . . . . .1625

Cross By Ms. Harris . . . . . . . . . . . .1640

Cross By Mr. Touger . . . . . . . . . . . .1662

Cross By Ms. Notari . . . . . . . . . . . .1664

Redirect By Ms. Mermelstein . . . . . . . .1665

1   CLIFTON MOORE

2   Direct By Ms. Mermelstein  . . . . . . . . .1667

3   Cross By Mr. Touger  . . . . . . . . . . .1688

4   Cross By Ms. Notari  . . . . . . . . . . .1689

5   Cross By Mr. Wenner  . . . . . . . . . . .1689

6   Redirect By Ms. Mermelstein  . . . . . . .1691

7   Cross By Mr. Touger  . . . . . . . . . . .1691

8               GOVERNMENT EXHIBITS

9   Exhibit No.                          Received

10   811, 813 . . . . . . . . . . . . . . . .1578

11   917, 925, 938, 943  . . . . . . . . . . .1578

12   1220, 1235, 1267 . . . . . . . . . . . .1578

13   2011, 2018, 2023, 2024, 2026, 2027  . . . .1579

14   2028, 2029, 2030, 2031, 2034, 2035  . . . .1579

15   2069, 2111, 2212, 2213, 2215  . . . . . . .1579

16   2216, 2217, 2224, 2229, 2633 and 2120  . . .1579

17   106, 107, 111, 153, 162, 186, 197, 198, 214 A1603 2609

18   185  . . . . . . . . . . . . . . . . . .1605

19   170  . . . . . . . . . . . . . . . . . .1608

20   171  . . . . . . . . . . . . . . . . . .1615

21   175  . . . . . . . . . . . . . . . . . .1616

22   130, 131, 132, 134, 135, 136, 137  . . . .1672

23   2607, 2632 and 2411  . . . . . . . . . . .1677

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   927   . . . . . . . . . . . . . . . . . .1683

2                        DEFENDANT EXHIBITS

3   Exhibit No.                              Received

4   4722   . . . . . . . . . . . . . . . . .1510

5   1583   . . . . . . . . . . . . . . . . .1519

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25