I6D7GAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                16 Cr. 371 (RA)

JOHN GALANIS, et al.,

           Defendants.

------------------------------x

                         New York, N.Y.
                         June 13, 2018
                         9:40 a.m.

Before:

               HON. RONNIE ABRAMS,

                         District Judge

                 APPEARANCES

ROBERT KHUZAMI,
    Acting United States Attorney for the
    Southern District of New York
BY:  BRENDAN F. QUIGLEY,
    REBECCA G. MERMELSTEIN,
    NEGAR TEKEEI,
       Assistant United States Attorneys

PELUSO & TOUGER
    Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
    Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
    LAURA HARRIS
    CRAIG WENNER

I6D7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              – and –
     O'NEILL and HASSEN
5         Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                         Eric Wissman, Paralegal
                          Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6D7GAL1

1          (Trial resumed, jury not present)

2          THE COURT:  Good morning, everyone.  The jury is here.

3     Can we bring the witness out on the stand.

4          MS. MERMELSTEIN:  Your Honor, before we get started,

5     as we were just discussing, Enrique Santos from our office is

6     going to testify about the report run on Ms. Morton's phone.

7     We have offered to stipulate to the authenticity of the phone

8     but I think defense counsel has some questions they want to ask

9     him, which is fine.

10         This morning we were given for the first time excerpts

11    of the report that the defense intend to offer; they're fairly

12    voluminous.  A cursory review indicates that there is hearsay

13    and other relevance and admissibility issues.  We don't

14    obviously dispute that they're authentic, but there is no way

15    we're going to have time to review the volume of the exhibits

16    that were given to us this morning before he testifies.

17         We have no objection to them being authenticated

18    through him, but we object to them being shown to the jury or

19    offered into evidence until we've had time to review them,

20    which we're not going to do today.

21         THE COURT:  Look, let's just put Mr. Martin on for

22    now, and then we will talk about it.

23         MS. MERMELSTEIN:  Thank you, your Honor.

24         THE COURT:  Thanks.  And this is for the next witness

25    who you're going to call next?

I6D7GAL1

1          MS. TEKEEI:  Mr. Santos is next.

2          THE COURT:  OK.

3          MS. TEKEEI:  We have one additional issue with regard

4    to Mr. Santos.  We can do it now or during the break.

5          THE COURT:  I think during the break.

6          MS. TEKEEI:  OK.  Thank you.

7          THE COURT:  Can that person come back on Monday?  Is

8    that one of the people with the scheduling --

9          MS. MERMELSTEIN:  Mr. Santos?

10          THE COURT:  Yes.

11          MS. MERMELSTEIN:  Yes.

12          THE COURT:  OK.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Good morning, everyone.

3            You may proceed, Mr. Touger.

4     FRANCISCO JOSE MARTIN FERNANDEZ, resumed.

5    CROSS EXAMINATION (Continued)

6    BY MR. TOUGER:

7    Q.  Good morning, Mr. Martin.  Is it Martin or Martine?  I

8    don't want to mispronounce it?

9    A.  It doesn't matter, Martin, Martine.

10   Q.  Just one more question on Calvert.  You opened up that

11   company in England?

12   A.  Excuse me?

13   Q.  You opened up that company in England, correct?

14   A.  Correct.

15   Q.  And England has no privacy protections similar to the

16   Seychelles like where you opened the other corporations?

17   A.  That is my understanding.

18   Q.  England collaborates with the United States as far as that

19   is concerned.

20   A.  That's my understanding, yes.

21   Q.  And you're also familiar with a company called Thorsdale

22   Fiduciary?

23   A.  Yes.

24   Q.  And it's a company related to Jason Galanis, correct?

25   A.  Correct.

I6D7GAL1                    Martin Fernandez – Cross

1    Q.  And basically it's run by Jason Galanis.

2    A.  That is my understanding, yes.

3    Q.  These are all your understandings.  And you opened up bank

4    accounts for Thorsdale?

5    A.  I tried to open bank accounts for Thorsdale, yes.

6    Q.  And you did that based on what Jason told you to do.

7    A.  Correct.

8    Q.  And, by the way, you also know that the actual owners

9    though, the listed owners, are Ralph Berger and Lucas Mann,

10   correct?

11   A.  I have heard those names, but I didn't know they were

12   actual owners.

13   Q.  And Ralph Berger is Mr. Galanis' father-in-law, correct?

14   A.  That's my understanding, yes.

15   Q.  Now, you also know Gary Hirst?

16   A.  Yes.

17   Q.  And you've known him for -- and I'm going back in time as

18   of 2014, not now, right?

19   A.  Correct.

20   Q.  And you knew him in 2014.

21   A.  I didn't know him in 2014; I only knew him by name.

22   Q.  You've heard of him.

23   A.  Yes.

24   Q.  And in 2014 you actually started working with him, correct?

25   A.  After I signed the investment management agreement,

I6D7GAL1                    Martin Fernandez - Cross

1     correct.

2     Q.  And before that, you didn't know him at all?

3     A.  I heard of him, yes.

4     Q.  You had never met him.

5     A.  Never.

6     Q.  But since you've met him, you have had business

7     relationships with him, correct?

8     A.  Correct.

9     Q.  And you worked on investments with him?

10    A.  On one investment.

11    Q.  And you've opened up bank accounts for him and corporations

12    for him?

13    A.  Not for him but for corporations.

14    Q.  That he owned.

15    A.  That he was a co-owner of.

16    Q.  And that he told you -- he gave you the instructions on

17    what to do.

18    A.  He and Jason Galanis, yes.

19    Q.  Jason Galanis and Gary Hirst were working together.

20    A.  Correct.

21    Q.  That's -- not disputing that.

22            And Mr. Hirst actually wrote you a letter of

23    recommendation in April of 2015, correct?

24    A.  I recall, yes.

25    Q.  And he called you, I believe, a person of sterling

1   character and unquestioned integrity.

2   A.  I remember something like that, yes.

3   Q.  And what was that recommendation for?

4   A.  That was for opening the offshore accounts.

5   Q.  OK.  And you also knew a man named Jason Sugarman, correct?

6   A.  Yes.

7   Q.  And you met him through Jason Galanis, right?

8   A.  Correct.

9   Q.  And you just knew him socially though, no business

10  relationship.

11  A.  No direct business relation.

12  Q.  You had hoped there might be a business relationship, but

13  none ever materialized, correct?

14  A.  You could say that, yes.

15  Q.  But you have met him between 2014 and 2016 about four or

16  five times.

17  A.  More around 2000 -- yes, around that time, correct.

18  Q.  And you knew that he and Jason Galanis were working

19  together though, right?

20  A.  Yes.

21  Q.  And you have met Hugh Dunkerley, right?

22  A.  Yes.

23  Q.  When did you first meet Hugh Dunkerley?

24  A.  I don't remember the exact date, but it was shortly after I

25  came back to California.

I6D7GAL1                    Martin Fernandez - Cross

1   Q.  So that would be in 2014, 2015?

2   A.  Around that time.

3   Q.  And you had general business discussions with him, correct?

4   A.  Yes.

5   Q.  And you knew that he worked at Burnham.

6   A.  Yes.

7   Q.  And would I be correct in saying that you've never had any

8   business dealings with John Galanis?

9   A.  That's correct.

10  Q.  And have you heard of a company named Sovereign Nations

11  Development?

12  A.  No.

13  Q.  Now, you have heard of a company called Forces Vives,

14  correct?

15  A.  Yes.

16  Q.  And what is Forces Vives?

17  A.  Forces Vives is a Swiss insurance company.

18  Q.  And it was up for sale, right?

19  A.  That's correct.

20  Q.  And you brought that fact to Jason Galanis.

21  A.  Correct.

22  Q.  Hoping he would buy that company and you could get a

23  commission for the deal, correct?

24  A.  Correct.

25  Q.  And because getting a commission for a deal -- as you know

I6D7GAL1                        Martin Fernandez - Cross

1    as somebody who is involved in the purchasing and sale of

2    companies -- which is called private equity, right?  The

3    purchasing and sale of companies?

4    A.  I wouldn't call it private equity; it's more a business

5    brokerage.

6    Q.  It's common in those businesses that people get commission

7    for bringing successful ideas --

8              MS. MERMELSTEIN:  Objection.

9    Q.  -- to other companies and persons.

10             THE COURT:  I will allow that.

11             Do you feel qualified to answer that?

12             WITNESS:  Can I hear the question again?

13   Q.  Sure.  It's common in that business practice that if you

14   bring a deal to somebody and it's successful, that you get a

15   commission on that deal.

16   A.  That's usually how it works, yes.

17   Q.  And you're not the first person to come up with this idea.

18   This is a known way it works in the area, right?

19             MS. MERMELSTEIN:  Objection.

20             THE COURT:  Sustained.

21             MR. TOUGER:  Your Honor, may I approach?

22             THE COURT:  Sure.

23             (Continued on next page)

24

25

I6D7GAL1                        Martin Fernandez - Cross

1              (At the sidebar)

2              MR. TOUGER:  On direct examination, your Honor, you

3     allowed the government to ask a question about whether they

4     thought this was the right investments for this deal that he

5     had no knowledge of because of his vast experience.  I'm asking

6     a very similar question just on a different topic.

7              THE COURT:  I let him answer the question about his

8     understanding of people got commissions, and then you asked him

9     a more general question about practice, and so I sustained the

10    objection to that.

11             MR. TOUGER:  It's that it's the practice of the

12    business, that's all I want to bring out, that it's not just

13    him, this is what is done.

14             THE COURT:  But my point is that I'm not going to let

15    him speak for other people.  You can ask those questions

16    generally.

17             MR. TOUGER:  OK.

18             (Continued on next page)

19

20

21

22

23

24

25

I6D7GAL1                        Martin Fernandez - Cross

1            (In open court)

2    BY MR. TOUGER:

3    Q.  You've gotten commissions on other deals you brought to

4    other companies and individuals?

5    A.  In the past?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Now, in your experience, what was the going rate for those

9    commissions?  Was it based on a percentage of the deal, or was

10   it a negotiated percentage?

11            MS. MERMELSTEIN:  Objection, your Honor.

12            THE COURT:  Yes, sustained.

13   Q.  How much of your commission that you got on these prior

14   deals, how much did you get relative to the --

15            THE COURT:  Did you get the same commission rate per

16   deal?

17            WITNESS:  No.

18   Q.  So it's a variable rate.

19   A.  That's correct.

20   Q.  And it's basically what you negotiate, right?

21   A.  That's correct.

22   Q.  And so if someone got a 40 percent commission on a deal,

23   that would be really good, right?

24            MS. MERMELSTEIN:  Objection.

25            THE COURT:  Sustained.

I6D7GAL1                    Martin Fernandez – Cross

1    Q.  Did you ever get a 40 percent commission on a deal?

2    A.  Not to my recollection.

3    Q.  Usually the percentage that you got was in the five or six

4    percent range?

5    A.  It's about that, yes.

6    Q.  Now, you knew about FundVest, correct?  Do you know that

7    company?

8    A.  I knew of a company called of Fondinvest, yes.

9    Q.  And you knew it to be a reputable private equity firm,

10   correct?

11   A.  Correct.

12   Q.  And do you know what the term bargain purchase gain means

13   in your business?

14   A.  Can you say that again.

15   Q.  Bargain purchase gain.

16   A.  Never heard of it.

17   Q.  OK.  Do you know -- in your experience, right, people buy

18   companies or corporations by other corporations every day in

19   this world, correct?

20              MS. MERMELSTEIN:  Objection.

21              THE COURT:  I will allow that.

22              Can you answer that?

23              WITNESS:  Can you repeat the question?

24              MR. TOUGER:  Sure.

25   Q.  It's not uncommon for individuals or corporations to buy

I6D7GAL1                      Martin Fernandez – Cross

1   other corporations, correct?

2   A.  Correct.

3   Q.  And deals are rated whether they're good or bad, right?

4   A.  Not necessarily.  Sometimes people buy bad companies.

5   Q.  Right, and they hope to make money later on from those

6   companies increasing in value, right?

7   A.  Correct.

8   Q.  And one of the ways of rating a transaction though

9   immediately upon purchase is a term called the bargain purchase

10  gain, how much money your profits went up from your purchase of

11  that company.

12          MS. MERMELSTEIN:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14  Q.  In this context, do you understand what that means?

15  A.  I don't feel comfortable in saying I do.

16  Q.  OK.  And the higher that profit would be, the better the

17  deal is, right?

18  A.  From the purchaser's view, yes.

19  Q.  Yes, from the purchaser's view.  And so basically the more

20  money the purchaser makes, the better the deal is for him,

21  right?

22  A.  That's correct.

23  Q.  Or the corporation.

24  A.  Correct.

25  Q.  And would you agree with me that a private equity

I6D7GAL1                         Martin Fernandez – Cross

1    investment that brings about $179 million profit the minute

2    it's done is a good deal?

3    A.   It depends on how much you invested.

4    Q.   OK.  If you only invested less than $10 million and you

5    make $179 million the minute the deal is made, is that a good

6    deal?

7              MS. MERMELSTEIN:  Objection to this whole line of

8    questioning, your Honor.

9              THE COURT:  Sustained as to the particular

10   hypotheticals.

11             MR. TOUGER:  I need to approach on it.  I don't really

12   understand.

13             THE COURT:   OK.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I6D7GAL1                    Martin Fernandez – Cross

1           (At the sidebar)

2           THE COURT:  Should we give him different hypotheticals

3     about different deals?

4           MR. TOUGER:  No, no, no, not at all.  In this case

5     there is already testimony that WAH purchased Valor for less

6     than $10 million and received $179 million profit the minute

7     the deal was consummated.

8           MR. SCHWARTZ:  Valorlife.

9           MR. TOUGER:  I mean Valorlife.  The minute WAH

10    purchased Valorlife.

11          All I'm going to ask him.  That's what this is based

12    on, nothing else, no other hypotheticals, no other deals, this

13    is the only one.  It's exactly what they did on direct.

14          MS. MERMELSTEIN:  It's not at all what we did on

15    direct.  The questions here are problematic in two respects.

16          One, they are enormously broad.  There has been a

17    conflation here.  Mr. Touger is asking these questions like in

18    business in general, but there is no in business in general,

19    and the questions are as a result not appropriate.

20          Secondly, this witness was not involved in the actual

21    acquisition of Fondinvest; he doesn't know the terms of the

22    deal, which is why it's being -- he doesn't know the terms of

23    any of these deals, which is why it's being asked in this

24    hypothetical, because he doesn't know.

25          THE COURT:  On direct what did you ask him about?

I6D7GAL1                    Martin Fernandez – Cross

1    What specifically did you get his opinion about?

2              MS. MERMELSTEIN:  I asked as the private equity

3    manager in this transaction whether or not it made sense for

4    the bond deal to be invested in private equity, and I asked him

5    about his understanding that the Fondinvest transaction was

6    funded with proceeds from the bonds.

7              I don't know what the -- I mean if I'm forgetting

8    something, please tell me, but I'm not aware of anything else.

9              MR. TOUGER:  This question has nothing to do with

10   Fondinvest; this question has to do with in this case there is

11   testimony already in the record that WAH purchased Valorlife

12   for less than $10 million and got $179 million profit.

13             THE COURT:  But he had nothing to do with that.

14             MS. MERMELSTEIN:  Right.

15             MR. SCHWARTZ:  He had nothing to do with any of these

16   things.

17             MR. TOUGER:  He had nothing to do with any of these

18   things, your Honor.  He had nothing to do -- we proved that

19   yesterday.  He knew nothing about this deal.  And you let them

20   ask questions do you think it was a good idea for private

21   equity to be invested in this transaction.

22             MR. SCHWARTZ:  The question --

23             Ms. Mermelstein is correct, her question was as the

24   private equity manager did this deal make sense to you.  But

25   their entire thesis is that he was not the private equity

manager; he just lent his name to a piece of paper.  He

testified super clearly that he didn't know anything about the

deal; he hadn't spoken to anyone on the deal; he was just a

name on a piece of paper.  So, it really is exactly the same.

          MS. MERMELSTEIN:  It's not exactly the same.  He

understood that he was being asked to be the investment manager

on a bond transaction, and he was asked about his understanding

of whether or not what he understood about that deal made sense

to him.

          These questions go to aspects of this deal.  He did

not testify about it on direct; he does not know anything about

it.  And there is testimony in the record about it, fair

enough, but not with respect to this witness.  So, these aren't

appropriate hypothetical questions to pose to him.

          MR. TOUGER:  It's not a hypothetical.

          MS. MERMELSTEIN:  It is.  You posed it as a

hypothetical because he doesn't know the real answer.

          MR. QUIGLEY:  It's not -- he's not testifying as an

expert, so it's not obviously expert opinion, and it's not

permissible lay opinion under Rule 701 because he's not being

asked about his own personal experience and involvement.

          MR. TOUGER:  You see, that's exactly what it is.

          THE COURT:  Again, that's different than what you

asked him on direct.

          MS. MERMELSTEIN:  Absolutely, because he was involved

1    in that personally.

2            MR. TOUGER:  You was not involved in it.  Their whole

3    case, your Honor, is that it was fictional.  Their whole case

4    is based on the fact that he being private equity --

5            If they're going to get up there and say he was really

6    the private equity manager, that's a different story.  But

7    they're going to get up there on summation and say that was a

8    whole farce; he wasn't the private equity manager, that's a

9    farce.

10           And yesterday he made very clear that he knew nothing

11   about this deal; he was doing it based on his general

12   experience that private equity should not be done.  And, as a

13   matter of fact, on cross he actually changed his mind once he

14   figured out, once he decided that, oh, yeah, there were other

15   things going on, maybe it would have been a good investment.

16           Now I'm just following that up with if they made $179

17   million profit the minute they walked out of the showroom on

18   the deal, that that's a good deal, and that's all; the

19   questioning ends at that point.

20           MS. MERMELSTEIN:  The questions he was asked on direct

21   related to information that was given to him with respect to

22   the request that he serve as private equity manager and whether

23   or not that information made sense to him.

24           These are questions about information that he has

25   never had, and the reason they're being posed as a hypothetical

I6D7GAL1                        Martin Fernandez – Cross

1    if this, if that, is because he doesn't know; and that's not

2    appropriate for the reasons Mr. Quigley has just said.

3              MR. TOUGER:  Your Honor, he even testified he didn't

4    remember if he had read the document that made him the private

5    equity manager.  He answered that question totally based on his

6    own experience and knowledge in the business world, not on

7    whether this was good or bad in this particular purpose, and

8    that's all I'm asking him right now.

9              THE COURT:  I'm not going to allow it.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. TOUGER:  If you could please read back the last

3     question and answer.

4              (Record read)

5     BY MR. TOUGER:

6     Q.  Now, just to finish off this topic, you would agree with me

7     the higher the profit, the better the deal?

8              MS. MERMELSTEIN:  The same objection, your Honor.

9              THE COURT:  Sustained.

10    BY MR. TOUGER:

11    Q.  Let's switch topics.

12             You would agree with me that part of you being granted

13    immunity here today is based on you telling the truth when you

14    testify here yesterday and today?

15    A.  Yes.

16    Q.  And that if you don't tell the truth, that the deal becomes

17    null and void?

18    A.  Correct.

19    Q.  And if the deal becomes null and void everything, you said

20    here yesterday and today can be used against you in a court of

21    law?

22    A.  Yes.

23    Q.  Whatever happens at that point happens, right?

24    A.  Correct.

25    Q.  By the way, you agree with me that the arbiter of whether

I6DJGAL2                          Martin - cross

1    you're telling the truth or not is the U.S. Attorneys that are

2    sitting at this table, correct?

3    A.   My understanding is the jurors and the attorneys do.

4    Q.   Excuse me?

5    A.   I am not a lawyer so my understanding --

6    Q.   What is your understanding?

7    A.   The jurors and the District Attorney.

8    Q.   Is it your understanding that if the jury acquits these

9    defendants, the immunity deal is off?

10              MS. MERMELSTEIN:   Objection, your Honor.

11              THE COURT:   He can answer as to his understanding.

12              THE WITNESS:   Again I am not a lawyer so I cannot --

13   BY MR. TOUGER:

14   Q.   Is it your understanding that if the jury comes back with

15   an acquittal of any one or all of the defendants, you don't get

16   immunity?

17   A.   No, you know, I am getting confused here with the way

18   you're questioning.

19   Q.   Let's break it down and start again.

20   A.   Okay.

21   Q.   You understand you have to tell the truth, right?

22   A.   Correct.

23   Q.   Someone has to be the arbiter of whether you're telling the

24   truth, right?

25   A.   Correct.

I6DJGAL2                      Martin - cross

1    Q.  It is not you, right?

2    A.  Correct.

3    Q.  It is not me, right?

4    A.  Correct.

5    Q.  It is not anybody sitting at that table, the far table,

6    right?

7    A.  Correct.

8    Q.  Is it your understanding that it is the people sitting at

9    this table decide whether you're telling the truth here

10   yesterday and today?

11   A.  Probably so, yes.

12   Q.  It is the prosecution that paid for your ticket from Spain

13   here to New York?

14   A.  I don't know who ultimately paid for my ticket.  They

15   arranged it.

16   Q.  Are you paying for it?

17   A.  No.

18   Q.  Somebody paid for that ticket, right?

19   A.  Somebody did.

20   Q.  It wasn't me?

21   A.  Not to my knowledge.

22   Q.  It wasn't anybody sitting at that table, right?

23   A.  Correct.

24   Q.  It was the people sitting at this table, right?

25   A.  Again, I don't know if they paid it.  I don't know who did.

I6DJGAL2                         Martin - cross

1    Q.  The government paid for it, right?

2    A.  Correct.

3    Q.  Okay.  The government is paying for your hotel room, right?

4    A.  Correct.

5    Q.  And the government is paying for your ticket back to Spain,

6    right?

7    A.  Correct.

8    Q.  I believe you testified yesterday that once you get back to

9    Spain, you know that the government can't come and get you in

10   Spain, right?

11   A.  That is my understanding.

12           MR. TOUGER:  Have a nice trip back to Spain.

13           MS. MERMELSTEIN:  Objection, your Honor.

14           THE COURT:  All right.  I will strike the last

15   comment.  Any additional cross?

16           MR. SCHWARTZ:  Yes, please.

17   CROSS EXAMINATION

18   BY MR. SCHWARTZ:

19   Q.  Good morning, Mr. Martin.

20   A.  Good morning.

21   Q.  My name is Matthew Schwartz.  I am one of Devon Archer's

22   lawyers.  We have never talked, right?

23   A.  Correct.

24   Q.  To be clear, you've never met Mr. Archer, right?

25   A.  No.

I6DJGAL2                      Martin - cross

1   Q.  I want to ask you a few questions.  I am going to try my

2   best not to go over the things that all the other lawyers have

3   asked you about, okay?

4   A.  Okay.

5   Q.  You have testified at length about the terms under which

6   you're here under immunity.  I don't want to go over that

7   again.  I do want to understand, however, what it is exactly

8   you did wrong that you require immunity for, okay?

9   A.  Okay.

10  Q.  Am I correct that you've admitted here that you failed to

11  file your income taxes in the year 2015?

12  A.  That is correct.

13  Q.  Did you also fail to file your income tax in the Year 2016?

14  A.  I don't recall that.

15  Q.  You have failed to be current on your child support

16  obligations?

17  A.  That is correct.

18  Q.  You have falsified certain records regarding a company

19  called Seymour Capital?

20  A.  Can you be more specific?

21  Q.  Well, did you create any false documents in connection with

22  Seymour Capital?

23  A.  Yes.

24  Q.  Did you also create any false documents in connection with

25  a company called Thunder Valley Engineering?

I6DJGAL2                              Martin - cross

 1   A.  Yes.

 2   Q.  Did you also, in connection with those two companies,

 3   Seymour Capital and Thunder Valley Engineering, tell lies to

 4   certain brokerage firms?

 5   A.  Yes.

 6   Q.  Including Pershing?

 7   A.  Yes.

 8   Q.  And Interactive Brokers?

 9   A.  Yes.

10   Q.  And Ameritrade?

11   A.  Yes.

12   Q.  And Burnham Securities?

13   A.  Yes.

14   Q.  You also falsified certain documents relating to Thorsdale

15   Fiduciary & Trust Company?

16   A.  Yes.

17   Q.  You also falsified documents related to Private Equity

18   Management, LLC, true?

19   A.  Can you be more specific.

20   Q.  Did you create any false documents or tell any lies in

21   connection with Private Equity Management, LLC?

22   A.  It is too broad of a question for me to answer correctly.

23   Q.  Just any, can you think of a single document you falsified

24   or a lie you told?

25   A.  I can't.

1  Q.  Or --

2  A.  I can't.

3  Q.  You can't?

4  A.  I can't.

5  Q.  You also talked a little bit about Calvert, Calvert Capital

6  Limited?

7  A.  Yes.

8  Q.  That was a company you created, correct?

9  A.  Correct.

10  Q.  Am I correct, however, to say that you did not understand,

11  when Jason Galanis instructed you to create that company, that

12  he was going to use it to deceive the SEC?

13  A.  That was my general understanding.  I didn't know that was

14  his understanding.  I didn't know that he was going to do that,

15  no.

16  Q.  You did not know?

17  A.  I did not know.

18  Q.  As far as you knew, he had asked you to create a company,

19  true?

20  A.  That is correct.

21  Q.  And there is nothing wrong with creating a company, right?

22  A.  No.

23  Q.  And what he and Gary Hirst did with that company was up to

24  them, right?

25  A.  Pretty much, yes.

I6DJGAL2                      Martin - cross

1    Q.  That's what I thought.

2              In connection with the bonds, you talked at length

3    about the fact that you signed on paper to be the investment

4    manager for the bonds, true?

5    A.  Correct.

6    Q.  You did not actually receive the bond money to invest,

7    true?

8    A.  Correct.

9    Q.  But am I correct in saying that at the time you did not

10   understand that Jason Galanis was going to steal any of the

11   bond money?

12   A.  At the time I did not know that, no.

13   Q.  You would not have helped him at the time if you understood

14   he was going to steal the bond money, right?

15   A.  Correct.

16   Q.  As you testified yesterday you don't know what happened to

17   the bond money at the end of the day, true?

18   A.  I don't know all the details were, yes.

19   Q.  You also told lies to the FBI?

20   A.  Can you be more specific?

21   Q.  Well, at some of your early meetings and video conferences

22   with the FBI, you said things that were untrue?

23   A.  That can be, yes.

24   Q.  Not that can be; you said some things that were untrue,

25   right?

I6DJGAL2                          Martin - cross

1    A.  Yes.

2    Q.  You said lots of things that were true, right?

3    A.  Correct.

4    Q.  But some things that were untrue?

5    A.  Correct.

6    Q.  When you met by video conference with representatives of

7    the U.S. Attorney's Office about a month later, also you said

8    some things that were not true during that meeting as well,

9    correct?

10   A.  Correct.

11   Q.  Throughout the process that you were beginning to have

12   those conversations with the government in early 2016, you were

13   still in close contact with Jason Galanis, true?

14   A.  Yes.

15   Q.  You talked about that secure, encrypted self-destructing

16   messaging app that you used, right?

17   A.  Correct.

18   Q.  WICKR, right?

19   A.  Yes.

20   Q.  W I C K R?

21   A.  Yes.

22   Q.  And you used WICKR to talk to Jason Galanis about your

23   planned meeting with the FBI, right, the very first one?

24   A.  Yes.

25   Q.  You were communicating with him on WICKR just two hours

I6DJGAL2                          Martin - cross

1    before you met the FBI in that Starbucks, right?

2    A.   I don't remember the exact timing.

3    Q.   It was within a few hours of going to talk to the FBI at

4    that Starbucks, right?

5    A.   I don't remember the exact timing.

6    Q.   We'll come back to that.

7              Certainly Jason Galanis knew beforehand that you were

8    going to have that meeting with the FBI, right?

9    A.   Yes.

10   Q.   Because you told him?

11   A.   Correct.

12   Q.   Over WICKR?

13   A.   I don't remember the exact communication method.

14   Q.   After that meeting with the FBI at the Starbucks, you had

15   more communications with Jason Galanis, correct?

16   A.   Correct.

17   Q.   You told him generally how it went, right?

18   A.   Excuse me?

19   Q.   You told him generally how it went, how it had gone, that

20   meeting with the FBI?

21   A.   I recall, yes, yes.

22   Q.   At the very first meeting with the FBI, it was sort of

23   casual, right?

24   A.   Yes.

25   Q.   You met at a Starbucks, right?

I6DJGAL2                         Martin - cross

1    A.  Correct.

2    Q.  That was your choice, right?

3    A.  Yes.

4    Q.  They would have preferred to go to your house.  Isn't that

5    right?

6    A.  I don't know about that.

7    Q.  Didn't they ask to go to your house?

8    A.  No.

9    Q.  They asked you to suggest some place to meet?

10   A.  I don't remember.

11   Q.  But, anyway, you chose the Starbucks?

12   A.  Yes.

13   Q.  There were no lawyers on either side at that meeting,

14   correct?

15   A.  Correct.

16   Q.  You were at Starbucks.  Did you have a beverage?

17   A.  I don't remember.

18   Q.  It was California.  Is that an ice coffee day, a frappucino

19   day or hot coffee day?

20          MS. MERMELSTEIN:  Objection.

21          THE COURT:  Sustained.

22   BY MR. SCHWARTZ:

23   Q.  It was a casual meeting, right?

24   A.  Yes.

25   Q.  Over time your meetings with the representatives of the

I6DJGAL2                          Martin - cross

1    government became more formal, true?

2    A.  Yes.

3    Q.  Lawyers got involved?

4    A.  Yes.

5    Q.  Prosecutors got involved?

6    A.  Yes.

7    Q.  There were formal written proffer agreements, true?

8    A.  Correct.

9    Q.  There were two different versions of the safe passage

10   letters, true?

11   A.  Correct.

12   Q.  And ultimately there is the immunity pursuant which you're

13   testifying today, correct?

14   A.  Correct.

15   Q.  You told us earlier it was not until pretty late in the

16   game, you think you said closer to 2018, that you decided to be

17   fully forthcoming with the government.  Is that right?

18   A.  That's correct.

19   Q.  And you're being fully forthcoming today, right?

20   A.  I am.

21   Q.  I want to talk now about your relationship with Jason

22   Galanis generally, okay?

23   A.  Okay.

24   Q.  I think you told us that you've known him since about the

25   Year 2000.  Is that right?

1    A.  No.  I said around 2003-4.

2    Q.  2003-4, okay.  So you have known him for about 14 years at

3    this point?

4    A.  More or less.

5    Q.  You probably haven't spoken to him in a year or two, right?

6    A.  That is difficult to do.

7    Q.  You spoke to him, however, immediately after that first

8    interview with the FBI, true?

9    A.  Yes.

10   Q.  If I show you defense Exhibit 4907 in evidence --

11   Mr. Jackson -- do you recognize that as Jason Galanis, right?

12   A.  Yes.

13           MR. SCHWARTZ:  Mr. Jackson, if you could just move

14   that over to the left side and next to it just for the witness,

15   the lawyers and Judge Abrams, bring up Exhibit 4819.

16   Q.  That is you, right?

17   A.  Yes.

18           MR. SCHWARTZ:  I offer 4819.

19           MS. MERMELSTEIN:  May we approach, your Honor?

20           THE COURT:  Sure.

21           (Continued on next page)

22

23

24

25

1            (At sidebar)

2            MS. MERMELSTEIN:  I have never seen this exhibit

3    before.  It is plainly not for impeachment.  There are other

4    photos available.  Mr. Schwartz -- indeed, everyone -- has

5    access to his Instagram account.  I don't think there is any

6    reason to use a goofy photo of him.  This is the second time

7    Mr. Schwartz is using Ms. Morton's photo side-by-side in some

8    kind of comparison.  One time is appropriate.  I object.  We

9    have agreements to this, and I object to this particular

10   exhibit and I object --

11           THE COURT:  Do you guys really not have normal head

12   shots?

13           MR. SCHWARTZ:  Except for Momtazi, I really do not.

14           For him, I have a different picture.  He took this

15   picture.  I will use a different one if you want.  To be clear,

16   I told Ms. Mermelstein this morning I would use a picture of

17   Mr. Martin himself, with him on my cross-examination.

18           THE COURT:  Use a professional picture.

19           MS. MERMELSTEIN:  Why didn't you give it to us before?

20           MR. SCHWARTZ:  You didn't ask for it.

21           (Continued on next page)

22

23

24

25

I6DJGAL2                         Martin - cross

1                    (In open court)

2                    MR. SCHWARTZ:  If you could take down 4819 and put up

3      4818.

4      BY MR. SCHWARTZ:

5      Q.  That one is also you, right?

6      A.  Yes.

7                    MR. SCHWARTZ:  I offer 4818.

8                    MS. MERMELSTEIN:  No objection.

9                    THE COURT:  It will be admitted.

10                   (Defendant's Exhibit 4818 received in evidence)

11                   MS. MERMELSTEIN:  Your Honor, we --

12                   THE COURT:  Overruled.

13                   MR. SCHWARTZ:  You can publish this, please,

14     Mr. Jackson.

15     BY MR. SCHWARTZ:

16     Q.  Now, Mr. Martin, by the way, where is that picture on the

17     left?

18     A.  I believe that is either Barcelona or Madrid.

19     Q.  You testified that your wife was friends with Mr. Galanis'

20     wife, Jason Galanis' wife, true?

21     A.  Yes.

22     Q.  I think you told us you actually went to their wedding,

23     Jason Galanis and his wife, Monet?

24     A.  Yes.

25     Q.  You also served as somewhat of a financial adviser to Jason

I6DJGAL2                          Martin - cross

1    Galanis, true?

2    A.  I think that's farfetched.

3    Q.  Well, do you recall -- strike that.

4           You told the government that you were Galanis'

5    financial adviser, did you not?

6    A.  I believe I did.

7    Q.  By the way, you have the necessary experience to be a

8    financial adviser, true?

9    A.  Yes.

10   Q.  You hold a Series 7 license, true?

11   A.  I did.

12   Q.  Held, excuse me, you held a Series 7 license, correct?

13   A.  Correct.

14   Q.  And Series 63 license, correct?

15   A.  Correct.

16   Q.  Series 65 license, right?

17   A.  Correct.

18   Q.  And Series 3 license, right?

19   A.  Correct.

20   Q.  And could you just explain generally to the jury what those

21   securities licenses are.

22   A.  A Securities 7 is a general securities license to act as a

23   broker.  65 is a financial adviser license to act as a

24   financial adviser.  Series 3 is a blue skies license which

25   again allows you to act as a financial adviser.  63 is a

I6DJGAL2                         Martin - cross

1   commodities broker license.

2   Q.  Did I miss any licenses that you held?

3   A.  No.

4   Q.  You understood generally, I think as you just testified,

5   that Jason Galanis was in private equity investing, true?

6   A.  Amongst other things.

7   Q.  Amongst other things?

8           For example, you understood that he had real estate

9   investments, true?

10  A.  I didn't know that he had real estate investments.

11  Q.  You personally handled wires for some of his real estate

12  investments, didn't you?

13  A.  I wired once money to an escrow account, yes.

14  Q.  For a real estate placement?

15  A.  I don't know if it was an investment.  I just wired money

16  to an escrow account.

17  Q.  For a real estate purchase?

18  A.  Most likely.

19  Q.  For what you understood, you wired money to an escrow

20  account for what you understood to be a real estate purchase on

21  behalf of Jason Galanis?

22  A.  Correct.

23  Q.  Generally speaking, you understood that Jason Galanis was a

24  deal-maker, right?

25  A.  Yes.

I6DJGAL2                         Martin - cross

1    Q.   And you believed that he was very successful, right?

2    A.   Correct.

3    Q.   You saw evidence that he was very successful, right?

4    A.   Correct.

5    Q.   You knew that he lived in a beautiful house, right?

6    A.   Yes.

7    Q.   You knew that he and his wife drove fancy cars, right?

8    A.   That he drove fancy cars, yes.

9    Q.   He drove a Bentley, right?

10             MS. MERMELSTEIN:   Objection.

11             THE COURT:   Sustained.

12             MR. SCHWARTZ:   It was Super Bentley before, but not

13   Bentley.

14   BY MR. SCHWARTZ:

15   Q.   You heard him talking about buying a private plane at one

16   point, right?

17   A.   That's correct.

18   Q.   So, generally speaking, he had all of the trappings of

19   success and wealth, true?

20   A.   True.

21   Q.   You were at that house, 1920 Bel Air Road, on a number of

22   occasions, right?

23   A.   Correct.

24             MR. SCHWARTZ:   If I show you, Mr. Jackson, just for

25   the witness, the lawyers and Judge Abrams Exhibit 4914.

I6DJGAL2                        Martin - cross

1    Q.  That is Jason Galanis' house, right?

2    A.  It looks that way, yes.

3            MR. SCHWARTZ:  I offer 4914.

4            MS. MERMELSTEIN:  No objection.

5            THE COURT:  Admitted.

6            (Defendant's Exhibit 4914 received in evidence)

7            MR. SCHWARTZ:  You can publish that.

8    BY MR. SCHWARTZ:

9    Q.  Now, fast forwarding to August of 2014, okay, so you had

10   known Jason Galanis for about 10 years at that point, right?

11   A.  Yes.

12   Q.  Again you thought he was a successful businessman, you

13   thought he generally knew what he was doing in business, right?

14   A.  Yes.

15   Q.  You yourself wanted to do business with Jason Galanis

16   because he was so successful, correct?

17   A.  Correct.

18   Q.  And I think we just said you had been working with him sort

19   of as an informal financial adviser prior to that time, true?

20   A.  Prior to which time?

21   Q.  Prior to August of 2014?

22   A.  No.

23   Q.  Well, you told the government that prior to August 2014,

24   you indirectly managed Galanis' money and invested on his

25   behalf and that Jason Galanis would generally ask you for

I6DJGAL2                    Martin - cross

1    personal financial advice, true?

2    A.  I don't remember that.

3           MR. SCHWARTZ:  Mr. Jackson, can we show just to the

4    witness, the lawyers and Judge Abrams 3522-2.

5    Q.  You see what we're looking at, correct?

6    A.  Yes.

7           MR. SCHWARTZ:  If you can turn to the next page,

8    please, Mr. Jackson, and just blow up the top six lines, 10

9    lines, thereabouts.

10   Q.  Read that to yourself, and my question is just:

11          Does this refresh your recollection that you told the

12   government that you indirectly managed Galanis' money and

13   invested on his behalf?

14   A.  (Pause)  No, it doesn't.

15          MR. SCHWARTZ:  You can take that down, please, Mr.

16   Jackson.

17   Q.  Is it fair to say that prior to any discussion of these

18   bonds, you had talked about a lot of deals with Jason Galanis?

19   A.  We talked about a few deals, yes.

20   Q.  You told the FBI that you talked about a lot of deals,

21   right?

22   A.  I don't know if I said a lot or a few.

23   Q.  You tried to find deals for him, to source deals, right?

24   A.  Yes.

25   Q.  Sometimes you managed the progress of those deals, true?

I6DJGAL2                     Martin - cross

1    A.  What do you mean by that?

2    Q.  You were involved in the discussions, the negotiations,

3    true?

4    A.  That wasn't really my job.  My job was just to introduce

5    deals, that's it.

6    Q.  In the course of those introductions, is it fair to say you

7    followed Jason Galanis' instructions?

8    A.  What do you mean by that?

9    Q.  Well, let me ask you this:

10            Is it fair to say that Jason Galanis was always very

11   deliberate about information flow?

12   A.  Again I don't understand what you mean.  What do you mean

13   by "deliberate"?

14   Q.  Wasn't he very sensitive to how communications flowed in a

15   deal?

16   A.  I don't know.

17            MR. SCHWARTZ:  Let me show you what has been marked as

18   Exhibit 4801.  Again, Mr. Jackson, just for the witness, the

19   lawyers and Judge Abrams.  We're not able to bring it up now?

20   That's okay.  (Pause)

21            (Off-the-record discussion)

22   BY MR. SCHWARTZ:

23   Q.  You recognize this Exhibit 4801 as an email from yourself

24   to someone named Peter Hottinger?

25   A.  I don't specifically remember this email, but it appears,

I6DJGAL2                          Martin - cross

1    yes.

2    Q.  One of the deals that you discussed with Jason Galanis was

3    acquisition of something called -- long name -- we'll talk

4    about it a little more later, Hottinger Bank, right?

5    A.   Correct.

6               MR. SCHWARTZ:  I offer Exhibit 4801.

7               MS. MERMELSTEIN:  I don't think there is a foundation,

8    your Honor, so, yes, objection.

9               THE COURT:  Let's just meet at sidebar briefly.

10              (Continued on next page)

1                (At sidebar)

2                THE COURT:  Is this just to refresh?

3                MR. SCHWARTZ:  This is an email Mr. Martin produced to

4      the SEC, his lawyers produced to the SEC.  I have introduced

5      them for impeachment, but it gets to a point which is the way

6      that Jason Galanis controlled information in the deals and

7      micromanaged what information.  That is a directly relevant

8      point.

9                MS. MERMELSTEIN:  I think what he said is, I don't

10     think his answers whether he wanted to control information was

11     sufficient to allow it to come in for impeachment.

12               He can ask if this refreshes his recollection that he

13     said this.  I don't think the email is admissible.  I take Mr.

14     Schwartz's proffer what he produced.  It doesn't have a Bates

15     number on it.

16               MR. SCHWARTZ:  The one on the screen has a Bates

17     number.

18               THE COURT:  I don't think the email should come in.

19     You can ask him isn't it true you said this.

20               MR. SCHWARTZ:  What is the basis?

21               THE COURT:  I don't think it should come in.  Ask

22     about the particular clause.

23               MR. SCHWARTZ:  I don't understand why?  I want to

24     understand the ground rules.  This is an email that this

25     witness --

I6DJGAL2                    Martin - cross

1              THE COURT:  This is extrinsic evidence.  It has other

2       information in it and it is something unrelated.  You can ask

3       about a particular phrase that you are using to impeach him.

4       That is what I think is relevant.

5              MR. SCHWARTZ:  Throughout the trial we have gone into

6       personal business deals between alleged and actual

7       co-conspirators.  I intend to discuss the Hottinger Bank deal

8       at greater length throughout the cross-examination.  It is a

9       topic that will involve lies.  It is directly relevant to the

10      charged crimes.  I bring it up now specifically because it

11      contradicts what he just told the jury, but this exhibit has

12      independent relevance.

13             MS. MERMELSTEIN:  I agree with your Honor's

14      assessment.  We'll see how -- I don't know what Mr. Schwartz is

15      going with this prior deal from 013.  I suspect a lot of it

16      isn't proper, but I will take it as it comes.

17             THE COURT:  For now do what I said and see what goes.

18             MR. TOUGER:  Off the record.

19             (Off-the-record discussion)

20             (Continued on next page)

21

22

23

24

25

I6DJGAL2                        Martin - cross

1            (In open court)

2     BY MR. SCHWARTZ:

3     Q.  Mr. Martin, am I correct that you wrote to Peter Hottinger,

4     Jason is very, all caps, very sensitive on how communication

5     flows?

6     A.  I don't remember writing it, no, but --

7     Q.  Seeing this email, does this refresh your recollection that

8     you wrote that Jason is very sensitive on how communication

9     flows?

10    A.  It doesn't refresh my recollection, but again I must have

11    written it.

12            MR. SCHWARTZ:  Thank you.  You can take that down,

13    Mr. Jackson.

14    Q.  Would you agree with me that when you worked on deals with

15    Jason Galanis, you ensured at his direction that information

16    was only disseminated to the proper parties at the proper time?

17    A.  I don't understand the question.

18    Q.  When you worked on a deal with Jason Galanis, you ensured

19    that information was only disseminated to the proper parties at

20    the proper time, true?

21    A.  I don't remember saying that.

22            MR. SCHWARTZ:  Mr. Jackson, can I ask you to bring up

23    again for the witness, the lawyers and Judge Abrams the same

24    document, Exhibit 4801, and go to Page 2 of this document.

25    Q.  In the middle of the page do you see an email from

I6DJGAL2                        Martin - cross

1    yourself, dated January 9th, 2013?

2            MS. MERMELSTEIN:  Objection to reading of a document

3    not in evidence.

4            MR. SCHWARTZ:  It is the same point, your Honor.

5            THE COURT:  Just ask him the targeted question.

6    BY MR. SCHWARTZ:

7    Q.  The question is, didn't you write in the context of

8    discussing the Hottinger Bank deal to Peter Hottinger, sending

9    this to the entire team was not a good idea.  Jason Galanis is

10   not pleased.  You should have --

11           THE COURT:  Let's not read the whole thing.  Just ask

12   more targeted question, please.

13   BY MR. SCHWARTZ:

14   Q.  The question was, isn't it true that you ensured that

15   information was only disseminated to the proper parties at the

16   proper time?

17   A.  Again I don't remember this email, so I can't answer that

18   question.

19   Q.  You don't recall writing that you made sure all

20   correspondence gets disseminated to the proper parties at the

21   proper time?

22   A.  This email was written five years ago.  I don't remember

23   every email.

24           MR. SCHWARTZ:  I offer this email, your Honor.

25           MS. MERMELSTEIN:  The same objection.

I6DJGAL2                      Martin - cross

1              THE COURT:  Yes.  I am not going to admit the email.

2              Are you denying that you wrote this?  Do you have any

3    reason to doubt you wrote this?

4              THE WITNESS:  I am not denying it, but I don't

5    remember.

6              THE COURT:  Okay.

7    BY MR. SCHWARTZ:

8    Q.  You don't deny that you wrote emails that said Jason

9    Galanis is not pleased, you should have sent this to me and I

10   would have delegated it.  We must go through one source of

11   communication, me, and I --

12             THE COURT:  Let's not read the whole thing.

13             MR. SCHWARTZ:  I make sure --

14             THE COURT:  Let's not read the whole thing.  You asked

15   the question.  He didn't deny that he wrote it.

16             MR. SCHWARTZ:  But they haven't seen the email.

17             THE COURT:  If you have another specific question you

18   want to ask him, ask him a different question.

19   BY MR. SCHWARTZ:

20   Q.  You don't deny that you make sure all correspondence gets

21   disseminated to the proper parties at the proper time, right?

22   A.  That's not what I said I deny or don't deny.

23   Q.  Fair to say that in these deals, you only shared

24   information when Jason Galanis said it was okay to share

25   information, true?

I6DJGAL2                         Martin - cross

1    A.  Most likely.

2    Q.  And you specifically requested permission from Jason

3    Galanis before you shared any information in the course of the

4    deal, true?

5    A.  I don't remember.

6           MR. SCHWARTZ:  Let me show you again just for the

7    witness, the lawyers and Judge Abrams Exhibit 4802.  If you go

8    to the next page, please, Mr. Jackson, the next page.

9    Q.  Does this remind you that you asked Jason Galanis

10   specifically what you could disclose in the course of a deal?

11   A.  I don't see what you mean.

12          MR. SCHWARTZ:  Mr. Jackson, could you blow up the top

13   third.

14   A.  Okay, I see it.

15   Q.  Does this remind you that you asked Jason Galanis in the

16   course of a deal what can I disclose?

17   A.  Again it doesn't remind me anything because it has been

18   five years.

19   Q.  Again you don't deny that you wrote this email, do you?

20   A.  I am not denying it.

21   Q.  And Jason Galanis was so particular about what information

22   got shared in the course of a deal that he would actually write

23   out the emails for you to send, right?

24   A.  What do you mean?

25   Q.  I mean he would send you the text of an email which you

I6DJGAL2                         Martin - cross

1    would then make come from you to the counter-party in the deal,

2    true?

3    A.  Are you talking generally?

4    Q.  That happened, correct?

5    A.  I don't remember.

6    Q.  Can we go to Page 1 of this document, please.

7            You see in response to your question what can I

8    disclose, Jason Galanis told you I would say the following,

9    true?

10           MS. MERMELSTEIN:  Objection to the reading of the

11   email not in evidence.

12           THE COURT:  Just ask the more targeted question

13   instead of reading from the whole document.

14   BY MR. SCHWARTZ:

15   Q.  Isn't it true that on March 26, 2013, in the course of

16   discussing a deal, Jason Galanis told you exactly what to say

17   when you asked him what you were allowed to say?

18   A.  I do not remember.

19   Q.  Looking at this email, Defense Exhibit 4802, does this

20   refresh your recollection that on March 26, 2013, in response

21   to your question what can I disclose, Jason Galanis ghost wrote

22   a response for you?

23   A.  I do not remember.

24   Q.  Isn't it correct that on occasions when you were handling a

25   deal for Jason Galanis, you would blind-copy him on your

I6DJGAL2                    Martin - cross

1    communications so that he could see what you were saying, true?

2    A.  I used to do that, yes.

3    Q.  Because he was very concerned about what information was

4    being conveyed to whom, true?

5    A.  I just CC'd him to keep him in the loop.

6    Q.  One of the things that he often instructed you to do was to

7    name-drop, correct?

8    A.  No.

9    Q.  No?  Well, for example, didn't he encourage you on more

10   than one occasion to mention the names of Jason and Steven

11   Sugarman?

12   A.  I don't recall that.

13   Q.  You don't recall Jason Galanis encouraging you to mention

14   the Sugarmans and their father-in-law, Peter Gruber?

15   A.  I don't remember.

16          MR. SCHWARTZ:  Mr. Jackson, can you take this down and

17   can we show the witness, the lawyers and Judge Abrams exhibit

18   4804.

19   Q.  This is an email correspondence between you self and --

20          MS. MERMELSTEIN:  Your Honor, objection again.  If he

21   wants to ask if this refreshes his recollection --

22          MR. SCHWARTZ:  I am authenticating it.  I am not

23   reading it.

24          THE COURT:  He says he doesn't remember, so just show

25   him the document.  You don't have to announce what it is and

I6DJGAL2                    Martin - cross

1     see if it refreshes his recollection.  He can read it.

2     BY MR. SCHWARTZ:

3     Q.  Does this document refresh your recollection that Jason

4     Galanis encouraged you to mention Steve and Jason Sugarman as

5     well as Peter Gruber, Jason's father-in-law?

6     A.  It doesn't refresh my recollection.

7              MR. SCHWARTZ:  You can take that down.

8     Q.  You did from time to time name-drop Jason and Steven

9     Sugarman and their father-in-law Peter Gruber, correct?

10    A.  Again I don't remember.

11             MR. SCHWARTZ:  Let me show you defense Exhibit 4813.

12    You can blow up the third paragraph, please, Mr. Jackson.

13    Q.  Does this refresh your recollection in the course of deals

14    involving Jason Galanis, you name-dropped Steven and Jason

15    Sugarman and mentioned Peter Gruber, the part owner of the Los

16    Angeles Dodgers?

17    A.  It slightly rings a bell, yes.

18    Q.  That one rings a bell?

19    A.  Yes.

20             MR. SCHWARTZ:  Thank you.  You can take that down,

21    Mr. Jackson.

22    Q.  I want to talk a little bit more about that Hottinger Bank

23    deal we mentioned a moment ago, okay?

24    A.  Okay.

25    Q.  And the full name of Hottinger Bank, I'll butcher this, the

I6DJGAL2                    Martin - cross

1    pronunciation, La Compagnie Financiere Rodolphe Hottinger SA?

2    A.  Correct.

3    Q.  And that was a deal that involved Jason Galanis, Jason

4    Sugarman, Rory Knight, amongst others, correct?

5    A.  It was a deal that never happened.

6    Q.  That was a contemplated deal that involved Jason Sugarman,

7    Jason Galanis, Rory Knight, amongst others, correct?

8    A.  Correct.

9    Q.  It never happened because the Hottinger brothers were

10   fighting with one another and couldn't agree, right?

11   A.  Correct.

12   Q.  That was a deal that Jason Galanis was interested in

13   because, as he explained to you, he was looking to acquire an

14   offshore bank, right?

15   A.  Correct.

16   Q.  And you knew that the Sugarmans were already involved in

17   banking and financial services at that point, true?

18   A.  Yes.

19   Q.  You were familiar with the COR companies, right?

20   A.  Yes.

21   Q.  Were you ever employed by the COR companies?

22   A.  No.

23   Q.  Were you ever a part of the COR companies?

24   A.  No.

25   Q.  Another deal that you sourced for Jason Galanis, another

I6DJGAL2                      Martin - cross

1    potential deal, excuse me, that you sourced for Jason Galanis
2    related to the Swiss insurance company Forces Vives, true?
3    A.  Correct.
4    Q.  And that was an opportunity that had come to you because
5    you knew the former CEO for Forces Vives, right?
6    A.  Correct.
7    Q.  And again you knew that Jason Galanis was interested in
8    acquiring an interest in an insurance company, right?
9    A.  Yes.
10   Q.  And you were hoping to earn a commission on that deal,
11   right?
12   A.  Correct.
13   Q.  And that deal also involved the -- potential deal, excuse
14   me -- also involved in addition to Jason Galanis, Jason
15   Sugarman and Dr. Rory Knight, correct?
16   A.  Correct.
17   Q.  And fair to say that in the course of the discussions
18   regarding that potential deal, you were in close contact with
19   Jason Sugarman, true?
20   A.  I wouldn't call I close, but I was in contact with him.
21   Q.  Even though you were not affiliated with the COR companies,
22   as you just testified, you did hold yourself out as being
23   affiliated with the COR companies, correct?
24   A.  I don't remember that.
25   Q.  Do you remember that you changed your email contact

I6DJGAL2                          Martin - cross

1    nickname to include the word COR?

2    A.  No.

3              MR. SCHWARTZ:  Let me show you exhibit -- again

4    Mr. Jackson just for the lawyers, the witness and Judge

5    Abrams -- Exhibit 4805.  If you can blow up the header for the

6    middle of the page.

7    Q.  Does this refresh your recollection that you changed your

8    email contact to Francisco Martin-COR?

9    A.  You understand that this email came from Felix Keller and

10   it comes from his contact, so this COR connotation comes from

11   him, not from me.

12   Q.  Okay so Felix Keller is the one told you you were

13   affiliated with COR?

14   A.  I didn't say that.  He put me in the same bucket as the COR

15   members.  That doesn't mean I used COR.

16   Q.  Your testimony is you did not hold yourself out as a

17   representative of the COR companies?

18   A.  That is correct.

19   Q.  That was a miscommunication on Mr. Keller's part?

20   A.  I don't know if it was a miscommunication.  It definitely

21   was a misunderstanding on his part.

22   Q.  Remind us who was Felix Keller?

23   A.  He was the CEO of Forces Vives.

24   Q.  He was your contact, correct?

25   A.  He was my contact, yes.

I6DJGAL2                          Martin - cross

1   Q.   He was the one who brought the deal to you in the first

2   place, right?

3   A.   That is correct.

4   Q.   You weren't strangers, right?

5   A.   We knew each other, yes.

6   Q.   But he was somehow laboring under a misunderstanding, not

7   fostered by you, you were affiliated with the COR companies?

8          MS. MERMELSTEIN:   Objection.

9          THE COURT:   Sustained.

10  BY MR. SCHWARTZ:

11  Q.   This deal also did not go through, true?

12  A.   That's correct.

13  Q.   You remained in touch with Mr. Galanis, Jason Galanis,

14  after this deal fell apart, right?

15  A.   Correct.

16  Q.   And also with Jason Sugarman, true?

17  A.   Correct.

18  Q.   You understood at that point even though this deal, the

19  Forces Vives deal, had come apart, the two Jasons, Jason

20  Galanis and Jason Sugarman, they were still looking to acquire

21  a European insurance company, right?

22  A.   That was my understanding, yes.

23  Q.   We'll come back to that in a little bit.  I want to talk

24  about the bonds for a second, okay?

25  A.   Okay.

I6DJGAL2                         Martin - cross

1   Q.   When Jason Galanis first approached you to serve as the

2   investment manager for the bonds, you were excited, right?

3   A.   I don't remember exactly my feelings, but I was happy.

4   Q.   Happy?

5   A.   Happy.

6   Q.   Happy is a feeling, right?

7   A.   Sure.

8   Q.   You needed the money, true?

9   A.   Correct.

10  Q.   You were living in Italy with your mother at the time,

11  right?

12  A.   Correct.

13  Q.   And you wanted to work with Jason Galanis, right?

14  A.   Correct.

15  Q.   And he had tracked you down specifically, right?

16  A.   Yes.

17  Q.   He called you and asked for help, right?

18  A.   Yes.

19  Q.   That made you feel good, right?

20  A.   Again I don't remember my exact feelings, but yes.

21  Q.   Did you feel happy?

22  A.   Correct.

23  Q.   And you were looking forward to working with him, right?

24  A.   Yes.

25  Q.   But you understood that Jason Galanis was running the deal,

I6DJGAL2                        Martin - cross

1   right?

2   A.   That was my understanding.

3   Q.   He was the mastermind, right?

4   A.   He was -- sorry?

5   Q.   He was the mastermind, right?

6   A.   That was my understanding.

7   Q.   Whatever information you received about the bond deal you

8   got from Jason Galanis, true?

9   A.   Correct.

10  Q.   He explained to you a sort of general overview of how it

11  was going to work, right?

12  A.   Correct.

13  Q.   He sent you certain materials, correct?

14  A.   Yes.

15  Q.   He sent you that investment management agreement which you

16  ended up signing, right?

17  A.   Correct.

18  Q.   He sent you the annuity contract, true?

19  A.   Yes.

20  Q.   He sent you the actual trust indenture for the bonds,

21  right?

22  A.   Yes.

23  Q.   He sent you some marketing materials, correct?

24  A.   Yes.

25  Q.   And that's how you got a general understanding of what the

I6DJGAL2                    Martin - cross

1   bond deal was supposed to be, right?

2   A.  Correct.

3   Q.  And what your role in that deal was supposed to be, right?

4   A.  Yes.

5   Q.  You understood that the proceeds of the bond were going to

6   be invested in an annuity, true?

7   A.  Yes.

8   Q.  You believed that as the investment manager, you were going

9   to be at some point directing the annuity investments, right?

10  A.  Part of the annuity investments.

11  Q.  You believed there would be other managers as well, right?

12  A.  Correct.

13  Q.  So you believed that you were going to direct the

14  investments of part of the annuity, correct?

15  A.  Correct.

16  Q.  Again you actually personally signed the annuity contract,

17  true?

18  A.  Correct.

19  Q.  And you signed it on behalf of the owner of the contract,

20  the WLCC, true?

21  A.  I don't remember.

22          MR. SCHWARTZ:  Let me show you Exhibit 200.  This is

23  in evidence.  You can put this up, please, Mr. Jackson.

24  Q.  You recognize this to be the annuity contract for the first

25  bond issuance, true?

I6DJGAL2                    Martin - cross

1   A.  I don't remember this particular document.

2   Q.  You recognize this to be the annuity contract in connection

3   with the WLCC bonds, true?

4   A.  No.

5          MR. SCHWARTZ:  Mr. Jackson, can you flip the pages.

6   Q.  Now, that is your initials in the bottom-left, true?

7   A.  Correct.

8   Q.  And you put those there, right?

9   A.  I don't remember specifically, but those are my initials.

10         MR. SCHWARTZ:  If you flip a few more pages, please,

11  Mr. Jackson.

12  Q.  You have initialed every page, correct?

13  A.  I usually don't initial like that, that is not my

14  handwriting, but again I say the same, I don't remember this

15  particular document.

16         MR. SCHWARTZ:  You can flip a few more pages and show

17  Mr. Martin the signature.  One more, please.  We don't have the

18  signature page on this one?  We'll come back to this.  You can

19  take that down.

20  Q.  In any case, although your initials appeared for the owner,

21  you never had any contact with the Wakpamni Lake Community

22  Corporation, true?

23  A.  Yes, correct.

24  Q.  No one from the Wakpamni Lake Community Corporation

25  authorized you to sign on its behalf, true?

I6DJGAL2                        Martin - cross

1    A.  That's correct.

2    Q.  You did that because Jason Galanis had asked you to,

3    correct?

4    A.  Again I don't remember specifically signing this, but --

5    Q.  Well, in general -- I don't want to have to go through each

6    piece of paper -- you signed papers in connection with the bond

7    issuance, correct?

8    A.  Yes.

9    Q.  Throughout that process, the only person that you spoke to

10   was Jason Galanis about the bonds, true?

11   A.  Jason Galanis, Gary Hirst and Hugh Dunkerley.

12   Q.  And your conversations with Hugh Dunkerley were never

13   one-on-one about the bonds, correct?

14   A.  You can say that, yes.

15   Q.  It is fair to say that you understood that Gary Hirst,

16   Jason Galanis and Hugh Dunkerley, none of them were

17   representatives of the Wakpamni Lake Community Corporation,

18   true?

19   A.  Correct.

20   Q.  And so when you were signing contracts with or on behalf of

21   the Wakpamni Lake Community Corporation, you were doing it

22   based upon one or all of their say-so, correct?

23   A.  Again I don't specifically remember signing on behalf of

24   the tribe.

25   Q.  Well, you looked at with the government the investment

I6DJGAL2                         Martin - cross

1     management agreement, correct?

2     A.   Correct.

3     Q.   That was a contract with the WLCC, correct?

4     A.   Correct.

5     Q.   They were the counter-party, correct?

6     A.   Correct.

7     Q.   And that was a document, if you recall, that was signed on

8     behalf of the WLCC by someone named Geneva Lonehill, correct?

9     A.   I slightly remember that, yes.

10    Q.   You have never never communicated with Geneva Lonehill in

11    any way, shape or form, correct?

12    A.   Correct.

13    Q.   You have not communicated with any of her representatives,

14    correct?

15    A.   Correct.

16    Q.   So you entered into a contract with the WLCC on behalf of,

17    in that case, Private Equity Management, based only upon the

18    representations of Gary Hirst, Hugh Dunkerley or Jason Galanis,

19    true?

20    A.   True.

21    Q.   To be clear, when you did that, you did not know that Jason

22    Galanis was planning to steal the bond proceeds, correct?

23    A.   That's correct.

24    Q.   It is fair to say you were copied on a variety of

25    communications regarding the bonds?

I6DJGAL2                    Martin - cross

1   A.  I was forwarded a lot of materials, yes.

2   Q.  Also fair to say you didn't read everything you were

3   forwarded?

4   A.  That is fair to say, yes.

5   Q.  You read some of the documents, but not all of them?

6   A.  Correct.

7   Q.  Now, after you signed all of those documents, you had

8   expected at some point to receive a portion of the proceeds,

9   correct?

10  A.  Correct.

11  Q.  You were expecting to manage those proceeds, correct?

12  A.  Yes, some of the proceeds, yes.

13  Q.  In your discussions with Jason Galanis or anyone else, were

14  you told what portion of the proceeds you would receive to

15  manage?

16  A.  No.

17  Q.  But, in any case, you never received any of the proceeds,

18  right?

19  A.  Correct.

20  Q.  Am I also correct in saying that you never had access to

21  the account for the annuity provider, Wealth Assurance Private

22  Client Corporation?

23  A.  That's correct.

24  Q.  Is it fair to say that in general, nothing really happened

25  with the bonds after you signed the investment management

I6DJGAL2                         Martin - cross

1    agreement?

2    A.  What do you mean by, "nothing happened"?

3    Q.  You didn't receive money, you didn't receive any more

4    proceeds, that was sort of the end of your involvement in the

5    deal, true?

6    A.  You can say that, yes.

7    Q.  To be clear, there were two investment management

8    agreements, right?

9    A.  Correct.

10   Q.  Because there was a second issuance, right?

11   A.  Correct.

12   Q.  But really all the same deal, right?

13   A.  That was my understanding, yes.

14   Q.  Now, that second investment management agreement, fair to

15   say you're not sure whether you were the one who actually

16   signed that?

17   A.  I have to see the document.  I don't remember.

18   Q.  Well, let me ask you a different question.

19        You are aware that Jason Galanis forged people's

20   signatures from time to time?

21   A.  I understood that was his MO.

22   Q.  You also understood that he would cut and paste people's

23   electronic signatures on documents from time to time?

24   A.  I think so, yes.

25   Q.  In one of your conversations with the government, one of

I6DJGAL2                    Martin - cross

1   your recent ones, your 2018 ones after you decided to be fully

2   forthcoming, you told the government you believed Jason had

3   simply cut and pasted your signature on the second investment

4   management agreement, true?

5           MS. MERMELSTEIN:  Objection to the form of the

6   question, your Honor.

7           MR. SCHWARTZ:  I can break that down.

8   BY MR. SCHWARTZ:

9   Q.  Isn't it true that in one of your recent, your 2018

10  meetings with the government, you told them that your

11  assumption was that Jason Galanis had simply cut and pasted

12  your signature onto the second investment management agreement?

13  A.  I don't specifically remember it, but again that was his

14  MO, so I would not be surprised.

15  Q.  That was his --

16  A.  MO.

17  Q.  MO, modus operandi?

18  A.  Modus operandi.

19  Q.  That is the way he did business, right?

20  A.  Yes.

21  Q.  You did ask Jason Galanis what happened to the money,

22  right, because you were expecting to receive it?

23  A.  Yes.

24  Q.  You actually wanted to receive it, true?

25  A.  Yes.

I6DJGAL2                    Martin - cross

1    Q.  You wanted to invest it, right?

2    A.  Correct.

3    Q.  Because that is how you were going to make money, right?

4    A.  That's right.

5    Q.  You received a relatively modest fee up front for signing

6    the documents, true?

7    A.  Correct.

8    Q.  But the way your expected profit in the deal was you were

9    going to get a return on assets under your management, right?

10   A.  That was my understanding.

11   Q.  So you wanted to receive the money and grow the monies so

12   you could profit, too, right?

13   A.  Correct.

14   Q.  And Jason Galanis told you not to worry, right?

15   A.  Yes.

16   Q.  He told you to sit tight, right?

17   A.  Yes.

18   Q.  He told you that the proceeds were tied up in private

19   equity, true?

20   A.  I don't remember that specifically, but --

21   Q.  Well, you recall telling the government that when you asked

22   Jason Galanis about the bond proceeds, Galanis said they were

23   being invested in private equity?

24   A.  I don't remember saying that.

25           MR. SCHWARTZ:  Mr. Jackson, can you bring up just for

I6DJGAL2                          Martin - cross

1    the witness, the lawyers and Judge Abrams 3522-2.  Go to Page 4
2    of this document.  If you could blow up just the first few
3    lines there.
4    Q.  My question to you, Mr. Martin, is does this refresh your
5    recollection that when you asked Jason Galanis about the bond
6    proceeds, Jason Galanis said they were being invested in
7    private equity?
8    A.  I don't remember.
9    Q.  This doesn't refresh your recollection?
10   A.  It doesn't.
11   Q.  Does this refresh your recollection that you told that to
12   the FBI?
13              MS. MERMELSTEIN:  Objection, your Honor.
14              THE COURT:  Sustained.
15              MR. SCHWARTZ:  You can take that down, Mr. Jackson.
16              (Continued on next page)
17
18
19
20
21
22
23
24
25

I6D7GAL3                     Martin Fernandez – Cross

1   BY MR. SCHWARTZ:

2   Q.   In any case, Jason Galanis didn't tell you where the money

3   went, true?

4   A.   True.

5   Q.   By the way, in your 20 years in the business, are you

6   familiar with the Silicon Valley venture capital private equity

7   firm Hercules Capital?

8   A.   Never heard of it.

9   Q.   You don't recall ever hearing anything called Hercules

10  Capital?

11  A.   It doesn't ring a bell, no.

12  Q.   Let me see if I can refresh your recollection.

13              MS. MERMELSTEIN:   Objection to relevance, your Honor.

14              THE COURT:   I will allow it.

15  Q.   And, Mr. Martin, my question to you is simply:   In taking a

16  look at that, does that refresh your recollection that Hercules

17  Capital is a multi-billion dollar Silicon Valley venture

18  capital fund?

19  A.   Not at all.

20  Q.   Not at all, you said?

21  A.   It doesn't.

22  Q.   Were you aware that Jason Galanis had told other people

23  that Hercules was appointed to invest the annuity?

24              MS. MERMELSTEIN:   Objection.

25              THE COURT:   Sustained.

I6D7GAL3                         Martin Fernandez - Cross

1    Q.  I'm sorry.  Were you present when Jason Galanis told anyone

2    that the annuity was being invested with Hercules?

3    A.  I don't remember that.

4    Q.  OK, thank you.

5            Fair to say that Jason Galanis frequently kept

6    information from you?

7    A.  I would say that, yes.

8    Q.  Now, by the way, we talked a moment ago about Jason

9    Galanis' MO of cutting and pasting people's signatures.  Do you

10   recall that?

11   A.  Yes.

12   Q.  That was something you did too, right?

13   A.  Correct.

14   Q.  For example, you cut and pasted a signature for a man named

15   John Greenwood, correct?

16   A.  Correct.

17   Q.  John Greenwood was the person that was held out as the

18   owner of Thunder Valley Engineering, correct?

19   A.  Correct.

20   Q.  And you have copied and pasted Mr. Greenwood's signature

21   on, for example, wire requests, true?

22   A.  True.

23   Q.  And you sent those requests to banks, true?

24   A.  True.

25   Q.  You've never met Mr. Greenwood; is that right?

I6D7GAL3                    Martin Fernandez - Cross

1    A.   That's right.

2    Q.   You were just sort of trying to keep your name off the

3    documents?  Or was it was that Jason Galanis told you to do it

4    that way?

5    A.   I don't remember that.

6    Q.   Well, why did you cut and paste John Greenwood's signature

7    on wire authorizations instead of just signing your own name?

8    A.   Because John Greenwood was the beneficial owner of that

9    company.

10   Q.   Right.  But you had a power of attorney, correct?

11   A.   Correct.

12   Q.   And you had the authority to sign on those accounts, true?

13   A.   Correct.

14   Q.   So, again, my question is:  Why did you cut and paste John

15   Greenwood's signature instead of signing it yourself?

16   A.   I don't specifically remember why.

17   Q.   On some occasions did Jason Galanis tell you to do it that

18   way?

19   A.   I don't remember him telling me that specifically.

20   Q.   On some occasions did you decide to do it that way to keep

21   your name off things?

22   A.   That could be.

23   Q.   You're familiar with a person named Clifford Wolff,

24   correct?

25   A.   He sounds familiar.

I6D7GAL3                          Martin Fernandez - Cross

1    Q.  You know the name, right?

2    A.  He sounds familiar.

3    Q.  You knew that Mr. Wolff was an attorney who worked with

4    Jason Galanis, correct?

5    A.  I understand that, yes.

6    Q.  And do you recall that on one occasion Jason Galanis

7    instructed you to wire $15 million to Mr. Wolff's attorney

8    escrow account?

9    A.  Yes.

10   Q.  And that money came from the account for Thorsdale

11   Fiduciary and Trust, correct?

12   A.  I don't specifically remember all the details, but it rings

13   a bell.

14   Q.  It didn't come from one of your accounts, right?

15   A.  No.

16   Q.  It didn't come from the Seymour Capital or Thunder Valley

17   accounts, correct?

18   A.  Correct.

19   Q.  It didn't come from the Private Equity Management accounts,

20   correct?

21   A.  Correct.

22   Q.  Did Private Equity Management LLC even have a bank account?

23   A.  I don't know.

24   Q.  This was $15 million that Jason Galanis instructed you to

25   wire to Mr. Wolff's attorney escrow account from Thorsdale,

I6D7GAL3                        Martin Fernandez - Cross

1   true?

2   A.  Again, I don't remember the specifics.

3   Q.  And he instructed you to wire that money to attorney

4   Wolff -- excuse me.  Strike that.

5           Jason Galanis directed you to give instructions to

6   attorney Wolff to wire that $15 million on to something called

7   Rosemont Seneca Bohai LLC, correct?

8   A.  Again, I don't specifically remember all the details, but

9   it sounds familiar.

10  Q.  And the purpose of the wire from Thorsdale to attorney

11  Wolff to Rosemont Seneca Bohai -- as explained to you by Jason

12  Galanis -- was to make an investment, correct?

13  A.  Again, I don't remember the details.

14  Q.  The purpose was to help settle an investment, correct?

15  A.  I don't remember.

16  Q.  Let me show you, please -- Mr. Jackson, for the lawyers,

17  the witness and Judge Abrams -- Exhibit 4795.  This is an

18  e-mail from Jason Galanis to yourself, true?

19  A.  It appears that way, yes.

20          MR. SCHWARTZ:  I offer Exhibit 4795.

21          MS. MERMELSTEIN:  No objection.

22          THE COURT:  It will be admitted.

23          (Defendant's Exhibit 4795 received in evidence)

24  Q.  Can you publish that, please.

25          Mr. Martin, this is an example of Jason Galanis

I6D7GAL3                      Martin Fernandez - Cross

1    ghostwriting an e-mail for you to send on, true?

2    A.   True.

3    Q.   And in the very first line he is giving you the e-mail that

4    you should send it to, cwolff@wolfflawfirm.com, correct?

5    A.   Correct.

6    Q.   And then he gives you the full text of the e-mail that you

7    were supposed to send, true?

8    A.   Correct.

9    Q.   And that text is that Thorsdale wired your firm $15 million

10   today.  Please accept this e-mail as your written instruction

11   to release the funds to -- and then it provides information for

12   an account in the name of Rosemont Seneca Bohai LLC, correct?

13   A.   Correct.

14   Q.   And the final line is "Thank you for your assistance in

15   helping to settle this investment for your client."  Correct?

16   A.   Correct.

17   Q.   And since this is an e-mail to Mr. Wolff, you understood

18   his client to be Jason Galanis, correct?

19   A.   Again, I don't remember the exact how they were related,

20   but yes.

21   Q.   And you did in fact send that e-mail to Mr. Wolff, true?

22   A.   Yes.

23   Q.   And just generally speaking, your understanding of

24   Thorsdale was that was Jason Galanis' family office, correct?

25   A.   Yes.

I6D7GAL3                      Martin Fernandez - Cross

1    Q.  Meaning Thorsdale managed what you understood to be the

2    Galanis family money, correct?

3    A.  His family money, yes.

4    Q.  Thank you.

5            You can take that down, Mr. Jackson.

6            This would be a convenient time to break if your Honor

7    wants, or I can push on.

8            THE COURT:  No, I'd like to go -- since we're only

9    going to take one break today, if you can go another 15 or 20

10   minutes, that would be great.

11           MR. SCHWARTZ:  Absolutely.

12   Q.  I'd like to speak now about -- let's talk about Thunder

13   Valley and Seymour Capital.  OK?

14   A.  OK.

15   Q.  Those were companies that you created in conjunction with

16   Jason Galanis and Gary Hirst, correct?

17   A.  Correct.

18   Q.  And it was specifically Gary Hirst who instructed you to

19   form those companies, correct?

20   A.  Correct.

21   Q.  But ultimately again Jason was the mastermind, right?

22   A.  That was my understanding.

23   Q.  And you testified that he had instructed you -- he, Jason

24   Galanis -- had instructed you to form those companies in the

25   Seychelles, correct?

I6D7GAL3                     Martin Fernandez - Cross

1    A.  He instructed me to form companies off shore and asked me

2    what jurisdiction would be best.

3    Q.  I see.  And did he instruct you -- did Jason Galanis

4    instruct you specifically to choose a so-called privacy

5    jurisdiction?

6    A.  Yes.

7    Q.  And when I say privacy jurisdiction, you understand I'm

8    talking about a place where it would be difficult because of

9    bank secrecy laws for information about those accounts to reach

10   the United States.  True?

11   A.  Correct.

12   Q.  And were you the one who knew that Seychelles was a good

13   privacy jurisdiction?

14   A.  Yes.

15   Q.  By the way, have you ever been to Seychelles?

16   A.  No.

17   Q.  Now, you were the owner of Seymour Capital, correct?

18   A.  I was the beneficial owner of Seymour Capital, yes.

19   Q.  Was there some other person who was the owner in a

20   different meaning?

21   A.  Ultimately both Jason Galanis and Gary Hirst were the

22   actual owners.

23   Q.  Well, they controlled it, right?

24   A.  Indirectly, yes.

25   Q.  And they were -- you understood them to be the

I6D7GAL3                    Martin Fernandez – Cross

1   beneficiaries of the assets, correct?

2   A.   Correct.

3   Q.   It wasn't your assets in those companies, right?

4   A.   Correct.

5   Q.   But on paper you owned all the shares.

6   A.   On paper, yes.

7   Q.   Of Seymour Capital, correct?

8   A.   Correct.

9   Q.   And for Thunder Valley Engineering it was that fellow

10  Greenwood, John Greenwood, who owned all the shares, correct?

11  A.   Correct.

12  Q.   And again you had power of attorney on behalf of

13  Mr. Greenwood, correct?

14  A.   Correct.

15  Q.   And John Greenwood never had anything to do with the actual

16  operation of Thunder Valley Engineering, correct?

17  A.   Correct.

18  Q.   And when I say operation, we really are just talking about

19  moving money and trading in securities, correct?

20  A.   Correct.

21  Q.   These companies had no employees, right?

22  A.   Correct.

23  Q.   They had no other operations, correct?

24  A.   Correct.

25  Q.   They didn't make anything or sell anything, correct, other

I6D7GAL3                        Martin Fernandez - Cross

1    than securities?

2    A.  Correct.

3    Q.  And you opened brokerage accounts for both Thunder Valley

4    Engineering and Seymour, correct?

5    A.  Correct.

6    Q.  And was that at the direction of Jason Galanis or Gary

7    Hirst?

8    A.  Mostly Gary Hirst.

9    Q.  And I believe you testified previously that both Jason

10   Galanis and Gary Hirst also had online access to those

11   brokerage accounts?

12   A.  Correct.

13   Q.  And so they could go directly into the account online and

14   execute trades, true?

15   A.  Correct.

16   Q.  And is it fair to say that looking at the trading activity

17   in those accounts you couldn't tell us today which trades you

18   executed, which ones Gary Hirst executed, and which ones Jason

19   Galanis executed?

20   A.  I couldn't tell you with certainty, no.

21   Q.  And when you did yourself execute trades it was at the

22   instruction of Gary Hirst, correct?

23   A.  Correct.

24   Q.  And you also authorized wire transfers of money for Seymour

25   Capital and Thunder Valley, correct?

I6D7GAL3                    Martin Fernandez - Cross

1   A.  Correct.

2   Q.  And when you were wiring money out, that was typically at

3   the instruction of Jason Galanis, correct?

4   A.  That's correct.

5   Q.  So in general Gary Hirst instructed you on trading and

6   Jason Galanis instructed you on money?

7   A.  That's correct.

8   Q.  And when you sent a wire out, it typically required a

9   letter of authorization, right?

10  A.  Correct.

11  Q.  And when we were talking before about you cutting and

12  pasting John Greenwood's signature on a letter, it was on one

13  of those letters of authorization, true?

14  A.  Correct.

15  Q.  And in general the letter of authorization required you to

16  state the purpose for the wire, right?

17  A.  Correct.

18  Q.  You did not know the actual purpose of wires out of those

19  accounts, correct?

20  A.  Correct.

21  Q.  Jason Galanis or Gary Hirst would give you made-up reasons,

22  correct?

23  A.  They would give me purposes; I don't know if they were made

24  up.

25  Q.  That was my question.  So, they would tell you the purpose,

1    and at the time you didn't know if they were true or false,

2    right?

3    A.  Correct.

4    Q.  And some of the wires, by the way, that you sent out, I

5    think you testified about on direct, went to Rosemont Seneca

6    Bohai, correct?

7    A.  That's correct.

8    Q.  I think you said on direct that it was about $100,000; is

9    that right?

10   A.  More or less.

11   Q.  It was actually a little bit more, right?  It was about

12   $178,000?

13   A.  That could be.

14   Q.  And the purpose for those wires, you were told, was to

15   repay money that Mr. Archer had expended, correct?

16   A.  I don't remember specifically saying that, but I have to

17   see the document.  I don't remember.

18   Q.  Well, you understood that that money went to Mr. Archer in

19   repayment for money that he had advanced, true?

20   A.  That was my understanding.

21   Q.  And that was your understanding from Jason Galanis, true?

22   A.  Correct.

23   Q.  By the way, that was not full repayment for the money that

24   Mr. Archer had advanced, was it?

25   A.  I don't know.

I6D7GAL3                    Martin Fernandez - Cross

1    Q.  You don't know the details of what Mr. Archer may have

2    advanced, true?

3    A.  True.

4    Q.  In fact you don't even know if he did advance any money,

5    right?

6    A.  I don't know.

7    Q.  You just know what Jason Galanis told you, right?

8    A.  Yes.

9    Q.  Let's talk about Calvert for a second.  Now, you told us

10   earlier that you created Calvert at Jason Galanis' instruction,

11   correct?

12   A.  Correct.

13   Q.  And Calvert is a real UK company, correct?

14   A.  Correct.

15   Q.  And it was formed on or about October 1, 2015, correct?

16   A.  Correct.

17   Q.  And you put it in your brother Salvador's name, correct?

18   A.  Correct.

19   Q.  You told us how you came up with the name, right?

20   A.  Yes.

21   Q.  And you also told us earlier that even though some of the

22   Calvert documents were backdated, you did not understand at the

23   time for what purpose Jason Galanis was going to use them,

24   right?

25   A.  I mean I didn't understand all the details of those

I6D7GAL3                    Martin Fernandez - Cross

1   documents, correct.

2   Q.  Well, did you understand that Jason Galanis had instructed

3   you to form Calvert for the sole and only purpose of deceiving

4   people?

5   A.  No.

6   Q.  No, you didn't know that, right?

7   A.  No.

8   Q.  And in your experience in business it sometimes happens

9   that an agreement is made as of a prior date, correct?

10           MS. MERMELSTEIN:  Objection.

11           THE COURT:  I'll allow that.  You can answer that.

12  A.  Can you repeat the question?

13  Q.  In your experience in business, sometimes an agreement is

14  made as of an earlier date, correct?

15  A.  It happens, yes.

16  Q.  And the government showed you Exhibit 612.

17           Pull that up, please, Mr. Jackson.  I'm sorry, 1612.

18  I apologize.

19           Do you recall looking at this e-mail on direct

20  examination?

21  A.  Yes.

22  Q.  And the bottom e-mail is dated just about a week after

23  Calvert was formed, correct?

24  A.  Correct.

25  Q.  And it's an e-mail from Jason Galanis to what you testified

I6D7GAL3                         Martin Fernandez - Cross

1    was a lawyer, correct?

2    A.   Correct.

3    Q.   And in that e-mail Jason Galanis is instructing the lawyer

4    to secure a valuation for the assets of Calvert Capital,

5    correct?

6    A.   Correct.

7    Q.   And the lawyer did in fact commission that valuation; isn't

8    that so?

9    A.   I don't know.

10   Q.   Well, let me show you what has been marked as Defense

11   Exhibit 4023B.  That very thick document is the valuation of

12   Calvert Capital's assets that was prepared, correct?

13   A.   It's a valuation of Valor Group, not Calvert.

14   Q.   Look at page 2.  I direct your attention to the first

15   paragraph.

16              MS. MERMELSTEIN:  Your Honor, before we start reading

17   from the document, I think the witness should be asked if he

18   has ever seen it before.

19              THE COURT:  We're waiting for that.

20   Q.   I'm just asking you to read it to yourself.  And my

21   question is, this exhibit, Defendant's Exhibit 4023B, is the

22   independent valuation of Calvert Capital's assets --

23              THE COURT:  Have you seen this before?

24              WITNESS:  It doesn't ring a bell ever that I've ever

25   seen this -- or even read it for that matter.

I6D7GAL3                    Martin Fernandez - Cross

1   Q.  You don't think you've ever seen that document?

2   A.  It doesn't -- I'm pretty positive I have not seen it or

3   read it.

4   Q.  All right.  Then why don't you put it aside.

5   A.  OK.

6   Q.  Now, going back to Seymour Capital and Thunder Valley for a

7   second, fair to say there was still quite a bit about those

8   entities even though you technically owned one and had power of

9   attorney over the other, that you did not know?

10  A.  Can you repeat the question?  I don't understand the

11  question.

12  Q.  Isn't it fair to say that there was a good deal about

13  Thunder Valley and Seymour Capital that you didn't know?

14  A.  I'm sure there is more to it that I didn't know.

15  Q.  Well, let me just ask you an easy one.

16          You became aware at some point in your meetings with

17  the government that Gary Hirst had opened a bank account for

18  Seymour Capital, correct?

19  A.  During my meetings, yes.

20  Q.  Through your meetings, right.

21  A.  Correct.

22  Q.  You did not know that at the time, true?

23  A.  That's correct.

24  Q.  So even though you were the technical owner of Seymour

25  Capital, you had no idea that Gary Hirst had opened a bank

I6D7GAL3                         Martin Fernandez - Cross

1    account, correct?

2    A.   Correct.

3    Q.   And that was at Chase Bank, correct?

4    A.   I don't remember which bank it was, but ...

5    Q.   By the way, you testified earlier that you had had no

6    business dealings with Wealth Assurance Private Client

7    Corporation; is that correct?

8    A.   That's correct.

9    Q.   Just to be clear though, you did wire millions of dollars

10   to Wealth Assurance Private Client Corporation, correct?

11   A.   I remember wiring money to Wealth Assurance, but in that

12   specific name connotation I don't remember exactly.

13   Q.   I'm sorry.

14   A.   I don't remember that name specifically.  I remember Wealth

15   Assurance.

16   Q.   So you knew that you were sending millions of dollars to

17   something you knew as Wealth Assurance, correct?

18   A.   I don't remember it being millions; I just remember doing

19   wires to Wealth Assurance.

20   Q.   More than one, right?

21   A.   I don't specifically remember how many, but certainly at

22   least once.

23   Q.   More than a million dollars, right?

24   A.   I don't know.

25   Q.   Now, you opened a trading account for Thorsdale -- Jason

I6D7GAL3                    Martin Fernandez – Cross

1   Galanis' entity Thorsdale –– at Ameritrade, true?

2   A.   Correct.

3   Q.   And also at Interactive Brokers, true?

4   A.   Correct.

5   Q.   And when you opened those accounts, you listed yourself as

6   the sole 100 percent owner of Thorsdale, correct?

7   A.   Correct.

8   Q.   You also listed yourself as the managing director of

9   Thorsdale, correct?

10  A.   Correct.

11  Q.   To be clear, you were not the owner of Thorsdale, right?

12  A.   Correct.

13  Q.   You were not a managing director of Thorsdale, correct?

14  A.   Correct.

15  Q.   You were never employed by Thorsdale, right?

16  A.   Correct.

17  Q.   You had no formal affiliation of any kind with Thorsdale,

18  true?

19  A.   Correct.

20  Q.   As you testified earlier, you understood Thorsdale to be

21  the family office for Jason Galanis' personal wealth, correct?

22  A.   Correct.

23  Q.   But when you opened those trading accounts, you listed

24  yourself as the owner and managing director of Thorsdale,

25  correct?

I6D7GAL3                        Martin Fernandez - Cross

1    A.  Correct.

2    Q.  And that misstatement -- you agree with me that was a

3    misstatement to the brokerage firms, correct?

4    A.  Correct.

5    Q.  That misstatement was designed to make things

6    administratively easier, correct?

7    A.  Correct.

8    Q.  You weren't trying to steal Jason Galanis' money, correct?

9    A.  No.

10   Q.  And at that point you weren't lying to help him steal

11   millions of dollars in bond proceeds, correct?

12   A.  What do you mean?

13   Q.  At that point, at the point at which you listed yourself as

14   the owner of Thorsdale and the managing director of Thorsdale,

15   you didn't do that so you could help Jason Galanis steal

16   millions of dollars in bond proceeds, right?

17   A.  No, these accounts held very little money.

18   Q.  Right.  You did that for convenience.

19   A.  Explain that, please.

20   Q.  You did that for convenience so you could transact in that

21   account, correct?

22   A.  Correct.

23   Q.  On behalf of Jason, correct?

24   A.  Correct.

25   Q.  When he would give you instructions to do so, correct?

I6D7GAL3                    Martin Fernandez – Cross

1    A.  Correct.

2    Q.  You were just trying to make it easier to manage the

3    account, correct?

4    A.  Correct.

5    Q.  Mr. Martin, when Jason Galanis thought it was important for

6    you to meet someone, he made an effort to introduce you to

7    them, didn't he?

8    A.  Yes.

9    Q.  So he introduced you -- Jason Galanis introduced you to

10   Jason Sugarman, correct?

11   A.  Correct.

12   Q.  And, Mr. Jackson, if you can show the witness, Judge Abrams

13   and the lawyers Exhibit 4911.

14          You recognize that as Jason Sugarman, correct?

15   A.  Correct.

16   Q.  Can you publish that, please, Mr. Jackson.

17          And when was that that Jason Galanis introduced you to

18   Mr. Sugarman?

19   A.  I don't recall the exact time.

20   Q.  It was some time ago, true?

21   A.  Yes.

22   Q.  You had been -- as we went through -- you had been

23   discussing potential deals with him back in 2013, right?

24   A.  About, yes.

25   Q.  And you knew that Mr. Sugarman was a close business partner

I6D7GAL3                    Martin Fernandez - Cross

1   of Jason Galanis' right?

2   A.  I assumed, yes.

3   Q.  And you had been told by Jason Galanis that Mr. Sugarman

4   had acquired Burnham Securities, correct?

5   A.  I don't recall exactly that, no.

6   Q.  You recall telling the government that you understood that

7   Jason Sugarman acquired Burnham?

8   A.  I don't remember saying that.

9   Q.  You understood that Mr. Sugarman had some sort of interest

10  in Burnham Securities though, correct.

11  A.  Yes.

12  Q.  By the way, have you ever heard of Burnham Asset

13  Management?

14  A.  I think I've heard about it, yes.

15  Q.  You had nothing to do with that, right?

16  A.  No.

17  Q.  The bonds, as far as you know, had nothing to do with that,

18  right?

19  A.  I don't know.

20  Q.  And just going back to Jason Sugarman very quickly, you

21  talked with him about Forces Vives, about the Hottinger Bank

22  deal, correct?

23  A.  Yes.

24  Q.  And you also brought deals directly to Mr. Sugarman,

25  correct?

I6D7GAL3                    Martin Fernandez - Cross

1    A.  Yes.

2    Q.  You were trying to get him interested in various things,

3    correct?

4    A.  Correct.

5    Q.  You wanted to see if he would invest in a marina in Costa

6    Rica, correct?

7    A.  I vaguely remember that, yes.

8    Q.  You tried to get him interested in a fund that you were

9    raising for Gene Simmons, correct?

10   A.  Correct.

11   Q.  That's Gene Simmons from the band Kiss, right?

12   A.  Yes.

13   Q.  And, by the way, Mr. Sugarman told you in response that his

14   father-in-law, Mr. Guber--

15            MS. MERMELSTEIN:  Objection, your Honor.

16            THE COURT:  Is this relevant?  You know I think

17   actually it's time to take our morning break anyway, so why

18   don't we do that now.

19            So we're going to take a half hour break.  We're going

20   to start again at noon.  This will be our only break for the

21   day.  Just remember keep an open mind and don't discuss the

22   case.

23            Also, ladies and gentlemen, I know that these short

24   weeks have been frustrating, and I want to apologize for that.

25   Next week we are sitting a whole week; we will be sitting from

I6D7GAL3                         Martin Fernandez - Cross

1    9:30 to 5:30.  I wanted to ask you all, to the extent the trial

2    is still going on Friday, if you are available to sit on

3    Friday, again just to keep things moving as quickly as

4    possible.  So, if you could just let Ms. Cavale know, I would

5    appreciate it.  Thank you.

6              (Jury and witness not present)

7              THE COURT:  Everyone can be seated.

8              MR. TOUGER:  Can I tell you about Friday the 22nd that

9    you spoke about?

10             THE COURT:  Yes.

11             MR. TOUGER:  I have no problem sitting in the morning,

12   but when I checked my calendar I realize that I have a doctor's

13   appointment that was made months ago that I can't change.

14             THE COURT:  What time?

15             MR. TOUGER:  It's at 3, and I have to get all the way

16   out to New Jersey.  So I could sit until maybe 12:30 or 1, but

17   after that --

18             THE COURT:  Well, let's see what the jury says first

19   and then we will address it.

20             First of all, the relevance of Gene Simmons and

21   Mr. Sugarman and the response?

22             MR. SCHWARTZ:  I think that again the prior course of

23   dealings between alleged conspirators -- and the government's

24   view is that Mr. Sugarman is an unindicted coconspirator -- is

25   relevant.

1          MS. MERMELSTEIN:  I just can't see the relevance of

2     the fact that this witness talked to Mr. Sugarman about someone

3     famous and his father-in-law.

4          I'm not saying not saying that no course of dealings

5     could be relevant, but the repeated efforts to elicit the sort

6     of famous people stuff I think is irrelevant, and I don't see

7     it.  So if there is a more specific proffer about why this

8     course of dealings is relevant -- and maybe there is one -- but

9     I can't see it.

10         MR. SCHWARTZ:  I mean I can't help the fact that this

11    is what they talked about.  I'm not trying to get out anything

12    specific about, you know, Kiss.  I also brought out a marina in

13    Costa Rica.  I have one more question.

14         THE COURT:  But what was the rest of that question?

15    You said and, by the way, Mr. Sugarman told you in response to

16    his father-in-law, Mr. Guber.

17         MR. SCHWARTZ:  The course of communication is that

18    Sugarman says my father-in-law managed Kiss, and they said, ah,

19    small world.  That's it.

20         MS. MERMELSTEIN:  So what is the relevance?

21         MR. SCHWARTZ:  It's the familiarity they have with one

22    another.  Mr. Archer doesn't know any of these people, and they

23    all have done business with one another for years and years.

24         THE COURT:  I think you've got enough on that point to

25    make that point clear, so I don't think the response is really

I6D7GAL3                    Martin Fernandez – Cross

1    relevant.

2              So on Mr. Santos, first of all, just on scheduling --

3    are you almost done?

4              MR. SCHWARTZ:  This is my last line of questioning.

5              THE COURT:  So on Mr. Santos, let's talk.

6              MS. TEKEEI:  Your Honor, Mr. Santos is an employee of

7    the U.S. Attorney's office who extracted data from Michelle

8    Morton's phone during what we believe was during a proffer

9    session that she had with our office.  That was done on

10   September 3, 2015.  We produced in the course of discovery the

11   entire extraction report to the defendants years ago, to all of

12   them, when they were all still in the case.  And we marked

13   certain excerpts of that extraction report as we were preparing

14   for trial as exhibits.

15             As we got closer to trial, obviously Ms. Morton pled,

16   and so we very, very much narrowed down the pool of data from

17   that report that we, the government, intended to offer.

18             We have been asking defense counsel for several weeks

19   whether they would stipulate to the authenticity of the phone

20   extraction report.  They have refused to do so.  That's fine.

21             We intend to call Mr. Santos.  We have told them that

22   since he is a U.S. Attorney's office employee, we plan to fit

23   him in where it made sense and where there was time, given

24   there were other witness scheduling issues.

25             We gave them notice last week that we would be calling

I6D7GAL3                      Martin Fernandez - Cross

Mr. Santos --

                THE COURT:  Is he the only other witness you have

scheduled for today?

                MS. TEKEEI:  Yes, your Honor.

                THE COURT:  I know you are going to read stuff into

the record as well.  How long is that going to take?

                MS. TEKEEI:  I think approximately one, one and a half

hours.

                THE COURT:  OK.

                MS. TEKEEI:  I'm sorry.  Mr. Santos -- just to be

totally clear -- Mr. Santos' testimony is very short, and we

don't plan to read anything.

                THE COURT:  No, I understand.  But if the issue is you

want to review the materials and object before the cross, I'm

wondering if we can do the reading first and then Mr. Santos,

and that way you can look at them tonight and tomorrow, and

write me a letter.

                MR. SCHWARTZ:  That's what I was going to speak up on

as they confer.

                Just as a logistical matter, the government gave us

the list of e-mails they intend to read at like midnight on

Monday, and I just missed it, and so when they told us today

that they were adding like three other e-mails, I realized I

had missed that list before.  So I need at some point 15, 20

minutes to go through that list of however many, 40 e-mails,

I6D7GAL3                    Martin Fernandez - Cross

1    and make sure I don't have any objections.  We could do Santos'

2    direct and then take our longer break.  We can do it however

3    you want.

4              THE COURT:  So I think -- well, first of all, you have

5    the 20 minutes right now.

6              MR. SCHWARTZ:  Oh, this is our long break?

7              THE COURT:  Yeah.

8              MR. SCHWARTZ:  Then I will do it right now.  That's

9    fine.

10             MS. NOTARI:  Your Honor, I do have objections to

11   several of their e-mails.  As far as I know I got notice of

12   this yesterday, and I haven't had a chance.  But some of these

13   e-mails I think are related to the Court's previous ruling, and

14   I would like the opportunity to follow up on the ones I'm

15   objecting to with the court.

16             THE COURT:  Which ones are you objecting to?

17             MS. TEKEEI:  Your Honor, I'm sorry, I don't mean to

18   interrupt Ms. Notari, but we were focused on the phone.  I just

19   want to round out that issue.

20             THE COURT:  This is not about the same thinking?

21             MS. TEKEEI:  No, I think it's a totally different

22   issue.  It's with respect to the e-mail reading.

23             Mr. Santos' testimony is purely to authenticate the

24   extraction of the records.  We don't expect we will have any

25   objections to the authenticity of the records that Mr. Schwartz

1    and Ms. Notari have marked as exhibits, so we could move

2    forward with his testimony today.  We're not planning on

3    reading anything in through him.  We don't expect that they

4    would, since he is our witness.  But we will have --

5              THE COURT:  I'm sure they plan to.  I mean who are you

6    going to try to get the things you wanted from the Morton

7    phone?  Mr. Santos?

8              MR. SCHWARTZ:  If they're not going to read, we're not

9    going to read either, that's fine.  I assumed that they were

10   going to read, but if not --

11             THE COURT:  So can we have Santos authenticate

12   everything and then decide on the admissibility and the

13   publishing of these items for later?

14             MR. SCHWARTZ:  I think that's fine --

15             MS. TEKEEI:  Yes.

16             MR. SCHWARTZ:  -- with one exception, which is, that

17   analytics part of the phone, we're going to have some

18   substantive questions for him on that, so this is not the

19   content of actual texts but --

20             THE COURT:  Can you do that today?

21             MR. SCHWARTZ:  The cross?  Of course.

22             THE COURT:  Yeah.  OK.

23             MS. MERMELSTEIN:  Of all the things they've marked, we

24   can look at that right now.

25             THE COURT:  Fine.  So we can still have Santos testify

I6D7GAL3                    Martin Fernandez - Cross

1    today, and we can sort these things out.  I won't be here, as

2    you know, but I will read whatever you submit to me, and we can

3    discuss it Monday morning at nine.

4              MS. TEKEEI:  Thank you.

5              And one further issue with respect to Mr. Santos.  He

6    is an employee of the U.S. Attorney's office, he has been for

7    several years.  Mr. Schwartz has questioned at least one

8    witness in this case about their familiarity with the fact that

9    he used to work in this office, general questions about the

10   administration.  We don't think any of that is appropriate with

11   Mr. Santos.

12             THE COURT:  I agree.

13             MS. TEKEEI:  Thank you, your Honor.

14             THE COURT:  Ms. Notari?

15             MR. SCHWARTZ:  Ms. Harris will ask all the questions.

16             THE COURT:  Ms. Harris, will ask the questions, OK, so

17   we won't have as many problems.

18             MS. NOTARI:  I have identify for the government

19   certain e-mails.  I am just asking that they not read them

20   today and that I be given a chance to address them before the

21   next reading of the e-mail.

22             THE COURT:  I'm sorry.  You have done that, or you

23   want to do that now?

24             MS. NOTARI:  I have objected, and I want the chance to

25   talk to them about it.

I6D7GAL3                  Martin Fernandez - Cross

1          THE COURT:  Do you want to talk now over the break?

2    What do you want to do?  I'm happy to use this time, but -- I'm

3    happy to talk about it now.

4          MS. NOTARI:  I think at least two of them are going to

5    require the Court's involvement.

6          THE COURT:  OK, so I'm here.  What do you want to talk

7    about?  Which two?

8          MS. NOTARI:  Well, there is one involving a redaction,

9    but --

10          OK.  First, the court previously ruled in a prior in

11    limine ruling -- and unfortunately I don't have that document,

12    but it was a profit and loss statement for approximately $1.9

13    million, and it involved an e-mail to Gary Hirst.  I filed a

14    motion in limine that they were trying to use this as 404(b)

15    evidence and we weren't given notice of it, and the Court kept

16    that out.

17          MR. QUIGLEY:  That was 2280, your Honor.  That's not

18    an exhibit we're seeking to offer.

19          MS. NOTARI:  So now they're trying to get in 2281,

20    which is related -- which is an e-mail between Bevan Cooney and

21    Gary Hirst, and it's related to that transaction.

22          And again the Court's ruling was with regard to

23    keeping out, you know, the relevance of Gary Hirst and

24    Mr. Cooney, and it was just -- you know, I'm not sure what

25    they're trying to argue with this, but I think it's again more

I6D7GAL3                    Martin Fernandez - Cross

1   404(b) evidence.

2          The fact that the records -- the bank records which

3   are attached to this seem to show -- I'm not sure exactly what

4   they're trying to show.  But if it's the fact that Mr. Cooney

5   received money for the bonds, I mean there is already evidence

6   of that.  I'm not sure what the purpose of this is.

7          MR. QUIGLEY:  I think it's relevant for a couple of

8   reasons.  Number one, it shows the relationship that Mr. Cooney

9   and Gary Hirst knew each other.  I mean if there are sensitive

10  things in the attached financial statement that -- we're not

11  going to publish the financial statement.  We can avoid

12  publishing the financial statement to the jury today and talk

13  about what needs to be redacted.

14         But obviously the fact that they knew each other -- as

15  evidenced by this e-mail -- is relevant, particularly in light

16  of the defense arguments that people were siloed, people were

17  kept out of the loop.

18         This is an e-mail -- just so we're clear, I mean this

19  is an e-mail we marked and produced to the defense as an

20  exhibit on March 15, so it's something they have had quite a

21  while.

22         THE COURT:  OK.  But you're not planning to publish

23  the attachment anyway.

24         MR. QUIGLEY:  That's correct, your Honor.

25         THE COURT:  But are you seeking to admit it into

I6D7GAL3                    Martin Fernandez - Cross

1   evidence?

2          MR. QUIGLEY:  We're seeking to admit it into evidence.

3   I mean we're I'm happy to take it up with Ms. Notari.

4          THE COURT:  Why don't you discuss with Ms. Notari how

5   it should be redacted.  But in any event you're not going to

6   publish it today.

7          MS. NOTARI:  I would just ask that I be given more

8   time to review it.  It's --

9          THE COURT:  That's fine.  So I'm letting the e-mail

10  in, and I'm going to reserve ruling on the attachment.

11  Although you can elicit the fact the fact that there was an

12  attachment.

13         MR. QUIGLEY:  That's fine.

14         MS. NOTARI:  So 2252, this is completely related to

15  the profit and loss statement that your Honor kept out.  It's

16  an e-mail, you can see it, it has to do with reclassifying

17  income.  It's an e-mail between my client and his accountant,

18  and it's completely linked to that previous document which your

19  Honor ruled is not admissible, and it's very prejudicial; it

20  calls for all kinds of speculation.

21         MR. QUIGLEY:  I think here is why it's relevant, your

22  Honor.  Again, this shows -- obviously Thorsdale is Jason

23  Galanis' company.  Showing that Mr. Cooney got $1.9 million

24  from Jason Galanis from Thorsdale accounts is relevant to show

25  the nature of his relationship with him, and again particularly

I6D7GAL3                    Martin Fernandez - Cross

1    in light of defense arguments that the defendants didn't get

2    anything out of this -- or at least certain defendants didn't

3    get anything out of this.  Again, this was an exhibit that was

4    produced in our original set on March 15.

5           MS. NOTARI:  And I objected to it.  And last night I

6    slept at a hotel.  I live in New Jersey.  I didn't have my

7    computer.  I didn't have a chance.  I just want the opportunity

8    to follow up on this with the Court.  It's very, very

9    prejudicial document, and there is no prejudice for us not

10   putting this into evidence today.

11          MR. QUIGLEY:  I mean, Judge --

12          MS. NOTARI:  Your Honor, they gave us 4,000 exhibits.

13   I am one person.

14          THE COURT:  Honestly we don't have time to have the

15   back and forth.  Were you going to publish this today?

16          MR. QUIGLEY:  We would like to be able to, your Honor.

17   Again, the issue for us is our case is rapidly coming to a

18   close.

19          MS. NOTARI:  One e-mail is not going to make a

20   difference.

21          MR. QUIGLEY:  And, it's fine, we have tabled a lot of

22   things, and we just want to make sure we get stuff in in an

23   orderly fashion.

24          THE COURT:  And what you want to do, Ms. Notari, is

25   have more time to review it?

I6D7GAL3                        Martin Fernandez - Cross

1              MS. NOTARI:  Yes, exactly.

2              THE COURT:  Is there someone else you could get this

3    in through on Monday?

4              MR. QUIGLEY:  There is an authenticity stipulation.

5    We can do another round of e-mail reading.

6              THE COURT:  As a professional courtesy let's hold off

7    on this one.

8              MR. QUIGLEY:  That's fine, your Honor.

9              THE COURT:  Thanks.

10             So we will come back in 15 minutes.  Thanks.

11             MS. NOTARI:  Your Honor, there are others.  I would

12   just --

13             (Luncheon recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I6DJGAL4                         Martin - cross

1            AFTERNOON SESSION

2            12:00 pm

3            (Trial resumes)

4            (In open court; jury not present)

5            THE COURT:  Everyone may be seated.  Thanks.  Are we

6    ready for the jury?

7            MR. SCHWARTZ:  May I have two minutes?

8            THE COURT:  All right.

9            (Pause)

10           MS. NOTARI:  Your Honor, I identified four emails that

11   I would like the opportunity to review this weekend over the

12   break, and two of the emails, two additional, have to do with

13   redactions regarding CNB, email exhibits that were addressed

14   during the testimony of Steve Shapiro, and we need to talk more

15   about that.

16           THE COURT:  It is 2252 and plus three more?

17           MS. NOTARI:  So it is 3251, 2281, 3205 and 2259.  I

18   may just withdraw my objections, but I just need the chance to

19   evaluate them.

20           MS. MERMELSTEIN:  We'll wait, your Honor.

21           THE COURT:  Thank you for that.

22           MS. MERMELSTEIN:  For the record, because we disclosed

23   them on Monday so we could avoid this and the government could

24   put in the case it wanted to, I think we are going to wrap up

25   on Monday, so we can't be in this position on Monday.  We have

I6DJGAL4                       Martin - cross

1     to be able to put our case on.

2                  THE COURT:  I understand.

3                  MS. MERMELSTEIN:  We'll wait for these ones to take

4     them on order.

5                  THE COURT:  On timing, it is hard for the Marshals,

6     which I completely understand, getting back if we finish at

7     5:30.  So what I propose is that we sit from 9:00 to 5:00 every

8     day next week.  Are you guys okay with that?  I know it is not

9     convenient for you, Mr. Touger?

10                 MR. TOUGER:  9:00 is and 5:00, but I can't be here at

11    8:30.

12                 THE COURT:  Then don't raise any issues.  I am just

13    kidding.  Can you be here at 8:45?

14                 MR. TOUGER:  I have said the least.

15                 THE COURT:  I was just kidding, obviously.  Can you be

16    here at 8:45?

17                 MR. TOUGER:  Yes.

18                 THE COURT:  I will ask everyone to make an effort to

19    raise any issues at 5:00 because I think Mr. Galanis has been

20    willing to waive his presence for the legal argument, okay?  So

21    let's plan to sit next week, I will ask the jury, but plan to

22    sit from 9:00 to 5:00 every day next week and at least half the

23    day, till 1:00 on Friday.  All right.

24                 MS. TEKEEI:  Your Honor, we have reviewed the

25    analytics report.  We understand, we understand Ms. Harris

I6DJGAL4                    Martin - cross

1    would like to walk through at least portions of it with

2    Mr. Santos.  It appears to be, it is a report that shows the

3    frequency of communications of the holder of the phone with

4    various individuals.

5         We don't have, we think, any objection to Ms. Harris

6    asking Mr. Santos about portions or the frequency of

7    communications with people who are involved in this case, but

8    obviously the phone itself communicated with all sorts of

9    personal people that Ms. Morton knew in her life; for example,

10   her parents, her nephew, various friends and family members,

11   and we don't think it is appropriate to show, and we don't

12   think it is relevant to show, communications with those

13   individuals.

14        MS. HARRIS:  If I could be heard, your Honor.

15        I understand the government's objection, but I think

16   one of the key issues in this case is the nature of the

17   relationships among not only folks indicted, but frequency of

18   communications that Ms. Morton had with those individuals, and

19   the relative frequency that she had with them versus her own

20   family members we think does underscore the intensity and

21   relevance of that relationship.

22        MS. TEKEEI:  Your Honor, she also didn't live with

23   people like Jason Galanis.  She lived with people like her

24   mother, her father, potentially other family members, and so I

25   don't see that that, first of all, is a fair argument.  I think

1    it is misleading and I also think again it goes into her

2    relationships with her family members and other people who are

3    not in any way, shape or form related to this case, which I

4    think is irrelevant, prejudicial and confusing.

5           THE COURT:  I think I will allow you to get -- first

6    of all, take out any personal identifying information of family

7    members.  Is there a way to do that or is that too complicated?

8           MS. HARRIS:  The way it is listed on the phone is a

9    contact for mommy and a contact for daddy.  Those are really

10   the only two.

11          THE COURT:  Mommy and daddy?

12          MS. HARRIS:  Yes.

13          THE COURT:  You're not going to get into the

14   communications with her parents?

15          MS. HARRIS:  No.

16          THE COURT:  But the frequency of the conversations?

17          MS. HARRIS:  Yes.

18          THE COURT:  That I will allow as long as it doesn't

19   say their names and phone numbers, but just says the contact.

20          MS. HARRIS:  We can redact the phone numbers, your

21   Honor.

22          THE COURT:  With that, I will allow.  With that, let's

23   bring the jury in.

24          MR. SCHWARTZ:  During the break I looked at all the

25   exhibits the government had identified for reading.  I have

1    objections I guess to just three of them, and I think there are

2    one or two that -- at least the version I have still in my

3    system -- the redaction needs to be fixed.  I need to look at

4    what the government is actually planning to show.  I can

5    address that now or later.

6              (Off-the-record discussion)

7              MR. SCHWARTZ:  1401 and 2061 and 62 are the ones I

8    object to.  Then 2069 and 2103 are the redaction issues.

9              MR. TOUGER:  I think, Judge, 2103 is the one that has

10   the press release.  We'll propose something over the weekend.

11             THE COURT:  Fine.  We'll deal with that on Monday.

12   Then on the other ones, what do you want to do?

13             MS. MERMELSTEIN:  I'll just check and see whether they

14   come in the first or second batch to predict the necessity of

15   dealing with it right this minute.

16             THE COURT:  Get them ready, but ask them if they can

17   do 9:00 to 5:00, and Friday 9:00 to 1:00, please.  Thank you.

18             (Pause)

19             MS. MERMELSTEIN:  Only 2061 and 62 up in the first

20   tranche of reading.  We can address those and see if we can get

21   them to the end of the day.

22             MR. SCHWARTZ:  I will tell you what my objection is

23   and you can look at it.

24             THE COURT:  What is the basis of the objection?

25             MR. SCHWARTZ:  It is emails, but basically the same

I6DJGAL4                    Martin - cross

1    thing which is Michelle Morton is relaying a conversation from

2    another person, and so it is just a hearsay within hearsay

3    objection to all of it.

4         MR. QUIGLEY:  Your Honor, in the conversation Michelle

5    Morton relaying consent to Jason Galanis that he then sends on

6    to Archer and Cooney.  We believe it is relevant to the fact it

7    was made and kept in the loop.

8         THE COURT:  You are not admitting it for the truth,

9    but rather who saw it?

10        MR. QUIGLEY:  They're admissible as adopted

11   co-conspirator statement of Morton.  In the alternative, we

12   would take them not for the truth of the matter asserted.

13        THE COURT:  Is she adopting it?

14        MR. QUIGLEY:  She is forwarding on --

15        MR. SCHWARTZ:  Do you want to bring up 2061 so the

16   Judge can see it.

17        THE COURT:  They can't do Friday.  Can they do 9:00 to

18   5:00?

19        THE CLERK:  Yes.

20        MR. SCHWARTZ:  If there is a non-hearsay use the

21   government wants to articulate, that is okay.  I think they're

22   trying to put it in for the truth of the conversation.  These

23   are all statements of Josh Bogart, whoever Josh Bogart is.

24        MR. QUIGLEY:  We are happy to take it not for the

25   truth of the matter asserted.  It is relevant these emails are

1    sent to Archer and Cooney from Mr. Galanis.

2              MR. SCHWARTZ:  I am not so sure they'll relevant, but

3    with that instruction, I think that is fine.

4              THE COURT:  One more?

5              MR. QUIGLEY:  1401 is not going to come up in the

6    first round.

7              THE COURT:  2062 is the only one?

8              MR. SCHWARTZ:  It's the same issue.

9              THE COURT:  Not being admitted for the truth, but just

10   remind me and I am happy to give that.

11             MR. SCHWARTZ:  I'll ask the government, are you

12   reading 2102 today?

13             MR. QUIGLEY:  It is in our second round.

14             MS. MERMELSTEIN:  I don't know that we'll get to it

15   today.

16             MR. SCHWARTZ:  2102, I don't object to it, but in

17   light of your Honor's ruling the arrest will come in as against

18   Mr. Archer, that email is sort of best understood in light of

19   the fact that Jason Galanis has just been arrested, so it might

20   be an appropriate time for that instruction.

21             MR. QUIGLEY:  We have no objection to that

22   instruction.

23             THE COURT:  I am sorry.  Tell me which is it?

24             MR. SCHWARTZ:  The best way to do it, if you guys did

25   2102 and 2103 properly redacted at the same time, but it sounds

I6DJGAL4                          Martin - cross

1    like you're not ready to do 2103.  I don't want to tell you how
2    to do your case.
3              MR. QUIGLEY:  Thanks.
4              MR. SCHWARTZ:  Those two should be done together
5    because they're about the same issue and the instruction should
6    be given at the same time.
7              THE COURT:  I will give this instruction.  You had
8    previously objected to the reference to the date.  I included
9    it last time because it was in the question that the government
10   asked of the witness.
11             MR. SCHWARTZ:  Depending on how the press release
12   evidence comes in and that puts a first date only it.  My
13   objection was --
14             THE COURT:  To my testifying?
15             MR. SCHWARTZ:  Exactly.
16             MR. QUIGLEY:  Now that the date is in evidence, it
17   would be appropriate to include the date in whatever limiting
18   instruction you give because the jury is not speculating about
19   multiple other arrests.  We are talking about the same
20   incident.
21             THE COURT:  All right.  Okay.  All right.
22             MR. SCHWARTZ:  That is fine.
23             THE COURT:  Let's bring the jury in.  Thanks.
24             (Jury present)
25             THE COURT:  Everyone can be seated.  Thank you.

I6DJGAL4                          Martin - cross

1              MR. SCHWARTZ:  May I?

2              THE COURT:  Yes.

3              MR. SCHWARTZ:  Thank you.

4    CROSS-EXAMINATION continued

5    BY MR. SCHWARTZ:

6    Q.  Just a few more questions for you, Mr. Martin.

7              When we left off, we were talking about your business

8    dealings with Jason Sugarman, correct?

9    A.  Yes.

10   Q.  And the fact that he was one of the people that Jason

11   Galanis had introduced you to, correct?

12   A.  Correct.

13   Q.  Now, Jason Galanis also introduced you to Jason Sugarman's

14   brother, Steven Sugarman, correct?

15   A.  Yes, very briefly.

16   Q.  You said very briefly?

17   A.  Yeah, I just met him once.

18   Q.  Just once, right.

19             That one time was when Jason Galanis had hosted a

20   lunch with you and Jason and Steven Sugarman for the precise

21   purpose of making an introduction, correct?

22   A.  I don't recall it as such, but it was a lunch meeting.

23   Q.  Well, wasn't the purpose of the lunch to introduce you to

24   people?

25   A.  I don't remember.

I6DJGAL4                        Martin - cross

1   Q.  Didn't you tell the government in one of your meetings to

2   prepare to testify today that you met Steven Sugarman

3   approximately two years ago at a lunch, and the purpose of the

4   lunch was for Jason Galanis to introduce you to several people?

5   A.  I don't remember saying it.

6           MR. SCHWARTZ:  Mr. Jackson, can you pull up for the

7   witness, Judge Abrams and the lawyers 3522-6.

8   Q.  You see what this document is, correct?

9   A.  Yes.

10          MR. SCHWARTZ:  Can you go to Page 5, please,

11  Mr. Jackson.

12  Q.  If you look sort of 10 lines up from the bottom, read that

13  to yourself, and my question is:  Does this refresh your

14  recollection that you told the government that you met Steven

15  Sugarman at a lunch, and the purpose of the lunch was for Jason

16  Galanis to introduce you to several people?

17  A.  It can be -- I don't necessarily recollect, refresh my

18  memory.  It doesn't refresh my memory, but I definitely met him

19  at lunch.

20  Q.  The point is you met Steven Sugarman at a lunch Jason

21  Galanis had arranged, true?

22  A.  Correct.

23  Q.  That would have been in about the summer of 2014, true?

24  A.  Again I don't remember the exact time of it.

25          MR. SCHWARTZ:  You can take that down, please,

I6DJGAL4                         Martin – cross

Mr. Jackson.

Q.   You also met Hugh Dunkerley a number of times, correct?

A.   Correct.

Q.   In fact, Mr. Dunkerley put you on the board of directors of Fondinvest, correct?

A.   It wasn't an official board of directors.  It was an informal advisory role.

Q.   Thank you.

         So, Mr. Dunkerley put you on the board of advisers for Fondinvest, correct?

A.   Correct.

Q.   Although Mr. Dunkerley was the CEO of that company, you understood that Jason Galanis had a hand in putting you on that board of advisers, correct?

A.   Yes.

Q.   He told you that he was putting you on that board of advisers because he had concerns about Mr. Dunkerley, correct?

A.   Correct.

Q.   Jason Galanis told you that Mr. Dunkerley was clumsy and had marital problems and was drinking too much, right?

A.   I remember something like that, yes.

         MR. SCHWARTZ:  Can I show you Exhibit 4912 in evidence.  You can publish that.

Q.   You recognize that as Mr. Dunkerley, correct?

A.   Yes.

I6DJGAL4                    Martin - cross

1   Q.  Now, another person that Jason Galanis introduced you to

2   was Mr. Cooney, correct?

3   A.  Correct.

4   Q.  That was socially, true?

5   A.  Correct.

6   Q.  You testified that you went to a celebratory lunch with

7   Mr. Cooney, correct?

8   A.  Correct.

9          MR. SCHWARTZ:  Let me show you just now for the

10  witness, the lawyers and Judge Abrams Exhibit 4916.

11         MS. NOTARI:  We have no objections, your Honor.

12         THE COURT:  Okay.

13  BY MR. SCHWARTZ:

14  Q.  You recognize that as a picture of Mr. Cooney, right?

15  A.  Yes.

16         MR. SCHWARTZ:  I offer Exhibit 4916.

17         MS. MERMELSTEIN:  No objection.

18         THE COURT:  It will be admitted.

19         (Defendant's Exhibit 4916 received in evidence)

20         MR. SCHWARTZ:  You can take that down, Mr. Jackson.  I

21  am sorry.  Did it ever go up for the jurors?  Why don't you put

22  that up for the jurors for a second.  You can take that down.

23  Q.  Another person that Jason Galanis introduced you to in

24  person was Gary Hirst, correct?

25  A.  Correct.

1    Q.  And Jason Galanis introduced Gary Hirst to you as a

2    business partner, correct?

3    A.  Correct.

4    Q.  And that was in about 2012-2013.  Is that right?

5    A.  More or less.  I don't remember the exact time, but --

6    Q.  It was Mr. Hirst who told you to set up Thunder Valley

7    Engineering and Seymour Capital, correct?

8    A.  Correct.

9    Q.  And he was the one who told you to trade in those

10   companies' names, correct?

11   A.  Correct.

12   Q.  And let me show you Exhibit 4917 in evidence.  You can put

13   that up.  You recognize that to be Gary Hirst, correct?

14   A.  It is a little bit blurry, but yes.

15   Q.  But you've never met Mr. Archer, have you?

16   A.  Say again.

17   Q.  You have never met Devon Archer, have you?

18   A.  No.

19   Q.  Jason Galanis did not set up a lunch for you and

20   Mr. Archer, did he?

21   A.  No.

22   Q.  He never set you up with one of Mr. Archer's companies the

23   way he did with Mr. Dunkerley, did he?

24   A.  I don't recall that, no.

25   Q.  Mr. Archer never directed your trading activities the way

I6DJGAL4                         Martin - redirect

1    that Gary Hirst did, did he?

2    A.  No.

3    Q.  You never got together socially with him the way you did

4    with others, did you?

5    A.  No.

6    Q.  You've never met Mr. Archer, correct?

7    A.  Correct.

8            MR. SCHWARTZ:  Thank you very much, Mr. Martin.

9    REDIRECT EXAMINATION

10   BY MS. MERMELSTEIN:

11   Q.  Good afternoon.

12   A.  Good afternoon.

13   Q.  Just a few questions.

14           Now, you were asked on cross-examination about the

15   fact that Gary Hirst opened a bank account in the name of

16   Seymour Capital, and you didn't know about that bank account,

17   right?

18   A.  Correct.

19   Q.  Fair to say, though, that Gary Hirst with Jason Galanis

20   were, in fact, controlling the activities of Seymour Capital

21   generally, right?

22   A.  Correct.

23   Q.  I want to just clear up some timing things that I think got

24   a little confused.  Let's pull up 1601 in evidence, please.

25           This is the email on August 26, 2014 where you're

1    being sent a signature page for the first investment management

2    agreement, right?

3    A.  Correct.

4    Q.  You had been at this point talking to Jason Galanis for a

5    few months about the deal.  Is that right?

6    A.  Correct.

7    Q.  If we can go to 1604, this is the second investment

8    management agreement being sent to you.  Is that right?

9    A.  Correct.

10   Q.  That is on what date?

11   A.  September 29th, 2014.

12   Q.  You were asked some questions about whether or not you had

13   actually signed this agreement or whether or not Jason Galanis

14   had put your signature on it.  You clearly knew that your name

15   was being put on this agreement whether or not you were the one

16   who literally signed, right?

17   A.  Correct.

18   Q.  Did Jason Galanis hide from you the fact that he was using

19   your name in that way?

20   A.  I believe so.

21   Q.  I am sorry?

22          If he sent you this agreement asking for your

23   signature, he wasn't hiding from you the fact that your name

24   was going to be on the document?

25   A.  Correct, correct.

I6DJGAL4                        Martin - redirect

1   Q.  You said on cross-examination that Jason Galanis at various

2   points sent you information generally about the bonds, so he

3   wasn't hiding that information from you, right?

4   A.  Correct.

5   Q.  Some of that was information you didn't really need in

6   order to be the frontman for Private Equity Management, right?

7               MR. SCHWARTZ:  Objection to leading, your Honor.

8               THE COURT:  Sustained.

9   BY MS. MERMELSTEIN:

10  Q.  Okay.  So I want to talk to you a little bit about the

11  proffer agreements and the immunity that you were asked about

12  on cross-examination.

13              MS. MERMELSTEIN:  So if we can pull up 3522-3 which is

14  in evidence as a defense exhibit, but we don't have a copy of

15  with a defense exhibit sticker.  Just one minute.  (Pause)

16  Q.  Can we go to the last page for a minute.  So this is your

17  signature on this agreement.  Is that right?

18  A.  Correct.

19  Q.  Whose signature is underneath yours?

20  A.  I guess this is my -- it was my attorney at the time.

21  Q.  Let's go to the first page of this agreement then and let's

22  look at Paragraph 2.  Let me ask you to read that paragraph to

23  the jury, please.

24  A.  Paragraph 2?

25  Q.  Yes, please.

I6DJGAL4                    Martin - redirect

1   A.   In any prosecution brought against client by this office,

2   except as provided below, the government will not offer in

3   evidence on its case in chief, or in connection with any

4   sentencing proceeding for the purpose of determining an

5   appropriate sentence, any statements made by client at the

6   meeting, except:  (a) in a prosecution for false statements,

7   obstruction of justice or perjury with respect to any acts

8   committed or statements made during or after the meeting or

9   testimony given after the meeting; or (b) if, at any time

10  following the meeting, client becomes a fugitive from justice.

11  Q.   Okay.  So what did you understand, according to your

12  proffer agreement, was the state of affairs with respect to

13  whether the government could use the statements you made

14  directly against you?

15  A.   My understanding was that the statements that I made during

16  the proffer session could not be used against me.

17  Q.   Then if you look at Paragraph 3, I won't ask you to read

18  the whole thing, but there are a few exceptions to that rule.

19          Is that right?

20  A.   Correct.

21          MS. MERMELSTEIN:  Your Honor, may I approach?

22          THE COURT:  Yes.

23  BY MS. MERMELSTEIN:

24  Q.   I have just given you what is marked for identification as

25  Government Exhibit 4200.  This an Order from the Court.  Do you

1   see that?

2   A.   Yes.

3   Q.   This is the order giving you immunity, right?

4   A.   Correct.

5           MS. MERMELSTEIN:   The government offers Government

6   Exhibit 4200.

7           MR. SCHWARTZ:   Objection.

8           MS. NOTARI:   Objection.

9           THE COURT:   Can I just see a copy of it again?

10  Thanks. (Pause)   I have it here.   Thanks.   I'll allow this in.

11          (Government's Exhibit 4200 received in evidence)

12  BY MS. MERMELSTEIN:

13  Q.   Mr. Martin, we don't have this loaded yet into the system,

14  so let me ask you to read to the jury the second to last

15  paragraph, the two last paragraphs on Page 2 so the paragraph

16  beginning order that.

17          MR. SCHWARTZ:   Can we talk for a second before this is

18  published?

19          THE COURT:   Sure.

20          (Continued on next page)

21

22

23

24

25

I6DJGAL4                        Martin - redirect

1              (At sidebar)

2              MR. SCHWARTZ:  So I have no problem with them reading

3      the text of this order.  I don't think it is appropriate they

4      put up an order with your Honor's signature on it.  If they do,

5      I think it is important the jury understand you're not somehow

6      endorsing this witness' testimony or the government's decision

7      to immunize him.

8              MS. MERMELSTEIN:  I don't agree with that, but it is

9      not in the system, I can't publish it right now.  I will have

10     to read it.

11             MR. SCHWARTZ:  Reading it is fine.

12             THE COURT:  You can read it if it is in evidence, just

13     take my name out.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I6DJGAL4                          Martin - redirect

1              (In open court)

2     BY MS. MERMELSTEIN:

3     Q.   Let me ask you to read those two paragraphs beginning

4     ordered that.

5     A.   Ordered that pursuant to Title 18 United States Code

6     Section 6002 and 6003, Francisco Martin Fernandez give

7     testimony and provide other information as to all matters about

8     which he may be questioned in United States versus John

9     Galanis, et al., and it is further ordered that pursuant to

10    Title 18 United States Code Section 6002 and 6003, no testimony

11    or other information compelled under this order or any

12    information directly or indirectly derived from such testimony

13    or other information may be used against Martin in any criminal

14    case except a prosecution for perjury, giving false statements

15    or otherwise failing to comply with this order.  This order

16    shall become effective only if after the date of this order

17    Martin refuses to testify or provide other information on the

18    basis of his privilege against self-incrimination.

19    Q.   So pretty similar language to the proffer agreement?

20    A.   Correct.

21              MS. NOTARI:  Objection.

22              MR. SCHWARTZ:  Objection.

23              THE COURT:  Overruled.

24    BY MS. MERMELSTEIN:

25    Q.   Just so we're clear, what was your understanding or what is

I6DJGAL4                          Martin - redirect

1    your understanding about whether any information that you talk

2    about today can be used directly against you in a prosecution?

3    A.   My understanding is as long as I'm truthful, everything

4    that I say here in court today cannot be directly used against

5    me.

6    Q.   If you lie, you could be prosecuted for the crime of lying?

7    A.   Yes.

8    Q.   Can you be prosecuted for the securities frauds that you

9    have described here today notwithstanding this immunity order?

10                MR. SCHWARTZ:   Objection.

11                THE COURT:   I'll allow his understanding of it.   What

12   is your understanding?

13   BY MS. MERMELSTEIN:

14   Q.   What is your understanding whether or not you can still be

15   prosecuted?

16   A.   My understanding is I can still be prosecuted.

17   Q.   Now, when you met with the government in the various

18   meetings, you told the government about your own wrongdoing,

19   right?

20   A.   Correct.

21   Q.   What, if anything, did you disclose to the government about

22   your knowledge of conflicts of interest with respect to the

23   bond transaction?

24   A.   I mentioned that it was a clear conflict of interest of

25   having ownerships in all the different parts of the bond

I6DJGAL4                          Martin - redirect

1    transactions.

2    Q.  What, if anything, did you tell them about whether or not

3    Private Equity Management had ever received money to invest on

4    behalf of the bonds?

5    A.  I told them that Private Equity Management, the investment

6    advisory firm that was set up by Jason Galanis, never received

7    any proceeds.

8    Q.  What, if anything, did you tell the government about your

9    involvement in opening entities and accounts in order to hide

10   the involvement of Jason Galanis and Gary Hirst?

11   A.  I mentioned to the government that I had opened two

12   offshore corporations and opened several brokerage accounts to

13   hold stocks in my name and John Greenwood's name.

14   Q.  You told the government in your later meetings that you had

15   lied to the government in your earlier meetings, right?

16   A.  Correct.

17   Q.  Fair to say the government knew about your wrongdoing

18   because you were the one who told them?

19   A.  That's correct.

20   Q.  Now I want to talk lastly about the timing of your concerns

21   with respect to these various transactions.  So before you

22   signed the first Private Equity Management agreement, what, if

23   anything, did you know about Jason Galanis' background?

24            MR. SCHWARTZ:  Objection; scope.

25            THE COURT:  I think there were some questions on cross

1   about that.  I'll allow it.

2   BY MS. MERMELSTEIN:

3   Q.  Go ahead, Mr. Martin.

4   A.  My understanding was that Jason Galanis had some issues

5   with, previous issues with the SEC.

6   Q.  Prior to signing that first Private Equity Management

7   Agreement, what did you understand about any conflicts of

8   interest with respect to Jason Galanis' involvement with the

9   transaction and with Burnham Securities?

10  A.  I only knew about it after I signed the agreement.

11  Q.  Did you receive money to invest after you received that

12  agreement?

13  A.  No.

14  Q.  Did you understand at that point there was a problem?

15  A.  Yes.

16  Q.  When you signed the second Private Equity Management

17  Agreement, what did you understand about the conflicts of

18  interest?

19  A.  Much more.

20  Q.  Remind us what that was.

21  A.  At that point I understood that Jason Galanis had an

22  ownership in Burnham Securities, Wealth Assurance and at least

23  a couple of investment advisers.

24  Q.  And you signed the agreement anyway?

25  A.  Yes.

I6DJGAL4                        Martin - redirect

1   Q.  Allowed your name to be placed on it anyway?

2   A.  Yes.

3   Q.  Were you also involved in making interest payments on the

4   bonds?

5   A.  Yes.

6   Q.  That was with money that was not in the purported annuity,

7   right?

8   A.  Correct.

9   Q.  Did you understand that that was a problem?

10  A.  Yes.

11  Q.  Did you understand that Jason Galanis had used bond

12  proceeds to make his investment in Fondinvest?

13  A.  That was my understanding.

14  Q.  You also said that you, on cross-examination, you didn't

15  always know the purpose of the wires that Jason Galanis told

16  you to send.  You did understand, though, that you were sending

17  a wire to make interest payments on the bonds.  Is that right?

18  A.  Correct.

19  Q.  What did you understand about the purpose of the wires that

20  you sent to Devon Archer?

21  A.  Jason Galanis had told me that Devon Archer had paid some

22  interest on the bonds and the wire that I sent to his company

23  were as a repayment.

24  Q.  Is the reason that you exercised your Fifth Amendment right

25  not to testify and, thus, received immunity that you

I6DJGAL4                        Martin - recross

 1   participated in a securities fraud with respect to the Wakpamni

 2   bonds?

 3   A.  Yes.

 4            MS. MERMELSTEIN:  Nothing further.

 5            THE COURT:  Any recross?

 6            MS. NOTARI:  No.

 7            THE COURT:  Mr. Touger?

 8   RECROSS EXAMINATION

 9   BY MR. TOUGER:

10   Q.  Good afternoon.

11   A.  Good afternoon.

12   Q.  You would agree with me that your first meeting with the

13   FBI in this case was in that famous Starbucks on February 10,

14   2016, right?

15   A.  Around that time, yes.

16   Q.  You testified at that meeting you told them truths and you

17   told them lies?

18   A.  Yes.

19   Q.  There was no proffer agreement, though, at that meeting?

20   A.  That's correct.

21   Q.  Your next meeting with them was approximately five weeks

22   later, March 23rd, 2016, right?

23   A.  Yes.

24   Q.  At that meeting there was a proffer agreement, right?

25   A.  Correct.

1           MR. TOUGER:  If you could just bring that up,

2    Mr. Jackson.

3    Q.  You can agree with me, while we're waiting for that to come

4    up, at that meeting also you told them some truths and you told

5    them some lies?

6    A.  Yes.

7    Q.  Isn't it a fact that in the proffer agreement, it says that

8    if you lie to the government during this session, they can

9    prosecute you for perjury, obstruction, various other offenses,

10   correct?

11   A.  Correct.

12   Q.  Were you prosecuted for perjury, obstruction of justice or

13   anything for the lies you told them on March 23rd?

14   A.  No.

15   Q.  Then you met with the government again approximately two

16   weeks later, on April 5th, 2016, right?

17   A.  Correct.

18   Q.  Again you told them some truths and you told them some

19   lies?

20   A.  Yes.

21   Q.  You signed another version of this proffer agreement,

22   right?

23   A.  Correct.

24   Q.  And were you prosecuted for any of the lies you told them

25   on April 5th, 2016 for perjury, obstruction or any other

1    offenses?

2    A.  No.

3    Q.  Then you decided in 2018 you're going to tell them the

4    truth, according to what you're saying, right?

5                MS. MERMELSTEIN:  Objection to that form of question.

6                THE COURT:  Overruled.

7    A.  Yes.

8    Q.  But there is no way of really knowing whether you're

9    telling the truth?  We're depending on you saying it is the

10   truth, right?

11               MS. MERMELSTEIN:  Objection.

12               THE COURT:  Sustained.

13   BY MR. TOUGER:

14   Q.  You weren't prosecuted for any lies you admit saying back

15   in 2016, right?

16   A.  Correct.

17   Q.  You just testified on redirect that you could be arrested

18   for this stock fraud, quotes, you don't know if you're going to

19   be or not, right?

20   A.  Correct.

21   Q.  But it's true that they can't arrest you on this trip to

22   New York?  You have a safe passage letter that gets you back to

23   Spain up until June 20th?

24   A.  Correct.

25   Q.  So as long as you make it out of the United States by June

I6DJGAL4                          Santos – direct

1    20th, 2018, you can't be arrested?

2    A.   Correct.

3    Q.   As we already went through both on direct and cross, they

4    can't get you once you're back in Spain, right?

5    A.   That's my understanding, yes.

6              MR. TOUGER:  I guess you shouldn't miss your flight

7    back then.

8              MS. MERMELSTEIN:  Objection.

9              THE COURT:  Strike the last remark.  Anything else,

10   Mr. Schwartz?

11             MR. SCHWARTZ:  No.

12             THE COURT:  Anything from the government?

13             MS. MERMELSTEIN:  No.

14             THE COURT:  You may step down.

15             (Witness excused)

16             MS. TEKEEI:  The government calls Enrique Santos.

17    ENRIQUE SANTOS,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. TEKEEI:

22   Q.   Good afternoon, Mr. Santos.

23   A.   Good afternoon.

24   Q.   Where do you currently work?

25   A.   The U.S. Attorney's Office.

I6DJGAL4                         Santos – direct

1    Q.   What is your position there?

2    A.   I am an administrative support specialist.

3    Q.   How long have you worked at the U.S. Attorney's Office?

4    A.   10 years.

5    Q.   What are your duties as an administrative support

6    specialist at the U.S. Attorney's Office?

7    A.   I perform forensic examinations of mobile devices such as

8    cell phones, GPS devices and tablets.  I maintain and operate

9    an evidence vault.  I do some purchasing and I schedule

10   interpreters for meetings.

11   Q.   Have you received special training in cell phone extraction

12   technology?

13   A.   Yes.

14   Q.   Can you describe some of that training for the jury.

15   A.   Sure.  So I have about 160 hours worth of formal classroom

16   training.  That's technical training about the actual forensic

17   tools that we use in the office, and I received certificates

18   for each of the tools that I use.

19        I attended numerous conferences and workshops

20   regarding cell phone forensics.

21   Q.   Can you describe what certificates you are referring to.

22   A.   So the predominant one is Cellebrite Logical Operator, and

23   the Cellebrite Physical Analyst certificate, which is the more

24   advanced one.  I also have certificates from the –– other tools

25   such as XRY Tool, the beginner and more intermediate

I6DJGAL4                        Santos - direct

1   certificate, and I also have a certificate from the New York

2   State Department of Criminal Justice Services for basic cell

3   phone investigations.

4   Q.  You mentioned Cellebrite.  Is that one of the tools you use

5   to extract data?

6   A.  Yes.

7   Q.  Can you describe what that is for the jury.

8   A.  Cellebrite is a tool that extracts and analyzes data from

9   mobile devices such as cell phones, tablets, GPS devices.

10  Sometimes it can unlock phones if they're locked and then it

11  will put the data into a format you can read it into a report

12  basically.

13  Q.  How frequently do you use Cellebrite tool?

14  A.  I have used it just about every day since about 2014.

15  Q.  Approximately how many times have you personally used the

16  Cellebrite tool?

17  A.  Well over a thousand.

18  Q.  Can you describe for the jury what types of reports

19  Cellebrite generates?

20  A.  They're different formats.  You can choose which one you'd

21  like, but some of the examples are the UFED, a proprietary

22  format, a little bit easier to navigate.

23       The PDF version which is easy because you can use a

24  PDF on just about any computer.  You can produce it in a Word

25  document, an Excel Spreadsheet; HTML file, XML file, so there

I6DJGAL4                    Santos - direct

1    are different formats for different applications.

2    Q.  Can you describe generally what type of information or data

3    is reflected in the reports.

4    A.  It varies.  On the phone model, some phones we're able to

5    get more data than others, but usually it is like call history,

6    text messages, contacts, web browsing history, photos, videos,

7    et cetera.

8    Q.  Is that data modifiable?

9    A.  So once we have pulled the data, it is considered a

10   forensic extraction, so we can't modify any of the data.  We

11   can choose to exclude information when we produce a final

12   report, but we can't modify any of the data that is there.

13   Q.  Directing your attention to September 3rd, 2015, did you

14   examine an Apple iPhone in connection with this case?

15   A.  Yes.

16   Q.  What was the basis for your examination?

17   A.  One of the special agents that works for our office came to

18   me with a phone and asked me to perform an extraction.

19   Q.  Was it on consent or was it pursuant to a search warrant?

20   A.  It was on consent.

21   Q.  You have in front of you what is marked for identification

22   purposes as Government Exhibit 3004.  Do you recognize that?

23   A.  I do.

24   Q.  How do you recognize it?

25   A.  This is a disk that I created that contains the report for

I6DJGAL4                          Santos - direct

1    that phone that I extracted, and it has my initials and my

2    handwriting on it.

3    Q.  I would like you to put that disk to the side and show you

4    now Government Exhibit 30040.  Do you have that in front of you

5    as well?

6    A.  Yes.

7    Q.  Do you recognize that?

8    A.  Yes.

9    Q.  How do you recognize it?

10   A.  This is an excerpt of the report that I created, the PDF

11   version.  Before I came here, I compared it to the original

12   that is stored on my server at the office and I confirmed it is

13   the same report.

14           MS. TEKEEI:  We offer Government Exhibit 30040.

15           THE COURT:  Any objection?

16           MR. SCHWARTZ:  No objection.

17           THE COURT:  It will be admitted.

18           (Government's Exhibit 30040 received in evidence)

19           MS. TEKEEI:  Can you please publish 30040.  If you

20   could just blow up the middle portion of that.

21   BY MS. TEKEEI:

22   Q.  Mr. Santos, what is the information that is reflected here?

23   A.  So the top half of this section is information pertaining

24   to the time and date of the extraction.  So here it is showing

25   that the extraction was started on September 3rd, 2015 at 4:33

I6DJGAL4                            Santos - direct

1    pm.  It shows you what type of extraction was performed, the

2    make and model of the phone is listed here as well as the

3    specific Cellebrite version that was used to perform that

4    extraction, and below that is the only information that on the

5    report I am allowed to enter or modify, which is my name, the

6    unit that I work in and the office where I am located.

7    Q.  Focusing on the time zone settings portion where it says

8    UTC, what does that mean, original UTC value?

9    A.  UTC stands for universal coordinated time.  UTC is a French

10   acronym, so the T and C are swapped, but UTC basically is the

11   reference time zone off which the world sets its clocks to, so

12   here it is saying that everything on this report is going to be

13   set off that original UTC value, so in here it is not adjusted

14   for the specific time zone, it is just that reference time

15   zone.

16          MS. TEKEEI:  If you could turn to the second page of

17   this report and focusing on the device information section.

18   BY MS. TEKEEI:

19   Q.  Mr. Santos, what is the phone number for this associated

20   with this device?

21   A.  The phone number here is listed on lines 15 and 16, it says

22   next to phone 732-598-5189.

23   Q.  If you could look at Line 2, the Apple ID section, what is

24   the value that is listed there?

25   A.  Mamorton2@gmail.com.

I6DJGAL4                        Santos - direct

1    Q.  Next I would like to show you what is Government Exhibit

2    3004 A.  Do you recognize that?

3    A.  My screen is blank.

4    Q.  It may also be in front of you in hard copy.

5    A.  Yes.

6            MS. TEKEEI:  Ms. Shinewald, this just for the parties

7    and the Court, thank you.

8    BY MS. TEKEEI:

9    Q.  Mr. Santos, do you recognize this document?

10   A.  I do.

11   Q.  How do you recognize it?

12   A.  So this is an excerpt from that PDF report.  It is an

13   iMessage conversation.

14   Q.  Are there any redactions to this particular excerpt?

15   A.  Yes.

16   Q.  But besides those redactions, are there any changes in the

17   excerpts that make them different than the full report that you

18   created that is on Government Exhibit 3004?

19   A.  No.

20           MS. TEKEEI:  We offer 3004 A.

21           THE COURT:  Any objection?

22           MR. SCHWARTZ:  No objection.

23           THE COURT:  It will be admitted.

24           (Government's Exhibit 3004 A received in evidence)

25           MS. TEKEEI:  You can take that down, Ms. Shinewald.

I6DJGAL4                        Santos - cross

1    BY MS. TEKEEI:

2    Q.  Mr. Santos, other than extracting data from this cell

3    phone, did you have any other involvement in this case?

4    A.  No.

5              MS. TEKEEI:  No further questions at this time.

6              THE COURT:  Any cross-examination?

7              MS. HARRIS:  Yes, your Honor.

8    CROSS EXAMINATION

9    BY MS. HARRIS:

10   Q.  Good afternoon, Mr. Santos.

11   A.  Good afternoon.

12   Q.  My name is Laura Harris, and I represent Devon Archer.  We

13   have never met before, right?

14   A.  No.

15   Q.  You work at U.S. Attorney's Office, you mentioned, correct?

16   A.  Yes.

17   Q.  You testified that the data that you extracted from Ms.

18   Morton's cell phone wasn't altered in any way.  Is that right?

19   A.  That's correct.

20   Q.  All of the phone's data is included in the extraction,

21   correct?

22   A.  To my knowledge, yes, and like I mentioned earlier, not all

23   data is extracted from every cell phone model, so I would have

24   to have the original cell phone in front of me to compare it

25   with the report, but there are some apps that we certainly may

I6DJGAL4                          Santos - cross

1   not get data from.  There is just so many apps that are

2   released every day, it is impossible to get everything.

3   Q.  But in the case of Ms. Morton's cell phone specifically,

4   you're not aware at this moment of any data that was not

5   extracted from the cell phone?

6   A.  No.

7   Q.  You mentioned the program Cellebrite earlier, correct?

8   A.  Yes.

9   Q.  That is a pretty powerful forensic tool, isn't it?

10  A.  Yes.

11  Q.  As I understand it, it lets you search for not just a

12  particular contact name, but whether or not that name exists in

13  the phone at all, correct, so you can confirm whether or not a

14  particular contact is in the phone because the owner of the

15  phone communicated with that individual, right?

16          MS. TEKEEI:  Objection to form.

17          MS. HARRIS:  I can rephrase, your Honor.

18          THE COURT:  Okay.

19  BY MS. HARRIS:

20  Q.  So if you're searching for a particular contact, you can

21  determine whether or not the phone's owner communicated with

22  that individual on the phone, correct?

23          MS. TEKEEI:  Objection.

24          THE COURT:  I'll allow you to answer that.

25  A.  You can search the forensic image that is created as a

1    result of the extraction.  When you're doing a search, doing a

2    Cellebrite, you're not searching the device per se, but

3    forensic extraction.  It will only search the data it has been

4    able to extract and successfully analyze.

5         Like I mentioned earlier, if there is an app there

6    that we don't recognize that's maybe new to the market, we may

7    not getting off of that.  Yes, you can do searches off the

8    forensics image that is produced.

9    Q.  Thank you for correcting me.

10        I was referring to the forensic images.  You can also

11   search the forensic image for the presence of a particular name

12   in that forensic image.  Is that right?

13   A.  Yes.

14   Q.  When you're searching Cellebrite, you can identify whether

15   or not that individual existed as a contact, for example, or

16   whether or not the owner of the phone referenced that

17   individual in any communications that are present on that

18   forensic image.  Is that right?

19   A.  Yes, it will tell you where the search item was found.

20   Q.  You can also search for numbers, correct?

21   A.  Yes.

22   Q.  Turning to I believe it was Government Exhibit 3004 that

23   you have in front of you, correct?

24   A.  Yes.

25   Q.  We have marked a full version of the report that I think

I6DJGAL4                         Santos - cross

1    was present and you had it on disk, I think.  We marked that as

2    Defendant's Exhibit 3004 for identification.

3              MS. HARRIS:  Mr. Jackson, if you could bring that up

4    for the Court, the lawyers and the witness.

5    BY MS. HARRIS:

6    Q.  Mr. Santos, do you recognize this as the front page of the

7    extraction report that you prepared?

8    A.  Yes.

9    Q.  You see your name there next to examiner name?

10   A.  Yes.

11   Q.  Turning to Page 2 of the document, Mr. Jackson, do you

12   recognize this -- this is Page 2 of the examiner's report that

13   you prepared?

14   A.  Yes.

15   Q.  I think that is identical to Government Exhibit 30040 that

16   you just referenced?

17   A.  Yes.

18   Q.  Now, the content of the examination report includes

19   essentially the information that you extracted from the cell

20   phone.  Is that right?

21   A.  Yes.

22   Q.  It will include calendar items, correct?

23   A.  Depending on the cell phone model, but for iPhones, I think

24   it is a yes.

25   Q.  In this case, there are calendar items?

1    A.   Yes.

2    Q.   There were iChats?  There is a list of contacts.  Is that

3    right?

4    A.   Yes.

5    Q.   There is also a section called timeline.  Is that correct?

6    A.   Yes.

7             MS. HARRIS:  Mr. Jackson, if you could move forward to

8    Page 1788 of this document again just for the Judge, the

9    witness and the lawyers.  I am sorry.  This is a different

10   version of the document.  Maybe we can talk about it in general

11   terms.

12   BY MS. HARRIS:

13   Q.   You're familiar with the section called timeline?

14   A.   Yes.

15   Q.   What exactly is -- how is the information presented in that

16   section?

17   A.   The timeline feature takes data from different sections of

18   the report and it will try to organize it in a manner that puts

19   it in a chronological order.

20             So it will list a phone call, a text message, contact

21   that was entered, it will put it in the order that it occurred.

22   Q.   In that section of the report for a particular item or line

23   item, you may not have all of the data that is present for that

24   particular piece of data.  Is that right?

25   A.   Yes.

I6DJGAL4                          Santos - cross

1    Q.  So for certain messages, it may indicate who the message is
2    from, but not necessarily who the message was sent to.  Is that
3    right?
4    A.  It's possible.
5            MS. HARRIS:  I'd like to turn to page 3060 of this
6    document, Mr. Jackson.
7    Q.  Mr. Santos, do you recognize this as an activity analytic
8    section?
9    A.  Yes.
10   Q.  Can you describe for us the type of information that is set
11   forth in the activity analytic section?
12   A.  Activity analytics is just a summary of, for example, how
13   often a specific contact was contacted.  It is just like that
14   kind of data, so it will put it in order from most contacted to
15   least contacted.
16   Q.  Just looking at the columns here, the first column
17   indicates name.  Is that right?
18   A.  Yes.
19   Q.  And for certain line items we see a phone number, for
20   others there is actually a name indicated in that section,
21   right?
22   A.  Yes.
23   Q.  That is just a function of whether or not that individual
24   was entered as a contact?
25   A.  Yes.

1   Q.   Or not?

2   A.   Correct.

3   Q.   And then the second column you see entries, correct?

4   A.   Yes.

5   Q.   That is the phone number for that particular contact,

6   correct?

7   A.   Yes.

8   Q.   Then skipping ahead to the column marked phone events, what

9   exactly is calculated for the purposes of tabulating a number

10  of phone events indicated in that column?

11  A.   Phone events, I believe, are the total number of times that

12  that entry was contacted.

13  Q.   At all?

14  A.   I am sorry?

15  Q.   Contacted at all?

16  A.   Yes.

17  Q.   So skipping ahead to other events, what would other events

18  indicate?

19  A.   That I do not know.

20  Q.   You're not certain which --

21  A.   Sitting here, I don't recall.

22  Q.   Would it include iMessages?

23  A.   Maybe.

24  Q.   Okay.  So in general is it fair to say that the numbers in

25  these columns indicate the number of times Ms. Morton had any

I6DJGAL4                          Santos - cross

1    contact with the particular individual listed at that contact

2    number or email provided in this forensic image?

3              MS. TEKEEI:  Objection.

4              THE COURT:  Can you answer that?  Do you have enough

5    information to answer that?

6              THE WITNESS:  Yes.

7              THE COURT:  Go ahead.

8    A.  I believe so.

9    BY MS. HARRIS:

10   Q.  These contacts are listed in order, is that right, in order

11   of the frequency with which Ms. Morton contacted these

12   individuals, as reflected in the forensic image, correct?

13   A.  Yes.

14             MS. HARRIS:  Your Honor, I would like to move DX 3004

15   into evidence, and we have prepared certain sections of that as

16   reflected on the screen.

17             MS. TEKEEI:  Your Honor, may we approach?

18             THE COURT:  Yes.

19             (Continued on next page)

20

21

22

23

24

25

I6DJGAL4                      Santos - cross

1              (At sidebar)

2              MS. TEKEEI:  Your Honor, I just wanted to be clear and

3    I didn't want to do it in front of the jury, 3004 is the entire

4    3,000 page report on Ms. Morton's phone.  I want to be sure Ms.

5    Harris is not moving to admit the entire 3,000 page report.

6              We are obviously still reviewing the portions of which

7    we object for various grounds.  To the extent she is offering

8    the analytics section of the report, which is the one addressed

9    before this witness stood, we don't have a problem with the

10   analytics section of the report subject to the limitations we

11   discussed of the redactions of the personal identifying

12   information and the potentially and.

13             MS. HARRIS:  I can clarify page numbers and sections

14   of the report ultimately we are going to seek to move into

15   evidence.  The analytics section is pages 3060 to 3092, and I

16   can clarify that on the record.  The other portions as well

17   we'll move subject to your Honor's Bench ruling.

18             MS. TEKEEI:  What is the other section?

19             MS. HARRIS:  Timeline section and identified in the

20   sections we provided to you earlier.

21             MS. TEKEEI:  Okay.

22             MS. HARRIS:  Right now I'll move into evidence 3060 to

23   3092.  I will clarify that the remaining sections in the

24   portion of 3004 we provided to you are subject to your Honor's

25   Bench ruling.

I6DJGAL4                        Santos - cross

1           MS. TEKEEI:  No problem with the analytics section

2     being offered today.  We would like to look at the other

3     sections before we discuss them.

4           THE COURT:  I will refer --

5           MR. HASSAN:  Similarly, we have three pages I believe

6     that we wanted to move in, but.

7           MS. HARRIS:  On your --

8           MS. TEKEEI:  As we said, we don't have objections to

9     authenticity, and we'll take up the other objections.

10          MS. HARRIS:  For clarification, you're willing to

11    authenticate 4817 that we provided to you?

12          MS. TEKEEI:  I think so, subject to any problems, we

13    will receive them and take them back and compare them.  I don't

14    currently think there is any authenticity issue.

15          MS. HARRIS:  I'll put those in subject to your Honor's

16    Bench ruling.

17               (Continued on next page)

18

19

20

21

22

23

24

25

I6D7GAL5                        Santos - Cross

         1        MS. HARRIS:  Your Honor, for clarity, I'd like to move

         2   in DX3004, pages 3060 to 3092 and the remaining sections

         3   subject to your Honor's eventual ruling.

         4        THE COURT:  Understood and admitted.  Yes.

         5        MS. TEKEEI:  Thank you, your Honor.

         6        (Defendant's Exhibits 3004 received in evidence)

         7        MS. HARRIS:  Mr. Jackson, if you could publish this

         8   image for the jury as well.

         9   Q.  So, Mr. Santos, do you see the number indicated at line 1?

        10   A.  Yes.

        11   Q.  Do you recognize that as Ms. Morton's number?

        12   A.  One second.  Yes.

        13   Q.  And moving to line 2, do you recognize the number indicated

        14   there?

        15   A.  Yes.

        16   Q.  You do?

        17   A.  No, I'm sorry, I don't recognize that number.  I can see

        18   it.

        19   Q.  OK.  We'll identify that in a second.  But if you could

        20   identify for the jury the total number of events that were

        21   calculated with that number -- sorry -- with that line item.

        22   A.  8,954.

        23   Q.  And again that in general is a reflection of the number of

        24   instances Ms. Morton and the individual at that number

        25   communicated using this phone as reflected in the forensic

I6D7GAL5                         Santos - Cross

1    image.

2    A.  Yes.

3    Q.  And that number is indicated in both the column labeled

4    "total" and the column labeled "other events," is that right?

5    A.  Yes.

6    Q.  So is it fair to say that that's probably just a

7    calculation of the other events and not any phone events or

8    e-mail events?

9    A.  My interpretation of that is that the Cellebrite program

10   couldn't attribute where these -- like whether these were text

11   messages, calls, IM messages, so I would have to go in and

12   specifically look at each contact to attribute each one, so I

13   think that's why it just says other events.

14   Q.  OK.  So Ms. Morton communicated with this number again

15   8,954 times, so far as we can see from the activity analytics

16   section.

17   A.  Yes.

18   Q.  Further down you see a name Richard Deary on the remainder

19   of the entries on this page, correct?

20   A.  Yes.

21   Q.  And do you know who Mr. Deary is?

22   A.  No.

23   Q.  Turning to page 3062, line 115 --

24           Mr. Jackson, if you can blow up the bottom of the

25   page, and actually, Mr. Jackson, if you could put this on the

I6D7GAL5                        Santos - Cross

1      right-hand side of the page and pull up 3060 on the left-hand

2      side of the page.  It's a little bit difficult to see.  If we

3      would blow up line 2 on the left-hand side and line 115 on the

4      right-hand side.

5               Mr. Santos, do you see on line 115 that the entry is

6      attributed to a contact named Jason Galanis?

7      A.  Yes.

8      Q.  And can you identify the number in line 2 having this

9      contact information in front of you?

10     A.  Yes.  On line 115 it's listed as the mobile number.

11     Q.  So, the line indicated in line 2 is the mobile number of

12     Jason Galanis?

13     A.  Yes.

14     Q.  And we don't have the column headings just above anymore,

15     but do you see that the number -- the total number of events

16     indicated for line 115 is 912?

17     A.  Yes.

18     Q.  And that those are indicated as phone events?

19     A.  Yes.

20     Q.  So, is it fair to say that those 912 instances of

21     communication are in addition to the 8,954 other events that

22     were calculated for the purposes of line 2?

23     A.  It's possible.  I'd have to go in and manually check.

24     Q.  Whether those were in fact unique instances of

25     communication?

I6D7GAL5                          Santos - Cross

1    A.  Exactly.

2    Q.  OK.  We can take those down, Mr. Jackson.  Thank you.  And

3    going back to page -- actually 3063, please.

4              Mr. Santos, do you see lines 127 --

5              let's actually pull up 127 to 148, Mr. Jackson.

6              You see here there are a number of entries for an

7    individual Jerry Thunelius?

8    A.  Yes.

9    Q.  And below that a number of other entries for Jason Galanis?

10   A.  Yes.

11   Q.  And then a contact for somebody named Mommy?

12   A.  Yes.

13   Q.  Again these are listed in order of frequency of contract,

14   correct?

15   A.  Yes.

16   Q.  And further turning to page 3064 at line 200 down to 203,

17   do you see a number of entries for Gary Hirst?

18   A.  Yes.

19   Q.  Correct?  And then moving forward to line 244 on the

20   following page, do you see an entry for a contact designated as

21   Hugh Dunkerley, correct?

22   A.  Yes.

23   Q.  And if you could move forward to page 3072, Mr. Jackson, at

24   line 533.  That's an entry for an e-mail address jsugarman@

25   camdencap.com, correct?

I6D7GAL5                         Santos - Cross

1   A.  Yes.

2   Q.  And, Mr. Jackson you can take that down.

3           Sorry.  3004.

4           Now, Mr. Santos, in the course of your work with the

5   Cellebrite program, did you ever run a search for the name --

6   or for the phone number for Devon Archer?

7   A.  No, I wasn't asked to run any searches.

8   Q.  You were not asked to run those searches.

9   A.  No.

10  Q.  Did you identify a contact for Devon Archer?

11  A.  No.

12  Q.  Just paging through this analytics report, have you seen

13  the name Devon Archer present?

14  A.  I didn't search for that name.

15  Q.  You didn't search for that name.  Would it surprise to you

16  learn that that name is not present in the activity analytics

17  section?

18          MS. TEKEEI:  Objection.

19          THE COURT:  Sustained.

20  Q.  And that no phone number for Mr. Archer is present in that

21  section?

22          MS. TEKEEI:  Objection.

23          THE COURT:  Sustained.

24  Q.  But you testified that once you extracted the data it's

25  very easy to run those searches, correct?

I6D7GAL5                        Santos - Redirect

1    A.  If you're using the pdf version of the report, you can just

2    do a control F and type in what you want to search for and it

3    will search for it.

4    Q.  And with the Cellebrite program in general, when it's

5    active you can actually search it the way you would search like

6    your g-mail or something, right?

7    A.  Yes, in any section of the report you can run searches.

8          THE COURT:  Just to be clear, you never saw Mr.

9    Archer's name; is that right?

10         WITNESS:  No.

11   Q.  And you've run those searches thousands of times, right, on

12   a number of different cases, correct?

13   A.  When I'm asked to, yes.

14   Q.  When you're asked to.  And in this case you were not asked

15   to run that search.  No.

16         MS. HARRIS:  Your Honor, may I have just one moment?

17         THE COURT:  Yes.

18         MS. HARRIS:  No further questions.  Thank you.

19         THE COURT:  Thank you.

20         Any other cross-examination?  Any redirect?

21         MS. TEKEEI:  Just a few questions.

22         THE COURT:  Sure.

23   REDIRECT EXAMINATION

24   BY MS. TEKEEI:

25   Q.  Mr. Santos, you were asked some questions on

I6D7GAL5                        Santos - Redirect

1    cross-examination about particular names that you were or were

2    not asked to search for.  Do you recall those questions?

3    A.  Yes.

4    Q.  Were you asked to search for any names on this report?

5    A.  No.

6    Q.  And were you asked only to extract the data from the phone?

7    A.  Correct.

8    Q.  Now, you were also asked some questions about Defense

9    Exhibit 3004, the portions of the pages from 362 to I believe

10   390.

11          Mr. Jackson, I'm so sorry to ask you to do this, but

12   we don't have it loaded.  If you don't mind pulling up that

13   portion, that would be very helpful.  And if you could please

14   turn to 3070.  Thank you very much.

15          And, Mr. Santos, just focusing on lines 475 and 476,

16   what is the name associated with that contact?

17   A.  Bevan Cooney.

18          MS. TEKEEI:  Thank you.  No further questions, your

19   Honor.

20          THE COURT:  Anything else?

21          MS. HARRIS:  Yes.

22          THE COURT:  Go ahead.

23

24

25   RECROSS EXAMINATION

I6D7GAL5                          Santos - Recross

1   BY MS. HARRIS:

2   Q.  Mr. Jackson, if you could pull up DX 3004B as well.  And

3   actually let's pull up the unredacted version.

4           MS. TEKEEI:  Your Honor, I believe this is beyond the

5   scope, and it's also not in evidence.

6           MS. HARRIS:  Your Honor, it's not in evidence, and I

7   can illustrate the scope.

8           THE COURT:  You're not showing it to the jury.

9           MS. HARRIS:  I'm not showing it to the jury right now.

10  Q.  Mr. Santos, do you recognize this exhibit?

11  A.  I do.

12  Q.  Can you describe what it is, please.

13  A.  So these are messages from the same extraction, and the

14  specific version you have here is not the pdf report but it's

15  the underlying -- it would be I believe a text file that's

16  included with the report in a different folder.

17  Q.  OK.  So this was a report that you personally prepared,

18  correct?

19  A.  Yes.

20  Q.  And can you describe for us how you prepared this report.

21          MS. TEKEEI:  Your Honor, we object.  We think it's

22  beyond the scope.  And can we approach on this?

23          THE COURT:  Sure.

24          MS. TEKEEI:  Thank you.

25          (At the side bar)

1             MS. TEKEEI:  First, it's beyond the scope of redirect.

2   But also this is not an exhibit that this witness has prepared;

3   it's a different exhibit.  He was not asked to extract

4   individual files.  I believe that our office in the course of

5   preparing for trial he extracted this one.  He was not asked to

6   extract this particular text file until -- I would hate for

7   there to be a misimpression and the jury to have confusion

8   about that issue.  But I think most of all it's way beyond the

9   scope of redirect.

10            MS. HARRIS:  Your Honor, he did testify that he

11  prepared this, and Ms. Tekeei asked him on cross whether or not

12  he was asked to pull particular messages for particular

13  contacts.  He said no.  This is a -- as we I think he will

14  testify -- an extraction of messages between Ms. Morton and Mr.

15  Galanis.

16            THE COURT:  But was he asked to pull it?

17            MS. HARRIS:  Well, he testified that he was.

18            MR. SCHWARTZ:  He testified he created that document.

19  We just put a DX sticker on a government exhibit.

20            THE COURT:  Just clarify.

21            MS. HARRIS:  Sure.

22            MS. MERMELSTEIN:  I think there is a misunderstanding.

23  He's not saying he didn't pull the whole report, but he didn't

24  then extract this individual file.

25            MS. HARRIS:  I think -- I'm sorry, I didn't mean to

I6D7GAL5                          Santos - Recross

1    interrupt.

2              MS. MERMELSTEIN:  And so to then -- if you want to

3    start sort of putting in other evidence here, then it's very

4    far beyond the scope of the three questions that were asked on

5    redirect.

6              THE COURT:  Yeah, I think it's beyond the scope, but I

7    think it's important that the jury get a fair and accurate

8    understanding of it.

9              MS. HARRIS:  And I will ask him what his understanding

10   is of what this exhibit is.

11             MS. TEKEEI:  Can you show him the whole thing?

12             MS. HARRIS:  Of course.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I6D7GAL5                         Santos - Recross

1                (In open court)

2      BY MS. HARRIS:

3      Q.  Mr. Santos, I'm sorry to hand this up to you; it's a very

4      large exhibit.

5      A.  No problem.

6      Q.  It might be easier to review.

7                Mr. Santos what I have just handed to you is an

8      unredacted version of what we marked for identification as

9      3004B.  Do you recognize this exhibit?

10     A.  Yes.

11     Q.  Can you describe this exhibit?

12               MS. TEKEEI:  Your Honor, can we have just one moment?

13               THE COURT:  Sure.

14               MS. TEKEEI:  I think it's fair to ask him whether he

15     knows what it is.  But to identify what she believes what it

16     is, I'm not sure that that's appropriate.

17               THE COURT:  Do you know what this is?

18               WITNESS:  So, I recognize the names, and I recognize

19     that this is something that would have been produced along with

20     the pdf.  I didn't review the specific text files that these

21     would have derived from, but it does look --

22               THE COURT:  Is this something you have seen before in

23     connection with this case, this particular exhibit?

24               WITNESS:  Not this specific set of notes here, of

25     texts messages.

I6D7GAL5                          Santos - Recross

1            MS. HARRIS:  Can I ask just a few follow-up?

2            THE COURT:  Sure.

3    Q.  Mr. Santos, can you describe in general terms what you

4    understand this to be?

5    A.  So, along with the pdf report that I produced, in that

6    folder there is a text document version of the i-messages and

7    text messages.  It's the same material that's included in the

8    pdf report.  I didn't compare these to what is in the pdf

9    report, but that's what I recognize this to be -- or what it

10   would be.  It would just be an exact copy of what is already in

11   the pdf report.

12   Q.  Thank you.  And turning to the first page of that document,

13   can you indicate the name that is indicated there?

14           MS. TEKEEI:  Objection.

15           THE COURT:  Yes, sustained.

16           I mean did you run this?  Did you pull this?  I'm not

17   sure what terminology to use.

18           WITNESS:  I didn't review this specific document; I

19   just recognize the type of document that it is or where it

20   would have come from, but I didn't specifically --

21           THE COURT:  From other cases.

22           WITNESS:  Yes.

23   Q.  But, Mr. Santos, were these messages extracted from the

24   file that you extracted and prepared in the extraction report?

25   A.  I recognize some of the names, or at least one of the

I6D7GAL5                          Santos - Recross

1    names, but I didn't review the specific text document.  I have

2    an idea of what it is, but I didn't specifically review these.

3    Q.  And what's your idea of what it is?

4    A.  That these would be text messages and i-messages that would

5    have been included in the folder along with the pdf.  But I

6    only reviewed the pdf document.  I didn't include any of the

7    underlying note pad, or text messages, or text document files

8    that were in that folder.

9    Q.  And messages between whom exactly?

10            MS. TEKEEI:  Objection, your Honor.

11            THE COURT:  I mean have you reviewed it?

12            WITNESS:  Not this specific binder.

13            THE COURT:  Would you know who the messages are

14   between unless you read it?

15            WITNESS:  I just recognize one name on this first

16   page, and that's about it.

17   Q.  And what is the name that you recognize?

18            MS. TEKEEI:  Objection.

19            THE COURT:  Sustained.

20            MS. HARRIS:  Your Honor, we would move in Defense

21   Exhibit 3004B, subject to your Honor's ruling on admissibility

22   later.

23            THE COURT:  OK.  So I will reserve decision on that.

24   But did you ask any foundational question you wanted to ask of

25   this witness?

1    Q.  Sure.  Mr. Santos, did you -- you recognize this document

2    as a document that was generated in the course of your

3    preparation of the examination report, correct?

4                MS. TEKEEI:  Objection.

5                THE COURT:  Is that true?  I mean do you recognize it

6    as that?

7                WITNESS:  The actual pdf report has over 4,000 pages

8    to it.  I only recognize one name from this binder that's been

9    given to me.

10               THE COURT:  Like what is in the binder, have you ever

11   seen that before specifically?  Or do you just recognize that

12   this is the kind of thing that would be generated?

13               WITNESS:  Exactly, the second, your Honor.  I

14   recognize, from previous experience working with other cases,

15   what kind of data this is and where it would be found, but I

16   didn't review this specific data for this case.

17               THE COURT:  I will just reserve decision on this.

18               MS. HARRIS:  Sure.  And, your Honor, I think we would

19   also move into evidence DX4817, which Ms. Tekeei and I have

20   discussed previously, subject to your Honor's eventual ruling

21   on that as well.

22               THE COURT:  OK.  Thank you.

23               (Defendant's Exhibit 4817 received in evidence)

24               MS. HARRIS:  One moment.

25   Q.  Mr. Santos, just one more question.  Were you ever asked to

I6D7GAL5                        Santos - Recross

1    prepare a report of text messages between Ms. Morton and Mr.

2    Galanis?

3             MS. TEKEEI:  Objection, your Honor.  Objection, your

4    Honor.

5             THE COURT:  Yes, sustained.

6             MS. HARRIS:  No further questions, your Honor.

7             MS. TEKEEI:  We have no further questions, your Honor.

8             THE COURT:  Do you have further questions?

9             MR. HASSEN:  Our client was brought up in redirect.

10            THE COURT:  Sorry?

11            MR. HASSEN:  I have a few questions.

12            THE COURT:  Go ahead.

13   RECROSS EXAMINATION

14   BY MR. HASSEN:

15   Q.  Good afternoon, Mr. Santos.

16   A.  Good afternoon.

17   Q.  My name is Abraham Hassen, and I'm an attorney for Bevan

18   Cooney over here, and I just want to direct you to a few

19   things.

20            Ms. Tekeei asked you to identify or to look at page --

21            I'm sorry to ask, Mr. Jackson, if you could bring up

22   page 3070, please, for the witness.

23            And you said that you had recognized the name there as

24   Bevan Cooney.

25   A.  No, I didn't say I recognized his name.  I just read the

I6D7GAL5                        Santos - Recross

1   name.

2   Q.  You just read the name.  And could you read the number of

3   activity -- phone activities associated with that name.

4   A.  Six.

5   Q.  And could I point you to page --

6           THE COURT:  What does that mean six?  Is that six

7   minutes?  Six calls?  What is that?

8           WITNESS:  It's the number of times contacted -- that

9   that person was contacted -- so six.  It's activity analytics.

10          THE COURT:  Outgoing calls?

11          WITNESS:  Incoming, outgoing, combination.

12  Q.  Calls or text messages?

13  A.  Yes.

14  Q.  And could I also point you to page 3063, please.  And do

15  you see in the middle the name Jason Galanis?

16  A.  Yes.

17  Q.  How many activities are associated with that name?

18  A.  823.

19  Q.  And if I point you to page 3065, and do you see the name

20  Hugh Dunkerley there?

21  A.  Which line?

22  Q.  Line 244, 250, 251 and 252.

23  A.  Yes.

24  Q.  And how many activities, phone activities, are associated

25  with that number?

I6D7GAL5

1    A.  99.

2    Q.  My apologies.  This file is quite large so it's slow to

3    scroll through.

4              MR. HASSEN:  That's enough from me.  Thank you.

5              THE COURT:  Thanks.

6              All right.  Anything else?

7              MS. TEKEEI:  No, thank you, your Honor.

8              THE COURT:  You may step down.  Thanks.

9              (Witness excused)

10             THE COURT:  You may proceed.

11             You're still under oath.  You are going to read things

12   as accurately as you can.

13             WITNESS:  Yes, your Honor.

14             MS. MERMELSTEIN:  Before I begin, I'll offer all the

15   exhibits we're going to read:  Government's Exhibits 2303,

16   2307, 1224, 2059, 2242, 2061, 2062 and 2063 -- which are the

17   two that are going to be offered with the limiting instruction

18   regarding hearsay, your Honor -- 2251, 2246, 1278, 1228, 1280,

19   1285, 951, 1282, 1229, 833, 2076, 1365, 2078, 962, 963, 966,

20   2251 and 2246.

21             THE COURT:  Yeah, I think you mentioned that.  They

22   will be admitted.

23             MS. MERMELSTEIN:  Let me have one moment, your Honor.

24   I will point it out when we get there, because I think the

25   instruction is probably best when we are looking at them, but

I6D7GAL5

1     it's 2061 and 2062 that are subject to the limiting

2     instruction.

3               THE COURT:  Regarding hearsay.

4               MS. MERMELSTEIN:  Yes.

5               THE COURT:  Correct.

6               (Government Exhibits 2303, 2307, 1224, 2059 received

7     in evidence)

8               (Government Exhibits 2242, 2061, 2062 2063 received in

9     evidence)

10              (Government Exhibits 2251, 2246, 1278, 1228 received

11    in evidence)

12              (Government Exhibits 1280, 1285, 951, 1282 received in

13    evidence)

14              (Government Exhibits 1229, 833, 2076, 1365 received in

15    evidence)

16              (Government Exhibits 2078, 962, 963, 966 received in

17    evidence)

18              (Government Exhibits 2251 and 2246 received in

19    evidence)

20    Q.  Let's start with 2303, please.  On August 28, 2014, Jason

21    Galanis wrote:  "As of 12/31/2013, AAM managed on a

22    discretionary basis approximately U.S. $1.8869 billion of

23    client assets and provides advisory services on a

24    nondiscretionary basis with respect to U.S. $7.1457 billion of

25    client assets.  Attachment titled AAM form ADV.pdf."

I6D7GAL5

A.   Bevan responded to Jason Galanis, cc'ing Devon Archer with
the subject:  We have a decent shot of adding this one to the
family.

          "Greek just running at a frenetic pace.  Love it."
Q.   Going to 2037, September 20, 2014,
jason@holmbycompanies.com, sent an e-mail attaching overview
Atlantic Asset Management.pdf.
A.   And Devon Archer responded to jason@holmbycompanies.com
with the subject:  Overview Atlantic Asset Management.pdf.

          "Will review.  Devon Archer."
Q.   Turning to Government Exhibit 1224.  If we can begin on the
second page, please.  E-mail from Michelle Morton to Ron
Sellers, Joshua Bogart, Michael Allen and Richard Deary on
September 21, 2014, subject:  Request for information and
meeting.

          "Good morning, Mr. Sellers and Mr. Bogart.  I hope you
are both well.

          "we are very interested in moving forward, to this
end, I want to get a preliminary term sheet to you as soon as
possible.  However, because I wish to present a proposal that
is close to meeting your needs, I find that I require
additional information.  Since we have signed the NDA, I am
wondering if you would provide me with internal financial
reports for the firm.  It will be helpful for me to review the
year to date (end of month or quarter) income statement,

I6D7GAL5

1    balance sheet, and cash flow statement."

2               Then let's skip to the first page, please.

3    A.  This is an e-mail from Michelle Morton dated September 22,

4    2014 to Jason Galanis with the subject:  Request for

5    information and meeting.

6               "FYI see below.  I will speak with them later today."

7    Q.  That same day jason@holmbycompanies.com forwards the e-mail

8    to Devon Archer and Bevan Cooney.

9               Turning to Government Exhibit 2059 from Jason Galanis

10   to Devon Archer and Michelle Morton on October 28, 2014:

11              "Devon, I want to introduce one of my favorite people

12   to you.  Michelle has been our angel in executing the fixed

13   income ambitions of our group.  More than that, she has an been

14   a thoughtful and supportive partner, and has been a godsend in

15   launching our Burnham Native American initiatives.

16              "I propose a call tomorrow to discuss the brain

17   therapy financing.  I think Michelle can be instrumental in

18   putting this together with us.  Let's give her your intentions

19   and objectives tomorrow and disclose how you see your partner

20   Hunter involved and Clint and others.  That will help frame

21   things for her so she can approach our pension fund clients.

22   Let me know a time."

23   A.  Devon Archer then wrote:  "Jason, thank you kindly for

24   yours.  And it's a genuine pleasure to meet you Michelle.  I

25   look forward to speaking to you tomorrow.  How is 11 a.m. EST

I6D7GAL5

1    tomorrow?  Very best, Devon."

2    Q.  The next day Michelle morning writes:  "Good morning to you

3    both.  I hope Jason hasn't overpraised me, for he has been the

4    true angel.  We have a conference call at 11 with a significant

5    prospect and I need to participate in the beginning of the

6    call.  Are either of you available at 11:30 a.m.?

7        "Devon, I'm very interested in learning morning about

8    this to determine how we can support the effort."

9    A.  Devon Archer then wrote:  "11:30 is great.  Speak then."

10   Q.  Michelle Morton then wrote to both Devon Archer and cc'ing

11   Jason Galanis:  "Look forward to speaking with you both."

12       Turning next to Government Exhibit 2242, from Michelle

13   Morton to Jason Galanis, dated October 30, 2014.  Subject:

14   Native Initiative conference with chief strategist at

15   AAM/Atlantic Asset Management.

16       "Had conversation this evening with Jerry about our

17   SRI/Native American initiative.  I thought it was time given

18   the positive feedback I got from Josh.

19       "basically, it was the conversation he and I needed to

20   have before a deal is consummated.  I told him that we will get

21   the opportunity to invest in Native sovereign private placement

22   bonds.  He was familiar but had never invested in one.  I told

23   him that being an SRI was a key component of our vision and

24   that investing in these securities was important to me.

25       "He is on board with this.  So much so, I would like

I6D7GAL5

1    to have a conference call to introduce the two of you.  He said

2    and I quote 'if there is a deal coming up, let me know the

3    details well ahead of time, and I will do my damndest to get it

4    placed within a day after the acquisition (once you are the

5    owners).  He gets it too.

6            "It was very important to me to have this conversation

7    before Tuesday's meeting."

8    A.  On the same day Jason Galanis then wrote:  "Working on more

9    liquidity and sources for the various projects ... see below.

10   Promising."

11   Q.  That same day Bevan Cooney responded to Jason Galanis,

12   cc'ing Devon Archer:  "Very promising Greco."

13           Turning to Government Exhibit 2061 from Michelle

14   Morton to Jason Galanis on October 30, 2014, subject:  Update

15   on AAM.

16           "At the request of Josh Bogart, we had a conference

17   call to discuss the term sheet.  Here are the highlights:"

18           Then skipping to the last paragraph.

19           "Judging by the topics he discussed, I'd say we are 90

20   percent there.  If we are no longer discussing multiples, if we

21   are discussing bonuses, if we are discussing wording in a final

22   document that protects them, if we mutually agree that the deal

23   has to be completed this calendar year (we did), and if we're

24   discussing which employees are important and which have to go,

25   I'd say we practically have a deal.  Talk to you soon.

I6D7GAL5

Michelle"

A.   On the next day that message was then forwarded from

jason@holmbycompanies to Devon Archer and Bevan Cooney.

Q.   Turning to Government Exhibit 2062 from Michelle Morton to

Jason Galanis that same day October 30, 2014.  Subject:  Forgot

important element in last e-mail-AAM.

          "If he has information on the issue, he will begin the

process of going through the client information to determine

where they can be placed.  Can't believe I forgot that

extremely important part of the conversation.  M."

A.   That message was then forwarded from

jason@holmbycompanies.com to Devon Archer and Bevan Cooney.

          THE COURT:  Just to be clear, with respect to

Government's Exhibits 2061 and 2062, they're not being admitted

for the truth of what is contained in them but, rather, you

know, who saw and received them.

          MS. MERMELSTEIN:  Thank you, your Honor.

Q.   Turning to Government Exhibit 2063 -- and if we can put

that up, the first and second pages side by side, please.

          At the bottom of the page from Jerry Thunelius on

November 10, 2014 to Michelle Morton, subject:  My prayers have

been said; my attendance at mass done.

          "I remain hopeful.  Today begins a brand new day for

Atlantic under your leadership?

A.   That e-mail was then forwarded from Michelle Morton to

I6D7GAL5

1    Jason Galanis.

2    Q.  Jason Galanis sent that e-mail to Jason Sugarman on

3    November 10 of 2014 and wrote:  "From the CIO of Atlantic to

4    Michelle"

5    A.  Jason Galanis then wrote:  "The below will add $11.5

6    billion to the empire.  Also have Andrew working directly with

7    Michelle regarding the hedge fund operations of Atlantic.  He

8    seems into it."

9    Q.  Devon Archer responded to Jason Galanis, cc'ing Bevan

10   Cooney:  "Great message.  Devon Archer."

11          Turning to 2246 -- and again if we can put up pages 1

12   and 2 side by side, please.  Beginning at the bottom of the

13   first page, from Ron Sellers to Michelle Morton and Richard

14   Deary, cc'ing Joshua Bogart on November 20, 2014, subject:

15   Call follow up.

16          "Michelle and Richard, after a little thought, a three

17   year employment agreement for me sounds best.  Thank you for

18   the consideration.  And may I say:  You two are definitely

19   "great closers."  I will be very excited to work with you both.

20   Thank you again, Ron"  Signed Ronald W. Sellers, Chairman and

21   CEO of Atlantic Asset Management LLC.

22   A.  Michelle Morton then forwards that e-mail to Jason Galanis:

23          "FYI."

24   Q.  On November 20, 2014 at 9:58 p.m. jason@holmbycompanies.com

25   forwarded that e-mail again.

I6D7GAL5

1   A.   Then Bevan Cooney sends to jason@holmbycompanies.com:

2   "Huge final push to get Ron Sellers over the hump."

3   Q.  Let's go to Government Exhibit 2251.  Starting at the

4   bottom of the first page, from Michelle Morton to Joshua Bogart

5   and Ron Sellers on December 1, 2014, importance:  High.

6         "Here you go."

7         If we can look at the first page of the attachment,

8   please.  Term sheet for the proposed acquisition of Atlantic

9   Asset Management LLC by Hughes Capital Management, Inc.,

10   December 1, 2014.

11         Then Special Agent Kroll, let me ask you to continue

12   on the first page.

13   A.   Then Michelle Morton forwards that e-mail to Jason Galanis:

14         "Here you go."

15   Q.  Jason Galanis then sends that e-mail -- forwards that

16   e-mail to Jason Sugarman and Devon Archer, cc'ing Andrew

17   Godfrey and Bevan Cooney, subject:  Boom.

18         "Attached executed term sheet.pdf".

19         Turning next to Government Exhibit 1278.  And if we

20   can start by putting up the first two pages side by side,

21   please.

22         At the bottom, from Andrew Kleinman at Proskauer.com

23   to Spencer Feldman, Hugh Dunkerley and Michelle Morton, cc'ing

24   Joshua Bogart, Ron Sellers, Michael Mavrides, James Gurkis and

25   Smirte Kodondonponi.

I6D7GAL5

1        "Attached is a revised draft of the merger agreement

2    and a red line marked to show our changes to your initial

3    draft.  These are being sent to Atlantic simultaneously and

4    remain subject to their further review and comment.  We look

5    forward to working with you on this transaction.  Please let us

6    know if you have any questions or would like to discuss.  Best

7    Andrew H. Kleinman."

8    A.   Hugh Dunkerley then forwards this message to Jason Galanis:

9    "FYI, all the best Hugh.  Hugh Dunkerley, Director and CEO, COR

10   Capital International LLC."

11   Q.   Jason Galanis then forwards to Devon Archer, Jason

12   Sugarman, Bevan Cooney and Andrew Godfrey, Burnham Financial

13   president:

14       "Proskauer in New York city is representing Atlantic

15   in the sale.  Attached are their comments to the agreement.

16   Feels like we are getting there and I like that they have real

17   counsel.  Target signing is Friday.  We'll see.  On another are

18   other notes, we are now in agreement with IMRE on the buy-out

19   of his participation in Fondinvest.  A document has been

20   circulated by counsel.  Hope to sign Monday.  I have high hopes

21   there.  Andrew, I believe firmly we need Stephen involved in

22   the company going forward.  Let's discuss the practicality of

23   that and how it might work."

24       Then if we can look at the first page of the

25   attachment, please, page 4 of this document, I think.

I6D7GAL5

1            Agreement and Plan of Merger by and among Hughes

2    Capital Management LLC, Wealth Assurance Holdings Ltd, Atlantic

3    Asset Management LLC, and all of the members of Atlantic Asset

4    Management LLC, dated as of January 2015.

5            Go to Government Exhibit 825, please, from Gary Hirst,

6    gary@hirstlaw.com, to Jason Galanis on February 1 of 2015,

7    subject:  AAM purchase price.

8            Agent Kroll, I will ask you to read the top e-mail.

9    A.  Sure.  This is from Jason Galanis to Michelle Morton --

10   Q.  I am so sorry.  Can you read the middle e-mail.

11   A.  Sure.  This is from Gary Hirst to Jason Galanis with the

12   subject AAM purchase price, dated February 1, 2015.

13           THE COURT:  I'm sorry?  Let's give it a minute.

14   Better?  OK, they're working now.  Thanks.

15   Q.  Let's just skip to 1228, please, beginning on the second

16   page, from Jason Cabico, on January 31, 2015 to Joshua Bogart,

17   Andrew Kleinman, Kenneth Schlesinger, Spencer Feldman, Michelle

18   Morton.  Subject:  Revised HCM-AAM merger agreement.

19           "Gentlemen, attached for your review are clean and

20   marked copies of the revised HCM-AAM merger agreement that

21   reflect all changes discussed this week.  The blackline shows

22   the changes made against the prior version of the merger

23   agreement we circulated to you."

24           Then skipping to the first page, please, Agent Kroll.

25   A.  So this is a message from Andrew Kleinman to Jason Cabico,

I6D7GAL5

1   Joshua Bogart, cc'ing Kenneth Schlesinger, Spencer Feldman and

2   Michelle Morton.

3           "Attached are the Proskauer/Atlantic comments to the

4   merger agreement."

5   Q.  Michelle Morton forwards to Jason Galanis, Hugh Dunkerley

6   and Richard Deary on February 2, 2015:  "I can't review until

7   morning but I wanted you to have this.  I will be up at the

8   crack of dawn to review."

9   A.  Jason Galanis then forwards that to Devon Archer, Bevan

10  Cooney:  "Very close boys."

11  Q.  If we can go next to Government Exhibit 1280.  If we can

12  put up the first two pages side by side, please.

13          From Jason Cabico to Andrew Kleinman, Joshua Bogart,

14  cc'ing Kenneth Schlesinger, Spencer Feldman, Michelle Morton

15  and Richard Deary on February 13, 2015.

16          "Attached are Hughes' signature page to the merger

17  agreement and Valor Group's fully executed guaranty.  The

18  attached signatures are released; accordingly, we understand

19  Atlantic and the seller's signature pages to also be released.

20  Congratulations on signing."

21          And if we can skip to the e-mail that begins on the

22  bottom of the first page, Agent Kroll.

23  A.  On February 13, 2015 Ron Sellers wrote:  "Michelle, Richard

24  and Hugh, congratulations to you and to us.  A big job well

25  done.  We are very excited, and look forwards to working

I6D7GAL5

1    closely with you, and growing your and our business very fast.

2              "The local beer garden is already filling with

3    Atlantic employees beginning the celebration.  Josh and I are

4    headed there now.

5              "We will see two of you on Tues.  And Hugh, we hope to

6    see you soon as well."

7    Q.  From Hugh Dunkerley, forwarding to Ron Sellers, Michelle

8    Morton, Richard Deary and Joshua Bogart:  "Absolutely,

9    congratulations all around.  2015 and forward is exciting for

10   Atlantic.  All the best, Hugh."

11   A.  Jason Galanis then wrote:  "$12.5 billion AUM, boys.

12   Greeks can get shit done."

13   Q.  Devon Archer responds to Jason Galanis, cc'ing Jason

14   Sugarman, himself and Andrew Godfrey, Burnham Financial

15   president:  "Tremendous.  Beer garden sounds like the plan.

16   Devon Archer."

17              Going to Government Exhibit 1285, that same e-mail on

18   February 13, 2015 from Jason Galanis, reading "$12.5 billion

19   AUM, boys.  Greeks can get shit done."

20   A.  Then a message from Bevan Cooney to Jason Galanis, cc'ing

21   Jason Sugarman, Devon Archer, Andrew Godfrey, Burnham Financial

22   president:  "Absolutely huge, Greek.  I'm heading over to my

23   local beer garden."

24   Q.  Turning to Government Exhibit 951.

25   A.  This is an e-mail dated Friday, March 6, 2015, the subject:

I6D7GAL5

1    Proposal for Roc Nation (Sports Division), from Michelle Morton

2    to Ron Sellers and Joshua Bogart.

3         "Good morning.  I have been given the opportunity to

4    develop a proposal to form a strategic alliance with the sports

5    agency division of Roc Nation to provide investment advisory

6    services to their talent.  I am working with one of my

7    partners, Bevan Cooney, who is currently working with its

8    founder on other projects.  Regards, Michelle."

9    Q.  Turning to Government Exhibit 1282.  If we can put up the

10   first two pages side by side, please.

11        From Jason Galanis to Aloyce Steichen, Jason Sugarman,

12   Rory Knight and Hugh Dunkerley, on March 30, 2015, subject:

13   Atlantic.

14        "Gentlemen, attached are the executed documents

15   concerning the acquisition of 100 percent of Atlantic Asset

16   Management LLC by Hughes Capital Management LLC.  The

17   transaction is a merger of AAM into HCM.  The surviving HCM

18   will be renamed Atlantic Asset Management, and the holding

19   company will be named Atlantic Holdings.  It is proposed,

20   subject to the consent of the recipients of this e-mail, that

21   the existing SPV by which Valor/WAAG owns its 100 percent

22   preference shares of HCM undertake a name change to Valor Asset

23   Management Holdings (US) LLC.  Attached is a diagram of the

24   proposed entity chart for your review.

25        "Closing consideration is $6,240,398 and a deferred

I6D7GAL5

portion of $4,854,420 to be paid pursuant to two reset notes

issued at closing by Hughes and guaranteed by WAH (and not by

Valor).   The reset notes are automatically reduced if there are

reductions in client fee income in the first and second year

post closing.

"Of the cash proceeds, $2,470,840.91 will go to

Tri-state Bank to pay off Atlantic's bank credit facilities

(see bank pay-off letter attached) and $3,649,557.09 will go to

the sellers with $120,000 to Olshan, buyer's counsel.   The

closing is being facilitated through counsel's client trust

account (wiring attached) with the law firm responsible for

disbursements upon receipt of all executed closing documents

and deliveries.

"A closing condition imposed by the buyer is the

receipt of client consent.   Attached are executed client

consents that reflect affirmative consent to the continuation

of the respective investment management agreements with AAM.

AAM and HCM have/has approximately $12.4 billion in client

assets under management.

"There will be a flurry of closing related documents

tomorrow including board appointments.   Rory has requested that

Hugh and Jason serve on the board of Atlantic.   This has been

accepted and incorporated into the documents.   This is a

considerable milestone, and I congratulate everyone at Valor

for the accomplishment.   It is quite a calling card to be

I6D7GAL5

nearly $18 billion in client assets.

           Please direct me as needed for any clarity required.
Jason.

           "Attachments:  HCM/AAM merger agreement; disclosure
schedule; form of note; WAH guaranty; client consent letters,
two attachments; form of closing certificate, to be delivered
at closing; Tristate Bank payoff letter; and wiring
instructions."

A.   Jason Galanis then forwards that e-mail with the
attachments to Devon Archer, Bevan and Andrew Godfrey.

Q.   Turning to Government Exhibit 1229, please.  And if we can
put up pages 1 and 2 side by side, please.

           Beginning at the bottom of the first page, Jason
Galanis to Aloyce Steichen on April 1, 2015, subject:  Atlantic
closing.

           "Aloyce, per your request, there is one wire to the
lawyers.  The amount is $6,240,398.  The lawyers will directly
make three authorized disbursements from this amount:
$2,470,840.91 to Tristate Bank; $3,649,557.09 to the sellers;
and $120,000 Olshan.  Please use the wire instructions below.
Jason."

A.   On April 1, 2015 Jason Galanis wrote:  "See below.  We
already delivered the notes for the $4,854,420.  Will be nice
to have dry powder to fire.  BIISL helps.  IWI will readily do
it with $900 million dry."

I6D7GAL5

1   Q.   Bevan Cooney responds to Jason Galanis, cc'ing Devon Archer

2   and Andrew Godfrey:  "Just a big time hump day closing."

3           Government Exhibit 833 is an e-mail from

4   jason@holmbycompanies.com to Michelle Morton, attaching

5   transfer Atlantic 02.04.2015 pdf.

6           And if we look at the attachment, please.

7           "International payment to Olshan Frome Wolosky LLP

8   IOLA account.

9           "Currency amount:  US $6,240,398,000.

10          "Reason for payment:  Atlantic closing Wealth

11  Assurance.

12          "Account holder:  Valorlife."

13          Turning to Government Exhibit 2076, on April 2, 2015

14  jason@holmbycompanies wrote:  "Attaching transfer Atlantic

15  02.04.2015.pdf."

16  A.   Then an e-mail from Devon Archer to Jason Galanis:

17  "congratulations ."

18  Q.   Jason@holmbycompanies responds to Devon Archer:  "To you

19  too."

20          Government Exhibit 1365.

21  A.   This is an e-mail with subject:  Soft final on third.

22  Dated Thursday, April 9, 2015 from J. Galanis to tanderson@

23  dilworthlaw.com, cc'ing jason@holmbycompanies and steven@

24  haynesinvestments.net.

25  Q.   Looking briefly at the first page of the attachment, can

I6D7GAL5

1    you read just the top of that, Agent Kroll.

2    A.   Yes.   This is a private supplemental memorandum dated April

3    1, 2015.   20 million, Wakpamni Lake Community Corporation,

4    Special Limited Revenue Bonds (taxable), series of 2015 (Town

5    Center Development).

6    Q.   Government Exhibit 2078, beginning at the bottom.   On April

7    14, 2015, Jason Galanis wrote:   "Attached is the hedge fund

8    PPM, the audited financials and the performance.   The

9    administrator is SS&G, a $550 billion AUA administrator.   The

10   fund was $99 million.   Omaha added 25 million two weeks ago,

11   subsequent to their consent to the change of control.   The fund

12   is discretionary and managed by Atlantic.   Michelle has

13   proposed that Andrew and Stephen step in to take over.   She is

14   going over this with the CCO/general counsel now.   No apparent

15   objection.   Only finesse needed will be Don Trotter being

16   marginalized but he seems like an agreeable guy."

17   A.   On April 14, 2015, Devon Archer wrote:   "how do we get

18   ahead of Don Trotter?   Anything to do now?"

19   Q.   Jason Galanis responds to Devon Archer, cc'ing Jason

20   Sugarman and Andrew Godfrey:   "Feels like the plan is winning

21   hearts and minds through a full preppy assault on the

22   Connecticut contingent.   Not sure what floats the boat of the

23   Kansas guy.   Résumé below.   Donald W. Trotter, CFA, managing

24   director."

25              Let's go to 962, please.   If we can start at the

I6D7GAL5

1    bottom of the first page -- next to the third page actually.

2              From Michelle Morton to karen.humphrey@usbank,

3    atlantic.ops@globeop.com, usbankdelaware@usbank, subject:  Wire

4    transfer for purchase, importance high.  Sent April 15, 2015.

5              "Karen, I am the new owner and CEO of Atlantic Asset

6    management.  You can confirm with Dina or Sarah.  You may reach

7    me at 203-351-2819.  Please effect these transfers today to

8    distribute cash among our sleeve manager accounts."

9              And looking at the middle of page 3.

10             "And then please wire $16.2 million to the following:

11   U.S. Bank National Associate, reference Wakpamni Lake

12   distribution, for the purchase of CUSIP 931130AE8, Wakpamni

13   Lake District 6.2 percent, 5/1/2022.  Michelle A. Morton, chief

14   executive officer."

15             If can we return to the first page, please.

16   A.   Then Michelle Morton sent to Timothy B. Anderson, bcc'ing

17   jason@holmbycompanies.com.

18             "Please forward to Keith to expedite.  Thanks,

19   Michelle Morton."

20   Q.   Turning to Government Exhibit 963, please, and beginning on

21   the third page, from David McMillan to Richard Deary, copying

22   Cliff Cole, Don Trotter, Michelle Morton and Dina Clements,

23   subject:  Re thoughts on disclosures to OSERS.

24             "This is not of course an exhaustive list but these

25   come to mind quickly.  Explain in detail your relationship with

I6D7GAL5

1    Burnham Wealth Assurance.  Why were these changes not discussed

2    with the investors before it was done?  Variant:  Isn't it a

3    little late to be asking my view on this?  A very

4    characteristic type of question.  What are the GYOF

5    diversifications effects of this change?  What will be done to

6    mitigate concentration risk in this sleeve?  Has Atlantic ever

7    bought a bond like this before?  Default history on tribal

8    gaming bonds.  If asked, what rating would you give this bond?

9    Everybody feel free to chime in with either questions or

10   answers, approaches.  Dave."

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6DJGAL6

A.   Don Trotter then replied to David McMillan, Richard Deary,

CC Cliff Cole and Michelle Morton.  We can express some of this

at the analysis longer with Mike includes an explanation that

this is in effect an insurance company credit risk and that you

are an expert on insurance companies.  You have looked at

Wealth Assurance and they are a B to B type credit and 6

percent is a good return for B to B credit.  I have attached

the Wealth Assurance financials.  I have 2013, $65 million of

equity.  I suspect 2014 financials are available.

Q.   Turning to the first page for Michelle Morton, to Ron

Sellers, Richard Deary, Cliff Cole, Don Trotter, David

McMillan, Dina Clements and Sarah Roush.  Thanks, Ron.  Glad

you're available.  Please provide Richard and me with document

and outlines of program I'll presented to the board.  If so I

would appreciate if some one of them would forward it to me

immediately.  Thanks, Michelle.

A.   Ron Sellers then sends message to Michelle Morton, Richard

Deary, Cliff Cole, Don Trotter Dave McMillan Dina Clements and

Sarah Roush.

        Michelle, I would add to the assessment of liquidity

that OSERS being a principal investor in GYOF, knows that they

are, that they have an extra fiduciary duty to understand and

follow it thoroughly.  Any significant trade will, for this

reason, will come under direct scrutiny.  I am sorry.  Atlantic

has wide latitude per the investments per the docs.  Size of

I6DJGAL6

1   any particular investment is important to overall risk and

2   liquidity profiles and larger investments must be shown to have

3   exceptional merit.  I will be on the call in 10 minutes if the

4   phone system in the Bahamas chooses to be functioning at that

5   time.  Ron.

6   Q.  Lastly in this group if we can turn to Government Exhibit

7   966 and put the first two pages up side-by-side, please.  It is

8   from Ron Sellers to Michelle Morton, Richard Deary, Dina

9   Clement Cliff Cole Don Trotter, April 24, 2015.  Subject Omaha

10  and the GYOF purchase.  Michelle and Richard, Mike Smith called

11  me this morning.  His message was the note has got to go.  Get

12  it out or OSERS will withdraw from agreement, implies the same

13  result.  He was not impressed with the size or lack of team

14  purchase, apparent ethics, disclosure your post trade and more.

15  If disclosed before trade, he would have said no.  He said the

16  quote ethical squishiness makes it imperative it has to go.  I

17  told him we would need a little time that would move as quickly

18  as possible.  Obviously, if the trade could be broken, that

19  would be the best outcome.

20          Second would be to do develop a plan quickly to redo

21  the position as soon as possible.  Hopefully Burnham can help

22  us, ran.

23  A.  Then Michelle Morton forwards that email to Andrew Godfrey.

24  Been working on this today.  Another email to follow.

25          MS. MERMELSTEIN:  Thank you, Agent.

I6DJGAL6

1        THE COURT:  So, ladies and gentlemen, we're going to

2    stop for the day.  We'll meet back on Monday.  We are going to

3    be sitting after all from 5:00 to 9:00.  We are not sitting

4    Friday.  It is Good Friday, which is fine.  Please be here in

5    advance of 9:00 o'clock on Monday.  Remember don't discuss,

6    don't research the case and have a nice long weekend.

7        (Jury excused)

8        THE COURT:  If there are any of the issues you want to

9    brief, and I am not suggesting should, but if you feel like you

10   need to, if you can do it by tomorrow, and any responses get to

11   me by noon on Friday, and then please be here at 8:45 on

12   Monday, okay?

13       MS. MERMELSTEIN:  One quick thing on the record your

14   Honor?

15       THE COURT:  Yes.

16       MS. MERMELSTEIN:  The government received a press

17   request for a copy of Government Exhibit 301, the RSB Bank

18   records.  As a general matter, the exhibits at trial are a

19   matter of public record and we normally provide them without

20   raising the issue.  They're bank records, so I think that

21   Mr. Archer should have the opportunity to indicate if there is

22   any personal information, although it is obviously a business

23   account he would like redacted.  If Mr. Schwartz provides us

24   with anything he would like to redact, we will make any

25   appropriate redactions before providing the exhibit.  I

I6DJGAL6

1    understand there may be additional requests for --

2              MR. SCHWARTZ:  We will do that.  We have been relaxed

3    throughout this trial about not redacting things that

4    ordinarily get redacted before they get published.

5              THE COURT:  Thank you for working together on that.

6    I'll see you all on Monday morning.

7              (Court adjourned until Monday, June 18, 2018, at 8:45

8    am)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2   Examination of:                              Page

3   FRANCISCO JOSE MARTIN FERNANDEZ

4   Cross By Mr. Touger  . . . . . . . . . . .2273

5   Cross By Mr. Schwartz . . . . . . . . . .2292

6   Redirect By Ms. Mermelstein  . . . . . . .2382

7   Recross By Mr. Touger  . . . . . . . . . .2393

8   ENRIQUE SANTOS

9   Direct By Ms. Tekeei . . . . . . . . . . .2396

10  Cross By Ms. Harris  . . . . . . . . . . .2403

11  Redirect By Ms. Tekeei . . . . . . . . . .2418

12  Recross By Ms. Harris  . . . . . . . . . .2420

13  Recross By Mr. Hassen  . . . . . . . . . .2427

14                      GOVERNMENT EXHIBITS

15  Exhibit No.                             Received

16   4200     . . . . . . . . . . . . . . . .2386

17   3004 O   . . . . . . . . . . . . . . . .2400

18   3004 A   . . . . . . . . . . . . . . . .2402

19   2303, 2307, 1224, 2059 . . . . . . . . .2430

20   2242, 2061, 2062 2063  . . . . . . . . .2430

21   2251, 2246, 1278, 1228 . . . . . . . . .2430

22   1280, 1285, 951, 1282  . . . . . . . . .2430

23   1229, 833, 2076, 1365  . . . . . . . . .2430

24   2078, 962, 963, 966  . . . . . . . . . .2430

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    2251 and 2246   . . . . . . . . . . . . . . .2430

 2                         DEFENDANT EXHIBITS

 3    Exhibit No.                              Received

 4    4818      . . . . . . . . . . . . . . . . . .2303

 5    4914      . . . . . . . . . . . . . . . . . .2307

 6    4795      . . . . . . . . . . . . . . . . . .2339

 7    4916      . . . . . . . . . . . . . . . . . .2380

 8    3004  . . . . . . . . . . . . . . . . . . . .2413

 9    4817      . . . . . . . . . . . . . . . . . .2426

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```