I6L7GAL1

```
 1    UNITED STATES OF AMERICA
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          16 Cr. 371 (RA)

 5    JOHN GALANIS, et al.,

 6                   Defendants.

 7    ------------------------------x

 8                                       New York, N.Y.
                                         June 21, 2018
 9                                       9:00 a.m.

10
      Before:
11
                        HON. RONNIE ABRAMS,
12
                                         District Judge
13

14                         APPEARANCES

15    ROBERT KHUZAMI,
           Acting United States Attorney for the
16         Southern District of New York
      BY:  BRENDAN F. QUIGLEY,
17         REBECCA G. MERMELSTEIN,
           NEGAR TEKEEI,
18              Assistant United States Attorneys

19    PELUSO & TOUGER
           Attorneys for Defendant John Galanis
20    BY:  DAVID TOUGER

21    BOIES, SCHILLER & FLEXNER LLP (NYC)
           Attorneys for Defendant Devon Archer
22    BY:  MATTHEW LANE SCHWARTZ
           LAURA HARRIS
23         CRAIG WENNER

24

25
```

I6L7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              - and -
     O'NEILL and HASSEN
5          Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ-HASSEN
6

7
     Also present:  Kendall Jackson, Paralegal
8                    Ellie Sheinwald, Paralegal
                     Eric Wissman, Paralegal
9                    Special Agent Shannon Bienick, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6L7GAL1

1        (Trial resumed; jury not present)

2        THE COURT:  Is Ms. Notari or Mr. Hassen here?  She

3    will be right back?  All right.

4        Mr. Quigley, do you want to talk about your scheduling

5    issues at the sidebar?  Is there anything we need to talk

6    about?  We can do it off the record.

7        MR. QUIGLEY:  Sure.

8        THE COURT:  OK.

9        (Discussion held off the record at sidebar)

10        (In open court)

11        THE COURT:  All right.  So I wanted to address Defense

12    Exhibit 3004B.  With a few exceptions I am going to allow the

13    exhibit in.  I find that most of the messages are relevant to

14    Mr. Archer's defense by showing, among other things, the manner

15    in which Jason Galanis traded on his name and reputation, and a

16    lack of relationship between Morton and Archer.  Moreover, the

17    messages are not being offered for the truth of the matter

18    asserted in them.

19        There are though a few excerpts that I think should

20    stay out just pursuant to Rule 403.  I don't think they have

21    much probative value, and there is a danger of unfair

22    prejudice.

23        So, starting on page 6, I think all of pages 6 and 7

24    should stay out.  And then on page 9, I think you should take

25    out starting with "consequently," so it's the fourth text down.

I6L7GAL1

1   You should take out the rest of that page.  And I think you

2   should take out all of 10.  Then I think you should take out

3   the last message on 20 and the first message on 24, and then

4   the last three messages on 27.  And then finally I think you

5   should take out the message on page 39.

6              MR. SCHWARTZ:  Can I just repeat that to make sure I

7   got it?

8              THE COURT:  Yes.

9              MR. SCHWARTZ:  So, pages 6 and 7 out, page 9 beginning

10  with "consequently" out, 10 out, the last message on 20, the

11  first message on 24, the last three messages on 27 and the

12  message on 39?

13             THE COURT:  Right.  But everything else can come in

14  but not for the truth of the matters assert.  So, I'm happy to

15  give an instruction if anyone asks me to.

16             MS. TEKEEI:  Thank you, your Honor.  We would.  Since

17  we're talking about the text messages, I just want to confirm

18  our understanding that the defense is withdrawing 4817 and the

19  corresponding excerpts of 4817 that are in their Defense

20  Exhibit 3004.  Given what the government read in yesterday,

21  we've incorporated the portions they were concerned about.

22             MS. HARRIS:  We're happy to do that, your Honor, as

23  long as we can agree on the way to present it.

24             MS. TEKEEI:  Sure.

25             THE COURT:  I didn't hear the last thing you said.

I6L7GAL1

1          MS. HARRIS:  Sorry.  We're happy to do that, your

2     Honor, as long as we can agree on how to present it in 3004A.

3          THE COURT:  Why don't you try to talk about that now

4     as we're waiting for jurors.

5          MS. MERMELSTEIN:  We have a number of other issues

6     that have to be raised, I guess.

7          So, we have tried very hard to get along here, but I

8     think that there are some real problems with the last -- well,

9     I will just say.

10          So, first of all as your Honor will recall at the very

11     beginning of the trial the government raised a concern about

12     Dr. Archer being in the courtroom during all of the testimony

13     in light of the fact that she was an expected witness, and

14     there was a proffer from defense counsel that given the nature

15     of her testimony there really wasn't any reason to exclude her,

16     and your Honor encouraged the government to let it go so that

17     Mr. Archer could have his wife.

18          What was said at that point in time about the scope of

19     her testimony, I asked whether or not she was going to testify

20     about certain relevant facts or just as a character witness,

21     and the proffer was "It depends on what you mean by the facts,

22     but I expect she will testify, for example, where he was

23     physically at certain times during the relevant time period."

24          It's now been proffered -- for the first time

25     yesterday -- that Dr. Archer is going to testify about

I6L7GAL1

communications with Jason Galanis that she was a part of.
That's a very different kind of factual testimony, and I think
that it is unfair to make a representation about the scope of a
witness's testimony, and in reliance on that to have the
government say, OK, that person can be present for the trial,
and then say in fact she is going to testify about things that
are going to be relevant to the testimony of other witnesses.

So, I'm not asking your Honor to preclude her as a
witness, but I think the gamesmanship is unfair to the
government and it continues to be ongoing.

The second issue is, as your Honor will recall, having
produced its summary charts weeks in advance, defense counsel
refused to produce its similar summary charts on the grounds
that they were impeachment for the government's witness, and
your Honor indicated that they wouldn't be ordered to do so
given that representation.  We got it yesterday at 5 o'clock.
It's not.  It's not impeachment.  It is a separate area of
proof.  It essentially is a chart that purports to show that
Mr. Archer ended up losing money from this.

That has nothing to do with what Agent Kendall
testified about.  There is no reason the government couldn't
have had that in advance.  And if Mr. Schwartz was concerned
that the government was then going to try and put in its own
chart that said something different on that topic, throughout
this whole trial we had an agreement that when defense exhibits

I6L7GAL1

were given they wouldn't be incorporated into directs.  They

had all of her exhibits; they knew what we were going to do

with her; so there is no reason not to have given that to the

government.  The only reason -- the only reason is in an effort

to create a situation where the government has 12 hours to

review complicated bank records instead of three weeks, and

it's unfair.

On top of it, that was given to us at the end of the

day as your Honor ordered at 5 o'clock.  At 10:30 last night we

got a new version that had, as it turns out, not incredibly

significant changes, but the numbers are different.  In order

to check everything, you've got to start over.  It's not fair,

it's not right, and it's not operating I think in good faithed.

We also got last night for the first time additional

exhibits at -- I think these were 1 o'clock in the morning.

They are to say wildly inadmissible -- my initial reaction was

that defense counsel was joking, although that isn't the nature

of our general communications.

Can we pull them up?  Can we do 4842 first?

Defense counsel has suggested that it is going to

offer the following two exhibits as party opponent admissions

by the government.  As you can see, this is a tweet from the

President regarding his view that people will flip and lie if

the government will let them get out of trouble.

THE COURT:  OK, this is not coming in.  Let's just say

I6L7GAL1

1     that right now.

2              MS. MERMELSTEIN:  And the second one, which is 4844,

3     is an excerpt from the transcript of the Gerova trial in which

4     in argument concerning whether or not there was sufficient

5     reliability to admit certain statements of Jason Galanis the

6     prosecutor -- one of the prosecutors in the trial, not me --

7     Mr. Blais, argued that Jason Galanis can't be believed about

8     anything.  Defense counsel now wants to put that in.

9              I think it's not a proper party opponent statement,

10    one.  Two, the basis for Mr. Blais's statement is in large part

11    Jason Galanis' Gerova conduct, so if this comes in, Gerova come

12    in.  And, three, this trial transcript is from two years ago.

13    We have been fighting about Gerova the last six months in this

14    case.  The only reason for giving us this the night before it's

15    coming in, at one o'clock in the morning, is sandbagging.

16             THE COURT:  I mean will hear you out, but I don't

17    expect this to come in.

18             MR. SCHWARTZ:  I think you ought to.  And I am happy

19    to address these issues in reverse order.

20             First of all, can you go to the next page and just

21    show the excerpt that we intend to display.  It's simply this

22    sentence:  "It is difficult to conceive of a declarant who is

23    less trustworthy than Jason Galanis, given all the

24    circumstances."

25             THE COURT:  Go ahead.

I6L7GAL1

1          MR. SCHWARTZ:  This was said -- and I just want to be

2     clear for the record, this was said by the prosecutor -- the

3     same prosecutor who was the lead prosecutor on this case until

4     maybe a year ago -- in regards to precisely the issue we have

5     in this case, which is whether Jason Galanis' statements as an

6     out-of-court declarant offered for the truth of the matter are

7     trustworthy.  And he said, in arguing they should not be

8     admitted, that "It is difficult to conceive of a declarant who

9     is less trustworthy than Jason Galanis, given all the

10     circumstances."

11          This is, if not a judicial admission, a clear

12     admissible party admission under among other things binding

13     Second Circuit precedent.

14          The United States, as you will instruct the jury, is a

15     party like any other party, and when they say things -- and in

16     this case specific to an individual who is offered as an

17     out-of-court declarant in this case -- saying basically nothing

18     this man says could be trusted, that is relevant, and that

19     ought to be admitted against the government.

20          THE COURT:  It's not being admitted for a couple of

21     reasons.  At the very least it's cumulative.  I don't think

22     there is any doubt in the jury's mind about whether or not

23     Jason Galanis is trustworthy.  The government has not argued

24     that he is trustworthy.  So, at the very least it's cumulative.

25          I am also concerned about the fact that this comes

I6L7GAL1

from the Gerova case, and you, among others, have been arguing

to me throughout that nothing from Gerova should come in.

That's been a big source of contention, so I'm not going to

allow the government's statement in the context of that case,

particularly when it's not disputed in this case.  So for those

reasons I'm not going to allow that in.

MR. SCHWARTZ:  Thank you.  And then talking about the

summary charts.  So, as you saw, I handed over the money

charts, as agreed, as soon as we were done.  And of course the

conclusion reached in that chart is a different conclusion than

the one that was offered by Agent Kendall.

Ms. Mermelstein is right, the point of that chart is

to do an accounting of the sort of cumulative balance for Mr.

Archer, to show, as I said in opening, that he lost about a

million dollars in this endeavor.  But that chart includes some

of the very same transactions that I walked through and

impeached Agent Kendall on, including the $903,000 wire

reversal and the two wires —— the $100,000 wire and the

$600,503 wire —— to Thorsdale, and so it was directly

responsive.  If they had had that beforehand, they knew what

exhibits we were going to use, Agent Kendall could have been

prepared on those points, and that's why we withheld it.

The thing that came on a little later last night, I

mean, look, just as Agent Kendall testified she was reviewing

her charts and making sure they were right to the last second,

I6L7GAL1

1    our witness was doing the same.  You know, what came across

2    last night, we gave over the second that we got it.  He picked

3    up one additional wire and incorporated it into his chart, and,

4    you know, that's fair cross if they want to cross, I guess, but

5    there is no gamesmanship, and there is really no need for sort

6    of name calling here.  We're preparing things and turning them

7    over as we get them.

8         THE COURT:  On the chart, frankly it does seem to me

9    like there is some gamesmanship, but I don't think the remedy

10   is to prevented you from using it.

11        If you want to have rebuttal case on Monday, you can

12   do that.  We will leave that open.  And if you want any of the

13   defense witnesses to be recalled at that time, you will let me

14   know, but I think that's the appropriate remedy.

15        MR. SCHWARTZ:  Well, I mean before we get to that,

16   your Honor should actually see the chart, but I don't think

17   they will want to do that anyway.

18        Then, finally, with respect to Dr. Archer, again

19   they're not asking for anything, so I'm not sure what the point

20   is, except suffice it to say Dr. Archer is not going to testify

21   about any interaction with Jason Galanis that has been the

22   subject of any testimony in this trial.  Her testimony doesn't

23   and is not affected by -- to the best of my knowledge --

24   anything that has gone on in this courtroom, and of course that

25   also is fair grounds for cross-examination.

I6L7GAL1

1          THE COURT:  There is no request on the table in any

2     event with respect to Dr. Archer, just an expression of

3     frustration, so I don't think there is anything I need to

4     address at this point.

5          MS. MERMELSTEIN:  Thank you, your Honor.

6          So then I think we have just some more mundane exhibit

7     objection kind of issues.

8          Last night at I think about one o'clock in the

9     morning -- and so I confess especially in light of Mr.

10     Quigley's personal situation we didn't get to some of this --

11     but there were redactions discussed at sidebar to the BIT board

12     e-mails concerning the fees, and the blackmail, and extortion

13     language.  Some of the extortion language is still in the

14     redacted version that was produced to us as being pursuant to

15     your Honor's ruling.

16          THE COURT:  My recollection was that all the extortion

17     language went to the fees.

18          MS. MERMELSTEIN:  And as a result it was coming out.

19          THE COURT:  Right.

20          MS. MERMELSTEIN:  So what has been done is there has

21     been a redaction of the fee language but the extortion

22     allegation now just exists sort of --

23          THE COURT:  I think that would be misleading, based on

24     my recollection of the documents.

25          MS. MERMELSTEIN:  Agreed.

I6L7GAL1

1          MR. SCHWARTZ:  Just so there is no doubt, can we pull

2     it up so we can get clear guidance.

3          THE COURT:  And the jury is here, so whenever we're --

4          MR. SCHWARTZ:  I think it's either 4332 or 4387.

5          THE COURT:  I thought it was 4332 was the one we

6     talked about yesterday.

7          MR. SCHWARTZ:  It's one of those two.  No, it's the

8     other one, 4387.

9          So this is the way we redacted it, and just tell us

10    what we should take out.

11         MS. MERMELSTEIN:  So the word blackmail obviously I

12    think is not in keeping with your Honor's ruling.

13         THE COURT:  Can you pull it up before it was redacted,

14    please.

15         MR. SCHWARTZ:  Excuse me?

16         THE COURT:  Can you pull up the copy without the

17    redactions so I can see the context?

18         MR. SCHWARTZ:  Of course.

19         Do we have the unredacted version?  I can hand it up.

20         THE COURT:  That's fine.  Thank you.

21         So now pull up on the screen your proposed redactions.

22         So starting from the bottom up, I would take out the

23    comment "Also her comment that paying Molly ASAP was close to

24    blackmail," as well as the line that follows that.

25         And then moving up I would take out the line "Let's

I6L7GAL1

settle with Molly because it did feel like blackmail and

something that will hold the process up," as well as the two

lines that follow that all have to do with her payment.  Then I

would probably take out everything above that, because I think

it's all about her payment and the agreement on her payment.

           Does anyone want to be heard?

           MR. SCHWARTZ:  I no longer have a copy of the

document, so --

           THE COURT:  I'm sorry.  So here I will show you.  I'm

doing it old school with Post-its.

           MR. SCHWARTZ:  If you just want to cross out.  Here is

what we redacted up on the screen.  What else needs to come

out?

           THE COURT:  I would take out "It did feel like

blackmail and something will hold the process up.  Hard to know

what exactly she's done, but it will hold out the process."  So

I would take out that line.

           MR. SCHWARTZ:  OK.

           THE COURT:  And then I would take out also her comment

about "ASAP was close to blackmail".

           MR. SCHWARTZ:  OK.

           THE COURT:  And I think that's it.

           MR. SCHWARTZ:  OK, understood.

           MR. QUIGLEY:  That's fine with the government, your

Honor.  Thank you.

I6L7GAL1

1                    THE COURT:  Sorry?

2                    MR. QUIGLEY:  That's fine with the government.

3                    THE COURT:  So I will give you this back.  Thanks.

4                    MR. SCHWARTZ:  And I know the jury is here, and I

5      don't want to keep them waiting.  Just sort of to give you an

6      update on where the rest of the disputes are.

7                    So, we received about an hour ago a list of objections

8      from the government, which I guess are -- in addition to or

9      include?

10                   MR. QUIGLEY:  They overlap, in addition to what we

11     gave your Honor yesterday.

12                   MR. SCHWARTZ:  To a number of exhibits.  Of those -- I

13     believe I did it very quickly because we just got it -- of

14     those only five of the objections are ones we intend to read or

15     publish to the jury today, and the other ones can be dealt

16     with, you know, in some form or fashion when we're not doing it

17     and keeping them waiting, so at an appropriate time.

18                   THE COURT:  So can we bring the jury in now?  Or do we

19     need to do this now?

20                   MR. SCHWARTZ:  No, we can bring the jury in now.

21                   THE COURT:  So we will bring the jury in now, and then

22     over the morning break we can discuss those five exhibits.  Do

23     you want to just give me the exhibit numbers?

24                   MR. SCHWARTZ:  Yes.  I couldn't even know what the

25     nature of the objection is; all I know is objection.

I6L7GAL1

1             THE COURT:  Then we will talk about it over the break.

2             MR. SCHWARTZ:  But I will tell the government which

3    they are.

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good morning, everyone.  Everyone can be

3     seated.  Thank you.

4              Mr. Atkins, I'm going to remind you you are still

5     under oath.

6              Mr. Wenner.

7              WITNESS:  Yes.

8      PAUL ATKINS, resumed.

9     DIRECT EXAMINATION (Continued)

10    BY MR. WENNER:

11    Q.  Good morning, members of the Jury.

12             Good morning, Commissioner Atkins.

13             When we broke yesterday you had described how after

14    you served as chief of staff and counselor to Chairman Levitt,

15    you went on to work as a partner at Price Waterhouse Coopers.

16    A.  Right, or at the time Coopers & Lybrand and then it merged

17    later.

18    Q.  And can you explain to the jury what it means to be a

19    partner.

20    A.  It means you're a part owner of the business and

21    responsible for a particular type of line of business in the

22    firm, and you have a decision-making -- a part decision-making

23    authority with the rest of the partnership.

24    Q.  And approximately how long were you at Price Waterhouse

25    Coopers?

1   A.  For about six years.

2   Q.  And what were your responsibilities there?

3   A.  Well, I was part of -- leading a unit that dealt with

4   regulatory issues for brokers and for investment advisors.

5   Q.  If you could maybe pull the microphone a little bit closer.

6   A.  OK.

7   Q.  And did any of your work at PWC involve issues of corporate

8   governance?

9   A.  Yes, we advised companies in that regard with respect to

10  mergers and that sort of thing.  And with Deutsche Telecom, for

11  example, we helped with their privatization.  It was a German

12  government entity at the time.

13  Q.  And just generally speaking in basic terms what is the work

14  of PWC?

15  A.  It's a big accounting firm.  Now there are only four big

16  accounting firms left, but what an accounting firm does is it

17  looks after the financial statements of public companies

18  mainly, and private ones too, but their biggest task is to look

19  after public companies.

20  Q.  And what do you mean when you say financial statements?

21  A.  Well, companies need to keep good books for their

22  shareholders' purposes and also for the government, showing

23  money that comes in, and then what goes out, and then at the

24  end of the day what the company has made.  Then they decide

25  what dividends to pay, and so all that's reflected in these

1    financial statements.

2    Q.  And what did you do when you left PWC?

3    A.  I was appointed by the President and confirmed by the

4    Senate to be Commissioner of the Securities and Exchange

5    Commission.

6    Q.  Can you comment brief briefly on what you did as a

7    commissioner to the Securities and Exchange Commission?

8    A.  Well, the Commission is kind of like a board.  The statute

9    provides for five commissioners, one of whom is the chairman.

10   Before I had said I worked for two chairmen in the early '90s,

11   but as commissioner you have a vote equal to the chairman, and

12   so the chairman, you know, is the one to whom the staff of an

13   agency reports -- about 4,000 people now -- and so you vote on

14   enforcement actions that are being brought, whether or not to

15   bring those for people who allegedly violated rules or

16   regulations of the SEC.  You hear appeals where people have

17   been brought before various organizations that report to the

18   SEC.  And you vote on rules that the SEC adopts.

19   Q.  While you were commissioner on the SEC, were there any

20   major pieces of legislation that were passed?

21   A.  Yes.  Well, actually like ten days before I was confirmed

22   the Sarbanes-Oxley Act of 2002 was adopted, and that was

23   centered on -- after Enron and WorldCom -- corporate governance

24   issues in the main.

25   Q.  Would you describe, please, your educational background.

I6L7GAL1                        Atkins - Direct

1   A.  Well, I received a bachelor's in accounting and English

2   literature from Wofford college in Spartanburg, South Carolina;

3   and my law degree from Vanderbilt in Nashville, Tennessee.

4   Q.  You may have mentioned one or two yesterday, but are you a

5   member of any professional organizations?

6   A.  I am a member of the New York bar and Florida bar; those

7   are the two main ones.

8   Q.  Any other societies?

9   A.  Yes.  Well, the Association of the Bar of the City of New

10  York, and I guess this Court as well, and then the American

11  Enterprise Institute I have been affiliated with.

12  Q.  Have you testified as an expert before?

13  A.  Yes.

14  Q.  And approximately how many times?

15  A.  About 15 times, I guess, over the last nine years.

16  Q.  Have you performed any other kind of expert-related work?

17  A.  Yes.  Well, as part of my firm, we have -- I think I

18  mentioned yesterday -- we act as what is called an independent

19  compliance consultant that's in the context of enforcement

20  actions by the SEC and CFTC.  We kind of are delegated to go in

21  and look at how the company remediates the allegations that

22  were made and that they've settled to in that enforcement

23  action, and as serving as a monitor -- I mentioned yesterday --

24  for a bank for a judge in this court.

25  Q.  And have you worked for both plaintiffs and defendants?

I6L7GAL1                    Atkins - Direct

1    A.  Yes.

2              MR. WENNER:  Your Honor, at this time I would like to

3    move to qualify Commissioner Atkins as an expert in securities

4    and corporate governance.

5              THE COURT:  Any objection?

6              MR. QUIGLEY:  No objection.

7              THE COURT:  He will be so qualified.

8    Q.  Commissioner Atkins, are you being compensated for your

9    time?

10   A.  Yes.

11   Q.  And what is your standard hourly rate.

12   A.  For this sort of thing, 1450.

13   Q.  Is that the rate that you're being compensated for here

14   today?

15   A.  Yes.

16   Q.  And who is paying your fees?

17   A.  The defense team.

18   Q.  Does your compensation depend in any part on the outcome of

19   the case?

20   A.  No.

21   Q.  Did you review any documents from this case prior to

22   testifying here today?

23   A.  I did.  A few months ago in deciding whether or not to take

24   it on, I looked at the indictment, I guess it's called.

25   Q.  Does the testimony that you expect to give today depend in

I6L7GAL1                          Atkins - Direct

1   any way on the document or documents you may have reviewed a

2   few months ago?

3   A.  No.

4   Q.  Have we met before?

5   A.  No.

6   Q.  Well, you and I.

7   A.  Oh, well, I mean before today, yes, but not before this

8   matter.

9   Q.  Not before this matter.  And approximately how many times

10  did you and I meet to prepare for your testimony?

11  A.  A couple.  Two, three, I guess.

12  Q.  Is there a slide deck that we will be using today to guide

13  our discussion?

14  A.  Yes.

15          MR. WENNER:  Your Honor, with your permission, I would

16  like to publish for the jury but not as evidence the slide

17  deck?

18          MR. QUIGLEY:  No objection.

19          THE COURT:  So, this is just going to be used as an

20  aid to you to assist in following the testimony, but it's not

21  being admitted as evidence.

22  Q.  Mr. Jackson, could you please pull up DX9000.

23          And, Commissioner Atkins, did I ask you today to

24  discuss specific examples of companies?

25  A.  Yes.

1    Q.  And the slides that are in this deck, are they

2    predominantly just images from the Internet, publicly available

3    images?

4    A.  Yes, they are all from websites for the most part.  We

5    created one of them.

6    Q.  Well, Mr. Jackson, turn the page, please.

7            Is this the one slide that's just not from the

8    Internet?

9    A.  Yes.

10   Q.  And this is a slide that you prepared?

11   A.  Yes.

12   Q.  And you discussed a little bit about your time as a

13   commissioner at the SEC, and could you just describe what is

14   the general leadership structure of the Securities and Exchange

15   Commission?

16   A.  Well, there is a chairman who is one of five commissioners,

17   and he is the one to whom the staff reports.

18   Q.  And who do the commissioners answer to?

19   A.  The President.

20   Q.  And what generally is the SEC's role in the marketplace?

21   A.  Well, it's the primary regulator of the securities markets

22   and other market participants in and around the securities

23   market, so the stock exchanges, and brokers, investment

24   advisors, and mutual funds and that sort of thing.

25   Q.  And are there other regulators in the marketplace?

1   A.   There are.  The states have securities administrators.  And

2   then you have what we call self-regulatory organizations, and

3   those are predominantly the stock exchanges.  Then there is an

4   association of brokers that's called the Financial Industry

5   Regulatory Authority, or FINRA for short.

6   Q.   And just to slow down for a moment.  What is a

7   self-regulatory agency?

8   A.   Well, it's a concept that was set up way back in 1934 in

9   the Securities Exchange Act of 1934, so this was in the wake of

10  the market crash of 1929.  So, the idea was allow the various

11  industries to police themselves in the first instance, and then

12  have a government entity like the SEC then oversee what they do

13  and act -- I mentioned before the SEC acts as an appellate body

14  for determinations by some of these self-regulatory

15  organizations.

16  Q.   And there is a lot of other acronyms and names on the

17  chart.  Could you just explain at high level why there are all

18  of these other names here.

19  A.   Yes.  So this basically -- these are all federal financial

20  services regulators.  So it's like a clock, so the SEC is up

21  there at 11 o'clock.

22       But in the wake of a statute that was passed in 2010,

23  the Dodd-Frank Act, if you've heard of that, it set up a thing

24  called the Financial Stability Oversight Council.  So these

25  regulators sit around a table, and so they're bank regulators,

I6L7GAL1                          Atkins - Direct

1   credit union.  The CFTC down at 5 o'clock oversees commodities

2   like trading in gold and silver and wheat and what not.  And

3   you have various others.  But the Federal Reserve is up at 1

4   o'clock.

5   Q.  And insurance just a little bit different from the others

6   on this chart?

7   A.  It is.  The federal government doesn't have authority over

8   insurance; that's left to the states.  But there is -- pursuant

9   to this Dodd-Frank act -- a person who heads a federal

10  insurance office, which is part of Treasury, and who looks

11  after and keeps informed about the insurance industry.

12  Q.  Thank you.

13          Mr. Jackson, could you please turn the page.

14          And before I ask you the question at the top of the

15  screen "What is a stock?" can you explain in a more fundamental

16  level just generally what is a security?

17  A.  Well, a security is a general term.  It's basically a

18  contract between a company and a person who buys that contract.

19  And what makes a security interesting is that it's what we say

20  is negotiable, meaning that the person who holds it can then

21  sell it, or give it, or whatever, transfer it to somebody else.

22  So, that's what sets up our stock markets or stock exchanges,

23  because you have this idea of an ownership interest in a

24  company or, more broadly, it can be other things; but generally

25  a stock is part ownership of a company.

I6L7GAL1                         Atkins - Direct

1  Q.  And is a stock just one example of a security?

2  A.  Yes.  There are lots of types of securities out there.

3  Q.  Are debt instruments securities?

4  A.  They are, yes.

5  Q.  And can you explain in broad terms what a debt instrument

6  is.

7  A.  Well, a debt instrument is what it sounds like.  If a

8  company wants to borrow money from somebody, it becomes

9  indebted to that person, so that's what we call a debt

10  instrument, so that's generally a bond, debenture.  I mean

11  there are lots of names for various types of them depending on

12  their term.  Some are very short, like letters of credit or

13  commercial paper, and then others are very long termed.

14  Q.  And specifically on stocks, can you describe what we're

15  looking at on the screen.

16  A.  Yes.  So this is a company.  You will probably have heard

17  of Apple Computer, and so what is evidenced -- your holding in

18  the company if you're a stockholder in the old days you would

19  get a piece of paper, a certificate and squirrel that away in

20  your safe deposit box or whatever.  Nowadays it's mostly

21  electronic, because they charge you if you want to get your

22  stock.  But a lot of people like for Disney or something they

23  want to have Mickey Mouse on the stock certificate and frame

24  it.  But, anyway, these are stock certificates, and that's what

25  evidences your ownership interest in the company.

1    Q.  And there are arrows coming from the company, and you

2    mentioned before the concept of stock being negotiable.  Could

3    you discuss just the idea of the stock coming from the company

4    versus then being traded afterwards.

5    A.  Well, so the company has authorized shares.  So a company

6    is a creature of generally state law, and it's set up under

7    those laws, and so when a company wants to raise money or

8    broaden its ownership, we say it goes out and issues stock.  So

9    just like you if you want to sell your apartment, your house,

10   or whatever, you go to a broker to do that.  So, companies go

11   to what we say or call underwriters.  Underwriters are brokers

12   and dealers, and they buy the securities in the first instance

13   from the company, and then they go out and as quick as they can

14   generally try to sell it to other people so they're not left

15   holding the stock for any long period of time.  But that's how

16   stock gets issued and then spread out to other owners.

17   Q.  And just one more time to make sure we understand.  The

18   issuer is?

19   A.  The issuer is the company.  So when you buy a stock, you

20   are buying an interest in that company, so you can't walk into

21   the company and say I want that chair, that's mine, my

22   interest, but you own an undifferentiated interest in the

23   company.

24   Q.  And the broker in this context, what is their role?

25   A.  The broker is one where, you know, it has relationships

I6L7GAL1                        Atkins - Direct

1     with all sorts of people.  Like if you have an account with

2     Merrill Lynch, or Fidelity, or something like that, you have

3     your investment with that broker, and that broker is acting on

4     your behalf if you want to buy or sell securities.

5                  So the same with a company, when they want to issue

6     stock they hire Merrill Lynch or Goldman Sachs or something

7     like that, who has the means and the relationships to buy the

8     securities from the company and then sell it to brokers, who

9     then are acting on behalf individuals, or institutions, or

10    mutual fund or whatever, and that's how the securities get

11    spread out.

12    Q.  Commissioner Atkins, are you familiar with a term called

13    liquidity?

14    A.  Yes.

15    Q.  And does liquidity have different meanings in different

16    contexts?

17    A.  Oh, sure.

18                  MR. QUIGLEY:  Your Honor, can we approach on this?

19                  THE COURT:  Yes.

20                  (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2              MR. QUIGLEY:  Your Honor, we object to this.  I mean

3      we have given him a little bit of leeway to ask about stocks,

4      but there is nothing about stocks in his expert notice, and

5      there is certainly nothing about liquidity.  This is beyond the

6      scope of the notice; I don't think it should be allowed.  It's

7      pretty straightforward.

8              MR. WENNER:  Your Honor, we are not going to be

9      belaboring any particular point; but we're going to be moving

10     through a broad swath of concepts that have been covered at a

11     very high level and very quickly in this case.  And, as we

12     noticed, the purpose of General Atkins' testimony is to help

13     ground the jury in an understanding of the types of documents,

14     bonds, corporate agreements that they're going to see presented

15     in front of them, and it's our intention to give them the

16     foundational groundwork just to understand how to read these

17     types of documents.

18             MR. QUIGLEY:  Well, it's not in the notice, that's the

19     problem.  There is nothing about liquidity.  It's about boards

20     of directors.  It's about form ADVs.  It's about SEC

21     enforcement actions.  And it's about different types of

22     acquisitions.  So, you know, I'm not saying it wouldn't be

23     appropriate expert testimony, but this is what they noticed two

24     and a half months ago, and they haven't updated it, and it

25     should be prohibited.

1          MR. WENNER:  Your Honor, like I said, we're not

2     belaboring any particular point.  And to understand who a board

3     of directors is and their relationship to shareholders and

4     owners, as well as management teams and companies, you need to

5     start with the understanding of what a company is, how that

6     company gets investors and gets owners, and how that company is

7     managed.  This is just building to a point where we can have an

8     intelligent conversation about corporate structure.

9          MR. QUIGLEY:  Judge, with respect to liquidity, it's

10    obviously a key term in this trial, right?  And it doesn't

11    matter whether they're belaboring it or not, but he shouldn't

12    be able to opine on that, particularly in light of the lack of

13    notice.

14         THE COURT:  I will let him define it but at a very

15    general level.

16         In the future you should be more specific in your

17    notice.  But I don't want you to get into liquidity --

18         MR. QUIGLEY:  That's the point, he doesn't know

19    anything about this case.

20         THE COURT:  Right.  He can talk generally about what

21    it means.

22         MR. WENNER:  Well, in the context of corporate

23    governance, when a company wants to raise capital, they can do

24    so through issuing stock, they can do so through debt, they can

25    do so through venture debt, combinations, and those are just

1    concepts that I want the jury to understand so when they talk

2    about how companies interact with shareholders they understand

3    the relationships there.

4           So my questions are -- for example, with liquidity,

5    what does it mean for the cash flow of a company in terms of

6    liquidity, it can raise capital through cash, through debt,

7    through issuing stock.  These are just concepts.

8           MR. QUIGLEY:  Judge, these are concepts that are

9    nowhere in their notice, and this is completely inappropriate.

10   This notice is from March 30.  They had two and a half months

11   to update this.  You can look at it.  There is nothing about

12   how a company raises money; there is nothing about liquidity.

13   It's completely beyond the scope.  And the government is

14   frankly prejudiced because we would have called a rebuttal

15   expert potentially that we are not going to be able to retain

16   now.  We have no idea what his opinions are.

17          MR. WENNER:  When we go into mergers and acquisitions,

18   one important component of mergers and acquisitions is how they

19   are funded, and they can be funded in many different ways, and

20   so all of this is just basic background principles so that the

21   jury can understand the later concepts that are more complex

22   and are directly relevant.

23          The government has also elicited from many nonexperts

24   essentially opinion testimony about things like what are LLCs

25   and how they've raised money and conducted their mergers.

I6L7GAL1                          Atkins - Direct

1              MR. SCHWARTZ:  It's probably just worth being clear

2      that -- you know better than I do -- but Commissioner Atkins is

3      not going to offer any opinions on any of these subjects.

4              MR. QUIGLEY:  He just got asked about liquidity.

5              MR. SCHWARTZ:  That's definitional.  The law of notice

6      in criminal cases is that you have to give notice of the

7      opinions and the reasons for the opinions, but it's not like a

8      civil case where you get an expert report.  These are

9      definitional terms.  If you think our definition is wrong and

10     you want to call a rebuttal expert, that's totally fine.

11             MS. MERMELSTEIN:  Throughout this trial you have tried

12     to make suggestions about what the defendants mean when they

13     say the word liquidity, and letting this witness get into

14     liquidity is not background for how a board of directors works.

15     That's ridiculous.  They don't need that information; they have

16     what they need.  It's an effort to try to further an argument

17     that he was not noticed on.  And the late notice and the

18     failure to disclose in a timely fashion, at some point there

19     has to be a consequence to that, your Honor.

20             MR. SCHWARTZ:  Can you do this without using the word

21     liquidity?

22             MR. WENNER:  I can do this without saying the word

23     liquidity.

24             THE COURT:  So don't use the word.

25             MR. WENNER:  OK.  Thank you.

1           (In open court)

2    BY MR. WENNER:

3    Q.   Commissioner Atkins, what is the purpose of issuing stock?

4    A.   Primarily to raise money, but companies use other things,

5    like for acquisitions, instead of paying cash they might issue

6    stock to buy another company.

7    Q.   And do they sometimes issue debt rather than stock?

8    A.   Sure.  Yes.

9    Q.   Maybe you could just explain a little bit the difference

10   from a company's perspective when it issues stock versus debt?

11   A.   Well, a lot hinges on tax.  You know, there was a big tax

12   law that was passed earlier this year, I guess, so that has

13   changed some things from companies' perspectives.

14           But stock and debt, it all depends on how the company

15   is valued in the marketplace.  Maybe they can borrow at a lower

16   interest rate because they're viewed as a good credit, but

17   otherwise they may have to issue stock because maybe people

18   don't want to buy their debt.  I mean it just depends on the

19   circumstances.

20   Q.   And what is venture debt?

21   A.   Well, venture debt is generally where investors are putting

22   money into a company that is on the rise or they're hoping is

23   developing and then to invest in those sorts of securities.  It

24   can refer to a lot of different things, anything from what we

25   call high yield investments to, you know, start-up companies

1   and that sort of thing.

2   Q.  Can you just give some examples of companies in the

3   marketplace that issue venture debt?

4   A.  Well, you know, at the beginning, well, Apple was an

5   example when it started off as a small company.  In the

6   technology area there are a lot of companies in that realm.

7   And I guess you could also apply the term to firms that are

8   investors into developing companies and venture capital type of

9   firms.

10  Q.  And looking at the slide it says common stock.  Are there

11  other kinds of stock?

12  A.  Yes.  There are many different kinds of stock, but

13  generally it divides between common stock, which is kind of the

14  basic stock where you're an owner of the company and you have a

15  vote on various things.  There is also preferred stock where

16  it's a hybrid of it between the debt securities and common

17  stock; you generally have a preference.  You get a guaranteed

18  dividend if the company makes any money; and you take

19  preference -- we say, if the company goes bankrupt, common

20  stock holders are at the bottom of the barrel, and they take

21  whatever is left, but the preferred shareholders get before

22  they do.

23              (Continued on next page)

24

25

I6LJGAL2                          Atkins - direct

```
 1   Q.  Just to slow down and make sure everyone understands, what
 2   are the typical rights that are associated with common stock?
 3           MR. QUIGLEY:  Objection, the same objection as before,
 4   your Honor.
 5           THE COURT:  I'll allow that.
 6   A.  Common stockholders, it is basically set up by state law
 7   and as the company decides its basic documents, the common
 8   stockholders vote on important issues that face the company;
 9   for example, how many shares to authorize, if the company would
10   be absolved and mergers and merger context, shareholders vote
11   on that.  They go for approval of auditors, that sort of thing.
12   Q.  What are the types of rights that are associated with
13   preferred stock typically?
14   A.  Typically they have no vote, but they do, like I said, have
15   a preference if they take before the common stockholders, if
16   the company goes bankrupt, but if there is not enough money to
17   pay off first the debt holders and come preferred, if there is
18   not enough money at the end of the day to distribute to the
19   common shareholders, they don't get anything.
20   Q.  How did common and preferred stock fit within the concept
21   of corporate control?
22   A.  Well, the common stockholders are the ones who own the
23   company basically, and prefer shareholders have rights, but
24   those are defined by their preferred shareholder contract,
25   basically that they bought from the company.
```

1    Q.  Mr. Jackson, if you could turn the slide, please.

2                How are stocks typically traded?

3    A.  On a stock exchange usually.  They're what we call listed

4    securities of a company goes to the New York Stock Exchange,

5    says I'm going to have my securities listed on the New York

6    Stock Exchange, they pay a fee, a listing fee, and they like

7    the idea the New York Stock Exchange companies have a certain

8    credential about them.  People think they're solid and that

9    sort of thing and there is another stock exchange called NASDAQ

10   or Batts I referred to yesterday and those are more technology

11   stocks.  The stocks are listed on the exchanges and registered

12   with the SEC.  Those are publicly traded stocks.

13   Q.  On the right side of the screen can you explain what we're

14   looking at there.

15   A.  Over-the-counter stocks, those are stocks not listed on the

16   stock exchange.  We say they're traded over-the-counter, and

17   that is broker-to-broker mainly, so if you want to sell OTC

18   stock, you call your broker and say can you find me somebody

19   who wants to buy this and perhaps a broker will buy it from

20   you.  It is a market that is not so liquid we say as the public

21   markets.

22   Q.  Where are securities located?  Where are they physically

23   locate?

24   A.  If you have a stock certificate, you better put it in your

25   safe deposit box or your safe at home.  Usually nowadays you

I6LJGAL2                      Atkins - direct

1  leave it with your broker and then your broker puts it in kind

2  of like a bank, called Depository Trust & Clearing Corporation,

3  which is a collaborative arrangement among brokers that was

4  started back in the 60's, I think.  It just got to be too many

5  stock certificates, and so they left them in one place and

6  there is negotiable securities.

7            MR. QUIGLEY:  May we approach again?

8            THE COURT:  Sure.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6LJGAL2                          Atkins - direct

 1              (At the sidebar)

 2              MR. QUIGLEY:  We have the same objection again.  I

 3     have no problem with him allowing him simply to explain

 4     background principles to develop the testimony, but this is

 5     clearly designed, just like the liquidity point, designed to

 6     get at issues in this case under the guise of background.

 7              There has been a lot of testimony about OTC physical

 8     delivery.  If they were going to notice him as an explanation

 9     to explain those things to the jury based on training and

10     experience and not personal experience, that should have been

11     included in the notice, and it wasn't.

12              MR. WENNER:  They have had these slides for a few days

13     now and they could have raised this with us.  I am just about

14     to -- the next slide is going into corporate structure.

15              THE COURT:  Go to the next slide now.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2    BY MR. WENNER:

3    Q.  Mr. Jackson, would you please turn the slide.

4          Mr. Atkins, you have spoken a little bit about this,

5    but can you explain on a basic level what a corporation is.

6    A.  A corporation is basically people who have come together to

7    try to, in the first place, hopefully make money, right, on

8    behalf of their shareholders, but to produce goods and services

9    for the marketplace, to provide what people want to buy.

10         So, for example, with Disney, they're producing

11   cartoons and movies and other things, services for people that

12   hopefully like what they're consuming.

13   Q.  Are there different types of companies?

14   A.  Yes, there is a myriad of companies out there, all types

15   and sizes and shapes.

16   Q.  As far as their legal structure, are there different types

17   of corporations?

18   A.  Yes.  There is a basic corporation which is created,

19   everything is created under state law mostly, but the

20   corporation and there are other limited liability companies and

21   other sorts of things that are created under state law.

22   Q.  Explain a little bit.  What is the difference between an

23   LLC and a corporation?

24   A.  An LLC is a limited liability company, and it's kind of

25   like, almost like a partnership in a way, it is an easier,

1    smaller or simpler form of a corporation, but the real key to

2    it is limited liability aspects.

3             So that means the shareholders' liabilities are

4    limited to what is in the company itself.  So if they're sued,

5    their houses won't be taken away or something like that, which

6    is what happens in a partnership where if the partnership

7    doesn't have enough assets to meet whatever the judgment is

8    against it, then the creditors or the people who won the

9    judgment can go after the assets of the individual partners.

10            So that is why the limited liability company was

11   created, and the corporation as well, so it was a big change

12   back in like the 1700s when that came about.

13   Q.  What kinds of documents are associated with creating a

14   company?

15   A.  Well, if it is a regular corporation --

16            THE COURT:  The objection is to?

17            MR. QUIGLEY:  Notice, your Honor.

18            THE COURT:  I'll allow that in a very general level.

19   You can answer.

20   Q.  Well, the basic document that creates a corporation is a

21   charter that is filed with the state, and the company becomes

22   registered with the state and pays a fee to the state.  Then

23   bylaws are set up by the company and also filed publicly.

24   Q.  What are the function of bylaws?

25   A.  Charters, like the Constitution like for the United States

1   Government, you have the Constitution.  The bylaws get more

2   specific as to how the company's run and how the various

3   officers, what their responsibilities are and that sort of

4   thing.

5   Q.  Are there corporate documents that are specific to LLCs?

6   A.  Yes.

7               MR. QUIGLEY:  The same objection, your Honor.

8               THE COURT:  Overruled.

9   A.  You have a similar types of documents, you have an

10  operating agreement usually, a management agreement that sets

11  up again how the LLC is to be run and governed, and the rights

12  of the members of the LLC vis-a-vis each other.

13  Q.  Mr. Jackson, could you turn the page, please.

14              How, generally speaking, are companies run or managed?

15  A.  Well, generally you have a chief executive officer of the

16  company who is the leader to whom all of the employees report.

17  Then there is a board of directors of the company that they can

18  hire and fire the CEO basically, and they're the body that

19  represents the shareholders.

20  Q.  Mr. Jackson, can you turn the slide, please.

21              Could you explain what we're looking at here.

22  A.  This is from the Disney website, but this is the management

23  team of the Walt Disney Company, and so you see top left hand

24  is Bob Iger, who is the chief executive officer of the company.

25  It also calls him chairman, so he is chairman of the board of

directors, so he serves a dual function.  He is a director and

he is also the CEO of the company.

Q.  What are some of the other key people in the company on the

management team?

A.  Well, you have Mr. Braverman there next to Iger is the

general counsel, next to him is Bob Chapec, he is in charge of

all of the Disney parks, the theme parks and whatnot.

          Right be behind, Ms. McCarthy is the chief financial

officer, so she worries about how the company is making money

or not, and how they're managing their cash flow because they

have to pay money out as well as keep track of what's coming

in.  This is an example of the team that is running Disney

day-to-day.

Q.  Are there certain kinds of documents that the management

team is responsible for creating?

A.  Yes.  Well, Disney is a public company and registered on

the New York Stock Exchange, and listed on the New York Stock

Exchange and registered with the SEC, so they have to file all

sorts of documents, especially what we call a 10-K, Form 10-K

which is their annual report.  Then they have periodic reports

and there are lots of things they have to file with the SEC.

          But suffice it to say that thanks to the Sarbanes

Oxley Act adopted in 2002.  Bob Iger and Ms. McCarthy have to

certify with their own name what is in those documents filed

with the SEC are correct and so we have vicarious liability on

I6LJGAL2                         Atkins - direct

1  themselves for making those filings.

2  Q.  To be clear, what you're just discussing pertains to a

3  public company?

4  A.  Public companies, right.

5  Q.  Do private companies also generate similar types of

6  documents?

7  A.  They do.  They're not filed with the government.

8          Companies have investors, and the investors are very

9  interested in how the company is doing, and so there are

10 usually auditors who come in to check the books and make sure

11 that the management team is correctly reflecting in these

12 financial statements how the company is doing, whether it is

13 making money, losing money and that they're following

14 accounting principles.

15 Q.  You mentioned annual reports.  Can you comment generally on

16 what you might see, what kind of content you might see in an

17 annual report?

18         MR. QUIGLEY:  Objection, your Honor.

19         THE COURT:  I'll allow it just at a very general

20 level.

21 A.  Well, in an annual report for a public company like I

22 mentioned is called a 10-K.  It will have various financial

23 statements.  One of the most important ones is called an income

24 statement that shows what is coming in and going out, and

25 hopefully you're in the black here making money with a company.

1    Otherwise, there is a deficit.  You also have what is called a

2    balance sheet, and then that shows the assets and the

3    liabilities, and again you hope it is positive at the end of

4    the day.

5            Then there is a discussion for public company, we call

6    it management's discussion and analysis.  That is to inform the

7    shareholders how the management team, in particular the CEO

8    thinks the company is going to do in the future, so

9    shareholders are very attentive to that kind of presentation.

10   Q.  How are companies typically managed below the level that

11   we're looking at here?

12   A.  Well, each one of these people have maybe a few dozen, a

13   few hundred people or thousands of people reporting to the

14   person.  So again Bob Chapec probably has literally tens of

15   thousands of people reporting to him.  Others of the general

16   counsel probably not so many, of course.

17           Anyway, so all of these people are in charge of large

18   businesses of the company.

19   Q.  Going in the other direction, who does the management team

20   report to?

21   A.  The management team reports to, generally, to the chief

22   executive officer of the company.

23   Q.  Turn the slide, please.

24           Could you explain at a high level what we're looking

25   at here.

I6LJGAL2                         Atkins - direct

1   A.   This is the board of directors of The Walt Disney Company,

2   and you see again Bob Iger over on the top left, so he's the

3   chairman of the board, and then you have these other members

4   who have been elected directors of the company.

5   Q.   You have mentioned Mr. Iger has a dual role.  Is that

6   common to see in companies?

7   A.   In the United States, yes.  It is always under discussion

8   whether or not companies should have a separate chairman, say a

9   non-executive chairman of the board versus like Iger here is

10  the executive chairman of the company.

11        The chairman of the board sets the agenda for board

12  meetings and basically is a leader of the board.

13  Q.   How do you describe the role of the non-executive

14  directors?

15  A.   Well, non-executive directors are part time people, they

16  have lots of other things going on.

17        So, for example, on the top, the third one down, Mary

18  Barra, she is the chief executive officer and chairman of the

19  board of General Motors, so she has a lot going on, needless to

20  say.  The next line down, Jon Chen, he is the CEO of

21  Blackberry, and for someone who still uses the a Blackberry, I

22  wish them within well.

23        The last one down there, Mark Parker is the CEO of

24  Nike, just three examples here, but these people have other

25  things going on, but they meet regularly to keep appraised of

I6LJGAL2                    Atkins - direct

1    what is going on with the company and act as representatives of

2    the shareholders.

3    Q.  You say representatives of the shareholders.

4            Can you just explain what it means, the relationship

5    between the directors and the shareholders.

6    A.  Sure.  It is rather like when you elect Congress, members

7    of Congress or Senators, you're choosing your representative.

8    That is our system representative of democracy.  A similar

9    thing is with a company, shareholders elect directors, and

10   these directors then serve on various committees of the board

11   and their job is to oversee management from a high level

12   basically.

13   Q.  You mentioned board meetings.  What typically might happen

14   at a board meeting?

15   A.  Board members get presentations from executives of the

16   company and there are reports, so if you remember the last

17   slide, usually the chief financial officer will make a

18   presentation about how the company's doing.  You'll probably

19   hear from the general counsel as to lawsuits or whatever that

20   might be pending against the company or have arisen or have

21   gotten settled.

22           The key leaders of the various divisions or businesses

23   of the company report to how things are doing.  Disney right

24   now is trying to acquire Fox, 21st Century Fox.  I am sure

25   these board members are busy on considering that acquisition,

I6LJGAL2                    Atkins - direct

1    whether to approve it or not.

2    Q.  You mentioned the acquisition.  What other types of issues

3    might the board vote on?

4    A.  Well, whether to keep the CEO.  The CEO might put other

5    questions to the board.  His role is chairman there.

6            It depends on the company as to how the board is, how

7    active it is and in what way -- what things it considers.

8    Q.  You mentioned briefly, but this is how Disney is

9    structured, their board.  Can companies decide to structure

10   their own boards differently?

11   A.  Sure.  This is actually relatively small for the size

12   public company that Disney is.  A lot of times it could be

13   twice the size.  This is relatively small, but it is very high

14   quality.  To get three CEO's like that of other major

15   corporations to be on your board, that is a good fete, I think.

16   Q.  You have discussed Mr. Iger's dual role.  Can you give an

17   example of your own personal experience from companies there is

18   a non-dual role?

19   A.  I mentioned yesterday I was executive board of the board of

20   Batts Global Markets.  There is an example where I was asked to

21   come in and serve as chairman because the board decided that

22   they wanted to have a different governing structure, so they

23   separated the chairman and the CEO role.

24   Q.  When you talk about the work of the board of directors,

25   would that separation of the dual role, how did the work of the

1    board differ from how you described how Disney might operate?

2    A.  Well, generally as non-executive chairman, I needed to work

3    closely with the CEO as far as setting up the agenda of

4    meetings of the board and what the board would be discussing

5    and what we'd be considering, and I would ask for certain

6    people to come and make presentations and arrange to have with

7    the CEO to make sure those people would be there on time.

8    Q.  Are directors compensated?

9    A.  Yes.

10   Q.  What are the different ways in which directors may be

11   compensated?

12   A.  Usually directors get cash, but nowadays what is really

13   done is that directors get usually half of their compensation

14   in stock because the idea is to make the director have his

15   interests aligned with the shareholders, so the director's

16   acting not just as an independent person generally, but that

17   the director is independent, but also feels the pain of the

18   shareholders if it is not, if the company is not doing so well.

19   Q.  Other than the actual managers of the executive team, are

20   there other people who help the board of directors do their

21   work?

22   A.  Yes.  Again with Sarbanes Oxley Act, that allowed directors

23   of public companies anyway to hire advisers, so financial

24   advisers or lawyers and especially in the context of, say, a

25   tender offer where somebody wants to try to acquire the company

I6LJGAL2                    Atkins - direct

1   in an unfriendly way or just -- then directors need to hire

2   their own lawyers and consultants to help them on advising how

3   they should react to that.

4   Q.  What other kinds of consultants might boards of directors

5   have?

6   A.  Well, with respect to, for example, setting the

7   compensation of the CEO, they could have employment salary

8   people who are, who can advise them on that sort of thing.  I

9   mentioned financial advisers, accountants, legal advisory, that

10  sort of thing.

11  Q.  We have been talking about Disney, which is media and

12  entertainment.  Do we see this kind of structure in the

13  management team in other financial sectors?

14  A.  Sure, yes.  Every company again has a board, and the CEO

15  usually with respect to his management team has people in

16  charge of key business lines for the company.

17  Q.  Mr. Jackson, please, the next slide.

18          You mentioned the board would consider acquisitions.

19  How do companies in your experience generally pursue the goal

20  of growth?

21  A.  Well, there are basically two ways.  One we say is

22  organically, so that means as the company's business grows and

23  gets its products are more popular and in demand, then the

24  company needs to expand, and so it will either, like we were

25  saying before, borrow money or sell stock to try to fund that

growth, but then also they'll see strategic type of things.

          So here over time on this slide you'll see that Disney
acquired the American Broadcasting Corporation, ABC.  It
acquired ESPN.  Now you see in the newspapers they're looking
to acquire 21st Century Fox.  Companies do that to kind of
propel their growth.  They see synergies in their business with
another company that might have attractive business for them.

Q.  Mr. Jackson, please.

          Can you just explain in a very high level for business
purposes, what this slide is depicting.

A.  If you remember back to the first one with the management
team of Disney, Bob Chapec is in charge of basically this line
of business of Disney, parks experiences and consumer products.

          You can see all the different theme parks, including
overseas and Hawaii, I hadn't heard of the Aulani one until I
looked into it here, also their publishing and their consumer
products, their stores that they have.

Q.  Is there a connection between where Disney started and the
theme parks and things you see on this slide?

A.  Well, so Disney --

          MR. QUIGLEY:  Objection.

A.  -- started back in the to ease probably with a --

          MR. QUIGLEY:  Objection.

          THE COURT:  I didn't hear you.  I don't think we need
to get into Disney.  Sustained.

I6LJGAL2                        Atkins - direct

BY MR. WENNER:

Q.  If you can turn the slide, Mr. Jackson.

      Just as an example, did Disney stay with its initial

concept as it grew and expanded?

      MR. QUIGLEY:  The same objection.

      THE COURT:  I don't think we need to -- I know we have

gotten into Disney a fair amount as an example, but sustained.

BY MR. WENNER:

Q.  We discussed a little bit acquisitions.

      What are mergers?

A.  Mergers are akin to an acquisition, but basically merging

we say two companies have come together.  People sometimes

describe some as mergers of equals, but basically two companies

that are either coming together to put their businesses

together.

Q.  What is the kind of process a company engages in when

considering mergers and acquisitions?

A.  There is negotiation of above all, price, of course, and

whether or not it is one company acquiring the other or if

they're coming together as a merger of equals.  I was at Price

Waterhouse Coopers, and that was Coopers & Lybrand and Price

Waterhouse coming together, two partnerships, but the same kind

of idea, and so with companies, each has assets, each has

different businesses, and so they're coming together to -- and

they're either forming -- either way they're forming a new

company, which new stock would be issued to the shareholders of
both through the merger process.

Q.   What are different ways that companies fund mergers and
acquisitions?

A.   Different ways, including cash or stock can be issued, you
know, to compensate the shareholders of the company that is
being acquired.

Q.   Could you turn the slide, please, Mr. Jackson.

     We were talking about Disney, which is in media and
entertainment.  Can we have the same kind of discussion in
financial services?

A.   Yes.

Q.   Can you explain for the jury what we're looking at on this
slide.

A.   This is an organization chart, what we say, call of a
financial services, diversified financial services company
called Guggenheim.  So Guggenheim Partners is the holding
company at the top.  It is a limited liability company.  Then
they have various lines of business under that.

Q.   What do they, generally speaking, when you look at a chart
like this, what do the lines represent?

A.   Those are in this case ownership interests and inherently
reporting lines of the people in these various companies and
how they fold up into the holding company.

Q.   Do you see under the blue box, 100 billion assets under

1  management.  What do you understand that to mean?

2  A.  Well, assets under management in the investment industry

3  means assets, cash mainly, that investors give to an investment

4  adviser or investment company to manage on their behalf, sort

5  of like you're putting your money into your bank account and

6  keeping it in safekeeping at the bank, this is a similar

7  concept but they're investing it for you to hopefully grow over

8  time and not lose money.

9  Q.  Looking at the slide on the left, just under Guggenheim

10  Investment Advisers in a sentence or two, what is an investment

11  adviser?

12  A.  Well, there is a statute called the Investment Advisors Act

13  of 1940, so an investment adviser is someone who advises his

14  client about how his money should be invested, and that

15  investment adviser has what we call fiduciary duty to act in

16  the best interests of the investor.

17        So here in this case, this is probably their advising

18  mutual funds or have their own mutual funds under this line of

19  business.

20  Q.  Two boxes to the right, Guggenheim Capital Markets you

21  discussed a little bit before, but this is the same kind of

22  idea, broker-dealer you were discussing earlier?

23  A.  Right.  So Guggenheim has a brokerage function where they

24  are trying to help their clients with respect to securities

25  transactions in the capital markets.

I6LJGAL2                          Atkins - direct

Q.   To the right can you say just very, very briefly what asset
management suggests?
A.   Usually that's for companies where they're managing assets
of institutions, so of either mutual funds or perhaps insurance
companies or pension funds or things like that.  So again this
is the same idea, like an investment adviser, this money is
given to the manager to try to hopefully invest it wisely and
to have it grow over time.
Q.   From looking at this chart, what would you infer is the
relationship among all these different entities that are
listed?
            MR. QUIGLEY:  Objection.
            THE COURT:  I'll allow that.  You can answer.
A.   Well, from the org chart here, you see they're all commonly
owned by the holding company up top, so the way companies try
to manage their business is to segregate the various lines of
business so that you can tell is this doing well or not and
have the people within those various lines of business have a
common direction to push forward their strategies as described
here.
Q.   When we started, you discussed the SEC and the other
regulators in the chart you prepared.  Do these different
companies that are represented here, are they regulated in
different ways?
A.   Yes.

1             MR. QUIGLEY:  Objection.

2             THE COURT:  I'll allow that.  You can answer.

3   A.  Yes.  Well, presumably the broker-dealers are regulated by

4   the SEC and --

5             MR. QUIGLEY:  Objection to speculation.

6             THE COURT:  Yes.  When you say "presumably," what do

7   you mean?

8             THE WITNESS:  Well, this comes off their website.

9   They called the broker-dealer for a company like that with a

10  size of a hundred billion dollars under management, it would be

11  a size --

12            THE COURT:  Maybe we shouldn't speak specifically in

13  terms of Guggenheim, so you can talk generally.

14  BY MR. WENNER:

15  Q.  You described a high level investment advisors,

16  broker-dealers, asset managers in the marketplace, generally

17  are they typically regulated in different ways?

18  A.  Yes.  At the SEC, for example, there are different

19  divisions of the SEC, kind of like what you see here, but the

20  SEC regulates according to statute pretty much.  So brokers are

21  regulated under one division, investment advisers under another

22  along with mutual funds, and then you have other types of

23  divisions of the SEC.  So, yes, they are regulated in that way

24  by different statutes.

25  Q.  Mr. Jackson, please.

I6LJGAL2                          Atkins - direct

1           Just for the purpose of helping the jury read this

2   kind of chart, do you understand the lower left, that to be the

3   key?

4   A.  Yes.

5   Q.  By reference to the key, can you explain what we're looking

6   at on the chart, how to read the chart.

7   A.  Well, so this is an organization chart again of Citigroup,

8   Inc., which is a public company.  Then so Citigroup, Inc. is

9   the stock that is sold on the New York Stock Exchange.

10          Down on the bottom right is a key, so if you look at

11  the light blue, the lines of business that Citigroup has,

12  because they're in lots of different businesses, but you have

13  lending, banking, then you have commercial finance, and that

14  kind of a creme color, and that is like their credit card

15  company, if you have a Citibank credit card.

16          Then the gray is their broker arm, their broker-dealer

17  arm so, therefore, facing regular investors or institutions.

18  The green is insurance, so they have a reinsurance company, and

19  so at the very bottom there it says certain intermediate

20  holding companies omitted, so they have a pretty complicated

21  international structure, so there are a lot of boxes that are

22  not shown here.

23  Q.  Are you familiar with the term diversification?

24  A.  Yes, yes.

25  Q.  What generally does that mean?

1          MR. QUIGLEY:  Objection to notice.

2          THE COURT:  You can answer it generally.

3   A.  Diversification is basically they'll don't put all your

4   eggs in one basket.  It is put to try to spread out your assets

5   so that in case one tanks, you still have other things that can

6   support you, support what your goals are.

7          So companies do that just like ordinary people do, and

8   so they're hoping that if one marketplace, say, if you're an

9   international company, say if the United States is not doing so

10  well economically, then maybe India or Europe or something else

11  is doing well, so you're hoping all of that will balance out so

12  your shareholders will do well overall, and that's the power of

13  diversification.

14  Q.  We spoke briefly about the charts that were prepared by

15  Guggenheim and Citigroup.  Do they get more complex than what

16  we see here?

17  A.  Yeah, yes, pretty much.  This is a very general overall

18  view of the business of Citigroup.

19  Q.  Mr. Jackson, could you turn the slide, please.

20         What are we looking at here?

21  A.  This is another financial services company, this is AXA,

22  which is a French insurer, but they bought Equitable Life here

23  in the United States about 20 some years ago, probably 30 years

24  ago maybe.  They're international, they're diversifying by

25  buying Equity Life.

I6LJGAL2                     Atkins - cross

1    Q.  Are these org charts of different segments of its business?

2    A.  Yes, there are various companies and businesses and that

3    sort of thing.

4           MR. WENNER:  Mr. Atkins, thank you very much.

5           THE COURT:  All right.  Any cross-examination?

6           MR. QUIGLEY:  Just briefly, your Honor.

7    CROSS-EXAMINATION

8    BY MR. QUIGLEY:

9    Q.  Good morning, Mr. Atkins.

10   A.  Good morning.

11   Q.  Starting with your background, you were appointed a

12   commissioner of the SEC by the president in 2002, right?

13   A.  Right.

14   Q.  You served until 2008.  Is that right?

15   A.  Yes.

16   Q.  You testified about your customary hourly rate of $1,450.00

17   an hour?

18   A.  Right.

19   Q.  How many hours have you spent on this case?

20   A.  I don't know.

21   Q.  Can you estimate an count?

22   A.  No, I --

23   Q.  More than 10?

24   A.  Probably.

25   Q.  More than 20?

I6LJGAL2                        Atkins - cross

1    A.  Probably, I guess.

2    Q.  More than 30?

3    A.  I doubt that.

4    Q.  Potomac Partners is your company, right?

5    A.  Right.

6    Q.  You're the chief executive officer?

7    A.  Yes.

8    Q.  You have other people at Potomac Partners that work for

9    you, right?

10   A.  They do.

11   Q.  Have any of them worked on this case?

12   A.  A few of them, a couple of --

13   Q.  How many?

14   A.  This has been going on for, you know, a few months so I

15   don't really know.  Two for sure, and a couple of people might

16   have been minor roles.

17   Q.  It might have been more than two?

18   A.  Yeah, I would have to look at the records.

19   Q.  You don't know who worked on this case?

20   A.  I didn't say that.  I don't know how many people spent what

21   amount of time.

22   Q.  It could have been more than five?

23   A.  I don't think so.

24   Q.  Somewhere between two and five?

25   A.  It is probably three or so.

I6LJGAL2                          Atkins - cross

1    Q.  What is the hourly rate that those people charge?

2    A.  It varies from maybe 300, 700 or something like that.

3    Q.  It could be more than 700?

4    A.  Again I don't remember who has spent or what their rate is,

5    but I'd have to check.

6    Q.  How many hours, how much money is Potomac due in this case

7    in total?

8    A.  I wouldn't be able to tell you.  I don't know what the

9    bottom line is.

10   Q.  More than $20,000?

11   A.  Probably.

12   Q.  More than $40,000?

13   A.  I'm not sure.

14   Q.  It could be, though, right?

15   A.  It could be.  I don't know what the tally is.

16   Q.  More than $50,000?

17   A.  I think.  I am not sure.

18   Q.  It is possible, though?

19   A.  Yeah, but who knows.  Again I can't really -- I couldn't

20   hazard a guess.

21   Q.  It is hard, right, because you spent a lot of hours on this

22   case and a lot of people worked on it?

23   A.  I have a lot of things going on at the same time, so I am

24   trying to balance all of that, so I haven't really focused on

25   this, and we had one person who was pregnant and had a baby in

the meantime who started out on it, so there is a lot of coming

and going in any case, as you know.

Q.  Fair enough.  Just to talk about the skill of your work in

this case, you said your company Potomac does something called

independent compliance consulting, right?

A.  Yes.

Q.  That was not your role here, just to be sure, right?

A.  Right.  I am an expert witness.

Q.  You were brought in to testify in that seat for trial?

A.  Yes.

Q.  Has anyone outside of Potomac consulted with you on this

case other than Mr. Archer and his attorneys?

A.  On this case, no.

Q.  You were brought in as a consultant on this, in a case in

this district involving a company called SAC Capital, right?

A.  Yes.

Q.  SAC Capital was fined $1.8 billion for securities fraud

that occurred between 1999 and 2010, right?

A.  Yes, but I wasn't involved in that part of it.

Q.  But you were brought in in a subsequent civil case to look

at the sufficiency of their compliance programs during part of

that time period, right?

A.  We were hired by them, right, as a compliance consultant

during the pendency of those actions.

Q.  As a defense expert, right?  They were the defendants in

I6LJGAL2                          Atkins - cross

1   the case, correct?

2   A.   Yes.

3   Q.   You made a report to the court on their behalf, right?

4          MR. SCHWARTZ:   Objection.

5          THE COURT:   Sustained.

6   Q.   You concluded that --

7          THE COURT:   Let's have a sidebar.   Thanks.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6LJGAL2                          Atkins - cross

1              (At the sidebar)

2              MR. QUIGLEY:  I have two more questions on this.  It

3      goes to his bias and credibility.  They concluded that SAC

4      compliance programs were adequate during the time when they

5      committed one of the largest securities frauds.

6              THE COURT:  Is he testifying to anything in this case

7      you were questioning --

8              MR. QUIGLEY:  Does to his goes to his general

9      credibility.

10             MR. SCHWARTZ:  Your Honor, they're trying to display

11     or illustrate that this is someone who was hired by guilty

12     people to concoct false defenses.  He is not testifying about

13     anything involved to the defense of this case.  That is not

14     fair impeachment.

15             THE COURT:  I think that's right.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1                (In open court)
 2                THE COURT:  Off the record.  We have a juror in the
 3     restroom.  (Pause)  You may proceed.
 4     BY MR. QUIGLEY:
 5     Q.  Mr. Atkins, you were asked some questions on direct about
 6     preferred stock.  Do you recall that?
 7     A.  Yes.
 8     Q.  Just to be clear, preferred stock is different than common
 9     stock, right?
10     A.  Right.
11     Q.  But it can still be valuable, right?
12                It still has value right?
13     A.  Presumably.
14     Q.  Assuming the company has value, correct?
15     A.  Right.
16     Q.  The stock has value, right?
17     A.  If people perceive the terms and conditions of the
18     preferred as having value, then I would say so.
19     Q.  You testified about different types of companies and
20     different organizational structures.  Do you recall that?
21     A.  Yes.
22     Q.  Safe to say there are over two million corporations in the
23     United States, right?
24     A.  Not public, but overall maybe.
25     Q.  That is actually where I was going with this.  There are
```

I6LJGAL2                    Atkins - cross

1    non-public corporations, correct?

2    A.   Right.

3    Q.   And those are what is called closed or privately held

4    corporations, right?

5    A.   Right.

6    Q.   And just to be clear, with respect to privately held

7    corporations or privately held companies, they do not have to

8    file those reports that you mentioned with the SEC?

9    A.   Right.

10   Q.   They don't have to file a 10-K or 10-q, correct?

11   A.   Right.

12   Q.   You talked a little bit about the Sarbanes Oxley Act of

13   2002.  Do you recall that?

14   A.   Yes.

15   Q.   You talked about certain requirements that chief financial

16   officers have to certify their company's financial statements,

17   right?

18   A.   Right.

19   Q.   And that also applies to publicly held companies, right?

20   A.   Yes.

21   Q.   That does not apply to closely held companies, right?

22   A.   Although I think the big accounting firms and others are

23   actually advocating that like, for example, Batts, a company I

24   was a chairman of, voluntarily abided by Sarbanes Oxley

25   requirements not with respect to filing with the SEC, but the

I6LJGAL2                         Atkins - cross

1   idea was this is the best practice.

2   Q.  Just to be clear, the answer to my question about whether

3   privately held companies have to file, comply with those

4   requirements under Sarbanes Oxley Act is "no," correct?

5   A.  Right.

6   Q.  Thank you.

7        Walt Disney, again the companies we talked about, the

8   companies in the United States have massive range of size,

9   right?

10  A.  Right.

11  Q.  You testified about Bob Chapec at Disney?

12  A.  Who is the head of the parks.

13  Q.  He alone has tens of thousands of people reporting to him?

14  A.  Probably, yes.

15  Q.  That doesn't include all the people who work at ABC, right?

16  A.  Right.

17  Q.  It doesn't include all the people who work a ESPN?

18  A.  Right.

19  Q.  It doesn't include all the people who work at ESPN II,

20  right?

21  A.  Right.

22  Q.  To deal with all the people at PIXAR or any of the other

23  movie studios that Disney has, right?

24  A.  There are a separate divisions.

25  Q.  Disney is a massive company, correct?

I6LJGAL2                          Atkins - cross

1    A.  It is.

2    Q.  And that scope is very different than a company, the scope

3    of their operations is very different than a company that has

4    50 or a hundred employees, correct?

5    A.  It could be.  If you look at what Warren Buffett looks

6    after, his management team is relatively small compared to the

7    spread of the Berkshire Hathaway.

8    Q.  Generally a company with tens of hundreds of thousands of

9    employees is going to be different in scope than a company with

10   50 or a hundred employees?

11   A.  Yes.

12   Q.  Certainly it will be different than, generally different

13   than a one or two person limited liability company, correct?

14   A.  Probably.  Again it just depends on what that limited

15   liability oversees and has the owners' interest in.

16   Q.  Disney has, assuming a limited liability company did not

17   have ownership interest over multiple theme parks, multiple

18   movie studios, multiple divisions, that would probably be a

19   company with a different scope than Disney, correct?

20   A.  Maybe.  Anything is possible.

21   Q.  Anything is possible?

22          Just with respect to directors, directors have, you

23   talked about fiduciary duties in the context of investment

24   advisors, but directors of a company have fiduciary duties to

25   the company, right?

I6LJGAL2                        Atkins - cross

1    A.  They do, yes.

2    Q.  Those include a duty of care, right?

3    A.  Right.

4    Q.  A duty of loyalty, right?

5           And part of those duties is to make sure that to know

6    what is going on at the company, right?

7    A.  Yep.  Well, at a general level, yes.

8    Q.  Just to be clear, and I think this was brought out on

9    direct, your testimony is based on your general experience with

10   businesses and corporations, right?

11   A.  Right.

12   Q.  You weren't asked to review any of Mr. Archer's

13   communications in this case, correct?

14   A.  Yeah, I haven't looked at those.

15   Q.  You haven't looked at any of Mr. Cooney's communications in

16   this case, correct?

17   A.  Right.

18   Q.  You haven't looked at any of John Galanis' communications

19   in this case, right?

20   A.  Right.

21   Q.  You haven't looked at any documents in this case other than

22   the indictment, as you testified on direct, right?

23   A.  Right.  At some point I've probably seen in a cursory way

24   some, I remember a prospectus or two, and I don't recall.

25   Q.  But none of your testimony is based on your general

I6LJGAL2                         Atkins - cross

1    experiences in the business world and not on anything you have

2    seen in this case, correct?

3    A.  Yes.

4           MR. QUIGLEY:  No further questions.

5           THE COURT:  Does anyone else have any questions for

6    Mr. Atkins?

7           MR. TOUGER:  Yes.

8    CROSS-EXAMINATION

9    BY MR. TOUGER:

10   Q.  Good morning, Commissioner.

11   A.  Good morning.

12   Q.  We have never met?

13   A.  No.

14   Q.  Could you just describe for the jury the difference between

15   a subsidiary and an affiliate.

16   A.  Well, it depends again on how a corporation and a holding

17   company structure is organized, but a subsidiary usually is a

18   wholly owned --

19          MR. QUIGLEY:  Objection, your Honor, beyond the scope.

20          THE COURT:  Overruled.

21   A.  -- is a wholly owned entity by the company, by the

22   corporation.  It could be a separately incorporated entity, but

23   usually a subsidiary is a hundred percent owned by that holding

24   corporation.

25          An affiliate can mean either that, or it depends on

I6LJGAL2

1    the context, but it could be a partly owned company, it could

2    be a joint venture.  So if a holding company doesn't own or one

3    of the subsidiaries owns, say, 25 percent or something like

4    that, that could be an affiliate.

5    Q.  The basic difference is in a subsidiary, the parent company

6    owns the whole company; in an affiliate, it owns a percentage

7    of that company?

8    A.  Right.

9                MR. QUIGLEY:  Nothing further.

10               THE COURT:  Any additional questions for Mr. Atkins?

11               MR. QUIGLEY:  We don't, your Honor.

12               THE COURT:  Thanks, you may step down.

13               (Witness excused)

14               THE COURT:  Why don't we take our morning break now

15   and just remember to keep an open mind and don't discuss the

16   case.

17               (Jury excused)

18               THE COURT:  Do you want to walk me through those

19   exhibits you have objections to now or later during lunch?

20               MR. SCHWARTZ:  I want to make sure the government got

21   the email I sent as we were sitting here because I identified

22   one other you objected to.

23               MS. MERMELSTEIN:  I did not.

24               MS. NOTARI:  There has been a lot of back-and-forth

25   with emails.  I need the chance to review these because a

I6LJGAL2

```
1    lot --
2                THE COURT:  Would you rather talk about it over lunch?
3                MS. NOTARI:  Which email are you talking about, the
4    ones --
5                THE COURT:  I am talking about any evidentiary issues
6    for the purposes of today that you need me to resolve.
7                MS. MERMELSTEIN:  It is not clear to me what the order
8    of the defendant's case is for today.  I am not sure whenever
9    the --
10               MR. SCHWARTZ:  I will tell you what is coming in next.
11               Right now I am going to read a stipulation into
12   evidence and some emails that are not objected to.  Then we'll
13   call our summary witness to talk about the organizational
14   structure of the Burnham Financial Group entities.  Then if
15   we're still going before lunch, I think we'll probably call Dr.
16   Archer.  If that takes us to the lunch break, then we'll go to
17   Ms. Notari's witness who has to go then, Mr. Filler who has to
18   go.
19               THE COURT:  All right.  Are there any issues that I
20   should address now?
21               MR. SCHWARTZ:  I am sorry.  I was mistaken.  After the
22   summary witness, I am going to read three emails, one of which
23   is objected to, and then we'll call the signature summary
24   chart, 4111, and then Dr. Archer.  The only one that is
25   objected to that is up this morning is 4111.
```

I6LJGAL2

1              MR. QUIGLEY:  I know I said my schedule did not

2      matter, but I have a slight preference for them doing the

3      entities, one, summary witnesses sooner rather than later.

4              MR. SCHWARTZ:  That is still going to be up right

5      after we read emails.  That will happen this morning, the

6      entity summary chart.

7              THE COURT:  Do you want to talk about 4111?

8              MR. QUIGLEY:  Sure.

9              MR. SCHWARTZ:  Can you bring that up, please.

10             (Pause)

11             MS. MERMELSTEIN:  Your Honor, so the issue with this

12     is, as you can see, the bottom email is from Jason Galanis to

13     Andrew Godfrey and Momtazi.  Above it, Momtazi writes he has

14     been speaking to, quote, Devon throughout the process.

15             There is no question here what the defense is trying

16     to do, they're trying to suggest Mr. Momtazi was posing as Mr.

17     Archer, to try to suggest Mr. Archer sort of didn't know what

18     his own -- what he himself was doing.  That is hearsay of the

19     most classic kind.  It is Mr. Momtazi's statement.  I don't

20     think the meaning of the statement is clear, but to the extent

21     that is a suggestion that will be offered to show Mr. Momtazi

22     spoke to someone holding himself out as Mr. Archer, that is

23     hearsay.

24             Mr. Momtazi was on the defense witness list.  They can

25     call him to say that is what he said if, in fact, that is true.

I6LJGAL2

1    The government would be able to ask him about the extent Mr.

2    Archer knew he was doing that which, anyway, it is hearsay, not

3    admissible and it has no legitimate purpose.  That is our

4    objection.

5          MR. SCHWARTZ:  It is not hearsay.  They're right, it

6    supports the inference -- and the reason we're offering this --

7    it supports the inference that Mr. Momtazi communicated with

8    others that he was pretending to be Mr. Archer.  That is

9    directly relevant to one of the elements of conspiracy, which

10   is whether there was a conspiratorial agreement amongst the

11   various alleged members of the conspiracy.

12          So this is being offered, as the government has

13   offered numerous, numerous exhibits on the alleged

14   co-conspirator's state of mind.  In this case, it indicates

15   very clearly Mr. Galanis is being informed that it is Mr.

16   Momtazi, not Mr. Archer that is taking certain actions.

17          MS. MERMELSTEIN:  That is not what this email means.

18          Mr. Momtazi is saying with respect to communications

19   with someone purported like a bank, the suggestion is he poses

20   as Mr. Archer.  There is no suggestion that Jason Galanis

21   didn't really conspire with Mr. Archer because it was, in fact,

22   he was conspiring with Sebastian Momtazi, Mr. Archer's personal

23   assistant the whole time.  That is kind of ridiculous.

24          MR. SCHWARTZ:  To be clear, this is with U.S. Bank

25   about WLCC bonds.  This is exactly about the subject matter of

I6LJGAL2

this alleged conspiracy.

             THE COURT:  I don't doubt the relevance of it and I
don't think that is the objection.  The objection is hearsay.
I do think it is hearsay and I do think that there is a real
potential for confusing the jury.

             MR. SCHWARTZ:  I am happy to take it pursuant to a
limiting instruction.

             MS. MERMELSTEIN:  If they want to call Mr. Momtazi to
say he sometimes posted as Mr. Archer, I don't think we object
to the admissibility of that testimony.  We object to the
truthfulness of it.  That is neither here nor there.

             THE COURT:  I think that is right.  If you want to get
in that testimony, you have to call Mr. Momtazi.

             MR. SCHWARTZ:  As the government well knows, Mr.
Momtazi won't testify absent a grant of immunity.  Are they
offering that?

             MS. MERMELSTEIN:  Certainly not, no.  I don't know
that to be true.  I haven't spoken to counsel for Mr. Momtazi
in quite a long time.  I understand that he continues to work
for an entity affiliated with Mr. Archer.  It wouldn't surprise
me to learn he was willing to testify.  The government does not
credit his testimony and would not give him immunity.

             MR. SCHWARTZ:  Mr. Momtazi does not work for Mr.
Archer any more.  They're not in contact any more, as the
government well knows because they spoke to him after they

I6LJGAL2

compelled his testimony through a grant of immunity.  That is

the only way that he will speak.

        By the way, this has sufficient indicia of reliability

such that it could come in under the residual hearsay option if

you think it is being offered for the truth of the matter

because, as the government well knows, when they interviewed

him, he confirmed that he represented himself as Mr. Archer on

calls.  I am offering it for a non-hearsay purpose.

        THE COURT:  Let me think about it for a minute.  Let's

come back and talk about it.

        MR. SCHWARTZ:  That is for later this morning, but not

now.

        THE COURT:  Okay.

        (Recess)

        (Continued on next page)

I6L7GAL3

1              (Jury not present)

2              THE COURT:  I'm not going to allow in 4111.  As I

3     noted, I do think it's hearsay; I think it's being admitted for

4     the truth.  I also think it's unduly prejudicial to the

5     government if they are in a position where they are unable to

6     cross-examine Sebastian Momtazi about what he meant about "who

7     has been speaking to Devon," and even if in fact this means

8     that he was pretending to be Mr. Archer, it leaves open a lot

9     of questions as to whether that was just in the course of

10    correspondence with Zane Wright or whether it was with others,

11    whether he was authorized to speak on his behalf and what the

12    scope of that authorization was.  So, I'm not going to admit

13    this in.

14             All right.  We will bring in the jury.

15             MR. SCHWARTZ:  Thank you, your Honor.  Can we set up?

16             THE COURT:  Sure.

17             MR. QUIGLEY:  I just want to raise one other thing

18    about the e-mails.

19             THE COURT:  Just bring the mic closer.

20             MR. QUIGLEY:  We've noticed that a number of them that

21    were read in yesterday that they were e-mails that Mr. Galanis

22    sented to various people that have been forwarded on to

23    Mr. Cooney, and the portions with Mr. Cooney are not being read

24    in.  We think that's certainly inconsistent with how we did

25    things, where unless it was an e-mail chain, we generally read

I6L7GAL3

1    the entire e-mail at defense request.  So, we would just note

2    our objection to that for the record.

3                (Continued on next page)

I6L7GAL3

1          (Jury present)

2          THE COURT:  Everyone can be seated.  Just let me know

3    if we need to have a sidebar about any particular issue.  Thank

4    you.

5          MR. SCHWARTZ:  May I?

6          THE COURT:  Yes.

7          MR. SCHWARTZ:  Good morning, ladies and gentlemen.

8          And good morning, Mr. Jackson.

9          MR. JACKSON:  Good morning.

10          MR. SCHWARTZ:  Can you pull up on the screen

11   Government Exhibit 784.

12          While she does that, your Honor, I would like to offer

13   Defendant's Exhibits 4332, 4326, 4331 and 4387 pursuant to our

14   discussion this morning.

15          THE COURT:  Yes, they will be admitted.

16          (Defendant's Exhibits 4332, 4326, 4331 and 4387

17   received in evidence)

18   Q.  Mr. Jackson, can I just ask you to read at the very bottom

19   of page 1 starting from the second sentence of the final

20   paragraph beginning Ms. Moynihan.

21   A.  "Ms. Moynihan asked Mr. Archer if he had any involvement

22   with any of the events detailed in an SEC complaint against

23   Atlantic Asset Management, which had recently come to her

24   attention.  She said that issued on her reading of the

25   complaint one of the unnamed persons had certain

I6L7GAL3

1    characteristics in common with Mr. Archer.  Mr. Archer said he

2    had no involvement whatsoever with those events and that the

3    individual was likely Mr. Galanis."

4           MR. SCHWARTZ:  Thank you.

5           You can take that down.

6           At this point I would like to read a stipulation

7    between the parties, your Honor.

8           "The SEC complaint against Atlantic Asset Management

9    referenced in Government Exhibit 784 alleged that Atlantic

10   Asset Management committed violations of the Investment

11   Advisors Act of 1940 and concerns the first and third WLCC bond

12   issuances.  Devon Archer is not one of the unnamed individuals

13   discussed in that lawsuit."

14          Ms. Stillingham, could I ask you now to pull up

15   Exhibit 4332.

16   Q.  And I will start from the bottom.  On August 28, 2014 at

17   2:56 p.m., Mary C. (Molly) Moynihan to Pat Colletti.  Subject:

18   Per our discussion.

19          "Pat, here are some bullets on the issue of concern to

20   the trustees.  I think we are very close if these would be

21   acceptable.  Thanks, Molly."

22          And you can back out, please, Ms. Stillingham.

23          On August 28, 2014 at 3:30 p.m. from Pat Colletti to

24   Jon Burnham.  Forward:  Per our discussion.

25          Mr. Jackson, can you read the top e-mail, please.

I6L7GAL3

A.   Sent Thursday, August 28, 2014 at 7:20 p.m., e-mail from

Jon Burnham to Andrew Godfrey, cc'd Devon Archer.  Subject:

Per our discussion.

          "Here is the latest list for Molly.  Longer than the

one this morning.  I am forwarding also to Devon.  This is

really ridiculous overkill.  JMB."

Q.   Thank you.

          Ms. Stillingham, can you pull up now Exhibit 4326.  On

July 18, 2014 at 10:49 a.m. Jon Burnham wrote:

          "Please forward Weiss' docs or descriptions thereof

today if possible.

          "Mike Molloy (BAM's attorney) spoke to Molly Moynihan

(BIT independent lawyer) yesterday late p.m.  Molly contacted

him to tell him what her take was on last Wednesday's lunch

meeting (the 6 hour one!!!).  Nothing that we don't already

know.  Mike listened -- did not tell her what we're working on

although she asked!!!

          "Bottom line is that with Jason S. and Jason G. out of

the picture re BAM, we're in good shape with the board.  The

only potential problem (my opinion) could be Jason S. being on

the board of Burnham Financial Group.

          "Let's move ahead quickly and get this stuff done.  I

can be more specific with you by phone."  Best, JMB."

A.   E-mail sent Saturday, 7/19/2014, at 12:12 p.m., from Andrew

Godfrey to Jon Burnham, cc'd Devon Archer.  Subject:  Re:

I6L7GAL3

1            "Thanks, Jon.  I'm around for the first half of the

2   day today or any time tomorrow ... let me know if there is a

3   convenient time to speak?  I think we are just about there on

4   the docs ... waiting to receive.  Best, Andrew."

5   Q.  Ms. Stillingham, can we have now Defense Exhibit 4331, and

6   if you could put the two pages side by side.  Not as easy as it

7   looks.  OK, thank you.

8            On August 20, 2014, at 10:58 a.m., Jon Burnham wrote:

9            "I think the three of us need to have a conference

10   call today to discuss tomorrow's meeting.  I would prefer this

11   morning since we have lunch plans (with the kids and close

12   friends of ours) at 12:30.  This afternoon will be pretty busy

13   but I'll be around.  I have to leave for the airport at 5:20

14   p.m. to fly to Westchester airport.  Please let me know ASAP

15   when we can talk.  Thanks.  JMB."

16   A.  Message sent on Wednesday, August 20, 2014, at 11:05 a.m.

17   from Devon Archer to Jon Burnham, cc'd Andrew Godfrey.

18   Subject:  Re.

19            "I am on the boat and out of signal right now.  I will

20   be available at 1 p.m. and in signal for the rest of the day

21   for a quick call.  Devon Archer."

22   Q.  On August 20, 2014, at 11:10 a.m., Jon Burnham wrote:

23            "Let's plan the call for 3 p.m.  The call won't take

24   long, but we need to get our stories aligned.  I am concerned

25   that we have not responded to Molly Moynihan's five page letter

I6L7GAL3

          of questions.  And I gather that you and Andrew don't want to
          provide the board with a business plan tomorrow.

               "I just want to understand the reasoning behind this.
          And I want us to be on the same page entirely.

               "Best, JMB.  Let me know if 3 p.m. is OK.  Also who is
          to call whom!!!  The best way is probably to have John Ohlson
          conference you in to me."
A.        E-mail sent Wednesday, August 20, 2014, at 11:21 a.m., from
          Devon Archer to Jon Burnham, cc'd Andrew Godfrey.  Subject:
          Re, RE.

               "We have a detailed response drafted in a letter but
          reflecting on their approach, their tone is very antagonistic
          and we do not want to play down at their level.  So the thought
          was to go into the meeting and reacquaint ourselves with these
          lovely folks and answer their questions in a civil manner.  If
          they ask for a written response we will have it available.

               "To be frank, I'm still not even sure why we're having
          this meeting at this point but happy to answer any of their
          questions.  Devon Archer."
Q.        On Wednesday, August 20, 2014 at 3:34 p.m. from Jon Burnham
          to Devon Archer:

               "Remember that that letter was written by their
          attorney on their behalf.  If the board was not annoyed by the
          tone of the letter, they should have been and I have told the
          board that.

I6L7GAL3

1          "The reason we are having this meet is that this is

2    our regular quarterly meeting which we must have to approve a

3    number of things with respect to the ongoing business of the

4    funds.  This is NOT a special meeting per se to vote on our

5    deal, although it would be nice if that happens.

6          "All you and Andrew need to do is be your smart,

7    attractive, and articulate selves.  Answer the questions and

8    stay loose and calm.  I don't expect any fireworks at the

9    meeting.  Their big problem, as you know, is Jason S.

10   Hopefully Devon, you can put that to rest.  If so, we're home

11   free.  I think Andrew has already made real progress with Peggy

12   Eisen.

13         "Look forward to talking at 3 p.m.

14         "It would be nice if I could see a copy of the

15   detailed response.  JMB."

16         And finally, Ms. Stillingham, can you pull up Exhibit

17   4387.

18         On Friday, August 22, 2014, at 10:14 a.m. Jon Burnham

19   wrote to Devon Archer:

20         "I just want to thank you for your tremendous efforts

21   on our behalf at yesterday's board meeting.  You were

22   absolutely terrific in every way.  I was amazed at how cool you

23   remained in spite of their many ridiculous comments.  I thought

24   Peggy and Bill were needlessly repetitious and wasted a lot of

25   time on matters where they already knew the answers.

I6L7GAL3

1          "Peggy's comment to you re Steve Weiss was uncalled

2     for and none of her business in my view.  And totally

3     unnecessary.

4          "Again thanks for being there when I know you would

5     rather have been in Quogue with your family.  My best, JMB"

6     A.  E-mail sent August 22, 2014, at 3:52 p.m. from Devon Archer

7     to Jon Burnham.  Subject:  Re.

8          "Thanks Jon.  That was interesting and a first in my

9     career. :)  And I agree with all your points.  Hard to know

10    what exactly what she's done but it will hold up the process."

11         MR. SCHWARTZ:  Devon Archer calls Seth Fliegler.

12         MR. WENNER:  While we bring the witness up, there are

13    a number of exhibits that we would like to move in.  These are

14    subject to a business records stipulation, and they are cited

15    on the charts we will be using with this witness.

16         THE COURT:  All right.

17         MR. WENNER:  They are defense exhibit numbers 4009,

18    4015, 4027, 4044, 4300, 4338, 4340 and 4341, and I'd like to

19    move those into evidence.

20         MR. QUIGLEY:  Just give us a second, your Honor.

21         MR. WENNER:  Your Honor, are they received in

22    evidence?

23         THE COURT:  Yes.

24         MS. MERMELSTEIN:  Your Honor, we are just confirming

25    that they are in fact in the stipulation.  If we could just

I6L7GAL3                    Fliegler - Direct

1      have one moment before they're received.

2                    THE COURT:  All right.  I'm sorry, I thought it was

3      pursuant to a stipulation.  But confirm that those are the

4      right exhibits.

5       SETH FLIEGLER,

6            called as a witness by the defendant,

7            having been duly sworn, testified as follows:

8                    THE COURT:  So should we wait for the exhibits?

9                    MR. WENNER:  I can proceed while they check.

10                   THE COURT:  Why don't do you that.  Thank you.

11     DIRECT EXAMINATION

12     BY MR. WENNER:

13     Q.  Good morning, Mr. Fliegler.

14     A.  Good morning.

15     Q.  What is your educational background?

16     A.  I received my Bachelor of Arts in economics and French at

17     the University of Pennsylvania.  I received my MBA in finance

18     at the Wharton School at the University of Pennsylvania.  And I

19     received my Masters of Arts in international studies also at

20     the University of Pennsylvania.

21     Q.  Would you please explain your employment background.

22     A.  Sure.  Prior to graduate school I worked for Nera Economic

23     Consulting.  There I performed a host of economic analyses

24     largely due to antitrust or intellectual property issues.

25                   After graduate school I worked for the Federal Reserve

Bank of New York in their international capital policy group.
We were helping to revise the Basel Accord, which sets minimum
capital requirements for banks.

      After the Federal Reserve I worked for Bank of
America.  I worked in the Bank of America securities division,
and I worked in a small internal consulting group called new
product development.

      Currently for the past ten years I've worked at Duff &
Phelps.  It is a corporate finance and valuation advisory firm.
I work in our disputes and investigations group, working on
financial matters that require consulting or many times expert
testimony.

Q.  Are you being paid to provide testimony today?

A.  I am.

Q.  What is the hourly rate that you are being paid to testify
here today?

A.  It is $650 an hour.

Q.  Does your payment depend in any way on the outcome of the
case?

A.  It does not.

Q.  When was the first time that you and I met in person?

A.  In person?  Today.

Q.  When was the first time that you and I spoke on the phone?

A.  Probably one week ago -- or two weeks ago.

Q.  That you and I spoke?

I6L7GAL3                    Fliegler - Direct

1    A.   About a week ago.

2    Q.   Have you helped prepare summary charts for this case?

3    A.   I have.

4    Q.   And this morning we will be discussing the corporate

5    structure of Burnham Financial Group.  In connection with those

6    charts, what kinds of documents did you review?

7    A.   I reviewed operating agreements, transactional documents.

8    Q.   Who provided you the documents that you reviewed?

9    A.   You and your team did.

10   Q.   And what were you asked to do in connection with the

11   preparation of the charts concerning the Burnham Financial

12   Group?

13   A.   I was asked to review those documents, and to assess the

14   organizational structure of the relevant entities and the

15   change in structure over time.

16   Q.   Were you asked to look at any bank records or wire

17   transfers in connection with making the charts concerning the

18   Burnham Financial Group?

19   A.   I reviewed bank records but not in connection with the

20   organizational charts.

21   Q.   And that's for other testimony.

22   A.   That is correct.

23   Q.   And, Mr. Jackson, just for the judge, witness and the

24   lawyers, could you please bring up what is marked as DX9001.

25        Mr. Fliegler, do you recognize what this is?

1    A.  I do.

2    Q.  And what is it?

3    A.  This is an organizational --

4    Q.  I just mean the document generally.  We will talk about the

5    content in a moment.  Just generally speaking what is this

6    document?

7    A.  This pertains to Burnham Financial Group.

8    Q.  And these are the charts that you prepared to testify here

9    about?

10   A.  That's correct.

11   Q.  And did you participate directly in the creation of this

12   slide deck?

13   A.  I did.

14   Q.  And are these slides based on evidence and testimony that

15   you reviewed from this case?

16   A.  Yes, that's correct.

17   Q.  Do these charts fairly and accurately depict the

18   information reflected in those documents you reviewed?

19   A.  Yes, they do.

20   Q.  And on the bottom of the first slide here we see citations.

21   What do those citations refer to generally?

22   A.  Those are the supporting documents that I used to create

23   these slides.

24            MR. WENNER:  At this time I would like to move in

25   those documents cited at the bottom, which are the ones I read

I6L7GAL3                       Fliegler - Direct

1    in before.

2                 THE COURT:  Any objection?

3                 MR. QUIGLEY:  No objection.

4                 THE COURT:  All right.  So they will be admitted, as

5    well as 9001.

6                 MR. WENNER:  You can publish that, please.

7                 (Defendant's Exhibits 4009, 4015, 4027, 4044, 4300

8    received in evidence)

9                 (Defendant's Exhibits 4338, 4340, 4341 and 9001

10   received in evidence)

11                MR. WENNER:  Your Honor, with permission I would like

12   to hand out hard copies.

13                THE COURT:  That's fine.

14                MS. MERMELSTEIN:  I thought counsel said he was going

15   to hand them up to the witness.  He appears to be discussing

16   them with the jury.

17                MR. WENNER:  I asked if she would take one and pass

18   them down, your Honor.

19                THE COURT:  You can pass them.  Thank you.

20   Q.  Mr. Fliegler, what are we looking at here on the first

21   slide?

22   A.  The first slide is showing the organizational and ownership

23   structure of Burnham Financial Group.

24   Q.  And what is the date in the upper left?

25   A.  The date is February 25, 2013.

I6L7GAL3                       Fliegler - Direct

1   Q.  Mr. Jackson, could you please bring up what is in evidence

2   as DX4300.

3         Mr. Fliegler, what is this document?

4   A.  This is a loan and stock purchase option agreement.

5   Q.  Mr. Jackson, if you could turn the page, please.  And if

6   you would, please, expand the entirety of section A under

7   introduction.  Can you include section B as well too, please.

8   Thank you.

9         Mr. Fliegler, under section A here, including

10  subsections A and B, can you describe generally what is being

11  discussed in this section.

12  A.  Sure.  This again is describing the organizational

13  structure of Burnham Financial Group, and in subparts A and B

14  describing Burnham Securities, Incorporated and Burnham Asset

15  Management Corporation.

16  Q.  And what is the relationship of Burnham Securities and

17  Burnham Asset Management to Burnham Financial Group?

18  A.  They are wholly owned subsidiaries of Burnham Financial

19  Group.

20  Q.  Mr. Jackson, could you please turn to pdf page 57.

21         Mr. Fliegler, what are we looking at here?

22  A.  This is providing a little bit more detail regarding the

23  exact ownership of Burnham Financial Group.

24  Q.  And as reflected in this document, what is Jon Burnham's

25  ownership interest in the Burnham Financial Group?

I6L7GAL3                    Fliegler - Direct

1    A.  He owns 54.07 percent of all the outstanding common stock.

2    Q.  Mr. Jackson, could you please go back to Exhibit 9001.

3         Does this chart reflect the information that you were

4    just discussing?

5    A.  Yes, it does.

6    Q.  In the documents reviewed, do you recall seeing an entity

7    named BFG Socially Responsible Investments?

8    A.  I do.

9    Q.  Are the documents you saw in connection with that entity

10   listed on the bottom?

11   A.  Yes, that is correct.

12   Q.  Did you rely on those documents in creating this chart?

13   A.  Yes.

14   Q.  But I just want to be clear that those are not cited on the

15   bottom here.  You may not recall the numbers.

16        Maybe, Mr. Jackson, could you please bring up what is

17   in evidence as DX4039E.  Actually I want to confirm that that's

18   in evidence.  It's in evidence, so please publish it to

19   everyone, 4039E.

20        Would you identify what this document is?

21   A.  This is the operating agreement for BFG Socially

22   Responsible Investments.

23   Q.  And in what you reviewed in preparation for today, did you

24   see anything to suggest that BFG Socially Responsible

25   Investments Ltd. was a subsidiary or otherwise affiliated with

I6L7GAL3                          Fliegler - Direct

1   the Burnham Financial Group?

2   A.   There was nothing to lead me to that conclusion.

3   Q.   And do you recall who owned -- based on the documents you

4   reviewed -- BFG Socially Responsible Investments?

5   A.   Wealth Assurance AG.

6   Q.   Could you turn to page 9, please, Mr. Jackson.

7           And what does this show?

8   A.   Like the other document we saw, this is showing the precise

9   ownerships of the entity, which shows that Wealth Assurance AG

10  owns 100 percent of the entity.

11  Q.   Mr. Jackson, could you please go back to DX9001.

12          And we were just looking at Exhibit 4039E.  Just for

13  the record, to be clear, is that listed on this chart?

14  A.   That is not.

15  Q.   And is BFG Socially Responsible Investments depicted on

16  this chart?

17  A.   It is not.

18  Q.   Could you please turn the slide, Mr. Jackson.

19          Can you explain for the jury what the change is that

20  we saw from slide one to slide two?

21  A.   Sure.  The difference between the first slide and the

22  second slide is that CORFA is now loaning money to Burnham

23  Financial Group.

24  Q.   And what is the name to the right of CORFA?

25  A.   The name is Lausanne LLC.

1  Q.  And what is Lausanne LLC's relationship to CORFA at the

2  time of this chart?

3  A.  It is the initial member.

4  Q.  Mr. Jackson, please bring up DX4009.

5        Would you please identify this document.

6  A.  Sure.  This is an amended and restated operating agreement

7  for CORFA.

8  Q.  And looking in the first paragraph, how is Lausanne

9  defined?

10  A.  Lausanne is defined as a Delaware limited liability company

11  and defined as Lausanne or the initial member.

12  Q.  Mr. Jackson, would you please blow up section A under the

13  introduction.

14        Mr. Fliegler, would you please read that.

15  A.  "On February 11, 2013, the initial member formed the

16  company as a limited liability company under the Delaware

17  Limited Liability Company Act, as amended ("Act"), by the

18  filing of a certificate of formation with the office of the

19  Delaware Secretary of State."

20  Q.  Thank you.

21        Mr. Jackson, can you turn the page, please, and would

22  you blow up section E, as in echo.

23        Taking a moment to just look at this paragraph,

24  Mr. Fliegler, when you're ready can you explain in general

25  terms what this is discussing.

1    A.  Sure.  So this is discussing the fact that CORFA is

2    providing loans to Burnham Financial Group.

3    Q.  And is this the information that's reflected on the second

4    slide of the charts that we were just looking at?

5    A.  Yes, that's correct.

6    Q.  Mr. Jackson, could you please go back to page 1.

7            And who has entered into this agreement?

8    A.  In this document it is indicating that Lausanne LLC, BOE

9    Capital and Welling Investment Corporation entered into this

10   agreement.

11   Q.  Can you explain generally what is happening by this

12   document.

13   A.  Sure.  So these three companies -- so that would be --

14   well, actually now we have two additional ones.  Initially we

15   had Lausanne as the initial member of CORFA.  We now have BOE

16   Capital and Welling Investment Corporation becoming additional

17   investors into the corporation.

18   Q.  Mr. Jackson, if you could pull up Exhibit 9001 at page 2.

19           And this is what we were just discussing; is that

20   right?

21   A.  Yes, that's correct.

22   Q.  And if you could turn the slide, please, Mr. Jackson, to

23   page 3.

24           And can you just explain again what we see happening

25   on this.

1    A.   Sure.  If you look to the right-hand side, you will see the

2    change that I just mentioned.  So initially we had Lausanne on

3    the other slide, and now on this slide you can see the addition

4    of BOE Capital and Welling Investment Corporation as investors

5    in CORFA.

6    Q.   Ask you please read the names under the company BOE

7    Capital.

8    A.   Devon Archer, Bevan Cooney, Thorsdale Fiduciary and

9    Guaranty Company.

10   Q.   What is the date as reflected on this slide?

11   A.   August 30, 2013.

12   Q.   And this is as of?

13   A.   This is as of that date.

14   Q.   Can you explain what is implied by "as of"?

15   A.   As of, meaning that this is effective as of that date.

16   Q.   And based on the documents you reviewed, what do you

17   understand the relationship of those names you just listed to

18   BOE Capital LLC?

19   A.   My understanding is that those individuals or entities are

20   members of, or investors in, BOE Capital.

21   Q.   And based on what you reviewed, what do you understand the

22   name Nurlan Abduov to suggest?

23   A.   Based on my review of the documents, it appears as though

24   he formed Welling Investment Corporation.

25   Q.   Can you please turn the slide, Mr. Jackson.

1          Is it fair to say as we go forward with the slides,

2     we're going forward in time?

3     A.   Yes, that's correct.

4     Q.   And what change happened on this slide?

5     A.   Sure.  So, similar to what we've seen in the other slides,

6     you're seeing additional investors into CORFA.  In this slide

7     we are seeing the addition of Kirin International Holding.

8     Q.   What is the name associated with Kirin International

9     Holding?

10    A.   It's --

11    Q.   If you can pronounce it.

12    A.   I will do my best.  I believe it's Yaojun or Larry Liu.

13    Q.   Could you please turn the slide, Mr. Jackson.

14         And, Mr. Fliegler, would you identify the members of

15    CORFA as of August 11, 2014.

16    A.   Sure.  As depicted here, the members of CORFA are Lausanne

17    LLC, BOE Capital LLC, Welling Investment Corporation, Kirin

18    International Holding, BFG Partners LLC, AG Burnham LLC and

19    Daniel McClory.

20    Q.   And we saw another change on this chart to the ownership

21    interest in Burnham Financial Group.  Would you please explain

22    for the jury what that change was and how it became about,

23    based on the documents you reviewed for this chart.

24    A.   Sure.  So if you look at the top blue box you will see

25    there is an addition there.  It now says CORFA, 24.5 percent

I6L7GAL3                        Fliegler - Direct

1   minority share.  What happens is CORFA changed its loan into a

2   minority interest in Burnham Financial Group, so now it is a

3   minority shareholder.

4   Q.  Mr. Jackson, would you please bring up what is in evidence

5   as DX4044.  Would you blow up the e-mail, please.

6           Mr. Fliegler, who is this e-mail from and to?

7   A.  It is from Hunter Taubman Weiss, and it is to Stephen

8   Weiss.

9   Q.  And you can shrink that down and turn the page, please.

10  Mr. Jackson, could you blow up the control number on the lower

11  left hand part of the document.

12          Would you please read the first three letters of that

13  number?

14  A.  Sure.  HTW.

15  Q.  And you can close that, Mr. Jackson.

16          Would you identify this document, please.

17  A.  This is an amended and restated operating agreement for BOE

18  Capital.

19  Q.  What is the effective date for this agreement?

20  A.  The effective date is August 12, 2014.

21  Q.  And who entered into this agreement?

22  A.  Listed here it's BOE Capital, along with Devon Archer,

23  Bevan Cooney and Thorsdale Fiduciary and Guaranty Company.

24  Q.  Mr. Jackson, would you please blow up the third to last

25  paragraph.

1          Mr. Fliegler, taking a moment to look at this

2     paragraph, when you're ready, would you please explain for the

3     jury what is happening as reflected in this document.

4     A.   Sure.  What is happening now is that Bevan Cooney and

5     Thorsdale are transferring their investment or their ownership

6     interest in BOE Capital and moving it directly into CORFA.

7     Q.   Mr. Jackson, could you bring back up DX9001 at page 5.  And

8     would you please turn the page.

9          Could you explain what just happened.

10    A.   Sure.  So if you look under BOE Capital you used to see

11    Devon Archer, Bevan Cooney and Thorsdale.  There is now a blank

12    space there, and they are now on the bottom indicating that

13    they are investors in CORFA and not BOE.

14    Q.   Mr. Jackson, please bring up DX4338.

15         Mr. Fliegler, would you please identify this document.

16    A.   Sure.  This is a securities purchase agreement between

17    Thorsdale and BOE Capital.

18    Q.   What is the effective date of this agreement?

19    A.   It is September 30, 2014.

20    Q.   Who is listed as the seller?

21    A.   The seller is Thorsdale Fiduciary and Guaranty Company.

22    Q.   Who is the purchaser?

23    A.   The purchaser is BOE Capital.

24    Q.   Mr. Jackson, you can shrink that down and please expand the

25    control number of the document.

1          Mr. Fliegler, would you please read the first three

2     letters.

3     A.   HTW.

4     Q.   Thank you.

5          Mr. Jackson, please turn to page 2, and, if you would,

6     please blow up the last "whereas" clause above, under recitals.

7     That's right.  The one right above that, please.  Thank you.

8          Mr. Fliegler, what is being described in that

9     paragraph?

10    A.   Sure.  What is happening is that Thorsdale is selling its

11    interest in CORFA, and essentially BOE is buying that interest.

12    Q.   Mr. Jackson, please bring up 9001 at page 6.  Would you

13    please turn the slide.

14         Mr. Fliegler, again if you could explain what we just

15    saw.

16    A.   Sure.  So as I explained previously, we saw that Bevan

17    Cooney and Thorsdale moved out of BOE Capital to the bottom,

18    showing that they were investors in CORFA.  Now we see only

19    Bevan Cooney -- with that change -- is on the bottom; Thorsdale

20    is no longer an investor in CORFA.

21    Q.   Mr. Jackson, please Exhibit 4027.

22         Mr. Fliegler, could you identify this document for me.

23    A.   Sure, this is an operating agreement for BAM Holdings LLC.

24    Q.   And what is the effective date of this agreement?

25    A.   The effective date is December 31, 2014.

I6L7GAL3                    Fliegler - Direct

1   Q.  Mr. Jackson, if you could blow up the third "whereas"

2   clause.

3        Mr. Fliegler, what does this explain?

4   A.  This is explaining that this entity, BAM Holdings, wishes

5   to purchase Burnham Asset Management, Incorporated.

6   Q.  Thank you, Mr. Jackson.  Could you go to page 12 of the

7   document.

8        What does this show?

9   A.  This shows the ownership interest in BAM Holdings LLC.

10  Q.  And who are the members of BAM Holdings LLC as of the date

11  of this document?

12  A.  The members are Devon Archer,Kirin Global Enterprises, AG

13  Burnham, Welling Investment Corporation, Daniel McClory and Jon

14  Burnham.

15  Q.  Mr. Jackson, please exhibit 4341.

16       Mr. Fliegler, would you please identify this document.

17  A.  Sure.  This is the actual stock purchase agreement by BAM

18  Holdings.

19  Q.  What is the effective date?

20  A.  December 31, 2014.

21  Q.  Mr. Jackson, could you please turn to pdf page 3.  Would

22  you blow up section C, please, including its subsections.

23       Mr. Fliegler, I'm not going to ask you to read the

24  whole thing, but could you take a moment to explain to the jury

25  what is being described in this section of the agreement.

I6L7GAL3                    Fliegler - Direct

1   A.  Sure.  It's describing the -- it's describing the ownership

2   structure of BAM and the transaction that the purchase

3   agreement is depicting.

4   Q.  And this is the purchase of BAM by BAM Holdings; is that

5   right?

6   A.  That's correct.

7   Q.  I will ask you to read, please, Roman numeral V at the

8   bottom.

9   A.  Sure.  "CORFA has entered into a separate stock purchase

10  agreement, dated as of October 31, 2014 ("BSI Purchase

11  Agreement") to purchase 90 percent of the capital stock of

12  Burnham Securities ("BSI purchased shares") for a purchase

13  price of $5,500,000.

14  Q.  Based on the documents reviewed in this case, is it your

15  understanding that BAM Holdings did in fact acquire Burnham

16  Asset Management?

17  A.  Yes, that's correct.

18  Q.  Mr. Jackson, could you please bring up DX4340.

19          Mr. Fliegler, is this the stock purchase agreement we

20  just saw referenced in the prior document?

21  A.  Yes, that's correct.

22  Q.  Mr. Jackson, could you please turn to page 3, and would you

23  please blow up section D, as in delta.

24          Mr. Fliegler, would you please read that.

25  A.  "CORFA desires to purchase from Burnham 90 percent of the

1   issued and outstanding shares of capital stock of Burnham

2   Securities ("BSI purchased shares"), and Burnham desires to

3   sell to CORFA the BSI purchased shares."

4   Q.  Mr. Jackson, if you could turn to page 3, please.  I'm

5   sorry.  Please turn the page to page 4.  Page 4.  I'm sorry if

6   I misspoke, not 84.  And if you could expand section 1

7   including its subsections.

8            Just at the highest level, what are the types of

9   provisions that are falling under section 1 here?

10  A.  Sure.  These are essentially the conditions that must be

11  met for this transaction to close.

12  Q.  And based on the documents you reviewed, have you seen

13  anything to suggest that these conditions were ever satisfied?

14  A.  No.

15  Q.  Have you seen anything to suggest that CORFA in fact

16  acquired Burnham Securities?

17  A.  No.

18  Q.  Mr. Jackson, could you bring up DX9001 at page 7.  If you

19  would please turn the page.

20            Mr. Fliegler, is the change to this slide, does it

21  reflect what was just happening in those purchase agreements we

22  were looking at?

23  A.  Yes, that's correct.

24  Q.  And could you describe this slide, please.

25  A.  Sure.  So it's split now.  We now have on the right-hand

I6L7GAL3                          Fliegler - Cross

1   side with the green colors showing that BAM Holdings is now the

2   owner of Burnham Asset Management Corporation.  And on the

3   left-hand side, still in the blue, we're showing that Burnham

4   Securities, Incorporated is still owned by Burnham Financial

5   Group.

6   Q.  And with respect to BAM Holdings, these are the same

7   individuals that we saw listed on the cap table in one of the

8   previous documents, right?

9   A.  Yes, that's correct.

10  Q.  Who are the members of CORFA at this time?

11  A.  The members of CORFA are still the same members that we saw

12  in the previous slide, and that was as of September 30, 2014.

13  Q.  Mr. Jackson, could you go back one slide, please.

14          And remind us again, what was the change that was

15  reflected on this slide.

16  A.  The change that we discussed before was that Thorsdale is

17  now no longer an investor in CORFA.

18          MR. WENNER:  Thank you very much, Mr. Fliegler.  No

19  further questions, your Honor.

20          THE COURT:  Any cross-examination?

21          MR. QUIGLEY:  Yes, your Honor.

22  CROSS EXAMINATION

23  BY MR. QUIGLEY:

24  Q.  Good morning again, ladies and gentlemen.

25          Good morning, Mr. Fliegler.

1    A.  Good morning.

2    Q.  We've never met, correct?

3    A.  We have not.

4    Q.  It's nice to meet you.

5    A.  Same here.

6    Q.  Sir, you said you were retained.  When were you retained on

7    this case?

8    A.  I'd say approximately two weeks ago.

9    Q.  And since then how many hours have you spent on this case?

10   A.  I honestly cannot tell you; I didn't calculate that.

11   Q.  More than five?

12   A.  More than five, yes.

13   Q.  More than 15?

14   A.  Yes, more than 15.

15   Q.  More than 30?

16   A.  Perhaps around 30.

17   Q.  More than 35?

18   A.  That I couldn't tell you.

19   Q.  And you work at a company called Duff Phelps; is that

20   correct?

21   A.  Duff & Phelps.

22   Q.  I'm sorry.  Did any of your associates or colleagues at

23   Duff & Phelps help you on this case?

24   A.  I had one associate helping me.

25   Q.  What does he or she bill at?  Do they bill at an hourly

1    rate?

2    A.   They do bill at an hourly rate.

3    Q.   What is that?

4    A.   I don't recall what that rate is.

5    Q.   And how many hours did they spend on this case?

6    A.   Approximately five, ten hours.

7    Q.   Could it have been more than ten?

8    A.   Maybe, but probably not much more than that.

9    Q.   And Mr. Wenner asked you some questions about in-person

10   meetings.  I think you said you only met him yesterday; is that

11   correct?

12   A.   In person I met him today.

13   Q.   But you talked to him and other members of the defense team

14   on the phone?

15   A.   That's correct.

16   Q.   And you communicated with them via e-mail?

17   A.   Correct.

18   Q.   And they provided you with the documents that you reviewed

19   in creating these summary charts, correct?

20   A.   That's right.

21   Q.   You didn't go out and do any independent investigation.

22   A.   I did not.

23   Q.   So just a couple of questions about the charts themselves.

24           Can we pull up Defense Exhibit 9001, I believe it's

25   page 4.  It's the org chart for January 10, 2014.  Thank you.

I6L7GAL3                        Fliegler - Cross

1          So this reflects I believe the investment by Kirin

2     International Holding into COR Fund Advisors; is that correct?

3     A.   That's correct.

4     Q.   And there is a document you reference down -- and the

5     members of BOE Capital are listed as Devon Archer, Bevan Cooney

6     and Thorsdale Fiduciary and Guaranty; is that right?

7     A.   That's right.

8     Q.   And the document that reflects Kirin Global's -- or

9     sorry -- Kirin's investments is Defendant's Exhibit 4015; is

10    that correct?

11         Can you pull it up?  I want to put it side by side.

12         That's one of the documents -- 4015 is one of the

13    documents you have listed down there at the bottom of the

14    chart, correct?

15    A.   That's correct.

16    Q.   And this is a term sheet for Kirin International Holding's

17    investment in CORFA, right?

18    A.   That's right.

19    Q.   So if you could turn to the third page, Ms.Sheinwald, and

20    just blow up where it discusses the name and the cap table up

21    there, name and address.  Right?  And that re.

22         That reflects that the founders of CORFA are BOE

23    Capital, which consists of Mr. Archer, Mr. Cooney and a Lucas

24    Mann affiliate, and Lausanne LLC.  Correct?

25    A.   That's what it states, yes.

I6L7GAL3                         Fliegler - Cross

1   Q.   Sorry.  Can you move that over.

2              So Lausanne LLC, it's actually on the chart.  Even

3   though it says it's an affiliate of Jason Sugarman, it's listed

4   as Elizabeth Sugarman on the chart, right?

5   A.   That's correct.

6   Q.   And even though BOE Capital the members are listed as Devon

7   Archer, Bevan Cooney and Thorsdale Fiduciary, Thorsdale is not

8   listed in Government Exhibit 4015 as a member of BOE Capital,

9   correct?

10  A.   That's correct.

11  Q.   Instead it's something called a Lucas Mann affiliate,

12  correct?

13  A.   That's what it states, yes.

14  Q.   And if we could go to the next page.  This document is in

15  fact signed by Mr. Archer on behalf of BOE Capital, correct?

16  A.   Yes, that's correct.

17  Q.   And, by the way, your analysis depends on all these

18  agreements being actual duly executed agreements, right?

19  A.   I would agree with that.

20  Q.   Right.  And you weren't asked to examine whether anybody's

21  signature was forged in any of these agreements or anything

22  like that, correct?

23  A.   That's correct, yes.

24  Q.   And you have no reason to think that, right?

25  A.   I do not.

I6L7GAL3                        Fliegler - Cross

1   Q.  Thanks.

2           And we can take that down.  And if we could pull up on

3   4009 the org chart for the dates.  Put up side by side the org

4   charts for August 12 and September 30, 2014.  I believe those

5   are pages 6 and 7 of the document.  Sorry, 9001.  So that page

6   and the next one.  Thank you.  There we go.

7           So, the change here is that between the August 12th

8   chart and the September 30th chart -- the change to the

9   organization of CORFA deals with the fact that BOE Capital --

10  one of the changes is that BOE Capital essentially bought out

11  Thorsdale; is that right?

12  A.  That's correct.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.   The transaction that, the document that reflects that

2   transaction is what is in evidence as Defendant's Exhibit 433

3   B.   Can we pull that up, Ms. Sheinwald.  Is that right?

4           This is the securities purchase agreement between

5   authorizes and deal I capital, right?

6   A.   Correct.

7   Q.   On the first page, Thorsdale is the seller, right?

8   A.   Yes.

9   Q.   They're selling their share of CORFA, right?

10  A.   Yes.

11  Q.   And BOE Capital is the bond?

12  A.   Correct.

13  Q.   If we go two pages in, Ms. Sheinwald.  The Section 2.2,

14  blow that up.  The closing is on or about October 31, 2014,

15  correct?

16  A.   That is what it says, yes.

17  Q.   If you can blow up the paragraph below that, the closing

18  documents are to be delivered to a law firm called Crone Kline

19  and Rinde, attention of someone named Stephen Weiss, correct?

20  A.   That is what it says, yes.

21  Q.   Again, if you go to the purchase price in the paragraph

22  below that, the purchase price is $600,513.00, right?

23  A.   That is what it says, yes.

24  Q.   Again the purchaser is BOE Capital, Mr. Archer, correct?

25  A.   Yes.

I6LJGAL4                         Fliegler - cross

1   Q.   The seller is Thorsdale Fiduciary, correct?

2   A.   Correct.

3   Q.   If you could look at what is in evidence as Government

4   Exhibit 301, at 74 if you can blow up the entry for 11-10,

5   where there is a wire coming in from Thorsdale.  Do you see on

6   11-10, this account, Rosemont Seneca Bohai, actually received

7   $600,513.00 from Thorsdale, right?

8   A.   Yes, that is what it says.

9   Q.   And Thorsdale is the seller in the share purchase

10  agreement, correct?

11  A.   Yes.

12  Q.   Selling their interest in BOE Capital, right?

13  A.   Yes.

14  Q.   If we can look at a couple of lines below that, at the

15  other entry for $600,513.00, this account says $600,513.00

16  back, right back out to Crone Kline and Rinde, right?

17  A.   Correct.

18  Q.   That was the law firm referenced in share purchase

19  agreement, Defendant's Exhibit 433, correct?

20  A.   That's correct.

21  Q.   Can we pull up -- you can take that down and pull up

22  Government Exhibit 312, which is in evidence.  Go to Page 91.

23       This is a document dated November 12th of 2014,

24  correct?

25  A.   That is what it says, yes.

1    Q.  And this appears to be signed by Mr. Archer?

2    A.  It appears to be so, yes.

3    Q.  This is a wire from Rosemont Seneca Bohai account for

4    600,513, correct?

5    A.  Yes, it says that.

6    Q.  That is the same amount we just saw in the bank records,

7    correct?

8    A.  Correct.

9    Q.  It says this wire, on the right this wire is for the

10   purchase of securities through Burnham Financial, right?

11   A.  It is what it says.

12   Q.  It says Laura Nicholson of branch management confirmed with

13   authorized individual Devon Archer on 11-12, 11:45 at Phone No.

14   646-436-3745, correct?

15   A.  Correct.

16              MR. QUIGLEY:  One moment, your Honor.

17              (Off-the-record discussion)

18   Q.  So it appears that the money that was used to buy out

19   Thorsdale, right, came from Thorsdale to RSB Capital and went

20   back to Thorsdale in a matter of a couple of days, correct?

21   A.  Based on the documents that you have shown me and based on

22   just these transactional issues, yes, that does seem to be what

23   is happening.

24              MR. QUIGLEY:  No further questions.

25              THE COURT:  Any additional questions.

I6LJGAL4                          Fliegler – cross

1    CROSS EXAMINATION

2    BY MR. TOUGER:

3    Q.  Good afternoon, sir.

4    A.  Good afternoon.

5    Q.  We have never met or communicated, have we?

6    A.  That's correct.

7    Q.  My name is David Touger.  I represent John Galanis.

8    A.  Nice to meet you.

9    Q.  Can you bring up 9001, Page 3 if you would be so kind.  Do

10   you have the chart in front of you?

11   A.  I do.

12   Q.  This shows that CORFA Adviser is just making loans to

13   Burnham Financial Group as of August 30th, 2013, correct?

14   A.  That's correct.

15   Q.  In your view of documents, do you know how much in loans

16   they made to Burnham Financial Group?

17   A.  I'd have to refer back to them.  I don't recall.

18   Q.  Excuse me?

19   A.  I would have to refer back to them.  I don't recall.

20   Q.  Was it in the tens of thousands or in the millions?

21   A.  It was in the millions, I believe.

22   Q.  Can we go to the next page.  So this is now as of January

23   10th, 2014, correct?

24   A.  That's correct.

25   Q.  As you said now, Thorsdale Fiduciary and BOE Capital –– BOE

1    Capital with Thorsdale Fiduciary Capital as investor, enters

2    into the COR Fund Ownership Group, right?

3    A.  BOE Capital is an investor CORFA.

4    Q.  Go to the next page.

5            This shows as of August 11, 2014, somewhere between

6    those two dates, CORFA now became a minority owner of Burnham

7    Financial Group, right?

8    A.  That's correct.

9    Q.  BOE Capital is still an investor in CORFA?

10   A.  Yes.

11   Q.  Thorsdale is still an investigator in BOE Capital?

12   A.  Yes.

13   Q.  Would it be correct in saying during the time period of

14   January 2014 to August 2014, that BOE Capital and Thorsdale,

15   through BOE Capital, had a relationship with Burnham Financial

16   Group?  Is that too much of one question? .

17   A.  If you can repeat it again.

18   Q.  I am talking about the time between between January 2014

19   and August of 2014.

20   A.  Yes.

21           MR. QUIGLEY:  Objection to opinion testimony.

22           THE COURT:  I'll allow it.

23   BY MR. TOUGER:

24   Q.  During that time period was Thorsdale Fiduciary investor in

25   BOE Capital?

I6LJGAL4                           Fliegler - cross

1    A.  Yes.

2    Q.  Was BOE Capital an investor in COR Fund Advisers?

3    A.  Yes.

4    Q.  During that time period COR Fund Advisers had a

5    relationship with Burnham Financial Group?

6    A.  That's correct.

7    Q.  And the relationship was first as loaner of millions of

8    dollars and then to a almost one quarter share of the company?

9    A.  That's correct.

10   Q.  During that time period Thorsdale, with its relationship

11   with BOE, was related to Burnham Financial Group?

12   A.  In that scenario in going through those connections, yes,

13   that is correct.

14   Q.  It wasn't until I believe you just testified to August

15   30th, 2014 when Thorsdale sold its shares in BOE Capital to

16   Devon Archer?

17   A.  Correct.

18   Q.  It was after September of 2014 that Thorsdale Fiduciary no

19   longer had a relationship to Burnham Financial Group?

20   A.  That's right.

21            MR. TOUGER:  Nothing further.

22            THE COURT:  Any additional questions?

23            MR. QUIGLEY:  Not from the government.

24            THE COURT:  Anything else?  All right.  Thanks.  You

25   may step down.

I6LJGAL4

1           (Witness excused)

2           MR. SCHWARTZ:  Ms. Dillingham, can I ask you to pull

3     up Defense Exhibit 4126 already in evidence.

4     Q.  Mr. Jackson, if you could begin from the bottom.

5     A.  From Timothy Anderson, dated September 24, 2014, at 7:56 am

6     to Jason Galanis.  Attached is the investor letter, can you get

7     to Devon for signature.  If he has any questions, tell him he's

8     free to call.  Tim.

9     Q.  September 24, 2014 at 2:52 pm from Jason Galanis to

10    Clifford A. Wolff, Esquire, Devon Archer, Sebastian Momtazi

11    forwarding a previous e-mail.  Cliff, can you review this for

12    RSB, LLC, Jason.

13    A.  From Clifford Wolff, dated Wednesday, September 24, 2014,

14    at 3:52 pm.  To Jason Galanis, Devon Archer, Sebastian Momtazi,

15    subject Re:  WLCC 2014 Town Center.

16          Gentlemen:  Based on my understanding of the

17    transaction and intentions, the letter is approved for

18    signature by Devon.  Cliff.

19    Q.  From Sebastian Momtazi to Clifford A. Wolff, Esquire, Jason

20    Galanis, Devon Archer, on September 24, 2014 at 8:56 pm,

21    gentlemen:  Based on my understanding of the request, this

22    letter is executed and attached.  Seb.

23          Ms. Dillingham, can I ask you to go to the next page,

24    4126, and the next page, please.  Thank you.

25          MR. SCHWARTZ:  With your Honor's permission, can Mr.

1    Jackson be sworn now so I can ask him some questions?

2              THE COURT:  Yes.

3     KENDALL JACKSON,

4          called as a witness by the Defendants,

5          having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. SCHWARTZ:

8    Q.  Good morning, Mr. Jackson?

9    A.  Good morning.

10   Q.  Where do you work?

11   A.  Boies Schiller & Flexner.

12   Q.  What is your position at that law firm?

13   A.  I am a paralegal there.

14   Q.  Generally what do you do as a paralegal?

15   A.  Generally I do a lot of administrative work, whatever the

16   attorneys need, be of assistance, making binders and things

17   like that.

18   Q.  Before you were a paralegal, were you in school?

19   A.  Yes.  I attended Columbia University, graduated last year

20   in 2013.

21   Q.  What did you study at Columbia?

22   A.  I studied psychology and business management.

23   Q.  Did you do anything else there?

24   A.  Yes, I was also on the basketball team there.

25   Q.  Have you been one of the paralegals that have assisted with

I6LJGAL4                          Jackson - direct

1    this case?

2    A.   I have.

3    Q.   What sort of tasks have you done in this case?

4    A.   I've created documents involving things in regards to like

5    making sure it is easier for everyone to be able to review

6    these documents.  I have created power points, I've done the

7    tech throughout this trial.

8    Q.   Did you suspect when you joined this team, you would end up

9    in the witness box?

10   A.   I did not.

11   Q.   When did you find out that was a possibility?

12   A.   Two days ago.

13   Q.   Are you a little nervous?

14   A.   A little bit, yes.

15   Q.   Did I ask you to review certain of the evidence?

16   A.   No.

17   Q.   Well, did I ask you to look at certain material and put it

18   into --

19   A.   I am sorry.  Yes.

20   Q.   Just generally speaking, can you explain to the jury what

21   you were asked to look at.

22   A.   So I was asked to look a few documents in regards to Devon

23   Archer's signature.

24   Q.   Do you have in front of you what has been marked as Exhibit

25   4348 and 4348 A?

1    A.  I do.

2    Q.  Are those charts that you reviewed?

3    A.  Yes.

4    Q.  Are they based upon the exhibits that are cited on the face

5    of the charts?

6    A.  Yes.

7    Q.  Do those charts fairly and accurately capture the

8    information that you were asked to convey on them?

9    A.  They do.

10             MR. SCHWARTZ:  I offer defense Exhibits 4348 and 4348

11   A.

12             MR. QUIGLEY:  No objection.

13             THE COURT:  They will be admitted.

14             (Defendant's Exhibits 4348 and 4348 A received in

15   evidence)

16             MR. SCHWARTZ:  With your Honor's permission, I will

17   hand copies to the jury.

18             THE COURT:  Sure.

19             (Pause)

20             MR. SCHWARTZ:  Ms. Dillingham can you bring up first

21   4348 A.

22   Q.  Tell us what we're looking at here.

23   A.  So with this document, it is Devon Archer's signature

24   displayed two different signatures, GX 343 and GX 352.

25   Q.  You have been here throughout the trial.  Are those two

I6LJGAL4                    Jackson - direct

1   exhibits we reviewed with Catharine Driever, the witness from

2   Morgan Stanley?

3   A.  Correct, yes.

4   Q.  And all you've done here is you've put the client

5   representation letter and blown up the signature, true?

6   A.  Correct.

7   Q.  Thank you.  Now, can we look at Exhibit 4348.  Just go

8   ahead and jump to the end.

9        What generally is depicted on this exhibit?

10  A.  Generally, you have Devon Archer's signatures depicted

11  based on the charts that are displayed in the far left-hand

12  column, and where it is dated, the letter of the date of the

13  letter and where it is transmitted, who sent the email and when

14  the email was sent.

15  Q.  Thank you.

16       Again you've been here, these are the exhibits we

17  reviewed with Molly Moynihan from Perkins Coie?

18  A.  Correct.

19  Q.  Just to take an example of what is depicted here, you can

20  take this down, Ms. Dillingham and, can you bring up, let's

21  just look at the third entry on the list.

22       You have listed two exhibits here, a defense exhibit

23  and government exhibit, correct?

24  A.  Correct.

25  Q.  So can you bring up first the Government Exhibit 753,

1    please.  The government exhibit is the letter itself, correct?

2    A.  Correct.

3    Q.  Where you have a column on your chart that says date of

4    letter, is that taken from the face of the letter itself or any

5    transmission information?

6    A.  From the face of the letter, correct.

7    Q.  Then the last column in your chart is signature, and if we

8    can turn to the last page of this, you have simply cut the

9    signature and pasted it into your chart?

10   A.  Correct.

11   Q.  Can we look at the other referenced exhibit for this Line

12   4311.  We heard testimony that this was that same letter with a

13   cover email.  Do you recall that?

14   A.  Correct, I do recall it.

15   Q.  The information about the transmitted by/on column, does

16   that come from this cover email?

17   A.  It does.

18   Q.  Is that why there is a date of letter column as well a date

19   in the transmitted by/on column?

20   A.  Yes.

21   Q.  Just to take another example, the following line in your

22   chart only references a defense exhibit.  Is that correct?

23   A.  That is correct.

24   Q.  Let's just look at that.  That is Exhibit 4313.  The same

25   information generally is depicted here?

I6LJGAL4                          Jackson - direct

1    A.  Correct.

2              MR. QUIGLEY:  Objection to the leading.

3              THE COURT:  I'll allow it.  Just watch it going

4    forward.

5              MR. SCHWARTZ:  Sure.

6    BY MR. SCHWARTZ:

7    Q.  Then you can take that down.

8              I want to jump to the fourth from the bottom where on

9    your chart it says under the transmitted by/on Sebastian

10   Momtazi to Andrew Godfrey.  Do you see that?

11   A.  I do.

12   Q.  Can we bring up the referenced Exhibit 2038.  If you can

13   just look at the header information.  That corresponds to what

14   is on your chart.  Is that correct?

15   A.  That is correct.

16   Q.  Am I correct -- and if you need to go through the exhibits

17   to be sure, that's fine -- am I correct that the two lines on

18   your chart that have the "to" information to Andrew Godfrey in

19   the transmitted by/on column are the two letters that are not

20   sent between the lawyers?

21   A.  Yes, that's correct.

22   Q.  Finally, I want to look at the last item on your chart.

23             You put a question mark under the transmission by/on

24   column.  Is that right?

25   A.  That's correct.

I6LJGAL4                        Jackson - direct

1    Q.  Can we pull up Exhibit 762.  Is there a cover email for

2    Exhibit 762?

3    A.  There is not.

4              MR. SCHWARTZ:  Thank you, Mr. Jackson.  I don't have

5    any other questions.

6              MR. QUIGLEY:  Just a very brief sidebar?

7              THE COURT:  Sure.

8              (Continued on next page)

9              (At sidebar)

10             MS. MERMELSTEIN:  We don't have any problem with the

11   fact the jury is given hard copies.  That should have been

12   raised before with the jury.  I don't think they should have

13   them now in the jury room for the evidence when we send all the

14   exhibits, we can.  It should not be left.  I don't want to

15   raise that in front.

16             MR. SCHWARTZ:  I was just the individual --

17             THE COURT:  I will note that.

18             MR. SCHWARTZ:  We'll call Dr. Archer next, and if that

19   takes us to lunch, we should take an early lunch because

20   everything else requires --

21             THE COURT:  Okay.

22             (Continued on next page)

23

24

25

I6LJGAL4                          Jackson - cross

 1                  (In open court)

 2                  THE COURT:  One of the jurors just stepped out.  If

 3      anyone else needs to use the restroom, feel free.

 4                  (Recess)

 5      CROSS EXAMINATION

 6      BY MR. QUIGLEY:

 7      Q.  Good afternoon, Mr. Jackson.

 8      A.  Good afternoon.

 9      Q.  Can we pull up Defense Exhibit 4348.  Go to the last page.

10      Mr. Jackson, this is your chart you prepared, correct?

11      A.  Correct.

12      Q.  There are 11 emails on this chart, right, or 11 transmittal

13      emails?

14      A.  Right.

15      Q.  If we could look at the chart on one side and Defense

16      Exhibit 4306 on the other side, Ms. Sheinwald.

17                  Just highlight the header information.  This is the

18      first email on your chart, right?

19      A.  Right.

20      Q.  This is sent by Stephen Weiss, correct?

21      A.  Correct.

22      Q.  And Mr. Archer is copied on it, correct?

23      A.  Correct.

24      Q.  Then if we go to the second email on the chart, Defense

25      Exhibit 4385, and blow up the header again, and on your chart

I6LJGAL4                        Jackson - cross

1    this is an email from Stephen Weiss, and once again Mr. Archer

2    is copied on it, correct?

3    A.   That is correct.

4    Q.   Take that down and put up Defense Exhibit 4311.  This is

5    the third email on your chart, and again from Stephen Weiss,

6    and again Mr. Archer is copied, correct?

7    A.   Correct.

8    Q.   Take that down and put up Defense Exhibit 4313.  Once again

9    Mr. Archer is on this email, correct?

10   A.   Correct.

11   Q.   You can take that down.  Put up 4317.  Again an email from

12   Stephen Weiss.  In fact, Mr. Archer is the only person copied

13   on this email, right?

14   A.   Correct.

15   Q.   Take that one down and put up Defense Exhibit 4345.

16           This is the 6th one on your chart e-mail from Stephen

17   Weiss, and again Mr. Archer is copied, right?

18   A.   That is correct.

19   Q.   Take that one down and put up the 7th email, Defense

20   Exhibit 4333.  An email from Andrew Godfrey, and once again Mr.

21   Archer is copied, correct?

22   A.   Correct.

23   Q.   Take that down and put up Defense Exhibit 2038.  Once again

24   an email from Sebastian Momtazi, and it copied Mr. Archer,

25   correct?

I6LJGAL4                        Jackson - cross

1    A.   That is correct.

2    Q.   Take that one down and put up Defense Exhibit 4388.

3            Email from Sebastian Momtazi, once again copying Mr.

4    Archer, correct?

5    A.   Yes, correct.

6    Q.   And 4389, you can take that down and put up 4389.

7            An email from Andrew Godfrey, and once again Mr.

8    Archer is copied, correct?

9    A.   Correct.

10   Q.   For 762, there is no cover email, right?

11   A.   That's correct.

12   Q.   For each of the transmittal emails in your chart, Mr.

13   Archer is copied on every single one of them, correct?

14   A.   Correct.

15   Q.   Look at Defense Exhibit 4126 which is in evidence.  You saw

16   this before you were sworn in, right?

17   A.   Yes.

18   Q.   This again is the email from Sebastian Momtazi.  Once again

19   Mr. Archer is CC'd, correct?  He is on the "to" line?

20   A.   Yes he is on the "to" line.

21   Q.   And Jason Galanis at Burnham Equity Partners is CC'd,

22   right?

23   A.   On the "to" line.

24   Q.   He is on the "to" line, yes.  The date is of this email is

25   September 4, 2014, correct?

I6LJGAL4                          K. Archer – direct

1    A.   Correct.

2               MR. QUIGLEY:  No further questions.

3               THE COURT:  Any additional questions for Mr. Jackson?

4    You may step down.

5               (Witness excused)

6               MR. SCHWARTZ:  I call Krista Archer.

7               THE COURT:  We can take those exhibits from you so you

8    don't have to keep them on your lap.

9     KRISTA ARCHER,

10        called as a witness by the Defendants,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MS. HARRIS:

14   Q.   Good afternoon, Dr. Archer.

15   A.   Good afternoon.

16   Q.   Where are you from?

17   A.   I am from Long Island, New York.

18   Q.   Where do you live today?

19   A.   We live in Brooklyn, New York.

20   Q.   Are you married, Dr. Archer?

21   A.   I am married.

22   Q.   To whom are you married?

23   A.   I am married to Devon Archer.

24   Q.   Do you have any children?

25   A.   We do.  We have three kids, Lucas, Lakeland and Felix.

I6LJGAL4                         K. Archer - direct

1    Q.  When were they born?

2    A.  Lucas was born in 2007, lakeland in 2013 and Felix in 2014.

3    Q.  How long have you known Devon?

4    A.  I've known Devon my entire life.  We were born on to the

5    same street and we went through preschool through 12th grade

6    together.

7    Q.  Tell me about your family.

8    A.  Personally, I'm from one of four kids, as is Devon, a big

9    families from Long Island.  We have three kids, three dogs and

10   three fish.  I am not having -- no more kids.  Maybe another

11   dog.

12   Q.  What do you do for a living?

13   A.  I am a physician, sole practitioner in private practice

14   here in New York and also on staff at Lenox Hill Hospital.

15   Q.  Do you have any other businesses?

16   A.  I do.  I have-- created and founded a natural skincare

17   line.  I named it Arch by Dr. Krista Archer.

18   Q.  What do you remember about the summer and fall of 2014, Dr.

19   Archer?

20   A.  I kind of gauge time by pregnancies and childbirth, so that

21   time Felix was born on July 4th, 2014.  It with was a very

22   hectic time because I still had a baby at home, Lakeland was

23   just 17 months, Lucas was going to be in second grade, so I was

24   extremely busy, and owning my own business, I went back to work

25   about two weeks after he was born, so trying to juggle family

I6LJGAL4                         K. Archer - direct

1  and work life, having a husband that also works, and it was

2  chaotic, but fortunately I had family support.  Both of our

3  parents are still in Long Island and they would help.

4  Q.  What do you remember about Devon's schedule in that time

5  period?

6  A.  I remember that he was extremely busy.  He was focused on

7  closing up, selling one business and then also starting another

8  business, so he was traveling quite often.

9  Q.  How did you deal with that?

10  A.  It was difficult, but again with the family support,

11  babysitters, you throw it altogether.  On weekends we tried to

12  spend as much family time as possible.  Lucas and Devon teamed

13  up and Lucas had sport practices and I would stay home with the

14  little two.

15  Q.  Do you have any particular recollection of where Devon was

16  traveling during that time period?

17  A.  I do, domestic and international.  Domestically because he

18  was with Rosemont Realty back-and-forth and they're in the U.S.

19  Then internationally to China quite a bit, but I think BHR.

20  Q.  Do you have any role with Devon's businesses, Dr. Archer?

21  A.  I have no role.  I am busy enough with my own businesses.

22  Q.  Is there any relationship between your businesses and

23  Devon's businesses?

24  A.  No.

25  Q.  Have you ever been to the offices of any of his businesses?

I6LJGAL4                              K. Archer – direct

1    A.   I have.

2    Q.   Which offices?   .

3    A.   I have been to his Greenwich Street office downtown here in

4    Manhattan, and then an office at West 57th street.

5    Q.   How many times did you visit the office on West 57th

6    street?

7    A.   I think just once when he first started, I was on the train

8    and I got out and visited.

9    Q.   Dropped by?

10   A.   Dropped by.  I live on the F.

11   Q.   Do you know any of Devon's business partners?

12   A.   I do.  I know one of his business partners, Chris Heinz,

13   quite well because he went to college with Devon and they

14   started up Rosemont together.  I know Chris and his family, his

15   kids.  We have been traveling together.

16        I also know Hunter by then, another business partner.

17   Again I know them quite well.  I know Hunter's family, went to

18   their Christmas parties, et cetera.

19   Q.   Dr. Archer -- actually, Mr. Jackson, if could pull up DX

20   4928 just for the court, the lawyers and the witness.

21        Dr. Archer, do you recognize the person in this

22   photograph?

23   A.   I do.

24   Q.   Who is that?

25   A.   That is Sebastian Momtazi.

1            MS. HARRIS:  We offer defense Exhibit 4928.

2            MS. TEKEEI:  No objection.

3            THE COURT:  It will be admitted.

4            (Defendant's Exhibit 4928 received in evidence)

5            MS. HARRIS:  You can publish it.

6   Q.  I realize it is a little blurry.  I apologize.  Who is

7   Sebastian Momtazi, Dr. Archer?

8   A.  Sebastian Momtazi was Devon's assistant.

9   Q.  Do you have any knowledge of what his role was in Devon's

10  business?

11  A.  He started out as Devon's assistant.  I know over the years

12  he gains more responsibility.  I don't know technically what

13  his role was.  Maybe it was something like COO or of that

14  nature.

15  Q.  Do you know Bevan Cooney, Dr. Archer?

16  A.  I do.

17  Q.  Before you saw him in court for this case, when was the

18  last time you had seen Mr. Cooney?

19  A.  In person, probably events associated with this case, so it

20  has been long since 2016.

21  Q.  And before that time?

22  A.  Before that time, again children, so Lakeland was probably

23  when Lakeland was a baby, so 2013.

24  Q.  Do you consider Mr. Cooney your friend?

25  A.  I do.

I6LJGAL4                          K. Archer - direct

1    Q.  Do you know John Galanis?

2    A.  I don't.  I know he is here, but I don't know him

3    personally.

4    Q.  Do you know Hugh Dunkerley?

5    A.  I don't.  Again I saw him here but, no.

6    Q.  Do you know Francisco Martin?

7    A.  No.  The same.  I have seen him here.

8    Q.  Do you know Gary Hirst?

9    A.  No.

10   Q.  Do you know Michelle Morton?

11   A.  I don't.

12   Q.  I would like to pull up Government Exhibit 2082, at Page 2,

13   please, Mr. Jackson.  I believe it is in evidence.

14          Dr. Archer, do you recognize any of the people in this

15   photograph?

16   A.  I do.

17   Q.  Who do you recognize?

18   A.  I recognize Devon and --

19   Q.  Where is Devon in this photograph?

20   A.  On the top picture, all the way to the left.

21   Q.  Do you recognize anyone else in this top picture?

22   A.  I recognize Jason Galanis.

23   Q.  Where is Jason Galanis?

24   A.  He is second from the right.

25   Q.  Have you ever met Jason Galanis, Dr. Archer?

I6LJGAL4                        K. Archer - direct

 1   A.  I have.

 2   Q.  When did you meet him?

 3   A.  I met him very briefly in the spring of 2015 and then the

 4   second time we were invited by his wife to his birthday party

 5   here in New York at a restaurant called Il Buco.

 6   Q.  Do you recall his wife's name?

 7   A.  Her name is Monet.

 8   Q.  Like the painter?

 9   A.  Yes.  I want to call her Manet, but is Monet.

10   Q.  What is Il Buco Wine Seller?

11   A.  Il Buco Wine Cellar is a private wine cellar beneath the

12   restaurant.  As you would imagine, a wine cellar to be

13   cavernous, intimate, and she reserved the room for a private

14   party.

15   Q.  How large was the party?

16   A.  It was probably about 12 to 15 people.

17   Q.  Did you know anybody at the party?

18   A.  I did not.

19   Q.  What do you remember about that night?

20   A.  I remember that she did it very well.  She had a table very

21   nicely set for about twelve people with name cards and

22   preprinted menus and many courses, and we talked a little bit

23   for before sitting down for dinner and that was actually the

24   first time I met her in person, and so I had no initial

25   judgments of her.

I6LJGAL4                          K. Archer – direct

1    Q.  How long did the dinner last?

2    A.  Probably over two hours with everything, all the courses.

3    Q.  Where were you sitting at that dinner?

4    A.  I was sitting to the right of her friend who was a Herbsman

5    instructor and across from a person who looked familiar to me I

6    met for the first time, he was an a Bravo TV show.  He was at

7    the head of the table to my left.

8              MS. TEKEEI:  Your Honor, may we approach?

9              THE COURT:  Sure.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6LJGAL4                      K. Archer - direct

1           (At sidebar)

2           MS. TEKEEI:  Your Honor, this is entirely irrelevant

3    and her conversations with all the guests.  We are trying to be

4    very cautious and raised an issue in advance so we wouldn't

5    have to do this.  This is utterly irrelevant and I will say as

6    well I think Dr. Archer has opened the door to communications

7    with her husband since she is discussing the role Sebastian

8    Momtazi may have played in their business.

9           MS. HARRIS:  I can address both of those.  With

10   respect to the latter issue, this is entirely based on Dr.

11   Archer's knowledge.  I am happy to lay that foundation.

12          THE COURT:  What is the relevance here of the details

13   of the dinner?

14          MS. HARRIS:  The relevance is a huge part of this case

15   is Jason Galanis over-ingratiated himself.

16          THE COURT:  You have made that point.  Do you have

17   anything left on that issue?

18          MS. HARRIS:  We have only I think about three or four

19   more questions left about her personal interactions with Jason

20   Galanis at the dinner, her impressions.

21          MR. SCHWARTZ:  Jason Galanis gives a toast at the

22   dinner, and that is what will come out next.

23          THE COURT:  Toast about what?

24          MS. HARRIS:  To Devon.  He toasts to Devon at his

25   birthday dinner and I think that is relevant to illustrate

1  Devon's state of mind with respect to Jason Galanis during this

2  period.

3          MS. TEKEEI:  Your Honor, this is exactly the kind of

4  inappropriate testimony that we attempted to head off.  There

5  has been enough evidence about Jason Galanis' relationship with

6  Devon Archer, the way each of them used their connections to

7  each other's advantage, and this is just superfluous testimony.

8          THE COURT:  I will let you get the fact he made a

9  toast.  I don't want any more details about fancy dinner, and

10 then I want you to move on.

11         MS. MERMELSTEIN:  Before we go back, there is no

12 question that what is going on is exactly what the government

13 accepted would happen.  The level of detail about children, it

14 is going beyond what your Honor said.  Defense counsel knows

15 what they're doing.

16         THE COURT:  We understand.

17         MS. MERMELSTEIN:  They should proffer now what the

18 rest of the questions are so we don't have to do this.

19         THE COURT:  Where else are you going with this?

20         MS. HARRIS:  I will go directly to the toast that

21 Jason made.

22         THE COURT:  We don't need the details of the toast,

23 just the fact he made one.

24         MR. SCHWARTZ:  And what he said.

25         MS. TEKEEI:  No.

1              MR. SCHWARTZ:  This dinner is an act of seduction,

2      right?  This was Jason Galanis showing the Archers a bit of

3      their life and bringing them into the fold and making them feel

4      loved and honored and whatever.  This goes to the nature of the

5      relationship, and while certainly there have been emails and

6      testimony, there has not been any sort of thing like this that

7      illustrates the true nature of the relationship.

8              THE COURT:  What did she say during the toast.

9              MS. HARRIS:  What I expect her to testify is that he

10     praised Devon in a manner that was over the top, it was -- he

11     laid on the charm.  It was a completely gratuitous act at

12     dinner hosted by his wife for him.  He singled out Devon.  That

13     was -- she will testify it charmed her and it made her feel

14     special.  We are not going to --

15             THE COURT:  I will allow the fact he gave this toast.

16     I don't think whether it charmed her or not is --

17             (Inaudible).

18             THE COURT:  Where else are you going?

19             MS. HARRIS:  Dr. Archer is going to also identify

20     Devon's signature based on his signature chart.

21             MS. MERMELSTEIN:  That is fine.

22             MS. HARRIS:  And offer character testimony.

23             MS. MERMELSTEIN:  Tell us what the questions are.

24             THE COURT:  With respect to just honesty?

25             MS. HARRIS:  Yes, honesty.

I6LJGAL4                          K. Archer - direct

 1              THE COURT:  But no specific instances of conduct,

 2     right?

 3              MS. HARRIS:  No, no.

 4              MR. SCHWARTZ:  Two permitted questions, opinion and

 5     reputation.

 6              MS. TEKEEI:  (Inaudible) she is tending to --

 7     (inaudible) -- and we don't want to have to object.  I

 8     apologize in advance.  I don't want to have to do that so if

 9     she does go on, I want to know.

10              MS. HARRIS:  I will absolutely to my best to --

11     (inaudible) Dr. Archer, so unless I need her --

12              THE COURT:  I will be sensitive to it.

13              MS. MERMELSTEIN:  On the privilege thing, Mr. Archer

14     has tried to suggest in this trial that Sebastian Momtazi was

15     the COO of the company.  That is preposterous.  He is a

16     personal assistant.  It is not true.

17              MS. HARRIS:  There are emails in which --

18              MS. MERMELSTEIN:  I know.  It is not true.

19              Dr. Archer has just said she has nothing to do with

20     her husband's business.  There is a proffer.  She won't testify

21     anything her husband told her.  She has literally no basis for

22     talking about Sebastian Momtazi's increased role.  It is a

23     blatant attempt to offer information in a fashion that allows

24     the suggestion she knows what she is talking about, when she

25     doesn't.  If she knows that, she has waived the privilege on

I6LJGAL4                          K. Archer - direct

1    that question.

2              MS. HARRIS:  I will ask the --

3              MS. MERMELSTEIN:  What is the answer?

4              MS. HARRIS:  The answer is she spoke to Sebastian

5    Momtazi directly and she had introduced him as Devon's

6    assistant and he corrected her.

7              MS. MERMELSTEIN:  It is hearsay.  We move to strike

8    that answer.

9              MS. HARRIS:  That is (multiple voices)

10             MR. SCHWARTZ:  The fact that he was offended and being

11   called an assistant is not hearsay.

12             THE COURT:  I am going to strike her testimony about

13   what Momtazi's role was, but I don't think the privilege has

14   been waived.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1            (In open court)

 2            THE COURT:  I am going to strike the testimony about

 3   what Sebastian Momtazi's role was because it was based on what

 4   we call hearsay, so please disregard that.  You may proceed.

 5   BY MS. HARRIS:

 6   Q.  Dr. Archer, did Jason Galanis give a toast at the dinner at

 7   Il Buco Wine Cellar that evening?

 8   A.  He did.

 9   Q.  What did he toast?

10   A.  He stood up and thanked everyone for coming and he also

11   gave a toast to Devon and said how happy he was to have him

12   there and have him as a new friend and relationship.

13   Q.  Did you have any contact with Monet Berger after that

14   night?

15   A.  No.

16   Q.  Did you consider Jason Galanis and Monet to be friends of

17   yours after that night?

18   A.  I did not.

19            THE COURT:  Overruled.  You can proceed.

20   Q.  Dr. Archer, I would like to bring up Defense Exhibit 4348

21   A, if you could, Mr. Jackson.

22            Have you seen Devon sign documents before?

23   A.  I have many times.  I have known him my whole life and our

24   marriage document and we sign homework assignments together

25   often.

I6LJGAL4                        K. Archer - direct

1   Q.  Would you recognize Devon's signature if you saw it?

2   A.  I would.

3   Q.  Focusing on the first signature on the top half of this

4   page, do you recognize that signature?

5   A.  The top signature, yes, that is Devon's signature.

6   Q.  And the bottom signature?

7   A.  I don't recognize that signature.

8   Q.  Turning to Defense Exhibit 4348 and the final slide in that

9   series, Mr. Jackson.

10          Dr. Archer, I'll apologize, I am going to ask you to

11  walk through these with me one-by-one.  Focusing on the first

12  signature in the first line for DX 4306, do you recognize that

13  signature?

14  A.  I don't.  It looks like the one in the previous slide, the

15  one on the bottom.

16  Q.  In the second row, 4385, do you recognize that signature?

17  A.  Yes, that is Devon's signature.

18  Q.  The third signature in the line for DX 4311, do you

19  recognize that signature, Dr. Archer?

20  A.  No.  It looks like someone is trying to copy it.  No.

21  Q.  The next signature, DX 4317 --

22  A.  4313.

23  Q.  The next signature, yes, thanks.  Do you recognize that

24  signature, Dr. Archer?

25  A.  No.  It looks like the ones from above, but not Devon's

1  signature.

2  Q.  Then the next signature, DX 4317?

3  A.  It looks to be the same as 4313.  Again, I don't recognize

4  that signature.

5  Q.  And the next signature in the series DX 4345, do you

6  recognize that signature, Dr. Archer?

7  A.  That looks like Devon's signature, but it is small.

8  Q.  DX 4333, do you recognize this signature, Dr. Archer?

9  A.  The same thing, it looks small.  I recognize it as Devon's

10  signature, but it looks small and maybe an electronic copy.

11  Q.  And the following signature in DX 2038, do you recognize

12  this signature, Dr. Archer?

13  A.  I do, but this one is blurry, maybe pixilated, maybe it is

14  an electronic signature.

15  Q.  I am sorry?

16  A.  It looks pixilated, a little blurry.  It looks like Devon's

17  signature, but perhaps it was electronic.

18  Q.  The next signature, DX 4388, do you recognize this

19  signature, Dr. Archer?

20  A.  Yes, that looks like Devon's signature.

21  Q.  DX 4389 we can stipulate.

22          GX 762, do you recognize this signature, Dr. Archer?

23  A.  That looks to be like Devon's signature.

24  Q.  Dr. Archer, do you and Devon have any friends in common?

25  A.  We do.  We have known each other our whole lives so we have

I6LJGAL4                         K. Archer - direct

1    a lot of friends still from grade school.

2    Q.  You obviously live in the same community?

3    A.  Yes.

4    Q.  I have to ask these in kind of a formulaic way.  You have

5    had the chance to see Devon interact with your friends and

6    others in the community, right?

7    A.  Yes, of course.

8    Q.  Have you heard people discuss Devon?

9    A.  Yes.

10   Q.  Are you aware of whether Devon has a reputation for honesty

11   and trustworthiness in your community?

12   A.  I believe he does have a reputation to be honest and

13   trustworthy, to distinguish between older friends and newer

14   friends, he is a lacrosse coach now, so those people nominated

15   him to be that.

16            (Inaudible).

17   BY MS. HARRIS:

18   Q.  Do you have an opinion whether Devon is an honest and

19   trustworthy person?

20   A.  Yes, I think he is an honest and trustworthy person and I

21   believe he would do the right thing.

22            MS. HARRIS:  Thank you very much, Dr. Archer.

23            THE COURT:  Cross-examination.

24            MS. TEKEEI:  Just one moment, your Honor.

25            THE COURT:  Sure.

1              (Off-the-record discussion)

2    CROSS EXAMINATION

3    BY MS. TEKEEI:

4    Q.  Good afternoon, Dr. Archer.

5          Dr. Archer, you were asked to identify Sebastian

6    Momtazi.  Do you recall that testimony?

7    A.  Yes, I do.

8    Q.  Sebastian Momtazi was Mr. Archer's personal assistant?

9    A.  Correct.

10   Q.  For example, he would send out schedules for Mr. Archer's

11   daily activities.  Is that right?

12   A.  I'm not sure how he would send them, no, I am not sure.

13   Q.  Well, you were sometimes copied on emails that Sebastian

14   Momtazi sent regarding Mr. Archer's day-to-day activities.  Is

15   that right?

16   A.  Really only when I was involved.  I often received an email

17   from Seb, yes.

18   Q.  And sometimes Mr. Momtazi would let Mr. Archer know, for

19   example, when it was time to go to the gym?

20   A.  I don't recall.

21   Q.  Ms. Sheinwald, if you could pull up for the witness, Judge

22   Abrams and the parties Government Exhibit 5010.

23         Without reading from this, does this refresh your

24   memory that Mr. Momtazi would sometimes send out the daily

25   schedule of Mr. Archer's activities?

I6LJGAL4                     Archer - cross

1   A.   Yeah, but this doesn't have anything with going to the gym,

2   so that is why I was confused by your question.

3   Q.   If you could look at the middle email, do you see a

4   schedule for the day?

5   A.   Yeah, but I don't know if I was on that particular.  When I

6   see I was on the one at the top that says Dima picking you up

7   at yours at 10:00 am.

8   Q.   That was in reference, what you just read, to the person

9   who was to pick up Mr. Archer at the airport, right?

10  A.   Yeah, because he was going to --

11  Q.   And Mr. Momtazi was arranging for someone to pick up Mr.

12  Archer at the airport?

13  A.   Yes.

14  Q.   The types of tasks that a personal assistant would do?

15  A.   Yes.

16        MS. TEKEEI:  Thank you, Ms. Sheinwald.  You can please

17  take that down.

18  BY MS. TEKEEI:

19  Q.   Now, you testified earlier that you obviously didn't work

20  at Rosemont Seneca Bohai, right?

21  A.   Correct.

22  Q.   You didn't participate in Mr. Archer's day-to-day business

23  dealings?

24  A.   Correct.

25  Q.   You weren't copied on his business emails.  Is that right?

I6LJGAL4                          Archer - cross

1   A.  Correct.

2   Q.  You weren't part of his work-related phone calls?

3   A.  Correct.

4   Q.  You didn't go to his business meetings with him?

5         You didn't generally go on his business trips with

6   him?

7   A.  No.  I was with the kids generally.

8   Q.  Showing you again Government Exhibit 2082, Ms. Sheinwald,

9   would you please publish that to everyone and if you could turn

10  to the second page.  Let's just take a look at the attachment

11  which appears slightly grainy.

12        You testified earlier that the picture at the top is

13  of Mr. Archer, and over on the right, about the or fourth

14  person down is Jason Galanis.  Do you recall that testimony?

15  A.  Correct.  I am sorry.  I don't know the preceding slide.

16  Was it an -- I didn't see that that matters.  I didn't read

17  that part.

18  Q.  Of course.  That is all right.

19        Ms. Harris I believe just showed you the second page,

20  and that is all we are showing you again now.

21  A.  Okay.

22  Q.  If you could look at the picture that is just below that

23  main picture at the top, do you see the picture on the

24  bottom-right-handl corner?

25  A.  It is cut off.

I6LJGAL4                          Archer - cross

1    Q.  Not all the way in the bottom.  In the middle, yes?

2    A.  Yes.

3    Q.  Do you recognize the person at the left of that picture?

4    A.  That is the picture of Devon.

5    Q.  And the person at the far right of that picture, do you

6    recognize that person?

7    A.  I can't tell from this picture.  I don't think so.

8    Q.  Thank you.  Ms. Sheinwald, you can please take that down.

9          Again putting aside any discussions that you had with

10   your husband, I am not interested at all in that.  You didn't

11   know what types of investments he made in his business work?

12   A.  I did not.

13   Q.  Or where he got the money to make those investments?

14   A.  Correct.

15   Q.  You don't know what his involvement was in the acquisition

16   of Burnham?

17   A.  Correct.

18   Q.  You didn't go to meetings with him to the Board of Trustees

19   of the Burnham Investors Trust, did you?

20   A.  Of course not, no.

21   Q.  You didn't participate in his purchase of Wakpamni bonds on

22   behalf of Rosemont Seneca Bohai?

23   A.  Correct.

24   Q.  And you weren't part of his business dealings with Jason

25   Galanis?

I6LJGAL4                        Archer - cross

1    A.  Correct.

2    Q.  Or Bevan Cooney?

3    A.  Correct.

4         MS. TEKEEI:  No further questions.

5    CROSS EXAMINATION

6    BY MR. TOUGER:

7    Q.  Good afternoon, Dr. Archer.  Up until yesterday, had we

8    ever spoken?

9    A.  I have seen you in court, but no.

10   Q.  We have never spoken about the case at all?

11   A.  No.

12   Q.  By the way, may the man in the wheelchair, that is John

13   Galanis, right?

14   A.  Yes.

15   Q.  Have you ever seen that man before?

16   A.  Besides here, no.

17   Q.  At the birthday party for Jason Galanis, he was not there?

18   A.  Correct.

19        MR. TOUGER:  Nothing further.

20        MS. NOTARI:  No questions.

21        THE COURT:  Is there any redirect?

22        MS. HARRIS:  No, your Honor.

23        THE COURT:  You may step down.

24        (Witness)

25        THE COURT:  Why don't we take our lunch break now.  So

I6LJGAL4                         Archer – cross

1    to the jury, please remember keep an open mind.  Don't discuss

2    the case.

3              (Jury excused).

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6L7GAL5

1            MR. QUIGLEY:  I don't know what.

2            THE COURT:  Any progress?

3            MR. QUIGLEY:  I don't know what Mr. Schwartz intends

4    to read in in the afternoon.

5            MR. SCHWARTZ:  So the ones that I understand the

6    government is objecting to that we are intending to publish

7    today, if we can take them in order.  1446, whoever has control

8    can bring that up.  Am I telling you for now, or do you want to

9    go through them?

10            THE COURT:  Look, if on the lunch break you can try

11    and work that out.

12            MR. SCHWARTZ:  We haven't talked yet, so maybe.

13            THE COURT:  Why don't do you that.  Try and meet back

14    here at 1:45, and then any remaining disputes we will talk

15    about then.  Does that work?

16            MR. QUIGLEY:  That's fine.

17            THE COURT:  Good.  Thank you.

18            (Luncheon recess)

19            (Continued on next page)

20

21

22

23

24

25

I6LJGAL6

1           AFTERNOON SESSION

2           1:45 pm

3           (Trial resumes)

4           (In open court; jury not present)

5           THE COURT:  I understand you're still talking about

6    exhibits?

7           MR. QUIGLEY:  Yes.

8           THE COURT:  All right.  Good.

9           (Pause)

10          MR. QUIGLEY:  There are five exhibits.

11          Judge, I think we have successfully narrowed the

12   disputes to three of them.

13          THE COURT:  Thank you.

14          MR. QUIGLEY:  The exhibits that are still in dispute

15   are 4825, 4826 and 4128.  I think they relate to the same

16   topic, and our objection to them is generally hearsay.  They

17   refer to a transfer of $3.1 million from Valor Life in December

18   2014 to, purportedly to purchase Wakpamni bonds.  Those bonds

19   were never purchased, but again the emails are just full of

20   factual information about the bonds by people who are not

21   testifying at this trial, are not here:  Elizabeta Sockborn

22   from Wealth Assurance.  Mr. Anderson, I would add, was asked

23   about some of this stuff on his cross, and he didn't really

24   have a recollection of anything.  There is some evidence in the

25   record, we think emails themselves contain multiple levels of

I6LJGAL6

1    hearsay.

2             THE COURT:  Can we just print these three for me.

3             MR. SCHWARTZ:  Perhaps you should have them.  I told

4    Mr. Quigley, we want them, very limited parts of them.  There

5    is a lot of stuff in there.  I am not offering it for a hearsay

6    purpose, but that said, I don't need the other stuff if they

7    find it problematic.

8             The issue is, as he says, the three emails all have to

9    do, in addition to some others they don't object to, with the

10   purported purchase by Valor Life of WLCC bonds, and then Valor

11   Life wires funds to the Cliff Wolff law firm in what it

12   believes is a transaction to acquire the bonds.

13            Their summary witness testified yesterday that that

14   wire was, in fact, the wire that went from Valor Life to Cliff

15   Wolff and ultimately was used to buy Mr. Galanis' apartment.

16   So one purpose is to impeach the testimony of Agent Kendall.

17   She testified that she had looked at emails and things

18   reflecting the purposes of wires, including that very wire, but

19   she hadn't looked at these.  So I was able to introduce them

20   then, but I think they are fairly introduced for that purpose.

21            THE COURT:  For the purpose of impeaching the charts

22   that she introduced because she hadn't reviewed them?

23            MR. SCHWARTZ:  Impeaching her, her testimony.

24            THE COURT:  But you said she didn't review them?

25            MR. SCHWARTZ:  That is what her testimony was.

I6LJGAL6

1          More specifically, as are more generally and more

2     centrally, the relevance of this line of evidence is that the

3     same representations which were not true; and, therefore, are

4     not being offered for their truth, were made to the board of

5     directors of Valor Life, which considered the issue and

6     formally authorized the purchase of WLCC bonds for Valor Life's

7     inventory and then was on all sorts of communications about the

8     mechanics of that transaction.  The lawyer, Tim Anderson, was

9     involved.

10          Later on when the finance function was trying to get

11     information about the bonds, and that is what I had questioned

12     Mr. Anderson about at the very beginning, and that is directly

13     relevant here because the picture that the jury has right now

14     is that the bonds were either foisted upon the clients of

15     Atlantic and Hughes by Ms. Morton and Mr. Galanis and

16     Mr. Hirst, or they were purchased by what the government

17     obviously says are co-conspirators, Mr. Archer and Mr. Cooney,

18     who -- I don't know exactly what their theory is why they did

19     that, but it is not an innocent explanation.

20          This is evidence that a real corporate board actually

21     considered the issue and made a decision to purchase WLCC bonds

22     and transacted and was with all the same players; Dunkerley,

23     Tim Anderson, Mr. Archer and Cooney were dealing with.

24          It is evidence, critical evidence to come in to

25     complete the picture there, though the instructions to banks

I6LJGAL6

1    and things like that to complete the wire I understand the

2    government not to object to.  That is not hearsay.

3            What they're objecting to is, I am not sure exactly

4    which parts of it, but some of the corresponding

5    communications.  As I said, most of that I am very happy to

6    redact.  That is not what --

7            THE COURT:  Why don't you specify exactly which

8    communications you want in.

9            MR. QUIGLEY:  On the relevance point, none of the

10   defendants in this case were involved in this bond transaction.

11           Again, what happened was, in reality what happened was

12   the money was wired from Valor Life to the bank account of

13   Wolff, and then it was used to buy Galanis' house.  There is no

14   evidence -- his apartment.  None of the defendants in this case

15   had any involvement of that, knowledge of that, and there is a

16   reason that nobody really knew about it, including Tim

17   Anderson, when they were cross-examined.  The bonds never

18   actually changed hands.  So it is of limited relevance.

19           There is a whole 403 issue about this faux transaction

20   involving these bonds.

21           THE COURT:  Was this the subject that the transfers of

22   one of the charts that was admitted by Agent Kendall?

23           MR. QUIGLEY:  It just shows money going from Valor

24   Life to the Wolff law firm.  It doesn't show what that was for.

25   It shows the money went from Valor Life to the Wolff law firm

I6LJGAL6

and next day wired out in connection with the sale of Jason
Galanis' apartment.

I don't think it is impeaching of her at all.  She
didn't opine what the money was for and she has never seen it.
She testifies about a wire coming in and a wire transfer going
out, and again none of the defendants in this case were
involved in this, in this part of it.  We're not alleging that
they were.

The fact that the board -- it is also the board of
Valor Life approved the transaction, the voting board members
are, including Hugh Dunkerley and Jason Sugarman, one indicted
co-conspirator and one in indicted co-conspirator.  So the
point that Mr. Schwartz I think wants to make is there was
legitimate interest in the marketplace in these bonds, is
really belied by that and it gets into a whole 403 issue about
the approval of process of Valor Life for these bonds, and no
one on trial here was involved in it.  It is not something we
are going to stand up and argue about certainly in summation or
rebuttal.

MR. SCHWARTZ:  They're going to make a broader
argument.  I know it is the government's theory that Jason
Sugarman is a co-conspirator, but I submit to you there has not
been sufficient evidence in this trial for your Honor to
conclude that even by a preponderance of the evidence.  If you
didn't know that from the government having said it, I think

I6LJGAL6

you wouldn't even think that.  I suspect this jury doesn't
think that.

Even if the government is not going to argue Mr.
Archer had knowledge of this specific transaction, what they're
going to do is argue, based on what is in evidence, inferences
essentially that there must have been imagined communications
between Mr. Galanis and Mr. Archer.  That is the only point of
contact.

Your Honor has now sat through the entirety of the
government's case.  You know that there are no witnesses who
have testified about the substance of those communications, no
witness who has testified they have talked to Mr. Archer about
the bonds.  In fact, and the government is going to argue there
is an inference from the emails and things that are in evidence
that those sorts of communications must have occurred.

I think that is not even a proper inference, which is
why I think I have a strong Rule 29 motion.  If they're allowed
to argue that inference to the jury, then I need to have
ammunition to argue the opposite inference, which is that
things like this show that Galanis and others were telling lies
to and fooling others into purchasing WLCC bonds with the real
money.  That allows me to counter the argument that the
government is going to make.

If they're not going to argue there were
communications between Mr. Archer and Mr. Galanis, in which

I6LJGAL6

they somehow put Mr. Archer on notice of the fact that the bond
proceeds were being misappropriated, then that is fine, but
they're going to make that argument and they're also going to
look at those money charts and say you can infer from where the
money goes that people involved in those transactions knew the
purpose.

          I have to be able to rebut that because here is a case
where they have a chart, and the chart shows the money went
from Valor Life to Cliff Wolff and ended up in an apartment.
There is evidence that says Valor Life had no idea about that,
Valor Life was tricked into sending their money to Cliff Wolff
for that purpose, and you know that to be true because you see
the communications between Tim Anderson and the finance
function of Valor Life talking about the logistics for
receiving the bonds and things like that afterwards.

          If the government is going to make those inferences
from the evidence, from the money flows, then I have to have
the ammunition to rebut those inferences.

          MR. QUIGLEY:  I don't think it is a fair rebutting of
the inferences the government seeks to draw.  Again, nothing
was hidden from Valor Life.  Yes, they were lied to, but the
transaction was approved by again an indicted co-conspirator
and unindicted co-conspirator.  Their whole, a whole theme of
the defense cross has been tying Mr. Sugarman and Mr. Jason
Galanis together at the hip.  I reject that that it is

I6LJGAL6

probative of the defendants in this case being lied to or
mislead about the bonds.  I think it creates a whole 'nother
issue about a whole 'nother bond transaction that never, in
fact, happened.

          THE COURT:  Who is on the Valor Life board aside
from --

          MR. QUIGLEY:  Rory Knight and Aloise Stoyken.

          MR. SCHWARTZ:  We heard testimony from Mr. Dunkerley
that Dr. Knight was the dean of Oxford Business School and
Aloise Stoyken was, if I recall correctly, had had a
preexisting association with the company before any of these
people were involved.

          MR. QUIGLEY:  The resolution in the board of
director's meeting is that the board is putting its trust in
the proven expertise of Jason Sugarman and Hugh Dunkerley to
invest, to purchase these bonds.  That is who was driving this
transaction.  To the 403 point, there is a similar resolution
already in evidence about the purchase of Wealth Assurance
Group's purchase of Hughes Capital Management, that they were
putting their trust in Jason Sugarman and Hugh Dunkerley.

          On that point to impeach Sugarman and Dunkerley, it is
cumulative and it is not relevant to the bond transactions at
issue here.

          THE COURT:  If you can just say the numbers again,
4825, 4826 and 4828?

I6LJGAL6

1                MR. QUIGLEY:  4128.

2                THE COURT:  4128?

3                MR. QUIGLEY:  Yes.  4825, 4826 and 4128.

4                THE COURT:  Do you have those and can you print those?

5                MR. QUIGLEY:  I can hand them up.

6                MR. SCHWARTZ:  Do you have all the attachments and

7    stuff?

8                MR. QUIGLEY:  Yes.

9                (Recess)

10               THE COURT:  I want to follow up on a couple of things

11   regarding these documents.  First of all, when do you intend to

12   read these, this afternoon?

13               MR. SCHWARTZ:  It depends on how things go.

14               We're going to have Ms. Notari's witness, then the

15   expert, then we will read a different series of emails to which

16   there is a short -- we have been doing short series, obviously,

17   but another short series of emails to which there is no

18   objection.  We are going to play that recording and then we

19   come to this series of emails.

20               THE COURT:  I will decide by the afternoon break.

21               I guess the question that I have is with respect to

22   the argument, Mr. Quigley, you made that, look, Mr. Dunkerley

23   and Sugarman were the ones controlling these.  In any event, it

24   is not especially probative.  Is there anything to Mr.

25   Schwartz's argument the other two members, Rory Knight, and

I6LJGAL6

1   other individual who were the other members of the board were

2   similarly duped?

3              MR. QUIGLEY:  I don't think the argument is Dunkerley

4   or Sugarman duped any of the defendants in this case.  The

5   arguments is they were duped by Jason Galanis.  I don't

6   think -- no, I don't.

7              THE COURT:  Is there anything about these documents

8   you think can come in?

9              MR. QUIGLEY:  I don't have them in front of me.

10             THE COURT:  Do you want to borrow my copies and then

11  give them back and let me know?

12             We borrowed them from you?  Sorry.  I usurped them.

13             Why don't you look at them and let me know and we'll

14  bring the jury in.  We'll proceed and then let me know and I'll

15  rule on it.  All right.  We are going to bring the jury in at

16  this point.

17             (Off-the-record discussion)

18             (Recess)

19             THE COURT:  They're on their way.

20             MR. SCHWARTZ:  The first witness is Ms. Notari's

21  witness who has to be taken out of order.  If your Honor could

22  say something to make clear that is what is happening.

23             THE COURT:  Sure.

24             MR. SCHWARTZ:  Thank you.

25             (Jury present)

I6LJGAL6

 1            THE COURT:  Thank you.  So, ladies and gentlemen, we

 2    are just going to for scheduling purposes take a witness out of

 3    order.  We are going to hear from one of Mr. Cooney's witnesses

 4    now and then we'll go back to Mr. Archer's case.

 5            MS. NOTARI:  Before we get started, if I could read

 6    some exhibits into evidence.

 7            THE COURT:  Sure.

 8            MS. NOTARI:  These exhibits, there is no objection and

 9    they have been stipulated to or they have been moved into

10    evidence.

11            THE COURT:  All right.

12            MS. NOTARI:  Defense Exhibit DX 3056 A, 3062, 3063,

13    3156, 3162 B, 3504, 3512, 3519, 3520, 3532, 3703, 3709, 3710,

14    3755, 3760, 3761, 3763, 3764, 3206, 3207, 3208, 3209, 3239,

15    3248, 3250, 3251, 3252, 3254, 3256, 3259, 3261, 3262, 3270,

16    3271, 3272, 7273, 3274, 3285, 3521, 3541, 3583, 3590, 3592,

17    3527, 3263, 3266, 3286, 3277, 3282.

18            3711, the 1920 video was not moved into evidence, so

19    we are moving that into evidence.

20            THE COURT:  With the redactions we talked about

21    earlier?

22            MS. NOTARI:  Yes.  3800 was the excerpt from 3004 A.

23    3901 is Mr. Cooney's exhibit stipulation.  Government exhibit,

24    no objection from the government, Government Exhibit 525,

25    Government Exhibit 512, Government Exhibit 432 and then the

I6LJGAL6                        Laventhirarajah - direct

1    real estate transaction documents are 1920 Bel Air.  I have

2    them, your Honor.  Do you have a copy?  I have the originals.

3    The government -- DX 3720 through DX 3734.

4              THE COURT:  Right.  Those are admitted.  The rest will

5    be admitted.

6              MS. NOTARI:  3415, 3455, 3755, 3232, 3233, 3234, 3236,

7    3240, 3246, 3247, 3258, 3260, 3280, 3283, 3516 A, 3291, 3292,

8    3293, 3294, 3382, 3381, 3121, 3053 and Government Exhibit 3209.

9              THE COURT:  They'll all be admitted.

10             MS. NOTARI:  If I may call my witness?

11             THE COURT:  Yes.

12             MS. MERMELSTEIN:  We have no objection those exhibits.

13             Ms. Notari originally referred to Defense 3209, not

14   Government 3209.  I want to confirm what she is offering.

15             MS. NOTARI:  Government Exhibit 3209.

16             MS. MERMELSTEIN:  No objection.

17             THE COURT:  Thanks.

18             MS. NOTARI:  Mr. Hassan went to get the witness.

19             (Pause)

20    SARANYA LAVENTHIRARAJAH,

21        called as a witness by the Defendants,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MS. NOTARI:

25   Q.  Good afternoon, Ms. Laventhirarajah.

1    A.   Good afternoon.

2    Q.   Is it okay if we call you Saranya?

3    A.   Of course.

4    Q.   How are you employed?

5    A.   I am currently a paralegal.

6    Q.   How long have you been a paralegal?

7    A.   For six years now.

8    Q.   What is your educational background?

9    A.   I have a bachelors in public accounting as well as business

10   management and finance.

11   Q.   When did you graduate?

12   A.   May 2017.

13   Q.   Did you work as a paralegal during your undergraduate

14   studies?

15   A.   Yes.

16   Q.   Who did you work for?

17   A.   I worked for the law offices of Travis & Konoski.

18   Q.   What were your responsibilities with the law offices of

19   Travis & Konoski?

20   A.   I was a medical records coordinator as well as a case

21   manager for their social security disability cases.  I also did

22   a lot of discovery review for Mr. Konoski, who was a criminal

23   defense attorney, and he handled state and federal matters.

24   Q.   What were your responsibilities in those criminal cases?

25   A.   Discovery reviews, summarizing evidence.

1   Q.   In that capacity, did you you ever prepare summary charts?

2   A.   Yes.

3   Q.   How is it that you became involved in this case?

4   A.   I wanted a bit more of a flexible schedule to be able to

5   study for the law school admissions test, so I was referred to

6   you, Ms. Notari, from Brian Konoski.

7   Q.   How long have you been working on this case with me?

8   A.   Since February 2018.

9   Q.   Have you participated in the preparation of a summary chart

10  in connection with this trial?

11  A.   Yes.

12  Q.   Generally speaking, what kinds of things did you review in

13  connection with the preparation of your chart?

14  A.   Generally speaking, I looked at bank statements, different

15  financial documents, a lot of emails and also in some instances

16  other testimony.

17  Q.   When you say "testimony," do you mean portions of the trial

18  transcript in this case?

19  A.   Yes.

20  Q.   Where did you get the materials that you received?

21  A.   They were given by you, Ms. Notari, and also Mr. Cooney's

22  other lawyer, Mr. Hassan.

23  Q.   In broad strokes, what kinds of analysis did you do of

24  these documents?

25  A.   So it was basically looking at different wire transactions

1     from Mr. Cooney's City National Bank account starting from

2     March 2013, which is when he invested in Burnham all the way to

3     July 2015.

4     Q.  Is this chart based on documentary evidence or testimony

5     admitted at this trial?

6     A.  Yes.

7     Q.  Is this chart based on the evidence you have reviewed?

8     A.  Yes.

9     Q.  Let me direct your attention to what has been defense

10    Exhibit 3802.  Do you have that in front of you?

11    A.  Yes.

12    Q.  Is this chart familiar to you?

13    A.  Yes.

14    Q.  Is that the chart that you prepared in this case?

15    A.  Yes.

16          MS. NOTARI:  I would like to move Defense Exhibit 3802

17    into evidence.

18          MS. MERMELSTEIN:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 3802 received in evidence)

21          MS. NOTARI:  With court's permission, I have already

22    checked with the government.  Okay if I pass these out?

23          THE COURT:  Sure.

24          (Pause)

25    BY MS. NOTARI:

1   Q.  Saranya, if you can just generally look at the chart and --

2              THE COURT:  Do you have an extra copy, Ms. Notari?

3              MS. NOTARI:  Yes, I do.

4              THE COURT:  Thank you.

5              MS. NOTARI:  I didn't give it to you?

6              THE COURT:  No.

7              (Pause)

8   BY MS. NOTARI:

9   Q.  Now, Saranya, if you could just tell us generally what did

10  you try to encapsulate on the summary chart before you?

11  A.  This summary chart has basically all of Mr. Bevan Cooney's

12  wire transactions, whether incoming or outgoing, to any other

13  person or entity related in this case starting from March 2013

14  to July 2015.

15  Q.  How did you determine which wire transfers were related to

16  this case?

17  A.  Through discussions with the attorneys, and the attorneys

18  also gave me a list of entities to look for while reviewing the

19  discovery.

20  Q.  I'd like to focus on the information you provided on this

21  chart beginning with the first column, tran date.  Tell us what

22  that means.

23  A.  Tran Date is basically the date of the transaction, which

24  is the date the wire transfer occurred.

25  Q.  In the next column we see it says direction.  Can you

1    explain what that means.

2    A.  Yes.  Direction is, it would be either incoming or outgoing

3    wire transfer into or out of Mr. Cooney's bank account.

4    Q.  When you say "incoming," what would that mean?

5    A.  An incoming wire transfer is when you yourself send money

6    to another person's bank account.  In this case, it would be

7    Mr. Bevan Cooney sending money from his bank account to another

8    person or another entity.

9    Q.  What would be an outgoing wire?

10   A.  An outgoing wire is when another person or another entity

11   sends money to you, or in this case it would be to Mr. Bevan

12   Cooney's bank account.

13   Q.  So if we go to the first transaction, outgoing was money

14   going --

15   A.  Yes.  The first transaction happened on the 14th of March

16   in 2013.  It was an outgoing wire transfer in the amount of

17   $400,000 from Bevan Cooney to an entity called Hunter Taubman

18   Weiss, LLP and if you look at the last column, you will see

19   three different exhibits that verify that amount.

20   Q.  So where it says "amounts," that number in the chart, where

21   did that number come from?

22   A.  This was given in the wire transfer in the actual bank

23   statement.

24   Q.  Where it says "from," what does that mean?  What

25   information is provided there?

I6LJGAL6                              Laventhirarajah - direct

1    A.  The "from" column has the originator of the wire transfer,

2    which is also the original account where the money came from.

3    Q.  Where does that information come from?

4    A.  It is also given in the wire transfers in the bank

5    statement.

6    Q.  Where it says "to" in the column, what information is

7    provided there?

8    A.  That would be the account where the money was sent to.

9    Q.  Where does that information come from?

10   A.  That is also given in the wire transfer in the bank

11   statement.

12   Q.  I think there was some confusion.  First, have you ever

13   testified before?

14   A.  No.

15   Q.  Are you nervous?

16   A.  No.

17   Q.  No?

18   A.  No.

19   Q.  What do you do in your pastime?

20   A.  I am a dancer.  I don't really get stage fright.  It is

21   very comfortable for me.

22   Q.  What kind of dancing?

23   A.  Classical Indian dance, modern, contemporary and ballet.

24   Q.  You may not get nervous, but I think you should just

25   clarify outgoing and incoming wires again.

1    A.   Yes.

2    Q.   Outgoing, go ahead?

3    A.   Outgoing, an outgoing wire is when someone else sends you

4    money.   So in this case it would be another person or another

5    company sending Mr. Bevan Cooney money to his bank account.

6            An incoming is the complete opposite.   So when Bevan

7    Cooney sends money from his account to another person or

8    another entity.

9    Q.   Again I am confused.   An outgoing wire is in the first

10   transaction?

11   A.   Right.

12   Q.   It is money going from Bevan Cooney out to another source?

13   A.   Right, from Bevan Cooney to this company called Hunter

14   Taubman Weiss.

15   Q.   So the money is actually leaving Mr. Cooney's account and

16   going to Hunter Taubman Weiss?

17   A.   Right.

18   Q.   And incoming would be if we go down to March 3, 2014, that

19   would be money going from Thorsdale Fiduciary & Guaranty to

20   Bevan Cooney, correct?

21   A.   Yes.

22   Q.   And let's just go over government exhibit, the last column.

23   Explain to us what that is.

24   A.   So this last column has different exhibits that would

25   verify the wire transfers.   So some of these exhibits could be

1   a bank statement, in some instances it could be an email.  In

2   other instances, it could be a financial document.

3   Q.  I see there it says TR-169.  What is that?

4   A.  That is actually a page from the trial transcript, and

5   specifically it is actually someone's testimony.

6   Q.  If we could pull up, Mr. Hassan, DX 3291.

7          Can you please tell us what we're looking at.

8   A.  Sure.  Exhibit 3291 is a defense exhibit, and it is a wire

9   transfer detail.  You will see --

10  Q.  We want to wait until everyone has it on their screen.

11         (Off-the-record discussion)

12         MS. NOTARI:  Who doesn't have it on their screen?

13         JUROR:  I don't have it.

14         THE COURT:  We'll work on the screens right now.

15         (Pause)

16         THE COURT:  We have to call our IT folks.  In the

17  meantime, if you could look over people's shoulders.

18         (Off-the-record discussion)

19         THE COURT:  Thank you all for changing seats.

20         MS. NOTARI:  Sorry.

21         (Pause)

22  BY MS. NOTARI:

23  Q.  Saranya, if you look at 3291, and if we can focus where

24  would you provide the information as to where in this

25  transaction, where was the money -- just explain what is in

1    this document.

2    A.  You'll see the debit amount which was $400,000, that's the

3    amount that was sent over.  You'll see the debit name, which is

4    Bevan Cooney.  That is where the money came from.

5    Q.  Just debit address, what is that reference?

6    A.  That is Bevan Cooney's address.

7    Q.  Is that his home address?

8    A.  Yes, but it says care of Fulton Myer, so they were the

9    people in charge of his money and his businesses.

10   Q.  Is Fulton & Meyer consistently referenced in almost all of

11   these documents?

12   A.  Yes.

13   Q.  Did you review email in connection with this case regarding

14   emails between Mr. Cooney and Fulton & Meyer?

15   A.  Yes.

16   Q.  Hunter Taubman -- beneficiary, what is that?

17   A.  Beneficiary information, Hunter Taubman Weiss, that is the

18   account where the money went into.

19   Q.  If we can just pull up 3209, Government Exhibit 3209.

20   Please tell us what we're looking at here.

21   A.  This is an email at the bottom where Bevan Cooney asks one

22   of his managers, Alexis Gluckman --

23            MS. MERMELSTEIN:  I am sorry.  I am happy to have the

24   witness read from the document, but I think she is testifying

25   beyond her personal knowledge.

1          THE COURT:  That is right.  If you can read the

2    document.  I wouldn't summarize it.

3          THE WITNESS:  Sure.

4    A.  Alexis, can you send me the wire proof for $400,000 for

5    Burnham Investment from last year.  Also three other outgoing

6    wires.  I think to Gorsil, 100 K, 350 K, 135 K.  Thanks.

7    Q.  So you say the subject of this email is wire proof?

8    A.  Yes.

9    Q.  And what documents are referenced underneath that?

10   A.  There are four attachments:  One, the first one, Oxford

11   Metrica; the second one, Thorsdale; the third one, Hunter

12   Taubman Weiss; and the last one, Anslow & Jaclin.

13   Q.  Are these four wires, are these wire transactions?

14   A.  Yes.

15   Q.  And are they reference on your chart?

16   A.  Yes.

17   Q.  And where would we find -- where is Oxford Metrica on your

18   chart?

19   A.  Oxford Metrica is the fourth row, August 13, 2013, the

20   fourth transaction is the one to Oxford Metrica.

21   Q.  Where is the transaction involving Hunter Taubman Weiss?

22   A.  That is the very first one on the chart.

23   Q.  Where is the transaction involving Anslow & Jaclin?

24   A.  That is the second one on the chart.

25   Q.  And the Thorsdale Fiduciary & Guaranty is?

1    A.  The third one on the chart.

2    Q.  If we can just pull up Government Exhibit 3294, and what is

3    that?

4    A.  This is the proof of the wire transfer from Bevan Cooney to

5    Anslow & Jaclin, LLP.

6    Q.  This verifies which transaction?

7    A.  This verifies the second transaction on the chart.

8    Q.  If we go down to DX 3236, what is this?

9    A.  This is an email where Mr. Cooney is asking Alexis Gluckman

10   to please wire 35 K this A.M., this morning, wire instructions

11   are attached.  Thank you.

12   Q.  Can we go to the next page.  Which transaction does this

13   verify?

14   A.  This verifies the fourth transaction on the chart from

15   Bevan Cooney to Oxford Metrica Limited.

16   Q.  Here you reference trial transcript 1290 to 1291.  What is

17   that?

18   A.  This is an excerpt from a testimony during this trial.

19   Q.  What was that testimony about?

20   A.  That testimony basically, the person verified that there

21   was someone named Dr. Rory Knight who was involved in this

22   case.  He was the owner of Oxford Metrica Limited.  He is also

23   on the board of Wealth Assurance.

24   Q.  You can stop there.

25           Basically you were able to verify that Oxford Metrica

1   Limited was related to this case, correct?

2   A.  Yes.

3   Q.  Let's go to Government Exhibit 423, the last page.

4           If we can just go to the page before that.  I am

5   sorry.  Now, is there anything on this -- first of all, what am

6   I looking at?

7   A.  This is a balance sheet.

8   Q.  Is this evidence in this trial that you reviewed?

9   A.  Yes.

10  Q.  Did you review it with the lawyers in this case?

11  A.  Yes.

12  Q.  Were you able to verify any of the transactions on your

13  sheet with what is listed in Government Exhibit 423?

14  A.  Yes.  So on the balance sheet under other current assets,

15  you'll see investment in Burnham function for $400,000.

16  Q.  Where is that on your chart?

17  A.  That is the very first transaction on the chart.

18  Q.  Is there another --

19  A.  Yes.  Loan to Jason holmby, 95,000, that is also on the

20  chart, the second one on the chart.

21  Q.  Let's focus on that.

22          What was your basis for relating -- why did you put

23  Jason holmby in connection with what is the second entry on

24  your chart?

25  A.  So there is an email.

1    Q.  If we can pull up Government Exhibit 3233 -- sorry --

2    Defense Exhibit 3233.

3              THE COURT:  I think all the screens are working now.

4              THE JURY:  Yes.

5              THE COURT:  Thank you.

6    BY MS. NOTARI:

7    Q.  What is that?

8    A.  This is an email from holmby, Jason at holmbycompanies to

9    Bevan Cooney, and on the next page you'll see, yes, you will

10   see wiring instructions where Mr. Holmby or in this case Jason

11   Holmby asked Bevan Cooney to wire a certain amount in U.S.

12   dollars to this account name called Anslow & Jaclin.

13   Q.  If we can go back to the first page, the email address

14   where it says "from," what email is that?

15   A.  Jason at holmbycompanies dot com.

16   Q.  Referring to what is on your chart as trial transcript 169,

17   what is the relevance of that?

18   A.  There was testimony where it was confirmed that this email

19   address, Jason at holmbycompanies dot com, or Jason Holmby, is,

20   in fact, also Jason Galanis.

21   Q.  So if we could just skip down now on your chart to the

22   entry on November 10, 2014, can you please tell us what that

23   is.

24   A.  On November 10, 2014, there was an incoming wire transfer

25   in the amount of $100,000 from a company Thorsdale Fiduciary &

I6LJGAL6                        Laventhirarajah – direct

1  Guaranty to Bevan Cooney's bank account, and you'll see three
2  exhibits that verify that transaction.
3  Q.  Can you tell us what is DX 3257?
4  A.  3257 is a wire transfer document from the City National
5  Bank statements.
6  Q.  What is GX 522?
7  A.  That is Thorsdale's Chase Bank statements.
8  Q.  What is GX 432?
9  A.  That is a document from the discovery which has all of
10 Cooney's wire transfers.
11 Q.  What specifically is that document?  Is it a bank document?
12 A.  From CNB, City National Bank.
13 Q.  If we go down to November 12, 2014, but directly below
14 that, what is that?
15 A.  What was that?
16 Q.  If we go right below to November 12, 2014?
17 A.  Yes.
18 Q.  What is that?  Can you please describe that transaction?
19 A.  There are two transactions on November 12th.  The first one
20 is an incoming wire in the amount of $3,895,000.00 from Wealth
21 Assurance Private Client to Bevan Cooney, and you'll see three
22 exhibits that verify that.
23        The second transaction is an outgoing one in the
24 amount of $100,000 from Bevan Cooney to Camden Escrow, and
25 there is also another two exhibits that verify that transfer.

1    Q.   If you just go right below that, the next transaction?

2    A.   13th of November, 2014, an outgoing wire transfer in the

3    amount of $3,850,000.00 from Bevan Cooney to Camden Escrow

4    again, and then in the final column you'll see the two exhibits

5    that verify that amount.

6    Q.   If we focused on the incoming $100,000 wire transfer on

7    November 10, 2014, that means it appears from your chart, was

8    almost two days later, it was out to Camden Escrow?

9    A.   Yes.

10   Q.   The money that is referenced in your chart as November 12,

11   2014 is incoming $3,895,000.00 was wired into Mr. Cooney's

12   account and it appears from your chart on November 13, 2014, it

13   was wired out to Camden Escrow?

14   A.   Right.

15   Q.   If we go into October 6th, 2014, this, can you tell us what

16   that is.

17   A.   It was an incoming wire transfer in the amount of

18   $5,050,000.00 from Thorsdale Fiduciary to Bevan Cooney, and

19   three exhibits verify that.

20   Q.   And right below that?

21   A.   Right below that is a transfer of October 9th, 2014.  It

22   was an outgoing wire transfer in the amount of $5 million from

23   Bevan Cooney's bank account to U.S. Bank, and there are two

24   exhibits that verify that as well.

25   Q.   The money went into his account, $5,050,000.00 on October

1    13, 2014, three days later it went out of his bank to U.S.

2    Bank?

3    A.  Yes.

4    Q.  And those documents listed in that column reference that

5    transfer?

6    A.  Right.

7    Q.  Now, if you skip down to July 6, 2015, can you please tell

8    us what that is.

9    A.  So on July 6, 2015, there was an outgoing wire transfer in

10   the amount of $100,000 from Bevan Cooney's bank account to

11   Thorsdale, and you will see three exhibits that verify that.

12          Then the final one is on July 9th, 2015, another

13   outgoing wire transfer in the amount of $50,000 from Bevan

14   Cooney to Thorsdale, and then three exhibits that verify that.

15   Q.  Referring to the bottom two transactions, this was money

16   that actually went from Mr. Cooney's City National Bank account

17   on both occasions to Thorsdale Guaranty?

18   A.  Correct.

19   Q.  Is based on your review of the documents and email and bank

20   records, are these the only documents in this case that

21   reference these transactions?

22   A.  That reference these transactions.  There are other emails

23   as well, but these are the main ones that reference these

24   transactions.

25   Q.  These are the ones that we asked you to put on the chart,

1  correct?

2  A.  Yeah, yeah.

3  Q.  It is fair to say that based on your review of Mr. Cooney's

4  bank records, that this is not every wire transaction, correct?

5  A.  No, of course not.

6  Q.  You were just asked to put on your chart the transactions

7  related to this case, correct?

8  A.  Yes.

9  Q.  In other words, if we go back to Government Exhibit 423,

10  the second to last page, so in the section of this chart called

11  "Other current assets," where in your chart, which transactions

12  are verified in your chart?

13  A.  So the first transaction, the 400,000 transaction from

14  Bevan Cooney to Hunter Taubman Weiss, that is the investment in

15  Burnham Financial for $400,000 under other current assets on

16  the balance sheet.  It is also the loan to Jason holmby $95,000

17  that verifies the second transaction on my summary chart for,

18  yeah, $95,000, and then there is one more which is the loan to

19  Oxford Metrica Limited for $35,000, and that verifies the

20  fourth transaction on my chart.

21              (Continued on next page)

22

23

24

25

I6L7GAL7                           Laventhirarajah - Cross

 1   BY MS. NOTARI:

 2   Q.  So these are described in this chart as assets, but in fact

 3   these were wires out of Mr. Cooney's account, correct?

 4   A.  Correct.

 5   Q.  And it's fair to say that the other assets listed -- loan

 6   to Rob Cooney, Scott Cooney, Sean Young, Titus Richards --

 7   those are not referenced in your chart.

 8   A.  No, correct.

 9   Q.  And if you look below that, Wakpamni bonds, $5 million, is

10   that referenced in your chart?

11   A.  Yes, it is.  It's the outgoing wire, $5 million, Bevan

12   Cooney to U.S. Bank on October 9, 2014.

13   Q.  Now, the wire transaction that you reviewed did not

14   actually say Wakpamni bonds did it?

15   A.  No.

16   Q.  That was just based on your review of this case.

17   A.  Right.

18           MS. NOTARI:  OK.  I have no further questions.

19           THE COURT:  All right.  Any cross-examination.

20           MS. MERMELSTEIN:  Very briefly.

21   CROSS EXAMINATION

22   BY MS. MERMELSTEIN:

23   Q.  Can with we look at Defense Exhibit 3209 very briefly.

24   Good afternoon.  Wrong one.  Government Exhibit 3209.

25           So this is one of the exhibits that you reviewed in

I6L7GAL7                          Laventhirarajah - Cross

1   preparing your charts; is that right?

2   A.  Right.

3   Q.  And you see that in this e-mail Mr. Cooney asks Alexis

4   Gluckman to send him wire proof for four wires, including three

5   other outgoing wires which he says he thinks are from Thorsdale

6   from 100,000, 50,000 and 35,000.  Do you see that?

7   A.  Right.

8   Q.  And then she attaches wires that are not to Thorsdale,

9   right?

10  A.  Right.

11  Q.  And she says, "Attached are the only wires that I show that

12  match or come close to the amounts below."  They don't actually

13  match up, right?

14  A.  Right.

15  Q.  We can take that down.  Thank you.

16          You testified that you prepared this chart based on

17  documents that were given to you by the defense, right?

18  A.  Right.

19  Q.  And in the right-hand most column in the government

20  exhibit/defense exhibit column, those documents are meant to be

21  the support for the facts that are laid out in that column,

22  right?

23  A.  Right.

24  Q.  But some of them don't match up, right?

25  A.  Sorry?

1    Q.  Sure.  Let's just look at an example.

2          So can we pull up Defense Exhibit 3292, and can we

3    pull up the summary chart itself, Exhibit 3802, side by side.

4    OK.  So, can I ask you to highlight the second entry on the

5    summary chart, Exhibit 3802, and can you also zoom in on the

6    information on 3292 so we can see what it says.

7          OK.  So your chart shows that on March 22, 2013 there

8    was an outgoing wire for $95,000 from Bevan Cooney to Anslow &

9    Jaclin LLP, and you say that is supported by Defense Exhibit

10   3292, right?

11   A.  Um-hum.

12   Q.  If you look at 3292 though that's a $50,000 to Thorsdale

13   Fiduciary, right?

14   A.  Correct.

15   Q.  It's also a wire transfer.  It's not the right one for this

16   entry on your chart, right?

17   A.  Right.

18   Q.  And then let's just look at one other one.  If we can leave

19   up the summary chart and pull up -- excuse me -- 3293 side by

20   side.  And can we zoom in on the fourth line down on the

21   summary chart.  Excuse me, I've looked at the wrong one.  Can

22   we look at the 4/17/2013, third down line on the summary chart.

23   Perfect.  Thank you.

24          So this indicates an outgoing wire for $50,000 from

25   Bevan Cooney to Thorsdale, and it says that 3293 is the

I6L7GAL7                      Laventhirarajah - Cross

1    reference point.  If you look at 3293, that's actually a

2    $35,000 wire to Oxford Metrica, right?

3    A.  Right.

4    Q.  So something got mismatched on the chart, right?

5    A.  There was a mix-up.

6    Q.  And you said that you also reviewed portions of the trial

7    transcript; is that right?

8    A.  Right.

9    Q.  So when it says in your chart "Tr.," that's the page number

10   in the transcript?

11   A.  Right.

12   Q.  Can we pull up the parties' transcript 169.

13          And if everyone has the summary chart in front of

14   them, the second entry has a reference to the transcript

15   citation at transcript 169, right?

16   A.  Right.

17   Q.  If you -- and take your time -- if you look at the

18   testimony that appears on the transcript page 169, that has

19   nothing to do with Anslow & Jaclin, or wire transfers, or

20   anything about that.  It's a discussion by Tim Anderson of an

21   e-mail with Yanni Galanis, right?

22   A.  No.  So, in the chart -- in my chart -- in the column that

23   says "to," the wire is from Bevan Cooney to Anslow & Jaclin

24   LLP, and in parentheses you will see Jason Holmby.  In this

25   page from the transcript if you look all the way at the bottom,

I6L7GAL7                        Laventhirarajah - Cross

1   line 22 -- 21 -- it says "Steven Haynes, oh, cc line, sorry,

2   jason@holmbycompanies.com."  The next line says, "Who is

3   jason@holmbycompanies.com?"  The answer is "Jason Galanis."

4   Q.  So the reference here is because of the Jason Holmby --

5   A.  Right, to show that Jason Holmby is the same person as

6   Jason Galanis, that's why it was put in the chart.

7   Q.  Got it.  And we looked at two examples where the citation

8   doesn't match the entry.  Do you know if there are other

9   similar errors in the chart?

10  A.  No.

11  Q.  Let me ask you if we can look very briefly at Government

12  Exhibit 423.  So you testified about this exhibit on direct

13  examination.  You will see that this is a personal financial

14  statement for Bevan Cooney, right?

15  A.  Right.

16  Q.  And if we go to the actual personal financial statement

17  itself -- can we put this up side by side with 3802, Mr.

18  Wissman.

19          So you testified I think on your summary chart the

20  entries for 10/6 and 10/9 are related to a purchase of Wakpamni

21  bonds, right?

22  A.  Correct.

23  Q.  And so there is Thorsdale Fiduciary and Guaranty wires

24  $5,050,000 to Bevan Cooney on 10/6, right?

25  A.  Um-hum.

I6L7GAL7                        Laventhirarajah - Cross

Q.  And then three days later on 10/9 Bevan Cooney wires $5

million to U.S. Bank to purchase Wakpamni bonds.

A.  Right.

Q.  And Bevan Cooney didn't have $5 million in his account

before he received this wire, right?

A.  Right.

Q.  So he used the money from Thorsdale to buy the Wakpamni

bonds, right?

A.  Yeah.

Q.  You're also aware that he subsequently transferred those

bonds in May of 2015, right?

          MS. NOTARI:  Objection.

          THE COURT:  What's the objection?  Knowledge?

          MS. NOTARI:  Yes.

          MS. MERMELSTEIN:  I will rephrase, your Honor.

          THE COURT:  OK.

Q.  You have been given all kinds of documents related to this

case to review in preparing this chart, right?

A.  Right.

Q.  Have you been given documents that reflect that at the end

of May 2015 Mr. Cooney transferred the Wakpamni bonds out of

his account to Bonwick?

A.  I would not remember that.  There was nearly like 3 million

documents in discovery.

Q.  Fair enough.  Looking at Government Exhibit 423, you will

I6L7GAL7                     Laventhirarajah - Cross

1   see that there is an entry there for the Wakpamni bonds, right?

2   A.  Right.

3   Q.  If we can go to the first page of 423.  And can we take

4   down the zooming in so we can see it.  There we go.

5          The date of that e-mail attachment and personal

6   financial statement is March of 24, 2016, right?

7   A.  Right.

8   Q.  Have you reviewed documents that made clear that Mr. Cooney

9   did not in fact own the Wakpamni bonds on March 24, 2016?

10  A.  I would not remember that, no.

11  Q.  Fair to say that the statements contained in the personal

12  financial statement are statements by Mr. Cooney himself,

13  right?

14  A.  Right.

15          MS. NOTARI:  Objection, your Honor.  I don't think she

16  testified to that.

17          THE COURT:  How are you answering that?

18          WITNESS:  Well, I'm going off what is written in the

19  e-mail.  But I would not know if that's Cooney himself or

20  someone else writing it.  I would not know that.

21  Q.  It's Mr. Cooney's financial statement, right?

22  A.  Right.

23  Q.  And the contents with respect to the Wakpamni bonds are not

24  true, right?

25  A.  Sorry?

I6L7GAL7                    Laventhirarajah - Redirect

1   Q.  That personal financial statement says Mr. Cooney owned

2   Wakpamni bonds in 2016, right.

3   A.  Right.

4   Q.  You have not reviewed anything that suggests that that is

5   correct, right?

6   A.  I have.  I have reviewed certain documents that have to do

7   with the bonds being 5 million.  I have seen this amount come

8   up numerous times but --

9   Q.  But you don't know one way or the other whether or not they

10  were transferred out of his account in 2015; is that right?

11  A.  I would not remember that right now, no.

12  Q.  You don't know if any of the statements in Mr. Cooney's

13  personal financial statement are true.

14  A.  I would not know that, no.

15          MS. MERMELSTEIN:  Nothing further.

16  REDIRECT EXAMINATION

17  BY MS. NOTARI:

18  Q.  Ms. Laventhirarajah, I just want to clarify.  If we look at

19  Government Exhibit 3209, correct --

20          If we could pull that up.

21          Now, can you please explain to us on this chart what

22  is 3209 and what is DX3291, 3292, 3293 and 3294?

23  A.  Sure.  So I actually have them with me now.  So 3209 is

24  what is on the screen; it's the e-mail where Bevan is asking

25  Alexis for wire proof for those four amounts.  3291 I have in

I6L7GAL7                          Laventhirarajah - Redirect

1    front of me.

2    Q.  Can you go to the next page.  So this particular -- this is

3    included in 3209?

4    A.  Right, yeah.

5    Q.  And is this also labeled as a defense exhibit?

6    A.  Yes.

7    Q.  And what defense exhibit is it?

8    A.  This is DX3291.

9    Q.  OK.  And can you go to the next page.

10   A.  This is part of DX3291.

11   Q.  Can we go to the next page, 3209.  And what is this?

12   A.  This is another defense exhibit.  This is 3293.

13   Q.  So it appears that there was an error in numbering the

14   documents, correct?

15   A.  Right.  It's out of order.

16   Q.  Did I help you make this chart?

17           MS. MERMELSTEIN:  Objection, your Honor.

18   Q.  OK.  So 3209 -- but, nevertheless, there is a mislabeling,

19   but all the documents for these four transactions are

20   referenced in 3209, correct?

21   A.  Right, right.

22   Q.  So if somebody wanted to verify any one of the first four

23   transactions, they could look to Government Exhibit 3209?

24   A.  Exactly, yes.

25   Q.  So 3291 was just given as an extra cite if somebody wanted

I6L7GAL7                          Laventhirarajah - Redirect

1    to look at the document by itself.

2    A.   Right.

3    Q.   OK.  And it's fair to say that you did not -- you did

4    not -- you have been working on this case, correct, since

5    February.

6    A.   Right.

7    Q.   And you were asked to prepare this chart.

8    A.   Right.

9    Q.   And you were not asked to focus on other details regarding

10   Mr. Cooney's case, correct?

11   A.   Exactly.

12   Q.   And the personal financial statement, you were never asked

13   to look at that before.

14   A.   No.

15   Q.   And you were never asked to look at anything involving

16   Bonwick Capital?

17   A.   No.

18   Q.   You were not asked to prepare a chart involving that?

19   A.   No.

20   Q.   So other than this error -- which now we've clarified is an

21   error, but we can find the information in Government Exhibit

22   3209 -- it's fair to say that this is a fair and accurate

23   representation of the wire transfers.

24   A.   Everything is there.

25   Q.   And in addition to these wire transfers there are other

I6L7GAL7                          Laventhirarajah – Redirect

1   documents in this case that verify these transactions, correct?

2   A.   Right.

3            MS. NOTARI:  Thank you.

4            THE COURT:  Anything else?

5            MS. MERMELSTEIN:  No, your Honor.

6            THE COURT:  You can step down.  Thank you.

7            So why don't we take our afternoon break now.  All

8   right.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  All right.  Are you in a better position

3     to talk about those exhibits?

4              MR. QUIGLEY:  Yes, your Honor.  Yes.  We continue to

5     object on hearsay and relevance grounds.  I mean if you look at

6     --

7              THE COURT:  Is there anything in those that you think

8     can come in, in your view?

9              MR. QUIGLEY:  There is another -- even though we don't

10    think it's relevant, there is another exhibit that shows the

11    wire transaction -- and it shows that it's for the purpose of

12    the Wakpamni bonds -- that we haven't objected to that.  I

13    think that is simply to show that it was made, that it was for

14    the purported purpose of buying the Wakpamni bonds.  That's

15    4124.  We haven't objected to that at all.

16             I'm just saying this back and forth about the board

17    minutes, about the communications at the board, involves a ton

18    of hearsay, and I think it creates -- and it has limited

19    relevance.

20             I mean they can prove with the document that we are

21    not objecting to that somebody at Valorlife understood that the

22    purpose of that wire transfer was to purchase bonds.  It wasn't

23    used for that.  But again I think the back and forth about what

24    happened in board minutes, at board meetings that these

25    defendants weren't at -- yeah, we introduced board minutes for

I6L7GAL7                    Laventhirarajah - Redirect

1    Ms. Moynihan, but we had to lay a proper foundation.  Here

2    there is no foundation for that; it's classic hearsay.  So

3    that's our objection.

4           THE COURT:  All right.  Is there anything else you

5    wants to say on this point?  Would that be sufficient in your

6    view, 4124?

7           MR. SCHWARTZ:  Well, there are, as I mentioned --

8    originally there are some exhibits that are not objected to on

9    the same subject.  All they say, to my memory, is in the

10   reference line in the wire instructions that it's for purchase

11   of Wakpamni bonds, which is, you know, quite different than

12   understanding as you do through the board minutes -- the set of

13   representations that was made to Valorlife.

14          I note that we had this whole discussion earlier this

15   week about the fact that board minutes are business records;

16   and I think if that was true before, that's true now as well.

17          THE COURT:  Right.  But there is still hearsay within

18   hearsay.

19          MR. QUIGLEY:  We laid a foundation for it over their

20   objection.

21          THE COURT:  Yeah, so there is both the foundational

22   issue, but then there is also the hearsay within hearsay issue.

23          MR. QUIGLEY:  Right.

24          THE COURT:  OK.  All right.  So why don't we come back

25   in ten minutes.

1          MR. SCHWARTZ:  And then could we either now or then

2     talk about scheduling a little bit?

3          THE COURT:  Yeah, go ahead, sure.

4          MR. SCHWARTZ:  So we're going to call Ron Filler next,

5     and I expect -- obviously I don't know what the cross will be,

6     but I think that he will take us until about 4:30, 4:15,

7     something like that.  We will then read in -- I don't have them

8     in front of me -- but a small number of e-mails which I believe

9     are not objected to at this point.  Yes, because 4835 was the

10    one we agreed upon.  Yeah.

11         MR. QUIGLEY:  We got a message from Ms. Hairs while we

12    were sitting here of additional exhibits that you're going to

13    read in this afternoon?

14         MR. SCHWARTZ:  No.  I don't know what that is, but,

15    no, we are not reading anything that we haven't told you about.

16         MR. QUIGLEY:  Are you reading in 4705?

17         MR. SCHWARTZ:  That is on our list.

18         MR. QUIGLEY:  OK.

19         MR. SCHWARTZ:  But what I was going to say is I don't

20    think we're going to get there.  So, I was trying to go through

21    the schedule.

22         So after Professor Filler we will have somewhere

23    between 45 minutes and a half an hour left until 5 o'clock.

24    There are six or seven e-mails that we're going to read without

25    objection, and we can also put in the Michelle Morton texts at

I6L7GAL7                    Laventhirarajah - Redirect

1    that time.

2            There is a stipulation that we will read in.  We will

3    play the recordings.

4            I would suggest, although we may be a little bit

5    early, that we end there, because the alternative is you go

6    into these objected-to e-mails and then a following witness who

7    is not going to be finished today.

8            THE COURT:  Is not going to --

9            MR. SCHWARTZ:  I mean he is not going to be finished

10   today unless we sit long.  But it's a summary witness on all

11   the money stuff.  I just don't think that he is going to be

12   finished.

13           So I will do whatever you want, but since there are

14   issues with these things, and we're going to come fairly close

15   but maybe perhaps not exactly to 5 o'clock, it might be --

16           THE COURT:  If it's just a couple minutes, I don't

17   mind leaving a couple months early.  But I know how much the

18   jury wants to get out of here, so if it's half an hour, I would

19   like to use the time.

20           MR. SCHWARTZ:  I will do whatever you want.  But we

21   did put some thought into the order in which these things go in

22   and stuff like that, so to the extent it's possible to preserve

23   that, subject to your Honor's rulings, that would be our

24   preference.

25           THE COURT:  Well, let's just see what time it is.

1              MS. MERMELSTEIN:  One other thing on the expert, which

2    is that I think that this morning's expert testimony was in

3    many ways really improper.  It went wildly beyond the scope of

4    the notice.  And the purported explanation for that, that it

5    was somehow underlying background to an explanation of what a

6    board of directors is, simply wasn't really accurate.  I mean

7    it's just not true that you need that as background.

8              My concern is that that's going to happen again this

9    afternoon with Professor Filler.  As we've already agreed, the

10   summary demonstrative that is being used references investment

11   advisors.  That has to come out because there has been no

12   notice on that.

13             We hate to sort of be objecting, objecting, objecting,

14   but that's not how this works.  You have to give proper notice.

15   And I think what is really going on is it's an effort to lay

16   sort breadcrumbs for an argument in closing about these facts.

17   So, for example, this morning there are e-mails here in this

18   case about Guggenheim.  The random selection of Guggenheim as

19   an example is an effort to say, look, that's a real thing, and

20   so what these defendants were trying to do in emulating is a

21   real thing.

22             That's just not proper, and I think it's about putting

23   the marker down, that there has to be an enforcement here about

24   what is proper testimony and what was noticed.  And we will

25   obviously be objecting, but I want to put on your Honor's radar

I6L7GAL7                    Laventhirarajah - Redirect

1    that we don't think what has happened so far has been

2    acceptable.

3              THE COURT:  Is there anything in Mr. Filler's

4    testimony that is outside the scope of the notice?

5              MS. HARRIS:  Not to my knowledge, your Honor.

6              THE COURT:  I mean literally question for question, is

7    there anything that's not --

8              MS. HARRIS:  So professor Filler is going to testify

9    generally about what broker dealers are, what they do, to kind

10   of lay the foundation for the net capital rule and his opinion

11   that a 100 percent haircut would be appropriate for an

12   ungraded, unregistered bond.

13             It's very general testimony.  He is not going to get

14   into the facts of the case.  He's not going to get into

15   Guggenheim.  The only specifics -- and I think this might be

16   what Ms. Mermelstein is referring to -- is he is giving

17   examples of broker dealers, just to illustrate that Citigroup,

18   or I think Charles Schwab is one of the ones on his slide.

19             We took out the investment advisor slide in connection

20   with Ms. Mermelstein's objection the other day, as well as

21   another slide that explained what a bond is, but that was also

22   because we think the jury has heard quite enough on that

23   already.

24             THE COURT:  So when were all the slides produced?

25             MS. HARRIS:  Those slides I believe were produced

I6L7GAL7                    Laventhirarajah - Redirect

1    Sunday.

2             MR. SCHWARTZ:  They were the first set I handed,

3    right?

4             MS. HARRIS:  The days are running together.  They were

5    produced recently.  There were only six then, and we've reduced

6    them to four.

7             MR. SCHWARTZ:  I mean recently enough that we've

8    discussed them before.

9             MS. TEKEEI:  Your Honor, something Ms. Harris just

10   said with respect to one of Professor Filler's opinions

11   triggered a question for us about notice.  Because in the

12   notice they wrote on page 4 "Most securities get a haircut of a

13   hundred percent for purposes of calculating net capital."  And

14   I think what Ms. Harris just said is nonrated --

15            MS. HARRIS:  I mean it's specific to bonds.

16            MS. TEKEEI:  And that's just not in here.

17            THE COURT:  I thought you had said previously you were

18   not going to elicit the testimony about the haircut.

19            MS. HARRIS:  I'm not sure.  If I did, I was mistaken.

20   All I meant to say is that he is not testifying specifically

21   about the facts of this case.

22            MR. SCHWARTZ:  The testimony we said we would not be

23   eliciting was about the Rule 144 and 144(a) transfer of

24   restricted bonds.

25            MR. QUIGLEY:  They said they're not offering --

1        THE COURT:  Go ahead.

2        MS. TEKEEI:  I think Mr. Quigley was just pointing me

3   to the paragraphs that they said they were not offering.

4   That's on page 5 of their notice.  There is the fourth bullet

5   point down beginning with "The WLCC bonds are a type of highly

6   illiquid municipal bonds," they're not eliciting that.  And

7   they're not eliciting the last two bullet points on that list.

8        My question was about on the prior page, page 4, the

9   second bullet point from the bottom says that "Professor Filler

10  will be testifying that most securities get a haircut of a

11  hundred percent for purposes of calculating net capital."  And

12  that's not what Ms. Harris just said.

13       There is nothing in here about unrated bonds; there is

14  nothing more specific in here about any of that.  And that

15  general statement "most securities get a haircut of a hundred

16  percent for purposes of calculating net capital" I think is

17  simply not true.  So I think it has changed a little bit

18  already.

19       MS. HARRIS:  Your Honor, I think what was intended

20  with the notice is to say securities of this type, and I think

21  what I just described is consistent generally with what our

22  cross of Walch elicited, which is that we aren't contesting the

23  fact that the bond at issue in this case would receive a

24  haircut of a hundred percent.  That's not specifically what

25  Professor Filler is going to testify about.  He is testifying

1    on a far more general level, and particularly on the mechanics

2    of calculating net capital, the regulations that apply to

3    broker dealers.  I think that a lot of this will come in in a

4    much more innocuous general way than even we're discussing it

5    right now.  I'm happy to go into greater detail though if it

6    would be helpful.

7              MS. TEKEEI:  Your Honor, look, the notice provides

8    that he will generally discuss different ways of calculating

9    haircuts.  But there is no notice as to this particular type of

10   security.  There is no notice as to unrated bonds here at all.

11   So we think it would be inappropriate for him -- given the lack

12   of notice -- to be testifying about that level of specificity.

13             Again, we don't have an objection to the general level

14   of the nature of the notice that's provided here.

15             MS. HARRIS:  We agree that we are not going to be

16   eliciting specific testimony about specific facts in this case.

17   We aren't going to be getting into that level of detail.  This

18   is all going to be very high level.

19             MR. SCHWARTZ:  It also can't be emphasized enough we

20   all agree on this opinion.  There is not a dispute about the

21   underlying fact that these bonds are valueless for net capital

22   purpose.

23             MS. MERMELSTEIN:  I'm not really sure I understand

24   what Mr. Schwartz just said.  I mean they issued a notice.  The

25   notice says "Most securities get a haircut of a hundred percent

1    for purposes of calculating net capital."  That is I think even

2    they now agree just not true.  But that is what their expert

3    notice says.

4            It does not say that anything about securities of this

5    type, unrated bonds, are generally a hundred percent.  It just

6    doesn't say that.

7            So I'm not saying that I disagree that the Wakpamni

8    bonds appropriately got a haircut of a hundred percent.

9    Indeed, as has been established at this trial, there was an

10   effort by these defendants to count them at Bonwick and

11   Burnham.  FINRA rejected that, and they weren't ultimately

12   counted, and that created all sorts of issues.

13           But, you know, there are rules of the road here, and

14   there are requirements for expert notice.  This isn't what they

15   said.  And, frankly, if what they're saying is they agree with

16   what the government witness said -- which I think is what

17   they're saying, that Ms. Walch was a hundred percent right,

18   that sort of there generally are different kinds of haircuts

19   for different things and that these particular bonds needed a

20   haircut of a hundred percent -- then I don't know why this

21   witness is testifying at all.

22           THE COURT:  Please explain to me exactly what this

23   witness is going to add.

24           MS. HARRIS:  Your Honor, I think one of the things

25   that we think Professor Filler can help the jury understand is

I6L7GAL7                         Laventhirarajah - Redirect

just the nature of the entities that we're dealing with in this

case.  Broker dealers I think are not something that most

people understand intuitively; it's not a business that people

interact with; and I think in particular this jury doesn't have

that type of background framework.  And so all Professor Filler

is going to be opining on is the nature of the regulations that

apply to broker dealers, the way that broker dealers value the

securities on their books, and how that plays out in a very

bread and butter way.  He teaches this class at law school, and

I think it's going to come in as much more of an educational

opinion.

You know, we had not thought that this was something

that was going to elicit this level of controversy, given, as

we said -- and I think was clear from Mr. Schwartz's

cross-examination of Ms. Walch -- that that isn't a fact that

we are contesting, and it's going to not be particular to these

bonds; it's going to be particular to the nature of the net

capital calculation for bonds that are illiquid.

MS. TEKEEI:  I thought Mr. Schwartz said we're all in

agreement, and Ms. Harris just said we're disputing the fact.

So I think I'm a little confused.

THE COURT:  I'm a little confused too.

MS. HARRIS:  I meant to say we are not in dispute.

MS. TEKEEI:  Well, if we're not in dispute, then

Ms. Walch's testimony provided --

1           THE COURT:  Then what's the harm to you if you are all

2     in agreement on it?

3           MS. TEKEEI:  I think the harm or the danger here is

4     that what was just proffered as his testimony earlier was far

5     more specific than what is in the notice.  And we just haven't

6     been provided with it sounds like with the level of detail that

7     he intends to be testifying to.  We're going to be objecting a

8     lot again.

9           THE COURT:  Do you dispute the accuracy of it?

10          MS. TEKEEI:  Well, I'm not sure what he is going to

11    say now.

12          THE COURT:  Say it one more time what he's going to

13    say so we're all on the same page.

14          MS. HARRIS:  So what I understand Professor Filler to

15    opine about today is that -- and this is a question -- is that

16    illiquid, unrated bonds should receive a haircut of a hundred

17    percent -- unregistered bonds.

18          MS. TEKEEI:  That is nowhere in their notice, your

19    Honor.  It just isn't.

20          THE COURT:  All right.  Let me just think about it for

21    a minute.

22              On one hand it wasn't in the notice; it should have

23    been.  Your notices in general should have been more specific.

24              On the other hand, I'm not sure I understand what the

25    harm is to the government if you don't dispute that to be true

1  and you don't question its accuracy.  I am not sure what the

2  harm is.

3          I understand in a situation where you weren't provided

4  notice and you would have gotten your own expert, or you would

5  have been better prepared to cross-examine someone, but in a

6  situation where you believe something to be true, I am not sure

7  what the harm is.

8          MS. TEKEEI:  So we just want to be clear, your Honor.

9  We think that the Wakpamni bonds deserved the haircut of a

10  hundred percent.  We don't know about general illiquid nonrated

11  securities the way that the professor is proffered to testify.

12  That notice was not provided.

13         We didn't ask Ms. Walch those questions.  We didn't

14  prepare questions along those lines.  I think it's that

15  statement generally, and then with the leap being -- I think we

16  all agree --

17         Let me be clear, I think we all agree that the

18  Wakpamni bonds were not an allowable asset for net capital

19  purposes.  Ms. Walch said that.  What their witness is about to

20  testify to though is something broader than that, and we just

21  don't know the answer to that, so we can't say that we agree to

22  that broad statement.

23         MR. SCHWARTZ:  Last thing on this.

24         THE COURT:  Yes, last thing.

25         MR. SCHWARTZ:  I mean I will just say the government

I6L7GAL7                    Laventhirarajah - Redirect

 1    knew about the proper construction of this sort of bullet

 2    because they pointed it out when they objected to the

 3    testimony.  They said the way that that's phrased is not

 4    really, you know, right, the same way that they're saying now.

 5    And we have been agreement with them on the substance all

 6    throughout this trial.

 7              You know, they objected to the adequacy of notice.

 8    Your Honor ruled that it was sufficient.  I think it's a little

 9    bit unfair to Mr. Archer now, just a moment before Professor

10    Filler is going to testify, to say that on an opinion on which

11    we agree -- and on which they had pointed out the notice

12    issue -- and which your Honor had said we didn't need to cure

13    the notice issue -- that that's going to stop him from

14    testifying.  But I will leave it at that.

15              Just one other thing before you step out on a totally

16    separate subject, just so we can prepare the exhibit.

17    Ms. Harris has a question about the way your Honor wants the

18    text messages done.

19              MS. HARRIS:  Just one moment, your Honor.  I think on

20    page 27 you had indicated -- this is 3004B.

21              THE COURT:  Can you pull it up, please.

22              MS. HARRIS:  Sure.  I think your Honor had indicated

23    that the final three text messages on that page should be

24    redacted.

25              THE COURT:  Yes.

1            MS. HARRIS:  And we were wondering whether we could

2    leave unredacted that penultimate text message "you're

3    confusing me."

4            We can put up the prior page next to it just to

5    illustrate the text chain there.

6            THE COURT:  Who is the black guy?  What is that a

7    reference to?

8            MR. SCHWARTZ:  Devin Wicker.

9            MS. HARRIS:  That text message would be redacted.  We

10   are only asking whether that second text message from the

11   bottom could left unredacted.

12           THE COURT:  Which says "You're confusing me."

13           MR. SCHWARTZ:  Yes, because he's confusing the two

14   Devons/Devins.

15           THE COURT:  Right.  So, let's do this.  Why don't we

16   leave in "Whatever, Einstein, you know who I'm talking about"

17   and then take out "I don't know the black guy yet," unless

18   there is agreement on that, and then leave in "You're confusing

19   me."

20           MS. TEKEEI:  Your Honor, although very poorly worded

21   in this text message, Devin Wicker is an African American and

22   Devon Archer is not, and I think if we're going to keep that

23   line in, I think we'd rather for clarification purposes leave

24   it there.

25           THE COURT:  All right.  So let's leave both of those

I6L7GAL7                        Laventhirarajah - Redirect

1   in.  Let's just take out the suggestive final comment.  So can

2   we take out the final text --

3               MR. SCHWARTZ:  Sure.

4               THE COURT:  -- about the belt buckle?

5               MR. SCHWARTZ:  Sorry.  Your Honor wants to keep in --

6   or the government wants to keep in "I don't know the black guy

7   yet"?

8               THE COURT:  Yes, we will keep in --

9               MR. SCHWARTZ:  Just because the jury has no idea.  I

10  mean it's fine but the jury has no idea.

11              THE COURT:  We will keep those in.  I think we can

12  keep out the last text "I'm going to go to work.  FYI, today is

13  short girl appreciation day.  Since I come up to your belt

14  buckle I qualify."

15              Is everyone OK with just taking tat one out?

16              MR. QUIGLEY:  That's fine.

17              MS. TEKEEI:  Yes.

18              MS. HARRIS:  Thank you, your Honor.

19              (Recess)

20              THE COURT:  So, in terms of the notice, I don't think

21  you should ask questions that are broader than the notice that

22  was provided for William Janis, so I think you should stick

23  within the parameters of most securities getting a haircut of a

24  hundred percent for purposes of calculating net capital and

25  then the rest of what was provided here on page 7 of your --

1            I mean right now I'm looking I think at the

2    government's memorandum, but that was part of the notice.  So,

3    I think you should stick within the parameters of the notice.

4            All right.  We're going to bring the jury in now.

5            MS. HARRIS:  Understood, your Honor.  Thank you.

6            THE COURT:  And, otherwise, with respect to Filler, I

7    assume the testimony will be just what you had noticed with

8    respect to Janis.

9            MS. HARRIS:  I don't have the expert notice in front

10   of me, but the content of his testimony is generally going to

11   be background information on broker dealers and the nature and

12   purpose of the net capital rule and how net capital is

13   calculated.

14           (Continued on next page)

I6L7GAL7                        Filler - Direct

1              (Jury present)

2              THE COURT:  Everyone can be seated.

3              Call your next witness.

4              MR. SCHWARTZ:  Thank you, your Honor.  Mr. Archer

5    calls Ronald Filler.

6              MS. HARRIS:  And, your Honor, while Professor Filler

7    is taking the stand, we would just like to move into evidence

8    Defense Exhibit 4845, which is the stipulation we read into

9    evidence earlier.

10             THE COURT:  Yes, it will be admitted.  Thank you.

11             MS. HARRIS:  Thank you very much, your Honor.

12             (Defendant's Exhibit 4845 received in evidence)

13    RONALD FILLER,

14        called as a witness by the defendant,

15        having been duly sworn, testified as follows:

16             THE COURT:  You may proceed.

17   DIRECT EXAMINATION

18   Q.  Good afternoon, Professor Filler.

19   A.  Hi.  How are you?

20   Q.  Very well thank you.  How are you employed?

21   A.  I'm a professor of law at New York Law School, which is

22   just a few blocks away.

23   Q.  How long have you taught at New York Law School?

24   A.  I just finished my eleventh full year as a full professor

25   at the law school.

1    Q.  I'm sorry.  How many years?

2    A.  Eleven.

3    Q.  Congratulations.

4    A.  Thanks.

5    Q.  Where did you go to school before that?

6    A.  I'm sorry?

7    Q.  Stepping back for a bit, where did you go to school?

8    A.  In college I went to the University of Illinois in

9    Champagne.  Following that I went to George Washington

10   University Law School.  And after graduating from GW Law I also

11   got a Master's of Law in taxation at Georgetown University Law

12   School.

13   Q.  What year did you graduate from law school?

14   A.  1973.

15   Q.  And after you graduated, where did you work?

16   A.  My first job was with the U.S. Securities and Exchange

17   Commission, the SEC, and I worked in the Division of Investment

18   Management at the SEC.  That division is responsible for two

19   main acts:  The Investment Company Act of 1940 and the

20   Investment Advisors Act of 1940.

21   Q.  And what did your work at the SEC involve?

22   A.  I was an attorney in that division, and we handled a number

23   of regulatory matters involving investment companies --

24   investment companies are mutual funds.  You may have heard of

25   them -- and investment advisors.

1    Q.   What did you do after your work at the SEC?

2    A.   I joined a law firm in Chicago called Abramson & Fox.

3    Q.   And you became a life-long Chicago Cubs fan I assume after

4    living in Chicago.

5    A.   No, I'm sorry, I don't like the Cubs.

6    Q.   No one is perfect, professor.

7    A.   I apologize.

8    Q.   And what did you do at the law firm?

9    A.   I was an attorney doing a lot of securities work.  The firm

10   also was involved in a law called futures or derivatives, and

11   that was my first introduction to that area of the law.  And I

12   spent most of my career now either in the futures or the

13   securities areas.

14   Q.   And after you left the law firm, where did you work?

15   A.   After I was at that law firm, I joined a brokerage firm

16   called ContiCommodity Services, which at the time was the

17   largest futures brokerage firm in the world.  Conti was a

18   subsidiary of a company called the Continental Grain Company,

19   which is probably one of the largest private companies in the

20   world, and I was both an associate general counsel at Conti,

21   and then I went over to the business side and became the

22   director of their managed account division.

23   Q.   And what did your role at ContiCommodities involve?

24   A.   As a lawyer I did everything that an in-house lawyer does

25   at a brokerage firm.  On the managed account side I would put

1    together a number of public and private offerings of securities

2    involving derivatives and other types of products.

3    Q.  How long did you work at Conti commodities?

4    A.  A little over three years.

5    Q.  And what did you do after you left Conti?

6    A.  I left Conti, and I formed my own brokerage firm Filler

7    Weiner & Zaner -- I drew the straw that got my name first --

8    and we were a brokerage firm that was involved in both

9    securities and futures-related products.

10   Q.  Did you acquire any licenses while you were at your own

11   firm?

12   A.  So at Conti I had two licenses.  We can go back from that.

13   I held what was called the Series 7 exam or license.  Series 7

14   is the license that every stockbroker is required to maintain

15   and hold.  I was also a Series 3 registered, which the

16   technical name is associated person, but the equivalent is a

17   commodity broker.  So I was Series 3 and Series 7 at Conti.

18           When you leave one brokerage firm and go to another,

19   those licenses transfer over, and at the Filler Weiner firm I

20   held other licenses.  One was I was a branch manager, so I

21   was -- then it was series 8.  Now it's called series 910, which

22   is required for branch managers.

23           I also took what was called the Series 27 exam.

24   Series 27 is required for people who calculate the net capital

25   of a broker dealer.  The technical term for that person is a

1    financial operations principal or fin-op principle.  I took the

2    27 exam and passed.  Hardest exam I've ever taken, by the way.

3    Q.  Harder than the bar exam?

4    A.  Much harder than the bar exam.

5    Q.  Did you have any responsibilities related to the

6    calculation of net capital?

7    A.  Yeah.  In connection with being the financial principal at

8    that brokerage firm, that broker dealer, I had the

9    responsibility of not only preparing the focus reports and the

10   net capital requirements on behalf of that firm; I signed them

11   because I was the financial principal; and I was also involved

12   with those types of reports even later on in my career.

13   Q.  Where did you work next?

14   A.  I joined a law firm called Vedder Price, which at the time

15   was a large Chicago-based law firm.  I was a partner at that

16   law firm.  I later became the head of their corporate practice,

17   and later on I became a member of their executive committee.

18   The executive committee was a three person committee that

19   basically ran the law firm.

20   Q.  What sorts of clients did you represent at Vedder Price?

21   A.  All types of firms and persons involved in the financial

22   services industry:  Brokerage firms, investment advisors,

23   investment companies, hedge funds, really the wide range of any

24   kind of person or firm involved in financial services.

25   Q.  And what sorts of situations did you help your clients out

I6L7GAL7                        Filler - Direct

1   with?

2   A.  Well, my clients, you know, had a variety of issues, you

3   know, so we would deal with not only making sure they were

4   aware of the laws and regulations that would apply to them,

5   helping them comply with them, create manuals for them, prepare

6   documents for them that they had to have on their books and

7   records.  I did the whole gamut of any kind of matter or issue

8   relating to primarily brokerage firms and investment advisors.

9   Q.  And did you interact with any regulators in particular on

10  behalf of your clients?

11  A.  Constantly, not just in private practice but even

12  subsequent in my other careers, actively involved with the

13  Securities and Exchange Commission on the futures and

14  derivatives side.  That agency is called the Commodity Futures

15  Trading Commission or CFTC.

16          The SEC and the CFTC are like brother/sister type

17  relationships, they're very related.  The SEC deals with

18  securities; CFTC deals with futures and derivatives.  There are

19  other regulators in that industry.

20          We have in the securities world an organization called

21  FINRA.  FINRA regulates broker dealers.  On the futures and

22  derivatives side the organization, the regulator is called the

23  National Futures Association, or NFA.  And I'm currently a

24  member of the board of the NFA.

25  Q.  What did you do after you left Vedder Price?

I6L7GAL7                         Filler - Direct

1   A.   After Vedder Price I had the opportunity to move here to

2   New York, and I became a managing director in a brokerage firm

3   called Lehman Brothers.

4   Q.   What did you do at Lehman Brothers?

5   A.   I was responsible for a lot of their global futures and

6   derivatives activities.  We had 20, 30,000 clients who traded

7   derivatives all over the world, and I was responsible for not

8   only the legal regulatory aspects of that firm in connection

9   with that client business; I also was involved in making sure

10   the clients had the proper what we call execution and clearing

11   services.  So I had a lot of responsibilities over our client

12   base.

13   Q.   How long were you at Lehman Brothers?

14   A.   I was there 15 years.

15   Q.   And after Lehman Brothers?

16   A.   I became a professor of law at New York Law School.

17   Q.   What sorts of classes do you teach at New York Law School?

18   A.   I taught a variety of courses at the law school.  In the

19   last two or three years I've taught five courses.  Should I

20   name them?

21   Q.   Please, go ahead.

22   A.   So one course is called Securities Regulation, which by its

23   name it deals with how the securities laws in the country apply

24   to all aspects of whether you're a broker dealer or you're a

25   public company trying to register your shares.  Take all the

large public companies, they have all registered their

securities or shares with the SEC.

          I teach a course called Derivatives Market Regulation.

Derivatives market Regulation is the equivalent of securities

regulation but as applicable to the futures and derivatives

part of the industry.

          I have taught a course not only currently but since

1988, '89, Regulation of Brokerage Firms at not only New York

Law School but other law schools as well.

          I teach a course called Financial Services Seminar,

basically a current events type thing, current laws, current

regulations, current cases going on.

          And then I also have a course called Financial

Services Workshop, where our law students literally do

externships in Wall Street firms.  And I'm like the faculty

advisor for those students.

Q.   Have you had any leadership positions in your industry?

A.   I'm sorry?

Q.   Have you had any leadership positions in your industry?

A.   As I mentioned, I am currently a public director of The

National Futures Association, of its board and also its

executive committee.

          I have also served on a number of boards and advisory

committees of exchanges, clearinghouses.  I was the former

chair of an advisory committee at the CFTC.  So, I have held

I6L7GAL7                          Filler - Direct

1    several over the past 30, 35 years.

2    Q.  Professor Filler, have you testified before?

3    A.  I have.

4    Q.  About how many times?

5    A.  Oh, God, I'm trying to guess right now.  Probably ten, 12

6    times.

7    Q.  And have you testified on behalf of both plaintiffs and

8    defendants.

9    A.  Both.

10   Q.  Have you testified in a criminal case before?

11   A.  No, this is my first.  But I did file an amicus brief with

12   the Supreme Court in a criminal case just recently, so does

13   that count?

14   Q.  Congratulations.

15           MS. HARRIS:  We tender Professor Filler as an expert

16   in broker dealers, your Honor.

17           THE COURT:  Any objection?

18           MS. TEKEEI:  No objection.

19           THE COURT:  He will be so qualified.

20           MS. HARRIS:  Thank you, your Honor.

21   Q.  Professor Filler, before we move on, are you being paid to

22   testify today?

23   A.  Yes, I am.

24   Q.  What is your rate?

25   A.  I get paid $1100 an hour.

I6L7GAL7                         Filler - Direct

1    Q.  And about how much time would you estimate you spent in

2    preparing for your testimony today?

3    A.  Well, I haven't really added that up.  I'm guessing

4    somewhere in the 15 to 20 hours, maybe a little more, but

5    somewhere in that range.

6    Q.  And are you affiliated with an organization called The

7    Bates Group?

8    A.  Yeah.  Bates Group or Bates Consulting provides a list of

9    potential expert witnesses for law firms and other professional

10   firms.  I am a member of that group, and whenever a case comes

11   up that's in my area of expertise, they would recommend me to

12   the law firm.  So, yes.  It's not really an appointment; it's

13   more of a consulting type of arrangement.

14   Q.  And did anybody help you prepare your testimony today?

15   A.  No, completely on my own.

16   Q.  So you're a one-man show?

17   A.  Well, for this case.

18   Q.  So do we have a few slides to help us out today, Professor

19   Filler?

20   A.  Sure.

21   Q.  Mr. Jackson, if you could bring up -- I'm forgetting the

22   number, I'm sorry -- I think it's 9002.

23        I'd like to ask you a couple questions about what

24   exactly we're talking about when we talk about broker dealers.

25   So can you tell us what a broker dealer is?

I6L7GAL7                        Filler - Direct

1   A.  Sure.  The broker dealer term is the legal term for a

2   brokerage firm.  You probably hear the words brokerage firm or

3   stock brokerage firm.  The legal term is called a broker

4   dealer.

5           Anyone who has clients who wants to buy stocks, bonds,

6   mutual funds, that individual customer needs to open an account

7   at a brokerage firm, broker dealer.  And as this slide

8   demonstrates, the broker dealer provides what we call a trading

9   opportunity, the opportunity for customers to buy stock or sell

10  stock, and that's what the purpose of this slide shows.

11  Q.  I'm sorry, I think we forgot to ask to publish that for the

12  jury as a demonstrative.

13           THE COURT:  Go ahead.

14           MS. HARRIS:  Thank you, your Honor.

15           Please go ahead, Mr. Jackson.  Is that better?

16  Q.  Please go ahead.  I'm sorry to interrupt.

17  A.  So this slide just demonstrates a number of activities,

18  opportunities, transactions, that a broker dealer will offer to

19  his customers.

20  Q.  Can you give us a few examples of some broker dealers we

21  might have heard of.

22  A.  Sure.  We have a slide, but there are different types of

23  broker dealers, some large, some small.  This is an example of

24  three of what I call the larger broker dealers:  Morgan

25  Stanley, E-Trade and Charles Schwab.  You have other firms like

I6L7GAL7                        Filler - Direct

1    JP Morgan, which is connected with Chase Bank.  You have firms
2    called Bank of America/Merrill Lynch connected with Bank of
3    America.  You have firms broker dealer called Citigroup Global
4    Markets connected with Citibank.  Fidelity Investments.  You
5    probably have seen them all on TV.  These are some of what we
6    call the larger broker dealers here in the U.S.
7    Q.  And what types of broker dealers are there?
8    A.  There are two principal types.  The larger ones that we
9    just talked about are called clearing broker dealers, sometimes
10   called general broker dealers.
11          A clearing broker dealer or a general broker dealer,
12   those tend to be the larger brokerage firms.  And the big point
13   there is if you're a clearing broker dealer you can physically
14   hold customer assets.  So when I want to buy a hundred shares
15   of let's say Apple and I deposit money, the bigger brokerage
16   firms hold my assets and then pass them on to the seller.
17          The second type is called an introducing broker
18   dealer.  An introducing broker dealer tend to be the smaller
19   broker dealers, and they tend not to be able to hold customer
20   assets.  So that's the big distinction between the larger firms
21   who do act as like a custodian over client assets; and the
22   smaller ones, introducing broker dealers, which do not.
23   Q.  I hesitate to delve into this -- we've heard a lot about it
24   already -- but can you tell us very briefly what an investment
25   advisor is?

I6L7GAL7                          Filler - Direct

A.  Sure.  Investment advisor is another type --

            MS. TEKEEI:  Objection, your Honor.

            THE COURT:  I will allow it very briefly.

A.  An investment advisor is another type of person or firm in
the securities industry that gives advice to customers.

            If you fall within that definition -- meaning you do
give advice to customers in connection with their securities
business or activities -- you're required to register.  The
larger investment advisors are required to register with the
SEC.  The smaller investment advisors are required to register
in the respective states.

Q.  And are broker dealers and investment advisor ever
connected?

A.  Yeah, as I just mentioned, when I go through the big
brokerage firms that I just mentioned, Chase Bank has JP Morgan
Securities; Bank of America has Bank of America Merrill Lynch.
Citigroup Bank has Citigroup Global Markets.  Each of them also
have a subsidiary or affiliate that's also involved and
registered as an investment advisor.

            So most of your larger financial companies offer a
variety of products, investment and financial products, to
their clients; and depending on the type, they are required to
have different registrations within each of the affiliates.

Q.  Can you describe the specific statutory and regulatory
frameworks that govern broker dealers just generally.

I6L7GAL7                        Filler - Direct

1   A.   Sure.   There are four principal laws dealing with

2   securities in general.   One is called the 33 Act and one is

3   called the 34 Act.   The technical name for the 34 Act is called

4   the Securities Exchange Act of 1934.   Think about 33 and 34,

5   they were created under President Roosevelt in the New Deal

6   legislation.   The 34 Act is the federal securities law that

7   regulates broker dealers and requires their registrations.

8   Q.   So what sorts of regulations specifically govern the

9   day-to-day business of a broker dealer?

10  A.   Well, first there is a lot.   The SEC has regulations.   The

11  organization I mentioned before called FINRA is the principal

12  regulatory agency in regulating broker dealers or brokerage

13  firms, and FINRA has a tremendous amount of regulations.

14          Broker dealers are also required to register with the

15  states.   So, take a Morgan Stanley, they're registered in all

16  50 states and the various territories.   Each of the states have

17  their own state securities commission, and those agencies at

18  the state level also regulate broker dealers as well.

19  Q.   And so what aspects of what a broker dealer does day to day

20  are subject to regulation?

21  A.   Almost everything.   I mean there is just such an extensive

22  amount of laws and regulations applicable to broker dealers

23  that they are subject to a tremendous amount of regulations.

24  Q.   And can you describe a couple of those.

25  A.   Sure.   Well, I mentioned registration as one.   Every broker

1    dealer is required to maintain records and have certain books

2    and records on their premises.  They have to maintain those

3    records for a certain period of time, it's called

4    recordkeeping.  You may have heard the concept called

5    suitability.  Before a broker can recommend a stock to one of

6    its customers, the broker must make sure that particular

7    customer is suitable for that particular investment.

8            You have anti-money laundering.  You have probably

9    heard that from banks and so forth.  They're also subject to

10   broker dealers.

11           And every broker dealer is required to have net

12   capital requirements.

13   Q.  And we will get to net capital requirements in just a

14   little bit.  But are there any employees at the broker dealer

15   who are charged with making sure that the broker dealer is

16   complying with all the various statutes and regulations that

17   govern their business?

18   A.  Yes.

19           MS. TEKEEI:  Objection to the scope, your Honor.

20           THE COURT:  I will allow that.

21           WITNESS:  May I continue.

22           THE COURT:  Yes, you can answer that.

23   A.  All right.  So every broker dealer is required to have what

24   we call a chief compliance officer, CCO.  The chief compliance

25   officer is that person, he or she, at the top of their clients

I6L7GAL7                        Filler - Direct

1    department.  The brokerage firms like on this page and the

2    other ones, the larger ones, they will probably have a

3    compliance staff of 200, 300, 400 individuals.  When I was will

4    at Lehman Brothers our compliance department was around 250,

5    300 people.  Each of them are responsible for the various

6    aspects of a broker dealer in making sure that the broker

7    dealer complies with all of these laws and regulations that

8    we've been talking about.

9    Q.  Now moving on to the net capital requirements that you

10   alluded to earlier, can you tell us just on a general level

11   what the net capital rule is, Professor Filler.

12   A.  Sure.  So in general every broker dealer, large or small,

13   is required to have a minimum amount of what we call net

14   capital.

15           Can we go to a slide to help me explain that a little

16   bit better?

17   Q.  Oh, sure.  And I could just ask you to explain what net

18   capital is generally.

19   A.  Net capital is a very restricted type of term in defining

20   the assets of a broker dealer.  So, in essence it's the amount

21   of what we call liquid assets of that broker dealer -- by

22   liquid assets I mean cash or cash equivalent items, assets,

23   that can be converted to cash within 30 days -- the total of

24   the cash and the cash equivalent assets in excess of all of the

25   total liabilities of that broker dealer.

1          So, if you think about net capital, the SEC and FINRA

2     want broker dealers to have a lot of cash to meet their daily

3     needs and to make sure their customers are protected.

4     Q.  And I think you asked for us to move to the next slide.  So

5     if we could, Mr. Jackson.  Thank you.

6          And you were going to explain I think how we go about

7     calculating that net capital.

8     A.  Sure.  So this is just a picture that I put together with

9     assistance of counsel on just showing a balance sheet from

10    accounting purposes.

11         So I'm sure many of you have seen a basic balance

12    sheet.  This is of a broker dealer -- a hypothetical broker

13    dealer.  We just made up the numbers.  And if you look on the

14    left there are six types of assets that we put together for

15    this hypothetical broker dealer, and the total of those assets

16    at the bottom is $16.5 million.

17         On the right-hand side are the liabilities of that

18    broker dealer which total $2 million.  So from a net worth,

19    from an accounting perspective, the net worth of that company

20    is $14.5 million.  That's for balance sheet purposes, for

21    accounting purposes, but this is not for net capital purposes.

22         Remember what I said, net capital only applies to

23    those types of assets that are cash or cash equivalent; and by

24    cash equivalent, which assets of that broker dealer can

25    reasonably be converted to cash -- meaning sold -- in a 30 day

1    period.

2              So if we can go to another slide, I can maybe explain

3    that.

4    Q.  Sure.  Let's go to the next one.

5    A.  So here is the more realistic picture, financial picture,

6    of a broker dealer's net capital.  You notice we scratched out

7    three items at the bottom on the asset side.  Buildings?

8    Buildings is a good asset.  What if this broker dealer owned

9    this courthouse -- they don't -- but hypothetically it's a good

10   asset, it's a good investment for accounting purposes, but no

11   one can be assured that we could sell this building in 30 days,

12   so the $10 million that we put down for buildings or real

13   estate are removed from the net worth of that firm in trying to

14   determine its net capital.

15             Another name for net capital that might interest you

16   is called regulatory capital.  Same thing with art.  What if

17   that broker dealer owns, just pick one, the Mona Lisa.  It's a

18   valuable asset; it's worth a lot of money; it's a good asset

19   for accounting purposes; but no one can be assured that you

20   could sell that art in 30 days, so we put a value of $2 million

21   in art, you got to take it away for net capital purposes.  Same

22   thing for computers or other types of assets like that; they're

23   good assets for accounting purposes; they are not considered a

24   good asset.

25             So the bottom line is from a cash or cash equivalent

1    item -- cash, stocks and bonds -- you can pretty much

2    reasonably sell stocks and bonds -- not all of them but most of

3    them -- in a 30 day period.  So, the total liquid assets of

4    this broker dealer for calculating its net capital is 4

5    million.

6            Remember what I said, assets, cash assets in excess of

7    the total liabilities -- the liabilities haven't changed,

8    they're still $2 million -- so basically the net capital of

9    this firm, the regulatory capital, is 2 million.  And in some

10   of the assets, even if they're cash equivalent, are subject to

11   what we call haircuts or discounts against their fair market

12   value, against that million dollars of stocks and a million

13   dollars of bonds.  The SEC has specific rules discounting their

14   fair market value, so in this particular example, hypothetical,

15   the regulatory net capital of this broker dealer will be

16   slightly less than $2 million even though it had $16.5 million

17   of assets.

18   Q.  Sir, just to focus specifically on two items here, you have

19   stocks and bonds, each listed at $1 million.  Can you describe

20   just very briefly what sorts of factors would be taken into

21   account in determining the size of the haircut.

22   A.  Sure.  So let's take stocks of a million.  A lot of stocks

23   are traded on an exchange.  If any of you are from New York,

24   you have heard of the New York Stock Exchange.  Stocks are

25   traded on that exchange.  That is a market where you can

1    readily sell shares of companies that are listed or traded on

2    that exchange.

3           You have other types of shares or securities that have

4    not traded on an exchange, and they are less liquid, and so the

5    haircuts might be greater against those types of stocks.  So,

6    you really have to break down the stocks and determine their

7    type.

8           The same thing with bonds.  Bonds are traded quite

9    often, very liquid, most bonds, not all bonds, so you have to

10   look to the specific bond that was listed here as an asset and

11   determine its liquidity, its ability to be converted into cash

12   within 30 days; and that determines then the haircut that the

13   SEC applies this SEC Rule 15c3-1, which is a mouthful, but it's

14   a technical rule determining the net capital requirements of a

15   broker dealer.

16   Q.  And what under circumstances might a bond be marked down a

17   hundred percent for net capital purposes?

18   A.  If a bond is not treated in an active manner and is very

19   difficult with a typical type of bond where you cannot

20   determine its fair market value, or the bond is not traded much

21   by bond holders, there is not a lot of trading activity in that

22   particular bond, they are considered less liquid.  Think of

23   this term liquidity.  If they're less liquid, some of the

24   haircuts can be a hundred percent.

25          So, if this particular bond that we used on this

1    hypothetical balance sheet was one of those less liquid bonds,

2    then we would have to draw a line through those bonds as well

3    in determining the net capital requirement of that broker

4    dealer.

5    Q.  And I also want to go back to an issue that you alluded to

6    earlier, which is the distinction between fair market value and

7    the value of a particular asset for net capital purposes.

8            With respect to assets like real estate or art, is it

9    generally the case that an asset might have one fair market

10   value but a different value for net capital purposes?

11   A.  Yeah.  All three of the items that are crossed out on this

12   exhibit, the numbers next to them -- 10 million for buildings,

13   $2 million for art, half a million for computers -- those are

14   valid what we call fair market value for accounting rule

15   purposes to determine the net worth or financial condition of

16   that company; but the SEC really wants broker dealers to have a

17   more cash, more liquid types of assets, so in calculating the

18   capital requirements, net capital requirements of a broker

19   dealer, that $12.5 million of assets would be zero for purposes

20   of regulatory capital, because you cannot condense or prove

21   that you can sell any of these items in that 30 day window;

22   they're not considered liquid.  And the SEC wants broker

23   dealers to have a lot of cash, liquid assets, because you can

24   have some sudden market moves, and they need cash to make sure

25   that the brokerage firm is alive and not filing for bankruptcy.

I6L7GAL7                         Filler - Direct

1   Q.  And separately you mentioned earlier that broker dealers

2   also have notification requirements.

3   A.  I'm sorry.  What?

4   Q.  You mentioned earlier that broker dealers are also subject

5   to certain notification requirements.

6   A.  Correct.

7   Q.  And when do those requirements kick in?

8   A.  So, as I mentioned earlier, broker dealers are required to

9   have forms, file forms with the SEC and with FINRA.  One of

10  those reports we talked about earlier was called this focus

11  report, and they're filed monthly.

12          If the net capital requirements of a particular broker

13  dealer, let's say hypothetically it's 100,000, if the net

14  capital requirement of that broker dealer fell below 100,000,

15  they have to file what is called a notification with FINRA

16  promptly and immediately, notifying FINRA that we have fallen

17  below this minimum net capital requirement for that particular

18  firm.  If the net capital requirements were 10 million for that

19  firm and they're at 9.9 million, same type of notice.

20  Q.  And so it sounds likes this is a self-reporting exercise.

21  A.  It's absolutely.  It's the duty, the responsibility of

22  every broker dealer to calculate their net capital daily.  They

23  report it monthly to FINRA and so forth.  But in calculating it

24  on a daily basis, if their daily calculations show they are

25  below this required net capital level of whatever it might be,

1   they have to give prompt and immediate notice to FINRA.  FINRA

2   will then come in and inquire as to what is going on, and make

3   sure that the customers of that broker dealer are protected.

4   Q.  And who at a broker dealer is responsible for filing those

5   reports?

6   A.  It's called the financial principal.  Every broker dealer

7   is required to have someone who is Series 27 licensed, what I

8   call the financial operations principal or financial principal.

9   That individual is required to calculate the net capital and

10  make the required notifications by law.

11  Q.  And after those notifications have been filed, what

12  typically happens next?

13  A.  FINRA, once they receive any types of those types of

14  notifications, will immediately make inquiry, what's going on,

15  why have your net capital requirements fallen below their

16  required level.  Depending on the issue, FINRA will send a team

17  of auditors to that broker dealer to investigate, to make sure

18  the broker dealer is able to put more capital back in, to

19  maintain its operation.

20          So, it's really a relationship between FINRA and the

21  broker dealer.  FINRA wants to make sure all of its broker

22  dealers that it regulates meet their net capital requirements.

23  Q.  And is that dialog part of the everyday business of a

24  broker dealer or is it exceptional?

25  A.  No.  Well, I mean obviously notifications are a little bit

I6L7GAL7                    Filler - Direct

1    unique when you fall below the net capital.  But when I was in

2    private practice, or when I had my own brokerage firm, I would

3    be in constant communication with regulators.  I wanted to make

4    sure my brokerage firm was in compliance with all the rules and

5    regulations.  So, if I had a question mark, I would reach out

6    to the regulators to try to get their input or advice, to make

7    sure what we were doing was in compliance.  Sometimes I would

8    reach out to professional firms, accounting firms, law firms,

9    to seek their advice as well.

10   Q.  And in your experience, do novel products sometimes lead to

11   this type of back and forth?

12        MS. TEKEEI:  Objection, your Honor.  No notice.

13        THE COURT:  Sustained.

14        MS. HARRIS:  Thank you, your Honor.

15   Q.  Can certain of those questions take some time to resolve?

16   A.  Sure.  I mean FINRA -- if I am at the broker dealer and I

17   make an inquiry of FINRA what are your thoughts, they will get

18   back to me sometimes in weeks, or months, or whatever time it

19   takes to get back to me and provide their input or advice.

20   There is a lot of what I call give and take.  They may want

21   more information to help them make those decisions.

22        Same thing is true, if FINRA notices something unusual

23   happening at that broker dealer, they have a right to inquire

24   of the brokerage firm what is going on, and provide

25   information, facts, records, relating to that particular event

I6L7GAL7                         Filler - Cross

1    or situation.

2                So, there is a lot of what I call communications going

3    from the industry to FINRA and from FINRA back to the brokerage

4    firm industry.

5    Q.  Would it strike you as unusual for that sort of regulatory

6    dialog to unfold over the better part of a year?

7                MS. TEKEEI:  Objection.  Notice.

8                THE COURT:  Sustained.

9                MS. HARRIS:  Thank you, Professor Filler.  I have no

10   further questions.

11               THE COURT:  OK, thank you.

12               Cross-examination.

13               MS. TEKEEI:  Yes, your Honor.  May I have one moment?

14   CROSS EXAMINATION

15   BY MS. TEKEEI:

16   Q.  Good afternoon, professor.  Professor, when did you first

17   begin working on this case?

18   A.  I'm sorry, I can't understand you.

19   Q.  Oh, sure.  Is that better?

20   A.  Yes.  Thank you so much.

21   Q.  When did you first begin working on this case?

22   A.  A couple weeks ago.

23   Q.  And you testified earlier that you didn't know -- well,

24   that no one else, to your knowledge, at Bates Group has worked

25   on this case.  Is that right?

I6L7GAL7                        Filler - Cross

1    A.  No, I said no one helped me in connection with my

2    testimony.

3    Q.  Fair, OK.  Thank you.  Are you aware that before retaining

4    you Mr. Archer's defense retained another expert in this topic?

5            MR. SCHWARTZ:  Objection.

6            THE COURT:  Sustained.

7    Q.  You testified, professor, that -- well, you described a

8    series of rules that broker dealers are required to comply

9    with, right?

10   A.  Yes, ma'am.

11   Q.  And those are rules set -- well, those regulations are

12   enforced -- those rules are enforced by the SEC; is that right?

13   A.  Well, mostly FINRA.  SEC does play a role.  Most of the

14   regulations applicable to broker dealers come from FINRA.  The

15   SEC has their own regulations.  The SEC acts as an oversight

16   regulator over FINRA, so most of the day-to-day involvement

17   between broker dealers and FINRA -- which is the principal

18   regulator for brokerage firms -- the SEC can -- there is

19   nothing that prevents them from also contacting their broker

20   dealer, but I'm saying 99 percent of the involvement is between

21   FINRA and broker dealers.

22   Q.  Thank you.  And that's exactly where I was going next.

23   FINRA regulates the broker dealers on a day-to-day basis,

24   right?

25   A.  Correct.

Q.  And the rules that you describe by and large are designed
to protect the customers of the broker dealers; is that right?

A.  Absolutely, they're all customer protection regulations.

Q.  And one of the rules that you describe has to do with net
capital, right?

A.  Yes.  Net capital is an SEC rule.  FINRA just requires
firms to meet the capital, but the calculation of net capital
is an SEC rule, 15c3-1.

Q.  Thank you.  And one of the reasons why FINRA regulates a
broker dealer's net capital is because the net capital rule is
designed to make sure that a broker dealer has enough cash and
liquid assets to be able to pay back all of its customers,
right?

A.  Correct.

Q.  And one way that broker dealers tell regulators that they
have enough net captain is through filing something called a
focus report.  You talked a little bit about that.

A.  That is correct.  Most brokerage firms file the focus
reports on a monthly basis; smaller ones do it on a quarterly
basis.

Q.  And separate and apart from the monthly or quarterly focus
reports -- I think you've talked a little bit about this on
direct -- but if a broker dealer is getting close to being net
capital deficient, they're required to file a notification with
FINRA, right?

I6L7GAL7                          Filler - Cross

1   A.  OK.  So there are two tests.  May I describe them?

2   Q.  Well, let me see if I can help us shortcut this.

3            Is one of them the 120 percent rule?

4   A.  It's called the early warning test.  So let's use

5   hypothetically the capital requirements of that broker dealer

6   is 100,000.  The early warning would be 120 percent of that or

7   120,000; so broker dealers with 100,000 minimum net capital, if

8   they ever fell below 120, let's say they get to 119, they have

9   to file this notification.

10  Q.  Thank you.  And the next notification is when they do fall

11  below that 100,000 requirement, right?

12  A.  That would be correct.

13  Q.  And when they file that notification, they have to report

14  to FINRA the time period that they were net capital deficient,

15  right?

16  A.  They proved the period of time.  Typically if they just

17  discovered it and it happened over the last three days, five

18  days, seven days, they report that period that they had just

19  discovered today that they have been undercapitalized.

20  Q.  And they would also have to report why they were net

21  capital deficient, right?

22  A.  Well, I'm not sure the why part of it comes in.  It's just

23  that the net capital calculations have now fallen below the

24  necessary numbers.  FINRA will then come in and inquire what

25  happened.

1   Q.  And one of the questions that FINRA asks are often what

2   steps are being taken to make the firm compliant with net

3   capital again, right?

4   A.  Yeah.  The key is how quickly can the broker dealer put in

5   additional cash or capital to bring up the net capital

6   requirements above those two levels.

7   Q.  And the reason for that is so that FINRA can ensure that

8   the customers are protected, right?

9   A.  There are two principals:  One is customer protection.

10  Two, customers have a lot of obligations in connection with

11  their buying of stocks and other things, and a broker dealer

12  needs a lot of cash; sometimes customers don't come up with the

13  cash that they need to in a relatively quick period.

14          The second part or the reason for the net capital, by

15  setting these minimum levels -- whether it's early warning or

16  net capital -- the SEC and FINRA believe that that particular

17  broker dealer has enough cash to maybe prevent it from filing

18  for bankruptcy.

19  Q.  Thank you for that.

20          My question is:  The net capital rule is an important

21  one for broker dealers to comply with, right?

22  A.  Absolutely.

23  Q.  And if they don't comply with the net capital rule, they're

24  not allowed to operate, right?

25  A.  Well, it depends whether they are below the early warning

1   or below the minimum net capital.

2   Q.  That's right.  So if they are below the $100,000 minimum

3   net capital requirement, they have to stop operating as broker

4   dealers.

5   A.  Unless FINRA gives them -- if they notify FINRA we're below

6   using the $100,000 hypothetical, they fall to 99,000, if FINRA

7   is given assurance that it's going to have money put in

8   quickly, they will sometimes allow that broker dealer to

9   continue; sometimes they do not.

10  Q.  And just to confirm, professor, you're just testifying

11  generally about your knowledge of broker dealers and those

12  requirements, right?

13  A.  That's correct.

14  Q.  You don't know anything about Burnham Securities, Inc.

15  A.  They sent me a copy of the indictment; I looked at it

16  briefly.  The answer is no.

17  Q.  And you don't know anything about Bonwick Capital; is that

18  right?

19  A.  Same thing.

20          MS. TEKEEI:  Thank you, professor.  I have no further

21  questions.

22          MR. TOUGER:  One question.

23

24

25

I6L7GAL7                          Filler - Cross

1   CROSS EXAMINATION

2   BY MR. TOUGER:

3   Q.   Good afternoon, professor.

4   A.   Hi.

5   Q.   We've never spoken about this case before, have we?

6   A.   No.

7   Q.   On the phone or in person.

8   A.   Sorry?

9   Q.   On the phone or in person?

10  A.   No, sir.

11  Q.   And what is a clearing firm?

12  A.   A clearing firm is -- as I mentioned, clearing firm,

13  clearing broker dealer, the legal term is called a general

14  broker dealer, and they tend to be the larger brokerage firms.

15  Q.   And would a broker dealer who does not have -- excuse me.

16  Would an investment advisor usually be related to a clearing

17  firm?

18          MS. TEKEEI:   Objection, your Honor.   Beyond the scope.

19          THE COURT:   I will allow it.

20          You can answer that.

21  A.   So can you repeat the question, sir?   I just want to make

22  sure I understood it.

23  Q.   Sure.   If somebody is just an investment advisor, would

24  they be associated with a clearing firm?

25  A.   As I mentioned in my testimony, almost every one of the

I6L7GAL7                       Filler - Cross

1   larger clearing firms has an affiliate that is registered as an

2   investment advisor.  They sometimes call it the asset

3   management part of that firm, but they are technically

4   investment advisors.  So you would have one affiliate of a

5   parent holding company that's the registered broker dealer; you

6   would have another affiliate of that parent holding company

7   that's the registered investment advisor.

8   Q.  And would an independent investment advisor use another

9   clearing firm because they're not a clearing firm?

10              MS. TEKEEI:  Objection.

11              THE COURT:  Sustained.

12              You don't have to answer that.

13              MR. TOUGER:  Nothing further, your Honor.

14              THE COURT:  Thanks.

15              Any additional questions for Professor Filler?

16              MS. HARRIS:  Nothing.

17              THE COURT:  Thanks.  You can step down.  Thank you

18   very much.  Have a nice afternoon.

19              (Witness excused)

20              MS. HARRIS:  Your Honor, we'd like to read in some

21   text messages from Defense Exhibit 3004B?

22              (Mr. Kendall Jackson takes the stand)

23   BY MS. HARRIS:

24   Q.  Good afternoon, Mr. Jackson.

25   A.  Good afternoon.

1    Q.  And Ms. Dillingham, if you could please put Defense Exhibit

2    3004B, the redacted version, up on the screen and publish it to

3    the jury.  And if you could go to page -- if you could please

4    go to page 21, Ms. Dillingham.

5           Text message from 3104259575, Jason Galanis.  Time

6    stamp:  September 28, 2014, 11:49 p.m.

7           "Said Hunter is the Taft-Hartley king.  Just spoke to

8    Devon, maybe he can put in a word at WSSC.  Will call shortly."

9           I'm sorry.  And the following page, Ms. Dillingham.

10          "No way.  Don't want his first exposure to be one that

11   has fired us.  Are you nuts?"

12   A.  "Oops, I am."

13   Q.  Next on page 24, Ms. Dillingham.

14          From 3104259575, Jason Galanis.  Time stamp:  February

15   13, 2015, 3:56 a.m.

16          "Just finished a booze-a-thon with Andrew and Bevan."

17   A.  From 17325985189.  Time stamp:  February 13, 2015.

18          "Body:  A ... is that Devon maybe?  Hugh has lobbed me

19   to you.  I knew I was going to need you sober.  Let me know

20   when your head is clear tomorrow."

21   Q.  "I'll be good in an a.m.  Bevan is Bevan.  Devon is Devon.

22   And there is a Kevin.  And a Devin."

23          And on the following page, page 26, Ms. Dillingham.

24   A.  From 17325985189.

25          "Texting you and Devin at the same time.  He's given

1   me a new name "the Greek whisperer"  I love it."

2   Q.  "Bevan.  Devon is someone else.  And Devin is someone else

3   too."

4            The next page, Ms. Dillingham.

5            "Bonwick Devon."

6   A.  "You're confusing me."  Oh, I'm sorry.

7            "Whatever Einstein, you know who I'm talking about.  I

8   don't know that black guy yet ... you're confusing me."

9   Q.  And on page 679, Ms. Dillingham.  I'm sorry, 29.

10  A.  "From 17325985189.  Time stamp:  3/14/2015, 5:42 p.m.

11           "Who's Rory night?  Sorry I don't know but I was stuck

12  on a mountain in Ramona trying to survive.  Names escape me."

13  Q.  "Well, was my dean at Templeton 20 years ago.  So he ran

14  the business school at Oxford University, which was endowed by

15  Sir John Templeton."

16  A.  "Oh, that guy."

17  Q.  "He is now on the investment committee of the $6.8 billion

18  Sir John Templeton Foundation."

19           On the next page, Ms. Dillingham.

20           "I installed him as our chairman at the insurance

21  group.  Is institutional contacts are incredible he doesn't

22  have a good instinct for making money but the Rolodex is pretty

23  impressive."

24  A.  "I should be the one to meet him.  I didn't screw up Sugey

25  (I made him laugh by the way so I won our bet) so now I feel I

I6L7GAL7                     Filler - Cross

1    can face anyone."

2    Q.   Turning to page 38, Ms. Dillingham.  I'm sorry, page 38.

3    A.   "From 17325985189.  Time stamp:  7/4/2015, 3:29 a.m.

4         "What are you doing for the 4th... and is there a

5    birthday party planned???"

6    Q.   "Malibu.  Gubers staying over Sugarman will be there for a

7    while, super fun and interesting people."

8         And if you could turn to page 23, Ms. Dillingham.

9    A.   From 17325985189.  Time stamp:  10/29/2014 at 9:09 p.m.

10        "Sorry I was whiney today.  You were very nice to me

11   and thank you for that."

12   Q.   "No problem.  Get your head back in the game.  Hunter and

13   Devon will change your access forever."

14        Thank you, your Honor.

15        MR. SCHWARTZ:  Your Honor, Mr. Archer offers Exhibits

16   4804, 800, 4835, 4836, 4315 and 4708.

17        THE COURT:  They will be admitted.

18        MR. SCHWARTZ:  Thank you.

19        (Defendant's Exhibits 4804, 800, 4835, 4836, 4315,

20   4708 received in evidence)

21        MR. SCHWARTZ:  Do you have that stack in front of you?

22   It's probably the bottom most one in your pile.

23        Meanwhile, Ms. Dillingham, could you bring up Exhibit

24   4804.

25   BY MR. SCHWARTZ:

I6L7GAL7                      Filler - Cross

1   Q.  "From Jason Galanis to Francisco Martin, Friday, January

2   17, 2014 at 9:09 a.m.

3           "Francisco, you could share this with Fred.  You could

4   also mention Steve and Jason Sugarman, as well as Peter Guber,

5   Jason's father-in-law.  Many local connects in common I am

6   certain.  Jason."

7   A.  "From Francisco Martin, sent Friday, January 17, 2014 at

8   9:19 a.m., to Jason Galanis.  Subject:  Re:

9           "OK perfect."

10  Q.  Thank you.  You can take that down, and can you pull up

11  Exhibit 800.

12          From Jason Galanis to Michelle Morton, Tuesday, June

13  3, 2014 at 2:04 p.m.

14          "For Frankie when appropriate to demonstrate who your

15  financial sponsors are.  Jason."

16  A.  From Michelle Morton to Richard Deary.  Subject:  Forward.

17  Received June 3, 2014:

18          "I love this guy!!!"

19  Q.  And, Ms. Dillingham, could I ask you to just publish the

20  attachment to the jury.  Page 6, please, just to make sure

21  everyone sees it.  You can take that down.  And can we look at

22  Exhibit 4835.

23          Mr. Jackson, could I ask you -- excuse me -- I will

24  read the first one.

25          From Jason Galanis to Cameron Wald.  Subject:  Harvest

I6L7GAL7                        Filler - Cross

Global Investment.  Date:  August 7, 2014 at 9:25 p.m.

         "Cam coupe of updates first.

         "1.  Wealth Assurance agreed to terms with Hanover Re

for $6.6 million at 3.57 percent rate.  Third largest reinsurer

in the world.

         "2.  We have Deutsche Bank at credit committee.  They

funded Blackstone's purchase of our main competitor, so they

know the asset.

         "3.  We have Beachwood Re now begging us to take $10MM

in senior convertible at $8.

         "4.  We have a portfolio (swiss life) of $7 billion

that we can acquire for small money; money we can get at will

from Hanover Re.

         "So ...

         "Where we are is a partnership with Hunter Biden,

Devon Archer, and their partners at Harvest Global.  Jason and

I think this group has value beyond capital.

         "Harvest is $60 billion AUM with 8MM customers.

         "Deutsche bank asset management ($1.3 trillion AUM)

owns 30 percent.

         "Harvest is the "H" in the BHR Partners private equity

fund with the Bohai and Rosemont, so the parties are already

equity partners.  The BHR fund has $4 billion in newly obtained

Chinese government allocation commitments.  Devon is the vice

chairman of BHR.

1           "BHR and Harvest want to benefit from an American

2      investment bank that will do the work for the BHR private

3      equity deals.  They are convinced a western brand is the

4      correct means to accomplish that ... thus Burnham.

5           "So, the plan is as I described in a deck that I sent

6      you while you were in Hawaii.  A roll-up/tuck under of Burnham

7      under WAH, and a rebranding of WAH to Burnham.

8           "The plan is this ...

9           "$12 million from an investor at $8 with 100 percent

10      warrants, executed subscription agreements.

11           "$18 million from Harvest on the same terms.

12           "No debt ... would like to not take on anymore other

13      than possibly Deutsche Bank since this institutionally

14      validates us.

15           "Attached is my butchered cap table.  It is correct I

16      think.  It doesn't flow through the model, which doesn't matter

17      unless we are looking for IRR calculations.  This would be fine

18      to have, but not necessary.

19           "I would prefer to concentrate resources on sorting

20      out how to express the banking business and the asset

21      management business.  I am sending you an e-mail for those two.

22           "Our mission is to convince Lindsay Wright that

23      Harvest should allocate $18 million to our venture.  Jason."

24           And if you go back to the first page.

25      A.  From Jason Galanis to Bevan, sent Thursday, August 7, 2014

I6L7GAL7                        Filler - Cross

1  at 10:54 p.m.  Forwarded the previous e-mail:  Harvest global

2  investment attachment:  Wealth Assurance deal analysis-Valor

3  life acquisition v7 and BFG Harvest discussion v3.

4  Q.  Thank you.  Can we have Exhibit 4836 and go to page 2.

5           And can I ask you, Mr. Jackson to start from the

6  e-mail in the middle of the page.

7  A.  From Larry Liu?

8  Q.  Below that.

9  A.  From Dan McClory to Larry Liu.  Forwarded Mgt bios:

10  COR/Burnham.

11          "Read Devon's bio below -- he is very connected with

12  big Chinese investors, and is a great guy in NY.  Dan."

13  Q.  Can you go up to the next one, please.

14          From Larry Liu to Dan McClory, Monday, December 30,

15  2013"

16          "Dan, thank you for the reply.  Here are more

17  questions:

18          "Was Welling's $1 million invested in addition to the

19  $500,000?

20          "Can I have more info on the Bohai Harvest RST fund?

21  Such as the website or other introduction.

22          "What is the relationship of Wanda and Rosemont/COR

23  and what is the deal size and arrangement working for Wanda?

24          "Only for information, so if any confidential

25  information is involved, I can only have basic info like,

1    Rosemont/COR is help raising $500 million for Wanda's project

2    in Beijing.

3            "Can I have more information on the background of

4    Welling, the other investor in the company?

5            "Who is the investor for the $625,000 out of the

6    current $3.125 million investment?  Thanks, Larry."

7            Go to page 1, please.  There is one at the very, very

8    bottom there.

9            So on December 29, 2013 at 10:10 p.m., Dan McClory

10   wrote.

11           It's empty, and go ahead.

12   A.  "Confidential treatment requested by Burnham Securities,

13   Inc."

14   Q.  I am sorry.  Go to the e-mail above.  Go on page 1.

15   A.  From Jason Galanis, sent Sunday, December 29, 2013 at 10:28

16   p.m. to danmcclory@cox.net, cc Hugh Dunkerley.  Subject:  Re

17   mgt bios:  COR/Burnham.

18           "It may be worth clarifying that Devon's two partners

19   in Rosemont are Chris Heinz and Hunter Biden, the stepson of

20   the Secretary of State John Kerry and the son of Vice President

21   Joe Biden, respectively.  Both are active in the Rosemont

22   business.

23           "In addition to Rosemont, Devon is managing partner to

24   the Burnham investment vehicle, COR Fund Advisors.

25           "Welling is investing $1.5 million, with $1 million in

1   escrow currently and to be released as part of the option

2   exercise and closing.

3          "Welling is owned by Nurlan Abduov, a high net worth

4   investor from Kazakhstan.  Rosemont is deeply involved in

5   Kazakhstan.  The SWF of Kazakhstan is involved with Rosemont

6   Seneca Technology Partners, Rosemont's technology investment

7   vehicle.

8          "On Wanda, the relationship is by way of Bohai.  Wanda

9   is a limited partner in Bohai that has provided capital.  Wanda

10  has also asked Bohai and Rosemont to source a significant

11  acquisition.  The details are their own decision to disclose.

12         "On Bohai, this is the publicly available information.

13  Www.bohaicapital.com.

14         "I am not authorized to provide the corporate

15  materials.  Jason."

16  Q.  And then from Hugh Dunkerley to Shaun Lieu on January 6,

17  2014.  Forward:  Mgt bios:  COR/Burnham.

18         "Sean, here is some background information on Rosemont

19  Capital which is a $2.2 billion real estate fund that has a

20  joint venture with Bohai Capital in China who are based in

21  Tianjin.  I think that this is only another reason to get

22  closer with Burnham as it is obvious we are getting into the

23  Chinese market so with your help this should speed up the

24  process.  Let's talk tomorrow when you have a moment.  All the

25  best, Hugh."

1              Can we go to 4315, please.

2              On April 1, 2014 at 12:04 p.m., Jason Galanis wrote:

3              "I tried calling you.  You should decide what you want

4       on Burnham.  The trustee meeting was put off until Thursday.  I

5       do not think it is a good idea to put it off again."

6              Go to page 2.

7              "I will support whatever you want.  I am worn out.

8       Should Burnham blow apart (its close), I expect we will lose

9       Archer on other opportunities.  Richerson and Nathaniel will

10      come in and buy the business.  J."

11      A.  From Jason Sugarman to Jason Galanis dated April 1, 2014 at

12      3:24 p.m.  Subject:  Re.

13             "Told Archer I was fine this a.m.  Regards, Jason."

14      Q.  On April 1, 2014 at 12:35 p.m. Jason Galanis wrote:

15             "Don't forward."

16      A.  On April 1, 2014, at 3:37 p.m., Bevan wrote:

17             "Good bear wrangling!

18      Q.  You can take that down.  Can we have Exhibit 4708.

19             And, Mr. Jackson, could I ask you just to read the

20      header at the bottom.

21      A.  From Greg Harrington, dated Wednesday, January 22, 2014 at

22      12:53, to Jason Galanis and Bevan.  Subject:  Galanis training

23      video.

24      Q.  On January 22, 2014 at 6:51 p.m., jason@holmbycompanies.com

25      wrote:

I6L7GAL7                        Filler - Cross

1              "Please respect Bevan's relationship with Devon.  I

2    saw some bizarre e-mail to him just now about a $50 million

3    valuation.  Why not call Bevan first?  You'll mush this if you

4    send shit like that."

5    A.  From Bevan, dated Wednesday, January 22, 2014, to

6    jason@holmbycompanies.com, cc Greg Harrington.  Subject:  Re

7    Galanis training video.

8              "Pretty dumb, Greg.  The company is tracing at far

9    below a penny."

10   Q.  On January 22, 2014 at 6:56 p.m., jason@holmbycompanies.com

11   wrote:

12             "There is nothing about this that warrants $50

13   million.  That's a long way off, after a lot of execution ...

14   none of which has been evidenced to date.  I think you should

15   use Bevan.  Just my advice.  The alternative is to pimp Devon

16   and see how quickly he stops responding ... it will happen."

17   A.  From Bevan to jason@holmbycompanies.com, January 22, 2014,

18   cc Greg Harrington:

19             "Devon is not used to "swimming in shit"."

20             MR. SCHWARTZ:  Your Honor, at this point I'd like to

21   read a stipulation.

22             THE COURT:  Go ahead.

23             MR. SCHWARTZ:  "Defense Exhibits 4908 and 4909 are

24   true and accurate copies of recordings of conversations

25   involving Bevan Cooney and Billy Crafton recorded on or about

I6L7GAL7                        Filler - Cross

1    May 29, 2014."  And I would offer Exhibits 4908 and 4909 and

2    this stipulation, which is 4743.

3           MS. NOTARI:  Your Honor, we're also offering this.  We

4    are not objecting; it's a joint offer.

5           THE COURT:  All right, it will be admitted.

6           (Defendant's Exhibits 4908, 4909 and 4743 received in

7    evidence)

8           MR. SCHWARTZ:  Mr. Jackson, can you play those

9    recordings for the jury, and with your Honor's permission we

10   have transcripts as demonstrative aids to the jury.

11          THE COURT:  Yes, go ahead.

12          (Audio played).

13          MR. SCHWARTZ:  Your Honor, obviously the transcript

14   and the audio are getting disassociated with one another, so

15   let us reset.

16          THE COURT:  OK.  We can also do it Monday morning if

17   you'd rather.

18          MR. SCHWARTZ:  Whichever your Honor prefers.  Once we

19   get it working, it's only about two minutes long.  But I see

20   what time it is, so either way.

21          THE COURT:  Do you all want to go home for the

22   weekend?

23          OK, so we're going to adjourn.  Just remember what I

24   say every night:  Don't research the case.  Don't discuss the

25   case.  Keep an open mind.  Have a nice weekend.  I will see you

1    Monday at nine.  And we're on schedule, as I previously noted.

2    We anticipate having summations early in the week.

3              (Jury not present)

4              THE COURT:  So, first of all everyone can be seated.

5    I'm going to distribute the charge right after this.  So I will

6    distribute a draft charge, a draft verdict sheet.  We will meet

7    tomorrow at 11; we will go over the charge.  If you want to

8    make your motions then, you can.  If you'd rather reserve, you

9    can do that.  So, I'm open to either.

10             Are there other issues you want to raise with me?

11             MR. SCHWARTZ:  We all got together over the lunch and

12   finally agreed on one thing, which was a proposed schedule for

13   your Honor, but only if it works for you and for the jury.

14             So I think we had been hoping to finish the testimony

15   this afternoon; that obviously didn't happen.  We have one more

16   live witness.  We have about more than ten, fewer than 20, I

17   think, e-mails to read in, so maybe go through the midmorning

18   break or so on Monday.

19             I think it is the joint application of everyone for a

20   variety of reasons -- if it's acceptable to your Honor -- that

21   we adjourn for the day at that point, perhaps we could have the

22   charge conference then, or we can do it tomorrow, and then give

23   closings on consecutive days on Wednesday and Thursday.

24             THE COURT:  Yes, I'm sorry, I'm not going to do that.

25   It's just not fair to this jury.  I don't even know if they can

I6L7GAL7                          Filler - Cross

```
1    sit on Friday.  So I'm open to seeing if they can stay late on
2    Monday, but if we're only sitting to the midmorning break, I
3    really just don't think it's fair to them to ask them to
4    potentially go into July 4th week.  I mean who knows how long
5    deliberations will be, so it may have gone into that week
6    anyway, but I don't think it's fair to take off most of the
7    day.  I am sorry.
8            MR. SCHWARTZ:  I totally understand.
9            THE COURT:  Other than that, I'm happy to work with
10   you on scheduling.  I am happy to, you know, take a shorter
11   lunch, not take breaks.  I mean I understand we need some
12   breaks for health reasons, but I'm happy to go as late as you
13   want on Monday.  You know, I'm flexible in terms of just about
14   anything else, but I don't think it's fair to the jury to take
15   off most of the day on Monday.
16           On Tuesday, if you want to meet and go over anything
17   you want to go over with respect to motions, I'm happy to save
18   the motions for Tuesday afternoon, if that makes life easier
19   for you.
20           MR. SCHWARTZ:  Well, we still have the issue that
21   we're not going to be sitting on Tuesday as it stands now.
22           THE COURT:  I think that's right, unless there is
23   consent to substitute -- to take out 8 and 13.  We still
24   have -- I mean we can also figure this out on Monday, see if
25   everyone is here on Monday, and then make that decision.  I
```

I6L7GAL7                          Filler - Cross

1      mean I'm amenable to doing that and going forward on Tuesday,

2      because we will still have three alternates.

3              MR. SCHWARTZ:  I think where we had left that point

4      was the government had asked to inquire whether Juror 8 was out

5      for the entire day.

6              THE COURT:  Did we find that out, Alison?

7              DEPUTY COURT CLERK:  They both have graduations.

8      That's as much as I know.

9              THE COURT:  Are they still here or did they leave?  Do

10     you want to see if 8 and 13 are here and just confirm that

11     they're out the entire day?

12             DEPUTY COURT CLERK:  OK.

13             THE COURT:  We will do that now.  I'm sorry we didn't

14     do that sooner.  I think we had assumed they were out the

15     entire day, but we will confirm that.

16             Any other issues you want to raise?  I mean I know I

17     need to rule on those few remaining documents, which I will.

18             MR. SCHWARTZ:  I mean to be clear, there is a larger

19     universe of documents that I think the government has

20     objections to that we're moving in but not publishing to the

21     jury.  It's not a ton but it's some more.  We haven't talked

22     about them yet, so we will do that first.

23             THE COURT:  If you would do that.  I mean you can

24     raise any tomorrow with me, and then any that I don't have time

25     to look at, I will, you know, either issue a ruling or let you

1    know Monday morning.

2          MR. QUIGLEY:  No criticism of anyone -- it's been a

3    fast moving last couple of days -- but if we could get kind of

4    like a final final list from Mr. Schwartz of what he intends to

5    introduce that's not in evidence already, that would be

6    helpful.  I mean we got a list while we were sitting here this

7    afternoon.  So just a final list.

8          THE COURT:  Why don't you meet after this; why don't

9    you go over all of the exhibits.  Then just write me a letter

10   saying which exhibits are the issues that remain that I need to

11   decide, and I will take a look at them.  And if I don't have

12   them -- I mean if I have them already, don't worry about it --

13   but if I don't have them, if you can either e-mail them to me

14   or include them attached to the letter.

15         All right, I think that's it.

16         You know, why don't you wait for a minute just to see

17   if Ms. Cavale was able to catch either 8 or 13.

18         DEPUTY COURT CLERK:  So number 13 is gone, but number

19   8 says that she can sit from maybe 1 to 5, because her son's

20   graduation is in the Bronx and it's at ten a.m. and then she

21   can get here.

22         THE COURT:  OK.  So did everyone hear that?  So Juror

23   8 can sit from 1 to 5.  I'm happy to sit from 1 to 5.  We don't

24   know about 13 yet.  We can call 13 and ask 13, and then you can

25   let me know tomorrow what you want to do with 13.

I6L7GAL7                          Filler - Cross

1              MR. QUIGLEY:  I think we would be onboard sitting

2    Tuesday afternoon from 1 to 5.

3              THE COURT:  And do we think timewise -- so if we get

4    through the morning break, then the government's summation you

5    said two and a half hours; is that right?

6              MS. MERMELSTEIN:  My best estimate at the moment.  I

7    confess I don't have -- it's not definitive yet.

8              THE COURT:  You know, that takes us to lunch, probably

9    through part of lunch.  And let me know in advance if you want

10   to take a break, if you don't want to take a break, if you want

11   me to see how the jury is doing.

12             Then I don't know how long defense summations are.  I

13   don't know if you've worked out the order yet.  If you think we

14   can -- I mean it doesn't seem like we can fit everything in

15   Tuesday, but we can at least have things be consecutive if we

16   sit in the afternoon, and then finish up Wednesday morning.

17             MR. SCHWARTZ:  Well, we will talk amongst ourselves.

18             THE COURT:  OK.  All right.  So I will see you

19   tomorrow at 11.  OK, thank you.

20             (Trial adjourned to June 22, 2018 at 11 a.m.)

21

22

23

24

25

1                          INDEX OF EXAMINATION

2      Examination of:                              Page

3      PAUL ATKINS

4      Direct By Mr. Wenner . . . . . . . . . . . . .3177

5      Cross By Mr. Quigley . . . . . . . . . . . .3218

6      Cross By Mr. Touger  . . . . . . . . . . . .3229

7      SETH FLIEGLER

8      Direct By Mr. Wenner . . . . . . . . . . . . .3245

9      Cross By Mr. Quigley . . . . . . . . . . . .3263

10     Cross By Mr. Touger  . . . . . . . . . . . .3272

11     KENDALL JACKSON

12     Direct By Mr. Schwartz . . . . . . . . . . .3276

13     Cross By Mr. Quigley . . . . . . . . . . . .3283

14     KRISTA ARCHER

15     Direct By Ms. Harris . . . . . . . . . . . .3286

16     Cross By Ms. Tekeei  . . . . . . . . . . . .3303

17     Cross By Mr. Touger  . . . . . . . . . . . .3307

18     SARANYA LAVENTHIRARAJAH

19     Direct By Ms. Notari . . . . . . . . . . . .3321

20     Cross By Ms. Mermelstein . . . . . . . . . .3339

21     Redirect By Ms. Notari . . . . . . . . . . .3346

22     RONALD FILLER

23     Direct Q. . . . . . . . . . . . . . . . . .3367

24     Cross By Ms. Tekeei  . . . . . . . . . . . .3391

25

Cross By Mr. Touger  . . . . . . . . . . . .3397

DEFENDANT EXHIBITS

Exhibit No.                                    Received

4332, 4326, 4331 and 4387   . . . . . . . . .3238

4009, 4015, 4027, 4044, 4300  . . . . . . .3249

4338, 4340, 4341 and 9001   . . . . . . . .3249

4348 and 4348 A  . . . . . . . . . . . . .3278

4928   . . . . . . . . . . . . . . . . . . .3290

3802   . . . . . . . . . . . . . . . . . . .3324

4845   . . . . . . . . . . . . . . . . . . .3367

4804, 800, 4835, 4836, 4315, 4708   . . . . .3401

4908, 4909 and 4743   . . . . . . . . . . .3410