I6P7GAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              16 Cr. 371 (RA)

JOHN GALANIS, et al.,

          Defendants.

------------------------------x

                                New York, N.Y.
                                June 25, 2018
                                9:07 a.m.

Before:

                HON. RONNIE ABRAMS,

                            District Judge

                    APPEARANCES

ROBERT KHUZAMI,
    Acting United States Attorney for the
    Southern District of New York
BY:  BRENDAN F. QUIGLEY,
    REBECCA G. MERMELSTEIN,
    NEGAR TEKEEI,
      Assistant United States Attorneys

PELUSO & TOUGER
    Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
    Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
    LAURA HARRIS
    CRAIG WENNER

I6P7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              - and -
     O'NEILL and HASSEN
5         Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ-HASSEN

6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                   Eric Wissman, Paralegal
                    Special Agent Shannon Bienick, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6P7GAL1

<table>
<tbody>
<tr><td>1</td><td>(Trial resumed; jury not present)</td></tr>
<tr><td>2</td><td>THE COURT:  All right.  Some of these submissions I</td></tr>
<tr><td>3</td><td>got very late, so they're not frankly as helpful as they could</td></tr>
<tr><td>4</td><td>have been, but let's talk about what we can.</td></tr>
<tr><td>5</td><td>First, with respect to the charge, I don't think I got</td></tr>
<tr><td>6</td><td>a submission from any defense counsel.</td></tr>
<tr><td>7</td><td>MR. SCHWARTZ:  Your Honor had said on Friday that you</td></tr>
<tr><td>8</td><td>wanted that by today, so we were anticipating putting it in</td></tr>
<tr><td>9</td><td>today.</td></tr>
<tr><td>10</td><td>THE COURT:  Maybe I misspoke.  I thought I said I</td></tr>
<tr><td>11</td><td>wanted it Friday or Saturday.</td></tr>
<tr><td>12</td><td>MR. SCHWARTZ:  As my team can vouch for, I checked the</td></tr>
<tr><td>13</td><td>record three times on that.  Your Honor said you wanted the</td></tr>
<tr><td>14</td><td>charge letter by Monday because the charge wouldn't happen</td></tr>
<tr><td>15</td><td>until Wednesday at the earliest, and the exhibit letters on</td></tr>
<tr><td>16</td><td>Friday.  So I apologize; we will get that in.</td></tr>
<tr><td>17</td><td>MR. QUIGLEY:  Your Honor did say that.  I think the</td></tr>
<tr><td>18</td><td>clear import though is that -- I mean the charge needs to be</td></tr>
<tr><td>19</td><td>final before we close.</td></tr>
<tr><td>20</td><td>THE COURT:  Yeah, so I don't know.  If I said that, I</td></tr>
<tr><td>21</td><td>misspoke, because obviously the whole point of doing the charge</td></tr>
<tr><td>22</td><td>conference in advance of summations is to give you what you</td></tr>
<tr><td>23</td><td>need.</td></tr>
<tr><td>24</td><td>I will tell you I'm inclined to give the conscious</td></tr>
<tr><td>25</td><td>avoidance charge.  I'm not inclined to give multiple conspiracy</td></tr>
</tbody>
</table>

I6P7GAL1

1    charge.  I think we can sort out all of the other details

2    later.  In any event, let's just focus right now on evidentiary

3    rulings for this morning.

4            MR. SCHWARTZ:  Your Honor, it's a red line, but I'm

5    happy to hand up the substantially final version of our letter.

6    I didn't mean to obviously --

7            THE COURT:  No, if I said it, it's my fault.  You

8    know, I apologize for any confusion.  I just want to get the

9    government and whichever defense counsel goes today the

10   information they need to give the summation.  I will read it

11   over the break.

12           MR. SCHWARTZ:  Because obviously I would like your

13   Honor to have the benefit of the defendant's thinking.

14           THE COURT:  Yes, of course.  So I will read that over

15   the break.  I mean I had already told you how I was leaning on

16   that, and I haven't changed my view, but I will read your

17   letter before I decide.

18           MS. TEKEEI:  Can we get a copy of that?

19           THE COURT:  Let's talk about the Cooney exhibits, Ms.

20   Notari.  So, I just want to understand the relevance of some of

21   these.  I mean there are hearsay issues with respect to some of

22   these exhibits.  But why don't you walk me through the

23   relevance of the exhibits.

24           MS. NOTARI:  So --

25           THE COURT:  Starting with 3756, which is the letter

I6P7GAL1

from City National Bank that Mr. Cooney is in good standing.  I

mean why is that not hearsay, and why is it relevant?

          MS. NOTARI:  Your Honor, I think that it's relevant

because it is part of the defense case that he was a client in

good standing.  In actuality, the witness who testified,

testified that he was a client in good standing dating back

to -- this actually dates back to a time before what he had

knowledge of.  And this is an authentic document that was part

of the discovery; it was submitted as part of a real estate

application; and I just think it corroborates his defense.  So

with that I would defer to the court.

          THE COURT:  All right.  I'm not going let this in.  I

think it's hearsay.  I don't think it's been established that

it's a business record.  I don't think it's directly relevant

in any event.

          MS. NOTARI:  If I could start with 3235.

          THE COURT:  Sure.

          MS. NOTARI:  This is a crucial, crucial e-mail from

Jason Galanis to Bevan Cooney, and it absolutely is a state of

mind e-mail where he says, "Cooney, the wiring instructions are

on the second page.  Thank you so much for handling this for

us.  The real estate proceeds will pay it off, but thank you

for taking the shot again."

          It just shows the relationship that he had with Jason

Galanis, how he was constantly trying to get him to pay for

I6P7GAL1

1    things, and it was all in the guise of business, and it

2    actually supports the defense theory that 1920 Bel Air, that

3    was actually a legitimate real estate transaction, where

4    Mr. Cooney believed that the proceeds of that sale were going

5    to pay off loans that he had made.  Specifically the attachment

6    here is Oxford Metrica.  That's already in evidence.  The

7    government put that into evidence -- didn't object.  It's on

8    our chart that my client paid expenses for Dr. Rory Knight.

9    This was Oxford Metrica.  This was all related to -- Oxford

10   Metrica was -- professor Knight was the director of the board

11   of Wealth Assurance, and I don't know what more I can say; it's

12   his state of mind.

13          THE COURT:  Does the government want to respond on

14   this?  Why does it not go to Mr. Cooney's state of mind?

15          MS. TEKEEI:  Your Honor, this is an e-mail, a document

16   from August of 2013, which is well before the time period of

17   the conspiracy.  Now, while that alone may not be dispositive,

18   it has no relevance to the Wakpamni bond scheme, and it has no

19   bearing on his state of mind with respect to the much later

20   1920 Bel Air transaction.

21          THE COURT:  I'm going to let it in.  I think it goes

22   to his state of mind and shows the course of dealings between

23   him and Jason Galanis.  I'm going to let that in.  I wasn't

24   sure what the relevance of 3003 was.  It wasn't clear to me

25   that this was specifically about the WLCC bonds as opposed to

I6P7GAL1

1   possibly some other investment regarding Native Americans.

2          MS. NOTARI:  But 3003 -- first of all, there are not

3   many documents which we actually put in.  There are a lot of

4   cumulative documents which Mr. Cooney is either forwarded to or

5   cc'd on, you know, where Jason Galanis is talking about his

6   vision of the Native American bonds and all of these

7   different --

8          THE COURT:  Well, what's the relevance of this one?

9          MS. NOTARI:  Well, this one in particular is September

10  2014; it's just about the time when Mr. Cooney is purchasing

11  the bond; and, you know, here he is, he includes an article, an

12  American Indian Law article about Greenberg Traurig, the law

13  firm representing the WLCC, and there is included, you know,

14  language in his e-mail about, again, just the legitimacy of

15  what's going on, and it's another very crucial document for his

16  state of mind.

17         THE COURT:  Do you want to respond on this one?

18         MS. NOTARI:  And, your Honor, they are putting so many

19  e-mails in about Mr. Cooney, probably close to two dozen

20  e-mails with just Mr. Cooney reacting.

21         THE COURT:  The issue is this seems related to other

22  transactions, and that's why I'm trying to figure out what the

23  relevance is.

24         MS. NOTARI:  Actually the article is directly talking

25  about Greenberg Traurig, who clearly is the law firm for the

I6P7GAL1

1    WLCC.  And, you know, the date of the e-mail, September 2014,

2    so that's exactly the timeframe Mr. Cooney purchases, he has

3    already signed -- you know, he is just about to sign the big

4    boy letter, and he is working on him.  He is working on him.

5    Because the evidence shows that Mr. Cooney was the backup plan

6    and he was not intended to be the investor in the second

7    tranche of bonds, and clearly Galanis is like working on him to

8    show the legitimacy of these bonds, and this is just one of

9    those e-mails.

10            MS. TEKEEI:  Your Honor, this e-mail has nothing to do

11   with the Wakpamni bonds.  It is confusing in that it relates to

12   a lawyer and a law firm that was involved in the Wakpamni

13   bonds, but it has nothing to do with the bond scheme.  It's

14   just another attempt to try to show some legitimacy in the

15   transactions that have nothing to do with this particular bond

16   scheme.

17            THE COURT:  I think this would lead to confusion.  It

18   doesn't have anything to do with the issues that the jury needs

19   to decide on in this trial, so I'm going to exclude 3003.

20            And then 3605, Ms. Notari, do you want to address this

21   one?

22            MS. NOTARI:  Well, you know, there has been a lot of

23   different capital allocation charts that show specifically

24   Mr. Cooney is grouped into the COR Fund, the cumulative

25   investment, but actually this parses out what his specific

I6P7GAL1

1    contribution was, the 400,000.  And I don't think the

2    government is disputing the representation in this chart.

3    Certainly this chart is in evidence.  The substance of the

4    chart is I believe a Boies Schiller exhibit, and I think it's

5    important that he conveyed this to his accountant, and it's

6    accurate, and it really sets out very clearly what his

7    investment was in Burnham and the percentage.

8              THE COURT:  Do you want to respond on this, 3605?

9              MS. TEKEEI:  I mean I think it is very clearly

10   hearsay.  We are trying to grasp what possible relevance this

11   has to the charged scheme here other than another sort of

12   attempt to show potentially tangentially related transactions

13   and information about those things being provided to Fulton &

14   Meyer.  We just don't see that it's relevant, your Honor, and

15   we think it's hearsay.

16             THE COURT:  I agree, I think this is both irrelevant

17   and hearsay, so I'm going to keep that one out.

18             Lastly, we have the e-mail correspondence with

19   Mr. Cooney's mother.

20             MS. NOTARI:  Again, this is a state of mind.  It's an

21   e-mail to his mother saying, you know, why specifically "This

22   is why we bought Burnham, mom.  Drexel Burnham just has an

23   amazing history."  The government's theory here -- although

24   we're not entirely clear what it is -- seems to be from the

25   get-go this was all a grand scheme to, you know, commit fraud,

I6P7GAL1

1    and so this e-mail is a state of mind and it says exactly what

2    he was thinking; this is why they bought Burnham.

3                 THE COURT:  Do you want to respond to this one?

4                 MS. TEKEEI:  I mean, your Honor, we think this is

5    clearly an effort to present a self-serving statement of

6    Mr. Cooney's, to suggest that everything that he did in

7    connection with the roll-up and the purchase of Burnham was

8    done in good faith, that that is contrary to our theory.

9            While there may have been aspects of it that were

10   potentially legitimate, there were many aspects that were not.

11   And we think this is just an attempt to, one, engender sympathy

12   with the jury, since it's an e-mail to his mother, who Ms.

13   Notari has already discussed in her opening, and, two, it's a

14   gratuitous self-serving statement to sort of intimate that

15   everything that he was doing with respect to this was in good

16   faith.  Obviously we can't cross-examine him on this.

17                THE COURT:  I'm going to allow this in.  I think it's

18   a close question, but I don't think it prejudices the

19   government and, you know, it arguably goes to his state of

20   mind, so I am going to allow that in.

21                MS. TEKEEI:  Your Honor, I'm so sorry to interrupt.

22   If your Honor is inclined to let it in, then we would ask that

23   the top e-mail where his mother responds "so happy for you, XO,

24   XO" be redacted.

25                THE COURT:  Absolutely, that will be redacted.

I6P7GAL1

1          Let's talk about the Archer exhibits.  The government

2     objects to the following:  Government Exhibit 2000, 4023B -- or

3     excuse me, Defense Exhibits -- 4128, 4325, 4384, 4606, 4705,

4     4772, 4825, 4826, 4839 and 4846, and then I got an additional

5     letter regarding 4318.

6          Just to clarify, Mr. Archer is no longer seeking to

7     introduce 4606; is that right?

8          MR. SCHWARTZ:  That's correct.

9          THE COURT:  OK.

10         OK.  So as to 4023B, is a ruling still necessary as to

11    this one?  Is there still a dispute as to the authenticity of

12    this document?

13         MS. TEKEEI:  Yes, there is, your Honor.

14         THE COURT:  How are you going to seek to introduce

15    this?

16         MR. SCHWARTZ:  I mean we got this document from the

17    government.  It is subject to a stipulation.  It was produced

18    to the government by Mr. Dunkerley.  There is testimony in the

19    record that this valuation report was solicited by Jason

20    Galanis and Francisco Martin through a lawyer -- and you have

21    the communication with the lawyer in evidence -- and there is

22    further testimony from Mr. Dunkerley that the whole purpose of

23    Calvert and Calvert documents was to provide them to the

24    government.  To me that's more than sufficient to lay a

25    foundation to authenticate the document, which, to be clear, is

I6P7GAL1

1    not being offered remotely for the truth of the matter

2    asserted.  I would be happy to take it pursuant to instruction

3    that the document is entirely false in fact, because it is

4    entirely false.  The purpose of introducing it is simply to

5    demonstrate that this valuation report was generated.

6            THE COURT:  And does the government intend to argue

7    that Mr. Archer knew that Calvert was a sham entity?

8            MS. TEKEEI:  Yes, your Honor, we do.  I'd just like to

9    add it is the case that Mr. Dunkerley provided this.  However,

10   the testimony that Mr. Schwartz just described simply did not

11   happen.  There was general testimony about a valuation report

12   being commissioned or requested, but not this particular one.

13   And he had a chance to show Mr. Dunkerley this precise

14   valuation report.  He chose not to.  He tried to show it to

15   Mr. Martin; Mr. Martin didn't recognize it.  It is being

16   offered for the truth of what is in here, which is that another

17   entity did some sort of report and came up with a retrospective

18   valuation of Calvert.

19           It's not a proper argument to say that just because

20   other people touched Calvert or other people had a chance to

21   look at Calvert and found it to be somewhat legitimate then Mr.

22   Archer knew that it was legitimate.  There is no connection

23   here.

24           Mr. Schwartz has provided no evidence to show that Mr.

25   Archer ever saw this valuation report, that Mr. Archer knew

I6P7GAL1

1    anything about it, that Mr. Archer ever communicated with

2    anyone in Avenue M, that there was anything that would have led

3    Mr. Archer to see this.  He hasn't provided that.

4           So, it cannot possibly go to Mr. Archer's state of

5    mine.  And if it's being offered to show that someone else at

6    one point thought that Calvert was a legitimate entity, that's

7    just simply irrelevant and improper.

8           MR. SCHWARTZ:  So, first of all, I don't disagree that

9    there is no evidence, and I would not argue that Mr. Archer saw

10   this report or knew anything about this report, but let's be

11   clear about what the government intends to argue in its

12   summations.

13          It is going to argue -- based upon a stray reference

14   to Calvert in a single e-mail -- that Mr. Archer, therefore,

15   must have known that it was a sham entity and that he was

16   participating in the fraud because he mentioned Calvert.  That

17   to me is a totally false argument.

18          But if the government is going to be permitted to make

19   that argument based on that one e-mail that I cited to you in

20   our letter, then I think we have to be free to demonstrate that

21   there were a lot of people who said the word Calvert and there

22   is no reason to believe that they believed that it was

23   fraudulent, let alone they were let in on the picture by Jason

24   Galanis and Hugh Dunkerley and Gary Hirst, the people who knew

25   the truth about Calvert and the only people who knew the truth

I6P7GAL1

1     about Calvert.

2              I mean, honestly, I think the better course is to

3     preclude the government from making that argument in summation,

4     but I don't want to intrude upon that at this moment.

5              MS. TEKEEI:  Obviously, we disagree with that.  Mr.

6     Archer knew there was no Calvert in 2014; it didn't exist.

7     Mr. Schwartz's purported basis for entering this evidence is to

8     try to show that other people were duped, those people being

9     Avenue M.  We have no question of questioning the people at

10    Avenue M at this late hour about what information was provided

11    to them, about who made the request, how they went about

12    gathering the documents and gathering the information that led

13    to this report.  We have no way of doing that.

14             So, it is being offered for its hearsay basis; it's

15    being offered for the improper purpose of showing that someone

16    else was duped based on the fraudulent Calvert related

17    documents; and that's just not relevant to Mr. Archer's state

18    of mind.

19             MR. SCHWARTZ:  I think it might be helpful for your

20    Honor to look at the single e-mail that the government is going

21    to rely upon to make this Calvert argument with respect to Mr.

22    Archer.  Because unlike some of the other evidence about

23    Calvert that you have seen in this trial, there is no evidence

24    that Mr. Archer, for example, signed a back-dated document.  In

25    fact, Mr. Dunkerley testified that he and Jason Galanis had to

I6P7GAL1

create a backdated Calvert document that related to Rosemont
Seneca Bohai, which they did without Mr. Archer's knowledge.

          The only thing they have -- and, Mr. Jackson, if you
could pull it up -- is Exhibit 2119, where Mr. Archer makes a
stray reference when talking about sort of what to do with the
bonds in November 2015, that he says to Mark Waddington -- a
person not alleged to be a coconspirator -- "These are to be
replaced/returned to Calvert.  I wanted to share the below."

          There is no suggestion here that anything is
backdated.  There is no suggestion that Mr. Archer knew or must
have known whether this entity existed or didn't exist.  There
is nothing like that.  This is it.

          And I challenge the government to say otherwise, but
this is the only thing connecting Calvert to Mr. Archer in the
entire trial.  And if they're going to make the argument that
based on this one slim piece of evidence -- when every witness
who knows about Calvert says they never spoke to Mr. Archer
about it; he never signed anything about it -- if they are
going to be permitted to make the argument that this one slim
piece of evidence proves that Mr. Archer knew Calvert was a
sham and was being used to fool the SEC and others -- which I
don't think they should be allowed to do, then at the very
least I need something to rebut that.

          MS. MERMELSTEIN:  Well, that's a perfectly reasonable
argument for Mr. Schwartz to make to the jury, and he can tell

I6P7GAL1

the jury that the government is relying on one e-mail.  But I think there are two important things here.

First, Mr. Schwartz is acting like -- I mean your Honor has precluded them, and we understand that, but the other e-mails in which Mr. Waddington recounts to Mr. Archer their conversations in which Mr. Archer lies about Calvert and Mr. Archer does not respond and does not correct it, those are adopted admissions, and so it is a fact as a factual matter clear that Mr. Archer was lying about Calvert.

Now, this is the e-mail that's in evidence, and from which the government is allowed to make that point.  It is not in any fashion similar to the Avenue M issue.  It could not be more different.  If you look at the second e-mail on this chain, Mr. Archer says, "I think the consensus is we would like to return these bonds to the lender and beneficial owner in the quickest and orderly possible manner."

So, what Mr. Archer is saying is Calvert is the lender.  That's false.  That's the made-up story.  Mr. Archer knows that's not true, because he got the money in 2014 and it wasn't from Calvert.  This reveals that he is telling the same lie everyone else is telling.

And the notion that a report that was commissioned later, a report commissioned after Calvert has come into fruition, presumably then write documents that are fake and were backdated are given to Avenue M and they buy that story,

I6P7GAL1

1 that has nothing to say about what Mr. Archer knew, and it's

2 grossly prejudicial and confusing to the jury.

3          First of all, I think without explanation that

4 document suggests to them that it's possible Calvert existed in

5 2014 -- which it obviously didn't and everyone agrees it

6 didn't -- but more than that it improperly suggests that people

7 might reasonably have believed that it did.

8          Mr. Archer is just not remotely similarly situated.

9 If he wants to call someone from Avenue M to talk about what

10 they got and who they got it from, fine, but this document

11 cannot come in simply because Mr. Dunkerley produced it.

12          THE COURT:  I agree with the government on this for

13 the reasons just articulated, so I'm not going to allow 4023B

14 in.  So let's move on.

15          MR. SCHWARTZ:  Your Honor, sorry, just on that point,

16 assuming the government is going to be allowed to argue this in

17 summation, can my objection to that be noted now so I don't

18 have to interrupt them?

19          THE COURT:  Yes, absolutely.

20          MS. NOTARI:  Your Honor, I would join that as to

21 Calvert.

22          THE COURT:  Understood.

23          MR. SCHWARTZ:  And just generally --

24          THE COURT:  And I am not precluding you from calling a

25 witness as suggested, but I understand.

I6P7GAL1

1          MR. SCHWARTZ:  I understand.  Just in general for

2     summations, unless I think there is something that needs an

3     immediate curative instruction, it would be my request that the

4     defendants can hold their objections to the break so we're not

5     interrupting Ms. Mermelstein.

6          THE COURT:  That's fine.  But again if there is

7     something that you think you want me to correct, and you're

8     asking me to do something, you've got to do it so that I can

9     consider that request.

10          MR. SCHWARTZ:  Of course.

11          THE COURT:  All right.  Moving on to Exhibits 4128,

12     4825 and 4826, which we discussed last Thursday, putting aside

13     the relevance concerns for now, Mr. Schwartz, why aren't these

14     exhibits hearsay?

15          MR. SCHWARTZ:  Well, again, they're not being offered

16     for the truth of the matter.  Again, the underlying statements

17     here are false.  They are being admitted to demonstrate that

18     this is what happened and this is what was said, and in

19     particular that the board of Valorlife approved the purchase of

20     Wakpamni shares that they never purchased.

21          I note as well that the language of the board

22     resolution approving the purchase of the Wakpamni shares by

23     Valorlife is virtually identical to the language of the board

24     resolution for I believe it was Wealth Assurance AG when they

25     approved the Ballybunion transaction.  And basically these are

I6P7GAL1

1    side frauds or side embezzlements that Mr. Galanis and Hugh

2    Dunkerley are running where they are looting these companies of

3    money.  And all I'm trying to demonstrate is that this is what

4    was said and not the truth of anything in those documents.

5            THE COURT:  All right.  I am not going to allow these

6    in.

7            As reflected in the meeting minutes, Dr. Rory Knight

8    and Aloyse Steichen -- I may be pronouncing that -- A-L-O-Y-S-E

9    S-T-E-I-C-H-E-N -- who are not alleged in any way to have been

10   involved in this conspiracy relied on the input and expertise

11   of Hugh Dunkerley who has pled guilty for his role in this

12   conspiracy, and Jason Sugarman, an unindicted coconspirator

13   with close ties to Jason Galanis, in voting their approval to

14   purchase the WLCC bonds, but I fail to see similarities between

15   this evidence and Mr. Archer's defense.

16           The board of Valorlife was misled as to soundness of

17   the bonds as an investment vehicle, and the money supplied by

18   the board was also directly misappropriated, and thus the board

19   never received any bonds.

20           But I think this is significantly different from the

21   defense asserted by Mr. Archer, who does not claim to have been

22   misled about the soundness of the bonds as an investment, or to

23   have had any of his own money misappropriated.  Rather, he

24   claims not to have known of the criminal aspects of the WLCC

25   bond offering.

I6P7GAL1

         At the very least, the scant probative value provided
by these exhibits is substantially outweighed by the danger of
misleading the jury and of unfair prejudice to the government.
I similarly find impeachment an insufficient basis to admit
these exhibits, as they're extrinsic evidence.

         In any event, there has already been evidence to show
that the funds provided by Valorlife were misappropriated to
purchase Jason Galanis' condominium.

         All right.  So now let's go to Exhibit 2000, which is
an e-mail from Mr. Archer to Chase Coleman.

         Can you bring that up, please.  Thank you.

         So what's the relevance of this e-mail?

         MR. SCHWARTZ:  So again this is Mr. Archer long before
there was WLCC bond idea, long before that first meeting that
John Galanis and Raycen Raines and Tim Anderson had in Las
Vegas.  And if you blow up, please, the bottom three
paragraphs, you see as Mr. Archer is talking to this hedge fund
investor and laying out his various business interests he
explains that even at that point he was an investor in Wealth
Assurance Holdings and that the purpose of the investment and
the idea here was a roll-up of similar providers.

         So what this demonstrates is that contrary to the
government's argument that all of the corporate transactions
here were simply an artifice in order to facilitate the bond
fraud, this shows that the corporate transactions had begun and

I6P7GAL1

1    Mr. Archer's investment had begun long before there was an idea

2    for those bonds, and that his state of mind -- and this is

3    being offered for state of mind -- was that the purpose of the

4    investment is the roll-up.

5            THE COURT:  I will allow in just that portion of the

6    exhibit, that he viewed his role in the large roll-up as that

7    of an investor, but I want the rest of it out because I don't

8    think it's relevant.  OK?

9            MR. SCHWARTZ:  Sure.  Thank you.

10           THE COURT:  All right.  Now 4325 and 4384, I wasn't

11   clear on the relevance of these e-mails.

12           MR. SCHWARTZ:  So these two -- and I think the new one

13   that the government wrote about, 4318 -- are communications

14   between Mr. Archer and Jon Burnham in connection with the

15   course of dealings with the BIT board.  And there are long

16   e-mail chains.  I don't disagree with the government that there

17   is a lot in there that, you know, that's just irrelevant or

18   nuts and bolts of arranging phone calls.  But in each of these

19   e-mails there are important substantive communications.

20           So, for example, if you go to the second page of this

21   one, Mr. Burnham is reporting that he had an excellent meeting

22   with Bill Connell who is one of the independent trustees of the

23   BIT board and wants to discuss it with Mr. Archer.  Then at the

24   top on the first page Mr. Burnham talks about the anticipated

25   timing of a vote on approving.  So, these are just part of

I6P7GAL1

1    filling out the picture of what was in Mr. Archer's head during
2    the discussions with the BIT board.
3             THE COURT:  So consistent with my prior ruling
4    regarding negotiations with the BIT board as they're relevant
5    to Mr. Archer's state of mind, I will allow in those portions,
6    but I want everything else to come out.
7             MR. SCHWARTZ:  Sure.
8             THE COURT:  About the nursery camp and all the
9    permanent details, which I don't think are relevant.
10            MR. SCHWARTZ:  Thank you.
11            THE COURT:  Then why don't you turn to 4384, because I
12   think I had a similar reaction to this one, which is that the
13   personal issues -- personal remarks should come out.
14            MR. SCHWARTZ:  I think what the government objected to
15   was the line in the top, "In multiple closes over the weekend,
16   one of which is the insurance company, we're planning to use
17   ..."
18            I think it's present sense impression, but that's
19   really not why we're introducing this, so if you want that
20   redacted, we're happy to do it.
21            THE COURT:  All right, so why don't you do that.
22            MR. SCHWARTZ:  Then if you want to look at the last
23   one, 4318.
24            THE COURT:  OK.
25            MR. SCHWARTZ:  So this one I don't think there is

I6P7GAL1

1    anything irrelevant, but you can take a look.

2            THE COURT:  All right, that's fine.  This can come in.

3    Then can you bring 4705.  That was one I actually wasn't able

4    to access electronically when I was sent it.

5            MR. SCHWARTZ:  Sure.

6            THE COURT:  Was this produced with your initial trial

7    exhibits, Mr. Schwartz?

8            MR. SCHWARTZ:  Absolutely.

9            THE COURT:  And tell me the relevance of this.

10           MR. SCHWARTZ:  OK.

11           THE COURT:  This is just one page?

12           MR. SCHWARTZ:  No.  So if you go to I think it's page

13   6, Mr. Jackson, it's the beginning of the e-mail chain.  Sorry,

14   one back.  One more back.  So this is -- it's an e-mail chain,

15   and we're happy to redact some of the stuff in the middle --

16   but it's an investment opportunity being presented to Jason

17   Galanis to invest in a Maui hotel, a Ritz Carlton in Maui.

18   It's then forwarded at the top to Mr. Archer and I believe

19   Mr. Cooney, and the attachment is presentation materials about

20   the investment.  This is critically relevant to Mr. Archer's

21   state of mind.

22           The government is going to argue this afternoon that

23   Mr. Archer was lying when he said that the funds that were used

24   to buy the WLCC bonds, the $15 million by Rosemont Seneca

25   Bohai, they were generated from real estate.

I6P7GAL1

1           There is zero in the record about direct

2     communications with Mr. Archer about where that money came

3     from.  So, my argument is that that was a true statement, that

4     Mr. Archer believed that Jason Galanis' money here came from

5     real estate.  This is one exhibit that demonstrates very

6     clearly that Mr. Archer was aware of Jason Galanis' investment

7     in the real estate sector, and that's the purpose of this.

8     It's for state of mind in connection with what the government

9     contend is basically one of only two false statements, albeit

10    on a collateral matter, that Mr. Archer allegedly made in this

11    case.

12          THE COURT:  I am going to let this in.  I think it's

13    relevant to Mr. Archer's defense that he didn't violate its

14    technical terms and that the agreement was the result of formal

15    negotiations and vigorous back and forth.

16          MS. MERMELSTEIN:  Your Honor, I'm so sorry to

17    interrupt you, but I don't understand.  I mean with respect to

18    your Honor's BIT board ruling, I understand the contours of the

19    state of mind.  This has nothing to do with representations to

20    the BIT board; this has to do with the lies that were told to

21    Morgan Stanley and to Deutsche Bank, in which Mr. Archer when

22    asked about the source of the proceeds used to buy the $15

23    million of bonds in October of 2014 says real estate proceeds.

24          The notion that an e-mail from Jason Galanis almost a

25    year before, a stray e-mail saying here is a transaction, there

I6P7GAL1

1   is no evidence that this transaction came to fruition, there is

2   no evidence that Mr. Archer believed it came to fruition --

3          THE COURT:  Give me one second, because I think I'm

4   confused, because this is one I could not access.

5          MS. MERMELSTEIN:  Sure.

6          THE COURT:  Just walk me through this.  Let me hear a

7   little bit more about it, because I am confused as to the

8   purpose of this.

9          MR. SCHWARTZ:  Ms. Mermelstein is correct, this does

10  not have to do with the BIT board, this has to do with the

11  representations to Morgan Stanley and Deutsche Bank.  So if

12  your Honor recalls, Morgan Stanley --

13         THE COURT:  This was as to the $15 million.

14         MR. SCHWARTZ:  Correct, as to the $15 million.

15         So Morgan Stanley asked the question how was the $15

16  million generated, and the response that comes back is real

17  estate.  And our point is there is evidence -- and this is some

18  of that evidence -- that demonstrates that Mr. Archer believed

19  that Jason Galanis had substantial real estate investments and

20  that that was a true statement.  There is absolutely nothing in

21  the record that suggests that that is untrue.  There is no

22  evidence whatsoever about suggesting that Mr. Archer had a

23  different understanding of the source of the funds.

24         In particular, there is zero evidence -- and

25  Ms. Mermelstein is not going to stand up and point to any --

I6P7GAL1

1    that says that Mr. Archer knew that that was money from the

2    first bond issuance.  In fact, the people that actually

3    transacted in that $15 million before it reached Mr. Archer

4    didn't understand what was going on.  That was Hugh Dunkerley

5    and Francisco Martin.

6            So, I think I'm entitled to prove again as to one of

7    basically only two lies they're going to say Mr. Archer told.

8    They are going to say that he lied to the BIT board and he lied

9    to the banks.

10           THE COURT:  Can you scroll this, please.

11           MR. SCHWARTZ:  Yes.  So what it is is -- you will see

12   it's presentation materials.  It's a deck that was prepared for

13   potential investment.

14           THE COURT:  And then go back to the -- the rest of it

15   is a deck?

16           MR. SCHWARTZ:  I think there are two decks, but it's

17   all the same.

18           THE COURT:  Go back to the initial e-mail.

19           MR. SCHWARTZ:  Sure.  So the top is the information

20   being forwarded to Mr. Archer by Jason Galanis, and then what

21   follows is basically a nonsubstantive discussion about

22   coordinating calls and information sharing regarding this

23   potential real estate investment.

24           MS. MERMELSTEIN:  Your Honor, look, the point here

25   is --

I6P7GAL1

1          THE COURT:  But why doesn't it go to his reasonable

2     belief with respect to the $15 million.

3          MS. MERMELSTEIN:  A year before?  Because there has to

4     be some connection between the evidence -- you can't just say

5     anything goes to your state of mind.  Right?  It has to be

6     somehow reasonably tied to what you would have reasonably

7     believed at the time.  And a year earlier there are two e-mails

8     where Jason Galanis says I'm looking at this real estate

9     transaction.  He never tells Devon Archer that it has been

10    consummated.  Indeed, it was not consummated.  There is no

11    evidence that Mr. Archer thought it was consummated.  It's

12    months and months and months before the bonds are purchased.

13    It's not like it's shortly before.

14          And there is testimony in the record -- first of all,

15    let me be clear, the government absolutely intends to argue

16    that Mr. Archer knew that he was using misappropriated bond

17    proceeds when he got that $15 million, but I guess that's an

18    issue for the jury.

19          But Francisco Martin made clear that Jason Galanis

20    openly had no other business sort of going on at this time.

21    There is constant e-mails about their desperate source of need

22    for liquidity.  The notion that Mr. Archer from something a

23    year earlier reasonably thought it was real estate is just so

24    preposterous that I think it can't reasonably be argued.  So,

25    it has no significance.  Something from a year earlier does not

I6P7GAL1

1    go to his state of mind.  It's an attempt to try to drop into

2    the record at the last minute one piece of evidence that from

3    which you can argue that he wasn't lying, which he clearly was.

4    But I think it creates a misleading impression to the jury

5    that's so far before it shouldn't come in.

6              THE COURT:  I think you can make that argument to the

7    jury, but I think the fact that Jason Galanis made these

8    statements to him related to real estate investments goes to

9    his purported reasonable belief for making this statement to

10   Morgan Stanley, so, you know, as to the source of the $15

11   million that was used to purchase the second tranche of --

12   purchase of the second tranche was the real estate investment.

13   So for that reason I think that this is appropriate.

14             MR. SCHWARTZ:  Thank you.

15             THE COURT:  I don't know if anything needs to be

16   redacted from this or shortened, but I'm OK with this in any

17   event.

18             MR. SCHWARTZ:  And 4846 is to similar effect.  This is

19   about a different transaction, but the purpose is Jason Galanis

20   is again emphasizing that he is "all over the real estate

21   stuff."

22             MS. TEKEEI:  Your Honor, this is quite a lengthy

23   e-mail chain about a whole bunch of things that have nothing to

24   do with --

25             THE COURT:  What if we redact everything but the

I6P7GAL1

1    references to the real estate stuff?

2              MR. SCHWARTZ:  Fine.

3              MS. TEKEEI:  Our objection is the same, but we

4    understand your Honor's ruling, and so if that's how you would

5    like to proceed.

6              THE COURT:  That's what I think we should do.  So

7    consistent with what I just stated with respect to 4705, I want

8    you to redact everything other than the references to the real

9    estate.  OK?  So can you still make your point that way,

10   Mr. Schwartz?

11             MR. SCHWARTZ:  I think so.  Well, what I would propose

12   is that we would redact the content of the second e-mail down

13   and just leave the top one as is.  I think that provides

14   context that he is talking about something, and the jury

15   doesn't need to know what that something is, but he is all over

16   the real estate stuff.

17             THE COURT:  So you just have the January 7, 2014

18   e-mail from Galanis to Archer cc'ing Cooney.

19             MR. SCHWARTZ:  And we would show basically the header

20   information for the bottom one, so the jury could see that

21   there was the substance of something discussed, but they don't

22   need to see what it is.

23             THE COURT:  And you will take out the rest.

24             MR. SCHWARTZ:  Exactly.

25             THE COURT:  That's fine.

I6P7GAL1

1          MS. TEKEEI:  Your Honor, there is a sentence in that

2     first e-mail, "KPMG is who we are going to us for the opinion.

3     He has contacts there."  We think that has nothing to do with

4     any potential or purported real estate transaction, and that

5     should be redacted as well.

6          MR. SCHWARTZ:  Fine.

7          THE COURT:  So take that out.  OK.

8          So we're at 4772 now.  Can you pull that up, please.

9          Let me just ask you a question.  We only have a few

10    more things I want to talk about.  But with respect to

11    Alternate 1, do we want to let her go?

12         MR. SCHWARTZ:  We have been talking about that a

13    little bit more.  I think before your Honor does that, it's

14    probably important to ask the jurors about what next week looks

15    like.  We have never asked them for their schedules past June

16    30, and next week is going to be a very tricky week for a lot

17    of people.  I don't know what your Honor's schedule would be.

18    I'm assuming that we're going to sit some of the July 4th week.

19    But when July 4th falls on a Wednesday it's hard to know who

20    celebrates it before or after or not at all, and I would hate

21    for us to be in a situation where we let someone go and then

22    find out next week that we would have all sorts of problems and

23    we need --

24         THE COURT:  Do you have any objection to that?  What I

25    would like to do is bring them in, say "We expect to have

I6P7GAL1

1    summations begin today."  Is that still fair?

2            MR. SCHWARTZ:  Yes.

3            THE COURT:  "And we expect that you will get the case

4    this week, but I just want to make sure -- I know that there

5    are scheduling conflicts for tomorrow, but I want to make sure

6    I know of any other scheduling conflicts in the near future.

7    Is that an issue?"

8            MS. MERMELSTEIN:  I just worry, your Honor, that -- I

9    only worry that if you invite scheduling conflicts, they tend

10   to appear, and that if we just tell the jury what the schedule

11   is, that they will have the case, and then they will deliberate

12   as long as they need to, and anyone who has a real issue will

13   understand that they should raise it, but that we won't be

14   inviting people to say actually I was going to take off July

15   4th.

16           MR. SCHWARTZ:  Well, I presume we're not going to sit

17   on July 4th.

18           MS. MERMELSTEIN:  I meant the July 4th holiday,

19   although we're happy to sit whenever.

20           THE COURT:  Well, what about with respect to this

21   Friday too?  I think what I'd like to do is we just have a few

22   more exhibits we need to talk about.  Just bring them in and

23   say I want to let you know summations are going to begin today,

24   you are going to get the case this week, I wanted to find out

25   anything about your schedule that you haven't told me already,

I6P7GAL1

1    including whether you can sit this Friday if you're still

2    deliberating, and leave it open.  But I will make it clear it's

3    just this Friday.  So, why not bring them in, and then we will

4    let them back out, and then you will speak to them, Alison.

5    OK?  Thank you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6PJGAL2

1          (Jury present)

2          THE COURT:  Good morning, everyone.  Everyone can be

3     seated.  I wanted to let you know, I wanted to talk about

4     scheduling for a minute.  You want to let you know we have a

5     little bit more testimony this morning, but we anticipate that

6     summations will begin today.  I wanted to let you know that.

7     That won't be finished today.  I wanted to check in with all of

8     you and have you speak to Ms. Cavale about scheduling.  I

9     understand we have two conflicts tomorrow, Juror No. 8 can sit

10    from 1:00 to 5:00 in the afternoon, but can't sit in the

11    morning, and Juror No. 13, can you sit the same schedule?

12          JUROR:  Ah-huh.

13          THE COURT:  What I will ask you to do, go back to the

14    jury room for one minute.  We are otherwise ready to proceed,

15    and let Ms. Cavale know if you have any other scheduling issues

16    in the near future.  For example, could you sit on Friday if

17    you're still deliberating?  Are there other issues?  We are

18    taking off for July 4th, but if you're deliberating, are there

19    any other scheduling issues you I should know about?

20          As I said, we're nearing the end of the trial, but I

21    want to see if there is anything I should know.  I will ask you

22    to step out for a minute, speak to Ms. Cavale if you have any

23    issues and come back to hear the rest of the testimony.

24          Thank you.

25          (Jury excused)

I6PJGAL2

| | |
|---|---|
| 1 | THE COURT:  Can we have a few -- |
| 2 | MS. MERMELSTEIN:  I have one scheduling issue. |
| 3 | It struck me as you were talking about the 1:00 to |
| 4 | 5:00, it seems likely that the government will close today with |
| 5 | one defense counsel closing today, maybe a second one, but I |
| 6 | don't know how optimistic people are about that. |
| 7 | If that is true, and we get through half of the |
| 8 | closings today, it seems to me if we are going to sit half day |
| 9 | Tuesday, we should try to get both defense closings in.  Four |
| 10 | hours ought to be enough.  Can we see if the jury would be able |
| 11 | to stay late to accommodate that. |
| 12 | It shouldn't -- to split -- |
| 13 | MR. SCHWARTZ:  First of all, we discussed today's |
| 14 | schedule on the record and we all agreed that no defendant |
| 15 | would have to split their closings.  Only one of us is prepared |
| 16 | to go today, and we had all discussed it on the record. |
| 17 | THE COURT:  Who is going today? |
| 18 | MR. SCHWARTZ:  Mr. Touger. |
| 19 | MR. TOUGER:  Me. |
| 20 | MR. SCHWARTZ:  With respect to tomorrow and Wednesday, |
| 21 | look, to be very frank, and you can see what goes on, the |
| 22 | government wants to have an extra night to prepare their |
| 23 | rebuttal, and I prefer they not have an extra night.  The |
| 24 | easiest thing to do, and I understand your Honor wants to be |
| 25 | mindful of the jury's time, is scratch tomorrow. |

I6PJGAL2

1              THE COURT:  I won't scratch tomorrow.

2              MR. SCHWARTZ:  I figured you wouldn't, but I figure I

3      would say it out loud.  Otherwise we are --

4              THE COURT:  Why don't we talk about this at the end of

5      the day?  Ms. Cavale, do they have any issues?

6              (Off-the-record discussion)

7              THE COURT:  Juror No. 8 cannot deliberate on Friday

8      because she had a funeral out of state.  So, all right, why

9      don't we hear back from everyone before we make any decisions

10     and finish this quickly.

11             I think we were going to talk about 4772, which is the

12     email from Rory Knight to David Ezekiel and CC to Sugarman,

13     Dunkerley, Archer as well as one other person, forwarding

14     previous emails.  What is the relevance of this?

15             MR. SCHWARTZ:  The relevance is simply to Mr. Archer's

16     state of mind, and it shows the independence of the board of

17     directors of Wealth Assurance Holdings, which is the entity in

18     the Wealth Assurance family that Mr. Archer was also on the

19     board of, that is why he is on this email, and this is a very

20     spirited and at times sharp debate between Mr. Ezekiel and Dr.

21     Knight about who's going to serve as chairman of the Valor

22     Group and who is going to serve as president.

23             It is simply to demonstrate Mr. Archer's state of mind

24     with respect to the corporate independence of Wealth Assurance

25     Holdings because I expect the government will anticipate that

I6PJGAL2

1    Jason Galanis was effectively controlling all of these entities

2    through Hugh Dunkerley.

3            THE COURT:  I think its scant probative value is

4    outweighed by the danger of confusion of the issues and

5    misleading the jury.  I won't allow this in.

6            Two more.  I think, 4839, this is the document

7    purportedly signed by Seb, right?

8            MR. SCHWARTZ:  Correct.  As you can see, it is signed

9    by Seb.

10           THE COURT:  Yes.

11           MR. SCHWARTZ:  We would argue that the inference is

12   that Seb Momtazi, who the government elicited testimony, served

13   as a personal assistant to Mr. Archer, had access to and

14   occasionally used Mr. Archer's emails.

15           MS. TEKEEI:  Your Honor, we are at a complete loss to

16   be able to cross-examine Mr. Momtazi as to whether he actually

17   did send this.  The defense called Dr. Archer, who had some

18   understanding of the relationship that Mr. Momtazi had with Mr.

19   Archer, and did not elicit testimony about Mr. Momtazi using

20   Mr. Archer's email accounts.

21           I think this is confusing.  I think it is misleading.

22   We have no ability to cross-examine a witness as to what this

23   means and the import of it, and I think it is clearly hearsay

24   on its face.  It is being used to prove what it says, which is

25   that parentheses Seb sent this email.  That is a hearsay basis.

I6PJGAL2

1          MR. SCHWARTZ:  It is not with respect to what hearsay

2     is.  Hearsay is when there is a factual contention made by an

3     out-of-court declarant which is being offered for its truth.

4     There is no factual contention here.  We are simply offering

5     this for the fact that this is signed Seb.

6          THE COURT:  I will allow this in.  This, unlike the

7     one I didn't allow in previously which I thought was ambiguous,

8     here it is specifically says Seb.  I think it supports the

9     argument that it was signed by Seb and probative of the fact

10    Mr. Momtazi used and sent emails from Mr. Archer's email

11    account.  This one is coming in.

12         And then finally I think let's discuss 4318, which is

13    the email from Jon Burnham to Devon Archer.

14         MR. SCHWARTZ:  We did that one.

15         THE COURT:  We did that?  Okay.

16         MS. TEKEEI:  Your Honor, Mr. Schwartz raised our

17    attention to one additional exhibit today.  He raised our

18    attention to several others, one we have an objection to.  It

19    is 4823, and we apologize for not putting it in our letter.  We

20    received it in the list this morning.

21         MR. SCHWARTZ:  4823.

22         MS. TEKEEI:  Our objection is based on hearsay.

23         MR. SCHWARTZ:  Again this is a state of mind email.

24    This is from Jason Galanis to Mr. Archer and Mr. Cooney

25    basically laying out the progress of the roll-up plan.

I6PJGAL2

1          THE COURT:  How does this not go to Mr. Archer's state

2     of mind?  What is on the next page?  Is it just two pages long?

3          MR. QUIGLEY:  It is four pages long, your Honor.

4          MR. SCHWARTZ:  Go to the back page.

5          MR. QUIGLEY:  Later pages contain numerous factual

6     assertions regarding deals and proposals that we think are

7     hearsay.

8          THE COURT:  Do you want to go back and talk to them

9     about scheduling, Allison.  We are almost done.  Tell them

10    we're just about ready to bring you back in.  What do you want

11    me to tell the Judge about any scheduling issues.

12          Thank you.

13          MR. SCHWARTZ:  This is the third page, the last page,

14    it has just a bit of a signature block.

15          This is the deal terms that are discussed and

16    forwarded ultimately to Mr. Archer and Mr. Cooney to keep them

17    appraised of the fact that this roll-up plan is going according

18    to schedule.  This is really no different than all of the

19    emails that the government had put in to show allegedly Mr.

20    Archer's state of mind with respect to the acquisition of

21    Atlantic and Hughes.

22          THE COURT:  Can you scroll back.

23          MR. SCHWARTZ:  See Page 2.  What you see, these are

24    discussions amongst people at Wealth Assurance AG.  There has

25    been some testimony about Ms. Sotborn being at the finance

I6PJGAL2

1    function at Wealth Assurance AG and Mr. Steiken, of course, was

2    on the board of directors.

3        THE COURT:  Do you need more time to look at this?

4    When are you introducing this this morning?

5        MR. SCHWARTZ:  We are not planning to publish this to

6    the jury, but obviously we are going to rest our case this

7    morning.  We are going to move it in.

8        MS. TEKEEI:  There is quite a lot of discussion, I was

9    scrolling through the third and fourth pages about various

10   other deals and valuations.  I have not had a chance --

11       THE COURT:  Why don't you move it in, and I'll reserve

12   ruling and we'll figure that out, okay, because I don't want to

13   keep them waiting any more.  Finally, we need to talk about

14   your summary witness.

15       MR. SCHWARTZ:  There is one other document issue and I

16   had thought that the government and I reached agreement on

17   this, but it seems like maybe not, and that is Exhibit 4838.

18   So bring it up and I'll explain to you the context for this.

19   Can you bring up the unredacted version.

20       So what this is, and there should be text on this

21   front page, but this is Jason Galanis forwarding back in

22   February 2014 to Mr. Archer and Mr. Cooney a draft S1 for Code

23   Rebel, and there is some communications that we would propose

24   to redact if this needs to be admitted on the front page.

25       The purpose of our admitting this evidence, and

I6PJGAL2

obviously we have tried to stay as far away from Code Rebel as possible, but the purpose is to anticipate and be able to rebut a government argument.  I will explain what it is.  Over the weekend they told us they were not going to make the argument, but now it seems maybe they have thought better of that.

This goes to the BIT Board representations.  One of the representations that Mr. Archer allegedly makes to the BIT Board in October 2014 is that Jason Galanis will not source any new deals to the Burnham Financial Group.  So the Code Rebel IPO actually happens in May of 2015.  So it actually closes after those representations.

Now, if the government were to argue, contrary to the facts, that that IPO somehow represented a violation of the representation that Mr. Galanis wouldn't source new deals to Burnham after October 2014, then I need to be able to demonstrate that this deal actually originated back in 2014 and that Mr. Archer knew it.  That is the only purpose for which I was offering this exhibit.

Over the weekend the government said no, no, no, we are not going to make that argument, we are not going to argue the Code Rebel IPO was a violation to the representation to the BIT Board about sourcing deals.  We didn't have time to finish this conversation.  It seems like they're no longer willing to say that.  So we need to talk about this exhibit.

MR. QUIGLEY:  We have no objection to the document

I6PJGAL2

1  coming in.  We would say, though, if the S1 is going to come

2  in, then the entire email should come in as well.  The top

3  email should not be redacted.  I think it is rule of

4  completeness.  I think it goes to why Jason Galanis was sending

5  this to Devon Archer and Bevan Cooney and what he was advising

6  them about.  If they want to introduce the S1 registration,

7  that is fine, but the top email should come in as well.

8          THE COURT:  All right.

9          MR. SCHWARTZ:  Look, the more troubling thing is the

10  government intends to make this argument that is totally

11  contrary to the facts.  If they intend to make that argument, I

12  think what is necessary is that the S1 went to Mr. Archer.

13  Given your Honor's rulings about Code Rebel, I don't think it

14  is necessary or advisable that we get into the content of this

15  email.

16          MR. QUIGLEY:  You can't have it both ways.

17          THE COURT:  Does anything about this suggest the pump

18  and dump?

19          MR. QUIGLEY:  No, not at all.  It suggest they were

20  putting together an IPO.  That is in the record.

21          MR. SCHWARTZ:  It doesn't suggest the pump and dump.

22          Notwithstanding your Honor's ruling, the government

23  has not just shown the proceeds of bond issuance were invested

24  in Code Rebel shares which were then redeemed to pay -- put on

25  a lot of evidence, which is fine, basically throwing dirt on

I6PJGAL2

```
1    Code Rebel as an entity, and that shouldn't be part of this

2    case.  It is not part of the charged scheme.  That is just

3    atmospherics.  I think it is prejudicial to put Mr. Archer and

4    Mr. Cooney at the genesis of that deal when so much about it is

5    problematic.

6              THE COURT:  I am going to allow in the email along

7    with the underlying document.

8              Let's just talk about your summary witness.  Just

9    putting --

10             MS. MERMELSTEIN:  I was going to talk about it.  Go

11   ahead, your Honor.

12             THE COURT:  I want to ask you a few questions.

13             I wanted to say initially, putting Code Rebel aside

14   momentarily, I am not going to require Mr. Archer remove the

15   language that he and RSB operated at a loss position when the

16   financial impact of all of the transactions is calculated.  I

17   think the more difficult question is whether the testimony

18   opens the door to the Code Rebel evidence.  I am happy to hear

19   you out on that.  As I said, I have a few questions.  Maybe

20   we'll start with those.

21             MS. MERMELSTEIN:  Sure.

22             THE COURT:  Under your theory, Mr. Archer received his

23   shares via convertible note for which he didn't pay, right?

24             MS. MERMELSTEIN:  Exactly.

25             THE COURT:  I know other individuals who received
```

I6PJGAL2

1 pre-IPO shares for free could not dispose of those shares due

2 to certain restrictions.  What restrictions, if any, and I

3 apologize if we've gone over this before, but apply to the

4 shares Mr. Archer received by convertible note?

5     MS. MERMELSTEIN:  They were restricted, your Honor.

6     THE COURT:  They were?

7     MS. MERMELSTEIN:  Yes.

8     MR. SCHWARTZ:  Can I talk to that for a second.  Every

9 share was restricted.  There was no such thing as shares that

10 were issued as unrestricted, all of the stuff we are talking

11 about in this case during the lock-up period.  Someone who held

12 restricted shares had to take steps, usually getting an opinion

13 of counsel, in order to make them unrestricted to sell.

14    That is what Francisco Martin did with respect to the

15 shares that were sold that went to ultimately pay the coupon on

16 the bond issuances.  There was no such thing as shares that

17 were issued unrestricted in this case.  There is certainly no

18 evidence of that.

19    MS. MERMELSTEIN:  Mr. Schwartz is wrong about the

20 Francisco Martin shares which were purchased during the IPO

21 and, thus, were not restricted.  I am not sure it really

22 matters for this purpose.

23    The point here is this, your Honor.  I understand your

24 Honor's ruling with respect to Code Rebel, and we have abided

25 by it.  The defense has suggested once that ruling is made,

I6PJGAL2

they can do anything they want, it doesn't open the door, and
that is obviously not true.  What they're doing here is so
misleading and so prejudicial.

They have to pick.  They can make this argument, and
the government gets to respond to Code Rebel; or not make the
argument, your Honor, and we respond with Code Rebel.  They
can't have it both ways.  This is the chart that shows, the
sum, the net of all of Mr. Archer's business dealings with
Galanis in essence is what it suggests.  These are all entities
the jury will have heard about with the exception of Alex
Partners, and sort of I understand why that is on this chart.

These are not, these are not all of the transactions
that Mr. Archer was involved in in the roll-up, in Galanis,
however you want to define it.  To say there is a net loss, to
calculate a specific net loss to suggest to the jury, this is
the universe of Jason Galanis interactions with Mr. Archer and
when the music stops, he is down this amount of money, it is
false.  There can be no real dispute that it is false.  I don't
think anyone disputes Mr. Archer held the Code Rebel shares
where they had an enormous value in his account and that he
then transferred them --

THE COURT:  You didn't use the 19 million figure.  If
you used the $500,000 figure, he would still be at a net loss,
right?

MS. MERMELSTEIN:  I don't think the $500,000 figure is

I6PJGAL2

the right amount because if you leave out the pump and dump, I
think the proper way to calculate it would be the value of
those shares on the day they convert, not the value of the
note.  So it is a few million dollars, and so, no, I think he
would not be at a net loss.

THE COURT:  Let me ask you.  Is this going to be
before the break?  Can we hear any testimony and sort this out?
I feel like we have been keeping the jury waiting forever.

MR. SCHWARTZ:  What we intend to do this morning is
pick up where we left off, which was play the recordings.  We
are going to read some emails into evidence and then we are
going to call Mr. Fliegler.  I was going to respond.

MS. MERMELSTEIN:  Just one point, your Honor, which is
as your Honor noted last week, this chart was produced very
late to the government in what your Honor recognized was
somewhat of a gamesmanship move, and your Honor said if what
that means, the chart can't come in because there are things
that can't be resolved because of what the defense has chosen
to do, that is what it is.  That is where we are.  This chart
is improper.

The case is resting today.  We are prepared to close.
We are going to have to put on a rebuttal case if this comes
in, and I don't think it should.  They should have to pick.
They can do it or not do it, but it opens the door.

MR. SCHWARTZ:  This is a summary chart.  It summarizes

I6PJGAL2

evidence that is already in the record, so I don't understand

how by simply compiling this into a chart, I can possibly open

doors that weren't already opened.  The government made

precisely this argument that because I had argued that Mr.

Archer was a net loser; that, therefore, that opened the door

to Code Rebel when your Honor rejected it the first time

around.  We pulled some of those cites.

         I opened on the fact Mr. Archer lost nearly a million

dollars.  This chart simply shows that, and your Honor knew

that, your Honor considered that when you excluded the Code

Rebel evidence in the first place.  I'd say also, by the way,

that even on a net cash basis, Mr. Archer's loss would be even

bigger if you included the Code Rebel because by any

calculation, Mr. Archer actually put in at least $200,000 of

his own money, this is separate from the so-called convertible

note, he actually put in $200,000 of his own money into Code

Rebel, and he actually at the end of the day got zero dollars

from Code Rebel and holds zero shares of Code Rebel.

         Obviously, we did not put that $200,000 in cash out of

his pocket on to this chart.  That I understand would open the

door if we were suggesting he took a loss from Code Rebel.

Code Rebel is just not part of this case.  The defendants

profit or gain from it in the same way there are lots of other

business dealings with Jason Galanis that are not part of this

case.  This was not the only one that we didn't put on this

I6PJGAL2

chart.  There are other businesses that Mr. Archer lost money

on that were not part of this case that we didn't put on this

chart.

          The summary chart doesn't purport to represent every

course of business between Mr. Galanis or these various

entities and Mr. Archer and purports to represent just what is

in the chart, which is that based on these calculations, he is

in a loss position.

          It does, with respect to the entities that are

depicted on the chart, Burnham Financial Group, Burnham

Securities, all those, it does, I believe, pick up all of the

transactions.  That is totally fair.  That is what the witness

was asked to present.  It does not impeach him to say that he

chose to leave off something that he was never asked to put on

and something he was never asked to look at.  The witness

doesn't know what Code Rebel is.  It doesn't impeach him one

bit to ask that question and it doesn't open any doors for him

to summarize what is already in evidence.

          Look, the government can say that they didn't get this

chart until after their summary witness testified, but that was

last week.  They have now had this chart for a long period of

time.  They had all weekend to go over it.  They don't really

have any objections to the chart.  They're simply trying to

relitigate an issue we litigated endlessly in this case and

your Honor finally reached decision on.

I6PJGAL2

There is no cause to reevaluate that now, especially when our ability to deal with that evidence which your Honor precluded because we couldn't rebut the Code Rebel evidence without going into the pump and dump is now even further crippled by the fact we can't even get at the witnesses who know about it.  Your Honor should adhere to your past ruling.

MS. MERMELSTEIN:  The notion summary chart can't be impeached by asking things can't be -- that the question is what is this chart, the value of this chart to the jury?  The impeachment, you weren't shown all kinds of important things and they're not on here and this chart is meaningless.  It is not wrong.

I don't dispute that if you do the math of what is displayed here, the math is right, but the significance of choosing these things and nothing else makes this chart worthless, and the government can can't -- this chart is labeled Mr. Archer and RSB experience net loss, net loss from what.  The clear import is from his involvement in this matter, right, with Jason Galanis.  That is not true and we can't say that because the defendants are successfully using the Code Rebel ruling as a shield.

This chart is false.  If they want to put it in, then they have to let the government cross-examine their witness and offer evidence that shows it is false.  If the government can't --

I6PJGAL2

1          THE COURT:  But other than Code Rebel?

2          MS. MERMELSTEIN:  There may be other places where

3    there is other evidence not on here the government would ask

4    about.

5          THE COURT:  If it is other than Code Rebel, I don't

6    have a problem with it.

7          MS. MERMELSTEIN:  Code Rebel changes the math

8    completely.  It flips this on its head, and keeping that out --

9    giving the misimpression that this is the summary of the

10   dealings with Jason Galanis and Devon Archer is a net loser, it

11   is not true.

12         THE COURT:  But part of the problem -- look, I

13   expressed frustration with you when the Code Rebel issue was

14   litigated.  I wish I had known more at the very start.  Maybe

15   the government should have charged it differently.

16         In any event, all of that has passed.  I think the

17   problem is that for the same reason I limited the

18   cross-examination of Francisco Martin, I mean it may well have

19   been that Archer didn't receive these shares for his own

20   benefit, but to hold them for Jason Galanis.

21         There was no way without getting the pump and dump out

22   for that cross-examination to take place, and why are we at a

23   different situation now?  I agree they can't represent that

24   these are all the dealings with Jason Galanis.  This is the

25   evidence that has come in in the course of this trial, and if

I6PJGAL2

1    you want to cross-examine the witness about other things that

2    doesn't get into the pump and dump and the transfer of those

3    shares because in doing that, they couldn't cross-examine

4    adequately without getting at the pump and dump, then I am okay

5    with that.  I think that is where we are now.  That is my

6    ruling.  Why don't we bring the jury in?

7              THE CLERK:  This is the jury's schedule for this week

8    and next.  Tuesday, 1:00 to 5:00.  Wednesday, Thursday, 9:00 to

9    5:00.  Friday, no.  Next week, No. 7 and 13 are on vacation for

10   the entire week.  No. 4 leaves for vacation on the 6th.  And

11   the rest of the jury is available Monday, 11:00 to 5:00,

12   Tuesday, 9:00 to 5:00, Wednesday, no.  And that is as far as I

13   got.

14             THE COURT:  Let's just bring them in and we'll sort

15   this out at the break.

16             MR. SCHWARTZ:  Your Honor, could we have two minutes

17   before the jury comes in?

18             THE COURT:  Do you have to?  Okay.  All right.

19             MR. SCHWARTZ:  I will do whatever your Honor wants.

20             THE COURT:  Why don't you bring them in and we can

21   take a bathroom break before your witness.  How about that?

22             MR. SCHWARTZ:  Sure.

23             THE COURT:  Thank you.

24             (Jury present)

25             THE COURT:  I am sorry for keeping you waiting.  I

I6PJGAL2

 1    promise you we are working hard in here.

 2              You may proceed, Mr. Schwartz.

 3              MR. SCHWARTZ:  Thank you, your Honor.  At this point,

 4    without objection and subject to our discussion this morning, I

 5    would like to move in a number of exhibits.  I will try to

 6    speak slowly.

 7              THE COURT:  Thank you.

 8              MR. SCHWARTZ:  Don't worry, am not going to read all

 9    of this.  It is 362, 371, 378, 379, 451, 802, 1263, 1411, 1446,

10    1591, 1592, 1593, 2064, 2209, 2292, 3550, 4108, 4110, 4113,

11    4114, 4117, 4318, 4325, 4384, 4506, 4508, 4511, 4512, 4514,

12    4516 through 4520, 4522, 4524, 4525, 4601, 4606, 4654, 4659,

13    4705, 4706, 4707, 4709, 4711 through 13, 4726, 4727, 4733,

14    4772, 4774, 4797, 4800, 4801, 4813, 4823, 4824, 4831, 4839,

15    4837, 4840, 4843, 4752 A and 4846.

16              Good morning, folks.

17              Your Honor, if we could pick up where we left off on

18    Thursday afternoon, I had just read a stipulation that Defense

19    Exhibits 4908 and 4909 are true and accurate copies of

20    recordings of conversations involving Mr. Cooney and Billy

21    Crafton, recorded on or about May 29th, 2014.  That stipulation

22    is Defense Exhibit 4743.

23              I think we fixed the kinks, Mr. Jackson.  Can you

24    please play for the jury Defense Exhibit 4908 in evidence.

25              (Tape played)

I6PJGAL2

1          MR. SCHWARTZ:  Just so the record is clear, can you

2     play 4909 now.

3          (Tape played)

4          MR. SCHWARTZ:  Thank you.

5          Mr. Jackson, if I could ask you to join me up in the

6     witness box.  Mr. Wenner, can you pull up Defense Exhibit 4801

7     in evidence.

8     Q.  Mr. Jackson, start with the header information for the

9     bottom email.

10    A.  From Peter Hottinger, Wednesday, January 9, 2013, to Jason

11    Galanis, CC Jason Sugarman, Lucas Mann, Rory Knight and

12    Francisco Martin, subject FINMA letter.

13    Q.  On January 9, 2013, at 6:37 pm, Francisco Martin wrote,

14    Peter.  Sending this to the entire team was not a good idea.

15    Jason Galanis, is not pleased.  You should have should have

16    sent this to me and I would have delegated it.  We must go

17    through one source of communication (me) and I make sure all

18    correspondence gets disseminated to the proper parties at the

19    proper time.

20    A.  From Peter Hottinger, dated Thursday, January 10th, 2013 to

21    Francisco at MKCP LLC dot com.  Subject re FINMA letter.

22    Q.  Then on Thursday, January 10th, 2013, at 7:47 am, Francisco

23    Martin responded to Peter Hottinger, I know Peter and I didn't

24    in any way or fashion think you undermined me at all.  Jason is

25    very, capital letters, sensitive on how communication flows and

I6PJGAL2

I am trying my best to get you the funds you need.  I will ask

Jason again today to get a conference call organized.  Best,

Francisco.

          Can we have Defense Exhibit 4797.  On April 7th, 2015,

at 10:53 pm, Neil Callahan wrote, do you know Francisco?

Hyperlink H T T P, could on bank slash back slahs WWW zoom info

dot com back slash P, back slash Francisco-Martin back

slash-51854.

A.   From Devon Archer and Neil at Equity Partners dot com sent

Wednesday, April 8, 2015, at 2:00:  58 am subject re:

Francisco Martin question mark?  Not off the top of my head but

how --

Q.   Can we have Exhibit 1591, please.  On October 5th, 2015 at

3:08 am, Hugh Dunkerley wrote Dear Ms. Lone Hill:  You have

requested a distribution from your annuity contract.  We

acknowledge this request and will assist you in completing the

procedures required.

          And, Mr. Wenner, can I ask you to leave this up for a

moment and display the second page to the jury.

          VOICE:  (Inaudible).

          MR. SCHWARTZ:  Go ahead to the next email, please.

A.   From Timothy Anderson, sent Monday, October 5, 2015, at

5:03 pm to Hugh Dunkerley.  Subject re: annuity distribution

request.  Hugh-Steven Haines, as project manager, would like to

have a call today.  Would you be free at 1:00 or 2:00 eastern

I6PJGAL2

1    today?  Tim.

2    Q.  On October 5th, 2015, at 11:04 am, Hugh DP Dunkerley wrote

3    FYI, do I want to do this call?

4    A.  From legal at cross ventures dot com sent October 5, 2015,

5    at 3:10 pm to Hugh DP Dunkerley, subject re: annuity

6    distribution request.  You're in France and going to a business

7    dinner.  Tomorrow.

8    Q.  Mr. Wenner, can we have Defense Exhibit 1592.

9           From Raycen Raines, dated Thursday, October 8, to 15

10   at 8:04 pm to Hugh Dunkerley, CC Geneva Lonehill, L. Steven

11   Haines, Keith dot Henzelen, at U.S. Bank dot com and Thompson

12   HD at GT law dot com.  Subject:  Wealth Assurance Private

13   Client Corporation dot dock, dot dock, dot PDF signed.  Please

14   respond to our letter of formal request.

15   A.  From Hugh Dunkerley, sent Friday, October 9, to 15, at 9:23

16   am.  To Francisco Martin, subject forward Wealth Assurance

17   Private Client Corporation, dot dock X, dot dock, dot PDF

18   signed.  Francisco, please read the attached letter.  This is

19   new to me seeing your name come up, what should I do about

20   giving your contact details to WLCC????

21          ATB, Hugh.

22   Q.  Francisco Martin replied to Hugh DP Dunkerley on October 9,

23   to 15 at 4:26 pm.  Hi, please ask JG how to proceed.  Please

24   let me know what he says.

25          Can we look now, Mr. Wenner, at Exhibit 4705.  Turn to

I6PJGAL2

1    Page 4.  On December 18th, 2013, at 4:49 pm, Steve Ludwig

2    wrote:  Kevin and Jason, on behalf of James Killian, I would

3    like to introduce you to each other to discuss a great and

4    immediate Maui hotel investment opportunity.  Can we schedule a

5    conference call for this evening?  If so, let's do 6:00 pm

6    using the below conference call info.

7             Jason, if another time is better, please let us know.

8    T H X, Steven Ludwig, President, Coastline Real Estate

9    Advisers, Inc.

10            Then Mr. Wenner, if you go to Page 1, and Mr. Jackson,

11   could I ask you to read the email in the middle of the page?

12   A.  From Kevin McTavish to Jason Galanis, CC Jimmy Killian,

13   Drew McCarney, Steve Ludwig subject:  Re:  Conference call.  Re

14   ritz Carlton.

15            Jason, it was a pleasure to speak with you today.

16   Attached is information on the opportunity we discussed.  We

17   look forward to speaking again tomorrow.  Kevin McTavish.

18   Q.  Mr. Wenner, can I ask you to turn to Page 6 of this

19   document.  Then Page 7.  Mr. Jackson, if you could read the

20   first paragraph of Page 7.

21   A.  This confidential offering memorandum (this memorandum) is

22   being delivered subject to the terms of the confidentiality

23   agreement) the confidentiality agreement) signed by you and

24   constitutes part of the evaluation material (as defined in the

25   confidentiality agreement) it is being given to you for the

I6PJGAL2

1    sole purpose of evaluating the possible investment in or

2    acquisition of the fee-simple interest in the Ritz Carlton

3    (Capalua) property or resort), Maui, Hawaii, and is not to be

4    used for any other purpose or made available to any other party

5    without the prior written consent of RCK Maui, LLC (seller) or

6    its exclusive broker, Jones Lang LaSalle's hotels and

7    hospitality group (JLL), and Ritz Carlton.

8    Q.  Mr. Wenner, could you turn to page -- 4705 -- page 60,

9    please.  Mr. Jackson, could I ask you to read the first

10   paragraph there on Page 61.

11   A.  Executive summary.  We have an opportunity to purchase a

12   truly world class asset, the Ritz Carlton Capalua (RCK) at a

13   significant discount -- about 60 percent -- to the $390 million

14   spent to buy slash renovate, slash rebuild the property.  The

15   current buyer does not have the capacity to close -- creating a

16   brief window of opportunity for a strong, decisive purchaser to

17   buy a superior asset at distressed pricing.

18   Q.  Mr. Wenner, could you go back to Page 1, please.  On

19   Thursday, December 19, 2013, at 9:59 pm, forward conference

20   call re Ritz Carlton from Jason Galanis to Devon Archer and

21   Bevan Cooney.  Attaching Capalua investor summary and 01 writs

22   Capalua offer memorandum.

23        Mr. Wenner, can we have Defense Exhibit 4117 now.  Can

24   I ask you to read that, please, Mr. Jackson.

25   A.  To Jason Galanis, Devon Archer, Bevan Cooney from Holmby

I6PJGAL2

1    sent Friday, April 10, 2015, at 7:15 pm.  They are getting --

2    they are getting there.  See attached.  They signed as

3    exclusive national distributor to Indian casinos for all

4    necessarily wines brands.  All imports will come to the below

5    duty free warehouse.  Sysco has signed as distributor.

6    Rewarding to see it happening. .

7    Q.  Mr. Wenner, could I ask you to turn the page.  Can we go

8    now to defense Exhibit 3550.  Mr. Jackson, can you just read

9    the header information there.

10   A.  From Jason Galanis to Devon Archer, Bevan Cooney, Jason

11   Sugarman, sent August 5, 2015 at 4:56 am, subject bonded duty

12   free warehouse being built on Pine River Reservation.

13   Q.  Mr. Wenner, if you could just publish the pages here to the

14   jury.  (Pause) can we go now to Exhibit 4659.  Can you read Mr.

15   Archer's response, please.

16   A.  From Devon Archer to Jason Galanis, CC Bevan Cooney and

17   Jason Sugarman, sent August 5, 2015, at 6:37 am.  Subject:  Re

18   bonded duty free warehouse being built on Pine River

19   Reservation.  This is a beautiful thing!  Devon D. Archer.

20   Q.  Can we have Defense Exhibit 2064, please, Mr. Wenner.

21   A.  To Jason Sugarman, Devon Archer from Holmby, sent

22   Wednesday, November 19th, 2014 at 5:11 pm.  Guys, this is the

23   actual groundbreaking for the town center for which we placed

24   $20 million of bonds.  Our attorney had to fly to South Dakota

25   the other day.  We actually break ground in the spring thaw.

I6PJGAL2

 1   This was ceremonial for the Indians.  Had to be done.  I
 2   refused to go there.  Greeks hate the cold.
 3   Q.  Mr. Wenner, can you flip the page -- two more.
 4          Mr. Jackson, can we look at Exhibit 4127.  Can I ask
 5   you to read that.
 6   A.  Sure.  From Elzbie Sotbarn, to T. Anderson at D Worth Law
 7   dot com, subject.  Valor Life purchase of municipal bonds
 8   Ogalala Sioux Wakpamni Lake Community Corporation date:
 9   Wednesday, January 7, 2015, 10:56 am.
10          Dear Mr. Anderson, I received your contact details
11   from Jason Galanis.  He informed me that I can contact you with
12   regards to details of the purchase of the bonds by Valor Life
13   (USD 3,195,000 on the 08-12-2014).
14          Valor Life need some information that I hope you can
15   help me with.  They need the following (with regards to where
16   the bonds are deposited, et cetera.) Deposit bank name and
17   deposit number.
18          ISIN number, Swiss Valor number (1 suppose Swiss valor
19   number is not available) of the bonds.
20          Date of first coupon payment?  Is it yearly?  Slash
21   semiannual payment?
22          Is it possible to have the details of the buy (price,
23   et cetera)?
24          Can we receive a statement as of 31-12-2014?  Then
25   quarterly?

I6PJGAL2

1          Any information is highly appreciated.  Thank you in

2     advance, kind regards, Ela.

3     Q.  Can we have defense Exhibit 4824.  Mr. Jackson, can you

4     begin with the bottom email on the first page.

5     A.  Dear Ela, the transfer should be made shortly, value date

6     8-12-2014.  I will send you a confirmation tomorrow as soon as

7     possible.  Best regards Laurent.

8     Q.  On December 8th or December 2014 at 12:23, Elzbie Sotbarn

9     wrote:  Dear all, below is the confirmation from the bank that

10    the transfer will be done with value date today (8-12-2014) it

11    was explained to me over the phone, that due to technical

12    reasons, they can produce debit advice only on the following

13    day) will be received tomorrow) kind regards, Ela.

14    A.  On December 8th, 2014, at 12:30, Elzbie wrote thank you.

15    Q.  From Elzbie Sotbarn, dated December 9, 2014 at 8:06 am to

16    Rory Knight at Oxford Metrica dot com, Eloise Steiken, Jason

17    Sugarman, Hugh at Dunkerley dot U.S., and Jason Galanis,

18    subject transfer request slash Valor Life.  Attachment T P dot

19    PDF.  Dear all, please find attached transfer confirmation

20    (value date 8-12-2014) kind regards, Ela.

21          Mr. Wenner, can you turn to the attachment which is at

22    Page 3.  It says debit from bank (French) the account of Valor

23    Life (French) in favor or (French) the Wolff Law Firm trust

24    account, USD 3,195,000.00.  And communications Valor Life

25    purchase of municipal bonds Oglala sue slash Wakpamni Lake

I6PJGAL2

1    Community Corporation.  Thank you.

2              MR. SCHWARTZ:  Thank you, Mr. Jackson.

3              THE COURT:  Ready to call your next witness?

4              MR. SCHWARTZ:  Yes, your Honor.

5              THE COURT:  Does anyone need a short break?  Yes.

6    Okay.  If need anyone needs to step out to go to the restroom,

7    feel free to do so.

8              MR. SCHWARTZ:  Can we put our witness up?

9              THE COURT:  Yes.  I don't don't I see the lawyers at

10   sidebar for a moment, please.

11             (Off-the-record discussion)

12             THE COURT:  What makes sense, ladies and gentlemen,

13   why don't you just all head out and we'll bring you back in a

14   minute.  Thank you.

15             (Jury excused)

16             THE COURT:  Just to be clear, are there additional

17   issues that need to be discussed with respect to this witness?

18             MR. SCHWARTZ:  I don't believe so.

19             THE COURT:  Why don't we take two minutes and come

20   right back.

21             (Recess)

22             (Continued on next page)

23

24

25

I6P7GAL3                          Fliegler - Direct

1              (Jury present)

2        SETH FLIEGLER,

3              called as a witness by the defendant,

4              having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MR. SCHWARTZ:

7     Q.   Welcome back, Mr. Fliegler.

8     A.   Thank you.

9     Q.   You testified last week about some charts that you

10    prepared.  Do you recall that?

11    A.   That's correct, yes.

12    Q.   Did you prepare some other charts too?

13    A.   I have.

14    Q.   Can you remind these folks where you work?

15    A.   I work for Duff & Phelps.

16    Q.   By the way, you testified last week that you met my

17    colleague Mr. Wenner that very day for the first time in

18    person, correct?

19    A.   Correct.

20    Q.   Just so the jury knows, how long have we known each other?

21    A.   We have known each other for about five years.

22    Q.   And have you testified on behalf of both the government and

23    defendants in criminal cases previously?

24    A.   I have.

25    Q.   Now, last week Mr. Quigley asked you some questions about

1    the number of hours you had worked on this case.  Do you recall

2    that?

3    A.  Yes, I do.

4    Q.  You said about 30 hours; is that right?

5    A.  Yes.

6    Q.  Just so we're clear, was that for both parts of your work?

7    A.  Correct.

8    Q.  So it wasn't just related to the testimony you gave last

9    week.

10   A.  No, that was an aggregate.

11   Q.  And you haven't changed your hourly rate since last week,

12   right?

13   A.  I have not.

14   Q.  Mr. Jackson, can we pull up just for the witness, the

15   lawyers and Judge Abrams Exhibit 9003.

16           Mr. Fliegler, can you explain to the jury generally

17   what you were asked to do in connection with this chart.

18   A.  Sure.  I was asked to review certain fund transfers that

19   were presented to me and the documents supporting them.

20   Q.  And what is Defense Exhibit 9003?

21   A.  This exhibit is simply a table that summarizes those fund

22   transfers.

23   Q.  And is this table and the pages that follow it based upon

24   the documents that are referenced in the footer?

25   A.  Yes, that is correct.

I6P7GAL3                          Fliegler - Direct

1    Q.  And generally speaking, what kind of documents did you look

2    at to prepare this chart?

3    A.  Largely they were bank statements, account statements.

4    Q.  And in preparing these charts, did you scour every bank

5    statement for every potentially relevant transaction, or did

6    you just look at the things I asked you to look at?

7    A.  I simply looked at the transactions that you had referred

8    me to.

9    Q.  If you had questions, did I provide follow-up information?

10   A.  Yes.

11   Q.  Or follow-up documents?

12   A.  Correct.

13   Q.  Is Defendant's Exhibit 9003 a true and accurate summary of

14   the information that I asked you to look at in the referenced

15   exhibits?

16   A.  Yes, it is.

17            MR. SCHWARTZ:  Your Honor, I offer Defense Exhibit

18   9003.

19            THE COURT:  It will be admitted.

20            (Defendant's Exhibit 9003 received in evidence)

21            MR. SCHWARTZ:  And, your Honor, I would like to hand

22   out copies to the jury.

23            THE COURT:  That's fine.

24   Q.  And you can publish this, please, Mr. Jackson.

25            So, looking, Mr. Fliegler, at page 1 of your chart,

1   Defense Exhibit 9003, generally what does this page depict?

2   A.  So in general what you'll see are all of the inflows and

3   all of the outflows of those fund transfers, and then on the

4   bottom they are totaled, so you will see the total inflows, the

5   total outflows and the net result.

6   Q.  And again these are only the transactions that you were

7   asked to focus on; is that right?

8   A.  Correct.

9   Q.  When you prepared this chart, did you do any work to

10  determine the purpose of these transfers?

11  A.  No, I did not.

12  Q.  So this is simply an accounting chart; is that right?

13  A.  Yes, that's correct.

14  Q.  Now, there is one set of transfers that I asked you to look

15  at that is not depicted on this chart; is that right?

16          MS. MERMELSTEIN:  Objection generally to the leading.

17          THE COURT:  I will let you ask this question, but I

18  agree with the sentiment.

19  A.  Yes, that's correct.

20  Q.  What is that?

21  A.  It's $15 million that were transferred.

22  Q.  And are you aware of a $15 million transfer into and out of

23  the account of the Rosemont Seneca Bohai?

24  A.  In the general sense, yes, I am.

25  Q.  I told you you didn't need to depict that, right?

I6P7GAL3                        Fliegler - Direct

1    A.   That's right.

2              MS. MERMELSTEIN:   Objection.

3              THE COURT:   Sustained.

4    Q.   Why is that not depicted?

5    A.   It's not depicted.   My understanding is that both the

6    government and the defendants have agreed to this transfer.

7    Q.   OK.   So let's just look at that for a second.   As part of

8    your work, did you take a look at some summary charts that were

9    prepared by a government witness?

10   A.   Yes, I have.

11   Q.   Mr. Jackson, can we bring up Government Exhibit 4004 and

12   turn to page 7.

13             What does this chart show about the net effect on the

14   cash balance of Rosemont Seneca Bohai of the $15 million

15   transaction?

16   A.   My understanding from looking at this chart is that $15

17   million is coming into RSB and $15 million is going out of RSB,

18   which means that there is a net zero result.

19   Q.   And when you looked at the bank records, did you conclude

20   the same thing?

21   A.   From the bank records, I really didn't look at $15 million.

22   Q.   And what does this chart show about the net effect of the

23   asset balance on Rosemont Seneca Bohai's account with respect

24   to bonds?

25   A.   That $15 million in bonds were taken out of RSB.

1    Q.  Now, still talking about that $15 million transfer, do you

2    recall how that money came into Rosemont Seneca Bohai's

3    account?

4    A.  I really don't recall.

5    Q.  Mr. Jackson, can we pull up Government Exhibit 301 in

6    evidence.  This is a bank statement for Rosemont Seneca Bohai.

7    Is this one of the records that you reviewed in doing your

8    work, Mr. Fliegler?

9    A.  I really don't recall.

10   Q.  Well, generally speaking, did you look at bank statements

11   for Rosemont Seneca Bohai as part of your work?

12   A.  Yes, that's correct.

13   Q.  And can we turn to page 53, please.  And, Mr. Jackson, if

14   you highlight the second transaction on October 1.

15         Can I ask you what it says under the heading

16   "description"?

17   A.  "Wired funds sent."

18   Q.  And, Mr. Jackson, can we go to page 63 of the same exhibit,

19   and can I ask you to blow up the September 25 $15 million

20   transaction.

21         And can you read under the description category for

22   the 9/25 transaction.

23   A.  "Wire funds received as of 9/24/14."

24   Q.  You can take those down.  Mr. Jackson, I ask you to pull up

25   Government Exhibit 343, and turn to page 2 and blow up Section

I6P7GAL3                    Fliegler – Direct

1   1A and B.

2            With respect to the $15 million, how did it enter

3   Rosemont Seneca Bohai's account?

4            MS. MERMELSTEIN:  Your Honor, may we approach?

5            THE COURT:  Yes.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MS. MERMELSTEIN:  I've let Mr. Schwartz go on for a

3       while now, but this is a summary chart witness who has now been

4       asked about documents that he doesn't remember them, they're

5       not in his summary charts, and he is just being asked to read

6       from them.  Now he is being shown a document, and it looks like

7       he is going be now -- they are going to try and set him up to

8       opine on the truthfulness of what is in that document?  I think

9       that's an improper opinion for this summary witness.

10             Obviously, there has been no indication that he was

11      going to do this; it's not in the summary charts.  We've

12      essentially gotten no 26.2 material for him, so we don't know

13      what he's going to say.  I don't know where this is going, and

14      I don't think it's improper.

15             MR. SCHWARTZ:  I'm not going to offer opinions.

16             MS. MERMELSTEIN:  Well, what are you going to do?

17             MR. SCHWARTZ:  I'm going to do what I'm doing, which

18      is to go through the records.  Some of them underlie his

19      summary charts, some of them are related records that he

20      reviewed.  And I can have him read into evidence certain parts

21      of related records.  That's all he's doing right now.

22             THE COURT:  He is just reading documents that are in

23      evidence?  That's all you plan to do with him.

24             MR. SCHWARTZ:  Absolutely.

25             THE COURT:  And then to lay the foundation for the

I6P7GAL3                          Fliegler - Direct

1    summary chart.

2              MR. SCHWARTZ:  Absolutely.

3              THE COURT:  I will allow that.

4              MS. MERMELSTEIN:  Thank you, your Honor.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Record read)

3   A.  My high level understanding is that there was a law firm

4   involved, but I really don't know any more specifics than that.

5          THE COURT:  Just to be clear, that was very helpful.

6   So going forward, if you don't have personal knowledge of

7   something, please state that so that we all get an accurate

8   understanding of what you're testifying to.  Thank you.

9   Q.  And to be clear, you don't have personal knowledge of any

10  of this, correct?

11  A.  I don't have knowledge of it at all.

12  Q.  You were not there at the time.  You were just assigned to

13  look at some records, correct?

14  A.  That's correct.

15  Q.  And can you read what it says under 1B up on the screen

16  here.

17  A.  "Manner of payment:  Wire transfer."

18  Q.  And you have no personal information about that, correct?

19  A.  I do not.

20  Q.  And you certainly don't know what may or may not have been

21  told to Mr. Archer in connection with that transaction.

22          MS. MERMELSTEIN:  Objection.

23          THE COURT:  Overruled.

24  A.  That's correct.

25  Q.  OK.  Let's go back to your chart, Exhibit 9003, please,

1    Mr. Jackson.

2           Now, have you prepared a few slides that sort of

3    illustrate how you did your work?

4    A.   Yes, that's correct.

5    Q.   Can we turn to page 2, please, Mr. Jackson.  So, generally

6    speaking what's depicted here on page 2?

7    A.   What this intends to show is giving a snapshot of the

8    transactions or a subset of the transactions that you see on

9    the first slide.  So right here we're showing the $750,000

10   transaction with Burnham Financial Group.  So the top part of

11   the slide is showing an outflow of $750,000 from RSB to Burnham

12   Financial Group, and the bottom part shows an inflow of

13   $750,000 from Burnham Financial Group to RSB.  So at the end,

14   on the bottom, what you see is there was an outflow of

15   $750,000, an inflow of $750,000, with a net result being zero.

16   Q.   And you've referenced at the bottom a variety of different

17   documents here.  Is that correct?

18   A.   Yes.

19   Q.   So just to illustrate, let's look at these.

20           Mr. Jackson, can you pull Exhibit 301 up again.

21           Again, this is the Rosemont Seneca Bohai Bohai bank

22   statement we were just looking at, true?

23   A.   Yes.

24   Q.   Can we turn to page 190, please, Mr. Jackson.

25           And as relevant to page 2 of your charts, what do we

I6P7GAL3                    Fliegler - Direct

1   see here on this page?

2   A.  On this page, if you look to the October 1st transaction

3   you will see that $750,000 were wired out to Burnham Financial

4   Group.

5   Q.  And then if we turn to the next page, to 191, what do we

6   see here?

7   A.  If you look to October 16 you will see wired funds received

8   from Burnham Financial Group in the amount of $750,000.

9   Q.  Now those two transaction records that we just looked at,

10  are those the ones that are actually sort of cut and pasted on

11  your slide?

12  A.  Yes, exactly.

13  Q.  But you looked at other documents as well, true?

14  A.  For various transactions, yes.

15  Q.  For this transaction I mean.  In other words, there are

16  exhibits other than 301 referenced on this slide, true?

17  A.  Oh, yes, that's correct.

18  Q.  OK.  So let's just look at those for completeness.  Can we

19  pull up Exhibit 605.  And generally what is this document?

20  A.  This document is again another bank account statement from

21  U.S. Trust.

22  Q.  And who is the account holder?

23  A.  Burnham Financial Group.

24  Q.  The transaction depicted on page 2 of your charts, Exhibit

25  9003, is between what two entities?

1   A.   Between RSB and Burnham Financial Group.

2   Q.   So this is sort of the other side of the transaction?

3   A.   That's correct.

4   Q.   And turning to page 3 of Exhibit 605, what is the first

5   entry tell us?

6   A.   The first entry is an October 1 wire transfer in of

7   $750,000 to Burnham Financial Group.

8   Q.   And who is listed as the originator of the wire?

9   A.   The originator is RSB.

10  Q.   And turning to page 4, if you blow up the final entry there

11  under the 16th.  What is this?

12  A.   This is showing the outgoing wire from Burnham Financial

13  Group to RSB in the amount of $750,000.

14  Q.   Now can we also look at Exhibit 378 in evidence.  DX378 is

15  another document that's referenced on page 2 of your slides,

16  true?

17  A.   Yes.

18  Q.   And what is the -- can you read the e-mail on the front

19  page there.

20  A.   Sure.  Which part would you like me to read?

21  Q.   The text.

22  A.   "please see attached for two wires to go out immediately."

23  Q.   And what is the date of this e-mail?

24  A.   This is October 1, 2015.

25  Q.   Is that the same date as the outgoing wire from RSB to

I6P7GAL3                        Fliegler - Direct

1    Burnham Financial Group?

2    A.  Yes.

3              MS. MERMELSTEIN:  Objection to leading.

4              THE COURT:  I'm sorry.  What was the objection?

5              MS. MERMELSTEIN:  To the continued leading.

6              THE COURT:  Just watch the leading, please.

7    Q.  Who is this e-mail from?

8    A.  Sebastian Momtazi.

9    Q.  Who is it to?

10   A.  It is to Iris Gomez.

11   Q.  And?

12   A.  It was cc'd to Devon Archer.

13   Q.  And is there another person on the "to" line?

14   A.  Oh, my apologies, yes, Joseph Fereno.

15   Q.  And what is the e-mail domain for Ms. Gomez and Mr. Fereno?

16   A.  Morgan Stanley.

17   Q.  And can we go to page 3, please, Mr. Jackson.

18             What is this document, Mr. Fliegler?

19   A.  This is a letter or a note that is asking for the wire

20   transfer to be effected or to be executed.

21   Q.  Again, what is the date of this instruction?

22   A.  October 1, 2015.

23   Q.  Now -- you can take that down, Mr. Jackson.  The last

24   exhibit referenced on page 2 of your chart is Defense Exhibit

25   4518; is that right?

1    A.   I believe it is.

2    Q.   And do you have a copy of your chart?

3    A.   I don't.

4    Q.   The last exhibit on your chart on page 2 is Exhibit 4518,

5    correct?

6    A.   4518 is there, yes, that's correct.

7    Q.   Can we pull that one up, please, Mr. Jackson.

8            And what is the top e-mail here?

9    A.   The top e-mail is from Iris Gomez at Morgan Stanley to Mr.

10   Archer essentially confirming that the wire requests have been

11   executed.

12   Q.   And can you just read the last six digits of the wire

13   confirmation starting right after the C.

14   A.   033342.

15   Q.   And if you could leave this up on one side of the screen,

16   Mr. Jackson and go back to Exhibit 605 on the other side and go

17   to page 3.  If you could blow up again the top transaction.  Do

18   you see those same last six digits here?

19   A.   Yes, I do.

20   Q.   And just point them out to the jury.

21   A.   They're right before the origination of RSB, 033342.

22   Q.   Thank you.

23           You can take that down, Mr. Jackson.

24           All right.  So those are the sorts of records you

25   looked at to get comfortable with this $750,000 transaction,

I6P7GAL3                          Fliegler - Direct

1    correct?

2    A.   Yes.

3    Q.   So going back to your chart, Exhibit 9003, let's go to the

4    next page, what does this page depict?

5    A.   So, similar to the transaction we just walked through with

6    the $750,000, this is another combination of transactions for

7    $903,000.  And on the top you will see the inflow or the wire

8    transfer of $903,000 from U.S. Bancorp to RSB, and then on the

9    bottom you will see a reverse wire transfer out of RSB of

10   $903,000.

11   Q.   So again let's go, Mr. Jackson, please, to Exhibit 301 at

12   page 190.  And if you could blow up the first entry on October

13   1.

14        What is this, Mr. Fliegler?

15   A.   This is showing on the Morgan Stanley bank account that

16   funds were received by RSB in the amount of $903,000.

17   Q.   And where did the money come from?

18   A.   It came from U.S. Bancorp.

19   Q.   And turning to the next page, Mr. Jackson, and if you blow

20   up the entry for October 12, what does this show, Mr. Fliegler?

21   A.   That there was a cash adjustment of $903,000, essentially

22   showing that money was being taken out of the account in that

23   amount.

24   Q.   Now, did you make any effort to determine what happened to

25   this money after the wire was reversed?

I6P7GAL3                     Fliegler - Direct

1   A.  No.

2   Q.  But do you have a general understanding of what happened

3   within Morgan Stanley on this transaction?

4   A.  Yes, there were e-mail communications describing what

5   happened.

6   Q.  Mr. Jackson, can you pull up Exhibit 4523 in evidence and

7   go to page 6.

8           Is this one of the e-mails you were just referring to?

9   A.  Yes, that's correct.

10  Q.  So can I ask you to read the bottom e-mail from Lisa

11  Budnichuk.

12  A.  "please reverse payment made to incorrect client today, and

13  then we can wait for the outcome of the dollar discrepancy.

14  Also, the payment instructions at the agent need to be updated

15  so that future payments are not wired with a reference to this

16  client account."

17  Q.  And can you go please go to page 1 of this document and

18  read the top e-mail, please.

19  A.  "Thanks for clarifying ... so end result is this:  We need

20  to debit account 654-031823 for the $903,000 wire that was

21  booked to their account.  Then I need to credit account

22  654-032278 $156,520.00 on $2.6 million and credit account

23  654-032073 $746,480 on 12.4 million.  I will make those

24  adjustments today."

25  Q.  And the account that is being debited here, 654-031823, do

I6P7GAL3                    Fliegler - Direct

1   you recognize whose account number that is?

2   A.  I haven't memorized the account number.

3   Q.  Can we put this over on one side, please, Mr. Jackson.  You

4   can leave that account number highlighted.  And go back to

5   Exhibit 301, page 191 on the other side.  GX301.

6           This is the page we were just looking at that has the

7   $903,000 cash adjustment, correct?

8   A.  Yes, correct.

9   Q.  And can you just look at the first digits of the account

10  number in the top middle of the page.

11  A.  Sure.  654-

12  Q.  No?  Page 191, please.

13          We'll come back to this.

14          Let's go back to your chart, please, Mr. Fliegler.

15  That's Exhibit 9003.  And turn the page.  All right.  Tell us

16  what we're looking at here.

17  A.  So this last example -- similar to the other two that we

18  went through -- is for another series of fund transfers, this

19  time for $251,000.  So you'll see in sequence 1, 2, 3, that

20  $251,000 were advanced from RSB to Burnham Financial Group.

21  Then approximately two weeks later $251,000 were returned to

22  RSB from Burnham Securities, Inc.  And then two deals later, on

23  March 27, 2015, funds were again transferred out of RSB to

24  Burnham Financial Group.

25          So, on the bottom what you see is $251,000 were

1    transferred out, $251,000 were transferred back in, and

2    $251,000 were again transferred out, for a net amount of

3    $251,000 that were transferred out of RSB.

4    Q.  Now, the document that you have pasted in your slide says

5    portfolio loan account statement; is that right?

6    A.  That's correct.

7    Q.  Mr. Jackson, can we pull up Exhibit 4503 and go to page 2.

8            So, is this the same statement that is excerpted on

9    your chart?

10   A.  Yes, that's correct.

11   Q.  So tell us what we're looking at here.

12   A.  Sure.  So this is a summary of all of those transactions.

13   It is showing what is going out of and into this portfolio loan

14   account.

15           So, if you look at the top you will see the $251,000

16   being advanced initially, $251,000 then going out -- or coming

17   back in, rather -- and $251,000 again being advanced on the

18   27th.

19   Q.  Now, does this document say where the money is going to or

20   coming from?

21   A.  It does not.

22   Q.  How did you determine that?

23   A.  There were other documents that I reviewed.

24   Q.  So, for example, let's look at Defendant's Exhibit 361.

25   And who is this e-mail from?

I6P7GAL3                    Fliegler - Direct

1   A.  The top e-mail is from Sebastian Momtazi.

2   Q.  And who is it to?

3   A.  It is to Iris Gomez at Morgan Stanley and Devon Archer.

4   Q.  And to be clear, this document, Defense Exhibit 361, is one

5   of the documents you relied upon in preparing the page of your

6   chart that we were just looking at, correct?

7   A.  Yes, that's correct.

8   Q.  Turn to page 2 of Exhibit 361, please, Mr. Jackson.

9          And can you read the heading on the top of this

10  document.

11  A.  Sure.  "Section 2 - Destination instructions for loan

12  disbursement."

13  Q.  And in the middle of the page who is identified as the

14  beneficiary?

15  A.  Sure.  Burnham Financial Group.

16  Q.  Now, by the way, you just explained to the jury that

17  $251,000 went from RSB to Burnham Financial Group back from

18  Burnham Securities and then to Burnham Securities, true?

19  A.  That's correct.

20  Q.  Do you have any idea why it happened that way?

21  A.  I do not know why it happened that way.

22  Q.  Can you, Mr. Jackson, pull up Exhibit 9001.  So this is one

23  of the charts that you prepared and testified about last week,

24  correct?

25  A.  Yes, that's correct.

I6P7GAL3                          Fliegler - Direct

1    Q.  At the time of the transfers, the $251,000 transfers that

2    we're talking about, March 2015, what was the relationship

3    between Burnham Financial Group and Burnham Securities, Inc.?

4    A.  Burnham Financial Group owned 100 percent of Burnham

5    Securities.

6    Q.  And to your knowledge, at the time were there any other

7    subsidiaries of Burnham Financial Group?

8    A.  Not that I'm aware of.

9    Q.  And at this time in March of 2015 was Burnham Asset

10   Management a subsidiary of Burnham Financial Group?

11   A.  No, it was not.

12   Q.  OK, let's go back to 9003.  And can we turn to the last

13   slide, please, Mr. Jackson.

14           What does this depict?

15   A.  So this is just a more visual depiction of the net inflows

16   and outflows to the various entities to and from Rosemont

17   Seneca Bohai.

18   Q.  And so on that point I want to talk about a few things.

19   The first is you have reflected here $250,000 going to WAPCC,

20   correct?

21   A.  Yes, that's correct.

22   Q.  And then there is a footnote.  What is that?

23   A.  The footnote says that funds transferred to/from Devon

24   Archer's Citibank account.

25   Q.  So that was a transaction that involved the personal

I6P7GAL3                    Fliegler - Direct

1   account, not the Rosemont Seneca Bohai account?

2   A.  Yes, that's correct.

3   Q.  Now, this chart also nets the $250,000 to WAPCC with

4   $178,000 from others; is that correct?

5   A.  Yes, that's correct.

6   Q.  And the identities of those others are also listed in a

7   footnote, true?

8   A.  That's correct.

9   Q.  Now, generally speaking, what did you rely upon to decide

10  to net those two bubbles against one another?

11  A.  There was trial testimony that mentioned that they were

12  connected.

13  Q.  And do you recall whose testimony that was?

14  A.  Francisco Martin.

15  Q.  Other than using that testimony to associate those two

16  bubbles together, did you rely on Mr. Martin's testimony for

17  any other purpose?

18  A.  No, I did not.

19  Q.  And associating those two bubbles together and netting them

20  against one another, does that affect the ultimate net loss

21  here?

22  A.  It does not.

23  Q.  In other words, the net loss of $826,142.36?

24  A.  Correct, the math would be the same either way.

25  Q.  So, in other words, if the jury were to decide that

1    everything that Francisco Martin said was not credible, would

2    it affect the net loss depicted on this chart?

3              MS. MERMELSTEIN:  Objection.

4              THE COURT:  Sustained.

5    Q.  Well, if the jury were to disregard that testimony and rely

6    only on the --

7              THE COURT:  Let's not focus on what the jury does.

8    You can rephrase the question.

9    Q.  If you were not to have relied upon that testimony at all,

10   would it affect the net loss calculation on this slide?

11   A.  No, I could have shown negative $250,000 and positive

12   $178,000, and the net result would still be the same.

13   Q.  Thank you.  Now, just moving to the right a few bubbles you

14   have something called Alix Partners.

15   A.  Yes.

16   Q.  And that shows a net payment of a little bit more than

17   $30,000; is that right?

18   A.  That's correct.

19   Q.  Can you explain to the jury generally what is going on with

20   the Alix Partners bubble?

21   A.  My understanding is that $3 million were needed for a

22   lease, and a letter of credit were created, and the $30,142 was

23   payment for that letter of credit.

24   Q.  So you have fee written next to the $30,000.

25   A.  Correct.

1    Q.   Who was that fee paid to?

2    A.   That fee I believe was to Morgan Stanley.

3    Q.   So that was a fee on account of Alix Partners but not to

4    Alix Partners; is that right?

5    A.   That was not to Alix Partners, that's right.

6    Q.   And now I want to talk about the last bubble all the way on

7    the right, the one that says Thorsdale.  You show a net payment

8    of $100,000 from Thorsdale; is that so?

9    A.   That's correct.

10   Q.   Now, Mr. Jackson, can I ask you to pull up Defendant's

11   Exhibit 8012, which is the demonstrative aid to the jury I used

12   with Agent Kendall last week.  And so if you could let's roll

13   it back.  Can you go back one slide?

14            So putting back the $600,513 transaction to RSB at the

15   bottom, do you see that, Mr. Fliegler?

16   A.   Yes, I do see that.

17   Q.   Is that transfer from Thorsdale to RSB in the amount of

18   $600,513 depicted on your chart?

19   A.   The $100,000 is not included.

20   Q.   My question right now is is the $600,513 transfer from

21   Thorsdale to RSB depicted on your chart?

22   A.   Yes, it is.

23   Q.   And is there a corresponding payment from RSB to Thorsdale

24   depicted on your chart?

25   A.   On my part, yes.

I6P7GAL3                        Fliegler - Direct

1    Q.  And, Mr. Jackson, on the one that's up on the screen,

2    Exhibit 8012, can you take it back one more?  And one more,

3    please.  OK.

4           Now, that just added $100,000, right?

5    A.  Correct.

6    Q.  And does your chart reflects $100,000 from Thorsdale to

7    Rosemont Seneca Bohai during the time period August 2014

8    through October 30, 2015?

9    A.  Yes, it does.

10   Q.  And is there a corresponding payment from RSB to Thorsdale?

11   A.  On my chart, yes.

12   Q.  On your chart.

13   A.  Yes.

14   Q.  Now, your chart seems to show another $100,000 from

15   Thorsdale that is not depicted on Exhibit 8012; is that right?

16   A.  That's correct.

17   Q.  Can you tell us about that transfer?

18   A.  I don't know much about that transfer other than $100,000

19   was transferred.

20   Q.  Let me ask you this.  Was it to Rosemont Seneca Bohai or

21   was it to a personal account?

22   A.  I believe it was to a personal account.

23   Q.  And just going back to the last page of 9003 for a second.

24   Is that reflected in that little footnote 1 hanging off the

25   $100,000 transfer?

I6P7GAL3                    Fliegler - Direct

1   A.  Yes, that's correct.

2   Q.  And the time period from Agent Kendall's chart that we were

3   just looking at started with August 2014.  What was the date of

4   this $100,000 transfer from Thorsdale?

5   A.  I don't recall the exact date, but it was certainly prior

6   to that timeframe.

7   Q.  So, would it help you to look at the first page of your

8   chart?

9   A.  Yes, June 27, 2014.

10  Q.  And that's before the time period that was depicted on

11  Agent Kendall's chart?

12  A.  Yes, that's correct.

13  Q.  That's before there were ever any bond proceeds?

14  A.  I don't know the nature of that.

15  Q.  You don't know anything about bonds, right?

16  A.  No.

17  Q.  So going back to the last page.  Mr. Fliegler, after

18  looking at all of this information you were asked to look at,

19  what was the total effect on Mr. Archer and Rosemont Seneca

20  Bohai LLC from the information that you reviewed?

21  A.  So for the fund transfers that I reviewed, adding both the

22  inflows and the outflows, it results in a net outflow of

23  $826,142.36.

24  Q.  And when you say outflow, that means net loss; is that

25  correct?

I6P7GAL3                    Fliegler - Cross

1   A.  Net loss, correct.

2           MR. SCHWARTZ:  Thank you very much, Mr. Fliegler.

3   CROSS EXAMINATION

4   BY MS. MERMELSTEIN:

5   Q.  Good morning.

6   A.  Good morning.

7   Q.  Just before we get started, I think that you were asked

8   last week a little bit about your compensation on this case.

9   You made some changes to these charts over the weekend, right?

10  A.  I have, yes.

11  Q.  And so how many hours did you bill this weekend to this

12  matter?

13  A.  Only a couple of hours.

14  Q.  OK.  Now I want to ask you a little bit about some of these

15  charts.  Let's start with the second page of Defendant's

16  Exhibit 9003, please.  And this is one of the examples you

17  showed.  Do you see that you indicate in green at the bottom

18  that on October 16, 2015 it was a repayment of $750,000 from

19  Burnham Financial Group to RSB, right?

20  A.  Correct.

21  Q.  And the four documents that you relied on in preparing this

22  chart, those are listed as your sources at the bottom, right?

23  A.  That's correct.

24  Q.  I think Mr. Schwartz just showed them to you, but am I

25  right those are the bank statements from Burnham Financial

I6P7GAL3                       Fliegler - Cross

1    Group and Rosemont Seneca Bohai, right?

2    A.   Yes.

3    Q.   And then directions for the wire transfers themselves,

4    right?

5    A.   That's correct.

6    Q.   Nothing in any of those documents says that it's a

7    repayment, right?

8    A.   That's correct.

9    Q.   That's your inference from the fact that they are similar

10   numbers, right?

11   A.   Close in date, exactly.

12   Q.   And then let's go to the next page of your exhibit, to the

13   $903,000.  And I just want to confirm what I think you said

14   with Mr. Schwartz, which is, you agree that based on your

15   review of the bank records, $903,000 did in fact get wired to

16   USB on October 1, 2015, right?

17   A.   Yes, that's correct.

18   Q.   And then you reviewed e-mails that showed that was in fact

19   an error, right?

20   A.   That's right.

21   Q.   So internally at Morgan Stanley they reversed that money

22   out of the RSB account, right?

23   A.   That's right.

24   Q.   And you can't see from what you looked at, but it's clear

25   it's going to two different accounts, the money is being split

I6P7GAL3                        Fliegler - Cross

1    up, right?

2    A.  Correct.

3    Q.  Now, you also looked a little bit at disbursements from a

4    PLA, right?

5    A.  Yes.

6    Q.  That's a portfolio loan account, right?

7    A.  That's right.

8    Q.  And that's basically a loan against the contents of

9    someone's brokerage account, right?

10   A.  That's right.

11   Q.  And so if you look at the next page of your chart, that

12   shows a couple of back and forth transactions relating to money

13   from the PLA, right?

14   A.  Correct.

15   Q.  The date of all of those transfers, they are all in March

16   of 2015, right?

17   A.  Correct.

18   Q.  And you mentioned that you reviewed Agent Kendall's charts

19   prepared in connection with this case, right?

20   A.  I reviewed some of them, yes.

21   Q.  Let's pull up Government Exhibit 4004.  Can we do the side

22   by side, Mr. Wissman?

23          So you will agree with me that the transfer of the

24   bonds from RSB to VL Assurance takes place on April 9, 2015,

25   right?  It's been highlighted in blank which is a little hard

I6P7GAL3                    Fliegler - Cross

1    to read.  You see there is the orange RSB, just to the right of

2    it $15 million in bonds and underneath the date is April 2015.

3    Do you see that?

4    A.  I do see April 9, 2015 on that line, yes.

5    Q.  OK.  So all of these PLA disbursements are before the bonds

6    left the RSB account, right?

7    A.  The dates that I have indicated are before April 9, that's

8    correct.

9    Q.  And do you know whether or not in allowing these amounts to

10   be disbursed from the PLA, Morgan Stanley relied on the fact

11   that those bonds were in the Rosemont Seneca Bohai account?

12   A.  I have no indication.  I have no knowledge of that.

13   Q.  Got it.  OK.  Now, let's turn to one of your conclusions on

14   your chart.  You say Mr. Archer and RSB experienced a net loss

15   of $826,142, right?

16   A.  I do have that on my slide, yes.

17   Q.  And you have grouped Mr. Archer and Rosemont Seneca Bohai

18   as being sort of one entity for purposes of calculating net

19   loss in your charts, right?

20   A.  That's correct.

21   Q.  And that's because, as you understand it, Mr. Archer and

22   Rosemont Seneca Bohai are basically the same thing.

23   A.  Yes.

24   Q.  Now, just so we're clear, when you prepared this chart --

25   you don't know anything about this case really, right?

I6P7GAL3                          Fliegler - Cross

1  A.  Not much.

2  Q.  OK.  And so Mr. Schwartz or some of his associates told you

3  which entities should be included in terms of demonstrating

4  these transactions, right?

5  A.  Yes.

6  Q.  And you calculated the net loss based on what you were told

7  to put on this chart, right?

8  A.  I calculated the net loss based on the fund transfers that

9  I reviewed, yes.

10  Q.  In other words, right, if there are other relevant fund

11  transfers that are not on your chart, then your net loss number

12  is not going to be right.

13  A.  Yes, this does not take into account any of those other

14  transactions.

15  Q.  And so, for example -- as you acknowledged, I think -- this

16  chart does not show the $15 million worth of bonds that were

17  sent to the Rosemont Seneca Bohai account, right?

18  A.  Correct.

19  Q.  And I think what you said on direct was that that was

20  because those bonds ultimately were transferred out of the

21  Rosemont Seneca Bohai account, right?

22  A.  That's my understanding.

23  Q.  Now, to be clear though, this chart just shows when you

24  kind of net things out, it shows back and forths between

25  Rosemont Seneca Archer on the one hand and third parties on the

I6P7GAL3                        Fliegler - Cross

1    other hand, right?

2    A.  Exactly.

3    Q.  With respect to the bonds though, it's not a round trip

4    transaction in quite the same way, right?

5    A.  I really don't know.

6    Q.  Sure.  If you look back at Government Exhibit 4004 -- can

7    we go to the last page again -- so, you will see -- and I think

8    you looked at this wire transfer with Mr. Schwartz on direct --

9    that on September 24, 2014 the Wolff Law Firm sent $15 million

10   to RSB, right?

11   A.  Yes, I see that.

12   Q.  And so in general on your chart when you reflect something

13   as having netted out to zero, it would mean that RSB sent the

14   $15 million back to the Wolff Law Firm, right?

15   A.  My chart would show $15 million going in from an entity and

16   out to a different entity -- or out to an entity, a third

17   party.

18   Q.  Well, your chart doesn't show that, right?  If we go back

19   to your chart, and we go to the last page -- I think everybody

20   has a hard copy in front of them --

21          OK.  For example, you will see that all the way on the

22   left you've got a gray arrow, and it has arrows pointing in

23   both directions from U.S. Bancorp, right?

24   A.  That's correct.

25   Q.  And that's because money came from U.S. Bancorp to Rosemont

I6P7GAL3                     Fliegler - Cross

1    Seneca Bohai and then that money came back out, right?

2    A.  Correct.

3    Q.  Similarly, for example, with BFG you have $750,000 -- we

4    looked at that example -- it goes one way and comes back the

5    other way, right?

6    A.  That's right.

7    Q.  That's not what happened with the bonds, right?

8    A.  If we look at the chart.

9    Q.  If we go back to 4004.  The money comes in from Wolff Law

10   Firm to RSB, right?

11   A.  I see that, yes.

12   Q.  RSB sends it somewhere else entirely, right?

13   A.  The $15 million is going to U.S. Bank.

14   Q.  Then RSB owns $15 million worth of bonds, right?

15   A.  That I don't know.

16   Q.  And then you see that in April they were transferred a

17   number of months later, right?

18   A.  I see a line showing that $15 million in bonds was

19   transferred, yes.

20   Q.  OK.  Now, let's go back to your chart for a minute.  To the

21   extent that payments from Rosemont Seneca Bohai to any of these

22   entities were investments in these entities, and in return

23   Rosemont Seneca owned shares or an equity stake in the company,

24   your chart doesn't account for the value of that shareholdering

25   or equity stake, right?

I6P7GAL3                           Fliegler - Cross

1   A.   I would not know one way or the other.

2   Q.   Right, you don't know.  And so, for example, if Rosemont

3   Seneca Bohai invested in Burnham Financial Group, sent $950,000

4   as an investment, and it got back ownership of BFG, the value

5   of that ownership doesn't show up on this chart.  Right?

6   A.   My chart simply shows the fund transfers.

7   Q.   And so Rosemont Seneca could have something valuable to set

8   off the net loss, and it's not going to be on this chart,

9   right?

10  A.   Again, the chart is simply just fund transfers.

11  Q.   And again this doesn't purport to be all of the transfers

12  between, for example, Mr. Archer and Thorsdale, right?

13  A.   If there are other transfers between them that I don't know

14  about, correct, they're not shown on here.

15  Q.   It doesn't purport, just to we're clear, to include all of

16  the business dealings between Mr. Archer and Mr. Galanis,

17  right?

18  A.   I don't have knowledge of that.

19  Q.   OK.  Can I pull up just for the witness, the parties and

20  the Court Government Exhibit 5050.

21        Do you recognize this as a bank statement for Archer

22  Diversified Investments?

23  A.   It does say Archer Diversified Investments, and it does

24  look like an account statement, yes.

25  Q.   It's not something that you were shown; is that right?

I6P7GAL3                          Fliegler - Cross

1    A.  Correct.

2            MS. MERMELSTEIN:  Is there any objection to the

3    government offering Government Exhibit 5050?

4            MR. SCHWARTZ:  Objection.

5            MS. MERMELSTEIN:  All right, we will put it in in our

6    rebuttal case.

7            THE COURT:  Sustained.

8    Q.  You agree with me that you have never reviewed this

9    document, right?

10   A.  Yes.

11   Q.  And so any assets or transfers that are reflected in this

12   bank statement is not on any of your charts, right?

13   A.  Correct.

14   Q.  So if these documents show that Mr. Archer owned millions

15   of dollars of for example shares in these companies, your net

16   number is going to change from a loss to a gain, right?

17   A.  If those numbers were not included in my transfers,

18   correct, that will change.

19           MS. MERMELSTEIN:  Nothing further.

20           THE COURT:  Anything additional for this witness?  Ms.

21   Notari or Mr. Touger, any questions?

22           MR. TOUGER:  No questions.

23           MS. NOTARI:  No.

24           THE COURT:  Any redirect?

25           MR. SCHWARTZ:  I just want to be clear on one thing.

I6P7GAL3                        Fliegler - Redirect

 1   REDIRECT EXAMINATION

 2   BY MR. SCHWARTZ:

 3   Q.  With respect to the $15 million transaction --

 4   A.  Yes.

 5   Q.  -- if you had depicted that on your chart, what would the

 6   net loss be?

 7   A.  Zero.

 8   Q.  And so what would the total net loss, if you included that

 9   amongst the ones on your chart, be?

10   A.  So the net loss would be the same that I've depicted on my

11   chart.

12   Q.  Which was what?

13   A.  $826,142.36.

14           MR. SCHWARTZ:  Thank you.

15           THE COURT:  Anything additional?

16           MS. MERMELSTEIN:  No, thank you, your Honor.

17           THE COURT:  You can step down.  Thank you.

18           (Witness excused)

19           MR. SCHWARTZ:  Your Honor, at this point Mr. Archer

20   rests.

21           THE COURT:  All right.  Thank you.

22           MS. MERMELSTEIN:  Your Honor, can we approach one

23   moment before Ms. Notari gets started?

24           THE COURT:  Yes.

25           (Continued on next page)

1            (At the sidebar)

2            MS. MERMELSTEIN:  I just wanted to raise this now so

3    we can be efficient with respect to the rebuttal case.  There

4    are two government exhibits, they are both Deutsche Bank

5    statements from Archer Diversified Investments.  Mr. Schwartz

6    produced a subsection of those as Rule 16 and declined to

7    produce the entirety of those statements.  The government has

8    gotten them; they reflect millions of dollars of Wealth

9    Assurance Holdings shares in Mr. Archer's accounts, and those

10   are relevant, and we are intending to offer them.

11           If we have to call the Deutsche Bank witness to

12   authenticate them, their offices are 15 minutes here, and he

13   can be here in 15 minutes.  I think it's silly, but I want to

14   know if we should tell him to start coming so we don't end up

15   wasting time at the end of the defense case.

16           MR. SCHWARTZ:  Well, one, I would like to see the

17   documents.  Two, that's not a rebuttal case.  He didn't testify

18   to anything about shares.  We don't know anything about these

19   shares.  The only testimony that's in the record about Mr.

20   Archer having Wealth Assurance Holdings shares is that he

21   received Wealth Assurance Holding shares as compensation for

22   serving on the board of directors.  Mr. Dunkerley testified to

23   that.

24           THE COURT:  I'm going to allow the government to put

25   it in the evidence, assuming it has the appropriate witness.

I6P7GAL3                        Fliegler - Redirect

 1   So why don't you just tell them what your view is on their need

 2   to call the witness to authenticate the document.

 3              MR. SCHWARTZ:  Can you give me the documents?

 4              MS. MERMELSTEIN:  Yes, of course.

 5              Do you know how long you're going to be?  I just want

 6   to know when I should tell him to be here.

 7              MS. NOTARI:  I am putting in the exhibits that were

 8   admitted.

 9              MS. MERMELSTEIN:  OK.  So we will give him a copy.  I

10   can tell him to just come, and then we'll send him home if we

11   don't need him.

12              THE COURT:  Tell him to come now.

13              MS. MERMELSTEIN:  We will do that now.  Thank you.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I6PJGAL4

1          (In open court)

2          THE COURT:  We are just waiting for one juror.

3          (Pause)

4          MS. NOTARI:  Your Honor, on behalf of Mr. Bevan

5   Cooney, we move the following exhibits into evidence:  Defense

6   Exhibit 32350, 3235, 3514 A, defense Exhibit 3514 B, Defense

7   Exhibit 3520, Defense Exhibit -- Government Exhibit 403 which

8   is also been marked as Defense Exhibit 3910, Government Exhibit

9   3226, which is being marked as Defense Exhibit 3911, and also

10   Defense Exhibit 3154 -- not sure if I said this Defense Exhibit

11   3235.

12          THE COURT:  Are there any objections other than ones

13   we may have discussed previously?

14          MS. TEKEEI:  Can you give us one moment.

15          THE COURT:  Sure.  Take a minute to look through the

16   list.

17          (Off-the-record discussion)

18          MS. TEKEEI:  No objection, your Honor, subject to your

19   Honor's prior rulings.

20          THE COURT:  Yes.  Do you want to publish any of them

21   them or is that not necessary?

22          MS. NOTARI:  No, that is not necessary.  Mr. Cooney

23   rests.

24          MR. TOUGER:  At this time, Mr. Galanis rests.

25          THE COURT:  Does the government ha rebuttal case?

I6PJGAL4

1              MS. MERMELSTEIN:  We do, we are going to put on a

2       rebuttal testimony case in light of the testimony from this

3       morning.  That witness will be here in 15 minutes.

4              THE COURT:  Just remember, ladies and gentlemen,

5       please don't discuss the case.

6              MR. QUIGLEY:  Your Honor, one second?

7              THE COURT:  Yes.  Can they go?

8              MR. SCHWARTZ:  Can we talk to you --

9              THE COURT:  Wait one minute.  Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6PJGAL4

1          (At sidebar)

2          MR. SCHWARTZ:  So having had an opportunity now to

3    look at the records, everybody says there were the shares that

4    Mr. Dunkerley testimony about and -- (inaudible) I don't think

5    it is fair rebuttal.  If your Honor thinks otherwise, I

6    think --(inaudible).

7          In fairness, we ought to put in self-authenticating

8    the past history because -- the price history of Wealth

9    Assurance which is publicly traded.  They put in a particular

10   moment in time, obviously those things are not worth what they

11   were worth at that particular moment, but I have no objection

12   to the evidence subject to your Honor's ruling.

13         MS. MERMELSTEIN:  If you want to put in price history

14   for the relevant time period, I have no objection.

15         MR. QUIGLEY:  Should we offer those exhibits now and

16   they can go to lunch?

17         THE COURT:  Do you have anything else?

18         MS. MERMELSTEIN:  No.

19         THE COURT:  We'll take an early lunch.  Just to make

20   sure we get done with two summations by the end of the day.

21         How long should I have them here?

22         MR. TOUGER:  How long is their summation?

23         MS. MERMELSTEIN:  Mine is between, close to -- two

24   hours and 15 minutes depending on how fast I talk.

25         THE COURT:  Talk slowly.  You're going today.  Just

I6PJGAL4

```
1   tell me how long do you think it will be?

2              MR. TOUGER:  Mine will be around two hours.  I thought

3   we had the two afternoon?

4              MS. MERMELSTEIN:  We can ask the jury to sit until

5   5:30.

6              THE COURT:  Why don't you do this.

7              MR. TOUGER:  I would like -- I am going today.  I

8   would like just because I think it is fair sometime between my

9   summation and their summation, I could have --

10             THE COURT:  Five minutes.  What I will do, I will ask

11  the jury --

12             MR. TOUGER:  Your Honor, look, I am going today.  I am

13  not arguing with that.  I think they're going to have three

14  days to piece my -- I should get at least a half hour.

15             THE COURT:  You don't have half an hour.  I will see

16  how much time they have.  This happens every day in federal

17  court.

18             MR. TOUGER:  No, it doesn't happen every day in

19  federal court when they get three days.

20             (Continued on next page)

21

22

23

24

25
```

I6PJGAL4

1            (In open court)

2            MS. MERMELSTEIN:  5050 and 5051, the government

3    offers.

4            MR. SCHWARTZ:  No objection pursuant to your Honor's

5    ruling.

6            THE COURT:  Do you want to publish those or is that

7    not necessary?

8            MS. MERMELSTEIN:  Let's just publish one of them, your

9    Honor, if we can pull up 5050, please.  If we can go to page I

10   believe it is 3.  Can you highlight the first listing under

11   Equities, Wealth Assurance Holdings, and can you also highlight

12   the market value of those shares.  I think you have already

13   highlighted the whole thing, the $4,550,000.

14            Can we look at the bottom of that page under account

15   number, the name of the account on this statement.  Zoom in on

16   Archer Diversified Investments, LLC.

17            Nothing further your Honor.  The government rests.

18            THE COURT:  All right.  So, ladies and gentlemen, the

19   evidence is in.  As I noted, the next stage of the trial is to

20   hear the closing arguments of the attorneys for all sides.  We

21   are not going to get through them in one day.  We are going to

22   hear two this afternoon.  Remember closing arguments are not

23   evidence but, nonetheless, are very important so I will ask you

24   to listen carefully.  The real question I have for you is again

25   scheduling, which is I want to make sure we get through two

I6PJGAL4

1     today.  If we need to stay a little past 5:00, is that a

2     problem for anyone?  Okay.

3              So I am letting you know that.  We are going to take a

4     shorter lunch.  Maybe we'll take a -- is half an hour enough

5     time to get out and get lunch?  All right.  We'll take 45

6     minutes.  Why don't we do that, take 45 minutes for lunch and

7     come back here and then we'll hear closing arguments.  Again

8     don't yet discuss the case.  Thank you.

9              (Jury excused)

10             THE COURT:  So let's all be back here promptly.  I

11     won't give you a half hour.  I will give you 10 minutes.  If

12     you had been on time for court today, I would give you a half

13     hour.

14             MR. TOUGER:  I was on time.

15             THE COURT:  You are supposed to be in this courtroom

16     at 8:45.  It is a courtesy for you not getting here earlier

17     today.  You will have 10 minutes.  It happens every day in

18     federal court.  That is sufficient.  You know the government's

19     arguments, so I will meet you back here in 45 minutes.

20             MR. TOUGER:  I was in the courthouse at 8:35.  At not

21     one point in this case has there been a line with 20 people in

22     front of me.

23             (Luncheon recess)

24             (Continued on next page)

25

I6PJGAL4

1              AFTERNOON SESSION

2              12:45 pm

3                  (Trial resumes)

4                  (In open court; jury not present)

5              THE COURT:  Can we talk about the charge for one

6     minute while we are waiting for Mr. Galanis.  So I read your

7     letter, Mr. Schwartz.  It doesn't change my view, so I am going

8     to include the conscious avoidance charge and I am not going to

9     include a multiple conspiracies charge.  I am happy to outline

10    my reasoning for you now.

11             So a conscious avoidance instruction may be given if

12    the defendant asserts the lack of some specific aspect of

13    knowledge required for conviction and the appropriate factual

14    predicate for the charge exists, i.e., the evidence is such

15    that a rational juror may reach the conclusion beyond a

16    reasonable doubt that the defendant was aware of a high

17    probability of the fact in dispute and consciously avoided

18    confirming that fact.  That's from the Ferinini case, 219 F.3d

19    at 154.  Mr. Archer's, of course, correct when he notes that

20    conscious avoidance is a theory of knowledge rather than

21    intent.  That does not foreclose the possibility of such an

22    instruction in this case.

23             All three defendants have consistently argued that

24    despite their extensive involvement in various transactions

25    related to the fraudulent scheme, they were unaware of the

I6PJGAL4

criminal object of the conspiracy; namely, that Jason Galanis

was misappropriating the bond proceeds.  Moreover, there is a

sufficient factual predicate by which a reasonable juror could

conclude that -- why don't we see if the jury is ready and I'll

just stop.  We are still waiting for one?  Okay -- could

conclude if defendants lacked positive knowledge, it was only

because they closed their eyes to what otherwise would have

been obvious to them.

          Here, as in the Cuti case, the defendants' argument

they lacked knowledge of Jason Galanis' fraud despite their

deep involvement in the transactions that effectuated the fraud

all but invite the conscious avoidance charge, 720 F3d.

          at 463.  For instance, Mr. Archer was given $15

million by Jason Galanis to purchase the second tranche of WLCC

bonds, which particularly given Galanis' role in setting up the

bond issuances, seems unusual to say the least.  Those funds

were, in fact, recycled bond proceeds from the first issuance

of bonds.  After purchasing the bonds, they were transferred to

Bonwick, which entity, which that entity used to meet net

capital requirements.  These are the sorts of red flags about

the legitimacy of the transaction that may be used to show both

actual knowledge and conscious avoidance.  See the Goffer case,

721 F.3d at 127.

          So for those reasons, I believe it is appropriate to

instruct the jury that should they conclude the defendants

I6PJGAL4

1  lacked the requisite knowledge, they may consider whether it

2  was the result of conscious avoidance.

3          I understand --

4          MR. TOUGER:  I accept the court's ruling, but there is

5  no similar instance with Mr. John Galanis.  There is nothing

6  that he knows that he ignored in the record.  There just isn't.

7  He is not involved in any entities.  He makes no investments in

8  any of the entities.  What happened is he gets $2.35 million,

9  that is what happens, and there is no ignoring that fact.  He

10 admits he got that money.

11         What fact did Mr. Galanis consciously avoid to deserve

12 the charge?

13         THE COURT:  You can argue any of that to the jury.

14         MS. NOTARI:  I make the same objection as to Mr.

15 Cooney.

16         THE COURT:  Understood.

17         MR. SCHWARTZ:  I won't reargue this.  My objection is

18 preserved.  I wanted to ask two questions:  One, I raised this

19 this at the charge conference, but didn't reiterate in my

20 letter.  Accepting your Honor's going to give the conscious

21 avoidance charge, there was a paragraph at the edge of the end

22 of the knowledge, willfulness and intent section of the

23 subsequent securities fraud charge that averted to conscious

24 avoidance, and I had made the point I thought it was confusing

25 there because it suggested that conscious avoidance was

I6PJGAL4

1  sufficient for the entire mental state for fraud, when we agree

2  it is not.

3       THE COURT:  I think that is a valid point, and so I

4  will take it out of that part of the charge.

5       MR. SCHWARTZ:  It would be helpful, when you talk

6  about conscious avoidance, to remind the jury it is not a

7  substitute for evidence of fraudulent intent or willfulness.

8       THE COURT:  I will show you the particular language in

9  advance of the charge and you can make any objections to it.

10       MR. SCHWARTZ:  Thank your Honor.

11       The other point I raised in my letter and at the

12  charge conference was if you were going to give a conscious

13  avoidance charge, it was particularly important to restore the

14  cannot infer guilt from position.

15       THE COURT:  I will put that concept in somewhere.  I

16  think we need to talk a little bit more about where it should

17  go, but I will put the general concept in not necessarily as a

18  stand alone charge, but language in the charge somewhere.  We

19  need to talk about more where it should go.

20       MR. SCHWARTZ:  On a totally unrelated note, I wanted

21  to say the government in their letter about the charge had said

22  they had thought about it and wanted for the indictment not to

23  go back and for there not to be a defense theory of the case.

24  You did not address that in our letter, but we have all spoken

25  and we are fine with that.

I6PJGAL4

1          THE COURT:  We are going to do neither, not going to

2     send the indictment back and I am not going to instruct on the

3     defense theory of the case?

4          MR. SCHWARTZ:  Exactly.  Thank you.

5          THE COURT:  We are still waiting for one juror.  I

6     will read you my ruling with respect to the multiple

7     conspiracies charge.  I haven't changed my mind with respect to

8     that.  I don't think it is appropriate here.

9          Although there were two types of misrepresentations

10    made to the WLCC regarding how the proceeds would be invested

11    on its behalf and to the clients of Hughes and Atlantic in the

12    form of material admissions, both sets of misrepresentations

13    were clearly in furtherance of the same goal; namely, to

14    misappropriate the bond proceedings for the personal use of the

15    co-conspirators.

16         Accordingly, I don't think there is a factual

17    predicate for a jury to conclude that there were multiple

18    conspiracies here, nor have any of the defendants introduced

19    such evidence.  Indeed, each of the defendants contends instead

20    they were part of no conspiracy, not that they belonged to a

21    conspiracy different from or smaller than the one alleged in

22    the indictment.  It is well established that a single

23    conspiracy is not transformed into multiple conspiracies merely

24    by virtue of the fact it may involve two or more phases or

25    spheres of operation so long as there is sufficient proof of

I6PJGAL4

1     mutual dependence and assistance.  See the Epolito case, 543

2     F.3d at 48.  Here that there were multiple steps undertaken in

3     furtherance of John Galanis' efforts to misappropriate the bond

4     proceeds does not require the issuance of a multiple

5     conspiracies instruction to the jury.

6          All right.  Those are the rulings I think you needed

7     for the purposes of this afternoon's summations, and we'll talk

8     about the rest of the charge tomorrow.  I was thinking we could

9     meet at noon, all right?

10          Do you want to set up?

11          MR. TOUGER:  This is not an application not to go

12     today.

13          THE COURT:  All right.

14          MR. TOUGER:  Your Honor's statement this goes on every

15     day in this courthouse is somewhat --

16          THE COURT:  By gone on every day, I mean that there is

17     a government summation and a defense summation 10 minutes

18     later.

19          MR. TOUGER:  Usually the government then has to go

20     right after mine and there is not two or three days in-between

21     where they get to review it.  I think if the court is going to

22     stick to its ruling, that it is only fair that the minutes of

23     the summations do not be given out to any counsel, at least

24     that even hand it somewhat among the parties.

25          If not, I am going to sum up today and the government

I6PJGAL4

will have two days to review my summation in detail and do what
they do to it.  Yes, I know basically the arguments the
government is going to make and they know basically the
arguments I am going to make.  It is pretty clear.  The
individual pinpoint arguments, no, I don't know what they're
going to say and I hope they don't know what I'm going to say.

It puts Mr. Galanis at a distinct disadvantage.  The
government goes, we go, and then they get two days with the
minutes in front of them to go over my summation and then do
what they do to it on Wednesday.  That is not the normal course
of events in this courthouse.  Most summations happen either in
one day usually.

THE COURT:  It depends on how long they are.  Here
we're really -- and this actually relates to what we do
tomorrow afternoon -- we're at risk of losing jurors because we
have --

MR. TOUGER:  I am not asking for any delays.

THE COURT:  This is a separate issue.  I understand
your request.  It is denied, but I want to talk about tomorrow,
whether there should be one defense summation and two.  I think
I am going to require two to go forward if the jury can stay
long enough to hear both.  I don't want to cut anyone off.  I
don't want to split up anyone's summation, but I am really
concerned in particular that we're going to lose Juror No. 4
who is going on vacation all of next week.  None of the jurors

I6PJGAL4

1    can sit on Friday or they have collectively indicated that they

2    can't sit on Friday.

3              As a result, I just want to make sure they have the

4    time, whatever time that we can give them, we should be giving

5    them.  We'll see what they say about tomorrow.  Have you ever

6    heard of a Judge not allowing either side to review the

7    transcript?

8              MR. TOUGER:  I can honestly say in my federal court

9    trials, which is a half dozen or so, I have always got the

10   summations in in one day so it was never an issue.  I never

11   raised that before.

12             It just seems grossly unfair, especially now with what

13   the court has said, the government gets to read everybody's

14   summations, reflect on it, see it in front of them and then sum

15   up.  It seems completely unfair and not what everybody -- in

16   fairness, it is just not fair.  I understand the court's time

17   requirements and how it is worked out and how it is done, how

18   it has worked out that we have to sum up in this way, and I am

19   not arguing with the court's schedule, it just --

20             THE COURT:  I asked all of you if you wanted to

21   dismiss the two jurors who had issues on Tuesday and if the

22   answer was yes, then we would have had all the summations

23   tomorrow, but we have a real scheduling issue at this point

24   with respect to tomorrow.  I understand your point about the

25   minutes.  I have never heard of such a request and I am not

I6PJGAL4                    Summation - Ms. Mermelstein

1    going to grant it.

2              (Pause)

3              THE COURT:  You can bring them in.  Thank you.

4              MR. TOUGER:  What the record is clear as far as what

5    the court said early this morning, the only reason I asked for

6    8:45 is not because I want to sleep late, for medical reasons,

7    the court only knows half of that.  I have never fought a court

8    about coming to court, so it is not that I just want to sleep

9    until 7:00 o'clock in the morning.  It has nothing to do with

10   that whatsoever.  For the court to continue to bring that up to

11   me is --

12             THE COURT:  I brought it up once when you were half an

13   hour later that time.  I knew nothing of medical issues.  I

14   think I have granted every request with respect to you.

15             MR. TOUGER:  You have.

16             THE COURT:  And with respect to Mr. Galanis regarding

17   scheduling.

18             (Jury present)

19             THE COURT:  Everyone can be seated.

20             Ms. Mermelstein, whenever you're ready.

21             MS. MERMELSTEIN:  Thank your Honor.

22             Teachers, janitors, manufacturers, school bus drivers,

23   sanitation workers, nearly a dozen different pension funds

24   benefiting these hard working Americans are out tens of

25   millions of dollars.  On a small Native American community in a

remote corner of South Dakota, the most impoverished county in

the country, half completed structures never built, the roads

to get there never completed, they owe nearly $65 million that

they will never be able to repay, and all of them are victims,

victims from clear across the country.

        What brought them together is one thing, the Wakpamni

bonds.  The Wakpamni bonds were a massive fraud, a scam, a

scheme, a plan from the beginning to prey on the vulnerable and

the trusting, to fund the luxurious lifestyles of the few, to

fund personal business ventures, a criminal conspiracy that

left only devastation in its wake.

        There is no real dispute in this case that a

devastating criminal scheme took place involving the Wakpamni

bonds, that the Native American Community was induced to issue

these bonds through lies and that unsuspecting investors were

duped into buying them.  There is really only one dispute in

this case:  Did these defendants, John Galanis, Bevan Cooney,

Devon Archer, were they knowing participants in this scheme?

Were they Jason Galanis' willing co-conspirators?  Did they

each play their role, lending their talents to this crime?  Or

were they somehow unwitting dupes?

        And you have now sat through this entire trial and,

ladies and gentlemen, you know that these three men were

nobody's dupes.  We are going to talk this afternoon about how

you know that John Galanis and Devon Archer and Bevan Cooney

1    were knowing participants in this trial, and here's how we're

2    going to do it.

3           First, I want to begin by giving you an overview of

4    the scheme itself.  As Ms. Tekeei told you in the opening

5    statement, complexity was these defendants' friend.  It was

6    their hope that if they made their financial dealings

7    complicated enough, if they moved the money around fast enough,

8    if they threw up similar sounding shell companies and wire

9    transfers and purchase agreements, then nobody would ever be

10   able to put it altogether in front of a jury like you.  But we

11   have, and when you strip it all down right down to the basics,

12   you can see the scheme for what it really is:  Lies and theft

13   and greed.

14          Second, I want to talk very briefly about the crimes

15   charged in this case.

16          Third, we're going to talk about the victims and about

17   how the victims of this scheme were misled, how the Wakpamni

18   people were lied to again and again and again and ended up $65

19   million in debt, and how the pension fund victims lost tens of

20   millions of dollars by being forced to buy bonds they wouldn't

21   have wanted in a million years, bonds that they are stuck to to

22   this very day.

23          And then, fourth, we'll spend most of our time going

24   through the roles that John Galanis and Bevan Cooney and Devon

25   Archer knowingly played in this scheme, how each was necessary

to the conspiracy, and we'll go through all of the lies they told to keep the illegal money moving and the lies they told to try to cover it up.

Let's start with the overview.  Jason Galanis and Bevan Cooney and Devon Archer and some of their friends had a big plan.  They were going to buy up a lot of financial services companies and then they were going to make them into one big super company, a company that would be worth much more than all of its parts, and then they would sell that company for a big payday.

As you know, they had just one problem.  You have to have a lot of money to buy all those companies, and they didn't have it.  So they came up with a plan to get it, a plan to convince a Native American tribal entity to issue bonds, an unsophisticated, unsuspecting community that would believe their promises, that would believe their lies, and to make this happen, they got John Galanis involved.  He ran the front end of the scheme.  He was the salesman, and it worked.

The Wakpamni Lake Community Corporation issued the bonds not once, not twice, but three separate times, to the tune of $65 million.  As you know, nobody wanted these bonds, but they had a plan for that, too.  If you can't convince investors to buy them, they would force investors to buy them, and so John Galanis, Bevan Cooney and Devon Archer arranged to take over firms that managed other people's money, investment

1    advisers trusted with their clients' companies.

2            Galanis and Archer and Cooney, they bought Hughes and

3    then they bought Atlantic.  They were the investment advisers.

4    Once they had them under their control, they installed their

5    cronies, Michelle Morton and Gary Hirst.  You know why they did

6    that, so Morton and Hirst could use tens of millins of dollars

7    of pension funds to buy the bonds, the bonds that no one

8    wanted.

9            Eventually they ran out of investment advisers to

10   corrupt, and they still needed to keep their money-printing

11   business going, and that is when Archer and Cooney stepped out

12   of the shadows to play a more direct role.  They ran the back

13   end of this scheme.  They were the money recyclers, moving the

14   fraud proceeds around to keep the scheme going and to support

15   their own business ventures.

16           Here is what they did.  They took money from the first

17   bond sales, money that was supposed to be invested on behalf of

18   the Wakpamni people, and they used that money to buy more

19   Wakpamni bonds.  Because they did that, because they used that

20   recycled money to buy more bonds, no additional investor money

21   came into the Wakpamni, but the amounts that the Wakpamni owed

22   went up and up.

23           Think about that for just a second.  They used money

24   generated by the first bond sales, money for the tribe, and

25   then they used the tribe's own money to buy more bonds.  They

1    were causing the Wakpamni tribe to go deeper and deeper into

2    debt by borrowing money from itself and then using the cash for

3    their own benefit.  That is a vicious circle of fraud.  This

4    illegal money-making scheme benefited the defendants in two

5    ways:

6          First, members of the scheme like John and Jason

7    Galanis used it to fund their lavish lifestyles.  You saw how

8    they spent that money on mansions and Tribeca apartments and

9    cars and jewelry.  Archer and Cooney used it in a slightly

10   different way.  After causing the Wakpamni to churn out round

11   after round of bonds, they used those bonds as a kind of

12   currency.  They used the bonds to prop up other companies that

13   they owned or were investing in, and they used them to trick

14   people into thinking that those companies had a lot of assets.

15         Then the house of cards came crumbling down.  The

16   money in the Wealth Assurance Private Client Corp. account had

17   all been spent.  The payments to the Wakpamni that were owed

18   went unpaid, and Jason Galanis got arrested in an unrelated

19   matter.  His secret control of Burnham became known.  The

20   further acquisitions fell apart, the government started to

21   investigate, to issue subpoenas and the whole scheme began to

22   unravel.  That is how we ended up here.

23         So let me talk just for a moment about the crimes.

24   Because of their participation in this scheme, the defendants

25   are all charged with securities fraud and conspiracy to commit

I6PJGAL4                    Summation - Ms. Mermelstein

1    securities fraud.  As I expected Judge Abrams will explain to

2    you, the crime of securities fraud at its core relates to

3    deception.  You heard a lot of back-and-forth in this case

4    whether or not the Wakpamni were harmed and whether or not this

5    was really a lot of money to the pension fund investors.  As I

6    will explain, the evidence is overwhelming the victims in this

7    case were harmed, but all of that back-and-forth is in a lot of

8    ways a distraction because the defendants are guilty of

9    securities fraud even if no one was harmed.

10          Let me make that very clear.  The defendants are

11   guilty of securities fraud even if no one was harmed.  The

12   question, as I anticipate the court will tell you, is whether

13   or not the defendants attempted to deceive people, to lie to

14   them, to hide the truth from them.  Even if the defendants

15   hoped that it would somehow all work out in the end, and even

16   if investors weren't hurt, they would still be guilty because

17   the law is clear that you cannot lie to people in connection,

18   in order to trick them into buying or selling securities.

19          In this case, the victims were told lie after lie

20   after lie.  So let's talk for a moment about how the victims

21   were misled in a little more detail.  Let's start first by

22   talking about some of the things that were told to the Wakpamni

23   in order to sell them on the bonds, how the structure of the

24   bonds was explained to the tribe and how all of this would have

25   worked if this had really been on the up and up.

How was it going to work?  The Wakpamni people were
going to issue bonds.  Investors would buy the bonds.  The
community would get a lump-sum payment right off the bat to
build a warehouse, and the vast majority of the money was going
to be used to buy an annuity.  An annuity, you know, is a very
safe kind of investment that generates a regular source of
funds here on an annual basis in order to allow the community
to pay interest payments on the bonds and to fund their
continuing development projects.  That was it kind of
straightforward.

The annuity here was an essential part of the
structure.  It is what made issuing these bonds a reasonable
decision for the Wakpamni because it's clear that without the
annuity, they would have had no hope of repaying the bonds or
of financing their development projects.

The representations that were made to the Wakpamni in
this case were very clear.  Here is what ray sin Raines was
told.  An annuity is an insurance contract similar to a
pension.  The payments would be guaranteed for the annual
interest rate to the bond owed as well as income coming out for
the tribal business to help cover operating costs; in other
words, a very safe investment.

The documents that you saw in this case reflect those
representations that the Wakpamni relied on.  The annuity
contracts themselves were an essential part of the bond

I6PJGAL4                    Summation - Ms. Mermelstein

1    documents, and they are very clear.  Take a look at the first

2    page of all three annuity contracts.  Those are Government

3    Exhibits 200, 201 and 202, and let me say just a word before we

4    go on.

5          All of the exhibits and all of the testimony in this

6    case will be available to you when you retire to deliberate,

7    but the presentations by the lawyers are not.  So if there are

8    exhibits or transcript testimony that you think is important,

9    you should note that down so you will be able to find it

10   because you won't have these slides with you.

11         Let's talk about Government Exhibits 200, 201 and 202.

12   Right up front, on the front page of the contract it says

13   Wealth Assurance Private Client Corporation, the annuity

14   provider, will pay subject to the provisions of the contract,

15   income payments to the Wakpamni.  And the Wakpamni were

16   promised that the bond proceeds would be used to buy these

17   annuities and that the proceeds from the annuity would be used

18   to make regular payments on the bonds.

19         Did that happen?  No.  These representations were

20   lies.  You heard at this trial that the money generated from

21   the bonds never went to an annuity.  Francisco Martin, the guy

22   who is supposed to manage the money, he never got any money to

23   manage.  He told you that himself.

24         Instead it disappeared into the defendants' criminal

25   enterprise.  It went to John Galanis' personal expenses and

Jason Galanis' personal expenses, and Archer and Cooney used it to buy more bonds to prop up more of their businesses. Some of it went to entities the Wakpamni had never heard of, and this is a big deal. This is a big problem for the defense, so they tried to mislead you about it.

The defense asked witnesses about this one line on the front page of the annuity contracts, right? That line read the dollar amount of any payments and values under this contract which are based on an investment result of the separate account are variable and not guaranteed. They tried to say to you, ah-huh, you see, nothing is guaranteed, there is no promise under this contract. That is ridiculous. The entire point of the annuity is to have regular guaranteed payments. That is the one thing that makes this deal work.

If you actually look at the contracts, not just read that one line in isolation, it is perfectly clear what that is talking about. Let's look just just at the first contract as an example because they're all basically the same.

Government Exhibit 200, on the front page it says income payments, payments shall be made as follows: Shall be made. And remember the way the bond is set up, interest payments have to be made every year for 9 years, and at the end of that time, at the 10th year the bond is repaid. So you can see in this schedule about $1.8 million is going to be thrown off by the annuity each year. That is going to cover interest

1    payments and payments to the community.  At the end of the 10

2    years, the pension funds get their principal back and the

3    Wakpamni get an additional series of payments.

4            Then look what it says at the very end, right, in the

5    contract.  It says the balance in the separate account on the

6    25th anniversary of the date of this contract, up to a maximum

7    amount of $5 million, shall be distributed, an amount of up to

8    $5 million.  So that small piece is not guaranteed.  This is

9    what the contract is talking about when it says the amounts

10   that are in the separate account are variable.

11           By the way, let's not forget how the conspirators

12   pulled a last minute switch with respect to the annuity

13   provider because remember initially the promise was the annuity

14   provider would be Wealth Assurance AG.  Wealth Assurance AG was

15   a major insurance company with an enormous number of assets.

16   That sounded great, a financially stable insurance company

17   would be able to make payments on a regular basis so the

18   Wakpamni would be payable to pay the interest on the bonds.

19           At the last second John Galanis swaps out Wealth

20   Assurance AG in favor of Wealth Assurance Private Client Corp.

21   Wealth Assurance Private Client Corporation and Wealth

22   Assurance AG, they sound kind of similar, but Wealth Assurance

23   Private Client Corp. was not a major insurance company.  It was

24   a shell company.  It was basically a bank account set up by

25   Hugh Dunkerley, and when the Wakpamni asked questions about

1    this change, Galanis and others lied to them.  They said Wealth

2    Assurance Private Client Corp. is a subsidiary, it is a part of

3    Wealth Assurance AG.  That wasn't true.

4            John Galanis wanted to make the Wakpamni issue these

5    bonds and he was going to make it happen no matter how many

6    lies he had to tell, and the Wakpamni were lied to over and

7    over and over again, and every time they were deceived into

8    issuing more bonds.  That is in brief how the Wakpamni were

9    misled.

10           Now let me say a quick word about the other victims in

11   this case, the pension fund clients of Atlantic and Hughes.

12   Remember that Jason Galanis and Devon Archer and Bevan Cooney

13   and their friends were buying up these investment advisers.

14   Why did they do that?  They did that so they could get access

15   to the very real money that the investment advisers' clients

16   had.  Once Jason Galanis and Devon Archer and Bevan Cooney

17   controlled Atlantic and Hughes, they could take advantage of

18   their investors, they could use that money for their own

19   purposes.  It was how they extracted real money from their

20   criminal scheme, and it worked.

21           Once they installed fellow members of the scheme,

22   Michelle Morton and Gary Hirst at the investment advisers, they

23   immediately caused unwitting pension funds to buy the Wakpamni

24   bonds not because Morton and Hirst had researched the bonds,

25   not because they had decided they were a good investment, not

I6PJGAL4                    Summation - Ms. Mermelstein

1   because they made sense, but solely because that is what Jason

2   Galanis told them to do.

3        Let's talk about Hughes and then we'll talk about

4   Atlantic.  Even before the Hughes acquisition goes through,

5   Morton is focused on getting those bonds into client accounts.

6   She has to do that.  That is why Jason Galanis and his friends

7   are funding her acquisition.  Let's take a look at just a few

8   of her communications with Jason Galanis.

9        Take a look at Government Exhibit 3004 A.  These are

10  text messages between Morton and Galanis on July 21 of 2014.

11  And here is no acquisition yet, and Morton says how can we

12  proceed with bonds, getting information?  And Jason Galanis

13  says I'm confident you will figure it out.  Of course, he is

14  confident she will work it out because she has agreed to do his

15  bidding in return for the investment adviser.

16       The Hughes acquisition closes a few weeks later, on

17  August 11th of 2014.  Just as Michelle Morton has promised from

18  the minute she arrives, priority one, is stuffing these bonds

19  into client accounts, not figuring out if they make sense, not

20  figuring out if they're good investment, just dumping them into

21  client accounts.

22       Let's look at one other example of those

23  communications, Government Exhibit 3004 A again.  August 17th

24  of 2014, let than a week after the acquisition, and Morton

25  texts Galanis.  Let's be clear.  If you want the bonds to go

1   in, I have no say.  I am not sitting in the position of making

2   a judgment.  If you invested in Hughes for this sole purpose,

3   then it is your call, not mine.  If you're thinking that I can

4   or would stop this, then I have totally screwed up my

5   communication.  So even though Michelle Morton is the

6   investment adviser, she is going to do whatever Jason Galanis

7   does because he gave her the money, and Morton and Hirst do

8   exactly that.

9            Beginning on August 25th of 2014, they use Hughes'

10  client money to buy the entirety of the first round of bonds,

11  $28 million.  You heard that the employees at Hughes, the

12  long-standing employees who were already there, they were so

13  uncomfortable with this, they wouldn't participate.  They

14  wouldn't sign the trade tickets, and Gary Hirst had to sign

15  those trade tickets himself.

16           You heard from one of those employees, Daniel Turney.

17  Remember he described the environment at Hughes when all of

18  this was going on.  He said there had always been a kind of

19  cloud over the Wakpamni bonds.  There was stress just from the

20  general conversation in the office and the negativity that the

21  portfolio managers were discussing the bonds.  Remember he was

22  asked about someone named Justin Malkin.  You mentioned someone

23  named Justin Malkin.  What did he do when the trade was

24  executed?  The answer was he quit.  The day the trade was

25  executed, he quit.

1      You heard from some of the representatives of the

2  pension funds themselves, and they told you pretty much the

3  same thing across the board.  They had no idea that these bonds

4  had been purchased until it was too late.  Nobody told them

5  about any of the conflicts of interest for the bonds, that

6  Hughes had been ordered to buy the bonds by Michelle Morton's

7  backers, Jason Galanis, Bevan Cooney, Devon Archer, who stood

8  to gain from these bonds being sold.  No one disclosed there

9  was a relationship between Morton's backers and the placement

10  agent on the bond or the purported annuity provider on the

11  bond.

12      The pension fund reactions were across the board the

13  same:  Get rid of them, we don't want them, they don't fit in

14  our accounts, they violate our investment parameters, they're

15  unrated, they're a private placement, they're not U.S. Treasury

16  Bonds, you bought too many.  That's exactly what pension funds

17  did not want.

18      Within literally weeks of this purchase, virtually all

19  of the pension funds had fired Hughes.  That is how much they

20  didn't like these bonds.  That didn't alter the defendants'

21  plans at all.  They didn't care that the pension funds had been

22  victimized or Hughes was imploding.  That was the cost of doing

23  business.  They had gotten the money they wanted out of client

24  accounts.

25      How do you know that?  Because they did exactly the

1   same thing with Atlantic.  In 2015, Morton gets money to go buy

2   another investment adviser, right, Atlantic, and again the

3   purpose of that acquisition is to dump Wakpamni bonds into more

4   client accounts, and that is exactly what Morton does almost

5   immediately after she buys Atlantic.  She buys the entirety of

6   the last round of bonds, $16.2 million, using one single

7   pension fund's money, and you saw how that victim reacted;

8   pretty much exactly as you would think.

9        Look at his email in Government Exhibit 719.  That is

10  Michael Smith of the Omaha School Employees Retirement System.

11  I strongly disagree with the purchase.  The reasons for GYOF

12  not purchasing these bonds are so numerous that I won't go into

13  them on this short email.  He made his point crystal clear.

14       Look at Government Exhibit 966, the bonds have got to

15  go.  You heard these bonds could never be sold.  They never

16  were sold.  No one wanted them.  The pension funds, all of

17  them, lost their entire investment.

18       Let's be clear about something.  Investment advisers,

19  as you know, have special obligations to their clients.  They

20  have fiduciary duties, they have to act in the best interests

21  of their clients.  They have to avoid conflicts of interest.

22  They have to choose investments based solely on what is in the

23  client's interests.  They don't have to be any kind of

24  sophisticated financial professional to know that.  That is

25  pretty basic stuff.  So the basic premise here, the idea that

1   Galanis and Archer and Cooney can buy an investment adviser in

2   order to put bonds in client accounts, it makes no sense.  It

3   is not possible.  Investment advisers have to act only in the

4   best interests of their clients.  These victims, these pension

5   fund victims were taken hostage by the defendants.  They were

6   victimized by the rampant conflicts of interest.

7           That is in short an overview of how the scheme worked

8   and how the investors were misled; take control of the bond

9   issuance, lie to make sure it happens, control every side of

10  the transaction.  Turn the bonds into unwitting investor

11  accounts and then steal the money for your own purposes, and

12  then repeat.

13          The basic facts of the scheme are largely not in

14  dispute.  So I want to spend most of today talking about what

15  is in dispute, and it is really one thing, whether these

16  defendants knew that they were participating in a fraud, and

17  the answer for every single defendant is of course they did.

18          Let's start with John Galanis, the man running the

19  front end of the scheme, the salesman who dealt directly with

20  the Wakpamni people, and I want to talk to you about all of the

21  ways you knew he knew this was a fraud.

22          Let's start with the first one.  The first way you

23  know that John Galanis was a knowing participant in this scheme

24  is he went to that Native American Development Conference in

25  Las Vegas trolling for victims, not just any victim, he was

I6PJGAL4                     Summation - Ms. Mermelstein

1   trolling for Raycen Raines.  It was not a coincidence that John

2   Galanis ended up at that lunch with Raycen Raines.  John

3   Galanis went to that conference to find Raycen Raines and to

4   target him for this scheme.

5          Take a look at Government Exhibit 2003.  This is an

6   email from Jason Galanis to Bevan Cooney and Devon Archer in

7   February of 2014, so before the Native American development

8   conference, that conference where Raycen Raines met John

9   Galanis, and Jason Galanis is telling his partners, Archer and

10  Cooney, about a nerve American bond deal, a bond deal that he

11  says would "let them direct part of the proceeds for their own

12  purposes."

13         Now, this is a key email.  It tells you two things:

14         It tells you who is in on the scheme from day one,

15  Jason, Devon Archer and Bevan Cooney, and it tells you what

16  they're up to, direct the proceeds for their own purposes, not

17  send it to an annuity provider, direct the proceeds for their

18  own purposes.  These guys know what they're doing right from

19  the jump.

20         Look at what is attached to this email.  Information

21  about Raycen Raines and his efforts to get permission for the

22  Ogala Sioux to issue bonds.  Think about that.  In February of

23  2014, Raycen Raines never heard of Jason Galanis, never heard

24  of John Galanis, never heard of Devon Archer, never heard of

25  Bevan Cooney, but they had heard of him, and they were coming

I6PJGAL4                    Summation - Ms. Mermelstein

1    for him, and they sent John Galanis.  This email makes it

2    perfectly clear that John Galanis was at that conference as

3    part of this scheme.  He was looking for a victim, and he

4    already knew which victim he was looking for.

5         Remember the defense counsel tried very hard with some

6    of the witnesses who were at that conference to make it seem

7    like maybe the Wakpamni sought out John Galanis for advice.

8    Please, there is no evidence of that because it did not happen.

9    Defense counsel has to try and make that argument because when

10   you realize that John Galanis was there looking for Raycen

11   Raines, you know that he was a participant in this fraud.  That

12   is just one way that you know that John Galanis participated in

13   the fraud.

14        The second way that you know, well, all of the lies

15   that he told to Raycen Raines and to Tim Anderson.  When you

16   look at John Galanis' interactions with both Raycen Raines and

17   Tim Anderson, you see he played his part perfectly.  He closed

18   the sale.  John Galanis made this deal seem like it made sense,

19   like it was safe, like it was reasonable, like it was low risk.

20        So John Galanis' first lie, claiming his son was an

21   investment banker at Burnham Securities, the placement agent

22   for the bond.  He has told the same lie to Tim Anderson and

23   Raycen Raines.  Anderson told you exactly what he said.  John

24   Galanis said that Jason Galanis' role was that he was an

25   investment banker at Burnham, and unsurprisingly Raycen Raines

told you the same thing.  Yanni Galanis I said that he had a

son that worked at Burnham Securities whose name was Jason

Galanis.

        Yanni said socially responsible investors would want

to buy a bond issued by a Native American entity.  The annuity

would make it totally safe, guarantee all of the payments, and

this annuity would be provided by a large reputable European

insurance company called Wealth Assurance AG.

        The problem was John Galanis was lying straight-up,

100 percent lying.  There is no dispute Jason Galanis wasn't an

investment banker at Burnham.  He wasn't employed at Burnham.

Now, was he pulling strings at Burnham behind the scenes?  For

sure.  Was he controlling Hugh Dunkerley, his puppet at

Burnham?  He definitely was.  But imagine what that

conversation looks like if John Galanis tries to tell the

truth.

        Look, my son, Jason, has got kind of a checkered past

so he is keeping a low profile, but don't worry, he is

controlling everything through his frontman.  Nobody was going

to sign up for that.  So John Galanis lies.  He says Jason is

an investment banker at Burnham to try and make the shady deal

seem legitimate.

        John is not just peddling this lie about Wealth

Assurance AG in person, he is putting it in writing.  Let's

look at Government Exhibit 1304.  Here is an email from John

1    Galanis to Tim Anderson on June 16th of 2014.  Jason Galanis is

2    copied, and you can see what John Galanis is attaching a

3    document called Wakpamni source and use of funds version 15.

4         Look at what that documents says about the annuity

5    provider.  Annuity issuer:  Wealth Assurance AG is a European

6    insurance company company owned by COR Capital, Inc., a private

7    equity investor with banking and asset management investments

8    of over 13 billion, and -- a 120 year old $80 billion insurance

9    company based in Hamburg.  That sounds pretty good.

10        As you may remember, come July now John Galanis is

11   swapping it out for Wealth Assurance Private Client Corp.  Take

12   a look at Government Exhibit 1307.  Here is a July 7th, 2014

13   email from Jason Galanis to Tim Anderson.  Subject:  Form of

14   annuity.  Look at what is attached, the WAPC annuity contract

15   version 2.

16        Look at the attachment.  This is that draft annuity

17   contract with Wealth Assurance Private Client Corp.  Wealth

18   Assurance AG and Wealth Assurance Private Client Corp., those

19   names sound very similar.  That is not a coincidence.  It is

20   not an accident.  Those names are designed to try and keep

21   people from noticing that they're not the same thing.

22        Raines and Anderson did notice that they're not the

23   same thing.  They noticed the change and they asked John

24   Galanis about it.  So unsurprisingly, he lies.  Look at what

25   Raycen Raines told you:  What, if anything, did Yanni Galanis

1    tell you about the relationship between Wealth Assurance AG

2    that had initally been mentioned and Wealth Assurance.  Did you

3    call it private placement?  Yes.

4            What did Yanni tell you about the relationship between

5    the two?  That it was a subsidiary of the company.

6            Then John Galanis tells a similar lie to Tim Anderson.

7    He says this entity, Wealth Assurance private Client Corp., is

8    a BVI, British Virgin Islands subsidiary of Wealth Assurance AG

9    and that they handled private equity investments in the United

10   States.

11           But the thing is, that is not true.  Wealth Assurance

12   Private Client Corp. is not affiliated with Wealth Assurance

13   AG.  It is not a subsidiary.  It is a piggy bank.  It is just a

14   bank account for Jason Galanis and his friends.

15           You know that John Galanis knew exactly how that

16   account was being used because look at how he reacts when

17   Raycen Raines suggested maybe they should shop around for a

18   different annuity provider, right?  Raines says we should shop

19   around for another annuity provider, maybe they offer a

20   competitive rate.  And look how John Galanis responds.  He

21   shuts Raines down.  He says there is no reason to change.  You

22   know a good thing, the relationship that is existing, the way

23   the structure is.

24           Why?  What is the harm in seeing if you can get a

25   better price?  Because if they found a legitimate annuity

1    provider to use for this bond deal, then they would have to

2    actually buy the annuity.  If they buy a real annuity, they

3    can't steal all the money.  That is why John Galanis has to

4    tell Raycen Raines no way, leave it alone.  That is another way

5    that you know that John Galanis knew that this was a fraud.  So

6    those lies to Anderson and Raines are very revealing.

7             Let's turn to the next way you know that John Galanis

8    was a knowing participant in this fraud, and that is that he

9    was the driver of this deal at the beginning.  He was the one

10   drafting documents, he was the one providing information to the

11   attorneys.  John Galanis didn't think that this deal was

12   legitimate because there were attorneys involved.  He was the

13   one feeding the lawyers the false information.  You can't claim

14   you're relying on lawyers when you're the one lying to them.

15            Let's look at just a couple of examples how John

16   Galanis fed information to Tim Anderson.  Let's start with this

17   email in May of 2014, Government Exhibit 1301.  John Galanis

18   emails Tim Anderson providing for Burnham's engagement of

19   Dillworth Paxson.  Burnham hires Tim Anderson, the lawyer on

20   the bond deal.  John Galanis tells Anderson the contact

21   information for the transaction will be Jason Galanis.  So John

22   Galanis makes sure that even though Jason Galanis doesn't work

23   at Burnham, it is Jason who will be the point person on the

24   Burnham deal, Jason will get all of the communications.

25            John Galanis sets it up so Jason will have control.

I6PJGAL4                    Summation - Ms. Mermelstein

1    One other thing about this email.  Look how John Galanis knows

2    exactly who Hugh Dunkerley is.  He specifies that Dunkerley is

3    a director of two different companies that may play a role in

4    the transaction, Burnham Securities and Wealth Assurance

5    Holdings, the parent company of Wealth Assurance AG.  So you

6    know that John Galanis knows that Dunkerley is connected to

7    both Burnham and Wealth Assurance.

8         It keeps going.  Look at Government Exhibit 1302.  In

9    June of 2014 John Galanis emails Anderson and others attaching

10   a very rough draft memo, and attached is a memo discussing a

11   bond structure for Wakpamni bonds.  John Galanis sends draft

12   after draft after draft of Wakpamni documents.  I am not going

13   to go through them all, but June 9, Wakpamni source and use of

14   funds Version 9.  A week later, June 16th, and he is already on

15   Wakpamni source and use of funds version 15.  June 25, he sends

16   term sheet, version 6.  June 27th, term sheet, version 6.1.

17        We go to July, go to Government Exhibit 1307.

18   Remember John Galanis is the one sending Tim Anderson the form

19   of the annuity contract.  Tim Anderson is not drafting it.  He

20   is getting it from John Galanis.  Look at Government Exhibit

21   1311, here we are in August and John Galanis is sending out

22   Burnham marketing materials and on and on and on.

23        After the first round of bond goes through, it is John

24   Galanis who starts the thing all over again.  You heard that

25   from Raycen Raines.  Did there come a time when Yanni Galanis

1    proposed another bond issuance?  Yes.  Approximately when was

2    that?  It was soon after the first one.  And how soon?  Well,

3    there was -- it was a immediately.  Well, what, if anything,

4    did Yanni Galanis say about why he was proposing another bond

5    issuance so shortly after the first one?  There were investors

6    who didn't make the initial bond closure, and they were

7    interested in the social responsible capital bond structure,

8    and they would be interested in investing in another bond right

9    away.

10        No surprise, the Wakpamni agree and Yanni is again

11   send documents and documents to Tim Anderson.  Here he is,

12   September 4th, 2014, Government Exhibit 1314, email to

13   Anderson, and he is attaching the Wakpamni second tranche,

14   source and use of funds Version 1.  We are not going to do

15   every single email, but the third round of bonds, it is the

16   same thing, John Galanis is the one convincing the Wakpamni to

17   issue these bonds.

18        Even after the bonds have been issued, John Galanis is

19   still running the show, explaining to Tim Anderson what the

20   deal documents mean.  Take a look at Government Exhibit 1367.

21   This is an email all the way at the tail end in July of 2015,

22   and Yanni writes you have requested clarification regarding

23   Wealth Assurance Private Client Corporation's position

24   regarding the funding of its loan commission as provided for in

25   the terms of the annuity contract.  Tim Anderson is asking John

I6PJGAL4                    Summation - Ms. Mermelstein

1   Galanis for help understanding the terms of the annuity

2   contract.

3           John Galanis does not rely on Tim Anderson.  He is

4   leading him around by the nose.  Let me say one other thing

5   about all of these draft documents that are being circulated by

6   John Galanis.  Take a look back at Government Exhibit 1304.

7   Remember this is being sent in June of 2014.  It lists

8   Francisco Martin for Private Equity Management.

9           You will remember when you heard from Francisco Martin

10  himself, he had never heard of Private Equity Management until

11  he signed the agreement at the end of August.  So John Galanis

12  knew about Francisco Martin's role before Francisco Martin did.

13  You know why that is true because John Galanis was in on the

14  fraud.

15          All of these emails we just went through, they show

16  you one thing, that John Galanis was driving the deal, that he

17  was the one feeding information to Tim Anderson, false

18  information, and that is just another way that you know that

19  John Galanis was a knowing participant in this fraud.

20          I'll give you another reason.  John Galanis was in

21  this with Jason Galanis.  No, there is no dispute in this case

22  that Jason Galanis' participation in the Wakpamni bonds was a

23  crime, and to be clear, having a son who is committing a crime

24  doesn't make you guilty on its own, but look at how intertwined

25  John Galanis and Jason Galanis are.  Look how in this they were

I6PJGAL4                  Summation - Ms. Mermelstein

1   together and ask yourselves what that means about the way in

2   which they shared information.

3          Remember Tim Anderson was asked in your conversations

4   with Yanni Galanis and Jason Galanis, did they ever contradict

5   each other?  And he said no, they appeared to be in perfect

6   harmony.  Tim Anderson knew them to always be on the same page,

7   to have consistent answers to everything.  They were so

8   intertwined that when Tim Anderson asked Jason Galanis for

9   information about the annuity, it was John Galanis who provided

10  it.  You heard that from Tim Anderson.

11         Who provided you with that information?  Yanni

12  Galanis.  Who did you ask for the information?  Jason Galanis.

13  And you heard that Yanni Galanis, just like his son Jason, used

14  WICKR.  WICKR is a small phone app that lets you send coded

15  messages that automatically delete.  How many fathers and sons

16  do you know need no use an automatically deleting message app?

17  Just another way that John and Jason Galanis worked together to

18  try and hide their fraud.  All of this connectedness means one

19  thing, it means that Jason Galanis wasn't hiding things from

20  his father, not at all.  They were in this together.

21         Then last but definitely not least, when you think

22  about why you know that John Galanis was in on this fraud, you

23  got to look at the money because you saw that John Galanis got

24  $2.35 million right off the top.  Take a look at Government

25  Exhibit 512.  That is the Wealth Assurance Private Client

I6PJGAL4                    Summation - Ms. Mermelstein

1   Corporation bank account.  Look at the very first withdrawal

2   from that account as soon as the bond money comes in.

3          We looked at this during the trial.  The very first

4   transfer is a $1 million transfer that goes to Katsky Korins,

5   and you remember that was in connection with Jason Galanis

6   buying his Tribeca mansion.  What is the second transfer of the

7   whole fraud?  It is the $2.35 million that went to Sovereign

8   Nations.  That is a John Galanis front company, a shell.  So

9   John Galanis is at the head of the line for getting his cut of

10  the fraud proceeds.

11         Now, there is no real dispute, and we'll talk about

12  this in a minute, the Sovereign Nations Development account is

13  John Galanis' account, and you heard that directly from Mark

14  McMillan.  You saw the Sovereign Nations account was used for

15  John Galanis' personal expenses, jewelry, cars, money to

16  Galanis family members, payments to live in a hotel in

17  California, and there is just no legitimate dispute here John

18  Galanis was not entitled to this money.  You saw that the

19  disposition of the bond proceeds was carefully set out in the

20  bond documents, in those settlement statements we looked at

21  during the trial.

22         Look at the closing statement for first round of

23  bonds, Government Exhibit 214.  Most of the money is supposed

24  to used to buy an annuity.  You all know how that turned out.

25  2.25 million is supposed to go to the Wakpamni for their

I6PJGAL4                    Summation – Ms. Mermelstein

development project, and $500,000 is going to go to pay closing

costs, and you know exactly what those closing costs were

because there is a Schedule B, $6,500 goes to U.S. Bank as the

trustee, 75,000 20 Greenberg Traurig as counsel for the

community, $97,000 to Dillworth Paxson for their work on the

deal, $250,000 goes to Burnham Securities, $60,000 goes to

Haines Investments, Raycen Raines' partner, 6500 to Russo &

Russo and $5,000.00 to miscellaneous.

            You know who is not on this list?  John Galanis is not

on this list.  Sovereign Nations is not on this list.  He was

definitely not supposed to get any of the bond proceeds and he

was definitely not supposed to get $2.35 million.  That is more

money than the Wakpamni themselves got.  You know that John

Galanis knew that he wasn't entitled to the money.

            Take a look at Government Exhibit 1303.  That is an

email from John Galanis to Tim Anderson of June of 2014, not

too long before the bonds issue.  Look at the attachment.  It

is the Wakpamni source and use of funds.  Look at what it says

about the source of funds.  $28 million in proceeds of the

offering, $250,000 goes to Burnham, $27,500,000 goes to

purchase the annuity from Wealth Assurance.  This is a document

John Galanis is sending to the lawyers, and there is not one

word about a payment to John Galanis, not a word about a

payment to Sovereign Nations.  So you know that John Galanis

knows that he is not entitled to this money.  The $2.35 million

1   was definitely not a finder's fee for originating this deal.

2   There is literally no evidence of that whatsoever.

3          Raycen Raines understood, as he told you, that he,

4   meaning Yanni Galanis, would receive a success fee from Burnham

5   Securities for putting together the deal, and that makes sense,

6   right?  It was the same way Raycen Raines Raines was going to

7   be compensated through Steven Haines, his partner.  Any

8   payments to John Galanis would have to come out of the Burnham

9   money, and Burnham only got $250,000, so there is no way John

10  Galanis was supposed to get $2.35 million.  And no one, at

11  least no one who wasn't in on the crime, had any idea that John

12  Galanis was stealing this money.

13         Let's go back to the Sovereign Nations setup for a

14  minute.  That tells you a lot of what is going on, and ask

15  yourselves, is this how a legitimate business works?  John

16  Galanis first meets Raycen Raines in March of 2014.  He is at a

17  Native American Development Conference, and he is holding

18  himself out as involved in Native American economic

19  developments.  You would think he would already have some kind

20  of corporate entity.  Is he using Sovereign Nations the whole

21  time?  Not at all.  You know when Sovereign Nations was

22  created.  You saw the certificate of incorporation,

23  Incorporated August 21 of 2014.  That is literally days before

24  the first bonds were issued.

25         Look who incorporated.  Not John Galanis.  It was mark

I6PJGAL4                        Summation - Ms. Mermelstein

McMillan.  And the Sovereign Nations bank account opened the
very next day.  You see the account opening documents,
Government Exhibit 623, opening August 22 of 2014.

          John Galanis had this account opened on the eve of the
bond transaction for the sole purpose of dumping the stolen
money into an account that sounded legitimate.  John Galanis
wasn't involved in Native American economic development.  He
was involved in a fraud.  Again look who is on the account, not
John Galanis, it is Mark McMillan, and that tells you John
Galanis knew he was getting dirty money because he was hiding
his involvement.  He kept his name off the incorporation
documents, he kept his name off the bank account, he hid behind
Mark McMillan the exact same way Jason Galanis hid behind Hugh
Dunkerley and Francisco Martin and Devon Archer.  Jason Galanis
used them to hide his involvement just like his father did.

          John Galanis even went so far as to use a fake email
address, an email address in the name of an attorney in order
to give directions to Mark McMillan, more efforts to hide his
involvement in the Sovereign Nations account.  And you saw
examples of that.  Look at Government Exhibit 3400.  That is an
email from August 28th of 2014 from JEP Feiner at Gmail dot com
to Mark McMillan, directing wires out of the Sovereign Nations
account, but this was not an email from Barry Feiner, a lawyer,
as Mark McMillan told you.  It was an email from John Galanis,
just another way he was hiding his involvement.

I6PJGAL4                    Summation - Ms. Mermelstein

1          The last way you know that the Sovereign Nations

2     account was a sham, it was only opened for a matter of months.

3     As soon as John Galanis had spent the stolen bond proceeds, he

4     had McMillan close the account, so you know John Galanis wasn't

5     planning to do any more Native American consulting any more.

6     He didn't have any intention of building up Native American

7     development initiative.  He created the account for one

8     purpose, to hide the bond proceeds and the fact he was stealing

9     them.  When that had been accomplished, he didn't need it any

10    more, so he threw it away.

11          That is John Galanis, the man who ran the front of the

12    scheme, who tracked down Raycen Raines, the salesman who lied

13    to the Wakpamni time and time and time again, who stole the

14    Wakpamni money, money that he was clearly not entitled to.  He

15    hid that money in an account he hoped would never be traced

16    back to him.  He helped set the entire scheme in motion..

17          So let's turn now to how you know that Devon Archer

18    and Bevan Cooney also knew that they were participating in a

19    fraud.  I want to be clear about something because, as Judge

20    Abrams will tell you, it is your task to consider each

21    defendant separately and, of course, that is absolutely what

22    you should do.  Just as you heard that there were the two

23    Jasons in this case, Archer and Cooney were in many ways two

24    peas in a pod.  They were both close with Jason Galanis.  They

25    both had dreams of establishing a financial super company paid

1   for with the proceeds of the Wakpamni bonds.  They both

2   recycled Wakpamni bond proceeds from the first round of bonds

3   to buy up the second round of bonds, driving the Wakpamni

4   deeper into debt.

5            They each lied to banks about those bonds.  They each

6   used the bonds to prop up other companies that they were

7   investing in.  They each behaved in very revealing ways when

8   Jason Galanis was arrested.  They both took steps to cover up

9   their crime, in Archer's case, among other things, by making

10  interest payments on the bonds so no one would realize that

11  there was no annuity.

12           They were on many, many, many of the same emails,

13  devastating emails.  Because the evidence of their knowledge is

14  so similar, it makes sense to walk through that evidence

15  similarly.  Archer and Cooney ran the back end of this fraud,

16  but they were kept up to speed on this scheme every step of the

17  way.  They were the money recyclers who kept the fraud going

18  and pretended to own these bonds for their own personal gain.

19           Before I turn to each of their roles in the fraud, let

20  me just say a few words about what Archer and Cooney expected

21  to get from this fraud because the defendants have tried to

22  suggest by showing you money that was between them and Jason

23  Galanis, that he didn't really benefit from this fraud.  They

24  are trying to point you in the wrong direction.  The question

25  is not what these defendants were holding when the music

I6PJGAL4                    Summation – Ms. Mermelstein

1    stopped; it is what they thought they were going to get when

2    the fraud succeeded.  Of course, they don't need to have made

3    any money to be guilty, but it is still forth talking about

4    what they thought they were going to get.

5                 (Continued on next page)

1          MS. MERMELSTEIN:  The big item, of course, is they

2     thought they were going to own the super company, and they were

3     going to sell the company for an enormous amount of money, and

4     everybody was going to get very rich.  You heard that was the

5     plan, and you saw that Teneo presentation that was trying to

6     launch that plan into fruition.

7          Take a look at it, it's Defense Exhibit 4733A.  You

8     saw that Archer is listed as the chairman of Burnham & Co. and

9     the lead investor in Burnham Financial Group, and so you know

10    he expected a huge pay out when the Burnham roll-up was

11    successful.

12         Or look at how he and Galanis talk about the roll-up

13    plan.  This is an e-mail from Archer to Jason Galanis in

14    September of 2014.  Subject:  Atlantic Asset Management.  And

15    Galanis says:  This chapter -- the Atlantic chapter -- will be

16    the real earner now.  And you know what that means:  A big

17    pay-out on the fraud.

18         The same goes for Cooney.  Cooney similarly expected

19    to make a lot of money when the whole roll-up was successful.

20    And the problem for Archer and Cooney is that they got caught

21    before they finished.  The roll-up never completed, and so they

22    were never able to sell Burnham for a big pay-out.  And of

23    course even with all of that, they did financially benefit from

24    this fraud.

25         Look at Archer's holdings.  It's Government Exhibit

1    5050.  It's that last exhibit that was put in at this trial.

2    He had millions of dollars of Wealth Assurance Holdings stock

3    that he received for his role as a director of Wealth Assurance

4    Holdings, one of the entities that was involved in driving the

5    roll-up.  Cooney got all kinds of cash from Thorsdale from the

6    bond proceeds.  He can call those loans if he wants to to his

7    business manager, but when the music stopped, he was up a lot

8    of money.  And we're going to talk about it in more detail in a

9    minute, but remember he used the bonds to get a $1.2 million

10   loan, and then he spent the money and never paid it back.  So

11   these defendants did profit, and they expected to profit even

12   more.

13           So let's go back to talking about the ways you know

14   that Archer and Cooney were knowing participants in the fraud.

15   And one of the ways you know is they knew what was going on at

16   every step of the way.

17           There has been a lot of talk in this trial about how

18   Jason Galanis tried to keep things secret, that he told people

19   only what they needed to know.  And that's partially true.  But

20   if the defendants wanted you to believe that Galanis played

21   things close to the vest and that he only told the people he

22   trusted his dirty secrets, well look at how much information he

23   shared with these defendants.

24           And as we go through these communications, pay

25   attention to how frequently Jason Galanis communicates with

1    someone and then he forwards the e-mail to Archer and Cooney,

2    how he protects Archer and Cooney's role by keeping them off

3    the front lines and updating them behind the scenes.

4             Archer and Cooney are in the loop on efforts to issue

5    the Wakpamni bonds; they know when the bonds are first being

6    discussed; they are kept apprised as the bonds develop, and not

7    just at a high level.

8             Remember Government Exhibit 2003?  We looked at it

9    earlier.  Remember, this is an e-mail in February of 2014 from

10   Galanis to Archer.  It's that e-mail with the Raycen Raines

11   letter attached.  And so here you have proof that Archer and

12   Cooney knew when Galanis identified Raines and the Wakpamni

13   Lake Community as the victim of this fraud.

14            Take a look at Government Exhibit 1267.  This is an

15   August 13, 2014 e-mail.  You can see that Galanis gets sent the

16   CUSIP -- that's the unique identifier for the bonds -- kind of

17   a mundane update on the situation, and he promptly forwards it

18   to Archer and Cooney.

19            Galanis lets Archer and Cooney know when the bond

20   documents are signed.  Take a look at Government Exhibit 2217.

21   Subject:  Wilma Standing Bear and Geneva Lone Hill have fully

22   executed the agreements.

23            So it's not just that Archer and Cooney knew the bonds

24   are going forward; they know the names of the board members of

25   the Wakpamni Lake Community who are going to execute the

I6P7GAL5                       Summation - Ms. Mermelstein

1    agreements.  And Cooney is excited.  "This is pure genius.  The

2    Native American bonds.  Great work Greek."

3            And critically they know the purpose of the bond, to

4    generate money that they will spend on their own endeavors, a

5    piggy bank for the Three Musketeers.

6            Simultaneously -- and this is of course not a

7    coincidence -- Archer and Cooney are also involved in the

8    efforts to acquire Hughes and then Atlantic so that they can

9    force investors to buy bonds.  That's how they're going to get

10   their money.

11           Take a look at Government Exhibit 2018.  This is a May

12   2014 e-mail from Galanis to Archer, Cooney and Godfrey, and

13   here is what he says:  "Partha Charkrabroty brought us and RIA

14   to acquire."  RIA you know is just a registered investment

15   advisor.  They are talking about Hughes.  And Galanis says,

16   "Possibly useful."

17           Possibly useful?  You know exactly what he meant by

18   that.  Useful because you could steal investor money and force

19   the bonds into their accounts.

20           But in case there was any doubt about the purpose of

21   acquiring Hughes, Galanis specifically told them that Hughes

22   would take the entire first tranche of the Wakpamni bonds.

23   Take a look at Government Exhibit 2030.  It's an e-mail in July

24   of 2014 from Galanis to Archer and Cooney, and here is what he

25   says:  "Gents, Greek is forging ahead for us.  See attachment

1    term sheet for the acquisition of 100 percent of Hughes."  Then

2    at the bottom:  "I believe they will take $28.5 million of the

3    Wakpamni/Oglala Sioux issue that Greenberg Traurig is working

4    on."  28.5 million?  That's the whole thing.

5           Galanis even sends Cooney the specific allocation of

6    which Hughes clients are going to get the bonds.  You saw that

7    in Government Exhibit 2299.  Archer to Cooney:  "Subject HCM

8    native bond allocation."  And you recognize the client names

9    that are on that attachment:  Birmingham Water Works, Chicago

10   Transit, Michelin, and on and on.  So Cooney knows which

11   victims are being forced to buy the bonds.  This is critical

12   evidence that he knew full well that the scheme involves

13   capturing these investment advisors in order to engineer the

14   sale of Wakpamni bonds.

15           Galanis also talks to Archer and Cooney about how they

16   are going to pay for the Hughes acquisition.  Look at

17   Government Exhibit 2030.  Galanis says:  "Need to determine

18   where the 2.647 million for the acquisition is getting

19   allocated from."

20           And then after they decide to use Wealth Assurance AG

21   to finance the purchase, Galanis tells Archer and Cooney when

22   the wire goes out.  You saw that in Government Exhibit 2034.

23   Jason Galanis e-mails Archer and Cooney:  "WAAG wired $2.76

24   million today to close Hughes."

25           And after the Hughes acquisition is successful, it is

I6P7GAL5                    Summation - Ms. Mermelstein

1  exactly the same thing with Atlantic.  Archer and Cooney know

2  when the idea to acquire Atlantic first arises.  Look at

3  Government Exhibit 2303.  Galanis e-mails Archer and Cooney on

4  August 28, 2014 about Atlantic, and he attaches the Atlantic

5  ADV for their review.  Remember, that's the form that

6  registered investment advisors are required to file.  And what

7  does he say?  "We have a decent shot of adding this one to the

8  family."  And you know who the family is; they are in it

9  together:  Archer and Cooney and Galanis.

10         And time goes on, and Galanis sends more information

11 about Atlantic.  Look at Government Exhibit 2037.  Jason

12 Galanis sends Archer an overview of Atlantic Asset Management,

13 and Archer says:  "will review."

14         And Galanis keeps Archer and Cooney apprised of the

15 status of that deal.  Take a look at Government Exhibit 2161,

16 October 31, 2014.  Morgan e-mails Jason Galanis.  Subject:

17 Update on AAM.  And she says, "I'd say we are 90 percent

18 there."  And as always Galanis shares that information with

19 Archer and Cooney, he forwards it to them.

20         Look at Government Exhibit 2251.  Now we are in

21 December of 2014, and the deal is moving forward, and Galanis

22 e-mails Archer and Cooney a copy of the term sheet.  Again,

23 there is no argument that Archer and Cooney just they thought

24 Jason Galanis was keeping them up to date on a potential

25 acquisition for their corporate empire.  They knew exactly why

1    they were buying Atlantic.

2              Look at Government Exhibit 2062.  Morton e-mails

3    Galanis.  "Subject:  Forgot important element in the last

4    e-mail AAM."  And says:  "If he has information on the issue,

5    he will begin the process of going through the client

6    information to determine where they can be placed."  And

7    Galanis forwards that to Archer and Cooney.  That's not how

8    investment advisors work.  They don't decide to buy bonds and

9    then figure out where to put them.  They figure out what

10   investments are good for their clients and then they buy them.

11             So, this is critical evidence that shows that Archer

12   and Cooney knew full well that the scheme involved capturing

13   yet another investment advisor to dump more Wakpamni bonds on

14   more unwitting investors.  And that's the first reason you know

15   that Archer and Cooney knew what was going on.  Jason Galanis

16   was telling them from the very first plan to approach Wakpamni,

17   through the issuance of the bonds, through the acquisition of

18   the investment advisors, through the dumping of the Wakpamni

19   bonds on unknowing investors.

20             And before I go on in all of this conversation about

21   knowledge, I want to say a word here about something called

22   conscious avoidance.  We're going to discuss and continue

23   discussing this afternoon all of the ways you know that these

24   defendants knew exactly what they were doing, that they acted

25   knowingly when they committed this crime.  But you should

I6P7GAL5                    Summation - Ms. Mermelstein

1    know -- and I expect Judge Abrams will give you this

2    instruction -- that you can find that the defendants acted

3    knowingly even if you only find that they deliberately closed

4    their eyes to what otherwise would have been obvious.  What

5    that means is under the law you can't put your head in the

6    sand; you can't see all these red flags, all these things about

7    these transactions that don't make any sense and not want to

8    know.  That is the same thing as acting knowingly.  Of course

9    there is so much evidence that these defendants knew, you don't

10   have to rely on that, but you should know that you can.

11           So, let me turn you to another way that you know that

12   Archer and Cooney were knowing participants in this fraud.  And

13   it's because of the nature of their relationship with Galanis.

14   You heard from multiple sources that Galanis and Archer and

15   Cooney were close friends and they were business partners.

16   Francisco Martin told you Jason Galanis and Bevan Cooney,

17   childhood friends who were doing business together and were

18   close.  Martin also told you Jason Galanis and Devon Archer

19   were business partners and close.  Dunkerley told you Bevan

20   Cooney and Jason Galanis were the best of friends.

21           And that matches up with some of the documents you saw

22   in this case.  Take a look as an example at Government Exhibit

23   3201.  This is an e-mail from Cooney to his business manager

24   and he describes a corporate apartment that he is getting, and

25   it's a corporate apartment you will recall that he's going to

I6P7GAL5                    Summation - Ms. Mermelstein

1   share.  Cooney, his wife, Jason Galanis and Monet Berger, Jason

2   Galanis' wife, that's how close these guys are, they are

3   sharing an apartment.

4           And look at how Cooney describes Galanis:  My business

5   partner.  And you saw in the way that these three communicated

6   with each other that these guys were 100 percent in it

7   together.

8           Take a look as an example at Government Exhibit 2030.

9   Here is Jason Galanis writing to Archer and Cooney about the

10  acquisition of Hughes, and he says, Jason Galanis referring to

11  himself, "Greek is forging ahead for us."  Galanis, Archer and

12  Cooney are an us, they are a team.  Whatever entity is

13  involved, they are all in it for their shared benefit.

14          And we looked at this one before, but look at what

15  Galanis says:  "Need to determine where the $2.67 million for

16  the acquisition is getting allocated from."  It doesn't really

17  matter to them which entity the money comes from.  They are not

18  being that careful about what is what.  They will take the

19  money from whatever entity is available and use it for the

20  scheme because they are part of one cohesive goal.

21          Let's look at a few more examples of how these guys

22  make it clear that they have a shared financial interest.  Look

23  at Government Exhibit 2026.  Galanis writes to Cooney and

24  Archer:  "You guys as partners are enabling so much more" and

25  Archer says:  "Completely correct."

1            Or look at 2063.  This is another e-mail from Galanis

2    to Archer and Cooney.  They are talking about the Atlantic

3    acquisition, and Galanis says:  "It will add 11.5 billion to

4    the empire."  Whose empire?  Their shared empire.  It doesn't

5    matter who technically is acquiring Atlantic.  That is money

6    for Archer and Cooney and Galanis plain and simple.

7            Look at this e-mail, Government Exhibit 2052.  They

8    are talking both about Atlantic and the Fondinvest acquisition.

9    Galanis says:  "Frenetic.  Working on Fondinvest and Atlantic."

10   Jason is keeping Archer and Cooney updated on their plans to

11   buy Atlantic so they can dump more Wakpamni bonds in on them

12   and to update them on Fondinvest.

13           Now, Remember this e-mail is in October 1, 2014.

14   Remember what Devon Archer is doing that very day?  He is

15   buying $15 million worth of Wakpamni bonds with money from the

16   first round of bonds.  Jason is doing his part for the scheme

17   and Archer is doing his.  And look what they say to each other:

18   "Big accomplishment today, gentlemen.  Let's each have a remote

19   chug of wine, beer or shot."

20           Look at Government Exhibit 2067.  Jason Sugarman

21   e-mails Hirst and Galanis:  "VL assurance funded."  Remember

22   that VL Assurance is part of the big roll-up plan.  Galanis

23   forwards that to Archer and Cooney:  "Weasels gettin shit

24   done."  Archer agrees:  "Weasels win."  All one big collective

25   effort.

1          And not for nothing, Galanis, Archer and Cooney are

2     describing themselves as weasels, because they know they are up

3     to no good.  They are pleased to be up to no good.  They are

4     reveling in their bad behavior.

5          It is the same thing with Valorlife.  Take a look at

6     Government Exhibit 2084.  Remember Valorlife was purchased from

7     Vaudoise.  That was also part of the roll-up, and it was

8     purchased with bond proceeds.  And Galanis sends that update to

9     his partners, and Cooney is excited for them.  "The Greek

10    machine just doesn't stop."  Galanis says he and Archer are

11    attacking Teneo.  Remember that's the consulting company that

12    was going to help with the roll-up plan.  It was going to help

13    sell the super company.  And Cooney says:  "We continue to

14    press until we have a huge surplus of honey.  Devin with an I

15    should be a great bee keeper for our native bonds."

16         So, not only are they in on the Valorlife acquisition

17    together, but look at Cooney's discussion of our native bonds.

18    You know what he is referring to.  He is referring to the bonds

19    bought with recycled money and which were sent to Bonwick --

20    remember run by Devin Wicker with an I -- for net capital.

21    These aren't Jason's bonds; they're not John's bonds; they're

22    Morton or Hirst's bonds; they are our bonds.  The scheme is

23    ongoing, and these guys are in it.

24         Finally, look at Government Exhibit 2054.  Galanis

25    e-mails Archer and Cooney, the Wealth Assurance holdings final

report, and he says in the subject of the e-mail: "Guys, this
is not the final but gives you an idea of where we are going.
It will appear very buttoned down and institutional."

        "Where we are going"?  And not that it's going to be
buttoned down and institutional.  It's going to appear buttoned
down and institutional.  That's fraud, making it look like
something when it was something else.

        Now I'm not going to review every e-mail from this
trial in this closing, but look at all the e-mails we just
reviewed.  Look at how Galanis and Archer and Cooney had one
shared purpose.  You know that Archer and Cooney knew that this
was a fraud because they were intertwined with Jason Galanis in
a collective effort.

        Let me turn to the next reason you know that Archer
and Cooney were in on this.  They knew the bond money was being
stolen.  The evidence is clear that they knew that the whole
point of these bonds was to give themselves a piggy bank that
they could raid at will.

        Look at the very first e-mail all the way back in
April of 2014.  Galanis tells Archer and Cooney that the Oglala
bonds are approved.  And he says: "20 million approved.  15
million to us discretionary."  Step back for just a minute from
that.  $15 million to us?  Discretionary?  We can do anything
we want with this money?  Ladies and gentlemen, that's not how
bonds work.  You can't get the Native American community to

I6P7GAL5                     Summation - Ms. Mermelstein

issue bonds and then spend the money that comes in any way you

want.  Of course you can't do that.  This is money that was

supposed to go into an annuity.

          You will recall at the very beginning of this trial

that we asked you to use your common sense.  This is it, here

you go, this does not make sense.

          And you know that Archer and Cooney knew that this

money had to go into an annuity.  Look at Government Exhibit

1235.  This is a June e-mail, so it's a few months after the

e-mail we just looked at, and Galanis tells them:  "The indians

signed two hours ago our engagement."  And then further down he

tells them:  "The use of proceeds is to place the bond proceeds

into a Wealth Assurance annuity."

          So, Archer and Cooney knew what was supposed to

happen, that the money was supposed to go into annuity, and

they were perfectly aware of what they were going to do with

the money instead.

          Look at another example.  Look at the tone of the

e-mail, Government Exhibit 2004.  Jason Galanis tells Archer

and Cooney about a possible Native American tribal bond deal,

and Galanis says:  "We can direct part of the proceeds I am

told."  And what is attached is a letter to Bob Griffo about a

Native American bond deal.  And look at how Cooney responds:

"I will gladly help direct some of Mr. Griffo's funds."  That

is not the tone of someone who is talking about a legitimate

1   investment.  He's laughing at Griffo.  He's hungry to get ahold

2   of his money.

3          Or look at Government Exhibit 2024, July 5, 2014.

4   Galanis tells Archer and Cooney:  "I'm not counting the money

5   yet, but that his primary objective is to get us a source of

6   discretionary liquidity.  Sick of begging."  Same thing, this

7   money is not supposed to be discretionary.  The money is

8   supposed to be in an annuity.

9          Government Exhibit 2216 is pretty simple.  The bonds

10  have not even been issued yet, and Galanis e-mails Archer to

11  say:  "I thought I would share another Greeky piece of the

12  puzzle," which was the acquisition of Fondinvest.  And look at

13  what he says:  "Dan and Hugh have locked it up and came to me

14  for the money, which I have agreed to arrange/provide (probably

15  Indians)."

16         "Probably Indians"?  Again, this e-mail speaks for

17  itself.  Galanis and Archer are openly discussing how they're

18  going to fund the Fondinvest acquisition with money from the

19  Wakpamni Lake Community.  They're going to use the bond

20  proceeds for their own purposes.

21         There are a lot of these e-mails, but I think they are

22  worth looking at.  Look at Government Exhibit 2031.  Galanis

23  e-mails Archer that if they get the $28 million they will have

24  12 to 15 million to put in Wealth Assurance Holdings.

25         Now this one is really nuts, because we're going to

I6P7GAL5                    Summation - Ms. Mermelstein

1   talk a little bit more about the various entities involved

2   here, but let's break down what Jason Galanis is saying.

3          28 million is the exact amount of the first bond

4   issue.  Right?  He is talking about the whole first bond

5   issuance, and he's talking about what they can do if they get

6   it.  Now, remember what Wealth Assurance Holdings is.  That's

7   the parent company of Wealth Assurance AG.  It's the company

8   that Archer, Cooney and Galanis used to buy Wealth Assurance

9   AG.  Wealth Assurance AG was supposed to be the annuity

10  provider.  So what they are saying is if they get the money

11  from the bonds, money that is supposed to go into the annuity

12  at Wealth Assurance AG, then they can invest that money back up

13  into Wealth Assurance Holdings?  Wealth Assurance can't use

14  other people's money to invest in itself.  That doesn't make

15  any sense.

16         And Galanis, Archer and Cooney have these same

17  conversations again and again and again.  Look at Government

18  Exhibit 2242.  Morton is e-mailing with Archer -- excuse me --

19  with Galanis about Atlantic buying more bonds.  And Galanis

20  forwards that e-mail to Archer and Cooney and says "working on

21  more liquidity and sources for the various projects ..."

22         There is no legitimate way for bonds being purchased

23  by Atlantic to result in liquidity for these guys.  This does

24  not make sense.  More liquidity means more money for them,

25  money that was taken from clients of a corrupt investment

1      advisor that they bought and paid for, money that was supposed

2      to go to the annuity provider, and money that they're going to

3      use instead for their various projects.

4              Look at Government Exhibit 2065, Galanis is e-mailing

5      Archer and Cooney and the subject line is honey trail, and what

6      is attached is information about the Wakpamni bonds.  That kind

7      of tells you everything you need to know.  That is money that

8      is supposed to be set aside for residents of the poorest county

9      in the country, and for them it's just a honey trail.  Their

10     fraud is working out just the way they planned.

11             Finally one more, because these guys talked a lot

12     about their need for honey and how they wanted to get it.  Look

13     at Government Exhibit 2253.  Cooney and Galanis are e-mailing

14     about a wire transfer that they're expecting and hasn't come

15     through?  And Cooney says "super stressful having no liquid

16     honey."  This goes on e-mail, after e-mail, after e-mail, all

17     making perfectly clear that Archer and Cooney saw the Wakpamni

18     bonds as their personal piggy bank.

19             Now the defense has tried to suggest, well, this was

20     totally fine because, you know, the Wakpamni understood that

21     the annuity was going to be invested in private equity and so

22     it was OK for the defendants to use this money for their

23     personal business endeavors.  There are a couple of huge

24     problems with that argument.  I don't want to sound like a

25     broken record, but there was no annuity.  The defendants made

I6P7GAL5                    Summation - Ms. Mermelstein

1    up the idea to steal the money.  And Hugh Dunkerley took the

2    stand and he told you that himself.  Those are his words:

3    There was no annuity.  Because the money went to everything

4    else but an annuity contract.  And he was asked by defense

5    counsel:  "That's your opinion?"

6              "No, that is a fact."

7              And you know that in part that there was no annuity

8    because of the way in which they tried to cover it up.  Look at

9    what happens when the Wakpamni start asking questions.

10   Dunkerley sends them fake annuity statements.  Look at one of

11   them; it's Government Exhibit 282.  This statement shows a

12   September 26, 2014 payment for an annuity purchase.  Right?  It

13   shows the bond money being used to buy an annuity.  That is a

14   lie; there is no annuity.  This is not a real statement, as

15   Hugh Dunkerley told you.

16             And, second, if all of these investments that Galanis

17   and Archer and Cooney were making into Valorlife and

18   Fondinvest, if that was really for the benefit of the annuity,

19   if that was really for the Wakpamni, then the Wakpamni would

20   own those investments.  But you know that that's not what

21   happened.  The Wakpamni weren't benefiting from the roll-up.

22   Archer and Cooney and Galanis were benefiting from it.  They

23   were going to own these things that they bought with someone

24   else's money.

25             All of these e-mails show you that Archer and Cooney

knew that the bond proceeds were being misappropriated.  They

knew that money was being taken from the bond proceeds, that it

wasn't going into an annuity and that it was being used to fund

their personal projects.  But Archer and Cooney didn't just

have a general understanding that the bond proceeds were being

stolen.  They knew exactly why, and they participated in that

misappropriation themselves.  More evidence that they were

knowing participants in this scheme.

Remember this chart that showed you where some of the

money from the last series of bonds went?  And you can see

$75,000 of that money went straight to Bevan Cooney.  And

notably Cooney knew exactly where that money was coming from,

because look at Government Exhibit 3250.  Cooney's business

manager sees that money come in, and she asks was the wire from

Wealth Assurance a loan?  And he says yes.  So he knows the

money coming in is from Wealth Assurance.

Of course the Wealth Assurance money can't be a loan.

Wealth Assurance is supposed to be an insurance company; it's

supposed to be an annuity provider.  They don't make personal

loans to Jason Galanis' friends.  When is the last time your

insurance company loaned you money?  That is Cooney lying

because he knows the real place the money is coming from.

And this is even more extreme when you look at what

happened with Cooney's involvement in the purchase of 19 Bel

Air.

1           So first you remember this chart.  Right?  In short it

2     shows you that bond proceeds were laundered through Cooney and

3     multiple other accounts before being used to purchase Valorlife

4     from Vaudoise, which is part of the roll-out plan.  In other

5     words, the fact that bond proceeds were being used to fund the

6     roll-up plan was being hidden by going through all of these

7     accounts.

8           And you heard that as part of that effort to hide what

9     was going on, Bevan Cooney claimed that he was wiring the money

10    as part of his purchase of 1920 Bel Air.  That is ridiculous.

11    Jason Galanis lived at 1920 Bel Air.  He lived at 1920 Bel Air

12    before that wire; he lived at 1920 Bel Air after that wire.  He

13    was wasn't selling his house to Bevan Cooney.  That is a

14    made-up reason to be transferring the money.

15          And by no coincidence, Devon Archer was also involved

16    in funding Jason Galanis' luxury homes with bond proceeds.

17    Archer helped Jason Galanis steal bond proceeds to pay for

18    those homes.  Let's walk through the evidence of that.

19          As you will recall, in addition to his Bel Air mansion

20    at 1920 Bel Air, Jason Galanis bought a $10 million apartment

21    in Manhattan in Tribeca, 260 West Broadway, and he did it with

22    proceeds from this scheme, and Devon Archer knew exactly what

23    he was doing and he helped him do it.

24          Let's look at Government Exhibit 2028.  At the bottom

25    of that e-mail Galanis gets a draft distribution list for the

Wakpamni bonds, and he says to Archer: "Close, Archie.  Target close is July 31."  Archer responds: "From your lips to God's ears."  And Jason says: "So close.  Cliff is running the stall for me on the New York City mansion.  I want to be here, and I won't live in a 1750 square foot cage.  Massively motivated."

I don't think there are that many New Yorkers who think that 1750 square feet is a cage, but here is the really important part.  Jason Galanis' response seems like kind of a non sequitur.  Right?  They're talking about the bonds, and all of a sudden he is talking about his mansion.

Why does Galanis' response make sense?  Because those two things are connected, because Galanis needs the stolen bond money to buy the Tribeca apartment.  Galanis is massively motivated to get the bond deal done so he can buy his New York City mansion, a space that is so big, 1750 square feet seems like a cage.  That is Jason Galanis.

And Galanis did exactly what he told Archer he was going to do.  On August 27, 2014, the bond proceeds arrive in a Wealth Assurance Private Client Corp. account.  And we looked at this earlier with John Galanis.  What is the very first thing, the first thing that is done with that money?  A million dollars is wired out as a down payment on the Tribeca mansion.

So here in this e-mail Jason Galanis is keeping Devon Archer up to speed on how he is siphoning off bond money that by all rights should have gone to the Wakpamni.  Galanis is

stealing it and Archer knows it.

But there is something even more interesting about the way this deal gets done, because Jason Galanis didn't buy the apartment in his own name; he didn't buy it through Thorsdale, his entity.

Look at the purchase agreement, Government Exhibit 225.  Jason Galanis buys this apartment in the name Archer Diversified TCG, LLC.  And that's pretty weird, right?  Because Devon Archer uses a company that's also called Archer Diversified, not TCG, but they sound almost exactly the same.

Why is Jason Galanis using an almost identical named entity to buy that Tribeca mansion?  Well, you know that Devon Archer knows exactly why.  Look at Government Exhibit 2122. Here is an e-mail from Clifford Wolff to Archer and his personal assistant Momtazi, and the lawyer says "Jason Galanis is going to purchase a condo using the above name and Devon's cache.  The company is using your office address."  If you look in the subject line there is the name that Jason Galanis is going to use.

This whole nonsense idea that Jason Galanis was trading on Devon Archer's good name without his knowledge, all those questions that were put to witnesses about whether or not Galanis talked about Archer and his fancy friends when Archer wasn't around, that is a complete sideshow, because you see exactly how Archer and Galanis' relationship worked.

I6P7GAL5                    Summation - Ms. Mermelstein

1          Archer allowed Galanis to trade on Archer's less

2     tarnished name.  He permitted Galanis to buy a Tribeca

3     mansion -- a mansion bought with stolen bond proceeds -- and to

4     do it in the name virtually of Archer's entity.  And not just

5     that, to list Archer's business address on the documents so

6     that any documentation that comes in is going to go to Archer.

7          So, that is the first way that both Archer and Cooney

8     directly participated in stealing the bond proceeds, both of

9     which are connected to Jason Galanis' luxury homes.

10         So another big way you know that Archer and Cooney

11    knew the bond money was being stolen -- this is a big one -- is

12    because they themselves accepted millions and millions of

13    dollars of those bond proceeds to buy more bonds.

14         You saw that Jason Galanis sent money from the first

15    bond proceeds to both Cooney and Archer:  $15 million to Archer

16    and $5 million to Cooney.  And then Galanis arranged for Cooney

17    and Archer to buy between the two of them the entirety of the

18    second round of bonds using that pool of money, bond proceeds,

19    to buy more bonds, a vicious circle of fraud.

20         Now, Archer and Cooney of course knew that they

21    couldn't sell those bonds.  The whole reason that the

22    conspirators had to take over Atlantic and Hughes is nobody

23    wants to buy these bonds.  You have to force someone to buy

24    them.  But Archer and Cooney still found the bonds valuable,

25    and here is how:  Archer and Cooney each transferred their

1    bonds -- not sold them -- just transferred them.  Archer sent

2    his to VL Assurance and then partially to Burnham.  Remember,

3    Burnham was kind of the crown jewel in the roll-up plan.  And

4    Cooney sent his to Bonwick, who is another broker dealer that

5    was being acquired as part of the roll-up.  And then these

6    bonds -- bonds that they bought with stolen money -- they were

7    used to prop up those businesses.  Archer and Cooney didn't pay

8    a dime for those bonds; they just moved them over to support

9    their other business endeavors.

10           And let's stop here for a minute.  Archer and Cooney

11   want you to think they didn't get anything out of this?  But

12   that's false right here.  They got $20 million of bonds, and

13   they used them for their own business purposes.  Because you

14   heard that businesses like Burnham and Bonwick are regulated by

15   the Securities and Exchange Commission and overseen by FINRA,

16   the industry regulator.

17           And you may recall that the SEC imposes something

18   called a net capital requirement, which just basically means

19   they have to have a certain amount of assets at any one time or

20   they can't do business; they would be shut down.

21           So Bonwick and Burnham were important pieces of the

22   financial empire that Archer and Cooney were trying to build,

23   but they were struggling to meet their net capital requirements

24   and the Wakpamni bonds gave them an opportunity.  They sent the

25   Wakpamni bonds to Burnham and Bonwick, bonds that nobody really

1    wanted to buy, but they were valuable there because they could

2    be used as net capital to keep FINRA away.  They could say to

3    FINRA, see, we're good, we're meeting all of our requirements;

4    look at the size of our assets.

5         And never mind that Archer and Cooney knew full well

6    nobody wanted these bonds, nobody would buy these bonds, but

7    might as well also try and fool FINRA.

8         Now, Archer and Cooney know that these facts are bad

9    news; they are bad news for their defense; they're getting

10   fruits of the scheme, the corrupt Wakpamni bonds, and they are

11   using them for their own purposes; so they try to run away from

12   this evidence as fast as they can.

13        Cooney says, look, you got this -- you got this wrong.

14   I didn't know the money that I used to buy the bonds came from

15   the bonds; I just thought I was borrowing $5 million from my

16   friend Jason Galanis.

17        Well, think about that for a minute.  A guy who needs

18   to take out a loan to pay his personal living expenses thought

19   it would be a good idea to borrow $5 million from his friend

20   and to buy one single investment, bet it all on black.  It's a

21   nice day out, maybe I'll borrow $5 million and start engaging

22   in Native American bond speculation.

23        That argument is absurd.  He was given the money by

24   Jason Galanis for a very specific purpose, which was to buy the

25   bonds.  And he knew where Galanis was getting the money from

because he was on all of those e-mails about the bonds, and the
scheme to sell them through corrupt investment advisors from
the very beginning.

     And Devon Archer tried to do the same thing.  In his
opening statement Archer's lawyer told you that Archer thought
he was investing in Jason Galanis' own money when he bought the
bonds, not the Wakpamni money.  But, ladies and gentlemen, we
have been here for six weeks, and there is literally no
evidence of that.  In fact, all the e-mails between Archer and
Galanis about the scheme easily demonstrate that Archer knew
where the money was coming from.  Remember all those e-mails
about discretionary income and the honey that they wanted so
badly?  That was how the scheme was supposed to work.

     But in any event, Archer's explanation doesn't make
any sense.  Jason Galanis didn't need Devon Archer to help him
invest in the Wakpamni bonds; jason Galanis knew all about the
Wakpamni bonds.  If he had actually wanted to buy them, he
could have bought them on his own.

     There is no legitimate reason for Jason Galanis to
give Devon Archer $15 million in order to buy these bonds.  And
look at Devon Archer's bank statements.  He don't have $15
million; this isn't a regular kind of transaction.  Archer knew
exactly what he was doing, and he did it to further the scheme.

     Now, defense counsel tried to suggest to you that the
Wakpamni money that went from Galanis to Archer was passed from

I6P7GAL5                    Summation - Ms. Mermelstein

Wealth Assurance through Thorsdale in order to hide from Archer
exactly what was going on, and that is nonsense.  Archer knew
exactly where the money was coming from for all of the reasons
that we have just spent the last hour discussing.

        Galanis had Dunkerley send that $15 million of
Wakpamni money from Wealth Assurance, to Thorsdale, to Wolff,
to Archer, to make it harder for law enforcement to find out
what was going on, to keep the government from following the
money, to protect Archer and Galanis and Cooney in an effort to
avoid exactly where they are right now.

        And so Archer and Cooney's direct participation in
stealing the bond proceeds and recycling them to buy more bonds
is devastating evidence they knew exactly what was going on.
But in this case there is always more.

        If you want more evidence that Archer and Cooney knew
well that the bonds they were buying were fraudulent and based
on stolen proceeds, look at all of the lies.  Each of them lies
again and again and again.  They lie to banks about where they
got the money to buy the bonds, about whether or not they have
the bonds; they lie about who owns the bonds; and they lie
because they can't tell the banks the truth.

        Let's start with Bevan Cooney and his lies to City
National Bank.  As you saw, Cooney has a lot of trouble keeping
his story straight about the Wakpamni bonds, and that's what
happens when you're not telling the truth, it's hard to

1    remember.

2          Let's start with Government Exhibit 3216.  You will

3    recall that the $5 million comes into Cooney's account, and his

4    business manager asks him how do you want me to record that

5    wire that came in yesterday?  And Cooney says to book it as a

6    loan.  And as we just discussed, he then uses that $5 million

7    to buy more bonds.  And then Cooney thinks to himself, hey,

8    maybe I can use the Wakpamni bonds to get a loan from the bank.

9    Cooney knows he can't sell them, nobody wants to buy them, but

10   maybe the bank doesn't know that.  So, he goes to City National

11   Bank and he says, hey, I'm good for a loan, you know, I have $5

12   million in bonds.

13         And you saw Government Exhibit 405.  That is the

14   personal financial statement that Cooney filled out.  Do you

15   know what he doesn't say in this statement though?  He doesn't

16   say he got a $5 million loan.  He doesn't say that the $5

17   million he got from Galanis wasn't really his.  Do you think

18   that would have mattered to the bank, that he was already out

19   $5 million?  He decides to leave that out.  And you can see

20   that in what he lists as his liabilities.  He lists liabilities

21   of less than $500,000.  No $5 million loan.

22         And then in May Cooney transfers the entirety of the

23   Wakpamni bonds in his possession to Bonwick for net capital

24   reasons that we were talking about a minute ago.  But look at

25   what Cooney does after he transfers the bonds:  He goes back to

1    City National Bank; he doubles down on his lies; he goes out

2    and gets a way bigger loan, a loan for $1.2 million.

3              And you saw that loan document -- it's Government

4    Exhibit 414 -- and you saw what Cooney had to sign:  "Financial

5    statement certification:  Borrower represents and promises to

6    lender that the most recent financial statements borrower has

7    given to lender are true and correct in all respects."   And

8    you heard from Steve Shapiro at City National Bank that the

9    most recent financial statements were the personal financial

10   statement that we just looked at.

11             And Bevan Cooney reaffirms in writing that his

12   financial statement remains the same.  He doesn't say, oh,

13   wait, I think I left this out the first time but actually I

14   should tell you I borrowed the money to buy those bonds.  He

15   doesn't say, by the way, those aren't really my bonds because

16   it wasn't really my money.  And what he definitely doesn't say

17   is, oh, by the way, I don't have the bonds any more; I have

18   already transferred them somewhere else.

19             And you know the bank had no idea about any of this

20   until it was far too late.  You heard what Cooney did when he

21   was confronted by the bank.  For the first time he admits he

22   doesn't have them anymore, that he never really had them, that

23   he pledged them as collateral for someone else.

24             And one more thing about these bonds.  Cooney was able

25   to turn them into a profit, because he used those bonds to get

I6P7GAL5                    Summation - Ms. Mermelstein

1    a $1.2 million loan.  And you heard what happened to that loan:

2    Cooney never paid it back.  City National lost virtually the

3    entirety of the money that they had loaned to Cooney.  So think

4    about that when Cooney argues that he didn't get any money from

5    this scheme.

6              So those are Cooney's lies to banks.  Let's talk about

7    Archer's lies to banks.  Let's start with Government Exhibit

8    344.  Remember Archer was trying to deposit the $15 million of

9    Wakpamni bonds at Morgan Stanley, and in order to do that he

10   had to provide certain information about the bonds, and so

11   Catharine Driever, an associate at Morgan Stanley, asks him how

12   is was 15 million generated that was used to purchase the

13   bonds?  And he says $15 million was generated through sale of

14   real estate.  That's a lie.  The money is not from the sale of

15   real estate; it's from Jason Galanis; it's from the first bond

16   proceeds; and it is a lie that's being told directly by Devon

17   Archer.

18             And why is he lying?  Because if he tells the truth

19   that Jason Galanis gave him the money to buy the bonds in order

20   to perpetrate their fraud, Morgan Stanley is not going to let

21   him deposit the bonds, and they take other steps like calling

22   the F.B.I.  So, he lies.

23             Now, ladies and gentlemen, this e-mail alone is enough

24   to show you that Archer was a knowing participant in this

25   scheme, and it's enough to convict him.  And because it's so

I6P7GAL5                    Summation - Ms. Mermelstein

1    devastating, defense counsel has used every trick he can think

2    of to try and make you doubt it.

3           So, what did he do first?  Well, first he tries to

4    suggest maybe this doesn't really mean what it seems like it

5    means.  Maybe this question means, well, where did the money

6    originally come from?  Morgan Stanley doesn't care who the

7    money came from; they just want to know at its original source

8    where did it come from.

9           Then defense counsel tries to suggest that Archer's

10   answers were really truthful because Jason Galanis got the

11   money from the sale of real estate and so Archer's answer was

12   really correct.  That's silly.  That is just ridiculous.

13          It's silly for at least two reasons:  First, there is

14   no evidence that Galanis had money from real estate

15   transactions.  Francisco Martin told you in 2014 Galanis' only

16   income was the bond proceeds.  And we looked at all of those

17   e-mails about Jason Galanis' desperate need for liquidity.  If

18   he was sitting on $15 million in real estate proceeds, he

19   wouldn't have a liquidity crisis.

20          So what does Archer do?  He points you to two old

21   e-mails a year before the bonds where Jason Galanis talks about

22   a real estate deal.  We have been here for six weeks, and the

23   best that Archer can do on this point is two e-mails a year

24   before this deal when Jason Galanis says he might do a real

25   estate transaction?  There is no evidence that that real estate

I6P7GAL5                    Summation - Ms. Mermelstein

1   transaction ever happened.  That real estate transaction didn't

2   happen.  You know where Galanis got the money, and so did

3   Archer:  From the bond proceeds.

4          But, frankly, the bigger picture point is that's

5   really silly because that's not what this question means.  The

6   bank doesn't care where you got it from originally; they want

7   to know where you got it from immediately.

8          And that lie gets worse because you saw the client

9   representation letter; it's Government Exhibit 352.  You know

10  what happened to it.  Catharine Driever used the information

11  provided by Archer to create an updated client rep letter, and

12  here is what she wrote:  "The funds used to purchase the bonds

13  were from real estate sales through my business Rosemont Seneca

14  Bohai."

15         Well, there is no dispute that that is not true.

16  Right?  That is not where the money came from.  There were no

17  real estate sales through Rosemont Seneca Bohai.  And this is

18  information that Archer provided to Catharine Driever, and it's

19  a lie.

20         And the defense knows that, so now they're scrambling

21  again.  Well, maybe Ms. Driever just made an assumption, and

22  she kind of filled in the blanks and Mr. Archer never said

23  that.  That is preposterous.  Ms. Driever was crystal clear on

24  this point.  She said it was her practice to only write exactly

25  what a client told her.  She didn't remember the exact

I6P7GAL5                    Summation - Ms. Mermelstein

1    conversation, it was a few years ago, but she was absolutely

2    sure that she would never have added or embellished any

3    information that didn't come from the client.

4           And you saw her for yourselves when she took that

5    witness stand.  She was a very cautious, nervous, careful

6    person.  She wouldn't even feel comfortable answering questions

7    about an account statement if it wasn't from exactly the time

8    that she was on that account.  She was not adding anything in.

9           And you know that Archer endorsed those lies to Morgan

10   Stanley, because Driever fills out that form, and she e-mails

11   it to Archer and his personal assistant, and his personal

12   assistant e-mails back the signed copy.  And when he does that,

13   Sebastian Momtazi sends it back, he cc's Devon Archer.  There

14   is no hiding this from Devon Archer.  And Momtazi also hand

15   delivers the original.

16          Now, Let me say one thing here.  There has been a

17   notion floated that Sebastian Momtazi was the COO of Rosemont

18   Seneca Bohai.  And that is simply not true; that is ridiculous.

19   He sometimes put that on his e-mails, but the evidence is

20   perfectly clear that he was Archer's personal assistant.  Even

21   Dr. Archer admitted that that was true.  And he does the kinds

22   of things that personal assistants do:  He makes travel

23   arrangements, he makes gym appointments, and he hand delivers

24   documents.  Chief operating officers do not hand deliver

25   documents.

1            So let's go back to the lies.  What does Archer do

2       with all of this evidence that he lied to Morgan Stanley about?

3       He tries to say, well, I didn't sign the document; that's not

4       really my signature.  But that is a complete red herring.

5       Archer is on the e-mail sending back the updated form.  He is

6       on the e-mail getting the form, and he is on the e-mail when

7       the signed version is being sent back.  He knows full well what

8       representation is being made.  And it doesn't matter whether or

9       not he physically put his signature on the document or he asked

10       his personal assistant to do so.  Those are the same.

11            You know how you absolutely know that Devon Archer is

12       the one telling these lies?  Because he didn't just do it to

13       Morgan Stanley.  He told virtually exactly the same lies to

14       Deutsche Bank.

15            Remember, Archer was frustrated at the time it was

16       taking Morgan Stanley to agree to hold the bonds, and he looks

17       into putting them into Deutsche Bank.

18            Look at Government Exhibit 1226.  Archer is asking

19       about depositing the bonds at Deutsche Bank.  And because banks

20       aren't that different, Deutsche Bank has a pretty similar

21       question:  How did the entity come to own these bonds?  And

22       Archer again says real estate.

23            The entity didn't come to own the bonds through real

24       estate.  The entity came to own the bonds through money from

25       Jason Galanis.  Archer bought these bonds through Rosemont

1   Seneca Bohai using money given to him by Jason Galanis.

2           Even if Jason Galanis had gotten this money from real

3   estate -- and that is not what happened -- Archer's answer is

4   intentionally misleading, and he is lying because he can't tell

5   the truth.

6           And that's what all of these different lies to banks

7   show you.  They show you that the defendants knew that he were

8   in a fraud.  They knew they were doing something wrong, and

9   that is why they have to lie about it.

10          Another way that you know that Devon Archer knew full

11  well that he was participating in a fraud is how much he was

12  willing to lie to the BIT board to keep things going and to

13  allow Jason Galanis to continue running this fraud.

14          We are going to walk through the BIT board story in a

15  fair amount of detail, but you remember what happened.  The BIT

16  board was very smart.  From the get-go they heard about Jason

17  Galanis, and they said no way; we don't want anything to do

18  with him.  And they were incredibly clear about it with Archer

19  again and again and again.  And Archer pitched them one thing

20  and the other, and the BIT board said no.  They held firm.  We

21  will not do this deal if Jason Galanis has any involvement.

22  And they were right.

23          So Archer lies.  Right?  He tells the BIT board one

24  thing, and then he goes out and does the complete other.  He

25  engaged in sham transactions to make it look like Galanis was

getting out of the deal when he really wasn't.  And literally

at the exact same time as Devon Archer is promising the BIT

board that Jason Galanis will have nothing to do with Burnham,

Devon Archer is literally on that day buying the $15 million

bonds that Jason Galanis has coordinated and for which Burnham

is the placement agent.

          So, let's start at the beginning and look at that in a

little more detail.  You remember that Archer and his friends

want to acquire Burnham Financial Group and its subsidiaries.

And at the time they have a plan to do that through CORFA,

which is going to change its name to Burnham Equity Partners.

And the managing member of CORFA is going to be BOE Capital,

which is controlled by Devon Archer.

          Now, the BIT board wanted to make sure that all of the

investors had good reputations, that they could be trusted,

that they were appropriate people to be involved with an asset

manager.  And, of course, as an aside, Devon Archer was all too

well aware that Jason Galanis had reputation problems.  Anyone

who Googled Jason Galanis would have known that.

          And in fact look at this e-mail, government Exhibit

2111.  Right?  Galanis talks to Archer about whether or not to

pay $12,000 to clean up his reputation.  Galanis tells Archer

he has a quote to hire Reputation.com for $12,000.  And Archer

says:  "I think it's a worthwhile investment.  Don't get me

wrong, I enjoy defending you, but it might be nicer if it

1    wasn't as challenging.  Let's do this."  And Galanis says:

2    "OK, I'm going all in on it."  So, Devon Archer knows full well

3    Jason Galanis has reputation problems.

4          And then let's go back to the BIT board.  So the BIT

5    board asks Archer to break down the investors.  They put their

6    requests in writing that they want each member of Burnham

7    Partners and BOE Capital; they want to know all the investors.

8    And Archer responds in a letter that's Government Exhibit 753.

9          And what is important here is how he lists BOE

10   Capital.  He says that it's made up of himself, Bevan Cooney

11   and Thorsdale.  There is no mention that Thorsdale is really

12   just Jason Galanis.

13         And then the next day Archer goes to a BIT board

14   meeting -- it's the very first one he goes to -- and you saw

15   the minutes of that meeting; it's Government Exhibit 792 -- and

16   the BIT board has learned that Jason Galanis was involved in

17   the early phases and they ask Archer about it.  They say in the

18   minutes:  "It was noted that the independent trustees had

19   commissioned background checks on members of the new investor

20   group, and Mr. Connell then turned to specific questions that

21   were raised by the background reports.  The independent

22   trustees drew particular attention to their concerns regarding

23   the apparent involvement of John Moran and Jason Galanis in the

24   early stages of the transaction."

25         And what does Devon Archer do?  He says, don't worry,

1    despite the many different investors, Mr. Archer stated that he

2    would have primary management control.  And he explained that

3    it was not expected that the Sugarmans -- who the BIT board was

4    also concerned about -- would have control.

5          But the BIT board is not comforted; they have more

6    questions.  Then they send a request for Archer to provide more

7    information.  And you saw how he answered those questions in

8    Government Exhibit 755.  Look at number 2.  They want written

9    commitment that "Jason Galanis will not be involved in any

10   matters related to, be employed by, receive any payments from,

11   or be otherwise associated with Burnham Financial Group or its

12   subsidiaries, Burnham Asset Management or Burnham Securities."

13         And you saw how Archer responds:  "Mr. Galanis will

14   not be employed by Burnham Financial Group, Burnham Asset

15   Management or Burnham Securities, or otherwise be associated in

16   any operational, supervisory or investment capacity with

17   Burnham Financial Group, Burnham Asset Management or Burnham

18   Securities, nor will he receive any payments from any such

19   entities.  However, for the avoidance of doubt, following

20   consumption of the transaction the managing member of Burnham

21   intends in connection with the source of potential investment

22   banking opportunities for Burnham Securities."  So, Archer is

23   saying he is going to have nothing to do with it, but I might

24   still let him source deals.

25         And just as an aside, look at Archer's answer to the

1   BIT board about how he learned about the Burnham transaction.

2   Right?  They want an explanation of how Devon Archer became

3   aware of the opportunity to invest in Burnham; who originally

4   brought that idea to his attention.  And he says Bevan Cooney,

5   a member of BOE Capital and a personal friend of Devon Archer

6   introduced the Burnham investment opportunity.

7          Of course there is no evidence that Bevan Cooney was

8   the one who introduced this opportunity.  This was a Jason

9   Galanis idea; it was his brainchild.  But Archer can't say that

10  because he is hiding Jason Galanis' involvement.

11         So back to Galanis.  The BIT board, smart people, say

12  no way; if Galanis is still sourcing deals, we don't want to go

13  through the transaction; and they won't approve it, and the

14  transaction is off.

15         And then on August 21, 2014, Archer meets with the BIT

16  board again.  And you saw those minutes at Government Exhibit

17  758.  And now there is a slightly different proposal:  Instead

18  of buying all of Burnham Financial Group at once, they're going

19  to split up Burnham Asset Management and Burnham Securities,

20  and BAM Holdings is going to buy Burnham Asset Management and

21  CORFA is going to buy Burnham Securities.

22         But in this meeting the BIT board again raises the

23  issue of Jason Galanis.  Right?  "The independent trustees then

24  reviewed events over the past seven months and noted the

25  importance of reputation in the asset management business.  Mr.

Archer was specifically asked to explain statements he had made

at his last meeting with the independent trustees in light of

later developments concerning John Moran and Jason Galanis.

Mr. Archer responded that he had been asked to remove Mr.

Galanis from the deal and that he had done so, and said that he

did not know Mr. Moran.  The independent trustees stressed the

damage that could be done by people whose past actions were

subject to regulatory approbation to a firm like BAM and the

risks they posed to shareholders."

Now, that very same day Archer sends a letter to the

BIT board, and here is what he says:  "While Jason Galanis has

consulted with CORFA and certain of its members, he has never

been, and it has been represented to you and the trustees that

he will never will become, an officer, employee, consultant,

director or member of the management of either Burnham

Financial Group, Burnham Asset Management or Burnham

Securities."

But the BIT board still wants more comfort, so they

ask more questions, and they seek more confirmation, and then

Archer tells them what they wants to hear.  So, on September 5,

2014 Archer responds to a request from the BIT board.  It's

Government Exhibit 760.  And they say:  "We need your written

statement that Jason Galanis will not be referring transactions

to any Burnham entity.  We understand that he will not be an

employee or a consultant, and we want it abundantly clear that

1   he will not be sourcing any type of transaction to the Burnham

2   organization.  No deals."

3         Now, before we get to Archer's response, just a quick

4   reminder of what is happening in September of 2014.  This is

5   just about a week before the first bond transaction had closed.

6   That's the deal that Jason Galanis referred to Burnham.  And

7   Archer of course knew that, and Archer knew that there are more

8   in the works.  That's not what Archer says to the BIT board.

9   Look at how he responds:

10        "We have represented to you that Jason Galanis has

11   never been, and will not become, an officer, employee,

12   consultant, director or member of the management of either BFG,

13   BAM, Burnham Securities, and Mr. Galanis will not be sourcing

14   any type of transaction to the Burnham Group or any member

15   thereof.

16        And look at what Archer is saying out of one side of

17   his mouth to the BIT board.  Look at that side by side to what

18   he is saying to his friend Jason Galanis.  It's Government

19   Exhibit 2221.  Because there has been a lot of talk in this

20   trial about Jason Galanis lying to his coconspirators.  But as

21   you can see no honor among thieves, they have lied right back.

22   Here is what Devon Archer says:  "I sent letter back to BIT

23   yesterday saying I can't deny doing business with you

24   basically... take it or leave it."

25        That is not what Devon Archer said to the BIT board.

He told them there would be no involvement with Galanis.  And the BIT board is still not comforted.  September 26, 2014, the BIT board writes to Archer, and they say:  "You have provided us with assurances regarding the nonparticipation of Jason Galanis.  We believe you understand our views on the subject. That is, we want an iron-clad assurance that going forward he will not be involved with any of the Burnham entities or their affiliated persons."

And you heard that term "affiliated persons" is very broad.  The BIT board is very clear:  Iron-clad assurances.  No involvement of Jason Galanis whatsoever.  And so they go on to say:  For the avoidance of doubt, it is our understanding Mr. Galanis will have no interest of any kind in any Burnham entity, will not source deals to Burnham, and that Burnham will not invest with or in anything in which he is involved.  And you saw how Archer answered:  "Confirmed."

And following all of these letters back and forth, Archer meets again with the BIT board on October 1, 2014.  It's Government Exhibit 763, the minutes of that meeting.  And the BIT board is now prepared, based on these representations, to approve the transaction.  And one of the conditions -- it's a big one -- relates to Jason Galanis, and here is what they say. It's getting kind of repetitive, but they were really clear: "Jason Galanis will not be involved with any of the Burnham entities and their affiliated persons, as well as their

successors or assigns at BFG, Burnham, Burnham Securities, or

the trust.  For the avoidance of doubt, Mr. Galanis will have

no interest of any kind ... in any of the Burnham entities or

their successors.  He will not source deals..." etc., etc.,

etc.

         And based on that representation, the BIT board says

OK, and they approve the transaction.  And again look at what

Archer was doing on that very same day.  That's the day that he

transferred $15 million from Rosemont Seneca Bohai to U.S. Bank

to buy the bonds.  That's the transaction that Jason Galanis

arranged; it's the transaction that involves fees going to

Burnham.  Jason Galanis wasn't just involved; he was the

quarterback of that deal.

         And look at what Archer is generally up to at the time

that he is selling the story to the BIT board.  He is arranging

to buy the Wakpamni bonds.  He is buying the bonds, toasting

his success with Cooney and Galanis.  He is discussing Cooney's

more successful efforts to deposit the bonds.  Right?  Cooney

had an easer time depositing them than Archer does.

         This evidence is devastating.  This evidence is game

over.  Archer is speaking out of both sides of his mouth at the

same time.  He is shaking hands with the BIT board on the one

side, and he is passing $15 million under the table to Jason

Galanis on the other.  So defense counsel has to try very hard

to attack this evidence, but those efforts are a failure.

1          First, again, defense counsel tries to suggest that

2    Archer didn't really sign these documents, that these false

3    statements to the BIT board were not really made by him.

4    Remember that whole chart of his signatures, it's the same

5    argument that Archer tried to rely on when he tried to lie to

6    Morgan Stanley.  But this is silly.  There is no doubt as a

7    matter of convenience Archer had his personal assistant put his

8    signature on documents.  There is nothing wrong with that; it

9    doesn't make it less his real signature.  More than that, it's

10   silly to say Archer didn't make these representations when he

11   went to the meetings in person and said exactly the same thing

12   as he said in each and every one of these letters.  You don't

13   need to do a handwriting analysis to know that he is lying to

14   the BIT board.

15          Now, Archer's next argument is even more acute.

16   Remember all of those charts that defense counsel offered to

17   show the changing ownership of CORFA over time?  Remember,

18   those charts were designed to tell you that Archer did what the

19   BIT board had asked.  Right?  Because if you look at the

20   charts, in August Thorsdale is an investor in CORFA, and in

21   September Thorsdale is off the flow chart.  And the idea, what

22   is being sold to you, is that Archer bought out Thorsdale's

23   share and therefore Jason Galanis didn't really have an

24   investment and therefore there was no lying to the BIT board.

25          Now, there are lots of lies to the BIT board besides

I6P7GAL5                      Summation – Ms. Mermelstein

1    Jason Galanis' ownership, but let's go over Archer's efforts to

2    paper over this supposed buy-out.  OK?  Start with Defense

3    Exhibit 4338.

4                 (Timed on next page)

1          This is the September 30th, 2014 agreement through

2     which Archer, through BOE, is supposedly going to buy out

3     Thorsdale, and the amount of that purchase is $600,513.00,

4     right?  Remember that.  Archer -- the BIT Board, it was

5     literally true because I bought out Galanis, and so technically

6     speaking he wasn't formally involved, right?

7          He tried to suggest that he had to be cute with the

8     truth because the BIT Board was being too cautious, Jon Burnham

9     didn't think it was a problem and he didn't think Galanis had

10     to be get out.

11          Think about that for a second.  Archer is saying to

12     you look, they were being unreasonable so I had to lie, right,

13     because their requests were not reasonable.  That is not the

14     way this works.  You don't get to lie because you don't like

15     the conditions that are being set.

16          Of course, what I said was literally true, is a pretty

17     bad defense because even if that were true, and I will tell you

18     why it is not, it is clear that Archer is hiding critical facts

19     from the BIT Board.  Devon Archer's statements weren't true

20     literally or any other way.  At the very time this was

21     happening, Archer was in the middle of buying Wakpamni bonds

22     with the deal with Jason Galanis.  He was involved in placing

23     additional Wakpamni bonds through Burnham and Atlantic months

24     later.  You heard from Dunkerley that Jason Galanis was pulling

25     strings at Burnham all the way through and saw Galanis'

1   involvement with the roll-up plan with Burnham and Teneo.  It

2   is just false.

3        Devon Archer didn't buy Thorsdale.  He didn't really

4   take Jason Galanis out of the deal.  They just papered it over

5   to make it look like that.  Surprise, surprise for these guys,

6   the money goes in one big circle.

7        Look at the bank records.  Government Exhibit 301,

8   those are the Rosemont Seneca Bohai statements.  On November

9   12th, 2014, Rosemont Seneca Bohai sent $600,513.00 to Kline.

10  You know what that is.  That is that exact number, kind of an

11  unusual amount of the purchase price and it is the exact price

12  Archer appears to have agreed to pay for Thorsdale shares.

13       You saw the wire transfers so you know that exactly,

14  Government Exhibit 312.  You saw the direction from Archer to

15  wire $600,513.00 to Crone Kline BAM Holdings.  That makes it

16  look like this is really happening, really buying out

17  Thorsdale.

18       You have to remember where that money came from

19  because days earlier Thorsdale wired that exact same amount of

20  money to Rosemont Seneca Bohai, right?  Galanis sends money to

21  Archer, and Archer sends that money same right back, so it

22  looks like he is buying out Galanis.  He is not really buying

23  out Galanis; he is giving Galanis back his own money.  Of

24  course, Archer kept involving Galanis in Burnham while hiding

25  it from the BIT Board long after he made these representations.

1              Look at Government Exhibit 2066.  We have regulatory

2       issues with JG so you can't mention his name.  You know who

3       that is.  That is Jason Galanis.  Archer isn't saying he can't

4       do business with him, we can't involve him in Burnham.  He is

5       saying you have to hide Jason Galanis' involvement from

6       Burnham.  That worked for a while, right?

7              Then in September of 2015, Jason Galanis got arrested

8       in an unrelated matter, and now Archer has to explain himself

9       to the BIT Board.  You saw the minutes of that meeting.  Take a

10      look at that.  Archer thanked the independent trustees for

11      their insistence that Mr. Galanis not be involved in the

12      management of Burnham.  That is really some chutzpah.  He is

13      thanking them while he has been lying to them the whole time.

14      Jason Galanis is involved in Burnham.

15             He says Mr. Archer explained that these developments,

16      Jason Galanis' arrest, had caused the investor group to change

17      its plans concerning the broker-dealer.  He said the financing

18      and working capital for the acquisition of BSA had intended to

19      come from the offshore insurance fund, Wealth Assurance AG, now

20      Valor Life.

21             Mr. Archer said Mr. Galanis was an adviser to the

22      board of Wealth Assurance.  He said since they now intended to

23      sever all connections with any firms associated with

24      Mr. Galanis, it was no longer possible to finance the

25      operations BSI or proceed with that transaction and BSI would

1    now be acquired by Bonwick.  This is exactly what Burnham made

2    Archer promise not to do, right?

3          He is now admitting to them he was doing exactly what

4    he said he wouldn't do, involving Jason Galanis' entities in

5    Burnham.  It is a total violation of the agreement.  In 2016,

6    Archer met with the BIT board again, Government Exhibit 784.

7    By now the SEC has filed a complaint against Atlantic in

8    connection with Wakpamni bonds.  The BIT Board asked Archer

9    about it wants to know if he is one of the people named in the

10   complaint.  He says it is not him and speculates it is probably

11   Jason Galanis.  He said he had no involvement whatsoever with

12   these events.  That is not true, right?

13         You know Archer was involved with the placement of

14   bonds in Atlantic.  We just looked at all of those emails.

15   More than that, remember what happens when Jason Galanis gets

16   arrested.  Look who steps up to handle things at Atlantic.

17         Government Exhibit 2102, the day after Galanis'

18   unrelated arrest.  Look at what Devon Archer does.  He emails

19   Cooney, Jason Sugarman and Godfrey.  Look at how he describes

20   the situation.  Our dear friend will be preoccupied for the

21   foreseeable future.  He is not thanking anyone for having Jason

22   Galanis get cut out of the deals, he is looking out for a dear

23   friend and he has a whole list of to do items, independent bond

24   due diligence, damage control, outstanding bills.

25         The second to last, Atlantic funding request?

1          Michelle might as well be asking for 1 billion.  Are

2     they solvent?  Look at that.  Atlantic needs money.  Morton

3     made request to Galanis.  He has an outstanding request.  Now

4     Galanis is unavailable, and Archer knows all about it.  When

5     Galanis can't be there to do it himself, Archer steps in to

6     handle the Atlantic situation.

7          The first person he looks to for help with that is

8     Bevan Cooney.  Two things about that.  All this nonsense about

9     which entity on two and part of what in these guys didn't

10    operate the way things looked on paper.  They were in the

11    together.  They treated it as one joint endeavor and, second,

12    it shows you Archer's claim to have no involvement in the

13    Atlantic events, that is simply false.  He knew Atlantic was

14    being bought to place these bonds and he was right there to

15    deal with Morton when Galanis was unavailable.

16         We see the same thing in Government Exhibit 1453,

17    right?  This is an email in October of 2015, and the issue is

18    that they're going to appoint the board of Atlantic is going to

19    have directors appointed, right, one of the terms of the

20    acquisition, the investors could choose them.  When it is time

21    for the investors to make a decision who to appoint, look who

22    is on this email, Devon Archer, Godfrey and Jason Galanis.

23         Why does Archer lie, lie, lie to the BIT Board?

24    Because he has to hide Galanis' role in the scheme because he

25    can't admit the truth.  It would have derailed the whole fraud.

I6PJGAL6                    Summation - Ms. Mermelstein

That is why these frauds are such strong evidence of Archer's

knowing participation in the scheme.

          The BIT Board evidence is mostly about Archer.  Let's

talk about Bevan Cooney's reaction to learning Jason Galanis is

being arrested in an unrelated matter.  What does Bevan Cooney

do?  He calls Francisco Martin.  It is a person he barely

knows.  They have met two, three times, and what does Cooney

say?  He says John Galanis got arrested.  Don't worry, it has

nothing to do with the municipal bonds.

          Don't worry, it has nothing to do with the municipal

bonds?  Think for a moment about what it means that Cooney is

calling Francisco Martin.  The defense keep harping on how

everything is need to know, how Jason Galanis kept him secret.

Jason Galanis didn't tell Hugh Dunkerley and Francisco Martin

everything, but this phone call from Cooney to Martin tells you

something very important.  It tells you Bevan Cooney knew that

Francisco Martin was playing a role in this offense and it

tells you he knew Francisco Martin was involved in the Wakpamni

bonds and it tells Cooney knew they were in it together, even

if Francisco Martin didn't know exactly what Cooney's role was.

          Think about the message they're sending.  Don't worry,

it is not about the municipal bonds.  I am shocked a friend got

arrested.  Not surprised Jason Galanis was involved in a crime.

Just don't worry, they haven't caught us.  This isn't about our

fraud.  Jason Galanis got arrested for something different.

1          Let me turn to the final way you know that Archer and

2     Cooney were knowing participants in this fraud, and it is

3     because of all of the ways they tried to cover it up.  Let's

4     turn first to Archer because he played an essential role in

5     covering up this fraud by helping to make the first interest

6     payment on the bonds.  This is important.

7          Remember that at the end of the anniversary of the

8     first bond issue, the annuity is supposed to pay out $1.8

9     million to cover interest payments to investors and payments to

10    the Wakpamni bond.  Those interest payments were supposed to go

11    to the investors at Hughes.  Of course, there is no annuity, so

12    there is no money to go to the investors.

13         What do they do?  They rob Peter to pay Paul.  They

14    take funds from the last round of bonds, remember all that

15    money circled through Code Rebel and Seymour Capital and they

16    use it to make payments to the first set of investors.  It is

17    kind of a Ponzi scheme, and Archer is right there in the middle

18    of it.  He kicks in $250,000 so that the interest payment can

19    be made just in the nick of time so no one will realize there

20    is no annuity.

21         Look at Government Exhibit 2121, right, the e-mail on

22    September 1, 2015 from Jason Galanis to Devon Archer and he

23    says subject.  If you get this out today, I am assured we can

24    turn it today.  And the wire focus is for the Wealth Assurance

25    Private Client Corp. account.  Jason Galanis is telling Devon

I6PJGAL6                    Summation - Ms. Mermelstein

1    Archer we need the money now, the interest payment is due.  If

2    you get it to me today, we can make it in time.  You know

3    Archer understands exactly what that money is for.

4         One more thing.  Defense counsel tried to suggest

5    well, after Archer wired money to the Wealth Assurance Private

6    Client Corp. account, Wealth Assurance private sent money to

7    Thorsdale.  It is basically like Devon Archer was giving money

8    to Thorsdale.  No, it is not.  He didn't wire money to

9    Thorsdale.  He wired it to Wealth Assurance Private Client

10   Corp. and he knew exactly what that money was for.

11        Of the $250,000 that he puts up, you saw he eventually

12   gets about 170,000 back.  Where does that money come from?  It

13   doesn't come back from Wealth Assurance Private Client Corp.

14   It comes from Francisco Martin, from Thunder Valley and from

15   Seymour Capital, from Francisco Martin.  That is all money that

16   is bond proceeds cycled through Code Rebel and sent back around

17   to him.  Even Devon Archer himself basically admits that these

18   wires from Francisco Martin, Seymour Capital and Thunder Valley

19   were repayment for that interest payment, right?  You saw in

20   that I lost money chart, he netted that out.

21        Ask yourselves this.  In what legitimate world does

22   Devon Archer make a payment to Wealth Assurance Private Client

23   and is getting paid by Francisco Martin, Thunder Valley and

24   Seymour Capital?  Shouldn't Archer be saying who are you and

25   why are you sending me money, right?  He doesn't do that

because he knows who these people are.  He knows how the scheme
is working.  He knows the money is being circled through all of
these different accounts, so it isn't strange to him to be
getting repaid from somewhere totally different than where the
money went.

Let's talk about the next aspect of the coverup.  That
relates to Calvert.  You remember that on October 1, 2015,
Francisco Martin created Calvert.  You saw the certificate of
incorporation, Government Exhibit 1609.  You heard it from
Francisco Martin.  You heard that Francisco Martin came up with
the name Calvert on his own.  He named it on a street, cross
street where he used to live.  That is important because here
is what it means.  It means that there are no Calvert documents
before October 1, 2015.  There were no handshake agreements
involved in Calvert before October 1, 2015.  No one heard the
name Calvert until October of 2015.

Hugh Dunkerley told you the same thing.  He told you
the document was created in October 2015 to paper over the
fraud, make it seem like transactions that had no legitimate
reason somehow to look like they were okay.  Dunkerley signed
all kinds of fake Calvert documents, and he dated them in 2014.
He told you these documents were fake, they were an effort to
make it look like there was a real annuity, there would
actually be involvement on behalf of the Wakpamni to justify
all the money that moved around in circles.

1          Let's take a look at Bevan Cooney and Calvert.  Here

2    is Government Exhibit 2298.  It is an email from Bevan Cooney

3    to Fulton Management.  Those were his business managers.  He

4    says he is attaching the secured loan agreement for the bonds.

5    Look at what is attached.  It is an agreement dated October 2,

6    2014, two days before Cooney bought the bonds and it is between

7    Cooney and Calvert Capital Partners.  Calvert is described as

8    the managing partner.

9          According to this document, Calvert is lending $5

10   million to Cooney so Cooney can make an investment in tribal

11   government municipal bonds, make the Wakpamni bonds, and it is

12   signed by Bevan Cooney and Jason Galanis.  This is fake, right?

13   You know this is fake.  There is no Calvert in October of 2014.

14   This agreement cannot have existed.

15         You know the money that Galanis gave to Cooney came

16   straight from Thorsdale.  It didn't come from Calvert.  There

17   was no Calvert.  There was not enough for Cooney to produce

18   this fake document to his business manager.  He produced it to

19   the SEC, like Dunkerley and Martin.  Take a look at Government

20   Exhibit 1271.  That is the same document, the same fake

21   agreement.  This is the version produced to the SEC.  You know

22   that because there is a stipulation, it is Government Exhibit

23   4501.  There is no dispute government exhibits, among others,

24   1271 are true and accurate copies of documents produced by

25   Bevan Cooney to the Securities & Exchange Commission.

I6PJGAL6                     Summation - Ms. Mermelstein

1           There is some suggestion in this trial sometimes in

2     business people reach handshake agreement and they don't get

3     around to documenting it, so there could be an agreement and

4     later there would be documentation.  That is nonsense.  There

5     can not be a handshake agreement about Calvert because there

6     was no Calvert.  If you are claiming that something happened in

7     Calvert in 2014, then you are lying.

8           When people document things after-the-fact, they say

9     that is what they're doing.  They acknowledge they're

10    documenting something that happened before.  You don't send

11    fake documents to the SEC.  You don't have to guess at what the

12    point of these Calvert documents was because Francisco Martin

13    and Hugh Dunkerley told you that this was the plan.

14          Do you think that Jason Galanis was open with Hugh

15    Dunkerley about these documents and not with his best friend

16    Bevan Cooney?

17          Of course not.  Let's talk a little bit about Devon

18    Archer and Calvert.  Devon Archer kept his hands a little

19    cleaner.  He didn't submit the fake Calvert documents himself.

20    Dunkerley did it for him.  Look at Government Exhibit 1577.  It

21    is another Calvert agreement.  It is pretty similar to Cooney's

22    fake agreement, and what it makes it look like is Calvert

23    invested $15 million in Rosemont Seneca Bohai.  He is trying to

24    give some reason why the $15 million was transferred.

25          Archer can't keep his fingerprints off this entirely

I6PJGAL6                    Summation - Ms. Mermelstein

1     because look at Government Exhibit 2119.  These are emails in

2     November of 2015, after things are starting to fall apart.

3     Remember that Archer had transferred his bonds first to the VL

4     Insurance and then in part to Burnham.  Archer is talking about

5     the bonds, and he says these are to be replaced, returned to

6     Calvert.

7             Looking further up in that email, he says the

8     consensus is we would like to return these bonds to the lender

9     and beneficial owner in the quickest orderly manner possible.

10    He is a little more subtle.  Here is Devon Archer in November

11    2015 walking around claiming that the lender who funded his

12    purchase of the bonds was Calvert, that there was an agreement

13    with Calvert back in 2014.  Just like everyone else, he knows

14    that is not true.  He knows where he got the money.  He is

15    peddling the same fake story as everyone else.

16            You can see a bit more of Archer and Cooney's

17    involvement in the coverup when you take a look at the Colaris

18    Ventures emails.  Remember after John Galanis' unrelated

19    arrest, he has Francisco Martin create this other email

20    account, legal at Colarisventures, and the point of that,

21    explicit point Francisco Martin told you, was a clean email

22    account law enfocement doesn't know about and won't be able to

23    find.

24            Francisco Martin doesn't know who else was emailing on

25    with Devon Archer on this.  You do.  It is not a good club.

1   Hugh Dunkerley, Government Exhibit 1593, Bevan Cooney,

2   Government Exhibit 2294, Devon Archer and Andrew Godfrey and

3   Jason Sugarman, Government Exhibit 1453, that is the email that

4   Jason Galanis used when he is trying to hide from law

5   enforcement.  Who is he emailing on that account?

6          Now, Archer spent a lot of time at this trial trying

7   to suggest that he was used by Galanis and by Cooney for his

8   fancy connections.  When Archer wasn't around, they were

9   trading on his wealthy friends.  One thing is true, Devon

10  Archer spent a lot of time trying to hype up his connections.

11  They followed his lead.  Nobody was a taking advantage of

12  Archer.  He knew exactly what as happened.

13         When Galanis was getting ready to move out of cage

14  into his Tribeca mansion, look at 2231, Galanis says to Archer,

15  he says Greek is getting reference letters together for West

16  Broadway closing.  Dean of Oxford, Ex-assistant Deputy Attorney

17  General of United States and former Assistant United States

18  Attorney, not president and secretaries, but scrappy for the

19  damaged Greek.  He is bragging about connections he has and the

20  letters of reference he is able to get.  This is how these guys

21  operated.

22         Archer knows that Galanis is doing the exact same

23  thing with Archer's own connections.  Look at Government

24  Exhibit 2059.  Galanis was putting Morton and Archer in touch,

25  and Galanis is name dropping Hunter Biden.  Let's get

I6PJGAL6                    Summation - Ms. Mermelstein

1    attention, and the objective was to you say you know Hunter

2    Biden is involved.  He is on this email.

3           When Archer and Galanis are brainstorming how to get

4    one of Atlantic's partners on board for the acquisition, it is

5    Government Exhibit 2078, and Archer asks what they can do get

6    out ahead of Don Trotter.  As I said, Archer is taking an

7    active role in acquiring Atlantic, and Galanis says the plan is

8    to win hearts and minds through a full preppy assault on the

9    Connecticut contingent.  You know what that means.  That means

10   send the guy who brags about playing lacrosse at Yale, send the

11   guy who brags about his fancy friends, who drops references to

12   his employment connections, send Devon Archer.

13          Finally look at Government Exhibit 2211.  Archer,

14   Galanis and Cooney are talking about their roll-up plan in June

15   of 2014, all the companies in their cross-hairs.  Look at what

16   Galanis says at the bottom.  With Archer's new enterprising

17   global profile, it aligns the media and political stature Mr.

18   Archer now enjoys with the financial stature.  Add the golden

19   smile, and we could be massively effective.

20          Galanis was definitely using Devon Archer's fancy

21   pedigree, but he was doing it with Devon Archer's full

22   approval.  He was doing it just the way Devon Archer did it

23   himself, and this email shows you why Devon Archer was doing

24   his whole roll-up with Jason Galanis, why he was committing a

25   fraud because he thought his financial stature should match his

1   perceived political importance.

2         You saw how Archer played up his connections to his

3   well connected friends.  Look at what Archer tells the BIT

4   Board in the BIT Board meeting 758 and 763.  Archer noted his

5   friendship with Chris Heinz.  He discussed his friendship with

6   Chris Heinz and Hunter Biden, who he said were also involved in

7   various investment endeavors.

8         You heard from the BIT Board this was Archer's MO, to

9   name-drop his well-connected friends, to lend himself an air of

10  legitimacy.  Based on your dealings with Mr. Archer, did he

11  frequently invoke the name of Chris Heinz and Hunter Biden?

12  Yes, often.

13        That is exactly what Devon Archer has tried to do in

14  this trial.  Remember back in opening statements, here is what

15  the defense said about Mr. Archer.  He also had the fortune

16  while he was in college to meet some people who became very

17  important to him in his life.  One was Chris Heinz.  You may

18  remember that Chris' mother, Teresa Heinz, is married to John

19  Kerry, who was a senator at the time.  Another person Devon

20  befriended was Hunter Biden who is Joe Biden's son.

21        Defense counsel ask witness after witness Archer's

22  connection to Kerry and Biden.  Why does he keep doing that?

23  What possible relevance is there in a fraud of Native American

24  bonds to the fact that Archer is friends with well known

25  politicians' sons?  Archer is trying to do what he has been

I6PJGAL6                    Summation - Ms. Mermelstein

1  doing his entire professional life, which is play on his

2  important friends to get ahead.

3          Defense counsel tried to suggest to you that Archer's

4  friends are somehow relevant to this trial because this

5  prosecution is politically motivated, and the Judge has already

6  told you this prosecution has nothing to do with politics, and

7  it is deeply preposterous to say otherwise.  You can be sure of

8  that for one very simple reason.

9          Hugh Dunkerley told you that he first met Devon Archer

10  after they got arrested.  They met in this courthouse.  It was

11  in May of 2016.  In May of 2016, Barach Obama was the President

12  of the United States.  Joe Biden was the vice president.  So

13  the idea that this prosecution was brought as a political

14  attack on Hunter Biden's friends is ridiculous.  It is

15  ridiculous and, frankly, kind of offensive.

16          The defendant is making that ridiculous argument to

17  you for one reason and one reason only:  because he is trying

18  to distract you from the evidence.  He is trying to distract

19  you from evidence that he is overwhelmingly --

20          MR. TOUGER:  Objection.

21          THE COURT:  Let's move on from this.

22          MS. MERMELSTEIN:  Ladies and gentlemen, over the

23  course of the last month you have heard from many of the

24  victims in this case.  You have heard about the very real

25  consequences to these victims, the pension funds that lost the

I6PJGAL6                    Summation - Ms. Mermelstein

1    entirety of their investment in the bonds.  Remember what

2    Michael Smith of OSERS told you in explaining the consequences

3    that were very significant.

4          The first impact is loss of $16.2 million in bonds,

5    but the unwinding of GYOF in this rapid fashion meant he

6    actually lost 25 million in GYOF investment, and that 25

7    million is not just stand alone, because when you pre-fund a

8    retirement system, you are doing so so you can accrue money

9    over the lifetime of your members.  So over the lifetime of our

10   members, that 25 million would have grown to in excess of 100

11   million to be able to pay the benefits to our members, and that

12   money is gone.

13         Look the cost of John Galanis' lies to Wakpamni.  Look

14   at what Raycen Raines had to say on behalf of the Wakpamni

15   Community.

16   Q.  Since the payments ceased on the bonds, has construction of

17   the town center ever been fully completed?

18   A.  No.

19   Q.  How much has been accomplished?

20   A.  We put the outer shells of the buildings in that town

21   center site plan.

22   Q.  Is there a functioning warehouse distribution business?

23   A.  No.  And the law and the driveway and the parking lots were

24   never completed, so they're still prairie.

25   Q.  Without the annuity, has the Wakpamni Lake Community

1    Corporation been able to make the payments it owes on the

2    bonds?

3    A.   No.

4    Q.   Have any of the pension funds that bought the bonds reached

5    out to the Wakpamni Lake Community to discuss the missing

6    interest payments?

7    A.   Yes.

8    Q.   What has the community told them about its ability to pay?

9    A.   We spoke with them and said we don't have functioning

10   businesses there in order to make payments.

11   Q.   Does the Wakpamni Lake Community Corporation still owe

12   those interest payments?

13   A.   Yes.

14   Q.   If the warehouse business became operational and

15   successful, would that money be used to pay interest?

16   A.   Yes.

17   Q.   In your view, is there a realistic possibility that the

18   warehouse could ever be successful enough to pay back $65

19   million?

20   A.   No.

21            This fraud had real consequences to pension funds, to

22   the Wakpamni Community, and today these three men have to face

23   their own consequences, to answer for their roles in

24   perpetrating a massive fraud, of making themselves and their

25   friends rich on the backs of everyday Americans, impoverished

1    Native American people.

2              You have listened carefully for more than a month now

3    and you have heard the evidence, and you know that there is

4    only one verdict that is consistent with the evidence in this

5    case, that these men, John Galanis and Devon Archer and Bevan

6    Cooney, are guilty.  Thank you.

7              THE COURT:  Thank you.  Why don't we take a 10-minute

8    break.  We'll keep it short so we can get you out not too late

9    today.  Please remember don't yet discuss the case.  Thank you.

10             (Jury excused)

11             THE COURT:  I'll see you in 10 minutes.

12             (Recess)

13             THE COURT:  You may be seated.  You may bring the jury

14   back in now.

15             (Jury present)

16             THE COURT:  You may be seated.  Thank you.  Mr.

17   Touger.

18             MR. TOUGER:  Thank your Honor.

19             Good afternoon, ladies and gentlemen.  It is my

20   privilege after six weeks to start talking to you at a quarter

21   to 4:00 in the afternoon.  I will try to keep you awake and

22   invigorated.  Hopefully, none of you will snore.  If you fall

23   asleep, do it quietly.

24             When I was a much younger man, probably in 1984 I

25   think it was I was graduating law school and there was a

I6PJGAL6                    Summation - Mr. Touger

commercial that became a worldwide phenomenon, it featured a
very old lady walking into a burger place looking at the
hamburger she is given -- the one person as old as me remembers
the commercial -- and she looks at the hamburger and says
where's the beef?  I don't see no beef.  Where is the beef?

        You know what, ladies and gentlemen?  That commercial
became a worldwide phenomenon.  People used it time and time
again to express themselves when they're being sold something
that doesn't measure up.  In this case, the where's the beef
turns into where is the evidence?  Where is the evidence that
proves that John Galanis is guilty beyond any reasonable doubt,
that John Galanis from the moment he shook Raycen Raines' hand
in March of 2014, or if you believe the prosecution's summation
we just heard, even before that, intended to steal the bond
money that was yet to come six months later?

        Did the prosecution produce the beef?  Did they
produce the evidence that sustains that burden of proof, or did
they just produce to you a very good looking bun, some nice,
fresh tomatoes, a really good special sauce with no beef?

        Let's make no mistake about it, we just heard the
government sum up to you for about two hours and 15 minutes.
During that whole summation, I would say about 10 minutes of
that summation had to do with what you heard from that witness
stand.  They hardly mentioned their witnesses at all.  Their
evidence is in all of these binders.  That is what they spent

I6PJGAL6                    Summation - Mr. Touger

1    that two hours going through.

2            What is the one consistent thing about all the

3    evidence that is in those binders?  All those emails that you

4    heard, all those text messages that you heard?  Well, 95

5    percent of them don't have John Galanis' name anywhere to be

6    found.  He is not even a party to them.  He is not CC'd on

7    them.  He is just not there, including, I might add, the email

8    they say in their summation you just heard that seals their

9    case, where Jason Galanis, Tim Anderson are talking about the

10   payments on the bonds and how they're going to be made.

11           Now do yu know whose name wasn't on that email?  Did

12   you notice?  John Galanis is not there.

13           Jason Sugarman is on more emails in this case than

14   John Galanis.  The only emails that you saw in this case were

15   between John Galanis, Raycen Raines, Timothy Anderson, and they

16   discuss the negotiation of the bond deal and the paperwork of

17   the bond deal and edits.  No doubt about it, they're there.

18   There is those emails, a handful of them, and they're a handful

19   of emails between John Galanis and Mark McMillan, and we will

20   discuss those all in detail as we move forward.

21           As we go through the emails and as you when you retire

22   into that jury room, go through the emails.  Are there any

23   emails that show John Galanis to be a thief?  That is what she

24   said, john Galanis is a cold-blooded thief.  Is there one email

25   that proves that?

I6PJGAL6                    Summation - Mr. Touger

1           There are those emails for Jason Galanis.  Were there

2      any emails that prove that for John Galanis?  There are those

3      emails for Hugh Dunkerley.  There are those emails for others,

4      but not for Jon Galanis.

5           I would not be afraid, although I might get a little

6      bored waiting for you, if you went back into that jury room and

7      you look through every single government exhibit with a

8      fine-tooth comb because if you did, you would learn one thing:

9      Either John Galanis isn't there or he is not forcing anybody to

10     do anything, cajoling anybody to do anything or lying to

11     anybody.  All John Galanis did, and he did it in this case, no

12     doubt about it, was act as a marriage broker.  He brought the

13     WLCC together with Jason Galanis to do a bond deal that the

14     evidence shows would hopefully benefit all parties.

15          During that time period those two parties were

16     represented by two of the largest, most respected, most

17     talented law firms in the country.  It is not like the WLCC did

18     not have a lawyer.  They had a giant law firm representing them

19     with a person who was a Native American and happened to be even

20     dating Raycen Raines at that point and later married him.

21          As I said, I challenge you to find one email that

22     shows John Galanis threatening anybody, ordering anybody,

23     cajoling anybody, convincing anybody to do anything.

24          His emails do not contain anything more than edits to

25     documents written by lawyers, accountants, or IBS suggestions.

I challenge anyone to find an email that says from John
Galanis, with John Galanis CC'd, that says do something
illegal.  I challenge anyone to find an email or a text message
that says John Galanis is deceiving someone.

Compare those emails which involve Michelle Morton,
Jason Galanis and Hugh Dunkerley, all those emails, John
Galanis is nowhere to be present.  In those emails do you see
them openly discussing fraudulent and illegal plans?

Compare those with the emails of Gary Hirst, Francisco
Martin and Jason Galanis, again where John Galanis is never to
be found.  There they discuss openly deception, conflicts of
interest, fraudulent paperwork, but there is no John Galanis.

Compare the emails with John Galanis' name on them to
the emails with Jason Galanis' name, Andrew Godfrey's name,
Jason Sugarman's name and others who were congratulating
themselves for their business triumphs.  Who is not there?
John Galanis.

The evidence shows John Galanis is just not there.  He
is, as they say in Hamilton, and now moving up a few years, the
evidence shows he's not in the room.  We all know that song.
He's not in the room.  That is what the evidence shows.  The
evidence further shows not only is he not in the room, he
wasn't allowed in the room.

Everything John Galanis did was out in the open and
merely brought two groups together.  The WLCC was looking to

1    make some money.  Burnham through, Jason Galanis, was looking

2    to make some money, and he introduced the two parties.  Those

3    two parties then retained legal representatives who negotiated

4    and blessed the deal.  John Galanis certainly didn't tell

5    Greenberg Traurig what to do, and if he tried, they certainly

6    wouldn't have even listened to him.

7          They had a client to represent the WLCC and for

8    hundreds and thousands of dollars, that is just what they did.

9    John Galanis did not tell Dillworth Paxson what to do.  They

10   had a client to represent, and again for hundreds of thousands

11   of dollars, that's what they did.  When you go into the jury

12   room and begin to deliberate this case against John Galanis, go

13   through each and every document, each email, each witness's

14   testimony and try to find the email with John Galanis barking

15   out orders.  There are none.

16         Let me pause here to say one thing.  You have a very

17   difficult task.  Not only have you been sitting here as a juror

18   for six weeks, not only is this a very document-intensive case,

19   not only are there literally hundreds of documents and tens of

20   witnesses, you have three defendants sitting here at that

21   table.  The Judge will tell you at the end of this trial, as

22   she told you in the beginning, that you have to keep each one

23   separate and come to three separate verdicts.  Keep the

24   evidence straight as to what evidence goes to which defendant.

25   That is an extra difficult task that you have.

1          Now getting back to John Galanis.  The prosecution, in

2     their failure to meet their burden of proof, they haven't

3     proved it.  These volume of documents prove nothing, but what

4     about the witnesses, what did they bring to the table?

5          Most of them, what did hey say?  They never heard of

6     John Galanis, never met John Galanis, never did any business

7     with John Galanis, never communicated with John Galanis.  Again

8     there were more witnesses who testified in this case about

9     Jason Sugarman than John Galanis.

10         Tim Anderson and Raycen Raines both knew and

11    interacted with John Galanis throughout the bond deal, and we

12    will deal with their testimony in great detail, but neither of

13    them testified to John Galanis doing anything improper.

14    Neither of them testified to John Galanis ever lying to them.

15    Neither of them ever testified that John Galanis was ever

16    forcing them or convincing them to do anything.  Both of them

17    just said John Galanis came up with a unique idea at that

18    convention.  They both were intrigued by that idea, and there

19    was nothing illegal in nature and both decided to pursue it.

20         Tim Anderson is a lawyer, a tax expert, an experienced

21    Native American deal-maker, and he told you point blank the

22    idea John Galanis came up with was legal and intriguing and he

23    decided on his own to pursue it.

24         All these witnesses, all these documents are just some

25    fancy, fresh looking fixings trying to cover up there is no

1    beef in this sandwich.  There is one witness that would, no

2    doubt, the prosecution has and will continue to say when they

3    get up here to rebut my summation that provides the beef.  Not

4    only will they say he provides the beef, he provides a nice

5    quick quarter pound of beef, and that is Mark McMillan.  Mark

6    McMillan came into this courtroom and he told you the truth, no

7    doubt about it.

8           He said that John Galanis with his lawyer, Barry

9    Feiner -- and, by the way, Barry Feiner, what did he say about

10   him?  Not only is he a lawyer, but he had control over that

11   account also.  He was to follow instructions with Barry Feiner.

12   In that phone call they told him to set up a corporation named

13   Sovereign Nations, and that $2.35 million came in, and a few

14   months later it was gone, all under the direction of John

15   Galanis and Barry Feiner and that that money came from the

16   WAPC, WAPC.

17          Mark McMillan did not know why John Galanis got the

18   money.  He did not know the reason why the other people or

19   entities that he gave money to got their money.  All he knew is

20   that the money came in and he was told where to send it.

21          The prosecution says there is the beef, there is the

22   proof beyond a reasonable doubt that John Galanis is a thief.

23   They will most assuredly say when they come back up here after

24   I am done, like they have said already, the best proof that

25   John Galanis is a thief and a fraudster is the $2.35 million.

I6PJGAL6                    Summation - Mr. Touger

That is all the prove you need, that is what they'll say.

Well, not so fast.  Again the prosecution wants you to take the easy road and not really look at where the road is going.  John Galanis got $2.35 million, so he is guilty, case closed.  But what does this testimony, the testimony of this case actually prove?  How far does the testimony -- and that is what is important -- how far does the testimony actually bridge the gap between meeting their burden of proof and not?  The first thing it proves is the annuity did exist, 2.35 million came from WAPC.  WAPC had money.  They were the annuity provider.

Why did John Galanis get the $2.35 million of bond proceeds, money the prosecution has argued and will continue to argue he never should have gotten if he is not guilty of these crimes?  Unfortunately, their own witnesses don't support their theory, and remember lawyer arguments are worthless, not evidence, you have to listen to them, but they're not evidence.  The evidence is what you heard from that witness stand and what is in those documents.  That is what you have to consider.

So what did the witnesses say?  The first witness to testify, Tim Anderson, he said finders fees or commissions are very common in this business.  Remember he told you John Galanis seemed like an old guy who would find deals for his son.  Never once did he say on direct or cross that John Galanis receiving money was wrong.

1        If the prosecution was so convinced and right that

2   John Galanis receiving money was outside the parameters of the

3   deal, which is what they're arguing to you and proof of the

4   illegality on his part, why didn't they ask their own witness

5   that question?  Why didn't they just say, Mr. Anderson, was it

6   right for John Galanis to get that money?  They didn't because

7   they knew what the answer would be.  He told you it is

8   perfectly acceptable for people to receive commissions or

9   finder's fees.

10       Then we heard from Raycen Raines.  He also testified

11  that finder's fees and commissions, John Galanis never

12  discussed that with him, but he assumed, check the record, Page

13  1839 and again at 1902, he assumed that John Galanis would get

14  one.  On Page 1958, when asked by the prosecution, he had no

15  idea to who would I pay the finder's fee, but he assumed John

16  Galanis would get money.  We know full well that Raycen Raines

17  would feel this way and that it was normal because that is

18  exactly how he got paid for his work for the WLCC, Page 1834.

19       All the money he gets from the WLCC he gets through

20  commissions and finder's fees.  In this case, specifically he

21  got a commission and finder's fee, and he got it through Steven

22  Haines.  He testified to you about that.  Not only that, we

23  know that that commission came directly from the bond proceeds.

24                  (Continued on next page)

25

1          MR. TOUGER:  So not only does Raycen Raines tell you

2     that the commissions are perfectly normal in general, in this

3     case specifically he got one, and he got it directly from the

4     bond proceeds through Steven Haynes.

5          Again, why not ask Raycen Raines the same question?

6     After all, he is the WLCC; he is their representative in this

7     deal, and it is his money that, according to the prosecution,

8     John Galanis is stealing.  So why not ask him that question?

9     Because they knew his answer.  His answer would be:  Fine.  He

10    told you that.

11         If you need proof that that would be his answer

12    besides his testimony that he figured John Galanis would get a

13    commission, the proof is right there in the evidence:  Raycen

14    Raines himself got a wire transfer directly from Sovereign

15    Nations, directly from John Galanis.  The very money that the

16    prosecution is saying is illegal gains, proof that he is a

17    criminal, Raycen Raines gets a distribution from that fund.

18         There is the dagger to the heart of their argument.

19    If this money should not be in John Galanis' hands, if this

20    money is stolen from the WLCC, why is Raycen Raines receiving

21    some of it with open arms and without question?  And, more than

22    that, why did the prosecution ignore it in their summation, on

23    their summary charts and everywhere else?

24         And, finally, Francisco Martin, what did he say about

25    this?  He also told you commissions are perfectly normal in

1   private equity deals; that he has received many in his years of

2   business; and that he actually sought to receive one in this

3   case but the deal never went through, so he didn't get one; but

4   it's certainly normal business practice for individuals who are

5   responsible for the genesis of the deal to get a commission.

6   And we know that that's what John Galanis did.  Even the

7   prosecution admits that John Galanis brought these two parties

8   together.

9           But, wait, the prosecution will say.  Even if it is OK

10  for John Galanis to get a commission for his efforts, even

11  though it was never discussed specifically with the WLCC and

12  never on any paper, the prosecution will say what about the

13  fact that John Galanis got $2.35 million, a lot of money, way

14  beyond any normal commission and way beyond what anybody else

15  got.

16          Yes, it is a lot of money, and it's more than others

17  got, but remember John Galanis is the originator.  The evidence

18  shows that if not for his idea, it never would have happened.

19  It's not Jason Galanis' idea; it's not Raycen Raines's idea;

20  it's not even Steven Haynes' idea; and it's not Tim Anderson's

21  idea.  Although, as the evidence shows, it is not John Galanis

22  who sends out that memorandum on April 4 in an attempt to

23  convince everyone to move on to this idea.  That is important.

24  Let's talk about that for a second.

25          It is Tim Anderson, the lawyer for the WLCC at that

1    time -- he hadn't started working for Burnham yet -- trying to

2    convince Jason Galanis and the WLCC to do the deal.  That alone

3    demonstrates that John Galanis did not participate in any

4    criminal conspiracy, because that -- according to what she just

5    told you -- that was John Galanis' role.  He was the one that

6    was supposed to be convincing Tim Anderson to do the deal.

7              But what did Tim Anderson tell you?  He sent out a

8    memo on April 4 -- a mere two to three weeks after the

9    convention -- having not spoken to John Galanis -- remember, he

10   said he didn't speak to John Galanis for six weeks after the

11   convention -- he sends out that memo.  That alone demonstrates

12   that John Galanis did not participate in any criminal

13   conspiracy, because that is the role he should have been

14   playing.

15             John Galanis is standing on the sidelines April 4

16   waiting to see what happens.  Tim Anderson -- the high-priced,

17   highly respected, highly educated attorney -- is the one trying

18   to convince Jason Galanis and the WLCC to move forward.

19             But let's get back to the money.  What did Francisco

20   Martin tell you?  The prosecution's witness, the one they stand

21   by a hundred percent, the one they put up there saying he is

22   telling the truth and nothing but the truth, he told you

23   commissions are up to negotiation, that the average is about

24   six percent.  In the record at page 2281, if you're writing

25   this stuff down.

1              And remember John Galanis initially is the most

2      important actor in this deal; it is his idea that brings the

3      two parties together, so his submission should be larger.  What

4      did Steven Haynes do to deserve his commission?  And he got

5      one.  He did nothing; he called a lunch.  He got a commission,

6      and he got $2.2 million to build a building.  So Haynes

7      actually, if you think about it, got just as much as John

8      Galanis and directly from the bond proceeds.

9              So what is six percent of $28 million?  Well, I did

10     the math on this one with a calculator, but feel free to check

11     it on your own.  Six percent of $28 million, which is the total

12     of the first bond deal, is $1.68 million.  So, wait, you'll

13     say, when you get back in the jury room, what about that extra

14     $670,000?  Well, the evidence gives you the answer.  The answer

15     is one of two things:  Either John was a good negotiator and

16     instead of getting six percent he got eight percent.  That's

17     what $2.35 million, just about eight percent.  Remember

18     Francisco Martin says it's up to negotiation, six percent is

19     average.  Average means there are some above it and some below

20     it.

21             But it is important to note again Mr. McMillan's

22     testimony.  Did John Galanis get all the money?  Did he pocket

23     all that $2.35 million?  The evidence shows you he certainly

24     did not.  He had to reimburse others who helped him work on

25     this deal.  Barry Feiner, he is a lawyer directly associated

1    with the deal got $90,000.  Mike Murphy, another lawyer who you

2    saw e-mails from, he got $75,000.  Dan Hothpersicitus, that

3    name none of us could pronounce, and I still can't, he was the

4    marker on this deal, he got $165,000.  Jared Galanis, one of

5    John's other children, who was a lawyer and worked on this

6    deal, as you heard, he got $100,000.  And many other family

7    members and friends got large gifts or payments from the

8    account.  Even Mark McMillan told you at the end there was

9    $20,000, so he took it.  I asked him did John Galanis complain

10   about you taking that last 20 grand?  He said, no, you can keep

11   it.  And most importantly of all Raycen Raines gets his wire

12   transfer from Sovereign Nations.

13            So, did John Galanis get money from the bond proceeds?

14   No doubt about it.  Was the commission negotiated with the WLCC

15   or their lawyers?  Certainly not.  Did the WLCC through Raycen

16   Raines and their lawyers anticipate that John Galanis would,

17   however, get a commission?  The evidence says yes.  Did John

18   Galanis receive a normal commission?  The evidence says yes.

19   Did John Galanis share his commission with people who helped

20   him earn it?  The evidence says yes.  Did John Galanis give out

21   generous payments to others and take some for himself?  The

22   evidence says yes.  That doesn't make it illegal.  What you do

23   with the funds you earn doesn't make anything illegal.

24            And remember this fact when the prosecution argues

25   that even if John Galanis earned a commission, it should have

1   come from Burnham, not the bond proceeds.  You heard them say

2   that this morning.

3          On its face that argument also seems a little

4   legitimate.  He was working for Burnham; that's who should pay

5   his commission.  But what proves that invalid is the evidence

6   itself.  Steven Haynes' commission directly from the bond

7   proceeds.  It should have come from the WLCC, but it didn't.

8   So if Steven Haynes and Raycen Raines could take their

9   commission straight from the bond proceeds, why couldn't John

10  Galanis?

11         But what is the biggest proof that this payment does

12  not help the prosecution meet their burden of proof and it is

13  not proof of John Galanis' involvement in the criminal

14  conspiracy?  The biggest and most important piece of evidence

15  is what John Galanis didn't get.  Did Sovereign Nations get any

16  payments from the second series of bonds?  No.  Did Sovereign

17  Nations get any payment from the third series of bonds?  No.

18  Mark McMillan tells you no.

19         As a matter of fact, as the government just finished

20  telling you, when the third series of bonds is done, Sovereign

21  Nations doesn't exist anymore; the account is closed; the money

22  is spent.  So second series of bonds $20 million, third series

23  of bonds $16 million.  John Galanis' share?  Zip.  If he is an

24  ongoing participant in a criminal conspiracy, as they allege he

25  is, he gets his money.  So, the prosecution's theory, if it's

1   correct, he would get paid.  Why is he still not getting his

2   cut?  After all, according to the prosecution, John Galanis is

3   still involved in the second and third series.  You just heard

4   them argue that to you.  But he gets nothing.  It doesn't make

5   any sense.

6        But you don't need me to tell you that.  You can

7   figure that out all on your own.  It's obvious.  If you're

8   helping someone steel $35 million, you're getting some money;

9   and he didn't, not one penny.  Lots of other people get

10  pay-outs from these bond deals, including Jason Sugarman, but

11  not John Galanis.

12       So, what does that evidence prove?  The evidence

13  proves just what I've been saying it proves:  That John Galanis

14  got a commission for his unique idea, a commission that is

15  perfectly acceptable in these types of deals, and a commission

16  that was anticipated by all parties involved in the

17  transaction.  But because he had very little to do with the

18  second series, even less to do with the third series, he gets

19  nothing.  Just do the math.  If you calculate $2.35 million as

20  part of the total transaction, he got three and a half percent,

21  much less than six percent.

22       Remember, John Galanis, even according to the

23  prosecution's own witness, does not even get all of it, and

24  Raycen Raines gets his wire.  So why do these funds prove

25  criminal intent?

1          Jason Sugarman gets hundreds of thousands of dollars

2     from each bond deal but John Galanis getting money is proof of

3     criminal intent?  The evidence does not support such an

4     argument.  The evidence again just proves that the testimony of

5     Mark McMillan is the antithesis of supplying the beef, but is

6     more of the same fake news, more cover-up by the prosecution

7     about their lack of evidence and lack of their ability to meet

8     their burden of proof.

9          What is the law in this case?  The prosecution must

10    prove to you beyond any reasonable doubt that John Galanis

11    joined the charged conspiracy whose goal was to steal the bond

12    proceeds.  It is not enough for the prosecution to just prove

13    to you that the charged conspiracy existed.  I'll make it easy

14    for you.  It did.  People got together and decided to steal

15    money from the Wakpamni bond proceeds.  You've heard how Jason

16    Galanis, Michelle Morton, Gary Hirst and Hugh Dunkerley have

17    pled guilty to being members of that conspiracy.  You've also

18    heard how Francisco Martin was so fearful for being indicted

19    for his actions, that he high-tailed it out of the country to

20    Spain and came back here only when he got immunity and a safe

21    passage letter.  By the way, it's past June 20, I hope he made

22    his plane.

23         So, there is no doubt that the charged conspiracy

24    existed and operated to attain its goal, but that is mostly an

25    unimportant fact when considering what verdict John Galanis

should receive.  What is important is did the prosecution prove

to you that John Galanis knowingly -- and that means

purposefully -- joined the conspiracy.  I strongly and most

respectfully suggest to you that the evidence proves to you

that they have failed in that regard.

       The Court will charge you on the law at the end of the

days, and the Court will tell you the fact that a person

without knowledge that a crime is being committed merely

happens to act in a way that furthers either of the alleged

purposes or objectives of the conspiracy does not make that

person a coconspirator.

       What is necessary is that defendant joined the

conspiracy with knowledge of its unlawful purposes and with

intent to aid its accomplishment of one or both of its unlawful

objectives.  Thus, mere association with members of a

conspiracy is not enough; that for someone to be found guilty

they must knowingly join the conspiracy.

       Just like I told you during my opening statement a

month ago, the fact that John Galanis is Jason Galanis' father

is not enough -- although the prosecution wants you to think it

is.  The prosecution has the burden of proving to you not just

that John Galanis has a son named Jason who did some bad

things; the prosecution has the burden of proving to you beyond

any reasonable doubt that John Galanis knowingly helped his son

to do those bad things.  And again, most respectfully, I

1    suggest to you that the evidence proves they have not.

2            In considering the case against John Galanis, I

3    believe you have to break it up into two parts:  The first time

4    period from March 2014 when John Galanis is brought by Steven

5    Haynes to a lunch meeting with Raycen Raines at the Native

6    American Convention in Las Vegas, to late August, early

7    September 2014, when the first bond series is executed, and the

8    second time period that starts after that.

9            I think we can all agree that the evidence

10   demonstrates that after that time, John Galanis' involvement in

11   this deal is quite minimal.  Even the prosecution seemed to say

12   in their summation that John Galanis is not involved at all in

13   the whole Michelle Morton part of this case.  They didn't even

14   mention his name when referring to that part of the case.

15           When discussing this first time period, I think it's

16   quite important to decide who has told you the truth and who

17   has lied to you or misinformed you.  Many people have come

18   forward in this case and told you they lied.  Hugh Dunkerley

19   told you he lied to many people.  Francisco Martin told you he

20   lied to everyone, including all the people sitting at this

21   table, and that he could have been prosecuted for that, but he

22   is not being prosecuted.  Many crimes he committed, but they're

23   not prosecuting him for that.  But just as I told you, he said

24   quite bluntly that he is telling the truth that they want him

25   to tell.  That's what he said.  It's their judgment of the

1   proof that matters.  We don't really know in fact what the

2   truth is, and frankly Mr. Martin doesn't care, because he is

3   safely back in Spain and can't be prosecuted as long as he is

4   there.  But I will tell you that personally I believe that the

5   witness who testified about this first time period --

6            MR. QUIGLEY:  Objection.

7            THE COURT:  Sustained.

8            MR. TOUGER:  I will show you that the evidence shows

9   that the people who testified about this first time period --

10  Tim Anderson and Raycen Raines -- testified quite honestly, and

11  you should believe them.  What is important to note is that

12  that testimony does not make a liar out of John Galanis; it

13  doesn't make him a deceptor; it makes them a deceptor.

14          Their testimony doesn't prove quite clearly that the

15  prosecution tried quite strongly to deceive you during their

16  opening statement and again here today.  And again if they did

17  not tell you the honest story at the beginning and here at the

18  end, why would you believe anything they say.  Their witnesses

19  told you the truth, but the truth doesn't meet their burden of

20  proving guilt beyond a reasonable doubt, so they have to

21  embellish, extend and outright misstate the evidence, anything

22  to get that conviction against John Galanis.  So, let's look at

23  what they said during their opening statement and today about

24  this time period, and let's compare it to what the actual

25  evidence was.

1            First, right in the beginning of their opening

2       statement -- in an attempt to get your blood boiling against

3       the defendants, and again here today -- the Wakpamni Lake

4       Community is hopelessly in debt for $60 million because of the

5       bonds they issued.  Page 52 of the record.  They got the

6       Wakpamni people to issue tens of millions of bonds.  No mention

7       of sovereign immunity, WLCC or anything.  And again today they

8       did the same thing.  They went their whole summation without

9       ever mentioning the words sovereign immunity.

10           Compare that with what I said.  I told you that the

11      Wakpamni Lake Community risked nothing, that they didn't issue

12      the bonds and that the bonds were issued by a corporation named

13      the WLCC, and that the WLCC hasn't lost a penny, and neither

14      has the Wakpamni community.

15           What does the evidence show?  Again the most important

16      part.  What does the evidence show?  Well, both Raycen Raines

17      and Tim Anderson made it quite clear that the bonds were not

18      issued by Native Americans either individually, in a community,

19      in a district or in a tribe.  They were issued by a

20      corporation.  They each told you quite clearly that the

21      Wakpamni Lake Community is separate and distinct from the WLCC,

22      and the Wakpamni Lake Community did not waive any part of its

23      sovereign immunity.

24           As a matter of fact, Raycen Raines told you point

25      blank at page 1913 of the record that written right into the

1    resolution adopting the bond deal it states quite clearly that

2    the Wakpamni Lake community is not financially responsible for

3    anything relative to this deal and neither are any individuals.

4    And it's quite clear that the bonds themselves only mention the

5    WLCC and not the Wakpamni Lake Community itself.

6           They both also told you that the WLCC also has

7    sovereign immunity and entered into only a limited waiver of

8    that immunity.  And basically what they told you at page 358 is

9    that all they said, if the bond proceeds make money and we

10   don't pay the bonds back, they can come after the bond

11   proceeds; all the other assets of the WLCC protected.

12          Remember, this is quite important.  The WLCC only

13   waive their sovereign immunity to the profits generated by the

14   bond proceeds and nothing else.  So, as Raycen Raines told you,

15   since the bond deal the WLCC has been making approximately

16   $250,000 a year.  All that is safe and untouchable from any

17   creditor.

18          I might add that, as Raycen Raines told you, this

19   amount is about 100 percent increase in profits for the WLCC as

20   compared to before the bond deals.  So, don't let the

21   prosecution argue to you that their reputation has been ruined,

22   because obviously it is not; they're making more money today

23   than they've ever made before.

24          And just like I said during my opening, and supported

25   by Raycen Raines' testimony, not only have they not lost a

1    penny; they received millions and built the warehouse.

2           Did the WLCC make as much money as it hoped?

3    Certainly not.  But they clearly, as the evidence shows, made

4    millions and not lost a penny.  And not one Native American

5    individual, community, district or tribe is on the hook for any

6    amount of money.

7           Then at the very end of their opening, as they're

8    building to that crescendo, and today here again, that is

9    because more than anything this case is about victims, the

10   Wakpamni people who trusted defendants and their partners in

11   crime, and believed that the defendants were interested in

12   their economic involvement, who now owe, who now owe, tens of

13   million of dollars that they will never be able to repay.  They

14   don't owe it.  They only owe it if they make money on that

15   warehouse.  And the Wakpamni Lake Community owes nothing.  The

16   Wakpamni Lake district owes nothing.  The Oglala tribe owes

17   nothing.

18          So who told you the truth here and who tried to play

19   with your emotions and inflame your anger against these

20   defendants?  I suggest to you Raycen Raines did not lie, Tim

21   Anderson did not lie; but look at what the prosecutor told you

22   and answer that question for yourself.

23          Second, John Galanis said his son worked at Burnham

24   and would help the Wakpamni people find buyers who would buy

25   bonds.  And today John Galanis told the people that his son

1    Jason was an investment advisor at Burnham.  And the

2    prosecution says that is a complete lie, that is a deception by

3    John Galanis, that is untruth, that is John Galanis lying to

4    Raycen Raines and the WLCC.

5           Really?  That's a lie?  That's a deception?  Their own

6    star witness, Hugh Dunkerley, tells you at page 917 that Jason

7    Galanis was involved in the inner workings of Burnham

8    Securities.  Look at Government Exhibit 756 where Jason Galanis

9    has outlined the method about how the deal to buy Burnham was

10   going to take place.

11          The BIT board, they put a whole witness up there, Mary

12   Moynihan, and they just went through it in their summation.

13   Her whole goal was to get Jason Galanis to stop being an

14   investment advisor for Burnham.  That was her goal.  That was

15   the BIT board's goal.  But when John Galanis says that to the

16   Wakpamni representatives, to the WLCC, he's lying.  They put a

17   witness on who sits there and tells you her whole goal was to

18   get Jason Galanis to stop being an investment advisor for

19   Burnham.  But John Galanis is lying.

20          And we know that Jason Galanis had a financial

21   interest in Burnham from the expert witness Seth Fliegler.  He

22   testified quite clearly that from January of 2014 up until at

23   least October of 2014 John Galanis was an investor in Burnham.

24   And the convention took place in March of 2015.

25          Let's look at the testimony of Raycen Raines and Tim

1    Anderson -- again the only two witnesses the prosecution

2    produced from the meeting in Vegas.  They know others attended,

3    but they chose only to call those two individuals.

4           Well, when it comes to proving that John Galanis lied

5    in assistance, I suggest that neither of the two witnesses they

6    called support their story.  What did Raycen Raines and Tim

7    Anderson testify about what John Galanis said regarding his

8    son's relationship with Burnham?  Look at their testimony.

9    Their testimony demonstrates that they couldn't really exactly

10   remember the exact words John Galanis used.  Tim Anderson said

11   on direct at page 152 john Galanis was helping him get deals

12   for his bank.  Sounds pretty honest to me.  Read it.

13          I will read it exactly right from Tim Anderson's

14   testimony:

15          "Now, getting back to the meeting for a little bit.

16   It was pretty clear to you at that meeting that Mr. Galanis" --

17   meaning John Galanis -- "was a retired old man who didn't work

18   for anybody, right?

19   "A.  That was my impression at the time. yes.

20   "Q.  And basically he seemed to be just like an old guy looking

21   for something to do, right, if I can quote you?

22   "A.  That was my impression, yes.

23   "Q.  But John did mention that his son who was an investment

24   banker, right?

25   "A.  Correct.

1   "Q.  And he would try to get him interested in the deal, right?

2   "A.  Correct."

3            Where is the lie?  Where is the deception?  Can the

4   government actually sit here and tell you that John Galanis

5   didn't make decisions for Burnham?  Remember the BIT board.

6            Raycen Raines said at page 1891 John Galanis said

7   specifically that his son worked on special projects at

8   Burnham.  Where is the deception?

9            Does it matter anyway the exact words that John

10  Galanis used when you look at the evidence?  Did John Galanis

11  ever say point blank that his son worked as meaning employed

12  by, received a paycheck from Burnham?  No, he never said that.

13  I suggest to you that it doesn't really matter at all, that

14  it's all semantics anyway, because if there is one thing that

15  is made out by all of the evidence in this case, by almost

16  every single witness, it's that Jason Galanis certainly was

17  involved at Burnham, controlled many of its actions that

18  Burnham took, had great influence there, used their office

19  space, dictated instructions to their employees including Hugh

20  Dunkerley and Andrew Godfrey, was business partners with their

21  largest investor Jason Sugarman, and even had his own

22  investment into Burnham.

23            Can the prosecution really argue to you that Jason

24  Galanis during this time period didn't have more or at least as

25  much influence at Burnham as anyone else?

I6P7GAL7                    Summation - Mr. Touger

1          Let's be serious.  Their whole case is built on the

2    fact that Jason Galanis used Burnham as his personal investment

3    tool.  And they want you to believe that they were telling the

4    truth when they stated John Galanis lied to the man at the

5    luncheon that Jason Galanis worked at Burnham?  Come on, that's

6    a joke.

7          Tim Anderson himself stated it is because of Jason

8    Galanis' influence at Burnham that he became counsel for

9    Burnham on the bond deal.  But Hugh Dunkerley put it best at

10   page 1097 when speaking of Jason Galanis' power at Burnham:

11   Informal power is sometimes greater than actual power.  So who

12   was telling you will the truth here and who was trying to fool

13   you?

14         And although it is not relevant to this particular

15   misstatement by the prosecution, I believe it is quite relevant

16   to your overall decision for you to realize whose name John

17   Galanis did not drop at this meeting.  Who did John Galanis not

18   say anything about?  He is the only one in this case that

19   supposedly knew -- according to the prosecution -- that Chris

20   Heinz and Hunter Biden were behind this deal?  Did John Galanis

21   say that at the meeting?  Did he drop their names?  Did he ever

22   use their names?  The answer is, unequivocally, according to

23   the evidence, no.

24         So that shows right there in the evidence that John

25   Galanis is not involved in this scheme whatsoever.  Because, if

1    he was, according to what they say, he wouldn't have been

2    dropping Jason Galanis' name.  Whose name would he have been

3    dropping?  But he didn't know.  And that is further proof that

4    he was not in the know.  The evidence, as I will show you,

5    continually shows that John Galanis is an island to himself.

6            Third, right after that part, and again here today,

7    the annuity was to be used for safe investments.  Did the

8    prosecution read the bond documents before they spoke to you in

9    this case and again this afternoon?  Or are they just ignoring

10   them because to state what they say doesn't help their case?

11   You can read them yourselves and remember the testimony.

12           The bond documents state very clearly in black and

13   white that proceeds of the bonds were not to go into safe

14   investments.  They couldn't.  Because just as the witnesses

15   told you, safe investments would not cover the cost of the

16   bonds.  Remember that whole part, Native American bonds can't

17   charge what U.S. bonds are because they're more risky, people

18   won't buy them, you have to charge a higher interest rate, pay

19   a higher interest rate to get people to buy them?  So they

20   couldn't put them in government bonds because they wouldn't pay

21   off.  It's the whole point of the bond deal.  So they had to go

22   into private equity; not just private equity, but the proceeds

23   were to be invested in companies that were in financial

24   distress, even bankruptcy.

25           And remember these documents weren't forced on the

1   WLCC.  They were the result of months of negotiations,

2   give-and-take between two of the largest, most respected and

3   knowledgeable law firms in the country.  The WLCC knew just

4   what they were signing.

5          I mean Raycen Raines was dating his soon to be wife

6   Heather Thompson who was negotiating the deal.  Do you think

7   Heather Thompson was going to make it so her husband-to-be

8   would look like he got ripped off?  No.  Raycen Raines knew

9   what he was signing; he knew where the bond proceeds were

10  supposed to be invested.  He told you point blank -- and Tim

11  Anderson did also -- the proceeds were to be invested into

12  risky private equity deals in order to support the bonds, and

13  nothing was guaranteed, because in those types of investments

14  nothing can be.  Read the bond documents.  Remember the

15  testimony.  Who has told you the truth and who has not?

16         Again, Tim Anderson, the evidence shows, told you the

17  truth.  Raycen Raines, the evidence shows, told you the truth.

18  The bond documents speak for themselves.  Only the prosecution

19  seems to ignore the bond documents and the testimony.

20         On even a more basic level, Tim Anderson and Raycen

21  Raines weren't even sure the annuity idea was discussed at this

22  meeting.  The government just ignores that fact and tells you

23  what they want to you hear.  Sounds familiar, doesn't it?

24         Fourth, in their opening and again today -- and they

25  even put on witnesses to say it -- the annuity never existed.

1    Again, their own charts, the evidence proves it did.  Money

2    went from the bond proceeds to the WAPC account.  And not only

3    was it a separate account, it was the only account WAPC had.

4            There is the annuity.  And the annuity made

5    investments, as we will discuss later, that would have easily

6    supported the bond payments for the rest of their lives.

7            Was money misappropriated from the annuity by Jason

8    Galanis?  Certainly, there is no denying that Jason Galanis

9    took money from the annuity, but that doesn't mean the annuity

10   didn't exist.

11           Their own charts demonstrate that money was placed

12   into an account in the name of WAPC.  The fact that Jason

13   Galanis misappropriated money from the annuity does not mean

14   the annuity did not exist.  In fact it proves that it did.

15           Again, let me remind you that the fact that Jason

16   Galanis misappropriated those funds does not make John Galanis

17   equally guilty.  The prosecution has the burden of proving

18   beyond a reasonable doubt that John Galanis knew that Jason

19   Galanis was going to take that money.

20           Remember just last week the prosecution put on that

21   whole PowerPoint presentation with their summary witness, and

22   chart after chart had misstatements in them and

23   mischaracterizations, but the biggest was when they showed you

24   the transactions of the first bond series.  They wrote on the

25   chart the funds went into Wealth Assurance.  They know they

I6P7GAL7                    Summation - Mr. Touger

didn't.  Their witness on the stand quite candidly admitted it

didn't go into Wealth Assurance; it went into WAPC.

        Why couldn't they have just written that on the chart?

Because again if they did, it would prove the annuity existed.

So they tried to deceive you again.  From the very first words

that they spoke to you, to their very last, and with their last

witness, the prosecution is playing fast and loose with the

facts, trying to keep you from seeing the truth by using

deception and confusion.  Don't let them.  Look at the

evidence.

        Fifth, after the bond series, and again here today

they stated quite clearly, John Galanis convinced -- notice the

word they used -- convinced the Wakpamni to issue another round

of bonds.  This is an outright exaggeration of the evidence.

But the prosecution has to exaggerate the evidence during this

time period, because after the first bond execution John

Galanis completely drops out of the picture except for a

handful of e-mails and calls.

        How do we know it's an exaggeration of the evidence?

Because both Tim Anderson and Raycen Raines told you so.  Both

witnesses on direct stated that Jason and John Galanis told

them that there was demand for another series, and the

prosecution left it at that.

        The prosecution tries to convince you that John

Galanis did this first and alone; but when directly asked, Tim

1   Anderson says no.  He said -- remember the testimony -- he got

2   a conference call from John and Jason Galanis together, that a

3   second series of bonds had been green lit, and he remembers

4   Jason -- not John Galanis -- stating that they had additional

5   buyers.  Page 406 of the record.

6           And then look at page 586.  He changes his testimony

7   and he says only Jason told him that.

8           Raycen Raines states at page 1918, when I asked him

9   point blank who was the first person to tell you that another

10  series of bonds could be sold?  And what did he say?  He

11  couldn't remember.

12          Now let's look at that word "convinced".  Besides the

13  fact that they're blurring over the testimony as to who made

14  this initial call, let's look at the word "convinced".  They

15  use that word because that makes their case sound better; it

16  makes John Galanis sound more guilty.  But the important

17  question is:  Is it the right objective to use?  Or is it used

18  by the prosecution to sell you a story that never happened?

19          Well, what did the witnesses say?  "John or Jason

20  called and said a second bond series could be done, so we said

21  yes because we were so excited of how the first series went."

22  Tim Anderson said Raines called him, said and he wanted a

23  second series; and Greenberg Traurig also.  Page 407 of the

24  record.  He didn't question the idea of a second series at all.

25          And there it is, more like I said at page 69 of my

1    opening when I asked Raycen Raines point blank did John Galanis

2    ever force, cajole, bribe, or in any way try to convince you to

3    a bond transaction?  His answer:  No.

4         Furthermore, if John was -- as the prosecution wants

5    you to believe -- the main impetus in getting the WLCC and Tim

6    Anderson to go forward with the bond series, then wouldn't it

7    follow that John would be the one to tell Tim Anderson who the

8    investors are in that series?  But in fact he wasn't.  At page

9    221 of the record Tim Anderson says clearly and unequivocally

10   that he received the name of the investors from Jason Galanis.

11        Then look at page 271, the prosecution asks the

12   pointed question:  "Can you describe the conversation you had

13   with Yanni Galanis about the issuance of the third bond

14   series?"  A completely leading question.  The prosecution

15   doesn't even mention Jason's name in the question.  But what

16   was Mr. Anderson's answer?  He states:  "There was a third deal

17   I learned from Jason and Yanni."

18        So the prosecution asked him a pointed question:  Did

19   Yanni call you about the third bond series?  Not even

20   mentioning Jason's name.  But Tim Anderson -- knowing he

21   doesn't really remember -- says I got it from Jason or Yanni.

22        So even when asked a pinpointed leading question that

23   the prosecution had reviewed with him for hours -- and you

24   heard how they met time and time again for hour upon hour and

25   went over questions and answers -- Tim Anderson can't

1    distinguish between who actually gave him what information.

2            So, who again is accurately describing the evidence?

3    And who was telling you a story or using fake news to convince

4    you that they are right?

5            What is also important to note, as I've already

6    mentioned, is if in fact John Galanis' role -- as the

7    prosecution argues -- is at this time convincing the WLCC to go

8    forward with the second and third series, and he successfully

9    completed that designated role, why was he not rewarded for his

10   conduct?

11           Are we to believe that John Galanis -- who if the

12   prosecution is correct is a coldblooded thief -- would just

13   help his cohorts get another $35 million and get nothing for

14   it, not a penny?  That is ridiculous.  If John Galanis is the

15   criminal the prosecution says he is, and that they say the

16   evidence shows he is, then he is getting paid.  The fact that

17   the evidence shows he didn't get paid disproves the

18   prosecution's theory completely.

19           I could go on, but these are the five major factors

20   that go to the very heart of the prosecution's case against

21   John Galanis.  Who told you the truth and who exaggerated the

22   evidence to support their argument?  The answer is clearly

23   demonstrated by the evidence before you.

24           Now let's look in a little more detail about this time

25   period.  What do we know?  We know from Raycen Raines that Pete

1    Shannon -- that businessman from Chicago -- owned a liquor

2    distribution company and was looking for a Native American

3    tribe to sign on as an investor so that the company, SSH, could

4    reap the economic and tax benefits allotted to Native American

5    tribes.  We also know that Steven Haynes attended the

6    convention as a rep for Pete Shannon.  And Mr. Haynes had a

7    business partner and a mentee in Raycen Raines who was also

8    there looking for deals that would bring economic development

9    to the Wakpamni Lake Community through the corporation the

10   WLCC.

11              We then found out that Mr. Raines is invited to a

12   lunch meeting to discuss the SSH idea.  By who?  Who invited

13   him?  The prosecution wants you to believe he was invited by

14   that troller, John Galanis.  No.  He was invited by Steven

15   Haynes.  And he brings with him John Henning and John Galanis

16   who is then introduced to Raycen Raines for the first time.

17              What did we learn from this that is important for you

18   in deciding whether John Galanis is guilty of joining the

19   charged conspiracy beyond a reasonable doubt?  The prosecution

20   just told you it's their allegation that John Galanis sought

21   out Mr. Raines, was trolling him.  Is there any proof of that

22   anywhere?  Where?  Is there an e-mail that proves that?  Is

23   there a text message that proves that?  Anything?  Any

24   testimony?  No.

25              John Galanis did not seek out the WLCC, Raycen Raines

1     or the Wakpamni Lake community.  He was brought to the meeting

2     by a respected businessman, and, by the way, with other people,

3     not just by himself, with many other people, by Steven Haynes

4     and asked to express his thoughts along with numerous others

5     who were there.

6             So, do not let the prosecution argue that John Galanis

7     picked his prey and then swooped in like a hawk.  If nothing

8     else, this evidence proves that John Galanis was just acting as

9     an advisor to Steven Haynes who had an idea, and the idea was

10    anything but a finished product.

11            The next important event is that Tim Anderson

12    approximately two weeks later sends out a memorandum for the

13    first time that outlines the parameters of the deal that

14    finally came to fruition months later.  So what is important

15    about this?  Well, we discussed it a little bit more, but let's

16    go into a little bit more detail about it.

17            Who sent out the memo?  Tim Anderson sent out the

18    memo.  Did it come from John Galanis or anyone associated with

19    John Galanis?  No.  Did it come from Jason Galanis?  No.  It

20    came from Tim Anderson, the WLCC's high-priced mouthpiece.  He

21    has nothing to do with John Galanis.  He has not even met Jason

22    Galanis, and he is paid by the WLCC.  He sent out this memo,

23    and the evidence shows that he sent out this memo with no

24    prompting or conversations with John Galanis.

25            Remember, as I said before, Tim Anderson told you he

1    didn't speak to John Galanis for six weeks after the

2    convention.  And the memo is sent out a mere two to three weeks

3    later.

4           So, if this was the plan from the very beginning by

5    John Galanis to defraud the WLCC and everyone else, why is Tim

6    Anderson the one pushing the idea?  Shouldn't it be John

7    Galanis trying to sell the idea?  But, no, it's Tim Anderson

8    the lawyer, the trained professional, the tax expert, who

9    realizes the benefit of the deal, and he stated time and time

10   again it was a good deal, and he decided to push it.  The

11   evidence before us tells us that John Galanis hasn't said a

12   word since Vegas.

13          If this is a corrupt deal from the very beginning --

14   as the prosecution would have you believe, and as they argued

15   time and again -- don't let them change course now; and it

16   certainly doesn't seem like they're going to.  If they aren't

17   making up theories out of whole cloth not based in evidence

18   then Jason Galanis would need no convincing.  If it's going

19   according to plan, why does Jason Galanis need to be convinced

20   by Tim Anderson to do anything?  It would have to be that Jason

21   Galanis and John Galanis were in it together from the

22   beginning.  And I have stated the evidence certainly shows they

23   were not.

24          If it is the truth the prosecution wants you to

25   believe that John Galanis came back from Vegas and said to his

1   son, hey, I found those chumps you wanted me to look for, and

2   we could rip them off, if that's the truth -- if that's what

3   actually happened -- how come it is Tim Anderson sending out

4   that letter on April 4, long after John has returned, and he's

5   the one trying to convince Jason Galanis to do the deal?

6         Why does Jason need convincing?  And certainly why

7   would it come from Tim Anderson of all people?  If this is a

8   corrupt deal from its inception, it is Jason and John who are

9   attempting to convince Tim Anderson and Raycen Raines to do the

10  deal, not vice versa.  The April 4th memo written by Tim

11  Anderson proves that this deal was not corrupt from the

12  beginning but that Jason Galanis decided sometime later that he

13  could profit in more ways than anyone anticipated.

14        There is no question that Tim Anderson wrote this,

15  without any provocation from John Galanis.  Tim Anderson told

16  you he didn't even speak to John Galanis, so how could John

17  Galanis be involved?

18        And then what happens?  Well, as both Tim Anderson and

19  Raycen Raines told you, the deal takes on its own momentum, and

20  as time goes on John Galanis becomes less and less a player in

21  the deal.  More lawyers get involved, top-flight world renowned

22  lawyers get involved, negotiations between the parties take

23  place, none of which, as the evidence shows, is John Galanis

24  involved in.

25        John Galanis is as Tim Anderson told you an old man

1    looking to make some business for his son at Burnham.  Yes,

2    that much is definitely true, and I certainly do not deny it,

3    but the fact, as the evidence has presented to you

4    demonstrates, does not mean that he is guilty of these crimes.

5

6         Again, the law states that the prosecution must prove

7    to you beyond any reasonable doubt that John Galanis was in on

8    the scam with his son and that the scam was already operating.

9         However, if the evidence fails to prove this to you,

10    that either John Galanis was not in the scam or the scam had

11    not been contemplated yet, you must acquit.

12        Both Tim Anderson and Raycen Raines made it very clear

13    that John Galanis' role during this time period of April and

14    May and June was acting as a go-between all the parties.  He

15    wasn't suggesting ideas or giving any original thought.  He was

16    just, as the evidence shows, acting as a message deliverer

17    between the parties because he was the only one who knew all

18    the parties.

19        But as spring turned to summer and Tim Anderson signed

20    on to represent Burnham, and Greenberg Traurig through Heather

21    Thompson -- Raycen Raines soon-to-be wife -- got involved, John

22    Galanis was no longer necessary.  He was, as Tim Anderson told

23    at page 324, replaced by Tim Anderson because Tim himself now

24    knew and was related to almost everybody involved.

25        As the evidence shows, John Galanis became an

1    afterthought.  His involvement in e-mail chains gets reduced if

2    not ended completely.  His telephone contact went down, and, as

3    the evidence shows, he served his role just to bring the two

4    parties together.  And the evidence shows either side only used

5    him when there was a really big problem and he was brought in

6    to soothe things down.  Because as Tim Anderson stated, John

7    you could joke with, Jason not so much.  Jason, by all the

8    witnesses who testified here, was bossy and hard to get along

9    with, and wanted things done his way, so John was brought in

10   when there was a problem.

11          From the record at page 323, this is Tim Anderson

12   testifying:

13   "Q.  Would you agree with me that the way the process was

14   working in this May, April to June time period, that basically

15   Mr. Galanis would speak to you about -- when I say Mr. Galanis,

16   I mean John Galanis -- would speak to you about a problem you

17   would discuss the problem, and then John would say let me get

18   back to Jason, and then Jason would talk, and then he would

19   talk to Jason and get back to you with what Jason said?  Right?

20   "A.  Yes."

21          Page 325, question to Tim Anderson:

22   "Q.  And your point of contact really switched somewhere around

23   late June of 2014, where you switched from more John to more

24   Jason?

25   "A.  I don't recall specifically when it switched, but as we

1  approached close to closing on the deal there was a switching,

2  yes.

3  "Q.  Would you say that John structured and organized the

4  parties to the deal in the beginning, then Jason Galanis took

5  over the negotiations over the point, and you really closed the

6  deal, signed the closing documents, right?

7  "A.  That is a fair description.

8  "Q.  As a matter of fact, you got the e-mail from John that the

9  contacts at Burnham" -- the one they showed you during their

10 summation -- "Jason and Hugh Dunkerley, and I believe you got

11 that on May 19, 2014."

12 "A.  I don't know if that was the specific date, but on or

13 about there.

14 "Q.  And on or about there, and that is when you really thought

15 you would have more contact with Jason and Hugh Dunkerley than

16 you would with John, correct?

17 "A.  That's correct."

18         That's John Galanis' role:  Bring the parties together

19 and then let them negotiate.

20         The prosecution referred you to a few e-mails that he

21 was on, Government Exhibit 1312, in their summation.  First, it

22 was so unrelated to the bonds -- if you remember, that was the

23 testimony -- Tim Anderson didn't even read those marketing

24 e-mails.  This is an e-mail that included John Galanis, Jason

25 Galanis, Tim Anderson, Michael Murphy and Steven Haynes, and it

1    was regarding some marketing materials that were being edited.

2    And what does John Galanis say?  "Hear me my chiefs."  This

3    demonstrates clearly of how John thought of his role in this

4    matter.  He worked for everyone, just trying to get the parties

5    together.  He was no one's boss, no one's employee, just a

6    person bringing the parties together.  There is no doubt about

7    that, and there is no denying John Galanis' role in this case

8    as a marriage broker.  I would not insult your intelligence and

9    argue otherwise.  But just because that was his role does not

10   mean the prosecution has met their burden.  It does not mean

11   they have proved to you he was in the room where the conspiracy

12   was being discussed.

13          Now the second stage of the evidence:  The second and

14   third bond series; the actions of Michelle Morton and Gary

15   Hirst with the pension fund investors, the theft of funds and

16   the cover-up.

17          The evidence shows that John Galanis was not involved

18   in any of that.  The evidence clearly shows that Michelle

19   Morton never heard of John Galanis.  John Galanis is not in her

20   contacts in her phone, plus the evidence demonstrates that

21   Michelle Morton never communicated with John Galanis and

22   neither did Gary Hirst.

23          The prosecution's own witness, Dan Turney, the Hughes

24   general manager, never heard of John Galanis.  Hugh Dunkerley

25   never communicated with John Galanis.  Tim Anderson told you at

1    page 384 that he found out that the buyers were found for the

2    bonds not from John Galanis but from Jason Galanis.  And it was

3    Jason Galanis who distributed the list in an e-mail to numerous

4    individuals, except one.  Who is missing?  John Galanis.  Tim

5    Anderson told you directly at page 387 that he got the letter

6    signed by Michelle Morton that each investor had the ability to

7    sign the bonds, so he felt it was OK.  He trusted Jason Galanis

8    to tell him the truth.  But John Galanis' name is nowhere to be

9    found, nor does the evidence show his involvement in this

10   aspect of the case at all.

11            Francisco Martin met John Galanis once in his life at

12   Jason's wedding; never had any business dealings with John

13   Galanis.

14            All the pension fund reps who came before you, they

15   never knew or heard of John Galanis.  They heard of everybody

16   else except for Francisco Martin, but John Galanis, never heard

17   of him.

18            All the e-mails sent about the purchase of Hughes or

19   Atlantic, you can't find one with John Galanis' name on it.

20            All the texts, all the purchases of the companies, no

21   John Galanis.

22            Government Exhibit 2059, an e-mail from Jason

23   introducing everyone to Michelle Morton, almost everyone in the

24   case, except for one person:  John Galanis.

25            This continues in Government Exhibit 2061, 2062, 2063.

1    Everyone involved in that e-mail giving a congratulations to

2    everyone on the successful purchase of Atlantic.  Even Jason

3    Sugarman gets in on the congrats.  Who is missing?  You guessed

4    it, John Galanis.

5             As I said, there are more Sugarman e-mails than John

6    Galanis e-mails.  All the e-mails and documents about the bond

7    sales, no John Galanis.  As a matter of fact, the only e-mail

8    with John Galanis' name on it relative to these actions is an

9    e-mail where John Galanis is requesting that the WLCC get its

10   money.  That is the words of a criminal?  No, of course not,

11   because the evidence hasn't shown, nor has the prosecutor

12   proven to you, that John Galanis is a member of the charged

13   conspiracy.

14            Government Exhibit 2067, Jason Sugarman to Jason

15   Galanis -- excuse me -- Jason Sugarman to Jason Galanis and

16   Gary Hirst:  We are in business.  No John Galanis.

17            Government Exhibit 2251, the term sheet of the

18   purchase of Atlantic, everyone on it again including

19   Mr. Sugarman, but no John Galanis.

20            Government Exhibit 1267, almost a dozen people are on

21   this e-mail from Jason Galanis to Tim Anderson and many others

22   about the CUSIP number on the bond deal.  One person missing:

23   John Galanis.

24            Government Exhibit 1278, the person from Fondinvest.

25   Everyone on it again but no John Galanis.

1          Government Exhibit 2078, Jason e-mail regarding

2     purchasing of the bonds from Atlantic clients.   Sugarman,

3     Godfrey, and others, but no John Galanis.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           Government Exhibit 2086, Jason Galanis and many others

2      about the valor purchase, the biggest purchase they made.

3      Guess who is missing from this email?  John Galanis.

4           Government Exhibit 2092, Jason Galanis and numerous

5      others on the Bonwick purchase.  No John Galanis.  I could go

6      on and on, exhibit after exhibit, the prosecution, Archer or

7      Cooney, and there is one common denominator.  No John Galanis.

8           Even to this very end, this morning those emails that

9      were put in concerning bond payments, they just went to

10     evidence today, who is missing from all those emails about the

11     bond payments?  John Galanis.  There is one name that is

12     involved in this trial that is conspicuously never mentioned in

13     this time period, and that is the name of John Galanis,

14     everyone else but John Galanis.

15          The way the prosecution would say, remember what I

16     said during my opening, follow the money and it will show you

17     that John Galanis is not guilty.  The prosecution will argue if

18     you follow the money, it shows the opposite, that John Galanis

19     is guilty, but unlike the prosecution, I can stand by my words

20     in my opening statement because if you follow the money as the

21     evidence shows, all John Galanis got was his rightfully earned

22     commission that was anticipated and not disputed by anyone, and

23     as the evidence shows, all John Galanis knew was that WAPC, the

24     annuity, was making payments on bonds and buying companies

25     through private equity deals.

1    It is important to look at the evidence.  The evidence

2   shows that John Galanis had no insight into the bank account at

3   WAPC.  The evidence shows he had no knowledge of where the

4   money was going.  The evidence shows he is not on any emails,

5   he has no oversight in this bank account, he is not being

6   consulted as to where the money is going.  The evidence shows

7   he has no computer access.  Hugh Dunkerley told you point blank

8   and quite clearly only he, Gary Hirst and Jason Galanis had any

9   idea where the bond proceeds were going.

10   Any outsider looking at WAPC would see it was doing

11   what it was supposed to do because as Hugh Dunkerley told you

12   they lied to people, formed a company, faked documents, all in

13   an effort to protect their fraud.

14   The evidence shows that John Galanis' knowledge of the

15   proceeds, if any, is the same as WLCC's knowledge.  Payments

16   are being made sometimes late or negotiated to be made at a

17   later date between lawyers.  The companies are being bought and

18   these deals are highly profitable.

19   Remember the signed addendum by WLCC in November of

20   2015, written by Tim Anderson they have reviewed the private

21   equity deals that have been made and found them to be

22   consistent with the terms negotiated, that the market value of

23   the security holdings in the contract are in excess of the

24   issuer's obligations set forth in the contract.  This is signed

25   in November of 2015.

1            The evidence shows that John Galanis had no

2    information that was different from the WLCC.  The evidence

3    shows they had no reason to question the validity of the

4    annuity over the WAPC.  The evidence clearly shows he was

5    outside of the room where the action was happening, where the

6    criminal conspiracy was -- do you want me to continue?

7            THE COURT:  Yes.

8            MR. TOUGER:  Yes, you said follow the money and

9    remember what I also said, it would be a difficult task, and

10   the evidence shows if you follow the money based on the

11   knowledge John Galanis had at his disposal, there was no reason

12   in the evidence for him to believe that the criminal activity

13   was being done.  The evidence clearly demonstrates this.  The

14   evidence shows that he had no more information that the WLCC

15   had, that Tim Anderson had, that Greenberg Traurig had.  They

16   all thought everything was fine and above board, so why

17   shouldn't John Galanis think that, as the evidence shows?

18           The evidence shows there is no reason to question the

19   validity of WAPC.  It is not creating some offshore island

20   account like other nefarious corporations did.  You heard about

21   that.  Let's make this Seychelles and this there.  Where is the

22   WAPC created?  Right here in America.

23           What else?  The prosecution produced no evidence that

24   demonstrates John Galanis had no knowledge of what was

25   happening with the bond proceeds than Raines, Anderson or

Greenberg and Traurig.  By the way, in addition here, another
lawyer okays the bond deals.  Remember Defense Exhibit 4126,
Clifford Wolff, an attorney, saying second bond deal perfectly
okay.

          You had to be in the room with Jason to know what was
happening, and the evidence clearly shows John was not.  You
want to know who the people in the room were?  Look at the
distribution list, Government Exhibit 2027.  That answers the
question.  There is one person missing from that distribution
list, John Galanis.

          The evidence shows that on September 2nd, 2015,
$126,908.70 interest payment on the first bond was made.  The
evidence does not prove that John Galanis had any insight where
it was made from.  On September 3, 2015, $1,419,508.43, another
interest payment on the bond was made, but no evidence
indicates that John Galanis knew the source of those funds.

          September 30, 2015, 903,000 for interest on the second
series, again no evidence points to John Galanis knowing the
source of those funds.

          October 1, 2015, $294,311.11, interest on the second
series, again no evidence that shows John Galanis knows the
source of those funds.

          November 17, 2015, $277,000 a payment to the WLCC as
required by the first bond series documents.  There is no
evidence to show John Galanis knows where those funds came

I6PJGAL8                    Summation - Mr. Touger

1    from.

2            February 4, 2016, $250,000 payment to the WLCC as

3    required by the second series.  There's no evidence to show

4    that John Galanis knows where that money came from.

5            What the prosecution has failed to produce to you is

6    any evidence that there was any communication between John and

7    Jason Galanis that demonstrates John Galanis' involvement in

8    this scheme, not one.  The evidence they presented indicated

9    that the only reason John Galanis should know Jason Galanis had

10   a criminal intent is because he is Jason's father.

11           They have presented no evidence that demonstrates that

12   John Galanis had any knowledge of Jason's true intent or he was

13   involved with Michelle Morton illegally finding investors in

14   the bonds or that Jason Galanis was stealing proceeds from the

15   bonds.  As a matter of fact, the evidence clearly shows a

16   division between John Galanis and Jason Galanis in their

17   business deals even if they were involved in some fashion in

18   the same deal.

19           What is the evidence of that?

20           First, there is no evidence that John was an investor

21   in any company Jason was involved in.  There is no evidence

22   that John Galanis had a financial stake in any company

23   mentioned in this case, that Jason was involved in Burnham,

24   WLCC, WAAG, Valor, WAPC, you can go through them all, and one

25   name is conspicuously missing from all those companies, john

1    Galanis.

2             If John Galanis were involved in the criminal

3    conspiracy, why wouldn't he be the one to control WAPC or at

4    least involved in some fashion?  After all, according to the

5    prosecution, it is John Galanis that had the connection to

6    Raines and WLCC, it would be a very smooth transition, but he

7    is not because, as the evidence shows, he is not in the room.

8             Remember the testimony of Hugh Dunkerley about the

9    brainstorming white board sessions, about the bond deal and

10   corporate purchases?  First, just him with Jason Galanis and

11   the Sugarmans and as more and more people were brought into

12   those sessions and other people were mentioned, who is never

13   there?  John Galanis.  Who is never mentioned?  John Galanis.

14   Page 1103 of Hugh Dunkerley's testimony.

15            Remember according to the prosecution, John Galanis is

16   the frontman, but when Jason is outlying this part of the deal

17   and his criminal intent, John Galanis is not only not there, he

18   is not even mentioned.

19            Never do you hear anybody saying don't worry about

20   getting the bond deal done, my dad is taking care of it.  Never

21   in those white boarding sessions did Hugh Dunkerley say those

22   statements were made.  Hugh Dunkerley is there.  Jason Sugarman

23   is there.  Other people are there, but no John Galanis.

24            Page 1104, Hugh Dunkerley says clearly countless

25   emails were exchanged, countless telephone calls were made.

1   Every aspect of the deal was laid out.  Never a mention of John

2   Galanis.  Examine the proof of the evidence presented that

3   Jason kept his business separate from John.

4          Hugh Dunkerley testified at Page 1121 that he was

5   Jason's right-hand man on the bond deal doing most of the

6   day-to-day work on the deal and he told you he never worked

7   with John Galanis or heard his name mentioned relative to this.

8          Even the Thorsdale, the company that, according to the

9   evidence, Jason Galanis' family trust, which family members are

10  involved in that?  The evidence is clear.  Ralph Berger, his

11  father-in-law, is the director of that company, Government

12  Exhibit 2113, not John Galanis.  Even this most personal

13  company, the evidence shows that John Galanis' name is nowhere

14  to be found.

15         Then there is the one company that John Galanis is

16  associated with in this case, Sovereign Nations, the company

17  that the prosecution wants you to believe that the mere

18  existence proves John Galanis' guilt.  The evidence here tells

19  you a lot about John and Jason's business relationship and

20  their desire to keep their businesses inherently separate.

21         Remember the testimony of Mark McMillan, who told you

22  specifically that when they first went to work for John Galanis

23  in 2010, the one person, the one person John points out he

24  shouldn't take any instruction from is Jason Galanis.  Don't

25  listen to him.  Don't take any instructions from Jason Galanis.

1          What did he also tell you in the whole time that he

2     worked for John Galanis in this case, he never once had any

3     contact with Jason Galanis.  You have been listening to

4     evidence for a month now in this case, is there any other

5     instance Jason Galanis did not have his huge powerful hands

6     involved in what was going on?

7          The answer is a resounding no.  Jason Galanis was

8     involved in everything in this case, but this company, the one

9     and only associated with John Galanis, not only is Jason not

10    involved at all, Mark McMillan was given specific instructions

11    do not let him get involved even if he tries to.

12         Mr. McMillan went on to say John and Jason Galanis

13    guarded their interests and kept them separate, Page 2914 of

14    the record.  Mark McMillan should know because as he told you,

15    he is the one person in this case out of all the people, he is

16    the only one who worked for both Jason and John at different

17    times, so he knows how guarded they are and how much they

18    separated themselves from each other.

19         So what does this evidence combined with the evidence

20    about Thorsdale tell you?  The evidence tells you when it comes

21    to business, the two Galanis keep things separate from each

22    other.  That is what the evidence tells you.  The evidence

23    tells you everyone gets Code Rebel shares except for one

24    person, John Galanis.

25         Remember Francisco Martin's testimony about the

celebratory luncheon, the bond sale?  Who is not at the
luncheon?  It is in Los Angeles.  Who is not there?  John
Galanis.

          Finally, what did Francisco Martin say whether Jason
and John did business together?  He said at Page 2173 that
Jason told him from time to time that his father would help him
with business affairs.  Does that sound like John Galanis was
intimately involved in Jason Galanis' business, or he was an
insider to all these deals, or does it sound exactly like Tim
Anderson, John was an old guy who referred deals to his son if
he could.

          What was Mr. Martin's last comment on this subject,
that John Galanis had no involvement or role in the Wakpamni
bonds.  Further evidence of the separation was the fact as we
discussed that John gets none of the proceeds from a second and
third bond series.  This proves nothing.  When a pirate captain
gets his booty, we have seen it and it is put on the boat, yes,
the captain takes his lion's share, but everybody else shares
in the booty.  Not this time, not John Galanis.

          There is also ample evidence to show Jason Galanis
kept his social life separate and distinct from John.  All the
witnesses came forward saying they never met John Galanis even
though they were good friends with Jason.  Dunkerley never met
John or did any business with him, nor did Francisco Martin
except at the wedding.  In every testimony from a witness that

1    visited Jason's house, John is never there.

2            Finally, the testimony of Dr. Archer.  She didn't even

3    realize the importance of her story because, as she told you,

4    she had never spoken to me before about the case, and she

5    testified that John wasn't even at Jason's birthday party in

6    the event thrown by Jason and his wife to celebrate a milestone

7    and impress their friends, and who is missing?  John Galanis.

8            The evidence shows they might be father and son, but

9    there is a clear and distinct separation in their lives.  This

10   separation of people and entities involved in Jason's life not

11   only concerning John Galanis, the evidence demonstrates this is

12   exactly how Jason Galanis acts in all of his business

13   endeavors.  The evidence shows when it comes to information and

14   business with Jason Galanis, he believes you only need to know

15   enough information for you to complete the task he has given

16   you, no more, no less.  Information is at a premium and is not

17   to be shared.

18           Remember Defense Exhibit 4719, an email the

19   prosecution didn't show you from Jason Galanis literally

20   cursing out an individual from giving out information to

21   someone who shouldn't have had it.  When you work with Jason,

22   the evidence clearly shows you got information on a

23   need-to-know basis and it wasn't to be shared.

24           Francisco Martin's testimony, Jason is very sensitive

25   to how information flows.  Information is to be disseminated to

1    the proper people at the proper time, only shared when

2    necessary.  Francisco Martin is intricately involved with

3    everything with Jason Galanis, but he told you Jason kept

4    secrets from him.  Hugh Dunkerley described it best.  Jason is

5    the hub of the wheel and keeps all the spokes separate.  Jason

6    is in the middle of the wheel giving out information to each

7    individual, but he is the only one who knows everything.  The

8    different spokes are people involved in this plan might not

9    even know each other and they certainly do not have the same

10   information.

11           Page 1119 of the record, Hugh Dunkerley is testifying:

12           As far as you knew, the idea originated with Jason

13   Galanis?  It was Jason Galanis' idea, correct.

14           Jason Galanis' told me it was a Michelle Morton idea,

15   okay.  And Jason Galanis, once the idea started to pick up

16   speed around the summer of 2013 was the one pushing that deal

17   more than Jason Sugarman and he was controlling the deal,

18   wasn't he?  Answer, yes.

19           I believe he described Jason Galanis as the hub of the

20   wheel on the deals he was working on correct?  Yes.

21           What do you mean by this?  If you think of a common

22   wheel that has a hub and spokes that come out of one, right?

23   Yes.

24           And Jason Galanis is described as the middleman, the

25   hub giving out instructions to all different spokes, right?

1    Correct.

2              And not all those spokes in the wheel knew each other,

3    right?  As far as you know?

4              THE COURT:  To your knowledge?  Answer:  To my

5    knowledge, not all.  They did not know all each other

6    absolutely.

7              And, furthermore, not Jason Galanis told you at times

8    don't tell other people certain information?  Correct.

9              As far as you know, you had some knowledge that other

10   people in the wheel may be different?  Correct.

11             That's Jason Galanis.  Francisco Martin supports that

12   this is the way Jason Galanis operated when he testified that

13   Jason Galanis would frequently get information from him, Page

14   2336.

15             But not only would Jason be very scarce who he would

16   give information to, the evidence shows that he would lie to

17   people to protect the privacy of his information.  As Hugh

18   Dunkerley told you at Page 1142, Jason lied straight to his

19   face.  He couldn't even tell when he was lying.

20             Hugh Dunkerley, his most trusted adviser, it made no

21   difference.  Information was kept from him, and Jason lied to

22   all to keep his business private and his actions concealed.

23   Mr. Dunkerley continues that Jason Galanis was consistently

24   lying to people using fraudulent documents.  Mr. Dunkerley

25   admitted on many occasions he had no idea what Jason was

1    telling other people.

2           A perfect example of this is described by Hugh

3    Dunkerley, at Page 1144 of the record.  Jason told him there

4    there was demand for the second series of bonds.  Here he is

5    clear as day in the evidence, Jason Galanis telling so many

6    people the same lie.  He told it to Hugh Dunkerley.  He told it

7    to Tim Anderson.  He told it to Raycen Raines and others and

8    everyone believed him because there was no reason not to.

9           The evidence clearly shows Jason was lying to everyone

10   to get more funds.  The prosecution has produced no evidence

11   that shows that anyone knew the truth.  Remember Hugh

12   Dunkerley's testimony about the Ballybunnion affair, Page 1147.

13   He didn't even tell his partner in crime, Gary Hirst, about it,

14   the one who helped him do one fraudulent act after another and

15   yet he didn't tell him.  Why?  He told you why.  Jason told

16   you, no one else is to know, so no one else did.

17          After four weeks of testimony, numerous testimony,

18   hundreds of exhibits, the prosecution will stand here and say

19   convict John Galanis for two reasons:  One, because he is

20   Jason's father; two, because of the $2.35 million.

21          First, because he is Jason's father.  The

22   prosecution's argument because he is Jason's father, he had to

23   know not only that Jason was involved in but he agreed to help

24   him steal the money.  They argued this even though they haven't

25   produced one iota of evidence that demonstrates they routinely

1    shared their business opportunities, and with clearly showing

2    exact opposite, not only they routinely not shared their

3    business, but they kept them separate and knowledge of them

4    from each other, not only separate in business, but separate

5    socially, and the evidence further dictates this is normal

6    business for all his business.  The evidence shows Jason is the

7    epitome of the hub in the wheel in business.

8            Tim Anderson testified:

9    "Q   By the way, you didn't even know Michelle Morton until the

10   closing of the deal, right?  Page 402.

11   "A   Correct.

12   "Q   And again because that information was not necessary for

13   you?

14   "A   Correct.

15   "Q   You had a job to do, and you completed that job?

16   "A   Yes.

17   "Q   Others involved in the deal had other jobs, right?

18   "A   Correct.

19   "Q   If they were not recommended to your role, it was not

20   necessary for you to know about them?

21   "A   Correct."

22           That is how Jason operated.  On the second argument,

23   2.35 million, as we have discussed this already, but just to

24   quickly review, while it is certainly disputed John Galanis

25   received these funds directly from the bond proceeds, one,

1    there is ample evidence in the record to support credible

2    reasons for him to receive that money that doesn't place him

3    inside a criminal conspiracy and the testimony from numerous

4    witnesses that a commission was reasonable in that type of

5    financial transaction.

6            Two, the fact that the commission was well within the

7    normal reasonable parameters of commissions.  Again it sounds

8    like a lot of money, but it is a percentage.  Just like a real

9    estate agent gets a lot more if he or she sells a hundred

10   million dollar home or $10 million home than if he sells a

11   hundred thousand dollars home, you get a percentage, and that

12   is all this was, was a percentage the testimony from Raines and

13   Anderson that Jason Galanis will John Galanis receive a

14   commission, the fact John Galanis used some of the money to pay

15   people involved in this deal, including attorneys and marketing

16   people.

17           Finally, the fact when Raines got his wire, he didn't

18   say hey, what is this?  Where is this coming from?  The

19   evidence shows he just accepted it and took the money.  Yes,

20   John Galanis made a lot of money on this deal, money he used to

21   give his family and invest in one of his son's business, not

22   Jason's but Jesse's and, yes, to buy some jewelry.

23           Finally, what is most important is that John Galanis

24   receives no money when Jason gets millions after the second

25   bond deal and again after Jason gets millions after the third

bond deal, Jason keeps millions but doesn't share any of that

with his allegedly similar crooked father.  That makes no

reasonable sense.

         The evidence makes it clear John Galanis wasn't

involved because the evidence demonstrates he didn't get a

penny.  I ask for any testimony that demonstrates John Galanis

got a penny from the proceeds of his second and third bond

series.  You will find the answer will be none.

         The prosecution wants you to believe this is a family

affair between a father and a son, but the evidence

demonstrates the exact opposite, that Jason continues to take

millions for the second bond series, but John gets none.  The

evidence shows there is no collusion between John and Jason to

steal the proceeds of the bonds.  This was Jason's one-man show

with Hugh Dunkerley, Francisco Martin, Gary Hirst, and Michelle

Morton acting his his liaison, but no evidence to show John

Galanis got any money.

         The government started by using fake news in opening

statement and ended doing the same thing to blind you from the

real truth, the real facts.  The government seems to go by the

old theory of make up a story, make it a grand story and repeat

it many times until it gets believed.

         An example is last witness, FBI Agent Kendall.  Her

charts looked quite pretty and effective, but were they based

on all this evidence in the case, but just the evidence the

1    government wanted her to know and showed her and, thus, what he

2    related to you.  She answered that question.  She stated quite

3    clearly she did not a painstaking analysis of all the evidence

4    and the testimony in this case.  She just made a presentation

5    of the evidence given to her by these three people.

6              She stated accuracy is more important, but then

7    admitted to mistake and misstatements of fact.  You watched as

8    Mr. Schwartz painstakingly proved to everyone in this courtroom

9    that she misstated thousands of dollars, in the end admitting

10   her error.  You saw how she tried to confuse you using the name

11   WAH instead of WAPC.  You saw how she labeled money coming out

12   of Sovereign Nation as cash in an effort to make John Galanis'

13   distribution is more devious when she knew that Mark McMillan

14   testified that never happened, no cash was ever taken out.

15             You saw how even she was listing individuals who

16   received payments from Sovereign Nations, she failed to show

17   you Raycen Raines' name in an effort to hide that fact from

18   you.  However, even with her efforts to hide the truth, certain

19   facts couldn't be hidden even by her.  The annuity was formed

20   by WAPC, formed as required in a second account, and John

21   Galanis' name disappears after the first bond series.

22             I am sure every person over on that side of the

23   room -- these people over here -- will agree with me don't let

24   the government do to you what it did to FBI Agent Kendall.

25   Don't let them feed you just the evidence they want you to hear

1     and decide the case on that.  Try to remember all the evidence,

2     use all the evidence, then cast your vote.  We are not afraid

3     of you understanding everything.  Only the prosecution is, and

4     that is what this witness completely demonstrates.  They tried

5     to paint a picture they want you to see, but one that does not

6     accurately paint the picture of the evidence.  Cash when there

7     is no cash, payments when there is no payments, and leave it to

8     people like Raines to deceive you.

9          That is not the only time the government tried to

10    paint a picture falsely with the use of witnesses.  There is a

11    question to Francisco Martin on whether he thought private

12    equity was a good investment for bond proceeds, and he answered

13    no.  So the prosecution put a man on the stand whose testimony

14    is bought and paid for with an immunity agreement and safe

15    passage letter to say there is something wrong here.

16         This is another example of the government trying to

17    pull the wool over your heads, deliberate fake news.  They

18    don't ask Tim Anderson that question because they know he will

19    say private equity was fine because that is what he said and

20    that is what the bond documents themselves say and that is what

21    he approved.

22         They don't ask Raycen Raines that question for the

23    same reason.  They don't ask the two men who knew all about the

24    bond deal that question.  They save it for the man who knows

25    nothing about the bond deal.  To his credit, Francisco Martin

1   admitted he didn't know anything about the details.  He

2   admitted he didn't know the bond deal itself was approved by

3   two big law firms, the best accounting firms, the paperwork is

4   explicit where the money is to be invested and it was the

5   fruits of months of fair market negotiation.

6            Mark knew of that information, yet the prosecution

7   asked him for his opinion because they had bought and paid for

8   his answers.  He didn't even bother to call any attorneys from

9   Greenberg Traurig, including Heather Thompson, but we know

10   their answer because they also wrote the same memo Tim Anderson

11   did approval the deal.  More of the same of the prosecution,

12   tell a story, make it a big story, and tell it over and over

13   again until it becomes the procedure.

14            Unfortunately for them, the evidence tells the real

15   story, everyone involved in the deal thought it was a good

16   deal.  Yes, Jason Galanis decided to to do what he did.  The

17   evidence indicates the bond was clean, negotiated and

18   evenhanded.  The court will tell you among other things when

19   she charges you on the law of the case as a practical matter,

20   to prove his charge against a defendant, the government must

21   establish beyond a reasonable doubt that the defendant knew

22   that his conduct was calculated to deceive and that he

23   nevertheless associated himself with the alleged fraudulent

24   scheme.

25            That, in essence, is what the prosecution has to

1    prove, that John Galanis set out to defraud the WLCC, commit

2    acts to aid in that deception, associated himself with others

3    who were working on the same scheme.  We have talked a lot

4    about -- it is getting late, so I will try to move quickly --

5    about what hasn't been proved by the prosecution.

6           What did they prove?  What did the evidence show?

7           Does the evidence show John Galanis was trolling Mr.

8    Raines?  Certainly not.  Is there one email, as said, one text

9    messages with anyone proving that allegation?  No.  Does Mr.

10   Raines say that Steven Haines said hey, Ray, I brought John

11   Galanis over here to this lunch because he wanted to meet you.

12   A perfectly normal thing to say.  No, he doesn't say that.

13          Does John Galanis say when he meets Raycen Raines,

14   hey, I have been waiting to meet you?  No, that is not said.

15   Another perfectly normal thing to say.  No evidence of

16   trolling, none, just made up, fake news.

17          Even the email they acted on does not even show John

18   Galanis' name on it.  The email, that February email, who is

19   that between?  There is one person not on that email.  Who is

20   it?  John Galanis.

21          The evidence demonstrates in mid-March there were four

22   separate groups of people:  The WLCC represented by Mr. Raines,

23   Steven Haines and John Hensley, representing Pete Shannon SSH,

24   Dillworth Paxson and John Galanis all were looking for

25   business.  They came together for a lunch meeting arranged for

Steven Haines.  Mr. Haines invited each party and those in
attendance to get business going.  To make a long story a
little shorter, a lot of business ideas were floating that day.
There was some discussion of using $200 million of ted bonds,
but Mr. Raines did not like that idea because WLCC couldn't be
involved in it.  Page 308.

          Out of that meeting came an idea makes everyone happy.
SSH would get their business partnership, the WLCC would get
economic development with Wakpamni Community and make money for
themselves, Tim Anderson would generate some legal fees for his
law firm, and John Galanis was the one who came up with the
idea.

          Everyone that left Vegas, instead of the idea what
goes on in Vegas stays in Vegas, they kept it going.  Tim
Anderson was so enamored with the idea, he sent out that idea
on April 4, pushing the idea on his own.  Mr. Raines takes the
idea back to this corporation, WLCC board, and John Galanis
takes the idea over to Jason Galanis, and both parties say yes.

          Some time goes by, there are emails, telephone calls
between the parties, including John Galanis, and the idea, as
the witness stated, takes on own momentum.  Time Anderson takes
more money for Burnham, so he decides to switch sides and work
for Burnham instead of WLCC.  Nobody minds this because it
makes the deal easier to contemplate, everybody knows
everybody.  Nobody cares.

1          WLCC just brings in another big, experienced, talented

2     law firm, Greenberg, and they come in to represent the WLCC.

3     Time moves on.  The deal gains more momentum.  Now that both

4     sides have attorneys, John Galanis becomes less of a figure in

5     the negotiations, replaced by Tim Anderson and his son Jason

6     Galanis.

7          In July, Hugh Dunkerley comes on the scene.  The

8     actual performance of the deals were in flux up until the day

9     of the closing.  Finally everything is set, the deal is ready

10    to go through, but there is one problem, one huge problem.

11    There are no buyers for the bonds.  Read that email in late

12    July, early August from Tim Anderson.  We are ready to go.  We

13    hope to close soon, but Jason hasn't done his part.  He hasn't

14    found any buyers, so what does he do?

15         Exactly what Ms. Mermelstein said this morning.  He

16    goes out and finds Michelle Morton.  Unbeknownst to everybody

17    else, he makes that backroom deal with Michelle Morton.  Yes, I

18    said unbeknownst to anyone else involved.  The evidence shows

19    there is not one email, one text message, one witness testimony

20    that demonstrates anyone besides Jason Galanis, Michelle Morton

21    and later on Hugh Dunkerley and Gary Hirst knew what the actual

22    deal was between her and Jason.  This relationship, this

23    decision made by Jason Galanis as the evidence shows, by

24    himself, without any evidence of other participants, is the

25    fatal one, the one that ultimately will bring down this deal.

1          Michelle Morton's firm, firmly in toe, the deal is

2     executed, the bonds are issued, the money is transferred, the

3     WLCC gets its $2.35 million to build.  The attorneys get their

4     fees.  Steven Haynes and Mr. Raines get their commissions and

5     the annuity established not with Wealth Assurance as first

6     contemplated but a new company formed in America for this

7     purpose, the WAPC, WAPC.  Is this done for nefarious reasons?

8     No, the evidence says, at Page 397, it is done for tax

9     purposes.

10         Tim Anderson, Page 321, tells you indisputably there

11    is nothing illegal as far as he could tell by the way this deal

12    was put together.  He said I would not have involved myself in

13    an illegal transaction.  At Page 377 he said at the time he saw

14    nothing illegal.  Even Hugh Dunkerley, Jason's inside man,

15    states 1118, at the time of the execution of the first bond

16    deal, he had no inkling there was anything wrong with this

17    deal.  If he couldn't tell and he was in the room, how could

18    those outside the room know what was going on?  The evidence

19    unequivocally tells you they couldn't.

20         Don't let the prosecution tell you parts of the deal

21    are nefarious, deceptive and illegal when they're not.  Tim

22    Anderson tells you, 410, private placement deals of Native

23    American bonds are routinely done.  Page 502, the idea between

24    private investments to invest in a company, it will grow and

25    sell for a profit.  At Page 505, the bonds were not to be

rated.  He knows that.  It is in the paperwork, which means at

page 506, there is no public market for the bonds.  That is why

it is done with a private placement.  Page 512, the price for

the bonds will go down because of that fact there is no public

market.

        At that point WAPC gets the bond proceeds and then

things begin to happen.  Again at this point no one involved

thinks anything illegal is happening because Jason has done

such a great job covering his tracks with the help of Hugh

Dunkerley, Gary Hirst and Michelle Morton.

        Now, the prosecution has alleged that the fact that

the annuity shifts from Wealth Assurance to WAPC is a big lie

told by John Galanis.  But is it?  First of all, the WLCC had

ample warning that the annuity placement was going to change

from Wealth Assurance to WAPC.  They got that big word long

before the execution.

        Second, as Tim Anderson told you at page 367, WAPC is

an affiliate of WAH, page 367, he uses the word affiliate.

What did the expert expert tell you.  An affiliate is a company

that has a relationship with another company, WAPC does to

WLCC, being managed by the same individuals.

        His testimony, Mr. Anderson's testimony continues at

page 368, according to annuity contract signed by everyone,

that none of the interest payments are guaranteed, that is

acknowledged the account value could go up or it could go down.

1   Read the testimony.  Don't listen to argument.  Read the

2   testimony.

3         Money is then transferred to Sovereign Nations

4   controlled by John Galanis, and we have discussed that fact

5   already.  Money is also taken by Jason Galanis straight out of

6   WAPC.  Again the evidence shows no one except Hugh Dunkerley

7   knows this.

8         Everyone thinks everything is fine except one big

9   problem, Michelle Morton's clients, they don't like the bonds,

10  just as the government argued, they don't want those bonds in

11  their accounts.  It is not because the bonds have missed any

12  payments.  They haven't at this point.  They just don't like

13  them.  They don't like the idea of having those bonds on their

14  books, so they call up to complain.

15        Lo and behold, they don't find Ms. Hughes there any

16  more.  They get Ms. Morton, and that just enrages them even

17  more and they're angry and they want the bonds removed.  So

18  they tell Ms. Morton to sell the bonds.  This is the beginning

19  of the end.  Ultimately, a year or so later, even after

20  interest payments are made, this is what unraveled Jason's

21  house of cards that the evidence shows only he built with the

22  assistance of Gary Hirst, Hugh Dunkerley, Francisco Martin.

23        What does the rest of the world see?

24        The evidence shows to an outsider the annuity is doing

25  just what it is supposed to do.  At Page 370, Tim Anderson says

1    the bond proceeds are to be invested in private equity.  516,

2    the investment management agreement states specifically the

3    investment is to be in high-risk, high-reward investments.

4            Government Exhibit 210 itself, the Exhibit A, the

5    statement of investment objectives, invest in situations that

6    may be overlooked by others, including in companies suffering

7    from market dislocation, financial distress, complexity or

8    negative market settlement.  I don't know what that means, but

9    it ain't good.

10           Including investments through the bankruptcy process.

11   How can the government stand up here and tell you the big word,

12   safe investments, when that is right in their own exhibits,

13   bankruptcy process.  That is not safe.

14           Page 372, they are to find companies selling low,

15   possibly with a big up-side, and that is risky.  Tim Anderson

16   told you that point.  This is what happens, just what happens

17   when bond proceeds are used to purchase Valor, which is then

18   combined with insurance to make one company called the Valor

19   Group.

20           1582, November 14, 2014, Valor Life is bought with

21   funds from Wealth Assurance, that went through Thorsdale and

22   then to purchase Valor.  Government Exhibit 4016 A, Valor Life

23   orders the deal, made $7 million the minute it was made.  The

24   payoff of the deal was more than $179 million.  I am not

25   telling you that.  The number one worldwide auditor is telling

you that.  The bond deal, even if you add them all up together, was 65 million.  The Valor deal alone made $179 million.  Many witnesses sat right here and told you that this one deal could have financed all the bond series, not just the first one.

As an example, Hugh Dunkerley, Page 1092, states he believed that Valor Group had enough assets to support the bonds.  In the meantime, Jason decides to offer a second bond series for $20 million.  He calls all players in involved in the first one, including, as the evidence shows, John Galanis and tells them a second series.  As the evidence shows John Galanis jumps on board just like everyone else, and the second series is sold and everyone gets their money but one, as the evidence shows, everyone except John Galanis.

In November the groundbreaking ceremony for the warehouse is held.  Even though it is quite cold, everyone turns out for the ceremony because it is a momentous occasion, the first commercial building built on the reservation in over 20 years.  The annuity continues to buy companies, not just any companies, but good companies, solid companies, companies with a large up-side.  The annuity finds Fondinvest.  Hugh Dunkerley says 1051, $5.3 million used to buy Fondinvest.  Page 1143, it was a good investment, sound, nothing improper about it, and guess whose gets his hands on it?  Jason Galanis.

To the people outside the room, the evidence shows that the annuity is doing just what it is suppose to do.  Jason

I6PJGAL8                    Summation - Mr. Touger

then decides in April 2015, because everyone is still so happy, to do one final bond series for $15 million.  Again he tells everybody green lip, everybody jumps on board.  Nobody needs any convincing.

          That bond series buys another company, BIISL was born, another good, sound investment with the bond proceeds.  Even Tim Anderson, 587, tells you he loved this investment.  Each deal that is made strikes gold.  The Teneo says you have WLCC bonds used to finance deals for a few million dollars to buy a billion dollar company with more assets and still operating.  The evidence demonstrates from the outside looking in the bond deal did just what it was supposed to do, took the proceeds and invest in risky private equity deals and each one paid off.  Not one deal went bad.

          Hugh Dunkerley, 1088, the Teneo report shows all Jason's work worked.  All the companies together were worth more than apart.  In the end, like any house of cards, this one also falls apart.  Again there is no excuse for what Jason Galanis did or what Michelle Morton did to her clients, but the evidence shows that from the outside the room looking in, the annuity was doing just what it was supposed to do, making payments back to WLCC, making interest payments to purchasers, and the evidence demonstrates that if Jason Galanis and Michelle Morton, Gary Hirst and Francisco Martin didn't corrupt the deal, it would have worked in the end.  If they hadn't

decided to use the bond proceeds as they're own little piggy

bank, the bond deal would have been successful for years to

come.

Hugh Dunkerley tells you point blank, at Page 1162,

Valor Group is still alive and kicking with David Ezekiel on

the bond.  Because Jason Galanis did what they did, we'll never

know if it would have worked.

The outsiders thought what was happening, as Hugh

Dunkerley put it, ha-ha, roll up everything together, sell it

and then everyone reaped their profits.  That is what should

have happened.  The evidence demonstrates Jason Galanis was

able to fool each and every person in this case, get each and

everyone at some time to do what he wanted without letting them

know the real reason for what was really happened.

Jason fooled two of the largest successful law firms.

He fools Mr. Raines, he fooled the most respected accounting

firms in the world, that all the deals were on the up and up.

He fools the marketing, he fooled his own cronies.  The

evidence clearly shows, and the prosecution has not produced

any evidence to the contrary, this proves the fact that Jason

could fool anyone.

Through it all, the prosecution has produced no

evidence that shows that John Galanis had any idea or

involvement with what his son was doing and he, John Galanis,

was still held in high regard to the end.  Tim Anderson was so

devoid of suspicion of John Galanis, he entertained business
ideas in 2016.  They had a good friendly relation ship -- Mr.
Raines in 1919, after the first -- continued to grow -- page
1920, not suspicious of John, even the time period after the
last bond series.

There is also no excuse for the criminal conduct that

In the end, pension funds did lose money.  They are
victims.  They shouldn't have been, but they lost a miniscule
percentage of their assets.  Yes, it is a large amount of
money, but as you heard each one say it was a miniscule
percentage of their assets.  They have lost that percentage
before and has not stopped them from meeting any of their
requirements to their pensioners.

There is also no excuse for the criminal conduct that
was perpetrated in this case and you can't let your sympathy
for the pension funds or losses for the WLCC for the money they
didn't make sway you.

During the court's large, you will hear the court
speak about conscious avoidance.  It is a legal concept a
person can't just stick their head in the ground and ignore
what is going on around them to avoid being held responsible
for his actions.  I am sure the prosecution, as they did, will
argue that John Galanis should be found guilty because even if,
as the evidence proved he had no direct knowledge of what Jason
was doing, he should have known.  Thus, he should be convicted
anyway.

1          To argue this prosecution to you, the prosecution has

2    failed to prove John Galanis had direct knowledge of his son's

3    guilt.  That doesn't matter because he should have realized all

4    that is going on around him that his son was a crook.  Again

5    where is the evidence of this?

6          If John Galanis had been a party to all those emails

7    and conversations that Jason was having with his cohorts, the

8    prosecution would have a leg to stand on here, but he wasn't.

9    If John Galanis was present for all those white board sessions

10   conducted by Jason Galanis, then certainly they would have a

11   good argument, but he wasn't, not even mentioned.

12         If the evidence demonstrate John Galanis was involved

13   first hand with Michelle Morton, Gary Hirst or Hugh Dunkerley

14   or involvement with her at all, certainly go ahead and make

15   that argument, but the evidence proves John Galanis didn't know

16   Michelle Morton and had no involvement with her companies.  If

17   the evidence demonstrated John Galanis was in on any purchase

18   of any entity, then maybe the conscious avoidance argument

19   would be plausible, but the evidence doesn't demonstrate that

20   at all.  If the evidence demonstrated John Galanis was at least

21   offered a stake in any of the involved entities, possibly the

22   prosecution could argue he attempted to extricate himself from

23   the criminal enterprise, but it doesn't.  There is no evidence

24   of that.

25         In reality, the evidence demonstrates all John

I6PJGAL8                    Summation - Mr. Touger

1    Galanis' conduct was out in the open and acceptable conduct,

2    anticipated by all the parties involved.  There is absolutely

3    no evidence at all that demonstrates John Galanis ignored one

4    fact or turned away any activity in order to protect himself.

5         It is the court's job to charge you on the law, and

6    conscious avoidance is just another aspect of the law.  Just

7    because the court is telling you about it does not mean it

8    existed.  The prosecution must still prove to you that John

9    Galanis' action fall within this definition, and the evidence

10   clearly demonstrates his actions did not.  The burden of proof

11   never shifts.  It is always on the prosecution to prove to you

12   beyond any reasonable doubt the guilt of John Galanis, and here

13   in this case they have not.

14        In the end, it comes down to one simple question:  Is

15   John Galanis guilty?  I suggest to you that the evidence, and

16   that is what is important, not my opinion, not their opinion,

17   not anybody's opinion but your own, what does the evidence tell

18   you?  And the evidence in this case tells you quite clearly why

19   others in this case, including his son, are thieves, but John

20   Galanis is not.

21        I go back to where is the beef?  Has the prosecution

22   placed before you a real hamburger?  No matter what topics or

23   how good a bun or how good the sauce, for you to convict, they

24   need to produce the beef.  The fact that Jason is his son and

25   that John got a large commission is just fixings with no beef.

1          The government makes a big deal that they represent

2     the Government of the United States.  The Government of the

3     United States is not asking you for any particular verdict.

4     They are not banging on the door of this courtroom or outside

5     protesting, saying convict anybody here.  All the Government of

6     the United States wants from you is what the Constitution

7     requires, that you go into that jury room and decide this case

8     based on the facts and the evidence, without sympathy or

9     anything else, the facts and the evidence and come to the

10    verdict that the facts and the evidence supports.

11         The facts and evidence support only one verdict in

12    this case, that John Galanis is not guilty of either charge

13    alleged in the indictment.  Thank you.

14         THE COURT:  Thank you, Mr. Touger.  Ladies and

15    gentlemen, go home for tonight and we'll see you at 1:00

16    o'clock tomorrow.  Don't discuss the case.  Have a nice

17    evening.

18         (Jury excused)

19         THE COURT:  I want to thank the Court Reporters and

20    Marshals for staying so late today.

21         MR. QUIGLEY:  There is one issue.

22         We have been down this road before, but I do think Mr.

23    Touger made a bunch of arguments he didn't have to make that I

24    think clearly crossed the line.  We can put in something in

25    writing once we get the transcript, but a couple of examples

1    discussing no one involved thinks anything illegal involved.

2    Jason has done such a great job covering his tracks.  For

3    everyone outside the room, not including John Galanis, things

4    are going on just as they're supposed to go.  From the outside

5    looking in, the annuity was doing just what it was supposed to

6    do, and then I think most clearly, most clearly Jason fooled

7    each and every person in this case.

8            If that is not saying I was duped by Jason Galanis and

9    opening the door to Gerova, I don't know what does.  That is an

10   explicit argument, and your Honor put Mr. Touger on notice

11   about this if he opened the door during closing, you would

12   allows us to introduce evidence.  He has done that, and that is

13   where we are.  He knew about it and he ran and crossed the

14   line.

15           MR. TOUGER:  Every, every line I said was introduced

16   by the evidence shown.  The Second Circuit says clearly no

17   matter what is being argued, as long as you say the evidence

18   shows, you have a right to question the government's evidence.

19   I asked ask the court to look at United States versus Roseman,

20   831, F.3d 95.

21           In Roseman, the defendant proffered with the

22   government before ultimately proceeding to trial.  During the

23   proffer sessions, the defendant stated that he knew as a result

24   of his actions, the victim would be killed.  At trial the

25   defense counsel argued that the government's evidence failed to

1    prove the defendant knew the victim would be killed.

2           The District Court ruled that defense counsel's

3    arguments were barred by the terms of the proffer agreement.

4    The Second Circuit reversed, holding that there is a material

5    difference between defense counsel making factual assertions

6    regarding his client's knowledge versus argument that the

7    government's proof was insufficient to show that his client

8    knew that the victim would be killed.

9           Similarly, defense counsel here should be free to

10   challenge the sufficiency of the government's proof.  In my

11   summation and argument, I argued that insufficient evidence was

12   presented to prove John Galanis' knowledge of the

13   misappropriation of funds.  The government will argue that any

14   argument regarding John Galanis' knowledge in this case will

15   open the door to inclusion of his prior financial fraud

16   conviction.

17          However, as long as defense counsel clearly states he

18   is challenging the sufficiency of the government's proof rather

19   than making a factual assertion, which I never made regarding

20   John Galanis' knowledge, there is no reason for this Court to

21   change its prior ruling.  The Second Circuit has acknowledged

22   this distinction is more easily stated than applied.  It has

23   consistently held defense attorneys must be allowed to attack

24   the sufficiency of the government's proof at trial.  See United

25   States versus Roberts, 660 F.3d 149 at Page 148 (2d Cir.2011),

1    concluding that defense arguments that merely challenge the

2    government's proof as opposed to making separate factual

3    assertions are allowable.  See also United States versus

4    Oluwanisola, 605 F.3d 124, at Page 132 (2d Cir. 2010), holding

5    defense counsel must be able to challenge the sufficiency of

6    the government's proof and argue that the government failed to

7    meet its burden.  United States versus Barrow, 400 F.3d 109,

8    Page 119 (2d Cir. 2005), advising district courts when

9    evaluating defense arguments to consider carefully what fact,

10   if any, actually has been implied to the jury before deciding a

11   line has been crossed.  In this case, I previous prefaced every

12   statement saying the evidence either failed to prove or did

13   prove.  I never gave an opinion.  I never said anything except

14   the evidence either failed to prove or the evidence proved.

15             THE COURT:  What is the Roseman cite again?

16             MR. TOUGER:  831 F.3d 95.

17             MR. QUIGLEY:  I am somewhat familiar with it.

18             Roseman is a case about interpreting a proffer

19   agreeing agreement and what triggers the opening the door to

20   proffer agreement.  This is different.  Here your Honor made a

21   very clear multiple times evidentiary ruling about what the

22   contours of Gerova would be.  You put Mr. Touger on notice that

23   if he crossed that line in making argument, that that would

24   open the door to it even if it occurred during closing, and

25   here he said the evidence clearly shows Jason Galanis is lying

1    to everyone.  That opened the door.  This is not a case about

2    interpreting a proffer agreement.  This is a case about, a

3    situation where the court, in keeping out what was probative

4    evidence, put some limits on Mr. Touger's ability to argue.

5    He ran roughshod over those limits.  It wasn't any clearer than

6    saying the evidence clearly shows Jason Galanis is lying to

7    everyone.

8         MR. TOUGER:  Your Honor, I am more acquainted with

9    this case than Mr. Quigley because I tried this case.  The

10   proffer statements from Mr. Roseman was that he knew that

11   the -- he was charged with assault with intent to murder.  His

12   proffer statements was I knew when I hired these guys, they

13   were going to kill the individual who ended up dying.

14        Before the trial, Judge Kaplan gave me the same

15   warnings that you gave me, and we went over the same thing,

16   that if you open the door by saying that your client didn't

17   know or that there is nothing in your opinion your client

18   didn't know or anything like that, you are opening the door for

19   those proffer statements to go through.

20        I did the same thing in that summation before Judge

21   Kaplan I did here, I prevaced everything with the evidence

22   proving or disproving.  I never said my opinion or a fact that

23   actually happened.  I referenced everything to the evidence

24   either showing or not showing.  I have a perfect right to do

25   that.  The case law supports that.  I stand by that law.

1              That is exactly the same thing.  It was 404 (b)

2    evidence.  In the Roseman case, it is 404 (b) evidence.  Here,

3    and there is no distinction, I never once said the fact is

4    Jason Galanis fooled everybody.  I said the evidence shows that

5    Jason Galanis fooled everybody.

6              MR. QUIGLEY:  He did say that.  He said Jason fooled

7    each and every person in this case.  Your Honor was very clear

8    on May 16th in terms of what you think will open the door.  I

9    think as well, if you were to argue that John Galanis didn't

10   know Jason Galanis had a history of engaging in fraud, an

11   argument he was duped by him in the context of this conspiracy,

12   that will open the door.  That has been your Honor's ruling for

13   the last 16 --

14             MR. TOUGER:  I said the evidence shows that has

15   occurred, and that is perfectly acceptable.

16             THE COURT:  Clearly you violated the spirit of my

17   ruling.  I will look at the cases you cited and make a

18   decision.  I don't know if any other counsel want to be heard.

19             MR. TOUGER:  Just so if the court does rule that the

20   door was opened, and I don't see how the court could once it

21   reads its decision, I will be putting on a major defense case

22   at that point in time, including calling Jason Galanis from

23   across the country to here, including calling Steven Haynes and

24   many other witnesses to disprove what they're alleging.

25             THE COURT:  To disprove what he admitted in court, so

1   you're saying he lied?

2            MR. TOUGER:  He had no knowledge of what Jason Galanis

3   was doing.

4            MS. MERMELSTEIN:  It puts the government in a grossly

5   unfair position.  Your Honor ruled 100 percent clearly.  We

6   raised this and again and again.  There is no question he just

7   did it on purpose.  He came prepped with citations to fight

8   back against this.

9            I understand the reluctance to say that he has opened

10  the door, but there are rules, and what he has done has now

11  given the jury a false impression of the situation.  He has

12  suggested two things that are grossly inconsistent with what is

13  actually true:

14           One, he suggested that why didn't John Galanis talk to

15  anyone else?  Everyone knew he was a serial felon, that is why.

16  The government hasn't been able to say that.  Now he is saying

17  I was duped by Jason.  He fooled everyone.  You do not get to

18  do that by saying the evidence shows.

19           I agree there are very specific rules about triggering

20  a proffer agreement, and you can say the government didn't

21  prove it however you want and that is fair game.  That is not

22  what happened.  What he did was he intentionally misled the

23  jury and put the government in the spot we are in now.

24           Your Honor, the Gerova evidence should have come in

25  from the beginning.  This so grossly open the door.  There can

1   be no question this is going to give the jury an impression

2   that is so misleading, it prejudices the government.  It is not

3   acceptable Mr. Touger knew what he was doing and he made a

4   choice.  There have to be rules.  There are otherwise

5   absolutely no -- the Jason Sugarman has done all these emails?

6   Where is he?  Allusions are in violation of your Honor's rule.

7   Any reasonable doubt is a misstatement of the law?  We stayed

8   in our seats.  We are trying to honor the allowance.  That was

9   outrageous.  It was a violation of your Honor's rule and that

10  is it.  He has crossed the line.  Your Honor said if he crossed

11  the line, it was coming in, and it has to come in.

12          MR. TOUGER:  The rules are I can't argue that is a

13  fact?  I didn't.

14          MS. MERMELSTEIN:  You said this.  This is a quote,

15  Jason fooled each and every person in this case.

16          MR. TOUGER:  I said right before that the evidence

17  shows.

18          MS. MERMELSTEIN:  You can't say the evidence shows and

19  said you didn't --

20          (Multiple voices)

21          THE COURT:  There is no doubt he knew exactly what he

22  was doing.  It clearly violates the spirit of my ruling, you

23  know that, and I will look at the law and see if I agree with

24  you.  I don't know that there is any basis if I were to say

25  that part of his plea allocution comes in, you then get to open

1    the door and put on whoever you want at that stage.  You

2    knowingly made this decision.  You didn't front it with me.  We

3    didn't talk about it at all.  I made very clear that I may

4    reopen the evidence after summations, and you made a decision.

5           MR. TOUGER:  I made a decision based on the law as it

6    is.  The court will agree with me when it reads the law.  If

7    you will allow in evidence that John Galanis should have known

8    because of his conviction, then I get to present evidence from

9    the people who actually were involved that John Galanis didn't

10   know.

11          THE COURT:  Mr. Schwartz.

12          MR. SCHWARTZ:  Mostly because I was sitting for a very

13   long time.  I have no view on this.  I would like to read the

14   transcript, except to say I will say what I said from the very

15   beginning when the government first wanted to introduce this

16   evidence, which is appropriate or not in a trial, John Galanis

17   I don't think is every appropriate in a joint trial Mr. Archer

18   and Mr. Cooney.  For that reason alone, no matter what has

19   happened here at this stage in the case, it counsels in favor

20   of admitting that evidence.

21          I was rising on a different point.

22          THE COURT:  Look, there has already been an

23   instruction with respect to Mr. Cooney and Mr. Archer that they

24   were not targets of that investigation, they didn't know about

25   it until his arrest.  I think the jury has already been

1   instructed to that effect.

2           MR. SCHWARTZ:  Fair enough.  I would have tried this

3   case differently if I were allowed to go to Gerova, as I said

4   in my motions.  I was rising on a different thing, that I

5   thought I heard Mr. Touger say, I thought, in his discussion of

6   sort of the difference between John Galanis and a lot of other

7   people, one of the things he said was everyone got Code Rebel

8   shares and John Galanis did not.

9           If I heard that right:  One, I don't think there is

10  any factual predicate for that in the record; and, two, I would

11  want to be certain that the government wouldn't feel compelled

12  to respond to that in a way that touched the issue that we have

13  spoken about at length with regard to Mr. Archer and Mr.

14  Cooney.

15          THE COURT:  I assume the government is not going to

16  argue anything with respect to Mr. Cooney or Mr. Archer and

17  Code Rebel shares?

18          MS. MERMELSTEIN:  Yes.  Look, I find myself agreeing

19  with Mr. Schwartz, which has been an unusual occurrence.  I

20  just cannot express in strong enough terms the frustration that

21  there are no rules and that your Honor's rulings are just

22  openly flouted.

23          THE COURT:  First of all, that is not true.  I mean I

24  made a ruling.  I have not ruled on this yet.  As I said, I do

25  think he has violated the spirit of the rule.  What I do about

1    it is yet to be seen.  I am going to read the cases he cited.

2              MS. MERMELSTEIN:  We have cited exactly what was said

3    about Code Rebel.  What he did is a violation of that ruling,

4    too.  We had an agreement that wasn't going to happen, and for

5    him to say everyone else but me got them is also a violation of

6    the rules.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6P7GAL9

1          MR. SCHWARTZ:  There wasn't even evidence to support

2     the statement.

3          THE COURT:  No, I know that's true.  I think the

4     question is what do I do about it.  You didn't object; I

5     understand why.  I didn't say anything either.

6          MS. MERMELSTEIN:  We are not treating that as a door

7     opening with respect to Code Rebel.  It's not going to change

8     with their muddle is; we're just going to leave it.

9          THE COURT:  Unless, you know, Mr. Cooney or Mr. Archer

10    ask me to do anything, I think that's right.

11         MR. SCHWARTZ:  No, that's fine.  I just wanted to

12    confirm that.  I'm going to try not to say the words Code Rebel

13    at all tomorrow.

14         THE COURT:  No, I think that's a good idea.  OK.  All

15    right, I'm going to see you at noon.  Thank you.

16              (Trial adjourned to June 26, 2018 at 12:00 p.m.)

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    SETH FLIEGLER

4    Direct By Mr. Schwartz . . . . . . . . . . .3542

5    Cross By Ms. Mermelstein . . . . . . . . . .3568

6    Redirect By Mr. Schwartz . . . . . . . . . .3577

7                         DEFENDANT EXHIBITS

8    Exhibit No.                                Received

9     9003    . . . . . . . . . . . . . . . . . .3544

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25