UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                               :

UNITED STATES OF AMERICA

                               :

          - v. -

                               :     S3 16 Cr. 371 (RA)

GARY HIRST,

                               :

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

ROBERT KHUZAMI
Attorney for the United States,
Acting Under Authority Conferred by 28
U.S.C. § 515

Rebecca Mermelstein
Brendan F. Quigley
Negar Tekeei
Assistant United States Attorneys

     - Of Counsel -

## <u>Table of Contents</u>

BACKGROUND ............................................................................................................. 1

DISCUSSION ............................................................................................................... 4

   I.   The Applicable Guidelines Range is 151 to 188 Months' Imprisonment ........................... 4

     A.  The Loss Amount is Between 25 and 65 Million Dollars................................................. 5

     B.  The Enhancement for Ten or More Victims Applies ....................................................... 5

     C.  The Investment Adviser Enhancement Applies .............................................................. 6

     D.  A Minor Role Reduction is Not Appropriate ................................................................. 9

  II.  A Sentence Within the Guidelines Range is Appropriate................................................. 10

     A.  A Guidelines Sentence Would Recognize the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Ensure Adequate General Deterrence .... ……………………………………………………………………………………11

     B.  A Guidelines Sentence Would Also Be Appropriate in Light of the History and Characteristics of the Defendant ........................................................................................ 13

     C.  A Guidelines Sentence Would Not Cause an Unwarranted Sentencing Disparity ........ 16

  III.   Restitution and Forfeiture................................................................................................. 18

CONCLUSION................................................................................................................ 19

The Government respectfully submits this memorandum in connection with the sentencing of defendant Gary Hirst, which is scheduled for Friday, September 7, 2018, at 3:30 p.m.   For the reasons that follow, the Government submits that a sentence within the 151 to 188 months Guidelines range is appropriate, with 60 months of that sentence to be served consecutively to the sentence that Judge Castel imposed on Hirst in 15 Cr. 643 (the "Gerova" case).

## **BACKGROUND**

The Government understands that the Court is familiar with the facts of this matter, given that it presided over a lengthy trial of Hirst's co-defendants and extensive pre-trial litigation by Hirst before his last-minute guilty plea.   Nonetheless, in light of Hirst's argument that his "role in the offense was limited in nature," Hirst Sent. Submission at 3, the Government provides an overview of Hirst's critical participation in the Wakpamni bond scheme.

First, Hirst set up the annuity provider, Wealth Assurance Private Client ("WAPCC"), the conspirators' vehicle for misappropriating tens of millions of dollars of bond proceeds.   On July 7, 2014, Hirst incorporated WAPCC in Florida.   (Trial Tr. 1011-12 (Dunkerley testimony); GX 513 (certificate of incorporation)).   On August 6, 2014, just weeks before the first bond issuance, Hirst opened the WAPCC bank account into which all of the bond proceeds—from each of the issuances—were to be deposited. (PSR ¶ 23).   Hirst and Hugh Dunkerley were the only two defendants who had signatory authority on the WAPCC account.   (GX 511).

Second, and nearly simultaneously, Hirst became associated with Hughes Capital Management, the investment adviser that managed hundreds of millions of dollars for various pension funds.   More specifically, in early August 2014, when Michelle Morton, with the financial backing of her co-defendants, finalized her acquisition of Hughes, Hirst and Dunkerley

were at the closing to provide guidance and support.   (Trial Tr. 946-47).   Following the closing,

Hirst remained at Hughes for several days and analyzed the portfolios of Hughes clients.   (*See*

Trial Tr. at 2039).   Over the next few weeks, Hirst played a crucial role in investing $27 million

of Hughes' client funds in the first Wakpamni bond issuance. (PSR ¶¶ 17, 29).   Hirst invested

these clients' funds without disclosing the numerous conflicts of interest surrounding the bond

transaction, which included his own role at both Hughes and WAPCC, and without disclosing

that the bonds were outside the investment parameters of many of the clients.

Third, after the first bond issuance, Hirst did not simply fade into the background.

Instead, he provided advice on the appropriate purchase price for Atlantic Asset Management,

GX 825, the investment adviser the conspirators took over in April 2014 and promptly used to

purchase the entirety of the final Wakpamni bond issuance.   And following the Atlantic

purchase and the issuance of the final set of bonds, Hirst wired illicit proceeds out of the

WAPCC account to fund the purchase of Fondinvest, a European fund of funds, and to pay off

American Express charges by Jason Galanis.   (*See* GX 1583; *see also* GX 1587 (5/13/15 email

from Hirst directing $2.4 million wire out of WAPCC account to Burnham)).

Hirst also played a key role in the misappropriation of proceeds to fund the initial public

offering ("IPO") of Code Rebel.   Specifically, Hirst directed Francisco Martin to set up two off-

shore entities, Seymour Capital and Thunder Valley, which received approximately $5 million of

the final bond proceeds from WAPCC.   (*See* Trial Tr. 2161; GX 512).   On May 19, 2015, the

Seymour Capital and Thunder Valley accounts controlled by Hirst, but opened in the names of

Martin and John Greenwood, *see* Trial Tr. 2161-62, purchased 867,000 shares of Code Rebel—

approximately 87% of the stock offered in the IPO.   As such, Hirst's argument that "there is no

2

evidence that he knew funds from the WAPCC were used to purchase Code Rebel stock," Hirst Sentencing Submission fn. 2, borders on the frivolous, since Hirst controlled both the WAPCC account and the Seymour Capital and Thunder Valley accounts used to purchase Code Rebel stock.   (*See also, e.g.*, GX 1436 (email from Hirst to Andrew Godfrey attaching information for wire from WAPCC to Seymour Capital)).   Defendants Devon Archer, Bevan Cooney, Hirst, and family members and spouses of Archer and Cooney were among the purchasers of the remaining 13% of the shares offered in the IPO.   As a result, defendants Jason Galanis, Archer, Cooney and Hirst controlled virtually the entirety of Code Rebel's stock.   The stock price quickly moved from approximately $5 to a high of more than $40, making their shares, including the shares purchased with the proceeds of the final bond issuance, worth millions of dollars for a period of time.

Not content to commit these crimes, Hirst also attempted to cover them up.   Hirst was involved in making purported interested payments, in a Ponzi-like fashion, on the first set of WLCC bonds.   Specifically, funds from the Hirst-controlled accounts for Seymour Capital and Thunder Valley were sent to the WAPCC account and then used to pay interest on the first set of bond issuances.   (*See* PSR ¶ 41).   This was a critical step in attempting to keep the vast misappropriation of moneys by the conspirators a secret.   But Hirst went even farther in attempting to hide the charged crimes, ultimately participating in the creation of back-dated documents relating to Calvert Capital.   (*See* Trial Tr. 1228 (Dunkerley testimony); Trial Tr. 1290 (Dunkerley testimony acknowledging that Hirst was involved in altering pdf files)). Calvert Capital documents were later submitted to the SEC in an attempt obscure the fact that millions of dollars of bond proceeds were misappropriated, including by being recycled.   (*See,*

*e.g.*, Trial Tr. 1057-60 (Dunkerley testimony); GX 1271 (Calvert document defendant Cooney submitted to SEC)).

In short, far from being limited, Hirst's role in the charged scheme was extensive in both its duration and its scope.

## DISCUSSION

In light of the seriousness of the offense, the need to promote respect for the law, and the requirement of just punishment, the Government respectfully submits that a sentence within the 151 to 188 months Guidelines range is appropriate.

## I.   **The Applicable Guidelines Range is 151 to 188 Months' Imprisonment**

The Government and the Probation Department agree that the Guidelines range is 151 to 188 months' imprisonment, calculated as follows:

- The base offense level is seven, pursuant to U.S.S.G. § 2B1.1(a)(1), because the offense of conviction has a statutory maximum sentence of more than 20 years.

- Because the loss was greater than $25,000,000 but less than $65,000,000, 22 levels are added pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

- Because the offense involved ten or more victims, two levels are added pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

- Because the offense involved a violation of the securities laws, and, at the time of the offense, the defendant was a person associated with an investment adviser, four levels are added pursuant to U.S.S.G. § 2B1.1(b)(19)(A)(iii).

- Two points are subtracted for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).

Accordingly, the total offense level is 33.   Hirst has three criminal history points and is thus in Criminal History Category II, as a result of his conviction in the Gerova case.

Accordingly, the Guidelines range is 151 to 188 months imprisonment.

In the PSR, Hirst disputes a number of aspects of the Guidelines calculation.   Below, the

4

Government addresses those challenges.

### A.  The Loss Amount is Between 25 and 65 Million Dollars

Hirst contends that the loss amount is less than $25,000,000, because of interest payments made to the WLCC.   (PSR at page 29).   The Court should reject this argument.

To begin with, in the first bond issuance, with which Hirst was directly involved, the pension fund victims invested over $27 million.   (*See* PSR ¶ 29(a)).   None of these victims have been paid back their principal, and thus, that alone makes the loss greater than $25 million, regardless of any payments to the WLCC.

In addition, as discussed above, Hirst was directly involved in misappropriating the final bond issuance, which was worth $16.2 million.   Among other things, Hirst was involved in sending funds to Newline Trading, to fund the purchase of Fondinvest, and to Thunder Valley and Seymour Capital, to buy stock in the Code Rebel IPO.

Again, none of the money issued in the third bond issuance has been repaid to the Omaha Public Schools Employee Retirement System ("OSERS"), the pension fund whose money was invested in that bond issuance.

As such, the loss amount is between 25 and 65 million dollars, and this amount was directly foreseeable to Hirst, given his involvement in misappropriating it.

### B.  The Enhancement for Ten or More Victims Applies

The ten or more victims enhancement is also appropriate.   Hirst appears to claim that the enhancement does not apply because the WLCC was not a reasonably foreseeable victim to him and he was not aware of the pension fund on whose behalf the final set of bonds were purchased. (PSR at page 30).

The Court should reject Hirst's argument.   Hirst acknowledges that he is responsible for at least nine victims—the nine pension funds whose funds Hirst invested, without their knowledge, in the first bond issuance.   Hirst oddly claims that it was not foreseeable to him that the WLCC was also a victim of the scheme.   However, even if Hirst was not directly involved in making misrepresentations to the WLCC, it was clearly reasonable foreseeable to him that such misrepresentations were made by his co-conspirators.   It defies logic to think that the WLCC, had they been fully informed, would sign up to issue $60 million in bonds knowing that those bond proceeds would be misappropriated.   Further, Hirst was clearly familiar with the terms and conditions of the WLCC bonds.   (*See. e.g.*, GX 811 (8/20/14 email from Hirst "attach[ing an] excerpt from the bonds" relating to the accrual of interest)).

Moreover, OSERS, the pension fund in the final bond issuance, was also a reasonably foreseeable victim for Hirst.   Indeed, as noted above, Hirst was directly involved in misappropriating OSERS' investment.

As such, all 11 victims of the scheme were reasonably foreseeable to Hirst.

### C.  The Investment Adviser Enhancement Applies

The four-point investment adviser enhancement in UnS.S.G. §2B1.1(b)(19)(A)(iii) also applies.

First, the enhancement in U.S.S.G § 2B1.1(b)(19) applies to "a person associated with an investment adviser."   Here, there is no dispute that Hughes was a registered investment adviser during the relevant time period.   All "employee[s]" of an investment adviser are considered to be "person[s] associated with an investment adviser."   *See* U.S.S.G. § 2B1.1, app. note 15 (defining "person associated with an investment adviser" by reference to the definition in 15 U.S.C. § 80b-

2(a)(17)); 15 U.S.C. § 80b-2(a)(17) (defining "person associated with an investment adviser" as "any person directly or indirectly controlling or controlled by such investment adviser, including any employee . . . .").

Hirst appears to contend that "clerical or ministerial" staff are exempted from the definition of "person[s] associated with an investment adviser."   However, the statutory language reads, in relevant part,

> the term "person associated with an investment adviser" means . . . any person directly or indirectly controlling or controlled by such investment adviser, including any employee of such investment adviser, *except that for the purposes of section 80b-3 of this title (other than subsection (f) thereof), persons associated with an investment adviser whose functions are clerical or ministerial shall not be included in the meaning of such term.*

15 U.S.C. § 80-2(a)(17) (emphasis added).   Thus, the exemption for "clerical or ministerial" employees is only for purposes of 15 U.S.C.§ 80b-3, which concerns requirements related to the registration of investment advisers.

However, the "clerical or ministerial" carve-out does not apply to the investment adviser Guidelines enhancement or to the anti-fraud provisions under which Hirst was convicted.   In *United States* v. *Emmenegger*, 329 F. Supp. 2d 416, 420-21 (S.D.N.Y. 2004), Judge Lynch, in ruling on the applicability of an analogous Guidelines enhancement and statutory definition for "a person associated with a broker or dealer," held that statutory definition "includes clerical or ministerial employees, except with regard to one particular aspect of the securities laws, which is not implicated here."   *See id.* ("The effect of the 'clerical or ministerial' exception is therefore simply to exempt employees in that category from certain requirements of § 15(b) of the Securities Exchange Act of 1934, which deal, among other things, with the registration of broker-dealers and the qualifications required of associated persons.").   Accordingly, Judge

Lynch held that the "clerical or ministerial" carve-out was not a defense to the applicability of the Guidelines enhancement, because "the crime did not involve a violation of § 15(b), but of § 10(b) of the Act and Rule 10b–5 of the corresponding federal regulations," *i.e.,* the statutes under which Hirst stands convicted.

Second, even if the enhancement could not apply to clerical or ministerial employees, Hirst's role at Hughes was not merely clerical or ministerial.   Hirst was employed as a Hughes employee from August 12 to 15, 2014 and was held out as the Chief Investment Officer.   During this time, Hirst engaged in discussions with other Hughes employees about "the guidelines for portfolios, what the portfolios could hold, their restrictions, [and] the parameters about what we could invest in"—clearly topics that are not simply clerical or ministerial.   (Tr. 2039).   And while Hirst became a consultant after that, he remained "associated" with Hughes in a substantive way.   For example, Hirst signed the trade blotter and trade tickets for the first Wakpamni bond issuance.   (GX 813, 2616, 2617).   These tasks were not simply clerical or ministerial either.   To the contrary, they were necessary to complete the purchase of the bonds and were binding on Hughes.   (Trial Tr. 2045).   Notably, Hughes' portfolio managers—who were clearly not mere clerical or ministerial employees—would have signed the trade tickets in the ordinary course of business but refused to do so for the Wakpamni bonds.   (*See* Trial Tr. 2046).

In short, Hirst was a person "associated with" Hughes, a registered investment adviser, during the time when Hughes, in a transaction in which Hirst was directly and substantively involved, bought $27 million of Wakpamni bonds on behalf of unwitting clients.   Accordingly, the investment adviser enhancement is applicable here.

### D.  A Minor Role Reduction is Not Appropriate

Finally, the Court should reject Hirst's argument that a minor-role reduction is warranted.

#### 1.  Applicable Law

A mitigating role adjustment under Section 3B1.2 is appropriate only when a defendant is "substantially less culpable than the average participant in the criminal activity."   U.S.S.G. § 3B1.2, app. note 3(A).   In considering the applicability of a mitigating role adjustment, the Sentencing Commission has instructed courts to "consider the following non-exhaustive list of factors:

> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)     the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)    the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)     the degree to which the defendant stood to benefit from the criminal activity."

U.S.S.G. § 3B1.2, app. note 3(C).

#### 2.  Discussion

Hirst is not entitled to a minor-role adjustment because he is not "substantially less culpable than the average participant in the criminal activity," *i.e.*, the Wakpamni bond fraud.

Hirst clearly understood the "scope and structure of the criminal activity," having created WAPCC, executed the purchases of the first set of bonds while working at Hughes, and set up Thunder Valley and Seymour Capital, entities used to misappropriate the final set of bond

9

issuances and then used to pay interest on the first set of bonds.   Moreover, in setting up entities such as WAPCC, Thunder Valley, and Seymour Capital, Hirst also certainly played a role in "organizing the criminal activity."   And, in deciding where to place the first set of Wakpamni bonds, Hirst exercised a degree of "decision-making authority."   While it is true that Hirst acted at the direction of Jason Galanis and his personal financial gain was significantly less than Jason Galanis's, the same could be said for most of his co-conspirators.   Thus, these factors do not make him "substantially less culpable than the average participant in the criminal activity."   As such, a minor-role reduction is not appropriate.

***

Accordingly, the applicable Guidelines range is 151 to 188 months' imprisonment.

## II.   A Sentence Within the Guidelines Range is Appropriate

A sentence within the 151 to 188 months' Guidelines range is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

The Court should reject out-of-hand Hirst's argument that his sentence in this case be fully concurrent to his sentence in the Gerova case.   Such a sentence would be tantamount to a free pass for serial fraud and would fail to recognize the seriousness of the offense here.   It would also fail to recognize the differences between this case and the Gerova case, including that three years passed between the Gerova conduct and the Wakpamni scheme, during which Hirst had ample opportunity to reflect on this association with Jason Galanis.   And it would create an unwarranted sentencing disparity, given that 60 months of Jason Galanis's sentence in this case are running consecutive to his Gerova sentence.

The Probation Department's recommendation of 90 months' imprisonment, with 30 months' consecutive to the Gerova case, appears largely based on a need to avoid a sentencing

10

disparity with Galanis and, to a lesser extent, on Hirst's "age and mental health."   (PSR at pages 34-35).   As discussed more below, even with a Guidelines sentence, Hirst's sentence would be significantly lower than Galanis's.   Further, Hirst's current apparent mental-health issues do not lessen his culpability for the offense, and the Bureau of Prisons is capable of treating Hirst's issues.

### A. A Guidelines Sentence Would Recognize the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Ensure Adequate General Deterrence

A Guidelines sentence would be appropriate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and to provide general deterrence, 18 U.S.C. § 3553(a)(2)(B).

### 1.   Hirst Ranks Among the Most Culpable of Fraud Defendants

Simply put, this was a massive fraud.   To start with, the loss amount of $43 million plainly puts Hirst and his co-conspirators among the most culpable of fraud defendants nationwide.   Sentencing Commission statistics for 2017 show only 1.3 percent of defendants sentenced last year pursuant to U.S.S.G. § 2B1.1 had a loss figure of greater than $20,000,000. *See* U.S. Sentencing Comm., *Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2017*, at 11, *available at* https://www.ussc.gov/sites/default/files/pdf/ research-and-publications/federal-sentencing-statistics/guideline-application frequencies /2017/Use_of_SOC_Guideline_Based.pdf.   Hirst himself contributed to that statistic, since he was sentenced for a loss exceeding 25 million in the separate Gerova fraud in 2017.   (*See* PSR ¶¶ 63-64).

Further, the Wakpamni scheme was designed to be highly complex in an effort to fool investors and law enforcement.   In both the late summer of 2014 and the spring of 2015, the

11

conspirators nearly simultaneously (i) executed the purchase of an investment adviser firm (Hughes in 2014 and Atlantic in 2015) and (ii) executed a bond issuance, the entirety of which they placed with clients of that newly acquired investment adviser.  *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

Hirst played a key role in this scheme.   Not only was he directly involved in placing the first tranche of bonds with Hughes' clients, but he also created or controlled numerous entities used to carry out the scheme, including WAPCC, Seymour Capital, and Thunder Valley.   The amount of the loss, the scope of the fraud, and Hirst's involvement in numerous aspects of the fraud show that a Guidelines sentence is necessary to reflect the seriousness of the offense, promote respect from the law, and deter others from engaging in similar conduct in the future.

## 2.  In Light of the Seriousness of the Offense, at Least 60 Months Should Be Served Consecutive to the Gerova Sentence

Relatedly, the Court should reject Hirst's suggestion that his sentence in this case run fully concurrent to the Gerova sentence.   At least 60 months' of Hirst's sentence in this case should be served consecutively to the sentence imposed by Judge Castel.

Hirst's criminal conduct with respect to Gerova and with respect to Wakpamni were unrelated.   Gerova involved the theft of shares from a publicly traded company, followed by a market manipulation.   The present crime involves the fraudulent issuance of bonds, the misappropriation of investment advisor client funds to purchase the bonds, and the outright theft of the bond proceeds.

12

Nor did the two crimes overlap in time.   The Gerova fraud occurred between 2009 and 2011.   (PSR ¶ 64).   Questions had been raised about Gerova, and about Jason Galanis's background, as early as January 2011.   *See, e.g.*, Jean Eaglesham, *Gray Areas In Jobs After An SEC Ban*, The Wall St. Journal, Jan. 28, 2011, at C1 (discussing Galanis's background, his involvement with Gerova, and a short-seller's report that Gerova was "likely fraudulent").   The Wakpamni fraud did not begin until approximately 2014.   Hirst thus had years to reflect on his involvement in the Gerova fraud, and to decide on a different path.   Instead, he moved from defrauding the shareholders of a publicly traded company to defrauding one of the poorest Native American tribes in the country, as well as numerous pension funds.

In short, Hirst's involvement in the Wakpamni fraud is a standalone crime and necessitates a standalone sentence.   Hirst's suggestion that *no* additional punishment be imposed on him should be rejected out of hand.   Instead, the Court should require 60 months' of Hirst's sentence—the same amount Jason Galanis is serving consecutive to his sentence for the Gerova fraud—to be served consecutive to Hirst's Gerova sentence.

### B. A Guidelines Sentence Would Also Be Appropriate in Light of the History and Characteristics of the Defendant

A Guidelines sentence is also appropriate in light of the history and characteristics of the defendant.

#### 1. Hirst is a Repeat Offender

First, Hirst is a repeat offender, given his conviction in the Gerova matter.   (PSR ¶¶ 63-64).   Further, as discussed above, although Hirst's arrests and prosecutions in this matter and the Gerova case overlapped, the offense conduct did not.   Not only did Hirst recidivate when he became involved with the Wakpamni fraud, but he had ample time, before the Wakpamni fraud,

13

to reflect on his association with Jason Galanis and his involvement in fraudulently activity.

Second, Hirst is a highly sophisticated individual, and he undoubtedly used that sophistication and business acumen to assist in this fraud.   Hirst has an undergraduate degree in computer science and mathematics, as well as a law degree and a medical doctorate.   (PSR ¶¶ 94, 96, 97).   Moreover, before becoming involved with Jason Galanis, Hirst had decades of experience in the financial-services industry.   For 15 years, Hirst was the "sole owner" of an investment management and advisory company that managed over 600 million dollars in assets on behalf of a variety of entities, including pension plans.   (PSR ¶ 107).   Before that, Hirst spent another 15 years as an investment manager for an entity that managed "allocation and trading for all investment portfolios of the Hirst family and its associates."   (PSR ¶ 108).   As Judge Castel observed in sentencing Hirst in the Gerova Matter, even if Jason Galanis manipulated Hirst, "Hirst was smart enough to know better and strong enough to resist.   But he didn't."   (Gerova Sent. Tr. at 72).

### 2.  The Court Should Reject Hirst's Arguments Regarding His Lack of "Personal[] Financial Gain"

The Court should also reject Hirst's argument that he "did not personally financially gain from his conduct in either the present case or his prior conviction."   (Hirst Submission at 4).   In both this case and the Gerova matter, Hirst received millions of dollars, which he used to further his own business interests.

To begin with, Hirst appears to acknowledge he received $1.3 million dollars in Wakpamni bond proceeds from Jason Galanis but contends it is somehow mitigating because he used the money on another company he ran, Insurance Company of the Americas.   (*See id.*).   But regardless of *how* Hirst spent the money, the fact remains he made received over a million

dollars in bond proceeds, which he used to further his own interests.

Second, Hirst was paid for the four days he spent as Chief Investment Officer at Hughes and for his role as a consultant.   (*See* GX 2618).

Finally, with respect to Gerova, Judge Castel found that Hirst "accepted 2.62 million, paid to an entity he controlled, as compensation for his role in the crimes."   (Gerova Sent. Tr. at 72).   While the Court is not being asked to sentence Hirst again for his role in the Gerova fraud, Judge Castel's finding clearly puts to lie Hirst's assertion that he did not gain from his prior fraud as well.

In short, Hirst's involvement in this scheme and the Gerova fraud earned Hirst millions of dollars, and thus Hirst clearly personally and directly benefitted from his crimes.   His failure to own up to his financial gains—even in the present case, where he pled guilty and did not go to trial—is further indicative of the need for a significant consecutive custodial sentence.

### 3.  Hirst's Mental Condition Does Not Warrant a Significant Variance

Further, Hirst's mental-health issues do not warrant a downward variance.   Hirst's actions during the time of the offense conduct—which included discussing the investment parameters for Hughes' clients, Trial Tr. 2039; executing trades, Trial Tr. 2045-46; calculating the purchase price of Atlantic, GX 825; setting up multiple entities; and coordinating aspects of the Code Rebel IPO—show Hirst was certainly capable of "exercising independent judgment" and "process[ing] information"[1] during the time of the fraud.   Indeed, given the breadth of Hirst's involvement, it is clear that he drew on his talents and many years of experience in the

---

[1] ████████████████████████████████████████████████████

financial services industry to carry out the scheme.   And, of course, Hirst admitted in his plea allocution in his case that "he knew what he was doing was wrong."   (Plea Tr. 27).   Thus, Hirst's purported ███████████ does not lessen his culpability.

Nor are Hirst's current medical conditions significantly mitigating.   Hirst has been undergoing medical treatment during this period of incarceration on the Gerova matter and, at his plea in this case, commented that, "if anything," the medications he takes "improve" his ability to think, remember, and understand.   (Plea Tr. at 7).   Defense counsel's April 4, 2018 request for an adjournment of the trial date indicated Hirst was actively participating in his defense and actively attempting to gain access to discovery at the MCC.   (*See generally* Dkt. No. 376).   In short, Hirst has not demonstrated that his mental condition either at the time of the offense conduct or at the current time justifies a significant variance.

### C.  A Guidelines Sentence Would Not Cause an Unwarranted Sentencing Disparity

A sentence within the 151 to 188 Guidelines' range would not cause a disparity "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

First, as discussed above, given the loss amount, his broad involvement in the scheme, and his criminal history, Hirst is among the most culpable of fraud defendants.

Second, with respect to defendants in this case, only Jason Galanis has been sentenced. In that matter, this Court essentially imposed a 188-month sentence, at the low end of the applicable 188 to 235 month Guidelines range.   (*See* Jason Galanis Sent. Tr. at 33).[2]

---

[2] Ultimately, the Court imposed a 173-month sentence, with 60 months to be served consecutive to the Gerova conviction, to account for the 15 months Jason Galanis had spent in custody on the

The Probation Department's recommendation for a 90-month sentence for Hirst appears largely based on its desire to avoid an unwarranted sentencing disparity with Galanis and particularly situation "resulting in a release date [for Hirst] that exceeds [Jason] Galanis."   (PSR at 34-35).   With all due respect to Probation, it is the 90-month sentence recommended in the PSR—*i.e.,* essentially half the sentence that Jason Galanis received—that would cause an unwarranted disparity.   Like Jason Galanis, Hirst participated both the Gerova and Wakpamni frauds, he was fully aware of the full scope of the Wakpamni fraud, and he played multiple roles in helping the Wakpamni fraud succeed.

Further, whatever else may be said about Jason Galanis, the fact remains that, in both the Gerova matter and in this case, Jason Galanis pled guilty.   Indeed, given Galanis's relatively early plea in this case, it has been over a year since the Court sentenced him.   In contrast, Hirst proceeded to trial in Gerova.   And here, he pled guilty just days before jury selection—after receiving the Government's exhibits, after receiving the Government's 3500 material, and after a three-week adjournment of the trial date.

And Probation's concerns notwithstanding, it is not clear how Hirst's release date could be after Jason Galanis's, even if Hirst received a Guidelines sentence.   Hirst's current release date is in April 2023, and Galanis's current projected release date is in April 2030, over seven years later.[3]

In short, a Guidelines sentence would fully account for the differences in Hirst and Jason Galanis's role in the offense, while at the same time recognizing the similarities between Hirst

_____

Gerova case, for which he would not receive credit on his Wakpamni sentence.

[3] Further, the statutory language of § 3553(a)(6) speaks of "sentence disparities," not "release date disparities."   As Probation acknowledges, Jason Galanis went into custody before Hirst.

and Galanis's criminal histories, the scope of Hirst's own involvement in the Wakpamni fraud, and the seriousness of the offense.

In short, a Guidelines sentence would not cause an unwarranted sentencing disparity

*** 

Accordingly, a Guidelines sentence is appropriate.

## III.   Restitution and Forfeiture

Consistent with the recommendation of Probation, the Court should order restitution in the amount of $43,785,175.   A proposed order of restitution (with a schedule of victims filed under seal) is attached.   In addition, the parties have agreed to a consent order of forfeiture in the amount of $1.3 million, representing the proceeds from the Wakpamni fraud that Hirst directly received, and the Government will provide a proposed preliminary order of forfeiture prior to sentencing.

## CONCLUSION

For the foregoing reasons, the Government requests that the Court impose a sentence within the 151 to 188 month Guidelines range, with 60 months of any sentence to run consecutively to Hirst's sentence in the Gerova matter.

Respectfully submitted,

ROBERT KHUZAMI
Attorney for the United States,
Acting Under Authority Conferred by 28
U.S.C. § 515

By: _____
Rebecca Mermelstein/Brendan F. Quigley/
Negar Tekeei
Assistant United States Attorneys
(212) 637-2360/2190/2444

Dated: September 4, 2018
       New York, New York

19