**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

JOHN GALANIS, a/k/a "Yanni,"
DEVON ARCHER, and
BEVAN COONEY

         Defendants.

No. 16 Cr. 371 (RA)

**DEVON ARCHER'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
HIS MOTIONS FOR JUDGMENT OF ACQUITTAL UNDER RULE 29(a) AND (c)
AND FOR A NEW TRIAL UNDER RULE 33**

Matthew L. Schwartz
Laura C. Harris
Craig Wenner

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
cwenner@bsfllp.com
lharris@bsfllp.com

*Attorneys for Devon Archer*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

ARGUMENT ......................................................................................................... 1

I.     The Government's Case Against Mr. Archer Depends On Impermissible
Inferences Of Knowledge And Fraudulent Intent. ...................................... 1

       A.    The Government Relies On The Volume Of The Evidence, Not Its
Quality. ................................................................................................ 4

       B.    Mr. Archer Intended To Build A Financial Services Conglomerate, Not
Steal Bond Proceeds. .......................................................................... 9

            1.    There are no communications with Mr. Archer demonstrating his
knowledge of the charged conspiracy. ........................................ 10

            2.    Mr. Archer did not have access to information demonstrating that
he knew Galanis was stealing bond proceeds. ............................ 16

            3.    Mr. Archer did not "help" Galanis use bond proceeds to purchase
the Tribeca condominium. .......................................................... 17

            4.    Mr. Archer did not knowingly or intentionally purchase bonds with
recycled bond money. .................................................................. 18

            5.    Mr. Archer was not involved in the Calvert cover-up. ............................. 21

            6.    Mr. Archer's $250,000 wire to WAPCC does not show criminal
intent. ......................................................................................... 24

       C.    The Government Finds Connections To The Charged Conspiracy Where
None Exist. ......................................................................................... 26

            1.    Mr. Archer did not lie to the BIT Board and certainly did not do so
in connection with Galanis's scheme to steal money from the
WLCC. ....................................................................................... 27

            2.    Mr. Archer did not try to mislead FINRA. ............................. 29

II.    The Surprise Introduction Of The Gerova Evidence Prejudiced Mr. Archer And
Created A Manifest Injustice Requiring A New Trial. ................................. 32

       A.    The Government's Argument That Mr. Archer Was Not Prejudiced By
The Introduction Of The Gerova Evidence Is Without Merit. ............................. 32

B.   The Government's Opposition Brief Ignores The Reality That Mr. Archer Prepared And Executed His Trial Strategy On The Understanding That John And Jason Galanis's Guilty Pleas From The Gerova Case Would Not Be Admitted. ................................................................................ 34

III.   Instructional Errors Denied Mr. Archer A Fair Trial........................................ 38

A.   The Court Improperly Gave A Conscious Avoidance Instruction Without A Factual Predicate. ................................................................................ 38

B.   The Jury Should Have Been Instructed On The Possible Existence Of Multiple Conspiracies. .......................................................................... 41

C.   The Jury Should Have Been Instructed On Specific Issue Unanimity. ............... 44

IV.   ████████████████████████████████████████████████████████████████████████████████████████████████████ ..................................... 46

CONCLUSION ............................................................................................ 53

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992).................................................................................. 26

*United States v. Alkins*,
    925 F.2d 541 (2d Cir. 1991)................................................................................. 42

*United States v. Aracri*,
    968 F.2d 1512 (2d Cir. 1992)............................................................................... 42

*United States v. Austin*,
    No. CR 94 737 (JBW), 1997 WL 43523 (E.D.N.Y. Jan. 27, 1997) ...................... 50

*United States v. Avellino*,
    136 F.3d 249 (2d Cir.1998).................................................................................. 50

*United States v. Bellomo*,
    954 F. Supp. 630 (S.D.N.Y. 1997) ...................................................................... 43

*United States v. Beros*,
    833 F.2d 455 (3d Cir. 1987)................................................................................. 45

*United States v. Biaggi*,
    823 F. Supp. 1151 (S.D.N.Y. 1993), *aff'd*, 48 F.3d 1213 (2d Cir. 1994) .................. 48, 51, 52

*United States v. Cambindo Valencia*,
    609 F.2d 603 (2d Cir. 1979)................................................................................. 43

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005).............................................................................. 1, 4, 26

*United States v. Ceballos*,
    340 F.3d 115 (2d Cir. 2003)................................................................................... 3

*United States v. Coriaty*,
    No. 99-cr-1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001) ............................. 27

*United States v. Cusimano*,
    123 F.3d 83 (2d Cir. 1997)............................................................................. 42, 44

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)................................................................................... 2

*United States v. DiNome*,
    954 F.2d 839 (2d Cir. 1992)................................................................................. 43

*United States v. Ferguson,*
  676 F.3d 260 (2d Cir. 2011)................................................................................. 44

*United States v. Friedman,*
  300 F.3d 111 (2d Cir. 2002).................................................................................. 9

*United States v. Gelzer,*
  50 F.3d 1133 (2d Cir. 1995)................................................................................. 38

*United States v. Goffer,*
  721 F.3d 113 (2d Cir. 2013)................................................................................. 38

*United States v. Goyal,*
  629 F.3d 912 (9th Cir. 2010) ................................................................................. 2

*United States v. Harris,*
  8 F.3d 943 (2d Cir. 1993)..................................................................................... 43

*United States v. Jackson,*
  335 F.3d 170 (2d Cir. 2003) ............................................................................... 6, 7

*United States v. Jones,*
  393 F.3d 107 (2d Cir. 2004).......................................................................... 4, 5, 10

*United States v. Lincoln,*
  630 U.S. 1313 (8th Cir. 1980)............................................................................... 27

*United States v. Lorenzo,*
  534 F.3d 153 (2d Cir. 2008).......................................................................... passim

*United States v. Lujan,*
  529 F. Supp. 2d 1315 (D.N.M. 2007) .................................................................. 33

*United States v. Maldonado-Rivera,*
  922 F.2d 934 (2d Cir. 1990)................................................................................. 41

*United States v. Martino,*
  664 F.2d 860 (2d Cir.1981).................................................................................. 42

*United States v. McDermott,*
  245 F.3d 133 (2d Cir. 2001)................................................................................. 33

*United States v. Natelli,*
  527 F.2d 311 (2d Cir. 1975)................................................................................. 45

*United States v. Ozsusamlar,*
  428 F. Supp. 2d 161 (S.D.N.Y. 2006).................................................................. 38

*United States v. Peltz*,
    433 F.2d 48 (2d Cir. 1970)........................................................................... 26

*United States v. Persico*,
    645 F.3d 85 (2d Cir. 2011) ...................................................................... 5, 6

*United States v. Pitre*,
    960 F.2d 1112 (2d Cir.1992) ................................................................... 7, 8

*United States v. Restrepo*,
    547 F. App'x 34 (2d Cir. 2013) .................................................................. 41

*United States v. Rodriguez*,
    392 F.3d 539 (2d Cir.2004) ........................................................................ 10

*United States v. Samaria*,
    239 F.3d 228 (2d Cir.2001) ........................................................................ 10

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ..................................................................... 27

*United States v. Schiff*,
    801 F.2d 108 (2d Cir. 1986)........................................................................ 44

*United States v. Schlesinger*,
    438 F. Supp. 2d 76 (E.D.N.Y. 2006) ......................................................... 50

*United States v. Spencer*,
    4 F.3d 115 (2d Cir. 1993)............................................................................ 48

*United States v. Stewart*,
    305 F. Supp. 2d 368 (S.D.N.Y. 2004)......................................................... 26

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003)................................................................... 38, 40

*United States v. Torres*,
    604 F.3d 58 (2d Cir. 2010).......................................................................... 9

*United States v. Upton*,
    856 F. Supp. 727 (E.D.N.Y. 1994) ............................................................. 43

*United States v. Wiley*,
    846 F.2d 150 (2d Cir. 1988)........................................................................ 2

*Zafiro v. United States*,
    506 U.S. 534 (1993)..................................................................................... 33

v

**Rules**

Fed. R. Crim. P. 29 ........................................................................................................ 1, 6, 53

Fed. R. Crim. P. 33 ............................................................................................................ passim

Fed. R. Crim. P. 403 ................................................................................................................ 33

Fed. R. Crim. P. 404(b) ...................................................................................................... 33, 35

Devon Archer respectfully submits this reply memorandum in further support of his motions for judgment of acquittal under Rule 29(a) and (c), and in further support of his motion for a new trial under Rule 33.

## ARGUMENT

I.     **The Government's Case Against Mr. Archer Depends On Impermissible Inferences Of Knowledge And Fraudulent Intent.**

At base, the government asks the Court to sanction inferences that the trial evidence did not and could not support.  In order to be convicted, the evidence must have permitted the jury to conclude beyond a reasonable doubt that Mr. Archer knowingly, willfully, and with intent to defraud participated in Jason Galanis's criminal scheme.  It failed to do that, and in opposition the government does not argue otherwise.  Rather, under the rubric of viewing the evidence "as a whole,"[1] the government's opposition points to a series of communications that themselves fail to demonstrate Mr. Archer's knowledge or fraudulent intent – arguing, in essence, that the whole is greater than the sum of its parts.  But when each of those parts fails to provide evidence of fraudulent intent, the sum of the parts is still zero, and the sheer volume of suspicious-in-hindsight-sounding e-mails cannot overcome the absence of actual proof.  *See United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (ruling that evidence "in its totality [was] insufficient to dispel reasonable doubt on the part of a reasonable fact finder" where "each of the areas of proof by the Government was characterized by modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of the three"); *see also United States v. D'Amato*,

---

[1]     *See* Government Memorandum In Response To Defendants' Post-Trial Motions [ECF No. 623] ("Opp'n") at 50; *see also id.* at 31 n.12 ("Archer asks the Court to view this evidence in isolation instead of in conjunction with the totality of the Government's evidence . . . . When viewing the evidence in its totality"); *id.* at 43 ("is undermined by the totality of the evidence"); *id.* at 47-48 ("again views the evidence in isolation and not as a whole"); *id.* at 51 ("ignores the totality of the evidence").

39 F.3d 1249, 1256 (2d Cir. 1994) ("[A] conviction based on speculation and surmise alone cannot stand.  In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." (citing *United States v. Wiley*, 846 F.2d 150, 155 (2d Cir. 1988))); *see also United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) (holding that government "must offer some evidence to support a culpable explanation" for possibly innocent conduct and that court must reverse conviction where there is "'a total failure of proof' of the required mental state"). In this case, each part of the government's evidence against Mr. Archer fails to demonstrate that he knowingly and intentionally joined a conspiracy to misappropriate bond proceeds, rather than what he reasonably believed was a concerted, completely legal, and above-board effort to grow a financial services conglomerate. "The government's failure to offer any evidence supporting even an inference of willful and knowing deception undermines its case."  *Goyal*, 629 F.3d at 919.

There is no dispute in this case that there was a conspiracy to steal bond proceeds that included as its members, at the least, Jason Galanis and Hugh Dunkerley. "However, the evidence highlighted by the government, when considered in the aggregate, still lacks a critical element – any indication from which a jury could reasonably infer that [Mr. Archer] knew of the nature and specific object of the conspiracy." *United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008); *see also id.* ("although there is ample evidence demonstrating the existence of the conspiracy, and that Julio was present at and participated in events that furthered the conspiracy, there is insufficient evidence to show that he did so knowingly and with the specific intent to further a cocaine smuggling and distribution conspiracy.").

Contrary to the government's characterization of Mr. Archer's arguments, Mr. Archer is not asking the Court to interpret the evidence in the light most favorable to him or to choose among competing reasonable and permissible inferences. Rather, he is asking the Court to perform its gatekeeping function to determine what the permissible and *impermissible* inferences were that the jury could rely on in reaching its verdict. While it is "the jury's choice of the competing inferences that can be drawn from the evidence," "the jury's inferences must be based on evidence and must be reasonable." *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003) (internal quotation marks omitted); *see also Lorenzo*, 534 F.3d at 159 ("specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." (internal citations, quotation marks, and alterations omitted)).

As its opposition brief demonstrates, the government has combed the enormous trial record for any evidence of Mr. Archer's knowing and intentional participation in the specific schemes alleged in the indictment, that is, to induce the WLCC to issue bonds so that they could misappropriate the proceeds, and to force the bonds upon the clients of Hughes and Atlantic. Despite its best efforts to marshal the evidence, the government's opposition fails to set out evidence from which a jury could have permissibly convicted Mr. Archer:

- There is **no evidence** of Mr. Archer's involvement in any communications directly related to *stealing* bond proceeds. The government takes facially innocent communications – such as those concerning the need for "discretionary liquidity" – and, without any evidentiary predicate to interpret the evidence as such, asks the Court to find that jury was entitled to infer criminality.

- There is **no evidence** that Mr. Archer controlled or had visibility into the accounts from which bond proceeds were taken, or that he received transfers directly from those accounts (rather than through a series of intermediaries that others controlled). Nonetheless, the government asks

3

the Court to find that the jury was entitled to know that Mr. Archer knew the source of the funds he received indirectly.

- There is **no evidence** that Mr. Archer made any misrepresentations to any victim of the conspiracies, or that any misrepresentations that could be attributed to him were connected to the charged conspiracy, as opposed to some other suspicious behavior.

Interpreted in the light most favorable to the government, the evidence shows, at worst, that Mr. Archer helped obscure Jason Galanis's involvement in business deals. But the government never bridged the gap between that and demonstrating that Mr. Archer knowingly and intentionally helped Jason Galanis steal the WLCC bond proceeds. *Cf. United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004) ("There was no evidence that either defendant participated in conversations directly related to dealing crack cocaine, or that either defendant exercised authority within the alleged conspiracy itself; or that either defendant explicitly confirmed the nature of the activity in which the co-conspirators were engaged." (internal quotation marks and alterations omitted)).

The evidence before the jury, even viewed in the best light to the government, came nowhere close to overcoming the demanding standard of guilt beyond a reasonable doubt. The question before the jury was not whether Mr. Archer intended to minimize Galanis's visibility in the "roll-up" plan; it was whether Mr. Archer intended to help Galanis steal bond proceeds. "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Lorenzo*, 534 F.3d at 159 (internal quotation marks and alterations omitted); *see also Cassese*, 428 F.3d at 103  (same).

A.    **The Government Relies On The Volume Of The Evidence, Not Its Quality.**

Notwithstanding the sheer number of witnesses called by the government and documents introduced, the trial evidence – even "viewed 'in conjunction, not in isolation,'" as the

government reiterates – was insufficient to demonstrate beyond a reasonable doubt that Mr.

Archer knowingly, intentionally, and with fraudulent intent joined a scheme to defraud the

WLCC or the clients of Atlantic and Hughes.  Opp'n at 27 (quoting *United States v. Persico*, 645

F.3d 85, 104 (2d Cir. 2011)).  In arguing otherwise, the government repeatedly urges – without

citation or elaboration – that various items of proof that are consistent with its theory of the case

must therefore support an inference of guilt beyond a reasonable doubt.  But there is a difference.

The Second Circuit, including in cases the government cites, such as *Persico*, has consistently

required more than circumstantial evidence that is consistent with the government's theory of the

case – the Court of Appeals requires the government to introduce "facts sufficient to draw a

logical and convincing connection between circumstantial evidence of an agreement, and the

inference that an agreement was in fact made." *Jones*, 393 F.3d at 111 (internal quotation marks

omitted).

     In *Persico*, for example, the defendant argued the evidence was insufficient to support his

conviction for participating in the murder of Wild Bill, another crime family underboss. But the

evidence showed that within the span of one month, the defendant, who was in a power struggle

with Wild Bill, had asked one testifying witness how he felt "about killing Wild Bill"; told

another testifying witness not to worry about the problems with Wild Bill because "things are

going to change"; appeared at Wild Bill's home hours after he disappeared demanding his books

and records; informed other mafia family members that they would be dealing with him and his

allies going forward; told another witness Wild Bill "had to go" because he was "getting too

powerful"; and attempted to buy another witness's silence for $300,000. *Persico*, 645 F.3d 85,

92-3, 95 . Later, the defendant became the new underboss in place of Wild Bill and admitted in

prison that "'he brought Billy into the family. . . .  [A]nd he took him out of the family.'" *Id* at 97.

Even as to the somewhat closer question of whether the conspirators in *Persico* participated in witness tampering, the evidence amply supported conviction. The conspirators were recorded telling witnesses that if their "true feelings" came out, no harm would come to them as long as it happened only in the meeting with the conspirators' investigator ("the investigator is Allie's investigator, she's not the law"), not the government. Otherwise, the witness should not "show your feelings. What you got in your heart, what you got in your stomach." The conspirators told the witnesses that they were "in a position" to prevent the witness from getting "hurt." The recorded statements go on like this. A witness testified at trial that one of the conspirators "was explicitly threatening her and her children and that he was telling her to '[k]eep [her] mouth shut' [and] she believed that if the [witnesses] told anyone 'what we really felt, that it would be taken out on my husband or my brother, even my kids.'" *Persico*, 645 F.3d at 108 (alterations in original).  None of the trial evidence against Mr. Archer remotely resembled this kind of proof, which – albeit entirely circumstantial – supported an inference of criminal intent.

The government here warns that "particularly in reviewing a conspiracy conviction, the Court must also 'be careful to avoid usurping the role of the jury.'" Opp'n at 18 (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)).  But this reasoning is circular:  a court may never usurp the jury's role in deciding a motion under Rule 29 or 33, but it must also independently exercise its gatekeeping function to ensure that the jury's verdict was supported by competent proof beyond a reasonable doubt.

Again, the difference between the case cited by the government and this one is stark. The issue in *Jackson* was whether the defendant, Jackson, personally conspired to import five or more kilograms of cocaine into the United States. A rational jury could have determined that Jackson participated in the charged conspiracy based on numerous pieces of evidence: his receipt of the $5,000 agreed-upon price per kilogram for importing cocaine; a cooperating witness's "personal observations as to the number of pellets Jackson swallowed and excreted on his trips to Jamaica"; Jackson's complaint to his co-conspirator that they were "underpaid for the 'key and a half' they were collectively smuggling on each trip"; and a different co-conspirator's statement that "Jackson was like a 'dump truck' because he was capable of smuggling a whole kilogram of cocaine at a time." Jackson was additionally responsible for the cocaine imported by other co-conspirators insofar as those importations were reasonably foreseeable to him, such as the cocaine imported by a co-conspirator that Jackson *had agreed to travel to Jamaica with specifically to smuggle cocaine. See Jackson*, 335 F.3d at 181-83.

Even though, as the government points out, "it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel,'" Opp'n at 18 (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992)), the cases the government cites involved a quantum and quality of proof – and therefore provided a level of confidence in the jury's verdict – that is completely absent here as to Mr. Archer. The evidence in *Persico* and *Jackson* provided a rational jury with the evidence necessary to infer that the defendants in those cases possessed a very specific state of mind. There was also a logical connection between the circumstantial evidence and each of the charged conspiracies in those cases. In the case of *Persico*, the defendants discussed the murder (both prospectively and retrospectively), and the threats to the witnesses were in direct response to the anticipated government interviews

concerning that murder. The jury in *Jackson* similarly did not have to speculate about the defendants' knowledge of the amount of drugs involved in the smuggling conspiracy – Jackson's conversations and actions all had rational connections to the quantum of drugs involved.

The evidence of participation in a conspiracy to sell drugs in *Pitre*, cited by the government, likewise allowed a rational jury to infer not only that there was a conspiracy, but that each defendant intended to participate *in that conspiracy*. Edwyn Pitre, one of the three defendants challenging the sufficiency of the evidence in that case, argued that "the government's evidence only established his 'mere presence' at the arrest scene." *Pitre*, 960 F.2d at 1121. Statements Pitre made to his co-conspirators, however, showed that he was acting as a look-out and knew he was participating in planned illegal activity, which involved traveling with a four-car caravan with cash to a meeting in a deserted section of Manhattan. That evidence, "coupled with the prior act evidence, from which the jury could have found that Edwyn Pitre was present for at least one prior narcotics deal with Peechaphand and Lin, was sufficient to support a jury finding that Edwyn Pitre intentionally and knowingly participated in a narcotics transaction on the night of July 13, 1989." *Id.* at 1122.

The government's case against Mr. Archer lacked the "critical element" that connects the evidence of Mr. Archer's state of mind to the specific charged crime. *Lorenzo*, 534 F.3d at 160. Rather, the evidence showed – again and again – that Mr. Archer was part of a plan to acquire and ultimately sell financial services companies. Although there is no dispute that Mr. Archer was informed about, for example, the acquisitions of Atlantic and Hughes as well as the issuance of the WLCC bonds, the evidence of criminal intent is entirely lacking. The government's opposition focuses almost exclusively on a series of e-mails that no witness ever testified about, which contain words like "discretionary" and "liquidity." The government argues that the jury

was permitted to infer that these terms were a sort of code for stolen bond money, contrary to their common meaning in the financial community and based on nothing other than the communications themselves and the fact that the bond was ultimately stolen.  But this is not fair *inference*, it is *speculation* – speculation that Jason Galanis and Mr. Archer had some other interaction in which the scheme was agreed to, or in which these code words were explained, or that otherwise actually evidenced Mr. Archer's knowledge, willfulness, and intent.

### B.    Mr. Archer Intended To Build A Financial Services Conglomerate, Not Steal Bond Proceeds.

Mr. Archer agrees with the government that the evidence supports an inference that Mr. Archer knowingly and intentionally participated in an attempt "to create a financial services conglomerate to sell for a large profit." Opp'n at 29.  The government is also right that Mr. Archer and others were looking for ways to finance their business plan, and that – as a matter of objective fact, and not Mr. Archer's subjective knowledge or intent – a portion of the funding came from the bond proceeds. *Id.* What the trial evidence does not show, however, is that in the course of pursuing the goal of building a financial services conglomerate, Mr. Archer agreed to or knew of the scheme to misappropriate the WLCC bond proceeds or that Mr. Archer actually knew that any of the funds that were used to finance the business plan had been stolen.

The evidence at trial simply did not support the inferences the government urges.  *See generally United States v. Torres*, 604 F.3d 58 (2d Cir. 2010) (describing cases where criminal knowledge and intent could not be inferred from circumstantial evidence). Evidence of illegal behavior is not enough. *Lorenzo*, 534 F.3d at 159-60. Association with conspirators under suspicious circumstances is not enough. *United States v. Friedman*, 300 F.3d 111, 124-26 (2d Cir. 2002), *cert. denied*, 538 U.S. 981 (2003). Even serving as a lookout in a suspicious transaction while sitting beside a package containing narcotics is not enough to show a narcotics

conspiracy when there was no evidence that the defendant knew what was in the package. *United States v. Rodriguez*, 392 F.3d 539, 545-48 (2d Cir.2004); *see also United States v. Samaria*, 239 F.3d 228, 236-37 (2d Cir.2001) (sitting next to a package containing goods stolen by means of credit card fraud).  Taken together or separately, the evidence against Mr. Archer was simply not enough.

###### 1.    *There are no communications with Mr. Archer demonstrating his knowledge of the charged conspiracy.*

The government points to several different categories of communications in its attempt to justify the jury's verdict. In each instance, the government asks the Court to draw inferences that are either unwarranted from the evidence or unrelated to the charged conspiracy.  But impermissible, unreasonable, or unfair inferences cannot provide a rational jury with the evidence it needs to find guilt beyond a reasonable doubt.

The e-mails concerning the need for "discretionary liquidity" are a prime example of the government's overreach in this respect. In GX 2023, quoted by the government multiple times, Galanis attaches the Trust Indenture and writes, "my primary objective is to get us a source of discretionary liquidity. sick of begging." In GX 2120, Cooney asks "What do we get to do with the 15mm," and Galanis answers, "Discretionary." *See also* Memorandum In Support at 30-32 [ECF No. 567] ("Br."). The government argues that these and related e-mails support an inference that Mr. Archer "viewed any WLCC bond proceeds as *their* money ('15mm to *us*') to use however *they* wanted." Opp'n at 29. But that is not what the e-mails say – Galanis never writes that he, Cooney, and Mr. Archer can do *anything they want* with the money. Rather, he writes that they have discretion over the money. The government's urged inference regarding Mr. Archer's state of mind – that "discretion" means "steal" – simply does not have "a logical and convincing connection" to the text of these communications. *Jones*, 393 F.3d at 111 (internal

quotation marks omitted). Again and again, these kinds of e-mails only reasonably support an inference that Mr. Archer knew they would have discretion over how bond proceeds would be used or invested, not that they would steal it or could otherwise use it in a way that was inconsistent with the annuity contracts. *See, e.g.*, GX 1235 (Galanis writing to Mr. Archer and Cooney, "The use of the proceeds is to place the bond proceeds into a Wealth Assurance annuity. . . . btw annuity proceeds get invested by an appointed manager on a discretionary basis on a 20 year contract.").

Consider an only slightly different hypothetical.  What if Galanis had used marginally different language:  say, "15m to our fund" instead of "15m to us," and "We get to invest it" instead of "Discretionary."  The government's argument would be no different.  It would still contend that – because the money was in fact misappropriated by Galanis – these statements somehow reflected a conspiratorial understanding that the money would be fraudulently misdirected.  But that would plainly not be the case; without some other evidence that Mr. Archer knew the money was being stolen, an e-mail that the money was going to "our fund" to "invest" could not plausibly put Mr. Archer on notice of the crime.  The shorthand used in Galanis's actual e-mail – "us" and "discretionary" – is no different.  In order for this e-mail to help support a guilty verdict, there must have been some other evidence that would allow the jury to draw a *permissible* inference of criminal intent.

To take another example, Mr. Archer agrees that (taken in the light most favorable to the government) the trial evidence could support the inference that he knew that Hughes purchased the first bond offering shortly after it was acquired by Wealth Assurance AG. *See* Opp'n at 29-32. As with the e-mails concerning "discretionary liquidity," however, the trial evidence fails to provide a basis on which the jury could infer from these Hughes-related e-mails that Mr. Archer

11

knew anything about the *criminal* aspects of Hughes' bond purchase – either that Hughes had been purchased for the sole purpose of creating victims for the bond scheme, or that Hughes's clients had been stuck with the bonds in violation of the investment adviser's fiduciary duties.

In the first e-mail the government cites, GX 2018, Galanis describes Hughes as "$1.0 billion AUM. all fixed income. 52 clients. all institutional." The only rational inference from this email is that the acquisition would significantly increase the assets under management of the financial services conglomerate that Mr. Archer believed he was investing in – that is, their discretionary liquidity. The government then points to the testimony of Hugh Dunkerley in an attempt to paint this document in an illicit light, noting that Dunkerley testified that "'the primary reason for the purchase of Hughes Capital was for the purchase of the bond issuances.'" Opp'n 29-30 (quoting Tr. 933). But Dunkerley did not testify about any conversations *with or about Mr. Archer* or otherwise provide any basis to infer that Mr. Archer shared that same alleged understanding.

Again and again, the government goes to the same move:  it points to a communication that is entirely innocent ("15m to us," "discretionary liquidity," "52 clients"), and then couples it with facts about which Mr. Archer had no knowledge (the bond proceeds were diverted to a fake WLCC account, the bonds were purchased in Hughes client accounts against the wishes of clients), and argues that the jury was permitted to infer that Mr. Archer understood some criminal connotations.  This reasoning is entirely circular, and the Court should reject it.

The government also suggests the timing of the first bond issuance and the Hughes acquisition is evidence of Mr. Archer's criminal intent. But the information available to Mr. Archer at that time shows only that he knew Hughes would be given "an opportunity to participate in native american new bond issues." GX 2213. The evidence does not show that Mr.

12

Archer knew anything about what misrepresentations were made to Hughes's clients, or that the bonds were purchased in violation of client investment guidelines. Rather, Mr. Archer, as he wrote, simply found the acquisition "very encouraging." *Id.* What the communications therefore show is that Mr. Archer knew they were attempting to acquire an asset manager whose clients also might choose to purchase the WLCC bonds.

The government argues that the innocent language in GX 2213 (Mr. Archer's "very encouraging" comment) was actual criminal code, meant to "put a façade of legitimacy over the various aspects of their fraudulent scheme." Opp'n at 31 n.12.  But by this twisted logic, every innocent and even exculpatory comment would actually support an inference of guilt.  To validly make this argument, there must have been some evidence from which the jury could conclude that Mr. Archer made some effort to "put a façade of legitimacy" on his communications with alleged co-conspirators.  But as with the government's reference to Dunkerley's testimony above – suggesting, without any evidentiary foundation, that Dunkerley's understanding of the Hughes acquisition was the same as Mr. Archer's understanding – the government points to no evidence from which a jury could determine that Mr. Archer ever tried to disguise his own language, let alone when he was talking to Galanis. There is no evidence that Mr. Archer ever participated in discussions using coded language or even that he used encrypted apps like Wickr, as some other conspirators did. The *assumption* that innocent language is actually criminal code is an impermissible inference because it is speculative, not evidence-based and not a choice among reasonable inferences, as the government suggests.

That is particular so because at the same time that Mr. Archer was engaging in entirely legitimate communications that the government tries to paint as a "façade," Galanis was engaging in vastly different conduct and communications with his true conspirators.  For

example, Galanis told Mr. Archer that "WAAG wired $2.78 million today to close Hughes." GX 2034. A permissible inference with respect to Mr. Archer's knowledge is that WAAG paid for the Hughes acquisition. What was completely hidden from Mr. Archer, however, is that the Hughes acquisition was paid for using money originally stolen from WAAG in the Ballybunion fraud. *See* Br. 14 n.4, 72, 81. Dunkerley, who pleaded guilty to the Ballybunion fraud, testified that only he and Galanis knew about it. Using fake documents, Dunkerley and Galanis tricked WAAG into redirecting funds to a fake Ballybunion account. The WAAG board minutes show that Dunkerley knew that WAAG's acquisition of Hughes was contingent on releasing Ballybunion funds. These are the kinds of facts that would show knowledge and criminal intent – facts that are missing in the case against Mr. Archer.[2]

The communications with Mr. Archer concerning the acquisition of Atlantic are more of the same.  It was no secret, nor was it evidence of anything illegal or even suspicious, that Valor Group wanted to acquire asset managers. The acquisition of financial services firms was, in fact, Valor Group's business purpose. *See, e.g.*, GX 1282 (Galanis e-mailing the Wealth Assurance AG board of directors, forwarded to Mr. Archer, after the closing of the Atlantic acquisition and writing, "This is a considerable milestone and I congratulate everyone at Valor for the accomplishment. It is quite a calling card to be nearly $18 billion in client assets.").

---

[2]      As discussed at greater length below, the evidence against Galanis's true conspirators was far stronger than Mr. Archer knew or was able to show at trial.  In a surprising post-trial revelation to the defendants dated September 13, 2018, the government revealed that ████

Second, the government purposefully ignores any and all distinction between the roll-up plan and the charged conspiracy – the government needs them to be coterminous in order to transform any of Mr. Archer's communications concerning what he believed to be the legitimate roll-up plan into an act in furtherance of the conspiracy. For example, the government selectively quotes an e-mail from Jason Galanis, GX 2078, in which Galanis discussed the management transition in the anticipated purchase of Atlantic, as evidence of Mr. Archer's state of mind with respect to stealing bond money. *See* Opp'n at 14. The government wrote that "Galanis noted that the 'only finesse needed will be Don Trotter,' a Kansas City-based Atlantic employee, 'being marginalized, but he seems like an agreeable guy.'" *Id.* (quoting GX 2078). While the government insinuates that the "finesse needed" concerns the bonds, the e-mail itself, which copies non-co-conspirator Andrew Godfrey, actually concerns Morton's discussion with Atlantic's "CCO/General Counsel" regarding her proposal that "Andrew and Stephen step in to take over" the management of the Atlantic hedge fund account following the Atlantic acquisition. While there was "No apparent objection" from the CCO/General Counsel, the "Only finesse needed will be Don Trotter being marginalized, but he seems like an agreeable guy." GX 2078. Trotter was "one of the founding partners of Atlantic" and "a Managing Director." *Id.* There is no discussion in GX 2078 about the bonds. The face of the document concerns the necessary result of a takeover, the marginalization of a founding partner and the need to be sensitive to company politics. The actual purchase of the bonds was done unilaterally by Morton – Don Trotter had nothing to do with, and did not need to be "finessed" in order to effectuate that purchase. *See* GX 962 (Morton introducing herself to U.S. Bank as "the new owner and CEO" and instructing that $16.2 million be wired for the purchase of WLCC bonds).

Third, like with the placement of the bonds with Hughes, whose clients he understood would merely be given "an opportunity" to buy bonds, GX 2213, Mr. Archer was informed that the staff at Atlantic was going to examine "client information to determine where [the bonds] can be placed." GX 2062. Mr. Archer was never informed that the bonds failed to satisfy any investment criteria, that they were placed into any client accounts without proper disclosures or approvals, or that Atlantic's client immediately demanded that the bonds be removed from their account.

### 2. Mr. Archer did not have access to information demonstrating that he knew Galanis was stealing bond proceeds.

The government recognizes that the e-mails are not enough on their own, which is why it makes repeated appeals to the so-called "totality" of the evidence. But the other evidence – cooperating witness testimony, actions taken by Mr. Archer, bank records, and the like – provides no basis for the jury to infer criminal knowledge and intent.

Of course, the trial evidence showed that the annuity was, in fact, a façade put in place by Galanis, who was using the bond money for purely personal benefit.  But again, the jury lacked evidence from which it could rationally infer *that Mr. Archer knew that*. Hirst and Dunkerley knew Galanis was stealing the bond proceeds because they had access to the WAPCC accounts, and Dunkerley testified that he first learned of the thefts when he saw where the money in the WAPCC account was actually being directed. Tr. 1139:24-1140:11. Dunkerley testified that there was no annuity, *see* Tr. 1092:23-1093:11, but he never testified to any conversations with Mr. Archer about that fact, *see* Tr. 1310:7-13, 1524:13-24.  Francisco Martin knew that the investment manager Galanis asked him to set up never received the bond proceeds, but Martin did not know about the thefts, *see* Br. at 22-23, and he, too, never discussed the WLCC bonds with Mr. Archer, *see* Tr. 2381:17-2382:7.

At each turn, the government fails to point to any evidence – like that which exists for Hirst, Dunkerley, and Martin – indicating that Mr. Archer knew anything about the misappropriation of bond proceeds. Instead, the government points to certain of Mr. Archer's actions and argues that his knowledge and intent can be inferred from what he did – in effect, that he must have known.  But as explained immediately below, the evidence does not permit such a conclusion, let alone beyond a reasonable doubt.

### 3. *Mr. Archer did not "help" Galanis use bond proceeds to purchase the Tribeca condominium.*

The first "action" the government points to is actually not an action at all, and is emblematic of the overreach in its argument: Mr. Archer's assumed acquiescence to Galanis's use of Mr. Archer's name and "cachet" in connection with Galanis's purchase of a Tribeca condominium. *See* Opp'n at 36-37. The e-mail to Mr. Archer from lawyer Clifford Wolff informing him of the use of Mr. Archer's name for Galanis's condo purchase, *see* GX 2122, could allow a jury to infer Mr. Archer's knowledge that Galanis was taking advantage of Mr. Archer's good name. But to try find some connection to the charged conspiracy (as far as Mr. Archer is concerned), the government then points to GX 2028, where Galanis writes "So close[.] Cliff is running the stall for me on nyc mansion[.] I want to be here and won't live in a 1750 square foot cage[.] Massively motivated[.]"  But the jury is still left to *speculate* as to what Mr. Archer might have understood Galanis's admitted "non sequitur" to mean, Tr. 3647:8-10 (government closing argument), other than the logical and unremarkable suggestion that Galanis was waiting for a business deal to close before making a substantial personal investment.

In his opening brief, Mr. Archer pointed to a related e-mail, GX 2222, that showed (as far as Mr. Archer knew) Galanis was "earning" money, not "stealing" it. *See* Br. at 40. The government responds that this is another instance where, despite the facially innocent and even

17

exculpatory language of the e-mail (stating explicitly that Galanis needed to "earn" money), this term was actually code for "stealing the bond proceeds." *See* Opp'n at 37. These are not merely competing inferences regarding what Mr. Archer understood Galanis to mean in GX 2028 – one inference, to "earn" money, has a rational foundation in contemporaneous documentary evidence and is consistent with compensation provided to others responsible for the transaction, such as Tim Anderson. The only factual predicate for the other inference – that Galanis's reference to "earning" money or needing a deal to close before he would spend extravagantly – is the fact that Galanis was actually stealing the money. That is, of course, a very significant fact, but not one that Mr. Archer knew. The government's argument – that Mr. Archer must have known that "earn" meant "steal" because the money was actually stolen, even though there was no evidence that he knew it was actually stolen – simply does not follow as a matter of logic.

### 4. *Mr. Archer did not knowingly or intentionally purchase bonds with recycled bond money.*

The second act the government points to is Mr. Archer's involvement in purchasing bonds in the second bond offering via Rosemont Seneca Bohai LLC. *See* Opp'n at 37-41. The government begins its argument building off an already flawed premise – that Mr. Archer knew that there was no real annuity and was engaged in a conspiracy to misappropriate bond proceeds. This, the government argues, entitled the jury to infer that Mr. Archer knew that anything relating to the bonds was inherently fraudulent. For example, the government argues Mr. Archer was necessarily aware of the misstatements made to the WLCC *by others*, such as John Galanis, and of the connection of Mr. Archer's own purchase of bonds to the broader scheme. *Id.* at 38. In other words, the government argues that Mr. Archer knew what others in the conspiracy were doing because Mr. Archer was a member of the conspiracy. This circularity aside, the government points to the following evidence that it argues enabled the jury to determine beyond

a reasonable doubt that Mr. Archer knew the $15 million worth of bonds he purchased were

purchased with recycled bond proceeds:

- Starting on September 8, 2014, Galanis informed Mr. Archer of the plan to wire money to attorney Clifford Wolff, who would then wire the money to Mr. Archer. *See* Opp'n at 38-39 (citing GX 2223, GX 2300, GX 2115, GX 2112).

- Galanis e-mailed Mr. Archer about the need for discretionary liquidity (which the government characterizes as Galanis "bemoaning his need for money"). *Id.* (citing GX 2023, GX 2024, GX 2025, GX 2026).

- Mr. Archer's (and his assistant Seb Momtazi's) communications with Morgan Stanley and Deutsche Bank after the purchase, when arranging to custody the bonds.

The common thread in each of these categories of evidence is that there is no link

between the information that Mr. Archer had available to him and the transfer of $15 million

from WAPCC (the fraudulent annuity provider) to Thorsdale (Galanis's entity).  Without some

proof that Mr. Archer knew the funds originated with WAPCC, the government's argument falls

apart.

In GX 2223, for example, Galanis writes Mr. Archer two weeks after the close of the first

offering and describes WLCC and Greenberg Traurig's desire to close the next offering. The

government points to Galanis's statement in GX 2223 that "we would need to wire cliff this

week so he can wire to you on monday i would think" as evidence of Mr. Archer's "knowledge

of the origin of the $15 million dollars that Jason Galanis gave him to purchase the WLCC

bonds." Opp'n at 38. But all this proves is that Mr. Archer knew that the source of the money

wired from Wolff's firm account came from Galanis.  The trial evidence actually shows that

Galanis was the only one who knew that the money wired to Wolff's attorney escrow account

originally came from the WLCC, and his e-mail in GX 2223 states only that "we" need to wire

money – it is entirely silent on the source of the money. *Id.*  Even Francisco Martin – the man

19

who actually wired the money from Thorsdale to Wolff's escrow account – had no idea that the money came from the WLCC account.  Tr. 2338:6-2341:3 (Martin).

As to Mr. Archer's representation to Morgan Stanley that the funds used to purchase the bonds were generated from real estate sales, the jury still could not infer any intent on Mr. Archer's part to misappropriate bond proceeds. *See* Br. at 46-58. The trial evidence shows that Mr. Archer had access to information from which the jury could infer that he knew the money came from Jason Galanis via Cliff Wolff.  As an initial matter, there was no basis on which the jury could have inferred that Mr. Archer's statements to the bank about the origin of the funds were *intentionally* false.  Indeed, there was no evidence whatsoever about what Mr. Archer knew or was told about the origin of the funds, other than that they came from Galanis via Wolff.[3]  But even if the jury could have concluded that Mr. Archer's statements to the banks about real estate sales were intentionally false, it could not have permissibly inferred that he therefore knew that the money was stolen from the WLCC.  At worst, the jury could have inferred that Mr. Archer intended to hide the fact that he got the money from Galanis.

In fact, the trial record shows that *only Galanis* knew where the money for the purchase of the second bond offering came from. Dunkerley, who handled the WAPCC account, did not know what the $15 million he transferred out of that account was to be used for.  Tr. 1312:8-1313:5 (Dunkerley); *see also id.* at 1511:15-1512:8 (Dunkerley).  And Martin, who controlled the Thorsdale account and caused the transfer from Thorsdale to Wolff, did not know where the money came from (Thorsdale's records reflected a "cash" deposit, *see* GX510 at 32; GX522 at 47, which Dunkerley had made, *see* Tr. 1027:1-18, 1312:8-1313:5, 1516:10-1517:15

---

[3]     It is not even clear that an answer from Mr. Archer describing his receipt of the money from Thorsdale would have been responsive to the question of how the money was "generated" that was used to purchase the bonds. *See* Br. at 49. Morgan Stanley did not ask "who" generated the money. Tr. 862:8-864:11.

(Dunkerley)) or what its purpose was.  *See* DX 4795; Tr. 2339:10-2340:16 (Martin).  The e-mails

the government introduced traced the money back only as far as Thorsdale. No one other than

Galanis had the full picture. In other words, no one – the jury included – could do anything but

speculate as to what Mr. Archer knew about how Thorsdale/Galanis generated its money, and

whether it was real estate, WAPCC, or some other source entirely.

### 5.   *Mr. Archer was not involved in the Calvert cover-up.*

In yet another attempt to stretch the evidence beyond any reasonable inference, the

government claims that Mr. Archer's single reference to Calvert in an e-mail with non-

conspirator Mark Waddington, GX 2119, shows that Mr. Archer, "with Dunkerley's help,

worked to paper over the $15,000,000 transfer from Thorsdale to RSB that funded his purchase

of the second WLCC bond issuance as a 'loan' to RSB by Calvert[.]" Opp'n 48. There are at

least three unsupported assumptions in the government's interpretation of GX 2119: (1) that Mr.

Archer did anything "with Dunkerley's help" in connection with Calvert; (2) that Mr. Archer

intended or knew of Galanis's intention to "paper over" transfers from Thorsdale; and (3) that

Mr. Archer believed or intended to portray that there was any "'loan' to RSB by Calvert."  To

the contrary, the trial evidence showed that Galanis and Dunkerley deliberately *excluded* Mr.

Archer from their efforts to fabricate RSB/Calvert documents, in stark contrast to others.

The trial evidence included precisely one document and no testimony tying Mr. Archer to

Calvert – the entity Galanis, Dunkerley, Martin, and Hirst created and used in an attempt to

obstruct the SEC's investigation and cover up their crimes. In that one document – a November

2015 e-mail chain between Mr. Archer and Mark Waddington and David Ezekiel of Valor Group

(neither of whom was ever alleged to be a conspirator) – Mr. Archer writes to Waddington that

the WLCC bonds held by VL Assurance (Bermuda) "are to be replaced / returned to Calvert"

and that "the consensus is we would like to return these bonds to the lender and beneficial owner

in the quickest orderly manner possible." GX 2119.  The government argues that this single e-mail supports an inference that Mr. Archer knew about and conspired in the Calvert cover-up. But no jury could reach that conclusion without making huge leaps of logic and drawing entirely speculative inferences.

First, the conspirators who created Calvert testified that Mr. Archer had nothing to do with it. Dunkerley testified that neither he nor anyone else discussed Calvert with Mr. Archer. Tr. 1464:1-13, 1509:6-8. Martin, who actually created Calvert (Tr. 2181:14-17), testified that he never even met Mr. Archer. Tr. 2292:24-25, 2381:17-18.  There is simply no evidence that anyone ever revealed Calvert's true, fraudulent nature to Mr. Archer.

Second, the jury was left to speculate how Mr. Archer came to learn that the "lender and beneficial owner" was supposedly Calvert. The government argues that "[t]his suggestion by Archer that 'Calvert' was the 'lender and beneficial owner' of the bonds was obviously false[.]" Opp'n 48.  But while this statement was certainly factually untrue, there is no evidence that Mr. Archer knew that – once again, the government attempts to elide objective reality with Mr. Archer's subjective state of mind, arguing that the jury is permitted to infer that any factually incorrect statement must have been *deliberately* false.  But if such an inference were legally or logically permissible, it would read the *mens rea* requirement out of the fraud laws – where that requirement is in fact most stringent, requiring knowledge, willfulness, and fraudulent intent – by allowing proof of conduct (*i.e.*, a false statement) to by itself serve as evidence of fraudulent intent.

There is simply no evidence of any communications concerning Calvert between Mr. Archer and anyone who knew the true story behind Calvert.  Indeed, as discussed above, there is no evidence that Mr. Archer knew precisely what entity was the original "lender and beneficial

owner" of the bonds.  While the truth is that the money came from Thorsdale to the Wolff law

firm to RSB, the evidence showed only that Mr. Archer knew that the money came from *Jason

Galanis or a Galanis entity* to the Wolff law firm to RSB.  The government is therefore wrong to

argue that the mere utterance by Mr. Archer of the name "Calvert" was fraudulent – as far as the

evidence is concerned, Mr. Archer did not find out who the purported "lender and beneficial

owner" of the bonds was until November 2015, when he was told (falsely) that it was Calvert.

Third, the undisputed evidence is that Galanis took steps to hide the true nature of Calvert

from Mr. Archer.  Unlike Galanis, Dunkerley, Martin, and Bevan Cooney, Mr. Archer never

signed – and was never asked to sign – any fake Calvert documents. *See* GX 2298 (Cooney and

Galanis); GX 1577 (Dunkerley); Tr. 2181:14-17 (Martin).  To the contrary, Galanis and

Dunkerley did create fake Calvert documents concerning a purported loan between Calvert and

RSB, but intentionally did not have Mr. Archer sign them – precisely because Mr. Archer did not

know about Calvert's fraudulent nature, which would have been revealed had he been asked to

sign a fake back-dated loan.  Instead, in GX 1577, Galanis create a fake, back-dated WAPCC

resolution *describing* a loan to RSB by Calvert, *see* Opp'n at 48.  But that document was signed

only by Dunkerley, and there is no evidence Mr. Archer ever saw, discussed, or was aware of

that document. *See* Tr. 1464:7-9 (Dunkerley).  This evidence affirmatively shows Mr. Archer's

lack of involvement in or knowledge about the true, fraudulent nature of Calvert.

Calvert was designed to trick people into believing it was legitimate. Dunkerley testified

that "Calvert's sole purpose was to deceive people," (Tr. 1508:12-13), and he only discussed that

"illicit purpose" with Gary Hirst and Jason Galanis. Tr. 1508:14-17.[4]  Martin, who created

---

[4]    In its overreach, the government goes so far as to claim that Mr. Archer used Calvert
"with Dunkerley's help." Opp'n 48.  This statement is simply false, and totally at odds with the
government's own witnesses.  The trial evidence was undisputed that Mr. Archer and Dunkerley

23

Calvert, did not even know that it was designed to deceive. Tr. 2348:2-7. So the admitted conspirators designed Calvert to fool innocent parties into believing it was legitimate, and not even the man who incorporated it knew its illicit purpose. In this context, a single e-mail in which Mr. Archer referred to Calvert cannot possibly support an inference that Mr. Archer knew about Calvert's true purpose let alone that he knew that Galanis had stolen the proceeds of the bonds.

### 6.     Mr. Archer's $250,000 wire to WAPCC does not show criminal intent.

The government acknowledges – as it must, given the number of legitimate parties who dealt with WAPCC – that Mr. Archer's wire on its own proves nothing. The government contends, though, that this wire shows knowledge when the evidence is viewed "as a whole." Opp'n at 47-48. The government claims that Mr. Archer had "participated for more than a year in multiple aspects of the fraudulent scheme," and then he paid WAPCC "seemingly out of nowhere . . . just in time for the first interest payment to be made," so he must have been in on the conspiracy. This is another circular argument – the payment is evidence of fraudulent intent because Mr. Archer was a knowing member of the fraud – built on impermissible inferential leaps.

First, the government has to assume that Mr. Archer is guilty in order to get the inference it wants. Again reading the *mens rea* requirement right out of the statute, *anything* Mr. Archer did during the pendency of the conspiracy could seem nefarious if you assume he was an active and intentional fraudster.  If Mr. Archer had used a payphone to call Jason Galanis, he would have been covering his tracks.  If he called from his own line, it would have been a "façade"

---

had no interactions of any kind, direct or indirect, involving Calvert – or anything else illegitimate or improper, for that matter.  Tr. 1464:1-13, 1509:6-8 (Dunkerley); *see also id.* at 1024:18-23, 1310:7-13, 1524:13-24 (Dunkerley).

designed to create the impression of legitimacy.  These tautological arguments cannot substitute for actual evidence and *fair* inference.

The government offered no direct evidence that Mr. Archer knew about Galanis's scheme. The government's cooperators testified that they never conspired with Mr. Archer about anything illicit.  Indeed, the Court even went so far as to alter its usual cooperator instruction to the jury in recognition of the fact that neither Dunkerley nor Martin could have even plausibly implicated Mr. Archer by their testimony.  Tr. 3467:3-3469:16..

Second, Mr. Archer frequently made short-term capital contributions to the companies he was investing in, and there was absolutely no evidence to suggest (let alone prove beyond a reasonable doubt) that Mr. Archer knew WAPCC was not in fact associated with the entirely legitimate Wealth Assurance family of companies. Mr. Archer never, for example, received a direct payment *from* WAPCC – a fact that might have clued him in to the fact that the bond proceeds were not being invested as promised – as other defendants had. *See* DX 9003 at 5; GX 4007; GX 4009; GX 4013. Furthermore, Galanis actively misled Mr. Archer about WAPCC and told Mr. Archer the same lie that he told other innocents:  that it was "a Wealth Assurance annuity," GX 1235, rather than an unaffiliated entity with a misleading name that Galanis created for the sole purpose of misappropriating bond proceeds.  A single payment from Mr. Archer to a company he had no reason to know was fraudulent cannot support an inference of fraudulent intent.

Finally, Jason Galanis pocketed $240,000 of the $250,000 wire to WAPCC by Mr. Archer. *See* GX 4010; GX 512 at 66.  The fact that Galanis in fact stole Mr. Archer's money eliminates any possible inference that Mr. Archer was a knowing coconspirator who understood that the purpose of the payment was to make lulling payments to bondholders.

### C.   The Government Finds Connections To The Charged Conspiracy Where None Exist.

The government argument also overreaches in trying to connect evidence to the charged crimes where no such connection is supported by the record or logically exists.[5]  As discussed below, these examples are, at most, "only circuitously related to" the charged crime. *United States v. Stewart*, 305 F. Supp. 2d 368, 378 (S.D.N.Y. 2004). As such, the falsity, if any, of Mr. Archer's "statements is less significant in assessing the sufficiency of evidence of intent." *Id.*

Under Second Circuit precedent, a false statement only tangentially related to a securities fraud is insufficient to support a finding of fraudulent intent beyond a reasonable doubt.  To sustain a securities fraud conviction, there must be proof beyond a reasonable doubt not that the defendant was aware of or engaged in *any* wrongful act, but an act that is wrongful "under the securities law," and "in a situation where the knowingly wrongful act involved a significant risk of effecting the violation that has occurred." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks omitted) (citing *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir. 1970); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 364 (2d Cir. 1992)).

At most, the government offered proof of alleged misstatements that, even if intentionally false, were told to persons who were not in any way connected to the alleged victims of the charged securities fraud. Nor did the government offer any proof that these alleged false statements were in any way part of "effecting" a securities fraud. Therefore, this evidence cannot

---

[5]     Mr. Archer discusses the two most prominent examples in this section (relating to the BIT Board and FINRA), but the government's brief provides numerous other examples. For example, the government misleadingly suggests that CORFA acquired a minority stake in Burnham Financial Group the "same day" as the closing of the Hughes acquisition. *See* Opp'n at 6. CORFA actually converted one of its notes into shares of common stock in Burnham Financial Group in May 2014, three months before the Hughes acquisition. *See* DX 4340 at 3.

be sufficient – as a matter of law – to demonstrate Mr. Archer's knowledge, willfulness, and fraudulent intent.

With regard to Mr. Archer's Rule 33 motion, the government's failure of proof is even more severe, as the government is not entitled to have all inferences drawn in its favor. Rather, this Court "is not required to view the evidence in the light most favorable to the prosecution," but rather "is permitted to weigh the evidence and evaluate the credibility of the witnesses." *United States v. Coriaty*, No. 99-cr-1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001) (citing *United States v. Lincoln*, 630 U.S. 1313, 1319 (8th Cir. 1980); *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).

> ### 1.    *Mr. Archer did not lie to the BIT Board and certainly did not do so in connection with Galanis's scheme to steal money from the WLCC.*

Mr. Archer demonstrated in his opening brief why his statements to the BIT Board were factually accurate, *see* Br. at 59-66, and why his interactions with the BIT Board were entirely unrelated to the charged conspiracy, *see* Br. at 66-67. The government's response, *see* Opp'n at 43-47, continues to search for a lie in Mr. Archer's carefully lawyered representations to the BIT Board and to draw some connection to the scheme to steal bond proceeds. The government argues, for example, that after Galanis's arrest, Mr. Archer "had the audacity to thank the BIT Board for their insistence that Jason Galanis not be involved in Burnham." *Id.* at 45 (citing GX 782). Setting aside for the moment that the BIT Board minutes are not verbatim transcripts but are the self-serving record of the BIT Board lawyer, the minutes themselves actually say that Mr. Archer "had been shocked by the development and thanked the Independent Trustees for their insistence that Mr. Galanis not be involved in *management* of Burnham." GX 782 at 1 (emphasis added). That Galanis was not to be involved in the management of Burnham Asset Management – which is what the defined term "Burnham" meant in this context, *see id.*(defining Burnham

Asset Management as "Burnham" in the introductory paragraph) – is precisely what Mr. Archer represented to the BIT Board, GX 760 at 2, and what actually happened. By all accounts, Galanis had nothing to do with Burnham Asset Management.

The government is similarly imprecise when it argues that Galanis serving as a consultant to Valor Group, which had considered acquiring Burnham Securities, was also evidence of a lie by Mr. Archer. *See* Opp'n at 45-46. The government argues that "in complete violation of his 2014 promises to the BIT Board that Jason Galanis would have 'no involvement' with Burnham, Archer finally admitted to the BIT Board that he had planned to have a Burnham entity acquired by a company that Jason Galanis advised." *Id.* The problem for the government is that Mr. Archer *never said* Galanis would have "no involvement" in a potential acquirer of Burnham Securities. The statement the government is quoting from comes from BIT Board minutes where *Ms. Moynihan*, not Mr. Archer, reviewed and outlined conditions she believed were contained within the correspondence and discussions with the BIT Board and CORFA. *See* GX 763 at 3. As explained in Mr. Archer's opening brief, *see* Br. at 62, the September 26, 2014 letter that Ms. Moynihan relies on in those minutes, GX 762, begins with a recitation of what the BIT Board *wants*: an assurance that Galanis "will not be involved with any of the Burnham entities and their 'affiliated persons.'" But the actual commitments that CORFA confirmed were far more precise. *See* Br. at 62-65. It was also known to the BIT Board from the very beginning that Galanis was a consultant to CORFA (the anticipated purchaser of Burnham Securities) and certain of its members. *See id.* at 65.

Regardless of whether Galanis's status as an advisor to a potential acquirer of Burnham Securities violated Mr. Archer's very specific representations, the entire exchange with the BIT Board was completely unrelated to the scheme to steal money from the WLCC. Galanis had

already sourced the WLCC bond deals to Burnham Securities, which was moving forward with those transactions whether or not CORFA ultimately acquired the Burnham Financial Group. In other words, the interactions with the BIT Board had no bearing on the conspiracy, and shows at most that Mr. Archer knew he "can't deny doing business with [Galanis] basically." GX 2221. But obscuring Jason Galanis's role in certain of the companies – assuming for the sake of argument that Mr. Archer did so intentionally – is a far cry from conspiring with him to steal millions in bond proceeds.  Indeed, as the government points out, Galanis had a checkered reputation and lying about his role – even if that were what Mr. Archer did – would only support the inference that Mr. Archer believed Galanis needed to be more involved than the BIT Board wanted.  While that might be dishonest (had it happened), it would not be evidence that Mr. Archer was helping Jason Galanis steal the proceeds of bonds that had nothing to do with the BIT Board, its money, or its investment adviser.

### 2.    *Mr. Archer did not try to mislead FINRA.*

The government's arguments about FINRA and net capital are not only not supported by the evidence, they are flatly contradicted by it.  The government continues to argue that Mr. Archer knew the bonds were transferred to Burnham Securities, Inc. for net capital purposes, to somehow further the bond scheme. *See, e.g.*, Opp'n 11 ("Archer transferred a portion of the Wakpamni bonds he purchased to Burnham, to attempt to help Burnham meet net capital requirements."). This was a serious allegation at the trial, with the government arguing to the jury that Mr. Archer wanted to "try and fool FINRA." Tr. 3650:21-3651:7 (closing). The government introduced numerous exhibits concerning BSI's reporting to FINRA and called a FINRA witness, a surveillance director tasked with ensuring that regulated entities comply with capital rules and sales practice activities. *See* Tr. 2068:7-2069:24 (Walch). The government's

argument, coupled with powerful demonstratives, *see* GX 4004, and extensive testimony from a regulator, undoubtedly made a significant impression on the jury.

The problem is that BSI's use of the bonds for net capital is entirely irrelevant to the case against Mr. Archer. There is *no* evidence showing that Mr. Archer approved or even knew that the WLCC bonds were being used for BSI's net capital.[6] *See* Br. 67-70.

The government's brief, unfortunately, is too cavalier with the facts in continuing to press this argument. The government writes, "Archer authorized the transfer of WLCC bonds to Burnham (GX 2075)," and then goes on to explain in detail its net capital argument. *See* Opp'n 51-52. What is GX 2075 exactly? It is an e-mail from Sebastian Momtazi to Iris Gomez attaching copies of letters signed by Mr. Momtazi (in Mr. Archer's name), requesting bonds be transferred from RSB's Morgan Stanley account to an account titled "BURNHAM SECURITIES, INC. – SDN COLLATERAL ACCOUNT." *See* GX 2075. This is decidedly *not* Mr. Archer authorizing the transfer of bonds "to Burnham." This was an authorization to transfer bonds to a "collateral account" associated with BSI; there is no evidence whatsoever in the record to explain what this collateral account was or what the purpose of the anticipated transfer was.

In any case, and more to the point, the transfer to this collateral account *never happened*. For reasons that are not explained in the trial record, RSB instead transferred the bonds to the account of VL Assurance (Bermuda) Ltd. *See* GX 301 at 135 (April 9 transfer out of RSB account); GX 306 at 8 (April 9 transfer into VL Assurance (Bermuda) account). As Mr. Archer explained in his opening brief, David Ezekiel (not a conspirator) later transferred those bonds,

---

[6]     And as Mr. Archer noted, the use of bonds for net capital purposes is not even evidence of criminal intent; it is merely evidence that BSI thought they could use bonds as net capital, which FINRA later determined did not qualify as an "allowable asset." *See* Br. 67-68 (citing Tr. 2094:3-12).

not to a "collateral account," but to BSI's own account, care of Jon Burnham. *See* GX 327 at 7 (May 29 transfer into BSI's account). It was thus Ezekiel, and not Mr. Archer, who transferred the bonds to BSI, where they were used for net capital purposes.

The government then takes a similarly misleading approach with respect to the WLCC bonds transferred to Bonwick Capital Partners, LLC. The government argues that the "evidence also demonstrated that Archer was, around the same time as his transfer of WLCC bonds to Burnham, well aware of Bonwick's net capital problems and made sure that Bonwick –another Burnham roll-up entity – would get a timely transfer of funds to meet its net capital requirements." Opp'n at 52. In support, the government cites three documents. The first two, GX 2092 and 2095, are May 2015 e-mails involving Mr. Archer, who helped Bonwick open an account at Morgan Stanley to receive WLCC bonds. This evidence is little different from Mr. Archer transferring bonds to VL Assurance (Bermuda) – there is nothing to suggest Mr. Archer's knowledge or intent concerning the use of the bonds for net capital, let alone improperly so.

The government tries to bridge this gap by pointing to a July 2015 e-mail in which Mr. Archer asked, "Can we all get on the same page about what we need to transfer funds to Bonwick for their requirements today." GX 2097. But this demonstrably had nothing to do with Bonwick's use of the bonds for net capital, because by July 2015 Bonwick *was already using* the WLCC bonds for net capital. *See* GX 1073 at 2 (Bonwick's June 22, 2015 FINRA notification listing the WLCC bonds); GX 2095 (Morgan Stanley confirmation).

Mr. Archer's July 2015 e-mail actually concerned an unrelated transfer of $125,000 to Bonwick's Citi account – one of Mr. Archer's many personal cash infusions that were never repaid. *See* GX 2097 (Mr. Archer writing on July 1 to Momtazi and Morgan Stanley, "hold on the wire to Bonwicks Citi account and let's power through this tomorrow first thing"); GX 301 at

162 (July 2 transfer of $125,000 out of RSB's account); DX 9003 at 1, 5 (showing July 2 transfer of $125,000 to Bonwick as a net loss to Mr. Archer). The government overreaches when it suggests that Mr. Archer's payment of $125,000 to Bonwick in July shows that he knew Bonwick used the WLCC bonds for net capital over a month earlier.

Yet somehow, with no actual evidence, circumstantial or otherwise, showing that Mr. Archer was aware of what BSI did with bonds it received from David Ezekiel, the government argues that the jury could still determine beyond a reasonable doubt that Mr. Archer "knowingly used the fraudulently-purchased WLCC bonds to help prop up Burnham so that it did not fail before the time came for the ultimate Burnham conglomerate sale from which he and his conspirators would reap substantial profits." Opp'n at 52. As this net capital example shows, the government hopes that the Court will view the volume and complexity of the evidence (extensive testimony and documents concerning FINRA's net capital requirements, e-mails about transferring the bonds to accounts Mr. Archer did not control, and a sleight-of-hand that confuses Mr. Archer's $125,000 contribution for approval of the prior use of $5 million worth of bonds for net capital) as some sort of proxy for actual evidence that Mr. Archer knowingly and intentionally attempted to mislead FINRA. As with the government's other evidence, there is a lot of it, but it does not prove Mr. Archer's criminal knowledge, willfulness, and fraudulent intent beyond a reasonable doubt.

## II.    The Surprise Introduction Of The Gerova Evidence Prejudiced Mr. Archer And Created A Manifest Injustice Requiring A New Trial.

### A.    The Government's Argument That Mr. Archer Was Not Prejudiced By The Introduction Of The Gerova Evidence Is Without Merit.

The government argues that the Gerova evidence did not prejudice Mr. Archer. But the Court had already ruled that the prejudice of the introduction of the Gerova evidence substantially outweighed its probative force, at least at that time. *See* April 13, 2018 Hearing Tr.

26:2-26:8; Trial Tr. 332:1-22 (noting that allowing more evidence of the Gerova arrest would have been "simply too prejudicial"). Thus the government's arguments that courts routinely deny motions to sever that rely on Rule 404(b) evidence, *see* Opp'n at 76, 78, are inapposite. This is not a case where defendants argued for severance premised only on the admission of Rule 404(b) evidence; Mr. Archer was prejudiced by the admission of evidence that also failed the Rule 403 balancing test.

Moreover, the introduction of Rule 404(b) evidence against John Galanis can, in fact, prejudice Mr. Archer such that severance must be granted. Indeed, the Supreme Court's leading case on severance demonstrates that such prejudice may be so severe as to necessitate severance. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (holding that prejudice sufficient to require severance may exist when "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant"). The danger presented by the Gerova evidence is especially acute, as *Zafiro* recognized that Rule 404(b) evidence has a unique ability to "erroneously . . . lead a jury to conclude that a defendant [is] guilty." *Id.* As discussed more extensively in Mr. Archer's opening brief, *see* ECF No. 567 at 86-87, courts recognize that such evidence is a "factor weighing in favor of severance." *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007).

Moreover, the Court's instructions to the jury could not have cured the prejudice. While in many circumstances the jury is presumed to properly follow such instructions, prejudicial evidence admitted against another defendant can render such instructions insufficient. *See United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2001) (holding that the presumption that jurors follow limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity"). Here, the

33

appropriate remedy was either to exclude the evidence, to sever Mr. Archer's trial from that of

the codefendant against whom the prejudicial and otherwise-inadmissible evidence was offered,

or to grant a mistrial.

Nor is the government correct that the introduction of evidence that Jason and John

Galanis pleaded guilty to securities fraud did not prejudice Mr. Archer any more than the prior

evidence that Jason Galanis was arrested in September 2015. There is a significant difference

between the introduction of a statement that Jason Galanis was arrested in an unrelated matter,

and a stipulation that Jason and John Galanis pleaded guilty to previously violating the same

exact statute that Mr. Archer was being accused of violating. Even if mentions of the Gerova

evidence during trial did not incurably prejudice Mr. Archer, the eleventh-hour introduction of

John and Jason Galanis's guilty pleas in Gerova created such "prejudicial spillover" that the

limiting instructions "cannot be presumed to be effective." *Id* at 140.

**B.      The Government's Opposition Brief Ignores The Reality That Mr. Archer
         Prepared And Executed His Trial Strategy On The Understanding That
         John And Jason Galanis's Guilty Pleas From The Gerova Case Would Not
         Be Admitted.**

As argued above and in Mr. Archer's opening brief, s*ee* ECF No. 567 at 85-88, the

introduction of this evidence in a trial against Mr. Galanis called for the severance of Mr. Archer,

and thus he now should be granted a new trial. While that argument does not depend on when or

how the evidence was presented to the jury, the timing and manner in which Jason and John

Galanis's guilty pleas were introduced reinforces the need for a new trial. *See* ECF No. 567 at

88-91.

The government makes three principal arguments that the Gerova evidence was not

prejudicial:  (1) Mr. Archer did not seek to reopen the defense case, *see* Opp'n at 83; (2) Mr.

Archer did not try to introduce Gerova evidence earlier, *see id.* at 82 ("Archer's incentive and

ability to offer such evidence or make such an argument existed throughout trial."); and (3) Mr. Archer's attempts to mitigate the prejudice were successful, *see id.* at 74 ("[C]ounsel repeatedly pointed to the unequivocal nature of the Court's limiting instruction to argue to the jury that Archer and Cooney – unlike John Galanis – knew nothing about the Gerova fraud or Jason Galanis's criminal past until after the September 2015 arrests.").

These arguments miss the realities of what happened:  after the evidence was closed, after the government's principal summation, and after one co-defendant's summation, the Court permitted the government to introduce evidence that the co-defendant and the prime mover of the fraud had committed another securities fraud together in the recent past, and that Jason Galanis was arrested for that other securities fraud in the middle of the period relevant to this case, prompting all sorts of obstructive behavior.  The Court then permitted the government to give a supplemental summation, followed by a supplemental summation for John Galanis.  After this enormous spotlight on the Gerova arrests and convictions – facts that had been meticulously kept from the jury for the six weeks prior – Mr. Archer had to sum up.

To argue that Mr. Archer should have asked to put in more evidence about the Gerova fraud at that point, or that in retrospect he should have put it in all along, is absurd.  The Court had excluded this evidence as inadmissible 404(b) evidence against John Galanis and irrelevant and prejudicial evidence against Mr. Archer.

Trial realities aside, the government's arguments also do not address the fundamental legal question: whether the admission of the Gerova evidence created a risk that Mr. Archer was denied a fair trial. Indeed, the government does not cite any case where the outcome of such a question turned on what measures defense counsel did or did not take to mitigate prejudice from a ruling that was properly preserved for review. At the same time, none of the government's

points undermines the force of Mr. Archer's argument that the prejudice of the Gerova evidence was amplified by its introduction when the government reopened its case, immediately preceding Mr. Archer's closing argument.

First, there was no suggestion by the government or the Court that the defense could reopen its case to present further evidence; indeed, the Court expressed hostility to this possibility when John Galanis suggested he might call a witness. *See* Tr. 3802:10-3803:25 ("[THE COURT:] The evidentiary portion of this trial is over."). Moreover, Mr. Archer had already prepared and presented his defense case premised on the Gerova evidence being excluded; there is no reason to believe that Mr. Archer would have been granted the time and latitude necessary to investigate and marshal the evidence necessary to put on an alternate defense case that accounted for the surprise eleventh-hour introduction of the Gerova evidence. Doing so would have been in tension with the case Mr. Archer did put on, anyway.

Similarly, there was no reason for Mr. Archer to have presented such a defense case during trial, as evidence of Jason and John Galanis's guilty pleas had been excluded; indeed, it would have called attention to the very matter Mr. Archer objects to as prejudicial, and might arguably have opened the door to the introduction of such evidence against Mr. Archer.

Finally, Mr. Archer certainly did attempt to minimize the prejudice from the last-minute bombshell in his own closing arguments, and to make "lemons into lemonade" by relying upon the Court's instruction. But these efforts were not sufficient to offset the prejudice of the evidence and the way it was introduced, nor could they have been.

Making the most of a prejudicial development is in no way inconsistent with the argument that the prejudice was, in the end, insurmountable and denied Mr. Archer a fair trial. For example, the government points to the fact that Mr. Archer's counsel participated in

negotiating the instruction to the jury, Opp'n at 85 ("That it was Archer who request this instruction makes his present claim to have been prejudiced by it somewhat baffling."). First, the earlier instructions regarding the September 2015 arrest were negotiated in the context of the exclusion of all other Gerova evidence. *See* Trial Tr. 330-332. In other words, those instructions were negotiated without knowing that the jury would later hear that Jason and John Galanis had pleaded guilty to securities fraud. Second, all instructions regarding Gerova evidence were attempts to mitigate undue prejudice in the face of the Court's ruling, and do not reflect Mr. Archer's acceptance of any of the Gerova evidence.

Mr. Archer consistently objected to any mention of Gerova, including introduction of Jason Galanis's September 2015 arrest "on unrelated charges." Having been overruled earlier in trial and having preserved that objection, but faced with the introduction of further Gerova evidence, Mr. Archer faced a choice between two prejudices: One was for the jury to be told that Jason Galanis and John Galanis had pleaded guilty to securities fraud, and leaving them to speculate whether this had anything to do with the September 2015 arrest or whether it was yet another prior bad act.  The other was to tell the jury that the September 2015 arrest was for the securities fraud to which Jason and John Galanis later pleaded guilty. Having chosen what he believed was the lesser of two evils does not mean that Mr. Archer was not still prejudiced by the evidence.

Nor is Mr. Archer's counsel's summation inconsistent with arguing that the evidence is unduly prejudicial. Given the Court's ruling allowing the government to admit this evidence, it was impossible for counsel to ignore it.  No matter how effective counsel's summation was, it does not negate the fact that this evidence would not have been admissible against Mr. Archer in a separate trial, and that it presented an undue risk that the jury improperly inferred Mr. Archer's

guilt based on the evidence presented of his codefendant's guilt. *See United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 173 (S.D.N.Y. 2006) ("The Second Circuit recognizes the potential 'spillover' prejudice that a co-defendant may incur in a joint trial where prior-act evidence is admitted against another co-defendant." (citing *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995))).

In summary, the introduction of the Gerova evidence constitutes a sufficient basis for granting Mr. Archer's Rule 33 motion for a new trial.

## III.   Instructional Errors Denied Mr. Archer A Fair Trial.

### A.   The Court Improperly Gave A Conscious Avoidance Instruction Without A Factual Predicate.

There was no factual predicate for a conscious avoidance instruction because "[n]o trial evidence suggested that Mr. Archer took 'deliberate actions to avoid learning' anything." ECF No. 567 at 93 (quoting *United States v. Goffer*, 721 F.3d 113, 128 (2d Cir. 2013)). The government does not dispute this, but argues that "a defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (internal quotation omitted) (emphasis supplied); Opp'n 88. Mr. Archer's involvement in the bond scheme does not approach the level of overwhelming suspicion necessary to support a conscious avoidance instruction.

First, Jason Galanis's "regulatory background" was an open fact to those he dealt with, *see* Tr. 1331:24-1332:12, and the government offered no evidence that Mr. Archer believed or should have believed that people who long ago entered into "no admit, no deny" settlements with the SEC are likely to then engage in multimillion dollar frauds. That Jason Galanis entered a

civil settlement with the SEC, which had expired before the bond deal arose, *see* Tr. 1331:24-1332:8, hardly creates the kind of overwhelming suspicion needed to support a conscious avoidance instruction.

Second, the main circumstance the government relies on – the $15 million transfer – is not "overwhelmingly suspicious" given Jason Galanis's flamboyant displays of wealth. Trial evidence showed Jason Galanis had a multimillion-dollar mansion in Bel Air, *see* DX4914, DX3709-10, Tr. 2195:7-9 (Martin), with daily maids and servants, Tr. 1196:23-25, on which he was doing a multimillion-dollar renovations, Tr. 1204:21-24 (Dunkerley), as well as a multimillion-dollar TriBeca apartment (*see* GX 225; Tr. 1203:1-4) adorned with expensive fine art. Tr. 1203:23-25. Jason Galanis also drove Bentleys, Tr. 1195:5-6, and flew first class and in private jets. Tr. 1194:24-1195:1. In short, Jason Galanis "led a very lavish life," Tr. 1194:7-9, and "appeared to be a wealthy and successful person." Tr. 1417:1-3. That such a person had a large amount of cash is not so "overwhelmingly suspicious" that it justifies a conscious avoidance instruction when there is zero evidence of actual conscious avoidance.

Third, the trial evidence showed that the bonds were not a focus for Mr. Archer. During the relevant period he was busy selling Rosemont Realty and pursuing other completely unrelated business ventures, and he traveled frequently for both purposes. *See* Tr. 3288:4-19 (K. Archer). As outlined above, Mr. Archer had no contact with the WLCC or pension fund victims, the lawyer who quarterbacked the bond deals (Tim Anderson), Michelle Morton or her firms, Gary Hirst, John Galanis, or Francisco Martin. He only spoke with Hugh Dunkerley on legitimate conference calls. The government can only argue that Mr. Archer was "kept in the loop" from e-mails he received, *see, e.g.*, Opp'n 46, 59; Tr. 62:21-24 (government opening), 3630:4 (government summation) – evidence that says far more about Jason Galanis and the way

39

he manipulated people than it does about Mr. Archer, who more often than not did not respond –
because there was no evidence Mr. Archer actively participated in the scheme.

Finally, as explained above, the bond deals appeared legitimate, even to those who were
much more involved than Mr. Archer. The participants in the deal included prestigious,
sophisticated law and accounting firms and one of the largest banks in the world. Tim Anderson
was an experienced tribal lawyer who quarterbacked the bond deals, but even he "did not suspect
that anything untoward was happening with the bonds until the SEC started" investigating them.
Tr. 521:25-522:3. If the lawyer directing the bond deals did not suspect any foul play, then how
could Mr. Archer's passive involvement be "*so overwhelmingly suspicious*" as to presume
conscious avoidance?  It is true, as the government points out, that Anderson and Mr. Archer had
different information, and certainly Anderson had far more and more detailed information than
did Mr. Archer.  But what is important is that Mr. Archer lacked the critical information that
would have revealed the fraudulent nature of the scheme:  that the WLCC was a sham entity, that
Galanis was stealing the money for his personal benefit, that the clients of Atlantic and Hughes
were lied to and their investment parameters ignored.

The case the government relies on, *Svoboda*, shows how involved a defendant must be to
establish the "overwhelming suspicion" necessary to justify a conscious avoidance instruction.
347 F.3d 471 (2d Cir. 2003). There, the defendant received and acted on a series of stock tips
from a bank employee regarding his clients, several of the stock tips came right before tender
offer announcements for those clients, and all the stock tips led to outsized returns. *Id.* at 480-81.
The defendant in *Svoboda* was a continuing active participant in conduct that was
overwhelmingly criminally suspicious on its face, not someone passively "kept in the loop"
about a series of transactions that were not even suspicious to the seasoned bond lawyer

organizing them. The evidence in the record does not come close to providing the factual

predicate necessary to support a conscious avoidance instruction.

> **B.**     **The Jury Should Have Been Instructed On The Possible Existence Of Multiple Conspiracies.**

The government contends that "[t]he conspiracy alleged and proved at trial was a single

conspiracy" because, in its view, "[t]he misrepresentations to the WLCC were necessary to

secure the issuance of the bonds, and the failure to disclose material facts to the Hughes and

Atlantic investors was necessary to find purchasers of those bonds." Opp'n at 90-91. But while

this is of course the government's contention (as it always in when multiple conspiracy

instructions are given or litigated), it is not the only permissible conclusion the jury could have

reached.  A rational trier of fact could have concluded from the trial evidence that there were two

conspiracies, rather than one.

And that is the relevant question:  whether a rational juror could have found that the

conspiracy to misappropriate bond proceeds was separate and distinct from the conspiracy to

take over the investment advisers and breach the fiduciary duties owed to their clients. In other

words, that a rational juror *could* find that there was only one conspiracy does not render a

multiple conspiracies charge unnecessary.  What matters is whether the jury could *only* find that

there was a single conspiracy (in which case the instruction is not required) or whether, instead,

the juror could find either that there was one conspiracy or that there were two or more

conspiracies (in which case the instruction is required). *See*, *e.g.*, *United States v. Maldonado-*

*Rivera,* 922 F.2d 934, 962 (2d Cir. 1990) ("[W]here the proof is *susceptible to the inference* that

there was more than one conspiracy, the question of whether one or more

than one conspiracy has been established is a question of fact for a properly instructed jury.")

(emphasis added); *United States v. Restrepo*, 547 F. App'x 34, 40 (2d Cir. 2013)

("A multiple conspiracies charge is required where several different conspiracies *could be inferred* from the evidence offered at trial." (citing *United States v. Aracri,* 968 F.2d 1512, 1520 (2d Cir. 1992) (emphasis added)); 1 SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL ¶ 19.01, Instruction 19-5 & cmt. at 19-22 (2009) ("Generally speaking, the instruction is appropriate in cases where a number of defendants have been collectively charged in the indictment with participation in a single, overall conspiracy, but *where there is a basis* for the defense claim that multiple conspiracies existed." (emphasis added)); *compare United States v. Alkins*, 925 F.2d 541, 553-54 (2d Cir. 1991) ("If the evidence admits of *no possibility* that there was more than one conspiracy, a multiple conspiracies charge is not necessary.") (citing *United States v. Martino,* 664 F.2d 860, 875 (2d Cir.1981), *cert. denied,* 458 U.S. 1110 (1982) (emphasis added)).

The government's brief ultimately never grapples with the fact that "a rational juror *could have* easily concluded that there were two conspiracies," and that those two conspiracies "can easily be separated." Br. at 97 (emphasis added).  Simply put, the jury could have concluded that one conspiracy existed to steal bond proceeds for the personal enrichment of Galanis and his confederates, and another existed to defraud the clients of Atlantic and Hughes.  Each of these conspiracies relied upon different misrepresentations, had different victims, served different interests, and either one of them could have stood alone without the other.  Accordingly, because Mr. Archer has brought forward "evidence of separate networks operating independently of each other," *United States v. Cusimano*, 123 F.3d 83, 89 (2d Cir. 1997), the Court should have given a multiple conspiracies charge.

The failure to give this charge resulted in "substantial prejudice" to Mr. Archer.  *Id.*  The need for a multiple conspiracies instruction stems, among other things, from the potential "'spill

over effect' of permitting testimony regarding one conspiracy to prejudice the mind of the jury against the defendant who is not part of that conspiracy." *United States v. Harris,* 8 F.3d 943, 947 (2d Cir. 1993). Here, Mr. Archer had nothing to do with the investment adviser fraud (and was never charged in those counts).  As Mr. Archer pointed out in his opening brief, "[e]ven though the investment adviser defendants pled, the government spent weeks of trial putting on evidence about fiduciary duties, conflicts of interest, and other issues specific to the takeover and exploitation of investment advisers, none of which concerned Mr. Archer." Br. at 91.

Simply put, the mountains of investment adviser fraud evidence presented at trial substantially prejudiced Mr. Archer given his complete and utter lack of involvement in any of the relevant events surrounding Hughes and Atlantic. *See United States v. Cambindo Valencia*, 609 F.2d 603, 629 (2d Cir. 1979) (ordering new trial for defendants who "may have in fact have been participants in the [at-issue] conspiracy" when "there was simply too much other evidence offered of entirely separate actions and unconnected defendants, fanning the flames of prejudicial spillover"); *cf. United States v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994) (finding that defendants may be entitled to severance where they "would have to endure a trial involving many incidents of misconduct which do not involve them"); *United States v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992) (reversing trial court's denial of severance as to certain defendants because they had, as a result of said denial, been "swamped" by a "mass of irrelevant evidence"); *United States v. Bellomo*, 954 F. Supp. 630, 650 (S.D.N.Y. 1997) ("Absent severance, these defendants would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating . . . which would not be presented at a separate trial and which is not alleged to have been a part of their criminal activity. Thus, there is clear potential for spillover prejudice in this case."). The spillover prejudice to

43

Mr. Archer was also substantially exacerbated by the length and complexity of the three-defendant trial. *See Cusimano*, 123 F.3d at 89 ("It is generally more difficult to make such a showing where . . . the trial was a short trial involving a single defendant.").

And the government's quotations from portions of the Court's jury instructions supposedly in support of the notion that Mr. Archer cannot "show substantial prejudice from a failure to give a multiple conspiracies instruction," in fact, only serve to reinforce Mr. Archer's arguments on this point. For example, when the Court's instructions referenced, among other things, "fraudulently caus[ing] clients of Atlantic and Hughes to buy . . . bonds, thereby defrauding those entities as well," the Court essentially dragged into the conspiracy to steal bond proceeds a substantial volume of evidence from what the jury could easily have considered to be, if properly instructed, the entirely separate conspiracy to commit investment adviser fraud, a conspiracy with which Mr. Archer had no involvement. Opp'n at 91 (quoting Tr. 4143-44).

### C.     The Jury Should Have Been Instructed On Specific Issue Unanimity.

The government acknowledges that a general instruction on unanimity, such as the one that was given in this case, is not sufficient to ensure unanimity "'in cases where complexity of the evidence or other factors create a genuine danger of jury confusion.'" Opp'n at 93 (quoting *United States v. Ferguson*, 676 F.3d 260, 279-80 (2d Cir. 2011) (quoting *United States v. Schiff*, 801 F.2d 108, 114-15 (2d Cir. 1986)) (emphasis added). The government argues, however, that this case was simply not complex enough to create the requisite level of confusion. *See id.*  But the reality is that this *was* an extraordinarily complex, multi-defendant case that involved a multi-faceted and arguable multiple conspiracies with different sets of victims.

As the government repeatedly asserted during trial (though it now tries to back away from its prior statements), the evidence before the jury was incredibly complex. The fact that the government essentially tried two distinct conspiracy cases together as one (whether it was

technically one or two conspiracies) could very well have resulted in some jurors believing that Mr. Archer had been a member of the securities fraud conspiracy but not the investment adviser fraud conspiracy, while the remaining jurors believed the opposite.

Simply put, in order for Mr. Archer's conspiracy conviction to stand, the jury needed to unanimously agree that he had conspired to commit securities fraud beyond any reasonable doubt. But the manner in which the government put on its case and the Court's decision not to give a multiple conspiracies instruction combined to create a situation where he may well have been convicted for conspiracy to commit securities fraud based on evidence that supported an altogether different investment adviser conspiracy in which he took no part. *Cf. United States v. Natelli*, 527 F.2d 311, 325 (2d Cir. 1975) ("When there is more than one specification as a predicate for guilt, each dependent on particular evidence which is unrelated to the other, it would be sound practice to instruct the jury that they must be unanimous on a particular specification to convict."); *see also United States v. Beros*, 833 F.2d 455, 462 (3d Cir. 1987) ("When the government chooses to prosecute under an indictment advancing multiple theories, it must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury. It cannot rely on a composite theory of guilt, producing twelve jurors who unanimously thought the defendant was guilty but who were not unanimous in their assessment of which act supported the verdict. Conviction by a jury that was not unanimous as to the defendant's specific illegal action is no more justifiable than is a conviction by a jury that is not unanimous on the specific count.").

Accordingly, because there is a significant possibility that the Court's error in failing to give the requested jury unanimity charge (or, alternatively, a detailed verdict sheet) may have

resulted in a non-unanimous verdict in violation of the Sixth Amendment, the Court should grant Mr. Archer a new trial.

**IV.** ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

There can be no denying that Jason Galanis was at the heart of the government's case against Mr. Archer and his co-defendants at trial.  Galanis was indisputably the mastermind of both the conspiracy to foist the WLCC bonds upon the unsuspecting clients of Hughes and Atlantic and the conspiracy to steal the proceeds of those bonds.  Galanis controlled the flow of information to and from his co-conspirators, to the WLCC and pension fund victims of his dual frauds, and to those who, like Mr. Archer, became unknowingly ensnared in those frauds.

The government's trial case against Mr. Archer hung entirely on its ability to prove his knowing, willful, and intentional participation in Galanis's schemes.  But the so-called "proof" of Mr. Archer's purported knowledge and intent depended entirely on circumstantial evidence regarding exactly what information Galanis did or, more accurately, did not share with him.  It is therefore surprising, and extremely disconcerting, to learn that the government, ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[7]     Mr. Archer also joins co-defendant Bevan Cooney's arguments and motion for a new trial based on newly discovered evidence. *See* Cooney Reply Brief at 31-34.



Sept. 13, 2018 letter from R. Mermelstein to defense counsel at 1-2 (attached as Exhibit 1).

██████████████████████████████████████████████████

████████████████████████████████

The bombshell post-trial revelation of this newly discovered impeachment evidence

constitutes a wholly independent ground for a new trial, separate and apart from everything

addressed above and in Mr. Archer's opening brief in support of his Rule 29 and 33 motion

(which brief was filed before Mr. Archer learned of this information and evidence).  Normally,

a motion for a new trial based on newly discovered evidence should be granted "if the defendant

makes a showing that the evidence is in fact 'new,' *i.e.*, it could not have been discovered,

exercising due diligence before or during trial, and that the evidence is so material and non-

cumulative that its admission would *probably* lead to an acquittal."  *United States v. Spencer*,

4 F.3d 115, 119 (2d Cir. 1993) (emphasis added; quotation marks and citation omitted).  ████████

████████████████████████████████████████████████

██████████████████████ .  ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████

"The culpability of the Government is central where the newly-discovered evidence

concerns the purportedly false testimony of a Government witness.  If the Government either

knew or should have known that the witness was perjuring himself, a new trial must be granted if

the new evidence *might* have altered the jury's verdict."  *United States v. Biaggi*, 823 F. Supp.

1151, 1156 (S.D.N.Y. 1993), *aff'd*, 48 F.3d 1213 (2d Cir. 1994) (emphasis in original; citations

omitted).  In such situations, "[t]he test is whether there is *any reasonable likelihood* that the

false testimony would have affected the judgment of the jury."  *Id.* (emphasis added; citation

omitted).  If, however, the government was "unaware of the perjury at trial, a new trial is required only if the new evidence goes to an issue so material that it would *probably* result in acquittal upon retrial.  This standard is met only if the perjured testimony would leave the court with a *firm belief* that but for the perjured testimony, the defendant would *most likely* not have been convicted."  *Id.* (emphasis added; quotation marks and citations omitted).

███████████████████████████████████████████

██████████████████████ *See United States v. Avellino*, 136 F.3d 249, 261 (2d Cir.1998) (district

court has discretion to order an evidentiary hearing where there is "a nonspeculative basis for

inferring that ... the government had not made available to [the defendant] all pertinent material

in its possession"); *United States v. Schlesinger*, 438 F. Supp. 2d 76, 95-96 (E.D.N.Y. 2006)

(quotation marks and citation omitted) ("[T]he Court issued an order scheduling an evidentiary

hearing on the claims of prosecutorial misconduct to resolve the disputed facts and to develop

the record on the materiality of the alleged Giglio material, as well as the government's actual or

constructive knowledge of such information.  As to the Schwimmer recantation, the Court stated

that although an evidentiary hearing was not required, . . . a hearing would be helpful in

evaluating the credibility and materiality of Schwimmer's alleged recantation that was neither

sworn to nor taken under oath."); *United States v. Austin*, No. CR 94 737 (JBW), 1997 WL

43523, at *1 (E.D.N.Y. Jan. 27, 1997) (referencing "full post-trial evidentiary hearing" on,

among other things, the "failure of the government to supply [defendant] with exculpatory

evidence known to the government at trial" and "newly discovered evidence").

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████



- 

Even though Mr. Archer believes that he can already establish his entitlement to a new trial based on the small fragments of information in the September 13 letter, he anticipates that, after the above-requested evidentiary hearing, he will be able to make much more robust and definitive showings as to each prong of the newly discovered evidence test, whether the more rigorous or more lenient standard is applied, and therefore put his entitlement to a new trial beyond all doubt.

## **CONCLUSION**

The Court should acquit Mr. Archer of the charges against him under Rule 29, and order

a new trial under Rule 33.


Dated:      September 27, 2018
            New York, New York

Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
Laura C. Harris
Craig Wenner

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
cwenner@bsfllp.com
lharris@bsfllp.com

*Attorneys for Devon Archer*