I5U7GAL1

1  UNITED STATES OF AMERICA
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                          16 Cr. 371 (RA)

5  JOHN GALANIS, et al.,

6              Defendants.

7  ------------------------------x

8                                      New York, N.Y.
                                       May 30, 2018
9                                      11:10 a.m.

10

11 Before:

12                    HON. RONNIE ABRAMS,

13                                      District Judge

14                    APPEARANCES

15 ROBERT KHUZAMI,
        Acting United States Attorney for the
16      Southern District of New York
   BY:  BRENDAN F. QUIGLEY,
17      REBECCA G. MERMELSTEIN,
        NEGAR TEKEEI,
18          Assistant United States Attorneys

19 PELUSO & TOUGER
        Attorneys for Defendant John Galanis
20 BY:  DAVID TOUGER

21 BOIES, SCHILLER & FLEXNER LLP (NYC)
        Attorneys for Defendant Devon Archer
22 BY:  MATTHEW LANE SCHWARTZ
        LAURA HARRIS

23

24

25

I5U7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              – and –
     O'NEILL and HASSEN
5          Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                     Ellie Sheinwald, Paralegal
9                          Eric Wissman, Paralegal
                           Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5U7GAL1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  You may be

3     seated.

4          MS. HARRIS:  Your Honor, we are just waiting for

5     Mr. Schwartz.

6          THE COURT:  That's fine.  When he gets here, we will

7     meet briefly at side bar.  And the jury is just filling out

8     lunch forms, but they are all here now.

9          MS. NOTARI:  Mr. Hassen was on the line outside.

10          THE COURT:  OK.

11          Ms. Notari, can we meet at sidebar now?

12          MS. NOTARI:  Yes.

13          THE COURT:  Thank you.

14          (At the side bar)

15          THE COURT:  I just wanted to clarify about the

16     impeachment.  You can impeach him on what you perceive to be

17     his dishonesty, if he has made statements that you think he

18     doesn't believe to be true on e-mail.

19          I don't think just under 403 that those particular

20     texts should go to the jury, because I think that there are

21     other ways for you to do it.  And if you want to show it to him

22     and ask him generally and make a generalized comment about what

23     it is, if in fact he says everything on e-mail I say I believe

24     to be true.  What I don't think is a fair inference is if he

25     made some sexist comment as part of banter, for you to take

I5U7GAL1

```
1    that and suggest that that means in the context of business

2    everything -- everybody lies in the context of business.  I

3    don't think that's a natural inference.

4           MR. SCHWARTZ:  Well, certainly my argument is not

5    going to be everyone lies.  And this is not a today issue; this

6    is a closing statements issue, because it's about what

7    arguments one can make from the evidence.

8           THE COURT:  That's fair.  And I'm not limiting your

9    arguments to closing argument.

10          MR. SCHWARTZ:  I think I understand very clearly what

11   I can and can't do with this witness.

12          THE COURT:  But it's fair for you to impeach his

13   credibility, which is what I wanted to get at yesterday.  I

14   just wanted to make sure I was clear that I don't want the

15   texts before the jury, the sexist texts, because I don't think

16   that -- I think they are substantially more prejudicial than

17   probative.  But I'm going to ask you to ask questions if he

18   is --

19          MR. SCHWARTZ:  We will pull that page out of the

20   exhibit, and I may show it to him, depending on the question,

21   but we won't publish it or have it read to the jury.

22          THE COURT:  That's fine.  And you can get at generally

23   the fact that there is banter, and I understand your desire to

24   do that.

25          Yes?
```

I5U7GAL1

| | |
|---|---|
| 1 | MS. TEKEEI:  Your Honor, I just want to be clear as to |
| 2 | the questions Mr. Schwartz thinks he is allowed to ask so that |
| 3 | there are no surprises here. |
| 4 | we don't think it's appropriate under 403 and other |
| 5 | rules for him to ask generally people lie when they're talking |
| 6 | about business, right?  In fact, you have done that in the past |
| 7 | before, right? |
| 8 | I think those questions are improper, and I just want |
| 9 | to be clear about what Mr. Schwartz is going to ask, so that |
| 10 | it's not confusing to the jury. |
| 11 | THE COURT:  I think that people lie is too vague |
| 12 | anyway.  I don't know who that means and in what context.  You |
| 13 | can ask about him -- |
| 14 | MR. SCHWARTZ:  Yes. |
| 15 | THE COURT:  -- saying things he believes not to be |
| 16 | true, because I think that's proper impeachment.  But generally |
| 17 | don't people lie in the course of business, that's not |
| 18 | particularly probative anyway because it's such a generalized |
| 19 | statement. |
| 20 | MR. SCHWARTZ:  Agreed. |
| 21 | THE COURT:  OK, thank you. |
| 22 | MS. NOTARI:  Your Honor, I just want to -- along the |
| 23 | same lines, I mean I'm going to go into his e-mails here, |
| 24 | because he e-mails with Cooney.  And I just want to bring out |
| 25 | the fact that during the course of business -- and I just -- |

I5U7GAL1

1   I'm preempting any objection -- that he has close relationships

2   with his clients, and his e-mails are not always about

3   business; there are times when they talk about social things.

4          THE COURT:  That's fine.

5          MS. NOTARI:  And I'm not going to go into anything

6   specific, but I just want to get that out there, that e-mails

7   between business people are not always about the deals they are

8   making.

9          THE COURT:  I understand.  And I understand the need

10  to get out that there is banter too.  I just thought that those

11  sexist e-mails were just too prejudicial.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I5U7GAL1                      Anderson - Cross

1           (Jury present)

2           THE COURT:  Good morning, everyone.

3           Please be seated.

4           Mr. Anderson, I remind you you are still under oath.

5           THE WITNESS:  Thank you.  Your Honor.

6           MR. SCHWARTZ:  Thank you, your Honor.  Good morning,

7    ladies and gentlemen.

8     TIMOTHY ANDERSON, resumed.

9    CROSS EXAMINATION (Continued)

10   BY MR. SCHWARTZ:

11   Q.  Good morning, Mr. Anderson.

12   A.  Good morning.

13   Q.  Did you get stuck outside in the fire drill this morning?

14   A.  I did not.  Some people did apparently.

15   Q.  The lines were bad.  When we broke yesterday we were

16   talking generally about your business development efforts in

17   connection with Jason Galanis and Burnham.  Do you recall that?

18   A.  I do.

19   Q.  And I had asked you the question Jason Galanis would send

20   you information about deals he was working on to acquire new

21   companies under the Burnham brand, and you replied I don't know

22   if I recall that but I do recall receiving marketing materials.

23           Do you recall giving that testimony?

24   A.  I do.

25   Q.  And is it your testimony that you don't recall Jason

1    Galanis providing specific updates to you about acquisitions

2    that he was overseeing as part of the Burnham brand?

3    A.  I recall he was discussing different things at various

4    times, and I didn't follow it all that closely.

5    Q.  You didn't follow it all that closely, but he would keep

6    you in the loop.

7    A.  He seemed to, yes.

8             MR. SCHWARTZ:  So can I put up, Mr. Jackson, on the

9    judge, the witness and the lawyers' screens Defense Exhibit

10   3156, please.  And if you could, please, blow up the bottom

11   e-mail on this communication.

12   Q.  So at the very bottom, Mr. Anderson, this is an e-mail from

13   Jason Galanis to you dated March 20, 2015, true?

14   A.  Yes.

15            MR. SCHWARTZ:  Your Honor, I offer Defense Exhibit

16   3156.

17            MS. TEKEEI:  No objection.

18            THE COURT:  It will be admitted.

19            (Defendant's Exhibit 3156 received in evidence)

20            MR. SCHWARTZ:  Mr. Jackson, could you please show this

21   to the jury now.

22   Q.  Can you please read Mr. Galanis' e-mail to you.

23   A.  Tim, Burnham is committed to municipals by buying a

24   majority interest in a fixed income oriented investment bank

25   called Bonwick Capital, and a concurrent lift-out of 12 members

1   of a municipal finance team at Rice Financial Products.  The

2   term sheet is executed and definitives are being drafted, so we

3   are close to on-boarding this capability.  Burnham just leased

4   41,000 square feet at 40 West 57th in Manhattan with a move-in

5   date of May 1.  The municipal team will function from there."

6   Q.  You understood the reference in Mr. Galanis' e-mail to you

7   about fixed income to include bonds, correct?

8   A.  Yes.

9   Q.  And when Jason Galanis referred to a lift-out of 12 members

10  of the municipal finance team, you understood that to mean that

11  in addition to buying Bonwick Capital, he was telling you that

12  Burnham was hiring a 12 member team from Rice Financials that

13  specialized in municipal bonds, right?

14  A.  Correct.

15          MR. SCHWARTZ:  Mr. Jackson, if you could go to the

16  next page of this document, just blow up right in the middle

17  there, above that.

18  Q.  It looks like there were some attachments to Mr. Galanis'

19  first e-mail to you, true?

20  A.  That's what it states here.

21          MR. TOUGER:  Mr. Schwartz, could you just classify

22  Mr. Galanis as Jason Galanis?

23          MR. SCHWARTZ:  Thank you.

24  Q.  Jason Galanis it appears attached some documents to his

25  e-mail to you, true?

1   A.  It appears to, yes.

2   Q.  One is called Bonwick Capital Overview, October 2014 pdf,

3   correct?

4   A.  Correct.

5   Q.  And then there is something called Burnham Market Analysis,

6   Rice Bonwick (final) pdf?

7   A.  Correct.

8   Q.  And it looks like someone's résumé or CV, right?

9   A.  Correct.

10  Q.  Can we go back to the first page, and can you blow up right

11  in the middle of the page, Mr. Jackson, the response from

12  Mr. Anderson.

13          What was your response to Jason Galanis' e-mail?

14  A.  "That's terrific news Jason, congrats for being so

15  aggressive on this.  We'll need to circle up in Manhattan this

16  summer, I have a NYC office I've never been to despite being a

17  New York attorney."

18  Q.  Now, when you wrote "congrats for being so aggressive on

19  this," you didn't know all the details of these deals he was

20  discussing, did you?

21  A.  No.

22  Q.  Had you looked at the attachments to his e-mail?

23  A.  No.

24  Q.  You were just congratulating him on something that he

25  seemed to be excited about, true?

1    A.   Correct.

2    Q.   And you also knew from Jason Galanis' reference to

3    Burnham's "commitment to municipals" that there was potentially

4    more work for your law firm Dilworth Paxson, correct?

5    A.   Hopefully, yes, correct.

6    Q.   And that's one of the reasons -- the prospect of getting

7    more work -- why you suggested that you and Jason Galanis get

8    together in person in New York City over the summer, right?

9    A.   Correct.

10   Q.   Because he was a potentially valuable source of business to

11   you and your law firm.

12   A.   Right, and they were opening up a new office, right.

13   Q.   Now, Mr. Anderson, would you agree with me that in addition

14   to congratulating Mr. Galanis -- Mr. Jason Galanis -- on things

15   that you didn't necessarily understand the details of, you also

16   sometimes said things that you didn't mean to Jason Galanis or

17   Yanni Galanis, because their business was important to you?

18   A.   No, I wouldn't say that.

19            MR. SCHWARTZ:  Well, can we take this down,

20   Mr. Jackson, and can we pull up Defense Exhibit 1344 at page 6.

21            MS. TEKEEI:  Your Honor?

22            MR. SCHWARTZ:  It's not that page.

23            THE COURT:  This is not for the jury, correct?

24            MR. SCHWARTZ:  It is.  It's in evidence.

25            THE COURT:  All right.

I5U7GAL1                          Anderson - Cross

1   Q.  Now, at the bottom -- again, this is your text with Yanni
2   Galanis, true?
3   A.  I can't tell if they're with Yanni or not but, yes, they're
4   texts.
5   Q.  This is the same exhibit that we looked at yesterday.
6   Yesterday we were looking at your texts with Yanni Galanis,
7   right?
8   A.  OK, yes.
9   Q.  Now, the stuff on the left side is him, and the stuff on
10  the right side is you, true?
11  A.  Yes.
12  Q.  He sent you a picture; do you see that?  A picture of a
13  sign.
14  A.  Yes.
15  Q.  What does that sign say?
16  A.  "If a man speaks in the forest" --
17              MR. TOUGER:  Objection.
18              THE COURT:  This is in evidence?  The government
19  introduced this?
20              MS. TEKEEI:  We did not introduce this, your Honor.
21              THE COURT:  Can we meet at sidebar for a minute,
22  please?  Why don't we take this down for a minute.
23              (Continued on next page)
24
25

I5U7GAL1                          Anderson - Cross

1            (At the sidebar)

2            MR. SCHWARTZ:  This is a page that no one objected to.

3     I confirmed with the government, I confirmed with Mr. Touger

4     yesterday; there was no objection, and it's in evidence.

5            THE COURT:  If that's the case, that's the case.  I

6     had thought that the objections from yesterday were both to the

7     picture of the other woman and the colloquy afterwards and to

8     this one, but if it's in evidence already and no one objected

9     --

10           MR. TOUGER:  No this one, I thought we were going to a

11    different spot.

12           MR. SCHWARTZ:  I'm not.  I apologize.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I5U7GAL1                    Anderson - Cross

1              (In open court)

2              MR. SCHWARTZ:  Mr. Jackson, can we go back to what we

3    were just looking at, Defendant's Exhibit 1344, page 6.

4    Q.  And I believe where we left off, Mr. Anderson, was you were

5    going to read the sign that's depicted in that picture.

6              MR. TOUGER:  I withdraw my objection.

7              THE COURT:  Thanks.  Go ahead.  I'm sorry,

8    mr. Schwartz, please go ahead.

9    Q.  Can you read that sign that's depicted in the picture that

10   Yanni Galanis sent to you?

11   A.  Yes.  "If a man speaks in the forest and there is no woman

12   there to hear ... is he still wrong?"

13   Q.  And what was your response?

14   A.  "Philosophical" exclamation point.

15   Q.  Philosophical, right?

16   A.  Um-hum.

17   Q.  There is nothing philosophical about that, is there?

18   A.  I disagree.  I don't know.  It's clearly a humor statement.

19   Q.  You find that to be a philosophical statement?

20   A.  Well, it's a play on the philosophical statement "If a tree

21   falls in the forest and no one hears it, or no one is around,

22   did it really make a noise," or whatever that saying was.

23   Q.  It's your testimony, Mr. Anderson, that the phrase "If a

24   man speaks in the forest and there is no woman there to hear

25   it, is he still wrong" is like a Zen Koan to you?

1        MS. TEKEEI:  Objection.

2        THE COURT:  Overruled.

3   A.  I don't know who Zen Koan is.

4   Q.  Fair enough.  Mr. Anderson, would you agree with me that in

5   your communications with Jason and Yanni Galanis you sometimes

6   said things that were the exact opposite of what you meant?

7   A.  Not to my recollection.

8        MR. SCHWARTZ:  Mr. Jackson, can you take this off the

9   jury's screen for a moment and show just to the witness, the

10  judge and the lawyers page 10 of this same document.

11  Q.  Can you read that to yourself, not out loud, please,

12  Mr. Anderson.

13  A.  Which part?

14  Q.  The whole thing.

15  A.  OK.

16  Q.  Having reviewed that, does that refresh your recollection

17  that sometimes you said things that you did not mean when you

18  spoke to Jason or Yanni Galanis?

19  A.  I have made jokes that are not to be taken literally, yes.

20  Q.  That you didn't believe, right?  You spoke words or wrote

21  words that you did not believe, true?

22  A.  In jest, yes, and clearly in jest.

23  Q.  Clearly in jest.

24  A.  Correct.

25  Q.  It was good for business to have a friendly joking

1   relationship with Yanni and Jason Galanis, true?

2   A.  It's always good to have friendly relationships with

3   people, yes.

4   Q.  You got very friendly with Yanni and Jason Galanis, true?

5   A.  With Yanni, yes.

6   Q.  So, for example, let's look at page 17 of this exhibit.

7        You can put it back up for the jury, please,

8   Mr. Jackson.

9        Here you're sharing some of your weekend plans, your

10  family plans with Yanni Galanis, right?

11  A.  Correct.

12  Q.  And up at the top of this page Yanni Galanis had shared

13  some information with you about his family's real estate

14  investments, right?

15  A.  Correct.

16  Q.  So it was helpful to you to develop a business from Jason

17  and Yanni Galanis to have that kind of personal relationship,

18  true?

19  A.  Personal relationships are always good in the development

20  of business, yes.

21  Q.  And to joke with them.

22  A.  For some people, yes.  Other people that may not be funny

23  people or humorous people, it may not work.  For some people it

24  does, yes.

25  Q.  But for these people, for John and Jason Galanis, it was

1  helpful to have a jokey, casual, familiar relationship with

2  them, true?

3  A.  With Yanni, correct; Jason, not so much.

4  Q.  I want --

5           You can take this down, Mr. Jackson.

6           And I want to talk about the bond issuances themselves

7  now for a little bit.

8  A.  Sure.

9  Q.  So, to reorient us, you began working on the first WLCC

10 bond issuance in about May 2014; is that right?

11 A.  On or about, yes.

12 Q.  And you told us that you drafted or reviewed every one of

13 what you call the core documents for the bond issuances,

14 correct?

15 A.  Correct.

16 Q.  So if we can pull up Exhibit 204 already in evidence.  This

17 is a copy of the trust indenture for the first bond issuance,

18 right?

19 A.  Correct.

20 Q.  And if we jump to page 20 of this document, Section 2.11,

21 at the bottom of the page, that lists certain key documents

22 that needed to be finalized and executed before the bonds could

23 actually be issued, right?

24           Can you blow that up for him, please, Mr. Jackson.

25 A.  It begins to.  It only gets to A on this screen, but the

1    first document.

2    Q.  Well, we will flip the page in a second, but you know this

3    contains a list of certain key documents that needed to be

4    finalized and executed before the bonds could actually be

5    issued, right?

6    A.  Correct, yes.

7    Q.  And you were involved in drafting or reviewing each of

8    those important documents, right?

9    A.  I can only see the first one at this point.

10   Q.  OK.  Well, let's go through them.  First of all, there is

11   the document we are looking at which is the trust indenture

12   itself.

13   A.  Right.

14   Q.  You drafted that.

15   A.  Um-hum.

16   Q.  You drafted the trust indenture, true?

17   A.  Initial draft, yes.

18   Q.  And then the certified corporate resolution authorizing the

19   execution of the indenture and the bonds, did you draft that?

20   A.  I did not.

21   Q.  Did you review that?

22   A.  I did.

23   Q.  And if we can flip the page, please, Mr. Jackson.

24        By the way, that was a resolution by the WLCC, right?

25   A.  Correct.

1    Q.  So it would have been drafted on their side.

2    A.  Correct.

3    Q.  And you reviewed it as counsel to the placement agent.

4    A.  Correct.

5    Q.  B, executed counterparts of the indenture, we just went

6    over, you did the individual draft of that, true?

7    A.  Correct.

8    Q.  Next is an opinion of bond counsel to the placement agent?

9    A.  That was my opinion, yes -- my firm's opinion.

10   Q.  You were bond counsel?

11   A.  To the placement agent.

12   Q.  So you drafted an opinion from your law firm, Dilworth

13   Paxson, to the placement agent, your client, Burnham

14   Securities, Inc.?

15   A.  Correct.

16   Q.  And then there is also an opinion of bond counsel to the

17   tribe addressed to the trustee?

18   A.  Correct.

19   Q.  Did you draft that?

20   A.  No.

21   Q.  That would have been an opinion from Greenberg Traurig,

22   true?

23   A.  Correct.

24   Q.  Greenberg Traurig, as we discussed, was representing the

25   WLCC in this deal?

1   A.  Correct.

2   Q.  And Mr. Touger asked you a bunch of questions about

3   Greenberg Traurig yesterday.  It's one of the biggest law firms

4   in the world?

5   A.  That's my understanding, yes.

6   Q.  Very, very, very big, full service, awesome law firm,

7   right?

8   A.  I know it's very big and has a very good reputation.

9   Q.  So great that Rudy Guiliani worked there until two months

10  ago.

11          MS. TEKEEI:  Objection.

12          THE COURT:  Sustained.

13  Q.  Big law firm.

14  A.  That's my impression, yes.

15  Q.  And in this case the opinion letter from Greenberg Traurig

16  was directed in part to you and to your client, true?

17  A.  In part.

18  Q.  And so that was something -- the Greenberg Traurig opinion

19  letter -- that you reviewed very carefully, right?

20  A.  Correct.

21  Q.  And you relied upon that opinion letter, true?

22  A.  I did.

23  Q.  Now, can we go, please, to page 54 of this Exhibit 204.

24  This is appendix A to the trust indenture, and this is what the

25  bonds actually look like, right?

I5U7GAL1                        Anderson - Cross

1    A.  It's a form of the bonds, yes.

2    Q.  So the actual bonds would look just like this except the

3    blanks would be filled in for the owner and the amount, true?

4    A.  There may be some other information throughout the bond

5    that needed to be filled in.

6    Q.  Customized to who the buyer was.

7    A.  The date.

8    Q.  And you drafted this form of the bonds, true?

9    A.  As part of the indenture, yes.

10   Q.  Now, the idea behind these bonds was that most of the money

11   was going to be invested, right?

12   A.  Most, yes.

13   Q.  Some of it would go to fees, right?

14   A.  Correct.

15   Q.  And some of it would go to the WLCC in the first instance?

16   A.  Correct.

17   Q.  Which they would use for construction.

18   A.  Correct.

19   Q.  But most of it was going to be invested, true?

20   A.  Yes.

21   Q.  And it was going to be invested in what was called an

22   annuity, right?

23   A.  That's right.

24   Q.  And you also reviewed and provided comments on the annuity

25   contract itself, true?

I5U7GAL1                        Anderson - Cross

1    A.   Correct.

2    Q.   The entity that was identified as the provider of the

3    annuity, that was something called Wealth Assurance Private

4    Client Corporation, true?

5    A.   State that again.

6    Q.   The entity that was identified as the provider of the

7    annuity was called Wealth Assurance Private Client Corporation,

8    true?

9    A.   The entity that provided the annuity contract is Wealth

10   Assurance Private Client Group -- Corporation.

11   Q.   And you understood Wealth Assurance Private Client

12   Corporation to be a subsidiary of a company called Wealth

13   Assurance AG, correct?

14   A.   Correct.

15           MR. TOUGER:   Objection.   I believe he testified it was

16   an affiliate.

17           THE COURT:   I'm sorry.   What's the objection?

18           MR. TOUGER:   I believe he testified it was an

19   affiliate.

20           MR. SCHWARTZ:   Well, I'm asking a different question.

21           THE COURT:   Yes, exactly.   Overruled, to the extent

22   that was an objection.

23   Q.   Sorry.   So the question was:   You understood Wealth

24   Assurance Private Client Corporation to be a subsidiary of a

25   company called Wealth Assurance AG, correct?

1   A.  Correct.

2   Q.  And how did you come to that understanding that Wealth

3   Assurance Private Client Corporation was a subsidiary of Wealth

4   Assurance AG?

5   A.  From discussions with Jason Galanis and Yanni Galanis.

6   Q.  And you had no reason to doubt Jason Galanis when he told

7   you that Wealth Assurance Private Client Corporation was a

8   subsidiary of Wealth Assurance AG, true?

9   A.  True.

10  Q.  You did not feel the need to conduct any independent

11  research to confirm that fact, correct?

12  A.  Correct.

13  Q.  And, by the way, when we use the word subsidiary, you

14  understand I'm saying the subsidiary is wholly owned by the

15  parents, right?

16  A.  That's what I would term a subsidiary, yes.

17  Q.  So in this case you understood -- your understanding was

18  that Wealth Assurance Private Client Corporation, the annuity

19  provider, was wholly owned by a company called Wealth Assurance

20  AG.

21  A.  Correct.

22  Q.  And at some point in fact you were in direct communication

23  with personnel from Wealth Assurance AG, correct?

24  A.  Correct.

25  Q.  And you were in direct communications with people from

1   Wealth Assurance AG specifically concerning the bonds, true?

2   A.  Correct.

3   Q.  You communicated with Wealth Assurance AG's head of finance

4   concerning the bonds that had been purchased by a different

5   subsidiary called Valorlife, true?

6   A.  I don't recall the title of the person who I communicated

7   with, but there was a person I communicated with.

8   Q.  You communicated with someone from Wealth Assurance AG

9   about WLCC bonds that had been purchased by a company called

10   Valorlife, true?  Acquired by a company called Valorlife.

11   Excuse me.

12   A.  I recall communicating with them.  I don't recall if it was

13   relating to Valorlife.

14   Q.  Do you have an understanding that at some point a company

15   called Valorlife acquired a portion of the WLCC bonds?

16   A.  I don't recall.

17           MR. SCHWARTZ:  Can you take this down for a second,

18   please, Mr. Jackson, and show just to Mr. Anderson, and the

19   judge, and the other lawyers Exhibit 4127 -- Defense Exhibit

20   4127.

21   Q.  This is an e-mail to you from someone named Elzbieta

22   Sotbarn, true?

23   A.  That's the person, yes.

24   Q.  OK.

25           MR. SCHWARTZ:  I offer Defense Exhibit 4127.

1              THE COURT:  Any objection?

2              MR. SCHWARTZ:  Can you blow that up, please.

3              MS. TEKEEI:  No objection, your Honor.

4              THE COURT:  All right, 4127 will be admitted.

5              (Defendant's Exhibit 4127 received in evidence)

6              MR. SCHWARTZ:  Can you blow up the entire thing and

7    please publish it to the jury.

8    Q.  This is an e-mail from Ms. Sotbarn to you dated January 7,

9    2015, correct?

10   A.  It is.

11   Q.  And you see here that Ms. Sotbarn, at least according to

12   his signature, is head of finance at Wealth Assurance AG?

13   A.  Yes.

14   Q.  And the subject of the e-mail is Valorlife purchase of

15   municipal bonds Oglala Sioux/Wakpamni Lake Community

16   Corporation?

17   A.  I see that.

18   Q.  And so do you agree with me now that you spoke with the

19   head of finance at Wealth Assurance AG concerning Valorlife's

20   acquisition of some of the WLCC bonds?

21   A.  Yes.

22   Q.  And you understood that Valorlife was also a subsidiary of

23   Wealth Assurance AG, true?

24   A.  No.

25   Q.  You understood that Valorlife had some affiliation with

1   Wealth Assurance AG, true?

2   A.   Some affiliation, yes.

3   Q.   That's why you are getting an e-mail from the head of

4   finance of Wealth Assurance AG about a Valorlife acquisition,

5   right?

6   A.   Right.

7   Q.   By the way, you testified yesterday that your law firm

8   Dilworth Paxson received $250,000 approximately in compensation

9   for its work on the bonds.

10  A.   Correct.

11  Q.   And those fees were paid out of the closing of the

12  different bond series, true?

13  A.   At the closing of each bond issue we received a payment,

14  and then we received a subsequent payment with respect to the

15  first bond issue.

16  Q.   When did you receive the subsequent payment?

17  A.   Approximately May, early May 2015.

18  Q.   And what was the amount of that subsequent payment?

19  A.   $50,000.

20  Q.   What was the reason that Dilworth Paxson was receiving this

21  extra $50,000 beyond what had been agreed to in the bond

22  documents?

23  A.   When the first bond deal closed, we had a discussion of I

24  had provided an estimate leading into the bond issue of what I

25  thought it would take, and that was the amount that was agreed

1    upon, but there had been delays, and there was need for

2    additional documentation, and also having a supplemental deal

3    that went with that, so at the end of the transaction I had a

4    conversation with Burnham, and they said how did that work out

5    from an estimate standpoint, and I stated that we spent more

6    time on it than we were paid.  And at the time -- and this

7    would have been August, end of August 2014 -- they said, well,

8    send us an invoice, and we will catch you up when we can.

9            Then subsequently in early May, I believe, or maybe

10   late April, I received an e-mail from Jason Galanis saying

11   we're in a position to catch you up now, so tell your

12   accounting to look out for a wire.  And the money was wired,

13   and that was the remaining $50,000 or so.

14   Q.  And at the beginning part of that answer you said you had a

15   conversation with Burnham.  That was a conversation with Jason

16   Galanis, true?

17   A.  Yes.

18   Q.  And in essence you had done more work than you originally

19   anticipated, so you got paid extra for the additional work,

20   right?

21   A.  Right.

22   Q.  Nothing weird about that.

23   A.  Right.

24   Q.  The additional $50,000 that Dilworth Paxson received did

25   not come from your client Burnham Securities, Inc., did it?

I5U7GAL1                      Anderson - Cross

1   A.  It did not.

2   Q.  It came directly from Wealth Assurance Private Client

3   Corporation, true?

4   A.  It came from Wealth Assurance.

5   Q.  It came directly from Wealth Assurance Private Client

6   Corporation, didn't it?

7   A.  I believe so, yes.

8   Q.  Well, let me show you --

9           Mr. Jackson, if you could take this down and show only

10  the witness, the judge and the lawyers Exhibit 512, and go to

11  page 40, please.  And, Mr. Jackson, if you could blow up the

12  bottom half of the screen there.

13          Does this refresh your recollection as to when

14  Dilworth Paxson received the $50,000?

15  A.  Yes, May 4th.

16  Q.  And if you could back out of that, Mr. Jackson, and go to

17  the first page, and just blow up the top half.

18          Would you agree with me, Mr. Anderson, that that

19  $50,000 subsequent payment to Dilworth Paxson came directly

20  from Wealth Assurance Private Client Corporation?

21  A.  Yes.

22          MR. SCHWARTZ:  At this time I'd offer Exhibit 512.

23          THE COURT:  Any objection?

24          MS. TEKEEI:  This is Government Exhibit 512; we have

25  no objection.

1          THE COURT:  Is it already in evidence?

2          MS. TEKEEI:  It is not, but we have no objection.

3          THE COURT:  So it will be admitted on agreement of the

4    parties.

5          (Government Exhibit 512 received in evidence)

6    Q.  This is a bank statement for Wealth Assurance Private

7    Client Corporation.  True?

8    A.  It appears to be, yes.

9    Q.  And flipping back to page 40, and blowing up the bottom

10   half again, we see on May 4 that $50,000 wire transfer to

11   Dilworth Paxson LLP, correct?

12   A.  Correct.

13   Q.  And so Dilworth Paxson received a $50,000 supplemental

14   payment directly from the annuity provider, correct?

15   A.  Correct.

16   Q.  And you would agree with me that there is nothing wrong

17   with that.

18   A.  Correct.

19   Q.  There was nothing concerning about that.

20   A.  Correct.

21   Q.  There is nothing suspicious about that.

22   A.  No.

23   Q.  OK.  Can we go back to the annuity itself, which is

24   Government Exhibit 200 already in evidence.

25          This is one of the annuity contracts, true?

I5U7GAL1                    Anderson - Cross

1    A.  Yes.

2    Q.  For the first bond issuance?

3    A.  It appears to be, yes.

4    Q.  And again the issuer of the annuity is Wealth Assurance

5    Private Client Corporation, right?

6    A.  Correct.

7    Q.  And who signs on behalf of Wealth Assurance Private Client

8    Corporation?

9    A.  Hugh Dunkerley, president and director.

10   Q.  And the owner of the annuity is the WLCC, true?

11   A.  Correct.

12   Q.  Now, if we can go to page 4 of this document, you

13   understood that something called Private Equity Management LLC

14   was appointed as the manager for the annuity investment, right?

15   A.  Correct.

16   Q.  In fact you wrote that right into the bond indenture,

17   right?

18   A.  Correct.

19   Q.  And under this annuity contract, Private Equity Management

20   LLC had the responsibility of actually investing the money in

21   the annuity, right?

22   A.  That was not necessarily my understanding.

23   Q.  Well, let's look at it.  Let's go to page 7 of this

24   document, please, Mr. Jackson.

25              And if you could blow up the bottom where it says

I5U7GAL1                         Anderson - Cross

1   private investment funds and managed accounts.

2            This document says, "Your net payment will be invested

3   in one or more accounts managed by the investment managers."

4   Right?

5   A.  Yes, it states that.

6   Q.  And the investment manager is Private Equity Management

7   LLC, correct?

8   A.  I'm not sure if that's defined in here, but yes.

9   Q.  You're not sure if?

10  A.  I'm not sure if investment manager is defined in here.

11  Q.  But you agree with me that what this contract says is the

12  net payment into the annuity will be invested into one or more

13  accounts managed by Private Equity Management LLC, true?

14  A.  Yes, it states that.

15  Q.  And, by the way, at the very bottom of this page you see

16  it's initialed?

17  A.  Yes.

18  Q.  On the right side for the issuer there is the initials HD,

19  right?

20  A.  It is.

21  Q.  And the issuer in this case is the issuer of the annuity,

22  true?

23  A.  Correct.

24  Q.  Not the issuer of the bond, right?

25  A.  Correct.

1   Q.  So the issuer for purpose of this document -- let's keep it

2   straight -- is Wealth Assurance Private Client Corporation.

3   A.  Correct.

4   Q.  For purposes of this document, WLCC is the owner of the

5   annuity, correct?

6   A.  Correct.

7   Q.  So do you know who HD is?

8   A.  No.

9   Q.  But we just saw a second ago someone named Hugh Dunkerley

10  signed on behalf of the issuer.

11  A.  He did.

12  Q.  And Hugh Dunkerley's initials are HD, right?

13  A.  His initials are HD, yes.

14  Q.  And on the left side is the annuity owner, right?

15  A.  Correct.

16  Q.  The initials for the annuity owner.  And it says FM, right?

17  A.  It does.

18  Q.  Do you know who FM is?

19  A.  I don't.

20  Q.  You understood, however, that the principal of Private

21  Equity Management LLC was a man named Francisco Martin, right?

22  A.  He signed the agreement.

23  Q.  He signed the agreement on behalf of Private Equity

24  Management LLC, true?

25  A.  He did.

1    Q.  And Francisco Martin's initials are FM, right?

2    A.  Yes.

3    Q.  And Mr. Martin also signed what is called the investment

4    management agreement that was directly between the WLCC and his

5    company Private Equity Management LLC, right?

6    A.  I don't have that in front of me.

7    Q.  Let's look at it.  That's Government Exhibit 209.

8            We're looking at the investment management agreement

9    in this case for the second issuance, true?

10   A.  September, so that would have been the second, yes.

11           (Continued on next page)

1    Q.   This is the bond issuance that was purchased in part by

2    Rosemont Seneca Bohai, LLC?

3    A.   Yes.

4    Q.   And if we turn to Page 9 of this, this document is signed

5    by Francisco Martin as managing director on behalf of Private

6    Equity Management Limited, true?

7    A.   That's the name on the signature block.

8             MR. SCHWARTZ:   Just to show the jury if you flip the

9    page, Mr. Jackson.

10   Q.   You see the signature block for the counter-party to this

11   agreement which is WLCC, correct?

12   A.   Correct.

13   Q.   You would agree with me now that Mr. Martin signed the

14   investment management agreement that was directly between the

15   WLCC and private equity management, correct?

16   A.   That appears to be a signature, yes.

17   Q.   Let's go to now Exhibit 201.   This is the annuity contract

18   for the second bond issuance, right?

19   A.   Gauging by the amount, it appears to be, yes.

20   Q.   This is the annuity contract that goes with the investment

21   management agreement, Exhibit 209, we were looking at one

22   second ago, right?

23   A.   Right.

24   Q.   This is the bond issuance that was purchased in part by

25   Rosemont Seneca Bohai, LLC, correct?

1    A.  Correct.

2    Q.  The terms of the annuity and the investment contracts are

3    basically the same for the first and second and third

4    issuances, true?

5    A.  Correct.

6    Q.  By the way, this version for the second bond issuance is

7    not signed by owner, right, if you can flip the page?  We don't

8    see an --

9    A.  It is not initialed, no.

10   Q.  Do you know if it was ever signed?

11   A.  No.  I don't know either way.

12   Q.  You understood that the annuity that the bond proceeds were

13   going to be invested in for all the issuances, it was going to

14   be invested in high-risk, high-reward-type investments, right?

15   A.  Predominantly.

16   Q.  So, for example, let's look at Exhibit 1303 in evidence.

17   Go to the second page.  This is one of the very early documents

18   you received from Yanni Galanis about the very first bond

19   issuance, true?

20   A.  I didn't see the date on the initial part.

21   Q.  I am sorry.

22        MR. SCHWARTZ:  Mr. Jackson, could you go back to the

23   email.

24   A.  Yes, June 2014.  That would be the initial.

25   Q.  This is one of the first documents you received from Yanni

I5UJGAL2                        Anderson - cross

1   Galanis, true?

2   A.  Yes.

3   Q.  Now going back to Page 2, under considerations, this

4   document talks about the need to, "Identify a portfolio manager

5   with access to alternative investment opportunities"?

6           Do you see that?

7   A.  Which paragraph?

8   Q.  This is --

9   A.  The first paragraph, last sentence.

10  Q.  Exactly.  Finally, there is the requirement to identify a

11  portfolio manager with access to the alternative investment

12  opportunities that can grow to provide an endowment, do you see

13  that?

14  A.  I do.

15          THE REPORTER:   your Honor, may I?

16          THE COURT:  Just take a break for one moment.

17          (Recess)

18          THE COURT:  I think we're ready to proceed.  Thank

19  you.

20          MR. SCHWARTZ:  Thank you, your Honor.

21  BY MR. SCHWARTZ:

22  Q.  We had just read the highlighted language which talks about

23  the need to identify a portfolio manager with access to

24  alternative investment opportunities, right?

25  A.  Yes.

1    Q.   And as an experienced corporate lawyer, among other things,

2    you understood the phrase alternative investments or

3    alternative investment opportunities to mean more exotic

4    investments than ordinary stocks and bonds, right?

5    A.   I understood it to mean private equity-type investments.

6    Q.   Specifically private equity, true?

7    A.   That is what was discussed, yes.

8    Q.   In fact, in the next paragraph it says specifically that

9    long term net returns for private equity, as an example, has

10   been the best performing asset class.  Do you see that?

11   A.   Yes.

12   Q.   And when we talk about private equity, we mean direct

13   investment in a company rather than through publicly traded

14   securities like stocks and bonds, right?

15   A.   That is my understanding of the definition of private

16   equity, yes.

17   Q.   And private equity investments typically involve taking a

18   substantial stake or even control of a company, right?

19   A.   Correct.

20   Q.   And that means that private equity investments often

21   require a lot of money, right?

22   A.   Depending on the company, yes.

23   Q.   You're not just buying a few shares of a company; you're

24   buying a substantial stake in it, right?

25   A.   Correct.

1  Q.  If it is a very big company, it is more money?

2  A.  Yes.

3  Q.  Either way, it is a capital-intensive form of investment,

4  true?

5  A.  That's true.

6  Q.  Meaning it requires a lot of money, right?

7  A.  Yes.

8  Q.  The idea behind private equity investments is that you'll

9  invest in that company, it will grow and then you'll sell that

10  investment, right?

11  A.  Correct.

12  Q.  To make money, right?

13  A.  Correct.

14  Q.  Typically, private equity investors are not investing to

15  operate the company, true?

16  A.  I don't know the finer points of private equity.  It sounds

17  true to me, but I don't know.

18  Q.  Fair enough.

19          It is fair to say that if the company that is the

20  subject of a private equity investment and is successful, then

21  a private equity investor can make a lot of money, right?

22  A.  Right.

23          MS. TEKEEI:  Objection.

24          THE COURT:  Overruled.

25  Q.  Correct.

1   Q.  If a company that is the subject of a private equity

2   investment is not successful, the investor may not be able to

3   easily sell out of the investment, right?

4   A.  Correct.

5   Q.  I want to turn now to Exhibit 1314.

6           Again this is an email from Yanni Galanis to you,

7   among other people, correct?

8   A.  Correct.

9   Q.  And it's concerning the second issuance, true?

10  A.  Yes.

11          MR. SCHWARTZ:  So let's go to Page 2 of this, please,

12  Mr. Jackson.  If you can blow up the middle of the page where

13  it says approach.

14  Q.  This says that the money from the first issuance had gone

15  in part to the WLCC to assist in building a distribution

16  center, correct?

17  A.  It does state that, yes.

18  Q.  That was true, it was accurate, wasn't it?

19  A.  Yes.

20  Q.  And this also says that the money from the first bond

21  issuance had gone to the purchase of an annuity which permitted

22  the application of institutional portfolio management

23  opportunities such as high return private equity transactions,

24  right?

25  A.  It states that, yes.

I5UJGAL2                           Anderson - cross

1    Q.   And that was also true, correct?

2    A.   That was my understanding, yes.

3    Q.   And the fact that the annuity was going to be invested in

4    private equity was disclosed in numerous of the relevant

5    documents we have looked at, right?

6    A.   That was the planned approach, yes.

7    Q.   Now, one of the things that you looked at briefly with the

8    other lawyers was called a PPM or private placement memorandum,

9    right?

10   A.   I am not sure.  Did we look at that?

11   Q.   Okay.  We'll look at it in a second, but just in general, a

12   private placement memorandum or PPM is a document that is

13   written for potential purchasers of the security in a private

14   issuance, right?

15   A.   Correct.

16   Q.   It is supposed to describe in somewhat less technical terms

17   than the transactional documents the nature of the deal and

18   make various disclosures, right?

19   A.   Correct.

20   Q.   So let's look at it together.  Let's look at Exhibit 1334.

21        This is an email from you to M. Morton at Hughescm dot

22   com, true?

23   A.   Correct.

24   Q.   that was a woman named Michelle Morton, right?

25   A.   Correct

1   Q.   The subject is, "WLCC third tranche PPM," right?

2   A.   Correct.

3   Q.   The attachment here is the PPM for the third bond issuance,

4   right?

5   A.   It was a draft of a PPM for the third bond issuance, yes.

6   Q.   What is the name of the attachment?

7   A.   "WLCC third tranche soft final Version 1."

8   Q.   And the body of the email is simply PPM with an

9   exclamation?

10  A.   Exclamation point, right.

11  Q.   Let's now turn to the next page, please.

12  A.   Ah-huh.

13  Q.   This is the first page of the actual in this case

14  supplemental memorandum, right?

15  A.   It is.

16  Q.   And this document makes various disclosures, among other

17  things, right?

18  A.   Yes.

19  Q.   For example, right in the middle of the page in bold you

20  see the words the bonds are not rated, right?

21  A.   Correct.

22  Q.   That was true, the bonds were not rated, right?

23  A.   Correct.

24  Q.   Now, turning to the next page, Page 3 of this document, in

25  capital letters in that paragraph, that third paragraph, this

1    discloses that the bonds are not registered under the

2    Securities Act of 1933, right?

3    A.  Correct.

4    Q.  Or under applicable state securities laws, right?

5    A.  Correct.

6    Q.  These were what is called unregistered securities, right?

7    A.  Correct.

8    Q.  That was accurate, wasn't it?

9    A.  It was.

10   Q.  By the way, there is nothing wrong with an unrated bond,

11   right?

12   A.  Correct.

13   Q.  There is nothing wrong with an unregistered security,

14   right?

15   A.  Correct.

16   Q.  Those are just features of the deal in this case, right?

17   A.  That's right.

18   Q.  Just as they had been features of many other deals you had

19   worked on?

20   A.  Yes.

21   Q.  On Page 18 of this document there are various disclosures

22   about the annuity itself, correct?

23   A.  There are, yes.

24          MR. SCHWARTZ:  So, Mr. Jackson, if you blow up that

25   section called, "The annuity and insurance provider."

I5UJGAL2                          Anderson - cross

1    Q.  One of the disclosures in the second full sentence is, "The

2    use of a single premium indexed annuity to finance a municipal

3    project is believed to be novel."

4            Did I read that right?

5    A.  You did.

6    Q.  And that was true, correct?

7    A.  I don't know that that is novel.  I don't know.

8    Q.  In your experience, that was true, right?

9    A.  In my experience, yes.

10   Q.  And you were an experienced bond lawyer, true?

11   A.  Correct.

12   Q.  And we won't read it all, but the PPM goes on, you can look

13   at it for yourself, to make various disclosures about the

14   identity of the annuity provider itself, Wealth Assurance

15   Private Clients Corporation, right?

16   A.  Right.

17   Q.  And here it says it is a subsidiary of Valor Group Limited.

18   Do you see that?

19   A.  Yes.

20   Q.  Do you recall earlier we talked about Wealth Assurance

21   Private Clients Corporation being, to your understanding, a

22   subsidiary of Wealth Assurance AG?

23   A.  Yes.

24   Q.  Am I correct, Mr. Anderson, that Wealth Assurance AG at

25   some point changed its name to Valor Group?

I5UJGAL2                    Anderson - cross

1  A.  I don't know that.

2  Q.  Okay.  Now, in this document, Wealth Assurance Private

3  Client Corporation is sometimes defined as the quote-unquote

4  insurance provider, right?

5  A.  I don't know.

6  Q.  Can we look at Page 8.  You see at the very top on the

7  second line, it talks about the annuity being initially

8  invested in a segregated account maintained by Wealth Assurance

9  Private Clients Corporation, and then it defines that as the

10 insurance provider?

11 A.  I see that, yes.

12 Q.  So in this document when it says the insurance provider, it

13 means Wealth Assurance Private Client Corporation, true?

14 A.  Right.

15 Q.  So now let's go to Page 19 of this document.

16        Right in the middle of the page is a sentence that I

17 think you looked at yesterday, the very last sentence before

18 investment considerations, it says, "In addition, certain

19 officers and directors of the placement agent are affiliated

20 with the insurance provider."

21        Do you see that?

22 A.  I do.

23 Q.  The placement agent here is Burnham Securities, Inc., true?

24 A.  Yes.

25 Q.  And the insurance provider is Wealth Assurance Private

1  Clients Corporation, correct?

2  A.  Correct.

3  Q.  And you knew this to be true, right?

4  A.  Yes.

5  Q.  You knew that someone named at least Hugh Dunkerley was

6  associated with both Burnham Securities, Inc. and Wealth

7  Assurance Private Client Corporation, true?

8  A.  Yes.

9  Q.  Now, just backing out and looking at the bottom half of

10 this page, again just a bunch more disclosures, right, it tells

11 us again that the bonds are not rated, right?

12 A.  It states that, yes.

13 Q.  And it stays says that the bonds are restricted, right?

14 A.  Yes.

15 Q.  And it says the bonds may only be sold to accredited

16 investors and qualified institutional buyers, right?

17 A.  That's right.

18 Q.  We talked about that a little bit yesterday, didn't we?

19 A.  I believe so, yes.

20 Q.  You remember we looked at those investor letters?

21 A.  Yes.

22 Q.  Which you also called a big boy letter?

23 A.  Correct.

24 Q.  We looked at the one that maybe had Mr. Archer's signature

25 and maybe didn't, you weren't sure?

1          MS. TEKEEI:  Objection.

2          THE COURT:  I'll allow it.  You can answer that.

3   A.  We looked at the document for Rosemont Seneca.

4   Q.  And that was Government Exhibit 281, right?

5   A.  I don't know that.  I don't know the number.

6   Q.  I won't waste our time by pulling that back up.  It was

7   281.  The purpose of those investor letters was to demonstrate

8   that the purchaser of that series of bonds fit into this

9   definition of an accredited investor or qualified institutional

10  buyer, right?

11  A.  Correct.

12  Q.  Now, this also says in the last paragraph there is no

13  public market for the bonds and none is expected to develop in

14  the future.  Do you see that?

15  A.  It does state that, yes.

16  Q.  And it goes on to say that investors, buyers of the bonds,

17  might have to hold their bonds for a long period of time where

18  the price could be adversely affected in the secondary market

19  because they're restricted, right?

20  A.  Correct.

21  Q.  And just stepping back for a second, I think you described

22  when you were testifying yesterday a bond as sort of like a

23  loan, right?

24  A.  Sort of like a loan, yes.

25  Q.  So one thing if you buy a bond that you can do is you can

1    just hold onto it until the loan comes due, and then you get

2    your principal back, what you loaned plus interest, right?

3    A.  Right.

4    Q.  But another thing you can do, because bonds are securities,

5    is you can buy and sell the bonds themselves, right?

6    A.  Correct.

7    Q.  And that's like buying and selling debt, right?

8    A.  Yes.

9    Q.  The way we know banks now buy and sell mortgages all the

10   time, right?

11   A.  Correct.

12   Q.  What this is saying is you may not be able to buy and sell

13   this debt, you may have to hold onto it, right?

14   A.  That is what that states, yes.

15   Q.  Or it states if you try and buy or sell it, it may trade at

16   a deep discount because, among other things, it is restricted,

17   right?

18   A.  I don't know if it states that.

19   Q.  Well, it says, this is the very last sentence, "To the

20   extent a secondary market for the bonds develop, the secondary

21   market price of the bonds may be affected adversely as a result

22   of the transfer restrictions on the bonds."

23        Do you see that?

24   A.  I do.

25   Q.  A secondary market means the market where the bonds are

1    bought and sold, right?

2    A.  Correct.

3    Q.  And "affected adversely" means the price could be down,

4    right?

5    A.  Yes.

6    Q.  So you would agree with me now that one of the things that

7    this document discloses is that if a buyer of the bond later

8    tries to sell it instead of holding onto it, the price can be

9    depressed because, among other things, of the transfer

10   restrictions, right?

11   A.  Correct.

12   Q.  That is if there is a secondary market at all, right?

13   A.  Correct.

14   Q.  But this says there is no public market and none is

15   expected to develop, true?

16   A.  True.

17           MR. SCHWARTZ:  Now if we can turn to Page 20 of this

18   document and highlighting the portion at the top called,

19   "Special and limited obligations."

20   Q.  This discloses that the bonds are not a general obligation

21   of the issuer, right?

22   A.  Yes.

23   Q.  The issuer here is the WLCC, right?

24   A.  Correct.

25   Q.  And so these are what is sometimes called limited recourse

I5UJGAL2                         Anderson - cross

1    bonds, right?

2    A.  Correct.

3    Q.  Meaning if a payment is missed, right, if they don't repay

4    the loan or don't repay the interest, you can't just go sue the

5    WLCC for your money, right?

6    A.  You could.

7    Q.  This is America.  Anyone can sue anyone for anything,

8    right?

9    A.  Correct.

10   Q.  But you wouldn't be successful, right?

11   A.  Correct.

12   Q.  One of the things that this says is a buyer of the bonds in

13   the event of default can only look to very certain pots of

14   money for recovery, right?

15   A.  As the collateral for the debt, yes.

16   Q.  And that is the only place they can look in the event of

17   default, right?

18   A.  Correct.

19   Q.  So they couldn't just go into the bank accounts of the WLCC

20   and seek to recover money in the event of default, true?

21   A.  True.

22   Q.  They could only go to the specific things that are listed

23   here, right?  It says these are special and limited obligations

24   of the issuer payable solely from -- and there is a list of

25   places, right?

1    A.  That's right.

2    Q.  And we won't go through them, but it is basically the money

3    that is invested in the annuity and the revenue from the

4    projects, right?

5    A.  That's right.

6    Q.  Other than that, the WLCC is not on the hook even if it

7    defaults, true?

8              MS. TEKEEI:  Objection.

9              THE COURT:  Overruled.  Can you answer that?

10             THE WITNESS:  I can, but it will take some background

11   on it.  It is not a yes or no question.

12             It is a debt of the WLCC.  The collateral is what is

13   stated here, the annuity payments and the revenue from the

14   warehouse or town center or whatever the project may be similar

15   to if you have a mortgage, you're responsible for those loans,

16   your collateral is your home.  That is the distinction between

17   the two, but it is a debt.

18   Q.  That is a good example, right?

19             If I have a mortgage on my home and I miss a payment,

20   one thing the bank can do is they can repossess my home, right?

21   A.  That's right.

22   Q.  But if, when they do that and they sell the house, if that

23   is not sufficient to pay off the mortgage, they can actually

24   come after me for the difference, right?

25   A.  They can.

1  Q.  That's not the way these bonds are written, though, right?

2  A.  I disagree.

3  Q.  These bonds are written to be limited obligations solely to

4  the collateral, correct?

5  A.  Well your recourse is to the collateral.

6  Q.  Right, "recourse" meaning that's the only source of

7  recovery, true?

8  A.  That is the source of recovery.

9  Q.  Now I want to move down the page a little bit, and there is

10  a section at the bottom called, "Substantial reduction in the

11  value of the annuity."  Do you see that?

12  A.  I do.

13  Q.  Can you read from the middle of the paragraph beginning

14  with the words, "Unlike some annuities."?

15  A.  "Unlike some other annuities which are required to be

16  invested solely in a combination of debt and publicly traded

17  equity securities, the issuer has permitted the investment in

18  private equity.  There is no way to quantify this inherent

19  investment risk.  Returns that exceed 10 percent per anum are

20  shared equally between the insurance provider and the issuer as

21  excess returns over the guaranteed amount.  These excess

22  returns are above the guaranteed payment rate."

23  Q.  This is really saying two things, right?

24          One is, as you've already testified to on several

25  occasions, that the money in the annuity is going to be

1  invested in a high-risk, high-reward private equity strategy,

2  true?

3  A.   It states that, yes.

4  Q.   But another thing that this is saying, there is going to be

5  some element of profit sharing, right?

6  A.   Yes, it states that.

7  Q.   In other words, what this states is if the private equity

8  investment is really successful, we, the annuity provider, are

9  going to share some of that success back with the WLCC over and

10 on top of the annuity payments that are in the indenture, true?

11 A.   That was the structure, yes.

12 Q.   And so that allowed this disclosure you're saying that the

13 WLCC would share in the upside of the private equity

14 investments, true?

15 A.   That was the structure, yes, that is what this states.

16          MR. SCHWARTZ:   So now let's take this down,

17 Mr. Jackson.  Can we go back to Exhibit 209 for a second.

18 Q.   This again is the investment management agreement for the

19 second bond issuance, right?

20 A.   Based upon the date, yes.

21 Q.   This is the one that was purchased in part by Rosemont

22 Seneca Bohai, right?

23 A.   Right.

24 Q.   This document also makes clear that the investments are

25 going to be in the high-risk, high-reward private equity

1    strategy, right?

2    A.  It does.

3    Q.  And you looked at this with Mr. Touger on Page 10 of this

4    document?

5    A.  We looked at it yesterday, Page 10 probably.

6    Q.  Actually, you didn't look at this.  You looked at a

7    different version.  That is why I am doing this.

8    A.  Okay.

9            MR. SCHWARTZ:  If you can blow up the bottom paragraph

10   there, Mr. Jackson.

11   Q.  So you see this says the client is a value-oriented

12   investor, and would suggest the manager invest in situations

13   that may be overlooked by others, including in companies

14   suffering from capital markets dislocation, financial distress,

15   complexity or negative market sentiment, right?

16   A.  Yes.

17   Q.  Now, yesterday with Mr. Touger you looked at the investment

18   management agreement for a different issuance, and it started

19   instead of the word the "client," it says we are a

20   value-oriented investor.  Do you recall that?

21           MS. TEKEEI:  Objection.

22           THE COURT:  Overruled.

23   A.  I do.

24   Q.  You weren't sure who "we" was in that document?

25   A.  Correct.

1    Q.  So this is a defined term, "the client," right?

2    A.  I think so.

3    Q.  The client is the WLCC, right?  Do you want to see the

4    beginning of the document?

5    A.  Yes, please.

6    Q.  Can we go to Page 1.  You see in the very top of the first

7    paragraph --

8    A.  Yes.

9    Q.  -- it says the Wakpamni Lake Community Corporation (the

10   client), right?

11   A.  Yes.

12   Q.  In this document the client is the WLCC, right?

13   A.  Yes.

14   Q.  So going back to Page 10 now, do we agree that this

15   paragraph is saying that, "The WLCC is a value-oriented

16   investor, and would suggest the manager invest in situations

17   that may be overlooked by others, including in companies

18   suffering from capital markets dislocation, financial distress,

19   complexity or negative market sentiment"?

20   A.  Yes.

21   Q.  Then it goes on, "To secure the best investments, the

22   manager is to take a flexible approach to sourcing and

23   structuring investments, and be involved in multifaceted

24   transactions (including investments through the bankruptcy

25   process)," right?

1   A.   That is what it states.

2   Q.   Again you understood this to be a reference to high-risk,

3   high-reward private equity investments, right?

4   A.   I had a general understanding that the annuity proceeds

5   would be invested in private equity.

6   Q.   You agree with me companies in bankruptcy or financial

7   distress, these are not sure things, right?

8   A.   That's my general understanding, yes.

9   Q.   Companies with a negative market sentiment, that means the

10  market thinks it is a bad investment, right?

11  A.   Just from common knowledge, yes.

12  Q.   Finally, this document says the manager whenever possible

13  will give preference to investments in the financial services

14  sector, right?

15  A.   It states that, yes.

16  Q.   And so this was saying that the focus of the private equity

17  investments would be financial services companies, true?

18  A.   That's what this states.

19  Q.   And, in fact, you understood that the high-risk nature of

20  the investments meant that it might sometimes be difficult for

21  the WLCC to be paid, true?

22  A.   No.

23  Q.   Well, you testified yesterday that there were late payments

24  on some of the first annual payments on the bonds, correct?

25  A.   Correct.

I5UJGAL2                    Anderson - cross

1   Q.  You believed when the payments were late, that was simply

2   because the investment manager had made bad investments, right?

3   A.  No.

4   Q.  You didn't believe that?

5   A.  For those first two bond payments?

6   Q.  After the first two bond payments were not timely made, you

7   thought that there was a bad investment, and that was the

8   reason for the delayed payment, true?

9   A.  No, not true.

10  Q.  You testified yesterday about your numerous meetings with

11  the prosecutors, correct?

12  A.  Correct.

13  Q.  Do you recall telling them -- excuse me -- didn't you tell

14  them in a meeting, on November 28th, 2017, that you thought

15  that there was a bad investment, and that was the reason for

16  the delayed payments?

17  A.  Yes, but I was talking about a different time, different

18  time period.

19  Q.  Didn't you tell the government on November 28th, 2017, that

20  quickly after the first tribal payment was made, the second

21  payment was not made, and that was concerning to you, you

22  thought there was a bad investment and that was the reason for

23  the delayed payment?

24  A.  That's not my recollection of what I said.

25  Q.  Well, let me see if I can refresh your recollection.

1           MR. SCHWARTZ:  Mr. Jackson, can you show, please, only

2    to the witness and the lawyers and the Judge Exhibit 3501-3, at

3    Page 10.  (Pause)

4    BY MR. SCHWARTZ:

5    Q.  If you look at the top third of the page, can you read that

6    to yourself and let me know if that refreshes your recollection

7    that on November 28th, 2017, you told the government that,

8    "Quickly after the first tribal payment was made, the second

9    payment was not made, which was concerning to you, you thought

10   there was a bad investment and that was the reason for the

11   delayed payments"?

12   A.  (Pause) I see the section you're referring to, and again

13   those aren't my notes.  I think I understand why the notes were

14   taken down that way and I can explain what my thinking was.

15   Q.  I am simply asking if you recall telling the prosecutors

16   and the FBI Agent and U.S. Postal Inspectors that were present

17   at that interview -- you were represented by a lawyer at that

18   interview, correct?

19   A.  Yes.

20   Q.  Do you recall telling all of those folks that quickly after

21   the first tribal payment was made, the second payment was not

22   made, which was concerning to you, you thought there was a bad

23   investment and that was the reason for the delayed payments.

24           Do you recall saying that?

25   A.  I recall saying part of that.

1   Q.  Just backing up for a second, you did not suspect that

2   anything untoward was happening with the bonds until the SEC

3   started investing, true?

4   A.  Correct.

5           MS. TEKEEI:  Objection.

6           THE COURT:  Overruled.

7   A.  Correct.

8   Q.  I want to look at the placement agency agreement.  That was

9   a document that was of particular relevance to your client, the

10  placement agent, right?

11  A.  Correct.  They signed it.  It was a document they executed,

12  yes.

13  Q.  The placement agent for the WLCC bonds was Burnham

14  Securities, Inc., right?

15  A.  Correct.

16  Q.  That was your client?

17  A.  Correct.

18  Q.  Did you draft the placement agency agreement?

19  A.  I did not.

20  Q.  Who drafted it?

21  A.  The law firm of Greenberg Traurig, the issuing counsel.

22  Q.  The placement agent to the agreement, this an agreement

23  with the issuer, WLCC, and placement agent, Burnham Securities,

24  Inc., right?

25  A.  That's correct.

1   Q.   You're saying the WLCC side, their lawyers, Greenberg

2   Traurig, are the ones who drafted that document in the first

3   place?

4   A.   Correct.

5   Q.   And you reviewed it carefully?

6   A.   I did.

7   Q.   Because your clients were going to be asked to sign it,

8   right?

9   A.   Correct.

10   Q.   And in a nutshell, the placement agency agreement was an

11   agreement between the WLCC and the placement agent, where the

12   WLCC was agreeing that it would allow the placement agent to

13   help it find buyers for the bonds, right?

14   A.   That's right.

15   Q.   And WLCC was also agreeing it wouldn't hire anyone else to

16   find buyers for the bonds, right?

17   A.   For that period, yes.

18   Q.   So it is sort of like if I get a real estate broker to sell

19   my apartment, right?

20   A.   That is probably an apt comparison.

21   Q.   I let the broker market the apartment, and in return I

22   don't let anyone else try to sell it, right?

23   A.   For a period, correct.

24   Q.   Just like a real estate broker, there is a fee for the

25   placement agent, right?

1   A.   There is.

2   Q.   Let's look at Exhibit 211.

3            MR. SCHWARTZ:   You can put this back on the jury

4   screens, please, Mr. Jackson.

5   Q.   This is the placement agency agreement for the first

6   issuance, right?

7   A.   Yes.

8   Q.   And it is dated as of August 8th, 2014, right?

9   A.   Correct.

10  Q.   Now if you can go to Page 7, there is a list of who needs

11  to receive notice in certain circumstances, right?

12  A.   That's right.

13  Q.   So for the WLCC, it is the fellow you've talked about

14  Raycen Raines, right?

15  A.   Correct.

16  Q.   With a copy to their lawyers at Greenberg Traurig, true?

17  A.   That's right.

18  Q.   And for the placement agent, Burnham Securities, Inc., it

19  is Jason Galanis, right?

20  A.   That's right.

21  Q.   With a copy to you as their lawyer, right?

22  A.   That's right.

23  Q.   The address for Burnham Securities, Inc., by the way, is in

24  Irvine, California, right?

25  A.   Correct.

1            MR. SCHWARTZ:  You can take that down, Mr. Jackson,

2    and let's bring up Exhibit 213.

3    Q.  This is the placement agency agreement for the second bond

4    issuance, right?

5    A.  It is.

6    Q.  This is the bond issuance that was purchased in part by

7    Rosemont Seneca Bohai?

8    A.  Yes.

9    Q.  And it is basically the same as the placement agency

10   agreement for the first issuance, true?

11   A.  It is.

12   Q.  And turning to Page 7, the notice parties are all the same

13   as for the first bond issuance, true?

14   A.  They appear to be, yes.

15           MR. SCHWARTZ:  Now you can take that down.

16   Mr. Jackson, if you can pull up Exhibit 212.

17   Q.  This is the placement agency agreement for the third bond

18   issuance, right?

19   A.  It is.

20   Q.  This one is dated April 6th, 2015, true?

21   A.  True.

22   Q.  So it is the following year, right?

23   A.  It is.

24   Q.  Let's turn to Page 7.  The notice party for Burnham

25   Securities, Inc. has changed from Jason Galanis to Andrew

I5UJGAL2                          Anderson - cross

1    Godfrey, true?

2    A.   It has.

3    Q.   Do you know who Andrew Godfrey is?

4    A.   Yes.

5    Q.   Who is he?

6    A.   He is at the time an employee, a representative of Burnham

7    Securities.

8             MR. SCHWARTZ:   You can take that down.

9    Q.   Now, part of your job as counsel to the placement agent in

10   these bond issuances was coordinating between the various

11   parties that were involved in the deal, true?

12   A.   That's right.

13   Q.   And, in fact, for the WLCC bonds, you brought some of the

14   parties into the deal, true?

15   A.   For which deal?

16   Q.   The WLCC bonds?

17   A.   For all three?

18   Q.   Yes.

19   A.   Yes, yes.

20   Q.   For example, you were the one that introduced U.S. Bank

21   into the deal, right?

22   A.   Correct.

23   Q.   U.S. Bank ended up being the trustee for all three bond

24   issuances, right?

25   A.   They did.

1    Q.   U.S. Bank is a big, well-known financial institution,

2    right?

3    A.   Yes.

4    Q.   It is, in fact, one of the top five biggest banks in the

5    country, right?

6    A.   Yes, and perhaps the biggest in tribal-related.

7    Q.   In aggregate terms, it is bigger than some brand name banks

8    like Capital One or Morgan Stanley or PNC, right?

9    A.   That is my impression, yes.

10   Q.   You had worked with U.S. Bank before, true?

11   A.   I have.

12   Q.   And so you suggested that U.S. Bank would be a good fit as

13   a trustee for the WLCC bonds, right?

14   A.   I did, yes.

15   Q.   In addition to U.S. Bank, you had worked with some of the

16   other people and entities that were involved in this deal

17   before also, right?

18   A.   Yes.

19   Q.   Other than U.S. Bank, did you bring any of the others into

20   the deal?

21   A.   No, not to my recollection.

22   Q.   By the way, that's always good for business, too, right, to

23   be able to do a favor to someone like U.S. Bank that is a

24   repeat player in the bond market?

25   A.   Yes, if you had confidence in them, sure.

1    Q.  You had confidence in U.S. Bank?

2    A.  Yes, sure.

3    Q.  Very reputable?

4    A.  A reputable large bank with serious experience in Tribal

5    Indian Country.

6    Q.  You have continued to do business with U.S. Bank after

7    these WLCC bonds, true?

8    A.  Yes.

9    Q.  And Greenberg Traurig, that is a firm you had worked with

10   before?

11   A.  Yes.  Not those specific attorneys but, yes, the firm.

12   Q.  Have you worked with them since?

13   A.  I don't recall.

14   Q.  Is it fair to say that if you had any questions about the

15   legitimacy of the deal, you wouldn't have brought U.S. Bank

16   into it?

17   A.  Correct.

18           MR. SCHWARTZ:  Now I want to turn to Exhibit 2027,

19   Mr. Jackson, if you could bring that up for everyone.

20   Q.  You testified about this previously, right?

21   A.  Yes.

22           MR. SCHWARTZ:  If you can turn to Page 2, please,

23   Mr. Jackson.

24   Q.  This is the distribution list, the draft distribution list

25   that was sent to you by Greenberg Traurig, right?

1    A.  Yes.

2    Q.  In fact, it was sent to everyone who was involved in the

3    deal at that point, right?

4    A.  I don't know.  I believe everyone on this list.

5    Q.  Everyone who is on this list, right?

6    A.  Yes.

7    Q.  This list, what we were just talking about, the role of

8    U.S. Bank and their lawyers and the WLCC and their lawyers, all

9    of the different parties had lawyers on this the deal, true?

10   A.  Correct.

11            MS. TEKEEI:  Objection.

12            THE COURT:  Overruled.

13   Q.  Right?

14   A.  Right.

15   Q.  By the way, the trustee's lawyers, Russo, Russo and Slania,

16   that was chosen by U.S. Bank, right?

17   A.  Correct.

18   Q.  Those were lawyers that they chose to work with on this

19   bond deal, right?

20   A.  That's right.

21   Q.  Had you worked with Russo, Russo and Slania before?

22   A.  I had not.

23   Q.  You testified you hadn't worked with these specific

24   Greenberg Traurig lawyers before?

25   A.  I had not worked with Mike McGuinness before and I knew of

1   Heather Thompson.  I don't know that we ever worked together,

2   though.  Jennifer Weddle, I don't know if I knew her.

3   Q.  You certainly knew by reputation these were all highly

4   competent securities lawyers, right?

5   A.  Greenberg as a firm or these individuals?

6   Q.  These individuals?

7   A.  I can't speak to Jennifer Weddle and Heather Thompson as

8   far as securities law, I don't know.  Mike McGinnis is a well

9   known bond lawyer in that part of the country.

10  Q.  You talked a little bit yesterday about Heather Thompson.

11  Among other things, she was a federal government lawyer on the

12  Oglala Sioux Reservation?

13              MS. TEKEEI:  Objection?

14              THE COURT:  Overruled.

15  A.  I didn't know that.  I know she is a tribal attorney of

16  some fame.

17              MR. SCHWARTZ:  Can we go back, Mr. Jackson, to the

18  first page of this, the cover email.

19  Q.  So this was distributed by someone at Greenberg Traurig to

20  a whole bunch of people, right?

21  A.  Yes.

22  Q.  And at the very top it looks like it was forwarded by

23  Mr. Galanis to Devon Archer, right?

24  A.  That is what it appears.

25  Q.  So you see on the original email in the bottom half, it is

1   addressed to Jason Galanis at the email address Jason at

2   Burnham Equity Partners dot com, do you see that?

3   A.  I do.

4   Q.  You understood Jason at Burnham Equity Partners dot com to

5   be Jason Galanis, right?

6   A.  Yes, Jason Galanis.

7   Q.  If we look at the email in the top half --

8            MS. TEKEEI:  Your Honor, objection.  May we approach,

9   please?

10            THE COURT:  Sure.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            THE COURT:  I thought we agreed not to do the top

3    part.

4            MR. SCHWARTZ:  I was just getting into the use of the

5    different email messages, so he knows the top email address,

6    Jason at holding companies whatever is Jason Galanis.  I simply

7    wanted to confirm the two email addresses, not talk about the

8    substance.

9            MS. TEKEEI:  He can ask if he knew whether Mr. Jason

10   Galanis had the holding companies email address.  Mr. Anderson

11   testified to that on direct and during Mr. Touger's

12   cross-examination.

13           THE COURT:  I agree.

14           MS. TEKEEI:  This is improper.

15           THE COURT:  I agree.

16           MR. SCHWARTZ:  So I can ask the question, but I

17   can't --

18           THE COURT:  Yes.  We discussed the fact that with

19   respect to these government exhibits, you can show the jury the

20   portions that this witness is on, but you shouldn't be showing

21   the portions he can't testify about, so just ask him or blow up

22   the email address without showing the entirety of the email.

23           MR. SCHWARTZ:  No problem.

24           (Continued on next page)

25

I5UJGAL2                         Anderson - cross

1              (In open court)

2    BY MR. SCHWARTZ:

3    Q.  Jason at Burnham Equity Partners dot com is Jason Galanis,

4    true?

5    A.  That is true.

6    Q.  That is the bottom email, right?

7    A.  Ah-huh.

8    Q.  That is on the bottom email, right?

9    A.  Yes.

10             MR. SCHWARTZ:  Mr. Jackson, could you blow up just the

11   from line on the very top.

12   Q.  This is Jason at holmbycompanies dot com.  Do you see that?

13   A.  I do.

14   Q.  Jason at holmbycompanies dot com was also an email

15   associated with Jason Galanis, right?

16   A.  Yes.

17   Q.  And that was an email address that he communicated with you

18   at sometimes, right?

19   A.  Sometimes.

20   Q.  Not a secret email address?

21   A.  Correct.

22   Q.  Do you have an idea what holmbycompanies is?

23   A.  I do not.

24   Q.  Are you familiar with the Holmby Hills neighborhood of Los

25   Angeles next to Beverly Hills and Bel Air?

1    A.  I know it is a neighborhood out there, yes.

2    Q.  A fancy neighborhood?

3    A.  Yes.

4    Q.  You were aware that Jason Galanis lived in Los Angeles,

5    right?

6    A.  Yes.

7    Q.  You are aware he had a huge mansion in Bel Air, right?

8    A.  I don't know that I knew that.

9    Q.  He never bragged to you about his huge mansion in Bel Air?

10   A.  No.

11   Q.  And you knew he had other investments in the area, right?

12   A.  I knew he was involved in other industries, yes.

13          MR. SCHWARTZ:  Now, you can take that down,

14   Mr. Jackson.

15   Q.  As part of your work for Burnham Securities, Inc. on the

16   bonds, on WLCC bonds, you performed what is called due

17   diligence, right?

18   A.  I did.

19   Q.  Due diligence in general means that you conducted some

20   level of review to make sure that the bond issuance was proper

21   and appropriate, right?

22   A.  Correct.

23   Q.  In this case, your due diligence consisted of reviewing the

24   WLCC itself and confirming that it was part or owned ultimately

25   by a federally recognized Native American tribe, right?

1    A.   For the tribal side, yes.

2    Q.   And you also reviewed the rules relating to the WLCC's

3    ability to issue bonds, right?

4    A.   I did.

5    Q.   And based upon your due diligence and, of course, your

6    knowledge of the securities laws and your research and your

7    experience, your law firm Dilworth Paxson issued an opinion

8    letter in connection with all three bond issuances, right?

9    A.   Correct.

10   Q.   You talked about it before, I won't go through it again,

11   but in general at the time that Dilworth Paxson issued its

12   opinion letter, you had no concerns about the due diligence,

13   right?

14   A.   Correct.

15   Q.   And you had no concerns about the bonds, right?

16   A.   Correct.

17   Q.   And for each of the bond issuances, Dilworth Paxson and you

18   concluded that the bond structure was financially sound, right?

19   A.   That it was legally sound.

20   Q.   And financially sound, right?

21   A.   We don't come to conclusions on the financial side of

22   things.  We're lawyers.

23   Q.   Well, didn't you verify the infrastructure integrity from a

24   financial standpoint?

25   A.   It depends on what you mean by that.

1    Q.   Well, let me ask it this way.

2    A.   What do you mean by, "verify"?

3    Q.   Didn't you have a meeting with the government on November

4    28th, 2017, tell them that you verified the infrastructure

5    integrity from a financial standpoint?

6    A.   I don't believe so.  I don't believe that is my language.

7    There did not appear to be any reason to believe it wasn't

8    financially solid, but we don't review investments and those

9    type of items.

10   Q.   Fair enough.

11            In fact, in general the WLCC bond deals were similar

12   to other bond deals you had worked on in the past, right?

13   A.   Other than the annuity component, yes.

14   Q.   The annuity you testified about earlier was novel in this

15   case, right?

16   A.   Correct.

17   Q.   But you believed it made sense?

18   A.   It seemed to, yes.

19   Q.   I just want to talk a little bit now specifically about the

20   second bond issuance.  There were two buyers for that issuance,

21   right?

22   A.   Correct.

23   Q.   One was Rosemont Seneca Bohai LLC, correct?

24   A.   That's right.

25   Q.   And the other was Bevan Cooney, true?

1    A.  Correct.

2    Q.  And I think you told us before, although Bevan Cooney is a

3    person as opposed to an institution, there is nothing

4    particularly unusual or weird about a person buying bonds as

5    opposed to an entity, right?

6    A.  Correct.

7    Q.  That happens all the time?

8    A.  That is my understanding, yes.

9    Q.  And as with the first issuance, again you drafted or

10   reviewed all of the core bond documents, right?

11   A.  The core bond documents, yes.

12   Q.  The indenture?

13   A.  Yes.

14   Q.  The closing statement?

15   A.  Correct.

16   Q.  The form of the bond itself?

17   A.  Correct.

18   Q.  The legal opinion, obviously?

19   A.  Our legal opinion, yes.

20   Q.  Dilworth Paxson legal opinion?

21   A.  Correct.

22   Q.  You drafted?

23   A.  Yes.

24   Q.  And the Greenberg Traurig legal opinion you reviewed

25   closely, right?

1   A.  Right.

2   Q.  With respect to the portion of the second bond issuance

3   that was purchased by Rosemont Seneca Bohai LLC --

4   A.  Right.

5   Q.  -- you understood that after they were purchased, those

6   bonds were going to be custodied at Morgan Stanley, right?

7   A.  I believe so, yes.

8   Q.  And when I say "custodied," we just mean that Morgan

9   Stanley was going to hold onto them, right?

10  A.  Correct.

11  Q.  They weren't going to be the bank or the institution

12  through which they were bought, they were just going sort of

13  like a safe deposit box where they were held, right?

14  A.  Correct, there was a physical bond.

15  Q.  In fact, you dealt directly with Morgan Stanley to arrange

16  for delivery of those physical bonds, didn't you?

17  A.  Correct, confirmed their contact information, et cetera,

18  ah-huh.

19  Q.  I am sorry?

20  A.  Yes, correct.

21  Q.  And as you were dealing with Morgan Stanley to arrange for

22  the custody-ing of the bonds purchased by Rosemont Seneca Bohai

23  LLC, you dealt extensively with Jason Galanis, true?

24  A.  I don't recall.  I don't recall.  Jason worked on the deal.

25  I just don't recall that portion of it.

I5UJGAL2                          Anderson - cross

1    Q.  You don't recall reporting back specifically to Jason

2    Galanis about the process of arranging for the bonds to be

3    transferred to Morgan Stanley after they were purchased?

4    A.  I don't discount it.  I just don't recall that portion of

5    it.

6    Q.  I'll come back to this in one second, but let me just be

7    clear.  You would agree with me that throughout the process of

8    dealing with Morgan Stanley to arrange for the delivery of the

9    bonds purchased by Rosemont Seneca Bohai LLC, you never, ever

10   dealt with Devon Archer, right?

11   A.  Correct.

12   Q.  Even though you understood Devon Archer was associated with

13   Rosemont Seneca Bohai, LLC?

14   A.  Correct.

15   Q.  But you don't remember if you dealt with Jason Galanis

16   specifically in connection with arranging for the bonds to be

17   transferred to Morgan Stanley?

18   A.  Right, and what that arrangement looked like.  I just don't

19   recall that detail.

20        MR. SCHWARTZ:  So let me show you and for now,

21   Mr. Jackson, if you can just put it up for the witness, the

22   Judge and the lawyers what has been been marked as Defense

23   Exhibit 4600.  Just sort of slowly flip the pages so

24   Mr. Anderson can see it.

25   Q.  My question for you, first of all, Mr. Anderson, most of

1    this document is an email exchange between yourself and a woman

2    named Maggie Fiore, right?

3    A.  Yes.

4    Q.  And Maggie Fiore worked at Morgan Stanley, right?

5    A.  She appears to, yes.

6          MR. SCHWARTZ:  I offer Defense Exhibit 4600.

7          THE COURT:  Any objection?

8          MS. TEKEEI:  We have no objection.

9          THE COURT:  All right.  That will be admitted.

10          (Defendant's Exhibit 4600 received in evidence)

11          MR. SCHWARTZ:  If you can publish this to the jury,

12   Mr. Jackson.

13          THE COURT:  Mr. Schwartz, tell me when it would be a

14   good time to break for lunch.  If you want to finish this line

15   of questioning, that is fine.

16          MR. SCHWARTZ:  That would be fine.

17   Q.  So in general the purpose of this exchange, the exchange

18   that is depicted in Exhibit 4600 was to get information from

19   Morgan Stanley about how to get the bonds to them, right?

20   A.  Right.

21   Q.  So let's turn to Page 2 of this.  Right in the middle of

22   the page if you blow up sort of the middle third, there you go,

23   from there down, you write we can issue in whatever name you

24   need in order to take possession.  Do you see that?

25   A.  Yes.

1   Q.  And at the bottom of the page you write let me know whose

2   name Morgan is nominee or Rosemont and we'll do physical,

3   right?

4   A.  Correct.

5   Q.  And what you're referring to in that conversation is whose

6   name should be filled in on the bond certificate, right?

7   A.  Correct.

8   Q.  That form of bond that you drafted that needed the name of

9   the holder filled in, right?

10  A.  Correct.

11  Q.  So you were asking Morgan Stanley, Morgan Stanley, in order

12  for you to hold onto these bonds, should we say that they're

13  Rosemont Seneca Bohai's bonds or should we say they're Morgan

14  Stanley as nominee, right?

15  A.  Correct.

16  Q.  And Morgan, as nominee, simply means Morgan Stanley as

17  nominee for Rosemont Seneca Bohai, right?

18  A.  That's right.

19  Q.  Why don't you explain, what does nominee mean in this

20  context.

21  A.  The person named to hold on behalf of another person.

22  Q.  Now, backing out and going to Page 1, so if you can blow up

23  the bottom third of this, from there down, you forward this

24  entire five page email chain to Jason Galanis, right?

25  A.  Yes.

1  Q.  And you write FYI, for your information, right?

2  A.  Correct.

3  Q.  Hope to have resolved A M, right?

4  A.  Correct.

5  Q.  And then if you back out and blow up the top half of this,

6  you are sort of joking with him, right?

7  A.  Yes.

8  Q.  And he writes what a pro and you write ha, not that it was

9  really funny, right?

10  A.  Right.

11  Q.  And it wasn't funny, right?  You were just humoring him,

12  right?

13  A.  What part?

14  Q.  There is nothing funny in this email chain, right?

15  A.  I think it is funny that somebody would call someone a pro,

16  a joking compliment.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. SCHWARTZ:

2    Q.  OK.

3    A.  I mean it's a joking compliment.

4    Q.  That's what qualifies as funny?

5    A.  It's a dry business.

6             MS. TEKEEI:  Objection.

7             THE COURT:  Sustained.  You don't have to answer that.

8             THE WITNESS:  I'm sorry.

9             THE COURT:  That's OK.

10   Q.  Now, Jason writes to you on the October 1st, 6:58 a.m.

11   e-mail, "Seems you also found someone who has a clue."  Do you

12   see that?

13   A.  I see that.

14   Q.  And you say in response, "We got to the right person for

15   sure."  Right?

16   A.  Correct.

17   Q.  Now, you have that exchange because before you were dealing

18   with Maggie Fiore, you had been dealing with a different person

19   at Morgan Stanley, right?

20   A.  I don't know.

21   Q.  Do you recall dealing with a woman at Morgan Stanley named

22   Catharine Driever?

23   A.  No.

24   Q.  Let's look at page 4 of this exhibit.  You see at the very

25   bottom, the last e-mail in the middle of the page -- this is

1   the first e-mail in the chain, right -- Ms. Fiore is writing to

2   someone named Catharine Driever, asking for your contact

3   information, right?

4   A.  Yes.

5   Q.  And then above that Ms. Driever just loops you into the

6   conversation, right?  She cc's you on that chain.

7   A.  I see that.

8   Q.  And that's because you hadn't dealt with Maggie Fiore

9   before this, correct?

10  A.  I don't believe so, no.

11  Q.  You had been dealing with Catharine Driever, right?

12  A.  Yes.

13  Q.  But when you wrote, "We got to the right person for sure,"

14  you were referring to Maggie Fiore, right?

15  A.  That appears to be the case.

16  Q.  She seemed to know what she was doing, right?

17  A.  What a nominee was, yes.

18  Q.  Backing out of this, let me go to page 1.  By the way, do

19  you know the name Sebastian Momtazi?

20  A.  It sounds familiar.  I can't place him though.

21  Q.  Is that someone that you ever dealt with directly, to your

22  recollection?

23  A.  His name did come up in connection with the transaction.

24  Q.  You might have dealt with him directly.

25  A.  Yes.

1  Q.  Definitely did not deal with Mr. Archer directly.

2  A.  Correct.

3  Q.  This?

4            MR. SCHWARTZ:  This would be a good place to break.

5            THE COURT:  OK.  So, ladies and gentlemen, why don't

6  we take our lunch break, come back in an hour.  Please remember

7  don't discuss the case and keep an open mind.  Thank you.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              MS. TEKEEI:  We do have one issue we would like to

3    address perhaps when Mr. Anderson has left.

4              THE COURT:  Do you want to come back at two?

5              MS. MERMELSTEIN:  Let's come back at two.

6              MS. TEKEEI:  Sorry.  It has to do with Mr. Anderson.

7              THE COURT:  That's fine.

8              MS. TEKEEI:  Your Honor, Mr. Schwartz asked

9    Mr. Anderson some questions about a piece of 3500 material,

10   which is 3501-3.  In particular, he asked -- I will wait until

11   the court has it.

12             THE COURT:  I'm just getting it out.

13             MS. TEKEEI:  It's November 28, 2017.  Mr. Schwartz

14   showed Mr. Anderson page 10, or in particular the paragraph

15   where the sentence is that appeared to relate to Mr. Anderson,

16   saying that he thought there was a bad investment and that was

17   a reason for the delayed payment.

18             The context of this conversation, your Honor, if you

19   turn to page 9, relates to Mr. Anderson being informed about

20   the Gerova arrests and the indictments, and so when

21   Mr. Schwartz was questioning Mr. Anderson, and Mr. Anderson

22   responded that it had to do with bad investments in part and

23   explicitly said he could explain further, Mr. Schwartz didn't

24   follow up.  Instead, I think he asked him a question about,

25   well, you didn't start being concerned until the SEC began

I5U7GAL3                       Anderson - Cross

1    investigating.

2              Mr. Anderson knows that the Gerova -- we -- in the

3    course of preparation, so that nothing accidentally came out on

4    direct examination, we explicitly told him that we weren't

5    going to be asking any questions about that.  The context of

6    his statements about the quality of the investments, as are

7    indicated in this paragraph, had to do, we think -- and we

8    understood certainly -- in part with respect to the Gerova

9    arrests and indictment.

10             I don't know if Mr. Schwartz had a deal with

11   Mr. Touger on this issue.  I don't know if he alerted

12   Mr. Touger to this issue.

13             MR. TOUGER:  There are no deals.

14             MS. TEKEEI:  I mean that in sort of parlance, your

15   Honor.  But as it stands the testimony is unclear on this

16   issue.  It appears as though Mr. Anderson was -- it could

17   appear to the jury that Mr. Anderson was being evasive.  He was

18   not.  And in the context of the statement in here it makes it

19   clear that by bad investment -- at least we think -- he in part

20   believed because of the Gerova investments and the

21   Gerova-related issues was one of the reasons why he had

22   concern, not just about the SEC investigation into this case.

23             MR. SCHWARTZ:  Your Honor, I don't know what the

24   objection is.  I don't know, the government seems to be

25   suggesting that somehow I have opened the door to Gerova, which

1   is crazy to me.  The 3500 does not say in part.  The 3500 says

2   Anderson thought there was a bad investment and that was the

3   reason for the delayed payment.  Definitive.

4           That was the statement that I confronted him with.  To

5   the extent that he was going to say it had anything to do with

6   the arrests, first of all that's news to me; I didn't know

7   that.  But certainly I'm not trying to elicit that, and I

8   didn't ask for any further explanation.

9           There is nothing that's come out that in any way

10  remotely touches the Gerova arrest.  And it cannot be the

11  government's view of this case that any time we go near any

12  statement that anyone made, anywhere near some discussion of

13  Gerova or John or Jason's criminal past, then that opens the

14  door to everything, because that is throughout the 3500.

15          It may be -- I don't know if it's right -- but it may

16  be that the Gerova arrest is what got them on to this line of

17  discussion.  But what the 3500 says is that Mr. Anderson

18  believed the reason for the late payment was simply a bad

19  investment.  That's all I was trying to elicit, that's it.

20          MS. TEKEEI:  Your Honor, immediately --

21          MR. TOUGER:  For the record, there is no agreement

22  between myself and Mr. Schwartz about either my cross, his

23  cross or any other cross.

24          THE COURT:  OK.

25          MR. SCHWARTZ:  No agreement.  We haven't seen what one

1   another was going to say, nothing like that, just to be clear.

2          MR. TOUGER:  The only thing we talked about was the

3   order of cross-examination.

4          THE COURT:  You are welcome to ask questions on

5   redirect.  Why don't you think about how to do that without

6   opening the door, if there is a way to frame it in terms of the

7   timing or something else.

8          MS. TEKEEI:  Your Honor, sure.  I am just not sure how

9   we do that.  I mean at the bottom of page 9 it says, "Anderson

10  was very concerned because of Yanni and Jason Galanis'

11  involvement in the bonds deal."  This is immediately after a

12  discussion about the arrests in the indictment.  I am just not

13  sure how can I ask that question without -- obviously, the

14  witness doesn't want to be untruthful; he wants to provide a

15  clear and complete answer.

16         It's hard to know how we can ask the answer to what he

17  meant by -- or what these notes -- obviously he doesn't know

18  what the agent meant by these notes -- but the context of the

19  conversation.  I would have to ask him to look at the context

20  of the conversation and the context of the communications to

21  come up with a fulsome and accurate answer, and I can't do

22  that.

23         Our motion is to strike the question and to strike the

24  answer.

25         THE COURT:  Do you want to respond?

1          MR. SCHWARTZ:  That doesn't make sense.  The question

2    was appropriate.  The answer was appropriate.  Again, if the

3    answer to a question is, you know, I thought this was partly

4    the reason -- and he is saying that for the first time on

5    cross, it's not what the 3500 says -- and the other --

6          THE COURT:  He said what for the first time?  I didn't

7    hear you.

8          MR. SCHWARTZ:  So, the issue that they're hung up on

9    is the 3500 is definitive.  The 3500 says the reason in his

10   mind for the delay in payment was bad investment.  What Ms.

11   Tekeei is saying her memory of the testimony is -- I don't

12   remember -- is it was in part because of a bad investment, and

13   then the dot dot dot in Ms. Tekeei's mind is and the other part

14   somehow some way had to do with the Gerova arrest.

15         THE COURT:  Not the testimony, the proffer.

16         MR. SCHWARTZ:  But the proffer has nothing to do with

17   the testimony.  The context doesn't matter.  You have to just

18   look at the transcript.  Let's go to the transcript.

19         THE COURT:  But I was just saying when you were

20   articulating her argument, she was talking about the context in

21   which the statement that you impeached him with was made is in

22   the context of the proffer, and in that discussion they were

23   talking about Gerova.

24         MR. SCHWARTZ:  But again that may have been how they

25   got into the conversation, but the particular line that I

1  confronted him with has nothing whatsoever to do with Gerova.

2  It is him saying that regardless of anything else, I believed

3  the reason why they were late on the payment was a bad

4  investment in the annuity.  That was the reason.  That's what

5  the 3500 said.  So the arrest is totally irrelevant to the

6  statement that I confronted him with.  All right?

7          And I would suggest that if this is ever an

8  evidentiary issue for your Honor -- if it is ever an issue for

9  your Honor -- it is not with Mr. Anderson's testimony; it is if

10  and when I try to call the agent who wrote this, to try and

11  impeach him with a prior inconsistent statement.  Then if they

12  want to argue that that's inappropriate or that's 403, I would

13  understand that argument at that point, but at this point it is

14  not appropriate.

15          I asked a proper question; I got a proper answer; and

16  it didn't open the door to the Gerova arrests.

17          MS. TEKEEI:  Mr. Anderson said he could -- I don't

18  know the quote; I don't have LiveNote -- but he said I can

19  explain further, something along those lines.

20          MR. SCHWARTZ:  But I am allowed to say no thank you.

21          MS. TEKEEI:  And that's fine, but that means that his

22  answer when he said that -- I forget his answer, your Honor,

23  but the answer that he gave to that question initially, that he

24  wanted to explain, means that there is an incomplete record on

25  this issue.  So, the question and answer that Mr. Schwartz

wants to rely on could have very much to do with implications

related to Gerova.  I'm sorry I don't have the transcript, so I

can't look at it.

          But I think when Mr. Schwartz says that he asked about

a specific line, that line is in the middle of this paragraph,

surrounding information about the Gerova arrests and indictment

and the impact that it had on this witness's thinking about

this particular bond issuance and why the annuity payments

weren't going through.

          So, it isn't the case that that line can be taken out

and stood up alone as if it were a stand-alone statement about

the quality of the investments that the annuity was making.

They have to be read in context.

          MR. SCHWARTZ:  That is the way -- one, that's the way

3500 works.  He didn't embrace my question; I got a proper

answer.

          Two, if Ms. Tekeei's argument is right, then we have

to cut off all the facts in this case on September 25, 2015,

because otherwise -- you know, I've never talked to this

witness before.  I never know when in the back of his head, or

the next witness' head, or the next witness's head, they are

going to tell me something that's not in the 3500, that is in

some way informed by evidence that your Honor has ruled

inadmissible.

          But I didn't seek to elicit that.  I did not elicit

1     that.  And it can't be because, you know, they're saying that

2     he had something else in his head, therefore, the question and

3     answer gets struck, or, therefore, I've opened the door to

4     Gerova.

5              THE COURT:  Let me look.  I can't find it right now.

6     So, let me try and find the transcript.  I will look at it over

7     the break, and then we will talk about it when we get back.

8     OK?

9              MS. MERMELSTEIN:  On scheduling, your Honor, if we

10    could get a sense from the defendants of how much longer this

11    witness is going to be on cross-examination.  We have a witness

12    who has been waiting for some days to testify and has a doctors

13    appointment tomorrow.  The witness does not live in New York,

14    and we would really like to get them on and off the stand

15    today.

16             THE COURT:  Any thoughts?  Can you give us any

17    guidance?

18             MR. SCHWARTZ:  I think I will be 15 minutes more.

19             THE COURT:  Ms. Notari, can you give us a sense of the

20    length of your cross?

21             MS. NOTARI:  Probably an hour.

22             MS. MERMELSTEIN:  OK.  It seems like a lot of cross

23    for this witness, but OK.

24             We I think have a lot of legal issues that need to be

25    taken up before we get past today's witnesses, so we can do it

I5U7GAL3                    Anderson – Cross

1    at the end of the day.

2              THE COURT:  We can do it at the end of the day.  I

3    have a sentencing at five, but we can take a break and meet at

4    5:30.

5              MS. MERMELSTEIN:  That's fine, your Honor.  Thank you.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5U7GAL3                         Anderson - Cross

1                   A F T E R N O O N   S E S S I O N

2                            2:00 p.m.

3          (Jury not present)

4          THE COURT:  So I can give you a copy or read from the

5     real-time related to these questions and answers.  Would that

6     be helpful?  Or do you feel like -- because you had said you

7     don't have the transcript in front of you.  I mean it seems to

8     me the real issue is what you can do on redirect with him in

9     this respect.

10         MS. TEKEEI:  Your Honor -- yes, I mean I think because

11    of the constraints, it is hard to develop from him a fulsome

12    answer to that question.

13         THE COURT:  I mean just going back -- and again this

14    is rough, but just to give you a sense of it, the question was:

15    "Q.  You testified yesterday you had numerous meetings with the

16    prosecutors, correct?"

17         Well, first going back, saying, "You believed that

18    when the payments were late, that was simply because the

19    investment manager had bad investments, right?

20    "A.  No.

21    "Q.  You didn't believe that for those first two bond payments?

22    After the first two bond payments were not timely made, you

23    thought that there was a bad investment, and that was the

24    reason for the delayed payment, true?

25    "A.  No, not true.

I5U7GAL3                        Anderson - Cross

1   "Q.  You testified yesterday about your numerous meetings with

2   the prosecutors, correct?

3   "A.  Correct.

4   "Q.  Do you recall telling them -- excuse me.  Didn't you tell

5   them in a meeting on November 28, 2017, that you thought there

6   was a bad investment and that was the reason for the delayed

7   payments?

8   "A.  Yes, but I was talking about a different time, different

9   time period.

10  "Q.  Didn't you tell the government on November 28, 2017 that

11  quickly after the first tribal payment was made, the second

12  payment was not made, and that was concerning to you, you

13  thought there was a bad investment, and that was the reason for

14  the delayed payment?

15  "A.  That's not my recollection of what I said."

16          And then the 3501-3 at page 10 is shown.

17  "Q.  If you look at the top of the third page, can you read

18  that to yourself, and let me know if that refreshes your

19  recollection that on November 28 you told the government that

20  quickly after the first tribal payment was made the second

21  payment was not made, which was concerning to you; you thought

22  there was a bad investment and that was the reason for the

23  delayed payments?

24  "A.  I see the section you're referring to, and again those

25  aren't my notes.  I think I understand why the notes were taken

down that way, and I can understand -- I can explain what my

thinking was.

"Q.  I'm simply asking you if you recall telling the

prosecutors, and the F.B.I. agent, and U.S. postal inspectors

that were present at that interview -- you were represented by

a lawyer, correct?

"A.  Yes.

"Q.  Do you recall telling all of those folks that quickly

after the first tribal payment was made, the second payment was

not made, which was concerning to you; you thought there was a

bad investment, and that was the reason for the delayed

payments?  Do you recall saying that?

"A.  I recall saying part of that."

"Q.  Just backing up for a second, you didn't suspect anything

untoward was happening with the bonds until the SEC started

investigating.

"A.  True."

            Then there was an objection.

            So, I mean just in light of that, what is it that you

want to do?  I mean the 3500 material does have that statement

in it.  You know, Anderson thought that there was a bad

investment and that was the reason for the delayed payment.  In

light of that, what do you want to do, or what are you asking

for?

            MS. TEKEEI:  Your Honor, he says "I recall saying part

1    of that."  I understood that to mean that there were additional

2    reasons why that were giving him concern.  And based on the

3    context of the 3500, I understood him to be conveying that some

4    of those reasons were not just -- some of the reasons why it

5    could have been a bad investment are not reasons that he is

6    able to discuss here.  So, I think when I say we're constrained

7    to get a fulsome answer on that, that's what I mean.

8              THE COURT:  I think we should just move off of this

9    area is what I think we should do.  You know, that statement is

10   clear in the 3500 material, so I don't think it was

11   inappropriate anyway for Mr. Schwartz to ask the question.

12             And my concern is that, you know, even if it's going

13   to come out that Jason Galanis is arrested in Gerova, I didn't

14   have any intention of having it come out that John Galanis was,

15   unless he opened the door to it -- which I don't think he has

16   done yet -- and that's my concern.

17             MS. TEKEEI:  So, we understand that, your Honor.  And

18   I think our point is not that necessarily that it was improper

19   for Mr. Schwartz to ask the question; it is that the answer was

20   an incomplete answer.  And the reason why the answer was an

21   incomplete answer goes into the reasons that are not before the

22   jury and cannot be before the jury, which would include that

23   both Mr. John Galanis and Jason Galanis' arrest.  So, we're

24   constrained to ask on redirect questions that would provide a

25   fulsome answer, for example, refreshing his memory with the

I5U7GAL3                          Anderson - Cross

1    entire back and forth.  So, it is -- you know, we can't -- we

2    can't ask questions like that on redirect.

3              THE COURT:  Let's just move off of this.  I think

4    that's the best solution at this point.

5              MS. TEKEEI:  And we're fine with that so long as the

6    answer is stricken.

7              THE COURT:  I don't think it's proper to strike the

8    answer.  I think he made clear that he had more in mind, and

9    Mr. Schwartz wasn't interested in asking him about it.

10             I mean he says, you know, I think I understand why the

11   notes were taken down that way, and I can explain what my

12   thinking was.  Then Mr. Schwartz cut him off and said I'm

13   simply asking if you recall.

14             So, I don't think it made him look evasive.  If

15   anything, it made it look like Mr. Schwartz didn't want to know

16   the answer.  But I think it would be unduly prejudicial to John

17   Galanis to elicit the facts regarding Gerova.  I have ruled on

18   that.  I don't think he has opened the door.  I don't think the

19   question was asked in bad faith, so I think we should move on

20   and stay away from this.  OK?

21             MR. SCHWARTZ:  Thank you, your Honor.

22             MS. TEKEEI:  Thank you, your Honor.

23             THE COURT:  We will bring the jury back in now.

24             (Continued on next page)

25

1                (Jury present)

2                THE COURT:  Everyone can be seated.  You can proceed,

3      Mr. Schwartz.

4                MR. SCHWARTZ:  May I question, your Honor?

5                THE COURT:  You may.

6      TIMOTHY ANDERSON, resumed.

7      CROSS EXAMINATION (Continued)

8      BY MR. SCHWARTZ:

9      Q.  Good afternoon, ladies and gentlemen.

10               Good afternoon, Mr. Anderson.

11     A.  Good afternoon.

12     Q.  Did you have an enjoyable lunch?

13     A.  Fair.

14     Q.  Now, before the break we had just finished talking about

15     the second -- the second bond issuance piece that was purchased

16     by Rosemont Seneca Bohai.  Do you recall that?

17     A.  I do.

18     Q.  The other part of the second bond issuance was purchased by

19     Bevan Cooney, correct?

20     A.  Correct.

21     Q.  And you also communicated with Jason and Yanni Galanis

22     concerning the bonds that Mr. Cooney purchased; is that right?

23     A.  Correct.

24     Q.  And unlike Mr. Archer, who you did not deal directly with,

25     you did deal directly with Mr. Cooney, correct?

I5U7GAL3                          Anderson - Cross

1   A.   Yes.

2   Q.   And then turning finally to the third bond issuance, the

3   third bond issuance had the same basic structure as the first

4   two, right?

5   A.   It did.

6   Q.   And I won't go through it all again, but you had a role in

7   drafting or reviewing all of the core bond documents for that

8   third bond issuance, right?

9   A.   Correct.

10  Q.   And that issuance was purchased by something called

11  Atlantic Asset Management, true?

12  A.   It was purchased through DTC.   It appeared to be Atlantic,

13  yes.

14  Q.   DTC was the mechanism, but the purchaser was Atlantic Asset

15  Management, true?

16  A.   I'm not sure if they were the actual purchaser or they were

17  speaking on behalf of their client.

18  Q.   So perhaps Atlantic was purchasing that third issuance on

19  behalf of one or more of its clients, correct?

20  A.   Correct.

21  Q.   They were involved in the last bond issuance, right?

22  A.   That's right.

23  Q.   And the investor letter, the so-called big boy letter, that

24  came back from Atlantic Asset Management, right?

25  A.   It did.

1   Q.  And we looked at it before -- and I won't do it again --

2   you sent the PPM for the third bond issuance to Michelle

3   Morton, correct?

4           MS. TEKEEI:  Objection.

5           THE COURT:  Overruled.

6   A.  A draft of it, yes.

7   Q.  And, by the way, you had sent that investment letter to

8   Michelle Morton also in connection with the third issuance,

9   right?

10  A.  I don't know if I sent it or if someone from Burnham sent

11  it.

12  Q.  Someone from Burnham?

13  A.  The blank form.

14  Q.  Someone from Burnham meaning Jason Galanis?

15  A.  Or it could have been someone else who was working.  I'm

16  not sure.

17  Q.  In the past, for example, with the bonds that were

18  purchased by Rosemont Seneca Bohai, you had sent the draft

19  investment letter to Jason Galanis, true?

20  A.  Correct.

21  Q.  And with respect to the third bond issuance, you helped

22  coordinate the wire for the purchase price from Atlantic to

23  U.S. Bank, true?

24  A.  I don't recall.

25  Q.  Well --

1    A.  I very well may have.  I just don't recall.

2              MR. SCHWARTZ:  Can we look at Exhibit 1338,

3    Mr. Jackson.

4    Q.  This is an e-mail chain between yourself and Michelle

5    Morton, correct?

6    A.  Correct.

7    Q.  And the bottom e-mail in this chain you ask her, "Michelle,

8    do you guys" -- meaning Atlantic -- "have everything squared

9    away with U.S. Bank for the Atlantic Fund?"  Right?

10   A.  Yes.

11   Q.  And then you're talking later on about needing to keep DTC

12   updated, because you're helping to coordinate the logistics,

13   right?

14   A.  Yes.

15   Q.  Including the wire for the purchase price, right?

16   A.  Right.

17   Q.  Now, when the WLCC bonds were issued --

18              You can take that down.

19              When the WLCC bonds were issued, they were issued in

20   certificate form, right?

21   A.  Which series of bonds?

22   Q.  Well, let's talk about that.  Were any of them issued

23   electronically?

24   A.  Yes.

25   Q.  The third series --

1    A.   Correct.

2    Q.   -- was issued electronically, correct?

3    A.   Right.

4    Q.   And that's why you were talking about DTC delivery with

5    Michelle Morton in that e-mail we just looked at, right?

6    A.   That's right.

7    Q.   And you testified about this before, but DTC is just an

8    online electronic clearinghouse, right?

9    A.   Correct.

10   Q.   But you can also transact in bonds in physical form, right?

11   A.   Correct.

12   Q.   Just buying and selling a bond like a piece of paper,

13   right?

14   A.   Correct.

15   Q.   All right.  And the first two bond issuances were issued in

16   certificate form, correct?

17   A.   That's correct.

18   Q.   It was only the third that was issued in electronic form,

19   after the DTC issues had been squared away, true?

20   A.   Correct.

21   Q.   And you testified earlier this is not the only or the first

22   physical delivery issuance that you worked on, right?

23   A.   Correct.

24   Q.   And you would agree with me, wouldn't you, that major

25   financial institutions are all equipped to deal with physical

1    delivery of securities like the WLCC bonds, right?

2    A.  They are.

3    Q.  So, for example, you -- we looked at Government Exhibit

4    1268 before.

5           If you could pull that up, Mr. Jackson.

6           This is an e-mail from Jason Galanis to you copying

7    Michelle Morton, providing delivery instructions for the

8    physical bond certificates for the first issuance, right?

9    A.  It is.

10   Q.  And if you turn to page 2, please.

11          For each client --

12          And just blow up the first one as an example.

13          For each buyer of the bonds there is instructions for

14   what to do with the physical bond certificates, right?

15   A.  There is.

16   Q.  And for all of them they're going to major financial

17   institutions, right?  I don't want to make you look through

18   each and every one.  This one is going to JP Morgan, right?

19   A.  It is.

20   Q.  JP Morgan is a big bank, right?

21   A.  It is.

22   Q.  And it specifically has a physical receive department?

23   A.  They do.

24   Q.  That's a part of the bank that's specially set up to deal

25   specifically with physical securities, correct?

1   A.  Correct.

2   Q.  And just looking at the next one, same thing, this is an

3   instruction to go to the DTCC New York window at M&T Bank,

4   which is another big bank, right?

5   A.  It is.

6   Q.  And they also have a department that's set up to deal with

7   physical certificates, right?

8   A.  Right.

9   Q.  By the way, DTCC, it's the same thing as DTC, right?

10  A.  Yes.

11  Q.  It changed its name.  It used to be the Depository Trust

12  Company, and now it's Depository Trust Clearing Company?

13  A.  Um-hum.

14  Q.  Correct?

15  A.  Correct.

16  Q.  OK, you can take that down.

17          Now, I just want to be crystal clear, with respect to

18  each of the bond issuances, you worked with Jason Galanis,

19  correct?

20  A.  Correct.

21  Q.  And you communicated at length with Jason Galanis about

22  each of the bond issuances, right?

23  A.  Correct.

24  Q.  And you relied on Jason Galanis to provide certain

25  necessary information in connection with the bond issuances,

1   correct?

2   A.  Correct.

3   Q.  And you didn't have any difficulty relying on the

4   information that Jason Galanis provided to you, correct?

5   A.  What do you mean by difficulty?

6   Q.  It didn't give you any pause, did it?

7   A.  Oh, no.

8   Q.  You didn't hesitate to rely on his information, did you?

9   A.  No.

10  Q.  He seemed to know what he was talking about, correct?

11  A.  Right.

12  Q.  He seemed to be sophisticated, true?

13  A.  Correct.

14  Q.  And Jason Galanis' involvement never bothered you, true?

15  A.  Correct.

16          MR. SCHWARTZ:  Thank you very much, Mr. Anderson.  I

17  don't have any other questions.

18          THE COURT:  Ms. Notari?

19          MS. NOTARI:  Yes.

20  CROSS EXAMINATION

21  BY MS. NOTARI:

22  Q.  Good afternoon, Mr. Anderson.  Last but not least.

23  A.  Good afternoon.

24  Q.  You testified just a few moments ago that you dealt with

25  Mr.  Bevan Cooney -- you dealt with him in the past but you

1   never actually met him, correct?

2   A.  Correct.

3   Q.  The only dealing with him was essentially a few e-mails.

4   A.  Correct.

5   Q.  We'll get to that.  But, Mr. Anderson, I'd like to focus --

6   I'm going to try not to be too repetitive, because the jury has

7   heard a lot, and you have gone over a lot about the details in

8   this case, but if you can just indulge me to give context to

9   the jury as it pertains to Mr. Cooney.

10          Now, Mr. Anderson, you testified that you worked on

11  approximately four to five tribal bonds in the past.

12  A.  Probably a little more than that, but yes, in that range,

13  five to ten.

14  Q.  And this particular deal, we will refer to it as the WLCC

15  deal, was very similar to deals that you had done in the past.

16  A.  In ways, yes.

17  Q.  And it's fair to say that in each deal you do there are

18  always complexities that arise.

19  A.  True.

20  Q.  And this deal was no different, correct?

21  A.  Correct.

22  Q.  And I take it that in this particular deal you were

23  representing Burnham Securities, the placement agent.

24  A.  Yes.

25  Q.  And you did your due diligence before you got involved with

1   Burnham Securities.

2   A.  I did, yes.

3   Q.  Now, you would agree that Burnham has a historical

4   background.

5   A.  Yes.

6   Q.  And they date actually -- the original firm dates back to

7   1935.

8   A.  I know it's been around for a while, yes.  I don't know the

9   specific date.

10  Q.  And you reviewed online information about Burnham.

11  A.  I did, I looked at their website.

12  Q.  And you actually were able -- you visited their offices in

13  Manhattan.

14  A.  I did.

15  Q.  And it's fair to say that you were very impressed by what

16  you saw.

17  A.  I was impressed by what they were doing, yes.

18  Q.  This was a big, beautiful office in Manhattan, with a lot

19  of space, a lot of desks, a lot of fancy furnishings?

20  A.  In my opinion it was a nice office.

21  Q.  And you met with several individuals while you were there.

22  You met with Andrew Godfrey, correct?

23  A.  I did.

24  Q.  And at one point you met with Devin Wicker?

25  A.  I did.

1    Q.  Devin Wicker was going to head up Bonwick Capital?

2    A.  Bonwick Capital, yes.

3    Q.  And Devin Wicker previously worked at Goldman Sachs?

4    A.  It was my understanding he came from one of the sort of

5    white shoe investment banking firms.  I don't know if I knew it

6    was Goldman Sachs.

7    Q.  And if you at some point learned that it was Goldman Sachs,

8    how could you describe Goldman Sachs?

9            MS. TEKEEI:  Objection.

10           THE COURT:  You can just answer that in general terms.

11   A.  It is generally considered one of the elite investment

12   banking firms.

13   Q.  So it's fair to say that the literature you observed online

14   about Burnham matched what you saw visually when he went to

15   their offices.

16   A.  I think that's a fair statement.

17   Q.  And you believed that you were acting on behalf of a

18   reputable investment firm, correct?

19   A.  That's true.

20   Q.  And it's fair to say -- Mr. Schwartz went over this

21   before -- but you thought this was going to lead to future

22   business, correct?

23   A.  I thought it might.

24   Q.  Now, as part of your legal duties you signed what is called

25   a retainer agreement.

1              Could we have defense Exhibit 3504.

2              If you prefer a physical copy of the exhibit, I have

3    one, otherwise I'm happy to show it to you on the monitor.

4    A.  We can try it here online, on the monitor.

5    Q.  So what we are looking at here, is this your retainer

6    agreement?

7              MS. TEKEEI:  Your Honor --

8              THE COURT:  Yes?

9              MS. TEKEEI:  I'm not sure that this is in evidence

10   yet.

11             MS. NOTARI:  Well, I'm going to try to move it into

12   evidence.

13             MS. TEKEEI:  And we have no objection to that once the

14   witness has seen it.  I'm just saying it's being shown to the

15   jury and it's not in evidence.

16             THE COURT:  They don't have it up yet.

17             MS. TEKEEI:  Oh, OK.

18             THE COURT:  So just lay a foundation.

19   Q.  Is this a copy of the retainer agreement that you entered

20   into with Burnham Securities?

21   A.  It appears to be, um-hum.

22   Q.  And essentially this letter provides the scope of your

23   engagement with them, correct?

24   A.  Correct.

25   Q.  And it sets out the basic terms of your representation?

I5U7GAL3                    Anderson - Cross

1    A.  Correct.

2    Q.  It sets out the fees that you will be charging?

3    A.  The hourly rates, yes, um-hum.

4    Q.  And in fact it sets out that your hourly rate on this

5    project was $410 per hour.

6    A.  It jumped ahead to the second page.

7    Q.  I'm sorry.  Second paragraph?

8    A.  Yes.  Yes.

9    Q.  And actually in this retainer agreement it talks about two

10   other lawyers from the firm, Elizabeth Preate Havey and Andrew

11   Maher.  Were those your associates or cocounsel?

12   A.  Cocounsel.

13   Q.  And they were charging respectively $385 per hour and $305

14   per hour, correct?

15   A.  That's correct.

16   Q.  Now I'd like to go on to the next page, the section of the

17   retainer agreement that talks about communication.

18   A.  Yes.

19   Q.  Paragraph six talks about communication.  Now, I take it

20   that this is very standard language that you include in all of

21   your retainer agreements, correct?

22   A.  Most, if not all, um-hum.

23   Q.  And what this paragraph specifically says is that the firm

24   regularly communicates with its clients and with third parties

25   on behalf of its clients through use of landline, digital,

1    cellular phones, wireless, e-mail devices, unencrypted e-mail,

2    telecopier machines.  Essentially what this paragraph is saying

3    is that it sets forth what the modes of communication you will

4    have with your clients.

5    A.  Yes.

6    Q.  And it's fair to say that a large portion of your business

7    today is conducted through e-mail?

8    A.  Correct.

9    Q.  And this case was no different than any other case.

10   A.  In the modes of communication.

11   Q.  Yeah, modes of communication.

12   A.  Yes.

13   Q.  And in this case -- and most of your cases -- your e-mails

14   with your clients are part of the typical course of your daily

15   business?

16   A.  Correct.

17   Q.  It's not unusual for you to e-mail a client instead of

18   picking up the phone.

19   A.  Correct, yes.

20   Q.  And sometimes in cases like this one you never even meet

21   the people that you're dealing with; you just communicate with

22   them through e-mail, correct?

23   A.  That's true.

24   Q.  Did you ever pick up the phone and call Mr. Cooney?

25   A.  No.

1   Q.  You never even spoke to him.

2   A.  No.

3   Q.  Now, Mr. Schwartz went over some previous text messages

4   that you had in this case with some of the participants who

5   drafted the bonds.  He went over text messages with John

6   Galanis?

7   A.  Yes.

8   Q.  And in fact he talked about also -- or did you text message

9   Jason Galanis?

10  A.  Yes.

11  Q.  And it's fair to say that in the normal course of business

12  you often do text message your clients?

13  A.  Correct.

14  Q.  Now, this is probably something you more frequently do with

15  clients that you feel close to?

16  A.  I haven't thought about that question, but it's to the

17  point where if I have had enough involvement with them, that a

18  cell phone has come into use, people have each other's cell

19  phone numbers, and that's when texts start, so yes.

20  Q.  So it's usually the type of relationship where there is

21  more involvement and somebody actually has your cell phone

22  number and you will give it to them.

23  A.  Yes.

24  Q.  And it's fair to say that you talked about joking and

25  banter on these text messages, but that's not uncommon in --

 1   and when you are talking to clients, in their e-mail or text

 2   messages, it's not uncommon that you might make a joke.

 3          MS. TEKEEI:  Objection.

 4          THE COURT:  I will allow it.

 5   A.  It's not uncommon, no.

 6   Q.  It's fair to say that bonds are pretty boring?

 7   A.  That would be most people's assessment, yes.

 8   Q.  So once in a while it's kind of nice to get a joke on an

 9   e-mail, correct?

10   A.  Correct.

11   Q.  It sort of breaks up the monotony of talking about

12   indentures and placement bonds and so forth.

13          Now, you never text messaged Mr. Cooney, did you?

14   A.  I did not.

15   Q.  We also talked about the lawyer representing the WLCC,

16   Greenberg Traurig.

17   A.  Yes.

18   Q.  Now, if you were in the NBA play-offs and Dilworth Paxson

19   was the Knicks, it's fair to say -- I'm poor with my basketball

20   analogies -- but it's fair to say that Greenberg Traurig was

21   like another NBA team?

22          MS. TEKEEI:  Objection.

23          MR. TOUGER:  I join in that.  The notion of the Knicks

24   in a play-off is hypothetical.

25   Q.  OK, so we will go back to basics.  Greenberg Traurig had an

1    American Indian law practice which handled complex litigation

2    involving commercial and governmental affairs regarding Native

3    Americans.

4    A.  That was my impression of it, yes.

5    Q.  So Dilworth Paxson had a specialty division dealing with

6    Native American commercial transactions, correct?

7    A.  Correct.

8    Q.  And you were part of that division?

9    A.  Yes.

10   Q.  If a Native American tribe who was trying to do a bond like

11   this had an interest, and the phone call came to Dilworth

12   Paxson, they would pass on the phone call to someone like you.

13   A.  Yes.

14   Q.  And in fact Dilworth Paxson -- I'm sorry -- Greenberg

15   Traurig has the same level of expertise in their field dealing

16   with these types of bonds.

17   A.  I don't know that, but probably fair to say.

18   Q.  And Heather Thompson was a lawyer for Greenberg Traurig?

19   A.  Correct.

20   Q.  And she actually was working on this bond?

21   A.  Correct.

22   Q.  And she has published research articles on Native American

23   development?

24   A.  I don't know.  She may have.  She is well known.

25   Q.  And like Dilworth Paxson Greenberg Traurig has been ranked

1    by U.S. News and World Reports --

2              THE COURT:  I am going to sustain that.  I think we

3    got the point about Greenberg Traurig.

4    Q.  So, it's fair to say that these were two top tier law firms

5    working on this deal.

6    A.  I would like to think that, yes.

7    Q.  Now, previously you were referred to Government Exhibit

8    2027.

9              Your Honor, can I move 3504 into evidence?

10             THE COURT:  Any objection?

11             MS. TEKEEI:  No objection, your Honor.

12             THE COURT:  It will be admitted.  Thank you.

13             (Defendant's Exhibit 3504 received in evidence)

14   Q.  Previously you testified about this list, correct?

15   A.  I have.

16   Q.  And this was a list of all the important people involved in

17   creating this bond?

18   A.  Correct.

19   Q.  And Mr. Cooney's name is not on this list, correct?

20   A.  No.

21   Q.  Mr. Cooney's contact information is not on this list?

22   A.  No.

23   Q.  Now, you began reviewing documents for the WLCC bond in

24   2013?

25   A.  No.

I5U7GAL3                    Anderson - Cross

1    Q.   The idea surfaced in 2013.

2    A.   No.

3    Q.   When you attended the Native American conference?

4    A.   That was 2014.

5    Q.   Sorry, 2014.  So in early 2014 you began working on this

6    bond, correct.

7    A.   (No verbal response).

8    Q.   And it's fair to say, as the lawyer representing the

9    placement agent, it was your job to keep the deal moving

10   forward.

11   A.   Correct.

12   Q.   And it was your job to make sure that all the documents

13   were needed to move the deal forward?

14   A.   That's correct.

15   Q.   And again you've drafted numerous documents in this case,

16   correct?

17   A.   I have.

18   Q.   Just briefly, you talked about the legal opinion, correct?

19   A.   Yes.

20   Q.   You drafted that.

21   A.   Well, our legal opinion, yes, there were two.

22   Q.   Now just specifically, the two legal opinions that were

23   drafted by Dilworth Paxson and Greenberg Traurig, a separate

24   opinion was issued for each issuance of the bonds, correct?

25   A.   That's correct.

1   Q.  And there were three issuances of the bonds here?

2   A.  There were.

3   Q.  Now you also talked about all of the other transaction

4   documents that were part of the closing in this case, correct?

5   A.  Correct.

6   Q.  And each separate issuance had different documents for each

7   separate closing.

8   A.  That is correct.

9   Q.  And it's fair to say that those documents were part of the

10  closing documents on the bonds.

11  A.  Correct.

12  Q.  And those were part of a public record?

13  A.  I can't answer that.  I'd have to have more background.  I

14  think that's a decision for Wakpamni.

15  Q.  Let me withdraw that question and ask you something more

16  specific.  Specifically, if an investor who was interested in

17  buying the bond wanted to be able to review those documents,

18  those documents would be made available to them.

19  A.  Correct.

20  Q.  And, in fact, if an investor contacted you regarding

21  purchasing the bond, your duty as the lawyer would be to talk

22  to that investor and provide them with that kind of

23  information.

24              MS. TEKEEI:  Objection.

25              THE COURT:  Sustained.

I5U7GAL3                          Anderson - Cross

1   Q.  If an investor contacted you, you would make your efforts

2   to provide them whatever information you could provide.

3          MS. TEKEEI:  Objection.

4          THE COURT:  Yes, sustained.  Let's just focus on what

5   he did.

6   Q.  Did there come a time when an investor contacted you and

7   asked you to provide them with the documentation of the bond?

8          MS. TEKEEI:  Objection.

9          THE COURT:  Sustained.

10          Overruled.  Sorry.  I will let you answer that.

11   A.  No, not to my knowledge.

12   Q.  OK.  I'd like to refer you to Defense Exhibit 3703.  Do you

13   recall this e-mail?

14   A.  I do not offhand.

15   Q.  You would agree that that's your e-mail?

16   A.  Yes.

17   Q.  OK.  And what is the subject matter of this e-mail?

18          MS. TEKEEI:  Objection.

19          THE COURT:  Yeah, why don't you authenticate it first.

20          MS. NOTARI:  Your Honor, the e-mail has been

21   authenticated.  It's a defense exhibit, so --

22          THE COURT:  Are you objecting to the admission, Ms.

23   Tekeei --

24          MS. TEKEEI:  I don't think.

25          THE COURT:  -- or the authentication?

1            MS. TEKEEI:  Authentication, your Honor.

2            MS. NOTARI:  Your Honor, it's on my e-mail exhibit.

3       We agreed to this exhibit.

4            THE COURT:  I know, but you still have to ask the

5       witness the foundational question.

6            MR. SCHWARTZ:  This is subject to a stipulation, I

7       believe, your Honor.

8            THE COURT:  Is that right, Ms. Tekeei?  Is this

9       subject to a stipulation about it's admissibility?

10           MS. TEKEEI:  Your Honor, it is subject to a

11      stipulation as to authenticity.  I think she has not offered it

12      yet and then could ask the questions about it, and that's the

13      basis for the objection.

14           THE COURT:  Fine.  If there is a stipulation as to its

15      admissibility, Defense Exhibit 3703 will be admitted, and now

16      you can ask your questions.  Thank you.

17           (Defendant's Exhibit 3703 received in evidence)

18      Q.  Mr. Anderson, can you please tell us what this document is.

19      A.  The subject line is PE Agreement, and there is an

20      attachment.  It's an e-mail from me to Jennifer Weddle, Heather

21      Thompson and Mike McGinnis at Greenberg, dated November 2,

22      2015.

23      Q.  And referring you to paragraph 4 of this document,

24      paragraph 4, can you -- Mr. Anderson, you drafted this

25      document, correct?

I5U7GAL3                          Anderson - Cross

1   A.   I did the first draft, yes.

2   Q.   And can you please explain to us what you mean by what is

3   stated in paragraph 4.

4   A.   Should I read it or?

5   Q.   Sure.

6   A.   It says, "Manager acknowledges that Thorsdale Fiduciary and

7   Guaranty Company, Ltd. is an entity contracted by manager as an

8   advising consultant regarding private equity investments."

9   Q.   Now, in relation to this document, Thorsdale was a

10  legitimate entity that was contracted out to provide consulting

11  information?

12  A.   I don't know.

13  Q.   What is your understanding of what this paragraph means?

14  A.   I do not have a firm understanding of what that paragraphs

15  means, and that paragraph was provided to me for inclusion in

16  the addenda to the annuity contract.

17  Q.   So the information was provided, and you put it in there.

18  A.   As a draft, yes.

19  Q.   And you're not sure what it means.

20  A.   Correct.

21  Q.   Do you recall hearing the name Thorsdale in your capacity

22  dealing with this bond?

23  A.   I recall receiving an e-mail that had a Thorsdale address.

24  Q.   Do you recall who sent that e-mail?

25  A.   Jason Galanis.

1    Q.  Well, we will move on.

2            Mr. Anderson, we have gone over Wealth Assurance

3    repeatedly now in this case, and I just would like to focus

4    that on your previous testimony you agreed that Wealth

5    Assurance appeared to be a real company with large assets.

6    A.  Yes.

7    Q.  And it's fair to say that it was your goal that the annuity

8    in this case would pay enough for the bonds, the principal and

9    the interest.

10   A.  The economic performance of the annuity was important to

11   the bond, um-hum.

12   Q.  And you testified that if Wealth Assurance could not

13   satisfy the necessary payment schedule, the deal would not

14   work?

15   A.  Correct.

16   Q.  And you believed that you had every reason to believe that

17   Wealth Assurance would do what it was supposed to do and that

18   the deal would work.

19   A.  Correct.

20   Q.  Now, we touched upon this briefly, but in the past you've

21   worked on unrated bonds.

22   A.  Correct.

23   Q.  And in fact most of the bonds you've worked on have been

24   unrated.

25   A.  No, I wouldn't say most.  Most -- excuse me -- most tribal

1    bonds?  Or most bonds generally?

2    Q.  Well, are most tribal bonds unrated?

3    A.  Yes.

4    Q.  So --

5    A.  Most bonds are not -- are rated.

6    Q.  Previously in one of those sessions where you met with the

7    government and you spoke to them, there was a statement that

8    said that you worked on unrated --

9              MS. TEKEEI:  Objection.

10             THE COURT:  What's the objection?

11             MS. TEKEEI:  It's fine if she asks the question, your

12   Honor, but I think reading from it in the first instance would

13   be an improper way to do that.

14             MS. NOTARI:  Your Honor, I'm just trying to confront

15   the witness with the statements he made.

16             THE COURT:  I will allow it.

17   Q.  I don't want to misuse your words.  So, you said that you

18   worked on unrated bonds as most were not unrated.

19   A.  Say that again.

20   Q.  Those are your words?

21   A.  I think there is a double negative there.  I don't know

22   what that says about me, but --

23   Q.  You worked on unrated bonds, as most were not rated.

24   A.  With respect to tribal bonds, yes.

25   Q.  So you meant in the context of tribal bonds.

I5U7GAL3                          Anderson - Cross

1    A.  Correct.

2    Q.  So most tribal bonds are not rated.

3    A.  That's been my experience.

4    Q.  And it's fair to say that there is nothing wrong with

5    unrated bonds.

6    A.  Correct.

7    Q.  And there is nothing wrong with unregistered bonds.

8    A.  Correct.

9    Q.  Now, in the context of this case, it was your job to move

10   along the bonds, correct?

11   A.  The process, yes.

12   Q.  And you were working with Burnham Securities, the placement

13   agent?

14   A.  Yes.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   Q.  And it is fair to say that you were repeatedly assured that

2   there were buyers for the bond?

3   A.  Yes.

4   Q.  At some point you were told that there was significant

5   investor demand; and, therefore, a need to invest in more

6   bonds?

7   A.  There was a demand, yes.

8   Q.  Shortly after the issuance of the first bond and it closed,

9   you received what was information from Jason Galanis, and it

10  was called the green light to go forward with the second

11  issuance, correct?

12  A.  Correct.

13  Q.  If I can refer you to Government Exhibit 1268 which I

14  believe was already moved into evidence.

15          Now, this email was sent to you on August 24th by

16  Jason Galanis, correct?

17  A.  Correct.

18  Q.  And this was a list of pension funds who purchased the

19  first issuance of the bonds?

20  A.  That's right.

21  Q.  So it is fair to say this list was consistent with what you

22  were being told that there was a significant interest of buyers

23  in the bond?

24  A.  That's correct.

25  Q.  These buyers that are listed, would you call those

1    institutional investors?

2    A.   Yes.

3    Q.   There is a difference between an institutional investor and

4    an individual investor, correct?

5    A.   Correct.

6    Q.   In this case Mr. Cooney was an individual investor?

7    A.   He was, yes.

8    Q.   And he was actually the only individual investor in this

9    case?

10   A.   Yes.

11   Q.   And there is nothing wrong with being an individual

12   investor, correct?

13   A.   There is not.

14   Q.   In fact, you had dealt with individual investors in the

15   past?

16   A.   I have.

17   Q.   And on October 6th, that was the first time that you heard

18   the name Bevan Cooney?

19   A.   I don't know that that is the date.   That is the general

20   time period, though.

21   Q.   Perhaps we can refresh your recollection.   Government

22   Exhibit 1272.

23   A.   Yes, October 6th.

24   Q.   This email was sent to you from -- it was originally you

25   got an email from Jason Galanis on October 6th, at 7:24 pm,

1    2014, and that email said to you -- do you want to read it?

2    A.   Sure.  If you could collapse it a little bit.  It is too

3    large.  I'd like to close him tomorrow if possible.  His name

4    is Bevan Cooney.  He has his money managed at City National.

5    Experienced institutional bond desk there.  Let me know what we

6    need.

7    Q.   What was your understanding of this email?

8    A.   That the second bond issue was going to have 20 million and

9    15 million had already been allocated and there was a $5

10   million piece that was still unallocated and it would be

11   allocated to Bevan Cooney.

12   Q.   And this was the first information you learned about Bevan

13   Cooney as a buyer for this bond?

14   A.   To my recollection, yes.

15   Q.   You respond Bevan Cooney is okay closing tomorrow question

16   mark.  He'll need to sign the big boy letter.  Nothing else.

17   I'll get Burnham's signature packaged together as well?

18   A.   Correct.

19   Q.   What did you mean when you said, "nothing else"?

20   A.   As far as what I need to have him sign, just the big boy

21   letter, the investor letter.

22   Q.   It was your job, you prepared the big boy letter?

23   A.   I prepared a form of it.  It was Mr. Cooney or someone, his

24   bank's job to fill in the information related to him to verify

25   the information in the investor letter.

1   Q.  Now, yesterday you spoke about the fact that you gave

2   Mr. Archer an investor letter, but you never dealt with him,

3   correct?

4             MR. SCHWARTZ:  Objection.

5             THE COURT:  Overruled.

6   A.  I believe I testified that I provided a form of the letter

7   to Jason for Seneca Bohai.

8   Q.  And your information, let's focus on Mr. Cooney.

9             Essentially the information you learned about

10  Mr. Cooney as far as you called him a sophisticated investor,

11  that information came from Jason Galanis, correct?

12  A.  That came, the information related to Bevan Cooney came

13  from Jason Galanis.  The investor letter stated that he was a

14  sophisticated investor and that is what Mr. Cooney signed.

15  Q.  So your basis for calling Mr. Cooney a sophisticated

16  investor, I think you testified yesterday, was that he had his

17  money managed at City National Bank?

18  A.  Between that and the letter he signed, yes.

19  Q.  And so you did not do any verification in terms of asking

20  for any documentation from City National Bank?

21  A.  No.  Just a certification for Mr. Cooney.

22  Q.  Again this was the first time you learned about Mr. Cooney,

23  correct?

24  A.  October 6th, I believe so, yes.

25  Q.  Now, if I could just focus on Government Exhibit 1270.

1            Yesterday or earlier today we reviewed this document.

2     This was an email that was sent from Jason Galanis to you on

3     September 23rd, several weeks earlier, where Mr. Galanis

4     provides information about the first investor for the $15

5     million portion of the $20 million issuance which was the

6     second issuance, correct?

7     A.   That's correct.

8     Q.   And if I could just focus on the bottom portion of that

9     paragraph.

10    A.   Okay.

11    Q.   Now, in this email Mr. Galanis says I will send you

12    information on the other buyer tomorrow, correct?

13    A.   Correct.

14    Q.   Your understanding of that meant that this was talking

15    about the person who was purchasing the $5 million portion of

16    the bond?

17    A.   Correct.

18    Q.   And this email was sent on September 23rd, 2014?

19    A.   Yes.

20    Q.   The following day did Jason Galanis send you any

21    information about the buyer?

22    A.   I don't recall.  I don't believe so.

23    Q.   So if we could refer back to 1272.

24    A.   Okay.

25    Q.   The bottom of that page, Page 2.

1    A.  Yes.

2    Q.  Can you read what that says.

3    A.  I can.  The investor for the second tranche of 5 MM fell

4    out last week.  We've worked out something with a back-up.

5    He's prepared to proceed.  Is it the same cusip.  .

6    Q.  Your understanding was there an initial buyer for this $5

7    million tranche, correct?

8    A.  Correct.

9    Q.  And that person fell through?

10   A.  Based upon what was written, yes.

11   Q.  And Mr. Cooney was brought in at the last minute to

12   purchase the second tranche of bonds?

13             MS. TEKEEI:  Objection.

14             THE COURT:  Sustained.

15   Q.  Well, this email says that we've worked out a back-up.

16   What did you understand that to mean?

17   A.  A replacement investor.

18   Q.  Again you never heard about Mr. Cooney's involvement before

19   this date?

20   A.  I don't believe so, no.

21   Q.  So the following day Mr. Cooney signed the big boy letter,

22   is that your recollection?

23   A.  The following day or the day after that.  I don't know the

24   exact date.

25   Q.  Let's focus on defense Exhibit 3512.

I5UJGAL4                        Anderson - cross

1          This document was sent from Jason Galanis to Bevan

2     Cooney, and if we could show the attachment.  This was a draft

3     of the big boy letter that you had sent to Mr. Cooney?

4     A.  I sent it to Jason, and Jason forwarded it to Mr. Cooney.

5     Q.  You didn't send it directly to Mr. Cooney, you sent it to

6     Jason Galanis, correct?

7     A.  I believe so, right.

8     Q.  Now, at some point Mr. Cooney, you said, signed the big boy

9     letter?

10    A.  Yes.

11    Q.  And were you present when he signed the letter?

12    A.  No.

13              MS. TEKEEI:  We have no objection to this being

14    admitted into evidence if that --

15              MS. NOTARI:  Thank you.

16              THE COURT:  Are you seeking to admit?

17              MS. NOTARI:  Yes.

18              MR. SCHWARTZ:  No objection.

19              THE COURT:  Admitted.

20              (Defendant's Exhibit 3512 received in evidence)

21    BY MS. NOTARI:

22    Q.  Now, you drafted this letter, correct?

23    A.  Yes.

24    Q.  And big boy is just a common usage of the term, it has

25    nothing to do with Mr. Cooney, correct?

1  A.  Right, right.

2  Q.  It is just an industry term?

3  A.  It is an industry term for an investor letter, yes.

4  Q.  There is nothing improper about a big boy letter?

5  A.  No, no.

6  Q.  In fact, it is required?

7  A.  It is not required.  It is helpful.

8  Q.  You drafted everything but the names, addresses and the

9  dates, correct?

10  A.  Correct.

11  Q.  And you said that you relied on Jason Galanis to make sure

12  that Mr. Cooney filled out this letter?

13  A.  Correct.

14  Q.  And you say in the email that Mr. Cooney should just sign

15  it, nothing else?

16  A.  That was the only document I needed back from him to close

17  the transaction.

18  Q.  Now, last week when you testified on direct examination,

19  Ms. Tekeei, the government prosecutor, asked you questions

20  about Government Exhibit 1272 and Government Exhibit 254, which

21  was the big boy letter.

22          You testified that Mr. Cooney was a sophisticated

23  investor based on the fact that Jason Galanis represented to

24  you that he had money, his money was managed at City National

25  Bank, and City National Bank was an experienced institution,

1    they had a bond desk there.  Is that correct?

2    A.  That is what Jason said, yes.

3    Q.  Now, it is fair to say that we talked about private

4    placement bonds, and this was a private placement bond?

5    A.  Yes.

6    Q.  And as far as unregistered private placement bond, the

7    Security Act of 1933 requires that certain investors who invest

8    in these kinds of private placement unregistered bonds fulfill

9    certain requirements, correct?

10   A.  There are a number of exemptions, and one is accredited

11   investors, yes.

12   Q.  There are exemptions to this registration requirement, but

13   those exemptions must be satisfied?

14   A.  Some exemption needs to be satisfied in order to be exempt,

15   correct.

16   Q.  It is actually your job as representing the placement agent

17   in issuing the legal decision, legal opinion in this case, to

18   make sure those exemptions are satisfied?

19             MS. TEKEEI:  Objection.

20             THE COURT:  Overruled.

21   A.  There is an exemption or to state it is exempt from

22   registration, correct..

23   Q.  There are what are called accredited investors and

24   sophisticated investors, correct?

25   A.  Right, that is one exemption, correct.

1    Q.  And there are certain tests that must be satisfied in order

2    for a person to be classified as an accredited investor?

3    A.  Correct.

4    Q.  So, for example, an individual or natural person who is not

5    an institutional buyer could purchase a bond, but they would

6    have to meet certain threshold requirements?

7    A.  For that exemption, correct.

8    Q.  So a natural person who was buying this bond who was not

9    affiliated with any type of financial adviser would have to

10   make a certain amount of money to purchase this bond?

11   A.  Correct.

12   Q.  The reason for that is because there are risks involved in

13   this kind of bond, correct?

14   A.  With any investment, yes.

15   Q.  And we talked a little bit before lunch about the fact that

16   some of the investments with regard to this bond were, there

17   was a risk?

18   A.  Yes.

19   Q.  So it was your job to determine, to qualify Mr. Cooney to

20   make sure that he was qualified as an investor to purchase this

21   bond?

22   A.  Or find another exemption, correct.

23   Q.  I am sorry?

24   A.  Or find another exemption.

25   Q.  So your basis for qualifying him was not on the fact based

1    on his income, it was based on the fact that you believed that

2    he had a financial adviser that was sophisticated?

3    A.   Correct.

4    Q.   And your basis for that determination was your conversation

5    with Jason Galanis?

6    A.   Conversation with Jason and the investor letter.

7    Q.   And the investor letter?

8    A.   Correct.

9    Q.   But you did not do any independent searching as to

10   corroborate the fact that Mr. Cooney actually had an investor?

11   A.   Had an investor?

12   Q.   A financial adviser?

13   A.   Based upon his certifications and that investor letter and

14   the information I received from Jason.

15   Q.   Let's focus on the investor letter.

16            First, the investor letter, can we have Government

17   Exhibit 254.  Now, I would just like to focus, we keep using

18   this term sophisticated investor.  Sophisticated investor is

19   actually a term that is defined by the Security Act of 1933?

20            MS. TEKEEI:  Objection.

21            THE COURT:  I'll allow that.

22   A.   State that again, please.

23   Q.   The term sophisticated investor is a term that is defined

24   within the Securities Act of 1933?

25   A.   I believe that's correct.

1   Q.  A sophisticated investor is somebody that understands the

2   risks of the bond, correct?

3   A.  Correct.

4   Q.  And it is also someone that is saying that they understand

5   that the parameters of the investment of the bond fit within

6   their investment profile, correct?

7   A.  I believe that is accurate, yes.

8   Q.  So, in other words, a person who only makes $100,000 a year

9   might not be a good candidate to buy a $5 million bond,

10  correct?

11  A.  Depending on what their other assets are, I don't know.

12  Q.  So the security laws are geared toward protecting investors

13  who purchase this bond?

14          THE COURT:  Sustained.

15          MS. TEKEEI:  Objection.

16  Q.  So if we focus on where in this big boy letter does it say

17  that Mr. Cooney is a sophisticated investor?

18  A.  I would state that in (c), that would cover that, in my

19  opinion, on the first page.

20  Q.  You said, you previously testified your basis was, first,

21  there is nowhere in this document where it says Mr. Cooney is a

22  sophisticated investor, correct?

23  A.  It does not use that word, correct.

24  Q.  It does not use that terminology?

25          And you said your basis for qualifying him was his

I5UJGAL4                          Anderson - cross

1   relationship with City National Bank, correct?

2          MS. TEKEEI:  Objection; misstates.

3          THE COURT:  I will let the witness clarify it.

4   A.  His relationship goes to the overall conclusion he would be

5   a sophisticated investor in addition to what he states in the

6   investment letter.

7   Q.  But in order for him to be qualified as a sophisticated

8   investor by virtue of his relationship with a financial

9   adviser, essentially you would have to believe that the

10  financial adviser:  One, explained the risks of the investment;

11  and, two, reviewed the investment with his investment profile

12  and decided that it was within the parameters of his

13  investment, it was an appropriate investment for him?

14  A.  I disagree.  I think you can be a sophisticated investor

15  without having an investment manager.

16  Q.  You can be, but you did not -- your testimony was that your

17  basis for qualifying him as a sophisticated investor was his

18  relationship with City National Bank?

19          MS. TEKEEI:  Objection.

20          THE COURT:  Sustained.

21  Q.  In order for you to determine that an individual investor

22  is a sophisticated investor based on what's indicated, you

23  would have to make some determination that they understood the

24  risks and that the investment portfolio was within their

25  investment, correct?

A.  I would make a determination that they seemed to understand what they're doing based upon their certifications, also whatever the other background materials were, background information I was aware of.

Q.  You had no background information on Mr. Cooney except for his signature?

A.  I had information that described him, and then based on what he signed in this letter, the certifications in this letter, representations in this letter.

Q.  But you were not present when he signed it, correct?

A.  No, I was not.

Q.  This is not a notarized document, so you don't even know if he signed it, correct?

A.  I was not present, no.

Q.  62, I am referring to the handwriting, 621 Caddie Court, that is Mr. Cooney's home address?

A.  I don't know.  I don't know if it is a home or business or what the address is.  I am not familiar with that area.

Q.  There was no determination in the big boy letter, there was no indication that Mr. Cooney was qualified in terms of satisfying any other of the tests set forth in Regulation D, correct?

      You did not assess his net worth, you did not assess his income, none of those, there was no attempt to do that?

A.  In Reg. D, I relied on his representations here.

1    Q.  So after Mr. Cooney was qualified as an investor in this

2    case, he went on to purchase the bond, correct?

3    A.  That is my understanding, yes.

4    Q.  And it is fair to say that you had some dealings with him

5    after he signed the big boy letter, correct?

6    A.  Correct.

7    Q.  You emailed with him?

8    A.  Correct.

9    Q.  Actually, he emailed you?  Do you remember that?

10   A.  I remember there were email communications with him related

11   to the delivery of the bond.

12              MS. NOTARI:  If we could refer to Government Exhibit

13   402.  If I can just have a moment.

14              (Pause)

15              MS. NOTARI:  Your Honor, may I approach?

16              THE COURT:  You may.

17   BY MS. NOTARI:

18   Q.  If you could just review that to see if it refreshes your

19   recollection.  Now, if you could just first tell me who is on

20   that email chain.

21   A.  On the top page?

22   Q.  Yes.

23   A.  It is Bevan Cooney, Keith Henselen at U.S. Bank, Matthew

24   Fillman, Alexis Gluckman and myself.

25   Q.  Do you know who Matthew Fillman is?

1    A.  No.

2    Q.  Do you know who Alexis Gluckman is?

3    A.  No.

4    Q.  Do you know Fulton Management?

5    A.  No.

6    Q.  Do you know who Keith Henselen is?

7    A.  I do.

8    Q.  Keith Henselen was the trustee in the case?

9    A.  He was.

10   Q.  He was representing U.S. Bank?

11   A.  Correct.

12   Q.  And again the trustee is a part of, an integral part of a

13   bond and he must be, he is a participant?

14   A.  Correct.

15   Q.  He doesn't have to be a participant on every email,

16   correct?

17   A.  It depends on what the email is but, correct, yes.

18   Q.  So you testified earlier that part of your job was to make

19   sure that the bond was physically transferred to the right

20   party?

21   A.  Right.

22   Q.  In this case, the bond was not DTC-eligible, correct?

23   A.  Correct.

24   Q.  So it had to be physically transferred to the investors?

25   A.  Correct.

1    Q.  You made efforts to transfer this bond to Mr. Cooney?

2    A.  U.S. Bank did, yes.

3    Q.  U.S. Bank?

4            You relayed the information as to where U.S. Bank

5    should contact Mr. Cooney, and U.S. Bank physically mailed him

6    a copy of the bond?

7    A.  That is my understanding, yes.

8    Q.  And in this particular email Mr. Cooney is asking you, I

9    have this paperwork from the bond, should I deliver this to

10   City National Bank?

11   A.  He did ask that, yes.

12   Q.  And he included several people in that email?

13   A.  Yes.

14   Q.  He included you, he included Matthew Fillman, he included

15   Alexis Gluckman, he included U.S. Bank and he was simply asking

16   for directions as to what he should do with the bank, with the

17   bond, correct?

18   A.  Yes.

19   Q.  Tell us what the subject of this email is.

20   A.  These instructions are for purchase of Wakpamni Town Center

21   bonds for tomorrow A M, 10-9-2014.

22   Q.  This subject matter was part of an ongoing thread regarding

23   Mr. Cooney's instructions on purchasing the bond.  Is that

24   right?

25   A.  That is what it appears to be, yes.

1    Q.  It is fair to say when you receive an email that is part of

2    an email thread, you are given all of the previous

3    conversations on that email thread?

4              MS. TEKEEI:  Objection.

5              THE COURT:  I'll allow that.

6    A.  I don't understand the question.  Sorry.

7    Q.  So when you receive an email thread, you're not just

8    getting your comments, you're getting everyone else's comments

9    on the email?

10   A.  When you're added to an existing email, right, the

11   information below shows up on the email.

12   Q.  This particular email chain was entitled, "Instructions for

13   purchase of the Wakpamni Town Center bonds for tomorrow," and

14   it was dated October 29th, 2014?

15   A.  That is what it states, yes.

16   Q.  It is fair to say all the people on these emails were

17   involved in Mr. --

18             MS. TEKEEI:  Objection.

19   Q.  Now, at some point you provided Mr. Cooney with

20   instructions on where he should send the wire for the bond,

21   correct?

22   A.  His wire instructions?

23   Q.  Yes.

24   A.  Yes.

25   Q.  Referring you to Defense Exhibit 3532, can you describe

I5UJGAL4                          Anderson - cross

1    what is going on in that email, referring to first the top

2    portion of the email.

3    A.  The top portion?  It appears to be a wire information for

4    National Financial Services, LLC.

5    Q.  3532?

6    A.  It is wire information.

7    Q.  And you provided that information to Mr. Cooney, correct?

8    That email is from you to Mr. Cooney?

9    A.  I believe it is from Mr. Cooney to me.

10   Q.  I am sorry.  It is from Mr. Cooney to you?

11   A.  Yes.

12   Q.  And he is asking you, again he is asking you for

13   information about how to purchase the bond?

14   A.  I believe the bonds were purchased at this point already.

15   Q.  So what does that detail?

16   A.  This details there was a physical bond delivered by U.S.

17   Bank to Mr. Cooney, and for the annual interest payments U.S.

18   Bank, if you give them wire information, will just

19   electronically wire it to you.

20          If you don't give them wire information, they will

21   send you a check.  This was sort of a post-closing issue

22   between U.S. Bank and Mr. Cooney on how he wanted to receive

23   his annual interest payments and then subsequently principal

24   payments down the line.

25   Q.  It is fair to say that Mr. Cooney was reaching out to you

1   for assistance, correct?

2   A.  I think it was the other way around.  I think U.S. Bank was

3   reaching out to him, and I was sort of in the middle of it.

4   Q.  He was following through on the requirements of being an

5   investor in this?

6   A.  Correct.

7   Q.  And he was taking the necessary steps to do what he was

8   supposed to be doing?

9   A.  Correct.

10  Q.  And Jason Galanis is not on the emails that we have

11  described involving Mr. Cooney?  Jason Galanis is not on those

12  emails, correct?

13  A.  Not on this one, correct.

14  Q.  And he was not on the previous email where Mr. Cooney asked

15  what should he do with his bonds?  Jason Galanis was not on

16  that email?

17  A.  Correct.

18          MS. NOTARI:  If you could just go to Defense Exhibit

19  3520.  Your Honor, we move 3512 into evidence.

20          THE COURT:  3512, any objection?

21          MR. SCHWARTZ:  Can you put it up first.

22          THE COURT:  3512 or 32?

23          MR. SCHWARTZ:  No objection to that one.

24          MS. NOTARI:  3519 also.

25          MR. SCHWARTZ:  No objection to 3512.

1           MS. TEKEEI:  We have no objection to 3512.

2           THE COURT:  3512, 3532 and 3509.

3           MS. NOTARI:  3512, 3519.

4           THE COURT:  19?

5           MS. TEKEEI:  Please pull up 3519.

6           MS. NOTARI:  Sure.

7           MR. SCHWARTZ:  No objection to 3519.

8           MS. NOTARI:  Before we do that --

9           MS. TEKEEI:  We have no objection to 3519.

10          THE COURT:  19.

11          MS. TEKEEI:  Yes, your Honor, 19.

12          THE COURT:  Those three exhibits will be admitted.

13          (Defendant's Exhibits 3512, 3532 and 3519 received in

14  evidence)

15          MS. NOTARI:  And 3532, do you have any objection?

16          MS. TEKEEI:  We have no objection to 3532.

17          THE COURT:  All right.  That will be admitted as well.

18          (Defendant's Exhibit 3532 received in evidence)

19  BY MS. NOTARI:

20  Q.  So focusing on 3520, defense exhibit --

21          MS. TEKEEI:  Your Honor, may we approach on this one?

22          THE COURT:  Sure.

23          (Continued on next page)

24

25

1              (At sidebar)

2              MS. TEKEEI:  I haven't seen yet what Ms. Notari has

3      put up on the screen for 3520.  This is any document she told

4      us would be 3520.  It doesn't have the defense exhibit sticker

5      on it as it was provided to us, but I think this is the one she

6      was talking about.

7              MR. SCHWARTZ:  That is what I have.

8              MS. TEKEEI:  An email from Mr. Cooney to Mr. Fillman.

9      It appears to be copying and passing an email from Mr.

10     Anderson.  We don't know.  He is not a recipient or part of

11     this email.  Going back to your Honor's prior ruling on this

12     issue --

13             THE COURT:  Ask him without showing it to the jury.

14             MS. NOTARI:  Okay.

15             THE COURT:  How much longer do you have?

16             MS. NOTARI:  Not much longer.

17             MS. TEKEEI:  What is Ms. Notari going to ask?

18             THE COURT:  She is going to show it to him without the

19     jury and saying were you familiar with this and involved in

20     drafting the email.

21             MS. TEKEEI:  Fine.  Thank you.

22             (Continued on next page)

23

24

25

1              (In open court)

2    BY MS. NOTARI:

3    Q.  Mr. Anderson, would you look at 3520.

4    A.  Yes.

5    Q.  And that is, it appears to be an email that was forwarded

6    to you.  Can you just read that and does it refresh your

7    recollection?

8              THE COURT:  Just read it to yourself.  Is this

9    something?  Did you send this email?  Did you receive it?  Were

10   you a part of it?  Can you tell?

11             THE WITNESS:  I believe I forwarded this email, but I

12   didn't forward it to the parties as they're stated at the top

13   of this email.

14   BY MS. NOTARI:

15   Q.  So that appears to be what you wrote?

16   A.  It appears to be something I wrote, yes.

17             THE COURT:  Do you have an objection to admissibility

18   of 3520?

19             MR. SCHWARTZ:  No objection.

20             MS. TEKEEI:  No objection.

21             (Defendant's Exhibit 3520 received in evidence)

22   BY MS. NOTARI:

23   Q.  Can you read now out loud to the jury.

24   A.  By way of update, all the documents are finalized and have

25   been executed and delivered to U.S. Bank.  All that is required

1    to close is Burnham's signature on the closing statement and

2    U.S. Bank's receipt of the $5 million wire, Tim.

3           That is me.  It is unclear who I sent this to.

4    Q.  Mr. Anderson, it is fair to say that you and both U.S. Bank

5    tracked every aspect of the transaction on the bond?

6           MS. TEKEEI:  Objection.

7    Q.  You tracked every aspect of the bond?

8           MS. TEKEEI:  Objection.

9           THE COURT:  Sustained.

10   BY MS. NOTARI:

11   Q.  This email was just your way of letting Mr. Cooney know

12   that the bond was finalized?

13          MS. TEKEEI:  Objection.

14          THE COURT:  Is that a fair statement?

15          THE WITNESS:  I wrote this email.  I don't know who it

16   was directed to.  It looks like whoever I sent it to, that

17   section has been removed from the email.  People do that, and

18   that person at some point it was forwarded to Mr. Cooney or he

19   was on the original email.  I just can't tell from -- there is

20   no "to" or "from" Tim Anderson to someone here.  I don't know,

21   it could have been to Jason Galanis or someone else.

22   BY MS. NOTARI:

23   Q.  It is not uncommon for you to keep an investor appraised of

24   what the bond is finalized, correct?

25   A.  It would be in an instance like this.  This is something

1    that perhaps the trustee would do or the investment banker

2    would do.

3    Q.  Now, you asked Mr. Cooney to provide you information as to

4    where the interest payments were going to be paid, correct?

5    A.  Correct.

6    Q.  Because there were interest payments due annually to

7    Mr. Cooney as an investor of the bond?

8    A.  Correct.

9    Q.  And it is fair to say that when you did that, you were

10   acting on the belief these interest payments would actually be

11   paid?

12   A.  Correct.

13   Q.  It is fair to say at the point Mr. Cooney purchased these

14   bonds, you had no concern about the WLCC bond?

15   A.  Correct.

16   Q.  And you also responded to his email, you provided

17   information about where the wire transfer should go to, where

18   he should wire the money for the bond?

19   A.  Where he would receive interest payments on the bond,

20   correct.

21   Q.  And you responded to his email requesting information about

22   what he should do with the bond, correct?

23   A.  Where he should deliver it if he was having physical

24   delivery, yes.

25   Q.  Now, at some point you testified that you met with Devin

1   Wicker, you talked about Bonwick Capital?

2   A.  Yes.

3   Q.  And you learned from Jason Galanis that Burnham was buying

4   a major interest in a fixed income oriented investment?

5   A.  Correct.

6   Q.  And that investment bank was Bonwick Capital?

7   A.  Correct.

8   Q.  If we could refer you to Government Exhibit 1281.

9   A.  Yes.

10  Q.  We previously reviewed this email?

11  A.  The portion relating to me, yes.

12  Q.  In this email Mr. Jason Galanis is telling you that Burnham

13  was going into, was acquiring Bonwick Capital and they were

14  getting space at the New York office?

15          MS. NOTARI:  Your Honor, I believe this exhibit is in

16  evidence.

17          THE COURT:  Any objection?  This is already in?

18          MS. NOTARI:  I believe.  I believe Matt moved it in

19  as --

20          THE COURT:  It is in evidence.  Go ahead.

21  BY MS. NOTARI:

22  Q.  If we can focus on the lower portion of this email.

23  A.  Yes.

24  Q.  Again the details that are provided here are consistent

25  with your understanding that Burnham was purchasing an

1    investment bank called Bonwick Capital?

2    A.  An interest in an investment bank, yes.

3    Q.  You responded to Mr. Galanis, Jason Galanis, that this is

4    terrific news, congrats for being so aggressive on this,

5    correct?

6    A.  Correct.

7    Q.  You saw this as a positive move for --

8    A.  A commitment to the industry, yes.

9    Q.  It is fair to say we talked about the fact that Bonwick

10   Capital was also involved in mutual bonds?

11   A.  Yes.

12   Q.  And your understanding at some point Galanis told you they

13   were bringing in these bond yields to go smoothly?

14   A.  That's correct.

15   Q.  These were bond specialists, correct?

16   A.  Correct.

17   Q.  It is fair to say that part of the deals that Jason Galanis

18   talked to you about was his vision that Burnham would expand

19   into this field of municipal bonds?

20   A.  Correct, they were committed to the industry.

21   Q.  And that was promising news for you because that's your

22   area of expertise?

23   A.  Yes.

24   Q.  And you were hoping that in the future you would continue

25   to do business with Burnham and Bonwick?

1    A.   Yes.

2    Q.   Now, at some point you visited Burnham Securities in New

3    York City?

4    A.   Correct.

5    Q.   You visited with Bevan Cooney?

6    A.   Yes.

7    Q.   Is that the visit where you saw Hunter?

8    A.   Yes, it was the same visit.  There was only one visit.

9    Q.   As part of your dealings with the WLCC Raycen Raines, was

10   there any discussion about Hunter Biden?

11   A.   Discussions with Raycen Raines about Hunter Biden?

12   Q.   Hunter Biden?

13   A.   No, not to my recollection.

14   Q.   Do you recall recall someone from WLCC referring to the

15   fact that Jason Galanis told him Hunter Biden was part of this

16   and there was excitement on their end?

17   A.   I don't recollect that.  It is possible, but I don't recall

18   that.

19   Q.   It is fair to say that when you saw Hunter Biden, you knew

20   he was at that moment the son of the Vice President of the

21   United States?

22              MS. TEKEEI:  Objection.

23              THE COURT:  Overruled.

24   A.   2015, yes, correct.

25   Q.   Is it fair to say that also impacted your view of Burnham

1   Securities, correct?

2   A.  It was not a negative.

3   Q.  It was not a negative?

4           Now, at some point you had interaction with Bevan

5   Cooney in October of 2015 specifically about Mr. Cooney,

6   Government Exhibit 731, do you recall that?

7   A.  No.

8   Q.  If I could refresh your recollection.  Government Exhibit

9   731 -- ?

10          MS. TEKEEI:  We note this is not yet in evidence.

11          THE COURT:  Are you going to lay a foundation, Ms.

12  Notari?  Is this another one of the exhibits you stipulated to?

13          MS. NOTARI:  If I could just have a moment.

14          THE COURT:  Sure.

15          (Pause)

16          MS. NOTARI:  Actually, I am referring to Government

17  Exhibit 1346.

18          THE COURT:  How much longer do you have?  I want to

19  know when we should take a break.  Are you almost done?

20          MS. NOTARI:  No.  I miscalculated.

21          THE COURT:  Why don't you finish this line of

22  questioning, and we'll take our afternoon break.

23          MS. NOTARI:  Okay.  1346, is that in evidence?  1346,

24  your Honor?

25  BY MS. NOTARI:

1    Q.   Now, this email is on June 23rd, 2015 and it is from, the

2    email thread starts earlier in the day, and Jason -- do you

3    want to read what Jason sends you at 11:30 am?

4    A.   I have read it.

5    Q.   Can you read it to the jury.

6    A.   Sure.  I had a call with Bonwick guys this morning.

7    Resumes below.  Sort of a mini teach-in on what is happening

8    with the first PFA deal, as well as setting expectations for

9    next two.  Propane pot issue, I assume.  We are reconvening

10   today after they meet internally.  They mentioned willing to

11   meet counsel.  I suggested you rather than GT.  Let me know

12   your thoughts.  Quite helpful to have their assistance.

13   Q.   Now, what was your understanding of this email?

14   A.   Well, Bonwick was the municipal bond for Bonwick Jason were

15   partners with, and he is reiterating that was dominance what

16   their plans were for the future and future deals, and they were

17   meeting again later that day or shortly thereafter and they

18   mentioned wanting to meet counsel, and Jason suggested me,

19   rather than GT, which was Greenberg Traurig, I believe, let me

20   know your thoughts and quite helpful to have their assistance,

21   meaning muni experience, municipal bond bankers around.

22   Q.   You reviewed this had an attachment of the emails of the

23   individuals.  Is the attachment here, the attachments from

24   Bonwick that would be heading up Bonwick Capital, just if we

25   could stop right there.

1          This is just an example of one of the persons, Mr.

2     Stovall, who was supposed to head up Bonwick, he is giving you

3     details about his resume.  Mr. Stovall says received a

4     bachelors degree in economics from Howard University.  He holds

5     a license, serves as chair of the board of Far Brook School in

6     Short Hills, New Jersey.

7          Basically there was information in this email about

8     the resumes of all of the people that were supposed to head

9     Bonwick Capital, correct?

10    A.  Correct.

11    Q.  You were impressed by what you saw?

12    A.  Correct.  They seemed to have good experience.

13    Q.  You responded to that.  You said impressive group of

14    people?

15    A.  Correct.

16    Q.  That is what you were thinking?

17    A.  What I was thinking, yes.

18    Q.  Again you had every reason to believe this was a high

19    profile investment firm?

20    A.  Experienced bankers, yes.

21          MS. NOTARI:  I have one more part of this.  Do you

22    want to take a break?

23          THE COURT:  Why don't we take five-minute break now.

24    Please remember don't discuss the case and keep an open mind.

25    Thank you.

1            (Jury excused)

2            THE COURT:  Try to keep this short so we can keep

3    moving.  Thank you.

4            (Recess)

5            THE COURT:  Everyone may be seated.  Please bring

6    Mr. Galanis back in.

7            MS. NOTARI:  Your Honor, the next exhibit I wanted to

8    go over was Government Exhibit 731, but it hasn't been moved

9    into evidence, so --

10           THE COURT:  Any objection to 731?

11           MS. TEKEEI:  While reserving our ability to object to

12   other similar exhibits on hearsay grounds, because it is very

13   clearly hearsay, we have no objection to this particular one.

14           THE COURT:  Any other exhibits that -- he is coming

15   back in.  Can we bring the jury back in.

16           MR. SCHWARTZ:  I do appreciate giving me the

17   opportunity to object or not object to defense exhibits as we

18   are looking to make sure.

19           THE COURT:  Yes.  I thought when I asked if there was

20   an objection, that applies to everybody.

21           MR. SCHWARTZ:  I understand.  I was still looking.

22           THE COURT:  All right.  So do you have an objection to

23   371?

24           MR. SCHWARTZ:  I do not have an objection.

25           THE COURT:  We'll bring the jury in.  Thanks.

1             (Defendant's Exhibit 371 received in evidence)

2             MS. NOTARI:  I do only have a few more minutes.

3             THE COURT:  Okay.  Great.  We can let Mr. Anderson go

4    today.

5             THE WITNESS:  Thank you, your Honor.

6             (Jury present)

7             THE COURT:  Everyone may be seated.  Thank you.

8    BY MS. NOTARI:

9    Q.  Mr. Anderson, welcome back.

10   A.  Thank you.

11   Q.  When we were last talking, I am not sure if this was up on

12   the screen, but referring to Government Exhibit 731, do you see

13   that on the screen?

14   A.  I do.

15   Q.  If we could just go to the second page where the email

16   starts.  Now, you previously, in the way of background, you

17   previously testified that Mr. Wicker who works with Bonwick

18   Capital, you had follow up with him and you had conversations

19   with him in October of 2015, correct?

20   A.  Correct.

21   Q.  And there was follow-up regarding the DTC eligibility issue

22   with the bond?

23   A.  Correct.

24   Q.  And can you please describe in this email which has been

25   admitted into evidence, you are asking him -- can you just read

1    it to us and explain to us what is going on here.

2    A.  The very bottom of the email starting at the beginning, it

3    is an email from Devin Wicker to me with the subject line DTC

4    "chill" on the bond and then the narrative is Tim, quick

5    question for you.  Looking for clarity on why there is a DTC

6    "chill" on our Wakpamni bonds.  Is it because they are

7    currently slated to be converted into electronic form?

8            My response to that which appears to be the same day

9    or around the same time in the afternoon on October 8th, 2015

10   is Devin, the chill is due based upon the need to have full DTC

11   registration which can can't occur until tomorrow by way of due

12   diligence.  Have the Town Center bonds been with the two

13   current owners the entire time, Tim?  That was a question to

14   him.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

BY MS. NOTARI:

Q.  Can I just ask you before we get to the next part, why were
you asking that question?

A.  The bonds for the second bond deal were physical
certificate bonds, so the owners or their custodians received
physical bonds.  As we discussed, DTC is an electronic platform
where the bonds are established electronically, and it is my
opinion it's the preferred way that bonds are held nowadays,
like a lot of things they are done electronically.

Q.  So in that e-mail you're asking Mr. Wicker have the town
center bonds been with the two current owners the entire time,
correct?

A.  Correct.

Q.  And what if anything did he -- what was the response?

A.  You have to turn to the next page.  I guess it would be the
first page.

        His response was the $15 million piece was with the
same owner the whole time, the $5 million piece originally was
issued to Bevan Cooney and then contributed to Bonwick as an
investment in the firm, meaning presumably Bonwick.

Q.  So you were told by Mr. Wicker that the $5 million portion
of the bond that was issued to Mr. Cooney was then contributed
to Bonwick as an investment in the firm, correct?

A.  That's what it states there, yes.

Q.  And that was part of your due diligence inquiry.

I5U7GAL5                          Anderson - Cross

1    A.   Yes.

2    Q.   And then as far as your knowledge in performing your due

3    diligence, you learned that in October of 2015 Mr. Cooney no

4    longer owned the bonds and it had been transferred to Bonwick

5    Capital?

6    A.   That's what the statement is, yes.

7    Q.   Now, if we could just -- we previously -- Government

8    Exhibit 1312.   Earlier this morning Mr. Schwartz was talking to

9    you.   I will just ask, this is background -- Mr. Schwartz was

10   talking to you about Jason Galanis and Mr. Jason Galanis having

11   ideas about business.   And it's fair to say that he had a very

12   strong belief in Native American development, correct?

13   A.   He appeared to, yes.

14   Q.   And it's fair to say that he was -- it wasn't uncommon for

15   him to send research materials to you?

16   A.   He did, yes.

17   Q.   And he would substantiate his ideas to you backed up by

18   literature, correct?

19              MS. TEKEEI:   Objection.

20              THE COURT:   Sustained.

21   Q.   So, in this particular -- this particular e-mail was sent

22   by John Galanis, and in this -- can you just describe to us

23   what the attachment is?

24   A.   The attachment is Burnham Municipal Capital LP --

25   Q.   Can we just look at the exhibit.

1              Your Honor, has this been moved into evidence?

2              MS. TEKEEI:  This has been admitted.

3              THE COURT:  Yes.

4    Q.  OK.  So can you just go to the table of contents, the next

5    page.  Did you ever review this document?

6    A.  No.

7    Q.  You never reviewed it.

8    A.  No.

9    Q.  OK.  What was your understanding -- is your understanding

10   of this document that it was a document tailored to Burnham

11   Securities' involvement with the WLCC bond?

12   A.  In Indian projects generally.

13   Q.  And it provides background information in terms of socially

14   responsible investing and performance, correct?

15   A.  Correct, yes, it appears to be a marketing document.

16   Q.  It's a marketing document.  And it provides statistics,

17   numbers, information, to back up their belief that this was a

18   viable source of economic development.

19             MS. TEKEEI:  Objection.

20             THE COURT:  I will allow that.

21             You know what, I'm going to sustain it.  Why don't you

22   rephrase that.

23   Q.  This was -- this was --

24             THE COURT:  Take out the part about their belief.

25   Q.  Mr. Anderson, this was essentially marketing materials

1    about the viability of Native American development as it

2    pertained to the WLCC bond.

3    A.  I think it was broader than that.  Again, I didn't review

4    it at the time other than maybe glancing at it, but it was an

5    overall marketing document.  It bragged a little bit about the

6    Wakpamni bonds but talked generally about what they were

7    looking to do in Indian country.

8    Q.  And this was consistent with Jason Galanis' conversations

9    with you about Native American development.

10   A.  Yes.

11   Q.  And it was also consistent with what you were experiencing

12   in terms of Burnham Securities' idea to expand into the

13   municipal market.

14            MS. TEKEEI:  Objection.

15            THE COURT:  Sustained.

16   Q.  Burnham we already discussed was hoping to expand into the

17   municipal market bonds?

18   A.  My impression is they were committed to the industry, yes.

19   Q.  And this marketing was consistent with Burnham's desire to

20   expand into that market.

21            MS. TEKEEI:  Objection.

22            THE COURT:  As far as you know.

23   A.  As far as I know, it was my impression, yes.

24   Q.  As far as you know, was this kind of marketing information

25   distributed to investors?

```
1   A.  I don't know.

2   Q.  And is this the first time you had ever seen any type of

3   marketing literature like this?

4   A.  From Burnham?  Or?

5   Q.  From any type of investment firm.

6   A.  Investment banks like other businesses, typically you get

7   on their mailing list and they send you things, yes.

8   Q.  It's a fairly expensive proposition to prepare and

9   circulate this kind of marketing material.

10          MS. TEKEEI:  Objection.

11          THE COURT:  Sustained.

12  Q.  It's fair to say that when you received this, you were

13  impressed with what you saw?

14  A.  I don't know it's fair to say that.  I didn't take a whole

15  lot of notice of it, other than they seemed to be committed to

16  the industry.

17  Q.  Mr. Anderson, you testified yesterday that you were

18  intrigued by this bond?

19  A.  Which bond?

20  Q.  The WLCC bond.

21  A.  Yeah, um-hum.

22  Q.  And you believed that the economic structure of the bond

23  would work.

24  A.  The legal structure worked if the economics were good.

25  Q.  And you believed in both.
```

1   A.  I had no reason to believe that the economics weren't going

2   to work, correct.

3   Q.  And it's fair to say you did your due diligence, and you

4   issued a legal opinion that all of the legal requirements for

5   the bond were satisfied?

6   A.  I did, yes.

7   Q.  You had no issues with Jason Galanis on this bond?

8   A.  I did not.

9   Q.  And you testified earlier today that you did not believe

10  that there was anything untoward about this bond.

11  A.  Correct.

12          MS. TEKEEI:  Objection.

13          THE COURT:  I will allow it.

14  Q.  And it's fair to say that you would never knowingly involve

15  yourself in illegal transaction -- in an illegal transaction.

16          THE COURT:  Sustained.

17  Q.  And it's fair to say that you did your due diligence on

18  Wealth Assurance, the annuity?  Yes?

19  A.  I did a review of their website, yes.

20  Q.  And you believed it was a reputable firm?

21  A.  Yes.

22  Q.  Asset management company.

23  A.  Correct.

24  Q.  And all of the paperwork that you reviewed was in order,

25  correct?

1  A.  It appeared to be, yes.

2  Q.  And there was no reason for you to believe that there was

3  anything out of order with any of the documents you reviewed?

4  A.  Correct.

5  Q.  And you had worked on tribal bonds before, correct?

6  A.  I did, yes.

7  Q.  And there was nothing out of the ordinary about this tribal

8  bond.

9  A.  You have to define out of the ordinary, but, yes, I had

10  worked on tribal deals before.

11  Q.  And you had no reason to know that the proceeds of the

12  bonds were not being invested properly.

13  A.  Correct.

14  Q.  And it's fair to say that as far as you know the investors

15  who invested in this bond had no reason to know that the

16  proceeds of the bond were invested improperly.

17          MS. TEKEEI:  Objection.

18          THE COURT:  Sustained.

19  Q.  Now, there has been a lot of discussion about meetings and

20  people involved in drafting the transaction documents.

21  Mr. Cooney was never a part of those meetings, correct?

22          MS. TEKEEI:  Objection.

23          THE COURT:  Sustained.

24  Q.  Mr. Cooney -- your involvement with Mr. Cooney was solely

25  as an investor, correct?

1   A.  Yes.  Yes.

2   Q.  And your interaction with him was limited to those few

3   e-mails that we talked about today?

4   A.  Correct, relating to the investor letter.

5   Q.  Mr. Cooney, when you visited Burnham Securities, he was not

6   there?

7   A.  He was not.

8   Q.  And your e-mails with Mr. Cooney were strictly limited to

9   his purchasing his portion of the bonds, correct?

10  A.  The investor letter and his delivery of the bonds.

11  Q.  And it's fair to say that based on your experience with

12  Mr. Cooney, that you believed that he appeared to have

13  sophisticated money managers who were advising him.

14  A.  Yes.

15  Q.  And as part of your work on this case you relied upon the

16  fact that you believed that he was being advised by financial

17  advisors?

18  A.  In part, yes.

19          MS. NOTARI:  I have no further questions.

20          THE COURT:  Thanks.  Any redirect?

21          MS. TEKEEI:  Briefly, your Honor.

22  REDIRECT EXAMINATION

23  BY MS. TEKEEI:

24  Q.  Good afternoon, Mr. Anderson.

25  A.  Good afternoon.

```
 1   Q.  You were asked some questions on cross-examination about

 2   the annuity for these three bond series.  Do you recall those

 3   questions?

 4   A.  I believe so, yes.

 5   Q.  Now, an annuity is an investment that provides payments on

 6   a set schedule, right?

 7   A.  Correct.

 8   Q.  And the annuity here was structured to provide a fixed sum

 9   of money on a payment schedule.

10   A.  Correct.

11   Q.  Because the interest on the bonds was due and had to be

12   paid on a fixed schedule, right?

13   A.  Correct.

14   Q.  And, therefore, a guaranteed payment on a regular schedule.

15   A.  Correct.

16   Q.  You were asked some questions about Government Exhibit 200,

17   which was the annuity contract for the first series of bonds

18   issuances.

19           Ms.Sheinwald, please publish that to the jury.

20           And you were asked to review some of the language on

21   the first page of this document.  Do you recall those

22   questions?

23   A.  I do.

24   Q.  Now, I'd like to direct your attention to the page that

25   ends in 15 at the bottom right-hand corner.  Do you see the
```

1    section with the heading "income payments"?

2    A.  I do.

3    Q.  Can you read what is in all capital letters directly to the

4    right of "income payments"?

5    A.  Yes.  "Payments shall be made as follows:  $1,823,600 per

6    year for the first nine years of the contract; $25,750,000 on

7    the 10th anniversary of the contract; and $350,000 per year for

8    years 11 through 25."

9    Q.  And so this is annuity contract therefore provides that

10   these payments shall be made; is that right?

11   A.  Correct.

12   Q.  I'd like to direct your attention to Government Exhibit

13   1304.

14          Ms.Sheinwald, can you please publish that to the jury.

15   And, Ms.Sheinwald, if you could turn to the attachment.

16          Mr. Anderson, can you remind us generally what this

17   document is.

18   A.  This is an overview of the program that was forwarded to me

19   by Yanni Galanis.

20   Q.  And if you could --

21          Ms.Sheinwald, if you could turn to the last page where

22   it says program flow chart.

23          Mr. Anderson, what payments are reflected in this flow

24   chart?

25   A.  The payments of how the proceeds of the bond at closing

1    were to be disposed of, as well as the money -- how the money

2    was to be disposed of throughout the life of the annuity, and

3    what payments the annuity was to pay back to the bond trustee

4    for the benefit of the bond holders and for WLCC, the tribe.

5    Q.  And is the structure of the payments conveyed here

6    consistent with the structure that was provided for in the

7    annuity contract?

8              MR. TOUGER:  Objection.

9              THE COURT:  Can you answer that?

10             THE WITNESS:  I believe so.

11             THE COURT:  Go ahead.

12   A.  Yes, it's consistent.

13             MS. TEKEEI:  Thank you, Ms.Sheinwald.

14   Q.  Now, on cross-examination you were asked some questions

15   about your understanding of these bond transactions, and you

16   said that at the time you looked at these transactions, in

17   reviewing the bond documents per your role as bond counsel, you

18   didn't have any suspicion of wrongdoing at that time.  Do you

19   recall that?

20   A.  Correct.

21   Q.  Sitting here today, you know otherwise?

22   A.  Yes?

23             MR. TOUGER:  Objection.

24   Q.  For example --

25             MR. TOUGER:  Objection.

I5U7GAL5                           Anderson - Redirect

1                  THE COURT:  Yeah, let's meet at sidebar.

2                  (Continued on next page)

1              (At the side bar)

2              THE COURT:  Where are you going with this?

3              MS. TEKEEI:  That was my only question on that issue,

4    since defense counsel have asked repeated questions about his

5    understanding at that time.  I don't have any further questions

6    along this line.

7              MR. TOUGER:  Your Honor, that answer is based on

8    hearsay, complete hearsay.  He has no personal knowledge.

9              THE COURT:  I think that's right.

10             MR. QUIGLEY:  All his information is based on --

11             THE COURT:  What's that?

12             MR. QUIGLEY:  All that his answers to that line of

13   questioning by defense is also hearsay.  It's his

14   understanding.

15             THE COURT:  That went to his state of mind at the time

16   of he was involved.

17             MR. TOUGER:  Now he read an indictment which is

18   complete hearsay.

19             THE COURT:  Yeah, strike that answer.

20             (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  I'm going to strike that last question and

3     answer, so please disregard it.

4     BY MS. TEKEEI:

5     Q.  Mr. Anderson, today you know that Jason Galanis did not in

6     fact work at Burnham Securities.

7              MR. TOUGER:  Objection.

8              THE COURT:  Sustained.

9     Q.  OK.  Mr. Anderson, at the time of these bond transactions,

10    you were not aware that Atlantic and Hughes, that the two

11    investment advisor firms that bought the bonds for their

12    clients, were funded by Jason Galanis and his friends.

13             MR. TOUGER:  Objection.

14             THE COURT:  Sustained.

15    Q.  Mr. Anderson, you don't know what Devon Archer knew about

16    these bonds.

17             MR. SCHWARTZ:  Objection.

18             THE COURT:  Sustained.

19             MS. TEKEEI:  Your Honor, can we have a sidebar?

20             THE COURT:  Sure.

21             (Continued on next page)

22

23

24

25

1              (At the sidebar)

2              MS. MERMELSTEIN:  Your Honor, these defendants have

3      spent the last three days suggesting that because this witness

4      didn't understand that there was something illegal here, their

5      clients didn't understand there was something illegal here.

6      That's not true.  It's perfectly fair for the government to

7      elicit from this witness that there are facts about which he

8      was not aware.

9              THE COURT:  So, ask about generally, but don't go

10     through sort of defendant by defendant and suggesting that he

11     is supposed to know the guilt of each of these defendants.

12             MS. MERMELSTEIN:  We're not asking about the guilt.

13     We're eliciting that he doesn't know what other people knew.  I

14     think that's perfectly fair.

15             THE COURT:  You can ask that in a general way, but I

16     don't want to go through question by question, and you can make

17     that argument on summation.

18             MS. MERMELSTEIN:  Thank you, your Honor.

19             (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2    BY MS. TEKEEI:

3    Q.  Mr. Anderson, at the time of these bond transactions, you

4    didn't know what other people knew.

5              MR. TOUGER:  Objection, your Honor, to the form.

6              THE COURT:  I will allow that.

7    A.  Correct.

8              Always a safe bet.

9    Q.  Now, let me ask you this:  Have you ever lied to anyone

10   about Jason Galanis' involvement in these bonds?

11   A.  I haven't.

12             MR. TOUGER:  Objection.

13             THE COURT:  Overruled.  I will allow that.

14   A.  I have not.

15   Q.  Have you ever hidden Mr. Jason Galanis' involvement in

16   these bond transactions from anyone?

17   A.  I have not.

18   Q.  And have you ever lied to a bank about these bonds?

19             MR. TOUGER:  Objection.

20             THE COURT:  Yeah, I'm going to sustain that.

21   Q.  Mr. Anderson, have you been truthful with respect to your

22   interactions with these bonds?

23   A.  I have.

24             MS. TEKEEI:  No further questions, your Honor.

25             THE COURT:  Is there any recross?

Anderson - Recross

1              MR. TOUGER:  Can I just have a quick minute?

2              THE COURT:  Just keep it within the scope.

3              MR. TOUGER:  No, I just need a minute.

4              THE COURT:  Oh, OK.

5    RECROSS EXAMINATION

6    BY MR. TOUGER:

7    Q.  I'm back.

8    A.  I see that.

9    Q.  Mr. Anderson, agree or disagree with this:  There was no

10   guaranty that the annuity in this case was going to make money.

11             MS. TEKEEI:  Objection.

12             THE COURT:  Overruled.

13             Is that something you feel qualified to answer?

14             THE WITNESS:  I'm not an annuity expert.  I can give

15   you a common sense answer just based upon investment strategy.

16             THE COURT:  I am going to sustain that.

17   Q.  I will rephrase the question.  Based on the paperwork that

18   was either written or reviewed by you, there are multiple times

19   in many different documents where it says this is a high risk

20   investment, correct?

21   A.  Correct.

22   Q.  And high risk means that sometimes it doesn't pay off.

23   A.  Correct.

24   Q.  And the annuity -- the entity, shall we say -- was making

25   these investments.

I5U7GAL5                         Anderson - Redirect

1    A.  Correct.

2    Q.  So if the annuity's investments in these high risk funds,

3    there was a possibility that it wouldn't make any money.

4    A.  Correct.

5    Q.  And if the annuity didn't make any money, it couldn't make

6    the payments that it was required to make.

7    A.  Correct.

8            MR. TOUGER:  Nothing further.

9            THE COURT:  Mr. Schwartz, anythings from you?

10           MR. SCHWARTZ:  No.  Thank you, your Honor.

11           THE COURT:  Ms. Notari?

12           MS. NOTARI:  No.

13           THE COURT:  Anything else from the government?

14           MS. TEKEEI:  Sorry, your Honor.  One moment.

15           Just one question, your Honor.

16   REDIRECT EXAMINATION

17   BY MS. TEKEEI:

18   Q.  Mr. Anderson, under the contract that we reviewed,

19   Government Exhibit 200 and the annuity contracts, the annuity

20   was required to make those payments, correct?

21   A.  Correct.

22           THE COURT:  All right.  Thanks.

23           MR. TOUGER:  Wait, one follow-up question.

24

25   RECROSS EXAMINATION

1    BY MR. TOUGER:

2    Q.  It is clear though from the annuity contract, Exhibit 200,

3    that the payments were not guaranteed if there were no funds to

4    make the payment.

5              MS. TEKEEI:  Objection.

6              THE COURT:  Is that something that is addressed in the

7    paperwork?

8              THE WITNESS:  The annuity states that the funds should

9    be paid.  From a common sense standpoint if the annuity is for

10   lack of a better word not robust, then they won't be able to

11   make the payment.  But they are legally required to make those

12   payments.

13             THE COURT:  All right.  Thanks.

14             You can step down.

15             THE WITNESS:  Thank you, your Honor.

16             (Witness excused)

17             THE COURT:  The government can call its next witness.

18             MS. TEKEEI:  Thank you, your Honor.  The government

19   calls Mike Smith.

20    MICHAEL SMITH,

21        called as a witness by the government,

22        having been duly sworn, testified as follows:

23             DEPUTY COURT CLERK:  You may be seated.  Please state

24   and spell your name for the record.

25             THE WITNESS:  Michael W. Smith, M-I-C-H-A-E-L W.

1    S-M-I-T-H.

2    DIRECT EXAMINATION

3    BY MS. TEKEEI:

4    Q.  Good afternoon, Mr. Smith.  How are you?

5    A.  I'm well.

6    Q.  Sir, where do you currently work?

7    A.  I'm retired.

8    Q.  When did you retire?

9    A.  Retired on January 1, 2016.

10   Q.  Before you retired, where did you work?

11   A.  I worked at the Omaha School Employees Retirement System.

12   Q.  What is the Omaha School Employees Retirement System?

13   A.  In the state of Nebraska there is a school district called

14   Omaha, Nebraska, and Omaha, Nebraska school district has a

15   retirement system exclusively for the full-time employees of

16   the Omaha public school district, so that retirement system

17   covers those employees of the Omaha public schools.

18   Q.  What was your role at the Omaha School Employees Retirement

19   System before you retired in January of 2016?

20   A.  I was the executive director of the retirement system.

21   Q.  In your role as executive director, did you become familiar

22   with bonds issued by the Wakpamni Lake Community Corporation in

23   April of 2015?

24   A.  Yes.

25   Q.  How did you become familiar with them?

I5U7GAL5                          Smith - Direct

A.   I was informed of them in a phone call to me held April 23,

2015.

Q.   And what size of bonds did you -- were you alerted to?

A.   Size?

Q.   How many bonds?

A.   $16.2 million worth of bonds.

Q.   I'm going to ask you some more questions about that in a

little bit, but first what is the Omaha School Employees

Retirement System pension plan?

        MR. TOUGER:   Objection, your Honor.

        THE COURT:   Overruled.

A.   The Omaha School Employees Retirement System is considered

a defined benefit retirement system.   It's part of Nebraska

state statute.   It covers the full-time employees of the Omaha

public schools, and it provides them with a lifetime pension

based on service, salary and multiplier at the time that they

retire.

Q.   And approximately how many current and former employees are

covered by this pension plan?

A.   When I retired there were 7,400 active members of the plan

and about 4,300 retired members of the plan.

Q.   What types of employees receive or will receive pensions

pursuant to that plan?

A.   We have food service workers, we have van drivers, we have

bus drivers, we have custodians, we have teachers aides, we

I5U7GAL5                          Smith - Direct

1   have teachers, we have administrators of all varieties; so, a

2   whole variety of folks, all of whom must be full-time employees

3   of the district.

4   Q.  And we have been referring to it as the Omaha School

5   Employees Retirement System.  Can we call it OSERS for short?

6   A.  We use that acronym when we talk about it, yes.

7   Q.  And, sir, what is OSERS's mandate or mission?

8   A.  We have an exclusive benefit to the members of the

9   retirement system to create the funds necessary to pay those

10  monthly benefits when they retire for the remainder of their

11  lifetimes.

12  Q.  When did you first begin working at OSERS?

13  A.  1989 is when I started.

14  Q.  Approximately how long had you had the role of executive

15  director before you retired at the end of 2015?

16  A.  I was advanced to that role in November of 1997.

17  Q.  And focusing on the year 2015, what were your day-to-day

18  responsibilities?

19  A.  I had a variety of responsibilities.  I was responsible to

20  discuss retirement benefits with the members of the plan so

21  that they would understand what they were entitled to when they

22  retired.  I worked with legislators because, as I said, we're a

23  creature of state statute.  I also then oversaw the investment

24  managers that were employed by the school district for the

25  administration of the funds that we've talked about.

1    Q.  So, how did OSERS pension fund generate money to pay

2    employee pensions?

3    A.  The pension plan was administered by a board of trustees on

4    a day-to-day level.  They would work with a professional

5    investment consultant to establish an investment strategy or

6    policy, and then they would interview investment managers to

7    then carry out various portions of that strategy.  Once they

8    determined whom they wanted, they then would recommend that

9    firm to the board of education, and the board of education

10   would then contract for the management of those funds by that

11   firm.

12   Q.  So who made the decisions about OSERS's investment

13   strategies?

14   A.  Strategy was at the board of trustees level.

15   Q.  What happened if investments didn't make enough money to

16   pay the pensions?

17   A.  When there isn't sufficient resources to keep the promises

18   made, it's necessary then for contribution rates to go up.

19   That's happened throughout the course of the retirement system,

20   and it's incumbent upon the school district then to make up

21   whatever is necessary to keep the pension plan solvent.

22   Q.  Did OSERS have any requirement or mandate to make a certain

23   percentage of its investments in socially responsible causes?

24   A.  No, in fact just the reverse.  The legal counsel that the

25   board of trustees received again and again was that their

1    exclusive responsibility was to the members of the plan, and

2    that we were prohibited from considering anything other than

3    the benefit of the members as the investment strategy was

4    created or investments were purchased.

5    Q.  I think you mentioned that the board selects investment

6    managers.  Who supervised or supervises the managers, the

7    investment managers selected by the board?

8    A.  After the board of trustees would make their decision, then

9    it was my responsibility as executive director to oversee and

10   make sure that those managers in fact were doing what they were

11   asked to do.

12   Q.  Now, are you familiar with a fixed income manager?

13   A.  I am.

14   Q.  What is that?

15   A.  When you loan money to another party, you then are getting

16   a promise to provide interest on that loan that in the larger

17   context is considered a fixed income.  You could be loaning

18   money to individuals, to corporations, to other entities.  The

19   manner of that fixed income varies, but the whole body of

20   securities is called fixed income.

21   Q.  Are you familiar with an asset management firm called

22   Atlantic Asset Management?

23   A.  Yes, I am.

24   Q.  What was Atlantic Asset Management?

25   A.  Atlantic Asset Management was a fixed income investment

1   management firm.  They also on behalf of OSERS provided

2   something called integrated pension fund management, where they

3   helped OSERS maintain the strategy that the board of trustees

4   had put in place, by ensuring that if equities were higher than

5   need be, that they then would be able to redirect funds into

6   fixed income, or other assets as the strategy called upon, so

7   they did both for OSERS.

8   Q.  For how many years had OSERS worked with Atlantic Asset

9   Management before you retired?

10  A.  OSERS contacted with Atlantic Asset Management in 1993.

11  Q.  And who owned Atlantic Asset Management from the time when

12  OSERS first began working with it until approximately April of

13  2015?

14  A.  Ron Sellers was the primary owner, and then there were

15  employee owners as well that had minority interest in the firm.

16  Q.  During that timeframe from when OSERS first began working

17  with Atlantic Asset Management until approximately April of

18  2015, were there any disputes between Atlantic Asset Management

19  and OSERS?

20  A.  None that I can recall.

21  Q.  What funds did OSERS have with Atlantic?

22  A.  Atlantic, as I say, did both the fixed income as well as

23  this integrated pension fund management, so they managed

24  corporate bonds for us.  They did this integrated pension fund

25  management.  Then they were the overseer of a fund called the

1    Global Yield Opportunity Fund.

2    Q.  So let's talk about that.  Did there come a time when you

3    learned about the Global Yield Opportunity Fund?

4    A.  Yes.

5    Q.  How did you learn about it?

6    A.  When the fixed income yields were less than what we needed

7    for maintaining the strategy we had set out in the early teens,

8    2010, '11, '12, we engaged in discussions with a number of

9    managers -- Atlantic being one of them -- looking for ways that

10   we might be able to improve upon the yields.

11           The concept of the Global Yield Opportunity Fund was

12   presented to us as a means whereby a single fund could

13   diversify a strategy across multiple styles of fixed income

14   investing, thereby harvesting a higher yield with reduced risk.

15   Q.  Now, let me just back up for one moment.  I should have

16   asked you this earlier.  But generally speaking, what governed

17   the relationship between OSERS and Atlantic Asset Management?

18   A.  An investment management contract is always put in place

19   with each manager that the Board of Ed would contract with, and

20   that would then govern what was expected of the manager and

21   what was expected of OSERS.

22   Q.  And what is your understanding of the obligations of the

23   manager pursuant to the OSERS's investment agreement or

24   agreements with Atlantic?

25   A.  The simplest way I would think about it was they were a

1   fiduciary.  They were expecting to work in the exclusive

2   benefit of the members of the plan just like we were.

3   Q.  Now, going back to the Global Yield Opportunity Fund -- and

4   can we call it GYOF for short?

5   A.  We do, yes.

6   Q.  You mentioned some of the strategies.  How was the Global

7   Yield Opportunity Fund structured?

8   A.  In that fund it was set up with seven distinctly different

9   styles of fixed income management, so that you then have

10  investments from throughout the world all working together but

11  in their own -- again we use the jargon of sleeve -- but their

12  own area, so that they would be able to provide the expertise

13  of those individual managers in their small area of investment,

14  but by blending that all together you would reduce the risk

15  associated with those various types of investments.

16  Q.  You used the term sleeve.  If you could for a moment

17  describe to the jury what you mean by that.

18  A.  Well, each one of the various managers had their own style.

19  You had asset-backed management; you had collateralized loans;

20  you had mortgages; you had corporate bonds; you had

21  international bonds; you had high yield bonds; and they were

22  all specialists in their own unique area of investment, so they

23  weren't then going to then be crossing over and buying assets

24  in something that one of the other managers had, and that's why

25  they are referred to as sleeves or, you know, identities.

There is jargon you can use, but they were unique in their own

specialty.

Q.   What was Atlantic Asset Management's role in the Global

Yield Opportunity Fund?

A.   Atlantic was an overseer, they were the ones who came up

with the concept; they are the ones who created the fund.  They

located five specialists in areas that they themselves did not

have expertise, so they were managing two of the identities.

They then contracted with five outside firms to do the other

five.  Then they would administer, distribute funds among the

seven.  Some would do better, some would not do as well at

certain times, and then they would go ahead and redistribute

funds to be able to harvest the most gain.

Q.   What was the process through which OSERS became involved

with the Global Yield Opportunity Fund?

A.   Step one, Atlantic provided us with a fairly significant

document called a private placement memorandum, which was the

governing document for the GYOF fund, and it laid out what all

the expectations were, the dos and don'ts, the rules that

govern that particular fund.

        After that was evaluated by legal counsel and by the

board of trustees, then a subscription agreement was completed

which said, yes, we do want to invest in this particular fund

and here are our credentials to be able to do so.

        MS. TEKEEI:  Your Honor, at this time I would like to

1    offer into evidence Government's Exhibits 122, 2433, 2436,

2    2441, 2664 and 2663.

3              THE COURT:  Is there any objection?

4              MR. TOUGER:  Our screen is down.

5              THE COURT:  So we will work on that.  Is there any

6    objection to those exhibits?

7              MR. TOUGER:  No, no objection.

8              THE COURT:  All right.  They will be admitted.  Thank

9    you.

10             MS. TEKEEI:  Ms.Sheinwald, can you please pull up to

11   the screen Government Exhibit 122.

12             (Government Exhibits 122, 2433, 2436, 2441, 2664 and

13   2663 received in evidence)

14   Q.  Mr. Smith, do you recognize this document?

15   A.  That is the private placement memorandum that I had spoken

16   of that we received from Atlantic.

17   Q.  Now, would it help if you had a hard copy of that?

18   A.  For my eyes, yes.

19   Q.  OK, thank you, sir.  If you could just give us one moment.

20             THE COURT:  One of your screens is down?  We will look

21   at it.  If you want to move seats, feel free.

22             MS. TEKEEI:  Your Honor, may I approach?

23             THE COURT:  You may.

24   Q.  Is that better?

25   A.  It is.  Thank you.

I5U7GAL5                        Smith - Direct

1   Q.  What is this private placement memorandum?

2   A.  This is the document that governs the manner in which a

3   fund -- in this case the GYOF fund -- is going to operate, the

4   dos, the don'ts, the ins, the outs.

5   Q.  Did this document have any bearing on OSERS's decision to

6   invest in the Global Yield Opportunity Fund?

7   A.  Yes.

8   Q.  So let's go through some of the provisions in this

9   agreement.  I'd like to direct your attention to the second

10  page of the document and the second paragraph of that page

11  where it defines what is Atlantic Asset Management.  If you

12  could look at the last two lines.

13  A.  Yes.

14  Q.  How is Atlantic Asset Management defined in this private

15  placement memorandum?

16  A.  Atlantic asset is defined as the investment manager in this

17  document.

18  Q.  OK.  And if I could now direct your attention to the page

19  that ends in 155 at the bottom right-hand corner.  Do you see

20  the heading -- sorry, I didn't mean to jump ahead.

21  A.  OK.

22  Q.  Do you see the heading "Investment Objective and Approach"?

23  A.  Yes, I do.

24  Q.  Can you read the third sentence beginning with "The

25  investment manager believes..."

1  A.  "The investment manager believes the master fund's

2  investment objective can be achieved by investing in high

3  yielding securities researched and selected by a diverse group

4  of specialized investment managers and/or teams of investment

5  specialists within the investment manager (each, a designated

6  manager)."

7  Q.  Is this a reference to the sleeve structure that you were

8  discussing earlier?

9  A.  Yes, it is.

10  Q.  And if I could direct your attention to the last sentence

11  of this paragraph.  Can you please read that beginning with

12  "The investment manager..."

13  A.  "The investment manager has wide discretion in selecting

14  the designated managers with which to invest master fund

15  assets, and the investment manager can at any time increase or

16  decrease the allocation to a designated manager, or replace a

17  designated manager, or change the strategies or sectors

18  utilized by the master fund."

19  Q.  What is your understanding of what that means?

20  A.  That within the parameters of the private placement

21  memorandum, that Atlantic had the authority to change who the

22  designated manager might be, or change a strategy within the

23  context of the governing documents.

24  Q.  And it references discretion.  Was that discretion

25  unlimited?

I5U7GAL5                          Smith - Direct

1   A.  No, no.  The private placement memorandum established some

2   very clear guidelines as to what the limitations were, so that

3   had limitations on it.  And in an understanding -- because

4   OSERS was the only institutional investor in GYOF, the

5   management of Atlantic assured OSERS that if there was going to

6   be anything in way of a significant change, that we would be

7   consulted prior to that change because of our relationship

8   between OSERS and Atlantic.

9   Q.  So directing your attention now to the page ending in 157

10  at the bottom right-hand corner, if you could look at the first

11  full paragraph, and directing your attention to the second to

12  last sentence beginning with "no single".  Can you please read

13  that.

14  A.  "No single credit exposure is expected to exceed 5 percent

15  of the master fund's assets cost."

16  Q.  What is your understanding of what that means?

17  A.  One of the real advantages of this blended fund was risk

18  mitigation.  And this is one more measure of the risk

19  mitigation.  You do not want to have any concentration of

20  credit in one particular security because of the risk that that

21  then affords to the entire plan.  So this particular provision

22  assured OSERS that no more than 5 percent of the funds in GYOF

23  would be directed to a single credit to be able to then lessen

24  the risk that would be there.

25  Q.  And when you say a single credit, what does that mean?

A.   A single entity, a single borrower, a single name.

Q.   Who decided that limit, that 5 percent limit?

A.   Atlantic Assets.

Q.   If how if at all did that limit weigh on OSERS's decision
to invest in GYOF?

A.   It was an important provision, because against OSERS is
looking for risk mitigation.  We needed the returns but not at
any cost, not with unlimited freedom, and so these kinds of
risk parameters were important in the decision to say, yes, we
feel that this is a well-regulated and well-controlled risk
vehicle.

Q.   Now, if I could direct your attention to a few lines down,
the first sentence of the fourth full paragraph, beginning with
"Designated managers have ..."  Can you please read that first
sentence.

A.   "Designated managers have complete discretion to purchase
and sell securities and other financial instruments, subject to
any limitations or guidelines as set forth in each managed
account agreement."

Q.   So, according to this language, did Atlantic Asset
Management or the designated managers have discretionary
authority over the investments in GYOF?

A.   Within the parameters of the contractual language, they
did, but, again, as it says right here in the sentence, "in
accordance with the investment agreement".  So, each one of the

1    individual managers had a set of guidelines established for

2    them indicating what types of securities they would then be

3    utilizing in their sleeve of this portfolio.

4           So, within their style, they had latitude.  They

5    didn't have latitude just to go out and buy whatever they

6    wanted, because again that then crosses over the sleeve idea.

7    Q.  Thank you.  And directing your attention now to the page

8    that ends in 159 at the bottom right-hand corner, and focusing

9    on the section with the heading "Primary Investment

10   Strategies".

11   A.  Yes.

12   Q.  And if you could turn the page to 160, you will see a

13   listing -- additional headings.  If you could, please read

14   beginning with 159 the heading for each listed investment

15   strategy.

16   A.  Emerging market corporate bonds; collateralized loan

17   obligations mezzanine securities; structured MBS and ABS

18   securities; U.S. high yield "off the run" securities; European

19   corporate credits; high quality U.S. high yield; crossover

20   corporate bonds BBB/BB.

21   Q.  Are these the sleeves, the investment strategies you

22   discussed earlier?

23   A.  Yes, they are.

24   Q.  Do these listed strategies say anything about Native

25   American bonds?

1   A.  No, they do not.

2   Q.  Now, how much did OSERS invest in the Global Yield

3   Opportunity Fund when it initially invested in the fund?

4   A.  The initial investment was $100 million.

5          MR. TOUGER:  Excuse me, I couldn't hear that.

6          THE WITNESS:  $100 million.

7          THE COURT:  Thank you.  You haven't heard the actual

8   answer?

9          Why don't you testify.  You say the answer.

10  A.  OSERS's initial investment in GYOF was $100 million.

11  Q.  Did OSERS rely on the statements in the private placement

12  memorandum that we just reviewed before it invested $100

13  million in GYOF?

14  A.  Yes.

15  Q.  Did OSERS rely on statements made by Atlantic employees in

16  the course of -- during the process of investing in GYOF?

17  A.  Yes.

18  Q.  And did OSERS rely on its understanding of Atlantic's

19  typical investment policies and procedures at that time?

20  A.  Yes.

21  Q.  At the time -- well, let me ask you this.  Approximately

22  when did OSERS first invest in the Global Yield Opportunity

23  Fund?

24  A.  July of 2013 was the initial investment.

25  Q.  And at that time were there any other institutional

1    investors in GYOF?

2    A.  No.

3    Q.  OK.  Directing your attention to 2015, did there come a

4    time when you learned about a change in Atlantic Asset

5    Management's ownership?

6    A.  Yes.

7    Q.  Approximately when did you learn that?

8    A.  February of 2015 we were informed that Atlantic Asset was

9    being acquired by Hughes Capital Management, owned by Michelle

10   Morton and Richard Deary.

11   Q.  And how did you learn that?

12   A.  Ron Sellers, the previous owner of Atlantic Asset, shared

13   that in a phone call and then a follow-up letter.

14   Q.  And did the change in ownership change OSERS's decision

15   about using Atlantic Asset Management as one of its managers?

16   A.  No.

17   Q.  Did it change OSERS's decision with respect to the

18   investments that OSERS had made in GYOF?

19   A.  No.

20   Q.  Earlier you mentioned the school board and its role.  Did

21   the school board consent to the change in ownership?

22   A.  Yes.

23   Q.  Now, during that time period, early April -- sorry, early

24   2015 -- did OSERS provide any additional funding to GYOF at

25   that time?

1    A.  Yes, OSERS increased the funding to GYOF by an additional

2    $25 million.

3    Q.  OK.  Now, did there come a time when you learned that the

4    Global Yield Opportunity Fund had purchased bonds issued by the

5    Wakpamni Lake Community Corporation?

6    A.  Yes.

7    Q.  Approximately when was that?

8    A.  April 23rd of 2015.

9    Q.  How did you learn about it?

10   A.  In the phone call that I received from Atlantic Management.

11   Q.  Who participated, to your recollection, in that phone call?

12   A.  Ron Sellers, Michelle Morton, Richard Deary.  I am of the

13   opinion that others were on the call, but those were the ones

14   that I had conversation with.

15   Q.  Now, did this call happen before or after the bonds had

16   been purchased in GYOF?

17   A.  After.

18   Q.  What was your reaction to learning that the new management

19   had purchased a Native American bond?

20   A.  Unhappy, disappointed, confused.  I did not see how these

21   fit within the GYOF fund.  I was disappointed with the

22   conflicts of interest that were presented to me in the call,

23   so, you know, I wasn't happy.

24   Q.  Now, what was your understanding of the conflicts of

25   interest involved?

1            MR. TOUGER:  Objection.

2            MS. NOTARI:  Objection.

3            THE COURT:  Overruled.

4    A.  I was told in the call that the funds that were used by --

5            THE COURT:  You know what, actually let's just stop.

6    Let's have a quick sidebar on this.  All right?  Thank you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  It sounds like he is about to testify to

3    what he heard during this call.

4              MS. TEKEEI:  I thought the objection was to the use of

5    conflicts of interest.

6              What was the basis of the objection?

7              MR. SCHWARTZ:  It was that, but it's mostly this is

8    all going to be hearsay.

9              THE COURT:  And that's what I understood the objection

10   to be.

11             MS. TEKEEI:  OK.  So Ms. Morton participated in this

12   call; she is a coconspirator; these are statements made in

13   furtherance of the conspiracy.

14             I am happy to rephrase it and ask what is his

15   understanding of the relationships between the parties, and

16   tell him not to tell us what anyone said.  But I think it's

17   relevant to his testimony what his understanding of the

18   conflicts are that he just testified to.

19             And to explain, your Honor -- and to explain his

20   future actions with respect to the bonds, which were a

21   direction to sell them immediately because of the interrelated

22   parties.

23             MR. TOUGER:  What was your last line you said?

24             MS. TEKEEI:  And to explain his actions with respect

25   to the bonds after this phone call, which was a demand that the

1   bonds be sold out of the Global Yield Opportunity Fund because

2   of the, among other things, conflicts that had not been

3   disclosed to him prior to the purchase into the Global Yield

4   Opportunity Fund.

5          MR. SCHWARTZ:  I have no problem with him testifying

6   that after receiving this phone call he decided to sell the

7   bonds or give the instruction to sell the bonds, but the

8   factual information that Michelle Morton supposedly relayed to

9   this witness is hearsay.

10         If the explanation for why this isn't hearsay is that

11  this is a coconspirator statement, I don't understand this,

12  because the conspiracy is supposedly hiding conflicts.  He's

13  not a coconspirator, and this is the revelation of conflicts,

14  so it's the exact opposite of the charged conspiracy.

15         MS. TEKEEI:  Your Honor, it shows that Michelle Morton

16  participated in this phone call and later on in e-mail

17  interactions with this witness knew about those conflicts.

18         It was one of the reasons why he demanded that the

19  bonds be sold.  I think he's allowed to say that had I been

20  told about these before, I would have -- before the purchase --

21  I would not have authorized this purchase, and knowing about

22  the conflicts among some of the other violations, I absolutely

23  wanted the bonds sold as soon as possible.  And that's what he

24  would say.

25         And it's Morton's knowledge here -- who the defendants

1    want to bring in evidence that Ms. Morton pled guilty to these

2    crimes, and I think her knowledge is directly relevant.

3              MR. SCHWARTZ:  There is a lot said there.

4              Last things first.  The fact that Ms. Morton's plea is

5    coming in, as we've discussed, is solely to impeach.  Her

6    statements are being offered for the truth of the matter, her

7    legitimate coconspirator statements.  This is not a legitimate

8    coconspirator statement, so it has nothing to do with it, one.

9              Two, the "if he had been told" question is an improper

10   hypothetical question, so that question on its own right is not

11   proper.

12             Three, he was not given the opportunity to, you know,

13   to pass upon these before they were stuck to him.  I have no

14   problem with him saying I didn't like the fact that I was stuck

15   with these bonds and I demanded that they be sold.  I have no

16   problem with him saying that I had a phone call with AAM, and

17   after I learned about the bonds I demanded they be sold.  But

18   Michelle Morton --

19             THE COURT:  Know what about the bonds?  What is he

20   allowed to say?

21             MR. SCHWARTZ:  It doesn't matter.

22             MS. TEKEEI:  It does matter.

23             MR. TOUGER:  Your Honor, what he said was he didn't

24   want them.  That's what he said.  So he had a phone call, he

25   didn't want them having Indian bonds --

1          MS. NOTARI:  It's not even that.

2          MR. TOUGER:  And he told them to sell them.  That's

3      what he testified to.

4          MS. NOTARI:  But his whole thing is that he doesn't

5      like the bonds because they don't fit within the sleeves, the

6      parameters of these investments.

7          MS. TEKEEI:  That's not the only reason why.  That

8      mischaracterizes his testimony.

9          MR. SCHWARTZ:  They can't use this witness to get in

10     their thesis which is that there was an undisclosed conflict of

11     interest.

12         MS. MERMELSTEIN:  Your Honor, respectfully I think

13     we're missing the point here.

14         Ms. Morton is a coconspirator in this case.  The

15     allegation in this case is that these defendants knew that

16     there was a conflict of interest and failed to disclose it,

17     among other allegations.

18         Her disclosure of these conflicts is direct evidence

19     that she knew that the conflicts existed.  Of course the

20     government gets to tell the jury that Ms. Morton -- a

21     coconspirator in this case, who had a fiduciary duty to

22     disclose -- didn't do it and knew that they existed.  If she

23     didn't know, then there is no crime here.

24         THE COURT:  She is not a defendant here.

25         MS. MERMELSTEIN:  It's a conspiracy.

1          MR. SCHWARTZ:  No, but this goes to the discussion we

2    were having --

3          THE COURT:  But is this in furtherance of this

4    conspiracy when she is disclosing it to him?

5          MS. MERMELSTEIN:  Yes, of course.

6          THE COURT:  When she is disclosing the conflict of

7    interest as opposed to hiding the conflict of interest?

8          MS. MERMELSTEIN:  Yes, for two reasons at least.  One

9    is that Ms. Morton -- as the evidence is going to show --

10   Ms. Morton essentially gets forced to disclose it, and she is

11   doing it in an effort -- the way she is handling this is an

12   effort to keep the theme going and get people to keep the bonds

13   so as to keep the fraud going, One.

14          Two, it doesn't matter whether or not that's true,

15   because the point is this:  That phone call immediately after

16   the bonds are purchased -- which is, by the way, we should have

17   told you this -- and there are e-mails that are going to come

18   in where she talks about how are we going to tell them this --

19   it's incredibly significant proof that she knew that these

20   conflicts existed when these bonds were purchased, and that is

21   indisputably direct evidence of this crime.

22          That she is not on trial here is irrelevant.  These

23   defendants are were all charged in a conspiracy in which the

24   allegation, among others, is that there was a conflict of

25   interest that they knew about and it was failed to be

1    disclosed.  I don't see how it can be kept out.

2            THE COURT:  Let me ask you, it's four of five; I mean

3    he has to come back tomorrow, unfortunately.  So, why don't we

4    let the jury go; I will hear you out; I will hear you out for a

5    few minutes on other issues; and then if we need to come back

6    after my sentencing, at 5:30 we can.

7            MS. MERMELSTEIN:  I think we probably will.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Ladies and gentlemen, we are going to let

3      you go home for the night.  Thank you all.  Please remember

4      don't discuss the case and keep an open mind, and have a nice

5      evening.

6              We are back to the traditional schedule tomorrow, so

7      we will start promptly at 10, so breakfast will be here at

8      9:30, so please come early.  Thank you.

9              (Jury not present)

10             THE COURT:  You can step down.  Thank you.

11             (Witness not present)

12             THE COURT:  So, as I said, I'm happy to hear you out

13     momentarily on this issue.  Then I have this sentencing, and we

14     can meet again at 5:30.  You can tell me about any issues.  I

15     will rule on some today, and then, If I need to, I will rule on

16     the rest tomorrow morning.

17             MS. MERMELSTEIN:  That's fine.  Do you want us to list

18     the issues that we think need to be decided today?

19             THE COURT:  Sure.  Why don't you finish telling me

20     your view on this issue.  Again, it's hard for me to understand

21     how this disclosure is a coconspirator statement.

22             MS. MERMELSTEIN:  Sure.  I think, your Honor, first --

23     and because I think this is so obvious, it ends the inquiry,

24     I'm going to focus on this first.

25             Ms. Morton's state of mind is obviously relevant here;

1   what she knew is obviously relevant because her failure to

2   disclose it is a significant piece of the conspiracy.

3           That she immediately after the bonds are purchased

4   admits that she knew of the conflicts of interest on this call

5   is direct evidence of what she knew.  And his testimony that he

6   only learned of it on this call is of course testimony that

7   demonstrates that it was not disclosed in advance of the

8   purchase.

9           That's the ballgame.  That evidence has to come in.

10  The government in order to prove that these disclosures were

11  not made has to prove that the coconspirators knew of the

12  conflict and didn't disclose them.

13          This is essential evidence of how we can prove that

14  Ms. Morton knew.  And there are lots of e-mails that are going

15  to finish telling this story where Ms. Morton e-mails other

16  people about the fact that they are going to have to tell this

17  to the OSERS people and how are they going to explain it.

18          It is also a statement in furtherance of the

19  conspiracy, because if OSERS sort of blows the whole thing up

20  over this; if they don't succeed in sort of calming them down

21  and giving them a false sense that things are OK, then what is

22  going to happen is what eventually happened.  So, the efforts

23  to explain this in a way that will cause them not to make a big

24  fuss, to report things, etc., is a statement in furtherance of

25  the conspiracy.

I5UJGAL6

1          MS. MERMELSTEIN:  To get to that issue --

2          THE COURT:  Tell me what was he about to testify to?

3          MS. MERMELSTEIN:  He will say Ms. Morton -- let me let

4     Ms. Tekeei say it.

5          MS. TEKEEI:  The question was what is your

6     understanding of the relationships or the parties involved in

7     the transactions.  I think he can to that in a non-hearsay way

8     if that is one of the objections.

9          I think he would say his understanding is the people

10    who funded Atlantic and Hughes, Atlantic Asset Management were

11    also involved with policing the bonds with the placement agent

12    and there were other relationships between the parties he

13    learned about after the transaction.  I think that sums up what

14    he would say and I think what he knows about it.  That goes to

15    the fact that these overtures were not made to him prior to the

16    purchase.  He learned about them afterwards in communication

17    with Ms. Morton, that involved Ms. Morton and others.

18         MR. SCHWARTZ:  This is even worse because now we have

19    just heard that in addition to apparently being told about the

20    undisclosed, alleged undisclosed conflicts which is part of the

21    charged conspiracy, he was also told by Michelle Morton about

22    the control that the funders of the acquisition of Hughes and

23    Atlantic had over the placement agency.  That is a veiled

24    reference to Mr. Archer and Mr. Cooney.

25         This is the same issue that we all discussed in

I5UJGAL6

1    connection with the Form ADV which is whether there had to be a

2    disclosure either on the form and now I guess it is

3    conversation about indirect through funding ownership in

4    Atlantic and Hughes.  So a few things.

5           One, this is not the right witness for this to come in

6    if they're going to prove up these facts.  The idea Michelle

7    Morton's knowledge is an important part of this trial is so

8    misplaced.  No one, no juror is ever going to be asked to pass

9    on Michelle Morton's knowledge of criminal intent.  The only

10   question is the criminal intent or lack of criminal intent of

11   three defendants that are on trial here.

12          Michelle Morton could have failed to disclose

13   conflicts at the criminal urging of others, even though she

14   didn't know it and she could have criminally failed to disclose

15   conflicts about other people without them knowing it, but her

16   knowledge is irrelevant.

17          What this really gets to, among other things, is

18   beyond the hearsay question, is whether any of this was

19   reasonably foreseeable to these defendants, right?  They're

20   saying this is a co-conspirator statement.  I don't understand

21   that.  I don't understand how revealing conflicts of interest

22   is in furtherance of a scheme to hide conflicts of interest.

23          I understand the point that lulling statements are

24   important, that they didn't want this to blow up, and so they

25   wanted to introduce, assured us there will be no problem.  We

I5UJGAL6

were assured they were going to sell in an orderly fashion.
That is one thing, but the disclosure of conflicts is not in
any universe a comforting statement.  This witness won't
testify he was comforted or lulled by the disclosure of those
conflicts.

         Their proffer is he is going to testify that was one
of the things that concerned him and demanded him to sell.  It
was precisely contrary to the interest of the charged
conspiracy, but most importantly, it is not anything that any
of these defendants knew about or was potentially reasonably
foreseeable to them.

         There has been no foundation for that, there is no
proffer on the government on that point, and the notion that
this defendant is going to testify to a hearsay conversation by
Michelle Morton who is not on trial here to the very thesis of
their case, which is that these people took control and then
failed to make disclosures about it is crazy to me.

         MR. TOUGER:  The government is jumping a hurdle, a
fact that is very important.  It isn't at all the fact that
before the purchase of these bonds, this witness was told X, Y
and Z that was false and okayed the purchase, then after the
purchase is told A, B and C and rejects the purchase.

         What happens here is the bonds are purchased.  As soon
as he gets the bonds, without talking to anybody, he decides he
wants those bonds out of his portfolio, and he calls Michelle

I5UJGAL6

Morton to say get these bonds out of my portfolio, and all
Michelle Morton says is say yeah, you're right, there is a
conflict here.

There is no effort on Ms. Morton's part to put the
conspiracy forward whatsoever, if there ever was.  None of
these defendants are charged in the third and fourth count of
the indictment.  They're not investment advisers.  So the fact
that nobody tried to get them to buy the bonds first when
Michelle Morton just tells the truth when she is called by this
individual to sell the bonds, where is the furtherance of the
conspiracy, if there is one at all?

MR. SCHWARTZ:  The point is, this was the defense that
Michelle Morton wanted to advance.  This is her affirmative
disclosure, and our position and their position always was that
was false, that was her trying to save herself by falsely
casting blame on other people.  That is not part of the
conspiracy.  This is Michelle Morton advancing her own interest
when she is afraid of being caught for her own bad conduct she
has now pled guilty to.

MS. MERMELSTEIN:  That is not it at all.  The issue
with Ms. Morton's false exculpatory statement was related to
the matter before the SEC and FBI that was the problem.  What
she said to investors was never in the government's view.  It
is admissible.  Mr. Schwartz's suggestion it was Ms. Morton's
head is irrelevant is preposterous.  This is a conspiracy.  She

I5UJGAL6

1  is a member of the conspiracy.  Indeed, she has pled guilty.

2  There can be no question she was a member.  She was the

3  investment adviser.  The notion because there wasn't an

4  affirmative misrepresentation to investors, that changes

5  something.  That doesn't change anything.  She had an

6  affirmative duty to disclose any conflicts of interest which

7  she did not do.

8      And she knew about those conflicts of interest.  I am

9  repeating myself.  It seems so obvious, I don't know how there

10 can be dispute of her knowledge there were conflicts of

11 interest as evidenced by her admission to that fact is direct

12 evidence of this conspiracy.  There is also no question it was

13 reasonably foreseeable to these defendants there was going to

14 be fraud in forcing these garbage bonds into the pension fund

15 client accounts.  There are emails -- I won't go into every

16 single one -- between Galanis and Archer and Cooney about

17 acquiring Atlantic and Hughes, the purpose of acquiring

18 Atlantic and Hughes to convince the clients to go along.

19     There is in Government Exhibit 2078, Galanis sends

20 information about Atlantic to -- and in particular about the GL

21 Fund and its parameters to Devon Archer, Mr. Sugarman and says

22 the big issue will be getting ahead of a particular Atlantic

23 client, and what Galanis and Archer is, the plan is winning

24 hearts and minds through a full preppy assault on the

25 Connecticut contingent, a reference to Devon Archer's persona.

I5UJGAL6

1        In any event, it is, given the nature of these bonds,

2   given the plans to acquire Atlantic and Hughes and the purpose

3   of acquiring them, it was clearly reasonably foreseeable to

4   these defendants that the purpose of acquiring Atlantic and

5   Hughes was to place these bonds with them, and that is not a

6   proper purpose to acquire an investment adviser.  Investment

7   advisers have fiduciary obligations, if you're acquiring them

8   for the purpose of putting your own investment in, you're on

9   notice there is a criminal scheme afoot, and so of course the

10  government gets to prove that those acquisitions happened, that

11  these were placed in pension fund accounts, that the pension

12  fund clients were not informed of these conflicts of interest,

13  and the defendants knew the conflicts of interest existed.

14       Also I was a little taken back this is raised now

15  because we have produced 3500 for these witnesses I don't know,

16  what it is now, 6, 10 weeks ago.  The nature of the theft was

17  clear from the beginning.  These are allegations in the

18  indictment.  I think it is just not a close call.

19       MR. TOUGER:  So the record is clear, there is not one

20  iota of proof Mr. John Galanis knew about the purchase of

21  Hughes or any of these investment banks whatsoever.  There is

22  not one email they can show John Galanis on there, not one

23  phone call, not one statement they can show.  There is no proof

24  that John Galanis had any knowledge that Jason Galanis or

25  anybody else was purchasing these investment advisers.  So the

I5UJGAL6

1    idea that he had foreseeable knowledge that this was going to

2    happen, to use her term, to quote her, is ridiculous.  What is

3    important here is to keep our eye where we are.

4          This witness is saying he decides to sell those bonds

5    before he even called Michelle Morton.  Before that call was

6    ever made, he decided he was getting those bonds out of his

7    account, and Michelle Morton, all she did was verify everything

8    that he had no knowledge of any conflicts.  He only learned

9    about them after the phone call with Michelle Morton.  He

10   wanted the bonds sold before he learned anything.

11         MS. MERMELSTEIN:  That is not what that witness said.

12         THE COURT:  I think that is not accurate.

13         MR. TOUGER:  What is not accurate?  He saw the bonds,

14   he said I don't want any bonds, they're not within --

15         THE COURT:  My understanding, but I will let the

16   government speak for itself, he was going to testify that he

17   wanted the bonds sold because of the undisclosed conflicts.

18         MR. TOUGER:  Read the testimony.

19         (Multiple voices)

20         MR. TOUGER:  Go back and read the testimony.

21         MS. TEKEEI:  That mischaracterizes the testimony.

22         THE COURT:  All right.  In any event, let's do this.

23   I have a sentencing now, so why don't we break for half an hour

24   and come back, we'll raise whatever issues we can discuss

25   tonight, and then we can come back in the morning for the rest

I5UJGAL6

```
 1    of it.
 2                (Recess)
 3                THE COURT:  Everyone may be seated.  Thank you.
 4           You know, it is obviously late and we have the
 5    Marshals and the Court Reporters here.  Why don't we do this.
 6    Tell me what the issues are so that I can think about and read
 7    about anything I need to tonight and we can meet in the
 8    morning.
 9                MS. MERMELSTEIN:  That is fine, your Honor.
10           Look, I think with respect to this issue about
11    Mr. Smith's testimony, I hesitate to suggest that people put
12    things in writing if it is not necessary, but I think this is
13    important and not a close call.  If your Honor's not inclined
14    to allow the testimony, we would like I think to put something
15    in writing.
16                THE COURT:  Go ahead, yes, I am happy for you to.
17                MS. MERMELSTEIN:  Let me float -- sorry.  One second.
18           I don't know, is your Honor concerned about
19    non-hearsay bases of admissibility or co-conspirator bases
20    because I think, one, one issue that was not fully flushed out
21    at sidebar is that obviously and we have had this fight in this
22    trial, victim testimony with respect to the significance or
23    materiality of omissions or false statements made to them are
24    clearly admissible.  Indeed, in Cuti the court said you can ask
25    a victim a hypothetical would this have mattered to you.  Here
```

I5UJGAL6

where the victim did learn it, and is going to say it was

important to them, it obviously is proper testimony for him to

say that.

I think there are other reasons why no limiting

instruction is necessary, but your Honor at a minimum could let

him testify to that and have a limiting instruction that that

is not evidence, right, it is true that those conflicts

existed, but simply that having learned that information, it

mattered to him and he acted commensurate with that.

For all the reasons, we said there are so many bases

it is admissible I don't think a limiting instruction is

necessary.  We can put that in writing if your Honor wants a

particular issue --

THE COURT:  No.  You should put it in writing.  I am

inclined to agree with you with respect to the victim testimony

generally.  What I am more concerned about is the basis of his

knowledge, like on what basis, legal basis is it coming in,

that he was informed of this conflict of interest.  Again it is

hard for me to see how it is a co-conspirator statement when

she is disclosing the conflict.  And the disclosure, it doesn't

appear to have been in furtherance of the conspiracy, but I

heard you out earlier, obviously, on that.

(Continued on next page)

1          MS. MERMELSTEIN:  Yeah, we will.

2          THE COURT:  I will hear you later, but I can see how

3    it went to his state of mind at being non-hearsay, but I think

4    in that case you have to leave the conversation act out.  And

5    now I'm just talking about, thinking out loud, but I'm happy to

6    hear you out.  But, you know, it may be that you just ask him

7    generally did there -- you want to get out why he did what he

8    did.  You don't want to get out that Michelle Morton informed

9    him of the following.  I mean that's my inclination, but again

10   I haven't made a decision yet.

11         MR. SCHWARTZ:  We're certainly happy to put in a

12   response, assuming the government puts in their papers in a

13   timely fashion this evening.

14         I think this idea of it being victim testimony is a

15   little bit of a red herring.  This is not a situation where

16   this witness was the recipient of misrepresentations.

17   Misrepresentations, victims can testify about that, one,

18   because it's part of the criminal act.  It is by definition

19   nonhearsay.  It is not for the truth.  There are

20   misrepresentations, and they go to issues like materiality.

21   That's not what this issue is.  This is essentially Michelle

22   Morton saying after the fact I failed to disclose conflicts to

23   you, not that she made lies before the purchase about the

24   absence of conflicts, but, rather, that she made a factual

25   statement after the fact about the existence of conflicts.

I5U7GAL7

1    That is to me what is plainly not in furtherance of the

2    conspiracy.

3              I have no problem if the government wants to ask, you

4    know, was it important for you to know who the identity of the

5    investment manager is?  Would it have been important for you to

6    know, you know, those sorts of materiality questions?

7              But I think your Honor is exactly right, conveying

8    factual information that was related to this witness by

9    Michelle Morton is not appropriate.

10             THE COURT:  What about if the government were to ask

11   sort of what did you do next and why?  And if he says, you

12   know, well, I understood there was a conflict of interest and,

13   therefore, I did the following?

14             MR. SCHWARTZ:  But that's just hearsay by another

15   word.  I have no problem with them eliciting the testimony I

16   received a call on April 23, 2015 and received information for

17   the first time about these bonds, and in response I directed

18   that Atlantic sell the bonds.  No problem with that.

19             But whether the testimony comes in Michelle Morton

20   told me X, Y, Z, or I understood X, Y, Z, it's hearsay either

21   way.  And actually the second version is worse, because it is

22   just sort of taking as a fact this thing that he understands

23   without eliciting the basis for that knowledge, which is

24   hearsay, and which is the basis that has nothing to do with

25   these defendants.  So I don't think that solves the problem.

I5U7GAL7

1          MS. MERMELSTEIN:  But, your Honor, I think what Mr.

2     Schwartz is saying makes clear why anything other than the way

3     the government started out doing this is nonsensical.

4          We all agree that this victim can testify that certain

5     conflicts of interest were important to them, right, that they

6     matter, and indeed that they were so important that it was one

7     of the factors that caused them to direct that the bond be

8     sold.

9          To say did you got a phone call and after that phone

10    call what did you do, it doesn't have any meaning without we

11    learned certain pieces of information, and that information

12    caused us to do something.  It doesn't matter whether or not

13    that information -- I mean it is of course true, but the point

14    here is that his understanding and how that information caused

15    them to behave -- namely that it was so important to them that

16    they directed the bonds to be sold -- is essential testimony.

17         I think Mr. Schwartz says it will be worse to just

18    have him say we came to an understanding that there was a

19    conflict and that was so important that we caused the bonds to

20    be sold.  I agree, the better way is to say we had a phone

21    call, we were told this information, and here is how we

22    reacted.

23         But it's not just one of these things where the

24    hearsay issue is sort of all we want to do is see what the

25    person did next, and you can just say did you have a

I5U7GAL7

1   conversation and what did you do following that conversation.

2           The import is the understanding that he came to have

3   as a result of the conversation, and understanding sort of his

4   own understanding that certain facts existed, how that mattered

5   to OSERS and how it affected his conduct.

6           I also think that, as I've said -- and we can sort of

7   put it all in writing -- that leaving aside coconspirator

8   statements, and whether or not they're in furtherance of the

9   conspiracy, Morton's knowledge that the conflicts existed is

10  direct evidence of the conspiracy, and her participation in the

11  disclosure of them -- and you will see in the trial that other

12  people are telling her she has to disclose them, she doesn't do

13  it, she then kind of gets pushed into it, which is why this

14  phone call happens.  That whole story and what she knew and how

15  she behaved is direct evidence of the conspiracy, and so these

16  things, you can't slice these things this fine.

17          So, I don't want to repeat myself.

18          THE COURT:  You can put in a brief letter.  I will

19  read it tonight.  I will rule first thing tomorrow.

20          MR. TOUGER:  Just one last thing.  I think

21  Ms. Mermelstein just answered the question how it should be

22  done:  I made a phone call, I learned information; I sold the

23  bond because of the information I learned.  But the information

24  that he learned is not important to the defendant on trial.

25          MS. MERMELSTEIN:  It is important.  If the information

I5U7GAL7

was, you know, something silly and preposterous and that caused

them to sell the bonds, that wouldn't suggest there is a fraud

here.  Right?  It's the nature of the information.  Anyway --

MR. TOUGER:  Part of information he learned, your

Honor, is they broke the 5 percent rule.  Part of the

information he learned was they weren't B rated bonds or

greater; they were unrated bonds.  Part of the information they

learned has nothing to do with anything in the alleged

conspiracy.  So, the way to elicit this without any hearsay,

without -- and what we would say are not coconspirator

statements -- is to say I made a phone call, I learned some

information, I ordered the bonds be sold.

MR. SCHWARTZ:  I agree with that.  And I am happy to

leave this to writing, but I just want to ask a question,

because I think this may be helpful.

I mean aren't there going to be other witnesses that

received direct misrepresentations about the absence of

conflicts?

MS. MERMELSTEIN:  I think you know the sort of

testimony that's going to come in on this.  You have all the

3500.  So, I think the government thinks it's important to

elicit it from this victim.  I think it's important in the jury

understanding as things unfold.  Frankly, to the extent it's

going to be in anyway, it seems like the concern about it being

offered for the truth here, when this is a nonhearsay basis,

I5U7GAL7

1    when it's going to come in for the truth other placings, seems

2    like it's not worth belaboring.

3            THE COURT:  It seems like you want it in for the

4    truth.

5            MS. MERMELSTEIN:  Yes, I think it's true.

6            Your Honor, there are a couple of other things that

7    have been left that I think we need to have decided before

8    tomorrow, and then there are some that are left but don't need

9    to be decided before tomorrow.

10           THE COURT:  Of course.

11           MS. MERMELSTEIN:  With respect to tomorrow, first

12   defense counsel -- we gave the defendants our exhibits a few

13   days in advance, and we got the ones for the anticipated

14   witnesses for today last night.  We had a couple of

15   conversations.  Mr. Schwartz and I were not able to resolve our

16   differences of opinion, so we need to raise with your Honor the

17   disagreements about what exhibits can be shown to Ms. Driever,

18   who I expect -- I don't know if -- I don't have the sense of

19   the length of the cross-examination of Mr. Smith, but I expect

20   she will be on in the morning, so that's one.

21           I think that following Ms. Driever is going to be Mr.

22   Dunkerley, and him being on the stand triggers the need for a

23   rulings on the following:  One -- and I think that your Honor

24   has ruled on this, but I want to make sure we are all on the

25   same page -- that the proposed stipulation with respect to

I5U7GAL7

1    Jason Galanis' California conviction will not include any

2    language concerning the California prosecutor's opinions.

3              THE COURT:  That's right.  That is right, I have ruled

4    on that.

5              MS. MERMELSTEIN:  I think the stipulation with respect

6    to the fact of Hirst, Galanis and Morton's convictions in this

7    case has to be resolved.  There are pending cross motions about

8    the admissibility of various photos.  The government has marked

9    the intake photos for all the people for whom we have them.

10   Mr. Archer in particular has marked exhibits of himself as a

11   child, himself with his wife as a child.  We intend to use the

12   intake photos with Mr. Dunkerley.  I could imagine Mr. Schwartz

13   might then try and use his photos at the same time.

14             There is also a photo of Mr. Momtazi to which we have

15   objected to.  It's him playing poker and wearing sunglasses

16   with a baseball hat.  Ms. Driever met Mr. Momtazi.  I don't

17   know if Mr. Schwartz to get into that with her.  He didn't mark

18   that as an exhibit, but in any event.

19             THE COURT:  These are all the issues that you have

20   already briefed.

21             MS. MERMELSTEIN:  Yes.

22             THE COURT:  Just let me look at all the exhibits

23   tonight, and I will rule first thing in the morning.

24             MS. MERMELSTEIN:  With exception I guess to our

25   exceptions to Ms. Driever's exhibits, which we didn't because

I5U7GAL7

1    we were on the phone late last night.

2                THE COURT:  Just tell me the exhibit numbers.

3                MR. SCHWARTZ:  I don't think there is actually a

4    disagreement about that, and I am happy to talk about it when

5    Ms. Mermelstein is done.

6                MS. MERMELSTEIN:  A few other sort of pending things

7    we need rulings on are with respect to the fighting a the ADV

8    and the admissibility of the ADV, that is not coming now, but

9    Mr. Dunkerley is going to talk about his knowledge that ADVs

10   were being filed, and his sort of -- how enthused they were to

11   learn that Morton had not -- in their view, as she should have

12   done -- disclosed the full ownership, because they thought it

13   gave them kind of a further way to get her to continue doing

14   their bidding, because she had now done this bad thing that

15   they could have hanging over her head.  And we have moved to

16   preclude cross-examination of Mr. Dunkerley with respect to two

17   e-mails, and that's also before your Honor.

18               THE COURT:  Go ahead.

19               MS. MERMELSTEIN:  And then I'm going to turn next to

20   the Driever issue, so if there is something else, I'm happy to

21   let Mr. Touger go first.

22               MR. TOUGER:  I noticed in their exhibits that they

23   want to put in through Mr. Dunkerley is a picture of

24   Mr. Galanis, if I'm not mistaken.

25               MR. QUIGLEY:  There is no picture of Mr. Galanis.

I5U7GAL7

1    There is a picture of Jason Galanis.

2              MR. TOUGER:  No, of John Galanis.  No, OK, then I am

3    mistaken.

4              MR. SCHWARTZ:  There are photos of all the defendants.

5              MR. TOUGER:  There were.

6              MR. QUIGLEY:  We are not intending to offer any photo

7    of John Galanis through Mr. Dunkerley.

8              MR. SCHWARTZ:  Are you intending to offer the photo of

9    Mr. Archer?

10             MR. QUIGLEY:  Yes.

11             MR. SCHWARTZ:  They never met.  You are going to have

12   him do an ID based on meeting at the arraignment?

13             MR. QUIGLEY:  It's a percipient witness; he can say

14   it's a fair and accurate depiction.

15             THE COURT:  There is no need to do that.  I mean if he

16   has never met him -- yeah, I don't think that should -- I don't

17   think we should do that.

18             MS. NOTARI:  I realize that one of the issues raised

19   with Mr. Dunkerley is about an e-mail that Mr. Cooney and Mr.

20   Dunkerley exchanged, and the government -- I didn't file a

21   response because they filed it late, and I was very -- so I

22   thought we might handle it in the morning, but this e-mail

23   is -- I understand their problem with the e-mail is that it has

24   Mr. Dunkerley's racist comments about, you know, we're willing

25   to -- the e-mail is absolutely relevant to our defense.  I

I5U7GAL7

1    opened my opening statement on the e-mail.  I don't have it in

2    front of me, it's upstairs, but if you want, can we talk about

3    that tomorrow?

4            THE COURT:  Sure.  Just to save time if there is

5    anything you want me to look at tonight, tell me what to look

6    at, but, if not, I will meet you at 9 or 9:15 tomorrow.

7            MR. SCHWARTZ:  I think the suggestion I made -- which

8    I take it there is no objection to -- is just redacting the

9    racist stuff.

10           MR. QUIGLEY:  I'm not sure it's racist, but I have no

11   objection to redacting the comment.

12           MS. NOTARI:  If that's it, we're fine with that.

13           MR. QUIGLEY:  For both of the exhibits that you

14   raised.

15           THE COURT:  OK.

16           MR. SCHWARTZ:  When we talk about these things, it

17   turns out that there is actually no disagreement.  I don't

18   think there is going to be a disagreement on the Drieveer stuff

19   either.  I can explain why first, or you can explain what you

20   think is the disagreement first.

21           MS. MERMELSTEIN:  As we left it last night, I thought

22   we said we needed to raise it with the court because we

23   couldn't agree, but if you have changed your view, I am happy

24   to hear it.

25           Mr. Schwartz identified for us as exhibits various

I5U7GAL7

exhibits he intends to use with Ms. Driever, and with respect
to some we have no objection.

A significant percentage of them are documents that
this witness has never seen, are e-mails she has is not on, or
are transactions for which she was not sort of any kind of a
connected witness.

So, let me explain that Ms. Driever worked at Morgan
Stanley, she was kind of an executive assistant kind of person
who received and sent paperwork and things like that.  There
came a point in time when her group no longer was managing
Mr. Archer's accounts; it swung to a different group at Morgan
Stanley; and after that point in time she has no connection to
the account; she doesn't have access to the account; she
doesn't sort of know anything about what happened.

So, Mr. Schwartz has identified a significant number
of exhibits that relate to a loan that Mr. Archer obtained from
Morgan Stanley following the transfer of the account.  I'm not
disputing that that may be admissible evidence in this trial,
but she doesn't know anything about it, and I don't think she
is therefore an appropriate witness to question about it.

What I said to Mr. Schwartz is if he wants to ask
her -- and I don't know that she is actually going to know
this, but that's fine -- you know, what is a PLA, what forms
are generally required, I don't have an objection to him asking
those because she is a Morgan Stanley witness, but I do object

I5U7GAL7

to taking a witness who is 25 minutes on direct and making it
into two hours on cross-examination in order to explore a
completely different area that she is not really a witness to.
I think if he wants to do that, it should be sort of done sort
of in the defense case.

          And separately, there are a number of in that group
e-mails that are -- it's one thing for something like a bank
record.  There are e-mails she is not on, and I think as we
have already discussed those shouldn't be before her.

          Then there is one e-mail that relates to the conduct
she is talking about that I don't think should come into
evidence.  It is Government Exhibit 350.  Let me pull it up.
It's a little bit confusing to follow what happens.  Basically
Ms. Driever e-mailed a blank form to Mr. Momtazi -- or
e-mails -- e-mails a form to Mr. Momtazi saying you have to
sign this and Mr. Archer has to sign it and return it.  He
sends back a document, and she says I think you attached the
wrong thing, and he says, oh, oops, like they were next to each
other, and then he sends the corrected document.

          The government intends to elicit in general terms that
she sort of asked him to send it back and then he sent it back,
and that includes the e-mails where there is a discussion of
having attached the wrong thing.  But the e-mail which attaches
the wrong document is not relevant, because the wrong document
sort of is irrelevant.  And so we object to the admissibility

I5U7GAL7

1    of that one document.

2              MR. SCHWARTZ:  OK.  And I want to actually tick

3    through the entire list of issues that Ms. Mermelstein teed up.

4    I will start with the Driever stuff first.

5              I really doesn't think except for this exhibit that

6    there is any disagreement.

7              So, with respect to e-mails on which Ms. Driever is

8    not a party --

9              MR. TOUGER:  Your Honor, is it OK if Mr. Galanis goes

10   back?

11             THE COURT:  Yes, yes.  All right.  Good night.

12             MR. SCHWARTZ:  With respect to --

13             THE COURT:  I will just note for the record that

14   Mr. Cooney waived his presence here.

15             MR. SCHWARTZ:  With respect to e-mails on which Ms.

16   Driever is not a participant, I don't intend to use them with

17   her unless I need to confront her with them for some reason as

18   impeachment material.

19             I have in an effort to bubble issues up to your Honor

20   in advance sort of overdisclosed -- as I have throughout this

21   case, and it keeps coming back on me, but I will keep doing it.

22   I'm not going to use anything affirmatively that she is not on.

23   I don't think this is an issue.

24             With respect to the other kinds of Morgan Stanley

25   documents, the issue here is they don't object to the

I5U7GAL7

documents; they're afraid of how I'm going to use the

documents.  I really don't intend to make a proffer about what

I'm going to do on cross, but I don't intend to have this

witness up there for hours and hours and hours talking about

transactions that she doesn't have personal knowledge about.

What I do intend to do -- which I think

Ms. Mermelstein said she has no problem with -- is this woman,

she was an account executive in the private wealth branch of

Morgan Stanley, and she is familiar with all of Morgan

Stanley's records for private wealth customers.  There are

certain records that I want her to explain to the jury what

they are.  She may not have had a personal hand in those

records.  I believe she will be familiar with them.  If she is

not, that's fine, I'll stop.  If she is, I just want her to

explain an example so that I don't have to call -- she is the

only Morgan Stanley witness.  Otherwise, I'm going to have to

come back a month from now, call another Morgan Stanley witness

for no purpose other than to explain what a form is.  It's a

total waste of time.  My question will be tight, and it will

just be designed --

THE COURT:  To explain what a what is?  I didn't hear

you.  To explain what a form is?

MR. SCHWARTZ:  Right, it's this loan thing that Ms.

Mermelstein is talking about.

THE COURT:  OK.

I5U7GAL7

1          MR. SCHWARTZ:  And then.

2          THE COURT:  So with respect to Ms. Driever, your view

3     is the only exhibit that you're arguing about is the one where

4     the wrong document was attached?

5          MR. SCHWARTZ:  I think that's right.  I think

6     everything else -- you know, look, I know that they will object

7     if they think I'm using documents incorrectly, but I am really

8     not going to.

9          THE COURT:  What's the relevance of the e-mail with

10     the wrong document attached?

11          MR. SCHWARTZ:  I will tell you -- although in general

12     again I sort of resent this process where I'm having to make

13     proffers about my cross strategy because I've given them

14     advanced notice of documents.  This is not even a 403

15     objection; this is a 401 objection; and this is an exhibit that

16     they marked -- so obviously it must be relevant -- it is about

17     the form that they say is falsified.  This is the 404(b).

18          The reason why this particular e-mail from Mr. Momtazi

19     attaching the wrong form is in itself relevant is because

20     although it did attach the wrong form, it shows how quickly he

21     responded to the request for the form.  That's why this version

22     is relevant.

23          MS. MERMELSTEIN:  I mean first of all if Mr. Schwartz

24     doesn't want to make the proffer, I'm happy to have the proffer

25     when it's offered and objected to.  I think that's fine, if

I5U7GAL7

1     that's that purpose.  The attachment shouldn't come in then,

2     but the e-mail to show how quickly he responds is fine.

3               MR. SCHWARTZ:  What is wrong with the attachment?

4               MS. MERMELSTEIN:  I think it's irrelevant.  It's an

5     inadvertently sent form that Mr. Momtazi says should be deleted

6     when he realizes he sent the wrong one.

7               MR. SCHWARTZ:  It's not scandalous.  Turn the page.  I

8     mean there is nothing wrong with it.

9               MS. MERMELSTEIN:  I just don't think that forms that

10    are irrelevant and have nothing to do with the matter here, and

11    sort of are documents that are signed and stuff should come

12    into evidence because they happen to be attached to something.

13              MR. SCHWARTZ:  It's relevant because it was attached

14    to the relevant e-mail.

15              THE COURT:  I'm going to allow it.  Just clarify that

16    it was -- I am sure it will be clear that it was the wrong

17    document, and so -- but if it was sent, I think that's a fair

18    purpose.

19              MR. SCHWARTZ:  So with respect to the -- so I think

20    that takes care of the Driever stuff.

21              With respect to the other things that Ms. Mermelstein

22    talked about, on the Dunkerley material, your Honor said that

23    you ruled regarding the California arrest stipulation.  I

24    appreciate you said how you were going.  I would appreciate for

25    the record at some point -- it doesn't have to be tomorrow

I5U7GAL7

1    morning -- a basis for that ruling.

2            THE COURT:  I think I stated the basis already, but I

3    am allowing that in not as 404(b) but as impeachment.  And

4    whether or not someone else was essentially duped by his lies

5    is not impeachment.  What is impeachment is the fact that he

6    lied.

7            MR. SCHWARTZ:  Well, the fact that he committed

8    another fraud, not that these were empty lies to a credulous

9    government audience who knew better, but that he successfully

10   defrauded the government.  It's the exact same argument they

11   are making about the significance of victim testimony here.

12           THE COURT:  But whether it's successful or not, I

13   don't think is the issue.  The issue is with impeaching him

14   with respect to his credibility.  So that was the basis of my

15   ruling.

16           MR. SCHWARTZ:  Thank you.

17           With respect to the Galanis, Hirst, Morton

18   stipulation, I thought we were in agreement that -- we were in

19   agreement on the language.  I thought we were in agreement that

20   this was going to be a joint stipulation that was going to be

21   read by your Honor at the close of the government's case.

22           THE COURT:  I thought you were in agreement about that

23   as well.  I didn't realize that was still a live issue.

24           MR. QUIGLEY:  Your Honor, we sent them a joint

25   stipulation I think before trial started.  We haven't heard

I5U7GAL7

1       back, so obviously the ball is kind of in their court on that.

2              MR. SCHWARTZ:  We're happy to sign the agreement

3       again.  The judge will read it, and we will read it between the

4       close of the government case and the opening of the defense

5       case.

6              MS. MERMELSTEIN:  No, that was not the agreement.  No,

7       no, no, no, that's not the agreement.

8              This is evidence that is being offered to impeach

9       non-declarant witnesses of the government.  If the government

10      called those witnesses -- as we already talked about -- we

11      would obviously be allowed to elicit from them on direct

12      examination these facts.  We intend to offer this during the

13      government's case.  We have agreed to have it be a joint

14      exhibit; we have agreed to have your Honor read it.  It comes

15      in as part of the government's case because the government is

16      offering the statements that are being impeached.

17             MR. SCHWARTZ:  The agreement -- and we can go back to

18      the transcript on this one too -- was that your Honor was going

19      to read it and say it was a request by both parties, and it

20      wasn't going to come in as part of anyone's case.  I think

21      that's what makes sense.  But you have the issue; we don't need

22      to argue it.

23             THE COURT:  I will figure out the timing.  It sounds

24      like that's the only thing that's in dispute about that.

25             MR. SCHWARTZ:  On the photos, I don't see -- except

I5U7GAL7

1  for one thing, since they gave me a good idea -- I don't think

2  this is an issue for tomorrow.  Your Honor has now ruled that

3  they're not going to use Mr. Archer's photo with Mr. Dunkerley.

4  I am definitely not going to use any other photos of Mr. Archer

5  in cross-examination of Mr. Dunkerley, so I don't think any of

6  that has --

7          THE COURT:  I know that there are childhood photos and

8  other things, and, as I said, I will rule on that tomorrow

9  morning.

10          MR. QUIGLEY:  I'm sorry.  I understand your Honor's

11  ruling with respect to Mr. Archer.  I would say for Mr. Cooney,

12  Ms. Morton, Mr. Hirst, Jason Galanis, Jason Sugarman --

13          THE COURT:  If he knows them personally --

14          MR. QUIGLEY:  He knew them.

15          THE COURT:  -- I don't have a problem with him

16  identifying a photo unless the photo is unduly prejudicial for

17  one reason or another.  So, if you're making the prejudice

18  argument, tell me why.  I mean I have the exhibits in front of

19  me.

20          MS. NOTARI:  That's part of our objection.  We join in

21  Mr. Archer's objection, but I believe Mr. Archer submitted an

22  appropriate photo.

23          THE COURT:  Right.  So what do we have?  We have with

24  respect to Mr. Cooney we have 3601.

25          MR. QUIGLEY:  That's right, your Honor.

I5U7GAL7

1          THE COURT:  And --

2          MS. NOTARI:  I mean that's just a horrible photo.

3          MR. QUIGLEY:  Judge --

4          THE COURT:  Are there any better pictures?

5          MR. QUIGLEY:  That's what we have.  I mean --

6          MR. SCHWARTZ:  Well, we marked a different one of him.

7          MR. QUIGLEY:  They marked of him drinking a Guinness.

8          THE COURT:  Then we have this photo.

9          MS. NOTARI:  I have a family photo too.

10          THE COURT:  Is there just a photo with him without his

11   family that looks less like a mug shot?

12          MS. NOTARI:  You don't like the ones.

13          THE COURT:  You want the one with him drinking beer?

14          MS. NOTARI:  Sure.  We can crop out the beer.

15          MR. QUIGLEY:  The photo of him is Government Exhibit

16   3601.  I mean there are many -- I've been through a number of

17   conspiracy trials, and any time it's a neutral photo --

18          MS. NOTARI:  It's not.

19          MR. QUIGLEY:  It could be his driver's license

20   photo -- my driver's license photo.

21          MR. SCHWARTZ:  I mean before the one with the beer was

22   so prejudicial that it made him look horrible, and now the

23   government doesn't want to introduce it?  I don't understand

24   it.

25          THE COURT:  I tell you, I don't think you should have

I5U7GAL7

```
 1  a photo -- I think it's fair to have a photo of him by himself.

 2  Ms. Notari, if you want him to just send a photo of himself,

 3  whether it's in a tie or whatever it is, but just of his face,

 4  I am fine to have you substitute it if you think this looks too

 5  much like a mug shot.  But, you know, I'm not going to prevent

 6  the government from utilizing a photo.

 7            MS. NOTARI:  OK, I will find one.

 8            THE COURT:  OK.

 9            MR. SCHWARTZ:  And I don't care about the other

10  things.

11            THE COURT:  All right.

12            And is this Mr. Momtazi?

13            MR. SCHWARTZ:  Yes.

14            THE COURT:  This is 4916.

15            MR. SCHWARTZ:  Yeah.  And so the government I think

16  informed me what is not clear from the 3500, which is

17  apparently Ms. Driever met Mr. Momtazi, so I will ask her to

18  identify him.  I don't think there is anything wrong with that

19  picture.  If you do, I offered to crop out the poker chips.  I

20  don't think --

21            THE COURT:  Is there a problem with this photo?

22            MS. MERMELSTEIN:  Yeah.  I mean first of all, I've met

23  Mr. Momtazi, and I am pretty sure that's him.  I mean it's not

24  sort of an easy to identify his photo given that he is wearing

25  a baseball hat and glasses.
```

I5U7GAL7

1          I mean If Mr. Archer had that photo of Mr. Momtazi who

2     was sort of his assistant for a long time, he certainly has a

3     more generic one, and a more generic one is appropriate.  I

4     think in a case in which it appears to the government that

5     Mr. Archer is attempting to suggest that he didn't do certain

6     things, that it was Mr. Momtazi doing them, if there are going

7     to be neutral photos, there should be neutral photos, and not

8     one that makes him look like that.

9          MS. NOTARI:  One where he looks like --

10          MR. SCHWARTZ:  What is the problem with that picture?

11          MS. MERMELSTEIN:  Do you do not just have a picture of

12     him?

13          MR. SCHWARTZ:  I don't.  That's literally the only

14     picture I have of him.

15          THE COURT:  Look, if you can find a picture of him

16     without sunglasses and a hat, use that.  If you can't, crop

17     this.  So and just -- you know, that will be the best that we

18     can do, but I'm not going to preclude it.

19          MR. SCHWARTZ:  And then the last thing is I guess the

20     form ADV evidence.  And when we had left off with that, your

21     Honor was going to decide whether that was admissible at all in

22     light of Ms. Morton's plea.  And now we're hearing that through

23     Mr. Dunkerley supposedly there is going to be testimony that

24     quote unquote they and them were happy about the fact that

25     certain people were not disclosed on the ADV.

I5U7GAL7

1            I don't know who the pronouns are in that

2    conversation, but I'm very confident it's not Mr. Archer, and

3    so it goes to the same issue, which is --

4            I mean really this entire investment advisor, you

5    know, breach of fiduciary duty, failure to disclose conflict

6    stuff, it no longer really has anyplace at all in this trial

7    with these three defendants.  But these particular acts that

8    are lies that other people told about Mr. Archer and

9    Mr. Cooney, are for all the reasons that we discussed before --

10   I won't rehash them -- are incredibly problematic.  They are

11   not appropriately admitted certainly without a factual

12   predicate for how they were reasonably foreseeable to

13   Mr. Archer and with a robust limiting instruction.  But that

14   doesn't exist here.  We have challenged them time and time and

15   time again.

16           MR. QUIGLEY:  Your Honor, if I could -- so why don't I

17   make a proffer so we know what actually we're talking about

18   here.  So, I would agree with Mr. Schwartz in that Mr. Archer's

19   name is not going to come up in this evidence about form ADV

20   here.  Essentially, what Dunkerley is going to testify is that

21   he, Gary Hirst and Jason Galanis in the fall of 2015 -- well,

22   in the fall of 2014, the year prior -- they had discussed that

23   Atlantic -- or sorry -- Hughes and Michelle Morton had not

24   included Jason Galanis or BFG Socially Responsible Investing

25   any of the financial backers on the form ADV.

I5U7GAL7

1          Fast forward a year later -- that's just by way of

2     background.  The relevance to the testimony to Dunkerley -- and

3     this is partially frankly Giglio for Dunkerley -- is Dunkerley

4     is going to testify, I expect, that in the fall of 2015, when

5     the SEC subpoenas started coming in, he and Galanis discussed

6     how they could -- Jason Galanis -- discussed how they could

7     essentially cover this up.  And one thing they recognized was

8     that they had some leverage over Michelle Morton in part

9     because, as they knew from the year earlier, she had failed to

10    include her financial backers with the BFG Socially Responsible

11    Investing on the form ADV.  I'm happy not to get into that

12    level of detail with him.

13          We're not intending to introduce the form ADVs with

14    him.  Again, it's strictly by way of background and frankly as

15    Giglio for the witness about his actions with Jason Galanis in

16    the fall of 2015.

17          MR. SCHWARTZ:  May I suggest, I would have no problem,

18    I don't think -- maybe I want to think about this overnight,

19    but I don't think I have any problem if they want to sort of

20    sanitize that and make it just about Jason Galanis, which I

21    think gets them everything that they need.  But when you talk

22    about generically the financial backers, that's the problem,

23    because they're going to argue that these are the financial

24    backers.

25          MR. QUIGLEY:  I think -- well, I think we would --

I5U7GAL7

1   there are ways, your Honor, I think we can lead a little bit

2   with him through that.

3          THE COURT:  That's fine.

4          MR. QUIGLEY:  I think frankly we're still deciding --

5   I know the form ADV issue is kind of -- has been briefed

6   already -- but there is kind of a slightly different issue than

7   the issue that's before your Honor.  This is more again by way

8   of Giglio for Dunkerley.  And I am happy to lead him through

9   that portion of his testimony a little bit so as we don't --

10  like I say, was there certain information that Michelle Morton

11  failed to disclose that you felt gave you leverage over her?

12  Without getting into detail as to what that information was.

13         MR. SCHWARTZ:  Well certain information about Jason

14  Galanis.

15         MR. QUIGLEY:  Well --

16         MR. SCHWARTZ:  Yeah.

17         MR. QUIGLEY:  It wasn't just Jason Galanis.  I think

18  it was the fact that -- the fact that people her purchase of

19  these firms -- Hughes and Atlantic had been financed by other

20  members of the conspiracy.

21         MR. SCHWARTZ:  I understand that's the proffer if you

22  were free-wheeling.  I'm suggesting that the way it could come

23  out is certain information about Jason Galanis, or to analogize

24  to Brutonize --

25         MR. QUIGLEY:  That would be in some ways be forcing

I5U7GAL7

1    the witness to give misleading testimony.

2            THE COURT:  But could you lead in a way that could

3    make that happen without it being misleading, obviously?

4            MR. QUIGLEY:  I don't think it's just Jason Galanis.

5    I mean I could say -- we could -- I think what I would say is I

6    could say something -- I'm thinking out loud here -- did

7    Michelle Morton fail to make certain disclosures -- without

8    getting into what those disclosures were -- that led you and

9    Jason Galanis to believe -- and Gary Hirst to believe -- that

10   you leverage over her.  Because that's who he discussed this

11   with.

12           THE COURT:  Why don't you talk about this.  All right?

13   See if you can work out language.  See if you can work out a

14   little bit of leading so that you only get out what you want to

15   get out but it's not misleading.

16           MR. QUIGLEY:  Just to be clear, we would not use this

17   testimony to argue I think --

18           THE COURT:  OK.

19           MR. QUIGLEY:  We will talk.

20           MR. SCHWARTZ:  OK.

21           THE COURT:  Why don't you talk.  Why don't you let me

22   know if the ADV issue is a still a live issue.

23           I will say, I don't think 4924, the childhood photo,

24   while very cute, is relevant, so I'm going to keep that out.

25           We talked about the so-called mug shots.

I5U7GAL7

1          On the stipulation regarding the convictions, people

2    in this case, I'm going to read it when the government asks me

3    to read it, but I will give whatever intro you can agree to

4    give, including that it was a joint stipulation, so you should

5    consider it to be evidence on both parties' behalf, but I'm

6    going to let you do that.  It seems like again that the

7    issue -- so for tomorrow it's really the Smith testimony, which

8    you're going to write a letter on.

9          What else is remaining?

10          MS. MERMELSTEIN:  I think there are a number of other

11    photos that Mr. Archer marked that the government objected to

12    besides the one of him and his wife as children.  Off the top

13    of my head there is a photo of Mr. Archer and his siblings as

14    children with his father and a magazine advertisement.  There

15    is a photo of what appears to be Mr. Archer in an advertisement

16    as a 20 something.  There is a photo of Mr. Archer on the

17    subway with his wife.

18          THE COURT:  So let me look at those photos tonight.

19          MS. MERMELSTEIN:  And there is a photo of a panda bear

20    that I can only assume is Mr. Schwartz joking with us, but --

21          MR. SCHWARTZ:  These are issues for like a month from

22    now.

23          THE COURT:  All right, fine.

24          MS. MERMELSTEIN:  That's fine, we don't have to deal

25    with it now.

I5U7GAL7

1            THE COURT:  OK.  But again, just to clarify for

2    purposes of tomorrow, so I can figure out how much time we

3    need, it's just the Smith issue -- which you are submitting

4    letters on -- is there anything else?  You are going to talk

5    about the ADV issue.  Is there anything else?  The Dunkerley

6    e-mails is resolved.

7            MR. QUIGLEY:  We're fine with them as long as the

8    language objected to is redacted to.

9            THE COURT:  So it's really the Smith issue, and that's

10   it.  All right, so I don't think we need to meet before 9:30,

11   so why don't we meet at 9:30.  OK?  Good night.

12            (Trial adjourned to May 31, 2018 at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

TIMOTHY ANDERSON

Cross By Mr. Schwartz . . . . . . . . . . . 471

Cross By Ms. Notari  . . . . . . . . . . . . 567

Redirect By Ms. Tekeei . . . . . . . . . . . 627

Recross By Mr. Touger  . . . . . . . . . . . 636

Redirect By Ms. Tekeei . . . . . . . . . . . 637

MICHAEL SMITH

Direct By Ms. Tekeei . . . . . . . . . . . . 639

GOVERNMENT EXHIBITS

Exhibit No.                            Received

 512   . . . . . . . . . . . . . . . . . . . 493

 122, 2433, 2436, 2441, 2664 and 2663  . . . . 648

```
 1                       DEFENDANT EXHIBITS

 2     Exhibit No.                              Received

 3     3156    . . . . . . . . . . . . . . . . 472

 4     4127    . . . . . . . . . . . . . . . . 489

 5     4600    . . . . . . . . . . . . . . . . 540

 6     3504    . . . . . . . . . . . . . . . . 577

 7     3703    . . . . . . . . . . . . . . . . 581

 8     3512    . . . . . . . . . . . . . . . . 592

 9     3512, 3532 and 3519  . . . . . . . . . . 606

10     3532    . . . . . . . . . . . . . . . . 606

11     3520    . . . . . . . . . . . . . . . . 608

12     371  . . . . . . . . . . . . . . . . . . 618

13

14

15

16

17

18

19

20

21

22

23

24

25
```