I647GAL1

```
UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                      16 Cr. 371 (RA)

JOHN GALANIS, et al.,

              Defendants.

------------------------------x
                                      New York, N.Y.
                                      June 4, 2018
                                      9:30 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                      District Judge


                        APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY:  BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
         Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
     LAURA HARRIS
```

I647GAL1

Appearances (Cont'd)


PAULA J. NOTARI
     Attorney for Defendant Bevan Cooney
          – and –
O'NEILL and HASSEN
     Attorneys for Defendant Bevan Cooney
BY:  ABRAHAM JABIR ABEGAZ-HASSEN



Also present:  Kendall Jackson, Paralegal
               Ellie Sheinwald, Paralegal
                    Eric Wissman, Paralegal
                    Special Agent Shannon Bienick, FBI

I647GAL1

1          (Trial resumed, jury not present)

2          THE COURT:  Good morning, everyone.  I want to talk

3     about the dispute relating to the Code Rebel evidence.  I know

4     this issue originally came to light in the context of

5     Mr. Schwartz's objection to Government Exhibit 1286, but now we

6     have a broader dispute regarding the admissibility of an entire

7     category of evidence, the distribution by Jason Galanis to

8     various alleged coconspirators of shares of Code Rebel stock

9     that were not purchased using proceeds from the WLCC bond

10    issuances.

11         I have your most recent submissions, but I want to ask

12    a few questions, and then if there is anything you'd like to

13    add to your submission, I will give you the opportunity to do

14    so.

15         So, first, Mr. Archer notes that Government's Exhibits

16    1213, 1245 and 1286 were marked just in the last two weeks, and

17    I believe the government touched on this in its letter of

18    yesterday, but just to confirm, which exhibits included in the

19    government's initial exhibit list produced on March 20 related

20    to the purchase of shares of Code Rebel with funds other than

21    bond proceeds?  Like what is new basically?

22         MS. MERMELSTEIN:  So, I should clarify, your Honor,

23    that it's not the government's view that with respect to those

24    pre-IPO shares they were purchased with proceeds other than the

25    bond proceeds.  They weren't purchased.  They were --

I647GAL1

1          THE COURT:  -- transferred.

2          MS. MERMELSTEIN:  They were given by Jason Galanis as

3   part of -- they were issued in connection with sort of pre-IPO

4   preparations purportedly to people who had sort of participated

5   in helping with the IPO.  None of those people paid for them,

6   and no one paid for them, so just to be clear.

7          THE COURT:  For any of them.

8          MS. MERMELSTEIN:  Correct.

9          MR. SCHWARTZ:  Except for Mr. Archer's.

10          MS. NOTARI:  And Mr. Cooney.

11          MS. MERMELSTEIN:  So, that's a factual dispute, I

12   think.  As we've said, there are two categories of shares:

13   There were the shares that were issued -- sort of just issued.

14   That includes Mr. Cooney's shares.  He did not pay for them.

15   If he wants to contend now that he did, he can do that.  It's

16   not true.

17          With respect to Mr. Archer's shares, as we've set

18   forth, those were papered through a purported convertible note

19   that he did not pay for.  He then at the time of the IPO the

20   convertible note converted, and Rosemont Seneca Bohai received

21   something like a half million shares pursuant to the

22   convertible note.  The other two convertible note holders, not

23   insignificantly were Francisco Martin and Ralph Berger, Jason

24   Galanis' father-in-law.

25          So with respect to -- now I've lost track of your

I647GAL1

Honor's question -- what other documents pertain to that fact?

THE COURT:  I just want to know what is new so that I can assess Mr. Schwartz' and Ms. Notari's argument that they weren't on notice in part because of what was on your initial exhibit list and what wasn't.

MS. MERMELSTEIN:  So, I think that the only two new exhibits I can think of -- three that pertain to this are the following:  One is although the Continental stock transfer records that were previously in the government's possession make clear that Rosemont Seneca Bohai received shares at the time of the IPO, they did not make clear how that had been done and what direction was given.  The government received from Continental's stock transfer, after the trial had begun, the documentation that was essentially the directive to convert the convertible notes.  It didn't have it before trial.  When it received it, it produced it the same day to the defendants.

Mr. Archer signed a convertible note.  There is an e-mail in which he forwards the signed version to Jason Galanis.  Although Mr. Schwartz asserted in court that there is no such note and Mr. Archer didn't sign it, it exists and the government marked that as an exhibit.

And there is this e-mail with respect to Mr. Dunkerley concerning the opening of the RSTP Capital account which, as I've said, is necessary only in the event that Mr. Archer is going to somehow claim that it was actually his funds that paid

I647GAL1

1     for those shares.  To the extent that --

2          THE COURT:  And that's 1286.

3          MS. MERMELSTEIN:  Correct.

4          THE COURT:  How long has this been your theory that

5     this is essentially how they were paid for their involvement in

6     the WLCC scheme?

7          MS. MERMELSTEIN:  Your Honor, I think this has been

8     our theory for many, many, many months, if not since the

9     beginning of the case, and I understand that there is a

10    disagreement now about what everyone's understanding was, but

11    as we quoted from the record, in arguing that the pump and dump

12    should come in, I said many times that the government's view

13    was that people received these Code Rebel shares in return for

14    nothing, and that because that was true, the way in which those

15    shares had been caused to increase in value was relevant.

16          But even without the way in which they were caused --

17          THE COURT:  But wasn't part of the way that the Code

18    Rebel scheme was going to work is only if the shares were

19    controlled by certain individuals and entirely, so that there

20    was a reason that those people needed to have those shares,

21    those people allegedly in on the pump and dump scheme?

22          MS. MERMELSTEIN:  Yes, it is true the government's

23    contention is that as part of the pump and dump scheme the

24    defendants sought to control the entirety of the public float

25    in order to be able to manipulate the stock price.  But the

I647GAL1

1    government was clear that it's view from the beginning was that

2    -- I mean I can quote again from the record.  We said they

3    received these shares for nothing.  The point was never just

4    that they could then be controlled; it was that they then owned

5    these shares and that these shares had value.  And the fact

6    that the pump and dump doesn't come in does not change that

7    analysis.  And for the defendants to get up in opening and say

8    we didn't get anything, we lost money, when they in fact had

9    received all of these shares, and they deposited these shares

10   into accounts they controlled, Mr. Cooney then got a loan on

11   the basis of those shares.  Mr. Archer started to question Ms.

12   Driever about this, about revolving loan agreement that relied

13   on the assets in the account.  So, even if they never intended

14   to sell these shares, they then used those shares to benefit

15   themselves.  And keeping it out in a case that like all white

16   collar cases is going to be about sort of circumstantial

17   evidence, suggesting they didn't get anything when that's not

18   true I think is incomprehensible.

19        THE COURT:  I just want to make sure I understand your

20   good faith basis for believing that this is why those shares

21   were transferred to these individuals, that it was essentially

22   pay-back for the WLCC scheme or their involvement.  And, as I

23   understand, your position is that the factual basis underlying

24   the inference that you urge has to do with the timing of when

25   the Code Rebel shares were distributed, the Code Rebel IPO's

I647GAL1

relationship to the bond scheme -- and by that I mean that some
of the shares were purchased using bond proceeds -- and the
profits from the pump and dump were used to make an initial
payment on the bonds, and the overlap between some of the
individuals who participated in the scheme and those who
received Code Rebel shares.  Is that right?

          MR. QUIGLEY:  I think it's right with two more things
I would add.  One is in addition to using the shares to benefit
themselves -- as we pointed out in our letter -- the Code Rebel
shares were like the Wakpamni bonds used to support the
businesses that these defendants were trying to roll up.

          So, what is clear if you look at the entirety of the
Code Rebel story is that Code Rebel shares were used as a
currency in this scheme in many ways.  They were used for net
capital, they were sold to make interest payments, they were
used to pay various individuals.  And it's not just the fact
that if you look at who got these shares it's like a laundry
list of unindicted coconspirators; it's that Francisco Martin
is going to say I was paid these shares, right, for my role in
this scheme.  So it's obviously an inference but --

          THE COURT:  And that was disclosed in 3500 material?

          MS. MERMELSTEIN:  Yes.

          THE COURT:  And of that list -- included I think in
Mr. Archer's letter -- was everyone who got the shares somehow
involved in WLCC scheme, or a relative, or somehow related to

I647GAL1

people who were involved in that scheme?

MS. MERMELSTEIN:  So, I think if you look at the list in our letter of Friday of who got the shares, it's the letter dated June 1, we can't tie out every single one.

With respect to some of these, I think that the government could proffer reasons to think that these are additionally related, although we're not prepared to prove it at trial.  But Arben Kryeziu, who obviously is Arben Kane, he was the CEO of Code Rebel, Bipoflis his partner, Sugarman, Insurance Company of --

THE COURT:  Give me one second.  Yeah, it was your letter.  I misspoke.  It was the June 1 letter.  So I'm looking at the list on page 2 and 3.

MS. MERMELSTEIN:  Sure.  So without committing that we wouldn't be able to come up with evidence if it was necessary that more of these were involved, Insurance Company of America is Gary Hirst's company; Condor is Francisco Martin's company; Dunkerley is Hugh Dunkerley, obviously; Thorsdale is Galanis, Zasis is related to Hirst; VL Assurance is an entity involved in this very scheme; Cooney speaks for itself; Hilltop Trust is a trust associated with Monet Berger, Jason Galanis' wife; Elizabeth Sugarman is Jason Sugarman's wife; Gary Hirst speaks for himself; Rachel Cooney was Mr. Cooney's then wife; Curante is associated with Hirst; Nancy Nyacht is associated with Hirst; and John Greenwood, as your Honor will recall is one of

I647GAL1

1    the individuals whose name was put on the Thunder Valley and

2    Seymour Capital accounts as a cover to make it look like it

3    wasn't all being controlled by the same group; and Francisco

4    Martin will testify to that fact.

5              So, an enormous percentage of these shares are being

6    given to sort of the players.  And Mr. Archer in arguing that

7    1240 might have had other meanings says, look, the government

8    may have wanted to prove that Dunkerley got shares for this,

9    and Hirst got shares for this, and Martin got shares for this.

10   And that's exactly right, the people who got these shares were

11   being compensated for their role in the scheme, and for the

12   defense to say you can say that about everybody but us is

13   unreasonable.

14             THE COURT:  OK.  Even if I were to allow you to

15   introduce that evidence of these share transfers, why should I

16   permit you to elicit the fact that the value was $19 million as

17   opposed to the $485,000 or $500,000, whatever it was, at the

18   time it was transferred?

19             MS. MERMELSTEIN:  Well, I think your Honor is of

20   course right to see that those things are not the same, that

21   your Honor could easily allow evidence that these defendants

22   received shares, step one, without getting into the increase of

23   the value.  But your Honor in precluding the pump and dump

24   scheme found that it was just more prejudicial than probative,

25   not that it didn't happen, and the reality is that the pay-out

I647GAL1

1    to these defendants was not hundreds of thousands of dollars,

2    it was tens of millions of dollars, by the very actions of

3    these defendants.

4              THE COURT:  Just to be clear, I didn't find as a

5    factual matter that they knew what was involved in the pump and

6    dump scheme.  I mean I didn't rule one way or the other on

7    that.

8              MS. MERMELSTEIN:  I understand that, your Honor, but I

9    think my point is that it was ultimately I guess -- first of

10   all, I'm not sure it matters if -- I mean to be clear, the

11   government's view is they of course understood that was being

12   done.

13             But say they didn't.  The jury is entitled to

14   understand the amount of the payment that these defendants

15   received for participating in the fraud, and the value of that

16   pay-out from Jason Galanis was not hundreds of thousands of

17   dollars; it was tens of millions of dollars, however it got

18   there.  And the government is not intending to elicit how it

19   got there, just that the value of what they were given had a

20   particular value.  And it's in bank statements in their

21   accounts what that value is; it's not hard to ascertain.

22             I think it's misleading to the jury to suggest that

23   what these defendants received for their participation in

24   moving around millions and millions of dollars was only

25   hundreds of thousands of dollars, which isn't what happened.

I647GAL1

1          And I don't think this is a jury that's going to have

2     an inherent sense of what a pump and dump scheme is, that

3     eliciting that they received these shares without discussing

4     what those shares were worth on the day they were received, and

5     then looking at an account statement that reflects what they

6     were worth, is not going to suggest some other nefarious

7     conduct; it's simply going to inform the jury accurately the

8     value of the pay-out.

9          THE COURT:  And what do you make of the fact that

10    according to Mr. Archer the shares were transferred out of

11    Rosemont Seneca Bohai for no consideration ultimately?

12         MS. MERMELSTEIN:  Well I believe that where they went

13    was Wealth Assurance Holdings.  I guess what I would say is,

14    exactly right, he is using -- what they're constantly doing is

15    they're moving around shares and bonds that don't have the

16    value they sort of purport to have, for all kinds of purposes

17    in supporting each of these business endeavors, and so that Mr.

18    Archer -- just as he transferred the Wakpamni bonds to VL

19    Assurance and then in part to Burnham -- bonds he did not pay

20    for and then was using to support other businesses -- is not in

21    any fashion inconsistent with the government's theory for him

22    to take the Code Rebel shares and use them for another purpose

23    in connection with the roll-up.

24         MR. SCHWARTZ:  What was the purpose?

25         MS. MERMELSTEIN:  I don't think -- I mean -- well, I'm

I647GAL1

1    not going to answer that question.  I mean the transfer by Mr.

2    Archer, consistent with his practice in this case repeatedly,

3    to yet another one of the entities involved in the roll-up

4    speaks for itself.

5         THE COURT:  Last question in terms of timing.  Other

6    than the issue with respect to 1286, when did you seek to admit

7    this evidence?  Is it through Mr. Dunkerley?  Through Francisco

8    Martin?

9         MS. MERMELSTEIN:  I mean I guess what I would say is

10   it's not the exhibits that are coming in through Mr. Dunkerley.

11   Obviously, we will call a Continental stock transfer

12   representative.  The transfer records I don't think quite speak

13   for themselves; they are sort of confusing without a little

14   explanation.  But both Mr. Dunkerley and Mr. Martin have

15   information about their receipt of Code Rebel shares, about

16   what they understood Jason Galanis to be doing with the Code

17   Rebel shares that is relevant.

18        THE COURT:  And is that in the 3500 material, that Mr.

19   Dunkerley understood that he got Code Rebel shares as payment

20   for his participation in the WLCC bonds scheme?

21        MR. QUIGLEY:  Your Honor, with respect to Dunkerley,

22   where it would come in his Q and A is he was essentially the

23   investment banker for the Code Rebel IPO, although he would say

24   that he didn't have to do anything because all the purchasers

25   of those shares had been identified by Jason Galanis.  Where

I647GAL1

1    it's especially relevant is going through the bank records with

2    him, to show how the proceeds of the fourth bond issuance were

3    distributed.  He will identify certain companies as companies

4    that were involved in the Code Rebel IPO.

5              THE COURT:  So I have to decide this now, basically.

6              MR. QUIGLEY:  I think so.

7              THE COURT:  OK.  And why were these exhibits marked

8    late?

9              MS. MERMELSTEIN:  Well, one of them was received only

10   after the trial started; it was marked the same day; so, it was

11   marked when it was gotten.

12             The other one -- look, obviously it was in the

13   possession of the government; it was in the possession of the

14   defense; there is no secret there.  But this is a complicated

15   trial, and as the facts unfold and the government works to

16   solidify the proof, in Mr. Archer's assertion that --

17             Look, the reality is I think that the government

18   realized it had not marked an exhibit that was relevant to the

19   story in starting to think about summary charts, and when it

20   realized it had not marked that exhibit, it marked that exhibit

21   in order to tie out the fact that those shares that Mr. Archer

22   received were shares he had not paid.

23             MS. NOTARI:  Can I speak with cocounsel?

24             THE COURT:  Yes.

25             MS. NOTARI:  In the case of Mr. Cooney, part of the

I647GAL1

1    problem here is that we keep having to preview our defense

2    strategy, which is really problematic because we have to

3    divulge what we know of the evidence, and then we're simply

4    giving our strategy.

5            THE COURT:  I'm not asking you, just to be clear.

6            MS. NOTARI:  I understand.  So it's very difficult for

7    me to lay out, but I can assure you that Mr. Cooney was paid

8    for these shares.

9            But more problematic than that is Mr. Cooney -- Arben

10   Kane was behind Flikdate and Code Rebel, and he was doing --

11   his job was that of someone who works with start-up companies

12   and IPOs, and he had had success with that in the past, and he

13   would get -- he would do all of the leg work, and he would get,

14   you know, in the IPO world you get shares at a discounted

15   price, friends and families.  There is all of this evidence

16   that we have not -- you know, we have not been able to focus

17   on.

18           When I am reviewing the last couple months I'm

19   reviewing -- since the court's ruling, as I go through the 3500

20   material and these different witnesses, I'm not focused on this

21   portion of the evidence and all of this IPO evidence.  You

22   know, I'm so prejudiced.

23           THE COURT:  I mean I don't know if this is in the

24   letters, but the thing that stuck out from this morning is if

25   it was really in Francisco Martin's 3500 material, that he was

paid-- that he was essentially paid for his involvement in the
WLCC scheme with these shares --

            MR. SCHWARTZ:  That's not what it says.  It says that
he received the shares as compensation for the pump and dump.
Francisco Martin was the person who did the Code Rebel pump and
dump.  There is nothing in the 3500 connecting his statement
about compensation to the WLCC bonds.

            And it doesn't make sense, right?  It doesn't make
sense.  The conduct about Code Rebel they're talking about, the
distribution of pre-IPO shares, was before, way before the very
first bond offering.  There were no WLCC bonds.

            At best there was a nascent idea that Jason Galanis
and Tim Anderson and John Galanis and Raycen Raines had about
WLCC bonds.  At best Mr. Archer and Mr. Cooney at that point
knew that that idea generically existed, but they had no
involvement.  There was no at that point first bond issuance
let alone second bond issuance.  This is a theory that the
government has come to very, very late.  All right?

            In addition to the documents that I pointed out in my
letter, another document -- if I can pull this up -- it's
Government Exhibit 601, they produced this to us on Friday,
after this issue was already raised with your Honor.  This is
the wire record from Jason Sugarman's lawyer, Dan White, to
RSTP Capital.  This is the wire record that they say evidences
the $485,000 that went to the purchase of the Rosemont Seneca

I647GAL1

Bohai Code Rebel shares.  They produced this to us on Friday.
Right?

It is obvious that they realize that their theory of
compensation was wrong, and so they've had to come up with some
entirely new cockamamie theory that doesn't make sense, and now
they're searching for the evidence of it.  And they're
producing it just like they're introducing tons of other new
exhibits, by the way.  We haven't complained about this, but
yesterday we got ten new government's exhibits.  Throughout the
course of this very complex trial we keep getting more
exhibits, more discovery, more exhibits, more 3500, and at some
point there has to be a stop to it.  But this in particular,
this entire theory, it's wrong and it's counterfactual.

Let me say a few things.  The first and most important
thing is Mr. Archer and the Code Rebel shares that Mr. Archer
and Rosemont Seneca Bohai supposedly received are different
from every other thing that Ms. Mermelstein just talked about.
The chart that your Honor was looking at on page 2 of the
Government Exhibit's June 1 letter, it has a chart of all of
these people that were supposedly gifted for no consideration
pre-IPO shares of Code Rebel.  Mr. Archer is not on that chart.
Rosemont Seneca Bohai is not on that chart.  That is not a way
that he or any entity associated with him received any shares
of Code Rebel.

Their theory is that he received shares of Code Rebel

I647GAL1

 1    in two ways:  One, he went into his pocket and paid $200,000

 2    for some shares; two, their theory is Jason Sugarman paid

 3    actual cash -- having nothing to do with the WLCC bonds --

 4    $485,000, and those shares ended up at Rosemont Seneca Bohai.

 5    But those are paid for shares; they are not gifted shares.

 6    That's different than everything else.  So their theory of

 7    compensation --

 8              THE COURT:  I think I just heard them say they weren't

 9    paid for.  I mean is that a factual dispute?

10              MS. MERMELSTEIN:  No.  So let me be clear.  While 601

11    is up, your Honor, you know, Mr. Schwartz obviously doesn't

12    know what the government has been thinking about this case

13    ever.  This has been our theory for some time.  It is clear in

14    internal government dialog about it.  We knew this wire -- this

15    wire transfer is evidenced on the bank records that were

16    produced as just being from Dan White.  There are other Dan

17    White wire records that make clear that they are sort of

18    re-Jason Sugarman.  We have been trying to get this specific

19    document from the Banc of California.  The day we got it, we

20    produced it.  But we knew it existed and had been looking for

21    it for some time.  It is not the case that we went out and got

22    it on Friday.

23              With respect to the RSTP issue, as we set forth in our

24    letter, there are two categories here.  There are the shares

25    that were just given out by Jason Galanis -- that's the chart

I647GAL1

1    that's in our letter.  There are separately the three

2    convertible notes, which not to belabor the same point, it's

3    Rosemont Seneca Bohai, it's Francisco Martin and Ralph Berger,

4    Jason Galanis' father-in-law.  It's not a group you want to be

5    a part of.  Those shares were paid for in that there was a wire

6    transfer into the Code Rebel account.  That money was not sent

7    by Mr. Archer.  He didn't pay for them.

8           So that money got moved around to make it look like

9    this was actually being funded is irrelevant.  He got something

10   for nothing.  It is no different than if Jason Galanis had

11   given him the cash.

12          And, if I am recalling correctly, that money goes

13   right back out to Thorsdale, so it doesn't even actually sort

14   of sit for the benefit of Code Rebel; it's a round trip to make

15   things look legitimate.

16          I think the other thing that is getting lost in this

17   conversation is you cannot draw a bright line between Code

18   Rebel and the bonds; this is one scheme.  There was one

19   enormous effort to defraud, and it had a lot of pieces.  And

20   the effort to draw a bright line and say this is Code Rebel and

21   that's the bonds, it doesn't work because that's not how this

22   was effectuated.  And that's exactly clear from someone like

23   Francisco Martin.  His view is not I got paid for Code Rebel.

24   His view is I got paid for this fraud in connection with the

25   whole system with Jason Galanis that includes both his role as

I647GAL1

1    private equity manager and his role in manipulating the price

2    of Code Rebel, and directing the share of sales that were used

3    to make the interest payments.

4          It cannot be that finally divided.  And the

5    defendants' efforts to parse everything into these narrow

6    windows is an effort to keep out the evidence that demonstrates

7    that they received so much money.

8          THE COURT:  The problem is though that I ruled that I

9    was keeping out the pump and dump aspect of Code Rebel, and

10   that ruling stands.  The new question is how can defendants

11   address this evidence, to the extent they choose to, without

12   eliciting the fact that there was a pump and dump scheme.

13         MS. NOTARI:  Exactly.

14         MS. MERMELSTEIN:  That's only, your Honor, with

15   respect to the ultimate value of the shares; it's not true with

16   respect to the receipt of the shares, which have nothing to say

17   about a pump and dump.

18         MS. NOTARI:  I want to reveal one thing.  Again, I

19   would be more than happy to meet with the court ex parte and go

20   through my evidence of Mr. Cooney, and I'm not prepared to

21   disclose that, because I don't think I should.  But clearly

22   they're saying that in May of 2014, you know, Mr. Cooney for a

23   living, he is working with Arben, he is working with Flikdate.

24   The Billy Crafton tape that the government doesn't want to go

25   into evidence is all about Mr. Cooney's work on Flikdate and

I647GAL1

| | |
|---|---|
| 1 | how he is working with Arben and this is Code Rebel, but May |
| 2 | 14, 2014 the government's letter says, you know, they get these |
| 3 | Code Rebel shares -- which is before they ever buy the bond -- |
| 4 | and now we know from Tim Anderson and from the e-mails that |
| 5 | came out that Mr. Cooney was like the backup plan; he wasn't |
| 6 | even scheduled to be an investor; it was like a last minute |
| 7 | thing that Jason Galanis was part of. |

8              And so how does that show that there is any
9      relationship between Code Rebel and -- it's just they're
10     literally -- this is like, you know -- I'm trying to think of
11     an analogy, but it's like prosecuting a doctor for touching a
12     patient, without the jury knowing, you know, all of the
13     background evidence as to what the nature of a doctor/patient
14     relationship is, and the touching is basically required to give
15     the physical exam.

16             Now, that may not be the perfect analogy.  And one
17     more thing.  Yesterday we realized -- we went on Relativity,
18     which is, we have been sharing the defense discovery with
19     Morton and Gary Hirst's attorneys.  They shut down Relativity.
20     We can't even do discovery searches anymore.  We spoke with the
21     people yesterday who were in charge of that, and they said it's
22     going to cost $12,000.  Yesterday we couldn't do any research
23     or go through the documents.

24             I mean this is the kind of thing we're dealing with
25     day by day, and they're just like pouring things on us.  We're

I647GAL1

1    having to deal with -- I'm only one person.  Mr. Hassen is

2    helping me, but it's just not fair.  It's hard to even

3    concentrate on tomorrow's witnesses because we're constantly

4    dealing with these side issues.

5              THE COURT:  Mr. Schwartz?

6              MR. SCHWARTZ:  All right.  So, I think where I was was

7    I had said Mr. Archer's shares, unlike everyone else on that

8    chart on page 2, were paid for.  And you asked the government

9    if that was true, and I think the answer was, yes, that was

10   true.  And the page that's up on the screen is the wire that

11   proves that that's true.  It was just produced to us on Friday,

12   but that is the $485,000 that they say is transferred from Dan

13   White to RSTP Capital, and then from RSTP Capital to Code Rebel

14   to pay for the shares.

15             Now, Ms. Mermelstein said, well, this is a gift from

16   Jason Galanis and these guys are all moving money around.  But

17   what is the evidence of that?  This is money -- even on their

18   theory -- that comes from Jason Sugarman, not Jason Galanis.

19   There is no connection in anything that they have produced to

20   us that says that this is Jason Galanis.  This is not an

21   argument that the government can make based upon this evidence.

22   That's point one.

23             Point two, your Honor is exactly correct that even if

24   they were permitted to make that argument, we couldn't meet it

25   without getting into the pump and dump evidence, because the

I647GAL1

only -- the only evidence about Code Rebel stock as
compensation anywhere in all the discovery, in all the
government exhibits, in all the 3500, is the line from
Francisco Martin, and he received compensation I say just for
the pump and dump, Ms. Mermelstein says for everything, but the
one thing that is undeniable is that Francisco Martin was the
person with Jason Galanis who was presiding over the pump and
dump.  So, the logical way to impeach that argument is to point
out that he was presiding over the pump and dump, but I can't
do that without opening the door to the pump and dump, which I
shouldn't have to make that choice.

          THE COURT:  I just don't understand why this didn't
come up in the context of the 404(b) discussion regarding Code
Rebel.

          MR. SCHWARTZ:  Right.

          THE COURT:  I mean why am I learning about this for
the first time?  I understand the defendants' position is why
they are learning about this for the first time.

          MR. SCHWARTZ:  Yes.

          THE COURT:  But it does make it a lot harder when it
was not clear to me at the time that I made that decision.

          MS. MERMELSTEIN:  Well, your Honor, I certainly wish I
had made it clearer, but respectfully I don't think that this
was withheld by the government in any fashion.  It's not
404(b).

I647GAL1

1          THE COURT:  It's not, but neither is the fact that the

2     bond proceeds then went to Code Rebel.  But still you argued to

3     me that that's why you needed it, and then you argued to me

4     that you needed the proceeds from Code Rebel going to pay the

5     interest payments, and that's why I allowed those facts in,

6     because you advised me of them, because I didn't view them as

7     404(b), but now I'm hearing about this, and it's frustrating at

8     the very least.

9          MS. MERMELSTEIN:  I apologize, your Honor, that it

10     wasn't more clear; we certainly wish it had been.  This is

11     important evidence, and it needs to come in, and I wish it had

12     been teed up earlier.  There is no reason -- I wish we weren't

13     having this conversation now.

14          To be clear, the Code Rebel has to be teed up -- first

15     of all, we noticed things as 404(b) that are plainly not 404(b)

16     in an abundance of caution.

17          THE COURT:  That I get.  And those two facts that I

18     just mentioned I didn't view as 404(b), which is why they're

19     coming in.  But in the context of that discussion I just don't

20     understand why we weren't having a more fulsome discussion so

21     that I could understand the context of everything that was

22     happening in connection with Code Rebel.

23          From my recollection -- and correct me if I'm wrong --

24     Code Rebel is mentioned in the complaint but it's not mentioned

25     anywhere in the indictment, right?

I647GAL1

1          MS. MERMELSTEIN:  I think it's referenced as

2     technology company one, but I could be wrong.

3          THE COURT:  In any event, go on.

4          MS. MERMELSTEIN:  But, your Honor, I think that -- I

5     think it's unfair to the government to say that having been

6     cautious in trying to identify things that are not even 404(b),

7     to tee them up earlier, that it should be penalized for

8     anything that isn't 404(b) that it sort of didn't include in

9     that vastly over-noticing.

10          THE COURT:  But it didn't bear on whether the 404(b) I

11     ruled is not coming in may have to come in, or the defendants

12     may open the door to it.  That's why we teed these things up

13     earlier.  Because if they're in a position to not being able to

14     properly cross-examine a witness about like Francisco Martin

15     about exactly what he was being paid for -- was it in

16     connection with the Code Rebel pump and dump scheme, or was it

17     in connection with a whole host of fraudulent schemes -- how

18     are they supposed to do that cross-examination?

19          MS. MERMELSTEIN:  Well, your Honor, I don't think

20     that -- again, first of all, with respect to Code Rebel, it's

21     the pump and dump.  It never occurred to the government that

22     people's receipt of these shares could in any fashion be seen

23     as 404(b), and that Mr. Martin sort of committed other

24     additional crimes that the defendants want to keep out, then

25     obviously they can't ask him about those things.  I mean he did

I647GAL1

them; he would say he did them if you asked him.  Indeed, he has admitted it to the government.  But with respect to cross-examining him, if you want to keep out the fact that there was a Code Rebel pump and dump, then obviously you can't cross-examine him with respect to the fact of the Code Rebel pump and dump.

He is going to nonetheless obviously describe for the jury the fact that he opened these accounts, that he received Code Rebel shares into the accounts, that they were not in fact his shares, that John Greenwood was not in fact controlling the account that his name was on, and that he then sold those shares at the direction of Galanis and Hirst and transferred the money at their direction.

We're not going to elicit anything about the manner in which he sold them, and sort of when he sold them, and those kinds of things because that's the pump and dump evidence.  But the fact that he runs the accounts that hide the fact of Galanis and Hirst's involvement with the Code Rebel shares, and transfers the money that goes to the interest payment, they can certainly cross-examine him on the extent to which his payment with Code Rebel shares was in connection with his opening of those accounts and his sale of those shares, without getting into the fact that that was a pump and dump scheme.  So, that's available to them as cross-examination.  They are not in any fashion limited from trying to suggest that the Code Rebel

I647GAL1

shares were not in fact payment for the Wakpamni scheme.

THE COURT:  But I thought you said earlier he is going
to testify that he was getting Code Rebel shares in part for
his involvement in the WLCC scheme.

MS. MERMELSTEIN:  Yes.  He doesn't see the WLCC scheme
and the Code Rebel scheme as being different things, your
Honor.  He was recruited by Jason Galanis to commit a fraud,
which he did.  He sees those things as part and parcel of one
scheme, which they are.  So, certainly he can be asked about
sort of wasn't this really more payment for this conduct than
that conduct, and the conduct is --

THE COURT:  So, how are you going to elicit from him
the fact that he got those shares for the WLCC scheme, that was
his understanding, but not get out the pump and dump?

MS. MERMELSTEIN:  Because I think, your Honor, his
conduct with respect to the Code Rebel shares is nefarious and
criminal without the pump and dump scheme.  He is opening
accounts, one in his own name, one is someone's else's name
that he has never met, for the purpose of concealing the true
ownership of those shares, and then he is moving those shares
around at the direction of other people for the purpose of
hiding their involvement.  So his sort of eliciting that he was
paid for his involvement in opening those accounts and for the
purchase and sale of the Rebel shares does not get into the
pump and dump; that gets into exactly what everyone agrees is

I647GAL1

1    allowed, which is the money was used to buy those shares, those

2    shares were then sold and the money was used to make interest

3    payments.

4            And I don't think the jury is going to understand the

5    difference between the pump and dump and the secret account,

6    sort of accounts you don't really own.  He was doing things he

7    wasn't supposed to be doing, and he got paid for it, and so I

8    don't think that's a problem at all.

9            MR. SCHWARTZ:  I mean, look, I think what the

10   government has just described is part of the pump and dump.  I

11   mean the reason why accounts had to be opened in the way they

12   were is because apparently Francisco Martin and Jason Galanis

13   intended to manipulate the price of Code Rebel.  That's not an

14   inherent part of taking bond proceeds and investing them into

15   Code Rebel, or redeeming Code Rebel, or borrowing against Code

16   Rebel and using it to pay the coupon on the bond; it's part of

17   the pump and dump.  So, I think that should be excluded.  But

18   honestly I don't care about it that much because it doesn't

19   involve Mr. Archer at all.  The only thing I care about is the

20   insinuation that shares that he received that were fully bought

21   and paid for were somehow compensation.

22           And I cannot -- beyond everything else, I cannot

23   effectively cross-examine Francisco Martin on this point

24   without referencing the pump and dump, because that is why he

25   was paid in that currency, and that's why it was valuable

I647GAL1

currency to him.  Right?  It was a valuable currency to him

because he understood that he was going to be involved in the

pump and dump.  That's a critical point.

Even on their theory where Mr. Archer was rewarded

with shares of Code Rebel by Jason Galanis -- even though there

is no evidence that Jason Galanis had anything to do with those

shares, and the money came from Jason Sugarman -- even on that

theory it's $485,000 in shares more than a year or a year

before the IPO.  All right?  That's not the promise of tens of

millions of dollars without reference to the pump and dump.

That's $485,000 in the form of a loan to a pre-IPO tech company

that's probably worth less than $485,000 at that particular

moment.

And the government's desire to prove up tens of

millions of dollars in profits is crazy to me.  Even if all of

this other stuff comes in, certainly that cannot come in.

That's like saying, you know, he was rewarded with the rookie

card for a baseball player today that was worth a quarter out

of a pack of baseball cards, and then five years from now, when

that became the greatest baseball player in the history of the

world, and the card was worth a lot of money, then he had all

that money and that was the reward.  No, the reward was a

baseball card worth a quarter.

Here, even on their theory in the best of worlds the

reward was $485,000 in a high risk convertible note.  But even

I647GAL1

1    that theory doesn't hold up.  Again, there is zero evidence,

2    and they haven't articulated any evidence to suggest that this

3    was compensation to Mr. Archer.  The very best thing that they

4    have to even support that inference is Francisco Martin saying

5    that he received shares as compensation for wholly different

6    conduct, and I can't cross him on that.  And if you exclude

7    that bit of testimony, there is zero, truly zero, that supports

8    the inference that this was compensation to Mr. Archer.

9            Again, Mr. Archer's shares in the Rosemont Seneca

10   Bohai shares are different from every single other person

11   listed on that chart on page 2 of the government's letter, let

12   alone the hundreds upon hundreds of people that are listed in

13   the Exhibit 1040 that the government said supposedly put us on

14   notice of this theory.

15           And this is not a theory with respect to Mr. Archer

16   and the unique way that he and Rosemont Seneca Bohai acquired

17   these shares that we have ever had notice of.  The government

18   has not pointed in all of these pages of briefing to a single

19   time where they've ever articulated this theory with respect to

20   Mr. Archer.

21           They have talked about prior to your Honor's ruling

22   the gifting of pre-IPO shares, but the gifting of pre-IPO

23   shares plainly -- to me at least -- refers to the chart on page

24   2 of the shares that were distributed with no consideration.

25           Mr. Archer's shares, the Rosemont Seneca Bohai shares,

I647GAL1

|     |                                                                          |
|-----|--------------------------------------------------------------------------|
| 1   | were fully paid for.  Now, they say not paid for by Mr. Archer,           |
| 2   | paid for by Mr. Sugarman, but what is the connection in their            |
| 3   | mind back to Jason Galanis?  It's not Galanis' money; it's not           |
| 4   | money that has anything to do with the WLCC bonds; it is just            |
| 5   | money -- even on their theory -- from Jason Sugarman that was            |
| 6   | paid in before there were any bonds, a year before the IPO.  It          |
| 7   | has nothing to do with anything.  There is no evidence                   |
| 8   | connecting this to anything, but they just want to show Archer           |
| 9   | received some shares, those shares became worth tens of                  |
| 10  | millions of dollars, therefore that was the reward, he is               |
| 11  | guilty.  And that inference is not supported even by their              |
| 12  | evidence, even if they had given us disclosure of this a year           |
| 13  | ago.  But they didn't, they sprung it on us in the middle of            |
| 14  | trial, in direct contravention of the language of your Honor's          |
| 15  | ruling.  And again this was an issue on which --                        |

THE COURT:  In fairness, I don't know if it was in
direct contravention of the language of my ruling.  Maybe the
spirit -- because I didn't know about this -- because I don't
think it was before me one way or the other, but in any event,
we need to do this now; we can't go ahead with Dunkerley.
Because again I know you're worried about timing and yet --

MR. QUIGLEY:  The only thing we would ask -- I would
intend to get into with Dunkerley the fact that he did not --
even though he was the investment banker for the IPO theory, he
did not actually have to go out and solicit anyone, because the

buyers of the IPO shares had been identified already.

THE COURT:  Without identifying who they are?

MR. QUIGLEY:  We can do that, your Honor.

THE COURT:  All right.

MR. QUIGLEY:  And go through -- and I think this is
squarely within the orbit of what your Honor's ruling
allowed -- is go through the disposition of proceeds from the
fourth bond issuance and show that they went to entities that
were involved in the Code Rebel IPO.

THE COURT:  So can we proceed with Dunkerley?

MR. SCHWARTZ:  I think if the proffer is that the Code
Rebel testimony is just, one, he received shares as
compensation for being the investment banker even though he
didn't do much in the way of investment banking, and, two, the
stuff that supports the argument that the WLCC proceeds went in
and came to use the coupon, I think that's fine, that's within
your Honor's ruling.

THE COURT:  Right.

MR. SCHWARTZ:  I mean I will say this -- not that it's
an issue for this morning's testimony for Dunkerley -- but this
is such a substantial issue in this trial that really is
critical that we have a ruling on sooner rather than later.

THE COURT:  No, I understand.  I just want to move
forward.  I agree with you about its importance, which is why I
want to make sure I think about it, I want to reread the

I647GAL1

1     transcript of what you said this morning, and your letters, and

2     make sure I have a full -- I have thought about it.

3              MR. SCHWARTZ:  Can I just say one thing?

4              THE COURT:  Yes.  And then I want to turn back to the

5     government on the connection between Sugarman and Galanis and

6     why that payment from Sugarman was necessarily at Galanis'

7     direction.

8              MR. SCHWARTZ:  I just want to say one thing about the

9     prior record on this point, because you're right of course this

10    precise use of the Code Rebel evidence did not come up, in a

11    404 briefing it did not come up in that argument, it's brand

12    new, it's a surprise to everyone; but what had happened was

13    that we had a discussion in March, on March 6, about the way in

14    which the government was going to make its 404(b) motion, and

15    we all agreed that the government bore the burden and had to

16    file a motion, and they did file a motion to put in Code Rebel

17    evidence, and then there was briefing on that, and we discussed

18    it at the April 13 hearing.

19             And at that hearing the government argued -- as it did

20    in its motion -- that there was evidence that was admissible as

21    404(b), and as direct evidence of the conspiracy.  Evidence

22    that they pointed to, the use of the Code Rebel evidence, was

23    in connection with the WLCC bonds, not compensation for

24    anything else, not gifting of shares, and certainly not the

25    peculiar facts of the Rosemont Seneca Bohai fully bought and

I647GAL1

paid for shares.

And then at that hearing your Honor said you were granting their motion to the extent of allowing in evidence of Code Rebel as it related to the recycling of WLCC bond proceeds.  That's what your Honor granted.  So, on an issue in which they bore the burden of moving for permission to put in this evidence, your Honor limited what was admissible. Everything else, therefore, was inadmissible by implication, and there was never, ever, ever -- until this came up totally coincidentally on Thursday -- notice of this theory.

If I hadn't objected to that exhibit which had reference to Ballybunion, we wouldn't have known about this until some witness started talking about this crazy theory. And that is not the spirit or the letter of your Honor's April 13 ruling.  That's not the way the 404(b) briefing was supposed to work, and that is not a theory that's ever been articulated in this case.  I think that's important.

THE COURT:  Look, why don't we bring the jury in, and while Ms. Cavale is getting the jury, before they come in, you can speak to this Sugarman/Galanis point.

MR. SCHWARTZ:  Can I hand up a limiting instruction for the exhibit?

THE COURT:  Yes.

MR. SCHWARTZ:  There is not total agreement on this, Mr. Quigley would like a shorter version, but let me hand up my

I647GAL1

1    proposal.

2            THE COURT:  This is exhibit for what?

3            MR. SCHWARTZ:  1577.

4            MR. QUIGLEY:  1577 and 1575.

5            Your Honor, we think it's a more straightforward

6    limiting instruction that is typically used for what evidence

7    is admitted for nonhearsay purpose is appropriate.  I mean I

8    haven't seen precisely what Mr. Schwartz handed up, but based

9    on the e-mail yesterday it includes a lot -- it includes

10   material about the document that was created and who created

11   the document.  I think the jury can simply be instructed that

12   these exhibits are not being offered for the truth of matter

13   asserted, simply to show that the statements were made.

14           MR. SCHWARTZ:  That's just my proposal.  I'm sure I

15   will be happy with whatever instruction your Honor gives.  I

16   think we are in agreement on the basic substance of it.

17           I will just tell you my observation.  I don't think

18   juries understand the meaning of the bare phrase "it's not

19   offered for the truth of the matter asserted."  That's a

20   legalism, so that requires in my experience a little bit of

21   explanation, but I'm sure whatever your Honor comes up with

22   will be fine.

23           THE COURT:  What about just saying I want to make

24   clear to you that this document you're seeing, Government

25   Exhibit 1577, is not being admitted for the truth of what is

I647GAL1

```
1    contained in the document, or what is said in the document, but
2    just to show that this was a document that was created by the
3    witness?
4         MR. QUIGLEY:  I'm not sure he created it by himself.
5    It was created I believe with Jason Galanis.  He signed it.  To
6    show that this was a document was created or was made.
7         MR. SCHWARTZ:  I don't have any problem saying created
8    by the witness and Jason Galanis.  I don't have any problem
9    saying the document was created by the witness and Jason
10   Galanis.
11        MR. QUIGLEY:  It was signed by Dunkerley, it was
12   created by Jason Galanis.
13        THE COURT:  And do you mind my saying that it was
14   created by Jason Galanis and signed by this witness?
15        MR. QUIGLEY:  I think just created, your Honor.
16        THE COURT:  How about just saying signed by the
17   witness?
18        MR. QUIGLEY:  That's fine.
19        THE COURT:  All right, OK.
20        All right.  We will bring the jury in.  Thanks.
21        MS. MERMELSTEIN:  Your Honor, did you want me to speak
22   to that issue?
23        THE COURT:  Yes, I think now that the witness is here
24   we will wait.  Thank you.
25             (Continued on next page)
```

1              (In open court; jury present)

2              THE COURT:  Good morning, everyone.  I hope you had a

3    nice weekend.  Please be seated.  Mr. Dunkerley, I remind you

4    you're still under oath.

5     HUGH DUNKERLEY,

6              previously called as a witness by the Government,

7          having been previously duly sworn, testified as follows:

8    DIRECT EXAMINATION

9              MR. QUIGLEY:  Good morning, ladies and gentlemen.

10   BY MR. QUIGLEY:

11   Q.  Good morning. Mr. Dunkerley.

12             Mr. Dunkerley, when we left off on Thursday, we had

13   talked about Michelle Morton's August 2014 acquisition of

14   Hughes Capital Management.  Do you recall that?

15   A.  I do.

16   Q.  That was around August 11 or so of 2014.  Is that right?

17   A.  Yes, it was.

18   Q.  Let's shift topics.  You said on Thursday you were also

19   working at Burnham Securities at this time.  Is that right?

20   A.  It was.

21             MR. QUIGLEY:  I would like to offer one Burnham

22   related document I neglected to offer on Thursday, Government

23   Exhibit 756.

24             THE COURT:  Any objection?

25             MR. SCHWARTZ:  One second.  No objection.

1     (Government's Exhibit 756 received in evidence)

2  BY MR. QUIGLEY:

3  Q.  What, if any, role was Burnham Securities going to play in

4  the first issue of the Wakpamni issuance?

5  A.  They were the placement agent for the bond.

6  Q.  As a general matter, what is the placement agent supposed

7  to do?

8  A.  The placement agent undertakes due diligence on the bonds,

9  does a lot of legal putting together of the contracts and then

10  finally finds investors for the bonds.

11  Q.  Now, were you the investment banker at Burnham working on

12  the Wakpamni bond deal?

13  A.  I was.

14  Q.  Did you actually have to find any purchasers for these

15  bonds?

16  A.  I did not.

17  Q.  Why was that?

18  A.  Because Hughes Capital Management purchased all the bonds.

19  Q.  Can we publish what is in evidence as Government Exhibit

20  211.  Mr. Dunkerley, do you recognize this document?

21  A.  I do.

22  Q.  What is this?

23  A.  This is a placement agency agreement between the Wakpamni

24  Lake Community Corporation and Burnham Securities, Inc.

25  Q.  Would you highlight the date on the first line.  What is

I64JGAL2                          Dunkerley – direct

1     the date on this document, Mr. Dunkerley?

2     A.  August 8, 2014.

3     Q.  Can we go to Page 2, and Paragraph 2 C.  Can you read the

4     first sentence, Mr. Dunkerley.

5     A.  Upon receipt of instructions from the issuer, the placement

6     agent will solicit purchases of the bonds in the aggregate

7     principal amount of $28 million without any discount, at an

8     interest rate of 5.62 percent and a maturity date of September

9     1, 2014, final maturity.

10    Q.  Can we move ahead to Page 6.  In Paragraph 8 A, can you

11    highlight that.  Mr. Dunkerley, where are the bonds going to be

12    delivered?

13    A.  To Hughes Capital Management, 16 Prince Street, Alexandria,

14    Virginia to the attention of Michelle Morton, CEO.

15    Q.  So at this point the buyers of the bonds had already been

16    identified.  Is that right?

17    A.  Correct.

18    Q.  If you go to Page 7, the next page, to the notice

19    provisions, and who is noticed at Burnham supposed to be

20    delivered to?

21    A.  To Jason Galanis.

22    Q.  Have you seen Jason Galanis' name spelled in other places

23    ending in 0 S as opposed to I S?

24    A.  I have.

25    Q.  What is your understanding of why he spelled his name

I64JGAL2                          Dunkerley - direct

1    sometimes ending in 0 S?

2    A.   For basic Google searches, it doesn't bring up his past

3    history.

4    Q.   Was there --

5              MR. TOUGER:   I move to strike.

6              THE COURT:   I'll allow it.

7    Q.   Was there a process at Burnham for approving a transaction

8    that Burnham was going to be involved in?

9    A.   Yes, there was.

10   Q.   What was the name of that process.

11   A.   It is called the investment committee.

12   Q.   Who was on the investment committee at Burnham at the time

13   the first tranche of Wakpamni bonds were issued?

14   A.   John Burnham, Sylvan Schefler, Devon Archer, Jason Sugarman

15   and Andrew Godfrey.

16   Q.   Can we publish what is in evidence as Government Exhibit

17   2218.   Focusing on the bottom email, what is the date on this

18   email?

19   A.   August 16, 2014.

20   Q.   Who are you sending this to?

21   A.   Andrew Godfrey.

22   Q.   Who is Andrew Godfrey?

23   A.   Andrew Godfrey, I believe was the COO, chief operating

24   officer, of Burnham Securities, Inc.

25   Q.   Who is carbon copied?

1    A.   Jason Galanis and personal email address for myself.

2    Q.   What is the subject of the email?

3    A.   BSI commitment committee member, Oglala, WLCC proposed bond

4    advisory and placement transaction.

5    Q.   Can you highlight in the middle of the page the sentence we

6    have the smallest amount of downside possible going into the

7    transaction.  This is a slam-dunk in my opinion?  (Slam

8    Dunkerley).  Just before that, who is the accredited buyer you

9    were referring to?

10   A.   Hughes Capital Management.

11   Q.   So at this point Hughes had already been identified as the

12   buyer?

13   A.   Correct.

14   Q.   And if we can put up the placement agency agreement,

15   Government Exhibit 200, with this email side-by-side --

16   sorry -- 211.

17          Can you highlight the date on the placement agency

18   here.  Is this the placement agency agreement actually dated

19   for the approved for the Burnham Investment Committee?

20   A.   It is.

21   Q.   Focus back on Government Exhibit 2218.  The paragraph

22   begins once you have reviewed and if you're in agreement with

23   everything being in order.  Do you see that?

24   A.   I do.

25   Q.   Would you read that sentence.

1    A.   Once you have reviewed, and if you are in agreement with

2    everything being in order, then perhaps it is easiest if you

3    could forward the email to the rest of the committee, John, Syl

4    and Devon, also including Rachel Golodetz, as she organized a

5    lot of the filing, et cetera.  Otherwise, I am more than happy

6    to send it to the rest of the committee, whatever you think is

7    best.

8    Q.   Who is the Devon you're referring to?

9    A.   Devon Archer.

10   Q.   Go to the second page of the document.  Is this an

11   attachment to this email, Mr. Dunkerley?

12   A.   Yes.

13   Q.   Who is on the front line of this memo?

14   A.   From myself.

15   Q.   Who actually wrote this?

16   A.   The --

17   Q.   Do you want a hard copy?

18   A.   Yes.  This is not the whole document, but I believe I wrote

19   this.

20            MR. QUIGLEY:  Permission to approach with a binder,

21   your Honor.

22            (Pause)

23   BY MR. QUIGLEY:

24   Q.   Who actually wrote that document, Mr. Dunkerley?

25   A.   So I probably wrote this document, but the majority of the

1    content in the document would have come from Jason Galanis.

2    Q.  Can we move ahead further back in the attachments to Page

3    10 of the document.  What is this the first page of, Mr.

4    Dunkerley?

5    A.  This is the first page of a trust indenture between

6    Wakpamni Lake Community and U.S. Bank Association.

7    Q.  This is for the first bond issuance?

8    A.  It is.

9    Q.  Can we move two pages ahead from there, and focusing on the

10   bottom of that page and continuing on to the next page, can you

11   read the paragraph beginning whereas the corporation.

12   A.  Whereas, the corporation intends to issue bonds in the form

13   of its $28 million special limited revenue bonds taxable series

14   of 2014 the 2014 bonds, the proceeds of which will be used to:

15   (a), finance the purchase of a certain annuity investment as

16   described more fully herein (b), finance economic development

17   projects near the junction of Routes 18 and 31, including,

18   inter alia, a certain warehouse distribution center and other

19   revenue producing enterprises to be located on allotted lands

20   in the Wakpamni Lake District, subject to agreement with the

21   tribal member allottees, the junction 18 development project

22   and (c), pay the cost of issuance of the 2014 bonds together

23   the project, and --

24   Q.  We can take that down.

25           Did the Burnham Investment Committee actually meet to

1   approval Burnham as the placement agent in this transaction?

2   A.  Yes, it did.

3   Q.  How was that meeting conducted?

4   A.  I believe the majority of the people at the meeting were in

5   Manhattan, and I was on a conference call from Irvine in

6   California.

7   Q.  Who else was on the call?

8   A.  Sylvan Schefler, Burnham, Devon Archer, Andrew Godfrey and

9   Jason Sugarman.

10  Q.  Was the Burnham's involvement in the transaction approved?

11  A.  It was.

12  Q.  Now I want to shift topics.

13       You mentioned previously that the bond proceeds were

14  supposed to be invested in an annuity.  Who was supposedly

15  providing the annuity?

16  A.  A corporation called Wealth Assurance Private Clients.

17  Q.  What was your role at Wealth Assurance Private Clients?

18  A.  I was the sole managing member and director of Wealth

19  Assurance Private Clients.

20  Q.  Who had created Wealth Assurance private client?

21  A.  Gary Hirst created that company.

22  Q.  Can we pull up what is in evidence as Government Exhibit

23  513.  What is this, Mr. Dunkerley?

24  A.  This is in corporation document from the Florida Department

25  State Division of Corporations for Wealth Assurance Private

1    Client Corporation.

2    Q.   Under filing information, what is the date that this

3    document was filed with the Florida Division of Corporations?

4    A.   The 7th of July, 2014.

5    Q.   Directing your attention to the principal address for the

6    company, do you see that?

7    A.   I do.

8    Q.   It is 801 International Parkway, Suite 500, Lake Mary,

9    Florida?

10   A.   Yes, it is.

11   Q.   Have you ever seen that address in your dealings with other

12   individuals?

13   A.   This is Gary Hirst's main address for doing his business

14   operations.

15   Q.   Go to Page 3 of this document.  What is this, Mr.

16   Dunkerley?

17   A.   This is a resolution being given by me to Gary Hirst

18   resolving that he can become a signatory on the bank account of

19   Wealth Assurance Private Clients.

20   Q.   What is the date on this document?

21   A.   The 5th of August 2014.

22   Q.   You can take that down.  Put up what is in evidence as

23   Government Exhibit 511.  Blow up the top of the document.

24          What is this document, Mr. Dunkerley?

25   A.   This is a signature card from Chase Bank for opening a bank

I64JGAL2                         Dunkerley - direct

1    account.

2    Q.   What is the name of the company opening the bank account?

3    A.   Wealth Assurance Private Client Corporation.

4    Q.   What is the account number?

5    A.   6/20/2014.

6    Q.   If we can go down the page a little bit.  Who is the

7    individual who opened this account?

8    A.   Gary Hirst.

9    Q.   On what date?

10   A.   On the 6th of August 2014.

11   Q.   Did you eventually become a signer on this account?

12   A.   I did.

13   Q.   Go two pages ahead.  What date did you become a signer on

14   this account?

15   A.   The 21st of August, 2014.

16   Q.   Now, you mentioned the annuity.  Was there a document that

17   was set out what was supposed to happen with the annuity?

18   A.   Yes.

19   Q.   Put up Government Exhibit 200.  What is this document, Mr.

20   Dunkerley?

21   A.   This is the document that sets out what is supposed to

22   happen with the annuity.  It is their Wealth Assurance Private

23   Client Corporation variable annuity contract, proposed

24   contract.

25   Q.   Is this for the first issuance of Wakpamni bonds.

1   A.   It is.

2   Q.   What is the address listed as the home office for Wealth

3   Assurance Private Client?

4   A.   1 Harcourt House, second floor, Waterfront Drive, Tortola,

5   British Virgin Islands..

6   Q.   Is that the same address that was on the Florida Division

7   of Incorporation a few minutes ago?

8   A.   It is.

9   Q.   Have you ever been to his address?

10  A.   Never.

11  Q.   Who signed this document?

12  A.   I signed this document.

13  Q.   Go to Page 2, Mr. Dunkerley.

14          Do you see where it says the issuer is incorporated

15  and authorized to do business in the British Virgin Islands and

16  is part of the Wealth Assurance Group of Companies?

17  A.   I do.

18  Q.   Was Wealth Assurance actually part of the Wealth

19  Assurance -- Private Client actually part of the Wealth

20  Assurance Group of Companies?

21  A.   Legally it was not, no.

22  Q.   In substance, what was supposed to happen under this

23  annuity contract?

24  A.   In substance, an annuity contract was created, it pays out

25  principal and interest over a period of years.

1   Q.   Directing your attention to the page ending 15, can you

2   read what it says next to income payments?

3   A.   Payments shall be made as follows:  $1,823,600 per year for

4   the first 9 years of the contract.  $25,750,000 on the 10th

5   anniversary of the contract, $350,000 per year for years 11

6   through 25.

7   Q.   Continue on to the next page, the very last bullet point

8   there?

9   A.   The balance of the separate account on the 25th anniversary

10  of the date of this contract, up to a maximum amount of 5

11  million shall be distributed on the 25th anniversary of this

12  contract.

13  Q.   Can we go back to the page ending 15, the previous page.

14          Do you see there is a reference to Private Equity

15  Management as the independent manager for the separate account?

16  A.   I do.

17  Q.   What was supposed to be the role, or what was your

18  understanding of the role of private equity management?

19  A.   Private Equity Management was the intermediary between the

20  tribe and Wealth Assurance Private Client, both monitoring and

21  advising on the use of funds for the bond placements.

22  Q.   Who was the representative of Private Equity Management?

23  A.   Francisco Martin.

24  Q.   Do you see there are two sets of initials on the bottom of

25  this page, one is HD.  Who is that?

I64JGAL2                         Dunkerley - direct

1   A.  That is me.

2   Q.  Who is FM?

3   A.  Francisco Martin.

4   Q.  Were you present when Mr. Martin initialed this document?

5   A.  I was not.

6   Q.  Did you ever get any guidance from Mr. Martin at any point

7   or prior at --

8            MR. TOUGER:  Objection.

9            THE COURT:  Sustained.

10  BY MR. QUIGLEY:

11  Q.  Did Mr. Martin ever provide you with any guidance as to how

12  to invest --

13           MR. TOUGER:  Objection.

14           THE COURT:  You know what, let's meet at sidebar for a

15  moment.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

I64JGAL2                    Dunkerley – direct

1              (At sidebar)

2              THE COURT:  Why isn't this statement in furtherance of

3    the conspiracy?

4              MR. TOUGER:  There is no reason for Francisco Martin

5    to be giving Hugh Dunkerley advice.

6              MR. QUIGLEY:  He said Private Equity was to provide, I

7    don't have the repose, provide guidance and advice on how to,

8    paraphrase, how to invest in annuity proceeds, and it was a

9    natural follow-up question.

10             THE COURT:  All right.  Okay.

11             MR. TOUGER:  Okay.

12             (Continued on next page)

1             (In open court)

2     BY MR. QUIGLEY:

3     Q.  Mr. Dunkerley, did Francisco Martin or Private Equity

4     Management provide you with any input on how to invest the

5     proceeds of the first Wakpamni bond issuance?

6     A.  No.

7     Q.  Did Private Equity Management, Francisco Martin, provide

8     you with any advice or input on how to invest the proceeds of

9     any Wakpamni bond issuance?

10    A.  No.

11    Q.  Now, directing your attention two pages ahead to the page

12    ending in 021.  Do you see under Section 6 there is a

13    discussion of separate accounts?

14    A.  I do.

15    Q.  What is your understanding of what this document means when

16    it talks about separate accounts?

17    A.  Most financial firms have more than one client, and so each

18    client's monies that are managed at the firm are kept in

19    separate accounts.  In some firms the monies are co-mingled to

20    make investments, but in this case obviously it talks about

21    separate accounts where the money would be separated.

22    Q.  Are there really any separate accounts at this point at

23    Wealth Assurance Private Client?

24    A.  There was only one account at Wealth Assurance.

25    Q.  Did Wealth Assurance Private Client have any money coming

I64JGAL2                         Dunkerley - direct

1    in other than from the Wakpamni Lake Community at this time?

2    A.  It did not.

3    Q.  Did there come a time when you learned the first tranche of

4    Wakpamni bonds had been issued?

5    A.  I did.

6    Q.  How did you learn that?

7    A.  I learnt it as the placement agent from U.S. Bank that the

8    escrow had been closed and also the money moved from U.S. Bank

9    into the bank account of Wealth Assurance Private Client and so

10   as the sole managing member of that entity I saw the money come

11   in.

12   Q.  So what, if any, instructions did you get once the money

13   came into the Wealth Assurance Private Client account?

14   A.  I received wire instructions to wire the money out to

15   certain individuals.

16   Q.  Just to be clear, when you say the Wealth Assurance Private

17   Client account, is that the account ending in 026 we looked at

18   earlier?

19   A.  It is.

20   Q.  Can we pull up what is in evidence as Government Exhibit

21   1579.  So, Mr. Dunkerley, who is this email from?

22   A.  Jason Galanis.

23   Q.  Who is it to?

24   A.  Myself.

25   Q.  What is the subject?

1    A.   "Direct wires to external banks."

2    Q.   What is this in reference to?

3    A.   This is to wire out money from Wealth Assurance Private

4    Clients to wires outside the bank.

5    Q.   Is this money that came in as a result of the Wakpamni

6    bonds being issued?

7    A.   Yes, it is.

8    Q.   Do you see the second sentence there is a reference to

9    Thorsdale?

10   A.   I do.

11   Q.   What is Thorsdale?

12   A.   Thorsdale Fiduciary Trust & Guaranty Corporation is the

13   entity owned by Jason Galanis.

14   Q.   Can we pull up the attachment to this email.

15            Directing your attention to the first wire for $2.3

16   million, where is that $2.35 million, where is that supposed to

17   go?

18   A.   Sovereign Nations Development Corporation.

19   Q.   At this time did you have any understanding of what

20   Sovereign Nations Development Corporation was?

21   A.   No, none at all.

22   Q.   On the next line there is further down the page there is a

23   wire for $1 million.  Where is that supposed to go?

24   A.   Katsky Korins, LLP.

25   Q.   Do you know what Katsky Korins, LLP is?

1    A.   It is an attorney legal firm.

2    Q.   Go to Government Exhibit 512, please.   What is this, Mr.

3    Dunkerley?

4    A.   This is a statement from JP Morgan Chase Bank for the

5    Wealth Assurance Private Client main account.

6    Q.   What is the opening balance on this account as of the

7    beginning of August?

8    A.   Zero dollars.

9    Q.   Do you see two deposits or additions for about $24 million

10   on August 27th of 2014?

11   A.   I do.

12   Q.   What do those represent?

13   A.   They were the proceeds from the Wakpamni Lake Community

14   Corporation bond issuance.

15   Q.   The first tranche?

16   A.   Yes.

17   Q.   If you go ahead to the next page, do you see where it says

18   withdrawals, electronic withdrawals?

19   A.   I do.

20   Q.   Do you see the two wires 8-28 for Katsky, Sovereign Nations

21   and Katsky Korins?

22   A.   I do.

23   Q.   Are those the two wires we just saw in the email?

24   A.   Yes, they are.

25   Q.   Then there is, do you see the wire below that on electronic

I64JGAL2                          Dunkerley - direct

1   below that on 8-29?

2   A.  I do.

3   Q.  Where is that supposed to go?

4   A.  Thorsdale Fiduciary & Guaranty.

5   Q.  Other than you, Mr. Dunkerley, did anyone else to your

6   knowledge ever make transfers out of this account?

7   A.  Yes, Gary Hirst.

8   Q.  Go to Page 5 of this document ending in 139.

9           Do you see credit card, a series of credit card

10  purchases here?

11  A.  I do.

12  Q.  Where were these made?

13  A.  I believe the majority are made in Zurich, Switzerland.

14  Q.  Who made those?

15  A.  I made them.

16  Q.  Why were you in Zurich?

17  A.  To attend a board meeting for Wealth Assurance AG.

18  Q.  Now, beyond this were you paid for your involvement in the

19  first issuance of Wakpamni bonds?

20  A.  I was paid as a placement agent, yes.

21  Q.  For Burnham?

22  A.  From Burnham Securities, yes.

23  Q.  How much did you get?

24  A.  I received $125,000.

25  Q.  Did Burnham get a larger amount?

1  A.  They received a further $125,000, the total being $250,000

2  for the placement.

3  Q.  Now, did there come a time when you learned a second,

4  another round of Wakpamni bonds was going to be issued?

5  A.  Yes.

6  Q.  How did you learn that?

7  A.  Jason Galanis told me.

8  Q.  What did Jason Galanis say to you about why another set of

9  Wakpamni bonds were being issued?

10  A.  I believe he gave me two reasons:

11          Firstly, the first issuance had gone well and there

12  was also appetite in the market for further bond issuance, and

13  actually finally a third reason that the tribe could use the

14  money to do further economic development and help the tribe.

15  Q.  Pull up what is in evidence as Government Exhibit 213.

16  What is this document, Mr. Dunkerley?

17  A.  This is the placement agency agreement between the Wakpamni

18  Lake Community Corporation and Burnham Securities, Inc.

19  Q.  Is this for the second round of bonds?

20  A.  Yes, it is.

21  Q.  What is the date on this agreement?

22  A.  September the 12th, 2014.

23  Q.  So a few weeks after, couple of weeks after the first

24  issuance?

25  A.  Yes.

I64JGAL2                    Dunkerley - direct

1    Q.   Who was going to be the placement agent for this bond

2    offering?

3    A.   Burnham Securities, Inc.

4    Q.   Again what is the placement agent supposed to do?

5    A.   A placement agent does basic due diligence, puts all the

6    legal documentation together, represents the offering and finds

7    financial buyers for the bonds.

8    Q.   Now go to Page 6 of this document, Paragraph 8 A.

9    According to this document, where are bonds going to be

10   delivered to?

11   A.   The Depository Trust Company in the name of Cede Company as

12   the placement agent -- sorry -- to Rosemont Seneca Bohai LLC,

13   152 West 57th street, 47th floor, New York to the attention of

14   Devon Archer.

15   Q.   Were you the main investment banker at Burnham working on

16   this?

17   A.   I was

18   Q.   Did you ever have, play any role in getting Mr. Archer to

19   purchase these bonds?

20   A.   I did not.

21   Q.   Did you ever have any conversations with him about

22   purchasing the Wakpamni bonds?

23   A.   I did not.

24   Q.   Directing your attention to the next page, who is the point

25   of contact for the placement agent?

I64JGAL2                        Dunkerley - direct

1    A.   Jason Galanis.

2    Q.   What, if anything, did Jason Galanis tell you about Mr.

3    Archer's purchase of these bonds?

4    A.   He explained to me that Mr. Archer had a remitter or a

5    contract from China to make investments in either the U.S. or

6    other places, but he had this contract that he had to use the

7    money by a certain date and time or the contract would run out;

8    therefore, he was buying these bonds in order effectively to

9    park the money so that he could use it for future investments

10   as they came up.

11   Q.   What was supposed to be done with the proceeds of this bond

12   issuance?

13   A.   It was supposed to be invested into a variable annuity

14   contract.

15   Q.   And again who was supposed to provide the variable annuity?

16   A.   Wealth Assurance Private Client.

17   Q.   Can we pull up what is in evidence as Government Exhibit

18   201.  What is this document, Mr. Dunkerley?

19   A.   This is the purported variable annuity contract issued by

20   Wealth Assurance Private Client Corporation.

21   Q.   This is for the second round of Wakpamni bond issuances?

22   A.   Yes it is.

23   Q.   Publish this side-by-side with Government Exhibit 200.

24          In general, how does this compare to the second

25   annuity contract, Government Exhibit 201, compared to the first

I64JGAL2                         Dunkerley - direct

1    annuity contract, Government Exhibit 200?

2    A.   They're significantly the same.

3    Q.   Go to 201, the second annuity contract.  Directing your

4    attention to the page ending in 29, do you see there is a

5    reference to loan?

6    A.   I do.

7    Q.   Can you read that.

8    A.   The issuer shall loan to the owner through U.S. Bank, as

9    trustee, the amount of $1,250,000 on May 1, 2015 pursuant to

10   the terms of the trust indenture and the parties and the

11   independent manager shall facilitate.

12   Q.   Was that provision in the first bond, first annuity

13   contract?

14   A.   No, it wasn't.

15   Q.   Who is the owner here?

16   A.   The owner is the Wakpamni Lake Community Corporation.

17   Q.   And issuer is WAPC?

18   A.   Correct.

19   Q.   Now, back up to the page ending in 028.  Do you see where

20   it says an initial payment is due $14.7 million is due on or

21   before the contract date?

22   A.   I do.

23   Q.   Right above that what is listed as the contract date in

24   this document?

25   A.   The 26th of September 2014.

1    Q.  Go to Government Exhibit 565.  Go to Page 2.  Do you

2    recognize this, Mr. Dunkerley?

3    A.  I do.

4    Q.  What is this?

5    A.  This is a withdrawal slip from Chase Manhattan Bank.

6    Q.  From the Wealth Assurance private account account?

7    A.  It is.

8    Q.  Who signed this withdrawal slip?

9    A.  I signed it.

10   Q.  How much was it for?

11   A.  $15 million.

12   Q.  What happened to the money?

13   A.  The money was electronically transferred to Thorsdale

14   Fiduciary & Guaranty, Limited.

15   Q.  Even though it is a withdrawal, you didn't physically carry

16   $15 million out of the bank?

17   A.  I did not physically carry $15 million.  It was

18   electronically transferred from this account to Thorsdale.

19   Q.  Go to Government Exhibit 512 again.  Go to the page ending

20   in 143.  Now blow up the deposits and additions.

21          This is again, sir, Mr. Dunkerley, the Wealth

22   Assurance Private Client Corporation account?

23   A.  It is.

24   Q.  How much money came into the account on October 1, 2014?

25   A.  $14,780,000.

1   Q.   Where did that money come from?

2   A.   From U.S. National Bank on behalf of Wakpamni Lake

3   Community Corporation.

4   Q.   Just back up one second.

5        That $15 million transfer to Thorsdale we saw before,

6   a few minutes ago, do you recall that?

7   A.   I do.

8   Q.   Before you got arrested in this case, did you know what

9   happened to that money after it went to Thorsdale?

10  A.   I had no idea.

11  Q.   I am sorry.  You said this October 1, deposit was $14.78

12  million?

13  A.   Yes.

14  Q.   Go to the next page of the document, the page ending in

15  144, do you see a transfer out on 10-6?

16  A.   I do.

17  Q.   How much is that for?

18  A.   $5.97 million.

19  Q.   Put this page and the previous page side-by-side.

20       After that transfer out on the right side of the page,

21  after that withdrawal on 10-6, how much comes back into the

22  account on 10-9?

23  A.   $4,966,500.

24  Q.   Where is that from?

25  A.   That is again from U.S. National Bank Association on behalf

I64JGAL2                          Dunkerley – direct

1    of Wakpamni Lake Community Corporation.

2    Q.  Do you understand both the deposit on 10-1 and 10-9 to be

3    proceeds of subsequently issuance of Wakpamni bonds?

4    A.  Yes.

5    Q.  Pull up what is in evidence, as Government Exhibit 1581.

6    Q.  Who is this from, Mr. Dunkerley?

7    A.  Jason Galanis.

8    Q.  And who is it to?

9    A.  Myself.

10   Q.  What is the date?

11   A.  The 2nd of October, 2014.

12   Q.  Directing your attention to the first sentence under Hugh.

13        What is Mr. Galanis instructing you to do with respect

14   to the WAPC?

15   A.  WAPC needs to move $500,000 to Thorsdale today.  Thorsdale

16   well take care of the $200,000 to Adam Levin to buy back his

17   stock.  Thorsdale will also move $100,000 from Thorsdale to

18   Wealth Assurance Holdings to pay Hunter Taubman Weiss.  We need

19   to pay 62,500 from Wealth Assurance Holdings, not Wealth

20   Assurance Private Client to Czucker as well.  Lastly, I need a

21   Burnham invoice for $75,000 for the Wakpamni deal so that that

22   can get paid today.  Andrew will pay you $52,500 immediately.

23   Q.  What do you understand the reference to WAPC to be?

24   A.  Wealth Assurance Private Client.

25   Q.  That is the same bank account we have been looking at?

1    A.  It is.

2    Q.  In Government Exhibit 512?

3    A.  Yes.

4    Q.  And Thorsdale, what do you understand that to represent?

5    A.  Thorsdale is the shortening for Thorsdale Fiduciary &

6    Guaranty Corporation owned by Jason Galanis.

7    Q.  And W A H?

8    A.  Wealth Assurance Holdings.

9    Q.  And Hunter Taubman Weiss?

10   A.  Is a legal firm.

11   Q.  Who is Adam Levin?

12   A.  Adam Levin is an investor and lender in the Los Angeles

13   area.

14   Q.  What do you understand the reference to Czucker to be?

15   A.  Edward Czucker is a property developer in the Los Angeles

16   area and an investor in Wealth Assurance Holdings.

17           MS. NOTARI:  Can you say that again?

18           THE WITNESS:  Edward Czucker is I believe a property

19   developer in the Los Angeles area and also an investor in

20   Wealth Assurance Holdings.

21   BY MR. QUIGLEY:

22   Q.  Take that down.  Put up Government Exhibit 1582.  What is

23   the date on this email?

24   A.  The 14th of November, 2014.

25   Q.  Who is it to?

I64JGAL2                          Dunkerley – direct

1    A.   To Adam Bakhash and myself.

2    Q.   Who is it from?

3    A.   Jason Galanis.

4    Q.   What does Mr. Galanis say in this email?

5    A.   Adam, Hugh is on this way to see you in the branch now.

6    Below are the transactions in connection with partial payment

7    of the acquisition of Valor Life from Vaudoise.

8    Q.   They were two entities we talked about on Thursday in the

9    context of the overall plan.  Is that right?

10   A.   Yes, yes.

11   Q.   Again the reference to the first reference under internal

12   group transfer?

13   A.   I do.

14   Q.   What is that instruction for?

15   A.   $2,075,000 from Wealth Assurance Private Client to

16   Thorsdale.  $6,080,000 from Thorsdale to Wealth Assurance

17   Holdings.

18   Q.   And again Wealth Assurance Private Client is the annuity

19   provider for the bonds?

20   A.   Yes, it is.

21   Q.   Go back to the Wealth Assurance Private Client page

22   reference, Government Exhibit 512 for a second.  Go to page

23   ending 147.  Go to the top of the page.  What is the time

24   period covered by this statement?

25   A.   November 1, 2014 through to November 28th, 2014.

1  Q.  Can we look down at the withdrawals.  What does it reflect

2  happened on 11-12 of 2014?

3  A.  There was an electronic withdrawal wire to Bevan Cooney for

4  $3.895 million.

5  Q.  At the time did you have any understanding when he made

6  that transfer, understanding why that money was going out?

7  A.  No, I did not.

8  Q.  Do you see the the entry on 11-14?

9  A.  I do.

10  Q.  Is that one of the transactions that was at the Bevan

11  Cooney referenced in the email we just looked at?

12  A.  Yes, I believe it is.

13  Q.  Take that down.

14        Shifting topics, but staying in the fall of 2014, did

15  you become involved in an acquisition of another investment

16  adviser firm at that time?

17  A.  We did.

18  Q.  What was the name of that investment adviser firm?

19  A.  Atlantic Asset Management.

20  Q.  Who was going to acquire Atlantic Asset Management?

21  A.  Hughes Capital Management.

22  Q.  Michelle Morton and her partner again?

23  A.  Michelle Morton was the owner and CEO of Hughes Capital

24  Management, yes.

25  Q.  How was Hughes going to finance the purchase of Atlantic?

I64JGAL2                        Dunkerley – direct

1    A.  Originally it was undetermined, but in the end Wealth

2    Assurance Holdings or Valor Group, as it became, ended up being

3    the financial sponsor of that acquisition.

4    Q.  What was your role in the transaction?

5    A.  I represented Wealth Assurance Holdings and the Valor Group

6    as the investor for the acquisition to take place and also the

7    guarantor for other parties of the acquisition to take place.

8    Q.  Was an entity in the portion from Olshan Frome in the

9    transaction?

10   A.  They were the accountants who paid for the transaction,

11   yes.

12   Q.  How was it structured?

13   A.  They were the attorneys, not the accountants.  I apologize.

14   Q.  How was the purchase of Atlantic structured?

15   A.  I believe the overall purchase price was about $10 million,

16   of which 4.8 million, roughly, half of which was cash and the

17   other half was the guarantee and the reset of notes or debts

18   that the firm had a run-up in previous years.

19   Q.  Who provided that guarantee?

20   A.  The Valor Group.

21   Q.  Essentially the Valor Group, you're saying the Valor Group

22   agreed to take over some of Atlantic's debts?

23   A.  It agreed to be a guarantor for those debts, yes.

24   Q.  And who was on the board of directors of the Valor Group?

25   A.  Myself, Abe Skewkin, Jason Sugarman, Devon Archer, Dr. Roy

1    Knight and David Ezekiel.

2    Q.  Put up what is in evidence as Government Exhibit 828.  Look

3    down at the bottom of the page, there is an email from Jason

4    Cabico to you.  What does he ask you to do?

5    A.  "Could you please sign the attached guarantee and return a

6    PDF of the signed signature page to via email.  We will not

7    release your signature page without your authorization."

8    Q.  What happens in the top email?

9    A.  I attach and complete the signed contract.

10   Q.  What is the date on this email?

11   A.  13th of February, 2015.

12   Q.  If we can go to the attachment to the page ending in 280.

13   Can you read the first two paragraphs -- first of all, what is

14   this document?

15   A.  A guarantee document.

16   Q.  The guarantee referred to before?

17   A.  Yes.

18   Q.  So can you read the first two paragraphs?

19   A.  This guarantee this guarantee is made as of February 13,

20   2015 by Valor Group Limited, formerly Wealth Assurance

21   Holdings, Limited the guarantor to and for the benefit of the

22   sellers, as such term is defined in that certain agreement and

23   plan of merger, the merger agreement, dated as of the date

24   hereof, by and among Hughes Capital Management LLC, the

25   purchaser, Atlantic Asset Management, LLC, Atlantic, and the

1    sellers.  Capitalized terms used, but not defined herein have

2    the meanings assigned to them in the merger agreement.

3              Do you want me to continue?

4    Q.  Please.

5    A.  Whereas, Atlantic and the sellers have agreed to the merger

6    of Atlantic with and into the purchaser in exchange for the

7    cash payment at closing of million $120,398 and a deferred

8    portion of $4,854,420 to be paid pursuant to two reset notes

9    issued at closing, provided the sellers receive a guarantee

10   from the guarantor on the terms set forth below.

11   Q.  Who was the individual or individuals who were selling

12   Atlantic Asset Management to Hughes?

13   A.  The management team and shareholders, the CEO at the time

14   was a man called Ronald Sellers.

15   Q.  S E LL E R S?

16   A.  Correct.

17   Q.  Put up as an aid to the jury Government Exhibit 40011.

18             Does this summarize the flow of funds for the Atlantic

19   capital acquisition?

20   A.  It does.

21   Q.  Who is providing the money in the first instance?

22   A.  The Valor Group.

23   Q.  Where is it going?

24   A.  To BFG socially responsible investing.

25   Q.  To where?

1   A.  GMT Duncan and and finally Atlantic Asset Management.

2   Q.  Put this document up on the screen up alongside Government

3   Exhibit 4001.  Do you recall looking at the Hughes Capital

4   Management on Thursday?

5   A.  I do.

6   Q.  Is the flow of funds substantially similar between the two

7   transactions?

8   A.  Substantially similar, yes.

9   Q.  Leave that up for a second.  Now, pull up what is in

10  evidence as Government Exhibit 958.  Do you recognize this

11  document, Mr. Dunkerley?

12  A.  I do.

13  Q.  Go back to Government Exhibit 4001 and 4001.  In the Hughes

14  Capital acquisition, the apparent top entity as Wealth

15  Assurance AG?

16  A.  It is.

17  Q.  Is that Atlantic acquisition is Valor?

18  A.  It is.

19  Q.  What was the relationship between Wealth Assurance AG and

20  Valor?

21  A.  Valor Group assumed Wealth Assurance AG.  So basically the

22  name of Wealth Assurance AG changed into the Valor Group at a

23  certain point in time.

24  Q.  That was the entity name we talked about on Thursday, but

25  what was the name of the entity that purchased Wealth Assurance

I64JGAL2                          Dunkerley - direct

1    AG back in 2013?

2    A.   Wealth Assurance Holdings.

3    Q.   Did Wealth Assurance Holdings later acquire a company

4    called Valor Life?

5    A.   It did.

6    Q.   What happened to the name of Wealth Assurance Holdings

7    after it acquired Valor Life?

8    A.   It became the Valor Group, but it was also occasionally

9    known as Valor Life as well.

10   Q.   Essentially Valor Group is the parent company of both Valor

11   Life and Wealth Assurance AG?

12   A.   It was the surviving entity of the merger of those two

13   corporations, yes.

14   Q.   Can we go back to Government Exhibit 958.  Do you recognize

15   this, Mr. Dunkerley?

16   A.   I do.

17   Q.   What is this?

18   A.   This is the amended and restated company agreement for GMT

19   Duncan, LLC.

20   Q.   If we go to the page ending 771, Page 4 of the document --

21   Page 5 -- what is the date on this agreement?

22   A.   April 1, 2015.

23   Q.   Is that around the time that the acquisition of Atlantic

24   assessment management closed?

25   A.   It is.

I64JGAL2                        Dunkerley - direct

1   Q.   Did there come a time when there was a final issuance of

2   Wakpamni bonds?

3   A.   Yes, there was.

4   Q.   Before we get into that, before that issuance happened,

5   were you asked to solicit any investors in connection with the

6   Wakpamni bonds?

7   A.   I was.

8   Q.   Who asked you to do this?

9   A.   Jason Galanis.

10  Q.   What did he do?

11  A.   He introduced me to a firm from Chicago called Ziegler

12  Group.

13  Q.   When, approximately, was that?

14  A.   It would have been in the winter-fall of 2014.

15  Q.   Did that group ending up purchasing any Wakpamni bonds?

16  A.   No, they did not.

17  Q.   What, if any, concerns did they raise with you?

18  A.   The major concern they raised was --

19            MR. TOUGER:  Objection, your Honor.

20            MR. QUIGLEY:  Just the fact it was made, your Honor.

21            THE COURT:  Sustained.

22  BY MR. QUIGLEY:

23  Q.   Did they end up purchasing any bonds?

24  A.   No.

25  Q.   Who ended up buying the bonds?

I64JGAL2                        Dunkerley - direct

1   A.   Investors in Atlantic Asset Management.

2   Q.   The company we just talked about having been acquired?

3   A.   Yes.

4   Q.   Who was the placement agent for the final issuance?

5   A.   Burnham Securities, Inc.

6   Q.   Was there a placement agreement?

7   A.   There was.

8   Q.   Pull up what is in evidence as Government Exhibit 212,

9   please.  Do you recognize this document, Mr. Dunkerley?

10  A.   I do.

11  Q.   What is this?

12  A.   It is a placement agency agreement between the Wakpamni

13  Lake Community Corporation and Burnham Securities, Inc.

14  Q.   What is the date on this agreement?

15  A.   April 6th, 2015.

16  Q.   Go to the signature page.  Who signed on behalf of Burnham

17  Securities?

18  A.   Daniel McClory.

19  Q.   Who is Mr. McClory?

20  A.   Mr. McClory was my partner in the Burnham Securities office

21  in Irvine, California.

22  Q.   Have you signed the two previous placement agreements?

23  A.   I had.

24  Q.   Why did you ask Mr. McClory to sign this one?

25  A.   So that there would be less -- I wouldn't be the signatory

1   on every aspect of the transaction.

2   Q.  Is that because investors had expressed concern to you

3   about that?

4          MR. TOUGER:  Objection, your Honor.

5          THE COURT:  Sustained.

6   BY MR. QUIGLEY:

7   Q.  Go to Page 6 of this document.  Where are the bonds for

8   this issuance supposed to be delivered?

9   A.  To the Depository Trust Company, DTC, registered in the

10  name of Cede Company, New York.

11  Q.  Directing your attention to Page 7.  Who is it in this

12  agreement, the point of contact for the placement agent?

13  A.  Andrew Godfrey.

14  Q.  What was supposed to happen to the proceeds of this bond

15  issuance?

16  A.  They were supposed to be invested into a variable annuity

17  contract.

18  Q.  Was there an annuity contract created for this issuance?

19  A.  There was a purported annuity contract created, yes.

20  Q.  Can we put up on the screen what is in evidence as

21  Government Exhibit 202.  Is this the annuity contract you

22  referred to?

23  A.  It is.

24  Q.  Can we go to the second page.  Again what does it say about

25  the relationship between Wealth Assurance Group and Wealth

1    Assurance Private Client?

2    A.   It says that Wealth Assurance Private Client is part of the

3    Wealth Assurance Group of Companies.

4    Q.   Again was that accurate?

5    A.   No.

6    Q.   Again who is initials are FM at the bottom of the page?

7    A.   Francisco Martin.

8    Q.   Did there come a time you learned these bonds had been

9    issued?

10   A.   Yes.

11   Q.   Go back to Government Exhibit 512, Page 33.

12           In terms of deposits and additions, what do we see

13   happening on April 16th, 2015?

14   A.   We see a deposit by U.S. National Bank on behalf of

15   Wakpamni Lake Corporation of $15.85 million.

16   Q.   Now, go to the next page of the document.

17           Directing your attention to the entry on 4-17, do you

18   see a wire to Newline Trading for $49,700.00?

19   A.   I do.

20   Q.   If we can also highlight another wire on April 22nd for

21   $5.3 million to Newline Trading.  Do you see that one as well?

22   A.   I do.

23   Q.   What first of all, down who sent that wire?  Did you send

24   that wire?

25   A.   I did not send that wire.

1    Q.   Why not?

2    A.   Because I was in Paris and Europe at the time so it is very

3    hard to send a wire abroad to yourself effectively.

4    Q.   What was Newline Trading?

5    A.   Newline Trading was a special purpose vehicle used for the

6    purchase of Fondinvest Capital.

7    Q.   What was this money supposed to be used for in the entries

8    on 4-17 and 4-22?

9    A.   Originally this money was supposed to go towards a variable

10   annuity contract.

11   Q.   What is it being used for here?

12   A.   It is being used to purchase a corporation.

13   Q.   Is that Fondinvest?

14   A.   It is.

15   Q.   The same Fondinvest you were the president of and you

16   talked about on Thursday in your testimony?

17   A.   Yes.

18   Q.   Further down on the page on 4-23, do you see a $305,000

19   wire to Hughes Capital Management?

20   A.   I do.

21   Q.   Do you have any understanding what was that was for?

22   A.   I believe that was working capital.

23   Q.   Go ahead to the page ending 169.

24            THE COURT:   Why don't we take a morning break now and

25   we'll keep it short since we started a little bit late.  Please

I64JGAL2                          Dunkerley – direct

1    be back in 10 minutes.  Thank you.  Just remember to keep an

2    open mind and don't discuss the case.

3                (Jury excused)

4                (Recess)

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I647GAL3

                    (Jury not present)

1                   THE COURT:  Can I see the lawyers at side bar for a

2   minute if everyone is here.

3                   (At the side bar)

4                   THE COURT:  If I were to ask Mr. Dunkerley why he

5   received this $50,000 worth of the pre-IPO shares, then what

6   would he say?

7                   MR. QUIGLEY:  I'm going from memory.  It hasn't been a

8   focus of my prep with him.  I think he viewed it as a general

9   gift from Jason Galanis with all of these different activities

10  for him, including the bonds but not limited to the bonds.

11                  THE COURT:  Does anyone have an objection of my asking

12  that outside the hearing of the jury?

13                  MR. SCHWARTZ:  I have no objection to asking him.  I

14  am not sure it's a particularly relevant question given the

15  number of different separate frauds that Mr. Dunkerley and Mr.

16  Galanis were involved in.

17                  THE COURT:  I just want to get a better understanding

18  of why these individuals thought they got these pre-IPO shares

19  and therefore if there is a good faith basis for believing that

20  Mr. Archer and Mr. Cooney essentially got it as payback for

21  their involvement in WLCC's fraud.

22                  MR. SCHWARTZ:  I had the opportunity to go back and

23  look at the 3500 for Mr. Martin, who says he was compensated

24  separately in money for his role, which was fairly slight, in

I647GAL3

1    connection with the WLCC bonds.

2              THE COURT:  So you do have an objection to my asking

3    that outside the hearing of the jury?

4              MR. SCHWARTZ:  I just don't think it tells you

5    anything.

6              THE COURT:  OK, all right.  So we will bring the jury

7    back in.

8              (In open court)

9              THE COURT:  Can I see you back up at the sidebar.

10             (At the side bar)

11             MR. QUIGLEY:  In an abundance of caution, to make sure

12   I'm about to go into the Code Rebel piece with him, what I

13   intend to ask him is reference him to certain entries in the

14   records and say what are those entities, and he is going to

15   testify that some of those were broker dealers or other

16   entities that were part of the Code Rebel, received shares or

17   purchase shares in the Code Rebel IPO; and also were you as the

18   investment banker involved in finding investors for the Code

19   Rebel IPO, and he is going to say no.  I'm going to say without

20   getting into -- I'm going to say who actually -- who found the

21   investors, who is responsible for finding the investors, and

22   nothing more.  He is going to say Galanis.  I want to make sure

23   that doesn't run afoul of any --

24             MR. SCHWARTZ:  The bank records you are showing him

25   are the WAPC bank records?

I647GAL3

1    MR. QUIGLEY:  Yes.

2    THE COURT:  OK.

3    (Continued on next page)

I647GAL3                    Dunkerley – Direct

1           (Jury present)

2           THE COURT:  Thank you.  You can be seated.

3    HUGH DUNKERLEY, resumed.

4    DIRECT EXAMINATION (Continued

5    BY MR. QUIGLEY:

6    Q.  Mr. Wissman, can we pull up Government Exhibit 512 again,

7    go to the page ending in Bates number 169, pull up the

8    electronic withdrawals.

9           Mr. Dunkerley, before the break we were talking about

10   the issuance of Wakpamni bonds in mid-April of 2015; do you

11   recall that?

12   A.  I do.

13   Q.  And focusing on these bank records, do you see an entry on

14   4/24 for $75,000 from the WAPC account?

15   A.  I do.

16   Q.  Who is that money going to?

17   A.  Bevan Cooney.

18   Q.  And the entry below that for $650,000, where is that going?

19   A.  To Burnham Financial Group.

20   Q.  And two below that, do you see an entry for Bump Networks?

21   A.  I do.

22   Q.  What was Bump Networks?

23   A.  Bump Networks is an Internet service provider owned by a

24   man called Arben Kerezu.

25   Q.  And do you also see the entry above that for Seymour

I647GAL3                          Dunkerley - Direct

1   Capital?

2   A.  I do.

3   Q.  What was Seymour Capital?

4   A.  Seymour Capital is a broker dealer based out of the United

5   Kingdom.

6   Q.  And around this time were you involved in a transaction

7   involving a company called Code Rebel?

8   A.  I was.

9   Q.  And what type of transaction was it?

10  A.  It was an initial public offering or IPO.

11  Q.  And in general terms what do you mean by an initial public

12  offering?

13  A.  So companies when they're first created are generally

14  created privately, owned by private individuals, then they are

15  taken to a national market like Nasdaq or the American

16  Exchange, and they are traded -- the public is allowed to trade

17  in their shares.

18  Q.  And Nasdaq is N-A-S-D-A-Q?

19  A.  It is.

20  Q.  Who was the owner of Code Rebel before it became a publicly

21  traded company?

22  A.  Arben Kryeziu.

23  Q.  The same individuals we talked about with respect to Bump

24  Networks?

25  A.  Yes.

I647GAL3                    Dunkerley – Direct

1   Q.  And in what capacity were you involved in the Code Rebel

2   initial public offering?

3   A.  I was the placement agent for Burnham Securities, Inc.

4   Q.  Let me back up one second.  Were you familiar with any

5   other entities owned or operated by Arben Kerezu?

6   A.  Yes.  There was an entity called Flikmedia and Flikdate,

7   owned by Arben Kerezu.

8   Q.  And in what capacity were you involved in Code Rebel IPO?

9   A.  I was the placement agent for Burnham Securities, Inc.

10  Q.  And did you actually find any investors in the Code Rebel

11  IPO?

12  A.  No.

13  Q.  Who found the investors?

14  A.  The investors came from the internal group within the

15  Burnham group of families -- or family or companies.

16  Q.  And what was your understanding of who the person was

17  responsible for finding the investors?

18  A.  I believe Jason Galanis who was the person who really put

19  together those financial transactions.

20  Q.  And you previously mentioned an entity called Seymour

21  Capital.

22  A.  Yes.

23  Q.  Do you see the entry on page ending 169 for Seymour Capital

24  that we just looked at, above Bump Networks?

25  A.  Yes.

I647GAL3                         Dunkerley – Direct

1   Q.   What was the role of Seymour Capital in the Code Rebel IPO?

2   A.   To provide financing and to also provide at least 300

3   investors for the IPO to take place.

4   Q.   And why do you need 300 investors?

5   A.   It's part of the rules and regulations for a company to go

6   public on the Nasdaq market it has to have at least 300

7   individuals who invest into the company.

8   Q.   And are you also familiar with an entity called Thunder

9   Valley?

10  A.   I am.

11  Q.   And what is Thunder Valley?

12  A.   Thunder Valley is a corporation owned by Jason Galanis.

13  Q.   And what was -- how, if at all was Thunder Valley involved

14  in the Code Rebel IPO?

15  A.   It was an investor.

16  Q.   Did you invest in the Code Rebel IPO?

17  A.   No.

18  Q.   Did you get any pre-offering shares?

19  A.   Yeah, I didn't invest my own money, but I received shares

20  as a part of being the placement agent for Burnham Securities,

21  Inc.

22  Q.   Now, moving ahead, directing your attention to later in

23  2015, did there come a time when interest payments became to

24  you on came due on the Wakpamni bonds?

25  A.   Yes.

I647GAL3                     Dunkerley - Direct

1    Q.  When approximately did that happen?

2    A.  Roughly a year after the issuance would have, would have

3    been the summer of 2015.

4    Q.  Did you become aware at any point that issues had arisen

5    with paying interest on the bonds?

6    A.  Yes.

7    Q.  And how did you become aware of that?

8    A.  I received communications from representatives of the

9    tribe.

10   Q.  And were you living at that time?

11   A.  Paris, France.

12   Q.  Why were you in Paris?

13   A.  I was running Fondinvest Capital.

14   Q.  Did you respond to inquiries about the interest payments?

15   A.  I did.

16   Q.  Did you give truthful responses?

17   A.  I did not.

18   Q.  How were they not truthful?

19   A.  With the account statements that were provided, it showed

20   that the money had been invested into an annuity and that the

21   balance was protected, and that interest was being paid, none

22   of which had -- that was not truthful.

23   Q.  Are you saying you provided false account statements to

24   representatives of the Wakpamni Tribe?

25   A.  That's what I'm saying, yes.

I647GAL3                    Dunkerley - Direct

1    Q.   And where did you get those documents from?

2    A.   I got the account statements from Jason Galanis.

3    Q.   And when you sent those documents to the Wakpamni Tribe's

4    representatives, did you know they was false?

5    A.   I did.

6    Q.   Are you familiar with an e-mail address

7    legal@colarisventures.com?

8    A.   I am.

9    Q.   And whose e-mail is that?

10   A.   Jason Galanis.

11   Q.   And around the same time, the fall of 2015, did Michelle

12   Morton make requests for additional money for her financial

13   backers?

14   A.   Yes, she did.

15   Q.   Can we pull up what is in evidence as Government Exhibit

16   867.  If we go to the final page of the document, the bottom,

17   can we put up pages 3 and 4 side by side actually?

18            So focusing on the bottom e-mail, who is that from?

19   A.   That's from myself.

20   Q.   And what's the date on it?

21   A.   October the 2nd, 2015.

22   Q.   And who is it to?

23   A.   Michelle Morton.

24   Q.   What do you say to Ms. Morton?

25   A.   "Michelle, Jason" -- as in Jason Sugarman, Devon Archer and

1   Andrew Godfrey have asked me to reach out to you in order to

2   arrange a meeting for you all on Monday in New York.  Can you

3   confirm and what is the best time, around noon at the Burnham

4   offices?"

5   Q.  And when you say Jason, Devon and Andrew, who are you

6   referring to?

7   A.  To Jason Sugarman, Devon Archer and Andrew Godfrey.

8   Q.  And had they asked you to reach out to her?

9   A.  Yes, they had.

10  Q.  What was your understanding of why Sugarman, Archer and

11  Godfrey wanted you to reach out to Ms. Morton?

12  A.  They wanted -- sorry, can you repeat the question.

13  Q.  What was your understanding of why they wanted -- why

14  Mr. Sugarman, Archer and Godfrey had asked you to reach out to

15  Ms. Morton?

16  A.  To discuss the operation of Atlantic Asset Management.

17  Q.  What was their relationship with Atlantic Asset Management?

18  A.  Jason Sugarman, Devon Archer were on the board of Valor

19  Group, which was the major investor in Atlantic Asset

20  Management, and Andrew Godfrey had a working relationship

21  between Atlantic and Burnham.

22  Q.  Prior to this e-mail around this time, what if any request

23  had Michelle Morton made of Valor Group?

24  A.  She made a few requests but mainly for money.

25  Q.  And did that money -- was that money ultimately provided

I647GAL3                         Dunkerley - Direct

1   in the fall of 2015?

2   A.  Yeah, some money was, but not all of the money she

3   requested was provided, correct.

4   Q.  And can we go to the first page of the document.  Do you

5   see -- you can take the second page down and just put up the

6   first page.

7           Do you see where Michelle Morton writes to you --

8           Can we hide the second paragraph.

9   A.  Yes.

10  Q.  And do you see where it says, "I have copied Devon, Jason

11  and Andrew on this e-mail because I do not want them to wait to

12  get this message.  I would like to meet with them again as well

13  ..."

14  A.  Yes.

15  Q.  Was it your understanding that she, Michelle Morton, had

16  met with them before?

17  A.  Yes.

18  Q.  Do you know whether she met with them as a result of this

19  e-mail chain?

20  A.  I'm not a hundred percent sure, but I believe they did not.

21  Q.  Staying around the same time period, the fall of 2015, did

22  you learn that government agencies were investigating the

23  Wakpamni bonds?

24  A.  Yes.

25  Q.  How did you learn that?

I647GAL3                         Dunkerley - Direct

1    A.  I learned it because I had been a major investor in

2    Atlantic Asset Management, and I learned from government

3    subpoenas.

4    Q.  From government subpoenas?

5    A.  Receiving them, yes.

6    Q.  Where were you living at this time?

7    A.  In Paris, France.

8    Q.  Did you return to the United States at any point in the

9    fall of 2015?

10   A.  I did.

11   Q.  And where did you -- did you have any discussion with Jason

12   Galanis when you came back to the United States?

13   A.  I did.

14   Q.  Where did you meet with him?

15   A.  In his house.

16   Q.  Where was that?

17   A.  1920 Bel Air, Los Angeles, California.

18   Q.  By the way, had Jason Galanis lived at 1920 Bel Air the

19   entire time you knew him going back to 2013?

20   A.  The entire time I knew him he had a residence at that

21   address, yes.

22   Q.  Did he have a residence anywhere other than 1920 Bel Air?

23   A.  Yes, he had an apartment in New York as well that I knew

24   of.

25   Q.  Now, when you met with Jason Galanis at 1920 Bel Air in the

1    fall of 2015, was anyone else present at those meetings?

2    A.  No, just myself and Jason Galanis.

3    Q.  And about how many times did you meet with him at his house

4    in the fall of 2015?

5    A.  Two, possibly three times.

6    Q.  And did you discuss a strategy for -- or did he have a

7    strategy for responding to the investigation?

8    A.  Yes.

9    Q.  And how many essentially parts did this strategy have?

10   A.  There were two essential parts to the strategy.

11   Q.  And did the first part -- what did the first part involve?

12   A.  The first part involved Atlantic Asset Management and

13   effectively placing the blame on Michelle Morton.

14   Q.  And did you think -- and was that for placing the blame on

15   her for putting investors in investments they weren't supposed

16   to be in?

17   A.  That was just what I was about to say, yes.

18   Q.  And, your Honor, pursuant to our discussion, I'm just going

19   to lead a little bit here.

20              And did Jason Galanis believe he had leverage over

21   Michelle Morton?

22   A.  Yes.

23   Q.  And was that in part because she failed -- he believed she

24   failed to fill out certain documents properly regarding the

25   ownership of Hughes Capital Management when it had been

I647GAL3                     Dunkerley - Direct

1    acquired?

2    A.   Correct.

3    Q.   Now, you mentioned there was a two-part strategy.  What was

4    the second part of the strategy?

5    A.   The second part of the strategy was to show how the tribe's

6    money had been invested into the series of financial companies

7    that we had bought over that period of time and how the money

8    had grown significantly and how they owned a significant amount

9    of the Valor Group, which was more than enough to pay the

10   bond's principal and interest for that period of time.

11   Q.   Did you have to create false documents to make that

12   strategy work?

13   A.   Yes.

14   Q.   And earlier you mentioned you pled guilty to obstruction of

15   justice.  Was the basis of that the creation and submission of

16   these false documents?

17   A.   Yes.

18   Q.   Who created these documents?

19   A.   Jason Galanis and myself.

20   Q.   And as part of the creation of the false documents, what if

21   any entities -- what if any entity or entities were created?

22   A.   The most significant entity created was an asset manager

23   called Calvert Capital out of the United Kingdom.

24   Q.   And what was Calvert's role supposedly in the Wakpamni

25   transaction?

I647GAL3                    Dunkerley - Direct

1   A.   It was supposed to hold the shares and the assets on behalf

2   of the tribe in the Valor Group.

3   Q.   And at this time I'd like to publish Government Exhibit

4   1575 and 1577.

5          THE COURT:  All right.  Go ahead.

6   Q.   I think the defense asked for a limiting instruction.

7          THE COURT:  Yes.  Do you want me to publish it first

8   or?

9          MR. QUIGLEY:  We can publish the documents side by

10  side.

11         THE COURT:  OK.  Ladies and gentlemen, I just want to

12  make clear to you that the documents that you are seeing are

13  not being admitted for the truth of what is in the documents

14  but, rather, to show you that this was a document created and

15  that it was a document signed by this witness, at least with

16  respect to 1577.  Is that correct?

17         MR. QUIGLEY:  That's right.

18         MR. SCHWARTZ:  That's right.

19  Q.   If we can just focus on 1575 for a second.  What is this

20  document, Mr. Dunkerley?

21  A.   It's a general partnership agreement between Calvert

22  Capital Partners and another entity.

23  Q.   And if we can go to the first page of the actual page of

24  the document after the table of contents and highlight the

25  first paragraph.  When is this agreement supposedly dated?

I647GAL3                     Dunkerley - Direct

1    A.   The 22nd day of August, 2014.

2    Q.   And when was this document actually created?

3    A.   The winter/fall of 2015.

4    Q.   Is it your understanding that any Calvert document like

5    this is back dated?

6    A.   All Calvert documents like this are back dated.

7    Q.   Any documents showing Calvert in existence in 2014.

8    A.   Correct.

9    Q.   If we go to Government Exhibit 1577.  What is this, Mr.

10   Dunkerley?

11   A.   This is resolution by Wealth Assurance Private Client

12   Corporation resolving a proposed investment by Calvert Capital

13   Partners in Rosemont Seneca Bohai, private equity vehicle to

14   the sum of $15 million.

15   Q.   And if you go to the last page of the document, who signed

16   this?

17   A.   I signed this.

18   Q.   And did you actually sign it on August 23, 2014?

19   A.   I did not.

20   Q.   When was the document actually created?

21   A.   It was created in the winter of 2015.

22   Q.   Mr. Dunkerley, I used the term before "back dated".  What

23   do you understand the term back dated to mean?

24   A.   The date that's put on the document is not the actual date

25   it was signed, but the date that's put on is before the day the

I647GAL3                    Dunkerley – Cross

1    document is actually signed.

2    Q.  So, for example, signing a document with a date August 23,

3    2014 in 2015.

4    A.  Correct.

5            MR. QUIGLEY:  One moment, your Honor.

6            THE COURT:  Sure.

7    Q.  I think you said with respect to when these documents were

8    created, you said the winter of 2015.  Do you mean late 2015?

9    A.  Yes, yeah, November/December of 2015, I believe.

10            MR. QUIGLEY:  Thank you, your Honor.  Nothing further.

11            THE COURT:  All right.  Cross-examination.

12   CROSS EXAMINATION

13   BY MR. TOUGER:

14   Q.  I guess we moved into the afternoon, so good afternoon, Mr.

15   Dunkerley.

16   A.  Good afternoon.

17   Q.  Mr. Dunkerley, can we agree you have never met John

18   Galanis?

19   A.  I have never met John Galanis.

20   Q.  And you have never spoken to John Galanis?

21   A.  I have never spoken to John Galanis.

22   Q.  And you have never communicated in any fashion with John

23   Galanis?

24   A.  I have never communicated in any fashion with John Galanis.

25   Q.  And you never knew when you saw that wire going to

I647GAL3                          Dunkerley - Cross

1    Sovereign Nations -- after the bond was the first series of

2    bonds was executed -- what Sovereign Nations was.

3    A.   Correct.

4    Q.   And you thought it was associated with Jason Galanis, did

5    you not?

6    A.   I believed it was associated with the tribe actually.

7    Q.   OK.  And, by the way, how many times has the government

8    interviewed you?

9    A.   At least 20.

10   Q.   And how many times have I interviewed you?

11   A.   Zero.

12   Q.   How many times have I spoken to you?

13   A.   Zero.

14   Q.   How many times have I e-mailed you?

15   A.   Zero.

16   Q.   How many times has the government e-mailed you,

17   approximately?

18   A.   The government e-mailed me?

19   Q.   How many times have you received an e-mail from any of the

20   people sitting at this desk?

21   A.   Zero.

22   Q.   OK.  So all conversations have been in person?

23   A.   It means through my lawyer.  All e-mails have been from the

24   government to my lawyer.

25   Q.   How many has your lawyer received from these individuals?

I647GAL3                    Dunkerley - Cross

1         MR. QUIGLEY:  Objection.

2    Q.  If you know.

3         THE COURT:  Sustained.

4    Q.  Not the contents.  But would it be fair to say that your

5    lawyer received dozens of e-mails from the government?

6         MR. QUIGLEY:  Objection.

7         THE COURT:  Sustained.

8    Q.  Now, during those 20 times that you spoke with the

9    government and they interviewed you, some of those sessions

10   lasted quite a long time, right?

11   A.  It depends on what you mean by a long time.

12   Q.  How long -- what was the longest that one of those sessions

13   lasted?

14   A.  Five or six hours maybe.

15   Q.  And what was the shortest one of those sessions lasted?

16   A.  One or two hours.

17   Q.  So all the sessions were between one or two hours and five

18   and six hours.

19   A.  Correct.

20   Q.  And during those sessions they asked you a lot of

21   questions.

22   A.  Correct.

23   Q.  And you gave them a lot of answers.

24   A.  Correct.

25   Q.  And would it be fair to say that those first four questions

1    I asked you they asked you?

2    A.  I can't specifically remember that, no.

3    Q.  He never asked you if you ever met John Galanis?

4    A.  Yes, they did ask me that question, yes.

5    Q.  And they never asked you have you ever spoken to John

6    Galanis?

7    A.  I don't specifically remember them asking me that, but they

8    could have easily asked me that.

9    Q.  And, by the way, you testified on direct that according to

10   your cooperation agreement you have to tell the truth.

11   A.  Absolutely.

12   Q.  And the government wouldn't let you get up on that stand --

13   withdraw that question.

14          The government wouldn't have given you the cooperation

15   agreement unless they thought you were telling the truth when

16   they spoke to you.

17          MR. QUIGLEY:  Objection.

18          THE COURT:  Sustained.

19   Q.  In your mind, if you had lied to the government during your

20   interviews with them, would they have given you the cooperation

21   agreement?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  I will allow that as to what your

24   understanding is of the cooperation process.

25   A.  The cooperation process is that I have to tell the truth.

1    Q.   At all times, right?

2    A.   Absolutely.

3    Q.   You can't lie one day and then come back and tell the truth

4    the next day, right?

5    A.   I can't lie at all.

6    Q.   And through those 20 times you told the truth each and

7    every time.

8    A.   Absolutely.

9    Q.   And at any time during those sessions did the government

10   ever say, you know, Mr. Dunkerley, we don't believe you, or

11   you're not telling the truth, to you?

12   A.   They had a lot of questions for me.

13   Q.   But did they ever tell you that they don't think you're

14   telling the truth?

15   A.   Not that I can specifically remember, no.

16   Q.   So basically you've told the truth through your 20

17   interviews and here today on direct, of course, correct?

18   A.   Absolutely.

19   Q.   And I believe it was brought out on direct, but one final

20   question.  In your cooperation agreement, it is the

21   government's choice whether to write this letter to the judge

22   when you finish testifying, right?

23   A.   It is.

24   Q.   And they get to decide whether you told the truth here or

25   not, right?

I647GAL3                      Dunkerley - Cross

1    A.  I believe so, yes.

2    Q.  Now, so the government knew full well every answer that you

3    were going to give on direct testimony; they went over each and

4    every question with you before they asked it to you on direct.

5            MR. QUIGLEY:  Objection.

6            THE COURT:  Sustained.

7    Q.  Did the government review your direct testimony with you?

8    A.  Can you highlight the question a little bit more?  Did they

9    review my?

10   Q.  Sure.  You have just been on the stand for approximately

11   three or four hours, right?

12   A.  Yes.

13   Q.  The government asked you a lot of questions.

14   A.  Yes.

15   Q.  Had you heard all those questions before you answered them

16   here today?

17   A.  I hadn't heard all of them, no.

18   Q.  Would you say you heard about 90 percent of them?

19   A.  I heard a lot of them, yes.

20   Q.  OK.  So the government knew when you entered this courtroom

21   last Thursday that you had never met John Galanis.

22           MR. QUIGLEY:  Objection.

23   Q.  You had told them that.

24           THE COURT:  Sustained.

25   Q.  You had told the government you had never met John Galanis

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I647GAL3                          Dunkerley - Cross

1   during your sessions.

2           MR. QUIGLEY:  Objection.  Asked and answered.

3           THE COURT:  I will allow that.

4   A.  I had told the government that I had never met John

5   Galanis, absolutely correct.

6   Q.  And they didn't rip up your cooperation agreement when you

7   said that, right?

8   A.  Why should -- Sorry.

9           No, they did not rip up my cooperation agreement.

10  Q.  The truth.

11  A.  Absolutely.

12  Q.  Can you name the companies that you either acted as a

13  director, officer or a nominal shareholder that are relative to

14  this investigation?

15  A.  These proceedings?  Can you repeat the question again.

16  Q.  Can you name the companies that are relative to this -- to

17  what you're testifying about -- that you acted as either

18  director, officer or nominal shareholder?

19  A.  Wealth Assurance AG, Wealth Assurance Holdings, which

20  became the Valor Group and Valorlife.  I was a managing

21  director of Burnham Securities, Inc., so effectively a nominee

22  or agent.  I was the sole managing member of Wealth Assurance

23  Private Clients and the sole managing member of what is called

24  BFGSRI, which is the Burnham Financial Group Socially

25  Responsible Investing fund.

I647GAL3                         Dunkerley - Cross

1   Q.   And were you also part of 1920 Bel Air Real Estate

2   Holdings.

3   A.   Yes, I was the agent for that entity.

4   Q.   And were you part of COR Capital?

5   A.   Yes, and COR Securities Holdings, and other companies as

6   well.

7   Q.   And COR International, right?

8   A.   COR International, yes.

9   Q.   And what were you at COR International?

10  A.   I was a one percent shareholder of that entity and

11  representative of that entity.

12  Q.   And you were the trustee, right?

13  A.   I was also the trustee.

14  Q.   That's a trust company, right?

15  A.   COR International is not a trust company, but I was a

16  trustee of a trust that ran COR International.

17  Q.   OK.  So a trust ran COR International, and you were the

18  trustee of that trust.  I just want to make sure I understand

19  it.

20  A.   I -- it's -- can you repeat the question again?

21  Q.   Just repeating what you said.  A trust ran COR

22  International, and you were the trustee of the trust.

23  A.   There is a document saying that I am the trustee of the

24  trust, and I was a one percent shareholder and effectively the

25  CEO of COR International, correct.

I647GAL3                          Dunkerley - Cross

1    Q.  Now, in all those companies that you just listed, were you

2    acting for yourself or for the owners of those companies?

3    A.  In most cases for the owners of those companies.

4    Q.  And most of them you were acting on behalf of either Jason

5    Galanis or Jason Sugarman, correct?

6    A.  Correct.

7    Q.  And all those companies are in some way important players

8    in this investigation.

9              MR. QUIGLEY:  Objection.

10   Q.  In your mind.

11             THE COURT:  Sustained.

12   Q.  Now, your initial work for the Sugarmans was with Steve

13   Sugarman at COR Capital, correct?

14   A.  Correct.

15   Q.  And how long had you worked for COR Capital?

16   A.  For roughly three years.

17   Q.  And then you shifted to COR Clearing?

18   A.  I was including COR Clearing as part of the COR Capital

19   period of working for the COR entities, so the main COR

20   entities of companies, so about 18 months for both of those

21   entities.

22   Q.  OK.  But first with COR Capital and then for COR Clearing.

23   A.  Correct.

24   Q.  And COR Clearing was founded when the Sugarmans bought

25   Legion Clearing and renamed it COR Clearing, correct?

I647GAL3                    Dunkerley - Cross

1  A.  Correct.

2  Q.  And to your knowledge, again, didn't Jason Galanis through

3  his company Thorsdale lend the Sugarmans millions of dollars in

4  securities to act as collateral for that purchase of Legion

5  Clearing?

6  A.  I don't know about that.

7  Q.  OK.  Now I want to run through some of the financial

8  transactions that are part of this deal, and again through all

9  of these questions that I'm about to ask you I'm just asking

10  based on your knowledge, nobody else's.

11          In 2013 CORFA loaned some money to Burnham, correct?

12  A.  Yes.

13  Q.  And it wasn't a small amount; it was in the millions of

14  dollars, correct?

15  A.  Yes.

16  Q.  And CORFA's investors are I think -- and I don't know how

17  to pronounce it -- Lausanne?

18  A.  You are going to have to try again.

19  Q.  Elizabeth Sugarman's company is named what?

20  A.  Lausanne.

21  Q.  I didn't take French in high school.  How do you pronounce

22  it?

23  A.  Lausanne, Limited.

24  Q.  And that's Elizabeth Sugarman's company, correct?

25  A.  Elizabeth or Jason Sugarman.  I don't know between them.

I647GAL3                    Dunkerley - Cross

1   It is the Sugarman's entity, yes.

2   Q.  And Elizabeth Sugarman is married to Jason Sugarman?

3   A.  She is the wife of Jason Sugarman, yes.  I believe she goes

4   by the name of Elizabeth Gerber as well.

5   Q.  And who is Elizabeth's father?

6   A.  Peter Gerber.

7   Q.  Who is he?

8   A.  He is a film director.

9   Q.  And does he own many things?

10  A.  I believe he does.

11  Q.  And he owns a basketball team, correct?

12  A.  I believe he is a partial owner of a basketball team.

13  Q.  Which team is that?

14  A.  The Golden State Warriors.

15  Q.  The ones that are in the finals right now, right?

16  A.  Very exciting, yes.

17  Q.  And CORFA itself, let's talk about the 2013 to summer of

18  2014 period, Jason Galanis was a one third investor in CORFA,

19  correct?

20  A.  I don't know about that.

21  Q.  OK.  You don't know that Jason Galanis invested in CORFA.

22  Or you don't know it was one third?

23  A.  Jason Galanis was an investor in CORFA through Thunder

24  Valley Limited.  I do not know if it was a third.

25  Q.  Excuse me?

1   A.  I do not know it was a third.  I don't know what amount it

2   was.

3   Q.  And but I believe you testified on direct that Jason

4   Galanis was involved in the inner workings of Burnham

5   Securities.

6   A.  Yes.

7   Q.  And if you could bring up Government Exhibit 756. please.

8          You've seen this exhibit on direct, correct?

9   A.  Yes.

10  Q.  And this demonstrates that Jason Galanis was basically

11  giving out orders about how the closing of a deal to buy

12  Burnham was going to go, correct?  Look at the last paragraph

13  for instance.

14  A.  I'm just reading it again.  It gives a rough outline of how

15  the closing of the deal and transaction is taking place,

16  correct.

17  Q.  And just so we're clear, also so everybody understands who

18  is related to what, Thorsdale is Jason Galanis' holding

19  company.

20  A.  Yes.

21  Q.  And would I also be correct in saying that Jason Galanis,

22  although an investor in CORFA and affiliated with CORFA, he was

23  not on the board of CORFA?

24  A.  Correct.

25  Q.  Now, getting back to Burnham, Burnham owns Burnham Asset

I647GAL3                     Dunkerley – Cross

1   management, correct?

2   A.  Yes.

3   Q.  And that is an investment advisor, right?

4   A.  It's an asset manager.

5   Q.  And it has approximately $1.5 billion in client assets?

6   A.  Approximately, yes.

7   Q.  And it also owns Burnham Securities, which is an investment

8   bank, right?

9   A.  No, it doesn't own Burnham Securities.  Burnham Financial

10  Group owns Burnham Securities and Burnham Asset management.

11          MR. SCHWARTZ:  Objection.  Could we just have a

12  timeframe for this?

13  Q.  Sure.  The timeframe of early 2014 leading into the summer

14  of 2014, that's the timeframe I'm talking about right now,

15  Burnham Financial Group owns two companies underneath it,

16  right?

17  A.  Yes.

18  Q.  One of them being Burnham Asset Management.

19  A.  Yes.

20  Q.  And one of them being Burnham Securities.

21  A.  Yes.

22  Q.  And Burnham Securities is what?

23  A.  A broker dealer/investment bank.

24  Q.  And they used JP Morgan Chase as their clearinghouse,

25  correct?

1   A.  I believe so, and also COR Allegiant.

2   Q.  Now sometime late 2013 leading into 2014 Jason Galanis and

3   Jason Sugarman set out a plan to develop COR to get bigger,

4   right?

5   A.  Yes.

6   Q.  And they were trying to be opportunistic about this plan

7   and finding companies that are a little distressed that are

8   worth more than they're selling for.

9   A.  Correct.

10   Q.  And that doesn't make those transactions illegal, right?

11        MR. QUIGLEY:  Objection.  Calls for a conclusion.

12        THE COURT:  Sustained.

13   Q.  And what they -- when I say they, I mean Jason Galanis and

14   Jason Sugarman -- they think that they could find these

15   companies in European insurance companies, correct?

16        MR. QUIGLEY:  Objection.  Somebody else's state of

17   mind.

18        THE COURT:  Sustained.

19        MR. TOUGER:  What was the objection?

20        THE COURT:  It's not his personal knowledge.  You're

21   asking about other people's knowledge.

22   Q.  I'm saying did they tell you that they were looking to buy

23   European insurance companies?

24   A.  We were looking at financial companies all over the world.

25   Q.  All over the world.

I647GAL3                        Dunkerley - Cross

1    A.  Correct.

2    Q.  And would I be correct in saying -- and you have personal

3    knowledge of this deal -- the first company they looked to

4    purchase was Forces Vives?

5    A.  That's correct.

6    Q.  Did I pronounce that correctly?

7    A.  You did.

8    Q.  And that's V-I-E, just so the court reporter has it right?

9    A.  V-I-E-S.  Forces Vives, F-O-R-C-E-S V-I-V-E-S.

10   Q.  OK.  And in this transaction Jason Sugarman considered you

11   an important piece of the decision of whether to buy this

12   company or not.

13              MR. QUIGLEY:  Objection.

14              THE COURT:  Sustained.

15   Q.  Did Jason Sugarman give you tasks related to this purchase?

16   A.  Yes.

17   Q.  And what were those tasks he gave you?

18   A.  To complete due diligence on the transaction.

19   Q.  What does that mean?

20   A.  That means to run through every aspect of the corporation

21   and to assess its value and the purchase price that we were

22   going to pay for it and to assess if we were going to undertake

23   the transaction or not.

24   Q.  And basically he trusted your financial acumen to decide

25   whether this would be a good investment, correct?

I647GAL3                        Dunkerley - Cross

1          MR. QUIGLEY:  Objection.

2          THE COURT:  Sustained.

3   Q.  So he tells you to do the due diligence on this deal,

4   right?

5   A.  Yes.

6   Q.  Did you think he was going to ignore your advice?

7          MR. QUIGLEY:  Objection.

8          THE COURT:  Sustained.

9          MR. TOUGER:  What he thought, your Honor?

10         THE COURT:  Sorry?

11         MR. TOUGER:  What he thought?

12         THE COURT:  Rephrase that.

13  Q.  Did you think you were doing a valuable service to

14  Mr. Sugarman?

15  A.  Yes.

16  Q.  And actually Mr. Sugarman asked you -- Jason Sugarman asked

17  you to attend the negotiations for Forces Vives in Switzerland.

18  A.  Yes.

19  Q.  And would I be correct in saying that you attended these

20  negotiations even though you had recently suffered from a

21  motorcycle accident?

22  A.  The day I traveled to Switzerland I had a very serious

23  motorcycle accident, correct.

24  Q.  And the fact that you continued to go, in your mind this

25  made a big impression on Jason Sugarman, correct?

1   A.  I believe so, yes.

2   Q.  And, by the way, did you also attend the negotiations that

3   took place at the Banc of California in Orange County

4   California?

5   A.  For Burnham Securities and the negotiations that took place

6   at the Banc of California I was present at those negotiations,

7   yes.

8   Q.  And Banc of California is a Sugarman entity, correct?

9   A.  The CEO of Banc of California and major investor was Steven

10  Sugarman, yes.

11  Q.  Who is Jason Sugarman's brother.

12  A.  Yes.

13  Q.  Ultimately the Forces Vives transaction never occurs,

14  correct?

15  A.  Correct.

16  Q.  Basically the deal just could not be made.

17  A.  A deal could have been made, but the deal would not have

18  been profitable or worth pursuing for us -- for the

19  corporation.

20  Q.  They wanted too much money for their company.

21  A.  There were a number of reasons.  One of them was the price,

22  correct.

23  Q.  And so Jason Sugarman and Jason Galanis set out to find

24  another company to buy.

25  A.  We were looking at many companies at that point in time, so

I647GAL3                    Dunkerley - Cross

1    it was just one of many.

2    Q.  Right.  And at some point the company Wealth Assurance AG

3    appears on the horizon, right?

4    A.  Yes.

5    Q.  And how did that company appear on the horizon?

6    A.  A prior owner of Wealth Assurance AG, Aloyse Steichen -- I

7    believe that's the correct spelling, I could be incorrect -- he

8    being a former owner of the entity, we basically said it was a

9    good opportunity to buy this entity, which was in distress.

10   Q.  Did you know Aloyce Steichen before this occurred?

11   A.  No.

12   Q.  Did you know of his reputation in the financial community

13   before this occurred?

14   A.  No.

15   Q.  Did you find -- did you do any due diligence on Aloyce

16   Steichen before or during your research on this deal?

17   A.  Some basic due diligence, yes.

18   Q.  And what did you find out about Aloyce Steichen?

19            MR. QUIGLEY:  Objection.

20            THE COURT:  Overruled.

21            You can answer.

22   A.  That he had been in the insurance business for many years,

23   he had effectively I believe built a very large business called

24   Lombard Insurance, I think it's Lombard, and then had gone on

25   to build Wealth Assurance AG.

I647GAL3                      Dunkerley - Cross

1  Q.  So you -- because you found that out, you trusted his

2  opinion on whether Wealth Assurance AG would be a good

3  investment.

4          MR. QUIGLEY:  Objection.

5          THE COURT:  I will allow it.

6  A.  Repeat the question, please.

7  Q.  Because of what you found out, you trusted his opinion on

8  whether Wealth Assurance AG would be a good investment to look

9  to purchase.

10 A.  I took his opinion into account, but we also did our own

11 due diligence.

12 Q.  That was my next question.  And then you did your own due

13 diligence on Wealth Assurance AG, right?

14 A.  Absolutely.

15 Q.  And were you part of that?

16 A.  Yes.

17 Q.  And you found out that in your opinion Wealth Assurance AG

18 was selling at under value.

19 A.  It was distressed and selling under value, correct.

20 Q.  And so efforts were put in to buy Wealth Assurance AG,

21 right?

22 A.  Yes.

23 Q.  And but before the deal could be completed it had to get

24 the approval of the Lichtenstein Monetary Authority, right?

25 A.  Yes.

I647GAL3                       Dunkerley - Cross

1   Q.  And could you just tell the jury what the Lichtenstein

2   Monetary Authority is?

3   A.   The Lichtenstein Monetary Authority is the regulatory

4   agency for financial institutions in Lichtenstein, and it goes

5   by the initials of the FMA.

6   Q.  And would I be correct in saying that there were

7   conversations between you, Jason Galanis and Jason Sugarman

8   about what entity would be the purchaser of Wealth Assurance

9   AG?

10  A.   Yes.

11  Q.  And would I also be correct in saying that it was decided

12  that COR Clearing would be the best option to be the buyer

13  because COR Clearing was a highly regulated large broker

14  dealer?

15  A.   That would be incorrect.

16  Q.  Who decided to be the buyer?

17  A.   COR International.

18  Q.  And again COR International is a company that is owned by

19  who?  Or what?

20  A.   Jason Sugarman is the 99 percent owner at this time, and

21  I'm a one percent owner of that entity.

22  Q.  And the trust is for Jason Sugarman, correct?

23  A.   Correct.

24  Q.  So it's Jason Sugarman's company.

25  A.   Basically, yes.

I647GAL3                    Dunkerley – Cross

1   Q.   And he made you the trustee of that company.

2   A.   There is a document that outlines me to be the trustee of

3   that entity, yes.

4              (Continued on next page)

I64JGAL4                    Dunkerley - cross

Q.  And did you have any doubt at this time that Jason Sugarman
trusted you?

          MR. QUIGLEY:  Objection.

          THE COURT:  Sustained.

BY MR. TOUGER:

Q.  Did Jason Sugarman ever do anything to you around this time
that indicated to you that he didn't trust you?

A.  I never even thought about it, no.  There was nothing in my
mind that I can think of that said he did not trust me.

Q.  Now, would I be correct to say also that you had
demonstrated a certain amount of loyalty to the Sugarmans by
going to the COR negotiations when you had just suffered a
serious motorcycle accident?

          MR. QUIGLEY:  Objection.

          THE COURT:  Sustained.

BY MR. TOUGER:

Q.  The statement with Lichtenstein monitoring authority that
COR International would be the buyers of Wealth Assurance AG?

A.  Yes.

Q.  That was approved?

A.  Eventually, yes.

Q.  And so at that point a company was formed called Wealth
Assurance Holdings, right?

A.  Correct.

Q.  Wealth Assurance Holdings is a special entity corporation?

I64JGAL4                    Dunkerley - cross

1   A.  Special purpose vehicle, special purpose corporation, yes.

2   Q.  Would you describe to the jury what that is.

3   A.  A shell company created for the purpose, many purposes, but

4   in this case, to buy another company.  It is a blank sheet

5   company.

6   Q.  Wealth Assurance Holdings was created to buy Wealth

7   Assurance AG?

8   A.  Absolutely.

9   Q.  That was the purpose of creating this company?

10  A.  Yes.

11  Q.  Who created this company?

12  A.  I believe either Jason Sugarman or myself.  I can't exactly

13  remember.

14  Q.  There was nothing untoward about naming it Wealth Assurance

15  Holdings because it was going to buy Wealth Assurance AG?

16  A.  Absolutely.

17  Q.  What was your role at Wealth Assurance Holdings?

18  A.  I was a director of Wealth Assurance Holdings.

19  Q.  So Jason Sugarman put you in as the director of the

20  company?

21  A.  With him as a director as well, correct.

22  Q.  You were joint directors?

23  A.  Yes.

24  Q.  What jurisdiction was Wealth Assurance Holdings formed in?

25  A.  I believe Nevada, USA.

I64JGAL4                         Dunkerley - cross

1   Q.   Whose idea was that, if you know?

2   A.   Yeah, I don't have any specific knowledge about that.

3   Q.   WAH, wealth Assurance Holdings, had two classes of stock.

4   Am I correct?

5   A.   I believe so, yes.

6   Q.   It had a Class A class which had the voting rights, but no

7   economic interest?

8   A.   Right.

9   Q.   And they were owned by COR International?

10   A.   Yes.

11   Q.   So COR International had all the voting rights shares of

12   Wealth Assurance Holdings?

13   A.   Correct, yes.

14   Q.   And the Class B shares had no voting rights but had

15   economic interest?

16   A.   Correct.

17   Q.   And so the idea was to sell these Class B shares to raise

18   money to buy Wealth Assurance AG?

19   A.   Yes.

20   Q.   And the Class B shares of WAH, Wealth Assurance Holdings,

21   were placed under the Bermuda Stock Exchange, were they not?

22   A.   They were.

23   Q.   And just so the jury understands, Wealth Assurance AG was a

24   large German insurance company?

25   A.   Absolutely not.

I64JGAL4                        Dunkerley - cross

1    Q.  What was it?

2    A.  Wealth Assurance AG was owned by Lichtenstein Standards, a

3    large insurance company.

4    Q.  I stand corrected.  It was part of a large German insurance

5    company, correct?

6    A.  It is a very large insurance company that owned Wealth

7    Assurance AG and who we bought it from, correct.

8    Q.  So WAH then sets out to raise money to buy Wealth Assurance

9    AG?

10   A.  Wealth Assurance Holdings, correct.

11   Q.  And Wealth Assurance Holdings, the investors that actually

12   in the end started to come in, were all primarily friends and

13   family of Jason Sugarman?

14   A.  They were acquaintances, sure.

15   Q.  One of them was Mr. Czucker?

16   A.  Czucker.

17   Q.  How do you pronounce it?

18   A.  Czucker.

19   Q.  And he did that through a company called Centurion

20   Investments?

21   A.  I am not a hundred percent sure, but possibly, yes.

22   Q.  That was about $2.5 million, right?

23   A.  Yes.

24   Q.  David Ezekiel invested $1 million?

25   A.  I don't believe David was involved at that point in time.

I64JGAL4                    Dunkerley - cross

1   Q.  But at some point in time he invests $1 million in Wealth

2   Assurance Holdings, correct?

3   A.  Yeah, later on, about two and a half years later he

4   invested into Wealth Assurance Holdings, correct.

5   Q.  Who is David Ezekiel?

6   A.  David Ezekiel is an individual based in Bermuda who is the

7   ex-CEO of Marsh Insurance Industries.

8   Q.  A big-time investor, right?

9   A.  A big-time CEO.  I am not sure about big-time investor.

10  Q.  Elizabeth Gruber Sugarman also invested in WAH, correct,

11  Wealth Assurance Holdings?

12  A.  Yes.

13  Q.  And other people did also?

14  A.  Yes.

15  Q.  Wealth Assurance AG was going to be purchased for $13

16  million?

17  A.  Yes, I believe so.

18  Q.  And the deal called for a down payment in December of 2013

19  and then a second payment in early 2014?

20  A.  That sounds about correct, yes.

21  Q.  If this deal actually goes through, COR International buys

22  Wealth Assurance AG?

23  A.  Yes.

24  Q.  Would I be correct in saying that after the deal goes

25  through, is executed, that Jason Galanis, through his Thorsdale

I64JGAL4                         Dunkerley - cross

1    account at Banc of California, sends $4.8 million,

2    approximately, to Wealth Assurance Holdings and receives in

3    return 800,000 units of Wealth Assurance Holdings which

4    includes 800,000 shares valued at $6.00 per share?

5    A.  I need to see account statements to verify that.  It

6    doesn't come straight to memory.

7    Q.  Would you agree with me that Jason Galanis invested in

8    WAAG?

9    A.  Yes, I believe so.

10   Q.  Would you agree with me that he got back for that

11   investment shares of WAAG?

12   A.  I believe that's the case, yes.

13   Q.  Now, do you remember that in March of 2014 Ernst & Young

14   did an appraisal of Wealth Assurance AG's portfolio?

15   A.  I do.

16   Q.  What is Ernst & Young?

17   A.  A top five accountancy firm.

18   Q.  Excuse me?

19   A.  A top five accountancy firm.

20   Q.  In the world, right?

21   A.  Correct.

22   Q.  And very reputable?

23   A.  Very reputable.

24   Q.  Not some fly-by-night operation in some strip mall?

25   A.  They're a top five accountancy firm globally.

I64JGAL4                           Dunkerley - cross

1   Q.   And have offices all around the world?

2   A.   Globally.

3   Q.   Would I be correct in saying Wealth Assurance AG's

4   portfolio was appraised by Ernst & Young at $67.5 million?

5   A.   I would need to see the report, but that sounds about

6   correct.

7   Q.   Would it also sound correct that meant that each share was

8   worth approximately $36 a share?

9             MR. QUIGLEY:  Objection.

10            THE COURT:  I'll allow it if you know.

11  A.   I don't have these sums in my head, but if you look to the

12  documents and you went through that research, that sounds about

13  correct.

14  BY MR. TOUGER:

15  Q.   Now, what is Teneo?

16  A.   Teneo is a consulting company, strategic consulting

17  company.

18  Q.   Are they a fly-by-night operation or again a top flight

19  company?

20  A.   They are a highly reputable strategic consulting company.

21  Q.   How do they fit into this situation?

22  A.   After many years and the collection of all these financial

23  entities, they were asked to --

24  Q.   When were they asked, if I can just interrupt.

25  A.   I believe it would have been in the fall of about 2015, yet

I64JGAL4                          Dunkerley - cross

1    in the summer-fall, around that time, to produce a strategy for

2    Burnham for the sale of Burnham.

3    Q.  To who?

4    A.  To anyone.

5    Q.  Basically Burnham's investors were looking to sell their

6    company they had built up over the years?

7    A.  They were looking to justify the value that they had

8    created in through those entities and possibly looking for a

9    seller, yes.

10   Q.  The long and short of Teneo's results was the company was

11   worth a lot of money?

12   A.  More than the sum of the parts, correct.

13   Q.  Do you remember, were you involved in that work by Teneo?

14   A.  I was.

15   Q.  What was the final value, approximately?

16            MR. QUIGLEY:  Objection; hearsay.

17            THE COURT:  Do you know?

18            THE WITNESS:  I actually can't remember an exact

19   figure.

20            THE COURT:  Just move on then.

21            MR. TOUGER:  I'll look for that document during lunch,

22   your Honor.

23   BY MR. TOUGER:

24   Q.  Now, getting back to now the period of the late winter,

25   early spring of 2014, right, Wealth Assurance AG is now

1  purchased, right?

2  A.  Right.

3  Q.  It is in the hands of Jason Sugarman and his investors?

4  A.  Correct.

5  Q.  And at this point Jason Galanis and Jason Sugarman are

6  still looking for other companies to buy, right?

7  A.  Correct.

8  Q.  One of the companies they are looking at is called Valor,

9  right?

10  A.  Valor, yes.

11  Q.  And Valor is another European insurance company?

12  A.  Based out of Switzerland, yes.

13  Q.  Worth billions of dollars?

14  A.  So Valor is actually, Valor Life is a subsidiary of a much

15  larger parent company called the Vaudoise Group worth billions

16  of dollars.

17  Q.  Can we bring up Government Exhibit 1221, please.  Can you

18  blow up -- see that before you do -- you need to blow it up.

19  Can you read it?  (Pause) Can you just show that to the

20  lawyers, the Judge and Mr. Dunkerley.

21          Do you recognize that document?

22          MR. QUIGLEY:  We object to this witness --

23          THE COURT:  Sorry?

24          MR. QUIGLEY:  We object to this with this witness.  He

25  is not on the document.

I64JGAL4                         Dunkerley - cross

1           MR. TOUGER:  I asked him if he recognized it.  If he

2    says no, I'll deal with it.

3    BY MR. TOUGER:

4    Q.  Have you ever seen that document?

5    A.  I don't believe so.  I don't know.

6    Q.  Take it off.  Would I be correct in saying that during the

7    late winter of 2014, early spring of 2014, that Jason Galanis

8    and Jason Sugarman were researching many different ways to

9    purchase Valor?

10   A.  Yes.

11   Q.  And one of those ways that they were looking at -- I

12   withdraw that question.

13          Would I be correct in saying that the Wakpamni bond

14   idea was one of many different ideas that was being bandied

15   about to finance the purchase?

16          MR. QUIGLEY:  Form.

17   A.  Not with me.  I wouldn't know.

18   BY MR. TOUGER:

19   Q.  Now, at some point in the summer of 2014, it is decided

20   that the Wakpamni bond deal would be the methodology of

21   financing the sale, the purchase of Valor, correct?

22   A.  Again I wasn't privy to some of those conversations so I

23   actually don't know the answer to that question.

24   Q.  Okay.  You don't know that the idea -- just to clarify what

25   you're saying -- you don't know that the idea of the use of the

I64JGAL4                          Dunkerley - cross

1    Wakpamni bonds, the money they received in the Wakpamni bonds

2    was to buy Valor?

3                MR. QUIGLEY:  Objection; asked and answered.

4                THE COURT:  Sustained.

5                MR. TOUGER:  Whether he knows that, your Honor?

6                MR. QUIGLEY:  He just asked him the same question,

7    your Honor.

8                THE COURT:  Didn't --

9                MR. TOUGER:  I made it much more clearer the second

10   time, your Honor.

11               THE COURT:  You can answer it one more time.

12               THE WITNESS:  Can you repeat it one more time.

13   BY MR. TOUGER:

14   Q.  Sure.  Did you find out in the summer of 2014 at some point

15   that the idea to use the proceeds of the Wakpamni bonds was to

16   buy Valor?

17   A.  So I believed that the money was being used for that

18   purpose, but I didn't know for sure.

19   Q.  Okay.  Now, in the end, though, and jumping, skipping a lot

20   of steps, but just getting there for now, in the end money from

21   WAPC, Wealth Assurance Private Client, goes to Thorsdale, which

22   then goes to WAH to purchase Valor, right?

23   A.  I believe so, yes.

24   Q.  And that was shown in Government Exhibit 1582 if you could

25   bring that up.  Look under external wire.  That is money going

1   to how do you provide --

2   A.   Vaudoise.

3   Q.   -- to purchase Valor, right?

4   A.   Correct.

5   Q.   Once Valor was purchased, it was decided to combine Wealth

6   Assurance AG and Valor into one company and call it Valor or

7   Valor Life?

8   A.   The Valor Group.

9   Q.   That company, the combined company, Valor Group, was worth

10  hundreds of millions of dollars, correct?

11  A.   Yes.

12  Q.   You believed there was enough equity in that company to

13  support the annuity that was created by the Wakpamni first

14  series of bonds?

15           MR. QUIGLEY:  Objection.

16           THE COURT:  I'll allow it.

17  A.   Jason Galanis explained to me how he believed that it was

18  enough money in those entities to support the Wakpamni bonds,

19  correct.

20  BY MR. TOUGER:

21  Q.   When he explained it to you, you believed it, correct?

22  A.   Correct.

23  Q.   When he explained that to you, you believed that the

24  annuity would be able to pay the bondholders?

25  A.   There was no annuity.

I64JGAL4                      Dunkerley - cross

1    Q.  Well, the money went into Wealth Assurance Private Client,

2    right?

3    A.  Correct.

4    Q.  The annuity was formed at that moment that the money went

5    into Wealth Assurance Private Client?

6    A.  No, it wasn't.

7    Q.  Why not?

8    A.  Because the money went to everything else but an annuity

9    contract.

10   Q.  That is your opinion?

11   A.  That is the fact.

12          MR. QUIGLEY:  Objection.

13   Q.  The money went to Wealth Assurance Private Client, did it

14   or did it not?

15          THE COURT:  Overruled.

16   A.  The money went to Wealth Assurance Private Client.

17   Q.  Did part of the money from Wealth Assurance Private Client

18   buy Valor?

19   A.  From the --

20          MR. QUIGLEY:  Objection.  It mischaracterized his

21   testimony.

22          THE COURT:  Just ask the question again and just don't

23   interrupt.  Go ahead.

24   BY MR. TOUGER:

25   Q.  Did the money from Wealth Assurance Private Client buy

I64JGAL4                         Dunkerley – cross

1    Valor?

2    A.   Through Thorsdale, yes.

3    Q.   And Thorsdale got the money from Wealth Assurance Private

4    Client?

5    A.   I believe so.

6    Q.   Now, Valor was a real company, right?

7    A.   Absolutely.

8    Q.   With real assets?

9    A.   Absolutely.

10   Q.   And was making real profit?

11   A.   Yes.

12   Q.   The purchase of Valor was part of this plan by Jason

13   Galanis and Jason Sugarman to expand the holdings of COR?

14   A.   Yes.

15   Q.   And Valor was a perfect example of that?

16   A.   Part of it, yes.

17   Q.   Now, would you describe Jason Galanis and Jason Sugarman as

18   50/50 partners?

19   A.   Yes.

20   Q.   As a matter of fact, Jason Galanis specifically told you

21   that he and Jason Sugarman were partners?

22   A.   On several occasions he made it completely clear that they

23   were business partners and that wasn't to be corrected in any

24   way.

25   Q.   Would I be also correct in saying that you have personally

I64JGAL4                    Dunkerley - cross

1    described Jason Galanis as the brains of the operation and

2    Jason Sugarman was the brawn?

3    A.  I made that statement, yes.

4    Q.  You handled really the day-to-day activities of the various

5    companies that you were involved in, correct?

6    A.  Yes.  I was more on the operational person.

7    Q.  You were the execution man, right?

8    A.  I dealt with operations.

9    Q.  Jason Galanis or Jason Sugarman would give you

10   instructions, and you would do them?

11   A.  Yes.

12   Q.  Were you paid in 2013 for your work?

13   A.  Yes.

14   Q.  By who?

15   A.  By COR Capital and COR Clearing.

16   Q.  How much did you make in 2013 from COR Capital and COR

17   Clearing?

18   A.  I made $150,000 a year.

19   Q.  In 2014, were you paid?

20   A.  I was stopped being paid at some point in time.  I can't

21   remember the exact date, but I became a W-2 employee of Burnham

22   Securities, so it is not crystal clear, but I was paid by them

23   through doing placements, correct.

24   Q.  You testified this morning that you received certain

25   payments based on the first tranche of Wakpamni bonds, correct?

I64JGAL4                          Dunkerley - cross

1   A.   Yes.

2   Q.   I believe you testified you received $125,000?

3   A.   Yes.

4   Q.   So you got half of what Burnham got, right?

5   A.   Yes.

6   Q.   Would I be correct in saying that Jason Galanis had an

7   interest in the following companies:   Thorsdale?

8   A.   Yes.

9   Q.   Private Equity Management?

10  A.   I don't know.

11  Q.   Wealth Assurance Private Client?

12  A.   No.

13  Q.   He did not issue you instructions on what to do for Wealth

14  Assurance Private Client?

15  A.   You asked me if he had ownership and beneficial.

16  Q.   No.  Did he have decision-making authority in that company,

17  Wealth Assurance Private Client?

18  A.   Yes, yes, yes, he did.

19  Q.   During the years 2013 through September 2014, he had a

20  major influence at Burnham Securities, correct?

21  A.   Yes.

22  Q.   He invested, as you already said, in Wealth Assurance

23  Holdings?

24  A.   Yes.

25  Q.   Now, these were all unregulated companies with noncash

1    assets, right?

2            MR. QUIGLEY:  Objection to form.

3            THE COURT:  Can you answer that in its current form?

4            THE WITNESS:  He needs to repeat it a little bit.

5            MR. TOUGER:  Let me knock it down.

6    BY MR. TOUGER:

7    Q.  These were all non, or should I say, unregulated companies?

8    A.  Can you say the companies again.

9    Q.  Thorsdale, Wealth Assurance Private Client, Burnham

10   Securities and Wealth Assurance Holdings?

11   A.  Burnham Securities was absolutely a regulated entity and

12   Wealth Assurance Holdings was not a regulated entity.

13   Q.  In Burnham Securities' situation, we're just saying Jason

14   Galanis had a lot of power in that company, right?

15   A.  Informal power, correct.

16   Q.  I believe you once stated that informal power is sometimes

17   greater than actual power, right?

18   A.  It is a famous quote, correct.

19   Q.  You believed that to be true as far as Jason Galanis and

20   Burnham Securities?

21           MR. SCHWARTZ:  Objection.  May we have a time period

22   again?

23   BY MR. TOUGER:

24   Q.  Between 2013 and up to September 2014?

25   A.  It totally depends.  Formal power and informal power,

1    they're --

2    Q.  There is no doubt Jason Galanis had power in Burnham

3    Securities during that time period?

4    A.  Yes.

5    Q.  Jason Sugarman's companies that he had interest in were

6    more the regulated companies, correct, like COR Clearing and

7    Banc of California?

8    A.  Jason Galanis and Steven Sugarman, correct.  Steven

9    Sugarman had the regulated entities that they held together.

10   Q.  Would you agree the second and third series of bonds was

11   done to provide regulatory capital to the Sugarman brothers?

12            MR. QUIGLEY:  Objection.

13            THE COURT:  To the extent that you know the answer to

14   that, please answer.

15            THE WITNESS:  Repeat the question.

16   BY MR. TOUGER:

17   Q.  To the extent that you know, was the second and third

18   series of bonds done to provide regulatory capital to the

19   Sugarman brothers controlled companies?

20   A.  Yeah, I have no knowledge of that.

21   Q.  Were there any companies that Jason Sugarman and Jason

22   Galanis controlled together?

23   A.  From a legal standpoint, not that I know of.

24   Q.  But there is no doubt that they were working in harmony

25   between the two of them?

I64JGAL4                     Dunkerley - cross

1   A.   Absolutely.

2   Q.   This continued in 2014 and 2015, correct?

3   A.   Yes.

4   Q.   By the way, you said you made $150,000 in 2013 and you made

5   $125,000 for your work on the Wakpamni bonds.  Would that

6   compensation be sort of equitable to what other chief

7   executives of a billion dollar insurance company would get?

8             MR. QUIGLEY:  Objection.

9             THE COURT:  Sustained.

10  BY MR. TOUGER:

11  Q.   When did you first meet Jason Galanis, by the way?

12  A.   In the spring of 2011.

13  Q.   That was on the introduction of Steven Sugarman, right?

14  A.   Yes.

15  Q.   And he actually does the introduction, he introduces Jason

16  Galanis to you?

17  A.   Yes.

18  Q.   And you meet him in person?

19  A.   Yes.

20  Q.   Before you meet him, I believe you testified on Thursday

21  that Steven Sugarman said 50 percent think he is a crook and 50

22  percent think he is okay?

23  A.   To sum it up, correct, yes.

24  Q.   You did your own due diligence and found that to be true?

25  A.   Yes.

I64JGAL4                        Dunkerley - cross

1   Q.  But Steven Sugarman told you that in his mind, he told you

2   that Jason Galanis was not a crook?

3   A.  Correct.

4   Q.  What were the jobs you had for Steven Sugarman?

5   A.  The title he gave me was executive vice president, and my

6   main job was to create an index for business development

7   corporations that people could trade off.

8   Q.  Was this a position of trust?

9           MR. QUIGLEY:  Objection.

10          THE COURT:  Sustained.

11  BY MR. TOUGER:

12  Q.  Did that position have a certain amount of power to it?

13  A.  I was an employee.

14  Q.  Answering to Steven Sugarman, though, correct?

15  A.  Yes.

16  Q.  Nobody else?

17  A.  Nobody else.

18  Q.  And Steven Sugarman, in your mind, was a sophisticated

19  businessman?

20  A.  Absolutely.

21          MR. QUIGLEY:  Objection.

22          THE COURT:  Overruled.

23  BY MR. TOUGER:

24  Q.  He was a Yale-educated attorney?

25  A.  He is.

I64JGAL4                         Dunkerley - cross

1   Q.  And he had made some good business decisions in his life?

2   A.  I don't really know.  I can't really comment that much on

3   it.  He was a successful individual.

4   Q.  You never saw him get taken advantage of in any deals, did

5   you?

6              MR. QUIGLEY:  Objection.

7              THE COURT:  Sustained.

8   BY MR. TOUGER:

9   Q.  Now, you had this first meeting with Jason Galanis.  How

10  long after that meeting did you come into contact with Jason

11  Galanis again?

12  A.  It was about another -- well, there were a couple of

13  transactions in-between where I had phone call conversations

14  with Jason Galanis, but on occasion he would pop into the

15  office, but it was just hellos.  It took another year for the

16  financial roll-up plan to come together.

17  Q.  When was that, approximately?

18  A.  About the beginning of 2013, I believe.

19  Q.  Excuse me?

20  A.  The beginning of 2013, yes.

21  Q.  As you just said, it was at this meeting that you began to

22  discuss the financial roll-up plan, right?

23  A.  Yes.

24  Q.  And you found out at this meeting that Jason Galanis and

25  Jason Sugarman had desire to roll up companies?

1    A.  Yes.

2    Q.  As you said, the idea was to buy financial services

3    companies that were in distress, that could be worth more than

4    they were selling for?

5    A.  Yes.

6    Q.  The first conversation that you had about this was had, I

7    believe you said, at Jason Galanis' home?

8    A.  I think you're confusing a couple of topics.  If you could

9    repeat the question and clarify it.

10   Q.  Let me clarify it.

11            The first meeting you had about this financial

12   roll-up, where did that take place?

13   A.  It took place in the offices of COR Capital.

14   Q.  At that meeting was you and Jason Sugarman?

15   A.  And Steven Sugarman and Jason Galanis.

16   Q.  And Lucas Mann, correct?

17   A.  I can't remember Lucas definitely being there, but he could

18   have been.

19   Q.  Who is Lucas Mann?

20   A.  He is an associate of Jason Galanis.

21   Q.  Not of the Sugarmans?

22   A.  Not of the Sugarmans, no.

23   Q.  As these ideas began to germinate, more people were brought

24   into the discussion, right?

25   A.  Yes.

I64JGAL4                          Dunkerley - cross

1   Q.   Including Gary Hirst?

2   A.   Yes.

3   Q.   Michelle Morton?

4   A.   Yes.

5   Q.   And a many others, right?

6   A.   Every company we took over, people from those companies

7   became a part of the group that we discussed things with.

8   Q.   Would I be correct in saying you never saw John Galanis at

9   any of those meetings?

10  A.   Never.

11  Q.   You never her John Galanis participate in one of those

12  meetings by telephone?

13  A.   Never.

14  Q.   Or by video conference?

15  A.   Never.

16  Q.   And you never even heard his name mentioned at those

17  meetings?

18  A.   Never.

19  Q.   The goal here of this financial roll-up was to make Burnham

20  into a full service financial services firm, right?

21  A.   The overall goal, yes.

22  Q.   Basically you wanted to take care of any need a customer

23  might have?

24  A.   It is a very broad definition, but to be a large financial

25  services firm was the goal of doing this roll-up.

I64JGAL4                    Dunkerley - cross

1   Q.  To become bi-coastal, right?

2   A.  Well, we were international already so.

3   Q.  Over the course of the three years that this plan was being

4   implemented, you met with Jason Galanis and Jason Sugarman many

5   times?

6   A.  Many times.

7   Q.  You had countless telephone calls?

8   A.  Literally countless.

9   Q.  And literally countless emails?

10  A.  Yeah.

11  Q.  And in all those John Galanis is not mentioned, right?

12  A.  Never.

13  Q.  At these meetings would it be usual for the deal that is

14  being discussed be laid out in great detail?

15  A.  Yes.

16  Q.  The money flow would be laid out, right?

17  A.  Every aspect of the deal would be laid out.

18  Q.  Corporate structure, every aspect of this deal would be

19  laid out for everybody to understand?

20  A.  There were white boarding sessions where the overall

21  structure of the deal would be laid out, and then there are

22  also documents that we would go through in the case of most of

23  the deals that we undertook.

24  Q.  In all these meetings, Jason Galanis and Jason Sugarman

25  were at all of them?

I64JGAL4                    Dunkerley - cross

1   A.  No, they weren't at all of them.

2   Q.  They were at all the meetings where new ideas were

3   discussed, right?

4   A.  Where new ideas were discussed?

5   Q.  Yes.

6   A.  So at the majority of them, but not at all of them.  I

7   could not, hand on heart, say they were at all of them.

8   Q.  When Jason Galanis and Jason Sugarman were both at those

9   meetings, bid Jason Galanis ever bring up we're going to

10  defraud that person or defraud that company?

11          MR. QUIGLEY:  Objection.

12          THE COURT:  Sustained.

13  BY MR. TOUGER:

14  Q.  Did Jason Galanis bring up any idea of using false

15  documents to purchase a company?

16          MR. QUIGLEY:  Objection.

17          THE COURT:  Sustained.

18  BY MR. TOUGER:

19  Q.  Did you hear Jason Galanis at those meetings, did Jason

20  Galanis ever tell you that we're going to try to defraud a

21  company or take advantage of another company?

22  A.  No.

23  Q.  Did you ever hear Jason Galanis say we're going to use

24  fraudulent documents to purchase a company?

25  A.  No.

I64JGAL4                          Dunkerley - cross

1   Q.  You obviously never heard Jason Sugarman say that, either,
2   right?
3   A.  I never heard them say it.  To clarify, there were sort of
4   vaguely fraudulent documents produced, so there is some --
5   Q.  That happened happened later on in the transactions,
6   correct?
7   A.  No, because there is always confusion between the COR Group
8   of Companies and all the other entities that were heaped into
9   one part.  You could easily say that that was not exact in the
10  way it was put forward.
11  Q.  In the COR Group of Companies was the Jason Sugarman
12  companies and Steve Sugarman companies, right?
13  A.  Yes.
14  Q.  By the way, did you ever work for Jason Sugarman?
15  A.  Vicariously through Steve Sugarman, yes.
16  Q.  What do you mean by that?
17  A.  So there was a point in time where Steve Sugarman didn't
18  know what to do with me.  The BFG index had not worked out.  I
19  started working for Jason Sugarman and there were emails
20  back-and-forth about who should pay my wages.
21          It ended up, COR Clearing ended up paying my wages and
22  I ended up working for Jason Sugarman almost by default, but
23  there was never any specific conversation that I was an
24  employee of Jason Sugarman's.  It just happened.
25          MR. TOUGER:  This might be a good time to break.

1           THE COURT:  Let's break for lunch.  Come back in an

2     hour.  Please don't discuss the case and enjoy your lunch.

3           (Jury excused)

4           THE COURT:  Everyone can be seated.

5           First, with respect to the letter from the government

6     regarding various exhibits they anticipate will be used on

7     cross-examination, have you consulted about those?

8           MR. QUIGLEY:  We did.  We had a back-and-forth a good

9     part of the afternoon and yesterday after evening, which is the

10    reason I sent the letter at 6:00 o'clock in the morning.  That

11    is what we were able to narrow it down to.

12          THE COURT:  These objections still remain?

13          MR. QUIGLEY:  That's right.  We may be able to I think

14    on a couple of them reach a limiting instruction.  There are a

15    number in the realm of the vertical documents the government

16    wants an instruction for, and so other than that, those remain,

17    yes.

18          THE COURT:  Why don't you try and work it out over

19    lunch and why don't we come back earlier at 1:45 and try to

20    address those issues.  Mr. Schwartz?

21          MR. SCHWARTZ:  That is fine.  I will say, with respect

22    to the exhibits on that list that are mine, I have told the

23    government that everything they have identified as hearsay is

24    being offered for a non-hearsay use.  I think there are some

25    exceptions for parts of the documents, but it is all being

I64JGAL4                     Dunkerley - cross

1   offered for a non-hearsay use.

2           This is a lot of what happened with Ms. Driever where

3   they said there is a big list of objections, and as we took it

4   as it came in, it turned out nothing was objectionable.  I am

5   happy to address this however you want.

6           MR. QUIGLEY:  We will work to cut down the list.

7           THE COURT:  Why don't we come at 10 of and address any

8   issues then.  I understand the government's concerned about

9   scheduling.  Do you want to sit longer days?  I am happy to sit

10  from 9:30 to 5:30.

11          MR. SCHWARTZ:  I don't think this is going to be an

12  issue.  The witnesses that the government has identified for

13  the remainder of this week, once we get past Mr. Dunkerley are

14  manageable.  I don't see a real threat that they're not all

15  going to get done by the end of Thursday, and so whoever it is

16  that they have that needs to be up on Monday, they haven't

17  identified them yet, assuming those two people together are

18  one-day witnesses, I don't think it will be an issue.  If it

19  is, we can address it later in the week.

20          MS. MERMELSTEIN:  I think the government has no

21  objection to sitting longer days.  The advantage of putting

22  Friday into play is if we have gotten through sort of what we

23  all expect to get through, which we may well do, there won't be

24  an issue at all.  If we start sitting longer days, we may speed

25  up unnecessarily, but we are happy to sort of have as much

1    trial time as possible, whichever way --

2              THE COURT:  Right now I am not available on Friday,

3    but I am trying to accommodate the schedule of the witnesses

4    which is why I was suggesting we sit longer days.  We can wait

5    a day and see if it is worth raising with the jury.  I am

6    flexible.  I am trying to move things along.

7              MS. MERMELSTEIN:  I guess it is in part how long the

8    defense expects the cross-examination of Mr. Dunkerley to go.

9              Do you think you're still on track to finish by

10   tomorrow end of day?

11             MR. TOUGER:  Tomorrow, definitely.

12             MR. SCHWARTZ:  We'll be done by tomorrow.

13             THE COURT:  Let's just talk for one more minute about

14   the transfer of the shares.  Mr. Dunkerley, if I heard him

15   right, testified that he got the pre-offering Code Rebel

16   shares, but he was the placement agent for the Code Rebel IPO.

17             Is that relevant in your view?  Does that go to how

18   those, why those shares were given to various people, or is it

19   the government's position they were given to different people

20   for different reasons?

21             MS. MERMELSTEIN:  One second, your Honor.

22             THE COURT:  Sure.

23             (Off-the-record discussion)

24             MS. MERMELSTEIN:  The point there, your Honor, is that

25   the answer didn't come out clearly as it could have.  Mr.

1    Dunkerley received those shares in his personal capacity.  They

2    didn't go to Burnham, for example, for not having done any

3    work.  He didn't actually do anything.  He just allowed there

4    to be an appearance of a placement agent, and in return he

5    personally benefited.  I think that although he didn't say it

6    as cleanly as that, that is the import of what he said

7    consistent with the Code Rebel shares or currency of the broad

8    Wakpamni scheme.

9              MR. SCHWARTZ:  Even on that theory, it was

10   compensation for his role as the no-show placement agent for

11   Code Rebel.

12             THE COURT:  That was my point as opposed to -- I

13   understand the government's point generally that the same

14   people are involved in different schemes and so there is

15   overlap, but that being said, when Mr. Dunkerley I thought

16   testified that he was getting those shares from being the

17   placement agent for the Code Rebel IPO, not from his

18   participation in WLCC, it makes me wonder if the same may be

19   true with respect to other people's involvement in different

20   schemes.

21             MS. MERMELSTEIN:  I agree with your Honor's

22   characterization of his testimony, and I think part of the

23   problem here is that I don't agree at all with the

24   characterization of there having been different schemes.  I

25   understand your Honor's ruling of pump and dump, and we will

1   abide by it.  That part of the official note, separate Code

2   Rebel part is not parcel.  It is part and parcel of the same

3   scheme.  This is payment for Code Rebel and this is payment for

4   Wakpamni, and those things are separate, it is not true as the

5   fact.  That is where the problem is coming from.

6           I think people can sort of try and parse with

7   witnesses if they want to, but it is an artificial idea and

8   that is why it is a problem to try to do it that way because it

9   is one scheme.  Because it is one --

10          THE COURT:  Dunkerley didn't testify in that fashion.

11          MS. MERMELSTEIN:  He wasn't asked to testify in that

12  fashion, and the fact that he was paid for particular parts of

13  the scheme in particular ways or particular times does not

14  change that it was one scheme or that the receipt of the shares

15  by these defendants is direct evidence of the fraud.

16          THE COURT:  Let me ask two more questions.  So you

17  were going to respond on the Sugarman-Galanis earlier?

18          MS. MERMELSTEIN:  A few things on that point.  One is

19  Mr. Touger has made my point for me the Jasons are the Jasons.

20  There were openings on the Jasons.  There is now testimony on

21  it, and the government doesn't dispute that.  Those are the

22  facts.

23          So I think there is ample basis to say that something

24  from Jason Sugarman is attributable to Jason Galanis.  It is

25  worth knowing with respect to the notion that kind of how did

1    Jason Galanis even know this was happening, there is no

2    evidence of that.  You will note I think it is Government

3    Exhibit 1213 --

4              MR. TOUGER:  (Inaudible).

5              THE COURT:  Yes.

6              MS. MERMELSTEIN:  -- the RSTP convertible note signed

7    by Mr. Archer, Mr. Archer sends that to Jason Galanis, right.

8    Mr. Archer then does not make payment on the note, so who does

9    he think -- what does he think is happening when he makes a

10   loan and never pays it, and beyond that I think -- anyway,

11   those are really the two big pictures, right?

12             He provides this note to Jason Galanis.  He doesn't

13   pay for it.  He is not the one who pays for it and Jason

14   Sugarman, having been the one who paid for it, closes the loop

15   on the sort of where is that money truly coming from.  There

16   will also be ample evidence that Jason Galanis giving

17   directions with respect to Code Rebel money and Code Rebel

18   shares and things like that in a more general way.

19             THE COURT:  Then just the last question.  Did any of

20   the people who received the gifted pre-IPO Code Rebel shares

21   dispose of them by selling them?

22             MS. MERMELSTEIN:  They were restricted, and it becomes

23   clear in the trial they didn't become unrestricted in the

24   fashion they could be sold before things collapsed.

25             THE COURT:  Mr. Schwartz, did you want to respond?

I64JGAL4                    Dunkerley - cross

1              MR. SCHWARTZ:  There is not a whole lot to add because

2     we didn't hear anything new there.  This is still based on an

3     imagined conversation that never happened and that there is no

4     evidentiary support for it.

5              If the argument is that Jason Sugarman equals Jason

6     Galanis for all purposes; and so, therefore, if we see Jason

7     Sugarman spend a dollar, that is really Jason Galanis' money,

8     even though they have no evidence where this money came from,

9     and they say that some people like Hugh Dunkerley were

10    compensated with Code Rebel's stock for their role as no show

11    placement agent for Code Rebel; therefore, they want to draw

12    the inference that Mr. Archer received Code Rebel shares even

13    though Jason Sugarman paid for it for his role in a bond

14    issuance that didn't happen for months afterwards, right, it

15    just doesn't make sense.  There is not any evidence, there is

16    only imagination that supports this theory.  It is a brand new

17    theory.

18              I want to step back for a second and say this.  I

19    don't want to say this with bluster, but the government's case

20    is falling apart.  You heard from their star witness, their

21    cooperator who doesn't talk about any of these defendants.  He

22    never heard of John Galanis.  He only participated in board

23    calls with Mr. Archer.  He said he had no idea even though he

24    was the one who transacted in the money that the $15 million

25    that Rosemont Seneca Bohai used to buy the WLCC bonds was

i642gal5                      Dunkerley - Cross

1    recycled from Wealth Assurance Private Client.  He had no

2    conversations of any kind or interactions of any kind with Mr.

3    Archer around the bonds, and that is their only cooperator in

4    this case.

5              All they have in this case is 404 (b) and imagination,

6    and it would be a serious travesty if this Code Rebel evidence

7    came in, where there is absolutely no factual predicate to say

8    it was illicit to begin with or part of any quid pro quo for

9    illicit behavior.

10             THE COURT:  Why don't we take lunch.  If we don't need

11   to come earlier for the exhibits, I will rule on the fly.  I

12   have your letter.

13             MR. QUIGLEY:  We have a binder here, your Honor.

14             THE COURT:  I assume I have all the exhibits unless

15   they're new.

16             MR. QUIGLEY:  In an abundance of caution, we'll hand

17   these up.

18             MR. TOUGER:  We have until 2:00 o'clock.

19             THE COURT:  Yes, 2:00 o'clock.

20             (Luncheon recess)

21             (Continued on next page)

22

23

24

25

1           A F T E R N O O N   S E S S I O N

2                           2:05 p.m.

3           (Jury not present)

4           THE COURT:  We can bring Mr. Dunkerley back up.

5           (Witness present)

6           MR. TOUGER:  Your Honor, may I set up?

7           THE COURT:  Yes.  Please.

8           (Jury present)

9           MR. TOUGER:  May I continue, your Honor?

10          THE COURT:  Yes.

11          MR. TOUGER:  Thank you, your Honor.

12   BY MR. TOUGER:

13   Q.  Good afternoon, again, Mr. Dunkerley.

14   A.  Good afternoon.

15   Q.  I hope you had time for a good lunch.

16          We were talking about Jason Sugarman when we left.

17   A.  Yes.

18   Q.  When you met him originally, he was already an established

19   businessman, right?

20   A.  Yes.

21   Q.  And he had many different investments at that time.

22   A.  I believe so, yes.

23   Q.  And what were some of the investments that you knew about?

24   A.  I mean, the main trading and firm that he worked under was

25   Camden Capital.

i642gal5                    Dunkerley - Cross

1  Q.  He traded a lot of different areas?

2  A.  You know, I didn't know that much about Jason Sugarman's

3  businesses in general apart from the Camden Captial.

4  Q.  What was Camden Capital?

5  A.  It was pretty much a hard-money lender.

6  Q.  Excuse me?

7  A.  Hard-money lender, lending against or asset-based lender as

8  well.

9  Q.  Can you describe that for the jury because you are using

10  terms that are not common in everyday language.

11  A.  Sure.  So asset-based lender, obviously you have an asset.

12  It's worth $10 million.  You can take out $6 million against

13  it.  It is collateralized by the asset.  Hard money tends to be

14  at slightly higher rates of interest than a normal lender may

15  charge.

16  Q.  He had to be a pretty sophisticated businessman to be

17  involved in those businesses, right?

18          MR. QUIGLEY:  Objection.

19          THE COURT:  I will allow it.

20  A.  Reasonably sophisticated, yes.

21  Q.  Did you work on any deals with Jason Sugarman?

22  A.  Yes.

23  Q.  And those were also high finance type deals, correct?

24  A.  Real estate deals, lots of different types of deals.

25  Q.  And they were beyond the basic "buy a house and get a

1   mortgage" type deals?

2   A.  Yeah.

3   Q.  They were complicated?

4   A.  They were investment banking transactions.

5   Q.  And had many moving parts to them.

6   A.  Yes.

7   Q.  And I believe before we left you stated that at times you

8   found yourself working more for Jason Sugarman actually than

9   for Steven Sugarman?

10  A.  That is correct.

11  Q.  And Jason Sugarman, as we went over, actually put you as

12  the trustee of COR International?

13  A.  Yes.

14  Q.  And Jason Sugarman also kind of handed you off to a certain

15  extent to work with Jason Galanis also, right?

16  A.  Yes.

17  Q.  And you worked on, obviously, many deals with Jason

18  Galanis?

19  A.  Yes.

20  Q.  And in most of the deals that you worked on with Jason

21  Galanis, Jason Sugarman had an interest in those deals also?

22  A.  Yes.

23  Q.  And when you worked with Jason Galanis now, was he sort of

24  a controlling figure on the deals?  Let me describe what I mean

25  by that because it's a little unclear.

i642gal5                         Dunkerley - Cross

1          What I mean is not that he controlled the deal itself;

2     but, when he was involved, the part he was involved with, he

3     controlled that part.

4               MR. QUIGLEY:  Objection to form.

5               THE COURT:  Why don't you, yes, rephrase that, please.

6     BY MR. TOUGER:

7     Q.  Well, Jason Galanis would give you certain orders on deals,

8     right?

9     A.  Correct.

10    Q.  And he expected you to follow those orders, right?

11    A.  Correct.

12    Q.  And he didn't really take much response from you when he

13    gave you those orders, did he?

14              MR. QUIGLEY:  Objection.

15              THE COURT:  That I will allow, if you can answer it.

16    A.  What do you mean by response from me when he gave me those

17    orders?  I'm not so sure what you mean by the question.

18    Q.  Did he expect you just to do it?

19    A.  In most cases, yes.

20    Q.  Without asking many questions, right?

21    A.  Yes.

22    Q.  And most of the ideas that you worked on with Jason

23    Galanis -- excuse me.

24              Most of the deals you worked on with Jason Galanis

25    were where Jason Galanis had originated that idea, correct?

1    A.  I couldn't say that absolutely.

2    Q.  Did you ever give Jason Galanis any advice?

3    A.  Yes.

4    Q.  And did he take that advice well?

5    A.  It really depends on what you are talking about.  We talked

6    about so many different things that obviously I gave him advice

7    and we talked about many different deals, so it really depends.

8    Q.  Okay.  Now, let's talk about now the bond deal with the

9    WLCC.  Okay?  The WLCC is the Wakpamni Lake Community

10   Corporation right?

11   A.  It is.

12   Q.  They were the issuers of the bonds, right?

13   A.  Yes.

14   Q.  And as far as you knew, that idea originated with Jason

15   Galanis.  It wasn't a Jason Sugarman idea.

16   A.  Correct.  Actually Jason Galanis told me that it was a

17   Michelle Morton idea.

18   Q.  Okay.  And Jason Galanis, once that idea started to pick up

19   speed, around the summer of 2014, was the one pushing that deal

20   more than Jason Sugarman.

21   A.  Yes.

22   Q.  And he was controlling the implementation of that idea,

23   wasn't he?

24   A.  Yes.

25   Q.  And I believe you described Jason Galanis as the hub of the

i642gal5                        Dunkerley - Cross

1    wheel on the deals he was working on, correct?

2    A.  Correct.

3    Q.  What you mean by that is, if you think of a common wheel,

4    it has a hub and it has spokes that come out of that hub,

5    right?

6    A.  Yes.

7    Q.  And Jason Galanis you describe as the middleman, the hub,

8    giving out instructions to all the different spokes, right?

9    A.  Correct.

10   Q.  And not all of those spokes in the wheel knew each other,

11   right?

12              MR. QUIGLEY:  Objection.

13   Q.  As far as you knew.

14              THE COURT:  To your knowledge.

15   A.  To my knowledge not all -- they did not all know each

16   other, absolutely.

17   Q.  And furthermore, not -- Jason Galanis told you at times,

18   Don't tell other people certain information.

19   A.  Correct.

20   Q.  So as far as you know, you had some knowledge that another

21   spoke in the wheel maybe didn't.

22              MR. QUIGLEY:  Objection.

23              THE COURT:  I will allow that --

24   A.  Correct.

25              THE COURT:  -- to the extent you can answer it.

i642gal5                          Dunkerley - Cross

1     A.  No.  Absolutely.  Correct.

2     Q.  And so basically Jason Galanis's method of leadership on a

3     deal was to tell you something to do and for you to do that

4     operation, right?

5               MR. QUIGLEY:  Objection.

6               THE COURT:  Sustained.  Why don't you rephrase that.

7     BY MR. TOUGER:

8     Q.  Jason Galanis gave you a task to do and asked you to

9     complete it, correct?

10    A.  Correct.

11    Q.  And would you say -- withdraw that question.

12              During the summer of 2014, when the WLCC bond deal was

13    nearing execution, you were really Jason's right-hand man on

14    this deal, correct?

15              MR. QUIGLEY:  Objection.

16              THE COURT:  I'll allow that.

17    A.  What do you mean by "right-hand man"?

18    Q.  The person who was doing most of the actual day-to-day work

19    on the deal.

20    A.  So, yeah, as placement agent, as Burnham putting documents

21    together and representing the bond issuance in general, yes.

22    Q.  It came down to you doing all the different tasks that made

23    this deal actually get to execution, right?

24              MR. QUIGLEY:  Objection.

25              THE COURT:  Sustained.

i642gal5                    Dunkerley - Cross

1    BY MR. TOUGER:

2    Q.  You were the administrator of the deal.

3    A.  I was the placement agent of the deal.

4    Q.  Now, let's talk about the Ballybunion deal for a little

5    bit.  Okay?

6            Jason wanted that to get done, right?  Jason Galanis

7    wanted that to get done, right?

8    A.  Again, I'm not sure what context you mean, wanted --

9    Q.  Jason Galanis wanted money to go from Wealth Assurance AG,

10   through Ballybunion, to Thorsdale.

11   A.  That's what ended up happening, I believe, but that wasn't

12   the original plan.

13   Q.  What was the original plan?

14   A.  The original plan was that money would go from Wealth

15   Assurance A.G. to a U.K. asset manager called Ballybunion

16   Capital Growth Fund.

17   Q.  Right.  And then from there where would it go?

18   A.  I had no idea.

19   Q.  You had no idea.

20           But Jason Galanis wanted the money to go from Wealth

21   Assurance A.G. to Ballybunion England, right?

22   A.  Correct, yes, yes.

23   Q.  That's correct, right?

24   A.  Yes.

25   Q.  And when that didn't happen -- or Ballybunion rejected that

i642gal5                         Dunkerley - Cross

1   deal, right?

2   A.  Yes.

3   Q.  And not for any reason but they couldn't do it, right?

4   A.  Yeah, for some reason they couldn't do it.

5   Q.  It had nothing to do with Jason Galanis, right?

6   A.  Not that I know of.

7   Q.  And so Jason Galanis then decided, We're going to do this

8   anyway and create this Ballybunion Nevada, right?

9   A.  Correct.

10  Q.  And nothing was going to stop him from doing that, right?

11          MR. QUIGLEY:  Objection.

12  Q.  Well, did you advise him not to do that deal?

13  A.  He told me that that's what was happening, so, so, I didn't

14  advise him either way.

15  Q.  You just did what he told you.

16  A.  Correct.

17  Q.  Now, would I be correct in saying that during the summer of

18  2014, there was time pressure to finance the bonds because of

19  the other business endeavors which needed financing?

20  A.  There was always time pressure for financing.

21  Q.  Excuse me?

22  A.  There was always -- we always were looking for money to

23  finance more acquisitions, more growth, more everything, so --

24  Q.  Exactly.

25          And ultimately, as we said before, Jason Galanis

i642gal5                    Dunkerley - Cross

1    decided that the WLCC bonds would be that financing method,

2    right?

3              MR. QUIGLEY:  Objection.

4              THE COURT:  Sustained.

5    BY MR. TOUGER:

6    Q.  Before the deal actually closed, the WLCC bond deal, Jason

7    Galanis told you that the Hughes clients had the ability to buy

8    the WLCC bonds, right?

9    A.  Yes.

10   Q.  And you actually went to the closing of when Hughes was

11   purchased, right?

12   A.  Yes.

13   Q.  And you were there with Gary Hirst?

14   A.  Yes.

15   Q.  Michelle Morton?

16   A.  Yes.

17   Q.  And reps of the company that you were actually buying,

18   right?

19   A.  Yes.

20   Q.  And would I be correct in saying again that John Galanis

21   was not at that closing?

22   A.  Correct.

23   Q.  And John Galanis was not in communication with you or

24   anybody else at that closing as far as you knew.

25   A.  Correct.

1    Q.  And as far as you knew, John Galanis's name was never even

2    mentioned at that closing.

3    A.  Never mentioned.

4    Q.  Now, let's go back to that first time you meet Jason

5    Galanis when the WLCC bond deal is discussed, okay?

6    A.  Um-hmm.

7    Q.  Where did that take place?

8    A.  In his house in 1920 Bel Air, Los Angeles, California.

9    Q.  And when did that take place?

10   A.  In the summer of 2014.

11   Q.  And we could agree that it was June or July --

12   A.  Sorry.  It would have been spring at the time.

13   Q.  May or June?

14   A.  Yeah, yeah.  I'm not sure.  Earlier than the summer.

15   Q.  How did you know to go to that meeting?  How was it

16   arranged?

17   A.  We probably spoke on the telephone.  He probably called me

18   and he said -- we decided to meet.

19   Q.  It wasn't unusual for you to have the meeting at Jason's

20   house, right?

21   A.  Not that unusual.

22   Q.  And at that meeting was you and Jason Galanis?

23   A.  Yes.

24   Q.  And, again, John Galanis wasn't there?

25   A.  Nope.

i642gal5                          Dunkerley – Cross

1    Q.  John Galanis's name was never mentioned.

2    A.  Correct.

3    Q.  And never phoned in or video conferenced into that meeting?

4    A.  Nothing like that occurred.

5    Q.  And, by the way, you had no idea in 2014 that John Galanis

6    was ever involved in the Wakpamni Lake Community Corporation

7    bond deal, right?

8    A.  I had no idea.

9    Q.  Now, at this original meeting, Jason Galanis describes to

10   you the WLCC bond deal, right?

11   A.  Yes.

12   Q.  How long did that meeting last?

13   A.  An hour.

14   Q.  So it wasn't just, I got this idea, WLCC bonds, that's it,

15   see you, good-bye.  There was actual discussion about what was

16   going to happen, right?

17   A.  Absolutely.

18   Q.  And he described to you in detail the deal?

19   A.  No.  Overarching.  Details had not been worked out at that

20   stage.

21   Q.  In the overarching idea of the deal, did he tell you they

22   were going to falsely allocate the money?

23   A.  No.

24   Q.  Did he tell you that he was going to do any type of fraud

25   at all?

i642gal5                    Dunkerley - Cross

A.   Absolutely not.

Q.   Did he tell you whether he was going to use any fake

documents?

A.   No.

Q.   And in your mind now, the Wakpamni Lake Community

Corporation bonds became more seriously considered once

Michelle Morton entered into the equation, correct?

A.   I don't know how to answer that question exactly.  No, it

didn't become more serious for me just because she entered the

equation.

Q.   It did not?

A.   No.  I didn't know who Michelle Morton was.  Jason Galanis

just told me about this woman called Michelle Morton and Hughes

Capital and that was that.  I didn't have any reference points.

Q.   Okay.  At some point he tells you that Michelle Morton's

clients at Hughes were going to purchase the bonds, right?

A.   Much later on, yeah, well past the initial meeting.  You

are still talking about the initial meeting.

Q.   No.  I was talking about during the summer.  As the summer

went on, we moved into July -- excuse me, as we move into July,

Michelle Morton's firm and buying of Hughes became -- that idea

came into effect, the idea of the WLCC bonds started to move

even quicker, right?

A.   Yes, yes.

Q.   And as we already stated earlier, the idea was to use that

i642gal5                    Dunkerley - Cross

1   money to finance purchase of Valor.

2          MR. QUIGLEY:  Objection.  Mischaracterizes testimony.

3          THE COURT:  I will let you correct it.  Is that

4   accurate?

5          THE WITNESS:  I actually need the question to be said

6   again.

7   BY MR. TOUGER:

8   Q.  The idea was to use the proceeds of the WLCC bonds to

9   finance the purchase of Valor.

10  A.  There were no ideas what the proceeds would go to at all at

11  that time.

12  Q.  As far as you knew.

13  A.  As far as I knew, yes.

14  Q.  And I would be correct in saying that, up until the date

15  that the deal -- the WLCC bonds were executed, you had no

16  inkling that there was anything wrong with this deal.

17  A.  Correct.

18  Q.  Now, I would like to go talk a little bit about the annuity

19  provider.  Correct?  That was Wealth Assurance Private Client,

20  right?

21  A.  Yes.

22  Q.  And originally there was some discussion that Wealth

23  Assurance A.G. would be the annuity provider, right?

24  A.  Possibly.

25  Q.  And it was decided that Wealth Assurance A.G. couldn't be

i642ga15                    Dunkerley - Cross

1    the annuity provider because Wealth Assurance A.G. couldn't use

2    the money to buy a company that was going to be put into its

3    own company.

4    A.   Wealth Assurance A.G. couldn't provide the money to a

5    company --

6    Q.   Couldn't take the money from the proceeds --

7    A.   Right.

8    Q.   -- of WLCC bonds into its own control and then use that

9    money to buy another company which Wealth Assurance A.G. was

10   going to control?

11   A.   That's incorrect.

12   Q.   Okay.  That would be perfectly fine?

13   A.   No, your statement is incorrect.

14   Q.   Right.  They couldn't do that, right?

15          MR. QUIGLEY:  Objection.

16   Q.   Am I confusing you?

17          THE COURT:  Why don't you rephrase.

18   Q.   Let me rephrase.

19          Wealth Assurance A.G., as the annuity provider, was

20   supposed to act on whose behalf?

21   A.   Wealth Assurance A.G. was not the annuity provider.

22   Q.   I'm saying if Wealth Assurance A.G. was the annuity

23   provider, whose -- let me withdraw that question.

24          The annuity provider was to act on whose behalf?

25   A.   On behalf of the bond issuer.

i642gal5                    Dunkerley - Cross

1    Q.  The WLCC.

2    A.  Yes.

3    Q.  So the annuity provider should not be taking action that

4    benefits itself.  It should be taking actions that benefits the

5    WLCC.

6    A.  I'm not sure where you are going with this.

7    Q.  Just answer the question.

8    A.  It's very confusing how you are actually posing the

9    question.  I'm not sure --

10   Q.  Should an annuity provider take action that only benefits

11   itself and not the WLCC, the issuer of the bonds?

12           MR. QUIGLEY:  Objection.  Calls for a legal opinion.

13           THE COURT:  Sorry, Mr. Quigley.

14           MR. QUIGLEY:  Calls for an opinion.

15           THE COURT:  Sustained.

16           MR. TOUGER:  We will move on.

17   BY MR. TOUGER:

18   Q.  At the time of the execution of the bonds, okay, so I'm

19   talking about at that time, not the time afterward, not the

20   time before, at that time when the bonds were actually

21   executed --

22   A.  Created.

23   Q.  Late August, 2014, right?

24   A.  Um-hmm.

25   Q.  You believed that the WAPC would receive money and put it

i642gal5                         Dunkerley - Cross

1   into -- an annuity would be created.

2   A.   Correct.

3   Q.   And when was the WAPC bank account actually opened?

4   A.   I believe at the beginning of July/August.

5   Q.   It was done in August of 2014.

6   A.   Yeah, August.

7   Q.   WAPC was created to be the annuity provider?

8   A.   Yes.

9   Q.   And who created that company?

10  A.   Gary Hirst.

11  Q.   And who is Gary Hirst?

12  A.   Gary Hirst is an individual based out of Florida.

13  Q.   And he has a relationship with Jason Galanis.

14  A.   Yes.

15  Q.   He is a doctor.

16  A.   I believe so.

17  Q.   He is a lawyer.

18  A.   Yes.

19  Q.   And he acted -- withdraw that question.

20           Now, would I be correct in saying that at that time

21  when the bonds were executed in late August of 2014, you

22  believed that Valor Group would be able to pay the bondholders.

23           MR. QUIGLEY:  Objection.

24           THE COURT:  Can you answer that question?

25           THE WITNESS:  It's a complicated answer.

```
 1              THE COURT:  Why don't you break it down?  Can you
 2     rephrase the question, please?
 3              MR. TOUGER:  Sure, your Honor.
 4              My watch was going off for some reason.
 5              I will withdraw that question and ask a different
 6     question.
 7     BY MR. TOUGER:
 8     Q.  When the money went into the WAPC -- I withdraw that
 9     question.
10              When Valor was purchased, you believed that that
11     group, Valor Group, when that group was formed, they would be
12     able to pay the bondholders.
13     A.  It calls for speculation on my part, okay.  That's not what
14     happened.
15     Q.  I'm not asking what happened.  What was your belief at that
16     moment?
17              MR. QUIGLEY:  Objection.  Calls for speculation.
18              MR. TOUGER:  No.  I'm not asking for speculation.
19     Q.  What was your belief at that moment, not speculate, what
20     was your belief at that moment?
21              MR. QUIGLEY:  Same objection.
22              THE COURT:  That I will allow, if you remember.
23     A.  So my belief was that Wealth Assurance Private Client would
24     eventually become a part of the Valor Group that could pay the
25     annuity.
```

i642gal5                          Dunkerley - Cross

1  Q.  Okay.  And that is because, as we stated, Valor was a real

2  company with real assets making real money.

3  A.  Yes.

4  Q.  And you were president at both Valor Group and Wealth

5  Assurance Private Client.

6  A.  Yes.

7  Q.  So you had wherewithal to make that -- to have that

8  thought.

9          MR. QUIGLEY:  Objection.

10          THE COURT:  Sustained.

11  Q.  Now, let's go back and talk a little bit about Michelle

12  Morton, okay?

13          You had conversations with her, right?

14  A.  Yes.

15  Q.  And during the summer of 2014, you had many conversations

16  with her.

17  A.  Yes.

18  Q.  And during the time up until the purchase of the bonds, she

19  never expressed any concern to you about the execution of the

20  bond deal.

21  A.  The first bond deal?

22  Q.  Yes.

23  A.  She never -- there were some concerns, but overall, no.

24  Q.  And in front of you she never expressed any concerns to

25  anybody else about the bond deal.

i642gal5                    Dunkerley - Cross

1    A.  No.

2    Q.  And did anyone ever say -- well, I will withdraw that

3    question.  Morton told you that she had enough clients whose

4    accounts she had discretion and control of that were not given

5    good returns on the investments they had so that she could use

6    those to buy the first series of bonds.  She told you that

7    specifically, right?

8              MR. QUIGLEY:  Objection.

9              THE COURT:  Is the objection hearsay?

10             MR. QUIGLEY:  Yes, your Honor.

11             THE COURT:  Sustained.

12             MR. TOUGER:  Your Honor, may we approach?

13             THE COURT:  Sure.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Is this in furtherance of the conspiracy?

3           MR. QUIGLEY:  Coconspirator statement can only be

4    admitted by the government.

5           MR. TOUGER:  That's not the point, your Honor.  It's

6    not offered for the truth.  It's just offered that she said it.

7           THE COURT:  And what's the relevance of her having

8    said it?

9           MR. TOUGER:  Excuse me?

10          THE COURT:  What's the relevance of her having said

11   it.

12          MR. TOUGER:  Because it leads to his opinion that

13   there is nothing wrong with this deal, and she says that in

14   front of him and she says she has the clients, they are willing

15   to do it, she has the discretionary control, and that makes him

16   move forward on the deal.

17          MR. QUIGLEY:  But his opinion is in a sense --

18          MR. TOUGER:  It's not his opinion.  It's what she told

19   him.

20          MR. QUIGLEY:  It's not really relevant, his opinion.

21   At what point in time is not really relevant.  He has pled

22   guilty to his involvement in this.  It doesn't have any

23   relevance to the other defendants' state of minds.

24          THE COURT:  What does it matter what the state of mind

25   is?

i642gal5                        Dunkerley – Cross

1              MR. TOUGER:  Because it just shows you, your Honor,

2      that somebody like him, who is intricately involved in the

3      deal, was being told by another person who is intricately

4      involved in the deal something that they think is not true,

5      that other people involved in the deal could have believed

6      exactly what he believed.

7              MR. QUIGLEY:  His state of mind has no relevance.

8              MR. TOUGER:  His state of mind has all the relevance

9      of deal, your Honor.  That's the point.  This deal moves on

10     because Jason Galanis is having various people say this is a

11     good deal, and he is one of those people.

12             THE COURT:  I will allow it.

13             MR. TOUGER:  Okay.  Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. TOUGER:  Do you need me to repeat it?

3           THE COURT:  Yes, you should repeat it.

4    BY MR. TOUGER:

5    Q.  Can we agree, Mr. Dunkerley that Ms. Morton told you she

6    had enough clients whose accounts she had discretionary control

7    of who were not getting good returns on investments they

8    already had so that she could sell them their first series of

9    bonds?

10   A.  Jason Galanis told me this, not Ms. Morton.

11          MR. TOUGER:  One moment, your Honor.  My computer is

12   malfunctioning.  Can we just have a small break, your Honor.

13          THE COURT:  Sure.

14          (Pause)

15   BY MR. TOUGER:

16   Q.  You were interviewed by the government on October 27, 2016,

17   correct?

18   A.  Yes.

19   Q.  And you told them on that date that Morton said she had

20   enough clients over whose accounts she had discretionary

21   control --

22          MR. QUIGLEY:  Objection to reading from a document not

23   in evidence.

24          MR. TOUGER:  I will just show it to you.  That's the

25   spot.  You can look wherever you want, but that's the spot I

i642gal5                         Dunkerley - Cross

1    want to refer to.

2              (Pause)

3    A.   Right.

4    Q.   Does that refresh your recollection that on October 27,

5    2016, you told the government exactly what I just said?

6    A.   Yeah, but this is the notetaker.  How they have taken it is

7    incorrect.

8    Q.   Again the notetaker is wrong.  It seems like the F.B.I.'s

9    got real problems --

10             MR. QUIGLEY:  Objection.

11             THE COURT:  Sustained.

12   BY MR. TOUGER:

13   Q.   So it's your position that you never said that.

14   A.   No, no, I absolutely said that, but Michelle Morton did not

15   say that to me.

16   Q.   To you.

17   A.   Jason Galanis said it to me.

18   Q.   Okay.  And when Jason Galanis said that to you, did you

19   believe him?

20   A.   Yes.

21   Q.   And did you do any of your own due diligence on that

22   question?

23   A.   No.

24   Q.   You just trusted what you were told.

25   A.   Yes.

i642gal5                    Dunkerley - Cross

1    Q.  Now, isn't it also true that you never learned of any

2    conflict with Hughes' clients regarding the bond placements in

3    that time period?

4    A.  I was never told of any conflict, correct.

5    Q.  And by the way, Burnham never made any representations that

6    it would make a market for the bonds, right?

7    A.  Yeah, I don't believe they did, no.

8    Q.  Because Burnham was not a market maker in this, right?

9    A.  Uhm --

10   Q.  These were private placement bonds, right?

11   A.  Yes, correct.  They were not the market maker in the bond.

12   Q.  And what is a market maker, just so the jury understands

13   that term.

14   A.  A market maker is somebody who creates liquidity, who

15   effectively introduces buyers and sellers, creates a market for

16   the bonds to be bought and sold.  Otherwise they would just sit

17   there and they do nothing.

18   Q.  In this case, the buyers of the bonds were already selected

19   before they were ever executed, right?

20   A.  Yes.

21   Q.  And all Burnham was doing was acting as a placement agent

22   between the buyer and the seller.

23   A.  Yes.

24   Q.  And as far as you could tell in your experience as a

25   businessperson in these type of deals, when those bonds were

1   executed in late August of 2014, you had no indication that

2   anything was wrong with this deal.

3            MR. QUIGLEY:  Objection.

4            THE COURT:  I'll allow that.

5   A.  I saw nothing wrong with this deal, correct.

6   Q.  And would I be correct in saying that it wasn't until you

7   saw what the WAPC started to do with some of the money that

8   your suspicions started to get aroused?

9   A.  What I did with the money, by wiring it to different

10  corporations and not putting it into a variable annuity, more

11  than aroused my suspicions.

12  Q.  Right.  And would I be correct in saying that the second

13  series of bonds was talked about soon after the first was

14  completed?

15  A.  Correct.

16  Q.  And you never knew that the cash and bonds were being

17  transferred behind the scenes.  That was not part of your

18  knowledge.

19  A.  I knew -- you are going to have to repeat the question.

20  Q.  You never knew who bought the second and third series of

21  bonds, right?

22  A.  No, I didn't.

23  Q.  Now -- and you never knew the source of funds for the

24  second series of bonds, right, until after it was executed?

25  A.  I had a rough idea, but I didn't know for sure until after

i642gal5                    Dunkerley - Cross

1    it was executed.

2    Q.  And you were the placement agent of the bonds, right?

3    A.  Correct.

4    Q.  So this is another example of Jason Galanis giving out

5    information when it's necessary for you to have, right?

6              MR. QUIGLEY:  Objection.

7              THE COURT:  Sustained.

8    Q.  Jason Galanis didn't tell you this information until you

9    needed to know it, right?

10             MR. QUIGLEY:  Objection.

11             THE COURT:  Sustained.

12   BY MR. TOUGER:

13   Q.  Now, did you and Jason Galanis have a separate and secure

14   Dropbox from other people?

15   A.  Electronic Dropbox?  Yes.

16   Q.  Yes.

17   A.  Yes.

18   Q.  And it was a secure Dropbox.  Nobody else could get into

19   it.

20   A.  Correct.

21   Q.  And did you communicate with Jason Galanis through what's

22   called a Wickr app?

23   A.  Yes.

24   Q.  And what is a Wickr app?

25   A.  It's an application you can get on any mobile device, any

i642gal5                        Dunkerley - Cross

1    computer or electronic device that effectively destroys the

2    communication roughly 24 hours after it is created.

3    Q.  Excuse.  Me what was the end?  I missed the end.

4    A.  It destroys the communication roughly 24 hours after it is

5    created.

6    Q.  Right.  So nobody else can see it.

7    A.  It is destroyed.

8    Q.  And would you agree with me that Jason Galanis at times

9    during this whole deal -- and I'm talking about the whole time

10   period -- lied to your face?

11   A.  Can you repeat the question.

12   Q.  Do you agree with me that Jason Galanis lied to you at

13   times during this whole situation?

14   A.  At times he lied to me, absolutely.

15   Q.  Absolutely, right?

16   A.  Yes.

17   Q.  Right to your face.

18   A.  Yes.

19   Q.  And of course you didn't know he was lying at that point,

20   right?

21   A.  Correct.

22   Q.  Now, I would like to talk about the Fondinvest idea for a

23   little bit.  That was your idea, right, to buy Fondinvest?

24   A.  Yeah, yes, yes, it was.

25   Q.  And Fondinvest's prior owner was retiring, right?

i642gal5                    Dunkerley - Cross

1   A.  Correct.

2   Q.  So he wanted to sell the company.

3   A.  Yes.

4   Q.  And you brought that idea to Jason Galanis.

5   A.  Yes.

6   Q.  And Jason Galanis agreed that it would be a good deal.

7   A.  Yes.

8   Q.  And you brought that to Jason Galanis as a straightforward

9   investment.

10  A.  Yes.

11  Q.  Made good financial sense.

12  A.  Absolutely.

13  Q.  No fraud involved.

14  A.  None.

15  Q.  And -- but when Jason Galanis got involved, all of a sudden

16  some fraud kind of sneaked into the idea, right?

17  A.  Again, depends what you mean.

18  Q.  Well, it wasn't a completely straightforward deal once it

19  was finally executed, right?  Fraudulent documents were used.

20  A.  So, so, again, it's such an open-ended question, it's hard

21  for me to answer.

22  Q.  Well, were fraudulent documents used in that deal?

23  A.  Not for the original creation of the deal, no.

24  Q.  I'm talking about in the whole deal, from start to finish.

25  A.  If you are start everything, that is such an open-ended

i642gal5                    Dunkerley - Cross

1    question, it makes it difficult for me to answer.

2              THE COURT:  Rephrase the question.

3    Q.  From start to finish of the FundVest deal frauds were

4    committed, right, by Jason Galanis?

5    A.  Yes.

6    Q.  So Jason Galanis took what you had as a very good financial

7    deal and corrupted it to a certain extent.

8              MR. QUIGLEY:  Objection.

9              THE COURT:  Sustained.

10   BY MR. TOUGER:

11   Q.  Now, I want to go back to the second series of bonds, okay?

12             I believe you testified on direct that Jason Galanis

13   told you that there was more appetite in the market for these

14   bonds, right?

15   A.  Correct.

16   Q.  And that he had easily placed the first series, so he

17   thought he could place the second series.

18   A.  There was more appetite at the market and also that the

19   tribe could do with more money, so therefore there was --

20   Q.  When you say "the tribe," you mean the WLCC, right?

21   A.  Correct.

22             MR. QUIGLEY:  Objection.  I ask the witness be allowed

23   to answer the question.

24             THE COURT:  Just keep going.

25             MR. TOUGER:  Is he objecting to the answer?

1    THE COURT:  No.  He said don't interrupt.

2    BY MR. TOUGER:

3    Q.  All I was saying is the tribe is the WLCC, correct?

4    A.  Correct.

5    Q.  Now, when he said that to you, did you believe him?

6    A.  Yes.

7    Q.  Did you do any of your own due diligence on that issue?

8    A.  No.

9    Q.  Did Jason Sugarman ask you to do any due diligence on that

10   issue?

11   A.  No.

12   Q.  Did you do any of your own due diligence on your own on

13   that issue?

14   A.  No.

15   Q.  Now, let's go back to talking about Gary Hirst for a little

16   bit.

17          He was involved in this whole roll-up plan at some

18   point?

19   A.  Yes.

20   Q.  And he worked on the purchase of Burnham Financial Group,

21   correct?

22   A.  Yes.

23   Q.  And he worked on the purchase of Wealth Assurance A.G.?

24   A.  Yes.

25   Q.  And he was also involved later on, during the fourth

i642gal5                    Dunkerley – Cross

1    transaction, on the BIISL deal, right?

2    A.  Less to my knowledge.

3    Q.  But still involved?

4    A.  I don't know completely about that.

5    Q.  And he was also involved in the original investment in

6    Wealth Assurance Holdings through his company Rosemary & Rue,

7    right?

8    A.  Yes.

9    Q.  Rosemary & Rue is just Gary Hirst's company, right?

10   A.  It's one of Gary Hirst's companies, yes.

11   Q.  And he also used, I think you said, at times a fake name,

12   right?

13   A.  There was a fake name used, yes.

14   Q.  Paul Puncheon, I believe you said?

15   A.  Yes.

16   Q.  For the court reporter, P-U-N-C-H-E-O-N?

17   A.  Correct.

18   Q.  And Gary Hirst also helped you create false documents at

19   times.

20   A.  Yes.

21   Q.  And so you knew, met with, and worked with Gary Hirst

22   routinely --

23   A.  Routinely.

24   Q.  -- during this time period?

25   A.  Yeah.  He was based in Florida, I was based in California,

i642gal5                    Dunkerley – Cross

1    but we communicated routinely.

2    Q.  And you couldn't even tell this jury how many times you

3    communicated with Gary Hirst, could you?

4                MR. QUIGLEY:  Objection.

5    Q.  And I believe you stated in the past that you even tried to

6    talk to him about the Ballybunion deal, right?

7    A.  No, I wouldn't have tried to talk to him about the

8    Ballybunion deal.

9    Q.  Okay.  Because you wanted to keep that from him, correct?

10   A.  I was told specifically by Jason Galanis that no one else

11   was to know.

12   Q.  Now, let's go back, since we are there, let's go back to

13   that deal a little bit.

14                You said the original idea was for Wealth Assurance

15   A.G. to send 4 million or so proceeds to Ballybunion in

16   England.

17   A.  Yes.

18   Q.  And then at some point, for some reason, unrelated to Jason

19   Galanis or anything else, Ballybunion decided they couldn't do

20   the deal.

21   A.  Correct.

22   Q.  And Ballybunion England was a real holding company.

23   A.  A real asset manager, yes.

24   Q.  Right.

25                And so at that point, when that part of the

1    transaction got rejected, Jason Galanis said, You know what?

2    Let's form Ballybunion in Nevada.

3    A.   Yes.

4    Q.   And did you form Ballybunion in Nevada?

5    A.   No.

6    Q.   Who did?

7    A.   I'm not sure.

8    Q.   Okay.  And by the way, there was nothing wrong --

9    withdrawn.

10        The original deal of Wealth Assurance A.G. sending the

11   money to Ballybunion England, that was a proper financial

12   transaction in your mind.

13   A.   Correct.

14   Q.   And I believe you testified earlier that you did not know

15   where the money was going to go from Ballybunion, England, once

16   it arrived there, going to the original idea.

17   A.   Correct.

18   Q.   Now, then Jason Galanis -- was Jason Sugarman involved, as

19   far as you know, in the idea of forming Ballybunion Nevada?

20   A.   I have no knowledge of that.

21   Q.   You have no knowledge.

22   A.   Correct.

23   Q.   But the Ballybunion account was opened at Banc of

24   California, correct?

25   A.   There was a Ballybunion account opened there, yes.

i642gal5                          Dunkerley - Cross

1    Q.  At Banc of California?

2    A.  Yes.

3    Q.  And that is the bank that is controlled by Steve Sugarman

4    and the Sugarman family, right?

5    A.  At that time, yes.

6    Q.  And Jason Sugarman also had power over the money flow of

7    Wealth Assurance A.G., right?

8    A.  With the rest of the directors, correct.

9    Q.  Right.  He was a director of that company, right?

10   A.  Correct.

11   Q.  And so Jason Sugarman was on the board of directors of

12   Wealth Assurance A.G., right?

13   A.  Yes.

14   Q.  The company that sent the money to Ballybunion Nevada.

15   A.  Yes.

16   Q.  And the money went to an account in the Sugarman bank, Banc

17   of California.

18   A.  Yes.

19   Q.  And Steve Sugarman himself actually authorized the opening

20   of an account for Ballybunion in the Banc of California as far

21   as you know.

22            MR. QUIGLEY:  Objection to relevance, your Honor.

23            THE COURT:  I will allow it.

24   A.  Actually, no, I don't know that Steve Sugarman personally

25   approved --

i642gal5                    Dunkerley - Cross

1  Q.  You have no knowledge of that.

2  A.  The account was approved.  That's all I know.

3  Q.  Okay.  And when the money goes from Ballybunion -- excuse

4  me, from Wealth Assurance A.G. to Ballybunion Nevada,

5  Ballybunion Nevada then sends that money to Thorsdale, correct?

6  A.  Again, I have no idea.

7  Q.  You have no idea?

8  A.  I was not in control of that account.

9  Q.  Okay. now, I also believe you testified earlier that the

10 funding for the purchase of Hughes Capital Management came from

11 Wealth Assurance A.G. through a company called BFG Socially

12 Responsible Investors?

13 A.  Correct.

14 Q.  Who -- was that the original idea of who was going to

15 finance the purchase of Hughes Capital Management or was it

16 supposed to come from CORFA and then go through CORFA as

17 opposed to Wealth Assurance A.G. and BFG?

18 A.  Originally the funding of it was unknown.  A few different

19 entities were thought of to fund it.  It turned out that Wealth

20 Assurance A.G. was the one who had the ability to do it.

21 Q.  And BFG Socially Responsible Investors, you were involved

22 in that company, right?

23 A.  Correct.

24 Q.  What were you in that company?

25 A.  I was the sole managing member of that entity.

1   Q.  You were that company, right?

2   A.  Correct.

3   Q.  Now, you earlier stated that you were told not to tell Gary

4   Hirst at all about the Ballybunion situation, right?

5   A.  I was told not to tell anyone about the Ballybunion

6   situation, including Gary Hirst, if you want to phrase it that

7   way.

8   Q.  And in your conversations with Gary Hirst, did he ever say

9   to you that he had knowledge of the Ballybunion Nevada

10  situation?

11          MR. QUIGLEY:  Objection to relevance.

12          THE COURT:  Can I see the parties at sidebar for a

13  minute?  Thanks.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

i642gal5                    Dunkerley – Cross

1              (At the sidebar)

2              MR. TOUGER:  This is the last question on this topic.

3              MR. QUIGLEY:  Judge, fine.  It's far afield from

4    Mr. Dunkerley.

5              THE COURT:  I agree.  Last one.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

i642gal5                          Dunkerley - Cross

1                  (In open court)

2                  MR. TOUGER:  Do you need that question read back?

3                  THE WITNESS:  Please.

4                  (Record read)

5     A.  Never.

6     Q.  Okay.  Now, Jason Sugarman was the largest investor in COR

7     Capital, correct?

8     A.  In COR Capital?

9     Q.  Yes.

10    A.  I don't know that for sure.

11    Q.  Let's see if the computer works this time.

12                 Did you ever tell the government that Jason Sugarman

13    was the largest investor in COR Capital?

14    A.  No, I didn't.

15    Q.  If they have that in their notes, that's just another --

16                 MR. QUIGLEY:  Objection.

17                 THE COURT:  Yes, sustained.

18                 MR. TOUGER:  Sorry.  My computer is not functioning.

19                 (Pause)

20                 (Continued on next page)

21

22

23

24

25

I64JGAL6                      Dunkerley - cross

                    (Off-the-record discussion).

1                   MR. TOUGER:  Just on my screen and the witness's

2       screen.  Go to Page 3, 3506-123.

3                   MR. TOUGER:  3506-6, January 23, 2017 statement.

4       BY MR. TOUGER:

5       Q.  Maybe we can get beyond the technical difficulties and just

6       ask you this question.  He had a fair amount of influence at

7       COR Capital, correct?

8       A.  Correct.

9       Q.  And he actually had the ability to invest on behalf of COR

10      Capital with the permission of his brother, correct?

11      A.  I don't know that for sure.

12      Q.  And Jason Sugarman was also a director or owner of Burnham,

13      correct?

14      A.  Yes.

15      Q.  And Jason Sugarman and Jason Galanis were certainly aware

16      of the document entitled, "Introduction to COR Capital"?

17                  MR. QUIGLEY:  Objection.

18                  THE COURT:  Sustained.

19      BY MR. TOUGER:

20      Q.  Did Jason Sugarman write the document, "Introduction to COR

21      Capital," as far as you knew?

22      A.  Could you take this off my screen.  It is distracting me.

23      Q.  You can take that off.  Did Jason Sugarman write the

24      introduction to COR Capital?

I64JGAL6                          Dunkerley – cross

1    A.  I certainly edited it.

2    Q.  He certainly knew of the document?

3    A.  Correct.

4    Q.  As far as you know, the relationship between Jason Galanis

5    and Jason Sugarman was very close?

6    A.  Very close.

7    Q.  As far as you could tell in your work for both of them

8    together, in actuality as far as you could tell, a lot of

9    things could not happen without Jason Sugarman knowing about

10   them?

11            MR. QUIGLEY:  Objection.

12            THE COURT:  Sustained.

13            MR. TOUGER:  Your Honor, he worked with both

14   individuals.

15            THE COURT:  Just ask it in a different way.

16   BY MR. TOUGER:

17   Q.  Did Jason Sugarman have knowledge as far as you could tell

18   of the overall nature of what was happening in 2014?

19            MR. QUIGLEY:  Objection.

20            THE COURT:  Yes, sustained.

21   BY MR. TOUGER:

22   Q.  At the Wakpamni Lake Community Corporation bonds?

23            THE COURT:  Sustained.

24   Q.  Let's go individually.  Did Jason Sugarman have complete

25   knowledge of the fact that the bonds were going to be sold to

I64JGAL6                      Dunkerley - cross

1   clients of Michelle Morton, correct?

2            MR. QUIGLEY:  Objection.

3            THE COURT:  Sustained.

4            MR. TOUGER:  May we approach, your Honor?

5            THE COURT:  Yes.

6            (Continued on next page)

7            (At sidebar)

8            MR. TOUGER:  It is perfectly okay to ask a witness

9   that another person who is not indicted, not alleged to be a

10  co-conspirator, was in intimately in this deal had knowledge of

11  certain aspects of the deal.

12           THE COURT:  Ask him about it.

13           MR. TOUGER:  No.

14           MR. SCHWARTZ:  If he were to rephrase the question,

15  was Mr. Sugarman exposed to information that A, B, C, that is

16  really the same thing.

17           MR. TOUGER:  He said in his interviews with them that

18  he knows Jason Sugarman had knowledge of Michelle Morton and

19  his involvement.

20           MR. QUIGLEY:  Mr. Sugarman is an unindicted

21  co-conspirator.  We provided notice of that.  Two, I think that

22  just getting back to your Honor's initial point, what is in

23  somebody's head is not proper questioning.  It is of limited

24  relevance or no relevance here.  It is the only relevance is to

25  get sympathy argument Jason Sugarman should be guilty and these

1    defendants are not.

2              THE COURT:  Where are you going with this?

3              MR. TOUGER:  Just to show that a man who is not

4    indicted in this case, has knowledge and didn't get indicted.

5              THE COURT:  That is totally improper.

6              MR. SCHWARTZ:  Just while we are here, that form of

7    the question because I asked questions like that for a totally

8    different purpose, that one question is okay, but does the

9    Judge know Mr. Dunkerley's hair is black?  The next question

10   how does she know that?  She saw it, right?

11             THE COURT:  It depends on the circumstances of the

12   question.

13             MR. TOUGER:  The idea here is that they opened by

14   saying this was a corrupt deal from the very inception, okay?

15             This witness has already said that as far as he knew,

16   that is not true.  All I am trying to bring out is other people

17   were involved in this deal were never indicted.  What they said

18   in opening could not be true because if that was true,

19   everybody who ever did anything in this deal should have been

20   indicted.

21             THE COURT:  That is totally improper.

22             MR. TOUGER:  Why?

23             THE COURT:  To get at who was indicted and who wasn't

24   and why.

25             MR. TOUGER:  Why?

I64JGAL6                    Dunkerley - cross

 1           THE COURT:  The government is not on trial here.

 2           MR. TOUGER:  Mr. Galanis is on trial and Mr. Sugarman

 3    is not on trial, and Mr. Sugarman he says point blank that

 4    Jason Sugarman knew of the Wakpamni bond issuance, knew of

 5    Michelle Morton's conduct in this, knew her clients were there

 6    to purchase the accounts.  It is balanced --

 7           THE COURT:  The standard instructions the judges give

 8    in every case is that the jury is not to speculate what other

 9    people here are not on trial.

10           MR. TOUGER:  Of course not.

11           THE COURT:  That is exactly what you're asking me to

12    do.

13           MR. TOUGER:  I am asking you to show --

14           THE COURT:  Your client should be on trial?

15           MR. TOUGER:  No.  I am trying to show this was a valid

16    business transaction up until the moment when Jason Galanis

17    decided it wasn't.

18           THE COURT:  Ask him questions.

19           MR. TOUGER:  He already answered them.

20           THE COURT:  Exactly.

21           MR. TOUGER:  Now I am bringing out other people who

22    are relying on that same information.  Jason Sugarman is not

23    testifying here, but he says point black he had numerous

24    conversations and emails, over a hundred, several

25    conversations, over a hundred or more with Jason Sugarman where

1    this was discussed.  I think that is relevant information to

2    bring out to this jury.

3              THE COURT:  Not if the direction you're going in is

4    Jason Sugarman hasn't been indicted.

5              MR. TOUGER:  The direction is showing this was a valid

6    deal up until September of 2014 when Jason Galanis --

7              MR. QUIGLEY:  It has already been asked and answered.

8              MR. TOUGER:  That has.  What hasn't been asked, now I

9    am showing other ways to prove this was a valid deal.

10             THE COURT:  Call Mr. Sugarman.

11             MR. TOUGER:  I wish I could find Mr. Sugarman.

12             MS. MERMELSTEIN:  Mr. Sugarman's lawyer is in the

13   courtroom.

14             MR. TOUGER:  As long as --

15             MR. QUIGLEY:  The charging decision --

16             THE COURT:  I won't allow it.

17             (Continued on next page)

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2              MR. TOUGER:  I'll move on to a different topic, your
 3     Honor.
 4     BY MR. TOUGER:
 5     Q.  Jason Sugarman did actually, though, receive proceeds that
 6     came from the bonds via his wife's company.  How did you
 7     pronounce that?
 8     A.  Lausanne.
 9     Q.  Lausanne, and by Wealth Assurance and by COR Clearing?
10     A.  I can't directly point them to the bonds.
11     Q.  Jason Sugarman received money from Wealth Assurance Private
12     Client and Wealth Assurance AG, correct?
13     A.  Definitely from Wealth Assurance AG.  I would need
14     something to refresh my recollection on Wealth Assurance
15     Private Client.
16     Q.  I will show that to you.  Well, let me ask you this
17     question:  Isn't it a fact you were told specifically to send
18     money from the Wakpamni proceeds to Jason Sugarman related
19     entities?
20     A.  Again I need something to refresh my recollection.
21     Q.  I will give that to you.  (Pause).
22              MR. TOUGER:  I'll never depend on a computer again.
23     I'll find it later on.  I'll move on.
24              THE COURT:  Fine.
25     BY MR. TOUGER:
```

I64JGAL6                         Dunkerley - cross

1   Q.  Now, I believe you did testify that certain individuals got

2   money from the proceeds of the bonds.  One was Mr. Czucker

3   through Centurion Investments, correct?

4             MR. QUIGLEY:  Objection; mischaracterizes.

5   BY MR. TOUGER:

6   Q.  Did Mr. Czucker get money back from Wakpamni proceeds to

7   pay him back?

8   A.  I don't know if it was from the Wakpamni proceeds.  Mr.

9   Czucker got money back from investments in Wealth Assurance AG.

10  Q.  Where did he get that money back?

11  A.  I don't know.

12  Q.  Where Adam Levine get money back through --

13  A.  Adam Levine's company, and I believe he got paid back, yes,

14  from Wealth Assurance client funds.  I don't know this.

15  Q.  And Gary Hirst got money back from Rosemary and Rue for his

16  1.3 million he loaned, correct?

17  A.  Correct.

18  Q.  By the way, he described to you an incident where Jason

19  Galanis stiffed him on a deal, correct?

20  A.  Correct.

21             THE COURT:  Sustained.

22             THE COURT:  You don't have to answer that.

23  BY MR. TOUGER:

24  Q.  Basically he told you Jason Sugarman had stolen $1.5

25  million?

1        MR. QUIGLEY:  Objection.

2        THE COURT:  Sustained.

3   BY MR. TOUGER:

4   Q.  Do you know who the present day owners of Valor Life are?

5   A.  Valor Group is a publicly traded entity.

6   Q.  Do you know the the majority owners are?

7        MR. QUIGLEY:  Objection to relevance.

8        THE COURT:  I'll allow that.

9   A.  I don't know for sure.  I would imagine it is the board

10  that was left behind once I left.  I am not current on who --

11  Q.  Is David Ezekiel part of that board, as far as you know?

12  A.  As far as I know, he is.

13  Q.  And Valor Life is still an operating insurance company?

14  A.  The Valor Group is as far as I know, yes.

15  Q.  It is doing very well, correct?

16  A.  I don't know.

17  Q.  By the way, did Valor obtain an attorney for you at some

18  point in this investigation?

19       MR. QUIGLEY:  Objection to relevance.

20       THE COURT:  Sustained.  Move on from that.

21  BY MR. TOUGER:

22  Q.  Now, would you agree with me that you had many meetings,

23  both telephonic and in-person, about the WLCC bond transaction,

24  the whole deal?

25  A.  The whole thing, yes, absolutely.

I64JGAL6                         Dunkerley - cross

1  Q.  You spoke to many people about it, right?

2  A.  Yes.

3  Q.  You spoke to Jason Galanis?

4  A.  Yes.

5  Q.  You spoke with Michelle Morton?

6  A.  Yes.

7  Q.  You spoke with Gary Hirst?

8  A.  Yes.

9  Q.  Never spoke with John Galanis?

10 A.  No.

11 Q.  Never met with John Galanis?

12 A.  Never.

13 Q.  And you had many emails, you just said, about WLCC bonds

14 transactions, right?

15 A.  Yes.

16 Q.  You sent emails to Jason Galanis?

17 A.  Yes.

18 Q.  You sent emails to both Sugarmans about this, or at least

19 to Jason Sugarman?

20 A.  At least to Jason Sugarman, yes.

21 Q.  You sent emails to Raycen Raines?

22 A.  I have sent emails to Raycen Raines, yes.

23 Q.  You sent emails to Ms. Lonehill, president of WLCC?

24 A.  Yes.

25 Q.  And you sent emails to Bevan Cooney?

1    A.  Again I would need to see the emails to refresh my

2    recollection.  It wasn't a common occurrence I could send an

3    e-mail to Bevan about this transaction.

4    Q.  The same with Devon Archer, right?

5    A.  He was on the emails because he was president of Burnham

6    Financial, so he saw many of those emails, correct.

7    Q.  You sent emails to Tim Anderson?

8    A.  Yes.

9    Q.  You sent emails to Heather Thompson?

10   A.  Yes?

11   Q.  You sent emails to Gary Hirst?

12   A.  Yes.

13   Q.  And you sent emails to Michelle Morton?

14   A.  Yes.

15   Q.  And you sent emails to dozens of other people?

16   A.  Again talking specifically about WLCC?

17   Q.  Exactly.

18   A.  There were a lot of emails sent, correct.

19   Q.  Not ever did you send an email to John Galanis, though?

20   A.  I never communicated with John Galanis in any way.

21   Q.  We can do the same thing with telephone calls, right?

22   A.  We can do this all day if you want to.

23   Q.  I think we made it perfectly clear.

24           THE COURT:  I will stop that from happening.

25           MR. TOUGER:  That my only question.

I64JGAL6                          Dunkerley – cross

1    THE COURT:  You can keep moving.

2    BY MR. TOUGER:

3    Q.  Would you say as far as Jason Galanis is concerned, that

4    you met with him rather routinely through the spring and summer

5    of 2014?

6    A.  Not routinely.  It was sporadic, but I did meet with him

7    quite a lot.

8    Q.  You had quite a few telephone conversations?

9    A.  Many.

10   Q.  How many times were you speaking to him a week,

11   approximately?

12   A.  Sorry?  The time-frame again?

13   Q.  Spring and summer of 2014?

14   A.  It would have been 10 to 20 times a week.

15   Q.  You were earning money because of Jason Galanis, right?

16   A.  Yes.

17   Q.  And would you say that your relationship got closer to

18   Jason Galanis as you knew him more?

19   A.  Yes.

20   Q.  Business relationship?

21   A.  Yes.

22   Q.  And you actually talked about how you helped him commit

23   crimes, right?

24   A.  Correct.

25   Q.  And you did that yourself on his behest, right?

I64JGAL6                          Dunkerley - cross

1             MR. QUIGLEY:  Objection.

2             THE COURT:  Sustained.

3    BY MR. TOUGER:

4    Q.  You committed crimes because Jason Galanis told you to,

5    right?

6             MR. QUIGLEY:  Objection.

7             THE COURT:  That I'll allow.

8    A.  Yes.

9    BY MR. TOUGER:

10   Q.  You helped Jason Galanis cover up certain crimes or attempt

11   to cover up certain crimes?

12   A.  Yes.

13   Q.  You were on telephone conference calls or emails or

14   meetings with Jason Galanis where you saw or heard Jason

15   Galanis being dishonest with other people and didn't speak up

16   about it, correct?

17   A.  Yes.

18   Q.  You attended meetings with people and helped Jason Galanis

19   commit his crimes?

20   A.  Yes.

21   Q.  In the beginning when you first got the subpoena in this

22   case, you lied to the federal government?

23   A.  Yes.

24   Q.  As we said, though, you never heard Jason Galanis mention

25   the name of John Galanis?

1    A.   Correct.

2    Q.   Never heard his name in relation to the WLCC bonds in June

3    2014 when you first heard about the bonds at his house?

4    A.   Correct.

5    Q.   You never heard his name in July of 2014 when the deal was

6    going through its final negotiations and you began to play a

7    major role in the deal?

8    A.   Correct again.

9    Q.   You never heard his name in August of 2014 when the deal

10   was finally executed?

11               MR. QUIGLEY:   Objection.   Your Honor, may we approach?

12               THE COURT:   Sure.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I64JGAL6                          Dunkerley – cross

1              (At sidebar)

2              MR. QUIGLEY:  No. 1, we have established he never had

3     any contact with John Galanis.

4              MR. TOUGER:  The more questions --

5              MR. QUIGLEY:  He close to opening the door he is aware

6     of John Galanis and aware of his criminal past.  I think there

7     is a risk this is going to open the door to that.  He said I

8     never heard of John Galanis.

9              MR. TOUGER:  I never said never heard him.  In

10    relation to specific time periods and the time periods he never

11    has, that is all I said.  It was very limited in my questions.

12             THE COURT:  You made your point.  Be careful not to

13    open the door.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I64JGAL6                    Dunkerley - cross

1           (In open court)

2    BY MR. TOUGER:

3    Q.  Now, at some point you get arrested in this case, correct?

4    A.  Yes.

5    Q.  Then at some point you decide to cooperate?

6    A.  Yes.

7    Q.  You decided to cooperate because you were, in fact, guilty

8    of certain crimes?

9    A.  I decided to cooperate mostly for the potential of reducing

10   my sentence and, secondly, because I believe it is the right

11   thing to do.

12   Q.  Firstly, you decided to cooperate because you wanted to

13   reduce your exposure to jail time?

14   A.  That is what I just said.

15   Q.  You didn't want to go to jail for 70 years?

16   A.  I did not want to go to jail for 70 years, correct.

17   Q.  As a matter of fact, I believe you testified on direct you

18   didn't want to go to jail at all?

19   A.  Correct.

20   Q.  The way you decided to do that was to go and speak with the

21   government and tell them the truth?

22   A.  It seemed, yes.

23   Q.  And that is what you did here today, you told the truth?

24   A.  Yes.

25           MR. TOUGER:  Nothing further, your Honor.

1           THE COURT:  All right.  Mr. Schwartz.  Ms. Notari.

2   CROSS EXAMINATION

3   BY MS. NOTARI:

4   Q.  Good afternoon, Mr. Dunkerley.  We have never met before,

5   correct?

6   A.  Correct.

7   Q.  We have never, as far as you know, I have never

8   communicated with your lawyer?

9   A.  As far as I know, correct.

10  Q.  As far as you know?

11          We have gone through a lot these past few days, so

12  hopefully I will not keep going into the same subject matter,

13  but I do want to touch on some of the things you have already

14  testified about.

15          Mr. Dunkerley, you testified previously that you

16  started working for the FDIC in February of 2009?

17  A.  Correct.

18  Q.  That is a government agency, correct?

19  A.  Yes.

20  Q.  It is the FDIC stands for the Federal Deposit Insurance

21  Company?

22  A.  Corporation.

23  Q.  I am sorry, Corporation.  It is fair to say this is a very

24  prominent position?

25  A.  Yes.

I64JGAL6                    Dunkerley – cross

1   Q.  In fact, you told the government during your sessions when

2   you met with them that you were surprised you got the job?

3   A.  Yes.

4   Q.  While you were working at the FDIC, you met a man by the

5   name of Steven Sugarman?

6   A.  Yes.

7   Q.  And at that time Mr. Sugarman was looking to buy a bank,

8   and he asked you to come work with him.  Is that right?

9   A.  In a very simplified format, yes.

10  Q.  At that time you felt that the opportunity with Mr. Steven

11  Sugarman was a great opportunity because his star was on the

12  rise?

13  A.  The job I had at FDIC was temporary, only a three-year

14  contract.  I was two years into it anyway, so I would have have

15  to leave at some point in time.  I believed COR Capital was a

16  good firm to go and work for.

17  Q.  Steven Sugarman was the CEO of COR Capital?

18  A.  Yes.

19  Q.  And COR Capital was a hundred million dollar fund, correct?

20  A.  Reportedly, yes.

21  Q.  And at this point you still had not yet met early on Jason

22  Galanis?

23  A.  I had not met Jason Galanis at this point.

24  Q.  At some point Steven Sugarman purchased the Banc of

25  California?

I64JGAL6                         Dunkerley - cross

1    A.   Purchased a bank called Path Trust that eventually got

2    renamed Banc of California.

3    Q.   At the time you were working with him, was that 2016 or was

4    that before?

5    A.   Way before, 2011 to 2013.

6    Q.   Now, the Banc of California under the leadership of Steven

7    Sugarman became very successful.   Is that right?

8    A.   It grew rapidly, yes.

9    Q.   And, in fact, in 2016 Bloomberg named Steven Sugarman at

10   the age of 41 the youngest among CEOs making involved with U.S.

11   banks making more than $1 billion?

12            MR. QUIGLEY:   Objection to form.

13            THE COURT:   Sustained.

14   BY MS. NOTARI:

15   Q.   Did you ever, the accolade given to Steven Sugarman from

16   Blumberg regarding his accomplishments with Banc of

17   California --

18            MR. QUIGLEY:   Objection to relevance and hearsay.

19            THE COURT:   Yes, sustained.

20            MS. NOTARI:   I'll move on.

21   BY MS. NOTARI:

22   Q.   Now, you've already given some testimony that Mr. Steven

23   Sugarman came from a very rich family?

24   A.   I don't know that.

25   Q.   His brother was Jason Sugarman, right?

I64JGAL6                          Dunkerley - cross

1    A.   Correct.

2    Q.   And the Jason Sugarman and Steven Sugarman were extremely

3    close?

4    A.   They're brothers.

5    Q.   They're brothers, but in terms of their financial

6    endeavors, they work closely together?

7              MR. QUIGLEY:   Objection.

8              THE COURT:   Sustained.

9    Q.   Now, Jason Sugarman's father-in-law was a person by the

10   name of Peter Gruber?

11             MR. QUIGLEY:   Objection to relevance.

12             THE COURT:   Sustained.

13             MS. NOTARI:   Your Honor, I believe that -- okay.

14   BY MS. NOTARI:

15   Q.   It is fair to say that Steven Sugarman had significant

16   contacts in the business community?

17   A.   Yes.

18   Q.   And the same was true for Jason Sugarman?

19   A.   Yes.

20   Q.   And would you agree that were both millionaires?

21   A.   I would have no knowledge about that.

22   Q.   But they were extremely successful?

23   A.   Yes.

24   Q.   And at some point you testified last week that COR Capital

25   had been very successful and purchased a bank which is now

1   called Banc of California, correct?

2   A.  Yes.

3   Q.  And because of the success, the team decided that it would

4   be a good idea to do what is called a financial roll-up

5   strategy which would combine a series of financial firms into

6   one?

7   A.  Yes.

8   Q.  And the idea behind the roll-up was that the sum of the

9   parts would be more valuable as a whole?

10  A.  Yes.

11  Q.  Do you recall telling the government that?

12  A.  Yes.

13  Q.  What did you mean by that?

14  A.  I meant exactly what I said, in that each firm is worth X

15  million dollars.  When you combine them altogether, the X is

16  multiplied by a ratio, so it is worth much more than the sum of

17  the parts.

18  Q.  You previously testified that there were many investors

19  that got involved in this plan, correct?

20  A.  Yes.

21  Q.  You said as we took over companies, administrators of all

22  these companies became involved, CEO, CFOs also became involved

23  in the plan?

24  A.  Effectively, yes.

25  Q.  And Mr. Cooney, as far as you know, was one of the

1   investors that was brought in by Jason Galanis and Jason

2   Sugarman to invest in the idea of creating a financial roll-up?

3   A.  Mr. Cooney, I believe, invested in CORFA, correct, the

4   vehicle used for the financial roll-up.

5   Q.  You testified also that when you first became involved with

6   Jason Galanis, you took it upon yourself to do some internet

7   research on him?

8   A.  I was told to by Steven Sugarman, correct.

9   Q.  A great businessman, and some of your research showed he

10  was not so great, correct?

11  A.  Correct.

12  Q.  You also took it upon yourself -- do you normally, when you

13  get involved with people in business, do you search them on the

14  internet?  Is that a common thing for you?

15  A.  Yes.

16  Q.  In fact, when you met Mr. Cooney, you also searched him up

17  on the internet, correct?

18          MR. QUIGLEY:  Objection to relevance.

19          THE COURT:  I will allow that.

20  A.  Yes.

21  BY MS. NOTARI:

22  Q.  In fact, your research of him on the internet showed that

23  he had been a previous owner of the Viper Room in Los Angeles?

24          MR. QUIGLEY:  Objection to hearsay.

25          THE COURT:  Sustained.

 1   BY MS. NOTARI:

 2   Q.  Did you have personal knowledge of the information that you

 3   read on the internet that Mr. Cooney was involved in investing

 4   in nightclubs?

 5          MR. QUIGLEY:  The same objection.

 6          THE COURT:  Sustained.

 7   BY MS. NOTARI:

 8   Q.  Did you ever talk to Mr. Cooney about the fact he had been

 9   an investor in the Viper Room?

10          MR. QUIGLEY:  Objection; hearsay.

11          THE COURT:  Yes, sustained.  I think you can ask

12   questions that go to his state of mind, but don't use it as an

13   opportunity to just get in hearsay.

14   BY MS. NOTARI:

15   Q.  In terms of the internet research that you did on

16   Mr. Cooney, it is fair to say when you do this research, you

17   want to know what kind of person you're getting involved in in

18   terms of business deals, correct?

19   A.  Yes.

20   Q.  All of your research of Mr. Cooney showed that his

21   background was in music?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  Sustained.

24   BY MS. NOTARI:

25   Q.  Well, what, if anything, did you learn from your

1    background, researching Mr. Cooney on the internet?

2           MR. QUIGLEY:  The same objection.

3           THE COURT:  Yes, sustained.

4           MS. NOTARI:  Can we approach?

5           THE COURT:  Sure.  Ladies and gentlemen, we'll take

6    our afternoon break now.  Just remember don't discuss the case

7    and keep an open mind.

8           (Jury excused)

9           THE COURT:  So Ms. Notari, it seems like you're trying

10   to use what he read on the internet about your client to get

11   out facts about your client.  If you want him to testify, he

12   can testify, but if you don't, you can't just -- what is the

13   relevance of getting out all this through Mr. Dunkerley?

14          MS. NOTARI:  I was asking him his knowledge of his

15   background, which I think is relevant in the case.

16          THE COURT:  What is it relevant to?

17          MS. NOTARI:  His background is that of a person who is

18   a hip hop artist, which in my opening statement which is

19   consistent with an email that you're about to go into, and that

20   he was not your typical investor from like a blue chip

21   investment firm, that he had a different kind of background.

22          I think that is very relevant how the government will

23   go on and depict his emails, banter on the emails consistent

24   with his persona, which is part of the theory of the defense

25   which is extremely important.  If he did research, why is it

more relevant he learns that Jason Galanis was part of an

investment firm versus being, his background being of a person

who promotes hip hop stars.  I think it is relevant.

MR. QUIGLEY:  It is hearsay.  She is using what Mr.

Dunkerley found on the internet and what Mr. Cooney told him,

out-of-court statements about Mr. Cooney's background for the

truth of the matter asserted to prove he was a hip hop manager,

to prove he did operate the Viper Room and Viper Club, whatever

it is called.  That is the problem.

MS. NOTARI:  It is research, it is articles, it is

pictures.

THE COURT:  Why is it not hearsay?  Are you trying to

admit it for the truth of those facts?

MS. NOTARI:  It is more -- again I think it is for the

non-hearsay purpose of the impact on the listener, the person

who is viewing it in terms of how he went on to deal with him

because in the future conversation he asked him questions

about, you'll see in the email I am about to go into, he asked

him a question.  I will ask him, why would he ask him that

question.

THE COURT:  When you get to emails, ask him why he

asked him that question.

MS. NOTARI:  Okay.

MR. QUIGLEY:  I think the email is on the list of

exhibits we objected to, but we'll cross that bridge when we

I64JGAL6                       Dunkerley - cross

1    come to it.

2              THE COURT:  All right.  Thanks.

3              (Recess)

4              THE COURT:  Just to be clear, I'll give you leeway to

5    get out something relevant to his understanding of Mr. Cooney's

6    background to the extent it is relevant to the course of

7    dealing, but you can't just ask him about everything he read on

8    the internet --

9              MS. NOTARI:  I understand.

10             MR. TOUGER:  -- just to get it out.

11             MS. NOTARI:  Okay.

12             THE COURT:  Thanks.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I64JGAL6                     Dunkerley - cross

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          MS. NOTARI:  Welcome back.

4     BY MS. NOTARI:

5     Q.  Mr. Dunkerley, you testified last week that you met Mr.

6     Cooney two or three times at most, correct?

7     A.  Correct.

8     Q.  Those meetings that you had with him were not in

9     boardrooms?

10    A.  No.  They were social.

11    Q.  They were social?  In fact, Mr. Cooney -- you have been to

12    the offices at Burnham, correct?

13    A.  Yes.

14    Q.  But Mr. Cooney does not have an office in Burnham, did he

15    not?

16    A.  Did not and not that I know of.

17    Q.  In fact, he doesn't even have an office.  Is that correct?

18    A.  I wouldn't know that for sure.

19    Q.  In one of your prior sessions with the government you said

20    he didn't have an office.  Do you recall saying that?

21    A.  No, I don't recall saying that.

22    Q.  Well, we'll come back to that.

23    A.  Sure.

24    Q.  But you just testified before Mr. Touger asked you about

25    who you e-mailed, and you said that it was not a common

I64JGAL6                        Dunkerley - cross

1   occurrence to email with Mr. Cooney, correct?

2   A.  Correct.

3   Q.  You seem to have difficulty even remembering that you ever

4   e-mailed him?

5   A.  Correct.

6   Q.  So it was very uncommon for you to email him?

7   A.  Very uncommon.

8   Q.  Do you recall any emails with him?

9   A.  Yes, I do.  Especially where emails where we were carbon

10  copied on emails to other people so, yes.

11  Q.  E-mails where somebody was CC'd?

12  A.  Correct.

13  Q.  I would like to draw your attention to Defense Exhibit

14  3320, which should be right in front of your screen.  Can you

15  just take a moment and look at that email.

16          Does that email refresh your recollection of an email

17  correspondence with Bevan Cooney?

18  A.  Yes.

19  Q.  I would like to draw your attention to specifically March

20  10th, at 10:18, you email him and do you want to just tell us

21  what is going on in the email?

22          MR. QUIGLEY:  Objection.  The document is not in

23  evidence.  I believe it is hearsay based on the same reasons at

24  our prior discussions.

25          THE COURT:  Yes, I do think it is hearsay.

I64JGAL6                        Dunkerley – cross

1            MS. NOTARI:  Your Honor, I thought that you were going

2    to --

3            THE COURT:  I am happy to talk at sidebar if you want

4    to.

5            MS. NOTARI:  Okay.

6            (Continued on next page)

1          (At sidebar)

2          THE COURT:  Can we start without you guys?

3          MS. NOTARI:  This email I believe is important for

4    many of the different reasons.  One, it goes into his knowledge

5    of Mr. Cooney's background.  There is a portion of the email

6    where Mr. Cooney refers to Co -- he gets the name completely

7    wrong, and Mr. Dunkerley laughs at him and says ha, ha, ha,

8    that is like another take on the acronym.

9          Then it is important because it shows Mr. Cooney's

10   actually following up looking for email where he has contracted

11   a law firm and making inquiry as to an EIN number, shows his

12   due diligence.  The email is extremely important on many

13   different levels.  There is only one email from Mr. Dunkerley.

14   I think the jury is entitled to --

15         THE COURT:  Tell me the non-hearsay basis for getting

16   it in evidence.  Are you trying to admit it?

17         MS. NOTARI:  No.  I want to go through it.

18         THE COURT:  But again if you're trying to ask him what

19   is in a hearsay document, just tell me what your evidentiary

20   basis is for asking it.

21         MS. NOTARI:  I am asking him his foundation for

22   knowing Mr. Cooney's background, and again it impacts the

23   effect on the listener, the state of mind of Mr. Cooney.  I

24   think it is important the fact that like the COR -- he doesn't

25   know the name and gets it wrong, his state of mind.  That is

I64JGAL6                          Dunkerley - cross

1    very important.

2                 THE COURT:  Your client's state of mind?

3                 MS. NOTARI:  Yes.

4                 MS. NOTARI:  Also the fact that in terms of, I think

5    our theory of defense is there is a lot of Second Circuit cases

6    in terms of a defendant's theory of defense, and this is like a

7    very important evidence as to who Mr. Cooney was.

8                 We're entitled to get into the fact that what his

9    knowledge was of Mr. Cooney's background because he asked this

10   question, and he says I have this Bonwick guy, a partner, and

11   he follows up and says to him -- basically my defense will be

12   shut down because there is no other --

13                THE COURT:  I am asking you for the evidentiary basis

14   of getting in a hearsay statement.  You know you can't elicit

15   your only client's previous statements because it is not a

16   statement against penal interest or statement of party

17   opponent.  It is just sort of basic trial practice 101.

18                I am asking you the evidentiary basis of how you want

19   to get in your client's prior statements, if that is what

20   you're trying to do.  If you are trying to get in the witness's

21   state of mind or something about their course of dealing --

22                MS. NOTARI:  Also in terms of like the impact on I him

23   in terms of the questioning and the following up on this

24   particular Bonwick partner and he emails him, so I do think it

25   is relevant.  It is not being admitted for -- it is being

I64JGAL6                        Dunkerley - cross

1   admitted for state of mind really.

2               THE COURT:  Whose state of mind?

3               MS. NOTARI:  My client's state of mind.

4               MR. QUIGLEY:  Judge, emails don't --

5               MR. QUIGLEY:  It is filled with statements of fact,

6   out-of-court statements of fact, and I think the relevance of

7   the email depends on the statements of fact about Mr. Cooney's

8   promotion days, about the Bonwick web site.

9               MS. NOTARI:  It is also relevant to the background of

10  this particular partner at Bonwick which we want to get into.

11  We are trying to show that there was Mr. Cooney had -- there is

12  an email follow-up where he was doing research, so I could go

13  into it from that perspective.  In this email is he following

14  up with --

15              THE COURT:  Do you want to ask him about his

16  understanding of this Bonwick partner?

17              MS. NOTARI:  Yes, I want to ask him about his

18  knowledge of this particular partner at Bonwick.

19              THE COURT:  You can do that and you can ask, as I

20  said, to the extent that his knowledge of Cooney's area of

21  expertise affected his course of dealings with him, I will give

22  you leeway.  Ask about that generally.

23              You just can't elicit all the hearsay statements, but

24  as I said, you're trying to get out this witness' state of

25  mind.  You can do that, ask him general questions.

I64JGAL6                          Dunkerley - cross

1             MS. NOTARI:  This is about the part of the deal

2    that --

3             MR. QUIGLEY:  It doesn't sound like he had a huge

4    course of dealings.  He testified that --

5             THE COURT:  But in their limited interactions, as I

6    said, I will give you leeway to --

7             MS. NOTARI:  I will talk about Bonwick and what he

8    learned of this particular, what he was trying to convey to

9    Mr. Cooney about this partner and what Mr. Cooney had personal

10   knowledge of the partner.

11            MR. QUIGLEY:  Hi think that gets into the truth of the

12   statements of the document.

13            (Off-the-record discussion).

14            MR. HASSAN:  It is about Dunkerley's background,

15   knowledge of Cooney.  He had very limited interactions with him

16   and this is an example of an interaction where he is discussing

17   something that is related to Cooney's background.

18            MS. NOTARI:  The only meaningful interaction they're

19   talking about is about a rap star.

20            THE COURT:  As I said, I will allow you to get out in

21   the course of dealing his understanding of Cooney and his

22   background.  I am letting you do that.  You just can't -- if

23   you are trying to admit the document or not, statement by

24   statement because it is hearsay.

25            MS. NOTARI:  All right.  I will try.

I64JGAL6                    Dunkerley - cross

1          (In open court)

2     BY MS. NOTARI:

3     Q.  Mr. Dunkerley, in your dealings with Mr. Cooney, what was

4     your knowledge as far as his background?

5          MR. QUIGLEY:  Objection.

6          THE COURT:  I will allow this.

7     A.  My understanding was that he had been a partial owner of a

8     club in Los Angeles called the Viper Room, and he had been a

9     general businessman, but apart from that, nothing much else

10    about him.

11    Q.  Did you have any information he had ever worked for an

12    investment banking firm?

13    A.  No.

14    Q.  Did you have any information that he had gone to -- had a

15    masters degree in finance?

16         MR. QUIGLEY:  Objection.

17         THE COURT:  Yes, sustained.

18    BY MS. NOTARI:

19    Q.  In your previous correspondence there came a time when

20    Burnham acquired Bonwick Capital, correct?

21    A.  What capital?

22    Q.  Bonwick Capital?

23    A.  Bonwick, yes.

24    Q.  And you were providing information to some of the investors

25    at Burnham as far as individuals who would be working at

I64JGAL6                          Dunkerley – cross

1    Bonwick?

2    A.  Yes.

3    Q.  And did there come a time when you provided Mr. Cooney with

4    information regarding a certain partner at Bonwick by the name

5    of Marsier Jones?

6    A.  So the answer to that is no.

7    Q.  Would it help to refresh your recollection by referring to

8    Defense Exhibit 3320?

9    A.  So I was referring to a partner called Rashaun Williams and

10   the name of Marsier Jones came up in the email.

11   Q.  Who is Marsier Jones?

12   A.  I believe he is a rapper from somewhere, a rapper, music

13   rapper.

14   Q.  Did you discuss your knowledge of Marsier Jones' background

15   as far as being a rap star with Mr. Cooney?

16          MR. QUIGLEY:  Objection.

17          THE COURT:  Sustained.

18   BY MS. NOTARI:

19   Q.  Did Mr. Cooney provide any information to you regarding

20   Marsier Jones as far as him being in terms of Bonwick Capital

21   in terms of him being a partner?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  Sustained.

24   BY MS. NOTARI:

25   Q.  How did you learn as far as -- I'll move on.  If we go

I64JGAL6                    Dunkerley - cross

1    further in this email, you said previously that Mr. Cooney was

2    an investor in COR, correct?

3              MR. QUIGLEY:  Objection, your Honor.

4              THE COURT:  Why don't you rephrase that, not base it

5    on email.  Just ask him a question.

6    BY MS. NOTARI:

7    Q.  I said, and previously you testified, that Mr. Cooney was

8    an investor in COR?

9              THE COURT:  You can answer that.

10   A.  So in COR, the answer is no.  It depends on which COR

11   you're talking about.

12   Q.  COR, previously you testified that he was an investor in

13   the CORFA?

14   A.  CORFA, correct.

15   Q.  CORFA, correct?

16   A.  Yes.

17   Q.  Did there come a time Mr. Cooney emailed you about needing

18   information regarding an EIN number?

19   A.  I believe so, yes.

20   Q.  In that email did Mr. Cooney actually call CORFA?

21             MR. QUIGLEY:  Objection.

22             THE COURT:  Sustained.

23   BY MS. NOTARI:

24   Q.  Was there a time when Mr. Cooney -- you joked with Mr.

25   Cooney because he did not know the correct name of CORFA, and

I64JGAL6                         Dunkerley - cross

 1    he called it COR Ma instead of CORFA?

 2              MR. QUIGLEY:  Objection.

 3              THE COURT:  Sustained.

 4    BY MS. NOTARI:

 5    Q.  Now, in this email, dated March 10, 2015, Mr. Cooney was

 6    asking you --

 7              MR. QUIGLEY:  Objection.

 8              THE COURT:  Sustained.

 9    BY MS. NOTARI:

10    Q.  It is fair to say that you said there were two or three

11    times when you had social encounters with Mr. Cooney?

12    A.  Yes.

13    Q.  It is fair to say that during those encounters, he was not

14    what you would call a very serious finance person?

15              MR. QUIGLEY:  Objection.

16              THE COURT:  Could you rephrase that, please.

17    Q.  How would you describe his personality?

18              MR. QUIGLEY:  Objection.

19              THE COURT:  I'll allow that.

20    A.  He is a very nice guy.

21    BY MS. NOTARI:

22    Q.  Would you say he liked to joke around?

23    A.  He has a light attitude toward life, yes.

24    Q.  And you discussed the fact with him that you came from Hong

25    Kong, and I take it you discussed his background where he came

I64JGAL6                         Dunkerley - cross

1    from?

2              MR. QUIGLEY:  Objection.

3              THE COURT:  Sustained.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. NOTARI:

2    Q.  Now, we talked about previously that we have gone over the

3    fact that you were the placement agent for the tribal bonds,

4    correct?

5    A.  Yes.

6    Q.  And you testified that when you first became involved with

7    the bonds, you thought they were -- that -- you thought they

8    were completely -- you had no issues with them, correct?  You

9    thought they were legitimate.

10   A.  Correct.

11   Q.  And Jason Galanis discussed with you that the purpose of

12   the bonds was to provide financing to native Americans?

13            MR. QUIGLEY:  Objection.  Mischaracterizes testimony.

14            THE COURT:  Sorry?

15            MR. QUIGLEY:  It mischaracterizes testimony, your

16   Honor.

17            THE COURT:  I will allow it.  You can correct it if it

18   is wrong.

19   A.  I'm sorry the question again was?

20   Q.  Jason Galanis provided information to you that the purpose

21   of the bonds was to provide -- one of the purposes was to

22   provide financing to native Americans.

23   A.  Yes.

24   Q.  Now, at no time did you ever discuss with Bevan Cooney or

25   have -- did you discuss the tribal bond issuances with him,

I642gal7                    Dunkerley - Cross

1    correct?

2    A.  I never discussed the tribal bond issuances with Bevan

3    Cooney.

4    Q.  And you have no documentation to show that -- Mr. Cooney's

5    knowledge regarding the tribal bond issuances.

6            MR. QUIGLEY:  Objection.

7            THE COURT:  I will allow that.

8    Q.  Correct?

9    A.  Can you repeat the question again?

10   Q.  I said you have no documentation that shows Mr. Cooney's

11   knowledge regarding the tribal bonds issuances.

12   A.  Not that I am aware of, no.

13   Q.  And it's fair to say that you spoke -- you never spoke to

14   Jason Galanis about Mr. Cooney's knowledge of the tribal bonds

15   issuances.

16   A.  Correct.

17   Q.  And Mr. Cooney was not present at any of the meetings

18   involving the formation of the bonds, correct?

19   A.  Correct.

20   Q.  And Mr. Cooney is not on any e-mails regarding the

21   formation of the bonds, correct?

22           MR. QUIGLEY:  Objection.  Knowledge.

23           THE COURT:  Why don't you rephrase that.

24   BY MS. NOTARI:

25   Q.  Mr. Cooney was -- can -- Mr. Cooney was not involved in any

1  e-mail communications involving -- I'm sorry.  Withdrawn.

2          Mr. Cooney was not at any of the meetings when you

3  were putting together the bonds, correct?

4          MR. QUIGLEY:  Objection.

5          THE COURT:  I'll allow that, to your recollection.

6  A.  Correct.

7  Q.  Now, it is fair to say, Mr. Dunkerley, that Jason Galanis

8  led a very lavish life.  Correct?

9  A.  Yes.

10  Q.  He was jet-setting between the west coast and the east

11  coast?

12  A.  Yes.

13  Q.  When he flew, when he traveled, he flew first class?

14  A.  I don't know.

15  Q.  You don't know?

16  A.  No.

17  Q.  When -- well, in a prior session with the government, you

18  talked about Jason Galanis's prior life, his lavish -- the way

19  he has led his life, and you told the agents that he in fact

20  traveled by way of first class and using private planes.

21          Do you recall saying that?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  I will allow that.

24  A.  So you inferred earlier on that it was all the time.  He

25  occasionally flew first class and occasionally took private

I642gal7                    Dunkerley - Cross

1    planes, but not all the time.

2    Q.  And when he drove, he purchased, he drove by way -- he

3    owned fancy cars.

4    A.  He had an expensive car.

5    Q.  And he had two Bentleys, correct?

6    A.  He had one, I believe.  His wife owned the other.  Correct.

7    Q.  And his wife Monet Berger, she also -- to your knowledge,

8    she flew first class?

9    A.  Again, I'm not really sure.

10        MS. NOTARI:  Your Honor, can I have 3506-1.

11   Q.  I am referring you to the bottom section of -- this was an

12   interview that you participated in with the government --

13        MR. QUIGLEY:  Objection.

14   Q.  -- on July 21, 2016.

15        THE COURT:  Don't read it all out loud.  Do you want

16   him to read something to himself?

17        MS. NOTARI:  Yes.

18   BY MS. NOTARI:

19   Q.  If you could refer to the next page, the last page, last

20   paragraph, can you please read the last paragraph.

21        (Pause)

22   A.  The one starting with "JG lifestyle"?

23   Q.  Let us know when you are done reading.

24        (Pause)

25   A.  I have read it.

I642gal7                          Dunkerley - Cross

1    Q.  This interview took place -- if we can go to the first

2    page, it took place on July 21, 2016?

3              MR. QUIGLEY:  Objection.

4    Q.  Do you recall that interview?

5    A.  Yes.

6    Q.  And that was closer in time to the period you spent working

7    for Jason Galanis than today, correct?

8    A.  Correct.

9    Q.  And in -- does that refresh your recollection about what --

10   the information you provided regarding Jason Galanis?

11   A.  Yes.

12   Q.  Okay.  And you told -- you would agree that his wife, Monet

13   Berger, flew first class?

14   A.  Some of the time, yes.

15   Q.  And she -- they had dogs and she treated them like

16   children?

17   A.  Yes.

18   Q.  And can you give us examples of that?

19             MR. QUIGLEY:  Objection to relevance.

20             THE COURT:  Sorry.

21             MR. QUIGLEY:  Objection to relevance.

22             THE COURT:  Yeah, sustained.

23   Q.  It's fair to say that Jason and his wife Monet had daily

24   maids and servants in their Bel Air mansion?

25   A.  Yes.

I642gal7                          Dunkerley – Cross

1   Q.  Now, you testified that you spent –– you frequently visited

2   the 1920 Bel Air.

3   A.  Quite a few times.  Frequently, sure.

4           MS. NOTARI:  Your Honor, at this point I would like to

5   show the witness a video and just to see if he can recognize

6   1920 Bel Air.

7           MR. QUIGLEY:  Can we approach, your Honor?

8           THE COURT:  Sure.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I642gal7                        Dunkerley - Cross

 1          (At the sidebar)

 2          THE COURT:  So I didn't see the video.

 3          MS. NOTARI:  It's just a video of 1920 Bel Air.

 4          MR. QUIGLEY:  It's a real estate promotional video,

 5   your Honor.  So, first of all -- there are a number of things.

 6   The document is hearsay because it says things like, going from

 7   memory, but like seven bedrooms, listing of the price.  It's a

 8   promotional real estate video describing the features of the

 9   residence.

10          Number two, I think it is --

11          MS. NOTARI:  We can take the sound off.

12          MR. QUIGLEY:  There is text.

13          Number two, there is I think there is -- the probative

14   value is extremely limited and I think it is designed to --

15          THE COURT:  Do you have any still photos of his house

16   at 1920?

17          MR. QUIGLEY:  There are four still photos.

18          MS. MERMELSTEIN:  They are marked already by the

19   defendants exhibits.

20          THE COURT:  Do you want to use the still photos?

21          MS. NOTARI:  First they made 1920 Bel Air a core part

22   of the case.  Not only is it relevant to the lifestyle that

23   Jason Galanis led, but they made 404(b) evidence which we are

24   now about to get into, where Mr. Cooney was involved in a

25   transaction involving 1920 Bel Air, and there is going to be a

1    lot of questioning about Bel Air and the fact that it was

2    appraised at $10 million.  I think it is very important for the

3    jury to understand 1920 Bel Air.  Plus there is all kinds of

4    evidence about -- that's going to be testified to about the

5    meetings there and --

6          THE COURT:  But I'm just asking why you can't use

7    still photos as opposed to video.

8          MS. NOTARI:  Because it doesn't really capture the way

9    the video does.  The video really makes the jury -- it's a

10   visual that they are there and certainly it is foundational.

11   It is relevant and foundational.  He can absolutely say that

12   it's a fair and accurate representation of what Bel Air looked

13   like.  Why are we --

14         MR. QUIGLEY:  He can say the same thing about the

15   photos.  Raise any hearsay issue.

16         THE COURT:  What is the harm of letting in the video

17   if he isn't playing the sound?

18         MR. QUIGLEY:  The harm, the statements in the video

19   describing the property, the amount, the cost, the number of

20   rooms, all of the features that are coming in for the truth of

21   the matter.  It's a video, but it has features like a document.

22   It's no different than putting a listing up, there like a real

23   estate listing of 1920 Bel Air.

24         THE COURT:  Has he seen this before?

25         MS. NOTARI:  No.  We were going to show it to him

I642gal7                    Dunkerley - Cross

1    right now.

2              THE COURT:  If he hasn't seen the video, then don't.

3              MS. NOTARI:  Your Honor, I'm going to have to bring in

4    another witness to do this.

5              MR. QUIGLEY:  She can show him the photos.  I'm sure

6    he --

7              MR. SCHWARTZ:  I would say I saw this for the first

8    time last night when Ms. Notari circulated it to everyone.  The

9    video, which I'm sure can be stopped so as not to show the

10   price, which I get your point on the price, stuff about number

11   of rooms, that's objective facts.  He could testify to that.

12   It is the real liability.  That's not the question.  But it

13   does convey a picture of that property in a very, very

14   different way than just the still photos that they have marked.

15   It conveys the views, it shows how it is situated on the hill

16   top.  The grandeur of this property is not properly depicted in

17   the photos, which I'm sure they were trying to make it look

18   great, but this makes it look even greater.

19             THE COURT:  I don't think you should use a promotional

20   video that he has never even seen.  You can use the still

21   photos or if you want to show still photos from video without

22   showing the whole video, you can do that.

23             MR. TOUGER:  You could just click on the video and

24   stop it before any of the -- stop it before.

25             THE COURT:  That you can do.  Just don't show it to

1    the jury.  Make sure that there is no hearsay in it, that it is

2    just the visual of the property without any text on the screen

3    and see if he recognizes it; and, if he does, then we can stop

4    him.  But make sure he stops at the right time, okay?

5              MS. NOTARI:  Okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I642gal7                          Dunkerley – Cross

1          (In open court)

2          THE COURT:  Again, we are just showing this to the

3     witness.

4          (Video played)

5     BY MS. NOTARI:

6     Q.  Did you have a chance, Mr. Dunkerley, to view that video?

7     A.  Yes.

8     Q.  Would you say that's a fair and accurate representation of

9     1920 Bel Air looked like when you visited the Galanis home?

10    A.  Absolutely.

11         MS. NOTARI:  Your Honor, may I show this to the jury?

12         THE COURT:  Yes, up to this point.

13         (Videotape played)

14         THE COURT:  Did the jurors see that?

15         JURORS:  No.

16         THE COURT:  We can do it again.

17         (Pause)

18         THE COURT:  Now can you all see?

19         JUROR:  Yes.

20         (Videotape played)

21         THE COURT:  Okay.

22    BY MS. NOTARI:

23    Q.  Mr. Dunkerley, again, you would say that is how Bel Air

24    appeared to be, correct?

25    A.  That is 1920 Bel Air, correct.

I642gal7                         Dunkerley - Cross

1    Q.  And do you -- we talked a little bit -- you testified

2    previously about Mr. Galanis owned a $10 million -- I'm sorry

3    he owned an apartment in TriBeCa?

4    A.  Correct.

5    Q.  Had you ever been to that apartment?

6    A.  No, never.

7    Q.  He purchased the apartment in November of 2014, correct?

8    A.  I don't know exactly, but that sounds about correct.

9    Q.  And as far as your knowledge, being involved as his -- the

10   managing person of 1920 Bel Air, were you involved in any of

11   the decisions to purchase the New York apartment?

12   A.  No, I wasn't.

13   Q.  And do you have any knowledge as to how much he paid for

14   that apartment in New York?

15   A.  No, I don't.

16   Q.  Okay.  You also -- during your meetings with the

17   government, there came up a discussion about a $4 million piece

18   of artwork that Mr. Galanis owned?

19               MR. QUIGLEY:  Objection.

20               THE COURT:  Why don't you just ask him what you want

21   to ask him.

22   BY MS. NOTARI:

23   Q.  Did Mr. Galanis own a piece of artwork that was $4 million?

24   A.  He said in the apartment that he owned there was art on the

25   wall that was worth a tremendous amount of money, correct.

I642gal7                    Dunkerley - Cross

1   Q.  Are you referring to the Keith Haring mural in his New York

2   apartment?

3            MR. QUIGLEY:  Objection: hearsay.

4            THE COURT:  Did you see a Keith Haring mural in his

5   apartment?

6            THE WITNESS:  He told me about it.  I never saw it.

7            THE COURT:  So sustained.

8   BY MS. NOTARI:

9   Q.  Now, Mr. Dunkerley, you were the managing agent of 1920

10  Bel Air, correct?

11  A.  Correct.

12  Q.  And it's fair to say that you were never at the 1920

13  Bel Air property when Mr. Cooney was there, correct?

14  A.  Correct.

15  Q.  And during October/November of 2014, Mr. Galanis, Jason

16  Galanis was trying to refinance his property at 1920 Bel Air?

17  A.  Correct.

18  Q.  And you learned that Mr. Cooney was going to help him with

19  that, correct?

20  A.  Yes.

21  Q.  During this time period that you were working with Jason

22  Galanis, he was doing a two- to three-million dollars home

23  improvement, correct?

24  A.  Slightly after this period, but yes.

25  Q.  He was doing construction on the home?

I642gal7                         Dunkerley - Cross

1    A.  Yes.

2    Q.  And he was -- the kitchen was under construction, correct?

3    A.  Yes.

4    Q.  The dining room?

5    A.  Yes.

6    Q.  The outside area?

7    A.  Yes.

8    Q.  And his hope was -- well, first, were you -- did there come

9    a time when you were provided with an appraisal that was done

10   on 1920 Bel Air?

11   A.  Yes.

12          MS. NOTARI:  Your Honor, if I could just have one

13   moment.

14          THE COURT:  Sure.

15          (Pause)

16          MS. NOTARI:  It is Defense Exhibit 3007-1A.

17          Your Honor, may I approach?

18          THE COURT:  Sure.

19   BY MS. NOTARI:

20   Q.  Mr. Dunkerley, do you recall seeing that appraisal?

21   A.  I do not recall seeing this appraisal.

22   Q.  You said that you did recall that an appraisal was done of

23   1920 Bel Air?

24   A.  Yeah, there were a lot of documents to do with the

25   refinancing, and I remember an appraisal document being part of

I642gal7                        Dunkerley - Cross

1    that refinancing, but I don't remember this document being that

2    document.

3    Q.  And to your knowledge what approximately was 1920 Bel Air

4    appraised at?

5              MR. QUIGLEY:  Objection: hearsay.

6              THE COURT:  Sustained.

7              MS. NOTARI:  Your Honor, Mr. Dunkerley was the

8    managing agent, so. . .

9              THE COURT:  You didn't appraise it, did you?

10             THE WITNESS:  No.

11             MS. NOTARI:  I'm sorry?

12             THE COURT:  I said:  He didn't appraise it, did he?

13             MS. NOTARI:  We will have an appraiser come to court.

14   BY MS. NOTARI:

15   Q.  Now, you testified previously that Camden Capital was

16   involved in high-interest loans?

17   A.  Hard-money lending, correct.

18   Q.  Was Jason Galanis's mortgage on 1920 Bel Air with Camden

19   Capital as far as you know?

20   A.  I believe at one point in time he had taken money out from

21   Camden Capital on the property, correct.

22   Q.  And as the managing agent you knew that he was paying a

23   high-interest mortgage loan on his property, correct?

24   A.  He had several loans on his property, and that one was a

25   higher than normal interest loan, correct.

I642gal7                        Dunkerley - Cross

1    Q.  And he was hoping to refinance his loan and do some home

2    improvement so he could resell it at a profit at some point

3    down the line, correct?

4              MR. QUIGLEY:  Objection.

5              THE COURT:  Sustained.

6    Q.  As far as you know, he was paying a -- he had a

7    high-interest mortgage?

8    A.  He had several mortgages, a couple of which were higher

9    than normal interest, yes.

10   Q.  And as far as you know, the carrying costs on the mansion

11   were very expensive, the monthly charges.

12   A.  They were expensive, yes.

13   Q.  And he was trying to reduce his expenses on the mansion,

14   correct?

15   A.  He never specifically said that to me.

16   Q.  Now, as far as the home improvements, he was hoping at some

17   point to sell 1920 Bel Air at a profit, correct?

18   A.  Again, I -- we didn't specifically talk about the sale of

19   1920 Bel Air.

20   Q.  Now, we previously --

21             MS. NOTARI:  I would like to bring up Government's

22   Exhibit 512.  Government's Exhibit 512.  Sorry.  Can someone

23   bring up Government's Exhibit 512?

24             MR. QUIGLEY:  We can pull it up if need be.

25             THE COURT:  Sorry?

1    MR. QUIGLEY:  We can pull it up if need be.

2    MS. NOTARI:  Thank you.

3    THE COURT:  Okay.  Thank you.

4    BY MS. NOTARI:

5    Q.  Do you recall reviewing this document earlier today?

6    A.  Yes.

7    Q.  If we scroll down to November 12, you previously went

8    over -- I'm not sure what page it is.  The transaction

9    involving $3.8 million to Bevan Cooney.

10         Mr. Dunkerley, do you recall being asked about that

11   transaction on November 12?

12   A.  Yes.

13   Q.  You said that you had no understanding as to why that money

14   was going to Mr. Cooney, correct?

15   A.  Correct.

16   Q.  Now, you previously said that Mr. Cooney was assisting

17   Jason Galanis in --

18         MR. TOUGER:  Your Honor may we approach.

19         THE COURT:  Sure.

20         (Discussion off the record at the sidebar)

21         (In open court)

22   BY MS. NOTARI:

23   Q.  Mr. Dunkerley, you said that you don't recall what that

24   payment to Mr. Cooney was for, correct?

25   A.  Correct.

I642gal7                         Dunkerley - Cross

1  Q.  I am handing you what has been previously marked Defense

2  Exhibit 3056-A.  Can you please review that document.

3            (Pause)

4  Q.  You can review the e-mail and also the attachment.

5            (Pause)

6  A.  Yes.

7  Q.  Mr. Dunkerley, first, the e-mail that is --

8            MS. NOTARI:  Your Honor, at this time I would like to

9  move Defense Exhibit 3056-A into evidence.

10            MR. QUIGLEY:  We have no objection.

11            THE COURT:  All right.  It will be admitted.  Thank

12  you.

13            (Defendant's Exhibit 3056-A received in evidence)

14  BY MS. NOTARI:

15  Q.  Mr. Dunkerley, the e-mail address that is provided, is that

16  your e-mail address?

17  A.  It is.

18  Q.  And was that -- that was sent to M. Santana at Camden

19  Escrow?

20  A.  Yes.

21  Q.  And the subject is "addendum 1920 Bel Air"?

22  A.  Correct.

23  Q.  Can you please tell us what this document is to the best of

24  your recollection.

25  A.  So it is part of the refinancing of 1920 Bel Air.

I642gal7                          Dunkerley - Cross

1    Q.  So according to this document -- first of all, this

2    document, the date is November 13, 2014, correct?

3    A.  Yes.

4    Q.  So it is the day after the money was wired into

5    Mr. Cooney's account, correct?

6    A.  Correct.

7    Q.  So if you look at this document and we refer to the

8    attachment, this document -- can you just read to us what this

9    is or tell us in your best words.

10   A.  This is to do with the refinancing of 1920 Bel Air by Bevan

11   Cooney.

12   Q.  Is that your signature on the bottom page?

13   A.  It is.

14   Q.  And that's dated November 13, 2014?

15   A.  Yes.

16   Q.  And this document basically authorized 3.8 -- 3.995 to go

17   to -- from Bevan Cooney, who is listed as 1920 Bel Air Estate

18   Holding Company LLC, to the law firm of Wolff Law Firm,

19   correct?

20   A.  Correct.

21   Q.  And there is information there?

22   A.  Yes.

23   Q.  And the Wolff Law Firm was the law firm representing the

24   seller.

25   A.  Yes.

I642gal7                    Dunkerley - Cross

1    Q.  So this money -- so this actually document authorized the

2    payment of the $3.8 million from Mr. Cooney to Wolff Law Firm,

3    correct?

4    A.  $3.995 million.

5    Q.  Yes.

6           Now, the money went into escrow, correct?

7    A.  Correct.

8    Q.  So Mr. Cooney, after the money went into escrow, it's fair

9    to say he no longer had the money.

10   A.  Correct.

11   Q.  Now referring you to -- Maria Santana was the person who

12   was handling the escrow?

13   A.  Yes.

14   Q.  And it's fair to say there were e-mails going back and

15   forth with her during several months regarding this particular

16   real estate transaction.

17   A.  Yes.

18   Q.  And at some point -- if I can just hand you now Defense

19   Exhibit 3062.

20           MS. NOTARI:  Your Honor, if I may have Defense Exhibit

21   3062?  I move this into evidence.

22           THE COURT:  Any objection to --

23           MR. QUIGLEY:  No, your Honor.

24           THE COURT:  It will be admitted.  Thank you.

25           (Defendant's Exhibit 3062 received in evidence)

I642gal7                        Dunkerley - Cross

1    BY MS. NOTARI:

2    Q.  Do you recall that document?

3    A.  I do.

4              MS. NOTARI:  Your Honor, this is moved into evidence?

5              THE COURT:  Yes.

6              MS. NOTARI:  It is in evidence.  Okay.

7    BY MS. NOTARI:

8    Q.  At some point in March of 2015, the escrow in this

9    transaction was canceled.

10             JUROR:  Sorry.

11             THE COURT:  You are having trouble with the screens?

12             JUROR:  Yes.

13             THE COURT:  Raise your hand if your screens are

14   working, please.

15             I don't know if you all want to sit in the back or

16   just look over someone else's shoulder, whatever is more

17   convenient.  Thank you.  Can you see?  Can you see?  Can

18   everyone see?

19             JUROR:  Yes.

20   BY MS. NOTARI:

21   Q.  Mr. Dunkerley, this document was actually the cancellation

22   of the escrow, correct?

23   A.  Correct.

24   Q.  So the transaction never happened.

25             MR. QUIGLEY:  Objection.

I642gal7                          Dunkerley - Cross

1             MS. NOTARI:  Could we just refer to the attachment?

2             THE COURT:  Okay.  I will sustain the objection and we

3     will move on.  We will go to the attachment.

4             MS. NOTARI:  Is there an attachment?

5             (Pause)

6             MS. NOTARI:  That's a different exhibit.

7             (Pause)

8             MS. NOTARI:  Your Honor, we are also -- at this point

9     I think the attachment is Defense Exhibit 3063, so if we could

10    refer to that.

11            THE COURT:  Any objection?

12            MS. MERMELSTEIN:  Just give us a moment to pull it up,

13    your Honor.

14            THE COURT:  Sure.

15            MS. NOTARI:  Again, Defense Exhibit 3063, we would

16    move that one into evidence.

17            MR. QUIGLEY:  Give us one second, your Honor.

18            THE COURT:  I am just giving the government a

19    moment --

20            MS. NOTARI:  I think it is part of the same e-mail

21    chain.

22            (Pause).

23            MR. QUIGLEY:  No objection, your Honor.

24            THE COURT:  It will be admitted.

25            (Defendant's Exhibit 3063 received in evidence)

I642gal7                    Dunkerley - Cross

1    BY MS. NOTARI:

2    Q.  Can you see that, Mr. Dunkerley?  You have a physical copy.

3    Can you please tell us what that document is?  Is that your

4    signature on the bottom?  If you could just zoom out.

5    A.  This is my signature on the document and this is

6    cancellation instructions for the original 1920 Bel Air loan

7    funding transaction.

8    Q.  And what was -- did Mr. Cooney sign this also as far as you

9    know?

10   A.  I believe so, yes.

11   Q.  So the escrow was canceled, correct?

12   A.  Yes.

13   Q.  And the real estate never happened -- Mr. Cooney never

14   purchased the property?

15   A.  So it was a complicated transaction and it was canceled to

16   one point, but in the end I thought, I believe, that it went

17   through.  And the transaction did -- an e-mail came up a moment

18   ago where it said this is successful transaction, but it did

19   get cancelled at one point.

20   Q.  You mean the cancellation was successful.

21   A.  And also the actual transaction I believe went through at

22   one point, the $3.9 million did go from Bevan Cooney to the

23   Wolff Law Firm.

24   Q.  Oh, yes, okay.  Thank you.

25        MS. NOTARI:  I think we can move on, if I could just

I642gal7                    Dunkerley - Cross

1   have one moment.

2                (Pause)

3   BY MS. NOTARI:

4   Q.  So just to be clear, the escrow was canceled, but

5   Mr. Cooney never purchased 1920 Bel Air, correct?

6   A.  He was refinancing it.  He was never purchasing it.

7   Q.  Okay.  But this -- after this real estate transaction

8   involving Mr. Cooney ended, it ended there, correct?  As far as

9   you know.

10  A.  No, I believe the transaction still went through.

11  Q.  Okay.  Mr. Cooney purchased 1920 Bel Air?

12  A.  You keep on using the word "purchase."  It's refinance.

13  Q.  Refinance, refinance.  Okay.  Thank you.

14               Mr. Dunkerley, you testified on direct examination

15  that you were previously involved in a company called

16  Chromidex, correct?

17  A.  Absolutely.

18  Q.  And you worked -- you worked there from 2003 until 2016?

19  A.  I worked there as an employee for three years from 2003 to

20  2006 and then as a director until 2016.

21  Q.  And it's fair to say that during the time that you worked

22  from 2008 to 2016, you were not paid a salary.  You were paid

23  in stock options.

24  A.  Correct.

25  Q.  And at some point -- and is this common in the industry?

1    A.   Absolutely.

2    Q.   And would you say that the reason why you left Chromidex

3    was because the company did not go public soon enough?

4    A.   So as an employee, the company did not go public soon

5    enough, so I had to leave at that point in time, correct.

6    Q.   And eventually the company did go public, correct?

7    A.   Yes.

8    Q.   And the company grew and it went from three employees to

9    approximately 100 employees, correct?

10   A.   Yes.

11   Q.   And after you resigned, you continued to hold on to your

12   stock.

13          MR. QUIGLEY:  Objection to relevance.

14          THE COURT:  I'll allow it.

15   Q.   Isn't that right?

16   A.   So when I resigned, I had to sell my stock within 30 days

17   of resigning, so if you call 30 days a long period, then, yes,

18   I held on to it for a period of 30 days.

19   Q.   Okay.  Do you know -- okay.  I will move on.

20          Mr. Dunkerley, you -- there was a lot of testimony

21   about Thorsdale and it's fair to say that you did not have

22   visibility into the Thorsdale account.

23   A.   Not at all.

24          MS. NOTARI:  I would like to refer to Government

25   Exhibit 1581.

```
 1              (Pause)

 2              MS. NOTARI:  Can someone bring it up?

 3              MS. MERMELSTEIN:  We are bringing it up for you right

 4   now.

 5              MS. NOTARI:  Thank you.

 6   BY MS. NOTARI:

 7   Q.  Mr. Dunkerley, do you recall providing testimony on this

 8   document?

 9   A.  Yes.

10   Q.  Now, in this document, this is from Jason Galanis and it is

11   to you, and it is telling you that he wants to move $500,000

12   from WAPC, which means Wealth Assurance Private Client,

13   correct?

14   A.  Correct.

15   Q.  Into Thorsdale, correct?

16   A.  Correct.

17   Q.  You had no visibility into Thorsdale, you said.

18   A.  Correct.

19   Q.  Right.  So in this particular e-mail, he is telling you

20   that money from WAPC $200,000 is going to go to Adam Levine to

21   buy back his stock.

22   A.  Correct.

23   Q.  And $100,000 is going to go from Thorsdale to WAH to pay

24   Hunter Taubman Weiss.

25   A.  Correct.
```

I642gal7                          Dunkerley – Cross

1   Q.  And $62,500 is going to Zucker, correct?

2   A.  Correct.

3   Q.  Now, this money that was coming from WAPC was money that

4   came from the Wakpamni bonds?

5   A.  Yes.

6   Q.  Bonds proceeds?

7   A.  Yes.

8   Q.  And it's fair to say that Hunter Taubman Weiss did not know

9   that.

10          MR. QUIGLEY:  Objection.

11          THE COURT:  Sustained.

12  Q.  Did you ever provide information to Hunter Taubman Weiss

13  that the money that they received was money from the Wakpamni

14  bonds?

15          MR. QUIGLEY:  Objection.

16          THE COURT:  Sustained.

17  BY MS. NOTARI:

18  Q.  Mr. Dunkerley, you transferred money from the Wakpamni

19  bonds to Thorsdale, correct?

20  A.  Correct.

21  Q.  And you forwarded that money on to these individuals in

22  this e-mail?

23          MR. QUIGLEY:  Objection.  He said he didn't have any

24  insight into Thorsdale.

25          THE COURT:  I'm sorry?  What did you say?

I642gal7                    Dunkerley - Cross

 1            MR. QUIGLEY:  I think he testified he had no

 2    visibility into the Thorsdale account previously, your Honor.

 3            THE COURT:  I will let him explain for himself.  You

 4    can answer that.

 5            THE WITNESS:  The prosecution is absolutely correct.

 6    I couldn't have made these transfers.  I didn't know if these

 7    transfers ever happened.  I had no visibility into the

 8    Thorsdale bank account or operating of the Thorsdale entity at

 9    all.

10    Q.  Now, did there come a time when -- so your testimony is you

11    didn't make these transfers or you did?

12    A.  I would have made the original transfer WAPC 500,000 to

13    Thorsdale.  The rest of it, I have no idea if it took place or

14    not.  I was not a signatory on the Thorsdale account.

15    Q.  Now, you would agree that Jason Sugarman and Jason Galanis

16    borrowed money to purchase Valor.

17    A.  Yes.

18    Q.  And they borrowed from Burt Capital?

19    A.  I believe, so yes.

20    Q.  They borrowed to your -- approximately 600 to $800,000?

21    A.  Yes.

22    Q.  And at some point you were authorized to pay back Valor

23    from Wealth Assurance Private Client, correct?  You were told

24    to make a payment to pay back a loan to Burt Capital?

25    A.  Yes, I believe so, yes.

I642gal7                          Dunkerley - Cross

1    Q.  And how did you make that payment back to them?

2    A.  Electronically.

3    Q.  At no time when you made that electronic payment did you

4    say, Hey, Burt Capital this money is from the WLCC bonds.

5    A.  No.

6    Q.  Nobody knew that, right, except you and perhaps Mr. Jason

7    Galanis.

8              MS. MERMELSTEIN:  Objection.

9              THE COURT:  Sustained.

10   BY MS. NOTARI:

11   Q.  Now, you testified that there were fake e-mail addresses.

12   A.  Yes.

13   Q.  Jason Galanis used many fake e-mail addresses, correct?

14   A.  Yes.

15   Q.  He used Jason@Thorsdale.

16   A.  Yes.

17   Q.  That was one of them.  Approximately how many fake e-mail

18   addresses?

19             THE COURT:  Let him answer.

20   A.  That's not really a fake e-mail address because his name is

21   Jason and the company he ran was called Thorsdale, so it was

22   one of his more real e-mail addresses.

23   Q.  But he did use really fake ones, correct?

24   A.  Really fake?

25   Q.  Like he took on -- he took on fake identities.  He

I642gal7                          Dunkerley - Cross

1    pretended to be Julie Waldorf.

2    A.   He used fake e-mail addresses.

3    Q.   Do you recall him using the address, the identity of Julie

4    Waldorf?

5    A.   No, I don't actually.

6              MS. NOTARI:  Your Honor, can I bring 3506-2, page 6.

7              (Pause).

8              MS. NOTARI:  I don't see it there.  I will come back

9    to this.  Thanks.

10   Q.   And there was a lot of testimony about Ballybunion Capital

11   Growth Fund in the UK.  Now, Ballybunion Capital Growth Fund

12   was a real company, correct?

13   A.   Yes.

14   Q.   And Mr. Galanis created a company called Ballybunion

15   Capital Growth Fund LV, correct?

16   A.   Yes.

17   Q.   Now, the Ballybunion Capital Growth Fund UK was actually in

18   the U.K., correct?

19   A.   Yes.

20   Q.   And Ballybunion Capital Growth Fund LV was in Las Vegas.

21   A.   Yes.

22   Q.   And it was not a real company.

23   A.   Correct.

24   Q.   And Mr. Galanis, Jason Galanis, at some point told you to

25   forward money to -- if I could just have one moment.

 1            (Pause)

 2   BY MS. NOTARI:

 3   Q.  Mr. Galanis, Jason Galanis, told you to wire instructions

 4   to the accountants of Wealth Assurance, and those funds were

 5   wired to Ballybunion in the United States, not Ballybunion in

 6   the U.K., correct?

 7   A.  Correct.

 8   Q.  Now, when you wired the funds to the accountants of Wealth

 9   Assurance, you did not tell them what you were doing, correct?

10   A.  Correct.

11   Q.  The accountants at Wealth Assurance Private Client did not

12   know that the money was going to a fake account.

13            MR. QUIGLEY:  Objection.  Mischaracterizes the entity.

14            THE COURT:  Sustained.

15   BY MS. NOTARI:

16   Q.  Now, you previously testified that you sent fake investment

17   statements to Wealth Assurance?

18   A.  Fake account statements, correct.

19   Q.  You submitted fraudulent documents on behalf of Jason

20   Galanis?

21   A.  Correct.

22   Q.  You helped create fraudulent documents on behalf of Jason

23   Galanis.

24   A.  Correct.

25   Q.  And at some point in 2015 -- I'm sorry, October 2016, there

I642gal7                          Dunkerley - Cross

1   was -- subpoenas were sent regarding an investigation involving

2   WLCC bonds, correct?

3   A.   Correct.

4   Q.   And you and Jason Galanis were -- there was an

5   investigation and you had to respond to the subpoena requests.

6   A.   Correct.

7   Q.   And during this time period, you said there were several

8   meetings where you and Jason Galanis would meet at 1920

9   Bel Air.

10  A.   Correct.

11  Q.   And you said that there was discussion about how you were

12  going to strategize to create false documents, correct?

13  A.   As I spoke with the prosecution earlier on about that, yes.

14  Q.   There was backdating documents.

15  A.   Yes.

16  Q.   Galanis was trying to create documents to create -- cover

17  up the fraud and -- I'll stick with that.  He was trying to

18  create documents to cover up the fraud.

19  A.   Correct.

20  Q.   And he was trying to create documents to fill in gaps in

21  the story so that the government would believe his story,

22  correct?

23  A.   Correct.

24  Q.   And during these -- approximately how long did these

25  meetings last?

I642gal7                      Dunkerley - Cross

1    A.  Each meeting, about a half a day or so, four to five hours.

2    Q.  And when he would send you documents, he would do it

3    through a secure Dropbox called Tresorit.

4    A.  One of the ways was through a secure Dropbox, yes.

5    Q.  And only you and Mr. Galanis, Jason Galanis, had access to

6    this Dropbox, correct?

7    A.  Yes.

8    Q.  Now, it's fair to say that Mr. Cooney was not present

9    during any of these meetings, right?

10   A.  Absolutely correct.

11   Q.  Now, there was also a time when not only did you create

12   false documents, but you backdated them and notarized them,

13   correct?

14   A.  Documents were backdated.  I don't remember -- if anyone

15   notarized, it would have been Jason Galanis who got them

16   notarized.  I couldn't backdate the notarized document.

17   Q.  If you said in your report -- in your talks with the

18   government that they were notarized, it was probably -- that

19   came up and you said -- do you want to refer to your interview

20   notes?  3506-3.

21          THE COURT:  All right.  Do you think that would help

22   you remember?

23          THE WITNESS:  Yes, it would.

24          THE COURT:  All right.

25   Q.  Page 7.

I642gal7                    Dunkerley - Cross

1            (Pause)

2   A.  Do you want me to comment on this or?

3   Q.  If you go down toward the middle to the bottom.

4   A.  It starts with "Galanis also"?

5   Q.  Does that refresh your recollection?

6   A.  That's exactly what I just said, yes.

7   Q.  So there was actually there was not only the backdating the

8   documents, but there was the creation of false notarized

9   documents.

10  A.  By Jason Galanis, yes.

11  Q.  And you would agree that notarization of a document creates

12  an added extra layer of reliability, correct?

13  A.  Yes.

14  Q.  It's intended so that when you -- what is the -- why would

15  someone notarize a document?  Why did you notarize these

16  documents?

17          MR. QUIGLEY:  Objection.  Mischaracterized his

18  testimony.

19          THE COURT:  Why don't you rephrase that.

20  BY MS. NOTARI:

21  Q.  Well, why -- did you notarize the documents?

22  A.  No, I didn't.

23  Q.  Did you discuss with Jason Galanis your strategy in

24  notarizing these documents?

25  A.  He told me he was going to get the documents notarized

I642gal7                    Dunkerley - Cross

1   and -- backdated and notarized.  That's it.

2   Q.  And it's fair to say that the purpose of these meetings and

3   these creation of false documents was to create a cover story.

4   A.  Correct.

5   Q.  And you knew that these documents were going to be handed

6   over to the United States government, correct?

7   A.  Not exactly.  They were, but I didn't exactly know at the

8   time how and when and why they were going to be.

9   Q.  It's fair to say that federal investigators were reviewing

10  these documents and their reliability, correct?

11  A.  They did.

12  Q.  And in fact, this kind of investigation also often leads to

13  the arrest of people?

14          MR. QUIGLEY:  Objection.

15          THE COURT:  Sustained.

16  Q.  Now, you did this because Jason Galanis instructed you to

17  do this, right?

18  A.  What?

19  Q.  To create false documents.

20  A.  Yes.

21  Q.  And you signed these fraudulent documents.

22  A.  I did.

23  Q.  And Jason Galanis told you that after you signed them that

24  you should delete the originals so that there would be no

25  record of your conspiracy to create them, correct?

I642gal7                        Dunkerley - Cross

1    A.  That sounds correct.

2    Q.  And in fact, these fraudulent documents were produced to

3    your lawyer?

4    A.  They were.

5    Q.  Did you ever tell your lawyer that you were producing

6    fraudulent documents?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  Sustained.

9    Q.  It's fair to say that there was no -- you did not represent

10   to your lawyer that you were presenting fraudulent documents.

11             MR. QUIGLEY:  Objection.

12             THE COURT:  Sustained.

13   Q.  And the purpose of these false documents was, again, to try

14   to con the government.

15   A.  Yes.

16   Q.  You were hoping that the government would believe your

17   story.

18   A.  Yes.

19   Q.  And these meetings took place between December 2015 and

20   January 2016.  Is that right?

21   A.  Correct.

22   Q.  Now, at some point --

23             MS. NOTARI:  Your Honor, I'm happy to go on as long as

24   you want.

25             THE COURT:  You can go for another minute or two.

I642gal7                         Dunkerley - Cross

1   BY MS. NOTARI:

2   Q.  I would like to talk for a moment about your relationship

3   with Jason Galanis.

4          Now, it's fair to say, Mr. Dunkerley that you did not

5   do anything without the approval of Jason.

6          MR. QUIGLEY:  Objection.

7          THE COURT:  Overruled.

8   A.  In general that's a correct statement.

9   Q.  And Jason was the master planner.  Correct?

10         And it's fair to say that during the time that you

11  were committing frauds from him, he did not allow you to

12  speak -- he controlled who you spoke to.

13  A.  No, he didn't control it, but it was implied.

14  Q.  And you knew that it was a problem to just go and speak

15  freely to people, correct?

16  A.  Yes.

17  Q.  And in fact there was a time when you were talking -- Gary

18  Hirst also worked for Jason Galanis?

19  A.  With Jason Galanis.

20  Q.  And Gary Hirst was also a part of this fraud in creating

21  fraudulent documents?

22         MR. QUIGLEY:  Objection.

23         THE COURT:  I'll allow it.

24  A.  I believe so, yes.

25  Q.  And did there come a time when you spoke to Gary Hirst

I64JGAL8

1    about the fact that you thought Gary was suffering from

2    Stockholm Syndrome from working with Jason Galanis?

3              MR. QUIGLEY:  Objection.

4              THE COURT:  You know, why don't we end there for the

5    day?  Why don't we take a break until tomorrow.

6              So, ladies and gentlemen, have a nice evening.  Don't

7    discuss the case don't research anything.  Keep an open mind

8    and I will see you tomorrow morning.  Thank you.

9              (Jury not present)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I64JGAL8

1              (In open court; jury not present)

2              THE COURT:  The last objection is sustained.  I don't

3      know if he answered on the record.  I don't see it on the

4      transcript, but I think I heard him.  If I need to instruct the

5      jury, let me know tomorrow.

6              THE REPORTER:  I didn't hear an answer, Judge.  There

7      is no answer on the record.

8              THE COURT:  I have a sentencing now.  Is there

9      anything we need to discuss now?  Otherwise, we can meet

10     tomorrow morning.

11             MR. SCHWARTZ:  Nothing from us.  Just one little

12     housekeeping matter.  The video that was shown to the jury, I

13     think it was not moved into evidence.  I don't see a reason why

14     that needs to be done in front of the jury.  Can we offer that?

15             MS. MERMELSTEIN:  It is not offered.

16             MR. SCHWARTZ:  We'll cut it to what takes out the

17     hearsay, and we'll mark that call it Defense Exhibit 7000.

18             THE COURT:  Why don't you do that, and tomorrow

19     morning just say I'm moving in defense exhibit blank, and

20     you'll move it.

21             MR. SCHWARTZ:  That is fine.  I didn't want it to yet.

22             MR. TOUGER:  There is one issue I would like to bring

23     up.  Mr. Dunkerley stated on cross he was interviewed by the

24     government on 20 occasions, and I don't know the exact count of

25     interview notes we have, but it doesn't come close to 20.  I

I64JGAL8

1    want to make sure the government has given us all the notes

2    they have from the sessions.

3          MR. QUIGLEY:  We don't have any additional notes to

4    give over.

5          THE COURT:  Have you given all the notes?

6          MR. QUIGLEY:  We have given all the notes we have.

7          MR. TOUGER:  The other thing we can deal with, at some

8    point we have to deal with this issue with using for the

9    discovery.  We now have no access to discovery.  Do you want to

10   deal with that tomorrow morning?

11         THE COURT:  What are you requesting?  I only heard

12   about it for the first time this morning.

13         MR. TOUGER:  We only heard about it, me at 7:00

14   o'clock last night when I went to try to find a document.  We

15   had been using a discovery service through Michelle Morton's

16   attorneys that allowed us to go on, and they had documented all

17   the discovery on there so we could search for specific

18   documents.

19         When the government gave us the documents, it was not

20   in searchable form.  Basically we are lucky to find something.

21   We were allowed to use what Michelle Morton's attorneys were

22   doing it for a very small fee, much smaller than what they were

23   paying.  We were both paying that fee, Ms. Notari and I.  Now

24   we don't have that, nor do we have the ability now to set up

25   that process now because it takes literally weeks for that to

I64JGAL8

1     get up and running.

2                THE COURT:  What are you asking?

3                MR. TOUGER:  I guess what we're really asking is can

4     we use -- I don't know if the court wants to authorize a

5     $12,000 payment to Relativity, which is what I understand it

6     costs, right, $12,000?

7                THE COURT:  For the remainder of the trial?

8                MR. TOUGER:  It is a monthly fee.

9                MS. NOTARI:  We can follow up one more time.  I don't

10    know if maybe -- I don't know if there is a solution.

11               THE COURT:  Look into it tonight and think about what

12    makes the most sense.  I don't know if there is something you

13    can do with Mr. Archer, if there is some way the government can

14    assist, but come back and tell me what you're asking.

15               MR. TOUGER:  Maybe we can ask --

16               MR. SCHWARTZ:  We obviously have our own document

17    platform that has all the stuff up.  We will explore if there

18    is a cost efficient way to make it available to the other

19    defendants without obviously giving them our work product.

20               THE COURT:  Exactly.  Thank you for doing that.  Let's

21    meet at 9:30 tomorrow.  Thank you.

22               (Court adjourned until Tuesday, June 5, 2018, at 9:30

23    o'clock am)

24

25

1       INDEX OF EXAMINATION

2  Examination of:                              Page

3  HUGH DUNKERLEY

4  Direct Mr. Quigley . . . . . . . . . . . . .1004

5  Direct By Mr. Quigley  . . . . . . . . . . .1047

6  Cross Q. . . . . . . . . . . . . . . . . . .1060

7  Cross By Ms. Notari  . . . . . . . . . . . .1170

8                  GOVERNMENT EXHIBITS

9  Exhibit No.                              Received

10   756   . . . . . . . . . . . . . . . . . . .1005

11                   DEFENDANT EXHIBITS

12  Exhibit No.                              Received

13   3056-A   . . . . . . . . . . . . . . . . .1209

14   3062    . . . . . . . . . . . . . . . . . .1211

15   3063    . . . . . . . . . . . . . . . . . .1213

16

17

18

19

20

21

22

23

24

25