I65JGAL1                    Dunkerley – cross

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                            16 Cr. 371 (RA)

JOHN GALANIS, et al.,

          Defendants.

------------------------------x

                              New York, N.Y.
                              June 5, 2018
                              9:30 a.m.


Before:

                  HON. RONNIE ABRAMS,

                              District Judge


                    APPEARANCES

ROBERT KHUZAMI,
    Acting United States Attorney for the
    Southern District of New York
BY:  BRENDAN F. QUIGLEY,
    REBECCA G. MERMELSTEIN,
    NEGAR TEKEEI,
       Assistant United States Attorneys

PELUSO & TOUGER
    Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
    Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
    LAURA HARRIS

I65JGAL1                          Dunkerley - cross

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4              - and -
     O'NEILL and HASSEN
5         Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ-HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                     Ellie Sheinwald, Paralegal
9                          Eric Wissman, Paralegal
                          Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I65JGAL1                    Dunkerley – cross

1            (Trial resumes)

2            (In open court; jury not present)

3            THE COURT:  Good morning, everyone.  You may be

4    seated.  Are we waiting for Mr. Cooney?  Good morning,

5    Mr. Cooney.

6            So I wanted to resume our conversation from yesterday

7    regarding evidence that Mr. Archer and Cooney received pre-IPO

8    shares on the exchange for their participation in the bond

9    scheme, and I have a question.

10           As I noted yesterday, I think this is a really close

11   question, so first I want to be clear that the government is

12   not intending to call a single witness who will testify about

13   why Mr. Archer and Cooney received those shares.  No one can

14   speak to that?

15           MS. MERMELSTEIN:  That's correct, your Honor.

16           THE COURT:  With respect to Francisco Martin, you

17   know, he seems to delineate between the bond scheme and Code

18   Rebel in one of the 302s.  I looked at 3522-1, Pages 3 and 6.

19           He first says that he received $75,000 in exchange for

20   being the investment manager related to the WLCC scheme.  He

21   later says in the same interview he received 50,000 shares of

22   Code Rebel for helping to set up the two corporate entities

23   that purchased the vast majority of the shares offered in the

24   IPO.

25           Then he seems to potentially conflate the two in a

I65JGAL1                    Dunkerley - cross

later interview, but there is at least some ambiguity about
what he would say about why he received the shares.  As I noted
yesterday, my concern is heightened by the fact Mr. Dunkerley
testified on direct examination yesterday that he received the
Code Rebel shares for his role as a placement agent in the IPO.

        So to the government, doesn't the testimony referred
so far cut against your theory as to why the defendants
received the shares, namely, as compensation for the WLCC?

        MS. MERMELSTEIN:  I don't think it does, your Honor.

        THE COURT:  I don't know if my microphone is working,
either.  Why don't we speak loudly.

        MS. MERMELSTEIN:  I don't think it does, your Honor.

        As we argued yesterday, I think that the efforts to
delineate cleanly between code Wakpamni bond fraud and Code
Rebel fraud are factually themselves inaccurate, and that is
why the efforts to artificially separate them, I think that is
wrong as a matter of the facts of this case and that as a
result, I don't think you can make that arbitrary distinction.

        I also think that if you look at the timing of Mr.
Martin's receipt of the first set of Code Rebel shares, not the
convertible note shares, the shares that were sort of given
through the pre-IPO distribution, they were given before any
actual Code Rebel efforts began.  They were given in May of
2014, which is to say, when the focus of these conversations
with Mr. Galanis was about, assuming the role as private equity

I65JGAL1                      Dunkerley - cross

1    manager, which further makes two points:

2              One is to the extent that those shares were for one

3    purpose or another, they were more for the Wakpamni fraud;

4              Two, those things can't be separated because efforts

5    to set up the Code Rebel piece and to start giving out shares

6    to people started sort of in the midst of the Wakpamni bond and

7    efforts to issue the Wakpamni bonds, and you can't delineate

8    cleanly between one and the other.

9              THE COURT:  What about the fact that Francisco Martin

10   said he didn't actually own the Code Rebel shares he received,

11   but instead it was a way for Jason Galanis to surreptitiously

12   control all of the Code Rebel shares essentially so that he

13   could carry out the pump and dump.  That is what it seems to

14   suggest on Page 2 of 3522-9.

15             MS. MERMELSTEIN:  With respect, so I think, look, this

16   was not an issue that the government had tried to parse this

17   finally for all of the reasons I have said.  There is a piece

18   of 3500, 3522-16, the last piece of Mr. Martin's 3500, which is

19   an email from his counsel, and in clarifying what he said was,

20   there are two sets of shares that went to Mr. Martin.  Some

21   were for him personally, some were to be controlled by Jason

22   Galanis, and so that there was a pump and dump scheme is, of

23   course, true and there are other related reasons why

24   individuals were sort of holding shares, including Mr. Martin,

25   but Mr. Martin has been clear that of the shares that he

1   received into the Condor account, those were for his benefit.

2           MR. SCHWARTZ:  The cite for that?

3           MS. MERMELSTEIN:  Sorry?

4           MR. SCHWARTZ:  Which 35 is that?

5           MS. MERMELSTEIN:  3522-16.

6           MR. SCHWARTZ:  That is the one you produced this

7   morning.

8           MS. MERMELSTEIN:  I don't believe so.  I believe it

9   went out to you on June 2.  Did you just get it this morning?

10          MR. SCHWARTZ:  Yes.

11          MS. MERMELSTEIN:  Well, I had understood it went out.

12  You have it now, in any event.  It is one line, you can read

13  it.  Mr. Martin would also say that he understood that when the

14  shares that was sort of were in his name for Jason Galanis'

15  benefit were sold, he would share in the profits from them.

16  There is not an agreed-upon amount, but that is what Jason

17  Galanis conveyed to him, and so I don't know that there is that

18  much more to say on this topic.

19          For all the reasons we have said, the government

20  continues to believe that this was one fraud, that it cannot be

21  delineated in this fashion and that in this case in particular

22  where defendants opened on having received no material benefit,

23  their receipt of something of enormous value in the midst of

24  the conspiracy is direct evidence.  The government should get

25  to offer it, and they can make whatever arguments they want to

1    make where the government's theory is wrong.

2              THE COURT:  Again the problem I am facing is how they

3    can cross-examine Mr. Martin.  He is the only witness, is that

4    right, who will testify, or is there someone else who is going

5    to testify about receiving shares themselves even if they won't

6    testify why Mr. Archer and Mr. Cooney know got the shares?

7              MS. MERMELSTEIN:  We intend to show the jury that many

8    of the people in the Wakpamni bonds received shares as sort

9    of -- but as circumstantial evidence of what the purpose was.

10   No, there are no other witnesses who are going to testify about

11   the purpose of the receipt of those shares.

12             THE COURT:  When is he going to testify?

13             Does anyone think it would be useful to put him on the

14   stand outside of the presence of the jury to talk about this

15   issue?

16             MS. MERMELSTEIN:  I don't, your Honor, but --

17             THE COURT:  Also from the defense team, Ms. Notari,

18   Mr. Schwartz, do you think it would be useful?

19             MR. SCHWARTZ:  Sorry.  I didn't hear the question,

20   your Honor.

21             THE COURT:  Does anyone think it would be useful to

22   put Mr. Martin on the stand outside the hearing of the jury to

23   get a clearer understanding of why, in his view, he received

24   these shares?

25             Again my concern is that it is going to be more

1  difficult for defense counsel to cross-examine Mr. Martin about

2  the purpose of getting those shares without opening up the 404

3  (b) regarding Code Rebel that I ruled should not come in.

4        MR. SCHWARTZ:  I agree with that.  I think it would be

5  impossible to cross-examine Mr. Martin.  I will say, however,

6  that I think the 3500 from Mr. Martin and from Mr. Dunkerley,

7  which I will talk about in a second, is already crystal clear

8  that there was separate compensation for separate schemes.

9        With respect to Mr. Martin, your Honor has pointed to

10 some of the 3500.  Let me just point to one other thing just by

11 way of example.  So you were looking at 3522-9 --

12       THE COURT:  Right.

13       MR. SCHWARTZ:  -- on Page 2 where he talks about how

14 the Code Rebel shares were not really his.  On the prior page

15 under the topic of bond issuance, I don't know if you have in

16 it front of you.

17       THE COURT:  No.  Give me a second.  (Pause)

18       MR. SCHWARTZ:  3522-9, at Page 1.  This is a trial

19 prep session.  They have already had plenty of time with him at

20 this point.  If your Honor has it?

21       THE COURT:  I do.  Go ahead.

22       MR. SCHWARTZ:  On Page 1 at the bottom under the

23 heading bond issuance, the third bullet is JG said he would pay

24 him, Mr. Martin, two payments of 75 K for coming onto the deal,

25 okay?

1                Just hold that in your head for one second.  Now take

2       a look at Mr. Dunkerley's 3500.  He says in 3506-1 -- we can

3       pull these up on the screen if that is easier.

4                THE COURT:  That would be easier.  Thanks.

5                (Pause)

6                MR. SCHWARTZ:  3506-1.  This is page -- can we go to

7       Page 2 on the left side, 3506-1, and for Mr. Dunkerley, Mr.

8       Dunkerley says -- just looking for it on the page -- right, so

9       in the middle of the page separate investment management

10      agreements signed by Francisco Martin.

11               This is referring to the Private Equity Management,

12      LLC investment management contract to manage the annuities.

13      They never got any money to actually manage.  He didn't truly

14      understand the role of Private Equity Management in the

15      process, but agrees that they never got the money and that the

16      docs suggest they would manage the money.  Knows FM got 150 K

17      for doing nothing.  FM was a friend of Jason Galanis.  That is

18      crystal clear.  He got paid cash money for his role in the bond

19      fraud and he got Code Rebel shares, maybe they were his, maybe

20      they were Jason Galanis' in connection with the pump and dump.

21      That is crystal clear.

22               The fact that the government after this issue has been

23      raised the last two days, has gone back to Mr. Martin

24      desperately trying to muddy the waters shouldn't open the door

25      for this evidence, your Honor.

1           THE COURT:  One other question as to the timing.

2           You know, as I understand it, Mr. Archer signed the

3    convertible note in May of 2014, approximately three months

4    before the first bond issuance, and I know the indictment

5    references in April 2014, I think an April 4th, 2014 email from

6    Jason Galanis to Mr. Archer, in which Galanis references the

7    progress of the bond deal.  It was still in the sort of nascent

8    stages at that point.

9           Under your theory, wouldn't Galanis at the very least,

10   you know, have wanted to assess Archer's contributions before

11   determining an appropriate amount of compensation in the Code

12   Rebel shares?

13          MS. MERMELSTEIN:  Your Honor, that is a fair point,

14   but the answer is clearly that he didn't since he gave him the

15   shares, if the notion is those shares only relate to some Code

16   Rebel pump and dump scheme.  The pump and dump scheme was

17   further in the scheme than Wakpamni fraud.  Jason Galanis had

18   no problem expecting Mr. Archer would do exactly as Mr. Archer

19   did, which is participate in the fraud with him.

20          No, I don't think that the fact that he did that at a

21   point in time when the roll-up plan was already well under way

22   and being discussed and the bond schemes already being

23   discussed suggests it was too early for him to be compensating

24   Mr. Archer for his role in the fraud.

25          THE COURT:  Why, in your view, would Archer transfer

1    the shares without receiving any compensation?

2              MS. MERMELSTEIN:  He transferred them to an entity in

3    which he had an interest, so it is not -- he didn't give them

4    to sort of Joe Schmo and said here is a present for you.  He

5    transferred them to yet another entity in which he had an

6    interest.

7              I think in the event that your Honor's point is well,

8    isn't it possible these were being used as a currency in the

9    scheme like the Wakpamni bonds and not directly as

10   compensation, that doesn't make them any less admissible,

11   either, right?

12             If the part of the scheme was we're going to acquire

13   this Code Rebel company, we're going to get all the shares and

14   use the shares to pump up our -- not pump and dump, but to buoy

15   our other business as we did with the Wakpamni bonds.

16             THE COURT:  That is not what you charged and that is

17   not what you charged in this case.  Maybe that is a different

18   case.  You didn't charge Code Rebel in this indictment.  As I

19   recall, the references in the complaint were all to the use of

20   the bond proceeds, right?

21             We're talking about different activity here.

22             MS. MERMELSTEIN:  Well, look, the government's theory

23   is not what your Honor just said.  It would be no less

24   admissible.  The government's theory this is compensation, and

25   the fact he used the compensation for other business interests

I65JGAL1                    Dunkerley - cross

1    makes it no less compensation.

2              THE COURT:  You have no witness saying this is

3    compensation for the bond scheme.

4              MS. MERMELSTEIN:  That is true, your Honor, but I

5    think the circumstantial -- first of all, they received this

6    money in the midst of the scheme.  Other people who got the

7    money are all participants here.  That sort of -- yes, there is

8    no direct evidence.  This is the nature of these kind of

9    complicated securities fraud cases, often there isn't, but that

10   doesn't make the circumstantial evidence any less strong, and I

11   think the government is entitled to argue it.

12             So, you know, if your Honor wants to ask Mr. Martin

13   questions not in the presence of the jury, I am happy to do

14   that.  He is not in the country yet and he won't be here.

15   Given what your Honor said, I think that is unlikely to change

16   your view.

17             THE COURT:  As I said, my concern, because normally I

18   would allow the jury to determine what the proper inference

19   should be, and my concern here is about prejudice that may flow

20   from the defense counsel not being able to properly

21   cross-examine someone like Martin about why he might have

22   gotten those shares so that they can make the argument about

23   why Archer and Cooney got these shares, which is part of the

24   Code Rebel scheme and not part of WLCC.

25             Wouldn't you agree it limits their ability to

cross-examine without opening the door to the pump and dump
scheme?

      MS. MERMELSTEIN:  No, your Honor, I don't think so.

      I think, first of all, they can absolutely ask Mr. --
to the extent there is a view, it is not a view I think that is
correct, but if there is a view these two things were separate,
they can ask Mr. Martin sort of his understanding he was
compensated for opening those accounts, for selling at Jason
Galanis' direction out of accounts he knew he wasn't the person
who controlled, and so those things can be delineated and to
the extent that there is some additional value being able to
point to the pump and dump scheme.

      For all the reasons the government previously said, it
is sufficiently a part of this fraud it should have come in.
It can be done without opening the door.  The incremental
difference between asking the questions I just proposed and
other questions shouldn't preclude the evidence that coming in.
I think that is the tail wagging the dog.

      THE COURT:  Mr. Schwartz, is this something you're
going to raise on the cross of Mr. Dunkerley?

      MR. SCHWARTZ:  No, I don't intend to talk about that.

      THE COURT:  I know you want a ruling soon.  I fully
understand that.  I just want to know if you need it before I
bring the jury in?

      MR. SCHWARTZ:  I don't.

1          MS. MERMELSTEIN:  There is one other issue, I am

2     sorry.  There are a number of outstanding rulings that are

3     starting to constrain the parties' ability to prep witnesses.

4          THE COURT:  Tell me what they are.

5          MS. MERMELSTEIN:  I understand you want time.

6          One, the admissibility of the Cooney recording; two,

7     the government has noted for your Honor we submitted a letter

8     last night that I think Mr. Touger's questioning with respect

9     to the payday lending has been in violation of your Honor's

10    ruling and seeking further clarification about whether or not

11    there is, in fact, a good-faith basis to proceed on that line

12    of questioning with Mr. Raines, who I expect to testify as

13    early as tomorrow.

14         Your Honor has not yet ruled on the defense experts

15    and, of course, I understand those experts are not scheduled to

16    testify for some time, but Professor Laby, the government's

17    expert I expect to testify this afternoon if we finish with Mr.

18    Dunkerley.  I think we have to be able to talk to Professor

19    Laby about any questions the defense may try to suggest we

20    think are improper.

21         If your Honor's going to preclude such testimony from

22    their expert witnesses, it is obviously inappropriate to

23    cross-examine our expert on the topic.  We have to have clarity

24    on that.

25         THE COURT:  I will rule on that before the afternoon.

1           MS. MERMELSTEIN:  If possible, we would like to be

2     able to talk to Professor Laby about it.  There is the issue of

3     the Francisco Martin gold bars.  Mr. Schwartz, having fought

4     tooth and nail to keep out pump and dump in every possible way,

5     wants to use facts related to pump and dump to cross-examine

6     Mr. Martin.  If the pump and dump --

7           THE COURT:  What is your position with respect to the

8     gold bars?

9           MR. SCHWARTZ:  Very simple.  I don't intend to say

10    anything about the pump and dump.  Jason Galanis instructed at

11    least Francisco Martin to buy gold bars.  That gives me a

12    good-faith basis to ask him.

13           I also think, by the way, it gives me good-faith basis

14    to ask Mr. Dunkerley if he was ever tasked with buying gold

15    bars or doing anything else that would make money harder to

16    trace.  That is my only question.  It has nothing to do with

17    Code Rebel and pump and dump, anything other than Jason Galanis

18    wanted to make money untraceable.

19           THE COURT:  Why does that open the door to the pump

20    and dump?

21           MS. MERMELSTEIN:  Mr. Schwartz opened on this.  We

22    raised this with Mr. Schwartz.  You're getting in pump and

23    dump.  That is not true.  The 3500 is clear, the 3500 could not

24    be more clear that Jason Galanis directed Francisco Martin to

25    buy gold bars for the purpose of paying stock promoters to

I65JGAL1                    Dunkerley - cross

inflate the price of Code Rebel shares, and so what Mr.

Schwartz wants to suggest is there is some kind of nefarious

money laundering secret proceeds element, and the government is

entitled to elicit from Mr. Martin the purpose was to pay

promoters for the stock thing.

We can't do that because of the preclusion of the pump

and dump scheme.  If we are not going to be able to elicit what

the purpose of that was, it is unfair to allow Mr. Schwartz to

suggest something more nefarious than what actually happened.

I don't think he has a good-faith basis to ask some

other witness whether or not that person did it because someone

else did it, but I think that it is unfair to ask the

government to be constrained by a ruling that precludes

accurate evidence about what happened with Code Rebel and use

just the nefarious pieces against the government's witnesses.

If Mr. Martin will be asked about the pump and dump

scheme, he should be allowed to explain the entirety of his

conduct and why he did.  If he is not, he is not, that is the

court's ruling.  Evidence of how he affected the scheme should

not come in.

THE COURT:  You will have a ruling by lunch, end of

the day or latest tomorrow morning, but I will get back to you

soon.

MR. SCHWARTZ:  The question remains I did want to ask

Mr. Dunkerley -- and I do believe I have a good-faith basis to

1    ask him -- if he was ever tasked with buying gold bars or

2    taking other steps to obscure the money trail.  To the extent

3    the government is saying the 3500 doesn't provide me a

4    good-faith basis to ask Mr. Dunkerley, when it is plainly not

5    involved with any pump and dump scheme, I guess we need a

6    ruling on that.

7            THE COURT:  Is that in Dunkerley's 3500 or just

8    Martin?

9            MR. SCHWARTZ:  It is silent on the issue.

10           Dunkerley certainly takes other steps to obscure money

11   trails.  I don't know if he takes this issue up.  I don't know

12   if he was ever asked the question.  The 3500 doesn't say

13   anything about it.  The fact Martin was asked to, gives me a

14   good-faith basis to ask Mr. Dunkerley if he was asked to as

15   well.

16           MS. MERMELSTEIN:  That is exactly why it is

17   inappropriate with respect to Mr. Martin.  The evidence is this

18   was done in one area just with respect to the pump and dump

19   scheme.

20           If Mr. Schwartz's contention is that Mr. Dunkerley

21   wasn't involved in that aspect of it, of course he can't ask

22   him about gold bars.  To ask a witness something where there is

23   no basis to, of course, the government has zero reason to think

24   the answer to that question is yes.  It is like asking the

25   witness whether or not he ever murdered someone, when there is

I65JGAL1                    Dunkerley - cross

1    no basis to do that.  Even asking the question gives a

2    suggestion there is some reason to ask it, and there is no

3    reason to ask it.

4              THE COURT:  I don't think it would be appropriate to

5    ask that of Mr. Dunkerley.  I don't want you to do that.

6              MR. SCHWARTZ:  Fine.

7              MR. QUIGLEY:  We still have the outstanding issues

8    letter we submitted yesterday with respect to the

9    cross-examination of Mr. Dunkerley.  In addition --

10             THE COURT:  I thought we were going to deal with those

11   on the fly.  I thought that is what you wanted to do.  I am

12   happy to talk about them right now.  I thought the decision was

13   you were going to speak to each other and see if you could

14   reach any resolution, and then with respect to -- I am happy to

15   address it right now.

16             MR. QUIGLEY:  We should.  In addition, Mr. Schwartz

17   informed me they want to introduce an additional exhibit which

18   is the Teneo presentation which has been talked about.

19             THE COURT:  What?

20             MR. QUIGLEY:  Teneo, T E N E 0, consulting

21   presentation.  It was designed to market Burnham Securities.

22   We think that even if Mr. Dunkerley is aware of that, it is

23   clear a hearsay document that should not come in.  I can give

24   your Honor our copy of it.

25             MR. SCHWARTZ:  Look, I am happy to talk about anything

I65JGAL1                    Dunkerley - cross

now.  I am a hundred percent confident I will lay a foundation

that Mr. Dunkerley saw this and Mr. Archer saw this and it was

part of the plan.  It is not being offered for the truth; it is

being offered for a document that was exchanged that was part

of the plan.  I really think we can take as much time as you

want right now, but it will all be very obvious when I do it

through my questioning.

        MR. QUIGLEY:  It is clearly being offered for the

truth.  This is a presentation that was done in the summer

of --

        THE COURT:  The exhibits?

        MR. QUIGLEY:  Government's Exhibit 375.

        MR. SCHWARTZ:  The version I intend to use is 4733 A.

        MR. QUIGLEY:  Say what?

        MR. SCHWARTZ:  4733 A.  It is the same deck.  The top

is an email from Teneo to a bunch of people including Devon

Archer and Hugh Dunkerley.  Then the deck, if you go to the

next page, it is presentation deck that was prepared by Teneo

Consulting after speaking with, amongst others, Hugh Dunkerley

in order to pitch the Burnham roll-up plan.  There is nothing

in here that I am offering for the truth of the matter.

        MR. QUIGLEY:  It is clearly --

        MR. SCHWARTZ:  It is true, but --

        THE COURT:  Why are you offering it?

        MR. SCHWARTZ:  I am offering it again the core defense

theory here, right, is that Mr. Archer was part of, and

investing into what he believed to be a legitimate plan to

build a financial services conglomerate.

What Mr. Dunkerley testified to was that the purpose

of engaging Teneo, the purpose of this dec was by the middle of

2015 they had gotten to the point and acquired enough companies

where they were going to think about the exit or they were

beginning to think about selling this entire conglomerate for

much more than they had paid to acquire it.

This is the dec that was created, shown to my client,

shown to Mr. Dunkerley, made with the input I believe of Mr.

Dunkerley and Mr. Archer, he will testify, and it goes,

therefore, to Mr. Archer's state of mind.  So it is relevant

for that non-hearsay purpose.  It is relevant to show the

subsequent course of dealings that Mr. Dunkerley engaged in

that he has testified about and that he will testify about.

I don't know what is in here that the government is

concerned about.  Maybe they'll tell us, but --

MR. QUIGLEY:  A couple of things.  On relevance it is

important, the date is important, July 18, 2015.  This is after

all four bond issuances relatively late in the charged

conspiracy.  In terms of explaining anyone's probative state of

mind in connection with the bond issuances themselves, it has

very limited relevance.  The document is full of hearsay.

MR. SCHWARTZ:  Ms. Mermelstein just told us in April

I65JGAL1                    Dunkerley - cross

1    or March of 2014, there were discussions about the roll-up

2    plan.  That was the plan all along.

3              THE COURT:  Right.

4              MR. SCHWARTZ:  This is the document when they got to a

5    certain point.

6              MR. QUIGLEY:  He can be asked about the roll-up plan.

7    They're introducing out-of-court statements to prove up the

8    roll-up plan.  For instance, on the page ending in 42, there is

9    talk about how many high net worth clients these companies

10   have, the number of assets on the balance sheet.

11             There is two pages further, there is evidence, there

12   is statements about their established relationships, including

13   that they have Burnham established relationships, it appears

14   like this with the SEC and with FINRA.

15             MR. SCHWARTZ:  I won't go into any of that stuff.  It

16   is for a non-hearsay purpose.  The documents always have facts

17   in them, but I can still introduce a document for a non-hearsay

18   purpose.

19             THE COURT:  I will let him use it.  I will allow it to

20   be admitted to prove Archer's state of mind.  I am happy to

21   give an instruction like I have done for other things, not to

22   be admitted for the truth, but as to an individual's state of

23   mind if you want me to. .

24             MR. TOUGER:  I don't know if you want to deal with the

25   Raines issue now.  I have a response to it.

1           THE COURT:  What issue?

2           MR. TOUGER:  The Raines issue, we can deal with it now

3   or later.  It doesn't matter to me.  I have a response.

4           THE COURT:  Let's see if the jury is here.  Are there

5   any other exhibits you want to talk about?  I am happy to look

6   at anything now.

7           MR. QUIGLEY:  Sure, your Honor, I think a couple --

8   well, taking these in order, 510, 522 and 524, these are all

9   Thorsdale bank records.  Mr. Dunkerley testified yesterday he

10  had no insight what was going on in the Thorsdale account.  We

11  don't think he is a percipient witness for that.

12          MR. SCHWARTZ:  These documents are in evidence.

13          THE COURT:  Are those documents in evidence?

14          MR. QUIGLEY:  They are.

15          THE COURT:  He can ask him if he knows anything about

16  them if they're in evidence.  If he doesn't, we'll move on.

17          MR. SCHWARTZ:  I will proffer I will only ask him

18  about entries where he was on the transaction, but anyway.

19          THE CLERK:  We are still missing one.

20          THE COURT:  Thanks.

21          MR. QUIGLEY:  There are a number of documents related

22  to Calvert Capital which came up yesterday in Mr. Dunkerley's

23  testimony.  We would be fine with those coming in, assuming the

24  court gave a similar limiting instruction to what it gave when

25  1575 and 1577 came in, and those are 1573, 1574, 4020 J, 4023

I65JGAL1                    Dunkerley - cross

1    A, 4023 D, 423 E, 423 F and 4049.

2              MR. SCHWARTZ:  That is fine.  I have no problem with

3    that.

4              THE COURT:  Does anyone have a problem with that?

5              MR. SCHWARTZ:  To be clear, the limiting instruction

6    there is not for state of mind, it is for -- these are not

7    being offered for the truth, these are documents that, whatever

8    the right words are, the witness --

9              MR. QUIGLEY:  Or signed.

10             MR. SCHWARTZ:  Part of his obstruction of justice.

11   You get the point.  These are not things Mr. Archer saw.

12             THE COURT:  Essentially the same instruction I gave

13   with respect to 1577?

14             MR. SCHWARTZ:  Correct.

15             THE COURT:  Why don't you want to do that first thing?

16   Who is moving to admit those?

17             MR. SCHWARTZ:  I will be using some of those documents

18   on cross.  When I do, I am confident if I forget --

19             THE COURT:  Do you want me to just say to the jury

20   that these exhibits are being admitted on agreement and that --

21   and then give essentially the same instruction with respect to

22   them?  Do you want me to give that instruction when they're

23   looking at the document?

24             MR. QUIGLEY:  When looking at them.

25             MR. SCHWARTZ:  That is fine.

1    THE COURT:  Just again when you're using those

2    documents, feel free to remind me, but someone should move to

3    admit them in front of the jury.

4    MR. SCHWARTZ:  Yes.

5    THE COURT:  Okay, there is no objection on those.

6    MR. SCHWARTZ:  To be clear, I may decide not to admit

7    all of them, but any one I choose to admit, I will do it in

8    front of the jury and will request --

9    THE COURT:  Fine.  Okay.  Any other exhibits we should

10   talk about?

11   MR. QUIGLEY:  4007 M, your Honor, Defense 4007 M.

12   THE COURT:  M or N?

13   MR. QUIGLEY:  M as in Mary.

14   THE COURT:  Can you pull that up, please.

15   MR. QUIGLEY:  You have it up.

16   MR. SCHWARTZ:  These two are not being offered for its

17   truth.  This is an offer, being offered for the act of offer.

18   This is signed by David Ezekiel, but it is an offer on behalf

19   of Wealth Assurance Holdings Limited, as Mr. Dunkerley

20   testified at length.  He was both an executive and and on the

21   board of directors of Wealth Assurance Limited Holdings.  I

22   expect he will be familiar with this document and certainly

23   with the proposal.

24   MR. QUIGLEY:  He is not on the document at all.

25   MR. SCHWARTZ:  I will show it to him.  If he doesn't

I65JGAL1                    Dunkerley - cross

1    know about the document, I will ask him about the --

2            MR. QUIGLEY:  The first one and two are statements of

3    fact regarding terms of the offer.

4            MR. SCHWARTZ:  They're proposals just like yesterday

5    you pointed out a directive or an instruction is not a

6    testimonial act for hearsay purposes, so it is an offer and a

7    negotiation.

8            THE COURT:  Why don't you first ask about if he knows

9    about the offer.

10           MR. SCHWARTZ:  Sure.

11           THE COURT:  If he says yes --

12           MR. SCHWARTZ:  He testified about this a little bit

13   already, so I think we have gotten it, but I am happy to lay

14   the foundation.

15           THE COURT:  Ask about the facts.

16           MR. SCHWARTZ:  Sure.

17           THE COURT:  I don't think you need to admit the

18   evidence, but you can ask him about the facts, okay?

19           MR. SCHWARTZ:  Well, I will --

20           (Multiple voices)

21           MR. SCHWARTZ:  I want to show it to him and see if he

22   is familiar with it.  If he is familiar with the document, I am

23   certainly entitled to offer it.  If he is not, that is fine.

24           THE COURT:  That is fine.

25           MR. QUIGLEY:  4020 J, your Honor, Defense 4020 J, if

1    you can pull it up.  It is the letter from Michelle Morton.

2    The defense has objected to similar letters from her by talking

3    about -- again a document that is full of hearsay -- talking

4    about what she has done at Atlantic, talking about the status

5    of the finances, you know, talking about issues at Atlantic.

6    Again she is not here.

7         MR. SCHWARTZ:  It is the same thing.  I have reason to

8    believe this is directed to the board members of Valor Life.

9    Mr. Dunkerley, I believe, testified he was a board member of

10   Valor Life.  I believe he was a recipient of this document.  If

11   he is not familiar with it, I won't admit it, but I think I am

12   entitled to ask him about it.

13        THE COURT:  Just if he is familiar with it, that is

14   not a basis.  It has to have an effect on him and his state of

15   mind.

16        MR. SCHWARTZ:  I believe some of the information in

17   this letter came from him.

18        THE COURT:  Sorry?

19        MR. SCHWARTZ:  I believe some of the information in

20   this letter came from him.

21        THE COURT:  Right, but if other information in the

22   letter didn't come from him?

23        MR. SCHWARTZ:  I won't ask about any of that.

24        My purpose in using this exhibit, if I choose to use

25   it, is that he provided information to Michelle Morton, which

I65JGAL1                     Dunkerley - cross

1    was then communicated to the board of directors of Atlantic

2    Capital Holdings, Valor Life and various investors.  That is

3    relevant to the dissemination of information.  It is certainly

4    relevant to his conduct and his crimes and the way that he

5    dealt with his real co-conspirators like Michelle Morton.  That

6    is the only purpose for which I am using this if, in fact, he

7    recognizes it.

8              If he doesn't recognize it, then I will just question

9    on the facts.  If he denies the facts, then I will move on and

10   I will impeach him at some other part of the case.

11             MR. QUIGLEY:  He can ask about the document.  Our

12   issue is coming into evidence because it is full of hearsay.

13             THE COURT:  I think that's right.  If there are

14   portions he contributed to incorporated in this, but then there

15   are portions that are not, the whole thing should not be coming

16   in.

17             MR. SCHWARTZ:  None of it is being offered for its

18   truth, to be clear.  It is being offered for the fact that it

19   was said and that he was making misrepresentations to investors

20   through Michelle Morton, that he was working hand-in-glove with

21   Michelle Morton.  None of this, to be clear, is being offered

22   for the truth.

23             I have no objection to a limiting instruction that

24   none of it is being offered for the truth if I end up offering

25   it if he recognizes it.  We are a few ifs down the road, but if

I65JGAL1                        Dunkerley - cross

1   I can lay that foundation, then I do think it is appropriately

2   offered with whatever limiting instruction the government

3   wants.

4            MR. QUIGLEY:  I am not sure, I don't understand the

5   non-hearsay probative value of the document itself as opposed

6   to asking about did he provide this information.

7            THE COURT:  I think that's right.  It should be

8   limited to the information that he provided.  I don't think the

9   whole document should be coming in.

10           MR. SCHWARTZ:  Okay.

11           THE COURT:  Any other exhibits we should talk about?

12   Is the jury here?

13           THE CLERK:  I just checked.

14           (Off-the-record discussion)

15           THE COURT:  We knew one juror was late today, but she

16   said she would be here shortly.

17           MS. NOTARI:  May I have a bathroom break?

18           THE COURT:  Yes, of course.  You can go right now.

19           MR. SCHWARTZ:  We can take five?

20           THE COURT:  Yes.

21           (Recess)

22           (Continued on next page)

23

24

25

I657GAL2                    Dunkerley - Cross

1              (Jury present)

2              THE COURT:  Everyone can be seated.

3      HUGH DUNKERLEY, resumed.

4      CROSS EXAMINATION (Continued)

5      BY MS. NOTARI:

6      Q.  Good morning, Mr. Dunkerley.

7      A.  Good morning.

8      Q.  Yesterday when you were testifying you testified that you

9      were the managing agent of 1920 Bel Air, correct?

10     A.  Correct.

11     Q.  That was the managing agent of 1920 Bel Air Real Estate

12     Holding LLC.

13     A.  Correct.

14     Q.  And we established you looked at Government Exhibit 512,

15     and we established that on November 12, 2014, approximately

16     $3.8 million, a little bit more, was wired into Mr. Bevan

17     Cooney's account, correct?

18     A.  Correct.

19     Q.  And we also established the following day, November 13,

20     2014, Maria Santana at Camden Escrow opened escrow and $3.995

21     million was wired into the account of Camden Escrow, which is

22     located at 9595 Wilshire Boulevard, Beverly Hills, California

23     90212.

24             MR. QUIGLEY:  Objection.

25             THE COURT:  What's the objection?

1           MR. QUIGLEY:  Form.

2           THE COURT:  Why don't you just try and ask a little

3     more direct question.

4           It's all right.  You can answer that.

5     A.  Can you repeat the question?

6     Q.  Well, Mr. Dunkerley, you reviewed Defense Exhibit

7     3056-A --I'll hand it to you so that you have it.  Do you

8     recall reviewing that document?

9     A.  Yes.

10    Q.  And you testified that after you review of this document,

11    that on November 13, 2014 Maria Santana at Camden Escrow opened

12    escrow, correct?

13    A.  Correct.

14    Q.  And $3.995 million was wired into the account of Camden

15    Escrow, correct?

16    A.  Yes.

17    Q.  And that same day, November 13, 2014, you as a managing

18    member of 1920 Bel Air, along with Mr. Cooney, instructed

19    Camden Escrow to release the $3.995 million to the law firm of

20    Clifford Wolff.  It says Wolff law firm.

21    A.  Yes.

22    Q.  Correct.  OK.  And that was signed -- that document was

23    signed by you, correct?

24    A.  Yes.

25    Q.  And it was also signed by Mr. Cooney.

I657GAL2                    Dunkerley - Cross

1    A.   Yes.

2    Q.   Now, we subsequently looked at a different document.

3         If I may approach.

4         THE COURT:  Yes.

5    Q.   DX3063.  Do you recall looking at that document?

6    A.   I do.

7    Q.   So, on March 12, 2015 that document was provided -- that

8    document was signed and the escrow was canceled.

9    A.   So, the second page of the document says the escrow is

10   canceled, and the first part of the e-mail says the attached is

11   a signed copy from what looks to be a completed escrow.  So,

12   this is where my confusion comes in.  At one point I do believe

13   the escrow was canceled, but then I believe the transaction was

14   completed after that, even though the escrow was canceled at

15   one point in time.

16        MS. NOTARI:  Your Honor, at this time -- your Honor, I

17   am handing Mr. Dunkerley what is marked Defense Exhibits 3720

18   through Defense Exhibits 3734.

19   Q.   Mr. Dunkerley, if you could just take a moment to look at

20   these documents.  These documents are certified records from

21   the Los Angeles County registrar.

22        THE COURT:  You don't need to announce.  Just ask him

23   and see if he recognizes them.

24   Q.   OK.  Can you review these documents?  And, in particular,

25   can you review document Defense Exhibit 3726.

I657GAL2                        Dunkerley – Cross

1            Your Honor, we will be moving those into evidence.

2            Does the government have any objection?  These are

3       certified documents relating to 1920 Bel Air.

4            MR. QUIGLEY:  Some of them, your Honor, yes.

5            THE COURT:  Sorry?

6            MR. QUIGLEY:  Some of them.  3720 and 3721 off the

7       bat.  Do you want me to hand them up?

8            THE COURT:  Yes, please.

9            MR. QUIGLEY:  We just got these.

10           MS. NOTARI:  Your Honor, we can talk about that.  Did

11      you have any objection to 3726?

12           THE COURT:  I think they just had an objection to

13      the --

14           Do you have an objection to anything else between 3720

15      and 3734?

16           MR. QUIGLEY:  Can we approach for a second?

17           THE COURT:  Sure.

18           (Continued on next page)

19

20

21

22

23

24

25

I657GAL2                        Dunkerley – Cross

1                    (At the side bar)

2                    THE COURT:  We had half an hour of not doing anything.

3        This is exactly what I'm asking you to do.  It's almost 11

4        o'clock.  You could have shown the record these records.

5                    MS. NOTARI:  We didn't know what he was going to say.

6        If he said he remembered correctly, then --

7                    THE COURT:  But you didn't even ask him.

8                    MR. QUIGLEY:  Your Honor, it's not impeachment; it was

9        never -- maybe they got this recently, but it wasn't disclosed

10       under Rule 16.

11                   MS. NOTARI:  It's absolutely impeachment.  He is

12       saying that he thinks that the transaction happened, and it

13       didn't.

14                   MR. QUIGLEY:  I mean as far as we can tell, he is not

15       on any of these documents.

16                   MS. NOTARI:  He is, 3726, he's the managing -- he

17       signed it.

18                   MR. SCHWARTZ:  To impeach his testimony that the deal

19       closed.

20                   MS. NOTARI:  He is saying the deal closed on

21       Mr. Cooney, and that document says that -- in 3726.

22                   MR. QUIGLEY:  I don't think he said that the deal

23       closed; he said that the money went through.

24                   THE COURT:  So why don't you clarify that.

25                   MS. NOTARI:  No, he is saying that Mr. Cooney went

through with the refinance, and it didn't.  So, this clarifies

that in June of 2015 there was a hard money loan on the

property, and he was the managing member, and it didn't go

through.

         Well, I can ask him if that refreshes his

recollection.

         THE COURT:  I'm fine with you asking him that

follow-up for sure, and I'm fine with you impeaching him with a

document he's familiar with, or refreshing his recollection,

with whatever.  I don't know why you need the subpoena, which

is 3720.

         MS. NOTARI:  That's fine.

         THE COURT:  The other one you had an objection was

3721?

         MS. MERMELSTEIN:  I'm sorry, your Honor.  Because we

just received these we're struggling to look through them.

         It does appear some were signed by Mr. Dunkerley, so

certainly he can be asked about them.  I don't know that

they're -- it's sort of hard to know if we object to their

admissibility.

         But this, for example, is a document that has to do --

it's a substitution of trustee with respect to Peak Foreclosure

Services to the beneficiary of Lone Oak.  Lone Oak was the

prior lender on 1920 Bel Air before the purported refinance.

Dunkerley is not on this.

1          I don't frankly understand the significance of it, and

2     it's not at all clear to me how it could properly impeach what

3     he just said, which is he is not sure but his recollection is

4     that although the escrow was canceled, that some transactions

5     subsequently went through.

6               THE COURT:  Why don't you see if you can refresh his

7     recollection.

8               MS. MERMELSTEIN:  Your Honor, I'm sorry, can we borrow

9     back our copies.

10              THE COURT:  Of course.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MS. NOTARI:

3    Q.  Mr. Dunkerley, have you now had a chance to review document

4    3726?

5    A.  I'm still actually in the process of reviewing it.  There

6    are quite a few documents you gave me.

7    Q.  And I would refer you to page 16.

8    A.  Page 16, the notary page?

9    Q.  Yes.

10   A.  Yes.

11   Q.  Is that your signature?

12   A.  Well, on page 15 is my signature, yes.  It's different page

13   numbers.  Page 16 says at the top, it says page 15 at the

14   bottom, so regardless.

15   Q.  Oh, I understand.  OK.  So you're talking about the typed

16   page 15 versus the handwritten 16.

17   A.  Yeah, but that's my signature, yes.

18   Q.  So, it's fair to say that this document was --

19              Your Honor, we would move this document into evidence.

20              MR. SCHWARTZ:  No objection.

21              THE COURT:  Any objection from the government?

22              MR. QUIGLEY:  No objection.

23              THE COURT:  So that will be admitted.

24              (Defendant's Exhibit 3726 received in evidence)

25   Q.  This document appears to be a hard money loan from Camden

I657GAL2                          Dunkerley - Cross

1   Real Estate on the property involving 1920 Bel Air?

2   A.  Yes.

3   Q.  And yesterday you talked about the fact that there were

4   several loans on the property, correct?

5   A.  Correct.

6   Q.  And this was a loan that was obtained on June 2, 2015 it

7   was recorded?

8   A.  Yes.

9   Q.  And the loan was in the amount of $1.182 million?

10  A.  Yes.

11  Q.  And you actually were the managing agent on this deal.  You

12  were the seller here, correct?

13  A.  Correct.

14  Q.  You -- this transaction did not involve Mr. Cooney,

15  correct?

16  A.  Correct.

17  Q.  At this point, Mr. Cooney, he is not on this document?

18  A.  He's not on this document.

19  Q.  And it's fair to say you're still the owner acting on

20  behalf of the LLC, 1920 Bel Air?

21  A.  Yes.

22  Q.  Does this refresh your recollection?

23  A.  My recollection of?

24  Q.  That Mr. Cooney never obtained a finance on 1920 Bel Air

25  after the November 2014 -- after March -- withdrawn -- after

I657GAL2                    Dunkerley - Cross

1    March 2015 escrow was canceled, correct?

2    A.   There was escrow canceled at one point, but I still believe

3    the transaction actually went through.  I could be mistaken.

4    As you said, there were more than one loan on this particular

5    property, so this is one of the loans on the property.

6    Q.   But as of June 2015 Mr. Cooney is not the owner of 1920 Bel

7    Air, correct?

8    A.   He was never the owner of 1920 Bel Air.

9    Q.   And, to your knowledge, he never financed the property.

10   A.   No, I believe he did finance the property at one point in

11   time.

12   Q.   Well, those are all the records pertaining to --

13              MR. QUIGLEY:  Objection.

14   Q.   In your possession you have all of the records pertaining

15   to 1920 Bel Air.

16              MR. QUIGLEY:  Objection to the testimony.

17              THE COURT:  Sustained.  Just ask the question.

18   Q.   Can you review those documents and see if you see

19   Mr. Cooney's name in any of those documents.

20   A.   I do not see Mr. Cooney's name in any of these documents.

21   Q.   Do these documents refresh your recollection as to 1920 Bel

22   Air and the transactions that happened during the time in

23   question?

24   A.   There were more transactions than just the ones represented

25   here for 1920 Bel Air, so it does not completely refresh my

I657GAL2                          Dunkerley - Cross

1  recollection, no.

2  Q.  So if Mr. Cooney was involved in any type of refinance of

3  1920 Bel Air, it's fair to say that he would have to be the

4  owner of the property, correct?

5           MR. QUIGLEY:  Objection.

6           THE COURT:  I will allow it based on his

7  understanding.

8  A.  No, it's not correct.  He would not have to be the owner of

9  the property to refinance the property.

10  Q.  And if there was any type of loan, or any type of action on

11  the property, that would have to be recorded with the Los

12  Angeles County Registrar's recorder based on your knowledge of

13  being the managing agent of this property.

14           MR. QUIGLEY:  Objection.

15           THE COURT:  Do you understand the business well enough

16  to answer that, like what the rules are with regard to whether

17  things need to be recorded and the like?

18           THE WITNESS:  I'm not a real estate professional.

19           THE COURT:  OK, sustained.

20  Q.  It's fair to say that there are several documents in that

21  file from the Los Angeles Recorder's office that have your name

22  on it, your signature on it?

23  A.  Yes.

24  Q.  And if we look at Defense Exhibit 3724?

25  A.  Yes.

I657GAL2                          Dunkerley - Cross

1   Q.  And here again that's your signature on that document?

2   A.  Yes.

3   Q.  And this was -- this signature, this was November 14, 2014,

4   correct?

5   A.  I can't see a date off the top of my head, but...

6   Q.  Well, if you look on page 1 of the document --

7   A.  Right, November 14, 2014, correct.

8   Q.  Yes.  And this is in fact another loan for $1,050,000.

9   A.  Correct.

10  Q.  And Mr. Cooney's is not on this document?

11  A.  Mr. Cooney's name is not on this document.

12  Q.  Now, how many transactions do you recall there being on

13  1920 Bel Air in -- after the --

14          Since you were the managing member, how many

15  transactions have there been?

16  A.  Three major transactions.

17  Q.  OK.  And what were those three transactions?

18  A.  I believe one was with Camden Capital, a refinancing there.

19  Q.  And do you recall how much that was for?

20  A.  I believe it was roughly a million dollars, just over a

21  million.

22  Q.  OK.  Now, is that the document that is reflected in Defense

23  Exhibit 3726?  That document references Camden Capital?

24  A.  Yes.

25  Q.  Is that the document that you're referring to?

I657GAL2                          Dunkerley - Cross

1    A.   Yes.

2    Q.   And what was the -- you said there were three.   What were

3    the other two?

4    A.   The other one was with an individual I believe called Evan

5    Frank that was serviced by a different company, USI Servicing.

6    And the original one was with Lone Oak Fund, that took out the

7    first lien on that particular property.

8    Q.   Can you review those documents and see if those two

9    transactions are reflected in those documents.

10   A.   Those two transactions are reflected in these documents, I

11   know that.

12   Q.   So the three transactions you're referring to are all

13   reflected in the documents in front of you, correct?

14   A.   Correct.

15   Q.   And there is no other transaction you recall at this point

16   involving Mr. Bevan Cooney that is reflected in those documents

17   or your memory.

18   A.   There is no transaction reflected in these documents.   In

19   my memory, post these transactions taking place, I believe that

20   there was a refinancing for roughly $3.8 million on 1920 Bel

21   Air.

22   Q.   But that's not reflected in those documents.

23   A.   No, because the date is post these documents, I believe.

24   Q.   So, these documents, when do you think that that might have

25   been?

1  A.  These are in 2014.  Roughly around the same time, but I

2  think it was -- it was afterwards.  I mean the Lone Oak was the

3  first one; the USI and the Camden were the second ones; and

4  then the final one would have been the note with Mr. Cooney.

5  Q.  And when do you think that occurred?

6  A.  I can't remember an exact date on it.

7  Q.  OK.  These documents were a court subpoena for documents

8  between --

9          MR. QUIGLEY:  Objection.

10          THE COURT:  Yes, sustained.  You don't need to read

11  what the documents are.

12  Q.  So let's look at the time span of documents.  Well, first

13  let's -- OK, 3721.  3722 is dated September 18, 2013.  This is

14  a document which pertains to a grant deed?

15  A.  Dated June 1, 2018?

16  Q.  This document is dated September 18, 2013.

17  A.  Sorry.  The document again is 3721?

18  Q.  The Defense Exhibit 3722, which has a serial number on the

19  top of the document 20131442525.

20  A.  September 18, 2013, correct.

21  Q.  Does that document pertain to Mr. Cooney?

22  A.  No.

23  Q.  Let's go to the next one, Defense Exhibit 3723.

24  A.  Yes.

25  Q.  This is a document, if you look at page 15, which was

I657GAL2                          Dunkerley - Cross

1   recorded on October 1, 2013.

2   A.   Right.

3   Q.   And this relates to a deed of trust with absolute

4   assignment of leases and rent, security agreement and fixture

5   filing, correct?

6   A.   Yes.

7   Q.   Does this document pertain to Bevan Cooney?  Is his name in

8   there?

9   A.   No, it's not.

10   Q.   Let's go to the next one, Defense Exhibit 3724.  Now, we

11   have already said that this was a document from November 14,

12   2014, correct?

13   A.   Yep.

14   Q.   And this is assignment of deed of trust?

15   A.   Yes.

16   Q.   And you're the managing agent on this deal?

17   A.   Yes.

18   Q.   And nowhere does this document reflect the name Bevan

19   Cooney?

20   A.   As I've said before, no, none of these documents reflect

21   the name Bevan Cooney.

22   Q.   If we go to document 3725, defense exhibit, this is another

23   document on page 20, it's dated November 14, 2014, and it was

24   actually signed on January 5, 2015.

25   A.   Right.

I657GAL2                    Dunkerley - Cross

1   Q.  Nowhere on that document does it say the name Bevan Cooney.

2   A.  No, it doesn't.

3   Q.  Defense Exhibit 3727, this document is called full

4   reconveyance of deed of trust, and this document is dated

5   August 3, 2015?

6   A.  The notarized document August 3, 2015, correct.

7   Q.  And this document does not reference Bevan Cooney, correct?

8   A.  Correct.

9   Q.  And at this point you were still the managing member of the

10  property?

11  A.  Yes.

12  Q.  Now, Defense Exhibit 3728, this document is called

13  substitution of trustee, and this is a document which refers to

14  Lone Oak Fund, I think you referenced earlier.

15  A.  Correct, Lone Oak is there, yes.

16  Q.  And there document has no reference to Bevan Cooney?

17  A.  Correct.

18  Q.  Were you still the managing member at this point?

19  A.  Yes.

20  Q.  Defense Exhibit 3729, this was a document which has to do

21  with notice of default and election to sell under deed of

22  trust, and at this point it's fair to say that the property was

23  heading toward foreclosure?

24  A.  Right.

25  Q.  And at this point nowhere in this document does it have the

1    name Bevan Cooney.

2    A.   Nowhere in this document does it have the name Bevan

3    Cooney, correct.

4    Q.   Defense Exhibit 3730, this is a document entitled notice of

5    pendency of action, and this was a civil complaint which was

6    filed against 1920 Bel Air --

7            MR. QUIGLEY:  Objection.

8            THE COURT:  Yes, you don't need to identify everything

9    that's not in evidence.

10   Q.   This document does not pertain to Bevan Cooney, correct?

11   A.   This document does not mention Bevan Cooney, correct.

12   Q.   And this is June 6, 2016?

13   A.   Yes.

14   Q.   Defense Exhibit 3731, this is an ex parte order appointing

15   receiver and order to show cause --

16           MR. QUIGLEY:  Objection.

17           THE COURT:  Same ruling.

18   Q.   This is June 8, 2016?

19   A.   June 28, 2016.

20   Q.   And nowhere does it say Mr. Cooney's name, correct?

21   A.   Correct.

22   Q.   And at this point were you still the managing member of the

23   LLC?

24   A.   I believe so.  Yeah, I don't believe I've ever resigned as

25   the managing member of 1920 Bel Air.

I657GAL2                        Dunkerley - Cross

1    Q.  Document 3732, this is dated August 30, 2016.  This is a

2    notice of trustee sale?

3             MR. QUIGLEY:  Objection.

4             THE COURT:  Sustained.  If you want to lay the

5    foundation for him knowing what it is, go ahead.

6    Q.  Do you know what this document is?

7    A.  It's the first time I've seen this document.  As you say,

8    it's a notice of a trustee sale, so ...

9    Q.  Is Mr. Cooney's name mentioned anyplace?

10   A.  No.

11   Q.  Now, just as an aside, Bevan Cooney, as far as you know,

12   only went under the name of Bevan Cooney, correct?

13   A.  Correct.

14   Q.  You never in -- in fact his e-mail was btcooney@g-mail.  Do

15   you recall that?

16   A.  I don't specifically recall that, but --

17   Q.  Do you ever recall Mr. Cooney being associated with any

18   other identity, or e-mail, or firm, or any other -- or was he

19   always under the name B.T. Cooney?

20   A.  I don't remember -- no other alias that I know of.

21   Q.  Defense Exhibit 3733.

22   A.  Yes.

23   Q.  The date on this is?

24   A.  June 6, 2016.

25   Q.  And actually if you go to the last page there is a document

I657GAL2                          Dunkerley - Cross

1    where it's September 13, 2016.

2    A.   Yes.

3    Q.   And again Mr. Cooney is not mentioned in this document.

4    A.   He is not.

5    Q.   And if we go to Defendant's Exhibit 3734?

6    A.   Yes.

7    Q.   Again this document is dated September 13, 2016, correct?

8    A.   September 13, 2016.

9    Q.   Now, this document has the name Monet Berger?

10   A.   Yes.

11   Q.   She made a personal appearance it appears in Los Angeles

12   County Court?

13              MR. QUIGLEY:  Objection.

14              THE COURT:  Sustained.

15   Q.   Do you know what this document is?

16   A.   It's the first time I've seen it, so, no, I don't really

17   know what this document is.

18   Q.   On September 14, 2016 were you still the managing member of

19   1920 Bel Air?

20   A.   Yes, I was.

21   Q.   I'm sorry?

22   A.   I believe I was, yes.

23   Q.   Perhaps you could refresh your recollection on the last

24   page, does that refresh your recollection?

25   A.   Exhibit A, legal description?

I657GAL2                          Dunkerley – Cross

1    Q.  I'm sorry, the page before that.

2    A.  A grant deed signature page?

3    Q.  Yes.

4    A.  Refresh my recollection to what?

5    Q.  As to whether you were the managing member.

6    A.  It doesn't particularly refresh my recollection because

7    nowhere does it mention me being managing member.

8    Q.  Well, were you ever the managing member of the LLC with

9    Monet Berger?

10   A.  I believe actually at one point in time the title was -- I

11   did not -- so, yes, I did not -- she became the managing

12   director of 1920 Bel Air at one point in time.  Now this does

13   refresh my recollection of that, but I can't remember what date

14   that happened.

15           I moved address at one point in time, and documents

16   went to my previous address; I didn't see them; and I didn't

17   really follow what happened with 1920 Bel Air after my arrest.

18   Q.  So it's fair to say after you reviewed all of these

19   documents, these documents span in time from 2013 until

20   September 2016, correct?

21   A.  Correct.

22   Q.  And nowhere in any of these documents does it have the name

23   Bevan Cooney.

24   A.  Correct.

25   Q.  And you recalled three significant transactions in -- three

I657GAL2                      Dunkerley - Cross

1    significant transaction involving 1920 Bel Air, correct?

2    A.  Correct.

3    Q.  And as far as you know, those transactions are reflected in

4    the documents that you just reviewed.

5    A.  Yes.

6    Q.  And nowhere does it mention the name Bevan Cooney.

7    A.  Correct.

8              MS. NOTARI:  If I could just have a moment.

9              Thank you.  Your Honor, at this time I would like to

10   move in Defendant's Exhibit 30 -- sorry.

11             THE COURT:  306?

12             MS. NOTARI:  No, I'm sorry.  One moment.  3056.

13             THE COURT:  Any objection to 3056?

14             MS. NOTARI:  Defense Exhibit 3056.

15             Does the government have any objection?

16             MR. QUIGLEY:  We have no objection.

17             THE COURT:  It will be admitted, 3056.

18             (Defendant's Exhibit 3056 received in evidence)

19   Q.  Again, Mr. Dunkerley, this is a document which if you look

20   at the first e-mail, is this your e-mail?

21   A.  It is.

22   Q.  And can you just briefly look at it and reflect if you have

23   a memory of this e-mail?

24   A.  I do.

25             MS. NOTARI:  OK.  I would just like that document also

I657GAL2                    Dunkerley - Cross

1    to be moved into evidence.

2              THE COURT:  Any objection?

3              MR. QUIGLEY:  I thought we just agreed that 3056 could

4    come in.

5              THE COURT:  I thought so too.  Did you say an

6    additional exhibit?

7              MS. NOTARI:  No, no, just that document.

8              THE COURT:  Excuse me?

9              MS. NOTARI:  Just this document, 3056.

10             THE COURT:  Yes, it's already in.

11             MS. NOTARI:  OK.

12   Q.  Now, Mr. Cooney -- sorry -- Mr. Dunkerley, we reviewed

13   several e-mails in this case today and yesterday, Defense

14   Exhibits 3056, Defense Exhibit 3063, Defense Exhibit 3062,

15   Defense Exhibit 3056-A, and these are all e-mails between you

16   and Maria Santana from Camden Realty, correct?

17   A.  Camden Real Estate doesn't -- sorry.  Can you repeat

18   question.

19   Q.  These e-mails all relate to a real estate transaction

20   involving you as the managing member of 1920 Bel Air and Maria

21   Santana from Camden Escrow, correct?

22   A.  From Camden Escrow, correct.

23   Q.  And in this case your e-mail that's reflected in these

24   documents was consistently you at dunkerley.us?

25   A.  Yes.

I657GAL2                    Dunkerley – Cross

1   Q.  Was that the only e-mail account you used?

2   A.  No, I have several e-mail accounts with my name in them.

3   Q.  As far as this case, were all of your e-mail produced to

4   the government?

5   A.  Yes.

6   Q.  And at any time did the government during their 20

7   preparation sessions with you review these e-mails with you?

8   A.  I believe so, yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I65JGAL3                          Dunkerley - cross

1   Q.  You believe that you discussed them?

2   A.  I certainly looked at a variety of exhibits that were going

3   to come up in the case.

4   Q.  Thank you.

5         I just want to go back to something you discussed

6   yesterday because I think it is important.  You said that there

7   was home improvements done on 1920 Bel Air?

8   A.  Yes.

9   Q.  In particular, you said there was construction on the

10  kitchen, correct?

11  A.  There was construction on the kitchen.

12  Q.  If you can just refer to defense exhibit -- not show this

13  to the jury -- 3709.  Would you say that is a fair and accurate

14  representation of the kitchen at Bel Air when you visited the

15  house?

16  A.  Of the new kitchen, yes, absolutely.

17             MS. NOTARI:  I move that photo into evidence.

18             MR. QUIGLEY:  No objection.

19             THE COURT:  It will be admitted 3709.

20  BY MS. NOTARI:

21  Q.  Is this the fair and accurate way the kitchen looked after

22  the home improvement?

23  A.  Yes.

24  Q.  You also said that there were some home improvements to the

25  dining room, correct?

I65JGAL3                          Dunkerley - cross

1    A.  Yes.

2    Q.  If we could just show Mr. Dunkerley 3709 again.  Does this

3    photo fair and accurately represent the dining room as it

4    appeared during your visits?

5    A.  After the renovation, yes.

6    Q.  This is also a photo of what it looked like after the

7    renovation, correct?

8    A.  Correct.

9              MS. NOTARI:  We move Defense Exhibits 3709 and 3710.

10   I think they're into evidence, yes.

11             MR. QUIGLEY:  No objection to either.

12             THE COURT:  Yes.  3709 is not yet, but it will be now.

13             (Defendant's Exhibits 3709 and 3710 received in

14   evidence)

15   BY MS. NOTARI:

16   Q.  Mr. Dunkerley, yesterday we talked about the fact that

17   Jason Galanis created fraudulent business accounts?

18   A.  Business -- what type of accounts?  Sorry?

19   Q.  In particular, there was a time when in August of 2015 when

20   you had a conversation with Gary Hirst about creating, sending

21   money into an account that was one digit from the actual

22   account number?

23             MR. QUIGLEY:  Objection.

24             THE COURT:  Why don't you rephrase the question.

25   BY MS. NOTARI:

I65JGAL3                    Dunkerley – cross

Q.  Do you ever recall a time when you, as part of your

employment for Jason Galanis, sent money to an account number

that was not the actual account number, but was one digit off?

A.  I was never employed by Jason Galanis, but there was a

conversation with Gary Hirst where we discussed there was an

account which had one digit difference in it, yes.

Q.  Were you told to send money to an account, that essentially

this account was one digit off from an account that had the

same name, correct?

A.  Correct.

Q.  Why were you told to do that?

A.  I was not told to send money to that account.  Gary Hirst

just informed me this account existed, and that is all there

was about that.

Q.  Why was that done, as far as you know?

          MR. QUIGLEY:  Objection.

          THE COURT:  Sustained.

BY MS. NOTARI:

Q.  Was the account that was one digit off from the account

which appeared to have the same name, was that an attempt to

hide the fact that there was an original account?

          MR. QUIGLEY:  Objection.  He said he didn't know

anything.  That is what he already testified to.

          THE COURT:  Sustained.

BY MS. NOTARI:

I65JGAL3                      Dunkerley - cross

1    Q.  Why did Gary Hirst tell you to do that, do you know?

2              MR. QUIGLEY:  The same objection.

3              THE COURT:  The same.  Did Gary Hirst tell you

4    anything else about that account?

5              THE WITNESS:  Absolutely nothing.

6              THE COURT:  All right.

7    BY MS. NOTARI:

8    Q.  Gary Hirst, let's talk about Gary Hirst.

9              Gary Hirst was a lawyer who acted as a legal adviser

10   to Jason Galanis?

11   A.  Yes.

12   Q.  He also acted as a legal adviser and secretary for the

13   Wealth Assurance Private Client?

14   A.  Yes.

15   Q.  And it is fair to say that Gary Hirst drafted forms as part

16   of this case, and you were asked to sign them, correct?

17   A.  Yes.

18   Q.  At one point Gary Hirst, as far as you know, had a computer

19   science degree?

20             He was very good with documents, fair to say?

21   A.  He was very good with documents.  I am not sure what the

22   question means.

23   Q.  So Gary Hirst was an expert at changing PDF -- I'll

24   withdraw that question.

25             It is fair to say that Gary Hirst, during the time

I65JGAL3                        Dunkerley - cross

1    that he was working with you, was able to change documents, PDF

2    documents?

3    A.  He certainly created PDF documents, yes.

4    Q.  Do you recall Jason Galanis telling you that Gary Hirst

5    could do anything they needed to be done, you needed to be done

6    with PDF documents?

7               MR. QUIGLEY:  Objection.

8               MS. NOTARI:  This is a co-conspirator statement.

9               MR. QUIGLEY:  It can't come in.

10              THE COURT:  Yes.  Sustained.

11   BY MS. NOTARI:

12   Q.  Do you recall discussing with Gary Hirst changing PDF

13   documents?

14   A.  Yes.

15   Q.  Why would you change these PDF documents?

16              MR. QUIGLEY:  Objection.

17              THE COURT:  Sustained.

18   BY MS. NOTARI:

19   Q.  It is fair to say that you changed PDF documents in your

20   attempt to cover up the fraud in this case?

21   A.  Again you're going to have to be more specific.  I am not

22   exactly sure what you mean.

23   Q.  Yesterday you testified about times when you and Jason

24   Galanis met and you created fraudulent documents, correct?

25   A.  Correct.

I65JGAL3                          Dunkerley - cross

1    Q.  And there were times when you changed PDF documents,

2    correct?  You modified documents to make them appear as if they

3    happened back in time?

4              MR. QUIGLEY:  Objection; mischaracterizes testimony.

5              THE COURT:  I'll allow that.

6              THE WITNESS:  So I didn't do the changes.  I signed

7    documents that were back-dated, correct.

8    BY MS. NOTARI:

9    Q.  Do you know who made those changes?

10   A.  No, I don't know who made all those changes.

11   Q.  Was there a time when you would send Gary Hirst documents

12   that you wanted to be altered?

13   A.  There were a couple of occasions where that occurred, yes.

14   Q.  Do you recall a time when you needed an address on a bank

15   statement changed?

16   A.  Yes.

17   Q.  Do you recall Gary Hirst helping you with that change?

18   A.  Yes.

19   Q.  Was there a time when Gary Hirst helped you create an email

20   account that appeared to be separate, but were funneled through

21   one account.  Do you recall that?

22   A.  Your description I don't recall, but he did send email

23   accounts at certain points in time.

24   Q.  Now, there has been testimony about a Dr. Rory Knight in

25   this case.  You testified on direct that Dr. Rory Knight was on

I65JGAL3                         Dunkerley - cross

the board of directors of Wealth Assurance Holdings?

A.  Yes.

Q.  And he was, as far as you know, his background, he was the

dean of Oxford Business School?

A.  Yes.

Q.  Did you ever meet him?

A.  Many times.

Q.  It is fair to say that Dr. Knight owns a company called

Oxford Metrica?

A.  Yes.

Q.  Can you tell us about that company.

A.  No.  I only now its name.  As far as I can tell you, it is

a consulting company that he was the sole employee of.  That is

my knowledge of it.

Q.  And Jason Galanis was doing business with Dr. Knight?

A.  They knew each other.  I don't know what business affairs

they had between each other.

Q.  Well, he was involved with as far as being on the board of

directors of Wealth Assurance, correct?

        MR. QUIGLEY:  Objection to he was.

BY MS. NOTARI:

Q.  Dr. Rory Knight was involved?

A.  Dr. Rory Knight was on the board of Wealth Assurance, yes.

Q.  It is fair to say he was a big supporter of Jason Galanis?

A.  They knew each other well, yes.

I65JGAL3                          Dunkerley - cross

1   Q.  They appeared to be good friends?

2   A.  Yes.

3   Q.  As far as you know, Dr. Rory Knight was not part of the

4   fraud in this case, correct?

5              MR. QUIGLEY:  Objection.

6              THE COURT:  Sustained.

7   BY MS. NOTARI:

8   Q.  Mr. Dunkerley, you testified yesterday about the WLCC

9   bonds, and as part of your role in this case, you were the

10  representative from Burnham Securities?

11  A.  I was the placement agent on the first two tranches, yes.

12  Q.  And you prepared the investment committee memorandum,

13  correct?

14  A.  Yes.

15  Q.  It is fair to say that when you prepared it, it was

16  accurate?

17  A.  Yes.

18  Q.  At some point the investment committee approved Burnham as

19  the placement agent, correct?

20  A.  Yes.

21  Q.  Mr. Cooney was not on the investment committee, correct?

22  A.  Correct.

23  Q.  Your understanding originally was that Valor was going to

24  take over Wealth Assurance?

25             MR. QUIGLEY:  Objection; mischaracterizes.

```
1            THE COURT:  I'll allow the question.  Is that your
2     understanding?
3            THE WITNESS:  Valor did take over Wealth Assurance.
4     BY MS. NOTARI:
5     Q.  Your understanding was early on it was supposed to happen,
6     and it did happen?
7     A.  It happened, yes.  Sorry.  I am confused by the question.
8     Q.  Let me just be more specific.
9            Your understanding was that valor was going to take
10    over Wealth Assurance and back up the annuties supporting the
11    bonds, annuities supporting the bonds?
12           MR. SCHWARTZ:  Objection to Wealth Assurance here.
13           MS. NOTARI:  I'll withdraw the question.
14    BY MS. NOTARI:
15    Q.  During this time period, you met a person by the name of
16    Michelle Morton, correct?
17    A.  Yes.
18    Q.  At the time you had conversations with her about who she,
19    her clients at Hughes Capital Management, correct?
20    A.  No.
21    Q.  She told you she was doing -- she told you that she had
22    researched the bonds and that she believed that the bonds would
23    fit into her clients' accounts?
24           MR. QUIGLEY:  Objection; mischaracterizes testimony
25    and asked and answered.
```

I65JGAL3                    Dunkerley - cross

1          THE COURT:  Why don't you rephrase that.

2     BY MS. NOTARI:

3     Q.  Did you ever have a conversation with Michelle Morton as to

4     whether she believed that the WLCC bonds would fit into the

5     client accounts of her clients?

6     A.  I never had that conversation.

7     Q.  If I can just have 3506-3, perhaps this will refresh your

8     recollection, 3506-3, Page 3.

9          MR. HASSAN:  Repeat that.

10          MS. NOTARI:  3506-3.

11          (Pause)

12    BY MS. NOTARI:

13    Q.  If you can scroll down to the bottom of the page toward the

14    end, the sentence where it starts --

15          MR. QUIGLEY:  Objection to reading from the document.

16          THE COURT:  Yes.  Just note the bullet point, please.

17    BY MS. NOTARI:

18    Q.  The fourth bullet point from the bottom of the page, does

19    that refresh your recollection?

20    A.  Yes, it does.

21    Q.  And so is it fair so say that Morton told you that she had

22    enough clients -- that she told you that -- fair to say you had

23    a discussion with Michelle Morton about whether the client,

24    WLCC bonds would fit into the profile of her clients?

25    A.  So Jason Galanis had this discussion with her, and I learnt

I65JGAL3                        Dunkerley - cross

1    about this discussion.  I didn't have direct conversation with

2    her in any real depth.  She may have said this particular

3    statement in passing.  Again it slipped my memory because it

4    was not that material.

5    Q.  In this statement, though, it doesn't say Jason Galanis?

6              MR. QUIGLEY:  Objection.

7    Q.  She told you Jason Galanis, correct?

8              Did you tell the government that statement came from

9    Jason Galanis or did you tell them it came from Michelle

10   Morton?

11   A.  So here it says from Michelle Morton.

12             MR. QUIGLEY:  Objection.

13             THE COURT:  I'll allow him to answer the question.

14   Tell us what you remember.

15             THE WITNESS:  I specifically remember Jason telling me

16   that rather than Michelle telling me that.  So just that it

17   says it slightly different here, it is contextual to my

18   particular interview.

19   BY MS. NOTARI:

20   Q.  Mr. Dunkerley, you never heard of any conflicts with Hughes

21   Capital Management regarding the bonds placements?

22             MR. QUIGLEY:  Objection.

23   Q.  Did you ever hear of any clients from Hughes Capital

24   Management that were unhappy that the bonds were placed in

25   their profiles during this time period?

I65JGAL3                      Dunkerley – cross

1           MR. QUIGLEY:  Objection.

2           THE COURT:  Sustained.  Let's just have a sidebar for

3    a moment.  Thanks.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I65JGAL3                    Dunkerley - cross

1          (At sidebar)

2          MS. NOTARI:  I will withdraw my question.

3          MS. MERMELSTEIN:  One scheduling matter.  I think

4    given where we are and given Mr. Schwartz's rendition of his

5    cross-examination, we have about an hour of an email reading

6    module.  I don't think we are going to get past, we have one

7    more hour, I don't think we will --

8          MR. SCHWARTZ:  What time is it?

9          THE COURT:  Before lunch?

10          MS. MERMELSTEIN:  I want to know whether or not the

11    last witness of the day on deck should not get on a train and

12    come up because I don't think he is really realistically

13    getting on the stand.  I want to confirm if people have a

14    different view?

15          MR. QUIGLEY:  We have an hour of reading we can do at

16    the end of the day.

17          MR. SCHWARTZ:  If you're going to kill an hour with

18    reading, that is fine.

19          THE COURT:  If you want to take a late lunch since we

20    started late, I am happy to do that.

21          MS. NOTARI:  I am almost done.

22          THE COURT:  Thanks.

23          (Continued on next page)

24

25

1               (In open court)

2    BY MS. NOTARI:

3    Q.  Mr. Dunkerley, just recapping on your testimony yesterday,

4    you testified that you saw -- how many years were you working

5    with Jason Galanis?

6    A.  About two or three years, I think.

7    Q.  You said that in your life basically you've only met Mr.

8    Cooney on two or three times on social occasions, correct?

9    A.  Correct.

10   Q.  You testified that Mr. Cooney was a great guy?

11   A.  Absolutely.

12   Q.  And you were never together at 1920 Bel Air, correct?

13   A.  Never.

14   Q.  And you testified that it was not a common occurrence for

15   you to email Mr. Cooney, correct?

16   A.  Correct.

17   Q.  In fact, you had difficulty remembering even one email that

18   you had with him?

19   A.  Yes.

20   Q.  You said that you never spoke to Mr. Cooney about the WLCC

21   bonds?

22   A.  Never.

23   Q.  And you testified that Jason Galanis lied to you, correct?

24   A.  Yes.

25   Q.  And you knew for a fact that he was consistently lying to

I65JGAL3                        Dunkerley – cross

1  people?

2  A.  Yes.

3  Q.  You knew for a fact that he was sending out fraudulent

4  documents?

5  A.  Yes.

6  Q.  He sent fake documents?  He ordered fake documents to be

7  sent to the government?

8  A.  Yes.

9  Q.  There were times when he created fake companies like

10  Ballybunion, LLV Las Vegas, which was not a real company?

11  A.  Correct.

12  Q.  On many occasions you would agree you had no idea what he

13  was telling other people, correct?

14  A.  Correct.

15  Q.  You met with the government, you said, at least 20 times?

16  A.  Correct.

17  Q.  You sat with them for dozens of hours in this case?

18  A.  Correct.

19  Q.  You often told them that you did not know the answers to

20  their questions?

21          MR. QUIGLEY:  Objection.

22          THE COURT:  That is sustained.

23  BY MS. NOTARI:

24  Q.  It is fair to say that there were times when you could not

25  answer their questions, correct?

1          MR. QUIGLEY:  Objection.

2          THE COURT:  I'll allow that.

3          THE WITNESS:  Correct.

4    BY MS. NOTARI:

5    Q.  You were asked about dozens of documents?

6    A.  Correct.

7    Q.  As far as you know, Jason Galanis lied to lawyers, correct?

8          MR. QUIGLEY:  Objection.

9          THE COURT:  Sustained.

10   BY MS. NOTARI:

11   Q.  You testified that there were times that you were asked to

12   lie for Jason Galanis, and you did?

13   A.  Correct.

14   Q.  As you sit here today, Mr. Dunkerley, and you reflect on

15   the statements that Jason Galanis made to you during the time

16   that you knew him, is it fair to say that it is hard for you to

17   decipher which is the truth and which is a lie?

18         MR. QUIGLEY:  Objection.

19         THE COURT:  Sustained.

20   BY MS. NOTARI:

21   Q.  Do you, as you sit here today, have an understanding of --

22   do you believe anything he told you was true?

23         MR. QUIGLEY:  Objection.

24         THE COURT:  Sustained.

25   BY MS. NOTARI:

1    Q.  Now, you testified at the beginning of your direct, and I

2    think there was also some testimony on cross-examination, that

3    your online research showed that there were two Jason

4    Galanises?  The savvy investment guy, correct?

5    A.  Correct.

6    Q.  A person who was a good businessman, correct?

7    A.  Correct.

8    Q.  A successful businessman?

9    A.  Correct.

10   Q.  And then there was the other side of Jason Galanis you

11   researched about that he was not to be trusted, correct?

12   A.  Correct.

13   Q.  And it is fair to say, as you sit here today, that that's

14   true, both sides?

15   A.  Yes.

16          MS. NOTARI:  I have no further questions.

17          THE COURT:  Does anyone need a break or are you okay?

18   You need a short break?  Why don't we take a break for five

19   minutes and we'll continue to lunch.  Thank you.

20          (Jury excused)

21          (Recess)

22          THE COURT:  Yes.

23          MR. SCHWARTZ:  This doesn't require a response.  The

24   government has been objecting a lot to, "misstates his

25   testimony."  My question is you testified A, B, C, my view is

1    that is not proper testimony.  It won't be a surprise to Mr.

2    Dunkerley, I will go over some of the things that he said over

3    the last few days.

4         THE COURT:  I don't think I have -- I think I have

5    sustained all of those objections.  I think I have let the

6    witness answer in his own words all of those, I think.

7         MR. SCHWARTZ:  I agree with you.  I am just saying I

8    don't think it is a proper objection to begin with.

9         MR. QUIGLEY:  If we think there is a proper objection,

10   if we think there is a proper objection, we'll object and

11   you'll rule.

12        THE COURT:  Okay.  In any event, I will let the

13   witness say it in his own words.

14        THE CLERK:  Ready?

15        THE COURT:  Yes.  Just to make clear, Ms. Mermelstein,

16   your expert is not testifying today?

17        MS. MERMELSTEIN:  Correct, your Honor.

18        THE COURT:  As I said, I will rule on outstanding

19   issues, all of them first thing in the morning at the latest.

20        (Jury present)

21        THE COURT:  You can be seated.

22   CROSS EXAMINATION

23   BY MR. SCHWARTZ:

24   Q.  Good afternoon, Mr. Dunkerley.

25   A.  Good afternoon.

I65JGAL3                        Dunkerley j- cross

1   Q.  I am the last one to go, so you're almost done, okay?

2   A.  Great!

3   Q.  So last week you told us that you decided to cooperate with

4   the government after you had been arrested in this case,

5   correct?

6   A.  Yes.

7   Q.  Since you have been arrested, where have you been living?

8   A.  In Orange County in California.

9   Q.  That is where you have been the entire time?

10  A.  Yes.

11  Q.  At the time that you were arrested, you had been residing

12  in France, true?

13  A.  I had an apartment in both places, in Paris, France and in

14  Orange County, California.

15  Q.  You were first interviewed by the government in the summer

16  of 2016, right?

17  A.  Correct.

18  Q.  That was obviously after this case had begun, right?

19  A.  Yes.

20  Q.  Because you first met with them after you had been

21  arrested, right?

22  A.  Yes.

23  Q.  You've told us over the last several years you've met with

24  the government 20-something times, right?

25  A.  Yes.

I65JGAL3                    Dunkerley j- cross

1  Q.  During the course of those 20 meetings, you met with a

2  number of different people from the government, right?

3  A.  Yes.

4  Q.  You met with these prosecutors?

5  A.  Yes.

6  Q.  And other prosecutors?

7  A.  Yes.

8  Q.  You met with some people from the SEC?

9  A.  Yes.

10  Q.  A bunch of law enforcement agents?

11  A.  Yes.

12  Q.  Did you meet with Special Agent Roberts who is sitting in

13  the back of the courtroom?

14  A.  Yes.

15          MR. QUIGLEY:  Objection.

16          THE COURT:  I'll allow that.

17  BY MR. SCHWARTZ:

18  Q.  Did he mention that we worked together when I was a

19  prosecutor in the Obama Administration?

20          MR. QUIGLEY:  Objection.

21          THE COURT:  Sustained.  Let's move on.  Do you want to

22  approach?

23          MS. MERMELSTEIN:  Yes, your Honor.

24          (Continued on next page)

25

I65JGAL3                    Dunkerley j- cross

1           (At sidebar)

2           MR. QUIGLEY:  That is completely inappropriate on many

3      levels.  Mr. Schwartz should be admonished.

4           THE COURT:  I totally agree.  It is totally

5      inappropriate.

6           MS. MERMELSTEIN:  It is so far out of bounds, having

7      said it, it is in such bad faith, I am speechless.  How could

8      you think that was a proper question?

9           MR. SCHWARTZ:  I am asking with his prep --

10          THE COURT:  To mention Obama --

11          (Multiple voices)

12          MR. SCHWARTZ:  A million times, I just elicited it.

13          MS. MERMELSTEIN:  I think your Honor should direct the

14     jury that was an inappropriate question.  It has nothing to do

15     with this case, politics has nothing to do with this case.  He

16     cannot think that was an okay question.

17          MR. SCHWARTZ:  I cannot agree politics have nothing to

18     do with this case.

19          MS. MERMELSTEIN:  I move to preclude politics has

20     anything to do with this case.

21          MR. SCHWARTZ:  We don't need to do that right now.

22          THE COURT:  They know what we're talking about.  I am

23     happy to make a brief statement that, of course, politics has

24     nothing to do with this case, just the facts for you to

25     determine, something to that effect.  I have already sustained

I65JGAL3                     Dunkerley j- cross

1    an objection, so they know I think it is improper.  I think I

2    said something to the effect of come on!  It is clear.

3              (Continued on next page)

I65JGAL3                    Dunkerley j- cross

1                (In open court)

2                THE COURT:  Ladies and gentlemen, I think you all know

3      that politics has nothing to do with this case, so I don't

4      think I need to say anything else beyond that.

5                You can proceed.

6      BY MR. SCHWARTZ:

7      Q.  Your first meetings with the government were in the summer

8      of 2016, correct?

9      A.  Yes.

10     Q.  You met with them once in July of 2016, right?

11     A.  Yes.

12     Q.  Then you next met with the government over two days in

13     October of 2016, true?

14     A.  I can't remember the specific dates, but yes.

15     Q.  You met with them a few times in January of 2017, right?

16     A.  Again if you say so, yes.

17     Q.  And this is my point.  More than a year passed, right,

18     before you saw them again?

19     A.  Possibly.  Again I don't really remember the time frames.

20     Q.  Does it sound about right that between late January 2017

21     and early March 2018, you didn't meet with anyone from the

22     government?

23     A.  Possibly right, yes.

24     Q.  Since then, March, April, May 2018, you've met with the

25     government numerous times, true?

I65JGAL3                          Dunkerley j- cross

1    A.  Yes.

2    Q.  The majority of times you met with the government have just

3    been over the last two or three months, to prepare for your

4    testimony today, right?

5    A.  Yes.

6    Q.  In those meetings you went over much of the material that

7    Mr. Quigley covered with you, right?

8    A.  Yes.

9    Q.  You went over much of the material that the other defense

10   lawyers covered with you, true?

11   A.  Some of it, yes.

12   Q.  You probably went over the stuff we're about to talk about,

13   right?

14   A.  I don't know because it is in the future.

15   Q.  Fair enough.  There are no surprises.

16        Did you practice cross-examination?

17   A.  I was asked some cross-examination questions, yes.

18   Q.  Cross-examination style, right?

19   A.  Yes.

20   Q.  Did someone play me?

21        MR. QUIGLEY:  Objection.

22        THE COURT:  Sustained.

23   BY MR. SCHWARTZ:

24   Q.  Throughout those many many meetings and throughout your

25   testimony today, you have endeavored to tell the truth, right?

1    A.   Absolutely.

2    Q.   You told the truth when you told the jury you have never

3    met Mr. Archer prior to the start of this case, true?

4    A.   Prior to the arraignment, I had never physically met

5    Mr. Devon Archer.

6    Q.   You had never seen him in person?

7    A.   Yes, that's correct.

8    Q.   You had only spoken to Mr. Archer on conference calls,

9    true?

10   A.   True.

11   Q.   You had never had a one-on-one conversation with him,

12   right?

13   A.   I don't believe I had spoken to him personally on the

14   phone, correct.

15   Q.   And those conference calls of which you and Mr. Archer were

16   a part, those were mostly board of directors calls, true?

17   A.   True.

18   Q.   You two were on the boards of some of the same companies,

19   right?

20   A.   Yes.

21   Q.   One or two of the calls were about other business, right?

22   A.   Yes.

23   Q.   For example, Mr. Archer was on the phone when you

24   participated in an in-person meeting with the folks from Teneo,

25   right?

I65JGAL3                          Dunkerley j- cross

1    A.   True.

2    Q.   Teneo is what you called the high power consulting firm?

3    A.   That is what it was referred to, yes.

4    Q.   You knew Mr. Archer had made the introduction to Teneo,

5    correct?

6    A.   Yes.

7    Q.   You were also telling the truth when you said you had never

8    spoken to Mr. Archer about the second WLCC bond issuance, true?

9    A.   True.

10   Q.   Certainly you never had a conversation with Mr. Archer in

11   which you discussed misappropriating the funds from the WLCC

12   bonds, true?

13   A.   True.

14   Q.   At some point you knew that was what was happening, right?

15   A.   Yes.

16   Q.   Because you had direct visibility into the bank account for

17   Wealth Assurance Private Client, true?

18   A.   True.

19   Q.   Even so, Jason Galanis lied to you about various aspects of

20   the WLCC bond scheme, true?

21   A.   True.

22   Q.   He lied to you about the circumstances under which Rosemont

23   Seneca Bohai bought the second tranche of bonds, right?

24   A.   He told me a story.  I assume it was a lie.

25   Q.   He told you that Mr. Archer had a contract from some

1    Chinese investors and that he had to use the money or that

2    contract would expire, correct?

3    A.  Yes.

4    Q.  He told you that that was the money, the Chinese investor

5    money, that was being invested into the second bond issuance by

6    Rosemont Seneca Bohai, correct?

7    A.  Can you repeat the question again.

8    Q.  Mr. Galanis told you that that Chinese investor money that

9    Mr. Archer supposedly had a contract to manage, that's the

10   money that Rosemont Seneca Bohai had used to buy the second

11   bond issuance, true?

12   A.  That is what I believed, yes.

13   Q.  And you believed him, right?

14   A.  Yes.

15   Q.  At the time?

16   A.  Yes.

17   Q.  You believed that until after you were arrested, correct?

18   A.  Correct.

19   Q.  It was not until the government showed you otherwise that

20   you understood that's not where the money had come from, right?

21           MR. QUIGLEY:  Objection.

22           THE COURT:  Sustained.  Why don't you rephrase that.

23   BY MR. SCHWARTZ:

24   Q.  You learned where that money had come from by looking at,

25   for example, the complaint in this case, correct?

1    A.  Correct.

2    Q.  And then over the course of your many meetings with the

3    government, they showed you documents, true?

4               MR. QUIGLEY:  Objection.

5               THE COURT:  I'll allow that.  You can answer that.

6               THE WITNESS:  There were some documents, yes.

7    BY MR. SCHWARTZ:

8    Q.  For example, they showed you documents related to that $15

9    million wire transfer from Wealth Assurance Private Client

10   Corporation to Thorsdale, correct?

11   A.  Correct.

12   Q.  You know now that that was the money that was used to buy

13   the second bonds, correct?

14   A.  Correct.

15   Q.  You did not know that until after you were arrested, true?

16   A.  True.

17   Q.  Even though you yourself had done that transfer, right?

18   A.  Correct.

19   Q.  So even though you yourself had transacted $15 million from

20   the Wealth Assurance Private Client Corporation account to the

21   Thorsdale account, you did not know that that is the money that

22   was used to buy the second bond issuance, correct?

23   A.  Correct.

24   Q.  That is something that Jason Galanis orchestrated, true?

25   A.  True.

I65JGAL3                     Dunkerley j- cross

1   Q.   Is something he he lied to you about, right?

2   A.   Effectively, yes.

3   Q.   Not effectively.  He lied to you.  He gave you a different

4   story where the money came from, right?

5   A.   Yes, yes, sorry, yes.

6   Q.   I want to talk now about some of the many, many companies

7   that you've testified, you talked about some companies with the

8   name Wealth Assurance, some companies with the name Burnham,

9   some companies with the name COR, right?

10  A.   Yes.

11  Q.   And you were involved in some of those companies, right?

12  A.   Yes.

13  Q.   Not all of them, true?

14  A.   Most of them, but not all.

15  Q.   I think you testified last week that there was confusion

16  amongst those companies, right?

17  A.   Yes.

18  Q.   But they were separate companies, true?

19  A.   True.

20  Q.   They had separate ownership?

21  A.   True.

22  Q.   They had separate boards of directors?

23  A.   True.

24  Q.   They had separate management?

25  A.   True.

I65JGAL3                          Dunkerley j- cross

1    Q.  In the course of your testimony over the last few days, you

2    have tried to be honest when you talked about these various

3    companies, right?

4    A.  Absolutely.

5    Q.  In thinking back on your testimony, though, you have made

6    some mistakes.  Isn't that right?

7    A.  Possibly, but not intentionally.

8    Q.  Not intentionally, right.

9         You testified, for example, that Wealth Assurance AG

10   changed its name to valor Group.  Do you recall that?

11   A.  I do, and perhaps it was Wealth Assurance Holdings that

12   changed its name to Valor Group, again this confusion between

13   the names at different points of time.

14   Q.  There is no confusion on that, is there, sir?  It was

15   Wealth Assurance Holdings Limited that changed its name to

16   Valor Group Limited, true?

17   A.  True.

18   Q.  There is no confusion.  It wasn't Wealth Assurance AG that

19   changed its name, correct?

20   A.  Correct.

21   Q.  Wealth Assurance AG was a subsidiary of the Valor Group,

22   correct?

23   A.  Correct.

24   Q.  You also testified last week that Jason Galanis had an

25   investment in something called COR Fund Advisers through a

I65JGAL3                        Dunkerley j- cross

1   company called Thunder Valley.  Do you recall giving that

2   testimony?

3   A.  Yes.

4   Q.  That was mistaken, was it not?

5   A.  I am not sure.  That is my understanding, so I am not sure

6   if that is a mistake or not.

7   Q.  Fair enough.  Your understanding is that Thunder Valley at

8   some point had an interest in COR Fund Advisers?

9   A.  Yes.

10  Q.  Not based on any documentation, I take it?

11  A.  Not based on any legal documentation, no.

12  Q.  I'd like to show you now Government Exhibit 4001.  Do you

13  recall you testified about this being the structure of the

14  Atlantic Capital acquisition?

15  A.  Yes.

16  Q.  This is not accurate, is it?

17  A.  I believe it is accurate.

18  Q.  Doesn't Wealth Assurance AG sit between Valor Group and BFG

19  Socially Responsible Investing?

20  A.  It is a subsidiary of.  It doesn't mean it sits between.

21  Q.  Is it your testimony that BFG Socially Responsible

22  Investing is a direct subsidiary of the Valor Group Limited?

23  A.  I believe it became one.  At the time it was slightly

24  different, the structure.

25  Q.  It was slightly different at the time of the Atlantic

1    Capital acquisition?

2    A.   Yes, and this was a simplified diagram with the help of the

3    jury rather than making things more complicated.

4    Q.   Sure.  In the lead it says GMT Duncan, and underneath that

5    Morton/Deary.  Do you see that?

6    A.   I do.

7    Q.   That is not accurate, is it?

8    A.   I believe that is accurate.

9    Q.   Well, isn't it true that Michelle Morton an Richard Deary

10   were the Class A shareholders of GMT Duncan?

11   A.   Correct.

12   Q.   And BFG Socially Responsible Investing was the Class B

13   shareholders of GMT Duncan?

14   A.   Class B non-voting, non-operating shareholder of GMT

15   Duncan, yes.

16   Q.   So Morton and Deary were not the same thing as GMT Duncan,

17   were they?

18   A.   They operated the company GMT Duncan.

19   Q.   They were the shareholders, correct?

20   A.   They were the operators and the Class A shareholders who

21   made the decisions on the day-to-day operations of GMT Duncan.

22           MR. SCHWARTZ:  I want to show you now Defense Exhibit

23   4063 just for the lawyers, the Judge and the witness, please,

24   Mr. Jackson.  By the way, happy birthday, Mr. Jackson.

25           (Pause)

I65JGAL3                    Dunkerley j- cross

1   BY MR. SCHWARTZ:

2   Q.  This is an accurate depiction of Atlantic Asset

3   Acquisition, is it not?

4   A.  Yes, a more accurate one, I would think so.

5   Q.  Thank you.

6          MR. SCHWARTZ:  I move Defense Exhibit 4063 into

7   evidence.

8          MR. QUIGLEY:  Your Honor, we would object based on his

9   objection to 4001.  It confuses the jury.

10          THE COURT:  Why don't we use it as an aid to the jury.

11   It won't be in evidence, but you can use it as demonstrative.

12          MR. SCHWARTZ:  This is a summary chart.  We can take

13   this up at a different time.  Put this up on the jury screens

14   as a demonstrative, Mr. Jackson.  Why don't you put this on the

15   right and Government Exhibit 4001 on the left.

16   BY MR. SCHWARTZ:

17   Q.  The one on the right, Defense Exhibit 4063, you just

18   testified was the more accurate depiction, correct?

19   A.  Yes.

20   Q.  The one on the left you testified was a simplification,

21   correct?

22   A.  Yes.

23   Q.  And sometimes it is important to simplify, but where things

24   are --

25          MR. QUIGLEY:  Objection.

I65JGAL3                         Dunkerley j- cross

1    Q.  Precision matters, doesn't it?

2              THE COURT:  Overruled.

3    A.  Can you repeat the question.

4    Q.  Precision matters in these things, does it not, Mr.

5    Dunkerley?

6    A.  Yes.

7              MR. SCHWARTZ:  You can take those down.  I want to

8    show you now, Mr. Jackson, just for the witness, the Judge and

9    the lawyers Defense Exhibit 4733 A.

10   BY MR. SCHWARTZ:

11   Q.  This is an email from someone at Teneo Consulting to a

12   number of people including yourself, true?

13   A.  True.

14             MR. SCHWARTZ:  I move defense Exhibit 4733 A into

15   evidence.

16             MR. QUIGLEY:  No objection.  This is what we talked

17   about before.

18             THE COURT:  It will be admitted.

19             (Defendant's Exhibit 4733 A received in evidence)

20             MR. SCHWARTZ:  If you could publish that for the jury,

21   please.

22             MR. QUIGLEY:  We ask for a limiting instruction.

23             THE COURT:  This is being admitted to show the

24   creation, correct?

25             MR. SCHWARTZ:  For state of mind, your Honor.

1    THE COURT:  Correct.  Just, ladies and gentlemen,

2   please understand that this exhibit is not being admitted for

3   the truth of what is contained in it, but the state of mind of

4   the person who reviewed it, correct?

5    MR. SCHWARTZ:  Correct.

6   BY MR. SCHWARTZ:

7   Q.  As we just said, this is an email from some folks at Teneo,

8   right?

9   A.  Yes.

10  Q.  You see there is a whole bunch of people at Teneo copied on

11  this, right?

12  A.  Yes.

13  Q.  There was a whole team of them helping out with this

14  project, true?

15  A.  True.

16  Q.  It is to Mr. Archer, right?

17  A.  Yes.

18  Q.  To Jason Galanis, correct?

19  A.  Yes.

20  Q.  To Jason Sugarman, right?

21  A.  Yes.

22  Q.  To someone with the email address Sebastion at Burnham

23  Equity Partners, dot com.  Do you see that?

24  A.  Sebastian Momtazi.

25  Q.  Have you met Mr. Momtazi?

I65JGAL3                         Dunkerley j- cross

1    A.  Yes, I believe I have.

2    Q.  Someone named Neil at Burnham Equity Partners?

3    A.  Yeah, that is actually I believe he is an employee of

4    Rosemont Seneca Technology Partners.  I don't know what his

5    last name is, Neil.

6    Q.  Kneel Callagan?

7    A.  There you go.

8    Q.  You believe Neil Callahan was an employee of something

9    called Rosemont Seneca Technology Partners?

10    A.  Yes.

11    Q.  Sebastian Momtazi, he was the chief operating officer of

12    Rosemont Seneca Bohai, correct?

13    A.  I have no idea about that.

14    Q.  Someone named Hunter Biden is a recipient, correct?

15    A.  Yes.

16    Q.  And Mr. Biden, that is the son of Joe Biden, correct?

17    A.  I believe so, yes.

18    Q.  You knew that he was someone that worked with Mr. Archer,

19    true?

20    A.  Yes.

21    Q.  And he worked with the Burnham team.

22    A.  I never saw him working with the Burnham team, so I can't

23    comment on that.

24    Q.  You knew he had an office at Burnham's office at 57th

25    Street, true?

1    A.  Yes.

2    Q.  Finally, this was sent to you, correct?

3    A.  Yes.

4            MR. SCHWARTZ:  If we can flip the page, Mr. Jackson.

5    BY MR. SCHWARTZ:

6    Q.  This is a presentation that was put together by the folks

7    at Teneo, right?

8    A.  Yes.

9    Q.  I believe you testified last week that this was done, this

10   Teneo project was done in connection with starting to think

11   about selling the Burnham conglomerate, correct?

12   A.  Correct..

13   Q.  You had an idea Mr. Sugarman, Mr. Galanis, others were

14   going to acquire all these financial services companies, true?

15   A.  True.

16   Q.  They were going to roll them up together in one big

17   company, right?

18   A.  Yes.

19   Q.  They were going to brand it Burnham because that was a

20   famous name, right?

21   A.  Correct.

22   Q.  And they were going to sell it for more than the sum of the

23   parts, right?

24   A.  Yes.

25   Q.  And this deck represents one of the efforts to start to put

I65JGAL3                          Dunkerley j- cross

 1   together the exit from this roll-up strategy, correct?

 2   A.  Correct.

 3              MR. SCHWARTZ:  If we can flip the page, Mr. Jackson,

 4   if you blow up the page at the bottom there before the exhibit.

 5   BY MR. SCHWARTZ:

 6   Q.  This chart depicts many of the companies that you have

 7   talked about, correct?

 8   A.  Yes, and others, yes.

 9   Q.  Under current acquisitions, those companies that are listed

10   there, those are companies that were actually acquired and were

11   part of this conglomerate, true?

12   A.  True.

13   Q.  In some cases it is a little bit more complex than just the

14   brand names, right?

15   A.  Yes.

16   Q.  For example, it says Burnham at the top, right?

17   A.  Right.

18   Q.  Burnham was at least two different operations, right?

19   A.  Yes.

20   Q.  There was Burnham Securities, true?

21   A.  True.

22   Q.  That was what is called the broker-dealer, right?

23   A.  Yes.

24   Q.  And they deal in stocks and bonds, right?

25   A.  Yes.

I65JGAL3                        Dunkerley j- cross

1    Q.   And there is also Burnham Asset Management, right?

2    A.   Yes.

3    Q.   Burnham Asset Management managed, was an investment manager

4    that managed more than a billion dollars in assets, true?

5    A.   True.

6    Q.   Were you ever involved in Burnham Asset Management?

7    A.   Never.

8    Q.   You were only on the Burnham Securities side, true?

9    A.   True.

10   Q.   They were pretty separate, right?

11   A.   Yes.

12   Q.   Next is Valor Life, and that was really acquired, right?

13   A.   Yes.

14   Q.   That was a multi-billion dollar life insurance company,

15   true?

16   A.   True.

17   Q.   Then Atlantic Asset Management.  You talked about that

18   enough.  That was really acquired, right?

19   A.   Yes.

20   Q.   In this case, Atlantic Asset Management also included

21   Hughes Capital Management, right?

22   A.   Yes.

23   Q.   Which was branded Atlantic Asset Management post-merger,

24   right?

25   A.   Absolutely.

I65JGAL3                        Dunkerley j- cross

1    Q.  Next is Fondinvest Capital, right?

2    A.  Yes.

3    Q.  That is a European asset manager, right?

4    A.  Europe fund of funds.

5    Q.  And, in effect, you were living in Paris because you had

6    gone to run Fundinvest, true?

7    A.  True.

8    Q.  A real legitimate fund of funds, right?

9    A.  Yes.

10   Q.  And Bonwick Capital, that you testified was a fixed income

11   asset manager, true?

12   A.  Yes.

13   Q.  That was the one run by Devin Wicker, yes.

14   Q.  Of the Goldman Sachs background?

15   A.  I don't know about Devin's background.  That refers to

16   Rashaun Williams, who has a Goldman Sachs background.

17   Q.  All of these companies, Burnham Securities, Burnham Asset

18   Management, Valor Life, Atlantic Asset Management, Hughes

19   Capital Management, Fundinvest Capital, Bonwick Capital, they

20   were actually acquired and were part of this roll-up strategy,

21   right?  They collectively managed many, many billions of

22   dollars, correct?

23   A.  Yes.

24   Q.  They were all real and legitimate, true?

25   A.  Absolutely.

I65JGAL3                         Dunkerley j- cross

1   Q.  This doesn't depict everything that was acquired, does it?

2   A.  No.  It is a simplified version of everything that was

3   acquired.

4   Q.  For example, you testified last week about something called

5   BIISL, right?

6   A.  Yes.

7   Q.  Remind us what BIISL is.

8   A.  BIISL is an insurance company based in Bermuda.

9   Q.  That is another company that was acquired and made part of

10  this roll-up, right?

11  A.  Yes.

12  Q.  And then down at the bottom under future acquisitions, you

13  or others on behalf of the conglomerate had actually taken

14  steps to start discussing acquiring these companies, true?

15  A.  Yes.

16  Q.  For example, you actually had extensive conversations with

17  IWI, International Wealth Insured at the bottom?

18  A.  Yes.

19  Q.  We'll talk about that a little later.

20          MR. SCHWARTZ:  If you can go forward a few pages to

21  Page 11 of this exhibit, please, Mr. Jackson.  Blow that up.

22  BY MR. SCHWARTZ:

23  Q.  This is the leadership team that was being put forward as

24  the management of the rolled-up company, correct?

25  A.  Correct.

1  Q.  On the left Mr. Archer was chairman of Burnham & Company,

2  correct?

3  A.  Correct.

4  Q.  And then in the middle, Mr. Biden was vice chairman, true?

5  A.  True.

6  Q.  And on the right, Mr. Sugarman was the CEO, correct?

7  A.  Correct.

8  Q.  And then underneath that is the name of all of those other

9  CEOs and executives that you testified you had been working

10  with who were actually running the various companies that were

11  part of the rolled-up conglomerate, right?

12  A.  Yes.

13          MR. SCHWARTZ:  Take that down now, Mr. Jackson.

14  BY MR. SCHWARTZ:

15  Q.  It is fair to say that the WLCC bonds were just a small

16  part of a small part of a small part of this big financial

17  conglomerate?

18          MR. QUIGLEY:  Objection.

19          THE COURT:  Why don't you rephrase that.

20  BY MR. SCHWARTZ:

21  Q.  Well, the WLCC bonds were one product that was offered by

22  Burnham Securities, Incorporated, right?

23  A.  Right.

24          (Continued on next page)

25

I657GAL4                        Dunkerley – Cross

1   BY MR. SCHWARTZ:

2   Q.  And Burnham Securities Incorporated was part of Burnham

3   Financial Group, true?

4   A.  True.

5   Q.  And Burnham Financial Group was just one of these many,

6   many companies that were part of the conglomerate, correct?

7   A.  Correct.

8   Q.  And Mr. Archer was chairman of the entire thing, right?

9   A.  Yes.

10  Q.  I want to talk about some of these companies in a little

11  bit more detail.  You and Mr. Archer both sat on the board of

12  directors of the Valor Group Ltd., true?

13  A.  True.

14  Q.  On the other hand, you sat on the board of directors of

15  Wealth Assurance AG but Mr. Archer did not, true?

16  A.  True.

17  Q.  And again Wealth Assurance AG, that was the Lichtenstein

18  insurance company that was basically the first company that was

19  acquired, right?

20  A.  True.

21  Q.  Now, you sat on the board of Wealth Assurance AG, but you

22  didn't run the company, right?

23  A.  Right.

24  Q.  There was management.  There was a CEO and executives that

25  ran the company day today, right?

1   A.  Yes.

2   Q.  And that's what you were referring to last week when you

3   testified on direct, correct?

4   A.  Yes.

5   Q.  Now, it was in the context of some of these, for example,

6   Valor Group Ltd. board of director meetings where you and Mr.

7   Archer were on the same conference calls together, correct?

8   A.  Yes.

9   Q.  You never physically participated in the same board

10  meetings for Valor Group Ltd., correct?

11  A.  We were never in the same room for those board meetings.

12  No, I never met him during that time.

13  Q.  And that was by design, was it not?

14          MR. QUIGLEY:  Objection.

15  Q.  Well, let me rephrase.  Jason Galanis told you not to go

16  physically to the board meetings for Valor Group Ltd. at which

17  he knew Mr. Archer would be physically present.

18          MR. QUIGLEY:  Action to what Galanis knew.

19  Q.  Not what he knew; what he told you.  Jason Galanis told

20  you, he instructed you not to physically attend Valor Group

21  Ltd. board meetings when Devon Archer would be physically

22  present, true?

23  A.  That is true, yes.

24  Q.  Jason Galanis told you you were not needed at those

25  meetings, correct?

1    A.  Correct.

2    Q.  Even though you were a director of Valor Group Ltd.,

3    correct?

4    A.  Correct.

5    Q.  And he was not.

6    A.  Correct.

7    Q.  And on those occasions the other members of the board would

8    be there in person, true?

9    A.  True.

10   Q.  And you would be on the phone, right?

11   A.  Yes.

12   Q.  Because that's what Jason Galanis had instructed you to do,

13   right?

14   A.  Yes.

15   Q.  You did want to meet Mr. Archer, didn't you?

16   A.  Yes, absolutely.  Yes, I did.

17   Q.  You thought he could be helpful to you; isn't that right?

18   A.  We were obviously on the board together, doing business

19   together, so it only made sense that I would actually know him

20   physically in person.

21   Q.  You specifically thought that he could be helpful to you in

22   your business, true?

23   A.  I hadn't really thought about it that way, but yes.

24   Q.  Yes.  And in fact you desperately tried to arrange a

25   meeting with him to see if he could get the Sovereign Wealth

1     Fund of the Nation of Kazakhstan interested in one of your

2     companies, correct?

3     A.   Yes.

4     Q.   He had those connections, right?

5     A.   Yes.

6     Q.   And you wanted to take advantage of them, true?

7     A.   True.

8     Q.   But you did not meet with him, correct?

9     A.   Correct.

10    Q.   He was unavailable, true?

11    A.   True.

12    Q.   He had other priorities; is that right?

13    A.   Yes.

14    Q.   Now, I want to talk for a second about the COR companies.

15    You testified that COR Capital was a company associated with

16    Steven and Jason Sugarman, right?

17    A.   Yes.

18    Q.   And I don't want to repeat what others have said before,

19    but just for context, COR Capital purchased the bank that

20    became Banc of California, right?

21    A.   Yes.

22    Q.   And it purchased the clearing company that became COR

23    Clearing, right?

24    A.   Yes.

25    Q.   And there was also an associated hedge fund, right?

1   A.  Yes.

2   Q.  What was that called?

3   A.  The original hedge fund was COR Capital.

4   Q.  And were you involved in any of those acquisitions?

5   A.  Yes, all of them.

6   Q.  And was Jason Galanis involved in those acquisitions?

7   A.  I believe he was involved with the COR Clearing.

8   Q.  And he made clear to you at some point that he and Jason

9   Sugarman were partners, correct?

10  A.  Yes.

11  Q.  Jason Galanis told you that he and Jason Sugarman spoke ten

12  times a day, right?

13  A.  Yes.

14  Q.  You recall that Jason Galanis called Jason Sugarman Suggie

15  Bear?

16  A.  I do, yes.

17  Q.  That was his name for Jason Sugarman?

18  A.  Yes.

19  Q.  And, by the way, you mentioned last week that before the

20  first time you met Jason Galanis you Googled him, right?

21  A.  Yes.

22  Q.  There were good things and bad things, right?

23  A.  Yes.

24  Q.  And you said one of the not so great things was that you

25  found out that he had entered into a civil settlement with the

I657GAL4                         Dunkerley - Cross

1    SEC a few years before, correct?

2    A.   Correct.

3    Q.   And as a result of that civil settlement, he wasn't able to

4    be on the board or an officer of a public company, correct?

5    A.   Correct.

6    Q.   Although in fact by the time you had met Jason Galanis that

7    had expired; isn't that right?

8    A.   During that time it had expired, correct.

9    Q.   And that information wasn't hard to find, right?

10   A.   Correct.

11   Q.   It was right there on Google, true?

12   A.   True.

13          MR. TOUGER:  Please repeat that question.

14   Q.   It was right there on Google, right?  And he said yes.

15          And I think one of the other lawyers asked about this

16   before, but Jason Galanis told you that he, Jason Galanis, was

17   the brains of the operation and that Jason Sugarman was the

18   brawn, right?

19   A.   That's how I expressed the partnership.

20   Q.   That's how you expressed it.

21   A.   That's how I actually expressed it.

22   Q.   And jason Sugarman was the brawn because of his

23   connections, true?

24   A.   True.

25   Q.   And you talked a little bit before about his family

1    connections, correct?

2    A.  Yes.

3    Q.  That his father-in-law is a billionaire, true?

4    A.  His father-in-law is a billionaire, yes.

5    Q.  I think you referred to him as a director, right?

6    A.  Who?  Sorry.

7    Q.  Jason Sugarman's father-in-law.

8    A.  Oh, as a film director, yes.

9    Q.  But he is not a film director, right?  He was the CEO of

10   Sony Pictures, right?

11   A.  Yeah, you know, I never did background research on him.  I

12   just know he is a famous individual who produced some movies.

13   Q.  And he's a billionaire.

14   A.  And he's a billionaire.

15   Q.  Now, you talked a little bit about a company called COR

16   Fund Advisors or CORFA, right?

17   A.  Yes.

18   Q.  Now CORFA originally was a Jason Sugarman company, correct?

19   A.  Yes.

20   Q.  Originally it's only member was something called Lausanne,

21   LLC?

22   A.  I believe so, yes.

23   Q.  And Lausanne, LLC at least on paper was owned by Jason

24   Sugarman's wife Elizabeth?

25   A.  Yes.

I657GAL4                    Dunkerley - Cross

1    Q.  Now, with respect to all of the COR companies other than

2    CORFA, COR Fund Advisors, you were directly involved, true?

3    A.  I believe so, yes.

4    Q.  So let me show you just for the judge, the witness and the

5    lawyers right now Defense Exhibit 4000K.  That's your

6    signature, is it not?

7    A.  It is.

8             MR. SCHWARTZ:  I offer this document, your Honor.

9             MR. QUIGLEY:  No objection.

10            THE COURT:  All right.  It will be admitted.

11            (Defendant's Exhibit 4000K received in evidence)

12            MR. SCHWARTZ:  If you can show this to the jury.

13   Q.  This is a power of attorney that you signed, correct?

14   A.  Yes.

15   Q.  And this authorized COR Securities Holdings, Inc. to

16   acquire something called Legent Clearing LLC, right?

17   A.  Legent Clearing.

18   Q.  Legent, thank you.  Otherwise I was correct, right?

19   A.  Totally correct.

20   Q.  And Legent Clearing was the company that became COR

21   Clearing, right?

22   A.  Correct.

23   Q.  You can take that down.  And now let me show again to the

24   witness the lawyers and Judge Abrams Defense Exhibit 4012.

25            So, moving forward in time to October of 2013, a

I657GAL4                      Dunkerley – Cross

1   company called COR International Ltd. was formed in the British

2   Virgin Islands, true?

3   A.  True.

4   Q.  And if you turn to page 2 of this document, you are the

5   sole shareholder, Hugh Dunkerley, of COR International Ltd.

6   when it was formed, true?

7   A.  True.

8           MR. SCHWARTZ:  I offer this document, 4012.

9           MR. QUIGLEY:  No objection.

10          THE COURT:  It will be admitted.

11          (Defendant's Exhibit 4012 received in evidence)

12  Q.  Mr. Jackson, if you could show the jury page 1.

13          This is the certificate of incorporation for COR

14  International Ltd., true?

15  A.  True.

16  Q.  And flipping to page 2, again this shows that all 1,000

17  shares were held by you, correct?

18  A.  True.

19  Q.  And if we turn to page 3 of this document, in addition to

20  being the sole shareholder, you were the only director of COR

21  International at its founding, correct?

22  A.  True.

23  Q.  That's what it says at the top there, right?

24  A.  Yes.

25  Q.  And at the bottom it says that you were the president as

1    well, right?

2    A.  Yes.

3    Q.  Now, at some point Jason Sugarman also became a director of

4    COR International, right?

5    A.  Yes.

6    Q.  If you can take this down and show again for the Judge, the

7    witness and the lawyers, Defense Exhibit 4014.

8            This is a certified copy of the share register for COR

9    International Ltd., true?

10   A.  Yes.

11           MR. SCHWARTZ:  I offer this document.

12           THE COURT:  Any objection?

13           MR. QUIGLEY:  We have no objection.

14           THE COURT:  It will be admitted.

15           (Defendant's Exhibit 4014 received in evidence)

16   Q.  Now, if you can show this to the jury, please, Mr. Jackson.

17           Now, on the first line there are those 1,000 shares of

18   COR International that you had, right?

19   A.  Yes.

20   Q.  And it says all the way on the right side "canceled," true?

21   A.  True.

22   Q.  And in its stead those shares were distributed 990 to Hugh

23   Dunkerley as trustee for the COR 2013 Trust, right?

24   A.  Correct.

25   Q.  And ten to you in your individual capacity, right?

I657GAL4                    Dunkerley – Cross

1   A.  Yes.

2   Q.  And the beneficiary of the COR 2013 Trust was Jason

3   Sugarman, right?

4   A.  Yes.

5   Q.  So when you testified yesterday that there was a trust who

6   was the beneficial owner of COR International but that held

7   those shares for Jason Sugarman, you were talking about the COR

8   2013 Trust, true?

9   A.  True.

10  Q.  And so what is documented here in Defense Exhibit 4014 is

11  that as of October 24, 2013, the day after the company was

12  formed, you had one percent of this company, and the trust for

13  the benefit of Jason Sugarman had 99 percent, correct?

14  A.  Absolutely correct.

15  Q.  You, however, continued to act for the company with

16  authority, correct?

17  A.  Correct.

18  Q.  Now, you can take that down.

19          Now, you testified at length that COR Capital was

20  going to be the vehicle for the acquisition for all of these

21  companies that were part of the roll-up, right?

22  A.  No, COR Fund Advisors or COR International; it hadn't been

23  decided.  So, COR Capital was a separate hedge fund run by

24  Steven Sugarman, so it was never going to be the vehicle used

25  for these acquisitions.

1    Q.  Well, do you recall testifying last week that it was COR

2    Capital in general but the person who was asked to really lead

3    the plan was Jason Sugarman and Jason Galanis also got involved

4    in this plan as well?

5    A.  Yes.

6    Q.  And one of the first acquisitions, as we discussed a moment

7    ago, was Wealth Assurance AG, correct?

8    A.  Yes.

9    Q.  The Lichtenstein insurance company, right?

10   A.  Yes.

11   Q.  To acquire Wealth Assurance AG you created a brand new

12   company called Wealth Assurance Holdings Ltd., right?  You're

13   getting hung up on "you created," right?

14   A.  Yeah, and hung up on some of the names as well.  I believe

15   eventually we bought Wealth Assurance with COR International,

16   but its a COR entity.

17   Q.  Let me ask it a different way.  In order to acquire Wealth

18   Assurance AG, the Lichtenstein insurance company, the new

19   company called Wealth Assurance Holdings Ltd. was created,

20   right?

21   A.  Yes.

22   Q.  And let's just be crystal clear about one thing.  Neither

23   of those companies -- Wealth Assurance AG or Wealth Assurance

24   Holdings Ltd. -- has anything to do with a company called

25   Wealth Assurance Private Client Corporation, right?

I657GAL4                    Dunkerley - Cross

1   A.  Correct.

2   Q.  Wealth Assurance Private Client Corporation is a fake

3   company that you and Gary Hirst and Jason Galanis created in

4   connection with the WLCC bonds, correct?

5   A.  Correct.

6   Q.  It is not part of the financial roll-up plan.  It's not

7   part of the family tree of Wealth Assurance Holdings and Wealth

8   Assurance AG, correct?

9   A.  Correct.

10  Q.  And, by the way, it was the bank account for that separate

11  company Wealth Assurance Private Client Corporation that

12  received the bond money, right?

13  A.  Yes.

14  Q.  And that was the account that you and Gary Hirst had

15  control over, true?

16  A.  True.

17  Q.  And Jason Galanis directed some of the transactions out of

18  it, true?

19  A.  True.

20  Q.  And it wasn't until you saw those transactions go out and

21  see where Jason Galanis was telling you to send money from

22  Wealth Assurance Private Clients that you first began to

23  understand that something was amiss, true?

24  A.  True.

25  Q.  And, to your knowledge, Devon Archer never had any

I657GAL4                    Dunkerley - Cross

1    visibility into the Wealth Assurance Private Client bank

2    account, correct?

3    A.   True.

4    Q.   Now, on some of the documents related to the bonds it says

5    that Wealth Assurance Private Client Corporation -- the fake

6    company -- is affiliated with Wealth Assurance AG or Wealth

7    Assurance Holdings Ltd. the legitimate companies, correct?

8    A.   Correct.

9    Q.   But that was a lie, correct?

10   A.   Correct, that's a lie.

11   Q.   So I want to talk about the real companies.  So just for

12   context the real companies are Wealth Assurance AG and Wealth

13   Assurance Holdings, OK?

14   A.   Yeah.

15   Q.   Wealth Assurance Holdings Ltd. was first incorporated in

16   Nevada in May 2013, right?

17   A.   Yes.

18   Q.   Let me show Exhibit 4007A just to the witness, the lawyers

19   and Judge Abrams, please, Mr. Jackson.

20            And if you flip to the last page of the exhibit, you

21   see your name there all over the bottom?

22   A.   Yes.

23            MR. SCHWARTZ:  I offer this Exhibit, 4007A.

24            MR. QUIGLEY:  No objection.

25            THE COURT:  Admitted.

1        (Defendant's Exhibit 4007A received in evidence)

2    Q.  If you can go back to page 1 and publish it to the jury,

3    please.

4        Mr. Dunkerley, this is the corporate charter for

5    Wealth Assurance Holdings Ltd., correct?

6    A.  Correct.

7    Q.  And if you flip the page, you see at the bottom in section

8    6 it says the incorporator is someone named Steven Weiss,

9    correct?

10   A.  Correct.

11   Q.  And who is Stephen Weiss?

12   A.  He's an attorney.

13   Q.  He was a corporate lawyer who handled a lot of these

14   transactions, correct?

15   A.  Correct.

16   Q.  And let's now jump to the last page of the exhibit.  And

17   the heading on this page was "Initial List of Officers,

18   Directors and Registered Agent and State Business License

19   Application for Wealth Assurance Holdings Ltd.," correct?

20   A.  Yes.

21   Q.  And you are listed here on the bottom as the president,

22   correct?

23   A.  Yes.

24   Q.  Secretary, true?

25   A.  Yes.

I657GAL4                    Dunkerley - Cross

1    Q.   Treasurer?

2    A.   Yes.

3    Q.   And director, right?

4    A.   Yes.

5    Q.   And you signed this document as the president, correct?

6    A.   Yes.

7    Q.   You can take that down.

8              I want to show you know Defense Exhibit 4007P.

9              Again for the judge, the witness and the lawyers.

10             This is share, sale and purchase agreement, correct?

11   A.   Yes.

12             MR. SCHWARTZ:  I offer this document.

13             MR. QUIGLEY:  No objection.

14             THE COURT:  It will be admitted.

15             (Defendant's Exhibit 4007P received in evidence)

16   Q.   Publish this please, Mr. Jackson.

17             This exhibit, Defense Exhibit 4007P, this is the

18   agreement under which Wealth Assurance Holdings Ltd. -- the

19   company that had just been created -- acquired actually two

20   Lichtenstein companies, correct?

21   A.   Correct.

22   Q.   One of those companies was Wealth Assurance AG, correct?

23   A.   Correct.

24   Q.   And I'm going to ask you to pronounce the other once?

25   A.   It's Wealth Assurance Beteiligungs.  I can't pronounce it

I657GAL4                          Dunkerley - Cross

 1   myself, so.

 2   Q.  You don't speak German?

 3   A.  No, sadly not.

 4   Q.  How many languages do you speak?

 5   A.  I mainly speak English with a tiny bit of French.

 6   Q.  And this transaction that's evidenced in Exhibit 4007P,

 7   this was the whole purpose of creating Wealth Assurance

 8   Holdings Ltd., correct?

 9              THE COURT:  Yes.

10   Q.  And you've testified before -- I won't go over it again --

11   that this deal required the approval of financial regulators,

12   correct?

13   A.  Yes.

14   Q.  And this was also when that gentleman Dr. Rory Knight got

15   involved, correct?

16   A.  Yes.

17   Q.  And as you testified to this morning, he was the dean of

18   the business school at Oxford, correct?

19   A.  Yes.

20   Q.  And Jason Galanis told you that he knew Dr. Rory Knight

21   because he had been a student at Oxford, correct?

22              MR. QUIGLEY:  Objection.

23              THE COURT:  Sustained.

24   Q.  You have no idea if Jason Galanis was actually a student at

25   Oxford, do you?

I657GAL4                    Dunkerley – Cross

1   A.  I have no idea.

2   Q.  You can take that down.  If we can look at 4007V, again for

3   the lawyers, the judge and the witness.

4           This is a certificate of incumbency for Wealth

5   Assurance Holdings Ltd., correct?

6   A.  Yes.

7   Q.  Dated March 18, 2014, true?

8   A.  Dated May 29, 2013.

9   Q.  Well -- sorry.  I offer this Exhibit.

10          MR. QUIGLEY:  We have no objection.

11          THE COURT:  It will be admitted.

12          (Defendant's Exhibit 4007V received in evidence)

13  Q.  So you've pointed out exactly what I was getting to.

14          You can publish this to the jury now.

15          So at the top of this exhibit is the text

16  incorporation date May 29, 2013, correct?

17  A.  Correct.

18  Q.  But this certificate, if you look right above the signature

19  of Mr. Sugarman in the middle of the page, it is dated the 18th

20  day of March 2014, correct?

21  A.  Correct.

22  Q.  And that, as we just said, is signed by Jason Sugarman,

23  correct?

24  A.  It is.

25  Q.  Now, if you look at the first paragraph of this document,

I657GAL4                    Dunkerley - Cross

1    is it correct that Jason Sugarman at this time, March 18, 2014,

2    was a member and managing director of COR Capital LLC?

3    A.  You know, I don't know that for sure.

4    Q.  OK.  You had testified before that COR Capital in general

5    was Steven Sugarman's company, correct?

6    A.  Exactly right.

7    Q.  Is it correct, or do you not know whether at some point

8    Jason Sugarman became a member and managing director of COR

9    Capital?

10   A.  I believe he was an investor in COR Capital, and he managed

11   some of the projects that we did.  Actual titles and the way

12   you just described it, I couldn't attest for sure.

13   Q.  Fair enough.  You understood him at least to be a member of

14   COR Capital?

15   A.  Yes.

16   Q.  An investor.  Excuse me.

17   A.  Yes.

18   Q.  And when you invest in an LLC, you typically do that

19   through acquiring what is called a membership interest, right?

20   A.  Yes.

21   Q.  So when it says member in this document, that's really just

22   another word for investor, right?

23          MR. QUIGLEY:  Objection to interpreting a document

24   he's not on.

25   Q.  I will withdraw that.  In the context of LLCs, in your

I657GAL4                    Dunkerley - Cross

1    experience the word member and investor are basically

2    interchangeable, true?

3    A.   True.

4    Q.   And in or around this time, March 2014, COR Capital was the

5    majority voting shareholder of Wealth Assurance Holdings Ltd.,

6    correct?

7    A.   Sorry.  Can you repeat the question again?

8    Q.   At this time -- and I am just looking really one line below

9    what is highlighted there --

10   A.   Right.

11   Q.   -- COR Capital LLC was the majority voting shareholder of

12   Wealth Assurance Holdings Ltd., correct?

13   A.   Yes.

14   Q.   OK.  And this reminds you that you were mistaken a few

15   moments ago when you said that the investments in Wealth

16   Assurance AG and Wealth Assurance Holdings were done with COR

17   International, correct?

18   A.   I could have been mistaken about that, yeah.

19   Q.   And we now know it was through COR Capital, right?

20   A.   Yes.

21   Q.   And under this certificate of incumbency --

22            If you back out, Mr. Jackson, and just blow up the

23   next paragraph for a second.

24            This authorizes you, Hugh Dunkerley, to act as

25   president, managing director and member of the board of

1    directors of Wealth Assurance Holdings Ltd., correct?

2    A.  Correct.

3    Q.  That's what the corporation is on this document, true?

4    A.  True.

5    Q.  You can take that down.  Now can we show to the Judge, the

6    witness and the lawyers Defense Exhibit 4007S.

7            This is a confidential memorandum from Wealth

8    Assurance Holdings Ltd. to prospective investors dated November

9    9, 2013, correct?

10   A.  Yes.

11           MR. SCHWARTZ:  I offer this document.

12           MR. QUIGLEY:  No objection.

13           THE COURT:  It will be admitted.

14           (Defendant's Exhibit 4007S received in evidence)

15           MR. SCHWARTZ:  If you can publish this to the jury.

16   Q.  And this is cc'd to Jason Sugarman, correct?

17   A.  Yes.

18   Q.  And to Hunter Taubman Weiss LLP, correct?

19   A.  Yes.

20   Q.  And that's the law firm associated with Stephen Weiss, the

21   lawyer who had incorporated Wealth Assurance Holdings, correct?

22   A.  Correct.

23   Q.  And if you look at the first paragraph of this, under terms

24   of the investment, it was anticipated at this time that Wealth

25   Assurance Holdings was going to acquire 90 percent of Wealth

I657GAL4                        Dunkerley - Cross

1   Assurance AG, the Lichtenstein insurance company, correct?

2   A.  Correct.

3   Q.  And if you flip to page 2 and highlight the paragraph that

4   says "Use of proceeds" -- or blow up I should say the paragraph

5   that says "Use of proceeds" -- the original structure of this

6   deal was that Wealth Assurance Holdings was going to acquire

7   100 percent of Wealth Assurance AG, and then it was going to

8   sell back immediately 10 percent of the company to something

9   called DRK, correct?

10  A.  Correct.

11  Q.  I am not going to try and pronounce what DRK stands for.

12          That's what actually happened, correct?

13  A.  That was the original deal.  I mean DRK ended up keeping --

14  actually DRK or Signal Iduna, you know, ended up keeping 10

15  percent of Wealth Assurance Holdings.  So the deal did change

16  over time.

17  Q.  And at some point DRK sold that 10 percent back to Wealth

18  Assurance Holdings, correct?

19  A.  Yes, I believe so.

20  Q.  Do you recall when that was that Wealth Assurance Holdings

21  received back DRK's 10 percent ownership interest?

22  A.  I don't remember a specific date, no.

23  Q.  And this deal, the acquisition of Wealth Assurance AG, this

24  is when the gentleman David Ezekiel gets into the picture,

25  right?

A.  When the DRK gets -- that share amount 10 percent gets sold
back?

Q.  No, in general when Wealth Assurance AG was acquired.

A.  No.  No, David Ezekiel got involved much later in the
transaction.

Q.  David Ezekiel ended up on the board of Wealth Assurance
Holdings Ltd., correct?

A.  I'm not a hundred percent sure about that.

Q.  Your memory is fuzzy on that point?

A.  Yes.

Q.  And as you sit here today, are you confident that David
Ezekiel didn't join the board of Wealth Assurance Holdings Ltd.
as part of this deal that we're looking at right here?

A.  I'm fairly confident about that, yes.

Q.  OK.  And you testified yesterday I think that Mr. Ezekiel
was what you called a big time CEO, right?

A.  Yes.

Q.  And in particular in the insurance industry he was big
time, correct?

A.  Yes.

Q.  Let's take this down.

        And I want to show you now again for the judge, the
lawyers and the witness Defense Exhibit 4007I.  You recognize
this as the 2013 annual report for Wealth Assurance Holdings
Ltd., correct?

I657GAL4                    Dunkerley - Cross

1   A.  Yes.

2           MR. SCHWARTZ:  I offer this Exhibit, 4007I.

3           MR. QUIGLEY:  No objection.

4           THE COURT:  It will be admitted.

5           (Defendant's Exhibit 4007I received in evidence)

6   Q.  And, again, this is the parent company that had purchased

7   Wealth Assurance AG, correct?

8   A.  Yes.

9           MR. SCHWARTZ:  If we can turn to -- this is up for the

10  jury, correct?  Thank you.

11  Q.  If we turn to page 5 of this exhibit, you signed this

12  annual report as the CEO of Wealth Assurance Holdings Ltd.,

13  correct?

14  A.  Yes.

15  Q.  And on page 4, that's your picture, right?

16  A.  It is.

17  Q.  And if we go back to page 3, at this point -- which is

18  mid-2014, right --

19  A.  Yes.

20  Q.  -- the board of directors of Wealth Assurance Holdings Ltd.

21  consisted of yourself, Mr. Sugarman and Mr. Archer, correct?

22  A.  Correct.

23  Q.  And this page also lists all of the various professionals

24  that were working with Wealth Assurance Holdings Ltd., right?

25  A.  It does.

I657GAL4                    Dunkerley - Cross

1  Q.  JP Morgan, right?

2  A.  Yep.

3  Q.  Ernst & Young, right?

4  A.  Yes.

5  Q.  Price Waterhouse Coopers, right?

6  A.  Yes.

7  Q.  Baker & McKenzie, which is one of the biggest law firms in

8  the world, right?

9  A.  Yes.

10  Q.  And this also says that Wealth Assurance Holdings Ltd. was

11  a publicly traded company on the Bermuda Stock Exchange,

12  correct?

13  A.  Correct.

14  Q.  Now, you testified last week that Wealth Assurance

15  Holdings -- or Wealth Assurance AG, I should say -- being an

16  insurance company received premiums from its clients and

17  invested those premiums in order to make money and to do

18  pay-outs; is that right?

19  A.  Yes.

20  Q.  And when you said do pay-outs, you meant pay out insurance

21  contracts, right?

22  A.  Yes.

23  Q.  Now, in addition to investing those premiums, those

24  insurance premiums, one service that Wealth Assurance Holdings

25  offered to its clients was to manage their money too, right?

I657GAL4                    Dunkerley - Cross

1    A.  I believe so, yes.

2    Q.  And so, for example, if we look at page 2 -- and if you

3    blow up at the bottom -- this says our private placement life

4    insurance solutions combine custom investment portfolios with

5    high-end life insurance for global, high net worth clients.

6    Right?

7    A.  Right.

8    Q.  And is it fair to say, Mr. Dunkerley, that in this time

9    period, mid2014, Wealth Assurance Holdings was looking to

10   explain both the insurance side of the business and the asset

11   management side of the business?

12   A.  Yes.

13   Q.  And it was going to do that by acquiring existing

14   companies, correct?

15   A.  Both organically and by acquisition, absolutely.

16   Q.  Principally by acquisition, correct?

17   A.  Actually there was a plan for organic growth throughout

18   Switzerland as well.

19   Q.  And who was heading up the organic growth plan?

20   A.   you know, it's an Italian name that doesn't come to mind

21   straight away.  Enzio, Enrico, something like that.

22   Q.  But the point is this company was looking to grow and grow

23   really by any means possible, correct?

24   A.  Yes, yeah.

25   Q.  Any legitimate means possible.

I657GAL4                     Dunkerley – Cross

1    A.   Absolutely.

2    Q.   Now, I think you told us that the prior owner of Wealth

3    Assurance AG was an affiliate of a company called Signal Iduna,

4    correct?

5    A.   Yes.

6    Q.   That was a $80 billion German mutual insurance group?

7    A.   Yes.

8    Q.   Now I want to turn to page 7 of this report.  This is the

9    audited financials for Wealth Assurance Holdings Ltd., correct?

10   A.   This is the auditor's report of the financials, yes.

11   Q.   And in this case the auditor was PWC or Price Waterhouse

12   Coopers, right?

13   A.   Yes.

14   Q.   And if we look to page 9 now, please and tell us what is

15   the total value of the consolidated balance sheet assets for

16   Wealth Assurance Holdings Ltd. as of December 31, 2013?

17   A.   The total balance sheet assets are $1,436,110,328.00.

18   Q.   Dollars.  Those are U.S. dollars, right?

19   A.   I believe so.

20            MR. TOUGER:  I think he said million twice.

21   A.   I said billion and then million.

22   Q.   A little bit more than $1.4 billion, correct?

23   A.   Correct.

24   Q.   You can take that down.

25            Now, again, that company, Wealth Assurance Holdings

1    Ltd. was publicly traded, true?

2    A.   Yes.

3    Q.   And there came a time when Mr. Archer received shares of

4    Wealth Assurance Holdings Ltd., correct?

5    A.   Yes.

6    Q.   Through a company called Archer Diversified LLC, correct?

7    A.   I believe so.

8    Q.   Well, let me show you -- and again for the witness, the

9    judge and the lawyers -- Defense Exhibit 4107.  Just flip the

10   pages.

11          You can take this down.  We will find the exhibit

12   later.

13          But it's correct that Archer Diversified LLC received

14   what is called class B shares of Wealth Assurance Holdings

15   Ltd., correct?

16   A.   They would have, yes.

17   Q.   And that was the nonvoting class, true?

18   A.   I believe so.

19   Q.   Let me show you now again for the judge, the witness and

20   the lawyers 4017.  We had them flipped there for a second.  You

21   recognize this as a share certificate for Wealth Assurance

22   Holdings Ltd. with your signature, correct?

23   A.   Yes.

24          MR. SCHWARTZ:  All right.  I offer 4017.

25          MR. QUIGLEY:  No objection.

I657GAL4                        Dunkerley - Cross

1        THE COURT:  It will be admitted.

2        (Defendant's Exhibit 4017 received in evidence)

3   Q.  And this document --

4        If you could publish it to the jury, please,

5   Mr. Jackson.

6        -- this reflects the issuance of 130,000 class B

7   shares of Wealth Assurance Holdings Ltd., correct?

8   A.  It does.

9   Q.  These shares were issued to Archer Diversified LLC at the

10  time that Mr. Archer joined the board of directors, correct?

11  A.  I believe so, yes.

12  Q.  These were compensation for joining the board, correct?

13        MR. QUIGLEY:  Objection.  Foundation.

14        THE COURT:  Do you know?

15        THE WITNESS:  I'm not a hundred percent sure, no.

16  Q.  But you signed this, correct?

17  A.  Yes.

18  Q.  And you were the controller of all the class A shares of

19  this company, correct?

20  A.  Yes.

21  Q.  And you know that members of the board for Wealth Assurance

22  Holdings Ltd. were compensated with class B shares when they

23  joined, correct?

24  A.  Some of them, not all of them.

25  Q.  Mr. Archer was, correct?

I657GAL4                      Dunkerley - Cross

```
 1   A.  You know, I honestly can't remember.  I mean the only
 2   difference I'm making here is whether he paid for the shares or
 3   whether he was given them as compensation for joining.  I just
 4   can't remember the difference between those two things.  He
 5   obviously received the shares.
 6   Q.  Fair enough.  And I mean in your experience that would be
 7   common, right, to compensate a member of the board of directors
 8   for joining with shares, correct?
 9   A.  That often happens, yes.
10   Q.  And one of the reasons why companies like to do that in
11   your experience is that it aligns the interests of the
12   directors with the company, true?
13           MR. QUIGLEY:  Objection.
14           MR. SCHWARTZ:  I will lay a foundation if you want.
15           THE COURT:  All right, go ahead.
16   Q.  Mr. Dunkerley, you are an experienced investment banker,
17   true?
18   A.  Yes.
19   Q.  You have been the CEO of numerous companies, correct?
20   A.  Correct.
21   Q.  You have been on the board of directors of numerous
22   companies, correct?
23   A.  Yes.
24   Q.  And you have experience with executive compensation, true?
25   A.  Yes.
```

I657GAL4                        Dunkerley - Cross

1   Q.  And with board compensation, correct?

2   A.  Absolutely.

3   Q.  And in your experience as an investment banker, you know

4   that one of the reasons that senior executives and directors

5   are compensated with shares of stock is to align the incentives

6   of those executives or directors with the company, correct?

7              MR. QUIGLEY:  Same objection.

8              THE COURT:  I will allow it.  You can follow up on

9   redirect for other reasons that may exist.

10             What is your answer?

11  A.  Yes.

12  Q.  Because if you own stock in a company, then if the company

13  does better, it's worth more, right?

14  A.  Exactly.

15  Q.  OK.  You can take that down, and I want to show now again

16  to the witness, the lawyers and the judge Defense Exhibit

17  4038E.

18             This is the amended and restated certificate of

19  incorporation for the same company we have been talking about,

20  Wealth Assurance Holdings Ltd., correct?

21  A.  Correct.

22             MR. SCHWARTZ:  I offer this.

23             MR. QUIGLEY:  No objection.

24             THE COURT:  This will be admitted.

25             (Defendant's Exhibit 4038E received in evidence)

I657GAL4                          Dunkerley - Cross

1   Q.  And this was adopted in October of 2013, correct?

2   A.  Correct.

3   Q.  And if we flip to page 8, you have signed as director and

4   chief executive officer or CEO of Wealth Assurance Holdings

5   Ltd., correct?

6   A.  Yes.

7   Q.  OK.  And we talked before about the fact that class A

8   shareholders have voting rights for Wealth Assurance Holdings

9   Ltd. and class B shareholders do not, correct?

10  A.  Correct.

11  Q.  And that's one of the things that's reflected in this

12  document, correct?

13  A.  I believe so, yes.

14  Q.  And again Archer Diversified or Mr. Archer was a class B

15  shareholder, correct?

16  A.  Correct.

17  Q.  Now, it was this company, Wealth Assurance Holdings Ltd.,

18  that changed its name to Valor Group Ltd., correct?

19  A.  Correct.

20  Q.  And that happened at the very end of 2014, correct?

21  A.  Yes.

22  Q.  And that happened -- Wealth Assurance Holdings Ltd. changed

23  its name to Valor Group Ltd. in connection with its acquisition

24  of the company called Valorlife, right?

25  A.  That's correct.

I657GAL4                      Dunkerley - Cross

Q.  And we will come back to Valorlife in a little bit.  I want
to show you Exhibit 4061 again for the Judge, the lawyers and
the witness.

        This is a securities purchase agreement between Wealth
Assurance Holdings Ltd. and something called Thorsdale
Fiduciary & Guaranty Company Ltd., correct?

A.  Correct.

Q.  You have --

        MR. SCHWARTZ:  I offer this.

        MR. QUIGLEY:  Your Honor, this was something we
objected to before.  Can we have a sidebar?

        THE COURT:  You know what, I think it's actually time
for lunch in any event, so why don't we take our break for
lunch.  Please come back in an hour.  Don't discuss the case
and just keep an open mind.

        (Continued on next page)

 1              (Jury not present)

 2              THE COURT:  Remind me what your objection was to this.

 3              MR. QUIGLEY:  Your Honor, this is a securities

 4    purchase agreement between Wealth Assurance Holdings and

 5    Thorsdale.  Our objection is really to one of the exhibits

 6    which sets out a schedule, purported schedule of the pro forma

 7    capitalization of Wealth Assurance Holdings, and I think that's

 8    coming in for the truth of the matter asserted, and I think

 9    that's hearsay.

10              MR. SCHWARTZ:  I'm happy to take it pursuant to a

11    limiting instruction.

12              THE COURT:  I'm sorry?

13              MR. SCHWARTZ:  I am happy to take it pursuant to a

14    limiting instruction.

15              MR. QUIGLEY:  But I don't see its relevant nonhearsay

16    purpose.

17              THE COURT:  Tell me how you intend to get this in.

18              MR. SCHWARTZ:  Well, this is a document that this

19    witness knows about, so there is no question about that.  The

20    issue that Mr. Quigley has is that the cap table that's

21    attached to it I think he is going to argue it's not accurate.

22    I'm not going to argue it's accurate.  However, it's exactly

23    the cap table that's critical, and I will tell you why.

24              This afternoon the government is going to try and read

25    through a paralegal an e-mail that I will object to that makes

I657GAL4                    Dunkerley - Cross

1   reference to Indian warrants, it's a totally misleading e-mail.

2   The cap table, if you go to it in this document -- it's at the

3   very end --

4            MR. QUIGLEY:  The very last page.

5            MR. SCHWARTZ:  -- it's got something called Wakpamni

6   in the cap table, and, as you see, Wakpamni holds class B

7   voting shares and warrants per this document, so those are the

8   Indian or Wakpamni warrants.

9            Now, if you go to the definitions in this document,

10  Wakpamni is not the WLCC, it is not the Wakpamni Lake

11  Community, it is something entirely different -- it's on page

12  2, I believe under -- no, I'm sorry -- yeah, there it is --

13  "Wakpamni shall mean the Wakpamni Trust, a pension plan and

14  purchaser of 1,625,000 shares under this offering."

15           Now, my point is not that that's true, or that that

16  happened or anything like that.  My point is simply they are

17  going to put up this afternoon this e-mail where Mr. Archer

18  refers to I forget if it's Wakpamni warrants or Indian warrants

19  and argue that it means stolen money from the WLCC.  And I have

20  to be able to get this evidence in to show that that's totally

21  wrong and Wakpamni warrants refers to this thing.

22           If they want to for go that exhibit, by the way, I

23  will scrap this entire bit, which will save us a good deal of

24  time.  But if that exhibit is coming in, I have to be able to

25  do this.

I657GAL4                    Dunkerley - Cross

1          MR. QUIGLEY:  Your Honor, I mean this is the first

2     we've heard of Mr. Schwartz's offer of proof on this, so we can

3     discuss it over lunch and circle back.  I mean if he is

4     representing that he will withdraw the exhibit if we withdraw

5     that exhibit, I mean we would consider that.

6          THE COURT:  OK.  Why don't you consider it over lunch.

7          MR. QUIGLEY:  I would just add there is a similar

8     exhibit, I think it's 4062, that we have the same objection to.

9          MR. SCHWARTZ:  It's the same point.  It's the exact

10    same point.  So, if they want to withdraw their exhibit, I will

11    scrap both of those two.

12         MR. QUIGLEY:  We will discuss.

13         THE COURT:  OK.  So why don't we come back at five

14    after, and we can discuss it.  Is that good?

15         MS. MERMELSTEIN:  Your Honor, I'm sorry, just in terms

16    of the scheduling issue with the outstanding rulings, I just

17    wanted to know, if your Honor could tell us about the experts

18    at the end of today so that we can prep with the person.

19         THE COURT:  I am going to try and finish it.

20         MS. MERMELSTEIN:  I know there is a lot out there.

21         THE COURT:  I'm going to try and finish it over lunch

22    and give you a ruling before the end of the day.  And I

23    understand because you probably want to prep your witness

24    tonight.

25         MS. MERMELSTEIN:  Thank you.   (Luncheon recess)

1        AFTERNOON SESSION

2        2:05 pm

3        (Trial resumes)

4        (In open court; jury not present)

5        THE COURT:  Everyone may be seated.  Thank you.  Did

6  you work out the issues?

7        MR. QUIGLEY:  Yes, your Honor, I believe we will not

8  intend to offer or read in that email this afternoon, 2214,

9  assuming Mr. Schwartz will not get into the documents related

10  to Wakpamni Private or Wakpamni Investments Ltd.

11        I agree with him those don't have anything, at least

12  don't appear to have anything to do with the bonds.  Unless

13  some door is opened down the line, we'll take his

14  representation he will not get into that and we'll refrain from

15  offering 2214.

16        MR. SCHWARTZ:  Is the agreement, to be clear, because

17  I haven't scoured every exhibit they have offered, but they

18  intend to offer.  The deal is we're going to stay away from

19  those entities entirely on the Wakpamni Warrants, Wakpamni

20  Trust, Wakpamni, those other entities that Mr. Quigley just

21  mentioned, they won't get into it or ever get into it unless I

22  open the door, which I will not.

23        THE COURT:  Can we bring the jury in?

24        MR. SCHWARTZ:  Yes.

25        THE COURT:  Great.

1           (Jury present)

2           THE COURT:  Everyone may be seated.  Thanks.  You may

3   proceed.

4           MR. SCHWARTZ:  Good afternoon, ladies and gentlemen.

5   BY MR. SCHWARTZ:

6   Q.  Good afternoon, Mr. Dunkerley.

7   A.  Good afternoon.

8   Q.  You have a caffeinated beverage next to you there?

9   A.  I do.

10  Q.  You'll need it not because this is hard, but because it is

11  boring.  Let's talk about Valor Life, all right?

12          Valor Life was purchased by Wealth Assurance

13  Beteillgungs, correct?

14  A.  Wealth Assurance.  I am not exactly sure which part of

15  Wealth Assurance bought Valor Life.

16  Q.  Wealth Assurance Beteillgungs AG was subsidiary of Wealth

17  Assurance holdings, true?

18  A.  Yes.

19  Q.  It was that subsidiary that bought Valor Life, true?

20  A.  Again I am not a hundred percent sure of that fact.

21          MR. SCHWARTZ:  Let me show you, again just for the

22  witness the lawyers and the Judge, Defense Exhibit 4016 A.

23  Q.  This is the 2013 report of the auditors for Valor Life,

24  true?

25  A.  Yes.

1           MR. SCHWARTZ:  I offer this exhibit.

2           MR. QUIGLEY:  No objection.

3           THE COURT:  It will be admitted.

4           (Defendant's Exhibit 4016 A received in evidence)

5           MR. SCHWARTZ:  Would you publish this to the jury,

6    please, Mr. Jackson.

7    BY MR. SCHWARTZ:

8    Q.  What is the full technical name of what we have been

9    calling Valor Life?

10   A.  Are you talking about the parent company to Valor Life?

11   Q.  Right?

12   A.  So the parent company to Valor Life is the Vaudoise Group.

13   Q.  That was the parent company from which the Wealth Assurance

14   family of companies acquired Valor Life, right?

15   A.  Yes.

16   Q.  This up on the screen here, this refers to what we have

17   been calling Valor Life, true?

18   A.  Yes.

19   Q.  Its actual name is this --

20   A.  Yes.

21   Q.  This German word, right?

22   A.  Yes.

23   Q.  Which Mr. Wissman can prounounce, but I can't.  This is

24   Valor Life, true?

25   A.  Yes.

I65JGAL5                      Dunkerley - cross

1   Q.  Valor Life's auditor for 2013 was KPMG?

2   A.  Yes.

3   Q.  KPMG just like the companies that we have talked already,

4   Price Waterhouse Coopers, PWC and Ernst & Young, these are

5   three of the big four accountancy firms in the world, true?

6   A.  They are.

7                MR. SCHWARTZ:  Can we look at Page 6 of this document.

8   Mr. Jackson, if you can blow up the bottom third of the page

9   beginning with the words the huge efforts.

10  Q.  Can you just read what it says under the following results

11  were attained in 2013.

12  A.  In summary, the following results were attained in 2013.

13  Total premiums colledted in 2013.  Swiss francs, 376,96,922

14  Swiss francs.  The balance sheet total, 4,457,911,253 Swiss

15  francs, and the profit for 2013 in Swiss francs again 7,

16  893,202 Swiss francs.

17  Q.  You spent a good time in Zurich, true?

18  A.  True.

19  Q.  You know from your personal experience that in this time,

20  as now, a Swiss franc is worth slightly more than a dollar,

21  true.

22  A.  True.

23  Q.  If these numbers were expressed in U.S. dollars, they would

24  actually be a little bit bigger, true?

25  A.  True.

I65JGAL5                        Dunkerley - cross

```
 1   Q.  Valor Life issued an annual report every year, right?

 2   A.  Yes.

 3   Q.  And that annual report provided update on the company's

 4   finances to investors, right?

 5   A.  Yes.

 6           MR. SCHWARTZ:  So, Mr. Jackson, if you could take this

 7   down and show to the witness, Judge Abrams and the lawyers

 8   Defense Exhibit 4016 B.

 9   Q.  This is the 2014 annual report for Valor Life, true?

10   A.  Yes.

11           MR. SCHWARTZ:  I offer Defense Exhibit 4016 B.

12           MR. QUIGLEY:  No objection.

13           THE COURT:  It will be admitted.

14           (Defendant's Exhibit 4016 B received in evidence)

15           MR. SCHWARTZ:  Can you please publish this to the

16   jury.

17   BY MR. SCHWARTZ:

18   Q.  And for 2014, KPMG was still the auditor for Valor Life,

19   true?

20   A.  Yes.

21   Q.  Now, if we turn to Page 3, please, if you blow up where it

22   says board of directors, this reflects the board of directors

23   for Valor Life before and after it was acquired and became part

24   of the Wealth Assurance family of companies, true?

25   A.  True.
```

I65JGAL5                        Dunkerley – cross

1   Q.  The three names at the top are the old directors when it

2   was part of the was group, right?

3   A.  Yes.

4   Q.  And the names at the bottom are the new directors after

5   Valor Life became part of the Wealth Assurance family of

6   companies, correct?

7   A.  Correct.

8   Q.  The directors were yourself, Jason Sugarman, Mr. Steiken

9   and Dr. Rory Knight, true?

10  A.  True.

11  Q.  Mr. Archer was not a director of Valor Life, true?

12  A.  True.

13  Q.  If you back out of that, underneath that, under management,

14  that is the executive team, correct?

15  A.  Correct.

16  Q.  Those were the people who were actually running the

17  company, right?

18  A.  Yes.

19          MR. SCHWARTZ:  Can we turn to the next page, please,

20  Mr. Jackson.  Can you blow up the bottom third under management

21  report.

22  Q.  This shows that the profits of Valor Life in 2014 were

23  7,417,900 Swiss francs, true?

24  A.  True.

25  Q.  That was up from 6.8 something million Swiss francs the

1   prior year, right?

2   A.   Yes.

3   Q.   To be crystal clear, the directors of Valor Life were

4   different from the directors of Wealth Assurance AG, right?

5   A.   Yes.

6   Q.   And they were different from the directors of Wealth

7   Assurance Holdings limited, right?

8   A.   Yes.

9   Q.   They were different companies, right?

10  A.   Yes.

11  Q.   Mr. Archer was a director of Wealth Assurance Holdings

12  Limited, correct?

13  A.   Yes.

14  Q.   As we just went over he was not a director of Valor Life,

15  right?

16  A.   Correct.

17  Q.   He was not a director of Wealth Assurance AG, the

18  Lichtenstein Insurance Company, true?

19  A.   True.

20  Q.   You were director of all three companies, correct?

21  A.   Yes.

22  Q.   Now, you recall that earlier we discussed the 2013 Wealth

23  Assurance Holdings annual report that is the one that had your

24  picture on it?

25  A.   Yes.

I65JGAL5                          Dunkerley - cross

1    Q.  It had the audit letter from PWC, right?

2    A.  Yes.

3             MR. SCHWARTZ:  I want to look at the following year,

4    4007 I, Mr. Jackson, if you could pull that up for the witness,

5    the lawyers and Judge Abrams.  I am sorry, 4007 L.

6    Q.  This is the PWC report of the auditor to the board of

7    directors of Valor Group Limited for 2014, correct?

8    A.  Yes.

9             MR. SCHWARTZ:  I offer 4007 L.

10            MR. QUIGLEY:  No objection.

11            THE COURT:  It will be admitted.

12            (Defendant's Exhibit 4007 L received in evidence)

13   BY MR. SCHWARTZ:

14   Q.  To be clear, Valor Group Limited is the same company as

15   Wealth Assurance Holdings Limited, correct?

16   A.  Yes.

17   Q.  This is the same company just after it changed its name,

18   right?

19   A.  Correct.

20   Q.  Now can we turn to Page 2.  I am sorry.  The next page.

21            This report was signed on the 18th of September 2015,

22   right?

23   A.  Yes.

24   Q.  If you turn to the following page, can you see there are

25   two columns here?

```
1   A.  Yes.

2   Q.  One for 2013 and one for 2014?

3   A.  Yes.

4   Q.  So for 2013, the total assets of the Valor Group were a

5   little bit more than $1.4 billion, true?

6   A.  Correct.

7   Q.  And for 2014, what is shown as the total assets of the

8   Valor Group?

9   A.  Roughly $5.7 billion.

10  Q.  That increase from $1.4 billion in assets to $5.7 billion

11  in assets is largely attributable to the acquisition of Valor

12  Life, true?

13  A.  True.

14  Q.  Those are all real assets, right?

15  A.  Yes.

16  Q.  None of those are WLCC bonds, right?

17  A.  Correct.

18  Q.  Can we turn to Page 6 of this document.  This reflects at

19  the bottom net income for the Valor Group in year end 2014 of

20  more than $177 million, true?

21  A.  True.

22  Q.  And can we look at Page 9, please.

23       You see right in the middle of the page there is

24  something that is referred to bargain purchase gain?

25  A.  Yes.
```

I65JGAL5                         Dunkerley - cross

1    Q.   Do you understand what is being referred to here as bargain

2    purchase gain or do we need to go over it?

3    A.   I understand this concept.

4    Q.   When this refers to bargain purchase gain, this represents

5    the discount that Wealth Assurance Holdings Limited got between

6    what it paid for Valor Life and what Valor Life was worth,

7    right?

8    A.   Exactly correct.

9    Q.   So the bargain that Wealth Assurance Holdings got when it

10   acquired Valor Life was a little bit more than $179 million,

11   right?

12   A.   Correct.

13   Q.   Sort of like buying a car for $179 million under sticker

14   price, right?

15   A.   Yes.

16   Q.   Or under Blue Book price, I guess, to be technical?

17   A.   It is a great bargain.

18   Q.   And again that is real dollars in value to Wealth Assurance

19   Holdings Limited, correct?

20   A.   Correct.

21   Q.   You can take that down.

22           So we talked now about acquisitions of Wealth

23   Assurance AG and Valor Life.  I want to now talk about Bermuda

24   International Insurance Services Limited or BIISL, okay?

25   A.   Yes.

1           MR. SCHWARTZ:  Can I show you again for the witness,

2    the lawyers and Judge Abrams Defense Exhibit 4000 M.

3           THE COURT:  M as in Mary?

4           MR. SCHWARTZ:  Yes.  Thank you, your Honor.

5    BY MR. SCHWARTZ:

6    Q.  This is an offer letter for BIISL on behalf of Wealth

7    Assurance Holdings Limited, correct?

8    A.  Correct.

9           MR. SCHWARTZ:  I offer 4007 M.

10          MR. QUIGLEY:  We objected to this before.  I don't

11   know if you had ruled.  We discussed this before.

12          MR. SCHWARTZ:  Do you want me to lay some more

13   foundation?

14          THE COURT:  Yes.

15   BY MR. SCHWARTZ:

16   Q.  This letter is dated January 30, 2015, true?

17   A.  Yes.

18   Q.  And at that time you were the CEO of Wealth Assurance

19   Holdings Limited?

20   A.  Yes, I believe I was.

21   Q.  You were a director of Wealth Assurance Holdings Limited?

22   A.  I believe I was.

23   Q.  And you understood that Wealth Assurance Holdings Limited

24   was going to put in an offer to acquire BIISL, true?

25   A.  Yes.

I65JGAL5                          Dunkerley - cross

1    Q.  And this document, Defense Exhibit 4000 M, reflects the

2    terms of that offer, true?

3    A.  It does.

4                MR. SCHWARTZ:  I offer 4007 M.

5                MR. QUIGLEY:  No objection.

6                THE COURT:  It will be admitted.

7                (Defendant's Exhibit 4007 M received in evidence)

8                MR. SCHWARTZ:  Can you publish to the jury, please,

9    Mr. Jackson.

10   Q.  This is a letter from David Ezekiel to the president and

11   CEO of something called BF&M Insurance Group, true?

12   A.  True.

13   Q.  BF&M Insurance Group was the prior owner of BIISL, right?

14   A.  Correct.

15   Q.  And what this document reflects is that Wealth Assurance

16   Holdings Limited was offering to purchase BIISL at what is

17   called book value, correct?

18   A.  Correct.

19   Q.  What does book value mean in this context, please, Mr.

20   Dunkerley?

21   A.  It's the value of the assets within the company what

22   they're actually worth, so no added price to the actual price.

23   Q.  Thank you.  This reflects an all-cash offer, true?

24   A.  Yes.

25                MR. SCHWARTZ:  You can take that down and can we show

I65JGAL5                    Dunkerley - cross

the witness, the lawyers and Judge Abrams Defense Exhibit 4038

B.

Q.  You recognize this as unanimous resolution of the board of

directors of the Valor Group, correct?

A.  Yes.

Q.  And again you were a director of Valor Group Limited,

correct?

A.  Yes.

          MR. SCHWARTZ:  I offer Exhibit 4038 B.

          MR. QUIGLEY:  Give us one second.

          THE COURT:  Sure.

          (Pause)

          MR. QUIGLEY:  We have no objection.

          THE COURT:  It will be admitted.

          (Defendant's Exhibit 4038 B received in evidence)

          MR. SCHWARTZ:  Can you publish that, please,

Mr. Jackson.

Q.  The purpose of this resolution of the board of directors of

the Valor Group Limited is to authorize a subsidiary called VL

Assurance Bermuda to merge with BIISL, correct?

A.  Correct.

Q.  That is the way the Valor Group was going to acquire BIISL,

was through the merger of BIISL and a subsidiary called VL

Assurance Bermuda?

A.  That's correct, yes.

1   Q.  And the new merged company was going to keep the name of

2   the sub VL Assurance Bermuda, correct?

3   A.  I believe so, yes.

4   Q.  And that happened, right, VL assurance, the subsidiary of

5   Valor Group Limited, in fact, acquired BIISL, correct?

6   A.  Correct.

7            MR. SCHWARTZ:  You can take that down.

8   Q.  Now, after Valor Group acquired Valor Life and BIISL, did

9   it also attempt to acquire something called IWI International

10  Wealth Insurer, S.A.?

11  A.  Yes.

12           MR. SCHWARTZ:  So let me show the witness, Judge

13  Abrams and the lawyers Exhibit 4038 F.

14  Q.  This is a letter that you signed on behalf of the Valor

15  Group, true?

16  A.  True.

17           MR. SCHWARTZ:  I offer 403 F.

18           MR. QUIGLEY:  No objection.

19           THE COURT:  It will be admitted.

20           (Defendant's Exhibit 403 F received in evidence)

21  BY MR. SCHWARTZ:

22  Q.  If we flip the page, you have copied Dr. Rory Knight and

23  Jason Sugarman on this letter, correct.

24  A.  Correct.

25  Q.  Going back to the first page, this is called binding offer.

I65JGAL5                          Dunkerley - cross

1   Is that right?

2   A.  Yes.

3   Q.  And the purpose of this was to make an offer to acquire IWI

4   International Wealth Insurer, from a company called Belfius

5   Insurance, correct?

6   A.  Correct.

7   Q.  In this case, IWI was going to be acquired through a

8   subsidiary of the Valor Group Limited called Valor Life

9   Beteillgungs, correct?

10  A.  Correct.

11  Q.  And again this, too, was an all-cash offer, right?

12  A.  Yes.

13  Q.  And the proposed purchase price here, it is in the third

14  paragraph from the bottom, is 75 million euros, right?

15  A.  That's correct.

16  Q.  You again from your experience that at the time a euro was

17  worth a little bit more than a dollar, correct?

18  A.  Correct.

19  Q.  If expressed in dollars, it would be a slightly bigger

20  number, right.

21  A.  Correct.

22          MR. SCHWARTZ:  You can take this down.  I want to show

23  you again just for the witness, Judge Abrams and the lawyers

24  what has been marked as Exhibit 4038 G.

25  Q.  This is a document entitled summary of Valor Group Limited

I65JGAL5                          Dunkerley - cross

1    strategy and ownership structure that was drafted in connection

2    with the negotiations to acquire IWI, correct?

3    A.   Correct.

4              MR. SCHWARTZ:  I offer 4038 G.

5              MR. QUIGLEY:  No objection.

6              THE COURT:  4038 G will be admitted.

7              (Defendant's Exhibit .4038 G received in evidence)

8    BY MR. SCHWARTZ:

9    Q.   I'll ask you to read the first paragraph under the heading

10   structure and control.

11   A.   "Valor is controlled by COR International Limited.

12   (www.corfunds.com) through its ownership of 100 percent of the

13   voting shares of Valor Group.  In turn, COR International is 99

14   percent owned by Jason Sugarman, Valor's ultimate beneficial

15   owner."

16   Q.   And we discussed this before.  COR International owned all

17   of the Class A shares of Valor Group Limited, correct?

18   A.   Correct.

19   Q.   Rather 99 percent, correct?

20   A.   Correct.

21   Q.   That is the way it exercised control and beneficial

22   ownership, right?

23   A.   Correct.

24   Q.   You still held the other 1 percent, right?

25   A.   Correct.

I65JGAL5                        Dunkerley - cross

1    Q.   And you and COR International were the only Class A

2    shareholders, correct?

3    A.   Correct.

4    Q.   Can you turn to Page 2 of this document, please.

5           This chart shows the ownership structure of Valor

6    Group Limited and the Valor Group family of companies at that

7    point in time, correct?

8    A.   Correct.

9    Q.   This is accurate, true?

10   A.   True.

11   Q.   I want to talk a little bit about Hughes and Atlantic,

12   okay?  If I could first ask you, first of all, yes or no, you

13   testified on direct that CORFA was the owner of Hughes Capital

14   Management and Atlantic Asset Management.

15          Do you recall giving that testimony?

16          MR. QUIGLEY:  Objection; mischaracterizing his

17   testimony.

18          THE COURT:  I'll allow it.

19          THE WITNESS:  Could you repeat the question again.

20   BY MR. SCHWARTZ:

21   Q.   You testified on direct when Mr. Quigley was questioning

22   you that CORFA was the owner of Hughes Capital Management and

23   Atlantic Asset Management.  Do you recall giving that

24   testimony, yes or no?

25   A.   I believe I would have said that BFG SRI was the owner of

1    Hughes and the other entity Atlantic.

2              MR. SCHWARTZ:  Mr. Jackson, could I ask you to pull up

3    a transcript Page 898, and from the top do you see where you

4    testified before this jury:  I also was a director of or at

5    least the face of a company called CORFA that owned Hughes

6    Capital Management and Atlantic Asset Management.

7              Do you see that?

8    A.  The ultimate beneficial owner of.  You asked me a slightly

9    different question just now.

10   Q.  My question, just be clear about it, my question was do you

11   recall giving the testimony that CORFA owned Hughes Capital

12   Management and Atlantic Asset Management?

13   A.  Yes, I do.

14             MR. SCHWARTZ:  You can take that down.  I want to ask

15   some questions that will clear that up.  We talked before about

16   Government Exhibit 4000, if you could bring that up, please,

17   and 4001, if you could bring those up side-by-side, that would

18   be great.

19   Q.  You told us previously that this is a simplified, less

20   accurate version of these charts, right?

21   A.  Yes.

22             MR. QUIGLEY:  Objection; mischaracterizes his

23   testimony.

24             THE COURT:  Overruled.

25   BY MR. SCHWARTZ:

I65JGAL5                      Dunkerley - cross

1    Q.  My question to you is, CORFA, CORFA Advisors is not

2    anywhere on these charts, true?

3    A.  True.

4    Q.  When I showed you earlier a different version of the chart

5    that you told us was more accurate, CORFA was not on that,

6    either, true?

7    A.  True.

8            MR. SCHWARTZ:  So you can take those down.  Let's talk

9    about Atlantic.  Can I show you again for the witness, the

10   lawyers and Judge Abrams Defense Exhibit 4043 A.  If you can

11   flip the page.  The next page.

12   Q.  You recognize this as the February 13th, 2015 merger

13   agreement between Hughes Capital Management and Atlantic Asset

14   Management, correct?

15   A.  Yes.

16           MR. SCHWARTZ:  I offer 4043 A.

17           MR. QUIGLEY:  No objection.

18           THE COURT:  Admitted.

19           (Defendant's Exhibit 4043 A received in evidence)

20           MR. SCHWARTZ:  Would you publish that, please, Mr.

21   Jackson.

22   Q.  Under this agreement, Hughes Capital Management bought

23   Atlantic Asset Management and merged with that company at the

24   same time, true?

25   A.  True.

I65JGAL5                          Dunkerley – cross

1    Q.  And the name of the remaining company was Atlantic Asset

2    Management, right?

3    A.  Yes.

4    Q.  And, by the way, both Hughes and Atlantic were represented

5    by counsel in that deal, right?

6    A.  Yes.

7    Q.  Experienced, big law firms, right?

8              MR. QUIGLEY:  Objection.

9              MR. SCHWARTZ:  Do you remember that -- withdrawn.

10   Q.  Do you recall Atlantic was represented by a firm called

11   Proskauer Rose?

12   A.  Vaguely, yes.

13   Q.  And that Hughes was represented by a law firm called

14   Olshinsky Frome Wolosky.

15   A.  Yes.

16   Q.  Those are well-recognized, reputable law firms, true?

17   A.  Yes, they are, yes.

18   Q.  You talked before about a guaranty that the Valor Group

19   entered into.  Do you recall that?

20   A.  Yes.

21             MR. SCHWARTZ:  That was Exhibit 828, if you could

22   bring that up, please, Mr. Jackson.  Flip the page, I think two

23   pages.  One more.

24   Q.  This is the guaranty, right?

25   A.  Yes.

I65JGAL5                    Dunkerley - cross

1    Q.  And in this guaranty, the Valor Group was promising that

2    the sellers of Atlantic Asset Management will get paid, right?

3    A.  Yes.

4    Q.  Do you know whether the Valor Group actually put up any

5    money as part of this acquisition?

6    A.  Yes.

7    Q.  It did, right?

8    A.  Yes, they put up I think --

9    Q.  You signed this guaranty as president of the Valor Group,

10   right?

11   A.  Yes.

12   Q.  In other words, as an executive of the company?

13   A.  Yes.

14   Q.  True?

15          And you were also a member of the board of directors,

16   right?

17   A.  Yes.

18   Q.  After the merger, the combined Atlantic Asset Management

19   was owned by a company called GMT Duncan principally, correct?

20   A.  Correct.

21   Q.  And the members of GMT Duncan also had either Class A or

22   Class B shares, right?

23   A.  They had Class A shares, correct.

24   Q.  They were Class A shares at GMT Duncan, true?

25   A.  Yes.

1  Q.  And there were Class B shares, right?

2  A.  I can't recall that, but again perhaps there were some.  I

3  know we had Class B shares.  I am not sure about GMT Duncan,

4  exactly their structure.

5  Q.  Who is the "we" in that sentence?

6  A.  The we would have been the BFG SRI, Burnham Financial Group

7  entity.

8  Q.  First of all, there was no such company called Burnham

9  Financial Group Socially Responsible Investing, correct?

10  A.  No, that is incorrect.

11  Q.  Isn't it correct that the true and accurate name of the

12  company was BFG Socially Responsible Investing?

13  A.  Yes, yes.

14          MR. SCHWARTZ:  Can I show you now just for the witness

15  the lawyers and Judge Abrams 4020 H, Defense Exhibit 4020 H.

16  Q.  This is the amended, restated company agreement for GMT

17  Duncan, correct?

18  A.  Yes.

19          MR. SCHWARTZ:  I offer 4020 H.

20          THE COURT:  Any objection?

21          MR. QUIGLEY:  One moment, your Honor.  No objection.

22          THE COURT:  Admitted.

23          (Defendant's Exhibit 4020 H received in evidence)

24          MR. SCHWARTZ:  Can we turn to Page 50 of this

25  document, please, Mr. Jackson.

1  Q.  This reflects that BFG Socially Responsible Investments

2  Limited held Class B units of GMT Duncan, correct?

3  A.  Correct.

4  Q.  And it reflects that Michelle Morton an Richard Deary held

5  Class A units of GMT Duncan, correct?

6  A.  Yes.

7  Q.  So we can agree GMT Duncan had Class A units and Class B

8  units, right?

9  A.  Sorry, yes.  Now I understand your question.  I was

10 interpreting it slightly differently earlier on.  Yes.  I

11 apologize.

12 Q.  They were the issuer of Class A and B units?

13 A.  Yes.

14 Q.  All of the Class A units were held by either Ms. Morton or

15 Richard Deary, correct?

16 A.  Correct.

17 Q.  And all the Class B units were held by BFG Socially

18 Responsible Investing, correct?

19 A.  Correct.

20 Q.  I think you testified earlier that the purpose of this

21 structure was to ensure that the Class A holders had all the

22 control, correct?

23 A.  Correct.

24 Q.  And that was true, they did have all the control, right?

25 A.  Correct.

1          MR. SCHWARTZ:  You can take that down, and I want to

2     show you now again just for the witness, the lawyers and Judge

3     Abrams Defense Exhibit 4039 E.

4     Q.  Do you recognize this to be the operating agreement for BFG

5     Socially Responsible Investments Limited?

6     A.  I do.

7          MR. SCHWARTZ:  I offer 4039 E.

8          THE COURT:  Any objection?

9          MR. QUIGLEY:  No, your Honor.

10         THE COURT:  Admitted.

11         (Defendant's Exhibit 4039 E received in evidence)

12         MR. SCHWARTZ:  You can publish this to the jury.

13    Thank you, Mr. Jackson.

14    Q.  BFG Socially Responsible Investments Limited was a company

15    that had been created by Wealth Assurance AG, correct?

16    A.  It was eventually assumed by Wealth Assurance AG, correct.

17    Q.  Wealth Assurance AG again is the Lichtenstein Insurance

18    Company that except itself was a subsidiary of what became

19    Valor Group Limited, yes?

20    A.  Yes.

21    Q.  If we turn to Page 8 of this document, you signed this as

22    director of Wealth Assurance AG, correct?

23    A.  Yes.

24    Q.  And turning to the next page, this reflects that Wealth

25    Assurance AG owned 100 percent of BFG Socially Responsible

1    Investments Limited, correct?

2    A.  Correct.

3    Q.  You can take that down.  Now you were the president and

4    secretary of BFG Socially Responsible Investments Limited,

5    correct?

6    A.  Yes.

7    Q.  The board of Wealth Assurance AG approved investing in BFG

8    Socially Responsible Investments in order to buy Hughes,

9    correct?

10   A.  Correct.

11   Q.  I want to show you what has been marked as Defense Exhibit

12   4060.  This is an agenda for the meeting of the board of

13   directors of Wealth Assurance AG, true?

14   A.  Yes.

15   Q.  And you were a director at the time, correct?

16   A.  Yes.

17            MR. SCHWARTZ:  I offer Defense Exhibit 4060.

18            THE COURT:  Any objection?

19            MR. QUIGLEY:  I have no objection, your Honor.

20            THE COURT:  It will be admitted.

21            (Defendant's Exhibit 4060 received in evidence)

22   BY MR. SCHWARTZ:

23   Q.  And the chairman of the board of Wealth Assurance AG at the

24   time was Dr. Rory Knight, correct?

25   A.  Correct.

I65JGAL5                    Dunkerley - cross

1              MR. SCHWARTZ:  Could you please read the first
2      sentence under the word introduction if you could blow that up,
3      Mr. Jackson, please.
4      A.   "The chairman emphasizes that in absence of a professional
5      investment manager within Wealth Assurance AG, the board
6      welcomes the formal proposal from the company's shareholder to
7      invest in BFG Socially Responsible Investments Limited, BFG,
8      and puts its trust in the proven expertise of Jason Sugarman
9      and Hugh Dunkerley on investment matters."
10     Q.   So the board of Wealth Assurance AG was putting its trust
11     in the proven expertise of Hugh and -- you, excuse me, Y O U --
12     and Jason Sugarman on investment matters, correct?
13     A.   Correct.
14     Q.   You did have expertise on investment matters, correct?
15     A.   Correct.
16     Q.   As did Mr. Sugarman, true?
17     A.   Yes.
18     Q.   Now, the other members of the board of Wealth Assurance AG,
19     the ones who were putting their trust in you and Mr. Sugarman
20     was Dr. Knight, true?
21     A.   Yes.
22     Q.   And Mr. Steiken, correct?
23     A.   Correct.
24     Q.   Mr. Archer was not a director of Wealth Assurance AG,
25     correct?

1    A.  Correct.

2    Q.  You can take that down.

3         Now, just stepping back for a second, sometimes when

4    the board of directors of Wealth Assurance AG made decisions,

5    they had meetings, correct?

6    A.  Yes.

7    Q.  And sometimes they made decisions on what is called written

8    consent, correct?

9    A.  Correct.

10   Q.  And that means that they don't actually sit together in the

11   same room or get on a conference call, but they sign onto a

12   written resolution, right?

13   A.  Yes.

14        MR. SCHWARTZ:  Can we actually bring 4060 back up,

15   Mr. Jackson.  Can we flip the page.

16   Q.  Do you see what is listed as resolution two there?

17   A.  Yes.

18   Q.  This says that the board of directors of Wealth Assurance

19   AG was approving the payment of $2.7 million to acquire Hughes

20   Capital Management, correct?

21   A.  To acquire 80 percent of Hughes Capital Management,

22   correct.

23   Q.  Thank you.  If you back out of that and look at resolution

24   three, do you see that?

25   A.  I do.

I65JGAL5                          Dunkerley - cross

1    Q.   The board of Wealth Assurance AG is also resolving to

2    redeem immediately the full investment in the Ballybunion Fund.

3    Do you recall that?

4    A.   I do.

5    Q.   I am not going to go over it again, but you've told us that

6    that reference to an investment in the Ballybunion Fund was

7    money that Jason Galanis had diverted to a fake Ballybunion

8    bank account in the United States, correct?

9    A.   Correct.

10   Q.   And this says that at the same time that Wealth Assurance

11   AG is investing in Hughes Capital Management, it is going to be

12   getting its money out of Ballybunion, correct?

13   A.   Correct.

14   Q.   Because the rest of the board of Wealth Assurance AG didn't

15   realize that Jason Galanis had taken that money, true?

16              MR. QUIGLEY:   Objection.

17              THE COURT:   Sustained.

18   BY MR. SCHWARTZ:

19   Q.   There was no discussion that you're aware of amongst any of

20   the other members of the board that Jason Galanis had taken

21   that money, true?

22   A.   There was no discussion of that kind.

23   Q.   Am I correct that the reason that these resolutions were

24   passed simultaneously was to make it appear that the

25   Ballybunion money was being redeemed and was being used to fund

I65JGAL5                          Dunkerley – cross

1   Hughes Capital Management?

2           MR. QUIGLEY:  Objection.

3           THE COURT:  Sustained.

4   BY MR. SCHWARTZ:

5   Q.  Sir, isn't the reason why Jason Galanis directed these two

6   resolutions to happen simultaneously is to cover up his theft

7   of the Ballybunion money, as far as you know?

8           MR. QUIGLEY:  Objection.

9           THE COURT:  Do you know the answer to that?

10          THE WITNESS:  No, I don't know the answer to that.

11  BY MR. SCHWARTZ:

12  Q.  Did Jason Galanis ever discuss that with you?

13  A.  No.

14  Q.  That is just something he did without your knowledge?

15  A.  Correct.

16          MR. SCHWARTZ:  You can take that down.

17  Q.  I want to show you now something that Mr. Quigley showed

18  you, Government Exhibit 1412.  Do you recall looking at this?

19  A.  Yes.

20  Q.  Could you just read out the first two whereas classes here.

21  A.  Whereas, the company through its subsidiary Wealth

22  Assurance AG (WAAG), is prepared to finance BFG to enable BFG

23  to make an investment in GMT Duncan LLC, a Delaware limited

24  liability company, (GMTD); and, whereas, the company has caused

25  to be wired to the escrow agent the sum of $2,760,218.00, the

I65JGAL5                          Dunkerley - cross

1    escrow funds.

2    Q.  Now, the title in this document is Wealth Assurance

3    Holdings Limited, correct?

4    A.  Yes.

5    Q.  As we just saw in the prior document, it was the Wealth

6    Assurance AG board that had approved the investment into

7    Hughes, correct?

8    A.  Yes.

9    Q.  Can you turn to Page 6 of this document.

10           This document is signed by you on behalf of Wealth

11   Assurance Holdings, correct?

12   A.  Yes.

13   Q.  By the way, it is Wealth Assurance Holdings Limited, true?

14   A.  Yes, I believe so.

15   Q.  There is no Wealth Assurance Inc., is there?

16   A.  That is a typo.

17   Q.  You also signed for BFG Socially Responsible Investments

18   Limited, correct?

19   A.  Correct.

20   Q.  The full board of Wealth Assurance Holdings Limited didn't

21   sign this agreement, correct?

22   A.  Correct.

23   Q.  And the full board of Wealth Assurance Holdings Limited did

24   not approve the investment, true?  It was approved at the WA

25   AG, Wealth Assurance AG level, correct?

I65JGAL5                         Dunkerley - cross

1    A.  Correct.

2    Q.  This is something you signed on behalf of Wealth Assurance

3    Holdings, correct?

4    A.  Correct.

5    Q.  And again Mr. Archer was only on the board of Wealth

6    Assurance Holdings Limited, true?

7    A.  True.

8    Q.  And not on the board of Wealth Assurance AG that had

9    actually approved the investment, correct?

10   A.  Correct.

11          MR. SCHWARTZ:  I can take this down.

12          MR. SCHWARTZ:  Can we look at Government Exhibit 801.

13   Go to the next page.

14   Q.  You described this last week as a term sheet for the

15   conditional financing of Hughes, correct?

16   A.  Yes.

17   Q.  You see this refers to investment by COR Fund Advisers or

18   CORFA into GMT Duncan, correct?

19   A.  Yes.

20   Q.  As we saw in the documents we just reviewed, however, it

21   was Wealth Assurance AG, not CORFA Advisors that acquired

22   Hughes through BFG Socially Responsible Investments, right?

23   A.  Correct.

24   Q.  It was Wealth Assurance AG, not CORFA, that had formed and

25   was the parent company of BFG Socially Responsible Investments,

I65JGAL5                          Dunkerley - cross

1  correct?

2  A.  Correct.

3  Q.  It was not CORFA or an affiliate of the Burnham Financial

4  Group, as reflected in this document, correct?

5  A.  Correct.

6  Q.  Now turning to Page 7, you signed this document on behalf

7  of CORFA or CORFA Advisors, correct?

8  A.  Yes.

9  Q.  But as you told us last week, you had absolutely no role in

10 CORFA, true?

11 A.  True.

12 Q.  You signed this just because Jason Galanis told you to sign

13 it, correct?

14 A.  Correct.

15         MR. SCHWARTZ:  You can take this down.

16 Q.  All that aside, Hughes and Atlantic were established asset

17 managers when they were acquired, true?

18 A.  Yes.

19 Q.  They were managing hundreds of millions if not billions of

20 dollars, correct?

21 A.  Correct.

22         MR. SCHWARTZ:  I want to show you now just to the

23 witness, the lawyers and Judge Abrams what has been marked as

24 Defense Exhibit 4016 D, as in dog.

25 Q.  This is a consultant report, dated February 2nd, 2015, to

1    the board of Valor Life regarding the proposed acquisition of

2    Atlantic Asset Management, correct?

3    A.  Yes.

4    Q.  You were on the board of Valor Life at the time, true?

5    A.  Yes.

6              MR. SCHWARTZ:  I offer Exhibit 4016 D.

7              MR. QUIGLEY:  No objection.

8              THE COURT:  It will be admitted.

9              (Defendant's Exhibit 4016 D received in evidence)

10             MR. SCHWARTZ:  Can you publish this, please.

11   Q.  Now, on the from line of this document it says, "Consultant

12   Report," correct?

13   A.  Yes.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I657GAL6                    Dunkerley - Cross

BY MR. SCHWARTZ:

Q.  Jason Galanis drafted this document, true?

A.  I believe he did, yes.

Q.  Jason Galanis was the consultant, right?

A.  Yes.

Q.  Can you please read the very first bullet under the
investment?

A.  "Wealth Assurance AG owns a hundred percent of BFG Socially
Responsible Investments Ltd. which is the owner of an eight
percent stake in Hughes.  The existing Hughes stakeholding
carries an additional eight percent annual preference."

Q.  And that's the deal, the correct structure of the deal,
that we just walked through, correct?

A.  Correct.

Q.  Now, can you read the next two bullets.

A.  "Proposal is for Valor to act as financial sponsor for a
follow on acquisition of a hundred percent of Atlantic Asset
Management LLC, a larger asset manager.

        "Consideration is $6 million cash at closing and $4.5
million in performance payments if assets and revenue are
retained.  See Exhibit A, Olshan legal memo."

Q.  And so this is now discussing the next step, which is the
proposed financing of the Atlantic Capital acquisition by
Hughes, correct?

A.  Correct.

I657GAL6                    Dunkerley – Cross

Q.  And can you just read the second bullet under the word

"business considerations."

A.  "The total combined Atlantic/Hughes assets under

management, AUM, is $12.4 billion at closing."

Q.  And that was true, right?

A.  Yes.

Q.  And assets under management, again, those are assets

available for investment, correct?

A.  Yes, under management.

Q.  And you understood that the majority of those assets were

discretionary investments, correct?

          MR. QUIGLEY:  Objection.

          THE COURT:  Do you know the answer to that?

          THE WITNESS:  It depends what he means by

discretionary.

          THE COURT:  Why don't you clarify the question,

please.

Q.  Well, were you aware that Atlantic and Hughes had

discretionary authority over the vast majority of assets they

were managing?

A.  I knew they had some discretion; I didn't know whether it

was the vast majority or not.

Q.  Fair enough.  And can you just explain to the jury what you

mean by discretion in this context so we're speaking the same

language.

1   A.   Sure.  So if an investor has given you their money, they've

2   also given you permission to invest it in what you believe is a

3   good investment for them.  You have discretion over how that

4   money is spent; they've given you that legal responsibility.

5   Q.   And if we turn to page 12 of this document, this is a memo

6   from that law firm, Olshan Frome Wolosky discussing the deal

7   that we have just been talking about, correct?

8   A.   Yes.

9   Q.   You can take that down.

10          I just want to go back and clarify one thing.  Can I

11  show you Exhibit 4020H.  Again, this is the April 1, 2015

12  amended and restated LLC agreement for GMT Duncan, correct?

13  A.   Correct.

14  Q.   And as we discussed before, the class A members were

15  Michelle Morton and Richard Deary, correct?

16  A.   Correct.

17  Q.   And the class B member was BFG Socially Responsible

18  Investments, correct?

19  A.   Correct.

20  Q.   And like most contracts, there is a notice of default

21  provision in here, correct?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  I will allow that.

24  A.   I would have to look at the whole contract, but like most

25  contracts there are notices of default, yes.

I657GAL6                      Dunkerley – Cross

1    Q.  So can we turn to page 45 of this.  And you see Section

2    14.5 notices?

3    A.  Yes.

4    Q.  And this requires notices to be provided to what is

5    described as the holders or their representatives, right?

6    A.  Yes.

7    Q.  And a holder in this case is a holder of a membership

8    interest in GMT Duncan, correct?

9    A.  Correct.

10   Q.  Meaning Michelle Morton, Richard Deary or BFG Socially

11   Responsible Investments, right?

12   A.  That's correct.

13   Q.  And if you back out of this, you are listed as the notice

14   party for BFG Socially Responsible Investments, correct?

15   A.  I would -- yes, I would think so.

16   Q.  OK.

17               Can we take this down.

18               And I want to show you Defense Exhibit 4041.  This is

19   the prior year's amended and restated operating agreement for

20   GMT Duncan, true?

21   A.  Yes.

22               MR. SCHWARTZ:  I offer Defense Exhibit 4041.

23               THE COURT:  Any objection?

24               MR. QUIGLEY:  Just one second, your Honor.

25               THE COURT:  Sure.

I657GAL6                         Dunkerley - Cross

1    MR. SCHWARTZ:  This is the subject of a business

2    record stipulation, Defense Exhibit 4041.

3                    MR. QUIGLEY:  No objection.

4                    THE COURT:  All right.  It will be admitted.

5                    (Defendant's Exhibit 4041 received in evidence)

6    Q.  Put this up and turn to page 27, please, Mr. Jackson.

7                    This is signed by Michelle Morton, correct?

8    A.  Yes.

9    Q.  And Richard Deary, correct?

10   A.  Yes.

11   Q.  And if we flip the page, it's signed by you on behalf of

12   BFG Socially Responsible Investments, correct?

13   A.  Correct.

14   Q.  This document was also drafted by Stephen Weiss, correct?

15   A.  Yes.

16   Q.  And you were in direct contact with Michelle Morton and

17   Richard Deary about GMT Duncan, correct?

18   A.  Yes.

19   Q.  And you never asked Mr. Archer to communicate with Michelle

20   Morton or Richard Deary about GMT Duncan on behalf of BFG

21   Socially Responsible Investments, correct?

22   A.  Never.

23   Q.  You never discussed BFG Socially Responsible Investments

24   with Mr. Archer in your life, correct?

25   A.  Correct.

1   Q.  Can we turn to page 25.  Can you see at the very bottom

2   under notices it says "Each holder of preferred units on behalf

3   of itself, and its successors and assigns, hereby appoints

4   Devon Archer to give and receive notices and to otherwise

5   communicate with the company."  Do you see that?

6   A.  I do.

7   Q.  That's a typo, right?

8   A.  Yes, I believe it would be.

9   Q.  Thank you.

10          You can take that down.

11          Now, you started working fairly closely with Michelle

12  Morton starting in about July 2014 in connection with the

13  bonds, correct?

14  A.  Yes.

15  Q.  And later you dealt with her in connection with acquisition

16  of Atlantic that we were just talking about, correct?

17  A.  Yes.

18  Q.  You held yourself out at the time as president of Wealth

19  Assurance Holdings, correct?

20  A.  Yes.

21  Q.  Can I show you, by the way, just for the witness, Judge

22  Abrams and the lawyers Defense Exhibit 3605.

23          In the meanwhile, do you see that on your screen?

24  A.  I do.

25  Q.  Do you recognize that person?

I657GAL6                          Dunkerley - Cross

1    A.  I do.

2    Q.  Who is that?

3    A.  Michelle Morton.

4    Q.  And on the other side of the screen, by the way, can you

5    bring up Defense Exhibit 4912.  That's you, right?

6    A.  That is me.

7            MR. SCHWARTZ:  I offer Defense Exhibit 4912 and what

8    will be marked Defense Exhibit 3605.

9            THE COURT:  Any objection?

10           MR. QUIGLEY:  Yeah, your Honor, it's actually

11   Government Exhibit 3605, but we have no objection.

12           THE COURT:  That's fine.

13           MR. SCHWARTZ:  I'm going to offer it as a defense

14   exhibit.

15           THE COURT:  As a defense exhibit.

16           MR. SCHWARTZ:  We will put a sticker on it.

17           THE COURT:  OK.  So just leave the government sticker

18   on and we will have both stickers on.

19           (Defendant's Exhibits 4912 and 3605 received in

20   evidence)

21   Q.  So that's you on the left and Ms. Morton on the right?

22   A.  Right.

23   Q.  Throughout that period of time, 2014 into 2015, you were

24   working closely with Michelle Morton, correct?

25   A.  Yes.

I657GAL6                    Dunkerley - Cross

1  Q.  You got friendly with Michelle Morton, correct?

2  A.  Yes.

3  Q.  You were fairly informal with Michelle Morton, correct?

4  A.  Yes.

5  Q.  You would joke with her, correct?

6  A.  Yeah, that was her general nature, yes.

7  Q.  She was jokey, right?

8  A.  Yeah, she liked to joke a lot.

9  Q.  She gave you a porn name, for example, right?

10          MR. QUIGLEY:  Objection.

11          THE COURT:  Sustained.

12 Q.  You discussed Downton Abbey together, right?

13          MR. QUIGLEY:  Objection.

14          THE COURT:  That's fine.  Overruled.

15 A.  I discussed Downton Abbey with her.

16 Q.  OK.  You can take that down.  Can I show to the witness the

17 lawyers and the Judge Defense Exhibit 4769C.

18          This is a string of text messages between yourself and

19 Michelle Morton, true?

20          MR. QUIGLEY:  Objection.

21          THE COURT:  Just one second.

22          All right.  You can answer that.

23 A.  You know, I don't know her telephone off by heart, so I

24 have to assume that this is her telephone number or not.

25 Q.  Well, do you recognize this as a transcript of your text

1    conversations with Michelle Morton?  We can flip the pages if

2    you'd like.

3            Can you show him the next page, please, and the next

4    page.

5            Do you recognize that as your text messages with

6    Michelle Morton?

7    A.   Yeah, but they're representative of.  You know, I don't

8    specifically remember these ones, but they're representative.

9            MR. SCHWARTZ:  I offer this exhibit.

10           MR. QUIGLEY:  We object, your Honor.

11           THE COURT:  Let's just have a sidebar.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. QUIGLEY:  So we object.  It's the same, even more

3    so than Mr. Schwartz tried to do with Mr. Anderson in GX1344.

4    There is a lot of joking, innuendo in these exhibits -- in this

5    exhibit.  Frankly, most of it comes from Ms. Morton.

6          You know, this is not something we got advanced notice

7    of.  In fact, Mr. Schwartz refused to stip to the authenticity

8    of her phone.  So, we could have worked this out beforehand,

9    and we're getting sandbagged with it now if there is indeed a

10   relevant portion, but I mean, she gives him -- there is a lot

11   of back and forth.  I think frankly most of it is Ms. Morton,

12   she engages in similar conversations with Jason Galanis, but

13   she gives him -- calls him Huge Dickerly; she makes jokes about

14   making English food like spotted dick.  It's just a ton of --

15   it's also obviously not impeachment of Mr. Dunkerley, because

16   he has agreed that he had a joking relationship with her and

17   she was someone who liked to joke, so we don't see the

18   relevance of it.

19         MR. SCHWARTZ:  So, first of all, I will say this

20   exhibit is identical to what they have marked as Government

21   Exhibit 3004C.  I just put a defense exhibit sticker on it.  I

22   heard your Honor's ruling about the porn name, so I'm not going

23   to go into any of that stuff, but there are other parts of

24   those communications, and we can clean up the final exhibit

25   where he tells her, you know, he will follow all of her orders

1    and things like that, that's directly relevant to the course of

2    communications about the bonds.

3         MS. MERMELSTEIN:  So, are you saying that you are not

4    offering this for impeachment?  Because you agreed to give us

5    everything that was not impeachment, and you didn't give us

6    this.

7         MR. SCHWARTZ:  I said that I am offering this for a

8    variety of purposes --

9

10        MS. MERMELSTEIN:  Are you going to impeach him in any

11   fashion?

12        MR. SCHWARTZ:  -- including to show the nature of

13   their relationship.

14        MS. MERMELSTEIN:  Which does not impeach his testimony

15   since he's agreed to it.

16        MR. SCHWARTZ:  OK.

17        MS. MERMELSTEIN:  So you agree it's not for

18   impeachment.

19        MR. SCHWARTZ:  The use that I'm using it right this

20   second is not for impeachment.

21        THE COURT:  So, if you want to take out the sexual

22   innuendos, what's left that you want to admit?

23        MR. SCHWARTZ:  I mean a bunch of stuff.  So why don't

24   I do this.  Why don't I do it just showing him the exhibit

25   without admitting the exhibit, and then we can clean it up and

I657GAL6                          Dunkerley – Cross

1    show it later, so we can just move on.

2              THE COURT:  OK, so I will rule on it later.

3              MR. SCHWARTZ:  Yes.

4              THE COURT:  You can show it to him, but I don't want

5    you to go through everything that's in it with him.

6              MR. SCHWARTZ:  I mean I understand.

7              THE COURT:  OK.

8              MR. SCHWARTZ:

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I657GAL6                         Dunkerley – Cross

1              (In open court)

2     BY MR. SCHWARTZ:

3     Q.  Mr. Jackson, turn to page 7 of this document.

4              You refer to yourself in conversations with Michelle

5     Morton as talking to her as your humble servant, correct?

6     A.  Page 7?  I can't see that.

7     Q.  Well, do you recall -- just putting the document aside for

8     a second, do you recall referring to yourself as "my humble

9     servant" when communicating with Michelle Morton?

10    A.  I don't immediately recall that, no.

11    Q.  OK.  We can come back to that.  And you knew that during

12    this period of time Jason Galanis was also in regular contact

13    with Michelle Morton, correct?

14    A.  Yes.

15    Q.  And in your communications with Michelle Morton you or she

16    would often say to each other, well, that's something we need

17    to bring to Jason Galanis, correct?

18    A.  Yes.

19    Q.  And between the three of you, you discussed various aspects

20    of the AAM, Atlantic Asset Management, acquisition, true?

21    A.  Yes.

22    Q.  And the issuance of the WLCC bonds, correct?

23    A.  Yes.

24    Q.  Those were not things that you ever discussed with Mr.

25    Archer, true?

I657GAL6                         Dunkerley - Cross

1    A.  I'm sorry.  Which part of your question?  So did I discuss

2    the acquisition of Atlantic with Mr. Archer on a conference

3    call and stuff like that?

4    Q.  Right.

5    A.  Yes.

6    Q.  Well, we went through a moment ago that that acquisition

7    was only approved at the Wealth Assurance AG level, correct?

8    A.  Yes, but I still believe it came up on other conference

9    calls even though it was only approved at that level, so it was

10   well known.

11   Q.  Well, I'm not saying it's a secret.

12   A.  Right.

13   Q.  It was approved at the Wealth Assurance AG level, true?

14   A.  Yes.

15   Q.  And Mr. Archer was not a member of the Wealth Assurance AG

16   board, correct?

17   A.  True.

18   Q.  And, in any case, you did not ever discuss the WLCC bonds

19   with Mr. Archer.

20   A.  No.  Well, again, Mr. Archer was on the investment

21   committee of Burnham Securities, so, yes, I did discuss the

22   bonds with him and the investment committee of Burnham

23   Securities, so yes.

24   Q.  We're going to get to that.

25   A.  Sorry.

I657GAL6                           Dunkerley – Cross

1    Q.  But what you're referring to is when Burnham Securities,

2    Inc. agreed to be the placement agent for the bonds, correct?

3    A.  Yes.

4    Q.  And that was with the entire investment committee, is your

5    testimony, right?

6    A.  Yes.

7    Q.  And there was no discussion there about Wealth Assurance

8    Private Client misappropriating the funds, correct?

9    A.  Correct.

10   Q.  And the idea of you and Gary Hirst and Jason Galanis

11   controlling Wealth Assurance Private Client didn't come up on

12   that phone call, correct?

13   A.  Correct.

14   Q.  And in fact Mr. Archer was not on that phone call, was he?

15   A.  On the investment committee phone call?  He was in the

16   investment committee; he was in the meeting.

17   Q.  He was on the investment committee for Burnham Securities,

18   Incorporated, correct?

19   A.  Correct.

20   Q.  He was not at any investment committee meeting at which the

21   WLCC bond issuance was approved; isn't that correct?

22   A.  You know, I would need something to refresh my memory on

23   that, because I believe that he was part of the investment

24   committee on all of those calls.

25   Q.  You don't recall that particular one; is that right?

I657GAL6                    Dunkerley - Cross

1    A.  I don't specifically recall it, but the investment

2    committee was the investment committee that always met to

3    approve those deals.

4    Q.  Right.

5    A.  And he was part of that investment committee.

6    Q.  Now, he was part of a committee, and that committee

7    approved the issuance, correct?

8    A.  Yes.

9    Q.  You don't recall specifically him being part of the meeting

10   at which the WLCC bonds were approved, true?

11   A.  I don't understand what the difference is in your question.

12   Q.  Really?

13   A.  Yeah.

14   Q.  You don't understand the difference between being part of

15   something and being there every time they do something?

16   A.  Well, yes, I understand that, but --

17   Q.  For example, you were a member of the board of directors of

18   many companies, correct?

19   A.  Yes.

20   Q.  Did you ever miss a board meeting?

21   A.  Yes.

22   Q.  Right.  And when you missed a board meeting, the board

23   could still take action, correct?

24   A.  Correct.

25   Q.  Right.  And on those occasions, the board of a company --

I657GAL6                    Dunkerley - Cross

1    of which you were a member -- had approved an action, true?

2    A.   Yes.

3    Q.   Even though you weren't there, right?

4    A.   Yes.

5    Q.   And so you would agree with me that even though the Burnham

6    Securities Incorporated investment committee approved the WLCC

7    bond issuance, you do not recall specifically Mr. Archer being

8    at that meeting, true?

9    A.   No, not true.  I thought he was at that meeting.

10   Q.   And there are no minutes for that, correct?

11   A.   There might be, but I don't know of them.

12   Q.   OK.  Now, you testified previously that Burnham Financial

13   Group was the parent of Burnham Securities, Inc. and Burnham

14   Asset Management, correct?

15   A.   Yes.

16   Q.   And we looked at this before, Government Exhibit 4002.  And

17   I think you and I agreed before that this reflects the

18   ownership structure of the Burnham Financial Group when it was

19   owned by the Burnham family, true?

20   A.   Yes.

21   Q.   This is, for lack of a better term, the before, correct?

22   A.   Yes.

23   Q.   And the ownership structure changed over time, correct?

24   A.   Correct.

25   Q.   And in particular as the entities in the Burnham Financial

1    Group were incorporated into this roll-up plan, this ownership

2    structure changed quite a bit; isn't that correct?

3    A.  Yes.

4    Q.  I want to show you now --

5           You can take that down and show it to the witness, the

6    lawyers and the Judge.

7           -- Defense Exhibit 4027.  You recognize this as the as

8    the operating agreement for BAM Holdings LLC, correct?

9    A.  Yes.

10   Q.  And what this document says is that a new company called

11   BAM Holdings LLC was going to acquire Burnham Asset Management,

12   correct?

13   A.  Correct.

14   Q.  And can we go to page 9.  I'm sorry, I offer this exhibit.

15          MR. QUIGLEY:  We have no objection.

16          THE COURT:  It will be admitted.

17          (Defendant's Exhibit 4027 received in evidence)

18   Q.  Can we go to page 9, please, Mr. Jackson.

19          You see there are signatures of various people.  There

20   is Mr. Archer, correct?

21   A.  Yes.

22   Q.  There is someone named Larry Liu, correct?

23   A.  His signature is not there, but he is there in name, yes.

24   Q.  And there is someone named Nurlan Abduov, correct?

25   A.  Yes.

I657GAL6                        Dunkerley – Cross

1   Q.  There is Andrew Godfrey, correct?

2   A.  Yes.

3   Q.  Jon Burnham, correct?

4   A.  Yes.

5   Q.  And, Mr. Jackson, can you just flip the pages so the jury

6   can see that everybody signed.

7           Right there you see the signatures of Mr. Burnham and

8   Larry Liu, true?

9   A.  Yes.

10  Q.  And flip to the next page, there is Mr. Godfrey, and Jon

11  Burnham again, true?

12  A.  Yes.

13  Q.  Flip to the next page.  And this reflects the memberships

14  of BAM Holdings, correct?

15  A.  Yes.

16  Q.  By the way, these were the investors that you testified

17  about on direct, correct?

18  A.  Sorry.  What did I testify?  Can you just rephrase the

19  question a little bit.

20  Q.  Well, let me withdraw that.

21          These individuals who signed, they were investing in

22  Burnham Financial -- Burnham Asset Management, true?

23  A.  Yes.

24  Q.  And you knew that some of these people were investors that

25  Mr. Archer had brought into the deal, true?

I657GAL6                          Dunkerley - Cross

1    A.  Yes.

2    Q.  You knew that Larry Liu was someone that Mr. Archer had

3    brought into the deal, correct?

4    A.  No, that's incorrect.  Daniel McClory brought Larry Liu

5    into the transaction.

6    Q.  And you knew that Nurlan Abduov was someone that Mr. Archer

7    had brought into the deal, correct?

8    A.  Actually, I didn't know that.

9    Q.  Well, who is it that you knew Mr. Archer had brought into

10   the deal?

11   A.  In that he had met all of these people but no one

12   specifically.  I didn't know -- sorry.  So, I didn't

13   specifically know that Mr. Archer had brought anyone into this

14   deal.

15   Q.  OK, you can take that down.

16        By the way, you were the one who introduced Dan

17   McClory to Burnham Securities, correct?

18   A.  Yes.

19   Q.  And he worked with you, you said, at the Irvine office,

20   true?

21   A.  True.

22   Q.  And the Irvine office was only a Burnham Securities, Inc.

23   office, right?

24   A.  True.

25   Q.  There was no Burnham Asset Management presence over there,

I657GAL6                    Dunkerley - Cross

1    true?

2    A.   True.

3    Q.   I think you told us you didn't have anything to do with

4    Burnham Asset Management.

5    A.   True.

6    Q.   Now, the Burnham offices in Manhattan, we talked about that

7    before; they were on 57th Street, true, at a point?

8    A.   Yeah, they came on to 57th Street, yes.

9    Q.   And I think you told us that at a point there were, you

10   know, 100 employees at Burnham's New York offices.

11   A.   By my estimate, yes.

12   Q.   And Jason Galanis was there from time to time?

13   A.   Yes.

14   Q.   And that wasn't a secret, right?

15   A.   That was no secret, correct.

16   Q.   And I think you testified that Hunter Biden had an office

17   there, correct?

18   A.   Yes.

19   Q.   Did you have an office there?

20   A.   No.

21   Q.   I want to talk about Jason Galanis for just one second.

22            And can we pull up Defense Exhibit 4907 in evidence.

23            That's Mr. Galanis, true?

24   A.   That is Mr. Galanis.

25   Q.   And I'm not going to go over it again, but you've testified

I657GAL6                        Dunkerley - Cross

1   at length about how he appeared to be a wealthy and successful

2   person, right?

3   A.   Correct.

4   Q.   I do have one question.  You told us before that he and his

5   wife had Bentleys, right?

6   A.   Yes.

7   Q.   And at one point he traded in a Bentley as something you

8   described as a super Bentley, right?

9            MR. QUIGLEY:  Objection to relevance.

10           THE COURT:  The objection was?

11           MR. QUIGLEY:  Relevance.

12           THE COURT:  Yeah.

13           MR. SCHWARTZ:  I just wanted to know what a super

14   Bentley was.

15           THE COURT:  Sustained.

16           MR. QUIGLEY:  Same objection.

17           MR. SCHWARTZ:  That's fine.  I will withdraw that.

18   Q.   You knew that Jason Galanis along with Jason Sugarman had

19   sold a hotel in Miami, true?

20   A.   Yes.

21   Q.   And that had resulted in a commission of more than $1

22   million?

23           MR. QUIGLEY:  Objection, relevance.

24   A.   Yes.

25           THE COURT:  Sustained.

I657GAL6                    Dunkerley - Cross

1    Q.  And you knew -- you testified on direct about something

2    called Aman Resorts, correct?

3    A.  Yes.

4    Q.  And Aman Resorts was a large hotel company, correct?

5    A.  Yes.

6    Q.  It had assets of between $500 million and $1 billion,

7    correct?

8    A.  Yes.

9    Q.  And you knew that Jason Galanis along with a man named Omar

10   Amanat was going to purchase Aman Resorts, correct?  That was

11   their plan.

12   A.  Their plan was to purchase it out of bankruptcy, correct.

13   Q.  And they were going to use your company, Fondinvest, to do

14   that, correct?

15   A.  Yes.

16   Q.  And that was -- that was a deal that real estate deal that

17   Jason Galanis had arranged, true?

18   A.  True.

19            THE COURT:  Mr. Schwartz, just tell us when would be a

20   good time for a break, please.

21            MR. SCHWARTZ:  Sure, this would be an excellent time.

22            THE COURT:  OK.  So why don't we take our afternoon

23   break.  Please don't discuss the case and keep an open mind.

24   Thank you.

25            (Recess)

I657GAL6                    Dunkerley - Cross

1          (Jury present)

2          MR. SCHWARTZ:  Thank you, your Honor.

3    HUGH DUNKERLEY, resumed.

4    CROSS-EXAMINATION (Continued0

5    BY MR. SCHWARTZ:

6    Q.  Mr. Dunkerley, a second ago we were talking about the

7    Burnham Securities, Inc. commitment committee meeting.

8    A.   Investment committee meeting.

9    Q.   Investment committee meeting in connection with the first

10   WLCC bond issuance, correct?

11   A.   Yes.

12   Q.   Are you sure there was such a meeting?

13   A.   Absolutely.

14   Q.   I want to show you -- you can bring this up on the witness,

15   the lawyers and Judge Abrams' screen.

16          Defense Exhibit 4131.  Who was Rachel Golodetz?

17   A.   She was an assistant analyst at Burnham Securities, Inc.

18   Q.   And if you go to the second page of this, she was

19   responsible for handling much of the paperwork associated with

20   commitment -- investment committee issues, correct?

21   A.   Investment committee issues and transactions in general,

22   yes.

23   Q.   Go back to page 1.  This is an e-mail chain between

24   yourself and Ms. Golodetz, true?

25   A.   Yes.

I657GAL6                    Dunkerley − Cross

1          MR. SCHWARTZ:  I move Defense Exhibit 4131 into

2    evidence.

3          MR. QUIGLEY:  Objection to hearsay.

4          MR. SCHWARTZ:  It's for impeachment.

5          THE COURT:  Why don't we meet at sidebar.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I657GAL6                    Dunkerley - Cross

1             (At the sidebar)

2             THE COURT:  Can you explain how this is for

3    impeachment?

4             MR. SCHWARTZ:  Sure.  If you look at this e-mail she

5    is making note of the placement agent fee that BSI received in

6    connection with the first bond issuance, and she says, you

7    know, it's great to get the money but there was no investment

8    committee meeting in front of this.

9             By the way, this is the exact same e-mail that had the

10   stuff about Indian moccasins above it, and I said at the time I

11   was going to use it with the Indian moccasin stuff redacted.

12            MR. QUIGLEY:  Right.  We said we reserved the right to

13   object on hearsay grounds.  I don't think it's for impeachment.

14   It's not his prior inconsistency.  And she doesn't say -- I

15   mean you can interpret the e-mail any way you want.  She has a

16   little smiley face.  I remember the investment committee.  But

17   he can't impeachment with extrinsic evidence of -- it's not his

18   statement.  It's not a prior inconsistent statement.

19            MR. SCHWARTZ:  It's an e-mail chain that he is on in

20   which they're joking about the fact that there was no

21   investment committee meeting.

22            MS. MERMELSTEIN:  That's your interpretation.  She

23   says she doesn't remember the meeting.  Then call her as a

24   witness.

25            MR. QUIGLEY:  You can cross him on it, but you can't

I657GAL6                      Dunkerley - Cross

use the document.

            THE COURT:  I agree you can cross him on it, but I
don't think you should introduce the document.

            MR. SCHWARTZ:  That's fair, but I mean as a general
matter impeachment is a proper nonhearsay use for a document,
so I don't understand the objection to introducing the
document.

            MR. QUIGLEY:  It's not --

            MR. SCHWARTZ:  It's very hard to cross him on this
document without referencing the contents of the
communications.  I mean I can ask him didn't Rachel tell you
this and, you know, when he says I don't remember, say does
this refresh your recollection, but --

            THE COURT:  I think you should do that.

            MR. SCHWARTZ:  OK, that's fine.

            (Continued on next page)

I657GAL6                         Dunkerley – Cross

1                   (In open court)

2     BY MR. SCHWARTZ:

3     Q.  Mr. Dunkerley, Burnham Securities, Inc. received a $250,000

4     fee for being the placement agent on the first bond issuance,

5     correct?

6     A.  Correct.

7     Q.  And that was in late August 2014, true?

8     A.  True.

9     Q.  And do you recall when the wire for the $250,000 placement

10    agent fee hit BSI, Rachel Golodetz told you, "I don't remember

11    the committee call for this"?

12    A.  She told me?

13                  (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I65JGAL7                    Dunkerley - cross

1    Q.  Expressed to you, "I don't remember the committee call for

2    this"?

3    A.  Yes.

4    Q.  And that is because there was not a committee call?

5    A.  No, that is not the case.  She did not attend all of the

6    committee calls for all instances.

7    Q.  So she was not at that investment committee meeting, true?

8    A.  She said she doesn't remember it, so I assume she wasn't,

9    yes.

10         MR. SCHWARTZ:  You can take that down.  I want to show

11   just to the witness, the Judge and the lawyers Defense Exhibit

12   4910.

13   Q.  Do you recognize this as a pucture of Sebastian Momtazi?

14   A.  No, I don't, either.

15         MR. SCHWARTZ:  You can take that down, Mr. Jackson.

16   Q.  Do you recall Mr. Momtazi would sometimes impersonate

17   Mr. Archer on phone calls?

18   A.  Absolutely not.

19   Q.  The investment committee meeting you were describing, by

20   the way, that was -- there is nothing improper discussed on

21   that call, correct, or at that meeting?

22   A.  What do you mean by, "improper"?

23   Q.  You were discussing approval to act as placement agent for

24   the first WLCC bond issuance, correct?

25   A.  Yes.

I65JGAL7                          Dunkerley - cross

1   Q.  And as far as you knew at that time, there was nothing

2   improper about the bonds, true?

3   A.  True.

4   Q.  And there was nothing inappropriate discussed during that

5   meeting, correct?

6   A.  True.

7   Q.  Certainly there was no discussion of misappropriating the

8   bond proceeds?

9   A.  Absolutely not.

10  Q.  No one even hinted at that, right?

11  A.  There was nothing like that.

12  Q.  Now, you often met with Jason Galanis, true?

13  A.  Yes.

14  Q.  You met with him at his home, right?

15  A.  Yes.

16  Q.  Sometimes you met with him at the offices of COR

17  International?

18  A.  Camden and COR Capital, yes.

19  Q.  Jason Galanis' offices?

20  A.  Yes.

21  Q.  And you had a close relationship with Jason Galanis, true?

22  A.  Yes.

23  Q.  Is it fair to say that you would have done anything that he

24  asked?

25  A.  Not absolutely anything, but quite a lot.

I65JGAL7                    Dunkerley – cross

1    Q.  I want to show you what has been marked as defense Exhibit

2    4787.  These are your text messages with Jason Galanis, true?

3    A.  Yes, that is true.

4              MR. SCHWARTZ:  I offer Defense Exhibit 4787.

5              MR. QUIGLEY:  Objection, your Honor.

6              THE COURT:  Relevance?

7              MR. QUIGLEY:  Relevance.

8              MR. SCHWARTZ:  Can we go to Page 3.  Back one.  Yep,

9    there you go, right in the middle of the page.

10             MR. QUIGLEY:  Your Honor, may we approach?

11             THE COURT:  Yes.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (At sidebar)

2       MR. SCHWARTZ:  I'll offer just that one page.

3       MR. QUIGLEY:  If you want to ask him did you ever

4  say --

5       MR. SCHWARTZ:  No.  I asked him that and he said no.

6  Now I am impeaching him.

7       MR. QUIGLEY:  You never asked him that.

8       MR. SCHWARTZ:  I asked him would he do anything.  He

9  said not anything.  In the text, "I would do anything."

10       THE COURT:  Redact that statement from the whole page,

11  that statement.

12       MR. SCHWARTZ:  Redact the rest?

13       THE COURT:  Yes.

14       MR. SCHWARTZ:  Fine.

15       (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I65JGAL7                          Dunkerley - cross

1              (In open court)

2              MR. SCHWARTZ:  Mr. Jackson, can I ask you to blow up

3      just the fourth bubble on the right side.  Is there a way to

4      obscure the rest of the page?  (Pause)

5              I offer this as Defense Exhibit 4787, your Honor.

6              THE COURT:  Yes.

7              MR. QUIGLEY:  No objection.

8              THE COURT:  That is admitted.

9              (Defendant's Exhibit 4787 received in evidence)

10             MR. SCHWARTZ:  Would you publish this, please,

11     Mr. Jackson.

12     Q.  That is a text from you to Jason Galanis, true?

13     A.  Yes.

14     Q.  And you said, "And you know I'll do anything you ask,"

15     right?

16     A.  In a corporate context, yes.

17     Q.  In a corporate context, correct?

18     A.  Correct.  If he said jump in a fire, I wouldn't jump in a

19     fire.

20     Q.  If he told you to do a transaction, you would do a

21     transaction, true?

22     A.  Yes.

23     Q.  Even if it was a fraudulent transaction?

24     A.  Yes.

25     Q.  You referred to him as your quarterback, right?

I65JGAL7                          Dunkerley - cross

1    A.  Yes.

2    Q.  You were the wide receiver, right?

3    A.  Yes.

4    Q.  And you told him that you only took directions from him,

5    true?

6    A.  True.

7    Q.  He told you that he wouldn't ever abandon you ever, ever,

8    true?

9    A.  True.

10   Q.  And you said thanks, same goes for me, right?

11   A.  Right.

12   Q.  And you referred to him as your brother in love and war,

13   correct?

14   A.  Probably, yes.

15   Q.  Actually, your brother in Leavenworth, true?

16        Now, at some of these meetings that you had with Jason

17   Galanis, you would draw or Jason Galanis would, excuse me, draw

18   out plans on white boards, right?

19   A.  Yes.

20   Q.  And he would basically use white boards to brainstorm

21   different things that he could do with the various companies,

22   correct?

23   A.  Yes.

24   Q.  And generally where were these white boarding sessions

25   held?

1   A.  I think the ones you're referring to in his house.

2   Q.  And how often did they take place?

3   A.  Many in the summer of 2015, I believe.

4   Q.  Weren't there also white boarding sessions much earlier?

5   A.  Yes, but they happened in COR offices, Camden offices,

6   offices.

7   Q.  For those earlier white boarding sessions, sometimes other

8   people would be present, correct?

9   A.  Yes.

10  Q.  Jason Sugarman sometimes, true?

11  A.  True.

12  Q.  For the later white boarding sessions, was it just you and

13  Jason Galanis?

14  A.  Yes.

15  Q.  The purpose of the later white boarding sessions was really

16  to figure out how you were going to get out of this mess, true?

17  A.  Basically, yes.

18  Q.  That was after you knew that the government was

19  investigating, true?

20  A.  Yes.

21  Q.  And that's where Jason Galanis cooked up some of his

22  efforts to cover up his crimes, true?

23  A.  True.

24  Q.  The earlier white boarding sessions that were at Camden and

25  other places, they were about potential corporate transactions,

I65JGAL7                    Dunkerley - cross

1    right?

2    A.  Yes.

3    Q.  And is it fair to say that even those earlier corporate

4    transactions, those earlier white boarding sessions did not

5    result in any legitimate outcomes?

6    A.  Didn't result in any legitimate outcomes?

7    Q.  Yes.

8    A.  I'm confused by your question.

9    Q.  Do you recall in particular a session that you had where

10   Jason Galanis and Lucas Mann were present at Steven Sugarman's

11   house?

12   A.  Yes.

13   Q.  At that particular session, nothing legitimate came out of

14   that white boarding session, did it?

15   A.  Correct, but you're talking about so many different white

16   boarding sessions in one thing.  You need to be a little bit

17   more specific which white boarding session you're talking

18   about, but that white boarding session, correct, no business

19   came out of that.  In fact, there was no white board in that

20   particular meeting, so again it is hard for me to quite

21   understand your question.

22   Q.  Fair enough.

23           Did Jason Galanis brainstorm aspects of the WLCC bond

24   scheme at any of these white boarding sessions?

25           MR. TOUGER:  By the way, could you speak louder?  We

I65JGAL7                          Dunkerley - cross

1    have lost the transcription here.

2    BY MR. SCHWARTZ:

3    Q.  My question was did Jason Galanis brainstorm any aspects of

4    the WLCC bond scheme at any of these white boarding sessions?

5    A.  Yes.

6              MR. SCHWARTZ:  I just want to look at some of these.

7    Can we pull up Exhibit 1700 just for the witness and the

8    lawyers and Judge Abrams.

9    Q.  Do you recognize this to be a picture that you took of one

10   of the early white boarding sessions?

11   A.  Yes.

12             MR. SCHWARTZ:  I offer Defense Exhibit 1700.

13             MR. QUIGLEY:  No objection.

14             THE COURT:  It will be admitted.

15             (Defendant's Exhibit 1700 received in evidence)

16   BY MR. SCHWARTZ:

17   Q.  Fair to say most of the handwriting here is Jason Galanis'?

18   A.  Half of it is, yes.

19   Q.  Who is the other half?

20   A.  I think it is Jason Sugarman's.

21   Q.  You see in the middle there there is FV in a box?

22   A.  Yes.

23   Q.  That is a reference to Forces Vives you testified about,

24   true?

25   A.  Absolutely true, yes.

I65JGAL7                        Dunkerley - cross

1    Q.  What is depicted here is the potential structure for an

2    acquisition of Forces Vives through a new Forces Vives

3    Holdings, which would ultimately be owned by COR Capital and

4    COR International, true?

5    A.  Yes.

6             MR. SCHWARTZ:  You can take this down and can bring up

7    for the witness the judge and the lawyers Exhibit 1701.

8    Q.  This is another picture of a white board that you took,

9    correct?

10   A.  Yes.

11   Q.  This appears to be in a different physical location.  Is

12   that true?

13   A.  It is.

14   Q.  Do you recall where this one is?

15   A.  9595 Wilshire Boulevard.

16   Q.  What was that address?

17   A.  So that's the address 9595 Wilshire Boulevard and the

18   actual office space is for the Banc of California holding

19   company.

20   Q.  This depicts various things, including over on the right

21   side BFG for Burnham Financial Group, correct?

22   A.  Yes.

23   Q.  And BSI, Burnham Securities underneath it, true?

24   A.  Yes, yes.

25   Q.  And BSM, Burnham Asset Management, true?

1    A.  Yes.

2    Q.  CCI, correct?

3    A.  Correct.

4    Q.  That is a reference to COR Clearing International?

5    A.  Yes.

6    Q.  And at that time the idea was COR Clearing was going to

7    become part of the Burnham Financial Group in that structure,

8    correct?

9    A.  I think that was the proposal, yes.

10   Q.  Look at one more -- before I do, I am sorry.  I offer

11   Exhibit 1701.

12            MR. QUIGLEY:  We have no objection.

13            THE COURT:  It will be admitted.

14            (Defendant's Exhibit 1701 received in evidence)

15            MR. SCHWARTZ:  Can we show that to the jury for a

16   minute.  (Pause)  You can take that down and can we show Mr.

17   Dunkerley, Judge Abrams and the lawyers Exhibit 1702.

18            (Pause)

19   Q.  This is another picture of a white board that you took,

20   true?

21   A.  Yes.

22   Q.  Where was this one taken?

23   A.  I believe in the same location, 9595 Wilshire Boulevard.

24            MR. SCHWARTZ:  I offer Exhibit 1702.

25            MR. QUIGLEY:  No objection.

1           THE COURT:  Admitted.

2           (Defendant's Exhibit 1702 received in evidence)

3    BY MR. SCHWARTZ:

4    Q.  And this refers to something called ISRB in the middle; do

5    you see that?

6    A.  Yes.

7    Q.  What is that?

8    A.  It is called Inspired Builders.  It is the name for a

9    publicly-traded company that goes by the name Inspired

10   Builders.

11   Q.  What is the name?

12   A.  Inspired Builders.

13   Q.  Builders?

14   A.  Builders, yes, a construction company.

15   Q.  A construction company, right?

16           And Jason Galanis and Jason Sugarman were talking

17   about an investment into this construction company, true?

18   A.  I believe they had already made, had an investment in

19   the --

20   Q.  There is a dotted line to, quote-unquote, Rosemont, right?

21   A.  Yes.

22   Q.  Not any particular Rosemont entity, right?

23   A.  No.

24   Q.  Mr. Archer was never involved in these white boarding

25   sessions, true?

I65JGAL7                         Dunkerley - cross

1    A.  Correct.

2            MR. QUIGLEY:  Objection.

3            THE COURT:  Overruled.  You were involved with at

4    least?

5            THE WITNESS:  Correct.

6            THE COURT:  Right.

7            MR. SCHWARTZ:  You can take that down, please,

8    Mr. Jackson.

9    Q.  I want to talk now about the second WLCC bond offering,

10   okay?

11   A.  Yes.

12   Q.  This is the one that was ultimately purchased by Rosemont

13   Seneca Bohai, LLC and by Bevan Cooney, true?

14   A.  True.

15   Q.  The original idea, though, that Jason Galanis had was that

16   the second series of bonds would also be placed with customers

17   of Hughes or Atlantic, true?

18   A.  I actually don't know.

19   Q.  Do you recall having a conversation with Michelle Morton

20   about Atlantic accepting the second series of bonds on behalf

21   of its customers in October 2014?

22   A.  If there was something to refresh my recollection, but I

23   don't specifically remember having the conversation.

24   Q.  Do you recall that you offered her as a fee $400,000 to

25   place those bonds with her customers?

1    A.  Again if there is something that you can help me to remind

2    me, but otherwise I don't remember that.

3              MR. SCHWARTZ:  Sure.  Can we pull up just for the

4    witness, the Judge and the lawyers 3508-8, at 3.  If we can

5    blow up the last few bullets, please.

6    Q.  Does this refresh your recollection that you had a

7    conversation with Michelle Morton in which you asked Atlantic

8    to accept the second series of bonds and offered her $400,000,

9    and she said no thank you?

10   A.  I don't believe I had that conversation with her.

11   Q.  So it doesn't refresh your recollection?

12   A.  Correct.

13   Q.  You can take that down.

14             Now, in any case, Atlantic did not buy the second

15   series of bonds, right?

16   A.  Correct.

17   Q.  I want to talk now about the money that was used by

18   Rosemont Seneca Bohai to purchase the second series of bonds,

19   okay?

20   A.  Yes.

21   Q.  As we discussed, you and Gary Hirst had control over and

22   visibility into the Wealth Assurance Private Client Corporation

23   bank accounts, right?

24   A.  Yes.

25   Q.  You told the government in one of your interviews that Gary

1    Hirst performed a $15 million transfer in connection with the

2    second bond deal, true?

3    A.  I believe so, yes.

4    Q.  It was actually you who did that transfer, true?

5    A.  Sometimes I get confused between who did the transfers, but

6    the transfer was made from WAPC to Thorsdale $15 million,

7    correct.

8    Q.  You don't remember that particular one?

9    A.  There were so many transfers, sometimes it is difficult to

10   remember.

11   Q.  You testified on direct about that specific transaction.

12          Do you remember Mr. Quigley asked you if it was an

13   electronic transfer?

14   A.  I do remember that, and I do remember the $15 million, and

15   I did make that transfer, yes.

16   Q.  And it was a cash transfer, wasn't it?

17   A.  Electronic wire, yes.

18   Q.  No.  It was a cash transfer, wasn't it?

19   A.  Well, an electronic wire.

20   Q.  Let's look at Exhibit 510 in evidence.  Go to Page 32.

21          This is a deposit slip for $15 million into the

22   account of Thorsdale Fiduciary & Guaranty Company Limited,

23   correct?

24   A.  Correct.

25   Q.  And was this deposit of $15 million into the Thorsdale

1  account the one we have been talking about?

2  A.  Yes.

3          MR. QUIGLEY:  We don't have any objection to

4  Government Exhibit 510 coming in.

5          MR. SCHWARTZ:  I offer 510.

6          THE COURT:  It will be admitted.

7          (Defendant's Exhibit 510 received in evidence)

8  BY MR. SCHWARTZ:

9  Q.  Now I want to show you and for a moment just for the

10 witness, the lawyers and the Judge, Government Exhibit 565.  Go

11 to Page 2.  I offer this exhibit.

12         MR. QUIGLEY:  It is already in evidence.

13         THE COURT:  Excuse me?

14         MR. QUIGLEY:  This is already in evidence.

15         THE COURT:  All right.

16         MR. QUIGLEY:  So is Exhibit 565.

17         MR. SCHWARTZ:  Can you publish this, please,

18 Mr. Jackson.

19 BY MR. SCHWARTZ:

20 Q.  This is a withdrawal slip signed by you, correct?

21 A.  Correct.

22 Q.  So this is documentation of that $15 million that was

23 withdrawn from the Wealth Assurance Private Client account and

24 transferred to the Thorsdale account, correct?

25 A.  Yes.

I65JGAL7                    Dunkerley – cross

Q.  Again Thorsdale was the Trust & Guaranty Company for Jason
Galanis, correct?

A.  Yes.

Q.  Now I want to look at Government Exhibit 522 in evidence.

          MR. QUIGLEY:  It is actually not in evidence.

          MR. SCHWARTZ:  No.  I offer Government Exhibit 522.

          THE COURT:  It will be admitted.

          (Government's Exhibit 522 received in evidence)

BY MR. SCHWARTZ:

Q.  This is a bank account statement for Thorsdale Fiduciary &
Guaranty Company, true?

A.  Yes.

Q.  This is not a bank account that you ever had direct access
or control over, correct?

A.  Correct.

Q.  You didn't know what was happening inside this bank
account, true?

A.  Correct.

Q.  Can we go to Page 6 of this.  I am on the wrong page.  Why
don't you take this down.  We'll come back to this after I
straighten that out.

          I want to talk to you now about the money that you
made, okay?

A.  Yes.

Q.  Now, did you tell the government that you never received

1   wires from Jason Galanis or related entities as part payment?

2   A.  No.  I received some payments and wires from Jason Galanis.

3   Q.  I am sorry.  I didn't hear that?

4   A.  I received some money from Jason Galanis at different

5   points in time.

6   Q.  Didn't you tell the government that all payments were

7   reflected on W-2s?

8   A.  So my general employment status, I was an employee of all

9   these firms and I had W-2s.  There were some payments that were

10  made outside of that scenario.  They weren't material in size,

11  but there were some.

12  Q.  Just to take you through them, at COR Capital you earned

13  $150,000, approximately, true?

14  A.  Yes.

15  Q.  Then you received 150,000 as the placement agent for the

16  first WLCC bond issuance, correct?

17  A.  I received 125,000 cash of the $150,000 fee.

18  Q.  I am sorry.  Say that one more time.

19  A.  I received $125,000 payment of a $250,000 fee.

20  Q.  The other half went to Burnham Securities, Inc., correct?

21  A.  Yeah.

22  Q.  By the way, a man named Francisco Martin got paid $150,000

23  in connection with that issuance, too, correct?

24  A.  I believe so, yes.

25  Q.  And he was the investment manager associated with an entity

1    called Private Equity Management LLC, true?

2    A.  Yes.

3    Q.  The $125,000 that you received came directly out of the

4    proceeds of the WLCC bonds, true?

5              MR. QUIGLEY:  Objection.

6              THE COURT:  If you know?

7              THE WITNESS:  It was connected to the proceeds.  I

8    don't know for sure.

9    BY MR. SCHWARTZ:

10   Q.  Wasn't there a closing on the bonds?

11   A.  Yes.

12   Q.  When the bond closed, didn't Burnham Securities, Inc. take

13   its placement fee directly out of the bond proceeds?

14   A.  Yes.

15   Q.  You got half of it, correct?

16   A.  Yes.

17   Q.  You were also the CEO of a company called Insurance Company

18   of the Americas, correct?

19   A.  Yes.

20   Q.  That was a Gary Hirst company, was it not?

21   A.  Yes.

22             MR. SCHWARTZ:  By the way, I want to show you, the

23   witness, the lawyers and Judge Abrams Defense Exhibit 4917, a

24   picture.

25   Q.  Do you recognize that as Gary Hirst?

I65JGAL7                    Dunkerley - cross

1   A.  I do.

2           MR. SCHWARTZ:  I offer Defense Exhibit 4917.

3           MR. QUIGLEY:  No objection.

4           THE COURT:  It will be admitted.

5           (Defendant's Exhibit 4917 received in evidence)

6           MR. SCHWARTZ:  Would you show that, please, Mr.

7   Jackson.

8   Q.  So as CEO of Mr. Hirst's company, Insurance Company of the

9   Americas, you received a little bit more than $52,000, correct?

10  A.  That sounds about right, yes.

11  Q.  And then in connection with the second WLCC bond offering,

12  you got another fee of maybe seventy-five- or a

13  hundred-thousand dollars.  Is that right?

14  A.  I think so, yes.

15  Q.  Am I correct that Jason Galanis also paid off your personal

16  credit cards?

17  A.  There was a personal -- I took out a personal credit card,

18  and he ran up a considerable amount of money on it, so he paid

19  off the amount that he had spent on the card, correct.

20  Q.  He paid off the whole thing, right?

21  A.  Yes.

22  Q.  And that was about $250,000, true?

23  A.  No.  It was more like a hundred thousand dollars.

24  Q.  You received a salary from Fondinvest, true?

25  A.  Yes.

1    Q.  That was about 150,000 euros, correct?

2    A.  Yes.

3    Q.  You also received stock in Valor Group Limited, correct?

4    A.  Yes.

5    Q.  What did you receive that for?

6    A.  Being president of Valor Group.

7    Q.  That was part of your compensation?

8    A.  Yes.

9    Q.  And you received shares in COR International as well,

10   correct?

11   A.  Yes.

12   Q.  We went through that earlier, right?

13   A.  Yes.

14   Q.  You received wire transfers directly from Thorsdale

15   Fiduciary & Guaranty, true?

16   A.  Yes.

17   Q.  Right?

18   A.  Yes.

19   Q.  Tens of thousands of dollars, correct?

20   A.  Yes.

21   Q.  You received wires from Wealth Assurance Holdings, the

22   parent company, correct?

23   A.  I need my memory refreshed on that.  I actually don't

24   believe I ever got paid by Wealth Assurance Holdings.

25   Q.  Sure.  Let me just for the witness, the Judge and the

1    lawyers, show you Exhibit 539.  If you can go forward to the

2    May 2015 slip.  While he finds that, I'll ask you some other

3    questions, okay?  There it is.

4           Looking at three transactions down, does that refresh

5    your recollection that you received transfers from Wealth

6    Assurance Holdings?

7    A.  Yes, yes.

8    Q.  Jason Sugarman also received distributions from Wealth

9    Assurance, correct?

10   A.  Yes.

11   Q.  Jason Sugarman received distributions from Wealth Assurance

12   Private Client, correct?

13   A.  Yes.

14   Q.  He did it through various entities, correct?

15   A.  Yes.

16   Q.  Now, in addition to your salary at Fondinvest, you actually

17   sort of received the whole company, right?

18   A.  I effectively had control of the entity, yes.

19   Q.  Technically, you owned Fondinvest, correct?

20   A.  Technically, yes.

21   Q.  You were the majority owner of the a company called Newline

22   Trading, correct?

23   A.  Yes.

24   Q.  Which was a subsidiary, yes?

25   A.  It was the parent of Fondinvest, the SPV, special purpose

1   entity that bought fund invest.

2   Q.  Sorry.  I asked that backwards.  Fondinvest was owned by

3   Newline, correct?

4   A.  Correct.

5   Q.  And you were the majority holder of Newline, correct?

6   A.  Correct.

7   Q.  In addition to the personal credit card we talked about a

8   second ago, you had a Wealth Assurance American Express Card,

9   correct?

10  A.  Yes.

11  Q.  You used that Wealth Assurance American Express Card for

12  various personal expenses, true?

13  A.  So it was -- yes.

14  Q.  You used it for landscapers, true?

15  A.  No.  That is Jason Galanis.

16  Q.  You and Jason Galanis had separate cards from that account,

17  true?

18  A.  Yes.

19          MR. SCHWARTZ:  What is marked as Government Exhibit

20  4760 just for the witness and the lawyers and the Judge.

21  Q.  You recognize this as the American Express account

22  statement for December 2014 for the Wealth Assurance credit

23  card?

24  A.  Yes.

25          MR. SCHWARTZ:  I offer Exhibit 4760.

1    THE COURT:  Any objection?

2    MR. QUIGLEY:  No objection.

3    THE COURT:  It will be admitted.

4    (Defendant's Exhibit 4760 received in evidence)

5    MR. SCHWARTZ:  If you can publish this.  Mr. Jackson,

6    can you turn to the next page and the next page.

7    Q.  Now, you see at the bottom of the page there are

8    transactions under Hugh Dunkerley?

9    A.  Correct.

10   Q.  And then other transactions under Jason Galanis, correct?

11   A.  Yes.

12   Q.  The ones under your name are transactions on your card,

13   right?

14   A.  So not all of them, no.

15   Q.  Well, this statement only lists two of them.

16   A.  Correct.

17   Q.  And those transactions were both done on your card,

18   correct?

19   A.  Yes, but Jason asked me to pay to the one to Theodoris

20   Papadopoulis for landscaping.

21   Q.  That was a transaction you did on your card, but for his

22   benefit?

23   A.  Correct.

24   Q.  That was a landscaper for that 1920 Bel Air property?

25   A.  Yes.

1    Q.   You did charge on this card numerous personal expenses for

2    yourself, correct?

3    A.   Yes.   This was a personal card.   It was my credit that

4    actually opened this account.   Even though it has Wealth

5    Assurance Assured, it has my credit that holds this account

6    together.

7    Q.   Right.   The payment for this credit card, however, came

8    from money from Wealth Assurance Private Client Corporation,

9    true?

10   A.   I don't know.

11   Q.   Did Gary Hirst not pay for this card using money from

12   Wealth Assurance Private Client Corporation?

13   A.   Jason Galanis eventually paid off this card and the

14   outstanding debt.   I do not know where he got that money from

15   to pay for it.

16   Q.   Fair enough.   Wealth Assurance Private Client Corporation,

17   however was the WLCC bond money, true?

18   A.   Yes.

19   Q.   And so you did not pay off these cards, correct?

20   A.   Correct.

21   Q.   It was Jason Galanis, and you're not sure where the money

22   came from.   Is that right?

23   A.   Absolutely correct.

24   Q.   There were numerous personal expenses for you, correct?

25   A.   Yeah.

I65JGAL7                    Dunkerley – cross

1    Q.  By the way, you didn't report this as income on your taxes,

2    did you?

3    A.  I believe I gave this to my tax accountant, I believe so.

4    Q.  You testified on direct that you're in arrears in child

5    support.  Is that right?

6    A.  That's right.

7    Q.  When did you start falling behind?

8    A.  I believe in January two years ago.

9    Q.  January of 2016?

10   A.  Yes.

11   Q.  Now, since January of 2016, though, you've had occasion to

12   spend plenty of money on plenty of frivolous things, true?

13   A.  You have to give me examples.  I don't know what you're

14   talking about.

15          MR. SCHWARTZ:  Let me show you for the witness, the

16   lawyers and the Judge what has been marked as defense Exhibit

17   4926.

18   Q.  This is from your Twitter account, is it not?

19   A.  It is.

20   Q.  This is you at the World Surfing Championships?

21   A.  The free world surfing championships.  That occur on

22   Huntington Beach each year.

23   Q.  Free to use?

24   A.  Free to anyone, even you.

25   Q.  But you had a good time there, correct?

1    A.  Yes.

2           MR. SCHWARTZ:  You can take that down.

3    Q.  I want to talk now a little bit about Calvert Capital?

4    A.  Yes.

5    Q.  You testified last week that one of the crimes that you

6    have pleaded guilty to was obstruction of justice, true?

7    A.  True.

8    Q.  And that included the falsification of documents, right?

9    A.  True.

10   Q.  And you were directly involved in creating or signing those

11   false documents, correct?

12   A.  Yes.

13   Q.  That happened in the end of 2015 and early 2016, correct?

14   A.  Correct.

15   Q.  After Jason Galanis became aware that there was an

16   investigation of him.  Is that right?

17   A.  Yes.

18   Q.  At that time you were still taking instructions at least in

19   business matters from Jason Galanis, true?

20   A.  True.

21   Q.  Some of the white boarding sessions that we talked about

22   earlier happened during this time period, correct?

23   A.  They happened before that time ready.

24          MR. TOUGER:  May we have the time period.

25          MR. SCHWARTZ:  Late 2015, early 2016.

I65JGAL7                          Dunkerley - cross

1           THE WITNESS:  They happened in the summer of 2015 and

2     then the falsification of documents was in late 2015, 2016.

3     BY MR. SCHWARTZ:

4     Q.  When did Jason Galanis hatch the idea for Calvert Capital,

5     to your knowledge?

6     A.  I believe it would have been the summer of 2015.

7     Q.  So that would have been before there was any investigation

8     of his conduct in connection with the WLCC bonds?

9     A.  Yes, I suppose so.  I am sorry.  I haven't really thought

10    about that one before.

11    Q.  So, in other words, even before there was an investigation,

12    Jason Galanis realized that, and expressed to you, that there

13    was paperwork that needed to be fixed, correct?

14          MR. QUIGLEY:  Objection to what Jason Galanis

15    realized.

16          THE COURT:  I will sustain it.  Why don't you

17    rephrase.

18    BY MR. SCHWARTZ:

19    Q.  You and Jason Galanis discussed the need to fix some of the

20    paperwork even before there was an investigation, correct?

21    A.  There had been subpoenas and investigation into Atlantic,

22    and so that prompted the creation and the talking and the

23    strategies about these documents.

24    Q.  Those subpoenas began in approximately October of 2015.

25    Isn't that right?

I65JGAL7                          Dunkerley - cross

1    A.  I'm not exactly sure of the date, but yes.

2    Q.  Let's forget about dates for a second.

3            Is it your memory that the discussion about Calvert

4    and the need to make up documents happened after the first

5    subpoenas were issued or before?

6    A.  Thinking about it, it is after the subpoenas, so it is in

7    the fall of 2015, not the summer or fall.

8            The other thing that would refresh my memory was some

9    of those white board pictures that you brought up early on, if

10   it says Calvert in there, that is the time-frame.  I believe

11   they do, it was in the summer of 2015.

12   Q.  Okay.  Now you confused me a little bit.

13   A.  Sorry.

14   Q.  The discussion of Calvert --

15   A.  Yeah.

16   Q.  Forget about dates.  Did it start before or after the

17   subpoenas came?

18   A.  I believe before.

19   Q.  Before?  Okay.

20           So Jason Galanis expressed to you even before there

21   was an investigation that he needed to fix the paperwork,

22   correct?

23   A.  Yes.

24   Q.  And Calvert Capital was an entity that he dreamed up in

25   order to put on all this fake paperwork, right?

I65JGAL7                      Dunkerley - cross

1    A.  Correct.

2    Q.  None of the Calvert agreements or paperwork reflected

3    memorializations of prior real agreements, right?

4    A.  Correct.

5    Q.  That sometimes happens in business, right?

6            In other words, in your experience, in your extensive

7    experience in business, sometimes you'll do a transaction, and

8    the paperwork doesn't get completed until afterwards, it

9    doesn't get finalized until afterwards, true?

10           MR. QUIGLEY:  Objection.

11           THE COURT:  Overruled, to the extent that you can

12   generalize about it.

13           THE WITNESS:  Yes, sometimes the paperwork doesn't

14   happen until afterwards, correct.

15   BY MR. SCHWARTZ:

16   Q.  But that is not what this was?

17           MR. TOUGER:  Objection to that question.

18           THE COURT:  I'll allow that.

19           MR. TOUGER:  Time period?

20           THE COURT:  Would you clarify the time period, please.

21           MR. SCHWARTZ:  We are talking about Calvert.  I don't

22   want to use dates because I think we got confused about dates.

23   Q.  We are talking about Calvert?

24   A.  Right.

25   Q.  The Calvert paperwork was not the creation of legitimate

1    agreements that simply reflected things that had been agreed to

2    in the past but not put on paper, correct?

3             MR. TOUGER:  Is that to his knowledge, your Honor?

4             THE COURT:  Yes, to your knowledge?

5             THE WITNESS:  Absolutely to my knowledge.  Another way

6    of expressing that is anything that is a Calvert document,

7    where Calvert is mentioned is a false document.

8    BY MR. SCHWARTZ:

9    Q.  Right.  Anything with Calvert you know to be false,

10   correct?

11   A.  Correct.

12   Q.  And you had conversations with Jason Galanis about that,

13   correct?

14   A.  Yes.

15   Q.  And Gary Hirst, too, as well?

16   A.  I believe so.

17   Q.  Was there anyone else that was involved in the creation of

18   fake Calvert documents, to your knowledge?

19   A.  Not that I know of.

20   Q.  Part of the story around Calvert Capital was that it was

21   established as an investment vehicle for the Fernandez family,

22   correct?

23   A.  No.  It was run by Salvatore Fernandez.  There was no story

24   associated with Calvert Capital like the one you described.

25   Q.  You said there was no story?

I65JGAL7                        Dunkerley — cross

1   A.   The story, if you had to have a story about Calvert

2   Capital, it was created to hold shares of the WLCC bond

3   offering and that only.

4           I had never heard this concept about it being some

5   vehicle for the Fernandez family.

6   Q.   Let me show you just for the witness, the lawyers and the

7   Judge Defense Exhibit 4023 D.  This is an operating agreement

8   of Calvert Capital Limited, correct?

9   A.   Yes.

10          MR. SCHWARTZ:  I offer this document and would invite

11  the court to give that limiting instruction again.

12          THE COURT:  Any objection?

13          MR. QUIGLEY:  No objection, your Honor.  We ask a

14  limiting instruction it is not admitted for the truth of the

15  matters asserted.

16          THE COURT:  And this is being admitted for what

17  purpose specifically?

18          MR. SCHWARTZ:  To show that this was a document this

19  witness created and used.

20          MR. QUIGLEY:  I don't think he testified that he

21  created it.

22          THE COURT:  Just to be clear, did you create this

23  document?

24          THE WITNESS:  No.

25  BY MR. SCHWARTZ:

1  Q.  Jason Galanis created this, correct?

2  A.  I have no idea.

3          THE COURT:  All right.  Just to be clear, this

4  document is not being admitted for the truth of anything in it,

5  but for the fact that it was created.  Is that right, folks?

6  Okay.

7          (Defendant's Exhibit 4023 D received in evidence)

8          MR. SCHWARTZ:  Can you publish this, please,

9  Mr. Jackson.

10 Q.  Now, again, this is a Calvert Capital document, and so we

11 know it is fake, right?

12 A.  Correct.

13 Q.  You knew it was fake, Jason Galanis knew it was fake, Gary

14 Hirst knew it was fake at the time?

15 A.  I don't know.

16 Q.  You knew anything Calvert was fake?

17         MR. QUIGLEY:  Objection to what other people knew.

18         THE COURT:  Sustained.

19 BY MR. SCHWARTZ:

20 Q.  You discussed with Jason Galanis the fact that everything

21 Calvert Capital was fake, right?

22 A.  That is an expression I just used to you.

23 Q.  Fair enough.  You didn't use that word with Jason Galanis,

24 right?

25 A.  Again the word, "fake"?

I65JGAL7                     Dunkerley - cross

1   Q.   Right.

2   A.   No, I didn't probably use that word with Jason Galanis.

3   Q.   In your discussions with Jason Galanis, there was no doubt

4   that what you were doing, what he was doing in creating

5   documents related to Calvert Capital was creating fake

6   documents, right?

7   A.   Correct.

8   Q.   That was the only purpose of it was to obstruct the

9   government investigations, right?

10  A.   Correct.

11  Q.   You were trying to fool the investigators, right?

12  A.   Correct.

13  Q.   Just looking at Paragraph 2 A here, you see it says the

14  company, Calvert, is created for the following business

15  purpose:  Calvert Capital Limited is a family investment

16  vehicle for the Fernandez family.  Do you see that?

17  A.   I do.

18  Q.   That is sort of a cover story, right.

19  A.   So, yes is the answer.  It is a fake document.  I only saw

20  this document a few days ago.  It means nothing to me.

21  Q.   The government showed this to you for the first time a few

22  days ago, right?

23  A.   Yes.

24  Q.   By the way, the Fernandez family, that is a reference to

25  Francisco Martin's family?

1           MR. QUIGLEY:  Objection.  It is not.

2           THE COURT:  Do you know the answer to that, who that

3      is a reference to?

4           THE WITNESS:  I believe it is Francisco Martin

5      Fernandez is his full name.

6      BY MR. SCHWARTZ:

7      Q.  You were vaguely granted power of attorney over Calvert

8      Capital, right?

9      A.  You know, I need to be refreshed on that because I can't

10     remember exactly it being a fake entity and everything, I

11     didn't really pay attention to my operating powers within this

12     entity.

13     Q.  That doesn't really matter what this all says, this is all

14     fake, right?

15     A.  Correct.

16     Q.  Let me show you just for the witness, the Judge and the

17     lawyers Exhibit 4023 F.  This is an appointment of you or David

18     Ezekiel as power of attorney for Calvert, correct?

19     A.  Correct.

20          MR. SCHWARTZ:  I offer Defense Exhibit 4023 F again

21     subject to the same limiting instruction that it is definitely

22     not for the truth of the matter asserted.

23          THE COURT:  Any objection?

24          MR. QUIGLEY:  No objection.

25          THE COURT:  Again this is being admitted, but not for

```
 1      the truth of what is in the document.  Thank you.
 2                  (Defendant's Exhibit 4023 F received in evidence)
 3      BY MR. SCHWARTZ:
 4      Q.  Jason Galanis caused numerous fake Calvert documents to be
 5      created, true?
 6      A.  True.
 7      Q.  He also created other fake documents, true?
 8      A.  Yes.
 9      Q.  For example, you testified earlier that there was
10      absolutely no real relationship between Wealth Assurance
11      Holdings Limited, the parent of the big financial conglomerate,
12      and Wealth Assurance Private Client Corporation, the fake
13      company that you ran that received the WLCC bond money,
14      correct?
15      A.  Correct.
16      Q.  One of the things that Jason Galanis created was a
17      subscription agreement between those two companies, true?
18      A.  Yes.
19      Q.  Because he wanted to create the appearance that they were
20      affiliated, when they were not, correct?
21      A.  I believe so.
22      Q.  And this was the beginning of the smoke and mirrors,
23      correct?
24      A.  Yes.
25      Q.  There was never a real stock issuance between Wealth
```

1    Assurance Private Client and Wealth Assurance Holdings Limited,

2    correct?

3    A.   Correct.

4    Q.   The actual board of directors of Wealth Assurance Holdings

5    Limited was never told about this fake subscription agreement,

6    correct --

7             MR. QUIGLEY:  Objection.

8    Q.   -- to your knowledge?

9             THE COURT:  I will allow it as to your knowledge.

10            THE WITNESS:  Yes, to my knowledge.

11   BY MR. SCHWARTZ:

12   Q.   You were on the board of directors of Wealth Assurance

13   Holdings Limited, correct?

14   A.   Yes.

15   Q.   You would have known if something --

16            THE COURT:  Just focus on, right, just focus on what

17   you knew.

18            THE WITNESS:  I was part of the scheme so, yes, I did

19   know.

20   BY MR. SCHWARTZ:

21   Q.   Outside of your capacity as scheming with Jason Galanis, in

22   your capacity as a board member of Wealth Assurance Holdings

23   Limited, right, you never received through those channels any

24   indication that Jason Galanis was cooking up that fake

25   agreement, right?

1   A.   Correct.

2   Q.   To your knowledge, the other directors of Wealth Assurance

3   Holdings Limited, the real parent company of the financial

4   conglomerate, they never received notice that of that fake

5   agreement, either, correct?

6   A.   To my knowledge, correct.

7   Q.   And that board of the real company that was the head of the

8   financial conglomerate, that is the board that Mr. Archer was

9   on, correct?

10   A.   Yes.

11   Q.   He had no affiliation with Wealth Assurance Private Client

12   Corporation, correct?

13   A.   Correct.

14   Q.   Now, you talked before about the $15 million that was

15   invested in the second bond issuance, correct?

16   A.   Yes.

17   Q.   Jason Galanis had originally lied to you about where that

18   money was from, right?

19   A.   Yes.

20   Q.   He had originally told you that it was from Mr. Archer's

21   investment contracts with China, right?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  Sustained.

24   BY MR. SCHWARTZ:

25   Q.   He originally told you that the money for the $15 million

1    that Rosemont Seneca Bohai, LLC used to buy the second bond

2    issuance was money that Mr. Archer had secured from Chinese

3    investors which needed to be placed before an investment

4    contract expired, right?

5    A.   Correct.

6    Q.   Once the investigation began, Jason Galanis created fake

7    documents around that $15 million, correct?

8    A.   I believe so.  I didn't actually see many of them, so I

9    believe that is correct.

10   Q.   One of them you looked at with Mr. Quigley, it was Exhibit

11   1577.  Can we look at this.

12            This is a consent of the sole director of Wealth

13   Assurance Private Client Corporation, correct?

14   A.   Correct.

15   Q.   This is a fake document, right?

16   A.   Yes.

17   Q.   If we go to the next page, you signed this, correct?

18   A.   Yes.

19   Q.   Let's be clear.  You did not sign this on the 23rd day of

20   August 2014, correct?

21   A.   Correct.

22   Q.   You signed this sometime maybe a year later after the

23   investigations began, correct?

24   A.   The fall of 2015, somewhere around there, correct.

25   Q.   Say again?

1  A.  The fall of 2015.

2  Q.  The fall of 2015?

3  A.  Yes.

4  Q.  If we go back to the first page, this says under the

5  resolution, it says resolved that the company, Wealth Assurance

6  Private Client Corporation, has agreed to the requested consent

7  to the proposed investment by Calvert Capital Partners in

8  Rosemont Seneca Bohai, LLC, the private equity investment

9  vehicle in Bohai harvest, RST Shanghai.  Do you see that?

10  A.  Yes.

11  Q.  What this is putting on paper is that Calvert was investing

12  the $15 million into Rosemont Seneca Bohai, correct?

13  A.  Correct.

14  Q.  This is claiming Rosemont Seneca Bohai is some some sort of

15  Chinese investment vehicle, correct?

16  A.  Correct.

17  Q.  This lie is the exact opposite of the original lie, right?

18  A.  This lie is the exact opposite of the original lie.

19  Q.  In other words, first he told you that Mr. Archer was

20  investing $15 million of Chinese money, right?

21  A.  Right.

22  Q.  And now he is saying that Calvert is investing $15 million

23  into a Chinese private equity fund, correct?

24  A.  Yes, the way I understand it, yes.

25  Q.  This is nonsense, right?

1    A.   Yes.

2    Q.   There was never a loan agreement between Calvert and

3    Rosemont Seneca Bohai, LLC, correct?

4    A.   Not that I know.

5    Q.   You understood Rosemont Seneca Bohai, LLC was an entity

6    that was associated with Mr. Archer, correct?

7    A.   Yes.

8    Q.   There were no discussions, to your knowledge, with

9    Mr. Archer about this document, true?

10   A.   Correct.

11   Q.   Or about this crazy cover story, true?

12   A.   To my knowledge, true.

13   Q.   Or about the falsification of documents, true?

14   A.   The general falsification, true, yes.

15   Q.   But Jason Galanis did begin telling people about Calvert

16   Capital, right?

17   A.   I don't know for sure.

18   Q.   And again some of this stuff with Calvert you planned in

19   person with Jason Galanis at his home at 1920 Bel Air Road in

20   California, right?

21   A.   Yes.

22            MR. SCHWARTZ:   So, for example, if we can take this

23   down, Mr. Jackson, and look at just for the witness, the

24   lawyers and the Judge Exhibit 1705.

25   Q.   This is a picture of a white board that you took, correct?

I65JGAL7                         Dunkerley - cross

1   A.  Yes.

2   Q.  And this is during that later period, correct?

3   A.  Yes.

4            MR. SCHWARTZ:  I offer 1705.

5            MR. QUIGLEY:  No objection.

6            THE COURT:  Admitted.

7            (Defendant's Exhibit 1705 received in evidence)

8            MR. SCHWARTZ:  You can show this to the jury,

9   Mr. Jackson.

10  Q.  Who was present for this white boarding session?

11  A.  Just myself and Jason Galanis.

12  Q.  And one of the things that he is doing here on this white

13  board -- is this mostly his handwriting?

14  A.  It is all his handwriting.

15  Q.  One of the things he is doing here is keeping a list of the

16  false documents that need to be created, correct?

17  A.  Yes, some of that is, yes.

18  Q.  So, for example, if you zoom in on that sort of

19  top-left-hand quadrant, he says one of the things we need is

20  resolutions for Wealth Assurance Private Client, correct?

21  A.  Correct.

22  Q.  We just looked at a fake resolution, right?

23  A.  Correct.

24  Q.  Then he said we need some sort of relationship between

25  Thorsdale and Calvert, right?

I65JGAL7                        Dunkerley - cross

1   A.   Yes, Calvert, yes.

2   Q.   In fact, we don't need to look at it, but one of the fake

3   documents that was created was an agreement between Thorsdale

4   and Calvert, right?

5   A.   Yes.

6   Q.   He also said we needed to create fake governance documents

7   for Wealth Assurance Holdings, right?

8   A.   I can't remember that specifically.  I can clearly see it

9   says there WAH and governance, but I can't remember if they

10  were talking about fake documents being created about that.

11           We talked about business things as well as fake

12  documents, so not everything that you see on the board means

13  it's fake.

14  Q.   I see.  Some of this might be real, some might be fake?

15  A.   Yes.

16  Q.   It got sort of all jumbled together there?

17  A.   Yes.

18  Q.   By the way, you testified that you've used cocaine in the

19  past, right?

20  A.   Sure.

21  Q.   You used cocaine with Jason Galanis, right?

22  A.   Yes.

23           MR. QUIGLEY:  Objection, your Honor.

24           May we approach?

25           THE COURT:  Actually, it is almost 5:00 o'clock.  Why

1    don't we adjourn for the day.  I'll see you all in the morning.

2    I want to let you know on Thursday I had said we were going to

3    leave early.  I want you to tell Ms. Cavale if you can come in

4    a little early, start at 9:30 and work through 3:30 and that

5    way we get more done during the day.  Please let her know if

6    that is a problem.  We'll just take shorter breaks so we can

7    get as much accomplished as possible.  Thank you.  Have a nice

8    evening.  Don't discuss the case and keep an open mind.

9            (Jury excused)

10           THE COURT:  Yes?

11           MR. QUIGLEY:  Your Honor, I think we have a relevance

12   objection, number one, and it already come out he used cocaine

13   in the past.  Number two, I was also concerned about door

14   opening potential because Ms. Notari in here motion in limine

15   had briefed to keep out Mr. Cooney's cocaine use.  Mr.

16   Dunkerley, Mr. Galanis and Mr. Cooney used cocaine together.

17   That was our concern.

18           MR. SCHWARTZ:  I wasn't going there.  I only had one

19   more question, which is they were doing cocaine together as

20   they were drawing up these crazy white boards and Mr. Cooney

21   was not there.  He already testified.

22           THE COURT:  All right.  When you say only one more

23   question, was it about this or was it --

24           MR. SCHWARTZ:  Only one more question about the

25   cocaine.

1          THE COURT:  I was just hopeful.

2          MR. SCHWARTZ:  15 minutes, Judge.

3          THE COURT:  Good.  All right.  So let's talk about the

4    expert issue now for a few minutes.

5          MS. NOTARI:  I have one issue.

6          THE COURT:  Fine.  I have to be out.  I have my

7    Diversion Program at 5:30.  I have half an hour.  Let's just

8    start about the experts and I'm happy to hear your issue, Ms.

9    Notari.

10          So, look, I have some specific questions that I want

11    to follow up on.  I am inclined to permit much of Mr. Archer's

12    proposed expert testimony.  I don't think it will usurp the

13    role of the jury in applying the law to the facts or my role

14    instructing the jury, but will provide context and describe

15    industry standards which will assist the jury in weighing the

16    evidence in this admittedly complex case.  So see the Bilzarian

17    case, 926 F2d. at 1294 to 95, but I do want to add certain

18    limitations.

19          Let's start with John Finnerty.  The government

20    objects to five aspects of his testimony, as I understand it.

21    If there is anything you want to be heard on, let me know.  I

22    have read your papers.  So for Finnerty, the motion is denied

23    in part and granted in part.

24          As for the first two objections relating to the terms

25    of the second and third purchases of the WLCC bonds, I don't

1    think it is inappropriate for an expert to explain documents

2    entered into evidence, particularly where it is relevant to any

3    opinions that the expert may offer.

4            I do want to ask the government whether it intends to

5    argue the defendants should have been on notice as to the

6    illegality of the WLCC bond scheme in light of any alleged

7    unusual aspects of the structure of the bonds and related

8    annuity investment.  I ask this with respect to your third

9    objection.

10           MS. MERMELSTEIN:  Your Honor, I think first of all,

11   with respect to the first two, it seems to me that to the

12   extent what this witness is going to say this is how the bonds

13   were structured, we have sat through in excruciating detail

14   that testimony already, and I don't see any additional value in

15   having a witness who is not a witness to these events come in

16   and re-explained what Tim Anderson, the documents Tim Anderson

17   who was involved in it already discussed.

18           (Continued on next page)

19

20

21

22

23

24

25

I657GAL8

1          THE COURT:  So, let me actually back up and ask in

2     light of the testimony so far have any of your positions

3     changed with respect to what is necessary in this case?  Do you

4     think you still need an expert?  Do you still think you need

5     John Finnerty to explain the structure of these, given

6     Mr. Anderson's testimony?

7          MR. SCHWARTZ:  So, look, we are certainly not going to

8     have the witness repeat what the jurors already know.  We

9     provided these bullets in the context of giving the government

10    notice of the anticipated testimony before the trial started;

11    and also, you know, some of this is predicates for the opinions

12    that the experts are ultimately going to offer.  But a lot of

13    the nuts and bolts of how these bonds worked is in evidence and

14    can be done in, you know, three questions with an expert just

15    to sort of set the time the table.  But that's real sort of

16    cumulative.

17          THE COURT:  Do you need Finnerty anymore?

18          MR. SCHWARTZ:  I think we do, unless the government is

19    going to abandon the argument that these bonds were fraudulent

20    by design.  If that's not their argument, then we can talk, but

21    I think that's their argument.  And they are going to have

22    their experts on their notice talk about all sorts of irregular

23    aspects of the bonds, and the insinuation is that --

24          MS. MERMELSTEIN:  That's just not correct as a factual

25    matter about what the government is going to do, if it changes

I657GAL8

1    your opinion.  We are not going to have our experts talk about

2    the irregularities of the bonds at all.

3              MR. SCHWARTZ:  So, you are not going to go into the

4    fact that they are unrated, unregistered?  You're not going to

5    talk about the 141A restrictions?  All that you are striking

6    from your notice?

7              We could have this conversation more effectively maybe

8    if the government wants to tell us what they are striking out

9    of that case, and then we can tell them what we don't need

10   anymore.  It's hard to do this on the fly.

11             MS. MERMELSTEIN:  Professor Laby, as your Honor may

12   recall, is going to give a primer on what an investment is,

13   what an investment advisor does.

14             THE COURT:  And that's still necessary even though

15   Counts Three and Four are no longer relevant?

16             MS. MERMELSTEIN:  Yes.  The obligations of investment

17   advisors in broad terms, what kind of documents govern

18   agreements with clients, what kinds of notices is the practice

19   in the industry.  Professor Laby knows nothing about this case;

20   he has been told nothing about this case; he has been told not

21   to look any publicly available documents about the case.  He is

22   just going to be kind of an investment advisor 101 kind of

23   person.  He may explain a securities term or two, but he is not

24   going to opine on anything really.

25             THE COURT:  OK.

I657GAL8

1          MR. SCHWARTZ:  I mean I guess what I would say, your

2     Honor, is I don't think any of these areas of testimony are

3     inappropriate for an expert to offer.  It is quite possible

4     that when the government is done putting in its case, we won't

5     need to put all this stuff in.  And that's a different

6     question.  Or part of it may become cumulative, and we may do

7     it in a greatly abbreviated fashion, and that's a different

8     question, and we can address that when the time comes.

9          I think what would be helpful at this point in the

10    trial is just to understand if there is anything that your

11    Honor deems inappropriate subject for expert testimony or, you

12    know, where you think somebody additional notice might be

13    required.

14         MS. MERMELSTEIN:  I think, your Honor, in an effort to

15    try to get to the most important issues sort of in order of

16    timeliness --

17         THE COURT:  Yeah.

18         MS. MERMELSTEIN:  -- my concern is that I think there

19    are grossly inappropriate sort of grounds of expert testimony

20    in the defense expert disclosures, and what I want to make sure

21    isn't going to happen is that professor Laby is going to be

22    asked about things that we've said that the defense experts

23    should not be asked about.

24         Now, the defense experts are not talking about

25    investment advisors, so, so long as the defense intends to

I657GAL8

1    constrain their questioning of professor Laby to the subjects

2    of which he is testifying on direct -- as they should -- I

3    don't know that we have to deal with this now.

4              What I don't want to have happen is to have questions

5    of professor Laby about how boards of directors are structured

6    and operated -- which is not his area of expertise in anything,

7    and which I don't think is an appropriate subject of testimony.

8    If those questions are not being put to this government

9    witness, we can take this up when everyone is not in such a

10   rush and turn to the matters that have to be decided before

11   tomorrow.

12             MR. SCHWARTZ:  I understood that question, and I don't

13   think I intend to ask that question of professor Laby, but I

14   don't know what those questions are.

15             THE COURT:  Well, I think those questions are the ones

16   that they disputed with respect to your experts.

17             MS. MERMELSTEIN:  Your Honor, he's not going to be

18   asked about how bonds are structured, or how net capital is

19   calculated, or any of the things that may or may not be a

20   proper subject of expert testimony but for which he is not the

21   proper expert.

22             MR. TOUGER:  But that's why I'm a little bit confused

23   of why professor Laby is testifying.  There are no investment

24   advisors on trial here.  We have already stipulated into

25   evidence that Michelle Morton and Gary Hirst committed a crime,

I657GAL8

1    so why is professor Laby testifying?

2              MS. MERMELSTEIN:  Well, first of all, we have not yet

3    stipulated into evidence that Michelle Morton and Gary Hirst

4    committed a crime.

5              MR. TOUGER:  Well, it's going to be.

6              MS. MERMELSTEIN:  It's being offered for an incredibly

7    limited purpose, which is to impeach their testimony.  I

8    think -- and this is a subject we can discuss -- it's going to

9    require a very explicit limiting instruction from your Honor

10   given Mr. Touger's efforts to suggest that there is something

11   relevant about who the government didn't charge in this case.

12   So, we can come back to that, but I don't think the fact of

13   their convictions means that we don't need to get into what an

14   investment advisor is.

15             I think that it remains an essential part of the fraud

16   that these bonds were placed into client accounts without their

17   knowledge, and that those bonds did not fit into the investment

18   parameters that were set forth in the governing investment

19   management agreements, and that in some cases because the bonds

20   were unrated -- although we're not going to say there is

21   anything wrong with an unrated bond, only if a client says they

22   don't buy unrated bonds, then you can't buy unrated bonds --

23   and that there was a complete failure to disclose all of the

24   conflicts of interest including the Wealth Assurance/Burnham

25   relationship and the Burnham/Atlantic Hughes relationship.

I657GAL8

1    MR. TOUGER:  That has nothing to do with any of the

2    clients here on trial.  There is not one point of evidence that

3    connects these clients to that part of the case.

4         MS. MERMELSTEIN:  Well, that's definitely not true.

5    These defendants --

6         First of all, we sort of have this fight, there is no

7    question that Mr. Cooney and Mr. Archer knew of, endorsed,

8    participated in the efforts to acquire Atlantic Hughes.  There

9    has been ample testimony that the purpose of buying Atlantic

10   Hughes was to have these bonds purchased.  You can't do that.

11   Because of investment advisor fiduciary duties, you can't buy

12   an investment advisor for the purpose of dumping something into

13   it.  And that remains a part of this case; it's charged in the

14   securities fraud conspiracy in the indictment; and I think it's

15   important for the jury to understand what an investment advisor

16   is.  It's going to take less than an hour.

17        THE COURT:  So, this witness is just generally about

18   investment advisors and the duties owed; is that right?

19        MS. MERMELSTEIN:  Yes.  I think one reason that we --

20   one reason that it tees up some of the other issues is that

21   there were some basic background questions we would ask in

22   order to make comprehensible some of the Code Rebel evidence

23   that I think I can predict where it's going, but your Honor

24   hasn't ruled yet.  And also in the event that the ADV evidence

25   is generally going to be discussed, I'm going to ask him

I657GAL8

questions about ADV requirements, so there is some sort of

that.

          But, no, he is not going to talk about bonds, he is

not going to talk about unrated bonds, he's not going to talk

about net capital requirements, he's not going to talk about

broker dealers; that 's not his area.  And if there are not

going to be questions on cross, I think we can defer the

defense experts until not this afternoon.

          MR. SCHWARTZ:  So I think two things.  One is I

believe they already got all that testimony from Mr. Smith, so

I'm not quite sure why they need another witness to do it.  But

if the question is just are we going to cross this expert about

his expertise?  Yes.  I mean they noticed different experts;

they noticed the bond expert.  We were going to cross that

expert about the bonds.  They noticed a broker dealer expert --

which I think they have withdrawn now -- but we were going to

cross that person.

          MS. MERMELSTEIN:  We never noticed a broker dealer

expert.

          MR. SCHWARTZ:  What was Haines?  They withdrew their

bond expert.  Whatever.  We are going to cross their experts

within the scope of their expertise.  I mean there is no

question about that.

          THE COURT:  So tell me what you -- I need to know.

          MS. MERMELSTEIN:  If defense counsel are going to

I657GAL8

1    honor their representation that the questions put to professor

2    Laby will be within the confines of investment advisor matters,

3    I think we should move on to the other areas that we need

4    rulings on.

5           MR. TOUGER:  The only question is are you going to

6    espouse anything about private annuities?

7           MS. MERMELSTEIN:  He is not going to talk about

8    annuities at all.

9           MR. TOUGER:  Just because I don't know if he is going

10   to say as an investment advisor I would never advise --

11          MS. MERMELSTEIN:  I gave you his expert disclosure;

12   he's not going to say anything about annuities.

13          THE COURT:  All right.  So then --

14          MS. MERMELSTEIN:  So then I think the other matters

15   that are sort of nonetheless relevant for tomorrow, I think

16   that his testimony is affected by the ADV and Code Rebel

17   issues, and although I don't know that Raycen Raines will get

18   on the stand tomorrow afternoon, he may, and there is this

19   issue the online lending.

20          THE COURT:  Right.  So, do you want to speak about

21   that anymore?

22          MS. MERMELSTEIN:  I think --

23          THE COURT:  Cold Rebel we talked about enough.  As I

24   said, I'm going to rule first thing in the morning.  I think

25   we've talked enough about ADV.  So, is there anything else you

I657GAL8

1    wanted to say with respect to --

2              MS. MERMELSTEIN:  As we set forth in our letter, your

3    Honor, I think that the questioning of Mr. Anderson asking

4    whether or not the WLCC was involved in online lending, trying

5    to elicit that that's also known as pay day lending, was very

6    much not what your Honor ordered, which was that the fact of

7    pay day lending is not a relevant topic for this trial, and

8    because it's a business that is in many people's view

9    exploitive and frowned upon, it shouldn't come in sort of to

10   besmirch the WLCC; and the efforts get it in were in direct

11   contravention of your Honor's direction.

12             Also, Mr. Touger asserted that the relevance of it is

13   not that it's sort of unseemly and they were doing it but that

14   it's relevant because Mr. Raines' involvement in it was

15   fraudulent.  But if you look at sort of what appears to be his

16   source documentation for that -- and he may have others that I

17   don't know about certainly -- what is clear is that an enormous

18   part of the allegation is that the structure of the

19   arrangements between the tribal and nontribal partners are

20   somehow themselves fraudulent; and that is what we briefed in

21   the first instance saying, look, I think reasonable minds can

22   disagree with that, because there is no question here that

23   Mr. Raines, in consultation with counsel, has a good faith

24   belief that this structure is legal, so it's not appropriate or

25   productive to ask those questions.

I657GAL8

1              Mr. Touger has asserted that based on Internet

2     research he has discovered that there are allegations that

3     Mr. Raines withheld information from borrowers about the true

4     interest rate payments.  I am not aware of any such allegation

5     that would give rise to any good faith basis to ask that

6     question.

7              So, what I fear is going to happen is this topic is

8     going to start getting explored on the purported notion that

9     there is something fraudulent there, and there is really not,

10    and really what is going to happen is an effort to say you are

11    involved in this really unseemly business in which you exploit

12    other sort of poor people, and I don't think that's

13    appropriate.

14             So, I think given the efforts to flout the initial

15    ruling, and the government's inability to locate the basis for

16    asking these questions, I think there needs to be sort of a

17    clarification of the court's original order and a

18    reconsideration of whether or not there is a good faith basis

19    to ask these questions.

20             MR. TOUGER:  Your Honor, I fully understand the

21    Court's order.  I have no intention to cross-examine on the

22    legality of an online lending business, no intention.

23             What they're saying is, your Honor, I can't call him a

24    used car salesman, I have to call him a salesman of slightly

25    used automobiles.

I657GAL8

1          MR. SCHWARTZ:  Certified preowned vehicles.

2          MR. TOUGER:  Certified preowned vehicles.  He is a

3     used car salesman.  If he was a used car salesman I could call

4     him a used car salesman.  The fact that it's legal to sell used

5     cars doesn't make it any more less acceptable.

6          So, the point of the matter is, your Honor, is they're

7     going to use this witness -- because they've already told us

8     they're not calling Ms. Lonehill, they're not calling the other

9     Native American representatives, so they're going to use this

10    witness to say how bad the tribe was affected by this case.

11         This witness was not working for the tribe in this

12    case.  That is clear from his 3500 material, it's clear from

13    his record, it's clear from everything.  He was working to make

14    money for the tribe through the WLCC.

15         The tribe, as we know from Mr. Anderson's testimony,

16    had a bad credit rating before this deal, has a bad credit

17    rating after this deal, not because of this deal whatsoever.

18         So, the idea that Mr. Raines can stand up there and

19    say, oh, this happened, that happened, the tribe has suffered

20    immensely, when he is not a tribal representative, first of

21    all, I think should not be allowed.  Second of all, I know what

22    the Court's ruling is, I follow the Court's ruling, I will not

23    cross-examine on that issue.  I will cross-examine on issues

24    where he has committed acts that other people have found

25    improper.  I have a good faith basis.

I657GAL8

| | |
|---|---|
| 1 | THE COURT:  What is your good faith basis? |
| 2 | MR. TOUGER:  I am happy to show that to the court ex |
| 3 | parte.  I don't have to show them so they can do it on direct. |
| 4 | THE COURT:  Just get me a letter tonight. |
| 5 | MR. TOUGER:  I will get it to you before he testifies. |
| 6 | MS. MERMELSTEIN:  Well, your Honor, first of all, what |
| 7 | Mr. Touger just said makes perfectly clear that he is doing |
| 8 | exactly what your Honor said he cannot do. |
| 9 | To say I don't have to call him a certified preowned |
| 10 | car dealer, I get to call him a used car dealer, no, the point |
| 11 | is you don't get to do either. |
| 12 | MR. TOUGER:  Why not?  Where does the Court's ruling |
| 13 | say I don't get to do that? |
| 14 | MS. MERMELSTEIN:  Your Honor ruled that the fact of |
| 15 | the involvement in pay day lending was not to be used and that |
| 16 | the sole appropriate point of cross-examination -- |
| 17 | MR. TOUGER:  No, she didn't rule that.  She ruled that |
| 18 | I can't say that pay day loaning is illegal.  And I don't plan |
| 19 | to say pay day loaning is illegal. |
| 20 | THE COURT:  But are you going to suggest that it's |
| 21 | improper? |
| 22 | MR. TOUGER:  No.  I'm just saying that online lending |
| 23 | is also called pay day loans. |
| 24 | THE COURT:  But what's the point of that? |
| 25 | MR. TOUGER:  Your Honor, what's the point?  So, you're |

I657GAL8

1    telling me now if somebody came in here and said I am an owner

2    -- what was that phrase again, Mr. Schwartz?

3              MR. SCHWARTZ:  Certified --

4              MR. TOUGER:  Certified preowned vehicles, I couldn't

5    say you're a used car dealer?

6              THE COURT:  Don't speak to me like that, first of all.

7    Second of all, I asked you a question.  I asked you what the

8    point of the question was.  Just answer it.

9              MR. TOUGER:  The point of it is no one knows what an

10   online lending business is, your Honor.  The jury doesn't

11   understand what that is.  The jury understands what a pay day

12   loaning business is.  It doesn't matter that it's legal.

13             THE COURT:  But what is your purpose in asking the

14   question?  Why is it relevant?

15             MR. TOUGER:  So the jury understands what he does.

16             THE COURT:  All right.  Look, I have to go.  So, Ms.

17   Notari, I want that letter, and I want it by 9 o'clock tomorrow

18   morning.

19             MR. TOUGER:  That's fine.

20             THE COURT:  And everyone should be here at nine.

21             You just wanted to raise one issue tonight.

22             MS. NOTARI:  Your Honor, the certified documents from

23   the Los Angeles County Registrar, I think I just wanted to move

24   them into evidence, because I do think that Mr. Dunkerley went

25   through them, and I think it's important for the jury to be

I657GAL8

1    able to understand that, you know, Mr. Cooney, these were the

2    complete records of 1920 Bel Air during the relevant time

3    period.  And they're certified.

4              THE COURT:  What's your objection to those records?

5              MR. QUIGLEY:  Our objection to the records, your

6    Honor, is a number of them have nothing to do with Mr.

7    Dunkerley.  I think he --

8              THE COURT:  But if there are certified records, what

9    is the objection?

10             MS. NOTARI:  And they were completely --

11             MR. QUIGLEY:  Your Honor, a couple of things.  Number

12   one, I mean the inference they are seeking to draw is this is a

13   complete set of transactions to do with 1920 Bel Air.  I'm not

14   an expert in real estate law -- I don't think anyone in the

15   jury is -- however, my understanding is you can can --

16             MR. TOUGER:  Can Mr. Galanis leave?

17             THE COURT:  Yes.

18             MR. QUIGLEY:  -- you can undertake transactions with

19   respect to a property without necessarily having to register it

20   with the county clerk or the town clerk or whatever.  So, I

21   think the inference they're seeking to draw is not supported by

22   that evidence.

23             THE COURT:  But why isn't that for the jury to decide?

24   I mean why are they not admissible?  And then if you want to

25   call a witness, introduce other documents, you can do that.

I657GAL8

1    But what's the objection to getting them in?

2              MR. QUIGLEY:  Then they should call a witness.  I mean

3    it's their burden.

4              MS. NOTARI:  No, it's actually your burden.

5              MR. QUIGLEY:  No, to establish admissibility it's the

6    proponent of the evidence's burden.

7              They should call a witness to say that --

8              THE COURT:  But what's your evidentiary basis for

9    keeping them out?  Relevance?  Like what?

10             MR. QUIGLEY:  Relevance, your Honor.  To say that

11   these documents are -- I mean there is a hearsay.  I realize

12   they're public records, but it relies -- their relevance

13   depends on a hearsay -- an inference that they're seeking to

14   draw from hearsay, that this is a complete.

15             MS. NOTARI:  It's not hearsay; it's a business record.

16             MR. QUIGLEY:  Right, that's not what I said.  The

17   inference they're seeking to draw depends on a hearsay

18   statement that this is the complete universe of documents that

19   have anything to do with 1920 Bel Air LLC.  These are land

20   records.

21             THE COURT:  Yeah, I understand.  I understand that,

22   but why can't the documents come in without that statement that

23   these are the complete records?

24             MR. QUIGLEY:  That's fine.  If they just want to

25   introduce the documents themselves -- I mean other than the

I657GAL8

1   subpoena obviously and the affirmation -- that's fine.

2          THE COURT:  So do you have a problem with that, Ms.

3   Notari?

4          MS. NOTARI:  Well, I do.  I think that the

5   certification, and it outlines -- do you want to talk about

6   this tomorrow morning?

7          THE COURT:  Just tell me the exhibit number.

8          MS. NOTARI:  I just wanted to raise the issue.

9          THE COURT:  Just tell me the exhibit numbers again of

10  the certification and the subpoena.

11         MS. NOTARI:  Do you want these?

12         THE COURT:  Sure.  And I will let you know in the

13  morning.

14         MS. NOTARI:  I think it's important to have at least

15  the second page.

16         THE COURT:  OK.

17         MR. SCHWARTZ:  Thank you, your Honor.

18         MS. NOTARI:  And I think the first page is also

19  important.

20         THE COURT:  Anything else?

21         MR. QUIGLEY:  Not from the government.

22         THE COURT:  Thank thanks.  Good night.

23         (Trial adjourned to June 6, 2018 at 9:00 a.m.)

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   HUGH DUNKERLEY

4   Cross By Ms. Notari  . . . . . . . . . . . .1262

5   Cross By Mr. Schwartz  . . . . . . . . . . .1302

6                    GOVERNMENT EXHIBITS

7   Exhibit No.                              Received

8    522  . . . . . . . . . . . . . . . . . . .1440

9                    DEFENDANT EXHIBITS

10  Exhibit No.                              Received

11   3726   . . . . . . . . . . . . . . . . . .1269

12   3056   . . . . . . . . . . . . . . . . . .1282

13   3709 and 3710  . . . . . . . . . . . . . .1286

14   4733 A   . . . . . . . . . . . . . . . . .1318

15   4000K   . . . . . . . . . . . . . . . . . .1334

16   4012   . . . . . . . . . . . . . . . . . .1335

17   4014   . . . . . . . . . . . . . . . . . .1336

18   4007A   . . . . . . . . . . . . . . . . . .1341

19   4007P   . . . . . . . . . . . . . . . . . .1342

20   4007V   . . . . . . . . . . . . . . . . . .1344

21   4007S   . . . . . . . . . . . . . . . . . .1347

22   4007I   . . . . . . . . . . . . . . . . . .1350

23   4017   . . . . . . . . . . . . . . . . . .1355

24   4038E   . . . . . . . . . . . . . . . . . .1357

25   4016 A   . . . . . . . . . . . . . . . . .1365

1   4016 B  . . . . . . . . . . . . . . . .1367

2   4007 L  . . . . . . . . . . . . . . . .1370

3   4007 M  . . . . . . . . . . . . . . . .1374

4   4038 B  . . . . . . . . . . . . . . . .1375

5   403 F  . . . . . . . . . . . . . . . .1376

6   .4038 G  . . . . . . . . . . . . . . . .1378

7   4043 A  . . . . . . . . . . . . . . . .1381

8   4020 H  . . . . . . . . . . . . . . . .1384

9   4039 E  . . . . . . . . . . . . . . . .1386

10  4060  . . . . . . . . . . . . . . . .1387

11  4016 D  . . . . . . . . . . . . . . . .1395

12  4041  . . . . . . . . . . . . . . . .1400

13  4912 and 3605  . . . . . . . . . . . . . .1402

14  4027  . . . . . . . . . . . . . . . .1413

15  4748  . . . . . . . . . . . . . . . .1428

16  1700  . . . . . . . . . . . . . . . .1432

17  1701  . . . . . . . . . . . . . . . .1434

18  1702  . . . . . . . . . . . . . . . .1435

19  510  . . . . . . . . . . . . . . . .1439

20  4917  . . . . . . . . . . . . . . . .1443

21  4760  . . . . . . . . . . . . . . . .1447

22  4023 D  . . . . . . . . . . . . . . . .1456

23  4023 F  . . . . . . . . . . . . . . . .1459

24  1705  . . . . . . . . . . . . . . . .1465