I6CJGAL1

```
UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        16 Cr. 371 (RA)

JOHN GALANIS, et al.,

            Defendants.

------------------------------x

                                    New York, N.Y.
                                    June 12, 2018
                                    9:10 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                      District Judge


                         APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY:  BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
          Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
     LAURA HARRIS
     CRAIG WENNER
```

I6CJGAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4             – and –
     O'NEILL and HASSEN
5         Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN
6

7

8    Also present:   Kendall Jackson, Paralegal
                     Ellie Sheinwald, Paralegal
9                         Eric Wissman, Paralegal
                          Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6CJGAL1

1          (Trial resumes)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everyone.  You may be

4     seated.  Sorry to get started late, but I wanted to make sure I

5     read all of the letters that you submitted, including the ones

6     that came in very late last night.

7          So first on immunity for Francisco Martin, when do you

8     want to do that?

9          MS. MERMELSTEIN:  I think the likelihood is that he

10    testifies after, right after lunch.  If I am right about that,

11    we can come back from lunch a few minutes early and do it

12    before the jury gets here.  Otherwise, I think we'll have to

13    take a quick break.

14         THE COURT:  That is fine.  Just let me know that.  I

15    have the signed order here.

16         Then let's start with Mr. Archer's various pending

17    objections to certain government exhibits.  With respect to

18    Government Exhibit 2117, Mr. Archer's motion is granted.  The

19    government argues that each of the emails qualify for the party

20    opponent hearsay exception because they represent adopted

21    admissions of Mr. Archer under Federal Rule of Evidence 801

22    (d)(2).

23         I find this argument unavailing.  While it is clear

24    from the emails Mr. Waddington is providing what he believes to

25    be accurate summaries of conversations he and Mr. Archer had on

I6CJGAL1

1    the telephone, there is no indication Mr. Archer adopted these

2    statements in the emails as being accurate.  I don't think the

3    hearsay exception applies and I fail to see any other

4    applicable exception.  Thus, unless the government is

5    prepared -- I am keeping that out.

6            As for Government Exhibit 2115, Mr. Archer's motion is

7    denied.  It is clearly probative of Mr. Archer's involvement in

8    the purchase of the second tranche of bonds, and I fail to see

9    how it is unduly prejudicial.  Mr. Archer points to the fact

10   that the notice is from Chase to Chase and Galanis regarding a

11   transfer exceeding the $125 alert limit, but I fail to see how

12   this suggests impropriety.

13           So now I want to talk about the Archer Diversified

14   documents, Government Exhibits 225, 226 and 2122.  So first I

15   would like to hear the government briefly with respect to when

16   you got these exhibits, when they were marked, just the notice

17   issue on this.

18           MR. QUIGLEY:  Your Honor, we got 225 and 226 we got

19   the week before trial and we produced them promptly.  They were

20   not stuff we had in our possession beforehand.

21           THE COURT:  You just had not planned to use them as

22   exhibits at trial?

23           MR. QUIGLEY:  Honestly, we got them in the week before

24   trial.  We were still assembling them and trying to build-out

25   summary charts and figure out what the wire went to, the first

I6CJGAL1

1    wire out of the WAPC issue with the bond.

2                    MR. SCHWARTZ:  That is not true.  The email you have

3    had.

4                    MR. QUIGLEY:  The email we have had.  Frankly, I think

5    the Archer Diversified piece of the closing documents frankly

6    was something we needed to investigate further.  It was

7    confusing to us.  Mr. Galanis clearly bought that apartment.

8    The email was produced, the Rule 16 long ago, but we

9    investigated what especially in light of the defense's opening

10   how Mr. Archer was used by Mr. Galanis.

11                   We wanted to make sure that we had closed the loop on

12   whether Mr. Archer was aware his name was being used in

13   connection with the purchase of that apartment.  That is how we

14   found an email.  We had the document, obviously we produced it

15   a long time ago, but realizing how that fit into our case in

16   chief and how we would have to prove it up was something that

17   developed during the course of the trial, as evidence often

18   does.

19                   I think just in terms of the probative value of this,

20   in terms of the probative value of 225 and 226, if the house

21   had been bought or apartment had been bought in the name of

22   Jason Galanis, full stop, I don't think there would be any

23   question that 225 and 226 are highly relevant.  They're highly

24   relevant regardless.  I acknowledge that Archer Diversified is

25   a complicated factor, but that is what happened.  Mr. Archer

I6CJGAL1

1   was aware of that.

2          THE COURT:  Just to be clear, in your view, this is

3   probative of the fact that Archer knew that Galanis was trading

4   on his name essentially.  You don't have any proof that Archer

5   knew that the proceeds of the condominium would be made using

6   bond proceeds, right?

7          MR. QUIGLEY:  I am not sure of that.  We cited an

8   email, 2068 in our brief, it is already in evidence, where

9   Mr. Galanis sends Mr. Archer contact lists for the Wakpamni

10  bond distribution.  I can pull it up.  It is noted in our

11  letter.  (Pause)

12         THE COURT:  You have 2028?

13         MR. QUIGLEY:  2028.

14         THE COURT:  You said in your letter that 512 and 2028

15  essentially put defendants on notice of this issue?

16         MR. QUIGLEY:  2028 puts defendants on notice of this

17  issue that Mr. Archer was aware Mr. Galanis was looking to

18  purchase an apartment with proceeds of the bond issues, yes.

19         512 puts defendants on notice the first wire out of

20  the WAPC account, the first wire that Jason Galanis tells

21  Dunkerley to send relates to the closing of the apartment.

22  This is highly relevant evidence what happens to the bond

23  proceeds, and the Archer Diversified piece of it is relevant

24  for two reasons:  Number one, to show that who bought the

25  apartment was, in fact, Mr. Galanis using Mr. Archer's name;

I6CJGAL1

1  and, second, to rebut and confront any argument that, defense

2  argument that Mr. Archer was not on notice of that.

3      THE COURT:  All right.  Do you want to respond, Mr.

4  Schwartz?

5      MR. SCHWARTZ:  Sure.  Just to start with the last

6  thing first, to be clear, Exhibit 512 are bank records for the

7  Wealth Assurance Private Client accounts, not something that

8  put Mr. Archer on notice of because it is not anything he ever

9  had insight into.  I agree with what Mr. Quigley said, and I

10  said this in my letter.

11      I have no problem with the government proving up the

12  fact, I would stipulate to the fact, that Jason Galanis

13  purchased an apartment in New York City using money that he had

14  taken out of the Wealth Assurance Private Client account.  No

15  problem with that.

16      The issue is simply the attempt to tie that to Mr.

17  Archer.  All they have on that point is two emails.  One is the

18  newly marked 2122, an e-mail that they've had for years and

19  years and years, and if what they were trying to prove was that

20  Mr. Archer was somehow aware of the fact his name was being

21  used, they could have marked this before trial.  That is not a

22  secret that that was going to be a defense theme.  That was

23  well fleshed out in all of our motions.  I object strongly to

24  the late notice part of this, but even taking it on its face,

25  it doesn't prove anything.  It doesn't support the inference

1    that they wanted to support.

2            Even if it is true that simply being passively CC'd on

3    an email from a lawyer to Momtazi was somehow to put Mr. Archer

4    on notice of the fact his name was being used, it wasn't being

5    used for anything inappropriate.  For someone to say hey, I'm

6    going to use your name when I apply to this club or some other

7    exclusive venue, that is very, very different from I'm going to

8    use your name in connection with the scheme to steal millions

9    and millions of dollars.

10           Even if it were true that Mr. Archer was aware his

11   name was being used by someone who he thought was a friend and

12   a business partner in order to do something legitimate like buy

13   a condominium, which he didn't know came from misappropriated

14   funds, that doesn't support the inference that he, therefore,

15   somehow knew Jason Galanis and others were using his name and

16   Mr. Biden's name in connection with their criminal scheme.

17           There is no evidence of that because if there was any

18   evidence of that, the government would be pointing to it

19   instead of pointing to this stuff, which is very late-coming,

20   right?

21           The email that they point to now, 2028, as the only

22   evidence that shows somehow Mr. Archer understood that the

23   Tribeca apartment that Jason Galanis purchased was being

24   purchased with money stolen from the Wakpamni bonds, that is

25   not what this email is.  That is not a fair inference from this

I6CJGAL1

1    email.  All this email says is look, we're about to close on

2    one of our first deals and I want to be in New York City.  That

3    is what this email says.

4           There is nothing that connects the two, and you've

5    seen already many, many, many emails that the government itself

6    has put into evidence that says what Jason Galanis communicated

7    to Mr. Archer and others was that the money from the bond

8    proceeds was going to be available for discretionary investment

9    so that the companies that they had invested in could use it to

10   make profits.  That's what Jason Galanis was telling people.

11          This email, 2028, doesn't prove anything, and again I

12   can't object strongly enough to the notice aspect of this

13   because we don't have time now to go through the millions of

14   documents that the government has produced to us and put

15   together the full story.  They have had these documents

16   forever.

17          Mr. Quigley said they just got 2225 and 226.  That is

18   not true.  2025 was a production from the SEC from years ago.

19   Maybe they didn't pay attention to it at the time.  It is

20   obvious they didn't pay attention to this issue until well

21   after trial started, but that shouldn't be charged against Mr.

22   Archer.  It is incredibly prejudicial for them to bring in new

23   evidence which is of such scant probative value this late in

24   the game without giving us an opportunity to fully investigate.

25          MR. QUIGLEY:  I disagree with Mr. Schwartz's

I6CJGAL1

1   characterization of 2028, number one, which is already in

2   evidence.  Mr. Galanis forwards Mr. Archer an email about the

3   bonds.  It is not about nothing else.  He said so close,

4   referring to the bond closing, massively -- Cliff, who is

5   Clifford Wolff, is running stall for me on NYC mansion.  I want

6   to be here and won't live in a 1750 foot cage.  Massively

7   motivated.

8          He is entitled to make his arguments from that, but I

9   think that suggests a strong inference that Mr. Archer was on

10  notice that Mr. Galanis intended to use at least some of the

11  bond proceeds in connection with the purchase a New York City

12  apartment.

13         So again, on the email we have to look back, your

14  Honor.  It is also possible that the email has Mr. Wolff on it.

15  I am not sure of this, but it may have been an email we got

16  relatively late in the game because it had Mr. Wolff on it, who

17  is an attorney subject to some of the privilege review.  I am

18  honestly not sure, but again the First American Title documents

19  we got the week before trial.  We produced in the same day to

20  the defense.

21         This was a matter of seeing how these documents fit

22  into our case.  It is two documents.  I don't think -- and it

23  is highly critical evidence in terms of proving what happened

24  to the first set of bond proceeds, just to be clear, and we are

25  responding to arguments raised by defendants at trial.  There

I6CJGAL1

was no -- we didn't get, you know, discovery before trial in

any meaningful way.  They argued, advanced the scheme

Mr. Galanis used Mr. Archer's name unknowingly, and this is

directly responsive to this.

          I don't have an issue with this, but we have, and this

makes sense from an efficient perspective.  We were willing and

accommodating to the defense, putting in defense exhibits in

our case rather than waiting for the defense case.  While we

are not waiving a rebuttal case, I think in light of that, in

light of the fact they are not having to put all that stuff in

in the defense case, it is permissible for us to do what is

ordinarily in the rebuttal case in government's case in

response.

          THE COURT:  I am going to allow these exhibits in.

          Mr. Archer rightly notes the only relevance to him is

that established through Government Exhibit 2122, in which he

is notified by Clifford Wolff, an attorney representing Jason

Galanis, the entity of which Jason Galanis was beneficial

owner, Archer Diversified, would rely on Mr. Archer's cachet so

purchase a condominium, and the company was using Mr. Archer's

office address.  The government apparently intends to show the

bond proceeds were used to purchase the condominium in

question.

          I agree with Mr. Archer this fails to definitively

establish he was aware Jason Galanis misappropriated the bond

I6CJGAL1

1    proceeds.  That fact does not warrant its exclusion.  Rather

2    the critical consideration is whether the risk of unfair

3    prejudice substantially outweighs the probative value

4    particularly in light of the critical nature to the government

5    of Mr. Archer's knowledge and intent in this case.

6            These exhibits have probative value.  Mr. Archer will

7    have ample opportunity to make his point to the jury that these

8    exhibits, in his view, do not establish his knowledge of the

9    improprieties committed by Jason Galanis.

10           With respect to 955, does the government want to be

11   heard on this?  I wanted to clarify whether you're seeking to

12   admit the statements made by the chairman of the board of

13   Wealth Assurance and two board members as relayed by Morton for

14   the truth of the matter asserted.

15           MR. QUIGLEY:  I think there is both a truth of the

16   matter asserted basis and state of mind basis to admit them.

17   Certainly I think they are -- if you want to break down the

18   email kind of sentence-by-sentence, right, we're going to move

19   forward, first of all, this a statement by a co-conspirator

20   during the course of the conspiracy.

21           It is also, as we said in our letter last night, in

22   furtherance of the conspiracy because he is seeking to enlist

23   the assistance of his attorney to provide color on payables to

24   the board of Wealth Assurance, so they get OP CAP and can close

25   ON the Atlantic acquisition.

I6CJGAL1

1          THE COURT:  My question is, so I understand that the

2     acquisition allowed Morton to later purchase the fourth tranche

3     of bonds on behalf of Atlantic's clients, but the acquisition

4     of Atlantic itself was a legitimate transaction, right?

5          So in terms of whether this was in furtherance of the

6     conspiracy, do you want to respond to that?

7          MR. QUIGLEY:  It depends on what you mean by

8     legitimate transaction.  There is evidence both in the record

9     and from --

10          THE COURT:  It wasn't financed with proceeds of the

11     bond issuance, but other illegitimate funds?

12          MR. QUIGLEY:  It was not financed with the proceeds of

13     the bond issues.  This is where the timing is critical and it

14     is the same pattern that occurred in Hughes.

15          A new company is bought, and within the matter of

16     weeks, over $16 million of bonds are placed in the Atlantic

17     account.  The purchase, Mr. Dunkerley testified that the

18     primary purpose of the acquisition of Hughes was to place the

19     first tranche of bonds in the Atlantic acquisition, and the

20     bonds followed the similar pattern.  The Atlantic closed seven

21     days after this, April 2, 2014.  Within two weeks OCERS had $16

22     million of the final tranche of Wakpamni bonds put in the

23     account, and a week after that Atlantic gets $300,000 infusion

24     of net capital.

25          So I guess it is not an illegitimate transaction.  It

I6CJGAL1

1    is illegitimate on its face.  The purpose of that transaction,

2    we argue and we think supported by the timing and the

3    circumstantial evidence, was to find buyers for the final

4    tranche of Wakpamni bonds.

5        Mr. Smith, his testimony supports that also.  He finds

6    out that the company has been bought, and then lo and behold, a

7    couple of weeks later he gets a message, by the way, we bought

8    $16 million of bonds in your account.  It is extremely, even if

9    not direct evidence, there is very strong circumstantial

10   evidence that the purpose of Atlantic, the purpose of Atlantic

11   acquisition was to find buyers for the final tranche of

12   Wakpamni bonds.

13       Here Michelle Morton is expressing -- and there will

14   be some testimony this morning from Turney and there was

15   testimony from Mr. Dunkerley, that that transaction closing of

16   Atlantic was drawn out and there was a back-and-forth about the

17   precise terms of that and that this was part of what got Ms.

18   Morton, and this is why it is relevant to her state of mind

19   also, not for the truth of the matter asserted, but what got

20   her over the hump in terms of closing Atlantic.

21       It is not a surprise she meets on March 25, 2015, and

22   we'll establish that one of the people she met with was Mr.

23   Archer on that day, and a week later the transaction closes,

24   and two weeks after that she buys $16 million of bonds that

25   nobody wants, and then gets $300,000 in operating capital, all

I6CJGAL1

1    within a span of less than, four weeks, less than a month.

2               THE COURT:  Does anyone want to respond on this one,

3    on 955?

4               MR. SCHWARTZ:  Excuse me?

5               THE COURT:  Does anyone want to respond on 955?

6               MR. SCHWARTZ:  I am not sure I heard the answer to

7    your Honor's original question, which was whether the hearsay

8    within hearsay is being offered for a non-hearsay --

9               THE COURT:  You are right.  Do you want to respond?

10              MR. QUIGLEY:  Sure.  I am not sure there is a

11   statement of fact from -- two things -- I am not sure that they

12   will give us the OP CAP, which is the statement Mr. Schwartz is

13   referring to, is a statement, out-of-court declaration from

14   somebody from Wealth Assurance coming in for the truth of the

15   matter asserted.  That shows Morton's state of mind and course

16   of dealing between her and the leadership of what he believed

17   was the board of Wealth Assurance.  There is not a hearsay

18   within a hearsay problem, I don't think.  It goes to her state

19   of mind and course of dealing.

20              THE COURT:  Do you want to respond?

21              MR. SCHWARTZ:  I will rest on the papers.

22              I don't think Michelle Morton's state of mind on this

23   issue is of any particular relevance.  This is not really a

24   statement in furtherance of the conspiracy.  I understand the

25   logic that Mr. Quigley just articulated, which is to say

I6CJGAL1

1    somehow the entire acquisition of Atlantic and Hughes was, in

2    their view, in furtherance of the bond scheme, but there is no

3    question these were also legitimate transactions, as he says,

4    in the sense they're all funded from legitimate money in order

5    to further a legitimate goal.

6           I don't know how your Honor can conclude in the way

7    that you would have to that this is a statement in furtherance

8    of the conspiracy, one; and, two, the underlying hearsay, the

9    statements of the board members, is plainly being offered for

10   its truth.  The relevance of Michelle Morton's state of mind is

11   unarticulated and totally unclear.  This entire thing is

12   totally confusing.

13          They say they're going to be able to prove there was a

14   meeting at which Mr. Archer attended.  If that is so, they

15   should prove it.  That is not what this says.  As we put in our

16   letter, there it is utterly unclear who this could be referring

17   to because it is simply impossible that Michelle Morton met

18   with the chairman and two other board members of Wealth

19   Assurance, and one of them was Mr. Archer because that

20   configuration of people literally could not exist.  It is very

21   very confusing.

22          MR. QUIGLEY:  On the last point, well, I don't think

23   that the statement they will give us OP CAP is a hearsay within

24   a hearsay statement.  Again it is relevant to Morton's state of

25   mind and future course of dealing.  Her state of mind is

I6CJGAL1

relevant.  She pled guilty, but she is still a co-conspirator
and her state of mind is relevant to proving the existence of
the conspiracy.

THE COURT:  Sorry.  Just clarify for me who all the
people referenced in the email are.

MR. QUIGLEY:  She had a meeting in New York City on
March 25th.  I believe it was at the Burnham offices.  In her
text message with Jason Galanis she makes clear one of the
people she met with was Mr. Archer that day, she met with him
that day.

In terms of the chairman of the board of Wealth
Assurance, I think, I don't know who she is precisely referring
to, but she is referring to, she met with Mr. Archer that day,
and they discussed, it is clear from the text messages that
will come in later, among the topics of discussion were the
acquisition of Atlantic.

I think one thing here in terms of Wealth Assurance
AG, Wealth Assurance Holdings, Wealth Assurance Private Client,
we have made, and the defense has made, and it is right to
make, to be accurately precise at trial.  That is not the way
people talk in context emails.  She is not necessarily
referring to the board of Wealth Assurance AG here.  She is
referring to the people who she believed were her financial
backers, who she was having discussions about the terms of the
Atlantic acquisition.

I6CJGAL1

```
 1              THE COURT:  The jury is here now.  When were you
 2    planning to read this?
 3              MR. QUIGLEY:  Turney, the first witness after the
 4    email reading because he is a percipient witness on this.
 5              THE COURT:  I will rule at sidebar before Turney comes
 6    in.  Do you want to make one more point?
 7              MR. SCHWARTZ:  To make the suggestion, which may not
 8    be practical, the evidence they say they're going to put in
 9    showing this meeting occurred, as we will demonstrate later on
10    in cross-examination, they're confused, they're conflating a
11    few different meetings, and I had suggested wait until that
12    comes in to rule.  If it is for Turney, you can't.  They're
13    simply wrong about the meeting.
14              MR. QUIGLEY:  We'll offer it to subject to connection
15    and not publish it to the jury.
16              THE COURT:  I am going to think about that for a few
17    minutes.  I ruled on the Cooney-Crafton reporting.  I want to
18    talk with defense counsel, with everyone, obviously, before the
19    defense case about ways in which I think the portion I have
20    been given should be shortened and redacted.  I have answered
21    the government's point on that.  Can we bring in the jury?
22              MR. SCHWARTZ:  Can I say one last thing going back to
23    to the Archer Diversified email?
24              THE COURT:  Yes.
25              MR. SCHWARTZ:  I am not seeking to reargue your
```

I6CJGAL1

1     Honor's ruling.  In light of the ruling, I want to renew my

2     request in alternative for an adjournment in order to

3     investigate.  In particular, through a witness, through

4     Catharine Driever, who was on the stand long before the

5     government marked this evidence, I brought out evidence about

6     the real Archer Diversifed, which is Mr. Archer's entity, and

7     it is going to be absolutely necessary to disentangle the Jason

8     Galanis Archer Diversified TCG from the real Archer

9     Diversified, and that will require some time unless the

10    government wants to stipulate that they're entirely different

11    entities and Mr. Archer has nothing to do with Archer

12    Diversified TCG.

13              THE COURT:  Would you be willing to stipulate to that?

14              MR. QUIGLEY:  Your Honor, we are willing to discuss a

15    stipulation.  I don't know if we are quite willing to go that

16    far in terms of Mr. Archer having nothing to do with it.  I

17    take the point that the Archer Diversified, there is more than

18    one entity with Archer Diversified.

19              THE COURT:  When are you going to utilize those

20    exhibits?

21              MR. QUIGLEY:  We were going to read them in -- well, I

22    think it depended -- we talked with Mr. Schwartz about a

23    stipulation from those exhibits which I think was awaiting your

24    ruling on this issue, then the email we were going to read in

25    through email reading.  It is not something that needs to

I6CJGAL1

1    happen today.

2            THE COURT:  Okay.  It is not something that --

3            MR. QUIGLEY:  Needs to happen today.

4            THE COURT:  My only question is can you talk about a

5    possible stipulation distinguishing the two Archer

6    Diversifides?

7            MR. QUIGLEY:  There are emails and documents in that

8    production that show when that Archer Diversified was created,

9    and we can work --

10            MR. SCHWARTZ:  We'll talk about.

11            THE COURT:  We'll bring the jury in, then.

12            MS. NOTARI:  Mr. Hassan, can we get him?

13            THE COURT:  Sure.  (Pause)

14            (Off-the-record discussion)

15            MS. NOTARI:  We are just reading now?

16            THE COURT:  We are just reading now, yes.

17            MS. NOTARI:  That is okay.  We can start.

18            (Jury present)

19            THE COURT:  Good morning, everyone.  Good morning.

20    You may be seated.  Thank you.  You may proceed.

21            MS. TEKEEI:  Thank you, your Honor.  Before we get

22    started, we would like to offer the following exhibits into

23    evidence:  Government Exhibits 2095, 2224, 2299, 2294 and 1271.

24            THE COURT:  They will be admitted.

25            (Government's Exhibits 2095, 2224, 2299, 2294 and 1271

I6CJGAL1

received in evidence)

        MS. TEKEEI:  Thank you, your Honor.

Q.  Special Agent, good morning.

A.  Good morning.

Q.  If you could turn to Government Exhibit 2115.

        MS. TEKEEI:  Per the court's earlier ruling, this is

now in evidence, your Honor.

        THE COURT:  Yes.

BY MS. TEKEEI:

Q.  This is an email on September 24th, 2014 from Chase to

subject your wire transfer to Jason at holmbycompanies dot com

for Chase account ending in 3181:  This is a security alert you

requested to help you protect your account.  A wire transfer of

USD $15 million to has exceeded your USD $125 alert limit on

September 24th, 2014.

A.  This email was forwarded on the same day from Jason Galanis

to Devon Archer, Clifford A. Wolff, Esquire, and Sebastian

Momtazi, FYI.

Q.  If we could now turn next to Government Exhibit 2052.

Email from Jason Galanis –– Jason at holmbycompanies dot com on

October 21, 2014.  Working Fondinvest and Atlantic.  Will

report.  Couple of other "sniblees" percolating.

A.  On October 1, 2014, Devon Archer, big accomplishment today

gentleman.  Let's each have chug of wine beer or shot.  Devon

Archer.

I6CJGAL1

Q.  Email on October 1, from Bevan Cooney to Devon Archer CC Jason at hombycompanies dot com.  A satellite toast is in order.

If we can turn next to Government Exhibit 2231.  On October 1, 2014, Jason Galanis wrote:  Agreeing is getting reference letters together for West Broadway closing.  Dean of Oxford, Ex-assistant Deputy Attorney General of the United States, and a former Assistant U.S. Attorney.  Not presidents and secretaries, but scrappy for the damaged Greek.

A.  Bevan Cooney then wrote, let me start by saying Jason Woodruff Galanis is a man of Valor and integrity.  He has a real appreciation for burning the midnight oil with his friends.  Loves blaring loud music, over eating and drinking more than his fair share of alcohol.  He is a modern day Roman.

Q.  From Devon Archer same day to Bevan Cooney, copying Jason Galanis, seconded.  Devon Archer.

If we can turn next to Government Exhibit 3215.  And Ms. Shinewald, if you can go to the second page of this exhibit to begin with.

We'll start with on October 1, 2014, Matthew Fillman wrote:  Bevan:  All the paperwork has been submitted.  I should have the new account forms for signature tomorrow morning.  Eric can sign those on your behalf.  I will scan a copy back to the bank and send the originals with our afternoon courier.  The account should be open and I will have the account number

I6CJGAL1

1    for you sometime tomorrow afternoon.

2    A.   Then on Thursday, October 2, 2014, Bevan Cooney sent an

3    email to Matthew Fillman, CC Eric Fulton with a subject line

4    re:   Securities account for muni bonds.

5         Matthew, do we have my securities account open.   Need

6    account number and wiring info asap.   Want to buy these bonds

7    tomorrow if possible.   Best, Bevan.

8    Q.   On October 2, Matthew Fillman wrote:   Where are you now?

9         And, Ms. Shinewald, if you could please place this

10   page over to the right and pull up the first page of the

11   exhibit on the left.

12   A.   Bevan Cooney then wrote to Matthew Fillman in Tahoe.

13   Q.   On October 2, Matthew Fillman wrote I forgot your checking

14   account is in your trust.   Are you okay with us signing a cert.

15   of trust on your behalf?   So we can get this done today.

16   A.   Bevan Cooney then responded to Matthew Fillman, CC'g Alexis

17   Gluckman, yes, of course.

18   Q.   On October 3, Matthew Fillman wrote account number is MGR

19   200234.   Reggie (Regina) Clark and Jimmy Torres are assigned

20   the account but anyone can help you.

21   A.   Then Bevan Cooney responded to Alexis Gluckman and Matthew

22   Fillman:   Thanks again Matthew, planning on wiring funds on

23   Monday and buying the bonds.   Have a great weekend.

24        (continued on next page)

25

I6C7GAL2

1    Q.   Turning next to Government Exhibit 2053.   On October 7,

2    2014, Catharine Driever wrote:

3            "Hi, Devon.   Our compliance group needs more info

4    regarding FLKM and Wakpamni.   More detail is better than less

5    in order to get these approved.

6            "FLKM

7            "1.   How were these shared shares obtains?   We know

8    they were transferred here from Interwest, but who did they get

9    to Interwest?

10           "2.   On the form you indicated that the shares were

11   free -- were they a form of compensation, etc.?

12           "3.   Were these shares ever restricted?

13           "Wakpamni

14           "1.   Please provide more detail as to how you came to

15   know of this issuance.

16           "2.   How was the $15 million generated that was used

17   to purchase the bonds?"

18   A.   Then Devon Archer responded, cc'ing Sebastian Momtazi,

19   Eugene Schatz, to Catharine Driever, on Tuesday, October 7,

20   2014, with the subject line:   More info needed FLKM and

21   Wakpamni.

22           "1.   Shares were part of compensation for packaging

23   deal.

24           "2.   I think they were purchased at $0.01 par.

25           "3.   Not restricted.

I6C7GAL2

1          "1.  Burnham Financial packaged the issuance of which

2     I am a shareholder.

3          "2.  $15 million was generated through sale of real

4     estate.

5          "Devon Archer."

6     Q.  If we could turn next to Government Exhibit 1272, e-mail

7     from Jason Galanis on October 6, 2014 to Timothy Anderson,

8     copying Jared Galanis:

9          "I'd like to close him tomorrow if possible.  His name

10    is Bevan Cooney.  He has his money managed at City National.

11    Experienced institutional bond desk there.

12         "Let me know what we need."

13    A.  A response from Timothy Anderson, dated October 7, 2014 to

14    Jason Galanis, cc'ing Jared Galanis:

15         "Bevan Cooney is OK closing tomorrow/Thursday?  He'll

16    need to sign the big boy letter.  Nothing else.  I'll get

17    Burnham's signature package together as well.  Timothy

18    Anderson."

19    Q.  E-mail forwarded from Jason Galanis on October 7 to Bevan

20    Cooney.  If we could turn next to Government Exhibit 1226.

21    And, Ms.Sheinwald, turning to the third page of that exhibit,

22    e-mail from Sebastian Momtazi to Cheryl Green and Alex Hewit

23    copying John Tonzola and Devon Archer, on September 30, 2014,

24    subject:  Bond Purchase:

25         "Hi, Cheryl.

I6C7GAL2

1          "Would we be able to purchase and hold some of the

2     bonds below through Deutsche Bank?  It's a knew issue, DTC

3     eligible.  Please let me know the process.  Thanks and best,

4     Seb."

5          "Issuer:  Wakpamni Lake Community Corp. S D SPL LTD

6     REV.

7          "Issue Description:  Taxable town center develop

8          "Dated:  September 26, 2014."

9     A.  Also on September 30, 2014 Cheryl Green wrote:  "Hi

10    Sebastian, we'll get back to you on this momentarily.  In the

11    meantime, the attached was sent earlier and I did not see a

12    signed copy back to us.  (See attached file:  W-9.pdf).  Thank

13    you.  Kind regards, Cheryl Green."

14    Q.  Ms.Sheinwald, if you could pull up page 1 of this exhibit

15    on the left and page 2 on the right side by side.  E-mail from

16    Sebastian Momtazi to Cheryl Green copying Alex Hewit, Devon

17    Archer and John Tonzola, on October 7:

18          "Hi, Cheryl and Alex.

19          "Thank you for your help getting the account opened so

20    swiftly.  Rosemont Seneca Bohai owns a portion of the bonds

21    now.  What steps would we need to take to have them held at

22    Deutsche Bank?"

23    A.  On October 7, 2014 John Tonzola wrote:  "How did the entity

24    come to own these bonds?  Also, where are these bonds held

25    currently?"

I6C7GAL2

1    Q.  E-mail from Devon Archer on October 8 to John Tonzola

2    copying Sebastian Momtazi, Alex Hewit and Cheryl Green,

3    regarding bond purchase:

4              "1.  Real estate sale.

5              "2.  Currently held at Morgan Stanley Archer

6    Diversified Private Banking account.  Devon Archer."

7              If we could turn next, Ms.Sheinwald, to Government

8    Exhibit 3216, and turning to the second page if you could

9    please put the first page next to the second page again.

10   E-mail from Alexis Gluckman on October 7:

11             "Hi, How do you want me to record the wire that came

12   in yesterday?"

13   A.  Then a response from Bevan Cooney sent Wednesday, October

14   8, 2014 to Alexis Gluckman, with the subject:  Huge wire.

15   Smiley face.

16             "Book as a loan, Alexis.  Thanks."

17   Q.  From Alexis Gluckman to Bevan Cooney the same day:  "Will

18   do."

19             If you could turn next, Ms.Sheinwald, to Government

20   Exhibit 3217.

21   A.  This is an e-mail with subject: "These instructions are for

22   purchase of Wakpamni Town Center bonds for tomorrow a.m.  From

23   Bevan, dated October 9, 2014, to Matthew Fillman:

24             "To whom it may concern, please consider this my

25   written instruction for the purchase of $5 million of the 6.02

I6C7GAL2

1  percent Wakpamni Town Center development bonds due in 2021

2  (CUSIP:  931130 AD0).

3          "The issue is a private placement new issue.  U.S.

4  Bank is the indentured trustee and the bond registrar.

5          "A wire should be initiated to U.S. Bank for $5

6  million and physical delivery should be coordinated with U.S.

7  Bank directly.  The bank's wiring and contact information is

8  below.

9          "thank you for your assistance.  Bevan Cooney.

10          "Issuer:  Wakpamni Lake Community Corp. S D SPL LTD

11  REV.

12          "Issue description:  Taxable Town Center DEV-SER A.

13          "Dated:  October 9, 2014."

14  Q.  Ms.Sheinwald, if you could turn next to Government Exhibit

15  1236, beginning with the e-mail in the middle of the page.

16          On October 9, 2014, Bevan Cooney wrote:  "Just

17  executed my $5 million bond purchase without a hitch at City

18  National Bank Archie.  Need to get you out of Morgan Stanley."

19  Emoticon.

20  A.  Also on October 9, 2014, Devan Archer wrote:  "It's over.

21  Milkman sucks.  Moving to DB.  Big leverage.  Devon Archer."

22  Q.  The same day Bevan Cooney wrote:  "We gave Milky his shot.

23  He's Dungi."

24  A.  Then Devon Archer wrote also on October 9, 2014 to Bevan

25  Cooney, with the subject line:  WLCC bond copy.

I6C7GAL2

1          "Loser.  Devon Archer."

2  Q.  If we could turn next, Ms.Sheinwald, to Government Exhibit

3  1273. and if you could please put page 1 and page 2 of this

4  exhibit next to each other.

5          E-mail from Michelle Morton.  Subject:  Proper Screen

6  Shot.  On October 16, 2014 to Jason Galanis:

7          "Embedded and attached is the proper screen shot:

8          "Wakpamni Lake Community Corp., Special Limited

9  Revenue Taxable Town Center Development Series A.

10         "Issue type:  Revenue bonds.

11         "Borrower:  Wakpamni Lake Community."

12 A.  Betty Mills then forwarded from Jason Galanis on Thursday,

13 October 16, 2014, to Bevan Cooney with the subject:  Proper

14 Screen Shot.

15 Q.  Ms.Sheinwald, if we could turn next to Government Exhibit

16 2241.

17         On October 9, 2014, Keith Henselen at U.S. Bank.com

18 wrote:  "The physical bond was sent via UPS on October 9, 2014,

19 received October 13, 2014 to Bevan Cooney per the instruction I

20 received.  Delivered to Incline Village, Nevada address?"

21 A.  Then Bevan Cooney responded on Wednesday, October 29 to

22 Keith Henselen, cc'ing Matthew Fillman, Alexis Gluckman and

23 Timothy B. Anderson with the subject line:  These Instructions

24 Are For Purchase of Wakpamni Town Center Bonds for tomorrow

25 a.m. 10/9/2014:

I6C7GAL2

1        "I have this paperwork from the bond.  Should I

2    deliver this to City National Bank?"

3    Q.   E-mail on October 29, Matthew Fillman wrote:  "Just get it

4    to me."

5    A.   Then Bevan Cooney responded to Matthew Fillman on

6    Wednesday, October 29, 2014:  "Just dropped off the bond at

7    Steve Shapiro's office.  Thanks Matt."

8    Q.   Ms.Sheinwald, if we could turn next to Government Exhibit

9    3276.

10        On November 10, 2014 Matthew Fillman wrote:  "They are

11    a go, started the process ..."

12        "What's the deal with/these bonds?  Is there a back

13    story?  Did someone turn you on to this particular issue?"

14    A.   Bevan then responded to Matthew Fillman on Monday, November

15    10, 2014, with the subject line:  Pershing is a go ...

16        "Good news Matt.  Yes, Burnham Securities out of New

17    York was the placement agent.  That's who turned me on to it.

18    Thanks for all the help.  Best, Bevan."

19    Q.   If we could turn next to Government Exhibit 2256, and,

20    Ms.Sheinwald, if you could turn to the second page of this

21    exhibit, the e-mail at the bottom from Bevan Cooney to Debbie

22    Robert, Eric Fulton, Elizabeth Ricin and Alexis Gluckman on

23    January 15, 2015, subject:  Source of Down Payment for 1920 Bel

24    Air:

25        "Please send me the wire info on the $3.9 million that

I6C7GAL2

1    came into my account and went out to Camden Escrow for the down

2    payment for the 1920 Bel Air purchase."

3    A.   On January 16, 2015 Debbie Robert wrote:  "I have added the

4    wire instruction sheets to the Dropbox.  I sent you the link

5    yesterday.  Please let me know if you need it again?"

6    Q.   Now, Ms.Sheinwald, if you could now turn to the first page

7    of this exhibit, an e-mail from Bevan Cooney on Tuesday,

8    January 20, 2015 to Debbie Robert:

9              "Debbie, please send me a pdf of the down payment wire

10   info from Wealth Assurance Holdings and the wire from CNB to

11   Camden Escrow.  It's not showing up in their Dropbox for some

12   reason."

13   A.   Then Bevan wrote to Jason Galanis with the subject:

14   Forward source of down payment for 1920 Bel Air.  On Tuesday,

15   January 20, 2015:  Two attachments:  One, wire incoming.pdf;

16   and the other, escrow outgoing.pdf.

17   Q.   And, Ms.Sheinwald, if you could pull up the fifth page --

18   sorry -- the 7th page of this document, which is the first

19   attachment.  One more page over.

20             Now, Ms.Sheinwald, if you could next turn to

21   Government Exhibit 2070, an e-mail from Jason Galanis, subject:

22   Responses requested.  On March 5, 2015 to Michelle Morton.

23             "Michelle, you asked for some specific information.

24   The responses are below.

25             "In connection with the issuance of the bonds, partial

I6C7GAL2

proceeds were released to the Oglala Sioux in accordance with

the bond offering.  The rest of the proceeds are invested in

the annuity.  The annuity is up four percent since issuance.

"The construction of the bonded warehouse has started.

Recent photos attached.  It will be operated as a certified

U.S. customs bonded warehouse and legally able to receive

imported distilled sports tax free and be authorized to sell

and ship to other Indian nations.

"The tribe has the right to draw additional monies

from the annuity on the 30th month anniversary of the bond

closing.  This is based on a third-party appraisal of the

business, as provided for in the supplemental offering

memorandum."

A.   Then Jason Galanis wrote to Devon Archer and Bevan Cooney

on Friday, March 6, 2015, forwarded responses requested and

attachment:  A recollection.pdf.

Q.   Ms.Sheinwald, if you could please pull up the first

attachment and the second attachment which are pages 3 and 4 of

this exhibit next to each other.  Sorry, I meant to say pages 2

and 3.

And if you could now turn to the fourth page of the

exhibit.

OK.  If you could turn next to Government Exhibit

2072, e-mail from jason@holmbycompanies.com on March 6, 2015 to

Michelle Morton, subject:  U.S. Bank confirm of annuity

I6C7GAL2

1    purchase.

2    A.   Then there was an e-mail from Holmby to Devon Archer and

3    Bevan Cooney, sent Saturday, March 7, 2015, with the subject:

4    U.S. Bank confirm of annuity purchase.   And two attachments:

5    WLCC Town center bonds closing statement, 9OCT2014.pdf; and the

6    other ATT00001.htm.

7    Q.   Ms.Sheinwald, if you could please turn to the first page of

8    the attachment, which is page 2 of the exhibit, closing

9    statement $15 million Wakpamni Lake Community Corporation,

10   special limited revenue bonds (taxable), series of 2014 (town

11   center development).

12        Ms.Sheinwald, if you could turn next to Government

13   Exhibit 2276, e-mail from Richard Isaacs, subject:  Pershing

14   and DTC on March 25, 2015 to btcooney@g-mail.com.

15        "Bevan, Pershing has refused to initiate the input of

16   the bonds into the DTC system.  They claim regardless of

17   circumstance, the broker/dealer that inputs a bond in the

18   system to create DTC eligibility is incurring a potential

19   liability to other issues if they arise with the bond.  Given

20   they didn't underwrite, and the size of the issue, I can't get

21   them comfortable or willing.  At this point I have run out of

22   options.  I believe the best course of action is to immediately

23   establish a Morgan Stanley account with the person who handles

24   your partners and arrange for them to complete this process for

25   you.  Logistically, if we're going to move them to Morgan

I6C7GAL2

Stanley, we need to deliver the bonds to you.  I have inquired
whether they will take your instructions to deliver the bonds
via their overnight service (UPS) to a direct contact at Morgan
Stanley or if they will only send to your address of record
which is listed on your account.  That address is Fulton &
Meyer.  Based on this past history, I suspect it will be to
address of record at F & M.  Given it's tax time, if we do send
to Fulton & Meyer, I want to make sure we send directly to Eric
and have Monika on the look out for the bonds.  We can provide
Monika on instructions on where to forward them.

          "I'm very sorry this is not the news/outcome we've
hoped for.  I appreciate your patience and effort as we
exhausted our options."

A.  Also on Wednesday, March 25, that e-mail was forwarded from
Bevan Cooney to Jason Galanis:  "Fuck."

Q.  Ms.Sheinwald, if you could turn next to Government Exhibit
2118, an e-mail from Devon Archer to jason@holmbycompanies.com,
copying Sebastian Momtazi on March 27, 2015, the subject:
Director Conf of APPT-VL Assurance (Bermuda) Ltd. and
attachment.

          And, Ms.Sheinwald, if you could show us the first page
of that attachment.

A.  This is a letter with the heading from the board of
directors of VL Assurance (Bermuda) Ltd.

          "Dear sirs, the undersigned hereby accepts the

I6C7GAL2

appointment as a director of VL assurance (Bermuda) Ltd, ("The Company") effective when so appointed by the shareholder of the company.  For the purpose of the register of directors and officers of the company, and for service of notice of board meetings, the contact details are as follows:

"Devon Archer, 152 West 57th Street, 47th floor, New York, New York 10019, USA, United States of America.

"E-mail:  Darcher@rosemontcapital.com,

"Yours faithfully, signed Devon Archer.  Dated March 27, 2015."

Q.  Ms.Sheinwald, if you could turn next to Government Exhibit 2075, e-mail from Sebastian Momtazi on March 31 to Iris Gomez, copying Devon Archer.  Subject is bond transfer:

"Iris, per our conversation, please see attached letter and instructions.  Let me know what we need to do to get this done quickly."

A.  Then on March 31, 2015 Sebastian Momtazi wrote to Iris Gomez, response with an attachment bond signatures.pdf. "Attached are signed copies."

Q.  And, Ms.Sheinwald, if you could turn to the second page of this exhibit.

A.  This is a letter dated March 27, 2015 from Morgan Stanley, attention Kyle Wool.

"Dear Mr. Wool, please DTC 9000 Wakpamni Lake SD Community Corp. SPL Limited Revenue bonds from the account

I6C7GAL2

titled RSB LLC (654-028319) to the follow instructions:

"DTC352, account:  Burnham Securities, Inc. SDN collateral account.

"If you have any questions, please feel free to call. Thank you.  Signed Devon Archer."

Q.  And, Ms.Sheinwald, if you could turn to the third page, regarding transfer instructions.

"Dear Mr. Wool, confirming our conversation, RSB is participating in a capital increase of Valor Group Ltd. (f/k/a Wealth Assurance Holdings; Bermuda stock exchange:  WAH.BH). Valor Group is acquiring 100 percent of Bermuda International Insurance Services Ltd. from the BF&M, the 100 year old Bermuda Stock Exchange-listed insurance group.

"As you know, Devon Archer is an existing beneficial owner of Valor Group common stock.  This stock is held with MSSB.

"Please consider this your written instructions to transfer to HSBC (instructions below) by DTC bonds from the account titled RSB LLC issued by Wakpamni Lake Community Corp. SPL (CUSIP) in the amount of $11.6 million, at par.

"The transaction is closing tomorrow, so the consideration needs to be delivered post haste.  Please advise what steps need to be taken to confirm the transfer for tomorrow.

"Thank you."  Signature.

I6C7GAL2

1          Ms.Sheinwald, if we could turn next to Government

2   Exhibit 3245, and beginning with the bottom e-mail.

3   A.   On Wednesday, April 1, 2015 Bevan Cooney wrote to Alexis

4   Gluckman with the e-mail subject:  Make sure this still gets

5   paid, Alexis.

6          "Alexis did you get the e-mail regarding the sale of

7   my bonds and the process we need to complete?"

8   Q.   On April 1, Alexis Gluckman wrote:  "Just read it now and I

9   will start the process."

10  A.   Then Bevan Cooney responded to Alexis Gluckman:  "Call Rich

11  Isaacs my broker if you have any questions.  We need to make

12  sure I sign anything we need me to before I leave on Saturday.

13  This is a huge trade.  Have an institutional buyer lined up to

14  take me out of this bond position.  Super top priority.  Solves

15  all my problems.  Thanks A."

16  Q.   If we could turn next to Government Exhibit 2077, e-mail

17  from Sebastian Momtazi to Iris Gomez and Joseph Fereno, cc

18  Devon Archer, on April 9, 2015, the subject is bonds transfer.

19         "Iris, please see attached for a bonds transfer

20  request to be completed ASAP."

21         And, Ms.Sheinwald, if we could turn to the attachment.

22  A.   The attachment has a header of RSB LLC, dated April 9,

23  2015, Iris Gomez, Morgan Stanley wealth management, re:

24  654-028319.

25         "Dear Iris, please take this letter as authority to

I6C7GAL2

transfer the entire position ($15 million) Wakpamni Lake

Community bonds (CUSIP 931130AC2) from RSB LLC Morgan Stanley

account 654-028319 to VL Assurance (Bermuda) Ltd. Morgan

Stanley account 654-030737.  Thank you."  Signed Devon Archer.

Q.  If we could turn next to Government Exhibit 2079, and

beginning at the e-mail on the bottom.

A.  On April 24, 2015 Jason Galanis wrote:  "Guys, if we

hustle, we can get the $5 million on the Burnham's balance

sheet this month.  This would require Bevan getting his

physical bond delivered to U.S. Bank for transfer into

Burnham's name.  This would mean Fed Ex'ing today.

        "As an alternative, Andrew, you should check with

Marcel to see if the bond can be recorded on the balance sheet

if Burnham has in hand, one, an executed secured demand notice

from Cooney, two, the physical securities delivered from Cooney

to Burnham together with medallioned stock powers.  My strong

belief is the securities would be deemed delivered if this were

in hand, and the deposit of the security would be

administrative only between Burnham and U.S. Bank.

        "We need to confirm "the deal" between the parties

today.  I've discussed with both of you what I wanted to

achieve.  Broadly the goal is to get Cooney some reliable

income while getting Burnham net cap it can be

commercialized" -- I'm sorry -- "it can commercialize.

        "Separate from Bevan, I believe that an structure that

I6C7GAL2

would be equitable to the Indians would be for Burnham to pay some partiipation on the revenue generated that is attributable to net cap.  Let's discuss today.

"Open question remains about Bonwick net cap and whether Burnham could deliver securities to Bonwick and essentially stack.

"Separately we need to paper the $3 million and the $650,000 cash infusions, and the impending $750,000.  Also the money we are putting in Burnham to put in Bonwick.  There will also be an aggregate of over $10.5 million of new money invested in Burnham.  Jason."

Q.  From Bevan Cooney the same day:  "Let me know if we should send to U.S. Bank or Burnham.  I can expedite this morning. Let's get the process started."

A.  Also on the same day, Andrew Godfrey wrote:  "The best bet would be to send to Burnham.  That way Marcelle can place into separate subordinated loan account."

Q.  E-mail from Bevan Cooney the same day to Andrew Godfrey, copying Jason Galanis and Devon Archer, Re:  Burnham.

"I will have the cert medallion guaranteed and sent to Burnham.  I will e-mail my business manager Alexis and copy you Andrew so we can hopefully get this expedited and out to Burnham this a.m."

If we could turn next to Government Exhibit 2084, and beginning with the e-mail on the bottom from Jason Galanis,

I6C7GAL2

1    subject:  Morgan revised five responses.  On April 30, 2015, to

2    asteichen@valorlife.com.

3            "Aloyse, one version is red lined so you can see the

4    revisions made to reflect your comments.  The other is clean.

5    They did not ask for an org chart.  My instinct and advice is

6    not to offer it yet.  I would recommend being responsive only

7    to what they asked in the teaser.  Your call of course.  Best,

8    Jason."

9    A.  On April 29, 2015, Jason Galanis wrote:  "Relentless Greek

10   attack."

11   Q.  The same day, Bevan Cooney wrote:  "The 'Greek Machine'

12   just doesn't stop."

13   A.  Then Holmby wrote:  "Arch and I attacking Teneo tomorrow.

14   I have Devin with an I tomorrow.  Huge."

15   Q.  E-mail from Bevan Cooney on April 30, 2015 to

16   jason@holmbycompanies.com, copying Devon Archer:  "We continue

17   to press until we have a huge surplus of excess honey.  Devon

18   should be a great bee keeper for our native bonds.  Excited to

19   hear how that meeting goes."

20           Ms.Sheinwald, if you could turn next to Government

21   Exhibit 2086.  On May 12, 2015 Sebastian Momtazi wrote:  "Hi,

22   David.  Would you be able to provide a letter requesting that

23   the Wakpamni bonds in the VL Assurance group be transferred to

24   be under the Kyle Wool/Jerome Niles Rep 41 group?"

25   A.  Also on May 12, 2015 Devon Archer wrote:  "Sorry to keep

I6C7GAL2

1   pressing this but if we can get the bonds back to MS Wool Group

2   statement it will be very helpful for the Burnham change of

3   control app with FINRA.  Change of control requires personal

4   statement.  Devon Archer."

5   Q.  E-mail from Jason Sugarman the same day to Devon Archer

6   copying jason@holmbycompanies.com, regarding the VL assurance

7   bonds.

8            "It's fine.  David already agreed.  No issue."

9            Ms.Sheinwald, if you could turn next to Government

10  Exhibit 2092, and beginning with the e-mail on the bottom.

11  It's an e-mail from Devin Wicker on May 28, 2015 -- I'm

12  sorry -- I think -- beginning with the e-mail at the very

13  bottom on May 28, 2015, Devon Archer wrote:  "Devon, how are we

14  tracking here?  Do we have everything on our side?  And,

15  secondly, is there anything else we need from MS?  Thanks,

16  Devon."

17  A.  Devin Wicker then wrote on May 28, 2015 to Iris Gomez,

18  Devon Archer, Andrew Godfrey, Sebastian Momtazi, Kyle Wool,

19  Jerome Niles, Joseph Fereno and Al Dedona:  "I believe we are

20  close to being open if not open already.  Regards, Devin

21  Wicker."

22  Q.  E-mail from Holmby to Devon Archer regarding Bonwick

23  account:  "Huge."

24            I'm sorry, Ms.Sheinwald, if you could go back to the

25  e-mail on the bottom of the second page here which we omitted,

I6C7GAL2

1    e-mail from Devon Archer on May 28, subject:  Bonwick account.

2    To Devin Wicker, Kyle Wool and Iris Gomez, copying Andrew

3    Godfrey and Sebastian Momtazi:

4         "Kyle, as discussed we need to open an account for one

5    of our operating subsidiaries Bonwick.  We plan to fund the

6    account immediately and request we move quickly to execute.

7         "Devin runs Bonwick and is copied here.  He can

8    provide all of the relevant details for the account opening.

9         "Many thanks.  Best, Devon."

10        Ms.Sheinwald, if we could turn next to Government

11   Exhibit 2093, and if you could put page 1 on the left next to

12   page 2 on the right.  E-mail from Bevan Cooney on May 28, 2015

13   to Sebastian Momtazi, subject:  Cooney bond power.  Attached

14   document May 28, 2015.

15   A.  The attachment is an irrevocable stock or bond power for

16   value receiver, the undersigned does (or do) hereby sell,

17   assign and transfer to, printed name, Bonwick Capital Partners

18   LLC, Social Security or taxpayer ID number 27-4436830, in the

19   principal amount of $5 million, dated May 28, 2015."  Signed.

20   Signature.

21   Q.  If you could turn next to Government Exhibit 2094.

22   A.  This is an e-mail from Bevan Cooney to Sebastian Momtazi

23   dated Friday, May 29, 2015:  "I authorize you to sign on my

24   behalf on my Wakpamni bonds Sebastian.  Thanks, Devon Bevan."

25   Q.  And, Ms.Sheinwald, if you could next turn to Government

I6C7GAL2

1    Exhibit 2095. and beginning with the e-mail on the bottom from
2    Freddie Rivera on May 29 to Kyle Wool, Jerome Niles, Iris Gomez
3    and Joseph Fereno.  Subject is bond certificate received.
4          "Good afternoon all, just wanted to inform you that we
5    received the below bond certificate today.  It has been
6    deposited into the account as of May 29, 2015 and should
7    reflect in the account by Monday.  The May statement should
8    also show the deposit for the clients record.
9          "Account received:  Bonwick Capital Partners LLC.
10         "Issuer:  Wakpamni Lake Community Corporation.
11         "Quantity:  $5 million.
12         "Issue date:  October 9, 2014.
13         "Registered to:  Bevan Troy Cooney Family Trust."
14   A.  On the same day Kyle Wool then forwarded that note to Devon
15   Archer and Sebastian Momtazi texting:  "Done."
16   Q.  And on the same day, e-mail from Devon Archer to
17   jason@holmbycompanies.com, forward bond certificate received.
18   Devon D Archer.
19         And, Ms.Sheinwald, if you could turn next to
20   Government Exhibit 2098 and beginning with the e-mail on page
21   2.
22   A.  On July 1, 2015 Devon Archer wrote:  "Seb, and Andrew and
23   Kyle, can we all get on the same page about what we need to
24   transfer funds to Bonwick for their requirements today.  Seb, I
25   believe you were working on some LOA but I am not sure if

I6C7GAL2

Bonwick has not responded or they're unclear on their request.
Let me know what I need to do.  Thanks.  D.  Devon D. Archer."
Q.  On July 1 Kyle Wool wrote:  "Where we are is we needed the
proper legal ownership docs for Bonwick, now we have it.  Then
we needed the legal ownership doc for Burham, since Burham owns
a piece of Bonwick.  Marcel just sent us a doc that I think
looks good but I need my internal guy to sign off on it.  I
think that should do it.  I will know by 8 a.m.  Once approved
I will journal.

          "Sorry I can't do it today as the back office guys
punch out at five.  Going coward let's try not to start this so
late in the day but also really this should be almost the last
of the docs."
A.  And then Kyle Wool responded on the same day to Devon
Archer, Sebastian Momtazi and Andrew Godfrey:  "Should be
good."
Q.  E-mail from Devon Archer to jason@holmbycompanies.com, same
day forward Bonwick transfer:  "Looks like we're resolved.
Confirm in the a.m.  Devon D. Archer."

          And, Ms.Sheinwald, if you could turn next to
Government Exhibit 2099.

          On July 6 Jason Galanis wrote:  "Attached backup of
WLCC Tombstone."
A.  Then Devon Archer wrote to Jason Galanis and Sebastian with
the subject:  Let's talk about the attached and all the others

I6C7GAL2

1     we need to do.

2              "Yes.  We need to get on there."  Devon Archer.

3     Q.  If you could turn next to Government Exhibit 2294, e-mail

4     from Bevan Cooney on February 10, 2015 to Tina VanderZee and

5     Mark Cohen, subject:  Cooney bonds account.

6     A.  That message was then forwarded from Bevan Cooney to Jason

7     Galanis on October 1, 2015.

8     Q.  And, Ms.Sheinwald, if you could pull up the third page of

9     this exhibit, and if you could put the third page next to the

10    fourth page, portfolio snapshot.  Portfolio value:  $5,523,600.

11    Holdings by Portfolio:  Wakpamni Lake Community Corporation.  S

12    D SPL LTD REV taxable town center development series A.

13             And, Ms.Sheinwald, if you could turn next to

14    Government Exhibit 2119, and we will start with the e-mail on

15    the bottom from Michael Earlywine on November 25, 2015 to John

16    Burnham, Ron Geffen, Marcel Devine, copying Devin Wicker, Al

17    Dadona, Andrew Godfrey, Devon Archer and Sebastian Momtazi:

18             "Regarding 931130AC muni is now priced as well!!

19             "23rd - 98.399, 24th - 98.401."

20    A.  On the same day that e-mail was forwarded from Devon Archer

21    to Mark Waddington:  "Mark, though these are to be

22    replaced/returned to Calvert I wanted today share the below.

23    Best, Devon."

24    Q.  On November 25, Mark Waddington wrote:  "interesting, do

25    you know what price source is?  If there are any real bids out

I6C7GAL2

1      there in range of 98ish price shown, let's take it.

2                "Definitely higher than what my price model comes

3      back.  I showed 96.151 as at 10/31 and I showed both credit

4      spread widening and UST yield increases.  At high level, I'd

5      have less than 94 with my model.  This price is treating as BB,

6      I've assess rating at B plus or so (mid of B and BB).  If

7      reputable price source, I'd like to use it at year end.

8      Hopefully we won't need it."

9      A.  On the same day Devon Archer then replied to Mark

10     Waddington, cc'ing David Ezekiel:  "Agreed.  I think the

11     consensus is we would like to return these bonds to the lender

12     and beneficial owner in the quickest orderly manner possible.

13     Devon Archer."

14     Q.  E-mail from Mark Waddington the same day to Devon Archer:

15     "give me a call when you have a chance."

16                And, Ms.Sheinwald, if we could turn next to Government

17     Exhibit 2298, beginning with the e-mail in the middle of the

18     page from Bevan Cooney on February 28, 2016 to

19     btcooney@gmail.com, subject:  Document.

20     A.  Then Bevan Cooney sent on February 28, 2016 to Eric Fulton:

21     "Below is the secured loan agreement for the bonds.  I will

22     send down the rest of the file its too big to scan."

23     Q.  And, Ms.Sheinwald, if you could turn to the second page of

24     this document, the first page of the attachment.

25                "This secured loan agreement is made and enter into as

I6C7GAL2

of 2nd day of October 2014, by and between Bevan Troy Cooney

Family Trust, a California irrevocable trust, care of Fulton &

Meyer, and Calvert Capital Partners G.P., a United Kingdom

general partnership, with its principal offices located at care

of Thorsdale Fiduciary and Guaranty, 2856 Hayden Creek Terrace,

Henderson, Nevada."

Q.   And if you could blow up the bottom portion, number one,

loan:

        "Secured party hereby lends to borrower, receipt of

which is hereby acknowledged, the sum of $5 million, payable to

the borrower's legal counsel trust account in certain funds

concurrent with the execution of this agreement and the other

documents/instruments referred to below.  The proceeds shall be

used to acquire $5 million of municipal bonds issued by

Wakpamni Lake Community Corporation in connection with a

private placement (which municipal bond shall herein after be

referred to as the Wakpamni bonds)."

        And, Ms.Sheinwald, if you could turn next to

Government Exhibit, next and finally to Government Exhibit

3272.

A.   This is an e-mail dated February 26, 2016 from Bevan Cooney

to Vanessa Siegel, subject:  1920 Bel Air Road document.

        "Vanessa I found this file for my taxes last year.

Thorsdale loaned me this money for a short period of time.  The

money went through my CNB account and to Camden Escrow in

I6C7GAL2

1    Beverly Hills.  It was a failed real estate transaction."

2    Q.  From Vanessa Siegel to Bevan Cooney, copying Matthew

3    Fillman and Eric Fulton:  "OK thanks Bevan."

4            And, Ms.Sheinwald, if you could turn to the attachment

5    here on the second page.

6    A.  This is a letter headed Thorsdale Fiduciary & Guaranty

7    dated January 7, 2015 to the Bevan Cooney Family Trust, care of

8    Bevan Cooney, trustee:

9            "Dear Bevan, you've requested information for your tax

10   preparation.  This letter confirms our earlier agreement

11   regarding the loan made to your family trust on November 12,

12   2014 for a proposed real estate investment.  This letter

13   confirms that the loan of $3,895,000 was made for the purposes

14   of a joint venture on a residential real estate investment.

15   You funded escrow on November 13, 2015 with the proceeds of the

16   loan made to you.  The transaction to acquire the Bel Air

17   property did not work out as expected for reasons beyond your

18   or our control.

19           "You were instructed by Thorsdale as the agent for the

20   lender, Calvert, to cancel escrow and wire the proceeds held in

21   escrow to the attorney/client trust account of counsel to

22   Thorsdale, which you did prior to year end.  Accordingly, when

23   you completed the wire, your loan was paid off and the proposed

24   venture terminated.

25           "Let us know if you require anything else for your

I6C7GAL2

1    financial records or accountants.

2         With regards, Thorsdale Fiduciary & Guaranty Company

3    Ltd.,"  Signed Jason Galanis, managing director.

4         MS. TEKEEI:  Thank you, Ms.Sheinwald.  Thank you

5    Special Agent Kroll.

6         MR. QUIGLEY:  The government calls Daniel Turney.

7         THE COURT:  And I will see the lawyers at sidebar for

8    a minute while the witness is coming in.

9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6C7GAL2

```
1              (At the sidebar)
2              THE COURT:  I'm going to take Mr. Schwartz's
3    suggestion to wait to decide on 955 until after the evidence
4    regarding the meetings is coming in.  You can still offer it,
5    as you suggested, Mr. Quigley, subject to connection, but, as
6    you suggested, not publish it to the jury.
7              MR. QUIGLEY:  OK.
8              THE COURT:  And then I will make my decision after the
9    evidence comes in.  So, you will offer it, and I will reserve
10   decision.
11             MR. QUIGLEY:  Can I ask him -- without publishing it
12   to the jury -- what he understands op co to mean?  Op co is
13   referenced in the document, and he will say that's operating
14   capital.
15             THE COURT:  I think you could ask that.  It will be a
16   little out of context, but yes.
17             MR. QUIGLEY:  Just to make a record.
18             MR. SCHWARTZ:  I'm showing you Exhibit 955 for
19   identification; what do you understand the term op co to refer
20   to?  I have no problem with that.
21             THE COURT:  OK.
22             MR. SCHWARTZ:  Just so I'm preserved, we are all
23   agreed I don't have to object when they offer it.
24             THE COURT:  That's correct.  I won't ask you either
25   way.  And, as I said, I will reserve ruling on the
```

I6C7GAL2

1    admissibility.

2             MR. QUIGLEY:  OK.  And, your Honor, I think in terms

3    of more generally your questions about Atlantic, I mean we have

4    another set of e-mails that relate to the Atlantic transaction.

5             In terms of your questions about how Atlantic fits

6    into the whole thing, we have another set of e-mails that we're

7    going to read in in the next couple of days that are focused on

8    the Atlantic transaction.  So, if you wanted to defer even

9    after that, that would be --

10            THE COURT:  OK.  So either orally or in writing you

11   will tell me.

12            MR. QUIGLEY:  We can do it at the close of evidence.

13            THE COURT:  Exactly.  And then I'll decide.

14            MR. QUIGLEY:  Thank you.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I6CJGAL3                    Turney – direct

1              (In open court)

2    DIRECT EXAMINATION

3     DANIEL TURNEY,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. QUIGLEY:

8    Q.  Good morning, Mr. Turney.

9    A.  Good morning.

10   Q.  Mr. Turney, did you ever work at an investment adviser firm

11   called Hughes Capital Management?

12   A.  I did.

13   Q.  When did you work there?

14   A.  From the Spring of 2005 until the spring of 2011 and then

15   again from December 2013 until January of '16.

16   Q.  2016?

17   A.  I believe, yes, yes.

18   Q.  Now, during your time at Hughes, did you become familiar

19   with bonds issued by the Wakpamni Lake Community?

20   A.  Yes.

21   Q.  How did you become familiar with those bonds?

22   A.  The people that purchased the firm wanted to purchase those

23   bonds and put them in the portfolios of --

24   Q.  Of Hughes' clients?

25   A.  Yes.

1    Q.  Let's back up a second.  You said you initially worked at

2    Hughes from 2005 to 2011?

3    A.  Correct.

4    Q.  What role did you play at Hughes during those years?

5    A.  Ms. Hughes hired me originally as her administrative

6    assistant, and shortly thereafter she promoted me to

7    operations, and I worked as an operations associate until I

8    left in 2011.

9    Q.  You said Ms. Hughes.  Who was Ms. Hughes?

10   A.  Frankie Hughes, she owned the company.

11   Q.  What did you do as the operations assistant?

12   A.  Operations was responsible for trade settlement, accounting

13   and bookkeeping, client reporting.

14   Q.  Why did you leave Hughes in 2013?

15   A.  I moved to San Francisco.

16   Q.  Did you return to work at Hughes?

17   A.  Yes.

18   Q.  Where was Hughes located?

19   A.  Alexandria, Virginia.

20   Q.  When did you move back to Virginia and start working at

21   Hughes again?

22   A.  December of '13.

23   Q.  What role did you have when you first got back to Hughes?

24   A.  Ms. Hughes called me in that summer and asked me to come

25   back and be her firm administrator.  She had a firm

1   administrator currently, but was having difficulty with that

2   individual, so she brought me back under the guise of

3   operations again, and then when she terminated the firm

4   administrator, she put me in that position.

5   Q.   Can you describe your responsibilities as the firm

6   administrator.

7   A.   The firm administration is responsible for a broad variety

8   of things; employee benefits, payroll, insurance, taxes,

9   accounts payable and receivable, office administration.

10  Q.   Were you involved in providing investment advice to Hughes

11  clients?

12  A.   No.

13  Q.   Were you involved in making investment decisions for Hughes

14  clients?

15  A.   No.

16  Q.   Is it fair to say you had an administrative role?

17  A.   Correct.

18  Q.   As of August 2014, how many people worked at Hughes?

19  A.   Six or seven.

20  Q.   You said Hughes had an office in Alexandria, Virginia?

21  A.   Yes.

22  Q.   At that time did it have any other offices?

23  A.   No.

24  Q.   You mentioned Frankie Hughes as the owner of Hughes?

25  A.   Correct.

I6CJGAL3                    Turney - direct

1   Q.   In August of 2014, was Hughes sold to someone else?

2   A.   It was.

3   Q.   When did you learn that the firm had been sold?

4   A.   The day she sold it.

5   Q.   Was that a surprise?

6   A.   It was.

7   Q.   What was your understanding of who the new owner or owners

8   were?

9   A.   The new owners, I was told, were Michelle Morton and

10  Richard Deary.

11  Q.   You said Michelle Morton and Richard Deary?

12  A.   Correct.

13  Q.   Before August of 2014, had you met Michelle Morton before?

14  A.   Briefly when I got back in December of 2013, she came into

15  the office to meet with Frankie, so I was introduced to her.  I

16  shook her hand and offered her a cup of coffee, but that was

17  the extent of it.

18  Q.   Now, shifting back to the firm in August 2014, did you meet

19  anybody else associated with the new owners?

20  A.   I met Gary Hirst, and there was another gentleman there who

21  I did not meet personally, but I saw him.

22          MR. QUIGLEY:  Can you show for the lawyers and the

23  witness and the Judge what has been marked for identification

24  as Government Exhibit 2609.

25  Q.   Mr. Turney, do you recognize this document?

I6CJGAL3                          Turney - direct

1    A.  I do.

2    Q.  What is this?

3    A.  This is an email to me from Michelle Morton.

4          MR. QUIGLEY:  This is already in evidence.  The if,

5    not the government offers Government Exhibit 2609.

6          THE COURT:  It will be admitted.

7          (Government's Exhibit 2609 received in evidence)

8          MR. QUIGLEY:  Can we publish it to the jury.

9    BY MR. QUIGLEY:

10   Q.  Who is this email from Mr. Turney?

11   A.  Michelle Morton.

12   Q.  Who is it to?

13   A.  It is to me, with a CC to Ms. Hughes and Richard Deary.

14   Q.  What is the date on the email?

15   A.  August 11th, 2014.

16   Q.  Is this around the time that Hughes closed?

17   A.  Yes, shortly thereafter.

18   Q.  What is the subject of the email?

19   A.  Gary Hirst and Hugh Dunkerley.

20   Q.  Had you met Gary Hirst or Hugh Dunkerley or heard of them

21   before this email?

22   A.  No.

23   Q.  What does it say in the email about Gary Hirst's role?

24   A.  She introduces him as our portfolio management consultant.

25   Q.  Focusing on the second paragraph, do you see where it says

I6CJGAL3                    Turney - direct

1   Hugh Dunkerley, who represents our investment adviser?

2   A.  Yes.

3   Q.  What did you understand Ms. Morton to mean by represents

4   our investment adviser?

5   A.  Ms. Morton had said she had a group of investigators who

6   had financed the purchase of the firm.

7   Q.  Over time what, if anything, did Ms. Morton tell you who

8   her investors were?

9   A.  Very little.  The never mentioned their name short of Mr.

10  Dunkerley, so I didn't know who they were.  They said they were

11  great people, that they ran in high social circles, they knew

12  politicians.

13  Q.  Around the the time of this email did you, in fact, meet

14  with Mr. Hirst?

15  A.  Yes.

16  Q.  What was the context of that meeting?

17  A.  Our office was set up as what we called a pit, so all of

18  the employees sat in an open area with low walls, and Mr. Hirst

19  and Mr. Deary came back to the back office to talk with

20  portfolio managers, so I was present for that conversation.

21  Q.  You mentioned portfolio managers.  Who were the portfolio

22  managers at the time?

23  A.  Michael Allen and Justin Malkin.

24  Q.  Had they been preexisting employees of Hughes?

25  A.  Yes.

1   Q.  You said you were present for the discussion.  What was the

2   context of the discussion?

3   A.  Mr. Deary and Mr. Hirst were interested in the guidelines

4   for the portfolios, what the portfolios could hold, their

5   restrictions, the parameters about what we could invest in.

6   Q.  Did you have any involvement in checking whether securities

7   fit into the client's investment guidelines?

8   A.  No.

9   Q.  Were you familiar with the details of the clients'

10  investment guidelines?

11  A.  I was tertiarily familiar with them.  I read them, but, no.

12  Q.  How would you describe the types of investments that Hughes

13  Capital made on behalf of his clients at this time?

14  A.  We were a fixed income asset manager.  We had institutional

15  clients, so corporations, foundations, endowments, Taft Hartley

16  plans.

17  Q.  By "fixed income," you mean bonds?

18  A.  Correct.

19  Q.  Approximately how many days did Mr. Hirst spend at Hughes'

20  office?

21  A.  Maybe three.

22  Q.  Just to be clear, other than seeing Mr. Dunkerley that one

23  time, you never saw him after that?

24  A.  No.

25  Q.  Where did Gary Hirst go after those three days?

I6CJGAL3                         Turney - direct

1    A.  I was told he went to Florida.

2    Q.  Around this time, mid-August, late August, 2014, did you

3    learn about the Native American bonds we discussed earlier?

4    A.  Yes.

5    Q.  How did you first learn about them?

6    A.  I only heard about it through conversations between the

7    portfolio managers.  They had separate private conversations

8    with Michelle and Richard, and so when they would come back

9    into the pit again, I would hear, overhear their conversations

10   about it.

11   Q.  Generally what was your role in the purchase of those

12   bonds?

13   A.  I executed or facilitated the settlement of the trade.

14           MR. QUIGLEY:  Can we show to the witness, the Judge

15   and the lawyers Government Exhibit 904.

16   A.  I'm there.

17   Q.  Do you recognize this email?

18   A.  Yes.

19   Q.  What is it?

20   A.  It is a conversation regarding how the trade is going to

21   settle.

22           MR. QUIGLEY:  The government offers Government Exhibit

23   904.

24           MR. SCHWARTZ:  No objection.

25           MS. NOTARI:  No objection.

1            MR. TOUGER:  No objection.

2            THE COURT:  It will be admitted.

3            (Government's Exhibit 904 received in evidence)

4            MR. QUIGLEY:  Can we publish it to the jury.

5            Can we go to the page ending in Bates 282, second page

6       and blow up the email from Gary Hirst.

7       BY MR. QUIGLEY:

8       Q.  Mr. Turney, can you read this email.

9       A.  Hi, Daniel.  I just called U.S. Bank and I believe the

10      physical delivery is the way that we should go.  Trying to do

11      the transaction through DTC would result in considerable delays

12      at this time, maybe as much as a couple of weeks.

13           Continue?

14      Q.  Yes, please.

15      A.  U.S. Bank can make physical delivery immediately and the

16      custodians can then dematerialize the bonds after they have

17      received them.  Thanks.

18      Q.  What do you understand Mr. Hirst to mean by physical

19      delivery?

20      A.  So trades these days are executed in what's called DVP,

21      delivery versus payment, so it is an electronic transaction

22      either through the DTC or over the fed wire where it happens

23      immediately.  It is literally a delivery versus payment.

24           So the bond will be delivered from the broker to the

25      custodian, and the custodian will deliver the cash back to the

I6CJGAL3                    Turney - direct

1   broker, and it happens immediately and automatically.

2   Q.   What is physical delivery?

3   A.   Physical delivery is a physical delivery of the bond, a

4   paper bond brought to the custodian physically.

5           MR. QUIGLEY:  Go to the first page of the document and

6   look at, Mr. Turney, the reply to Mr. Hirst.  Just highlights

7   the first paragraph.  That is fine.

8   BY MR. QUIGLEY:

9   Q.   How do you respond to Mr. Hirst?

10  A.   I told him we have never done a physical delivery before

11  and I would have to work on figuring out how to do it.

12  Q.   How long had you been working at Hughes Capital at this

13  time?

14  A.   I had been working at whose since 2005 again until 2011.

15  What is that, six years, but nine years altogether.

16  Q.   You had never done a physical delivery?

17  A.   No.

18  Q.   Go to the last page of the attachment to this document.

19  One up.  Sorry.

20          Do you recognize this, Mr. Turney?

21  A.   Yes.

22  Q.   What is this?

23  A.   This is a break-out of the allocation of the amounts that

24  would go into each account.

25  Q.   These under client name, are these entities all clients of

I6CJGAL3                         Turney - direct

1   Hughes Capital Management?

2   A.  Yes.

3   Q.  Clients where Wakpamni bonds would be placed?

4   A.  Yes.

5   Q.  Are you familiar with a trade blotter or purchase blotter?

6   A.  Yes.

7   Q.  What is that?

8   A.  It basically is an allocation of the trade, so if you buy a

9   security and you need to allocate it to multiple portfolios,

10  you put it in what is called a blotter, and it line-items each

11  account and the amounts that are supposed to go in, similar to

12  this attachment.

13          MR. QUIGLEY:  Can we show for the witness the lawyers

14  and Judge Government Exhibit 2616.

15  Q.  Do you recognize this document, Mr. Turney?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is an email conversation regarding allocation of the

19  trade.

20          MR. QUIGLEY:  Government offers Government Exhibit

21  2616.

22          THE COURT:  Any objection?

23          MR. TOUGER:  No objection.

24          MS. NOTARI:  No objection.

25          MR. SCHWARTZ:  No objection.

1          (Government's Exhibit 2616 received in evidence)

2          MR. QUIGLEY:  Please publish it to the jury.  Go to

3     the bottom email from Michelle Morton, August 20, 2014.

4     BY MR. QUIGLEY:

5     Q.  Who is that email from, Mr. Turney?

6     A.  Michelle Morton.

7     Q.  What is the date?

8     A.  August 20, 2014.

9     Q.  Who is it to?

10    A.  It is to Jason Galanis, Richard Deary and Gary Hirst.

11    Q.  Have you ever met Jason Galanis?

12    A.  No.

13    Q.  At this time, did you have any understanding of who he was?

14    A.  No.

15    Q.  Did he have any official role at Hughes?

16    A.  No.

17    Q.  Can you read the bottom of that email beginning hello.

18    A.  Please review?

19    Q.  Yes.

20    A.  Please review for accuracy.  Gary, if it looks okay to you,

21    I have set up a place for you to sign.  We have just got to get

22    it to Daniel tomorrow.  I will have a copy as well.  Let's not

23    send it in until -- let's not send it until I get -- let's not

24    send it until I get because the office because he will be

25    confused and I prefer to explain the denominations to him

I6CJGAL3                      Turney – direct

1    myself.  It is a simple but important doc.  Jason, it is very

2    important that you sign off on this.  I want to make sure the

3    information is accurate.

4    Q.  Eventually at the top of the chain did you get a copy of

5    this trade blotter?

6    A.  Yes.

7              MR. QUIGLEY:  Please see the attachment briefly and

8    publish it to the jury.

9    BY MR. QUIGLEY:

10   Q.  Again are these the clients of Hughes' accounts the bonds

11   are going to be placed?

12   A.  They are.

13   Q.  Mr. Turney, are you familiar with the term trade ticket?

14   A.  Yes.

15   Q.  What is a trade ticket?

16   A.  A trade ticket is a ticket that is generated by the

17   portfolio manager and given to the operations associate in

18   order to -- it has got all the details in it, finer details

19   used to settle the trade.

20   Q.  Do the trade tickets need to be signed for Hughes to

21   purchase these bonds?

22   A.  Yes, they did.

23   Q.  Who ultimately signed the trade tickets?

24   A.  In this instance, Gary Hirst did.

25   Q.  Normally at who, who would have signed the trade tickets?

I6CJGAL3                          Turney - direct

1    A.    The portfolio manager.

2    Q.    Michael Allen and Justin Malkin?

3    A.    Correct.

4    Q.    Did they sign trade tickets for the Wakpamni bonds?

5    A.    No.

6    Q.    Did you have an understanding why they didn't sign?

7    A.    So when you --

8              MR. TOUGER:    Objection.

9              THE COURT:    Sustained.

10   BY MR. QUIGLEY:

11   Q.    Do you know whether they were ever asked to sign?

12   A.    Sorry?

13   Q.    Do you know whether they were ever asked to sign?

14   A.    Whether they were asked to sign?

15   Q.    Yes.

16   A.    Yes.

17   Q.    Did they sign?

18   A.    No.

19   Q.    Did Michelle Morton ask whether it was possible for you to

20   sign a trade ticket?

21   A.    She did.

22   Q.    What did you say?

23   A.    I told her absolutely not.

24   Q.    Why was that?

25   A.    I am not a portfolio manager.  I didn't have the authority

I6CJGAL3                          Turney - direct

1    to do so.

2    Q.  Where was Gary Hirst at the time?

3    A.  Again I understood he was in Florida.

4    Q.  You mentioned he was the one who signed the trade tickets.

5    How did he get the trade tickets to sign?

6    A.  I either faxed or emailed them to him.

7    Q.  Did he send them back?

8    A.  Yes.

9         MR. QUIGLEY:  Can we pull up for the witness and the

10   lawyers and Judge, Government Exhibit 813.

11   Q.  Do you recognize that, Mr. Turney?

12   A.  Yes.

13   Q.  What is that?

14   A.  This is an email between myself and Gary Hirst.

15   Q.  Attaching the trade tickets?

16   A.  Correct.

17        MR. QUIGLEY:  The government offers 813.

18        THE COURT:  Any objection?

19        MR. TOUGER:  No objection.

20        MR. SCHWARTZ:  No objection.

21        THE COURT:  It will be received.

22        (Government's Exhibit 813 received in evidence)

23   BY MR. QUIGLEY:

24   Q.  Focusing on the top email in the chain, who is that from?

25   A.  From Gary Hirst.

I6CJGAL3                          Turney - direct

1    Q.   What is the date?

2    A.   August 22, 2014.

3    Q.   What does Mr. Hirst say?

4    A.   He is returning the trade tickets as requested.  Here are

5    the trade tickets, signed as requested.

6              MR. QUIGLEY:  If you could just scroll through the

7    attachments, Ms. Shinewald.

8    Q.   Mr. Turney, what do each of these represent?

9    A.   These are the trade tickets.

10   Q.   Each Hughes client had an individual trade ticket signed on

11   their behalf?

12   A.   Correct.

13   Q.   What did you do after you got these trade tickets?

14   A.   I facilitated the settlement.

15   Q.   What do you mean by that?

16   A.   So it was actually like I had mentioned in that previous

17   email, a physical delivery was something that was new to me,

18   and so it took a process of figuring out what the custodian

19   exactly, the logistics of how to do it.  Even some of the

20   custodians weren't even familiar with how to accept a physical

21   delivery, so it was a process but, yes.

22   Q.   You mentioned something named Justin Malkin.  What did he

23   do the day the trade was executed?

24   A.   He quit.

25   Q.   Quit?

I6CJGAL3                          Turney - direct

1    A.   Correct.

2    Q.   Was the trade ultimately able to settle?

3    A.   It was.

4    Q.   Did all the bonds settle at the same time?

5    A.   No.   There were several of them that settled ex post facto.

6    Q.   Did you talk with Michelle Morton after the trade settled?

7    A.   I did.

8    Q.   What did you say to her?

9    A.   I told her that that was an incredibly stressful situation,

10   and I asked her, I had told her never to do that to me again.

11   Q.   What was stressful about it for you?

12   A.   It was stressful in kind of two ways:

13        One, as I had mentioned, physical delivery was

14   something I hadn't done before, and I had, I don't know, a

15   dozen trades to get settled in a very short period of time, so

16   that was the stress of that as well as the stress from just the

17   general conversation in the office, then the negativity that

18   the portfolio managers were discussing about the bonds.

19   Q.   About the bonds?

20   A.   Correct.

21   Q.   After the bonds were issued, in your role at Hughes, did

22   you receive any correspondence or communications from Hughes

23   clients?

24   A.   Yes.

25   Q.   Based on receiving those, how did clients of Hughes react

I6CJGAL3                      Turney - direct

1     once they learned the bonds was placed in their accounts?

2     A.   Negatively across the board.

3                MR. QUIGLEY:  Can we look at just for the Judge, the

4     witness and the lawyers Government Exhibit 2625.

5                MR. TOUGER:  No objection.

6                THE COURT:  Admitted.

7                (Government's Exhibit 2625 received in evidence)

8                MR. QUIGLEY:  May we publish it.

9     BY MR. QUIGLEY:

10    Q.   Focusing on the bottom email in this chain from you to a

11    man named Richard Baker, do you see that?

12    A.   Yes, I do.

13    Q.   Can you read that email.

14    A.   Good afternoon, Mr. Baker.  As discussed, I will follow up

15    with Northern Trust and did verify that the bond was physically

16    delivered to them on August 27th.  The delivering agent was

17    U.S. Bank.  If you need anything further, please let us know.

18    Q.   When you referenced the bond in here, what was the bond you

19    were referring to?

20    A.   That is the Wakpamni bond.

21    Q.   Where did Mr. Baker work?

22    A.   He worked for WSSC, I believe.  Excuse me.  The Washington

23    Suburban Sanitation Commission, a client.

24    Q.   Was that one of the clients into whose account the bond --

25    A.   It was, yes.

1   Q.  How does he respond to the email?

2   A.  He asked, tells us to immediately cease trading.

3   Q.  Jump ahead a little bit to the spring of 2015.  Did Hughes

4   acquire another investment adviser at that time?

5   A.  Yes.

6   Q.  What was the name of that company?

7   A.  Atlantic Asset Management.

8   Q.  Where was Atlantic located?

9   A.  Connecticut.

10  Q.  What, if anything, did Morton say to you about how she

11  bought Atlantic?

12  A.  She said it was another round of funding from the

13  investors.

14          MR. QUIGLEY:  Can we show for the witness, the lawyers

15  and the Judge, Government Exhibit 955.

16  Q.  Do you see this email, Mr. Turney?

17  A.  I do.

18  Q.  Do you recognize it?

19  A.  Yes.

20  Q.  Directing your attention to the second line of the email in

21  the middle of the page where there is a reference to OP CAP,

22  what do you understand that reference to OP CAP mean?

23  A.  That is our operating capital.

24          MR. QUIGLEY:  We offer this subject to our previous

25  discussion, to connection.

I6CJGAL3                        Turney - direct

1              THE COURT:  Yes, and the rulings we discussed.  Thank

2      you.

3              MR. QUIGLEY:  You can take that down Ms. Shinewald.

4      BY MR. QUIGLEY:

5      Q.  You see in the document the reference to the buy?

6      A.  Yes.

7      Q.  What do you understand the buy to be a reference to?

8      A.  I believe that to be the purchase of Atlantic.

9      Q.  You can take that down.

10             After the acquisition of Atlantic, did you know

11     someone named Don Trotter?

12     A.  Yes.

13     Q.  Who is Mr. Trotter?

14     A.  He worked at Atlantic.

15     Q.  Where was he based?

16     A.  Kansas City, I believe.

17     Q.  After the purchase of Atlantic, did you learn anything

18     about the purchase of additional Wakpamni bonds?

19     A.  I did.

20     Q.  What did you learn?

21     A.  So I didn't I learn about them until probably June of that

22     year, two days before they were supposed to be sold to a

23     different broker or to a broker.

24     Q.  These were additional bonds that had been purchased on

25     behalf of Atlantic clients?

I6CJGAL3                          Turney - direct

1    A.  Yes.

2    Q.  What was your reaction, learning those bonds had been

3    purchased?

4    A.  I was stunned.

5    Q.  Why was that?

6    A.  A, I had no previous knowledge of them and -- so they had

7    purchased the security in Connecticut in probably April, and I

8    found out about it in June, and as the firm administrator, I am

9    supposed to know basically everything that goes on.

10   Q.  Was there a second reason.  You said there were two?

11   A.  Well, there had always been kind of a cloud over the

12   Wakpamni bonds, so I was surprised in general we had purchased

13   more.

14   Q.  Do you still work at Hughes?

15   A.  No.

16   Q.  Does either Hughes or Atlantic still exist?

17   A.  They do not.

18   Q.  What happened?

19   A.  They were put into receivership by the SEC in December of

20   '15.

21   Q.  When were you first interviewed by the government in this

22   case, approximately?

23   A.  In the spring of 2016.

24           MR. QUIGLEY:  One moment, your Honor.  No further

25   questions.

 1              THE COURT:  Any cross-examination?  Mr. Hassan.

 2     CROSS EXAMINATION

 3     BY MR. HASSAN:

 4     Q.  Good morning.

 5     A.  Good morning.

 6     Q.  I just have a few questions for you.  I am Abraham Hassan,

 7     Attorney for Bevan Cooney along with Ms. Notari.

 8              So you started working with Hughes in what was it,

 9     2005?

10     A.  Correct.

11     Q.  You worked there for several years?

12     A.  I did.

13     Q.  You really developed a career there?

14     A.  I was trying to, yes.

15     Q.  You were good at your job?

16     A.  I would like to think so, yes.

17     Q.  You were promoted?

18     A.  Yes.

19     Q.  You were in charge of organizing things, logistics?

20     A.  Correct.

21     Q.  And I take it you took pride in that work?

22     A.  I did.

23     Q.  At a certain point you went west and moved to California

24     for a while?

25     A.  Ah-huh.  That is correct.

I6CJGAL3                        Turney - cross

1   Q.  You worked in similar fields doing similar types of work

2   out there?

3   A.  Yes, I worked for a financial investment firm in San

4   Francisco.

5   Q.  So your career really hadn't been advanced and developed?

6   A.  I was hoping to, yes.

7   Q.  But at a certain point Frankie Hughes needed you back?

8   A.  She asked for me to come back, yes.

9   Q.  And brought you back to Hughes Capital?

10  A.  Yes.

11  Q.  So you moved back east and you really took hold of

12  organizing, setting the ship straight again?

13  A.  Correct.

14  Q.  You were promoted?

15  A.  As I had mentioned, she had a firm administrator at the

16  time that she brought me back, but she over the course of her

17  wooing he back to the East Coast, the intent was to hire me as

18  her firm administrator, but she needed some kind of time to

19  ease me into that, and so she brought me back on paper as the

20  operations associate.

21  Q.  So she helped you develop your career further and take on

22  more responsibility?

23  A.  Exactly.

24  Q.  At this time you had done that, you had reorganized things

25  and things were in a good place?

I6CJGAL3                    Turney - cross

1   A.  They were.

2   Q.  You didn't see, you didn't think the company was being

3   sold?

4   A.  I had no idea.

5   Q.  You didn't understand why it was being sold?

6   A.  Ms. Hughes was close to retirement and she told me as part

7   of the process of bringing me back, that she expected to

8   continue to own the firm for a number of three to five years,

9   so I expected to have three to five years worth of firm

10  administration experience under my belt at the time that she

11  retired, yes.

12  Q.  It is fair to say when it actually was sold, you were taken

13  aback?

14  A.  I was.

15  Q.  You weren't expecting and you weren't consulted on it?

16  A.  That is correct.

17  Q.  After it was sold, new people started to show up?

18  A.  Yes.

19  Q.  You mentioned Michelle Morton?

20  A.  Yes.

21  Q.  Gary Hirst?

22  A.  Yes.

23  Q.  And it is fair to say that some of their behavior gave you

24  pause?

25  A.  Correct.

I6CJGAL3                          Turney - cross

1   Q.  Michelle Morton acted -- she would disappear for weeks at a

2   time?

3   A.  There were times where she was absent, yes.

4   Q.  And she had the company paying for her hotel bills?

5   A.  She did.

6   Q.  Gary Hirst would ask people to do things that they weren't

7   comfortable with?

8   A.  I never heard him ask anyone to do things, so that would be

9   hearsay.

10  Q.  To make trades that you weren't -- he asked you to sign

11  things that you didn't want to sign?

12  A.  No, he did not.

13  Q.  Gary Hirst was often rude and he was wanting to get a

14  paycheck from you?

15  A.  "Often" is the wrong term.  I had a brief conversation with

16  him, as I had mentioned when I first came back, and I had

17  subsequent brief follow-up conversations with him via email and

18  one phone call after he left -- or went back to Florida.

19  Excuse me.

20  Q.  These new people, though, that showed up, again like I said

21  before, they made you -- you weren't comfortable with them?

22  A.  I don't know if, "wasn't comfortable with them" was quite

23  the word.  They were new people, and so it takes some time to

24  get to know folks.

25  Q.  You were told that the new investors were high society

I6CJGAL3                          Turney - cross

1    people with big connections, right?

2    A.   That is correct.

3    Q.   That is not really what you saw?

4    A.   I never met --

5              MR. QUIGLEY:   Objection.

6              THE COURT:   Overruled.   You can answer.

7    A.   -- I never met any of them.

8    BY MR. HASSAN:

9    Q.   You never met any of the people you were told about with

10   big connections?

11   A.   That's right.

12   Q.   You met Gary Hirst?

13   A.   I don't know if he was considered kind of an investor.   I

14   don't know.

15   Q.   Needless to say, the people you met were Gary Hirst and

16   Michelle Morton?

17   A.   And Richie Deary.

18   Q.   Not the people you were told had connections or high

19   society people?

20   A.   That's right.

21   Q.   You didn't meet Bevan Cooney?

22   A.   No.

23   Q.   You never communicated with Bevan Cooney?

24   A.   No.

25   Q.   And you never talked to him in any other way?

1   A.  No.

2              MR. HASSAN:  No further questions.

3              THE COURT:  Why don't we take our morning break then.

4   Remember to keep an open mind and don't discuss the case.

5   We'll come back in about 10 minutes.  Thank you.

6              (Jury excused)

7              THE COURT:  Briefly I just want to address two issues

8   before Francisco Martin's testimony.

9              So, first, I just want to briefly state my reasoning

10  on the record with respect to the gold bars issue.  Last week I

11  informed you I would not permit defendants to question

12  Mr. Martin about Jason Galanis' instructions for him to

13  purchase gold bars.

14             I agree with the government that to the extent that

15  any of the defendants wish to cross-examine Mr. Martin on this

16  topic, they will open the door to the entire universe of

17  evidence relating to the Code Rebel pump and dump.  As the

18  government knows, Mr. Martin's expected testimony is ambiguous.

19  Jason Galanis instructed him to purchase gold bars, which are

20  harder to trace, so Galanis could, so that Galanis could

21  compensate stock promoters in his efforts to execute the Code

22  Rebel pump and dump.  There is no good-faith basis for asking

23  Mr. Martin about the gold bars in any context other than the

24  Code Rebel pump and dump.  So again defense counsel are warned

25  they may open the door to the pump and dump if they question

I6CJGAL3                         Turney – cross

1    Mr. Martin about the gold bars.

2              I also just want to address the limiting instruction

3    that will be given regarding Mr. Cooney's lack of involvement

4    in Gerova after Mr. Martin testifies about the phone call in

5    which Mr. Cooney informed him of Jason Galanis' arrest.  So I

6    will read you the instruction I intend to give.

7              Ladies and gentlemen, you have just heard evidence in

8    September 2015 Jason Galanis was arrested.  You need to know

9    that Jason Galanis' arrest in September 2015 was for unrelated

10   conduct and had nothing to do with this case.  I further

11   instruct you that Mr. Cooney was not the subject of that

12   investigation and there is no evidence that he knew about Jason

13   Galanis' conduct in that case until after Jason Galanis was

14   arrested on or about September 25, 2015.

15             Everyone okay with that?

16             MR. QUIGLEY:  That is fine with the government, your

17   Honor.

18             MR. SCHWARTZ:  The only thing I would say is elicted

19   through the witness, I would not want your Honor to be

20   instructing the jury what the date of the arrest was.

21             THE COURT:  All right.  That is fine.  I mean the only

22   issue is that they know that he was separately arrested and

23   convicted in connection with this case, so I am just trying to

24   distinguish it.

25             MS. MERMELSTEIN:  If it helps, the witness will say

I6CJGAL3                      Turney - cross

1       the month, so not the exact date, so your Honor can read that

2       statement with respect to the month but not the date.

3              THE COURT:  Is that okay, September 2015?

4              MR. SCHWARTZ:  I am happy to have you mirror whatever

5       the testimony is, you just heard the testimony is --

6              THE COURT:  If the witness testifies it was September

7       2015, I will leave that in.  I will take out the date if he

8       doesn't testify about it, I will say that arrest.

9              MR. SCHWARTZ:  If they want to prepare Mr. Martin so

10      he can say September 25, I have no problem with the date.  I

11      don't want your Honor testifying.

12             THE COURT:  I agree with you.  I will be sensitive to

13      what does come in as for Jason Galanis' arrest as pertains

14      Mr. Archer.  I got your letter, Mr. Schwartz.  Thank you.

15             Upon further reflection, especially because the fact

16      of Jason Galanis' arrest is coming in through Mr. Martin, I

17      don't think the government needs to remove all references to

18      Jason Galanis' arrest in the other exhibits that we discussed,

19      so I think it is appropriate to permit the government to

20      provide this context for those exhibits.

21             I will give the same instruction with respect to

22      Mr. Archer.  As I stated previously, I think the SEC press

23      release is just too prejudicial.  If you're still trying to get

24      in a portion of 2103, let me know.  I don't know exactly how

25      you do that well.

1          MR. QUIGLEY:  I would still like to get in the top

2     email which is from Mr. Archer.  We think that has

3     independent -- everything about the press release --

4          MR. SCHWARTZ:  We'll talk about it.

5          THE COURT:  Why don't you talk about that.

6          I wanted to tell you where I was on that.  I will let

7     in those exhibits.  The only one issue I had aside from the

8     press release was that there is reference to, I think it is in

9     781 or 782, but to the rest of the federal indictment of

10    Mr. Galanis and others, I don't know the "and others" should be

11    included.

12         MR. QUIGLEY:  We'll take that out.

13         THE COURT:  Talk about that.  If you need to talk --

14         (Multiple voices)

15         MR. TOUGER:  When you decided to do one for Mr. Cooney

16    and Archer, they were going to come in on separate days; and,

17    therefore, the prejudice to Mr. John Galanis would be reduced.

18    If you will give that same charge again today?

19         THE COURT:  I am not.

20         MR. TOUGER:  You are not?

21         THE COURT:  I am not.  It is just a related issue.

22    That is exactly why I am doing it separately, Cooney, Archer in

23    connection with specific evidence.

24         MR. QUIGLEY:  I have one other issue, a scheduling

25    issue related to the testimony of Burnham Investors Trust

I6CJGAL3                    Turney - cross

1    witness.  She is available to be here tomorrow afternoon.  I

2    don't know that she is flying from out of town.  I think Mr.

3    Martin's going to be on cross at least until tomorrow morning.

4    We have one other witness between them and more email reading.

5    Given the early end tomorrow, I don't know if defense counsel

6    are in a position -- I prefer not to have have her fly here if

7    she won't get on, obviously, and if --

8           THE COURT:  Just remember tomorrow is a half day.  We

9    are ending at 3:00.

10          MR. QUIGLEY:  That is our point.  We would like to

11   tell her she doesn't have to come tomorrow.

12          THE COURT:  Let's see how it goes.  Let's see how far

13   we get by the end of the day and talk about it again.

14          MR. SCHWARTZ:  I have one question.  We can take it up

15   at the lunch break.  I want to be clear on the scope of the

16   government's request and your Honor's ruling about the cross of

17   Mr. Martin about fake documents.

18          They said he will not be crossed on fake documents

19   relating to Code Rebel, which is fine.  I want to be clear

20   whether I am allowed to simply ask him the question.  He met

21   with Jason Galanis and then coordinated to submit false

22   documents in response to SEC subpoenas.  I simply want to be

23   able to ask him that one question, did you submit false

24   documents to the SEC after talking to Jason Galanis.  I think

25   that his false documents were not just Code Rebel.  I want to

I6CJGAL3                    Turney - cross

1    be clear that is what I will do.

2            MS. MERMELSTEIN:  Just so it is clear, there is no

3    dispute Mr. Martin submitted fake documents to the SEC.  He is

4    going to admit that because some of them don't relate to Code

5    Rebel.  I don't think -- this can be done, you will see when it

6    comes in on direct, he received these 500,000 shares of Code

7    Rebel stock in his name, but really owned by Jason Galanis for

8    no consideration.

9            When stuff started to fall apart, there was an effort

10   to come up with a reason why he would have gotten them, and

11   there are convertible note and promissory note loan documents

12   with Thorsdale that are very similar to the ones that exist

13   with respect to Mr. Cooney.  Those only relate to Code Rebel.

14   They are fake.  He has admitted they're fake, but they only

15   relate to Code Rebel.

16           Separately he is the person who created Calvert, which

17   I think your Honor knows is one of the entities also then used

18   to try to create these cover stories, and he will say I created

19   Calvert and then he is going to identify documents that he

20   submitted himself to the SEC that are Calvert documents as

21   being obviously fake because they're dated in 2014.  I think

22   Mr. Schwartz has enough to work on you're the kind of person

23   who created false documents.

24           MR. SCHWARTZ:  That was my question.

25           Maybe Ms. Mermelstein is making a proffer that answers

I6CJGAL3                    Turney - cross

it for me.  It is not clear from his 3500.  He creates Calvert,

creates certain documents related to Calvert.  It is not clear

from his 3500 that he understood what he was doing with Calvert

was creating entirely fake documents.

          Obviously, he understood some of them were dated as of

earlier times, but that can be illegitimate backdating or can

be legitimate papering a deal that happened before.  If he will

testify he knew it was all fake, that is fine.

          MS. MERMELSTEIN:  I think what he is going to say I

created Calvert on this date at Jason Galanis' direction.  I'm

the person who came up with the name Calvert.  In fact, I named

it after the street that was the intersection where I lived, so

no one else knew it existed before I created it; and, thus, any

document dated before October 1, 2015 that references Calvert

is fake.

          He is going to say yes, these are documents I

submitted to the SEC that are Calvert documents, so they are

fake.  I think what he would say if pressed on this, I was

submitting all kinds of fake documents, I was in the midst of

this fraud, but I wasn't paying that close attention to this

particular Calvert document.  I searched my files, these --

          THE COURT:  In any event, it sounds like it is fair

game for Mr. Schwartz to ask the general question you have

submitted false documents or something to that effect.  He will

say yes, and then you don't need to get into --

I6CJGAL3                    Turney - cross

 1          MR. SCHWARTZ:  I mean --

 2          THE COURT:  -- necessary unless you want.

 3          MR. SCHWARTZ:  Let's see how it goes in on direct.  I

 4    won't touch anything Code Rebel at all.  With this

 5    clarification, it seems like I will know what I can and can't

 6    do.

 7          THE COURT:  Let's try to take a five-minute break

 8    then.

 9          (Recess)

10          (Jury present)

11    CROSS EXAMINATION

12    BY MR. WENNER:

13    Q.  Good day, Mr. Turney.

14    A.  Hi.

15    Q.  My name is Craig Wenner.  I represent Devon Archer.  Would

16    you please confirm for me you never met, talked to or

17    corresponded with Devon Archer?

18    A.  That is confirmed.

19          MR. WENNER:  Thank you.  No further questions.

20    CROSS EXAMINATION

21    BY MR. TOUGER:

22    Q.  Good morning, sir.

23    A.  Good morning.

24    Q.  The same question.  John Galanis, you have never met,

25    talked to, emailed, telephone-called with John Galanis?

I6CJGAL3                          Walch - direct

1   A.  I have not.

2   Q.  Ever heard his name mentioned?

3   A.  Over time, yes.

4   Q.  When you were working at Hughes?

5   A.  Not that I recall.

6   Q.  From the time period you were working there, you never

7   heard the name John Galanis?

8   A.  Not that I recall.

9           MR. QUIGLEY:  No redirect.

10          THE COURT:  You may step down.

11          (Witness excused).

12          MS. TEKEEI:  Your Honor, the government calls Patricia

13  Walch.

14   PATRICIA WALCH,

15       called as a witness by the Government,

16       having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MS. TEKEEI:

19  Q.  Good morning, Ms. Walch.

20  A.  Good morning.

21  Q.  Where do you work?

22  A.  I work at FINRA, the financial industry regulatory

23  authority.

24  Q.  What is FINRA?

25  A.  FINRA is a self-regulatory organization that is dedicated

I6CJGAL3                          Walch - direct

1    to investor protection and market integrity that oversees

2    broker-dealers.

3    Q.  If you could just pull the microphone a little bit closer

4    to you.  It is hard to hear in this courtroom.

5            What sorts of companies does FINRA regulate?

6    A.  Broker-dealers.

7    Q.  What is a broker-dealer?

8    A.  A broker-dealer is either a natural person, a company that

9    has been approved by the SEC to conduct securities business.

10   Q.  In the course of your work at FINRA, did you become

11   familiar with a broker-dealer called Burnham Securities, Inc.?

12   A.  Yes, I was.

13   Q.  Did you also become familiar with a broker-dealer called

14   Bonwick Capital?

15   A.  Yes.

16   Q.  Just focusing on the year 2015, did there come a time when

17   you learned about a series of Wakpamni Lake Community

18   Corporation bonds held by Burnham Securities?

19   A.  Yes, I did.

20   Q.  Also by Bonwick Capital?

21   A.  Yes, I did.

22   Q.  We'll get back to that in a moment.

23           First I want to ask you a few questions about your

24   work at FINRA.  What is your current position at FINRA?

25   A.  I am a surveillance director.

1    Q.  What do you do as surveillance director?

2    A.  I oversee the work of regulatory coordinators.

3    Q.  Just, generally speaking, how does FINRA regulate

4    broker-dealers?

5    A.  They basically review the filings that they make which

6    includes the financials and your sales practice.

7    Q.  Can it also discipline members who are not following

8    certain rules?

9    A.  Yes.

10   Q.  Who oversees FINRA's work?

11   A.  The SEC.

12   Q.  You mentioned regulatory coordinators earlier.  What are

13   the regulatory coordinators tasked with doing?

14   A.  The regulatory coordinators are tasked with ensuring the

15   member firms actually comply with the capital rule and sales

16   practice activities.

17   Q.  We'll talk about the capital rule in a moment, but what is

18   the purpose of the surveillance work conducted by the

19   regulatory coordinators?

20   A.  To make sure that they're conducting the business that

21   they're approved to do and doing it correctly, and so they

22   review the filings that they make either in a quarterly or

23   monthly basis, which includes focus reports and supplemental

24   statements that the firms provide.

25   Q.  Who, if anyone, is the regulatory oversight designed to

I6CJGAL3                          Walch - direct

1    protect?

2    A.  It is designed to protect the investors.

3    Q.  How long have you been a director in the surveillance

4    group?

5    A.  Seven years.

6    Q.  Prior to that, what did you do?

7    A.  Prior to that, I worked in a regulatory reporting group at

8    Barclays Capital, and before that I worked at Deutche Bank

9    Securities.

10   Q.  What are your day-to-day responsibilities as a director of

11   of a surveillance group at FINRA?

12   A.  To basically oversee and review the work that the

13   coordinators submit to me for review.  I would also communicate

14   with the coordinators and member firms as needed.

15   Q.  So again focusing on the year 2015, did there come a time

16   when you learned about a series of Wakpamni Lake Community

17   Corporation bonds held by Burnham Securities?

18   A.  Yes.

19   Q.  How did you learn about them?

20   A.  It was brought to my attention by the regulatory

21   coordinator.

22   Q.  What was the context in which you learned about them?

23   A.  The firm had filed the focus report and listed the Wakpamni

24   bonds as assets, and the coordinator didn't think that was

25   appropriate so it was brought to my attention.

I6CJGAL3                          Walch - direct

1   Q.   Approximately when was that first brought to your

2   attention?

3   A.   The focus report is filed 17 business days after month end,

4   so that would have been sometime for the May filing, it would

5   have been sometime in late June or early July depending on when

6   the coordinator was doing the actual review.

7   Q.   You have mentioned two terms, and and I think we'll go into

8   them a little bit later.

9        Before one of the terms you mentioned was net capital.

10  Can you describe for the jury what is net capital?

11  A.   The net capital is basically a measurement of a firm's

12  liquid net worth, and liquid net worth includes cash or assets

13  that are readily convertible into cash.

14  Q.   Such as securities?

15  A.   Yes.

16  Q.   Now, you also mentioned focus reports.  Before we go

17  further, if you could just give the jury a description of what

18  is a focus report?

19  A.   A focus report is basically a filing that is done either

20  quarterly or monthly that gives the assets and liabilities and

21  also the firm's P&L, profit and loss, and so operational

22  information.

23  Q.   Do broker-dealers such as Burnham Securities have a set

24  amount of net capital they're required to maintain?

25  A.   Yes, they are.

1   Q.  What is the purpose of the net capital requirement?

2   A.  To make sure that the broker-dealers don't go below a

3   certain threshold.

4   Q.  What was Burnham Securities net capital requirement or

5   threshold?

6   A.  $100,000.

7   Q.  Just in day-to-day terms, can you describe what that means.

8   A.  The threshold?

9   Q.  Yes, $100,000 net capital requirement, what did that mean

10  in day-to-day terms for Burnham Securities?

11  A.  We have what we call a statutory minimum capital

12  requirement, and what that means, it is based upon the firm's

13  activities, how they handle customer funds and securities, just

14  to make sure that based on that and the amount of risk that the

15  firm is willing to take, that is how the net capital, the

16  statutory minimum, the capital requirement is determined.

17  Q.  What was Burnham Securities required to do if its net

18  capital was below the $100,000 mark?

19  A.  They need to file a notification with FINRA.

20  Q.  Was Burnham also required to notify FINRA if it was getting

21  close to the $100,000 net capital requirement?

22  A.  Yes, they were.

23  Q.  What was the threshold that triggered its requirement to

24  notify FINRA if it was getting close to the net capital

25  requirement?

I6CJGAL3                          Walch - direct

1    A.  It's called an early warning, and it is 120 percent.

2    Q.  What is the process by which Burnham was required to make

3    such a notification to FINRA?

4    A.  They would have to file the notification through the FINRA

5    gateway.

6    Q.  So going back to the spring of 2015, let me direct your

7    attention to Government Exhibit 1076.

8              MS. TEKEEI:  Ms. Shinewald, if you could pull that up

9    for the witness, the Court and the parties.  Ms. Walch, there

10   is a binder in front of you with that exhibit as well.

11   BY MS. TEKEEI:

12   Q.  Ms. Walch, do you recognize this exhibit, Government

13   Exhibit 1076?

14   A.  Yes, I do.

15   Q.  How do you recognize it?

16   A.  Because I actually pulled this.

17   Q.  Therefore, is it a true and accurate copy of records from

18   FINRA's filing systems?

19   A.  Yes.

20   Q.  Was this a document that was created, kept and maintained

21   in the ordinary course of FINRA's work as an organization?

22   A.  Yes, it is.

23   Q.  Was it made part of FINRA's records at or near the time

24   that it was filed?

25   A.  Yes.

I6CJGAL3                          Walch - direct

1   Q.  Was it adopted by FINRA during that time?

2   A.  Yes.

3   Q.  Does FINRA rely on this report in the course of carrying

4   out its regulatory activities?

5   A.  Yes, it does.

6           MS. TEKEEI:  We offer Government Exhibit 1076.

7           THE COURT:  Any objection?

8           MR. SCHWARTZ:  No objection.

9           MS. NOTARI:  No.

10          MR. TOUGER:  No.

11          THE COURT:  It will be admitted.

12          (Government's Exhibit 1076 received in evidence)

13  BY MS. TEKEEI:

14  Q.  Ms. Walch, directing your attention to the very first page

15  of Government Exhibit 1076 -- Ms. Shinewald, please publish

16  that to the jury -- and focusing on the top half, what sort of

17  filing is this?

18  A.  This is a financial notification, indicating net capital

19  less than 120 percent of required minimum net capital.

20  Q.  Looking at the bottom of this document, who is the member

21  filing this notification?

22  A.  Burnham Securities, Inc.

23  Q.  If you could turn to the second page of this document,

24  looking at -- let me ask you one more question on that.

25          When you said the firm was filing a notification it

I6CJGAL3                          Walch – direct

1   was nearing less than the 120 percent mark, what did you mean

2   by that?

3   A.   They were in early warning, meaning they're having some

4   financial -- an indication that the firm may be having some

5   financial difficulties.

6   Q.   Thank you.  Now looking at this second page, can you read

7   the first question at the top.

8   A.   On what date date or -- date was the firm's net capital

9   below 120 percent of its required capital.

10                  (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6C7GAL4                          Walch - Direct

 1   BY MS. TEKEEI:

 2   Q.  And what is the date range or span that's reported here?

 3   A.  3/31/2015 to 3/31/2015.

 4   Q.  And looking just above that line, what date did the firm

 5   report that it discovered that its net capital was below the

 6   120 percent mark?

 7   A.  4/20/2015.

 8   Q.  And what's the amount of net capital that was reported for

 9   that date?

10   A.  $118,498.

11   Q.  Now, what are the repercussions when a firm has net capital

12   that is below the $100,000 minimum mark, for example, here

13   Burnham Securities?

14   A.  Well, first the firm would have to file a notification, and

15   secondly they would need to indicate to us what they're doing

16   to cure this.  Are they infusing cash?  You know, what are they

17   planning to do to get back to where they should be?

18   Q.  And if a firm goes below -- or, excuse me -- if Burnham

19   Securities goes below the $100,000 mark, what did it mean for

20   its ability to conduct in the securities business?

21   A.  It means they would be net capital deficient, and they are

22   supposed to cease conducting their securities business if they

23   are deficient.

24   Q.  So going back to this document, what steps does Burnham

25   report were taken to increase its net capital here?  If you

1    look at the bottom of the page, looking at that second box, if

2    you could read the sentence beginning with "Revenue"?

3    A.   Revenue was increased as three investment banking fees

4    received totaling $170,000, capital contributions made during

5    the month of April 2015:  4/20/2015, $75,000; 4/27/2015,

6    $200,000; and on 4/30/2015, $150,000.

7    Q.   Thank you.

8              Ms. Sheinwald, you can take that down.

9              Ms. Walch, in addition to financial notifications like

10   the one we just saw, what other financial reporting

11   requirements did Burnham have?

12   A.   To file what you call the SSOI, which is supplemental

13   statement of income; and they had inventory, so they would file

14   a supplemental inventory statement.

15   Q.   And earlier you mentioned focus reports as well.

16   A.   And focus reports.

17   Q.   And what were Burnham's focus report filing requirements?

18   A.   They would file the focus report on a monthly basis.

19   Q.   And do the focus reports also contain a calculation of the

20   broker dealer's -- in this case Burnham's -- net capital?

21   A.   Yes, it did.

22   Q.   I'd like to turn your attention now to Government Exhibits

23   1085 and 1080, which are also in your binder.

24   A.   Did you say 1080?

25   Q.   Yes, ma'am, 1080 and 1085.

1    A.  OK.

2    Q.  Do you recognize those documents?

3    A.  Yes, I do.

4    Q.  How do you recognize them?

5    A.  I printed them from our internal systems.

6    Q.  And are those true and accurate copies of records from

7    FINRA's filing systems?

8    A.  Yes, they are.

9    Q.  Are those records created or kept and maintained in the

10   ordinary course of FINRA's organizational work?

11   A.  Yes, they are.

12   Q.  And were they made part of FINRA's records at or near the

13   time they were filed?

14   A.  Yes.

15   Q.  Does FINRA rely on them in the course of carrying out its

16   regulatory activities?

17   A.  Yes, it does.

18           MS. TEKEEI:  The government offers Government Exhibits

19   1080 and 1085.

20           THE COURT:  Any objection?

21           MR. SCHWARTZ:  No objection.

22           THE COURT:  They will be admitted.  Thank you.

23           (Government Exhibits 1080 and 1085 received in

24   evidence)

25   Q.  Thank you.  Ms. Walch, if we could begin with Government

I6C7GAL4                          Walch - Direct

Exhibit 1085.

            And, Ms.Sheinwald, if you could please publish that
for everyone.

            Ms. Walch, can you briefly describe for us what is the
record that we're seeing here?

A.   This is the -- this page is the cover page of the focus
report.

Q.   Filed by which firm?

A.   Filed by Burnham Securities for the period 4/1/2015 through
4/30/2015.

Q.   And directing your attention to the page ending in 14288 at
the bottom right-hand corner, I believe it's the second page of
the document --

A.   Yes.

Q.   -- can you just describe generally what type of information
does this page report?

A.   So basically what this page is reflecting is assets -- both
allowable and non-allowable -- and the totals.  And the
allowable assets are assets that are readily convertible into
cash, while the non-allowable, they are not.

Q.   And are allowable assets, can those be counted toward a
firm's net capital?

A.   Yes.

Q.   And what about non-allowable assets, can they be counted
toward a firm's net capital?

1    A.   They're non-allowable.

2    Q.   And if you look at the left column, what are the first four

3    categories of assets that are listed here?

4    A.   It's cash, receivables from broker dealers, receivables

5    from non-customers, and securities and spot commodities owned

6    at market value.

7    Q.   And then focusing on the category for securities, 4B, and

8    looking at the allowable assets column for 4B, what is listed

9    there?

10   A.   Debt securities.

11   Q.   What is a debt security?

12   A.   Where you're basically borrowing -- you're lending money to

13   someone; that's basically all that is.

14   Q.   Is that like a bond?

15   A.   Like a bond, yes.

16   Q.   And what is the amount of debt securities listed by Burnham

17   as of April 30, 2015?

18   A.   That's a zero balance.

19   Q.   Let's turn now to the page ending in 90 at the bottom.  And

20   just generally speaking, what does this page reflect?

21   A.   Could you repeat that?

22   Q.   Sure.  The page ending in 90, it says at the top

23   "Computation of net capital."

24   A.   OK.  So this page is basically giving the firm's

25   computation of its net capital, which includes what is

1    allowable and non-allowable assets, the totals.

2    Q.  And if you could look at line 10, at the bottom of this

3    page, what is the amount of net capital reported by Burnham as

4    of April 30, 2015 in this report?

5    A.  $230,006.

6    Q.  Thank you.

7            Ms.Sheinwald, you can take that down.

8            Let's take a look next at May of 2015.

9            Ms.Sheinwald, if you could publish for the jury

10   Government Exhibit 1080, also for the witness, the parties and

11   the court.

12           And, Ms. Walch, can you describe for the jury

13   generally speaking what is Government Exhibit 1080?

14   A.  1080 is a focus report filed by Burnham Securities for the

15   period May 1, 2015 through May 31, 2015.

16   Q.  Thank you.  And turning to the next page, the page that

17   ends in 14832, is this the allowable and non-allowable assets

18   section of the report for the time period ending in May 31,

19   2015?

20   A.  Yes, it is.

21   Q.  If you could look now at the category 4B, debt securities,

22   what is the amount of debt securities reported for Burnham as

23   of May 31, 2015?

24   A.  $3,023,123.

25   Q.  Did there come a time when you learned what the debt

1    securities were that Burnham reported on this May 2015 focus

2    report?

3    A.  Yes, I did.

4    Q.  What were those?

5    A.  These were the Wakpamni bonds.

6    Q.  And is that as a result of your review of Burnham's

7    regulatory filings and financials during that time period?

8    A.  Yes, this was as a result of being brought to my attention

9    and getting the details behind it, yes.

10   Q.  Let's now take a look at the net capital computation for

11   Burnham as of May 31, 2015.  If you could turn to the page

12   ending in 14834, which is the fourth page of the document.

13          And, Ms.Sheinwald, if you could please put up page 4

14   of Government Exhibit 1085 in evidence on the left next to page

15   4 of Government Exhibit 1080.  I think it's on the right.

16          Ms. Walch, just looking at the right, what is the

17   amount of net capital that was reported for Burnham Securities

18   for the time period ending April 30, 2015?

19   A.  Can you repeat?

20   Q.  It's line 10 on the right-hand column.

21   A.  $230,006.

22   Q.  And that was the period ending April 30?

23   A.  Yes.

24   Q.  And now looking at the left side, what is the amount of net

25   capital reported by Burnham for the time period ending May 31,

I6C7GAL4                          Walch - Direct

1    2015?

2    A.   $3,733,771.

3    Q.   And what primarily accounted for the difference in these

4    amounts?

5    A.   The Wakpamni bonds.

6    Q.   Do you know the approximate amount of Wakpamni bonds that

7    Burnham acquired in May of 2015?

8    A.   The value or the quantity?

9    Q.   The amount that they acquired.

10   A.   It was $3,023,000.

11   Q.   Now, through your oversight of Burnham, did you learn that

12   another broker dealer also held Wakpamni Lake Community

13   Corporation bonds?

14   A.   Yes, I did.

15   Q.   And what broker dealer was that?

16   A.   Bonwick Capital.

17   Q.   If you could take a look at Government's Exhibits 1070,

18   1071, 1072 and 1073.  Do you recognize those documents?

19   A.   Yes, I do.

20   Q.   How do you recognize them?

21   A.   These were documents that I pulled from our internal

22   systems.

23   Q.   And so are they true and accurate copies of records from

24   FINRA's filing systems?

25   A.   Yes.

1                MR. SCHWARTZ:  No objection.

2    Q.  Were these documents kept and maintained in the ordinary

3    course of FINRA's organizational activities?

4    A.  Yes.

5    Q.  Were they made part of FINRA's records at or near the time

6    they were filed?

7    A.  Yes.

8    Q.  And does FINRA rely on them in the course of carrying out

9    its regulatory activities?

10   A.  Yes.

11               MS. TEKEEI:  Your Honor, the government offers

12   Government Exhibits 1070, 1071, 1072, and 1073.

13               THE COURT:  Any objection?

14               MR. SCHWARTZ:  No objection.

15               MR. TOUGER:  No objection.

16               MS. NOTARI:  No objection.

17               THE COURT:  They will be admitted.

18               (Government Exhibits 1070, 1071, 1072 and 1073

19   received in evidence)

20   Q.  Thank you.  Ms.Sheinwald, can you please publish Government

21   Exhibit 1070 for everyone.

22               Ms. Walch, can you describe for the jury what is

23   Government Exhibit 1070?

24   A.  It's a financial notification indicating the net capital

25   below minimum amount required filed by Bonwick Capital.

1   Q.  And if you could turn to the next page, what is the

2   reported date range of Bonwick's net capital deficiencies?

3   A.  February 25, 2015.  It was filed February 25, 2015 for

4   deficiency period January 10, 2015 through February 24, 2015.

5   Q.  And, Ms. Walch, are you familiar with Bonwick's net capital

6   requirement?

7   A.  Yes, I am.

8   Q.  What was that requirement?

9   A.  $100,000.

10  Q.  So looking here at the second page, what was Bonwick's

11  reported net capital for the time period that's reported here,

12  January 10, 2015 through February 24, 2015?

13  A.  $75,838.

14  Q.  Now, if you could please take a look next at Government

15  Exhibit 1071.

16          Ms.Sheinwald, can you please publish that for the

17  jury.

18          What is Government Exhibit 1071?

19  A.  It's a financial notification filed by Bonwick Capital

20  Partners that indicates that the firm has net capital less than

21  120 percent of required minimum net capital.

22  Q.  And turning to the next page, what is the reported date

23  range of Bonwick's near net capital deficiencies here?

24  A.  March 11, 2015 through April 6, 2015.

25  Q.  And what was Bonwick's reported net capital for that time

1   period?

2   A.   $102,980.

3   Q.   And does Bonwick provide an explanation here for what steps

4   were taken to increase its net capital?

5   A.   Yes.

6   Q.   And if you could just look at the bottom.  Can you please

7   read the first sentence in the second box here beginning with

8   "The firm..."

9   A.   "The firm is in the process of permanently recapitalizing

10  the company."

11  Q.   Go ahead and read the next sentence as well.

12  A.   "It has an executed term sheet from a prospective investor

13  for $6 million in new capital, and has already received a small

14  portion ($70,000) of that investment, along with $45,600 from

15  existing investors."

16  Q.   Let's turn now to Government Exhibit 1072, Ms.Sheinwald.

17  Can you please publish that.

18          Ms. Walch, what is Government Exhibit 1072?

19  A.   Financial notification filed by Bonwick Capital Partners,

20  indicating net capital below minimum amount required.

21  Q.   And if you could turn to the next page, what is the

22  reported date range of Bonwick's net capital deficiency?

23  A.   February 25, 2015 through April 29, 2015.

24  Q.   And what was Bonwick's reported net capital for that time

25  period?

I6C7GAL4                          Walch - Direct

1   A.  $49,437.

2   Q.  Does Bonwick provide an explanation here for what steps

3   were taken to increase its net capital?

4   A.  Yes, it did.

5   Q.  And if you could look at the bottom box and read the

6   sentence that begins with "In addition ..."

7   A.  "In addition, the firm has received a capital infusion of

8   approximately $6 million in cash and securities on 5/29/15."

9   Q.  Go ahead and read the following sentence as well.

10  A.  "Such infusion has brought the firm's net capital to

11  approximately $5.6 million, which is $5.5 million in excess of

12  the firm's requirement of $100,000."

13  Q.  And if you could turn next to Government Exhibit 1073.

14  What is this document?

15  A.  It's a financial notification filed by Bonwick Capital

16  Partners indicating net capital below amount required.

17  Q.  And if you could turn to the second page, can you tell us

18  what is the reported date range of Bonwick's net capital

19  deficiencies?

20  A.  April 30, 2015 through May 28, 2015.

21  Q.  And what was Bonwick's reported net capital for that time

22  period?

23  A.  Negative $95,886.

24  Q.  Does Bonwick provide here an explanation for what steps

25  were taken to increase its net capital?

1   A.  Yes, it did.

2   Q.  Can you read the first sentence in the section where

3   Bonwick provides that explanation, the sentence beginning with

4   "The company..."

5   A.  "The company received a capital infusion of $5,993,697 on

6   May 29, 2015 in the form of cash and securities, which

7   increased the firm's net capital by $5,532,173 (after

8   haircuts)."

9   Q.  Thank you.

10          Ms.Sheinwald, you can take that down.

11          Ms. Walch, was Bonwick Capital like Burnham required

12  to file focus reports?

13  A.  Yes, it was.

14  Q.  Let's take a look at a couple of them.  Directing your

15  attention to Government Exhibits 1084 and 1082.  Do you

16  recognize those documents?

17  A.  Yes, I do.

18  Q.  And how do you recognize them?

19  A.  I printed these from our internal systems.

20  Q.  And are these also true and accurate copies of records from

21  FINRA's filing systems?

22  A.  Yes, they are.

23  Q.  Were they created, kept, and maintained in the ordinary

24  course of FINRA's work?

25  A.  Yes, they were.

1   Q.  And were they made part of FINRA's records at or near the

2   time they were filed?

3   A.  Yes.

4   Q.  Does FINRA rely on those reports in the course of carrying

5   out its regulatory work?

6   A.  Yes, it does.

7           MS. TEKEEI:  Your Honor, the government offers

8   Government Exhibits 1084 and 1082.

9           THE COURT:  Any objection?

10          MR. SCHWARTZ:  No objection.

11          MR. TOUGER:  No objection.

12          THE COURT:  They will be admitted.

13          (Government Exhibits 1082 and 1084 received in

14  evidence)

15          MS. TEKEEI:  Thank you, your Honor.

16          Ms.Sheinwald, can you please publish for everyone

17  Government Exhibit 1084.

18  Q.  Ms. Walch, can you describe for the jury what is this

19  document?

20  A.  This is the focus report that was filed by Bonwick Capital

21  Partners for the period 4/1/15 through 4/30/15.

22  Q.  And if we could turn to the next page of this report, is

23  this the allowable and non-allowable assets portion of the

24  report for the same time period ending in April 30, 2015?

25  A.  Yes, it is.

1   Q.  And if we could just focus on that line 4B in Bonwick's

2   April focus report, debt securities.  What is the amount of

3   debt securities that Bonwick reports for the time period ending

4   April 30, 2015?

5   A.  $9,002.

6   Q.  And if you could turn to the fourth page of this document

7   which ends in 14927 at the bottom.  Is this the net capital

8   computation for Bonwick Capital as of April 30, 2015?

9   A.  Yes, it is.

10  Q.  And what amount of net capital does Bonwick report here?

11  A.  $229,892.

12  Q.  Now, if you could turn next to Government Exhibit 1082.

13          Ms.Sheinwald, can you publish that to the jury and

14  everyone.

15          Ms. Walch, what is this document?

16  A.  This is a focus report that was filed by Bonwick Capital

17  for the period 5/1/15 through 5/31/15.

18  Q.  And again let's turn to the second page of this report.  Is

19  this the allowable and non-allowable assets portion of the

20  report for the time period ending May 31, 2015?

21  A.  Yes, it is.

22  Q.  And again if we could focus on the line 4B and the

23  allowable assets column.  What is the amount of debt securities

24  reported in Bonwick's May 2015 focus report?

25  A.  $5,821,897.

I6C7GAL4                        Walch - Direct

1   Q.  Do you know what accounted for at least some of the

2   difference in the debt securities listed here between the April

3   and May focus reports for Bonwick?

4   A.  Yes, I do.

5   Q.  What was that?

6   A.  The Wakpamni bonds.

7   Q.  Let's now take a look at the net capital computation for

8   Bonwick.

9          Ms.Sheinwald, if you could please put up page 4 of

10  Government Exhibit 1084 on the left next to page 4 of

11  Government Exhibit 1082.

12         Now, starting with the left document, the April 30,

13  2015 report, Ms. Walch, can you remind the jury what was

14  Bonwick's reported net capital for the time period ending April

15  30, 2015?  That's line 10 on the lefthand document.

16  A.  $229,892.

17  Q.  And then turning to the right, document on the right, the

18  report filed for the time period ending May 31, 2015, what is

19  the amount of net capital reported for Bonwick for that time

20  period?

21  A.  5,504,800.

22  Q.  And what primarily accounted for the difference in these

23  amounts?

24  A.  The debt securities.

25  Q.  And in particular which debt securities?

1    A.   The Wakpamni bonds.

2    Q.   OK.   Thank you, Ms.Sheinwald.   You can bring that down.

3          Ms. Walch, turning back to Burnham Securities, did

4    there come a time when you became involved in questions that

5    FINRA posed to Burnham regarding the Wakpamni bonds that

6    Burnham had reported as allowable debt securities in its focus

7    reports?

8    A.   Yes, I did.

9    Q.   Approximately when was that?

10   A.   I think it might have been sometime in late June or July we

11   started having conversations with the firm.

12   Q.   And without telling us what anyone said, what steps did

13   FINRA take with respect to Burnham and the Wakpamni bonds?

14   A.   So, what we tried to do is go to the Bloomberg system.   We

15   went to the Bloomberg system just to see the type of security

16   it is and the pricing of the security since we were questioning

17   its allowability.

18   Q.   And did you participate in asking questions of Burnham

19   about the bonds?

20   A.   Yes, I did.

21   Q.   What were the questions that FINRA posed to Burnham

22   regarding the Wakpamni bonds during that time period?

23   A.   How did they come up with the pricing of the securities,

24   because, you know, from our independent research we weren't

25   able to find a price for these bonds.

I6C7GAL4                        Walch - Direct

1   Q.  Did FINRA ask Burnham questions about whether the bonds

2   were marketable?

3   A.  Yes, we did.

4   Q.  And did FINRA ask questions about how Burnham was

5   classifying the bonds?

6   A.  Yes, we did.

7   Q.  What were the questions that FINRA asked about how Burnham

8   was classifying the bonds?

9   A.  Well, our question is how did Burnham determine that the

10  bonds were actually allowable assets.  Based on our research,

11  we could not find that there was a ready market for these

12  securities.

13  Q.  And what was the purpose -- what was the ultimate goal of

14  these questions?  What were you trying to determine?

15  A.  Well, we were trying to determine if the bonds were

16  actually marketable and how to price it.  And the other thing

17  was that from our research it didn't appear to be a municipal

18  bond.

19  Q.  And why did it matter if it were a municipal bond?

20  A.  Well, it depends on what type of bond it is, it would

21  indicate how it's classified.

22  Q.  As allowable or non-allowable?

23  A.  As an allowable or a non-allowable asset.

24  Q.  And did Burnham provide prices for the bonds?

25  A.  Yes, they provided a statement to us.

1    Q.  And did FINRA accept the prices that Burnham provided?

2    A.  No, we did not.

3    Q.  For approximately how long did FINRA's review of the

4    Wakpamni bonds held by Burnham go on?

5    A.  It took a couple of months.

6    Q.  And at the end of that process what if any instructions did

7    FINRA provide to Burnham?

8    A.  Well, in conversation with the firm, we told them that we

9    communicated with -- we did our independent research, we

10    communicated with the SEC, and from our research the bonds were

11    not municipal bonds, and as such the firm would need to refile

12    a focus report and reclassify these bonds as non-allowable.

13    Q.  And what did that mean for Burnham's net capital?

14    A.  That means there they would be net capital deficient, and

15    they would have to file a financial notification.

16    Q.  And did Burnham refile financial notifications as a result?

17    A.  Yes, they did.

18    Q.  And how about Bonwick, did Bonwick receive similar

19    instructions from FINRA?

20    A.  Yes, they did.

21    Q.  And did Bonwick have to file financial notification

22    reports?

23    A.  Yes, they did.

24    Q.  So let's turn to Government Exhibit 1074.  Ms. Walch, if

25    you could take a look at it.  What is this document?

1  A.   This is a financial notification filed by Bonwick Capital

2  Partners indicating net capital below minimum amount required.

3          MS. TEKEEI:  Your Honor, we offer Government Exhibit

4  1074.

5          THE COURT:  Any objection?

6          MS. NOTARI:  No.

7          MR. SCHWARTZ:  No.

8          MR. TOUGER:  No objection.

9          THE COURT:  1074 will be admitted.

10         (Government Exhibit 1074 received in evidence)

11  Q.   And what is the time period of this net capital deficiency

12  report by Bonwick?

13  A.   September 2, 2015 through September 13, 2015.

14  Q.   Sorry.  I meant to tell you to go ahead and turn to the

15  second page, but you got there without me.

16         What was Bonwick's reported net capital for that time

17  period?

18  A.   $62,083.

19  Q.   Does Bonwick provide an explanation here for what caused

20  the deficiency?

21  A.   Yes, they did.

22  Q.   And what is the explanation provided by Bonwick in the what

23  caused the deficiency section?

24  A.   "One of the firm's marketable securities (11,499 shares

25  CDRB) decreased drastically from 8/31/2015 ($14.30 per share)

I6C7GAL4                    Walch – Direct

1    to 9/2/2015 ($8.42 a share), resulting in an unrealized loss of

2    approximately $67,000 in this two day period.  This loss was

3    compounded by the fact that the company had deemed one of its

4    other positions, a $5 million municipal bond illiquid and thus

5    non-allowable as of 8/31.  The combination of these two issues

6    caused the violation.  In addition, the company pierced early

7    warning one day early on 9/1/15."

8    Q.  What was the bond that was classified as non-allowable?

9    A.  The Wakpamni bonds.

10   Q.  If you could turn next to Government Exhibit 1075; do you

11   recognize this document?

12   A.  Yes, I do.

13   Q.  And what is this document?

14   A.  A financial notification filed by Bonwick Capital Partners

15   indicating that net capital below amount required.

16        MS. TEKEEI:  Your Honor, we offer Government Exhibit

17   1075.

18        THE COURT:  Objection?

19        MR. SCHWARTZ:  No objection.

20        THE COURT:  It will be admitted.

21        (Government Exhibit 1075 received in evidence)

22   Q.  Ms. Walch, turning to the next page, what's the reported

23   date range of Bonwick's net capital deficiencies?

24   A.  January 12, 2016 to January 14, 2016.

25   Q.  And what was Bonwick's reported net capital for that time

I6C7GAL4                          Walch - Direct

1   period?

2   A.   A negative $314,096.

3   Q.   And does Bonwick provide here an explanation for what

4   caused the deficiency?

5   A.   Yes, they did.

6   Q.   Can you read the first sentence in the section about what

7   caused the deficiency.

8   A.   "Bonwick possesses a $4.8 million bond that it has included

9   as part of its net capital in the past."

10  Q.   And can you read the second sentence as well.

11  A.   "On Tuesday, January 12th, FINRA determined that the bond

12  should be treated as non-allowable due to there being no active

13  market."

14  Q.   Thank you.

15          Ms.Sheinwald, you can take that down.

16          Let's turn next to Government Exhibit 1078.

17          Ms. Walch, do you recognize Government Exhibit 1078?

18  A.   Yes, I do.

19  Q.   And what -- how do you recognize it?

20  A.   I printed this from our internal systems.

21          MS. TEKEEI:  Your Honor, we offer Government Exhibit

22  1078.

23          THE COURT:  Any objection?

24          MS. NOTARI:  No objection.

25          MR. SCHWARTZ:  No objection.

I6C7GAL4                        Walch - Direct

1              MR. TOUGER:  No objection.

2              THE COURT:  Admitted.

3              (Government Exhibit 1078 received in evidence)

4    Q.  Ms.Sheinwald, can you publish that for everyone.

5              And what is this document, Ms. Walch?

6    A.  It's a financial notification filed by Burnham Securities

7    indicating net capital below minimum amount required.

8    Q.  And if you could turn to the next page, what is the time

9    period for the reported date range of Burnham's net capital

10   deficiencies?

11   A.  7/31/2015 through 1/15/2016.

12   Q.  And what was Burnham's reported net capital for July 31,

13   2015 through January 15, 2016?

14   A.  Negative $660,250.

15   Q.  Does Burnham provide an explanation here for what caused

16   the deficiency?

17   A.  Yes, they did.

18   Q.  And what is that explanation?

19   A.  "The deficiency was caused by a reclassification of a bond

20   position from an allowable asset to a non-allowable asset.  The

21   firm was made aware of the unallowable asset status of the bond

22   in a phone conversation with the SEC and FINRA on January 11,

23   2016."

24   Q.  And what was the bond position that was reclassified from

25   an allowable asset to a non-allowable asset?

1   A.   The Wakpamni bonds.

2   Q.   Thank you.

3          Ms.Sheinwald, you can take that down.

4          Ms. Walch, earlier you described how Burnham had

5   provided pricing for the bonds.  Do you recall that testimony?

6   A.   Yes.

7   Q.   And what were the types of information Burnham provided

8   when it provided pricing information for the bonds?

9   A.   Burnham provided us with a statement from Morgan Stanley

10  that indicated the price of the bond and the value.

11  Q.   And did there come a time when Burnham provided information

12  about a sale of a portion of the bonds?

13  A.   Yes, they did.

14  Q.   And what was that?

15  A.   They told us that there was another broker dealer that has

16  a pending sale of $100,000 worth of the Wakpamni bonds.

17  Q.   And what was that other broker dealer?

18  A.   Bonwick Capital.

19  Q.   And what was the amount of bonds that was reported to be

20  pending sale?

21  A.   100,000.

22  Q.   Do you recall the entity to which those bonds were to be

23  sold?

24  A.   I think it was Condor.  I'm not a hundred percent sure.

25  Q.   Did you say Condor?

I6C7GAL4                    Walch - Cross

1    A.  Yes.

2    Q.  Ms. Walch, is Burnham Securities still registered as a

3    broker dealer with FINRA?

4    A.  No, it's not.

5    Q.  Is Bonwick Capital still registered as a broker dealer with

6    FINRA?

7    A.  No, it's not.

8            MS. TEKEEI:  Thank you.  No further questions at this

9    time.

10           THE COURT:  Any cross-examination?

11   CROSS EXAMINATION

12   BY MR. SCHWARTZ:

13   Q.  Good afternoon, ladies and gentlemen.

14           And good afternoon, Ms. Walch.

15   A.  Good afternoon.

16   Q.  My name is Matthew Schwartz.  I am one of the lawyers for

17   Devon Archer.  You have never met Mr. Archer; is that right?

18   A.  No, that's correct.

19   Q.  And you have never communicated with Mr. Archer in any way,

20   true?

21   A.  True.

22   Q.  So when you've been testifying about what Burnham said or

23   Burnham did, whoever that refers to, it's not Mr. Archer, true?

24   A.  Right.

25   Q.  Now, in preparing to come here today you did meet with the

1    prosecutors on a few occasions, correct?

2    A.  Yes, I did.

3    Q.  You spoke to them on phone, right?

4    A.  Yes, I did.

5    Q.  You exchanged some e-mails with them, true?

6    A.  Yes.

7    Q.  And am I right that the very first time the prosecutors

8    contacted you about this case was on May 8th of 2018?

9    A.  I don't remember the date off the top of my head.

10   Q.  Sometime last month, true?

11   A.  As I said, I don't remember, you know, the exact date that

12   they contacted me, but they did contact me.

13   Q.  It wasn't months and months or years and years ago.

14   A.  No.

15   Q.  It was within the last few weeks, true?

16   A.  Yes.

17   Q.  And over the last few weeks they have spoken to you half a

18   dozen times maybe, right?

19   A.  Probably.

20   Q.  And the first time that they ever asked you about Devon

21   Archer, by the way, was just this past Friday on the 8th of

22   June; isn't that right?

23   A.  Yes.

24   Q.  Now, your testimony was principally about something called

25   net capital, right?

1    A.  Correct.

2    Q.  And net capital is governed by something called Rule 15C-3,

3    true?

4    A.  15C3-1, yes.

5    Q.  And that rule -- that's not a short rule, right?  That's a

6    long rule, true?

7    A.  Correct.

8    Q.  If you printed it out, it would take many, many pages,

9    right?

10   A.  Um-hum.

11   Q.  And one of the things that Rule 15C3-1 contains is a list

12   of haircuts, right?

13   A.  Correct.

14   Q.  And when we talk about a haircut, in the context of net

15   capital what we mean is that certain assets may be discounted

16   by a set percentage, right?

17   A.  Right.

18   Q.  For example, cash is not discounted at all, right?

19   A.  Correct.

20   Q.  And U.S. treasury bonds are also not discounted; is that

21   right?

22   A.  No, bonds, they take haircuts based on the maturity.

23   Q.  So a ten year U.S. T bill, what's the haircut on that?

24   A.  I don't remember that off the top of my head.

25   Q.  Pretty small though, right?

I6C7GAL4                      Walch - Cross

1   A.  It's small.

2   Q.  And that's because U.S. treasury bonds could very quickly

3   be turned into cash, right?

4   A.  Correct.

5   Q.  And big cap securities like IBM or Apple, they have a

6   bigger haircut, right?

7   A.  Yes.

8   Q.  But still relatively modest, true?

9   A.  Correct.

10  Q.  And this is all because the purpose of net capital

11  requirements is about insuring that a broker dealer has

12  sufficient liquidity, true?

13  A.  Correct.

14  Q.  And that's in case something were to happen, it would need

15  to have cash or the ability quickly to get cash in order to

16  close out its positions, right?

17  A.  Correct.

18  Q.  And FINRA and the SEC make distinctions between different

19  kinds of broker dealers, right?

20  A.  Yes.

21  Q.  And in this case we're talking about something called an

22  introducing broker, right?

23  A.  Correct.

24  Q.  Both Burnham Securities, Inc. and Bonwick Capital, Inc.

25  were what is called introducing brokers, right?

I6C7GAL4                       Walch - Cross

1    A.  Yes.

2    Q.  And introducing brokers as a rule have a $100,000 net

3    capital requirement, true?

4    A.  No.

5    Q.  In general they have a $100,000 net capital requirement,

6    true?

7    A.  No, it depends on the activity.

8    Q.  Maybe I'm phrasing this incorrectly.  The net capital

9    calculation for an introducing broker is the smaller of

10   $100,000 or a calculation based on its activity, true?

11   A.  Right, but you could have broker dealers where the minimum

12   net capital is $5,000.

13   Q.  Right.  And in general the net capital requirements for

14   introducing brokers are fairly low because they don't hold huge

15   positions on hand, right?

16   A.  They're fairly low.

17   Q.  The other kind of broker is called a clearing broker,

18   right?

19   A.  Correct.

20   Q.  And clearing brokers hold large securities positions,

21   right?

22   A.  Right.

23   Q.  So they typically require more net capital because they

24   have to close out in that worst case scenario much bigger

25   positions, right?

I6C7GAL4                        Walch - Cross

1    A.  Correct.

2    Q.  In the case of Burnham Securities -- well, let me strike

3    that.

4          An introducing broker will route its trades through a

5    clearing broker, true?

6    A.  Yes.

7    Q.  And in the case of Burnham Securities, Incorporated, its

8    clearing broker was JP Morgan Chase, true?

9    A.  Correct.

10   Q.  You would agree with me, Ms. Walch, that broker dealers are

11   highly, highly regulated, true?

12   A.  Can you repeat that?  I'm sorry.

13   Q.  You would agree with me that broker dealers are highly,

14   highly regulated, right?

15   A.  Yes.

16   Q.  And the net capital requirement is very carefully watched,

17   true?

18   A.  Yes.

19   Q.  For example --

20          Mr. Jackson, if you could pull back up Exhibit 1076 at

21   page 2 and just blow that up.

22          This was an occasion where on a single day, March 31,

23   2015, Burnham Securities pierced early warning by going beneath

24   the 120 percent net capital threshold, true?

25   A.  Yes.

1  Q.  And it went below that threshold by $1,502.  True?

2  A.  Yes.

3  Q.  It was at 118.5 percent of net capital instead of 120?

4  A.  Yes.

5  Q.  But still even though it was just for one day for only

6  $1,502 it had to file this form, right?

7  A.  Yes.

8  Q.  Because that's what FINRA requires.

9  A.  Yes.

10  Q.  And that's what Burnham Securities did.

11  A.  Correct.

12  Q.  Now, I do want to be clear about one thing.  When we talk

13  about what is allowable or non-allowable for net capital

14  purposes, we're not saying anything about the investment

15  quality of the assets, true?

16  A.  Yes, yes, you are saying something about the investment

17  quality.

18  Q.  Well, let me put it differently.  An asset may be

19  non-allowable but still be a very good investment, right?

20  A.  Yeah, but it's non-allowable.

21  Q.  That's exactly my point.  It's non-allowable for net

22  capital purposes, right?

23  A.  Yes.

24  Q.  For that very specific regulatory purpose it's

25  non-allowable.

I6C7GAL4                        Walch - Cross

1   A.  Correct.

2   Q.  But it may be a great investment for someone who wants to

3   make money, right?

4   A.  It may be.

5   Q.  Like real estate.  Real estate is generally considered to

6   be illiquid, right?

7   A.  Well, it all depends.

8   Q.  Can I use real estate to satisfy a broker dealer's net

9   capital requirement?

10  A.  No, generally, it wouldn't be allowable.

11  Q.  Right.  But real estate can be very, very valuable, right?

12  A.  Yes.

13  Q.  What about bit coin, can I use bit coin to satisfy net cap?

14          MS. TEKEEI:  Objection.

15          THE COURT:  I will allow it.

16          You can answer that.

17  A.  Bit coin, but bit coin would not be allowable.

18  Q.  Right.  But we all know from reading the newspaper that bit

19  coin can be worth tens of thousands of dollars, right?

20          MS. TEKEEI:  Objection.

21          THE COURT:  Sustained.

22  Q.  My point is -- and I think we agree with one another --

23  that what is allowable or non-allowable is a regulatory

24  definition, not a statement about whether something is a good

25  investment, right?

I6C7GAL4                          Walch - Cross

1    A.  It's a regulatory.

2    Q.  Now, am I right that you did not have much experience in

3    broker dealers using sovereign bonds for net capital purposes

4    prior to this discussion with Burnham and separately with

5    Bonwick?

6    A.  Yeah, most of the broker dealers that we have don't have

7    sovereign bonds.

8    Q.  It's rare.

9    A.  It's rare.

10   Q.  And so when you saw -- when FINRA saw that Burnham

11   Securities, Inc. owned these WLCC bonds and they were using

12   them for net capital purposes, FINRA had to do some research,

13   true?

14   A.  Correct.

15   Q.  And I think you testified one of the things that you did

16   was you went onto Bloomberg to locate an independent price,

17   true?

18   A.  Yes.

19   Q.  And there was a price on Bloomberg, right?

20   A.  No, we couldn't -- I couldn't find a price.

21   Q.  You couldn't find a price on Bloomberg for the bonds?

22   A.  Right.

23   Q.  And one of the things that you did was look at a statement

24   from a financial institution, true?

25   A.  A statement that was given to us by Burnham Securities.

1   Q.  Right.  And that was a Morgan Stanley statement.

2   A.  It was a Morgan Stanley statement, correct.

3   Q.  And then FINRA actually had a conversation with Morgan

4   Stanley.

5   A.  Yes, we did.

6   Q.  And no one tried to prevent that, right?

7   A.  Can you repeat that.

8   Q.  I said no one tried to prevent that, right?

9   A.  Having the conversation with Morgan Stanley?

10  Q.  Right.

11          MS. TEKEEI:  Objection.

12          THE COURT:  Sustained.

13  Q.  Well, no one at Burnham expressed any discomfort with FINRA

14  speaking directly to Morgan Stanley, true?

15  A.  Morgan Stanley is a broker dealer that we regulate.

16  Q.  Right.

17  A.  We could speak to Morgan Stanley.

18  Q.  Exactly.  You didn't need to ask anyone's permission.

19  A.  No, I did not.

20  Q.  And Morgan Stanley is a big reputable broker dealer.

21  A.  Yes, they are.

22  Q.  And, by the way, the kinds of conversations about net

23  capital and what was allowable for net capital, you have those

24  conversations all the time, right?

25  A.  Yes.

I6C7GAL4                        Walch - Cross

1   Q.  You have those conversations sometimes with Morgan Stanley,

2   right?

3   A.  No, I don't have that conversation with Morgan Stanley,

4   because I don't -- I am not responsible for Morgan Stanley's

5   focus reports.

6   Q.  Someone else at FINRA would have that conversation with

7   Morgan Stanley.

8   A.  Yes.

9   Q.  Now, in this case once FINRA understood that Burnham

10  Securities was using the WLCC bonds as part of its net capital

11  calculation, that began this process of discussion with Burnham

12  Securities, true?

13  A.  Correct.

14  Q.  And that began when the regulatory coordinator for Burnham

15  reached out to you, right?

16  A.  Yes.

17  Q.  And I think you testified that that was in maybe June of

18  2015?

19  A.  June or July of 2015.  I'm not sure of the correct date.

20  Q.  Now, to be clear, in May or June of 2015 when FINRA

21  understood that Burnham was using these WLCC bond, it didn't

22  just tell Burnham to stop, right?

23  A.  No.

24  Q.  The conversation that you've described with Burnham about

25  its net capital calculation took several months, right?

1   A.  It took several months because we were doing our due

2   diligence based on what the firm -- the conversation that we

3   had with the firm.

4   Q.  Absolutely.  And as part of that conversation you spoke

5   with lawyers for Burnham Securities, true?

6   A.  I don't recall if I spoke with the lawyers.

7   Q.  Do you recall that lawyers for Burnham Securities submitted

8   written opinions to FINRA?

9   A.  Yes.

10  Q.  And in those written opinions the real question -- and the

11  question throughout -- was whether these WLCC bonds should be

12  treated as sovereign bonds or municipal bonds, right?

13  A.  Right.  Because the firm said it's municipal, and counsel

14  came back to say it's municipal bonds, so that's why the letter

15  was trying to indicate as to why Burnham thought it was a

16  municipal bond.

17  Q.  Exactly.  So Burnham was arguing that these were municipal

18  bonds, and FINRA was thinking that they might be sovereign

19  bonds.

20  A.  Correct.

21  Q.  And one of the things that Burnham did was they put forward

22  an opinion by their lawyer that these were categorized as

23  municipal bonds, right?

24  A.  Correct.

25  Q.  And the reason why that matters is because in that big

I6C7GAL4                        Walch - Cross

1   chart, that haircut chart at the end of Rule 15C3-1, you apply

2   a different haircut to muni bonds, right?

3   A.  Correct.

4   Q.  So muni bonds could be used for a net cap, right?

5   A.  Yes.

6   Q.  And the opinion letter that FINRA received from Burnham

7   Securities' counsel, do you recall who that was from?

8   A.  I don't remember the full name of the counsel.  It's Hunter

9   something.  I don't remember the full name.

10  Q.  Can I show you --

11          Mr. Jackson, please, just to Judge Abrams and the

12  witness and the lawyers --

13          -- Exhibit 1402.  Is that the opinion letter that

14  you're talking about?

15  A.  Yes.

16          MR. SCHWARTZ:  I offer Exhibit 1402.

17          MS. TEKEEI:  Objection.  Hearsay.

18          THE COURT:  You know what, it's actually just about

19  lunchtime, so why don't we take a break now for lunch.  We will

20  come back in an hour.  Don't discuss the case and keep an open

21  mind.  Thank you.

22          You can step down, and if you could come back in an

23  hour as well.

24          WITNESS:  Thank you.

25          (Witness not present)

1              (Jury not present)

2              THE COURT:  I want to just -- I mean I understand it's

3     a hearsay objection.  Do you want to respond, Mr. Schwartz?

4              MR. SCHWARTZ:  I mean I'm not offering it for the

5     truth; I'm just offering it for the communication.

6              MS. TEKEEI:  Your Honor, this is just not relevant.

7     He already went over this with the witness.  She described that

8     there were communications with counsel.  We even, you know,

9     could have objected but allowed a little bit of discussion

10    about the nature of those communications.

11             This is hearsay; it's being offered for the truth of

12    what is in there.  You know, I think the witness has described

13    what is in her knowledge and what is in her memory, and I think

14    that's about all that needs to be done.

15             THE COURT:  I think that's right.  I'm going to keep

16    it out.

17             All right, I will see you all in an hour.

18             MS. MERMELSTEIN:  Your Honor, on scheduling, would you

19    prefer for us to have Mr. Martin here in order to invoke prior

20    to lunch, and then he will wait for Ms. Walch to finish?  Or do

21    you want us to just do that once she's off the stand?

22             THE COURT:  No, I mean if he is here, why don't you

23    bring him in at ten of two, we will do it really quickly, and

24    then we will finish with Ms. Walch.

25             MR. SCHWARTZ:  I don't know if anyone else intends to

1    cross her, but I can't have more than 15 minutes, if that,

2    left.

3            MS. MERMELSTEIN:  OK.

4            MR. QUIGLEY:  Let's just do it before lunch.

5            MS. MERMELSTEIN:  So we will have him here just before

6    two.

7            THE COURT:  At 1:50.  Thank you.

8            (Luncheon recess)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          1:50 pm

3          (Trial resumes)

4          (In open court; jury not present)

5          THE COURT:  You may be seated.  Thank you.  I think

6     everyone is here.  Does Mr. Martin have an attorney here?

7          MS. MERMELSTEIN:  He has an attorney, but he is not

8     here.  It is Mr. Cecutti, who is on trial himself.

9          THE COURT:  Okay.  Do you want to proceed with him now

10    with respect to the grant of immunity?

11         MS. MERMELSTEIN:  Yes, I am ready, your Honor.

12         THE COURT:  Okay.

13     FRANCISCO JOSE MARTIN FERNANDEZ,

14         called as a witness by the Government,

15         having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MS. MERMELSTEIN:

18    Q.  Mr. Martin, did you receive a subpoena to testify here

19    today?

20    A.  Yes.

21    Q.  Did you previously indicate that you would exercise your

22    Fifth Amendment right against self-incrimination if subpoenaed

23    to testify?

24    A.  Yes.

25    Q.  Are you now formally exercising your Fifth Amendment rights

1  against self-incrimination?

2  A.  Yes.

3          MS. MERMELSTEIN:  The government respectfully requests

4  that the court enter the immunity order.

5          THE COURT:  Yes, I have signed the order and it will

6  go into effect.  I think that is it.

7          MS. MERMELSTEIN:  Thank you.  Mr. Martin, you can step

8  out until you're called.

9          (Witness excused)

10          THE COURT:  Are we ready for the jury?

11          MS. MERMELSTEIN:  Your Honor, one quick issue just to

12  flag.  Pursuant to the parties' agreements last night, Mr.

13  Schwartz flagged to the government a non-impeachment exhibit he

14  intended to use with Mr. Martin, as did Mr. Touger.

15          We haven't received any -- Ms. Notari, I assume she is

16  not using any.  I have two issues to note with respect to Mr.

17  Schwartz.  One is that Defense Exhibit 4904 is an Instagram

18  post from the account of Monet Berger.  The government, as your

19  Honor will recall, moved to preclude all of the Monet Instagram

20  accounts, and Mr. Schwartz in his letter teeing up the

21  outstanding legal issues, is indicating this wouldn't arise

22  until the case defense case.  If you want to know if we are

23  going to publish this, we won't publish it now.

24          MR. SCHWARTZ:  That is exactly right, I will do the

25  picture without --

I6CJGAL5                        Walch - cross

1              MS. MERMELSTEIN:  And I will note Government Exhibit

2    508 is the account signature card for an account in the name of

3    Seymour Capital that Gary Hirst is the signatory on.  I don't

4    think Mr. Martin has any first-hand knowledge of this, so if

5    you want to inquire, that is fine.  I am not sure the document

6    will be appropriate.  Let's see how it goes.

7              MR. SCHWARTZ:  That is fine.  We'll see.

8              THE CLERK:  We are missing one juror.  I will go to

9    security and see if she is there.

10             THE COURT:  Thank you.  (Pause)

11             (Jury present)

12             THE COURT:  You may be seated.

13   CROSS-EXAMINATION

14   CROSS-EXAMINATION continued

15   BY MR. SCHWARTZ:

16   Q.  Good afternoon, Ms. Walch.  I am sorry to make you spend

17   your lunch break here.  I have just a few more questions for

18   you.

19             When we left off, we were looking at, Mr. Jackson,

20   just for the witness, Judge Abrams and the lawyers, Exhibit

21   1402.  We were talking about the legal opinion letter that

22   FINRA received about whether the WLCC bonds were municipal

23   securities or sovereign.  Do you recall that?

24   A.  Yes.

25   Q.  Looking at the document in front of you, does this refresh

I6CJGAL5                         Walch - cross

1    your recollection that the law firm that offered the opinion

2    was Hunter Taubman Fisher?

3    A.  Yes.

4    Q.  Thank you.  You can take that down.

5              Now, ultimately FINRA concluded that the bonds were

6    sovereign, not municipal, right?

7    A.  Correct.

8    Q.  And so after several months of discussions with Burnham

9    Burnham Securities and consultation internally within FINRA,

10   consultation with Morgan Stanley, research on Blumberg,

11   discussions with the SEC, FINRA reached the conclusion that,

12   therefore, the bonds were not allowable for net capital

13   purposes, true?

14   A.  Yes.

15   Q.  And that conclusion that the WLCC bonds were going to be

16   non-allowable for net capital purposes was conveyed to Burnham

17   Securities in a phone call on January 11th of 2016, true?

18   A.  I recall that we had a conversation in January.  I don't

19   recall the exact date.

20   Q.  Let me show you Exhibit 1078.

21             MR. SCHWARTZ:  This is in evidence, correct?

22             MS. MERMELSTEIN:  Yes.

23             MR. SCHWARTZ:  Thank you.  You can publish this to the

24   jury.  If you can go to Page 2, please, Mr. Jackson and if you

25   blow up the bottom language there.

I6CJGAL5                          Walch - cross

BY MR. SCHWARTZ:

Q.  You see it says the firm was made aware of the unallowable

asset status of the bond in a phone conversation with the SEC

and FINRA on January 11th, 2016.  Did I read that correctly?

A.  Yes.

Q.  So this is when FINRA and the SEC conveyed their conclusion

to Burnham Securities that the bonds were non-allowable for net

capital purposes, correct?

A.  Yes, the final decision, yes.

Q.  You can take that down.

       To be clear, when FINRA made that decision, Burnham

Securities abided by it, true?

A.  Yes.

Q.  It stopped counting the bonds towards its net capital,

correct?

A.  Yes.

Q.  I am sorry?

A.  Yes.

Q.  Burnham Securities filed a notification that we just looked

at to FINRA, indicating that the firm had fallen below the net

capital requirement, true?

A.  Correct.

Q.  And it filed the notification even though FINRA was

obviously aware of that fact because there were those

conversations, true?

I6CJGAL5                        Walch - cross

1    A.  Would you repeat that.

2    Q.  Burnham Securities filed the notification of net capital

3    deficiency even though FINRA was obviously aware that they were

4    net capital deficient at that point, true?

5    A.  Yes, because they needed to file the notification.

6    Q.  Exactly.  That was itself a regulatory requirement that

7    they file that notification, right?

8    A.  Yes.

9    Q.  Immediately after the bonds were reclassified as

10   non-allowable, Burnham Securities replaced the bonds with cash

11   in order to meet its net capital requirements, true?

12   A.  Yes.

13   Q.  I want to just talk about Bonwick Capital for one second.

14   A.  Sure.

15   Q.  You did not supervise Bonwick.  Is that right?

16   A.  Correct.

17   Q.  But in the course of preparing to come testify today, you

18   familiarized yourself with FINRA's records concerning Bonwick,

19   true?

20   A.  I was aware of Bonwick before a couple of days ago, as you

21   stated, so I knew about Bonwick before.

22   Q.  You knew about it in part because they had a very similar

23   issue with the WLCC bonds, right?

24   A.  Correct, and I share information with my colleague, so we

25   were aware of it.

I6CJGAL5                         Walch - cross

1    Q.  Right.  FINRA was coordinating internally as it was dealing
2    with this issue?
3    A.  No, because Burnham Securities told us that there was
4    another broker-dealer that actually has a similar bond and that
5    they were to sell the $100,000 worth of bonds, so they brought
6    that to my attention.
7    Q.  Burnham Securities brought that fact to your attention,
8    that Bonwick had these bonds?
9    A.  That another broker-dealer has the bonds and it was
10   Bonwick.
11   Q.  By the way, who was it at Burnham Securities that FINRA was
12   speaking to throughout this process?
13   A.  We speak to both individuals, Nolan Sheehan and Marcelle
14   Devine.
15   Q.  Ms. Devine is what is called a FIN OP for Burnham
16   Securities.  Is that right?
17   A.  Yes.
18   Q.  What is a FIN OP?
19   A.  Basically a FIN OP is a person that actually prepared the
20   focus report and the filings and submit that to FINRA.
21   Q.  In fact, just yesterday you checked FINRA's files and
22   confirmed that Ms. Devine was the person who filed Burnham
23   Securities' focus reports that you looked at on your direct
24   examination, true?
25   A.  Yes.

1    Q.  Who was it that filed Bonwick Capital's focus reports?

2    A.  I think if it is -- his name was Richard Feldman, I think

3    it is.

4    Q.  Thank you.

5            So going back to the Bonwick, you know and you

6    reviewed on direct examination that Bonwick was having trouble

7    meeting its net capital, was close to its net capital

8    requirement for a few months prior to May 2015, correct?

9    A.  Yes.

10   Q.  In May 2015, Bonwick began counting its own WLCC bonds

11   towards its net capital requirement, correct?

12   A.  Correct.

13   Q.  And just as with Burnham Securities, after Bonwick included

14   the bonds in its net capital calculation, that started a

15   process of interaction between FINRA and Bonwick over whether

16   the bonds were allowable, true?

17   A.  Yes.

18   Q.  And that process, I won't go through it, but it was quite

19   similar to the process that FINRA went through with Burnham

20   Securities, true?

21   A.  Yes.

22   Q.  And that also took a period of several months, correct?

23   A.  Yes.

24   Q.  That also involves an outside lawyer for Bonwick Capital

25   submitting an opinion letter that the WLCC bonds were municipal

I6CJGAL5                        Walch - cross

1    bonds for net capital purposes?

2              MS. TEKEEI:  Objection.

3    A.  I can't recall that.

4              THE COURT:  Sustained.

5    BY MR. SCHWARTZ:

6    Q.  Well, in the course of the communications between FINRA and

7    Bonwick Capital, did FINRA receive correspondence from an

8    outside lawyer on behalf of Bonwick Capital?

9    A.  I don't recall that they did because I wasn't directly -- I

10   wasn't the manager for --

11   Q.  You don't.

12             (Multiple voices)

13             MR. SCHWARTZ:  Let me show you just for the witness,

14   Judge Abrams and the lawyers Exhibit 4132.  Take a moment to

15   read that to yourself, please.

16             MS. TEKEEI:  Your Honor, we object to this.  I think

17   she has already answered that she didn't know at the time.

18             MR. SCHWARTZ:  She said she didn't recall.  I am just

19   refreshing her recollection.

20             THE COURT:  You can refresh her recollection, but

21   let's not get into the document which is hearsay.

22             MR. SCHWARTZ:  Correct, correct.  Just read it to

23   yourself.

24   BY MR. SCHWARTZ:

25   Q.  The question is, does this remind you that a lawyer

I6CJGAL5                     Walch - cross

1   submitted a letter on behalf of Bonwick?

2   A.  It doesn't remind me, so showing me that here, this

3   wasn't --

4   Q.  I am just asking for your memory.  If you don't remember

5   it, that is fine.  You can take that down.

6           The point is at the end of the process with Bonwick,

7   FINRA came to the same conclusion, right, which is that the

8   bonds were not allowable?

9   A.  Yes.

10  Q.  Just as Burnham Securities had, Bonwick abided by that

11  decision, correct?

12  A.  Yes.

13  Q.  And it corrected its net capital deficiency, true?

14  A.  I think it did.

15  Q.  Now, I just want to be clear about something.  In April

16  2015, before the bonds were used for net capital --

17  A.  Ah-huh.

18  Q.  -- Burnham Securities was meeting its net capital

19  requirements, true?

20  A.  Yes.

21  Q.  Its net capital requirement was a hundred thousand dollars,

22  true?

23  A.  Yes.

24  Q.  And its actual net capital was about 230 percent of its

25  minimum requirement, correct?

I6CJGAL5                         Walch - cross

1   A.  I don't recall what the percentage was.

2   Q.  So let me show you Exhibit 1085 in evidence, so this can go

3   to the jury, please, Mr. Jackson.  If you turn to Page 5, I

4   believe, and blow up the top half.

5   Q.  So excess net capital, looking at Line 14, was $130,000,

6   true?

7   A.  Yes.

8   Q.  So that's about 230 percent of the minimum net capital for

9   April 2015, correct?

10  A.  Yes, ah-huh, yes.

11  Q.  You can take that down.

12          Now, the following month, May 2015, is when Burnham

13  Securities started counting the WLCC bonds towards its net

14  capital requirement, true?

15  A.  Yes.

16  Q.  And you understood that it was counting about $2.6 million

17  in WLCC bonds towards net capital?

18  A.  Yes.

19  Q.  In its May 2015 focus report, Burnham Securities,

20  Incorporated reported net capital of more than $3.7 million,

21  correct?

22  A.  Yes.

23  Q.  And that was significantly more than was required, true?

24  A.  Yes.

25  Q.  And even if you discount the bonds entirely, $2.6 million,

I6CJGAL5                          Walch - cross

1   they were at $1.1 million net capital, true?  1.2 million.

2   Excuse me.

3   A.  Yes, because I think they had other securities listed on

4   their focus report.

5   Q.  So even forgetting about the bonds entirely, in May 2015

6   when Burnham Securities, Incorporated started counting the WLCC

7   bonds as allowable assets, they were over 1,000 percent of the

8   minimum net capital requirement, true?

9   A.  Yes, at that point.

10          MR. SCHWARTZ:  Thank you very much.  I don't have any

11   other questions right now.

12          THE COURT:  All right.  Any additional cross from

13   anyone?

14          MR. TOUGER:  Very briefly, your Honor.

15          THE COURT:  Yes.

16   CROSS EXAMINATION

17   BY MR. TOUGER:

18   Q.  Good afternoon, Ms. Walch.

19   A.  Good afternoon.

20   Q.  You never spoke to John Galanis about this investigation,

21   did you?

22   A.  No, I haven't spoke to him.

23   Q.  You never got any emails from John Galanis about this

24   investigation, did you?

25   A.  No.

I6CJGAL5                              Walch - cross

1    Q.  You never met with John Galanis?

2    A.  No.

3            THE COURT:  Thanks.  Ms. Notari or Mr. Hassan?

4    CROSS EXAMINATION

5    BY MR. HASSAN:

6    Q.  Good afternoon, Ms. Walch.

7    A.  Good afternoon.

8    Q.  I am Abraham Hassan.  I am representing Bevan Cooney here.

9            You didn't meet Bevan Cooney or --

10   A.  I can hardly hear you.

11   Q.  You never met Bevan Cooney?

12   A.  No.

13   Q.  You haven't really discussed Bevan Cooney?

14   A.  No.

15   Q.  He is not involved in any of the testimony that you just

16   talked about?

17           MS. TEKEEI:  Objection.

18           THE COURT:  Sustained.

19   BY MR. HASSAN:

20   Q.  You didn't discuss him specifically?

21   A.  Just now?

22   Q.  Just now or with the government, in any of your meetings

23   with the government?

24   A.  No.

25           MR. HASSAN:  No further questions.

I6CJGAL5                        Martin - direct

1          THE COURT:  All right.  Any redirect?

2          MS. TEKEEI:  No further questions, your Honor.

3          THE COURT:  Thank you.  You may step down.  Thank you.

4          (Witness excused)

5    FRANCISCO JOSE MARTIN FERNANDEZ,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. MERMELSTEIN:

10   Q.  Good afternoon.  Could you say your name one more time.

11   A.  Francisco Jose Martin Fernandez.

12   Q.  Good afternoon.

13          MS. MERMELSTEIN:  Before I call Mr. Martini, I was

14   going to read a stipulation.

15          THE COURT:  Go ahead.

16          MS. MERMELSTEIN:  I will do that anyway now.

17          It is hereby stipulated and agreed by and among the

18   United States of America, by Robert Khuzami, Attorney for the

19   United States, acting under authority conferred by 28 U.S.C.

20   Section 515, Rebecca Mermelstein, Brendan Quigley and Negar

21   Tekeei, Assistant United States Attorneys, of counsel; and John

22   Galanis, a/k/a Yanni, the defendant, by and with the consent of

23   his attorney, David Touger; Devon Archer, the defendant, by and

24   with the attorney of his attorney, Mr. Schwartz; and Bevan

25   Cooney, the defendant, by and with the consent of his attorney,

I6CJGAL5                        Martin - direct

1    Paula Notari, that:

2              Government Exhibits 100 and 101 are true and correct

3    copies of records that were made, kept and maintained in the

4    regular course of business of the Waterworks and sewer board of

5    the city of Birmingham and were made by persons with knowledge

6    of or made from information transmitted or made with

7    information transmitted by a person with knowledge of the

8    information shown and were made at or near the time that the

9    information became available.

10             Government 102 is a true and correct copy of a March

11   17th, 2015 letter from Hughes Capital Management to Macaroy, M

12   A C A R O Y, Underwood, general manager of the Birmingham

13   Waterworks Board.

14             Government Exhibit 104 is a true and accurate copy of

15   an email from-mail account of Macaroy Underwood, general

16   manager of Waterworks and Birmingham..

17             Government Exhibit 110 is a true and correct copy of

18   records made kept and maintained in the regular course of

19   business of the Chicago Transit Authority Retiree Health Care

20   Trust and were made by persons with knowledge of or made with

21   information transmitted with knowledge of the information shown

22   and were made at or near the time the information became

23   available.

24             Government Exhibits 120, 121, 124 and 125 are true and

25   correct copies of records that were made, kept and maintained

I6CJGAL5                          Martin - direct

in the regular course of business of the Omaha School

Employees, here OSES, and made by persons with knowledge of or

made with information transmitted by persons with knowledge of

the information shown and were made at or near the time the

information became available.

        Government Exhibit 122 is a true and accurate copy of

the private placement memorandum for the Atlantic Global Yield

Opportunity Fund LP.

        Government Exhibit 123 is a true and accurate copy of

the managed account agreement between the Atlantic Global Yield

Opportunity Master Fund LP, Atlantic GYOFP, LLC Atlantic Asset

Management, LLC and Mill Street Capital Management, LLC.

        Copies of Government Exhibits 122 and 123 were

provided to OSES by Atlantic Capital management.

        Government Exhibits 130 through 132 and 134 through

136 are true and accurate copies of the investment management

agreement between Michelin North America, Inc. Master Trust

Investment Committee and Hughes Capital Management, Inc. and

amendments thereto and were in effect at all relevant times.

        Government Exhibits 133 and 137 are true and correct

copies of records that were made kept and maintained in the

regular course of business of the Michelin North America, Inc.

Master Trust and were made by persons with knowledge of or made

from information transmitted by persons with knowledge of the

information shown and were made at or near the time the

I6CJGAL5                          Martin - direct

1     information became available.

2            Government Government Exhibit 140 is a true and

3     correct copy of the investment council agreement between Hughes

4     Capital messenger meant Inc. and management of ILA Managed

5     Health Care Trust Fund and was in effect at all relevant times.

6            Government Exhibit 141 is a true and correct copy of

7     records that were made, kept and maintained in the regular

8     course of business of the management of ILA Managed Health Care

9     Trust Fund and were made by persons with knowledge of or made

10    from information transmitted by persons with knowledge of the

11    information shown and were made at or near the time the

12    information became available.

13           Government Exhibits 150 through 152 are true and

14    correct copies of records that were kept, made, kept and

15    maintained in the regular course of business of the Milk

16    Drivers and Dairy Employees Local No. 246 Pension Fund and were

17    made by persons with knowledge of, or made from information

18    transmitted by persons with knowledge of the information shown

19    and were made at or near the time the information became

20    available.

21           Government Exhibits 160 and 161 are true and correct

22    copies of records that were made, kept and maintained in the

23    regular course of business of the Philadelphia Housing

24    Authority Pension Board, PHA, and the Connecticut General life

25    Insurance Company, subsequently taken over by Prudential,

I6CJGAL5                        Martin - direct

through whom PHA entered into an investment management

agreement with Hughes Capital Management, Inc. and were made by

persons with knowledge of or made from information transmitted

by persons with knowledge of the information shown and were

made at or near the time the information became available.

        Government Exhibits 170 through 184 are true and

accurate copies of emails from the email account of Leo

Griffin, Executive Director of the Richmond Retirement System

and/or Philip Guess, Counsel to the Richmond Retirement System.

        Government Exhibit 185 is a true and correct copy of

records that were made, kept and maintained in the regular

course of business of the Richmond Retirement System and were

made by persons with knowledge of or made from information

transmitted by persons with knowledge of the information shown

and were made at or near the time the information became

available.

        Government Exhibits 190 and 191 are true and correct

copies of records made kept and maintained in the regular

course of business of the Terrapin Insurance Company and made

by persons with knowledge of or made from information of people

with knowledge of the information shown and were made at or

near the time the information became available.

        Government Exhibit 192 is a true and accurate copy of

a January 21, 2015 letter to Michelle Morton and Richard Deary

from Steven S. Schultz, counsel to Terrapin Insurance Company.

1          Government Exhibit 195 is a true and correct copy of

2    records that were made, kept and maintained in the regular

3    course of business of Hughes Capital Management and were made

4    by persons with knowledge of or made from information

5    transmitted by persons with knowledge of the information shown

6    and were made at or near the time the information became

7    available.

8          Lastly, Government Exhibit 196 is a true and correct

9    copy of records that were made kept and maintained in the

10   regular course of business of the Washington Suburban Sanitary

11   Commission Employees Retirement Plan, and were made by persons

12   with knowledge of or made with information, the information

13   shown and were made at or near the time the information became

14   available.

15         It is further stipulated and agreed by and among these

16   parties that this stipulation is admissible as a government

17   exhibit at trial.  The government offers Government Exhibit

18   4503, which is the stipulation and the exhibits referenced

19   therein; that is to say, Government Exhibits 100, 101, 102,

20   104, 110, 120, 121, 124, 125, 122, 130 to 132, 134 to 136, 133

21   and 137, 140, 141, 150 through 152, 160 and 161, 170 through

22   184, 185, 190, 191, 192, 195 and 196.

23         THE COURT:  They will all be admitted.

24         (Government's Exhibit 4503 received in evidence)

25         MS. MERMELSTEIN:  May I just approach, your Honor?

I6CJGAL5                        Martin - direct

 1                THE COURT:  Yes.

 2   BY MS. MERMELSTEIN:

 3   Q.  Good afternoon again.

 4   A.  Good afternoon.

 5   Q.  What is your full legal name?

 6   A.  Francisco Jose Martin Fernandez.

 7   Q.  Do you have any shorter versions of that name?

 8   A.  Yes, Francisco Martin.

 9   Q.  Why do you go by Francisco Martin?

10   A.  When I emigrated into the United States, I chose to use a

11   shorter version of my name.

12   Q.  How come?

13   A.  It was cumbersome to use my full name, full name every

14   single time I signed a letter or something of that matter.

15   Q.  Where are you born?

16   A.  Born in Basil, Switzerland.

17   Q.  Where do you currently reside?

18   A.  In Spain.

19   Q.  What is your native language?

20   A.  I have two; Swiss, German and Spanish.

21   Q.  Are you comfortable testifying in English?

22   A.  Yes, I do.

23   Q.  Are you familiar with bonds issued by the Wakpamni Lake

24   Community Corporation?

25   A.  Yes.

I6CJGAL5                        Martin - direct

1    Q.  What, if any, involvement did you have with those bonds?

2    A.  I was hired by Jason Galanis as an investment manager to

3    manage some of the proceeds.

4    Q.  Did you actually manage the proceeds?

5    A.  No.

6    Q.  Were you paid for signing documents indicating that you

7    managed the proceeds in?

8    A.  Yes.

9    Q.  Are you familiar with a stock called Code Rebel?

10   A.  Yes.

11   Q.  What, if any, involvement did you have with that?

12   A.  I was asked by Jason Galanis and Gary Hirst to open several

13   offshore accounts and offshore entities to hold that

14   certificate.

15   Q.  Meaning shares of Code Rebel?

16   A.  Correct.

17   Q.  Did there come a time when you sold those shares?

18   A.  Yes.

19   Q.  What did you do with the proceeds?

20   A.  I wired them out to different attorneys, escrow companies

21   and such.

22   Q.  Did you use some of the proceeds of those Code Rebel

23   shares, sales to make interest payments on the Wakpamni bonds?

24   A.  Yes.

25   Q.  Let's back up for a minute before we delve into the

1    Wakpamni bonds.  What is your educational background?

2    A.  I have a masters in economics.

3    Q.  Approximately what year did you obtain that degree?

4    A.  1994.

5    Q.  What did you do when you finished your education?

6    A.  I did a postgraduate program at UBS in Zurich.

7    Q.  How long was that postgraduate program?

8    A.  Two years.

9    Q.  What did you do when you FBI finished it?

10   A.  I was hired by SBC Warburg Dillon Read.

11   Q.  Would you spell it, please.

12   A.  D I L L O N, R E A D.

13   Q.  Warburg was the challenged one for spelling.

14   A.  W A R B U R G.

15   Q.  Where did you go when you completed that?

16   A.  I started my position at Bank --

17   Q.  Where was that?

18   A.  In San Francisco.

19   Q.  How long did you stay there?

20   A.  Five years.

21   Q.  What happened after that?

22   A.  After that, I started brokerage company.

23   Q.  What was that called?

24   A.  MAM Group.

25   Q.  What kind of work did it do?

I6CJGAL5                       Martin - direct

1    A.  We were facilitators by issuing credit lines to brokers,

2    real estate brokers, packaged mortgages into small securities

3    and sold them off.

4    Q.  Was that mortgage involved in the mortgage industry?

5    A.  Yes.

6    Q.  What happened to that business?

7    A.  During the sub-crime crisis around 2008, it folded.

8    Q.  What did you do after that?

9    A.  After that, I started MK Capital Partners.

10   Q.  What was MK Capital Partners?

11   A.  It was a money management firm advisory firm that I

12   started.

13   Q.  How long did you devote yourself to that?

14   A.  It is actually an ongoing business.  I tried to get back

15   into the wealth management business.

16   Q.  Did there come a time following starting that business when

17   you also obtained employment for an employer?

18   A.  Yes.

19   Q.  When was that?

20   A.  That was around 2010 to 2011 with UBS.

21   Q.  What happened to that job?

22   A.  I was let go.

23   Q.  Why?

24   A.  Because I marketed my services to the public without

25   getting supervisory agreement.

1    Q.  Are you testifying here today pursuant to an immunity

2    order?

3    A.  Yes.

4    Q.  Did you refuse to testify absent the entry of such an

5    order?

6    A.  Yes.

7    Q.  What is your understanding about whether your testimony

8    here today can be used directly against you in a criminal

9    prosecution in light of the immunity order?

10   A.  I understand I can still be used against me.

11   Q.  Sorry.  Let me ask it one more time.

12           What is your understanding of whether your testimony

13   here today can be used against you in a criminal prosecution in

14   light of the immunity order that has been entered by the court?

15   A.  Sorry.  I understand what I say today here in court cannot

16   be used against me.

17   Q.  Do you understand even with a grant of immunity, you can

18   still be prosecuted for the crimes you're about to discuss?

19   A.  Yes, I understand that.

20   Q.  What are you hoping about whether or not you'll be

21   prosecuted?

22   A.  My hope is I am not going to get prosecuted.

23   Q.  Has anyone made you any promises to that effect?

24   A.  No.

25   Q.  Are you here today pursuant to a safe passage letter?

1   A.  Yes.

2   Q.  What does that mean?

3   A.  It means I can travel to the United States and leave the

4   United States without getting arrested.

5   Q.  Does it allow you to travel indefinitely in the United

6   States or for the time period you're here for your testimony?

7   A.  Just for the time period I am here.

8   Q.  Does it protect you from being arrested once that time

9   period has expired?

10  A.  No.

11  Q.  What is your understanding of whether the immunity order

12  protects you if you lie during your testimony today?

13  A.  My understanding is it doesn't.

14  Q.  Are you familiar with an individual named Jason Galanis?

15  A.  Yes.

16  Q.  When did you first meet him?

17  A.  On about 2003, 2004.

18  Q.  What were the circumstances?

19  A.  I was introduced to Jason by my then wife.

20  Q.  Prior to 2014-ish, did you have any business relationship

21  with Jason Galanis or was it social?

22  A.  Mostly social.

23  Q.  Are you familiar something called Forces Vives?

24  A.  Yes.

25  Q.  What is that?

1   A.   It is a Swiss insurance company.

2   Q.   What involvement did you have with it?

3   A.   I knew the owners of Forces Vives, and I understood that

4   they wanted to sell the company.

5   Q.   What did you do about that?

6   A.   I introduced the business opportunity to Jason Galanis.

7   Q.   Why?

8   A.   Because he had mentioned he was interested in purchasing

9   offshore insurance companies.

10  Q.   What did you hope to get from making the introduction, if

11  anything?

12  A.   I was hoping to get a finder's fee from the transaction.

13  Q.   Did the deal go through?

14  A.   No.

15  Q.   Why not?

16  A.   There was a discrepancy in terms of the purchase price that

17  Jason Galanis was willing to pay and what Forces Vives was

18  willing to sell the company for.

19  Q.   At the time that you brought that deal to Jason Galanis,

20  were aware of any problems Jason Galanis had had in business?

21  A.   Yes.

22  Q.   What was your understanding of his problems?

23  A.   My understanding was that he falsified statements to the

24  SEC.

25  Q.   Did you consider that a concern in doing business with him?

I6CJGAL5                        Martin - direct

1    A.  I didn't.

2    Q.  You did not?

3    A.  I did not.

4    Q.  Why not?

5    A.  Because this particular transaction was a transaction that

6    was just transactional, and I was not going to be involved on a

7    day-to-day business with him.

8    Q.  Turning your attention to 2014, did there come a time when

9    Jason Galanis proposed a business transaction to you?

10   A.  Yes.

11   Q.  What was your personal situation at that point in time?

12   A.  I was in financial distress.

13   Q.  Had you been employed since being let go from UBS?

14   A.  No.

15   Q.  What was your marital status at that time?

16   A.  I was divorced.

17   Q.  Do you have any children?

18   A.  Yes.

19   Q.  How many?

20   A.  Three.

21   Q.  Were you paying child support?

22   A.  At that time, no.

23   Q.  Had you shared your general situation with Jason Galanis?

24   A.  Yes.

25   Q.  Where were you living at the point in time he brought this

I6CJGAL5                        Martin - direct

1    proposed transaction to you?

2    A.   In Italy.

3    Q.   Why?

4    A.   Because of my financial situation, I was living at my

5    mother's at the time.

6    Q.   What did Galanis tell you about his proposed transaction?

7    A.   He mentioned he was going to be involved with a tribal bond

8    issue and though some of the proceeds were going to be managed

9    by a company called PEM, or Private Equity Management, and I

10   was going to be the manager of that entity.

11   Q.   Did you have just one conversation with Jason Galanis or

12   many conversations with him about this transaction?

13   A.   Many.

14   Q.   What did Jason Galanis tell you in the course of those

15   conversations about his role in the transaction?

16   A.   His role, as he told me, was that he was controlling the

17   issue of the tribal bonds.

18   Q.   What, if anything, did Galanis tell you about the role of

19   an annuity provider in the transaction?

20   A.   He mentioned that the proceeds of the municipal bond issue

21   were to go into an annuity provider and then ultimately the

22   annuity provider would then select investment managers.

23   Q.   Did he tell you the name of the annuity provider?

24   A.   Yes.

25   Q.   What was it?

I6CJGAL5                        Martin - direct

1   A.  Wealth Assurance.

2   Q.  Was he more specifically than that or just, "Wealth

3   Assurance"?

4   A.  Just "Wealth Assurance."

5   Q.  Did you have any discussion at that time about Jason

6   Galanis' role specifically with respect to Wealth Assurance?

7   A.  Yes, my understanding was that he was also an investor into

8   Wealth Assurance.

9   Q.  So if there was already an annuity provider in place, why

10  was there a need for an investment manager?

11  A.  Usually what happens is when an annuity provider receives

12  proceeds from a bond issue, the annuity provider is tasked to

13  find the several investment managers that would then manage the

14  money.

15  Q.  So were you going to be the only investment manager or one

16  of many?

17  A.  One of many.

18  Q.  What, if anything, did Jason Galanis tell you about how you

19  would be compensated?

20  A.  He mentioned I would be compensated right off the bat after

21  signing the investment management agreement and then a second

22  tranche of payment when the issue was traded.

23  Q.  How much were those payments going to be?

24  A.  The first tranche was 75,000, and then again another

25  75,000.

I6CJGAL5                          Martin - direct

1   Q.  What, if anything, did Jason Galanis tell you about the

2   role of any other entities in the bond transaction?

3   A.  He mentioned Burnham Securities.

4   Q.  What was Burnham Securities' role?

5   A.  Burnham Securities' role was to be the underwriter of the

6   muni issue.

7   Q.  What, if anything, did Jason Galanis tell you about his own

8   involvement in Burnham Securities?

9   A.  He mentioned that he was also an investor into Burnham

10  Securities.

11  Q.  Did you come to learn from Jason Galanis of any other

12  individuals involved in Burnham Securities?

13  A.  Yes.

14  Q.  Who was that?

15  A.  That was Hugh Dunkerley and Devon Archer.

16  Q.  What did he tell you about their respective roles?

17  A.  He mentioned that Hugh Dunkerley was more involved in the

18  day-to-day business and that Devon Archer was an investor into

19  Burnham Securities.

20  Q.  Did there come a time that you agreed to enter into the

21  investment management agreement?

22  A.  Yes.

23          MS. MERMELSTEIN:  Let me direct your attention to

24  Government Exhibit 1601 just for the parties, the court and the

25  witness, please.  There is also a hard copy in front of you if

I6CJGAL5                    Martin - direct

1   that is easier.

2   Q.  Do you recognize that document?

3   A.  Yes.

4   Q.  What is that?

5   A.  That is an email from Jason Galanis to me.

6           MS. MERMELSTEIN:  The government offers Government

7   Exhibit 1601.

8           MS. NOTARI:  No objection.

9           MR. SCHWARTZ:  No objection.

10          THE COURT:  It will be admitted.

11          (Government's Exhibit 1601 received in evidence)

12          MS. MERMELSTEIN:  If we can now publish that to the

13  jury, please.

14  BY MS. MERMELSTEIN:

15  Q.  Directing your attention to this email from Jason Galanis

16  to you on August 26th of 2014, let me ask you to read the

17  email.

18  A.  Francisco, please see attached the signature page for the

19  investment management agreement.  It needs to be countersigned.

20  We included the full agreement in Word as well for your tiles.

21          Also attached is the annuity that needs to be signed

22  by the investment manager on behalf of the client.  I will

23  arrange for Wealth Assurance to also countersign it after

24  receiving your signatures.  Once this is done, the money will

25  be wired by US Bank to Wealth Assurance today.  You will be

I6CJGAL5                          Martin – direct

1    wired tomorrow.  Thanks, Jason.

2    Q.  Did there come a time you signed the investment management

3    agreement?

4    A.  Yes.

5    Q.  Let me direct your attention to Government Exhibit 210 in

6    evidence.  Do you recognize that?

7    A.  Yes.

8    Q.  What is that?

9    A.  That is the investment management agreement that I signed.

10   Q.  Looking at the first page of this agreement, what is the

11   date of this agreement?

12   A.  It's August 26th, 2014.

13   Q.  Who are the parties to the agreement?

14   A.  That would be Private Equity Management Limited and the

15   Wakpamni Lake Community Corporation.

16   Q.  If we can pull up Page 9 of this document, please.  Is that

17   your signature?

18   A.  Yes.

19   Q.  Under your signature it says, "managing director."

20          Were you, in fact, the managing director of Private

21   Equity Management?

22   A.  No.

23   Q.  Had you, prior to receiving this investment management

24   agreement, had you heard of Private Equity Management?

25   A.  No.

1    Q.  Just so we are clear, when you mentioned Private Equity

2    Management before, in terms of timing, you only learned about

3    that entity after receiving the investment management

4    agreement?

5    A.  Correct.

6    Q.  Did you receive -- take that down -- did you receive the

7    agreed-upon payment upon signing the agreement?

8    A.  Yes.

9    Q.  Who paid you?

10   A.  That was an entity by the name of Thorsdale.

11   Q.  What was Thorsdale?

12   A.  Thorsdale was the private trust company set up by Jason

13   Galanis.

14   Q.  Did you also receive the agreed upon payment once the bond

15   transaction actually was effectuated?

16   A.  Yes.

17   Q.  Again where did that come from in?

18   A.  The same, Thorsdale.

19   Q.  Did it make sense to you that the payments you received as

20   investment manager for the annuity for the Wakpamni Lake

21   Community Corporation were coming from a Jason Galanis entity?

22           MR. TOUGER:  Objection, your Honor.

23           THE COURT:  Rephrase that.

24   BY MS. MERMELSTEIN:

25   Q.  What did you make of the source of the funds used to pay

1   you?

2          MR. TOUGER:  Objection.

3          THE COURT:  I'll allow it.

4   Q.  You can answer the question.

5   A.  I can answer?

6          Well, usually you get paid by the company that

7   actually hires you.  In this case, it was not the case.

8   Q.  In the weeks following the execution of that agreement, did

9   you learn more about Jason Galanis' involvement in the annuity

10  provider in Wealth Assurance?

11  A.  Yes.

12  Q.  What did you learn?

13  A.  That he was directly or indirectly controlling Wealth

14  Assurance.

15  Q.  What did you understand about the propriety of Jason

16  Galanis controlling the issuing, the issuance of the bonds

17  being an investor in the placement agent and controlling the --

18  A.  It was a conflict of interest.

19  Q.  At the time that you agreed to serve as the investment

20  manager, you said you were living in Italy?

21  A.  Yes.

22  Q.  Did you remain in Italy?

23  A.  No.

24  Q.  Why not?

25  A.  I was asked by Jason Galanis to come to California.

1    Q.  Did you?

2    A.  I did.

3    Q.  When you arrived in California, did you receive any money

4    from the bond proceeds to invest?

5    A.  No.

6    Q.  Have you ever received any money from the bond proceeds to

7    invest?

8    A.  No.

9    Q.  Let me direct your attention to Government Exhibit 1604

10   just for the witness, the court and parties.

11           Do you recognize that email?

12   A.  Yes, I do.

13   Q.  What is that?

14   A.  It's an email from Jason Galanis to me.

15           MS. MERMELSTEIN:  The government offers Government

16   Exhibit 1604.

17           THE COURT:  Any objection?

18           MR. SCHWARTZ:  No objection.

19           MR. TOUGER:  No.

20           THE COURT:  1604 will be admitted.

21           (Government's Exhibit 1604 received in evidence)

22           MS. MERMELSTEIN:  Let's publish that to the jury.

23   BY MS. MERMELSTEIN:

24   Q.  Let's start at the bottom of this email, the email from

25   Jared Galanis to Jason Galanis, CC'g Jay Galanis on September

I6CJGAL5                    Martin - direct

1    29th of 2014.  Let me ask you to read that email, please.

2    A.  If we haven't already, we need to get Tim final signed

3    versions of the investment management agreement and the

4    annuity.  Both are attached, let me know if you want me to

5    handle any part of organizing that.

6    Q.  The email is addressed to Jason at holmbycompanies dot com?

7    A.  That was an email that Jason used at the time.

8    Q.  Who is Jared Galanis?

9    A.  That is Jason Galanis' brother.

10   Q.  Are you familiar with the email address Jay Galanis at me

11   dot com?

12   A.  I have seen it.

13   Q.  Do you know for sure who used it?

14   A.  No.

15   Q.  Where have you seen it?

16   A.  I have seen it while I was at Jason Galanis' house on his

17   screen.

18   Q.  Let's go to the top email now, please.

19          Let me ask you to read the email from Jason Galanis to

20   you, forwarding the below email.

21   A.  Need your signature on the investment management agreement

22   attached.  The other document is for Hugh to sign.

23   Q.  If we can go to the first page of the attachment.  What is

24   that?

25   A.  That's the investment management agreement.

1    Q.   What is the date of that investment management agreement?

2    A.   That's September 26th, 2014.

3    Q.   Is that a month after the first one?

4    A.   Correct.

5    Q.   Who were the parties for the investment management

6    agreement?

7    A.   Private Equity Management, LLC and the Wakpamni Lake

8    Community Corporation.

9    Q.   Are you familiar with what Private Equity is?

10   A.   Yes.

11   Q.   What is it?

12   A.   It is usually a highly illiquid investment into a nonpublic

13   company.

14   Q.   Let's go to Page 10 of this agreement or Page 10 of the

15   document, so it is Page 11 of the agreement probably.

16             Directing your attention to the last paragraph to the

17   middle part of the paragraph stating that the manager invests

18   in situations that may be overlooked by others including in

19   companies suffering from capital markets dislocation, financial

20   distress, complexity or negative market sentiment, are those

21   things all the same as Private Equity?

22   A.   Yes.

23   Q.   Are they sort of illiquid and/or risky?

24   A.   Usually private equity investments are riskier, yes.

25   Q.   Did it make sense to you to be investing annuity proceeds

I6CJGAL5                          Martin - direct

1    from a bond in a risky or --

2              MR. TOUGER:  Objection.

3              THE COURT:  Why don't you rephrase that to kind of

4    make it make sense.

5              MR. TOUGER:  May we approach?

6              THE COURT:  Sure.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6CJGAL5                         Martin - direct

1              (At sidebar)

2              MR. TOUGER:  Your Honor, this is a negotiated -- as

3     Mr. Anderson testified to, negotiated (inaudible).  This man is

4     not involved in this deal at all.  He should not be allowed to

5     give his opinion, whether good or bad.  This was negotiated

6     within WLCC, their attorneys and the attorneys on the other

7     side.

8              MR. SCHWARTZ:  It is not relevant.

9              THE COURT:  Why is his opinion about this relevant?

10             MS. MERMELSTEIN:  The fact it was negotiate by

11    attorneys does not make it the fact that it makes sense.  It

12    does not make sense and this -- he was purportedly the manager

13    charged with executing this strategy, and he understands that

14    the strategy doesn't make any sense into entering into an

15    agreement like that.  He was an unindicted co-defendant in this

16    case who understood that this was a conflict of interest and it

17    doesn't make any sense and was a fraud.  I will elicit all of

18    that because it is relevant to the existence of the conspiracy.

19             MR. TOUGER:  It was negotiated deal.  He has no right

20    to comment whether it was a good deal or not.  His opinion is

21    not relevant.  If you wanted to ask Mr. Anderson who negotiated

22    the deal, maybe.  If you want to ask other attorneys or Mr.

23    Raines from yesterday, she didn't ask Mr. Raines this question

24    yesterday.  There was no hiding this deal.  This was the deal.

25    His opinion of the deal is completely irrelevant.

I6CJGAL5                        Martin - direct

1              MR. SCHWARTZ:  Also not the theory of the case chaged.

2              The thing that makes this criminal is undisclosed

3    conflicts and that Jason Galanis stole the money.  The facial

4    economics if it had been invested in private equity, the

5    position is it wasn't, that is not criminal.  There is no

6    testimony it is criminal.  He couldn't testify it was criminal

7    and his testimony that it is unusual, it doesn't make sense is

8    not relevant.

9              MS. MERMELSTEIN:  I don't agree with that.  It is not

10   the theory that this is what makes this crime.  I am not

11   suggesting that.  It is an enormous effort to suggest this

12   looks totally fine to everybody and not a misappropriation.

13   There was no idea that something that didn't make sense.  This

14   is a participant in the fraud who knew it didn't make sense,

15   and that is totally appropriate testimony.

16             Just so we are clear, you have additional questions

17   like this about the conflicts as they developed.  I gather

18   there is no objection to him talking about his --

19             (Multiple voices)

20             MR. TOUGER:  I object to the idea he would give his

21   opinion.  If you want to ask him whether it is legal, I object.

22   If he wants to point out why he thinks it is a conflict, that

23   is different.  He can't give a legal opinion.

24             MS. MERMELSTEIN:  He can.  He was a member of the

25   conspiracy, his understanding whether the conflict was legal --

 1              MR. TOUGER:  We are not there yet.  The question is he

 2      is giving an opinion whether he thought this was a good deal.

 3      The people involved in negotiating this deal have all said they

 4      thought it was a good deal, every single one of them.  This

 5      person is not involved in negotiations, doesn't represent any

 6      parties, is not an expert, will be able to get up on the stand

 7      and say this wasn't a good deal?

 8              MS. MERMELSTEIN:  He is a participant.  He is a

 9      participant.  Of course his understanding about it is relevant.

10      Of course he is entitled to say what his understanding was.

11              THE COURT:  I will allow it.

12              MR. SCHWARTZ:  So on the conflicts, I don't have an

13      objection in principle to it.  You have to lay a better

14      foundation that he has experience in these kinds of deals and

15      understands what a problematic conflict is.

16              MS. MERMELSTEIN:  I don't agree.  He is an unindicted

17      co-conspirator who understood there are inappropriate conflicts

18      of interest.

19              MR. SCHWARTZ:  It has to be a correct understanding.

20      Someone who doesn't know the business may think something is a

21      problem.  If you lay the foundation, which you can, then think

22      out the testimony.

23              MS. MERMELSTEIN:  I already have.  He talked about his

24      long history of working in the financial industry.  I can ask

25      him in the course, if he is familiar with what the conflict is.

I6CJGAL5                        Martin - direct

1          THE COURT:  Do it anyway.

2          MR. TOUGER:  If that question is being asked --

3    (Inaudible) -- talked to attorneys for anybody, has not talked

4    to anybody, it is his own personal opinion, no basis in

5    negotiating the fact, go into that.  There is no basis for his

6    opinion.

7          MS. MERMELSTEIN:  He made clear on direct he signed

8    the document that was sent to him, and if you want to draw out

9    that point, I have no objection.

10         MR. TOUGER:  It should be clear that the question is

11   this is his personal opinion, not a legal opinion.  This is his

12   personal opinion.  He has no right to make a legal opinion.

13         THE COURT:  You can ask that on cross-examination.

14         MR. TOUGER:  He shouldn't be allowed to give legal

15   opinions to the jury.  He is not a lawyer, he is not trained.

16         THE COURT:  It will be clear it is not a legal

17   opinion.  You can clarify that.

18         (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2     BY MS. MERMELSTEIN:

3     Q.  So what was your understanding of whether this investment

4     strategy made sense for bond proceeds in any way?

5     A.  Reading this, it says the client is a value-oriented

6     investor, Private Equities usually is not considered that.

7     Q.  Did it make sense with respect to bond proceeds to put them

8     in something that was illiquid?

9     A.  No.

10    Q.  Why not?

11    A.  Because the bond issue was to pay yield, and you cannot pay

12    any yield by basically having illiquid investments.

13    Q.  What do you mean by "yield"?

14    A.  Interest payments.

15    Q.  Prior to receiving this email from Jason Galanis, were you

16    aware that Galanis was seeking to have you serve as the Private

17    Equity Management manager with regard to a second bond

18    issuance?

19    A.  No.

20    Q.  Were you aware that there was a second bond issuance?

21    A.  No.

22    Q.  At the time that you received this email, had you received

23    any money from the first round of bonds to invest?

24    A.  No.

25    Q.  Let me direct your attention to Government Exhibit 1603

I6CJGAL5                          Martin - direct

1    just for the witness, Court and the parties, please.

2               Do you recognize that?

3    A.   Yes.

4    Q.   What is it?

5    A.   It's an email that I received from Jason Galanis.

6               MS. MERMELSTEIN:   The government offers Government

7    Exhibit 1603.

8               THE COURT:   Any objection?

9               MR. SCHWARTZ:   No objection.

10              THE COURT:   It will be admitted.

11              (Government's Exhibit 1603 received in evidence)

12              MS. MERMELSTEIN:   If we can publish that to the jury,

13   please.

14   BY MS. MERMELSTEIN:

15   Q.   Let's start at the bottom email from you to Jason Galanis

16   on October 3112 of 2014.  Let me ask you to read the email.

17   A.   Hey, Jason, I just looked at the original investment

18   management agreement sent to me on August 26th and the one you

19   just sent me which is dated September 26th.  I just want to

20   make sure I understand this correctly since I'm signing this.

21   Is this for --

22              MS. MERMELSTEIN:   We are having a screen problem, your

23   Honor.

24              THE COURT:   Are you for the jurors?

25              JUROR:   Yes.  (Pause)

1          THE COURT:  Give us one minute to try to work it out.

2          (Off-the-record discussion)

3          THE COURT:  Raise your hand if your screen is working.

4   Okay.  Good.  Can you all look over other people's shoulders.

5   Thank you.  Please proceed.

6   BY MS. MERMELSTEIN:

7   Q.  Mr. Martin, let me ask you this --

8   A.  Hey, Jason, I just looked at the original investment

9   management agreement sent to me on August 26th and the one you

10  just sent me which is dated September 26th.  I just want to

11  make sure I understand this correctly since I am signing this.

12  Is this for another set of tranche placement?  Please let me

13  know at your convenience.

14  Q.  You email to Jason at Burnham Equity Partners dot com,

15  whose email address is that?

16  A.  This is another email that Jason Galanis used.

17  Q.  Do you know if there is a Burnham Equity Partners?

18  A.  No.

19  Q.  Let's go up to the top of the email, please.  Let me ask

20  you to read his response to you.

21  A.  Yes, another tranche we did with Devon.

22  Q.  Had you ever spoken with Jason Galanis about an individual

23  named Devon?

24  A.  Yes.

25  Q.  Who was that?

1   A.  He mentioned that Devon was a business partner and a very

2   well connected individual politically and also in the business

3   world.

4   Q.  What was Devon's last name?

5   A.  Archer.

6   Q.  Did Jason Galanis say anything else about the nature of

7   their relationship?

8   A.  He just mentioned that they were close.

9   Q.  Did you sign the agreement attached to this email?

10  A.  Yes.

11  Q.  Did you ever receive any proceeds from the second round of

12  bonds to invest?

13  A.  No.

14  Q.  What ultimately happened to the Private Equity Management

15  agreement with the Wakpamni Lake Community Corporation?

16  A.  It was nullified.

17  Q.  If you weren't investing in the bond proceeds, what did you

18  do in California?

19  A.  I was asked to do other things for Jason Galanis and Gary

20  Hirst.

21  Q.  What were the things you were asked to do?

22  A.  I was asked to open two offshore corporations and open

23  several brokerage accounts for those corporations.

24  Q.  Who asked you to do that?

25  A.  That was both Jason Galanis and Gary Hirst.

1    Q.   What, if anything, were you told about the purpose of

2    creating these entities and opening these accounts?

3    A.   I was told that the purpose was to hold shares of Code

4    Rebel.

5    Q.   Where did you open, actually create the entities?

6    A.   That was in the Seychelles.

7    Q.   What are the Seychelles?

8    A.   It is an island country that has very strict privacy laws.

9    Q.   Why did you chose the Seychelles to create the entities?

10   A.   I was asked to use a jurisdiction that did not necessarily

11   collaborate with the U.S.

12   Q.   What names did you give the entities?

13   A.   One entity was Thunder Valley Engineering and the other was

14   Seymour Capital.

15   Q.   In whose names did you create those entities?

16   A.   Thunder Valley Engineering was created in the name of John

17   Greenwood and Seymour Capital was created in my name.

18   Q.   Who was John Greenwood?

19   A.   That was an individual whose identity was given to me by

20   Gary Hirst.

21   Q.   Did you ever meet John Greenwood?

22   A.   No.

23   Q.   What, if anything, did Hirst tell you about Greenwood?

24   A.   He told me it was a U.K. citizen living in Malta, who had

25   no aspirations to ever come to the U.S.

I6CJGAL5                      Martin - direct

1   Q.  Why couldn't the entities be created in Galanis' or Hirst's

2   name?

3   A.  They didn't want to hold these specific shares in their

4   names.

5   Q.  Why couldn't they both be created in your name?

6   A.  Because it would be too many shares in just one

7   individual's name.

8   Q.  Who chose the name Thunder Valley Engineer and Seymour

9   Capital?

10  A.  Thunder Valley Engineer was chosen by Gary Hirst, and

11  Seymour Capital I chose.

12  Q.  After you created the entities, what did you do with the

13  entities?

14  A.  I created several brokerage accounts.

15  Q.  At whose direction?

16  A.  That was mainly Gary Hirst and to lesser extent Jason

17  Galanis.

18  Q.  Where did you open brokerage accounts?

19  A.  At Pershing, at Burnham Securities, Interactive Brokers and

20  Ameritrade.

21  Q.  What made you choose those specific places?

22  A.  I knew -- well, I had done business before with Pershing,

23  Ameritrade and Interactive Brokers, and Burnham was suggested

24  to me by Gary Hirst.

25              (Continued on next page)

1          MS. MERMELSTEIN:  Let me offer pursuant to agreement

2     of the parties Government's Exhibits 786 to 788 and 789 to 791.

3          THE COURT:  They're admitted.

4          MS. MERMELSTEIN:  Thank you, your Honor.

5          (Government Exhibits 786-788 and 789-791 received in

6     evidence)

7     Q.  Let me direct your attention, Mr. Martin, to the exhibits

8     that I've just described in the binder in front of you.

9          And, Mr. Wissman, if we can pull up 786 and 789, side

10    by side.

11         Are these account statements for the Seymour Capital

12    and Thunder Valley Engineering accounts at Burnham Securities?

13    A.  Yes.

14    Q.  And if we can zoom in on the address information under each

15    of them.  Whose name and address are these accounts in?

16    A.  It's attention Francisco Fernandez, 23371 Mullholland

17    Driver, Suite 186, Woodland Hills, California 91364.

18    Q.  Whose address is that?

19    A.  That's a PO box that I had created.

20    Q.  And is that the same address that's on the Seymour Capital

21    account?

22    A.  Yes.

23    Q.  We can take those down.  Thank you, Mr. Wissman.

24         Who was formally the beneficial owner of the Seymour

25    Capital accounts?

1   A.  Can you specify?

2   Q.  Sure.  An account when it's opened has to have a beneficial

3   owner, right?  Who was the beneficial owner of the Seymour

4   Capital accounts?

5   A.  That was me.

6   Q.  And what about the Thunder Valley accounts?

7   A.  It was John Greenwood.

8   Q.  Did John Greenwood have any role in actually accessing,

9   reviewing, doing anything with the account?

10  A.  No.

11  Q.  And who actually was controlling these accounts?

12  A.  That was both Jason Galanis and Gary Hirst.

13  Q.  Did the statements for these various accounts come to you?

14  A.  Yes.

15  Q.  Did you have online access to the accounts?

16  A.  Yes.

17  Q.  Did anyone else have online access?

18  A.  Yes.

19  Q.  Who?

20  A.  Jason Galanis and Gary Hirst.

21  Q.  And how do you know that?

22  A.  I gave them the log-in information.

23  Q.  Could they make trades in the account using the log-in

24  information?

25  A.  Yes.

I6C7GAL6                    Martin Fernandez - Direct

1   Q.  Could they signed wires?

2   A.  No.

3   Q.  Now, other than for Thunder Valley and Seymour Capital, did

4   Jason Galanis ask you to open any other accounts for entities

5   that were connected to him?

6   A.  Yes.

7   Q.  And what was that?

8   A.  That was for Thorsdale.

9   Q.  Did you fill out paperwork to open various accounts for

10  Thorsdale?

11  A.  Yes.

12  Q.  How did you list yourself in opening those accounts?

13  A.  As the managing director.

14  Q.  Were you the managing director of Thorsdale?

15  A.  No.

16  Q.  Why did you say that?

17  A.  Jason Galanis wanted me to open those accounts not

18  necessarily in his name, so he suggested I use my name and that

19  title.

20  Q.  Now you said earlier that the purpose of opening the

21  Thunder Valley and Seymour Capital accounts was to hold Code

22  Rebel shares.  Did there come a time that they in fact held

23  Code Rebel shares?

24  A.  Yes.

25  Q.  So let's go to Government 787 in evidence and go to page

I6C7GAL6                        Martin Fernandez - Direct

1    18, please, which has the stamp 280944 at the bottom.  Can we

2    zoom in on investment activity at the bottom.

3              What is the trade date of that transaction?

4    A.  It's May 18, 2015.

5    Q.  And under transaction what does it say?

6    A.  Investment activity.

7    Q.  Sorry.  Under -- next to date where it says transaction, if

8    you go to the right, what does it say underneath that?

9    A.  Bought.

10   Q.  And what is being bought?

11   A.  Code Rebel.

12   Q.  And if you look at the total debit amount at the end of

13   that line, what is the purchase price of Code Rebel, of the

14   total shares of Code Rebel?

15   A.  2.5 million.

16   Q.  Then let's go to Government Exhibit 790 please -- this is

17   the Seymour Capital account -- and let's go to page 16 Bates

18   stamp ending in 189626.

19              And if you can look at that same section of the

20   statement, again what is the trade date there?

21   A.  May 18, 2015.

22   Q.  So same date as the transaction we just looked at?

23   A.  Yes.

24   Q.  And again what is being purchased?

25   A.  Code Rebel.

I6C7GAL6                       Martin Fernandez - Direct

1    Q.  And what is the total purchase price of the Code Rebel?

2    A.  1,835,000.

3    Q.  Do you specifically recall placing these trades?

4    A.  No.

5    Q.  Who else could have done it?

6    A.  Gary Hirst.

7    Q.  Now, separately from the Code Rebel shares --

8              We can take that down.  Thank you, Mr. Wissman.

9              Separately from the Code Rebel shares in the Seymour

10   Capital and Thunder Valley accounts, did any other entity with

11   which you were affiliated receive Code Rebel shares?

12   A.  Yes.

13   Q.  What entity is that?

14   A.  Condor Financial.

15   Q.  And what was Condor Financial.

16   A.  That was an entity that I set up to receive payments for my

17   services from Jason Galanis.

18   Q.  How many shares did Condor Financial receive?

19   A.  50,000.

20   Q.  Were they restricted or unrestricted?

21   A.  Restricted.

22   Q.  What does that mean?

23   A.  It means I could not sell those shares for a period of

24   time.

25   Q.  Did you pay for those shares?

I6C7GAL6                      Martin Fernandez - Direct

1   A.  No.

2   Q.  Why were they given to you?

3   A.  As an additional bonus.

4   Q.  And did you ever sell them?

5   A.  No.

6   Q.  Now, going back to the Code Rebel shares in the Thunder

7   Valley and Seymour Capital accounts, did there come a time that

8   you began to sell those shares?

9   A.  Yes.

10  Q.  At whose direction?

11  A.  At Gary Hirst's direction.

12  Q.  And how did you typically receive those directions?

13  A.  Through an online app called Wickr.

14  Q.  What is Wickr?

15  A.  It's a peer-to-peer messaging app that allows you to send

16  messages, and those messages autodestruct after a certain

17  period of time.

18  Q.  Other than Gary Hirst, did you communicate with anyone else

19  by Wickr?

20  A.  Yes.

21  Q.  Who else?

22  A.  That was Hugh Dunkerley, Gary Hirst, Jason Galanis, and

23  then a couple of the brokers at Pershing and Burnham.

24  Q.  What did you do with the money that you got when you sold

25  the Code Rebel shares from the Thunder Valley and Seymour

1    Capital accounts?

2    A.  I was receiving mostly wire instructions from Jason

3    Galanis.

4    Q.  And generally speaking, where were you wiring the money?

5    A.  Different places.  Attorneys, escrow, to buy a home, and

6    also to Thorsdale.

7    Q.  Did you have to give an explanation to the bank of the

8    purpose of wires when you sent wires?

9    A.  Yes.

10   Q.  What did you write?

11   A.  At the beginning I was given those instructions by Jason,

12   and then I proceeded in actually putting myself the reason.

13   Q.  And were those explanations generally true?

14   A.  To the most part, no.

15   Q.  Did there come a time that you were directed to wire money

16   to Wealth Assurance?

17   A.  Yes.

18   Q.  How much, do you remember?

19   A.  Around $100,000.

20   Q.  Sorry.  You know what, let me withdraw that question.

21         Do you remember anything more specific about which

22   Wealth Assurance entity you wired money to?

23   A.  No.

24   Q.  What if anything did Jason Galanis tell you was the purpose

25   of those wires?

1  A.  To pay interest.

2  Q.  On what?

3  A.  On the tribal bond issue.

4  Q.  What if anything did Jason Galanis tell you about other

5  sources of money that were being used to pay interest on the

6  tribal bonds?

7  A.  He told me that several -- for example, Devon Archer made a

8  payment as well.

9  Q.  Did you ever wire money to Rosemont Seneca Bohai?

10 A.  Yes.

11 Q.  Whose entity is that?

12 A.  My understanding is that it was Devon Archer's entity.

13 Q.  And approximately how much money did you wire?

14 A.  Around 100,000.

15 Q.  Just so we're clear, it was 100,000 to RSB, not to Wealth

16 Assurance?

17 A.  Correct.

18 Q.  Who directed you to wire money to RSB?

19 A.  Jason Galanis.

20 Q.  And what if anything did he say about the purpose of the

21 wire?

22 A.  As I recall, it was a repayment for the payment that Devon

23 Archer had made.

24 Q.  Interest on the bonds.

25 A.  Correct.

1   Q.  What did you put -- if you remember -- as for the reason

2   for the wire or wires to RSB when you made that payment?

3   A.  I believe I put purchase of municipal bonds.

4   Q.  Was it in fact for the purchase of municipal bonds?

5   A.  No.

6   Q.  Why did you put that?

7   A.  Because it would have looked weird to put to pay interest

8   on a municipal bond.

9   Q.  Are you familiar with an individual named Bevan Cooney?

10  A.  Yes.

11  Q.  Did you discuss him with Jason Galanis?

12  A.  Yes.

13  Q.  And what did Jason Galanis tell you about Bevan Cooney?

14  A.  That they were childhood friends.

15  Q.  And did they have an ongoing relationship?

16  A.  Yes.

17  Q.  What did Jason Galanis tell you about their present-day

18  relationship?

19  A.  He said they were from time to time doing business

20  together.

21  Q.  Were they close?

22  A.  It was my understanding that they were.

23  Q.  Did you ever meet Bevan Cooney?

24  A.  Yes.

25  Q.  Would you recognize him if you saw him again?

1   A.  Yes.

2   Q.  Let me ask you to look around the courtroom and see if you

3   see him.  And if you do, point him out to the jury and identify

4   an item of clothing he is wearing.

5   A.  The gentleman over there with a gray suit.

6   Q.  I think you're going to have to be more specific than the

7   gentleman with the gray suit.

8   A.  Gray suit and a gold tie.

9          MS. MERMELSTEIN:  I'll ask the record to reflect that

10  the witness has identified Mr. Cooney.

11         THE COURT:  It will so reflect.

12  Q.  Did you ever attend a celebratory lunch with Mr. Cooney?

13  A.  Yes.

14  Q.  Who else was at that lunch?

15  A.  I believe Jason Galanis was at the lunch, Hugh Dunkerley,

16  and then a couple of other individuals.

17  Q.  And where did that lunch take place?

18  A.  In Beverly Hills.

19  Q.  What was being celebrated?

20  A.  The bond issue.

21  Q.  Have you ever met an individual named John Galanis?

22  A.  Yes.

23  Q.  Who is that?

24  A.  That's Jason Galanis' father.

25  Q.  And what if anything did Jason Galanis tell but whether or

I6C7GAL6                        Martin Fernandez - Direct

1    not Jason had ongoing business dealings with his father?

2    A.  He just mentioned that from time to time he would help him

3    with his business affairs.

4    Q.  Did you have any understanding of whether John Galanis had

5    any role in the Wakpamni bonds?

6    A.  No.

7    Q.  Did you ever meet any other family members of Jason

8    Galanis?

9    A.  Yes.

10   Q.  Who are they?

11   A.  Jason Galanis' wife and father-in-law.

12   Q.  And what were their names?

13   A.  Ralph Berger and Monet Berger.

14   Q.  I assume Monet is the wife and Ralph is the father-in-law?

15   A.  Correct.

16   Q.  Let me turn your attention to an individual named Michelle

17   Morton.  Did you ever meet Michelle Morton in person?

18   A.  No.

19   Q.  Did there come a time that you became aware of Michelle

20   Morton?

21   A.  Yes.

22   Q.  How did you first hear of her?

23   A.  Jason Galanis mentioned that he was in the process of

24   purchasing a minority owned investment manager owned by

25   Michelle Martin.

I6C7GAL6                          Martin Fernandez - Direct

1    Q.  What did Jason Galanis tell you about the purchase of that

2    purchase?

3    A.  He told me that the purpose was for that investment manager

4    to buy some of the bond issue.

5    Q.  Did you understand that Jason Galanis was purchasing an

6    investment advisor who would buy the bonds at the time that you

7    signed the Private Equity Management agreement?

8    A.  No.

9    Q.  Having learned that, what did you understand about whether

10   it was proper for Jason Galanis to be controlling the

11   transaction -- controlling the annuity provider and investor

12   and placement agent and exercising control over the investment

13   advisor who bought the bonds?

14           MR. SCHWARTZ:  Object to the form.

15           THE COURT:  Rephrase, please.

16   Q.  What was your understanding about the propriety of Jason

17   Galanis' multiple roles in the bond issuance?

18           MS. NOTARI:  Objection.

19           THE COURT:  That I will allow.

20   Q.  You can answer the question.

21   A.  What it was, it was a conflict of interest.

22   Q.  So not proper?

23   A.  Not proper.

24   Q.  And then let me finally turn your attention to Hugh

25   Dunkerley.  Are you familiar with him, I gather?

1    A.  Yes.

2    Q.  How is that?

3    A.  He was introduced to me by Jason Galanis.

4    Q.  What was Hugh Dunkerley's involvement with Jason Galanis?

5    A.  The way I understood it was that he was sort of the front

6    man for some of the transactions that he was making.

7    Q.  Are you familiar with something called Fondinvest?

8    A.  Yes.

9    Q.  What is that?

10   A.  It's a French private equity company.

11   Q.  What involvement did you have with Fondinvest?

12   A.  I was asked to join the advisory board of Fondinvest.

13   Q.  By who?

14   A.  By Jason Galanis.

15   Q.  What was Jason Galanis' involvement in Fondinvest?

16   A.  He was a major investor into Fondinvest.

17   Q.  What was your understanding of how Jason Galanis'

18   investment in Fondinvest was funded?

19   A.  My understanding was that it was coming from bond proceeds.

20   Q.  And where did you get that understanding from?

21   A.  There was no other income that was generated from Jason

22   Galanis' businesses.

23   Q.  I want to turn your attention to August of 2015.  Are you

24   familiar with an entity called Bonwick?

25   A.  Yes.

I6C7GAL6                     Martin Fernandez - Direct

1   Q.  What was Bonwick?

2   A.  It was another minority owned investment management

3   company.

4   Q.  What if any involvement did Jason Galanis have with

5   Bonwick?

6   A.  My understanding is that he had an investment into that

7   company as well.

8   Q.  Did there come a time that you were involved in

9   transferring Code Rebel shares to Bonwick?

10  A.  Yes.

11  Q.  At whose direction?

12  A.  Jason Galanis.

13  Q.  And why did you do that?

14  A.  I was told that the reason was that they needed a minimum

15  capital requirement set by the SEC and that those shares would

16  basically contribute to that minimal capital requirement.

17  Q.  I want to direct your attention now to September of 2015.

18  What, if anything, happened with respect to Jason Galanis at

19  that time?

20  A.  I believe that's when he was arrested.

21  Q.  How did you learn that Jason Galanis had been arrested?

22  A.  I received a phone call from Bevan Cooney.

23  Q.  Was it common for you to receive phone calls from Bevan

24  Cooney?

25  A.  No, not often.

I6C7GAL6                        Martin Fernandez – Direct

1   Q.  How many times had you met Bevan Cooney at that point in

2   time?

3   A.  A couple times.

4   Q.  What did Bevan Cooney tell you?

5   A.  He told me that Jason Galanis was arrested but not to

6   worry, it didn't have anything to do with the bond issue.

7   Q.  Now, prior to that phone call, did you have any

8   understanding that Bevan Cooney was connected in any fashion to

9   the bond issue?

10  A.  I knew that he was somehow involved, but I didn't know the

11  extent of it.

12  Q.  And how did you react to that phone call?

13  A.  I was shocked and concerned.

14  Q.  Why?

15  A.  Because I was in the middle of doing all of these illicit

16  transactions together with Jason Galanis, and I thought that

17  was going to come back to me.

18  Q.  Did you stop working with Jason Galanis after that?

19  A.  No.

20  Q.  Why not?

21  A.  Because it was at the time my only income source, and I

22  proceeded to just close my eyes.

23         MS. MERMELSTEIN:  Your Honor, did you want to give

24  that instruction?

25         THE COURT:  Yes.

1          So, ladies and gentlemen, you've just heard evidence

2     that in September 2015 Jason Galanis was arrested.  You need to

3     know that Jason Galanis' arrest in September 2015 was for

4     unrelated conduct and had nothing to do with this case.

5          I further instruct you that Mr. Cooney was not a

6     subject of that investigation, and there is no evidence that he

7     knew about Jason Galanis' conduct in that unrelated case until

8     after Jason Galanis was arrested.

9          Should we take a break now?

10          MS. MERMELSTEIN:  Sure, your Honor.

11          THE COURT:  All right.  So we will take our afternoon

12     break now.  Please remember, keep an open mind and don't

13     discuss the case.

14          (Jury not present)

15          THE COURT:  You can step down and come back in ten

16     minutes.  Thank you.

17          Is there anything we need to discuss?  No?  All right.

18     Thanks.  I will see you in ten minutes.

19          (Recess)

20          (Continued on next page)

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Everyone can be seated.  Thank you.

3            MS. MERMELSTEIN:  May I proceed?

4            THE COURT:  Yes, of course.

5    FRANCISCO JOSE MARTIN FERNANDEZ, resumed.

6    DIRECT EXAMINATION (Continued)

7    BY MS. MERMELSTEIN:

8    Q.  Mr. Martin, did there come a time that Jason Galanis asked

9    you to buy any Wakpamni bonds?

10   A.  Yes.

11   Q.  And just so we're clear for the record, throughout your

12   testimony here today when you've referred to bonds are you

13   referring to the Wakpamni bonds?

14   A.  Yes.

15   Q.  What did Jason Galanis tell you was the purpose of asking

16   you to buy Wakpamni bonds?

17   A.  He told me to buy the bonds so that they would not go

18   stale.

19   Q.  What did you understand him to mean by not go stale?

20   A.  When a bond doesn't get traded for a period of time, it

21   becomes a zero balance on the statements of the owners.

22   Q.  Did you understand it to be proper to buy a bond for the

23   purpose of having it appear that it was trading?

24            MR. TOUGER:  Objection.

25            THE COURT:  Overruled.

I6C7GAL6                          Martin Fernandez - Direct

1                  You can answer that.

2    A.   It's not proper.

3    Q.   Now, did you agree to buy the bonds as Jason Galanis

4    requested?

5    A.   Yes.

6    Q.   And did you buy them sort of in your own name or through

7    any entity?

8    A.   Through an entity.

9    Q.   What entity was that?

10   A.   Condor Financial.

11   Q.   How much money worth of bonds did you buy?

12   A.   100,000.

13   Q.   Who did you buy them from?

14   A.   Bonwick.

15   Q.   Did you actually pay for the bonds?

16   A.   No.

17   Q.   Where did the money come from to pay for the bonds?

18   A.   From Code Rebel proceeds.

19   Q.   And where are those bonds now?

20   A.   I don't know.

21   Q.   Now, following Jason Galanis' arrest in September of 2015,

22   did you begin to communicate with him through any other means?

23   A.   Yes.

24   Q.   And what means are those?

25   A.   There was a new e-mail address.

1    Q.  What e-mail address was that?

2    A.  Legal@colarisventures.com.

3    Q.  Who created that e-mail address?

4    A.  I did.

5    Q.  And who used that e-mail address?

6    A.  Jason Galanis.

7    Q.  Did you also have a Colaris Ventures e-mail account?

8    A.  Yes, I did.

9    Q.  What was the purpose of creating those new e-mail accounts?

10   A.  Jason wanted to have an untainted e-mail address.

11   Q.  What does untainted mean?

12   A.  One that was not necessarily being subpoenaed or followed

13   by an agency.

14   Q.  Are you familiar with an entity called Calvert Capital?

15   A.  Yes.

16   Q.  What is that?

17   A.  It's an entity I formed.

18   Q.  Why did you form it?

19   A.  I was asked by Jason to form an offshore company.

20   Q.  Who chose the name Calvert Capital?

21   A.  I did.

22   Q.  Where did you get the name from?

23   A.  At the time I was living on Kitridge Street in Woodland

24   Hills, and my cross street was Calvert.

25   Q.  Prior to creating the Calvert Capital entity, had you ever

I6C7GAL6                         Martin Fernandez – Direct

1   had any discussions with Galanis about what you would name it?

2   A.  No.

3   Q.  And approximately when did you create it?

4   A.  That was around October 2015.

5   Q.  What did Jason Galanis say was the purpose of creating the

6   entity?

7   A.  He wanted the new entity to hold his Wealth Assurance

8   stock.

9   Q.  Let me direct your attention to Government Exhibit 1609,

10  just for the court, the witness and the parties, please.

11          Do you recognize that?

12  A.  Yes.

13  Q.  What is it?

14  A.  That's an incorporation document for Calvert Capital.

15  Q.  That's the incorporation document for the entity you

16  created?

17  A.  Yes.

18          MS. MERMELSTEIN:  The government offers Government

19  Exhibit 1609.

20          MR. TOUGER:  No objection.

21          MR. SCHWARTZ:  No objection.

22          THE COURT:  It will be admitted.

23          (Government Exhibit 1609 received in evidence)

24  Q.  And if we publish that to the jury.

25          And what is the date of the incorporation?

I6C7GAL6                    Martin Fernandez - Direct

1   A.  October 1, 2015.

2   Q.  Did you open the Calvert document in your own name or in

3   someone else's name?

4   A.  Someone else's name.

5   Q.  Why?

6   A.  Because I had already too much exposure.  I didn't want to

7   be on another set of corporations.

8   Q.  Whose name did you use?

9   A.  My brother.

10  Q.  What is your brother's name?

11  A.  Salvador Martin Fernandez.

12  Q.  Where does he live?

13  A.  In Spain.

14  Q.  And did he know that you were using his name to open this

15  entity?

16  A.  Yes.

17  Q.  Now, did you provide any Calvert documents in response to

18  an SEC subpoena?

19  A.  Yes.

20  Q.  Let me direct your attention in the binder to Government's

21  Exhibits 1610, 1611 and 1612, and let me ask you to open the

22  binder in front of you and take a look at those.  Are those

23  documents -- and then I will ask you are those documents that

24  you provided to the SEC?

25  A.  Yes for 1610.  Yes for 1611.  And yes for 1612.

I6C7GAL6                           Martin Fernandez – Direct

1            MS. MERMELSTEIN:  The government offers Government's

2     Exhibits 1610 through 1612.

3            THE COURT:  Any objection?

4            MR. TOUGER:  No objection.

5            MR. SCHWARTZ:  No objection, but, your Honor, I think

6     this would be an appropriate time for the limiting instruction

7     about the use of these documents.

8            THE COURT:  All right.

9            (Government Exhibits 1610 through 1612 received in

10    evidence)

11           MR. SCHWARTZ:  That they were documents that were

12    created.

13           THE COURT:  OK.

14           All right.  So, ladies and gentlemen, these documents

15    are not being admitted for the truth of what is contained in

16    them but for the fact that they were created.  Thank you.

17           MS. MERMELSTEIN:  Thank you, your Honor.

18    Q.  Let's start with Government Exhibit 1611, please.  Do you

19    recognize that document?

20    A.  Yes.

21    Q.  What is it?

22    A.  It's the operating agreement for Calvert Capital Ltd?

23    Q.  And if we go to the last page, whose name is signed to that

24    document?

25    A.  Salvador Martin Fernandez.

I6C7GAL6                          Martin Fernandez - Direct

1    Q.  Did he actually sign this document?

2    A.  No.

3    Q.  Who put his name on it?

4    A.  I did.

5    Q.  And if we can go to 1612, please.  These three documents

6    we're looking at, these are not all of the documents that you

7    produced to the SEC, right?

8    A.  Correct.

9    Q.  So let me direct your attention to the e-mail at the bottom

10   of this page from legal@colarisventures, subject:

11   Attorney/client communication to steve@horowitzrubenstein.com.

12   And again, who is legal@colarisventures.com?

13   A.  That would be Jason Galanis.

14   Q.  And who is steve@horowitzrubenstin?

15   A.  That was one of his attorneys.

16   Q.  Let me ask you to read this e-mail.

17   A.  "Calvert Capital Partners, a non U.S. partnership, is party

18   to the attached August 2014 convertible note.

19           "Thorsdale was appointed North American agent for

20   Calvert and administered the note until its mandatory

21   conversion in September 2015, pursuant to its terms.

22           "Calvert Capital, a UK company into which the

23   partnership was reorganized" -- sorry -- "in which the

24   partnership reorganized, was formed in October 2015.

25           "The WAPC annuity has a priority claim on the assets

I6C7GAL6                    Martin Fernandez - Direct

1   of Calvert.  The assets consist of the WAH shares and warrants.

2            "A valuation of the annuity assets should be completed

3   for good order.  The foundational documents would be:

4            (i) Deloitte valuation of Valorlife and Wealth

5   Assurance (sent).

6            (ii) 2014 audit of Valor Group by PwC ... which also

7   reflects value of subsidiaries (sent).

8            (iii) market price of the WAH public stock - level 1

9   observation.

10  Q.  Just so we're clear, the Calvert Capital you created was

11  not a reorganized partnership of a preexisting Calvert, right?

12  A.  No.

13  Q.  Calvert in 2014 had no assets, right?

14  A.  Correct.

15  Q.  Because there was no Calvert, right?

16  A.  No.

17  Q.  And if we can look up at the top of this e-mail from legal

18  to you, francisco@colarisventures.com, did you receive a

19  forward of this e-mail?

20  A.  Yes.

21  Q.  And if we can go to the attachment, please.  Who are the

22  parties to this convertible promissory note, according to what

23  is written here?

24  A.  That's Wealth Assurance Holdings Ltd. and Calvert Capital

25  Partners.

I6C7GAL6                        Martin Fernandez – Direct

1   Q.  And what is the date of this agreement?

2   A.  August 28, 2014.

3   Q.  This agreement did not exist on August 28, 2014, right?

4   A.  No.

5   Q.  And let me direct your attention now to Government Exhibit

6   1610.  This is that same agreement we were just looking at; is

7   that right?

8   A.  Correct.

9   Q.  And if we go to the end of this agreement -- I'm not sure

10  it's actually the last page, so let's scroll to the back and

11  then scroll up.  So this is a partially signed version of the

12  agreement; is that right?

13  A.  Correct.

14  Q.  Now, you mentioned earlier this afternoon that you got a

15  total of $150,000 from Thorsdale in connection with signing the

16  Private Equity Management agreement and the first bond

17  issuance.  Did you receive additional money from Jason Galanis

18  after that?

19  A.  Yes.

20  Q.  Approximately how much in total?

21  A.  Between 250 and $300,000.

22  Q.  Did there come a time that you were approached by the

23  F.B.I.?

24  A.  Yes.

25  Q.  Approximately when was that?

1    A.  It was around I would say February 2016.

2    Q.  And did there come a time when you spoke with

3    representatives of the United States Attorney's office?

4    A.  Yes.

5    Q.  Was that shortly thereafter?

6    A.  Yes.

7    Q.  In those initial meetings with the F.B.I. and with the U.S.

8    Attorney's office, did you tell the government everything that

9    you knew about the Wakpamni bonds and the Code Rebel sales?

10   A.  No.

11   Q.  Were you completely honest about all of the facts that you

12   relayed?

13   A.  No.

14   Q.  Why not?

15   A.  Because I knew that I was in the midst of legal activities,

16   and I didn't want to taint myself.

17   Q.  Did there come a time that you were charged by the SEC in

18   this case?

19   A.  Yes.

20   Q.  What were you charged with?

21   A.  With securities fraud.

22   Q.  And have you resolved that matter?

23   A.  Yes.

24   Q.  What is the nature of that settlement?

25   A.  It's no admit/no deny settlement.

I6C7GAL6                         Martin Fernandez - Direct

1   Q.  What does that mean?

2   A.  It means that I'm not denying the fact that I committed the

3   securities fraud but I'm also not admitting it.

4   Q.  I gather you are in fact now admitting it.

5   A.  Correct.

6   Q.  Are you going to have to pay a fine in connection with that

7   settlement?

8   A.  Yes.

9   Q.  And has the amount been determined?

10  A.  No.

11  Q.  Now, at the time that you were charged by the SEC where

12  were you living?

13  A.  In Spain.

14  Q.  So at some point you left California?

15  A.  Correct.

16  Q.  Why was that?

17  A.  My business activities here in the states were not anymore

18  possible because of the SEC situation that I had.

19  Q.  Have you fallen behind on your child support payments?

20  A.  Yes.

21  Q.  Why is that?

22  A.  When?

23  Q.  Why?

24  A.  Because I wasn't making any income at that time.

25  Q.  And approximately how much do you owe?

I6C7GAL6                    Martin Fernandez – Direct

1    A.  Approximately 10,000.

2    Q.  What is the status of your U.S. taxes for the last few

3    years?

4    A.  I still have to file the 2015 taxes, which I'm in the midst

5    of actually doing by next month.

6    Q.  Now, both before and after being charged by the SEC and

7    resolving that matter, did you continue to meet with

8    representatives of the U.S. Attorney's office and law

9    enforcement?

10   A.  Yes.

11   Q.  You did that even after leaving the United States?

12   A.  Correct.

13   Q.  Did you do that voluntarily?

14   A.  Yes.

15   Q.  Were you compelled to do it in any way?

16   A.  No.

17   Q.  Were the statements you made in those interviews protected

18   by a proffer agreement?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  It means that anything I say during the proffer session

22   cannot be used against me directly.

23   Q.  At the time that the U.S. Attorney's office sought your

24   testimony in this case, where were you living?

25   A.  In Spain.

I6C7GAL6                         Martin - Cross

1   Q.  What is your understanding of whether you could have been

2   compelled to come to the United States to testify in this

3   trial?

4   A.  I understand that I could have not been compelled.

5   Q.  And so you're here voluntarily?

6   A.  Yes.

7           MS. MERMELSTEIN:  Nothing further, your Honor.

8           THE COURT:  All right.  Cross-examination.

9   CROSS EXAMINATION

10  BY MS. NOTARI:

11  Q.  Good afternoon, Mr. Martin.

12  A.  Good afternoon.

13  Q.  My name is Paula Notari.  Myself and Abraham Hassen who is

14  seated to the right of Mr. Cooney are his lawyers.  We have

15  never before, correct?

16  A.  Correct.

17  Q.  We've never spoken?

18  A.  No.

19  Q.  As far as you know, I've never contacted your lawyer,

20  correct?

21  A.  Correct.

22  Q.  Now, you were introduced to Jason Galanis approximately 15

23  to 16 years ago, correct?

24  A.  About, yes.

25  Q.  And you met Jason through your exwife Julie Waldorf?

I6C7GAL6                    Martin - Cross

```
 1   A.  Correct.
 2   Q.  And your wife -- your exwife Julie Waldorf and Jason
 3   Galanis' wife Monet Berger were close friends, correct?
 4   A.  Correct.
 5   Q.  And for many years you were social friends with Jason
 6   Galanis before you conducted business with him, correct?
 7   A.  Correct.
 8   Q.  You conducted -- you talked about your business, but you
 9   didn't actually do business together.
10   A.  Correct.
11   Q.  And you attended Jason Galanis' wedding?
12   A.  Yes.
13   Q.  And there were a lot of close family friends and relatives
14   there?
15   A.  Yes.
16   Q.  Mr. Bevan Cooney was not at that wedding, correct?
17   A.  I don't remember.
18   Q.  You don't remember.  Well, you testified that the first
19   time you met him was approximately two years ago.
20   A.  Correct.
21   Q.  So your first memory of meeting him was about two years
22   ago.
23   A.  Correct.
24   Q.  OK.  And you said that at the time in August, around summer
25   of 2014, Jason Galanis contacted you, and you were living in
```

I6C7GAL6                        Martin - Cross

1   Italy.

2   A.  Can you repeat the date.

3   Q.  Around August of 2014 he contacted you?

4   A.  No, it was before that.

5   Q.  And at the time -- do you remember the date when he

6   contacted you?

7   A.  It was on or about May -- April, May of 2014.

8   Q.  And did you have -- did you have repeated -- did you talk

9   to him on a frequent basis?

10  A.  Yes.

11  Q.  How often did you speak to him?

12  A.  I couldn't tell you exactly.

13  Q.  Was it every month, or every other month, or every year?

14  A.  You could say it would be weekly.

15  Q.  So was that weekly for the 15 to 16 years you knew him?

16  A.  I don't understand the question.

17  Q.  I said you spoke to him -- you said that you knew him for

18  about 15 or 16 years, correct?

19  A.  Correct.

20  Q.  Did you speak to him weekly during that 15 to 16 year

21  relationship?

22  A.  No.

23  Q.  When did you start talking to him weekly?

24  A.  On or about when we talked about the bond issue.

25  Q.  And that was in April or May of 2014?

I6C7GAL6                    Martin - Cross

1   A.  Correct.

2   Q.  And he contacted you, and at that time you were living in

3   Italy.

4   A.  That's correct.

5   Q.  And he knew that you were having difficult financial times.

6   A.  Yes.

7   Q.  He knew that you had been fired from your employment at

8   UBS, correct?

9   A.  I'm not sure if I told him that.

10  Q.  OK.  And you were fired in 2011?

11  A.  Around that time.

12  Q.  And so you had been out of work for about three years.

13  A.  Correct.

14  Q.  And you had gone through a difficult divorce, correct?

15  A.  Correct.

16  Q.  You have three children?

17  A.  Correct.

18  Q.  At that time and now.

19  A.  Correct.

20  Q.  And you were behind on your child support payments.

21  A.  That's right.

22  Q.  So he knew that you were in need of some work.

23  A.  Yes.

24  Q.  And he contacted you while you were in Italy, and he asked

25  you if you were interested in working for him.

I6C7GAL6                     Martin - Cross

1    A.  That's correct.

2    Q.  And he told you that -- and at that time he appeared to be

3    financially successful, correct?

4    A.  That's correct.

5    Q.  At that time had you ever visited his home at 1920 Bel Air?

6    A.  Yes.

7    Q.  And so you knew that he had a multi-million dollar home,

8    correct?

9    A.  Yes.

10   Q.  And at that time had you met his partner Jason Sugarman?

11   A.  I met him after I came back to the U.S.

12   Q.  OK.  And you knew that Jason Sugarman's father-in-law was

13   Peter Gruber who was a billionaire?

14            MS. MERMELSTEIN:  Objection.

15            THE COURT:  Overruled.

16            You can answer that.

17   A.  Yes.

18   Q.  And it's fair to say that you saw this as a good

19   opportunity because Mr. Jason Galanis appeared to be

20   successful.

21   A.  Yes.

22   Q.  Now, when Jason first began to talk to you about the

23   Wakpamni bonds -- we have been referring to them -- have you

24   ever heard the expression WLCC bonds?

25   A.  No.

I6C7GAL6                          Martin - Cross

Q.  OK.  So I may use that terminology, WLCC bond, but that

refers to the Wakpamni tribal bonds.

A.  OK.

Q.  And Jason explained to you that he wanted you to be the

investment manager for the tribal -- for the WLCC bonds.

A.  Part of it, yes.

Q.  And at some point he said to you that he needed someone

unaffiliated with him to serve as the investment manager of the

bond issuance.

A.  Correct.

Q.  And what did you understand that term "unaffiliated" to

mean?

A.  My understanding was that the investment manager could not

be affiliated with any of the other participants of the

municipal bond issue.

Q.  And you agreed with that.

A.  Yes.

Q.  You would essentially be a neutral or independent person

investing the bonds.

A.  That was the idea.

Q.  OK.  And he asked you to do this position, and it's fair to

say that you had prior experience fulfilling this type of role.

A.  Correct.

Q.  And you came to some terms as far as what your payments

would be.

I6C7GAL6                    Martin - Cross

A.  Yes.

Q.  You agreed that you would initially be paid $75,000 for the first tranche, correct?

A.  Correct.

Q.  And that at some point there would be a second tranche, and you would get paid another $75,000?

A.  No, that's not correct, not for the second tranche.

Q.  So what was the -- what were the financial terms of the agreement?

A.  The terms were that I was going to be paid when I signed the investment management agreement $75,000 and then an additional $75,000 right after the first tranche was successfully placed.

Q.  And at some point you signed an investment manager agreement?

A.  That's correct.

Q.  And you signed that agreement on August 26, 2014?

A.  It was earlier than that.

Q.  OK.  And at that time you signed the agreement, the documents were sent to you in Italy?

A.  Correct.

Q.  But at some point you later moved back to California to fulfill this role, correct -- to work with Jason Galanis.

A.  Correct.

Q.  Now, Jason told you -- he gave you certain documents, and

I6C7GAL6                    Martin - Cross

1    he asked you to sign them, and you signed them, correct?

2    A.  Correct.

3    Q.  And it's fair to say that at the time that you agreed to

4    this role you trusted Jason Galanis.

5    A.  Trusted would be far fetched.

6    Q.  OK.  Well, you told the government when you met with them

7    that you trusted him.

8    A.  I don't remember saying that, but --

9    Q.  Well, perhaps we can refresh your recollection.

10   A.  Sure.

11   Q.  Could we bring up 3522-1, page 3.

12        If you skip down -- perhaps I'm asking you to refresh

13   your recollection -- if you go down from the first paragraph to

14   the sixth line, the sentence starting "Martin agreed ..."

15   A.  Yes.

16   Q.  Do you see that sentence?

17   A.  Yes.

18   Q.  And it says there that you told the government --

19        MS. MERMELSTEIN:  Whoa, whoa.  Objection to the

20   reading from the document.

21        THE COURT:  Yes, let's not read from the document.

22   Q.  Now, this was the first time you met with the government.

23   You spoke to them.  This was your first meeting?

24   A.  With the F.B.I.?

25        MS. MERMELSTEIN:  Your Honor, the witness has no way

I6C7GAL6                          Martin - Cross

1    of knowing whether or not a page that is being shown is from a

2    particular thing, so I think the question is just if this

3    refreshes his recollection.

4              THE COURT:  Do you want to see if it refreshes his

5    recollection?

6    Q.  Does that refresh your recollection?

7    A.  No.

8    Q.  It doesn't refresh your recollection.

9    A.  No, it doesn't.

10   Q.  You don't remember telling the government that when you

11   first agreed to be the investment manager that you trusted

12   Jason Galanis.

13   A.  I don't.

14   Q.  Was this -- you said that early on in your meetings with

15   the government you were lying to them.  Was this one of those

16   times?

17   A.  I don't know.

18   Q.  Now, early on when you first agreed to be the investment

19   manager you were acting under the belief that the proceeds of

20   the bond needed to be managed, correct?

21   A.  Correct.

22              (Continued on next page)

23

24

25

1  Q.  And you believe that you would, in fact, get to manage the

2  proceeds of the bond?

3  A.  That's correct.

4  Q.  And it was your plan to invest the proceeds of the bond in

5  marketable securities?

6  A.  That was the idea.

7  Q.  And after you signed the bonds, there was a period of time

8  where you did not receive access to the funds, correct?

9  A.  Correct.

10  Q.  Now, at this time you had never spoken to anyone from the

11  WLCC?

12  A.  No.

13  Q.  And you were only speaking to Jason Galanis?

14  A.  No.

15  Q.  Well, you were receiving instructions from Jason Galanis?

16  A.  Correct.

17  Q.  And you periodically -- now, at this point when exactly did

18  you move to California?

19  A.  It was around July of 2016.  Sorry.  July of 2015.  Sorry.

20  Q.  Now, after the time period where you weren't receiving the

21  funds, there came a time when you asked Jason for an update as

22  to when you would receive the funds that you could invest?

23  A.  Correct.

24  Q.  And Jason told you not to worry, that you would get the

25  assets to manage the funds?

I6CJGAL7                    Martin - cross

1    A.  Correct.

2    Q.  He assured you of that.  He told you to sit tight?  Those

3    were his words, correct

4    A.  That's correct.

5    Q.  And you continued to ask him, and he continued to tell you

6    to be patient, correct?

7    A.  Correct.

8    Q.  Now, Wealth Assurance private client was listed in the

9    annuity contract as -- withdrawn.

10           Jason told you that the provider for the annuity

11   contract is Wealth Assurance?  Did he tell you that?

12   A.  Can you repeat that, please.

13   Q.  Did Jason tell you that -- I am going to, to avoid

14   confusion in this case because there is more than one Galanis,

15   I will just refer as often as I can to Jason even though

16   perhaps we would normally call him Mr. Galanis, so I'll try to

17   refer to him as Jason to be clear.

18           But Jason told you that the annuity provider was

19   Wealth Assurance?

20   A.  Correct.

21   Q.  And you did not have any personal dealings with Wealth

22   Assurance?

23   A.  No.

24   Q.  Actually, there came a time when you learned that it was

25   Wealth Assurance Private Client, correct?

I6CJGAL7                         Martin - cross

1  A.  I've heard the name, but very faint recollection of that

2  name.

3  Q.  You knew that it was a life insurance company based in

4  Lichtenstein?

5  A.  I believe so.

6  Q.  And you believe it was a publicly-traded company?

7  A.  Correct.

8  Q.  You did not have any dealings with Wealth Assurance Private

9  Client in terms of your role?

10  A.  No.

11  Q.  Now, at some point in February of 2016 you were contacted

12  by the United States Government, and you were asked to meet

13  with them?

14  A.  Yes, I was contacted by the FBI.

15  Q.  At that point you were living in Los Angeles?

16  A.  Correct.

17  Q.  You made arrangements to meet with them at a Starbucks in

18  Forest Hills, California?

19  A.  I met with them at Starbucks in Woodland Hills.

20  Q.  At that point did you have a lawyer with you?

21  A.  No.

22  Q.  During that meeting with the FBI?

23  A.  Correct.

24  Q.  How many agents were there?

25  A.  Two.

1  Q.  Did they record the meeting?

2  A.  They took notes, I believe.

3  Q.  Was it a casual meeting or was it very formal?

4  A.  I don't know what you mean by "casual."

5  Q.  Well, you weren't in handcuffs, correct?

6  A.  No, I was not.

7  Q.  At that meeting you had with the FBI agents, they asked you

8  certain questions about the WLCC bonds, correct?

9  A.  Correct.

10  Q.  At that meeting were you trying to be truthful, or was that

11  not a truthful day?

12          MS. MERMELSTEIN:  Objection to form.

13          THE COURT:  Sustained.

14  BY MS. NOTARI:

15  Q.  Did you tell them the truth that day?

16  A.  Some of it.

17  Q.  Some of it?  You told them you never met anyone from WLCC

18  or their attorneys, correct?

19  A.  Correct.

20  Q.  You told them that you did not discuss the bonds with

21  anybody but Jason Galanis, correct?

22  A.  I don't remember.

23  Q.  Would something refresh your recollection?  I should say

24  would it be helpful?  If we could go to 3522-2, Page 4.

25          (Pause)

I6CJGAL7                        Martin - cross

1             MS. MERMELSTEIN:  Your Honor, may we approach for just

2   one moment?

3             THE COURT:  Yes, sure.

4             (At sidebar)

5             MS. MERMELSTEIN:  Thank you.

6             I don't have any objection to the witness having his

7   recollection refreshed, but I think it is unfair and misleading

8   to say did you tell the government something at a meeting in a

9   Starbucks on this date.  I don't remember.  Let me refresh your

10  recollection, and show him a 302 that is not a 302 from that

11  interview.  3522-2 is a phone call with the U.S. Attorney's

12  Office, and he is not being shown the whole document.

13            (Multiple voices)

14            MS. MERMELSTEIN:  It has to be --

15            THE COURT:  It sounds like an accident.  She said it

16  was the wrong document.  I think we all agree that would be

17  improper, but it was just an accident.

18            (Continued on next page)

19

20

21

22

23

24

25

1               (In open court)

2               (Off-the-record discussion)

3    BY MS. NOTARI:

4    Q.  For clarification, you met with the government several

5    times in this case, correct?

6    A.  Yes.

7    Q.  And you met with them on February 8th, 2016?

8    A.  With the FBI, yes.

9    Q.  And you met with them later on March 23rd, 2016?

10   A.  Yes.

11   Q.  You met with them on April 5th, 2016, or you spoke to them?

12   A.  I spoke to them.

13   Q.  March 23rd, 2016 and April 5, 2016 you were actually living

14   abroad, correct?

15   A.  When was that?  Sorry?

16   Q.  March 23rd, 2016 and April 5, 2016, you were living abroad?

17   A.  No.

18   Q.  No?

19   A.  No.  I was in the U.S.

20   Q.  Those meetings were telephonic?

21   A.  They were video conferences.

22   Q.  So let's get back to the question that I asked you, was

23   that you never discussed the bonds with anyone but Jason

24   Galanis?

25   A.  Is that question related to what I said?

1   Q.  I asked you that question.

2   A.  I don't remember.

3   Q.  So I would ask you to refer to what is being marked as

4   3522-2.  This is Page 4, and I would direct your attention to

5   the 9th line.

6   A.  Okay.  What does it start with?

7   Q.  Perhaps you can just read that whole section.

8   A.  Okay.  So Martin was --

9   Q.  No.  Don't read it.  Just read it to yourself.

10  A.  Okay.  (Pause)  Okay.

11  Q.  Does that refresh your recollection?

12  A.  It doesn't, actually.

13  Q.  So you don't remember telling the government that you did

14  not speak to anyone about the bonds except Jason Galanis?

15  A.  I don't remember specifically saying that, no.

16  Q.  Can you look at the date on that, on the top of that page?

17  A.  Yes.

18  Q.  Did you meet with the government around March 23rd, 2016?

19  A.  Yes.

20  Q.  It is fair to say that the events we're talking about date

21  back to 2014, correct?

22  A.  The events we are talking about, the WLCC bond date back to

23  2014, 2014, 2015, yes.

24  Q.  Now we're in 2018, correct?

25  A.  Correct.

I6CJGAL7                         Martin - cross

1  Q.  It makes sense that your memory was better back in 2014 and

2  2016 than it was today, correct?

3            MS. MERMELSTEIN:  Objection.

4            THE COURT:  Sustained.

5  BY MS. NOTARI:

6  Q.  Would you agree that your memory of the events that

7  happened concerning the bonds were probably better back in 2016

8  than they are today?

9            MS. MERMELSTEIN:  Objection.

10            THE COURT:  I'll allow that.

11  A.  Yes.

12  BY MS. NOTARI:

13  Q.  Now, you talked about -- did you have any -- you had no

14  dealings with Atlantic Asset Management, correct?

15  A.  Correct.

16  Q.  You never spoke to any of the people at Hughes Capital,

17  correct?

18  A.  Correct.

19  Q.  You said that you talked about Hugh Dunkerley.

20            You learned that Hugh Dunkerley was an executive at

21  Burnham Securities?

22  A.  Correct.

23  Q.  And your understanding was he was the president of Wealth

24  Assurance?

25  A.  I don't remember specifically that he was the president,

I6CJGAL7                    Martin - cross

1    but I know he was involved, yes.

2    Q.  You did not have specific conversations with Hugh Dunkerley

3    about the bonds, correct?

4    A.  When?

5    Q.  At any point?

6    A.  We had discussions over the bonds.

7         MS. NOTARI:  Can you put back 3522, the bottom of the

8    first paragraph.  (Pause)  No.  I am sorry.  This is Page 4.

9    (Pause)  Can we go back to that paragraph.

10   Q.  Again during a meeting March 2016, I direct your attention

11   to what is 3522-2, Page 4, the question is:  You did not have

12   specific conversations with Hugh Dunkerley regarding the bonds,

13   correct?

14   A.  It depends when it was, specifically when it was.  I had

15   discussions with Hugh Dunkerley about the bonds, but --

16   Q.  So you don't recall telling the government that you never

17   had specific conversations with Mr. Dunkerley?

18   A.  I don't remember, no.

19   Q.  So again would you like to --

20        MS. MERMELSTEIN:  May we approach again?

21        THE COURT:  Sure.

22        (Continued on next page)

23        (At sidebar)

24        MS. MERMELSTEIN:  I guess two things.  He hasn't said

25   he doesn't remember it.  He just said he didn't say that, that

I6CJGAL7                    Martin - cross

1     that isn't true.  Otherwise, that is not what the 3500 says.

2     The 3500 says he didn't have one-on-one conversations with

3     Dunkerley.  It is clear he did talk to Dunkerley, and that

4     makes the question unfair.  If you're going to suggest it says

5     something, it should say that.

6              MS. NOTARI:  Let me look at that.  I think it is the

7     exact question I asked.  (Pause)  Okay, so he says Martin did

8     not have specific one-on-one conversations with Dunkerley

9     regarding the bonds.  Martin and Dunkerley's conversation were

10    all pretty general.  Martin never discussed the bonds in detail

11    as his focus was more on --

12             THE COURT:  So here he just said he had discussions,

13    but I don't think he clarified that they were specific.

14             MS. NOTARI:  I'll move on.

15             THE COURT:  Okay.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2   BY MS. NOTARI:

3   Q.  Mr. Martin, you told the government at a prior occasion

4   that you did not have specific one-on-one conversations with

5   Hugh Dunkerley regarding the bonds?

6   A.  Again I don't remember about that specifically.

7   Q.  Now, you talked about in late 2015 Jason Galanis was

8   arrested, correct?

9   A.  Correct.

10  Q.  It's fair to say that when you first started working with

11  Jason Galanis in August of 2014, you did not question what he

12  was telling you, correct?

13  A.  Again I think that is farfetched.  I didn't blindly trust

14  him, everything he said.

15  Q.  You didn't have any concerns?

16  A.  About what?

17  Q.  You did not have any concerns about what Jason Galanis was

18  telling you about the WLCC bonds?

19  A.  It depends when.  I had concerns afterwards, not at the

20  very, very beginning.

21  Q.  When you first started working with him, did you have any

22  concerns about the bonds?

23  A.  I started having concerns around that time, yes.

24  Q.  So on a prior occasion you told the government that you did

25  not question what you're being told about the WLCC bonds.  Do

I6CJGAL7                        Martin - cross

1    you recall telling the government that?

2    A.  No.

3    Q.  Do you recall telling the government that you never had any

4    concerns about the bonds?

5    A.  No.

6           MS. NOTARI:  Your Honor, I refer you, if we can pull

7    up 3522-6, Page 4, Paragraph 2.

8    BY MS. NOTARI:

9    Q.  Does that refresh your recollection?

10   A.  Somewhat.

11   Q.  Do you recall now telling the government that you did not

12   question what you were being told to do or had any concerns?

13   A.  Again at the beginning I did not have any concerns about

14   the transaction itself.

15   Q.  So it says, so you had, you told the government that you

16   became more concerned and had questions after Galanis was

17   arrested.  Is that what you told the government?

18   A.  I don't remember saying that to the government.  It is just

19   what it says here, but I don't remember specifically saying

20   that to the government.

21   Q.  During these sessions, the government, the investigators

22   were taking notes, correct?

23   A.  I assume they did.

24   Q.  And they were writing down your answers?

25   A.  I never saw them actually writing down anything.

I6CJGAL7                     Martin - cross

1   Q.  Did you ever review these reports with the government

2   before today?

3   A.  These reports that we're looking at right now, I don't

4   remember, no.

5   Q.  So it is now fair to say that what you told the government

6   back in April 2016 was not true?

7           MS. MERMELSTEIN:  Objection, your Honor.

8           THE COURT:  Sustained.

9           MS. NOTARI:  Your Honor, may I?

10          (off-the-record discussion)

11  BY MS. NOTARI:

12  Q.  Now, Mr. Martin, when Jason Galanis was arrested, it is

13  fair to say you were extremely worried?

14  A.  Yes.

15  Q.  You were concerned because you knew that your name was all

16  over the bond documents?

17  A.  Yes.

18  Q.  Correct?  And you met with him at the Montage Hotel in

19  Beverly Hills after he was arrested?

20  A.  I recall that, yes.

21  Q.  And you told him that you were extremely concerned because

22  your name was all over the bonds, correct?

23  A.  That's correct.

24  Q.  He assured you that there was no problem --

25          MS. MERMELSTEIN:  Objection.

I6CJGAL7                         Martin - cross

1           THE COURT:  Sustained.

2    BY MS. NOTARI:

3    Q.  Now, we've established that you knew Jason Galanis for many

4    years on a social basis, correct?

5    A.  Correct.

6    Q.  In connection with the investigation in this case, you sat

7    down with the government -- you either sat down with them or

8    you had a telephonic conversation with them how many times?  Do

9    you remember?

10   A.  I couldn't tell you exactly how many times, but I met

11   several times.

12   Q.  I am sorry?

13   A.  I cannot tell you exactly how many times, but several

14   times.

15   Q.  Several times?

16           So you sat down with them or spoke to them at least 8,

17   probably 8 or 9 times, correct?

18   A.  I don't recall that number, that many times.

19   Q.  The first time was at the Starbucks, correct, in

20   California?

21   A.  Correct.

22   Q.  At some point you moved back to Spain?

23   A.  Correct.

24   Q.  When did you move back to Spain?

25   A.  It was around May 2016.

I6CJGAL7                         Martin - cross

1    Q.  You spoke to them -- do you recall speaking to them in
2    March of 2016?
3    A.  Yes.
4    Q.  At that point did you get a lawyer?
5    A.  Yes.
6    Q.  You did?  You had a lawyer?  Okay.
7           Each time you sat down with them, you understood that
8    it was your role to tell them the truth, correct?
9    A.  Correct.
10   Q.  And they asked you a lot of details about what happened,
11   and you provided what you considered to be the important
12   details, correct?
13   A.  Correct.
14   Q.  Now, you mentioned Mr. Bevan Cooney, and you said that
15   Bevan Cooney was a friend of Jason Galanis, correct?
16   A.  Correct.
17   Q.  And you met him the first time approximately two years ago?
18   A.  About.
19   Q.  And you said that you met him two or three times?
20   A.  About.
21   Q.  Early on in this case when you spoke to the agents, you
22   told them you had only spoken to Mr. Cooney or met with him
23   approximately two or three times?
24   A.  That can be.
25   Q.  In fact, in this case you reviewed a lot of documents with

I6CJGAL7                     Martin - cross

1   the government, correct?

2   A.  A few documents, yes, I reviewed.

3   Q.  We went through a stack of documents today, correct?

4   A.  Correct.

5   Q.  Your name is on many of those documents?

6   A.  Correct.

7   Q.  And the government has reviewed email with you, correct?

8   A.  Email?

9   Q.  Email?

10  A.  Specify that.  I don't understand the question.

11  Q.  Emails regarding the WLCC bond and your work, your role on

12  the WLCC bond?

13  A.  Yes.

14  Q.  The investment manager agreement?

15  A.  Correct.

16  Q.  All of the documents you reviewed on direct examination?

17  A.  Yes.

18  Q.  And none of those had anything to do with Bevan Cooney,

19  correct?

20  A.  That's right.

21  Q.  Mr. Cooney, you said he was a close childhood friend of

22  Jason Galanis.  Is that what you said?

23  A.  That's what I said.

24  Q.  That is what Jason told you?

25  A.  Correct.

I6CJGAL7                         Martin - cross

1   Q.  In fact, Jason told you a lot of things that we know today

2   are not true, correct?

3   A.  True.

4   Q.  He lied to you very frequently, correct?

5   A.  Yes.

6   Q.  And he lied to a lot of different people?

7        MS. MERMELSTEIN:  Objection.

8        THE COURT:  Sustained.

9   BY MS. NOTARI:

10  Q.  Now, at some point he provided reasons for you to do

11  things, correct, very often?

12  A.  I don't understand the question.

13  Q.  For example, he told you that he wanted you to buy the

14  Wakpamni bond, correct?

15  A.  Correct.

16  Q.  And he told you that the reason he wanted you to buy the

17  bond was because he didn't want the bond to go stale?

18  A.  Correct.

19  Q.  Is that true or a lie?

20  A.  That's true.

21  Q.  You think that was true?

22  A.  I think I said that statement is true.

23  Q.  You think that statement is true?

24  A.  You are confusing me with --

25  Q.  No, no, no.  Was that a true statement the bond was stale

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    and that is why he wanted you to buy it?

2    A.  I don't understand.  What is the question?  I don't

3    understand the question.

4    Q.  Do you think that the reason he gave you was true or false?

5    A.  No.  I believe that he really wanted me to buy those bonds

6    because he thought they were going stale, that is a true

7    statement, yes.

8    Q.  You thought that was a true statement?

9            You didn't buy the bonds in your own name, correct?

10   A.  Correct.

11   Q.  You bought them in someone else's name?

12   A.  In a corporation, yes.

13   Q.  As far as getting back to Jason Galanis, he would often

14   tell you things, but you would later learn that those things

15   were not true?

16   A.  Fair to say.

17   Q.  Did you know anything about Jason Galanis' background,

18   where he grew up?

19   A.  Yes.

20   Q.  You knew he grew up in Greenwich, Connecticut?

21   A.  I didn't know that one.

22   Q.  You didn't know that?

23   A.  No.

24   Q.  And Mr. Cooney actually grew up in Montana.  Did you know

25   that?

I6CJGAL7                          Martin - cross

1  A.  No.

2  Q.  Did you ever talk to Mr. Cooney about where he grew up?

3  A.  No.

4  Q.  So you were never able to verify what Jason Galanis told

5  you as far as them being childhood friends, correct?

6  A.  Yes, I actually was.

7  Q.  You knew that they were friends, right?

8  A.  Yes.

9  Q.  You said that you met him two years ago, but you don't

10  recall meeting him before two years ago?

11  A.  Correct.

12  Q.  In fact, you and Mr. Cooney were, you were -- you weren't

13  best buddies, you didn't see each other a lot, but you were

14  friendly?

15  A.  Yes.

16  Q.  In fact, Mr. Cooney at one point introduced you -- you told

17  the government that Mr. Cooney had a lot of high profile

18  friends?

19  A.  Correct.

20  Q.  And he was a person who was a good resource in terms of

21  raising capital?

22  A.  What's the question there?

23  Q.  Well, Jason Galanis told you that in terms of raising

24  capital, that Mr. Cooney was a good source of raising capital

25  because he had high profile friends?

1              MR. SCHWARTZ:  Objection.

2              THE COURT:  I'll allow that.

3    A.  Yes.

4    Q.  You knew he had been a part owner of the Viper Room in Los

5    Angeles?

6    A.  Bevan Cooney mentioned that to me.

7    Q.  And, in fact, he introduced you to the wife of Wayne

8    Gretzky, the famous hockey player?

9              MS. MERMELSTEIN:  Objection.

10             THE COURT:  Sustained.

11             MS. NOTARI:  May we approach, your Honor?

12             THE COURT:  Sure.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MS. NOTARI:  So he testified on direct examination

3         about this phone call, and out of the blue they didn't have any

4         type of social relationship, so we think it is very fair for me

5         to get exactly what the nature of the relationship was.

6              MS. MERMELSTEIN:  I don't have any objection about how

7         frequently they met or kinds of things they did socially.  The

8         fact that is being suggested, Mr. Cooney is friends with Wayne

9         Gretzky seems completely irrelevant to me, and I think with

10        respect to questions about what Mr. Cooney told him about

11        Mr. Cooney himself, I understand if he had actual knowledge,

12        fine, but they're just calling for hearsay because they're

13        calling for what Mr. Cooney told about himself, and it is not

14        to show anything other than, for example, Mr. Cooney owned the

15        Viper Room, and those are improper.

16             THE COURT:  I don't think it is relevant what Wayne

17        Gretzky or his wife said.  Stay with that and be careful not to

18        ask questions about what Cooney told him.  You can ask

19        questions about the relationship.

20             MS. NOTARI:  Okay.

21             (Continued on next page)

22

23

24

25

1            (In open court)

2            (Off-the-record discussion)

3            (Jury excused)

4            (Recess)

5            THE COURT:  Is there a sense of anything I can tell

6    the jury about scheduling?  I was thinking tomorrow we just sit

7    from 9:30 till 11:30, ideally with no break, and then take a

8    half an hour and then sit from 12:00 to 2:00, so we have four

9    solid hours of testimony with no other breaks than the half

10   hour.  Does that work?

11           If you don't finish with a witness, I'll stay later, I

12   will be late, but it sounds like you need to leave early anyway

13   tomorrow because you have those witnesses who can't start until

14   Monday.

15           MR. TOUGER:  Your Honor, it won't take two hours.  I

16   don't mean to be blunt, but --

17           THE COURT:  Let's try and we can't just sort of see

18   where we are.  Is there a way to do it without excusing the

19   jury and taking 15 minutes each time?  We can talk about it

20   privately.  I don't want to do this publicly.

21           MS. MERMELSTEIN:  With respect to scheduling, your

22   Honor, I think that works for the government.  I think that I

23   expect -- I think I can say this -- I expect there will be

24   cross-examination for some not insignificant part of tomorrow

25   if not all of tomorrow given the estimates from defense

1    counsel.  We have at least two more witnesses tomorrow and

2    email reading that needs to be done, so I think if we're

3    planning on sitting roughly four hours, we can comfortably not

4    bring -- sorry.

5                (Off-the-record discussion)

6                MS. MERMELSTEIN:  So I think that comfort --

7                THE COURT:  I'll bring the jury back in.  Sorry.  Tell

8    me until they get here.

9                MS. MERMELSTEIN:  We can solidly, comforted be able to

10   rely we can fill the time until 2:00 o'clock and not need the

11   BIT Board witnesses or the two that can't testify until Monday.

12               THE COURT:  You still think you're resting on Monday?

13               MS. MERMELSTEIN:  Yes.

14               MR. SCHWARTZ:  There are two more people that have to

15   go tomorrow.  Is there anyone that needs to get off tomorrow?

16               MS. MERMELSTEIN:  No.  I sorry.  I take that back.

17               There is one witness tomorrow who is very short who is

18   on vacation following the end of this week.  We can always take

19   witnesses out of order if that creates a problem for you guys.

20               MR. QUIGLEY:  Just one second.

21               THE COURT:  Is there anything defense counsel feel

22   like they can tell me about their cases just as it bears on

23   scheduling so I can give the jury some sense of their future?

24               MR. SCHWARTZ:  I am not sure I share the government's

25   optimism they will rest on Monday, but I think I don't want to

1    speak --

2              (Jury present)

3              THE COURT:  Thanks, folks.  Everyone can be seated.

4    You can proceed, Ms. Notari.

5    BY MS. NOTARI:

6    Q.  I just want to go back to one question.  You said that when

7    Jason was arrested, you were concerned because your name was

8    all over the bonds.

9              During the time that you learned that he had been

10   arrested, did you discuss what you're concerned about, your

11   involvement in this case with anyone?

12   A.  I don't specifically remember with who, but I obviously

13   discussed it with some people.

14   Q.  Do you recall telling the government that you did not

15   discuss it with anybody?

16   A.  I don't remember that.

17   Q.  You don't remember that?  Okay.

18             So now getting back to Mr. Cooney, you said that you

19   were friendly with him, and there was testimony earlier that

20   you went to a celebratory lunch after the bonds, the first

21   bonds?

22   A.  Yes.

23   Q.  You said that there were approximately two or three times

24   you met with him in social settings, correct?

25   A.  I remember specifically two.

1    Q.  But you don't remember the times you met him, where you

2    went?

3    A.  I do.

4    Q.  You do?  And they were mostly bars and restaurants?

5    A.  Correct.

6    Q.  You said that you agreed that he had some high profile

7    friends, correct?

8    A.  Correct.

9    Q.  Did you meet any of those high profile friends?  Did he

10   introduce you to any?

11              MS. MERMELSTEIN:  Objection.

12              THE COURT:  Sustained.

13   BY MS. NOTARI:

14   Q.  Now, you didn't really see each other more than two or

15   three times, but again you were friendly and, in fact, you were

16   Instagram friends, correct?

17   A.  Correct.

18   Q.  In fact, you're still Instagram friends, correct?

19   A.  Correct.

20   Q.  You recently went on a travel vacation throughout Europe,

21   and Mr. Cooney liked one of your vacation photos?

22              MS. MERMELSTEIN:  Objection.

23              THE COURT:  Sustained.

24   BY MS. NOTARI:

25   Q.  Now, you testified that you met with the government many

I6CJGAL7                          Martin - cross

1    times, correct?

2            You met with them -- let's go through your memory of

3    the meetings.  You met with them on February 8th, 2016.  Do you

4    recall that?

5    A.  I don't really recall dates specifically.

6    Q.  But you remember the Starbucks meeting in West Hills,

7    California?

8    A.  Yes.

9    Q.  And that was around the beginning of February 2016?

10   A.  Yes.

11   Q.  Then subsequently there was a meeting in March of 2016?

12   A.  Video conference, yes.

13   Q.  A video conference?

14           And then there was another meeting in April of 2016?

15   A.  Yes, another video conference.

16   Q.  Then there was a period of sort of quiet where you didn't

17   speak to the government about this case?

18   A.  Correct.

19   Q.  At that time you were living in Europe?

20   A.  Yes.

21   Q.  During that time that you were living in Europe, you were

22   consulting with your lawyer in this case?

23           MS. MERMELSTEIN:  Objection, your Honor.

24           THE COURT:  I'll allow that.

25   A.  Yes.

I6CJGAL7                          Martin - cross

1    BY MS. NOTARI:

2    Q.  Now, during these early meetings in 2016, again these were

3    close in time to the events involving the bond, correct?

4    A.  Involving the bond in what sense?

5    Q.  Well, the date, if we go back in time, early 2016 is closer

6    to the time when you agreed to be the investment manager,

7    correct?

8    A.  Yes.

9    Q.  During those early meetings the government asked you many,

10   many questions about your involvement in the case?

11   A.  Yes.

12   Q.  They asked you the involvement of other people in the case,

13   correct?

14   A.  Correct.

15   Q.  And you told them everything you could remember about

16   everybody that was involved in this case?

17   A.  I don't remember saying everything that I knew.

18   Q.  You told them the important details that you knew?  They

19   asked you questions, and you provided them with answers,

20   correct?

21   A.  I gave them answers, yes.

22   Q.  It is fair to say that you knew that they were trying to

23   prosecute other people in this case?

24   A.  Yes.

25   Q.  In fact, you knew that they were trying to prosecute at the

I6CJGAL7                         Martin - cross

1   time Hugh Dunkerley?

2           MS. MERMELSTEIN:  Objection, your Honor.

3           THE COURT:  Sustained.

4   BY MS. NOTARI:

5   Q.  They asked you questions about individuals involved with

6   the bond transaction, correct?

7   A.  Correct.

8   Q.  During those meetings, you told them what you knew,

9   correct?

10  A.  A lot of what I knew.

11  Q.  Now, you said earlier Ms. Mermelstein asked you a question

12  about your truthfulness, and you said that in the beginning of

13  these meetings you were not truthful.  Is that right?

14  A.  I wouldn't call it I wasn't truthful.  Sometimes I was not

15  truthful.

16  Q.  So sometimes not being truthful is called a lie.  Is that

17  right?

18  A.  It is not a blanket.  You're making a blanket statement.

19  Q.  Okay.  So, first of all, you understood that you were

20  required to tell the truth?

21  A.  Yes.

22  Q.  I am sure they told you that it was a federal offense to

23  lie to a federal investigator?

24  A.  Yes.

25  Q.  And they told you it was a federal offense to lie to a

1    prosecutor?

2    A.  Yes.

3    Q.  So is it your testimony today that you didn't tell the

4    truth back in early 2016, or you did tell the truth?

5    A.  My testimony is that I to a large extent I said the truth,

6    sometimes I lied, and I didn't come forward with all the things

7    that I knew.

8    Q.  Okay.  And so at what point did you decide to come forward

9    and tell everything that you knew?

10   A.  Probably when I was in Spain.

11   Q.  Can you give us a time-frame, a date?

12   A.  No, I don't.

13   Q.  You don't remember when you decided to tell the whole

14   truth?

15   A.  No.

16   Q.  Do you think it was in 2016?

17   A.  I don't remember.

18   Q.  So you don't want to put -- do you think that it was at the

19   end of 2016?

20   A.  I think it was closer to 2018.

21   Q.  So closer to 2018, you decided to tell the truth?

22   A.  I decided to come forward with more information, yes.

23   Q.  Okay.  And you decided, there was an original trial date in

24   this case of April 30th?

25            MS. MERMELSTEIN:  Objection, your Honor.

I6CJGAL7                    Martin - cross

 1              THE COURT:  Yes, sustained.

 2    BY MS. NOTARI:

 3    Q.  So it is fair to say that in 2018, you started meeting with

 4    the government because you knew that you were likely to be

 5    testifying at trial?

 6    A.  I didn't know then that I was going to be testifying.

 7    Q.  You didn't know?

 8              Let me ask you, did you realize that when you were

 9    speaking to the government in 2016, that the federal

10    investigators were taking down your words as part of a federal

11    investigation?

12    A.  I was assuming so.

13    Q.  Did you realize that they were asking you questions to

14    determine the liberty of certain people who were being charged

15    in this case?

16              MS. MERMELSTEIN:  Objection.

17              THE COURT:  Sustained.

18    BY MS. NOTARI:

19    Q.  Did you realize that the answers you were giving were being

20    relied upon by prosecutors in making decisions in this case?

21              MS. MERMELSTEIN:  Objection.

22              THE COURT:  Sustained.

23    BY MS. NOTARI:

24    Q.  What was your understanding of what your responsibilities

25    were when you were speaking to the government?

1   A.   To give information of the questions that they asked.

2   Q.   You knew you were supposed to be telling the truth?

3   A.   Correct.

4   Q.   So now you're telling us that you weren't telling the

5   truth?

6   A.   Again it is a blanket statement.

7   Q.   So we're here to decide which particular sessions with the

8   government you were telling the truth and which were not.  Is

9   that what we're supposed to decide here today?

10          THE COURT:  Sustained.

11  BY MS. NOTARI:

12  Q.   Let's focus on your meetings with the government.

13          Now, Ms. Mermelstein previously mentioned the word,

14  "safe passage letter"?

15  A.   Yes.

16          MS. NOTARI:  Your Honor, at this time I would like to

17  move into evidence Defense Exhibit 3760 through 3761.

18          MS. MERMELSTEIN:  May we approach, your Honor?

19          THE COURT:  Sure.

20          (Continued on next page)

21

22

23

24

25

1                  (At sidebar)

2                  (Off-the-record discussion)

3             MS. MERMELSTEIN:  I object.  I don't think they're

4      admissible.  To the extent there is relevance of the fact of

5      them, the witness testified and he can be asked about them.  I

6      secondarily want to note we have been operating on an agreement

7      throughout, the parties throughout the trial about

8      identification of exhibits.  We offered our exhibits with these

9      witness and did not identify, and Ms. Notari did not provide us

10     with any exhibits she intended to use.  If she is trying to

11     offer it, it is not for impeachment and we at lunch time before

12     the lunch break, I said on the record my understanding is we

13     got exhibits from Mr. Schwartz, Mr. Touger, we didn't get any

14     from Ms. Notari.  I assume there are none.

15             MS. NOTARI:  I have to say for starters the terms of

16     the agreement were completely breached.  This was not my

17     intention because I normally thought this stuff goes into

18     evidence.  I thought --

19             THE COURT:  Usually the cooperation agreement doesn't

20     legally go into evidence until cross-examination unless there

21     is consent.  I don't know why you think that.  In any event, I

22     think it is proper for you to use them.  I will admit them.

23     You're familiar with them so --

24             MR. SCHWARTZ:  So the record is clear, I was going to

25     use the safe passage letters.

1            THE COURT:  I am letting you both use them.

2            MS. NOTARI:  What about the proffer statements?  We

3    are not going into the order.

4            MS. MERMELSTEIN:  You want to put in the proffer

5    agreement itself?

6            MS. NOTARI:  Yes.

7            MS. MERMELSTEIN:  I don't think that is admissible,

8    either.  I don't think they're admissible, your Honor.

9            MS. NOTARI:  The proffer agreements?

10           MR. QUIGLEY:  What is the relevance?  It doesn't show

11   bias.

12           MR. SCHWARTZ:  Of course, it does.  He was immunized

13   for his statements then, like now.

14           THE COURT:  You can use the proffer agreements.  You

15   can use the cooperation agreement.  I don't have any problem

16   with that.  Just try to be more careful when you ask questions

17   and try to be careful when you're trying to impeach him.

18           MS. NOTARI:  Do you have a problem with the proffer

19   agreements in evidence?

20           THE COURT:  I don't.

21           (Continued on next page)

22

23

24

25

I6CJGAL7                        Martin - cross

1                  (In open court)

2                  MS. NOTARI:  Your Honor, I offer Defense Exhibits

3       3760, 61, 63, which is 3522-4 as far as 3500 material, and

4       Defense Exhibit 3764, which is 3522-3, the 3500 material.

5                  MS. MERMELSTEIN:  No objection.

6                  (Defendant's Exhibits 3760, 3761, 3763, 3764 received

7       in evidence)

8       BY MS. NOTARI:

9       Q.  Mr. Martin, you met with the government on February 8, 2016

10      at the Starbucks, and at that time you were living in

11      California, correct?

12      A.  Correct.

13      Q.  You already said that you attended that meeting without a

14      lawyer, correct?

15      A.  Correct.

16      Q.  At some point, on March 27, 2018, the government provided

17      you with what is called a safe passage letter?

18      A.  Correct.

19      Q.  And specifically the letter, what was your understanding of

20      that letter?

21      A.  My understanding was that I could fly in from Spain into

22      the United States and leave without being arrested.

23      Q.  You were provided a letter that specifically said that

24      during your travel to the United States on or about March 25,

25      2018 until March 30, 2018, you can enter into the United States

1    and you could not be arrested or detained, correct?

2    A.   Correct.

3    Q.   That was specifically in relation to your providing

4    information as a witness in this case, correct?

5              MS. MERMELSTEIN:  Objection.

6              THE COURT:  Overruled.  You can answer it.

7    A.   It was so that I could come here and talk to the

8    government.

9    BY MS. NOTARI:

10   Q.   So it is fair to say that they gave you this letter on

11   March 22, 2018 because you were living abroad, correct?

12   A.   Correct.

13   Q.   It is fair to say that after your February 8th, 2016 with

14   the government, you decided to move abroad?

15   A.   After, yes, it was after, yes.

16   Q.   You decided to get out of the United States?

17             MS. MERMELSTEIN:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.   Yes, I left the United States.

20   Q.   And your children live, they were living at the time in

21   California?

22             MS. MERMELSTEIN:  Objection, your Honor, to questions

23   about Mr. Martin's children.

24             THE COURT:  Sustained.

25   Q.   Your family was living in California?

1              MS. MERMELSTEIN:  Objection.

2              THE COURT:  Sustained.

3    Q.  So you consulted with your attorney.  You did not

4    personally ask the government for a safe passage letter,

5    correct?

6    A.  Correct.

7    Q.  Your lawyer negotiated this for you?

8    A.  Correct.

9    Q.  It is fair to say that it was not your intention to come

10   back to the United States unless you had one of these letters.

11   Is that right?

12   A.  Correct.

13   Q.  At some point you continued to live abroad, correct?

14   A.  Yes.

15   Q.  On March 23rd you had a video teleconference with the

16   government?

17   A.  When?

18   Q.  March 23rd, 2016?

19   A.  It could be.  I don't remember the exact date.

20   Q.  You were provided a safe passage letter, dated March 22nd,

21   2018 and you came to the United States, correct?

22   A.  Yes.

23   Q.  And you had meetings with the government on March 27, 2018

24   and on March 29th, 2018?

25   A.  I don't have the exact dates, but that sounds about right.

1    Q.  Then subsequently after your meetings, you went back to --

2    were you living in Spain?

3    A.  Yes.

4    Q.  And there came a time when the government wanted you to

5    again return to the United States for your testimony here in

6    this Court, and they provided you with another safe passage

7    letter?

8    A.  Yes.

9    Q.  So you were assured that you were not going to be arrested

10   in connection with your providing information on this case

11   during your visit?

12   A.  Correct.

13   Q.  And it is fair to say that if you violated the terms of

14   this letter, you could be arrested, correct?

15          MS. MERMELSTEIN:  Objection.  I think that misstates

16   the document.

17          THE COURT:  Let's get at your understanding of the

18   letter.

19          THE WITNESS:  My understanding is that I cannot be

20   arrested unless I do something during my time here, but I

21   cannot be arrested for my time that I'm here for the time-frame

22   that it states in this letter.

23          (Continued on next page)

24

25

1   Q.  OK.  Now, each time -- if we can have 3763 -- or 3522-4, if

2   that's easier.

3          Now, are you familiar with what is called a proffer

4   agreement?

5   A.  Yes.

6   Q.  And in connection with your providing information in this

7   case you signed a proffer agreement?

8   A.  Yes.

9   Q.  Now, the first time you met with the government in February

10  of 2016 you did not have any agreement with the government,

11  correct?

12  A.  Correct.

13  Q.  Was there a proffer agreement signed at that meeting?

14  A.  No.

15  Q.  It wasn't until after you went abroad and you spoke with a

16  lawyer that you were able to get a proffer agreement.

17          MS. MERMELSTEIN:  Objection to questions about Mr.

18  Martin's communications with attorneys.

19          THE COURT:  I didn't hear what you said.

20          MS. MERMELSTEIN:  I'm sorry.  Objection to questions

21  about Mr. Martin's communications with his attorneys.

22          THE COURT:  Yes, we shouldn't get into that.

23  Q.  So, the first proffer agreement that you signed, as far as

24  your memory, was when you spoke with the government -- I take

25  it you don't remember when you signed the first proffer

I6C7GAL8                     Martin Fernandez - Cross

1    agreement -- but your first meeting with the government

2    telephonically after the Starbucks meeting, which was March 23,

3    2016.

4    A.  What is the question?

5    Q.  You signed a proffer agreement then.

6    A.  Yes.

7    Q.  And at that point you had a lawyer advising you, correct?

8              I'm not getting into the communications, your Honor.

9              MS. MERMELSTEIN:  Objections to the questions about

10   the lawyer, your Honor.

11             THE COURT:  Try and stay away from his communications

12   with his lawyer.

13   Q.  Now I'd like to focus on what this proffer statement

14   says -- agreement.

15             It was your understanding at this time that there was

16   no yet promise or immunity that you were not going to be

17   prosecuted for your involvement in this case, correct?

18   A.  Correct.

19   Q.  And it was understanding at the time that you signed this

20   proffer agreement that there was again -- again there was no

21   promise to you that you were not going to be prosecuted.

22   A.  Correct.

23   Q.  I'd like to focus on the second paragraph.  If we can

24   highlight that.

25             If we look at paragraph 2, this paragraph, as you

understood it, said that in any prosecution against you by the

United States Attorney's office -- it says "this office, and

you understood that that meant the United States Attorney's

office for the Southern District of New York, correct?

A.  Correct.

Q.  And for those of us who don't know what that is, that is

the prosecutors in this case who are seated to the left of me

are prosecutors from this office, the Southern District of New

York, correct?

A.  Yes.

Q.  And it was your understanding that any statement that you

made could not be used against you if they chose to prosecute

you in their case in chief.

A.  Yes.

Q.  And it was also your understanding that if at a later point

you went to trial or were convicted and sentenced, that any

statement you made could not be used against you unless you

lied.

A.  Correct.

Q.  And each time you met with the government after the

Starbucks meeting you signed this proffer agreement, correct?

A.  Correct.

Q.  And it's fair to say that you would not have spoken to the

government if you did not have this proffer agreement in place.

A.  Correct.

I6C7GAL8                    Martin Fernandez - Cross

1    Q.  And you signed this proffer agreement every time you met

2    with the government after the Starbucks meeting, correct?

3    A.  Correct.

4    Q.  So you knew that all of the statements you were giving were

5    being given because they couldn't be used against you.

6    A.  Correct.

7    Q.  Now, during this time period you did not have what is

8    called an immunity agreement, correct?

9    A.  Correct.

10   Q.  You were -- it's fair to say that you were hoping for an

11   immunity agreement.

12   A.  I don't remember if I was hoping for an immunity agreement.

13   Q.  Well, you discussed with the prosecutors the possibility

14   that they would seek a formal order of immunity, which means

15   that you could not be prosecuted.

16   A.  When?  When are you talking about this?  During the

17   sessions?

18   Q.  Did you ever talk about an order of immunity with the

19   government?

20   A.  Later on, yes.

21   Q.  You did.  And what did you talk about?

22   A.  Specify, please.

23   Q.  You said that you talked -- you had discussions with the

24   government about an order of immunity.  Can you give us -- can

25   you remember what you talked about?

I6C7GAL8                    Martin Fernandez – Cross

1   A.  I don't remember specifically what we discussed about the

2   immunity agreement.

3   Q.  It's fair so say that your hope was that you would get an

4   immunity order and that you would not be prosecuted for your

5   involvement in this case.

6   A.  Of course.

7   Q.  And it's fair to say that if you didn't get an immunity

8   order, you probably would not have come back here to testify.

9   A.  That's right.

10  Q.  You would have continued to live abroad.

11  A.  Correct.

12  Q.  And I noticed -- I'll withdraw that.  Now, today you

13  received an order of immunity, correct?

14  A.  Yes.

15  Q.  Earlier today you were sworn and you received your official

16  order of immunity, correct?

17          MS. MERMELSTEIN:  Objection.

18          THE COURT:  Sustained.

19  Q.  Mr. Martin, today was a monumental day in your life,

20  correct?

21          MS. MERMELSTEIN:  Objection.

22          THE COURT:  Yes, sustained.

23  Q.  In all the months -- in all the years you have been talking

24  to the government, you only had what is called a proffer

25  agreement, correct?

I6C7GAL8                          Martin Fernandez - Cross

1    A.   Correct.

2    Q.   This was just a promise that your statements would not be

3    used against you, correct?

4    A.   Correct.

5    Q.   But today you got a more official order of immunity,

6    correct?

7                MS. MERMELSTEIN:   Objection.

8                THE COURT:   I'll allow that.

9                You can answer that.

10   A.   Yes.

11   Q.   And you are testifying here pursuant to a court ordered

12   immunity, correct?

13   A.   Correct.

14   Q.   That means that the government asked the court on your

15   behalf to grant you what we call immunity under the law in

16   exchange for your testimony.

17               MS. MERMELSTEIN:   Objection.

18               THE COURT:   I'll allow that.

19   A.   Yes.

20   Q.   You, with the assistance of your lawyer, asked for this

21   grant of immunity?

22               THE COURT:   Let's leave the lawyer out of it.

23   Q.   You asked for this grant of immunity.

24   A.   I didn't specifically ask for this, no.

25   Q.   OK.  And, again, you agree that without this order of

I6C7GAL8                    Martin Fernandez – Cross

1   immunity you would not be testifying here.

2   A.  Correct.

3   Q.  And you understand what immunity means, correct?

4   A.  I believe I do.

5   Q.  That nothing you say here in court can ever be used against

6   you in other court proceedings.

7   A.  That's the way I understand it.

8   Q.  So, the government cannot take your testimony and use it as

9   evidence in a criminal case against you.

10  A.  Whatever I say here cannot be used against me, yes.

11  Q.  And you wanted this immunity to protect you from being

12  prosecuted criminally in this case.

13  A.  For testifying, yes.

14  Q.  And you now know that your testimony cannot be used in this

15  way.

16  A.  Correct.

17  Q.  That no matter what you testify to here in court today,

18  your testimony cannot be used later against you.

19  A.  I wouldn't say no matter.  If I'm truthful it cannot be

20  used against me.

21  Q.  Now, it's your understanding that after you testify in

22  these proceedings and there is no more asked of you, that

23  you're not going to be charged in this case, correct?

24  A.  That is not my understanding.

25  Q.  That's not your understanding?

1    A.  No.

2    Q.  Do you still think you can be prosecuted?

3    A.  I could be.

4    Q.  And an order of immunity is essentially a free pass that

5    the government has asked the court to give you.

6    A.  I wouldn't call it a free pass.

7    Q.  What would you call it?

8    A.  I would call it that it protects me from whatever I say

9    today here in testimony, it could not be used against me.

10   Q.  OK.  And you know that this is probably the best protection

11   that a witness can get in a federal case.

12              MS. MERMELSTEIN:  Objection.

13              THE COURT:  Sustained.

14   Q.  Your understanding is that -- your understanding is that

15   the government prosecutors -- again this is your belief -- are

16   not going to prosecute in this case.

17              MS. MERMELSTEIN:  Objection.  Asked and answered.

18              THE COURT:  Yes, he answered that.  Let's move on.

19   Q.  Now, in this case Jason Galanis instructed you to do things

20   that were against the federal laws of the United States.

21   A.  Yes.

22   Q.  And in this case you submitted false documents to the SEC?

23   A.  Yes.

24   Q.  In this case you created a fake company called Calvert?

25   A.  I created the company.

I6C7GAL8                    Martin Fernandez - Cross

1    Q.  And it's not a real company, right?

2    A.  It is formally formed in the United Kingdom.

3    Q.  But is it a real company or a fake company?  Is it a real

4    company, Calvert?

5    A.  What do you mean by real or fake?  It exists.  It's a

6    real -- it was incorporated.

7    Q.  And did you create a name for that company?

8    A.  Yes.

9    Q.  And you made up the name?

10   A.  Yes.

11   Q.  That was based on a street that you lived in during your

12   childhood?

13   A.  That is not correct.  During my childhood I was living in

14   Switzerland.

15   Q.  So this was just a street you lived on during your adult

16   years.

17   A.  It was a cross street of a street that I used to live three

18   years ago.

19   Q.  In this case Ms. Mermelstein she asked you a lot of

20   questions about the crimes you committed in this case, correct?

21   A.  She asked me a lot of questions.

22   Q.  And you admitted that you committed several crimes.  Fraud?

23   A.  I admitted that I did, yes.

24   Q.  And your understanding is that this order of immunity

25   protects you from those -- from being charged in this case for

1    those crimes that you admitted to.

2              MS. MERMELSTEIN:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4    Q.  Mr. Martin, I notice that your lawyer is not here today.

5              MS. MERMELSTEIN:  Objection, your Honor.

6              THE COURT:  Sustained.  Let's stay away from the

7    lawyer.

8    Q.  Now, you testified that you lied about wire transactions?

9    A.  Can you be more specific?

10   Q.  No, it's OK, we'll leave it at that.

11             Are we going to 5:30, your Honor?

12             THE COURT:  We are.

13             MS. NOTARI:  OK.

14             THE COURT:  Are you almost done?

15             MS. NOTARI:  Yeah, I just have a few more minutes.

16             If I could have just one minute.  I'm wrapping up.

17   Q.  Mr. Martin, since you've -- we've already established that

18   you have moved back to Europe.

19   A.  Yes.

20   Q.  And you've been able to travel freely throughout this case?

21   You have no bail conditions.

22   A.  I understand there is none.

23   Q.  You don't have to report to any type of pretrial services

24   officer.

25             MS. MERMELSTEIN:  Objection.

1              THE COURT:  Yes, sustained.

2    Q.  And since -- as I said earlier, since you've been a witness

3    in this case it's been many years, correct?

4    A.  I don't understand the question.

5    Q.  Well, you've been pending your testimony here today for at

6    least two years.

7    A.  I mean, yes, you can say that.

8    Q.  And you've traveled extensively throughout Europe during

9    that time?

10             MS. MERMELSTEIN:  Objection.

11             THE COURT:  I think we've been through this.

12   Q.  Now, you testified -- well, I'll withdraw that question.

13             It's fair to say that this has been a very difficult

14   part of your life?

15   A.  Yes.

16   Q.  And you've testified that you admitted to crimes in this

17   case?

18   A.  Yes.

19   Q.  And last week on Instagram you posted that you have

20   absolutely --

21             MS. MERMELSEIN:  Objection.  Objection.  Objection.

22             THE COURT:  Sustained.

23   Q.  Did you recently post on Instagram --

24             MS. MERMELSTEIN:  Objection.

25   Q.  -- that you have no regrets?

I6C7GAL8                    Martin Fernandez – Cross

1            MS. MERMELSEIN:  Objection.

2            THE COURT:  OK, sustained.  Sustained.  Sustained.

3            MS. NOTARI:  May we approach?

4            THE COURT:  OK.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (At the side bar)

2                  MS. NOTARI:  Your Honor, I think it's fair.

3                  THE COURT:  What is the Instagram post?

4                  MS. NOTARI:  It says that it's been a long journey but

5       he has -- he was coming back from Italy to the United States,

6       and he said it's been a long journey, but I have absolutely no

7       regrets.

8                  THE COURT:  Is he talking about his life?  Italy?

9                  MS. NOTARI:  Well, no, I think he is talking about the

10      long journey and this case and he was traveling from --

11                 THE COURT:  Is he talking about the case on Instagram?

12                 MS. MERMELSTEIN:  No.

13                 MS. NOTARI:  Well, we don't know, but I still think

14      it's a fair --

15                 MR. SCHWARTZ:  It's nonspecific.

16                 THE COURT:  I will let you ask that question, but you

17      are now going over the same things over and over.  Frankly,

18      you're torturing the jury, and I don't think you're doing your

19      client a service.  So, you can ask the question about the

20      Instagram post, but otherwise I really want you to move on.

21                 MS. NOTARI:  OK.

22                 (Continued on next page)

23

24

25

1                (In open court)

2    BY MS. NOTARI:

3    Q.  Mr. Martin, do you recall posting on Instagram five days

4    ago?  At this time during your post you were in Italy right

5    before you came back to the United States; is that right?

6    A.  Correct.

7    Q.  And you posted "It has been a very long journey, but

8    absolutely no regrets."  Do you recall posting that?

9    A.  Absolutely.

10   Q.  And it's fair to say that in this case you got your

11   immunity and you have no regrets?

12             MS. MERMELSTEIN:  Objection.

13             THE COURT:  Sustained.

14   Q.  It's fair to say you have no regrets.

15             MS. MERMELSEIN:  Objection.

16             THE COURT:  Is that true?  Do you have any regrets

17   about your conduct in connection with this case?

18             WITNESS:  In connection with this case I do have many

19   regrets, but that statement on Instagram has absolutely nothing

20   to do with this case.

21             MS. NOTARI:  No further questions.

22             THE COURT:  OK.

23             MR. TOUGER:  Your Honor?

24             THE COURT:  Yes, please.  Thank you.

25

I6C7GAL8                         Martin Fernandez – Cross

1    CROSS EXAMINATION

2    BY MR. TOUGER:

3    Q.   Good afternoon.  My name is David Touger, and I represent

4    John Galanis.

5    A.   Good afternoon.

6    Q.   You testified earlier that you thought private equity was

7    not a proper investment for the bond proceeds.  Do you remember

8    saying that?

9    A.   Yes.

10   Q.   Did you ever speak to a man named Raycen Raines?

11   A.   It doesn't ring a bell.

12   Q.   Did you ever speak to a woman named Geneva Lonehill?

13   A.   No.

14   Q.   Did you ever speak to a man named Steven Haynes?

15   A.   It doesn't ring a bell.

16   Q.   Did you ever speak to a man named Tim Anderson?

17   A.   Don't recall.

18   Q.   Did you ever speak to any lawyers at Dilworth Paxson?

19   A.   Not to my knowledge.

20   Q.   Did you ever speak to a woman named Heather Thompson?

21   A.   No.

22   Q.   Did you speak to any lawyers at Greenberg Traurig?

23   A.   During my life I have.

24   Q.   In relation to this case.

25   A.   No, I don't think so.

1   Q.  Did you ever speak to anyone about the Wakpamni bonds

2   besides Jason Galanis?

3   A.  Yes.

4   Q.  Who?

5   A.  Hugh Dunkerley.

6   Q.  Besides those two?

7   A.  Bevan Cooney.

8   Q.  And that was after you had already been signed on as the

9   investment manager, correct?

10  A.  I don't recall the exact timing.

11  Q.  And you spoke to the government about these bonds, right?

12  A.  Correct.

13  Q.  And do you even know what the WLCC is?

14  A.  Now I do.

15  Q.  You didn't know back then though, right?

16  A.  I never --

17  Q.  You never heard that term.

18  A.  I might have, but I didn't remember.

19  Q.  And you have no knowledge about Native American financing,

20  correct?

21  A.  No.

22  Q.  You have never been involved in any Native American

23  financial deals.

24  A.  No.

25  Q.  And you have never been involved with any Native American

1    corporation.

2    A.  No.

3    Q.  And you have no knowledge as to whether the Wakpamni

4    Corporation -- do you know they are the issuers of the bonds?

5    A.  I do.

6    Q.  And do you have any knowledge that they had any lawyers

7    representing them in this case?

8    A.  I don't.

9    Q.  And do you have any knowledge as to whether the Wakpamni

10   Corporation agreed to the terms in the investment agreement?

11   A.  I don't.

12   Q.  Do you have any knowledge whether they were advised by

13   counsel when they signed that investment agreement?

14   A.  I don't.

15   Q.  Do you have any knowledge about how the deal was

16   negotiated?

17   A.  No.

18   Q.  About the months of negotiation that went into making this

19   deal?

20   A.  No.

21   Q.  And you basically have no independent knowledge of this

22   deal whatsoever.

23   A.  Whatsoever, I wouldn't say that.

24   Q.  You have independent knowledge about this deal?

25   A.  What do you mean by that?

I6C7GAL8                     Martin Fernandez - Cross

1    Q.  When you signed on as investment manager, had you done any

2    independent investigation of this bond deal?

3    A.  No.

4    Q.  And yet in your opinion, based on all that vast knowledge,

5    the private equity was not a valid investment for the bond

6    proceeds.

7            MS. MERMELSTEIN:  Objection.

8            THE COURT:  You can answer that.

9    A.  I've been in the business for 20 years; I know what is

10   suitable for an investment management to do.

11   Q.  You're the one sitting there with immunity, right?

12           MS. MERMELSTEIN:  Objection, your Honor.

13           THE COURT:  Sustained.

14   Q.  As a matter of fact, you testified just recently, just

15   before, that when you signed -- would you agree that the first

16   thing you did relative to this deal was sign the investment

17   management agreement?

18   A.  Yes.

19   Q.  And that was the beginning of your involvement, right?

20   A.  Correct.

21   Q.  And didn't you just testify 20 minutes ago that in the

22   beginning you had no questions about the bonds?

23   A.  You can say that.

24   Q.  And when you signed the investment agreement -- you signed

25   it, right?

1   A.  Yes.

2   Q.  That was your signature.

3   A.  It was.

4   Q.  Did you read the document before you signed it?

5   A.  I don't remember every detail of the document, no.

6   Q.  I didn't ask you if you remembered every detail; I asked

7   you do you remember reading the document before you signed it.

8   A.  I don't remember.

9   Q.  So you signed a document without reading it.

10  A.  I didn't say that.

11  Q.  OK.  Did you read the document or did you not read the

12  document?

13  A.  I said I don't remember reading the document.

14  Q.  Would you sign documents without reading them in your

15  normal course of conduct?

16  A.  Usually I wouldn't.

17  Q.  Usually you'd read them first, right?

18  A.  Correct.

19  Q.  So more than likely you read this document before you

20  signed it.

21  A.  Most likely.

22  Q.  And when you signed it, it clearly states in that document

23  that the funds were going to be involved -- were going to be

24  invested in private equity, right?  You read that paragraph.

25  A.  Yes.

I6C7GAL8                         Martin Fernandez - Cross

1    Q.  That's the very beginning when you sign it, and you just

2    testified 20 minutes ago you had no problem, but today you have

3    a problem with the money being invested in private equity.

4              MS. MERMELSTEIN:  Objection to form, your Honor.

5              THE COURT:  The objection is to form?

6              MS. MERMELSTEIN:  Yes, your Honor.

7              THE COURT:  Can you rephrase that, please.

8              MR. TOUGER:  Sure.

9    Q.  Today you testified that in the very beginning you had no

10   problem with the bond deal.

11   A.  Correct.

12   Q.  You read that paragraph before you signed the agreement,

13   more than likely.

14   A.  Correct.

15   Q.  That was the beginning of your involvement in the bond

16   deal.

17   A.  Correct.

18   Q.  And today you're testifying though that private equity is

19   not a valid agreement -- not a valid investment for the bond

20   proceeds.

21   A.  I didn't exactly say it that way.

22   Q.  So you think it is a valid investment for the bond

23   proceeds.

24   A.  Not for the entirety.

25   Q.  Excuse me?

1    A.  You cannot invest the full amount into private equity if

2    you need a yield to be generated by the investment.

3    Q.  Do you know where all the funds were invested?

4    A.  No idea.

5    Q.  No idea, right?

6    A.  No idea, that's what I said.

7    Q.  And I believe you also testified that you believed you were

8    not the only investment manager in this deal.

9    A.  Correct.

10   Q.  So the other funds could have been invested in perfectly

11   legitimate investments, correct, as far as you knew.

12   A.  That's fair to say.

13   Q.  Do you want to change your answer right now that private

14   equity could be a valid investment for the bond proceeds, or do

15   you want to stay with it?

16         MS. MERMELSTEIN:  Objection to the badgering of the

17   witness.

18         THE COURT:  Yes, why don't you just change your tone a

19   little bit.

20         MR. TOUGER:  I will be nicer.

21         THE COURT:  And watch the sarcasm, also unhelpful.

22   But you can ask another question.

23   Q.  Do you want to change your answer now that private equity

24   could possibly be a good investment for the bond proceeds?

25   A.  I can give you the long form if you want to.

I6C7GAL8                    Martin Fernandez - Cross

1    Q.   Excuse me?

2    A.   I can give you the long form if you want to.

3    Q.   I don't know what that means.

4    A.   I will just say what I think it is if you allow me.

5    Q.   I don't know what you're saying.  Is private equity a good

6    investment or not?

7    A.   It depends.

8    Q.   It depends.  It could be or it could not be.

9    A.   Correct.

10   Q.   Right?

11   A.   Correct.

12   Q.   And you have no way of judging in this case whether it was

13   or was not, because, one, you don't know where the other funds

14   were invested.

15   A.   Correct.

16   Q.   Two, you talked to nobody involved on the Wakpamni side of

17   the investment, right?

18   A.   Correct.

19   Q.   Three, you talked to none of the lawyers who negotiated

20   this deal.

21   A.   Correct.

22   Q.   And, four, you have never done any -- you have no

23   involvement with Native American financing, or Native American

24   corporations, or Native American deals, right?

25   A.   Correct.

I6C7GAL8                         Martin Fernandez - Cross

1   Q.  Thank you.

2           Now, you said Calvert is a real company, right?

3   A.  It was incorporated, yes.

4   Q.  It's a real company, it exists.

5   A.  Yes.

6   Q.  And it has real assets, right?

7   A.  What do you mean by that?

8   Q.  It has the WAH securities in it, right?

9   A.  Correct.

10  Q.  And you have no doubt that the WAH securities are real.

11  A.  Sure.

12          MR. TOUGER:  Your Honor, I think this is a good spot

13  to end.

14          THE COURT:  OK.  So why don't we adjourn for the day.

15          We're going to start -- I really would like to try and

16  start -- and I know you all have been so prompt, so thank you

17  for that -- promptly at 9:30 tomorrow.  So there will be

18  breakfast at nine.

19          We have a short day tomorrow, but what we're going to

20  try and do is just take one break of half an hour in the middle

21  and not morning breaks.  Maybe if someone needs to use the

22  restroom, we will take a two minute break.  But we are just

23  going to have one short break and we will have a snack in the

24  middle, and we will leave early but we will try to get as much

25  done as we would otherwise.

I6C7GAL8                         Martin Fernandez - Cross

1        So just remember keep an open mind, don't discuss the

2   case.  And we will start promptly at 9:30 tomorrow.  Thank you.

3        And you can step down.  I will see you tomorrow

4   morning.  Thank you.

5        (Jury not present)

6        THE COURT:  Is there anything we need to talk about

7   before tomorrow, or is there any rulings you want for tomorrow

8   morning?

9        Just to give you a heads-up, I have something tomorrow

10  morning at nine, a short criminal conference, but I want you to

11  be here at 9:10 if you can so that we can address anything.

12       MR. QUIGLEY:  Your Honor, I don't think we have

13  anything for tomorrow.

14       Just in terms of scheduling, I know we were kind of in

15  the midst of discussing that before.  I think we anticipate

16  that this witness will be on cross I would think certainly the

17  entire morning, until 12:30, one o'clock.

18       THE COURT:  Do you all have any estimates without

19  giving away any strategy?

20       MR. TOUGER:  Can he go?

21       THE COURT:  Yes, of course.  Good night.

22       MR. SCHWARTZ:  Long-term estimates or for the cross?

23       THE COURT:  Both.  I mean both the cross and long

24  term, whatever you feel comfortable telling me.

25       MR. TOUGER:  I think I would agree with Mr. Schwartz's

I6C7GAL8                    Martin Fernandez – Cross

1    analysis earlier that Monday is not realistic.  I think that

2    the cross -- and prior to this afternoon we talked, and I think

3    the crosses will take the whole morning.  Well, the cross --

4            THE COURT:  The whole morning meaning the whole day

5    until 2?

6            MR. TOUGER:  No, I don't think that.  But I don't

7    think we will get to the witness they have the problem with the

8    flight.

9            MR. QUIGLEY:  So, we have two relatively short

10   witnesses we can call tomorrow, and then we still have a bunch

11   of e-mails to read in, so that the witness who is flying in we

12   can call her off, because I think between the cross of Martin,

13   the two other witnesses and the e-mails, that will take us at

14   least until early afternoon, midafternoon.

15           THE COURT:  Right.

16           MR. QUIGLEY:  So just in terms of kind of long-term

17   scheduling, that leaves three I think kind of substantive

18   witnesses left for the government, potentially one or two

19   custodians -- depending on whether we can work out a

20   stipulation on a couple of things -- and potentially some

21   e-mails.

22           So, look, Monday, I guess I would tend to agree with

23   defense that I'm not certain that we will rest on Monday.  I

24   think it will be Monday or Tuesday.

25           MR. TOUGER:  Tuesday afternoon.

1          MR. QUIGLEY:  Yeah, because I think each of -- they

2     know who the witnesses are.  I think each of them individually

3     may have cross for one of those witnesses, because they each

4     pertain to one defendant.

5          THE COURT:  All right.  And are there any estimates

6     that you feel comfortable giving me about defense cases?

7          MR. TOUGER:  We will know that better tomorrow.  We're

8     still discussing that.

9          MS. MERMELSTEIN:  Your Honor, with respect to the

10    defense cases, we would like sort of an updated defense witness

11    list.  I think we should have it tomorrow at the close of the

12    case.  That's less than a week before those people may take the

13    stand.

14          Counsel provided witness lists at the beginning of the

15    case.  It's very clear that those were broad in an effort not

16    to be accused of not having disclosed, but they're not

17    realistic, and it's perfectly clear many of those people are

18    not testifying.  So, I think less than a week out the

19    government is entitled to know -- other than the defendants of

20    course -- who is going to be taking the stand.

21          MR. TOUGER:  Your Honor, at this time Mr. Galanis has

22    no witnesses.

23          MR. SCHWARTZ:  I will tell you what I told the

24    government before -- which I think is fair -- one, I will

25    certainly let them know promptly people that we've struck off

I6C7GAL8                    Martin Fernandez - Cross

1    our list so we know who is definitively eliminated; two, I will

2    let them know -- actually we haven't talked about who is going

3    to go first, but we will talk amongst ourselves and let the

4    government know tomorrow who would be called next week; and,

5    three, I think it's fair we can't give you a definitive or

6    close to definitive witness list until the government rests,

7    but you will get it a week ahead, as we've agreed.

8              THE COURT:  Do you think we will be summing up next

9    week?

10             MR. SCHWARTZ:  I don't think so.  I mean what I told

11   the government is I think the following week is more realistic.

12             THE COURT:  All right.

13             MS. MERMELSTEIN:  It's hard for us to have an opinion.

14             THE COURT:  No, I just want to make sure we're

15   building in time for the charge conference before summations.

16             MR. TOUGER:  I agree with the court that we need to

17   build all this time in, and I don't think next week is a

18   realistic ending, so I think we're going into the week

19   afterwards.  And my fear at that point, once we start getting

20   into how long summations are going to be, is that we're getting

21   awfully close to the July 4th weekend.  I don't know what

22   the --

23             THE COURT:  Well, look, first of all, I can sit 9:30

24   to 5:30 every day next week, and I think I told the jury we're

25   going to do that.

1            MR. TOUGER:  Your Honor, I can just tell you right now

2    Mr. Galanis is suffering.  And I'm not just saying this.  I

3    know the Court has been very, very, very -- and I accentuate

4    very -- very nice to Mr. Galanis with his medical conditions,

5    but you've got to remember his day starts at 5 o'clock in the

6    morning.

7            THE COURT:  Yes.  No, I understand.  We will see how

8    fast we're moving.

9            MR. TOUGER:  And the accident he had, you know -- like

10   he could not make it to 5:30 tomorrow, I'll tell you that right

11   now.

12           THE COURT:  Right now, as I said, I think we should

13   sit 9:30 to 5:30.  We will see how things are going.  Do you

14   want to sit next Friday, the 22nd?  I'm happy to do it.

15           MR. TOUGER:  Your Honor,I have to see if I can change

16   some court appearances.

17           THE COURT:  Why don't you try and do that.  Why don't

18   you a try and do that.

19           MR. QUIGLEY:  Your Honor, just out of curiosity, I

20   think it sounds like we may be going into the week of the 25th.

21   There are some jury scheduling issues on the 26th.

22           THE COURT:  Exactly.  That's my worry, that there are

23   two jurors -- I don't recall which ones -- I'm sure Alison

24   remembers -- OK, 8 and 14 have issues on the 26th.

25           MR. TOUGER:  I think we're obviously going to get

I6C7GAL8                    Martin Fernandez - Cross

1    there no matter what.

2              DEPUTY COURT CLERK:  8 and 13.

3              MR. TOUGER:  Maybe we can do the charge conference

4    that date.

5              THE COURT:  Well, we will think about whether we

6    should dismiss them.  We will see how far we've gotten.  I

7    would be inclined to sit next Friday, the 22nd.

8              So, in any event, please check your calendars.  Let me

9    know tomorrow if there is anything you cannot move so that we

10   can tell the jury that we'd like to sit next Friday.  OK?

11             And then as we go along, please just give me as good a

12   sense as you can of timing so that I can build in the charge

13   conference without wasting a day.  OK?

14             MR. SCHWARTZ:  OK.

15             THE COURT:  All right.

16             MR. SCHWARTZ:  I had asked the government last week --

17   and they weren't prepared to answer then -- whether they were

18   still pursuing potentially the argument that the transfer of

19   sale of the restricted bonds was improper.  I think if they're

20   willing to answer that, that would allow us to trim.

21             MR. QUIGLEY:  We will try to circle back to

22   Mr. Schwartz on that either later tonight or first thing

23   tomorrow.

24             THE COURT:  OK.  Yes, if you can do that so that the

25   issue is resolved by the morning one way or the other, that

I6C7GAL8                         Martin Fernandez – Cross

1    would be helpful.

2                    All right, thank you.  Have a good night.

3                    (Trial adjourned to June 13, 2018 at 9:10 a.m.)

```
1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    DANIEL TURNEY

4    Direct By Mr. Quigley  . . . . . . . . . . .2033

5    Cross By Mr. Hassan  . . . . . . . . . . . .2054

6    Cross By Mr. Wenner  . . . . . . . . . . . .2066

7    Cross By Mr. Touger  . . . . . . . . . . . .2066

8    PATRICIA WALCH

9    Direct By Ms. Tekeei . . . . . . . . . . . .2067

10   Cross By Mr. Schwartz  . . . . . . . . . . .2100

11   FRANCISCO JOSE MARTIN FERNANDEZ

12   Direct By Ms. Mermelstein  . . . . . . . . .2115

13   Cross  . . . . . . . . . . . . . . . . . . .2117

14   Cross By Mr. Touger  . . . . . . . . . . . .2126

15   Cross By Mr. Hassan  . . . . . . . . . . . .2127

16   FRANCISCO JOSE MARTIN FERNANDEZ

17   Direct By Ms. Mermelstein  . . . . . . . . .2128

18   Cross By Ms. Notari  . . . . . . . . . . . .2191

19   Cross By Mr. Touger  . . . . . . . . . . . .2251

20                        GOVERNMENT EXHIBITS

21   Exhibit No.                              Received

22    2095, 2224, 2299, 2294 and 1271   . . . . .2001

23    2609    . . . . . . . . . . . . . . . . . .2037

24    904   . . . . . . . . . . . . . . . . . . .2041

25    2616    . . . . . . . . . . . . . . . . . .2044
```

1    813    . . . . . . . . . . . . . . . . .2047

2    2625    . . . . . . . . . . . . . . . .2050

3    1076    . . . . . . . . . . . . . . . . .2074

4    1080 and 1085    . . . . . . . . . . . . .2078

5    1070, 1071, 1072 and 1073    . . . . . . . .2084

6    1082 and 1084    . . . . . . . . . . . . .2089

7    1074    . . . . . . . . . . . . . . . . .2095

8    1075    . . . . . . . . . . . . . . . . .2096

9    1078    . . . . . . . . . . . . . . . . .2098

10    4503    . . . . . . . . . . . . . . . . .2133

11    1601    . . . . . . . . . . . . . . . . .2145

12    1604    . . . . . . . . . . . . . . . . .2149

13    1603    . . . . . . . . . . . . . . . . .2158

14    786-788 and 789-791    . . . . . . . . . . .2163

15    1609    . . . . . . . . . . . . . . . . .2182

16    1610 through 1612    . . . . . . . . . . . .2184

17                      DEFENDANT EXHIBITS

18    Exhibit No.                          Received

19    3760, 3761, 3763, 3764    . . . . . . . . .2233

20

21

22

23

24

25