I6IJGAL1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        16 Cr. 371 (RA)

JOHN GALANIS, et al.,

                Defendants.

------------------------------x

                                          New York, N.Y.
                                          June 18, 2018
                                          8:45 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                          District Judge


                        APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY:  BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
         Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
     LAURA HARRIS
     CRAIG WENNER

I6IJGAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
         Attorney for Defendant Bevan Cooney
4            – and –
     O'NEILL and HASSEN
5        Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ–HASSEN

6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                        Eric Wissman, Paralegal
                         Special Agent Shannon Bienick, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6IJGAL1

1          (Trial resumes)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everyone, you may be seated.

4      I understand we're still waiting for Mr. Cooney.  Is

5  that right?

6          MS. NOTARI:  Yes, your Honor.  He has been staying in

7  Rockaway and his 7:15 ferry pulled in and then they canceled

8  it, but he's en route.  He is not far.

9          THE COURT:  All right.  Okay.  Let's address some of

10 the issues.  I got your numerous letters over the past couple

11 of days.

12         First, on the government's Gerova motion, I am not

13 going to permit the government to introduce evidence of John

14 Galanis' guilty plea in Gerova.  I don't believe Mr. Touger has

15 opened the door to evidence.  He has questioned certain

16 government witnesses about their interactions with Jason

17 Galanis, but I don't think that is a sufficient basis to open

18 the door to evidence of the Gerova conviction absent an

19 explicit argument that John Galanis was unaware of Jason

20 Galanis' history of fraud or he was duped by Jason Galanis in

21 the context of this conspiracy or questioned to that effect.

22         To the extent Mr. Touger makes such an argument or

23 questions a witness about the manner in which Jason Galanis

24 purportedly duped John Galanis, he can still open the door, and

25 he can do so on summations as well, and it would be within my

I6IJGAL1

1    discretion to reopen the case, as the government has suggested,

2    and permit the government to introduce an appropriate evidence

3    at that time.  See the Alcantara case, 674 Federal Appendix, at

4    29-30.

5           As for the anticipated testimony today of a witness

6    who set up the bank account in the name of Sovereign Nations

7    Development Corp., we are in agreement none of the defendants

8    intend to cross-examine him with respect to the witness's

9    involvement in the Gerova investigation.  The immunity order

10   compelling him to testify in grand jury proceedings in

11   September 2015 or the fact that some of the WLCC bond proceeds

12   in the Sovereign Nation accounts were used at John Galanis'

13   direction to pay for the witness's legal fees in connection

14   with Gerova.  Is that right?

15           MR. TOUGER:  Yes, your Honor.  There is just one issue

16   with Mr. McMillan.  Do I deal with that now or do you want to

17   wait till you finish?

18           THE COURT:  When is that witness testifying?

19           MR. TOUGER:  That is the question as far as we need to

20   talk about Mr. Galanis' condition.  I don't know when you want

21   to deal with this one issue.

22           THE COURT:  Sorry.  To deal with what issue?

23           MR. TOUGER:  Did you get my letter?

24           THE COURT:  I got your letter, but it seemed like we

25   are going to see how things go.  You didn't seem like you were

I6IJGAL1

1    asking me to do anything.

2             MR. TOUGER:  I have spoken to Mr. Galanis.  I have not

3    seen him since Friday when the condition was slightly worse,

4    but it is much worse.  It got worse over the weekend, and it is

5    much worse today, although I would say he stopped taking -- he

6    takes the medicine in the morning.  He did not take it today

7    because --

8             THE COURT:  It seemed like the issue was side effects

9    from the medication, correct?

10            MR. TOUGER:  I can tell you today Mr. Galanis is

11   definitely not fully here, and I feel very troubled going

12   forward when his speech is slurred, he is dizzy, he is

13   confused.  I asked him a few questions about the case, and I am

14   not getting -- I am getting less than coherent answers.

15            So I don't think it is proper to go forward with

16   testimony.  I think we can do the reading of the emails because

17   that is a physical document.  He has read them already so there

18   is no testimony regarding them.  Obviously, we can do legal

19   argument.

20            THE COURT:  How long has he been off the medication?

21            MR. TOUGER:  He stopped this morning.

22            THE COURT:  Just this morning?

23            MR. TOUGER:  Well, the symptoms didn't get really bad

24   until Sunday.

25            THE COURT:  When you say the "symptoms," you mean the

I6IJGAL1

1   side effects of the medication?

2            MR. TOUGER:  Side effects.  On Friday he was dizzy,

3   but still we had a very coherent conversation and he was able

4   to concentrate and do the trial prep he was doing.  It wasn't

5   until Saturday evening where things started spiraling out of

6   control.  Obviously, this morning he didn't take the medicine.

7            What I was sort of hoping we could get him back to MDC

8   early so he could see a doctor and maybe get some other type of

9   painkiller so he could not be, although he is willing to sit

10  here in pain, that is not the problem.  He did that in the

11  beginning of the trial.  He knows a few days after the

12  accident.  I am not asking for anything about that.

13           Basically we have a defendant who is not here.  He is

14  here, but mentally he is just not -- and he has been, I can

15  honestly say he has been quite helpful to me during the trial,

16  but besides that, the defendant has a right to be able to

17  comprehend his trial, what is going on.  At this point in time

18  I don't think he is really there.

19           I know there is -- I talked to the government prior to

20  the court coming to the courtroom -- I know there is a witness

21  they flew in they want to get on they want to say has nothing

22  to do with Mr. Galanis.  He is the BIT Board --

23           MR. QUIGLEY:  That witness offered no testimony

24  about --

25           MR. TOUGER:  But in the end, your Honor, I just don't

I6IJGAL1

1    think it is proper to go forward with testimony on a trial.

2    Every witness impacts in some way another defendant even if

3    they're not being mentioned.  Obviously, I don't want to deal

4    with McMillan today, although I believe his testimony will be

5    rather short considering all of the --

6            THE COURT:  What?

7            MR. TOUGER:  His testimony will be very short

8    considering all the limitations -- I mean, my cross is rather

9    short.  I still think I'll need Mr. Galanis' advice, which

10   leads me to the issue, which is the government wants to bring

11   out testimony that John Galanis told Mr. McMillan do not take

12   any instructions from Jason Galanis.  It is clear from the 3500

13   material and also clear from my conversations --

14           THE COURT:  Let's just discuss today.  What is the

15   government's position?

16           MR. QUIGLEY:  So, your Honor, a couple of things.

17           This is obviously a surprise to us.  We found out

18   about it 5, 10 minutes ago.  I think we would ask the court to

19   at least consider allowing us to call the witness who is here

20   from the board of Burnham Investors Trust.  She is a practicing

21   attorney, she has a lot going on, and she flew in for this

22   today.  She doesn't really touch upon John Galanis at all.  I

23   also think he should be allocuted on his current mental state

24   so the court can make an informed decision.

25           THE COURT:  That I'll do.  I also want you to call a

I6IJGAL1

1    doctor from the facility today and find out how long this pain

2    medication even stays in your body, I mean how long could it be

3    that there are side effects that result from this medication.

4    So I want to get a better understanding of that.

5            MR. QUIGLEY:  Understood, your Honor.

6            THE COURT:  I find it frankly surprising that this is

7    just happening now.

8            MR. TOUGER:  I am as surprised as the court is, your

9    Honor.  It has been a slow, according to Mr. Galanis, and I can

10   just tell from my -- look, I have been communicating with

11   Mr. Galanis almost every day except Saturday and Sunday.  I was

12   there on Friday for a few hours.  Friday was just --

13           THE COURT:  This was apparently happening last week,

14   right?

15           MR. TOUGER:  What do you mean, happening last week?

16           THE COURT:  When did he start taking this medication?

17           MR. TOUGER:  As I said in my letter, he didn't start

18   taking the medicine right away because he knew, they told him

19   there were side effects, so he tried to get through it without

20   taking the medicine.

21           Then last week he started taking the medicine because

22   the pain was just getting too great.  As the court knows, this

23   is difficult, every day is a difficult day for Mr. Galanis, no

24   fault of anybody's, but his day starts at 5:00 am and he

25   doesn't usually get back to the MDC until 8:00 o'clock, give or

I6IJGAL1

1    take.  It is a long day for any 75-year-old man, especially a

2    57-year-old man that has the problems he has.  As the pain got

3    greater last week, he started taking the medicine.

4            As of Friday, it was only affecting the fact he was

5    dizzy, and the fact he is sitting in a wheelchair doesn't

6    really sort of counteract the fact he is dizzy.  He won't fall

7    down sitting in a wheelchair.  I can tell you right now my

8    conversations with him this morning are not what they were on

9    Friday, and I trust Mr. Galanis when he sent me the email he

10   sent me last night that -- I don't think he is trying to delay

11   this trial.

12           I don't think this is a false -- there is no gain to

13   him to delay the trial.  It is what -- I mean, there is

14   absolutely no gain.  If anything, we want to get the trial

15   moving so we don't hit the July 4th weekend.  This is not any

16   kind of delaying tactic.  It just is what it is.  I don't know

17   how else to say that, your Honor.

18           Obviously, he doesn't want a mistrial.  That is why he

19   went off the medicine, and he'll deal with the pain in his back

20   and neck, he'll deal with that pain.  I think by not taking the

21   medicine hopefully this morning, by tomorrow he'll be just

22   dizzy again and hopefully the dizziness is not, when he was

23   able to comprehend during the dizziness, we didn't bring it up

24   because there was nothing to bring up.  We were getting through

25   it.  It wasn't an issue especially since he is in a wheelchair.

I6IJGAL1

```
1          When you can't really concentrate and you don't really
2    understand everything that is going on, I don't think you
3    should be sitting at a trial.  I understand the government's
4    argument that this witness has nothing to do with Mr. Galanis,
5    but in the end I have to err on the fact that I don't think
6    anybody should be -- should have -- the other thing is, your
7    Honor, I hope he could get back to the MDC and maybe, because
8    you can't go to medical at 6:00 o'clock at night or 7:00
9    o'clock at night.  If he gets back now and they can -- if he
10   gets back before 4:00 o'clock, I think it is before 4:00 they
11   close down, then maybe he can be seen there and they can work
12   out something there.
13          THE COURT:  I am going to swear in Mr. Galanis now.
14   Could you please put Mr. Galanis under oath.
15          (Defendant John Galanis was duly sworn)
16          THE COURT:  So explain to me, Mr. Galanis, how you're
17   feeling today.
18          DEFENDANT GALANIS:  I am dizzy, your Honor.  I don't
19   have --
20          THE COURT:  Move the microphone closer, please, Mr.
21   Touger.
22          DEFENDANT GALANIS:  I am confused about little
23   matters.
24          For example, when the guard asked me my number this
25   morning, I gave him my pin number, and I called my wife
```

I6IJGAL1

yesterday and it was my son's phone number.  I am just not

functioning normally.  The only thing I can put it at would be

the -- and the dizziness would be fine, it is just I am not as

focused as I should be.

THE COURT:  Do you think it would be difficult for you

to assist in your defense, to follow the testimony and to say

whatever you'd like to say to your attorney about the

testimony?

DEFENDANT GALANIS:  I do, your Honor, particularly

with the witness, you know, it is just one of the witnesses is

the witness that concerns just me, and that's what I would be

concerned about.

THE COURT:  With respect to the witness that doesn't

affect you, do you feel like that witness can proceed, the BIT

Board witness, do you have any objection to that?

Do you feel like you're with it enough to talk to Mr.

Touger about that?

DEFENDANT GALANIS:  If it doesn't affect me, I don't

know why.  Whatever David says.  If it doesn't affect me, I

don't know what difference does it make to me?

THE COURT:  All right.

MR. TOUGER:  I can honestly say Mr. Galanis would not

have given that answer in a different mood.

THE COURT:  All right.  So we'll listen, have the

reading of the exhibits and --

I6IJGAL1

1          MR. TOUGER:  We have a lot of legal arguments to make.

2     I would waive Mr. Galanis' appearance for that so he could get

3     back and we could knock out all these legal arguments that we

4     have.  I know I can -- I didn't read the letters intently, but

5     I know there were a lot of letters going back-and-forth.

6          THE COURT:  I am ready to rule on most things this

7     morning.  Mr. Touger, in good faith, you honestly feel like we

8     can't have the BIT Board witness today?

9          MR. TOUGER:  Your Honor, can we have a sidebar

10    conference?

11         MS. MERMELSTEIN:  I have legal from MDC on my cell

12    phone.  I can't just call a doctor there.  They wanted to know

13    what the medication is so that they can try to follow up and

14    get your Honor the answers you're asking for.

15         THE COURT:  Do you have the --

16         MR. TOUGER:  I have it here.

17         THE COURT:  I am going to spell it, D U L O X E T I N

18    E.

19         MS. MERMELSTEIN:  D U L O X E T I N E?

20         THE COURT:  Yes.

21         MS. MERMELSTEIN:  Thank your Honor.

22         THE COURT:  So you wanted to meet at sidebar.

23         (off-the-record discussion)

24         (At sidebar)

25         MR. SCHWARTZ:  I have no particular dog in this fight,

I6IJGAL1

1   but the witness scheduled for this morning does pertain to Mr.

2   Archer.  We are ready to go.  If this is really a 24-hour wish,

3   then fine, but if it persists for more than that, I am going to

4   renew my request for severance.

5           THE COURT:  There is not going to be a severance even

6   if that means he is not taking pain medication, there won't be

7   a severance.

8           MR. TOUGER:  He stopped taking the medication.  He is

9   feeling better this morning than he was last night and I fully

10  expect it will march out of his system.  Even cocaine marches

11  out of your system in 24 hours, in three to four hours.  I am

12  not looking to delay more, and the BIT Board will go tomorrow

13  and -- you are asking me?

14          THE COURT:  I am not asking you anything.  For the

15  record, I haven't asked you anything.

16          MR. TOUGER:  You haven't.  I understand everybody's

17  position here, and believe me, I want this trial, as I said

18  before, I want this trial to move forward because I don't want

19  this jury sitting close to deliberations, close to July 4th.

20          I fully want to start summations next Monday.  That is

21  my goal, but as a defense lawyer, I have a hard time saying

22  okay, let's do testimony without a client sitting next to me

23  who is comprehending the whole situation.  That is where I am

24  at.  I mean just a suggestion, we could read in stipulations

25  because they're physical documents.

I6IJGAL1

1          MR. QUIGLEY:  I don't even know -- she is subpoenaed,

2     so she has to be here.  I don't even know what things she would

3     have to move around to testify tomorrow, but perhaps one

4     option, have you talked to MCC?

5          MS. MERMELSTEIN:  I spoke to the Legal Department.

6     They're tracking down Medical.  I have given them Ms. Cavale's

7     number here and my cell phone and they understand we're all

8     waiting on them, but they don't have an answer.  They have to

9     look into it.

10          MR. QUIGLEY:  The email reading will take, this is our

11     last batch, so it will take a little while.  Perhaps we do

12     that, the stips, see how he is doing and then we --

13          THE COURT:  That is a good idea.

14          MR. TOUGER:  Good idea.

15          THE COURT:  In the meantime, speak to the doctor and

16     see how long this even stays in your system, and if this is

17     really related to this purported condition?

18          MR. TOUGER:  Sure.

19          THE COURT:  We'll do that.  Just since we are now

20     running late, tell me what I need to rule on to do this, to do

21     the readings?

22          MR. QUIGLEY:  There is 1401, which e-mail they say is

23     privileged.  We say is not.  There is three or four emails Ms.

24     Notari moved on.  It will be helpful to us to get a ruling on

25     the minutes, the board minutes also.

I6IJGAL1

1          (In open court)

2          MS. NOTARI:  Your Honor, are you going to rule on the

3     emails?

4          THE COURT:  Yes, but we are in open court.  I want to

5     clarify.  I am ready to rule on a number of motions that have

6     been made.  I have questions on some, but this is an effort not

7     to keep the jury waiting, just reiterate for me what you need

8     rulings on.  There is 1401, which is the privilege issue?

9          MR. QUIGLEY:  Then there is --

10         THE COURT:  Why don't I rule on 1401.  I am going to

11    keep the exhibit out on the basis that it is privileged.  It

12    seems that Mr. Weiss inadvertently produced this document to

13    the SEC.  In any event, Mr. Weiss is not the privilege-holder;

14    Mr. Archer is.  Mr. Archer clearly asserted the privilege with

15    respect to another copy of this identical document which I

16    never ruled was subject to the crime fraud exception or

17    otherwise was not privileged, so I see no basis for now finding

18    that this email is not privileged, as it clearly seems to have

19    been made in the course of Mr. Archer securing legal advice

20    from Mr. Weiss.  That is my ruling on 1401.

21         What else do you need for this morning's readings?

22         MR. QUIGLEY:  2281, 3205, 3250 and 3251.

23         MS. NOTARI:  Your Honor, those pertain to the Cooney

24    email.  I wanted to clarify for the court before the court

25    rules on this that at an earlier date I filed a motion to

I6IJGAL1

exclude Government's Exhibit 2280, and I am handing that up.

The court may recall I filed a motion to exclude that profit and loss statement specifically because the government was proffering it in the guise of -- I think they can speak to that, but I think they were arguing that to show the relationship with Gary Hirst and for other reasons, but I specifically excluded that because it was 404 (b) evidence.  In my mind, there was no notice, I didn't know where -- this was prejudicial, and specifically I wanted to be on notice if this was evidence that I needed to consider and deal with in this case.

Now the court precluded that evidence and now they're trying to use this email which is completely related to that, yes, Eric reclass 1.9 million of Thorsdale-related transfers of investment economic income.  This is communication relating to this profit-loss and Mr. Cooney's conversations with his accountant, which there is no answer.

It is very speculative and it really requires expertise in accounting as to what investment income is, and so if the court is inclined to allow this kind of evidence, it completely changes our case and it is so prejudicial.  We had no notice of it.  I think that the government is now seeking to exhibit 2281, which is again the Gary Hirst, which we have no problem with the cover letter coming in, and they're agreeing to that.

I6IJGAL1

1          If the purpose of these documents is for the

2     communications with Gary Hirst, we have no problem with the

3     cover letter coming in, but as far as any communication with

4     Mr. Cooney's accountant, you know, this is just, it is entirely

5     prejudicial and we would have to consult, ask for an

6     adjournment to consult, retain an accountant because --

7          THE COURT:  Just to confirm, is 2281 the profit and

8     loss statement that was attached to the email?

9          MR. QUIGLEY:  2281 is a separate email, your Honor,

10    between Gary Hirst --

11         THE COURT:  Just tell me why you need the financial

12    information?

13         MR. QUIGLEY:  We are willing to redact the numbers.  I

14    think we would like to just keep in the headers just to show it

15    was a financial statement without getting into the numbers.

16         MS. NOTARI:  I am not sure which one.

17         MR. QUIGLEY:  2281, because that goes into the nature

18    of the relationship.

19         THE COURT:  We'll talk about 2281.

20         MS. NOTARI:  2280 is excluded.  Your Honor ruled on

21    that, that is not coming in.

22         THE COURT:  I am sorry.  I thought you were re-raising

23    2280.

24         (Multiple voices)

25         MS. NOTARI:  This is another attempt to bring this

I6IJGAL1

1    before the court, and you have already ruled that is not

2    admissible, that it is all related, and my motion in limine was

3    specifically tied up in this 1.9 million.

4              THE COURT:  Right but they just said they're going to

5    delete the numbers.

6              MS. NOTARI:  Which one?

7              THE COURT:  2281?

8              MR. QUIGLEY:  Yes.

9              MS. NOTARI:  I am concerned about 2252.

10             THE COURT:  Let's do one at a time.  On 2281, the

11   government has agreed to redact the substantive financial

12   information?

13             MR. QUIGLEY:  Right, to leave in the headers like the

14   header his address, personal checking account, redact

15   everything under that, redact the numbers, but just so to show

16   it was a financial statement.

17             THE COURT:  Given the government is going to redact

18   the substantive financial information from 2281, I am going to

19   allow it.  The significance is Mr. Cooney sent Mr. Hirst his

20   financial statement, so I am going to permit the headings to

21   remain, but I agree the actual state of his finances is of no

22   consequence.  So that is 2281.

23             You wanted to be heard on 2252; is that right?

24             MS. NOTARI:  Yes.  2252 is tied to the court's ruling

25   on 2280, that we previously argued that this profit and loss

I6IJGAL1

statement, $1.9 million -- our purpose in addressing that

document was so that we would not allow this profit and loss

statement to come into evidence, and now they're trying to

bring it up again in this email, but more importantly, this is

an email between Mr. Cooney and his accountant, and it is just

completely based on a question, Mr. Cooney's comments, but

there is no -- but it is a communication that was -- that

actually didn't even -- the government later on spoke to

Mr. Fulton, they interviewed him, and it didn't stay on the

books as that.

        So now this is just so prejudicial and it is not

something that could just go into evidence because it talks

about investment income and it requires for the jury to

understand like a complete analysis of how investment income is

calculated, how assets, how loans, and it is just very

prejudicial.

        THE COURT:  The government just wants to show you

received the money, Cooney received the money from Thorsdale.

        MR. QUIGLEY:  Exactly.  The fact he received $1.9

million from Thorsdale is relevant to his relationship with

Jason Galanis and particularly in light of defense arguments

about the relationship between different  co-conspirators in

this case.

        MS. NOTARI:  Your Honor, they're putting on bank

records.  No one is disputing that Mr. Cooney received $1.9

I6IJGAL1

1    million or nobody is disputing -- there is going to be evidence

2    of bank records, but in terms of Mr. Cooney saying -- it just

3    appears to be something it is not.

4            MR. QUIGLEY:  It appears to be Mr. Cooney saying he

5    got $1.9 million from Thorsdale.  Whether it is investment

6    income or loans is highly relevant to his relationship with

7    Jason Galanis.  I would note again, your Honor, we dropped this

8    in a footnote in our brief.  This is an exhibit that has been

9    on our exhibit list since March 19th.

10           MS. NOTARI:  This is an exhibit, I specifically

11   objected to this whole line.  I didn't gather every piece of

12   evidence, but I specifically filed an in limine because it was

13   so prejudicial, and the court precluded this evidence.

14           MR. QUIGLEY:  I don't think that is accurate, your

15   Honor.  I don't think the court ever ruled.

16           THE COURT:  You objected to a single exhibit, 2280,

17   right?

18           MS. NOTARI:  If you look at the reasoning in my motion

19   in limine, we can pull that up.  It was all about the prejudice

20   and not being on notice and that this was going to be used for

21   the jury to speculate about -- it is just, it is just not -- it

22   goes so far afield of the bonds, and we're not disputing, no

23   one will be standing up disputing the fact Mr. Cooney received

24   money from Thorsdale.

25           MR. QUIGLEY:  Right, nobody is disputing that, but we

I6IJGAL1

1    have to be able to prove it, and this is the way to prove it.

2              MS. NOTARI:  This was just one conversation with Eric

3    Fulton, and actually Mr. Cooney is not savvy in understanding

4    investment income, and it didn't stay on the books as

5    investment income, and so now the jury's going to be left with

6    the impression that it was investment income when it wasn't.

7              THE COURT:  Does it matter to the government's case

8    whether it was classified as investment income or not or

9    whether, you know, he tried to have it reclassified as

10   investment income?

11             MR. QUIGLEY:  Judge, in the sense that he, in other

12   places, other emails, some of which are in evidence, or we're

13   going to put into evidence, where he discusses these as loans

14   versus investment income, and the moving target nature of how

15   he got the money goes to the nature of his relationship with

16   Jason Galanis and the state of mind.

17             THE COURT:  Let me ask this --

18             MS. NOTARI:  Mr. Hassan will --

19             THE COURT:  I was just going to ask, you said a minute

20   ago, Ms. Notari, that no one is disputing that he received $1.9

21   million.

22             MS. NOTARI:  There are loans going, there were loans

23   going back-and-forth.  As we know from the testimony, he was

24   wired --

25             MR. HASSAN:  Your Honor, the government is about to

I6IJGAL1

1    submit with their summary witness charts based on bank records,

2    plentiful bank records that show I think $5.5 million going

3    from Thorsdale to Mr. Cooney.  That is not disputed in terms of

4    that money being transferred.

5             THE COURT:  Let me ask you a question.  Would you

6    consent to, or would you stipulate that Mr. Cooney received

7    $1.9 million?

8             MR. HASSAN:  The reason that this is misleading is

9    because he received far more than $1.9 million from Thorsdale.

10   This is simply an accounting.  This is between him and his

11   accountant how to classify various forms of income for a

12   projection that was excluded and was actually never resulted in

13   any financial transactions.

14            The projection this email is asking for, this $1.9

15   million reclassification was itself excluded.  That I believe

16   was 2280 we talked about before.  This is simply about how he

17   internally is classifying various forms of income.  When you're

18   in the line of business Mr. Cooney is in, it is -- whether

19   something is -- how something is classified has to do with how

20   you pay your taxes and what you're doing with the money.

21            It is the intricacies of his personal finances.  This

22   has nothing to do with whether he received the money or not.

23   That is all demonstrated amply in the bank records that the

24   government has already submitted and will elaborate on with

25   their charts.

I6IJGAL1

1              MR. QUIGLEY:  Two things about that:

2              Number one, the bank records refer to the proceeds of

3      the bond issuance.  This is a little bit earlier than the bank

4      records.  In any event, I think it is a little bit -- I am not

5      sure how the defendant's own statement can be unfairly

6      misleading against that defendant.  He is acknowledging he

7      received in the lead-up to the bond issuance $2 million from

8      Mr. Galanis.  Whether that is investment income or loan

9      income --

10             THE COURT:  That is my question.  If they were willing

11     to stipulate to the transfer of the money, does it matter to

12     you whether he was asking his accountant to reclassify it as

13     investment income or not and, if so, why?

14             MR. QUIGLEY:  I think it does, your Honor, because it

15     speaks to the nature of that relationship.  We are not

16     intending to argue -- one second.

17             (Off-the-record discussion)

18             THE COURT:  Give him a minute, please.

19             MR. QUIGLEY:  I don't think it makes a huge deal.  The

20     point is he is acknowledging getting almost $2 million.  We

21     think, I would say as opposed to a stipulation, the email is

22     independent probative value because it is Mr. Cooney's own

23     statement.  I am seeing if there is anything that can be

24     redacted here.  We would be willing to redact -- I don't

25     think -- give me one second.

I6IJGAL1

1           THE COURT:  Take your time.

2           (Off-the-record discussion)

3           MR. QUIGLEY:  I don't think we are intending to argue

4    it was improper for him to reclassify it as investment income.

5           THE COURT:  That is why I am asking if there is a way

6    to get in the transfer of the 1.9 million from Thorsdale, and

7    Thorsdale, of course, is an entity controlled by Jason Galanis

8    and was used in the course of the WLCC bond scheme, but leave

9    out the fact he is asking his accountant to reclassify it as

10   investment income?

11          MR. QUIGLEY:  That is what --

12          THE COURT:  I haven't ruled yet.  I am asking.

13          MR. QUIGLEY:  I am not aware of any -- the bank

14   records pertain to money coming out of the Wealth Assurance

15   Private Client account in large measure.  I don't think this is

16   the same thing.  This is why we marked this email because it

17   shows that he is admitting he got $2 million.

18          THE COURT:  Look, as I said, I am going to let you get

19   in the fact he got that money.  My question is do you need this

20   extra piece of him saying this to his accountant or not?  Yes?

21          MR. HASSAN:  The problem here, your Honor, is that

22   this $1.9 million figure is not some particular transfer from

23   Thorsdale.  The government -- this is December 2014.  In

24   October 2014 he got a $5 million transfer from Thorsdale to buy

25   the bond, right?  This $1.9 million number is not some

I6IJGAL1

1    individual receipt of funds from Thorsdale.  It is simply an

2    almost arbitrary number that is being asked to be reclassified.

3    It is very much internal to his own finances, to let it in

4    independently as as a number out there to muddy the scene how

5    much money he got.

6              THE COURT:  How much money he got is absolutely

7    relevant.  The only thing I am hesitating about is the

8    interaction or discussion with his accountant how to classify

9    it.

10             MR. HASSAN:  This 1.9 million wasn't a transfer from

11   Thorsdale, ever.  That is the problem.  That is why it is

12   confusing.  It is not indicative of any particular transfer.

13             MR. QUIGLEY:  It says I got $1.9 million from

14   Thorsdale.  Mr. Hassan's point is there may have been multiple

15   transfers.  Still the fact he is acknowledging getting almost

16   $2 million from Thorsdale I think it is very relevant.

17             I am not aware of a way to kind of splice this email.

18   We are not going to stand up to the jury in closing and argue

19   that this email, because he says reclassify it as investment

20   income, is itself a crime, itself indicative of that -- the

21   reclassification itself is indicative of anything, but I don't

22   see from the face of the email how we can kind of slice it up.

23             MS. NOTARI:  Your Honor, perhaps we can hold off on

24   this one and we can see if we can reach resolution.

25             THE COURT:  I think we should do it now because you

I6IJGAL1

1    need this for the morning.

2           MR. HASSAN:  I ask the government, do you have some

3    accounting of what you think this $1.9 million is?

4           THE COURT:  Look, he is talking to his accountant

5    about the $1.9 million.

6           MR. HASSAN:  Again there is no the 1.9 million.

7           There are transfers back-and-forth, which the

8    government has all of these bank records and they're planning

9    on putting them into evidence that show individual transfers.

10   Those are completely relevant and actually tell the story,

11   whereas this is actually something that is internal to Mr.

12   Cooney's personal finances, not external in terms of money

13   coming in and out.

14          THE COURT:  I wanted to look back at the ruling on

15   2280 which I am doing now.  That was just about the profit and

16   loss so it is not relevant to this.

17          MR. HASSAN:  This is the prelude to that profit and

18   loss statement.  That profit and loss statement is what was

19   produced.

20          THE COURT:  Right, but I mean it doesn't get at the

21   issue I am focused on now which is the reclassification of the

22   $1.9 million as investment income or not.

23          What I had ruled on is 2280, and I had said that it is

24   an email Mr. Cooney sent to Mr. Hirst attaching his profit and

25   loss statement.  I am not going to allow that in.  It is

I6IJGAL1

probative, if anything, of the relationship between Cooney and

Hirst, but there will be other evidence of that.  In light of

its scant probative value, it is barred by -- again, back to

the government, is there any way to get out the fact he got the

money without focusing on the back-and-forth with his

accountant how to classify it?

MR. QUIGLEY:  We are not going to go -- again, we are

not going to highlight that point to the jury.  We are not

going to argue it.  The salient point is he got 1.9 million of

Thorsdale, at least 1.9 million of Thorsdale-related transfers

and he is classifying that as income.  Whether it is investment

income or not, I don't think matters. if the court wanted us to

redact "investment," I guess we could do that.

MR. HASSAN:  2280 is what his accountant produced in

response --

MR. QUIGLEY:  Sorry.  If we can just say classify,

redact, yes, Eric, right and classify 1.9 million of

Thorsdale-related transfers as income.  That way redact the

bottom email also.

THE COURT:  You redact the rest of it, is that the

idea?

MR. QUIGLEY:  He got the 1.9 million.  The email would

read classify, take out yes, Eric, re, right, classification

1.9 million of Thorsdale-related transfers as redaction income,

thanks, Devon.

I6IJGAL1

1              (Off-the-record discussion)

2              MR. QUIGLEY:  I think that is the bare bones we can

3    do.

4              (Off-the-record discussion)

5              THE COURT:  You can take out the, yes, right, Eric

6    reclassify 1.9 million of the Thorsdale-related transfers as

7    income.

8              MR. HASSAN:  The problem is then we have to go down

9    this road where that never happened.  His taxes didn't reflect

10   that.  That was simply for to produce a projection, 2280, which

11   is excluded, which was never used, and so this puts us in a

12   position of having to go and -- this is like a whole other 404

13   (b) issue where we have to go down a road to show something

14   that never happened that was not noticed.  2280 is the result

15   of this conversation.

16             THE COURT:  What do you mean that never happened?

17   This is what he wrote.

18             MR. HASSAN:  This is what he wrote.  This prompted his

19   accountant to create a projection which you excluded, as Ms.

20   Notari mentioned earlier, your Honor excluded.  This is simply

21   part of that process, so this is just hinting at something that

22   was excluded, and now we have -- there is no way to, no way to

23   tell the story without bringing in that was excluded and say

24   this never actually happened.

25             THE COURT:  But he got the transfers even if there

I6IJGAL1

1     wasn't a $1.9 million specifically.

2              Look, if there is some stipulation, I think it is

3     absolutely relevant he got these transfers from Thorsdale.  If

4     there is some stipulation you want to enter into to avoid any

5     confusion that may result from this particular correspondence,

6     I'll hear you out on that, but I am not going to keep the

7     government from admitting a document where your client

8     specifically said how to classify $1.9 million of the transfers

9     as income.

10             I don't have a problem with having them do that, but I

11    am trying to work with you to see if there is some way to make

12    it less --

13             MR. HASSAN:  Well, the problem is they're going to

14    show that he got far more than $1.9 million from Thorsdale.

15    This is just an alternative theory to their main theory, and

16    the only logical place for it to go is down this rabbit hole of

17    what the purpose of reclassification that is.

18             Maybe we can talk to the government, but my

19    inclination is they're introducing this just to make it look

20    like he got more money.  He got $5.5 million in transfers from

21    Thorsdale during their specific time period that they are

22    testifying to later today, so --

23             THE COURT:  Just to be clear, would you stipulate to

24    the amount of money, the amount of transfers that he got from

25    Thorsdale?

I6IJGAL1

| | |
|---|---|
| 1 | MR. HASSAN:  Yes.  We are not arguing with the amount |
| 2 | of -- |
| 3 | THE COURT:  Is the government okay with that or does |
| 4 | the fact he characterized it as income matter to you? |
| 5 | (Off-the-record discussion) |
| 6 | MR. QUIGLEY:  Judge, I think it is different because |
| 7 | he says other places it was a loan, right, and he is saying |
| 8 | this is income.  That is different. |
| 9 | THE COURT:  I will let the government get that fact |
| 10 | in, that he was saying it should be characterized as income. |
| 11 | MR. HASSAN:  Okay.  So that does make it impossible |
| 12 | for us to not bring out the fact that statement that was |
| 13 | excluded. |
| 14 | MS. NOTARI:  I think we have to bring in an accountant |
| 15 | to talk about investment income.  Specifically, we are |
| 16 | forgetting the fact this is in response to a question that is |
| 17 | being asked of him by his accountant.  You can't just -- |
| 18 | THE COURT:  Let the question in then.  That is fine. |
| 19 | MR. QUIGLEY:  We would be happy to redact almost |
| 20 | everything in here except for the fact he says classify this |
| 21 | Thorsdale-related income, related revenue as income. |
| 22 | MR. HASSAN:  Redacting it seems like he got another |
| 23 | $1.9 million he never got. |
| 24 | THE COURT:  Leave it as is then.  All right.  I ruled |
| 25 | on 2281.  I am also denying the motion as to 3205, 3251 and |

I6IJGAL1

1    3252.  None of the exhibits are being offered as 404 (b).

2    They're being offered as direct evidence to show Mr. Cooney's

3    motive to participate in the conspiracy and his relationship

4    with certain alleged co-conspirators.  Sorry, we just talked

5    about 2252.

6          3251 is also probative of Mr. Cooney's motive because

7    it is an email in which he states he did not have any income in

8    2015, and similarly Exhibit 3205 is an email in which he

9    provides information relating to his efforts to rent an

10   apartment with Jason Galanis.  So those exhibits are coming in.

11         What else do you need for the morning?

12         MR. QUIGLEY:  That is everything for the emails.  It

13   would be helpful to have a ruling on the minutes.  I don't

14   think if --

15         THE COURT:  Why don't we bring the jury in and hear

16   what we can, and I will rule.  We'll see if, in fact,

17   Mr. Galanis is hopefully feeling better and I will rule before

18   the testimony.

19         MR. QUIGLEY:  Ms. Moynihan is in the hallway.  Do you

20   want her to stay around the courthouse?

21         THE COURT:  I think so.  Mr. Galanis, how are you

22   feeling?  Do you feel any better?

23         DEFENDANT GALANIS:  I don't know.  There is no change,

24   your Honor.

25         MR. QUIGLEY:  Can I run out and talk to her?

I6IJGAL1

1          THE COURT:  Tell her the truth, we are going to try

2     our best to put her on today.  We can't promise her.  That is

3     what I would do --

4          MR. QUIGLEY:  Will do.

5          THE COURT:  -- with our apologies.  Bring the jury.

6          MS. MERMELSTEIN:  I have email from an MDC lawyer

7     saying, "I have an answer.  Call me."

8          THE COURT:  Do you want to take a minute now and call.

9          MS. MERMELSTEIN:  I think so.  Whatever your Honor

10    wants.

11         THE COURT:  Go ahead and take a minute and call.

12         Thank you.

13         (Recess)

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I6I7GAL2

1          MS. MERMELSTEIN:  So, your Honor, I just spoke to a

2    representative from the MDC legal department who has spoken to

3    both an MDC pharmacist and an MDC physician.  The medication

4    that Mr. Galanis is referencing is self-carrying, meaning he

5    has the pill bottle with him; it's not administered each dose

6    by MDC; so they don't have a way to confirm when he last took

7    it.  A dose lasts 17 to 18 hours, and its half life is 12

8    hours, so if he last took it yesterday morning, he shouldn't be

9    experiencing any side effects from it.

10         The pharmacist and doctor also noted that it's not an

11   expected side effect of this medication to experience confusion

12   or disorientation; that the common side effects are drowsiness,

13   headache and nausea, and that apparently Mr. Galanis e-mailed

14   the MDC physician yesterday saying I seem to be getting

15   confused.  That doesn't make sense to them.  And in the event

16   that was a side effect, it's their view that it should have

17   worn off by now.  I don't know where that leaves us.

18         THE COURT:  OK.  So why don't we go ahead with the

19   reading.  Hopefully Mr. Galanis will feel better by the morning

20   break, and we will be able to proceed.  All right?  So why

21   don't we bring the jury in.

22         MR. QUIGLEY:  One quick procedural thing.  So these

23   stipulations were drafted when there was a five defendant case,

24   and based on an exhibit list that was prepared three months

25   before trial.  Some of them are quite long.  Some of them deal

I6I7GAL2

1     with exhibits that we're not offering, so I don't intend to

2     read in the entirety of every stipulation; I intend to offer

3     the stipulations and read in a couple relevant paragraphs, but

4     they'll all be in evidence.

5               THE COURT:  That's fine.  And are you going to redact

6     the portions later with respect to exhibits that you didn't

7     admit?

8               MR. QUIGLEY:  We can do that, your Honor.

9               THE COURT:  I mean it may be that defense wants to

10    admit them.  I don't know.

11              MR. SCHWARTZ:  Look, I've never quite understood the

12    practice of reading these long authenticity stipulations into

13    evidence.  The point of them is to provide a foundation for the

14    exhibits.  If they just want to move the underlying exhibits in

15    that are subject to the stipulation, and move the stipulation

16    in without spending the extra 15 minutes reading, speaking for

17    myself I'm fine with that.  If you want to do it as Mr. Quigley

18    proposes, I'm fine with that as well.

19              MR. QUIGLEY:  By and large the stipulations are either

20    authenticity or business record stipulations.  There are a

21    couple of parts in the stipulations, for example, the e-mail

22    stipulation where it talks about certain people being blind

23    cc'ed on e-mails.

24              THE COURT:  I'm going to leave it to you.

25              MR. SCHWARTZ:  The one thing I want to raise is it

I6I7GAL2

1     will come up during this e-mail reading the fact of Jason

2     Galanis' arrest in connection with Mr. Archer, and this is

3     going to come up in the context of that e-mail that we've

4     discussed several times that has the SEC press release.  And

5     what we have agreed to do -- the government laid out in a

6     letter yesterday -- is they have redacted that entire bottom

7     e-mail -- I haven't seen it, but I assume they've redacted the

8     entire bottom e-mail, and we propose that at that point your

9     Honor instruct the jury that the parties have agreed that that

10    bottom e-mail provides news of or relates the fact that Jason

11    Galanis had been arrested on September 24, 2015, and then you

12    would provide the instruction that you did previously with

13    respect to Mr. Cooney with respect to Mr. Archer, meaning it

14    was for unrelated conduct, Mr. Archer was not subject to that

15    investigation, and he didn't have any knowledge of the

16    underlying conduct to the investigation until the arrest became

17    public.

18           MR. QUIGLEY:  That's right, your Honor.  I should have

19    mentioned that before.  We put that in our letter of yesterday,

20    and I think we reproduced the instruction that was given during

21    the testimony of Francisco Martin with respect to Mr. Cooney

22    and we would be fine with a parallel instruction here regarding

23    Mr. Archer.

24           THE COURT:  All right.

25           MR. SCHWARTZ:  So someone will signal when it's time.

I6I7GAL2

1          THE COURT:  All right.  And can I say, you know, the
2     bottom of this e-mail references a news article indicating that
3     Jason Galanis was arrested for unrelated conduct that you heard
4     about previously on September 25, 2015 and then read the
5     instruction that I've given previously?
6          MR. QUIGLEY:  Yes.  I think the date of the arrest was
7     actually the 24th.
8          THE COURT:  Oh, is that right?
9          MR. SCHWARTZ:  Yes.  I had mistakenly said out loud it
10    was the 25th, but it was the 24th.
11         That's fine with me.  Look, in a perfect world I would
12    prefer that you not reference a news article because I just
13    feel that tempts people to go look for it, but it relays the
14    fact or relays news of Jason Galanis' arrest on unrelated
15    conduct on the 24th.
16         THE COURT:  All right.  So I will just say the bottom
17    of this e-mail references news of Jason Galanis' arrest for
18    unrelated conduct that you've heard about previously on
19    September 24, 2015.
20         MR. SCHWARTZ:  Right.
21         THE COURT:  I'm not going to correct the record with
22    respect to the September 25th issue.
23         MR. SCHWARTZ:  The record is not wrong on that.  I
24    have said it outside the presence of the jury.
25         THE COURT:  Why don't I just say in September 2015.

I6I7GAL2

1          MR. SCHWARTZ:  Well, I think the date actually does

2    become important now, and you have evidence of the date, but

3    the important thing is just to make clear that this was the

4    same arrest you were talking about last week.

5          THE COURT:  Right.  So I'm going to say the bottom of

6    this e-mail references news -- should I say that is redacted?

7          MR. QUIGLEY:  Yes.

8          MR. SCHWARTZ:  Yes.

9          THE COURT:  That's redacted, references news of Jason

10   Galanis' arrest for unrelated conduct that you've heard about

11   previously on September 24, 2015, and then I will read that

12   instruction and say as I've noted before, his arrest was for

13   unrelated conduct, and then I will read the instruction I've

14   given previously.  Good.  Thank you.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I6I7GAL2

1          (In open court)

2          (Jury present)

3          THE COURT:  Good morning, everyone.  Thank you for

4    your patience.  I'm sorry to keep you waiting.  I promise you

5    that we are working hard in here and value your time, and so

6    thank you.  You can be seated.

7          You may proceed, Mr. Quigley.

8          MR. QUIGLEY:  Thank you, your Honor.  At this time the

9    government offers a number of stipulations.  We offer

10   Government Exhibit 4500, stipulation concerning bank records,

11   4501, 4502, 4504, 4505 into evidence.

12         MR. SCHWARTZ:  No objection.

13         THE COURT:  They will be admitted.

14         (Government Exhibits 4500, 4501, 4502, 4504, 4505

15   received in evidence)

16         MR. QUIGLEY:  And then can we pull up Government

17   Exhibit 4501, Ms.Sheinwald.

18         THE COURT:  Raise your hand if your screen is working.

19   Good.  Excellent.  OK.

20         MR. QUIGLEY:  And can we just publish?

21         THE COURT:  For those who aren't, feel free to move

22   and look over someone's shoulder.  Thank you.

23         MR. QUIGLEY:  Publish paragraph 18 of this

24   stipulation.

25         Agent Kroll, could you read that?

I6I7GAL2

A.   Government's Exhibits 1265, 1271, and 1284 are true and
accurate copies of documents produced by Bevan Cooney to the
Securities and Exchange Commission.

Q.   Take that down.  Can we blow up Government Exhibit 4502.

Your Honor, at this time pursuant to this stipulation,
we would offer Government's Exhibits 1100, 1101, 1110, 1112,
1102, 1103 through 1105, 1106 through 1107 and 1108 through
1109.

THE COURT:  OK.  They will be admitted.

(Government Exhibits 1100, 1101, 1110, 1112, 1102
received in evidence)

(Government Exhibits 1103 through 1105 received in
evidence)

(Government Exhibits 1106, 1107, 1108, 1109 received
in evidence)

Q.   Then, Ms.Sheinwald, can we pull up Government Exhibit 4504
and go to paragraphs 22 and 23.

And then, Agent Kroll, if you could read the second
sentence of paragraph 22.

A.   The e-mail address darcher@rosemontcapital.com was bcc'd on
the e-mail contained in Government Exhibit 2008.

Q.   If you can read the second sentence of the e-mail in
paragraph 23.

A.   The e-mail account bcooney@gmail.com was bcc'd on the
e-mail contained in Government Exhibit 2255.

I6I7GAL2

1    Q.  If we could take that down.

2                Your Honor, at this time I would ask to read to the

3    jury Government Exhibit 4505, which is a short stipulation.

4                THE COURT:  Go ahead.

5    Q.  It is hereby stipulated and agreed between the parties that

6    Archer Diversified TCG LLC is a New York limited liability

7    company which filed articles of incorporation on September 12,

8    2014.  The articles of organization were filed by Clifford A.

9    Wolff, Esquire, 1401 East Broward Boulevard, Victoria Park

10   Center, Suite 204, Fort Lauderdale, Florida 33301.  The

11   beneficial owner of Archer Diversified TCG LLC was at all times

12   Jason Galanis.  Devon Archer at no point had an ownership

13   interest in Archer Diversified TCG LLC, nor is there any

14   evidence that Mr. Archer had any affiliation, association, or

15   involvement with Archer Diversified TCG LLC.

16               Government's Exhibits 225 and 226 are true and correct

17   copies of records relating to Archer Diversified TCG LLC and

18   are admissible as government exhibits at trial.  Archer

19   Diversified Investments LLC is a different entity from Archer

20   Diversified TCG LLC.  Archer Diversified Investments LLC was

21   established and controlled by Devon Archer and had an account

22   at Morgan Stanley.

23               Your Honor, again pursuant to this stipulation, we

24   would offer Government's Exhibits 225 and 226.

25               THE COURT:  Yes, they will be admitted.

I6I7GAL2

1          (Government Exhibits 225 and 226 received in evidence)

2          MR. QUIGLEY:  Can we publish, Ms.Sheinwald, what is in

3    evidence as Government Exhibit 225.

4          And, agent, can you read the first paragraph of this.

5    A.  Agreement.  The agreement made as of August 13, 2014, the

6    effective date between 260 WB LLC, a Delaware limited liability

7    company, having an address at c/o Saunders Properties LLC, 6616

8    Lange Circle, Dallas, Texas 75214 ("Seller") and Archer

9    Diversified TCG LLC, a New York limited liability company,

10   having an address at 152 West 57th Street, 47th floor, New

11   York, New York 10019 ("Purchaser").

12   Q.  Can you read the paragraph below that.

13   A.  "Unit:  Seller agrees to sell and convey, and purchaser

14   agrees to purchase, unit number 1/2C ("unit") in the building,

15   ("Building") known as the 260 Broadway condominium

16   ("Condominium") and located at 260 Broadway, New York, New

17   York, together with a 6.5811 percent undivided interest in the

18   common elements (as defined in para 6) appurtenant thereto, all

19   upon and subject to the terms and conditions set forth herein.

20   Q.  And can you can stop there.  I think you said Broadway,

21   it's actually 260 West Broadway.

22          And if we could go ahead to page 13 of this document,

23   Ms.Sheinwald, and highlight the name of the seller's attorney.

24   If we could publish what is in evidence as Government's

25   Exhibits 226.  We will leave that for now.

I6I7GAL2

1      Your Honor, at this time the government offers

2  Government's Exhibits 214, 214A, 306, 308, 322, 327, 330, 432,

3  435, 508, 515 to 520, 523, 605, 610, 624, 640, 641, 641A, 643,

4  645, 1050, 1212, 3224 and 3274.

5      THE COURT:  All right.  They will be admitted.

6  Thanks.

7      (Government Exhibits 214, 214A, 306, 308, 322 received

8  in evidence)

9      (Government Exhibits 327, 330, 432, 435, 508 received

10  in evidence)

11      (Government Exhibits 515 to 520 received in evidence)

12      (Government Exhibits 523, 605, 610, 624, 640 received

13  in evidence)

14      (Government Exhibits 641, 641A, 643, 645, 1050

15  received in evidence)

16      (Government Exhibits 1212, 3224 and 3274 received in

17  evidence)

18      MR. QUIGLEY:  Sorry.  One more, Government Exhibit

19  4100.

20      THE COURT:  That will be admitted as well.

21      (Government Exhibit 4100 received in evidence)

22      MR. QUIGLEY:  We will proceed to e-mail reading now,

23  your Honor.

24      And at this time the government moves to introduce

25  Government's Exhibits 251, 340, 750, 1262, 1281, 1368, 1453,

I6I7GAL2

1   2003, 2004, 2008, 2021, 2025, 2054, 2065, 2066, 2067, 2069,

2   2074, 2097, 2102, 2103, 2113, 2121, 2122, 2203, 2210, 2211,

3   2219, 2220, 2221, 2222, 2228, 2243, 2247, 2252, 2253, 2255,

4   2257, 2259, 2269, 2281, 3201, 3205, 3208, 3250, 3251 and 3275.

5           THE COURT:  They will be admitted.

6           (Government Exhibits 251, 340, 750, 1262, 1281

7   received in evidence)

8           (Government Exhibits 1368, 1453, 2003, 2004, 2008

9   received in evidence)

10          (Government Exhibits 2021, 2025, 2054, 2065, 2066

11  received in evidence)

12          (Government Exhibits 2067, 2069, 2074, 2097, 2102

13  received in evidence)

14          (Government Exhibits 2103, 2113, 2121, 2122, 2203

15  received in evidence)

16          (Government Exhibits 2210, 2211, 2219, 2220, 2221

17  received in evidence)

18          (Government Exhibits 2222, 2228, 2243, 2247, 2252

19  received in evidence)

20          (Government Exhibits 2253, 2255, 2257, 2259, 2269

21  received in evidence)

22          (Government Exhibits 2281, 3201, 3205, 3208, 3250

23  received in evidence)

24          (Government Exhibits 3251 and 3275 received in

25  evidence)

I6I7GAL2

Q.   Could we publish what is in evidence as Government Exhibit
750, please.
A.   E-mail dated January 13, 2014 from Devon Archer to John
Burnham, subject follow up.

         Jon, thank you kindly for lunch today.  I thoroughly
enjoyed it.  As discussed, the following will make up the
balance of the syndicate for Cor Advisors acquisition (name to
be changed to Burnham Equity Holdings upon close and FINRA
approval).  The entity is owned and controlled by me, Jason
Sugarman, and Bevan Cooney.  The following individuals/groups
have executed term sheets indicating an interest and range of
participation to be invested through Burnham Equity Holdings:

         Wealth Assurance AG, 4.5 million equity back stop.
         Dan McClory Group, $2.5 million.
         Andrew Godfrey (Revenue Group), .25 to .50 million.
         Nurlan Abdov, $1 million.
         Weston Settlemier, .5 million.
         Donald Storino Group, $ .25 to .5 million.
         These named individuals/groups will not have controls
in Burnham Equities Holdings.  Many thanks, and speak to you
soon.  Best, Devon."
Q.   Please publish Government's Exhibits 2003.  E-mail from
Jason Galanis to Devon Archer and Bevan Cooney dated February
12, 2014.

         I was brought a deal today.  These guys got approved a

I6I7GAL2

1    $217 million tax free bond issuance by a Native American tribe.

2    The proceeds are exempt from the required on-reservation usage.

3    They need an underwriter for the municipal ponds.  We can

4    direct part of the proceeds I am told.  Digging into it.  Same

5    concept as I introduced a few months ago ... except they got it

6    done.  Jason.

7           And can we blow up the first page of the attachment

8    and highlight the attention.  You can take that down and pull

9    up Government Exhibit 2004.

10          And can you read Mr. Cooney's reply to that e-mail,

11   Agent Kroll, just the top e-mail.

12   A.  Mr. Cooney's reply to Bevan, cc'ing Devon Archer to Jason

13   Galanis, sent Wednesday, February 12, 2014:  We will gladly

14   help direct some of Mr. Griffos funds.

15   Q.  Pull up what is in evidence as Government Exhibit 3205 and

16   go to page 2 and put that alongside page 3.  And I will read

17   the e-mail beginning from Jocelyn Cloder on February 19, 2014

18   to Alexis Gluckman, cc Bevan, subject 24 North Moore, 4B, lease

19   rider, lead paint rider.  Thanks so much for your help Alexis,

20   you are nearing completion.  Please find the attached remaining

21   docs that need to be filled out and signed.  Here is a list of

22   checks to be overnighted to Jocelyn Cloder, Town Soho, 337 West

23   Broadway, New York, New York 10013.  First month, $13,000 made

24   out to Scorpio Revocable Trust; security deposit, 26,000, made

25   out to Loeb Block & Partners trust account; broker fees,

I6I7GAL2

1   $11,700, made out to the Corcoran Group; $11,700, made out to

2   Town Soho LLC; application fee, 450, made out to Hoffman

3   Management; move-in fee, $500, made out to Hoffman Management.

4   The remaining letters I need are two personal reference letters

5   and a letter from your employer (or business manager or CPA).

6   Thanks so much.   Jocelyn.

7           Go to the next e-mail up from Alexis Gluckman, page 1.

8   A.   From Alexis Gluckman:  Hi, Bevan, I'm filling out the

9   information sheet and I need to know how you want me to answer

10  the following questions:  1, current occupation; 2, yearly

11  income; 3, employer and address; 4, 2 personal references (not

12  employer or relatives); 5, will you be bringing pets into the

13  building?  If yes, what kind; 6, name of all people who will

14  reside in the unit; 7, will you maintain other residences; 8,

15  how did you hear about the availability of the unit; 9, do you

16  want window guards installed?"

17  Q.   From Bevan Cooney to Alexis Gluckman, Thursday, February

18  20, 2014:  Private equity; 800K; BOE Capital, self-employed;

19  621 Caddie Court, Incline Village, NV 89451; one pet, Boswell,

20  the 8 pound Yorkshire Terrier; Bevan Cooney, Rachel Cooney,

21  Jason Galanis, Monet Berger; yes, we own a home in Ohio;

22  windows guards are not necessary.

23          Go to Government Exhibit 3201.

24  A.   E-mail dated Monday, February 17, 2014, subject New York

25  apt lease, from Bevan to alexisg@fultonmeyer.com.

I6I7GAL2

| | |
|---|---|
| 1 | Alexis, we are getting a corporate apartment in New |
| 2 | York.  Sent you the details.  I am not handling any of the |
| 3 | financial side of the lease.  My business partner Jason Galanis |
| 4 | will be coordinating all of that.  All we need to do is get the |
| 5 | tax returns, bank ref, etc. ... together.  Please e-mail Elaine |
| 6 | at Marmot for a reference letter as well.  Thanks. |
| 7 | Q.  Pull up what is in evidence as Government Exhibit 1262, and |
| 8 | put up pages 1 and 2 side by side, and then just highlight on |
| 9 | the second page where it says amount and the beneficiary. |
| 10 | Agent Kroll, if you could read the e-mail on March 3, |
| 11 | 2014 at 2:03 from Jason Galanis on page 1. |
| 12 | A.  Coon ... thank you.  I'll get you the other half in two |
| 13 | weeks. |
| 14 | Q.  From Bevan Cooney, Monday March 3, 2014, to Jason Galanis, |
| 15 | subject outgoing wire confirmation. |
| 16 | That will work.  Great.  Thanks. |
| 17 | Then if we could pull up what is in evidence as |
| 18 | Government's Exhibits 2008 from Jason Galanis to Gary Hirst, |
| 19 | subject WAH shares, March 23, 2014 at 1:45 a.m.: |
| 20 | Gary, what do we need to get the WAH shares issued to |
| 21 | the shareholders?  I've kept everyone at bay until now, which |
| 22 | is remarkable.  Ezekiel put in 1 million already and has agreed |
| 23 | to do another 2 million for Valorlife.  He needs his shares.  I |
| 24 | also need Thorsdale shares for the Morgan Stanley account now. |
| 25 | We hired Appleby a couple weeks ago as registrar.  Can we act |

I6I7GAL2

1    now?  Jason.

2              Pull up what is in evidence as Government Exhibit

3    3208.

4    A.  E-mail, subject wire proof, from Bevan to Alexis Gluckman

5    dated March 25, 2014.

6              Alexis, can you send me the wire proof for the

7    $400,000 for Burnham Investment from last year.  Also three

8    other outgoing wires I think to Thorsdale, 100K, 50K, 35K.

9    Thanks.

10   Q.  Pull up what is in evidence as Government Exhibit 2210.  On

11   May 10, 2014 Jason Galanis wrote:  At the risk of being

12   simplistic, I'm trying to organize my thoughts into an area of

13   activity by outlining the four areas of investment.  The

14   intention is to define what is being built, frame how it is

15   organized, attempt to set priorities, and ensure that we have a

16   reference point to make sure we are tracking each other's

17   priorities.  I think the below needs a pipeline document as

18   well.  I will begin filling that in tonight.  Let me know if

19   I'm missing something.  Financials, investment banking, asset

20   and wealth management, insurance, alternative/private equity,

21   real estate, energy/resources, renewables, technology, special

22   opportunities, structured finance.

23   A.  Bevan then wrote:  Road map.

24   Q.  On May 11, 2014, Devon Archer wrote:  Yep.  It's all here

25   and there is a lot of beauty in simplicity.  I feel more

I6I7GAL2

1    organized in this thinking.

2              Pull up what is in evidence as Government Exhibit

3    2211.

4    A.  E-mail from Jason Galanis to Devon Archer, dated Sunday,

5    June 1, 2014, subject ours to take.  Attachment WA 2013 audit

6    report Eng (with two signatures) pdf.

7              Just to make the balance sheet more real, here

8    (attached) are the PwC audits for WAAG for December 31.  We got

9    them issued a couple weeks ago.  In USD, about $1.35 billion on

10   balance sheet, $97 million in revenue.  Valor is $5.1 billion

11   now.  $400 million in revenue in 2013.  Fiscale Scuda (tax

12   amnesty) in Italy is happening this year.  Valor did $1.95

13   billion in sales the year that last happened (in 2010).  So,

14   the P&L for the company will be well over $1 billion in

15   revenue, and could be $2 billion, especially with the Lombard

16   UK team joining us.  For me, personally, I did not envisage a

17   year ago being in control of a $1 to 2 billion revenue company.

18   With Archie's new enterprising global profile, having full

19   control over the platform would lead to world domination on P/E

20   trades we are looking to do.  Aligns the media and political

21   stature Mr. Archer now enjoys with the financial stature.  Add

22   the golden smile, and we could be massively effective.  I've

23   set up this to be a BOE dominated company.  Ours to take.

24   Greek.

25   Q.  If we could just highlight the first two pages of the

I6I7GAL2

1    attachment.  If we could publish what is in evidence as

2    Government Exhibit 2021, and put up the first two pages side by

3    side.  E-mail from Hugh Dunkerley June 26, 2014 to Jason

4    Galanis and Dan McClory.

5            Dan and I catch up lunch next week.  You name the day.

6    ATB, H.

7            J, we should have a catch-up lunch again as there is

8    so much happening.  We have lots to report on from our end.

9    You name the day so Dan and I can come to Beverly Hills for

10   lunch and brainstorm, like we did last time.  ATB, H.

11   A.  Then on June 27, 2014, Holmby, jason@holmbycompanies.com

12   wrote:  Bev, if you're in LA maybe you want to join.  I'm

13   working with Dan and Hugh on capital vehicles that result in us

14   controlling discretionary funds.  Dan is such a good salesman

15   that if I point him he will get it done, and we will end up

16   with the money to invest.  We are working on the BDC which he

17   wants to head.  We also have Fondinvest in contract.  A $1.6

18   billion French alternative investment business.  25 year track

19   record and all super institutional.  Greeky plans for it.  Dan

20   is a work horse and we need to keep maximum alignment there.

21   Q.  June 27, 2014, Devon Archer wrote to Holmby and Bevan

22   Cooney:  We need discretionary funds at our command soonest.

23   Are you still in Carib?

24   A.  Then Jason responded:  I'm laser focused on summer cash

25   hole, and discretionary.  I don't need anymore deals until we

I6I7GAL2

1   can pull triggers ourselves.

2   Q.  Can we pull up what is in evidence as Government Exhibit

3   2122 from Clifford Wolff to Sebastian Momtazi and Devon Archer,

4   sent 7/9/14, Archer Diversified TRG LLC.

5          Seb, Jason Galanis is going to purchase a condo using

6   the above name and Devon's cache.  The company is using your

7   office address.  It is possible certain documents will arrive

8   in the name of AD TRG.  I am listed as the registered agents,

9   so the documents could have my name as well.  Keep an eye out

10  as well.  Everything should get sent to my office, but I want

11  to be proactive and put the deal on your radar.  Thanks.

12  Cliff.

13          Pull up what is in evidence as Government Exhibit 251

14  and go to the page ending in WLCC2196, which is page 3.  E-mail

15  from Theresa Felix.

16          Dear clients, the office of Caldonian Trust (BVI) will

17  be closed from August 4 through 8, 2014 in recognition of our

18  BVI 60th emancipation celebrations.

19          The e-mail above that is from Gary Hirst to

20  jason@holmbycompanies.com, Jared Galanis, and the e-mail above

21  that is from --

22          And can you read, Agent Kroll, beginning on page 2 of

23  the document, the e-mail from jgalanis@me.com to Timothy

24  Anderson, Steven Haynes and Michael Murphy.  Actually, strike

25  that, it's just a forward.

I6I7GAL2

1           Move up to the first page, on August 4, 2014 at 10:38

2   a.m. Anderson Timothy wrote:  Yes, will it be possible to get

3   the annuity documents all this week?

4   A.   Then J. Galanis wrote:  Strength does not come from

5   physical capacity; it comes from indomitable will.

6   Q.   And there is a yes above that?

7   A.   Above that?  Yes, from J. Galanis to Timothy Anderson.

8   Yes.

9   Q.   From Timothy Anderson to Raycen Raines, Monday August 4,

10  2014:  OK.  It looks like we may be able to sign this week and

11  close next.  Details to follow.  Tim.

12          Can we pull up what is in evidence as Government

13  Exhibit 2219.  On August 16, 2014 jason@holmbycompanies wrote:

14  The path I see is Harvest and Wakpamni fortifies.  Burnham &

15  Co. has EV of $44 a share.  We acquire Swiss Life Lichtenstein

16  book.  Adds $45 to 50 EV per share.  We dedomicile Topco to

17  Switzerland, Dublin or Hong Kong and proceed to do list on LSE.

18  With Harvest and the portfolio scale, we will trade near EV.

19  See below the Deloitte chart on P/EV.  Very close to

20  centi-time.  If we can convert any reasonable percentage of the

21  policies holders in-house product.  Full on centi-time.  The

22  path is clear and executable.

23  A.   Devon Archer then wrote:  From your lips to God's ears.

24  Q.   Jason Galanis wrote:  You've enabled it all.  But for you,

25  Burnham died ten times.  But for you there is no Chinese.  But

I6I7GAL2

1  for you I couldn't do my part.

2  A.  Devon Archer responded:  Very kind.  Thank you.  Takes a

3  village.

4  Q.  Can we pull up what is in evidence as Government Exhibit

5  2221.  I will read the full page 1 and 2 side by side.  On

6  September 6, 2014 at 3:44 p.m. Jason Galanis wrote:

7          "Steve, per our discussion we need term sheet for the

8  proposed acquisition of a controlling interest in Atlantic

9  Asset Management.  Founded in 1992, Atlantic Asset Management

10  is a multi-strategy asset management firm, based in Stamford,

11  Connecticut, specializing in fixed income, overlay and

12  alternative strategies, independent and employee owned.

13  Atlantic manages $1.9 billion fixed income strategies, plus the

14  $7.1 billion in overlay strategies.  GMTD is the proposed

15  acquirer with right to assign to HCN if acquirers desire.  1.5

16  times revenue is purchase price.  $3.6 million adjusted revenue

17  excludes certain noncore revenue streams (see below).  Less

18  $1.8 billion in bank debt (which I believe we need to tie to

19  profit.  Consideration should be cash to pay off bank, 50

20  percent cash on the balance, with the rest tied to an earn-out

21  based on client retention.  Other factors are various equity

22  interests that Atlantic has in other ventures.  They are

23  disclosed starting on page 14 of the attached ADV.  However,

24  they are no disclosed in enough detail for us to evaluate them,

25  whether or not they should be included in the above purchase

I6I7GAL2

1    price.

2              Stop on that e-mail there.  And, Agent Kroll, if you

3    can continue reading from the e-mail from Devon Archer on

4    September 6 at 15:59.

5    A.  To Jason Galanis:  Tremendous, let's roll it up into a

6    Guggenheim story and tell everyone to pound sand.

7    Q.  On September 6, 2014, at 4:10 p.m. jason@holmbycompanies

8    wrote:  Exactly my thoughts.  If we buy Fondinvest and

9    Atlantic, we'll have $20.9 billion firm-wide assets by my

10   calculation, without giving effect to Swiss Life, $7 billion or

11   UBS Life.  Could get silly.  I need to dilute the relevance of

12   Jon and his morons so I can function like more than a hunchback

13   helper.  Getting sick of their attempted humiliations.

14   A.  Devon then responded:  I sent a letter back to Bit

15   yesterday saying I can't deny doing business with you basically

16   ... take it or leave it.  With that we have an Opco Holdco.

17   Can run out of my office co-locate with Guffey family office.

18   One block from Mustache ville.  Burnham Financial with Andrew

19   running interference.  Devon Archer.

20   Q.  Pull up what is in evidence as Government Exhibit 2222, and

21   if you can read Jason Galanis' reply to that e-mail on

22   September 6 at 4:44 p.m.

23   A.  Super comforting, Arch, especially as I take the Tribeca

24   plunge.  Got to earn to keep up with my rapper spending.

25   Q.  On September 6, 2014 Devon Archer wrote to

I6I7GAL2

1    jason@holmbycompanies.com, re Atlantic Asset Management:  Me

2    too.  Plus tuition for three for 16 years gross of private

3    school and then 12 years of college god willing.  Hence I

4    needed the pep talk yesterday to let go and sign this

5    exclusivity away from me for realty.

6    A.  Jason@holmbycompanies responded:  Realty has served you

7    well.  You've leveraged the crap out of it with all of your

8    inventory and international context that you're close to

9    monetizing.  If you thought about it, you've benefited from

10   five years of expenses (5 million?), a 5 million exit kiss,

11   plus dozens of monetizable contacts as a direct result.  No

12   reason to look back on it in anyway except it was really shrewd

13   top to bottom.  This chapter will be the real earner now.

14   Q.  Pull up what is in evidence as Government Exhibit 2228.

15   And can you read, Agent Kroll, beginning with the e-mail from

16   Holmby on September 30, 2014 at 9:28 a.m.

17   A.  This is an alternative to mssb.

18   Q.  From Devon Archer on September 30, 2014, at 9:55, subject

19   requested a meeting Tuesday or Wednesday, to Holmby

20   jason@holmbycompanies.com:  Spoke to Gene at MS and they'll

21   make the exception to hold the bond for me.  That said let's

22   discuss if we want to.  I can move to DB today just want to

23   preclear they're fine with it which they will be.  We're

24   certain to get lift with DB as well.  They're very open and one

25   of my college teammates is my banker there.  Let's discuss this

I6I7GAL2

1    morning.

2              Pull up what is in evidence as Government Exhibit 340.

3    A.   On September 29, 2014 Eugene Schatz wrote:  Devon, please

4    excuse been hit with conference calls all day I will call you

5    tomorrow morning if OK.  Gene.

6    Q.   September 30, 2014 at 10:35 p.m. Devon Archer wrote to

7    Eugene Schatz:  Thanks.  Please do.  I also tried to buy a DTC

8    eligible muni bond today and Catherine seems to be thoroughly

9    confused.  She wrote an e-mail asking for the bonds to be

10   delivered before I pay for them?  Will have to move funds back

11   to DB to execute the purchase if you cannot handle.  Please get

12   up to speed so you can discuss it with me when you call back.

13             If we pull up what is in evidence as Government

14   Exhibit 2054, from Jason Galanis to Bevan Cooney, Devon Archer,

15   October 10, 2014:  Guys, this is not the final.  But gives you

16   an idea of where we are going.  It will appear very buttoned

17   down and institutional.

18             Can we go to the page 3 of the attachment and just

19   blow up the bottom.  Can we pull up what is in evidence as

20   Government Exhibit 2243, and beginning with the e-mail I will

21   read that e-mail from Maria Santana sent Thursday, November 13,

22   2014 to Hugh Dunkerley and Bevan Cooney, re addendum to 1920

23   Bel Air Road:  Please sign the attached addendum ASAP and send

24   back to me to release the wire.  Thank you.

25   A.   Hugh Dunkerley then responded:  Maria, signed and attached.

I6I7GAL2

1    ATB, Hugh.

2    Q.   Maria Santana wrote:  Need buyer signature to release his

3    funds to you.

4    A.   Then Bevan wrote to Jason Galanis, subject addendum 1920

5    Bel Air Road, sent Thursday, November 13, 2014:  Done to the

6    done.

7    Q.   Can we pull up the attachment, Ms.Sheinwald, and highlight

8    the signatures.  Pull up what is in evidence as Government

9    Exhibit 2065 from Jason Galanis to Devon Archer and Bevan

10   Cooney, 11/20/2014.  Honey trail.  And if you could pull up the

11   attachment.

12           Issuer Wakpamni Lake/Oglala Sioux, issuer objectives

13   are to lock in a low cost of capital and to arbitrage the delta

14   of investment returns generated by a diversified private equity

15   portfolio in order to grow tribal assets and increase

16   on-reservation capital investment.  $500 million ten year

17   taxable municipal special reserve bonds, 7.0 rate, investment

18   grade rating sought, subject to obtaining credit enhancement

19   support from Assured Guaranty of Build of America Mutual, two

20   leading monoline municipal financial guaranty insurers, use of

21   proceeds:  Fund an interest reserve of $125 million and

22   purchase of $375 million indexed annuity from Valor Group, $6

23   billion insurance carrier founded in 1997, indexed annuity is

24   linked to the value of a separately managed account managed by

25   affiliates of Fondinvest, SMA investment strategy to invest in

I6I7GAL2

1    a diversified portfolio of global private equity investments

2    through the purchase of LP interests in professionally managed

3    private equity funds.  Fondinvest is the manager of the number

4    one ranked FOFs in Europe with annualized return of 21 percent.

5    Fondinvest majority shareholder is Rosemont Seneca Bohai LLC,

6    Burnham Securities (or Bonwick?) to advise on the placement and

7    structure of the credit enhancement.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6IJGAL3

1    Q.  If we can read Govenment Exhibit 2247.  The first

2    paragraph.  The press release at the bottom on November 25th,

3    2014, Jason Galanis wrote, Wealth Assurance Holdings

4    Acquisition notice, Wealth Assurance announces it completed the

5    acquisition of 100 percent of Valor Life from a Vaudoise, V A U

6    D O I S E, Assurances Holdings, S.A.  The closing of the

7    transaction followed receipt of all necessary regulatory

8    approvals.

9    A.  Devon Cooney wrote, what a release, five knuckle release.

10   Q.  On November 25th, 2014, at 10:21 am, Jason wrote, ha, ha,

11   ha, a biggest accomplishment, also first cash positive of the

12   business.

13   A.  Devon responded, refreshing having a business, the cash

14   flows, that cash flow positive day one.  We have arrived.

15   Q.  Government Exhibit 2067, can we pull up from Jason

16   Sugarman, subject, VL Assurance Fund, December 19, 2014 to Gary

17   Hirst, we're in biz.  Thanks.

18   A.  On December 19, 2014, Jason holmbycompanies, Jason Galanis

19   who weasels getting shit done.

20   Q.  December 20, 2014, Devon Archer wrote to Jason Galanis, CC

21   Bevan Cooney, subject VL Assurance Fund.  Weasels win.

22        Pull up what is in evidence as Government Exhibit

23   2253.  I'll read beginning from email from Elizabeth to Jason

24   Galanis on January 12th, 2015.  Jason, the account debited is a

25   Bank of Ireland account in Europe.  As this was the account

I6IJGAL3

1   where we had Euro available.  I'll ask whether or not if they

2   have information on this kind regards.

3   A.   That message is forwarded from holmby, Jason at

4   holmbycompanies dot com.

5   Q.   January 12, 2014, 7.  Bevan Cooney at least somewhere in

6   transit J L.

7   A.   Jason at holmbycompanies responded yeah, stressful.

8   Q.   Bevan Cooney wrote super stressful having no liquid honey.

9            Can we pull up what is in evidence as Government

10  Exhibit 2257.  On January 20, 2015, at 4:52 pm Jason Galanis

11  wrote Burnham market analysis final PDF.

12  A.   Then Bevan Cooney wrote to Jason Galanis, very impressive

13  performance with less than a million in net capital.

14  Q.   On January 21, 2015, Jason Galanis wrote to Bevan Cooney,

15  cusp of good stuff.

16           Can we publish what is in evidence as Government

17  Exhibit 2259.  Just publish this parent email alongside the

18  attachment.  Can we highlight where it says you elected to

19  initiate the policy loan on November 12, 2014.  Then can we

20  highlight the amount of loan principal and highlight the

21  individual who signed this document..

22           Pull up what is in evidence as Government Exhibit

23  2069.  I'll read beginning from the mail from Bevan Cooney on

24  February 25, 2015 and 6: 2:00 pm.  Road back coming together.

25  A.   Then Jason Galanis CC Archer, thanks Coon, I am confused

I6IJGAL3

the transit is for fight.

Q.  It says I am focused not confused.

A.  That was cut off.  I apologize.  Unfocused.  The franchise
is fortified by proprietary activities, in my view, we can
indulge in healthy competition after we are fortified.
Proprietary things are:  One, municipals for tribal
governments; two, Latin American credit desk; three, minority
asset management and sales and trading; four, Archer cross
border advisory (China, KZ); five, permanent capital vehicles
like BDC, six, 22 year track record inheritance from
Fondinvest.  All else in my mind will come in time.  The rest
of the plan is a scale scale scale.  That is, at first
appearance of scale, and then actual scale deriving from that
head fake.

        A key component is also differentiation in shareholder
sponsorship.  This means China.  We need, in my not so humble
opinion, to view Harvest as an optical fortifier as well as
financial.  Burnham needs relevance against.  Harvest
contributes to it and also adds two pinches of mystery to the
--  much needed in the reboot of Paillar Enterprises,
Incorporated, Greeky.

Q.  Can you pull up what is in evidence what is Government
1281.  On March 20, 2015 at 10:00 am Jason Galanis wrote:  Tim.
Burnham is committing to municipals by buying a majority
interest in a fixed income oriented investment bank called

I6IJGAL3

1  Bonwick Capital, and a concurrent lift out of 12 members of the
2  municipal finance team at Rice Financials Products.  The term
3  sheet is executed and definitives are being drafted, so we are
4  close to on-boarding this capability.  Burnham just leased
5  41,000 feet at 40 West 57th street with a move in date of May
6  1.  The municipal team will function from there.  Jason.
7  A.   Tim Anderson to Jason Galanis, CCJ Galanis, subject
8  Burnham.  That's terrific news, Jason, congratulations for
9  being so aggressive on this.  We'll need to circle up to
10  Manhattan this summer.  I have a NYC office.  I've still never
11  be able to despite being an NY attorney.
12  Q.   On March 20, 2015, Bevan Cooney wrote to Jason at Burnham
13  Equity Partners, Burnham.  Genius.
14  A.   Jason replied, trying everything.
15  Q.   Can you put up what is in evidence as Government Exhibit
16  2074.  Begin reading above the mail we just saw from Tim
17  Anderson beginning that is terrific news Jason.  Email from
18  Jason an Burnham Equity Partners, March 21, 2015.  To Devon
19  Archer.  Indian drift.  Needed to yarn for their counsel.  Pull
20  up what is in evidence as Government Exhibit 3250.
21  A.   April 28, 2015 Alexis Gluckman wrote.  Was the wire from
22  Wealth Assurance a loan? .
23  Q.   On April 28, 2015, Bevan Cooney wrote to Alexis Gluckman,
24  yes.  Please add up all the loans from Wealth Assurance and
25  Thorsdale for the last few years.  Also I loaned Thorsdale

I6IJGAL3

money originally.  Pull up what is in evidence as Government

Exhibit 3251.

A.   From Alexis Gluckman to Olga Abramson, CC Michelle Bryar,

subject Cooney, 4433 F, on Tuesday, May 2.  See attached.  I

don't know what to put down for his employment/income.

Everything else is completed.

Q.   Bevan, Alexis filled out your financial statements for IRS

purposes.  Please review and call me to discuss.  I need to be

able to explain how are you paying your monthly bills.  Do you

have any income for 2015?

A.   Bevan Cooney responded to Michelle Brian, zero income for

2015.  Only loans.

Q.   Can you pull up what is in evidence as Government Exhibit

2097.

A.   On July 1, 2015 Devon Archer wrote 7 Andrew and Kyle.  Can

we all get on the same page about what we need to transfer

funds to Bonwick for their requirements today.  Seb I believe

you were working on some L0A, but I am not sure if Bonwick has

not responded or they're unclear on their request.  Let me know

what I need to do.  Thanks.  D.

Q.   On July 1, 2015 Kyle wrote, where we are is we needed the

proper ownership docs for Bonwick.  No, we have it.  Then we

need to get the locally, doc for Burnham since Burnham owns a

piece of Bonwick.  Marcelle just sent us a doc that I think

looks good, but I need my internal guy to sign off on it.  I

I6IJGAL3

think that should do it.  I will know by 8:00 am.  Once an

proved I will journal.  Sorry I can't do it today as the back

office punch out at 5.  Going coward, let's try not to start

this so late in the day but also this really should the last of

the docs.

          Devon Archer pre responded to cool, Momtazi.  Okay,

Seb.  So hold on the wire to Bonwick's Citi account and let's

power through this tomorrow first thing and have it cross at

MS.  Devon Archer.

Q.  Can you pull up what is in evidence as government exhibit

1368.  On July 26, 2015 at 6:23 pm, Yani at reciprocal benefit

dot org, wrote you have requested clarification regarding

WAPC's position regarding the funding of its loan commitment as

provided for in the terms of the institutional single premium

variable annuity contract issued by WLCC to Wakpamni Lake

Community Corporation, wherein; on or before May 1, 2015, the

company shall loan to the certificate holder $1.25 million in

connection with the development of a tribal nation to tribal

nation to trade initiative on terms to be established by the

any in its sole and absolute discretion on or before May.

          May 1,2015 referenced in the above was the date funds

were anticipated as required to complete the project.  WAPC

understands, WLCC in order not to incur interest charges on any

advances did not request the loan commitment funds since the

project had sufficient funding.  However, WLCC may have need of

I6IJGAL3

additional financing in order to complete this project.  WAPC
will with 30 days' notice continue to honor its loan commitment
for up to $1.25 million to WLCC for the term of the policy at
6.02 percent for not longer than the terms of the policy.
Yanni.  It is not what you look at that matters, it's what you
see, Henry David thorough.
A.  Anderson replied to Yani at reciprocal benefit dot org,
with subject suggested language to WAPC to send to you.  On
Sunday July 26, 2015.  Thanks.  The annuity company will need
to communicate that to U.S. Bank and Wakpamni.  Can they do
that?
Q.  Can we pull up what is in evidence as Government Exhibit
2121.  Just read the parties and subject?
A.  From Jason Galanis to Devon Archer and the subject if you
get this out today, I am assured we can turn it today.
Q.  Pull up what is in evidence as Government Exhibit 2103.
          MR. QUIGLEY:  Your Honor, this would be the time to
read that instruction.
          THE COURT:  The bottom of this email that's redacted
in part references news of Jason Galanis' arrest for unrelated
conduct that you heard about previously on September 24th,
2015.
          As I've noted previously, Jason Galanis' arrest in
September 2015 was for unrelated conduct and has nothing to do
with this case.  I further instruct you that Mr. Archer was not

I6IJGAL3

1   a subject of that investigation and there is no evidence that

2   he knew about Jason Galanis' conduct in that case until after

3   Jason Galanis was arrested.

4            MR. QUIGLEY:  Thank your Honor.

5   Q.  I'll read beginning from email from Jon Burnham on

6   September 25, 2015, John Burnham wrote are you aware of this?

7   A.   Devon Archer, yes think was brought to your attention

8   yesterday.  Surprise to us both.  We're pleased with the

9   actions we took.

10  Q.  Can you pull up what is in evidence as Government Exhibit

11  2102.  On September 25th, 2015, Devon Archer wrote as we all

12  know our dear friend will be preoccupied for the foreseeable

13  future.  The following items are for immediate discussion

14  relative to some of the immediate holes liabilities loose ends

15  post yesterday's unfortunate events.

16           Indian bond due diligence and closing.  Damage

17  control.  Who are the main folks we need to preempt with a

18  call.  What's our consistent messaging.  We have 309 K funding

19  requirement for September 30.  Excluding J B ha K note.  We're

20  left with an office in NYC that is far too expensive on a

21  monthly run rate based on the COR business.  It absolutely

22  needs support from valor for the near term and all the

23  commitments were mate by Greek but not necessarily agreed to by

24  Sug.  What's within.  Teneo final 10,000 payment 2459 was

25  committed to be pay by valor and Sug -- these guys are big boys

I6IJGAL3

```
1    and need reputation damage control.  As I have already

2    negotiated another 150 K and scope we never signed up for

3    technically but they conducted.  Harvest term sheet.  Atlantic

4    funding request?  Michelle might as well be asking for 1

5    billion.  Are they solvent?  An Ru Sug have probably 10 others

6    for the immediate term.  Please list and let's get on a call

7    this morning.  Then Bevan Cooney replied good prelim checklist

8    Arch.  Let's all conference this am.  Let me know what time

9    works for all.  Best, Coon, C O O N.

10   Q.  Finally can we pull up what is in evidence as Government

11   Exhibit 1453.

12   A.  From legal at Colarisventures dot com, Atlantic Asset

13   Management, October 2, 2015 to Williams, WICKR and Jason

14   Sugarman.  Per instructions provide by Value Investment Group,

15   attached are:  One, director appointment letter; two, notice of

16   special meeting; three, draft of breach letter for review.

17   Q.  Email from legal at Colarisventures dot com to Devon Archer

18   and Godfrey, dated 10, 2, 15, 7:13:39 am.  Subject forward

19   Atlantic Asset Management forwarding several attachments.

20             MR. QUIGLEY:  That is all I have to read in.

21             THE COURT:  I think we'll take our morning break now,

22   all right?  Just remember don't discuss the case and keep an

23   open mind.

24             (Jury excused)

25             THE COURT:  You can step down.  Thanks.  Everyone can
```

I6IJGAL3

1    be seated.  Mr. Galanis, how are you feeling?

2                DEFENDANT GALANIS:  I am feeling okay, your Honor.

3                THE COURT:  Do you feel like if you ate something, it

4    may make you feel better?  Have you eaten today?

5                DEFENDANT GALANIS:  (Inaudible).

6                THE COURT:  Does he have food for a break, Mr. Touger?

7                MR. TOUGER:  He had no breakfast -- he had breakfast

8    at the jail, he did.

9                THE COURT:  Do you think that would be useful?  I

10   don't want to keep this jury longer than we have to.  I think,

11   look, if he is really not able to assist in his defense, then

12   I'll send him home for the day, although the doctors there are

13   saying the medication should be out of your system by now and

14   that confusion is not a standard side effect.

15               MR. TOUGER:  I don't want to argue with the doctors at

16   the MDC, but I looked this up last night.  Every web site I

17   went to said confusion, disorientation is a known -- I am not a

18   doctor, but I looked it up online.  Every single web site I

19   went to, including the company's web site, said that was a side

20   effect.  I don't know where that where they get that from.

21   That is neither here nor there.

22               I can say we have been on trial for three weeks.

23   There has never been a time when his name has been mentioned

24   where he didn't have a reaction.  We just went through two or

25   three documents that had information about him in it.  His pad

I6IJGAL3

1    is empty except for note his friend Paul came into the

2    courtroom.  That hasn't happened in three weeks.  I leave it up

3    to the court's wisdom.

4            THE COURT:  Is there anything else the government

5    wants to say.  Do you think it is worth him having something to

6    eat and seeing how he is feeling?

7            MS. MERMELSTEIN:  Sure, your Honor.  It is obviously

8    ultimately for your Honor to determine if he is competent to

9    participate in his defense today.

10           THE COURT:  Look, if he is not well after today, then

11   we're going to have him evaluated and have an immediate

12   hearing, but I am loathe to put this off, frankly.

13           MS. MERMELSTEIN:  I would just note, having observed

14   Mr. Galanis following along with the emails, he is reading what

15   is on the screen.  He appears to be paying attention.  It

16   doesn't appear he is having trouble following these

17   proceedings.  In addition to the fact that even assuming

18   confusion is a side effect of his medication, it should be out

19   of his system by now, and he seems to be following.

20           I think if we are going to proceed, your Honor should

21   make a finding on the record.  I think there is a basis for a

22   finding he is well enough to proceed.  To the extent it would

23   be helpful for him to eat something to see if that helps him

24   perk up, we have some bags of nuts in the trial cart, we are

25   happy to give him a break, or something can be obtained from

I6IJGAL3

1     the cafeteria.   .

2              THE COURT:  We are going to talk about legal issues,

3     in any event, for a few minutes.  You have waived his presence

4     on that, is that correct, Mr. Touger?

5              MR. TOUGER:  Yes.

6              THE COURT:  Let's take a break and get him something

7     to eat, see if it makes him feel better.  The doctors have

8     indicated even assuming that is a side effect and it should be

9     out of your system by now, so why don't you see if that helps,

10    and we'll meet back in a few minutes and we'll just stay and

11    discuss the legal issues for a few minutes.

12             MS. MERMELSTEIN:  Are the Marshals prepared to give

13    him something to eat?

14             THE COURT:  Do you have anything for him to eat?  Do

15    you want us to get him something to eat?

16             THE MARSHAL:  We don't have anything.

17             THE COURT:  Remind me to get him something to eat if

18    we can get it from the cafeteria.

19             THE MARSHAL:  Well, your Honor --

20             THE COURT:  We'll do that.

21             THE MARSHAL:  (Inaudible).

22             THE COURT:  Thank you.  So why don't we talk about

23    some of the legal issues for a minute or two.

24             So first on the BIT Board minutes, Mr. Archer is

25    moving to exclude Government Exhibits 758, 763, 782, 783, 784

I6IJGAL3

1    and 792.  Does anyone want to be heard on this?  I have read

2    your letters.  Is there anything you feel like you didn't get a

3    chance to note in your letter?

4             MR. QUIGLEY:  I think everything is in our letter.

5             MR. SCHWARTZ:  Everything is in my letter.

6             I may want to talk further depending upon what your

7    Honor's ruling is.  I assume your Honor has looked at the

8    exhibits and see also what they contain.  There is just a lot

9    of speculation and opinion and stuff.

10            (Defendant Galanis left the courtroom)

11            THE COURT:  I do want to talk about that.  I just want

12   to turn to the government.  What aspects of these reports are

13   you intending to use?  Are there additional redactions that

14   could be made to narrow the scope of the objections?  Is it

15   still the case you're not intending to elicit testimony

16   regarding the BIT Board's deliberations?

17            MR. QUIGLEY:  Right.  Just to be clear, and Mr.

18   Schwartz has marked additional minutes as exhibits, the only

19   minutes we marked as exhibits and we intend to introduce are

20   the minutes of the meetings in which Mr. Archer was actually

21   present.

22            THE COURT:  Are there any portions of those other than

23   the statements made by Mr. Archer which are either being

24   admitted for the truth or not the truth, but the fact he said

25   them, that you're seeking to admit other than for direct

I6IJGAL3

1   context?

2           MR. QUIGLEY:  No.  Everything is -- we are not

3   seeking, the Q and A is very focused on reading in what Mr.

4   Archer said, and I guess the only exception to that which is

5   simply coming in for the fact it was said, in the October 1

6   meeting, the board, it records the board laid out a certain

7   number of conditions for the purchase to go through.  That is

8   really it.  We are not introducing anything anyone else said

9   other than to provide context.

10          The board, paraphrasing now --

11          THE COURT:  What about, for example, Government

12  Exhibit 783, where the references to the questioning of his

13  candor.  I don't think it is appropriate for a document to be

14  admitted discussing the secretary's opinion that Mr. Archer's

15  candor was questioned by others at the meeting.

16          MR. SCHWARTZ:  While Mr. Quigley looks at that, I

17  obviously have no objection to them questioning the witness who

18  was there about what Mr. Archer said.  I have no objection to

19  these minutes being used to refresh her recollection.  It seems

20  to me that the documents themselves should be entirely

21  cumulative of her testimony, and there is so much in there that

22  is confusing and speculative and prejudicial, and who knows if

23  it is accurate.

24          So I think the best evidence is the witness we're

25  going to see.  If I question the witness's credibility with

I6IJGAL3

1    respect to the way that she reports what Mr. Archer said, I

2    understand these may come in as her prior consistent

3    statements.  I understand I run that risk.  It seems to me the

4    minutes themselves don't really add anything to her testimony

5    and carry a lot of extra baggage in addition to the fact

6    they're not Mr. Archer's statements, but the witness's

7    statement.

8            MR. QUIGLEY:  It is double hearsay.  She is clear

9    there is no double hearsay.  They're business records, and to

10   the extent there is double hearsay issue, Mr. Archer's

11   statements in them are certainly admissible as admissions.

12           THE COURT:  I do think there is double hearsay, but I

13   think you get around it because they're statements of his.

14           MR. QUIGLEY:  If you want, again I would just say,

15   your Honor, in terms of like these exhibits, the defense has

16   been on notice since March we intend to introduce them.  We had

17   discussions about these very exhibits in the context of Jason

18   Galanis' arrest.  We have been very clear we intend to

19   introduce them.

20           Waiting until the Friday before the witness testifies

21   so the exhibits should be precluded in their entirety is a

22   little late.  Setting that aside, this exhibits have been front

23   and center for sometime since the reference to 783, to the

24   Jason Galanis arrest.

25           THE COURT:  Let me just ask you one question about an

I6IJGAL3

argument made in the letters which relates to whether the

reports were prepared in anticipation of litigation.  Do you

have any response to that?

            MR. QUIGLEY:  No, they were not prepared.  They were

prepared well before any litigation took place or was

contemplated.  These are the records of the board's regularly

conducted activity.  They keep minutes for every board meeting.

Ms. Moynihan will testify to this.

            There are minutes that have been produced in discovery

going back to before Mr. Archer was even involved in this

transaction.  They produced minutes for every board meeting.

This is not an anticipation of litigation document.  These are

business records.  They're records of the meetings that the

board has.

            If there are specific, if there are specific areas

that the court believes are prejudicial, we are happy to

redact.  I also think the records would be -- I think they're

admissible as business records.  I don't think Mr. Schwartz's

cumulative argument, you can admit a document as a business

record with the witness testifying, that doesn't make it

cumulative.  If that would be the rule, there would be very few

documents in this case.  Certainly nobody would be introducing

Hugh Dunkerley or Timothy Anderson's documents because they

testified.  If A document is admissible on an independent

basis, the fact the witness is also testifying doesn't make it

I6IJGAL3

1   cumulative.

2          I would say I think they are admissible as business

3   records.  They're certainly admissible and we'll be able to lay

4   a foundation for this as past recollections recorded, and this

5   has been again we talked about this many weeks ago when we were

6   talking about the Archer arrest.  We said on the record we

7   thought 783 and other BIT Board minutes were admissible as

8   business records.  To claim now all of a sudden they're not

9   admissible is a little late.

10          The law is with us as well.  If they are business

11   records, Mr. Archer's statements made therein are his

12   admissions.  They're specific comments, and things like that

13   the court wants us to take out, we're happy to redact those.

14   Mr. Archer's statements are in those, and language necessary to

15   provide context about what the meeting was about and what

16   questions are posted to him is coming in for non-hearsay

17   purposes.

18          MR. SCHWARTZ:  Just briefly, first of all, to be

19   crystal clear, there is no business records stipulation with

20   respect to these documents.  I don't think the government asked

21   for one.  On the prepared in anticipation of litigation

22   argument, I want to be clear on what our argument is there.

23          That argument pertains only to the minutes that

24   postdate really the October 2015 issuance of subpoenas by the

25   SEC.  Your Honor can look at the content of those minutes.  I

I6IJGAL3

think there are three of the six the government is seeking to offer come from that post-Galanis arrest, post-SEC time-frame, and at least one and perhaps two of them postdate the SEC versus Atlantic Asset Management receivership action.

It is plain, any lawyer reading them can see it is plainly part of what is being done in these minutes, they're making a record for inevitable disputes that will arise as they break their investment management contracts with Burnham Asset Management, as they potentially face lawsuits from their own investors, whatever it is, they may sue Burnham and people they think are responsible not they suffered losses.  It is plain that is what is happening in those three sets of minutes that postdate the issuance of subpoenas, and the issuance of subpoenas put everyone on notice that this was in anticipation of litigation or at least litigation was reasonably likely at that point.

As we said in our letter, the law is crystal clear that something that otherwise qualifies as a business record losses its character as a business record if it is prepared in anticipation of litigation principally because it fails the last prong of Rule 803 (6), which is that it has independent indicia of reliability.  The law on that is clear certainly with respect to those last three which is where most of the opining and colorful language is, that those are particularly problematic.

I6IJGAL3

1    MR. QUIGLEY:  Judge, I don't think -- I disagree with

2    prepared in litigation.  They're business records, they're

3    meeting minutes prepared for every meeting of this board.  I

4    think there is -- 783 from January 19, 2016 and 784 are from

5    February 25, 2016, again these are records that are produced,

6    and they pertain, even the ones that postdate Mr. Archer's

7    arrest -- Mr. Galanis' arrest or SEC subpoenas concerning

8    number of topics, we are not asking anything about the received

9    subpoenas.

10   These are classic records conducted in the course of

11   the board's regularly conducted activity.  They prepare these

12   minutes for every meeting regardless of what is going on.

13   THE COURT:  All right.  So I am going to grant the

14   motion in part and deny it in part.  As minutes of the BIT

15   Board, these exhibits generally fall within the business

16   records exception to the rule against hearsay assuming a

17   foundation can be laid.  See United States versus DiPasse, 203

18   Federal Appendix at 370.

19   Mr. Archer does raise valid hearsay within hearsay

20   concerns, as I noted, but pursuant to Rule 805, his statements

21   contained within the report are admissible because if offered

22   for the truth, they qualify for a second hearsay exception;

23   namely, statements of a party opponent.  See Judge Cote's

24   recent opinion anyone the Ortiz case, 2017 WestLaw 56213735, at

25   11, where she permitted the admission of statements attributed

I6IJGAL3

to the plaintiff in a report prepared by EMTs.  The report

itself is admissible as a business record and statements

attributed to the plaintiff contained therein are admissible as

statments of a party opponent and for the purpose of receiving

medical treatment.

I fail to see why the present situation is any

different.  Here we have reports prepared in the regular course

of business by the BIT Board secretary in which she recorded

statements made by Mr. Archer which the government now seeks to

introduce against him.  I also note that several if not many of

the statements attributed to him are not being offered for the

truth, but rather for the fact that he made those statements.

Statements made by other individuals at the meeting

are not being offered for the truth of the matter asserted but

instead to contextualize his comments, which is a valid

non-hearsay purpose.  What I do want you to do, though, is go

through those exhibits now and focus them in on statements that

he made and what you need for the context of the statements

that he made.

For example, as I alluded to a moment ago, I don't

think it is appropriate for a document to be admitted

discussing the secretary's opinion of his candor or that his

candor was questioned by people in attendance at the meeting.

That I don't think should come in.  I want it to be more

narrowly tailored.

I6IJGAL3

1          MR. QUIGLEY:  I'll do it right now.

2          THE COURT:  For the record, I will note I am not

3    persuaded by Mr. Archer's argument that some of the records

4    were prepared in anticipation of litigation; and, therefore,

5    unreliable.

6          The purpose of the business records exception is to

7    ensure the documents were not created for personal purposes or

8    in anticipation of any litigation so that the creator of the

9    document had no motive to falsify the record in question.  See

10   the Kaiser case, 609 F.3d at 574.  However, the fact that Jason

11   Galanis was arrested for unrelated conduct does not render

12   these meetings of the BIT Board unreliable.  The BIT Board had

13   sought and received assurances a year prior to Jason Galanis'

14   arrest that he was not involved in any of the Burnham entities,

15   and there is no basis for suspecting the BIT Board was

16   anticipating litigation when these minutes were prepared, nor

17   has Mr. Archer demonstrated any other reason to believe that

18   they may be unreliable.

19         Why don't you look at the documents now and see if you

20   need me to get involved at all in terms of line-by-line

21   redactions.

22         MR. QUIGLEY:  I'll do it right now.

23         THE COURT:  So why don't we come back in 10 minutes.

24         MR. SCHWARTZ:  There is one specific -- I understand

25   your Honor's ruling and I don't disagree -- I do disagree.  I

I6IJGAL3

1    am not rearguing.

2              THE COURT:  Understood.

3              MR. SCHWARTZ:  There is one specific statement of Mr.

4    Archer that was discussed in the briefing that we should talk

5    about or at least --

6              THE COURT:  Can you pull it up while we're talking?

7              MR. SCHWARTZ:  784 at the bottom, this alleged false

8    exculpatory statement where Ms. Moynihan supposedly confronts

9    Mr. Archer with the SEC against AAM complaint and says I've

10   read this.  It looks to me like you are one of the unnamed

11   people in this complaint, and that complaint, just to refresh

12   your Honor's recollection, it is not the civil enforcement

13   action to this one, it is the receivership action that is

14   focused on undisclosed conflicts in connection with only what

15   we have been referring to as the first and third bond issuances

16   in this case, nothing about misappropriation of funds, nothing

17   about the fact that Rosemont Seneca Bohai has purchased the

18   second issuance, supposedly the response Mr. Archer made,

19   according to minutes, I am not one of those people.  I believe

20   it is Jason Galanis, and I had nothing to do with that.

21             The government agrees that the first part of that is a

22   hundred percent accurate.  Mr. Archer was not one of the people

23   that was alluded to in any way, shape or form in that

24   complaint.  We enumerated who the unidentified but specifically

25   named people are in that complaint.  It was Mr. Galanis, Mr.

I6IJGAL3

Dunkerley, Mr. Hirst, Ms. Morton and Mr. Deary, not Mr. Archer.

They want to introduce the statement I had nothing to
do with that whatsoever, however, as a false exculpatory.  It
is not.  It is a general denial, and the law is crystal clear
general denials are not probative of anything because they're
only false exculpatories if the jury determines the person is
guilty in the first place.  So because that statement is not a
false exculpatory and because it has no independent probative
value, I think that discussion should be excised on the
government's direct at least.

MR. QUIGLEY:  I think his statement that, "I had no
involvement whatsoever with those events" is plainly false.  If
they want to stipulate, we would be happy to stipulate Mr.
Archer was not one of the people referenced in the Atlantic
receiver complaint and that that complaint involved or directly
I think related to only the first and third bond issuances.  We
are happy to agree to that as well.  To say I had no
involvement whatsoever is highly, clearly false.

THE COURT:  I will allow it.  In any event, Mr.
Schwartz can cross-examine her about it.  She will be here.  To
the extent she got it wrong exactly what was said, I think that
is fair game for cross-examination, and you'll consider whether
you want to stipulate to the what the government has suggested.
Let's come back in five minutes and see how Mr. Galanis is
doing.  Thank you.

I6IJGAL3

1              (Recess)

2              (Defendant Galanis is present in the courtroom)

3              THE COURT:  All right.  So first, Mr. Galanis, how are

4     you feeling?  Did it help at all to eat something?

5              DEFENDANT GALANIS:  It didn't.

6              THE COURT:  It did not?

7              MR. TOUGER:  I think the yogurt coated his stomach and

8     the nausea is dissipating.  I don't know if the court watched

9     Mr. Galanis during this trial at all, I am sure it has.  There

10    has not been a day gone by Mr. Galanis has not been on the

11    computer taking notes working.  My notebook is full of

12    Mr. Galanis' notes and, as I said, they're not here.

13             Mr. Paul Grand is here today, and when I told him John

14    hasn't taken a note during -- he has known John probably longer

15    than I have been alive, and he couldn't believe that, either.

16             I hate to do this.  As I said, I want this trial to

17    move forward as everybody else does, but as a defense lawyer, I

18    can't sit during a trial and have my client not be here.  I

19    think he will be fine.  He won't be fine tomorrow, but I think

20    he will be fine to go forward tomorrow.

21             THE COURT:  I understand.  Look, he looks to me like

22    he's attentive,.  He seems like he is paying attention.  He is

23    not dozing off.  I obviously can't speak to whether he's

24    confused or focused or anything like that without having a

25    doctor examine him, and hopefully we'll get to that.

I6IJGAL3

Let me re-raise with you the issue of the BIT Board
witness.  I don't want to tell you how to do your job.  I am
just asking you, given his willingness to proceed if that
witness didn't involve him, if you're willing to move forward
with that witness today?

MR. TOUGER:  Again when I told Mr. Grand that, his
reaction was shock and awe.  Your Honor, I would love to say
yes, I really would, but I think I just can't do that.  I just
can't have a witness testify with a client who is not here.  He
is here presently, but not here completely mentally.

I would love to say yes, I really would, and half of
me says say yes, and I know it would make the court a lot
happier if I did, and the court would probably be much more
appreciative of me if I did, but I can't.  I should have a
client who is a hundred percent no matter what is going on.
The reason I would let the documents go in, that was just
document reading.  He has read those documents a hundred times.
I have his comments on those, although I would say that hasn't
stopped him from pointing out things before, but he hasn't
written one today.

THE COURT:  So we'll --

MR. TOUGER:  I know the court is not happy with me,
but I just cannot do it.

THE COURT:  -- we'll send the jury home today.  Is
there anything you want me to tell the jury?  Should I say

I6IJGAL3

1    there is a medical issue without saying who it is?

2              MR. TOUGER:  Just say there is an unavoidable issue

3    that necessitates us adjourning until tomorrow morning.

4              MR. QUIGLEY:  I think it is appropriate to say it is a

5    medical issue.  I wouldn't want it to look like we are not

6    ready to go, because we would be.

7              MR. TOUGER:  We can say it is an unavoidable issue and

8    has nothing to do with the prosecutor's ability to go forward.

9    I don't think it has to be a medical -- I think it has to be a

10   medical issue.

11             MR. QUIGLEY:  I think it has to be a medical issue

12   without ascribing it to any one individual.

13             THE COURT:  Is there anything else I can tell the jury

14   about scheduling so they have a little more of comfort what

15   their schedules will be going forward?

16             MR. SCHWARTZ:  I think it is safe to say that we'll be

17   done next week.

18             THE COURT:  What?

19             MR. SCHWARTZ:  Done next week.

20             THE COURT:  All right.  Can I say I expect the parties

21   will rest this week and we'll have summations next week or

22   would you rather me not do that?

23             MR. SCHWARTZ:  I am not so sure about that especially

24   since we are losing this day.

25             THE COURT:  Why don't we bring the jury in.

I6IJGAL3

```
 1              (Jury present)

 2              THE COURT:  Everyone may be seated.

 3              Ladies and gentlemen, I have some news that is a

 4   little bit frustrating, but I wanted to let you know I have to

 5   send you home for the day.  I know everyone wants to move

 6   forward with this trial.  I do, too, but this is unavoidable.

 7   Without saying anything else, it is no one's fault.  It is of a

 8   medical nature, and I apologize for that.

 9              We'll sit tomorrow morning, though.  We'll start at

10   9:00 and we'll continue on through the day.  I do want to just

11   give you a sense of timing.  We do I think everybody in this

12   case anticipates that the case will be over next week, that we

13   anticipate it will be completed next week at some point, and so

14   I wanted to let you know that if that gives you any assurance,

15   but I want to apologize for taking your time today and thank

16   you.  So we're going to adjourn now.  Remember don't discuss or

17   research the case.  Keep an open mind, and I'll see you first

18   thing tomorrow morning.  Thank you.

19              (Jury excused)

20              THE COURT:  Everyone may be seated.

21              Why don't we talk about some of the outstanding issues

22   while we're here.  Yes?  If you waive Mr. Galanis' presence, he

23   is free to leave.

24              (Defendant Galanis left the courtroom)

25              THE COURT:  All right.  So let's discuss the evidence
```

I6IJGAL3

1    relating to the alleged meeting between Mr. Archer and Michelle

2    Morton on March 25th.  In its letter regarding the

3    admissibility of Government Exhibit 955 --

4          MR. SCHWARTZ:  I don't mean to cut you off.  I think

5    we have had more discussions with the government.  They are not

6    going to advance the proposition that there was a meeting

7    between Mr. Archer and Ms. Morton on the 25th.  So we're going

8    to talk about what is appropriately admissible.

9          THE COURT:  Okay.  Fine.

10          MS. TEKEEI:  Your Honor, I would just like to say I

11    think what Mr. Schwartz said is largely accurate.  I think what

12    we are going to do is talk together and just discuss what

13    aspects of the text messages fairly reflect whether there was a

14    meeting at all between the two of them during that day and

15    excise the portions that might make it appear as though there

16    was the discussion we believe Ms. Morton had with Ms. Tunilus

17    with Mr. Archer.

18          We'll speak about that and reduce and narrow the

19    issues that-- we would raise with your Honor with respect to

20    those text messages.  I'll also note Ms. Notari has withdrawn

21    one of her exhibits.  We'll talk to Ms. Notari, too, and see if

22    we can come to an agreement.

23          THE COURT:  Let's be clear.  That relates to 955.  I

24    want to go through and I want to rule on whatever I can now.

25          MR. QUIGLEY:  955 in some sense, its relevance depends

I6IJGAL3

1    on Archer.  It is really relevant to Michelle Morton, who is

2    obviously not here but still a co-conspirator to her state of

3    mind and her understanding what she was going to get out of

4    buying Atlantic.  I think they're related but not necessarily

5    identical.  I think that best course of action is at this point

6    let us figure out what we are going to do with the text

7    messages.

8            THE COURT:  Let's fine.  I won't address 955, 3004,

9    4817 or 3004 B right now.  I will hold off?

10           MR. QUIGLEY:  That's right.  Ms. Notari, are we

11   talking about, are you withdrawing your objection to -- no.  I

12   am sorry.  So I have defense Exhibits 3800 and 3801.  I didn't

13   get a letter from Ms. Notari, but those are marked.  Is there a

14   dispute about those?

15           MS. NOTARI:  I withdrew.

16           THE COURT:  The one about Mr. Cooney's mother's

17   health?

18           MS. NOTARI:  I withdraw that one and I still, I think

19   the other one, the rule of completeness.

20           THE COURT:  Okay.  All right.  So it seems like 3800

21   is no longer an issue.

22           MS. NOTARI:  3801 is no longer an issue, the one

23   related to his mother.

24           THE COURT:  Right.  I thought that was 3800.  In any

25   event, whichever one of the two related to his mother, I

I6IJGAL3

1    thought it was 3800, will not come in, on agreement.

2           As for 3801, whichever the other one was, but that is

3    what I think it is, I think those messages are relevant in

4    light of an aspect of Mr. Cooney's defense, which is that Jason

5    Galanis similarly traded on his connections in the music

6    industry.  So I was going to allow in 3801.  That is my ruling

7    on that.

8           What about Mr. Archer had also moved to admit defense

9    Exhibits 4801 through 4804, 4813 and 4821.

10          MR. QUIGLEY:  That is fully briefed, your Honor.

11          THE COURT:  Is that some of what you're talking about

12   now?

13          MR. QUIGLEY:  Yes.

14          THE COURT:  Is there anything else anyone wants to

15   say?  I will allow in portions of 4801, 4804, 4813 and 4821.

16   The other exhibits identified by Mr. Archer seem to be classic

17   hearsay offered for the truth of the matter asserted, and I

18   don't see relevant non-hearsay purpose.

19          I will, however, permit the portions of 4804, 4813 and

20   4821 in which Jason Galanis communicates to, Francisco Martin,

21   who then replies to Jason Galanis and sends Fred Ruopp Mr.

22   Archer's biographical information in compliance with Jason

23   Galanis' instructions.

24          The significance of this information is not whether it

25   is true, but instead consistent with one of Mr. Archer's

I6IJGAL3

1    defenses, Jason Galanis instructed Mr. Martin continue to

2    leverage Mr. Archer's reputation and standing in the industry.

3    While these communications did not take place in the context of

4    the WLCC bond scheme, they were part of the larger roll-up

5    effort and are further evidence of Jason Galanis' modus

6    operandi, so I do find them to be relevant.

7            Mr. Schwartz, are you intending to introduce other

8    aspects of these exhibits detailing, for instance, the various

9    entities involved?

10           MR. SCHWARTZ:  I think the point was what we set forth

11   in our letter which was:  One, that it goes to Mr. Galanis' MO

12   in terms of holding people out and also control of information;

13   and, two, as we set out, that this really was the first

14   iteration of the so-called roll-up plan.  So I think we would

15   want to be able to elicit enough to show that is what this was.

16   We obviously don't need all of the details of the underlying

17   transaction.

18           THE COURT:  All right.  Why don't you see if you can

19   agree on the contours of that.  I will just say generally I

20   don't think portions relating to aspects other than the

21   instructions to forward Archer's biographical information are

22   really relevant.  Why don't you go from there.

23           MR. SCHWARTZ:  Sure.

24           THE COURT:  I will allow in the statement of 4801 that

25   Jason Galanis is "very sensitive" to how communication flows

I6IJGAL3

from the non-hearsay purpose of showing Francisco Martin's
belief, but I don't think, I don't believe that the emails
lower on the chain in that exhibit should come in.

    That still leaves Mr. Archer's renewed motion to admit
Defense Exhibit 4802 for impeachment of Francisco Martin.  I am
not altering my ruling from last week.  Mr. Martin claimed not
to remember whether he had asked Jason Galanis before sharing
information with potential business partners.  Mr. Schwartz
then refreshed Mr. Martin's memory by showing him Defense
Exhibit 4802 and asked does this remind you that you asked
Jason Galanis in the course of a deal what I can disclose.
That is from Page 2316 of the transcript.  Mr. Martin did not
deny writing the email asking for Jason Galanis' permission.

    I, thus, fail to see how this email is admissible as
impeachment material of Mr. Martin.  Mr. Schwartz noted in his
reply letter part of the problem here is that the jury did not
get to see the email because it was not admitted into evidence,
but I think the substance of the email was abundantly clear to
the jury based on the question when his memory was being
refreshed.

    Because Mr. Martin did not testify in a manner
inconsistent with the email or deny making the statements, I
don't think it is probative as impeachment.  Then there was the
issue of the summary charts.

    MR. SCHWARTZ:  Could I make sure I understand.

I6IJGAL3

1          THE COURT:  Go ahead.

2          MR. SCHWARTZ:  Going back one ruling on 4801.  With

3     respect to Jason Galanis' statements about information flow, I

4     want to be clear, there are two parts.

5          THE COURT:  Can you pull that up, actually.  Thanks.

6          MR. SCHWARTZ:  4801, please.  I want to be clear that

7     there are two parts of the email that speak to that issue and I

8     don't want a disagreement later on.  So there is the very top

9     portion, Jason is very sensitive how communication flows, that

10    is the part your Honor referenced explicitly.

11         In addition to that, I believe it is on the next page,

12    right in the middle there is the similar admonition from Mr.

13    Martin, Jason Galanis is not pleased, you should have sent this

14    to me.  It is all to the same point and again it illustrates

15    the modus operandi here.  I want to be certain, because your

16    Honor didn't say it explicitly out loud, these both fall within

17    the scope of your ruling.  We understand the rest of the

18    material will be redacted pre-ruling.

19         THE COURT:  I'll allow that, too.

20         MR. SCHWARTZ:  Thank you.

21         THE COURT:  But the rest of it should come out, all

22    right?  Then on the summary charts, I understand the government

23    intends to use these exhibits and move them.  Are you moving

24    them into evidence --

25         MS. MERMELSTEIN:  Yes.

I6IJGAL3

1          THE COURT:  -- with a witness who will testify I guess

2     tomorrow now?  I am not going to require the changes sought by

3     Mr. Archer, but do you have an objection to making those

4     changes?  Obviously, I saw your letter.

5          MS. MERMELSTEIN:  Yes, we do.

6          THE COURT:  Walk me through what the problem is

7     substantively.

8          MS. MERMELSTEIN:  We object to making the changes.

9     Let me take them in turn.

10         With respect to the opposition to indications on the

11    summary chart that says RSB/Archer, that is consistent with

12    other indications on the chart with respect to other

13    individuals when they are connected to entities.  So, for

14    example, there is reference to money going to Rosemary and

15    Rue, that is an entity that was created by Gary Hirst and

16    Dunkerley, who served as managing director according to

17    paperwork.  That paperwork says Rosemary and Dunkerley.  The

18    summary charts are intended to assist the jury in understanding

19    the money flow between all of these different entities and it

20    is helpful to them have it be clear who these entities, whose

21    entities these are.

22         This witness will testify the bank statements said

23    c/o. Archer.  There is notice that is true.  I will note in

24    opposing -- in seeking to permit -- what?

25         (Off-the-record discussion)

I6IJGAL3

1          MS. MERMELSTEIN:  Mr. Quigley corrected me that some

2     of this is sealed.  We can talk about it more at sidebar.  Mr.

3     Schwartz has expressly argued to this Court RSB was solely a

4     one-man show, that was Devon Archer's entity in connection with

5     various sealed proceedings.

6          There can be no reasonable dispute here that is an

7     accurate representation of whose entity it is.  It is helpful

8     to the jury to make that clear on the summary chart, and I very

9     much object to taking it off.  I don't think so we should have

10    to.  That is all there is to say about that.

11         With respect to Wealth Assurance, it is more of a kind

12    of logistical issue.  There are a lot of entities.  There is a

13    lot of movement.  It is hard from a graphic representation to

14    make summary charts that are not too cluttered.

15         THE COURT:  Why can't you put a footnote on it or

16    something that indicates that Wealth Assurance is Wealth

17    Assurance Private Client Corporation?

18         MS. MERMELSTEIN:  We have color-coded the entities, so

19    Wealth Assurance Privant Client Corp. on the first one where

20    there is space, it says Wealth Assurance Private Client Corp.

21    Thereafter, every time it appears, it is in the same unique

22    color, and the witness will say every reference that says

23    Wealth Assurance on all of these charts is Wealth Assurance

24    Private Client Corp., as indicated by the fact it is in this

25    light green color, and the only place where a different Wealth

I6IJGAL3

1    Assurance entity is referenced, there is one transferred to

2    Wealth Assurance Holdings that says Wealth Assurance Holdings,

3    and that is in a different color.

4            So I think it is perfectly clear, and just as a

5    logistical matter, there is not enough room in the box to put

6    that.  We are now, when we produced these summary charts three

7    weeks ago, these were raised Saturday at 7:00 pm.  There are

8    many, many pages of the charts.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6I7GAL4

1          THE COURT:  If the witness is going to make that

2     clear.

3          MS. MERMELSTEIN:  Yes, totally.

4          THE COURT:  Then I'm fine with it as is.  So I'm going

5     to overrule that objection.

6          Then I have the government's motion to exclude Defense

7     Exhibits 4308 and 4321, which are e-mails between Mr. Archer

8     and members of the BIT board.  This motion is denied.

9          As for 4308, with the exception of the beginning of

10    the first sentence, "apologies my flights were rearranged

11    today," it seems that the statements are either present sense

12    impressions or are statements of Mr. Archer's future intention,

13    and, therefore, qualify for exceptions to the ban on hearsay

14    under Rule 803(1) and 803(3).  The e-mails lower on the chain

15    appear to be offered for the nonhearsay purpose of their effect

16    on Mr. Archer and responding to and contextualizing the e-mail.

17         As for Defense Exhibit 4321, the middle sentence is

18    admissible as a statement of Mr. Archer's future intent under

19    803(3), and the lower e-mail chain from Jon Burnham is

20    admissible for the nonhearsay purpose of its effect on Mr.

21    Archer in responding to and contextualizing his e-mail.  It

22    does seem, however, that the first and third sentences in Mr.

23    Archer's response should be redacted, as I don't see an obvious

24    hearsay exception.  If that's unclear, we can pull it up and

25    talk about it together, but I think I tried to clarify.

I6I7GAL4

1          MR. SCHWARTZ:  Understood.

2          THE COURT:  All right.

3          And then, Mr. Schwartz, do you want to tell me where

4    you are on expert testimony at this point so I can address that

5    first thing in the morning?

6          MR. SCHWARTZ:  Yes.  So the government has clarified

7    that they're not going to make any argument that there were

8    inappropriate transfers of restricted securities here, so we

9    may have someone talk about background principles with respect

10   to restricted securities, but we're not going to have an

11   opinion offered on that because it just is no longer relevant.

12         MR. QUIGLEY:  We are not going to argue that the

13   transfer of the securities by Mr. Archer and Cooney violated

14   Rule 144A.  Obviously, the fact of the transfer is still

15   something that is part of our case.  We're not going to argue

16   that that is independently violative of Rule 144A.

17         THE COURT:  Understood.  All right.  OK.

18         MR. SCHWARTZ:  And then I'm not quite sure how to

19   answer your Honor, because we obviously have done a lot of work

20   in editing since the notices were first exchanged, seeing how

21   the government's case came in.  But I'm not sure I can explain

22   to you right now sort of how that matches up with what they

23   objected to.  If you tell us sort of what you're thinking, I'm

24   sure I can tell you whether you need to continue your thought

25   or not.

I6I7GAL4

```
 1          I suspect that most of your Honor's rulings will be
 2   substantially mooted by what we were going to do, but I just
 3   don't know how to explain that without kind of giving a full
 4   proffer of where we are.
 5          THE COURT:  Do you want to be heard at all on experts
 6   at this point?
 7          MR. QUIGLEY:  No, your Honor.  I think our position is
 8   clear I mean from our papers.
 9          THE COURT:  OK.  I think on this issue why don't we
10   meet tomorrow at 8:45, and I will address this, and I will
11   address I think the remaining issues.  And if you want to be
12   heard on them now, I will rule on them very briefly tomorrow
13   morning, but I think we still have -- and these relate to the
14   defendant's case in chief -- the Cooney/Crafton recording, and
15   then we have the Instagram posts of Jason Galanis' wife, and
16   then the PLA evidence.  Right?  Those are the only remaining
17   issues?
18          MR. QUIGLEY:  And the calendar entries.
19          THE COURT:  Sorry?
20          MR. QUIGLEY:  The calendar entries.
21          THE COURT:  All right.
22          MR. SCHWARTZ:  Remind me what the dispute is about the
23   PLA.  I don't think there is a dispute.
24          THE COURT:  The government moved to preclude a number
25   of defense exhibits that relate to Rosemont Seneca Bohai's
```

I6I7GAL4

1  revolving loan agreement with Morgan Stanley on relevance

2  grounds.

3        MR. SCHWARTZ:  I think that was resolved at the very

4  beginning.

5        THE COURT:  So that's resolved?  OK.  I mean all I had

6  a note of was that we were going to see how things went.

7        MR. SCHWARTZ:  I mean to be clear we're offering that

8  evidence, but I think that the government understands the

9  relevance of it.

10        MR. QUIGLEY:  I think we do.  If we need a ruling, we

11  will contact the Court.

12        MR. SCHWARTZ:  The only thing that I will say on the

13  calendar entries -- I don't want to argue it further -- but

14  pending your Honor's ruling, the government has told us they

15  may require a custodian.  That custodian is going to have to

16  fly in from out of town, so if on the off chance that was a

17  category of evidence you were going to exclude --

18        THE COURT:  I can rule on that by an order later

19  today.  That was not on my list of remaining issues.

20        But while we're here, why don't we pull up the

21  Instagram posts of Jason Galanis' wife.  It's 4900 to 4906.

22  The government moves to exclude these exhibits on two bases:

23  That the Instragram posts constitute hearsay and that they're

24  irrelevant.  And, as I understand it, it's been asserted by Mr.

25  Archer that they're neither being offered for the truth or --

I6I7GAL4

1   but I haven't heard the relevance of them.

2           MR. SCHWARTZ:  Sure.  So I think that you've heard

3   some evidence before about the way that Mr. Galanis' wife Monet

4   Berger was used by Jason Galanis in order to foster

5   relationships with various people that he did business with.

6   These posts are relevant to show, one, the way that the

7   Galanises held themselves out to the world.  They displayed

8   their wealth, they displayed their relationship with the

9   Gubers -- one of these is with a member of the Guber family --

10  and in particular some of these will be relevant to particular

11  testimony that we expect the defense witness to offer.  And

12  that witness will of course authenticate and explain that they

13  viewed these.

14          MS. MERMELSTEIN:  I think that they are wholly

15  irrelevant and any potential relevance is far outweighed on a

16  403 ground.

17          I mean there is no dispute in this case that Jason

18  Galanis led a luxury lifestyle.  I think every person in this

19  courtroom agrees with that.  But these are attacks on his wife.

20  That's just not relevant.  There is plenty of testimony in this

21  case about the way in which Jason Galanis and, in the

22  government's view, in a collective endeavor with his

23  codefendants, played up their important connections and sold

24  their connections.  That was the way that these men all did

25  business.  But the notion that Monet Berger's trip to Chanel

I6I7GAL4

1    with a bunch of female friends has any relevance is simply

2    wrong.  It is designed to try to not just cast aspersions on

3    Jason Galanis -- which of course is perfectly fair -- but on

4    his wife, who there is no doubt led a very luxurious lifestyle

5    as Jason Galanis' wife.  But so what?

6            And, in addition, the posts themselves in some cases

7    contain the necessary relevant information, and they are

8    hearsay statements by Monet Berger offered for their truth.

9    But I think they are irrelevant and in appropriate is really

10   the bigger problem here.

11           THE COURT:  All right.  I don't think that any of

12   these should come in.  I don't think that they are directly

13   relevant.  And while I understand how they support the defense

14   theory, I think they're cumulative in any event, and they are

15   of Jason Galanis' wife and not him, and so I don't think any of

16   these Instagram posts should come in, and I don't think the

17   jury is left with any misimpression about his wealth and how he

18   spent his money.  And I allowed in the video of his house, and

19   so I agree with the government on this.

20           MR. SCHWARTZ:  Can I be heard on this one in

21   particular that's in front of you?

22           So this is a picture of Jason Galanis, so it's about

23   him, and this is him with I believe Mr. Sugarman's

24   mother-in-law on his lap posting that they were all celebrating

25   Passover together.  This is very relevant to show the closeness

I6I7GAL4

1    of the relationship that was held out between Mr. Galanis and

2    the Sugarmans and the Gubers.  This is the way that people fell

3    for it, because he had people around him that were enormously

4    credible, enormously successful, enormously wealthy, that acted

5    as validaters for him, and unfortunately at the end of the day

6    Mr. Archer became one of those people too.  But, you know, on

7    the theory that a picture is worth a thousand words, I think

8    that this image is of particular relevance to the defense case.

9            THE COURT:  All right.  Do you want to respond to the

10   Guber Passover reference?

11           MS. MERMELSTEIN:  Only if your Honor thinks that

12   that's necessary.

13           THE COURT:  I think that there has been evidence

14   before the jury about the relationship through a number of

15   different witnesses, so I don't think that this should come in,

16   so I'm going to exclude this.

17           And then why don't we talk about the Cooney/Crafton

18   recording.

19           MR. SCHWARTZ:  Your Honor issued an order on that

20   already, and you indicated that there was going to be some line

21   editing.

22           THE COURT:  Thank you for clarifying that.  So I just

23   want to go through it together.  So I have it out here -- if

24   everyone can take it out -- and, Ms. Notari, my first question

25   is how page 1 --

I6I7GAL4

1              MS. NOTARI:  Your Honor, I have to get.

2              THE COURT:  Yes, take your time.

3              All right.  So, the first -- do you have it up?

4              MS. NOTARI:  Yes.

5              THE COURT:  The first question is how the first page

6    is at all relevant and what hearsay exception anything on the

7    first page -- what exception might apply.

8              I mean I was inclined to just have you redact the

9    entire first page and start at the beginning of page 2.

10   Because I largely agree with Mr. Archer that the statements are

11   admissible as nonhearsay statements, not being offered for the

12   truth.  And I do think it's relevant in light of the defense

13   strategy to show the manner in which the other alleged

14   coconspirators sought to capitalize on their relationship with

15   him, in an effort to give this fraudulent scheme a veneer of

16   legitimacy.  So I was inclined to redact the first page and

17   allow in most of the rest, although I had --

18             MS. NOTARI:  Your Honor, I did want to --

19             THE COURT:  If you need more time, that's fine.

20             MS. NOTARI:  I think the last paragraph that was sort

21   of -- once the deal is cut, you know, I can be wherever I want;

22   no one wants me managing a business.  And it sort of explains

23   what he does for a living.

24             It's been a while since I've looked at this.

25             THE COURT:  So, I tell you where I am, and then if you

I6I7GAL4

1    want to respond even tomorrow morning, that's fine.  But I was

2    inclined to delete the first page, allow in most of the rest of

3    it.  But the part that I was hesitating on though is

4    Mr. Cooney's statement that these guys don't do scuzzy deals.

5    And I will tell you exactly where that is.

6            MS. NOTARI:  We think that's important.

7            THE COURT:  I know why you want it, but my question is

8    what is your evidentiary argument as to why it should be

9    included?  It's on page 4.

10           MR. SCHWARTZ:  So the proposal would be to redact

11   beginning with "and these guys don't do scuzzy deals"?

12           THE COURT:  Well, so my proposal is, number one, to

13   redact the first full page and start on page 2, but then the

14   question is what is the evidentiary basis for getting in the

15   line "and these guys don't do fucking scuzzy deals"?

16           MS. NOTARI:  That's his whole state of mind.

17           MR. SCHWARTZ:  And also it goes hand in hand with the,

18   you know, holding out Mr. Archer and others for a veneer of

19   legitimacy.  That's the point; that's the punch line.  The

20   reason why you boast about your connection with all of these

21   credible, successful people is because they don't do scuzzy

22   deals.  They might do deals that might have a little BIT of

23   hair on them; they're not wimps; but they don't do scuzzy

24   deals; and so it really goes to that exact same point.

25           THE COURT:  Do you want to be heard on this?

I6I7GAL4

1              MS. MERMELSTEIN:  I do, your Honor.  I mean I think to

2      say something just on the first page, which is, we understand

3      your Honor's ruling with respect to the Code Rebel portions of

4      this recording, but the notion that Mr. Cooney could put in a

5      section talking about the way in which he does reverse mergers

6      and run shells, and suggesting that that's evidence of his

7      legitimate business, in light of the other portions of the

8      recording making clear that it is exactly that, which is the

9      pump and dump scheme, I think that's really impossible and

10     wildly misleading to the jury, and so I do think the whole

11     first page should come out.

12              With respect to the scuzzy deals and the legitimacy

13     point, I mean to the extent that your Honor is going to allow

14     this in order to show that these guys -- I mean I can't really

15     understand how it helps Mr. Cooney to have him selling Devon

16     Archer in exactly the same way that Jason Galanis is alleged to

17     have done, but that's for the defense to decide.

18              But there is no question that the true purpose of

19     offering the statement "so you have these layers of legitimacy

20     and these guys don't do scuzzy deals" is for its truth.  You

21     can try and argue that's not what you're doing, but that's very

22     obviously what you're doing.  It's an attempt to put in a

23     statement of the defendant for its truth without having him get

24     on the stand and say we didn't do scuzzy deals.

25              THE COURT:  That's why I'm hesitating about it.

I6I7GAL4

1          MS. MERMELSTEIN:  I think that's a violation of the

2     rules of evidence, and it gives a misleading impression, and it

3     doesn't allow the government to cross-examine the person who is

4     saying it, and so I don't think that should come in.

5          There is plenty in here about how Devon Archer is best

6     friends with sort of the Bidens, and the Obamas, and the

7     Kerrys, and how important he is, and that point comes through

8     plenty clear, if that's the point that needs to be made.  I

9     think that this paragraph, this last paragraph, the last

10    statement by Cooney, should just come out.

11         THE COURT:  All right.  So I will think about this.  I

12    will look at the calendar issue, and I will issue a ruling on

13    that today.

14         MS. NOTARI:  I also want to think about it, because if

15    the scuzzy deal part doesn't come in, then I may not want it

16    in.

17         THE COURT:  OK.  All right.

18         MS. NOTARI:  And there is a reference that says I'm

19    not an Obama supporter -- I'm not a big Obama supporter.  I

20    think that's just -- you know, that would just raise prejudice

21    against anybody that was -- there is a lot of Obama supporters

22    on the jury, and I don't think --

23         THE COURT:  Yeah, well, it will be up to you to decide

24    what you're seeking to admit.  I'll rule on that later today so

25    that you know before your defense case.  And then we will

I6I7GAL4

1    address the expert issue first thing in the morning.

2              MS. NOTARI:  You'll rule on what?

3              THE COURT:  On what aspects of this I think should

4    come in.  And then based on that ruling you can decide what you

5    want to do.

6              MR. SCHWARTZ:  Thank you.

7              And I was merely going to say with respect to the

8    experts, as soon as I get back to the office I will look with

9    fresh eyes at the government's motion, and it may well be that

10   I can tell you that there are certain opinions that they

11   objected to that are no longer in issue.  I will just identify

12   those opinions so you know they're off the table.

13             THE COURT:  That would be great.

14             MR. SCHWARTZ:  The one thing that they objected to

15   which won't be off the table is sort of background principles

16   and facts.  I don't really think there is a dispute about that,

17   but on the opinions I will let you know.

18             THE COURT:  OK.  All right.

19             So I will see you all --

20             MR. TOUGER:  Do you want to deal with the McMillan

21   issue, or do you want to wait until tomorrow?

22             THE COURT:  I'm sorry, I didn't hear you.

23             MR. TOUGER:  The McMillan issue as far as his

24   testifying.  I spoke to the government, and they want to bring

25   out that Mr. McMillan was told by John Galanis not to follow

I6I7GAL4

1   any instructions by Jason Galanis.  And that instruction was

2   issued during the Gerova involvement of Mr. Galanis and

3   Mr. McMillan, not during this instruction of Mr. McMillan and

4   Mr. Galanis' business relationship.  Therefore, I think it has

5   no relevance.

6           I'm not going to bring out -- and I will also say I'm

7   not going to bring out that Jason Galanis had any influence on

8   what Mr. McMillan did, because he didn't, but I don't think the

9   government should be able to bring out a fact that occurred

10   four years or whatever it was earlier that had nothing to do

11   with this account.  That instruction had to do with Gerova

12   involvement; it had nothing to do with this account.

13           And again, as I said, I don't plan to bring out that

14   Jason Galanis did anything with this account -- because he

15   didn't -- but I don't think the government should be able to

16   bring out that statement.

17           MS. TEKEEI:  Your Honor, if I may give the court a

18   little BIT of background.  Mr. McMillan is an individual who

19   Mr. Galanis -- John Galanis -- hired back in 2009 or 2010 for

20   the purpose of setting up companies and bank accounts related

21   to those companies.

22           Mr. Galanis and Mr. McMillan then engaged in a course

23   of dealing whereby Mr. Galanis -- John Galanis -- would direct

24   Mr. McMillan as to what transfers were to be made out of those

25   accounts, to whom, when those transfers were to be made, the

I6I7GAL4

1    amount of those transfers, and the account-related information

2    to which those transfers would go.  That is exactly what

3    Mr. John Galanis did with respect to Mr. McMillan here in this

4    case.  He directed Mr. McMillan to set up a corporation.  He

5    directed Mr. McMillan to set up a bank account.  And then he

6    proceeded to direct Mr. McMillan with respect to transfers out

7    of that account.

8            And so the course of dealing between John Galanis and

9    Mark McMillan is highly relevant to Mr. McMillan's testimony

10   and providing some background and explanation as to why it is

11   that he set up the company, set up the bank accounts and acted

12   solely at John Galanis' direction in connection with disbursing

13   the Wakpamni Lake Community Center funds.

14           Now, in the course of his conduct with John Galanis

15   over the course of several years now Mr. McMillan was

16   instructed by John Galanis that with respect to the bank

17   accounts that Mr. McMillan had set up for Mr. John Galanis,

18   that he was not to receive any instructions or follow any

19   instructions from Jason Galanis.

20           Mr. Touger has now spent a significant amount of time

21   cross-examining multiple government witnesses about what

22   instructions Jason Galanis gave them, whether they followed

23   those instructions, and whether those were orders that they

24   followed.  We're entitled to ask one witness what John Galanis

25   instructed him with respect to Jason Galanis' role in

I6I7GAL4

1      connection with bank accounts.  We do not in any way, shape or

2      form intend to elicit testimony about Gerova.  We don't intend

3      to name those bank accounts.  We don't intend to go into any

4      more substance than what I've already described, but we think

5      that's highly relevant and highly probative to John Galanis'

6      state of mind -- which is at issue in this case -- and that

7      background and their course of dealing with Mark McMillan

8      explains what happened here with the Sovereign Nations

9      Development Corporation account and bank accounts.

10            MR. TOUGER:  Your Honor, I have no objection to them

11     asking Mr. McMillan did Jason Galanis give you any instructions

12     with this account.  The answer will be no.  I don't plan to

13     cross-examine him on that at all.

14            The statement they want to bring out was made in 2009,

15     maybe 2010.  That's four years before this account was ever

16     opened.  It had nothing to do with this account.  This account

17     wasn't even a glimmer in anybody's eye at that point.

18            And I cannot bring out to cross-examine Mr. McMillan

19     of why that statement was made back in 2009, 2010.  There is a

20     very good reason it was made back then.  I can't bring that

21     out, because that would open up the door to going into all

22     about Gerova.

23            So, I have no problem -- and I said this to them in a

24     letter yesterday -- stipulating, them having the witness state

25     that Jason Galanis had nothing to do with this account; he

I6I7GAL4

1    received no instructions from Jason Galanis on this account;

2    Jason Galanis was never discussed relative to this account.  No

3    dispute on that.

4            But to bring out a statement that was made by John

5    Galanis in 2009 or 2010 relative to accounts that were created

6    in 2009 and 2010 is not relevant to the accounts made in 2014.

7            John Galanis did not say in 2014, "Remember what I

8    said to you back in 2009."  If he had said that, then that

9    could come out.  The 2009/2010 statement was never made.  As a

10   matter of fact, in his 3500 material he specifically states

11   that he says that statement when he is talking about those

12   accounts back in 2009 and 2010.

13           So, how is it relevant to accounts that were in 2014

14   when I have no intention -- and if I open the door, then it's

15   on me -- but I have no intention to bring out that Jason

16   Galanis gave one single instruction or ever talked to

17   Mr. McMillan during 2014.  He didn't, that's fine, that's the

18   facts, they can come out.  But to bring out a statement from

19   five years earlier I think is highly improper, one; two,

20   irrelevant; and, three, puts me in a position that I can't

21   counteract it because I can't bring out the information of why

22   that statement was made.

23           MS. TEKEEI:  Your Honor, obviously we disagree with

24   that.  Mr. McMillan will testify that the way that he acted in

25   his capacity as sole director of Sovereign Nations Development

I6I7GAL4

Corp. and the bank accounts that he set up was directly a
result of a course of dealing he had had with John Galanis for
several years including in 2010.  So, the instructions that
John Galanis provided Mr. McMillan with respect to Jason
Galanis' role in any Galanis-related bank accounts stood for
that entire time period and into the time period that
Mr. McMillan operated the Sovereign Nations Development Corp.
accounts.

                In other words, he did not take instruction from Jason
Galanis.  He didn't reach out to Jason Galanis for any
information, because he had been instructed not to by John
Galanis years before.  And the other instructions that John
Galanis had provided to Mr. McMillan years before remained in
place with respect to his course of dealing with the Sovereign
Nations Development Corp. account.

                It would not be an issue -- it almost wouldn't be an
issue if Mr. Touger had not spent so much time questioning
every witness about exactly what instructions they took from
Jason Galanis, how they relied on Jason Galanis, how they
followed Jason Galanis' control and instructions.  This is one
witness who will say he didn't and he didn't by design; he
didn't by John Galanis' design.  He didn't because John Galanis
had instructed him to, and he followed John Galanis'
instructions through the course of his dealings.

                MR. TOUGER:  Your Honor, that would be relevant if

I6I7GAL4

1  Jason Galanis called Mr. McMillan during this and said do X, Y

2  and Z and Mr. McMillan said, no, I can't.  There is no evidence

3  whatsoever that Jason Galanis contacted Mr. McMillan to do

4  anything in this case.  Therefore, it is a pure assumption on

5  their part to say that in 2014 Mr. McMillan would have followed

6  the statement, would have remembered a statement, would have

7  followed a statement that was made in 2009.  Jason Galanis

8  never contacted him, therefore, the statement has no relevance.

9  If Jason Galanis had contacted him and said do this with the

10  money, and he said no, and then said I said no because of this

11  statement back in 2009, then it would be highly relevant; I

12  could understand that; and I could see the argument.

13         But in this case, in July and August of 2014, John

14  Galanis and Barry Feiner call him up and say we would like you

15  to open up bank accounts for this company, all you have to do

16  is open the bank accounts, write the checks.  And he receives

17  no order, no contact, no order, no nothing from Jason Galanis.

18  So, how is a statement made five years earlier relevant to this

19  case when it never came into play?

20         THE COURT:  Just last word.

21         MS. TEKEEI:  Sure.  Mr. Touger cannot use this issue

22  of Gerova both as a sword and a shield.  He has made this

23  implicit argument.  We've laid out for the court the testimony

24  in which it's happened.  The government should be able to rebut

25  even the implicit argument that he has been making.

I6I7GAL4

1      It is the case that funds from the Sovereign Nations

2  Development Corp. account were wired directly to Jason Galanis

3  at John Galanis' direction.  That's indicated by the Sovereign

4  Nations Development Corp. records and the records that Mr.

5  McMillan kept.  So, it's not as though there was no interaction

6  between that account and those funds with Jason Galanis.  We

7  should be able to ask this question.

8      MR. TOUGER:  Yes, that can come out that John Galanis

9  told him to send money to Jason Galanis.  That still doesn't

10  impact Jason Galanis contacting him.  There is no contact,

11  literally none.

12      THE COURT:  OK.  So I will decide on this.  I will

13  either rule on it today by order or tomorrow morning orally.

14      Just lastly --

15      Yes?

16      MS. NOTARI:  So, does your Honor want me to point out

17  on page 3 the redaction that I'm requesting?

18      THE COURT:  Sure.

19      MS. NOTARI:  Cooney:  Not that I'm an Obama fan.  And

20  then Crafton says:  Hey, he can help us then.

21      MR. QUIGLEY:  Judge, we object to that.  You know,

22  every document has parts of it that are good for somebody and

23  are bad for somebody.  You know, if they want to offer this

24  exhibit and the court is inclined to admit the whole thing,

25  then the whole thing should come in, not just the parts they

I6I7GAL4

1    like.

2           And if it's, well, you know, we don't want to get into

3    political views, but their political ties are coming in, and

4    they can't -- they shouldn't -- all their political statements

5    should come in or none of them should come in.

6           THE COURT:  OK.  So, I will look at that.  As I say, I

7    will rule on that.  So there are four remaining issues that I

8    will rule on.

9           Yes, Mr. Schwartz?

10          MR. SCHWARTZ:  I wanted to talk about scheduling for a

11   second, but go ahead.

12          MS. MERMELSTEIN:  Mine relates to scheduling too but a

13   little substance.

14          So I guess two things.  One is there are -- as your

15   Honor will recall, there were a number of exhibits used on the

16   redirect examination of Mr. Shapiro that we didn't publish to

17   the jury because we were going to redact on them.  We largely

18   agree on the redactions but there are a few that we have not

19   agreed on that we need to put before your Honor.  We are

20   prepared to do that now.

21          THE COURT:  OK, I'm happy to do that now.  I have to

22   leave a little BIT before one, but otherwise I'm happy to do it

23   now.

24          MS. MERMELSTEIN:  So I wanted to put that on your

25   Honor's radar.

I6I7GAL4

1          The other thing is I wanted to raise -- and I think it

2     affects scheduling -- the issue of defense summary charts.  I

3     understand there are summary charts coming.  It wasn't clear to

4     me from Mr. Schwartz's e-mail communications if there is a

5     summary chart relating to the calendar entries in addition to

6     other summary charts.

7          But, as I understand it, the calendar entry exhibits,

8     if they come in, were going to come in tomorrow.  Now they are

9     either going to come in tomorrow afternoon or Wednesday.  But

10    there is obviously voluminous documentation underlying the

11    summary charts.  That's why we gave our draft to the defense so

12    many weeks in advance, because I think it's fair to let

13    everyone have time to review them.  The defense has said sort

14    of the government will have them when they're ready; and I

15    understand that summary charts are affected by trial, but they

16    are coming in as soon as tomorrow afternoon, and I think it's

17    unfair for the government not to have them sort of now, because

18    it won't allow us to adequately sort of review them and review

19    all of the underlying documentation in order to question a

20    witness about whether or not they're accurate.

21         So, I wanted to put on the court's radar that we have

22    raised this issue with defense, and the answer has been sort of

23    they're going to come when they're ready; but I just don't

24    think that's an adequate response, so I think they ought to be

25    produced by the end of today.

I6I7GAL4

1          Then with respect to scheduling, I guess what I would

2     say is it sounds like we're all in agreement that closings are

3     likely to start on Monday, but, if not, on Tuesday, but that

4     everyone will be ready for Monday, and I just wanted to make

5     sure we're all on the same page.

6          THE COURT:  Right.  So there are two issues on

7     scheduling.  One is the two jurors have issues on the 26th, and

8     the other is just when to have the charge conference, which I'd

9     like to do on Friday.

10          But, Mr. Schwartz, did you want to respond to the

11     substantive point about the summary chart?

12          MR. SCHWARTZ:  Sure.  First of all, as far as tomorrow

13     goes, I don't suspect that the defense case is going to be in

14     tomorrow.  I think that the government's case is going to take

15     the balance of the day based on the three witnesses that are

16     left.  I could be wrong, but that's what I suspect.

17          What I told the government when they asked about

18     summary charts was that I would give them as we received drafts

19     that I was comfortable turning over, except that we had charts

20     that are essentially responsive to an impeaching of evidence

21     that the government was going to put on today, will now put on

22     tomorrow, and I don't intend to turn over to them those charts

23     until after their witnesses have testified, because it will put

24     them on notice of our impeachment, in essence.

25          So, I take the point that they need time to look at

I6I7GAL4

them.  I will be prepared to turn them over promptly when the

witnesses are done, but I don't think it's fair or appropriate

to require me to turn over summary charts that will alter the

testimony of the government's witnesses.

And one of those -- one of the charts -- which I'm

happy to turn over as soon as I receive the draft -- is a

calendar summary chart, which is simply to take all those

entries and put them on a calendar, which is basically sort of

auto done by Outlook or anything like that.  But if they want

to see how that looks visually, I will ask our vendor to print

that out.  That I have no problem with.

MS. MERMELSTEIN:  That would be good, your Honor.  I

don't think that the calendar summary chart operates as

impeachment for anything.

MR. SCHWARTZ:  No, I agree.

MS. MERMELSTEIN:  I also don't agree that a

substantive summary chart being offered in the defense case in

chief is impeachment for the government's summary chart

witness.  If they had documents they wanted to show the summary

chart witness to say you've never seen this, it's not on your

charts, no one gave it to you, I think that would be fair game

and that's fair impeachment; but I don't think that the

existence of a summary chart that puts things in a different

framework is impeachment, and I just think it's unfair to say

that they should sort of have ours for three weeks to review

I6I7GAL4

1    and we should have them for three hours because of the way the

2    trial unfolds.  It's not a sufficient time to review them.

3              THE COURT:  How long are your charts?  Just give me a

4    sense.

5              MR. SCHWARTZ:  Look, I'm happy to come to sidebar and

6    make an ex parte representation in full of what they are, but

7    --

8              THE COURT:  I mean can the government really

9    realistically review it in a night and make objections for the

10   morning and then have you make changes in the morning if they

11   need to be made?

12             MR. SCHWARTZ:  I mean it will be logistically

13   difficult.  I don't disagree.  But I'm not quite sure how else.

14             THE COURT:  Then you're risking the possibility that

15   they may not come in at all.  I'm not going to adjourn the

16   trial --

17             MR. SCHWARTZ:  I understand.

18             THE COURT:  -- for a day.

19             MR. SCHWARTZ:  I perfectly understand that.

20             THE COURT:  All right.

21             MR. SCHWARTZ:  And if that's so, we will rejigger

22   things to put space in between them.  I mean as long as the

23   government is promising --

24             THE COURT:  I mean what if the government makes a

25   representation that it's not going to show the witnesses your

I6I7GAL4

charts?

MR. SCHWARTZ:  I mean and it's not going to use any information in those charts to inform their prep of their remaining witnesses?  That's a very hard representation for them to make and an impossible one for us to verify.

THE COURT:  Look, I think I'm not going to make you turn them over now but I want you to turn them over tomorrow right after trial.

MR. SCHWARTZ:  Absolutely.

THE COURT:  But recognize that you're running the risk if I think there is something objectionable and you can't turn it around, then you won't be able to use it.

MR. SCHWARTZ:  If the government gives us prompt objections, we will be able to turn it around.

MS. MERMELSTEIN:  Well, that's the problem, your Honor.  The issue is not whether or not Mr. Schwartz will be able to turn them around if there are objections.  The problem is it prejudices the government.

There are millions of pages.  So you're going to have a summary chart that shows money flows.  We have to go and tie out every single one to say is this really correct, or do I want to ask the witness is this really correct.  And I spent a lot of time with the bank records, but I can't memorized them. I can't do that in a number of hours.  So, if you're going to give them to us tomorrow at five and expect us to know at nine

I6I7GAL4

1   a.m. how to cross-examine that witness and whether or not

2   they're right and what our objections are, that's the problem,

3   not whether or not Mr. Schwartz can turn them around.  That's

4   frankly his problem.

5           MR. SCHWARTZ:  That's really the issue.  It's not that

6   they object to the summary chart; it's that they want to be

7   prepared to cross-examine?  I understand the instinct, but if

8   there are factual errors on the charts -- there aren't -- but

9   if there were, that would be fertile grounds for

10  cross-examination.  If there was something about the chart that

11  made it objectionable --

12          THE COURT:  But what kind of notice did the government

13  give on their summary charts?  I mean how much time did you

14  have to review their summary charts so that you could

15  cross-examine their witnesses about what was in them?

16          MR. SCHWARTZ:  Look, I don't think that there is any

17  parallels between the two.  They gave us -- and they would know

18  better than I would -- they gave us reasonably final versions

19  of the charts ten days ago?  Two weeks ago?

20          MS. MERMELSTEIN:  Three weeks ago.

21          MR. SCHWARTZ:  Three weeks ago maybe.  We've had them

22  for some time; I don't deny that at all.  And they've changed

23  as their witness has tinkered with them, but in ways that we

24  have been able to track.

25          Obviously, I'm not faulting anything the government

I6I7GAL4

1    has done with the summary charts other than their sort of

2    decision to label things the way they have.  But this is just

3    not a situation where what is good for the goose is good for

4    the gander.  Because the entire defense case is impeaching of

5    the government case, but these charts in particular -- and

6    again I'm happy to come to the sidebar and make an ex parte

7    proffer -- are directly responsive to testimony and evidence

8    that's going to come in tomorrow.

9              THE COURT:  All right.  So, I'm not the going to make

10   the defense give the summary charts over until tomorrow at the

11   end of the day.

12             If there are issues, let me know.  We will think about

13   what we can do in terms of timing, and I will consider the

14   possibility that I won't admit the chart if there are errors in

15   it and it can't be fixed.  So that's my ruling on that.

16             Let's schedule the time for the charge conference.  I

17   think, Mr. Touger, you said you had something personal on

18   Friday afternoon; is that right?

19             MR. TOUGER:  That's correct.

20             THE COURT:  So, why don't we meet at nine to have the

21   charge conference.  I will distribute a draft charge as soon as

22   I can but in advance of that to give you time to review it and

23   discuss it Friday at nine.

24             MR. SCHWARTZ:  I hate to make this request.  If we

25   could do it later.  I promised my kids that I would stay home

I6I7GAL4

```
 1    late that day.  My son is going to sleep away camp the next
 2    day, and I spent Fathers Day in the office yesterday.  So, if
 3    we could do 10 o'clock, that would make my home life much
 4    easier.
 5              THE COURT:  Mr. Touger, you have to leave at one,
 6    right?
 7              MR. TOUGER:  Yes.
 8              THE COURT:  OK.  I will see if I can move some
 9    conferences I have earlier and see if I can do it at 11, and
10    then we can do it 11 to one.  So if that's a problem, I will
11    let you know, but otherwise just assume that I will move it to
12    11.  Could you do 10:30?
13              MR. SCHWARTZ:  Look, I will do whatever your Honor
14    says.
15              THE COURT:  I understand, but I'm trying to --
16              So, let's for now have it be at 11.  OK?
17              And then what are your thoughts on the two jurors?  I
18    mean we now have four alternates.  We don't need four
19    alternates if things are coming to a close.  One is an
20    alternate, and I think it's Juror 8 and Juror 13 is my
21    recollection.
22              MR. QUIGLEY:  I guess our thought is really only Juror
23    8 is an issue.  Do we know if she is out the whole day on the
24    26th?  I think it was a graduation or something.
25              THE COURT:  I think it was her son's graduation, if I
```

I6I7GAL4

1   remember.  Is that right, Alison?

2              DEPUTY COURT CLERK:  Yes.

3              MR. QUIGLEY:  Because if we're closing conceivably

4   closing on Monday, we could do -- you know, if it's only part

5   of the day rather than -- it may not be.  I'm just saying --

6              THE COURT:  We can ask her.  I mean we will ask her,

7   and we will let you know, but I do want your positions on

8   whether we should let both of them go entirely.

9              I mean my understanding was that she wasn't available

10  at all that day, but I don't want to represent that without

11  going back and clarifying and confirming that.

12             But I don't want to -- I mean I'd rather not lose a

13  day when we have three alternates, but I'm also -- and we have

14  known this from the start, and we promised both of them that we

15  would respect their day, so I'm not going to require them to

16  sit.  And then the question is, you know, is there any

17  objection to excusing both of them or putting an alternate in

18  place of Juror 8 and proceeding.

19             I mean if we're going to do that next week, there is

20  no reason to make both of them sit through another week of

21  trial.  But I don't know if you want to be heard on it now or

22  confirm her schedule first.

23             MR. QUIGLEY:  I think we would prefer to confirm the

24  schedule first.

25             THE COURT:  OK.

I6I7GAL4

1            MR. SCHWARTZ:  We can certainly find out.

2            THE COURT:  So we will confirm both of their

3    schedules; we will let you know.  Then just let me know what

4    your position is.  OK?  All right.  OK.  So I will see you all

5    tomorrow at 8:45.

6            MR. SCHWARTZ:  Sorry, last logistical question.  So

7    with the anticipated close of the government's case tomorrow,

8    how does your want to handle Rule 29 motions?  This is a case

9    in which I feel like Mr. Archer has a very substantial Rule 29

10   motion.  I would like to be heard on it, but at the same time I

11   want to deploy my resources accordingly.

12           THE COURT:  Well, I'm happy to reserve your time to

13   make a motion to another time if you would like to do that.  I

14   don't know what you're asking specifically.

15           MR. SCHWARTZ:  I mean really what I'm asking is would

16   it be fruitful for us to put in full argument on the Rule 29

17   motion at the close of the government's case?

18           THE COURT:  I will obviously take any motion very

19   seriously.  I think I would like to move this along.

20           MR. SCHWARTZ:  Agreed.

21           THE COURT:  So I think it's better for us to move

22   forward, move forward with the defense case, reserve your

23   motion, and then make it at a time where we're not taking the

24   jury's time.

25           MR. SCHWARTZ:  I understand.

I6I7GAL4

1          THE COURT:  That's my preference.

2          MR. SCHWARTZ:  I understand.  Thank you.

3          THE COURT:  All right.  OK.  Thank you.  Have a good

4     afternoon.

5          (Trial adjourned to June 19, 2018 at 8:45 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6I7GAL4

1                      GOVERNMENT EXHIBITS

2     Exhibit No.                              Received

3     4500, 4501, 4502, 4504, 4505 . . . . . . . .2492

4     1100, 1101, 1110, 1112, 1102  . . . . . . . .2493

5     1103 through 1105  . . . . . . . . . . . . .2493

6     1106, 1107, 1108, 1109 . . . . . . . . . . .2493

7     225 and 226  . . . . . . . . . . . . . . . .2495

8     214, 214A, 306, 308, 322 . . . . . . . . . .2496

9     327, 330, 432, 435, 508  . . . . . . . . . .2496

10    515 to 520 . . . . . . . . . . . . . . . . .2496

11    523, 605, 610, 624, 640  . . . . . . . . . .2496

12    641, 641A, 643, 645, 1050  . . . . . . . . .2496

13    1212, 3224 and 3274  . . . . . . . . . . . .2496

14    4100   . . . . . . . . . . . . . . . . . . .2496

15    251, 340, 750, 1262, 1281  . . . . . . . . .2497

16    1368, 1453, 2003, 2004, 2008 . . . . . . . .2497

17    2021, 2025, 2054, 2065, 2066 . . . . . . . .2497

18    2067, 2069, 2074, 2097, 2102 . . . . . . . .2497

19    2103, 2113, 2121, 2122, 2203 . . . . . . . .2497

20    2210, 2211, 2219, 2220, 2221 . . . . . . . .2497

21    2222, 2228, 2243, 2247, 2252 . . . . . . . .2497

22    2253, 2255, 2257, 2259, 2269 . . . . . . . .2497

23    2281, 3201, 3205, 3208, 3250 . . . . . . . .2497

24    3251 and 3275  . . . . . . . . . . . . . . .2497

25