I6J7GAL1

```
UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                        16 Cr. 371 (RA)

JOHN GALANIS, et al.,

                Defendants.

------------------------------x
```

                                        New York, N.Y.
                                        June 19, 2018
                                        8:55 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                        District Judge


                         APPEARANCES

ROBERT KHUZAMI,
     Acting United States Attorney for the
     Southern District of New York
BY:  BRENDAN F. QUIGLEY,
     REBECCA G. MERMELSTEIN,
     NEGAR TEKEEI,
         Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant John Galanis
BY:  DAVID TOUGER

BOIES, SCHILLER & FLEXNER LLP (NYC)
     Attorneys for Defendant Devon Archer
BY:  MATTHEW LANE SCHWARTZ
     LAURA HARRIS
     CRAIG WENNER

I6J7GAL1

1    Appearances (Cont'd)

2

3    PAULA J. NOTARI
          Attorney for Defendant Bevan Cooney
4             - and -
     O'NEILL and HASSEN
5         Attorneys for Defendant Bevan Cooney
     BY:  ABRAHAM JABIR ABEGAZ-HASSEN
6

7

8    Also present:  Kendall Jackson, Paralegal
                    Ellie Sheinwald, Paralegal
9                   Eric Wissman, Paralegal
                    Special Agent Shannon Bienick, FBI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6J7GAL1

1          (Trial resumed; jury not present)

2          THE COURT:  Mr. Touger, are we ready to proceed?

3          MR. TOUGER:  Yes, your Honor.

4          THE COURT:  Good, I am a glad to hear that.

5          All right.  So there are still a few jurors who are

6     not here yet.  Why don't we talk about a few things.  I just

7     received your letter, Mr. Archer.

8          All right.  So first with respect to the anticipated

9     testimony of Mr. McMillan, I have a couple questions, Ms.

10    Tekeei.  So, was the instruction in question by John Galanis

11    repeated after 2009 or 2010, or the answer is, no, but the

12    course of conduct was followed?

13         MS. TEKEEI:  I think the answer is no but the course

14    of conduct was followed, your Honor.

15         THE COURT:  And can you give any additional gloss as

16    to kind of what was said and if there was any reasoning

17    provided?  I'm just trying to assess the probative value of

18    this anticipated testimony.

19         MS. TEKEEI:  Sure, your Honor.  My binder is in the

20    cart, so just let me grab it.

21         THE COURT:  Sure, go ahead.

22         And when is Mr. McMillan testifying today?

23         MS. TEKEEI:  We expect he will testify after

24    Ms. Moynihan, who is here.

25         So, Mr. McMillan was told in connection with the work

I6J7GAL1

1    that he did on bank accounts that John Galanis had directed him

2    to set up, Mr. McMillan would say that John Galanis was his

3    primary boss, but if Jared Galanis, or if a lawyer such as

4    Barry Feiner gave him instructions, he was allowed to follow

5    those instructions, but he was told by John Galanis not to take

6    instructions from Jason Galanis.

7              THE COURT:  But not told why.

8              MS. TEKEEI:  He was not told why, no.  He was also

9    told not to take direction from Derrick Galanis and again not

10   told why, and that was I think relatively early on in the

11   course of their dealings.  That's really only three to three

12   and a half years prior to when the Sovereign Nations

13   Development Corp. account was opened, and so Mr. McMillan

14   worked for John Galanis on an ongoing basis during that time

15   period.

16             He separately also worked or was trying to work on a

17   project with Jason Galanis, and there are certainly -- he being

18   McMillan -- there are certainly e-mails indicating that they

19   had a working relationship, but with respect to the bank

20   accounts he was not to take direction from Jason Galanis.

21             THE COURT:  And he continued to -- John Galanis --

22   utilize those bank accounts through 2014 and 2015?

23             MS. TEKEEI:  I think the answer to that is no.  I

24   think the answer to that is no, your Honor.

25             THE COURT:  OK.

I6J7GAL1

1          MS. TEKEEI:  That those bank accounts were closed

2     down.  There was a period of a few months -- the initial

3     accounts were closed down.  There was a period of several

4     months where Mr. McMillan was not receiving any work from John

5     Galanis, and then the Sovereign Nations Development Corp. bank

6     account was opened.

7          MR. TOUGER:  It was over a year.

8          THE COURT:  Please don't interrupt.

9          Finish.

10          MS. TEKEEI:  I couldn't give you the exact timeframe,

11     but there was a period of several months during which after the

12     last set of the initial bank accounts were closed where Mr.

13     McMillan did not work or didn't have work from John Galanis,

14     and then the next thing that he had from John Galanis was the

15     Sovereign Nations Development Corp. company and bank accounts.

16          THE COURT:  But there was no specific instruction with

17     respect to those.

18          MS. TEKEEI:  That is our understanding, yes.

19          THE COURT:  OK.  Was there any other instruction with

20     respect to who he could take instructions from with respect to

21     those bank accounts?

22          MS. TEKEEI:  So I think the answer is, no; they had an

23     established course of dealing at that point, and Mr. McMillan

24     was following that established course of dealing; that included

25     not asking questions about things like that, not asking

I6J7GAL1

1  questions about where the money was going or the source of the

2  funds; and he just did what he was told.

3          THE COURT:  All right.  And just to confirm -- and I

4  think you've answered it -- there is no evidence that McMillan

5  declined to work with or follow instructions from Jason Galanis

6  in the context of the WLCC scheme.

7          MS. TEKEEI:  That is correct.

8          THE COURT:  OK.  And, Mr. Touger, why can't you

9  effectively cross-examine McMillan on this subject?

10          MR. TOUGER:  Because the accounts that were opened and

11  closed, and --

12          THE COURT:  I mean on Gerova what I thought was overly

13  prejudicial was your client's conviction, but tell me why it is

14  that you can't -- you were about to say.

15          MR. TOUGER:  Well, if the Court will allow me to say

16  that was on prior work and not open the door, then I could, but

17  I didn't think that would be proper.  I thought that would be

18  using the Court's ruling, as she said yesterday, as a shield

19  and a sword, and I didn't think that was proper for me to do

20  it.

21          If the court will allow me to say that was prior work,

22  those accounts were closed, and a year and a half later other

23  accounts were opened, then that's fine.  But I didn't want to

24  open the door, and I thought that would open the door.  If the

25  Court is saying it won't, then fine.  But I anticipated the

I6J7GAL1

government's argument would be that once I brought out anything
relative to those accounts, that that would open the door of
why they were being operated.

MS. TEKEEI:  Your Honor, to be clear, we intend to ask
him -- and we have told Mr. Touger -- generally of Mr. McMillan
what was the type of work that you did for Mr. Galanis when you
first began working with him.  We expect he will say that he
would set up companies at John Galanis' directions; he would
set up bank accounts related to those companies, among other
things; and that he would take direction from John Galanis in
disbursing funds from those accounts.  We're not asking which
accounts those were.  We're not talking about any activity that
occurred really with those accounts, just that general
statement to establish their course of conduct in dealing.

So, if Mr. Touger wants to ask Mr. McMillan if that
instruction related to Jason Galanis not directing Mr. McMillan
to making disbursements, or not following Jason Galanis'
instructions, had to do with prior accounts, we don't think
that question in and of itself opens the door, since we're not
going into the nature of that activity.

MR. TOUGER:  Your Honor, I just think the important
factor here is that activity happened and stopped; it's not
like it was continuing.  That activity happened in 2009 through
2011, it stopped, and then two years later -- two and a half
years later -- a new activity begins.

I6J7GAL1

1              THE COURT:  If you were to ask Mr. McMillan if his

2       understanding was that his instructions were to carry over to

3       future bank accounts, what would he say?

4              MS. TEKEEI:  I think he would say that his

5       understanding as to all of the instructions that he received

6       from John Galanis with respect to whether they first began

7       working together carried over into his entire course of

8       dealings with John Galanis.

9              MR. TOUGER:  As you can see, Mr. Galanis is back to

10      being Mr. Galanis.

11             THE COURT:  Good, I'm glad to see him.

12             MR. TOUGER:  And I think the best thing might be to

13      bring Mr. McMillan in outside the presence of the jury, because

14      as Mr. Galanis describes it what happened was in prior business

15      activity there was no instruction, that Jason Galanis was

16      allowed to give him orders; and then during the activity that

17      we are talking of in 2010 there was a disagreement between John

18      Galanis and Jason Galanis, which is why John Galanis gave him

19      that order.  And it would be hard for me to bring out what that

20      disagreement was without going into the facts of Gerova, and I

21      think once I went into the facts of Gerova, the three

22      individuals at that table would be arguing that I'm opening the

23      door.

24             And that's the reason for those accounts that

25      occurred, because there was a dispute that arose between John

I6J7GAL1

1    Galanis and Jason Galanis over those accounts.

2             That McMillan might have even thought that carried

3    over is irrelevant.  His state of mind is irrelevant.  He's not

4    charged with anything; he has immunity.  He's not charged with

5    anything, and I don't even plan to bring out that he has

6    immunity unless they bring it out.  I don't even plan to bring

7    it out.

8             So my point, your Honor, is if the 2014 Sovereign

9    Nations account was being discussed back in 2009, 2010, I could

10   see it.  But not only is there no connection, there is a gap of

11   almost two and a half years in time, and there is no follow-up

12   instruction -- as the government freely admits -- there is no

13   follow-up instruction when this new account opens.

14            And, as I said, I'm not going to dispute that John

15   Galanis gave the only instructions, that he was the order.

16   That's not ever going to be disputed, never going to be argued

17   on summation, but the point is that McMillan's state of mind is

18   unimportant, and if you allow that question to be asked, I

19   can't go into why that order was given back in 2010.

20            MS. TEKEEI:  Not disputing something is not the same

21   as allowing us to establish their course of dealing and the way

22   that Mr. McMillan operated at John Galanis' direction, and that

23   included early on with a warning about dealing with Jason

24   Galanis.

25            THE COURT:  And so --

I6J7GAL1

1          MR. TOUGER:  But that's not exactly true, your Honor.

2     Early on it was allowed.  Then something happened and it wasn't

3     allowed.  Then it stopped, all contact between the individuals

4     stopped, and a new business was --

5          THE COURT:  What individuals?

6          MR. TOUGER:  Mr. McMillan and Mr. Galanis.  Mr.

7     McMillan did not work for Mr. Galanis for an extended amount of

8     time.  And we're not talking a couple weeks or couple months;

9     we're talking about at least two years.

10          THE COURT:  Does McMillan even believe that there was

11     a dispute between John and Jason Galanis in 2010?

12          MS. TEKEEI:  Your Honor, I would have to go back and

13     look through prior meetings.  I certainly haven't asked him

14     about that, primarily because we're keeping him focused on

15     excising the information related to those --

16          THE COURT:  Because we have to deal with the immunity

17     issue anyway outside the hearing of the jury.  Is he going to

18     testify before the break?

19          MS. TEKEEI:  Before the lunch break?

20          THE COURT:  No, before the morning break.

21          MS. TEKEEI:  It depends on the cross-examination of

22     Ms. Moynihan.  We will have him here to do the immunity

23     questions during that morning break.  We've asked him to be

24     here so as not to disrupt the rest of the schedule.

25          MR. TOUGER:  As far as Mr. Galanis' knowledge, he

I6J7GAL1

1  probably has no knowledge about the argument between him and

2  Jason -- between John Galanis and Jason.

3          MS. TEKEEI:  And so then Mr. McMillan couldn't anyway

4  be asked about the purpose of that instruction.

5          THE COURT:  Right.

6          MR. TOUGER:  He doesn't know.  That's my point, your

7  Honor.  But there is no reason for that in Sovereign Nations.

8  And we're not here to prove the state of mind -- as they've

9  said so many times -- of the witnesses; it's only the state of

10  mind of the defendants that count.  And the state of mind of

11  Mr. Galanis has nothing to do with what he said in 2010.

12          And I just don't see the relevance when conduct stops.

13  If there was no gap, if the accounts were just flowing one into

14  the other --

15          THE COURT:  But the government's position is that the

16  conduct didn't stop.

17          MR. TOUGER:  It did.

18          THE COURT:  That it was an ongoing course of conduct

19  and that directions carried over time.

20          MR. TOUGER:  But there isn't.  That doesn't happen.

21  There is a river between them with no bridge.

22          THE COURT:  All right.  Let me just --

23          Sorry.  Did you want to just finish this point?

24          MS. TEKEEI:  Just one more thing, your Honor, which is

25  that when you start a new job you get a set of instructions,

I6J7GAL1

1    and you're told what to do, and you follow those instructions

2    to the best of your ability.  Then when you get a new task

3    related to that job, I think all of us we carry our

4    understandings and instructions we receive with the initial set

5    of tasks on to the next set of tasks.  That is what was done

6    here.

7            In fact, even if there was some time period during

8    which Mr. McMillan did not work with directly John Galanis, he

9    was certainly paid $30,000 as soon as he opened the Sovereign

10   Nations bank account as a gift from John Galanis for not having

11   been able to give him work during that time period.  So, there

12   is even a payment at the initial set-up of the account that has

13   directly to do with their prior course of dealings and their

14   prior working relationship, and all of that is relevant to this

15   witness's testimony, and it goes directly to John Galanis'

16   intent with respect to the Sovereign Nations bank account and

17   the Wakpamni Lake Community Corporation bond proceeds that were

18   in there.

19           MR. TOUGER:  How does Mr. McMillan's state of mind go

20   to Mr. John Galanis' intent?

21           THE COURT:  It's not Mr. McMillan's state of mind;

22   it's the state of mind of John Galanis based on directions that

23   he had given that had not been altered over time.

24           MR. TOUGER:  But we don't know that they had not been

25   altered.  That's the point.

I6J7GAL1

1          THE COURT:  Well, you can ask him.

2          MR. TOUGER:  No, I can't ask him.

3          THE COURT:  Why?  Tell me why.

4          MR. TOUGER:  Because if I ask him why, and he might

5    have some inkling --

6          THE COURT:  You can cross-examine him about the time

7    that has gone by.  You can cross-examine him about it being in

8    connection with a different bank account.  Tell me exactly what

9    you can't do.

10          MR. TOUGER:  But I can't cross-examine him about the

11    reasons for the instructions back in --

12          THE COURT:  He may not even know the reasons.

13          MR. TOUGER:  I don't know if he does or not.  He might

14    have some little knowledge of it.  But if I go into that -- if

15    the court is going to close the door that it was arguments over

16    the way accounts were handled on the Gerova matter and that's

17    it, then that's fine, but I don't think the court is going to

18    close the door at that point.

19          THE COURT:  What do you think -- just last question

20    and then I want to check on the jury.  What can Mr. Touger ask

21    and not ask?

22          MR. TOUGER:  And, your Honor, that's a good point.

23    Sorry to interrupt you.  But Mr. Galanis has --

24          THE COURT:  Just please don't interrupt; just let me

25    ask my question.

I6J7GAL1

1          What do you think that Mr. Touger can and cannot ask

2     without opening the door?

3          MS. TEKEEI:  I think he can ask what your Honor

4     suggested, which was that was related to a different bank

5     account.  Right?  That you opened several years ago.  Right?

6     And you don't know the reasoning behind those instructions.

7     Right?  And I think that does it.  I think that gets the point

8     that Mr. Touger wants to make.

9          And nobody is disputing that Jason Galanis did not

10     give instructions to Mr. McMillan from September of 2014

11     through December of 2014 -- which is the time period in which

12     the primary conduct with respect to Sovereign Nations

13     happened -- but we're entitled to establish that in his course

14     of dealings with John Galanis he was specifically instructed

15     not to take instructions from Jason Galanis.  That goes to John

16     Galanis' intent.

17          MR. TOUGER:  Actually, the specific instruction, your

18     Honor -- I don't know if the court has any knowledge of what

19     the Gerova case is about.  The Gerova case was a -- for lack of

20     a better term -- a pump and dump scheme on Gerova.  And what

21     was specifically told to Mr. McMillan was not about bank

22     transfers, it was not about payments; it was he was not allowed

23     to make any trades in stocks on Jason Galanis' orders.  That's

24     what he was told.

25          If the court will allow me to ask that question, that

I6J7GAL1

the instructions had nothing to do with trades -- I mean

nothing to do with bank transfers but it had to do with stock

trades -- then fine.  But that's what the order had to do with.

It didn't even have to do with money transfers or payment of

people like it does in this case.  It had to do with --

        And Mr. Galanis also informs me that the accounts that

Mr. McMillan had control of back in the 2010 time period, the

Wells Fargo accounts, Jason Galanis was on that account and,

therefore, John had to give him the specific order of not to

follow through on any of Jason Galanis instructions on trades

through that account.

        It had nothing to do with payment of people; it had

nothing to do with bank transfers; it had to do with stock

trades.  And in this situation Mr. Galanis is not on the

account, this is not about stock trading, this is about merely

Mark McMillan was paying people according to John Galanis'

instruction.

        MS. TEKEEI:  It's clear from the 3500, your Honor,

that this instruction was with respect to bank accounts, and

the context of the 3500 materials makes clear that it's with

respect to wiring money from one place to the other, so --

        THE COURT:  Can we ask him a few questions when he is

up here addressing the immunity issue?  Can we ask him a few

questions?

        MS. TEKEEI:  Sure.

I6J7GAL1

1           THE COURT:  OK, just to sort this out.  I don't want

2   to do all the cross-examination in advance, but just to sort

3   this out, and then I will make a decision.

4           Mr. Schwartz?

5           MR. SCHWARTZ:  I was just rising on the mundane issue

6   of timing, which is that I think it's safe to say -- given the

7   government's representation of how long Ms. Moynihan's direct

8   examination will be -- that you could do both the immunity and

9   any other question of Mr. McMillan during the lunch break.

10          THE COURT:  OK, thanks.

11          We're just going to check on the jury.

12          While we're waiting I will address Defense Exhibits

13  5000 through 5203, which are the calendar entries.  I am going

14  to allow them in.

15          MR. QUIGLEY:  I think Mr. Schwartz withdrew those last

16  night.

17          THE COURT:  You withdrew the calendar entries?

18          MR. SCHWARTZ:  We did.

19          THE COURT:  Oh, I'm sorry.

20          MR. SCHWARTZ:  We appreciate the ruling, but we still

21  withdraw them.

22          THE COURT:  I did not see that.  OK.

23          What else?  I mean I saw your letter on experts.

24          MR. SCHWARTZ:  It was in the first paragraph of that

25  letter.  I should have emphasized it.

I6J7GAL1

 1            THE COURT:  No, no, no.  OK, I missed that.  Thank

 2   you.  All right.

 3            I want to ask a few questions also about the

 4   Cooney/Crafton recording.  So, you know, I already noted that I

 5   want to have the first page of that deleted.

 6            Now, as to pages 2 through 4, you know, as I suggested

 7   yesterday -- we're waiting for one person -- I'm going to admit

 8   most of the nonhearsay statements -- or most of the statements,

 9   I should say, as nonhearsay, not being offered for the truth

10   but how Mr. Cooney spoke of Mr. Archer relevant to one of Mr.

11   Archer's defenses, namely by showing the manner in which the

12   other alleged coconspirators sought to capitalize on their

13   relationship with him, in an effort to give this fraudulent

14   scheme a veneer of legitimacy.

15            You know, as I suggested yesterday, my concern -- I

16   don't have a problem taking out the line about the fact that

17   Mr. Cooney is not a fan of Mr. Obama -- President Obama -- so

18   I'm OK taking that out.  The line that I hesitated about is the

19   line that reads "These guys don't do scuzzy deals," and so I

20   just want to talk about that.

21            So tell me exactly, Ms. Notari, how in your view this

22   is probative of Mr. Cooney's intent and belief.  As I

23   understand from the government's representation, in the same

24   call he is essentially talking about engaging in pump and

25   dumps.  I mean if the idea is he only wants to work with

I6J7GAL1

1    people, you know, who don't do scuzzy deals but in the same

2    call he is talking about a pump and dump, I mean I haven't seen

3    that part of the call but that was my understanding.

4            MS. NOTARI:  Mr. Hassen will respond.

5            THE COURT:  All right.

6            MR. HASSEN:  I mean I think that the government's

7    characterization of the conversation Mr. Cooney has in this

8    recording as a pump and dump is a very overwrought

9    characterization.  What he discusses about a completely

10   different topic, it's very clear from the conversation that

11   when he says these guys don't do scuzzy deals, he's talking

12   about Burnham.  This is a two to three hour recording, so there

13   are many different sub conversations.

14           The part that the government alleges to be a pump and

15   dump is merely a conversation about -- it's about Flikmedia and

16   it's about wanting to have people hold onto shares.  There is

17   no discussion of a pump or a dump; it's the concept of holding

18   onto shares.  And, you know, if we were to go into this

19   issue -- which is obviously not part of this trial -- there is

20   a very clear argument that the purpose of that request is to

21   let the company have time to build.  Because the stock was at a

22   very low price, and when people come in and are hacking away

23   trying to sell away shares it can destroy the stock price.  So,

24   that was the conversation about Flikmedia.  If you listen to

25   it, you will not hear any -- you have to take many, many more

I6J7GAL1

nefarious steps for that to be a pump and dump scheme.

THE COURT:  Can I get a copy of the transcript?  And can the government direct me to certain portions of it?

MS. MERMELSTEIN:  I don't think we have a final transcript of that portion since it's been precluded, but we will get you a draft.

I think that so it's crystal clear -- and everyone is going to characterize it how they're going to characterize it -- of course I mean no one says the word pump and dump. That's not surprising; that isn't how people talk.  But Mr. Cooney is in a conversation with someone who he knows has had significant regulatory problems with respect to his investment advisor business.  Right?  Crafton is publicly in trouble with the SEC; he's also in trouble with law enforcement; that's not yet public at that point in time; and in that conversation Billy Crafton is offering to park shares with his clients who he can control.  Right?  That he will buy shares of Cooney's company not because those are a good investment but in return for kickbacks, and he will then be able to control those shares and make sure that they're not sold because he has largely professional athlete clients who aren't paying close attention, so he can sort of do what he wants with their money.  That is a discussion that takes place in the conversation about how what Cooney does is do these reverse mergers, control all the shares.

I6J7GAL1

1            There is I think just no question that that is a

2    conversation about a classic methodology for a pump and dump

3    scheme -- which is exactly what Mr. Cooney did with respect to

4    Flikmedia and Code Rebel -- and they are talking about Arben

5    Kane whose companies those were in this conversation.

6            Now that's not coming in, and so we don't have to

7    fight about it.  But the notion that Mr. Cooney gets to put in

8    his statement without taking the stand that they don't do

9    scuzzy deals, meaning his business partners that he's talking

10   about working with, and then keep out the very same

11   conversation with a person he knows is in trouble for his work

12   as an investment advisor, and with whom he is discussing

13   criminal conduct, I think that just builds a bridge too far.

14   If that is staying out, then you don't get to put in your false

15   exculpatory statement without taking the stand.  It's grossly

16   prejudicial.

17           And the notion that this is referring to Burnham, it's

18   not; it's talking about Mr. Cooney and his business partners

19   and the kinds of deals they do; and it is being offered for its

20   truth.  That's its sole purpose.  It has no other value other

21   than an assertion that that is true, which, A, it's not, but

22   more importantly it's hearsay.  If you want to say that you

23   didn't do scuzzy deals, you have to get on the stand and say

24   it.  You can't put it in this way.

25           MR. HASSEN:  I mean I think that the government is

I6J7GAL1

1   looking at everything -- Mr. Cooney did business with many

2   people, and even within this group of investors there were

3   separate deals.  First of all, he never sold a single share of

4   his Flikmedia, so the idea that he engaged in a pump and dump

5   with Flikmedia is just simply not true.

6          But he was doing business with many people.  The

7   government is conflating everything that he has ever done as if

8   it was one nefarious decades long scheme and that's just not

9   the case here.

10          So, I think for context of the conversation it's very

11   clear that Flikmedia was being discussed when he was talking

12   about shares, and later on he was talking about Devon Archer,

13   and he was talking about Burnham, and he was talking about this

14   very serious, you know, legitimate company.  So I think that

15   the context is clear if you look at the -- if you actually

16   separate the different bits of the conversation, you can see

17   that they're talking about very different things.

18          MR. SCHWARTZ:  And to sort of echo that and make a

19   different point, I agree entirely that it's crystal clear from

20   context that "these guys" in that paragraph --

21          THE COURT:  I don't want to interrupt you, but we're

22   going to bring in the jury, and we can talk about the rest of

23   this at the break.  Is that all right?

24          MR. SCHWARTZ:  Of course.

25          THE COURT:  I didn't mean to cut you off.

I6J7GAL1

1          MR. QUIGLEY:  Just one other quick thing on the

2     recording.  We would ask then if you're going to redact the

3     portion about Obama, that you also redact the line above that

4     with Crafton reading Obama, Biden and his son, just because I

5     think --

6          THE COURT:  Yeah, I just need to pull up a copy of it

7     again.  Can you pull up a copy, please, of that page, or hand

8     it up?  Whatever is easier.  Thanks.

9          MR. SCHWARTZ:  You know, you will see this in a

10     second, but we disagree.  This is relevant to the conversation

11     they're having above, which is the story about Mr. Archer in

12     The Wall Street Journal.

13          But before the jury comes in, I have one word to say

14     about Ms. Moynihan, who the witness is going to be right on.

15          The government sent us last night their proposed

16     redactions to the minutes.  I don't agree with all of them.  I

17     don't want to stop what is going to happen right now.  My

18     proposal is they can go ahead and do whatever they're going to

19     do.  Basically I think they over redacted.  And, you know, I

20     will elicit appropriate testimony on cross-examination, and we

21     can clean up the final exhibit, because I also expect since

22     they're all her statements there may be parts of them that end

23     up coming in as her prior inconsistent statements and things

24     like that, and rather than having competing versions of the

25     same document, I suggest that at the end of the day we clean it

I6J7GAL1

1      up and do it that way so that things aren't slowed down.

2                MR. QUIGLEY:  Judge we produced these late yesterday

3      afternoon about 5 o'clock.  There was plenty of time to address

4      it beforehand, but --

5                THE COURT:  Look, I will -- do what you need to do

6      with the witness.  I will admit them into evidence, and then we

7      will see if you can sort out the redactions, and if there is an

8      issue, just let me know.

9                MR. SCHWARTZ:  I'm certainly not suggesting the

10     government didn't provide them to us timely, but we have a lot

11     of things going on.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I6J7GAL1                     Moynihan - Direct

1          (jury present)

2          THE COURT:  Good morning, everyone.  We're back in

3    action.  Everyone is healthy again.

4          MR. QUIGLEY:  Your Honor, the government calls Mary

5    Moynihan.

6     MARY MOYNIHAN,

7          called as a witness by the government,

8          having been duly sworn, testified as follows:

9          DEPUTY COURT CLERK:  You may be seated.  Please state

10   and spell your name for the record.

11         WITNESS:  My name is Mary Moynihan, M-a-r-y

12   M-o-y-n-i-h-a-n.

13         MR. QUIGLEY:  Your Honor, may I proceed?

14         THE COURT:  Yes.

15   DIRECT EXAMINATION

16   BY MR. QUIGLEY:

17   Q.  Ms. Moynihan, what do you do for a living?

18   A.  I'm a lawyer.

19   Q.  And where do you work?

20   A.  I'm a partner at Perkins Coie LLP in Washington D.C.

21   Q.  And Coie is C-o-i-e?

22   A.  C-o-i-e, yes.

23   Q.  And how would you describe your practice?

24   A.  Well, I specialize in representing the independent trustees

25   of boards of directors of mutual funds.

1    Q.  And in the course of your work, have you become familiar

2    with the independent trustees of the Burnham Investors Trust?

3    A.  Yes, I have; I'm their lawyer.

4    Q.  And during the period of 2013 -- between roughly 2013 and

5    2016 -- what was the Burnham Investors Trust?  Who was the

6    Burnham Investors Trust affiliated with at that time?

7    A.  Well, at that time the Burnham Investors Trust had an

8    investment advisor -- who is the person who manages the

9    money -- that was called Burnham Asset Management, and Burnham

10   Asset Management was owned by the Burnham Financial Group; and

11   Burnham Securities was a broker dealer that was associated as

12   well with Burnham Financial Group.

13   Q.  Can we pull up as an aid to the jury Government Exhibit

14   4002.

15       Is this the structure you described previously?

16   A.  Yes.

17   Q.  And what was the relationship between the Burnham

18   independent trust and the Burnham Asset Management?

19   A.  Well, so a mutual fund like Burnham Investors Trust --

20   there were three funds -- has to hire an advisor to manage the

21   money, so we had a contract with Burnham Asset Management to

22   manage the funds.

23   Q.  Did you participate in meetings of the board of the

24   trustees between 2013 and 2016?

25   A.  Yes, I did.

I6J7GAL1                    Moynihan - Direct

1    Q.  And was one of your roles in those meetings to keep the

2    minutes?

3    A.  Yes, it is -- or was.

4    Q.  If you can look at the binder to your left, and take a look

5    at Government Exhibit 792, 758, 763, 782, 783 and 784.

6    A.  Yes.

7    Q.  And are those meetings -- are those minutes of meetings of

8    the board of Burnham Investors Trust between 2014 and 2016?

9    A.  Yes, they are.

10   Q.  And were these meetings made at or near the time of the

11   board meeting in question?

12   A.  Yes, the minutes were made, yes.

13   Q.  And who made them?  Who wrote them?

14   A.  Me.

15   Q.  And are the meetings kept in the course of the regularly

16   conducted activity of the trustees to the Burnham Investors

17   Trust?

18   A.  Yes.

19   Q.  And is it a regular practice of the trustees of the Burnham

20   Investors Trust to make minutes of the board meetings?

21   A.  Yes, it's required.

22             MR. QUIGLEY:  Your Honor the government offers

23   Government Exhibit 792, 758, 763, 782 and 784.

24             MR. SCHWARTZ:  No objection, your Honor, pursuant to

25   your ruling and our discussion this morning.

1          THE COURT:  Yes, understood.  Received.

2          (Government Exhibits 792, 758, 763, 782 and 784

3   received in evidence)

4   Q.  Ms. Moynihan directing your attention to March 19, 2014,

5   did you participate in a meeting of that day with the board of

6   the Burnham Investors Trust?

7   A.  Yes, I did.

8   Q.  Were you physically present?

9   A.  No, I participated by telephone.

10  Q.  Can we publish what is in evidence as Government Exhibit

11  792.

12          And these are the minutes of the March 19 meeting?

13  A.  Yes, they are.

14  Q.  So if you look to the first paragraph, who was present at

15  the meeting?

16  A.  Present at the meeting were the three trustees at the time,

17  William F. Connell, who is Bill; Margaret M. Eisen, who is

18  called Peggy; and Bruce Mac Corkindale.  Also present were

19  Devon Archer, Stephen Weiss, Mike Malloy and Kenneth Webster.

20  Q.  And directing your attention to the first paragraph under

21  call to order, can you read that paragraph?

22  A.  Yes.  "Ms. Eisen called the meeting to order and stated

23  that the meeting had been convened to discuss the board's

24  consideration of new investment advisory and investment

25  sub-advisory agreements (each, an agreement and collectively

I6J7GAL1                    Moynihan - Direct

1    the agreements) for the trust on behalf of three series

2    thereof:  The Burnham Fund, the Burnham Financial Services Fund

3    and Burnham Financial Industries Fund (each, a fund and

4    collectively the funds).  She reminded the independent trustees

5    that the approval of the agreements was required as a

6    consequence of the proposed change of control of Burnham

7    Financial Group, Inc., the parent company of Burnham Asset

8    Management Corporation (the adviser), pursuant to which Burnham

9    Equity Partners LLC (Burnham Partners) was proposing to acquire

10   all of the outstanding shares of BFG.  The managing member of

11   Burnham Partners is BOE Capital LLC, an entity controlled by

12   Mr. Archer."

13   Q.  And the funds that are listed here, Burnham Fund, Burnham

14   Financial Services Fund, Burnham Financial Industries Fund, are

15   those the three mutual funds that the trust oversaw?

16   A.  Yes.

17   Q.  And so based on this, was it the purpose of the meeting to

18   approve a change of control of Burnham Financial Group which

19   was being acquired by BOE Capital, which is managed by Mr.

20   Archer?  Is that right?

21   A.  Yes, it was to consider the -- it was to consider approval.

22   Q.  OK.  And why did the trustees need to approve a change of

23   control?  Where does that requirement stem from?

24   A.  Because under the 1940 Act -- which is the rule that

25   governs investments of federal security law -- it's required

1    that if you have a contract with an advisor and the advisor is

2    sold so that new people are running the advisor, you have to

3    have a new contract with them and you have to approve those

4    people to now be your advisor.

5    Q.  And so directing your attention to the paragraph beginning

6    on page 1 and continuing over to page 2, if you could read that

7    paragraph also.

8    A.  "Ms. Eisen began the discussion by asking Mr. Archer to go

9    over the identities and backgrounds of the key members of the

10   proposed investor group.  In particular, Ms. Eisen stated that

11   the independent trustees wished to understand the interests of

12   Jason and Steven Sugarman and their related parties (sometimes

13   referred to herein as the Sugarmans).  Mr. Archer reviewed the

14   background and associates of members of the investor group,

15   including:  Hugh Dunkerley, who he said was an employee of COR

16   Clearing LLC (COR Clearing), a firm controlled by Jason

17   Sugarman; Lucas Mann, who he said was connected with Thorsdale

18   Fiduciary & Company Ltd.; and Wealth Assurance AG, which he

19   said was a holding company controlled by the Sugarmans, based

20   in Lichtenstein.  Overall, Mr. Archer said that the Sugarmans

21   would control approximately 27.15 percent of the investor

22   group.

23   Q.  And if you could look at -- directing your attention to the

24   second full paragraph on the page, and read the sentence.

25   A.  The one beginning "Ms. Eisen next inquired"?

1   Q.  The second pull paragraph on the page beginning --

2   A.  Yeah.  Did you want me to read that?

3   Q.  Just the first sentence.

4   A.  "Despite the many different investors, Mr. Archer stated

5   that he would have primary management control."

6   Q.  And can we go to the second full paragraph on page 3

7   beginning "the independent trustees then reviewed ..."

8   A.  OK.  Did you want me to read that?

9   Q.  Read that, please.

10  A.  "The independent trustees then reviewed with Mr. Archer a

11  series of events that had raised concerns for them.

12  Mr. Connell noted in particular the fiduciary duties of the

13  trustees in a highly regulated industry and noted the

14  importance of understanding the backgrounds and reputations of

15  those it was proposed to do business with.  It was noted that

16  the independent trustees had commissioned background checks on

17  members of the new investor group, and Mr. Connell then turned

18  to specific questions that were raised by the background

19  reports.  The independent trustees drew particular attention to

20  their concerns regarding the apparent involvement of John Moran

21  and Jason Galanis in the early stages of the transaction.  Mr.

22  Archer stated that he did not know John Moran.  He stated that

23  he believed he had put together an accretive syndicate but that

24  he would have control of the business.  He stated that since he

25  had become involved, he had straightened things out and that

1    although he would not remove the Sugarmans, their role would be

2    subjugated and limited.

3    Q.   And around this time, were the trustees also engaging in

4    written correspondence with Mr. Archer?

5    A.   Yes.

6    Q.   And if you could look in the binder at Government's

7    Exhibits 753 and 755.

8    A.   Yes.

9    Q.   Are those letters that the trustees received from Mr.

10   Archer around this time?

11   A.   Yes, they are.

12            MR. QUIGLEY:   The government offers Government's

13   Exhibits 753 and 755.

14            MR. SCHWARTZ:   No objection.

15            THE COURT:   They will be admitted.

16            (Government Exhibits 753 and 755 received in evidence)

17   Q.   And looking first at Government Exhibit 753, who is this

18   letter sent on behalf of?

19   A.   The letter was sent by COR Fund Advisors and BOE Capital

20   Ltd., which was the manager of COR Fund Advisors, because COR

21   Fund Advisors is an LLC.  So it was sent by them to the board

22   of trustees.

23   Q.   And looking at the first paragraph, why was this letter

24   sent to the board of trustees?

25   A.   It was sent in response to an information request letter,

1   so it's customary in these transactions for the independent

2   trustees to put together lists of questions about information

3   that they want about the new manager, and that is sent in a

4   letter to the manager, and then the manager responds with

5   answers to the questions.  So, we had sent a letter, and this

6   is the answer.

7   Q.  And so if we go to the bottom of page 4 of the document,

8   and if you blow up the paragraph with the 4 in front of it.

9   A.  Yes.

10  Q.  What does that refer to?

11  A.  Well, that is an excerpt from the letter that we sent, so

12  these are the questions that we were asking.

13  Q.  And then the response below that is the response?

14  A.  And then the response is the response from COR Fund

15  Advisors.

16  Q.  And what's the question you're asking?

17  A.  "Please provide in spreadsheet form the percentage of the

18  respective ownership interests of each of the members of

19  Burnham Partners and BOE Capital, including a break-out of the

20  Lausanne and BOE Capital ownership interests in Burnham

21  Partners."

22  Q.  And if we go to the next page, Mr. Wissman, and if you

23  could highlight BOE Capital in the second row down.

24          Who are listed as the members of BOE Capital?

25  A.  Devon Archer, Bevan Cooney and Thorsdale Fiduciary &

1     Guaranty Company Ltd.

2     Q.  Now at this time did you have any idea who owned or

3     operated Thorsdale?

4     A.  Well, we had done a background investigation, and I think

5     it showed that --

6                MR. SCHWARTZ:  Objection.

7                THE COURT:  I'm sorry?

8                MR. QUIGLEY:  I will strike that, your Honor.

9     Q.  And could we put up what is in evidence as Government

10    Exhibit 755.  And what is this letter, Ms. Moynihan?

11    A.  Well, this is another one of these letters back and forth.

12    This is also from COR Fund Advisors by BOE Capital LLC, and

13    it's addressed to the board of trustees.

14    Q.  And directing your attention to page 2, question 2.  What

15    were the trustees asking here?

16    A.  The trustees were seeking -- I will just read it -- "a

17    written commitment that Jason Galanis will not be involved in

18    any matters related to, be employed by, receive any payments

19    from, or be otherwise associated with, Burnham Financial Group

20    or its subsidiaries Burnham Asset Management or Burnham

21    Securities.

22    Q.  And what did the response read?

23    A.  The response, let's see -- there it is.  It said, "Mr.

24    Galanis will not be employed by Burnham Financial Group,

25    Burnham Asset Management or Burnham Securities or otherwise be

associated in any operational, supervisory or investment

capacity with Burnham Financial Group, Burnham Asset Management

or Burnham Securities, nor will he receive any payments from

such entities.  However, for the avoidance of doubt, following

consummation of the transaction, the managing member of Burnham

Partners intends to utilize the services and talents of Mr.

Galanis (in addition to other persons or entities) in

connection with the sourcing of potential investment banking

opportunities for Burnham Securities as well as potential

acquisition opportunities for the Burnham Financial Group.

Although Mr. Galanis may be an investor in certain of the

companies or acquisition entities financed or acquired by the

Burnham Group, he will not, in any manner, be associated with

Burnham Financial Group, BAM, or Burnham Securities, nor will

he make any investment, investment banking or acquisition

decisions for BOE Capital, the board of managers of Burnham

Partners or the board of directors of Burnham Financial Group,

Burnham Asset Management or Burnham Securities."

Q.  And directing your attention to the next question, what

information were the trustees asking for here?

A.  An explanation of how Devon Archer became aware of the

opportunity to invest in Burnham; who originally brought the

opportunity to his attention.

Q.  And how did Mr. Archer respond?

A.  He said Bevan Cooney, a member of BOE Capital and a

1    personal friend of Devon Archer, introduced the Burnham

2    investment opportunity to Mr. Archer.

3    Q.   Directing your attention to the next question, what are the

4    trustees asking here?

5    A.   We were asking for an explanation of the e-mail exchange

6    between John Moran and Jason Galanis discussing the FINRA

7    registration and board approval.

8    Q.   And how did Mr. Archer respond?

9    A.   They responded that "The undersigned" -- which was Mr.

10   Archer, I believe in this case -- "has no knowledge of the

11   e-mail exchange referred to and deems any such exchange to be

12   totally irrelevant to the process.  Neither Mr. Galanis nor Mr.

13   Moran have any role in the FINRA registration process or the

14   implementation of the closing of the transaction.  This work is

15   being handled by the chief compliance officer of Burnham

16   Securities in conjunction with Salah & Cox, special FINRA

17   counsel engaged by Burnham Partners to assist Hunter Taubman &

18   Weiss LLP in the FINRA form 1017 application process.  Other

19   work being done to consummate the transaction is being handled

20   by Hunter Taubman Weiss and Skadden Arps, counsel to Burnham

21   Financial Group and subsidiaries.  Although we cannot be

22   certain, our assumption is that Moran was inquiring as to the

23   status of the transaction and the FINRA application process for

24   Burnham Securities and Galanis responded."

25   Q.   And go down to the last page of the letter.  Who is the

I6J7GAL1                          Moynihan - Direct

1   letter signed by?

2   A.  It's signed by Devon Archer.

3   Q.  Based on your involvement with the various parties to the

4   transaction, including communications with CORFA and members of

5   the Burnham Financial Group, how did the transaction leave off

6   at this point?

7   A.  So at this point the board of directors were very concerned

8   about this relationship that they perceived -- or possible

9   relationship with Jason, so we stopped.

10  Q.  What did the board communicate to --

11  A.  That they would not approve the -- that they would not

12  approve the transaction because they had not received the

13  representations that they were seeking.

14  Q.  Including regarding Jason Galanis?

15  A.  Yes.

16  Q.  So, I want to fast forward about four months to August 21,

17  2014.  Did the trustees have another meeting with Mr. Archer at

18  this point?

19  A.  Yes, they did.

20  Q.  And can we pull up what is in evidence as Government

21  Exhibit 758.  What was the date of this meeting?

22  A.  August 21, 2014.

23  Q.  And who was present?

24  A.  The trustees were present, William Connell, Margaret Eisen

25  and Bruce Mac Corkindale.  And also present were Devon Archer

I6J7GAL1                    Moynihan - Direct

1    and Andrew Godfrey from BAM Holdings, Jon Burnham, Pat

2    Colletti, myself and Michael Malloy.

3    Q.  And you said Mr. Archer was present.  Would you recognize

4    Mr. Archer in the court if you saw him today?

5    A.  I would.

6    Q.  Looking around the courtroom, can you identify him?

7    A.  I think he is standing up over there.

8            MR. SCHWARTZ:  We stipulate to the identification.

9            THE COURT:  OK.

10   Q.  And could we also put up what is for identification as

11   Government Exhibit 3608.

12           MR. SCHWARTZ:  No objection.

13   Q.  Can you identify that photograph?  Do you recognize that

14   photograph this morning?

15   A.  Yes.

16   Q.  Is that Mr. Archer?

17   A.  Yes.

18           MR. QUIGLEY:  The government offers Government Exhibit

19   3608.

20           THE COURT:  Admitted.

21           (Government Exhibit 3608 received in evidence)

22   Q.  Going back to 758, based on your attendance at this meeting

23   how had Mr. Archer's group become involved?

24   A.  Well, the original problem was representations with respect

25   to the relationship with Mr. Galanis, and so it was offered

I6J7GAL1                    Moynihan – Direct

1    that the Burnham Asset Management company -- which was the

2    advisor to the funds -- would be owned only by Mr. Archer's

3    group and would be separated from the rest of the organization

4    Burnham Financial Group and Burnham Securities.

5    Q.  So essentially you were splitting the acquisition of

6    Burnham Financial Group into a Burnham Securities acquisition

7    and a Burnham Asset Management acquisition.

8    A.  Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q.  Just to be clear, the board was approving the change in

control of Burnham Asset Management?

A.  Yes.

Q.  So directing your attention back to 758, at Page 3, the

fourth paragraph down, what is Mr. Archer saying here?

A.  Mr. Archer next explained his interest in the transaction

and various plans for the future.  He stated that he expected

to, one, be an active director; and, two, bring relationships

that he had which would include his relationship with Bohai and

Harvest.

          Mr. Archer then described his existing businesses and

stated he was in the process of either recapitalizing or

selling his real estate business.  He said he expected the

relationship with the Burnham companies to grow and he had a

roster of people he hoped to bring in.  He said he believed

that relative to potential valuation, he believed Mr. Sugarman

also saw the transaction as a great investment.

Q.  Directing your attention -- can you read the paragraph

below that also.

A.  In response to questions, Mr. Archer further commented on

his personal wealth and business relationships and stated that

he expected the sale of his real estate business to realize a

significant amount of money, many millions and noted his

friendship with Chris Heinz.  He further stated he believed his

personal net worth likely exceeded that of Mr. Sugarman.  Mr.

1    Archer again explained he was not --

2    Q.  By "Mr. Sugarman," you understand Mr. Archer maybe to be

3    referring to Jason Sugarman?

4    A.  Yes.

5    Q.  Do you see the reference to Chris Heinz?

6    A.  Yes.

7    Q.  Based on your dealings with Mr. Archer, did he frequently

8    invoke the name of Chris Heinz and Hunter Biden?

9    A.  Yes, often.

10   Q.  If we go to the bottom paragraph on Page 4.  If you can

11   read that.

12   A.  The independent trustees then reviewed events over the past

13   seven months and noted the importance of reputation in the

14   asset management business.  Mr. Archer was specifically asked

15   to explain statements he had made at his last meeting with the

16   independent trustees in light of later developments including

17   John Moran and Jason Galanis.

18        Mr. Archer responded he had been asked to remove

19   Mr. Galanis from the deal and he had done so and said he did

20   not know Mr. Moran.  The independent trustees stressed the

21   damage that could be done by people whose past actions were

22   subject to regulatory action, to affirm risks they pose to

23   shareholders.  They followed discussion of background and

24   association of certain persons duly associated with BAM and

25   BSI, including Mr. McClory and the connection with Revere

I6JJGAL2                         Moynihan - direct

1   Securities that had resulted in the recent hiring of

2   Mr. Godfrey and several of his associates from Revere

3   Securities.

4   Q.  Mr. McClory is a reference to Dan McClory.  Is that right?

5   A.  Yes.

6   Q.  What was his association with Burnham Securities?

7   A.  At that time I believe he was working in an office that

8   they had established in Newport, Newport Beach, California.

9   Q.  Again were the trustees also engaging in written

10  correspondence with Mr. Archer around this time?

11  A.  Yes.

12  Q.  Take a look in the binder Government Exhibit 757.  Do you

13  recognize that?

14  A.  Yes.

15  Q.  How do you recognize it?

16  A.  Well, it is a letter addressed to me from BAM Holdings, LLC

17  on behalf of the board.  It is to me at my capacity as counsel

18  to the board.

19  Q.  Who is it signed by?

20  A.  It is signed by Devon Archer and Andrew Godfrey.

21          MR. QUIGLEY:  The government offers Government Exhibit

22  757.

23          THE COURT:  It will be admitted.

24          (Government's Exhibit 757 received in evidence)

25  BY MR. QUIGLEY:

I6JJGAL2                    Moynihan - direct

1   Q.  What is the date on this letter, Ms. Moynihan?

2   A.  August 21, 2014.

3   Q.  That is the same date as the meeting that we just talking

4   about?

5   A.  Yes.

6   Q.  Directing your attention to Point 2 in the letter, what is

7   stated here?

8   A.  It says while Jason Galanis has consulted with CORFA and

9   certain of its members, he has never been, and is has been

10  represented to you and the trustees that he will not become, an

11  officer, employee, consultant, director or member of the

12  management of either Burnham Financial Group, Inc, Burnham

13  Asset Management, Inc, or Burnham Securities, Inc, BSI and with

14  BFG and BAM, the Burnham Group.

15  Q.  If we can go to point 4 in this document, Page 2 is this

16  earlier in the context of the minutes of the August 21 meeting

17  you referenced a separation of the acquisition of Burnham

18  Securities and Burnham Asset Management?

19  A.  Yes.

20  Q.  Is that what this paragraph is discussing?

21  A.  Yes.  Did you want me to read this?

22  Q.  Yes, please.

23  A.  CORFA is managed by BOE Capital, LLC which is totally owned

24  and controlled by Devon Archer.  In addition, in order to

25  provide further comfort to the trustees, the amendment

1   contemplates a total separation of ownership of BSI and BAM --

2   in that BSI will be owned 90 percent by CORFA and 10 percent by

3   Jon Burnham and that BAM will be owned 100 percent by BAM

4   Holdings, LLC, an entity 55 percent owned by Devon Archer, 10

5   percent owned by Andrew Godfrey, 25 percent owned by Kirin

6   Global Enterprises and 10 percent owned by Jon Burnham.

7   Q.   Did the trustees continue to seek information and

8   confirmation of certain issues from Mr. Archer after this?

9   A.   Yes.

10  Q.   Did those include questions about the relationship with

11  Mr. Galanis to the Burnham entities?

12  A.   Yes.

13  Q.   Take a look at Government Exhibit 760.  Do you recognize

14  this?

15  A.   Yes.

16  Q.   What is it?

17  A.   This is a letter from COR Fund Advisers and BAM Holdings,

18  dated September 5, 2014, addressed to the Board of Trustees.

19            MR. QUIGLEY:  The government offers Government Exhibit

20  760.

21            MR. SCHWARTZ:  No objection.

22            THE COURT:  It will be admitted.

23            (Government's Exhibit 760 received in evidence)

24  BY MR. QUIGLEY:

25  Q.   Can we go to Point 1 on Page 2.

1    A.   Yes.

2    Q.   Again what does the one, the paragraph numbered 1 represent

3    here?

4    A.   That represents the question that we had asked that they

5    were responding to in the letter.

6    Q.   What was the question you asked, if you can read that?

7    A.   We need your written statement that Jason Galanis will not

8    be referring transactions to any Burnham entity.  We understand

9    that he he will not be an employee or consultant, and we want

10   it abundantly clear that he will not be sourcing any type of

11   transaction to the Burnham organization.

12   Q.   By the Burnham organization, were you referring to both

13   Burnham Asset Management and Burnham Securities?

14   A.   Yes.

15   Q.   How does Mr. Archer respond?

16   A.   It says as we stated in our August 21 letter to the

17   trustees, we have represented to you that Jason Galanis has

18   never been, and will not become, an officer, employee,

19   consultant, director or member of the management of either

20   Burnham Financial Group, Inc, BAM or Burnham Securities, Inc,

21   and then BSI and with BFG, and BAM.  CORFA and BAM Holdings

22   will continue to abide by the above commitment.  In addition,

23   Mr. Galanis will not be sourcing any type of transaction to the

24   Burnham Group or any member thereof.

25   Q.   Just to be clear, BAM Holdings are, was that the entity

1   that had been split off to acquire BAM?

2   A.  Yes.

3   Q.  Who is this letter signed by?

4   A.  Who is it signed by?  Devon Archer.

5   Q.  Just go back to the first page.

6       For the record, COR Fund Advisers and BAM Holdings

7   appear to have the same address?

8   A.  Yes.

9   Q.  Again did the trustees continue to receive written

10  correspondence or have written correspondence with Mr. Archer

11  after this letter?

12  A.  Yes.

13  Q.  Take a look at what has been marked for identification as

14  Government Exhibit 762.  Do you recognize this?

15  A.  Yes.

16  Q.  How do you recognize it?

17  A.  This is a letter, dated September 26, 2014, and it is from

18  COR Fund Advisers and BAM Holdings, and it is addressed to the

19  Board of Trustees.

20  Q.  Just look at the first question for a second, if we can

21  blow that up.  Was another one of the concerns that is conveyed

22  in this question, did that relate to whether there would be

23  adequate capital to finance Burnham Asset Management going

24  forward?

25  A.  Yes.

1    Q.  If we can look at the second question --

2              MR. QUIGLEY:  We offer Government Exhibit 762.

3              MR. SCHWARTZ:  No objection.

4              THE COURT:  It will be admitted.

5              (Government's Exhibit 762 received in evidence)

6    BY MR. QUIGLEY:

7    Q.  Look at the second paragraph, Question 2, and we can blow

8    that up.  Can you read the question.

9              Again this is a question that the board asked in

10   another letter?

11   A.  Yes.  This is a question that we had directed and that

12   they're responding to.

13   Q.  Can you read the question you asked.

14   A.  Yes.  You have provided us with assurances regarding the

15   nonparticipation of Mr. Jason Galanis.  We believe that you

16   understand our views on this subject; that is, that we want an

17   ironclad assurance that, going forward, he will not be involved

18   with any of the Burnham entities and their affiliated persons

19   within the meaning of Section 2 (a)(19) of the Investment

20   Company Act, and that is a provision that includes everybody

21   that is in common control with, controlled by or under the

22   control of, so it was intended to be very broad -- as well as

23   their successors or assigns at Burnham Financial Group, Burnham

24   Asset Management, Burnham Securities or Burnham Investors

25   Trust.

I6JJGAL2                          Moynihan - direct

1          But, for the avoidance of doubt, it is our

2     understanding that Mr. Galanis will have no interest of any

3     kind, direct or indirect, in any of the Burnham entities or

4     their successors, that he will not source deals to the Burnham

5     entities and that the Burnham entities will not invest with or

6     in, directly or indirectly, any business or enterprise in which

7     Mr. Galanis has any association, affiliation, or investment,

8     pecuniary or otherwise, directly or indirectly.  Kindly confirm

9     this understanding.

10    Q.   What is the answer?

11    A.   "Confirmed."

12    Q.   I think you mentioned affiliated persons.

13         Was that, you said that term was intended to be very

14    broad?

15    A.   Yes, it is the broadest term in the Investment Company Act,

16    to pick up anybody that you might be doing business with or

17    have a business relationship with where there was a control

18    relationship.

19    Q.   And again there is a reference, a couple of references in

20    here to the Burnham entities.  Was that referring to Burnham

21    Financial Group, Burnham Asset Management, Burnham Securities

22    and Burnham Investment Trust?

23    A.   Yes.

24    Q.   Can we go down to Question 8.  Can you read that question.

25    A.   Yes.  Our question was, we continue to be concerned

1    regarding the types of transactions which might be entered into

2    by BSI.  Which is Burnham Securities.  We are aware that the

3    current investment committee of the firm is comprised of

4    Messrs. Schefler, Burnham, Godfrey and Archer.  We would like

5    an agreement that the independent trustees will receive notice

6    of any persons placed on the committee to replace Mr. Schefler

7    or Mr. Burnham and that such person will be well experienced in

8    the industry, totally independent of all investors and of a

9    rock solid reputation.

10   Q.  What is the answer?

11   A.  "Agreed."

12   Q.  Now, did the trustees, come a time shortly after this

13   letter when the trustees again met with Mr. Archer?

14   A.  Yes.

15   Q.  Can we put up on the screen what is in evidence as

16   Government Exhibit 763.  What is the date of this meeting?

17   A.  This meeting was October 1st, 2014.

18   Q.  Where did it take place?

19   A.  It took place at the offices of the trust investment

20   adviser which is Burnham Asset Management at 1325, Avenue of

21   the Americas, 26th floor, New York.

22   Q.  In addition to Mr. Archer, who else was present at this

23   meeting?

24   A.  The trustees were present, the independent trustees, so

25   William F. Connell, Mr. McCorkindale, Margaret Eisen, Jon

1   Burnham which is chair of the board, Devon Archer, Andrew

2   Godfrey, Frank Pasintino, Pat Colletti, Mike Malloy and myself.

3   Q.  Can you read the first paragraph under discussion of change

4   of control.

5   A.  Mr. Burnham stated that the purpose of the meeting was to

6   consider approval of new investment advisory and investment

7   sub-advisory agreements, each an advisory agreement and

8   collectively the advisory agreements, and a distribution

9   agreement, distribution agreement and together with the

10  advisory agreements, the agreements, for the trust, on behalf

11  of Burnham Fund, Burnham Function Services Fund, and Burnham

12  Financial Long-short Fund.

13          He reminded the trustees that the approval of the

14  agreements was required as a consequence of the proposed change

15  of control, the transaction, of Burnham Financial Group, Inc,

16  the parent company of the adviser.  Mr. Burnham stated that he

17  and Mr. Archer wished to answer any remaining questions of the

18  independent trustees prior to a vote on the agreements.

19  Q.  In short, this meeting was to actually approve the change

20  of control agreements?

21  A.  Yes.

22  Q.  Directing your attention to the bottom of Page 2 and

23  continuing on to Page 3, can you read that paragraph.

24  A.  Yes.  Mr. Archer then responded to further questions

25  concerning the financial solvency and independence of the new

1     investors.  He stated that his existing firm was in

2     negotiations with investors and that this would result in a

3     significant liquidity event.  He stated that when that happened

4     he would exit that firm to devote more energy to Burnham.  Mr.

5     Archer detailed his various business enterprises, including his

6     relationship to the Bohai Harvest RST, which he said invested

7     in China.  He discussed his relationships with Chris Heinz and

8     Hunter Biden, who he said were also involved in various of his

9     investment endeavors.  Mr. Archer estimated that he would spend

10    roughly half his time on Burnham matters.

11    Q.  Can you look at the paragraph below that.

12    A.  An extended discussion followed concerning cash flow and

13    other financial matters, during which Mr. Archer again

14    confirmed that there were adequate resources to fully fund

15    Burnham in a manner sufficient to provide appropriate services

16    to the funds.

17    Q.  In the paragraph below that, what is happening here in

18    substance?  What are you conveying to the people at the

19    meeting?

20    A.  Well, what we were doing was so when the board makes its

21    decision, we were making it based on a series of conditions,

22    and so the purpose of this was to make clear that these

23    conditions were -- the approval of the contract was only -- was

24    conditional on adhering to all of the conditions that we had, I

25    guess you would say, extracted, undertakings, agreements, et

1    cetera, so all of this correspondence we have just been going

2    through was incorporated that we were relying on that.

3    Q.   What is the first condition listed here?

4    A.   Do you want the numbered conditions?

5    Q.   Yes.

6    A.   The first numbered condition is that Jason Galanis --

7    refers to Jason Galanis.  Jason Galanis will not be involved

8    with any of the Burnham entities and their affiliated persons

9    within the meaning of Section 2 (a)(19) of the Investment

10   Company Act as well as their successors or assigns at BFG,

11   Burnham, Burnham Securities or the trust.

12           For the avoidance of doubt, Mr. Galanis will have no

13   interest of any kind, direct or indirect, in any of the Burnham

14   entities or their successors.  He will not source deals to the

15   Burnham entities and the Burnham entities will not invest with

16   or in, directly or indirectly, any business or enterprise in

17   which Mr. Galanis has any association, affiliation or

18   investment, pecuniary or otherwise, directly or indirectly.

19   Q.   If we can look at the 6th condition.

20   A.   It is titled Wealth Assurance AG.  Wealth Assurance, Wealth

21   Assurance will have no financial ties to Burnham.

22   Q.   Did Mr. Archer agree to these conditions?

23   A.   Yes.

24   Q.   Was the change in control approved at this meeting subject

25   to these conditions?

1    A.  Yes.

2    Q.  I want to jump ahead about a year to October of 2015.

3          Did the trustees meet again with Devon Archer at this

4    time?

5    A.  Yes, they did.

6    Q.  Can you take a look at what is in evidence -- sorry -- yes,

7    what is in evidence as Government Exhibit 782.

8    A.  Yes.

9    Q.  Are those minutes of a meeting on October 19, 2015?

10   A.  Yes, they are.

11   Q.  What was the status of the acquisition at this point?

12   A.  Well, the acquisition had been approved and so Burnham

13   Asset Management was now owned by BAM Holdings.

14   Q.  Just highlight the call to order in the first paragraph

15   under discussion.  Was one reason this meeting was convened to

16   discuss the fact that Jason Galanis had recently been arrested?

17   A.  Yes.

18   Q.  If you could read the first paragraph under discussion.

19   A.  Mr. Archer opened the meeting by addressing the issue of

20   the recent indictment of Mr. Jason Galanis.  He stated he had

21   been shocked by the development and thanked the independent

22   trustees for the insistence that Mr. Galanis not be involved in

23   management of Burnham.  He acknowledged that he had been wrong

24   in the past and explained that he had no contact with

25   Mr. Galanis following some initial phone calls at the time of

I6JJGAL2                        Moynihan – direct

1    the indictment.

2    Q.  Go to the paragraph below that.

3          What did Mr. Archer say here about how the arrest of

4    Mr. Galanis would impact the acquisition of the other part of

5    Burnham, Burnham Securities?

6    A.  Do you want me to read that?

7    Q.  Yes.

8    A.  Mr. Archer explained that these developments had caused the

9    investor group to change its plans concerning the

10   broker-dealer.  He said the financing and working capital for

11   the acquisition of BSI had been intended to come from the

12   offshore insurance firm, Wealth Assurance AG, now Valor Group,

13   Limited.

14         Mr. Archer said that Mr. Galanis was an adviser to the

15   board of Wealth Assurance.  He said that since they now

16   intended to sever all connections with any firms associated

17   with Mr. Galanis, it was no longer possible to finance the

18   operations of BSI or proceed with that transaction.  In any

19   event, he explained, his experience was with asset managers,

20   not broker-dealers.  He said that BSI would now be acquired by

21   Bonwick Capital, a full service institutional broker-dealer

22   that traded in municipal bonds and was a minority business

23   enterprise.  The independent trustees expressed their concern

24   that Mr. Galanis had continued to be associated with anything

25   to do with Burnham, given past assurances.

1           They further inquired concerning the continued

2     involvement of investors related to Jason Sugarman.  Mr. Archer

3     said that Mr. Sugarman would still be involved, but that

4     Mr. Sugarman had been as shocked as Mr. Archer concerning the

5     indictment.  Ms. Moynihan commented that Mr. Sugarman and his

6     associates had previously been connected with a Ponzi-like

7     scheme closed down by the Securities & Exchange Commission with

8     which Mr. Galanis was associated in press reports.  The

9     independent trustees asked if Mr. Sugarman would support the

10    sale to Bonwick, and Mr. Archer said that he would, but that in

11    any event, Mr. Archer controlled the board and could force the

12    sale.

13    Q.  Jump ahead to the third paragraph, to Page 3, the second

14    full paragraph beginning -- sorry.  The one after that, in

15    response to questions from the independent trustees.

16    A.  In response to questions from the understand trustees,

17    Messrs. Archer and Godfrey then provided information concerning

18    the activities of Hunter Biden, who had joined Burnham earlier

19    in the year.  It was explained that he was not currently being

20    paid a salary, while he built up a revenue stream for this

21    business.  Mr. Godfrey explained that he provided policy advice

22    and had a small broker-dealer whose business was small deals or

23    instructions.  A discussion followed.

24    Q.  Did the trustees meet again with Mr. Archer a few months

25    after this?

I6JJGAL2                        Moynihan - direct

1   A.   Yes.

2   Q.   If you could take a look at what is in evidence as

3   Government Exhibit 783.  What is this?

4   A.   These again are minutes taken of a meeting of the executive

5   session of the trust dated January 19, 2016.

6   Q.   In addition to the trustees, who else was present at this

7   meeting?

8   A.   Devon Archer, Andrew Godfrey, Pat Colletti and myself.

9   Q.   Directing your attention to the call to order, can you

10  reread that?

11  A.   Yes.  Ms. Eisen called the first executive session to order

12  and stated that the purpose of the executive session was to

13  discuss recent developments at Burnham.  Present were the

14  independent trustees, Ms. Moynihan, and Messrs. Archer and

15  Godfrey.

16  Q.   Can you read the paragraph under that under discussion.

17  A.   In response to questions, Mr. Godfrey reported that

18  representatives of the Securities & Exchange Commission (SEC)

19  were expected to return the following day.  He then explained

20  the issues that had been raised by the Financial Industry

21  Regulatory Authority with respect to to compliance with the net

22  capital rules by Burnham Securities, Inc.

23         Mr. Godfrey explained that he and others had sought to

24  raise sufficient additional capital to meet the requirements.

25  He said that FINRA had asked for an attestation from a client

1    of Mr. Burnham who was advancing funds to Mr. Burnham to

2    contribute to net capital.  He also said there were related

3    journal entries that Marcelle Devine, chief financial officer

4    for BSI, would need to make and which had not yet been

5    completed.

6    Q.  Go to the second paragraph on Page 2 and read the first

7    sentence?

8    A.  The independent trustees inquired into who was still

9    working at BSI, and Mr. Godfrey reported that there were 8

10   people left.  He said that accounts were being moved to Revere

11   Securities or SEC.  In response to further questions, he said

12   that the Newport California office had been closed and that Dan

13   McClory was gone and no longer being paid any salary.

14   Q.  Can you read the paragraph below that.

15   A.  In response to a question, Mr. Godfrey said that the Indian

16   bonds had come into BSI in June 2015.  The independent trustees

17   inquired if there was any connection with Burnham and if any

18   bonds had been purchased by or placed with any account at

19   Burnham.  Ms. Moynihan noted she had inquired directly of

20   Deborah Hyman, Burnham, chief compliance officer at Burnham,

21   and Mr. Colletti on this point previously.  Mr. Godfrey stated

22   that no bonds had been purchased or placed with any Burnham

23   account.

24   Q.  Without getting into any discussions you had with anybody,

25   when you say independent bonds here, what were you referring

I6JJGAL2                        Moynihan - direct

1   to?

2   A.   We were referring to some bonds we hat understood had been

3   posted as net capital.

4   Q.   For Burnham?

5   A.   For Burnham Securities.

6   Q.   Were those the Wakpamni bonds?

7   A.   At the time we didn't know that but, yes, I think they

8   were.  We later learned that.

9   Q.   Can you read the third paragraph on Page 2 -- sorry, the

10  fourth paragraph on Page 2, beginning the independent trustees

11  then asked Mr. Archer.

12  A.   The independent trustees then asked Mr. Archer to explain

13  his view of current events.  Mr. Archer said that since the

14  indictment of Mr. Galanis in September, it was clear that the

15  investment in BSI would not go forward.

16       He said that Mr. Burnham seemed to have a mental block

17  on the point, and appeared to have relied on a hope that he

18  would be bailed out.  In response to questions on his own

19  role,, Mr. Archer said that he was not the manager of

20  Mr. Burnham.

21  Q.   Continue with the paragraph below that beginning in

22  response to a question, in response to a question.

23  A.   In response to a question on the best path forward, Mr.

24  Archer said that it would be best to retain Forside and manage

25  the closing of BSI.

1   Q.  What is the under of what Foreside is?

2   A.  Foreside is a registered broker-dealer and the mutual funds

3   need to have a registered broker-dealer to sell the mutual

4   funds.  BSI had been formed that function, but so we needed to

5   find a new broker-dealer which was Foreside.

6   Q.  Go to Page 3, the second full paragraph.  Can you read

7   that.

8   A.  Mr. Archer said that Valor Group Limited, Valor, which he

9   said was a successor to Wealth Assurance, had contributed funds

10  for the purchase of BSI and put up a letter of credit.  He

11  explained that he saw no issue with this until September, when

12  Jason Galanis was indicted.  The independent trustees asked

13  whether Hugh Dunkerley had been fired.  In the strongest terms,

14  the independent trustees reminded Mr. Archer that he had

15  represented that he had no connections with Mr. Galanis.

16          This is a blank there.  And the independent trustees

17  emphasized that they did not believe any association with Jason

18  Sugarman was advisable and the continued connections did not

19  make them comfortable.  They further admonished that all

20  connection with BSI should be terminated and that the firm

21  should be promptly wound down.

22  Q.  Now, did you have a final meeting or another meeting with

23  Mr. Archer the following month after this?

24  A.  Yes.

25  Q.  Can you take a look at what is in evidence as Government

1    Exhibit 784.

2    A.   Yes.

3    Q.   What is the date of this meeting?

4    A.   This meeting was on February 25th, 2016.

5    Q.   At this time had you become aware of an SEC complaint

6    against Atlantic asset management involving the Wakpamni bonds?

7    A.   Yes.

8    Q.   Do you know whether for sure whether Mr. Archer was one of

9    the persons referenced in that complaint?

10   A.   No, I did not know for sure.

11   Q.   Can you read the second paragraph beginning under

12   discussion, beginning representatives of Burnham.

13   A.   Representatives of Burnham then explained that the

14   Securities & Exchange Commission was continuing its review of

15   BSI, which is Burnham Securities, primarily with respect to to

16   books and records.

17         Ms. Moynihan asked Mr. Archer if he had any

18   involvement with any of the events detailed in an SEC complaint

19   against Atlantic Asset Management, which had recently come to

20   her attention.  She said that based on her reading of the

21   complaint, one of the unnamed persons had certain

22   characteristics in common with Mr. Archer.  Mr. Archer said he

23   had no involvement whatsoever with those events, and that the

24   individual was likely Mr. Galanis.

25   Q.   Again just to be clear, you don't know for sure whether Mr.

1    Archer was, in fact, the person referenced in that complaint?

2    A.  That's correct.

3    Q.  What happened to the mutual funds, ultimately happened to

4    the mutual funds that the trustees oversaw?

5    A.  Well, as these events transpired, the Board of Trustees

6    decided that they needed to find a new investment manager, and

7    they contracted with a new firm, RMB Securities, based out of

8    Chicago to manage the funds.

9    Q.  The mutual funds were moved away from Burnham Asset

10   Management?

11   A.  Yes.

12           MR. QUIGLEY:  No further questions.

13           THE COURT:  All right.  Cross-examination?

14           MR. SCHWARTZ:  Yes.  Thank you, your Honor.

15   CROSS EXAMINATION

16   BY MR. SCHWARTZ:

17   Q.  Good morning, Ms. Moynihan.

18   A.  Good morning.

19   Q.  My name is Matthew Schwartz.  I am one of Mr. Archer's

20   lawyers.  I am going to ask you a few questions, okay?

21   A.  Sure.

22   Q.  You and I have never spoken before, correct?

23   A.  That's correct.

24   Q.  You have, of course, spoken with the prosecutors before,

25   correct?

1   A.  Yes.

2   Q.  Am I right that the very first time that you were

3   interviewed by the government as a potential witness was on

4   April 12th, 2018?

5   A.  I don't remember.

6   Q.  Does that sound about right, it was in mid-April?

7   A.  I guess so, yeah, roughly.

8   Q.  It was about two months ago, right?

9   A.  That sounds basically right.

10  Q.  It wasn't six months ago, right?

11  A.  Right.

12  Q.  It plainly wasn't three years ago?

13  A.  No.  It was sometime in the past, this recent few months.

14  Q.  Other than that conversation in mid-April, you had one

15  further telephone conversation with them in early May of this

16  year, correct?

17  A.  Both conversations were by telephone, yes, I guess it was

18  May, yeah.

19  Q.  The first time you actually met these prosecutors or met

20  anyone to be interviewed as a witness was when you came here

21  and testified, I guess.  Is that right?

22  A.  No.

23  Q.  You had been interviewed as a witness previously in person?

24  A.  No, but I met them previously in person.

25  Q.  Right, you did, because you were a lawyer for the

1    independent trustees of the Burnham Investors Trust, correct?

2    A.  Yes.

3    Q.  Certain members, certain of the independent trustees were

4    interviewed by the government during the course of their

5    investigation?

6              MR. QUIGLEY:  Objection to relevance.

7              THE COURT:  Sustained.

8    BY MR. SCHWARTZ:

9    Q.  Let me ask this question.

10             Were you not present when other individuals were

11   interviewed as witnesses by the government?

12   A.  Yes.

13   Q.  You were present as a lawyer, correct?

14   A.  Correct.

15   Q.  And now you're here as a witness, true?

16   A.  Yes.

17   Q.  To be clear, the interview you were present for as a

18   lawyer, that took place in November of 2017, correct?

19   A.  I don't remember the date, but that sounds roughly right.

20   Q.  It was at the very end of 2017, true?

21   A.  Yeah.

22   Q.  THAT was an interview of Peggy Eisen, correct?

23   A.  Yes.

24   Q.  And even sitting here today, by the way, you are still the

25   lawyer for the independent trustees, true?

I6JJGAL2                         Moynihan - cross

1    A.   Yes.

2    Q.   Is it still called the Burnham Investors Trust?

3    A.   No.  It is called the RMB Investors Trust.

4    Q.   It is still the same entity, you're still the lawyer?

5    A.   I am still the lawyer to the independent trustees of what

6    is now the RMB Investor Trust, yes.

7    Q.   Am I correct that as their lawyer, they enjoy a legal

8    privilege with you, an attorney-client privilege?

9    A.   Yes.

10             MR. QUIGLEY:  Objection.

11   Q.   My point is just this --

12             THE COURT:  I will allow that.

13   Q.   -- I want to be very, very clear in my questioning today

14   that I don't want to get into any of your advice as a lawyer.

15   I don't want to get into anything that you learned from your

16   clients as a lawyer.

17             I want to talk to you as a witness just about what you

18   saw and what you heard and what you read, okay?

19   A.   Ah-huh, okay.

20   Q.   Let's talk just generally for a second about what the Board

21   of Trustees of the Burnham Investors Trust was, okay?  You have

22   to answer orally.

23   A.   Yes, okay.  Sorry.

24   Q.   Can I call it the BIT Board?

25   A.   Yes.

1    Q.   So the BIT Board, you testified, oversaw certain mutual

2    funds on behalf of what was then called the Burnham Investors

3    Trust, correct?

4    A.   Well, no, not on behalf of.

5    Q.   Explain.

6    A.   They're the board of the trust, so on behalf of the

7    shareholders of the trust, the investors.

8    Q.   The BIT Board, this is my point, they didn't make

9    investment decisions.  Is that right?

10   A.   Correct.

11   Q.   They didn't directly manage the investments, right?

12   A.   No.  They're just responsible for protecting the interest

13   of the shareholders.

14   Q.   One of the ways they did that was to evaluate and approve

15   relationships with different investment advisers, true?

16   A.   True.

17   Q.   Specifically the one we are talking about here was Burnham

18   Asset Management, that was the investment adviser that actually

19   handled the investments on behalf of the mutual funds, correct?

20   A.   Correct.

21   Q.   In the time period that we're talking about, 2013 into

22   early 2016, and even today, you did not represent the entire

23   BIT Board, correct?

24   A.   Correct.

25   Q.   You represented only the so-called independent trustees of

1   the board, correct?

2   A.   Yes.   Currently the only trustees that are on the board are

3   independent, so I now represent the entire board.

4   Q.   During the time periods that we're talking about, there was

5   a difference, true?

6   A.   Yes.

7   Q.   We'll talk about that in a second.

8          By the way, you're a law at partner at Perkins Coie,

9   correct?

10  A.   Yes.

11  Q.   I think you told us your practice is specialized in the

12  representation of independent trustees to the boards of mutual

13  funds.   Is that right?

14  A.   Yes.

15  Q.   Is that a very specific practice?

16  A.   It's a type of practice in the investment management area,

17  yes.

18  Q.   Do you consider yourself more generally an investment

19  management lawyer?

20  A.   I would consider myself generally an investment management

21  lawyer who specializes in representing independent trustees.

22  Q.   Suffice it to say Perkins Coie is an excellent lawyer, a

23  reputable law firm, true?

24  A.   Well, that is your view but, yes, we like to think so.

25  Q.   In your view, too, right?

1   A.  Yes.

2   Q.  You yourself are an experienced and careful lawyer, right?

3   A.  Yes.

4   Q.  It was good you demonstrated your care by pausing.

5           MR. QUIGLEY:  Objection.

6           THE COURT:  Sustained.

7   BY MR. SCHWARTZ:

8   Q.  As an experienced investment manager lawyer, you handle a

9   lot of contracts, true?

10  A.  Yes.  Well, not a lot, but, yeah.

11  Q.  You review contracts, true?

12  A.  Yes.

13  Q.  Could you explain to the jury what an integration clause is

14  in a contract.

15  A.  An integration clause is a clause when you want to either

16  take other agreements and integrate them or prior agreements or

17  when you just want to -- you can say they're integrated or not

18  integrated.

19  Q.  Generally this is to say this is the universe of agreements

20  we are relying upon and not anything else, true?

21  A.  Yes.

22  Q.  Going back to the structure of the BIT Board, the person

23  who was not an independent trustee was Jon Burnham, correct?

24  A.  Yes.

25  Q.  Jon Burnham was the chair of the BIT Board, right?

1    A.  Yes.

2    Q.  But he was what was called an interested trustee.  Is that

3    right?

4    A.  Yes.

5    Q.  He was interested because he was also an executive at

6    Burnham Asset Management, true?

7    A.  True.

8    Q.  And he also had an ownership interest at the time in

9    Burnham Asset Management, correct?

10   A.  Correct.

11   Q.  And so during the time period at least that these

12   discussions began, am I correct in saying that there were three

13   independent trustees?

14   A.  Yes.

15   Q.  Ms. Eisen, Mr. McCorkindale and Mr. Connell?

16   A.  Yes.

17   Q.  By the way, Jon Burnham -- strike that.  You were the

18   lawyer at the time to Ms. Eisen, Mr. McCorkindale and Mr.

19   Connell, correct?

20   A.  I was the lawyer to the independent trustees, not to them

21   personally.

22   Q.  Fair enough?

23   A.  In their capacity as trustees.

24   Q.  Those three people were the independent trustees?

25   A.  Yes.

1    Q.  Jon Burnham, as the interested trustee, had his own lawyer,

2    true?

3    A.  Yes.  I don't know.

4    Q.  You recall someone named Mark Kaplan?

5    A.  Mark Kaplan was a friend of Mr. Burnham who in any

6    situation would say I'm not his lawyer, I am just his friend.

7    Q.  He was a lawyer, correct?

8    A.  Yes, he was a lawyer.

9    Q.  He was a lawyer at the Skadden Arps law firm, correct?

10   A.  Yes.

11   Q.  He did participate in a number of meetings of the BIT

12   Board, true?

13   A.  Yes.

14   Q.  But he was just there as a friend?

15   A.  That is what he said.

16   Q.  Now, am I correct that the Burnham Investors Trust also had

17   a lawyer?

18   A.  Yes.  So the funds had a lawyer.

19   Q.  Who was it?

20   A.  Michael Malloy.

21   Q.  We saw in some of the meeting minutes Mr. Quigley showed

22   you Mr. Malloy sometimes was at the BIT Board meetings as well,

23   true?

24   A.  Yes.

25   Q.  Mr. Malloy was a lawyer at a law firm called Drinker

1    Biddle?

2    A.   Yes.

3    Q.   He was also an experienced securities lawyer, right?

4    A.   Yes.

5    Q.   I want to go to the beginning of the conversations with an

6    entity called COR Fund Advisers.  Do you remember that entity?

7    A.   Yes.

8    Q.   They also had a lawyer, true?

9    A.   Yes.

10   Q.   Their lawyer was named Stephen Weiss.  Is that right?

11   A.   Yes.

12   Q.   He had been a partner at Greenburgh Traurig and Hotchkin

13   law firms?

14   A.   I don't know.

15   Q.   He was also an experienced securities lawyer?

16   A.   I don't know.

17   Q.   He was a lawyer that represented him in these transactions?

18   A.   Yes.

19   Q.   To be clear, you were not yourself a trustee independent or

20   otherwise, right?

21   A.   Correct.

22   Q.   You didn't vote on any matters that had to be brought to a

23   vote of the BIT Board, true?

24   A.   Correct.

25   Q.   But you did act as the secretary for the meetings of the

I6JJGAL2                        Moynihan - cross

1   independent trustees and the meetings of the BIT Board, true?

2   A.   Yes.  Did you say acted as the secretary?

3   Q.   Yes.

4   A.   Well, technically there is a secretary.  I acted, I

5   recorded the minutes, yes.

6   Q.   When you signed those minutes, didn't you sign them as the

7   secretary or secretary pro tem?

8   A.   I think -- let's see what it is.  Pro tem, yes.

9   Q.   What does that mean?

10  A.   That is a term that means you're acting as the secretary.

11  Q.   For the purposes of those meeting minutes, you were acting

12  as the secretary of the board, true?

13  A.   Yes.

14  Q.   Is it fair to say that some of those meetings were very

15  lengthy?

16  A.   Not really, no, in the great scheme of board meetings,

17  maybe a couple of hours at the most.

18  Q.   Some of them lasted a couple hours, fair?

19  A.   Some did.  Most lasted less than an hour.

20  Q.   The minutes that we looked at, fair to say that those are

21  not verbatim accounts of what took place of the meeting?

22  A.   They're not verbatim.

23  Q.   You didn't write down every word that was spoken?

24  A.   That's correct.

25  Q.   There is no Court Reporter like there is here today?

I6JJGAL2                         Moynihan - cross

1   A.   That's correct, although I do take very detailed notes

2   during the course of the meeting.

3   Q.   I was going to ask you about that.

4            How do you take notes at the meeting?

5   A.   Well, I sit there with a notepad and a pen and I take notes

6   as people speak.

7   Q.   So you're not taking notes in a computer and turning them

8   into those minutes?

9   A.   Correct.

10  Q.   Is there anyone else that is working with you taking notes

11  that gets incorporated into the meeting minutes?

12  A.   It's possible that I'll have an associate who will take

13  notes as well, yes.

14  Q.   That would be taking notes in addition to you?

15  A.   Yes.

16  Q.   Where are those notes?

17  A.   Our practice is that when we finished, we view the minutes

18  as the record of the meeting so our practice is once the

19  minutes have been written, the notes are discarded.

20  Q.   By "discarded," you mean destroyed, right?

21  A.   Yeah.

22  Q.   Typically how long after a meeting actually takes place do

23  you finalize the minutes of that meeting?

24  A.   Well, that can depend.  It can be that very afternoon or it

25  could be within a matter of a week or so.

1    Q.  It depends on the meeting?

2    A.  It depends on the meeting and the schedule and so we send

3    the minutes out to the trustees.  They may not respond

4    immediately.  We collect their comments and then finalize the

5    minutes.

6    Q.  And those draft minutes that you distribute to the

7    trustees, what happens to them?

8    A.  Well, not much.  We send them out.  I suppose they stay in

9    the -- probably in the records someplace, and then we print

10   out -- when the minutes are finalized, they're printed, signed

11   and placed in a file.

12   Q.  Am I correct that you would consider those drafts of the

13   minutes that were circulated to be under your attorney-client

14   privilege?

15   A.  Yes.

16   Q.  You haven't turned those over to the government, right?

17   A.  I have not been asked, but we would have claimed privilege.

18   Q.  So the minutes that Mr. Quigley showed you, the minutes for

19   other meetings, those are only notes of what took place at

20   those meetings that you're aware of that still exist, true?

21   A.  That I am aware of, yes.

22   Q.  So I want to now talk about the course of discussions

23   between various investor groups and the BIT Board over time,

24   okay?

25   A.  Okay.

Q.   During the period of time that we have been talking about,
from late 2013 through let's just stop at October 1, 2014 when
the transaction was approved for a second, there was some
meetings that were just for the independent trustees, true?

A.   Yes.

Q.   And there were some meetings that were for the entire BIT
Board, true?

A.   Yes.

Q.   Sometimes there were meetings of the independent trustees
at which Mr. Burnham attended as an invited guest, true?

A.   Yes, and yes, yes, that's right.

Q.   Mr. Quigley showed you during the time period prior to and
including October 1, 2014, the minutes from three of those
meetings.  Is that right?

A.   Prior to October 1, 2014, three of the minutes, I think
that's right.

Q.   But, in fact, there were at least 10 if not more meetings
during that time period, true?

A.   What kind of meetings?

Q.   Meetings of either the BIT Board or the independent
trustees specifically to discuss the potential change in
control?

A.   Yes, it's possible.

Q.   For all of those, you were the acting secretary and kept
the minutes, true?

I6JJGAL2                          Moynihan - cross

1    A.  Yes.

2    Q.  For all of the meetings up to and including October 2014,

3    Ms. Eisen and Mr. Connell attended those meetings either in

4    person or by telephone as two of the independent trustees,

5    true?

6    A.  Yes.  Well, I think all of them.  There may have been one

7    or two that somebody was absent from.  I just don't know, or

8    the ones we just looked at for all of them, yes.

9    Q.  Would it help to have a full set of meeting minutes?

10   A.  A full set?

11   Q.  Yes.

12   A.  I suppose so.

13   Q.  Let me hand up a binder.

14        Am I correct, Ms. Moynihan, that there were meetings

15   either of the independent trustees or of the entire BIT Board

16   on March 13th, March 19th, April 2nd, April 9th, April 14th,

17   April 24th, May 29th, July 9th, August 21st, and October 1st,

18   all of 2014?

19   A.  Yeah, that's correct.  The board was meeting very

20   frequently.

21   Q.  And there were other meetings dealing with other aspects of

22   the board's business, true?

23   A.  Correct.  There is a quarterly meeting that occurs, so it

24   would have occurred in June.

25   Q.  For all of the meetings that had to do with the change of

I6JJGAL2                      Moynihan - cross

1   control, though, Ms. Eisen and Mr. Connell participated, true?

2   A.  I think so, but we could go through these and see if that's

3   correct.  I assume you have done that.

4   Q.  Am I right that Mr. McCorkindale missed some of the

5   meetings due to illness?

6   A.  Yes.

7   Q.  Sometimes he would have to leave early or come late also

8   due to illness?

9   A.  Yes, he had cancer.

10  Q.  He ended up retiring in February 2015, true?

11  A.  Yes.

12  Q.  And he actually passed away the following month.  Is that

13  right?

14  A.  Shortly thereafter, yes.

15  Q.  Am I right -- and we saw these names on some of the later

16  minutes Mr. Quigley showed you -- that he was replaced actually

17  by two people, Peter Borish and Robert Sabelhaus.

18  A.  Yes.

19  Q.  So during the entire time period from 2013 through early

20  2016, there were a total of six people who served as trustees

21  including Jon Burnham, correct?

22  A.  Yes, but not at the same time.

23  Q.  Not at the same time?  So Jon Burnham, Peggy Eisen, William

24  Connell, Mr. McCorkindale, Mr. Borish and Mr. Sabelhaus,

25  correct?

1    A.   Yes.

2    Q.   Now, at the time that the discussions began, what was the

3    approximate total value of the Burnham Investors Trust's

4    investments?

5    A.   I don't know.  I think it was under a billion dollars.

6    Q.   Under a billion, but close to a billion, fair?

7    A.   I think more than 700, but I really don't remember exactly.

8    700 million.

9    Q.   700 million?

10        And Burnham Asset Management managed those funds

11   pursuant to certain investment advisory agreements, true?

12   A.   Yes.

13   Q.   I want to be very clear about one thing.

14        You talked a little bit about these Wakpamni bonds,

15   correct?

16   A.   Me?

17   Q.   Mr. Quigley asked you a few questions about them, right?

18   A.   Yes.

19   Q.   You said you only heard about that term much later on,

20   correct?

21   A.   Well, he asked around the February meeting, I believe, and

22   it was right around then that we learned the name of the bonds.

23   Q.   This is what I want to be clear on.  Am I correct in saying

24   that at no point was any of the Burnham Investors trustee money

25   invested in those bonds?

I6JJGAL2                          Moynihan - cross

1   A.  Yes, that's correct.

2   Q.  Am I also correct to say to your knowledge, that at no

3   point it was ever suggested that any of the Burnham Investors

4   Trust money would be invested in those bonds?

5   A.  I don't know.

6   Q.  To your knowledge?

7   A.  To my knowledge.  Well, my knowledge is I have no idea.

8   Q.  You have never heard the suggestion that anyone was

9   thinking, contemplating, talking about investing the Burnham

10  Investors Trust money in those bonds, true?

11  A.  You know, I just don't remember.

12  Q.  Is it also correct that none of the assets of the Burnham

13  Investors Trust was ever invested with a company called

14  Atlantic Asset Management?

15  A.  Yes.

16  Q.  None of the money managed by the -- excuse me.

17          None of the money belonging to the Burnham Investors

18  Trust was ever invested with or through a company called Hughes

19  Capital Management, true?

20  A.  To the best of my knowledge, yeah.

21  Q.  Again --

22  A.  We closely scrutinized the investments, so that would be

23  yes.

24  Q.  To the best of your knowledge, there was never a suggestion

25  that Atlantic or Hughes would be the investment adviser for the

I6JJGAL2                         Moynihan - cross

1     funds owned by the Burnham Investors Trust, true?

2     A.   True.

3     Q.   Is it also true that to your knowledge, Burnham Asset

4     Management never invested in or purchased these Wakpamni bonds

5     for any of its customers?

6     A.   Burnham Asset Management, that is the question?

7     Q.   Yes.

8     A.   Yes, well, we did, as soon as we learned about them, we

9     inquired to determine if they were aware of that, and we were

10    told no.

11    Q.   That is true, right?  Burnham Asset Management never

12    purchased Wakpamni bonds for --

13    A.   Well.

14    Q.   As far as you know?

15    A.   I only represented Burnham investment trust.  The mutual

16    funds never invested -- I can't speak for any clients, et

17    cetera, of Burnham Asset Management.

18    Q.   So let's talk a little bit about Burnham Asset Management.

19         Prior to October 2014, Burnham Asset Management, you

20    testified, was a subsidiary of the Burnham Financial Group,

21    true?

22    A.   Prior to what date?

23    Q.   October 2014?

24    A.   Prior to October 2014, yes.

25    Q.   I'll just use October 1st, 2014 sort of as an important

1  point in time because that was the meeting at which the change

2  of control was ultimately approved, right?

3  A.   Okay, yes.

4  Q.   So prior to the change in control, Burnham Asset Management

5  was owned by Burnham Financial Group, true?

6  A.   True.

7  Q.   And Burnham Securities, Inc. was also owned by Burnham

8  Financial Group, true?

9  A.   True.

10          MR. SCHWARTZ:   And Mr. Quigley showed you what's been

11  marked as Exhibit 4002, please, Mr. Jackson.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I6J7GAL3                         Moynihan - Cross

1    Q.  And this is an accurate depiction of the corporate

2    structure of the Burnham Financial Group at the time that the

3    change of control was first being discussed, true?

4    A.  True.

5    Q.  And that changed over time, right?

6    A.  Yes.

7    Q.  Now, even though they had a separate -- excuse me -- even

8    though they had a common corporate parent, you understood

9    Burnham Securities and Burnham Asset Management to be separate

10   entities, true?

11   A.  At what time?

12   Q.  Prior to October 20 --

13   A.  Well, they were separate corporate entities under common

14   control.

15   Q.  And common control through the Burnham Financial Group,

16   true?

17   A.  Yes.

18   Q.  And Burnham Financial Group at the time prior to the change

19   of control was owned by the Burnham family, true?

20   A.  True.  I mean I think that there were a number of different

21   investors, but essentially yes.

22   Q.  Controlled by the Burnham family.

23   A.  Yes.

24   Q.  Burnham Asset Management was an investment advisor, true?

25   A.  Yes.

I6J7GAL3                    Moynihan - Cross

1   Q.  And Burnham Securities, Inc. was a broker dealer, true?

2   A.  Yes.

3   Q.  And I think you testified earlier that mutual funds need to

4   have an associated or affiliated broker dealer; is that right?

5   A.  They don't need to have an associated or affiliated broker

6   dealer; they need to have a registered broker dealer to

7   distribute their shares.

8   Q.  I see.  The trades on behalf of the trust, however, didn't

9   clear through the Burnham Securities, true?

10  A.  Burnham Securities actually was the executing broker, I

11  believe, but the clearing was not through the broker dealer.

12  It was done -- it was not done -- they didn't clear through

13  Burnham Securities, if that's what you mean.

14  Q.  Yeah, they cleared through Chase, true?

15  A.  Correct.

16  Q.  And that was one of the many conditions that the trustees

17  insisted upon, that they continue to clear through Chase, true?

18  A.  Yes.

19  Q.  And just talking about --

20          You can take that down, Mr. Jackson.

21          Talking about the conditions, is it fair to say that

22  throughout the 2013 and leading up to October 1, 2014, the

23  discussions between the investor group on the one hand and the

24  trustees on the other were somewhat of a negotiation?

25  A.  Yeah, I guess so.

I6J7GAL3                        Moynihan - Cross

1    Q.  I mean I think you used the word before on your direct

2    examination when describing the conditions, that those were

3    conditions that had been quote "extracted," right?

4    A.  Yeah.

5    Q.  And so there was a give-and-take throughout this process,

6    true?

7    A.  Yes.

8    Q.  And now I want to talk about that give-and-take process.

9    Now, turning your attention all the way back to the summer of

10   2012, OK?

11   A.  Yes.

12   Q.  This was about the time that Ms. Eisen and Mr. Connell

13   first joined as independent trustees, right?

14   A.  That may be true.  I was not counsel to the board at that

15   time.

16   Q.  Fair enough.  When did you become counsel?

17   A.  I became counsel -- well, I guess I became counsel in --

18   let's see.  In May of 2013, I believe.

19   Q.  OK.  So I'm talking about before that, the summer of 2012.

20   A.  Um-hum.

21   Q.  Which you wouldn't have any personal knowledge of.

22   A.  That's correct.

23   Q.  OK.  Fair to say that when you became counsel to the

24   trustees, there was already discussion that Mr. Burnham wanted

25   to sell the Burnham Financial Group?

I6J7GAL3                    Moynihan - Cross

1    A.   Yes.

2    Q.   And he had been wanting to sell it for sometime, true?

3    A.   That's my understanding.

4    Q.   The initial potential acquirer was something called COR

5    Capital, right?

6    A.   That's what is in the documents.

7    Q.   And COR Capital was a company associated with Steven and

8    Jason Sugarman, true?

9    A.   I don't know, but I thought it was Jason Sugarman.

10   Q.   OK, Jason Sugarman.  And that's the origin of some of the

11   questions that Mr. Quigley showed you about the role of the

12   Sugarmans in the deal, true?

13   A.   True.

14   Q.   You understood that originally COR Capital was going to be

15   the acquirer, and then at a later point it changed but they

16   still were going to have some involvement, true?

17   A.   Correct.  Mr. Archer was introduced as an investor.

18   Q.   And Mr. Archer was introduced as the investor in the summer

19   of 2013, true?

20   A.   True.

21   Q.   Basically shortly after you became their lawyer.

22   A.   Yes.

23   Q.   And I think one of the things that you said that the

24   trustees did upon learning about new potential investor was

25   conduct a background check, true?

1    A.   Yes.

2    Q.   And you also -- the trustees also required additional

3    verification from Mr. Archer, true?

4    A.   I don't know what you mean.

5    Q.   Well, for example, he was required to produce paystubs from

6    his position as a trustee for the Heinz family trust, true?

7    A.   Not to my knowledge.

8    Q.   You don't recall that?

9    A.   No.

10   Q.   Now, the original proposed acquirer of Burnham Financial

11   Group you just told us was COR Capital, right?

12   A.   That's what I saw on the documents.

13   Q.   And the new proposed acquirer was something called COR Fund

14   Advisors, correct?

15   A.   Correct.

16   Q.   And although it was originally -- you understood at this

17   point in time when they were introduced as potential acquirer

18   of Burnham Financial Group, COR Fund Advisors was not part of

19   the so-called COR family of companies, right?

20   A.   I don't know what the COR -- I don't know what you're

21   referring to.

22   Q.   Well, put differently, you understood that COR Fund

23   Advisors was a Devon Archer-led investment group, not a

24   Sugarman-led investment group.

25   A.   That's correct.

1    Q.   And ultimately, however, it was something called BAM

2    Holdings that acquired Burnham Asset Management?

3    A.   Correct.

4    Q.   And you understood BAM Holdings also to be led by Mr.

5    Archer, true?

6    A.   Yes, that was a requirement.

7    Q.   And that resulted from some of this give-and-take that you

8    just described where the trustees insisted upon splitting the

9    ownership of Burnham Securities and Burnham Asset Management,

10   correct?

11   A.   Correct.

12   Q.   Now, you've talked a few times about the role of the

13   trustees in approving a change of control transaction, right?

14   A.   Correct.

15   Q.   Is it right to say that the trustees had the right to

16   approve a transaction?

17   A.   I'm sorry, I don't know what you mean by that.

18   Q.   Well, in other words, if Jon Burnham wanted to sell Burnham

19   Asset Management, the trustees couldn't stop him, right?

20   A.   He could sell the advisor but you cannot sell a fiduciary

21   office, which is the job of managing the money for the

22   investors.  So you can sell your company, but you can't sell

23   your funds, because the funds are there for the benefit of the

24   people who are the shareholders.

25            So that's why -- so he could go ahead and sell Burnham

1    Asset Management, but it would have no business because the

2    funds had to approve his working as an advisor for the funds.

3    Q.   That's my point.  The decision -- when we talk about

4    approving the change of control, as a formal matter the

5    question is whether the funds are going to enter into a new

6    investment advisory agreement with Burnham Asset Management

7    under its new control group.

8    A.   So as a formal matter when an advisor sells itself or

9    changes control, the contract immediately ends, and so you need

10   a new contract with a new advisor, and it's that new contract

11   that the board has to approve.

12   Q.   So in essence the funds or the trust were customers of

13   Burnham Asset Management, true?  And the decision was whether

14   to stay with Burnham Asset Management after the sale, true?

15   A.   Yes, we had to decide if the new owners were suitable.

16   Q.   But you knew that the funds that were administered by the

17   Burnham Investors Trust were an enormous client of Burnham

18   Asset Management, correct?

19   A.   I don't think you meant to say administered by Burnham

20   Investors -- by BIT.  The funds are Burnham -- the trust -- the

21   funds are the trust.

22   Q.   OK.

23   A.   So I'm not sure what you meant by your question.

24   Q.   The trust was Burnham Asset Management's biggest client,

25   true?

I6J7GAL3                        Moynihan - Cross

1    A.  Yes.

2    Q.  And, therefore, you understood that even though you

3    couldn't technically block a transaction, you had enormous

4    leverage, true?

5    A.  Boards have some leverage, not enormous leverage.  It's

6    very, very, very unusual for a board to not approve a sale,

7    just because they're just a board.  They have to find someone

8    else to manage the money, etc.  It's very hard to do.

9    Q.  And in this case the BIT board did approve the sale, true?

10   A.  In October of 2014, yes.

11   Q.  So, let me -- let me show you some of the back-and-forth

12   that led up to that October 2014 approval, OK?

13   A.  Um-hum.

14   Q.  Can I show, Mr. Jackson, to the witness, Judge Abrams and

15   the lawyers Exhibit 751.

16           This is a letter that you sent to COR Fund Advisors in

17   January of 2014, true?

18   A.  True.

19   Q.  And this was in connection with the proposed change of

20   control at Burnham Financial Group, true?

21   A.  Correct.

22           MR. SCHWARTZ:  I offer 751.

23           MR. QUIGLEY:  No objection.

24           THE COURT:  Admitted.

25           (Defendant's Exhibit 751 received in evidence)

I6J7GAL3                    Moynihan - Cross

1   Q.  Publish that to the jury, please, Mr. Jackson.

2            Now, am I correct in saying that this was the first

3   written correspondence with COR Fund Advisors about the

4   potential change of control?

5   A.  Yes, I think that's correct.

6   Q.  And for context, January 2014 is maybe six months after Mr.

7   Archer had been introduced or CORFA had been introduced as the

8   new lead investor, true?

9   A.  Correct.

10  Q.  And this letter is seven single-spaced pages long and

11  contains 37 different requests for information, true?

12  A.  Correct.

13  Q.  And some of those 37 different categories have

14  subcategories, right?

15  A.  Correct.

16  Q.  And this sort of I think you testified on direct extensive

17  due diligence is not uncommon when there is a potential change

18  of control at an asset management, true?

19  A.  Correct.

20  Q.  And fair to say that of the 37 different categories of

21  information, there were on all sorts of subjects, true?

22  A.  Well, they're on subjects relevant, but yes.

23  Q.  I mean some of them were about the background of the

24  control group, true?

25  A.  Yeah, true.

I6J7GAL3                         Moynihan - Cross

1    Q.  And some of them were about the business plan for the newly

2    controlled entity, true?

3    A.  Well, I only can see the front page, but I think that would

4    be right.  It would be business plan, financial information,

5    background, regulatory issues, etc.

6    Q.  These are the sort of things that you would typically ask

7    for in an initial request for information, true?

8    A.  Um-hum, yes.

9    Q.  And then you can take that down, and let me show you now

10   just for the witness, Judge Abrams and the lawyers Exhibit

11   4306.

12         Now, this is an e-mail from Stephen Weiss to amongst

13   others yourself, true?

14   A.  Yes.

15   Q.  And the subject is COR Fund Advisors response letter to

16   Burnham Investors Trust, right?

17   A.  Yes.

18         DEFENDANT ATTORNEY:  I offer Exhibit 4306.

19         MR. QUIGLEY:  No objection.

20         THE COURT:  Admitted.

21         (Defendant's Exhibit 4306 received in evidence)

22         MR. SCHWARTZ:  If you could publish this, please, to

23   the jury, Mr. Jackson.

24   Q.  So this is an e-mail from Mr. Weiss who I believe you

25   testified was CORFA's lawyer, true?

1   A.   Correct.

2   Q.   To Jon Burnham, copying yourself, Mark Kaplan and Devon

3   Archer, true?

4   A.   Correct.

5   Q.   Again, Mark Kaplan at the Skadden Arps law firm is the

6   person that you said was just a friend of Jon Burnham who

7   happened to be a lawyer?

8   A.   Correct.

9   Q.   And this is an e-mail by which Mr. Weiss was transmitting

10  to you a response to those 37 requests for information, true?

11  A.   Yes.

12  Q.   And is this typically the way these letters were exchanged;

13  there they were e-mailed back and forth?

14  A.   Yes.

15  Q.   I mean were any of them sent by post?

16  A.   We send all of our letters by post, but we also e-mail

17  them.

18  Q.   Any of them sent by messenger?

19  A.   I don't know, but they were -- I'm sure -- they were

20  usually an e-mail as well.  If they were messengered, I don't

21  know.

22  Q.   Were any of them hand delivered?

23  A.   They weren't hand delivered, no, to my knowledge.

24  Q.   Were any of them faxed?

25  A.   Not to my knowledge.

I6J7GAL3                     Moynihan - Cross

1    Q.  So, this response letter -- and we can flip the pages if

2    you need -- this was 22 single-spaced pages in response to your

3    37 requests for information, correct?

4    A.  That's correct.

5    Q.  And now just for context, at this time, February 2014, even

6    though this is relatively early in the conversations about

7    CORFA's acquisition of Burnham Financial Group, it's true that

8    CORFA already had a significant relationship with Burnham

9    Financial Group, true?

10   A.  That's my understanding.

11   Q.  So, for example, at this point, February 2014, Mr. Archer

12   was already on the board of directors, true?

13   A.  Yes.

14   Q.  He was on the board of directors of Burnham Financial

15   Group, Burnham Asset Management and Burnham Securities, true?

16   A.  I don't know.

17   Q.  And am I also correct that at this point, in February 2014,

18   CORFA had already extended loans to Burnham Financial Group in

19   excess of $2 million?

20   A.  My understanding is that there had been a series of loans

21   and there were some options associated with them.  I don't know

22   if CORFA originally extended the credit or not.  Some of those

23   relationships predated my involvement.

24   Q.  Fair enough.  But as of February 2014, did you understand

25   that CORFA had the option to convert those loans to equity?

1    A.   Yes.

2    Q.   And in addition to that convertible debt, it had a separate

3    option to purchase additional equity, true?

4    A.   Yes, I think that's correct.

5    Q.   And so as of February 2014, am I correct in saying that

6    CORFA had the right -- either by exercising its option or by

7    converting its debt -- to acquire about 90 percent of Burnham

8    Financial Group?

9    A.   Well, that's what they told us, yes.

10   Q.   That's one of the things that's explained in this letter,

11   right?

12   A.   Um-hum.

13   Q.   Yes?

14   A.   Yes.

15            MR. QUIGLEY:  Can we approach for a second?

16            THE COURT:  Sure.

17            You know what, ladies and gentlemen, why don't we take

18   our morning break now.  See we'll see you in a few minutes.

19            (Continued on next page)

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  It was time for a break anyway.  So why

3    don't we do this in open court.

4              MR. QUIGLEY:  Two quick things about this line of

5    questioning.  I have no objection to this letter -- and I

6    assume Mr. Schwartz is going to introduce similar letters --

7    coming in to show kind of a course of dealings between the

8    investor group and the trustees.  My concern is that

9    Mr. Schwartz now seems to be using this letter to establish the

10   truth of the matters that this witness has no personal

11   knowledge of beyond what is in this letter.  She was not

12   involved in the loans that were extended by CORFA to Burnham

13   Securities, and her answers are that's what it says in this

14   letter.  She was involved in a separate transaction, the

15   Burnham Asset Management acquisition, so I don't think these

16   letters should come in for the truth of the matters asserted

17   therein.

18             I think the second issue -- and this goes back to

19   1401, which your Honor excluded yesterday -- but to the extent

20   Mr. Schwartz is advancing a line of questioning that, hey, this

21   was really the lawyers; this wasn't Mr. Archer's

22   representations; this was the lawyer's going back and forth;

23   then I think he waives privilege certainly with respect to

24   1401, which is another similar later-on letter, and with

25   respect to any other correspondence between Mr. Archer and his

1   attorney regarding these letters -- these letters that are sent

2   to the board.

3          Because if he is going to argue that Mr. Archer didn't

4   see them or was less aware of them, and the lawyers going back

5   and forth, he is putting the communications between Mr. Archer

6   and Mr. Weiss at issue.

7          MR. SCHWARTZ:  So, on the first point, I agree this is

8   to demonstrate the course of dealings and not for the truth of

9   the matter.  This is what the witness understood.

10          I think I've been very clear for months and months and

11   months that I think that this particular piece of evidence can

12   only be understood in light of the lengthy and complicated and

13   very specific representations that went back and forth between

14   the parties, and that's what I intend to illustrate.  So, I

15   don't disagree with Mr. --

16          THE COURT:  Are you asking me to give an instruction

17   to the jury?

18          MR. SCHWARTZ:  I mean I will just say the things in

19   that letter, like this particular point, are true, and we will

20   independently prove their truth, so I'm not sure that the

21   government wants that instruction.  But I'm not offering this

22   document for the truth.

23          MR. QUIGLEY:  Not yet, your Honor.  I was kind of

24   flagging it as an issue.  I just think she shouldn't be asked

25   questions about -- and, look, I don't disagree that CORFA

I6J7GAL3                    Moynihan - Cross

 1    extended loans to Burnham.  The issue is asking this witness

 2    questions about things that she has no personal knowledge of

 3    but for letters that she received from a counterparty.

 4              THE COURT:  Well, let me know if you're asking

 5    anything, and obviously you can also clear that up on redirect

 6    if you want to do that, like what she knows and what she

 7    doesn't know; but if you're asking me to do something, just let

 8    me know that.  OK?

 9              MR. SCHWARTZ:  And if I need to -- I mean if I need to

10    set more of a foundation -- she reviewed all the loan

11    agreements and things like that.  She did the sort of

12    responsible due diligence you would expect a transactional

13    attorney to do, so she probably does have personal knowledge,

14    but again that's not the point that I'm trying to elicit; I'm

15    just trying to elicit the course of dealings.

16              On the second point about privilege, I mean this was

17    addressed in our letter.  In no way, shape or form does it open

18    the door to privileged communications to show that there were

19    lawyers involved in the deal.

20              And if Mr. Quigley is afraid that I am going to make

21    the argument that, in essence, this was done by Mr. Weiss

22    without Mr. Archer's knowledge or consent, that would be the

23    opposite of an advice of counsel defense.  That in no way -- if

24    I were to make that argument -- would waive any privilege.

25              It doesn't waive the privilege simply to talk about

1      the fact that there were lawyers, the fact that communications

2      were done through lawyers, the fact that lawyers exercised

3      their duty.  The thing that waives the privilege is when you

4      get into the substance of those communications.  I am not going

5      to get into the substance of any communications between Mr.

6      Archer and any lawyer, and she wouldn't know about them anyway.

7                MR. QUIGLEY:  Yeah, but I don't think he can say that

8      Mr. Archer thought these letters were OK because lawyers signed

9      off on them, that the representations to the board in letters

10     that he signed regarding Jason Galanis' noninvolvement with

11     these deals were OK because Stephen Weiss signed off on them.

12     That would be putting advice of counsel squarely at issue.

13               MR. SCHWARTZ:  Well, look, we cited authority in our

14     letter the other day dealing with 1401 -- when the government

15     first made this argument -- that that simply is not true.

16               There is a difference between a true advice of counsel

17     defense which says my lawyer told me that this was OK, in which

18     case you have to waive the privilege and you have to

19     demonstrate that the lawyer had all of the relevant

20     information, and on the other hand to say that the presence of

21     lawyers in the deal goes to that absence of bad faith, the

22     absence of intent to defraud.  And I think all of the

23     defendants, from literally the very first witness in this

24     trial, have been very clear that the presence of lawyers at

25     every step of the way has been one of the things that gave them

1    comfort; and that's fair argument and that doesn't waive any

2    privilege.

3         MR. QUIGLEY:  I think there is a difference between an

4    advice of counsel defense and just putting attorney advice at

5    issue.  We're not arguing that Mr. Schwartz has necessarily yet

6    gotten to an advice of counsel defense, but he has indicated

7    through his questioning that he is putting the advice that Mr.

8    Archer received from Mr. Weiss at issue with respect to these

9    communications.

10         THE COURT:  And do you have cases to support the

11    notion that if you do that, that you're waiving the privilege,

12    and if you are highlighting the fact that lawyers are involved,

13    if you are making the argument that he gave you comfort that

14    lawyers were involved.

15         MR. QUIGLEY:  That's not what we're saying.

16         I'm saying with respect to these letters, if he is

17    saying with respect to these communications with the board this

18    is the advice I received from my attorney -- not just lawyers

19    were involved in the transaction writ large -- but with respect

20    to these letters he is insinuating that this was the lawyers

21    who drafted them and that I wasn't really involved, certainly

22    an Exhibit like 1401, where he is getting a copy of a draft,

23    that puts that advice at issue.

24         MR. SCHWARTZ:  First of all, the government has to

25    stop making this argument by reference to the substance of a

1    communication that your Honor has held as privileged.  I want

2    to reiterate my request that the government destroy or return

3    that document.  That's not appropriate way to make this

4    argument; and anyway, as we pointed out, you can't tell from

5    the document what the attachment was.

6           Anyway, if I ever get into the substance of the

7    communications between Mr. Archer and any lawyer, I understand

8    that will potentially open the door.  All right?  That's not

9    what I am doing.  Arguably this witness has done that by

10   testifying about what the trustees believed and understood from

11   her communications with them, which I put everyone on notice in

12   my letter was a risk, but I'm not arguing waiver here.

13          I think that everyone is entitled to make their

14   arguments from the evidence, and as long as there are not

15   appeals to true attorney/client communications, there is not

16   going to be any waiver here.

17          MR. QUIGLEY:  Your Honor, I just with respect to Ms.

18   Moynihan, we were very careful I think in our direct to ground

19   her in the documents and not in her communications.

20          THE COURT:  So what are you asking me at this point?

21          MR. QUIGLEY:  We're just flagging it at this point,

22   because we're not asking for any specific relief at this point,

23   but I think if he continues to go down this road, to suggest

24   that, you know, Mr. Archer wasn't really involved in these

25   communications, he didn't review these communications, that it

I6J7GAL3                      Moynihan - Cross

1    was strictly Mr. Weiss, then communications between Mr. Archer

2    and Mr. Weiss regarding these letters, the privilege is waived.

3              MR. SCHWARTZ:  I mean, look, that's not a correct

4    statement of law, but that's not the argument I'm going to

5    make.  I mean the woman testified that there were in-person

6    meetings in which Mr. Archer made representations.  I can

7    question whether, you know, her recollection is exactly

8    accurate.  I'm not going to disavow her.

9              I'm definitely going to make the point, however, that

10   these letters were very, very specifically crafted and

11   contained very, very specific representations, and that was

12   done through the aid of lawyers.  I don't think anyone disputes

13   that, and that doesn't in any way get at attorney/client

14   communications.

15             THE COURT:  All right.  Let me take a look at the

16   cases that you cited in your letter again with respect to 1401

17   over the break.

18             Also, at the beginning of the lunch break can we have

19   McMillan here at the beginning?  And then we will take the

20   lunch break.  Is he available?

21             MS. TEKEEI:  Before we take the lunch break?  Yes, we

22   can contact him.

23             MR. QUIGLEY:  What time do you think about taking

24   lunch?

25             THE COURT:  Let's come back in ten minutes.

I6J7GAL3                      Moynihan - Cross

1              MR. QUIGLEY:  Lunch.

2              THE COURT:  I think one.

3              MR. SCHWARTZ:  If it's helpful, can I hand up a copy

4      of the letter.

5              THE COURT:  Sure.

6              (Recess)

7              THE COURT:  So, look, I will just say I agree with

8      Mr. Schwartz, and unless an advice of counsel defense is really

9      being made, that the privilege has not been waived; and I don't

10     think it has been yet.  Obviously, if a line gets crossed, we

11     can revisit the issue again.

12             MR. QUIGLEY:  Understood, your Honor.

13             THE COURT:  OK, thanks.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  You may proceed, Mr. Schwartz.

3           MR. SCHWARTZ:  Thank you, your Honor.

4           Mr. Jackson, could we go back to Exhibit 4306.

5   MARY MOYNIHAN, resumed.

6   CROSS-EXAMINATION (Continued)

7   Q.  Ms. Moynihan, before the break we were discussing the fact

8   that between convertible debt and options CORFA as of February

9   2014 had the right to acquire approximately 90 percent of the

10  equity in Burnham Financial Group, right?

11  A.  That's what they put in their letter to us.  I have no

12  independent knowledge.

13  Q.  And am I correct in saying that among other things in order

14  to complete an acquisition of Burnham Financial Group CORFA

15  would need approval from FINRA?

16  A.  To my understanding -- and I'm not a broker dealer

17  lawyer -- is that would be correct.

18  Q.  And, in addition, the majority of shareholders of the

19  Burnham Financial Services portfolio would have to approve the

20  change of control at a meeting held pursuant to a proxy

21  statement that was declared effective by the SEC, true?

22  A.  Sorry.  Could you repeat the question.

23  Q.  In order to finalize any change of control, the majority of

24  shareholders of the Burnham Financial Services portfolio had to

25  approve at a meeting held pursuant to a proxy statement

I6J7GAL3                          Moynihan - Cross

1    declared effective by the SEC the change in control?

2    A.  So you said the Burnham Financial portfolio?

3    Q.  I said the Burnham Financial Services portfolio.

4    A.  So that's one of the funds.  You have to have -- after the

5    board approves the contracts, then they're submitted to all of

6    the shareholders of all of the funds, and they have to approve

7    them as well in a proxy statement.

8    Q.  So you took my next two questions.  There were three funds

9    that were part of the Burnham Investors Trust, true?

10   A.  Yes.

11   Q.  Now, turning to page 5 of this document --

12           You can blow up the bottom half.

13           Your question -- so item 3 there -- so that item 3,

14   that was one of your information requests, true?

15   A.  Item 3, yes.

16   Q.  So you had asked for the identity of each person owning or

17   controlling an interest, including passive investors, in

18   Burnham Financial following the transaction, right?

19   A.  Yes.

20   Q.  And in response, CORFA explained that following the

21   consummation of the acquisition, 100 percent of the outstanding

22   Burnham Financial Capital stock shall be owned by Burnham

23   Partners; is that right?

24   A.  That's what it says.

25   Q.  And in this letter Burnham Partners means CORFA, true?

I6J7GAL3                          Moynihan - Cross

1   A.  Yes.

2   Q.  And can we go to page 2 of this document and just show that

3   to the jury, please, Mr. Jackson.

4           So if you go to the third paragraph, it's explained

5   that after the transaction closes, COR Fund Advisors LLC --

6   which we have been calling CORFA -- is going to change its name

7   to Burnham Equity Partners LLC, right?

8   A.  That's what it says, yes.

9   Q.  And then that term is defined in this letter as Burnham

10  Partners, true?

11  A.  That's what it says, yes.

12  Q.  And throughout these exchange of letters -- and indeed in

13  your meeting minutes -- we see a lot of defined terms like

14  this, correct?

15  A.  Yes.

16  Q.  And so you agree with me that that it's important to keep

17  track of what those defined terms are to understand what

18  everything means, right?

19  A.  Yes.

20  Q.  OK.  So for purpose us of referring to this for sort of

21  ease of understanding, can I just replace Burnham Partners with

22  CORFA?

23          MR. QUIGLEY:  Objection to what document we're talking

24  about.

25          MR. SCHWARTZ:  I'm looking at Exhibit 4306, this

I6J7GAL3                    Moynihan - Cross

1   February 20, 2014 letter.

2            MR. QUIGLEY:  As long as we're just talking about that

3   document and not generally, I have no objection.

4            THE COURT:  OK, so that's clarified.

5   Q.  Mr. Quigley is making the exact same point, right?  Which

6   is, the defined terms may actually change from document to

7   document, right?

8   A.  Yes.

9   Q.  So, for example, what is defined as Burnham in one document

10  might mean Burnham Financial Group, true?

11  A.  Yes.

12  Q.  And in a different document it might mean Burnham Asset

13  Management, true?

14  A.  Yes.

15  Q.  And we have to keep track of those things very carefully,

16  right?

17  A.  Yes.

18  Q.  We'll come back to that.

19            Let's go back to page 5.  And in this response to item

20  3, CORFA -- Burnham Partners -- CORFA wrote that it is

21  controlled by BOE Capital LLC, its managing member, which in

22  turn is exclusively controlled by Devon Archer as manager and

23  founding member of BOE Capital, correct?

24  A.  Well, that's what it says, yes.  So if you're asking me

25  what is in the letter, then that's true.  I don't have any

I6J7GAL3                         Moynihan - Cross

1    independent knowledge of the facts, other than as they were
2    represented to us in the letter, just to be clear.
3    Q.  All I'm asking you about here is your course of
4    communications with CORFA and BOE and BAM Holdings and Mr.
5    Archer, OK?
6    A.  Right.
7    Q.  Now, by the way, you see that at the bottom right there is
8    a footer on this letter?
9    A.  Yes.
10   Q.  Do you generically recognize what that is?
11   A.  It looks like it's just a document number.  I don't know;
12   it's not ours.
13   Q.  When you say yours, you mean Perkins Coie's right?
14   A.  Yes.
15   Q.  You have a document management system that inserts control
16   numbers like this in documents, right?
17   A.  Correct.
18   Q.  And you understood HTW -- Hunter Taubman Weiss -- to be
19   Stephen Weiss' law firm, true?
20   A.  I mean, yes, Stephen Weiss I understood to work with Hunter
21   Taubman Weiss.  I can't say I previously looked at that, but it
22   seems reasonable.
23   Q.  But you knew Stephen Weiss was with Hunter Taubman Weiss at
24   the time.
25   A.  That appeared to be the case, yes.

I6J7GAL3                          Moynihan - Cross

1    Q.  And turning to the next page of this document, there is a

2    list of seven members; is that right?

3    A.  Yes.

4    Q.  And those are the seven different members of CORFA, true?

5    A.  Could we just go back?  I think -- could we see the

6    beginning of the question?  But I think that's what that was.

7    Yeah, the members of Burnham Partners are.  Um-hum.

8    Q.  So the members as of February 20, 2014, as represented to

9    you in this letter, were Lausanne LLC, BOE Capital LLC, Welling

10   Investment Corporation PTE Ltd., Kirin Global Enterprises,

11   Inc., AG Burnham LLC, Anthony Lacavera and Wealth Assurance AG,

12   true?

13   A.  Yes.

14   Q.  And this letter further discloses that the members of BOE

15   Capital were Devon Archer, Bevan Cooney and Thorsdale Fiduciary

16   & Guaranty Company Ltd., correct?

17   A.  Correct.

18   Q.  And this was the membership -- these seven entities were

19   the members of CORFA as of February 20, 2014 as represented to

20   you, true?

21   A.  Yes.  We were calling them Burnham Partners, but yes.

22   Q.  Fair to say that you understood that the membership in

23   CORFA -- or Burnham Partners -- changed over time during the

24   course of the negotiations between the BIT board and CORFA,

25   true?

I6J7GAL3                         Moynihan - Cross

1   A.  Well, at the end of the transaction the asset manager was

2   being purchased by BAM Holdings.  I don't know that we paid --

3   I don't recall if there was a change in ownership from this

4   original list.  Perhaps it's in the documents.

5   Q.  Well, just jumping ahead in time, do you recall that even

6   though BAM Holdings was going to acquire Burnham Asset

7   Management, CORFA was still going to acquire Burnham

8   Securities?

9   A.  Yes, I do.  I just don't recall -- and as I say it may be

10  in the documents -- whether there was a change in that

11  ownership from this original letter.

12  Q.  Fair enough.  And your focus was on Burnham Asset

13  Management.

14  A.  Correct.

15  Q.  Now, another of your questions to CORFA was specifically

16  about Mr. Archer's role in Burnham Financial following the

17  transaction, right?

18  A.  Is that here in this letter?  I mean we asked it in other

19  letters.  I'm just not sure what you're referring to.

20  Q.  Can we go to page 11, please, of this document.  And if you

21  could blow up item 10 and down.

22  A.  Yes, so we did ask that in this letter.

23  Q.  The line "Please discuss the role of Devon Archer and

24  Burnham following the transaction," that was your question,

25  true?

1    A.  Yes, that is.

2    Q.  And in this letter Burnham means Burnham Financial Group,

3    true?

4    A.  For -- yes.

5    Q.  And the response was -- I'm looking at the second sentence

6    -- "Mr. Archer does not anticipate having a management role at

7    BAM, but will continue to serve on the board of directors of

8    BAM."  Correct?

9    A.  Yes.

10   Q.  And then there is a description of Mr. Archer's business

11   background, true?

12   A.  Correct.

13   Q.  And that's what was represented to the trustees, right?

14   A.  Yes.

15   Q.  And could I ask you to read underneath Devon Archer

16   president and managing member of BOE Capital?

17   A.  Sure.  "Mr. Archer is cofounder and a senior partner of

18   Rosemont Realty Group, a $2.4 billion private equity firm.

19   Rosemont's team has acquired over 30 million square of

20   commercial space in the U.S., deployed over $900 million of

21   investor equity, and completed transactions in excess of $3.0

22   billion in gross real estate value.  Mr. Archer is also the

23   cofounder and senior managing director of Rosemont Capital LLC

24   and Rosemont Seneca Partners LLC, a New York and Washington

25   D.C. based private equity firm with over $2.2 billion in assets

under management.

"Rosemont Seneca Partners is an equity partner of Bohai Harvest RST (Shen Zhen) Equity Investment Fund Management Company Ltd., a joint venture company formed with Bohai Capital and Ample Harvest, the largest mutual fund manager in China.

"The joint venture intends to establish a cross border private equity fund in the U.S. and China of in excess of $1 billion.  Mr. Archer serves as an investment committee member and vice chairman of Bohai Harvest.  The BOHAI investors are primarily comprised of state owned enterprises, including BOC International Holdings Ltd., Teda Investment Holding Company Ltd., China's National Counsel for Social Security Fund, Bank of China Group Investment Limited, Postal Savings Bank of China Company, Ltd., Tianjin Jinneng Investment Company, China Development Bank Capital Corporation Ltd., China Life Insurance Group Company, China Life Insurance Company Ltd., and Tianjin Urban Infrastructure Construction and Investment Group Company Ltd.

As a founding member through BOE Capital of Burnham partners, Mr. Archer currently serves as a member of the boards of director of Burnham Financial, BAM and BSI.

Mr. Archer is a trustee for the Heinz family office, served as a senior advisor to John Kerry during his 2004 presidential campaign and cochaired the National Finance Committee.  Along with Rosemont Realty, Mr. Archer serves on

I6J7GAL3                    Moynihan - Cross

the board of Viet Thai Joint Stock Company, Cataphora, Inc. and
the Howard J. Heinz trust.

          "Mr. Archer started his career at Citibank's Foreign
Direct Investment Group, Citicorp Asia Ltd., before serving at
New England Financial and subsequently MetLife, where he worked
as a special analyst to the strategic management group of both
group's executive committees; and was involved in MetLife's IPO
and demutualization in 2000.  Mr. Archer earned his Bachelor of
Arts in History from Yale University."

Q.  Now, you had commissioned a background check of Mr. Archer
when his name was first introduced, and so you knew all of that
was exactly true, correct?

          MR. QUIGLEY:  Objection.

          THE COURT:  Sustained.

Q.  Now, after you received CORFA's February 20, 2014 letter,
the independent trustees held a meeting just a few days later,
right, on February 25, 2014?

A.  So I am assuming that that is correct.  I don't have -- I
have not memorized all of the dates, but that would sound
reasonable to me.  Perhaps you have the minutes here.

Q.  And am I correct that Mr. Archer was invited to attend that
meeting but was unable to attend?

A.  I don't specifically recall, but I know that he did not --
we did not meet with him until later.

Q.  And do you recall that there were meetings that for

1  whatever reason he wasn't able to attend?

2  A.  I recall that the trustees made numerous efforts to meet

3  with Mr. Archer, and he was able to meet with us on some

4  occasions, yes.

5  Q.  On other occasions he wasn't able to meet because he was

6  traveling or had to attend to other business interests, as far

7  as you knew?

8          MR. QUIGLEY:  Objection.

9          THE COURT:  Sustained.

10  Q.  Fair to say that most of the interactions that you had with

11  CORFA were with Mr. Weiss and to a lesser extent Mr. Godfrey?

12  A.  I'm not sure that that is fair to say, no.

13  Q.  What is fair to say?

14  A.  I had very limited -- I mean we met with -- we met with Mr.

15  Archer.  Later we met with Mr. Godfrey.  We did not meet with

16  any of the other people, for example, Mr. Sugarman or any of

17  the other people identified.  I never actually met Mr. Weiss,

18  although I did have telephone calls with him.

19  Q.  And you say you never met him.  Because when he was at

20  meetings of the BIT board, you were there telephonically.

21  A.  Yes.  My mother had just died, so I was not there at that

22  meeting.

23  Q.  Understood.  And am I correct that the three board meeting

24  minutes that you looked at on direct examination, prior to and

25  including October 1, 2014, those were the only three times

1    prior to approval of the deal that you met Mr. Archer?

2    A.  I think that's correct, yes.

3    Q.  And for at least one of those you were by telephone.

4    A.  Correct.

5    Q.  Now, at certain points, although Mr. Archer wasn't at a

6    meeting, Mr. Burnham, Jon Burnham, would say what he thought

7    Mr. Archer would say, true?

8            MR. QUIGLEY:  Objection.

9            THE COURT:  Sustained.

10   Q.  Well, is it fair to say that Jon Burnham would act as a

11   go-between to some extent?

12           MR. QUIGLEY:  Same objection.

13           THE COURT:  To your knowledge.

14   A.  You know, occasionally Mr. Burnham would say, yes, he had

15   spoken to Mr. Archer.  I wouldn't describe it as a go-between.

16   Q.  Well, Mr. Burnham --

17   A.  He was having more regular communications I think with Mr.

18   Archer.

19   Q.  Thank you.  Fair to say that Mr. Burnham was a proponent of

20   this transaction, true?

21   A.  Yes.

22   Q.  He very much wanted it to happen.

23           MR. QUIGLEY:  Objection.

24   Q.  As far as you could tell.

25           THE COURT:  Sustained.

I6J7GAL3                          Moynihan - Cross

1    Q.  Well, he expressed the fact that he wanted it to happen,

2    true?

3              MR. QUIGLEY:  Objection.

4              THE COURT:  Sustained.

5    Q.  It's true that although Mr. Burnham was a proponent of the

6    deal, he was in fact a counterparty to CORFA, true?

7    A.  I don't understand that question.

8    Q.  Well, CORFA was acquiring Burnham Financial Group from the

9    Burnham family, true?

10   A.  Correct.

11   Q.  So in some sense they were on other sides of the deal from

12   one another.

13   A.  I guess that's right, yeah.

14   Q.  And I think you testified earlier that by the time that Mr.

15   Burnham introduced Mr. Archer to the board, he had been trying

16   to sell Burnham Financial Group for some time, true?

17   A.  I don't have actual knowledge of that.  That preceded my

18   time on the board -- representing the board.

19   Q.  And isn't it correct that in early 2014 Mr. Burnham told

20   the board that if the transaction didn't go forward it would

21   cause an enormous problem for him personally?

22             MR. QUIGLEY:  Objection.  Hearsay.

23             MR. SCHWARTZ:  Not for the truth.

24             MR. QUIGLEY:  Relevance.

25             THE COURT:  Sustained.

1          MR. SCHWARTZ:  Sorry, I didn't hear that.

2          THE COURT:  Sustained.

3          MR. SCHWARTZ:  Thank you.

4     Q.  Now, following that February 25th meeting, the trustees

5     through you --

6     A.  Sorry.  Could you just refer me?  Do we have copies?

7     Because you're talking about meetings that occurred.  I am

8     wondering if we have copies of those minutes, just so that I

9     know what you're talking about.

10    Q.  Right.  You don't have copies of the February 25, 2014

11    meeting minutes, true?

12    A.  I mean we would have -- assuming that it occurred, we would

13    of course have them in our own records at the firm, but I don't

14    see them in front of me now, which is why I'm asking.

15    Q.  That's because they weren't produced to the government,

16    true?

17    A.  If they weren't produced to the government, they would be

18    privileged, in which case I would prefer not to discuss them.

19    Q.  Now, isn't it correct that on February 26, 2014 you sent a

20    further request for information to CORFA?

21    A.  We did send a further request.  I believe it was dated

22    February 26.  Again, if we have a copy of it, I can confirm

23    that.

24    Q.  Sure.  Just for reference, the binder is just meeting

25    minutes, so everything else I will show you on the screen.  OK?

I6J7GAL3                    Moynihan - Cross

1    A.  OK, that's fine.

2    Q.  So let me show the witness, Judge Abrams and the lawyers

3    Exhibit 4376.

4           Is this an e-mail from you to Stephen Weiss amongst

5    others, subject Burnham?

6    A.  Yes.

7           MR. SCHWARTZ:  I offer Exhibit 4376.

8           MR. QUIGLEY:  No objection.

9           THE COURT:  It will be admitted.

10          (Defendant's Exhibit 4376 received in evidence)

11   Q.  Can you publish this, please, Mr. Jackson.

12          And this is in fact dated February 26, 2014, true?

13   A.  Yes.

14   Q.  And it says "Attached please find a second request letter

15   from the independent trustees ..."  Right?

16   A.  Yes.

17   Q.  Now, this second request letter contains an additional 13

18   requests for information, right?

19   A.  Can you show me the letter so that I can confirm that?  I

20   don't remember.

21   Q.  Sure.

22          Mr. Jackson, can we just flip through the pages.

23   A.  It looks like 12.

24   Q.  I counted 12, and then if you go back to page 3 -- next

25   page, please -- then there is an unnumbered paragraph.

I6J7GAL3                          Moynihan - Cross

1    A.  OK, then I guess that's 13.

2    Q.  We don't have to go through all of those right here, but

3    you received a response back from CORFA on March 10, 2014,

4    correct?

5    A.  Again, I don't have specific recollection of the dates of

6    these letters, but if that's the date of it, then that would be

7    the date it was received.

8    Q.  Well, so I don't want you to take my word for anything, so

9    if you don't remember, just say you don't remember.

10   A.  Well, I don't remember.

11   Q.  OK.  So let me show you again just for the witness, Judge

12   Abrams and the lawyers Exhibit 4385.

13             This is an e-mail from Stephen Weiss to you and

14   others, true?

15   A.  Yes.

16   Q.  And it is in fact dated March 10, 2014, correct?

17   A.  Yes.

18             MR. SCHWARTZ:  I offer Exhibit 4385.

19             THE COURT:  Any objection?

20             MR. QUIGLEY:  No objection.

21             THE COURT:  It will be admitted.

22             (Defendant's Exhibit 4385 received in evidence)

23   Q.  Now, am I correct that the trustees -- the independent

24   trustees, excuse me -- met again to discuss the potential

25   acquisition on March 13, 2014?

I6J7GAL3                    Moynihan - Cross

1   A.  We met frequently during this time, so if you have -- I

2   don't remember, but I assume you're going to show me the

3   meeting of the 13th.

4   Q.  Sure.  You can see it in the binder in front of you.

5   That's also --

6           We can bring up on the screen for the witness to look

7   at.

8   A.  Yes, so then we did meet on March 13.

9   Q.  And did Mr. Archer attend that meeting?

10  A.  No, he did not.

11  Q.  And did Mr. Burnham attend that meeting?

12  A.  No, he did not.  It was a meeting of the independent

13  trustees.

14  Q.  And without getting into any of the substance, did

15  Ms. Eisen report that she had had a number of phone calls with

16  Mr. Burnham in the week prior?

17  A.  Yes, she did.

18  Q.  Now, during the week following that March 13, 2014 meeting,

19  you sent on behalf of independent trustees a third information

20  request letter to CORFA, true?

21  A.  I did send a third request; I don't know the date.

22  Q.  So let me show you again just for the witness, Judge Abrams

23  and the lawyers Exhibit 4310.  Is this an e-mail from you to

24  Mr. Weiss and others, subject Burnham?

25  A.  Yes.

1          MR. SCHWARTZ:  I offer Exhibit 4310.

2          MR. QUIGLEY:  No objection.

3          THE COURT:  It will be admitted.

4          (Defendant's Exhibit 4310 received in evidence)

5   Q.  The attachment here was Burnham open issues, correct?

6   A.  Correct.

7   Q.  You begin by saying to Mr. Weiss, "Stephen, it was nice to

8   speak with you last week."  True?

9   A.  Yes.

10  Q.  And you had in fact had a phone call with Mr. Weiss, true?

11  A.  I don't recall specifically, but this would suggest yes.

12  Q.  Certainly you have no reason to believe otherwise, true?

13  A.  No, I was speaking to Mr. Weiss regularly at this time --

14  or back and forth on these letters.

15  Q.  Now, this third information request letter included another

16  15 open issues that the independent trustees felt needed to be

17  addressed, true?

18  A.  If you say -- can we see the thing?  I assume it was 15.

19  That sounds about right.  I know we had a number of questions

20  at the time.

21  Q.  Sure.  Can you flip the pages, please, Mr. Jackson.

22          15?

23  A.  15.

24  Q.  All right.  And again this was on a variety of topics,

25  true?

1    A.   Yes.

2    Q.   You had questions about the identities of the entire -- not

3    the identities -- excuse me -- about the entire investment

4    group, including Mr. Abduov, Mr. Liu, Jason Sugarman,

5    Mr. Lacavera and others, true?

6    A.   Yes.

7    Q.   And you were also asking, for example, item 9 here, about a

8    personal bankruptcy that Dan McClory had had sixteen years

9    earlier, true?

10   A.   Well, we were asking about a bankruptcy in 2007 and a 2013

11   IRS tax lien.  So 2007 and 2013 would have been seven years

12   prior; and a year prior on the IRS tax lien.

13   Q.   Let me just ask you to read that to yourself one more time.

14   A.   Oh, I'm sorry, yeah, you're right, it was 1998 was his

15   personal bankruptcy; and then his wife seemed to have the tax

16   liens.  I remember that now, yeah.

17   Q.   And again that personal bankruptcy was 16 years prior.

18   A.   That's correct.

19   Q.   And these are the sort of probing questions that you would

20   ask during the due diligence process, true?

21   A.   Yes.

22   Q.   Now, this letter --

23            And you can go back to page 1 of this document,

24   Mr. Jackson --

25            -- was sent to CORFA on March 17, 2014, true?

I6J7GAL3                          Moynihan - Cross

 1  A.  Correct.

 2  Q.  And am I correct that CORFA sent a response the very next

 3  day?

 4  A.  Well, I know they sent a response.

 5  Q.  Well, I think Mr. Quigley showed you on direct examination

 6  Government Exhibit 753.

 7  A.  That's right, it was right before the meeting.

 8  Q.  So could we bring that up, please, 753.

 9  A.  Yes.

10  Q.  Now, Mr. Quigley just showed you this letter.  Do you

11  recall how you received this?

12  A.  I do not recall.  No, I don't recall.

13  Q.  If you could take this down, Mr. Jackson, and please show

14  to the witness, Judge Abrams and the lawyers Exhibit 4311.

15          This is an e-mail from Stephen Weiss to you and others

16  dated the same day, March 18, correct?

17  A.  Yes.

18  Q.  Subject:  Response to third information request?

19  A.  Yes.

20          MR. SCHWARTZ:  I offer Exhibit 4311.

21          MR. QUIGLEY:  No objection.

22          THE COURT:  It will be admitted.

23          (Defendant's Exhibit 4311 received in evidence)

24  Q.  And if you turn the pages, the attachment to this e-mail is

25  that March 18 letter that we were just looking at as Government

1    Exhibit 753, true?

2    A.  Yes.

3    Q.  And one of the things that you reviewed with Mr. Quigley is

4    on page 5 of this document and going to the next page,

5    information showing the respective ownership interest on all of

6    the different members of CORFA, right?

7    A.  That's correct.

8    Q.  And this shows that BOE Capital had a plurality ownership

9    percentage at 35 percent, true?

10   A.  Yeah.  The trustees had asked -- they wanted to be sure

11   that Mr. Archer was -- so he's the managing member, and they

12   wanted to be sure that he would have control.

13   Q.  Right.  And this also shows, by the way, that as of at

14   least the date of this letter, March 18, 2014, Wealth Assurance

15   AG owned a little bit less than 12 percent of CORFA, true?

16   A.  11.79 percent, yeah.

17   Q.  And if you look at the asterisk, it also explains to you

18   the ownership interests in BOE Capital, correct?

19   A.  That's correct.

20   Q.  And it's disclosed here that the membership interests are

21   owned 30 percent by Devon Archer, 30 percent by Bevan Cooney,

22   and 40 percent by Thorsdale Fiduciary & Guaranty Company Ltd.,

23   correct?

24   A.  That's correct.

25   Q.  And again I'm being careful to say as of March 18, because

1   things can change over time, true?

2   A.  Yes.

3   Q.  Now, just going back to page 1 of this document, please,

4   Mr. Jackson.

5         Mr. Weiss in his e-mail says, "We look forward to

6   meeting at Burnham's office at 1 p.m."  Right?

7   A.  Yes.

8   Q.  And there was in fact a meeting of the independent trustees

9   on March 19, 2014?

10  A.  Yes, there was.

11  Q.  And this was the first meeting that Mr. Archer attended,

12  correct?

13  A.  That's correct.

14  Q.  And CORFA's lawyer Mr. Weiss also attended that meeting,

15  true?

16  A.  True.

17  Q.  And that's the meeting that you were on the phone for,

18  true?

19  A.  Yes.

20  Q.  By the way, were you still the note-taker even though you

21  were not there physically?

22  A.  Yes.

23  Q.  Was there someone in the room who was taking notes?

24  A.  Not to my knowledge.  No, I don't believe so.  It was me.

25  Q.  And am I correct that this meeting was the first time at

1    least with CORFA -- again not calling for any privileged

2    communications -- that the name Jason Galanis had come up?

3    A.  I don't understand the question.

4    Q.  Well, in other words, we just looked at -- we didn't flip

5    every page, but we looked at a number of letters back and forth

6    between yourself and CORFA, correct?

7    A.  Correct.

8    Q.  And there are references to Thorsdale Fiduciary & Guaranty,

9    but no references to Jason Galanis by name, true?

10   A.  At this time the trustees had been assured that Mr. Galanis

11   had no association whatsoever with the new investor group, so

12   there was no need to ask that question.

13   Q.  Well, except that his name comes up in that meeting on

14   March 19, true?

15   A.  Yes, because there had been prior concerns about his

16   participation.

17   Q.  Right.  And that was my point.

18   A.  Yes, it comes up then.

19   Q.  And it was known that he had been involved really going

20   back all the way to 2013, true?

21   A.  Yes, I believe that's true.

22   Q.  You knew that Peggy Eisen had seen Jason Galanis at

23   Burnham's offices, true?

24   A.  I don't know if I knew that then, but I know that she had

25   seen him in the offices in 2013.  Of course she thought she saw

I6J7GAL3                    Moynihan - Cross

1    him.  She was never a hundred percent sure it was him.

2    Q.  Sorry.  Say that one more time.

3    A.  She thought she had seen him in the offices.

4    Q.  OK.  Now, one of the questions that had come up during the

5    exchange of letters and was discussed in this meeting was a

6    company called COR Clearing.  Do you recall that?

7    A.  Yes.

8    Q.  And we alluded to this before, but COR Clearing was a

9    broker dealer associated with Jason Sugarman, correct?

10   A.  Yes.

11   Q.  And both in the information requests and at this March 19th

12   meeting the independent trustees had questions about COR

13   Clearing, true?

14   A.  Correct.

15   Q.  And am I correct that at the meeting on the 19th of March,

16   2014, Stephen Weiss, CORFA's lawyer, stated for the record that

17   going forward Burnham Financial Group would have no

18   relationship with COR Clearing?

19   A.  Can you refer me to that reference?  It does sound correct.

20   I recall a discussion along those lines.

21   Q.  Sure.  Let me point you to page 2 of Exhibit 792 in

22   evidence.

23   A.  Yeah, there it is.  Yeah, I remember that.

24   Q.  So that reminds you that Mr. Weiss said that, true?

25   A.  Yes.

I6J7GAL3                    Moynihan - Cross

1    Q.  And to your knowledge, that was true, correct, COR Clearing
2    in fact had no further relationship with Burnham Financial
3    Group?
4    A.  Sorry.  Who did you say acknowledged?
5    Q.  I'm asking you, that turned out to be a factually true
6    statement, to the best of your knowledge, true?
7              THE COURT:  Sorry.  What's the objection?
8              MR. QUIGLEY:  Misstates what is in the document.  He
9    said Mr. Weiss said that.  It's Mr. Archer.
10   Q.  No, I said that a few times.  Mr. Weiss said for the record
11   at that meeting that COR Clearing would have nothing further to
12   do with Burnham Financial Group.  True?
13             THE COURT:  Overruled.  You can answer.
14   A.  Yes.
15   Q.  And my question -- my next question was simply:  That was
16   an accurate statement, to the best of your knowledge, true?
17   A.  To the best of our knowledge, yes.
18   Q.  And after the fact, sort of when everything fell apart, you
19   did do sort of a postmortem, right?
20   A.  I'm not sure I understand what you mean by postmortem.
21   Q.  I mean you looked backwards at what had happened.
22             MR. QUIGLEY:  Objection.
23             THE COURT:  Overruled.
24   A.  Well, when are you talking about?
25   Q.  So, Mr. Quigley showed you a number of meeting minutes that

I6J7GAL3                          Moynihan - Cross

1    post-date late September 2015, correct?

2    A.  Post-date late September 2015?  Yes.

3    Q.  And the thing that happened in late September 2015 was that

4    Jason Galanis got arrested on unrelated charges, correct?

5    A.  Yes.

6    Q.  And subsequently there were SEC subpoenas to various

7    Burnham-related entities, correct?

8    A.  We were aware of subpoenas; we never saw them.  Or we might

9    have glanced at them, but we weren't really privy to what they

10   said.

11   Q.  And the businesses started to fall apart because they lost

12   their funding, true?

13              MR. QUIGLEY:  Objection.

14              THE COURT:  What's the basis of the objection?

15              MR. QUIGLEY:  Foundation.  Personal knowledge.

16              THE COURT:  Do you have personal knowledge of that?

17              WITNESS:  No.

18   Q.  Well, sorry, you were -- I'm jumping around in time.  But

19   you were personally present for a number of meetings at which

20   the trustees raised questions about the capitalization of BSI,

21   true?

22   A.  We were -- I was present at meetings at which we were told

23   that BSI had problems with its net capital, yes.

24   Q.  And in fact it was the strong admonition of the independent

25   trustees that BSI be wound down, true?

I6J7GAL3                      Moynihan - Cross

A.  We thought that was a good idea, but they were winding it

down.  Mr. Archer and Mr. Godfrey said it was going to be wound

down.

Q.  In other words, beginning at the end of September 2015,

early October 2015, things start to fall apart for these

businesses, true?

A.  They begin to have serious capital problems, yes.

Q.  And my question to you is:  Did the independent trustees

conduct any sort of backwards-looking exercise and determine,

for example, if it was true that all of their trades were

cleared through JP Morgan Chase as had been promised?

            MR. QUIGLEY:  Objection.

            THE COURT:  Is that something you have knowledge of?

            WITNESS:  Could you restate the question.

            MR. QUIGLEY:  Objection.

            THE COURT:  Is this foundation or hearsay?

            MR. QUIGLEY:  It's hearsay.  It's talking about what

they learned in an independent investigation but it's coming in

for the truth of the matter asserted.

            THE COURT:  Why don't you rephrase the question.

Q.  I'm simply asking the following question:  Whether you or

the independent trustees confirmed that at all times Burnham

Asset Management's trades were cleared through JP Morgan.

            MR. QUIGLEY:  Objection.  Hearsay.

            THE COURT:  I will allow it.

I6J7GAL3                          Moynihan - Cross

1           But just speak for yourself.

2    A.  Well, I can say that I -- well, for myself?

3           THE COURT:  Based on your knowledge.

4    A.  I mean we did ask Mr. Burnham if he was continuing to use I

5    think it was JP Morgan --

6    Q.  And you confirmed that they were.

7           MR. QUIGLEY:  Objection.  Hearsay.

8           THE COURT:  Sustained.

9    A.  We would have no means of confirming.

10          THE COURT:  You don't have to answer that.

11   Q.  Now let me take you back to March of 2014.  OK?

12   A.  OK.

13   Q.  And two days after that March 19 board meeting, the

14   independent trustees sent a fourth information request letter

15   to CORFA, correct?

16   A.  That sounds right, right in that timeframe.

17   Q.  And let me show the witness, Judge Abrams and the lawyers,

18   please, Mr. Jackson, Exhibit 4312.

19          And this is a March 21, 2014 e-mail from yourself to

20   Stephen Weiss and others, true?

21   A.  Yes.

22          MR. SCHWARTZ:  I offer 4312.

23          MR. QUIGLEY:  No objection.

24          THE COURT:  It will be admitted.

25          (Defendant's Exhibit 4312 received in evidence)

1    Q.  And this begins by saying, "Please see attached follow-up

2    questions from our meeting on Wednesday."

3    A.  Correct.  Um-hum.

4    Q.  Yes?

5    A.  Yes.

6    Q.  So this is the -- this is Mr. Weiss -- excuse me -- this is

7    you conveying to Mr. Weiss and others a fourth request for

8    information, true?

9    A.  Yes, to Stephen Weiss, Devon Archer, Jon Burnham and Tom

10   Calabria who is the CCO.

11   Q.  The CCO of?

12   A.  He was the chief compliance officer for the funds.

13   Q.  And the CC's here are the members -- the independent

14   trustees themselves, true?

15   A.  That's correct.

16   Q.  As well as Mike Malloy the lawyer to the funds, true?

17   A.  Correct.

18   Q.  And one of the things that you say in this e-mail is that

19   the trustees have scheduled an in-person meeting on April 1 to

20   consider your responses and vote on approval of the agreements,

21   correct?

22   A.  Yes.

23   Q.  Now, ultimately the trustees did not vote on the agreements

24   on April 1, correct?

25   A.  Correct.

I6J7GAL3                        Moynihan - Cross

1   Q.  The vote on the agreements came in October, October 1,

2   true?

3   A.  Correct.

4   Q.  But this was conveying a follow-up to the March 19 meeting,

5   true?

6   A.  Correct.

7   Q.  And you can flip through the pages if you like, but even

8   though Jason Galanis had come up at the March 19 meeting, am I

9   correct that none of the follow-up questions here are about

10  Jason Galanis?

11  A.  Well, maybe they could scroll through and I could see.  I

12  don't believe I have a paper copy of that, unless --

13  Q.  Sure.

14  A.  Nothing on page 2.  Yeah, I don't think we asked at that

15  time.

16  Q.  Now, you can take that down.

17          CORFA responded to this fourth request for information

18  by letter on April 1, 2014, true?

19  A.  I think that's correct.

20  Q.  And let me show, Mr. Jackson, the witness, the lawyers and

21  Judge Abrams Exhibit 4313.

22          This is an e-mail dated April 1, 2014 from Sebastian

23  Momtazi to yourself and others, true?

24  A.  Yes.

25          MR. SCHWARTZ:  I offer Exhibit 4313.

1          THE COURT:  Any objection?

2          MR. QUIGLEY:  No objection.

3          THE COURT:  It will be admitted.

4          (Defendant's Exhibit 4313 received in evidence)

5   Q.  Can we publish this, please, Mr. Jackson.

6          By the way, do you know who Mr. Momtazi is?

7   A.  If I knew, I don't recall.

8   Q.  Have you ever met him?

9   A.  No, not to my knowledge.

10  Q.  And as it stays here, "This is a response to your prior

11  questions."  True?

12  A.  Yes.  What I recall was we were waiting for Mr. Archer --

13  now that I think about this -- to sign the letter.  So we had

14  seen a draft prior to this letter, but that's why it was

15  especially signed, because he actually signed it.

16  Q.  That's why it says, "Please find attached a signed copy."

17  A.  That's right, it references a signed copy.

18  Q.  Now, can we turn to page 7.  Fair to say at this point

19  still the questions are very far reaching, true?

20  A.  Well, I think we were narrowing down our questions, but we

21  still had a number of areas of concern.

22  Q.  But I mean looking at number 5 there, you are still asking

23  about Dan McClory's personal finances, correct?

24  A.  Correct.

25  Q.  And number 6 there are questions about employee morale,

1    true?

2    A.  Correct.

3    Q.  And there is recommendation that certain employees get

4    bonuses to make sure that they stay on, true?

5    A.  That's correct.  Some of the employees had actually posted

6    capital to support the organization, so the trustees were

7    concerned about their well being.

8    Q.  And one of the recommendations that is in this letter is

9    that they receive bonuses, true, retention bonuses?

10   A.  Yes.

11   Q.  And those bonuses, to be clear, would be paid by Burnham

12   Asset Management, not by your clients, true?

13   A.  Well, not by the independent trustees and not from the

14   assets of the trust.  Obviously those are the shareholders'

15   assets.  So, no, only from the assets of the asset manager.

16   Q.  And again this exchange of correspondence is a negotiation,

17   true?

18   A.  At this point it is an effort to discover information that

19   would be relevant to the trustees.

20   Q.  But there is still a give-and-take, right?

21   A.  Well, they are letters back and forth asking questions and

22   seeking information.

23   Q.  Well, for example, number 5 about Dan McClory's personal

24   finances, your question says would you consider asking him to

25   step out as an investor, correct?

1    A.  Correct.

2    Q.  And the response was we don't think that's a fair or

3    reasonable request, right?

4    A.  Correct.

5    Q.  So there is still a give-and-take, true?

6    A.  So you could describe it that way.

7    Q.  You can take that down.

8            Now, let me show you Exhibit 4314, please.

9            Just for the witness, the lawyers and Judge Abrams,

10   Mr. Jackson.

11           This is an e-mail chain between yourself and Mr. Weiss

12   with Jon Burnham and Mr. Archer on copy?

13   A.  Yes.

14           MR. SCHWARTZ:  I offer Exhibit 4314.

15           MR. QUIGLEY:  We have no objection.

16           THE COURT:  4314 will be admitted.

17           (Defendant's Exhibit 4314 received in evidence)

18   Q.  Can I ask you, Mr. Jackson, so we can see the e-mail that

19   breaks across the pages, for you to put page 2 on the left and

20   page 3 on the right.

21           All right.  So that bottom e-mail is from you dated

22   April 1, 2014, correct?

23   A.  Yes, correct.

24   Q.  So that's the -- that's the same date as the letter that we

25   just looked at, true?

I6J7GAL3                          Moynihan - Cross

1   A.  Yes.

2   Q.  And in this e-mail you are asking questions about Jason

3   Galanis, true?

4   A.  Correct.

5   Q.  And in particular you're asking about whether Mr. Galanis

6   was due to receive any compensation upon closing of the deal,

7   true?

8   A.  Correct.

9   Q.  And you wanted to know if there were -- if they were going

10  to get -- excuse me.  You wanted to know if Mr. Galanis was

11  going to get any money, whether that was allowable.  True?

12  A.  Sorry.  Could you repeat the question.  That was allowed?

13  Is that what you said?

14  Q.  Let me back up.  You wrote this e-mail because you

15  understood that Jason Galanis had entered into a civil

16  settlement with the SEC back in 2007, true?

17  A.  Yes.  I mean that was one of the reasons.

18  Q.  And as part of your due diligence you had reviewed that

19  settlement, yes or no?

20  A.  I don't think I had.  I might have at that point.  I don't

21  know.

22  Q.  And you know that that's what is called a no admit/no deny

23  settlement, true?

24  A.  I don't know the technical term for it, but, you know, I'm

25  generally familiar.  I did ultimately read it, yeah.  This was

I6J7GAL3                          Moynihan - Cross

1    very fast breaking.  We had suddenly become aware of some

2    information relating to payments possibly being made to John

3    Moran and possibly to Jason Galanis.

4    Q.  So you wanted to make sure that in light of that past civil

5    settlement there was no prohibition on Mr. Galanis receiving

6    any fees out of the closing, true?

7    A.  Correct.

8    Q.  And that came up because you knew as part of his settlement

9    with the SEC Mr. Galanis had agreed not to serve as an officer

10   or director of a public company, true?

11   A.  Well, we were aware that Mr. Moran was subject to a

12   lifetime bar from any activities relating to broker dealer.

13   And this type of payment would be specifically covered by that.

14          With respect to Mr. Galanis, we understood that he had

15   a somewhat different prohibition, but the board was looking for

16   comfort that whether or not that covered this.

17   Q.  And that's my point.  You wanted to understand in light of

18   that civil settlement whether you could get comfort, correct?

19   A.  Correct.

20   Q.  And the response that came back came from Jon Burnham,

21   correct?

22   A.  Yes.

23   Q.  And can you read Mr. Burnham's response.

24   A.  "In answer to your questions re John Moran and Jason

25   Galanis:  They will have no involvement with Burnham Financial

I6J7GAL3                         Moynihan - Cross

1    Group going forward after completion of the transaction.  I

2    have never met John Moran nor do I intend to meet him, and I

3    know that Devon Archer has not met him, and I do not expect

4    that he will meet him in the future.  Jason Galanis will not be

5    associated with BFG going forward either.  He is a friend of

6    Devon's and may have a consulting arrangement with Devon

7    personally.  Mr. Moran will receive a fee from Burnham upon

8    completion of the deal of $75,000.  He is entitled to this

9    since he introduced the deal originally to us.  To my

10   knowledge, neither Mr. Moran or Mr. Galanis are subject to any

11   ban by the SEC or FINRA.  I am not aware of any arrangement for

12   Mr. Moran to receive any fee on this transaction from Devon or

13   his group.  I am not aware of any reason why Burnham should not

14   pay a fee to Mr. Moran for his work on our deal."

15   Q.  And then there is a further response on top of that from

16   Mr. Weiss, correct?

17   A.  Yes, it seems to be cut off on this screen.

18   Q.  Mr. Jackson, could we show pages 1 and 2 next to each

19   other.

20   A.  So this was the fact that the board -- or the members of

21   the board were concerned about these relationships between Mr.

22   Moran and Mr. Galanis that had raised some very significant red

23   flags all along.

24   Q.  And my question to you was:  After Jon Burnham's response

25   on this subject, there is a response from Stephen Weiss, true?

1    A.  Yes.

2    Q.  And can you read item 3 of Mr. Weiss's response.

3    A.  "We are advised that Mr. Galanis is not receiving any

4    payment upon the closing of the transaction either directly

5    from the proceeds of the sale or by payment to them by any

6    person or entity who has received payment from the proceeds of

7    the transaction, either directly or indirectly, including the

8    sharing of fees, nor his he receiving any payment from any

9    member of CORFA."

10   Q.  And could I also ask you to read item 5, Mr. Weiss's

11   response.

12   A.  To our knowledge, Mr. Galanis is neither currently subject

13   to, nor has he ever been subject to, a bar by the Securities

14   and Exchange Commission which would bar him from association

15   with certain types of financial businesses.  We are advised

16   that Mr. Galanis has signed a consent decree with the SEC under

17   which he agreed to a five year bar from serving as an officer

18   or director of a public company, which bar is no longer in

19   force or applicable.

20   Q.  Thank you.  And then there is some further back and forth

21   between yourself and Mr. Weiss, true?

22   A.  Yes.

23   Q.  You can take that down, Mr. Jackson.

24            Now, following those various exchanges of letters and

25   e-mails on April 1, the independent trustees had a meeting the

I6J7GAL3                    Moynihan - Cross

1    very next day on April 2, true?  April 2, 2014.

2    A.  Correct.

3    Q.  And again Mr. Archer did not attend that meeting, correct?

4    A.  Correct.

5    Q.  And you were participating telephonically, true?

6    A.  Yes.

7    Q.  And is it fair to say that at this meeting Jon Burnham

8    strongly defended Jason Galanis?

9              MR. QUIGLEY:  Objection.

10             THE COURT:  Sustained.  Sustained.

11   Q.  Throughout the course of dealings between Jon Burnham,

12   CORFA and the independent trustees, isn't it the case that

13   Mr. Burnham repeatedly defended Jason Galanis?

14             MR. QUIGLEY:  Same objection.

15             THE COURT:  Sustained.

16   Q.  Let me show you Exhibit 4354 --

17             Again just for the witness, the lawyers and Judge

18   Abrams.

19             These are the minutes of that April 2 meeting, true?

20   A.  Yes.

21   Q.  And if you go to the last page, you were the secretary pro

22   tem for these minutes, correct?

23   A.  Yes, I was.

24   Q.  And just as with all the minutes that Mr. Quigley showed

25   you, you made these minutes based upon your personal attendance

I6J7GAL3                        Moynihan - Cross

1    at the meeting, true?

2    A.   Well, I was in telephonic, but yes.

3    Q.   And you made them at or near the time?

4    A.   Yes.

5    Q.   And these were made under all of the same conditions as the

6    other minute meetings that Mr. Quigley showed you, true?

7    A.   Yes, they were.

8              MR. SCHWARTZ:  I offer this exhibit.

9              MR. QUIGLEY:  No objection.

10             THE COURT:  All right, admitted.

11             (Defendant's Exhibit 4354 received in evidence)

12             MR. SCHWARTZ:  And, your Honor, this is will be

13   redacted pursuant to our conversation this morning.

14             But I want to now focus your -- I'm sorry.  If you can

15   go to the prior page, please, Mr. Jackson.  And the prior page.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1   Q.  The prior page, the prior page.  Isn't it correct, looking

2   at the second paragraph, that Jon Burnham stated there was

3   nothing wrong with Mr. Galanis, true?

4   A.  Yes.

5   Q.  And Jon Burnham stated that Mr. Galanis operated as a

6   consultant, true?

7   A.  Yes.

8   Q.  You can take that down.

9            Isn't it true that at that meeting, Jon Burnham

10  strongly defended Jason Galanis?

11  A.  I don't know what you mean by, "strongly defended".

12  Q.  Why don't you take a moment and read that to yourself.

13  A.  Okay.  It is not on the screen.  (Pause)  I think it speaks

14  for itself.  I don't know if I'd use the word strongly.  There

15  had been an email that was discovered indicating Mr. Galanis

16  was involved in back-and-forth between Mr. Moran and

17  Mr. Galanis, referring to the board.

18  Q.  Well, again, Mr. Archer was not at --

19            MR. QUIGLEY:  May we approach for one moment?

20            THE COURT:  Sure.

21            (Continued on next page)

22

23

24

25

1                (At sidebar)

2                MR. QUIGLEY:  So these are the minutes, similar

3      minutes.  We don't have any objection to them coming in as a

4      business record.  This is the hearsay within the hearsay

5      problem we addressed by only offering minutes of meetings

6      Archer was at which solved that problem.

7                MR. SCHWARTZ:  I am not offering any of this for the

8      truth.  Am prepared to highly redact this.  I tried to do this

9      without introducing the minutes, but I was getting hearsay

10     objections.  It is not a factual statement to say that Jon

11     Burnham defended Jason Galanis.  That is not a factual

12     statement, not being offered for the truth of the matter.

13                The cleaner way to do this is simply allow her to

14     offer that testimony, but if your Honor's not going to do

15     that --

16                THE COURT:  The purpose of the offer, the truth of the

17     matter?

18                MR. SCHWARTZ:  To show the course of dealings.  The

19     government is making it seem as if Devon Archer was in there

20     telling lies about he was the only person defending Jason

21     Galanis, but the fact of the matter is that -- and I need to be

22     able to make the argument that everyone was defending this

23     deal, understood what Jason Galanis' past was and defending his

24     role in it and that the final solution that was reached was a

25     heavily negotiated resolution that balanced everyone on the

1    investor side, and Jon Burnham wanting Jason Galanis to not be

2    totally cut out of everything and the trustees, on the other

3    hand, having legitimate concerns about reputation or whatever

4    stuff.

5              It is a grossly misleading picture of the evidence if

6    all that comes in is the fact that Devon Archer was saying this

7    about Jason Galanis and the suggestion that is not true.  That

8    is necessary to complete think picture.

9              MR. QUIGLEY:  Whatever Jon Burnham said, whether he

10   made face or say, they're not relevant.  Mr. Archer's state of

11   mind and his association with Jason Galanis, what other --

12             THE COURT:  As part of the negotiation that led to the

13   result, what resulted is what no one else said is relevant.

14             MR. QUIGLEY:  Relevant by context.  I don't think the

15   fact that Mr. Burnham strongly defended Mr. Galanis at a

16   meeting six months before the transaction closed has much if

17   any relevance and it certainly should only come in for course

18   of dealing.

19             MR. SCHWARTZ:  That is all I want it for.

20             The point is this, the final, final list of conditions

21   is literally true, right?  Mr. Archer and CORFA adhered to the

22   letter of those undertakings, at least that will be our

23   argument.  It is critical to understand that a letter of their

24   agreement and everyone understood that this was hotly contested

25   and very specific and you have to look to the precise language

1    of this.

2            This was not just Mr. Archer leading them down the

3    primrose path where they were saying you can't to this, he said

4    fine.  You can't do this, and he said fine.  It wasn't

5    acquiescence, it was a hard negotiation and it is important

6    that Mr. Archer was not principally the one advocating for

7    Jason Galanis.

8            MR. QUIGLEY:  The issue is Mr. Archer's statements to

9    the board, not what Mr. Burnham said.  I don't think

10   Mr. Burnham's opinion whether Jason Galanis is a good guy, bad

11   guy is relevant.  The reason this evidence is relevant is to

12   show what Mr. Archer represented and Mr. Burnham is not here

13   and can't be cross-examined.  They're suggesting he had the

14   same understanding Mr. Archer's relationship with Mr. Galanis,

15   what Mr. Galanis did, which is not true.

16           THE COURT:  In your view, can Mr. Schwartz elicit

17   anything else about the course of dealings, who else said what

18   and how this was negotiated other than what Archer said?

19           MR. QUIGLEY:  I don't think so.

20           The relevance, the issue is what did Mr. Archer say to

21   the board and was it true.  The fact Mr. Burnham said something

22   else at some other time isn't relevant.  It is very clear in

23   that actual first meeting what the conditions were the board

24   ultimately approved.  If they want to argue that Mr. Archer

25   complied with the letter of the conditions, they can cite to

1   those conditions and say how he -- the letter, a meeting six

2   months before which Mr. Burnham defends Mr. Archer, I don't see

3   how that is relevant.

4           MR. SCHWARTZ:  Let me liken this to contract law,

5   right, at the end of the day you have an exchange of

6   undertakings on October 1 that I say were literally adhered to.

7           I don't know what the government's argument is.

8   Presumably they will say was not adhered to.  Presumably the

9   spirit was not adhered to.  If we go beyond the text of that,

10  which we are already far beyond, we are into parole evidence,

11  and parole evidence means how do we understand what the

12  agreement is.  That is the entire course of dealing between the

13  parties.

14          You either have to be stuck with only the language of

15  the final undertakings or you have to get the entire course of

16  dealings to understand what is it that was the end of the day

17  result.

18          MR. QUIGLEY:  This isn't a contract.  This is about

19  what representations Mr. Archer made in September and October

20  of 2014.

21          THE COURT:  I am willing to allow it a little bit

22  about the course of conduct, to allow the context for what has

23  happened.  The question is where to draw that line.  If you

24  have -- I am open to discussing that.  I think it is fair to

25  allow in some of the context in which these discussions

happened.

MR. SCHWARTZ: My intention was to do this fairly lightly. I won't use the document again because of the objections. My questions were Jon Burnham strongly defended Jason Galanis at that meeting. That was sort of going to be the end of it. She brought on the characterization, I could refresh her with her minutes. I wasn't going to go beyond that. That happens repeatedly over the course of months. That is the way I intend to deal with it.

MR. QUIGLEY: It doesn't go to Mr. Archer's state of mind at all. What he said at meetings where he wasn't present at, that is not relevant whether Mr. Archer intended to mislead the board.

THE COURT: If he wasn't there, how does it affect him?

MR. SCHWARTZ: It goes to what the ultimate agreement is at the end of the day. Mr. Quigley is wrong. This is effectively a contract. She testified on direct there was assent of the trustees to the exchange of change of control, was conditioned on those 12 bullet points. Above that it literally incorporates the entire course of conduct on top of it. This is a contract that was negotiated over a period of more than a year, and in order to understand what that contract means, you have to understand what happened before.

(Multiple voices)

I6JJGAL4                    Moynihan - cross

 1                THE COURT:  One at a time.

 2                MR. QUIGLEY:  On direct he said after early April they

 3     walked away from Mr. Archer.  I didn't get into that because it

 4     deals with other investors that aren't relevant.  They

 5     re-engaged with him after he promised to break off the Burnham

 6     Asset Management part of the deal.  I don't think that what was

 7     said at meetings Mr. Archer wasn't at, has no knowledge of, is

 8     relevant to his state of mind, which is the issue here.

 9                THE COURT:  I think you should stay away from comments

10     that were made when Archer wasn't at the meetings, all right?

11                MR. SCHWARTZ:  I can't ask whether Jon Burnham

12     defended Jason Galanis?

13                THE COURT:  What does that matter?  Why is it relevant

14     to the issue in this case?

15                MR. SCHWARTZ:  His whole state of mind is extraneous.

16     It is all extraneous.  Everything that happened with the BIT

17     Board and trustees is extraneous.  As she testified very

18     clearly, they had nothing whatever to do with these bonds.  The

19     reason why the government wants to put in this evidence, they

20     say the representation was false, and my point is that

21     representation can only be understood in light of the

22     back-and-forth.

23                If you look at the October 1 meeting minutes, they

24     literally incorporate everything that happened before, that

25     entire course of dealing going back before April 1st.  That is

I6JJGAL4                         Moynihan - cross

 1    in the heads of all of the parties as they're agreeing upon the

 2    final undertakings.

 3              If they want to say that Mr. Archer was not being

 4    honest, it is important to understand what both parties

 5    understood.  They only want to go to one side of the equation,

 6    the other side is equally important.  This is, therefore,

 7    relevant to the trustees' state of mind in reaching accord on

 8    the final undertakings that allowed them to approve the

 9    transaction.

10              MR. QUIGLEY:  The issue is Mr. Archer's state of mind

11    at meetings he was not at and had no apparent awareness of what

12    happened.  I don't see how that is relevant to his state of

13    mind.

14              THE COURT:  I think that's right.  The issue is

15    Archer's state of mind, and not the board's state of mind.  I

16    think that's right.  I am sustaining the objection.

17              (Continued on next page)

18

19

20

21

22

23

24

25

I6JJGAL4                        Moynihan - cross

 1              (In open court)

 2      BY MR. SCHWARTZ:

 3      Q.  We had just finished talking about this April 2nd, 2014

 4      meeting.  Am I correct that immediately following the meeting,

 5      immediately following, but still on the same day, you sent six

 6      more questions to Attorney Weiss?

 7      A.  I know that I sent additional questions.

 8      Q.  Let me show the witness, the lawyers and Judge Abrams

 9      Exhibit 4316.

10              Would you agree with me that you sent additional

11      questions to Mr. Weiss on April 2nd, 2014?

12      A.  Yes.

13      Q.  The very next day, April 3rd, you received a response on

14      behalf of CORFA, true?

15      A.  I assume it was the next day.

16              MR. SCHWARTZ:  That is one of the ones Mr. Quigley

17      showed you, Exhibit 755.  If we can bring that up, please, Mr.

18      Jackson.

19      BY MR. SCHWARTZ:

20      Q.  Now, again the government put this in just as a letter, but

21      how did you receive this?

22      A.  At that point I don't honestly remember, but I expect it

23      was email.  Most of these were back-and-forth.  Hard copies are

24      often also exchanged and I have no independent recollection of

25      which were hard copy and which were only email.

I6JJGAL4                        Moynihan - cross

1    Q.  You testified earlier that you would sometimes email with a

2    copy by post?

3    A.  Correct.

4    Q.  But in this case let me show the witness, the lawyers and

5    Judge Abrams Exhibit 4317.  This is an email from Stephen Weiss

6    to you and others, dated April 4th, true?

7    A.  Yes.

8    Q.  And flipping the pages, Mr. Jackson, would you agree with

9    me that this is the email transmitting that April 3rd letter?

10   A.  Yes, it appears to be.

11              MR. SCHWARTZ:  I offer Exhibit 4317.

12              THE COURT:  Any objection?

13              MR. QUIGLEY:  We think the second sentence should be

14   redacted in the cover email.  It is hearsay.

15              THE COURT:  I will allow it in.

16              (Defendant's Exhibit 4317 received in evidence)

17              MR. SCHWARTZ:  If you can publish that, please, Mr.

18   Jackson.

19   BY MR. SCHWARTZ:

20   Q.  And again this response is sent to you by Mr. Weiss, true?

21   A.  That's correct.

22   Q.  He tells you that he and Devon will be available for a

23   conference call if required, true?

24   A.  True.

25   Q.  One of your questions, one of the trustees' questions to

I6JJGAL4                         Moynihan - cross

1    CORFA at this point was still about Jason Galanis, true?

2    A.  Could you just open them up so I can --

3              MR. SCHWARTZ:  Can we go to Page 3 of this document,

4    please, Mr. Jackson.  Item 2?

5    A.  Yes.

6    Q.  Do you see there is a question?

7    A.  Yep.

8    Q.  You can take that down.

9              That is the same language you read before?

10   A.  I think I read that before, yes.

11   Q.  We don't have to do it again.

12             The following week, on April 9th, 2014, there was

13   another meeting of the independent trustees, true?

14   A.  That's correct.

15   Q.  That was a telephone meeting, right?

16   A.  Correct.

17   Q.  And Mr. Archer was not present for that meeting, true?

18   A.  Correct.

19   Q.  And Mr. Burnham, Jon Burnham, was present, true?

20   A.  Yes.

21   Q.  And fair to say, again without getting into the content of

22   anything, that Mr. Burnham was very frustrated at that point?

23             MR. QUIGLEY:  Objection.

24             THE COURT:  Sustained.

25   BY MR. SCHWARTZ:

I6JJGAL4                        Moynihan - cross

1    Q.  Now, that was April 9th, and there was another telephonic

2    meeting of the independent trustees on April 14th, correct?

3    A.  Yes.

4    Q.  And Mr. Archer was not present, true?

5    A.  Correct.

6    Q.  And Jon Burnham was present, true?

7    A.  Yes.

8    Q.  And Mark Kaplan was present, too, as well?

9    A.  Yes, he was.

10          MR. SCHWARTZ:  Can I ask you, please, Mr. Jackson, to

11   bring up Exhibit 4392.

12   Q.  Am I correct, Ms. Moynihan, that although you previously

13   testified that Mr. Kaplan was only involved in these

14   discussions as a friend of Jon Burnham's, here you have

15   recorded the fact that Mark Kaplan of Skadden Arps was counsel

16   to Burnham Asset Management?

17   A.  That's correct, although I note we asked Mr. Burnham to

18   please retain Skadden Arps, but he declined to do so and

19   Mr. Kaplan declined to do so.

20   Q.  But these are your minutes, true?

21   A.  We wrote counsel to them, yes, I did.

22   Q.  Now, just two days after this meeting on April 14th, you

23   received an email from Steve Weiss, true?

24   A.  That's certainly possible.

25          MR. SCHWARTZ:  If you can keep this up on the left

1   side, please, Mr. Jackson, and on the right side, if you could

2   bring up still just for the witness, the lawyers and Judge

3   Abrams, Exhibit 4319.

4   Q.  My question to you, Ms. Moynihan, is did you understand

5   that Mr. Kaplan, who was present at the April 14th meeting, had

6   relayed information about that meeting to Mr. Weiss?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  I'll allow that.

9   A.  Well, so I got an email from Steve, Stephen Weiss, saying

10  that he had spoken with Mark Kaplan.

11             MR. SCHWARTZ:  In light of that foundation, may I

12  inquire about the April 14th meeting?

13             MR. QUIGLEY:  Objection.  I don't see the basis for

14  that.

15             THE COURT:  Why don't we break for lunch now, ladies

16  and gentlemen.  I'll see you in an hour.  Just remember don't

17  discuss the case and keep an open mind.  Thanks.

18             (Jury excused)

19             THE COURT:  You may step down and come back in an

20  hour.  Thank you.

21             You all can be seated.  I just want to talk for

22  another minute about the relevance of the back-and-forth and

23  how it goes to Archer's state of mind particularly when it is

24  minutes he wasn't present for.

25             MR. SCHWARTZ:  It goes to the information that the

1    trustees had at the time that they extracted their final set of

2    conditions for Mr. Archer.  Those conditions and those very

3    specific representations were informed by everything they had

4    learned over the prior months.

5              It is impossible to understand accurately the specific

6    concessions that were required of Mr. Archer without

7    understanding -- remember, the October 1st conditions or the

8    October 1st letter -- can we pull up the September 26th letter

9    that the government introduced.  (Pause).

10             If you go to the answer about Jason Galanis that

11   straddles Page 1 and 2, it is not Mr. Archer that provided the

12   language.  It was the trustees, it was Ms. Moynihan that

13   provided the language, and the answer that came back was

14   "confirmed."

15             You can only understand what they're asking for and

16   what Mr. Archer is confirming if you understand what

17   information they had at that point.  Otherwise, it is just

18   impossible to accurately understand the representation they're

19   asking Mr. Archer to make here.

20             THE COURT:  But isn't the key again what Mr. Archer's

21   state of mind is and so what he is responding?  What does it

22   matter what went into the way that language was phrased as

23   opposed to how he responded to it?

24             MR. SCHWARTZ:  Well, because --

25             THE COURT:  Especially if it is not clear he knew what

1    went into how that question was phrased.

2                MR. SCHWARTZ:  He knew the actual arrangement, right?

3                This is my point.  This is what we're going to

4    demonstrate.  We're going to demonstrate that Mr. Archer

5    confirming this statement is literally true, okay?  And it is

6    literally true because this is a very specific set of

7    representations that is consistent with the truth, and it

8    results from an extended back-and-forth not only between Mr.

9    Weiss and Ms. Moynihan or Mr. Archer and Ms. Moynihan, but also

10   Jon Burnham, who was a proponent of this deal and repeatedly

11   made representations to the trustees about what Jason Galanis'

12   role was and wasn't.  You just cannot understand what is being

13   agreed to here unless you understand what information the

14   trustees had.

15               Look, at the end of the day, of course, Mr. Archer is

16   the one on trial and it is his state of mind that matters.  The

17   question is, is this a deceptive statement?  If it is a

18   literally true statement, by definition it can't be deceptive,

19   right?  I need to be able to show it was literally true and it

20   was consistent with the things that the trustees knew.  Literal

21   truth, literal truth has nothing to do with his state of mind.

22   It has to do with what is objectively true.

23               MR. QUIGLEY:  I disagree.  First of all, the issue is

24   whether Mr. Archer is being deceptive has everything to do with

25   his state of mind.  What happened at meetings he was not even

1    at is not relevant.  He can ask her, he can show her this

2    document and he can say when you asked questions in this

3    document, did you understand, X, Y and Z?  What did you mean by

4    this based on your course of dealing?  He doesn't need to get

5    in minutes of meetings Mr. Archer wasn't at that happened

6    months before the deal was finalized.

7              I don't see how this is relevant to Mr. Archer's state

8    of mind or to the truth of this representation.  He can

9    cross-examine her all he wants what she means in this language.

10             MR. SCHWARTZ:  If that is true, he conceded the point.

11             If I can ask her what she means, that depends on what

12   she knew.  I am certainly allowed then to confront her with

13   what she knew.  I am just trying to do it chronologically

14   rather than asking a witness who obviously wants to talk about

15   red flags and all the things that were wrong with the deal.  I

16   am trying to confront her with the information that they had

17   that informed this language.

18             Look, once Mr. Quigley says I can ask her what she

19   meant, then that turns on what was in her head.

20             MR. QUIGLEY:  The issue is what Mr. Archer meant.

21             THE COURT:  I am going to allow you to do what Mr.

22   Quigley suggested.  I am going to allow you to cross-examine

23   her on her understanding of what that meant.

24             MR. SCHWARTZ:  With respect, all that is going to do

25   is force me to make a horrible record because she is going to

1    fight me on the spirit of it instead of the letter of it.  I

2    want to be able, my point is, this is a heavily lawyered, a

3    very specific set of agreements, and I am not looking for her

4    ex-post interpretation of what that means.  I am looking for

5    what it meant at the time, which was informed by what she and

6    the trustees knew.

7            Again I am not going into depth in this stuff.  I am

8    not planning to play around in the minutes of those meetings.

9    I wasn't even going to introduce the minutes of the meetings,

10   but knowing that Jon Burnham, one, was a fierce advocate for

11   Jason Galanis and made very clear that he wasn't going to be

12   cut out of this deal, right, because they make it sound as if,

13   you know, the trustees said he is out and Mr. Archer said yes,

14   he is out, and that was a lie, but they don't have the

15   countervailing push to keep him in the deal.

16           THE COURT:  Is there evidence that Archer knew about

17   all of that that went into how these questions were phrased?

18           MR. SCHWARTZ:  There is ample evidence, some of it the

19   government read in yesterday, of the fact that Burnham and

20   Weiss and Burnham and Archer were in communication, close

21   communication during the course of time, and Ms. Moynihan

22   testified that she was aware that Mr. Burnham was in close

23   contact with Mr. Archer.

24           Can I tell you that he knew word-for-word what

25   happened in a meeting?  Of course I can't tell you that, but

1    again it goes to what it is they actually agreed upon.  I just

2    cannot get that evidence out, and with respect, you're

3    substantially hampering my defense if I can't make this point

4    to show that was a literally true statement and that they had,

5    the trustees had the factual predicate to understand that.

6              MR. QUIGLEY:  I don't see how Mr. Burnham's state of

7    mind is relevant to Mr. Archer's state of mind, particularly

8    when there is no evidence Mr. Archer knew what went on at these

9    meetings.  They want to have it both ways.  He knew what went

10   on at the meetings, but he was so busy --

11             MR. SCHWARTZ:  It is not Mr. Burnham's state of mind

12   that is relevant.  It is the information that the trustees had

13   as they were negotiating that is relevant.  I am getting it in

14   not for Burnham's state of mind, but for the fact it was said

15   to the trustees.

16             MS. MERMELSTEIN:  That is just wrong.  This is not a

17   case about a contract dispute.  What actually sort of was

18   agreed to is not the point.  It is actually irrelevant.  What

19   matters is whether or not Mr. Archer intentionally deceived the

20   BIT Board, which he did, and so what matters is whether or not

21   what he said was accurate, period.

22             What Jon Burnham, his opinion about Jason Galanis, did

23   he really want him is super-relevant.  Whether or not there was

24   some --

25             THE COURT:  It is irrelevant.

1              MS. MERMELSTEIN:   Irrelevant.   What is trying to be

2    suggested, the concerns about Jason Galanis were overblown, the

3    BIT Board was worried, but all these other people didn't see it

4    as a big deal, that doesn't matter.

5              They demanded representations and representations that

6    were made were false.   That is for you to argue.   What matters

7    is the reputations.   You can argue about the meaning of those

8    representations.   Mr. Schwartz can argue they were literally

9    true because they papered things over to transfer things away,

10   so as a technical matter he can say this is true.   They can

11   make that argument and make that argument based on the

12   representations Mr. Archer made and the evidence of how the

13   entities were reformed as things unfolded.

14             What is 100 percent relevant is what the BIT Board

15   thought in asking these questions because Mr. Archer didn't

16   know what they thought.   All he knows is they're saying is this

17   true, and he says yes.   That is the ballgame and we can fight

18   about what it means and we will fight about what it means,

19   obviously, but there is no basis whatsoever to admit evidence

20   of minutes that Mr. Archer wasn't there, there is no evidence

21   he knew what was being said.

22             It can't be argued it affected the way he made the

23   representation or thought.   There is zero evidence of that.

24   Mr. Schwartz, he talked to people, there is evidence he talked

25   to people.   If he wants to put on evidence he knew what was

1   said in those meetings, maybe that is a different conversation,

2   but there is zero evidence of that that has been offered.

3           Everything said when he was not in the room is

4   irrelevant and it can't come in.  It is hearsay and it is

5   irrelevant and it is not hampering the defense to prevent

6   information from coming in that is misleading to the jury and

7   Mr. Archer didn't know about.

8           MR. SCHWARTZ:  It is not hearsay because none of it is

9   for the truth.

10          MS. MERMELSTEIN:  Some of it is.

11          MR. SCHWARTZ:  Second of all, let me just show you,

12  for example, if we can bring up Exhibit 4374.  I don't agree

13  that it matters whether Mr. Archer knew what was said.

14          THE COURT:  I think it does matter.

15          MR. SCHWARTZ:  Look, here is an example of Jon Burnham

16  reporting to a number of people about things that are happening

17  at BIT Board meetings.  There are communications like this.

18  Again I can't match up an email to every single board meeting,

19  but there is enough of evidence, circumstantial evidence to the

20  extent you believe it is a relevant fact, to say that Mr.

21  Archer and certainly Stephen Weiss had an awareness of what was

22  being discussed at these meetings, and there is a lot more

23  communications like this that we can compile if this is

24  relevant.  I can't see it is not relevant.

25          Either the only thing that mattered was this letter,

1    and we can strike this witness' entire testimony, or what

2    mattered was the course of dealings between CORFA and the BIT

3    Board and that course of dealings is sometimes informed by

4    things that one party or the other wasn't there for.  That is

5    okay as long as it is being offered for a non-hearsay purpose

6    and it is not otherwise prejudicial.  There is nothing

7    prejudicial, certainly not more prejudical than probative about

8    the evidence I am trying to elicit.

9           MS. MERMELSTEIN:  The government did not get into a

10   course of dealings.  It talked about Mr. Archer's statements

11   and the statements that were made to him that put into context

12   what he said.  The government elicited not one iota of

13   information about what the BIT Board was saying when Mr. Archer

14   was not there.

15          If there is an email that Mr. Archer is on where

16   someone tells him what happened in a meeting he wasn't at, and

17   the content of that arguably affected whether or not he thought

18   his statements to the board were true, then I think we should

19   have that discussion.  The mere fact that sometimes people told

20   him some things that were said in a meeting does not establish

21   that his state of mind was impacted by other things that there

22   is no evidence he heard.

23          So course of dealing is not a catchall for anything I

24   wanted to put into evidence.  It is not relevant to the issue,

25   which is was Mr. Archer lying or deceiving the BIT Board,

I6JJGAL4                         Moynihan - cross

 1   period.

 2          THE COURT:  Let me just ask one question and I will

 3   hear you out.  How is it that this witness, or through another

 4   witness, someone can be cross-examined about what the meaning

 5   is of those questions there?

 6          MS. MERMELSTEIN:  I don't think it is appropriate for

 7   someone to be questioned about the meaning because the question

 8   is not what -- imagine that --

 9          THE COURT:  Everyone involved in the deal had the same

10   understanding of what that question was.  Hypothetically, we

11   don't know the answer to that.  Doesn't that bear on his state

12   of mind in saying yes or confirmed or whatever it is he said?

13          MS. MERMELSTEIN:  No, and here is why.  If Mr.

14   Archer -- if -- there isn't, but let's envision a world in

15   which there is some conversation that takes place between Mr.

16   Archer and other people involved in the deal, in which they

17   sort of agree to some meaning and the question is phrased in a

18   way that is unclear, so he thinks he is answering truthfully

19   because he is relying on their conversation, and so it is not a

20   total match-up with the written question, but he has a

21   good-faith basis for thinking he is answering it truthfully,

22   then we are in a different ballgame.  That is not what happened

23   here.  He doesn't know what communications the board is having

24   internally, he gets the request and he responds.  The request

25   speaks for itself.

It doesn't matter what the person asking the question
actually wanted to know.  What matters is when you read the
question what is it calling for because that is how Mr. Archer
answered it.  The only thing that matters is what did he know
when he answered the question that would have given him, if
there was, a basis for saying that his answer is true.  The
only thing that can be offered with respect to this is evidence
about what Mr. Archer's understanding of these were, and other
people's understanding he wasn't privy to is not relevant to
that.

MR. SCHWARTZ:  I will say a final thing because I
think you understand the arguments.  The government has argued
repeatedly that in a conspiracy case, the state of mind, making
an analogy of co-conspirators, we had this discussion a number
of times is relevant and they say it is relevant it going to
whether there was conspirator agreement -- to see whether there
was an agreement, you look at not only the state of mind of the
defendants, but the state of mind of the people they were
supposedly agreeing with.  This is the same issue.

The question is when you're assessing whether or not
there was a meeting of the minds, it matters what is in both
minds, and this is not this one that is up here, but the
September 26 representations, that is the final meeting of the
minds.  So it matters very much what is in both minds.  I think
that is compelled.

I6JJGAL4                          Moynihan - cross

1              THE COURT:  Let me just think about it for a little
2      while.  In the meantime, is Mr. McMillan here?
3              MS. MERMELSTEIN:  May I say one thing?
4              MR. TOUGER:  Before you question Mr. McMillan, I want
5      you to understand the facts as we know them so when you're
6      questioning him --
7              MS. MERMELSTEIN:  Before we go down that road, can I
8      say two things.  One is with respect to the conspiracy analogy,
9      it is a faulty analogy.  In a conspiracy there has to be a
10     meeting of the minds, so whether or not there was one is a
11     relevant fact.  It is not relevant whether there was a meeting
12     of the minds here.
13             (Off the I record conversation)
14             MR. TOUGER:  Basically in 2010 into 2011, Mark
15     McMillan with John Galanis in establishing brokers accounts for
16     the Atlantic partnership, this is directly relevant to Gerova.
17     You can't hear me?  Okay.  Sorry.
18             I will repeat.  In 2010 into 2011, McMillan worked
19     with Jason Galanis and Derrick Galanis in establishing brokered
20     accounts for Amir Shahini and Atlantic Partnership, both of
21     which are directly relevant to the Gerova situation.
22             Then McMillan tells Jason Galanis and Amir Shahini,
23     tell him to open bank accounts at Wells Fargo.  In 2011, John
24     Galanis asked Mark McMillan to open accounts in foreign Asia
25     capital markets, a bank account and brokerage account.  The

1    reason -- then they split up the partners' shares into those

2    two different accounts, and that is where the disagreement

3    comes in because John is angry, John Galanis is angry the way

4    Jason Galanis is conducting his business.

5         So 80 percent of the shares were transferred to an

6    equity controlled by Jason and the balance were put in Atlantic

7    brokerage account controlled by John.  That is when John told

8    Mr. McMillan don't follow any orders of Jason relative to those

9    funds because they were specifically separated from the Jason

10   Galanis money.

11        Then this all ends, so from the fall of 2013 to August

12   of 2014, there is no business relationship between Mr. McMillan

13   and John Galanis.  What I find interesting is they just spent

14   20 minutes arguing about how the only state of mind that is

15   relevant is Devon Archer's and not Jon Burnham's.  In this

16   situation, they're arguing the exact opposite, Mr. McMillan's

17   state of mind is important and not John Galanis'.

18             THE COURT:  I am not focused on McMillan's state of

19   mind.

20             MR. TOUGER:  If it is John --

21             THE COURT:  The question is what, if anything, does it

22   say about John Galanis' state of mind that he said to McMillan

23   that Jason --

24             (Multiple voices)

25             MR. TOUGER:  This is my problem.  The only reason he

1    said that to Mark McMillan was the reason I just said to you,

2    is because there was a dispute between him and Jason about the

3    way Jason was conducting business, so they separated the funds

4    and Jason got 80 percent and John got 20 percent, and for the

5    20 percent that John got, John said don't follow any orders of

6    Jason.  To now jump that statement because a year or two later

7    on totally different, irrelevant information is not John

8    Galanis' state of mind in the Sovereign Nations account, it has

9    nothing to do with Sovereign Nations, none whatsoever.

10             THE COURT:  Do you want to bring Mr. McMillan in?

11             MS. TEKEEI:  Yes, we can.

12             (Pause)

13    MARK MCMILLAN,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   MS. TEKEEI:

18   Q.  Mr. McMillan, did you receive a subpoena to testify here

19   today?

20   A.  I did.

21   Q.  Did you previously indicate that you would exercise your

22   Fifth Amendment right against self-incrimination if subpoenaed

23   to testify?

24   A.  I did.

25   Q.  Are you now formally exercising your Fifth Amendment rights

1    against self-incrimination?

2    A.  I am.

3          MS. TEKEEI:  Your Honor, the government respectfully

4    requests the Court enter the immunity order.

5          THE COURT:  Yes, I will do so.  Why don't you now ask

6    a few targeted questions of Mr. McMillan about what he was told

7    by John Galanis with respect to Jason Galanis.

8    BY MS. TEKEEI:

9    Q.  Mr. McMillan, to whom did you report when you began first

10   working for John Galanis?

11   A.  To John Galanis.

12   Q.  Did Mr. Galanis give you any instructions with respect to

13   the bank accounts that you opened for him?

14   A.  He did.

15   Q.  With respect to those bank accounts, what, if any,

16   instructions did John Galanis give you about who could direct

17   you to make disbursements from those accounts?

18   A.  John Galanis, Barry Feiner and Jared Galanis.

19   Q.  Did there come a time when you asked for additional

20   clarification regarding that?

21   A.  Yes.

22   Q.  What did you ask?

23   A.  I asked specifically if that meant that Jason Galanis and

24   Derrick Galanis were to be excluded from being to instruct me,

25   and the answer was yes.

I6JJGAL4                        McMillan - direct

1            THE COURT:  When was that?

2            THE WITNESS:  That was approximately 2010.

3            THE COURT:  Moving forward to the fall of 2013 or

4    2014, at that point or after that point did you open additional

5    accounts for John Galanis?

6            THE WITNESS:  I opened a checking and a savings

7    account for John Galanis.

8            THE COURT:  What was your understanding about whether

9    those directions he had given you previously applied to these

10   accounts that were opened, and if you could provide the

11   time-frame, that would be helpful.

12           THE WITNESS:  I really didn't get any further

13   instructions.  I just continued on assuming that he or Barry

14   Feiner were the only parties I was working with were able to

15   give me instructions.

16           THE COURT:  What about Jared?

17           THE WITNESS:  I didn't interact with him.

18           THE COURT:  Did Jason Galanis ever seek access to that

19   account, as far as you know?

20           THE WITNESS:  Are you talking in the 2014 time-frame?

21           THE COURT:  I am talking about 2014 time?

22           THE WITNESS:  Not that I am aware of.

23           THE COURT:  Do you have any knowledge of what the

24   reason is that you were directed not to follow any instructions

25   from Jason Galanis back in 2010?

I6JJGAL4                        McMillan - cross

1          THE WITNESS:  I didn't have any awareness at the time

2     of the instructions, if that answers your question.

3          THE COURT:  Okay.  Are there any additional questions

4     either side would like to ask?

5          MR. TOUGER:  I would like to.

6          THE COURT:  Keep it brief.  I don't want this to be

7     cross-examination.

8     CROSS EXAMINATION

9     BY MR. TOUGER:

10    Q.  To follow up on that last question, did you learn the

11    reason why John Galanis gave you that order?

12    A.  I was able to deduce.

13    Q.  What was that?

14    A.  It seemed to me that John and Jason had their own separate

15    interests.  They were working as partners, but they had their

16    own separate interests, and both John and Jason I think guarded

17    their interests and kept them separate.

18    Q.  Just to be clear, the accounts that you opened in 2010 and

19    2011 were closed before you opened the accounts in 2014?

20    A.  Yeah, they had been closed for probably a year or more.

21    Q.  Right.  And you had no contact with John Galanis during

22    that year, business contact?

23    A.  I had occasional phone conversations with him.

24    Q.  But no business operations?

25          MS. TEKEEI:  Objection, your Honor.  This is not an

I6JJGAL4                      McMillan - cross

1    opportunity for cross-examination.

2           MR. TOUGER:  I am not cross-examining him; I am

3    getting the information.

4           THE COURT:  I want to go back to one question, please.

5    Give me one second.  I am going back in the transcript.

6    (Pause)  So with respect to the 2010 bank accounts, again I

7    want to make sure I got this right, the people who were

8    permitted to direct you to make disbursements were John

9    Galanis, Jared Galanis and --

10          THE WITNESS:  Barry Feiner.

11          THE COURT:  -- and Barry Feiner, but with respect to

12   the 2014 --

13          THE WITNESS:  2014.

14          THE COURT:  -- 2014 accounts, it was Barry Feiner and

15   John Galanis, but not Jared.  Is that right?

16          THE WITNESS:  That's correct.

17          THE COURT:  That was because Jared was no longer

18   involved, is that your understanding?

19          THE WITNESS:  That is my understanding.

20          THE COURT:  Thank you very much.

21          MR. TOUGER:  One last question.

22          THE COURT:  Say the question.  Don't answer it yet.

23   BY MR. TOUGER:

24   Q.  The account that was involved when Mr. Galanis, John

25   Galanis, said don't follow Jason Galanis, was that a brokerage

I6JJGAL4

1   account or a bank account?

2   A.  (Pause)

3            THE WITNESS:  You instructed me not to answer.

4            THE COURT:  You can answer that.  I apologize.

5   A.  They were both brokerage accounts, bank accounts.

6            THE COURT:  You can step out and come back in, say, 40

7   minutes.  Thank you.

8            (The witness left the courtroom)

9            THE COURT:  Just one more minute, and I'll let you all

10  go to lunch.  In light of that expected testimony, why is that

11  probative, with that direction back in 2010?

12            MS. TEKEEI:  It informed the way that he set up and

13  followed orders from only John Galanis and another, additional

14  person who was involved in the prior bank accounts, Barry

15  Feiner, with respect to those accounts, to the exclusion of

16  anyone else and in particular to the exclusion of Jason

17  Galanis.

18            THE COURT:  Why is that relevant?

19            MS. TEKEEI:  Mr. Touger has spent considerable time

20  asking multiple witnesses about the control and direction that

21  they took from Jason Galanis.

22            I think it is relevant that in connection with this

23  deal, and implying that John Galanis was like those witnesses

24  and did what Jason said in the course of those deals.  He

25  hasn't said that yet so explicit, but that has been the

I6JJGAL4

```
1    implicit argument behind each of his multiple questions to

2    multiple witnesses about who took instructions from Jason and

3    whether they followed them and how controlling Jason was,

4    whether they ever questioned Jason.

5             It is relevant to John Galanis' state of mind that in

6    connection with the bank account that he set up that used the

7    proceeds of the Wakpamni Lake Community Center bonds, he made

8    sure that person who was in charge of that bank account knew

9    the only people that he could could take direction from were

10   John Galanis and Barry Feiner, to the exclusion of anyone else,

11   including the prior Galanis family members with whom this

12   witness had worked, Jared and Jason.

13            MR. TOUGER:  He never said that.  He didn't say --

14   what is interesting is that when you asked him about Jared

15   Galanis, he didn't even say Jared Galanis in this matter.

16            THE COURT:  Why is it prejudicial to you?

17            MR. TOUGER:  Because it sets up an argument that has

18   no bearing on this case.  Unless I can go back and say that

19   this happened four years ago and you just assumed, and these

20   are the circumstances and have him give the answers he just

21   gave, fine, let it in.

22            THE COURT:  Can't you just ask the question you just

23   asked him?  What is the harm?

24            MR. TOUGER:  If I don't open the door to Gerova, the

25   illegality of Gerova coming in, I have no problem with him
```

I6JJGAL4

outlining that in 2010 he opened up these accounts, and

understand this and there was a disagreement and he will give

the answer he just gave and that is why John gave him that

order in 2010 and when you --

THE COURT:  I don't think he said there was a

disagreement, unless I missed it.  I think he said they had

different interests.

MR. TOUGER:  Whatever his answer is.  In 2014 John

Galanis said nothing, and you just assumed, that is fine.  I

don't want to open any doors.

THE COURT:  Is that going to open the door, in your

view?

MS. TEKEEI:  First of all, the questions Mr. Touger

asked called for a little bit of speculation on Mr. McMillan's

part, and think he said I believe they were or I deduced it

was.  It wasn't recounting a conversation he had with John

Galanis.  He was giving pure speculation why he thought that

instruction had been given.

Mr. Touger has implicitly argued through every witness

that they trusted Jason.  This testimony is significant because

it shows that John Galanis, whose state of mind is at issue

here, did not trust Jason Galanis and had not trusted Jason

Galanis for some time period, and we should be allowed to argue

that given the amount of time Mr. Touger has asked multiple

witnesses.

I6JJGAL4

1          MR. TOUGER:  It is pure speculation by this witness

2    that John, pure what he said years ago is now still in effect.

3    That is pure speculation on this witness' part.  There is no

4    evidence, and the only evidence is that in this circumstance

5    back in 2010, John Galanis and Jason Galanis got into an

6    argument about a business transaction.  Now they want to throw

7    that forward to 2014.  I got into a lot of arguments in 2010, I

8    am very friendly with in 2014.

9          It is irrelevant, especially if they argue I opened

10   the door.  If I can go through this is a 2010 event, fine, they

11   can make their arguments.

12         MS. TEKEEI:  He can ask wasn't this four years ago?

13   Wasn't this about a separate set of bank accounts?  And I don't

14   think those questions in and of themselves open any doors.

15         THE COURT:  And you don't know why he directed him to

16   do that, right?

17         MS. TEKEEI:  I think that is totally fine.

18         MR. TOUGER:  He did know, your Honor.

19         THE COURT:  I think he said I assume because --

20         MR. TOUGER:  He later deduced.

21         THE COURT:  They had different interests that he

22   didn't know at the time.

23         MR. TOUGER:  Which is completely --

24         THE COURT:  Can he ask the question it may well have

25   been they had different interests, isn't that a fair

I6JJGAL4

1    assumption?

2              MS. TEKEEI:  He can ask that question.

3              THE COURT:  He can do that, and don't go beyond that,

4    and we are all in agreement.

5              MR. TOUGER:  If I open the door, then fine.

6              THE COURT:  I think that is fine.

7              MS. TEKEEI:  If all he is asking is it could have been

8    because they had different business interests, then I think

9    that question is fine.

10             THE COURT:  We're on the same page.  Let me just think

11   over lunch about the other issues with respect to the BIT

12   Board.  Why don't we come back at 10 of, and I will tell the

13   jury to come back at 2:00.

14             (Luncheon recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I6J7GAL5

1                        A F T E R N O O N   S E S S I O N

2                               1:55 p.m.

3              (Jury not present)

4              THE COURT:  So I don't think that it's proper to

5      cross-examine this witness based on hearsay statements of

6      others that it's not at all clear that Mr. Archer ever learned

7      about.  If there was any evidence -- whether it's an e-mail or

8      testimony of someone -- saying he was provided certain

9      information and that went to his understanding of what he was

10     confirming, then I think that that's fair game, but I don't

11     think it's proper to allow in hearsay statements about what

12     other people said months before when it's not clear he ever

13     learned about it.

14             I think a remaining question, however, is what Mr.

15     Quigley initially suggested was fair game, which is asking her

16     what her understanding was.  I mean but she wasn't a signatory

17     to the agreement, right?

18             MR. SCHWARTZ:  I mean she sent the letter.  Look, the

19     way this witness is answering, I don't want to ask that

20     question.

21             THE COURT:  OK.  Is there anyone else you can call to

22     get out facts that there is evidence that Mr. Archer based his

23     understanding based on something he was specifically told?

24             MR. SCHWARTZ:  I mean --

25             THE COURT:  Because I don't want to cut off your

I6J7GAL5

1    defense; I just think this is improper hearsay.

2              MR. SCHWARTZ:  I think the answer is no, because those

3    witnesses are either -- I mean that would either require a

4    waiver of privilege, or waiver of Fifth Amendment rights, or my

5    understanding is Mr. Burnham is not in a position to testify at

6    the moment, so I don't think there is a competent witness,

7    unless Mr. Archer decides to testify.

8              I do want to repeat I don't think it's a hearsay

9    issue.  Just to be formalistic about it, we had a very, very

10   clear business records foundation for the minutes, so that's

11   not hearsay, and the statements are not being offered for the

12   truth; they're being offered for their effect on the listener.

13             THE COURT:  But which listener?

14             MR. SCHWARTZ:  The BIT board, the trustees, who are

15   the party to the agreement.

16             THE COURT:  And the relevance of -- so then the

17   relevance of statements made -- and if we want to do this

18   outside the hearing of the witness --

19             MR. SCHWARTZ:  Yes, probably.

20             THE COURT:  OK.

21             MR. SCHWARTZ:  I'm happy to proffer the specific

22   statements I intend to elicit; it is very limited.

23             THE COURT:  So do that for me.

24             MR. SCHWARTZ:  Sure.  So, the statements are at the

25   April 9th meeting -- we can bring this up if you want.  But

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I6J7GAL5

1      again I was not intending to do this through documents.  I was

2      intending to do this just through witness testimony.  But I'm

3      reading from the minutes, and I would sort of do it that way.

4              So from the April 9th meeting, after Mr. Burnham joins

5      the meeting, it says he spoke in the strongest terms concerning

6      his displeasure with the unwillingness of the independent

7      trustees to proceed with approval of the transaction.  Mr.

8      Burnham stated that he thought the independent trustees had

9      gone beyond their authority.  Mr. Burnham then explained his

10     reasons for trusting Mr. Archer and stated that Mr. Galanis

11     could not do anything to the funds for which the independent

12     trustees were responsible.  He reminded the independent

13     trustees that the funds were completely separate and that the

14     independent trustees had no authority to question transactions

15     entered into that did not involve the funds.

16             Now, at the April 14th meeting Messrs. Burnham and

17     Kaplan stated that they did not share the view of the

18     independent trustees regarding Mr. Galanis and believed him to

19     be a bright professional with good investment ideas.  Mr.

20     Burnham stated he was strongly opposed to making any request of

21     Mr. Archer concerning his association with Mr. Galanis.

22             THE COURT:  And what is the relevance to any of this

23     to Mr. Archer's state of mind, which is the reason the

24     government is admitting this evidence?

25             MR. SCHWARTZ:  So -- and there is one more that I'm

I6J7GAL5

1    going to do.

2                THE COURT:  So why don't do you that first, and then

3    I'll --

4                MR. SCHWARTZ:  It is an April 24th meeting, after Mr.

5    Burnham joins, he spoke in the strongest terms concerning his

6    disappointment.  He particularly asked the independent trustees

7    to trust him, stating that he knew what he was doing.  Then a

8    lengthy discussion ensued where the trustees discussed various

9    options, including separating the advisor with ownership among

10   Messrs. Burnham and Archer.  Mr. Burnham stated his

11   unwillingness to separate ownership over the advisor.

12               Then there was the one statement that came in

13   previously -- and I think it probably came in already -- which

14   was -- I just have to find it -- it's from the April 1st or

15   April 2nd meeting.

16               Yeah.  So, from the April 2nd meeting -- and I think

17   this came in already, because this was the one that was

18   introduced, but obviously I don't have the transcript, and I

19   don't recall where the objection started -- but it says Mr.

20   Burnham stated there was nothing wrong with Mr. Galanis and

21   that Mr. Galanis was a friend of Mr. Archer.  He talked a

22   little bit about the SEC bar, and then Mr. Burnham stated that

23   Mr. Galanis operated as a consultant but that he would have

24   nothing to do with BAM or BFG going forward, and would not be

25   involved following consummation of the transaction.

I6J7GAL5

1          So, that's all I intend to elicit.  And, again, the

2     purpose of this I think is threefold:  It is, one, to really

3     paint the true picture -- which I think was obscured in the

4     parts that the government was permitted to elicit -- which is

5     that this was specifically with reference to presence of Mr.

6     Galanis in this deal a robust back-and-forth.  And the fact of

7     the matter is Mr. Burnham -- although he was not one of the

8     independent trustees -- he was the chairman of the BIT board,

9     and he was able to speak in a way that outside investors were

10    not permitted to speak.  He was able to speak very frankly, and

11    he did speak very frankly.  And he said, look, I like Jason

12    Galanis, there is nothing wrong with Jason Galanis, we're not

13    going cut him out of this deal.

14          THE COURT:  And what's the relevance of that?

15          MR. SCHWARTZ:  Because what we have now is a

16    misleading picture, which is that the trustees made a demand

17    and then the CORFA group acceded to the demand without any push

18    or pull.  And that's simply not an accurate picture of what

19    happened.  And what resulted, the final agreement, is the

20    product of that push and pull as opposed to terms that had

21    simply been dictated.  That's important to get out.

22          THE COURT:  Why is that important to get out?

23          MR. SCHWARTZ:  Because again our position is going to

24    be that the final agreement was factually correct and it was

25    factually correct as a result of these robust negotiations, and

I6J7GAL5

1      it can't be misleading if it was true.

2           Now, the government wants to say that, you know -- and

3      this gets to one of the other points too -- what the government

4      wants to say is the trustees said he can't have anything to do

5      with anything.  And that's not what was said, and that's

6      certainly not what was agreed to.  But that is the picture that

7      has been painted right now, that the trustees say he can't have

8      anything to do with anything, we can never hear the name Jason

9      Galanis again.  But what was agreed to instead was very, very

10     specific parameters, and it's only possible to understand that

11     in the context of the back and forth; and it's simply a true

12     fact that Mr. Archer was not personally party to every part of

13     that back-and-forth, but it still informs the ultimate

14     representations.

15          It's also true that in the course of these minute

16     meetings, in the course of these conversations with Jon

17     Burnham, Jon Burnham provides information to the trustees about

18     the relationship between Jason Galanis and Mr. Archer.  And

19     this is not being offered for the truth, but it's being offered

20     to show that it was conveyed to the trustees in no uncertain

21     terms that there was a relationship, but that relationship was

22     not at the BAM, BSI or BFG level.

23          THE COURT:  Did you want to respond?

24          MR. QUIGLEY:  I still don't see how Mr. Burnham's

25     state of mind is relevant to Mr. Archer's state of mind, or

I6J7GAL5

1    even the factual accuracy of the representations that were made

2    to the board months later.

3            I would also say in terms of the board's state of

4    mind, he kind of wants to have it both ways, because, you know,

5    one of the things he argued about in terms of stuff we should

6    redact from the later minutes was the board's assessment in

7    feeling that they had been essentially misled and lied to.

8            So, I don't think this is relevant.  I fail to see the

9    relevance of this.  I think your Honor's initial instinct is

10   right and that it should be kept out.

11           THE COURT:  As you know, I kept out the board's

12   reaction, and I think appropriately so, but I don't want the

13   jury to have a misleading impression.

14           Is there a way for you to ask in more general terms

15   about the robust negotiations and that there was a

16   back-and-forth that led to the particular language here?

17           MR. SCHWARTZ:  I mean, look, I can, but I'm going

18   to -- I'm just sort of seeing the future.  I'm going to end up

19   having to confront her with her prior statements unless she

20   gives me a clean answer.  And that's not the way she has been

21   answering.

22           THE COURT:  And what about the fact that if in fact

23   the relationship between Archer and Galanis was provided to the

24   BIT board, is that not relevant?

25           MR. QUIGLEY:  That's not what -- the issue is were the

I6J7GAL5

1    representations in September 26 and October 1, were those

2    accurate.  The fact that Mr. Burnham said four months prior,

3    hey, I think Jason Galanis is a great guy, that's not relevant.

4           The issue is they demanded very specific conditions.

5    In Government Exhibit 762 I think it's iron clad assurances.

6    And they confirm that.  Iron clad assurances that Mr. Galanis

7    will not be involved with any of the Burnham entities.  And if

8    they want to suggest or argue somehow that's literally true,

9    what Mr. Burnham said four months prior in a meeting that Mr.

10   Archer wasn't at, is not relevant.

11          THE COURT:  All right.  I don't think you should get

12   at exactly what Burnham said months before, I agree with that;

13   I don't think it's relevant.

14          I will allow you to ask questions about whether there

15   were negotiations back and forth, whether there was

16   disagreement among the board, just generally, so that the jury

17   is not left with a misleading impression.  But I don't think we

18   should be getting into particular statements of Burnham or

19   anyone else.  All right?

20          Can we bring the jury back in?

21          MR. QUIGLEY:  We would move to strike the one exhibit

22   that already came in.  I know we didn't object to it, but the

23   relevance of it was not clear to us, the minutes of the first

24   meeting.

25          THE COURT:  And did you object to that, to those

I6J7GAL5

1    minutes?

2            MR. QUIGLEY:  We did not.

3            MR. SCHWARTZ:  I have no problem, as I said at the

4    time, conforming the exhibit to the testimony.  You know, my

5    intention all along is not to put in the entirety of the

6    minutes, but the testimony, you know, is what it is, and, you

7    know, I think the government had an obligation to object

8    contemporaneously and they didn't.

9            MR. QUIGLEY:  Your Honor, we thought there was one

10   theory of relevance for coming in and that's not it, so I

11   think --

12           THE COURT:  I mean you're not going to use it anymore?

13           MR. SCHWARTZ:  I'm not going to go back to it.

14           THE COURT:  I will take a look at it, and I will let

15   you know.  OK.  So we will bring the jury in.  BIT board.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

I6J7GAL5

1              (Jury present)

2              THE COURT:  Everyone can be seated.  Thank you.

3    Proceed.

4    MARY MOYNIHAN, resumed.

5    CROSS EXAMINATION (Continued)

6    BY MR. SCHWARTZ:

7    Q.  Good afternoon, Ms. Moynihan.

8    A.  Hi.

9    Q.  Did you get to have lunch, or were you working through

10   lunch?

11   A.  I had lunch.

12   Q.  So before we broke, just to reset you, we had talked about

13   a meeting, a telephonic meeting of the trustees that took place

14   on April 14, 2014, and then we were just starting to talk about

15   an April 16, 2014 follow-up from Steve Weiss.

16              And, Mr. Jackson, if we could bring up -- I don't

17   think I moved it in yet.  So for the witness, the lawyers and

18   Judge Abrams, Exhibit 4319.

19              And this is an e-mail from Stephen Weiss to you and

20   others, true?

21   A.  Yes.

22              MR. SCHWARTZ:  I offer Exhibit 4319.

23              MR. QUIGLEY:  No objection.

24              THE COURT:  It will be admitted.

25              (Defendant's Exhibit 4319 received in evidence)

I6J7GAL5

Q.  And could we publish this, please, Mr. Jackson.

            Now, in this e-mail attorney Weiss writes that he had spoken to Mark Kaplan and that based on that conversation and Mr. Kaplan's advice CORFA was prepared to commit to certain assurances.  True?

A.  Well, that's what it says, yes.

Q.  And the assurance -- if we can go to below the signature line here -- is that neither Jason Galanis nor any company controlled by him will serve as an officer, director, employee, consultant or agent to Burnham Asset Management Inc., any sub-advisor to BAM, or have any dealings or association of any kind whatsoever with any of BAM, its sub-advisors, the Burnham Investors Trust or any of the Burnham funds.

            Did I read that right?

A.  Yes.

Q.  And then there is a longer paragraph below that which I won't read, but the gist of which is that they would form a special transaction commitment committee to review any deal originated by Jason Galanis.  True?

A.  I think that's basically what it says, yeah.

Q.  And then there is a signature block for Devon Archer, true?

A.  Yes.

Q.  Now, the independent trustees next met by telephone on April 24th of 2014, true?

A.  Yes.

I6J7GAL5

Q.   And again Mr. Archer was not there, true?

A.   Yes.

Q.   And yes it's true he was not there, right?

A.   He was not there.

Q.   And Mr. Weiss was not there?

A.   Correct.

Q.   And Jon Burnham was there, correct?

A.   Yes.

Q.   And it was at this meeting that there was first

discussion -- which you testified to on direct -- about the

idea of splitting Burnham Asset Management and Burnham

Securities, true?

A.   This is the first meeting of the independent trustees,

yeah, where that was discussed.

Q.   And that's exactly what ended up happening, true?

A.   Ultimately, yes.

Q.   Now, you can take that down, Mr. Jackson.

         By May of 2014, fair to say that the BIT board or the

independent trustees alone had had numerous separate special

meetings to discuss the potential change of control?

A.   I'm sorry.  By May?  Can you -- the timeframe after the

24th -- which we were just looking at when the BIT board

declined to approve the transaction, I think there were far

fewer meetings.

Q.   Sorry.  I mean May looking backwards from when the idea had

I6J7GAL5

1    been originated --

2    A.  Yes.

3    Q.  We haven't talked about every meeting at which this came

4    up, correct?

5    A.  We have talked about a lot of meetings.  You know, I don't

6    know if it was every meeting.

7    Q.  I mean I think you mentioned before --

8    A.  We were meeting very frequently.

9    Q.  At some point it was almost daily, right?

10   A.  I would say that's correct.

11   Q.  And, by the way, this was costing the independent trustees

12   some money, right?

13            MR. QUIGLEY:  Objection.  Relevance.

14            THE COURT:  Sustained.

15   Q.  Well, it was costing the independent trustees some money,

16   which ultimately the independent trustees required CORFA to

17   pay, true?

18            MR. QUIGLEY:  Objection.  Relevance.

19            THE COURT:  Sustained.

20   Q.  And so let's look at May 2014.  There was a telephonic

21   meeting of the independent trustees on May 29, 2014, true?

22   A.  Yes.

23   Q.  And again Mr. Weiss and Mr. Archer were not present,

24   correct?

25   A.  Correct.

I6J7GAL5

1    Q.   But again Jon Burnham was present, true?

2    A.   Yes.

3    Q.   Now, at certain points during this back-and-forth

4    negotiation were you aware that CORFA was attempting to find

5    additional investors for Burnham Financial Group?

6    A.   Well, during what period do you mean?

7    Q.   Throughout the spring of 2014.

8    A.   I was not aware until -- I don't remember exactly -- but

9    after the trustees declined to approve the transaction, it

10   later came up that there was a possibility of there being a

11   different investor.

12   Q.   And at some point CORFA, yes or no, brought to the trustees

13   a potential transaction -- potential investment by something

14   called Wright Investors' Service Holdings, correct?

15   A.   I don't recall who brought it to the trustees, but, yes,

16   there was the entity you just described was mentioned.

17   Q.   And so the idea was to bring in new investors to try and

18   satisfy some of the concerns.

19   A.   I don't know.  I thought they were going to do the

20   investment instead.

21   Q.   Well, is it your testimony that that Wright Investors'

22   Service Holdings potential investment was separate from CORFA?

23   A.   You know, I think that was never entirely clear.  There was

24   some nondisclosure agreements and so forth, so I don't actually

25   remember.  I thought it was presented more as in the

I6J7GAL5

alternative.

Q.   Well, I certainly don't want to ask you to violate any

nondisclosure agreements you may have with those other

investors.  But let me show you to refresh your recollection,

just for the witness, the lawyers and Judge Abrams Exhibit

4323.  And if you can turn to the second page.  And if you turn

to page 59.  Does this refresh your recollection, yes or no,

Ms. Moynihan, that the potential Wright Investors' Service

Holdings, Inc. investment was brought by CORFA?

A.   Well, you know, on its face it just says the parties agreed

that CORFA --

          MR. QUIGLEY:  Objection.

Q.   I don't want to you read the document.  The question is

does this remind you that Wright Investors' Service Holdings

was not totally separate from CORFA?

A.   I don't have a recollection either way.

Q.   You can take that down.

          In any event, that transaction ultimately fell

through, true?

A.   Correct.

Q.   Now, the independent trustees had another meeting on July

9, 2014, correct?

A.   Correct.

Q.   And again Mr. Archer and Mr. Weiss were not there, correct?

A.   Correct.

I6J7GAL5

1    Q.   And Jon Burnham was not there either, correct?

2    A.   That's correct.

3    Q.   And this was one of the meetings where Mr. Mac Corkindale

4    was not there?

5    A.   That's correct.

6    Q.   So it was you and Peggy Eisen and Bill Connell and also a

7    man named Peter Nathaniel.

8    A.   Correct.

9    Q.   And do you recall that that was one of the meetings that

10   was quite lengthy?

11   A.   It did go on for an extended period of time.  There was a

12   relatively lengthy conversation, not all of which was part of

13   the meeting.

14   Q.   And am I correct, however, that your minutes of the meeting

15   were less than a page long?

16   A.   Yes.

17   Q.   Now, later on in the summer, on August 1 of 2014, you sent

18   another information request to a large number of people

19   including Mr. Burnham and Mr. Kaplan and attorney Weiss and

20   others?  True?

21   A.   Sorry, what was the date?

22   Q.   August 1, 2014.

23   A.   August 1, yes.

24   Q.   And can we bring up for the witness, the lawyers and Judge

25   Abrams Exhibit 4329.

I6J7GAL5

1          One of the things that the trustees put forward on

2     August 1 to CORFA was this idea of splitting Burnham Asset

3     Management and Burnham Securities, true?

4     A.   Yes.   I think Mr. Nathaniel had -- we had met with him at

5     the request of Mr. Archer, and that's where it became apparent

6     that that idea, that people might be receptive to that idea, so

7     we pursued that during that interim period and then made that

8     request, as I recall.

9     Q.   And so this August 1, 2014 correspondence is the first time

10    that you are formally making this proposal to CORFA, true?

11    A.   That sounds about right, yeah.

12    Q.   Now, the next board meeting following that was August 21 of

13    2014, correct?

14    A.   That's correct.

15    Q.   And this is one of the meetings that Mr. Archer was present

16    for.

17    A.   That's correct.

18    Q.   And Andrew Godfrey was present too.

19    A.   Yes.

20    Q.   And Jon Burnham.

21    A.   Yes.

22    Q.   And am I correct that the purpose of that meeting on August

23    21, 2014, was specifically to discuss this idea of separating

24    Burnham Asset Management out of the rest of Burnham Financial

25    Group?

I6J7GAL5

1    A.   Well, I think that was one of the topics, yes.

2    Q.   And the discussion was around an investor group led by Mr.

3    Archer and Mr. Godfrey acquiring Burnham Asset Management,

4    correct?

5    A.   It was expected to include them, yes.

6    Q.   And the other members of that investor group that would be

7    acquiring Burnham Asset Management was Kirin Global?

8    A.   Yes.

9    Q.   Which was a company associated with somebody named Larry

10   Liu, correct?

11   A.   Yes, who we understood to be associated with Mr. Archer.

12   Q.   And in that structure where there would be a separation of

13   Burnham Asset Management, in addition to that investment group

14   it was expected that Jon Burnham would continue to have a

15   minority ownership position, true?

16   A.   Yes.

17   Q.   Now, there was a point in time in that meeting -- as with

18   many of the board's meetings -- where you went into what is

19   called executive session, correct?

20   A.   Correct.

21   Q.   Meaning that the outsiders were asked to step out and the

22   trustees talked amongst themselves.

23   A.   Yes.

24   Q.   And I don't want to get into those --

25   A.   Those conversations are typically privileged.

I6J7GAL5

1    Q.  Correct.  What came out of that though were those 11

2    conditions you looked at with Mr. Quigley, true?

3    A.  Yes.

4    Q.  And those conditions cover all sorts of topics, true?

5    A.  Yes, although they were focused on the issues that have

6    been of concern to the trustees.

7    Q.  But I mean as I referenced a second ago, one of the

8    conditions was that the investor group pay the independent

9    trustees legal fees, right?

10   A.  That's actually required by law.  Section 17(f) requires

11   that all fees of the transaction are paid by the acquiring

12   party.

13   Q.  And a lot of this conversation was dictated by legal

14   requirements, true?

15   A.  That's true.

16   Q.  I mean the fact that you were having it at all comes from a

17   requirement of the 40 Act, right?

18   A.  Correct.

19   Q.  This is an enormously regulated area, true?

20   A.  That's true.

21   Q.  Both mutual funds and separately asset managers and

22   separately broker dealers, true?

23   A.  All of them are subject to federal regulation, yes.

24   Q.  And separate and sometimes overlapping bodies of

25   regulation, correct?

I6J7GAL5

1                    MR. QUIGLEY:  Objection to relevance.

2                    THE COURT:  Overruled.

3    A.  Yes.

4    Q.  And now one of the conditions -- one of those 11 conditions

5    had to do with Jason Galanis, true?

6    A.  Yes.

7    Q.  And that was that Jason Galanis have no involvement in the

8    operation of Burnham Asset Management, Burnham Securities,

9    Incorporated, Burnham Financial Group or any other

10   Burnham-related firm, true?

11   A.  Yes.

12   Q.  Now, the very same day as that meeting, August 21, 2014,

13   you also received a letter on behalf of BAM Holdings, right?

14   A.  That's correct.

15   Q.  And BAM Holdings again is this new company that was going

16   to acquire just Burnham Asset Management, right?

17   A.  Yes.

18   Q.  Now, the government showed you Exhibit 757 on direct.

19                    If we can pull that up.

20                    This is the letter, right?  This is the letter we were

21   just discussing, true?

22   A.  Yes.

23   Q.  And this is the first time that you had received

24   correspondence from BAM Holdings LLC, correct?

25   A.  I think that's correct, yes.

I6J7GAL5

1    Q.  And again the government hasn't given you the transmission

2    information, but you recall how you received this?

3    A.  Again, I don't specifically recall, but typically it's by

4    e-mail.

5    Q.  And I show you Exhibit 4345 just for the witness, the

6    lawyers and Judge Abrams.  This is that transmission e-mail,

7    true?

8    A.  Yes.

9              MR. SCHWARTZ:  I offer Exhibit 4345.

10             MR. QUIGLEY:  No objection.

11             THE COURT:  It will be admitted.

12             (Defendant's Exhibit 4345 received in evidence)

13             MR. SCHWARTZ:  Publish this, please, Mr. Jackson.

14   Q.  This is a letter from attorney Weiss to you and others,

15   subject:  Letter to BIT trustees, correct?

16   A.  Yes, he is transmitting at the request of Devon Archer and

17   Andrew Godfrey attaching a letter, yes.

18   Q.  And if you flip the pages, this attachment is the same

19   thing as Government Exhibit 757 that we looked at a second ago,

20   true?

21   A.  Yes.

22   Q.  And if we go to page 3 under item 4, this is -- I won't

23   have you read it -- but this is discussing that split of

24   Burnham Securities, Inc. and Burnham Asset Management that we

25   were talking about a second ago, correct?

I6J7GAL5

1   A.  Yes, that's correct.

2   Q.  And it outlines the ownership split of BAM Holdings LLC,

3   correct?

4   A.  Correct.

5   Q.  And was it again a requirement of the trustees or at least

6   a condition of the trustees that Mr. Archer have control of BAM

7   Holdings?

8   A.  Yes.

9   Q.  And here the letter sets forth that Mr. Archer would own 55

10  percent of the entity, true?

11  A.  Correct.

12  Q.  And if we can go to page 2, item 2, these are the first

13  representations on behalf of BAM Holdings about Jason Galanis,

14  correct?

15  A.  I'm sorry.  Could you repeat the question.  This is the --

16  Q.  This is the first time that you are receiving

17  representations on behalf of BAM Holdings LLC concerning Jason

18  Galanis.

19  A.  Yeah, on behalf of BAM Holdings, yes.

20  Q.  And it recognizes here that Jason Galanis has consulted

21  with CORFA and certain of its members, true?

22  A.  Yes.

23  Q.  Now, am I correct in saying --

24              You can take that down, Mr. Jackson.

25              Am I correct in saying that shortly after you received

I6J7GAL5

1    this letter, you believed that the deal was close to being

2    finalized?

3    A.   I think we thought we were getting there.  As I recall,

4    there was some intervening travel on the part of one of the

5    trustees as well as some additional details to be ironed out.

6    Q.   Well, let me show you -- again just for the witness, the

7    lawyers and Judge Abrams -- what has been marked as Exhibit

8    4332.  You recognize this as an e-mail between yourself and Pat

9    Colletti?

10   A.   Yes.

11   Q.   And remind us who Pat Colletti is?

12   A.   Pat Colletti, at that time he was certainly the chief

13   financial officer of the trusts, and I believe he was also

14   serving as the chief compliance officer of the trusts as well.

15   Q.   And again you reiterate those 11 points and report that you

16   think that we're very close.  True?

17   A.   Yes, I think we thought we were.

18   Q.   Now, this is August 28, 2014, correct?

19   A.   Yes.

20   Q.   Take this down, please, Mr. Jackson.

21         Are you aware that the next day, August 29, Peggy

22   Eisen sent an e-mail to Jon Burnham, Andrew Godfrey and Mr.

23   Archer that you were not copied on?

24   A.   Yes, I was.

25   Q.   It was forwarded to you by Ms. Eisen, correct?

I6J7GAL5

1    A.  Yes.

2    Q.  And that also reiterated some of the same conditions, true?

3    A.  I have to have it in front of me to say, but I expect it

4    did.

5    Q.  Well, let me show you again just for the witness, the

6    lawyers and Judge Abrams Exhibit 759.  And just flip the pages

7    for Ms. Moynihan, please.

8    A.  So, yes, there are similar conditions.

9    Q.  If you can answer this without getting into anything

10   privileged, can you tell us why the lawyers were dropped from

11   this communication.

12   A.  I think Peggy thought sometimes when you're in a

13   transaction it makes sense for principals to communicate

14   directly.

15   Q.  Right, because all of the other correspondence had been

16   through lawyers, true?

17   A.  I don't know if it had all been through lawyers.

18   Q.  But certainly all the e-mails that we looked at were lawyer

19   to lawyer, right?

20   A.  The e-mails you've shown us, yes.

21   Q.  Thank you.  You can take that down, Mr. Jackson.

22           So, I want to move now to September of 2014.  And if

23   you could bring up -- this is in evidence, so for the jury --

24   Exhibit 760.

25           This is a letter on behalf of both COR Fund Advisors

I6J7GAL5

1    and BAM Holdings to the trustees, true?

2    A.  Yes.

3    Q.  And it's directed to Peggy Eisen's attention, correct?

4    A.  Yes.  Well, the board of trustees, attention Peggy, yeah.

5    Q.  And am I correct that this is a response to Ms. Eisen's

6    e-mail?

7    A.  Yes.

8    Q.  And --

9    A.  Well, so I think there were some things going back and

10   forth at the time and various requests being made.

11   Q.  I mean there was a lot of communication at this time.

12   Fair?

13   A.  Yes.

14   Q.  Now, again there is no transmission information here.  Do

15   you recall how the trustees received this letter?

16   A.  Again, I don't specifically recall, but it was typically

17   e-mail.

18   Q.  And I show you now just for the witness, the lawyers and

19   Judge Abrams Exhibit 4333.  Now, this is an e-mail from Andrew

20   Godfrey to Peggy Eisen and others.  Do you recognize this as

21   the transmission e-mail for that letter?

22   A.  I do.  I think Peggy was trying to create a relationship

23   with Andrew Godfrey at the time.

24          MR. SCHWARTZ:  I offer Exhibit 4333.

25          MR. QUIGLEY:  No objection.

I6J7GAL5

1          THE COURT:  Admitted.

2          (Defendant's Exhibit 4333 received in evidence)

3   Q.  And if you flip the pages, you can see the attachment is

4   that same September 5, 2014 letter that's in evidence as

5   Government Exhibit 760, correct?

6   A.  Yes.

7   Q.  And so this was something that Ms. Eisen forwarded to you,

8   correct?

9   A.  Did that show she forwarded it to me?  I assume she did,

10  but I don't recall it.

11  Q.  It didn't show it.  I'm asking.

12  A.  I assume she forwarded it to me.  It may also have come to

13  me through someone else, but in any event, I got it.

14  Q.  And turning to page 3, under item 1, this is what you read

15  before on direct as this reiterates that same language from

16  that August 21 letter about Jason Galanis, correct?

17  A.  Yes.  I'm not sure because I don't have them right next to

18  me.  There was a little bit of back-and-forth on exactly -- as

19  the trustees felt the need to be extremely clear, there may

20  have been some slight difference but yes.

21  Q.  Well the August 21 letter is in evidence.  We could compare

22  that later.  I don't want to take your time doing it.

23          Now, am I correct in saying --

24          You can take that down.

25          -- at this point in time -- which was early September

I6J7GAL5

1    2014 -- CORFA, BAM Holdings, this investor group, had put in

2    excess of $5 million into Burnham Financial Group?

3    A.   I don't know that for a fact.  I think it's in the letters,

4    but I don't know it.

5    Q.   So if we go to page 5 of this exhibit, and if you look at

6    item -- I'm having trouble locating it right now.  But you see

7    in response to item 13 there is a discussion of all the money

8    that had been advanced, true?

9    A.   Yeah.  The trustees were trying to get an understanding of

10   where the money was coming from and the amounts, who was

11   contributing what, and how these companies were being valued.

12   Q.   Right.

13           And you can take that down.

14   A.   I think we were asking for a capitalization table as well.

15   Q.   Exactly.  And we will come to that in a second.

16           Now, after the independent trustees received that

17   September 5, 2014 letter, Peggy Eisen herself sent another

18   letter to BAM Holdings on September 9, correct?

19   A.   That sounds right.

20   Q.   And again that's not a communication that you were a party

21   to, but you have seen that, true?

22   A.   I don't see it in front of me right now, so I assume I'm

23   not an addressee, but I certainly was familiar with the content

24   of it.

25   Q.   Mr. Jackson, bring up for the witness, Judge Abrams and the

I6J7GAL5

1    lawyers Exhibit 4335.  And if you flip the pages.

2              You've seen this letter before, correct?

3    A.  Yes.

4    Q.  Did you write this letter, or draft it?

5              MR. QUIGLEY:  Objection.

6              THE COURT:  Overruled.

7    A.  You know, I don't recall.  It's the custom -- I mean it

8    would not be surprising if we all of us talked about it

9    together.

10   Q.  Again I don't want to get into any of the content of that,

11   but fair to say for the letters that Peggy Eisen sent on behalf

12   of the independent trustees, you had seen and commented on

13   those before they went out, true?

14   A.  I'm not sure.  I think that would be a communication

15   between me and Peggy.

16   Q.  Yeah, I don't want to get into the content of it.  My

17   question is simply whether that happened.

18   A.  I would --

19             MR. QUIGLEY:  Objection.

20             THE COURT:  Overruled.

21   A.  So.

22             WITNESS:  So I can answer that?

23             THE COURT:  Yes.

24   Q.  Just yes or no.

25   A.  Probably.

I6J7GAL5

1   Q.  Fair enough.  And, I'm sorry, I offer Exhibit 4335.

2           MR. QUIGLEY:  No objection.

3           THE COURT:  All right.  It will be admitted.

4           (Defendant's Exhibit 4335 received in evidence)

5   Q.  And, Mr. Jackson, could you publish this to the jury.  And

6   just go back to the cover e-mail for a second.  This is from

7   Peggy Eisen to Mr. Archer and Mr. Burnham and Mr. Godfrey,

8   correct?

9   A.  Yes.

10  Q.  And this was more part of trying to create kind of a

11  personal relationship?

12  A.  I don't know at this point.  I think it was just a cover

13  memo.

14  Q.  The original reason why the lawyers have been dropped from

15  the communications was to foster a personal relationship.

16          MR. QUIGLEY:  Objection.

17  A.  No, that was with respect to Andrew Godfrey who was new.

18  Q.  Who was new.

19          Now, if you turn to page 2, it's directed to Mr.

20  Burnham and Mr. Archer, correct?

21  A.  Correct.

22  Q.  And one of the things that the letter does -- which you

23  reviewed with the government in their version of the

24  document -- it asks for more information about Jason Galanis'

25  role or lack of role, correct?

I6J7GAL5

1    A.  Correct.

2    Q.  And it goes through -- I won't have you read it again --

3    but it asks for Mr. Burnham, Mr. Godfrey and Mr. Archer to

4    confirm the trustees' understanding of the state of affairs,

5    correct?

6    A.  Correct.

7    Q.  And you can take this down.

8             Am I correct, by the way, that Mr. Archer was in

9    Europe when this letter was transmitted?

10            MR. QUIGLEY:  Objection.

11   Q.  If you know.

12            THE COURT:  Sustained.

13   Q.  Now, I want to show you what is in evidence as Government

14   Exhibit 762.

15            Can you publish that, please, Mr. Jackson.

16            This appears to be CORFA and BAM Holdings' response to

17   Peggy Eisen's September 9, 2014 letter, correct?

18   A.  Correct.

19   Q.  And on page 2 you reviewed with the government in response

20   to the requests that they confirm your understanding the answer

21   is confirmed, correct?

22   A.  Correct.

23   Q.  Now, just for context, at this point in time, late

24   September 2014, it had been almost two years since Jon Burnham

25   had first started talking about selling Burnham Financial

I6J7GAL5

1   Group, correct?

2   A.   I don't know.  I mean I think it's -- certainly I started

3   May of 2013, and it had been discussed from that time.

4   Q.   OK.  So you started about 18 months before this.

5   A.   Yes, I would say the serious conversations began in the

6   fall of 2013 with the board.

7   Q.   And Jason Galanis had been in explicit discussion of those

8   conversations since at least March of 2014, true?

9   A.   I don't understand your question.

10   Q.   His name first appears in the correspondence in the meeting

11   minutes.

12   A.   In the specific correspondence, yes, but not in the

13   discussion.

14   Q.   In internal discussion you're referring to.  I don't want

15   to get into internal discussions.  That's what you were

16   referring to.  There were no discussions with CORFA about Mr.

17   Galanis prior to March 2014, true?

18   A.   I don't know.

19   Q.   Well, it's not reflected in any meeting minutes.

20   A.   It's not reflected in these materials.

21   Q.   And it's not reflected in any correspondence that you are

22   aware of, true?

23   A.   Correct.

24   Q.   And now, by the way, we've talked about these exchange of

25   letters and the meetings and things like that.  Are you aware

I6J7GAL5

1    of what if any steps had been taken to actually effect the

2    trustees' request that Jason Galanis be taken out of the deal?

3    A.   I don't know what you mean by taken out of the deal.  He is

4    not supposed to be in the deal.

5    Q.   Well, are you aware that the Thorsdale Fiduciary & Guaranty

6    Company was removed as a member of CORFA?

7    A.   Not in connection with Mr. Galanis that I'm aware of.

8    Q.   My question is are you aware that Thorsdale Fiduciary &

9    Guaranty company was removed as a member of CORFA?

10   A.   At what time?

11   Q.   Prior to October 1, 2014.

12   A.   I don't think we were aware -- I don't think I was aware of

13   that, no.

14   Q.   Now, this September 26th letter that we're looking at,

15   Government Exhibit 762, you recall how you received this

16   letter?

17   A.   This is the one that's up on the screen right now?

18   Q.   Yes.

19            If you go back to page 1.

20   A.   I don't recall, but I assume by e-mail.

21   Q.   Now, if we go to the bottom of this page, you referenced a

22   moment ago a request for a capitalization table, correct?

23   A.   Correct.

24   Q.   And the answer to question 1 is:  "We have filled in the

25   blanks on the draft capitalization table attached."  True?

I6J7GAL5

1    A.   Yes.

2    Q.   And can we go to page 2.

3         Under number 3 you ask for more information about the

4    business plan, true?

5    A.   Correct.

6    Q.   And the answer is:  "Please see supplemental information

7    attached."  Correct?

8    A.   Correct.

9    Q.   Mr. Jackson, could I ask you to flip to the last page of

10   this document.

11        Am I correct, Ms. Moynihan, that there is no

12   capitalization table attached to this document?

13   A.   You are correct.

14   Q.   And am I correct that there is no supplemental information

15   about the business plan attached to this document?

16   A.   The document that you're showing me -- I assume this is the

17   full document --

18   Q.   Those attachments are not here.

19   A.   My recollection is that that was an issue for the board.

20   Q.   Are you sure that this is the letter that you actually

21   received?

22   A.   I honestly don't know.  How would I know that?

23   Q.   I mean you testified to Mr. Quigley that this was that

24   letter.

25   A.   This is the -- this is the letter, but if it's the actual

I6J7GAL5

1    e-mail that was sent to me that's being reproduced here, I

2    really don't know.

3    Q.  Well, Mr. Jackson, can you go back to page 1 and just move

4    this over to the left side of the screen.

5               And just for the witness, the lawyers and Judge

6    Abrams, can I show you Exhibit 2038A.  And can you flip the

7    first few pages on this document, please.

8               Would you agree with me that this is another version

9    of the same letter?

10   A.  It appears to be, yes.

11              MR. SCHWARTZ:  I offer 2038A?

12              MR. QUIGLEY:  No objection.

13              THE COURT:  It will be admitted.

14              (Defendant's Exhibit 2038A received in evidence)

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I6JJGAL6                         Moynihan - cross

1    Q.  Could I ask you on the left side, 762, Government Exhibit

2    762, to go to Page 3 -- sorry -- yeah.  And on the right side

3    also go to Page 3.

4          These appear to be correct?  One is a little darker

5    than the other?

6    A.  Yeah.

7    Q.  And can I ask you to flip to the next page of the Defense

8    Exhibit 203 A on the right.  There is that, right?

9    A.  Yes.

10   Q.  Are there any more pages, Mr. Jackson?  Could you flip

11   forward.

12         Still no business plan, right?

13   A.  I assumed he flipped forward.  He has flipped forward,

14   there is no business plan attached.

15   Q.  Thank you.  Now, Mr. Jackson, can I ask you to push these

16   up to the top half.  Can I ask you to bring up on the bottom

17   left the lawyers, the witness and Judge Abrams Exhibit 4388 A.

18   If you can pull that up so the witness can see it.

19         So this version is dated September 26, 2014, like the

20   government exhibit, correct?

21   A.  Correct.

22   Q.  But if you go to the last page it has the cap table like

23   Exhibit 2038 A?  Would you agree with me?  Am I correct?

24   A.  Yes.

25   Q.  You would agree with me this is a third version of the

I6JJGAL6                          Moynihan – cross

1   document?

2   A.  Well, I don't know.  What I recall was that we were having

3   trouble getting the cap table, and that we were working with

4   them and trying to show them what a cap table actually should

5   look like.  So I don't specifically recall what you described

6   as different versions.

7            MR. SCHWARTZ:  I offer 4388 A.

8            MR. QUIGLEY:  Judge, we object on authenticity

9   grounds.

10            THE COURT:  I am going to allow it in.

11            (Defendant's Exhibit 4388 A received in evidence)

12            MR. SCHWARTZ:  Would you publish that, please, Mr.

13   Jackson and go to Page 1.  Now just for the witness, the

14   lawyers and Judge Abrams can you bring up in the bottom right

15   Exhibit 4389.

16            MR. QUIGLEY:  Your Honor, can we approach?

17            THE COURT:  Sure.

18            (Continued on next page)

19

20

21

22

23

24

25

1           (At sidebar)

2           MR. QUIGLEY:  We have seen these before.  We ask for a

3   proffer.

4           MR. SCHWARTZ:  All of these have been produced.  There

5   are multiple versions of this document.  The one I will show

6   her now is the real version, the version that has the cover

7   email.  All of these versions, including the government

8   exhibit, are not the version that were actually exchanged and

9   evolved and produced from various sources by the government.

10          (Multiple voices)

11          MR. QUIGLEY:  762 is produced by --

12          MR. SCHWARTZ:  She has no idea which is the real one.

13          The one I will show her now has the cover email and is

14   the real one.

15          THE COURT:  That is the one that was just admitted?

16          MR. SCHWARTZ:  No.  It is the one in the bottom right.

17          (Inaudible).

18          THE COURT:  She just said it is not that it can't be

19   authenticated, but there hasn't been a proper foundation laid.

20          Who do you think you can get it in through?

21          MS. MERMELSTEIN:  I don't know.

22          MR. SCHWARTZ:  I will offer it subject to connecting

23   up in the defense case.

24          THE COURT:  Do that.  That makes sense.

25          (Continued on next page)

1              (In open court)

2              (Inaudible)

3     BY MR. SCHWARTZ:

4     Q.  Do you have any idea which of these are the version of the

5     document you actually received?

6     A.  Well, I don't know how they show up here.  I know that we

7     had in our file, which we create a file of all of the

8     correspondence that is received, that we provided at some

9     point, I believe, to the government so I assume that -- that is

10    all I know.  I have no idea the provenance of any of these

11    documents is.

12    Q.  Let me show you now in the bottom-right-hand corner Exhibit

13    4389.  If you can blow up the email so the witness can see it.

14              This is an email from Andrew Godfrey to you and

15    others, correct?

16    A.  Yes.

17    Q.  And the attachment is in response to September 9, 2014

18    trustee letter dot PDF, correct?

19    A.  Correct.

20              MR. SCHWARTZ:  I offer 4389.

21              MR. QUIGLEY:  No objection.

22              THE COURT:  It will be admitted.

23              (Defendant's Exhibit 4389 received in evidence)

24    BY MR. SCHWARTZ:

25    Q.  Now, the body -- and you can publish this -- the body of

I6JJGAL6                         Moynihan - cross

1    the email says please find attached the responses to your

2    letter received September 9, 2014, accompanied by a more

3    detailed business plan.

4              Did I read that right?

5    A.  Yes.

6    Q.  Mr. Jackson, can you turn to Page 14 of this exhibit.

7              This is another version of the letter that we've been

8    looking at, true?

9    A.  I don't know.  You are showing me things on the screen.  It

10   looks like the same letter to me.

11   Q.  Flip the pages so the witness can see, please, Mr. Jackson.

12             (Pause)

13   A.  Hold on.  Are you saying that the text is different or the

14   attachments are different?

15   Q.  They're all essentially the same letter in substance, true?

16             MR. QUIGLEY:  Objection.

17             THE COURT:  Overruled.  If you can answer that?

18             THE WITNESS:  I think I'd have to sit down and look at

19   them line-by-line, but they all look roughly the same.  I don't

20   know what your question is, to be honest.

21   BY MR. SCHWARTZ:

22   Q.  The one in the bottom right, 4389, go to Page 17, this

23   version has the cap table, true?

24   A.  Okay, yes.

25   Q.  And can we go, Mr. Jackson, to Page 2 of this Exhibit 4389.

1              This version also has a supplemental business plan,

2       true?

3       A.   That seems to be there, yeah.

4       Q.   Go to Page 10, for example.  There you see --

5       A.   I can't really read that.

6       Q.   I'll blow it up for you.

7       A.   Yeah.

8       Q.   There you see revenue projections, right?

9       A.   Ah-huh.

10      Q.   And this version, 4389, this was the version that was

11      actually conveyed in that email from Andrew Godfrey, true?

12      A.   If you want to show me the email with its attachments, I

13      will take your word for it.  I don't have a piece of paper in

14      front of me to confirm that.

15      Q.   I don't want you to take my word for it but, Mr. Jackson,

16      if you could go to Page 1 of this document.  Page 1 of Exhibit

17      4389 is the email from Andrew Godfrey to yourself and others,

18      true?

19      A.   Okay.  So then if you flip it through, you will see the

20      other pages?

21      Q.   Yes.

22      A.   Of the document you just showed me?

23      Q.   We can give you a hard copy if that is easier, but I only

24      have one more question.  Can we go to Page 16 of this document.

25      Can you tell me who signed?

I6JJGAL6                          Moynihan - cross

1    A.  That does not appear -- it is addressed, signed by Devon,

2    but I don't see his signature.

3    Q.  You can take that down.  You can take those all down,

4    please, Mr. Jackson.

5              Now, following your receipt of that unsigned CORFA BAM

6    Holdings letter on September 26, 2014, there was a meeting of

7    the independent trustees on October 1st, 2014, true?

8    A.  That's correct.

9    Q.  And the purpose of that meeting was to consider approval of

10   the new investment advisory and investment sub-advisory

11   agreements, correct?

12   A.  Correct.

13   Q.  Mr. Archer was there?

14   A.  Yes.

15   Q.  And Mr. Godfrey was there?

16   A.  Yes..

17   Q.  And Mr. Burnham was there, correct?

18   A.  Yes.

19   Q.  And the government showed you the minutes from this

20   meeting, Exhibit 763?

21   A.  763, okay.  I have a book in front of me that has Defense

22   Exhibit 4391, but I think it is the same document.

23   Q.  It is up on the screen, too.

24   A.  Yeah, ah-huh.

25              (Multiple voices)

1    Q.  In that paragraph right above the No. 1, this goes through

2    all of the lengthy correspondence between CORFA, BAM Holdings

3    and the trustees that we have just reviewed, correct?

4    A.  That's correct.

5    Q.  Am I correct that the outcome of this meeting was that the

6    new investment advisory agreements were unanimously approved?

7    A.  That's correct.

8    Q.  And they were first approved by the independent trustees?

9    A.  Yes.  That's the way you usually describe it, voting

10   separately.

11   Q.  And then by the full BIT Board?

12   A.  Yes.

13   Q.  You can take that down.

14          Now, I want to jump ahead by a year, okay?

15   A.  Okay.

16   Q.  That was October 1, 2014 when the new investment management

17   agreements were approved.  Let's go to October 2015, okay?

18          There was a meeting of the trustees, the independent

19   trustees on October 19th, 2015, correct?

20   A.  That's correct.

21   Q.  And that meeting was just a few weeks after the news broke

22   that we talked about a moment ago, or not a moment ago, but

23   this morning about Jason Galanis' arrest on unrelated conduct,

24   correct?

25   A.  Yes.

I6JJGAL6                      Moynihan - cross

1    Q.  Mr. Archer explained that he was shocked by that

2    development, true?

3    A.  Yes.

4    Q.  And he thanked the independent trustees for their

5    insistence that Jason Galanis' role be circumscribed, true?

6    A.  Yes, more than circumscribed but, yes.

7    Q.  Specifically he thanked the independent trustees for their

8    insistence that Jason Galanis not be involved in the management

9    of Burnham Securities or Burnham Asset Management, correct?

10   A.  Yes -- well, the minutes say involved in management of

11   Burnham, which would be Burnham Asset Management for this

12   purpose.

13   Q.  Right.

14   A.  That is what he said.

15   Q.  Right.  Say that one more time.

16   A.  So what Mr. Galanis said, and Mr. Galanis, Mr. Archer said

17   was he thanked the independent trustees for their insistence

18   that Mr. Galanis not be involved in management of Burnham.

19   Q.  And Burnham in this context was specific to Burnham Asset

20   Management, true?

21   A.  Yes.

22   Q.  Now, Mr. Archer also said at this meeting that working

23   capital for the acquisition of Burnham Securities, Inc had been

24   intended to come from Wealth Assurance, right?

25   A.  That's correct.

1   Q.  At that same meeting Mr. Archer explained that Wealth

2   Assurance AG would no longer be a source of working capital for

3   Burnham Securities because he was cutting all ties with Jason

4   Galanis, true?

5   A.  True.

6   Q.  And Mr. Archer did, in fact, cut all ties with Jason

7   Galanis, true?

8   A.  I wouldn't know.

9           MR. QUIGLEY:  Objection.

10          THE COURT:  Sustained.

11  BY MR. SCHWARTZ:

12  Q.  Mr. Archer said that he was committed to save Burnham Asset

13  Management by finding the necessary capital, true?

14  A.  Does it say that?

15  Q.  I am asking for your memory.

16  A.  I don't recall that specifically.

17  Q.  It is correct, is it not, that following this October 19th,

18  2015 meeting, Mr. Archer brought a new investor in?

19  A.  Yes, yes, he did.  Not immediately following.

20  Q.  Excuse me?

21  A.  Not immediately following, but I think yes later.

22  Q.  Just so we're talking about the same thing, that was a

23  Toronto-based private equity fund, correct?

24  A.  Interesting that you say that.  Much later we turned to a

25  Toronto based private equity fund had been involved.  That was

I6JJGAL6                    Moynihan - cross

1   not mentioned to the board, contrary to the agreement at that

2   time we had.  We only learned that in late 2016 I think,

3   mid-2016.

4   Q.  Something called JJR Capital provided more than a million

5   dollars, correct?

6   A.  The board was never informed of that, so I have no idea.

7   We certainly didn't know that at the time.  It certainly wasn't

8   mentioned.

9   Q.  You're not aware of that?

10  A.  I was not aware, nor was it ever mentioned at a meeting I

11  was at.

12  Q.  The independent trustees also had a telephonic meeting on

13  January 12, 2016, correct?

14  A.  Yes.

15  Q.  Again Mr. Archer was not there, correct?

16  A.  That's correct.

17  Q.  But Jon Burnham was there, correct?

18  A.  Jon Burnham was there for part of the meeting, but it would

19  be helpful if I could see the minutes to refresh my

20  recollection.

21  Q.  They should be in the binder in front of you?

22  A.  I have January 19 and October 19.

23  A.  I don't have those minutes.

24  Q.  Can we bring up for the witness, the lawyers and Judge

25  Abrams Exhibit 4393.

I6JJGAL6                          Moynihan - cross

1    A.   Okay, yes.

2    Q.   Does this remind you there was a telephonic meeting on

3    January 12, 2016?

4    A.   Yes.

5    Q.   And Mr. Archer was not present?

6    A.   Yes, that's correct.

7    Q.   Was Mr. Burnham present?

8    A.   Well, it is funny on this page, I think Mr. Burnham did

9    join the call is my recollection.  I don't see him referenced

10   on this page.

11   Q.   The minutes aren't perfect, right?

12   A.   Sorry?

13   Q.   The minutes aren't perfect?

14            MR. QUIGLEY:  Objection.

15            THE COURT:  Sustained.

16   BY MR. SCHWARTZ:

17   Q.   The trustees met again on January 19th, 2016, right?

18   A.   Yes.

19   Q.   This meeting took place at the offices of Burnham Asset

20   Management, right?

21   A.   Yes.

22   Q.   Burnham Asset Management was still the investment adviser

23   for the Burnham Investors Trust at that point, correct?

24   A.   Yes.

25   Q.   And Mr. Archer was present, true?

I6JJGAL6                          Moynihan - cross

1   A.  Yes.

2   Q.  And Mr. Burnham was present, true?

3   A.  Yes.

4   Q.  At that meeting Mr. Archer acknowledged all of the

5   trustees' concerns, correct?

6   A.  I am sorry.  Could you repeat the question.

7   Q.  Mr. Archer acknowledged all of the trustees' concerns,

8   correct?

9   A.  Mr. Archer acknowledged -- which concerns are you referring

10  to?

11  Q.  The concerns that were expressed in that meeting and over

12  time?

13  A.  Is that in the minutes?  I don't have a specific

14  recollection of that.  I believe the discussion at that time

15  was regarding Burnham Securities.

16  Q.  I am always asking for your recollection.  The minutes are

17  there just as an aid to your memory, okay?

18  A.  Yes.  Well, I don't recall anything.  I think we discussed

19  the situation with Burnham Securities.

20  Q.  One of the things that Mr. Archer said in that meeting was

21  that he had been duped in a sophisticated con, true?

22  A.  Yes, I think he did say that.

23  Q.  Now, the independent trustees met again on February 25th,

24  2016, right?

25  A.  Yes, we did -- or they did.

I6JJGAL6                           Moynihan - cross

1   Q.  You were there, true?

2   A.  Yes, I was.

3   Q.  Now, at that point the SEC had filed a civil lawsuit

4   against Atlantic Asset Management, correct?

5   A.  I think so, yes.  I had found, I had found a complaint on

6   the internet.

7   Q.  That was one of of the things discussed at that meeting,

8   true?

9   A.  Yes.

10  Q.  Mr. Archer was invited to participate in that meeting,

11  correct?

12  A.  Yes.

13  Q.  And one of the things that was discussed was you told him

14  that you had found that complaint, you had looked at it, true?

15  A.  That's correct.

16  Q.  You said that you thought that he was one of the people

17  unidentified who was discussed in that complaint, true?

18  A.  I actually didn't say that.  When we found the complaint,

19  we asked Drinker Biddle if they would please tell us and

20  Burnham Asset Management what had happened and whether any of

21  the people mentioned in the complaint were related.

22          They reported back the answer was no.  So when I asked

23  the question, I simply said was Mr. Archer one of the people in

24  the complaint because it appeared that he could have been?  I

25  didn't say I thought one way or the other.  I was just asking

1  the question.

2  Q.  Didn't you say that based on your reading of the complaint,

3  one of the unnamed persons had certain characteristics in

4  common with Mr. Archer?

5  A.  Correct, and those were the same reasons we flagged it to

6  Drinker Biddle.

7  Q.  Mr. Archer said he was not one of those people, true?

8  A.  That's correct.

9  Q.  That is true, he was not one of those people, correct?

10  A.  I don't know.

11  Q.  Isn't it true that the unnamed people in the SEC's

12  complaint against Atlantic Asset Management were Jason Galanis,

13  Hugh Dunkerley, Gary Hirst, Michelle Morton and Richard Deary?

14  A.  I have no knowledge of that.  This was just a due diligence

15  thing to ensure that there were no issues.

16  Q.  You had to ask the question, right?  Is that a yes?

17  A.  That's a yes.

18  Q.  You had to ask the question because at that time Burnham

19  Asset Management was still the investment adviser, true?

20  A.  Correct.

21  Q.  Fair to say at that point, though, the writing was on the

22  wall?

23  A.  What writing?

24  Q.  That the investors' trust were going to move their funds to

25  a new asset manager?

1   A.  No.

2   Q.  No?  So even at that point, in February of 2016, that was

3   not decided?

4   A.  That's correct.

5   Q.  Am I correct, however, that the trustees did eventually

6   move their money from Burnham Asset Management?

7   A.  Yes, they changed investment adviser.

8   Q.  By the way, am I correct that those funds have continued to

9   grow?

10          MR. QUIGLEY:  Objection; relevance.

11          THE COURT:  Overruled.

12  A.  I don't think so.  I think it is about the same.

13  Q.  But to be clear, none of the trustee money was ever

14  invested in Wakpamni bonds, true?

15  A.  True.

16  Q.  None of it was ever invested through Atlantic or Hughes,

17  true?

18  A.  I don't know what you mean by that, but none of the assets

19  of the funds were ever invested in that way, no.

20  Q.  Everything was done through Burnham Asset Management,

21  right?

22  A.  Burnham Asset Management was the investment adviser to the

23  funds, and it was their job to invest the assets of the funds

24  in the permitted investments that were set out in the

25  prospectuses.

1    Q.  Right.

2    A.  And that we made sure that occurred.

3    Q.  My point is Burnham Asset Management was the only relevant

4    investment adviser that the trust used during this entire time

5    period?

6    A.  That's correct.  We were just becoming aware of the

7    situation with the bonds, whether that was Burnham Securities.

8    Q.  That was something you were just learning about like the

9    rest of us in early 2016?

10              MR. QUIGLEY:  Objection.

11              THE COURT:  Sustained.  Rephrase that.

12   BY MR. SCHWARTZ:

13   Q.  That is something you were just learning about in early

14   2016?

15              MR. QUIGLEY:  Objection; relevance.

16              THE COURT:  I'll allow it.

17   A.  Can you rephrase the question so I know what you want, what

18   were we learning about.

19   Q.  The trustees were just learning about these Wakpamni bonds

20   in early 2016?

21   A.  So to be clear, at that time we were coming to an

22   understanding that some bonds had been posted --

23   Q.  I don't want you to get into the attorney-client stuff.

24   A.  It is not attorney-client.  They had just come to

25   understand that some bonds had been posted to net capital of

1   Burnham Securities that were not permitted to be posted as net

2   capital.

3   Q.  Right.

4   A.  They were not qualified.

5   Q.  I am simply confirming that that came to the attention of

6   the trustees in early 2016, correct?

7   A.  The net capital issue, yes.  None of the other issues, just

8   the fact that an Indian bond is not the type of bond that can

9   be used for net capital, so there are rules about what kind of

10  assets you can post, and apparently we can't post that kind of

11  asset.

12  Q.  My point is simply this:  The first time the trustees heard

13  anything about Indian bonds in connection with any of the

14  Burnham entities was around this net capital issue in early

15  2016?

16  A.  Yes, that's correct.

17          MR. SCHWARTZ:  Thank you very much, Ms. Moynihan.  I

18  don't have any other questions.

19          THE COURT:  Any additional cross-examination?

20  CROSS EXAMINATION

21  BY MR. HASSAN:

22  Q.  Good afternoon, Ms. Moynihan.

23  A.  Hello.

24  Q.  We have never met.  Let me introduce myself.  I am Abraham

25  Hassan, attorney for Bevan Cooney.

1    A.  Nice to meet you.

2    Q.  We have never met before?

3    A.  I don't think so, no.

4    Q.  We have never talked on the phone or anything?

5    A.  Correct.

6    Q.  You actually haven't met Bevan Cooney before, either?

7    A.  That's correct.

8    Q.  Never spoke with him or exchanged emails with him?

9    A.  I think that's correct.  I certainly never spoke with him.

10   I don't know if he was ever in any email exchanges, but I don't

11   think so.

12   Q.  You don't remember?

13   A.  No.

14   Q.  You do know a little bit about him?

15   A.  I know very little, actually.

16   Q.  You did some cursory due diligence, basic due diligence?

17   A.  We hired a private investigator, the board did, as part of

18   its due diligence.

19   Q.  You reviewed those materials?

20              MR. QUIGLEY:  Objection.

21              THE COURT:  Overruled.

22   BY MR. HASSAN:

23   Q.  Because he was a minor shareholder in one of the companies

24   that prospectively purchased Burnham?

25   A.  Correct.

I6JJGAL6                        Moynihan - cross

1    Q.  Did you learn that he owned clubs and bars in his past?

2             MR. QUIGLEY:  Objection; hearsay.

3             THE COURT:  Sustained.

4    BY MR. HASSAN:

5    Q.  You learned the general nature of his prior business

6    experience?

7    A.  You know, I don't specifically recall that.  They were very

8    dry reports.

9    Q.  You learned that he did have a history in high finance?

10            MR. QUIGLEY:  Objection.

11            THE COURT:  Sustained.

12   BY MR. HASSAN:

13   Q.  You learned some basic details about who he was and what

14   his past financial dealings were?

15            MR. QUIGLEY:  Objection.

16            THE COURT:  Sustained.

17   BY MR. HASSAN:

18   Q.  On your direct examination and on a part of the

19   cross-examination, you spent a significant time talking about

20   the role of Jason Galanis, Jason Sugarman, John Moran and

21   others?

22   A.  I am sorry.  I don't understand your question.

23   Q.  You spent a lot of time talking about what their respective

24   roles were.  There was a lot of back-and-forth about that.

25   A.  I answered the questions I was asked, yes.

1  Q.  During this whole course of dealings with the potential

2  acquiring of Burnham, that was an area of conversation and area

3  of negotiation?

4  A.  By "that," you mean the relationships with Mr. Galanis and

5  Mr. Sugarman?

6  Q.  Yes.

7  A.  Yes.

8  Q.  You were concerned about their history?

9  A.  I wasn't concerned specifically.  I was the independent

10  trustee.  I was their counsel.  The independent trustees --

11  Q.  (Multiple voices)

12  A.  Had concerns, yes.

13  Q.  And you were concerned particularly about the role

14  specifically of Jason Galanis, but what role others might play

15  in the new entity?

16  A.  Correct.

17  Q.  You were concerned about what kind of influence they might

18  have on the Burnham entities?

19  A.  We were concerned about reputation that they would have and

20  also possible past dealings.

21  Q.  You were concerned about reputation and you were concerned

22  about what role they had, you were concerned about what

23  influence they might have?

24  A.  The board's role is to protect the assets of the trust.

25  Q.  It is fair to say in all of these conversations and in all

1  of the meetings, Bevan Cooney wasn't a major topic of

2  conversation?

3  A.  I don't recall discussing Mr. Cooney in any great detail.

4  Q.  It is fair to say he wasn't a major topic of conversation,

5  you don't recall a single conversation about him?

6  A.  I don't recall discussing him, no.  Maybe once or twice.

7  Q.  Because Bevan Cooney wasn't ever contemplated as a director

8  of any of the entities or organizations in Burnham?

9  A.  I don't recall.

10  Q.  You don't recall?

11  A.  I actually don't recall.

12  Q.  You mentioned specifically that certain people shouldn't

13  be -- you wanted it to be clear certain people shouldn't be,

14  have positions as employees, directors or officers?

15  A.  So the Board of Trustees in the conditions required certain

16  enumerated people would not have any associations whatsoever

17  with the Burnham Asset Management, Burnham Investors Trust,

18  Burnham Securities or the Burnham Financial Group.

19  Q.  And Bevan Cooney wasn't one of those people who was --

20  A.  I think that's right, unless he was included.  I don't

21  think so.  I don't think he was one.  We had a group of people,

22  so-called Sugarman parties, but I don't think it included him.

23  I would have to double-check.  Well, let me look.  It is not in

24  here.  I don't know.  I don't think so, no.

25  Q.  You don't think his name ever came up specifically?

I6JJGAL6                    Moynihan - redirect

1   A.   I don't recall it coming up.

2   Q.   Because his role in this, as far as your understanding is,

3   he was a minor shareholder in one of the entities?

4   A.   That's correct, although I do think that the trustees did

5   have some concerns with the whole group of people, and I can't

6   say if Mr. Cooney was specifically one of those people.

7   Q.   You can't say specifically he was one of those people

8   because his name didn't really come up?

9   A.   I don't recall.

10              MR. HASSAN:   Thank you.

11              THE COURT:   Mr. Touger, do you have any questions?

12              MR. TOUGER:   No questions.

13              MR. QUIGLEY:   Ms. Sheinwald, can we pull up what is in

14   evidence as Government Exhibit 763 and go to the third page.

15   Stay right there a second.

16   REDIRECT EXAMINATION

17   BY MR. QUIGLEY:

18   Q.   Ms. Moynihan, this is the minutes of the board meeting on

19   October 1, 2014, right?

20   A.   Correct.

21   Q.   And Mr. Archer, this one of the meetings Mr. Archer was

22   present?

23   A.   Yes.

24   Q.   If you could look down at the bottom of the page next to

25   THE exhibit tab, do you see where it says Burnham underscore

I6JJGAL6                    Moynihan - redirect

1      0216?

2      A.  Yes.

3      Q.  And Burnham underscore was -- this document -- without

4      getting into any privileged communications, this was a document

5      that the board produced to the government in this case.  Is

6      that right?

7              MR. SCHWARTZ:  Objection; leading.

8              THE COURT:  Why don't you rephrase without the

9      leading.

10     BY MR. QUIGLEY:

11     Q.  Who produced these minutes to the government in this case?

12     A.  Burnham Investors Trust, the trust did -- or actually --

13     yes, the trust.

14     Q.  And Burnham underscore 0216 was put on there by, before it

15     was produced?

16             MR. SCHWARTZ:  Objection; leading.

17             THE COURT:  Sustained.

18     BY MR. QUIGLEY:

19     Q.  Do you know what the Bates prefix that Burnham Investors

20     Trust put on all the documents that are produced to the

21     government?

22     A.  That looks like one of the documents.  What I can tell you,

23     these are from our file.  We produced them at the request of

24     Burnham, and I assume they made their way to the government.

25     Q.  If you can look at Government Exhibit 762, this was a

I6JJGAL6                    Moynihan - redirect

1  document -- was this document -- what's the Bates stamp on this

2  document?

3  A.   That little number down there says ID Burnham 0177.

4  Q.   Does that indicate this document was received by Burnham

5  Investors Trust?

6  A.   I don't know that, but I would think that's correct.

7  Q.   You were asked some questions at the very end of Mr.

8  Schwartz's cross about the fact that you did not change the

9  investment adviser relationship with Burnham Asset Management

10  immediately in 2016?

11  A.   That's correct.

12  Q.   In your experience, how easy is it to change the

13  investment, an investment advisory agreement?

14  A.   It has only been done four times since the 1940 Act was

15  adopted, so it is very difficult.

16  Q.   You were asked some questions by Mr. Cooney's counsel about

17  whether the board had any concerns about Mr. Cooney.  Do you

18  recall that?

19  A.   Yes.

20  Q.   I think you said you didn't recall?

21          MR. QUIGLEY:  May I approach?

22          THE COURT:  Yes.

23  BY MR. QUIGLEY:

24  Q.   I am showing the witness what is marked for identification

25  as Defense Exhibit 4329.  If you can look at the whole thing,

1    but look at the paragraph labeled 1.  Does that refresh your

2    recollection as to?

3    A.  This was the question I --

4    Q.  The question is, does that refresh your recollection?

5    A.  It does.

6    Q.  Did the board express concerns about Mr. Cooney's

7    involvement in the transaction?

8    A.  Yes, he was one of the Sugarman parties.

9              MR. QUIGLEY:  No further questions.

10             THE COURT:  Any additional cross?

11             MR. SCHWARTZ:  I have two questions.

12   RECROSS EXAMINATION

13   BY MR. SCHWARTZ:

14   Q.  I just think I did not understand.

15             A moment ago you testified that something had only

16   happened four times since the '40 Act was passed?

17   A.  A contentious removal or a vote by a Board of Trustees to

18   take funds from an adviser is very rare, and to my knowledge,

19   it has only been done four times.

20   Q.  But funds can change investment advisers through contract

21   or other processes, true?

22   A.  If an adviser frequent -- frequently an adviser will sell

23   itself to a different adviser, and the board does, but that is

24   consensual and agreed to.

25   Q.  In any case, as we talked about a moment ago, as of the

I6JJGAL6                          McMillan - direct

1    February 2016 meeting, the trust had not decided to change

2    investment advisers, true?

3    A.   The independent trustees had not yet decided at that time.

4              MR. SCHWARTZ:  Thank you.

5              MR. QUIGLEY:  Nothing further.

6              THE COURT:  Thank you.  You may step down.

7              (Witness excused)

8              THE COURT:  Ladies and gentlemen, why don't we take

9    our afternoon break.  Keep an open mind and don't discuss the

10   case.

11             (Jury excused)

12             THE COURT:  See you in 10 minutes.

13             (Recess)

14             THE COURT:  You may be seated.  Is everyone ready for

15   the jury?

16             MR. SCHWARTZ:  Yes.

17             THE COURT:  Good.  Thank you.

18             (Jury present).

19             THE COURT:  You may be seated.  Thank you.

20    MARK MCMILLAN,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MS. TEKEEI:

25   Q.  Mr. McMillan, good afternoon.  Where do you live?

1    A.  I live in a suburb of the Phoenix area of Arizona.

2    Q.  Where do you currently work?

3    A.  I have an office I'm opening August 1st on the west side of

4    Phoenix.

5    Q.  What sort of work do you currently do?

6    A.  I'm an insurance agent.

7    Q.  Mr. McMillan, did there come a time when you began working

8    for John Galanis?

9    A.  Yes.

10   Q.  Describe how that came about.

11   A.  I had been working with his son, Derrick, writing articles,

12   giving advice how to trade the market, the stock market.  I was

13   getting a stipend for that, a relatively modest stipend.  I

14   needed more funds, so I told Derrick is there anything you can

15   find me to get more income, and he introduced me to his father.

16   Q.  Approximately when was that?

17   A.  2010.

18   Q.  So going back to when you first met John Galanis in

19   approximately 2010, what, if anything, did he propose to you

20   with respect to work?

21   A.  He said he had a couple of ventures that were doing

22   investments and I could come on as the manager of those

23   companies.

24   Q.  Did he tell you that you could act as an administrator on

25   some of the accounts related to those companies?

1                 MR. TOUGER:  Objection; leading, your Honor.

2                 THE COURT:  You can answer that, but just watch the

3      leading, please.

4                 THE WITNESS:  That was actually my primary role.

5      BY MS. TEKEEI:

6      Q.  Did he propose to you at that time how you would be

7      compensated?

8      A.  Yes.

9      Q.  What was that?

10     A.  It was $3,000 for each of the two entities that I would

11     manage.

12     Q.  So did you begin working for him?

13     A.  Yes.

14     Q.  Would you recognize John Galanis if you saw him again?

15     A.  Yes.

16     Q.  Do you see him in the courtroom today?

17     A.  Yes.

18     Q.  Can you point him out and identify an item of clothing he

19     is wearing.

20                MR. TOUGER:  We'll stipulate.

21                THE COURT:  You'll stipulate?

22                MR. TOUGER:  Yes.

23                THE COURT:  All right.

24                MS. TEKEEI:  Let the record will reflect the

25     witness --

I6JJGAL6                      McMillan - direct

1           THE COURT:  Has identified Mr. Galanis.

2    BY MS. TEKEEI:

3    Q.  Mr. McMillan, can you describe in general terms the type of

4    work you did for John Galanis from approximately 2010 through

5    2013.

6    A.  I functioned primarily in an administrative or clerical

7    role.  I would act as the manager of LLCs, put the company

8    formation documents through.  I would open and/or close

9    brokerage accounts and bank accounts and other tasks that would

10   be aligned with those primary roles.

11   Q.  To whom did you report during that time period?

12   A.  To John Galanis.

13   Q.  Did John Galanis give you instructions about the work that

14   you were doing during that time period?

15   A.  Yes.

16   Q.  I think you mentioned bank accounts.

17           What, if any, instructions did John Galanis give you

18   about who could direct you to make disbursements or engage in

19   transactions within those bank accounts?

20   A.  John Galanis, an attorney named Barry Feiner and another

21   attorney named Jared Galanis.

22   Q.  Did there come a time when you asked him for clarification

23   on that?

24   A.  Yes.

25   Q.  What did you ask him?

I6JJGAL6                          McMillan - direct

1    A.  I asked him if that specifically excluded his son Jason and

2    his son Derrick.

3    Q.  What did he say?

4    A.  He said yes, they are excluded.

5    Q.  Did you ever meet Jason Galanis?

6    A.  Yes.

7    Q.  Approximately when?

8    A.  Approximately one year before I met John Galanis.

9    Q.  In general terms, had you ever done any work with Jason

10   Galanis?

11   A.  Yes.

12   Q.  Now, did you get paid for the work that you did for John

13   Galanis in approximately 2010 through 2013?

14   A.  Yes.

15   Q.  Approximately how much did you get paid per month?

16   A.  Approximately $6,000 to $6,500.

17   Q.  Mr. McMillan, did there come a time when you learned about

18   an entity called Sovereign Nations Development Corp.?

19   A.  Yes.

20   A.  Yes.

21   Q.  When was that?

22   A.  August of 2014.

23   Q.  Describe how you learned about it.

24   A.  John had a conference call between himself, myself and

25   Barry Feiner, the previously-mentioned attorney.

1    Q.  What, if anything, did John Galanis say on that phone call?

2    A.  There was a new venture coming, and we needed to form a

3    legal entity for that venture, that Barry would take care of

4    pulling that together and getting it to me so that I could

5    sign.

6    Q.  What do you mean when you say, "venture"?

7    A.  I had managed LLCs for John, and I thought this was

8    actually going to be another LLC, so I was familiar with the

9    structure; and, therefore, you have a legal entity to be able

10   to operate from.

11   Q.  What, if anything, did John Galanis say about the name of

12   this entity during that phone call?

13   A.  It would be called Sovereign Nations Development.

14   Q.  What, if anything, did he say about the type of business

15   Sovereign Nations Development would be engaged in during that

16   phone call?

17   A.  I'm not sure that he clarified it during that phone call.

18   I believe it was shortly thereafter.

19   Q.  What was the plan for setting up the company after that

20   phone call?

21   A.  Barry would create the formation documents, get them over

22   to me for signature and then submit them.

23   Q.  Did you have another conversation with John Galanis shortly

24   after this conference call with Barry Feiner?

25   A.  Yes.

1   Q.  What, if anything, did John Galanis say during that phone

2   call?

3   A.  We wouldn't be using an LLC for the structure of the

4   company, we would be using a C Corp..

5   Q.  Can you describe your understanding of the difference

6   between the LLC structure and the C Corp. structure as it

7   related to this new entity that John Galanis had proposed?

8           MR. TOUGER:  Objection.

9           THE COURT:  Overruled.

10  A.  An LLC has a manager or a managing member and members.

11  That's the structure of an LLC.  The manager's in charge of

12  operating the LLC for the members and all income is passed

13  through to the members.

14          A C Corp. has officers that perform the functions of,

15  say, the equivalent of the manager, and they have stockholders

16  as opposed to members and it is a double-taxation structure

17  where the C Corp. pays taxes on income and then any

18  disbursements to shareholders are also taxed.

19  Q.  What, if anything, did John Galanis say about the timing of

20  setting up the C Corp.?

21  A.  It should be done immediately.

22  Q.  Did he say why?

23  A.  Funding would be incoming and we needed to have the entity

24  open.

25  Q.  Did you follow John Galanis' instructions to set up the

I6JJGAL6                          McMillan - direct

1   corporation?

2   A.  I did.

3   Q.  Did there come a time when you set up bank accounts in the

4   name of Sovereign Nations Development Corp.?

5   A.  Yes.

6   Q.  Approximately when was that?

7   A.  Approximately one day after we received the formation

8   documents from the Secretary of State of Delaware.

9   Q.  At whose direction did you set up those bank accounts?

10  A.  John Galanis.

11  Q.  Was money transferred into those bank accounts?

12  A.  Yes.

13  Q.  Approximately when was that?

14  A.  Within a week of setting up the bank account.

15  Q.  How much money was transferred in?

16  A.  $2.35 million.

17  Q.  At that time had you heard of an entity called the Wakpamni

18  Lake Community Corporation?

19  A.  No.

20  Q.  Had you heard of bonds issued by the Wakpamni Lake

21  Community Corporation?

22  A.  No.

23  Q.  What, if anything, did you do with that $2.35 million?

24  A.  I disbursed funds when instructed to do so.

25  Q.  At whose instructions did you disburse those funds?

1    A.   John Galanis.

2    Q.   Approximately, during approximately which months did you

3    make those transfers at John Galanis' directions?

4    A.   The vast majority of transfers were from approximately the

5    2nd of September through the end of December of 2014.

6    Q.   By the end of December of 2014, how much, approximately how

7    much money of that $2.35 million was left in the Sovereign

8    Nations Development Corp. bank accounts?

9    A.   Not much more than needed to keep a bank account open.

10   Q.   So approximately how much was left in the checking account

11   by December of 2014?

12   A.   I think it was less than 1,000.  It was certainly less than

13   $10,000.00.

14   Q.   Approximately how much was left in the savings account in

15   approximately the end of December of 2014?

16   A.   A little under $20,000.

17   Q.   Just generally speaking, and we'll go through this in a

18   little bit, but where was that money disbursed?

19            MR. TOUGER:  Objection.

20            THE COURT:  I'll allow it.

21   A.   The money was disbursed to any number of sources, John and

22   his family, myself, business entities that I didn't recognize

23   the names, I didn't recognize some to a jewelry store, car

24   dealerships.

25   Q.   I think you mentioned this, but did you transfer some of

1   that money to yourself?

2   A.  I did.

3   Q.  Approximately how much?

4   A.  A little under a hundred thousand dollars.

5   Q.  Mr. McMillan, are you testifying here pursuant to an

6   immunity order?

7   A.  I am.

8   Q.  Did you refuse to testify absent such an order?

9   A.  I did.

10  Q.  Do you understand that because the court has entered the

11  immunity order, your testimony here today cannot be used

12  directly against you in a criminal prosecution?

13  A.  Yes.

14  Q.  Do you understand that even with a grant of immunity for

15  your testimony, you can still be prosecuted for the actions you

16  are about to discuss?

17  A.  That's clear.

18  Q.  How are you hoping your testimony will affect the

19  likelihood that you are prosecuted?

20  A.  I would hope that it would reduce the likelihood I would be

21  prosecuted.

22  Q.  Has anyone made any promises to you to that effect?

23  A.  No.

24  Q.  What is your understanding of whether the immunity order

25  protects you if you lie today?

I6JJGAL6                        McMillan - direct

1   A.  It certainly does not protect me if I lie.

2   Q.  I'd like to go back to August of 2014 after the phone calls

3   with John Galanis that you just described.  Can you describe

4   for the jury what steps you took to set up the entity Sovereign

5   Nations Development Corp.

6   A.  Yeah, I waited to receive an email with documents from

7   Barry Feiner who had constructed them so that I could sign it,

8   scan it and send it back to him for submission to the Secretary

9   of State of Delaware.

10  Q.  What sorts of documents were those?

11  A.  There was two, a standard form when you're forming a

12  company and there was also a document, a resolution defining

13  authority to transact business for the entity.

14          MS. TEKEEI:  At this time I would like to move in some

15  exhibits.

16          THE COURT:  Go ahead.

17          MS. TEKEEI:  Government Exhibit 1112, Government

18  Exhibits 1510 through 1514, Government Exhibits 3400 to 3409,

19  Government Exhibit 3411, Government Exhibit 3414 through 3422,

20  and Government Exhibits 3428, 3429 and 3431 through 3466.

21          THE COURT:  Any objection?

22          MR. TOUGER:  No, your Honor.

23          THE COURT:  They will be admitted.

24          (Government's Exhibits 1112, 1510-1514, 3400-3409

25  received in evidence)

1          (Government's Exhibits 3411, 3414-3422, 3428, 3429,

2     3431-3466 received in evidence)

3          MS. TEKEEI:  Thank you.  Ms. Sheinwald, please publish

4     to the jury what is now in evidence as Government Exhibit 1112.

5     If you, Ms. Sheinwald, can turn to the second page of this

6     document.

7     BY MS. TEKEEI:

8     Q.  Mr. McMillan, do you recognize this document?

9     A.  Yes.

10    Q.  What is it?

11    A.  That is the first document I alluded to which is the form

12    to be filled out to, perhaps the form that comes from actually

13    the State of Delaware after you fill out the application.

14    Q.  Is this a certificate of incorporation?

15    A.  It is.

16    Q.  Why was this entity incorporated in Delaware?

17         MR. TOUGER:  Objection, your Honor.

18         THE COURT:  Overruled.

19    A.  I believe it was because --

20         MR. TOUGER:  Objection.

21         THE COURT:  Do you know why it was incorporated in

22    Delaware?

23         THE WITNESS:  It is fast.

24         THE COURT:  Sorry?

25         THE WITNESS:  It is a fast process.

I6JJGAL6                          McMillan - direct

1          THE COURT:  All right.  I overrule the objection.

2     BY MS. TEKEEI:

3     Q.   Let's go through some of the information here, Mr.

4     McMillan.  What is the formal name of the corporation?

5     A.   Sovereign Nations Development Corporation.

6     Q.   Who provided that name for the corporation?

7     A.   John Galanis.

8     Q.   Can you read the sentence beginning with third.

9     A.   "The purpose of the corportion is to engage in any lawful

10    act or activity for which corporations may be organized under

11    the general corporation law of Delaware."

12    Q.   And then looking at the next sentence, can you read the

13    sentence with Fourth.

14    A.   "The amount of the total stock of this corporation is

15    authorized to issue is 200 shares (number of authorized shares)

16    with a par value of no par per share."

17    Q.   What is your understanding of what that means, the 200

18    shares?

19    A.   My understanding is the ownership of the company is divided

20    into 200 shares, so you would own, for instance, 1 percent of

21    the company if you owned two shares.

22    Q.   Did Sovereign Nations Development Corp. ever issue shares?

23    A.   No.

24    Q.   What is the date of incorporation as is reflected in this

25    certificate of incorporation?

1   A.  The 21st day of August 2014.

2           MS. TEKEEI:  Ms. Sheinwald, if you can put that

3   exhibit to the left and pull up what is Government Exhibit 1510

4   to the right.

5   BY MS. TEKEEI:

6   Q.  Mr. McMillan, do you recognize Government Exhibit 1510?

7   A.  Yes.

8   Q.  What is this?

9   A.  That's the one that I signed.

10  Q.  Did you submit this to the State of Delaware?

11  A.  I sent it to Barry, who submitted it.

12  Q.  Now, I'd like to show you Government Exhibit 1511.  What is

13  this document?

14  A.  This is that second document I referred to, which is a

15  resolution granting me sole authority to transact business for

16  the corporation.

17  Q.  What is the title of this document, sir?

18  A.  "Written Consent of Sole Director."

19  Q.  What does it mean to be the sole director of Sovereign

20  Nations Development Corp.?

21  A.  There's no one other than the named director who has

22  authority to take action for the corporation.

23  Q.  In actuality, did you make decisions for the corporation on

24  your own on a day-to-day basis?

25  A.  No.

I6JJGAL6                        McMillan - direct

1   Q.  Did you follow directions from anyone?

2   A.  Yes.

3   Q.  Whose directions did you follow?

4   A.  John Galanis.

5   Q.  What is the date of this corporate resolution?

6   A.  The 22nd day of August, 2014.

7   Q.  Whose signature is that at the bottom?

8   A.  That's my signature.

9   Q.  So I'd like to direct you to the paragraph that begins with

10  the second paragraph that begins with resolved.  Who is

11  appointed to be the president of Sovereign Nations Development

12  Corp.?

13  A.  Myself.

14  Q.  And the secretary?

15  A.  Myself.

16  Q.  And vice president and treasurer?

17  A.  Myself.

18  Q.  And then going back to the third resolution listed here,

19  can you read that, please.

20  A.  "Resolved that the appropriate officers open a bank account

21  with Wells Fargo Bank on behalf of the company."

22  Q.  The very last resolution here, what authority does that

23  resolution give to you?

24  A.  Basically to conduct business.  Do you want me to be

25  explicit?

1    Q.  I think that's fine.

2         Just focusing on the clause in the middle of that

3    paragraph, "in such officer's sole discretion"?

4    A.  Yes.

5    Q.  What did you understand that to mean?

6    A.  I'm the only one who can make the decisions.

7    Q.  In actuality, were you the one who made decisions with

8    respect to Sovereign Nations Development Corp.?

9    A.  No.

10   Q.  Who made those discussions?

11   A.  John Galanis.

12   Q.  Now, did there come a time -- thank you, Ms. Sheinwald, we

13   can take that down -- when you opened up bank accounts at Wells

14   Fargo Bank in the name of Sovereign Nations Development Corp.?

15   A.  Yes.

16   Q.  Why did you do that?

17   A.  I was directed to do that.

18   Q.  By whom?

19   A.  John Galanis.

20   Q.  When you opened those accounts, was there any money to put

21   into the accounts at that time?

22   A.  I took $50.00 of my own funds to open the accounts.

23   Q.  What, if anything, did Mr. Galanis tell you about whether

24   there would be funds in that account?

25   A.  Funds would be incoming shortly.

1   Q.  Did he tell you how much?

2   A.  No.

3   Q.  Did he tell you where those funds would be coming from?

4   A.  No.

5        MS. TEKEEI:  Ms. Sheinwald, can you please publish

6   Government Exhibit 623.

7   Q.  Mr. McMillan, this is both on the screen and in the binder

8   that is next to you.  If it is easier to follow along with the

9   hard copy, but my first question is do you recognize this

10  document?

11  A.  I do.

12  Q.  Can you describe generally what it is.

13  A.  It's the application to open a bank account at Wells Fargo.

14  Q.  Which Wells Fargo branch was this application submitted?

15  A.  It was the branch on the corner of Baseline and Lakeshore,

16  I believe is the street.

17  Q.  In what city and state?

18  A.  In Tempe, Arizona.

19  Q.  Did John Galanis live in Arizona at that time?

20  A.  No.

21  Q.  Now, turning to the fourth page of this application, whose

22  signature appears on this last page?

23  A.  In three boxes, that's my signature.

24  Q.  What was the date that you signed this form?

25  A.  August 22, 2014.

I6JJGAL6                          McMillan - direct

1   Q.  Is that the same date as the corporate resolution we just

2   reviewed?

3   A.  I believe it was, actually, yes.

4   Q.  Now, turning back to the very first page of this document,

5   who filled out the information on this form?

6   A.  A banker named Sean Erickson.

7   Q.  Who provided the information to the bank representative?

8   A.  I did.

9   Q.  What types of accounts did you open that day in the name of

10  Sovereign Nations Development Corp.?

11  A.  One checking and one savings account.

12  Q.  Who is listed as the sole owner of those accounts?

13  A.  Sovereign Nations Development Corporation.

14  Q.  Who is listed as the signatory on those accounts?

15  A.  Myself.

16  Q.  Why didn't you list John Galanis as an owner?

17            MR. TOUGER:  Objection.

18            THE COURT:  Overruled.

19            MR. TOUGER:  May we approach?

20            THE COURT:  Yes.

21            MR. TOUGER:  I withdraw the objection.

22            THE COURT:  The objection is withdrawn.

23  BY MS. TEKEEI:

24  Q.  Why didn't you list John Galanis as the sole owner?

25  A.  John wasn't an officer of the corporation.

1   Q.  Why didn't you list him as a signatory?

2   A.  The only person authorized on the corporate form was

3   myself.

4   Q.  What is the date listed here for date originally

5   established?

6   A.  The 22nd of August 2014 -- sorry.  That is the date of this

7   application.

8   Q.  Let me hold on for just one moment.

9           MS. TEKEEI:  Ms. Sheinwald, if you can turn to the

10  second page of this document.

11  Q.  If you could look at the middle section, Mr. McMillan, what

12  is the date listed for date originally established?

13  A.  The day before, August 21st, 2014.

14  Q.  Do you see just below that where it says annual gross

15  sales?

16  A.  Yes.

17  Q.  What is the amount listed there?

18  A.  $2 million.

19  Q.  Just next to that it says year sales reported, do you see

20  that?

21  A.  I do.

22  Q.  What is the date listed there?

23  A.  December 31st of 2013.

24  Q.  Was Sovereign Nations Development Corp. an operating entity

25  at any point in 2013?

I6JJGAL6                          McMillan - direct

1    A.  No.

2    Q.  Did it have any annual gross sales?

3    A.  No.

4    Q.  So why is that information there?

5    A.  I'm sure I provided it to the banker.

6    Q.  Do you see where it, in the section just below that where

7    it says industry?

8    A.  Yes.

9    Q.  What is the industry listed there?

10   A.  Management of companies and enterprises.

11   Q.  Just below that do you see where it says description of

12   business?

13   A.  I do.

14   Q.  What does it say there?

15   A.  Native consulting.

16   Q.  Who provided that information?

17   A.  John Galanis.

18   Q.  How did you have the understanding -- I am sorry.  Can you

19   describe the process by which Mr. Galanis provided that

20   information.

21   A.  I called him from my cell phone at the bank.

22   Q.  What, if anything, did you ask him?

23   A.  I asked him what I should be putting in that field.

24   Q.  What did he say to you?

25   A.  "Native consulting."

I6JJGAL6                           McMillan - direct

1   Q.  Did you ask him any further questions about the nature of

2   the business?

3   A.  At that time, I don't know that I did.

4   Q.  What did you understand that to mean, native consulting?

5           MR. TOUGER:  Objection.

6           THE COURT:  I'll allow you to answer that.  Did you

7   have an understanding what that meant?

8           THE WITNESS:  I personally had some experience working

9   with native peoples in Canada, and so I understood it to be

10  working with tribes of native Americans.

11  BY MS. TEKEEI:

12  Q.  Looking now --

13          MR. TOUGER:  Objection to that answer.

14          (Inaudible)

15          THE COURT:  Overruled.

16  BY MS. TEKEEI:

17  Q.  Turning now to the third page of think document, who is

18  listed as the owner with control of the entity?

19  A.  I believe that is myself.

20          (Continued on next page)

21

22

23

24

25

I6J7GAL7                        McMillan - Direct

 1    BY MS. TEKEEI:

 2    Q.  And what is your position or title?

 3    A.  I was an officer of the corporation, not the owner.

 4    Q.  Had you done any marketing -- sorry.  Let me strike that.

 5        What does it say under position and title here?

 6    A.  Marketing.

 7    Q.  Had you done any marketing with respect to Sovereign

 8    Nations Development Corp. at that point?

 9    A.  No.

10    Q.  Did you ever do any marketing with respect to Sovereign

11    Nations Development Corp.?

12    A.  No.

13    Q.  In late 2014, in your role as the sole director, president,

14    secretary, vice president and treasure of Sovereign Nations

15    Development Corp., did you consult with any Native American

16    tribes?

17    A.  No.

18    Q.  Did you work on any Sovereign Nation development?

19    A.  No.

20    Q.  Did you do any work with Native American businesses?

21    A.  No.

22    Q.  Did you discuss Sovereign Nation development projects with

23    John Galanis?

24    A.  No.

25    Q.  Did he talk to you about bonds being issued by the Wakpamni

I6J7GAL7                          McMillan - Direct

1   Lake Community Corporation?

2   A.   No.

3   Q.   Did he discuss with you anything related to the issuance of

4   Native American bonds?

5   A.   No.

6   Q.   Thank you, Ms.Sheinwald.   You can take that down.

7        Mr. McMillan, after setting up the Sovereign Nations

8   Development Corp. bank accounts, did you provide John Galanis

9   with the account related information?

10  A.   Yes.

11  Q.   What did you provide him?

12  A.   I provided him with the account number for what I thought

13  was the checking account, but it turns out it was a savings

14  account.

15  Q.   And why did you provide him with that account number?

16  A.   He needed that account number to have an incoming wire come

17  into the account.

18  Q.   And what happened next with respect to those accounts?

19  A.   The wire came in I'm going to say on the 2nd of September.

20  Q.   And how much money was wired in?

21  A.   $2.35 million.

22  Q.   What if anything was your understanding of the source of

23  the funds that were wired in?

24  A.   I didn't have any explicit understanding; I had my own

25  conjecture.

1   Q.  Did you ask John Galanis any questions about where the

2   money was from?

3   A.  I did not.

4   Q.  Did John Galanis tell you where the money was from?

5   A.  He did not.

6   Q.  So, Ms.Sheinwald, can you please pull up now Government

7   Exhibit 624.

8           Mr. McMillan, this is also in the binder right next to

9   you.  Just generally speaking, do you recognize this document?

10  A.  This is the first bank statement we received for -- I

11  received for the savings and checking account.

12  Q.  And what month does that reflect?

13  A.  August 2014.

14  Q.  And if you just page through and the remainder of

15  Government Exhibit 624, can you tell us generally speaking what

16  this exhibit reflects?

17  A.  I'll continue, but I have a good idea of what this is.

18  Q.  So what is it?

19  A.  It looks to be all of the bank statements for the checking

20  and savings account for Sovereign Nations Development

21  Corporation from Wells Fargo Bank.

22  Q.  And showing you also Government's Exhibits 620 and 622.

23  What are these records?

24  A.  620 is withdrawal slips from savings and checking accounts

25  for Sovereign Nations Development Corporation.  622, every one

1    that I've seen is another withdrawal slip.  I'm just going to

2    go through them all and confirm that that's what they all are.

3    All of them but one look to be standard withdrawal slips from

4    the bank.

5    Q.  OK, thank you.  Turning now back to Government Exhibit 624,

6    and just looking at the pages 3 and 4 of this document --

7             Ms.Sheinwald, if you could put those next to each

8    other.

9             And, Mr. McMillan, does this reflect the August

10   statements for Sovereign Nations Development Corp.?

11   A.  Yes, it does.

12   Q.  And just looking at the timeframe at the very top, what are

13   the dates that this covers?

14   A.  August 22 through August 31.

15   Q.  August 22 was the date that you opened the account?

16   A.  That's correct.

17   Q.  And if you could look at the business market saving, rate

18   savings section and activity summary section, what is the

19   ending balance of the savings account on August 31, 2014?

20   A.  $25.

21   Q.  And what is the ending balance on the checking account for

22   August 31, 2014?

23   A.  Also $25.

24   Q.  And what does that amount reflect?

25   A.  Those were my personal funds that I opened the account

1   with.

2   Q.   Turning your attention now, Mr. McMillan, to page 13 of

3   this document.  Is this the savings account transaction history

4   for September of 2014?

5   A.   Page 13 is the summary of the savings account.

6   Q.   Thank you, yes.

7        And, Ms.Sheinwald, if you could pull up the prior

8   page.

9        And, Mr. McMillan, looking at the activity summary

10  section then, what is the beginning balance of the account on

11  September 1?

12  A.   $25.

13  Q.   And what are the amount of deposits and credits into the

14  account in September?

15  A.   $2,350,006.44.

16  Q.   Thank you.  Now turning to the following page, which was

17  the transaction history page.  If you could look at the very

18  first transaction listed here on September 2, what does that

19  reflect?

20  A.   That's that initial wire coming in for $2.35 million.

21  Q.   And where is the wire -- what is the source of that wire?

22  A.   It comes from an entity called Wealth Assurance Private

23  Client.

24  Q.   Do you have any understanding of what is Wealth Assurance

25  Private Client?

I6J7GAL7                      McMillan - Direct

1   A.  I do not.

2   Q.  And did you ask Mr. Galanis what was Wealth Assurance

3   Private Client?

4   A.  I did not.

5   Q.  And looking two lines down from this transaction, do you

6   see where it says withdrawal made in a branch/store?

7   A.  Yes.

8   Q.  What does that mean?

9   A.  That means I went in and took $2 million out of the savings

10  account.

11  Q.  And where did you -- where did that $2 million go?

12  A.  It went into the checking account.

13  Q.  And why did you do that?

14  A.  Upon John's direction.

15  Q.  And did you have a discussion then with Mr. Galanis about

16  transferring that money, the $2 million from the savings

17  account to the checking account?

18  A.  Yeah, I was directed to do so.  I don't know if it was so

19  much of a discussion as OK.

20  Q.  And did you ask Mr. Galanis any questions in connection

21  with that?

22  A.  No.

23  Q.  Looking at the next line down, do you see where it says a

24  trans-- it reflects a transaction on September 24?

25  A.  Yes.

1   Q.  And what is the transaction that's listed there?

2   A.  This is the withdrawal of $330,000 from the savings

3   account.

4   Q.  And where did that money go?

5   A.  To the checking account.

6   Q.  And what was the purpose of transferring the money from the

7   savings account to the checking account?

8   A.  To have it available to disburse funds.

9   Q.  And so as of September 30, 2014, what was the ending

10  balance in the savings account as reflected here?

11  A.  $20,016.44.

12  Q.  OK.  Now, turning back to page 8 of this exhibit, and

13  looking at the activity summary section, what is the beginning

14  balance in the checking account as of September 1, 2014?

15  A.  $25.

16  Q.  And what are the amount of deposits or credits during that

17  time period?

18  A.  $2.35 million.

19  Q.  Is that the money that we just saw in the savings account

20  that was transferred over?

21  A.  Yes.

22  Q.  And what are the total amount of withdrawals from the

23  checking account from September 1, 2014 to September 30, 2014?

24  A.  Approximately $1,418,500 and a little over.

25  Q.  And so if you could now take a look at the transaction

1  history just below, do you see a deposit of $2 million on

2  September 2?

3  A.  Yeah, that's the very first line.

4  Q.  And is that the transfer from the savings account that we

5  just talked about?

6  A.  It is.

7  Q.  Do you see a series of wire transaction fees and

8  disbursements after that initial deposit?

9  A.  Yes.

10  Q.  What does that reflect?

11  A.  Wells Fargo at the time for domestic wires was charging $30

12  per wire to effect a wire.

13  Q.  And so these wire transaction fees, do they reflect the

14  fees for various wire transactions that were made on September

15  3?

16  A.  Yes, all of them were made on September 3; all of them

17  reflect wires.

18  Q.  And if you could turn to the following page, is this

19  additional transaction history reflecting disbursements from

20  the checking account in September of 2014?

21  A.  Yes.

22  Q.  Who made all of these disbursements?

23  A.  I did.

24  Q.  And how did you know what disbursements to make?

25  A.  John Galanis told me.

I6J7GAL7                          McMillan - Direct

1  Q.  How did you know when to make the disbursements?

2  A.  John Galanis told me.

3  Q.  And how did you know where to transfer the money?

4  A.  John Galanis told me.

5  Q.  Was that true for all of September 2014?

6  A.  Yes.

7  Q.  Was that true for all of October 2014?

8  A.  Yes.

9  Q.  And how about November of 2014?

10  A.  Yes.

11  Q.  And also true for December of 2014?

12  A.  Yes.

13  Q.  How did you communicate with John Galanis during this time

14  period in late 2014?

15  A.  Three different methods:  Telephone calls, texts and

16  e-mail.

17  Q.  And how frequently did you communicate with John Galanis

18  during that time?

19  A.  On a daily basis.

20  Q.  And so if you could take a look -- and it may be easier to

21  just do this in your binder -- beginning with Government

22  Exhibit 3400, 3402 through 3409.

23  A.  OK.

24  Q.  And also 3411 and then 3414 through 3422.

25  A.  OK.

1  Q.  And do you recognize these documents?

2  A.  I do.

3  Q.  What are they?

4  A.  Most of them are e-mails directing me to disburse funds.

5  Q.  And who are the e-mails from?

6  A.  John Galanis.

7  Q.  Let's take a look at a couple of examples.

8        Ms.Sheinwald, if you could pull up Government Exhibit

9  3400.

10       And, Mr. McMillan, directing you to the top, to the

11 e-mail from jepfeiner@gmail.com on August 28, 2014, what is the

12 subject of that e-mail?

13 A.  Wires.

14 Q.  And who sent that e-mail?

15 A.  I believe it's from John Galanis.

16 Q.  How did you understand that to be from John Galanis?

17 A.  The context was the context that he would send from any

18 account, it was the same way, and I had learned from e-mails to

19 look not just at the e-mail address but to look at the context

20 to understand who it was coming from.

21       MR. TOUGER:  Your Honor, move to strike.  It's

22 assuming facts not in evidence.

23       THE COURT:  I'm going to allow that.

24       MR. TOUGER:  May we approach?

25       THE COURT:  Sure.

1                  (At the sidebar)

2                  MR. TOUGER:  If I understood the witness' answer

3       correctly, he has no knowledge from John Galanis that this is

4       from John Galanis; he has no knowledge from Barry Feiner that

5       it's from Barry Feiner.  It's Barry Feiner's e-mail address.

6                  THE COURT:  He explained who he thought it was from,

7       why he thought it was from him, and you can cross-examine him

8       as to the possibility that it wasn't from him.

9                  MR. TOUGER:  But he is just -- I just don't understand

10      how we allow his speculation into evidence when it's not his

11      state of mind that's important.  It's totally speculative.

12                 MS. TEKEEI:  I think he would say that he had received

13      e-mails from that e-mail address previously and had spoken

14      about the content of those e-mails with John Galanis

15      previously, so he understood that John Galanis sometimes used

16      that e-mail account.

17                 Now, I'm not going into all of that, but I think

18      that's what the witness would say if pressed on that issue.

19      It's also consistent in the format with later e-mails that we

20      will see that are from another John Galanis e-mail account in

21      terms of the way the wiring instructions are provided.

22                 MR. TOUGER:  There is no doubt the wire instructions

23      are consistent; I agree with that.

24                 THE COURT:  But do you have any objection to the

25      government eliciting why it is he believed it was from them?

I6J7GAL7                        McMillan – Direct

1                MR. TOUGER:  No, leave it the way it is.  If you're

2       going to let it in, just leave it the way it is.

3                (Continued on next page)

1            (In open court)

2            MS. TEKEEI:  Ms.Sheinwald, if you could put 3400 to

3    the side, if you could just put it on the left side, please.

4    And if you could put it next to Government Exhibit 3407.

5            Mr. McMillan, what is Government Exhibit 3407?

6    A.  It's a wire -- sorry -- it's an e-mail instructing me to do

7    wires from John Galanis.

8    Q.  And just looking on the left-hand side to Government

9    Exhibit 3400, who is the first person listed in that e-mail?

10   A.  John Galanis.

11   Q.  And what is the account information that's provided?

12   A.  It's a Citibank branch in Solana Beach, California with a

13   routing number and an account number.

14   Q.  And who is Norman Houston just below?

15   A.  John Galanis' father-in-law.

16   Q.  And the next entry, what is Perscitus Capital LLC?

17   A.  I don't know.

18   Q.  And who is Michael J. Murphy?

19   A.  He's an attorney.

20   Q.  And looking at the right-hand side, do you see the Beverly

21   Loan Company listed?

22   A.  Yes.

23   Q.  And what is the Beverly Loan Company?

24   A.  I don't know.

25   Q.  All right.  And just below that there is a person listed

1  Sherry wheeler?

2  A.  Yes.

3  Q.  And just below that, who is Jesse?

4  A.  That's Jesse Galanis, John's youngest son.

5  Q.  And just below that, underline 4, how much money is listed

6  above Norman Houston's name?

7  A.  $25,000.

8  Q.  And if you look at the from line of this e-mail, what is

9  the e-mail address listed there?

10 A.  Jgalanis@me.com.

11 Q.  And who did you understand to have sent you that e-mail?

12 A.  John Galanis.

13 Q.  And previously you said that your understanding was

14 jepfeiner@gmail.com on the left-hand side, that that -- that

15 that e-mail was also from John Galanis?

16 A.  That's my understanding.

17 Q.  And did you have conversations with John Galanis about the

18 wire transactions that are reflected in that e-mail in 3400?

19 A.  Did I have discussions with him about this; is that what

20 you said?

21 Q.  Yes.

22 A.  You will note there are no amounts there, so I had to have

23 some follow-up to be able to effect the wires.

24 Q.  And did that inform your understanding as to who sent you

25 that e-mail?

I6J7GAL7                    McMillan - Direct

1   A.  My discussions were with John Galanis.

2   Q.  Now, Ms.Sheinwald, can you take those down.

3        Mr. McMillan, you also describe receiving instructions

4   I think just now by voice calls and text messages with John

5   Galanis.  How would you track his instructions to transfer

6   funds from the Sovereign Nations Development Corp. account that

7   came by phone or text?

8   A.  I put them into a document, a Word document, that I could

9   then take a printed copy to the bank.

10  Q.  Let me just turn back quickly to the e-mails that you

11  received that we just looked at.  We didn't go through every

12  single e-mail that you had reviewed in that stack, but were

13  those e-mails a representative sample of the way that Mr.

14  Galanis provided you with instructions to make wire transfers

15  through e-mail?

16  A.  Yes.

17  Q.  Now, if you could take a look next at Government's Exhibits

18  3428, 3429 and then 3431 through 3466.

19  A.  OK.

20  Q.  And are these the Word documents or the way that you kept

21  track of some of the instructions that you received from John

22  Galanis by phone or text?

23  A.  Yes.

24  Q.  OK.  So let's take a look at a couple of examples.  If you

25  could first turn to Government Exhibit 3428.  And, Mr.

1    McMillan, what is this document?

2    A.   This was disbursement instructions to go as cashiers

3    checks.

4    Q.   And what are the cashiers checks that are reflected here?

5    A.   One is to the Del Mar Hilton for $8,000.  The other two are

6    going to Household Life Insurance Company with different

7    contract numbers, which is essentially life insurance policies.

8    One is in the amount of $3,172 and change, and the other is

9    $8,180 and change.

10   Q.   And what is the information that's reflected at the bottom

11   left of the page?

12   A.   That's John Galanis' residence at the time.

13   Q.   And what is that residence?

14   A.   The Hilton Hotel.

15   Q.   In what city?

16   A.   Del Mar, California.

17   Q.   Does that correspond to the entry for $8,000 to the Del Mar

18   Hilton that's listed above?

19   A.   Yes.

20   Q.   And if we could take a look also, Ms.Sheinwald, at 3428.

21   I'm sorry, 3429.

22          And what is this document, Mr. McMillan?

23   A.   This is a document I created for John when he requested

24   information on wires that had gone out.

25   Q.   And so let's take a look at some of these.  How much is

1    wired to David F. Murphy?

2    A.  $95,000.

3    Q.  And how much to John Galanis?

4    A.  $40,000.

5    Q.  How much to Michael J. Murphy?

6    A.  $15,000.

7    Q.  And what is BTI Jewelry Inc.?

8    A.  I don't know.

9    Q.  How much money was transferred to BTI Jewelry, Inc.?

10   A.  $55,000.

11   Q.  And two lines down from there, what is Mercedes Benz

12   Financial Services?

13   A.  It seems to me the finance arm of Mercedes Benz.

14   Q.  How much money was transferred there?

15   A.  A little under $38,700.

16   Q.  And, Ms.Sheinwald, if you could put this exhibit on the

17   right-hand side and pull up Government Exhibit 624 at page 9 on

18   the left-hand side, and if you could blow up some of the

19   transfers there.

20          Mr. McMillan, do some of the transfers on 3429

21   correspond to the wire information that's reflected on the bank

22   statement?

23   A.  Yes.

24   Q.  And at the very top of that line on Government Exhibit 624,

25   do you see where it says "online transfer to McMillan, M Custom

I6J7GAL7                         McMillan - Direct

1    Management"?

2    A.   Yes.

3    Q.   Who is that?

4    A.   That's my personal account.

5    Q.   And how much was wired to you, to your personal account, on

6    September 3?

7    A.   That was an in-bank transfer of $30,000.

8    Q.   And why did you receive a transfer of $30,000?

9    A.   Per John's instruction.

10   Q.   What did that $30,000 reflect?

11   A.   A gift.

12   Q.   Mr. McMillan, these wire transactions that we're looking

13   at, who had the authority to make those transactions out of the

14   Sovereign Nations Development Corp. account?

15   A.   I did.

16   Q.   But who was making the decisions about how the money was

17   actually disbursed?

18   A.   John Galanis.

19   Q.   Did you inform John Galanis as to whether the transactions

20   he directed had been made?

21   A.   Yes.

22   Q.   And how would you do that?

23   A.   That report that you have up on the screen is an example.

24   He had asked for what wires have gone out with the wire

25   numbers, but in general I would call him, text him, you know,

1   communicate with him that they had gone.

2   Q.  And I'd like you to take a look at Government Exhibit 3409.

3            One moment.  Your Honor, it's not clear to us that the

4   jury is able to see all of these exhibits on their screens.

5   The one in the back of the courtroom doesn't appear to be

6   working.

7            THE COURT:  All right.  How would you like to --

8   Q.  OK.  So let's go through -- let's take a look at Government

9   Exhibit 3409.  Is this an e-mail from John Galanis to you on

10  Monday, September 15?

11  A.  It's from me to John Galanis at the top.

12  Q.  Thank you.  And what is the subject line of this e-mail?

13  A.  "Regarding excel of receipt disbursements."

14  Q.  Let's take a look at the bottom one, the one that begins at

15  10:13 a.m. from John Galanis to you.  What's the subject line

16  there?

17  A.  Excel of receipts disbursements.

18  Q.  What did you understand that to mean?

19  A.  He wanted to be able to track the disbursements and wanted

20  the information.

21  Q.  So going back to the top e-mail, how do you respond?

22  A.  Can I read it verbatim?

23  Q.  Yes, of course.  Let's start with the first two sentences.

24  A.  "My apologies for the late delivery.  I have to wait until

25  the end of the accounting period to have a nice neat monthly

I6J7GAL7                        McMillan - Direct

1    report for September.  At this time, I did snapshots of the

2    journals.  I hope it can suffice until month end.  I did order

3    QuickBooks and Microsoft Office to be able to put things into

4    Excel formats for you.  I have not yet covered of past fees but

5    will take care of that this week (less than $200)."

6    Q.  And what did you mean when you wrote "my apologies for the

7    late delivery"?

8    A.  He sent the requested at 10:13 in the morning, I didn't

9    send it to him until 8:01 at night.

10   Q.  And when you wrote "At this time I did snapshots of the

11   journals," what were you referring to?

12   A.  A journal is a term used to refer to like a checking

13   register, and Wells Fargo has an online -- you can have website

14   access to look at your account.  And I took snapshots of what

15   Wells Fargo showed as the check register or journal.

16   Q.  And we will take a look at that in just a moment, but when

17   you wrote "I did order QuickBooks," what is that a reference

18   to?

19   A.  John had directed me to order an application called

20   QuickBooks where you can track all of the transactions from or

21   to a checking account.

22   Q.  OK.  So let's take a look at what is attached to this

23   e-mail.

24          Ms.Sheinwald, if you could begin with the first

25   attachment.

1          Mr. McMillan, what does the first attachment here

2   reflect?

3   A.  That's the activity summary page.

4   Q.  And does that show the $2 million transfer that we just

5   discussed between the savings account and the checking account?

6   A.  Yeah, it has the summary of the activity and it has two

7   transactions -- sorry -- it has three transactions and a fee.

8   One is the $2.35 million.

9   Q.  And what is the second page of the attachment?

10  A.  The summary of the checking and savings accounts.

11  Q.  And what's the time period that these transfers cover?

12          Ms.Sheinwald, if you could blow up the bottom right

13  there.

14  A.  The 28th of August through the 2nd of September.

15  Q.  And if you look at the very next page.

16  A.  You want those dates?

17  Q.  Yes, please, if you could give us the dates that covers.

18  A.  The 25th of August through the 3rd of September.

19  Q.  And in these attachments did you send John Galanis a record

20  of each transaction to and from the account up to the date of

21  your e-mail?

22  A.  Yes.

23  Q.  Did there come a time when John Galanis was able to access

24  the bank account transaction records online on his own?

25  A.  Yes.

1   Q.  And approximately when was that?

2   A.  Shortly after this.

3   Q.  And how did that happen?

4   A.  Wells Fargo allows both transactional authority and

5   view-only authority, and I was able to set up an account that

6   he had view-only authority on the account.

7   Q.  So, showing you Government Exhibit 3413 -- yes, just for

8   the witness for now -- oh, I'm sorry, yes, I'm sorry, 3413.

9           Your Honor, I apologize, I believe I made a mistake

10  earlier when I moved in 3414.  I meant to move in 3413?

11          THE COURT:  All right.  Any objection?

12          MR. TOUGER:  No, your Honor.

13          THE COURT:  All right, admitted.

14          MS. TEKEEI:  So we offer that now.

15          (Government Exhibit 3413 received in evidence)

16  Q.  Mr. McMillan, and now everyone, if you could take a look at

17  the bottom e-mail on Sunday, September 28 from John Galanis to

18  you, what is the subject line?

19  A.  "What is my view access info?"

20  Q.  And how do you -- sorry.  What did you understand that to

21  mean view access info?

22  A.  He wanted to know how he would have online access to see

23  the account.

24  Q.  And how did you respond?

25  A.  I gave him an account name and told him the password was

I6J7GAL7                          McMillan - Direct

1   the same as he already had used in the past.

2   Q.  And what did you mean by that?

3   A.  He had had this sort of access to accounts before, and it

4   would maintain the same password.

5   Q.  And so was John Galanis then able to view the account

6   information on his own?

7   A.  Yes.

8   Q.  Was he able to make any transfers without your help?

9   A.  No.

10  Q.  And why not?

11  A.  He only had view access, not transactional access.

12  Q.  Did you ever discuss with John Galanis the transactions

13  that he was able to view using his view access?

14  A.  Not directly.  It was inferred.

15  Q.  And what do you mean by that?

16  A.  He had information that he could only have by having seen

17  the account directly.

18  Q.  OK.  So in addition to the wire instruction sheets that we

19  reviewed, the bank account statements that we saw in Government

20  Exhibit 624 and the online access that you just described, how

21  else did you track disbursements from the Sovereign Nations

22  Development Corp. savings and checking accounts?

23  A.  I put the checking account information directly into

24  QuickBooks and would send him copies of that information for

25  his use.

I6J7GAL7                         McMillan - Direct

1  Q.  And I'd like to show you now Government's Exhibits 1512 and

2  1514.  You can just take a look at them:  Are these the

3  QuickBooks records that you described earlier?

4  A.  Yeah, I believe the first is actually a report from

5  QuickBooks, and that would be Exhibit 1512.  And Exhibit 1514

6  is just a snapshot of the screen in QuickBooks.

7  Q.  And do the transactions reflected in Government Exhibit

8  1514 reflect all of the disbursements from the checking and

9  savings accounts?

10  A.  That only shows disbursements from the checking account, I

11  believe.

12  Q.  OK.  But does it track all of them?

13  A.  All of them for the period covered.

14  Q.  But were there some gaps in there?

15  A.  Some of the information is missing, but the fact that it

16  was a transaction is there.  Some of the information within the

17  transaction is not there.

18  Q.  OK.  Let me show you then Government Exhibit 1512 -- I'm

19  sorry, I meant 1513.  Thank you, Ms.Sheinwald.

20              And what is this document?

21  A.  This is to make up for the information that was lacking in

22  the QuickBooks application.

23  Q.  And describe what you mean by that.

24  A.  So, QuickBooks is a one-to-one mapping.  If you do a

25  withdrawal, there has to be a corresponding deposit to be able

1    to put it into QuickBooks.  If you do a single withdrawal and

2    put it into two different accounts, you cannot represent it

3    within QuickBooks, so this was my remedy to that problem.

4            For instance, the top entry dated December 15 has two

5    items of deposits of $1,000 into two accounts.  That was a one

6    withdrawal of $2,000 which is shown in QuickBooks, but the

7    disbursements, since it was more than one, it had to be shown

8    in a separate record.

9    Q.  OK.  And so on that point, if I could direct your attention

10   back to Government Exhibit 624.

11           Ms.Sheinwald, can you please pull up page 9 of that

12   document.  And if you could zoom in on the entry on

13   September -- the entries on September 9 for withdrawal made at

14   a branch/store.

15           Is that the type of withdrawal that you were just

16   discussing, Mr. McMillan?

17   A.  Yes.

18   Q.  OK.  So, let's take a look at some of the transactions here

19   on the bank statement for September of 2014.

20           Ms.Sheinwald, if you could zoom out of that.

21           And, Mr. McMillan, do you see a series of wire WT Fed

22   transfers?

23   A.  Yes, sorry with the second line.

24   Q.  Sure.  And what do those represent?

25   A.  Those are wires that went out of Wells Fargo Bank from this

1    account to accounts in other banks.

2    Q.  So looking at September, some of the transactions on

3    September 10, do you see a transaction to John Galanis on

4    September 10?

5    A.  Yes.

6    Q.  And what was the amount of that transaction?

7    A.  $25,000.

8    Q.  And if you could, looking through some of the wire

9    transfers there, describe for us the amount of the wire

10   transfers and to whom they went as reflected in this statement.

11   A.  Would you like me to just pick up from there and go on?

12   Q.  Sure.

13   A.  All right.

14   Q.  So I'm directing you to the transfer on September 22 to

15   Nicholas Wise.  How much money was wired to Nicholas Wise?

16   A.  $2,000.

17   Q.  And who is Nicholas Wise?

18   A.  I don't know.

19   Q.  And looking down at several lines down from there,

20   transaction on September 25 to John Galanis, how much is

21   reflected there?

22   A.  $20,000.

23   Q.  And just below that, how much money is wired to Catharine

24   McGee?

25   A.  $5,000.

I6J7GAL7                        McMillan - Direct

1    Q.   And just below that, how much money is wired to BTI

2    Jewelry, Inc.?

3    A.   $10,000.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I6JJGAL8                         McMillan - direct

1    Q.  Do you know who is Catharine McGee?

2    A.  I do not.

3    Q.  Did you ask Mr. Galanis who is Catharine McGee?

4    A.  I did not.

5    Q.  Turning to the following page, the transaction on September

6    29th, to Mr. Galanis, how much money is wired on September 29th

7    to Mr. Galanis?

8    A.  $25,000.

9    Q.  A couple of lines below that, how much money was wired to

10   Rebecca Rivetti?

11   A.  $7,500.

12   Q.  Do you know who is Rebecca Rivetti?

13   A.  I do not.

14   Q.  Going back to Page 8 of this document, what is the total

15   amount of withdrawals out of the Sovereign Nations Development

16   Corp. checking account for September of 2014?

17   A.  1 million 418 thousand dollars, and a little over $500.00.

18   Q.  Let's take a look next at the month of October.

19           Mr. McMillan, if you could turn to Page 17 of this

20   document.  Is this the checking account statement for the month

21   of October 2014 for Sovereign Nations Development Corp.

22   checking account?

23   A.  It is.

24   Q.  What was the beginning balance on that account for October

25   1st?

1    A.  931,000 and a little more than $400.

2    Q.  What is the ending balance as of October 31st?

3    A.  A bit more than $555,000.

4    Q.  So if we could turn to the transaction history, what is the

5    wire transaction that is reflected on the first one that is

6    reflected on October 2nd?

7    A.  That is a wire transfer to John Galanis for $25,000.

8    Q.  How about on October 3rd for 15,000, what is that

9    transaction?

10   A.  It's a wire transfer to an account of Charles Carnesi.

11   Q.  How much was that for?

12   A.  $15,000.

13   Q.  Just below that, do you see where it says online transfer

14   to McMillan Custom Management?

15   A.  Yes.

16   Q.  How much was transferred to you, sir?

17   A.  $6,500.

18   Q.  What was the purpose of that payment?

19   A.  That is my monthly compensation.

20   Q.  What do you mean by that?

21   A.  John had agreed to compensate me $6,500 per month that I

22   was working on Sovereign Nations.

23          MS. TEKEEI:  It is now 5:00 o'clock.  This would be

24   the place to pause.

25          THE COURT:  Ladies and gentlemen, why don't we finish

I6JJGAL8                          McMillan - direct

1   for the day.  We'll start again at 9:00 in the morning.  Please

2   remember don't discuss the case and keep an open mind.  Thank

3   you.

4            (Jury excused)

5            THE COURT:  Let's talk about some issues.  First let

6   me just ask about timing.  Does the government have a better

7   sense of when you anticipate you'll rest?

8            MS. MERMELSTEIN:  I think we'll rest tomorrow morning,

9   your Honor.  There is just a few minutes left with this

10  witness.  I understand the cross-examinations of this witness

11  are short and our last witness is an FBI agent to do summary

12  charts.  That will take -- it is nothing -- I don't know the

13  exact amount of time, but 90 minutes maybe to go through them

14  all.  I don't have a sense of the cross-examination length, but

15  the government will rest tomorrow.

16           THE COURT:  Okay.  All right.

17           So on the Cooney recording I am keeping out Page 1.  I

18  articulated the basis for that.  I will take out both lines

19  about Mr. Cooney's dislike of Obama and the sentence right

20  before it.  I will keep out the statement regarding the scuzzy

21  deals.  It appears to be offered for the truth of the matter in

22  a thinly veiled attempt to admit hearsay evidence for the

23  proposition that Mr. Cooney and Mr. Archer did not conspire

24  with Jason Galanis in the context of WLCC scheme.  I don't see

25  an applicable hearsay exception.

1          Moreover, to the extent it is actually being offered

2     for the non-hearsay purpose to show Mr. Cooney's belief or

3     state of mind, it is not probative of Mr. Cooney conspired with

4     Jason Galanis in the WLCC scheme as the comment only pertains

5     to Mr. Archer's past activities.  It is particularly difficult

6     to conclude this comment is probative of Mr. Cooney's lack of

7     fraudulent intent in light of his other comments that have been

8     represented to me in the recording which I precluded, in which

9     he purportedly boasts among other things, conducting pump and

10    dumps.  In addition, I am allowing in a variety of other

11    remarks that Mr. Cooney made regarding his admiration of Mr.

12    Archer and the desirability of his connections.

13         As for Mr. Archer's intent with respect to the charges

14    here, Mr. Cooney's belief as to whether Mr. Archer previously

15    engaged in fraudulent activity, especially if not being

16    admitted for the truth, is of limited probative value

17    especially if I am allowing in other remarks regarding his

18    legitimacy.  Moreover, there is a substantial risk this comment

19    will confuse or mislead the jury and cause unfair prejudice to

20    the government, so I won't let the one comment in, but the rest

21    can come in.

22         If the government wants, I'll provide a limiting

23    instruction with respect to the purpose for which the remaining

24    comments are being admitted.  So then let's talk about Mr.

25    Archer's expert testimony.

1            MR. SCHWARTZ:  I will make sure I am clear so we can

2     prepare the exhibit accordingly.

3            THE COURT:  Yes.

4            MR. SCHWARTZ:  For the last section, and these guys

5     don't do scuzzy deals, stop?  Or the stuff that comes

6     afterwards?

7            THE COURT:  I think you can leave in the last if you

8     want to.  It is up to you.  I would take out the line "and

9     these guys don't do scuzzy deals," but if you want, to you can

10    leave in, "but he is also not afraid to work with people who

11    have a little hair on them," and goes on from there.

12           MR. SCHWARTZ:  I don't think you can understand that

13    without the prior sentence.  It is on one hand and the other.

14    I would say either we would skip to you know what I'm saying or

15    we would just end it at that point.

16           THE COURT:  I am fine with either of those.

17           MR. SCHWARTZ:  We'll decide.  Thank you.

18           THE COURT:  Okay.

19           MR. SCHWARTZ:  Then for the first part --

20           THE COURT:  Page 1 is out, and then on Page 3 we are

21    talking about taking out two lines.  It is, "Crafton: {reading}

22    Obama, Biden and his son....," "Not that I'm an Obama fan,"

23    right?

24           MR. SCHWARTZ:  Got it.

25           THE COURT:  On the expert testimony, as I stated

previously, I am going to permit much of Mr. Archer's proposed

expert testimony.  It doesn't sound to me, as it has been

represented, it will usurp the role of the jury in applying the

law to the facts or my role instructing the jury, but instead

will provide context and describe industry standards which will

assist the jury in weighing the evidence in this admittedly

complex case.  See United States versus Bilzarian, 926 F2d.

1294.  I will add certain limitations.

          Let's start with John Finnerty.  There is initially an

objection to five aspects of his testimony, but now three are

moot, so that there are two that remain which, as I understand

it, are related to the terms of the second and third purchases

of the WLCC bonds.

          The government's motion is denied.  I don't think it

is inappropriate for an expert to explain documents entered

into evidence, particularly where it is relevant to any

opinions the expert may offer.  He can't offer his personal

impressions of what was intended, but he can explain the

documents, which is what I assume you wanted him to do.

          Is that right?

          MR. SCHWARTZ:  Of course.

          THE COURT:  Now, with respect to William Jannace, I

understand he has been replaced by Ronald Filler, so I don't

know if they're similar notice objections with respect to

Filler.  I saw your letter, but I didn't see his CV or anything

1   else.

2            MR. QUIGLEY:  There is no additional notice so we

3   would have the same objection.

4            THE COURT:  All right.  Do you want to speak to that?

5            MR. SCHWARTZ:  I think what Mr. Quigley is saying is

6   the objection is the same.  In other words --

7            (Multiple voices)

8            THE COURT:  You had for Mr. Jannace; is that right?

9            MR. SCHWARTZ:  All we did was swap the names.

10           THE COURT:  Look, from Mr. Jannace's web site his

11  biography made clear he had over 25 years as experience as a

12  securities regulator and in-house counsel at broker-dealers

13  and, among other things, formerly ran FINRA's sales practice

14  policy department responding to interpretive policy and

15  disposition requests concerning topics including broker-dealer

16  registration and books and records.  So he seemed to have a

17  wealth of experience that served as the foundation of his

18  opinions.

19           So if he has the same background -- excuse me -- if

20  Mr. Filler has the same or an equivalent background to Mr.

21  Jannace, I am going to overrule the notice objections and the

22  qualifications.  I don't know if you want to be heard further

23  on that?

24           MR. SCHWARTZ:  Obviously, they are different people

25  with different backgrounds.

1      THE COURT:  Exactly.  That is why I am asking.

2      MR. SCHWARTZ:  I don't think they really object.

3      MR. QUIGLEY:  We'll take a look tonight.  He was just

4  substituted.

5      THE COURT:  Let me know if anything is different.  As

6  you rightly noted, it is a different person, but I was fine

7  with Jannace, so the question is are they sort of equivalent in

8  terms of their background?

9      With respect to Paul Atkins, I know, Mr. Schwartz, you

10  said we should deal with this on a question-by-question basis,

11  but is there anything we should talk about now with respect to

12  him?  I mean I have some thoughts based on what I have been

13  told so far, but shall we wait for tomorrow or should we talk

14  about him today?

15      MR. QUIGLEY:  We should do it now.

16      THE COURT:  I will tell you what my thoughts were just

17  based on the briefing, was that as an initial matter, there

18  does not seem to be a basis for precluding his testimony due to

19  the purported abstract nature of it.  It is well accepted that

20  expert testimony may, in fact --

21      MR. TOUGER:  May Mr. --

22      THE COURT:  Yes, of course.  It is well accepted

23  expert testimony may, in fact, be abstract and generalized.

24  See United States versus Paige, 335 Federal Appendix at 100.

25  Moreover, Mr. Atkins' notice is sufficient.  He details that

I6JJGAL8                        McMillan - direct

Mr. Atkins' opinions are based on the experience described in
his biography, including six years as an SEC commissioner, a
stint with a major international auditing firm, and most
recently his experience as CEO of the financial services
consulting firm he founded.

          I also don't believe the proposed testimony usurps the
role of the jury or runs afoul of 704 (b).  While Mr. Atkins
will offer opinions as to certain facts relevant to this case,
he may not opine as to any conclusions with respect to the
legal elements of the charges here.

          So, for instance, his testimony about the Form ADV and
the roll-up of Burnham do not regard elements of the legal
charges or Mr. Archer's state of mind.  See the Duncan case, 42
F.3d at 101.  I will not permit, however, Mr. Atkins to testify
about the knowledge or awareness of directors of a corporation,
including Mr. Archer.  I will allow him to opine generally as
to the obligations of directors or the expectations of them.
Of course, the government can cross-examine Mr. Atkins on the
differences between corporations.

          Finally, I do think it would be inappropriate for
Mr. Atkins to testify as to the likelihood that an individual
who has settled a case with the SEC is not more or less likely
to violate the law in the future.  I just don't think that is
appropriate.  That is my ruling.  Is there anything else we
need to talk about?

1          MR. QUIGLEY:  Just to be clear, your Honor, on Atkins,

2     I am looking at the notice right now.  It sounds like he should

3     not testify that as a director, Devon Archer should know, be

4     particularly aware of any particular business of Burnham,

5     including details of WLCC bonds.

6          THE COURT:  That's right, something specific does

7     usurp the role of the jury.  He can testify generally about

8     what kinds of information directors are provided and what is

9     expected of them generally, but it shouldn't be so specific as

10    to hypotheticals or expectations as to particular documents

11    that he would have seen.

12         MR. QUIGLEY:  Then it sounds like the bullet point on

13    Page 7 of the expert notice, the third bullet point the SEC in

14    general brings a relatively small percentages of case against

15    recidivists known as repeat offenders.  The fact an individual

16    settled one case with the SEC does not suggest he is any more

17    or less likely to violate the securities law.

18         THE COURT:  That should not come in.

19         MR. QUIGLEY:  The paragraph below that in particular,

20    there is nothing about Jason Galanis or John Moran's historical

21    SEC settlements that would have made it inappropriate to do

22    business.

23         THE COURT:  You said it reads there is nothing

24    about -- read it again.

25         MR. QUIGLEY:  In particular, there is nothing about

1    Jason Galanis or John Moran's historical SEC settlements that

2    would have made it inappropriate to do business with them.  To

3    the contrary, their settlements were remote in time and

4    involved relatively modest fines and other terms.

5            THE COURT:  Was that one that you objected to

6    specifically?

7            MR. QUIGLEY:  We objected to the entirety of his

8    testimony, your Honor.

9            THE COURT:  Do you want to be heard on that?  Let's

10   just talk about that one.

11           MR. QUIGLEY:  Again this fits into the category of

12   things that kind of go beyond background testimony or tied to

13   the facts of this case.  I think without knowing all the facts

14   about --

15           THE COURT:  Do you think he could testify generally

16   about an SEC settlement and what the consequences are of that?

17           MR. QUIGLEY:  Yes, I think he could say you're barred

18   for -- you might not be barred at all, you might be barred for

19   five years, you might be barred for life.  That is all fair

20   game.

21           THE COURT:  Mr. Schwartz.

22           MR. SCHWARTZ:  So upon further reflection, I think

23   that we won't offer that opinion at all.  In fact, I think it

24   is unlikely except in the most abstract sense that we'll get

25   into SEC enforcement actions with Commissioner Atkins, so I

1    would expect there will not be any cross-examination about

2    specific enforcement actions in the same way because, of

3    course, as a commissioner, he voted on certain enforcement

4    actions.

5              THE COURT:  Okay.  All right.

6              MR. QUIGLEY:  Yes, your Honor.  He was on the

7    commission during the time of Jason Galanis -- the charges were

8    filed against Jason Galanis.  I take Mr. Schwartz's

9    representation.

10             THE COURT:  All right.  Is there anything else?

11             MS. MERMELSTEIN:  Yes, a few things, your Honor.

12             So, one, there is still a few City National, there is

13   one document where there is disagreement about redactions I

14   think we should discuss before the government rests.

15             THE COURT:  Sure.

16             MS. MERMELSTEIN:  Two, we understand the lay of the

17   land is that leaving aside the defendants themselves, who I

18   think should be allocuted at some point about if they're

19   deciding not to testify, but we are not quite there, I think.

20             Ms. Notari is going to call a summary witness.  Mr.

21   Touger indicated he doesn't intend to call witnesses, and Mr.

22   Schwartz has given us some witnesses he intends to call this

23   week, but it is not clear we have the list, when we have called

24   every fact witness in the government's witness in the

25   government's case, we are entitled to the witnesses actually

1   being called and the order in which they're being called in.

2          So we would like that now.

3          THE COURT:  Can you tell me who we have on tap for

4   tomorrow?

5          MR. SCHWARTZ:  Sure.  To be clear, we have given the

6   government our witnesses for this week.  I think they're just

7   asking beyond that.

8          So tomorrow we have Mr. Atkins, we have -- I don't

9   remember.  Now I don't remember the order.  I am sorry -- so we

10  have Mr. Atkins, we have Dr. Archer, we will have a summary

11  witness or two.  We will have some email reading.

12         Mr. Filler will, I don't think we will get to him

13  tomorrow, but he will be here.  We are still talking to the

14  government and to Morgan Stanley, but we may have a witness

15  from Morgan Stanley, and then I suspect we'll have another

16  lengthier summary witness towards the end.  That is what we

17  anticipate this week.  If we get beyond that, we have

18  Mr. Finnerty, although he has some scheduling issues, as I

19  discussed with the government.

20         Then we are evaluating and will speak to the

21  government this evening about whether and how they want us to

22  prove up prior inconsistent statements, whether they're going

23  to make us call agents or we'll stipulate to 302s, whatever it

24  is.

25         MS. NOTARI:  I do have a summary witness, but she's a

1    paralegal who lives in Staten Island.  So I will have her come

2    Thursday because I don't --

3          THE COURT:  Work it out with each other if you want to

4    take people out of order.

5          MR. SCHWARTZ:  I am going to hand to the government

6    now a flash drive that has the exhibits that we intend to move

7    in on our case.  They have virtually all of these already, so

8    they have a complete set marked as defense exhibits because

9    some are unoffered government exhibits we are going to put in

10   on our defense case.  I will give them their flash drive and I

11   will give them all of our summary charts except for the one

12   directly responsive to Agent Kendals tomorrow morning.

13         I will give them draft demonstrative aids to the jury

14   we won't move into evidence with Mr. Atkins tomorrow, and we

15   will have similar things with Mr. Filler, but I don't happen to

16   have to hand you now.  I will do it this evening by email.

17         MS. NOTARI:  I will give the government by this

18   evening my summary, my rough summary chart and also my proposed

19   exhibits.

20         THE COURT:  Okay.

21         MS. NOTARI:  I have already given them, but there is

22   much less now.

23         THE COURT:  If you can give that to them.

24         MS. NOTARI:  Then we can address tomorrow whatever

25   issues there were.  Remember we had in limine motions we had

I6JJGAL8                        McMillan - direct

1    objections.

2              THE COURT:  Just tell me.  I will look in my notes,

3    but tell me what is left so I can rule first thing in the

4    morning.

5              MS. NOTARI:  For me personally, the big issue is,

6    okay, the government has put in, and I am not sure what their

7    position is on this so I should talk to them first, I know

8    they're objecting probably to when Steve Shapiro, the banker

9    from CNB testified, there was an issue with regards to the

10   admission of an email from Matthew Fulton who worked for Fulton

11   Management, who said to my client use big round numbers, and I

12   do believe that this is a critical email because their whole

13   case, we have sat through weeks and weeks of testimony and this

14   financial statement, and that bank loan is largely, they're

15   evidence against Mr. Cooney, and I think it is important in

16   terms of my client's state of mind.  I think that email is

17   very, very important.

18             THE COURT:  What is the exhibit number again?

19             MS. NOTARI:  I will get it to you.  I will give it to

20   your Clerk.

21             THE COURT:  The evidentiary basis for admitting it is

22   what?

23             MS. NOTARI:  My client's state of mind when he filled

24   out that form, when he filled out the financial statement that

25   he was told --

1              THE COURT:  An email from, remind me, Shapiro to?

2              MS. NOTARI:  I will provide you with the email.

3              MS. MERMELSTEIN:  Email from Mr. Fillman at Fulton

4    Management providing the form to Mr. Cooney to fill out for the

5    hundred thousand dollar loan is the email being discussed.

6              I would say this with respect to the defense exhibits

7    generally.  We obviously have had sort of the defense exhibits

8    for a long time.  We teed-up generic objections to the

9    categories.  I think it would be helpful if the defense did

10   what we did, indicate to us there is an email reader, what is

11   the bucket coming in so we can take it in an orderly fashion.

12   I expect we'll have some objections, the nature of things.  To

13   the extent there will be a thumb drive with 800 exhibits on it,

14   that will move us in the direction of being able to

15   specifically object.

16             So if Ms. Notari wants to direct us to something that

17   she wants to offer, we are not going to contest of authenticity

18   of the email.

19             THE COURT:  Just help me.  I don't want to keep the

20   jury waiting.  I want to have the time to read things, too, and

21   not keep people waiting.  If there is anything you can give me

22   in advance, I will read it.

23             MR. SCHWARTZ:  For sure.  I don't want to scare anyone

24   by having a flash drive.  There are only 50 exhibits on here.

25   It is just we haven't had a lot of success with other means of

1    transmitting things to the government.  I just want to correct

2    it for the record, this is not everything we intend to put in.

3    This is everything that has been remarked or new, so I will

4    send you an email, do it by buckets.

5         MS. MERMELSTEIN:  Fine.  One other -- not to get ahead

6    of ourselves question.  I can't remember what your Honor's

7    policy is with respect to sending back the exhibits to the jury

8    and whether or not you send back everything or make them make

9    requests because given the volume here, let's start getting

10   organized for next week.

11        THE COURT:  What is your request in that respect?  Do

12   you want to send back everything?

13        MS. MERMELSTEIN:  We may as well just send everything

14   back.  I don't see any reason not to, frankly.  We can prepare

15   a joint exhibit list.

16        THE COURT:  Is everything printed?  Everything is in

17   the binders?

18        MS. MERMELSTEIN:  We have a trial cart filled with a

19   printed set of the exhibits, of the government exhibits, not

20   defense exhibits.

21        THE COURT:  Normally what I do, I send back all of the

22   exhibits, and then I'll send back testimony if and when they

23   ask for it.

24        MR. SCHWARTZ:  Whatever your Honor wants is fine.  In

25   a case like this, it is more fruitful not to and the jury can

1    ask for whatever they want.  We defer to your Honor.

2              Do you send the indictment back?

3              THE COURT:  I usually do.  I don't always.  I will

4    hear you out on that if you have a strong opinion about it.  I

5    generally do, although frankly in the charge, I am going to

6    read most of the indictment.  Here we need to redact it anyway.

7              MR. SCHWARTZ:  It needs to be redacted.  A lot of it

8    is extraneous, but I will look at it again and we'll talk.

9              MS. MERMELSTEIN:  Whatever your Honor wants to do with

10   the exhibits is totally fine.  As a practical matter, it seems

11   likely to avoid the initial --

12             MS. NOTARI:  We want this.  We don't feel strongly --

13             THE COURT:  I am inclined to send it all back if you

14   all can get everything together and then say if you have

15   questions you want to ask because I want it to be clear to them

16   even though they're sending it back, if they don't remember

17   what the number is or the kind of document, an email between

18   these two people, they should ask for it and we'll identify the

19   exhibit and I'll make that clear to them in the charge.

20             So I am inclined to send back a redacted copy of the

21   indictment.  Why don't you work on that as well as all the

22   exhibits, so I would get that together both government and

23   defense.  Then have a category for the joint exhibits as well.

24   I know some of them were joint, right?

25             MS. MERMELSTEIN:  That will be an issue, your Honor,

1    because there are a few that are sort of joint-joint.  In many

2    cases the defense has, I can't say I understand why, put a

3    defense exhibit sticker on an already existing government

4    exhibit and called it a joint exhibit when they reference it.

5    We don't have any of those.  We have it only in the version

6    marked for our exhibits.  We can talk about that issue.

7              THE COURT:  Talk about it.  We can also have two

8    copies of the same thing.

9              MR. SCHWARTZ:  To be clear what happened, that never

10   happened.  I never called a government exhibit that was in

11   evidence a joint exhibit.  What happened was at the beginning

12   of this case, I told the government when I designated what I

13   was going to use on cross as government exhibits, I was giving

14   them the opportunity to move them in, but that I, if they

15   didn't want to do it that way, I was not going to move in a

16   government exhibit.

17             Where I on cross-examination used a government exhibit

18   that was not already in evidence, I called it a joint exhibit

19   so it wouldn't lose its numbering and screw up whatever they

20   had planned, but I was the one to put it in evidence.

21             THE COURT:  That is fine.  We can have duplicates.

22             You can have them in a defense section and government

23   section.

24             MS. MERMELSTEIN:  We'll talk.  There is this one City

25   National redaction issue.

1           THE COURT:  What is the exhibit?

2           MS. MERMELSTEIN:  439.

3           THE COURT:  What is the issue?

4           MS. MERMELSTEIN:  This is an email at that time was

5    used during the redirect examination of Mr. Shapiro.  It

6    corroborates sort of what he said and was challenged about that

7    with respect to his lack of knowledge that the bonds had been

8    moved.

9           The government agrees to the following redactions

10   which is on the third page of the email, the February 2nd email

11   we are going to redact the stock is back down at 212.  I don't

12   think the jury will get what that means, but since we have been

13   cautious about pricing of Code Rebel --

14          MS. NOTARI:  I ask it be redacted in white, your

15   Honor.

16          MS. MERMELSTEIN:  On the first page, at the top we

17   agree to redact the last line of the email.  He is desperate,

18   he will divert the bond proceeds and we cannot let that happen.

19   Similarly, we think we should redact in the February 7th email

20   the middle bottom of the page.  We should leave I think we

21   should send a --

22          THE COURT:  I am not sure what that is.  What is said?

23          MS. MERMELSTEIN:  There is testimony that was the

24   internal collections, and so I think it is sort of part of the

25   course of conduct being discussed in this witness' testimony.

1   We need to get a judgment and a lien because he is not taking

2   this seriously and he doesn't care should come out.

3          Then the place where we don't agree is on Page 2 of

4   this email, there is an email from Fillman to Fulton, where he

5   talks about the efforts to get in touch with Mr. Cooney, and

6   similarly an email from Mr. Fulton below directly to Mr. Cooney

7   asking whether he can borrow from someone, and there is no

8   response.  Those I don't think are unfairly prejudicial and

9   they are either directly relevant to Mr. Cooney's knowledge

10  about what was going on or about the failed efforts to contact

11  him.  We think those should stay.

12         MS. NOTARI:  I am specifically objecting to the first

13  two paragraphs, he left me a voice-mail.  Steve has a meeting

14  Monday to discuss, and then let's start with those two

15  paragraphs.  Those are basically -- the court may recall that

16  during the testimony of this witness, the government on

17  redirect alluded to the fact that my client was basically not

18  being, not being, not giving them information about these

19  bonds, and I confronted Mr. Shapiro with two dozen emails my

20  client sent him.  We have direct correspondence from my client

21  to Mr. Shapiro during that time and it is just not true.  I

22  don't see how it is relevant whether my client answered a

23  voice-mail or any of this.

24         There are a million reasons why, and it is such an

25  isolated period, but I think it is completely prejudicial if

1    you read those two paragraphs and it is not relevant.

2              THE COURT:  What is the relevance?

3              MS. MERMELSTEIN:  Mr. Cooney has suggested that he

4    had, in fact, told City National that he had moved the bonds.

5    City National says that's not true, and the fact that when

6    things went south and they were trying to communicate with him,

7    he was nonresponsive, indicates I think the extent to which he

8    was, for example, eager to be forthcoming with them about the

9    state of affairs.  I think it is relevant.

10             MS. NOTARI:  We are limited in our ability to put in

11   email to establish because of hearsay, and so the witness

12   testified, he agreed when he looked at all the email that I

13   confronted him with, there were extensive communications with

14   just my client alone, let alone his money managers at Fulton

15   Money Management.  This is not true.

16             THE COURT:  I am going to have it redacted.  I don't

17   think it is especially probative whether or not he was

18   responsive to the calls.  We'll take that out.  What is the

19   other objection?

20             MS. NOTARI:  My only other objection, if you see below

21   that any chance you can borrow from someone to make some sort

22   of good faith payment to CNB.  I don't see the relevance of

23   that question.  It is just a question from his accountant.

24             THE COURT:  Do you want to respond on that one?

25             MS. MERMELSTEIN:  It is not hearsay.  It is a question

1    that is sent to the defendant with respect to efforts to repay

2    the loan that he is delinquent on, and he doesn't respond to

3    it, which is consistent with the testimony of the witnesses

4    that he wasn't responsive.  It should stay.

5              MS. NOTARI:  We don't know if he responded.  They

6    could have had a phone call.

7              THE COURT:  This one I will leave in.  So that is the

8    City National document.  Anything else we should talk about?

9              In terms of timing, so I know you said you'll get

10   through this week.  When do you predict summations will be at

11   this point?

12             MR. SCHWARTZ:  I think probably Monday is right,

13   presuming none of the defendants testify.  I would like to

14   pretend that that is not likely here.

15             THE COURT:  I understand.  I will allocute the

16   defendants tomorrow when Mr. Galanis is here, and you don't

17   anticipate putting on a case, obviously, you will talk to your

18   client.  Does anyone have any additional views on Jurors No. 8

19   and 13?

20             MS. MERMELSTEIN:  We do, your Honor.  I think Mr.

21   Schwartz and we are in agreement.  We don't think we should

22   dismiss those jurors for a number of reasons.

23             First, they have sat attentatively and patiently

24   through a trial that through no fault of theirs or anyone else

25   has taken a long time, and they told us at the beginning this

1    one date was the date they couldn't be here.  I don't think it

2    is right to have taken their time for a month and say now there

3    is this one day, we are going to remove you from the jury.  I

4    think they have an interest in serving.

5            We do, of course, have at the moment a lot of

6    alternates, there is the possibility deliberations will run

7    into the July 4th weekend.  I don't want to lose two people

8    over that now and have a problem the following week.

9            MR. SCHWARTZ:  My quick reaction was the same as the

10   government.  I haven't spoken to my co-counsel.  We have a

11   logistical issue which is I don't think even if we start first

12   thing Monday morning, that we finish all of the closings in one

13   day, and then we're talking about a day in-between, and that's

14   a little bit awkward.  That is a lot of bit awkward, actually.

15           THE COURT:  How long are your summations?  Do you yet

16   have any idea?

17           MS. MERMELSTEIN:  I can't say that I am sufficiently

18   final to know an exact time.  I expect that the government will

19   endeavor very strongly to keep it under two and a half hours.

20           MR. SCHWARTZ:  Total?

21           MS. MERMELSTEIN:  For the main summation.

22           THE COURT:  We just have to --

23           MS. MERMELSTEIN:  I don't disagree with Mr. Schwartz.

24   It is not ideal to split them.  I don't think we want to wait

25   until Wednesday.  From the government's perspective, the

I6JJGAL8                          McMillan - direct

1   reality is that there will be at least one defense closing I

2   think probably on Monday following the government's summation,

3   if not two.  That leaves somebody with a whole day to respond

4   to the government's arguments, and that is just how the cookie

5   crumbles, I think.

6              THE COURT:  Okay.

7              MS. MERMELSTEIN:  I assume the defendants are going in

8   the order of indictment, but we get --

9              MR. SCHWARTZ:  We are still hashing that out.

10             THE COURT:  We'll see.  I am not inclined -- we'll see

11  what time we end on Monday.

12             MR. TOUGER:  We should wait and see where we end.

13             THE COURT:  That is what I was going to say.  We'll

14  see where we are on Thursday and talk about Monday.  I will see

15  you all tomorrow a little bit before 9:00.

16             (Court adjourned until Wednesday, June 20, 2018, 9:00

17  o'clock am)

18

19

20

21

22

23

24

25

```
1                     INDEX OF EXAMINATION

2    Examination of:                           Page

3    MARY MOYNIHAN

4    Direct By Mr. Quigley . . . . . . . . . .2604

5    Cross By Mr. Schwartz . . . . . . . . . .2640

6    MARK MCMILLAN

7    Direct  . . . . . . . . . . . . . . . . .2745

8    Cross By Mr. Touger . . . . . . . . . . .2748

9    Cross By Mr. Hassan . . . . . . . . . . .2806

10   Redirect  . . . . . . . . . . . . . . . .2811

11   Recross By Mr. Schwartz . . . . . . . . .2814

12   MARK MCMILLAN

13   Direct By Ms. Tekeei . . . . . . . . . . .2815

14                     GOVERNMENT EXHIBITS

15   Exhibit No.                            Received

16    792, 758, 763, 782 and 784 . . . . . . . .2607

17    753 and 755 . . . . . . . . . . . . . . .2611

18    3608  . . . . . . . . . . . . . . . . . .2617

19    757  . . . . . . . . . . . . . . . . . .2621

20    760  . . . . . . . . . . . . . . . . . .2623

21    762  . . . . . . . . . . . . . . . . . .2626

22    1112, 1510-1514, 3400-3409  . . . . . . .2825

23    3411, 3414-3422, 3428, 3429, 3431-3466  . .2826

24    3413  . . . . . . . . . . . . . . . . . .2857

25
```

1                         DEFENDANT EXHIBITS

2     Exhibit No.                                Received

3     751    . . . . . . . . . . . . . . . . . .2668

4     4306   . . . . . . . . . . . . . . . . . .2669

5     4376   . . . . . . . . . . . . . . . . . .2695

6     4385   . . . . . . . . . . . . . . . . . .2696

7     4310   . . . . . . . . . . . . . . . . . .2698

8     4311   . . . . . . . . . . . . . . . . . .2700

9     4312   . . . . . . . . . . . . . . . . . .2708

10    4313   . . . . . . . . . . . . . . . . . .2711

11    4314   . . . . . . . . . . . . . . . . . .2713

12    4354   . . . . . . . . . . . . . . . . . .2719

13    4317   . . . . . . . . . . . . . . . . . .2729

14    4319   . . . . . . . . . . . . . . . . . .2764

15    4345   . . . . . . . . . . . . . . . . . .2775

16    4333   . . . . . . . . . . . . . . . . . .2780

17    4335   . . . . . . . . . . . . . . . . . .2783

18    2038A  . . . . . . . . . . . . . . . . . .2788

19    4388 A  . . . . . . . . . . . . . . . . . .2790

20    4389   . . . . . . . . . . . . . . . . . .2792

21

22

23

24

25