UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

JOHN GALANIS, BEVAN COONEY, AND
DEVON ARCHER,

Defendants.

No. 16-CR-371 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

## INTRODUCTION

Following a six-week jury trial, defendants John Galanis, Bevan Cooney, and Devon Archer were convicted of securities fraud and conspiracy to commit securities fraud. Now before the Court are the defendants' motions for judgment of acquittal and a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.[1] After careful consideration and a thorough review of the record, the Court grants Archer's Rule 33 motion, but denies the others.

## BACKGROUND

It is undisputed that a massive fraud was perpetrated by Jason Galanis, the admitted mastermind of the conspiracy and a serial fraudster. It is also not in dispute that these defendants undertook actions that had the effect of assisting Galanis in this endeavor. The primary question for the jury was whether the defendants knowingly and willfully participated in the charged scheme, or, as they each have claimed, were themselves deceived by Jason Galanis. As the Court will detail, there was ample evidence demonstrating that John Galanis and Cooney were willful participants. The Court harbors substantial concern, however, that Archer lacked the requisite intent and is thus innocent of the crimes charged in this indictment.

---

[1] John Galanis initially moved only pursuant to Rule 29, but later submitted a supplemental Rule 33 motion predicated on newly discovered evidence.

## I.    Overview of the Conspiracy

This single conspiracy had two components critical to its overall success, with distinct groups of victims. First, the Wakpamni Lake Community Corporation ("WLCC") was induced into selling approximately $60 million worth of bonds. Tr. 156:17–24. The bond proceeds were to be invested in an annuity on behalf of the WLCC. Tr. 147:3–13. This investment was intended to generate sufficient returns to pay the interest and principal due to bondholders, with additional revenue remaining for the WLCC to fund certain economic development projects. Tr. 147:3–13. Instead, all of the proceeds were misappropriated at the direction of Jason Galanis, in part for his personal benefit.

The second group of victims consisted of certain clients of two SEC-registered investment advisers, Hughes Capital ("Hughes") and Atlantic Asset Management ("Atlantic"). The conspirators gained control of Hughes and Atlantic, which in turn purchased approximately $40 million worth of bonds on behalf of certain of their clients. This purchase violated the terms of certain clients' investor agreements and further failed to disclose that some individuals were involved on both sides of the transactions. *See* Tr. 1610:5–1614:13, 1617:3–13, 1680:9–1687:10; GX 927, GX 2632, GX 4016. Because the bond proceeds were not invested as intended (with the exception of the initial interest payment on the first set of bonds) these clients never received the interest to which they were entitled and never recovered their principal. *See* Tr. 752:20–753:4. Furthermore, as expected, there was no secondary market for the bonds and the clients of Hughes and Atlantic were thus unable to sell them. *See* Tr. 751:15–25.

## II.    The Relevant Entities and Individuals

The WLCC scheme took place during the course of a legitimate plan by Jason Galanis, Bevan Cooney, Devon Archer, and Jason Sugarman, among others, to conduct a "roll up" of various businesses with the goal of creating a financial services conglomerate that could be sold

for a sum larger than the value of its parts. *See* Tr. 906:9–15.[2] One of the entities they sought to acquire was Burnham Financial Group, which was intended to increase the value of the conglomerate by virtue of its reputation. *See* Tr. 1321:17–22; DX 4733 at 8. There is no indication that the roll up plan itself was illegal or otherwise suspect. Indeed, in pursuit of this plan the defendants and their business partners acquired numerous legitimate companies, which collectively managed assets in the billions of dollars. *See* Tr. 1324:18–24. But the complexity of the evidence in this case stems, in part, from the tangled web of related transactions involving the legitimate companies and those entities that were created at the direction of Jason Galanis solely to further the bond scheme and which were purposefully given names to make them appear related to the legitimate entities.

Before turning to the details of how the WLCC scheme was executed, the Court will provide an overview of the corporate entities and actors central to this case. Two companies, in particular, are implicated in many of the transactions: Burnham Financial Group ("Burnham") and Wealth Assurance Holdings. Burnham was the parent company of two other entities: Burnham Securities, Inc. ("BSI"), a registered broker-dealer, and Burnham Asset Management ("BAM"), an investment adviser with approximately $1.5 billion in assets during the relevant period. Tr. 1071:24–1072:22. Wealth Assurance Holdings was a special holding company created specifically to acquire Wealth Assurance-AG ("WAAG"), a European insurance company. Tr. 911:13–16, 1327:17–20. During the relevant period, Wealth Assurance Holdings also acquired another insurance company, Valorlife, and was subsequently renamed Valor Group. Tr. 1314:14–20. For the sake of clarity, the Court will refer to the Wealth Assurance Holdings/Valor Group entity only as Wealth Assurance Holdings ("WAH"). There was another entity, COR Fund

---

[2] Although he was not charged in this case, Jason Sugarman has been characterized by the government as an unindicted co-conspirator.

Advisers ("CORFA"), created by Jason Sugarman, the purpose of which was to raise money for corporate acquisitions and which was intended to play a role in the anticipated purchase of Burnham. Tr. 1333:15–19,

As the Court will describe, many of these entities touched, at least tangentially, the WLCC scheme. There were also a number of entities created at the direction of Jason Galanis for the sole purpose of furthering the scheme and which were given names to make them appear related to these companies, thus providing a veneer of legitimacy. For instance, one entity involved in the acquisitions of Hughes and Atlantic, BFG Socially Responsible Investing ("BFG SRI"), was in no way related to Burnham or its subsidiaries despite its name and was instead formed and owned by WAAG. Tr. 1384:8–13, 1386:4–16.[3] Similarly, the provider of the so-called annuity for the WLCC was a company called Wealth Assurance Private Client Corporation ("WAPC"). Tr. 367:8–10. Again, it bore no relationship to WAH or WAAG, but was named to give a misleading impression. Tr. 1014:18–21. Galanis even created a fake subscription agreement to perpetrate the lie that WAPC was in fact affiliated with WAH. Tr. 1459:8–20. While Dunkerley knew that WAPC and WAH did not enjoy a legal relationship, to his knowledge he was the only board member of WAH, including Archer, who was aware. Tr. 1460:11–1461:12. A third entity, Calvert Capital ("Calvert"), was later created to leave a paper trail of backdated, fraudulent documents in order to make certain of the WLCC transactions appear legitimate. Tr. 1057:14–1058:2.

Turning to the individuals who lie at the center of this case, Devon Archer was a principal of the Rosemont Group, a $2.4 billion private equity firm. DX 4733 at 12. During the relevant period, he was also the Chairman of Burnham, sat on the investment committee of BSI, and was on the board of WAH. Tr. 1033:24–1034:1, 1327:5–9, 1409:20–23. Jason Galanis, the admitted

---

[3] The name given this entity was "BFG Socially Responsible Investing"—not "Burnham Financial Group Socially Responsible Investing" as Hugh Dunkerley initially testified before correcting himself on cross-examination. *Compare* Tr. 936:5–6 *with* 1384:8–13.

mastermind of the criminal scheme who was the first of the defendants to plead guilty in this case, did not have a formal role at any of the Burnham entities but was nonetheless involved in their affairs. Tr. 1071:2–5. He was also considered an adviser to the boards of WAH and WAAG. Tr. 912:8–10. Despite being involved in the roll up plan, including as an investor, *see* Tr. 907:3–9, Cooney, a friend of Galanis', did not have a formal role at any of these entities, while John Galanis, Jason's father, apparently was not involved in any capacity.

The other members of the alleged conspiracy were Michelle Morton, Gary Hirst, and Hugh Dunkerley. Morton, who pleaded guilty the week before trial, was recruited to purchase and operate the two registered investment advisers, Hughes and Atlantic. *See* Tr. 1032:20–24. Hirst, who also entered a guilty plea shortly before trial, was installed as the Chief Investment Officer of Hughes following its acquisition, created WAPC, and possessed signatory authority over that entity's bank account. Tr. 946:25–947:1, 1011:20–1013:12. Dunkerley, a cooperating witness, occupied a variety of roles. He sat on the Boards of WAH and WAAG, was a director of CORFA, and was the sole managing member of both WAPC and BFG SRI, the previously discussed entities created solely to further the criminal scheme. Tr. 897:23–898:3, 937:21, 1327:10–16.[4] He also became an employee of BSI, the placement agent for the bonds. 897:23–898:3. Hirst and Dunkerley were responsible for transferring the bond proceeds out of the WAPC account. *See* Tr. 1020:1–13, 1022:5–7. The government's case was also assisted by Francisco Martin, who testified pursuant to a safe passage letter. His role was to advise the WLCC on the investments that would comprise the annuity by virtue of his alleged employment at an entity called Private Equity Management. Tr. 1015:13–21. He was also tasked with creating Calvert. Tr. 2181:14–19.

---

[4] Dunkerley pleaded guilty to two counts of securities fraud relating to the WLC scheme, as well as three counts for other crimes, including his production of fraudulent documents to cover-up the WLCC scheme and for his participation in a separate fraud relating to an entity called Ballybunion. *See* Tr. 927:7–21.

## III. The Genesis of the WLCC Bond Offerings

Jason Galanis and the defendants seem to have first contemplated becoming involved in the sale of Native American bonds in early 2014, with the intention, the government argues, of obtaining liquidity necessary to execute the roll up. On February 12, 2014, Jason Galanis emailed Archer and Cooney to inform them that he had been "brought a deal" involving a tax-free bond issuance by a Native American tribe that "need[ed] an underwriter for . . . municipal bonds." GX 2003. The email attached a letter from an employee of the U.S. Department of Treasury to Raycen Raines, a member of the Oglala Sioux Tribe, regarding its application to issue tribal economic development bonds. *Id.* The WLCC is operated by the Wakpamni Lake Community, a division of the Oglala Sioux. Tr. 155:15–21.

In March 2014, John Galanis met Raycen Raines at a Native American development conference in Las Vegas, Nevada. Tr. 1834:9–1835:11. Raines had not previously met John Galanis. Tr. 1834:22–23.[5] Beginning at that meeting and continuing for several months, John Galanis proposed that the WLCC issue bonds, the proceeds of which would be placed in an annuity. *See* Tr. 1835:24–1835:17. Based on certain representations made by John Galanis, Raines believed that the annuity "would be like an insurance wrapper that would protect the principal investment and generate annual income to cover the interest on the bond as well as generate income" for the WLCC's various development projects. Tr. 1836:9–14. John Galanis initially informed Raines that WAAG, the subsidiary of WAH, would serve as the annuity provider. Tr. 1840:7–14. Instead, the annuity provider ended up being WAPC (Wealth Assurance Private Client), which, contrary to John Galanis' representations to Raines, was in no way affiliated with WAH (Wealth Assurance Holdings) or WAAG (Wealth Assurance AG) despite its apparent affiliation based on its name. *See* Tr. 897:25–898:1, 1014:18–21. John Galanis further represented

---

[5] Instead of using his legal name, John Galanis introduced himself as "Yanni." *See* Tr. 1834:9–13.

(accurately) that the placement agent for the bonds would be BSI, the previously mentioned subsidiary of Burnham, and where Archer sat on the investment committee. Tr. 1838:8–14.

On June 16, 2014, John Galanis emailed Tim Anderson, a lawyer representing BSI, copying Jason Galanis. GX 1304. Attached to the email was a document setting forth the details of the anticipated transaction that were very similar to the final terms: the bonds were intended to create a revenue stream for the WLCC to fund economic development projects; BSI would be the placement agent and a company called Private Equity Management the portfolio manager; the initial offering was for $28 million, with all but $500,000 of that amount going to purchase an annuity from WAPC; the WLCC would receive annual payments ranging from $250,000 to $350,000 for the following twenty-five years; and the bondholders would receive annual interest payments, with the principal being recovered at the ten-year mark at which point the bonds would be retired. GX 1304; Tr. 170:13–177:9.

## IV. The WLCC Issues Bonds and the Proceeds are Misappropriated

The WLCC eventually conducted three separate bond issuances, worth differing amounts but otherwise structured similarly. The first and final issuances were purchased in their entirety by clients of Hughes and Atlantic, respectively. The second issuance was purchased by Archer and Cooney using misappropriated proceeds provided by Jason Galanis. A central issue at trial was whether Archer and Cooney knew that the money they used to purchase the second issuance was misappropriated from the proceeds of the first set of bonds.

At the time that John Galanis began discussions with Raines, the conspirators did not yet control either Hughes or Atlantic. On May 9, 2014, Jason Galanis forwarded Archer and Cooney an email concerning the potential acquisition of Hughes, which he described as "possibly useful." GX 2018; *accord* Tr. 1582:18–1583:7. The primary motivation underlying the acquisition was to secure purchasers of the first bond issuance. Tr. 933:8–11. Jason Galanis also attached the

resumes of Michelle Morton and Richard Deary. GX 2018. The acquisition, financed by wiring $2.76 million to Hughes from WAAG, closed on August 11, 2014. GX 2034; Tr. 1594:6–9. The funds went from WAAG to BFG SRI, which as previously discussed was not related to Burnham, then to an entity called GMT Duncan, before finally being provided to Hughes. Tr. 935:25–936:25. As a result of this transaction, Hughes became wholly owned by GMT Duncan. *See* Tr. 1383:18–20.[6] Hirst was installed as Hughes' Chief Investment Officer. Tr. 946:20–947:1.

On August 22, 2014, Hirst signed trade tickets effecting the purchase of the entirety of the first WLCC bond offering on behalf of clients of Hughes. *See* GX 813. In the following days, approximately $24 million from Hughes' clients was deposited into the WAPC account to fund the purchase of the annuity. GX 512 at 1; GX 4003 at 4.[7] Hughes' clients were not informed of the purchase, which presented a conflict of interest in light of the presence of the same parties on both sides of the transaction and which violated the terms of certain clients' investor agreements. *See* Tr. 1610:5–1614:13, 1617:3–13, 1680:9–1687:10; GX 927, GX 2632, GX 4016. Upon learning of this transaction, Hughes' clients responded negatively, with many demanding that the transaction be rescinded. Tr. 2049:21–2050:2.

Once the funds reached the WAPC account, they were not in fact used to purchase an annuity. Instead, through a series of transactions, the money was transferred to various individuals and corporations, with approximately $7 million being spent for the personal benefit of Jason and John Galanis. *See* GX 4003 at 4. For example, $1 million was sent to the law firm representing the seller of a Tribeca apartment that Jason Galanis was in the course of purchasing. GX 512 at 2,

---

[6] GMT Duncan was comprised of two classes of shareholders: voting Class A and non-voting Class B. The Class A shareholders were Morton and Deary while the sole Class B shareholder was BFG SRI, *see* Tr. 1385:1–19, a wholly owned subsidiary of WAAG (Wealth Assurance AG), Tr. 1386:14–20, which was itself a subsidiary of WAH (Wealth Assurance Holdings). As noted earlier, Archer sat on the board of WAH and Dunkerley on the boards of both WAH and WAAG.

[7] An additional $4 million of the clients' money was used to pay fees associated with the transaction and to provide $2.25 million immediately to the WLCC, which was earmarked for the construction of a warehouse. GX 4003 at 4.

GX 4013. An additional $2.35 million was sent to a bank account belonging to Sovereign Nations Development Corporation ("Sovereign Nations"), which was created at the direction of John Galanis days before the first bond issuance. GX 4013. The money wired to that account, which John Galanis characterizes as a legitimate commission he earned for his work on the deal, was ultimately disbursed to him for the purchase of luxury items, as well as to several of his family members. *Id.* An additional $4 million was sent from WAPC to Thorsdale Fiduciary and Guaranty ("Thorsdale"), an entity controlled by Jason Galanis that was a vehicle for investing his purported family money. GX 4003 at 4. Among other things, Jason Galanis distributed this money to members of his family and purchased luxury cars and jewelry. *Id.*

The remaining proceeds were used to purchase the second tranche of WLCC bonds by Archer and Cooney. This money was transferred out of the WAPC account at the direction of Jason Galanis, shuffled through various intermediaries, and finally transferred to Archer and Cooney. *See* GX 4006. On October 1, 2014, Archer purchased $15 million of bonds through an entity of which he was the sole managing member, Rosemont Seneca Bohai ("RSB"). GX 4004 at 7. Cooney purchased the remaining $5 million of the second issuance on October 9, 2014. GX 4005 at 6. The bonds purchased by Archer and Cooney were eventually used by entities with which the two were associated to satisfy net capital requirements set by the Financial Industry Regulatory Industry ("FINRA"). *See* GX 2075, GX 4004, GX 4005.[8]

As with the first offering, the proceeds from the second issuance were not invested on behalf of the WLCC. In November 2014, $3.8 million was wired from WAPC to Cooney, who allegedly intended to use it to purchase Jason Galanis' home in Bel Air. *See* GX 4007 at 4, GX 3224. Instead, the money was ultimately used by WAH to purchase the aforementioned Valorlife,

---

[8] FINRA ultimately determined, however, that bonds of this nature may not be used to satisfy net capital requirements. Tr. 2093:1–2094:24. There is no evidence, however, that anything was amiss with this aspect of the transactions. The entities seemed to have engaged with FINRA in good faith and ceased using the bonds to satisfy net capital requirements upon receipt of the agency's final decision. *See* Tr. 2117:16–2126:9

9

a subsidiary of an entity called Vaudoise, in furtherance of the roll up. *See* GX 4007 at 4. The remaining portion of the proceeds were transferred to Thorsdale, Jason Galanis' entity. *See* GX 4006. Archer did not receive any transfers from the WAPC account. *See id.*

Meanwhile, Jason Galanis was pursuing the acquisition of another investment adviser, Atlantic. On August 28, 2014, Jason Galanis emailed Archer and Cooney, with the subject line "we have a decent shot of adding this one to the family." GX 2303. Negotiations over this merger continued through the fall and winter of 2014-2015. *See* GX 828 at 1. Again, the acquisition was motivated by a desire to facilitate the purchase of WLCC bonds, this time for the third and final offering. *See* GX 2062; Tr. 1037:20–25.

Atlantic was eventually purchased for approximately $6.1 million in cash. *See* GX 828 at 4; Tr. 1033:15–1035:10. The structure was similar to the previous acquisition of Hughes—with the exception that the funds originated with WAH instead of WAAG—and Atlantic was merged into Hughes, with the resulting combined entity being known as Atlantic and remaining a subsidiary of GMT Duncan. *See* Tr. 1032:18–1037:13, 1383:18–20. Furthermore, WAH agreed to provide a guarantee for an additional $4,854,420 million of Atlantic's debts. Tr. 1035:5–10; GX 828 at 4. During this time, John Galanis approached Raines and suggested yet another bond issuance. Tr. 1858:13–21. On April 15, 2015, Morton purchased $16 million of the third and final WLCC bond issuance on behalf of the Omaha School Employees Retirement System ("OSERS"), which was a client of Atlantic. *See* GX 962; GX 4009. As with Hughes' clients, OSERS was not provided advance notice of the purchase, which violated certain aspects of its agreement with Atlantic, and was unable to liquidate the bonds due to the absence of a secondary market. *See* Tr. 656:3–25, 746:5–753:4.

The proceeds of the final issuance were similarly misappropriated: Cooney received $75,000, GX 4009; Jason Galanis used approximately $5.4 million to purchase Fondinvest, a

European fund of funds, with Dunkerley being installed as the owner, *see id.*, Tr. 1042:9–17; $4.6 million was sent to VL Assurance, another WAH subsidiary, GX 4009, Tr. 913:6–8; $305,000 went to Hughes, GX 4009; and millions more went to Seymour Capital and Thunder Valley, entities established at Hirst's direction and which were eventually used to purchase shares of Code Rebel in that company's IPO, *see id.*, Tr. 2160:19–2162:24. Again, Archer did not receive any proceeds from WAPC. *See* GX 4009.

## V.   Procedural History

The operative indictment in this case charged each of the three defendants with two counts: substantive securities fraud and conspiracy to commit securities fraud.[9] Trial commenced on May 22, 2018. The government rested on June 20, at which point the Court reserved ruling on the defendants' motions for acquittal, pursuant to Rule 29(b). Tr. 3131:13–22. Defendants Archer and Cooney then presented cases before resting on June 25. Following five weeks of testimony and nearly 800 documents being admitted into evidence, the jury began deliberations on June 28. *See* Tr. 4192:3–4. In spite of the undisputed complexity of this case, the jury did not ask a single question or request that any testimony be read back before finding all three defendants guilty of both counts. *See* Tr. 4195:2–4196:11. In total, the jury deliberated for less than three hours. *See* ECF No. 541-4.

### DISCUSSION

As mentioned above, the defendants were convicted of both securities fraud and conspiracy to commit securities fraud. It was clear that material misstatements and omissions were made in connection with the sale of securities. The only seriously disputed element was thus the intent of each of the defendants.

---

[9] As noted previously, the initial indictment charged seven individuals, four of whom pleaded guilty, including two, Michelle Morton and Gary Hirst, who entered pleas the week before trial. As a result of those two pleas, the third and fourth counts of the indictment, which charged investment adviser fraud and conspiracy, were rendered moot because none of the three remaining defendants were charged in either of those counts.

With respect to the required mental state for the substantive securities fraud offense, the Court charged the jury as follows: "Knowingly means to act voluntarily and deliberately rather than mistakenly or inadvertently. Willfully means to act knowingly and purposefully, with an intent to do something the law forbids; that is to say, with bad purpose, either to disobey or to disregard the law. Intent to defraud in the context of the securities laws means to act knowingly and with intent to deceive." Tr. 4153:8–17.[10] Regarding intent in the context of the conspiracy charge, the Court further instructed: "An act is done knowingly and willfully if it is done deliberately and purposefully; that is, a defendant's acts must have been the product of that defendant's conscious objective, rather than the product of a mistake or accident, or mere negligence, or some other innocent reason. . . . [T]he government must prove beyond a reasonable doubt that the defendant knew that he was a member of an operation or conspiracy to accomplish that unlawful purpose [to commit the charged substantive securities fraud], and that his action of joining such an operation or conspiracy was not due to carelessness, negligence, or mistake." Tr. 4169:12–4170:4.

**I.   Rule 29**

Each of the defendants challenges the sufficiency of the evidence pursuant to Rule 29. These motions are denied.

Rule 29 requires a court, "on the defendant's motion," to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When a court reserves its decision until after the jury returns a verdict, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). On such

---

[10] The Court also instructed the jury on aiding and abetting liability: "In order to aid or abet another to commit a crime, it is necessary that you determine that he willfully, knowingly associated himself in some way with the crime and that he willfully and knowingly would seek by some act to help make the crime succeed. Participation in a crime is willful if action is taken voluntarily or intentionally, or in the case of a failure to act, with a specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose, either to disobey or to disregard the law." Tr. 4159:15–23.

a motion, a court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (citation omitted). "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (citations omitted). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted). It is not the trial court's role to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (ellipsis in original) (citation omitted).

This strong "deference . . . to a jury verdict is especially important when reviewing a conviction of conspiracy" because conspiracies "by [their] very nature" are "secretive" and thus are "rare[ly] . . . laid bare in court." *Anderson*, 747 F.3d at 72–73 (citations omitted). "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct," *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001), *abrogated on other grounds by United States v. Huezo*, 546 F.3d 174, 180 n. 2 (2d Cir. 2008), and can be shown based on circumstantial evidence alone, *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir. 1993).

As noted earlier, at the time the government rested the Court reserved judgment on the defendants' motions pursuant to Rule 29(b), with each of the defendants filing written submissions after the verdict, in which at least Archer also moves pursuant to Rule 29(c). The practical difference is that Rule 29(c) permits the Court to consider all of the evidence presented at trial as

13

opposed to the evidence in the record at the time the Court reserved decision. *See* Fed. R. Crim. P. 29. The Court's conclusion, however, is the same under either approach. With one exception pertaining to John Galanis, which the Court will address in due course, the evidence introduced after the government rested either has no bearing on the analysis or was beneficial to the defense case.

### A.  John Galanis

There is no basis to disturb the jury's verdict with respect to John Galanis. In urging the Court to do so, he ignores both the governing legal standards and the evidence presented at trial, which overwhelmingly established his guilt.

The primary thrust of John Galanis' argument is that he only made two representations to the WLCC, neither of which was inaccurate in his view. As an initial matter, this argument mistakenly assumes that a defendant may only be liable if he personally made an actionable misrepresentation. But even assuming, *arguendo*, that John Galanis accurately states the law, his argument is unavailing because he did in fact make material misrepresentations to members of the WLCC. First, John Galanis acknowledges discussing his son's work at Burnham with members of the WLCC. He claims, however, that he merely said Jason "had a position at Burnham wherein he had great influence on deciding what investment opportunities Burnham would become involved in." Galanis Mot. at 2, ECF No. 564. It is of course true that Jason Galanis, despite not holding a formal position at Burnham or its subsidiaries, was actively involved in their affairs. *See* Tr. 1071:2–5. But the evidence at trial showed that John Galanis made a different and very specific

representation to the WLCC: that Jason was an employee of Burnham. Tr. 1838:15–17; *see also* Tr. 154:3–8.[11] This was indisputably false.[12]

There were additional misrepresentations, moreover, which John Galanis does not acknowledge in his moving papers. Most notably, he told members of the WLCC that the proceeds from the bond offerings would be placed in an annuity on its behalf. Tr. 1839:10–1840:6. Indeed, this was the entire motivation for the WLCC to participate in the transaction in the first place. It is undisputed that no such annuity was ever purchased. Instead, the proceeds were placed in the account of a shell company created specifically to facilitate the ensuing misappropriation.[13] Based on this representation, therefore, the jury could have easily concluded that John Galanis was guilty.

But equally as important, Galanis ignores the requirements for liability. There was ample evidence presented at trial of John Galanis' central role in the criminal enterprise, on which the jury could have concluded that he willfully participated in the scheme.[14]

---

[11] John Galanis does not appear to contest the materiality of this misstatement. Even if he did, however, the jury could have reasonably concluded that it was material by providing the representations made by John and Jason Galanis to the WLCC some veneer of legitimacy, particularly because it was John who was so intimately involved in structuring the deal in its early stages and he bore no formal relationship with Burnham. In any event, even if this statement was not material, as the Court will explain there were ample other bases on which the jury could have convicted John Galanis.

[12] The second representation identified by John Galanis is that he told the WLCC that sovereign immunity would shield them from any liability related to the bond offerings. It is unclear to the Court where in the record John Galanis made this representation, which, in any event, would not have been true in light of the clause in the governing documents partially waiving the WLCC's sovereign immunity. *See* Tr. 207:3–208:1.

[13] The government correctly notes that John Galanis initially told members of the WLCC that WAAG would be the annuity provider, presumably because it had a positive reputation. Tr. 1840:7–14. It is also undisputed, however, that John Galanis eventually informed members of the WLCC that instead WAPC would serve as the annuity provider. Tr. 1852:15–23. Whatever probative value this series of events may have with respect to John Galanis' intent, it cannot serve as the misrepresentation of material fact giving rise to liability.

[14] Unlike his co-defendants, John Galanis does not argue that the indictment alleges two distinct conspiracies. He does, however, make a related argument: that a prejudicial variance ensued because the evidence at trial failed to establish the single conspiracy alleged by the government. This argument lacks merit. It was well-established at trial that the conspirators made these two sets of misrepresentations—to the WLCC and the clients of Hughes and Atlantic—in a concerted effort in pursuit of a single goal: to steal the bond proceeds. *See United States v. Payne*, 591 F.3d 46, 61 (2d Cir. 2010) ("[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." (citation omitted)). In any event, to the extent the evidence did in fact establish two separate conspiracies, any such variance did not affect John Galanis' substantial rights. *See United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010).

John Galanis asserts that the government's case turned on the mere fact that he was related to Jason. Not so. The government even reminded the jury in its summation of the obvious principle that being related to a person who has committed a crime does not give rise to criminal liability. Tr. 3619:23–24. Rather, the evidence established that they were a father and son working in tandem in the context of this criminal scheme.

The jury could have reasonably inferred from the record that John Galanis did not by happenstance meet Raines in Las Vegas but specifically targeted him. Indeed, weeks earlier Jason Galanis had emailed Archer and Cooney about an opportunity to work with the WLCC, mentioning Raines by name. GX 2003. Moreover, there was at least one occasion on which Tim Anderson, an attorney who helped structure the WLCC issuances, contacted Jason Galanis seeking certain information about WAPC, a request to which John Galanis responded. Tr. 184:16–20. Finally, when Raines suggested that the WLCC explore alternative annuity providers in order to compare rates, John Galanis discouraged him from doing so. Tr. 1854:23–1855:10. If another entity had served as the annuity provider, it would not have been possible to misappropriate the proceeds.[15]

John Galanis also grossly mischaracterizes the record concerning the money he received for his assistance in executing the WLCC scheme. It is undisputed that he received $2.35 million, which he describes as a commission. Galanis is of course correct that commissions are not *per se* illegal. He also rightly notes that BSI received $250,000 for its role as the placement agent for the

---

[15] The one piece of evidence introduced after the Court reserved judgment on the Rule 29 motions that harmed any of the defendants was that regarding John Galanis' participation in a prior securities fraud scheme orchestrated by his son. The Court had precluded the government from introducing this Rule 404(b) evidence unless counsel for John Galanis argued that his client had been duped by Jason in the context of this conspiracy. In spite of the Court's explicit warnings, counsel did just that in his summation, at which point the Court briefly re-opened the evidentiary record to permit the government to introduce a stipulation that John Galanis had pled guilty to that previous fraud. Tr. 3829:2–16. The Court provided a robust limiting instruction that neither Archer nor Cooney were implicated in that conduct and that the jury was permitted to consider the evidence only against John Galanis for the purpose of assessing his intent in the present case. Tr. 3829:25–3831:11. Needless to say, this evidence was highly probative of whether John Galanis was a willing participant in the scheme at hand. But as the Court's analysis demonstrates, the jury had ample bases for convicting him based on the evidence that had been introduced at the time the government rested and the Court reserved judgment on his Rule 29 motion.

bonds. GX 214 at 5. Raines even believed that Galanis might receive a portion of the payment due to Burnham. Tr. 1947:17–21. But the circumstances under which John Galanis received this money belie the notion that it was payment for anything but his participation in the criminal scheme.

First, unlike the payment to Burnham, the $2.35 million distributed to John Galanis was not provided for in the schedule setting forth the payments of expenses owed at closing. *See* GX 214 at 5. Indeed, unlike the payment to BSI, which was made at closing, the funds given to John Galanis came at a later time out of the WAPC account. *See* GX 4013. At trial, he failed to identify any authority for such a distribution to be made to him in the context of these transactions. Second, the size of the payment further undermines his argument. It stands to reason that if BSI was receiving $250,000 for its role as placement agent, John Galanis should not have received nearly ten times that sum for whatever services he allegedly provided. To the extent John Galanis suggests that his payment was a finder's fee, that argument is contradicted by the trial record, which, as previously discussed, established that Jason Galanis and the other defendants at trial were aware of this potential transaction prior to John Galanis ever "meeting" Raycen Raines. *See* GX 2303. Finally, the manner in which the funds were disbursed to John Galanis is perhaps most probative of the fact that this payment was not legitimate. John Galanis was not simply wired the funds. Instead, mere days prior to the first issuance, he directed an associate to create Sovereign Nations. *See* Tr. 2820:1–2822:16; *see also* GX 623, GX 1112. The incorporation and account opening documents for this company are bereft of any mention of John Galanis, even though he was the one effectively exercising control over the bank account. *See* GX 623, GX 1112, Tr. 2826:3–2828:1, 2831:5–2837:5. The $2.35 million was wired to Sovereign Nations, at which point John Galanis directed distributions, using a fake email account, to himself and family members. *See* GX 3400, GX 4009, Tr. 2822:23–2823:24.

On this record, the jury's conclusion, supported by ample evidence, was eminently reasonable.

**B.     Devon Archer and Bevan Cooney**

The Rule 29 motions submitted by Archer and Cooney are similarly denied. With respect to Archer, as will become clear in the course of the forthcoming Rule 33 analysis, when drawing all inferences in the government's favor, there is not a valid basis to grant his Rule 29 motion. As the Court will further explain, Cooney's insufficiency of the evidence argument fails even under the more lenient Rule 33 standard.

**II.     Rule 33**

As mentioned above, Archer and Cooney both attack the sufficiency of the evidence in advancing motions for a new trial under Rule 33.[16] The defendants also make various other Rule 33 arguments. For reasons the Court will detail, Archer's motion based on the sufficiency of the evidence is granted, while all others are denied.

Rule 33 permits courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts have "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (ellipsis in original) (citation omitted). Motions for a new trial pursuant to Rule 33 "are disfavored in this Circuit" and "should be granted only in the most *extraordinary circumstances.*" *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011) (emphasis in original) (citations omitted).

**A.     Sufficiency of the Evidence**

---

[16] As previously noted, John Galanis does not attack the sufficiency of the evidence under Rule 33. Cooney has made several arguments for a new trial without explicitly attacking the sufficiency of the evidence, as he does under Rule 29. Nonetheless, particularly to the extent Cooney joins in Archer's motions, the Court construes Cooney's papers as also arguing that the evidence is insufficient under Rule 33.

"In deciding whether to grant a Rule 33 motion [predicated on sufficiency of the evidence], a judge may weigh the evidence and determine the credibility of witnesses" and "is not required to view the evidence in the light most favorable to the Government." *United States v. Tarantino*, No. 08-CR-655 (JS), 2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012) (citations omitted), *aff'd*, 617 F. App'x 62 (2d Cir. July 10, 2015). "The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134 (citations omitted). The Court, however, must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *Id.* at 133 (citation omitted). "The ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice. To grant the motion, there must be a real concern that an innocent person may have been convicted." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citations omitted).

### 1. Devon Archer

The Court has been mindful of the deference appropriately accorded juries and does not grant Archer's motion for a new trial lightly or absent careful consideration. As noted above, when drawing every inference in the government's favor, as the Court is required to do under Rule 29, the Court cannot conclude that no reasonable jury could have convicted him, particularly because the primary issue was intent and the government presented a substantial amount of circumstantial evidence to that effect.

The government's reliance on circumstantial evidence is of course perfectly appropriate. And the government's case against Archer is not without appeal at first blush. He did, after all, purchase WLCC bonds using misappropriated proceeds that he received from Jason Galanis. But

when each piece of evidence in this indisputably complex case is examined with scrutiny and in the context of all the facts presented, the government's case against Archer loses much of its force.

First, the government's overwhelming reliance on circumstantial evidence is coupled with Jason Galanis' deception, including of those who intentionally aided his crimes. His *modus operandi* was to compartmentalize his schemes, such that each participant knew only that which was essential to his or her narrowly defined role. Indeed, the trial record is replete with acknowledgements by accomplices of Jason Galanis that he was intentionally deceptive, rendering them unaware of various aspects of his illegal conduct—including those central to the WLCC scheme—and that sometimes they did not learn the truth until they reviewed the indictment in this case or were otherwise informed by the government. *See* Tr. 932:7–14, 933:17–20, 1028:4–10, 1120:17–1121:10, 1126:5–1128:17, 1142:12–21, 1311:24–1312:6, 1339:10–24, 1425:1–15, 1557:2–6, 2142:6–13, 2144:1–22, 2159:8–21, 2296:9–18, 2326:8–15, 2329:16–23, 2332:21–2333:17, 2335:2–4, 2336:5–7, 2345:15–2346:2.

This ignorance extended so far as to specific transactions in which they were involved. For example, the government's cooperating witnesses only learned that the WLCC deal was fraudulent by virtue of their independent observations. Dunkerley, despite his close relationship with Galanis and after already having performed discrete acts in furtherance of the conspiracy, arrived at this realization only when he noticed that the bond proceeds in the WAPC account, to which he had access, were not being used to purchase an annuity. *See* Tr. 1310:13–21. There were no such clues for Archer. Moreover, the evidence demonstrated that Galanis viewed Archer as a pawn to be used in furtherance of his various criminal schemes. *See, e.g.*, DX 4078. The role of Jason Galanis as it pertains to the defendants' intent is all the more vexing in light of the legitimate roll up plan, which involved many of the same entities and actors. It is through this prism that the evidence in this case must be assessed.

20

The Court's concerns are further exacerbated by the government's inability throughout trial to articulate a compelling motive for Archer to engage in this fraud. Although the government is of course not required to prove motive, it is notable that Archer never received money from the purported annuity provider, nor did he profit directly from the misappropriation of the bond proceeds.[17] The theory on which the government now relies is that Archer's admitted interest in the roll up being successful—due, principally, to his ownership interest in Burnham and the shares of WAH stock he received for serving on the board—created a motive for him to participate in the WLCC fraud, which, the government contends, provided funds critical to the roll up's success. The Court cannot dismiss this possibility entirely, though it is mitigated by the fact that Archer's commitment to the roll up also resulted in him spending substantial amounts of his own money, with one calculation offered by Archer estimating that he lost approximately $800,000 during the relevant period. *See* Tr. 3567:21–23; DX 9003. Nonetheless, the fact that Archer did not profit by virtue of retaining bond proceeds that he received, either directly or indirectly, from the purported annuity provider is a significant distinction between him and his co-defendants. *See* GX 4013 (entity controlled by John Galanis received $2.35 million directly from WAPC); GX 4009 (Cooney received $75,000 directly from WAPC); *cf.* GX 4012 (documenting the many millions of misappropriated funds Jason Galanis spent on himself); Tr. 1005:14–18, 1096:1–5 (Dunkerley received $125,000 at close of first bond issuance for being the placement agent even though he did not actually have to locate purchasers of the bonds); Tr. 2143:20–25, 2147:6–18, 2149:3–8 (Martin

---

[17] At trial, the government advanced a theory that Archer profited by way of $700,513 in misappropriated proceeds he received from Thorsdale, the entity controlled by Jason Galanis. *See* GX 4012. Cross-examination established, however, that this was not the case. The evidence on which the relevant government chart was based consisted of two wires from Thorsdale to RSB: one for $100,000 and a second for $600,513. The transfer for $100,000 appears to have been repayment of a loan made to Thorsdale by RSB one month earlier while the second wire was soon thereafter returned to Thorsdale. *See* Tr. 3002:25–3028:16. Indeed, the government seems to have abandoned its argument that these transfers are evidence of motive, instead describing the money as being "funneled" through RSB's account in the course of the conspiracy. *See* Govt Opp. at 51.

received $150,000 for serving as the investment manager for the annuity even though one was never purchased).

While some of Archer's conduct is troubling—particularly his repeated failure to disclose his involvement with Jason Galanis—the Court remains unconvinced that Archer knew that Jason Galanis was perpetrating a massive fraud. In short, when permitted to weigh the evidence on its own, as Rule 33 allows, the Court is left with an unwavering concern that Archer is innocent of the crimes charged.

The government's case as to Archer's intent was comprised primarily of the following evidence: (1) his purchase of $15 million of WLCC bonds; (2) emails involving him, Cooney, and Jason Galanis; (3) purported lies he told Morgan Stanley and Deutsche Bank in the course of custodying the WLCC bonds and to the Board of Trustees of the Burnham Investors Trust ("BIT Board"); and (4) various alleged efforts to cover up the WLCC scheme. The Court will address each in turn.

### i. Archer's Purchase of the Second Tranche

The primary aspect of the government's case against Archer was his purchase of WLCC bonds using proceeds from the first issuance. This $15 million represented approximately one-fourth of the total amount misappropriated during the course of the conspiracy. It is undisputed that Archer knew Jason Galanis supplied the money. *See* GX 2228. What is disputed, however, is whether he knew the funds Galanis gave him were misappropriated bond proceeds.

It is imperative to understand the nuances of these transactions, which were structured intricately by Jason Galanis, presumably, to aid his deception. It is clear from the record that Archer knew Jason Galanis was providing the money for him to purchase his portion of the second tranche. But critically, the funds were not transferred to Archer from WAPC, as when John Galanis received misappropriated proceeds. *See* GX 4013. Instead, the money took a circuitous

22

route. Hugh Dunkerley, operating at the direction of Jason Galanis, transferred $15 million to Thorsdale, the entity controlled by Galanis, at which point it was wired to Clifford Wolff, an attorney who represented Galanis in various transactions. *See* GX 4006. It was only then that Wolff sent the funds to an account belonging to RSB, an entity that, as previously discussed, was controlled by Archer. *See id.* RSB in turn purchased $15 million of WLCC bonds. *See id.*

Despite his involvement, the government presented no evidence that Archer knew that these funds came from WAPC, which presumably would have operated as a red flag. Moreover, the first transaction in this series was effected in a manner intended to prevent anyone from realizing that the funds were coming from the purported annuity provider. Instead of merely wiring the money, pursuant to an explicit instruction by Jason Galanis, Dunkerley went to a bank and withdrew $15 million from the WAPC account and then separately deposited it into Thorsdale's account. Tr. 1514:1–12, 1516:10–1517:15. As opposed to when a transfer is effected by wire, it is only possible to connect these two transactions by simultaneously examining the records for the two accounts and because a bank employee wrote on the withdrawal slip that the money was being deposited into Thorsdale's account. *See* GX 565; Tr. 1525:12–24. This was the only occasion on which Dunkerley effected a transfer from the WAPC account in this manner. Tr. 1517:13–17. The transfer from Thorsdale to the Wolff Law Firm was also accompanied by an email from Francisco Martin, ghost-written by Jason Galanis, in which Martin "[t]hank[ed]" Wolff for his "assistance in helping to settle this investment for your client." DX 4795; *accord* Tr. 2339:24–2340:22.

Perhaps most critically, even Dunkerley, who the evidence showed was privy to more aspects of Jason Galanis' various criminal acts than virtually anyone else—including frauds in which Archer is not alleged to have played any role—did not realize either (1) that the $15 million from the WAPC account was ultimately being sent to Archer or (2) that Archer ultimately

purchased bonds with misappropriated proceeds. *See* Tr. 1028:5–10, 1312:8–13. Instead, Jason Galanis told Dunkerley, who was an active participant in this series of transactions, that Archer had a contract from China to make investments in the United States, which required him to use the money by a certain date. *See* Tr. 1025:2–7. Archer, according to Galanis, was going to buy the bonds in order to "effectively park the money so that he could use it for future investments as they came up." Tr. 1025:8–10. The fact that Dunkerley knew only the details of the one transaction of this series in which he was directly involved—sending the money from WAPC to Thorsdale— counsels strongly against concluding that Archer had insight into the entire sequence, which would be necessary for him, as the recipient of the final transfer, to know where the money originated from, namely the WAPC account.

In sum, there was no evidence presented that Archer was aware that the money being provided by Jason Galanis constituted proceeds from the first issuance. As the Court has described, moreover, other aspects of the record suggest that he did not know. Indeed, Jason Galanis' measures to hide that he was sending Archer money from the WAPC account stands in stark contrast to other occasions on which Jason Galanis misappropriated proceeds, such as when money was sent directly to the account of an entity effectively controlled by his father and other funds were wired directly to Thorsdale. *See* GX 4003 at 4. And as previously noted, Dunkerley, who was instrumental in transferring the funds in question to Archer, only realized that bond proceeds were being misappropriated at all due to his access to the WAPC account, which obviously revealed that the funds were not being used to purchase an annuity. *See* Tr. 1310:13– 21. The evidence indicates that Archer had no such access. *See* Tr. 1339:25–1340:3.[18]

---

[18] Related to this transaction, the government asserts in a footnote in its opposition papers that the letter submitted by Archer to the WLCC indicating that he was a sophisticated investor could itself be an actionable misstatement. *See* Govt Opp. at 54 n.16 (citing GX 281). Assuming that the letter in fact contained a material misstatement, the government would still need to demonstrate that it was made with the requisite intent and the Court's Rule 33 analysis thus remains applicable.

## ii. Emails Involving Jason Galanis, Archer, and Cooney

The government next argues that emails between Archer, Cooney, and Jason Galanis, particularly those sent by Galanis, demonstrate an intention to steal the bond proceeds and defraud the clients of Hughes and Atlantic. These emails were read into evidence by law enforcement agents without any accompanying testimony. Indeed, the government's two witnesses who were participants in the scheme—Hugh Dunkerley and Francisco Martin—were not parties to these messages and could not interpret or explain the statements made therein. The government is, of course, not required to offer testimony accompanying such evidence. As the Court will explain, however, the language in the emails is facially innocuous or, at best, most naturally subject to innocent interpretations. Thus, although the government urged the jury to construe these emails as evidence of the defendants' intent to perpetrate fraud, the Court views them as more probative of Archer's innocence.

Broadly speaking, the emails concern two topics: (1) the genesis of the WLCC bond offerings, including planning the first issuance, and (2) the acquisitions of Hughes and Atlantic. The Court will address each in turn.

As for the emails regarding the structuring of the WLCC bond deal, the government points to terms such as "liquidity" and "discretionary" as if they are necessarily evidence of criminal intent. But the government interprets these communications with the benefit of hindsight, knowing that Jason Galanis in fact misappropriated the proceeds. Instead, the critical question is what these emails say about Archer's intent at the time they were made. As the government rightly notes, evidence must be interpreted in context, which also requires the Court to consider that these communications were sent among three individuals attempting to complete the previously discussed roll up plan, a primary goal of which was to increase assets under management. *See* DX 4733 at 13. That the defendants, by virtue of the WLCC bond deal, may have increased, or wanted

25

to increase, the assets over which they had discretion to invest is not evidence of criminal intent. Furthermore, the annuity was intended to include private equity investments. *See* GX 209 at 10, GX 210 at 11 (agreements providing for the annuity to include private equity investments); Tr. 370:17–19, 372:9–15, 500:22–504:6 (Anderson, the attorney who represented BSI, the placement agent for the bonds, understood that the bond proceeds would be invested in private equity, agreeing that such investments "typically involve taking a substantial stake or even control of a company"). Therefore, that certain communications may indicate a hope or belief that the defendants would benefit from the WLCC bond deal by virtue of it helping to advance the roll up does not mean that such benefit was mutually understood to result from *stealing* the bond money. In fact, consistent with these agreements, Dunkerley and Galanis even planned to cover up the theft of the proceeds by telling the WLCC that the bond money had been invested in various companies acquired in the course of the roll up and that the returns on their ownership stake in these entities were sufficient for the annuity to generate the expected returns. *See* Tr. 1057:5–10.

For instance, one of the first emails connecting Archer to the WLCC scheme, and on which the government places much weight, is an April 2014 message from Jason Galanis regarding a transaction that never came to fruition, in which he wrote "$20mm bond approved. Proceeds are 15mm to us and 5mm to them for a winery investment they want to make." GX 2011. In the government's view, Galanis was communicating that he and the defendants were free do as they wished with the $15 million. But a more reasonable interpretation of this message is that Galanis was conveying that $5 million of the bond proceeds would be immediately distributed to the WLCC while the remaining $15 million was to be invested on its behalf, thereby increasing assets under management. Indeed, this was similar to the structure of the deal that was eventually consummated, where $2.25 million was distributed immediately to the WLCC and roughly $24 million was earmarked for investment. *See* GX 4003. This interpretation also comports with the

opinion letter from a law firm attached to the message. *See* GX 2011. Moreover, Cooney replied, asking, "[w]hat do we get to do with the 15mm." GX 2120. While the government argues that this is further probative of criminal intent, a more natural inference is that Cooney did not understand Galanis to mean that they would steal the money but instead that there would be limitations of some sort on how the funds could be used, presumably pursuant to the agreements that would govern the contemplated transaction.

The Court is similarly concerned about a possible misinterpretation of Galanis' response that the funds were "discretionary." *Id.* Archer could easily have understood Galanis to be referring to the fact that the group would be able to invest the money for the WLCC as they saw fit, so long as they complied with any restrictions put in place by the client. This is not a novel concept. Discretionary liquidity is frequently referenced in the course of discussing perfectly legitimate transactions and entities, including the sorts at issue in the case at hand. *See* GX 2029 (noting that Hughes "manages $900 million on a *discretionary* basis for 29 institutional clients (pensions and endowments)" (emphasis added)); GX 2303 (noting that Atlantic "managed on a *discretionary* basis approximately US $1.8869 billion of client assets and provides advisory services on a *non-discretionary* basis with respect to US $7.1457 billion of client assets" (emphasis added)); DX 4733 at 13 (Burnham pitch deck emphasizing its discretionary assets under management); Tr. 650:19–651:8; 855:2–14; 1397:18–1398:4; 1605:20–1606:2; 1635:22–1636:4; 1660:8–12; 1673:13–20.

The foregoing analysis similarly applies to other emails in which Galanis emphasized the need for discretionary liquidity. *See* GX 1221 (June 2014 email correspondence in which Galanis informed Archer that he was working with "dan and Hugh on capital vehicles that result in us controlling discretionary funds" which would provide them with "money to invest," to which Archer responded that "[w]e need discretionary funds at our command soonest," and to which

27

Galanis replied that he was focused on "discretionary"); GX 2025 (Galanis writing "with some dry powder in our control soon, we will be scary effective"); GX 2026 (Galanis providing an update on the progress towards closing the transaction, adding "shooting for the end of month. lots to accomplish to finesse this over the line, im not counting the money yet . . . my primary objective is to get us a source of discretionary liquidity. sick of begging."); GX 2031 (on eve of closing of first issuance Galanis writes "[i]f I get this $28mm, I have 12-15mm to put into WAH [Wealth Assurance Holdings]"); GX 2065 (November 20, 2014 email from Galanis in which he lays out the details of a potential future bond deal, including that proceeds would be placed in a WAH annuity, with returns being "generated by a diversified private equity portfolio in order to grow Tribal assets"); GX 2216 ("Dan and Hugh have locked [Fondinvest] up and came to me for the money, which I have agreed to arrange/provide (probably Indians).").[19]

The Court's concern is further exacerbated when, as it must, the evidence is construed cumulatively and not in isolation. On June 20, 2014, Jason Galanis emailed Archer and Cooney, writing "Arch[,] the Indians signed two hours ago our engagement . . . Nothing for you to do at this point, but giving you a heads up. The use of the proceeds is to place the bond proceeds into a Wealth Assurance annuity . . . . btw, annuity proceeds get invested by an appointed manager on a discretionary basis on a 20 year contract. Hercules has been appointed." GX 1235. Far from being inculpatory, this email appears exculpatory because Galanis is specifically representing that the bond proceeds would be placed in an annuity. It further seems clear that when these individuals used the word discretionary in this context they were referencing the ability of an asset manager

---

[19] The government rightly notes in its opposition papers that Jason Galanis in fact later used $5.4 million in proceeds from the final bond issuance to purchase Fondinvest. *See* GX 4009. Archer contends that he plausibly understood this to mean that proceeds would have been used in the acquisition of Fondinvest, with the WLCC enjoying a stake in the company, *i.e.*, as a private equity investment. The government's counter to this argument appears to be the conclusory statement that Archer knew he and his alleged co-conspirators were instead using the bond proceeds for themselves. *See* Govt Opp. at 33 n.13 ("There was no annuity, and Archer knew that he and others were using the proceeds of the bond issuances for themselves and not, as promised to the WLCC, to an annuity."). But as the Court has noted, it was specifically contemplated that investments on behalf of the WLCC would include private equity. *See* GX 209 at 10, GX 210 at 11; Tr. 370:17–19, 372:9–15, 500:22–504:6

28

to exercise discretion in selecting investments for a client, in this case the WLCC. Galanis' response supports Archer's argument that this is probative of his belief that the proceeds could be legitimately invested on behalf of the WLCC while simultaneously advancing the roll up. Although Jason Galanis likely intended to steal the bond proceeds by this point, the Court remains unconvinced that he communicated such intent in these messages, or, more critically, that Archer understood him so. As noted earlier, during this period even Dunkerley and Martin believed the WLCC deal was legitimate. *See* Tr. 1139:24–1140:5, 2296:9–18.

Other emails regarding the first bond issuance are simply status updates, which appear facially innocuous. *See* GX 1220 (Galanis forwarding email correspondence with Tim Anderson and writing that he was "moving the $20MM sovereign nation debt issued"); GX 1267 ("closing soon" in reference to the first issuance); GX 2026 ("we got US Bank to act as trustee for the bond issue," "GT is issuer counsel," and "Tribe counsel met and approved the issue"); GX 2027 (Galanis writing that they were "close" and "target close is July 31"); GX 2031 (Galanis stating he was "in closing docs on $28mm with GT. Close. Could fall apart but close."); GX 2217 ("Wilma Standing Bear and Geneva Lone Hill have fully executed the agreements").

Finally, the government cites to various messages from Archer and Cooney in which they express enthusiasm in response to the information provided by Jason Galanis. *See* GX 2024 (Cooney responding with a picture of a Jack playing card and writing "The Greek! [which was a nickname for Galanis]"); GX 2026 (Archer responding "Unreal! This is just a testament to taking a portfolio approach to pursuing opportunity (aka the ping pong method). Unreal as you never know where the nuggets pop up."); GX 2026 (Archer responding "Appreciate that Jack! And completely correct!"); GX 2028 (Archer writing "[f]rom your lips to Gods ears! July 31 is right around the corner."); GX 2031 (Archer stating "I'm not sure I can take anymore of the precious. It's incredibly capital intensive greenfield work. But let's discuss because there's also a lot of blue

sky!"). In the Court's view, these emails simply do not give rise to the inference urged by the government.

The same is true of the emails related to the acquisitions of Hughes and Atlantic. There was nothing inherently illegal or illegitimate about these transactions, even though they were motivated by a desire to locate purchasers of the WLCC bonds.[20] Rather, the fraud as it pertains to the investment advisers is that bonds were purchased for their clients without disclosure of all of the potential conflicts of interest and the bonds fell outside certain clients' investment parameters.[21]

The emails relied on by the government make it clear that Archer was aware of the acquisitions of Hughes and Atlantic, as well as the goal that these transactions would facilitate the sale of WLCC bonds. *See* GX 1229 (in reference to acquisition of Atlantic closing, Galanis noting that it "will be nice to have dry powder to fire"); GX 2018 (Galanis emailing Archer, Cooney, and Andrew Godfrey regarding Hughes, noting that firm has "$1.0 billion AUM [assets under management]. all fixed income. 52 clients. all institutional."); GX 2029 (Galanis forwarding executed term sheet for acquisition of Hughes and noting that it "manages $900 million on a discretionary basis for 28 institutional clients (pensions and endowments)"); GX 2034 ("WAAG wired $2.78 million today to close Hughes."); GX 2242 (discussing how acquisition of Atlantic would provide "more liquidity and sources for the various projects" and that it could be used to purchase WLCC bonds, months before its acquisition); GX 2303 (email from Galanis indicating that "we have a decent shot of adding [Atlantic] to the family"); *see also* GX 1224, GX 1228, GX

---

[20] The one caveat is that the acquisition of Hughes was financed through the so-called Ballybunion fraud, *see* DX 4060 at 2 (conditioning $2.76 million for acquisition of Hughes on release of Ballybunion proceeds), a separate crime committed by Jason Galanis and Hugh Dunkerley in which none of these defendants are implicated, *see* Tr. 1151:4–8 (Dunkerley was told by Jason Galanis not to tell anyone else about the Ballybunion fraud).

[21] The Court notes that certain of the conflicts were apparently disclosed. *See* Tr. 508:15–509:8 (Dunkerley's involvement in both WAAG and BSI was disclosed in private placement memorandum); GX1334.

1282, GX 2037, GX 2063, GX 2076, GX 2078. There is no indication, however, that the individuals in control of the investment advisers, Morton and Hirst, would fail to disclose the conflicts of interest or violate the terms of the clients' investor agreements. Indeed, certain emails to which the government points support the opposite inference, namely that there existed a hope that clients of Hughes and Atlantic would purchase WLCC bonds, but no intent to unilaterally foist the bonds upon them. *See* GX 2029 (Galanis writing that "[w]e have agreed to give" Hughes "*an opportunity to participate* in Native American new bond issues" and asserting his belief that it would take "$28 million of the Wakpamni/Ogala [*sic*] Sioux issue" (emphasis added)).

The government, finally, places much emphasis on two emails related to Jason Galanis' purchase of a condominium in New York City, which was made in part with bond proceeds. On July 9, 2014, Clifford Wolff emailed Archer and his assistant, Sebastian Momtazi, that Galanis was going to "purchase a condo using the above name [Archer Diversified TRG, LLC] and Devon's cache [*sic*]. The company is using your office address." GX 2122. Later that month, Galanis, in an email thread in which he had previously specified that the closing date for the WLCC deal was July 31, commented "so close. Cliff is running the stall for me on nyc mansion[.] I want to be here and won't live in a 1750 square foot cage[.] Massively motivated." GX 2028. The inference urged by the government is that Archer knew Galanis was going to later use bond proceeds to purchase the condominium.

The Court is not convinced that this correspondence leads to the inference urged by the government. It is true that these emails suggest that Archer permitted Galanis, with whom he was working at the time, to effectively trade on his name in attempting to purchase a condominium. But that misleading impression is not probative of whether Archer knew Galanis was going to steal the bond proceeds. Moreover, that Galanis expressed the desire to make this real estate purchase in an email in which he also addressed the WLCC bond deal does not lead to the inference that he

31

would ultimately finance this purchase, in part, with misappropriated bond proceeds. As Archer notes, it can also be read as merely affirming that Galanis was going to purchase the property if the deal went through (*e.g.*, in part using money he might legitimately earn from the bond deal or fees later generated as a result of the anticipated investment on behalf of the WLCC). Burnham, a subsidiary of which was set to be the placement agent for the bonds, also maintained its offices in Manhattan, making the discussion of Galanis' anticipated move to New York City in the context of discussing the closing of the WLCC deal not illogical.

But the more critical point is this: because this email was admitted with no accompanying testimony or other evidence probative of its meaning, the Court (as the jury was) is left to speculate as to whether Galanis was implicitly conveying criminal intent to Archer. The Court is hesitant to conclude from this correspondence that Galanis was effectively stating that he intended to steal the bond proceeds, which is simply too large an inferential leap. The inference urged by the government is further undercut by the fact that Galanis financed the rest of this purchase by diverting money from Valorife, under the pretense that it was purchasing WLCC bonds. *See* GX 4015, DX 4127, DX 4824, Tr. 3539:4–3541:1. There is no indication that Archer was involved in that conduct.

One final point bears mentioning: the government attempts to read nefarious intent into certain of these messages by suggesting that the defendants knew that Jason Galanis intended to steal the bond proceeds because he was short on money but nonetheless discussed extravagant expenditures, such as a condominium in New York. This suggestion is unpersuasive, however, in light of the extensive evidence presented at trial demonstrating that Jason Galanis successfully misled virtually every person he met into thinking he was immensely wealthy and successful. *See, e.g.*, Tr. 2306:1–2303:17.

In sum, the Court does not view this body of evidence as tending to show that Archer was in fact aware of Galanis' theft. Indeed, certain emails, most notably Government Exhibit 1235, tend to show the opposite, namely that Archer had good reason to believe the WLCC bond deal was legitimate. At a bare minimum, the inferences urged by Archer are more closely tethered to the actual language used in these communications.

### iii. Purported Lies to Morgan Stanley, Deutsche Bank, and the BIT Board

The most damaging evidence against Archer, in the Court's view, were the purported lies he told three entities: Morgan Stanley, Deutsche Bank, and the BIT Board. While certain of these statements were clearly misleading, as the Court will explain the primary manner in which they were deceptive—hiding the involvement of Jason Galanis—does not lead to the ultimate conclusion necessary for Archer's guilt: that he was misleading because he knew Galanis was stealing the bond proceeds.

Archer's statements to Morgan Stanley and Deutsche Bank occurred in the course of identifying an institution to custody the WLCC bonds he purchased in the second tranche, which simply entails storing them. *See* Tr. 833:3–11. The government argues that Archer lied about the source of the $15 million he used to purchase the bonds when he told both entities that the money was generated via real estate sales. *See* GX 344, GX 1226. Archer contends that these statements were accurate in his view at the time because he was merely repeating lies Jason Galanis had told him about the source of the funds. There were also two pieces of evidence, however, that indicate the funds were generated by real estate sales specifically completed by RSB, as opposed to a third party, which would constitute statements that Archer clearly knew to be false. *See* GX 345, GX 352 at 4. Archer asserts that he did not actually provide this information because the statements in question were made by a Morgan Stanley employee, who must have assumed that any transactions generating the funds had been completed by the entity on whose behalf the bonds

would be custodied, RSB. The appropriate inference, in the government's view, is that Archer lied about the source of the money because he knew that it constituted bond proceeds recycled from the first issuance.

The communications with the BIT Board, on the other hand, were not related to the WLCC bond deal. Instead, these statements arose in the course of Archer's pursuit of the roll up plan. The Burnham Investors Trust, managed by the BIT Board, was the largest client of BAM, which, as previously discussed, was a subsidiary of Burnham. Tr. 2666:13–2667:9. Archer wished to retain the Trust as a client. The BIT Board and Archer engaged in a prolonged negotiation, each advised by legal counsel, in the course of which Archer made certain representations about the involvement of Jason Galanis, or rather, his lack of involvement in various entities related to Burnham. *See* GX 762 at 1–2, GX 763 at 3, Tr. 2765:1–2778:20. The government argues that Archer lied, which, it contends, is probative of his intent with respect to the WLCC scheme. Archer counters that the very technical statements with which he agreed to comply, with the advice of counsel, were in fact true, despite the involvement of Jason Galanis in certain capacities.

There are fair arguments by both the government and Archer about the statements he made to these entities and whether they were literally true, false, or technically true but nonetheless misleading. At the very least, it is a fair inference that even if Archer's various statements were technically true, he misled these entities and violated the spirit of his representations. Indeed, when crediting Archer's arguments as to the statements he made to the banks, his failure to acknowledge that a third party (Jason Galanis) provided the money is what led to Morgan Stanley's allegedly faulty assumption that the transactions generating the funds had been completed by RSB. The Court remains unconvinced, however, that this evidence, even considered with the rest of the government's case, establishes the only issue that matters for purposes of establishing Archer's guilt: that he was misleading because he knew that Jason Galanis was stealing the bond proceeds.

With respect to Morgan Stanley and Deutsche Bank, there are two possible inferences to be drawn from Archer's statements that the money used to purchase the bonds came from real estate sales: (1) he hid the fact that the funds constituted recycled bond proceeds and (2) he hid the involvement of Galanis. The probative value of the evidence with regard to the first inference, however, hinges on the assumption of the very fact for which it is offered. It is undisputed that the funds constituted misappropriated proceeds, rendering the statement false. It is only probative of Archer's intent, however, if he knew the statement was false. For all the reasons the Court has and will articulate, it does not find that particular inference persuasive. The inference is further weakened by the fact that Galanis specifically held himself out as having made money from real estate, bolstering the notion that Archer may well have repeated a lie told to him by Galanis. *See* Tr. 480:6–15; 924:3–14; 1417:18–20; 1418:1–18; 2305:19–22. More likely, in the Court's view, is that Archer was hiding the involvement of Galanis, whose role in supplying the money was indisputably a fact of which Archer was aware. There were other reasons, however, Archer may not have wanted to disclose Galanis' involvement that, while deceptive, are not probative of his intent with respect to the charged conspiracy.

Galanis, even during the relevant period, had a well-documented checkered past. Although he had never been charged criminally, he had been barred by the SEC from serving on the board, or as an officer, of a public company, though it had expired by the time of these events. Tr. 1332:3–8. In spite of this, the evidence at trial demonstrated that Galanis had many admirers in addition to his critics. *See* Tr. 904:10–16 (Dunkerley testifying that he had been told by Jason Sugarman that Galanis "had a mixed reputation, that fifty percent of the people who knew him didn't like him and fifty percent of the people who knew him did like him"). It is thus reasonable to believe that Archer misled the banks not because he knew Galanis was stealing the bond proceeds, but instead because he simultaneously viewed Galanis as a business asset while realizing that he was

a highly controversial figure. Indeed, in an email from Archer to Matt Nordgren on December 19, 2014, Archer specifically noted, in regard to Galanis' involvement in Burnham, that there were "regulatory issues with [Galanis] so [he couldn't] mention his name." GX 2066. Bolstering the strength of this inference, the communications at issue occurred in October 2014 on the heels of the aforementioned negotiations with the BIT Board, in which one of the primary concerns expressed by the Board was the involvement of Jason Galanis. *See* GX 762 (Archer's representation letter dated September 26, 2014).

The ultimate inference advocated by the government—that Archer knew about Galanis stealing the bond proceeds—is further undercut when Archer's statements are viewed in light of Dunkerley's testimony, the witness who provided the greatest insight into Jason Galanis' methods. Dunkerley definitively established that even Galanis' co-conspirators were ignorant about the details and import of transactions with which they were intimately involved. As noted earlier, Dunkerley had no idea that proceeds were being recycled to buy more bonds or that proceeds were being sent to Archer. *See* Tr. 1028:5–10, 1312:8–13. What is clear from his testimony is that his knowledge of the illegal nature of the WLCC scheme derived from what he personally observed— not what Galanis communicated to him. It was Dunkerley's access to the WAPC account that informed him of the bond misappropriation. *See* Tr. 1310:13–21. Archer was not privy to such information. *See* Tr. 1339:25–1340:3. The inference advanced by the government, therefore, depends largely on the assumption that Galanis had a conversation or correspondence with Archer that he never had with Dunkerley (or Martin, the other cooperating witness) proactively informing him that the WLCC deal was a fraudulent scheme. In light of the substantial evidence in the form of the government's own witnesses undercutting that notion, as well as the absence of any evidence that Galanis ever admitted as much to Archer—not to mention the other reasons Archer had for being deceptive, which are not probative of his intent in the context of the charged crimes—the

Court remains concerned that Archer did not mislead Morgan Stanley and Deutsche Bank because he knew Galanis was misappropriating bond proceeds.

The inference urged by the government is even less persuasive with respect to the BIT Board evidence, which, as the Court noted, did not concern the WLCC bond deal. Assuming the factual predicate of the government's argument, Archer did not fully disclose the involvement of Jason Galanis in various entities related to the Board, primarily his role as an adviser to the boards of WAH and WAAG and his actively working with Archer on the WLCC deal. The probative value of this evidence is that Archer was misleading about Galanis' involvement. And yet again the conclusion necessary to deem Archer guilty requires one more inferential leap: that Archer misled the BIT Board because he knew Galanis was stealing the bond money. As discussed above, there is substantial evidence cutting against this inference.

Relatedly, the government further alleges that Archer lied to the BIT Board when he denied being involved in the events described in a complaint filed by the SEC against Atlantic and being one of the anonymous defendants described therein. *See* GX 784 at 1–2. As an initial matter, the government conceded at trial that Archer is not in fact one of the defendants described in the complaint. Tr. 3239:12–13. While the government alleges that Archer was a member of the conspiracy here, which included defrauding the clients of Atlantic, it has never alleged that he personally failed to disclose the material conflicts of interest or violated the clients' investor agreements. Those duties were instead within the province of other members of the alleged conspiracy, namely Morton and Hirst.

The Court recognizes that Archer made statements intended to mislead these various entities, which is of course troubling. In light of the contexts in which Archer was deceptive, however, this evidence is not directly probative of his guilt with respect to the crimes charged in this indictment. Particularly bearing in mind the very plausible reasons for Archer to otherwise

hide Galanis' involvement and the unique features of this case stemming from Galanis' deception, the Court thus continues to harbor a concern that Archer is innocent.

### iv. Archer's Alleged Involvement in the Cover-Up

The government, finally, presented several pieces of evidence that, it claims, show Archer tried to cover up the scheme: (1) he made a $250,000 payment to the WAPC account shortly before the initial interest payment was due on the first set of bonds; (2) he sent an email referencing a fake entity, Calvert Capital, that was created to cover-up the bond scheme; and (3) he sent an email to Cooney and others discussing the next steps forward in light of Jason Galanis' arrest on unrelated charges in September 2015. This evidence does not alter the Court's doubt that Archer was unaware of Jason Galanis' fraud.

Archer does not dispute that he transferred $250,000 to the WAPC account, which, again, belonged to the purported annuity provider and was the account from which proceeds were wired in the course of the misappropriation. *See* GX 4010. The import of this evidence, in the government's view, is that Archer provided this money so that it could be used to make the initial interest payment to the bondholders who acquired bonds in the first issuance, thus delaying discovery of the fraud. But when construed in light of the roll up plan, the inference urged by Archer is equally if not more compelling.

Indeed, there are a variety of reasons, other than that the bond proceeds were being misappropriated, that could explain why Archer would make such a transfer. First, the evidence showed that it was relatively common for Archer to supply liquidity to entities with which he was affiliated. *See* DX 9003 at 5; Tr. 3562:12–3568:1. Critically, even Dunkerley testified that although he knew WAPC was not actually affiliated with WAH, to the best of his knowledge he was the only member of the WAH Board, which included Archer, to realize this because Jason Galanis had created a fake subscription agreement between the two companies. Tr. 1459:8–

1461:12. And the governing documents of the bond transaction were unambiguous that the anticipated investment on behalf of the WLCC entailed risk, as all investments do. As noted earlier, this one possessed an even greater risk profile than a typical annuity by virtue of including private equity investments. *See* GX 209 at 10, GX 210 at 11; Tr. 515:9–516:15. It is thus just as consistent with Archer's transfer of money that he was intending to assist what he believed to be a legitimate transaction by providing liquidity needed in the short-term.[22]

Next, the government places great emphasis on an email in which Archer references Calvert, a sham entity that was created by Hugh Dunkerley, Francisco Martin, and Jason Galanis to assist in the cover-up of the WLCC scheme. In writing to Mark Waddington, who is not alleged to have been a member of the conspiracy, Archer noted that the bonds he purchased in the second tranche, then held by VL Assurance, were "to be replaced/returned to Calvert," adding in a subsequent message in the exchange that "the consensus is we would like to return these bonds to the lender and beneficial owner in the quickest orderly manner possible." GX 2119. The inference urged by the government is that Archer knew about the Calvert cover up, which would obviously be probative of his intent with respect to the WLCC scheme.

On this record, however, a single reference to Calvert in an email does not establish Archer's knowledge that it was a sham entity and that he was thus a willful participant in the conspiracy. Indeed, the weight of the evidence undercuts the notion that Archer was aware of the Calvert cover-up. Jason Galanis and Hugh Dunkerley came up with the idea for the entity, Tr. 1450:2–1453:3, which Francisco Martin created, Tr. 2181:14–19. Dunkerley testified that neither he nor anyone else discussed Calvert with Archer, Tr. 1464:1–13, 1509:6–8, whom Martin never

---

[22] Of the amount that Archer and others transferred into the account in early September 2015, $240,000 was transferred to Thorsdale, presumably for Jason Galanis' personal affairs. *See* GX 4010, GX 512 at 66. These events serve to further illustrate that Jason Galanis and Archer were not as closely aligned as the government claims and also further undercuts the notion that Archer was aware that the money he supplied was being used for illegitimate purposes because Galanis was simultaneously stealing from Archer.

even met, Tr. 2381:15–18. While Galanis, Dunkerley, and Cooney all participated in backdating Calvert forms related to certain of the bond transactions, *see* Tr. 1464:17–1465:16, 2181:14–17, GX 1577, GX 2298, Archer did not participate in this backdating even though the conspirators created a fraudulent document describing a purported loan Calvert made to RSB, *see* GX 1577. Tellingly, this document was signed only by Dunkerley, *see* GX 1577, in contrast to other fraudulent forms relating to Calvert, *see* GX 2298 (document signed by both Dunkerley and the purported recipient of the "loan," Cooney). Finally, it bears mentioning that even Martin was unaware that Calvert was a fake entity intended to deceive even though he was the one who created it. Tr. 2295:10–25; 2348:2–7. This further highlights the extent to which Galanis did not disclose the true import of discrete acts he directed others to take, even those who were clearly willing participants in his criminal schemes.

The government's final strand of evidence relates to Archer's conduct after Jason Galanis' arrest on unrelated charges. It cites an email Archer sent Cooney, Jason Sugarman, and Andrew Godfrey. GX 2102. This email included a list of "immediate issues" to address in light of Galanis' arrest. *Id.* But there is nothing nefarious about the included items. *See id.* The import of this evidence, in the government's view, appears to be that Archer was aware of certain aspects of the bond transactions. But he has never argued otherwise.[23] The issue, rather, is whether he knew that Jason Galanis was stealing the bond proceeds.[24]

---

[23] In a footnote, the government also reminds the Court that Archer received an email from Galanis after his arrest from the "clean" email account set up for him by Dunkerley. *See* GX 1453, Tr. 2180:21–2181:13. The Court does not deem this evidence to be especially probative. The email did not concern anything inherently illegal—merely appointment of directors to Atlantic's board—and was also sent to Andrew Godfrey, who is not alleged to have been a member of the conspiracy. *See* GX 1453. Moreover, there is no evidence that Archer ever responded.

[24] The government also urges an inference against Cooney on the basis that he responded to Archer's message, indicating that it was a "[g]ood prelim checklist." GX 2102. For the same reasons as those discussed with respect to Archer, the Court does not rely on this evidence in denying Cooney's Rule 33 motion.

<u>v. Final Considerations</u>

Exacerbating the Court's concern about Archer are two additional considerations that further weigh in favor of granting a new trial: (1) the unique considerations pertaining to his relationship with Jason Galanis and (2) potential juror confusion over a government summary chart admitted as an exhibit.

As the Court has previously described, Jason Galanis operated to keep people in the dark, even those who were undoubtedly willful participants in his various crimes. But his efforts as to Archer were even more concerted. Galanis, for instance, explicitly instructed Dunkerley not to attend WAH board meetings where Archer would also be present, a demand with which Dunkerley complied. Tr. 1328:19–23. This acknowledgement by Dunkerley is all the more striking because it was he—not Jason Galanis—who was on the board with Archer, and Dunkerley further testified that he specifically wanted to meet Archer due to his various business connections. *See* Tr. 1328:19–1330:13. Even more telling is the manner in which those who were members of the conspiracy spoke of Archer when he was not present, burnishing his credentials to others and describing him, among other things, as "the biggest show pony of all time" whose involvement would "add layers of legitimacy" to the various deals. *See, e.g.*, DXs 4908–09 (Cooney bragging, while being surreptitiously recorded, that Archer is "the biggest whale of anyone," the "biggest show pony of all time," and "a total fucking whale," explaining that "[y]ou don't get any more politically connected [than Archer is] and make people more comfortable than that," and Archer's involvement would thus provide "layers of legitimacy with all the deals we're doing now"); Tr. 1864:8–24 (Raycen Raines had heard from others "more than once or twice" that Archer was business partners with Hunter Biden); Tr. 1867:12–15 (Raines acknowledging that Galanis "did in fact boast about Mr. Archer and Mr. Biden's involvement"); DX 4078 (Galanis writing to Cooney that "the alternative is to pimp devon and see how quickly he stops responding . . . it will happen");

41

DX 4836 (Galanis instructing Dunkerley that it may be worthwhile to clarify in Archer's bio that two of his business partners "are Chris Heinz and Hunter Biden, the step son of the Secretary of State John Kerry and the son of the Vice President Joe Biden, respectively"); Tr. 2159:22–2160:3 (Martin testifying that Galanis had told him that Archer "was a business partner and a very well connected individual politically and also in the business world").

At the same time Archer was spoken of in this manner, Galanis was simultaneously operating to ingratiate himself with Archer. There was anecdotal evidence, for instance, of an elaborate dinner held in New York by Galanis and his then-wife where he presented a toast to Archer, his "new" friend. *See* Tr. 3291:25–3293:7, 3299:6–12. This evidence further suggests that Archer was not a party to this conspiracy but was instead being manipulated by a skillful con artist.[25]

Second, the Court harbors some concern that the jury was confused by the testimony of the government's final witness, FBI Special Agent Kendall, who prepared and testified about a number of summary charts. The evidentiary portion of this trial was protracted and tedious. The summary charts gave the jury a relatively straightforward view of the numerous related transactions. There was one chart in particular that troubled the Court: Government Exhibit 4011. This exhibit detailed the interest payment on the second tranche of bonds, those purchased by Archer and Cooney. As previously discussed, RSB, the entity controlled by Archer, and Cooney transferred the bonds to other entities, meaning they were no longer in possession of them at the time the interest payment became due. The money to make this payment was transferred from VL Assurance to Burnham,

---

[25] The notion that Archer lacked the requisite knowledge and intent is all the more plausible in light of Archer's numerous commitments during the relevant time period. As the Court discussed in the background section, Archer's involvement in the WLCC deal came in the context of his substantial role in the overall roll-up, which involved numerous entities that collectively managed assets worth billions of dollars. There was also evidence about his other business—and personal—commitments during this time. *See, e.g.*, DX 4733 at 12; Tr. 3287:18–3288:19. Archer's relative lack of involvement in the WLCC deal is perhaps best demonstrated by the fact that none of the witnesses who took part in the deal had substantial interactions with Archer. While this consideration ultimately does not weigh heavily in the Court's mind, it is relevant in light of the nature of this case and Archer's defense.

which then sent it to the WLCC. Due to an internal error at Morgan Stanley, however, $903,000 was then accidentally wired to RSB. *See* Tr. 3063:22–3064:8; DX 4523 at 6. Realizing the mistake, Morgan Stanley corrected the error twelve days later, reversed the wire, and then sent the money to the intended recipients, BSI and VL Assurance. *See* GX 301 at 190; DX 4523 at 1. Agent Kendall agreed with the government that the chart depicted the conspirators "basically pa[ying] themselves the interest on the bonds[.]" Tr. 2970:20–21.

The issue arises because, although the chart had text indicating that the wire to RSB, Archer's entity, was reversed, there was no explanation as to what that meant and the arrows indicating the flow of money from entity to entity showed that the funds went directly from RSB to BSI and VL Assurance. *See* GX 4011. This gave the impression that RSB was involved in the transaction by which the conspirators were allegedly paying themselves the interest due on the second set of bonds. Indeed, immediately after Agent Kendall testified that $903,000 went to RSB, she further explained that at this point in time it no longer owned any of the bonds, further suggesting impropriety on the part of RSB and by extension Archer. *See* Tr. 2969:25–2970:4.

Any prejudice was certainly mitigated by the manner in which counsel for Archer elicited on cross-examination that the "wire reversal" really meant that RSB had received the money in error, accompanied by Morgan Stanley emails showing that it was an internal mistake later rectified by the bank. *See* Tr. 3063:1–3080:16. Given the persuasive power of summary charts, however, particularly in a highly complex, tedious case such as this one, and the manner in which the flow of money was visually depicted in the government exhibit, there is a real concern that the jury was confused by this aspect of Agent Kendall's testimony. This concern is exacerbated by the relatively limited nature of Archer's involvement in the universe of relevant transactions.[26]

---

[26] Indeed, the acquisition of bonds in the second tranche aside, the primary other connection Archer had to the conspiracy, as displayed in the government summary charts, was the purported profit of $700,513 that he received from Thorsdale. As discussed earlier, however, while there were transfers of funds, Archer did not actually enjoy any profit, as part of that money was repayment of a loan and the rest was returned to Thorsdale. *See supra* n. 17.

43

While this consideration is by no means a sufficient basis on which to grant Archer's motion, the Court of Appeals has recognized the power that such summary charts have on juries, even when, as here, they are not emphasized by the government on summation. *See United States v. Groysman*, 766 F.3d 147, 163 (2d Cir. 2014).

### vi. Conclusion

As is readily apparent, the government presented a good deal of circumstantial evidence concerning Archer's intent. This is, as the Court previously stated, a perfectly appropriate way to prove a defendant's guilt. The government is also right to note that its case must be assessed as a whole, rather than taking each piece of evidence in isolation. It is primarily for this reason that the Court, when drawing every inference in favor of the government, denies Archer's Rule 29 motion.

After scrutinizing the evidence and giving the various issues their due attention, however, the Court harbors substantial doubt about Archer's guilt. Neither of the government's cooperating witnesses ever communicated with Archer about the WLCC scheme. Most of the government's witnesses never communicated with Archer at all. Unlike his co-defendants at trial, he never received misappropriated proceeds directly from the purported annuity provider for the WLCC. Indeed, although the government need not prove motive, the Court is left wondering why Archer would have engaged in this scheme, especially in light of the illegal gains reaped by his alleged co-conspirators but not by him.

In hindsight, it now appears obvious that it was Jason Galanis' intent to misappropriate the bond proceeds from the inception of his plan to sell Native American bonds. And, as the evidence relating to the statements made to Morgan Stanley and the BIT Board demonstrates, Archer's behavior was troubling in some respects. But being misleading in contexts unrelated to the sale of securities does not render Archer guilty of the securities fraud offenses alleged in this indictment,

unless such behavior establishes that he knew of the object to steal the bond money and/or defraud the clients of Hughes and Atlantic.

In sum, when viewing the entire body of evidence, particularly in light of the alternative inferences that may legitimately be drawn from each piece of circumstantial evidence, the degree to which Jason Galanis manipulated even those who were members of the conspiracy together with his desire to benefit from Archer—the person who "add[ed] layers of legitimacy"—and the intertwined web of legitimate and illegitimate transactions, the Court harbors a real concern that Archer is innocent of the crimes charged and accordingly orders a new trial.

## 2. Bevan Cooney

In many respects, Cooney is similarly situated to Archer. Indeed, there is substantial overlap in the government's evidence against them, namely their purchase of the second tranche of bonds and the email communications involving them and Jason Galanis. The Court's analysis above with respect to those pieces of evidence is similarly applicable to Cooney. It may well be that Cooney—like Archer, Dunkerley, and Martin—was unaware of the criminal object of the WLCC deal at the time he participated in the vast majority of the email communications with Archer and Galanis. *See supra* Discussion, II.A.1.ii. But other evidence demonstrates that—also like Dunkerley and Martin—he at some point became a member of the conspiracy. Indeed, the compelling consideration that requires the denial of Cooney's Rule 33 motion is the other circumstantial evidence unique to him, primarily regarding his receipt of money from the WAPC account, his participation in the Calvert cover-up, and purported lies he told various entities about subjects that were indisputably within his realm of knowledge.

Specifically with respect to Cooney, the government introduced the following additional evidence: (1) his receipt of money directly from the WAPC account, consisting of $75,000 from the final issuance and $4 million purportedly to purchase Jason Galanis' home in Bel Air; (2) his

participation in backdating forms related to the previously referenced fake entity, Calvert; and (3) his purported lies to City National Bank ("CNB") regarding his purchase of the second tranche of bonds.[27] The Court addresses each in turn.

### i. Cooney's Receipt of Funds from the WAPC

The flaw most fatal to Cooney's motion, and which is the most substantial distinction between the evidence against him and Archer, is that Cooney received money directly from the purported annuity provider for the WLCC. After the final bond issuance, Cooney was wired $75,000 directly from the WAPC account, consisting of money provided by OSERS, Atlantic's client. *See* GX 4009. While defendants have argued that they believed WAPC to be a subsidiary of Wealth Assurance, which it was not, there has never been any suggestion that they were unaware that WAPC was to provide the annuity on behalf of the WLCC. Indeed, the only context in which WAPC, legitimate or not, was referenced at trial was in the context of it being the purported annuity provider.

It is unclear how Cooney could have received money from WAPC for legitimate reasons. It is true that the mere receipt of money from WAPC does not necessarily mean that such a transfer was part and parcel of the bond misappropriation. For instance, Tim Anderson received $50,000 from the WAPC account when, following the closing of the deal, his law firm performed additional work that had not been contemplated. Tr. 490:13–491:23. But there is no such apparent basis for Cooney to have received a payment for services rendered, nor has he suggested otherwise. He even argues throughout his moving papers that he was only a passive investor in relation to the bond offerings. Assuming that Cooney was the beneficial owner of the bonds he purchased, it is of course true that as an investor he would have been entitled, as all bondholders were, to periodic

---

[27] Cooney at times suggests that none of this evidence may support a conviction because these acts did not constitute material misstatements or omission in connection with the sale of a security. This is of course true. However, the government does not rely on this evidence for that purpose, but rather because it is probative of effectively the only question at issue in this case: whether Cooney acted with the requisite intent.

interest payments. But this $75,000 transfer occurred before any interest payments on the second tranche of bonds were due, which he did not even own at the time that particular payment was made. *See* GX 4005 at 6, GX 4011. Indeed, it occurred even prior to the first interest payment on the initial tranche. *Compare* GX 4010 *with* GX 4011.[28]

Further probative of the illegitimate nature of this transfer are Cooney's statements to his accountant concerning how to classify the payment. On April 28, 2015, Cooney's business manager at Fulton & Meyer emailed him, asking if the $75,000 wire from WAPC was a loan. GX 3250.[29] Cooney confirmed that it in fact was a loan and asked his manager to add up all of the loans from Wealth Assurance and Thorsdale from the previous couple of years. GX 3250. Not only did Cooney lie, it belies reason to suggest that WAPC could have provided legitimate loans to Jason Galanis' friends and business partners.

And this was not the only payment Cooney received directly from WAPC. On November 12, 2014, he also received a wire for $3.895 million. GX 4007 at 1. This money was allegedly earmarked for the purchase of Jason Galanis' home in Bel Air before ultimately being used to acquire Valorlife by WAH. *See id.* at 4, GX 3224. At trial and again in his moving papers, Cooney asserts that contrary to the government's contention, he genuinely intended to use the money to purchase Jason Galanis' home. The government rightly notes evidence that undermines this argument, namely that the day after the funds were deposited into the escrow account associated with the purchase of Galanis' home, Cooney requested that they be transferred out. *See* GX 4007

---

[28] Moreover, while Cooney purchased the second tranche of bonds, any suggestion that he would have been entitled to an interest payment would be dubious as he was not the beneficial owner of the bonds. As discussed above, it is undisputed that Cooney knew the money to purchase the bonds came from Jason Galanis. And as the Court will discuss below, he later acknowledged that he did not actually own the bonds he acquired.

[29] Consistent with Jason Galanis' lie that WAPC was a subsidiary of Wealth Assurance, Cooney's business manager refers to the loan as coming from "Wealth Assurance." GX 3205. Cooney, however, was aware that the money came from WAPC, which as discussed above, was the annuity provider for the WLCC regardless of whether Cooney honestly believed it to be a subsidiary of the legitimate Wealth Assurance entity.

at 2; DX 3056(a). At the very least, it is not unreasonable to credit the government's evidence on this point.

But even assuming, *arguendo*, that Cooney is correct about his intended use of the funds, his argument remains unavailing. In fact, Cooney's contention that he intended to use the money to purchase Jason Galanis' home in certain respects is more damaging to his defense than the purpose for which the money was ultimately used, *i.e.*, to acquire a subsidiary for WAH.[30] Regardless, Cooney's intent as to the use of the money is of no moment. The critical point is that Cooney personally received nearly $4 million in funds directly from the annuity provider for the WLCC. Moreover, Cooney later falsely informed his accountant that this money was a loan from Thorsdale, the entity controlled by Jason Galanis. *See* GX 3272; Tr. 2028:21–2029:2. On this record, as with the $75,000 transfer, the natural inference to draw is that Cooney knew this money constituted misappropriated bond proceeds.

### ii. Cooney's Participation in the Calvert Cover-Up

Further probative of Cooney's intent is his use of fraudulent documents related to Calvert Capital, which, as discussed, was created in order to cover up the WLCC scheme. On February 28, 2016, Cooney emailed his business managers at Fulton & Meyer a secured loan agreement purportedly showing that Calvert Capital had loaned the Bevan Cooney Trust $5 million days before he purchased the second tranche. *See* GX 2298; Tr. 2028:21–2030:3. This occurred just two days after Cooney similarly provided a letter from Thorsdale purporting to show that Calvert had loaned him the roughly $4 million he received directly from WAPC and which was ultimately used to purchase Valorlife. *See* GX 3272; Tr. 2028:21–2030:3. Cooney does not dispute that Calvert was a fraudulent entity created to cover up the scheme, nor could he credibly do so. Indeed,

---

[30] Indeed, it is probative of the relationship enjoyed by Cooney and Jason Galanis that it was Cooney whom Galanis asked to participate in this transaction related to his residence. Dunkerley also testified that they were the "best of friends" who had known each other since childhood. *See* Tr. 909:4–6, 2171:13–21.

Calvert did not even exist on October 2, 2014 and November 12, 2014, when it allegedly provided Cooney with these two "loans." *Compare* GX 2298 and GX 3272 *with* Tr. 2182:3–4. The backdated form regarding the $5 million used to purchase a portion of the second tranche of bonds was signed by both Jason Galanis, the alleged managing partner of Calvert, and Cooney. *See* GX 2298. Although Cooney did not sign the document regarding the loan for the $4 million used to acquire Valorlife, he gave it to his accountant while clearly aware that its substance was false because he received that money from WAPC—not Thorsdale, the purported agent, or Calvert. *Compare* GX 4007 *with* GX 3272. Therefore, the fact that Cooney, unlike Archer, signed one of these fraudulent forms and later distributed both of them is highly probative of his intent.

### iii. Cooney's Purported Lies to CNB

The final category of evidence against Cooney concerns various statements he made to CNB, specifically as they pertain to his ownership of the bonds he purchased. As the government rightly notes, upon his receipt of $5 million from Thorsdale he recognized the amount as a loan. *See* GX 3216. In January 2015 he then applied for a loan from CNB, in conjunction with which he personally completed a financial statement. *See* GX 405. He acknowledged owning the $5 million worth of bonds while omitting any reference to a loan. *See id.* In May of that year, Cooney transferred the bonds to an entity called Bonwick. Tr. 1741:15–19. The next month, in pursuit of a separate loan from CNB for $1.2 million, he signed an affirmation that the previously submitted financial statement remained accurate. *See* GX 414 at 2. It was not until Cooney was unable to repay the $1.2 million loan that CNB learned he no longer possessed the bonds and that he had financed their purchase with a loan. Tr. 1749:12–17; 1813:3–13; 1819:2–9.

On the basis of this evidence, the government urges the following inferences: (1) Cooney lied about the source of the funds used to purchase the bonds in order to hide the fact that the transaction was effected with recycled bond proceeds; (2) Cooney's inconsistent statements

regarding his ownership of the bonds reveal that he was a strawman for the purchase; and (3) Cooney financially benefited from his participation in the scheme. Although the first two inferences have some probative value, it is true that Cooney could just have easily told these lies in order to mislead CNB into providing him a loan. More critically, in the Court's view, is the final inference. Although proof of motive is not legally required, and Cooney obviously had no burden at trial, this evidence undermines one of the primary defenses advanced by Cooney, namely that he did not profit from this criminal scheme. It is clear from the trial record that Cooney's "ownership" of the bonds was one factor considered by CNB in electing to provide him with the $1.2 million loan, most of which he never repaid. *See* Tr. 1742:4–16.

Cooney asserts several arguments in an attempt to undermine this evidence: (1) he did not personally complete the various forms submitted to CNB; (2) a representative of CNB completed a medallion guarantee[31] effecting the transfer of the WLCC bonds to Bonwick; and (3) he made good faith efforts to repay the $1.2 million loan after he defaulted.[32] None of these arguments is persuasive.

First, while Fulton & Meyer may have submitted these forms to CNB, the forms were personally signed by Cooney and whatever information contained therein would have been provided by him. The inaccuracies contained in the forms are not administrative in nature but instead go to the very heart of Cooney's finances. Second, the issue relating to the medallion guarantee is a red herring. The import of this argument, in Cooney's view, is that prior to issuing

---

[31] A medallion guarantee "is a signature guarantee on a marketable security, a stock or a bond. So, similar to what a notary would do on real estate documents or other kinds of documents where you are guaranteeing somebody's signature, you use a medallion guarantee to guarantee somebody's signature on a stock or bond-related matter." Tr. 1740:3–8.

[32] Cooney also re-iterates, in conclusory fashion, his arguments regarding the admissibility of the CNB evidence, namely that unfair prejudice and potential for juror confusion substantially outweigh any probative value. The Court rejected this argument in permitting the government to introduce this evidence, and Cooney offers no new arguments. The Court remains of the opinion that inaccurate statements Cooney made regarding his ownership of the bonds he purchased from the second tranche are probative of his intent, which is the critical issue in this case, and were not substantially outweighed by the danger of unfair prejudice, potential for juror confusion, or any other factor enumerated in Rule 403.

the $1.2 million loan a representative of CNB guaranteed the document by which the WLCC bonds were transferred to Bonwick. Therefore, according to Cooney, CNB was well aware that he no longer possessed the bonds. But Steven Shapiro, the CNB representative who signed the medallion, testified at trial that (1) he was unaware that it was the WLCC bonds being transferred and (2) he similarly was not required to verify whether the bonds were being sold or, as was the case here because Cooney apparently never actually owned them, transferred absent consideration. *See* Tr. 1742:17–22, 1808:9–25. Finally, Cooney's contention that he made good faith efforts to repay the $1.2 million loan is irrelevant. The fact remains that he repaid only approximately $80,000 and it thus serves as powerful evidence of one way in which he profited from the scheme. *See* Tr. 1750:14–17.

Viewing the government's entire case, therefore, the Court is not persuaded that a manifest injustice results from permitting this guilty verdict to stand and accordingly denies Cooney's motion.[33]

## B.    Remaining Rule 33 Arguments

The defendants also make various other arguments under Rule 33. None have merit.

### 1. The Introduction of John Galanis' Guilty Plea in *Gerova*

First, Archer and Cooney each contend that the introduction, following summations of the government and John Galanis, of evidence of John Galanis' prior participation in a securities fraud scheme with his son prejudiced them. They rightly note that the duty to sever a trial continues throughout its duration. But neither has made the requisite showing that a severance was required

---

[33] The government also introduced testimony by Francisco Martin that upon Jason Galanis' arrest for unrelated conduct in September 2015, Cooney called Martin to inform him that Jason Galanis had been arrested but that it did not concern the WLCC bonds. *See* Tr. 2176:17–2177:22. The obvious inference, according to the government, is that Cooney's statement evinced his knowledge that the WLCC bond scheme was illegal because he was apparently concerned that Galanis may have been arrested for conduct relating to the bonds. The Court, however, did not view this as an especially compelling inference and does not rely on this evidence in denying Cooney's Rule 33 motion.

in light of the introduction of this evidence or that the manner in which it was introduced otherwise ran afoul of Rule 33.

Following proper joinder, which is not contested, severance is required only where the prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (citation omitted). The Supreme Court has instructed that severance should be granted only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Zafiro*, 506 U.S. 534, 539 (1993). Indeed, a defendant is not entitled to a severance merely because he may have a better chance of acquittal at a separate trial. *See id.* at 540. Notably, the introduction against one defendant of Rule 404(b) evidence by no means requires severance:

> Courts have distinguished between the adverse inference a jury may draw against a co-defendant because of his association with a prior criminal conviction, which can typically be cured by a limiting instruction and the potential for unfair prejudice in instances in which the submission of prior-act evidence against one defendant tends to prove directly or implicate another defendant's involvement in the prior act.

*United States v. Catapano*, No. 05-CR-229 (SJ) (SMG), 2008 WL 2222013, at *19 (E.D.N.Y. May 22, 2008) (citation omitted), *adopted by* 2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008).

In the matter at hand, the Court had barred the government from introducing evidence of John Galanis' prior guilty plea for securities fraud due to his participation in a scheme orchestrated by his son because, although probative of his intent in this matter, it ran afoul of Rule 403. *See* Tr. 7:25–8:1, May 16, 2018. The parties agreed, however, that counsel for John Galanis could open the door to such evidence if he argued that his client was duped by his son in the context of the WLCC scheme. *See* Tr. 8:8–9:10, May 16, 2018. On June 14, 2018, the government moved to introduce this evidence, arguing that the door had been opened. The Court denied this request, but

warned counsel for John Galanis that he could still open the door during his summation. *See* Tr. 2457:9–2458:4. That is precisely what transpired.

Consistent with the procedure followed in *United States v. Alcantara*, 674 F. App'x 27 (2d Cir. Dec. 22, 2016), the Court permitted the government to briefly re-open the evidentiary record. *See* Tr. 3829:2–5. The evidence of John Galanis' plea was introduced by way of stipulation:

> It is hereby stipulated and agreed between the parties that on July 20, 2016, John Galanis pled guilty to conspiring with Jason Galanis and others to commit securities fraud in or about 2009 through in or about 2011, in that John Galanis and others openly managed brokerage accounts of an individual and effected the sale of Gerova stock, and received and concealed proceeds derived therefrom, knowing that this activity was designed to conceal from the investing public the true ownership and control of that Gerova stock.

Tr. 3829:8–16.

The Court immediately gave the following limiting instruction as the evidence pertained to Archer and Cooney:

> It is also important for you to know that John Galanis' guilty plea was to charges stemming from the investigation that resulted in Jason Galanis' arrest in September 2015[,] which you have already heard about. I reiterate to you now that the conduct for which Jason Galanis was arrested and John Galanis pled guilty was entirely unrelated to this case.
>
> I further instruct you that Mr. Archer and Mr. Cooney were not subjects of that investigation, and there is no evidence that either of them knew about Jason or John Galanis' fraudulent conduct in that matter or the investigation of it until after Jason Galanis was arrested in September of 2015. You are not to consider this evidence in any way against either Mr. Archer or Mr. Cooney.

Tr. 3830:23–3831:11. The Court also permitted the government and counsel for John Galanis to offer brief supplemental summations, prior to proceeding with the remaining summations of counsel for Archer and Cooney, as well as the government's rebuttal. *See* Tr. 3831:12–3837:20.

Based on this record, the Court is not persuaded that either Archer or Cooney were prejudiced, and certainly not to the extent requiring severance or otherwise giving rise to a manifest injustice. While Archer accurately notes that the Court had previously found the introduction of

this evidence to run afoul of Rule 403, that was with respect to John Galanis. *See* Tr. 7:25–8:1, May 16, 2018; *cf.* Tr. 330:2–332:3. It is well-established that the introduction of Rule 404(b) evidence against a co-defendant does not require severance. *See Catapano*, 2008 WL 2222013, at *19. That is especially true given the circumstances of the case at hand. Although there had been evidence about Cooney's friendship with Jason Galanis, there was no evidence indicating that either Archer or Cooney enjoyed a relationship with John Galanis. The Court also gave a robust limiting instruction, specifying that Archer and Cooney were not involved in the previous conduct and that there was no evidence they were even aware of it until Jason Galanis was arrested in September 2015. Therefore, the fact that John Galanis was also implicated in one of Jason Galanis' prior crimes, which the jury was already aware of, did not operate to prejudice either Archer or Cooney. The Court remains of the view that this acted as a legitimate basis on which Archer and Cooney could distinguish themselves from John Galanis in summations, aided by the Court specifically instructing the jury that they were not involved in that prior conduct. There is simply no basis to conclude that a severance was required.

To the extent Archer and Cooney were prejudiced by the specific manner of introduction of this evidence, it was by virtue of the fact that, they claim, their trial strategy would have been different. Most notably, they argue that would have sought to introduce evidence that Jason Galanis, John Galanis, and Hirst had previously committed securities fraud together, thus highlighting who the "real" conspirators were in the context of the WLCC scheme. The Court is dubious of this argument, as the mere fact that certain participants had histories of engaging in fraudulent activity with Jason Galanis did not foreclose the possibility that either Archer or Cooney were guilty in the case at hand. The issue before the jury was whether they had the requisite intent with respect to the WLCC scheme, and this other evidence they may have presented, assuming its admissibility, would likely have been of limited probative value, if any. They also contend that

the introduction of this evidence exacerbated the prejudicial effect of earlier evidence of Jason Galanis' September 2015 arrest and undercut the Court's instruction that his arrest in that instance was for conduct unrelated to the case at hand. Such arguments, however, fly in the face of the Court's robust limiting instruction.

Accordingly, on this record no manifest injustice occurred.

### 2. Challenges to Jury Instructions

Archer and Cooney fare no better with their various arguments as to the jury instructions. The Court considered and rejected each of these arguments prior to giving the charge. The defendants have not raised any new considerations. Moreover, they have not provided any authority for the proposition that alleged instructional errors of this sort are a valid basis on which to order a new trial under Rule 33. Indeed, in the current posture the question is not whether the rulings were in error but whether any errors resulted in a manifest injustice. *See United States v. Soto*, No. 12-CR-556 (RPP), 2014 WL 1694880, at *5 (S.D.N.Y. Apr. 28, 2014), *aff'd sub nom.*, *United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015).

First, contrary to Archer's argument, there was an adequate factual predicate to give a conscious avoidance charge. The entire thrust of Archer's argument is that there is no evidence that he "saw a red flag *and* took specific action to avoid learning it." Archer Mot. at 94, ECF No. 567 (emphasis in original). The Court of Appeals has instructed, however, that such charges are appropriate where involvement in an offense was "so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003); *accord United States v. Goffer*, 721 F.3d 113, 127–28 (2d Cir. 2013). Given the extensive involvement of Archer and Cooney in transactions that were central to the execution of the criminal

conspiracy and in light of the various misleading statements they made, it was appropriate to provide such a charge to the jury.

It similarly was not a manifest injustice for the Court to decline to give the requested multiple conspiracies charge. Throughout this case, Archer and Cooney have contended that the government has alleged the existence of two conspiracies instead of one. Under their theory, there was one conspiracy to defraud the WLCC and another directed at the clients of Hughes and Atlantic. As the Court previously reasoned in rejecting this argument, however, the operative indictment was unambiguous in setting forth an overarching conspiracy with a single goal: to misappropriate the WLCC bond proceeds. That this single conspiracy may have had multiple components or spheres does not mean that the government instead alleged the existence of two conspiracies. *See Payne*, 591 F.3d at 61 ("[A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." (citation omitted)).

The final argument relating to the charge is the Court's decision not to provide Archer's requested unanimity instruction or, in the alternative, a more detailed verdict form. This argument is also without merit. Tellingly, the defendants have not provided any authority for the proposition that either of these steps were required. Instead, general unanimity instructions are considered sufficient unless there exists "a genuine danger of jury confusion." *United States v. Ferguson*, 676 F.3d 260, 279 (2d Cir. 2011) (citation omitted). On this record, the Court cannot conclude that a specific instruction was required, particularly in light of the repeated warnings to the jury that they were required to be unanimous in order to convict any of the defendants on either count. *See* Tr. 4123:23–25, 4183:7–10, 4185:6–9, 4185:15–17. Moreover, that certain aspects of the record in

56

this case were complex did not require the Court to give such an instruction. *See Ferguson*, 676 F.3d at 280.

### 3. Newly Discovered Evidence

Finally, each of the defendants in their reply briefs argues for a new trial on the basis of newly discovered evidence that was produced to them after they filed their initial motions. Archer also argues, in the alternative, for an evidentiary hearing. The Court rejects these arguments.

When the import of newly discovered evidence is that a witness committed perjury, "the threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992). If the answer is yes, the standard for assessing materiality differs based on when the government learned of the material contradicting the witness's testimony. "[I]f the prosecution was not aware of the perjury [at the time of trial], a defendant can obtain a new trial only where the false testimony leads to a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Stewart*, 433 F.3d 273, 296–97 (2d Cir. 2006). "If instead the prosecution knew or should have known about the perjury, then the conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Torres*, 128 F.3d 38, 49 (2d Cir. 1997) (citation omitted). Where the newly discovered evidence is impeachment material, however, a new trial "may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015).

The purportedly newly discovered evidence consists of ██████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████,[34] there is not a sufficient basis to grant a new trial for the following reasons: (1) with respect to the substance of the alleged perjury, the defendants cannot make the requisite showing, even under the more forgiving standard applicable when the government knew or should have known of the perjury and (2) as impeachment material it was cumulative and would not have affected the jury's verdict.

When considered as substantive testimony, the defendants cannot carry their burden. ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[34] In light of an ongoing investigation, at the government's request, portions of this opinion are redacted. An unredacted copy of the opinion will be provided to the parties and filed under seal.

[REDACTED]

[REDACTED]

Bearing these considerations in mind, there is no basis to conclude that this additional material, if known to the defendants at trial, would have had any possibility to affect the jury's verdict.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Accordingly, the Court declines to grant a new trial on the basis of newly discovered evidence. For substantially the same reasons, the Court also denies the requests for an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, Archer's motion for a new trial is granted, while all others are denied. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 563, 564, 565, and 566.

Archer and the government are directed to confer and propose next steps within forty-five days of this opinion.

SO ORDERED.

Dated:    November 15, 2018
         New York, New York

Ronnie Abrams
United States District Judge