J381gals

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                         16 Cr. 371 (RA)

JOHN GALANIS,

            Defendant.         Sentencing

------------------------------x

                              New York, N.Y.
                              March 8, 2019
                              11:47 a.m.


Before:

                    HON. RONNIE ABRAMS,

                               District Judge


                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  NEGAR TEKEEI
     BRENDAN F. QUIGLEY
     Assistant United States Attorneys

PELUSO & TOUGER
     Attorneys for Defendant
BY:  DAVID TOUGER, ESQ.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
     Attorneys for Defendant
BY:  PAUL R. GRAND, ESQ.


ALSO PRESENT:  SHANNON BIENIEK, Special Agent, FBI

J381gals

```
 1              (Case called)
 2              THE COURT:  Good morning, everybody.
 3          So I understand, just before your appearances, that
 4     we're getting another set of headsets for Mr. Galanis.  Can we
 5     get started, do you think?
 6              MR. TOUGER:  Sure.
 7              THE COURT:  All right.  So please state your
 8     appearances.  Good morning.
 9              MS. TEKEEI:  Thank you, your Honor.  Good morning.
10     Negar Tekeei and Brendan Quigley on behalf of the United
11     States, and joining us at counsel's table is Special Agent
12     Shannon Bieniek with the FBI.
13              THE COURT:  All right.  Good morning.
14              MR. TOUGER:  Good morning, your Honor.  David Touger,
15     T-O-U-G-E-R, for Mr. Galanis, and it's my honor to have at the
16     table Mr. Grand, Paul Grand.
17              THE COURT:  All right.  Good morning to all of you.
18     Good morning, Mr. Galanis.
19              THE DEFENDANT:  Good morning.
20              THE COURT:  Mr. Galanis, if you're having trouble
21     hearing anything, just raise your hand, all right?
22              THE DEFENDANT:  Thank you, your Honor.  I will.
23              THE COURT:  Okay.  This matter is on for sentencing.
24          Mr. Galanis was found guilty in June of conspiracy to
25     commit securities fraud and securities fraud.  I denied his
```

J381gals

1    request for a new trial in a memorandum opinion and order dated

2    November 15, 2018.

3            In connection with today's proceeding, I've reviewed

4    the following submissions:  The presentence investigation

5    report revised as of October 1st of 2018; Mr. Galanis's

6    sentencing memorandum dated January 3rd, with accompanying

7    exhibits; and I also have his prior sentencing memorandum in

8    the Gerova case as well; and the government's sentencing

9    memorandum dated January 9th.  Have the parties received each

10   of these submissions?  Am I missing anything?

11           MS. TEKEEI:  We have, your Honor, and you're not

12   missing anything as far as the government is aware.

13           THE COURT:  Right.  And today I see that you've also

14   submitted a proposed order of restitution and preliminary order

15   of forfeiture money judgment, correct?

16           MS. TEKEEI:  Yes, your Honor, that's correct, and we

17   provided copies to Mr. Touger as well.

18           THE COURT:  Thank you.

19           Mr. Touger?

20           MR. TOUGER:  You have everything that we have

21   submitted, your Honor.

22           THE COURT:  All right.  Thank you.

23           So why don't we begin by discussing the presentence

24   report, which, as you know, is prepared by the probation

25   office.

J381gals

1          Mr. Touger, have you reviewed the presentence report

2     with your client?

3          MR. TOUGER:  Yes, I have, your Honor.

4          THE COURT:  Do you have any remaining objections?  I

5     know you made a number to the probation department directly and

6     some changes were made.  Do you want to tell me if there are

7     any that remain from your perspective.

8          MR. TOUGER:  The only additional ones are the ones we

9     brought up in the sentencing memo that you have before you.

10         THE COURT:  With respect to loss amount and number of

11    victims?

12         MR. TOUGER:  Yes.

13         THE COURT:  Okay.  So let me ask --

14         (Defendant conferring with his counsel)

15         MR. TOUGER:  The only thing, your Honor, just to

16    complete it, in the Prior Crimes section, there is a Canadian

17    case that they have left sort of open.

18         THE COURT:  Right.

19         MR. TOUGER:  That case has been dismissed, as has the

20    New York case that they left open.  Both those cases have been

21    dismissed.  I don't know why they left them open.  I don't

22    think it matters much as far as calculations, but if they want

23    it to be --

24         THE COURT:  Does the government contest that?  Is

25    there any objection to noting that those cases were dismissed?

J381gals

| | |
|---|---|
| 1 | MS. TEKEEI:  We have no objection to noting that |
| 2 | that's what counsel has conveyed to the Court.  I don't have |
| 3 | information about the Canadian case, but as it doesn't affect |
| 4 | his criminal history category, we have no objection to noting |
| 5 | that for the record. |
| 6 | THE COURT:  Okay.  So we'll note that.  I mean, right |
| 7 | now, in the last sentence of paragraph 98, it reads -- oh, |
| 8 | sorry.  That was Connecticut.  Hold on. |
| 9 | Yes, that still relates to the Canadian matter. |
| 10 | MR. TOUGER:  Yes. |
| 11 | THE COURT:  It says, "It is unclear whether the |
| 12 | defendant was ever extradited to Canada in connection with this |
| 13 | case or if the case was dismissed."  Should we just revise that |
| 14 | line to read that Mr. Galanis was never extradited to Canada |
| 15 | and defense counsel has represented that the case was |
| 16 | dismissed? |
| 17 | MR. TOUGER:  That's fine, your Honor. |
| 18 | THE COURT:  Okay.  So that will be the last line of |
| 19 | paragraph 98. |
| 20 | And is there another change you wanted to make with |
| 21 | respect to the arrests for which there was no conviction? |
| 22 | MR. TOUGER:  If you look at No. 101 -- |
| 23 | THE COURT:  Yes. |
| 24 | MR. TOUGER:  -- that's the New York case I was |
| 25 | speaking of. |

J381gals

| | |
|---|---|
| 1 | THE COURT:  All right.  So I'll add a line at the end |
| 2 | of 101 as well saying defense counsel has represented that this |
| 3 | case was dismissed.  Is that right, Mr. Touger?  Can you |
| 4 | represent that? |
| 5 | MR. TOUGER:  It kind of says that in the report, |
| 6 | because if you read it, it says the case was superseded by |
| 7 | another indictment.  So it was dismissed. |
| 8 | THE COURT:  Okay.  So do you think we need to add |
| 9 | anything or do you think it's fine the way it is? |
| 10 | MR. TOUGER:  I think we should, your Honor, just so |
| 11 | it's clear. |
| 12 | THE COURT:  All right.  So I'll add that line. |
| 13 | All right.  I'll make those changes. |
| 14 | Mr. Galanis, have you had enough time and opportunity |
| 15 | to review the presentence report and discuss it with your |
| 16 | attorney? |
| 17 | THE DEFENDANT:  I have, your Honor. |
| 18 | THE COURT:  All right.  Does the government have any |
| 19 | objections?  And I'll of course get to the substantive |
| 20 | objections. |
| 21 | MR. TOUGER:  Let me ask Mr. Galanis one more question. |
| 22 | THE COURT:  Yes, sure.  Go ahead. |
| 23 | (Mr. Touger conferring with the defendant) |
| 24 | MR. TOUGER:  I guess we're going to try out the new |
| 25 | equipment. |

J381gals

```
1              THE COURT:  Okay.

2              Does the government have any objections to the

3    presentence report?

4              MS. TEKEEI:  No, your Honor.

5              THE COURT:  Okay.  All right.  So first of all, I'll

6    just note that I'm going to adopt the factual findings in the

7    report.  The presentence report will be made a part of the

8    record in this matter and placed under seal.  If an appeal is

9    taken, counsel on appeal may have access to the sealed report

10   without further application to the Court.

11             Now, Mr. Galanis, as you're well aware, the federal

12   Sentencing Guidelines are a set of rules that are published by

13   the United States Sentencing Commission, and they're designed

14   to guide judges.  Although at one time they were mandatory,

15   they're no longer mandatory, but judges must nonetheless

16   consider the guidelines, and so we have to ensure that we have

17   the calculated them properly.

18             I understand that you have three objections to the

19   guidelines calculation.  One relates to loss amount, one

20   relates to the number of victims, and one relates to criminal

21   history.  Is that correct?

22             MR. TOUGER:  That's correct, your Honor.

23             THE COURT:  All right.  Do you want to be heard

24   further on those?

25             MR. TOUGER:  No, your Honor.  I think the memo
```

J381gals

1    outlines the argument.

2              THE COURT:  Okay.  So with regard to the amount of

3    loss, it seems clear to me that the loss caused by

4    Mr. Galanis's offense of conviction exceeded $25 million and

5    that a 22-level enhancement for loss amount in this case is

6    entirely appropriate.

7              As I understand it, Mr. Galanis principally argues

8    that he should not be held responsible for the loss amount

9    suffered by the WLCC through its issuance of the bonds and the

10   Hughes and Atlantic clients' subsequent investments in these

11   instruments.  This is because, according to Mr. Galanis, he did

12   not knowingly engage in fraud in soliciting the WLCC bonds and

13   he understood that the $2.35 million that he received for the

14   execution of this deal was a legitimate commission for his

15   services.

16             I disagree.  As an initial matter, these arguments

17   were not only rejected by a jury but, as Mr. Galanis appears to

18   acknowledge, were also rejected by this Court in its Rule 29

19   decision.  As I made clear in that decision, the evidence

20   presented at trial established that Mr. Galanis made material

21   misrepresentations to members of the WLCC tribe to influence

22   them to issue the bonds at the heart of this case.  Among these

23   misrepresentations were Mr. Galanis's statements to the WLCC

24   representatives that:  (1) Jason Galanis worked at Burnham,

25   which in his sentencing memo Mr. Galanis concedes was

J381gals

objectively untrue; and (2) that the proceeds of the bond

offerings would be placed in an annuity on its behalf when in

fact no such annuity even existed.  Furthermore, Mr. Galanis

does not dispute that the $2.35 million payment was not

provided for in the schedule setting forth the payments of

expenses owed at closing, which would have been reported had

his been a legitimate commission for the execution of the bond

deal.  In response, Mr. Galanis now contends, for the first

time, that this supposed commission was not disclosed in the

schedule because he believed that it was not being paid from

the bond proceeds but by the company Wealth-Assurance because

that is who he was helping.  But Mr. Galanis does not point to

any evidence for this novel assertion, which, as the government

points out, directly contradicts Mr. Galanis's own claim at

trial that he was working for Burnham Securities.

        But perhaps even more probative of Mr. Galanis's

fraudulent intent was the way in which this commission was

received by him.  As explained in the Court's Rule 29 opinion,

these proceeds were not directly wired to the defendant but

instead sent to a front company called Sovereign Nations.  In

turn, Mr. Galanis then directed distributions of the

$2.35 million to both himself and family members through a fake

email account.  For these reasons, and those more fully

explained in the Court's Rule 29 decision, the Court therefore

agrees with the government that Mr. Galanis was well aware that

J381gals

1    the bond's proceeds were misappropriated.  It also follows that

2    Mr. Galanis was aware that the bond's investors would lose

3    whatever money they sank into this investment.

4            Because there's no dispute that this total investment

5    loss is between 25 million and 65 million, the Court will apply

6    the 22 levels to Mr. Galanis's sentence.

7            I also find that the two-level enhancement for ten or

8    more victims is appropriate in this case.  In his sentencing

9    memorandum, Mr. Galanis contends that he should not be held

10   responsible for the Hughes and Atlantic clients' investments in

11   the WLCC bonds, as he had no direct relationship with these

12   investors.  But again, I disagree.  As I just explained,

13   Mr. Galanis was aware that the bonds were misappropriated and

14   that their subsequent investors would therefore lose whatever

15   they put into these investments.  Nor does Mr. Galanis contest

16   that the subsequent investment victims numbered over ten

17   people.  As a result, the Court will apply this two-level

18   enhancement to Mr. Galanis's sentence.

19           Finally, Mr. Galanis argues that he should be placed

20   in criminal history category II, not III, because he received

21   three points for his federal conviction in 1987 and three

22   points for his conviction in New York County for grand larceny

23   in 1988, which violates double jeopardy and due process because

24   these crimes should not have been prosecuted separately.

25           As the government correctly points out, however,

J381gals

Mr. Galanis has not received criminal history points for the

1987 federal conviction; rather, the three points he received

from the 1988 grand larceny conviction, combined with the three

points he received from the 2015 Gerova conviction, is what

yields a criminal history category of III.

          All right.  So those are my rulings with respect to

the guidelines calculation.  As a result, I find that

Mr. Galanis's offense level is 31, his criminal history

category is III, and his recommended guidelines sentence is 135

to 168 months in prison.

          Now as I said a moment ago, that range is only

advisory.  Courts may impose a sentence outside of that range

based on one of two legal concepts -- a departure or a

variance.  A departure allows for a sentence outside of the

advisory range based on some provision of the guidelines

themselves.  As I understand it, you're moving for an actual

departure based on health conditions, is that correct?

          MR. TOUGER:  That is correct, your Honor.

          THE COURT:  And do you want to be heard further on

that?

          MR. TOUGER:  I thought we did deal with that in the

sentencing memorandum.

          THE COURT:  Okay.  All right.  I also just will note

that of course I also have the ability to impose a

nonguidelines sentence based on what we call variance, pursuant

J381gals

1    to the factors set forth in 18 United States Code Section

2    3553(a).

3              And now why don't I hear from the parties.

4              Would the government like to be heard.

5              MS. TEKEEI:  Only very briefly, as your Honor sat

6    through a lengthy trial in this case and is very familiar with

7    the facts.

8              We just would like to note -- and again, the Court is

9    aware of this, but -- capping a lifetime of criminal conduct,

10   John Galanis played what can only be described as a critical

11   role in this scheme.  He victimized one of the poorest Native

12   American tribes in the country by causing them to issue bonds;

13   he promised them money for needed tribal development projects

14   and guaranteed them the ability to repay investors in those

15   bonds through a secure annuity.  And then he defrauded the

16   investors, the pension fund investors in those bonds -- pension

17   funds that were held for the benefit of thousands of

18   hard-working people, by allowing their money to be invested in

19   bonds he knew were ultimately worthless.

20             For his conduct in this case, and in light of his

21   extensive criminal history, and the 3553(a) factors that we've

22   discussed in our submission, we seek a guidelines range

23   sentence in this case.

24             THE COURT:  All right.  Thank you.

25             Would any victims like to be heard today, Ms. Tekeei?

J381gals

1    Would any victims like to be heard today?

2              MS. TEKEEI:  Your Honor, victims have already

3    submitted letters.  There are none here today that I'm aware

4    of.

5              THE COURT:  Thank you.

6              Would you like to be heard now, Mr. Touger?

7              MR. TOUGER:  Yes, your Honor.

8              Actually, if it would be okay with the Court, could

9    Mr. Galanis speak first and I'll speak after?

10             THE COURT:  Sure.

11             Yes, Mr. Galanis.  You are free to say what you'd like

12   to say today.

13             THE DEFENDANT:  Thank you, your Honor.  And good

14   afternoon.

15             THE COURT:  Good afternoon.

16             THE DEFENDANT:  Give me one moment, your Honor.  I'm

17   sorry.  I need to --

18             Hopefully this plea is not too late to have you

19   consider what I say.  Your decision under Rule 29 was clear on

20   what you thought happened.  Your findings meant you did not

21   accept Jason's letter saying he did not tell me of his plan to

22   divert the bond proceeds and the other misinformation that he

23   gave me.  That leaves me pleading for leniency and hoping to

24   show you why my failures as a father resulted in this case.

25             At trial, to preserve the 404(b) ruling, I made a

J381gals

1    decision not to put on an affirmative defense, which would have

2    helped show why I was fooled.  However, my being fooled does

3    not mean I do not acknowledge or accept your conscientious

4    objection jury charge, which pointed out that my blissful

5    ignorance is not a defense.  I fully realize that through my

6    actions over 50 years ago, I lost receiving the benefit of the

7    doubt that you rightfully afforded to Mr. Archer.  Your doubts

8    will not evaporate with my explanations today, but I hope you

9    hear them in mitigation of my actions.  However, if you would

10   consider leniency, because I want to show you the emotional

11   aspects of my family's actions in this matter.

12          Often my history creates a negative judgment, but I

13   ask you to look at it differently, maybe as Judge Brieant saw

14   me and ruled that I deluded myself into believing that my acts

15   were legal in the complex case he decided that were before him.

16   I testified to over a week at that trial, and a jury was out

17   for over nine days.  My conscious avoidance of Jason's actions

18   is not unlike Judge Brieant's description of my deluding

19   myself.  I grant my guilt is a distinction without a

20   difference, but I want you and my family to know that I am

21   foolish, not larcenous.

22          I make these statements not only for you today but

23   also for my wife of 50 years, so she knows I did not lead our

24   son astray.  As Tolstoy wrote, all happy families are happy in

25   the same way, and all unhappy families are unhappy in a

J381gals

different way.  My sentencing submission focused on why my
child became unhappy with me, which caused unhappiness in my
family.  His warranted lack of trust and confidence in me
resulted in this case.  Even though I did not know his plan for
the bond proceeds, I must and do take responsibility for his
actions.  Ultimately it was my fault he did not trust me.  I
did not fault him -- I do not fault him for his rebuke of me.
However, he is right but for the wrong reason.  The reason
should have been by not rejecting -- that he should have been
angry at me for not rejecting his Gerova plan.  I was not the
father that had advised him for years on how to avoid problems.
I failed him.  Despite my loving him, I let him hurt himself
and others.

        There may be many reasons unknown to me why he changed
our relationship after 2011, but one thing remains undeniably
clear at this point.  He stopped introducing me to his friends
and business associates, and there was never any further family
events at which I was invited.  Jason -- goes to Jason's lack
of trust.  Jason had a very logical reason for not confiding in
me about his business plans.  And his attorneys had maintained
that his actions in Gerova were part of an immunity agreement
with the Central District of California.  That immunity
agreement was contingent on truthful disclosure.  Jason never
disclosed me or my role in Gerova.  I told Jason if there was
an incident -- I'm sorry -- if there was an indictment, I would

J381gals

1   seek to exonerate his brother Jared.  As biblical Jacob created

2   envy amongst Joseph's brothers by giving him a multicolored

3   coat, I showed Jason that he could not trust me to protect him

4   over his -- over his brother.  His lawyers knew of my position

5   and were constantly worried, because when I proffered Jared's

6   innocence, I might also discuss his then-current activities.  I

7   limited my proffer to exonerating Jared, but this was after all

8   the bond activity had occurred, so Jason never knew that I

9   couldn't -- could not have talked about him.

10          Mr. McMillan's testimony verified in 2011 the change

11  in Jason's and my relationship.  I asked Mr. McMillan not to

12  allow Jason in that year to control any accounts he ran for me.

13  On the stand, if you remember, he was willing to go further in

14  describing the issues but was stopped over concern of violating

15  the 404(b) ruling.

16          Brings up:  Why did I trust Jason?  As to his plan on

17  Gerova, I accepted his explanation that his illegal acts were

18  desperate, were to save a cash-rich -- pardon me -- a cash-poor

19  but asset-rich company.  He admitted desperation could make him

20  commit illegal acts, but there was no hint of desperation in

21  his discussions about Wealth-Assurance.  When I looked at

22  Wealth-Assurance, it was a very different company than Gerova.

23  It had a solid balance sheet, great auditors, and excellent

24  partners who listened to him.  No doubt, Jason was a primary

25  architect of the Burnham roller plan, which everyone agrees on

J381gals

     1   as thoroughly legal.  I thought he had finally made his

     2   fortune.  And there was no temptation for him to do anything

     3   illegal.  Wealth-Assurance was not a cash-starved company, and

     4   it had a fast-growing business.

     5            An important factor for my going to Jason was he was

     6   the only source in the securities industry I knew, after all my

     7   time in prison.  My relationship with Haynes and Shannon was

     8   just starting.  Ultimately my finances are probably what caused

     9   me not to question his explanations after I learned who the

    10   buyers for the second bond offering were, and that WAAG was not

    11   going to be the issuer of the annuity.  Also, I admit, I loved

    12   and admired my son and wanted to believe that he had redeemed

    13   himself.  However, after the bond interest payment was late, I

    14   knew there was something very wrong, with his actions and

    15   ultimately mine.

    16            Evidence which the government presented to determine

    17   my guilt I believe deserves an entirely different conclusion.

    18   The government's presentation is -- can be analogized to Lewis

    19   Carroll's Alice in Wonderland, where statements where Humpty

    20   Dumpty, in quotes, says, "A word is what I choose it to mean,

    21   not what you think it to mean."  The government's use of

    22   evidence followed that same logic.  Paraphrasing Mr. Carroll,

    23   the government would have you believe evidence means what they

    24   choose it to mean, not what it meant.

    25            Please consider these arguments and my submissions on

J381gals

1  the evidence.

2          There is one overall question which casts a cloud of

3  doubt over the government's contentions.  If I was Jason's

4  confidant and so close to him I knew the conspiracy from

5  inception, why did I know nothing about his illegal takeover of

6  Hughes and Atlantic?  Is it logical?  If I'm deeply embedded in

7  all aspects of the conspiracy, why not that one?  That's the

8  most critical part of his plan.  Hirst knew, Morton knew,

9  Dunkerley knew, Martin knew, but I didn't know, or certainly

10  the government would have named me in those charges.

11          Jason did not tell me of his plan to divert the money

12  or that there was not going to be a legal immunity because his

13  lawyers had convinced him I was betraying him with my

14  inevitable discussions about his breach of the immunity

15  agreement.

16          Giving a Humpty Dumpty-type claim, the government

17  maintains encryption was used on all emails until -- was used

18  in all emails, yet no encryption was used until after the

19  Gerova indictment on emails.  Not shown were hundreds of emails

20  between Jason and I, Shannon and I, Haynes and I, all painting

21  a different picture.  An example is Shannon's email which shows

22  I was not sent to Las Vegas by Jason targeting Raines; I was

23  sent by Shannon and Haynes to meet with their partner Ricen and

24  Stephen Haynes, and others at that meeting.

25          I ask you to put my submission statements and

J381gals

1    financial claims to the test.  Call Shannon, Haynes, and Jason

2    to the sentencing hearing.  Please do not leave me in the

3    position again which Judge Brieant had to write in his

4    sentencing results on me:  "An injustice without a remedy."

5         I am sure you realize that any additional time I

6    receive today will result in being the equivalent of a life

7    sentence.  I ask you not to consider -- I ask you to consider

8    all those extra years I spent in prison beyond what Judge

9    Brieant considered appropriate as a reason for a downward

10   departure in my sentence today.  I ask you not to leave me in

11   the same position as when Judge Brieant's sentencing intention

12   was thwarted by nonjudicial factors, which greatly increased my

13   prison time.  For example, even though I was a clear candidate

14   for the residential drug program, the BOP has rejected my

15   application.

16        I did not plan crimes.  The work I was doing for the

17   Indians was exciting, fulfilling, and rewarding.  My financial

18   background could have -- could have been put to good use with

19   Mr. Haynes and the Native Americans.  Finally, despite my

20   background, I found a group that needed and wanted my help.

21   Most importantly, it was a group who would work with me, not

22   Jason.  Yes, the first transaction was with him, but many

23   others were planned without him.  Why else would Ricen never

24   have met Jason and Stephen Haynes had only had one short lunch?

25        I did not intentionally intend to defraud the WLCC.

J381gals

If I thought I was involved in an illegal scheme, does it make

sense I would have spent the majority of the commission on

professional fees for future projects with Haynes and the WLCC?

Those projects Jason was not involved in.  I should have

paid -- yes, I should have paid more attention to the bond

transaction's due diligence, especially knowing that Jason had

taken shortcuts in Gerova.

        I take exception to the view that -- the government's

view of me as a career criminal.  My many references to Judge

Brieant's findings is because of his involvement in all my

criminal cases.  Having sentenced me in both my federal cases

and clearly stating the related state case should not have been

prosecuted separately, his later decision certainly made clear

he did not think of me as a career criminal.  Yes, I've made

mistakes and take responsibility.  I've also worked hard at

legal businesses with successes.  My error is not to have

heeded the higher command of being a responsible parent,

properly instructing my children.  I loved being a father, and

I hoped to be a parent who was respected and giving comfort and

protecting his children.  I am heartbroken I failed my two

older sons.  I did not stop Jason from committing a foolish

act, and he despised me for that lack of character.  Why does

he hate me remains a mystery.  He seems to have wanted me to

have gone into the illegal drug business.  He wanted me to act

like a Mafia don.  As I told him, that was a fool's role.

J381gals

1          What gives me solace is how tightly Chandra, my wife,

2     Jared and Jesse, my other sons, have stayed by me.

3          Now I must speak of the most humbling and painful part

4     of my request.  Given my age, medical issues, my current

5     sentence reduces the likelihood I'll ever enjoy any of the

6     years with my wonderful granddaughter Olivia.  There is a

7     sadness that at her same age, I had to have prison visits from

8     her father Jesse till he was 18.  My wife now lives with family

9     to take care of Olivia while Jesse and his wife work.  My wife

10    Chandra is a survivor of two onsets of breast cancer.  The most

11    recent one resulted in a double mastectomy.  I hope to be able

12    to be home to help her with Olivia.  Before I came east for the

13    trial, last spring, Olivia came to visit me on a special

14    children's visiting day, which allowed us to play games, draw,

15    and walk around, unlike normal prison visits.  We laughed as

16    she rode on my walker.  Through the prison visiting windows, we

17    marveled the size of the container ships that were in Los

18    Angeles Harbor.  We made up a story that the containers were

19    where Santa's helpers made presents.  As the pelicans flew over

20    the ship, she asked why they flew in a straight line, not like

21    other birds.  I will miss that wonderful part of raising a

22    child of where the questions are an endless joy.  Yes, we had a

23    magical time, but the departure was heartbreaking.  She lined

24    up to leave with my son and his beautiful wife, but ran back to

25    me, tugging at my arm, stamping her foot, demanding I come home

J381gals

now, Pappous.  "Pappous" is grandfather for -- in Greek.

Whether I will meet this request depends on how you see my

culpability, consideration for my age, medical condition, and

many years spent in prison.

          My medical issues are not idle speculation.  My father

died at 69 of a heart condition brought on by diabetes and high

blood pressure.  Both my grandfathers died of prostate cancer.

As my medical records show, I have all three of these

conditions.  The possibility I could overcome these issues in

prison was unlikely if I did not prepare myself from my prior

experience.  I believed if I undertook a healthy living

program, eating correctly, exercising daily, with medical help,

I expected I would be able to live out my sentence.

          Graciously, Judge Castel allowed me time before

surrendering to have two major surgeries to restore my maximal

ability to implement my healthy living program.  Unfortunately,

much about prison medical department and food services has

changed.  The situation about my orthopedic shoes mentioned in

the submission proves the old adage:  For want of a horseshoe

nail, the kingdom was lost.  In my case, it was for want of --

my mobility was lost, for want of shoes.  Confined now to a

wheelchair, the exercise that was part of my program to

moderating diabetes and blood pressure is gone.  Exacerbating

the problem, the prison food has gone from balanced meals with

fresh vegetables to meals high in glycemic index carbohydrates.

J381gals

1    Please understand, this is not from deliberate indifference of

2    the prison.  It's reality of the aging prison population,

3    putting a budgetary strain on the BOP's resources.  I hope you

4    can see from my respectful dealing with the van accident, I do

5    not cast blame on others for my difficulties.  I accept that

6    life is not free from the unavoidable, and I try not to be

7    judgmental.

8             Because all of those factors I have described, please

9    consider, is my role knowingly, or, as I maintain, unwittingly

10   assisting Jason worthy of a life sentence?  Whatever your

11   decision, I wish to thank the Court for its gracious

12   accommodation made because of my handicap before and during

13   trial.  If today's sentence could, as President Lincoln

14   advocated, bear the richer fruit of mercy rather than strict

15   justice, it would allow me to return to my wife, help heal my

16   family, and entertain Olivia.

17            Thank you, your Honor.

18            THE COURT:  Thank you.

19            Mr. Touger?

20            MR. TOUGER:  Thank you, your Honor.

21            Your Honor, this case teaches me a lesson that I've

22   learned many times in my career, that there are always two

23   sides to a coin, and depending on what side you're on, that's

24   how you're going to read the evidence in this case.

25            But I attached to my sentencing submission an email

J381gals

1    from Mr. Pete Shannon.  This was written long before the trial.

2    No way anybody could argue that it was made up to combat

3    evidence at the trial or anything else.  That memo, that email

4    puts, in my mind, a hole in the government's case that they

5    cannot fill.  That email says quite specifically that he wants

6    John Galanis to go meet up with Mr. Haynes and Mr. Raines.

7    This is not, your Honor, Jason Galanis sending him to Las

8    Vegas.  This is not anything to do with Jason Galanis.

9    Mr. Galanis met Mr. Shannon by his friend Mike Murphy, they

10   spoke, they came up with an idea, and they tried to implement

11   it.  There is no credible argument that can be raised against

12   that email.  Mr. Shannon takes so much credit for the idea that

13   at the end of that email, you'll notice he wants -- he finds

14   out that they made money and he wants a commission because it

15   was his idea.  So that puts the first hesitancy to adopt the

16   government's idea that Mr. Galanis was working with Jason from

17   the very beginning in this case in targeting the Wakpamni.

18          It leads us next to the meeting itself, and the

19   statements that were just mentioned that John Galanis

20   misinformed the WLCC representatives to get them to go along

21   with the bond idea by saying that Jason Galanis worked at

22   Burnham.  As we've always said, objectively, that is a lie.

23   Subjectively, it means it's a lie with no difference.  There is

24   no argument that is raised by the government, the Court, or

25   anybody else that Jason Galanis controlled how Burnham would

J381gals

1    invest their money.  So if you're not familiar with -- if

2    you're looking from the outside and you're not familiar exactly

3    with how everything is working out, and Jason calls up his

4    father and says, yeah, I can get this done, it's not

5    unreasonable for John Galanis to tell them, he's working at

6    Burnham.  Whether he was working at Burnham or not, he

7    controlled Burnham.  That statement was not false in what it

8    was being made to do.  The idea was, he was telling WLCC, if we

9    go ahead with this idea, I have somebody who can push it

10   through, the bond thing through.  That is not a lie.  That was

11   a true fact.  That was proved out by the evidence itself.

12         The next argument is that somehow that if John were

13   sent there by Jason, that after the meeting is over, John never

14   talks to the representatives for six weeks.  Now you might not

15   know John Galanis as well as I do, but I think you can rest

16   assured from the emails you saw during the trial, John Galanis

17   would never let anybody go six weeks without hearing from him

18   if he wanted him to do something.  That's an impossibility for

19   John Galanis.  I've represented John Galanis for years now.  I

20   hear from him every day.  If he wants something, he makes it

21   perfectly clear how he wants to get it done and keeps coming

22   forward, listening to your ideas, coming back with other ideas.

23   That's John Galanis.  John Galanis is sent to that meeting by

24   Jason Galanis to convince them to do something, does not go six

25   weeks without talking to those people after the meeting.

J381gals

1          THE COURT:  Are you asking me to reconsider my

2     decision on your motions?

3          MR. TOUGER:  No, your Honor.  What I'm trying to

4     outline to you is, you have a very difficult job here, to come

5     up with a just sentence, and the just sentence has to be based

6     on what somebody did to make them guilty of this crime.  If you

7     really believe that John Galanis was working with Jason from

8     the very beginning and this whole thing was laid out by the two

9     of them to sell the bonds from the Wakpamni and pocket the

10    money, then you should give John Galanis one sentence.

11    However, if you believe that in the beginning of this matter

12    that John Galanis was not working with Jason, that John Galanis

13    sought out Jason for the very purpose of -- he was the only one

14    he knew who could possibly sell these bonds, and didn't know

15    that these bonds were a falsity and a fake, and that Jason was

16    just going to steal the money, if he doesn't know that from the

17    beginning, he should get a different sentence.  And that's why

18    I'm outlining --

19         THE COURT:  If I thought someone was innocent of

20    crimes, we wouldn't be at sentencing.

21         MR. TOUGER:  I'm not even saying he's innocent of a

22    crime, your Honor.  It's when his guilt came into effect.  We

23    have never argued -- we understand that after, when we

24    figured -- I shouldn't say "we" -- when Mr. Galanis figured out

25    that something was wrong here and improper, that we didn't come

J381gals

1    forward and say stop, we didn't divorce ourselves from the

2    proceedings, we kept going.  We acknowledged our criminal

3    conduct at that point.  But that point happened after the first

4    tranche of bonds was done.  It doesn't mean he's not criminally

5    responsible.  Conscious avoidance, as I wrote in my sentencing

6    submission, makes him criminally responsible.  That is a

7    federal charge of law, that is federal law, and that makes him

8    responsible.  But there is a sentence on somebody who is

9    consciously avoiding figuring out a crime or somebody who

10   actively began, maintained, and completed a crime; it's a

11   completely different animal.  And that's why I'm putting this

12   to the Court.

13          What's also interesting, your Honor, is that as Tim

14   Anderson testified, it was his idea, and only his idea, to send

15   out the whole Wakpamni bond deals.  He did that two weeks after

16   the meeting in Las Vegas.  And what's also important for this

17   Court to remember is that Mr. Anderson testified that once the

18   bond idea was accepted by all parties, Mr. Galanis basically

19   dropped out of the picture and Jason Galanis took control.  So

20   that's another aspect that just flies in the face of what John

21   Galanis is as a person.  If John Galanis was part of this and

22   this was his plan, he would not have dropped out of any

23   picture.

24          Which leads us to the commission, and there are two

25   things that everybody and the government hammered on in their

J381gals

1    summations, and it's hammered on in their submissions, which

2    is: (1) the meeting, the false statements in Las Vegas; and (2)

3    the commission.  At the trial -- and the Court in its Rule 29

4    motion also.  There is no doubt his commission is higher than

5    anybody else's.  That's a fact.  We can't argue with that.

6    That's a fact.  There's also no doubt, as stated by the

7    government's witnesses at trial, that was a perfectly

8    legitimate commission based on the amount of money that was

9    involved here.  The government's argument, as you stated

10   previously, that this had to be -- if it was legitimate, it

11   would have been put in the bond papers.  That money was not

12   coming out of the bond payments.  There is no reason to put it

13   in the bond payments.  That money was coming from the

14   organization that was getting the bond money.  That's who owed

15   the commission, and nobody else.  They weren't making the

16   Wakpamni pay for it.  They weren't making the investors in the

17   bond pay for it.  They had to pay for it and therefore they

18   didn't have to reveal it to anybody.  And that's how the

19   business works.  This is not individual to this case.  That's

20   the normal operating procedure of this business.  If you're

21   being paid by the person who's making the money and it's not

22   coming out of the bond proceeds, you don't need to tell anybody

23   else that you're paying it, because nobody else is paying it.

24        What's also interesting is that the Court has

25   amplified, and the government amplifies in their summation,

29

J381gals

1    that it was Sovereign Nations, it wasn't John Galanis.  Why

2    would John Galanis take the $2.3 million into his personal bank

3    account if he knew that that money was not all going to him?

4    Most of that money, well over half of that money, went back to

5    try to start the other Wakpamni investments, such as the fire,

6    the fire, the water, and all these other programs that they

7    were trying to do, and the athletic organization.

8         And then, the most important part of the Sovereign

9    Nations testimony is the testimony of Mr. McMillan, who

10   testified that there was a break in the relationship of Jason

11   and John Galanis in 2011.  And that in and of itself shows that

12   there was no reason for Jason to trust John Galanis anymore,

13   and I won't go into any more depth than that because that's

14   covered completely in my submission.

15        What's interesting is the testimony of Mr. Dunkerley

16   during the trial that Jason only gave everybody the knowledge

17   they deserved or needed to have, and that he didn't know

18   everything that was going on.  But he knew all about the

19   purchase of Ms. Morton's company.  He knew it was happening.

20   John Galanis didn't know; we know that.  Mr. Hirst knew; we

21   know that.  Ms. Morton knew, obviously, but John Galanis didn't

22   know.  So if he was, again, this mastermind of this conspiracy

23   from the very beginning, why wouldn't he know anything about

24   this most important part?  Because this is where they were

25   getting the buyers of the bonds.  It just doesn't make sense.

J381gals

1    But this is all dealt with in great detail in my submission, so

2    I just wanted to emphasize those points.

3            I'd like to now turn to Mr. Galanis's health.  Whether

4    the Court wants to deal with it as a departure or just as

5    reasons why, as a variance, the Court can choose that way, but

6    I just hope that the Court deals with this issue.

7            The average life span of an American male right now is

8    79 years old.  Mr. Galanis has passed that age.  He's not an

9    average American male.  He has high blood pressure, he has

10   plaque build-up, he has prostate issues, he has diabetes, he

11   has renal disease --

12           THE COURT:  He's 75 now, correct?

13           MR. TOUGER:  Excuse me.  I meant we're past that on

14   the original sentence.  I'm sorry.  He will pass 79 based on

15   the sentence he has in Gerova.  I'm sorry.

16           He has joint deterioration, he has hearing issues, and

17   a myriad of other problems.  And he's not outside in the

18   American public with doctors dealing with that issue.  It is

19   unbelievable to me that the Bureau of Prisons couldn't even get

20   him a pair of shoes.  He has now been in custody for over a

21   year, and he still doesn't have a pair of shoes.  A simple pair

22   of orthopedic shoes.  A pair of orthopedic shoes, you must

23   understand, that he came into the jail system wearing and they

24   refused to allow him to take in, saying, oh, don't worry, we'll

25   get you those shoes.  A pair of shoes, I might add, that he's

J381gals

1    offered to pay for and they say, no, we'll get you those shoes.

2    The lack of those shoes has proved one thing and has done

3    another.  The lack of those shoes has put Mr. Galanis in the

4    wheelchair.  That's the effect of it.  And what it proves, your

5    Honor, is they will not take care of any of these other issues

6    that have been caused either by that lack of shoes or been

7    exacerbated by that lack of shoes.  So there is no doubt that

8    Mr. Galanis's life span expectancy is going to be less than the

9    average American male.

10           THE COURT:  Even if I'm sympathetic to the health

11   concerns, how should I factor in the fact that he committed

12   this crime in his 70s, committed the Gerova crime in his late

13   60s, when he already had some of these health conditions?

14           MR. TOUGER:  The way you can factor that in, your

15   Honor, is that as far as the Gerova crime, you have our

16   sentencing memorandum in that, so I'm not going to go into a

17   long explanation of why that occurred.  So the Court has proven

18   many things to this lawyer.  One thing this Court has proven to

19   this lawyer is that you read everything you've gotten and you

20   understand it, so I'm not going to go into that theory.  The

21   Gerova case is totally separate and distinct from this case, as

22   far as why they occurred.

23           Mr. Galanis did not come into this case committing a

24   crime, and I guess that's where we have a distinction, your

25   Honor, is, Mr. Galanis went into this case as a way, in

J381gals

1   essence, really, to top off a career that began before he

2   committed criminal conduct and go back and help out the Native

3   American tribes.  There is no doubt in my mind that Mr. Galanis

4   did not go into this to rip off the Native American tribe in

5   Wakpamni.  There is no doubt in my mind.  I have talked to

6   those people, and there is no doubt in my mind.  So he did not

7   commit a crime in his 70s.  He committed conscious avoidance

8   and he committed -- later, when it became known to him, he

9   didn't get Jason to stop this, but there was no going, in my

10  mid 70s, I need to commit a crime.  That did not occur.

11          And the way you can factor it in, your Honor, is --

12  I'm not going to sit here and argue -- or stand here and argue

13  to you that you should not give him any time for this case.

14  While I feel any time you give him just magnifies and increases

15  his chances of dying in jail, I understand that this Court has

16  to give him some time.  The Court has given Mr. Hirst -- or

17  Dr. Hirst, I should say -- three years, consecutive.

18          THE COURT:  Three years consecutive.

19          MR. TOUGER:  Consecutive.  In my mind, Mr. Galanis's

20  conduct is less than Dr. Hirst's conduct in this case, and

21  that's what I'm using sort of as my bar to be set.  Because

22  Dr. Hirst also had the Gerova conviction, also is a man of

23  age --

24          THE COURT:  He doesn't have as many prior convictions.

25          MR. TOUGER:  He doesn't have the record.  I was just

J381gals

1    going to say that.

2              THE COURT:  He hasn't been committing crimes since the

3    '70s, when Richard Nixon was president.

4              MR. TOUGER:  Well, that's a statement that is true

5    factually, but he spent 17 of those years in jail.  He wasn't

6    committing crimes for the last 40 years, your Honor.  He

7    committed a crime that led to multiple prosecutions that even a

8    judge of this court said were all related in and of itself.  He

9    spent 17 years in jail for those crimes.  And the only two

10   crimes he's committed since then, your Honor, are the Gerova

11   crime, which we've explained, and this crime.  So this is not a

12   man -- I know that the government wants to paint this man as a

13   man who, all he's done his entire life is commit crime.  That's

14   not true.  Yes, he has convictions from the 1970s and 1980s

15   that were basically one criminal conduct that he got 17 years

16   for, and then there's two other crimes, the Gerova and this.

17             In this case, Dr. Hirst knew exactly what he was

18   doing.  There is no way anybody could argue otherwise.  He was

19   an employee of Ms. Morton's company when they bought it.  He

20   convinced employees of that company that this was the right

21   thing to do to buy these bonds.  He signed the bond purchase.

22   There is no way he can argue -- and I don't believe he has

23   argued, as he pled guilty before trial -- that he did not

24   commit those acts knowingly.  His signature is on the purchase

25   of the bonds.  Mr. Galanis was not involved in that at all.  I

J381gals

1    think that is admitted by everybody.  Mr. Galanis's main role

2    here, even if you give him a role, was to bring the Wakpamni to

3    the table with Jason.  Even if you want to say that that was

4    his role and that's what he was sent out to do, that's all he

5    did.  He did not force the Wakpamni to do anything, he did not

6    take any money from the Wakpamni, and the Wakpamni, as we have

7    shown, has not lost a penny from this.  They have gained a

8    building, they have gained the money they got, and nobody has

9    come to them asking them for the $65 million.  And nobody ever

10   will.  So I believe Mr. Hirst's -- Dr. Hirst's conduct was

11   beyond that of John Galanis, and therefore, his sentence in

12   this case, especially with the health issues he has, and the

13   fact that we already know, from BOP already rejecting him from

14   the drug program, that he's going to do the time the Court

15   sentences him to -- he's not getting a year off.  Even with the

16   new legislation that has just been implemented -- I just went

17   to a CLE on that -- he's not going to get the benefit of any of

18   those programs.  He's not safety valve eligible.  None of those

19   programs -- especially now that he's not getting the drug

20   program -- will help him.  Every day that you sentence him to,

21   he's going to do 85 percent of that time.  So every day that

22   this Court gives him, he's doing.

23        And therefore, your Honor, I would ask that you give

24   him a sentence less than Dr. Hirst, as far as consecutive to

25   the sentence --

35

J381gals

1          THE COURT:  I'll just note for the record, Gary Hirst

2    got a sentence of 96 months in prison, with 36 months to run

3    consecutive to the sentence on Gerova.

4          MR. TOUGER:  Yes.  And my only request, your Honor,

5    is, based on everything you know and the sentencing submissions

6    you have, that John Galanis deserves a sentence less than

7    Dr. Hirst.

8          THE COURT:  Thank you.

9          Is there any reason why sentence cannot be imposed at

10   this time?

11         MS. TEKEEI:  No, your Honor.

12         MR. TOUGER:  No, your Honor.

13         THE COURT:  All right.  So I'm required to consider

14   the advisory guidelines range of 135 to 168 months, as well as

15   various other factors that are outlined in a provision of the

16   law, 18 United States Code Section 3553(a), and I have done so.

17   Those factors include, but are not limited to, the nature and

18   circumstances of the offense and the personal history and

19   characteristics of the defendant, because every defendant must

20   be considered individually as a person.

21         Judges are also required to consider the need for the

22   sentence imposed to reflect the seriousness of the offense, to

23   promote respect for the law, provide just punishment for the

24   offense, afford adequate deterrence to criminal conduct,

25   protect the public from future crimes of the defendant, and

J381gals

1    avoid unwarranted sentencing disparities, among other things.

2              Mr. Galanis, you have been defrauding people and

3    entities for well over 40 years.  That is nothing short of

4    extraordinary.  Many of the crimes that resulted in conviction

5    were in this very court, either in Manhattan or in White

6    Plains.  Your first conviction, as I noted a moment ago, was in

7    this court back in 1973, for mail fraud and conspiracy to make

8    false statements to the SEC.  You were convicted in this court

9    again in 1987 for a conspiracy to defraud the IRS.  Tax fraud,

10   RICO, securities fraud, bank fraud, and bribery.  And after

11   receiving a very lengthy sentence in another conviction in

12   state court, you were again convicted in this court at the age

13   of 72 before Judge Castel for a securities fraud in the Gerova

14   case we've spoken a lot about.

15             And then there's the conduct in this case, which

16   Mr. Galanis continues to challenge but which I have no doubt

17   was proven beyond a reasonable doubt at a very lengthy trial by

18   the government.

19             There's no real dispute, in my view, about the

20   seriousness of the crime and the harm caused to one of the

21   poorest Native American tribes in the country, as well as the

22   clients of Hughes and Atlantic, pension funds held for the

23   benefit of transit workers, longshoremen, housing authority

24   workers, and city employees, among others.  Over the course of

25   two years, Mr. Galanis helped steal more than $40 million from

J381gals

1    numerous pension fund clients and left the Wakpamni Lake

2    Community Corporation without money for economic development

3    and owing more than $60 million on the outstanding bonds.

4    2.35 million of the bond proceeds were sent to an entity

5    controlled by Mr. Galanis, who then used that money for, among

6    other things, jewelry, cars, hotels, and disbursements to

7    family members.

8            As I noted in my ruling on his application to apply

9    the minor role reduction, his involvement in this conspiracy in

10   my view was far from minor.  So I've considered his role, I've

11   considered the number of victims impacted, and how they were

12   impacted.

13           As I noted, Mr. Galanis, now 75, has five prior

14   convictions, with criminal histories dating back to the 1970s,

15   mostly for fraud-related offenses.

16           You know, Mr. Galanis, I recall your son Jason.  I

17   know you've had a complicated relationship, but I recall him at

18   sentencing describing what it was like growing up with a father

19   notorious for crimes.  That's not the legacy most people seek.

20           A substantial sentence thus must be imposed to reflect

21   the seriousness of the offense, promote respect for the law,

22   provide just punishment for the offense, and afford adequate

23   deterrence, both to you, Mr. Galanis, and to others who may

24   seek to engage in similar conduct.  Perhaps more than anything,

25   however, I need to protect the public from future crimes that

J381gals

you may commit.  While most people are less likely to

recidivate as they get older, as I noted earlier, you committed

your last two crimes in your late 60s and your 70s, so that

assumption appears not to apply to you.

          I have considered and am genuinely sympathetic to, and

I think you know tried to be throughout the trial and before,

Mr. Galanis's health problems, including his degenerative disc

disease, joint issues, spinal issues, prostate issues, high

blood pressure, hypertension, diabetes, among other ailments,

and I do take those medical conditions seriously, and if there

are any recommendations you want me to make on the judgment

that may assist in getting him the treatment he needs, I'm

happy to do that.  But as the government points out,

Mr. Galanis committed this fraud at a time when many of these

conditions were already manifest and so he was fully aware of

the potential consequences on his health if he was punished for

his wrongdoing.  I also believe that the BOP will be able to

handle Mr. Galanis's health issues, as they do with other

inmates who have conditions that he identifies.  So I don't

think a departure is warranted for that reason.  I have

considered it in the 3553(a) balancing, and as I said, I'm

happy to make any recommendation that may assist him going

forward.

          Finally, I've considered all of the other arguments

Mr. Galanis has made, including the need to avoid unwarranted

J381gals

1     sentencing disparities.

2              I've read all of the letters submitted from his wife

3     and children.

4              And I am ready to impose sentence.

5              So Mr. Galanis, can you rise?  If you can't, if it's

6     uncomfortable, you don't need to.

7              THE DEFENDANT:  It would be a problem, your Honor.

8              THE COURT:  In any event, if it's difficult for him,

9     there's no need to do that.

10             It is the judgment of this Court that you be committed

11    to the custody of the Bureau of Prisons for a term of 60 months

12    on Count One and 120 months on Count Two, to run concurrently

13    to one another.  48 of those months is to be served

14    consecutively to the sentence imposed by Judge Castel, and the

15    remainder of the sentence is to run concurrently to the

16    sentence imposed by Judge Castel.

17             That term of imprisonment shall be followed by a term

18    of supervised release of three years on each count, to run

19    concurrently.

20             I believe that this sentence is sufficient but not

21    greater than necessary to comply with the purposes of

22    sentencing set forth in the law.

23             So why don't we discuss the conditions of your

24    supervised release.  The standard conditions of supervised

25    release shall apply.  I'm not going to read them out loud.

J381gals

1   They're on page 47 to 48 of the presentence report.  Unless you

2   want me to.

3           The mandatory conditions shall apply:

4           You must not commit another federal, state, or local

5   crime;

6           You must not unlawfully possess a controlled

7   substance;

8           You must refrain from any unlawful use of a controlled

9   substance;

10          You must submit to one drug test within 15 days of

11  release from imprisonment and at least two periodic drug tests

12  thereafter, as determined by the Court;

13          You must cooperate in the collection of DNA as

14  directed by the probation office; and

15          You must make restitution in accordance with the law.

16  And those provisions of the law are set forth on page 47.

17          In addition, in light of the nature of the crimes, I'm

18  going to impose the special conditions recommended by the

19  probation office:

20          You must provide the probation officer with access to

21  any requested financial information.

22          You must not incur new credit card charges or open

23  lines of credit without the approval of the probation officer

24  unless you're in compliance with the installment payment

25  schedule.

J381gals

1          And you'll be supervised in your district of

2     residence.

3          I decline to impose a fine in light of the forfeiture

4     and restitution that will be imposed.

5          I'm imposing the mandatory special assessment of $200,

6     which shall be paid immediately.

7          So let's talk about restitution and forfeiture.  Do

8     you have an objection, Mr. Touger, to the preliminary order of

9     forfeiture money judgment?

10          MR. TOUGER:  Forfeiture?  No.

11          THE COURT:  So I'm ordering forfeiture in the amount

12     of -- the government's seeking the $2,585,000, is that correct?

13          MS. TEKEEI:  Yes, your Honor.

14          THE COURT:  Yes.  So I'm going to order forfeiture in

15     that amount, and I'm going to sign this order of forfeiture

16     money judgment, which will become part of the judgment in this

17     matter.

18          Now with respect to restitution, you have an objection

19     to the proposed restitution order, is that right, Mr. Touger?

20          MR. TOUGER:  Yes, your Honor, based on the arguments

21     we've already put forth to the Court.

22          THE COURT:  All right.  Would the government like to

23     be heard.

24          MS. TEKEEI:  Your Honor, as is clear in our submission

25     and as the Court has already held with respect to the loss

J381gals

1    amount, the full amount of the victims' losses can be directly

2    attributed to and foreseeable to Mr. John Galanis, and that is

3    why the restitution order covers the full amount of the

4    victims' losses, which is more than $43 million.

5         THE COURT:  I agree for the reasons that I've already

6    stated, so restitution shall be ordered in the amount of

7    $43,785,176, as indicated in this order of restitution, which I

8    will sign and will also be made part of the judgment in this

9    matter.

10        Does either counsel know of any legal reason, other

11   than the ones that you've stated and I've rejected, why this

12   sentence cannot be imposed as stated?

13        MS. TEKEEI:  No, your Honor.

14        MR. TOUGER:  No, your Honor.

15        THE COURT:  All right.  That's the sentence of this

16   Court.

17        Mr. Galanis, you have a right to appeal your

18   conviction and sentence.  If you do choose to appeal, the

19   notice of appeal must be filed within 14 days of the judgment

20   of conviction.  If you're not able to pay the cost of an

21   appeal, you may apply for leave to appeal in forma pauperis,

22   which simply means that court costs, such as filing fees, will

23   be waived.  If you request, the clerk of court will prepare a

24   notice of appeal and file it on your behalf.

25        Are there any open counts or underlying indictments?

J381gals

1          MS. TEKEEI:  There are underlying indictments, your

2    Honor, and we move to dismiss them at this time.

3          THE COURT:  They shall be dismissed.

4          Is there any recommendation you want me to make with

5    respect to housing or medical condition?

6          MR. TOUGER:  Two things, your Honor.

7          One, I would ask -- I'm presuming that I will be doing

8    the appeal, and so if you could have BOP keep him at the MDC

9    for the next two months just so I can lay the preliminary

10   groundwork for the appeal with him before he goes, and then,

11   because that relates to my second request, is that he go back

12   to Terminal Island from whence he came and that you also

13   order --

14         THE COURT:  How far away is that?

15         MR. TOUGER:  It's in Los Angeles.  That's where his

16   family is, and that's where he was, at the medical -- it's the

17   medical facility for the West Coast.

18         THE COURT:  Okay.

19         MR. TOUGER:  And also, your Honor, if you remember,

20   you had put an order that he be flown from LA to here for the

21   trial because of his medical conditions.  We'd ask that you put

22   that same order in, that he be flown back to Los Angeles and

23   not go on the bus trips across the country.

24         THE COURT:  Yes.  Is there an order you need to submit

25   to me to that effect?

J381gals

1              MR. GRAND:  I will submit it.

2              THE COURT:  Please submit that.

3              I will make the other two recommendations in the

4    judgment.

5              MR. TOUGER:  Thank you, your Honor.

6              THE COURT:  Are there any other applications at this

7    time?

8              MS. TEKEEI:  Not from the government, your Honor.

9              MR. TOUGER:  No, your Honor.

10             THE COURT:  Thank you.  We're adjourned.

11             MS. TEKEEI:  Thank you, your Honor.

12             MR. TOUGER:  Thank you.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25