# PELUSO & TOUGER, LLP

### ATTORNEYS AT LAW
### 70 LAFAYETTE STREET
### NEW YORK, NEW YORK 10013

TELEPHONE: (212) 608-1234
FACSIMILE:   (212) 513-1989

January 22, 2020

**BY HAND**
Honorable Ronnie Abrams
United States District Court Judge
United States Courthouse
40 Foley Square
New York, New York 10007

Re: <u>United States v. John Galanis,</u>
   16 CR 371 (RA)

Your Honor,

Enclosed please find a *Pro Se* Motion of Recusal that Mr. Galanis requested that I send to the Court on his behalf. This motion is filed pursuant to 28 USC §§ 144, 455(a) and 455(b)(5)(iii). Since, it is a *Pro Se* Motion I did not file it on ECF, if the Court wishes me to do so I of course will follow the Court's instructions. I have read the motion and as counsel of record I have no reason to believe that Mr. Galanis is not filing this motion in good faith and thus, pursuant to the requirements of 28 USC § 144 I certify that this motion is filed in good faith by Mr. Galanis *Pro Se*. As I understand the law I am just certifying the "good faith" of Mr. Galanis and not the facts stated in Mr. Galanis' affidavit, as I have no first hand knowledge of many of the facts stated therein.

Most Respectfully,

David Touger, Esq.

cc.: AUSA Rebecca Mermelstein



## AFFIDAVIT

I, John Galanis, hereinafter Declarant, hereby affirm and
declare under the panalty of perjury (28 U.S.C. § 1746), that
the following Facts stated herein are true and correct to the
best of the Declarant's personal knowledge, understanding, and
belief.

1.   Declarant is of the age of majority, of sound mind, and
competent to testify.

2.   This Affidavit is filed requesting the court to disqualify
itself from having presided at my trial and vacate the jury's
guilty verdict pursuant to the United States Code Title 28
Sections 144, 455(a) and 455(b)(5)(iii).

3.   **PROCEDURAL GROUNDS FOR RECUSAL:**
     Under Section 144 Title 28 recusal can only be considered
whenever a party files a sufficient affidavit stating the judge
has a personal bias or prejudice either against that party or
in favor of another party.  And, due process may sometimes
demand recusal even when a judge "ha[s] no actual bias" Rippo
v. Baker, 137 S.St. 905.  Quoting Rippo, "recusal is required
when objectively speaking, 'the probability of actual bias on
the part of the judge'... is too high to be constitutionally
tolerable" (citation omitted):  See Williams v. Pennsylvania,
136 S. Ct. 1899.

The United States Court of Appeals for the Second Circuit
considers that sections 144 and 455 are to be heard in
conjunction with each other as the sustentative analysis is the
same under both, Apple v. Jewish Hosp. & med. Ctr., 829 F.2nd
326 (2nd Cir. 1987).  Broader grounds for disqualification are
applicable under 28 U.S.C.S. section 455(a) than either 28 U.S.C.S.
section 144 or section 455(b)(5)(iii).  However, disqualification

may be waived under section 455(a) if a judge discloses bias
but not under section 455(b) and its subsections.  Under Title
28 section 455(a) an objective standard is set for determining
the bias of the court stating "any justice, judge, or magistrate
of the United States shall disqualify [her]self in any proceeding
which [her] impartiality might be questioned."  The standard is
to "be evaluated on an objective basis, so that what matters is
not the reality of bias or prejudice but its appearance."
(quoting from Liteky v. United States, 510 U.S. 540).  Under that
test a court must ask "Would a reasonable person, knowing all
the facts, conclude that the trial judge's impartiality could be
reasonablyquestioned." (United States v. Bayless, 201 F.3d 116).

However, section 455(b)(5)(iii) of Title 28 puts forth a
distinguishable standard from section 144 or section 455(a) in
that it cannot be waived bythe parties.  Dictating an absolute
prohibition on maintaining jurisdiction in a matter, section
455(b)(5)(iii) states: [She] shall have to disqualify [her]self
in the following circumstances: [She] or [her] spouse ... (iii)
is known by the judge to have an interest that could be
substantially by the outcome of the proceeding.  The United
States Supreme Court in Lilijeberg v. Health Services
Acquisition Corp, 108 S. Ct. 2194, found that subsection (b)
of section 455 had a "somewhat stricter provision" than
subsection (a).  The statute requires recusal once grounds for
disqualification arise even if insubstantial or absent an
appearance of impropriety.

## 4.  VALIDITY OF REQUEST FOR RECUSAL:

Despite the contentious political events since the 2016
United States presidential election, the judicial branch of
government is properly perceived as upholding the fair and
impartial rule of law.  The use of sections 144 and 455 of
Title 28 has had the desired affect of maintaining the public's
trust in the judiciary.  The issues which will be raised in this

request require the prudent use of the recusal statutes.  Both
the objective and subjective standards of higher courts have
been met by the evidence presented.  There have been substantial
issues of inadvertent judicial bias raised because of unforseen
revelations regarding Burnham/Wealth Assurance dealing with
Russian and Ukrainian oligarchs.  These issues are given greater
gravity due to the current presidential impeachment.  If the
newly discovered evidence is ignored the public's trust in the
judiciary as impartial arbiters would be questioned.  As the
newly discovered evidence demonstrates the principals in the
Wakpamni bond and Burnam/Wealth Assurance case shows attempts
at corrupt foreign interference in the American political
system.  One example out of many is the extraordinary connection
between the Mueller investigation and the Bursima controversy.
The government had the necessary facts to have informed the court
and defense attorney before trial of the conflicted position in
which the court was to be placed.  By ignoring facts detrimental
to its case, the government created a series of due process
violations against movant which are discussed and supported in
the sections that follow.

5.  **BACKGROUND OF TRIAL:**

    (A Glossary of Perticipants and Entities is attached and
encompassed to this Affidavit).

    After a six week trial where the government presented over
800 exhibits, the jury deliberated for under three (3) hours
not having requested any exhibits or reading of witnesses'
testimony to find movant, John Galanis, codefendants Devon
Archer and Bevan Cooney guilty of the charges against them in
the Wakpamni bond/Burnham/Wealth Assurance indictment.  Prior to
impaneling a jury, judge Abrams informed the parties she had met
Hunter Biden who was "a couple of years behind me" at Yale Law
School, and "we have a mutual friend."  There were no onjections,
however, during the opening argument by Devon Archer's attorney,
the court at sidebar admonished the attorney's that there should

-3-

not be references to political figures.  The government argued
that defendants Jason Galanis (JWG), Devon Archer (Archer),
Bevan Cooney (Cooney), and others were attempting to "obtain[ing]
liquidity necessary to execute the roll-up." (Judge Abrams Rule
29 decision, page 3).  The Securities and Exchange Commission
later charged in a civil suit that unindicted co-conspirator
Jason Sugerman was a key participant in the roll-up scheme.  The
roll-up refers to an acquisition plan to acquire financial
services companies by Jason Galanis, Devon Archer, Jason Sugerman
and others.  The initial acquisition in 2013 were of Burnham
Financial group, (BFG) by COR Financial Asset (CORFA) and Wealth
Assurance, AG (WAAG) by Wealth Assurance Holdings, Ltd. (WAH).
CORFA was operating the BSI subsidiary of BFG and awaiting board
approval to acquire the asset management subsidiary (BAM).
Wealth Assurance Ag was acquired in part by fraudulently
redirecting its funds through an account at Banc of California
which was controlled by the Sugarman brothers working with Jason
Galanis.  Through the Burnham/Wealth Assurance acquisitions,
Jason Sugarman, Devon Archer, and Jason Galanis controlled
over $2 Billion in assets.

Jason galanis informed movant that the Burnham/Wealth Assurance
partners were looking to fund the aquisition of a larger
insurance company, ValorLife.  Movant told Jason Galanis he had
been contacted by a representative of a Native Americantribe
looking to place economic development bonds.  A meeting with
representatives of the tribe was scheduled at a Native American
economic development conference in Las Vegas.  Jason Galanis
offered movant a commission if through a tribal bond issue WAH
could fund its acquisition of Valor Life.

At the Las vegas meeting, movant met with Raycen Raines, the
Wakpamni Lake Community Corporation (WLCC) economic development
director, L. Steven Haynes (Haynes), a co-venturer of the WLCC
in the payday loan business, and Timothy Anderson, the attorney

-4-

for the WLLC and Haynes.  Haynes explained that the WLCC was
allowed to issue bonds which had tribal sovereign immunity.
Movant, following a suggestion by Jason Galanis, explained
Burnham Securities, Inc. (BSI) would be the placement agent for
new issue of WLCC bonds.  Movant knew of Jason Galanis' control
of BSI through CORFA.  Initially, the proposal was the majority
of the bond proceeds would be used to purchase an annuity
issued by WAAG, so it might be able to acquire Valor Life.  The
bond indenture would provide for the proceeds remaining after
purchase of the annuity to be used to build a warehouse on the
reservation to distribute alcoholic beverages to the tribal
casinos.

After Haynes and the WLCC conceptually agreed to the proposal,
movant introduced Haynes and Anderson to Jason Galanis.
Anderson asked Galanis to become the attorney for BSI on the
bond offering.  Jason Galanis, through his control of CORFA,
directed Burnham to appoint Anderson the bond attorney for BSI.
Jason Galanis did not allow movant to meet or interact with any
officers or directors of the Burnham/Wealth Assurance Group.
Anderson and movant worked through the summer of 2014 preparing
the documentation for approval by Jason Galanis and Greenberg
Traurig, the WLCC's counsel.

Movant has no personal knowledge, nor does the government claim
movant participated in distribution of the WLCC bonds portion of
the conspiracy.  Proven at trial, the Burnham Partners funded the
acquisition of pension fund managers who conspired to illegally
sell the WLCC bonds to their clients.  During the summer of 2014,
Jason Galanis had been introduced to Michelle Morton who was
looking for funds to purchase an institutional asset manager,
Hughes Asset Management.  Morton assured Jason Galanis that she
had the qualifications necessary to manage the assets of the
pension funds who were Hughes' principal clients.  Morton assured
JWG that if lent the funds, she would support buying the WLCC

-5-

bonds by the pension funds.   JWG discussed the acquisition with his partners Jason Sugarman and Devon Archer, (the "Burnham Partners").   The Burnham Partners decided to have Wealth Assurance AG fund Morton's acquisition through a shell company BFG Socially Responsible investing.   Upon completing the acquisition, Morton and Gary Hirst completed the purchase of WLCC bonds by Hughes clients.

In the later part of August 2014, on a conference call, JWG for the first time informed movant and attorney Timothy Anderson that WAAG would not be issuing the annuity called for by the WLCC bond indenture.   JWG explained that a different subsidiary of WAH, named Wealth Assurance Private Client (WAPC) would be issuing the annuity.   Anderson did not believe that the change would substantively alter the transaction, and would contact Greenberg Traug, attorneys for WLCC.   Movant agreed to notify Raycen Raines, the economic development director for the WLCC. In fact, WAPC was not an affiliate of WAH, even though they shared the same director, Hugh Dunkerly.   Movant has maintained he was not informed by Jason Galanis that WAPC was not a subsidiary of WAH.   Jason Galanis wrote a post conviction letter to the court confirming his deception of movant regarding WAPC's lack of affiliation with WAH.

At the request of Jason Galanis, movant caused to be formed a company, Sovereign Nations Development Corp., to receive the commission due for having arranged the sale of the annuity. Movant asked Mark McMillan (McMillan), to act as the manager of the SNDC.   McMillan had a long history of managing companies for movant.   At trial, McMillan confirmed from 2010 on through the bond transactions there had been mutual distruct and separation of business interest between movant and Jason Galanis.   The government maintained the receipt of proceeds for WAPC proved movant knew of the Burnham Partners plan to misapply the bond proceeds.   However, Dunkerley testified as the sole director of

-6-

WAPC the SNDC funds were paid while he believed the annuity was
valid.  Only after Dunkerley was asked to transfer substantially
all of the proceeds to Thorsdale Fiduciary and Guarantee, LLC.,
a private trust company controlled by Jason Galanis, did he realize
those funds were being misappropriated.  Dunkerley was never
introduced or had any contact with movant.

Shortly after the first bond offering, Jason Galanis told movant
and Anderson that BSI could place a second traunche of WLCC bonds.
Movant spoke to Haynes and Raycen Raines to secure permission of
the WLCC for the second offering.  Anderson, as attorney for
BSI, drafted the documents and coordinated with WAPC.  The bonds
were issued to Archer and Cooney with money provided from the
first bond issue through Thorsdale.  There was no testimony or
evidence that the movant knew that the funds were circled back
from the first offering to Archer and Cooney to purchase the
second and third bond offerings.  The second bond issue was
used by Archer to purchase equity in WAH, where he was a member
of the board of directors.  The bonds were then transferred with
board approval to a subsidiary BISSL.  After trial, SEC maintains,
by adding the Archer bonds to capital allowed his partner, Jason
Sugerman, to improperly transfer over $8 Million dollars for his
person benefit.

a fourth bond issue was requested by Jason Galani.  Trial
evidence showed that Morton had convinced Jason Galanis to
assist in financing the purchase of Atlantic Account Management
(AAM).  Jason Galanis turned again to Jason Sugerman and
Archer who agreed to fund Morton from Valor Life, for
approximately $6 Million dollars.  AAM had approximately
$9 Billion under management.  The fourth WLCC bond issue was
approved and illegally placed with a client of AAM for $16.5
Million dollars.

-7-

6.  **TIMELINESS:**

United States v. Amico, 486 F.3d 764 (2nd Ct. 2007) held that
in regard to "a motion for disqualification, the actual time
elapsed between the events giving rise to the charge of bias or
prejudice and the making of the motion is not necessarily
dispositive.  Noting, that "to ensure that a party does not hedge
its bets against the eventual outcome of a proceeding, a party
must move for recusal" at the earliest possible moment after
obtaining knowledge of facts demonstrating the basis for such
a claim." (quoting from Apple v. Jewish Hosp. & Medical Center
826 F.2d 326).  There are four "Apple" factors cited in Amico
which allow a motion to remain viable despite a strict reading
of timelines.  The learned decision written by Judge Barrington
D. Parker on the four factors bears repeating as it is
remarkably similar to the conclusion the movant proposes.
Quoting Amico "the first two 'Apple' factors, the substantial
participation of the movant in pretrial proceedings and waste
of judicial resources indicates untimeliness.  The third factor,
the absence of a final judgment before the motion is filed,
should lean in the movant's favor.  This factor is dissimilar in
ceertain respect, but possibly inclusive under the following.
Although the jury verdict was rendered, the court's ruling
regarding the court's rule 29 decision is before the Appellate
Court.  The specific government motion to set aside the court's
rule 29 pertains to setting aside the jury's guilty verdict of
defendant Archer, the appellate court may have a broader ruling.
Thus, the final judgment has not yet been rendered.  In addition,
movant has filed notice of intent to appeal the jury's verdict.
The fourth factor "at the crux of the balancing" timeliness, is
can the movant show good cause for the delay.  As in United
States v. Brinkworth, 68 F.3d 633, the tolling of the time to
bring a request for recusal was for extraordinary circumstances.
The court is also asked to consider the standard set forth in
United States of America v. Parse, 789 F.3d 83 which held even
when there has been an unknowing and unintentional forfeiture

-8-

by a litigant the court may use its discretion to correct an
error affecting the movant's substantial right under the sixth
amendment of the Constitution.

In good faith, this court advised the parties of its desire to
maintain a trial record without reference to politically
relevant persons.  Unknown at the time was the manner in which
the court's spouse's role as an attorney in the office of
Special Prosecutor Robert Mueller would create an actual conflict
with the facts brought before the jury.  Evidence was produced
from prior discovery by the court's desire to maintain a neutral
trial.  The newly discovered evidence will show that the basis
for recusal was met in all three claims of this affidavit,
although for very distinctive reasons.  The argument for recusal
based on Title 28 sections 144, 455(a) rests on "impartiality
which might be resonably questioned" and could not have been
brought until very recent events showed the potential for the
public perceiving bias.  The claim under section 455(b)(5)(iii)
is not an objective standard of impartiality, rather the absolute
prohibition on merging the interest of the court hearing the matter
with an investigative body inquiring on matters directly related.
See Williams v. Pennsylvania, (S. Ct.).  As will be demonstrated,
there is evidence available that Mr. Andres' investigation and
indictment of Paul Manafort coincided with matters essential to
providing a fair trial in the Wakpamni bond case.

Further, this submission is timely since a specific point in time
can be shown well within a reasonable period to file this
motion after knowing of the potential for the court's bias.  On
October 3, 2019, in an e-mail from my wife, I was informed that
the court had recused itself from two civil proceedings where
President Trump was sued for violation of the emoluments clause
of the United States Constitution.  The court did not provide
any reason for its decision to recuse.  A news article
speculated that it may have been a few weeks later that her

spouse, Greg Andres, would join Robert Mueller Special
Prosecutor's foreign election interference investigation.  Prior
to reading this information, I [movant] had never been informed
of or about Mr. Andres' position.  Coupled with the knowledge
of Hunter Biden's role with Burnham/Wealth Assurance, I bagan
to have cause to inquire about the possible connection between
the two matter.  Also of note is the fact that the recusal that
followed the violation of the emoluments clause was prior to the
start of the trial regarding this instant case.

The court's spouse, Greg Andres, acting for Special Prosecutor
Robert Mueller, investigated and then cgarged Paul Manafort with
crimes resulting from improper use of political influence on
behalf of Russian and Ukranian oligarchs.  In addition, Manafort
was charged with fraudulently securing a loan from the banc of
California.  The newly discovered evidence will show that the
activities of Jason Sugarman, Jason Galanis, Devon Archer, and
Hunter Biden (hereafter referred to as the "Burnham Partners"),
intersected with matters being investigated by the Mueller team
of attorney's including Mr. Andres.  The same foreign parties
central to the Mueller inquiry were contemporaneously involved
in similar schemes with the Burnham Partners.  Furthermore,
post trial discovery in civil litigation involving improper
influence in the management of Banc of California (BANC) by
Jason Sugarman and Jason Galanis.  Substantially all of the
aforementioned facts were discovered post trial.

7.   **DISCUSSION OF THE MERITS:**
     **FACTUAL ISSUES UNDER SECTIONS 144 AND 455(a):**
The decision to grant or deny a recusal motion is committed to
the sound discretion of the judge to whom the motion is directed.
See in re Drexel Burnham Lambert, 861 F.2d 1307 (2nd Cir. 1988).
A judge must "carefully weigh the policy of promoting public
confidence in the judiciary against the possibility that those
questioning [her] impartiality might be seeking to avoid the

-10-

adverse consequences of [her] presiding over their case."
Initially, and through the point at trial where the court refused
to call Jason Galanis, I [movant] was not hesistant in the court
hearing the matter which resulted in my conviction.  After the
October e-mail from my [movant] wife, I began to examine the
court's ruling regarding co-defendant Archer.  As previously
noted, the court's admonition to the parties on maintaining a
politically neutral trial as to testimony, was an attempt to
avoid prejudicial political matters unfairly influencing the
jury.  Unfortunately, as with many undefined exclusionary efforts,
the path is more likely to lead to misconception of the evidence
and testimony presented.

Amongst other unintended consequences detrimental to my [movant]
due process rights, the ruling prevented full disclosure of the
reason Jason Galanis was induced by Archer to turnover his
ownership of Burnham/CORFA.  In addition to his directorship,
further evidence of Hunter Biden becoming an undisclosed partner
with Archer, Jason Sugarman, and Jason Galanis, was the purchase
of his broker/dealer Rosemont Seneca by Burnham.  Evidence is
provided that after Archer and Hunter Biden gained control of
Burnham, indirect political influence was used to obtain a $5
Million dollar investment in Burnham by a Chinese firm.  A full
vetting would reveal that Archer and Hunter Biden became the
majority of directors of Burnham to continue utilizing political
patronage to gain control of assets.  While the former displays
the potential of the public miscontruing the court's impartiality,
a far more serious concern is raised in the court allowing
Archer to travel while on bail.  The court docket shows numerous
requests for foreign travel for business purposes.  Many of the
travel permits are to jurisdictions which do not have extradition
treaties with the United States, and are suspiciously venues
frequented to parties of interest in the Mueller investigation.

Therefore, following the concept of appearance of bias over the reality of bias, it is possible to conceive that the Supreme Court's Liteky Test has been met.  The following is a synopsis of the potential factors for which the court may be viewed as biased.

1:    The court was appointed by President Obama;

2:    Family members include a father who is a well respected Constitutional law attorney active in democratic politics, a brother who is a national news network legal commentary analyst and critic of President of Trump, and a husband who is a prosecutor on the Mueller investigation often viewed by republicans as anti-Trump;

3:    Having attended Yale Law School with Hunter Biden and on the record as having friends in common;

4:    Without explanation, the court recused itself from two foreign emoluments civil law suits brought against President trump.  However, under-took a trial with far more tangible links to the potential of foreign parties having improper activity in the United States elections than the emoluments case;

5:    Restricting from the trial the general knowledge of Hunter Biden, Christpoher Heinz, and Devon Archer were each partners in soliciting foreign investors;

6:    Taking the highly unusual step of over turning the jury's guilty verdict for Archer;

7:    Ruling that the 'roll-up' was wholly legal, despite evidence it was financed by fraud at Banc of California and conducted numerous illicit activities described by government witness Dunkerley and the SEC's complaint against Jason Sugarman.  The ruling favors Hunter Biden as he was an officer and director.

8:    Permitting Archer extensive foreign travel, despite serious questions on how it might effect evidence in the matter before the court and with the Mueller investigation.

In Lijebberg, the Supreme Court held that recusal was the proper remedy for a judge, who, despite lacking actual knowledge of the facts which may have been indicative of the judge's interest or bias, if a reasonable person, knowing all the circumstances, would expect the judge would have such knowledge.  It is assumed the court did not know about the extensive 'quid pro quo' of political influence for capital that was being organized by the Burnham Partners.  However, there were numerous news articles which speculated on how Archer and Hunter Biden were able to secure hundreds of millions of dollars of foreign investment capital, despite having no financial industry background.

Absent the bias of the court to believe Archer and Hunter Biden without blemish, Jason Galanis would have been allowed to testify.  Two requests were made to the court to allow Jason Galanis to testify and explain the roles of each of the parties. The first request was made after the court ruled to allow a prior conviction to be disclosed to the jury, and the second was at sentencing to explain my minimum role.  However, the United States Attorney's office made no attempt to interview Jason Galanis to determine the role of Archer or Hunter Biden.  The court should examine its decisions before and after trial, which were made in good faith but cumulatively could be held by a 'reasonable' person to show partiality to one defendant.  The effect of such bias was to deny my [movant] basic due process rights.

### FACTUAL ISSUES UNDER SECTION 455(b)(5)(iii)

The post trial newly discovered evidence listed below demonstrates the linkage between the WLCC bonds/Wealth Assurance and the investigation under Special Prosecutor Robert Mueller.  The majority of the initial WLCC bond proceeds were utilized to expand the financial services firm to be utilized by the Burnham Partners to replace the reputation value previously afforded through involvement with the Heinz Falimy and Rosemont.  Jason Galanis gave his interest in Burnham/Wealth Assurance to Archer

-13-

on the prospect that Archer and Hunter Biden would continue to
attract foreign oligarchs on the promise of high level political
contacts.   The insurance companies which provided the core of its
$6 Billion in assets were domiciled and regulated in
Liechtenstein, a jurisdiction known for its secrecy.   As the
Mueller report and indictments demonstrate, oligarchs such as
Yanukovich, Firtash, and Zlochevsky would place large sums with
politically well conected Americans.   Both Manafort and the
Burnham Partners dealth with the same group of oligarchs.   The
Burnham Partners would be able to offer the added advantage of
secrecy, sanction busting, and money laundering through the use
of the well regarded reputation of Burnham Securities.   The Banc
of California, controlled by the Sugarman brothers through fraud,
financed the acquisition of Wealth Assurance, attempted to
facilitate money laudering by Russian oligarch Elena Baturina
and loaned Paul Manafort on fraudulent documents.   The court is
requested to determine if her spouse, Greg Andres, while
investigating activities in the Ukraine and Russia involving most
of the same group of oligarch's seeking influence with high
level officials, and as worked with Archer and Hunter Biden had
any reason to report the matter to the court or the United States
Attorney's office for the Southern District of New York, (SDNY).
In addition, an iquiry into how the Manafort loan was introduced
to banc of California and which senior banc officers approved
the loan.

as a Pro Se litigant, I [movant] was anxious to file this
affidavit on a timely basis and before the appeal is due before
the Appelate Court.   I have not been able to attach the following
referenced evidence to this affidavit, except for the
chronology prepared by Jason Galanis.   Detailed in that document
is not only the Rosemont 'quid pro quo' scheme and details how
it morphed into the Burnham/Wealth Assurance fraud, but many of
the names and places which link the Mueller investigation with
the Wakpamni bond matter.   Please consider the chronology and
its information as an integral part of the affidavit.

Jason Galanis did not confide in me the full nature of his
relationship with the other Burnham Partners.  The chronology
made part of this affidavit details only a small portion of
events to implement the new 'quid pro quo' method of attracting
capital.  The court will recognize many of the names from the
Mueller investigation.  Russians such as Mikhail Gutseriev, Yuri
Luzhov, Elena Baturina, and oleg Deripaska.  Ukrainians Victor
Yaukovich, Mykola Zlochevesky, Dymitri Firtash, and Hares Yousef.
Not only is it clear from the chronology that this pattern started
of political influence peddling start with Rosemont, but was
being refined with supplanting Archer and Biden's exclusion from
Rosemont with Burnham/Wealth Assurance's ability to launder
money.  Many of the plans were shared and involved Dunkerley, the
government's principal witness.  Yet there was no material from
the government that exposed this crucial fact.  An example would
be Dunkerley's purported sale of Fondinvest, a $1.5 Billion
dollar fund manager to Hares Yosef, acting for Firtash.  The
Fondinvest financing was provided by the Wakpamni bonds.  Only
a full hearing would demonstrate the linkage with the Mueller
investigation.

The post trial discovered evidence, which was unavailable pretrial,
integrating the Wakpamni/Wealth Assurance fraud case with the
Manafort matters were : 'Heinz e-mail to State Deptartment
officials'; 'Paul Manafort charge of defrauding Banc of
California'; 'Manafort indictment on Ukranian influence peddling';
'the Securities and Exchange Commissions suit against Jason
Sugarman'; 'the Banc of California class action suit alleging
securities fraud by Steven Sugarman'; 'the report of Special
Prosecutor Robert Mueller'; 'the chart and notes prepared by
Jason Galanis, detailing the various foreign parties which the
conspirators were soliciting funds for Wealth Assurance'.

When the aforementioned post trial evidence clarifies the
pre-trial discovery, such as 'the Hugh Dunkerley plea agreement';
'the Teneco report on the Burnham/Wealth Assurance roll-up'; and
the 'e-mails from Eliot Broidy regarding acquisition financing',
there is clarification of the government's misdirection on who
conspired to achieve what end.  The evidence will show certain
of the Wakpamni/Wealth Assurance conspirators and the parties
investigated by the Mueller team of attorney's, had served
related foreign parties in accomplishing improper acts against
the interest of America.  These facts would have caused an
impartial party to determine the statutory language of section
455 Title 28 had been met, requiring the court's recusal.  The
failure to develop the issue of potential judicial conflict
rests with the government, which did not inform the court and
the defense of the relationship between the Wakpamni/Wealth
Assurance case and the matters which were also being investigated
by the Mueller special prosecutors.

As will be shown, exculpatory evidencefor my [movant] defense
must have been available to various government agencies.  The
responsibility of coordinating  that evidence fell on the United
States Attorney's office for the Southern District of New York
and the Federal Bureau of Investigation.  It was their failure to
take an unbiased approach which resulted in the court not
realizing how tighlty bound the Wakpamni/Wealth Assurance matter
and Mueller investigation was/were.  The goal of the investigation
was limited to placing primary blame for initiating the conspiracy
against my [movant] son, Jason Galanis.  This investigatory
bias altered the role of a number of culpable individuals which
would have diminished his [Jason Galinas] role and demonstrated
my [movant] lack of criminal intent.

Described below are specific facts which obligate the court to have recused itself from United States v. Jason Galinas, et al, 16 CR 371.  As the Mueller investigation and subsequent indictments demonstrated, Paul manafort was interacting with Russian and Ukranian politically influenced persons, including powerful oligarchs.  Those foreign parties looked to improperly influence American political leaders.  As the Mueller investigation charged in an indictment, gaining political influence was the reason Manafort was retained by foreign parties and paid millions of dollars.

Contemporaneaously, the same oligarch's, in order to cover other major American political leaders, reached financial accomodations with certain of the Wakpamni defendants and their partners.  The Burnham Partners plan was to use Burnham/Wealth Assurance to profit by allowing foreign interests to influence American government officials and to avoid American financial sanctions.  Archer and Hunter Biden had been able to successfully merchandize their political access for foreign parties using affiliated investment vehicles to disguise payments.  the parent investment vehicle, Rosemont Capital, was an off-shoot of the Heinz family office, one of the wealthiest and well known American families. Christopher Heinz (Heinz), Secretary of State John Kerry's stepson, headed Rosemont, but not similarly named companies formed by Hunter Biden and Archer.  Heinz eventually understood the nature of Archer and Hunter Biden's scheme of conspiring with foreign parties and terminated the relationship.

At the time of the trial, the government was the only party which had the information demonstrating statutory conflict issues under Title 28, Section 455.  the government failed its duty to notify the court and the defendant's attorney of the necessity for recusal based on information developed by both the Mueller investigation and the Wakpamni/Wealth Assurance case case investigations demonstrating linkage between relevant parties.

-17-

In addition to resloving the recusal issue, the court should
inquire as to what information the Southern District of New
York United States Attorney's office had received in its cooperation
with the Mueller investigation, the Department of Justice, and/or
the Securities and Exchange Commission (SEC) regarding the
defendants in the Wakpamni case and other individuals
associated with the matter, in order to determine if material
information under the Brady doctrine or Giglio doctrine had
been withheld.  The facts presented do not require access to
the information withheld by the government as the evidence
demonstrates the connection between the Mueller investigation
and the Wakpamni case.  That connection requires the court's
recusal.

In order to put into context the newly discovered evidence, the
court is requested to take into account evidence which was
mischaracterized or marginalized by the prosecution.  A useful
analogy is to view the previously recognized facts as part of
a mosaic.  The prosecution used the incomplete mosaic in a
manner to distort the direction the jury should take.  When
filed with the newly discovered evidence, a different view of
my [movant] knowledge of the conspiracy is presented.  The
court adopted the government's unsupported contention that I
[movant] conspired with my [movant] son Jason Galanis to defraud
the Wakpamni.  There was clearly a conspiracy, however, when the
new evidence is viewed in an unbiased manner, the reasons and
goals are very different from the position adopted by the court
in the response to the defendant's post trial rule 33 motions.

Evidence at trial was Jason Galanis and presumably his partners
were attempting to find financing for Wealth Assurance to
acquire the much larger insurance company Valor Life, and other
acquisitions.  Archer convinced Jason Galinas and J. Sugarman,
utilizing his method of attracting capital from foreign parties
seeking United States political influence, would be more

-18-

profitable if able to use the Burnham/Wealth Assurance platform.
the only issue was who would reap the future economic benefit.
Funding the acquisition, the Wakpamni bonds, by investing in a
Wealth Assurance, AG annuity, would not permit the economic
value to flow to the Burnham Partners.

The Burnham Partners benefit was three fold.  First, to utilize
a large, reputable, regulated company to disguise as investments
improper payments from foreign parties for political purposes.
Second, to offer a method of avoiding United States and other
govbernments' sanctions on financial transactions through the
world wide banking facilities available to Wealth Assurance.
Third, the illegal payments would be recorded as legal profits,
thus on a sale of the company - capitalized at a premium.
Financial companies sold at premium capitalization values secure
capitalization values of eight to ten times the net profit.  thus,
shares bought with the Wakpamni funds would be worth many times
the amount of the illegal payments fraudulently booked and recorded
as net profit.

The benefit of the Wealth Assurance scheme to Jason Sugarman, an
unindicted co-conspirator, was made clear in a suit brought
against him by the Securities and Exchange Commission, subsequent
to the Wakpamni/Wealth Assurance trial.  It identified Jason
Sugarman as the principal beneficiary of the Wakpamni/Wealth
Arrurance fraud.  The SEC's allegations, the Banc of California
class action suit, and Dunkerley's plea agreement demonstrate a
pattern of fraudulent acts involving Burnham, Wealth Assurance,
and banc of California.  As defendants Jason Galanis, Hugh
Dunkerley, Jason Sugarman, and Devon Archer knew the acquisition
of Wealth Assurance was facilitated by a fraudulent transfer
assisted by Banc of California, assisted by Steven Sugarman.  The
banl was controlled by Steven Sugarman with an undisclosed
interest held for his brother Jason Sugarman.  The Manafort loan
from a bank controlled by defendants in the Wakpamni/Wealth
Assurance case should have been disclosed to the court by the
government.

-19-

Until post trial, unknown was how the aggressive use of political patronage from foreign parties caused both Hunter Biden and Archer to forfeit the partnership with Christopher Heinz, scion of a wealthy and politically active family.  This forfeiture of their enabling entity, Rosemont Capital, resulted in Archer and Hunter Biden soliciting Jason galanis and Jason Sugarman to become partners.  The dual components of Burnham Securities reputation and Wealth Assurances multi-billion dollar asset basewould allow Archer and Hunter Biden not only to continue, but enhance the services such as avoiding sanctions and money laundering offered to foreign oligarchs.

The Heinz e-mails discuss Archer and Hunter Biden joining the board of an energy company, Burisma Holdings, Ltd., (Burisma), which a top Ukraine government prosecutor maintained was a corrupt organization.  As the e-mails make clear, Heinz disavowed his and Rosemont's further relationship with Archer and Biden in the Ukraine.  Heinz's decision on the nature of implicit improper quid pro quo from the Ukranian oligarch was correct. On his first six (6) trips to the Ukraine, Vice-President Biden insisted that the prosecutor that was investigating Bursimabe discharged.  Subsequent to the afformentioned Rosemont Seneca Bohai (RSB), an Archer controlled entity not affiliated with Heinz interest, received over $3.4 Million distributed between Archer and Hunter Biden.

The intersection and collaberation of parties interest in the Mueller investigation and Wakpamni bond fraud can be demonstrated on a macro scale by examining the interaction of former Ukranian President Victor Yanukovich (Yanukovich), and his associates. Archer and Hunter Biden had direct involvment with the Bursima Holding, Ltd., (Bursima), owner, Mykola Zlochevsky (Zlochevsky), a former Minister of Natural Resources in the Yanukovich government.  Bursima was granted valuable natural resource rights when Zlochevsky was still a Minister.  In February of 2014,

Yanukovich, who was backed by Russian President Putin, was forced
to resign as President of the Ukraine.   Shortly thereafter,
Bursima and Zlochevsky were put under investigation for self
dealing while a government minister.   It is the termination of
this investigation for which Hunter Biden's father, the former
Vice-President Josesph Biden, is being criticized.

**RELIEF REQUESTED IS APPROPRIATE:**

The Second Circuit utilized the Lijeberg test of three
factors im Amico to determine how to best address a violation
of section 455.   The factors with the reason why each is an
extraordinary reason why this court should recuse itself:

1.   The risk of injustice to the parties in the particular case.
     The bias shown by the court against the movant permitted
     violation of constitutionally protected rights under the
     sixth and fourteenth amendments of the United States
     Constitution;

2.   The denial of relief will produce injustices in other cases.
     The court will be encouraged to examine partiality to a
     defednant over the due process rights required to be afforded
     to a co-defendant.

3.   The risk of undermining the public's confidence in the
     Judicial process.
     The perception of disguising the involvement of relatives of
     high level political figures and their friends in fraudulent
     activity by a United States District Court Judge is
     unacceptable under the rule of law.   The Archer/Biden scheme
     cleverly constructed to avoid detection of foreign parties
     engaging in quid pro quo payment for access to high level
     officials puts the activity close to treason.   The simplest
     way to clarify the allegation made in this affidavit is to
     have a hearing calling first party witnesses Jason Galanis
     and Greg Andres, amongst others.

Although the courts have granted incarcerated Pro Se Litigants extraordinary leeway in the procedural aspects of motions, certain apects of this matter are of such an unusual nature that I [movant] request appointment of counsel to fully brief the court on the applicable law and present the evidence in a more formalistic manner.

If the court decides to hold a hearing on the merits of this submission, I [movant] request that I be allowed to waive physical presence atthe hearing.  I [movant] understand that this institution [FCI Terminal Island, San Pedro, California], has the capability of my attending a hearing/proceeding through a video/audio system.  The reason this accomodation is requested is that I [movant] have not yet been seen by a medical specialist for the injuries I [movant] received while being transported from trial.  As the court might recall during the days of the trial, an accident in the van resulted in me being taken to the hospital emergency room.  Prior to the accident, I had two spinal surgeries.  Both of those area were compromised by the accident.  The Metropolitan Detention Center doctor referred me to a neuro surgeon who requested a full spinal MRI in order to evaluate the injuries.  Unfortunately, there were numerous delays in seeing the Neuro Surgeon after the MRI.  While waiting for an appointment, I was sent back to FCI/Terminal Island.  Although ackowledged as required and scheduled, it has been nine (9) months and I have not yet seen the specialist.  Thus the request of my accomodation herein.

Declarant has nothing further to state at this time.

Declarant John Galanis, herein referred to as Declarant/Movant
hereby affirms and declares under the penalty of perjury
(28 U.S.C. § 1746), that the foregoing statement of Facts herein
are true and correct to the best of the Declarant's personal
knowledge, understanding, and belief.

Executed this _16 th_ day of _____January_____, 2020.

By: _____

John Galanis
Declarant

SUBSCRIBED AND SWORN
TO BEFORE ME THIS 16
DAY JAN 2020
(MONTH & YEAR)
W. DOULOT /CASE MANAGER
FCI TERMINAL ISLAND
1299 S. SEASIDE AVE
TERMINAL ISLAND, CA 90731
AUTHORIZED BY THE ACT OF JULY 7, 1955,
TO ADMINISTER OATHS (18 U.S.C 4004)

-23-

FOOTNOTES

Rosemont Capital was established by Chris Heinz and Devon Archer, and later joined by Hunter Biden. Rosemont Seneca was folded into Jason Galanis' Burnham Group, including the acquisition of Washington-based FINRA broker-dealer RSP Investments owned by Biden (2015). The New York and DC based firm, and its principals, were engaged in far-ranging international money laundering activities and pay-for-play influence peddling. Financial transactions were conducted with the Russians, Ukrainians, Kazakhs, and Chinese, as further detailed. Prior to the May 11, 2016 indictment of Galanis/Archer for Rosemont Seneca Bohai ("RSB") transactions, however, Rosemont and its principals - Archer, Biden and Heinz - had conducted a systemic series of transactions with individuals from foreign countries involved in official corruption proceedings.

Note 1:   Rosemont Capital founded by Heinz and named for Rosemont Farms, the Heinz family farm in PA. Sometimes referred to as the Heinz "family office." J. Kerry is an investor. Archer is Trustee of Howard J Heinz Trust and Heinz Family Trust. Former co-chair of finance committee of Kerry 2004 presidential campaign.

Note 2:   Rosemont Capital expands into commercial real estate through the acquistion of 51% of BGK Properties from Eddie Gilbert, Santa Fe, NM. Gilbert remains shareholder of renamed company - Rosemont Realty. Gilbert is a two-time convicted felon for securities fraud. Remains partner with Rosemont until sale in 2014 to Chinese.

Note 3:   Oligarch 1. Luzhkov Family. Rosemont targets foreign nationals with a desire to move money to the US. $100 million invested by Luzhkov Family in Rosemont.

Note 3a:  Yuri Luzkhov and Elena Baturina (wife) were targets of public corruption investigatio in Moscow arising from his 18 year tenure as mayor and his wife becoming a billionair from property development in Moscow. Rosemont disregards the corruption and money laundering allegations.

Note 4:   Oligarch 2. Gutseriev Family. $500 million commitment to Rosemont. $35 million to purchase 35% stake in Rosemont general partner with Heinz and Archer.

Note 4a:  Gutseriev is Kremlin ally raised in Grozny, Chechnia. Sold oil company to Deripaska (a Manafort partner) "under duress" and bought back. State bank, Sberbank, equity partner and lender to Gutseriev.
          US sanctions in 2014 caused termination of proposed $500 million Rosemont investment.

Note 5:   Archer and Heinz arrange meeting with JK in DC with Foreign Minster of Kazakhstan who was unable to obtain meeting with the Secretary.

Note 5a:  Archer is recognized by Kazakh government with appointment as paid director ($300k) to the National Investment Company, the sovereign wealth fund.

Note 6:   Archer/arranges for Galanis co-founded potash mining company a strategic investment from Chinese state owned firm, Sichaun Chemical. Sichaun commits to purchasing $2 billion in potash over 10 years. Archer and James Bulger (nephew of Whitey) are paid $4 million in cash and stock. Galanis and Archer agree to partner.

Note 7:   Galanis/Archer/Cooney form COR Fund Advisors LLC and enter into agreements to acquire Burnham Financial Group. Archer is lead with Jon Burnham. (Burnham later acquires Biden's DC broker dealer RSP Investments; also is roll-up vehicle described in the Teneo Consulting financing document - see Teneo)

Note 8:   CORFA/Burnham is funded by Kazakh investor and Chinese investor closed by Archer.

Note 8a:  Burnham independent board rejects Galanis in ownership group and witholds consent to final change of control. Archer and Galanis agree on fraudulent plan to deceive the public board that involves Archer executing a document precluding Galanis' affiliatio and effecting a buyout, as alleged by the SDNY. Galanis and Archer coordinate fake buyout, including Galanis and Archer agreeing to "Round-Trip" the buyout money through lawyer Weiss' trust account - from Galanis to Archer and back to Galanis (note: same method used in RSB-Wakpamni indicted transaction; and in Latvian bank transaction - see EU Bank AML Work Around)

Note 9:   Oligarch 3. Nikoli Zlochevsky. Ukrainian politician and minister subject to domestic and international official corruption proceedings. Ecology Minister in Yanokovych adminstration. April 2014 Archer and H. Biden join board of Burisma, owned by Zlochevsky during UK Serious Fraud Office court proceedings on asset freeze ($23 MM). Galanis requested to propose allocation of promised proceeds if proceedings successfu

Note 9a:  VP Biden simultaneously (same month) makes first post EuroMaidan revolution visit to Ukraine. Publicly states adminstration's support for Ukrainian domestic gas industry. State Department announces the "Unconventional Gas Technical Engagement Program". Zlochevsky/Burisma successful in UK court proceeding and successfully retains all gas leases granted to his company while [...]

Note 10:  Russian Banker 1. Grigory Guselnikov. Owner of Vyatka Bank (Russia) since 2007. Gains UK passport. Gains control of EU Bank in Latvia called Norvik Bank by merging Vyatka Bank. Summer 2015 meets Archer and Galanis in Zurich at the Dolder Grand Hotel to discuss transaction with Norvik. Archer company Archer Diversified is to enter into another Round-Trip transaction wherein Guselnikov provides 100% of the money for Archer to front the acquisition of equity of Norvik Bank. EU banking regulatory approval required. Archer/Biden influence is motivation of the round trip

Note 10a:  Transaction is completed and announced. the next year Norvik Bank announces the acquistion of the 6th largest bank in Ukraine, 100% owned by Sberbank, and intention to rename Ukrainian bank "Norvik." The acquisition of a Latvian bank is described to Galanis as a "backdoor" for Russians to an EU bank and a EU AML Work Around.

Note 10b:  Norvik teams up on Sberbank Ukraine acquisition with Gutseriev Family as 55% partner Transaction portrayed as British citizens acquiring Ukrainian bank. Gutseriev son (age 29) is the front for the partnership. Ukraine denies approval. Archer already indicted at this point.

Note 11:  September 2014. Archer and Galanis complete the $15 million Round-Trip Transaction with Rosemont Seneca Bohai using Rosemont's lawyer's trust account.

Note 12:  Archer Diversified acquires the Galanis Residence in TriBeCa, New York. Rosemont attorney handles financing and closing.

Note 13:  CORFA/Burnham acquires 100% of RSP investments from Biden and Biden joins Burnham. Website notes that Rosemont Seneca is now part of Burnham.

Note 13a:  SDNY alleges in indictment that Archer conceals Galanis' continuing involvement from public directors in controvention of written agreement (May 2016 indictment).

Note 14:  Summer 2015 Teneo Consulting is engaged by Burnham to produce a financing document for presentation to Chinawse and Russians (Baturina). Galanis is designated the point to represent Burnham. Teneo produces over three months financing document. Sets forth business plan to combine Burnham with Liechtenstein/Bermuda insurance business and asset managers. Biden, Archer and Sugarman are disclosed in document as senior leadership and board (Biden - Vice Chairman).

Note 14a:  Biden and Archer deliver the document to Harvest Partners, China. request $15 millio Chinese do not committ

Note 14b:  To induce Chinese, Biden sends email to Henry Zhao, Chairman/founder of Harvest. Says investment would be important to his family. Chinese agree to $5 million investment in Burnham Asset Management alone; not roll-up plan reflected in Teneo. (Note: Teneo paid by Valor and Archer $300k. Supposed discount due to relationship with Clintons. Teneo founded by Doug Band and Declan Kelley)



GLOSSARY OF ENTITIES AND INDIVIDUALS

Entities

Banc of California (BANC): A federally insured community bank with over $10 Billion dollars in assets. Controlling interest was acquired by Steven Sugarman in undisclosed partnership with his brother Jason Sugarman. BANC was a lender to Paul Manafort. Utilizing COR Clearings securities arrangements the Sugarman brothers were able to place tens of millions of preferred shares allowing Steven Sugarman to take control of the bank. Firmed up control by having very close associates on to the board of directors as and officers.

Bursima Holding Corp.(Bursima): Ukrainian company owned by Mykola Zlochevsky (Zlochevsky). The company acquired significant natural gas properties while Zlochevsky was the Ukrainian Minister of Natural Resources during the presidency of Victor Yanukovich. Hunter Biden, Devon Archer and Alekander Kwanaseiwski were board members of the company.

Burnham Financial Group: Parent company of Burnham Securities, Inc. (BSI) a licensed securities broker/dealer and Burnham Asset Management (BAM) a registered investment advisor.  Through CORFA, Jason Galanis, Devon Archer, Jason Sugarman and later Hunter Biden took control of the BSI but were not permitted control of BAM.

COR Capital: The parent company for a number of entities with similar names utilize by the Sugarman brothers, Jason and Steven, to acquire financial assets. In partnership with Jason Galanis the Sugarman brothers formed several entities with similar names purportedly all linked to COR Capital. The following are the primary entities formed under the partnership:

COR Clearing: a federally regulated securities clearing firm with over $2 Billion in assets. The company was purchased with the assistance of Jason Galanis` pledge of $20 million dollars in securities.

COR Fund Advisors (CORFA): formed to acquired the Burnham Financial Group of Companies. Initially conceived by Jason Galanis and Jason Sugarman was later joined by Bevan Cooney and Devon Archer.

COR International: principal voting shareholder for regulatory approvals of several insurance companies, Wealth Assurance AG, ValorLife, Bermuda International, with assets of over $6 Billion dollars. The insurance companies where placed in a holding company, Wealth Assurance Holding, Ltd (WAH). Jason Sugarman and Steven Sugarman both signed the request to the insurance regulators as controlling parties of the acquire of Wealth Assurance AG.

Hapsburg Group: A working group of four former high ranking elected officials of European Union countries. Paul Manafort conceived of having the officials collectively collaborate on presenting favorable views on Viktor Yanukovich. Included in the group was Alekander Kwanseiski former president of Poland.

Rosemont Capital: A company within the H. Heinz family office controlled by Christopher Heinz.

Rosemont Realty: An affiliate of Rosemont Capital with Archer as managing member m which acquired a controlling in various real estate partnerships assembled by Edward Gilbert a twice convicted securities fraud. Later sold to a Chinese state sponsored entity for $1.5 Billion.

Rosemont Seneca Partners: A firm managed by H. Biden which was acquired by Burnham Securities when Biden became a Burnham director.

Rosemont Seneca Bohai: An entity controlled by Archer which received multi million dollar payments from Burisma substantial portions of which were transferred to H. Biden. Received $15 Million dollars misappropriated from the Wakpamni bond offering. The funds where used to buy Wakpamni Bonds in order to be contributes as capital to Wealth Assurance Holding so Archer would be shareholder.

Rossneft: With its affiliate Netisa are oil companies controlled by Mikhail Gutseriyev. Russian criminal tax evasion charges required Gutseriyev to move to London. The charges were eventually dismissed.

Sovereign Nations Development Corp: Formed by John Galanis at the request of Jason Galanis to receive the commission earned for having introduced the WLCC, Haynes and Anderson who facilitated the issuance of the bonds.

Thorsdale Fiduciary and Guaranty, LLC: A private trust company formed and controlled by Jason Galanis. Received proceeds of Wakpamni bond offering used to purchase control shares of Wealth Assurance Holding, Fondinvest and personal disbursements.

Wakpamni Lake Community Corporation: A tribal corporation established by a subdivision of the Oglala Nation. The reason for formation was to enter the payday loan business through using sovereign immunity. Steven Haynes is the principal advisor to the company and sponsored the concept of issuing bonds to be sold through Burnham.

Wealth Assurance Private Client Corp. (WAPC): a British Virgin Islands company controlled by Jason Galanis and through Hugh Dunkerley. On the advice of Gary Hirst issued a "private annuity" to WLCC. Was advised so as to avoid the regulatory compliance issues of a WAAG issued annuity purchasing shares in its primary shareholder WAH.

Burnham/Wealth Assurance, Various COR Companies and Banc of California Participants

Devon Archer

Hunter Biden

Bevin Cooney: A restaurant entrepreneur who invested in Burnham Group through CORFA. Purchased third tranche of WLCC bonds

Hugh Dunkerley: Functioned in various executive roles for various companies controlled by the Sugarman brothers. Entrusted to perform administrative roles which were often improper.

Rory Knight: Former Dean of the Templeton Business School at Oxford University. Often advisor and/or participant in many of Jason Galanis` ventures.

Jason Galanis: Entrepreneur specializing in the financing and developing of financial services intellectual property.  An SEC violation stemming from 2004 activity resulted in his taking a non control managerial roles in the ventures since that time. Partnered with Jason Sugarman since 2010 in various transactions. Plead guilty to fraud charges concerning Gerova Financial and Wakpamni bond cases. Second circuit vacated both pleas.

Jason Sugarman: Promoter of various real estate and mortgage investment vehicles which were investigated by the SEC and US Attorney`s office. While defending the ensuing litigation worked through his brother Steven in promoting the COR group of comapnies and Banc of California. Partnered with Archer, H. Biden and Jason Galanis in the Burnham/Wealth Assurance roll up plan.

Steven Sugarman: Yale Law School graduate with a business background in securities. With his brother Jason Sugarman as an undisclosed principal took control of Banc of California, COR Clearing, Wealth Assurance AG and ValorLife.

Paul Manafort: A Republican party political operative. Undertook lobbying efforts for Russian and Ukrainian politicians and oligarchs. For a short period acted as campaign manager for Donald Trump`s 2016 presidential candidacy. Convicted of various money laundering, political influence peddling and bank fraud.

Wakpamni Lake Community Corporation

L. Steven Haynes: Entrepreneur who maintained business arrangements with numerous Native American tribes in pay day loans, slot machines and alcohol distribution.  Maintained control of businesses by passing sovereign immunity restrictions on control of tribal corporations through administrative contracts and loan agreements.

Raycen Raines: A member of the  Wakpamni Lake Community.  At suggestion of Haynes convinced tribal elders to form an economic development entity to use tribal sovereign immunity to avoid state restrictions on pay day loans. Virtually all of WLCC`s income is from payday loans.

Timothy Anderson: An attorney with two specialties; municipal bond offerings and laws regarding Native American tribes. Introduced by Haynes to Raines to form WLCC.

Heather Thompson: A lawyer with Greenberg Traurig the attorneys for Wakpamni Lake Community. Represented the WLCC in all aspects of the bond offerings. Married to Raines.

Peter Shannon: Business man from Chicago who had alcohol distribution joint venture with Haynes. Had an agreement with Oglala Sioux Tribe so part of proceeds of a $200 million dollar bond offering would be invested in various corporation with which he was affiliated. Introduced John Galanis to Haynes, Raines and Anderson to see if Oglala bond could be placed.

Rosemont Participants

Devon Archer * previously listed

Hunter Biden * previously listed

Christopher Heinz: Heir to H. Heinz food products fortune. Father was a United States Senator. Step father is John Kerry former Secretary of State. Roommate of Archer at Yale.

Edward Gilbert: Twice convicted felon whose real estate tax shelter company a Rosemont affiliate acquired 51%. Later sold to Chinese company for $1.5 Billion.

Foreign Oligarchs and their Facilitators

Victor Yanukovich: Former President of the Ukraine forced out of office on corruption charges and supporting closer ties to Russia and Putin. Financial sanctions by United States and European Union.

Mykola Zlochevesky: Minister of Natural Resources under Yanukovich. As owner of Bursima Holdings awarded valuable energy rights while a Government minister. Close relationship to Yanukovich and Firtash. Appointed H. Biden and Archer to Bursima board of directors. Financial sanctions had been imposed by United States and European Union.

Dymtri Firtash: Amassed billions in productive assets during Yankuovich administration for Bursima. Utilized Boise Schiller law firm and H. Biden in an attempt to settle criminal charges brought in United States. Worked with Manafort. Through Yousef coordinated several financial transactions with Archer and Jason Galanis. Financial sanctions imposed by United States and European Union.

Alekander Kwasniewski: Former president of Poland. Close confidant and operative of Zlochevesky and Manafort.

Hares Yousef: Former advisor to Yanukovich. Acted as an intermediary for Firtash with H. Biden and Archer. Various transactions with Archer, Jason Galanis and Dunkerley. Firtash and Yousef were charged with money laundering by Spain. Charges were recently dismissed.

Yuri Luzhov: Former mayor of Moscow who became very wealthy during 12 years in office. Financial sanctions imposed by various jurisdictions.

Elena Baturina: Wife of Luzhov a billionaire through real estate transactions. Numerous attempts to avoid sanctions with assistance of Archer, Biden, Jason Sugarman and Jason Galanis. Conspired with Archer, Jason Galanis and the Sugarman brothers to avoid United States financial sanctions at Banc of California. Financial sanctions imposed by various jurisdictions had been imposed. Important client of Rosemont.

Mikhail Gutseriyev: Banker and principal shareholder in large Russian oil company. Financial sanctions imposed by various jurisdictions