*PELUSO & TOUGER, LLP*
*70 LAFAYETTE STREET*
*NEW YORK, NEW YORK 10013*
PelusoandTouger.com

**Ph. No. (212) 608-1234**
**Fax No. (212) 513-1989**

May 13, 2020

Honorable Ronnie Abrams
United States District Court Judge
United States Courthouse
40 Foley Square
New York, New York 10007

Honorable P. Kevin Castel
United States District Court Judge
United States Courthouse
40 Foley Square
New York, New York 10007

Re: **United States v. John Galanis, 15 CR 643 (PKC) &**
**United States v. John Galanis, 16 CR 371 (RA)**

Your Honors:

     John Galanis, through undersigned counsel, respectfully moves this Court under the First Step Act, 18 U.S.C. § 3582(c)(1)(A) for compassionate release. Specifically, Mr. Galanis moves this Court to modify Mr. Galanis' sentence and immediately release him to home confinement until his ultimate release date, to be followed by the already-imposed five-year term of supervised release. As the Court is surely aware, we are in the midst of an unprecedented health crisis in which New York and California are being deeply affected. Mr. Galanis, who is almost 80 years old and suffers from a series of serious physical conditions and diseases, is among the most vulnerable to COVID-19. He is at an extreme risk to suffer potentially fatal complications should he contract the coronavirus, and is further put in danger by his current incarceration at FCI Terminal Island, where 2/3 of the population has contracted COVID-19 and an even scarier number is out of the 693 cases after almost two months of this crisis only 6 have recovered. This unprecedented threat of COVID-19 could not have been foreseen at sentencing, as it is a threat like no other to the population in jail, and poses extraordinary risks to Mr. Galanis' health.

     Mr. Galanis is especially vulnerable to the threat of COVID-19, because he suffers from diagnosed [redacted][1] and other underlying medical conditions. His advanced age of 77 makes the risk of death a distinct possibility. Allowing Mr. Galanis to finish out his sentence

---

[1] *See* Exhibit A - letter from Mr. Galanis' primary care physician, [redacted].

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 2 of 14

at home is the only prudent response to the extraordinary and compelling circumstances created by the rampant spread of the novel coronavirus at FCI Terminal Island.

## BACKGROUND
### Mr. Galanis' Conviction and Incarceration

John Galanis has been incarcerated since April 25, 2017, and has been convicted of conspiracy to commit securities fraud, securities fraud, wire fraud, and investor adviser fraud, all non-violent felonies. *See United States v. Galanis*, 759 Fed. Appx. 88 (2d. Cir. 2019). In 2017, Judge Castel (15 Cr. 643) sentenced Mr. Galanis to 60 months on Count 1 and 72 months on Count 2 of the indictment, running concurrently. Subsequently, Judge Abrams (16 Cr. 371) sentenced Mr. Galanis to 60 months on Count 1 and 120 months on Count 2 of the indictment to run concurrently, with forty-eight (48) months of the total sentence running consecutively with the sentence imposed by Judge Castel, the rest to run concurrently.

In total, Mr. Galanis is serving 10 years. He is set for release in November 2025 (with basic good time calculated). Under the ordinary six-month limit for home confinement under 18 U.S.C. § 3624(c)(2), Mr. Galanis would be eligible for administrative transfer to his home by the BOP, without court action, in May 2025. The recently enacted Coronavirus Aid Relief and Economic Security (CARES) Act, § 12003(b)(2) states that "if the Attorney General finds that emergency conditions will materially affect the BOP's function, the BOP Director may 'lengthen the maximum amount of time for which [he] is authorized to place a prisoner in home confinement' under 18 U.S.C. § 3624(c)(2), which recognizes the BOP's authority to release inmates to home confinement in certain circumstances." *See United States v. Garcia*, No. 16-cr-719 (S.D.N.Y Apr. 15, 2020). In light of the conditions existing as a result of the global health pandemic, the Attorney General has made such a finding. *See* Memorandum from Att'y Gen. William Barr to Dir. of Bureau of Prisons (Apr. 3, 2020).[2]

### The COVID-19 Pandemic

Currently, the world—especially New York and California—is being impacted by a global health pandemic caused by the spread of the novel coronavirus disease 2019 (COVID-19). COVID-19 is a respiratory illness that spreads from person to person. The risk of infection is high for people who are in close contact with someone known to have COVID-19, including healthcare workers, household family members, and staff and inmates at detention facilities.

On January 20, 2020, the United States saw its first confirmed case of COVID-19.[3] Within ten days the World Health Organization (WHO) declared a global health emergency. By March 13, 2020, the President declared a national emergency. As of May 1, 2020, the United States has confirmed over 1 million positive tests of coronavirus and over 60,000 deaths attributed to the virus. While daunting, the reality is even more terrible as the reported numbers

---

[2] https://www.justice.gov/file/1266661/download.
[3] The New York Times, *How the Coronavirus Pandemic Unfolded: a Timeline*, https://www.nytimes.com/article/coronavirus-timeline.html

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 3 of 14

are significantly underestimated because our country is behind the curve on community testing. We still do not know the true extent of community spread.[4] The unprecedented nature of where we find ourselves is further proven by the fact that schools throughout the nation have been closed for the remainder of the school year, including most colleges, and all major sports leagues have been cancelled. Because of the virus' long latency period, studies show that "stealth" transmission by infected persons with low or no symptoms have played a "major role" in the pandemic.[5] New data published in the New England Journal of Medicine found that the highly-contagious virus "can remain viable and infectious in aerosols for hours and on surfaces up to days."[6] The White House has advised the public to avoid gathering and told people to quite simply stay at home.

On March 4, 2020, Governor Newsom of California declared a State of Emergency to help prepare the state for on onslaught of cases. Governor Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020. Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020. On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to maintain 6 feet of distance between each other. New York itself has emerged as the epicenter of this crisis with over 300,000 confirmed positive coronavirus tests in the state and over 18,000 deaths. California, where Mr. Galanis is detained, was one of the first hardest-hit states, and as of May 11, 2020, has confirmed 67,936 positive cases of COVID-19, over 14,000 of which are individuals over 65 years old and 2,718 deaths.

Five months after the first confirmed case of COVID-19 in the United States, 23 states have maintained their stay-at-home orders, mandating that all non-essential workers remain at home as states attempt to minimize contact between people and flatten the curve of the spread of the virus.[7]

The CDC and other public health organizations have identified individuals who are particularly susceptible to COVID-19, and who are at the greatest risk for life-threatening consequences should they contract it. These higher risk categories include older adults, specifically adults over 65 years old. Underlying medical conditions also make individuals at

---

[4] Sheri Fink, *'It's Just Everywhere Already': How Delays in Testing Set Back the U.S. Coronavirus Response*, N.Y. Times, (March 10, 2020), https://www.nytimes.com/2020/03/10/us/coronavirus-testing-delays.html.

[5] Melissa Healy, *How 'silent spreaders' are fueling the coronavirus pandemic*, L.A. Times (March 17, 2020), https://www.latimes.com/science/story/2020-03-17/how-silent-spreaders-are-fueling-the-coronavirus-pandemic; CDC Emerging Infectious Diseases, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020,* (March 12, 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article ("persons with asymptomatic COVID-19 can spread the virus").

[6] Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973.

[7] Sarah Mervosh, et. al, New York Times, *See Which States are Reopening and Which States Are Still Shut Down*, (May 1, 2020). https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 4 of 14

higher risk for contracting COVID-19. Adults between the ages of 65-84 make up 31-59% of all hospitalizations from the virus, 11-31% of admissions into intensive care, and 4-11% of deaths. The numbers are even starker for individuals on the higher end of that range and older.

### Mr. Galanis' Serious Health Issues

Mr. Galanis is specifically in the range of individuals who are likely to suffer the most from COVID-19. Mr. Galanis is 77 years old and, besides his age, he suffers from a number of conditions and diseases that make him even more susceptible to contracting the virus. The CDC has warned that individuals over 65 years old, and those who suffer from asthma, high blood pressure, and diabetes, are at higher risk of becoming severely ill and dying from COVID-19.[8] As previously stated, Mr. Galanis has been diagnosed with                  and he is           .[9] Basically Mr. Galanis suffers medically from almost every risk category there is.

Mr. Galanis is not a healthy man by anyone's estimations and certainly not by the doctors who have treated him. As undersigned counsel noted at sentencing, Mr. Galanis suffers from a multitude of ailments and many of the CDC's denoted increased risk factors, including          ,          ,          ,          ,          ,          ,          ,          and          .

As a result of having many illnesses, including, but not exclusively,          ,          and          ,          and          , Mr. Galanis is unequivocally significantly more vulnerable to complications should he contract COVID-19. Indeed, the WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing conditions. For those with hypertension, the mortality rate was 8.4%.[10] When this ailment is combined with his age (77), and the other ailments he has, it significantly magnifies the risk of death.

The result of Mr. Galanis contracting COVID-19 could be severe. Even if the virus does not cause death it can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system,

---

[8] *People Who Are at Higher Risk for Severe Illness*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[9] The weight gain is directly related to the poor medical treatment Mr. Galanis has already suffered while in BOP custody. Mr. Galanis entered BOP custody fully able to walk but due to the BOP's lack of attention to his medical condition and their inability to provide him with orthotic shoes he has been confined to a wheelchair and exercise has become difficult.

[10] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf (hereinafter "WHO-China Joint Mission Report").

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 5 of 14

reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner. These are just some of the serious permanent side effects that Mr. Galanis could suffer.

The BOP is not equipped to care for an individual like Mr. Galanis, should he be one of the unlucky to contract this virus. Even before this pandemic, BOP was not able to properly care for him. In 2018, BOP failed to take the steps necessary for Mr. Galanis to receive surgery meant to biopsy him for prostate cancer. He has not been provided a doctor-mandated MRI so that his spinal issues could be treated. On a daily basis, he has struggled with obtaining Ibuprofen for the pain he endures. Although Mr. Galanis is able to purchase Ibuprofen from commissary, prior to the coronavirus pandemic, the facility refused to give him enough to last from one commissary opportunity to the next.

Even more onerous acts have caused Mr. Galanis' condition to worsen at the hands of the BOP. In 2018, Mr. Galanis was meant to be moved to a hospital for testing. Rather than use a wheelchair accessible van, BOP officials tried to lift him, failed, and dropped him, exacerbating his spinal issues. At sentencing, counsel brought the Court's attention to the fact that BOP had failed to provide Mr. Galanis with a pair of orthopedic shoes which would have prevented him from being confined to a wheelchair. What makes this fact even more galling is that Mr. Galanis arrived at FCI Terminal Island wearing the very orthopedic shoes he needed, and the BOP confiscated those shoes. Three years later, they have not yet replaced them.

The situation is worse now. BOP facilities are under attack of this highly infectious disease, just like the rest of the world, with the horrifying limitation of not being able to properly "social distance" or provide necessary masks or gloves and the necessary medical care if an inmate contracts the disease.

### COVID-19 and Impact on Detention Facilities

Much like cruise ships and nursing homes, jails are extremely dangerous in a pandemic, given the impossibility of social distancing in a confined space.[11] As the former chief medical officer of Rikers explained, unlike free people, detainees cannot engage in "'social distancing' and 'self-quarantine' and 'flattening the curve' of the epidemic—all of these things are impossible in jails and prisons, or are made worse by the way jails and prisons are operated."[12]

---

[11] Dr. Jeffrey Keller, *COVID-19 in Jails? It Might Get Ugly,* Medpage, (March 12, 2020), https://www.medpagetoday.com/blogs/doing-time/85366.

[12] Jennifer Gonnerman, *How Prisons and Jails can Respond to the Coronavirus*, The New Yorker, (March 14, 2020), https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to-the-coronavirus ("it's going to be very, very difficult to deliver a standard of care

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 6 of 14

In the federal jails alone there have been a total of at least 2100 cases of inmate infection, 365 staff and 42 deaths as of May 7, 2020.

It must be remembered that inmates and staff interact in close proximity under cramped conditions that are designed to confine people rather than distance them. As a result, correctional facilities are highly susceptible to rapid transmission of the virus through contact, including asymptomatic carriers who show no signs of illness, and common surfaces. As one court, quoting another, recently summarized: the problem is that "[p]risons are 'powder kegs for infection' and have allowed 'the COVID-19 virus [to] spread[] with uncommon and frightening speed,'" *United States v. Salvagno*, 5:02cr00051-LEK (N.D.N.Y. Apr. 23, 2020) (Doc. 1166 at 8) (quoting *United States v. Skelos*, No. 15-CR-317, 2020WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020)).

On March 26, 2020, Attorney General Barr acknowledged the impact of the deadly virus on the federal prison system as he cited the need for the Department of Justice to issue new guidelines for the release of at-risk prisoners to home confinement. (*Press Conference ABC News 3/26/2020*). The reasons for this are obvious: People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning or laundry, avoid high-touch surfaces, or sanitize their own environment. Furthermore, unlike a person in the general public, this situation is uncorrectable by an individual inmate even if he or she wanted to adhere to any of these safety measures due to the rules in effect in the jails.

The situation for Mr. Galanis at FCI Terminal Island is stark. FCI Terminal Island has one of the largest outbreaks of the virus in the BOP system. The numbers there are horrific: FCI Terminal Island has a total of 1,042 inmates incarcerated at the facility. The latest count from the BOP website is that there are 693 confirmed cases of COVID-19 among the prison population including 7 deaths as of May 11th.[13] This means that the disease has already spread to 2/3 of the FCI Terminal Island's inmate population. Furthermore, Terminal Island accounts for 30% of all of the cases of Covid19 infection among BOP inmates. All fears that the virus would spread like wild fire through a prison have been confirmed at FCI Terminal Island. The BOP and FCI Terminal Island, specifically, have increased the chances of inmates contracting COVID-19 by failing to institute CDC guidance that states that correctional staff and incarcerated people should be trained on donning, doffing, and disposing of PPE. CDC guidance further recommends that correctional facilities post signage informing staff and incarcerated people how to report COVID-19 symptoms and advising staff to stay at home when sick. FCI

---

either in the detection or the treatment of people who are behind bars. I just have really grave concerns"); *see also* Dr. Lipi Roy, *Infections And Incarceration: Why Jails And Prisons Need To Prepare For COVID-19 Now,* Forbes, (March 11, 2020), https://www.forbes.com/sites/lipiroy/2020/03/11/infections-and-incarceration-why-jails-and-prisons-need-to-prepare-for-covid-19-stat/#1fa6b08e49f3 ("Hand sanitizers, for instance, are often considered contraband...Other harsh realities of jail life that prevent proper application of CDC recommendations include limited access to toilet paper and paper towels; and handcuffs prohibit the use of hands to cover one's mouth.").

[13] https://www.bop.gov/coronavirus/

6

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 7 of 14

Terminal Island has failed to adequately implement either of these training and educational interventions. I have been told of instances where staff go into quarantine units and then return to units that are purportedly COVID-free without changing gloves and masks or removing gloves without washing hands. The facility has further failed to provide prisoners or staff with clear guidance on what to do to protect themselves. Prisoners are often reluctant to report symptoms because they have no expectation that they will receive effective treatment, and they fear being isolated away from their friends into quarantine units that are often insufficiently hygienic.

Worse will likely follow with devastating consequences for Mr. Galanis and other vulnerable prisoners and the broader community. For many reasons:

1- It is commonly known that the COVID-19 virus is highly infectious and can be spread easily and sustainably from person-to-person.
2- The virus can live on plastic and steel surfaces for up to 72 hours, and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length.[14]
3- Critically, people who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread.
4- There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19.
5- Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19. None of which are available at FCI Terminal Island.

As a result of all these facts and his various medical conditions, Mr. Galanis has effectively been condemned to serve his sentence at substantial risk of serious illness or death. Mr. Galanis is currently housed in a small, two-man cell which makes it impossible to maintain social distancing. The housing unit only has communal bathrooms, showers, and sinks. The dining area is communal, as is the TV room. There is also a constant changing of the guards who enter the housing area. New inmates come and go each day. The medical facilities are overloaded and insufficient at the outset.

Quite frankly, FCI Terminal Island is totally unequipped to handle this virus. This is proven by the fact that two months into this crisis less than one percent of the inmates who have been infected with Covid19 at Terminal Island have recovered. This is extremely below the average of people who have contracted this disease in the general public (the recovery time is 2 weeks for a mild case and 3-6 weeks for a more aggressive case, discounting any complications

---

[14] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at https://doi.org/10.1056/NEJMc2004973 (accessed Apr 2, 2020); Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020).

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 8 of 14

that may arise.[15] ) and demonstrates Terminal Island's inability to treat the inmates who contract the disease. The inmates have basically been left to fend for themselves, while still dealing with BOP's inabilities to care for their existing medical needs. For example, Mr. Galanis has still not received any of the follow up medical care that was deemed necessary after the BOP van accident during his trial. If the BOP cannot give Mr. Galanis the medical care its own doctors have ordered in the years since the accident, how can we expect the BOP to give him adequate care while all organizations and facilities are overwhelmed during this pandemic?

### Mr. Galanis' Application to the Bureau of Prisons

It is common knowledge that Attorney General Barr has called upon the BOP to release medically vulnerable inmates to home confinement. Attorney General Barr further identified "[t]he age and vulnerability of the prisoner to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and "the security level of the facility," with "priority given" to prisoners incarcerated "in low and medium security facilities," as two of the critical, discretionary factors for consideration. Mr. Galanis meets both of those criteria. Attorney General Barr further stated: "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence."[16]

Despite this and other calls for the BOP to act, they have not. The BOP has, as of now, released less than one per cent of the inmates in its jails. On April 8, 2020, Mr. Galanis transmitted to the Warden Ponce of FCI Terminal Island[17] via email his request for compassionate release. As of the date of this letter (May 8, 2020) thirty days have passed and the BOP has yet to grant, rule, or respond on the request.

### ARGUMENT

### Because of an Ongoing Emergency, the Court Should Hear Mr. Galanis' Application to Reduce His Sentence Now.

Mr. Galanis brings this action because he is in imminent risk of contracting COVID-19, which feeds on precisely the unsafe, congregate conditions in which he is being held. The BOP is aware of the grave dangers posed by COVID-19 and has failed to implement measures to comply with their constitutional obligations to those in their custody. Because of their unlawful

---

[15] See WHO, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, (February 24, 2020) https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf#:~:text=Using%20available%20preliminary%20data%2C,severe%20or%20critical%20disease

[16] Memo from Attorney General to Director of Bureau of Prisons, April 3, 2020, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf

[17] *See* attached email.

8

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 9 of 14

and unconstitutional confinement, Mr. Galanis seeks immediate release to home confinement. The Government has conceded this constitutional obligation on behalf of the BOP in the case of *CESAR FERNANDEZ-RODRIGUEZ, ROBER GALVEZ-CHIMBO, SHARON HATCHER, JONATHAN MEDINA, and JAMES WOODSON, individually and on behalf of all others similarly situated, Petitioners, New York, N.Y. v. MARTI LICON-VITALE, in her official capacity as Warden of the Metropolitan Correctional Center, Respondent*, 20 Civ. 3315(ER) in the following question and answer at page 29 of the transcript of the initial court appearance on April 29, 2020:

> Judge Edgardo Ramos: That they have the right to be in a situation, despite the fact that they are incarcerated, where they are not unduly exposed, or exposed, to an infectious disease of this type, correct?
>
> MR. Barnea: **Well, I would agree, obviously, and I think it doesn't require me to agree with the fact that the Supreme Court and the Second Circuit has held that one of the duties of the Bureau of Prisons is to maintain inmates' health and safety.** [18]

The First Step Act ("FSA") expressly permits Mr. Galanis to move this Court to seek compassionate release, by which this Court may reduce his term of imprisonment, and order that he serve the balance of his term on home confinement as a special condition of an amended judgment. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been a lapse of 30 days from the warden's receipt of the defendant's request with no response or action, whichever is earlier. *Id*. After a defendant has exhausted the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).

Mr. Galanis, as required, made an application to the Warden of FCI Terminal Island for release and has not received any response to this application in over 30 days. Thus, this Court, most respectfully, must step in and correct the BOP's lack of response to this virus and grant Mr. Galanis' respectful and timely request for home confinement.

Although § 3582(c)(1)(A) does not define "extraordinary and compelling circumstances," the U.S. Sentencing Commission has identified four categories of situations that may qualify: serious medical conditions, advanced age, family circumstances, and a catch-all "other reasons." *United States v. Desage*, No. 213CR00039JADVCF, 2020 WL 1904584, at *2 (D. Nev. Apr. 17, 2020). The global health pandemic, the BOP's inability to follow state and CDC-approved guidance, the high infection rate, and the increasing number of American victims to this virus should be considered sufficient to establish "extraordinary and compelling circumstances" for

---

[18] See, exhibit C for the transcript of page 29.

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 10 of 14

Mr. Galanis' release, but even if it were not, Mr. Galanis' health condition *in addition to* the current pandemic should certainly qualify. The Sentencing Commission finds extraordinary and compelling reasons under the medical-condition category when the defendant has (1) a terminal illness or (2) a physical, mental, functional, or cognitive impairment "that substantially diminishes" his ability "to provide self-care within the environment of a correctional facility and from which he ... is not expected to recover." *Id.* As noted above, Mr. Galanis has a host of health issues which require regular attention, and his condition is made even worse by being incarcerated inside a facility where a potentially-fatal disease runs rampant. Should Mr. Galanis contract COVID-19 at his age and in his condition with the facilities available at Terminal Island there is a greatly likelihood of death or serious and permanent ramifications to his medical condition.

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

Based on this authority, district courts have reduced sentences for a variety of reasons—even if the reductions are opposed by the Bureau of Prisons and even if the reasons do not fit precisely into the Sentencing Commission's specifically enumerated reasons. *See United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *5-6 (M.D. Tenn. Mar. 4, 2020) (court granted compassionate release and rejected government's argument that defendant's motion should be denied because he did not meet the medical criteria in U.S.S.G. § 1B1.13). Courts across the country are increasingly using this statute to grant compassionate release and reduce a defendant's sentence based on the medical dangers posed to that defendant by COVID-19. *See United States v. Resnick*, No. 14 CR 810 (CM*)*, 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020) (court found that 65-year-old defendant, with approximately two years left of sentence, had medical conditions that made him particularly vulnerable to COVID-19); *United States v. Asaro,* No. 17-CR-127 (ARR), 2020 WL 1899221, at *8 (E.D.N.Y. Apr. 17, 2020) (even though no inmate in prison tested positive at time of the motion, court granted 85-year-old defendant's motion for compassionate release and released him on supervised release status, with home incarceration, for a period of 23 months because defendant suffered from an extensive list of medical conditions and was at a higher risk of contracting COVID-19); *United States v. Zukerman,* No. 16 CR. 194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) (court found that 75-year-old defendant who suffered from diabetes, hypertension, and obesity was at higher risk of contracting COVID-19 and this constituted an extraordinary and compelling reason to modify sentence to home incarceration); *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020) (75-year-old defendant exhausted his

10

administrative remedies, and extraordinary and compelling medical reasons existed to order defendant's immediate release from federal incarceration); *United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125, at *2 (D. Haw. Apr. 13, 2020) (73-year-old defendant, with approximately three years left of sentence, suffered from a mental illness as well as other physical ailments making him the "classic example" of the elderly patient who would "rapidly critically deteriorate" if infected by COVID-19, was "at the extreme risk of expiring from the disease," and, thus, sentence was reduced to home confinement); *Miller v. United States,* No. CR 16-20222-1, 2020 WL 1814084, at *1 (E.D. Mich. Apr. 9, 2020) (finding that 69-year-old defendant, with approximately three years left of sentence, fit the definition of an individual who was at higher risk of falling severely ill from COVID-19 and granted compassionate release because of his history of serious medical conditions); *United States v. Hammond,* No. CR 02-294 (BAH), 2020 WL 1891980, at *9 (D.D.C. Apr. 16, 2020) (75-year-old defendant, with multiple years left of sentence and who had deteriorating health conditions and a need to avoid exposure to the current worldwide pandemic, had shown that extraordinary and compelling reasons warranted a reduction in his sentence); *United States v. Hansen*, No. 07-CR-00520(KAM), 2020 WL 1703672, at *8 (E.D.N.Y. Apr. 8, 2020) (although 65-year-old defendant did not have terminal disease, his medical conditions were clearly serious and constituted an extraordinary and compelling reason to grant his release); *United States v. Almontes*, No. 3:05-CR-58 (SRU), 2020 WL 1812713, at *9 (D. Conn. Apr. 9, 2020) (defendant's medical condition combined with COVID-19 threat amounted to an extraordinary and compelling reason for release because his cervical myelopathy was a serious physical condition that will soon leave defendant unable to care for himself in prison); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *2 (D. Conn. Apr. 8, 2020) (65-year-old defendant's host of medical ailments, including chronic obstructive pulmonary disease ("COPD") and asthma, put him at a higher risk for severe illness from COVID-19); *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (court found that a 64-year-old defendant with COPD was the most susceptible to the devastating effects of COVID-19); *United States v. Perdigao*, No. CR 07-103, 2020 WL 1672322, at *4 (E.D. La. Apr. 2, 2020) (57-year-old defendant, with two years left of sentence, had medical records demonstrating an increasing need to seek care from medical professionals outside the BOP); *United States v. Resnick,* No. 14 CR 810 (CM), 2020 WL 1651508, at *1 (S.D.N.Y. Apr. 2, 2020) (65-year-old defendant, with approximately two years left of sentence, has motion for compassionate release granted because defendant has diabetes and end-stage liver disease making him particularly vulnerable to COVID-19); *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (55-year-old defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constituted an extraordinary and compelling reason to modify defendant's sentence to home incarceration).

"In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id*. (*quoting* 18 U.S.C. § 3582(c)(1)(A)). A district court may reduce a defendant's prison sentence after considering the 18 U.S.C. § 3553(a) factors if it finds "extraordinary and compelling" reasons for a reduction. *United States v. Hernandez*, 2020 WL 1684062, at *2 (S.D.N.Y. Apr. 2, 2020). The relevant Sentencing Commission policy statement defines "extraordinary and compelling reasons" to include a

11

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 12 of 14

defendant's medical conditions, age, family circumstances, and "other reasons." *See* U.S.S.G. § 1B1.13, Application Note 1. The Commission also requires that the "defendant is not a danger to the safety of any other person or to the community." *Id.*

Mr. Galanis is the exact type of defendant who should be released under compassionate release under these circumstances. He sought an administrative remedy through the BOP and has not received a response. He is 77 years old and has specific health concerns (          , ,     and          ) which have been identified by the CDC and the BOP as those which warrant an individual's self-isolation and release. His conditions and his incarceration at FCI Terminal Island drastically increase his chances for death or other serious and permanent medical consequences if he contracts COVID-19, which, considering the spread of the virus within FCI Terminal Island, it is an extremely high risk that he may. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Mr. Galanis' health. Mr. Galanis should be in the safest location available to him, otherwise his term of incarceration is a death sentence, which is certainly not "'sufficient, but not greater than necessary' to accomplish the goals of sentencing." *See Kimbrough v. United States*, 128 S.Ct 558, 571, 169 L.Ed 481 (2007).

**The Court Should Grant Mr. Galanis Compassionate Release**

Although the judgments in his criminal cases mean Mr. Galanis still must serve at least 5 years further on his sentence,[19] his medical condition and the pandemic mean that there is a grave risk that he will not make it out of FCI Terminal Island alive or will become terribly ill. This is unacceptable. If not for this virus ravaging the prison population and the risk to our older population, this motion would never be made. But these are unusual times. These times, most respectfully, demands drastic actions by our Courts. As this Court stated in *United States v. Haena Park,* 16 CR 473 (RA):

> Ms. Park deserves to spend every day of the sentence that she received in prison. But as other judges across this country have rightly noted, "we are not currently living under normal circumstances." The Court fears that leaving Ms. Park any longer at FCI Danbury may convert a three-year prison sentence into a death sentence. And that the Court cannot allow. (internal citation omitted).

---

[19] On 15 CR 643(PKC) Mr. Galanis was sentenced to 60 months on Count 1, 72 Months on Count 2 to run concurrently. In 16 CR 371 (RA) Mr. Galanis was sentenced to 60 months on Count 1 and 120 months on Count 2. The sentences run concurrent to each other with 48 months consecutive to the 15 CR 643 matter for a total of 10 years. Mr. Galanis surrendered to the BOP on April 25, 2017, thus beginning the counting of his sentence. With basic good time, he should be out in November 2025. At a minimum, he would be eligible for home confinement in approximately May 2025. As counsel has previously informed the Court, BOP has of yet failed to correct their sentencing calculation.

Similarly, this Court cannot allow Mr. Galanis' sentence to morph into a death sentence. Thus, Mr. Galanis must be released to home confinement. This is not an overstatement or exaggeration of the situation. Seven inmates at Terminal Island alone have already died and many more have suffered permanent serious medical consequences, and a look at the infection rate and the lack of care being given show that the number of deaths attributed to COVID-19 within FCI Terminal Island is certain to climb higher.

It is important to consider that most people in higher risk categories who develop COVID-19 will need advanced medical help and support, including specialized equipment, such as ventilators, and large teams of doctors and nurses. FCI Terminal Island is not equipped to provide advanced support in an ICU setting with ventilators, certainly not for a substantial group of seriously ill prisoners who may require such specialized care. Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, amputation due to clotting and reduced blood flow, loss of respiratory capacity, and tissue damage in other vital organs, including the heart and liver. This level of supportive care requires an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. None of this type of care is available at FCI Terminal Island, increasing the chance of death or serious side effects to Mr. Galanis if he contracts the disease.

On March 20, 2020, Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues — those people are likely to die from a coronavirus infection."

If released to home confinement, Mr. Galanis will not be completely at liberty; he will be confined to his son's home, in                , California, where he resided while out on bond pretrial in the Castel matter. There, Mr. Galanis will live with his son and daughter-in-law, granddaughter and his wife. It remains a stable and supportive home for Mr. Galanis to complete his sentence. No one in the home has tested positive for coronavirus, and Mr. Galanis would be able to self-isolate in a separate bedroom in the home for 14 days (or any other length of quarantine the Court should order) upon release to ensure neither he nor his family members contracted the virus. He will remain so confined until the end of his sentence, regardless of the hopeful passage of the threat of the virus.

## CONCLUSION

For the foregoing reasons, Mr. Galanis respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement for the remainder of his term with a term of 5 years of supervised release. Mr. Galanis understands the Court's reasoning at the time he was sentenced to the crimes he stands convicted of, but the situation has drastically changed. As Mr. Galanis faces a severe risk of death, he prays that the Court will grant his respectful motion in the alternative Mr. Galanis respectfully requests that he be allowed to enter home confinement for the duration of the time period that Covid19 remains a threat to the inmate population of Terminal Island.

13

Honorable Ronnie Abrams
Honorable P. Kevin Castel
May 13, 2020
Page 14 of 14

      To the extent that the Court requests any further information or briefing regarding this motion, counsel respectfully requests that such proceedings be in writing or via videoconference or telephone conference.

Dated:  New York, New York
         May 13, 2020

                                          Respectfully submitted,

                                          *David Touger*
                                          David Touger, Esq.