

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 15, 2020

**BY ECF**

The Honorable P. Kevin Castel
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re:   *United States v. John Galanis*, 15 Cr. 643 (PKC), 16 Cr. 371 (RA)

Dear Judges Castel and Abrams:

The Government submits this letter in opposition to defendant John Galanis's motion pursuant to Title 18, United States Code, Section § 3582(c) to modify his sentence and "immediately release him to home confinement until his ultimate release date, to be followed by the already-imposed five-year term of supervised release." (Br. at 1). For the reasons set forth below, Judge Abrams lacks jurisdiction to consider the motion because the case before Judge Abrams is pending on direct appeal. More importantly, the defendant is not at an increased risk from COVID-19 in prison because he has already tested positive for SARS-CoV-2 RNA, the virus that causes the disease COVID-19, was symptom free, and is no longer contagious. Nor would any risk from COVID-19 justify releasing this recidivist defendant after having served only one third of his sentence.

Relevant Background

*Prior Criminal Conduct*

In 1973, John Galanis was charged in this District with mail fraud and conspiracy to make false statements to the SEC, in connection with his participation in a scheme to hide investment losses by Microthermal Applications, Inc. from its investors through a fraudulent and backdated reverse merger. On February 2, 1973, Galanis was sentenced to a term of imprisonment of 60 months of which 54 months was suspended, apparently in light of his cooperation with the Government. On February 26, 1978, Galanis was discharged from probation.

Less than two years later, Galanis resumed his criminal activities. Over the course of the next several years, Galanis engaged in a number of tangentially interconnected criminal schemes relating to the oil and gas industry and to savings and loan institutions. Galanis and his co-conspirators hid their control of various entities and defrauded investors through false representations. They used the Transpac Drilling Venture Program to obtain fraudulent tax deductions, bribed bank employees to do their bidding, and used various entities to engage in fraudulent securities transactions. Separately, between November 1985 and September 1987, Galanis and his co-conspirators defrauded various investors in funds managed by the ISI Corporation and misappropriated the funds for their own purposes. In total, these fraudulent transactions generated more than $172 million in false deductions for Galanis and his cohorts.

In May 1987, the defendant was charged in this District with conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud and bribery in connection with the above described criminal conduct (the "1987 Federal Case").

Several months later, in January 1988, the defendant was charged in New York County Supreme Court with Grand Larceny in the Second Degree, arising out of a separate criminal scheme focused on the real estate industry (the "State Charges" or the "1988 State Case"). In the 1988 State Case, Galanis and his co-conspirators solicited investments in the Nashua Trust Company – a company purportedly acquiring and rehabilitating non-casino investments. In fact, however, no construction work was ever done and the investors' money was misappropriated and used to pay the defendants' personal expenses, among other purposes.

In July 1988, following a three-month trial in this District, the defendant was found guilty of 44 counts of conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud and bribery (the "Federal Conviction"). On September 28, 1988, the defendant was sentenced by the Honorable Charles L. Brieant to 27 years' imprisonment. As a result of this conviction, Galanis was subject to a judicially-imposed lifetime bar on executing securities trades in brokerage accounts other than accounts in his name or the names of his family members.

The defendant subsequently entered a guilty plea to the State Charges and was sentenced to a term of imprisonment of 7 to 20 years. The sentence was imposed concurrently to the sentence imposed on the Federal Conviction.

On December 18, 1998, Galanis was paroled from federal custody to the custody of the New York State Department of Corrections, pursuant to a detainer. In approximately September 2000, Galanis absconded from a state work release program. He remained a fugitive for over a year. On November 20, 2001, the defendant was remanded to state custody. He was released on parole on July 2, 2007.

*The Gerova Fraud*

In 2010, just a few years after his release from prison, John Galanis became involved in large scale scheme to fraudulently issue more than $72 million of shares of a publicly-traded company and to liquidate those shares through matched trading, using funds from client accounts of corrupt investment advisers (the "Gerova Fraud"). In particular, in approximately 2010, John

Galanis and his coconspirators began a scheme to take control of the publicly-traded company Gerova Financial Group, Ltd. ("Gerova"), fraudulently cause the issuance of Gerova stock that could be sold for their benefit, and ultimately manipulate the market in Gerova stock. More specifically, in May 2010, Jason Galanis caused more than 5 million shares of Gerova, worth more than $72 million, to be issued – for no legitimate business purpose – in the name of a foreign nominee, Ymer Shahini, whom Jason Galanis ultimately controlled. The co-conspirators then created various back-dated agreements which together purported to justify the share issuance. More specifically, the falsified documents purported to show that Shahini was owed a consulting fee for introducing Gerova to another entity, Weston, and that he had agreed to take payment of the consulting fee in the form of Gerova warrants. In truth, of course, Shahini had not made the introduction to Weston and knew nothing about Weston. In an effort to cover up the fraudulent nature of the transaction, John Galanis communicated directly with Shahini, providing him with information about Weston in order to disguise Shahini's otherwise complete lack of knowledge.

The co-conspirators then began to sell the Gerova shares. Because, however, Gerova was a relatively low-volume stock, these efforts caused the market price of Gerova to decline substantially. In an effort to "staunch the bleeding" caused by the open-market sales of Gerova, Jason Galanis and his co-conspirators lined up corrupt investment advisers, including James Tagliaferri, who were willing to buy Gerova stock at the time, price and quantity dictated by the conspirators. John Galanis spearheaded this effort. In some instances, in order to conceal his involvement in directing the stock trading in accounts in Shahini's name in direct violation of his lifetime bar, John Galanis utilized (i) an email account subscribed to Jared Galanis and used by both Jared and John (the "JMG Account"); and (ii) an email account in the name of an attorney who worked for John Galanis and his family (the "Attorney Account"), rather than in his own name.[1]

Ultimately, in early 2011, Jason Galanis's undisclosed role at Gerova and the history of financial fraud involving his family became publicly known. Soon thereafter, the New York Stock Exchange halted trading in Gerova's shares and Gerova was eventually de-listed and filed for bankruptcy protection. Individuals holding shares of Gerova at the time of the trading halt, including many of the corrupt investment advisers' clients, suffered substantial losses in Gerova.

Before Gerova was de-listed, more than $19 million of proceeds were generated from the sale of the Gerova shares orchestrated by Galanis, substantial portions of which were used to benefit the Galanis family. More specifically, approximately $4.3 million of these proceeds went to two entities controlled by Jason Galanis; more than $2 million was used to pay various lawyers and other expenses, and approximately $1 million was paid to entities controlled by John Galanis.

*The Wakpamni Bond Fraud*

Just a few years after that, John Galanis got involved with yet another fraud (the "Wakpamni Fraud"). In early 2014, Devon Archer, Bevan Cooney, and Jason Galanis, along with others, were trying to buy financial service companies. Their ultimate goal was to combine, or

---

[1] John Galanis also identified himself as "Jared Galanis" when speaking by phone to one of the corrupt investment advisers.

"roll-up," those companies into a conglomerate and then sell the combined company at a substantial profit. The conspirators, however, lacked the funds to effectuate their plan.

In early 2014, the conspirators began discussing using the proceeds of a Native American bond issuance to further their own business and personal interests, including the roll-up plan. John Galanis was the point person who targeted the victim. In 2014, John Galanis introduced himself to Raycen Raines – a representative of the Wakpamni Lake Community Corporation (the "WLCC"), the ultimate issuer of the bonds – at a Native American development conference in Las Vegas, Nevada.

At the meeting in Las Vegas and over the next several months, the defendant proposed to Raines that the WLCC issue bonds, the proceeds of which would be placed in an annuity, which would produce sufficient guaranteed funds to make interest payments on the bonds and support the WLCC's development projects.

John Galanis initially represented to Raines that Wealth Assurance-AG would provide the annuity, although later the annuity provider became Wealth Assurance Private Client ("WAPCC"). John Galanis represented that the WAPCC was a "subsidiary" of Wealth Assurance-AG. In truth, however, there was no actual relationship between WAPCC and Wealth Assurance-AG and the WAPCC bank account was wholly controlled by the coconspirators. John Galanis represented that Burnham Securities, an entity at which, according to John Galanis, his son Jason Galanis worked as an investment banker, would be the placement agent for the bonds. In truth, Jason Galanis was not employed at Burnham and various coconspirators were investors in or exerted control over Burnham.

In addition to his oral representations to Raines and others involved in the bond deal, John Galanis also drafted or edited documents that were consistent with those oral representations and which set forth the specific distribution of the bonds' proceeds. Notably, none of the bond documents included disclosure of *any* fee to be paid to John Galanis.

In August 2014, the conspirators purchased the entirety of the first issuance of Wakpamni bonds on behalf of nine clients of an investment adviser the conspirators' controlled. The clients were never informed of the various conflicts of interests inherent in the bonds – namely that the conspirators had orchestrated the bond issuance, controlled the placement agent, Burnham, the purported annuity provider, the WAPCC, and the investment adviser. As a result of the purchase, tens of millions of dollars of bond proceeds arrived in the WAPCC account for the purported purchase of an annuity. Instead, however, the conspirators misappropriated the proceeds for themselves. $2.35 million of the bond proceeds went to John Galanis through a sham entity, Sovereign Nations, Galanis had created solely for this purpose. Over the next several months, the $2.35 million was disbursed to John Galanis, John Galanis's relatives, and to fund the purchase of cars and jewelry for John Galanis.

Almost immediately after the first bond issuance, it was John Galanis who proposed a second tranche of bonds to the WLCC, falsely claiming that there were interested investors who had not had the opportunity to invest in the first bond issuance. And when both the second, and

eventually a third bond issuance went forward, John Galanis received additional bond proceeds from Jason Galanis.

*The Criminal Proceedings*

On September 24, 2015, John Galanis was arrested on the basis of an Indictment charging him with one count of conspiracy to commit securities fraud in violation of Title 18, United States Code, Section 371, one count of securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and one count of wire fraud, in violation of Title 18, United States Code, Section 1343, all in connection with his role in the Gerova Fraud. On July 20, 2016, Galanis pled guilty to Counts One and Two of the Indictment.

On February 16, 2017, Galanis was sentenced by Judge Castel. Judge Castel noted that Galanis "is a talented person" and "this talent has been used as weaponry in commission of crimes." (Tr. 41). "[O]ne of the most horrific aspects" of Galanis's behavior, was "bringing [his son] Jared Galanis in the midst of this" crime[2] and "extending this circle of criminality." (Tr. 42). Rather than "coming out of prison" after a long sentence "and being the person to communicate the message, 'don't even think of coming close to these things,' he became the agent of other people's involvement in this scheme." (Tr. 41-42). While Galanis was not the one who "cooked this scheme up," he got involved early and "knew the parameters," and received "his fair share" of the criminal proceeds." (Tr. 42). Judge Castel therefore found that a sentence of 72 months' imprisonment was sufficient but not greater than necessary to achieve the purposes of sentencing.

In the meantime, while the prosecution of the Gerova Fraud was pending, on May 31, 2016 a grand jury returned an indictment charging Galanis with one count of conspiracy to commit securities fraud in violation of Title 18, United States Code, Section 371, and one count of securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with his role in the Wakpamni Fraud. Galanis proceeded to trial and on June 28, 2018, a jury found Galanis guilty on all counts. On March 8, 2019, Galanis was sentenced by Judge Abrams. Judge Abrams found that "[t]here's no real dispute . . . about the seriousness of the crime and the harm caused to one of the poorest Native American tribes in the country, as well as" to "pension funds held for the benefit of transit workers, longshoremen, housing authority workers, and city employees, among others." (Tr. 36). In total, Galanis "helped steal more than $40 million" and personally received $2.35 million, which he used for "jewelry, cars, hotels and disbursements to family members." (Tr. 37). Judge Abrams found the defendant's "involvement in [the] conspiracy . . . far from minor." (Tr. 37).

With respect to Galanis's criminal history, Judge Abrams noted that Galanis had "been defrauding people and entities for well over 40 years," which was "nothing short of extraordinary," (Tr. 36), and that Galanis had continued to commit crimes "even after receiving a very lengthy

---

[2] As set referenced above, John Galanis posed as his son Jared Galanis, an attorney, in arranging the illegal matched trading.

sentence" for a prior conviction. (Tr. 36). Judge Abrams therefore believed a "substantial sentence" was necessary "to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence, both to [the defendant], and to others who may seek to engage in similar conduct." (Tr. 38). "[M]ore than anything, however," the Court found it "need[ed] to protect the public from future crimes that [Galanis might] commit." (Tr. 38). In contrast to "most people" who "are less likely to recidivate as they get older," the fact that Galanis "committed [his] last two crimes in [his] late 60s and your 70s" made clear that "that assumption" did not apply to Galanis. (Tr. 37-38). Thus, Judge Abrams sentenced Galanis to a term of imprisonment of 120 months, 48 months of which was to be served consecutively to his sentence for the Gerova Fraud.

Galanis has been in custody since April 25, 2017 and has a projected release date of May 30, 2027. Galanis has thus served approximately 3 years of his sentence and has approximately 7 years remaining.[3]

On April 8, 2020, Galanis filed a motion with the Bureau of Prisons seeking immediate release pursuant to Title 18, United States Code, Section 3582(c). That motion remains pending.

Discussion

The defendant seeks his immediate release, arguing that he is "especially vulnerable" to the threat of COVID-19 ("COVID") because he has "many of the CDC's denoted increased risk factors, including

               is of advanced age, and because FCI Terminal Island, the facility at which he is incarcerated, has a significant number of COVID cases. (Br. at 1). But as Galanis wholly fails to mention, he tested positive for SARS-CoV-2 in April, had a wholly asymptomatic course, and having been symptom free for more than 14 days is now completely recovered. Galanis is thus at no risk from COVID and has no basis to seek compassionate release. On this basis alone his motion must be denied. Nor would the outcome be different if Galanis had not already had COVID. First, Judge Abrams lacks jurisdiction to consider the motion because Galanis's case is on direct appeal. Second, many of Galanis's medical conditions do not render him uniquely susceptible to COVID. Third, the BOP has taken significant steps to contain COVID at FCI Terminal Island. Fourth, even if Galanis could establish that he was uniquely at risk from COVID, consideration of the 3553(a) factors, including the severity of his criminal conduct and his lifelong criminal history weigh heavily against releasing him only one third of the way through his sentence.

---

[3] Galanis's assertion that he has 5 years left on his sentence with good time credit appears to be incorrect. (Br. at 2). Galanis was sentenced to a total of 140 months: 72 months on the Gerova Fraud, and a consecutive 48 months on the Wakpamni Fraud. Assuming a 15% reduction for good time, Galanis will serve a total of 119 months. (140 months – 21 months = 119 months). He thus has approximately 7 years left on his sentence. That is consistent with the release date of May 30, 2027 listed on the BOP website, which generally includes good time credit. (https://www.bop.gov/inmateloc/).

I.    Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* The policy statement, which appears at Section 1B1.13 of the Guidelines, provides that a reduction of sentence is permitted if: "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3). The Application Notes of § 1B1.13, in turn, describe multiple ways that a defendant can show an "extraordinary and compelling reason," but only one is relevant here:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, Application Note 1.

As the proponent of the motion, the defendant bears the burden of proving "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

II. Judge Abrams Lacks Jurisdiction to Consider the Defendant's Motion

As an initial matter, Judge Abrams lacks jurisdiction to grant the defendant's motion. In *United States v. Ransom*, the Court of Appeals held that while the filing of a notice of appeal "does not preclude a district court, after notice of appeal has been filed, from 'correcting clerical errors under Fed. R. Crim. P. 36 or from acting to aid the appeal,'" it does not permit the "substantive modifications of judgments." *United States v. Ransom*, 866 F.2d 574, 575–76 (2d Cir. 1989) (quoting *Katsougrakis*, 715 F.2d at 776 n.7). Thus, the Second Circuit held that the district court in that case "lacked authority" to eliminate an unlawful term of supervised release while the defendant's appeal was pending.[4] *Id.* at 575. An order granting the defendant's motion to "reduce the term of imprisonment," 18 U.S.C. § 3582(c)(1)(A), would be no less a substantive modification of a judgment than the elimination of a supervised release term. *See Ransom*, 866 F.2d at 576 ("The fact that the [modification] benefits the appellant is not a reason for deeming the District Court authorized to act after notice of appeal has been filed."). Therefore, this Court lacks jurisdiction to grant the defendant's motion while his appeal remains pending. *See, e.g., United States v. Raia*, __ F.3d __, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (considering whether to "return jurisdiction to the District Court" so that it could "consider [defendant's] compassionate-release request in the first instance"); *United States v. Cardoza*, 790 F.3d 247, 248 (1st Cir. 2015) ("Because [defendant's] appeal was pending at the time the District Court ruled on his motion to modify the sentence under § 3582(c)(2), we hold that the District Court lacked jurisdiction to enter the order reducing the sentence." (quoting *United States v. Maldonado-Rios*, 790 F.3d 62, 64 (1st Cir. 2015))).

However, under Rule 37 of the Federal Rules of Criminal Procedure, the Court can defer ruling on the motion, deny the motion, or make an indicative ruling either that it would grant the

---

[4] The Second Circuit noted in dicta that "a district court may not grant a Rule 35[a] motion pending appeal of a judgment, even to correct an illegal aspect of a sentence." *Ransom*, 866 F.2d at 576. That dicta was abrogated when Federal Rule of Appellate Procedure 4 was amended in 1993 to provide that "the filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a)." Fed. R. App. P. 4(b)(5). *Ransom*'s holding and the principle that district courts lack authority to make "substantive modifications of judgments" while an appeal is pending have not been abrogated. *See United States v. Viola*, 555 F. App'x 57, 69–60 (2d Cir. 2014) (continuing to rely on *Ransom*); *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995) (same).

motion if the Circuit were to remand or that the motion raises a substantial issue. If the Court were to issue an indicative ruling, the defendant could promptly notify the Court of Appeals, and the Court of Appeals could then remand for this Court to decide the motion, pursuant to Rule 12.1 of the Federal Rules of Appellate Procedure and Rule 37 of the Federal Rules of Criminal Procedure. *See, e.g.*, *Raia*, 2020 WL 1647922, at *2; *Cardoza*, 790 F.3d at 248; *Maldonado-Rios*, 790 F.3d at 64–65.

### III. The Defendant Has Not Demonstrated Extraordinary and Compelling Circumstances

The defendant's claim also fails on the merits. The defendant spends much of his motion cataloging his medical conditions and attacking FCI Terminal Island's response to COVID. But the defendant omits the single most salient fact: as revealed by his medical records he has already tested positive for SARS-CoV-2, experienced an asymptomatic course, and is no longer contagious. (Ex. A, Galanis SARS-CoV-2 test results; Ex. B, Galanis temperature and COVID symptom checks). Nor are his representations about conditions at FCI Terminal Island correct.

As the Courts are aware, the BOP has taken significant action to limit the spread of COVID at BOP facilities and has implemented Phases One through Six of its pandemic plan. FCI Terminal Island has gone even further. After early COVID cases appeared among FCI Terminal Island staff and inmates, Terminal Island began isolating those inmates who tested positive and quarantining those who had been exposed. In mid-April, Terminal Island had an infectious disease doctor assigned to support the facility, and shortly thereafter six additional medical staff were assigned to the facility. Between April 24, 2020 and April 28, 2020 *all* Terminal Island inmates were tested for COVID.[5] While a significant percentage tested positive, a huge number of the positive cases, like the defendant, were asymptomatic.

Terminal Island has quarantined inmates according to test results. Thus, asymptomatic COVID positive inmates like the defendant are quarantined together. Those who tested negative are similarly isolated in a separate location.[6] Asymptomatic COVID positive inmates receive temperature checks twice daily. (*See, e.g.*, Ex. B, Galanis temperature checks). Inmates who are symptom free remain in isolation for 14 days prior to being transferred to step down units for an

---

[5] Those results were as follows:

| Date of Testing | Total # Tested | Positive | Negative | Indeterminate | Pending |
|---|---|---|---|---|---|
| 4/24/2020 | 268 | 161 | 105 | - | 2 |
| 4/25/2020 | 393 | 238 | 155 | - | - |
| 4/27/2020 | 213 | 99 | 100 | 12 | 3 |
| 4/28/2020 | 30 | 7 | 15 | 2 | 6 |

[6] Indeed, the US Coast Guard has erected portable air-conditioned tents within the Terminal Island facility to house COVID negative patients in isolation from the rest of the population.

additional 7 days to ensure they remain symptom free prior to returning them to their assigned housing units. In short, FCI Terminal Island has taken significant action to mitigate the spread of COVID. While the initial number of cases was undoubtedly high, efforts to quarantine similarly situated inmates has been successful. Indeed, the vast majority of the COVID positive inmates – more than 550 in total – have now recovered and according to the most recent information obtained directly from the facility, Terminal Island currently has less than 50 positive cases. Thus, even if the defendant had not already had COVID, he cannot show that he would be safer in the general California population than housed at Terminal Island.[7]

### 3553(a) Factors Also Weigh Heavily Against the Defendant's Early Release

Even assuming the defendant could establish that there are extraordinary and compelling circumstances warranting his release – and he cannot – consideration of the 3553(a) factors weigh heavily against his release. There is no question that the defendant's crimes were serious and left tens of millions of dollars of damage in their wake. The defendant enriched himself at the expense of innocent shareholders, an unknowing Native American Tribal entity, and the pension funds of hardworking civil servants and laborers. Most significantly, the defendant has shown himself to be an inveterate and unrepentant fraudster. Released from prison after many years, and already in his late 60s, the defendant demonstrated his true colors. Rather than learn from his mistakes, he immediately sought to earn easy money by any means necessary, even involving his own children in his criminal enterprise. The Government has no doubt that if and when released Galanis will waste no time returning to his lifelong criminal pursuits. To permit Galanis to serve a mere third of his sentence would thus undermine the purposes of sentencing.

---

[7] The Government does not dispute that at 77, the defendant is at higher than average risk from COVID, whether in prison or out. But the Government notes that many of the defendant's ailments:                                                                                   have no bearing on COVID risk. And while                                          and                                          may make an individual at higher risk, the defendant's "                              " and "                    " do not have that effect. (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html). Terminal Island is a Care Level 3 medical facility which provides specialized and long term care to the inmate population. It includes a 15 bed short stay unit providing short term IV therapy, post-operative care, and long term wound care. The facility is thus amply able to care for Galanis's medical needs.

Conclusion

      For the foregoing reasons, the Government respectfully requests the Court deny the defendant's request for early release.

              Respectfully submitted,

              AUDREY STRAUSS
              Attorney for the United States, Acting Under
              Authority Conferred by 28 U.S.C. § 515

By:    /s/
       Rebecca Mermelstein
       Brian Blais
       Negar Tekeei
       Assistant United States Attorney
       (212) 637-2360/2251/2482