KbiWmorS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                      16 Cr. 371 (RA)

5   MICHELLE MORTON,

6                   Defendant.
                                         Sentence (by telephone)
7   ------------------------------x

8                                        New York, N.Y.
                                         November 18, 2020
9                                        11:00 a.m.

10  Before:

11

                       HON. RONNIE ABRAMS,
12
                                         District Judge
13
                          APPEARANCES
14
    AUDREY STRAUSS
15       Acting United States Attorney for
         the Southern District of New York
16  BY:  REBECCA G. MERMELSTEIN
         Assistant United States Attorney
17
    CAHILL GORDON & REINDEL LLP
18       Attorneys for Defendant
    BY:  NOLA B. HELLER
19       SAMANTHA LAWSON

20

21

22

23

24

25

KbiWmorS

```
1              (Case called)
2              THE COURT:  Good morning, everyone.  This is Judge
3    Abrams.
4              MS. MERMELSTEIN:  Good morning, your Honor.  Rebecca
5    Mermelstein, for the government.  I'm joined by Negar Tekeei
6    and Elizabeth Hanft, who dialed in on the phone.
7              THE COURT:  Good morning.
8              MS. HELLER:  Good morning, your Honor.  Nola Heller,
9    for Ms. Morton, and I'm joined by Samantha Lawson, who's on
10   video.
11             THE COURT:  All right.  Good morning.
12             And good morning to you, Ms. Morton.
13             THE DEFENDANT:  Good morning.
14             THE COURT:  First, I want to remind everyone that this
15   is a public proceeding.  Members of the public and the press
16   are able to access the proceeding through the public call-in
17   number, but any listeners or participants are reminded that any
18   recording or rebroadcasting any portion of this proceeding is
19   prohibited.
20             We're here for Ms. Morton's sentencing.  We are, of
21   course, in the middle of the COVID-19 pandemic.  I'm thus
22   conducting this proceeding remotely pursuant to the authority
23   provided by Section 15002 of the CARES Act and the standing
24   orders issued by our chief judge pursuant to that act.  I'm
25   proceeding by videoconference, although I am within the
```

KbiWmorS

district, and counsel and Ms. Morton are also proceeding by way

of videoconference.

        Ms. Morton, I just want to confirm that you can see me

and that you can hear me.

        THE DEFENDANT:  I can see you and I can hear you, your

Honor.

        THE COURT:  Thank you.

        If at any point you would like to speak privately with

your attorneys, you should know that you're free to do so.

We'll take a break, you'll speak privately and then we'll

resume the proceedings.  Do you understand?

        THE DEFENDANT:  Yes, I do.  Thank you.

        THE COURT:  Thank you.

        Ms. Heller, could you please describe the process by

which you discussed with Ms. Morton her right to be present and

a knowing and voluntary waiver of that right.

        MS. HELLER:  Your Honor, we discussed, of course, the

right of every defendant to be present at their sentencing

proceeding.  We also discussed your Honor's opinion in which

your Honor stated that the sentencing would proceed on November

18, and we discussed the COVID pandemic and the implications

for appearing that day in person.  And given all those factors,

Ms. Morton and I decided that it was best to appear by video

for this proceeding.

        THE COURT:  All right.

KbiWmorS

1              Is that an accurate description of what occurred,

2    Ms. Morton?

3              THE DEFENDANT:  Yes, it is, your Honor.

4              THE COURT:  All right.  And do you understand that you

5    have a right to have this sentencing in person in court?  Do

6    you understand that?

7              THE DEFENDANT:  I do.  I do understand that, your

8    Honor.

9              THE COURT:  And are you choosing to give up that right

10   and to proceed with the sentencing by way of videoconference

11   today?

12             THE DEFENDANT:  Yes, I am giving up that right in

13   light of the COVID pandemic.

14             THE COURT:  All right.  Thank you.

15             Is there anything else the government thinks I need to

16   do before I make a finding as to waiver of physical presence?

17             MS. MERMELSTEIN:  Your Honor, I think it's fair that

18   Ms. Morton has knowingly waived her right, but I think under

19   the CARES Act and the necessary finding that the sentencing

20   cannot be further delayed without serious harm to the interest

21   of justice it's worth noting for the record that in this

22   particular case I think the interest of justice would be harmed

23   by further delay both because the unusual length of proceedings

24   here -- this case has been now pending for about four years --

25   and the large restitution order that is anticipated going to be

KbiWmorS

1    entered into -- victims, we just think there's a basis now to

2    go forward.

3              THE COURT:  I intended to mention that.  You've done

4    it for me, but I agree.

5              First, I'll note that I find that a knowing and

6    voluntary waiver of the right to be physically present for this

7    sentencing has been made, and I also find that today's

8    proceeding cannot be further delayed without serious harm to

9    the interest of justice.  This sentencing has already been put

10   off for over two years, and for the other reasons, including

11   restitution that Ms. Mermelstein noted, I believe it's critical

12   to move forward with the sentencing today.

13             Is there anyone, Ms. Heller, who's on the line -- any

14   family members or friends -- that I would know were in court if

15   we were physically in court that are on the line that I should

16   know are listening in?

17             MS. HELLER:  No, your Honor.  Just other members of

18   the Cahill team of attorneys who worked on the matter.

19             THE COURT:  All right.  Thank you.

20             By way of background, Ms. Morton pled guilty in May of

21   2018 to Counts One and Four of the indictment.  She's since

22   twice moved to withdraw her plea.  Those motions were denied,

23   and we're proceeding with sentencing today.

24             Before we proceed further, I also want to note that on

25   October 30, I issued an order pursuant to Federal Rule of

KbiWmorS

1    Criminal Procedure 5(f) to confirm the government's disclosure

2    obligations under *Brady v. Maryland* and its progeny and to

3    summarize the possible consequences of violating those

4    proceedings.

5              Ms. Mermelstein, I'm just going to ask you, has the

6    government complied with and will it continue to comply with

7    its disclosure obligations?

8              MS. MERMELSTEIN:  Yes, your Honor.

9              THE COURT:  Why don't we proceed now to the substance

10   of the proceeding.

11             In connection with today's proceeding, I have reviewed

12   the following submissions:

13             The presentence investigation report, which was

14   revised as of November 20, 2018;

15             Ms. Morton's sentencing memorandum, dated November 16,

16   2018;

17             Supplemental sentencing submissions -- actually, two

18   supplemental sentencing submissions, dated November 3, 2020,

19   and then an additional submission on November 9, 2020; and the

20   government's sentencing memorandum, dated November 23, 2018,

21   and supplemental submission, dated November 9, 2020.

22             Have the parties received each of these submissions,

23   and am I missing anything?

24             MS. MERMELSTEIN:  We have received them, your Honor,

25   and you're not missing anything.

KbiWmorS

1          MS. HELLER:  Your Honor, we have as well.  The only

2    other submission I would note would be our separate letter,

3    dated November 3, which is relevant to a few additional

4    corrections and objections to the PSR.

5          THE COURT:  Right.  When I noted that you had two

6    supplemental submissions dated November 3, one of them included

7    the letter that addressed your objections to the PSR.  So there

8    are two letters from November 3, but not a third.  Is that

9    correct?

10         MS. HELLER:  That's correct.  The third -- the third

11   submission was November 9.

12         THE COURT:  November 9.  OK.  So we're all on the same

13   page.  Thank you.

14         Why don't we begin by discussing the presentence

15   report that was prepared by the probation department.

16         Ms. Heller, we'll get to your objections in a moment,

17   but first let me ask you, have you reviewed the presentence

18   report and discussed it with Ms. Morton?

19         MS. HELLER:  Yes, we have in detail, your Honor.

20         THE COURT:  Ms. Morton, have you reviewed the

21   presentence report and discussed it with your attorneys?

22         THE DEFENDANT:  Yes, I have, your Honor.

23         THE COURT:  All right.

24         Ms. Heller, I know you have various objections and

25   there were some objections made by the prior attorneys as well.

KbiWmorS

```
 1    Why don't we go through which ones you want to pursue further,
 2    and then we'll hear the government out on those objections.
 3              MS. HELLER:  Sure.
 4              Your Honor, in our letter of November 3, everything on
 5    pages 1, 2 and 3 -- they're listed in bullets -- are all really
 6    minor.  I would call them corrections.  They're not objections.
 7    They're factual.  You know, we didn't -- the government didn't
 8    take a position on those, but I don't think we need to spend
 9    time in this proceeding going through them one by one unless
10    the government wants to.
11              We did a split through paragraph by paragraph and
12    corrected some things that either needed to be updated or we
13    believed were factually incorrect.
14              THE COURT:  Let me just stop you there.
15              MS. HELLER:  That's the bulk of them.
16              THE COURT:  I think if there are items, if there's
17    language that we're adding to the presentence report, I want to
18    hear the government out.
19              Ms. Mermelstein, why don't you tell me -- you have the
20    November 3 letter -- do you have objections to the language
21    being added in paragraph 9?
22              MS. MERMELSTEIN:  Your Honor, I'm just going to pull
23    up the letter.
24              We don't generally have any objections to the, as Nola
25    characterizes them, sort of minor updates and corrections --
```

KbiWmorS

that is to say, information about Ms. Morton's personal and

familial relationships, her financial situation, updates with

respect to the fact that since the time this was prepared

additional defendants have been sentenced.

       And I think with respect to the last paragraph about

Ms. Morton's intent and challenges to the factual recitation on

the basis that they were proven at a trial that Ms. Morton was

not a participant in, there we do have objections.  Obviously,

Ms. Morton pled guilty and admitted that she intended to commit

the fraud, and we would not be here if she had not intended to

do so, so the language with respect to intent clearly properly

belongs in the PSR.

       With respect to the suggestion that evidence adduced

at trial doesn't belong in the PSR, I think if Ms. Morton has

specific challenges to evidence that she wants to raise, she

can pursue them, but the mere fact that there's a citation to

the fact that it was put forth at trial is no reason that it

can't be included simply because she was not a trial defendant.

So there, too, we think that the language and the facts are a

problem.

       THE COURT:  All right.  As an initial matter, what I'm

going to do is I'm going to make all the corrections from

paragraph 9 to paragraph 142.

       I'm not going to include the footnotes, Ms. Heller,

unless you're asking me to do so.  Just clarify that for me,

KbiWmorS

1    please.

2            MS. HELLER:  Oh, no, your Honor.  Those were intended

3    as (indecipherable).

4            THE COURT:  And with respect to the updates regarding

5    the additional, the other defendants, the codefendants, I can

6    either leave it to the two of you to submit language.  I can

7    leave it to the probation department.  I mean there shouldn't

8    be dispute about that.  With respect to language, why don't you

9    do that.  Why don't you speak among yourselves and just submit

10   a letter to me or just give it directly to the probation

11   department.

12           Ms. Mermelstein, do you have a preference on that?

13           MS. MERMELSTEIN:  Your Honor, whatever you prefer.  If

14   it's easier for your Honor not to have to (indecipherable),

15   we're happy to work on it with probation.  I don't think

16   there'll be any dispute.

17           THE COURT:  OK.  Why don't you do that.

18           Now, with respect to what was proven at the trial, I

19   think the government is right, and I think it's, of course,

20   clear from the presentence report that Ms. Morton was not at

21   trial.  If there is particular evidence that you seek to

22   challenge, Ms. Heller, let me know that specifically.  I'll

23   just add if there's additional language you want me to add,

24   like Ms. Morton's now contesting blank, I can add that in.  I

25   think the language should stay as is, but I'm also happy to add

KbiWmorS

1    in language expressing Ms. Morton's current position if you

2    would like me to do that.

3            MS. HELLER:  Right.  Your Honor, I think what we would

4    contemplate for both this and the intent language was just

5    simply a sentence, perhaps, to this effect:  Ms. Morton was not

6    a defendant at the trial and thus did not have an opportunity

7    to challenge the evidence that was presented.  And for intent,

8    similarly, perhaps a sentence that would say Ms. Morton, in her

9    two motions to withdraw her guilty plea, alleged that she did

10   not have intent to commit the charged crimes, just simple

11   factual recitation.

12           THE COURT:  OK.  I'm going to do that.  I'm going to

13   add in language in paragraphs -- I don't know if I'll put it in

14   all of them; there's 60 to 63 -- to the effect that Ms. Morton

15   notes that she was not a defendant at trial, so I'm making it

16   clear that this is something she wants to say here, and did not

17   have the opportunity to challenge the evidence or the witnesses

18   presented.  And then I will add --

19           Go ahead.

20           MS. HELLER:  I was just saying my video has frozen.  I

21   can hear you perfectly.  I just wanted to note that, and I

22   don't know whether I should -- maybe we'll all just wait, but I

23   may want to log back on if it continues.

24           THE COURT:  That's fine.  Do you want to do that right

25   now?  Do you want to take a one-minute break and log out and

KbiWmorS

 1   log back in?

 2          MS. HELLER:  Yeah.  I apologize.  Perhaps that's best.

 3   I'll do that very quickly and be right back on, but I'm still

 4   on audio.

 5          THE COURT:  OK.

 6          MS. HELLER:  Because I'm on the audio through

 7   conference.

 8          THE COURT:  OK.

 9          MS. HELLER:  I think, actually, your Honor's fine if

10   you keep talking.

11          THE COURT:  All right.  I'll do that.

12          MS. HELLER:  I can hear you.

13          THE COURT:  That's what I'm going to do.  I'm going to

14   just add in one line saying that Ms. Morton, in her motions to

15   withdraw her plea, is now contesting that she had the requisite

16   intent, but I'll also add in that those motions to withdraw her

17   plea were denied.  I can't recall if that's -- that's

18   obviously -- I take that back.  That wouldn't be in this

19   report.

20          MS. HELLER:  That's right.

21          THE COURT:  Was the first one in here?  Let me look

22   back.

23          I'll look later, but in any event, I will note that

24   she's made two motions to withdraw her plea and that both of

25   those motions have been denied by the Court.

KbiWmorS

1           All right.

2           MS. HELLER:  I'm now back on video.

3           MS. MERMELSTEIN:  (indecipherable) PSR because the

4    first PSR contemplates the loss of acceptance points on the

5    basis of the effort to withdraw.

6           THE COURT:  You're absolutely right.  You're

7    absolutely right.  You're absolutely right.

8           I'll just add in that there were, in fact, two

9    motions.  She's now contesting that she had the requisite

10   intent, but I'll note somewhere in there that those two motions

11   have been denied.

12          If you all want to see where I put it before this is

13   released, you have the opportunity to do so, Ms. Heller.

14          Are you also persisting in some of the prior

15   objections, Ms. Heller, that were raised by prior counsel,

16   including that she is, in fact, entitled to acceptance points?

17          MS. HELLER:  No, your Honor.  We're not persisting in

18   the fact that -- we do not contest that Ms. Morton is entitled

19   to acceptance points, and I believe all of the prior objections

20   have been noted and -- within the third addendum, third

21   disclosure, so although we certainly don't withdraw any of

22   those objections, I don't think any of them need to be

23   addressed.

24          THE COURT:  OK.  All right.

25          With that said, does the government have any

KbiWmorS

1    objections to the presentence report?

2                MS. MERMELSTEIN:  No, your Honor.

3                THE COURT:  OK.

4           The Court adopts the factual findings in the report

5    with the modifications already noted, most of which were agreed

6    to.  The presentence report will be made part of the record in

7    this matter and placed under seal.  If an appeal is taken,

8    counsel on appeal may have access to the sealed report without

9    further application to the Court.

10          Ms. Morton, when you pled guilty in May 2018, I'm sure

11   you remember we discussed the federal sentencing guidelines,

12   and they've been raised a number of times in various

13   proceedings since then.  I'll just note for the record they are

14   recommendations to the Court.  At one point they were

15   mandatory, meaning judges were required to follow them, but

16   they're no longer binding on judges.  But judges must

17   nonetheless consider them in determining an appropriate

18   sentence and must ensure that they have properly computed the

19   guidelines range.

20          Based on the presentence report as well as my

21   independent evaluation of the guidelines, I find that

22   Ms. Morton's offense level is 35.  Her criminal history

23   category is I and her recommended guidelines sentence is 120

24   months because that's the statutory max, Which is now the

25   guidelines range.

KbiWmorS

```
 1                  Is there any dispute about that?

 2                  MS. MERMELSTEIN:  No, your Honor.

 3                  MS. HELLER:  No, your Honor, there's not.

 4                  THE COURT:  All right.  As I said a moment ago, the

 5      range is only advisory.  Courts may impose a sentence outside

 6      of that range based on one of two legal concepts: a departure

 7      or a variance.  A departure allows for a sentence outside of

 8      the advisory range based on some provision in the guidelines

 9      themselves.  Neither side, as I understand it, is seeking a

10      departure, but I understand that Ms. Morton is seeking a

11      variance.

12                  Is that correct, Ms. Heller?

13                  MS. HELLER:  That's correct, your Honor.

14                  THE COURT:  All right.  With that, I'll hear from the

15      parties.  Would the government like to be heard --

16                  MS. MERMELSTEIN:  Yes.

17                  THE COURT:  -- or would any victims like to be heard?

18                  MS. MERMELSTEIN:  Your Honor, no victims intend to be

19      heard.

20                  And I'll be brief, your Honor.  Your Honor's obviously

21      very familiar at this point with the facts of this case, but

22      the evidence here with respect to Ms. Morton is very clear:

23      That she assumed a fiduciary role with respect to pension fund

24      clients of both Atlantic and Hughes and she completely

25      abdicated that responsibility, having agreed even before the
```

KbiWmorS

purchase of those entities, that tens of millions of dollars of
worthless bonds would be put into the client accounts and
indeed the clients lost the entirety of those investments.

She did that not once, but twice.  She did it despite
protests of some of the employees, longstanding employees, of
the investment advisers, and after the first set of bonds was
discovered by the clients, they fired the investment adviser.
They demanded the bonds be sold, and everyone involved was very
aware that the bonds could not be sold because no one wanted
them.  And nonetheless, Ms. Morton went forward, doing exactly
the same thing a second time, with full knowledge of how
clients were reacting and the fact that they had no market and
could not be resold.  And those are pension funds that have
lost that money and will not recoup it.  There is no
expectation here that restitution or forfeiture will ever be
paid to these people in full.

Ms. Morton has also, uniquely perhaps, wholly failed
to accept any responsibility for her conduct here.  She has
along the way blamed the government, blamed other members of
the conspiracy, blamed at times her own lawyers, and will not,
continues to fail to acknowledge her role in this offense, and
I think that that is a very serious consideration at
sentencing.

As we've laid out in our sentencing submission, and I
won't belabor it, there's no question that COVID is something

KbiWmorS

1    that has to be considered here, but the remedy surely cannot be

2    a free pass for Ms. Morton, and given that she is not yet

3    incarcerated, there's really -- your Honor does not face the

4    challenge of a binary choice that we face in the compassionate

5    release setting, in which the choice is simply to let someone

6    out or have them serve the entirety of their sentence and there

7    is no middle ground.  There is very much a middle ground here,

8    and the government does not object to a surrender date that's

9    set many months from now, and which can be revisited, but feels

10   very strongly that your Honor should impose the sentence that

11   would be imposed in the absence of COVID and account for COVID

12   simply by delaying surrender.

13          I think a very serious incarceratory sentence is

14   appropriate here to punish the conduct, and as a result, we

15   think the guidelines are not an unreasonable sentence in this

16   case.

17          THE COURT:  Let me ask you this.  I mean you're asking

18   for a ten-year sentence.  Of the people that have already been

19   sentenced, the only person who got more than that is Jason

20   Galanis, and only half of that was run consecutively in the

21   initial sentence.  It's since been changed by Judge Castel in

22   light of the reversal in the Gerova case, but only half of that

23   was to run consecutively.

24          Gary Hirst got a 96-month sentence, but only 36

25   months -- three years -- were to run consecutively, and he had

KbiWmorS

1    prior criminal dealings with the Galanis brothers.

2            John Galanis got a 120-month sentence, and only four

3    of those years were to run consecutively.

4            Gary Hirst is already on home detention.

5            Why would it not lead to unwarranted sentencing

6    disparities to give Ms. Morton a sentence of 120 months or

7    anything close to that?

8            MS. MERMELSTEIN:  Your Honor, I think that's fair.  I

9    would say the government has asked for a guidelines sentence

10   for each of these defendants, and in keeping with that, I don't

11   think one would be unreasonable separate and apart from the

12   other sentences received.

13           Putting Ms. Morton in the context of the other

14   defendants, it's complicated with respect to the defendants who

15   are serving two sentences because how you accommodate those two

16   things together is a little bit nuanced.  But I would note with

17   respect to how to situate her that at Mr. Cooney's sentencing

18   your Honor asked if he should receive a minor role and whether

19   or not there were any participants in the scheme who were less

20   culpable than him, and the government's view, answer to your

21   Honor was that there were no participants in the scheme less

22   culpable than Mr. Cooney.

23           Mr. Cooney obviously had a serious role in the

24   offense, but he received 30 months.  He did not have any

25   fiduciary duty to the people whose money he stole, and as the

KbiWmorS

```
1    government said at his sentencing, there were no defendants it

2    viewed as being less culpable than him.  So I take your Honor's

3    point that while guidelines sentences in the government's view

4    were appropriate across the board here, in light of the

5    sentences imposed, 120 months might be disproportionate.  I

6    think nonetheless when you situate Ms. Morton you have to see

7    her as being between Mr. Cooney and Mr. Hirst; Mr. Hirst being,

8    of course, the only other defendant in the scheme who was

9    directly employed at and involved in the fiduciary assets of

10   the scheme and who also was (indecipherable) a fiduciary duty,

11   and so I would put her between Mr. Cooney and Mr. Hirst in that

12   respect.

13            THE COURT:  I can talk more about how I look at her as

14   different from Mr. Hirst, but with respect to Cooney, I think

15   that there was more evidence that he was aware of this broader

16   fraud.  And as you know, when Ms. Morton pled guilty, she

17   acknowledged that her conduct enabled Jason Galanis to steal

18   the bond proceeds through the broader fraud that led her

19   investors to lose money, but she specifically disclaimed any

20   knowledge of that broader fraud, and the government was

21   comfortable with that allocution at the time.

22            All right.  In any event, I think I've made my point

23   and I've heard you out, so thank you.

24            MS. MERMELSTEIN:  If I could say one thing, your

25   Honor?
```

KbiWmorS

```
 1              THE COURT:  Sure.  Go ahead.

 2              MS. MERMELSTEIN:  I do think Ms. Morton's allocution

 3    was unquestionably legally sufficient, but that doesn't mean

 4    the government agreed with the narrow way in which she pled.

 5              THE COURT:  I'm fully aware of that fact, and I think

 6    you've made your point very clear in your submissions, relying,

 7    among other things, on trial testimony.  So I think that's

 8    clear.  I just wanted to note that for the record when we're

 9    speaking about relative culpability.

10              Ms. Heller, would you like to be heard?

11              MS. HELLER:  I would, your Honor.  Thank you very

12    much.

13              And before I begin, I already discussed this with your

14    Honor's deputy, but with the Court's permission, Samantha

15    Lawson, who has filed a notice of appearance and is an

16    associate on the matter, would be speaking just for a minute on

17    one discrete issue in the middle of my presentation?

18              THE COURT:  Yes, of course.

19              MS. HELLER:  OK.

20              Welcome.

21              MS. LAWSON:  Thank you.

22              MS. HELLER:  And Ms. Lawson is on video.  I can't see

23    her on my screen, but I assume she will pop up.

24              THE COURT:  Yes, I can see her.

25              MS. HELLER:  OK.
```

KbiWmorS

1          Your Honor, thank you.  Thank you for the time today.

2          I want to spend a little bit of time talking about the

3     Michelle Morton that I've come to know over the past two years.

4     Michelle has lived a fascinating life, from being elected

5     president of her junior and senior year classes, one of the few

6     Black girls in her school, to working her way up the financial

7     industry ladder and eventually owning her own firm, Pacific

8     American Securities, to being asked to serve on the board of

9     directors of her alma mater, Hood College, Michelle is a person

10    who cares deeply.  She cares deeply about the causes she

11    believes in and for the people she loves.

12          As Ms. Lawson will discuss further, she's a devoted

13    daughter, spending her days and nights caring for her elderly

14    parents and assuring that their needs are taken care of.  She

15    believes in the advancement of those less fortunate, especially

16    people of color.  At Pacific American she made it a point to

17    employ women of color to help employ them -- to help empower

18    them.  Excuse me.  Long before she ever met her codefendants in

19    this case, she took an interest in Native-American causes,

20    attending NAFOA conferences.  And NAFOA is the Native-American

21    Finance Officers Association.  She networked with those engaged

22    in Native-American investment opportunities.  She was building

23    her expertise to financially advise Native-American tribes.

24          Michelle is also someone that I've come to know has a

25    firm sense of right and wrong.  That's a sense that led her to

KbiWmorS

stand up to CALSTRS when they asked her to take a financial
position that she thought was illegal when she was at Pacific
American, and that's described in detail in prior counsel's
submission.  That's the same sense that led her to call FInRA
and later begin working with the FBI and the U.S. Attorney's
Office, when she suspected that Jason Galanis and his crew were
committing fraud, to engage in conduct that she thought was
very personally dangerous, recording phone calls with and
meetings with Jason Galanis.

Michelle is someone who's suffered greatly also in her
life.  She was brutally and violently raped in high school, a
trauma that led to a pregnancy and a late-term abortion that
has scarred her forever.  She was never able to conceive a
child after that incident.  Michelle has also endured the
suicide of her ex-husband Tom, a man who she loved deeply but
who was troubled beyond her ability to help him.  Michelle also
suffers greatly from medical conditions that plague her,
including most seriously her lupus nephritis, which has led to
chronic kidney disease.  Her hypertension also poses
significant difficulty for her, often leading to dizziness,
headaches, incapacitation during spikes, and we've provided
hundreds of pages of medical records to document those
conditions in addition to a letter from a physician.

Beyond all of this, all of these things and these
experiences that Michelle has had, I've come to know that she's

KbiWmorS

| | |
|---|---|
| 1 | smart, funny; she's caring.  She's passionate.  She's a |
| 2 | remarkable person, who's lived an extraordinary life and |
| 3 | succeeded in the face of incredible challenges, up until she |
| 4 | met Jason Galanis, when it all turned upside down.  We submit |
| 5 | that Michelle's history and characteristics, which I just |
| 6 | recounted and are described at length in prior counsel's |
| 7 | submission, as well as the lack of a need for any specific |
| 8 | deterrence, which I'll address shortly (indecipherable), |
| 9 | particularly in light of the COVID-19 pandemic.  But now I |
| 10 | would like to address the pandemic and the government's |
| 11 | arguments, because the pandemic is necessarily front and center |
| 12 | of this proceeding, obviously, as we appear here. |
| 13 | THE COURT:  And while you do that, Ms. Heller, I'll |
| 14 | tell you I am inclined to take the government's suggestion and |
| 15 | to put off her surrender date until a time at which the |
| 16 | pandemic is under control in the federal facilities, so just |
| 17 | keep that in mind when you're making your argument, please. |
| 18 | MS. HELLER:  That's helpful, your Honor. |
| 19 | As we all know, as we're appearing right now, we are |
| 20 | in the midst of the worst period of the pandemic so far |
| 21 | nationwide, and as your Honor has just said and as the |
| 22 | government has also conceded, to surrender right now could |
| 23 | effectively be a death sentence for Michelle, a certainly |
| 24 | grave, grave danger for her, and so we appreciate that both |
| 25 | your Honor and the government don't feel that any surrender |

KbiWmorS

currently would be necessary.  But what we submit is what we've
previewed in our very brief submission of November 9, that this
alternative solution, the postponement of a sentence until some
unknown time in the future is also not particularly realistic.

     We don't know at this point when COVID-19 will have
receded to the point that a prison could be a safer place for
Michelle.  Of course, since we actually made our submissions
we've now received promising news of potential vaccines, but
it's totally unclear when the general public will begin being
able to receive the vaccine.  Prison populations are likely to
be among the last groups to receive those doses.  Prisons will
have to make special modifications to store the vaccine, which,
as we know, the Pfizer vaccine has to be stored at
exceptionally low temperatures and under -- and both vaccines,
I believe, under very specific conditions.

     Perhaps even more critically, the effect of vaccine on
lupus patients almost certainly has not yet been studied, so
it's unclear whether Michelle will ever be able to take a
vaccine.  As we sit here today, whether she would be able to do
that, I think, is entirely in question.  And all of that aside,
as we've argued and as prior counsel argued before, prison was
an exceptionally dangerous prospect for Michelle even before
COVID-19 due to the devastating effect that stress can have on
her lupus nephritis and hypertension, among other factors.

     We saw what happened on the day of the original

KbiWmorS

1    sentencing in this case and we've now seen the medical records

2    that document that she went into hypertensive crisis, and I,

3    frankly, shudder to think about what might happen if Michelle

4    is put in the extraordinarily stressful situation of being put

5    in prison on a day-to-day basis and how that would affect her

6    hypertension, her lupus and all of the serious conditions that

7    she ignored, COVID aside.  So we recognize that varying

8    downward from 120 months to a noncustodial sentence would be

9    extraordinary, but we respectfully submit these are

10   extraordinary times, as your Honor has noted and many other

11   courts have noted, and that even aside from those extraordinary

12   times, the documented medical conditions require, what we

13   submit, they require that any safe sentence for Michelle would

14   not include incarceration.

15          If your Honor has any questions on that, I'm at peace.

16   I'm happy (indecipherable) further.

17          THE COURT:  No.  Thank you.

18          MS. HELLER:  OK.

19          And now, with the Court's permission, Ms. Lawson will

20   speak for a few moments.

21          MS. LAWSON:  Thank you, Ms. Heller.

22          And good morning, your Honor.

23          THE COURT:  Good morning.

24          MS. LAWSON:  As Ms. Heller has explained, any term of

25   prison would be catastrophic for Michelle even prior to COVID,

KbiWmorS

1   but her incarceration would also have a disastrous impact on

2   her 82-year-old mother and her 86-year-old father.  Michelle

3   lives with her parents and (indecipherable) herself with their

4   care and well-being.

5          Michelle's mother Beatrice, called Betty, and her

6   father Ronald depend solely on Michelle to run their home,

7   ensure they have food to eat and help them remain healthy.  To

8   that end, Michelle cleans the house.  She does the family

9   laundry, stocks the kitchen with food and provides meals, pays

10  the household bills and runs errands outside the home for her

11  parents.  As Michelle's parents have gotten older, she has

12  stepped in to help them (indecipherable) own medical

13  conditions.  She reminds them to take their daily medications

14  and she refills prescriptions when they need it.

15         Michelle goes above and beyond every day to ensure her

16  parents feel supported as they enter (indecipherable) stage of

17  their lives, helping her father shave, something he can't do

18  anymore, and checking on her sleeping parents throughout the

19  night.  Michelle's parents are entirely dependent on her for

20  their basic needs and survival.  With Michelle by their sides,

21  they lead happy, healthy and stable lives.  Without Michelle to

22  care for them, they will struggle to prepare meals, take

23  life-sustaining medication and maintain their hygiene.

24         As we previewed, it was true before COVID and it's

25  even more pronounced now.  Due to their ages and health

KbiWmorS

conditions, Betty and Ronald are at high risk for complications
if they contract COVID, so they can't go to the grocery store
(indecipherable).  They can't do pharmacy runs.  They can't do
errand runs.  They rely on Michelle more than ever now, and the
government is simply wrong that Michelle's brother can take
care of their parents in her absence.

        Michelle's younger brother and his wife, who
temporarily live with her parents, are planning to move out of
the family home in short order; they're already house hunting,
and they are on their way to a permanent move.  But more
pressing is that Michelle's younger brother and his wife have a
nearly 13-year-old son with autism, who is completely dependent
on them for care.  Michelle's nephew is largely nonverbal and
does not keep a normal schedule (indecipherable) at 2 a.m.
sometimes.  He is incontinent and not able to use the toilet,
something that must be dealt with day and night by his parents.
As he grows, Michelle's nephew has become more physical and at
times more aggressive while being cared for.  He cannot be left
unsupervised for really any amount of time, because in the past
he has walked out of the house.  He's gone down the street.

        Michelle's brother and sister-in-law both have work
responsibilities as well, and they arrange their schedules so
that one of them is always with their son while the other
works, and then they switch.  They simply cannot provide care
for two additional people, let alone the same quality of care,

KbiWmorS

1    should Michelle be incarcerated.

2            Finally, Michelle's older brother does not live in New

3    Jersey, and so he is not able to step in either.  He travels

4    constantly for work, and his home base of late has been

5    Houston, Texas, and Minnesota.  Michelle actually just got word

6    that he will be relocating to Massachusetts shortly.  Contrary

7    to the government's assertion, this does, in fact, render him

8    completely unavailable (indecipherable).  Put simply, Michelle

9    is critical to her parents' survival and remaining in their

10   home is critical to hers.  By not sending Michelle to prison

11   it's not an understatement to say (indecipherable) three

12   people's lives and not just one.

13           MS. HELLER:  Your Honor, for purposes of --

14   (indecipherable).

15           THE COURT:  I'm sorry.  I didn't hear the last

16   comment.  The audio went out for a moment.

17           MS. HELLER:  Yeah.  Was it my comment or Ms. Lawson's

18   comment?

19           THE COURT:  No.  I think I heard the end of Ms.

20   Lawson.  Ms. Heller, I think it was you.  Were you saying

21   something about the court reporter?

22           MS. HELLER:  Yes.  I was just saying it's Ms. Heller

23   now for the court reporter.

24           THE COURT:  Oh, OK.  All right.  Understood.

25           MS. HELLER:  Yeah.

KbiWmorS

1              THE COURT:  Sorry.

2              MS. HELLER:  OK.

3              THE COURT:  Please (indecipherable).

4              MS. HELLER:  Your Honor, I want to finish our

5    presentation by just returning to the 3553(a) factors,

6    specifically focusing on disparity, deterrence, a just

7    punishment and the need to protect the public.

8              In response to the sentencing disparity issue, the

9    Court has already hit the nail on the head with respect to the

10   other defendants, and I don't think I need to further dwell on

11   that other than to say that we certainly don't feel that

12   Michelle ranks anywhere that highly on the culpability scale.

13   But we also want to note, what we emphasized in our submission,

14   is that we view Michelle as simply in a different category than

15   her codefendants.

16             She did not benefit financially from the crimes of

17   conviction, unlike many of her codefendants, who spent the

18   investors' money on their own lavish lifestyles.  Michelle, on

19   the other hand, is so destitute she cannot even afford the

20   medical care that she desperately needs.  And Jason Galanis

21   used her.  Jason Galanis and Hugh Dunkerley viewed her as a

22   scapegoat, someone they could blame for their actions.  She was

23   an easy and convenient mark for them because she was not part

24   of their crew.

25             Also, none of her codefendants that we're aware of had

KbiWmorS

1   family or medical situations anywhere of a similar severity to

2   hers, and as the Court knows, those issues were going to be

3   significant even at the initial sentencing proceeding.  And the

4   stakes are infinitely higher now.

5          Now, as far as the need for just punishment and

6   deterrence, this case has wreaked other destruction on

7   Michelle's life.  Her once flourishing career in the financial

8   industry, which she worked her whole life to achieve, is over

9   forever.  She knows that.  Thus, the Court has no reason to be

10  concerned that she's going to recidivate.  Michelle is sick

11  with a variety of medical conditions she cannot pay to treat,

12  as I mentioned.  She's lost her friends, her colleagues, her

13  personal and professional support system.  Her indictment and

14  conviction, we respectfully submit, are punishment enough.  Any

15  member of the general public who were to see what Michelle's

16  life has become would agree that she's suffered greatly already

17  by virtue of her conviction and will continue to suffer for the

18  rest of her life.  And neither the government nor the

19  guidelines suggest that a sentence of death or life

20  imprisonment should be imposed here.  But that's what a

21  custodial sentence might well be for Michelle, COVID aside.

22          Michelle is a strong woman.  I've come to know she's

23  an exceptionally strong woman, someone who I know can survive

24  almost anything, but she might well not survive a term of

25  incarceration in this case.  So for that reason and for the

KbiWmorS

1      many others argued in our submission, we respectfully submit

2      that a sentence of home confinement would be fair and

3      appropriate in this case.

4              Your Honor, unless you have any questions, that

5      completes our oral presentation.

6              THE COURT:  Thank you.

7              Ms. Morton, is there anything you'd like to say today?

8              THE DEFENDANT:  No.  Your Honor.

9              THE COURT:  OK.

10             THE DEFENDANT:  Thank you.

11             THE COURT:  Thank you.

12             Is there any reason why sentence cannot be imposed at

13     this time?

14             MS. MERMELSTEIN:  No, your Honor.

15             MS. HELLER:  No, your Honor.

16             THE COURT:  I'm required to consider the advisory

17     guidelines range of 120 months as well as various other factors

18     that are outlined in a provision of the law that's 18 U.S.C.

19     Section 3553(a), and I've done so.

20             Those factors include, but are not limited to, the

21     nature and circumstances of the offense and the history and

22     characteristics of the defendant, because each defendant must

23     be considered individually as a person.  Judges are also

24     required to consider the need for the sentence imposed to

25     reflect the seriousness of the offense, promote respect for the

KbiWmorS

law, provide just punishment for the offense, afford adequate

deterrence to criminal conduct, protect the public from further

crimes of the defendant and avoid unwarranted sentencing

disparities, among other things.

Look, as I've said a number of times previously with

respect to this case, there's no real dispute about the

seriousness of the crime and the harm that it caused real

people, the harm that it caused to one of the poorest

Native-American tribes in the country as well as the clients of

Hughes and Atlantic, pension funds held for the benefit of

transit workers, longshoremen, housing authority workers and

city employees, among others.

Given her admission at her plea, there's also or

should be no dispute that Ms. Morton breached her fiduciary

duty to the Hughes Atlantic clients when she agreed to purchase

the WLCC bonds into their accounts in violation of investment

parameters of those accounts and after failing to disclose

material conflicts of interest in the transaction.  I'm

especially troubled that even after the negative reaction of

the Hughes employees and clients following that purchase of

WLCC bonds she engaged in the same conduct at Atlantic.

Together with Jason Galanis and others, she used another

pension-fund client's money to purchase more than $16 million

of another round of WLCC bonds despite the material conflicts

and violations of investment policies and agreements.  And

KbiWmorS

Ms. Morton's role was essential to the success of this scheme.

All that said, I do view Ms. Morton's role as distinguishable from that of many of her coconspirators, as I alluded to earlier.  Critically, from my perspective, there's no direct evidence that she knew that the WLCC had been fraudulently induced to issue the bonds or that the bond proceeds were stolen.  Indeed, while she acknowledged during her plea allocution that her conduct enabled Jason Galanis to steal the bond proceeds through a broader fraud that led her investors to lose money, she disclaimed any knowledge of that broader fraud, and in that respect, it makes the guideline that is driven by the loss amount significantly less useful here.

Ms. Morton also didn't receive any of the bond proceeds herself, unlike her codefendants, who, other than Archer, received anywhere from thousands to millions of dollars for their involvement in the scheme.

Just to be clear, I don't mean in any way to minimize or excuse her conduct.  She knew that she was committing investment adviser fraud and played a critical role in the scheme that led her investors to suffer tremendous losses, but her conduct is distinguishable, in my view.

I also think she deserves some credit for her attempts to cooperate, including her agreement to wear a wire during two meetings with, and to record numerous telephone calls with, Jason Galanis and for providing information to law enforcement,

KbiWmorS

1   including the contents of her cell phone.  That credit should

2   be somewhat limited for the reasons noted by the government:

3   that her efforts to raise concerns with FInRA about Jason

4   Galanis appeared to have been part of an effort to save herself

5   after receiving document requests; and that she agreed to

6   assist the FBI and prosecutors only after she was approached by

7   the FBI.

8           That said, most cooperating witnesses only cooperate

9   after their conduct has been uncovered.

10          As for her remorse, or lack thereof, I agree that by

11  attempting to withdraw her guilty plea twice at least made a

12  wonder if she truly were remorseful and willing to accept

13  responsibilities for her actions.  At this point I think it's

14  clear she's not willing to accept responsibility for her

15  actions, although she may well be remorseful that people were

16  harmed in the way that they were.

17          I have also considered Ms. Morton's age; her

18  substantial medical issues, both physical and mental; the

19  traumatic events that she's experienced; and that she is a

20  caretaker for her elderly parents; and that, by all accounts,

21  she lived a hardworking and law-abiding life prior to

22  developing a relationship with Jason Galanis.

23          Finally, I've considered the need to avoid unwarranted

24  sentencing disparities, and as I noted earlier, I do think

25  giving her the guidelines sentence the government's requesting

KbiWmorS

1    would lead directly to unwarranted sentencing disparities.

2              I've already noted above how I view her and her

3    conduct as distinguishable in certain ways from some of her

4    codefendants.  Unlike Ms. Morton, for example, Gary Hirst, who

5    pled guilty to four counts involving securities fraud and

6    investment adviser fraud, had previously engaged in a different

7    fraud with John and Jason Galanis and received $1.3 million in

8    proceeds for his conduct.  And as I noted earlier, while I

9    imposed a sentence of 96 months in Mr. Hirst's case, only 36 of

10   those were imposed consecutive to the sentence that he got in

11   the Gerova fraud, the prior fraud case with John and Jason

12   Galanis, and that he was released to home confinement, I think,

13   approximately a year and a half after the sentence.  And those

14   are all, I think, relevant factors for me to consider.  Unlike

15   Mr. Hirst, for example, Ms. Morton has no criminal history

16   whatsoever.

17             For all those reasons, I think in the light of the

18   seriousness of the conduct, an incarceratory sentence is

19   necessary here.  I think I would be sending the wrong message

20   to the many victims in this case not to impose an incarceratory

21   sentence, but I don't think that it needs to be close to the

22   number that the government's requesting and that the guidelines

23   recommend.

24             Ms. Morton, it's the judgment of this Court that you

25   be committed to the custody of the Bureau of Prisons for a term

KbiWmorS

1   of 15 months on Counts One and Four to run concurrent to one

2   another.  That term of imprisonment shall also be followed by a

3   term of supervised release of three years on each count, also

4   to run concurrent.

5          In light of all of the various reasons I noted, I do

6   believe this sentence is sufficient but not greater than

7   necessary to comply with the purposes of sentencing set forth

8   in the law.  And while it may seem like and is a significant

9   reduction from the sentence that the guidelines recommend, I

10  just want to pause for a minute and have everyone think about

11  what it will mean to Ms. Morton, who's now 60 years old and has

12  never engaged in any prior criminal conduct, to spend over a

13  year of her life incarcerated.

14         What I'm going to do now is describe the conditions of

15  supervised release.  We'll talk about restitution and

16  forfeiture.

17         Are there any objections to the terms of supervised

18  release that were recommended by the probation department?

19         MS. HELLER:  No, your Honor.

20         THE COURT:  All right.

21         Ms. Heller, do you want me to read out loud the

22  standard conditions, or do you waive the public reading, since

23  you reviewed the presentence report with Ms. Morton?

24         MS. HELLER:  We waive that reading, and we went over

25  it and we can go over it again.

KbiWmorS

1          THE COURT:  All right.  All of the standard conditions

2     shall apply.  In addition, the mandatory conditions shall

3     apply.

4          Ms. Morton, you must not commit another federal, state

5     or local crime.

6          You must not unlawfully possess a controlled

7     substance.

8          You must refrain from any unlawful use of a controlled

9     substance.

10          You must submit to one drug test within 15 days of

11     release from imprisonment and at least two periodic drug tests

12     thereafter.

13          The probation department, I see, actually recommends

14     suspending the drug-testing condition.

15          Is there any objection, actually, upon reflection, to

16     suspending that condition?

17          MS. MERMELSTEIN:  No, your Honor.

18          MS. HELLER:  No.

19          THE COURT:  All right.  That will be suspended due to

20     Ms. Morton's low risk of future substance abuse and the

21     recommendation of the probation department.

22          Ms. Morton shall also cooperate in the collection of

23     DNA, as directed by the probation officer.

24          In addition, in light of the nature of the crime here

25     and the financial penalties that will be imposed, I'm going to

KbiWmorS

adopt the special conditions recommended by the probation

department:

One, Ms. Morton shall provide the probation officer

with access to any requested financial information.  She shall

not incur new credit card charges or open additional lines of

credit without the approval of the probation officer unless she

is in compliance with the installment payment schedule.

And in light of her mental health history, she shall

participate in an outpatient mental health treatment program

approved by the probation office.  She must continue to take

any prescribed medications unless otherwise instructed by the

healthcare provider.  She must contribute to the cost of

services rendered based on her ability to pay and the

availability of third-party payment.

The Court authorizes the release of available

psychological and psychiatric evaluations and reports,

including the presentence investigation report, to the

healthcare provider.

All right.  I decline to impose a fine in light of the

forfeiture and restitution orders that will follow and in light

of Ms. Morton's financial condition.

I am imposing the mandatory special assessment of

$200, which shall be paid immediately.

Ms. Heller, do you have any objection to the order of

restitution that the government sent last night, which had been

KbiWmorS

1    sent previously; but the version that we were sent last night,

2    do you have any objection to that?

3            MS. HELLER:  No.  No objection, your Honor.

4            THE COURT:  All right.

5            Consistent with the order of restitution, the

6    defendant shall pay $43,785,176 in restitution to the victims

7    of the offenses charged in Counts One and Four.  Her liability

8    is joint and several with that of the other defendants'.  The

9    names, addresses and specific amounts owed to each victim are

10   outlined on the schedule of victims.  The victim page will be

11   filed under seal, but that will be on the docket later today.

12   I will sign that.

13           With respect to forfeiture, my understanding is that

14   the government is requesting forfeiture in the amount of the

15   $9,086,016 representing the funds Ms. Morton received from GMT

16   Duncan to purchase Atlantic and Hughes in addition to the

17   $305,000 that she received to cover Atlantic expenses after

18   purchasing WLCC bonds into an Atlantic account.  Is that

19   correct?

20           MS. MERMELSTEIN:  Your Honor, I apologize.  I think

21   there's actually an update to that.  At the time we filed that

22   number, there was some lack of clarity with respect to

23   *Honeycutt* that I think has since been clarified in *Bergstein*,

24   788 F.App'x 742.  I actually think in light of that, because

25   Ms. Morton was the CEO of both Atlantic and Hughes and directed

KbiWmorS

1    that the proceeds, that the client funds be used to purchase

2    the bonds, that the entirety of the bond purchase amount is

3    forfeitable from her; that is to say, the same number as

4    restitution.

5          I think it's academic in this case, and the government

6    is happy to stand by the number included in its original

7    submission, but I note that because I actually think, upon

8    reflection, that the amount used to purchase the first

9    investment adviser, which was not itself derived from the

10   fraud, is arguably not a proper way to think about forfeiture

11   here; that the better way to think about it is in terms of the

12   money misappropriated from clients to purchase the bonds

13   without disclosure of the conflicts and with the knowledge that

14   the bonds were problematic.

15         I don't know if Ms. Heller has a view.  There was no

16   discussion of forfeiture in the defense submission, but I

17   wanted to make that record because I think the more accurate

18   way to think about the forfeiture is to think about it as the

19   same as restitution.

20         THE COURT:  Ms. Heller, do you want to be heard with

21   respect to forfeiture?  And I do believe given the numbers that

22   we're talking about that it is academic, but that being said, I

23   want to order the proper amount under the law.

24         MS. HELLER:  Your Honor, as Ms. Mermelstein said, this

25   issue wasn't briefed, and so I don't think I can take a

KbiWmorS

1    position right now based on what Ms. Mermelstein is saying.

2    However, I do think it's academic, and so I think we'd be fine

3    deferring to whatever decision your Honor chooses to make.

4            THE COURT:  OK.  All right.  Again, I think it's

5    academic too, but I think -- you know what?  I think in light

6    of the fact that the lower numbers, the nine-plus million and

7    $305,000, were what Ms. Morton was notified about prior to this

8    proceeding, I'm inclined to stick with that number.  Again -- I

9    see Ms. Mermelstein nodding; it seems like you don't have an

10   objection to that -- again, in light of the restitution figure.

11   So I'm going to order forfeiture in that amount.  All right?

12           Ms. Heller, I take it you don't have an objection to

13   that because you were aware of that figure in the past and

14   aren't objecting today.  Is that correct?

15           MS. HELLER:  That's correct.  And just to be clear for

16   our client, what I mean by academic is that it's very clear, I

17   think, to everyone here that Ms. Morton lacks -- completely

18   lacks -- the funds to pay either the restitution or the

19   forfeiture, and so though we understand that these items may be

20   legally required, but it's academic because everyone

21   understands she does not, at least currently, have the ability

22   to pay these sums.

23           THE COURT:  All right.  In any event, I'm sticking

24   with the lower numbers, and I think there's a very clear basis

25   for them in light of the evidence, among other things, that was

KbiWmorS

1    introduced at trial.

2              With respect to the restitution amount, do you have an

3    objection to what was recommended on page 42 of the presentence

4    report with respect to payments?

5              MS. HELLER:  Let me just get to page 42, your Honor.

6              THE COURT:  Yeah.  Go ahead.

7              MS. HELLER:  No objection, your Honor.

8              THE COURT:  OK.  I'm not going to read it out loud

9    given that there's no objection, but I'm going to incorporate

10   that into my judgment.

11             That's the sentence I intend to impose.

12             Does either counsel know of any legal reason why the

13   sentence cannot be imposed as stated?

14             MS. MERMELSTEIN:  No, your Honor.

15             MS. HELLER:  Your Honor, I just had one question.  Is

16   it 15 months or 16, one five or one six?  I couldn't quite --

17             THE COURT:  One five.

18             MS. HELLER:  OK.

19             No, your Honor, I don't know of any legal reason.

20             THE COURT:  Ms. Morton, before I read you your

21   appellate rights, I do want to talk about the surrender date.

22   As we noted earlier, I think the government agrees, and I agree

23   as well, that it's appropriate to ensure that the pandemic is

24   under control before you surrender.  I'm not going to put off a

25   surrender date forever, but I do want to ensure that you're

KbiWmorS

1    safe.  What I'm going to do is I'm going to schedule the

2    surrender date for six months from now, for May 18, 2021.

3          Ms. Heller, you're permitted to submit a letter if the

4    pandemic is not under control in federal facilities by May 18,

5    2021; you can request that that surrender date be put off.

6    Again, I don't intend to put that surrender date off forever,

7    but I just want to be clear that that's our date unless I grant

8    an adjournment in advance.

9          The conditions of your release will continue up until

10   the time that you report to begin your sentence, Ms. Morton,

11   and keep in mind that if you fail to report for your sentence,

12   you could be charged with another criminal offense.

13         That's the sentence of this Court.

14         You have a right to appeal your conviction and

15   sentence except to whatever extent you may have validly waived

16   that right as part of your plea agreement.  If you do choose to

17   appeal, the notice of appeal must be filed within 14 days of

18   the judgment of conviction.  If you're not able to pay for the

19   cost of an appeal, you may apply for leave to appeal *in forma*

20   *pauperis*, which simply means that court costs, such as filing

21   fees, will be waived.  If you request, the clerk of court will

22   prepare and file a notice of appeal on your behalf.

23         Is the government moving to dismiss the two open

24   counts?

25         MS. MERMELSTEIN:  Yes, your Honor.

KbiWmorS

1             THE COURT:  All right.  They'll be dismissed.

2             Ms. Morton, I say this a lot at sentencing, but I

3    really believe it to be true.  I don't think you need to be

4    defined by the worst thing you ever did in your life.  I don't

5    think you need to be defined by this conduct, but you have to

6    learn from it, and I think you would be better served accepting

7    what you did, as you did previously, coming to peace with it,

8    coming to peace with what I think is a very reasonable sentence

9    in light of how many people were harmed by this conduct and by

10   your conduct.  But you don't need to be defined by it.  You do

11   a lot of really good things in your life.  You care for your

12   parents.  You care for your family.  There are so many other

13   ways that you can define yourself.  I hope that you're able to

14   move forward from this after your sentence in a positive way,

15   and I wish you luck with that.

16            Are there any other applications at this time?

17            MS. MERMELSTEIN:  No, your Honor.

18            MS. HELLER:  Your Honor, I'm just picking up the phone

19   because there's a bit of background noise so hopefully you can

20   hear me properly.

21            THE COURT:  Yes.

22            MS. HELLER:  OK.

23            I'm not sure if this will -- I'm not sure if

24   Ms. Morton will choose to file an appeal, but since we're all

25   together here now, I wanted to raise the potential of bail

KbiWmorS

1    pending appeal.  Again, I don't know whether the surrender date

2    will actually be May 18 or whether it will be further adjourned

3    and whether -- if Ms. Morton does choose to file an appeal what

4    the status of that appeal would be; perhaps it will be resolved

5    by then.  But I would raise it, and your Honor knows the

6    standard, but we certainly don't think Ms. Morton is a flight

7    risk or a danger.  We think her appeal both, if she were to

8    file it, would potentially present a substantial question of

9    fact given all the year of briefing, a four-day evidentiary

10   hearing, hundreds of exhibits that were reviewed and that

11   potentially there could be an issue that the Court would want

12   to consider.

13        But that aside, there's another basis if your Honor

14   wanted to consider release under 3145(b) for exceptional

15   circumstances in light of the COVID pandemic.  So I don't think

16   we have --

17        THE COURT:  Can I stop you there.

18        I'm having trouble seeing what the exceptional

19   circumstances would be if I'm not having her surrender until I

20   think that it's safe for her to serve her time.

21        MS. HELLER:  Right.  And so that's what I was going to

22   say.  We may not have to discuss this issue today, and perhaps,

23   maybe we just simply revisit it depending on whether Ms. Morton

24   appeals and when she is surrendering.  Does that make sense?

25        THE COURT:  You're free to make that application at

KbiWmorS

another time.  I'll tell you I wouldn't be inclined to grant it

for the same reasons that I denied the motion most recently in

terms of the merits of the appeal, but I am happy to consider

that at another time.

          MS. HELLER:  OK.  Your Honor, I think it makes sense

to revisit, because again there's a lot of questions.  I just

wanted to raise it now since we were all here together.

          THE COURT:  That's fine.

          MS. HELLER:  Yeah.  No problem.  So if it becomes

relevant at any point in the future, we'll simply write your

Honor a letter addressing the issue further.

          THE COURT:  That's fine.  I just would advise you not

to do it one or two days before the surrender date, but give it

time to be fully briefed beforehand so that I can rule.

          Ms. Mermelstein, do you want to be heard on that at

all?

          MS. MERMELSTEIN:  I don't, your Honor.  I think the

government would oppose any such motion.  Your Honor has

already given Ms. Morton such a delayed surrender date that I

can't see why there's a need to then have bail pending appeal.

          I would note that Ms. Morton waived her right to

appeal a sentence within or below the guidelines, which she has

received, so I don't know that she, in fact -- that's a

question for her lawyers, but I don't actually think she can

file an appeal, and so I don't think that there is an issue

KbiWmorS

1   here, and we can brief it if she wants to file it.  But I think

2   given that the surrender date is six months out, she can file

3   an appeal now if she has a basis.  It may well be decided by

4   then, but I don't think there are any substantial legal issues.

5   Your Honor's record is very clear here, and so I don't think

6   there's a close call.

7              THE COURT:  All right.

8              MS. MERMELSTEIN:  But we can take it up if it's filed.

9              THE COURT:  OK.  I'm not going to rule on that now.

10  I'm just going to say to the extent that you intend to make

11  such a motion, just give us time.  Don't do it the night or day

12  before the surrender date.

13             But with that said, without any further applications,

14  I think we're adjourned.

15             Stay safe, everyone.  Thank you.

16             MS. MERMELSTEIN:  Thank you, your Honor.

17             MS. HELLER:  Thank you.

18             THE DEFENDANT:  Thank you.

19             (Adjourned)

20

21

22

23

24

25